**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) | Master Docket No.: 2:18-mn-2873-RMG |

| | | |
|---|---|---|
| | ) | |
| CITY OF CAMDEN, et al., | ) | Civil Action No.: |
| | ) | 2:23-cv-03147-RMG |
| *Plaintiffs,* | ) | |
| | ) | |
| *-vs-* | ) | |
| | ) | |
| 3M COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT, FOR CERTIFICATION OF SETTLEMENT CLASS AND FOR PERMISSION TO DISSEMINATE CLASS NOTICE

*"There is no small pleasure in pure water."*
OVID

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     STATEMENT OF CASE .......................................................................................3

III.    PROCEDURAL HISTORY.....................................................................................5

        A.      The AFFF MDL ...................................................................................5

        B.      The Mediation and Settlement...............................................................8

        C.      The Class Action Complaint ................................................................11

IV.     MATERIAL TERMS OF THE PROPOSED SETTLEMENT ...........................12

        A.      Consideration .......................................................................................12

        B.      Proposed Settlement Class Definition .................................................12

        C.      Establishment of a Qualified Settlement Fund and Payment by 3M ...................14

        D.      Court Appointments .............................................................................14

                1.      Notice Administrator .................................................................15

                2.      Claims Administrator .................................................................15

                3.      Special Masters ..........................................................................16

                        a.      Matthew Garretson..........................................................17

                        b.      Adjudicatory Special Master..........................................17

                4.      Escrow Agent..............................................................................17

        E.      Notice of Settlement .............................................................................18

                1.      Identification of Potential Settlement Class Members................18

                2.      The Notice Plan...........................................................................19

F.    Allocation of Settlement Amount between Phase One and Phase Two Qualifying Class Members ................................................................................20

    1.    Breakdown in Funds and Claims Forms ........................................23

        a.    The Action Funds............................................................23

        b.    The Supplemental Funds...................................................27

        c.    The Special Needs Funds...................................................27

        d.    The Phase Two Testing Compensation Fund ...............................28

    2.    Payment of Funds by 3M ...........................................................29

G.    Objections and Exclusion Rights .................................................................29

    1.    Objections ..............................................................................29

    2.    Requests for Exclusion ("Opt Outs").............................................30

H.    Termination of the Settlement – 3M's Walk-Away Right.....................................31

I.    Release of Claims, Covenant Not to Sue and Dismissal .....................................31

J.    Payment of Attorneys' Fees and Litigation Costs and Expenses ..........................32

V.    ARGUMENT .....................................................................................................32

A.    The Proposed Settlement Should Be Preliminarily Approved. .............................33

    1.    The Settlement Negotiations Were Fair. .........................................34

        a.    The Litigation as to Public Water Systems Was in a Trial-Ready Posture at the Time of the Settlement. ..........................................35

        b.    Before Reaching Settlement, the Parties Conducted Extensive Investigation and Discovery. ..........................................36

        c.    The Proposed Settlement Was Negotiated at Arm's-Length.........37

        d.    Class Counsel and Counsel for 3M Have Decades of Experience Litigating Complex Cases, including Environmental and Class Actions. ..........................................38

2.     The Settlement Provides Adequate Consideration to the Class.................40

     a.     The Settlement Is Reasonable Given the Strength of Plaintiffs' Case on the Merits and 3M's Existing Defenses. ....................................40

     b.     The Settlement Is Reasonable Given the Anticipated Duration and Expense of Additional Litigation.....................................................42

     c.     The Settlement is Reasonable Given the Solvency of 3M.............45

B.     The Proposed Settlement Class Should Be Provisionally Certified Under Federal Rule of Civil Procedure 23. ......................................................................45

     1.     The Requirements of Rule 23(a) Are Satisfied.........................................45

     a.     The Settlement Class Members Are Readily Ascertainable. .........46

     b.     Rule 23(a)'s Numerosity Requirement Is Satisfied. .....................46

     c.     Rule 23(a)'s Commonality Requirement Is Satisfied. ...................47

     d.     Rule 23(a)'s Typicality Requirement Is Satisfied.........................48

     e.     Rule 23(a)'s Adequacy of Representation Requirement Is Satisfied. ......................................................................................................49

     2.     Rule 23(b)(3) is Satisfied. ........................................................................50

C.     Upon Certifying the Settlement Class, the Court Should Appoint Class Counsel and Class Representatives.........................................................................................52

     1.     Appointment of Class Counsel. ................................................................52

     2.     Appointment of Class Representatives. ....................................................53

D.     The Court Should Commence the Notice Process by Approving the Proposed Form of Notice and Notice Plan and Appointing the Notice Administrator. ................ 53

E.     The Court Should Appoint the Claims Administrator and Special Master Matthew Garretson. .............................................................................................................54

F.     The Court Should Schedule a Final Fairness Hearing ..........................................54

VI.     CONCLUSION..................................................................................................................55

## TABLE OF AUTHORITIES

### STATUTES

Fed.R.Civ.P. 23(a) ................................................................................ 45, 46, 47, 48

Fed.R.Civ.P. 23(b) ......................................................................................... 50, 51

Fed.R.Civ.P. 23(e) ........................................................................................ passim

### CASES

*1988 Trust for Allen Children Dated 8/8/88 v. Banner Life Ins. Co*., 28 F.4th 513 (4th Cir. 2022) ............................................................................................... 32, 33, 49

*Amchem Prod., Inc. v. Windsor,* 521 U.S. 591 (1997) ................................................ 52

*Bass v. 817 Corp.,* 2017 U.S. Dist. LEXIS 225380 (D.S.C. Sept. 19, 2017) .............................. 38

*Case v. French Quarter III LLC*, 2015 WL 12851717 (D.S.C. July 27, 2015) ...................... 41, 42

*Commissioners of Public Works of City of Charleston v. Costco Wholesale Corp.*, 340 F.R.D. 242 (D.S.C. 2021) ........................................................................................ passim

*Crandell v. U.S.*, 703 F.2d 74 (4th Cir. 1983) ............................................................ 33

*Decohen v. Abbasi, LLC*, 299 F.R.D. 469 (D.Md. 2014) .................................................. 44

*Deiter v. Microsoft Corp.,* 436 F.3d 461 (4th Cir. 2006) .............................................. 48

*Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975) ..................................... 35, 38, 42, 45

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ................................................ 50

*Gray v. Talking Phone Book*, 2012 U.S. Dist. LEXIS 200804 (D.S.C. Aug. 10, 2012) ........ 41, 44

*Gunnells v. Healthplan Servs.,* 348 F.3d 417 (4th Cir. Oct. 30, 2003) ........................... 52

*In re Aqueous Film-Forming Foams Prod. Liab. Litig.*, No. 2:18-MN-2873-RMG, 2021 U.S. Dist. LEXIS 16470 (D.S.C. Jan. 25, 2021) ...................................................................... passim

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 168634 (D.S.C. Sep. 16, 2022).................................................................................................................... 7

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.,* 357 F.Supp.3d 1391 (J.P.M.L. 2018) ... 6

*In re Jiffy Lube Sec. Litig.*, 927 F.2d 155 (4th Cir. 1991)...................................................... passim

*In re LandAmerica 1031 Exch. Servs. Inc. Internal Revenue Service §1031 Tax Deferred Exch. Litig. (MDL 2054)*, 2012 U.S. Dist. LEXIS 97933 (D.S.C. July 12, 2012) ................. 33, 34, 41

*In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227 (4th Cir. 2021) ........................................... 46

*In re: Lumber Liquidators Chinese Manufactured Flooring Prods. Marketing, Sales Pract. and Prods. Liab. Litig.*, 952 F.3d 471 (4th Cir. 2020) ............................................................... 34, 45

*Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir. 2019) ................................................ 46

*Mullinax v. Parker Sewer & Fire Subdistrict*, No. 12-cv-01405, 2014 U.S. Dist. LEXIS 199340 (D.S.C. Mar. 11, 2014)................................................................................................................ 36

*Newbanks v. Cellular Sales of Knoxville, Inc.*, No. 12-1420, 2015 U.S. Dist. LEXIS 191550 (D.S.C. Feb. 4, 2015) ................................................................................................................. 36

*Parker v. Asbestos Processing, LLC*, No. 0:11-cv-01800-JFA, 2015 U.S. Dist. LEXIS 1765 (D.S.C. Jan. 8, 2015) ................................................................................................................. 50

*Peters v. Aetna Inc.*, 2 F.4th 199 (4th Cir. 2021)....................................................................... 45

*Reed v. Big Water Resort, LLC*, 2016 U.S. Dist. LEXIS 187745 (D.S.C. May 26, 2016)........... 33

*Robinson v. Carolina First Bank NA*, 2019 U.S. Dist. LEXIS 26450 (D.S.C. Feb. 14, 2019).... 38, 53

*S.C. Nat. Bank v. Stone*, 139 F.R.D. 335 (D.S.C. 1991) ....................................................... 37, 41

*Stillmock v. Weis Markets, Inc.,* 385 Fed.Appx. 267 (4th Cir. 2010) .................................... 51, 52

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). ................................................................ 47

*Williams v. Henderson*, 129 Fed. App'x 806 (4th Cir. 2005) ..................................................... 46

# I.     INTRODUCTION

Plaintiffs have achieved a groundbreaking settlement in the first step towards addressing a grave environmental crisis confronting the United States of America. The contamination of Drinking Water[1] groundwater wells and surface water sources across the country with chemicals known as per- and polyfluoroalkyl substances ("PFAS") has resulted in thousands of Public Water Systems ("PWSs") incurring substantial costs for testing and remediation/treatment to remove these chemicals before they reach their customers' tap. After years of litigation, 3M has agreed to pay up to $12.5 billion to be distributed to Qualifying PWSs pursuant to the terms of the Settlement.

Plaintiffs seek preliminary approval of the Class Action Settlement Agreement[2] between Class Plaintiffs ("Plaintiffs") and 3M Company ("3M")[3] – a settlement that is intended to provide significant compensation for 3M's contribution to the largest Drinking Water contamination threat in history. With this filing, Plaintiffs move this Court to allow them to take a significant first step towards helping PWSs ameliorate this nationwide crisis.

Plaintiffs filed the present lawsuit against 3M on behalf of themselves and other members of the proposed Settlement Class alleging contamination of their Drinking Water groundwater wells and surface water sources with PFAS. The proposed Settlement is intended to resolve Plaintiffs' and the other Settlement Class Members' claims against 3M arising from PFAS contamination. In exchange for releasing those claims, 3M has agreed to pay, in installments, between $10.5 billion to $12.5 billion (the "Settlement Amount") into a Qualified Settlement Fund

---

[1] All capitalized terms herein have the same meaning as provided for in the Class Action Settlement Agreement, Ex. 2, and/or in the Allocation Procedures, Ex. 2-K.

[2] Annexed hereto as Exhibit 1 is a proposed Preliminary Approval Order.

[3] Annexed hereto as Exhibit 2 is a copy of the Settlement Agreement, cited to as S.A.

("QSF") to be distributed to Qualifying Class Members across the United States pursuant to the terms of the Settlement. Ex. 2, S.A. 2.65, 3.1, 6.1, 6.7-6.10, 6.13. Additionally, 3M has agreed to pay up to an additional $5 million to cover the costs associated with Notice. *Id.* at 6.2, 6.12. Collectively, these payments, inclusive of any interest that accrues thereon, when deposited in the QSF, comprise "the Settlement Funds." *Id.* at 2.68, 6.12.

This landmark Settlement is the culmination of years of intense, full-throttled litigation against 3M. With a full assessment of the risks of trial and continued and prolonged litigation, the Parties commenced confidential, informal, parallel settlement negotiations in 2021 which significantly escalated in pace in October 2022, upon the Court's appointment of Settlement Mediator, the Honorable Layn Phillips (ret.). Judge Phillips conducted negotiations via in-person meetings, virtual meetings and numerous telephonic sessions, at all hours of the day and night, including weekends and holidays, to maintain the discipline necessary to accomplish this historic resolution. By all accounts, the negotiations were hard fought and combative to a fare-thee-well. Notwithstanding the sometimes-extreme adversarial postures presented by the Parties, the oversight provided by this Court, along with the steady guidance offered by Judge Phillips, steered the adverse parties into reaching the compromises that are memorialized in the Settlement Agreement on June 22, 2023.

Plaintiffs and proposed Class Counsel believe the Settlement is fair, reasonable, and adequate. They further believe that participation in the Settlement would be in the best interests of the Class.

In determining whether Preliminary Approval is warranted, the critical issue is whether the Court will likely be able to approve the Settlement under Rule 23(e)(2) and certify the Settlement Class for purposes of settlement. Fed.R.Civ.P. 23(e). Because of the thoughtful accommodations

made throughout the Settlement Agreement, Plaintiffs and proposed Class Counsel submit that the Settlement satisfies each of the elements of Rule 23(e)(2), as well as the factors set forth by the Fourth Circuit in *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155 (4th Cir. 1991). Further, certifying the Settlement Class proposed here would be consistent with established precedent on Rule 23's requirements for certifying a class.

