```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF SOUTH CAROLINA
2                     CHARLESTON DIVISION

3

4    IN RE:  AQUEOUS FILM-FORMING
     FOAMS PRODUCTS LIABILITY LITIGATION     MDL NO. 2:18 MN 2873
5

6

7

8

9

10

11         Status Conference in the above-captioned matter held

12   Monday, February 25, 2019, commencing at 10:04 a.m., before

13   the Hon. Richard M. Gergel, in Courtroom I, United States

14   Courthouse, 81 Meeting St., Charleston, South Carolina,

15   29401.

16

17

18

19

20

21

22         REPORTED BY DEBRA LEE POTOCKI, RMR, RDR, CRR
             Official Reporter for the U.S. District Court
23                    Charleston Division
                        P.O. Box 835
24                   Charleston, SC  29402

25
```

```
 1                      A P P E A R A N C E S

 2     APPEARED FOR PLAINTIFFS:

 3     JOSEPH F. RICE, ESQUIRE
       FRED THOMPSON, III, ESQUIRE
 4     ANNE McGINNESS KEARSE, ESQUIRE
       TEMITOPE O. LEYIMU, ESQUIRE
 5     T. DAVID HOYLE, ESQUIRE
       EDWARD J. WESTBROOK, ESQUIRE
 6     CHRISTIAAN MARCUM, ESQUIRE
       TERRY E. RICHARDSON, JR., ESQUIRE
 7     MICHAEL A. LONDON, ESQUIRE
       REBECCA G. NEWMAN, ESQUIRE
 8     PAUL NAPOLI, ESQUIRE
       LOUISE R. CARO, ESQUIRE
 9     PATRICK J. LANCIOTTI, ESQUIRE
       AARON R. MODIANO, ESQUIRE
10     SCOTT SUMMY, ESQUIRE
       T. ROE FRAZER II, ESQUIRE
11     CHARLES E. SCHAFFER, ESQUIRE
       VICTOR SHER, ESQUIRE
12     MATTHEW EDLING, ESQUIRE
       RICHARD S. LEWIS, ESQUIRE
13     MICHAEL OVCA, ESQUIRE
       LARRY R. COHAN, ESQUIRE
14     JOSHUA C. COHAN, ESQUIRE
       FRANK L. GALLUCCI, ESQUIRE
15     KEVIN S. HANNON, ESQUIRE
       JOSEPH L. FELICIANI, ESQUIRE
16     ROBERT A. BILOTT, ESQUIRE
       DANIEL A. OSBORN, ESQUIRE
17     MATTHEW J. SINKMAN, ESQUIRE
       NANCY CHRISTENSEN, ESQUIRE
18     WILLIAM J. JACKSON, ESQUIRE
       JOHN D.S. GILMOUR, ESQUIRE
19     J. NIXON DANIEL, III, ESQUIRE
       KEVIN MADONNA, ESQUIRE
20     RICHARD HEAD, ESQUIRE
       TATE J. KUNKLE, ESQUIRE
21     CARLA BURKE PICKREL, ESQUIRE
       ERIN DICKINSON, ESQUIRE
22     DAVID McDIVITT, ESQUIRE
       WESLEY BOWDON, ESQUIRE
23     JANPAUL PORTAL, ESQUIRE
       JAMES L. FERRARO, ESQUIRE
24     JAMES L. FERRARO, JR., ESQUIRE

25
```

```
1    APPEARED FOR 3M:
     MICHAEL A. OLSEN, ESQUIRE
2    DANIEL L. RING, ESQUIRE
     BRIAN DUFFY, ESQUIRE
3
     APPEARED FOR TYCO AND CHEMGUARD:
4    JOSEPH G. PETROSINELLI, ESQUIRE
     LIAM J. MONTGOMERY, ESQUIRE
5    DAVID E. DUKES, ESQUIRE
     AMANDA S. KITTS, ESQUIRE
6
     APPEARED FOR FEDERAL DEFENDANTS:
7    ARASTU K. CHAUDHURY, ESQUIRE
     LEE BERLINSKY, ESQUIRE
8    SAMUEL DOLINGER, ESQUIRE
     SARAH WILIAMS, ESQUIRE
9
     APPEARED FOR NATIONAL FOAM:
10   KEITH SMITH, ESQUIRE

11   APPEARED FOR THE PORT AUTHORITY OF NY AND NJ:
     NICHOLAS MINO, ESQUIRE
12   MARK A. CHERTOK, ESQUIRE

13   APPEARED FOR STATE OF NEW YORK:
     MIHIR DESAI, ESQUIRE
14
     APPEARED FOR SUFFOLK COUNTY, NY:
15   THOMAS STAGG, ESQUIRE

16   APPEARED FOR SWF/NEG, INC.:
     DEAN S. SOMMER, ESQUIRE
17   KRISTIN C. ROWE, ESQUIRE

18   APPEARED FOR FEDERAL EXPRESS:
     EUGENE F. MASSAMILLO, ESQUIRE
19
     APPEARED FOR UTC/KIDDE:
20   JONATHAN HANDLER, ESQUIRE
     JOHN W. CERRETA, ESQUIRE
21
     APPEARED FOR TOWN OF EAST HAMPTON:
22   NICHOLAS C. RIGANO, ESQUIRE

23   APPEARED FOR BUCKEY FIRE EQUIPMENT CO.:
     MICHAEL CARPENTER, ESQUIRE
24
     APPEARED FOR CITY OF NEWBURGH:
25   ALAN J. KNAUF, ESQUIRE
     AMY K. KENDALL, ESQUIRE
```

1           THE COURT:  I feel like we have the full employment

2    plan here for all lawyers.  Congratulations.

3        You know, in my last MDL I would run into young attorneys

4    who had told me they could not get a job, and they said, we

5    have been hired, we have gotten a job.  They're all doing the

6    discovery for both sides' document production.  So we are glad

7    to contribute to the greater prosperity of the Bar.

8        Okay.  Folks, this is our organizational meeting in the

9    AFFF MDL.  And part of it is I want to hear -- I know that

10   many times, prior to organizational meetings like this,

11   counsel will get together, both sides, and talk to each other

12   about how it might be organized.  And though I don't rubber

13   stamp lawyers, I am open to hearing what you have to say and

14   what ideas you might have.

15       So let's just start first of all on the plaintiffs' side.

16   Have there been meetings and discussions about lead counsel,

17   liaison counsel?

18           MR. RICE:  Yes.  Joe Rice from Motley Rice.

19           THE COURT:  Yes, Mr. Rice, good morning, sir.

20           MR. RICE:  There have been multiple meetings.

21           THE COURT:  Surprise.

22           MR. RICE:  Yes, sir.  Some in Charleston and some up

23   in New York.  And I believe that the request is to have Motley

24   Rice be appointed as liaison counsel, and we are prepared to

25   give the Court a proposal.  We are prepared to do it at the

1     Court's schedule.  The lawyers that are proposed to be co-lead

2     are here today, if the Court would like to talk with them.  I

3     think we have a consensus of a structure.

4          This MDL is going to be a little different in structure,

5     maybe, than some of the others that you've had.  Because, as

6     you can see from our chart, and Mr. Thompson is going to talk

7     about, we have plaintiffs that are situated in different

8     places, and that's going to present some unique issues in the

9     management.  So we're going to probably have a couple three

10    leads, and then we're going to have really sub-leads in a

11    couple areas that are going --

12              THE COURT:  We have distinct issues like the water

13    systems and so forth that have their own discrete issues.

14              MR. RICE:  They'll have their issues they can deal

15    with and be in charge of.

16         So I think with that structure, everybody is on board and

17    we're prepared to move forward at whatever schedule you give

18    us; or, again, everyone is here today if you'd like to have me

19    introduce --

20              THE COURT:  So who is, Mr. Rice, who is proposed as

21    the co-lead counsel?

22              MR. RICE:  These two gentlemen right here, Scott

23    Summy --

24              THE COURT:  Where are you from?

25              MR. SUMMY:  Dallas, Texas.

1           THE COURT:  Now, what I'm going to do is I'm going to

2    want anyone who wishes to be either lead counsel, liaison

3    counsel or on the steering committee, to provide me a resume

4    and references.  And I want references to judges who you have

5    dealt with in other MDLs.  And for those who know, what I do

6    is I call the judges.  This is like one of the critical

7    decisions you make early in an MDL as a judge is getting the

8    right leadership doing this.  And it's not just experience,

9    it's also compatibility, reasonableness, time to devote to

10   this effort.

11       I think this case, I'm going to hear from y'all a little

12   bit about this, I think it's one of those onion cases; as you

13   peel off one layer, there's just so much to it, and we're

14   going to have to sort all this out, and I think a lot of us

15   are going to be on a journey together filling out the full

16   implications of it.

17       So, okay, Mr. Summy.  Who else?

18           MR. NAPOLI:  Good morning, Your Honor.

19           THE COURT:  Your name?

20           MR. NAPOLI:  Paul Napoli, N-A-P-O-L-I.

21           THE COURT:  And you're from New York?

22           MR. NAPOLI:  Yes, New York.

23           THE COURT:  And you have a large percentage of the

24   cases?

25           MR. NAPOLI:  I have a few cases filed, yes.

1          THE COURT:  I think I counted 58 maybe?

2          MR. NAPOLI:  And a few more coming, yes, Your Honor.

3          THE COURT:  We're going to talk about that.  I

4    suspect we are just beginning.  I had that in the Lipitor

5    case, we had an initial run, and then we had just massive

6    numbers of cases coming in.  I'm going to want to hear what

7    y'all are anticipating about that.

8      And the third person?

9          MR. LONDON:  Good morning, Your Honor, Michael

10   London.

11         THE COURT:  And where are you from?

12         MR. LONDON:  Douglas and London Law Firm in New York

13   City.

14         THE COURT:  Okay.  So do we have a proposed steering

15   committee?  Executive committee?

