**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2-18-mn-2873-RMG<br><br>This Document Relates to:<br>*City of Camden, et al. v. 3M Company,*<br>Case No. 2:23-cv-03147-RMG |
|---|---|

**SUBSET OF SOVEREIGNS' SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT, FOR CERTIFICATION OF SETTLEMENT CLASS AND FOR PERMISSION TO DISSEMINATE CLASS NOTICE**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................ 1

II. ARGUMENT ........................................ 2

A. The Unduly Protracted Payment Schedule Shifts 3M's Insolvency Risk onto Class Members. ........................................ 2

B. The Settlement amount is very small compared to the amount of PFAS damages 3M has caused. ........................................ 4

C. The Settlement Likely Violates the Eleventh Amendment. ........................................ 6

D. The Few Class Representatives Are Atypical, Unrepresentative, and Inadequate to Represent the Many Thousands of Differently Situated Class Members. ........................................ 8

1. The Movants are atypical because their group is heavily skewed toward water providers that have detected well-known and recognized PFAS compounds. ........................................ 9

2. The Movants are atypical because none of them are state agencies. ........................................ 11

3. Phase One and Phase Two Class Members May Be in Conflict, Which Independently Renders Class Certification Inappropriate. ........................................ 12

III. CONCLUSION ........................................ 13

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997) ........ 12, 13

*In re Interior Molded Doors Antitrust Litig.*,
2020 WL 7259153 (E.D. Va. Dec. 10, 2020) ........ 6

*In re McKesson Governmental Entities Average Wholesale Price Litig.*,
767 F. Supp. 2d 263 (D. Mass. 2011) ........ 7, 8

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) ........ 5

*In re Motor Fuel Temperature Sales Pracs. Litig.,*
271 F.R.D. 263 (D. Kan. 2010) ........ 10, 12

*Thomas v. FAG Bearings Corp.*,
50 F.3d 502 (8th Cir. 1995) ........ 7

*Walker v. Liggett Group, Inc.*,
982 F. Supp. 1208 (S.D.W. Va. 1997) ........ 7, 8

**Federal Rules**

Fed. R. Civ. P. 23 ........ 12, 13

Fed. R. Civ. P. 23(a)(4) ........ 12

Fed. R. Civ. P. 23(e)(2)(D) ........ 10

**Other Authorities**

6 Newberg and Rubenstein on Class Actions § 18:23 (6th ed., June 2023 update) ........ 7

# I. INTRODUCTION

The People of the State of California ("People"), by and through Rob Bonta, the Attorney General of California, The District of Columbia, the Commonwealth of Pennsylvania, and the Commonwealth of Puerto Rico (together "Subset of Sovereigns"), respectfully submit this Supplemental Opposition to Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class, and for Permission to Disseminate Class Notice (ECF No. 3370) ("Motion") which seeks preliminary approval of a proposed class action settlement between Defendant 3M Company and public water suppliers ("Settlement").

The Subset of Sovereigns provide this Supplemental Brief to address certain additional concerns to those presented in the separately filed Sovereigns' Opposition, with which the undersigned Subset of Sovereigns concur in full. Like the signatories to the Opposition, the Subset of Sovereigns acknowledge and appreciate the extensive negotiations and effort that led to the Settlement, and do not intend to impede or prevent these cases from reaching resolution. The Subset of Sovereigns nonetheless believe the Settlement contains material defects that prevent it from being fair, reasonable, and adequate in its current form.

*First*, the Settlement creates an unduly protracted payment schedule that extends past 2035 and that shifts large amounts of 3M's insolvency risk onto all class members. *Second*, the Settlement amount pales in comparison to the PFAS-related damages 3M has caused in California alone. *Third*, the Settlement likely violates the Eleventh Amendment by expressly including certain state-owned water systems. And *fourth*, the moving plaintiffs' ("Movants") claims are neither typical nor representative of the putative class; instead, they skew heavily towards water providers with detections of well-recognized PFAS compounds and they do not include a single claim brought by a state agency.

