IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) | MDL No. 2:18-mn-2873-RMG<br><br>**This Document Relates to:**<br><br>*City of Camden, et al. v. 3M Company*<br>No. 2:23-cv-03147-RMG |

## OBJECTION OF CITY OF FORT WORTH

### I.    INTRODUCTION

City of Fort Worth, Texas ("Fort Worth"), by and through its below-signed counsel, respectfully submits these objections to the proposed settlement between Defendant 3M Company ("3M") and public water providers ("3M Agreement" or "Agreement"), as well as the Interpretive Guidance on Interrelated Drinking-Water Systems ("Interrelated Guidance"), Dkt. No. 3856-1, and the Interpretative Guidance on Entities That Own and/or Operate Multiple Public Water Systems ("Multiple System Guidance"), Dkt. No. 3918-1, in *City of Camden, et al. v. 3M Company*, No. 2:23-cv-03147-RMG. Fort Worth objects to the Agreement as presented by Proposed Class Counsel ("Class Counsel") because it does not meet the standard for approval under Federal Rule of Civil Procedure 23(e)(2). Fort Worth reserves the right to withdraw this objection at any time before the opt-out deadline of December 11, 2023, rendering it null and void, and to opt out of the Agreement. *See* Dkt. No. 3946; *see also* Dkt. No. 3942 at 3–4.

The 3M Agreement includes simultaneous, material deficiencies with respect to core requirements of Rule 23, each of which should be central to a determination of the fairness and

1

adequacy of the proposal, and many of which courts have deemed sufficient, individually, as a basis for rejecting a settlement. The proposed release is overbroad, encompassing both alleged and unalleged claims, including claims addressing wastewater, stormwater, and real property cleanup damages and even extending to unknown and unasserted personal injury claims that are nowhere even considered in the damages calculation in this proposed settlement. While now styled as a "claims-over" provision, Section 11.6 of the proposed settlement would continue to operate as an indemnity in many foreseeable instances and would significantly increase the Releasing Parties' potential exposure to further losses. The proposal is grossly unfair to interconnected water distribution systems and seeks to require those entities, including scores of subsidiary systems whose decisions necessarily require complex public processes, to satisfy deadlines that all know to be impossible. That outcome would be additionally unfair due to last-minute amendments cobbled onto the proposed settlement to address inadequacies previously identified by parties who fall into that category.

While the 3M Agreement acknowledges some conflicts among class members by identifying a representative for Phase Two claims, that minimal gesture cannot begin to address the fact that, despite a modest number of common legal issues, the case presents class member factual and legal conflicts that are dominant and overwhelming, starting with the inadequately narrow and atypical claims of those presented as class representatives. The funds proposed are grossly inadequate even to address the small number of Class Member claims currently supported by factual estimates, and consequently never could be deemed sufficient to address the thousands of additional claims possessed by retail and wholesale water systems across the country. Such deficiencies would have been made clear by a bellwether case, the absence of which, alone, should prove fatal to the proposed settlement. Finally, in a case in which water systems were readily

2

identifiable using publicly available information, thousands of water systems, including many that had publicly acknowledged PFAS contamination in their systems, were apparently not notified of the settlement, depriving those entities of a fundamental due process protection. As described in detail below, the Court should reject the proposed settlement and direct the Parties to address the deficiencies identified.

## II.    STANDARD OF REVIEW

The Court may only approve a class settlement when it determines that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Court must examine whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal;
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

*Id.*

Under Rule 23(e), courts play the role of fiduciary to absent class members, zealously scrutinizing the proposed settlement to combat the omnipresent "danger that the parties and counsel will bargain away the interests of the unnamed class members in order to maximize their own." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 715 (6th Cir. 2013); *see also Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983) ("Careful scrutiny by the court is necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of the absent class members."); *Sharp Farms v. Speaks*, 917 F.3d 276, 293–94 (4th Cir. 2019)

3

("When the court reviews a proposed class-action settlement, it acts as a fiduciary for the class.").

The Court's role far exceeds a mere rubberstamp. *See* Manual for Complex Litigation, Fourth, § 21.61 ("[T]he judge must adopt the role of a skeptical client and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation."). The Court has an affirmative duty to protect the interests of the "class members whose rights may not have been given adequate consideration during the settlement negotiations." *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

## III.    ARGUMENT

The 3M Agreement as drafted is not "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Fort Worth is a member of the settlement class (an Eligible Claimant) because it is an Active Public Water System in the United States of America that has one or more impacted water sources as of the 3M Agreement date. *See* 3M Agreement § 5.1; *see also* Ex. A (Aff. of Christopher Harder); Ex. B (Aff. of Counsel) (certifying information as required under Agreement); *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989).

### A.  Objection Topic: Release

#### 1.  The release is overbroad.

There is no identical factual predicate among the released future contamination and cleanup claims and the claims alleged in litigation. *See* 3M Agreement § 11.1. A court can approve a release only of claims that share an "identical factual predicate" with claims alleged in the case at issue. *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015); 4 Newberg and Rubenstein on Class Actions § 13:61 (6th ed.) ("[C]ourts often police a proposed settlement agreement to ensure that the release is not overly broad, that is, that it does not release claims outside the factual predicate of the class's claims"). "Claims have an 'identical factual predicate' when they depend upon the *very same* set

4

of facts." *McAdams v. Robinson*, 26 F.4th 149, 160 (4th Cir. 2022) (internal quotation marks and brackets omitted) (emphasis added).

The 3M Agreement would release a wide range of unalleged claims that lack an identical factual predicate with claims alleged by Class Members. Those claims cannot be extinguished. The release is so overbroad as to render the agreement unfair and unreasonable.

### a. The release includes unalleged claims as to PFAS that has not yet entered drinking water and PFAS in yet-to-be-developed water sources.

The release encompasses claims related to PFAS that "*may reasonably be expected* to enter Drinking Water or any Releasing Party's Public Water System." 3M Agreement § 11.1.1 (emphasis added). But PFAS that "may reasonably be expected" to enter water supplies in the future falls outside of the factual and temporal predicate of the claims alleged against 3M. No Class Member has asserted claims against 3M in the related litigation regarding PFAS contamination that has not yet come to pass; such a claim would be dismissed as speculative. Yet, the release encompasses such potential claims. The release also purports to cover factual scenarios different from any forming the basis of alleged claims. For example, if a Class Member expects to purchase a new future Water Source, and that Water Source is later found to contain PFAS, the release would seem to encompass a claim as to that Water Source—even though no claims as to future Water Sources have been or presently could be asserted in litigation. *See id.* § 11.1.1 (releasing "any Claim that . . . may arise at any time in the future out of, relates to, or involves PFAS that . . . may reasonably be expected to enter Drinking Water or any Releasing Party's Public Water System"). Rather than the required identical factual predicate between the claims released in the 3M Settlement and the claims alleged in litigation, there is a temporal disconnect, and the proposed release is boundless as to unknown future claims. *See Raquedan v. Centerplate of Delaware Inc.*, No. 17-CV-03828-LHK, 2018 WL 3368820, at *8 (N.D. Cal. July 10, 2018) (no

identical factual predicate between released wage-and-labor claims in 2015–2016 and wage-and-labor claims outside that time period); *McKinney-Drobnis v. Massage Envy Franchising, LLC*, No. 16-CV-06450-MMC, 2017 WL 1246933, at *5 (N.D. Cal. Apr. 5, 2017) (no identical factual predicate between released breach-of-contract claims and claims that "necessarily occurred at different times"); *Rivera v. Marriott Int'l, Inc.*, No. 219CV05050ODWKSX, 2023 WL 3766504, at *9 (C.D. Cal. June 1, 2023) (approving release "of all claims brought or that could have been brought based on the factual predicate in the action" that was temporally limited to a given "Class Period").

