IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | ) MDL No. 2:18-mn-2873-RMG <br> ) <br> ) **This Document Relates to:** <br> ) <br> ) *City of Camden, et al. v. 3M Company* <br> ) No. 2:23-cv-03147-RMG <br> ) |

## OBJECTION OF UPPER EAGLE REGIONAL WATER AUTHORITY

### I.    INTRODUCTION

Upper Eagle Regional Water Authority ("UERWA"), by and through its below-signed counsel, respectfully submits these objections to the proposed settlement between Defendant 3M and public water providers ("3M Agreement" or "Agreement"), as well as the Interpretive Guidance on Interrelated Drinking-Water Systems ("Interrelated Guidance"), Dkt. No. 3856-1, and the Interpretative Guidance on Entities That Own and/or Operate Multiple Public Water Systems ("Multiple System Guidance"), Dkt. No. 3918-1, in *City of Camden, et al. v. 3M Company*, No. 2:23-cv-03147-RMG. UERWA objects to the Agreement as presented by Proposed Class Counsel ("Class Counsel") because it does not meet the standard for approval under Federal Rule of Civil Procedure 23(e)(2). UERWA reserves the right to withdraw this objection at any time before the opt-out deadline of December 11, 2023, rendering it null and void, and to opt out of the Agreement. *See* Dkt. No. 3946; *see also* Dkt. No. 3942 at 3–4.

The 3M Agreement includes simultaneous, material deficiencies with respect to core requirements of Rule 23, each of which should be central to a determination of the fairness and adequacy of the proposal, and many of which courts have deemed sufficient, individually, as a basis for rejecting a settlement. The proposed release is overbroad, encompassing both alleged and unalleged claims, including claims potentially addressing wastewater, stormwater, and real property cleanup damages and even extending to unknown and unasserted personal injury claims that are nowhere even considered in the damages calculation in this proposed settlement. While now styled as a "claims-over" provision, Section 11.6 of the proposed settlement would continue to operate as an indemnity in many foreseeable instances and would significantly increase the Releasing Parties' potential exposure to further losses. The proposal is grossly unfair to interconnected water distribution systems and provides insufficient time to comply with a consultation certification.

While the 3M Agreement acknowledges some conflicts among class members by identifying a representative for Phase Two claims, that minimal gesture cannot begin to address the fact that, despite a modest number of common legal issues, the case presents class member factual and legal conflicts that are dominant and overwhelming. The funds proposed are grossly inadequate even to address the small number of Class Member claims currently supported by factual estimates, and consequently never could be deemed sufficient to address the thousands of additional claims possessed by retail and wholesale water systems across the country. Such deficiencies would have been made clear by a bellwether case, the absence of which, alone, should prove fatal to the proposed settlement. As described in detail below, the Court should reject the proposed settlement and direct the Parties to address the deficiencies identified.

## II.    STANDARD OF REVIEW

The Court may only approve a class settlement when it determines that the settlement is

"fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Court must examine whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

*Id.*

Under Rule 23(e), courts play the role of fiduciary to absent class members, zealously

scrutinizing the proposed settlement to combat the omnipresent "danger that the parties and

counsel will bargain away the interests of the unnamed class members in order to maximize their

own." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 715 (6th Cir. 2013); *see also Holmes v. Cont'l

Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983) ("Careful scrutiny by the court is necessary to

guard against settlements that may benefit the class representatives or their attorneys at the expense

of the absent class members."); *Sharp Farms v. Speaks*, 917 F.3d 276, 293–94 (4th Cir. 2019)

("When the court reviews a proposed class-action settlement, it acts as a fiduciary for the class.").

The Court's role far exceeds a mere rubberstamp. *See* Manual for Complex Litigation,

Fourth, § 21.61 ("[T]he judge must adopt the role of a skeptical client and critically examine the

class certification elements, the proposed settlement terms, and procedures for implementation.").

The Court has an affirmative duty to protect the interests of the "class members whose rights may

3

not have been given adequate consideration during the settlement negotiations." *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

## III.    ARGUMENT

The 3M Agreement as drafted is not "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). UERWA is a member of the settlement class because it is an active public water system in the United States of America that has one or more impacted water sources as of the settlement date. *See* 3M Agreement § 5.1; *see also* Ex. A (Aff. of Roman); Ex. B (Aff. of Counsel) (certifying information as required under Agreement); *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989).

