IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) MDL No. 2:18-mn-2873-RMG <br> ) <br> ) **This Document Relates to:** <br> ) <br> ) *City of Camden, et al. v. 3M Company* <br> ) No. 2:23-cv-03147-RMG <br> ) |

**OBJECTION OF LOWER COLORADO RIVER AUTHORITY**

**I.     INTRODUCTION**

The Lower Colorado River Authority ("LCRA"), by and through its below-signed counsel, respectfully submits these objections to the proposed settlement between Defendant 3M Company ("3M") and public water providers ("3M Agreement" or "Agreement"), as well as the Interpretive Guidance on Interrelated Drinking-Water Systems ("Interrelated Guidance"), Dkt. No. 3856-1, and the Interpretative Guidance on Entities That Own and/or Operate Multiple Public Water Systems ("Multiple System Guidance"), Dkt. No. 3918-1, in *City of Camden, et al. v. 3M Company*, No. 2:23-cv-03147-RMG. LCRA objects to the Agreement as presented by Proposed Class Counsel ("Class Counsel") because it does not meet the standard for approval under Federal Rule of Civil Procedure 23(e)(2). LCRA reserves the right to withdraw these objections at any time before the opt-out deadline of December 11, 2023, rendering them null and void, and to opt out of the Agreement. *See* Dkt. No. 3946; *see also* Dkt. No. 3942 at 3-4.

1

## II. Background on LCRA and Summary of Objections

LCRA is a conservation and reclamation district created by the Texas Legislature in 1934 under Section 59, Article XVI of the Texas Constitution. LCRA serves customers and communities throughout Texas. Pursuant to its enabling legislation, Chapter 8503, Special District Local Laws Code, LCRA sells raw, untreated water to over 120 firm customers in Central Texas, who divert water directly from the raw water sources managed by LCRA (e.g. lakes and rivers). Many of these customers are cities or other local entities that are, like LCRA, also political subdivisions of the State. Chapter 49, Texas Water Code authorizes LCRA to provide laboratory services. LCRA Environmental Laboratory Services provides environmental lab testing to persons and entities within and outside of LCRA's statutory territory.

LCRA is not a Class Member as to either Public Water System ("PWS"), however, because LCRA did not detect PFAS before the Settlement Date and is not listed in the U.S. Environmental Protection Agency's ("EPA") Safe Drinking Water Information System ("SDWIS") database as serving more than 3,300 people. *See* 3M Agreement § 5.1. LCRA could, however, arguably be construed as a Releasing Party under Section 2.61 of the 3M Agreement as drafted, as discussed below. This is unfair and unreasonable and violates, *inter alia*, Federal Rule of Civil Procedure 23(e). Because its rights stand to be prejudiced, LCRA may object to the Agreement. *See In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1387, 1983-1 Trade Cas. (CCH) ¶ 65409 (D. Md. 1983) (acknowledging that nonparty has standing to object to a class settlement if the nonparty demonstrates plain legal prejudice from the settlement); *see also* Newberg and Rubenstein on Class Actions § 13:24 (noting that nonparties have standing to object to settlements where their legal rights are prejudiced and that the objector "may then object to any aspect of the settlement").

The 3M Agreement includes simultaneous, material deficiencies with respect to core requirements of Rule 23, each of which should be central to a determination of the fairness and adequacy of the proposal, and many of which courts have deemed sufficient, individually, as a basis for rejecting a settlement. The Agreement's definition of a Releasing Party and Release are overbroad. A non-Eligible Claimant could arguably be a Releasing Party due the breadth of the definitions of Person and Releasing Party, and intent of the negotiating parties to make such terms "as broad, expansive, and inclusive as possible." 3M Agreement § 2.61, *seriatim*. Released Claims purportedly encompass both alleged and unalleged claims, including claims addressing wastewater, stormwater, and real property cleanup damages and even extending to unknown and unasserted personal injury claims that are nowhere considered in the damages calculation in this Agreement. *Id.* §§ 2.59, 11.1.

