```
                    UNITED STATES DISTRICT COURT
                    DISTRICT OF SOUTH CAROLINA

* * * * * * * * * * * * * * *
IN RE:  AQUEOUS FILM-FORMING   *
FOAMS PRODUCTS LIABILITY       *      MDL No. 2:18-mn-2873
LITIGATION                     *
                               *      June 21, 2019
* * * * * * * * * * * * * * *
```

```
      REPORTER'S OFFICIAL TRANSCRIPT OF THE STATUS CONFERENCE
          HELD BEFORE THE HONORABLE RICHARD M. GERGEL
                  UNITED STATES DISTRICT JUDGE
                       JUNE 21, 2019
```

Appearances:

For the Plaintiffs:          Fred Thompson
                             Gale Pearson
                             Nancy Christensen
                             David McDivitt
                             Joshua Cohan
                             Tope Leyimu
                             David Hoyle
                             Dick Ortega
                             Charles Schaffer
                             Christina Cossich
                             Michael London
                             Scott Summy
                             Carla Burke Pickrel
                             Paul Napoli
                             Christian Marcum
                             Rob Bilott
                             Esther Berezofsky
                             Matthew Sinkman
                             Viola Vetter
                             Janpaul Portal
                             Wes Bowden
                             Larry Cohan
                             Carl Solomon
                             Roe Frazer
                             Frank Gallucci
                             Gary Douglas
                             Kevin McKie
                             Terry Richardson
                             Frederick Longer
                             Nixon Daniel
                             Joseph Feliciani
                             Kevin Hannon
                             Tate Kunkle

```
For the United States:      Sarah Williams
                            Jerald Thompson
                            David Hammock

For the Defendants:         Mike Olsen
                            Brian Duffy
                            Daniel Ring
                            Liat Rome
                            Liam Montgomery
                            Joe Petrosinelli
                            Michael Carpenter
                            Elizabeth Knauer
                            Amanda Kitts
                            David Dukes
                            Jonathan Handler
                            Andrew Carpenter
                            Molly Craig




Also Appearing:             Amy Kendall
                            James Rigano
                            Clair Campbell
```

```
Official Court Reporter:    Tana J. Hess, CRR, FCRR, RMR
                            U.S. District Court Reporter
                            85 Broad Street
                            Charleston, SC  29401
                            843.779.0837
                            tana_hess@scd.uscourts.gov
```

Proceedings recorded by mechanical stenography using computer-aided transcription software.

|       |     |                                                              |
|-------|-----|--------------------------------------------------------------|
| 9:13AM | 1  | (Call to order of the Court.) |
| 9:13AM | 2  | **THE COURT:**  Good morning.  Please be seated.  Okay. |
| 9:13AM | 3  | We are here with our monthly status conference in our AFFF MDL. |
| 9:13AM | 4  | Let me have counsel first for the plaintiff who |
| 9:13AM | 5  | will be speaking here today identify themselves for the record, |
| 9:14AM | 6  | please. |
| 9:14AM | 7  | **MR. THOMPSON:**  Your Honor, my name is Fred Thompson. |
| 9:14AM | 8  | I'm the plaintiffs' liaison counsel. |
| 9:14AM | 9  | **THE COURT:**  Yes, sir. |
| 9:14AM | 10 | **MR. LONDON:**  Good morning, Your Honor.  Michael |
| 9:14AM | 11 | London on behalf of the PEC. |
| 9:14AM | 12 | **MR. SUMMY:**  Good morning, Your Honor.  Scott Summy. |
| 9:14AM | 13 | **MR. NAPOLI:**  Good morning, Your Honor.  Paul Napoli. |
| 9:14AM | 14 | **MR. BILOTT:**  Good morning, Your Honor.  Rob Bilott, |
| 9:14AM | 15 | advisory counsel. |
| 9:14AM | 16 | **THE COURT:**  Thank you.  Okay.  Mr. Petrosinelli, good |
| 9:14AM | 17 | morning. |
| 9:14AM | 18 | **MR. PETROSINELLI:**  Good morning.  Joe Petrosinelli, |
| 9:14AM | 19 | one of the defense co-leads. |
| 9:14AM | 20 | **MR. DUKES:**  Good morning, Your Honor.  David Dukes. |
| 9:14AM | 21 | **MR. OLSEN:**  Good morning, Your Honor.  Michael Olsen. |
| 9:14AM | 22 | **MR. DUFFY:**  Good morning, Your Honor.  Brian Duffy as |
| 9:14AM | 23 | co-lead. |
| 9:14AM | 24 | **MR. RING:**  Good morning, Your Honor.  Dan Ring. |
| 9:14AM | 25 | **MS. WILLIAMS:**  Good morning, Your Honor.  Sarah |

9:14AM    1    Williams for the United States.

9:14AM    2              THE COURT:  Okay.  Folks, I have a list, and then

9:14AM    3    we'll go through my list, and if there are other matters that

9:14AM    4    counsel wish to raise with me, I'm delighted to hear from you

9:14AM    5    about that.

9:14AM    6              Someone give me a status report on our efforts

9:15AM    7    to develop plaintiff and defense fact sheets.

9:15AM    8              MR. RING:  Mr. London and I will address that one.

9:15AM    9    Dan Ring on behalf of the Defense Coordinating Committee.

9:15AM   10              I'm pleased to report that after what could only

9:15AM   11    be described as extensive give and take and back and forth with

9:15AM   12    Mr. London and others that on four plaintiff fact sheets -- and

9:15AM   13    I'll explain what they are in a moment -- we've reached a

9:15AM   14    general consensus, with one caveat I will explain.  And the

9:15AM   15    four, Your Honor, are an individual personal injury fact sheet,

9:15AM   16    an individual property damage fact sheet, an individual medical

9:15AM   17    monitoring fact sheet, and a water provider fact sheet.

9:15AM   18              If a person has more than one of those

9:15AM   19    individual claims, they'll fill out more than one fact sheet.

9:15AM   20              THE COURT:  Sure.

