# EXHIBIT 32

Falco Exhibit
DL124
11/18/20 Carrie Campbell, RDR
exhibitsticker.com

# HISTORY OF THE DEVELOPMENT OF "LIGHT WATER" BRAND AQUEOUS FILM FORMING FOAM CONCENTRATES

By 1960 the Chemical Division of 3M Company had successful business operations based on the company's long-term commitment to the manufacture of fluorochemicals. The textile chemicals were growing, and an industrial fluorochemical business was developing satisfactorily in several areas. One of the industrial fluorochemical product lines contributing to growth and profits was the family of fluorochemical surfactants. At this time, there were three major application areas for these materials:

1) The emulsion polymerization of fluorine-containing polymers.

2) Acid stable surfactants for mist and vapor suppression in chrome plating.

3) Levelling agents in floor polish.

The Chemical Division Laboratory and Commercial Development Department, however, continued to be frustrated by the inability to develop applications for these unique materials in our own laboratories. Several applications research programs had developed useful data which had been incorporated in product information bulletins. Some of these bulletins dealt with the use of fluorochemicals to suppress evaporation of hydrocarbons. No significant sales as of 1960, however, had been attributed to evaporation suppression.

It was then that a fluorochemical surfactant advertising and sampling campaign was conceived. In this program 3M developed a series of trade advertisements that featured the surfactant technology and made specific reference to the unique properties obtainable with the fluorochemical molecule. The ads appeared in chemical industry trade journals and were designed to attract the bench chemist. When a request for more information was received from one of these ads, the respondent was sent a questionnaire in which he was asked to define his problem. The returned questionnaire was then screened by a committee from the laboratory and Commercial Development Department, and certain surfactant samples were sent. These samples were intended to be tried in the customer's laboratory as the solution to his problem. The samples were given "L" numbers so that their chemical structure would not be identified.

Through this program 3M intended to maintain an overview of the possible application areas, evaluate their market potential, and follow up the customers' experimental results either by phone or by direct personal contact. If any of the sample requests grew

to purchase requests, the Commercial Development Department had the responsibility for determining market justification, establishing product codes, and setting prices.

By early 1962 the program was continuing. Several hundred sample requests had been filled, and a number of small customer accounts had been developed for a variety of applications. On March 2, 1962, a surfactant questionnaire was received from E. J. Jablonski, who worked under Dr. Richard L. Tuve at the Naval Research Laboratory in Washington. The request dealt with materials that would improve the resistance of aqueous foam to breakdown by silicone materials. A sample of L-1083 surfactant was provided. In May of 1962 Maynard Olson of the Chemical Division Laboratory visited Naval Research Laboratories as part of a followup program. The NRL revealed that they were trying to make fire fighting foams that would be stable in the presence of silicone treated potassium bicarbonate. Additional quantities of L-1083 were provided to the Navy in response to requests from Dr. Tuve. During the summer of 1962 the Navy conducted a fire test at the Ansul Company in Marinette, Wisconsin, using one of their early experimental formulations based on L-1083. The results were extremely gratifying to the Navy and drew attention also from Ansul. Ansul had been selected by the Navy, since they were already its leading supplier of dry chemical systems, and because they had excellent fire testing facilities at Marinette, Wisconsin.

On August 8, 1962, Jim Rogers visited Naval Research Laboratories with Frank Warner. His report refers to the term "live water" and its effectiveness in preventing reflash from gasoline fires extinguished with dry chemical Purple K (potassium bicarbonate). Movies of their tests were shown and a number of questions about availability of L-1083 and other surfactants were asked. Dr. Tuve asked about solubility, toxicological data, decomposition products, and requested additional surfactant materials. At this time, Bob Burford became the main laboratory contact between Tuve's laboratory and 3M. He provided additional surfactants and an experimental run of L-1083 was made to fill a Navy purchase order. L-1083 was redesignated FX 172.

Meanwhile, 3M had established technical liaison with the Ansul Company as both parties worked to assist the Navy in the development of effective systems for dispensing what was now referred to in most reports and correspondence as "LIGHT WATER."

Ansul, although not experienced in the development or formulation of fire fighting foams, had asked for samples of surfactants to use in some of their own programs involving hydrocarbon vapor suppression and in treatment of dry chemicals.

While Dr. Tuve's first report did not actually issue until 1964, his work with the fluorochemical surfactants was made known to at least two other companies in the foam business, specifically National Foam and Chemical Concentrates. Presumably with the permission of 3M, NRL gave samples of surfactants to these companies and 3M supplied additional quantities. It was assumed by most persons at that time that the manufacture of a commercial fire fighting foam would be done by companies already in the foam business. Ansul would supply hardware and dry chemicals. 3M would be a supplier of the fluorochemical surfactants.