Accordingly, Plaintiffs now move this Court for an Order: (1) preliminarily approving the proposed Settlement; (2) preliminarily certifying, for settlement purposes only, the Settlement Class; (3) approving the form of Notice of the Settlement Class; (4) approving the Notice Plan; (5) appointing Class Counsel; (6) appointing Class Representatives; (7) appointing the Notice Administrator; (8) appointing the Claims Administrator; (9) appointing the Special Master; (10) scheduling Objection, Opt-out, and other deadlines; (11) scheduling a Final Fairness Hearing; and (12) granting any other relief deemed necessary or appropriate by the Court. *See* Ex. 1.

## II.    STATEMENT OF THE CASE

Plaintiffs' claims against 3M arise from the contamination of Drinking Water with PFAS, a family of chemical compounds that includes perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), among other compounds. PFAS are not naturally occurring compounds; rather, they are stable, man-made chemicals. They are highly water soluble and persistent in the environment, and because of this, they tend to stay in the water column and can be transported long distances. As relevant here, PFAS has been found in public groundwater wells and surface water sources ("Impacted Water Sources") which supply Drinking Water to the public, where they remain until remediated or filtered out.[4]

---

[4] See Agency for Toxic Substances and Disease Registry, Per- and Polyfluoroalkyl Substances and Your Health, available at https://atsdr.cdc.gov/pfas/index.html (Last accessed July 2, 2023).

Given the expense of removing PFAS, and potential health risks associated with exposure, PFAS in Drinking Water is now highly regulated by the Environmental Protection Agency ("EPA"). As science has evolved, the EPA has continued to impose stricter regulations and guidelines for PWSs as it applies to their Drinking Water, including the Third Unregulated Contaminant Monitoring Rule ("UCMR-3") requiring certain PWSs across the country to monitor for PFOS and PFOA between 2013 and 2015, and the Fifth Unregulated Contaminant Monitoring Rule ("UCMR-5") requiring all PWSs nationwide that serve populations over 3,300 persons, as well as a representative sampling of PWSs serving 25 to 3,299 persons, to test for 29 PFAS with sample collection beginning on January 1, 2023, and ending on December 31, 2025. Most recently, on March 14, 2023, the EPA published a notice of proposed rulemaking seeking public comments on its plan to set Maximum Contaminant Levels ("MCLs") under the Safe Water Drinking Act ("SDWA") for PFOA and PFAS at 4 parts per trillion ("ppt") individually, which would require additional monitoring and remediation by Class members.

As a result of the EPA regulations, PWSs across the country began to test for the presence of PFAS in their drinking water. Many PWSs that discovered PFAS in their supplies responded by taking actions to limit the levels of PFAS in their Drinking Water, such as taking wells offline, installing water treatment systems, reducing flow rates, drilling new wells, pulling water from other sources, and/or purchasing supplemental water. Given the EPA's recent rulemaking, many more PWSs that have tested or will test positive for PFAS will be required to take similar actions to limit the levels of PFAS in their Drinking Water. To this end, because most PWSs do not have filtration systems capable of filtering PFAS, many will have to spend significant amounts of money on capital and operation and maintenance on filtration systems that can meet these new standards.

4

3M began manufacturing PFAS in the 1940s and acquired the patent rights to the electrochemical fluorination ("ECF") process in 1950. Using this technology, 3M developed a new class of chemicals known as fluorocarbons, including fluorinated surfactants or fluorosurfactants. 3M subsequently received patents for specific fluorocarbon compounds, including PFOA and PFOS, throughout the 1950s and 1960s. For the next fifty (50) years, 3M developed, designed, formulated, manufactured, sold, transported, stored, loaded, mixed, applied and/or used PFAS alone or in end products that contain PFAS, including aqueous film-forming foam to suppress hydrocarbon fires ("AFFF"). Plaintiffs allege, as supported by volumes of documents, deposition testimony and scientific evidence, that, at all relevant times, 3M knew that its PFAS would never break down and would end up in the water sources that supply the public's Drinking Water. Prior to exiting the market in 2002, 3M occupied by far the largest market share of AFFF sales to the United States government.

### III.    PROCEDURAL HISTORY

#### A.    The AFFF MDL

As evidence has emerged showing the environmental prevalence and persistence of PFAS, municipalities, private companies, and individuals have all brought actions against 3M and other manufacturers of AFFF and/or PFAS for damages arising from actual or threatened contamination of Drinking Water with PFAS. A majority, but not all, of these actions have included allegations relating to AFFF's impact on the environment.

Relevant here are the claims that have been brought against 3M by PWSs, which generally allege that testing and/or monitoring of their Drinking Water sources for the presence of PFAS is now necessary, and that for any Impacted Water Source, remedial action is needed to remove these chemicals from their Drinking Water to protect the quality of their Drinking Water.

On December 7, 2018, the Judicial Panel on Multi-district Litigation ("JPML") created MDL 2873 and consolidated all federal actions alleging that AFFF caused PFAS contamination of groundwater. *In re Aqueous Film-Forming Foams Prods. Liab. Litig.,* 357 F.Supp.3d 1391, 1392 (J.P.M.L. 2018). Within a few months following this consolidation, the Court appointed Plaintiffs' and Defendants' leadership via CMOs 2 and 3, and the parties began discovery in earnest. To this end, three of the four proposed Class Counsel, Scott Summy, Michael A. London and Paul Napoli were appointed Co-Lead counsel over the entire leadership committee. *See* CMO 2.[5]

On October 4, 2019, the Court convened "Science Day" at which time both sides presented expert presentations regarding some of the key science issues to be presented in the litigation, including the scientific bases for regulatory limits on PFAS, whether a testing protocol can determine the potential toxic effects of human exposure to PFAS, whether medical causation could be established for any diseases or conditions, the methods, effectiveness, and cost of groundwater remediation processes, and whether safer alternative fire-fighting products were available. *See* Science Day Order dated July 24, 2019, 2:18-mn-02873-RMG [Dkt. 157]; Notice of Hearing dated September 9, 2017 [Dkt. 275]; and Minute Entry dated October 4, 2019 [Dkt. 358]. Thus, within only ten (10) months from the JPML's Transfer Order, the Parties were well along in their development of their positions and gathering supporting evidence on critical elements of the causes of action and claims.

Since its inception, the MDL has largely proceeded on two parallel tracks – one addressing defendants' general liability with a focus on the government contractor defense and the second addressing a bellwether process for selecting a pool of representative PWS cases and preparing a

---

[5] In support of this motion, annexed hereto as Exhibits 3, 4, and 5, respectively, are the Declarations of Scott Summy, Michael A. London and Paul Napoli.

subset of them for trial. *See* CMOs 13, 16–16.D, 19–19.G. As noted, the first track focused on certain general discovery regarding the liability of the MDL defendants, including 3M, and their bases for asserting the government contractor defense. Over a two-year plus discovery period, substantial document production by all defendants and the Department of Justice occurred, followed by depositions of defense witnesses and federal employees on the merits of the parties' claims and defenses. Thereafter, following exhaustive briefing, supplemental briefing, and an evidentiary hearing, the determination of the government contractor defense culminated in this Court's decision to deny the MDL defendants' motions for summary judgment. *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 168634 (D.S.C. Sep. 16, 2022).

The second track focused on selecting a pool of representative bellwether PWS cases and completing the necessary case-specific discovery to winnow these cases to a subset of cases for trial. All of the bellwether PWS cases underwent some level of fact discovery, and, thereafter, expert discovery was performed in a subset of the cases. Ultimately, *City of Stuart, Florida v. The 3M Company, et al.*, 2:18-cv-03487-RMG ("*Stuart*"), was selected to serve as the first bellwether trial case, and significant dispositive and *Daubert* motion practice ensued.[6] Trial was scheduled to begin on June 5, 2023, but was later adjourned for three weeks to allow 3M – the sole remaining trial defendant in the *Stuart* case – to continue negotiating a potential resolution with Plaintiffs.

Prior to the adjournment, Plaintiffs' trial team, along with Plaintiffs' leadership and the City of Stuart's individual counsel, had fully prepared the *Stuart* case for trial, a process which

---

[6] *See* Order dated September 23, 2022, MDL No. 2:18-mn-02873-RMG [Dkt. 2613]; Summary Judgment Order dated March 27, 2023, 2:18-cv-03487-RMG [Dkt. 241]; Daubert Order dated May 2, 2023, MDL No. 2:18-mn-02873-RMG [Dkt. 3059]; Summary Judgment Order dated May 5, 2023, MDL No. 2:18-mn-02873-RMG [Dkt. 3081]; Summary Judgment Order dated May 5, 2023, MDL No. 2:18-mn-02873-RMG [Dkt. 3082]; Summary Judgment Order dated May 18, 2023, MDL No. 2:18-mn-02873-RMG [Dkt. 3142].

included, among other things, preparing an exhibit list, arguing evidentiary objections, coordinating live witnesses for trial and preparing their respective direct examinations, preparing opening statements, and filing motions *in limine,* among other pretrial activity; all of which was a herculean and monumental effort. *See* Ex. 4 at ¶¶ 18-19.

**B.    The Mediation and Settlement**

In 2021, the Parties began discussing the potential for resolution informally. Ex. 3, ¶¶ 9-10. The litigation itself continued full throttle against 3M, especially with respect to general liability and discovery, advancement of the government contractor defense, and the Bellwether cases, including, ultimately, the designate *Stuart* case, which was being aggressively prepared for the June 5, 2023 trial. *Id.* at ¶¶ 18-20.  On October 26, 2022, Judge Phillips was announced as the Court-appointed Mediator to oversee the settlement discussions, *see* CMO 2.B, and he and his team from PADRE oversaw eight months of intense and combative mediation.[7] These included in-person mediations in various cities (primarily, New York and Washington, D.C), virtual mediations, multiple telephonic calls, and countless sessions between the mediator team and just one party – sessions that were conducted on weekdays, weekends, early morning and late night, as well as on holidays. Ex. 3. at ¶ 17; Ex. 4 at ¶ 20, Ex. 6 at ¶¶ 11, 15.

The Parties were also encouraged to meet separately and did, in fact, do so through in-person meetings in various cities (New York, Washington D.C. and Chicago), virtual meetings and telephonic calls. Ex. 4. at ¶ 20. And like the sessions with Judge Phillips and his team, these meetings were conducted on weekdays, weekends, holidays, as well as at all hours of the night, including multiple in-person and virtual sessions that went well-past midnight. *Id.*

---

[7] Annexed hereto as Exhibit 6 is the Declaration of Judge Layn Phillips.

After more than eight months of mediation, the efforts of the negotiating team, assisted by the Court, Judge Layn Phillips and most significantly, the pressures of trial, reached fruition on the eve of trial, June 4, 2023, when the parties jointly requested a stay of the trial. Ex. 3. at ¶ 21. This request was followed by the entry of an Order by the MDL Court granting a limited 21-day stay and strongly encouraging continued negotiations to memorialize the terms of the settlement. *See* Court's Order dated June 6, 2023, 2:18-mn-02873-RMG [Dkt. 3256].

From the outset, 3M had made it clear that it would only settle PWS claims on a national class basis to obtain as much relief as legally possible. Ex. 3. at ¶ 11. As a result, in these negotiations, all three Co-Lead Counsel served as Interim Class Counsel, and the Parties began to focus their efforts on class structure, the identification of class members and, ultimately, on allocation.[8] *Id.*

As part of the negotiations, the Parties contemplated that the Settlement Class Members would fall into one or two categories or "phases", with a Phase One Class Member being an Active PWS that has one or more Impacted Water Sources, and a Phase Two Class Member being an Active PWS that does not have one or more Impacted Water Sources but is either required to test for certain PFAS under UCMR-5, or serves more than 3,300 people as defined under the Safe Drinking Water Information System ("SDWIS").[9] *Id.*

In contemplation of the Settlement Agreement's ultimate resolution and this categorization, and prior to requesting the stay, Interim Class Counsel consulted with an ethics advisor over the terms of the Settlement. Ex. 4. at ¶¶ 21-22. Interim Class Counsel wanted to hone

---

[8] In the same CMO in which the Court appointed Judge Phillips mediator (CMO 2.B), the Court also granted the three Co-Lead Counsel unequivocal authority to engage in these negotiations.
[9] THE SDWIS is discussed in further detail below in Section IV(E)(1).

the class definition to ensure that all potential class members in both Phase One and Phase Two were adequately represented. *Id.*

Based upon comments received from an ethics consultant and using their own informed judgment, Interim Class Counsel determined that although it was likely not necessary, separate counsel should be nominated to represent Phase Two Class Members. *Id.* at ¶ 22. Out of an abundance of caution, proposed Class Counsel enlisted the assistance of an experienced class action counsel. *Id.* Elizabeth Fegan, Esq. of Fegan Scott was asked to represent the interests of Phase Two Class Members and assess whether the terms and conditions of the Settlement Agreement were fair, adequate, and reasonable.[10] *Id.*; Ex. 7 at ¶ 11.