16         MR. LONDON:  Your Honor, there's a proposed steering

17   committee executive committee.  I believe all members are

18   here.  It's on consensus.  They can speak, or we can submit to

19   Your Honor --

20         THE COURT:  What I want to do is obviously I don't

21   need to hear from everybody on your steering committee, but

22   here's what I do want to say.  This is going to take a lot of

23   time.  And anybody who has like lots of obligations and many

24   other pressures and deadlines, you're probably not -- you

25   should not be thinking about being in leadership in this

1    particular case.  For those who work with me know, I am going

2    to push you, I'm going to push you at every phase of this.

3    And I know I have -- sometimes the lawyers grouse at how hard

4    I work them to get through discovery.  But in the end, they

5    thank me, because it's just part of the process you've got to

6    do to get your arms around this issue.  And I think we're

7    reasonably looking at, you know, perhaps millions of

8    documents, and the question is, how do you manage them, how do

9    you get -- and we've got to get to all that.  We've got -- on

10   both sides.  And I know that sometimes I'll have these cases,

11   kickback from parties who are saying discovery is just so

12   burdensome.  Well, the normal calculation we would have, the

13   cost-benefit analysis we're mandated to give in every case,

14   changes fundamentally when you're dealing with thousands of

15   claims of individuals.  I mean, it's just a completely

16   different calculation.

17       So I'm just going to say, everybody, put on your seat

18   belt, we're going to do real discovery here.  I mean, you

19   know, if an appellate court reverses what we do here, it's not

20   going to be because you didn't have access to the information.

21   We're going to get to that.  And where that truth is, I don't

22   know, perhaps none of you fully appreciate where all this

23   goes.  But I assure you that if you don't get the information,

24   we'll never do this as thoughtfully and intelligently as

25   possible.

1    Here's what I want to do.  I want, in the next five days

2    or so, Mr. Rice, I don't -- you know, you and I have known

3    each other for 40 years, I don't have any problem with you

4    being liaison counsel, and I think that's just fine.

5        MR. RICE:  And Mr. Thompson is probably going to be

6    the primary person you're going to be dealing with.  Because

7    taking what you said to heart, I'm in the middle of the opioid

8    case, and we've got over a hundred million pages already, so I

9    appreciate the task.  And we've learned a lot at Motley Rice

10   in the opioid and managing the documents that's going to be

11   translated here.

12       THE COURT:  Of course, you have a lot of other

13   experience.

14     Mr. Thompson, good morning.

15       MR. THOMPSON:  Good morning, Judge.

16       THE COURT:  For full disclosure, we were classmates

17   at Duke together.  He always threw elbows when we played

18   basketball.

19       MR. THOMPSON:  I was hoping you would remember that

20   more fondly.  But you're right.

21     Judge, I am coming off of the transvaginal mesh

22   litigation, and have actually sort of glided for a couple

23   months, so I actually can fill my day with this case, and

24   intend to.

25       THE COURT:  Yeah.  And I think it's going to be, I

1    think, challenging for all the parties.  So what I want in the

2    next five days, if you will get me the resumes and references,

3    what I want to do is I'm going to get on the phone and talk to

4    my colleagues around the country.  I've found that very

5    valuable.  Generally, talking to my colleagues is something we

6    do in the MDL world, particularly our New Orleans judges, who

7    are legendary, and who I frequently consult with, Judge Fallon

8    in particular.

9        How about for the defense side?  Tell me -- Yes, sir.

10           MR. PETROSINELLI:  Your Honor, good morning, my name

11   is Joe Petrosinelli, I'm from the Williams and Connolly firm

12   in Washington, D.C., and I represent two --

13           THE COURT:  Give me the last name again.

14           MR. PETROSINELLI:  P-E-T-R-O-S-I-N-E-L-L-I.

15           THE COURT:  Yes, sir.

16           MR. PETROSINELLI:  And I represent two of the foam

17   manufacturer defendants.

18           THE COURT:  Which are those?

19           MR. PETROSINELLI:  Tyco Fire Products -- we call it

20   Tyco -- and Chemguard.

21       Judge, we've had some discussions amongst the foam

22   manufacturers here.  Let me back up.  I think there are

23   probably, for today's purposes, there are sort of three

24   categories of defendants.  There are foam manufacturers, there

25   are other private company defendants, and there are

1    governmental entities that are defendants in some cases.

2        On behalf of the foam manufacturers, we have gotten

3    together, and I think I speak on behalf of all of them, you

4    know, these cases, when the case -- before the cases got to an

5    MDL, we had been informally coordinating and sort of figured

6    out how to divide the labor.  And what we talked about is

7    having, on behalf of the foam manufacturers, two co-lead

8    counsel.

9            THE COURT:  Who is that?

10           MR. PETROSINELLI:  Would be me and Michael Olsen of

11   Mayer Brown, who represents 3M.

12           THE COURT:  I was --

13           MR. OLSEN:  Mike Olsen from Mayer Brown in Chicago.

14           MR. PETROSINELLI:  And when I say foam manufacturers,

15   Your Honor, I mean the following six companies; Tyco,

16   Chemguard, 3M, National Foam, Buckeye, and Kidde, K-I-D-D-E.

17       And on behalf of those six companies who are the

18   manufacturers of the AFFF foam that's at issue in the

19   litigation, that's what we had in mind in terms of a lead

20   counsel.

21       And then in terms of liaison counsel, Mr. Dukes from

22   Nelson Mullins --

23           MR. DUKES:  Morning, Your Honor.

24           THE COURT:  Morning, Mr. Dukes.

25           MR. PETROSINELLI:  -- Mr. Duffy from Duffy and

1    Young --

2            MR. DUFFY:  Morning, Your Honor.

3            MR. PETROSINELLI:  -- would be our, on behalf of the

4    foam manufacturers, our proposed liaison counsel.

5            THE COURT:  I want y'all to know that for years

6    Mr. Duffy has had himself bumped out of cases because his dad

7    was the judge.  So I have very frankly talked to my dear

8    friend, Judge Duffy, who is now fully retired, about serving

9    in a mediation role in this case, which he gladly was willing

10   to do.  But then Brian appears in the case, bumping out his

11   father.  And his only response to me was, "It was about time,

12   right?"

13           MR. DUFFY:  We'd still be willing to have him serve.

14           THE COURT:  I'm sure you all would.

15           MR. PETROSINELLI:  Your Honor, so with respect to the

16   other categories of defendants, the other --

17           THE COURT:  Tell me about the private company.

18           MR. PETROSINELLI:  So there are other private

19   companies that are defendants in only a small handful of

20   cases, just because of the site specific nature of some of the

21   cases.  For example, I'll just give you one example, in one of

22   the cases, Federal Express is a defendant in only one case.

23           THE COURT:  I saw that.

24           MR. PETROSINELLI:  So I think there are a number of

25   private companies that are defendants in one or two cases, and

1    they'll have to speak for themselves, I suppose, but our

2    thought is they're probably not going to be very active in the

3    common discovery or the overall --

4         THE COURT:  We have to fold them under something.

5    And let me just say this.  We need a lead counsel over

6    everything, just because you've got have the ability for one

7    person from the plaintiff and one from the defendant

8    communicating with each other.  It's just -- and it might be

9    that that person would be the liaison counsel, I mean, that

10   might work.  But we've got to have some overarching person.

11   Because even on issues like, say, the foam manufacturers and

12   the governmental entities, there may be common discovery that

13   needs to be coordinated.  You don't want them doing the same

14   discovery.  So I think it's important that we have a structure

15   so that we can communicate.  And if y'all want to do that

16   as -- I want y'all to think about that but, you know, there

17   will be times where I'm going to want to talk to one plaintiff

18   and one defense counsel about something, and I don't want to

19   create this thing every time we have a communication, to try

20   to solve a problem.

21        MR. PETROSINELLI:  One good thing is just Mr. Rice

22   and Mr. Thompson and Mr. Napoli, we know each other --

23        THE COURT:  I'm sure you do.

24        MR. PETROSINELLI:  -- and have dealt in MDLs,

25   Mr. Thompson mentioned the transvaginal mesh MDL, and I was in

1    that and we had a lot of dealings.  So I think I hope that

2    will make things easier.  But yes, we take your point, Your

3    Honor.

4            THE COURT:  So what I want you to do in the next five

5    days, just recommend to me -- I need resumes as well from you,

6    and with references.  And I want you to just think about some

7    overarching organization so that we'll have that one contact

8    point.  And it may well be Mr. Thompson for the plaintiffs,

9    and that might fit the profile of, you know, the role

10   between -- you know, some MDLs, the liaison and the leader are

11   the same person, they perform that same role.

12       So but I think we need to designate something so that we

13   can quickly address issues that come up, and mostly logistical

14   issues.  And somebody has to control central discovery on each

15   side so we don't have, you know, 20 people trying to depose

16   the same person.

17           MR. PETROSINELLI:  Absolutely, Your Honor.  One other

18   thing I should mention, just so you have this complication in

19   mind, or just fact in mind, on the governmental entities, some

20   of them are plaintiffs and defendants.  So --

21           THE COURT:  Yeah, well, help me.  I know that some of

22   them are these water systems, and they have claims, but I

23   would imagine some of those water systems could be defendants

24   in individual claims.

25           MR. PETROSINELLI:  Yes, that's exactly right.

1          THE COURT:  And the United States is a party?

2          MR. PETROSINELLI:  In one of the cases.

3          THE COURT:  In one of the cases.

4          MR. PETROSINELLI:  Then, for example, the State of

5    New York, they brought a case as a plaintiff, and they're a

6    defendant.

7          THE COURT:  Is anyone here speaking on behalf of the

8    governmental entities?

9          MR. CHAUDHURY:  Yes, Your Honor, Arastu Chaudhury

10   from the U.S. Attorney's office in the Southern District of

11   New York.

12         THE COURT:  Give me your name again.

13         MR. CHAUDHURY:  Arastu Chaudhury.  Last name is

14   C-H-A-U-D-H-U-R-Y.

15         THE COURT:  Thank you.

16         MR. CHAUDHURY:  Good morning, Your Honor.  I'm

17   speaking on behalf the United States and federal defendants in

18   the City of Newburgh case.  We have filed a motion to sever,

19   but that is before Your Honor.