The Subset of Sovereigns respectfully request that the Court deny the Motion. A denial need not end the public water supplier settlement effort. The Court may return the parties to mediation to reach a different compromise that leads to an approvable Settlement. In any case, the Court should ensure that any further proceedings—including any renewed preliminary approval motion—are litigated on a more appropriate timeline that affords affected public entities adequate time to make themselves meaningfully heard.

## II. ARGUMENT

### A. The Unduly Protracted Payment Schedule Shifts 3M's Insolvency Risk onto Class Members.

The Settlement's protracted payment schedule creates an unjustifiable risk that class members, especially those in Phase Two, may not receive the full consideration they are owed. This payment schedule substantially reduces the Settlement's true value.

The Settlement contemplates that 3M will pay thirteen annual installments into the Qualified Settlement Fund ("QSF") between 2024 and 2036. *See* Settlement § 6.11; Settlement Ex. K. The QSF, in turn, will consist of different subsidiary funds for Phase One class members, consisting of water suppliers that already know they have been impacted by PFAS; and Phase Two class members, consisting of those that do not. *See* Settlement Ex. Q § I(1)(a)–(b). Both in California and nationally, the vast majority of public water suppliers affected by the Settlement will fall within Phase Two. *Compare* Settlement Ex. E, *with* Settlement Ex. F.

The money earmarked for purchasing and installing remediation infrastructure for Phase One class members will be paid in full by mid-2025. *See* Settlement Ex. K. Funds dedicated to operating and maintaining that infrastructure, however, will not be fully paid until 2033. *Id.* In fact, 31.5 percent of the operation and maintenance funds for Phase One class members will not be paid until the 2030s. *Id.* The payment schedule is even more protracted for Phase Two class

members. The money earmarked for purchasing and installing remediation infrastructure for them will not be paid in full until 2028, and 75 percent of the funds dedicated to operating and maintaining that infrastructure will be paid between 2030 and 2036. *See id.* This schedule shifts large amounts of 3M's insolvency risk onto all class members, especially Phase Two class members. Class members may not receive sufficient funds to purchase, operate, and maintain remediation equipment if 3M goes bankrupt or otherwise proves unable to comply with the payment schedule.

The risk that 3M will become insolvent at some point in the next 13 years is not negligible. 3M faces mounting liabilities in other areas, such as the "nearly 260,000" lawsuits alleging that its defective military earplugs caused hearing loss. *See* Dietrich Knauth, *3M CEO Must Attend Mediation in Earplug Litigation, Judge Rules*, Reuters (May 22, 2023), https://perma.cc/36PS-5VBS; *see also In re 3M Combat Arms Earplugs Prods. Liab. Litig.*, No. 3:19-md-2885 (N.D. Fla.). Most of these cases involve current or former service members alleging serious, permanent injuries caused by 3M's knowing misconduct, and 3M may ultimately be liable for a huge aggregate sum. The Settlement transfers the insolvency risk resulting from these and other liabilities to absent class members in Phase Two, and it does little to guarantee that class members will enjoy sufficient seniority among 3M's creditors to recover the balance of funds still owed to them if 3M goes bankrupt. The inordinate financial risk borne by Phase Two class members further demonstrates that this Settlement is not fair, reasonable, or adequate.[1]

---

[1] Related to the issue of insolvency: the Movants' counsel declares that the Settlement is desirable because "a series of verdicts against 3M could threaten the financial viability of the company, resulting in a Chapter 11 bankruptcy filing that could leave Plaintiffs without compensation." *See* Declaration of Scott Summy ¶ 25 (ECF No. 3370-4), *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2:18-mn-2873-RMG (D.S.C. July 3, 2023). But that assertion is not necessarily true. A Chapter 11 bankruptcy filing would result in a plan of reorganization and payments to