> **b. The release seeks to include almost all wastewater, stormwater, and real property cleanup claims.**

The release excludes claims involving wastewater and stormwater systems and real property that are entirely "unrelated to Drinking Water or a Class Member's Public Water System or Water Sources" and involve facilities or real property that are "separate from and not related *in any way* to the Class Member's Public Water System." *See* 3M Agreement § 11.1.2 (emphasis added). The required absolute and total separation of such cleanup claims from drinking water poses what in many instances would be an insurmountable barrier. For example, even if wastewater is treated and recycled to make up just a fraction of a Class Member's drinking water supplies, under the applicable definition, the Class Member could be held to have released a wastewater cleanup claim in full. Putting aside recycled wastewater, arguments could be made that a wastewater or stormwater system is marginally "related" to a Class Member's Public Water System ("PWS")—and any remote relationship between the two would be sufficient to foreclose a claim under the release as written. Such a broad release of wastewater, stormwater, and real property claims diverges from the factual predicate of the claims asserted and is patently unfair.

6

### c. The release includes claims for unknown PFAS for which no claims are asserted in litigation.

The 3M Agreement releases claims as to *all* PFAS in drinking water. It defines PFAS as "any per- or poly-fluoroalkyl substance that contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen, chlorine, bromine, or iodine atom attached to it)," stating also its "intention" that the definition "be as broad, expansive, and inclusive as possible." 3M Settlement § 2.48. Because this definition of PFAS is based in chemical structure, the release encompasses claims relating to up to 15,000 different chemicals. *See* Nat'l Institute of Env't Health Sciences, *PFAS*, https://www.niehs.nih.gov/health/topics/agents/pfc (last accessed Nov. 1, 2023). Water providers will only know, at most, about contamination by the 29 PFAS within UCMR-5, and the water providers in litigation with 3M have only sought damages for the few PFAS they have tested for and detected—not 15,000 different chemicals. Accordingly, by seeking to encompass claims for thousands of chemicals, more than 99% of which are not subject to a single claim in this litigation, the release is entirely untethered from the required identical factual predicate. *Cf. Canter v. Midland Credit Mgmt., Inc.*, No. 3:14-cv-02939-MMA-MDD, 2017 WL 2817065, at *4 (S.D. Cal. June 28, 2017) (ruling that even if there was some "overlap" in subject matter between consumer-protection claims asserted in litigation and released claims that included different consumer-protection claims, there was no identical factual predicate between them, rendering release overbroad).

### d. The release includes personal-injury claims.

Personal-injury claims relating to PFAS in drinking water fit within "any Claim that . . . may arise at any time in the future out of, relates to, or involves PFAS that . . . may reasonably be expected to enter Drinking Water or any Releasing Party's Public Water System." 3M Agreement § 11.1.1. No water providers have alleged or could allege personal-injury claims in litigation

7

against 3M, nor have they sought recovery for such claims advanced against them by third parties. The claims proposed to be released and the litigated claims lack the required identical factual predicate. Thus on this basis as well, the release is overbroad and cannot meet the standard required by Rule 23.

The lack of any carve-out in the release for personal-injury claims matters a great deal. Customers are already beginning to sue water providers for personal injury. *See, e.g.*, Compl, *Vincent v. Aquarion Water Co.*, No. FBT-CV23-6128205-S (Conn. Sup. Ct. Oct. 16, 2023); Compl., *Hoffnagle v. Conn. Water Co.*, No. HHD-CV-23-6175540-S (Conn. Sup. Ct. Oct. 31, 2023). Water providers are facing, and will continue to face, considerable exposure to liability arising from conditions for which they likely bear no responsibility. If they participate in a settlement with the current release language, they would have no contribution recourse against 3M, a predominant tortfeasor. *See* AFFF MDL FAQs at 3, https://afff-mdl.com/wp-content/uploads/PFAS-FAQ.pdf (last accessed Nov. 1, 2023) (stating that 3M is responsible for some 70% of PFAS liabilities). In stark contrast to the breathtaking scope of the release, the 3M Agreement's structure, the method supposedly used to support the damages calculation, and the relatively small dollar amount of the proposed settlement (when compared to the scope of the problem and likely range of damage recovery at trial), *see infra* Part III.F.1, individually and collectively signal that the agreement was not intended to cover personal-injury claims. If such claims were intended to be included in the release, then the settlement amount is even more inadequate than explained herein, considering just the personal-injury decisions to date. *See, e.g.*, *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 54 F.4th 912, 921 (6th Cir. 2022) (affirming jury verdicts of $40 million and $250,000 for just one plaintiff and his wife in personal-injury action involving long-chain PFAS).

## 2. The Releasing Parties definition would bind parties that never assented to settlement.

The definition of Releasing Parties purports to bind not just the Class Member, but an array of other entities, including any "in privity with" the Class Member and "any person . . . acting on behalf of or in concert with a Class Member to prevent PFAS from entering a Class Member's Public Water System or to seek recovery for alleged harm to a Class Member." *See* 3M Agreement § 2.61. A so-called interpretive guidance issued by the parties advancing the settlement confirms that the Releasing Parties provision applies, notwithstanding whether those Releasing Parties can or want to participate in the 3M Settlement. *See* Dkt. No. 3856-1 at 5 ("In general, by participating in the Settlement, a Class Member releases claims on behalf of itself and its Releasing Parties (as defined in the Settlement Agreement) with respect to the water provided to (or supplied by) the Class Member.").

A "settlement agreement is a contract and must be interpreted as such." *Cox v. Shah*, 187 F.3d 629 (4th Cir. 1999); *Sadighi v. Daghighfekr*, 66 F. Supp. 2d 752, 759 (D.S.C. 1999). "This applies to class settlements as well as to the resolution of litigation between individual parties." *Dahingo v. Royal Caribbean Cruises, Ltd.*, 312 F. Supp. 2d 440, 445 (S.D.N.Y. 2004). It is axiomatic that one cannot be bound by a contract without assenting to it. *See, e.g.*, *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 236 (4th Cir. 2019) ("Under South Carolina law, a contract is formed between two parties when there is, inter alia, a mutual manifestation of assent to its terms." (internal quotation marks and brackets omitted)). But binding parties that have rejected the Agreement or could not assent to it—those that have affirmatively requested exclusion from the class or those that are not Class Members in the first place—is exactly what the 3M

Agreement attempts to do. The Releasing Parties definition purports to bind even entities over which a Class Member has no control, such as contractual counterparties that expressly opted out of the 3M Agreement. Whatever the merits of the parties' goal of preventing "double recovery," Dkt. No. 3856-1 at 5, that goal may not be accomplished through an unfair means that also violates a fundamental tenet of contract law—that all bound parties must have assented.