### A.    Objection Topic: Release

#### 1.    The release is overbroad.

There is no identical factual predicate among the released future contamination and cleanup claims and the claims alleged in litigation. *See* 3M Agreement § 11.1. A court can approve a release only of claims that share an "identical factual predicate" with claims alleged in the case at issue. *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015); 4 Newberg and Rubenstein on Class Actions § 13:61 (6th ed.) ("[C]ourts often police a proposed settlement agreement to ensure that the release is not overly broad, that is, that it does not release claims outside the factual predicate of the class's claims"). "Claims have an 'identical factual predicate' when they depend upon the *very same* set of facts." *McAdams v. Robinson*, 26 F.4th 149, 160 (4th Cir. 2022) (internal quotation marks and brackets omitted) (emphasis added).

The 3M Agreement would release a wide range of unalleged claims that lack an identical factual predicate with claims alleged by Class Members. Those claims cannot be extinguished. The release is so overbroad as to render the agreement unfair and unreasonable.

4

a.  **The release includes unalleged claims as to PFAS that has not yet entered drinking water and PFAS in yet-to-be-developed water sources.**

The release encompasses claims related to PFAS that "*may reasonably be expected* to enter Drinking Water or any Releasing Party's Public Water System." 3M Agreement § 11.1.1 (emphasis added). But PFAS that "may reasonably be expected" to enter water supplies in the future falls outside of the factual and temporal predicate of the claims alleged against 3M. No Class Member has asserted claims against 3M in the related litigation regarding PFAS contamination that has not yet come to pass; such a claim would be dismissed as speculative. Yet, the release encompasses such potential claims. The release also purports to cover factual scenarios different from any forming the basis of alleged claims. For example, if a Class Member expects to purchase a new future Water Source, and that Water Source is later found to contain PFAS, the release would seem to encompass a claim as to that Water Source—even though no claims as to future Water Sources have been or presently could be asserted in litigation. *See id.*(releasing "any Claim that . . . may arise at any time in the future out of, relates to, or involves PFAS that . . . may reasonably be expected to enter Drinking Water or any Releasing Party's Public Water System"). Rather than the required identical factual predicate between the claims released in the 3M Settlement and the claims alleged in litigation, there is a temporal disconnect and boundless release as to unknown future claims. *See Raquedan v. Centerplate of Delaware Inc.*, No. 17-CV-03828-LHK, 2018 WL 3368820, at *8 (N.D. Cal. July 10, 2018) (no identical factual predicate between released wage-and-labor claims in 2015–2016 and wage-and-labor claims outside that time period); *McKinney-Drobnis v. Massage Envy Franchising, LLC*, No. 16-CV-06450-MMC, 2017 WL 1246933, at *5 (N.D. Cal. Apr. 5, 2017) (no identical factual predicate between released breach-of-contract claims and claims that "necessarily occurred at different times"); *Rivera v. Marriott Int'l, Inc.*, No. 219CV05050ODWKSX, 2023 WL 3766504, at *9 (C.D. Cal. June 1,

2023) (approving release "of all claims brought or that could have been brought based on the factual predicate in the action" that was temporally limited to a given "Class Period").

### b. The release seeks to include almost all wastewater, stormwater, and real property cleanup claims.

The release potentially excludes claims involving wastewater and stormwater systems and real property that are entirely "unrelated to Drinking Water or a Class Member's Public Water System or Water Sources" and involve facilities or real property that are "separate from and not related *in any way* to the Class Member's Public Water System." *See* 3M Agreement § 11.1.2 (emphasis added). The required absolute and total separation of such cleanup claims from drinking water poses what in many instances would be an insurmountable barrier. For example, even if wastewater is treated and recycled to make up just a fraction of a Class Member's drinking water supplies, under the applicable definition, the Class Member could be held to have released a wastewater cleanup claim in full. Putting aside recycled wastewater, arguments could be made that a wastewater or stormwater system is marginally "related" to a Class Member's Public Water System—or even any remote relationship between the two would be sufficient to foreclose a claim under the release as written. Indeed, the wastewater being treated from homes and businesses is derived directly from the water distributed for potable use by the Public Water System. Such a broad release of wastewater, stormwater, and real property claims diverges from the factual predicate of the claims asserted and is patently unfair.