While now styled as a "claims-over" provision, Section 11.6 of the 3M Agreement would continue to operate as an indemnity in many foreseeable instances and would significantly increase the Releasing Parties' potential liability exposure. The Agreement is unfair to interconnected water distribution systems and seeks to require those entities, including scores of systems (related or not) whose decisions require complex public processes, to satisfy deadlines that all know to be impossible. That outcome would be additionally unfair due to last-minute amendments, like the Interrelated Guidance, cobbled onto the 3M Agreement to address inadequacies previously identified by entities that provide wholesale water service. The Interrelated Guidance raises significant concerns about what types of wholesale water providers are included as Class Members. For instance, the Interrelated Guidance suggests that even those entities that do not treat water could be included, while also subjecting wholesale water providers to the 3M Agreement's Release even if that entity opts out. Systems that provide raw, untreated water should be excluded

from the settlement class and should not be construed as a Releasing Party. Finally, in a case in which water systems were readily identifiable using publicly available information, thousands of water systems, including many that had publicly acknowledged PFAS contamination in their systems, were apparently not notified of the settlement, depriving those entities of a fundamental due process protection As a provider of raw, untreated water and a non-Eligible Claimant, however, LCRA focuses its objections on the threshold definitional issues that stands to prejudice its rights: LCRA is not a Class Member, Party, or Eligible Claimant. It is a Person, however, so could arguably fall under the definition of a Releasing Party. This cannot stand. To the extent the 3M Agreement as drafted purports to achieve that result, it is unfair, unreasonable, and unlawful, and cannot be approved under Rule 23(e)(2) without modification.

### III.     STANDARD OF REVIEW

The Court may only approve a class settlement when it determines that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Court must examine whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>     (i) the costs, risks, and delay of trial and appeal;
>     (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>     (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>     (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

*Id.*

Under Rule 23(e), courts play the role of fiduciary to absent class members, zealously scrutinizing the proposed settlement to combat the omnipresent "danger that the parties and

counsel will bargain away the interests of the unnamed class members in order to maximize their own." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 715 (6th Cir. 2013); *see also Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983) ("Careful scrutiny by the court is necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of the absent class members."); *Sharp Farms v. Speaks*, 917 F.3d 276, 293–94 (4th Cir. 2019) ("When the court reviews a proposed class-action settlement, it acts as a fiduciary for the class.").

The Court also has a duty to ensure that the proposed settlement will not bargain away or waive the interests of non-parties. LCRA's legal rights could be materially prejudiced by the 3M Agreement as drafted. While LCRA does not concede it is a Class Member, Eligible Party, Releasing Party, or otherwise subject to the Agreement, it has standing to object. Non-class members may "challenge a class action settlement when the settlement will prejudice them." *Rahman v. Vilsack*, 673 F. Supp. 2d 15, 19 (D.D.C. 2009). Plain legal prejudice exists "if the settlement strips the party of a legal claim or cause of action, such as a cross claim or the right to present relevant evidence at trial," or when there is "interference with a party's contract rights or a party's ability to seek contribution or indemnification." *New England Health Care Emps. Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008) (quotations omitted). The Court's role far exceeds a mere rubberstamp. *See* Manual for Complex Litigation, Fourth, § 21.61 ("[T]he judge must adopt the role of a skeptical client and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation.").

IV.   ARGUMENT

LCRA objects to the 3M Agreement as drafted because it is not "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Although LCRA maintains that as a provider of raw, untreated water, it is not a Class Member, the 3M Agreement is so broad that it brings in non-class members

and entities that have expressly chosen to opt-out of the Settlement Class into the scope of the Release. The 3M Agreement jeopardizes and threatens to waive LCRA's future rights and would severely limit its ability to bring claims against Defendants. LCRA, therefore, preemptively files these objections to preserve its rights. *See* 3M Agreement § 2.61; *see also* Ex. A (Aff. of Executive Vice President of External Affairs and Chief People Officer T. Oney); Ex. B (Aff. of Counsel) (certifying information as required under Agreement).