9:15AM   21              MR. RING:  And the one exception there is a question

9:15AM   22    that overlaps with the defense fact sheet that the defense has

9:15AM   23    proposed to take out, and if it's reciprocal, we'll take it out

9:16AM   24    in both.

9:16AM   25              The defense fact sheet, we have exchanged

9:16AM   1    drafts.  We're not yet at the point of being able to say we

9:16AM   2    have a consensus or disagreements to present to the Court.  The

9:16AM   3    CMO that goes along with those as a proposed implementing

9:16AM   4    order, we actually have made a great deal of progress, and

9:16AM   5    conceptually I think we're in agreement.  There are a couple of

9:16AM   6    issues, one of which is also on the agenda today, is -- relates

9:16AM   7    to the responsive pleadings and whether that's a trigger

9:16AM   8    date --

9:16AM   9           THE COURT:  Correct.

9:16AM  10           MR. RING:  -- for fact sheets.  And in part,

9:16AM  11    Mr. Petrosinelli will address responsive pleadings, but I'll

9:16AM  12    just touch on them now.

9:16AM  13                The plaintiffs have proposed that the trigger

9:16AM  14    date be off a responsive pleading.  The defense has proposed

9:16AM  15    the trigger date just simply be a set date number of days after

9:16AM  16    the order is entered implementing the fact sheets, and that

9:17AM  17    dispute is in front of the Court today.  Once that is resolved,

9:17AM  18    that will resolve certain provisions of the CMO itself and the

9:17AM  19    timing for when fact sheets would need to be answered.

9:17AM  20           THE COURT:  You know, I'm telling you something as an

9:17AM  21    experienced MDL lawyer you know.  The fact sheets are both of

9:17AM  22    y'all's best friends, right?  We're kind of narrowing and

9:17AM  23    focusing, and it makes everybody really drill down in a way

9:17AM  24    that narrows the case but focuses it, and it is in everybody's

9:17AM  25    interests.  So I understand how there could be disagreements,

9:17AM 1    and y'all have different needs and different approaches, and
9:17AM 2    I -- there are understandable differences.  If you reach an
9:17AM 3    impasse on any of this stuff, I'm glad to decide it, okay?  I
9:17AM 4    think it's better for y'all to do it, but I'm prepared to do
9:17AM 5    it.  It's not that hard for me.
9:17AM 6                Let me because you've raised the -- I was going
9:17AM 7    to do it a little bit later today, this whole responsive
9:17AM 8    pleading thing, and let me just raise a concern I have.  I
9:18AM 9    know, you know, people say, "Oh, you know, you file the
9:18AM 10   complaint.  Then you get a -- you know how lawsuits are.  You
9:18AM 11   get the answer."  MDLs are a little funny about all of that,
9:18AM 12   because we're talking about lots of pleadings.  The most
9:18AM 13   important part of a -- of both the complaint and the answer is
9:18AM 14   to put everybody on notice what issues are in contest.  And I'm
9:18AM 15   less concerned about, you know, pushing a date for the -- for
9:18AM 16   the answers as I am about having the defendants in some
9:18AM 17   meaningful way to assert what those major defenses are.  And
9:18AM 18   why do I want that?  Because we're going to do discovery, and
9:18AM 19   everybody has got to know -- I mean, I think Mr. London can
9:18AM 20   probably guess what those defenses are, but they need to be
9:18AM 21   stated, and that to me is like a really important thing.  I
9:18AM 22   think Ms. Williams actually made that proposal.  The whole idea
9:18AM 23   of getting the answers in -- I mean, I remember in my prior
9:19AM 24   MDL, we had all this stuff about how we were going to do it.
9:19AM 25   It was going to be a single common answer.  Are we going to

7

have individual ones?  And it just seemed to me a lot of trouble and a lot of burden on everybody that wasn't that important, but what is important is what are those defenses?  So I want y'all to talk about that.  I'm not all burned up about when that answer comes in right this moment.  That to me is less important than the defendants candidly disclosing what they see now as their defenses.

Now, listen, folks.  We could get in the middle of discovery, and there may be new claims and/or new defenses arising out of discovery.  That happens in litigation, but I think that is the bigger concern I have.  So I want y'all -- next month we'll talk about that, but I want y'all to think about a way in which the assumptions of the plaintiffs are confirmed about what the issues are.  That's really what I want laid out.

And, you know, if people feel strongly about having answers filed, we can talk about an efficient way to do it.  I just sort of think it's just at this point there are bigger fish to fry than the technicalities of getting all these answers in.

So unless y'all want to address that issue in more detail now, I'm going to suggest -- Mr. Petrosinelli, what are your thoughts about that?

**MR. PETROSINELLI:**  I think you've given us the guidance we need, and we ought to talk about it.

9:20AM  1        **THE COURT:**  But I don't want to hold up the fact
9:20AM  2   sheets.  I want the fact sheets moving.  I -- you know, one of
9:20AM  3   the things here is -- and, you know, this is MDL by Judge
9:20AM  4   Fallon, and he says get those fact sheets in, because it --
9:20AM  5   it's everybody's friend.  It helps the case get structured, and
9:20AM  6   I don't want to be delaying that for the answer, because to me
9:20AM  7   the fact sheet is a lot more important.
9:20AM  8              I mean, I can think in my 30 years of practice
9:21AM  9   maybe three times the answer actually mattered, okay?  Usually
9:21AM 10   when the defendant puts something in it he or it lived to
9:21AM 11   regret, okay?  Other than that, I never remember it mattering,
9:21AM 12   okay?  But -- so I'm not -- so y'all talk about it, and we'll
9:21AM 13   deal with it next month, and if I need to rule on it, I'll make
9:21AM 14   a determination of that.
9:21AM 15              But -- so I want y'all to get to the defense
9:21AM 16   fact sheets.  I'm not surprised that y'all have made progress
9:21AM 17   on the plaintiffs, but this needs to be reciprocal, and, you
9:21AM 18   know, we need to be -- one of our tasks here is to try to
9:21AM 19   trace, you know, where are the sites at issue, and tracing the
9:21AM 20   product that went to those sites is going to be an important
9:21AM 21   part of the building blocks of this case, and I want us to get
9:21AM 22   on with that.
9:21AM 23              At some point, you know, we're going to be going
9:21AM 24   to the federal government saying, "This is where -- we've come
9:21AM 25   to your door," but you got to do that.  You got to give them --