In the spring of 1963 the Navy identified a formulation for "LIGHT WATER" Agent that they believed was optimum from the materials available. When they requested larger quantities for test purposes, 3M made the decision to become involved in the formulation of the end product itself. This formulation was designated FX 183, and pricing was established for sale to Navy and Ansul.

Meanwhile, the Navy negotiated with Ansul a contract to produce a series of fire fighting units containing 450 pounds of Purple K dry chemical and 50 gallons of FX 183 premixed solution. FX 183 was a concentrate containing 3M surfactants and other materials. It was designed to be premixed with fresh water at the ratio of one part concentrate to three parts water.

The premixed solutions were pressurized with nitrogen, and Freon 12 was injected, because it was thought that it improved the properties of the foam. Through the balance of 1963 the system was tested and 3M continued to supply the experimental quantities of FX 183. In November of 1963 Roy Mordaunt and Bob Burford visited the Ansul facilities in Marinette to witness a test performed by Ansul for three visitors from the USAF. In this test the new "LIGHT WATER" Agent/Purple K system was tested and compared with protein foam and with the "LIGHT WATER" Agent by itself. Up until this time no one realized that the "LIGHT WATER" Agent did not need to be discharged in combination with dry chemicals to be an effective fire fighting foam. It was far superior to the protein foam when used by itself.

3M's Commercial Development Department, headed by Roy Mordaunt, had started a program to identify the size of the market for this product and for other fire fighting foams. They quickly learned that the FX 183 product was not one that could compete effectively against the 6% protein foam concentrate then purchased in large volumes by the Armed Services and by civilian fire departments.

To develop a satisfactory commercial product would require a great deal of testing and formulation. It was then that 3M negotiated and finally signed an agreement with Ansul Company in early 1964. By the terms of this agreement, Ansul would fire test at their facilities experimental 3M formulations until a satisfactory 6% "LIGHT WATER" Concentrate was developed. When

both parties agreed upon the suitability of this new concentrate, it would be sold to the commercial and military markets. In return for this fire test service, Ansul was made 3M's exclusive distributor of the present "LIGHT WATER" product, now known as FC 183. They would also, under the terms of the agreement, have a two-year exclusive right as sole commercial distributor of the new 6% concentrate when it was developed. 3M reserved a right to sell the federal government directly. The FC 183 product, which had some limited commercial use, continued to be sold to both industry and the government through Ansul.

The agreement between Ansul and 3M Company actually went into effect in April, 1964, and development work on commercial type foam formulations was already proceeding. This development work continued until August, 1965, when it appeared that a suitable 6% concentrate had been developed. This product was designated FC 194. Pricing was established and a new two-year term agreement was drawn up with Ansul designated as the exclusive distributor for FC 194. In July of 1965 3M decided to register the term "LIGHT WATER" as a trademark. The registration request was filed, and the trademark actually issued in 1966.

During the spring and summer of 1966 the Navy conducted extensive full scale modeling tests with FC 194 to compare it in their large crash trucks with the 6% protein foam then in use. These tests were conducted at Miramar Naval Air Station. While the Navy's report did not issue for almost a year, a very distinct performance advantage of the "LIGHT WATER" Brand product over protein foam was documented.

Certain technical deficiencies in FC 194 caused extensive reformulation work to be done by 3M in late 1966 and early 1967. This work resulted in a lower viscosity product and one with greatly improved fresh water premix stability. Because the Ansul Company felt that their development of commercial markets had been unnecessarily delayed by these deficiencies, they were given a one year extension on their exclusive marketing agreement.

In spring and summer of 1967 the Navy embarked on two programs; one involved equipping five major Naval Air Stations with sufficient quantities of FC 194 to conduct normal crash operations in part of its equipment. This was to be an experimental program in which the results would be closely monitored. If satisfactory, they presumably would lead to a total conversion on all Navy crash trucks. The second program was an additional series of full scale modeling tests at Miramar Naval Air Station. All sales of FC 194 to the Navy for this use were made on a direct basis by 3M. All sales to non-government accounts were made through Ansul.

06 156079

Concurrent with its equipment development program for the Navy, Ansul developed a commercial line of "LIGHT WATER" Agent/Purple K systems mounted on steel skids. These could be sold as stationary fire fighting units or for mounting on vehicles. This equipment and the "LIGHT WATER" Agent was made available by Ansul to the commercial market through its jobber/distributor network. 3M's price of FC 194 to Ansul was about $10.00/gallon. Ansul resold it for approximately $15 to its distributor, with a suggested list price of $25/gallon to the consumer and a suggested price of $20/gallon to large volume users. 6% protein foam at that time could be purchased commercially for about $3.00-3.50 per gallon. The federal government's price was about $1.25 per gallon.