Ms. Fegan engaged in an exhaustive review of the proposed Settlement Agreement, conducted an independent review of the experts' recommendations, and engaged in negotiations and numerous discussions concerning the proposed Allocation for Phase Two Class Members. Ex. 7 at ¶ 12. After her team's full review, Ms. Fegan agreed that the proposed Settlement Agreement provides fair, reasonable, and adequate compensation to Phase Two Class members and treats them equitably in relation to Phase One Class Members. *Id.* Also, she willingly accepted the responsibilities of becoming a proposed Class Counsel. *Id.* at ¶ 13. Ms. Fegan, together with Interim Class Counsel, are the proposed Class Counsel.

Following the June 4, 2023 request for a stay, up through and including the next 18 days, the settlement teams, with the assistance of Judge Phillips, worked around the clock to finalize the Settlement Agreement and supporting exhibits. Ex. 3. at ¶ 21; Ex. 6 at ¶ 16. On June 22, 2023, the Settlement Agreement was signed by the Parties, *see* Ex. 2, and at 5:01 p.m. EST, the settlement was publicly announced by 3M through a press release.

---

[10] Annexed hereto as Exhibit 7 is the Declaration of Elizabeth A. Fegan

As discussed herein, this unprecedented Settlement provides direct and significant benefits to both PWSs that have already detected PFAS in their Drinking Water wells and water supplies <u>and</u> to those that have not yet detected PFSA in their Drinking Water wells and water supplies, but are either required to test their Drinking Water for PFAS Contamination pursuant to UCMR-5, or serve more than 3,300 people according to the SDWIS. Ex. 2, S.A. 5.1. By providing these benefits, the many risks and delay associated with further litigation are also eliminated.

**C.   <u>The Class Action Complaint</u>**

On June 30, 2023, Plaintiffs filed a Class-Action Complaint against 3M on behalf of themselves and all other similar situated PWS seeking damages for one or more of the following types of compensation: (1) the costs of testing and monitoring of the ongoing contamination of their Drinking Water well and supplies; (2) the costs of designing, constructing, installing and maintaining a filtration system to remove or reduce levels of PFAS detected in Drinking Water; (3) the costs of operating that filtration system; and (4) the costs of complying with any applicable regulations requiring additional measures. *Compl.* at ¶¶15-16, 153-159, 172, p. 62.

This Complaint was filed because it identifies each Class Representative, defines the Settlement Class, and states the claims intended to become Released Claims and concluded by the Final Judgment. *Id. passim*. None of the issues identified in the Complaint are new, however, as each has been extensively litigated through this MDL to the eve of trial.

## IV.     MATERIAL TERMS OF THE
## PROPOSED SETTLEMENT

### A.     Consideration

3M has agreed to pay or cause to be paid, in installments, between $10.5 billion to $12.5 billion (the "Settlement Amount") in exchange for receiving releases, covenants not to sue and dismissals from Settlement Class Members as provided in the Settlement Agreement. Ex. 2, S.A. 2.65, 3.1, 6.1, 6.7-6.13. 3M will pay the first installment within sixty (60) calendar days after the Effective Date, but in any event no earlier than July 1, 2024, and then the remainder of the Settlement Amount in 12 separate installments due on April 15 of each calendar year from 2025 through 2036. *Id.* at 6.7.2, 6.8.2, 6.8.6, 6.12; *see also* Ex. 2-K (the "Payment Schedule").[11]

In addition to the Settlement Amount, 3M will pay up to an additional $5 million to be used to fund the provision of Notice pursuant to the Notice Plan and any reasonable fees, costs, or expenses incurred by the Notice Administrator. *Id.* at 6.2, 6.12.

### B.     Proposed Settlement Class Definition

The proposed Settlement Class includes "Every Active Public Water System in the United States of America that—

> (a)  has one or more Impacted Water Sources as of the Settlement Date; or
>
> (b)  does not have one or more Impacted Water Sources as of the Settlement Date, and
>
> > (i)  is required to test for certain PFAS under UCMR-5, or
> >
> > (ii)  serves more than 3,300 people, according to SDWIS."

*Id.* at 5.1.

---

[11] The Payment Schedule is Exhibit K to the Settlement Agreement which has been annexed hereto as Exhibit 2.

In defining the proposed Settlement Class, the parties adopted definitions consistent with the Safe Drinking Water Act ("SDWA"), an act that was established by the EPA to provide Drinking Water standards for certain contaminants, which, as of today, include PFAS.[12] As defined in the Settlement Agreement, a "Public Water System" is "a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen (15) service connections or regularly serves an average of at least twenty-five (25) individuals daily at least sixty (6) days out of the year[.]" *Id.* at 2.54. A PWS "includes (i) any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with such system, and (ii) any collection or pretreatment storage facilities not under such control which are used primarily in connection with such system." *Id.* In addition, "Water Source" is defined as "a groundwater well, a surface-water intake, or any other intake point from which a Public Water System draws or collects water for distribution as Drinking Water." *Id.* at 2.80.

Excluded from the definition of the proposed Settlement Class are: (a) certain PWSs that are associated with a specific PFAS-manufacturing facility owned by 3M, *see* Ex. 2-G; (b) any PWS that is owned by any state government and cannot sue or be sued in its own name, *see* Ex. 2-H; (c) any PWS that is owned by the federal government and cannot sue or be sued in its own name, *see* Ex. 2-I; (d) any PWS that has previously settled its PFAS-related Claims against 3M, *see* Ex. 2-J; and (e) any privately-owned well that provides water only to its owner's (or its owner's tenant's) individual household and any other system for the provision of water for human consumption that is not a PWS. *Id.* at 5.1.

---

[12] *See* Safe Drinking Water Act, 42 U.S.C. § 300f, et. seq. (1974); *see also* EPA, *Safe Drinking Water Act (SDWA)*, available at https://www.epa.gov/sdwa (last accessed June 27, 2023).

The parties anticipate that the proposed Settlement Class comprises over 12,000 PWSs. *See* Ex. 2-E; Ex. 2-F.[13]

**C.**     <u>**Establishment of a Qualified Settlement Fund and Payment by 3M**</u>

The Settlement Amount, the additional $5 million relating to Notice costs and administration, and any potential delinquency payments are to be deposited by 3M into a QSF to be administered by the Court-Appointed Escrow Agent. *Id.* at 2.55, 2.68, 3.1, 6.1, 6.2, 6.5-6.5.5, 6.11, 6.12. Together, all payments made by 3M into the QSF, inclusive of any interest that accrues thereon, make up the Settlement Funds. *Id.* at 2.68, 6.12. Once payments are made by 3M into the QSF in accordance with the Settlement Agreement, 3M shall have no liability whatsoever with respect to any installment of the Settlement Funds. *Id.* at 6.2, 6.5.3.

If the Settlement terminates for any reason, 3M is entitled to a refund of the amount it paid into the QSF (including any interest accrued thereon) less 3M's share of the sum of the notice, administrative, and any similar Court-approved costs actually paid or due and payable from the QSF as of the date on which the Escrow Agent receives the written notice of termination from 3M. *Id.* at 8.11.

The establishment of the QSF must be approved by the Court and Plaintiffs will be filing a Motion for the Establishment of the QSF in the near future.

**D.**     <u>**Court Appointments**</u>

The Settlement Agreement anticipates that the Court appoint five independent/neutral Persons to administer the Settlement: a Notice Administrator, *id.* at 2.38, 7.1-7.2; a Claims

---

[13] The list of anticipated Phase One Eligible Claimants identified by the Parties is Exhibit E to the Settlement Agreement which has been annexed hereto as Exhibit 2. The list of anticipated Phase Two Eligible Claimants identified by the Parties is Exhibit F to the Settlement Agreement, which has been annexed hereto as Exhibit 2.

14

Administrator, *id.* at 2.11, 7.3-7.4; two Special Masters, *id.* at 2.69, 7.5-7.6; and an Escrow Agent, *id.* at 2.25, 6.5.4. This motion requests the appointment of the first four; the subsequently filed Motion for the Establishment of the QSF will request appointment of the Escrow Agent.

## 1.     Notice Administrator

Subject to Court approval, the Settlement Agreement provides for the engagement of Steven Weisbrot of Angeion Group, LLC ("Angeion") as the Notice Administrator.[14] *Id.* at 7.1. Angeion is a class action notice and claims administration firm, and Mr. Weisbrot is its President and Chief Executive Officer. Ex. 8, at ¶ 1. Mr. Weisbrot has been responsible for the design and implementation of hundreds of court-approved notice and administration programs, *id.* at ¶ 4, and he and his firm are extremely qualified to serve as Notice Administrator for the Settlement.

In his capacity as Notice Administrator, Mr. Weisbrot and his firm will be responsible for providing Notice of the Settlement to all potential Eligible Class Members pursuant to the Notice Plan, discussed in Section IV(E)(2), *infra*. Ex. 2, SA 2.39, 7.2. Authorized to take all actions consistent with the terms of the Settlement Agreement to be reasonably necessary to effectuate the Notice Plan, Angeion will start providing Notice no later than 14 days after Preliminary Approval. *Id.* at 7.2.2, 8.2.1.

All fees, costs, and expenses incurred in the administration and/or work by the Notice Administrator, including fees, costs, and expenses of the Notice Administrator, shall be paid from the Settlement Funds. *Id.* at 6.3, 7.2.6.

## 2.     Claims Administrator

The Settlement Agreement also provides for the engagement, subject to Court approval, of Dustin Mire, Eisner Advisor Group ("EisnerAmper") as the Claims Administrator. *Id.* at 2.11,

---

[14] Annexed hereto as Exhibit 8 is the Declaration of Steven Weisbrot.

7.3.[15] Mr. Mire is a partner with EisnerAmper and, in this role, he is responsible for the operations of Eisner Amper's settlement administration programs, including the services it provides in the areas of class action, mass tort, and mass arbitration claims administration. Ex. 9, ¶ 1.

As the Claims Administrator, Mr. Mire will be primarily responsible for administration of the proposed Settlement, which includes: (1) reviewing, analyzing, and approving submitted Claims Forms, including all supporting documentation, to determine if the submitting entity falls within the definition a Qualifying Class Member and if the information provided is complete; (2) verifying whether a Qualifying Class Member is a Phase One or Phase Two Settlement Class Member; and (3) allocating and overseeing the distribution of the Settlement Funds fairly and equitably amongst all Qualifying Class Members in accordance with the Allocation Procedures.[16] SA 2.11, 7.4; *see also* Ex. 2-Q, *generally.* Mr. Mire will also be responsible for creating and maintaining the Settlement Website and toll-free hotline for the Settlement as addressed in the Notice Plan.[17] Ex. 9, ¶ 9.

All fees, costs, and expenses incurred in the administration and/or work by the Claims Administrator, including fees, costs, and expenses of the Claims Administrator, shall be paid from the Settlement Funds. Ex. 2, SA 6.3, 7.4.7.

### 3.    Special Masters

The Settlement Agreement contemplates that two special masters with two completely different roles be appointed by the Court. *Id.* at 7.5. All fees, costs, and expenses incurred in the

---

[15] Annexed hereto as Exhibit 9 is the Declaration of Dustin Mire.

[16] The Allocation Procedures is Exhibit Q to the Settlement Agreement which has been annexed hereto as Exhibit 2.

[17] The Notice Plan is Exhibit C to the Settlement Agreement which has been annexed hereto as Exhibit 2.

administration and/or work by these special masters, or anyone on their behalf shall be paid from the Qualified Settlement Fund. *Id.* at 7.6.8.

### a.    Matthew Garretson

The Settlement Agreement provides for the engagement, subject to Court approval, of Matthew Garretson, Wolf/Garretson LLC as the first Special Master.[18] *Id.* at 2.69, 7.5. Mr. Garretson is the co-founder of Wolf/Garretson LLC, and for almost 20 years (since 1998), he has been designing and overseeing claims processing operations for settlement programs in litigations involving product liability and environmental hazard claims. Ex. 10, ¶ 1.

Generally, Mr. Garretson's role will be to supervise the Settlement, which includes overseeing the work of both the Notice Administrator and the Claims Administrator. SA 2.69, 7.6. Mr. Garretson will also provide quasi-judicial intervention if and/or when necessary, such as for determinations (if any) related to appeals of Allocated Amounts. *Id.*

### b.    Adjudicatory Special Master

The Settlement Agreement also provides for the engagement of a retired judge to serve as the second Special Master to serve a unique adjudicatory function. *Id.* at 7.5. The responsibility of the second Special Master will be to resolve disputes that Class Counsel and 3M may identify, including disputes about the timing or amount of 3M's payments under Phase Two. *Id.*

### 4.    Escrow Agent

Finally, the Settlement Agreement proposes that Christopher Ritchie of Huntington National Bank serve as the Escrow Agent. *Id.* at 2.25, 6.5.4. Plaintiffs will be seeking Mr. Ritchie's appointment by way of a Motion to Establish a Qualified Settlement Fund to be filed at a later date. As the Escrow Agent, he will be responsible for managing the QSF, ensuring that all legal

---

[18] Annexed hereto as Exhibit 10 is the Declaration of Matthew Garretson.

17

responsibilities are met with respect to the QSF, and disbursing funds from the QSF when directed to do so by the appropriate Persons. *Id*. at 6.5.1-6.5.4

All fees, costs, and expenses incurred in the administration and/or work by the Escrow Agent, including fees, costs, and expenses, shall be paid from the Settlement Funds. SA 6.3, 7.7.