20         THE COURT:  I wouldn't hold my breath on that one.

21         MR. CHAUDHURY:  Understood, Your Honor.  Hope springs

22   internal.  But we have spoken with the other defendants in the

23   Newburgh action, both the nonmanufacturer private defendants

24   as well as the state entities and the city entities.  And we

25   have certain peculiar problems, both arising from the fact

1    that some of our -- some of the parties are on both sides of

2    the V, as well as for the government in particular, the fact

3    that we are in this case, but then much of the discovery we

4    expect to be actually directed to different entities than are

5    defendants in the City of Newburgh action.

6         So speaking on behalf of them, I guess at this earliest

7    stage, the only thought we really want to put in Your Honor's

8    head is that given the discrete and very specific issues that

9    arise for the governmental entities, and our particular case

10   up in Newburgh, New York, we'd like to keep in mind the idea

11   of maintaining some degree of carve out for those entities.

12        THE COURT:  Listen, I will work with you, and I

13   recognize -- It may well be that we'll discover some of the

14   water system issues have great commonality with others, some

15   who have not even arrived yet.  And we'll want to coordinate

16   that.  But I'm fully prepared to be hands on here.  And if

17   we've got to do specific issues which need attention for the

18   City of Newburgh case alone, I'll give you that attention,

19   we'll address that.  Obviously that's the kind of stuff I do

20   every day, manage civil litigation.  So that's not a

21   particularly complicated thing.

22        Just so you'll know, I'm going to have monthly status

23   conferences, and we'll do that as long as it's useful.  But I

24   find it very useful, it keeps everything moving, keeps me on

25   top of things, it affords folks, where there are discovery

1    disputes, to have a ready mechanism to address them.  And so

2    say the City of Newburgh has specific issues it would like my

3    attention, we'll arrange that after one of those status

4    conferences.  We'll keep you moving.  We're going to, you

5    know, we're going to keep the process moving.  The design of

6    this is that if the parties seek to try their case and return

7    home to do it, they get to do that, right?  I mean, I'm not

8    the trial judge for that.  But there may be, God forbid, some

9    group settlement here.  And to the extent we can facilitate

10   that, we're probably, you know, making sense.  If there's some

11   common solution, it may be -- you're talking about carving

12   out, there may be discrete issues we can carve out and

13   resolve, and leave the more complicated issues for further

14   discovery.  I mean, I think those are all things that I want

15   to get into once we have our lead counsel on both sides

16   designated, our leadership designated and everyone is sort of

17   thinking about those kinds of issues, I want to address those.

18       So yes, I've got a feeling there's going to be a lot of

19   issues where they will be discrete to you, we'll help you

20   facilitate that.

21       I don't think this MDL is going to be any nightmare for

22   you, I think you'll actually get resources and information,

23   and it will be labor saving in some ways to get the benefit of

24   all this talent being thrown at these issues.

25       Has anyone sued the United States for its role in using

1    the AFFF product?

2            MR. KNAUF:  In the City of Newburgh case.  Your

3    Honor, I'm Alan Knauf from Knauf Shaw in Rochester.  We

4    represent City of Newburgh, and we have sued the United States

5    for their use, the Air Force and other agencies, for use of

6    AFFF on the Stewart Air Force base as well as the Stewart

7    Airport.

8            THE COURT:  And are there other cases in which the

9    United States has yet been named as a defendant?

10           MR. KNAUF:  We have the only one, I believe.

11           MR. CHAUDHURY:  Not yet, Your Honor.

12           THE COURT:  Not yet may be the operative term.

13           MR. STAGG:  Your Honor, Tom Stagg representing the

14   County of Suffolk, New York.  We recently filed a lawsuit

15   against the United States government in connection --

16           THE COURT:  And, Mr. Thompson, are y'all anticipating

17   there will be more cases where the United States may end up

18   being a party?

19           MR. THOMPSON:  Your Honor, the EPA issued an action

20   plan a week ago.

21           THE COURT:  I read it.

22           MR. THOMPSON:  February 14th.  My experience with

23   publicity is that we need to form the bones of a good

24   structure, because we will have other cases filed into the --

25           THE COURT:  You don't think that New York Times

1    article had anything to do with it.

2            MR. THOMPSON:  I think we all need to have the

3    helmets on and a good structure, because there will be new

4    cases, and I believe that there will be a variety of

5    defendants, which will include the federal government.

6        Now, certainly discovery, and it's no surprise that the

7    government contractor defense will be one of the issues in

8    this case.  And so certainly there's going to be discovery

9    conducted into the federal government, and it wouldn't be the

10   worst thing in the world for me for them to be a party, as

11   opposed a FOIA type request.

12           THE COURT:  You have a right even under certain

13   circumstances, just because -- even nonparties do discovery

14   that's relevant to the case.

15           MR. THOMPSON:  Judge, I understand the right as

16   opposed -- but the practicality of it is a little bit --

17           THE COURT:  I gotcha.  We're going to -- as I tell

18   you, we're going to have robust discovery here, we're not

19   going to have privileged characters.  And obviously there are

20   literally privileges, but to the extent that those aren't

21   applicable, there are a lot of facts we need to know.  So I

22   anticipate this, and I am glad that counsel for the plaintiffs

23   have already anticipated what may be a, you know, a sudden

24   rise in the number of cases.

25       Let me just say this, folks.  And I'm going to -- I'm

1    talking here to the folks on the plaintiffs' side.

2        I was disappointed with the large number of plaintiffs,

3    named plaintiffs, identified plaintiffs in the Lipitor

4    litigation who ended up could not fill out a fact sheet,

5    mainly because they had no claim.  So the basic information --

6    it wasn't onerous -- they couldn't do it.  Please filter your

7    cases.  Okay?  Just exercise -- don't make it a race to the

8    courthouse where everybody whose name is slapped down.  Use

9    some, you know, real judgment and screening, so that --

10   because I'm going to warn you right now, we're going to have

11   plaintiff and defense fact sheets early, and we're going to

12   sort out -- we need to figure out the nature of these claims

13   and the basic factual basis of it.  And I just don't want a

14   bunch of people's names on a list who we then -- because I was

15   like every week dismissing parties simply because they had not

16   filled out the plaintiff fact sheet.  And I kept giving them

17   extra opportunities.  And I finally issued orders that said

18   I'm dismissing without prejudice with leave to restore if you

19   submit a fact sheet.  I don't think one person did.  Not one.

20   It was really -- and, you know, and I didn't find my

21   plaintiffs, the leadership, really objecting, because they

22   felt as burdened as the defendants did to it, that they were

23   having these people without real claims.

24       So, you know, I say to all of you, screen your cases.

25   Because early on, you're going to have a plaintiff fact sheet

```
 1    that is going to have to put out basic information.  And
 2    that's going to be important.  And I'm going to require the
 3    defendants' basic information.  I'm going to -- what products
 4    they use and so forth, so we can all, from the start, kind of
 5    have a foundational information about, you know, what are the
 6    facts literally on the ground, right?  What are those facts.
 7    And I think that's an important part of managing.
 8         Thank you, sir.
 9         MR. CHAUDHURY:  One thing, Your Honor.  I just wanted
10    to -- with respect to what defense counsel has said about the
11    three different groups, the -- because the United States is in
12    a particularly unique position -- or not necessarily unique,
13    but is a sovereign along with some other sovereigns that have
14    been named as defendants, and are, as we've heard, going to be
15    subject to requests at the very least.  The government
16    can't -- it's difficult for us to accede to being part of
17    having someone represent us in the form of liaison counsel
18    or --
19         THE COURT:  That is absolutely fine.  And it may well
20    be that the United States will just be -- I mean, you need to
21    be on the steering committee, because we need to coordinate,
22    and you need to be subject to a lead counsel's control
23    regarding discovery.  We've just got to do that.  And there's
24    a problem with that; that is, you want to do discovery someone
25    else won't let you do, I'll deal with that.  Okay?  But I've
```

1    got to have -- I can't have the United States scheduling a

2    deposition of somebody, and it's already scheduled for others,

3    and you want to do it at a different time.  We've got to have

4    some central control of this, or we have chaos.

5          MR. CHAUDHURY:  Understood, Your Honor.

6          THE COURT:  But I assure you that any decision -- I'm

7    not having you accede your sovereignty, but I'm going to have

8    you coordinate, and if there's a problem, you need to come to

9    me and not act unilaterally.  Because there's got to be

10    someone in charge.  Ultimately that's me, but frankly, it

11    needs to be as much as we can down with the folks litigating

12    the case and not the Court, if we can do that.  Just

13    otherwise -- and, you know, it doesn't take rocket science to

14    figure this out.  You know, there might be 60 people that

15    everybody needs their information, and we're not going to have

16    that person deposed ten times.

17          MR. CHAUDHURY:  Understood, Your Honor.  And seeing

18    where things are, we suspect we may be that entity that's

19    getting --

20          THE COURT:  You might be.  You might be the recipient

21    of this, but that's okay.

22          MR. CHAUDHURY:  We're all for coordination.

23          THE COURT:  I haven't heard anybody object to having

24    to come to Charleston.  Does anybody object to that?

25          MR. RICE:  I think the status conferences should be

1    Friday afternoon and Monday morning.

2         THE COURT:  Well, you notice it is -- we're doing it

3    here on a Monday.  Is that a good day to do it?  I mean, I

4    thought it would be kind of good because you get -- sometimes

5    we do it on a Friday and people come in because they like to

6    come for the weekend.  That's another thing I got from my

7    counsel, they like coming in.  But is there any particular day

8    of the week that's preferrable?

9         MR. RICE:  My co-leads are suggesting Friday may be

10   better.  I think their wives want to come to Charleston for

11   the weekend.