**B. The Settlement amount is very small compared to the amount of PFAS damages 3M has caused.**

A comparison of the Settlement terms with the likely value of putative class members' claims conclusively demonstrates that the Settlement is not fair, reasonable, or adequate in the context of these cases. This is especially concerning because the Subset of Sovereigns are not able to derive from the Settlement even an approximation of how much a typical public water supplier, or any water supplier, might receive. Even assuming the "$10.5 billion to $12.5 billion" figure reflected the Settlement's total true value, which it does not, the Settlement amount pales in comparison to the PFAS-related damages 3M—a PFAS market leader whose tortious conduct is well-established—has caused in California and across the United States. Several illustrative comparisons help show that the Settlement amount is insufficient.

*First*, the California State Water Board operates financial assistance programs that assist water providers with certain costs of PFAS remediation. The State Water Board has already received 18 applications to that program, with a collective PFAS remediation project cost of over $633 million. *See* Declaration of Christopher Stevens ¶ 6. And many thousands of California water providers have not even started testing for PFAS contamination. *See* Declaration of Andrew Altevogt ¶ 5. In California alone, statewide costs to investigate, monitor, and treat PFAS in drinking water will reach untold billions of dollars.

*Second*, a recent study by the U.S. Geological Service found that *at least* 45 percent of

---

creditors according to the preferences established in the Bankruptcy Code. Given the perpetual and uncapped indemnity obligations class members would be forced to assume under the Settlement, many class members may be *more likely* to secure adequate funds through a Chapter 11 proceeding than through this Settlement as currently constructed.

drinking water in the United States is PFAS-contaminated.[2] Assuming that a similar proportion of drinking water in California is PFAS-contaminated, the treatment costs for the thousands of public water suppliers in California alone could dwarf the Settlement amount. Water suppliers will have to investigate, test, purchase additional real property to install treatment infrastructure, install that infrastructure, and operate and maintain that equipment for decades.

*Third*, and finally, a recent study by the American Water Works Association, a major membership organization that includes public water suppliers, predicts nationwide costs for PFAS regulatory compliance that again dwarf the Settlement amount. For all public water systems across the United States, complying with the proposed federal maximum contaminant level ("MCL") for PFOA and PFOS would cost about $47.3 billion for capital costs *alone*.[3] For these systems, the combined capital, operating, and maintenance costs of complying with the proposed PFOA and PFOS MCL are projected to be about $5.2 billion per year on an annualized basis.[4] If these systems are subject to state MCLs with more stringent requirements or are required to remove other PFAS, even bare-minimum compliance would cost many billions more.[5] And many public water suppliers may reasonably elect to reduce PFAS concentrations to levels below applicable MCLs to safeguard public health, incurring even greater costs. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 105–07 (2d Cir. 2013) (recognizing that an MCL reflects contamination "so severe that it would be *illegal* to serve the water to the public," and holding under New York

---

[2] *See* U.S. Geological Survey, *Tap Water Study Detects PFAS "Forever Chemicals" Across the United States* (July 5, 2023), https://perma.cc/7F9Q-JR72.

[3] *See* Campins Decl. Ex. E at 28 tbl. 6-1. The right-most three columns of the table estimate the number of "Entry Points to the Distribution System" that are impacted by those PFAS, the per-entry-point capital costs, and the total cost for public water systems of various sizes.

[4] *Id.* at App'x A tbl. A-1.

[5] *See id.*

state law that a public water supplier may recover their costs of reducing drinking water contamination to levels below an applicable MCL (quotations omitted) (emphasis in original). Viewed against these figures, the Settlement amount is very small.

It is, of course, typical for a settlement to involve a settlement discount. That is not the same thing as settling claims for a miniscule percentage of their fair value, while giving away an indemnification right that may well render the overall settlement worthless as detailed in the Sovereigns' Opposition.[6] *See* Sovereigns' Opposition at Part II.B at 6-13.