### B. Objection Topic: Third-Party Claims

#### 1. The Claims-Over provision functions as an indemnity.

The initially proposed settlement contained a release and indemnity provision. After 17 States and Sovereigns objected (Dkt. No. 3462), 3M and Class Counsel revised Section 11.6 of the agreement by substituting "Protection Against Claims-Over" for the indemnity. The Agreement provides a "contribution bar" and a "Claims-Over" provision. 3M Agreement §§ 11.6.2, 11.6.4. Taken together, the two provisions function as an indemnity—differing from the initial indemnity provision only in minor ways. To the extent the Claims-Over provision functionally operates as an indemnity, it may contravene state constitutions and statutes that regulate the circumstances and procedures under which municipalities and other political subdivisions may assume debt. *See, e.g.*, Cal. Const. art. XVI, § 18; Tex. Const. art. III, § 52; Wash. Const. art. VIII, § 6; RCW 39.36.020(2)(a)(ii). In that event, the settlement agreement— which is a contract, *see Cox*, 187 F.3d at 629—would be void. *See Starr v. City & Cnty. of San Francisco*, 72 Cal. App. 3d 164, 167, 140 Cal. Rptr. 73, 74 (Cal. Ct. App. 1977) (voiding contracts violating constitutional provision on municipal indebtedness); *Galveston, H. & S. A. Ry. Co. v. Uvalde Cnty.*, 167 S.W.2d 305, 306 (Tex. Civ. App. 1942) (construing county contract as containing indemnity and refusing to enforce it because it was entered into in violation of state law regulating indebtedness of municipalities); *Whatcom Cnty. Water Dist. No. 4 v. Century Holdings,*

10

*Ltd.*, 29 Wash. App. 207, 211, 627 P.2d 1010, 1012 (Wash. Ct. App. 1981) (agreement construed as creating municipal debt and accordingly was "void as beyond the power of the Water District and contrary to the state constitution").

The contribution bar prevents any non-Released Party (i.e., non-settling defendants in the MDL) from suing 3M for contribution or indemnity. 3M Agreement § 11.6.2. Such contribution bars are widely used in multi-party litigations to facilitate partial settlements. But such provisions do not prevent claims by non-parties to the litigation, as such a bar would violate basic due process. *See Jiffy Lube*, 927 F.2d at 158 (citing Manual for Complex Litig. 2d, § 23.14 at 166 (1985)) ("If the proposed settlement is intended to preclude further litigation by absent persons, due process requires that their interests be adequately represented."). Section 11.6.2 cannot apply to either direct actions against 3M or contribution actions against 3M by non-parties to the MDL.

Because myriad, as-yet-unknown parties that are not subject to the contribution bar may bring actions against Releasing Parties and 3M under the settlement as proposed, Releasing Parties may lose the benefits of any settlements they receive from 3M. Section 11.6.4 of the 3M Agreement requires that if an action by a Releasing Party against a non-party gives rise to a contribution award against 3M by the non-party (a Claim-Over), the Releasing Party must, in effect, indemnify 3M by reducing the amount of the Releasing Party's judgment in any amount required to fully extinguish any Claim-Over. That is, to pay 3M's entire share of liability for contribution to the non-party.

An example illustrates the unfairness inherent in the proposed settlement structure. Consider the scenario where a PWS participates in the 3M Agreement and receives $100,000. It is later sued for cleanup by its state environmental agency and for personal injury and property damage by its customers, after the U.S. Environmental Protection Agency ("EPA") discovers

PFAS in the PWS's wells at concentrations exceeding the applicable cleanup level. The PWS ultimately is found liable to clean up its water supply at a cost of $100 million. Its customers win a judgment of $200 million for personal injury and property damages. The PWS then learns that the source of the PFAS in its water supply is AFFF applied during firefighting training exercises over a 30-year period at a local airport. The PWS sues the airport. It cannot sue 3M because it has released 3M. The airport sues 3M in contribution, which it can do because it is a non-party to the settlement with 3M. A court allocates 50% of the cleanup costs and 50% of the damages suffered by the customers to 3M, 50% to the airport, and nothing to the PWS. 3M then tenders its damages under the Claims-Over provision of the settlement to the PWS. Had the PWS not settled with 3M, its share of cleanup liability and customer damages would have been zero. Instead, it is $150 million—the 50% share the court allocated to 3M. That such a result is possible renders the settlement unacceptable under applicable Rule 23 standards.

The result for the PWS would be even worse if the court determines the airport to be only 10% liable and 3M to be 90% liable—a potentially more realistic scenario. In that event, the PWS would be required to reduce the $300 million judgment "by whatever amount is necessary . . . to fully extinguish the Claim-Over under applicable law." 3M Agreement § 11.6.4. The PWS, who settled with 3M for $100,000, would be responsible for 3M's $270 million share.

Such hypothetical third-party suits are neither remote nor unlikely. They are already occurring. *See supra* Part III.A.1.d. Because the 3M Agreement defines a Released Claim that could trigger the Claims-Over provision so broadly as to include far more than just PFAS contamination to the water supply, the universe of potential defendants, plaintiffs, and claims that could trigger the provision is immense.

**2. The Agreement fails to name a settlement crediting method.**

The Fourth Circuit has held that a failure to name a settlement crediting method "may deprive the plaintiff class members of information affecting their ability to assess fairly the merits of the settlement." *Jiffy Lube*, 927 F.2d at 161. "The plaintiff class's interest in the choice of setoff method is such that at least one court has held that the decision on setoff method must be considered by the class and its representatives before the settlement can be approved pursuant to Rule 23(c)." *Id.* (citing *In re Atl. Fin. Mgmt., Inc. Sec. Litig.*, 718 F. Supp. 1012, 1018 (D. Mass. 1988)). "Delaying final determination of the amount of the set-off deprives the plaintiff class of one of the chief inducements to settle: certainty. Particularly in class actions, this method generates significant practical difficulties as well, in that the indeterminate impact of any partial settlement would make it difficult to frame a notice to the class which fairly presents the merits of the proposed settlement." *Atl. Fin. Mgmt., Inc.*, 718 F. Supp. at 1018. Because the 3M Agreement never identifies a settlement crediting method, *see generally* 3M Agreement § 11.6, Class Members are unable to fairly assess the merits of the agreement.

### C. Objection Topic: Interconnected Drinking Water Systems

#### 1. The Guidance constitutes an improper late amendment to the 3M Agreement.

On October 25, 2023, Class Counsel filed a Joint Motion to Supplement the Preliminarily Approved Allocation Procedures ("Motion to Supplement"), seeking to amend the underlying 3M Agreement through incorporating the Guidance by reference. Dkt. No. 3856. The Court granted that motion the next day. Dkt. No. 3861.

With this entirely new document, Class Counsel announced for the first time that the proposed settlement class was intended to include water wholesalers, created a new joint claims submission process for interrelated water systems, and took the position that the releases would operate to rely on the language of the water sale agreements within those interrelated systems.