### c. The release includes claims for unknown PFAS for which no claims are asserted in litigation.

The 3M Agreement releases claims as to *all* PFAS in drinking water. It defines PFAS as "any per- or poly-fluoroalkyl substance that contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen, chlorine, bromine, or iodine atom attached to it),"

stating also its "intention" that the definition "be as broad, expansive, and inclusive as possible." 3M Settlement § 2.48. Because this definition of PFAS is based in chemical structure, the release encompasses claims relating to up to 15,000 different chemicals. *See* Nat'l Institute of Env't Health Sciences, *PFAS*, https://www.niehs.nih.gov/health/topics/agents/pfc (last accessed Nov. 1, 2023). Water providers will only know, at most, about contamination by the 29 PFAS the U.S. Environmental Protection Agency's ("EPA") Fifth Unregulated Contaminant Rule ("UCMR 5"), and the water providers in litigation with 3M have only sought damages for the few PFAS they have tested for and detected—not 15,000 different chemicals. Accordingly, by seeking to encompass claims for thousands of chemicals, more than 99% of which are not subject to a single claim in this litigation, the release is entirely untethered from the required identical factual predicate. *Cf. Canter v. Midland Credit Mgmt., Inc.*, No. 3:14-cv-02939-MMA-MDD, 2017 WL 2817065, at *4 (S.D. Cal. June 28, 2017) (ruling that even if there was some "overlap" in subject matter between consumer-protection claims asserted in litigation and released claims that included different consumer-protection claims, there was no identical factual predicate between them, rendering release overbroad).

**d.  The release includes personal-injury claims.**

Personal-injury claims relating to PFAS in drinking water fit within "any Claim that . . . may arise at any time in the future out of, relates to, or involves PFAS that . . . may reasonably be expected to enter Drinking Water or any Releasing Party's Public Water System." 3M Agreement § 11.1.1. No water providers have alleged or could allege personal-injury claims in litigation against 3M, nor have they sought recovery for such claims advanced against them by third parties. The claims proposed to be released and the litigated claims lack the required identical factual predicate. Thus, the release is overbroad and cannot meet the standard required by Rule 23.

7

The lack of any carve out in the release for personal-injury claims matters a great deal. Customers are already beginning to sue water providers for personal injury. *See, e.g.*, Compl, *Vincent v. Aquarion Water Co.*, No. FBT-CV23-6128205-S (Conn. Sup. Ct. Oct. 16, 2023); Compl., *Hoffnagle v. Conn. Water Co.*, No. HHD-CV-23-6175540-S (Conn. Sup. Ct. Oct. 31, 2023). Water providers are facing, and will continue to face, considerable exposure to liability arising from conditions for which they likely bear no responsibility. If they participate in a settlement with the current release language, they would have no contribution recourse against 3M, a predominant tortfeasor. *See* AFFF MDL FAQs at 3, https://afff-mdl.com/wp-content/uploads/PFAS-FAQ.pdf (last accessed Nov. 1, 2023) (stating that 3M is responsible for some 70% of PFAS liabilities). In stark contrast to the breathtaking scope of the release, the 3M Agreement's structure, the method supposedly used to support the damages calculation, and the relatively small dollar amount of the proposed settlement (when compared to the scope of the problem and likely range of damage recovery at trial), *see infra* Part III.E, individually and collectively signal that the Agreement was not intended to cover personal injury claims. If such claims were intended to be included in the release, then the settlement amount is even more inadequate than explained herein, considering just the personal injury decisions to date. *See, e.g.*, *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 54 F.4th 912, 921 (6th Cir. 2022) (affirming jury verdicts of $40 million and $250,000 for just one plaintiff and his wife in personal-injury action involving long-chain PFAS).