### A. Objection Topic: Release

**1. The Releasing Parties definition would bind parties that never assented to settlement and are not Class Members.**

The definition of Releasing Parties purports to bind not just the Class Member, but an array of other entities, including those "in privity with" the Class Member and "any person . . . acting on behalf of or in concert with a Class Member to prevent PFAS from entering a Class Member's Public Water System or to seek recovery for alleged harm to a Class Member." *See* 3M Agreement § 2.61. As drafted, this definition is so broad that it could apply to LCRA due to LCRA's provision of raw, untreated water to potential Class Members or its provision of PFAS testing. A so-called interpretive guidance issued by the parties advancing the settlement confirms that the Releasing Parties provision applies, notwithstanding whether those Releasing Parties can or want to participate in the 3M Settlement. *See* Dkt. No. 3856-1 at 5 ("In general, by participating in the Settlement, a Class Member releases claims on behalf of itself and its Releasing Parties (as defined in the Settlement Agreement) with respect to the water provided to (or supplied by) the Class Member."). Specifically as to "wholesalers," the Interrelated Guidance goes on to say: "In general, if a wholesaler opts out of the Settlement Class and its retail customer is a Settlement Class Member, the release would extend to the wholesaler as to the water it provided to the Settlement

6

Class Member."

A "settlement agreement is a contract and must be interpreted as such." *Cox v. Shah*, 187 F.3d 629 (4th Cir. 1999); *Sadighi v. Daghighfekr*, 66 F. Supp. 2d 752, 759 (D.S.C. 1999). "This applies to class settlements as well as to the resolution of litigation between individual parties." *Dahingo v. Royal Caribbean Cruises, Ltd.*, 312 F. Supp. 2d 440, 445 (S.D.N.Y. 2004). It is axiomatic that one cannot be bound by a contract without assenting to it. *See, e.g.*, *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 236 (4th Cir. 2019) ("Under South Carolina law, a contract is formed between two parties when there is, inter alia, a mutual manifestation of assent to its terms." (internal quotation marks and brackets omitted). But binding parties that have rejected the Agreement or could not assent to it—those that have affirmatively requested exclusion from the class or those that are not Class Members in the first place—is apparently what the 3M Agreement attempts to do. The Releasing Parties definition purports to bind even entities over which a Class Member has no control, such as contractual counterparties that expressly opted out of the 3M Agreement. Whatever the merits of the parties' goal of preventing "double recovery," Dkt. No. 3856-1 at 5, that goal may not be accomplished through an unfair means that also violates a fundamental tenet of contract law—that all bound parties must have assented.

**2. The Covenant Not to Sue bars non-parties from bringing future claims against 3M.**

Section 11.3 of the 3M Agreement would prevent any "Releasing Parties" from bringing suit for any "Claim, demand, or cause of action at law or otherwise for damages, loss, or injury arising out of, related to, or involving any act, error, omission, event, or thing within the scope of the Release." This would bar LCRA, if it is held to be a Releasing Party, from any future suit against 3M related to PFAS contamination even though LCRA is not a party to the suit. This

impermissibly constrains LCRA's and other non-parties' future legal rights. Settlements operate as contracts and cannot bind parties who do not assent to the settlement. *See supra* Part IV.A.1.

### 3. The Release is overbroad.

There is no identical factual predicate among the released future contamination and cleanup claims and the claims alleged in litigation. *See* 3M Agreement § 11.1. A court can approve a release only of claims that share an "identical factual predicate" with claims alleged in the case at issue. *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015); 4 Newberg and Rubenstein on Class Actions § 13:61 (6th ed.) ("[C]ourts often police a proposed settlement agreement to ensure that the release is not overly broad, that is, that it does not release claims outside the factual predicate of the class's claims"). "Claims have an 'identical factual predicate' when they depend upon the *very same* set of facts." *McAdams v. Robinson*, 26 F.4th 149, 160 (4th Cir. 2022) (internal quotation marks and brackets omitted) (emphasis added).

The 3M Agreement would release a wide range of unalleged claims that lack an identical factual predicate with claims alleged by Class Members. Those claims cannot be extinguished. The Release is so overbroad as to render the agreement unfair and unreasonable.

### a. The Release seeks to include almost all wastewater, stormwater, and real property cleanup claims.

The Release excludes claims involving wastewater and stormwater systems and real property that are entirely "unrelated to Drinking Water or a Class Member's Public Water System or Water Sources" and involve facilities or real property that are "separate from and not related *in any way* to the Class Member's Public Water System." *See* 3M Agreement § 11.1.2 (emphasis added). The required absolute and total separation of such cleanup claims from drinking water poses what in many instances would be an insurmountable barrier. For example, even if wastewater is treated and recycled to make up just a fraction of a Class Member's drinking water

supplies, under the applicable definition, the Class Member could be held to have released a wastewater cleanup claim in full. Putting aside recycled wastewater, arguments could be made that a wastewater or stormwater system is marginally "related" to a Class Member's PWS—or even any remote relationship between the two would be sufficient to foreclose a claim under the Release as written. Another example is the transmission of untreated raw water to an entity that will treat the water and convey it to retail water customers. If the retail customer is a Releasing Person, the Class Member could be held to have released a cleanup claim in full should there be a spill before the untreated water reaches the Class Member's system. Such a broad release of wastewater, stormwater, and real property claims diverges from the factual predicate of the claims asserted and is patently unfair.