9:22AM    1    that information, you know, I think is an important part of

9:22AM    2    that.  So --

9:22AM    3           MR. RING:  And to your point, Your Honor, to get to

9:22AM    4    the fact sheets, rather than even waiting to the next

9:22AM    5    conference, what Mr. London and I have discussed is using the

9:22AM    6    next week to two weeks to see if we can iron out differences on

9:22AM    7    the defense fact sheet which was trailing our work on the

9:22AM    8    plaintiff fact sheets and the CMO, and by July 9th, sooner if

9:22AM    9    we can, submit either we agree or we don't, and just --

9:22AM   10           THE COURT:  I'll rule.  I mean, you know, I don't

9:22AM   11    mind ruling on these things, but I do think it'll be the best

9:22AM   12    thing that happened to everybody to getting these fact

9:22AM   13    sheets -- the process beginning, and as new parties come in, to

9:22AM   14    get them filled -- it's an important part and building block

9:22AM   15    for the case.

9:22AM   16           MR. RING:  And one of the intersecting issues is we

9:22AM   17    did get the proposed master discovery, so we're looking at

9:22AM   18    that --

9:22AM   19           THE COURT:  Right.

9:22AM   20           MR. RING:  -- in conjunction with the defense fact

9:22AM   21    sheet.

9:22AM   22           THE COURT:  Right, and, you know, in some ways -- you

9:22AM   23    know, in some things we don't really need to address that,

9:23AM   24    because we're going to address it in the form of discovery

9:23AM   25    responses.  All I'm trying to do is in a sort of organized,

systematic way, let's get the document discovery moving, and

let's -- to the extent we have people who don't really have

claims, let's know that, and the people who do have claims, we

want to be able to, you know, to litigate their claims, okay?

MR. RING:  Thank you, Your Honor.

THE COURT:  Thank you very much.  Last month we

talked about a potential deposition protocol.  I know the

plaintiff said, "Hey, the rules are fine."  Defense said,

"Well, we had some small concerns."  Did y'all make any

progress on that?

MR. THOMPSON:  Your Honor, in the joint status report

though, we've exchanged deposition protocol, and I believe that

we're making good progress.  We will have one.

THE COURT:  Let's get it done, or if not -- I mean,

let's not reinvent the wheel.  I mean, rules are generally sort

of okay.  Y'all among yourselves ought to be able to work it

out, but if there's some basic things that for orderliness, I'm

all for doing it, but let's not reinvent the wheel on this

thing, okay?

Let's -- I had a motion to dismiss filed

recently by the County of Suffolk.  It raises a number of

issues that would cover all the cases, and I was a little

surprised to be getting a motion to dismiss at this stage.  I'm

certainly not going to issue orders on 106 different cases on

motions to dismiss picking apart pleadings.  That's just not

the way we do things in MDLs. The case is not going away on a
motion to dismiss, at least the one filed by the County of
Suffolk, and it highlights -- I was a little surprised, because
it wasn't signed by the -- by the Defense Coordinating
Committee, and I went back, and I realized the CMO didn't
require it, just consultation. And we're going to have chaos
if we have random parties filing motions to dismiss. There's
no way we're going to keep -- I mean, I'm not going to issue
106 different orders on motions to dismiss.

         And I'm thinking about changing the CMO 2 to
require the -- A, the -- if a motion to dismiss is filed, that
it be signed by the Defense Coordinating Committee; and
secondly, if it's applicable to other claims, to file them all
at once. Don't file me random ones, because there were many of
these claims in Suffolk County I think that would just cut
across all the cases. So I'm not going to issue random ones.

         So what did counsel think about -- first of all,
did the Defense Coordinating Committee endorse this motion to
dismiss?

         **MR. PETROSINELLI:** No, Your Honor, we -- because of
the way the CMO was written, as you pointed out, the County of
Suffolk called us and asked us what we thought, and to be quite
candid with the Court, the leadership advised them that we
didn't think a Rule 12 motion was appropriate at this point,
because we don't want to be litigating individual motions. And

so --

THE COURT:  It's just going to be chaos.  We've got some really important issues to do that may well -- I mean, I think they're more summary judgment motions than they are really motions to dismiss, and we need to do them in a sort of thoughtful way.  I mean, there are even some jurisdictional issues that are going to require discovery.

And what is your -- what is the Defense Coordinating Committee's view of the fact that I'm thinking about just establishing -- changing the rule to say that if you don't sign it, if your committee doesn't sign it, that they have to come to me to get permission to file it?

MR. PETROSINELLI:  That would be most welcome to us, Your Honor.

THE COURT:  Same thing for the plaintiffs.  What do y'all think about that?

MR. THOMPSON:  Your Honor, we believe this motion is premature.  It was improvidently filed, and frankly I thought the CMO required a -- some sort of pre-approval to file, and so --

THE COURT:  I thought so too frankly.  Ms. Niosi and I were looking this morning, because we thought that was a requirement as well.

MR. THOMPSON:  We don't oppose that.

THE COURT:  I kind of like support the committees.

There are times where the leadership committee may have it
wrong.  I mean, they just are keeping something out that needs
to be raised and addressed, and that's why I have them come to
me, because if they present it, and they say, "No, no, it's too
early," or whatever and it's like really distinct and it's
important to the party, I want to hear about it.  I may well
say, "You got to go back to your committee.  We'll do it at a
later point," but -- but what I want to do is support the
leadership, because it's just too many cases, too many issues
to have 106 different individual actors.  I mean, that's not
what doing an MDL is all about, that you're trying to have
these issues.

          So I'm not -- so here's what I'm going to do.
I'm going to enter -- I'm going to enter a CMO that amends
paragraph 42 that requires endorsement by the -- A, it will
require endorsement by the committee, the defense coordinating
committee, and to the extent the substance of the motion
applies to other cases, it needs to all be filed at one time.
I mean, those are just sort of I think generally what we would
do anyway, but I want to impose that.