3M had been asked several times about improving the compatability of FC 194 with sea water. Its foaming properties and fire extinguishing characteristics were decidedly reduced when proportioned at the normal conditions of use with sea water. Some attention was given to this in the 3M laboratory but most of 3M's efforts were aimed at improving our production capabilities and evaluating the commercial performance of FC 194 in fresh water situations. In late June of 1967 the Navy aircraft carrier, Forrestal, while on duty in the South China seas, suffered a serious deck fire that resisted extinguishment by the regular dry chemical units, reflashed, ignited aircraft containing live bombs and armament, and resulted in a series of explosions and fires that caused $25MM damage to the ship and killed a number of personnel. The Forrestal was out of action for almost a year for repairs. The loss was attributed in part to failure of the existing protein foam and dry chemical agents to prevent reflash of burning Av gas.

The day after this tragedy Admiral Connolly, who headed the Naval Air Systems Command, and several deputies met at the Naval Research Laboratory and saw demonstrations and movies of the "LIGHT WATER" Agent/Purple K system. An on-the-spot order caused 12 of these systems to be flown immediately to Subic Bay in the Philippines, where they were placed in service on the decks of other carriers.

3M received an urgent request from the Navy to develop sea water compatible formulations, and this program was undertaken. By late 1967 a sea water compatible product, designated as FC 195, was offered to the Navy for testing.

At the same time, the Navy's entire fire prevention program underwent an infusion of new personnel in Washington and a large increase in funds. All Naval Air Stations were advised of the advantages of "LIGHT WATER" Agent over protein foam and encouraged to purchase it through the Aviation Supply Office in Philadelphia.

In mid 1967 officers from the Los Angeles City Fire Department approached 3M. They had witnessed and participated in the second series of Navy tests at Miramar and saw that "LIGHT WATER" Concentrate showed great promise as a replacement for protein foam in their own crash fire rescue equipment. They requested from 3M and Ansul participation in an experimental program to determine its suitability in their equipment. These tests by the City of Los Angeles were run in the winter of 67-68. They resulted in a report that again validated the superiority of "LIGHT WATER" Agent over protein foam for CFR. A conversion program was started by the City of Los Angeles in 1968.

The Navy, in cooperation with 3M, conducted another series of large scale tests at Miramar in the spring of 1968. These tests culminated in the extinguishment of a 25,000 square-foot area fire in a 180-foot diameter pit containing 9,000 gallons of JP5. This was performed for the public, and a press conference was held. The test was witnessed by key fire officers from several California cities, from the USAF, and representatives from the NFPA 403 committee responsible for the codes governing aircraft rescue and fire fighting. In June of 1968 that committee met and voted acceptance of AFFF as a suitable alternative to protein foam in airport applications. This action was ratified in May of 1969 at the national NFPA meeting in New York City.

The term AFFF or aqueous film forming foam had been coined by this NFPA committee at a meeting two years earlier. The issuance of 3M's trademark registration for the term "LIGHT WATER" made it necessary to create a suitable generic and eliminate the use of the 3M Brand name from NFPA codes and documents. Also, in late 1968 3M advised the Ansul Company that it would not extend the exclusive marketing agreement. 3M established an OEM program for fire fighting equipment manufacturers and Ansul was invited to participate.

In August of 1968 3M placed its first full-time salesperson for the "LIGHT WATER" Brand products in the field, working out of its Los Angeles office. Sales growth was greater than had been anticipated, and both FC 194 and FC 195 were being produced at a rate that was closely approaching the limit of 3M productive capacity.

Major lab efforts had been underway to develop suitable surfactants for the "LIGHT WATER" Brand products from the sulfonic acid electrochemical cell derivatives of sulfonyl fluorides. Until this time, all "LIGHT WATER" surfactants were based on carboxylic cell products that had relatively low yields and higher costs.

In March of 1969 a second field salesperson was added. Full-scale adoption by Los Angeles, Atlanta, and a number of other California cities was achieved, and a number of demonstrations for the benefit of key USAF fire officers were conducted in a major effort to overcome Air Force resistance in Washington to replace their foam with "LIGHT WATER" Agent. By late 1969 key individuals in the USAF were in the process of making the decision to change.

Late in 1969 the first 6% "LIGHT WATER" Brand Concentrate based on the higher yield sulfonic acid derivatives was introduced as FC 196. It had several other advantages, including lower potential manufacturing costs and lower viscosity. As this material was being phased in, the Air Force decision to switch to "LIGHT WATER" Agent became final and a directive was signed in May of 1970 that ordered conversion to its use. At the same time, Naval Air Stations' adoption was complete and use was now being implemented in the fixed systems of all naval aircraft carriers. It was in late 1970 and early 1971 that the need for a low chloride concentrate with less tendency to pit stainless steel equipment became critical. The FC 196 formulation was phased out in early 1971 in favor of FC 199. FC 199 was the last of the acidic concentrates. It was phased out and replaced by FC 200, the first neutral pH material introduced by 3M in 1972.