E.    **Notice of Settlement**

1.    **Identification of Potential Settlement Class Members**

The Parties have endeavored to identify all potential Eligible Claimants through publicly available information (the "Class List"). *Id.* at 5.2; Ex. 2-E; Ex. 2-F. To this end, proposed Class Counsel retained Rob Hesse, an environmental consultant, to assist in identifying potential Eligible Claimants, particularly as it relates to those PWSs that have tested positive for PFAS contamination and those PWSs that are subject to test for certain PFAS under UCMR-5.[19]   Ex. 3 at ¶¶ 12-13.

As Mr. Hesse attests to in his Declaration, each PWS in the United States is a permitted entity that is regulated by the EPA. Ex. 11, at p. 1. The EPA assigns a unique identification number called a "PWSID" to each PWS and maintains a centralized database that contains an inventory of all PWSs in America. *Id.* at pp. 1-2. This database, called the Safe Drinking Water Information System ("SDWIS"), is regularly updated with classifying information about all PWSs, such as the population served, activity status, owner type and primary Water Source, and it also maintains administrative contact information for each PWS. *Id.* at p. 2.

Not every PWS in the SDWIS is an Eligible Claimant; rather, only a smaller subset of PWSs falls within the Settlement Class definition based on either: (1) PFAS detection in their Drinking Water before June 22, 2023; or (2) being subject to the monitoring rules set forth in

---

[19] Annexed hereto as Exhibit 11 is the Declaration of Rob Hesse.

UCMR-5, or serving more than 3,300 people, according to the SDWIS. *Id.* at p.2; *see* Ex. 2, SA 5.1.

Proposed Class Counsel have worked with Mr. Hesse and 3M separately to identify and create the Class List so that Notice can be effectuated pursuant to the Notice Plan.[20] Ex. 3 at ¶ 13; Ex. 2, SA 5.2; Ex. 2-C. Of course, the Class List is illustrative only. Ex. 2, S.A. 5.2. Whether a PWS on the Class List is eligible and qualifies for the Settlement must be determined in accordance with the Settlement Agreement and the Allocation Protocol. *Id.*

    2.    **The Notice Plan**

Mr. Weisbrot intends to employ the following methods to provide Notice to each Settlement Class Member: (1) Mailed Notice; (2) Reminder Postcard; (3) Emailed Notice; (4) Personalized Outreach; (5) Publication Notice; (6) Digital Notice; (7) Paid Search Campaign; (8) Press Release; (9) Settlement Website; and (10) Toll-Free Telephone Support. Ex. 2-C, Notice Plan *generally*; Ex. 8, at ¶¶ 12-31.

In providing Notice using the above methods, the Notice Plan will employ both a Long Form Notice[21] and Summary Notice.[22] The Long Form Notice: (1) advises Settlement Class Members of the general terms of the proposed Settlement; (2) provides an overview of the proposed Settlement's Allocation Procedures and Claims Form Process (described in more detail in Section IV(F), *infra*); (3) informs Settlement Class Members of their right to both opt out of and object to the proposed Settlement; (4) discloses that administrative fees and costs will be paid out

---

[20] The Notice Plan is Exhibit C to the Settlement Agreement which has been annexed hereto as Exhibit 2.

[21] The Long Form Notice is Exhibit B to the Settlement Agreement which has been annexed hereto as Exhibit 2.

[22] The Summary Notice is Exhibit M to the Settlement Agreement which has been annexed hereto as Exhibit 2.

of the Settlement Amount; and (5) discloses that class counsel will be filing a motion for an award of attorneys' fees and costs that will request that amounts due under the Common-Benefit Holdback Assessment provisions in CMO 3, private attorney/client contracts, and fees of Class Counsel all be paid from the Qualified Settlement Fund. Ex. 2-B, *generally*.

The Summary Notice is a condensed version of the Long Form Notice. It advises the Settlement Class of the Settlement Agreement by providing the most salient terms and information about how to submit a Claims Form(s) or contact Class Counsel, the Notice Administrator, or the Claims Administrator for additional information. Ex. 2-M.

It is Mr. Weisbrot's professional opinion, based upon his extensive qualifications and that of his firm, that the proposed Notice Plan is the best notice practicable under the circumstances and fully comports with due process requirements and Fed. R. Civ. P. 23. Ex. 8. at ¶¶ 11, 37-38. Once the Notice Plan has been executed, Angeion will provide a final report verifying its effective implementation to the Court. *Id.* at ¶ 38.

## F.    Allocation of Settlement Amount between Phase One and Phase Two Qualifying Class Members

The Settlement provides that the Settlement Amount will be divided among Phase One and Phase Two Qualifying Class Members. Phase One Qualifying Class Members will be allocated $6.875 billion of the Settlement Amount, payable in installments, subject to the requisite fees, costs and holdbacks as set forth in the Settlement Agreement (the "Phase One Funds"). Ex. 2, S.A. 2.48, 6.7.2; Ex. 2-K. Phase Two Qualifying Class Members will be allocated between $3.625 billion and $5.625 billion, also payable in installments, and subject to the requisite fees, costs and holdbacks as set forth in the Settlement Agreement (the "Phase Two Funds"). Ex. 2, S.A. 2.51, 6.8.2, 6.8.6; Ex. 2-K.

This division of funds between Phase One and Two Class Members was arrived upon based on the recommendation of Timothy G. Raab.[23] Mr. Raab is the Managing Director at Alvarez and Marsal, a global professional services firm. Ex. 12, I(1). He is an expert in the field of liability forecasting, which is a field that requires building statistical and mathematical models to forecast liability and assets for, among other things, settlement negotiations and complex settlement programs. *Id.* at I(4).

Mr. Raab was tasked with determining a methodology to be used to estimate the likely ratio between the Phase One and Phase Two Class Members. *Id.* at II(5). Mr. Raab's analysis was based upon public information provided by proposed Class Counsel and included: (a) state data showing PFAS detections and non-detections in certain PWSs; (b) the EPA's Third Unregulated Contaminant Monitoring Rule (UCMR-3) data showing PFAS detections and non-detections of the PWSs that were subject to UCMR-3; and (c) and information regarding the PWSs that are currently subject to UCMR-5. *Id.* at II(6). Based on this information, Mr. Raab identified the known Phase One Eligible Claimants and compared it to the number of PWSs that either have not yet tested for PFAS or have not reported a PFAS detection and would also meet the proposed Phase Two Class Definition. *Id.* at III. From this analysis, Mr. Raab determined that based on mathematical principles it is more likely than not that 69% of Eligible Claimants would be Phase One Eligible Claimants and 31% would be Phase Two Eligible Claimants. *Id.* at ¶ 16. To be conservative and account for any discrepancies in data, he then concluded that it would be fair, reasonable and adequate to estimate that 55% of Eligible Claimants would be Phase One Eligible Claimants and 45% would be Phase Two Eligible Claimants. *Id.* at ¶ 17. Based on these conclusions, proposed Class Counsel and 3M agreed to allocate 55% of $12.5 billion (or $6.875

---

[23] Annexed hereto as Exhibit 12 is the Declaration of Timothy G. Raab.

billion) to Phase One Eligible Claimants. Ex. 2, S.A. 2.48, 6.7.2. As to Phase Two Eligible Claimants, the remaining allocation to Phase Two Eligible Claimants would be between $3.625 billion and $5.625 billion, subject to the Phase Two Floor and Cap as provided for in the Settlement Agreement, discussed in the next subsection. Ex. 2, S.A. 2.51, 6.8.2, 6.8.6, 6.8.9-6.8.11. The division of funds between Phase One and Phase Two Qualifying Class is fair, reasonable and adequate and is based upon Mr. Raab's analysis of Phase One and Phase Two Class Members.

The Phase One and Phase Two Funds will then be allocated among Phase One and Phase Two Qualifying Class Members by the Court-appointed Claims Administrator, under the oversight of the Court-appointed Special Master, in accordance with the Allocation Procedures. *Id.* at 2.8, 2.11, 2.69, 3.3, 6.1, 6.7.4, 6.8.3, 6.8.6, 6.88-6.10, 7.4, 7.6, 7.8; *see also* Ex. 2-Q, *generally*.

The Allocation Procedures are a significant aspect of the Settlement. These Procedures are the culmination of a tremendous effort by both proposed Class Counsel and 3M to develop a protocol to fairly, reasonably and adequately allocate the Settlement Amount to Qualifying Class Members. As part of this massive effort, proposed Class Counsel engaged two highly qualified experts – Dr. J. Michael Trapp[24] and Dr. Prithviraj Chavan [25] – to provide their expertise and technical support to develop an objective formula that can score a Qualifying Class Member's Impacted Water Source(s) using factors considered when calculating the real-world costs for the installation of PFAS treatment systems. After applying the mathematical formula, the Impacted Water Source scores can be used to allocate the Settlement Amount among Qualifying Class

---

[24] Annexed hereto as Exhibit 13 is the Declaration of Dr. J. Michael Trapp.
[25] Annexed hereto as Exhibit 14 is the Declaration of Dr. Prithviraj Chavan.

Members (the "Allocated Amount"). Below are some of the most prominent aspects of the Allocation Procedures.

### 1.   **Breakdown in Funds and Claims Forms**

The Claims Administrator will separate the Phase One Funds into three distinct funds: the Phase One Action Fund, the Phase One Supplemental Fund and the Phase One Special Needs Fund, *see* Ex. 2, S.A. 2.48, 2.55, 2.70, 2.72, 6.7.1, 6.7.2, 6.10; Ex. 2-Q, pp. 4-15. Similarly, the Phase Two Funds will be separated into four distinct funds: the Phase Two Action Fund, the Phase Two Supplemental Fund, the Phase Two Special Needs Fund, and the Phase Two Testing Compensation Fund. Ex. 2, S.A. 2.51, 2.55, 2.70, 2.72, 6.8.1-6.8.10, 6.10; Ex. 2-Q, pp. 16-21.

Because there are seven different funds, seven Claims Forms are available: three for Phase One Qualifying Class Members and four for Phase Two Qualifying Class Members.[26] Ex. 2-A. These Claims Forms, along with all verified supporting documentation, must be timely submitted by the applicable deadlines set forth in the Allocation Procedures. Ex. 2-Q, Sects. II(4)(c), II(5)(d), II(6)(a), III(2)(b), III(5)(c), III(6)(d), and III(7). The Claims Administrator will make these Claims Forms electronically accessible on the Settlement Website, but a paper copy is also available upon request. Ex. 2-Q, p. 1; Ex. 9, ¶ 9.

### a.   **The Action Funds**

The Phase One and Phase Two Action Funds will compensate Phase One and Phase Two Qualifying Class Members that have timely submitted a Claims Form and performed the requisite

---

[26] All seven Claims Forms are contained in Exhibit A to the Settlement Agreement which has been annexed hereto as Exhibit 2.

testing for each of its Impacted Water Source(s). Ex. 2-Q, Sects. I(3), II(2), II(6)(a), III(2), III(3), III(7). The Claims Administrator will enter the test results and relevant information provided on the Claims Form into the mathematical formula set forth in the Allocation Procedures to score each Impacted Water Source owned and/or operated by a Qualifying Class Member. *Id.* at Sects. II(6)(b)-II(6)(e); III(7)(f)(i).

Phase One Qualifying Class Members (i.e. those with a Measurable Concentration of PFAS before June 22, 2023) are not required to retest their Impacted Water Source(s), but they are required to perform Baseline Testing of each of their Water Sources that either have never been tested for PFAS or were tested for PFAS before January 1, 2019, and the test did not result in a Measurable Concentration of PFAS. *Id.* at Sects. II(2)(a)-II(2)(d). Failure to test and submit Qualifying Test Results for Water Sources will disqualify Water Sources from consideration for present and future payments. *Id.*at Sect. II(2)(e). By contrast, all Phase Two Qualifying Class Members will have to perform Baseline Testing. *Id.* at Sect. III(3).

Those Qualifying Class Members with a detection will receive compensation from the appropriate Action Fund for each Impacted Water Source. *Id.* at Sects. II(6), III(7). Water Sources without a detection will remain eligible to receive compensation from the Phase One and Phase Two Supplemental Funds, discussed in the next subsection, through December 31, 2030, if later testing results in a PFAS detection. *Id.* at Sects. II(3)(b), II(4)(b)(i), II(4)(c), III(4)(b), III(5)(b)(i), III(5)(c).

While a Qualifying Class Member may use any laboratory, proposed Class Counsel took great efforts to arrange for significantly expedited analysis at reduced rates from Eurofins

24

Environmental Testing, which is a network of environmental labs that currently has North America's largest capacity dedicated to PFAS analysis.[27]

Both Drs. Trapp and Chavan agree that capital costs and operation and maintenance ("O&M") costs are the most important factors to consider when calculating the cost of treating PFAS-containing Drinking Water. Ex. 13 at pp. 4-9; Ex. 14 at pp. 4-10. Capital costs are primarily driven by the flow rate of the Impacted Water Source, while O&M costs are primarily driven by the flow rate of the Impacted Water Source <u>and</u> PFAS concentrations. *Id.* Thus, the flow rates and PFAS concentrations of each Impacted Water Source, obtained from the Qualifying Class Members' Claims Forms and supporting documentation, can be used by the Claims Administrator to formulaically calculate a Base Score for each Impacted Water Source based on the Allocation Procedures. *Id.; see also* Ex. 2-Q, Sects. II(6)(c)-II(6)(e).