12        THE COURT:  I would look out at my MDLs, I've done a

13   variety of collective actions, and I notice after awhile,

14   particularly when the weather was nice, I'd see spouses

15   sitting there.  And they come to find out exactly what their

16   spouses were doing in Charleston.

17      But let me talk a little something about practices that I

18   think are helpful.

19        MR. RICE:  Your Honor?

20        THE COURT:  Yes.

21        MR. RICE:  Before we leave the U.S., can we make a

22   request?  I'm assuming that DOJ is going to be involved in

23   Touhy requests and things of that nature.  It would be very

24   helpful if DOJ designated one person to deal with this

25   litigation, instead of us having to deal with a different DOJ

1    person for each agency that may come up?

2              THE COURT:  Is there a DOJ rep?  I know you're from

3    the Southern District of New York and you have the City of

4    Newburgh; do we have somebody from DOJ?

5              MS. WILLIAMS:  Yes, Your Honor, Sarah Williams, good

6    morning.  I'm hear from DOJ's civil division.

7              THE COURT:  Well, I do think that it looks like,

8    Miss Williams, we're going to have a number of cases in which

9    the Government may end up being a party, and -- Surprise.  And

10   I do think we're going to need coordination with that, for the

11   same reasons I was just discussing.  And also, that to the

12   extent there are issues about discovery, to have some central

13   coordination of that so we don't have everybody in individual

14   cases popping up.  And DOJ is obviously the logical sort of

15   central point of that.

16             MS. WILLIAMS:  Yes, Your Honor.  I certainly hope

17   your prediction is incorrect, but I am happy to work as the

18   coordinator.

19             THE COURT:  I look out here and I think I'm

20   absolutely right.

21        Let me talk to you also about what I found to be a very

22   helpful structure.  Let's say we're doing Fridays -- and I

23   think Fridays are, you know, often a good day to do it.

24   Mondays also have their benefit.  And we may have to change a

25   little bit based upon, frankly, my schedule as well, or when I

1   can do it.

2       But I think as a practice, you should plan that your

3   leadership on both sides should plan to meet together and try

4   to work out issues.  So again, my Lipitor MDL, we would do it

5   on Fridays, but on Thursdays the lead plaintiffs and defense

6   counsel would meet and try to work out issues.  When we have

7   issues in dispute, rather than brief it and all this back and

8   forth, we had both sides write a relatively short letter to me

9   on each side, just letter objections laying out the basic

10  issues.  I don't need more than that usually; if I do, I'll

11  let you know.  But it was adequate, and it gave me an

12  opportunity -- I didn't want to burden counsel to writing full

13  bore briefs on every issue.  A one- or two-page letter was

14  usually sufficient.  Sometimes it went three pages on a

15  particularly complicated issue.  And then if we needed more, I

16  would get lawyers on the phone sometimes when I had questions.

17  Usually we were able to resolve -- if it wasn't -- many of

18  those, we had letters submitted, and it was resolved by the

19  day before, they came in and said we've worked that out.  I

20  think that's great.

21      Sometimes -- I've told them that sometimes things can't

22  wait.  We're literally -- it's stopping the litigation, some

23  discovery issue's just stopping everybody in their tracks.

24  And if we get in that situation where we don't want to wait to

25  the next status conference, you can provide letters, and we'll

 1    have a telephone conference to address it.  The key is we want

 2    to keep things moving.  And I don't want to learn everything

 3    stopped because everybody was waiting for the next status

 4    conference.  I don't want that to happen.

 5         Let me tell you another thing we did, and it's a little

 6    unorthodox, I will confess, but it seemed to have a salutary

 7    effect.  I was having a lot of fussing back and forth between

 8    counsel.  And I was explaining to them that in Charleston we

 9    don't tend to do a lot of that, you know, particularly in

10    front of the judge.  And I said that what I would recommend

11    that they, when they're all in town working, like before the

12    status conferences, that they would alternate having a

13    cocktail party, and invite the other side.  And the only rule

14    was you can't talk about the case.  And my clerks and I came,

15    when I could, we came to them.  And we heard a lot about

16    summer camps and baseball teams and all kinds of things.  And,

17    you know, I noticed a lot less fussing in front of me.  People

18    knowing each other, being civil to each other, enjoying each

19    other's company helped resolve issues.  There's going to be

20    issues of disagreement, let's face it, that's just the nature

21    of the beast.  But so I'm not ordering y'all to do that, but

22    if you do it, I will -- and I'm available, I will come, okay?

23    And I want to urge y'all to think about doing that, because I

24    think it's also a way of getting -- of building personal

25    relationships that will help solve the difficult issues that

1    we will undoubtedly address.

2        How many water system cases do we have now?  How many do

3    we -- of those 80 some odd cases?  Do we have any idea?

4            MR. PETROSINELLI:  Your Honor, I think about a dozen.

5            THE COURT:  About a dozen right now?  Are there more

6    likely coming?

7            MR. RICE:  Yeah.  This is Roe Frazer.

8            MR. FRAZER:  More likely coming, Your Honor.  My

9    client is American Water Company, which has one filed so far

10   on --

11           THE COURT:  And you're in multiple locations?

12           MR. FRAZER:  Forty-seven states, Your Honor.

13           THE COURT:  Okay.  And how was -- just very briefly,

14   how does the water system identify that it has contamination?

15   Is there a test that it runs?

16           MR. FRAZER:  Yes, Your Honor.

17           THE COURT:  And is the test reliable?

18           MR. FRAZER:  It is.  And it varies from state to

19   state, because some states don't regulate these chemicals.

20   And our client's in New Jersey, where these chemicals are

21   regulated, so there's regulatory requirements, so there's

22   historical testing.

23           THE COURT:  Yes.  And how difficult, if you had to do

24   your own testing, how onerous is that?

25           MR. FRAZER:  It's expensive but not onerous.

1          THE COURT:  Okay.  And how about -- I notice in the

2     recent EPA filing it talked about certain remedial steps, two

3     of which they identified as being 100 percent effective.  How

4     costly are those methods?

5          MR. FRAZER:  They're very costly.  And my client in

6     particular has done remediation at some of its water treatment

7     facilities for various reasons, state regulatory.  You'll like

8     this one; in Kentucky they wanted to make sure the bourbon is

9     pure.

10          THE COURT:  Yeah, you can't imagine that.  The heck

11     with the water, right?

12          MR. FRAZER:  Everybody benefits from that filtration.

13     But yes, Your Honor, it's very expensive.  And it varies

14     depending on a lot of issues, because remediation often

15     requires additional real property, and if it's not within the

16     confines of the plant, now you have that issue popping up.

17     And it also -- some of the remediation may require just

18     shutting down a particular well that you're drawing from, and

19     having to --

20          THE COURT:  I saw one or more places they actually

21     had to change the municipality's water supply, right?

22          MR. FRAZER:  Yes, Your Honor.  So it's a very

23     interesting issue for water providers.  I expect there are

24     going to be a lot more water provider cases filed.

25          THE COURT:  And what is the science?  I know EPA is

1    now designating levels where it should be safe and there's

2    some controversy whether that's low enough or whatever.  Are

3    there studies out there on the human effects of these

4    chemicals?

5            MR. FRAZER:  Yes, Your Honor, there are.

6            THE COURT:  Peer reviewed?

7            MR. FRAZER:  We haven't been real concerned as a

8    water provider.

9            THE COURT:  Yes.  How about someone else.  Are there

10    out there, peer reviewed --

11            MR. FRAZER:  Personal injury lawyers --

12            THE COURT:  Yeah.  It's also going to be relevant to

13    the issue of medical monitoring as well, you know, what is the

14    potential exposure to health.

15            MR. NAPOLI:  There's been a number of studies and

16    ongoing studies.  So the first big study was out of the Ohio-

17    West Virginia case in front of Judge Sargus, it's known as the

18    C8 study.

19            THE COURT:  What is it called?

20            MR. NAPOLI:  The C8 study.  The letter C eight study.

21    You could actually find it, there's a web site where the C8

22    study is located, and that was jointly picked between the

23    plaintiff and the defendant duPont, picking experts --

24            THE COURT:  That was a manufacturing facility?

25            MR. NAPOLI:  That was a manufacturing facility, yes,

1    but it's the same product.

2              THE COURT:  I got it.  I understand that.

3              MR. NAPOLI:  There were also subsequent earlier

4    studies by 3M and some of the other defendants, animal

5    studies, there were some worker studies over time, there's

6    been some studies out of Europe, it's been banned in Europe.

7    There's been additional studies here in the United States.

8    But on a limited basis.  Because obviously, unlike a drug,

9    you're not going to have a controlled study where you're

10   feeding chemicals to individuals.

11        So right now the U.S. government is in the process of, at

12   11 -- I think 11 sites, ten or 11 sites where there are Air

13   Force bases, doing studies of individuals, testing their blood

14   and trying to see if they can replicate what they saw in the

15   C8 study out of West Virginia.  One of the -- that's on the

16   federal level.

17        On the state level there's also some studies.  In New York

18   State, the governor has required blood testing at Stewart Air

19   Force base, which is Newburgh; in Westhampton, which is

20   Gabreski Airport, and several other sites.  And also Hoosick

21   Falls, which is a manufacturing site that did not make it to

22   Your Honor, that's in front of Judge Kahn, Federal District

23   Court Judge in the Northern District of New York.

24             THE COURT:  What's the nature of that case?

25             MR. NAPOLI:  So that is a plant, that was a Honeywell

1    plant that was purchased by St. Gobain, and there was aeration

2    at this plant, and also water contamination.  Some believe,

3    some scientists believe it was not only from the aeration

4    landing on the ground, but also from releases from the plant

5    itself.  And it's a PFOS case.  It was not transferred here,

6    since this strictly is an AFFF case.  But I think you're going

7    to see a lot of the same issues, Your Honor.  Because, for

8    example, in our case, the City of Dayton case, which has 180

9    wells, 15 which were taken out of service; in Ohio you have

10   the Wright Patterson Air Force base that has contributed AFFF

11   to the aquifer, but you also have a large area of industry

12   that was using PFOA and PFOS as part of the industrial

13   processes.  So you're going to have overlap in the Colorado

14   case, Your Honor, where you've seen a large number of

15   individuals file a case, you had the Peterson Air Force base

16   with the AFFF foam, the Colorado airport, which was a private

17   facility that also used the firefighting foam.