**C. The Settlement Likely Violates the Eleventh Amendment.**

Contrary to the Movants' assertions,[7] the Settlement expressly includes state agencies. Specifically, Section 5.1 of the Settlement includes "[e]very Active Public Water System in the United States of America that" meets certain criteria regarding size and PFAS detections, *except* "[a]ny Public Water System that is owned by a state government, is listed in [a certain database] as having as its sole 'Owner Type' a 'State government' (as set forth in Exhibit H), *and* lacks independent authority to sue and be sued." (emphasis added). The plain meaning of Section 5.1 is that the Settlement expressly includes certain state-owned water systems owned by agencies that have independent authority to sue and be sued.[8]

---

[6] *See In re Interior Molded Doors Antitrust Litig.*, 2020 WL 7259153, at *7 (E.D. Va. Dec. 10, 2020) (noting that settlement amount was "hard to stomach" because it "reflect[s] a dramatic reduction of the projected damages in these cases"; but preliminarily approving settlement, while making final approval conditional on a "searching examination of the evidence and law" to ensure the settlement amount corresponded to the gravity of the injury).

[7] Campins Decl. Ex. B (Letter from Paul J. Napoli to Nicholas Campins, Deputy Attorney General (July 13, 2023)) at 3 (citing "Section 5.1 and Exhibit H of the [Settlement]" to claim that "the State of California and its instrumentalities have been *excluded* from the class action.").

[8] The People note that the Settlement's description of the class as comprised of "Public Water Systems" is confusing. *See* Settlement § 5.1. The Settlement defines "Public Water System" as "a system for the provision to the public of water." *Id.* § 2.54. But "a system for the provision to the

This approach gives rise to an Eleventh Amendment violation and comity concerns. The Eleventh Amendment issue is rarely litigated because class settlement agreements rarely seek *express* inclusion of state agencies. The few cases addressing this issue, however, have found that "if a class action litigated in federal court defines a class so as to encompass *state* entities as parties, it presents sovereign immunity concerns arising out of the Eleventh Amendment." *See* 6 Newberg and Rubenstein on Class Actions § 18:23 (6th ed., June 2023 update). In *Walker v. Liggett Group, Inc.*, 982 F. Supp. 1208, 1210 (S.D.W. Va. 1997), the court explained that "[t]raditionally, the Eleventh Amendment is used as a shield, immunizing states from suits in federal court brought and prosecuted by citizens of its own state or another state." *Id.* However, when a class action plaintiff seeks to certify a class including a state or state instrumentality that has "not consented affirmatively to participate" or "suggest[ed] their willing participation," the state's "status . . . is analogous to that of a defendant." *Id.* States and their agencies are "entitled to the protection of the Eleventh Amendment" from being pulled into a class action by a private plaintiff. *Id.* As another court put it, "significant sovereignty issues may preclude defining a class to include state entities as absent class members under the Eleventh Amendment of the Constitution." *In re McKesson Governmental Entities Average Wholesale Price Litig.*, 767 F. Supp. 2d 263, 271 (D. Mass. 2011) (citing *Thomas v. FAG Bearings Corp.*, 50 F.3d 502, 505–06 (8th Cir. 1995) (Eleventh Amendment barred involuntary joinder of a state in litigation)).

The Settlement poses additional comity concerns because the Movants' counsel effectively seeks to be appointed as class counsel to represent state agencies as absent class members. But

---

public of water" is not necessarily a legal person that may bring claims, release claims, or be bound by a settlement. Thus, for the purposes of this Supplemental Opposition, the People assume the putative class consists of *owners* of "Public Water Systems," not the "system[s]" themselves.

court-appointed class counsel "is not authorized to represent [] States" because "[g]enerally, no person or entity other than the Attorney General of a state is authorized to represent that state in any court or in any case." *Walker*, 982 F. Supp. at 1210-11. Put differently, "[t]o the extent [] representative [plaintiffs'] counsel purport to represent the interests of the States [or their agencies], these counsel" might "act *ultra vires*" under those states' laws. *See id.*[9]

The Court should avoid certifying a class that includes state agencies. Doing so would risk an Eleventh Amendment violation and lead to a strange outcome whereby the Court would appoint the Movants' counsel to represent state agencies without their express consent and, in fact, over the Subset of Sovereigns' express objections.