13

Together, those pronouncements operate as material substantive amendments to the underlying 3M Agreement because they alter both the distribution of settlement monies and the claims process, and significantly expand the scope of entities covered. These fundamental changes contradict the Court's preliminary approval findings, and fail to satisfy either the notice process or the notice timeline. The Guidance changes the 3M Agreement and fails to resolve related ambiguity.

Some form of amendment or guidance was and remains necessary to clarify several ambiguous aspects of the 3M Agreement.[1] In their Motion to Supplement (Dkt. No. 3856), Class Counsel equivocates on whether the Guidance substantively altered the Agreement with regard to interrelated systems. They argued, for instance, that the Guidance did not require additional time for eligible class members to analyze because it "adheres to existing principles" in the 3M Agreement. Dkt. No. 3856 at 3. Yet, the Guidance conjured a heretofore unmentioned process to address joint claims, and mandated that such claims be addressed on forms that do not yet exist. In other sections, the Guidance backsteps from providing substantive clarity. The "Scope of Release" section, for example, describes how the claims release should operate, but concludes that "[u]ltimately, whether claims are released will turn on the application of the release provisions of the Settlement Agreement." Dkt. No. 3856-1. That caveat in essence invalidates the entire related portion of the exercise apparently mischaracterized as a clarification.

---

[1] Of note, three separate groups have raised questions regarding the scope of the Agreement as proposed: states on behalf of themselves and other sub-federal sovereigns, Dkt. No. 3460; two large wholesalers raising concerns regarding the status of wholesale water providers, Dkt. No. 3829; and the Leech Lake Band of Ojibwe with respect to Tribes and Tribe-run water systems, Dkt. No. 3894.

### 2. Eligible class participants have not received adequate notice of this Guidance.

The Guidance is a substantive change to the 3M Agreement that requires notice. Class Counsel failed to provide notice to large portions of eligible claimants that are directly implicated by the Guidance. In fact, Class Counsel did not dispute that nearly *two thirds* of the 3,270 active wholesalers listed in EPA's Safe Drinking Water System ("SDWIS") database were not included in the 3M Agreement's exhibits of known Class Members to whom notices were mailed.[2] Dkt. No. 3829-1 at 1–2. As a result, those wholesalers may unknowingly be bound by the settlement, and have potential claims waived by their customers, due to fast-approaching deadlines for opting out that do not allow for coordination with customers or approval by relevant governing bodies. Such a result would violate fundamental due process, especially when wholesalers could easily have been identified and informed of their potential claims through a public database search. *See Ashok Babu v. Wilkins*, No. 22-15275, 2023 WL 6532647, at *1 (9th Cir. Oct. 6, 2023) (noting that due process requires notice to be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).

### 3. There is not enough time for interrelated systems to meaningfully evaluate the Guidance.

The Guidance sets out a new joint claims process by which interrelated water systems may together submit a unified claim or may separately file submissions for assessment and division by

---

[2] *See* U.S. EPA, *SDWIS Federal Reports Advanced Search* (last visited Oct. 18, 2023), https://ordspub.epa.gov/ords/sfdw_rest/r/sfdw/sdwis_fed_reports_public/1. A search in SDWIS for all active PWSs classified as wholesalers results in 3,270 systems. When cross-referenced with the 3M Agreement Phase I and Phase II designations (Amended Exhibits E and F), 236 match to Phase I, while 976 match to Phase II. That leaves 2,058—or more than 60 percent of active wholesalers—that are unlisted and likely never received a 3M settlement notice.

the Claims Administrator. This necessarily would require time to implement, as interrelated water systems now convene, analyze their water sales agreements, negotiate allocations based on treatment practices as well as potential claims, decide whether to join or opt out, and ultimately seek approval of those decisions from the relevant governing bodies. The operative deadlines will allow for none of those steps. The Guidance puts the onus on wholesalers and their customers to determine the fairest application of the Settlement as between their systems, yet fails to provide adequate time to do so, and potentially pits entities within an interrelated water system against one another as they navigate monetary claims and the implications of the proposed releases.

The North Texas Municipal Water District ("NTMWD") provides an illustrative example of the unfairness of what has been proposed here. NTMWD comprises 13 member cities, supplies treated water to 34 direct customer contracts, and provides treated water to 32 retail customers. *See* Dkt. No. 3829-1 at 5. In all these relationships, NTMWD serves as a treatment provider, diverting source water supplies to seven water treatment plants, with a capacity of nearly one billion gallons per day, and sending potable water to its customers. Under the Guidance, NTMWD would have to meet with each of its customers, analyze and negotiate claims, and seek approval from the various elected bodies in short order.

Discussions between and among at least 50 government agencies cannot happen overnight. The Agreement seeks to settle the liability of an entity with one of the greatest responsibilities for PFAS contamination in the world. Under the 3M Agreement and Guidance, the provider would waive most future claims against that company, potentially add liability through the claims-over provision (requiring the settling party to absorb 3M's share), and thus reduce recoveries against other polluters in the future. Each entity has its own elected councilmembers and boards that must ultimately approve the joint claim. Reaching agreement will require more than the 30 business

16

days afforded.

**4.    The Guidance fails to address fundamental issues unique to wholesalers and their customers.**

A variety of issues unique to wholesalers and their retailer customers are not addressed by the Agreement. Wholesalers process massive quantities of water that far exceed that processed by the typical PWS. They may sell treated or raw water to their members—that may themselves be wholesalers. Wholesalers represent a critical part of the public water system. Both the Agreement and Guidance fail to address and appear to have been drafted without appreciation for many features of these interconnected systems.

The Guidance does not address how settlement funds will be allocated when a related wholesaler and retail purchaser disagree on opt-out decisions, even though it recognizes that wholesalers and retailers may make conflicting decisions regarding whether to join the Agreement. In such circumstances, the Guidance leaves to the Claims Administrator to decide how to "divide the Allocated Amount based on relative capital and O&M costs of PFAS treatment." Dkt. No. 3856-1 at 2–3. Ignoring for the moment the fact that neither the Agreement nor the Claims Administrator properly has any role or authority with respect to a party once it has opted out of the settlement, until the Administrator acts, the Guidance confesses there is no way to assess how much money either entity would receive in such a circumstance. It is not clear what happens to the remaining funds that would have been designated to the opted-out entity. Nor is it clear how funds will be allocated from different Phases if the wholesaler and retail purchaser are members of different phases of the disbursement. The potential resulting confusion and unfairness render the 3M Agreement untenable.

The Agreement also failed to address, and the Guidance ignores, the potential introduction of PFAS at different points along interconnected systems. Water is not protected from contamination as soon as it is channeled, treated, or sold to another entity. As a result, the claims of a wholesaler may be distinct from the claims of a retailer further along the water system. The Guidance, as well as the underlying Agreement, do not offer a mechanism to cope with those circumstances, and might be wielded to foreclose such claims.

The Guidance and the Agreement conflict in how they address treated water. The 3M Agreement provides that treated water cannot constitute a Water Source for Allocation purposes. *See* 3M Agreement § 2.82. That would apparently render any treated water input for a water system unavailable for an allocation. Yet the Guidance provides, in conclusory terms, that the 3M Agreement would not prevent recovery as to a treated water source that required additional treatment. Dkt. No. 3856-1 at 6. While the Guidance purports to alter this aspect of the underlying agreement, Class Counsel have asserted that the Agreement text controls and remains unchanged. *See, e.g.*, *supra* Part III.C.1. Those positions are at odds; the Guidance introduces an entirely new way to deal with raw or treated water.