## 2. The Releasing Parties definition would bind parties that never assented to settlement.

The definition of Releasing Parties purports to bind not just the Class Member, but an array of other entities, including any "in privity with" the Class Member and "any person . . . acting on

behalf of or in concert with a Class Member to prevent PFAS from entering a Class Member's Public Water System or to seek recovery for alleged harm to a Class Member." *See* 3M Agreement § 2.61. A so-called interpretive guidance issued by the parties advancing the settlement confirms that the Releasing Parties provision applies, notwithstanding whether those Releasing Parties can or want to participate in the 3M Settlement. *See* Dkt. No. 3856-1 at 5 ("In general, by participating in the Settlement, a Class Member releases claims on behalf of itself and its Releasing Parties (as defined in the Settlement Agreement) with respect to the water provided to (or supplied by) the Class Member.").

A "settlement agreement is a contract and must be interpreted as such." *Cox v. Shah*, 187 F.3d 629 (4th Cir. 1999); *Sadighi v. Daghighfekr*, 66 F. Supp. 2d 752, 759 (D.S.C. 1999). "This applies to class settlements as well as to the resolution of litigation between individual parties." *Dahingo v. Royal Caribbean Cruises, Ltd.*, 312 F. Supp. 2d 440, 445 (S.D.N.Y. 2004). It is axiomatic that one cannot be bound by a contract without assenting to it. *See, e.g.*, *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 236 (4th Cir. 2019) ("Under South Carolina law, a contract is formed between two parties when there is, inter alia, a mutual manifestation of assent to its terms." (internal quotation marks and brackets omitted)). But binding parties that have refused the Agreement or could not assent to it—those that have affirmatively requested exclusion from the class or those that are not Class Members in the first place—is exactly what the 3M Agreement attempts to do. The Releasing Parties definition purports to bind even entities over which a Class Member has no control, such as contractual counterparties that expressly opted out of the 3M Agreement. Whatever the merits of the parties' goal of preventing "double recovery," Dkt. No. 3856-1 at 5, that goal may not be accomplished through an unfair means that also violates a fundamental tenet of contract law—that all bound parties must have assented.

UERWA has particular concerns about the Releasing Parties definition owing to its relationship with the Eagle River Water and Sanitation District ("ERWSD"). The Colorado Department of Public Health & Environment handles the two entities together for purposes of regulatory compliance programs, but each entity operates separate surface water and/or groundwater diversions and water treatment plants. ERWSD also treats wastewater from UERWA's customers, and in that respect they may be considered to be "in privity." The Agreement could thus be read such that ERWSD, if it participates, will release UERWA's claims, even if UERWA opts out, despite neither of the two entities having legal authority to bind the other entity.

**B. Objection Topic: Third-Party Claims**

**1. The Claims-Over provision functions as an indemnity.**

The initially proposed settlement contained a release and indemnity provision. After 17 States and Sovereigns objected (Dkt. No. 3462), 3M and Class Counsel revised Section 11.6 of the agreement by substituting "Protection Against Claims-Over" for the indemnity. The 3M Agreement provides a "contribution bar" and a "Claims-Over" provision. 3M Agreement §§ 11.6.2, 11.6.4. Taken together, the two provisions function as an indemnity—differing from the initial indemnity provision only in minor ways. To the extent the Clains-Over provision functionally operates as an indemnity, it may contravene state constitutions and statutes that regulate the circumstances and procedures under which municipalities and other political subdivisions may assume debt. *See, e.g.*, Cal. Const. art. XVI, § 18; Tex. Const. art. III, § 52; Wash. Const. art. VIII, § 6; RCW 39.36.020(2)(a)(ii). In that event, the settlement agreement— which is a contract, Cox, 187 F.3d at 629—would be void. *See Starr v. City & Cnty. of San Francisco*, 72 Cal. App. 3d 164, 167, 140 Cal. Rptr. 73, 74 (Cal. Ct. App. 1977) (contracts violating

constitutional provision on municipal indebtedness void); *Galveston, H. & S. A. Ry. Co. v. Uvalde Cnty.*, 167 S.W.2d 305, 306 (Tex. Civ. App. 1942) (construing county contract as containing indemnity and refusing to enforce it because it was entered into in violation of state law regulating indebtedness of municipalities); *Whatcom Cnty. Water Dist. No. 4 v. Century Holdings, Ltd.*, 29 Wash. App. 207, 211, 627 P.2d 1010, 1012 (Wash. Ct. App. 1981) (agreement construed as creating municipal debt and accordingly was "void as beyond the power of the Water District and contrary to the state constitution").