    **b. The Release includes claims for unknown PFAS for which no claims are asserted in litigation.**

  The 3M Agreement releases claims as to ***all*** PFAS in drinking water. It defines PFAS as "any per- or poly-fluoroalkyl substance that contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen, chlorine, bromine, or iodine atom attached to it)," stating also its "intention" that the definition "be as broad, expansive, and inclusive as possible." 3M Settlement § 2.48. Because this definition of PFAS is based in chemical structure, the Release encompasses claims relating to up to 15,000 different chemicals. *See* Nat'l Institute of Env't Health Sciences, *PFAS*, https://www.niehs.nih.gov/health/topics/agents/pfc (last accessed Nov. 1, 2023). Water providers will only know, at most, about contamination by the 29 PFAS within UCMR-5, and the water providers in litigation with 3M have only sought damages for the few PFAS they have tested for and detected—not 15,000 different chemicals. Accordingly, by seeking to encompass claims for thousands of chemicals, more than 99% of which are not subject to a single claim in this litigation, the Release is entirely untethered from the required identical factual

predicate. *Cf. Canter v. Midland Credit Mgmt., Inc.*, No. 3:14-cv-02939-MMA-MDD, 2017 WL 2817065, at *4 (S.D. Cal. June 28, 2017) (ruling that even if there was some "overlap" in subject matter between consumer-protection claims asserted in litigation and released claims that included different consumer-protection claims, there was no identical factual predicate between them, rendering release overbroad).

### c. The Release includes personal-injury claims.

Personal-injury claims relating to PFAS in drinking water fit within "any Claim that . . . may arise at any time in the future out of, relates to, or involves PFAS that . . . may reasonably be expected to enter Drinking Water or any Releasing Party's Public Water System." 3M Agreement § 11.1.1. No water providers have alleged or could allege personal-injury claims in litigation against 3M, nor have they sought recovery for such claims advanced against them by third parties. The claims proposed to be released and the litigated claims lack the required identical factual predicate. Thus, on this basis as well, the Release is overbroad and cannot meet the standard required by Rule 23.

The lack of any carve-out in the Release for personal-injury claims matters a great deal. Customers are already beginning to sue water providers for personal injury.[1] *See, e.g.*, Compl, *Vincent v. Aquarion Water Co.*, No. FBT-CV23-6128205-S (Conn. Sup. Ct. Oct. 16, 2023); Compl., *Hoffnagle v. Conn. Water Co.*, No. HHD-CV-23-6175540-S (Conn. Sup. Ct. Oct. 31, 2023). Water providers are facing, and will continue to face, considerable exposure to liability arising from conditions for which they likely bear no responsibility. If they participate in a settlement with the current Release language, they would have no contribution recourse against

---

[1] Nothing in these objections should be construed as waiving any immunities or defenses LCRA may have under state or federal law. LCRA expressly preserves all such immunities and defenses.

3M, a predominant tortfeasor. *See* AFFF MDL FAQs at 3, https://afff-mdl.com/wp-content/uploads/PFAS-FAQ.pdf (last accessed Nov. 1, 2023) (stating that 3M is responsible for some 70% of PFAS liabilities). In stark contrast to the breathtaking scope of the Release, the 3M Agreement's structure, the method supposedly used to support the damages calculation, and the relatively small dollar amount of the 3M Agreement (when compared to the scope of the problem and likely range of damage recovery at trial), individually and collectively signal that the agreement was not intended to cover personal injury claims. If such claims were intended to be included in the Release, then the settlement amount is even more inadequate than explained herein, considering just the personal injury decisions to date. *See, e.g.*, *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 54 F.4th 912, 921 (6th Cir. 2022) (affirming jury verdicts of $40 million and $250,000 for just one plaintiff and his wife in personal-injury action involving long-chain PFAS).