          I'm going to deny the motion without prejudice,
have them go back to you.  If you don't sign it, they can file
a motion with me.  I think it's early.  I think it's way too
early for this, and -- yes?  I see someone standing.

          **MS. KNAUER:**  Yes, Elizabeth Knauer, attorney for the

Port Authority --

        **THE COURT REPORTER:** I'm sorry. Could you come to the microphone?

        **THE COURT:** Come to the microphone if you could, please. It's like trying to hide in the back row of law school class, you know. We're not going to let you do that. Yes, ma'am.

        **MS. KNAUER:** I'm Elizabeth Knauer representing the Port Authority of New York and New Jersey, and we're also liaison counsel for the nonmanufacturing defendants.

        I just wanted to -- I understand the Court's concern about multiple motions to dismiss being filed. In our case, we do think that we may have some sort of unique defenses that we may want to present to the motion to dismiss. So I would just request that the Court have -- within the modified order include some means of requesting permission from the Court --

        **THE COURT:** Oh, we will definitely do that, but --

        **MS. KNAUER:** -- if the DCC doesn't agree.

        **THE COURT:** Let me say something about it. MDL is different from litigation where people will come in, and they'll trim down the complaint a little bit here and there. The case never goes away. It's just like these sort of random, unimportant claims that are not really central to the -- to the lawsuit are -- are -- you know, people try to get rid of them.

9:30AM  1   In an MDL if everybody was doing that, it would be like chaos.

9:30AM  2   I mean, you'd have -- it would just be -- and it's not

9:30AM  3   important.  It's not important to the result here, because the

9:30AM  4   case is not going to go away on a motion to dismiss.  So I'm

9:30AM  5   trying to not only maximize the time all counsel have to

9:30AM  6   spend -- because let me say, you come in, and you do a motion

9:30AM  7   to dismiss on some of these core issues, the whole defense

9:30AM  8   committee has got to get involved, because if they lose that,

9:30AM  9   you know, those -- some of their -- it may be one of their core

9:30AM  10  issues, and the plaintiffs say, "Oh, no.  We can't let the case

9:30AM  11  go."  You've now redirected the entire litigation where I'm

9:30AM  12  trying to get them going on discovery and trying to deal with

9:30AM  13  some of these threshold issues about immunity and so forth, and

9:30AM  14  you got us off doing an issue that we don't want to do yet.  I

9:30AM  15  know that's not the intent, but this is really different.

9:31AM  16          So the way we do this is you go to leadership

9:31AM  17  team.  You talk to them.  If you feel strongly, then you can

9:31AM  18  make a motion to me.  I'm going to tell you that my bias is in

9:31AM  19  favor of supporting committee decisions, because without

9:31AM  20  coordination, it's very hard to run an MDL, okay?  So it's got

9:31AM  21  to be a really compelling reason to do it.

9:31AM  22          Now, I'll eventually get to it.  We'll get to

9:31AM  23  it, but it just is a question of when we get to it, and so --

9:31AM  24  and I will tell you this is very different from your normal

9:31AM  25  litigation.  There's a certain culture to this, and I don't

9:31AM    1    know how much personal experience you have with that, but I

9:31AM    2    wasn't surprised what the defense lawyers were saying, you

9:31AM    3    know, that, "We were surprised.  We tried to urge them not to

9:31AM    4    do it."

9:31AM    5           **MS. KNAUER:**  Well, and I will say that the County of

9:31AM    6    Suffolk did not -- although we are liaison counsel for the

9:31AM    7    nonmanufacturing defendants, which includes them, they did not

9:32AM    8    actually come to me first.

9:32AM    9           **THE COURT:**  So who -- is someone here representing

9:32AM   10    the County of Suffolk?

9:32AM   11           **MS. KNAUER:**  No, they are not present.

9:32AM   12           **THE COURT:**  They just filed it and ran?

9:32AM   13           **MR. OLSEN:**  Your Honor, we did hear from them in

9:32AM   14    advance.

9:32AM   15           **THE COURT:**  I saw that.  They consulted, and, you

9:32AM   16    know, y'all urged them not to do it.  It's not bad.  I mean,

9:32AM   17    I'm going to get to these issues.  It's just how are we going

9:32AM   18    to run this thing?  And I think kind of making a little bit of

9:32AM   19    a big deal about it right now just kind of highlights that we

9:32AM   20    need to support our leadership committees on both the plaintiff

9:32AM   21    and defense side.

9:32AM   22           **MS. KNAUER:**  And that's all understood.  I just

9:32AM   23    wanted to ensure that there would be some procedure --

9:32AM   24           **THE COURT:**  There is definitely going to be a

9:32AM   25    procedure.  I will always hear you, and at the end of every --

9:32AM  1    not only can you file it, my CMO will say you -- any party that

9:32AM  2    does not get permission may file a motion with the Court.  That

9:32AM  3    will always be available.  We meet here every month.  My last

9:33AM  4    statement to you each month, "Is there any other issue anyone

9:33AM  5    wishes to raise?"  So you'll always have the opportunity to

9:33AM  6    have access to me.

9:33AM  7          MS. KNAUER:  And so there would be a motion to --

9:33AM  8          THE COURT:  Permission to file.

9:33AM  9          MS. KNAUER:  For permission to file the motion.

9:33AM  10         THE COURT:  Yes.

9:33AM  11         MS. KNAUER:  Thank you, Your Honor.

9:33AM  12         THE COURT:  Thank you.  Okay.  Folks, you know, we --

9:33AM  13   of course, my view of the world is 30 days ago I lifted the

9:33AM  14   stay on discovery, so I want to know when y'all are going to

9:33AM  15   finish, right?

9:33AM  16         MR. PETROSINELLI:  Mr. Dukes said you might ask that

9:33AM  17   today.

9:33AM  18         THE COURT:  Y'all were like 2000 never, you know.  So

9:33AM  19   let me just -- again, you know, I am not willing to bifurcate

9:33AM  20   discovery, because every time I do that, the lawyers are

9:33AM  21   calling me from depositions saying someone asked a question

9:33AM  22   outside, and it drives me crazy, so I don't do that.