These Base Scores will then be adjusted or "Bumped" depending on whether the Impacted Water Source's concentration levels exceed the proposed federal or applicable state MCLs, whether the Qualifying Class Member had Litigation relating to the Impacted Water Source pending at the time of Settlement, and whether the Qualifying Class Member was one of the Public Water Provider Bellwether Plaintiffs. *Id.* at Sect. II(6)(f).

The Claims Administrator will then divide an Impacted Water Source's Adjusted Base Score by the sum of all Adjusted Base Scores for the respective Action Fund to arrive at each Impacted Water Source's percentage of the respective Action Fund. *Id.* at Sect. II(6)(g). This percentage will be multiplied by the total respective Action Fund to provide the Settlement Award for each Impacted Water Source. *Id.*

---

[27] Exhibit 15 is the Declaration of Robert Mitzel, president of TestAmerica Laboratories, Inc. d/b/a Eurofins TestAmerica.

Because the Allocation Procedures require the information solicited in the Claims Forms to calculate Base Scores and all Base Scores are required to calculate individual Settlement Awards, each Qualifying Class Member's Allocated Amount will not be determinable until all applicable Claims Forms are submitted, analyzed, and processed by the Claims Administrator. When these Settlement Awards are determined and notification of the Settlement Award is provided, each Qualifying Class Member, proposed Class Counsel and/or 3M, may submit a request for reconsideration to the Special Master within the applicable deadlines, if an error in calculation can be established. *Id.* at Sects. II(6)(i), III(7)(b).

There is a critical distinction between Allocated Amounts calculated under Phase One and Phase Two – Allocated Amounts under Phase Two are subject to the Phase Two Floor and/or Phase Two Cap. Ex. 2, S.A. 6.8.9, 6.8.10.

It is the desire of the Parties that a Phase Two Qualifying Class Member receive the same approximate Settlement Award as a Phase One Qualifying Class Member with the same Adjusted Base Score, except for an inflation adjustment. Ex. 2-Q, Sect. III(7)(f)(i), III(7)(f)(iii). However, if the total payments from the Phase Two Funds would be less than $3,625,000,000.00 (the "Phase Two Floor"), the Claims Administrator must increase each Phase Two Qualifying Class Member's Allocated Amount by the same percentage, so that the total payments from the Phase Two Action Fund will meet the Phase Two Floor. Ex. 2, S.A. 6.8.9; Ex. 2-Q, Sect. III(7)(g). Conversely, if the total payments from the Phase Two Funds would be more than $5,625,000,000.00 (the "Phase Two Cap"), the Claims Administrator must reduce each Phase Two Qualifying Class Member's Allocated Amount by the same percentage, so that the total payments from the Phase Two Action Fund will meet the Phase Two Cap. *Id.*, 6.8.10; Ex. 2-Q, Sect. III(7)(h).

Notably, if either the Phase Two Floor or the Phase Two Cap is applied, the Settlement Agreement contains an equalization provision such that the Claims Administrator, with the Special Master's approval, may shift funds from Phase One to Phase Two or from Phase Two to Phase One in order to promote equity between Phase One Qualifying Class Members and Phase Two Qualifying Class Members. Ex. 2-Q, Sect. III(7)(i).

The Claims Forms submission deadline for the Phase One Action Fund is sixty (60) calendar days after the Effective Date. *Id.* at Sect. II(6)(a). The deadline for the Phase Two Action Fund is July 31, 2026, which is seventh months after the deadline for all UCMR-5 testing. *Id.* at Sect. III(7).

### b. <u>The Supplemental Funds</u>

The Supplemental Funds were created to compensate Qualifying Class Members that: (1) have a Water Source with Qualifying Test Results showing no Measurable Concentration of PFAS and because of later testing obtain a Qualifying Test Result showing Measurable Concentrations of PFAS; or (2) have an Impacted Water Source that did not exceed the proposed federal or an applicable state MCL at the time they submitted their Claims Forms and because of later testing obtain a Qualifying Test Result that exceeds an applicable MCL. *Id.* at Sects. II(4)(b), III(5)(b).

For each Impacted Water Source, the Claims Administrator will approximate, as closely as is reasonably possible, the Settlement Award that each Impacted Water Source would have been allocated had it been in the Action Fund with the later PFAS concentration, and shall issue funds from the Supplemental Funds in amounts that reflect the difference between the Impacted Water Source's Settlement Award and what the Qualifying Class Member has already received, if anything, for the Impacted Water Source. *Id.* at Sects. II(4)(d)-II(4)(e), III(5)(d)-III(5)(e).

27

Given the nature of the claims being submitted, the deadline for Claims Form submission for both the Phase One and Phase Two Supplemental Funds is December 31, 2030. *Id.* at Sects. II(4)(c), III(5)(c).

### c.    The Special Needs Fund

The Phase One and Phase Two Special Needs Funds will compensate Qualifying Class Members who have already spent money to address PFAS detections in their Impacted Water Sources, such as by taking wells offline, reducing flow rates, drilling new wells, pulling water from other sources and/or purchasing supplemental water. *Id.* at, Sects. II(5)(b)-II(5)(c), III(6)(b)-(6)(c).

A Phase One Special Needs Fund Claims Form must be submitted up to 45 calendar days after submission of the PWS Claims Form.  *Id.*, Sect. II(5)(d). Once all Phase One Special Needs Fund Claims Forms are timely received, the Claims Administrator will review them and determine which Phase One Qualifying Class Members shall receive additional compensation and the amount of compensation. *Id.* at Sect. II(5)(e). The Claims Administrator will recommend the awards to the Special Master who must review and ultimately approve or reject them. *Id.*

Phase Two Special Needs Funds claims will employ an identical process except that the deadline for submissions is August 1, 2026. *Id.* at Sects. II(6)(d)-II(6)(e).

### d.    The Phase Two Testing Compensation Fund

The Phase Two Testing Compensation Fund was created to allow Active PWSs with no evidence of PFAS contamination prior to June 22, 2023 to conduct Baseline Testing that could help them establish eligibility for payments from the Phase Two Fund. Although UCMR-5 requires PWSs to test for PFAS, the rule requires only that a PWS test once in its *distribution system*. The Phase Two Testing Compensation Fund pays for more thorough testing: it allows for Phase Two

28

Qualifying Class Members to receive compensation for testing *each Water Source*. *See* Ex. 2-Q, Sect. III(2). Thus, Phase Two Qualifying Class Members will be able to gather far more data regarding PFAS and, critically, will be able to seek compensation for those new detections in Phase Two. Payments from this fund are limited to the actual costs of testing and shall not exceed $800 per sample, absent extraordinary circumstances. *Id.* at Sect. III(2)(c). As mentioned above, Eurofins Environmental Testing will provide this testing and an expedited analysis at significantly reduced rates. Ex. 15. The deadline for submitting Phase Two Testing Compensation Claims Forms is January 1, 2026, which coincides with the UCMR-5 testing deadline of December 31, 2025. Ex. 2-Q, Sect. III(2)(b).

### 2.    Payment of Funds by 3M

3M shall make payments for the Phase One and Phase Two Funds in multiple installments over time, as set forth in the Payment Schedule. Ex. 2, S.A. 6.7.2, 6.8.3, 6.8.6; Ex. 2-K. Within five (5) Business Days after each installment payment is made for the Phase One and Phase Two Action Funds, the Escrow Agent shall transfer seven percent (7%) of the payment amount into the Supplemental Fund for the respective phases and five percent (5%) of the payment amount into the Special Needs Funds for the respective phases. Ex. 2, S.A. 6.7.2, 6.8.6; Ex. 2-Q, Sects. II(4)(a), II(5)(a), III(5)(a), III(6)(a); *see also* Ex. 10 at ¶ 6.

### G.    Objections and Exclusion Rights

### 1.    Objections

Any Settlement Class Member may file a written Objection to the Settlement or to an award of fees or expenses to Class Counsel with the Clerk of the Court. Ex. 2, SA 2.40, 8.4-8.4.4. The requirements for the written and signed Objection and service obligations are set forth in the Settlement Agreement, including the requirement that the person objecting has been legally authorized to object on behalf of the Settlement Class Member. *Id.* at 8.41. Any Settlement Class

Member who fails to comply with requirements of SA 8.4 through 8.4.2 waives and forfeits any and all objections the Settlement Class Member may have asserted. *Id.* at 8.4.3. No "mass," or "class" Objection shall be valid, and no Eligible Claimant may submit an Objection on behalf of any other Eligible Claimant. *Id.* at 8.4.4.[28]

Class Counsel asks that the Court set the deadline for submission of Objections to be sixty (60) calendar days after the date the Notice is mailed. *Id.* at 8.4.

## 2.  Requests for Exclusion ("Opt Outs")

Any Eligible Claimant may opt out of the Settlement by serving a written and signed "Request for Exclusion" on the Notice Administrator, Claims Administrator, 3M's Counsel, and Class Counsel. *Id.* at 2.41, 8.5-8.5.4. The requirements for the written and signed Request for Exclusion are set forth in the Settlement Agreement, including the requirement that the person submitting the Request for Exclusion has been legally authorized to do so on behalf of the Settlement Class Member. *Id.* at 8.5.1. No "mass," or "class" Opt-Out shall be valid, and no Eligible Claimant may submit an Opt Out on behalf of any other Eligible Claimant. *Id.* at 8.5.4.

Any Person that submits a timely and valid Request for Exclusion shall not (i) be bound by any orders or judgments entered in the MDL Cases with respect to this Settlement Agreement (but shall continue to be bound by other orders entered in the Litigation, including any protective order); (ii) be entitled to any of the relief or other benefits provided under the Settlement Agreement; (iii) gain any rights by virtue of the Settlement Agreement; or (iv) be entitled to submit an Objection. *Id.* at 8.5.2. Any Settlement Class Member that fails to submit a timely and valid Request for Exclusion (or submits and then withdraws its Opt Out) submits to the jurisdiction of

---

[28] Objections are not equivalent to a Request for Exclusion. "Opt outs" can only be accomplished by filing and serving a "Request for Exclusion" as discussed in the next section. *See e.g.* Ex. 2, S.A. 8.5.2(iv).

the MDL Court and shall be bound by all the terms of the Settlement Agreement and by all proceedings, orders, and judgments with respect to the Settlement. *Id.* at 8.5.3.

Class Counsel asks that the Court set the deadline for submission of Requests for Exclusion to be sixty (60) calendar days after the date the Notice is mailed. *Id.* at 8.5.

**H.**  **Termination of the Settlement – 3M's Walk-Away Right**

3M has the option to withdraw from the Settlement, and terminate the Settlement Agreement, if certain percentages/numbers of Settlement Class Members, broken down by PWS category, opt out of the Settlement ("Required Participation Threshold"). *Id.* at 9.1-9.4. The Special Master shall determine whether these percentages/numbers have been met and notify the Parties. *Id.* at 9.2. If the Special Master determines that some or all parts of the Required Participation Threshold have not been satisfied, or if 3M in good faith disagrees with a determination by the Special Master that it has been satisfied, then, within 21 calendar days of being notified by the Special Master, 3M must notify proposed Class Counsel, the Special Master and the Claims Administrator of its intent to exercise its termination right or waive its right to terminate. *Id.* at 9.2.

**I.**  **Release of Claims, Covenant Not to Sue and Dismissal**

After class members are notified and the time period for Opt-Out requests and Objections expires, if the Court grants Final Approval of the Settlement, then all Settlement Class Members who do not request exclusion from the class will be deemed to have released all claims as set forth in the Settlement Agreement against 3M, will be deemed to have agreed not to institute any Released Claims in the future, and, for those Settlement Class Members with pending Litigation, will be deemed to have agreed to dismiss their Released Claims with prejudice. *Id.* at 11.1-11.1.5, 11.3, 11.5.

As to dismissal, any pending Litigation shall be dismissed with prejudice to the extent it contains Released Claims against 3M. *Id.* at 11.5. However, should a Settlement Class Member believe that it has a preserved claim (*i.e.,* one that is not Released under the terms of the Settlement Agreement), it must notify the Special Master, Class Counsel, and 3M's Counsel before the date of the Final Fairness Hearing if it intends to seek a limited Dismissal, and, in accordance with any written agreement between the Settlement Class Member, Class Counsel and 3M's Counsel regarding the scope of limited Dismissal, shall execute a stipulation of limited Dismissal with prejudice, in the form annexed to the Settlement Agreement as Exhibit R, within fourteen (14) calendar days after the Effective Date. *Id.* at 11.5.1; Ex. 2-R. Failure to do so will result in dismissal of the entire claim against 3M in its entirety with prejudice. *Id.*

**J.       Payment of Attorneys' Fees and Litigation Costs and Expenses**

Proposed Class Counsel intends to file a motion for fees and costs not less than twenty (20) calendar days before Objections are due that will request that amounts due under the Holdbacks Provisions of CMO No. 3, private attorney/client contracts and fees and costs of Class Counsel all be paid from the Settlement Funds contained in the QSF before any portion of the Settlement Fund is distributed to the Settlement Class Members. *Id.* at 8.7, 8.8.   The motion will be made available on the Settlement website (www.PFASWaterSettlement.com), and the Court docket for *City of Camden, et al., v. 3M Company*, No. 2:23-cv-03147-RMG (D.S.C.). *See* Ex. 2-B, p. 9, Sect. IV(7).