18         THE COURT:  Then you have industry.

19         MR. NAPOLI:  And you had industry.  And the

20   defendants in that case actually pointed to industry as the

21   cause, as opposed to them, or at least a contributing factor.

22         THE COURT:  That was what a good defendant's supposed

23   to do, right?

24         MR. NAPOLI:  I don't blame them, but I just want to

25   tell you that's where the overlap lies.

1          And just -- I know Your Honor is concerned -- as

2     individuals, we went pretty far in Colorado, Your Honor, we

3     had a class certification hearing the day before the JPML

4     panel heard argument, and the judge withheld decision.  He

5     wanted to have some additional expert testimony.  But withheld

6     decision at the class certification trial, pending the JPML's

7     decision.  So now the case is here, but class discovery was

8     complete at that time.

9          THE COURT:  And what's the nature of the class

10    proposed?

11         MR. NAPOLI:  So that is those people in the three

12    water districts.  And there's a definition that's been refined

13    through discovery.  There were three water districts,

14    Fountain, Security and Widefield, where people were exposed.

15    And there was -- the expert --

16         THE COURT:  Is it a medical monitoring --

17         MR. NAPOLI:  It was a medical monitoring, and there

18    were some, I would say advisory opinions from the judge that

19    he was about to certify a class, waiting for the JPML to make

20    a decision.  And the individuals were filed in that case

21    because the statute of limitations required, under Colorado

22    law, that there be a filing.  Those individual plaintiff cases

23    were stipulated between the plaintiffs and defendants to stay

24    those cases pending Judge Jackson's determination on medical

25    monitoring.

1          There are other personal injury cases in Westhampton and

2     Newburgh and in other areas, in Spokane, Washington, that are

3     pending now and are not stayed by consent of either party.  We

4     haven't discussed it.  We were just doing the medical

5     monitoring cases first; it seemed the logical progression.

6          THE COURT:  And the medical monitoring cases, you

7     have the evidence as you've articulated here about general

8     causation, and I take it on the basis of that, you seek

9     medical monitoring.  Is that basically the reasoning?

10          MR. NAPOLI:  That is correct, Your Honor.  Based upon

11     the studies we've seen, the fact that most of these people who

12     have been tested have had PFOA and PFOS in their blood at

13     greater levels than have been found --

14          THE COURT:  You demonstrated that in -- You had

15     samples that showed that?

16          MR. NAPOLI:  We took 300 -- about 300 individual

17     blood tests, and we had experts review the blood testing in

18     Colorado Springs.  That was one of the things our experts

19     relied on.  Subsequently, the Colorado School of Mines did a

20     study funded by the U.S. government -- I believe the U.S.

21     government funded it -- and they tested about 200 individuals,

22     and they found exactly what we found, elevated levels of PFOA

23     and PFOS in these people's blood to a level of concern.

24          THE COURT:  And then if you have that information,

25     and let's say you have the medical monitoring conducted, what

1    then, if there are elevated levels?  Where does it go from

2    there, as you view it?

3            MR. NAPOLI:  So we had a medical monitoring expert in

4    Colorado, and a plan that we laid out.  And that was one of

5    the things that the judge wanted to hear some additional

6    testimony on, it's -- the question was to what extent, of

7    those six injuries that the C8 study found to be connected to

8    the ingestion of these chemicals, to what extent is monitoring

9    required; is it a yearly blood test, an x-ray, a physical.

10   And that was where we were with Judge Jackson before the JPML

11   sent us here.  So we were trying to figure out what is that

12   logical -- that logical conclusion, how far do we take it out?

13   Is it a year, is it a single physical test, what if the

14   findings --

15           THE COURT:  Let's assume for just a moment that it's

16   elevated in a level considered medically significant.  What

17   then?  What is the consequence of that?  Are there personal

18   injury claims arising from that or what?  Where do you view

19   that going?

20           MR. NAPOLI:  So we view that as going to additional

21   surveillance and treatment.

22           THE COURT:  Okay.

23           MR. PETROSINELLI:  Did you want to hear our

24   perspective?

25           THE COURT:  I would very much like to hear your

1    perspective.  That was my next question.

2        MR. PETROSINELLI:  Just a couple comments, and

3    Mr. Olsen could add what he likes.  I think you hit on, of

4    course, one issue that's going to be key in litigation, and

5    that is general causation.  It might not surprise you to know

6    that we -- and again, I speak on behalf of the foam

7    manufacturers -- we think there's no reliable evidence of

8    adverse effects of these chemicals in humans, at least at the

9    level that humans are reasonably exposed to.  And so that

10    whole science piece is going to be one big part of the case.

11        Just to give you one example, Mr. Napoli referred to the

12    C8 panel that was put together in connection with the other

13    litigation.  That panel looked at a whole panoply of alleged

14    health effects, and found most all of them had absolutely no

15    link to these chemicals.  They found six out of dozens that

16    there was a, quote unquote, "probable link."  And without

17    getting into the details of that, just to show you that that

18    is going to be a huge issue in the case.

19        I think that the other issue is with respect to the water

20    districts, and some of the plaintiff claims, as Mr. Napoli

21    noted, these chemicals, that is, PFOA and PFOS, they aren't

22    just produced by AFFF, they're used -- have been used

23    historically in all sorts of products.  And so, you know,

24    nonstick cookware and -- because of their fire-retardant

25    properties -- food packaging and the like.  So to the extent

1    that a water district finds levels of --

2            THE COURT:  Then you have to figure out who's

3    responsible.

4            MR. PETROSINELLI:  Exactly.  And then you have, on

5    the issue of the Bell case in Colorado, we did have class

6    certification proceedings, discovery and so on.  We did have a

7    hearing that I was at, and at that hearing the judge said he

8    was not inclined to certify a property damage class, and he

9    wanted to hear more about a proposed medical monitoring class.

10   And obviously we have reasons why we think these claims are

11   not susceptible to class treatment.  So there's all of that.

12       And then you have the overlay of the government contractor

13   defense that Mr. Rice had mentioned.  I would say, Your Honor,

14   about -- of the cases currently in the MDL, somewhere around

15   80 to 90 percent of them involve alleged contamination coming

16   from military facilities or FAA-approved airports.  And with

17   respect to those cases, which again, the vast majority of what

18   you currently have before you, the foam manufacturers have a

19   government contractor defense, which is an absolute immunity

20   to claims.

21       We're looking at some of the Fourth Circuit law on this.

22   The Fourth Circuit has actually a lot of case law on this

23   because there are a lot of government contractors within the

24   Fourth Circuit.  And so that turns on the issue of not only

25   did the government specify how these foams were supposed to be

1    produced, and we say they did, there's a so-called mill spec

2    for AFFF foam where the government says here's what you need

3    to produce for us.

4        But also, the sort of key element is did the contractor

5    warn the government of hazards that it knew about and that the

6    government didn't know about.  And you can see from that, that

7    the discovery into -- the plaintiffs surely are going to want

8    discovery into what the foam manufacturers knew along the

9    timeline.  Remember, you're talking about a 50-year timeline,

10   these foams have been in use for 50 years.

11            THE COURT:  Right.

12            MR. PETROSINELLI:  What the contractors and the

13   manufacturers knew about certain alleged hazards.  And then,

14   what we just talked about, with the government, the discovery

15   of the U.S. will, in part, focus on what did the government

16   know about these alleged hazards, because the government was

17   involved in actually designing the foam in the 1960s.

18       And so those issues are what I would call common issues,

19   meaning they would cut across the water district cases, the

20   personal injury cases, the putative class cases, every case

21   that Your Honor has before you, in some shape or form.

22            THE COURT:  Does it make sense -- and I want

23   everybody to get organized -- is that perhaps one of those

24   issues we want to address early, is to get discovery on those

25   issues so that we sort of sort out the scope of

1    responsibility, who is potentially responsible.

2            MR. PETROSINELLI:  That was exactly our thought in

3    terms of the foam manufacturers, that there would be -- I

4    mean, after all, we have an MDL, and I think the JPML sent it

5    here because there are common discovery issues.  And our

6    thought is that there would be a period, and obviously we

7    could talk about what time that would span, but there would be

8    a period of what I would call common discovery into issues

9    about the company discovery, the defendants, and what they

10   knew with the foams and their shipment records and so on; the

11   federal government, in terms of what the government knew; and

12   the science issues.  While at the same time, to Your Honor's

13   point, on the plaintiffs' side we'd have fact sheets where we

14   could find out -- because remember, Judge, many of these cases

15   were at basically their earliest stages when they got

16   transferred.

17           THE COURT:  I get that.  And what I'm trying to do on

18   both sides here is to give everybody enough sort of basic

19   information.

20       Mr. Thompson, what's your thought about getting into this

21   government contractor issue early?

22           MR. THOMPSON:  Judge, as I stand before you, I don't

23   have any authority to speak on behalf of anybody, so I have a

24   personal opinion.

25           THE COURT:  Okay.

1              MR. THOMPSON:  My personal opinion is that every time

2    I've ever been in a case where there has been an effort to

3    truncate and limit discovery because there's some overwhelming

4    issue, it has not worked out well.  It seems to me --

5              THE COURT:  Because everybody fusses about what is

6    relevant to that issue?

7              MR. THOMPSON:  If we let the rules and let the

8    discovery progress, and certainly we're going to recognize

9    this is an very important issue --

10             THE COURT:  No matter how we organize discovery, one

11   of the things, once y'all get organized, you're going to talk

12   among yourselves about this, is that no matter how we do it,

13   fairly early on we're going to need to address this issue.  I

14   mean, we're not going to have it years down the road,

15   because -- but you need basic information, it seems to me.