### D. The Few Class Representatives Are Atypical, Unrepresentative, and Inadequate to Represent the Many Thousands of Differently Situated Class Members.

Movants offer only a threadbare argument why their claims are typical of the many thousands of absent class members throughout the United States, which take all sizes and forms. *See* Mot. at 48–49. They conclusorily argue that their claims "are undoubtedly typical" merely because they sued for "actual or threatened" PFAS injuries, alleged that 3M's sale of defective PFAS products and associated failure to warn caused injuries, and seek to recover damages relating to providing safe public water. *Id.*

With this simplistic analysis, Movants ignore two key factors that make their claims atypical of many class members.

---

[9] *Cf. In re McKesson*, 767 F. Supp. 2d at 271 (explaining that "as sovereigns, states have a strong interest in individually controlling the prosecution of their own cases" and that "most states have laws providing the Attorney General of the state with exclusive authority to represent the state in litigation[,]" and finding that "a class action that includes state agencies is not a superior way in which to conduct this litigation.").

**1. The Movants are atypical because their group is heavily skewed toward water providers that have detected well-known and recognized PFAS compounds.**

The Movants that have detected PFAS in their public water supplies have predominantly experienced and claimed injuries relating to PFOA, PFOS, and other well-known and recognized PFAS compounds. This has led to a skewed approach to distributing the Settlement funds, as reflected in the allocation procedures in Section II(6) of Exhibit Q. These procedures give well-known and recognized PFAS—and especially PFOA and PFOS—undue preferential treatment.

*First*, under Section II(6)(c)(ii), PFOA and PFOS are given special treatment. A water provider with those chemicals in a well will likely obtain a higher "PFAS Score" for that well, which would ultimately increase that provider's "Adjusted Base Score" that measures the extent of their entitlement to Settlement funds (*see id.*, § II(6)(f)). For example, a water provider that detects PFOA and PFOS in their wells can rely on *both* detections to raise their PFAS Score. However, a water provider that detects two types of PFAS that are *not* PFOA or PFOS ("Other PFAS") can rely on only one of those detections to raise their PFAS Score. *See* Settlement Ex. Q § II(6)(c)(i) (allowing a water provider to benefit only from a "single [other] PFAS analyte"). Mathematically, Section II(6)(c)(ii) also diminishes the ability of Other PFAS to contribute to the PFAS Score. The formula always takes the square root of any detected concentration of Other PFAS, but does not take the square root of PFOA and PFOS concentrations. *See id.* § II(6)(C)(ii)(b).

*Second*, under Section II(6)(f)(ii) of Exhibit Q, a water provider that detects a well-known PFAS compound that is subject to current state MCL or a proposed federal MCL—especially PFOA and PFOS—may obtain a "regulatory bump" that applies an upward multiplier increasing their "Adjusted Base Score."

*Third*, under Section II(6)(f)(iii) of Exhibit Q, a water provider that initiated PFAS litigation at an early date may obtain a "litigation bump" that likewise applies an upward multiplier increasing their "Adjusted Base Score." These water providers are necessarily those that have detected well-known and well-documented compounds like PFOA and PFOS in their wells.

This systematic bias toward allocating more settlement money to public water suppliers that have detected well-known PFAS compounds is not only indicative of a typicality problem among the class representatives, but also points toward issues of "fair[ness], reasonable[ness], and adequa[cy]" under Rule 23(e)(2), including whether "the proposal treats class members equitably relative to teach other," Fed. R. Civ. P. 23(e)(2)(D). As the Court is well aware from having overseen the MDL, the science of PFAS is still nascent. Methods to identify and analyze different types of PFAS are still under development for all but the best-known PFAS. The toxicology of more obscure PFAS is very much unknown.