**5. The Agreement ignores the challenges of PFAS treatment at scale.**

The Agreement's focus on treatment ignores the challenges posed by treatment at the scales required for wholesalers and large water systems. NTMWD's water sources—from Lavon Lake, Lake Jim Chapman, Lake Texoma, Trinity River, and Bois d'Arc Lake in the Trinity, Sulphur, and Red River Basins in Texas—flow into NTMWD's seven water treatment plants at a rate of nearly one billion gallons per day. *See* Dkt. No. 3829-1 at 5. Implementing the limited set of technologies available to treat PFAS—like filtration or reverse osmosis—at this scale requires a cost that goes

far beyond what is contemplated under the settlement. The Agreement is inadequate for large-scale water systems like NTMWD.

### D. Objection Topic: Consultation Requirement

The 3M Agreement Claims Form requires that the Class Member declare under penalty of perjury that it "has consulted with *any other entity* that has incurred costs in connection with efforts to removed [sic] PFAS from, or prevent PFAS from entering, Settlement Class Member's Public Water System, and that Settlement Class Member's claim is *on behalf of any such other entity*." *See* 3M Agreement Claims Form. Along a single surface water source, there may be thousands of public water systems that draw, use, treat, and return water to that source. Groundwater sources may also be implicated—groundwater recharge from surface waters as well as general treatment by groundwater users may implicate a host of different entities. The Claims Form language would require a Class Member to identify and consult with all such entities, and ultimately make claims *on their behalf*. It is not clear how this certification potentially excludes other Class Members from making claims. It is also not clear whether this certification would implicate non-water systems that treat their water outputs, such as landfills. The logistical complexities necessarily involved in the mandated consultation, paired with the vague scope of that consultation, make this requirement unfair in operation.

### E. Objection Topic: Class Conflicts

#### 1. Common questions of law and fact do not predominate across the class.

Although Class Counsel contends 16 common questions of law or fact sufficiently unite the class, "the predominance criterion is far more demanding." *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997) (ruling that putative class members' common exposure to asbestos products supplied by defendants may have been enough to satisfy commonality but not

predominance). The proposed class is too broad, with too diffuse an array of individual questions of law and fact, claims and defenses, for common questions to predominate. Indeed, in this matter, individual claims dominate. *See id*.

For example, putative Class Members have varying amounts and types of PFAS in their systems, some of which are regulated and some of which are not. Many have not detected PFAS. Some Class Members purchase treated water from a wholesaler, others purchase raw water, while still others supply raw and/or treated water they distribute—some to consumers, others to retailers. Some have claims against the federal government. Class Members are located in all 50 states, with varying state laws and remedies. These numerous and different factual and legal circumstances significantly affect the strength of each Class Member's claim and thus the potential damages and recovery. These individual and subgroup questions predominate over the relatively few common questions of fact alleged by Class Counsel. Only a settlement with appropriate subclasses could address the predominance issue. *See* Fed. R. Civ. P. 23(c)(5) ("[A] class may be divided into subclasses that are each treated as a class under this rule.").

### 2. Proposed Class Representatives have claims atypical of many Class Members.

Class Counsel and 3M offer a conclusory argument that Class Representatives have asserted claims "undoubtedly typical of those of the Settlement Class Members" because they "have asserted claims for actual or threatened injuries caused by PFAS contamination[,]" they have alleged that 3M "knowingly sold defective PFAS and failed to warn of those defects[,]" and they have asserted a "common damages theory that seeks recovery of the costs incurred in testing, monitoring, remediating and/or treating" their drinking water. *See* Dkt. No. 3370-1 at 48–49. Class Representatives' claims are atypical and their claims lack many of the nuances of the Class Members they seek to represent, including: (1) large, interrelated water systems; and (2) Class

20

Members whose claims are affected by variations in state law.[3]

**a. No Class Representatives own or operate large, complex water systems that wholesale drinking water to multiple entities.**

Of the 17 Class Representatives, only four include wholesale water supply as a part of their business. *See* Dkt. No. 3370-2 at 10–11. The largest wholesaler of that group—Martinsburg Municipal Authority—has a maximum flow of 375,000 gallons per month.[4] Wholesaler Class Members can have systems that provide an average of 730 million gallons of treated water per day. *See* Dkt. No. 3829 at 17 n.1. In large systems, a PWS may be entirely separated from end water users through the sale of water to intermediaries. In litigating claims for these large systems, numerous questions of law and fact inapplicable to the claims of the Class Representatives would arise, including: who would constitute necessary parties under Rule 19; which of these various entities have claims for damages against the manufacturers; what claims and defenses these water providers have against each other; whether retailers have claims for increased rates; whether manufacturers have defenses to claims for increased rates; whether wholesalers or retailers have contractual authority to release claims on behalf of each other, and more. These questions significantly affect the claims and interests of water providers within complex systems. Class Representatives have not had to grapple with these issues and cannot adequately represent the interests of water providers that do.

---

[3] As explained in the Memorandum of Law in Support of Leech Lake Band of Ojibwe's Motion to Intervene for Limited Purpose to Clarify Settlements, none of the Class Representatives are Tribes, and Tribes have interests "beyond those of the Plaintiff Water Providers." Dkt. No 3893-1 at 7–8; Dkt. No. 3894-1 at 7–8.

[4] *See* Pennsylvania Department of Environmental Protection, Drinking Water State Revolving Fund Project Priority List (June 2, 2022),
https://files.dep.state.pa.us/Water/BPNPSM/InfrastructureFinance/StateRevolvFundIntendUsePlan/2022/DRINKING_WATER_Federal-FY_2022_PPL_JUN_REV_1.pdf.

### b.  Class Representatives only represent 13 states.

Class Representatives present claims atypical to the class because each plaintiff's *prima facie* case is shaped by state law. While there may be similarities between states, the differences can be stark. Some states have adopted no regulations for PFAS, while others have adopted drinking water and cleanup standards. The Class Representatives assessed only the strength of the claims for the City of Stuart, Florida. *See* Dkt. No. 3370-1 at 41–42. Florida does not regulate PFAS in drinking water. By contrast, several states have enforceable maximum contaminant levels ("MCLs") for multiple types of PFAS in drinking water. *See, e.g.,* 310 Code Mass. Regs. 22.07G (regulating six types of PFAS with a combined 20 ppt MCL); Mich. Admin. Code R. 325.10604g (regulating seven types of PFAS with individual MCLs); N.H. Code Admin. R. Env-Dw 705.06 (MCLs for four types of PFAS); N.J. Admin. Code 7:10-5.2 (MCLs for three types of PFAS). Washington State has both State Action Levels for 5 PFAS in drinking water and broad cleanup regulations that apply to *any* type of PFAS. WAC 246-290-315(4)(a), tbl.9; WAC 173-303-040, -100(6). Water providers in Washington and other states with such laws may be exposed to significantly more liability to investigate PFAS sources, treat drinking water, remediate water supplies, and take other actions as required by state regulators. Further, unlike the federal Superfund law, Washington law holds liable any person who sells a hazardous substance and is responsible for written instructions for its use if certain other conditions are met. *Compare* 42 U.S.C. 9607(a), *with* RCW 70a.305.040(a)(5). Water providers in Washington and other states therefore have unique state law claims that are much stronger and broader than the claims available to the City of Stuart. These distinctions matter. Class Counsel have left entirely unaddressed the strength of the claims held by Class Members in states with drinking water regulations.