The contribution bar prevents any non-Released Party (i.e., non-settling defendants in the MDL) from suing 3M for contribution or indemnity. 3M Agreement § 11.6.2. Such contribution bars are widely used in multi-party litigations to facilitate partial settlements. But such contribution bars do not bar claims by non-parties to the litigation, as such a bar would violate basic due process. *See Jiffy Lube*, 927 F.2d at 158 (citing Manual for Complex Litig. 2d, § 23.14 at 166 (1985)) ("If the proposed settlement is intended to preclude further litigation by absent persons, due process requires that their interests be adequately represented."). Section 11.6.2 cannot apply to either direct actions against 3M or contribution actions against 3M by non-parties to the MDL.

Because myriad, as-yet-unknown parties that are not subject to the contribution bar may bring actions against Releasing Parties and 3M, under the settlement as proposed, Releasing Parties may lose the benefits of any settlements they receive from 3M. Section 11.6.4 of the 3M Agreement requires that if an action by a Releasing Party against a non-party gives rise to a contribution award against 3M by the non-party (a Claim-Over), the Releasing Party must, in effect, indemnify 3M by reducing the amount of the Releasing Party's judgment in any amount required to fully extinguishes any Claim-Over. That is, to pay 3M's entire share of liability for contribution to the non-party.

An example illustrates the unfairness inherent in the proposed settlement structure. Consider the scenario where a public water system ("PWS") participates in the 3M Agreement and receives $100,000. It is later sued for cleanup by its state environmental agency and for personal injury and property damage by its customers, after the EPA discovers PFAS in the PWS's wells at concentrations exceeding the applicable cleanup level. The PWS ultimately is found liable to clean up its water supply at a cost of $100 million. Its customers win a judgment of $200 million for personal injury and property damages. The PWS then learns that the source of the PFAS in its water supply is AFFF applied during firefighting training exercises over a 30-year period at a local airport. The PWS provides water to a small community. It can ill afford to pay damages, so it sues the airport in contribution. It cannot sue 3M because it has released 3M. The airport, also small, cannot bear a large damage award, so it sues 3M, which it can do because it is a non-party to the settlement with 3M. After five years of litigation, a court allocates 50% of the cleanup costs and 50% of the damages suffered by the customers to 3M, 50% to the airport, and nothing to the PWS. 3M then tenders its damages under the Claims-Over provision of the settlement to the PWS. Had the PWS not settled with 3M, its share of cleanup liability and customer damages would have been zero. Instead, it is $150 million—the 50% share the court allocated to 3M. That such a result is possible renders the settlement unacceptable under applicable Rule 23 standards.

The result for the PWS would be even worse if the court determines the airport to be only 10% liable and 3M to be 90% liable—a potentially more realistic scenario. In that event, the PWS would be required to reduce the $300 million judgment "by whatever amount is necessary . . . to fully extinguish the Claim-Over under applicable law." 3M Agreement § 11.6.4. The PWS, who settled with 3M for $100,000, would be responsible for 3M's $270 million share. Here, instead of having to pay zero had it not settled with 3M, the PWS would have to pay $270 million.

Such hypothetical third-party suits are neither remote nor unlikely. They are already occurring. *See supra* Part III.A.1.d. And because the 3M Agreement defines a Released Claim that could trigger the Claims-Over provision so broadly as to include far more than just PFAS contamination to the water supply, the universe of potential defendants, plaintiffs, and claims that could trigger the provision is immense.

**2. The Agreement fails to name a settlement crediting method.**

The Fourth Circuit has held that a failure to name a settlement crediting method "may deprive the plaintiff class members of information affecting their ability to assess fairly the merits of the settlement." *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 161. "The plaintiff class's interest in the choice of setoff method is such that at least one court has held that the decision on setoff method must be considered by the class and its representatives before the settlement can be approved pursuant to Rule 23(c)." *Id.* (citing *In re Atl. Fin. Mgmt., Inc. Sec. Litig.*, 718 F. Supp. 1012, 1018 (D. Mass. 1988)). "Delaying final determination of the amount of the set-off deprives the plaintiff class of one of the chief inducements to settle: certainty. Particularly in class actions, this method generates significant practical difficulties as well, in that the indeterminate impact of any partial settlement would make it difficult to frame a notice to the class which fairly presents the merits of the proposed settlement." *In re Atl. Fin. Mgmt., Inc. Sec. Litig.*, 718 F. Supp. at 1018. The 3M Agreement never identifies a settlement crediting method. *See generally* 3M Agreement § 11.6. Accordingly, Class Members are unable to fairly assess the merits of the Agreement.