### B. Objection Topic: The Claims-Over provision functions as an indemnity.

The initial 3M Agreement contained an explicit indemnity provision. After 17 States and Sovereigns objected (Dkt. No. 3462), 3M and Class Counsel revised Section 11.6 of the agreement by substituting "Protection Against Claims-Over" for the indemnity. The Agreement provides a "contribution bar" and a "Claims-Over" provision. 3M Agreement §§ 11.6.2, 11.6.4. Taken together, the two provisions function as an indemnity—differing from the initial indemnity provision only in minor ways. To the extent the Claims-Over provision functionally operates as an indemnity, it may contravene state constitutions and statutes that regulate the circumstances and procedures under which municipalities and other political subdivisions may assume debt. *See, e.g.*, Cal. Const. art. XVI, § 18; Tex. Const. art. III, § 52; Wash. Const. art. VIII, § 6; RCW 39.36.020(2)(a)(ii). In that event, the settlement agreement—which is a contract, Cox, 187 F.3d at

11

629—would be void. *See Starr v. City & Cnty. of San Francisco*, 72 Cal. App. 3d 164, 167 (Cal. Ct. App. 1977) (finding contracts violating constitutional provision on municipal indebtedness void); *Galveston, H. & S. A. Ry. Co. v. Uvalde Cnty.*, 167 S.W.2d 305, 306 (Tex. Civ. App. 1942) (construing county contract as containing indemnity and refusing to enforce it because it was entered into in violation of state law regulating indebtedness of municipalities); *Whatcom Cnty. Water Dist. No. 4 v. Century Holdings, Ltd.*, 29 Wash. App. 207, 211 (Wash. Ct. App. 1981) (agreement construed as creating municipal debt and accordingly was "void as beyond the power of the Water District and contrary to the state constitution").

The contribution bar prevents any non-Released Party (i.e., non-settling defendants in the MDL) from suing 3M for contribution or indemnity. 3M Agreement § 11.6.2. Such contribution bars are widely used in multi-party litigations to facilitate partial settlements. But such provisions do not prevent claims by non-parties to the litigation, as such a bar would violate basic due process. *See Jiffy Lube*, 927 F.2d at 158 (citing Manual for Complex Litig. 2d, § 23.14 at 166 (1985)) ("If the proposed settlement is intended to preclude further litigation by absent persons, due process requires that their interests be adequately represented."). Section 11.6.2 cannot apply to either direct actions against 3M or contribution actions against 3M by non-parties to the MDL.

Because myriad, as-yet-unknown parties that are not subject to the contribution bar may bring actions against Releasing Parties and 3M, under the settlement as proposed, Releasing Parties may lose the benefits of any settlements they receive from 3M. Section 11.6.4 of the 3M Agreement requires that if an action by a Releasing Party against a non-party gives rise to a contribution award against 3M by the non-party (a Claim-Over), the Releasing Party must, in effect, indemnify 3M by reducing the amount of the Releasing Party's judgment in any amount required to fully extinguish any Claim-Over. That is, to pay 3M's entire share of liability for

contribution to the non-party. This is a particularly egregious outcome where the Releasing Party, like LCRA, is not a Class Member and receives no benefit from the settlement.

Further, a governmental entity, such as LCRA, or other political subdivisions of the State of Texas, are, generally, not authorized to provide such an arrangement. *See Galveston, H. & S. A. Ry. Co. v. Uvalde Cnty.*, 167 S.W.2d 305, 306 (Tex. Civ. App. 1942), *writ refused* W.O.M. (Mar. 10, 1943) (finding an indemnity is a pledge of credit and County could not "pledg[e] the credit of the county to cover an unlimited liability which might arise in the future and thereby subject the county to possible financial ruin."); *see also* Tex. Const. art. III, § 52 (restricting political subdivision's ability to lend credit).

### C. Objection Topic: Interconnected Drinking Water Systems

#### 1. The Interrelated Guidance and the Multiple Systems Guidance constitute improper late amendments to the 3M Agreement.