9:33AM  23         But I do think we need to be focused on some

9:33AM  24   really important issues.  I talked about this a little bit last

9:34AM  25   month.  Let me say again.  I think among the issues that I just

9:34AM  1    think prudently in trying to organize the MDL in a meaningful

9:34AM  2    way, we've got to address -- we got to do the discovery on

9:34AM  3    governmental contractor immunity.  And let me say, it's lot of

9:34AM  4    issues and a lot of facts, and it goes into history going back

9:34AM  5    to the origin of the -- of the creation of the AFFF, and, you

9:34AM  6    know, y'all got some work to do, and there are issues about

9:34AM  7    disclosure of risk.  There are kinds of issues in government

9:34AM  8    contractor immunity, and it's going to take some work, and

9:34AM  9    y'all need to get on this.  You know, y'all need to be getting

9:34AM  10   whatever documents might be available, and then you got to

9:34AM  11   get -- you got to take depositions.  You're going to run into

9:34AM  12   situations where people involved are no longer alive.  You're

9:34AM  13   going to have all kind of issues.  This is like really hard

9:34AM  14   work, and I want y'all to get on it, and I don't want someone

9:35AM  15   filing a motion to dismiss on that basis right this moment,

9:35AM  16   because we got too much work to do on that.

9:35AM  17          The -- another issue which -- and I said this

9:35AM  18   before.  And I know y'all are already working on the fact

9:35AM  19   sheets on the water districts, because I know the defense wants

9:35AM  20   to know what's the score there, how much critical information.

9:35AM  21   I think that is a really important threshold kind of set of

9:35AM  22   issues to deal with.  You know, the -- I think the hardest

9:35AM  23   issue for plaintiffs is, you know, individual causation.

9:35AM  24   General causation is sort of -- is not as arduous an issue.

9:35AM  25   But there appears to be a significant scientific dispute about

what threshold of PFOA and PFOS in the water poses a health
risk, and from the materials both sides provided me, I'm aware
of one time the EPA said it was 400 parts per trillion.  Then
they said it was 70 parts per trillion.  A committee of the CDC
says it's 10 or 11 parts per trillion.  New Jersey says
something in that same range.  It's a very dynamic moment right
now, and we need to be doing work about what is the underlying
scientific bases for -- for -- for those numbers?  That is
really important.

              And I said before, you know, the one drop, you
know, one part per trillion is -- is a single -- one part per
trillion is one single drop in a swimming pool the size of a
football field 43 feet deep, okay?  So 10 parts per trillion is
literally 10 drops in that.  Now, if there's a sound scientific
basis for that, we need to know about that.  If there's an
argument about it, we need to be developing that.  That's like
-- when we get to science day, I'm going to talk to you about
that.  I think this is like really an important threshold
issue.

              The C8 scientific panels have very interesting
information, but the level of exposure there was much more
intense than we're talking about here in the water supply, and
we need to know -- you know, I'm just very curious about what
was that Center for Disease Control panel, what were they
relying on when they talked about 10 parts per trillion?  What

9:37AM  1    was that information?  And is it reliable?  Are there -- if

9:37AM  2    it's disputed, how important is -- is duration?  I mean, there

9:37AM  3    are all these issues, and we'll also -- I'm going to mention

9:37AM  4    that on science day.  Y'all got to get to work on all of that,

9:37AM  5    and those issues will, of course, go into every other part of

9:37AM  6    this case.  And so I think we need to get on with the discovery

9:38AM  7    on all of that that really go to the water districts.

9:38AM  8          I know -- I'm not trying to stop other things,

9:38AM  9    but I just think that is a good focus and, you know, to the

9:38AM  10   extent that plaintiffs can't sustain their proof on that issue,

9:38AM  11   then you got real problems on the other issues.  If they can,

9:38AM  12   that may be a building block to other claims.

9:38AM  13         So I'm just saying I would -- I think in a

9:38AM  14   potential litigation raising as vast a number of issues as

9:38AM  15   here, if you try to swallow it whole, you just choke.  You try

9:38AM  16   to narrow it down to something.  And if y'all disagree with

9:38AM  17   that, I don't want to run your litigation, but it just strikes

9:38AM  18   me looking at that, that's an issue as the presiding judge it

9:38AM  19   looks like really interesting to me and really will answer a

9:38AM  20   lot of questions down the road that if we get answers to those

9:38AM  21   issues, we'll come to understand.

9:38AM  22         So I would like y'all to be conferring about how

9:39AM  23   we're going to get there.  You know, what is our discovery plan

9:39AM  24   here?  I didn't issue a scheduling order or anything.  I don't

9:39AM  25   want to do that right now.  But what I do want is to sort of

9:39AM  1   hear y'all's plans how are we going to get to this?  And it may

9:39AM  2   well be that, you know, the plaintiffs will have their own

9:39AM  3   plan, and the defendants will have their plan.  I don't expect

9:39AM  4   them to have the same plans, but they have different -- but,

9:39AM  5   you know, to get on with -- and to share with each other so

9:39AM  6   that we can -- so that I know that documents are being

9:39AM  7   exchanged, depositions are being taken.  We're moving on this,

9:39AM  8   okay?

9:39AM  9          Now let me talk to you about science day for a

9:39AM  10  second.  This is -- apparently has been the notion that you --

9:39AM  11  that the attorneys are going to litigate over what I'm going to

9:39AM  12  ask for for science day.  That is a mistake, okay?  This is for

9:39AM  13  me, not for y'all.  And I -- I'm considering everything y'all

9:39AM  14  wrote.  Thank you very much for that.  Some of them were good

9:39AM  15  ideas.  But let me mention to you some things, and I'm going to

9:40AM  16  issue an order about what -- the scope of science day, because

9:40AM  17  it's still a work in progress in my own head, and I'm going to

9:40AM  18  go over with some care the recent responses of counsel which

9:40AM  19  laid out different ideas they thought that I might want to

9:40AM  20  consider.