## V.       ARGUMENT

Preliminary approval of a class action settlement is warranted if the two requirements of Rule 23(e)(1) are satisfied. Under the Rule, the issue is whether the Court will likely be able to: (1) approve the Settlement as being fair, reasonable and adequate under Rule 23(e)(2); and (2) certify the Settlement Class for purposes of settlement and entering a judgment. Fed. R. Civ. P.

23(e)(1).[29] *See 1988 Trust for Allen Children Dated 8/8/88 v. Banner Life Ins. Co*., 28 F.4th 513, 521 (4th Cir. 2022) (recognizing that parties propounding settlement bear "the initial burden to show that the proposed class meets the Rule 23(a) requirements for certification and that a proposed settlement is fair, reasonable, and adequate").

In determining whether to approve a Settlement, the Court should be guided by the principle that "[t]here is a strong judicial policy in favor of settlements, particularly in the class action context." *Reed v. Big Water Resort, LLC*, 2016 U.S. Dist. LEXIS 187745, at *14 (D.S.C. May 26, 2016); *see also Crandell v. U.S*., 703 F.2d 74, 75 (4th Cir. 1983) ("Public policy, of course, favors private settlement of disputes."). Indeed, "[t]he voluntary resolution of litigation through settlement is strongly favored by the courts and is 'particularly appropriate' in class actions." *In re LandAmerica 1031 Exch. Servs. Inc. Internal Revenue Service §1031 Tax Deferred Exch. Litig. (MDL 2054)*, 2012 U.S. Dist. LEXIS 97933 at *13-14 (D.S.C. July 12, 2012).

A.     **The Proposed Settlement Should Be Preliminarily Approved.**

Preliminary approval of a proposed class settlement begins with a cursory determination of the fairness, reasonableness, and adequacy of the settlement terms using the factors enumerated in Fed.R.Civ.P. 23(e)(2). *See In re Aqueous Film-Forming Foams Prod. Liab. Litig*., No. 2:18-MN-2873-RMG, 2021 U.S. Dist. LEXIS 16470, at *1 (D.S.C. Jan. 25, 2021) (preliminarily approving the *Campbell* class action settlement) ("*Campbell*"). As the arbiter of fairness and adequacy, the district court "acts as a fiduciary of the class" to "ensure that the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately."

---

[29] Rule 23(e)(1)(B) provides: "The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal."

*1988 Trust*, 28 F.4th at 521 (quoting *Sharp Farms v. Speaks*, 917 F.3d 276, 293-294). The Court is obliged to review the Settlement Agreement and "determine whether it 'is "within the range of possible approval" or, in other words, whether there is "probable cause" to notify the class of the proposed settlement.'" *In re LandAmerica*, 2012 U.S. Dist. LEXIS 97933, at *5 (quoting *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 855 F. Supp. 825, 827 (E.D.N.C. 1994)). "At this preliminary stage of the proceedings, [the] Court is not required to undertake an in-depth consideration of the relevant factors for final approval." *Id.* at *6.

Here, Plaintiffs and proposed Class Counsel submit that both the form and substance of the proposed Settlement are fair, reasonable, and adequate, and, thus, preliminary approval by the Court is warranted. Indeed, the proposed Settlement satisfies each of the elements for assessing the reasonableness of the settlement under Rule 23(e)(2), as well as the factors set forth in *Jiffy Lube,* 927 F.2d at 158-59. *See also In re: Lumber Liquidators Chinese Manufactured Flooring Prods. Marketing, Sales Pract. and Prods. Liab. Litig.*, 952 F.3d 471, 484 n. 8 (4th Cir. 2020) (reaffirming the *Jiffy Lube* factors while noting that the elements listed in the 2018 amendment to Rule 23(e)(2) differ from the Court's considerations but "almost completely overlap").[30]

### 1.     **The Settlement Negotiations Were Fair.**

The Fourth Circuit uses the following *Jiffy Lube* factors to analyze the fairness of a proposed class settlement to ensure it was reached as a result of good-faith bargaining at arm's

---

[30] Rule 23(e)(2) provides: "If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other."

length, without collusion: (1) the posture of the case at the time the proposed settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) counsel's experience in the type of case at issue. *Id. See generally, Commissioners of Public Works of City of Charleston v. Costco Wholesale Corp.*, 340 F.R.D. 242, 249 (D.S.C. 2021).

        a.      **The Litigation as to Public Water Systems Was in a Trial-Ready Posture at the Time of the Settlement.**

As set forth in detail *supra* in Section III(B), the Parties agreed that a proposed Settlement likely only one day before the first PWS bellwether trial – the *Stuart* trial – was set to begin on June 5, 2023. Prior to that, for four-and-a-half years – since this MDL's inception in December 2018 – the parties had engaged in extensive, non-stop fact and expert discovery, as well as motion practice in an effort to move this MDL forward efficiently and effectively, and they did not let a global pandemic stop them; with the first of over 150 depositions in this MDL being taken remotely in the earliest days months of the pandemic. The culmination of their efforts resulted in trial counsel for both parties being ready to present the *Stuart* case to a jury, a process that included, among other things, analyzing and evaluating hundreds of thousands of documents and paring them down to the final core exhibit list, arguing evidentiary objections, securing live witnesses, identifying deposition cuts, and engaging in motion practice (i.e. summary judgment motions, *Daubert* motion*s,* and motions in limine). In this instance "all discovery ha[d] been completed and the cause [was] ready for trial" which is "important" because it ordinarily assures sufficient development of the facts to permit a reasonable judgment on the possible merits of the case." *Flinn v. FMC Corp*., 528 F.2d 1169, 1173 (4th Cir. 1975).

Notably, the PWS cases, in and outside of this MDL, were much farther along than those in other litigations where a proposed class settlement received preliminary approval in the Fourth

Circuit. Indeed, the Fourth Circuit has affirmed preliminary approval of a class settlement "reached so early in the litigation that no formal discovery had occurred, [because] the court found that documents filed by plaintiffs and evidence obtained through informal discovery yielded sufficient undisputed facts" to enable a decision regarding the merits of the claims. *Jiffy Lube*, 927 F.2d at 159 (vacated and remanded on other grounds); *see also Newbanks v. Cellular Sales of Knoxville, Inc.*, No. 12-1420, 2015 U.S. Dist. LEXIS 191550, at *4-5, 14 (D.S.C. Feb. 4, 2015) (discovery was sufficient to allow evaluation of the merits of the case where parties exchanged thousands of pages of documents during the discovery process); *Mullinax v. Parker Sewer & Fire Subdistrict*, No. 12-cv-01405, 2014 U.S. Dist. LEXIS 199340, at *16 (D.S.C. Mar. 11, 2014) (approving settlement "reached after nearly 10 months of litigation that had narrowed and defined the legal and factual issues as clearly as possible.").

Thus, the first *Jiffy Lube* factor for evaluating fairness supports preliminary approval of the proposed Settlement.

      **b.**    **Before Reaching Settlement, the Parties Conducted Extensive Investigation and Discovery.**

Preliminary informal exploratory settlement discussions began in 2021. By this time, the parties were already well along in the development of their positions and had gathered a substantial cache of relevant evidence on critical elements of the claims at issue. In fact, the PEC had by that point already served voluminous discovery requests on approximately twenty (20) core defendants in the MDL, including 3M, and Science Day (October 4, 2019) had already convened at which the Parties presented their respective positions regarding some of the key scientific issues at issue in this case. Before reaching settlement, over 4.6 million documents had been produced in discovery in this MDL, which amount to over 37.4 million pages. The Parties also collectively completed 162 depositions of fact and expert witnesses.

Accordingly, as the extensive and highly contentious settlement discussions unfolded between the Parties over the next couple of years, general liability discovery as to all of the core MDL defendants, including 3M, was substantially completed and available for use, including in the *Stuart* trial. To this end, both sides, along with Judge Phillips, were armed with this extensive discovery and primed to make well-informed and intelligent decisions regarding the credibility of liability and its impact on any proposed Settlement. Accordingly, the second *Jiffy Lube* factor for evaluating fairness also supports preliminary approval of the proposed Settlement.

### c.     The Proposed Settlement Was Negotiated at Arm's-Length.

As described in the Declarations of Judge Phillips and Class Counsel, the proposed Settlement arose out of serious and informed negotiations conducted at arms' length. From the time the Parties first began to informally discuss a potential settlement, proposed Class Counsel continued to vigorously prosecute the PWS claims brought against 3M and the other MDL defendants, which led to negotiations between the Parties that were difficult and often highly contentious.

This continued after Judge Phillips was appointed by the Court in October 2022 to mediate the Parties' negotiations, and Judge Phillips played a crucial role in supervising the negotiations, assisting in evaluating the strengths and weaknesses of the Parties' respective positions and bridging the wide gaps in said positions. And even as Judge Phillips oversaw multiple telephone, video conference and in-person mediation sessions, the negotiations remained difficult and contentious. Indeed, even after the Parties reached agreement on the material terms of the Settlement, the negotiations continued as the parties attempted to hammer out the details of the final Settlement Agreement.

The adversarial nature of the negotiations and the aid provided by Judge Phillips are factors that weigh in favor of preliminary approval. *S.C. Nat. Bank v. Stone*, 139 F.R.D. 335, 345–46 (D.S.C. 1991) (although supervision "is not mandatory in order to determine a settlement is fair, such participation can insure that the parties will negotiate in good faith without collusion."); *Robinson v. Carolina First Bank NA*, 2019 U.S. Dist. LEXIS 26450, *27 (D.S.C. Feb. 14, 2019) ("supervision by a mediator lends an air of fairness to agreements that are ultimately reached); Fed.R.Civ.P. 23(e)(2)(B).

Thus, the contentious nature of the negotiations along with the participation from Judge Phillips demonstrate that the Fourth Circuit's third factor for evaluating fairness supports preliminary approval of the proposed Settlement.

> ### d.     Class Counsel and Counsel for 3M Have Decades of Experience Litigating Complex Cases, including Environmental and Class Actions.

Because Plaintiffs and 3M are represented by competent counsel who are experienced in complex, large-scale environmental litigation, their opinions supporting the proposed Settlement weigh in favor of granting preliminary approval. *Robinson,* 2019 U.S. Dist. LEXIS 26450, at *13-14, 18-19; *Flinn*, 528 F.2d at 1173 (the opinion and recommendation of experienced counsel "should be given weight in evaluating the proposed settlement."); Fed.R.Civ.P. 23(e)(2)(A).

Indeed, Courts have recognized that class counsel's experience in similar litigation allows for a realistic assessment of the merits of a claim and the desirability of a settlement. *Bass v. 817 Corp.,* 2017 U.S. Dist. LEXIS 225380, *5-6 (D.S.C. Sept. 19, 2017). This court has previously given consideration to the "Parties' history of litigating similar, if not identical issues, combined with Plaintiff's counsel's extensive experience of the same" as "indicat[ing] the settlement was negotiated at arm's length." *Commissioners*, 340 F.R.D. at 249.

Here, proposed Class Counsel has extensive experience in complex environmental litigation, class actions, and settlements of large, nationwide cases. Indeed, this Court appointed each as Co-Lead Counsel to oversee the prosecution of this MDL out of recognition of their experience. Their recommendation of the Settlement is informed by their acquired knowledge.

Scott Summy has litigated and resolved several large-scale cases involving water providers who sought the costs of removing chemicals from their water. *See* Ex. 3. As just one example, in 2009, he successfully settled MDL-wide claims brought by water suppliers against the nation's major oil companies for contaminating their drinking water supplies with the gasoline additive, MTBE. *Id.*

Michael London has devoted his entire legal career to representing consumers and injury victims, primarily in complex litigation settings involving mass torts. *See* Ex. 4. As just one example, Mr. London led the seminal PFAS litigation – *In re: E.I. du Pont de Nemours and Company C-8 Pers. Injury Litig.*, MDL No. 2433 (S.D. Ohio). *Id.*

Paul Napoli has litigated and resolved mass tort litigations involving complex environmental issues like those in this case. *See* Ex. 5. As just one example, Mr. Napoli, in his court-appointed role of Plaintiffs' Liaison Counsel, participated in the historic settlement for more than ten thousand first responders, construction workers, and laborers exposed to toxins from the September 11, 2001 attack of the World Trade Center. *Id.*

Elizabeth Fegan has litigated and resolved complex class actions involving consumers, third party payors, and other victims of fraud, defective products, and environmental contamination. *See* Ex. 7. As a result of her track record, two courts have recently *sua sponte* appointed her lead counsel in large class actions, i.e. *In re TikTok, Inc., Consumer Privacy Litigation*, MDL No. 2948 (N.D. Ill.) (second largest biometric privacy class settlement); *In Re:*

39

*Kia Hyundai Vehicle Theft Marketing, Sales Practices, and Prods. Liab. Litigation*, MDL 3052 (recently announced class settlement valued at more than $750 million). *Id.*

Considering proposed Class Counsel's broad knowledge of the facts surrounding this litigation, coupled with their extensive experience in class actions and resolving litigations involving similar issues, the fourth *Jiffy Lube* factor is met which supports preliminary approval of the proposed Settlement.