16   And what I don't want to get into, and I've had this

17   experience not in MDLs, but in other cases where someone

18   persuades me to limit, and then everybody is arguing what the

19   limit is, because it's not clear.  One side views a much

20   broader view of what is discoverable than the other, and they

21   spend all their time in depositions fighting over what they

22   can ask.  And I find that pretty nonproductive, you know, to

23   get that.

24        But on the other hand, we're going to have to -- one of

25   the things I want y'all to organize so you can talk among

1    yourselves, and you may reach a consensus about how all this

2    works out.  But if it isn't, I'm more than happy to set a

3    discovery plan that addresses how we do this.

4        So I've not had a government contractor immunity defense

5    before; that's not an issue I've ever addressed.  Are there

6    exceptions to it?

7            MR. THOMPSON:  Your Honor, the short answer is yes.

8    The long answer is yes.  It's an issue that I hesitate to

9    paint a picture on the wall today.  It's an issue that I

10   believe that we should organize, that to the extent that we

11   all need to be educated on it, that we have a sort of a more

12   formal setting than me speaking off the cuff.

13           THE COURT:  And I agree with that.  And we, early on,

14   if we have a dispute, we'll brief it, we'll just sort of sort

15   all that out.  But what I don't want to do is -- I want to

16   avoid two things.  One thing is that we go off doing massive

17   discovery, and if we had just answered a question early, a lot

18   of it would have been unnecessary, at least as to certain

19   parties.  I don't want to do that.  On the other hand, I don't

20   want interminable objections that somehow there's a line, and

21   one side can't get what they believe relevant information,

22   because the other side is objecting because of my ruling that

23   we're addressing this.  So we've got to find a middle ground

24   somehow where we get robust discovery on all issues

25   potentially relevant to it, but that we don't kick this thing

1    down the -- the can down the road for a protracted period of

2    time, when it may have a very significant impact on the shape

3    of the litigation.

4             MR. THOMPSON:  Judge, one of the things that I wanted

5    to make as a chart today was a diagram of the organic

6    chemical, the symbol for the fluorinated chemical that deals

7    with this.  And I was going to tell you that this is the

8    reason that I'm a lawyer today, was that when we turned the

9    page in the chemistry book from physical chemistry, which I

10   understood, and I loved it, to organic chemistry, all of a

11   sudden I didn't --

12            THE COURT:  That's a line between a law student and a

13   medical student, right?

14            MR. THOMPSON:  So this is an area that probably at an

15   early point I would suggest that perhaps some scientific

16   background would be helpful.

17            THE COURT:  Yeah, let me say this.  Number one, I

18   will read what you give me in terms of I'm interested in any

19   peer-reviewed studies, academic studies on this, this C8

20   study, if somebody wants to provide me that, I'm glad to look

21   at material.  Don't give me 12,000 articles.  But, you know,

22   if each side wanted to give me, say ten each, I will read

23   them.

24        I have done science days before, and I'll tell you how I

25   structured science days.  I have each side -- it happened in

those cases to be a sort of discrete issue.  I said you're

going to have one person speak, one expert, not a lawyer.  In

all those instances were academics.  They're going to come in

and they're going to explain to me the science.  No

cross-examination, no record from the lawyers.  I do keep a

record, because I go back and read it because it helps me

understand it.  And I ask questions, but the lawyers don't ask

questions, don't cross-examine the witness.  I mean, I found

that to be helpful.  And generally the lawyers have been

astute enough to bring in people who actually speak English in

a way that -- rather than scientific technology and don't

speak in abbreviations that I can't understand, and explained

to me the basic science here.

     But I'm already aware, as I'm hearing this, and I've read

enough myself, that there's -- that's why I was asking the

question, what is the consequences of having elevated

chemicals in the blood serum, I mean, what is that

consequence?  And do these medical monitoring cases go beyond

to personal injury cases, at what point does -- because I

understand we have personal injury cases.  Am I right about

that?

          MR. PETROSINELLI:  Yes, Your Honor.

          THE COURT:  Yeah, we have personal injury, we have

property damage case, we have -- and all those are like

different kinds of evidence.  But it seems to me that general

1    causation is going to be contested.  That is an area where we

2    might want to get to initially.  Again, I'm not trying to cut

3    things off, but we need to kind of get -- if there's no

4    general causation, specific causation as to individual

5    parties, get -- it's obviously not particularly relevant, if

6    you can't prove it causes general injury.  If you can prove

7    it, then we're now to the next level is what's the consequence

8    of that, right?  That's what we need to do.

9             MR. FRAZER:  I just add one thing that I'm always

10   mindful of, when I hear a defense lawyer speak about certain

11   things, we need to make sure we're on the record in response.

12   But I don't mean to burden it, but I think Your Honor

13   recognizes that for water systems, the government contractor

14   defense may be in a different light than in a personal

15   injury --

16            THE COURT:  And also the degree of -- and how -- what

17   is an injury to a water system is different than an injury to

18   a human.

19            MR. FRAZER:  Yes, Your Honor, if we're under a

20   regulatory pressure that says --

21            THE COURT:  You can't have it.

22            MR. FRAZER:  -- you can't have sugar in your water,

23   then the sugar has to come out, and whoever put the sugar in

24   there is responsible for it.

25            THE COURT:  I get all that, and we'll need to sort

1    through that.  And I do think when you structure your

2    leadership committee, you're probably going to end up having

3    people on some of these discrete issues sort of running the

4    show as to those issues, because they are different.  They're

5    just different.  And there will be some general overlap on

6    general causation and consequences, I mean, that informs

7    your -- and how it got there is going to be pretty darn

8    relevant to what y'all are doing.  And I mean, we're fully

9    aware there are multiple ways in which this chemical can get

10   into the ground and into the groundwater.

11            MR. FRAZER:  And, Your Honor, we have, in New Jersey,

12   the case that we filed so far, there's the New Jersey spill

13   out, which is a strict liability cause of action, contribution

14   statute in its essence really.  And I don't know if those

15   exist from state to state to state, because New Jersey is all

16   we've looked at.  So those kind of issues are --

17            THE COURT:  Let me tell you something, choice of law

18   issues are really going to be important in sorting this out.

19   And, you know, we're going to eventually, both sides are going

20   to be going state by state on some of these issues as they're

21   not -- you know, they're not uniform.  And there will be

22   different statutes of limitations and legal standards, having

23   to prove negligence versus -- or other claims versus strict

24   liability statutes, we've just got to have to take our time

25   and sort through all this.

1      Yes, sir.

2           MR. NAPOLI:  And, Your Honor, the regulations are

3    changing.  The Federal Government is anticipating having some

4    regulations, and currently there's only a health advisory

5    limit.  But there will be an MCL.

6      Just one thing I want to point out about the government

7    contractor defense.  Your Honor, it changes over time.  There

8    is a time component to what the manufacturers told the

9    government, what they've told end users.  But also, I don't

10   want it to get away, AFFF foam was not sold or used at an Air

11   Force base, it was also used in civil aviation.  It was also

12   used by local fire departments to put out car fires and truck

13   fires.  It was used at fire training facilities that many

14   counties and states have.  For example, the case that Motley

15   Rice and we are on together, is the case of the Town of

16   Farmingdale in New York, and the Nassau County Fire Training

17   Center used the firefighting foam.  They were not -- it was --

18   the government contractor defense wouldn't apply there, and

19   that is what contaminated the wells in the Town of

20   Farmingdale.

21           THE COURT:  See, here's my thinking about that.  Do

22   not take anything I say about the government contractor

23   defense, because I'm the first to say I've never had that

24   issue, we've got to look at it, we've got to sort it out,

25   we've got to apply it to the facts of this case, all that.

1    But to the extent you have a defense like that that has merit,

2    we need to know that, because we don't want to waste our time

3    on parties that may be immune, and we want to focus on parties

4    that are not immune.

5        So, you know, I just think -- and when we're trying to

6    order discovery and disposition of issues, it's important that

7    we don't just sort of go with the flow, do all of discovery,

8    and then we'll sort of see where the chips fall.  If there are

9    issues we have enough information on early, and it helps carve

10   and shape the litigation as it will ultimately become, then I

11   think we're contributing important things in terms of the

12   management of the litigation.  And I'm always looking at how

13   do you trim off the dead branches so that what you have left

14   are the claims that are actually in dispute that are

15   potentially viable.  And I think it helps everybody, I mean,

16   in terms of where we are.

17       So how about pending state cases?  And I'm talking about

18   any AFFF cases, are there any pending state?

19            MR. OLSEN:  Good morning, Your Honor.  There are some

20   precipices that were filed in Pennsylvania in Philly that

21   indicated an intent to sue.  We don't know if those are AFFF

22   cases, that the cases in Philly that have been filed have

23   ended up being AFFF cases and we removed them here.

24            THE COURT:  Okay.

25            MR. OLSEN:  We've had some very preliminary

1    discussion with the plaintiffs' counsel in Philly to see if we

2    can just work out bringing all those cases here.

3        Other than those precipices in Philly, there are no other

4    state AFFF cases.  There are state-based cases involving the

5    same family of chemicals that don't involve AFFF.

6            THE COURT:  Yes.

7            MR. OLSEN:  Many of the lawyers in this room on both

8    sides are involved in some of those cases, and of course we're

9    going to coordinate where appropriate with respect to

10    depositions or discovery.  At least our view is at this point

11    we don't need to set up a separate structure to coordinate

12    with those cases, but there are a handful of state-based cases

13    involving the same family of chemicals.

14            THE COURT:  Yes, sir?

15            MR. COHAN:  Morning, Your Honor, Larry Cohan from

16    Pennsylvania.  We have a group of us here today from

17    Pennsylvania.  There are probably well in excess of 500

18    individual state cases filed under our procedures there, which

19    is a summons, that have not yet been brought to the MDL.