The Settlement, as structured, allows the Movants—which mostly have already filed litigation and have known detections of well-known PFAS—to extract a beneficial settlement from 3M at the expense of the vast body of water providers, including those whose PFAS detections have centered on lesser-known and understood PFAS.[10] The Settlement's structure, a symptom of the typicality problems at hand, will especially harm those public water suppliers that—in the future—detect yet-ununderstood PFAS compounds capable of causing special harm.

Movants' information provided with respect to other relevant factors is likewise inadequate. The Movants only briefly analyze the strength of the claims in just one case, the *City*

[10] *See In re Motor Fuel Temperature Sales Pracs. Litig.*, 271 F.R.D. 263, 296 (D. Kan. 2010) (denying final approval where "the parties have not structured the proposed settlement in a way to assure that named representatives have operated under a proper understanding of their representational responsibilities to distinct subgroups within the settlement class.").

*of Stuart* action. *See* Mot. at 41–42. That analysis is insufficient to understand the strength of the claims thousands of other water providers may be able to develop under their own states' laws. Further, the Movants assert that the Court should accept the Settlement as fair based on a review of the procedures used to devise it, and on the fact that settlement negotiations were adversarial. *See id.* at 34–39. That assertion is insufficient because most settlement negotiations use facially adequate procedures, and any settlement negotiation is adversarial absent collusion. The use of sound procedures and the absence of collusion may be a *necessary* condition for settlement approval, but it is not a *sufficient* one to prove that a settlement is fair, reasonable, and adequate.

**2. The Movants are atypical because none of them are state agencies.**

The Settlement undoubtedly includes at least some state agencies in its sweep: those that may sue or be sued. *See* Settlement § 5.1. However, the Movants—which are municipalities or utilities—differ substantially from these state agencies, for whom the Settlement would have a very different effect. For example, the Settlement's overbroad release bars class members from bringing virtually any PFAS-related claim against 3M under Section 11.1.1 of the Settlement, subject to some narrow exclusions in Section 11.1.2. This release would have very different practical effects for a state agency than for an ordinary county, municipality, utility, or special-purpose local government. The various state agencies that may be implicated by the Settlement may have potential claims against 3M that non-state entities do not.

This points to another problem: to the extent state agencies fall within the Settlement's scope, the Movants have not shown that the typicality requirement can even be met for such class

members. State agencies are highly diverse; their authorities, and their potential claims against 3M, are shaped by laws peculiar to each state.[11]

**3. Phase One and Phase Two Class Members May Be in Conflict, Which Independently Renders Class Certification Inappropriate.**

Rule 23(a)(4) requires that named plaintiffs "will fairly and adequately protect the interests of the class." Related to the concerns above regarding the typicality and adequacy of the class representatives, the Subset of Sovereigns believe the Phase One and Phase Two class members are sufficiently differently situated that their respective interests in the Settlement are in conflict. Specifically, because the Settlement Class would group together both water providers who know at least some degree of the PFAS exposure in their water systems (class members in Phase One) and water suppliers who do not know their level of PFAS exposure (class members in Phase Two), those two dissimilar subclasses have fundamentally divergent interests.

The Supreme Court addressed a similar case set of facts in *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997), where the class was made up of claimants with current injuries from asbestos exposure and those claimants who had asbestos exposure but had not yet manifested injuries from asbestos. Class members with asbestos exposure but no manifested injury were asked to release their future claims without "know[ing] of their exposure, or realize the extent of the harm they may incur." *Amchem*, 521 U.S. at 628. The Court found that class certification was inappropriate in such circumstances as the class could not meet the requirements of Rule 23. *Id.* at 628–29. The proposed Settlement suffers from similar flaws in class composition. In *Amchem*, the conflict