### 3. Several groups of Class Members have interests in direct conflict with other groups of Class Members.

Class Representatives assert, without support, that "no indicia of conflicts of interest exists" among the proposed class and that "Plaintiffs allege the same or similar harms as the absent class members." Dkt. No. 3370-1 at 50. However, conflicts of interest are apparent on the face of the 3M Agreement. The fact that Class Members are divided into two Phases—those with a current injury as of the Settlement Date and those with only a future injury—belies Class Counsel's assertion. The appointment of Ms. Elizabeth Fegan as separate counsel to represent the Phase Two Class Members further indicates conflict *among* the Class Representatives. *See* Dkt. No. 3370-5 at 8. That appointment fails to meet the general requirement for subclass designation, and it in no way addresses a variety of other conflicts, such as the following.

- **Within Phase Two**: Phase Two Class Members with little or no PFAS detections have an interest in recovering monitoring costs and maintaining an ample fund available long-term in case the PFAS levels increase over time, whereas Phase Two Class Members with high detections, particularly above regulatory limits, have an interest in obtaining the maximum amount of funding as soon as possible after detection.

- **Between Wholesalers and Retailers**: Wholesalers and their customers are in direct conflict because they compete for the same allocation for the water source. *See* Dkt. No. 3856-1 at 2–3.  Under the Guidance, the Claims Administrator will have broad authority to interpret contracts between wholesalers and their customers to determine who bears the treatment costs "through the purchase price, under the contract, or otherwise." *Id*. Because the settlement fund is so inadequate, each party will have an interest in ensuring that it receives the full allocation amount. *See supra* Part III.C.1.

- **Between Class Members with or without Regulatory Violations**: Class Members with regulatory violations have both stronger claims and an interest in receiving the maximum amount of funding upfront to treat their water as soon as possible, whereas Class Members without such violations have weaker claims and an interest in recovering monitoring costs while ensuring that more funds are available later in case their detections increase over time.

23

- **Between Class Members with Well-Researched or Less-Researched PFAS**: Class Members with detections of relatively well researched PFAS such as PFOA and PFOS have an interest in basing allocation on the quantities of those chemicals in the water supply while other Class Members may not even be able to detect the types of PFAS in their systems. Other Class Members may have detections of PFAS chemicals for which there is currently no regulatory level (either enacted or proposed) but for which there may be in the future as PFAS research continues. Class Members with well-researched PFAS that have regulatory limits and health risks have an interest in recovering now based on those detections, while those without such detections have an interest in maximizing future funding as more is discovered about the types of PFAS in their systems. This conflict is shown by the bias in the allocation procedures for Class Members who have detections of PFOA and PFOS versus those who only have detections of other PFAS. *See* 3M Settlement Agreement, Ex. Q at 7–8.

- **Between Class Members that have PFAS with or without EPA-approved Test Methods**: The Agreement allocates funds largely based on those PFAS that have EPA-approved test methods as applied through UCMR 5. Nonetheless, the Agreement releases claims for all types of PFAS, even those that are not yet detectable by water providers. Water providers with these types of potential future claims but no current claims have an interest in either restricting the release of claims to fewer types of PFAS or ensuring funding well into the future when they might be able to detect these types of PFAS in direct conflict with Class Members who have detectable PFAS and have an interest in compensation as soon as possible.

Extensive and material conflicts exist among Class Members, and adequate procedures were not put in place to protect them against these conflicting interests; certification without such safeguards would not comply with Rule 23.

**F. Objection Topic: Money**

**1. The settlement funds are insufficient to redress 3M's harm to water providers.**

Under the 3M Agreement, 3M will pay between $10.5 billion and $12.5 billion to Eligible Claimants. *See* Dkt. No. 3370-3 at 11. Even assuming this figure reflects the settlement's true value—and it does not—the settlement amount pales in comparison to the PFAS-related damages that 3M has caused across the country while controlling over 70% of the historical PFAS market. *See* AFFF MDL FAQs at 3, https://afff-mdl.com/wp-content/uploads/PFAS-FAQ.pdf (last

accessed Nov. 1, 2023). Estimates indicate the nationwide cost of drinking water treatment of PFAS may range between $3–6 billion *annually*. *See* Ass'n of Met. Water Agencies, *AMWA Reacts to Proposed PFAS Settlement*, https://www.amwa.net/press-releases/amwa-reacts-proposed-pfas-settlement. Investigating, testing, purchasing and installing treatment infrastructure, and operating and maintaining equipment for decades will entail remediation costs orders of magnitude above what the settlement agreement provides from the predominant PFAS manufacturer. The funds do not begin to approach what the company with 70% of liabilities for PFAS should fairly pay to harmed communities across the country.

### 2. The 3M Agreement failed to compare the value of the settlement to the damages the class could have obtained at trial.

The "most important factor in evaluating the fairness and adequacy of a proposed settlement is an analysis of the value of the settlement compared to the potential recovery if the case went to trial," and courts reject settlements that fail to sufficiently assess awards in this manner. *In re Force Prot., Inc. Derivative Litig.*, No. 2:08-1904-CWH, 2012 WL 12985420, at *10 (D.S.C. Mar. 30, 2012); *In re Corrugated Container Antitrust Litig.*, 634 F.2d 195, 212 (5th Cir. 1981) (approving settlement where expert opined on total damages to class); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("In determining the fairness, adequacy and reasonableness of the proposed compromise, the . . . settlement terms should be compared with the likely rewards the class would have received following a successful trial of the case."). While a "cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair," *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 628 (9th Cir. 1982), "any fraction has a denominator, and without knowing what it is the Court cannot balance plaintiffs' expected recovery against the proposed settlement amount," *Rollins v. Dignity Health*, 336 F.R.D. 456, 463 (N.D. Cal. 2020) (internal quotation marks

omitted). It is reversible error to approve a settlement without providing a quantification of the alternative outcomes to a settlement. *See Reynolds v. Beneficial National Bank*, 288 F.3d 277, 285 (7th Cir. 2022) ("A high degree of precision cannot be expected in valuing a litigation, especially regarding the estimation of the probability of particular outcomes. Still, much more could have been done here without . . . turning the fairness hearing into a trial of the merits.").