**C. Objection Topic: Consultation Requirement**

The 3M Agreement Claims Form requires that the Class Member declare under penalty of perjury that it "has consulted with *any other entity* that has incurred costs in connection with efforts to removed [sic] PFAS from, or prevent PFAS from entering, Settlement Class Member's Public

Water System, and that Settlement Class Member's claim is *on behalf of any such other entity*." *See* 3M Agreement Claims Form. Along a single surface water source, there may be thousands of PWSs that draw, use, treat, and return water to that source. *See, e.g.*, Dkt. No. 3829-1 at 16 (describing the many entities that Metropolitan would have to consult with under such a scenario). Groundwater sources are also implicated—groundwater recharge from surface waters as well as general treatment by groundwater users may implicate a host of different entities. The Claims Form language would appear to require a Class Member to identify and consult with all such entities, and ultimately make claims *on their behalf*. It is not clear how this certification potentially excludes other Class Members from making claims. It is also not clear whether this certification would implicate non-water systems that treat their water outputs, such as landfills. The logistical complexities necessarily involved in the mandated consultation, paired with the vague scope of that consultation, make this requirement unfair in operation.

**D.  Objection Topic: Class Conflicts**

**1.  Common questions of law and fact do not predominate across the class.**

Although Class Counsel contends 16 common questions of law or fact sufficiently unite the class, "the predominance criterion is far more demanding." *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997) (ruling that putative class members' common exposure to asbestos products supplied by defendants may have been enough to satisfy commonality but not predominance). The proposed class is too broad, with too diffuse an array of individual questions of law and fact, claims and defenses, for common questions to predominate. Indeed, in this matter, individual claims dominate.

For example, putative Class Members have varying amounts and types of PFAS in their systems, some of which are regulated and some of which are not. Many have not detected PFAS.

14

Some Class Members purchase treated water from a wholesaler, others purchase raw water, while still others supply raw and/or treated water they distribute—some to consumers, others to retailers. Some have claims against the federal government. Class Members are located in all 50 states, with varying state laws and remedies. These numerous and different factual and legal circumstances significantly affect the strength of each Class Member's claim and thus the potential damages and recovery. These individual and subgroup questions predominate over the relatively few common questions of fact alleged by Class Counsel. Only a settlement with appropriate subclasses could address the predominance issue. *See* Fed. R. Civ. P. 23(c)(5) ("[A] class may be divided into subclasses that are each treated as a class under this rule.").

### E.  Objection Topic: Money

#### 1.  The settlement funds are insufficient to redress 3M's harm to water providers.

Under the 3M Agreement, 3M will pay between $10.5 billion and $12.5 billion to Eligible Claimants. *See* Dkt. No. 3370-3 at 11. Even assuming this figure reflects the settlement's true value—and it does not—the settlement amount pales in comparison to the PFAS-related damages that 3M has caused across the country while controlling over 70% of the historical PFAS market. *See* AFFF MDL FAQs at 3, https://afff-mdl.com/wp-content/uploads/PFAS-FAQ.pdf (last accessed Nov. 1, 2023). Estimates indicate the nationwide cost of drinking water treatment of PFAS may range between $3–6 billion *annually*. *See* Ass'n of Met. Water Agencies, *AMWA Reacts to Proposed PFAS Settlement*, https://www.amwa.net/press-releases/amwa-reacts-proposed-pfas-settlement. Investigating, testing, purchasing and installing treatment infrastructure, and operating and maintaining equipment for decades will entail remediation costs orders of magnitude above what the  Agreement provides from the predominant PFAS manufacturer. Simply put, the funds are inadequate.