On October 25, 2023, Class Counsel filed a Joint Motion to Supplement the Preliminarily Approved Allocation Procedures ("Motion to Supplement"), seeking to amend the underlying 3M Agreement through incorporating the Guidance by reference. Dkt. No. 3856. On November 6, 2023, Class Counsel filed a Joint Motion to Supplement the Preliminarily Approved Allocation Procedures ("Motion to Supplement 2"), seeking to amend the underlying 3M Agreement through incorporating the Multiple System Guidance by reference. Dkt. No. 3919. The Court granted each motion the next day. Dkt. No. 3862; Dkt. No. 3930.

With these entirely new documents, Class Counsel announced for the first time that the proposed settlement class was intended to include water wholesalers, created a new joint claims submission process for interrelated water systems, and took the position that the Releases would rely on the language of the water sale agreements within those interrelated systems. Class Counsel also announced for the first time how entities that own or operate multiple PWSs might opt out or

participate as to each individual PWS. Together, those pronouncements operate as material substantive amendments to the underlying 3M Agreement because they alter both the distribution of settlement monies and the claims process, and significantly expand the scope of entities covered. These fundamental changes contradict the Court's preliminary approval findings, and fail to satisfy the notice process, or the notice timeline. *Cf. Pearson v. Target Corp.*, 893 F.3d 980, 986 (7th Cir. 2018) ("Material alterations to a class settlement generally require a new round of notice to the class and a new Rule 23(e) hearing."). The Interrelated Guidance changes the 3M Agreement and fails to resolve related ambiguities.

Some form of amendment or guidance was and remains necessary to clarify several ambiguous aspects of the 3M Agreement.[2] In their Motion to Supplement (Dkt. No. 3856), Class Counsel equivocates on whether the Guidance substantively altered the Agreement with regard to interrelated systems. They vaguely asserted, for instance, that the Interrelated Guidance did not require additional time for Eligible Claimants or others to analyze because it "adheres to existing principles" in the 3M Agreement. Dkt. No. 3856 at 3. The Interrelated Guidance creates only more confusion as to the scope of the settlement class and the scope of the Release.

### 2. Ambiguity as to systems included.

The Interrelated Guidance introduces new, undefined terms including: Wholesaler, Retailer, and Purchased Water. Dkt. No. 3856-1. Wholesalers represent a critical part of the PWS and are not uniform in nature. They process massive quantities of water that far exceed that

---

[2] Of note, three separate groups have raised questions regarding the scope of the Agreement as proposed: states on behalf of themselves and other sub-federal sovereigns, Dkt. No. 3460; two large wholesalers raising concerns regarding the status of wholesale water providers, Dkt. No. 3829; and the Leech Lake Band of Ojibwe with respect to Tribes and Tribe-run water systems, Dkt. No. 3894.

processed by the typical PWS. And there are various types of wholesale water arrangements. For example, a wholesaler of treated water may sell treated water to its customer systems. A wholesaler of raw, untreated water may sell that water to its customers who may, themselves, in turn be wholesalers. Raw, untreated water may be purchased by another entity that, in turn, treats the water and then sells the treated drinking water directly to end-users or to other PWSs that provide water to end-users. In the wholesale context, LCRA provides raw, untreated water.

The Agreement and Interrelated Guidance both fail to address and appear to have been drafted without appreciation for many features and distinctions among these types of water systems. The Interrelated Guidance is not specific as to what type of Wholesalers or Purchased Water are covered by the 3M Agreement so fails to accord with practical realities. Because LCRA is not an Eligible Claimant or Class Member, it should not and cannot be held to be a Releasing Party under fundamental principles of due process and fairness.

**3. Ambiguity as to scope of Release.**

The Interrelated Guidance backsteps from providing substantive clarity as to the scope of the Release. The "Scope of Release" section in the Guidance, for example, describes how the Release should operate, and as discussed above purports to subject a wholesaler to the Release even if it has opted out. *See supra* Part IV.A.1. Then, the section concludes that "[u]ltimately, whether claims are released will turn on the application of the release provisions of the Settlement Agreement." Dkt. No. 3858-1. That caveat in essence invalidates the entire related portion of the exercise apparently mischaracterized as a clarification.