9:40AM  21          One of them is the issue I just raised about the

9:40AM  22  scientific bases of these varying numbers, and I think that's a

9:40AM  23  really important issue.  It goes to the issue is at what level

9:40AM  24  of this exposure poses human health risks?  That's really the

9:40AM  25  question.  And I will tell you that all those articles both of

9:40AM  1  you gave me, none of them really addressed that question about

9:40AM  2  in the water supply, you know, the levels -- at what levels,

9:40AM  3  and it may well be that we're literally at the cutting edge of

9:40AM  4  science on this.  I don't know, but I want to -- I mean, we're

9:41AM  5  not completely beyond the frontier, because you got groups

9:41AM  6  talking about levels that are very low.  I mean, I don't think

9:41AM  7  they're taking a dartboard out and throwing the dart at a wall

9:41AM  8  and hitting a number.  They got a reason for it.  I want to

9:41AM  9  know about that.  And if plaintiffs love that number and the

9:41AM  10  defendants think it's not sound science, I want to hear about

9:41AM  11  that too.

9:41AM  12          I want to know about -- I've read different --

9:41AM  13  in the materials I've reviewed, I am aware that there has been

9:41AM  14  some documentation about levels of exposure in the water

9:41AM  15  supply, contamination in the water supply.  I think I read

9:41AM  16  somewhere there were like 70 sites and 19 of them were over the

9:41AM  17  EPA number of 70 parts per trillion.  I'd like to know what

9:42AM  18  those specific numbers are at those sites, because, you know,

9:42AM  19  are they over 10 parts per trillion?  Are they under 10 parts

9:42AM  20  per trillion?  I'm not saying I love that number.  I'm just

9:42AM  21  saying, you know, the different standards, what actually is the

9:42AM  22  level there?  And do we have any idea about duration of that,

9:42AM  23  how long it's been there?  And has it gone up or down, or has

9:42AM  24  it been unchanged?

9:42AM  25          So that whole issue about what is our knowledge

1    about actual, you know, contamination of the water supply in

2    those various sites.

3                Another area of interest to me is if we were to

4    do medical monitoring, are there tests available to efficiently

5    and economically evaluate the levels of PFOS or PFOA in the

6    blood serum?  Are there tests to suggest that there are

7    complications from that exposure?  I was told last month about

8    there was a physician in New Jersey with a screening protocol.

9    I mean, I would imagine you might have something where you

10   would have an initial screening protocol, and then if certain

11   things came out indicating an issue, there would be some

12   further follow-up.  I mean, I don't want to reinvent the wheel

13   on this if we're going to do it.  Are there people out there

14   thinking about this, talking about this?  Is that a -- is there

15   a way to do it?

16                I've told you before that if we explore this --

17   and I'm not completely committed to doing it -- we might pick

18   one or two sites and see if it tells us anything worth having.

19   You know, is this information worth having?

20                I will tell you that one of the challenges of

21   ever proving individual causation is where a health

22   complication arises and may be related to a toxic exposure or

23   to a thousand other reasons, and how one gets to saying most

24   probably is caused by the exposure is always one of those

25   challenges.  And so I'm kind of interested are there tests out

there that might assist us in that, or are we going to be
looking at other, you know, less direct evidence?

And related to that, are there diseases or
conditions uniquely caused by PFOA or PFOS contamination or
ones which arise rarely in the absence of exposure among that
sort of age group affected?  I remember in Fen-Phen litigation,
primary pulmonary hypertension was very rare for young people,
and suddenly they had all of these cases, and all of them were
on Fen-Phen.  Is there something like that here?

If they're -- if there are common health
conditions caused or exacerbated by PFOA or PFOS exposure, are
there methods to demonstrate that it's likely related to that
exposure?

Another area is -- for me for science day, I'm
interested in it, is remediation methods, costs and
effectiveness.  What's it involve?  What are the methods?

And another issue which seems to be disputed
here, are there alternatives to PFOA and PFOS that were
available -- are available in this product, and were they
previously available?  You know, that could relate to a lot of
issues, including governmental contractor immunity.

So those are issues -- those are six issues that
just to me are things -- and I will issue an order that sets
forth these things that I'm interested in science day, and I
will selfishly say it, the science day is for me, not for y'all

1    to spoon feed me.  Y'all already have given me the spoon

2    feeding.  I loved that there were ten articles each side, and

3    none of them overlapped each other.  They're like two different

4    parallel universes there.  And what I'm going to try to do is

5    have a third line which is going to be stuff we all sort of

6    recognize, may get us closer to answering those questions.

7                I will also say something that I doubt I need

8    to:  That I won't be surprised in the course of this litigation

9    that there will be new studies and new articles and new

10   information that comes forward that will enhance our

11   understanding, because I think we are in many ways at the

12   frontier here on some of these medical and scientific issues.

13   Please provide them to me promptly.  I'm interested.  You know,

14   I'm trying to keep up with the literature, and we'll read them.

15   Don't flood me with every time there's something that's a

16   random footnote or something, but if there's something that

17   seems to be significant and -- you know, I've been in a lot of

18   litigation like this where material studies come in that are

19   really pretty important, important for the experts and so

20   forth.

21                Okay.  Let me talk about the -- I saw somewhere

22   y'all were debating over the limit of 25 interrogatories and

23   Rule 33(a).  The limit of 25 interrogatories will not apply to

24   this litigation, does not apply.  You know, we got 106 cases

25   right now.  We have thousands of plaintiffs.  It doesn't apply.