      2.      **<u>The Settlement Provides Adequate Consideration to the Class.</u>**

Under the terms of the Settlement Agreement, 3M will pay at least $10,500,000,000.00 (and possibly up to $12,500,000.00) plus $5,000,00.00 in Notice costs into a Court-approved QSF to be distributed to Settlement Class Members. Ex. 2, SA 6.1. Following appropriate deductions for fees and costs as set forth in the Settlement Agreement, those funds will be allocated equitably among the proposed Settlement Class Members under the Allocation Procedures described earlier in this memorandum, which rely principally on flow rates and degree of PFAS contamination in each system to calculate the final Allocated Amount. Ex. 2-K. The Settlement Amount will help, in part, to ameliorate the costs faced by PWSs in developing and implementing necessary, cost-effective systems to treat the water sources contaminated by 3M's PFAS.

At the preliminary approval stage, the Court need only find that the settlement is within "the range of possible approval," *Commissioners*, 340 F.R.D. at 249, considering (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." *Jiffy Lube*, 927 F.2d at 159; *Commissioners*, 340 F.R.D. at 250. *See also* Fed.R.Civ.P 23(e)(2)(C & D).

### a.     The Settlement Is Reasonable Given the Strength of Plaintiffs' Case on the Merits and 3M's Existing Defenses.

Although Plaintiffs are confident in the strength of their allegations and supporting evidence, "Plaintiffs' ability to prevail on the merits is uncertain. The Settlement confers relief that might well not be achievable through continued litigation." *Gray v. Talking Phone Book*, 2012 U.S. Dist. LEXIS 200804, at *16 (D.S.C. Aug. 10, 2012). When reviewing the adequacy of a proposed settlement, "the court can assess the relative strengths and weaknesses of the settling parties' positions to evaluate the various risks and costs that accompany continuation of the litigation." *Case v. French Quarter III LLC*, 2015 WL 12851717, at *8 (D.S.C. July 27, 2015).

Before the Settlement was reached, the *Stuart* case was trial ready and Proposed Class Counsel believed, and continues to believe, that they have a strong case against 3M. 3M was fully cognizant of all this credible evidence. The strength of Plaintiffs' position is what drove the Settlement Amount agreed to by 3M.

Of course, the outcome of any case that is tried on the merits is uncertain and for its part, 3M believes it had supportable legal and factual arguments that also impacted the Parties' negotiations. As Judge Phillips attests in his declaration, the settlement negotiations were . . . "difficult and contentious…because all involved held strong to their convictions that they had the stronger factual and legal arguments on issues relevant to liability, damages and otherwise, leading to robust debates on virtually aspect of the settlement, including the ultimate outcome of motions, trials, and appeals, if a negotiated agreement was not achieved." Ex. 6, ¶ 19.

As in many cases, uncertainty favors settlement because "hurdles to proving liability, such as proving proximate cause would remain and would necessitate expensive expert testimony." *Commissioners*, 340 F.R.D. at 250 (internal quotation marks omitted); *LandAmerica*, 2012 U.S. Dist. LEXIS 97933, at *11-12 (where defendants "vigorously dispute the Plaintiffs' claims on

numerous grounds," "their dispute underscores … the uncertainty of the outcome[.]"); *S.C. Nat. Bank*, 139 F.R.D. at 340 (settlement favored by risk to both sides of ultimate resolution of the numerous and significant factual and legal issues). 3M also insisted that the benefits of its product, AFFF, outweighed the risks associated with the use of the product. This issue, among others, would have been left in the hands of juries where the outcome is always uncertain.

Notably, as detailed earlier in Section II, prior to withdrawing from the market, 3M was the predominant global manufacturer of PFAS, but it was not sole manufacturer.[31] Correspondingly, notwithstanding Plaintiffs' confidence in the strengths of their proofs against 3M, this is a factor that could have potentially reduced any favorable jury award. It was therefore a consideration in agreeing to the Settlement Amount. *See e.g. Flinn*, 528 F.2d at 1173–74 (the fact that a cash settlement "'may only amount to a fraction of the potential recovery' will not per se render the settlement inadequate or unfair.") Accordingly, this factor supports that the Settlement is reasonable.

### b.    The Settlement Is Reasonable Given the Anticipated Duration and Expense of Additional Litigation.

Under the Settlement Agreement, 3M does not admit its liability and expressly declines to waive any affirmative defenses. If the Settlement Agreement is terminated, the Parties agree to return to their pre-settlement litigation positions. Only the *Stuart* case has been prepared for trial, so the vast majority of water providers would start a years-long litigation – after four-and-a-half years have already passed in the MDL. It could easily take many additional years for Settlement Class Members to make similar progress in their own cases. *See Case*, 2015 WL 12851717, at *8

---

[31] 3M intended to argue that its sales to the Department of Defense entitled it to a government contractor defense in specific trials. While proposed Class Counsel believes juries would not have found in 3M's favor, the risk of an adverse ruling on said defense at trial also supports settlement. Ex. 3, at ¶ 19.

(settlement is appropriate after extensive discovery where trial would be lengthy and costly). And there is the risk of recovering nothing or recovering only after years of trial and appeals. Adding years of litigation for PWS runs counter to having to expend funds in the near term to comply with the pending EPA MCLs for PFAS. This cannot be overstated.

Indeed, although the claims alleged by the Settlement Class Members involve straightforward tort principles, litigating their cases involves sophisticated factual, expert and legal analysis that in many cases will require hiring multiple consulting and testifying experts. A liability determination may turn on resolution of complex fact questions based on sophisticated scientific evidence, including analyses of the PFOA at a particular site to determine whether it is branched or linear or both, and if both, in what proportions. And looming over all of this is the possibility that a jury assesses discrete factual issues involving the government contractor defense and, however unlikely, finds that it applies in a particular case. All these uncertainties make settlement all the more desirable.

This complexity translates into time-consuming and expensive litigation. Preparing the Water Provider cases for potential bellwether trials alone required that Plaintiffs engage numerous expert witnesses at a cost totaling over hundreds of thousands of dollars, and that is before a single trial has even been conducted. Developing these specific expert opinions for hundreds of PWSs presents the real potential for enormously exorbitant costs.

Proposed Class Counsel has also expended time and effort in other ways in order to put the PWS cases into the best position possible for negotiating a potential settlement. For the *Stuart* trial, a core trial team was deployed to Charleston and prepared to present the best evidence against 3M

in a precise, cogent and persuasive manner, as Plaintiffs have done on prior occasions.[32] The firms involved invested extraordinary amounts of time in these efforts without any guarantee of future recovery due to the contingency nature of the litigation.[33] These risks and costs were also part of the Parties' calculus in negotiating the proposed Settlement and should be considered by the Court. *See* Fed.R.Civ.P. 23(e)(2)(C)(iii).

Moreover, any judgment would likely be subject to lengthy appeals, whereas the Settlement provides more immediate results and benefits to Settlement Class Members. "Accordingly, even after three and a half years of litigation, the road to recovery—particularly for the class as a whole—likely would be protracted and costly if the settlement were not approved." *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 480 (D.Md. 2014).

In brokering the proposed Settlement, proposed Class Counsel carefully evaluated all the hurdles involved in establishing 3M's liability, including getting past *Daubert* and summary judgment, as well as the possibility of a future trial and appeal. Based on these considerations, proposed Class Counsel believes that it is in the best interest of all Settlement Class Members to

---

[32] The *Stuart* trial team was led by Gary Douglas of Douglas & London and Wesley Bowden of Levin, Papantonio, Rafferty, and also included: Rebecca Newman, Lara Say, Anne Accettella, and Tate Kunkle of Douglas & London; Ned McWilliams, Madeline Pendley and Chris Paulos of Levin, Papantonio, Rafferty; Frank Petosa, Josh Autry and Henry Watkins of Morgan & Morgan; Nancy Christensen of Weitz & Luxenberg; Carl Solomon of Solomon Law Group, Stephanie Biehl of Sher Edling, and Fred Longer of Levin, Sedran & Berman. Many of these lawyers (and others on the law and briefing committee, including Carla Burke Pickrel and Kevin Madonna) were engaged in other important presentations to the court, including Science Day and the Government Contractor Defense hearing.

[33] To this purpose, the Settlement Agreement appropriately recognizes that all counsel will take their fees from the Settlement Fund. As discussed above, in Section IV(J), Proposed Class Counsel intends to file a motion for fees and costs not less than twenty (20) calendar days before Objections are due that will request that amounts due under the Holdbacks Provisions of CMO No. 3, private attorney/client contracts and fees and costs of Class Counsel all be paid from the Settlement Funds contained in the QSF. *Id.* at 8.7, 8.8.

resolve the claims through the proposed Settlement in order to avoid such risks. *See Gray*, 2012 U.S. Dist. LEXIS 200804, at *5-6, 15 (settlement negotiations involved consideration of avoiding the significant risk and burden of continuing litigation).

### c.    The Settlement is Reasonable Given the Solvency of 3M.

Although 3M has not indicated any plans to pursue bankruptcy protection (like its co-defendant in the MDL, Kidde-Fenwal, Inc. [34]), it is always a possibility, especially given the values of the claims at issues. Additionally, 3M has attempted, albeit unsuccessfully, to use the bankruptcy system to avoid litigation in another pending MDL and the potential for them to do try and do so here is a concern. The potential inability to pay litigated judgments weighs in favor of the adequacy of the billion-dollar settlement. *See Lumber Liquidators*, 952 F.3d at 485. In summary, probable cause for final approval of the Settlement has been amply demonstrated.

**B.    The Proposed Settlement Class Should Be Provisionally Certified Under Federal Rule of Civil Procedure 23.**

### 1.    The Requirements of Rule 23(a) Are Satisfied.

A proposed settlement class satisfies the requirements for class certification under Rule 23(a), if it meets the following requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed.R.Civ.P. 23(a). The Fourth Circuit also recognizes that "Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable" or ascertainable. *Peters v. Aetna Inc*., 2 F.4th 199, 241–42 (4th Cir. 2021) (internal citations omitted); *see also Commissioners*, 340 F.R.D. at 247.

At this preliminary stage, this Court is not required to undertake an in-depth consideration of the relevant factors; nor should the Court decide the merits of the case or resolve unsettled legal

---

[34] *In re Kidde-Fenwal, Inc*., No. 23-20638, Voluntary Pet. for Bankr. (D. Del. May 14, 2023).

questions but "limit its proceedings to whatever is necessary to aid it in reaching an informed, just and reasoned decision." *Flinn*, 528 F.2d at 1173.

a.     <u>**The Settlement Class Members Are Readily Ascertainable.**</u>

In analyzing any class action, the Fourth Circuit has imposed a non-textual condition that "a class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654–55 (4th Cir. 2019). This requirement is often called "ascertainability" where "[t]he goal is not to identify every class member at the time of certification, but to define a class in such a way as to ensure that there will be some administratively feasible [way] for the court to determine whether a particular individual is a member at some point." *Id.* at 658 (internal quotation marks omitted). This requirement will be met so long as the putative class is able to be "identified on a large-scale basis, and notified of the class action accordingly." *Id.*

As detailed above in Section IV(E)(1), the proposed Settlement Class meets this requirement because the putative class members it includes are objectively described, readily identifiable, and ascertainable by reference to publicly-available information and, if necessary, confirmatory testing results. For this reason, the Fourth Circuit's ascertainability requirement is satisfied.

b.     <u>**Rule 23(a)'s Numerosity Requirement Is Satisfied.**</u>

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). While this requirement was "easily satisfied" for a class of 14,000 public sewer system operators, *Commissioners,* 340 F.R.D. at 247, the Fourth Circuit has also found it satisfied where the proposed class included only 30 members. *Williams v. Henderson*, 129 Fed. App'x 806, 811 (4th Cir. 2005). The large number of PWSs and their disparate locations alone make joinder an unrealistic option in this case, thereby confirming the impracticality of

46

resolving their claims without use of the class action device. *See In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234-36 (4th Cir. 2021) (holding that when the proposed class is in the "gray area" between 20 to 40 members, "the district court should consider whether judicial economy favors *either* a class action or joinder.").

Thus, the proposed Settlement Class, projected to be over 12,000, easily satisfies Rule 23(a)'s numerosity requirement.

### c.   Rule 23(a)'s Commonality Requirement Is Satisfied.

Under Rule 23(a)(2), a district court may certify a class only when "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The key inquiry for evaluating commonality is whether a common question can be answered in a class-wide proceeding such that it will "drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "The commonality requirement – at least as it relates to a settlement class – is 'not usually a contentious one: the requirement is generally satisfied by the existence of a single issue of law or fact that is common across all class members and thus is easily met in most cases.'" *Commissioners*, 340 F.R.D. at 247-248. "What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S at 350 (emphasis in original). Thus, even a single common question is sufficient to meet this Rule 23(a) requirement. *Id.* at 359.