20    There are also three water authority cases.  They are just

21    about all AFFF cases.

22            THE COURT:  And are they going to be thus removed to

23    this court?

24            MR. COHAN:  We've had some brief discussions with

25    defense counsel about working it out, but I believe ultimately

1    they will be removed.

2           THE COURT:  I've got to tell you, my impression of

3    this is that, you know, the initial instinct is I want to have

4    my own case, I don't want to be caught in there with all these

5    others.  And I know there's been some bad experiences in some

6    MDLs where it's like a black hole and nothing happens.  That

7    will not be the case here, I assure you of that.  We're going

8    to move this.  And I think having a collective discovery on

9    some of these issues is going to be very efficient, it's going

10   to be cost effective on your clients.  And it will help us,

11   again, carve out where, you know, where this litigation goes.

12   I don't think any of us fully appreciate, I mean, we've got

13   EPA standards evolving as we speak.  We've got studies in the

14   field, I'm sure, going on right now on some of these issues

15   I've been asking about.  And I've been in litigation where a

16   major study comes out in the middle of the litigation and

17   completely reshapes the litigation.  And I think that could

18   well happen here, because this has become an area of real

19   study.  And, you know, you've got what, this study from the

20   prior litigation like 2006, am I right, something like that?

21          MR. PETROSINELLI:  You mean the C8 panel?  The

22   reports came out 2011 and '12.

23          THE COURT:  A little more current than I appreciated.

24   But I just think we ought to anticipate that the science is

25   going to continue to develop and evolve, that's not going to

1    stand still while we're litigating this issue.  And that can,

2    again, affect how we deal with issues like medical monitoring,

3    personal injury, et cetera.

4         MR. COHAN:  I'm all for being here, and we're talking

5    amongst ourselves about getting here.

6         THE COURT:  I think your family will enjoy

7    Charleston.

8       Yes, sir.

9         MR. JACKSON:  Your Honor, Bill Jackson with Kelley,

10   Prye and Warren.  We represent the state --

11        THE COURT:  Where are you from?

12        MR. JACKSON:  I'm from Houston, Texas.  We represent

13   the State of Ohio in this litigation against DuPont DeNemours

14   related to the facility in Parkersburg, West Virginia.  That's

15   the only PFOA site.

16      I want to let Your Honor know we also are going to be

17   representing a couple of other sovereign plaintiffs, state and

18   U.S. territories that have kind of waited to see how the

19   rulings on the severance issues went before they filed their

20   cases.  But based on what I'm hearing today, I expect there

21   will be more sovereign plaintiffs and U.S. territories.

22        THE COURT:  I think there's real wisdom in cases as

23   complicated as this, is not to spread them across all the

24   districts, federal district courts, at least in the discovery.

25   And I know my friends on the MDL panel talk to me about that,

1    that they desired to centralize it because they thought it was

2    going to be much larger than it was at this point, that they

3    thought the potential -- and felt like everybody would benefit

4    by centralization, and I think that's right.

5              MR. JACKSON:  Thank you.

6              THE COURT:  Thank you.

7         Yes, sir.

8              MR. DESAI:  Your Honor, my name is Mihir Desai, I'm

9    here on behalf of the State of New York.  We have a pending

10   state case in New York State that involves 39 or 40 sites

11   within the state, they are AFFF cases.  And, you know, to the

12   extent that other states, sovereigns would be joined in the

13   MDL, it strikes us that one of our cases, which is a separate

14   case, it's a Northern District of New York, it involves four

15   sites, is subject of conditional transfer order that's going

16   to be heard at the end of March by the judicial panel.  There

17   may be some interest in having some coordination among the

18   states as some kind of committee.

19             THE COURT:  And by the way, yeah, to the extent that

20   you have a number of states who have discrete interests, they

21   may, within their -- where they end up on the plaintiff or

22   defendants' side, because I can imagine you could end up on

23   both, as we talked about these water systems.

24             MR. DESAI:  In fact, the State of New York is on both

25   sides.  We are also defending the case brought by the City of

```
 1    Newburgh.

 2           THE COURT:  Yeah, I can understand how that would

 3    happen.  We'll need to sort of sort out about how we manage

 4    that.  But again, I want both sides to get themselves

 5    organized, and if you can work out among yourselves how to do

 6    those kind of issues, I'm likely to defer to your judgment.

 7    I'm not going to delegate authority, but I think y'all will

 8    know your case better than I will in terms of how to manage

 9    it.

10        Thank you.

11           MR. RICE:  Your Honor, on the government contractor,

12    we've got a lot of Fourth Circuit law, as counsel said.  I

13    remember early in the asbestos days, that was going to end the

14    asbestos litigation, and that hasn't turned out that way.  So

15    there is a lot of case law out there on this, on just basic

16    failure to warn and knowledge conveyed.  In an over-50-year

17    period, you might imagine this is going to change drastically

18    as time goes forward.

19           THE COURT:  It will be an issue we all will become

20    the world's experts on before it's over.

21        Okay.  So what I'm looking for in the next five days,

22    we're going to get resumes from the -- a suggested list for

23    the leadership and steering committee, with resumes and

24    references for everybody.  I am not being casual about that,

25    because there are some experiences where you have people who
```

1    have been disruptive in this process, and I don't want that to

2    happen.  So I will -- I intend to check out references and

3    find out what people have to say.

4        I've invited both sides, if you want to send me, say ten

5    articles each supporting your science, I will read them.  And

6    I will use those.  I sometimes will get into reading footnotes

7    and chasing issues.  I'm unclear about the consequences to

8    humans; I may be putting my finger on the pulse of what all

9    the science questions are right now as being implicated, what

10   are those consequences.  And I think that's something that I

11   have a particular interest in trying to figure out.

12       Once we organize, I want both sides to begin thinking

13   about an agreement on fact sheets.  Let's talk about fact

14   sheets for a second.

15       Usually the one side wants a fact sheet with name and

16   address, and the other side wants the DNA composition of the

17   party.  And the truth is, we need to be a fair balance here.

18   But, you know, if you're asserting a property claim, what is

19   the property, right?  I mean, if you're claiming a personal

20   injury claim, what is the injury and what is the basis of that

21   injury, do you have a medical diagnosis and so forth.

22       On the defense side, I think we need to sort of know, you

23   know, what these defendants know about the AFFF, how much was

24   there and where it was put and how it was used, all those

25   things are things that we need to know.  And that ought to be

1    in the defense fact sheet.  We just need to get to that

2    information.  And we need the underlying supporting

3    documentation, without being excessively -- there will be

4    independent discovery on all these issues.  But I just think

5    from the start, if we could work out among ourselves, and if

6    not, I'll enter orders, but I think that this will help us

7    focus about just where responsibility might lie.  And so I

8    want -- I think that's one of the early tasks we need to

9    undertake.

10        I know I have a couple pending motions, I have a motion to

11   dismiss, I have a motion to remand.  All those motions I will

12   address after I appoint a leadership committee and there's a

13   briefing schedule.  And some of these issues you may have

14   filed something in an individual court, but they may have far

15   broader implications, and you need to have the leadership

16   opportunity to address those issues.

17        I had gotten some word that the City of Newburgh had

18   dismissed somebody, was intending to dismiss somebody, a party

19   Fire Services Plus.  All I'm saying is on that you have a

20   stipulation, Rule 41 provides your method for doing that, you

21   just file a stipulation of dismissal.

22        What about early mediation; is there any value in that?

23   Do we need discovery?  Is there some value of the Court

24   considering appointing a mediator at this stage?  What are the

25   thoughts?  I'm not thinking about global, but are there issues

1    in which some discussion is worthwhile?

2            MR. RICE:  Your Honor, as you're probably aware,

3    there's been a previous settlement that was reached, 600

4    something million dollars.  I think until we get organized and

5    we get a little deeper in, I personally believe a mediation is

6    probably a little premature, appointing a mediator is a little

7    premature.

8            THE COURT:  That's fine.  I just think in the early

9    part -- and we're not trying to do that today.  What I'm

10   trying to do is stimulate a discussion, once you get

11   organized, if there's a desire to explore that, that, number

12   one, can we get some consensus on who that might be.  The

13   parties might feel comfortable with a particular mediator or

14   mediators, and are there issues which early on might be more

15   amenable to mediation than others.

16           MR. RICE:  I think as we get started and start

17   focusing on the different groups, this may be one of those

18   MDLs that has multiple resolution points, multiple --

19           THE COURT:  I really see there are multiple issues

20   with different legal standards.  And I mean, number one, we've

21   got to see who's coming to the table, first of all.  We don't

22   even know who the parties are yet.  And I'm sure that will

23   help shape how we're going to deal with this.  But what I

24   don't want to do is, you know, sometimes -- I was, you know, a

25   litigator myself, and sometimes people don't want to talk

1    about it among themselves because they think it's a sign of

2    weakness or a sign of giving up something.  So I'm always the

3    one that asks the question, and then everybody else has the

4    face saving, well, the judge thought of that, isn't that a

5    good idea.

6        But I do want us to be thinking strategically about this.

7    Because there are some really smart ways to manage complex

8    litigation like this, and there are some really bad ways to do

9    it.  And I would prefer the former rather than the latter, you

10   know, if we have the choice.

11       MR. RICE:  In that vein, Your Honor, because in some

12   of the class action -- some of the personal injury side, we're

13   actually dealing with class actions, I'd like the Court to

14   consider maybe some type of sampling plaintiffs' fact sheets,

15   because we really have no way of saying who all the plaintiffs

16   are.

17       THE COURT:  That's why you're going to talk among

18   yourselves about it and come up with a proposal for me and how

19   that works.  And I'm open to those kinds of discussions.  But

20   what we need to do is that each side needs to feel like they

21   have some foundational information from the other.

22       Okay.  Are there other matters that anyone wishes to bring

23   to my attention?