[11] *See In re Motor Fuel Temperature Sales Pracs. Litig.*, 271 F.R.D. 263, 296 (D. Kan. 2010) (denying final approval where "plaintiffs have not shown that representatives from one state can adequately represent the interests of class members who reside in different states with presumably different laws.").

between the members of the class with current injuries and those with only future injuries presented a conflict of interest that prevented class certification because "the interests of those within the single class are not aligned." *See Amchem*, 521 U.S. at 626. "Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation protected fund for the future." *Id.*

The attempt here to cure the *Amchem* problem by securing a separate attorney to represent Phase Two class members fails. Not only do the groups in the two groups have widely differing interests, but there is also conflict *among* Phase Two class members. Those claimants with little contamination have an interest in recovering costs for testing whereas those claimants with significant contamination have incentives to recover the cost of remediation. This conflict within Phase Two presents the same essential conflict—between two groups with fundamentally irreconcilable needs and desires—that the *Amchem* settlement did. Movants ignore this problem entirely in their cursory analysis of Rule 23. *See* Mot. at 50.

## III. CONCLUSION

For the foregoing reasons, the Court should deny the Motion and allow 3M, the Movants, and the Subset of Sovereigns the opportunity to address the concerns addressed herein. The Subset of Sovereigns also request any other relief to which they are justly entitled.

Dated: July 26, 2023

Respectfully submitted,

**THE PEOPLE OF THE STATE OF CALIFORNIA**
**ROB BONTA**
**Attorney General of California**
EDWARD H. OCHOA (SBN 144842)
Senior Assistant Attorney General
JEREMY M. BROWN (SBN 269159)
Supervising Deputy Attorney General

NICHOLAS G. CAMPINS (SBN 238022)
BRENDAN J. HUGHES (SBN 333690)
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Telephone: (510) 879-0801
Fax: (510) 622-2270
Email: Nicholas.Campins@doj.ca.gov

*/s/ Nicholas G. Campins*
NICHOLAS G. CAMPINS
Deputy Attorney General
*Attorneys for the People of the State of California, ex rel. Rob Bonta, Attorney General of California*

**DISTRICT OF COLUMBIA**
**BRIAN L. SCHWALB**
**Attorney General for the District of Columbia**
JENNIFER C. JONES
Deputy Attorney General
Public Advocacy Division
ARGATONIA D. WEATHERINGTON
Chief, Social Justice Section
By: */s/ Wesley Rosenfeld*
WESLEY ROSENFELD
Assistant Attorney General
LAUREN CULLUM
Special Assistant Attorney General
Office of the Attorney General for the District of Columbia
400 Sixth Street NW, 10th Floor
Washington, D.C. 20001
Tel: 202.368.2569
wesley.rosenfeld1@dc.gov
lauren.cullum@dc.gov

EDELSON PC
By: */s/ Jimmy Rock*
JIMMY ROCK
1255 Union St NE, 7th Floor
Washington, D.C. 20002
Tel: 202.270.4777
jrock@edelson.com

**COMMONWEALTH OF PENNSYLVANIA**
**MICHELLE A. HENRY**
**ATTORNEY GENERAL**
*/s/ James A. Donahue, III*
James A. Donahue, III
First Deputy Attorney General
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
717-787-3391
jdonahue@attorneygeneral.gov

***FOR THE COMMONWEALTH OF PUERTO RICO***
**DOMINGO EMANUELLI HERNÁNDEZ**
**SECRETARY OF JUSTICE**
**DEPARTMENT OF JUSTICE OF PUERTO RICO**
*/s/ Guarionex Diaz Martinez*
GUARIONEX DÍAZ MARTÍNEZ
Assistant Secretary
Department of Justice
PO Box 9020192
San Juan, PR 00902-0192
Tel. 787.721.2900
gdiaz@justicia.pr.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on July 26, 2023, I electronically filed the foregoing document with the Clerk of the Court using the Court's CM/ECF system, which shall send notice to all counsel of record.

*/s/ Nicholas G. Campins*
Nicholas G. Campins