The proposed settlement suffers a fundamental flaw because it fails to provide even a single estimated range of damages or recovery for proposed class members. *Iris Connex, LLC v. Dell, Inc.*, 235 F.Supp.3d 826, 849 (E.D. Tex. 2017) ("To determine whether a settlement is fair and made in good faith, it is not the absolute value of the settlement but rather the prospective recovery that must be evaluated, i.e., how much is at stake."). The formula used to create the settlement's allocation table is based on a combination of adjusted flow and PFAS levels. *See* 3M Agreement Exhibit K. Although this calculation relied on a theory of cost for PFAS filtration, it is not a replacement for an estimate of aggregate damages to Class Members. Such calculations are not impossible to conduct, and many courts have relied on expert testimony presenting methods for estimating damages and theorizing different levels of recovery. *See In re Domestic Air Transp. Antitrust Litigation*, 148 F.R.D. 297, 322 (N.D. Ga. 1993) (providing that although there are circumstances where a precise dollar valuation cannot be given to a settlement, an expert can provide an estimated range of value). The absence of a damage estimate constitutes reversible error. *See Reynolds*, 288 F.3d at 285. Although the circumstances, uncertainties, and complexities of the proposed settlement make it difficult to produce a single estimate of damages, a potential range is critical to determine whether the settlement award is fair, reasonable, and adequate. The Agreement lacks even minimal foundational guidance on an estimated range of damages or recovery for Class Members.

### 3. The lack of a bellwether trial renders the 3M Agreement unfair and inadequate.

No bellwether trial has occurred, leaving unaddressed what damages Class Members stood to potentially earn at trial against 3M. *See* Dkt. No. 3256 (continuance of City of Stuart bellwether trial, which was ultimately individually settled in wake of 3M Agreement).

Bellwether trials play a critical role in guiding parties toward an equitable and adequate settlement. They provide an opportunity to assess the underlying facts of disputes and the strengths of the parties' arguments, and form a bulwark against bias in settlement negotiations. The information provided by bellwether verdicts or settlements sheds light on a global settlement process that otherwise would be conducted exclusively between defendants and inherently self-interested lead plaintiffs' attorneys. *See* A.D. Lahav, *Bellwether Trials*, 76 Geo. Wash. L. Rev. 576, 593–94 (2008); E. E. Fallon *et al.*, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2342 (2008) (bellwether trials give parties an "understanding of the litigation that is exponentially more grounded in reality"); *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 348–49 (5th Cir. 2017) ("Bellwether trials are meant to produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis, and what range of values the cases may have if resolution is attempted on a group basis."). In contrast, juries are disinterested parties with no financial stake in the outcome of the MDL, making them less susceptible to influences that may warp a settlement in favor of a small segment of plaintiffs, their counsel, or even defendants. Introducing jury participation through bellwether trials protects the many parties that do not have direct input into settlement talks in MDLs.

The 3M Agreement necessarily was negotiated without any reference to bellwether results. Only 3M and Class Counsel weighed in on the value and structure of the settlement, behind closed

27

doors. No jury served as an objective counterbalance to potential biases and no bellwether result shed light on what funds could actually be recovered from 3M. Class Counsel has not otherwise attempted an "analysis of the value of the settlement compared to the potential recovery if the case went to trial." *In re Force Prot., Inc. Derivative Litig.*, 2012 WL 12985420, at *10. Given the class of potentially over 12,000 water providers, *see* Dkt. No. 3370-1 at 20, the public health consequences of moving forward without the critical information bellwether results provide are severe. Especially considering indications that the total settlement funds amount to a small fraction of expected nationwide PFAS remediation costs, the lack of any bellwether result raises serious fairness and adequacy concerns.

### 4. The settlement funds are not allocated properly between wholesalers and retailers and between different Phases.

The Agreement fails to treat "class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). In order to assess this factor, the Court must consider "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of release may affect class members in different ways that bear on the apportionment of relief." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 808 (3d Cir. 1995).

Rather than consistently compensate entities that may incur costs associated with PFAS contamination, the Agreement appears to treat class members differently by limiting the number of entities that may claim funds while nevertheless requiring all participating entities to broadly release their claims against 3M. For example: (1) when a retail water supplier obtains treated water from a wholesale supplier, it may not obtain funds, even if PFAS enters their system, *see* 3M Agreement § 2.82, *but see* Dkt. No. 3856-1 at 2–3 (providing guidance to the contrary); (2) when a retailer treats the water they may receive the full potential allocation even though the wholesaler

may face costs related to contamination, Dkt. No. 3856-1 at 2–3; (3) the allocation between Phase One and Phase Two Claimants provides more funding for Phase One, even if Phase Two claimants discover greater contamination, Dkt. No. 3370-3 at 19; and (4) the methodologies used by Class Counsel may have vastly undercounted and therefore undercompensated Phase One.[5] The Agreement's promoting-equity clause is too limited to deal with the potential inequities between Phases One and Two. *See* 3M Agreement § 6.8.11 (providing for limited funds shifting between Phases). This differentiated treatment for proposed class members is a clear sign that the settlement is not fair. *See Gen. Motors*, 55 F.3d at 808 ("[O]ne sign that a settlement may not be fair is that some segments of the class are treated differently than others.").

### 5. The settlement allocations place disproportionate risks on Phase Two claimants.

Courts frequently reject settlements that risk only part of the class receiving relief while the other releases claims but sees no relief. *See, e.g.*, *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 782, 57 Fed. R. Serv. 3d 1158 (7th Cir. 2004) (concluding that "the settlement cannot stand" in part because "one of the classes . . . received absolutely nothing, while surrendering all its members' claims" ); *Petruzzi's, Inc. v. Darling-Delaware Co., Inc.*, 880 F. Supp. 292, 299 (M.D. Pa. 1995) (noting that "[a]pproximately 50% of the class will not receive any 'premium certificates,' but their claims against Moyer will be discharged" and rejecting the proposed settlement).

More water providers in the Settlement Class will fall within Phase Two than Phase One. *Compare* Dkt. No. 3370-3, Ex. E, *with* Dkt. No. 3370-3, Ex. F. The Agreement's protracted payment schedule creates an unjustifiable risk that Class Members—especially those in Phase

---

[5] At a basic level, the estimate of Phase One members used data from UCMR 3, which tested a far more limited set of active PWSs. The use of UCMR 5 data to qualify for Phase One means that many more PWSs may qualify under Phase One than previously understood.

Two—may not fairly share in settlement funds yet are still bound to the proposed settlement's broad release of claims. The Settlement contemplates that 3M will pay thirteen annual installments into the Qualified Settlement Fund ("QSF") between 2024 and 2036. *See* Dkt. No. 3370-3 at 20; Dkt. No. 3370-3, Ex. K. The QSF, in turn, will consist of different subsidiary funds for Phase One and Phase Two class members. *See* Dkt. No. 3370-3, Ex. Q § I(1)(a)–(b). The money earmarked for Phase One Class Members will be paid in full by mid-2025. *See* Dkt. No. 3370-3, Ex. K. The payment schedule is delayed for Phase Two Class Members. The money earmarked for them will not be paid in full until 2028, and 75% of the funds dedicated to operation and maintenance will be paid between 2030 and 2036. *See id.* Considering only the implications of the ongoing PFAS and earplug litigation, the risk that 3M will become insolvent at some point in the next 13 years is not negligible. The schedule shifts most of 3M's insolvency risk onto Phase Two Class Members, creating an unjustifiable risk that many Class Members may release claims but receive no relief. That is inequitable. *See Ferrington v. McAfee, Inc.*, 2012 WL 1156399, *8 (N.D. Cal. 2012) ("Settlements in which . . . a significant subclass will receive no benefit have been rejected by courts because such agreements are not fair, adequate, and reasonable for all class members").[6]

### G. Objection Topic: Notice

#### 1. Notice is inadequate as to wholesalers and other water systems that are reasonably identifiable and should be given individual notice.