**2.  The 3M Agreement failed to compare the value of the settlement to the damages the class could have obtained at trial.**

The "most important factor in evaluating the fairness and adequacy of a proposed settlement is an analysis of the value of the settlement compared to the potential recovery if the case went to trial," and courts reject settlements that fail to sufficiently assess awards in this manner. *In re Force Prot., Inc. Derivative Litig.*, No. 2:08-1904-CWH, 2012 WL 12985420, at *10 (D.S.C. Mar. 30, 2012); *In re Corrugated Container Antitrust Litig.*, 634 F.2d 195, 212 (5th Cir. 1981) (approving settlement where expert opined on total damages to class); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("In determining the fairness, adequacy and reasonableness of the proposed compromise, the . . . settlement terms should be compared with the likely rewards the class would have received following a successful trial of the case."). While a "cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair," *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 628 (9th Cir. 1982), "any fraction has a denominator, and without knowing what it is the Court cannot balance plaintiffs' expected recovery against the proposed settlement amount," *Rollins v. Dignity Health*, 336 F.R.D. 456, 463 (N.D. Cal. 2020) (internal quotation marks omitted). It is reversible error to approve a settlement without providing a quantification of the alternative outcomes to a settlement. *See Reynolds v. Beneficial National Bank*, 288 F.3d 277, 285 (7th Cir. 2022) ("A high degree of precision cannot be expected in valuing a litigation, especially regarding the estimation of the probability of particular outcomes. Still, much more could have been done here without . . . turning the fairness hearing into a trial of the merits.").

The proposed settlement suffers a fundamental flaw because it fails to provide even a single estimated range of damages or recovery for proposed class members. *Iris Connex, LLC v. Dell, Inc.*, 235 F.Supp.3d 826, 849 (E.D. Texas 2017) ("To determine whether a settlement is fair and

made in good faith, it is not the absolute value of the settlement but rather the prospective recovery that must be evaluated, i.e., how much is at stake."). The formula used to create the settlement's allocation table is based on a combination of adjusted flow and PFAS levels. *See* 3M Agreement Exhibit K. Although this calculation relied on a theory of cost for PFAS filtration, it is not a replacement for an estimate of aggregate damages to Class Members. Such calculations are not impossible to conduct, and many courts have relied on expert testimony presenting methods for estimating damages and theorizing different levels of recovery. *See In re Domestic Air Transp. Antitrust Litigation*, 148 F.R.D. 297, 322 (N.D. Georgia, 1993) (providing that although there are circumstances where a precise dollar valuation cannot be given to a settlement, an expert can provide an estimated range of value). This is reversible error. *See Reynolds*, 288 F.3d at 285. Although the circumstances, uncertainties, and complexities of the proposed settlement make it difficult to produce a single estimate of damages, a potential range is critical to determine whether the settlement award is fair, reasonable, and adequate. The Agreement is inadequate because it lacks even minimal foundational guidance.

### 3. The lack of a bellwether trial renders the 3M Agreement unfair and inadequate.

No bellwether trial has occurred leaving unaddressed what damages Class Members stood to potentially earn at trial against 3M. *See* Dkt. No. 3256 (continuance of City of Stuart bellwether trial, which was ultimately individually settled in wake of 3M Agreement).

Bellwether trials play a critical role in guiding parties toward an equitable and adequate settlement in several ways. They provide an opportunity to assess the underlying facts of disputes and the strengths of plaintiffs' and defendants' arguments, and form a bulwark against bias in settlement negotiations. The information provided by bellwether verdicts or settlements sheds light on a global settlement process that otherwise would be conducted exclusively between defendants

17

and inherently self-interested lead plaintiffs' attorneys. *See* Alexandra D. Lahav, *Bellwether Trials*, 76 GEO. WASH. L. REV. 576, 593–94 (2008); Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2342 (2008) (bellwether trials give parties an "understanding of the litigation that is exponentially more grounded in reality"); *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 348–49 (5th Cir. 2017) ("Bellwether trials are meant to produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis, and what range of values the cases may have if resolution is attempted on a group basis."). In contrast, juries are disinterested parties with no financial stake in the outcome of the MDL, making them less susceptible to influences that may warp a settlement in favor of a small segment of plaintiffs, their counsel, or even defendants. Introducing jury participation through bellwether trials protects the many parties that do not have direct input into settlement talks in MDLs.