**4. Eligible Claimants have not received adequate notice of this Guidance.**

The Interrelated Guidance is a substantive change to the 3M Agreement that requires notice. Class Counsel failed to provide notice to large portions of eligible claimants that are directly

15

implicated by the Guidance. In fact, Class Counsel did not dispute that nearly two thirds of the 3,270 active wholesalers listed in the SDWIS database were not included in the 3M Agreement's exhibits of known Class Members to whom notices were mailed.[3] Dkt. No. 3829-1 at 1–2. As a result, those wholesalers may unknowingly be bound by the settlement, either as Class Members or Releasing Parties, and have potential claims waived by their customers, due to fast-approaching deadlines for opt-out that do not allow for coordination with customers or for approval by relevant governing bodies. Such a result would violate fundamental due process elements, especially when wholesalers could easily have been identified and informed of their potential claims through a public database search. *See Ashok Babu v. Wilkins*, No. 22-15275, 2023 WL 6532647 at *1 (9th Cir. Oct. 6, 2023) (noting that due process requires notice to be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).

**D. Objection Topic: Overbroad Definition of Water Source**

Water Source is defined as **"**any groundwater well, surface water intake, and any other intake point from which a PWS draws or collects Drinking Water, and the raw or untreated water that is thus drawn or collected." 3M Agreement, § 2.82. This definition is so broad that it could be read to encompass raw, untreated water such as that diverted by LCRA customers from the raw, untreated water sources managed by LCRA (e.g. lakes and rivers). The Release would, as worded,

---

[3] *See* U.S. EPA, *SDWIS Federal Reports Advanced Search* (last visited Oct. 18, 2023), https://ordspub.epa.gov/ords/sfdw_rest/r/sfdw/sdwis_fed_reports_public/1. A search in SDWIS for all active PWSs classified as wholesalers results in 3,270 systems. When cross-referenced with the 3M Agreement Phase I and Phase II designations (3M Agreement Amended Exhibits E and F), 236 match to Phase I, while 976 match to Phase II. That leaves 2,058—or more than 60 percent of active wholesalers—that are unlisted and likely never received a 3M settlement notice.

16

apply to claims arising from PFAS entering a PWS's Water Source. *Id*. In other words, entities that sell or draw water from vast swaths of rivers, streams, lakes that are the source of raw, untreated water could apparently be left without any recourse against the Released Parties should PFAS contamination later be identified in those water bodies. The overly broad definition of Water Source is beyond the claims of this litigation and may prevent any entity in a complex system from having a valid claim for Settlement Funds even if one or more are Class Members.

E.  **Objection Topic: Consultation Requirement**

The 3M Agreement Claims Form requires that the Class Member declare under penalty of perjury that it "has consulted with *any other entity* that has incurred costs in connection with efforts to removed [sic] PFAS from, or prevent PFAS from entering, Settlement Class Member's Public Water System, and that Settlement Class Member's claim is *on behalf of any such other entity*." *See* 3M Agreement Claims Form (emphasis supplied). The Claims Form language would appear to require a Class Member to identify and consult with all such entities, and ultimately make claims on their behalf. It is not clear how this certification potentially excludes other Class Members from making claims. It is also not clear whether this certification would implicate non-water systems that treat their water outputs, such as landfills. The logistical complexities involved in the mandated consultation, paired with the vague scope of that consultation, make this requirement unfair in operation.

V.  **CONCLUSION**

For the foregoing reasons, LCRA respectfully objects to the 3M Agreement as drafted.

Dated: November 10, 2023.

Respectfully submitted:

17

/s/ *Jessica K. Ferrell*
/s/ *Jeff B. Kray*
Jessica K. Ferrell, WSBA No. 36917
Jeff B. Kray, WSBA No. 22174
Marten Law, LLP
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jkray@martenlaw.com
jferrell@martenlaw.com

*Attorneys for Lower Colorado River Authority*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon all counsel of record in accordance with the Court's August 29, 2023 Preliminary Approval Order for Settlement Between Public Water Systems and 3M Company (Dkt. No. 3626), the Settlement Agreement Between Public Water Systems and 3M Company (Dkt. No. 3370-3), and Federal Rule of Civil Procedure 5.

Dated: November 10, 2023.

*/s/ Jessica K. Ferrell*
*/s/ Jeff B. Kray*
Jessica K. Ferrell, WSBA No. 36917
Jeff B. Kray, WSBA No. 22174
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jkray@martenlaw.com
jferrell@martenlaw.com

*Attorneys for Lower Colorado River Authority*