9:47AM 1            Now, here's the -- what I'm going to ask y'all
9:47AM 2     to think about.  Should there be a limit?  I don't want abuse.
9:47AM 3     I don't want trying to bury the other side in interrogatories.
9:47AM 4     The 25 interrogatory rule is there for a reason.  I've lifted
9:48AM 5     it in many complex cases, because it doesn't make sense.  You
9:48AM 6     need more than that, but I want the parties to consult should
9:48AM 7     we have a limit, and all the limit is is you come to me if you
9:48AM 8     have more.  And it may be useful to do that, but I will -- at
9:48AM 9     the next status conference, I want y'all to come to me with a
9:48AM 10    joint proposal, or if not, your separate thoughts about that,
9:48AM 11    but the 25 interrogatory limit will not apply, and the next CMO
9:48AM 12    will say that.
9:48AM 13           Okay.  That's my list.  From the plaintiff, any
9:48AM 14    thoughts, ideas, concerns?
9:48AM 15           MR. LONDON:  One second, Your Honor.  I'm just
9:48AM 16    looking at our joint report to make sure we did cover
9:48AM 17    everything.
9:49AM 18           THE COURT:  I used your report to prepare my notes.
9:49AM 19           MR. LONDON:  Well, you did an excellent job, Your
9:49AM 20    Honor.
9:49AM 21           THE COURT:  I didn't do it -- I'm not kind of like
9:49AM 22    random abstract artist or something.
9:49AM 23           MR. LONDON:  It was a good job then, Your Honor.  I
9:49AM 24    think you covered it all.
9:49AM 25           MR. THOMPSON:  The -- I think the United States, that

1    issue is -- well, it's for them to say, but that's still in the

2    report.

3         THE COURT:  Okay.  Mr. Petrosinelli?

4         MR. PETROSINELLI:  Nothing from the defense, Your

5    Honor.

6         THE COURT:  Ms. Williams, give me a little status

7    report on production of documents and where all that is with

8    the government.

9         THE WITNESS:  Well, we had been looking into Air

10   Force and Defense Logistic Agency's supply records.  We found a

11   private database which has been collecting documents that would

12   normally be destroyed in the government process, and so we're

13   getting that information and how to search it for the parties.

14        THE COURT:  That will -- that would be of great

15   benefit to everybody.  And how -- how did there happen to be a

16   private database for that?

17        MS. WILLIAMS:  I'm guessing, Your Honor, but I think

18   it's because for the Defense Logistics Agency's documents,

19   there's a market.  There are people who are interested who want

20   to know like how much does this document sell for?  So they're

21   able to collect all of those documents and then sell them back

22   to the defense supplier at a profit, because they have

23   information.

24        THE COURT:  Yes.  I get that.  That makes plenty of

25   sense.  I know at some point the government is going to want me

9:50AM  1    to address governmental immunity; is that a good guess?

9:50AM  2            MS. WILLIAMS:  That is an excellent guess, Your

9:50AM  3    Honor.

9:50AM  4            THE COURT:  Yes, thank you.  And we will.  I'm not

9:50AM  5    neglecting the issue, but let's -- are there factual issues

9:50AM  6    relevant to that -- to such a motion?

9:50AM  7            MS. WILLIAMS:  Yes, Your Honor.

9:50AM  8            THE COURT:  Well, I think you may want to alert the

9:50AM  9    parties that at some point you may be making motions, and that

9:50AM  10   they need to get on with discovery.

9:50AM  11           MS. WILLIAMS:  Yes, Your Honor.

9:50AM  12           THE COURT:  Because what I -- you know, I've talked

9:51AM  13   about governmental contractor immunity, but to the extent there

9:51AM  14   are issues, y'all ought to be consulting with the government.

9:51AM  15   Now, I'm wondering.  I know the parties got the *Bell* discovery

9:51AM  16   and other things.  Are there things from the government that

9:51AM  17   you are pursuing now that you have not received?

9:51AM  18           MR. THOMPSON:  Judge, we've actually had an

9:51AM  19   opportunity to confer with the government and with regard to

9:51AM  20   various databases, and the voluntary cooperation has been very

9:51AM  21   gratifying to date.  So we don't have any complaints.  As we go

9:51AM  22   forward, some of that patina may wear off, but we may --

9:51AM  23           THE COURT:  Right.  We may have our disagreements,

9:51AM  24   but I think everybody is very impressed with Ms. Williams'

9:51AM  25   diligence here.  So --

9:51AM   1          **MR. THOMPSON:**  Yes, sir.

9:51AM   2          **MR. OLSEN:**  Your Honor, we too appreciate -- we've

9:51AM   3   been perfectly cooperative with Ms. Williams.  The plaintiffs

9:51AM   4   have issued master discovery that will apply to everyone,

9:51AM   5   including the government.  We are looking at that discovery to

9:52AM   6   see if there's anything additional that the defendants need

9:52AM   7   from the government, and we will work with them as we evaluate

9:52AM   8   that.

9:52AM   9          **MS. WILLIAMS:**  And unfortunately, Your Honor, the

9:52AM   10  cooperation may be coming to an end, because the government

9:52AM   11  does have immunity defenses to discovery.  So while I have to

9:52AM   12  help people direct to third-party discovery, there are

9:52AM   13  thousands of claims which are not against the United States in

9:52AM   14  this lawsuit.  As a party, we have an immunity to suit, which

9:52AM   15  is different than the immunity that defendants are pursuing.

9:52AM   16  That's in the law of the Fourth Circuit a preemption defense,

9:52AM   17  so we're differently situated that way.

9:52AM   18         **THE COURT:**  Are you suggesting that Rule 45 does not

9:52AM   19  apply to the government even if it wasn't a party?

9:52AM   20         **MS. WILLIAMS:**  No, Rule 45 is the rule that should be

9:52AM   21  used, Your Honor, because the --

9:52AM   22         **THE COURT:**  But only if you're not a party.  As long

9:52AM   23  as you're a party, you're subject to discovery.

9:52AM   24         **MS. WILLIAMS:**  Not -- the United States is only

9:52AM   25  subject to jurisdictional threshold issues.  When we have a

9:52AM    1  jurisdictional defense, it's a threshold issue, and that

9:52AM    2  immunity has to be resolved before any merits-based discovery

9:53AM    3  on us.

9:53AM    4       THE COURT:  But even if you were to get -- have

9:53AM    5  immunity, you would still be subject to Rule 45.

9:53AM    6       MS. WILLIAMS:  Yes, Your Honor.  And in those cases

9:53AM    7  where we're not a party, non-party discovery is not affected

9:53AM    8  and not limited.