Recently, this Court found the commonality requirement was met in a class action where public sewer operators alleged, individually and on behalf of a putative class, that the manufacturers of flushable wipes knew that their wipes were not actually "flushable," failed to warn consumers, and caused harm to sewer systems. *Commissioners,* 340 F.R.D. at 247. In that case, this Court found that common questions existed "such as whether 'Defendants mislabel their

flushable wipes so as to have consumers believe that their flushable wipes will not cause harm to sewer systems in their area' and 'whether Defendants' flushable wipes cause adverse effects on STP Operators' systems.'" *Id.*

The same analysis supports a finding of commonality here. Plaintiffs' claims, individually and on behalf of the proposed Settlement Class, arise from allegations that 3M knew of the environmental and potential human health risks associated with exposure to PFAS, yet continued to develop, manufacture, distribute, and sell PFAS and products containing PFAS. Compl. at ¶¶ 101-135; *see also* Ex. 2, SA 12.1.1. Likewise, Plaintiffs and the proposed Settlement Class Members have all alleged that 3M failed to warn users, bystanders, or public agencies of these risks associated with their products that contained PFAS. *Id.* at ¶¶ 100, 134, 229-238, 262. Plaintiffs and the Settlement Class Members relied on a common core of salient facts relevant to 3M, and 3M's potential liability to Plaintiffs and the proposed Settlement Class is grounded in substantially similar legal theories. For this reason, Rule 23(a)'s commonality requirement is satisfied here.

### d.      Rule 23(a)'s Typicality Requirement Is Satisfied.

Typicality requires that the proposed class representatives' claims be "typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Typicality is satisfied if a proposed class representative's claim is not "so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Deiter v. Microsoft Corp.,* 436 F.3d 461, 466–67 (4th Cir. 2006). Still, courts have emphasized that this "is not to say that typicality requires that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned." *Id.* Rather, typicality is satisfied where there is "a sufficient link" between a representative plaintiff's claims and those of absent class members where both allegedly suffered

damages caused by the same product, arise out of the same alleged course of conduct by defendant, and are based on identical legal theories. *Commissioners,* 340 F.R.D. at 247-248.

Here, Plaintiffs, in their capacity as proposed Class Representatives, have asserted claims that are undoubtedly typical of those of the Settlement Class Members they seek to represent. To start with, Plaintiffs, like the Settlement Class Members, are PWSs that have asserted claims for actual or threatened injuries caused by PFAS contamination. Compl. at ¶ 172; Ex.2, SA 5.1. In addition, Plaintiffs and the Settlement Class Members rely on the same common core of facts to allege that 3M knowingly sold defective PFAS and failed to warn of those defects, leading to the actual or threatened contamination of their respective Water Sources. *Id.* at ¶¶ 169-171. Lastly, Plaintiffs and the Settlement Class Members also assert a common damages theory that seeks recovery of the costs incurred in testing, monitoring, remediating and/or treating their Water Sources, either to monitor for PFAS contamination or to remove existing PFAS contamination from their Drinking Water. *Id.* at ¶¶ 14-16.

Because Plaintiffs' and the Settlement Class Members' claims arise out of the same course of conduct by 3M, are based on similar – if not identical – legal theories, and assert similar damages theories, Rule 23(a)'s typicality requirement is satisfied. *Commissioners*, 340 F.R.D. at 247; *see also Campbell,* 2021 U.S. Dist. LEXIS 16470, at *11-12 ("Typicality exists if a plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory.")(citations omitted).

### e.     <u>Rule 23(a)'s Adequacy of Representation Requirement Is Satisfied.</u>

Rule 23(a)(4) requires that the "representative Parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). *See also 1988 Trust*, 28 F.4th at 524. "Determining adequacy of representation, therefore, requires the Court to determine: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) whether

the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the entire class." *Parker v. Asbestos Processing, LLC*, No. 0:11-cv-01800-JFA, 2015 U.S. Dist. LEXIS 1765, at \*24 (D.S.C. Jan. 8, 2015) (citations omitted). This inquiry "tend[s] to merge" with the commonality and typicality criteria. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982). In part, these requirements determine whether "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.*

The adequacy of representation requirement is satisfied here because Plaintiffs and proposed Class Counsel have no interests "antagonistic to the interests of the Settlement Class," no indicia of conflicts of interest exists, and Plaintiffs allege the same or similar harms as the absent class members. *Commissioners,* 340 F.R.D. at 247-248. Further, Plaintiffs and proposed Class Counsel have demonstrated a willingness and ability to vigorously prosecute the class claims as set forth in detail above. *Id.* Lastly, there is no basis for believing that proposed Class Counsel will not adequately represent the interests of absent class members given their extensive experience in class actions, robust prosecution of the class claims in this litigation, and the impressive results they have secured in this MDL by way of this Settlement. *See, e.g.*, *Campbell,* 2021 U.S. Dist. LEXIS 16470, at \*16 (finding Mr. Napoli would adequately represent the interests of absent members of a class comprised of residents of a community located in the vicinity of an AFFF manufacturing facility).

For all these reasons, the proposed Settlement satisfies Rule 23(a)'s adequacy of representation requirement.

### 2.    Rule 23(b)(3) is Satisfied.

In addition to the requirements of Rule 23(a), the proposed Settlement Class must also satisfy the requirements of Rule 23(b)(3). "An acceptable type of class provided for by Rule 23(b)

is where the class is superior to other methods of adjudication because common questions of law or fact predominate over those of individual class members ('superiority requirement')." *Campbell*, 2021 U.S. Dist. LEXIS 16470, at *5. In making this determination, a court must consider: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action." Fed.R.Civ.P. 23(b)(3).

Because a chief justification for class actions is efficiency, courts "must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." *Campbell*, 2021 U.S. Dist. LEXIS 16470 at *5-6 (citing 7AA Wright & Miller, Fed. Practice and Procedure § 1779 (3d ed. 2005)). "'Where . . . common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.'" *Stillmock v. Weis Markets, Inc.,* 385 Fed.Appx. 267, 273 (4th Cir. 2010).

Here, for the same reasons discussed in the preceding section, common questions clearly predominate over any individual questions that the Settlement Class Members may have. Again, Plaintiffs and the Settlement Class Members are PWSs that have been injured by a common course of conduct undertaken by 3M that resulted in substantially similar injuries to Plaintiffs and the putative Settlement Class Members. And while certain individual issues may exist for some Settlement Class Members, the nature and scope of the common questions in this case satisfy Rule 23(b)(3)'s predominance requirement.

In addition to efficiency, there are other factors the Fourth Circuit recognizes that favor class treatment over individual cases. These factors include the absence of a strong interest for the class members to pursue individual litigation, particularly when considering the expense, burden, risk, and length of trial and appellate proceedings involved. *See Stillmock,* 385 Fed.Appx. at 275. Here, this factor clearly favors class treatment here because there is a "sufficient desirability to concentrate the litigation in the forum given its familiarity with the relevant issues as the transferee Court." *Campbell*, 2021 U.S. Dist. LEXIS 16470, at *13. Another factor considered by the Fourth Circuit is whether class certification promotes consistency of results, which is not only applicable here but provides 3M with the finality and repose it desires in pursuing a global resolution of its liability to PWSs. *Gunnells v. Healthplan Servs.,* 348 F.3d 417, 429 (4th Cir. Oct. 30, 2003)(in contrast to class action proceeding, individual actions make a defendant vulnerable to the asymmetry of collateral estoppel). Finally, manageability concerns are displaced by the potential settlement itself. *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 620 (1997).

Thus, the proposed Settlement satisfies all the criteria necessary for class certification under Rules 23(a) and (b)(3). Having met these criteria, the proposed Settlement Class should be preliminarily certified, and Notice of the Settlement should be issued.

**C.**    **<u>Upon Certifying the Settlement Class, the Court Should Appoint Class Counsel and Class Representatives.</u>**

**1.**    **<u>Appointment of Class Counsel.</u>**

Proposed Class Counsel all have substantial experience in prosecuting and settling complex class actions, including those that involve environmental contamination of public water supplies. Exs. 3-5, and 7. In this vein, all have been appointed and served as Class Counsel in many class actions and mass torts. *Id.* This Court has previously recognized their capacity to manage and

oversee complex litigation by appointing three of them as Co-Lead Counsel. Proposed Class Counsel have the resources to oversee the Settlement for the Class Members.

Accordingly, because Proposed Class Counsel are well prepared to fairly and adequately represent the Class Representatives and the interests of the Class, *see Commissioners*, 340 F.R.D. at 248-249; *Robinson*, 2019 U.S. Dist. LEXIS 26450, at *13-14, Plaintiffs respectfully request that the Court appoint Scott Summy, Michael A. London, Paul Napoli and Elizabeth A. Fegan as Class Counsel for the Settlement Class.

### 2.    Appointment of Class Representatives.

As discussed above, Plaintiffs' claims are typical of the claims of the Class Members, and the claims share commonality. Plaintiffs are adequate representatives of the Class Members because no conflicts of interest exist between the two. Plaintiffs are interested in demonstrating that PFAS either caused or threatened to cause damages to their PWSs and these are the same interests of the Class Members. Plaintiffs have demonstrated a commitment to prosecuting this matter on their own behalf and on behalf of the absent Settlement Class Members, and they remain committed to doing so.

As to the Settlement itself, the Class Representatives have carefully read, know and understand the full contents of the Settlement Agreement and they voluntarily entered into this Settlement Agreement after having consulted with Class Counsel. The Court should appoint these Class Representatives to represent the Settlement Class.

### D.    The Court Should Commence the Notice Process by Approving the Proposed Form of Notice and Notice Plan and Appointing the Notice Administrator.

As discussed above in Section IV(E)(2), the Notice Plan was designed to provide the best notice that is practicable under the circumstances and to fully comport with due process requirements, and Fed. R. Civ. P. 23. The notice provides for individual direct notice via mail and

email to all reasonably identifiable Class Members, outreach to national and local water organizations, a comprehensive media plan, and the implementation of a dedicated website and toll-free telephone line where Class Members can learn more about their rights and options pursuant to the terms of the Settlement. This Notice Plan is substantially similar to the one that was confirmed as reasonable and adequate in *Commissioners*, 340 F.R.D. at 249, and satisfies all the criteria necessary to reach the class members and inform them of their legal rights.

Accordingly, the Court should approve the Notice Plan, direct Notice to begin, and set a date no less than sixty (60) calendar days after commencement of the dissemination of Notice as the deadline for the filing of Objections or Requests for Exclusion.

**E.**      **The Court Should Appoint the Claims Administrator and Special Master Matthew Garretson.**

Plaintiffs request that the Court approve the appointment of Dustin Mire, of Eisner Advisory Group as the Claims Administrator. *See* Ex. 9. Plaintiffs further request that the Court approve the appointment of Matthew Garretson of Wolf/Garretson LLC. *See* Ex. 10.

As to the Adjudicatory Special Master discussed in Section IV(D)(3)(b), the parties will endeavor in advance of the Final Fairness Hearing to engage a retired judge to serve as the Special Master to resolve disputes that Class Counsel and 3M may identify, including disputes about the timing or amount of 3M's payments under Phase Two.

**F.**      **The Court Should Schedule a Final Fairness Hearing**

Plaintiffs respectfully request that the Court schedule a Final Fairness Hearing to consider the fairness, reasonableness, and adequacy of the Settlement Agreement under Federal Rule of Civil Procedure 23(e)(2), and to determine whether the Order Granting Final Approval should be entered.

Once the Court schedules the Final Fairness Hearing, the date shall be communicated to the Settlement Class Members in the Long Form Notice and Summary Notice so as to provide the Settlement Class Members with sufficient notice.

## VI.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the instant motion and enter the Preliminary Approval Order, annexed hereto as Exhibit 1:

    a.       preliminarily approving the proposed Settlement Agreement;

    b.       preliminarily certifying, for settlement purposes only, the Settlement Class;

    c.       approving the form of Notice of the Settlement Class;

    d.       approving the Notice Plan, and directing the commencement of, the Notice Plan;

    e.       appointing Class Counsel;

    f.       appointing Class Representatives;

    g.       appointing the Notice Administrator;

    h.       appointing the Claims Administrator;

    i.       appointing the Special Masters;

    j.       scheduling the Final Fairness Hearing; and

    k.       granting any other relief deemed necessary or appropriate by the Court.

Dated: July 3, 2023

Respectfully submitted,

/s/ Michael A. London
Michael A. London
Douglas and London P.C.
59 Maiden Lane, 6th Floor
New York, NY 10038
212-566-7500
212-566-7501 (fax)
mlondon@douglasandlondon.com

Paul J. Napoli
Napoli Shkolnik
1302 Avenida Ponce de León
San Juan, Puerto Rico 00907
Tel: (833) 271-4502
Fax: (646) 843-7603
pnapoli@nsprlaw.com

Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
214-521-3605
ssummy@baronbudd.com

Elizabeth A. Fegan
Fegan Scott LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
312-741-1019
beth@feganscott.com

*Proposed Class Counsel*