24       MR. OLSEN:  One issue, Your Honor.  You mentioned

25   motion to dismiss.  There were a lot of motions to dismiss

1    filed.  One of the issues that was part of those motions to

2    dismiss was personal jurisdiction.  We don't have any strong

3    desire to push that issue, but we would ask if Your Honor

4    could include in the next CMO that we aren't waiving any

5    personal jurisdiction arguments by participating in the MDL.

6         THE COURT:  Right.  I will say that right now, nobody

7    is waiving anything by being here.  We'll address all those

8    issues.  Again, what I'm going to try to do is once you're

9    organized, I'm going to try to talk to your leadership about

10    now that you're organized, which of these do you want to

11    pursue.  A lot of times people just file things in an

12    individual action, but it's mostly just sort of stay holding

13    kind of motions that don't really intend the Court to address

14    it, and there needs to be some central control of that and you

15    have leadership on those kind of issues.

16        Yes, sir?

17        MR. CHAUDHURY:  Your Honor, just in that same vein,

18    we understand with the organizational theme trying to do with

19    the briefing process, but in some of our cases, our case in

20    particular, City of Newburgh, we're not in a place where we

21    even have finalized pleadings.  There's an open statement from

22    City of Newburgh that they are planning to amend their

23    complaint.  And we would just ask, so we can be in a position

24    to move in an expeditious manner once all the organizational

25    stuff is taken care of, that the Court set some time frame

1    relatively soon to file any amended pleadings, if they're

2    going to be filed.

3              THE COURT:  Okay.  I mean, we will get to all that.

4    Let's get organized first.  And we're going to meet in

5    another -- next meeting, for everyone's information, is

6    April 5th.  That's our next meeting.  And I'll have leadership

7    appointed by then.  And then among yourselves you can talk

8    about what kind of priorities and issues, but everything has

9    been stayed, so how do we get this process going.  And often,

10   you know, we have like -- we'll need to have different ones,

11   but sort of a standard complaint and a standard answer, and

12   don't have literally thousands of answers coming in.

13             MR. HANNON:  Your Honor?

14             THE COURT:  Yes.

15             MR. HANNON:  If I may, sorry, Kevin Hannon from

16   Denver, Colorado, Hannon Law Firm.  I just want to note that I

17   think April 5th the national championship.  And --

18             MR. RICE:  In South Carolina we don't worry too much

19   about that.

20             MR. HANNNON:  A couple years ago.  But at any rate --

21             THE COURT:  They beat Duke; I've never forgiven them.

22             MR. HANNON:  Your Honor, in full disclosure, I just

23   shared that interest.  And so I don't know if we could do it

24   the week after.

25             THE COURT:  Let me say this.  If somebody needs to go

1    to the national championship game, they're going to need to

2    send someone from their firm here.  We just can not organize a

3    complex litigation like this on such matters.  And y'all might

4    believe it or not, but this is not the only case on my docket.

5    And this is a purely, you know -- foolishly, I keep taking

6    these MDLs which everybody else shakes their head at, why I do

7    this.  But so we're going to have to have some order, and

8    there always will be conflicts.  I fully expect people will

9    have conflicts every time I schedule any day.  And if

10   April 5th is a -- Friday night is a national championship

11   game?  That doesn't sound right to me.  Isn't April 5th a

12   Friday?  Yeah, I don't think that's a national championship

13   game.  Usually a Monday night.  You can get out of Charleston

14   from Friday to Monday.  And I don't know who Duke's playing, I

15   haven't figured that out yet.

16            MR. THOMPSON:  Judge, let me just, because I'm slow,

17   let me ask, do you intend to make the appointment prior to the

18   status hearing?

19            THE COURT:  Yes.

20            MR. THOMPSON:  It would be very helpful if there

21   would be enough time after the appointment to allow us to

22   self-organize and to actually --

23            THE COURT:  I intend to do that.  That's why I only

24   gave you five days to get the information in.  There was a

25   method to my madness.

1          MR. THOMPSON:  Beyond that, to the extent that your

2     schedule that you can predict it, would actually be very

3     helpful to maybe go out three, four, five, six months, so that

4     we can calendar --

5          THE COURT:  I'll take -- Let me look at that.

6          MR. THOMPSON:  Obviously at your pleasure, Your

7     Honor.

8          THE COURT:  Just to give you what I'm going to try to

9     do, and I can't guarantee it, is I have a -- particularly on

10    odd months, I have -- I have jury selection, I have a running

11    jury roster every two months, and I usually do it like the

12    7th or 8th or 10th of the month, of that month, and we'll try

13    to do it before that jury call, just happens to fit well in

14    our schedule to do it that way.

15       But I will take a look and see what I can do to give

16    some -- carve out these dates long term.  I think that's a

17    reasonable request.

18          MR. THOMPSON:  And finally, with regard to the ten

19    articles, you don't want any articles on government contractor

20    defense, do you?

21          THE COURT:  No, no, no, I want science.  I want the

22    science is what I'm looking for.  I'm interested in the

23    science that shows injury to humans.  And maybe there are

24    animal studies and that's what you want to project out of that

25    or whatever, but I'm a sufficient nerd that I actually read

1    this stuff.  So I want to see where the science is.  And I've

2    been in other cases, both as a litigator and as a judge, where

3    the science is evolving.  And I think we're going to see -- I

4    don't think this is a static thing right now.  I think we're

5    in the middle of some very important issues.  And where it all

6    goes and what the consequences are, are something we will

7    learn as we journey on this.  I really believe that to be

8    true.

9              MR. RICE:  Your Honor, do you allow phone

10   participation at your status conferences, listen only?

11             THE COURT:  Phone participation is fine to listen.

12   If you're going to make an argument, you need to be here.  And

13   we'll set up a website.  And we will also allow phone in and

14   people to participate.  What is impossible is people start

15   trying to argue over the telephone, so I don't allow that.  So

16   you need to be here to make argument.

17        Anything further?

18             MR. DESAI:  Your Honor, one more thing from the State

19   of New York.  Again, you know, our state wants to sort of

20   coordinate with other members of the steering committee.  I

21   would like to contribute articles that you suggested, but

22   certainly we're -- we have limited financial resources.  And

23   also for the reasons that were previously mentioned regarding

24   sovereignty, you know, we can only refer representation to

25   private counsel in limited circumstances.  So certainly we'd

```
1    like to have a role in the steering committee, but to the
2    extent --
3              THE COURT:  You try to sort it out.  Obviously this
4    whole -- you've got to have some central organization, because
5    I can't have the State of New York noticing people for
6    depositions, and have no -- and without regard, they've
7    already been noticed or they're already part of the discovery
8    plan, we can't act unilaterally.  If you're an MDL, they have
9    to be coordinated.
10        But what I do say is if the leadership of the defense,
11   let's say you're trying to do it as the defense, if your
12   leadership, you think unreasonably, will not allow you to
13   pursue a certain discovery approach, you could file a motion
14   with the Court and I will take it up with the leadership,
15   we'll address that issue.  I have found that's generally not a
16   problem, that people manage to work things out.  But I can not
17   have -- it's impossible to have parties unilaterally
18   scheduling depositions.  That will not work when they're, you
19   know, as we say here, a courtroom full of lawyers, you can't
20   just have someone go back to their office and start noticing
21   depositions.
22             MR. DESAI:  Understood.  Thank you.
23             THE COURT:  Anything further?
24        Yes, sir.
25             MR. CHERTOK:  Your Honor, Mark Chertok representing
```

1   the Port Authority of New York and New Jersey, which is the

2   other sovereign in the City of Newburgh case; this is actually

3   a bi-state agency, neither a fish nor a fowl.

4        Two matters.  One, I want to join in the request by the

5   government to have an amended complaint served quickly.

6   Because we, like, I think, some of the other defendants, plan

7   to move to dismiss, and that may simplify some of the issues

8   from that particular matter.

9            THE COURT:  This is the City of Newburgh case?

10           MR. CHERTOK:  The City of Newburgh case, which will

11  probably be a thorn in your side.

12           THE COURT:  Not a thorn, but I will say this, that

13  I'm hearing enough issues that you might want to collectively

14  address some issues with me about, you know, the City of

15  Newburgh.  And I'm glad to meet with you separately after the

16  next status conference to sort some of these issues out, if

17  there's a particular need to do that, I'm glad to do that.

18           MR. CHERTOK:  Thank you, Your Honor.

19       Yes, sir?

20           MR. KNAUF:  Your Honor, Alan Knauf with the City of

21  Newburgh.  We'd be happy to meet with Your Honor separately.

22  We don't view the issue on the amended complaint the same way.

23  We've not gotten responses to our pleading, to our -- to claim

24  from any of the defendants, so we think we have an opportunity

25  to amend later on, but we'll be happy to sit down with Your

1    Honor.

2            THE COURT:  What we'll do is there's always like, you

3    know, one case that says we're like different from everybody

4    else.  This black hat here, you know, and -- but I'm glad to

5    sort it out and help you organize it.  It is frankly far

6    easier to handle an individual case than an MDL, so that

7    sounded like easy for me.

8        So if y'all can't work it -- first time I ask you, don't

9    come in here and ask me to work out a problem you haven't

10    tried to solve yourselves.  So I want y'all to sit down in

11    good faith and talk to these folks, but if you can work it

12    out, you'll let me know what it is, we'll have a status

13    conference and I'll rule.  I know how to rule.  So I'm glad to

14    do that.

15        Anything further?

16        Okay, folks, this hearing is adjourned.

17

18        (Court adjourned at 11:31 a.m.)

19

20

21

22

23

24

25

1
2                          REPORTER'S CERTIFICATION
3
4           I, Debra L. Potocki, RMR, RDR, CRR, Official Court
5    Reporter for the United States District Court for the District
6    of South Carolina, hereby certify that the foregoing is a true
7    and correct transcript of the stenographically recorded above
8    proceedings.
9
10
11
     S/Debra L. Potocki
12   _____
13   Debra L. Potocki, RMR, RDR, CRR
14
15
16
17
18
19
20
21
22
23
24
25