In the Guidance, Class Counsel asserted for the first time that the 3M Agreement applies to wholesale water providers and acknowledged that most wholesalers are registered as PWSs with EPA. Dkt. No. 3856-1 at 1. Class Counsel and 3M were required to develop a Notice Plan reasonably calculated to reach wholesalers who have detections of PFAS and qualify as Phase One

---

[6] Nor does the settlement include a mechanism to delay payment of or claw back portions of payments of legal fees that might be deemed excessive in the event of a future 3M insolvency.

Class Members. *See* Fed. R. Civ. P. 23(c)(2)(B) (requiring "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort"). This did not occur.

Individual notice is required for class members who are readily identifiable and whose contact information is easily ascertainable. *Eisen v. Carlisle and Jackson*, 417 U.S. 156, 175 (1974). The proposed class was defined to include any active public water system that conducted testing under UCMR 3, UCMR 5, or a comparable state program, *as well as any system that had positive PFAS test results*. Class Counsel failed to construct a Notice Plan that accounted for this final category. The Notice Plan utilized public information to identify water systems that tested for PFAS through UCMR 3 or UCMR 5 testing or similar state programs. *See* Dkt. No. 3370-12 at 5. However, many of the nation's largest public water systems are wholesalers that were not required to test under these programs. Wholesalers who tested for PFAS through voluntary self-initiative or through voluntary programs set by regulatory bodies were not captured by the Notice Plan. As Class Counsel's environmental consultant Mr. Rob Hesse noted in his declaration, other information regarding these water systems would have been publicly available through the Safe Drinking Water Information System ("SDWIS"), including their populations served and classification. *Id*. at 4. It was on that basis that Class Counsel and Mr. Hesse swore that Class Members were ascertainable from reasonably accessible records available to Class Counsel. *See* Dkt. No. 3370-1 at 46; Dkt. No. 3370-12 at 1. Yet the decision was made to provide notice only to those entities that tested under explicit testing programs. Because the proposed class includes PWSss that voluntarily tested for PFAS and the contact information for all such systems is readily available, individual notice should have gone to *every* active PWS in SDWIS. *See Eisen*, 417 U.S. at 175 (requiring individual notice to the 2,250,000 class members whose names and addresses

31

were easily ascertainable). Individual notice to identifiable class members whose information is easily ascertainable is not within the discretion of Class Counsel; it is a requirement of Rule 23. *See id.* at 176. Otherwise, those potential class members who held voluntary test results would unwittingly be forced into settlement, waiving their claims, and receiving no funds.

The Notice Plan should have included individual notice to all wholesalers to ensure that this group of over 3,000 PWSs who very likely have tested for PFAS would receive notice. If Class Counsel should argue that such an amended Notice Plan would be overbroad and that these Class Members who voluntarily tested are not readily ascertainable and easily identifiable, then the Agreement should have been limited to encompass only those water systems required to test under UCMR 3, UCMR 5, and/or state law. Those were the only methods Class Counsel chose to use to construct notices. *See* Dkt. No. 3370-12 at 4–5.

### 2. Notice to Phase Two Class Members violates due process.

Phase Two Class Members will be forced to decide whether to participate or opt out, without understanding whether they have PFAS in their water systems. Even if Phase Two Class Members test their water and find non-detects, these Class Members may still have PFAS contamination in the form of future releases, current releases that have not made it to test sites, and non-tested PFAS. The Supreme Court has cautioned that courts must defend such an "unselfconscious and amorphous" group when they cannot appreciate their potential future injuries. *See Amchem*, 521 U.S. at 628 ("Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out."). No amount of notice could sufficiently protect these water systems that simply do not know their potential claims.

### H. Objection Topic: Time

The proposed Class Members have been given insufficient time to consider whether to opt out of the settlement. The 3M Agreement was filed on July 3, 2023, Dkt. No. 3370-3, with amendments filed August 28, Dkt. No. 3620-1, and a further modification styled as interpretive guidance filed October 25, Dkt. No. 3856-1. By order issued August 29, 2023, the Court preliminarily approved the 3M Agreement and set the deadline for opting out on December 11, 2023. *See* Dkt. No. 3626 at 10–11. Notice of preliminary approval was sent to proposed Class Members on September 12, 2023. *Id.*

These complex documents implicate over 12,000 PWSs, and the contamination of public drinking water on an unprecedented scale. *See* Dkt. No. 3370-1 at 20. There is a growing scientific consensus that many PFAS pose a threat to public health, ecosystems, and the broader environment. These chemicals have effectively spread through our drinking water system, and they do not abide by the clean divisions within that system. Although 60 days may be sufficient time in other class settlements, this case is uniquely complex. It requires a decision-making process that involves significant amounts of internal and external communication and assessment across staff, water system managers, governing bodies, engineers, environmental consultants, attorneys, and more. For example, NTMWD serves over two million people in 70 communities in a 10-county region in North Texas. *See* Dkt. No. 3829-1 at 5. It requires more than two months merely to consult with internal authorities and external members and customers affected by such a critical and far-reaching decision.[7]

Time will continue to be an issue even after the settlement's approval. For Phase One Class Members, 60 days after the Effective Date likely will not be enough time to perform all the

---

[7] This is particularly true for those wholesalers who did not receive notice. *See supra*, Part III.C.2.

necessary consultations before submitting their Claims Forms. Pursuant to Class Counsel's Guidance, many proposed Class Members must consult with upstream and downstream parties on how to divide allocated awards. Further, the Claims Forms require consultation with yet further parties upstream. Assessing the available claims, reaching a division of any award, and preparing this supplementary form will require a great deal of communication, negotiation, and coordination between water suppliers, each of which must follow their own independent decision-making process.

These inherent complications exist alongside a shifting regulatory environment that makes future costs difficult to estimate, and an agreement that is unusually complex. Due to serious ambiguities in the 3M Agreement and the high stakes at issue, Class Members need more time to reach an informed decision.

## IV.     CONCLUSION

For the foregoing reasons, Fort Worth respectfully objects to the 3M Agreement as drafted.

Dated: November 10, 2023.

Respectfully submitted:

*s/ Jessica K. Ferrell*
*s/ Jeff B. Kray*
Jessica K. Ferrell, WSBA No. 36917
Jeff B. Kray, WSBA No. 22174
Marten Law, LLP
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jferrell@martenlaw.com
jkray@martenlaw.com

*Attorneys for City of Fort Worth*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon all counsel of record in accordance with the Court's August 29, 2023 Preliminary Approval Order for Settlement Between Public Water Systems and 3M Company (Dkt. No. 3626), the Settlement Agreement Between Public Water Systems and 3M Company (Dkt. No. 3370-3), and Federal Rule of Civil Procedure 5.

Dated: November 10, 2023.

*s/ Jessica K. Ferrell*
*s/ Jeff B. Kray*
Jessica K. Ferrell, WSBA No. 36917
Jeff B. Kray, WSBA No. 22174
Marten Law, LLP
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jferrell@martenlaw.com
jkray@martenlaw.com

*Attorneys for City of Fort Worth*