The 3M Agreement necessarily was negotiated without any reference to bellwether results. Only 3M and Class Counsel weighed in on the value and structure of the settlement, behind closed doors. No jury served as an objective counterbalance to potential biases and no bellwether result shed light on what funds could actually be recovered from 3M. Class Counsel has not otherwise attempted an "analysis of the value of the settlement compared to the potential recovery if the case went to trial." *In re Force Prot., Inc. Derivative Litig.*, 2012 WL 12985420, at *10. Given the class of over 12,000 water providers, *see* Dkt. No. 3370-1 at 20, the potential impact on ratepayers and the public of blindly moving forward without the critical information bellwether results provide could be significant. Especially considering indications that the total settlement funds amount to a

small fraction of expected nationwide PFAS remediation costs, *see supra* Part III.D.1, the lack of any bellwether result raises serious fairness and adequacy concerns.

## F. Objection Topic: Time

The proposed Class Members have been given insufficient time to consider whether to opt out of the settlement. The 3M Agreement was filed on July 3, 2023, Dkt. No. 3370-3, with amendments filed August 28, Dkt. No. 3620-1, and two further modifications styled as interpretive guidance documents filed more than ttwo months after preliminary approval, Dkt. Nos. 3856-1, 3818-1. By order issued August 29, 2023, the Court preliminarily approved the 3M Agreement and set the deadline for opting out on December 11, 2023. *See* Dkt. No. 3626 at 10–11. Notice of preliminary approval was sent to proposed Class Members on September 12, 2023. *Id*.

These complex documents implicate over 12,000 PWSs, and the contamination of public drinking water on an unprecedented scale. *See* Dkt. No. 3370-1 at 20. There is a growing scientific consensus that many PFAS pose a threat to public health, ecosystems, and the broader environment. These chemicals have effectively spread through our drinking water system, and they do not abide by the clean divisions within that system. Although 60 days may be sufficient time in other class settlements, this case is uniquely complex. It requires a decision-making process that involves significant amounts of internal and external communication and assessment across staff, water system managers, governing bodies, engineers, environmental consultants, attorneys, and more.

Time continues to be an issue even after the settlement's approval. For Phase One Class Members, 60 days after the Effective Date likely will not be enough time to perform all the necessary consultations before submitting their Claims Forms. Pursuant to Class Counsel's Guidance, many proposed Class Members must consult with upstream and downstream parties on

how to divide allocated awards. Further, the Claims Forms require consultation with yet further parties upstream. Assessing the available claims, reaching a division of any award, and preparing this supplementary form will require a great deal of communication, negotiation, and coordination between water suppliers that each has their own independent decision-making process.

These inherent complications exist alongside a shifting regulatory environment that makes future costs difficult to estimate, as well as an agreement that itself is complex. Due to serious ambiguities in the 3M Agreement and the high stakes at issue, Class Members need more time to reach an informed decision.

## IV.    CONCLUSION

For the foregoing reasons, UERWA respectfully objects to the 3M Agreement.


Dated: November 10, 2023.


Respectfully submitted:

*/s/ Jessica K. Ferrell*
*/s/ Jeff B. Kray*
Jessica K. Ferrell, WSBA No. 36917
Jeff B. Kray, WSBA No. 22174
Marten Law, LLP
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jferrell@martenlaw.com
jkray@martenlaw.com

*Attorneys for Upper Eagle Regional Water Authority*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon all counsel of record in accordance with the Court's August 29, 2023 Preliminary Approval Order for Settlement Between Public Water Systems and 3M Company (Dkt. No. 3626), the Settlement Agreement Between Public Water Systems and 3M Company (Dkt. No. 3370-3), and Federal Rule of Civil Procedure 5.

Dated: November 10, 2023.

*/s/ Jessica K. Ferrell*
*/s/ Jeff B. Kray*
Jessica K. Ferrell, WSBA No. 36917
Jeff B. Kray, WSBA No. 22174
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jferrell@martenlaw.com
jkray@martenlaw.com

*Attorneys for Upper Eagle Regional Water Authority*