9:53AM    9       THE COURT:  I'm sorry?

9:53AM   10       MS. WILLIAMS:  Non-party discovery is not affected

9:53AM   11  and limited in the same way that party discovery is.

9:53AM   12       THE COURT:  I recognize that.  I was aware of that,

9:53AM   13  but it doesn't -- it's not absent either, and to the extent

9:53AM   14  there are relevant document -- relevant -- documents relevant

9:53AM   15  to a case, even if the government is not a party, as a -- it

9:53AM   16  has certain duties under -- I know there are issues here about

9:53AM   17  how we get to them and what standards we use and all of that,

9:53AM   18  but they're not immune.  They're not off limits.  That's for

9:53AM   19  the Court to determine whether they fall within Rule 45 and

9:53AM   20  applicable standards in my circuit, right?  I mean --

9:53AM   21       MS. WILLIAMS:  Yes, Your Honor.

9:53AM   22       THE COURT:  So -- but I think to the extent that the

9:54AM   23  government doesn't have any heartburn about something that's

9:54AM   24  highly probative to this case and to the public health, it

9:54AM   25  should not be holding them back on some principle that -- that,

9:54AM   1   you know, somehow we have -- you know, we have immunity.

9:54AM   2   You're a party right now.  Some of these jurisdictional issues,

9:54AM   3   I would read them pretty broadly as to the applicability here.

9:54AM   4            So, you know, I would -- and to the extent we

9:54AM   5   encounter a situation where you're refusing, I want that to be

9:54AM   6   promptly brought to my attention, because I will immediately

9:54AM   7   address it.

9:54AM   8            But, you know, we're in the search for the truth

9:54AM   9   here, and frankly, Ms. Williams, the government's been way

9:54AM  10   ahead on some of these issues, and I have not seen the

9:54AM  11   government's view as in any way obstructionist, but just to the

9:54AM  12   contrary, very open.  But when you have critical information

9:55AM  13   that's essential to the public health, the government is going

9:55AM  14   to have a pretty tough time trying to keep that information out

9:55AM  15   of the -- beyond the reach of Rule 45.  I mean, whatever the

9:55AM  16   standard, it's going to be pretty tough.

9:55AM  17            So I urge y'all to continue to voluntarily

9:55AM  18   cooperate, and to the extent where you reach a point where you

9:55AM  19   can't go any further than that, I'll address those issues,

9:55AM  20   okay?

9:55AM  21        **MS. WILLIAMS:**  Yes, Your Honor.  And we're not at

9:55AM  22   that point now.  It's just important to lay out the --

9:55AM  23        **THE COURT:**  Listen, I know the Department of

9:55AM  24   Justice's view, you know.  I don't have a dog in that fight.

9:55AM  25   I'm just -- but I am -- as the presiding judge over this, I

9:55AM   1   want the parties to have the relevant information.  To the
9:55AM   2   extent the claims of the plaintiffs have merit, there is a huge
9:55AM   3   public health issue here, and, you know -- and I'm not going to
9:55AM   4   be the guy that suppresses the relevant evidence and that
9:55AM   5   doesn't allow this information to come forward.  There are a
9:56AM   6   lot of interests here having this information fully addressed.
9:56AM   7   If there's no merit to it, that's fine.  If there is merit to
9:56AM   8   it, this is the vehicle we have to discover that information.
9:56AM   9   That's what discovery is, right?  It's just to discover that
9:56AM  10   information.
9:56AM  11           So I have nothing but praise, Ms. Williams, for
9:56AM  12   you up to this point, and if we reach a point where we're
9:56AM  13   hitting a wall, let's all talk about it.  Okay?
9:56AM  14           **MS. WILLIAMS:**  Yes, Your Honor.
9:56AM  15           **THE COURT:**  Okay.  From the defense, any additional
9:56AM  16   matters?
9:56AM  17           **MR. PETROSINELLI:**  No, Your Honor.
9:56AM  18           **THE COURT:**  Very good.  Well, I noticed everyone
9:56AM  19   seemed fascinated last night with the fact that there was a
9:56AM  20   dungeon in the -- in the venue for the -- of the cocktail
9:56AM  21   party.  I didn't notice anyone wandering down there in the fear
9:56AM  22   they might not return, but I doubt they called it a dungeon in
9:57AM  23   1780, you know?  Though I'm sure it was like, you know -- it
9:57AM  24   wasn't like staying at the Ritz-Carlton.
9:57AM  25           But, you know, we have -- for those of you who

9:57AM  1 have done one of these carriage tours, there's also a City Jail

9:57AM  2 that is -- that I think was constructed in the early 19th

9:57AM  3 Century and existed -- I think it was used I think sometime

9:57AM  4 into the 20th century, and it is -- if it's not a dungeon, I

9:57AM  5 don't know what it is.  For those of you who have a moment, you

9:57AM  6 might want to go on the Ghost Tour of the City Jail.  I hear

9:57AM  7 many people leave completely frightened by it.

9:57AM  8    But -- so, you know, whose turn is it next month

9:57AM  9 for the venue of the cocktail party?

9:57AM  10    **MR. PETROSINELLI:**  Mr. Thompson.

9:57AM  11    **THE COURT:**  Oh, my goodness.  Mr. Thompson, you're

9:57AM  12 getting a tall order here after you -- are you going to have a

9:57AM  13 dungeon at yours, you know?

9:57AM  14    **MR. THOMPSON:**  Well, Judge, I would take them to

9:57AM  15 Bowens Island except I'm not sure how we would all get back.

9:58AM  16    **THE COURT:**  Well, you might rent a bus.  That's the

9:58AM  17 way -- okay.  I look forward to seeing y'all next month.

9:58AM  18    This hearing is adjourned.

9:58AM  19

20

21

22

23

24

25

* * * * * * * *

## CERTIFICATE

I, Tana J. Hess, CCR, FCRR, Official Court Reporter for the United States District Court, District of South Carolina, certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of proceedings in the above-entitled matter.

_____

Tana J. Hess, CRR, FCRR, RMR
Official Court Reporter