# EXHIBIT 58

Confidential - Pursuant to Protective Order

```
 1            UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF SOUTH CAROLINA
 2               CHARLESTON DIVISION
 3    IN RE: AQUEOUS           )
      FILM-FORMING FOAMS       )
 4    (AFFF) PRODUCTS          )   MDL NO.
      LIABILITY LITIGATION     )   2:18-mn-2873-RMG
 5    _____   )
      THIS DOCUMENT RELATES    )
 6    TO ALL CASES             )
 7
 8            THURSDAY, AUGUST 19, 2021
 9    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
10                  - - -
11            Remote videotaped deposition of 3M
12    Company 30(b)(6) designee Jon Gerber, held
13    remotely at the location of the witness in
14    Cottage Grove, Minnesota, commencing at
15    9:02 a.m. Eastern, on the above date, before
16    Carrie A. Campbell, Registered Diplomate
17    Reporter and Certified Realtime Reporter.
18
19
20
21                  - - -
22
           GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24
25
```

Confidential - Pursuant to Protective Order

```
 1      R E M O T E   A P P E A R A N C E S :
 2
 3      KELLEY DRYE & WARREN LLP
        BY:  LUIS PENA-NAVARRO
 4           lpena-navarro@kelleydrye.com
        101 Park Avenue
 5      New York, New York 10178
        (212) 808-7800
 6
 7      and
 8
        LEVIN, SEDRAN & BERMAN LLP
 9      BY:  CHARLES E. SCHAFFER
             CSchaffer@lfsblaw.com
10      510 Walnut Street, Suite 500
        Philadelphia, Pennsylvania 19106-3697
11      (215) 592-1500
12
        and
13
14      TAFT STETTINIUS & HOLLISTER LLP
        BY:  DAVID BUTLER
15           dbutler@taftlaw.com
        425 Walnut Street, Suite 1800
16      Cincinnati, Ohio  45202-3957
        (513) 357-9638
17
18      and
19
        BARON & BUDD, P.C.
20      BY:  CELESTE A. EVANGELISTI
             cevangelisti@baronbudd.com
21           CHRISTOPHER EDWARDS
             cedwards@baronbudd.com
22           SANGEETA KURUPPILLAI
             skuruppillai@baronbudd.com
23           STACI OLSEN
             solsen@baronbudd.com
24      3102 Oak Lawn Avenue, Suite 1100
        Dallas, Texas 75219
25      (214) 521-3605
```

Confidential - Pursuant to Protective Order

```
 1      and
 2

        FEARS NACHAWATI LAW FIRM
 3      BY:  GALE D. PEARSON
              gpearson@fnlawfirm.com
 4      5473 Blair Road
        Dallas, Texas  75231
 5      (214) 890-0711
 6

        and
 7

 8      ENVIRONMENTAL LITIGATION GROUP, PC
        BY:  GARY ANDERSON
 9            ganderson@elglaw.com
        2160 Highland Avenue
10      Birmingham, Alabama 35205
        (205) 328-9200
11

12      and
13

        RIGANO, LLC
14      BY:  ALYSE DELLE FAVE
              afave@riganollc.com
15      538 Broad Hollow Road, Suite 301
        Melville, New York 11747
16      (631) 756-5900
17

        and
18

19      NAPOLI SHKOLNIK PLLC
        BY:  ROSANNA CAL
20            rcal@nsprlaw.com
              CRISTINA RODRIGUEZ
21      270 Muñoz Rivera Avenue, Suite 201
        Hato Rey, Puerto Rico 00918
22      (833) 271-4502
23

        and
24

25
```

Confidential - Pursuant to Protective Order

```
 1      LEVIN PAPANTONIO RAFFERTY PROCTOR,
        BUCHANAN O'BRIEN BARR MOUGEY, P.A.
 2      BY:  NED MCWILLIAMS
             nmcwilliams@levinlaw.com
 3           WESLEY BOWDEN
             wbowden@levinlaw.com
 4      316 South Baylen Street
        Pensacola, Florida 32502
 5      (850) 435-7000
 6
        and
 7
 8      COSSICH SUMICH PARSIOLA & TAYLOR, LLC
        BY:  CHRISTINA COSSICH
 9           ccossich@cossichlaw.com
        8397 Highway 23, Suite 100
10      Belle Chasse, Louisiana  70037-2648
        (504) 394-9000
11
12      and
13
        ROSENBERG CALICA & BIRNEY LLP
14      BY:  JESSICA LYNCH
             jlynch@rcblaw.com
15           JUDAH SERFATY
             jserfaty@rcblaw.com
16      100 Garden City Plaza, Suite 408
        Garden City, New York  11530
17      (516) 747-7400
18
        and
19
20      KNAUF SHAW LLP
        BY:  JULIA O'SULLIVAN
21           josullivan@nyenvlaw.com
        2 State Street
22      1400 Crossroads Building
        Rochester, New York 14614
23      (585) 546-8430
        Counsel for Plaintiffs
24
25
```

Confidential - Pursuant to Protective Order

```
 1      DOUGLAS & LONDON, P.C.
        BY:   GARY DOUGLAS
 2            gdouglas@douglasandlondon.com
              REBECCA NEWMAN
 3            rnewman@douglasandlondon.com
              TATE J. KUNKLE
 4            tkunkle@douglasandlondon.com
              LARA SAY
 5            lsay@douglasandlondon.com
        59 Maiden Lane, 6th Floor
 6      New York, New York 10038
        (212) 566-7500
 7      Counsel for Plaintiffs and the
        Plaintiff Executive Committee
 8
 9
        SHER EDLING LLP
10      BY:   STEPHANIE BIEHL
              stephanie@sheredling.com
11            ANTHONY TOHME
              anthony@sheredling.com
12      100 Montgomery Street, Suite 1410
        San Francisco California  94104
13      (628) 231-2507
        Counsel for Plaintiffs' Executive
14      Committee and individual MDL
        Plaintiffs Suffolk County Water
15      Authority, Ridgewood Water, and the
        Atlantic City Municipal Utilities
16      Authority
17
18      ENVIRONMENTAL LAW GROUP
        BY:   ASHLEY CAMPBELL
19            acampbell@slenvironment.com
        91 North State Street
20      Concord, New Hampshire  03301
        (603) 715-9187
21      Counsel for State of NH, Westfield,
        MA. Fairbanks, AK, Barnstable
22      County, MA. Guam, and the Mariana
        Islands
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1      FORD MARRIN ESPOSITO WITMEYER &
        GLESER, L.L.P.
 2      BY:  VANI UPADHYAYA
             vupadhyayai@fmew.com
 3      Wall Street Plaza
        New York, New York 10005-1875
 4      (212) 269-4900
        Counsel for Village of East Hampton
 5

 6
        STAGG WABNIK LAW GROUP
 7      BY:  BRIAN A. LACOFF
             blacoff@staggwabnik.com
 8      401 Franklin Avenue, Suite 300
        Garden City, New York 11530
 9      (516) 812-4542
        Counsel for the County of Suffolk
10

11
        U.S. DEPARTMENT OF JUSTICE
12      BY:  MCKENZIE HYDE
             McKenzie.J.Hyde@usdoj.gov
13           TIMOTHY WALTHALL
             Timothy.Walthall@usdoj.gov
14      175 N Street NE
        Washington, DC 20002
15      (202) 616-4269
        Counsel for the United States
16

17
        GREENBERG TRAURIG, LLP
18      BY:  KEITH E. SMITH
             smithkei@gtlaw.com
19      1717 Arch Street, Suite 400
        Philadelphia, Pennsylvania 19103
20      (215) 988-7800
        Counsel for National Foam
21

22

23

24

25
```

```
 1      MAYER BROWN LLP
        BY:  CRAIG WOODS
 2           cwoods@mayerbrown.com
             DANIEL ROTTENBERG
 3           drottenberg@mayerbrown.com
        71 South Wacker Drive
 4      Chicago, Illinois  60606
        (312) 782-0600
 5
        and
 6
        MAYER BROWN LLP
 7      BY:  JORDAN SAGALOWSKY
             jsagalowsky@mayerbrown.com
 8      1221 Avenue of the Americas
        New York, New York  10020-1001
 9      (212) 506-2500
        Counsel for 3M Company
10
11
        SIDLEY AUSTIN LLP
12      BY:  ABIGAIL BACHRACH
             abachrach@sidley.com
13           ASHLEY B. MULLEN
             amullen@sidley.com
14      One South Dearborn
        Chicago, Illinois 60603
15      (312) 853-7463
        Counsel for Arkema Inc.
16
17
        NEXSEN PRUET, LLC
18      BY:  ALEXANDRA H. AUSTIN
             AAustin@nexsenpruet.com
19      205 King St, Suite 400
        Charleston, South Carolina 29401
20      (843) 579-7827
        Counsel for Amerex Corporation
21
22
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1      DAY PITNEY LLP
        BY:  AMBERLY NICOLE ANTEBI
 2           aantebi@daypitney.com
        One International Place
 3      Boston, Massachusetts 02110
        (617) 345-4740
 4      Counsel for Kidde PLC, Kidde-Fenwal,
        Inc., United Technologies
 5      Corporation, UTC Fire & Security
        Americas Corporation, Chubb Fire,
 6      Ltd.
 7
 8      WILLIAMS & CONNOLLY LLP
        BY:  CHRIS MENDEZ
 9           cmendez@wc.com
        725 Twelfth Street, N.W.
10      Washington, DC 20005
        (202) 434-5030
11      Counsel for Tyco Fire Products LP
        and Chemguard Inc.
12
13
        PARKER POE ADAMS & BERNSTEIN LLP
14      BY:  STEVEN D. WEBER
             steveweber@parkerpoe.com
15      200 Meeting Street, Suite 301
        Charleston, South Carolina  29401-3156
16      (843) 727-2670
        Counsel for Clariant Corporation and
17      Archroma US, Inc.
18
19      DUFFY & YOUNG LLC
        BY:  BRIAN C. DUFFY
20           bduffy@duffyandyoung.com
             JULIE MOORE
21           jmoore@duffyandyoung.com
        96 Broad Street
22      Charleston, South Carolina  29401
        (843) 720-2044
23      Liaison Counsel for 3M Company
24
25
```

Confidential - Pursuant to Protective Order

```
 1        SHOOK, HARDY & BACON L.L.P.
          BY:  DAVID BRENT DWERLKOTTE
 2             dbdwerlkotte@shb.com
          2555 Grand Boulevard
 3        Kansas City, Missouri 64108
          (816) 474-6550
 4
          and
 5
          HOOD LAW FIRM
 6        BY:  JAMES B. HOOD
               james.hood@hoodlaw.com
 7        172 Meeting Street
          Charleston, South Carolina  29401
 8        (843) 577-1223
          Counsel for E.I. du Pont de Nemours
 9        and Company; The Chemours Company,
          and The Chemours Company, FC LLC
10
11
          TUCKER ELLIS LLP
12        BY:  JOHN Q. LEWIS
               John.Lewis@tuckerellis.com
13             ERICA JAMES
               Erica.James@tuckerellis.com
14        950 Main Avenue, Suite 1100
          Cleveland, Ohio 44113
15        (216) 696-5325
          Counsel for Oshkosh and Pierce
16        Manufacturing
17
18        GRAY LAYTON KERSH SOLOMON FURR &
          SMITH, P.A.
19        BY:  MICHAEL L. CARPENTER
               MCarpenter@gastonlegal.com
20        516 South New Hope Road
          Gastonia, North Carolina 28054
21        (704) 865-4400
          Counsel for Defendant Buckeye Fire
22        Equipment Co.
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1      DLA PIPER LLP (US)
        BY:   JOHN WELLSCHLAGER
 2            john.wellschlager@dlapiper.com
              AMY RUBENSTEIN
 3            amy.rubenstein@dlapiper.com
              DAVID KOEHLER
 4            david.koehler@dlapiper.com
        6225 Smith Avenue
 5      Baltimore, Maryland 21209-3600
        (410) 580-3000
 6
        and
 7
        DLA PIPER LLP (US)
 8      BY:   BUFFY MIMS
              buffy.mims@dlapiper.com
 9      500 Eighth Street, NW
        Washington, DC  20004
10      (202) 799-4000
        Counsel for BASF Corporation
11
12
        GOLDBERG SEGALLA
13      BY:   GEORGE H. BUERMANN
              gbuermann@goldbergsegalla.com
14      1037 Raymond Boulevard,  Suite 1010
        Newark, New Jersey 07102-5423
15      (973) 681-7000
16      and
17      BY:   OLIVER E. TWADDELL
              otwaddell@goldbergsegalla.com
18      711 3rd Avenue, Suite 1900
        New York, New York 10017-4013
19      (646) 292-8700
        Counsel for Chemicals Incorporated
20
21
        LYLES & ASSOCIATES, LLC
22      BY:   ALLEN LELAND DUPRE
              ald@lylesfirm.com
23      1037 Chuck Dawley Boulevard, Suite G-100
        Mt. Pleasant, South Carolina 29464-4162
24      (843) 577-7730
        Counsel for Finley Fire Equipment Co.
25
```

Confidential - Pursuant to Protective Order

```
 1      GORDON REES SCULLY MANSUKHANI, LLP
        BY:  JONATHAN B. BLAKLEY
 2           jblakley@grsm.com
             WILLIAM SHELLEY
 3           wshelley@grsm.com
        One North Franklin, Suite 800
 4      Chicago, Illinois  60606
        (312) 565-1400
 5      Counsel for ChemDesign, Inc.
 6
 7      WILLIAMS MULLEN
        BY:  PIERCE WERNER
 8           pwerner@williamsmullen.com
        1441 Main Street, Suite 1250
 9      Columbia, South Carolina  29201
        (803) 567-4600
10      Counsel for Nation Ford Chemical
        Company
11
12
        SHUTTS & BOWEN LLP
13      BY:  BRETT RENTON
             BRenton@shutts.com
14      300 South Orange Avenue, Suite 1600
        Orlando, Florida 32801
15      (407) 423-3200
        City of Melbourne, FL
16
17
     ALSO PRESENT:
18
         ALLISON SCHAPER, Corporate Counsel,
19   DuPont
20       JOE WILLS, trial technician, Precision
     Trial Solutions
21
22
     V I D E O G R A P H E R :
23      VINCE ROSICA,
        Golkow Litigation Services
24
                      - - -
25
```

```
 1                    INDEX
 2                                    PAGE
 3  APPEARANCES.................................  2
 4  EXAMINATIONS
 5    BY MR. MCWILLIAMS.........................  25
 6    BY MR. DOUGLAS............................ 359
 7    BY MR. WOODS............................. 408
 8    BY MR. MCWILLIAMS........................ 434
 9
10                   EXHIBITS
11    No.   Description                    Page
12    3M 1  Plaintiffs' Amended Notice of    23
             30(b)(6) Deposition of Defendant
13           3M Company Regarding Knowledge of
             Respirabilities and Responses
14           Pursuant to TSCA
15    3M 2  Plaintiff's Notice of 30(b)(6)   23
             Deposition of 3M Company
16           Regarding Knowledge of PFOS,
             PFOA, and/or Other Organic
17           Fluorochemicals in
             Non-Occupationally Exposed
18           Workers
19    3M 3  Field letter of W.H. Pearlson,  414
             April 22, 1982,
20           3M_AFFF_MDL02174809 -
             3M_AFFF_MDL02174810
21
      3M 4  3M letter to Offices of Toxic   419
22           Substances, November 19, 1980,
             3M_AFFF_MDL01296821 -
23           3M_AFFF_MDL01296823
24
25
```

Confidential - Pursuant to Protective Order

| | | | |
|---|---|---|---|
| 1 | 3M 5 | "Health status of plant workers exposed to fluorochemicals - a | 422 |
| 2 | | preliminary report," Ubel, et al., | |
| 3 | | 3M_AFFF_MDL02182920 - 3M_AFFF_MDL02182925 | |
| 4 | | | |
| 5 | DL8 | Chronology - Fluorochemical in Blood, 3M_BELL00054589 - 3M_BELL00054593 | 201 |
| 6 | | | |
| 7 | DL9 | Central Analytical Laboratory Report No. 6448, 3MA00967400 | 164 |
| 8 | | | |
| 9 | DL11 | 3M Interoffice Correspondence dated August 20, 1975, 3M_AFFF_MDL00419718 - | 139 |
| 10 | | 3M_AFFF_MDL00419720 | |
| 11 | DL13 | Commercial Chemical Product Lines, | 206 |
| 12 | | 3M_AFFF_MDL00080683 - 3M_AFFF_MDL00080717 | |
| 13 | | | |
| 14 | DL49 | "3M Phasing Out Some of its Specialty Materials," 3M News, 3M_AFFF_MDL00207575 - | 400 |
| 15 | | 3M_AFFF_MDL00207576 | |
| 16 | LP68 | Timeline, 3M_BELL00054594 | 184 |
| 17 | | | |
| 18 | DL156 | "Phasing Out a Problem: Perfluorooctyl Sulfonate (PFOS)," Mary F. Dominiak, 3 August 2000, | 129 |
| 19 | | 3M_BELL0151644 - 3M_BELL0151660 | |
| 20 | LP190 | 3M Internal Correspondence dated June 28, 1994, | 271 |
| 21 | | 3M_AFFF_MDL00683348 - 3M_AFFF_MDL00683349 | |
| 22 | | | |
| 23 | LP203 | 3M Internal Correspondence dated April 6, 1978, 3MA10035579 - 3MA10035580 | 347 |
| 24 | | | |
| 25 | | | |

Confidential - Pursuant to Protective Order

| | | | |
|---|---|---|---|
| 1 | LP207 | 3M Internal Correspondence dated August 22, 1975, | 145 |
| 2 | | 3M_MN05382159 | |
| 3 | BB221 | Handwritten notes, 3MA00469749 - 3MA00469750 | 393 |
| 4 | | | |
| 5 | LP231 | 3M Internal Correspondence dated August 9, 1977, 3MA10067223 | 156 |
| 6 | | | |
| 7 | DL262 | E-mail(s), AFFF-MDL-EID-03001299 | 381 |
| 8 | DL349 | 3M Internal Correspondence dated February 6, 1979, | 178 |
| 9 | | 3MA00967517 - 3MA00967518 | |
| 10 | DL350 | 3M Interoffice Correspondence, October 19, 1977, | 194 |
| 11 | | 3M_MN00000479 - 3M_MN00000485 | |
| 12 | DL353 | 3M May 15, 1998 letter to US EPA, 3M_BELL02796621 - 3M_BELL02796622 | 52 |
| 13 | | | |
| 14 | DL393 | E-mail(s), 3M_BELL02624326 - 3M_BELL02624330 | 385 |
| 15 | BB424 | 3M Interoffice Correspondence dated September 22, 1975, | 150 |
| 16 | | 3M_BELL00054741 - 3M_BELL00054742 | |
| 17 | DL564 | 3M interoffice correspondence, October 18, 1977, | 190 |
| 18 | | 3M_AFFF_MDL00419747 | |
| 19 | DL898 | 3M Interoffice Correspondence dated April 26, 1979, | 283 |
| 20 | | 3MA00967775 - 3MA00967780 | |
| 21 | DL1056 | Annual 3M Production (1000 lbs) of 100% POSF-Based FC | 45 |
| 22 | | Equivalents, 1975-2005, data from 3M_BELL00538605 | |
| 23 | | | |
| 24 | DL1227 | 3M Internal Correspondence dated April 26, 1979, | 299 |
| | | 3MA10034826 - 3MA10034831 | |
| 25 | | | |

Confidential - Pursuant to Protective Order

| 1 | DL1228 | Interagency Testing Committee letter to 3M Company, | 316 |
| 2 | | 3M_AFFF_MDL01363347 | |
| 3 | DL1230 | 3M letter dated July 15, 1982 to TSCA Interagency Testing | 331 |
| 4 | | Committee, 3M_AFFF_MDL00460300 - | |
| 5 | | 3M_AFFF_MDL00460302 | |
| 6 | DL1234 | Sulfonated Perfluorochemical Release Estimation, Second Draft | 36 |
| 7 | | Final Report, 3M_AFFF_MDL00019199 - | |
| 8 | | 3M_AFFF_MDL00019306 | |
| 9 | DL1346 | Chemical Safety Information, Chemical Resources Division, | 340 |
| 10 | | 3M_AFFF_MDL01635202 | |
| 11 | DL1347 | 3M Product Environmental Data, 3M_AFFF_MDL01635203 - | 340 |
| 12 | | 3M_AFFF_MDL01635205 | |
| 13 | DL1353 | FC-95, FC-143 and FM-3422 - 90 Day Subacute Toxicity Studies | 264 |
| 14 | | Conducted at IRDC - Review of Final Reports and Summary, | |
| 15 | | 3M_AFFF_MDL02174949 - 3M_AFFF_MDL02174953 | |
| 16 | | | |
| | DL1356 | 3M Internal Correspondence dated | 209 |
| 17 | | June 22, 1979, 3M_AFFF_MDL02174988 - | |
| 18 | | 3M_AFFF_MDL02174990 | |
| 19 | DL1357 | Federal Register, Volume 67, | 126 |
| | | Number 236 | |
| 20 | | | |
| | DL1365 | 3M Interoffice Correspondence | 292 |
| 21 | | dated June 7, 1979, 3M_AFFF_MDL00647433 - | |
| 22 | | 3M_AFFF_MDL00647436 | |
| 23 | DL1372 | 3M Interoffice Correspondence | 304 |
| | | dated June 7, 1979, | |
| 24 | | 3M_BELL01440050 - 3M_BELL01440054 | |
| 25 | | | |

| 1 | DL1374 | Federal Register, Thursday, March 16, 1978, Part V, 3M_AFFF-MDL00410829 - 3M_AFFF-MDL00410836 | 73 |
| 2 | | | |
| 3 | | | |
| 4 | DL1389 | Technical Summary Report, date 5-4-77, 3M_AFFF-MDL00631449 - 3M_AFFF-MDL006331450 | 171 |
| 5 | | | |
| 6 | DL1391 | 3M Interoffice Correspondence dated September 19, 1977, 3M_AFFF-MDL01789404 - 3M_AFFF-MDL01789407 | 220 |
| 7 | | | |
| 8 | | | |
| 9 | DL1394 | 3M Interoffice Correspondence dated April 12, 1978, 3MA10067042 - 3MA10067045 | 242 |
| 10 | | | |
| 11 | DL1395 | 3M Interoffice Correspondence dated May 10, 1978, 3MA10066961 | 247 |
| 12 | | | |
| 13 | DL1396 | 3M Interoffice Correspondence dated July 14, 1978, 3M_AFFF_MDL00419759 - 3M_AFFF_MDL00419761 | 249 |
| 14 | | | |
| 15 | DL1398 | 3M Riker Laboratories Interoffice Correspondence dated October 20, 1978, 3M_AFFF_MDL00436061 - 3M_AFFF_MDL00436072 | 223 |
| 16 | | | |
| 17 | | | |
| 18 | DL1399 | 3M Interoffice Correspondence dated May 17, 1978, 3M_AFFF_MDL00419773 - 3M_AFFF_MDL00419775 | 258 |
| 19 | | | |
| 20 | | | |
| 21 | DL1407 | 3M Internal Correspondence dated May 3, 1979, 3M_BELL01741857 - 3M_BELL01741858 | 441 |
| 22 | | | |
| 23 | DL1408 | 3M Interoffice Correspondence dated May 4, 1979, 3M_AFFF_MDL00647427 - 3M_AFFF_MDL00647429 | 226 |
| 24 | | | |
| 25 | | | |

Confidential - Pursuant to Protective Order

| | | | |
|---|---|---|---|
| 1 | DL1411 | 3M Internal Correspondence dated July 26, 1979, 3M_AFFF_MDL00435637 - 3M_AFFF_MDL00435644 | 308 |
| 2 | | | |
| 3 | | | |
| | DL1416 | 3M Internal Correspondence dated June 25, 1980, 3M_BELL00848072 - 3M_BELL00848076 | 229 |
| 4 | | | |
| 5 | | | |
| | DL1423 | EPA Risk Management for Per- and Polyfluoroalkyl Substances (PFAS) under TSCA printout | 118 |
| 6 | | | |
| 7 | | | |
| | DL1425 | Decatur Worker Communication Timeline Concerning Fluorochemical Health and Safety Issues, 3M_AFFF_MDL00118637 - 3M_AFFF_MDL00118659 | 203 |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | DL1428 | Perfluorooctanesulfonyl fluoride, CRCS, Inc., working draft, No Bates | 351 |
| 12 | | | |
| 13 | DL1507 | 3M Interoffice Correspondence dated December 19, 1978, 3M_GU00166400 - 3M_GU00166402 | 253 |
| 14 | | | |
| 15 | DL1552 | EPA Activity Under TOSCA {sic}: Section 8E, Report of Public Meeting December 7, 1978, 3M_AFFF_MDL02315926 - 3M_AFFF_MDL02315927 | 112 |
| 16 | | | |
| 17 | | | |
| 18 | DL1553 | 3M Interoffice Correspondence dated June 1, 1978, 3M_AFFF_MDL02342749 | 280 |
| 19 | | | |
| 20 | DL1554 | Federal Register 47, Volume 38, Thursday February 25, 1982, 3M_AFFF_MDL02329107 | 322 |
| 21 | | | |
| 22 | DL1557 | TSCA Section 8(e) Reporting Guide, June 1991, No Bates | 96 |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Confidential - Pursuant to Protective Order

```
 1     DL1558   3M Initiatives, Response to 1997      391
                Discovery,
 2              3M_AFFF_MDL02327806 -
                3M_AFFF_MDL02327889
 3
       DL1566   3M letter dated August 21, 2000      403
 4              to Jesse Baskerville,
                3M_MN01257572 - 3M_MN01257579
 5
       DL1569   Enforcement Alert, Failure to         67
 6              Report Chemical Risks Can Result
                in Major Fines,
 7              No Bates
 8     DL1570   Potential for Bioaccumulation        232
                demonstrative
 9
       DL1571   Demonstrative of DL9 and DL1571      213
10
       DL1572   3M Products diagram demonstrative     42
11
       DL1574   Toxic demonstrative                  275
12
       DL1576   Screenshot of realtime testimony     371
13              of Jon Gerber
14     DL1577   Confidential Videotaped              374
                Deposition of Thomas DiPasquale,
15              J.D., December 1, 2017,
                transcript
16
17       (Exhibits attached to the deposition.)
18      CERTIFICATE.................................447
19      ACKNOWLEDGMENT OF DEPONENT..................449
20      ERRATA.....................................450
21      LAWYER'S NOTES.............................451
22
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1              VIDEOGRAPHER:  We are now on
 2       the record.
 3              My name is Vince Rosica.  I'm a
 4       videographer for Golkow Litigation
 5       Services.
 6              Today's date is August 19,
 7       2021, and the time is 9:02 a.m.
 8              This remote video deposition is
 9       being held in the matter of Aqueous
10       Film-Forming Foams Products Liability
11       Litigation, MDL number 2873, for the
12       United States District Court for the
13       District of South Carolina, Charleston
14       Division.
15              The deponent is Jon Gerber.
16              All parties to this deposition
17       are appearing remotely and have agreed
18       to the witness being sworn in
19       remotely.
20              Due to the nature of remote
21       reporting, please pause briefly before
22       speaking to ensure all parties are
23       heard completely.
24              Counsel will be noted on the
25       stenographic record.
```

Confidential - Pursuant to Protective Order

```
 1              The court reporter is Carrie

 2         Campbell and will now swear in the

 3         witness.

 4

 5              JON GERBER,

 6    of lawful age, having been first duly sworn

 7    to tell the truth, the whole truth and

 8    nothing but the truth, deposes and says on

 9    behalf of the Plaintiffs, as follows:

10

11              MR. MCWILLIAMS:  Good morning,

12         Mr. Gerber.  I believe your counsel,

13         Mr. Woods, wanted to say something

14         before we get started.

15              MR. WOODS:  Yeah.  I just want

16         to make clear for the record we are

17         offering Jon Gerber on certain topics

18         under Federal Rule of Civil Procedure

19         30(b)(6) that have been noticed.  I

20         want to make clear what those are.

21              Those topics include the

22         following:  We are offering him to

23         discuss the first topic, the nature,

24         extent, substance and timing of 3M's

25         knowledge of 3M's responsibilities
```

Confidential - Pursuant to Protective Order

```
1              pursuant to TSCA, including, but not

2              limited to, 3M's decision to make its

3              May 15, 1998 report referenced at

4              3M_BELL02796621.

5                    We are also offering him on

6              subject number 2, the nature, extent,

7              substance and timing of 3M's knowledge

8              of 3M's response to the February 25,

9              1982 TSCA Interagency Testing

10             Committee notice in the Federal

11             Register, 47 FR 8244.

12                   We are offering him on

13             subject 3, 3M's consideration of

14             possible TSCA 8(e) reports in

15             September 1977 and December 1977,

16             including, but not limited to,

17             consideration of extreme persistence

18             and/or widespread presence as

19             referenced at 3M_AFFF_MDL02174898.

20                   And finally, we're offering him

21             on Topic 4, all documents discussing,

22             referring, relating and/or -- I'm

23             sorry.  That is not correct.

24                   Find the right page.  Sorry,

25             this is subject 4.  The nature,
```

Confidential - Pursuant to Protective Order

```
 1         extent, substance and timing of 3M's

 2         communications with E.I. Du Pont De

 3         Nemours and Company through its

 4         officers, directors, and/or employees

 5         concerning organic fluorine, PFOA,

 6         PFOS, and other per and

 7         polyfluoroalkyl substances in the

 8         blood of nonoccupationally exposed

 9         persons, and TSCA 8(e), including, but

10         not limited to, a meeting in Chicago,

11         Illinois, in August 27, 1979.

12              We're offering him on these

13         topics, subject to the objections that

14         we filed in this case with respect to

15         the notice and the first set of

16         objections entitled "Defendant 3M

17         Company's Responses and Objections to

18         Plaintiffs' Amended Notice of 30(b)(6)

19         Deposition of 3M Regarding Knowledge

20         of Responsibilities and Responses

21         Pursuant to TSCA."

22              I'd like to mark that as

23         Exhibit 3M 1, our objections to that

24         notice, and I will provide a copy of

25         3M 1 to the court reporter.
```

Confidential - Pursuant to Protective Order

```
 1                 (Gerber 30(b)(6) Exhibit 3M 1
 2          and 3M 2 marked for identification.)
 3                 MR. WOODS:  And I'd like to
 4          mark as Exhibit 3M 2 defendant 3M
 5          Company's responses and objections to
 6          plaintiffs' amended notice of 30(b)(6)
 7          deposition of 3M regarding knowledge
 8          of PFOS, PFOA, and other organic
 9          fluorochemicals in nonoccupationally
10          exposed workers.
11                 That latter set of objections
12          is dated on July 30, 2021, and that's
13          Exhibit 3M 2.
14                 Exhibit 3M 1, just for the
15          record, is dated August 15, 2021.
16                 And those objections include,
17          but are not limited to, that the
18          witness, on issues relating to TSCA,
19          is limited to discussing the PFAS
20          chemistry at issue in this litigation,
21          which includes AFFF and the legacy
22          perfluorooctanyl chemistries at issue.
23                 So subject to those objections,
24          we're offering this witness.
25                 Now, one other thing, Ned.  As
```

Confidential - Pursuant to Protective Order

```
1            we've done in the past, and at Judge
2            Gergel's suggestion, we're willing to
3            stipulate that all objections will be
4            preserved, including those as to form
5            and including those as to scope.  I
6            just laid out what the scope of this
7            deposition is, so if you're amenable
8            to that, I'll agree to that
9            stipulation.
10                MR. MCWILLIAMS:  That sounds
11           good.  We agree.
12                MR. WOODS:  Okay.  I think
13           that's all I have on preliminary
14           comments, so you can proceed.
15                MR. MCWILLIAMS:  Okay.  And,
16           Craig, we got a letter on August 16th
17           that identified 227 items that the
18           witness used to educate themselves on
19           these topics.
20                Is that -- does that sound
21           right?
22                MR. WOODS:  I believe that's
23           correct, yes.
24                MR. MCWILLIAMS:  And you told
25           us before we went on the record that
```

Confidential - Pursuant to Protective Order

```
1            there was some additional materials
2            he's reviewed.
3                 Can you just give me a sense of
4            the volume of those additional
5            materials?
6                 MR. WOODS:  I believe it's two
7            documents, and I understand that
8            the -- that those documents are going
9            to be sent to you, along with a list
10           of the Bates numbers for those.  I
11           don't know the status of that.
12                MR. MCWILLIAMS:  No, I'm just
13           curious as to the volume.
14                MR. WOODS:  Yeah, it's not a
15           lot.  It's not a lot.  Just a couple
16           of extra documents.
17                MR. MCWILLIAMS:  Great.  Thank
18           you.
19                DIRECT EXAMINATION
20    QUESTIONS BY MR. MCWILLIAMS:
21        Q.    Good morning, Mr. Gerber.  How
22    are you?
23        A.    Good morning.  I'm well, thank
24    you.
25        Q.    Have you ever had your
```

1  deposition taken before?

2       A.    No, I have not.

3       Q.    Okay.  What is your

4  understanding of why you're here today?

5       A.    My understanding is that I am

6  representing the company in this matter and

7  speaking to issues related to the company's

8  understanding of the Toxic Substances Control

9  Act in this matter and how it carried out its

10  obligations there.

11      Q.    Okay.  So you understand today

12  that the answers you're giving are answers as

13  if they're coming from the company in total,

14  3M, right, not just from you, Mr. Gerber; is

15  that right?

16      A.    Yes, I understand that.

17      Q.    Okay.  And, Mr. Gerber, you

18  also understand that to the extent you have

19  personal knowledge of something, you can also

20  give that testimony as well?

21      A.    Yes.

22      Q.    Okay.  So in that respect, tell

23  us a little bit about who you are.

24            How long have you been at 3M,

25  and what do you do for 3M?

```
 1        A.      I started in 3M in the year
 2   2000.  I was part time as a technical aid at
 3   that time working for the stationery and
 4   office supplies division.
 5              In 2003, I was hired by bulk
 6   technical services and contracted to 3M in
 7   the corporate toxicology and regulatory
 8   services department.
 9              In 2004, I was hired back into
10   3M full time in the corporate toxicology and
11   regulatory services department, and I have
12   continued to work there until the present.
13              The department has reorganized
14   and changed -- changed names a few times
15   during that span, so we're currently known as
16   the 3M product stewardship organization.
17        Q.      Okay.  And what do you do
18   within the product stewardship organization?
19        A.      My current primary
20   responsibility is to be the TSCA subject
21   matter expert for 3M.
22        Q.      Okay.  So do you help 3M make
23   decisions as to whether and when to report
24   certain materials that are learned under
25   TSCA?
```

1    A.    So my -- my responsibilities

2  cover, you know, the full scope of TSCA.  One

3  of my specific responsibilities does relate

4  to TSCA Section 8(e) reporting, so I am the

5  program manager for 3M's corporate TSCA 8(e)

6  committee.

7    Q.    Okay.  And what is your

8  educational background?  Do you have any

9  experience or education or degrees in

10  toxicology or risk assessment?

11    A.    My bachelor's degree is in

12  chemical engineering, and then I have an MBA

13  and an MS in environmental health from the

14  University of Minnesota.  The MS is from the

15  U of M.

16    Q.    Gotcha.

17        So tell us, what did you do to

18  prepare for your deposition today?

19    A.    I have been reviewing

20  documentation that's been provided to me

21  covering this topic from a span of many years

22  and then meeting with several individuals to

23  review that material.

24    Q.    Okay.  What individuals did you

25  meet with to review those materials?

Confidential - Pursuant to Protective Order

1    A.    So I've met with individuals

2  from Mayer Brown, so Craig and Jordan and

3  Daniel, and two individuals from Bergeson &

4  Campbell.

5    Q.    What are the name of those two

6  individuals?

7    A.    Rich Engler and Todd Stedeford.

8    Q.    And are those all lawyers?

9    A.    Rich and Todd are technical

10 experts at Bergeson & Campbell.  I don't

11 believe they're attorneys.

12    Q.    Okay.  Who selected the doc --

13 I understand that you reviewed 227 documents

14 plus two -- does that sound right? -- in

15 preparing for your deposition today?

16    A.    That sounds right to me.

17    Q.    And do you know how those

18 documents were selected?

19    A.    I don't know specifically how

20 the documents were selected.  They were

21 provided to me by Mayer Brown, and my

22 understanding is their intent is to cover the

23 scope of what I need to speak to today.

24    Q.    Okay.  So if I understand your

25 testimony correctly, you did not select these

1    documents; is that fair?

2        A.    That's correct.

3        Q.    Did you make any effort to

4    obtain additional documents to help answer

5    any questions you might have while you're

6    preparing for your deposition?

7        A.    So I would rely on, you know,

8    my experience with TSCA and my TSCA 8(e)

9    responsibilities outside of the documents

10   that have been provided, but I did not

11   request any additional documentation.

12       Q.    Okay.  I saw on the list of

13   materials you reviewed two depositions.

14             Does that sound right?

15       A.    Yes, that sounds right.

16       Q.    And it -- the reference is just

17   a narrow range of pages.

18             Is that -- is that -- are those

19   the pages you read within the deposition, or

20   are those the pages you thought most

21   pertinent, or what's the significance of

22   those pages identified?

23       A.    From what I recall, I believe

24   those were the relevant sections to my

25   deposition to be reviewed.

Confidential - Pursuant to Protective Order

```
 1          Q.      Did you read any other sections

 2   of those depositions?

 3          A.      I did not.

 4          Q.      Okay.  Do you know how those

 5   few pages within the depositions were

 6   selected?

 7          A.      I don't know specifically.  My

 8   understanding is that those are the sections

 9   that are relevant to the topics that I need

10   to speak to.

11          Q.      Okay.  But you didn't review

12   the rest of the deposition to confirm whether

13   or not that was an accurate representation?

14          A.      I did not review the rest of

15   the deposition.

16          Q.      Okay.  And when did you begin

17   prepping for this deposition?  Approximately

18   how long ago?

19          A.      It was mid-July, if I recall

20   correctly.

21          Q.      Okay.  And can you give us a

22   rough sense of how many hours you spent

23   preparing?

24          A.      Oh, it's been dozens of hours.

25   So I've had a series of meetings with the
```

1    preparation team, and then I've spent a

2    significant amount of time outside of those

3    meetings reading and reviewing the materials

4    that have been provided.

5         Q.    Okay.  So many dozens of hours.

6              And approximately -- how much

7    this week?  Today's Thursday; is that right?

8         A.    That's correct.

9         Q.    Can you give me a sense of how

10   much time, if any, you've spent on Monday,

11   Tuesday, Wednesday of this week in preparing

12   for this deposition?

13        A.    I spent most of this week

14   preparing for this deposition.  So, you know,

15   I would estimate, you know, six to eight

16   hours a day.

17        Q.    Okay.  Are you aware that last

18   week lawyers on our side sent lawyers on your

19   side a list of documents that we intended to

20   ask you about?

21        A.    Yes, I'm aware of that.

22        Q.    Okay.  And did you make an

23   effort to review those documents?

24        A.    I did review those as best I

25   could in comparison to the materials that I

1   had already reviewed.

2        Q.      Okay.  And do you feel like you

3   were able to accomplish that?  Were you able

4   to review them to a degree -- to your

5   satisfaction?

6        A.      I do feel that I'm prepared to

7   speak to the issues in this deposition today.

8        Q.      I'm asking a little bit

9   different question.

10              I believe you're prepared to

11   talk about the issues, but I'm asking:  Do

12   you feel like you were able to adequately

13   review the documents that we sent to 3M and

14   3M's lawyers?

15       A.      I was not able to review all of

16   those documents in detail, but I believe that

17   I was able to do a sufficient review to -- to

18   testify today.

19       Q.      Okay.  Do you think that you

20   got through more than half of them?  Or

21   90 percent?  Do you have any sense of how

22   much of the documents that plaintiffs

23   provided you were able to review?

24       A.      My understanding is that there

25   was a pretty good overlap in the materials

1    that I had reviewed in my previous

2    preparation.  I don't know that I could put a

3    percentage on that off the top of my head.

4         Q.    Okay.  All right.  So let's

5    keep moving.

6              You understand that 3M made a

7    variety of products using POSF-based

8    chemistries, right?

9         A.    Yes, I do.

10        Q.    And that included things like

11   Scotchgard stain repellent, right?

12        A.    Yes, my understanding is that

13   that's one of the downstream products, and

14   POSF was an intermediate used to manufacture

15   substances that went into those products.

16        Q.    Right.

17              And another product was

18   Scotchban, also known as FC-807, which was

19   used as food packaging material; is that

20   right?

21        A.    Yes.

22        Q.    Okay.  And also a product named

23   Light Water, which is an AFFF firefighting

24   foam; is that right?

25        A.    Yes.

Confidential - Pursuant to Protective Order

1          Q.      And each of those products have

2     slightly different chemistries, but they all

3     started from POSF; is that right?

4          A.      Based on the documents that

5     I've reviewed, that's my understanding, but I

6     am not an expert in this chemistry.

7          Q.      I understand.

8                  But you do have a degree in

9     chemistry, right?

10         A.      In chemical engineering, yes.

11         Q.      Yeah.  Okay.

12                 And you understand, sir, that

13    it's been determined that any of those

14    products, or every product that starts

15    with -- that's a POSF-based chemistry can and

16    will eventually degrade or convert or

17    metabolize into a different chemical, PFOS;

18    is that right?

19         A.      And again, you know, the full

20    scope of the chemistry is a bit beyond my

21    experience.  I understand from the documents

22    that I've reviewed that some of substances

23    can hydrolyze to PFOS, but I don't -- I can't

24    speak to whether all of them do or not.

25         Q.      Okay.  But you understand that

1    POSF-based products have been determined to

2    be able to metabolize in organisms to PFOS,

3    right?

4         A.    And based on the documents that

5    I've reviewed, I've seen that this -- that

6    POSF can hydrolyze to PFOS.

7              And I understand that, you

8    know, that information is available; I don't

9    know the specifics of metabolic pathways.

10        Q.    Let's pull up a document that

11   we provided your lawyers, and let's see if

12   this can refresh your recollection.

13             Let's pull up DL1234, please.

14             (Gerber 30(b)(6) Exhibit DL1234

15        marked for identification.)

16             MR. WOODS:  And, Daniel, if you

17        could identify the tab number for the

18        witness?  If he wants to look at a

19        hard copy.

20             MR. MCWILLIAMS:  And, Joe,

21        maybe every time we pull up a new doc,

22        if you'll call out the Bates number, I

23        think that will help the other side

24        find it more quickly.

25             MR. WOODS:  This one's 191 --

Confidential - Pursuant to Protective Order

```
 1              MR. ROTTENBERG:  This is 181,
 2        Jon.
 3              MR. MCWILLIAMS:  Did you hear
 4        that, Joe?  If you could just call out
 5        the Bates stamp, please.
 6              JOE WILLS:  Sure.  So this
 7        is -- give me just a moment.  So it's
 8        3M_AFFF_MDL00019 --
 9              MR. MCWILLIAMS:  I meant just
10        actually blow it up on the screen.
11              JOE WILLS:  Oh, sure, no
12        problem.  Much easier on my end.
13              MR. WOODS:  This is Tab 181,
14        Jon.
15              THE WITNESS:  All right.  I
16        have it.
17   QUESTIONS BY MR. MCWILLIAMS:
18        Q.    All right.  And do you
19   recognize this as one of the documents that
20   we provided you for discussion today?
21        A.    Yes.
22        Q.    Okay.  And do you see that this
23   is a report dated August 1999 talking about
24   sulfonated perfluorochemical release
25   estimation?
```

```
 1                    Do you see that?
 2        A.      Yes, I do.
 3        Q.      And this was -- okay.  And
 4   let's turn, if we would, to Bates stamp page
 5   ending in 213, please.
 6                    (Discussion off the record.)
 7   QUESTIONS BY MR. MCWILLIAMS:
 8        Q.      Do you have that page, sir?
 9        A.      Yes, I do.
10        Q.      And you see this is the
11   Introduction section?
12        A.      Yes.
13        Q.      If we could blow up that second
14   paragraph, please.  It says, "3M has been
15   producing sulfonyl-based FCs for over
16   40 years using the ECF process.  The basic
17   building block of these products and the
18   highest production volume of FC manufactured
19   by 3M is POSF."
20                    That's the chemical we've been
21   talking about, right, sir?
22        A.      That's correct.
23        Q.      Okay.  It says, "POSF is used
24   to make a diverse variety of FC products."
25                    And that's the products we were
```

1   just talking about, like Light Water,

2   Scotchban and Scotchgard, right?

3        A.    Yes, I believe that those are

4   derivatives of POSF.

5        Q.    Okay.  And it says, "The

6   chemical or enzymatic hydrolysis of POSF

7   results in PFOS."

8             Is that right?

9        A.    Yes, I see that written there.

10       Q.    And that's what you've been --

11  you just told us about that a couple minutes

12  ago, that you understand that POSF-based

13  products can be exposed to water and then

14  convert into the different chemical, PFOS,

15  right?

16       A.    Yes, based on the conditions,

17  yes, it's -- you know, later on in that

18  paragraph it talks about the length of time

19  to ultimate degradation is variable, with

20  some fluoropolymers apparently stable for

21  hundreds of years.

22       Q.    Right.

23             It says, "Based on current

24  information from 3M, PFOS and/or its salt is

25  believed to be the ultimate degradation

Confidential - Pursuant to Protective Order

1    product in the ambient environment of all

2    POSF-based products."

3                Did I read that correctly, sir?

4        A.      Yes, you read that correctly.

5        Q.      So all 3M products that use

6    this POSF-based chemistries is capable of

7    converting to PFOS in the environment.

8                That's what that sentence

9    means, right?

10       A.      That -- that was the current

11   understanding at the time it was written.

12               Again, based on the current

13   state of the science, that's outside of my

14   expertise, so I really can't speak to that.

15       Q.      Well, that's what's written on

16   the page in front of you, right?

17       A.      Yes, what's written in this

18   report is based on current information from

19   3M.  PFOS and/or its salts is believed to be

20   the ultimate degradation product in the

21   ambient environment of all POSF-based

22   products.

23       Q.      Right.

24               And if we go to the next

25   paragraph, please, we can look at the very

Confidential - Pursuant to Protective Order

```
 1   last sentence -- well, actually, let's look
 2   at the first sentence.
 3              It says, "Because of the
 4   stability of PFOS and the ability of PFOS to
 5   be a marker for tracing all POSF-based
 6   products, these FCs are often described in
 7   terms of PFOS equivalents when discussing
 8   product volumes and FC release or discharge
 9   levels."
10              Did I read that correctly, sir?
11       A.    Yes.
12       Q.    Okay.  And the last sentence in
13   that paragraph says, "PFOS appears to be the
14   end result of both microbial and vertebrate
15   metabolism of POSF-based products."
16              Right?
17              I didn't hear your answer,
18   Mr. Gerber.
19       A.    Oh, I'm sorry, I mistakenly
20   muted.  I do see that written there.
21       Q.    Okay.  So the importance here
22   is that these POSF-based products can convert
23   to PFOS both in the environment and in
24   organisms via metabolism, right?
25       A.    I see that summarized in this
```

1    report, that that was the understanding at

2    the time.  Again, you know, speaking to the

3    current state of the science in that area is

4    beyond my area of expertise.

5        Q.    Okay.  But you have no reason

6    to think that the science has changed and

7    that this is incorrect, do you?

8        A.    I -- in the documents that I've

9    reviewed, I have not reviewed any documents

10   that -- that address that question.

11       Q.    Well --

12       A.    That would indicate a change in

13   that understanding.

14       Q.    Well, sitting here today, you

15   have no reason to think those statements are

16   no longer accurate, do you?

17       A.    No, I do not.

18       Q.    Okay.  And if we could pull up

19   DL1572.

20            And this is just a

21   demonstrative, Craig, to hopefully --

22            MR. WOODS:  Okay.

23            (Gerber 30(b)(6) Exhibit DL1572

24       marked for identification.)

25

```
 1   QUESTIONS BY MR. MCWILLIAMS:

 2        Q.     -- explain what's going on

 3   here.

 4               So on the left-hand side we

 5   have the POSF-based chemistries, right?

 6               And then -- and then 3M will

 7   add a moiety, I think that's what it's

 8   called, at the end of the head group, and

 9   then depending on how that's done will

10   determine which product, which 3M product,

11   we're talking about, right?

12        A.     That's my general

13   understanding, yes.

14        Q.     Okay.  And all of those

15   products, according to this document, once

16   they enter the environment or get into an

17   organism, they're capable of metabolizing or

18   degrading to this different chemical, PFOS,

19   right?

20        A.     And again, based on this

21   document, that's -- that's the information

22   that's provided here.

23        Q.     Okay.  Are you familiar with a

24   gentleman named Dr. Geary Olsen?

25        A.     Yes, I am.
```

Confidential - Pursuant to Protective Order

```
 1        Q.    And Dr. Olsen, he's an
 2   epidemiologist at 3M; is that right?
 3        A.    That's correct.
 4        Q.    Have you reviewed his
 5   deposition testimony in this case or any
 6   prior case?
 7        A.    Not that I recall.
 8        Q.    If Dr. Olsen testified that
 9   PFOS in the blood of an organism is evidence
10   of exposure to POSF-based products, would you
11   have any reason to disagree with them?
12        A.    No, I would not have reason to
13   disagree with Dr. Olsen.
14        Q.    Okay.  And do you have any
15   sense of how much POSF 3M manufactured over
16   the 40, 50 years it made that chemical and
17   those products?
18        A.    Not over the full production
19   history of that substance.  That's not one of
20   the pieces of information that I am prepared
21   to speak to.
22             I do recall reviewing in the
23   Interagency Testing Committee information
24   that was provided that POSF had a production
25   volume in the range of, I believe it was, 1
```

Confidential - Pursuant to Protective Order

```
 1    to 10 million pounds per year.
 2              (Gerber 30(b)(6) Exhibit DL1056
 3         marked for identification.)
 4    QUESTIONS BY MR. MCWILLIAMS:
 5         Q.    Okay.  Well, let's pull up
 6    DL1056.  This was another document I believe
 7    we provided to counsel.
 8              Do you recognize this chart, or
 9    this graph, Mr. Gerber?
10         A.    No, I don't think so.
11         Q.    Okay.  Well, this is a document
12    we obtained from Dr. Olsen's files.  And the
13    title here, this is reporting the
14    manufacturing volume of POSF by 3M over time;
15    is that right?
16         A.    That's correct.
17         Q.    And would you accept my
18    representation that 3M manufactured more than
19    100 million pounds of POSF?
20         A.    Yeah, just a -- I guess I'd
21    have to quickly do the math there.  But, you
22    know, I see the chart here, and, yeah, the
23    production volumes represented there.
24         Q.    Okay.  But you see that you're
25    talking 6, 7, 8 million pounds a year for
```

1    many, many years; is that right?

2        A.    Yes, over that span from --

3    looks like, you know, 1 million pounds up to

4    nearly 8 million pounds per year, depending

5    on which year.

6        Q.    All right.

7              We're talking for 25 years,

8    right?

9        A.    So this chart covers 1975 to,

10   you know, roughly 2003.

11       Q.    Right.

12             And do you accept my

13   representation that -- I mean, can you -- do

14   the quick math, if you need to, but do you

15   accept my representation that 3M manufactured

16   more than 100 million pounds of POSF?

17       A.    Let's see.  Sorry, just give me

18   a minute.

19             So that -- yeah, that looks

20   like the correct ballpark.

21       Q.    Now, we were talking about

22   the -- these POSF-based products able to

23   metabolize to PFOS.

24             Do you remember that discussion

25   just a few seconds ago?

Confidential - Pursuant to Protective Order

```
 1          A.      Yes.
 2          Q.      Okay.  And based on your review
 3   of the documents that you reviewed to get
 4   prepared for today, when did 3M first become
 5   aware of that fact, that their POSF-based
 6   products would convert into this different
 7   chemical, PFOS, once it got into an organism?
 8          A.      So I'm sorry, could you repeat
 9   the question?
10          Q.      Yes, sir.
11                  When did 3M first become aware
12   that POSF-based products could metabolize to
13   PFOS?
14          A.      I -- I'm not sure that I know
15   precisely when the metabolic information
16   was -- was discovered.  I do recall seeing in
17   the information provided to the Interagency
18   Testing Committee that the hydrolysis of POSF
19   to PFOS was understood at that time.  That
20   was 1982.
21          Q.      The hydrolysis is different
22   than metabolism, right?  So my question is
23   about metabolism.
24                  When did 3M first become aware
25   that their POSF-based products could
```

1  metabolize to PFOS?

2      A.    Based on my review of the

3  documents, I don't think I can give you a

4  precise date.  I think the experts in

5  toxicology at 3M would better be able to

6  answer that question.

7      Q.    Okay.  And if you can't give me

8  a precise date, I understand, but can you

9  give me the decade?

10      A.    I'm not sure that I can.

11      Q.    Did you review any documents

12  preparing for today's deposition that

13  discussed this exact topic?

14      A.    I do recall reviewing documents

15  that spoke about this information in the

16  context of TSCA 8(e) submissions, but off the

17  top of my head, I don't recall the dates

18  associated with those.

19      Q.    Would you have any reason to

20  disagree with me that 3M was aware of this

21  information in the 1970s?

22      A.    Again, I -- I don't think I can

23  answer that question.  I think that's beyond

24  my area of expertise, the understanding of

25  the metabolism of these compounds.

Confidential - Pursuant to Protective Order

1        Q.      Okay.  But, sir, you're here

2   today to talk about the May 1998 TSCA 8(e)

3   submission to 3M about PFOS in the blood of

4   the general population, right?

5        A.      Yes.

6        Q.      And you're aware -- and that's

7   a very short letter, isn't it?  Like one and

8   a half pages; is that right?

9        A.      Yes, I believe so.

10        Q.      And that very short letter

11   specifically mentions what 3M knows about

12   POSF-based products metabolizing to PFOS,

13   right?

14        A.      I believe that's correct.

15        Q.      Okay.  So with that refresher,

16   sitting here today, you can't tell me when 3M

17   became aware of that information?

18        A.      I think that that's information

19   that toxicologists could better speak to,

20   their understanding of that information and

21   when that information was obtained.

22        Q.      Okay.  So you're not prepared

23   to discuss that today, the timing of that

24   knowledge?

25        A.      I would be prepared to discuss,

Confidential - Pursuant to Protective Order

1    you know, 3M's deliberations under TSCA and

2    its evaluation of that information for

3    reportability under Section 8(e).

4         Q.    Okay.  And you understand

5    that -- we're jumping ahead here, but you

6    understand there's timing requirements

7    associated with TSCA 8(e), right?

8              You have to report information

9    within a certain amount of time upon

10   obtaining that information, right?

11        A.    That's correct.

12        Q.    Okay.  So with that in mind,

13   you can't tell me when 3M obtained this

14   information, that POSF-based products

15   metabolized to PFOS?

16        A.    And again, I don't have the

17   precise dates.  You know, we may be able to

18   review documents to answer that question more

19   specifically.

20        Q.    Okay.  So if you're not

21   familiar with when 3M obtained that

22   information, you would be unable to say

23   whether or not 3M was in compliance with TSCA

24   8(e) with respect to that specific

25   information, right?

Confidential - Pursuant to Protective Order

1    A.    No, I don't think that's

2    correct.  What I recall from my review of the

3    documents is that information was reviewed by

4    3M as it was obtained and evaluated

5    against -- against EPA's available guidance

6    for reporting under TSCA 8(e).

7    Q.    Okay.  So in your opinion, did

8    3M timely report that information to EPA?

9    A.    And by the "information," are

10   you referring to the metabolism information?

11   Q.    Yes, sir.

12   A.    So my understanding, based on

13   the documents that I've reviewed and EPA's

14   guidance, is that that metabolism information

15   by itself would not constitute reportable

16   information under TSCA 8(e), that there are

17   other factors that would need to be

18   considered in the company's decision whether

19   that information needed to be reported.

20   Q.    Okay.  But 3M did, in fact,

21   report that information, right?

22   A.    So my understanding is that

23   that information was included in the May 1998

24   submission to EPA.

25   Q.    All right.  The 8(e)

1    submission, right?

2         A.    Yes, that's correct.

3         Q.    Okay.  All right.  Like I said,

4    we jumped ahead of ourselves.  Give me a

5    second to get back on -- okay.

6              So we've been talking about

7    this May 1998 letter.  Let's pull up this

8    letter.  This is DL353.

9              (Gerber 30(b)(6) Exhibit DL353

10        marked for identification.)

11             MR. MCWILLIAMS:  And again,

12        Joe, if you would pull up the Bates

13        stamp.  You've probably got this

14        memorized by now, right?

15             MR. WOODS:  It's Tab 95, Jon.

16             THE WITNESS:  All right.  Just

17        a second, please.

18             All right.  I have that.

19   QUESTIONS BY MR. MCWILLIAMS:

20        Q.    Okay.  And this is the -- this

21   letter represents the very first time 3M

22   notified the EPA that it had determined that

23   the chemical PFOS was present in the blood of

24   the general population; is that accurate?

25        A.    I -- I'm not sure that that's

Confidential - Pursuant to Protective Order

1    entirely accurate.  My understanding, based

2    on the documents that I've reviewed, is that

3    some of this information was in the public

4    literature prior to this.  These were new

5    specific findings that 3M was disclosing in

6    this notice.

7              MR. MCWILLIAMS:  Okay.  Move to

8         strike as nonresponsive.  I can see

9         where this is going to go.

10   QUESTIONS BY MR. MCWILLIAMS:

11        Q.    But, sir, prior to May 1998,

12   have you seen any document where 3M informed

13   the EPA that PFOS was present in the blood of

14   the general population?

15        A.    Based on the documents that

16   I've reviewed, I don't believe that there was

17   a 3M notification associated with general

18   population blood of PFOS specifically.

19              Again, I do recall there being

20   other information in the general literature,

21   published data from 3M on worker exposure,

22   and then, again, the public literature like

23   the Guy and Taves paper that's referenced at

24   the bottom of this document.

25        Q.    Okay.  So you guys are taking

1    the position now that Guy and Taves'

2    publication informed the EPA that PFOS was

3    present in the blood of the general

4    population?

5         A.     I don't think that's what I'm

6    saying.  I'm just saying that that

7    information was available in the public

8    literature.

9              My understanding is that that

10   would be information that would be considered

11   to be known to the administrator.

12        Q.     Okay.  You said "that

13   information was available in the public

14   literature."  I'm -- are you saying that

15   there's information in the public literature

16   that states PFOS is present in the blood of

17   the general population?

18        A.     So in the case of Guy and

19   Taves, they had identified organic fluorine

20   in certain pooled blood samples.  They had

21   done tentative identification of some of

22   those compounds.  They had noted that it

23   could be PFOA or the -- or the sulfonic acid

24   of that derivative of that compound, which

25   would be PFOS.  But there was still

Confidential - Pursuant to Protective Order

1    uncertainty about that at the time.

2         Q.    Okay.  Does the acronym PFOS

3    appear in Guy and Taves?

4         A.    Not that I recall based on my

5    review of that document.

6         Q.    Does the word "perfluorooctane

7    sulfonate" appear in Guy and Taves?

8         A.    Not that I recall, but they do

9    give descriptions of the chemistry that I

10   think would lead people knowledgeable in the

11   chemistry to be able to identify those

12   substances.  That -- that's perhaps getting a

13   little bit beyond my area of expertise,

14   though.

15        Q.    Okay.  So do I hear you

16   correctly that 3M was aware of Guy and Taves

17   in the '70s when it was first published,

18   right?

19        A.    Based on the documents that

20   I've reviewed, there -- I have seen

21   discussion of those papers.

22        Q.    Okay.  And so does that mean

23   that if EPA could have determined that PFOS

24   was present in the blood of the general

25   population based on the Guy and Taves

Confidential - Pursuant to Protective Order

```
 1   publication, was 3M also aware of that at

 2   that same time?

 3        A.    I'm sorry, can you repeat the

 4   question?

 5        Q.    Yes, sir.

 6              If I'm understanding your

 7   testimony correctly, you're suggesting

 8   that -- you're -- well, strike that.  Let me

 9   try this again.

10              Sir, when did 3M first become

11   aware that PFOS was present in the blood of

12   the general population?

13        A.    You know, I -- I'm not sure I

14   have the full scope of the history on that

15   science.  I think 3M's toxicologists,

16   environmental scientists, would probably be

17   able to better speak to that.

18              Based on the documents that

19   I've reviewed, they were aware of the Guy and

20   Taves findings for organic fluorine and then,

21   you know, continued to investigate that over

22   time.

23        Q.    So is it your testimony that

24   a -- it's a reasonable interpretation of the

25   Guy and Taves publication to conclude that
```

Confidential - Pursuant to Protective Order

1    PFOS was present in the blood of the general

2    population?

3        A.    I think that that's beyond my

4    area of expertise to really draw the

5    conclusions from that.  I think our

6    toxicologists would better be able to

7    interpret that study and give an informed

8    opinion.

9        Q.    But I still need you to try to

10    answer it for me.

11            You've reviewed these

12    documents.  You're a smart guy.  You've got a

13    chemical engineering degree.

14            Based on your review of the

15    documents, was there -- was 3M aware that

16    PFOS was present in the blood of the general

17    population in the 1970s?

18        A.    So my understanding based on

19    the documents that I've reviewed is 3M was

20    aware of the Guy and Taves findings for

21    organic fluorine, and there was, you know,

22    further discussion of those results and

23    investigation into those results.

24            I'm aware of Richard Newmark's

25    memo where he had evaluated the spectra and

Confidential - Pursuant to Protective Order

1    concluded that the spectra most closely

2    resembled PFOS.  But based on, you know, my

3    area of expertise and the documents that I've

4    reviewed, I guess I can't speak to when 3M

5    might have specifically concluded that it was

6    PFOS or that it was present in the blood of

7    the general population.

8              I know some of those specific

9    findings, you know, were reported later in

10   1998 based on, you know, the additional work

11   that 3M had done and significant advances in

12   analytical capability.

13        Q.    Okay.  Let me try to get back

14   on track here.

15              I believe you answered in

16   the -- in the affirmative, that prior to this

17   May 1998 letter, 3M -- you've not seen any

18   indication that 3M had previously disclosed

19   to the EPA that PFOS was present in the blood

20   of the general population, fair?

21        A.    I don't recall seeing a

22   specific notice on that topic.

23        Q.    Okay.  And is it -- based on

24   your review of the documents in this case,

25   you understand that -- well, strike that.

1            One of the documents I sent you

2    in preparation for today's deposition was a

3    Washington Post article announcing the --

4    3M's decision to phase out POSF-based

5    chemistries.

6            Did you review that document?

7        A.    I do recall that document.

8        Q.    Okay.  And in that document did

9    you see the quote from Dr. Charles Reich of

10   3M?

11       A.    Would we be able to pull that

12   document up?  I don't recall the quote

13   offhand.

14       Q.    But sitting here, do you

15   remember him telling the Washington -- the

16   reporter at the Washington Post that it was a

17   complete surprise to 3M that PFOS was present

18   in the blood of the general population?

19       A.    I don't remember the specific

20   quote.

21       Q.    Okay.  Does that sound

22   generally what the quote was?

23       A.    I believe so.

24       Q.    Okay.  And so are you aware

25   that 3M's website today claims that prior to

1    the 1990s PFOS was undetectable at part per

2    billion concentrations in blood?

3         A.    I haven't reviewed that

4    information specifically.

5         Q.    You haven't reviewed 3M's

6    website on this topic?

7         A.    Not -- not that specific

8    information that I recall.

9         Q.    Okay.  But is that a true

10   statement, that prior to the 1990s PFOS was

11   nondetectable in the part per billion range

12   prior to the 1990s?

13        A.    The analytical capability is

14   really beyond my area of expertise.  I would

15   rely on our environmental scientists to, you

16   know, be able to speak to that.

17             My general understanding, based

18   on the documents that I've reviewed, is that

19   there were substantial advances in analytical

20   capability over this time period.

21        Q.    Okay.  Well, let's go back to

22   this letter.  Let's read this.  I skipped

23   right over it.  This is DL353.  And let's

24   read this.

25             This is, again, dated May 15,

Confidential - Pursuant to Protective Order

```
1    1998; is that right?

2         A.     Yes.

3         Q.     And this is a letter signed by

4    Dr. Charles Reich; is that right?

5         A.     That's correct.

6         Q.     That's the gentleman who told

7    The Washington Post that it was a complete

8    surprise, the presence of PFOS in the blood

9    of the general population, right?

10        A.     And again, I don't remember the

11   specific quote, but it -- the same

12   individual.

13        Q.     Right.  And let's see what he

14   wrote not EPA in 1998.

15              He says, "With this letter, 3M

16   Company is submitting information to the EPA

17   administrator pursuant to Section 8(e) of the

18   Toxic Substances Control Act.  As detailed

19   below, this information relates to

20   fluorochemicals, specifically perfluorooctane

21   sulfonate, PFOS, and consists of analysis of

22   blood sera samples showing PFOS at very low

23   part per billion levels."

24              Did I read that correctly, sir?

25        A.     Yes.
```

Confidential - Pursuant to Protective Order

```
 1        Q.    It says, "The presence of
 2   organic fluorochemicals in the blood of the
 3   general population and subpopulations, such
 4   as workers, has been known dating back to the
 5   1970s, and 3M's epidemiological study of its
 6   own workers indicates no adverse effects at
 7   part per million levels."
 8             Did I read that correctly?
 9        A.    Yes.
10        Q.    And there's a footnote there
11   for the -- that reference to the 1970s that
12   cites the Guy and Taves article; is that
13   right?
14        A.    That's correct.
15        Q.    Okay.  The Guy and Taves
16   article that does not have the words
17   "perfluorooctane sulfonate" or "PFOS" in it,
18   right?
19        A.    Right.  I believe that they
20   characterized it as organic fluorine and then
21   provided some additional compositional
22   details.
23        Q.    Okay.  It says, "3M does not
24   believe that any reasonable basis exists to
25   conclude that PFOS presents a substantial
```

 1    risk of injury to health or the environment."

 2              Did I read that correctly, sir?

 3        A.    Yes.

 4        Q.    And that last part is quoted

 5    directly from TSCA 8(e), the federal

 6    regulation, right?

 7        A.    Correct.

 8        Q.    Okay.  And it says,

 9    "Nevertheless, as a precautionary measure, 3M

10    is submitting this information to the TSCA

11    8(e) docket at this time."

12              Did I read that correctly, sir?

13        A.    Yes.

14        Q.    Okay.  Now, so even though 3M

15    was of the opinion that you were not required

16    to report this information, 3M erred on the

17    side of caution and disclosed it anyway; is

18    that right?

19        A.    I think that that's a fair

20    characterization here.  It's -- you know, it

21    was described as a precautionary filing.

22        Q.    Okay.  And so it's better safe

23    than sorry sometimes to disclose.

24              Do you agree with that

25    sentiment?

1    A.    That's -- you know, that's a
2  judgment call, and that is the approach that
3  the company took in this case.
4    Q.    Okay.  And I understand you
5  weren't at the company at the time, but
6  you -- you work in that capacity today.  You
7  help make these decisions on whether and when
8  and what to report under TSCA 8(e); is that
9  correct?
10   A.    Yes, I serve as the program
11 manager for the current TSCA 8(e) committee
12 at 3M.
13   Q.    Okay.  So are you critical of
14 your predecessor's decision to report this to
15 the EPA?
16   A.    Speaking only for myself?
17   Q.    Yes, sir.
18   A.    No, I'm not.
19   Q.    Would you have done the same
20 thing?  Would you have reported this same
21 information?
22   A.    So I guess as far as how the
23 TSCA 8(e) committee functions, that would not
24 solely be my decision.  It's, you know, a
25 committee made up of technical experts that

1    all have input into that decision.

2             But I do not disagree with the

3    decision to report this information.

4        Q.     And so if this information was

5    available to 3M sooner, do you think they

6    should have reported it sooner?

7        A.     And again, this is -- this was

8    characterized as a voluntary submission that

9    3M does not believe that this represented

10   substantial risk information.  So, you know,

11   that would be a judgment call, I think, on

12   the part of the company.

13       Q.     Right.  I get that it's a

14   judgment call, and I'm asking you to make

15   that judgment.

16             If this same information was

17   available to 3M earlier, do you, Mr. Gerber,

18   think they should have disclosed it earlier?

19       A.     So, you know, that's a

20   hypothetical situation, is my understanding,

21   because based on the documents that I've

22   reviewed, you know, there's a substantial

23   amount of information that was accumulated

24   over time that led up to this -- this filing.

25             So, you know, that same

1   information was not available to 3M earlier.

2        Q.    Are you not able to answer my

3   hypothetical?

4        A.    So I guess I can -- I can only

5   speak for myself and my opinion.

6        Q.    Yes, sir.

7        A.    But if that -- if that

8   information had been available at an earlier

9   time, then I think that would have been the

10  appropriate decision, to file just as 3M did

11  in 1998.

12       Q.    Okay.  So make sure I

13  understand your testimony correctly.

14            If this information was

15  available to 3M earlier, you, Mr. Gerber,

16  think it should have been disclosed earlier,

17  fair?

18       A.    I guess maybe to resummarize, I

19  agree with the committee's decision to report

20  this information in 1998.  My understanding

21  is that not all of this information was

22  available earlier than that.

23            In the hypothetical situation

24  that it had been, I would have agreed with

25  reporting that information at that time as

1    well.

2         Q.    Okay.  But, sir, are you aware

3    that there are allegations in this case that

4    3M in fact knew, was aware, that PFOS was

5    present in the blood of the general

6    population decades earlier than when this was

7    reported to the EPA?

8         A.    I'm aware of those allegations,

9    yes.

10        Q.    Okay.  And are you aware

11   there's allegations in this case that 3M

12   should have disclosed this information to the

13   EPA decades earlier?

14        A.    I'm aware of the allegations.

15        Q.    Okay.  Now, let's talk about

16   TSCA a little bit.  We're talking about 8(e),

17   but TSCA is part of a larger environmental

18   regulation, federal regulation; is that

19   right?

20        A.    That's correct.

21             (Gerber 30(b)(6) Exhibit DL1569

22        marked for identification.)

23   QUESTIONS BY MR. MCWILLIAMS:

24        Q.    Okay.  Now, let's pull up a

25   document I found online, DL1569.

Confidential - Pursuant to Protective Order

```
 1                 And this actually, I think, is
 2     a -- I found this yesterday, Craig, so we can
 3     just look at it on the screen or I can maybe
 4     ask Lara to drop it into the chat.  But it's
 5     pretty simple.  We're just going to look at
 6     the first page.
 7                 MR. WOODS:  If you don't mind
 8          dropping it in the chat just so if he
 9          wants to flip over to the second page
10          or something, just to make sure he --
11                 MR. MCWILLIAMS:  And, Joe, if
12          you could just blow up that top header
13          so we can see the date of this and the
14          author.
15     QUESTIONS BY MR. MCWILLIAMS:
16          Q.    You see this is from
17     August 2008, Mr. Gerber?
18          A.    I do.
19          Q.    And you see this is a
20     publication of the EPA?
21          A.    Yes.
22          Q.    Okay.  And it says -- the title
23     of it is, "Failure to report chemical risk
24     can result in major fines, Section 8(e) of
25     the Toxic Substances Control Act."
```

Confidential - Pursuant to Protective Order

```
1                    Do you see that, sir?

2          A.    I do.

3          Q.    And if we just go to the first

4    paragraph, please, if you just pull up that

5    whole left -- let's do the whole -- yeah,

6    thank you.  We can read this together.

7                    The EPA writes, "Those who

8    manufacture, import, process or distribute

9    chemical substances or chemical mixtures have

10   a clear duty to notify the United States

11   Environmental Protection Agency when they

12   obtain any information that their chemical

13   substances or chemical mixtures presents a

14   substantial risk to public health or the

15   environment."

16                   Did I read that correctly, sir?

17                   You're on mute, sir.

18         A.    I'm sorry.  Yes, you read that

19   correctly.

20         Q.    Okay.  Is that consistent with

21   your understanding of TSCA 8(e)?

22         A.    That is consistent with my

23   understanding.

24         Q.    Okay.  Let's keep reading.

25                   It says, "Failure to timely
```

1    report this critical information is a serious

2    violation of the law because it prevents EPA

3    from determining what actions may be

4    necessary to understand and manage these

5    potential risks."

6              Did I read that correctly, sir?

7         A.    Yes.

8         Q.    And do you agree with that

9    statement from the EPA?

10        A.    Yes.

11        Q.    Okay.  Let's go to the next

12   paragraph.  It says, "Effective management of

13   potential risks to public health and the

14   environment from chemical substances and

15   chemical mixtures is tied to reporting

16   requirements in the Toxic Substances Control

17   Act, or TSCA."

18             Right?

19        A.    Yes.

20        Q.    And it says, "Section 8(e) of

21   TSCA is particularly important:  Essentially

22   it establishes an early warning system to

23   immediately inform EPA" --

24             MR. SERFATY:  Is there a note

25        thing here?

Confidential - Pursuant to Protective Order

```
 1                    MR. MCWILLIAMS:  Judah, you're

 2          not on mute.

 3     QUESTIONS BY MR. MCWILLIAMS:

 4          Q.     Let me try that again.

 5                 It says, "Section 8(e) of TSCA

 6     is particularly important:  Essentially it

 7     establishes an early warning system to

 8     immediately inform EPA and the public of

 9     possible risks associated with chemicals."

10                 Did I read that correctly, sir?

11          A.     Yes.

12          Q.     And do you agree with that

13     sentiment as stated by the EPA?

14          A.     Yes, I agree.

15          Q.     Okay.  And if you want to flip

16     on a couple of pages, it talks about 3M being

17     fined for not complying with TSCA, but we're

18     not going to get into that.

19                 Now, based on your review of

20     the documents in this case in preparing for

21     today's deposition, have you seen any written

22     evidence or record where the EPA took a

23     position on whether or not --

24                    MR. SERFATY:  The notes --

25                    MR. MCWILLIAMS:  Hey, Judah,
```

```
 1          you're not on mute.  Judah, are you on

 2          mute now?  I guess he shouldn't

 3          answer.

 4               All right.  Where was I?

 5     QUESTIONS BY MR. MCWILLIAMS:

 6          Q.     Sir, have you seen any

 7     documents in this case where EPA took a

 8     position on whether or not the presence of

 9     PFOS in the blood of the general population

10     was a reportable event under 8(e) of TSCA?

11          A.     I haven't seen that with

12     respect to 3M's disclosures that I recall.

13          Q.     Okay.  But you're not aware of

14     any -- strike that.

15               Now -- all right.  Let's get

16     into another -- a guidance document from

17     TSCA.

18               So one of the things that the

19     EPA puts out to help companies like 3M to

20     know when and whether and what to report

21     under TSCA 8(e) includes guidance documents

22     about TSCA; is that right?

23          A.     That's correct.

24          Q.     And did you review any of those

25     guidance documents in preparation for your
```

1  deposition today?

2       A.    I did.  I reviewed several

3  guidance documents with respect to TSCA 8(e).

4            (Gerber 30(b)(6) Exhibit DL1374

5       marked for identification.)

6  QUESTIONS BY MR. MCWILLIAMS:

7       Q.    Okay.  Let's pull up DL1374,

8  please.  And if you can blow up the Bates

9  stamp for everyone, please.

10           Craig, I don't know if you're

11 supposed to tell him what binder, but I know

12 it's not me.

13           MR. ROTTENBERG:  It's me.  I'm

14      not finding it.  Is this the final?

15           MR. WOODS:  It's the March '78.

16           MR. DOUGLAS:  Hey, this is

17      Gary.  While you were all doing that,

18      I got a text from Wes Bowden, who is

19      in the waiting room.  Whoever is in

20      charge of that, if you could let him

21      in.  I don't know if he's already in

22      or not.

23           VIDEOGRAPHER:  He's now in.

24 QUESTIONS BY MR. MCWILLIAMS:

25      Q.    Do you have this document in

Confidential - Pursuant to Protective Order

```
1    front of you, sir?

2         A.      Not yet.  I'm sorry.

3              MR. MCWILLIAMS:  Craig, can

4         y'all tell him the binder?

5              MR. ROTTENBERG:  It's not

6         coming up by Bates.  I don't know if

7         it's in the --

8              MR. MCWILLIAMS:  It's the

9         March -- maybe could you blow up the

10        top of it, guys, so they can see what

11        it is?  I'm sure they've got this.

12             MR. WOODS:  Yeah, I'm sure we

13        can find it.

14             MR. MCWILLIAMS:  Maybe I can

15        ask Lara to drop it into the chat.

16             MR. WOODS:  Yeah.  Can you drop

17        it into the -- either into chat or in

18        the -- to the exhibit link?

19             JOE WILLS:  It's been uploaded

20        to the marked exhibits folder.

21             MR. MCWILLIAMS:  Yeah.

22             Mr. Gerber, do you know how to

23        pull up that folder?

24             THE WITNESS:  Yes.

25             What was the DL number?
```

Confidential - Pursuant to Protective Order

```
 1                MR. MCWILLIAMS:  1374.

 2                THE WITNESS:  All right.  Just

 3          a moment, please.

 4                MS. SAY:  This document was

 5          disclosed.

 6                MR. WOODS:  Okay.  We don't

 7          have it by Bates in the tab or maybe

 8          there's a mess-up in the Bates number.

 9   QUESTIONS BY MR. MCWILLIAMS:

10          Q.    But, Mr. Gerber, do you have it

11   in front of you now?

12          A.    I do.

13          Q.    Do you recognize this as one of

14   the documents you reviewed in preparation for

15   your deposition today?

16          A.    Yes, I do.

17          Q.    And this is a publication by

18   the EPA in the Federal Register; is that

19   right?

20          A.    That's correct.

21          Q.    Okay.  And this is dated

22   March 16, 1978, correct?

23          A.    Yes.

24          Q.    And that's shortly after the

25   enactment of TSCA; is that right?  TSCA was
```

1  1977 or '76?

2       A.     Passed in '76.

3       Q.     Okay.  And this is some of the

4  guidance documents we were talking about

5  previously.

6              It says it's "A statement of

7  interpretation, enforcement policy,

8  notification of substantial risk."

9              Is that right?

10      A.     That's correct.

11      Q.     And that's Section 8(e) of

12  TSCA, right?

13      A.     Yes.

14      Q.     Okay.  Let's go to the second

15  page, please.

16              MR. ROTTENBERG:  It's Tab 13,

17       Jon.  I found it.

18              THE WITNESS:  All right.  If

19       you can give me just a moment.  I

20       prefer to look at the hard copy if I

21       can.

22              Okay.  I have it.  And second

23       page, you said?

24  QUESTIONS BY MR. MCWILLIAMS:

25      Q.     Yes, sir.

Confidential - Pursuant to Protective Order

```
 1              On the left-hand column, you
 2  see under Summary, the second paragraph, it's
 3  written, Section 8(e) states that, quote,
 4  "Any person who manufactures, processes or
 5  distributes in commerce a chemical substance
 6  or mixture and who obtains information which
 7  reasonably supports the conclusion that such
 8  substances or mixtures presents a substantial
 9  risk of injury to health or the environment,
10  shall immediately inform the administrator of
11  such information unless such person has
12  actual knowledge that the administrator had
13  been adequately informed of such
14  information."
15              Did I read that correctly?
16      A.     Yes.
17      Q.     Okay.  And that's consistent
18  with your understanding of TSCA and the
19  requirements at that time?
20      A.     Yes.
21      Q.     Okay.  If we go to the next
22  page, please, over to the bottom right
23  corner, there's a paragraph titled "What
24  Constitutes Substantial Risk."
25      A.     Uh-huh.
```

Confidential - Pursuant to Protective Order

```
 1          Q.      And this is where EPA defined
 2    that "A substantial risk of injury to health
 3    or the environment is a risk of considerable
 4    concern because of, A, the seriousness of the
 5    effect," and then we'll -- and, "B, the fact
 6    or probability of its occurrence."
 7                  Did I read that correctly, sir?
 8          A.      Yes.
 9          Q.      Okay.  And this says, "The
10    human health effects listed in subpart A
11    below, for example, are so serious that
12    relatively little weight is given to
13    exposure.  The mere fact that the implicated
14    chemical was in commerce constitutes
15    sufficient evidence of exposure.  In
16    contrast, the remaining effects listed in
17    subparts B and C below must involve or be
18    accompanied by the potential for significant
19    levels of exposure."
20                  Did I read that correctly, sir?
21          A.      Yes.  And it goes on to give
22    you examples of factors that would be
23    considered:  general production levels,
24    persistence, typical uses, common means of
25    disposal and other pertinent factors.
```

1    Q.    So there's really two

2  components to your reporting requirement -

3  not only what is the potential adverse

4  effect, but who is potentially exposed,

5  right?

6    A.    I think the way that I would

7  state it is it's a sliding scale that depends

8  on the degree of the hazard and then the

9  degree of the exposure.

10    Q.    Okay.  And by the degree of

11  exposure you mean -- another way to describe

12  it is who was exposed or how many people are

13  exposed, right?

14    A.    That would be one consideration

15  but not the only consideration.

16    Q.    Right.

17         But is it a -- excuse me, go

18  ahead.

19    A.    So it -- again, the degree of

20  exposure would include, you know, number of

21  people exposed and then also the level at

22  which they were exposed.

23    Q.    Okay.  And we're jumping ahead

24  a bit, but you brought it up, the sliding

25  scale.  The way I understand it -- and you're

1    the expert; you correct me if I am wrong --

2    is that if something's exceptionally toxic,

3    the EPA doesn't -- or the adverse effect is

4    so severe, it doesn't matter if only one

5    person's exposed.  The EPA wants you to

6    report it.

7                Whereas, as you slide the other

8    way, as the harm is less severe but as more

9    people are exposed, they want you to report

10   as well; is that fair?

11       A.    Yeah.  So my understanding of

12   the sliding scale as EPA has articulated it

13   is that the more the -- the more severe the

14   hazard, the less exposure plays a role in a

15   decision to report.

16                Exposure plays a much greater

17   factor -- is a much greater factor in the

18   decision to report when you're dealing with

19   lesser hazards.

20       Q.    Okay.  And you would agree with

21   me that exposure to an entire population, the

22   general population, you don't get any larger

23   exposure than that, right?

24       A.    So in terms of scope of

25   exposure, that would be, you know, widespread

 1    exposure, but there's still kind of the

 2    dose-level component to it, the level of

 3    exposure, that would also be a consideration

 4    there.

 5        Q.    Let's keep reading on the next

 6    page, please.

 7              On the left-hand column, you

 8    see like the first half of it, please.

 9              It says, "The Agency considers

10    effects for which substantial risk

11    information must be reported to include the

12    following:  A, human health effects, any

13    instance of cancer, birth defects,

14    mutagenicity, death or serious or prolonged

15    incapacitation, including the loss or ability

16    to use a normal bodily function, with a

17    consequent relatively serious impairment of

18    normal activities."

19              Did I read that correctly, sir?

20        A.    Yes.  If one or a few chemicals

21    is strongly implicated --

22        Q.    Right.

23        A.    -- is the end to that.

24        Q.    Okay.  And it goes on.  It

25    says, "Any pattern of effects or evidence

Confidential - Pursuant to Protective Order

 1    which reasonably supports the conclusion that

 2    the chemical substance or mixture can produce

 3    cancer, mutation, birth defects or toxic

 4    effects resulting in death or serious or

 5    prolonged incapacitation."

 6              Is that correct?

 7         A.    Yes.

 8         Q.    And then under Environmental

 9    Effects it says, "Widespread and previously

10    unsuspected distribution in environmental

11    media, as indicated in studies, excluding

12    materials contained within appropriate

13    disposal facilities."

14              Did I read that correctly, sir?

15              You're on mute again.

16         A.    I'm sorry about that.

17              Yes.  In this -- this is a case

18    where EPA has issued substantial additional

19    clarifying guidance for how reporting

20    obligations are interpreted in this area.

21    And importantly, EPA has said, you know,

22    widespread, previously unsuspected

23    distribution in the environment on its own is

24    a measure of exposure, and there are other

25    necessary factors that need to be considered.

Confidential - Pursuant to Protective Order

1      Q.      Right.

2             Like a nontrivial adverse

3      effect, right?

4      A.      Correct.

5      Q.      Okay.  But you would agree with

6      me, sir, that PFOS is widespread in the

7      environment?

8      A.      Based on EPA's guidance, I

9      agree that finding it in, you know, various

10     environmental media, detecting it in various

11     wildlife species and in general population

12     blood, that that would meet EPA's definition

13     of widespread.

14     Q.      When did 3M first obtain

15     information that PFOS was widespread in the

16     environment?

17     A.      And again, I think that our

18     environmental scientists would best be able

19     to speak to the timeline and the specific

20     findings there.

21             My understanding is that much

22     of that information, detection in various

23     wildlife species, the ability to detect in

24     individual samples, in the general

25     population, that that was developed in the

 1  late '90s.

 2       Q.    Okay.  So 3M did not obtain

 3  information that PFOS was widespread in the

 4  blood of the general population until the

 5  late '90s?  That's your testimony?

 6       A.    Based on the documents that I

 7  have reviewed, those are -- appear to be

 8  factors that went into the decision in 1998

 9  to report to the TSCA 8(e) docket.

10            MR. MCWILLIAMS:  Okay.  I move

11       to strike as nonresponsive.

12  QUESTIONS BY MR. MCWILLIAMS:

13       Q.    Sir, I'm asking you

14  specifically if -- do I understand your

15  testimony correctly that 3M did not obtain

16  information that PFOS was widespread in the

17  blood of the general population until the

18  late 1990s?

19       A.    And again, I -- I don't think

20  that I'm best able to speak to that question.

21            My understanding based on the

22  documents that I've reviewed is that 3M's

23  understanding of that information evolved

24  significantly over time; that there was

25  recognition from the Guy and Taves paper of

 1    the potential for organic fluorine, but more
 2    specific findings came later.
 3        Q.    So you're not prepared today to
 4    discuss when 3M first obtained information
 5    that PFOS was present in the blood of the
 6    general population?
 7        A.    So based on the documents that
 8    I've reviewed, you know, 3M reviewed and made
 9    that conclusion as part of its 1998
10    disclosure to the EPA.  Those were specific
11    findings that resulted in the TSCA 8(e)
12    review.
13        Q.    Sir, there's -- I'm asking
14    when.
15              Can you please tell me when 3M
16    obtained this information?
17        A.    And again, I think that goes
18    to, you know, complex questions about the
19    state of the science that would be better
20    answered by 3M's environmental scientists.
21        Q.    So you're unprepared to answer
22    my question as to when 3M obtained this
23    information that was ultimately reported to
24    the EPA under TSCA?
25        A.    No, I'm prepared to answer

Confidential - Pursuant to Protective Order

```
 1   about 3M's evaluation of information under

 2   TSCA 8(e), and I see that there was

 3   evaluation of information from worker blood,

 4   consideration of the Guy and Taves

 5   information back in the late '70s.  I know

 6   that there was more specific information that

 7   was developed in the late '90s, and that was

 8   also reviewed for TSCA 8(e) reporting.

 9               MR. MCWILLIAMS:  Move to strike

10        as nonresponsive.

11   QUESTIONS BY MR. MCWILLIAMS:

12        Q.     Sir, either you can tell me

13   when 3M obtained this information or you

14   can't.  And if you can, I'd like you to tell

15   me when.  And if you can't, I'd like you just

16   to tell me you can't and not give me these

17   nonresponsive talking points, please.

18        A.     Right.  I cannot provide a

19   specific date for that.

20        Q.     Okay.  I can use that.  Thank

21   you.

22               Let's keep reading.  I forgot.

23   Where did we leave off?  I think we're -- so

24   we did environmental effects.  Let's keep

25   going.
```

1          Under 2 it says, "Pronounced

2    bioaccumulation."

3          Is there a period after that?

4    Yeah, okay.

5          So you would agree with me,

6    sir, that PFOS can bioaccumulate in organisms

7    to a pronounced degree?

8      A.     And the interpretation of those

9    results are beyond my area of expertise.  I

10   understand that it is recognized as a

11   bioaccumulative compound.

12     Q.     Okay.  And when did 3M first

13   obtain information that PFOS was a

14   bioaccumulative compound, to use your term?

15     A.     And based on the documents that

16   I've reviewed, this is again something that

17   appears to have evolved.  That understanding

18   has evolved considerably over time, so I'm

19   not sure that I can give you a specific date.

20     Q.     Are you prepared to take -- are

21   you prepared today to tell -- to testify when

22   3M obtained that information, that PFOS was a

23   bioaccumulative compound?

24     A.     I have reviewed documents that,

25   you know, recognized slow excretion of

Confidential - Pursuant to Protective Order

1    organic fluorine from blood and when that was

2    reviewed for TSCA 8(e) purposes, and then the

3    more specific findings later in the '90s as

4    well.

5           So, again, it appears to be

6    kind of a series of reviews based on new

7    information that was received at various

8    points in time.

9        Q.    Okay.  So when -- based on your

10   review, when did 3M first obtain information

11   that PFOS was a bioaccumulative compound?

12          I understand that more

13   information came in along the way.  That's

14   science.  That's knowledge.  It's an

15   iterative process.

16          But I want to know, when did 3M

17   first obtain any information indicating that

18   PFOS was a bioaccumulative compound?

19       A.    So I recall reviewing documents

20   where the slow excretion from -- was

21   recognized based on monitoring of worker

22   blood levels.  I believe that was in the late

23   1970s.  So that would be one indication that

24   was reviewed for TSCA 8(e) purposes.

25       Q.    Okay.  Thank you.

Confidential - Pursuant to Protective Order

```
 1        A.      Again, the understanding of

 2   that end point continued to evolve over time.

 3        Q.      Right.

 4                But you understand, sir, that

 5   TSCA specifically states that you -- that

 6   companies aren't to wait until there's

 7   conclusive evidence.

 8                The moment you obtain any

 9   information indicating a substance may be

10   harmful or it may be bioaccumulative, you

11   have a duty to report, right?

12        A.      I don't think that's quite

13   correct.  So EPA has said that you should not

14   wait for absolutely definitive information,

15   but you still have to have information that

16   reasonably supports a conclusion of

17   substantial risk.

18                And particularly for

19   bioaccumulation, that, in and of itself, is

20   not a reportable substantial risk

21   information.  That has to be considered along

22   with other factors.

23        Q.      Like nontrivial adverse

24   effects, right?

25        A.      That would be one of the other
```

```
 1   factors, and then the potential for

 2   widespread distribution and potential for

 3   widespread exposure.

 4       Q.    Okay.  We'll get to that.

 5             But death is a nontrivial

 6   adverse effect in Mr. Gerber's opinion,

 7   right?

 8       A.    Yes.

 9       Q.    Okay.  So let's keep reading.

10             Under Pronounced

11   Bioaccumulation it's written, "Measurements

12   and indicators of pronounced bioaccumulation,

13   heretofore unknown to the administrator,

14   including bioaccumulation in fish beyond

15   5,000 times water concentration in a 30-day

16   exposure or having an N-octanol/water

17   partition coefficient greater than 25,000,

18   should be reported when coupled with

19   potential for widespread exposure and any

20   nontrivial adverse effect."

21             Right?

22       A.    That's correct.

23       Q.    Okay.  Let's try this.  True or

24   false:  By 1980, 3M was in possession of

25   information that PFOS was a bioaccumulative
```

Confidential - Pursuant to Protective Order

```
 1   compound, that it was widespread in the blood
 2   of the general population, and that it killed
 3   rhesus monkeys that were exposed to it.
 4           True or false?
 5       A.    Based on my review of the
 6   documents, 3M had all of -- had those pieces
 7   of information, although it --
 8   bioaccumulation, again, I think that's
 9   that -- maybe it was the slow elimination
10   rate that was recognized at the time, but all
11   of those informations need -- all of that
12   information needs to be put together and
13   judgment applied in making a TSCA 8(e)
14   reporting decision.
15       Q.    Right.  And 3M did that.
16           3M had all of that information
17   and decided not to disclose it at that time
18   in 1980, right?
19       A.    Yes.  I've reviewed documents
20   that -- you know, after the -- those studies
21   were conducted, that information was reviewed
22   against EPA's reporting criteria, and the
23   company made the determination that the
24   information was not substantial risk
25   information under TSCA 8(e).
```

Confidential - Pursuant to Protective Order

1    Q.    Right.

2          That was the company's opinion

3    at the time, right?

4    A.    Yes.

5          And these decisions, EPA has

6    recognized, always involve a level of

7    judgment.

8    Q.    Okay.  Now, you seem to be kind

9    of distinguishing bioaccumulation from the

10   slow elimination.

11         Am I hearing you correctly?

12   A.    Yeah, I'm trying to kind of

13   accurately represent what I've reviewed and

14   not go beyond my area of expertise.  And so

15   the interpretation of those results and their

16   significance, I think our toxicologists would

17   best be able to speak to that.

18   Q.    Okay.  But you understand, sir,

19   that bioaccumulation is a function of a

20   substance's half-life in organisms, right?

21   A.    That -- again, that's not my

22   area of expertise, but that's my general

23   understanding.

24   Q.    Right.

25         And slow elimination, terms you

Confidential - Pursuant to Protective Order

```
 1    keep using, is a reference to how long it
 2    takes a chemical to leave a person's body,
 3    right?
 4         A.    That's my understanding.
 5         Q.    And the measure -- and the way
 6    a toxicologist measures the speed at which a
 7    compound leaves a person's body is half-life,
 8    right?
 9         A.    Yes, I believe that's correct.
10         Q.    Okay.  Let's keep reading.
11               It says, "Any nontrivial
12    adverse effect heretofore unknown to the
13    administrator, associated with a chemical
14    known to have bioaccumulated to a pronounced
15    degree or to be widespread in environmental
16    media."
17               Did I read that correctly, sir?
18         A.    Yes.
19         Q.    I think we already read that,
20    didn't we.
21               Well, let's go to the next
22    column over, the very bottom, please.
23               Actually, I think that's all I
24    have for that, so let's keep moving along.
25               Let's move --
```

Confidential - Pursuant to Protective Order

```
 1              MR. WOODS:  Ned?

 2              MR. MCWILLIAMS:  Yes, sir.

 3              MR. WOODS:  We've been going

 4         for a little over an hour.  Can we

 5         take a short break?

 6              MR. MCWILLIAMS:  If that's what

 7         you need, Craig, anything for you.

 8              MR. WOODS:  Okay.

 9              MR. MCWILLIAMS:  Let's go off

10         the record, then we'll talk.

11              VIDEOGRAPHER:  The time is

12         10:19 a.m.  We're off the record.

13          (Off the record at 10:19 a.m.)

14              VIDEOGRAPHER:  We're back on

15         the record.  The time is 10:27 a.m.

16    QUESTIONS BY MR. MCWILLIAMS:

17         Q.    We're back, Mr. Gerber.

18              Did you have an opportunity to

19    meet with your attorneys during that short

20    break?

21         A.    Yes, I did.

22         Q.    Okay.  Is there any of your

23    prior testimony you'd like to change?

24         A.    No.  We really didn't discuss

25    anything.
```

Confidential - Pursuant to Protective Order

1         Q.     Okay.  Mr. Gerber, you're

2    physically located today in Minnesota; is

3    that right?

4         A.     That's correct.

5         Q.     Are you at your residence?

6         A.     Yes.

7         Q.     Okay.  And do you know if the

8    water that's served to your residence there

9    in Minnesota is treated for PFOA or PFOS?

10        A.     I believe that it is.  We do

11   receive regular reports from the Cottage

12   Grove water department.

13        Q.     Okay.  And so do you know who

14   pays for that treatment?

15        A.     My understanding is that that

16   is paid for in part by 3M's settlement with

17   the State of Minnesota.

18        Q.     So, but is it fair to say that

19   3M pays for the treatment of PFOA or PFOS

20   from the water that serves your home in

21   Minnesota?

22        A.     I don't know the details of

23   that, but I have the general understanding

24   that that is what part of that settlement

25   went to.

Confidential - Pursuant to Protective Order

```
 1        Q.      Okay.  Do you think that's a
 2  good thing, that both it's treated and that
 3  3M is picking up the tab?
 4        A.      Just in my personal opinion?
 5        Q.      Yes, sir.
 6        A.      Yes, I think that that's a
 7  responsible thing to do.
 8        Q.      Okay.  And that's in part
 9  because 3M is responsible for the PFOA or
10  PFOS that's in your water; is that right?
11        A.      Again, I can't speak
12  specifically to my water.  I know that 3M has
13  manufacturing facilities in Cottage Grove and
14  that that was the subject of the settlement
15  with the State of Minnesota.
16                (Gerber 30(b)(6) Exhibit DL1557
17        marked for identification.)
18  QUESTIONS BY MR. MCWILLIAMS:
19        Q.      Okay.  All right.  Let's
20  keep -- let's move on to another document,
21  please, DL1557.
22                And this is the June '91 TSCA
23  guidance document.  This is one of the
24  documents that your lawyers were kind enough
25  to provide to us as one of the materials you
```

Confidential - Pursuant to Protective Order

1  considered in prepping for today's

2  deposition.

3           Do you recognize the document?

4  A.    Yes.

5  Q.    Okay.  Craig, can you tell him

6  where this is in his binder?

7           MR. MCWILLIAMS:  Yeah.

8           Do you have that, Daniel?

9           MR. ROTTENBERG:  Yeah.

10          MR. WOODS:  Maybe search for

11      the title if you don't have a Bates.

12          MR. ROTTENBERG:  Well, I don't

13      believe this is in the exhibits we

14      received, correct?

15          MR. MCWILLIAMS:  Correct.  This

16      is an exhibit I received from 3M.

17          MR. WOODS:  Yeah.  Jon, do you

18      have that handy?

19          THE WITNESS:  Not in front of

20      me, but I could go get it.

21  QUESTIONS BY MR. MCWILLIAMS:

22  Q.    I'm just going to pull parts up

23  on the screen and ask if it's consistent with

24  your understanding of TSCA.

25          Can you do that with us just in

Confidential - Pursuant to Protective Order

```
1    the interest of time?

2         A.    Yes.

3               MR. WOODS:  And if for some

4         reason you need to look at the whole

5         document, Jon, just say you need to

6         look at the whole document.

7               MR. MCWILLIAMS:  Craig is

8         absolutely right.  I will try to ask

9         questions in a way that you won't need

10        the full document, okay?

11              MR. ROTTENBERG:  And I can drop

12        the link in the chat.

13   QUESTIONS BY MR. MCWILLIAMS:

14        Q.    Sir, do you recognize this

15   document as one of the documents you reviewed

16   in preparation for today's deposition?

17        A.    Yes, I do.

18        Q.    And is this a document prepared

19   by the United States Environmental Protection

20   Agency, dated June 1991?

21        A.    Yes.

22        Q.    And does this document contain

23   Q&A additional information to companies such

24   as 3M to help them comply with TSCA

25   Section 8(e)?
```

Confidential - Pursuant to Protective Order

```
 1        A.     Yes, it does.

 2        Q.     Okay.  Now let's flip right

 3   into it then, please.  If you go to page 12,

 4   you'll see it's .12 on the bottom right

 5   corner, Joe.

 6               Okay.  And you see this is a

 7   titled section, Reporting Under Section 8(e)

 8   of TSCA.

 9               Do you see that, sir?

10        A.     Yes.

11        Q.     And then the second paragraph

12   says, "Why is Section 8(e) reporting

13   important?"

14               And the EPA writes, "In

15   general, the EPA considers Section 8(e) of

16   TSCA to be a critically important information

17   gathering tool that serves as a, quote,

18   'early warning' mechanism for keeping the

19   Agency and others apprised of newfound

20   serious chemical hazards and/or exposures.

21   Section 8(e) data are extremely valuable

22   input for the hazard identification and risk

23   assessment activities within and outside

24   EPA."

25               Did I read that correctly, sir?
```

Confidential - Pursuant to Protective Order

1        A.      Yes.

2        Q.      And do you agree with these

3   statements from the EPA?

4        A.      Speaking for myself, yes, I do.

5        Q.      Well, speaking for 3M, does 3M

6   agree that TSCA 8(e) reporting is important?

7        A.      Yes.

8        Q.      And that it's also not only

9   important to report chemical hazards but also

10  chemical exposures, right?

11       A.      Chemical exposures, again,

12  if -- if it meets the definition of

13  substantial risk information.  So exposure

14  information would always need to be paired

15  with hazard information to make a substantial

16  risk determination.

17       Q.      Right.

18               But the EPA, and I believe even

19  you, agree that death, there's nothing worse

20  than death.  There's nothing more adverse

21  than death as a nontrivial adverse effect,

22  right?

23       A.      Yes.

24       Q.      And it's something that should

25  always be reported?

1          A.     No, I -- that's not my

2    understanding based on EPA's guidance.

3          Q.     Okay.

4          A.     So there are other factors that

5    would need to be considered.  You know, EPA

6    establishes, like, acute lethality ranges of

7    what information would be reportable and

8    other information that would be of low

9    concern.

10              And there's also, you know, the

11   underlying considerations that are always

12   available about whether the information is

13   reliable or can reasonably support a

14   conclusion and whether the information is

15   known to the administrator already.

16         Q.     Okay.  Let's go over to the

17   next page, please, where it's written -- the

18   title is, "What is substantial risk

19   information?"

20              It says, "The term 'substantial

21   risk information' refers to that information

22   which reasonably supports a conclusion that

23   the subject chemical or mixture presents a

24   substantial risk of injury to health or the

25   environment; however, such information need

Confidential - Pursuant to Protective Order

```
 1    not and most typically does not establish

 2    conclusively that a substantial risk exists."

 3              Did I read that correctly, sir?

 4        A.    Yes.

 5        Q.    And do you and 3M agree with

 6    that statement?

 7        A.    Yes.

 8        Q.    Okay.  It continues.  It says,

 9    "In deciding whether information is, quote,

10    'substantial risk information,' one must

11    consider, 1, the seriousness of the adverse

12    effect; and 2, the fact or probability of the

13    effect's occurrence.  In determining

14    section" -- "TSCA Section 8(e)

15    applicability/reportability, these two

16    criteria would be weighted differently

17    depending upon the seriousness of the effect

18    or the extent of the exposure.  For example,

19    the more serious the effect, the less heavily

20    one should weigh actual or potential exposure

21    and vice versa."

22              Did I read that correctly, sir?

23        A.    Yes.

24        Q.    And that's in reference to the

25    sliding scale we discussed previously, right?
```

Confidential - Pursuant to Protective Order

1        A.        That's correct.

2        Q.        That the greater the extent of

3   exposure, the less -- the less toxic the

4   adverse effect needs to be in order to be

5   reportable, right?

6        A.        In general, yeah, the sliding

7   scale operates that way, and the EPA has

8   issued a lot of additional guidance to help

9   with interpretation of that.

10       Q.        Okay.  Let's keep reading.

11                 It says, "For example, in cases

12  where serious effects such as birth defects

13  or cancer as evidenced by benign and/or

14  malignant tumors are observed, the mere fact

15  that the implicated chemical is in commerce,

16  including chemicals at their research and

17  development stage, constitutes sufficient

18  evidence of exposure to submit the newfound

19  toxicity data."

20                 Did I read that correctly, sir?

21                 You're on mute again.

22       A.        I'm sorry.  Yes, you read that

23  correctly.

24       Q.        Okay.  And so what that means

25  is that even if you have -- even if there's

1    zero evidence of exposure, some adverse

2    effects are so adverse that you must report,

3    even if nobody's exposed, right?

4        A.    That's not how I understand

5    this guidance.  There is still an exposure

6    element there talking about the fact that the

7    implicated chemical is in commerce.

8             So, for example, you know, R&D

9    evaluations may not provide, you know,

10   sufficient exposure in those cases.

11       Q.    Even though it says, "including

12   chemicals at their research and development

13   stage"?

14       A.    Oh, I'm sorry.  Yeah, no,

15   that's correct for certain categories of

16   information.

17       Q.    So, again, so let's -- so I was

18   correct in there are some adverse effects

19   that are so adverse that even in the absence

20   of any exposure, one must report, correct?

21       A.    Yeah.  So to go back and

22   correct my -- my previous statement.  So,

23   yeah, EPA has defined certain effects where

24   if the chemical is in commerce, exposure is

25   essentially presumed.

Confidential - Pursuant to Protective Order

1      Q.    Right.  Okay.

2            Let's go to page 7, please.

3            There's a section titled "What

4    are the sources of Section 8(e) reportable

5    information?"

6            Do you see that, sir?

7      A.    Yes.

8      Q.    And it says, "TSCA Section 8(e)

9    reportable information can come from a

10   variety of sources, including, but not

11   limited to, draft, interim or final written

12   reports, including study reports, letters,

13   telegrams, telex reports, or verbal reports

14   received at meetings or by phone, that

15   involve observations, including preliminary

16   observations, from, for example, controlled

17   or uncontrolled human or animals

18   studies/events, including, but not limited

19   to, studies/events that involve high-dose

20   levels or nonroutine routes of exposure."

21           Did I read that correctly, sir?

22     A.    Yes.

23     Q.    So this -- and the reason I

24   read that is because the information could be

25   as simple as a phone call informing 3M of a

Confidential - Pursuant to Protective Order

1    particular fact that could be -- could be

2    reportable under TSCA section 8(e), right?

3         A.    Yes, that's correct.

4         Q.    Okay.  And, sir, you're aware

5    that 3M in fact received multiple phone calls

6    from Drs. Guy and Taves informing them that

7    they believed that 3M-made fluorocompound

8    PFOA was present in the blood of the general

9    population, right?

10        A.    I have reviewed documents

11   indicating that there were discussions

12   between 3M and Guy and Taves and discussions

13   about the identification of those substances.

14        Q.    And 3M also received letters

15   from Guy and Taves, right?

16        A.    Based on the documents I've

17   reviewed, I believe that's correct.

18        Q.    Okay.  Let's go down to the

19   bottom.

20             It says, "The evidence that

21   offers reasonable support for a conclusion of

22   substantial risk need not be complete nor

23   definitive but should provide a plausible

24   link between, 1, an observed serious effect

25   and one or few chemicals, e.g., in a discrete

1    process/operation; or 2, a specific

2    product/activity in a previously unrecognized

3    exposure to a chemical that is known or

4    reasonably anticipated to cause serious

5    adverse effects or environmental effects."

6              Did I read that correctly?

7       A.    Yes.

8       Q.    Was that consistent with your

9    understanding of TSCA?

10      A.    Yes.

11      Q.    Okay.  Let's go to page 13,

12   please, of this guidance document from the

13   EPA.

14              Down at the bottom half it

15   says, "How must Section" -- "How must

16   Section 8(e) information be reported?"

17              And I want to skip all this.

18   Actually, I'm sorry, I'm just going to skip

19   that for now.

20              Okay.  Let's go to page 21,

21   please.

22              And there's a section of this

23   guidance documents where there's -- it's like

24   a Q&A, right?  Kind of like what we call

25   frequently asked questions nowadays?

Confidential - Pursuant to Protective Order

1      A.     Yes.

2      Q.     Okay.  And let's go to the

3  first frequently asked question on page 21.

4             So the EPA poses a question and

5  then provides an -- a question that industry

6  may have, that 3M may have, right?

7      A.     Yes.

8      Q.     Okay.  And let's read this Q&A.

9             It says, "Does Section 8(e) of

10  TSCA intend the submission of animal test

11  information:  A, when the determination of

12  substantial risk has been made; or B, when

13  merely a finding of positive animal test

14  results useful in the further assessment of

15  human risk has been determined?"

16             Do you understand that question

17  that EPA's posed?

18      A.     Yes.

19      Q.     Okay.  And let's look at their

20  answer.

21             It says, "TSCA Section 8(e)

22  requires the timely submission of evidence,

23  including preliminary evidence, from animal

24  studies that implicates the tested chemical

25  as causing serious toxicological effects, for

Confidential - Pursuant to Protective Order

```
 1   example, cancer, neurotoxicity, birth

 2   defects."

 3              Did I read that correctly, sir?

 4        A.    Yes.

 5        Q.    And could we add death to that

 6   list of serious toxicological effects?

 7        A.    So EPA does not list it in its

 8   response, and, again, in EPA's other guidance

 9   here, they do establish certain categories,

10   especially for acute toxicity data.

11        Q.    So let me withdraw and let me

12   ask a different question.

13              Do you agree that death is a

14   serious toxicological effect?

15        A.    Yes.

16        Q.    Okay.  Let's keep reading.

17              It says, "A decision to report

18   the observance of such serious toxicological

19   effects should not hinge in any way on a

20   judgment of either the actual or potential

21   exposure to the chemical or a judgment about

22   the degree of relevancy of the findings to an

23   overall assessment of human risk.  In other

24   words, the decision to report under

25   Section 8(e) in such cases should be based
```

Confidential — Pursuant to Protective Order

1    simply on the observance of the serious

2    toxicological effects."

3              Did I read that correctly, sir?

4         A.    Yes.

5              Can I go back to my previous

6    response for a moment?

7         Q.    Sure.

8         A.    So, you know, yes, death --

9    death is a serious adverse effect, but it

10   does need to be evaluated within the context

11   of EPA's guidance for those end points.

12        Q.    Okay.  But this Q&A makes very

13   clear that if you have a serious-enough

14   toxicologic effect, there's no judgment to be

15   made about exposure or dose.  It says you

16   must report, right?

17        A.    Yes, that -- consistent with

18   the earlier statements that -- assuming the

19   chemical is in commerce, there are certain

20   end points that are serious enough that

21   exposure is not given much weight at all.

22        Q.    Okay.  And by 1980, 3M knew

23   that PFOS was in commerce, right?

24        A.    Yes.

25        Q.    And 3M knew that at the doses

Confidential -- Pursuant to Protective Order

1    studied in rhesus monkeys, it was capable of

2    killing them, right?

3        A.    So I have reviewed the studies

4    that I believe you're referring to.  I

5    believe there were range finder studies

6    there.  So this is where EPA's guidance

7    around, you know, lethality and death is

8    important.

9             I think it's also important to

10   recognize that this -- this guidance here is

11   dated at 1991 and reflects, you know, an

12   attempt to answer questions that had come up

13   from industry.

14            MR. MCWILLIAMS:  Move to strike

15        as nonresponsive.

16   QUESTIONS BY MR. MCWILLIAMS:

17        Q.    Mr. Gerber, my question was

18   slightly different.  I'm asking you if you

19   can answer this with a true or false.

20            True or false:  As of 1980, 3M

21   was aware of two things, that PFOS was in

22   commerce, and that PFOS killed rhesus monkeys

23   that were exposed to PFOS in toxicological

24   experiments; true or false?

25        A.    So I was -- yeah, 3M was aware

1    that PFOS was in commerce.  3M had study

2    results in a range finder study showing

3    deaths of monkeys.

4         Q.    Great.  Thank you.

5              (Gerber 30(b)(6) Exhibit DL1552

6         marked for identification.)

7    QUESTIONS BY MR. MCWILLIAMS:

8              Let's move on to DL1552,

9    please.  Can you pull up the Bates, please?

10             And again, I don't know...

11             MR. ROTTENBERG:  Is this

12        another one that you got from us that

13        you didn't provide?

14             MR. MCWILLIAMS:  Correct.

15        Because the sequence of events was --

16             MR. WOODS:  Yeah.

17             MR. MCWILLIAMS:  It's a

18        two-page document.  It's real simple.

19        Again, if you need it, we'll print it

20        out and send it to you.  I promise

21        there's no tricks with this one.  I

22        hope you saw that with the last one.

23   QUESTIONS BY MR. MCWILLIAMS:

24        Q.    If you just pull this up, sir,

25   you recognize this as a 3M document?

1           You see it's got 3M Bates

2    stamps on the bottom right corner?  That

3    means your lawyers gave it to us.  Craig will

4    shut me down if I misrepresent any of this to

5    you.

6           But you see this is -- at the

7    very top, you see this is EPA activity under

8    TSCA Section 8(e), report of public meeting,

9    December 7, 1978?

10          Do you see that, sir?

11     A.    Yes.  Just a second.  I'm going

12   to switch this over to my other screen so

13   it's a bit larger.

14     Q.    Do you recognize this is one of

15   the documents you reviewed in preparation for

16   your deposition today?

17     A.    Yes, I do.

18     Q.    Okay.  And you see this is a

19   report written by a 3M employee who attended

20   an EPA meeting specific to the topic of what,

21   when and where one must report certain

22   information under TSCA Section 8(e), the

23   subject of today's deposition, right?

24     A.    Yes.  My understanding, this is

25   a report out from a meeting attended with EPA

Confidential - Pursuant to Protective Order

```
 1    discussing interpretation of TSCA 8(e).

 2         Q.    Okay.  Let's read the first

 3    paragraph.

 4              It says, "Over 400 industry

 5    representatives heard the Environmental

 6    Protection Agency's toxic substances staff

 7    review issues related to enforcement of

 8    Section 8(e) of the Act in a sometimes stormy

 9    meeting on December 7th."

10              Did I read that correctly, sir?

11         A.    Yes.

12         Q.    And you knew, sir, that

13    industry was not a big fan of this law being

14    enacted because it put tremendous

15    requirements on the chemical industry, right?

16         A.    I really can't speak for the

17    state of mind of industry at the time, so

18    that's beyond my understanding.

19         Q.    Okay.  So let's go to the

20    second page, please.

21              It says -- the third paragraph,

22    it says, "The tone of the afternoon session

23    can be summed up in the following statement:

24    When in doubt, report."

25              Did I read that correctly, sir?
```

Confidential - Pursuant to Protective Order

```
1         A.      Yes.

2         Q.      And can you please underline

3    that in red, "When in doubt, report"?

4    Because I think this is critically important.

5                 Is that consistent with your

6    understanding of what EPA expects from

7    companies like 3M when it's trying to decide

8    whether or not to report?

9         A.      So I think this is a summary

10   statement that needs to be linked back to

11   EPA's other guidance and the statute itself

12   where there needs to be reasonable support

13   for a conclusion, but that doesn't have to be

14   absolutely definitive.

15                So that's how I would read this

16   statement.

17        Q.      Okay.  But the 3M

18   representative who attended this meeting

19   summed it up with these four words, right?

20        A.      I see that in this document.

21        Q.      Okay.  So just so there's no

22   ambiguity here, uncertainty, 3M -- excuse me.

23   EPA made crystal clear to industry, including

24   3M, who was in attendance at this meeting,

25   that when in doubt, you must report, right?
```

```
 1       A.    So this is one individual's

 2  summary report of that meeting.  I'm aware

 3  that 3M was actively involved in monitoring

 4  EPA's other guidance on this topic, and that

 5  would have informed the company's

 6  understanding of its obligations.

 7              So I don't think that this can

 8  be summed up in four words.

 9       Q.    Okay.  But nonetheless, it was

10  summed up in four words, right?

11              The people who actually

12  attended the meeting with EPA, it sounded so

13  crystal clear to them they were able to sum

14  it up in four words, fair?

15       A.    This was their summary from

16  that meeting.

17       Q.    Okay.  So back to this

18  May 1998.

19              May 1998, 3M, for the first

20  time, tells the EPA that a chemical it makes,

21  PFOS, is present in the blood of the general

22  population, right?

23              You're on mute.

24       A.    Sorry about that.

25              So the May 1998 report
```

Confidential - Pursuant to Protective Order

```
 1   reported, you know, blood samples from
 2   members of the general population.
 3        Q.    Okay.  And subsequent to that
 4   decision to inform the EPA of that fact, 3M
 5   decided to quit making PFOS, right?
 6        A.    That's my understanding, yes.
 7        Q.    And other related chemicals; is
 8   that right?
 9        A.    Yes.  Yes, there were other
10   substances that were also phased out.
11        Q.    And that phaseout accounted for
12   $300 million in annual sales, more than
13   $300 million in annual sales, at that point
14   in time, right?
15        A.    Based on the documents I've
16   reviewed, I believe that's correct.
17        Q.    Okay.  And also subsequent to
18   3M telling the EPA that this chemical was in
19   everyone's blood, the EPA essentially banned
20   other companies from making it or importing
21   it, right?
22        A.    That -- that's not quite my
23   understanding.  They did issue a SNUR for
24   perfluoroalkyl sulfonate substances that
25   required notification prior to manufacture or
```

Confidential - Pursuant to Protective Order

```
 1    import of those substances, but the Agency
 2    did allow for ongoing uses of certain PFAS
 3    substances.
 4         Q.    Well, let's see how the Agency
 5    characterized what they did.
 6              Is that -- would you defer to
 7    them on characterizing what they did or why
 8    they did it with respect to the SNUR?
 9         A.    Are you wanting to refer to
10    that document?
11         Q.    Yeah, but I'm asking you.  I'm
12    asking you, Mr. Gerber, who would know more
13    about what EPA did and why they did it, EPA
14    or you?
15         A.    EPA would articulate the
16    reasons for its action within the preamble to
17    the SNUR.
18         Q.    Okay.  Let's pull up -- and
19    we'll get to the Federal Register.  Let's
20    first look at the EPA website, which is
21    usually written in a format for people to
22    easily understand, right?
23         A.    That's -- that's my general
24    understanding.
25              (Gerber 30(b)(6) Exhibit DL1423
```

1              marked for identification.)

2    QUESTIONS BY MR. MCWILLIAMS:

3         Q.    Okay.  Let's pull up DL1423,

4    please.

5              Okay.  Sir, do you recognize

6    this as a printout from the EPA website?

7         A.    Yes, I do.

8              Is this -- do we have a tab

9    number for this document?

10        Q.    Ask your lawyer.  This was

11   disclosed.

12             MR. WOODS:  Oh, it was?  Okay.

13             Yeah.  Daniel, why don't you

14        see if you can get a tab number.

15   QUESTIONS BY MR. MCWILLIAMS:

16        Q.    Again, this could be very

17   quickly and easily done if we just go through

18   it together.  I promise there's no tricks to

19   it.  Craig will embarrass me if I do

20   something like that.

21             Okay?

22        A.    I -- it's really just easier

23   for me to follow along on the hard copy, if

24   that's okay.

25        Q.    I understand.  Okay.  We'll

```
 1    wait.

 2                 MR. ROTTENBERG:  Tab 180.

 3                 THE WITNESS:  All right.  I

 4         have it.  Thank you.

 5    QUESTIONS BY MR. MCWILLIAMS:

 6         Q.    You're welcome.

 7               Do you recognize this, sir, as

 8    a printout of the EPA website?

 9         A.    Yes, I do.

10         Q.    And if you would go -- I'm

11    sorry, I don't know what page, but there's a

12    section titled "EPA" -- I'm sorry, go to the

13    first page.  We can see what this is.

14               This is a website created by

15    the EPA titled "Overview of PFAS actions

16    under TSCA."

17               Right?

18         A.    Yes.

19         Q.    And PFOS, the chemical we've

20    been talking about all day, is one of the

21    PFAS chemicals, right?

22         A.    I'm sorry, can I interrupt for

23    just a second?

24               So Tab 180, that's EPA and 3M

25    announced phaseout of PFOS.  I don't -- yeah,
```

Confidential - Pursuant to Protective Order

```
1     I don't think I'm on --
2               MR. ROTTENBERG:  There's no
3          Bates number and it's not --
4               MR. WOODS:  167.
5               MR. ROTTENBERG:  Thanks, Craig.
6               MR. WOODS:  Tab 167.
7               THE WITNESS:  Sorry about that.
8               Okay.  I'm there now.
9     QUESTIONS BY MR. MCWILLIAMS:
10         Q.    If you go to the section
11    titled -- you see that this is an EPA website
12    about what EPA has done under TSCA with
13    respect to these chemicals we've been talking
14    about all day?
15         A.    Yes.
16         Q.    And if we could go to the
17    section entitled "EPA's Investigation of
18    Perfluorooctanyl Sulfonate?"  I don't know
19    what page it is.  It looks like this.  Yeah,
20    there we go.
21              MR. WOODS:  Yeah, page 4.
22    QUESTIONS BY MR. MCWILLIAMS:
23         Q.    Yeah.  If you could just blow
24    up the two paragraphs, please, the first two
25    paragraphs.  There you go.
```

Confidential - Pursuant to Protective Order

```
 1              You can see where it says, "In
 2    the late 1990s, EPA received information
 3    indicating that PFOS was widespread in the
 4    blood of the general population and presented
 5    concerns for persistence, bioaccumulation and
 6    toxicity"?
 7         A.    Yes.
 8         Q.    Okay.  So there's no mention of
 9    Guy and Taves' publication in the '70s in
10    this website, is there?
11         A.    Not in this summary, no.
12         Q.    Okay.  But it is true that 3M
13    for the first time informed the EPA of the
14    presence of PFOS in the blood of the general
15    population in the late 1990s, right?
16         A.    Yeah.  My understanding based
17    on the documents that I've reviewed is that
18    3M disclosed specific findings in 1998
19    related to general population blood samples.
20         Q.    Okay.  Let's keep reading.
21              It says, "Following discussions
22    between EPA and the 3M, the manufacturer of
23    PFOS, the company terminated production of
24    these chemicals."
25              Right?
```

Confidential - Pursuant to Protective Order

```
 1          A.     I see that, yes.

 2          Q.     Okay.  And the next

 3   paragraph -- you can read whatever you want,

 4   but I just want to skip down to the last --

 5   where it says -- it says, "Following the

 6   voluntary phaseout."

 7                 Do you see that, sir?

 8          A.     Sorry, just a moment.

 9                 Yes, I see that.

10          Q.     Okay.  It says -- let's read

11   this together.  This is what the EPA wrote --

12   has on their website today.

13                 "Following the voluntary

14   phaseout of PFOS by the principal worldwide

15   manufacturer" -- and that's 3M, right?

16          A.     That is my understanding.

17          Q.     3M was the principal worldwide

18   manufacturer of PFOS, right?

19          A.     I guess I can't speak to

20   worldwide manufacture, I haven't investigated

21   that, but I see what EPA has written here.

22          Q.     You have no reason to disagree

23   with the EPA on that particular point, do

24   you?

25          A.     I do not.
```

Confidential - Pursuant to Protective Order

1    Q.    Okay.  Let's keep reading.

2          It says, "EPA took prompt

3    regulatory actions in 2002 and 2007 under the

4    TSCA to limit any future manufacture or

5    importation of 271 of these chemicals,

6    essentially encompassing all of these PFAS

7    chemicals on the United States market."

8          Right?

9    A.    Yes, I see that.

10   Q.    Okay.  So the EPA learns about

11   this chemical in everyone's blood, 3M gets

12   out of the business, and then EPA promptly

13   prohibits other companies from making the

14   same chemical, right?

15   A.    Well, the -- I don't think

16   that's quite -- quite accurate that the

17   mechanism that EPA used was a Significant New

18   Use Rule.  So once that manufacture was no

19   longer ongoing, EPA issued the SNUR, and then

20   if any company wanted to reenter the market,

21   they would need to notify the Agency so the

22   Agency could do a risk evaluation and put

23   controls in place, if necessary.

24   Q.    Okay.  But S-N-U-R is, SNUR, as

25   you call it, is part of TSCA, right?

Confidential - Pursuant to Protective Order

```
1        A.      Yes.

2        Q.      Yeah.  Okay.

3                And do you know why the EPA

4    implemented this role intended to limit or

5    reduce other companies from making or

6    importing PFOS?

7        A.      So I think we could go to the

8    preamble of the SNUR to look at EPA's

9    specific reasons.  In general, it's so that

10   the Agency would have notice if anyone wanted

11   to reenter the market so that the Agency

12   would have the opportunity to assess those

13   risks and control them as necessary.

14       Q.      Well, that's what the

15   regulation does.  But do you know why EPA

16   took that action with respect to these

17   chemicals, including PFOS?

18       A.      I guess I can't speak for the

19   Agency beyond what they've, you know,

20   articulated in their rule.

21       Q.      Well, what do you think?

22   What's your understanding?  You spent weeks

23   getting ready for this deposition.

24               Why did the EPA essentially ban

25   other companies from making this chemical
```

Confidential -- Pursuant to Protective Order

1    that 3M made hundreds -- you know, a hundred

2    million pounds of?

3         A.     So my understanding based on

4    the documents that I've reviewed is that, you

5    know, 3M recognized -- or I'm sorry, EPA

6    recognized the phaseout activities and wanted

7    to put a check in place so that companies

8    could not resume those activities, to

9    present -- to prevent the potential for

10   future substantial risk -- or, I'm sorry,

11   unreasonable risk under TSCA.

12        Q.     Sir, are you not aware that EPA

13   has publicly stated that the reason they took

14   this action is because these chemicals,

15   including PFOS, may be hazardous to human

16   health or the environment?

17        A.     I see in -- up above that

18   they've identified concerns for persistence,

19   bioaccumulation and toxicity.  I'm aware in

20   the documents that I have reviewed that EPA

21   didn't think that those were imminent

22   concerns, but they wanted to take regulatory

23   action to prevent future risks.

24               (Gerber 30(b)(6) Exhibit DL1357

25         marked for identification.)

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. MCWILLIAMS:

 2        Q.    Okay.  Well, let's look at what

 3   the EPA actually wrote.  Let's look at

 4   DL1357, which is the Federal Register when

 5   they officially announced this new regulation

 6   significantly reducing other's ability to

 7   manufacture or import these chemicals.

 8             Okay?

 9             And if you could just pull

10   up -- highlight -- I mean, call out the left

11   column.

12             MR. ROTTENBERG:  145, Jon.

13             THE WITNESS:  All right.  I

14        have the document.

15   QUESTIONS BY MR. MCWILLIAMS:

16        Q.    Okay.  Down in the left-hand

17   column towards the bottom, where EPA's

18   explaining what they did, let's look at why

19   they did it.

20             It says, quote, "EPA believes

21   that this action is necessary because the

22   PFOSH component of these chemical substances

23   may be hazardous to human health and the

24   environment."

25             Did I read that correctly, sir?
```

Confidential - Pursuant to Protective Order

```
1          A.      Yes.
2                  Could I have a minute to read a
3     little bit further in this one?
4          Q.      You can do whatever you need to
5     do to answer my question.
6                  But my next question is, does
7     that refresh your recollection, sir, as to
8     why the EPA took action to prevent other
9     companies from making these chemicals?
10         A.      Just a moment.  I'd like to
11    review a little bit further.
12                 All right.  I -- I -- thank you
13    for that time.
14                 Can you repeat your question,
15    please?
16         Q.      Yes, sir.
17                 My question is, does that
18    refresh your recollection as to why the EPA
19    took this action to prevent other companies
20    from making PFOS?
21         A.      Yes, I see that there, and I
22    think EPA explains its reasoning in a little
23    bit more detail later on.
24         Q.      My question was whether or not
25    it refreshed your recollection.  Either it
```

1    did or did not.

2        A.    Sorry.  It does.

3        Q.    Okay.  Thank you.

4             (Gerber 30(b)(6) Exhibit DL156

5        marked for identification.)

6    QUESTIONS BY MR. MCWILLIAMS:

7        Q.    Well, if we want to discuss a

8    little bit more about EPA's reasoning and

9    thoughts on PFOS, let's pull up DL156,

10   please.  If you could call up the Bates

11   numbers for him first, please, guys.

12            MR. ROTTENBERG:  85, Jon.

13       Tab 85.

14            THE WITNESS:  Okay.  I have

15       that.

16   QUESTIONS BY MR. MCWILLIAMS:

17       Q.    Okay.  Sir, do you recognize

18   this as a document you reviewed in

19   preparation for your deposition?

20       A.    I do.

21       Q.    Okay.  And is this -- this is a

22   PowerPoint presentation created by the --

23   someone within the EPA specific to this topic

24   we've been discussing this morning?

25       A.    Yeah.  My understanding is

1  that, yeah, this is a presentation prepared

2  by someone on staff at the EPA for

3  presentation to the Naval Research

4  Laboratory.

5        Q.    Okay.  So let's just look at

6  the title.  It says, "Phasing Out a Problem:

7  PFOS."

8              Is that the title on this

9  document, sir?

10        A.    Yes.

11        Q.    Does that indicate to you that

12  3M -- excuse me, that EPA was of the opinion

13  that PFOS was a problem at that point in

14  time?

15        A.    I see that that's how it's

16  characterized in the title.  I think what the

17  Agency means by that is described in more

18  detail later.

19        Q.    Okay.  So let's -- that's a

20  good lead-up.  Let's go to the next page,

21  please.

22              Next page, please.  Thank you.

23              And the title -- the slide is

24  titled, "What is PFOS?"  And it's the

25  perfluorooctyl sulfonate, the acids, the

1  salts, the halides.  It's manmade.  It does

2  not occur in nature.

3              Is that accurate?

4       A.     I see that that's asserted in

5  EPA's presentation.  I haven't investigated

6  that myself, so that's beyond my area of

7  expertise.

8       Q.     Sir, you're a chemical engineer

9  by training and you work at 3M, and you don't

10  know whether or not PFOS is a manmade

11  substance?

12      A.     I know that it is a substance

13  that was manufactured by 3M.  I guess I can't

14  speak to, you know, the totality of the

15  science and whether it could occur anywhere

16  else.

17      Q.     You don't know if it's

18  naturally occurring, really?

19      A.     Based on the documents that

20  I've reviewed, I've seen in EPA summaries

21  that they have asserted that it is strictly a

22  synthetic chemical.

23      Q.     All right.  Okay.

24              And it says it's been produced

25  since the 1950s; is that right?

1    A.    I haven't investigated the full

2  production history of this substance, but I

3  see that that's what's reflected in EPA's

4  summary.

5    Q.    But do you have -- based on the

6  totality of your knowledge, do you have any

7  reason to disagree with this statement that

8  EPA -- that it's been made since the 1950s?

9    A.    I do not.

10    Q.    And it says, "Made mostly by

11  3M."

12          Right?

13    A.    Yes, I see that.

14    Q.    Okay.  Let's skip two more

15  pages.  There's a slide titled, "Why is PFOS

16  a problem?"

17          Do you see that, sir?

18    A.    Yes.

19    Q.    Okay.  And this EPA slide deck

20  says, "PFOS is a PBT chemical."

21          Did I read that correctly?

22    A.    Yes.

23    Q.    And PBT means it's persistent,

24  it's bioaccumulative and it's toxic, right?

25    A.    That's the acronym, yes.

Confidential - Pursuant to Protective Order

```
 1          Q.    Okay.  And 3M was in possession
 2   of information as early as 1980 that PFOS was
 3   persistent, was a bioaccumulative compound,
 4   and was toxic to the animals in which it was
 5   tested, right?
 6          A.    I don't know that that
 7   characterization is -- is correct, because
 8   each one of those terms has definition behind
 9   it with respect to TSCA.  And especially, you
10   know, the toxicity is something that was
11   developed over time.
12          Q.    Okay.
13          A.    I've seen that reflected in the
14   TSCA 8(e) evaluations by the company.
15          Q.    Let's put TSCA to the side.
16   Let's just use the common definition of these
17   terms.
18                Persistent means it doesn't
19   break down.  That fluorine-carbon bond is
20   incredibly strong, is expected to last for
21   eons, right?
22          A.    I understand that that's a very
23   stable bond that's resistant to degradation.
24          Q.    And that's what's -- and that's
25   why PFOS is so persistent, because of that
```

Confidential - Pursuant to Protective Order

1    carbon-fluorine bond, right?

2         A.    I'm not an expert in the

3    chemistry, but that is my understanding.

4         Q.    Okay.  And 3M was aware that

5    PFOS contained that carbon-fluorine bond

6    since 1975, right, if not earlier?

7         A.    So, yeah, 3M understood the,

8    you know, the chemical composition of it,

9    that substance.

10        Q.    Okay.  And we've already

11   discussed bioaccumulative compound, that

12   there was indicia of the slow elimination

13   rate, which is a function of half-life, which

14   is how you determine a bioaccumulative

15   potential of a compound in the 1970s, right?

16        A.    So -- and again, I don't think

17   that's quite correct because, again, there

18   are definitions that go with these things.

19   You know, there are different indications of

20   bioaccumulation potential in the EPA's

21   guidance.  It could include things like

22   bioconcentration factors in fish or

23   octanol-water partition coefficients, but the

24   elimination rate would be one consideration

25   in that evaluation.

Confidential - Pursuant to Protective Order

1    Q.    Okay.  And they had evidence of

2    slow elimination in the 1970s for PFOS,

3    right?

4    A.    Based on the documents I've

5    reviewed, I did -- I do recall seeing that

6    that was noted in worker blood levels with

7    information that EPA -- I'm sorry, that 3M

8    had collected.

9    Q.    Okay.  And also in the 1970s,

10   3M performed toxicology studies on rhesus

11   monkeys, rats and mice.  3M chose the doses

12   to expose those animals to, and based on the

13   results of those studies, 3M concluded that

14   PFOS should be regarded as toxic, correct?

15   A.    I would defer to my toxicology

16   colleagues to really interpret the results of

17   those studies.

18        I am aware from my review of

19   those documents that that was a range finder

20   study where they were trying to dial in the

21   correct doses for the investigation that they

22   wanted to do.

23        And here again, the term

24   "toxic" is something that has a lot of

25   definition and guidance behind it, and that's

Confidential -- Pursuant to Protective Order

1    important.

2        Q.    But based on your review of the

3    documents in preparation for today's

4    deposition, you did see documents, sir, where

5    3M representatives reviewed those toxicology

6    studies and concluded that PFOS should be

7    considered toxic, true?

8        A.    I saw that they had reviewed

9    those -- reviewed those results and noted the

10   deaths.  I am also aware of the TSCA 8(e)

11   evaluation where they did not conclude that

12   that represented substantial risk according

13   to EPA's guidance at the time.

14            MR. MCWILLIAMS:  Move to strike

15       as nonresponsive.

16   QUESTIONS BY MR. MCWILLIAMS:

17       Q.    I need you to respond to this

18   very particular point within my question,

19   which is 3M's interpretation of the

20   toxicology data in the 1970s.

21            True or false:  In the 1970s,

22   representatives of the DuPont {sic}, upon

23   reviewing this toxicology data, concluded

24   that PFOS should be regarded as toxic?  True

25   or false?

Confidential - Pursuant to Protective Order

1          A.      I'm sorry, could you repeat the

2    question?  Did you say representatives of

3    DuPont?

4          Q.      Yeah, I did, and I'm going to

5    fix it.  I apologize.

6                  True or false:  In the 1970s,

7    representatives of 3M, after reviewing the

8    toxicology data, concluded that PFOS should

9    be regarded as toxic?  True?

10         A.      I recall from my review of the

11   documents that -- initial animal studies,

12   PFOS was categorized as moderately toxic.

13         Q.      Okay.  I can take that.

14                 All right.  So let's -- I don't

15   know if I should do the whole Guy and Taves

16   thing.  I guess I should.

17                 So in preparation for your

18   deposition today, sir, did you make an effort

19   to determine what 3M knew and when they knew

20   it with respect to PFOS in the blood of

21   non-occupationally exposed persons?

22         A.      As part of my preparation, I

23   reviewed information related to 3M's TSCA

24   8(e) evaluations and its obligations under

25   TSCA.  So that -- that would involve, you

Confidential - Pursuant to Protective Order

1    know, specific studies being reviewed by the

2    TSCA 8(e) committee.

3         Q.    Okay.  Can you answer my

4    question?

5         A.    I'm sorry, can you repeat the

6    question?

7         Q.    Yes, sir.

8              In preparation for your

9    deposition, sir, did you make an effort to

10   determine what 3M knew and when they knew it

11   with respect to PFOS in the blood of the

12   general population?

13        A.    Yes.

14        Q.    Okay.  And I'm just going to

15   give you an open-ended question.

16             Tell me what you learned.

17        A.    So my understanding, based on

18   the documents I've reviewed, is that this is

19   information that evolved significantly over

20   time; that 3M was aware of the Guy and Taves

21   studies and reports of organic fluorine in

22   blood from pooled samples.

23             3M took measurements from its

24   own employees for worker exposure, so they

25   were aware of blood levels in some of its

Confidential - Pursuant to Protective Order

 1   employees who were exposed to the greatest

 2   amounts of these substances.

 3             My understanding is that the

 4   analytical capability evolved significantly

 5   over time.  The ability to detect and analyze

 6   with specificity came much later and resulted

 7   in those specific findings that were

 8   disclosed in 1998 as part of that submission.

 9        Q.    Okay.  Let's get right into it.

10   Let's look at DL11, please.

11             MR. ROTTENBERG:  Tab 16, Jon.

12             THE WITNESS:  All right.  I

13        have that one.

14             (Gerber 30(b)(6) Exhibit DL11

15        marked for identification.)

16   QUESTIONS BY MR. MCWILLIAMS:

17        Q.    Okay.  Do you recognize this as

18   one of the documents you reviewed in

19   preparation for today's dep?

20        A.    I do.

21             Can I have just a moment to

22   reread it quick?

23        Q.    I can't tell you no, but I

24   would rather you wait and let me ask a

25   question, because if we're going to have you

Confidential - Pursuant to Protective Order

1  re-review every document, we're going to need

2  a couple more days.  Okay?  That's why I sent

3  these to you ahead of time.

4           Okay?  Is that fair?

5      A.    Okay.

6      Q.    Okay.  First of all, do you

7  recognize this as a document you reviewed in

8  preparation for your deposition?

9      A.    Yes.

10     Q.    Okay.  And is this an internal

11 3M document dated August 20, 1975?

12     A.    Yes.

13     Q.    And do you see the subject at

14 the top right corner says, "Fluorocarbons in

15 human blood plasma"?

16     A.    Yes.

17     Q.    Okay.  And it's marked

18 "confidential" as well; is that right?

19     A.    Yes.

20     Q.    And this is a record of a

21 telephone conversation that occurred on

22 August 14, 1975, from Mr. -- excuse me, a

23 Dr. William Guy from the University of

24 Florida; is that correct?

25     A.    Yes.

Confidential - Pursuant to Protective Order

```
 1          Q.      Sidenote, Dr. Guy worked with
 2   my grandfather at the University of Florida
 3   dental school.
 4                  Let's read along.
 5                  It says, "Dr. Guy called again
 6   following up on the subject, see my earlier
 7   memo, to see if they had any further ideas as
 8   to the possible sources of the fluorocarbon
 9   carboxylic acids found in human blood samples
10   from Texas and New York."
11                  Did I read that correctly, sir?
12          A.      Yes.
13          Q.      And a telephone call is one of
14   the types of information that EPA says can be
15   reportable; is that correct?
16          A.      That's correct.
17          Q.      Okay.  And at this point in
18   time, 3M was in the business of manufacturing
19   fluorocarbon carboxylic acids; is that
20   correct?
21          A.      That's my understanding, yes.
22          Q.      Okay.  And this telephone call
23   is informing 3M that this investigator
24   believes that a chemical that 3M makes is in
25   the blood of the general population, correct?
```

Confidential - Pursuant to Protective Order

```
 1        A.     And here's where I'd like just
 2   a moment to reread the content here to make
 3   sure that I accurately represent --
 4        Q.     You can do whatever you need to
 5   do to answer my question, sir.
 6        A.     Thank you.
 7               All right.  I'm sorry, can you
 8   please repeat your question?
 9               MR. MCWILLIAMS:  Carrie, would
10          you please read it back?
11               (Court Reporter read back
12          question.)
13               THE WITNESS:  So my
14          understanding is that they had found
15          organic fluorine in pooled samples
16          from the general population.
17   QUESTIONS BY MR. MCWILLIAMS:
18        Q.     So this is talking specifically
19   about fluorocarbon carboxylic acids, correct?
20        A.     So what I read here is it
21   indicates that the fluorine is organic, and
22   the suspected species is fluorocarbon
23   carboxylic acid, with a C6 or C7 fluoroalkyl
24   group.
25        Q.     Okay.  So my question, sir:
```

1    Was this phone call that occurred on

2    August 14, 1975, an incidence of 3M being

3    provided information by an outside researcher

4    who believed a chemical manufactured by 3M

5    was present in the blood of the general

6    population?

7        A.    So I guess I read this that

8    they're providing information that these

9    substances that they've identified in this

10   chemical category have been detected in

11   pooled samples from the general population.

12       Q.    Okay.  And at this point in

13   time, are you aware of any other companies

14   other than 3M that manufactured fluorocarbon

15   carboxylic acids?

16       A.    I -- you know, I can't speak to

17   manufacturing activity of others companies.

18   I believe DuPont was also a manufacturer of

19   PFOA, but I don't know their manufacturing

20   history, so I guess I can't speak to that.

21       Q.    I believe DuPont was purchasing

22   their PFOA from 3M, but we'll debate that

23   later.

24       A.    Yeah.  Sorry.  And I shouldn't

25   speak to that because I -- I don't have

1    direct knowledge of their manufacturing

2    operations.

3         Q.    Okay.  But sitting here today,

4    are you aware of any other company, other

5    than 3M, that was manufacturing fluorocarbon

6    carboxylic acids in 1975?

7         A.    I personally am not.

8         Q.    Okay.  If you go to the next

9    page, please.

10              First -- the top paragraph.  It

11   says, "Somewhere he got the information that

12   3M's fluorocarbon carboxylic acids are used

13   as surfactants and wanted to know if they

14   were present in Scotchgard or other items in

15   general use by the public."

16              Did I read that correctly, sir?

17        A.    Yes.

18        Q.    And let me ask you this:  Isn't

19   it true that as of 1975, 3M was indeed

20   manufacturing fluorocarbon carboxylic acids

21   that were in general use by the public?

22        A.    My understanding is that

23   POSF-derived substances did go into

24   applications such as the Scotchgard products

25   and other applications.

Confidential - Pursuant to Protective Order

```
 1        Q.     Okay.  So these outside

 2   researchers were asking 3M if 3M made these

 3   types of chemicals.

 4               And what's the next line in

 5   this document, sir?  What did 3M say in

 6   response to these outside researchers?

 7        A.     So this reads, "We plead

 8   ignorance" -- or "pled ignorance, but advised

 9   him that Scotchgard was a polymeric material,

10   not an FC acid."

11        Q.     Okay.  And by "plead

12   ignorance," it means you play dumb.  You

13   pretend to not know something you know the

14   answer to.

15               That's what that phrase means,

16   right, sir?

17        A.     I guess I can't speak to what

18   the authors intended there, but in the

19   general meaning it's -- yeah, to plead

20   ignorance is not to -- yeah, to not share

21   information that you have.

22               (Gerber 30(b)(6) Exhibit LP207

23        marked for identification.)

24   QUESTIONS BY MR. MCWILLIAMS:

25        Q.     Let's go to LP207, please.
```

```
 1              MR. ROTTENBERG:  110, Jon.

 2              THE WITNESS:  And I'm sorry,

 3         can I go back to your question on the

 4         Scotchgard products?

 5    QUESTIONS BY MR. MCWILLIAMS:

 6         Q.    Sir, I'm sure if there's any

 7    clarification, Mr. Woods will ask those.  My

 8    time is limited, so I'm going to proceed to

 9    the next document, please.

10              Do you have LP207 in front of

11    you?

12         A.    I do.

13         Q.    Okay.  And do you recognize

14    this as a document you reviewed in

15    preparation for your deposition today?

16         A.    Yes, I do.

17         Q.    Okay.  And this is dated

18    August 22, 1975; is that right?

19         A.    Yes.

20         Q.    And that's approximately one

21    week subsequent to the prior document we were

22    just discussing, the phone call from Dr. Guy?

23         A.    Yes, that's correct.

24         Q.    Okay.  If you look at the top

25    right corner, it says this is a "telephone
```

Confidential - Pursuant to Protective Order

```
 1    call from Dr. Warren Guy, University of

 2    Florida, regarding fluorochemical in human

 3    blood."

 4              Did I read that correctly?

 5       A.    Yes.

 6       Q.    Okay.  And you see -- you can

 7    see all the people that received a copy of

 8    this document, including 3M's general

 9    counsel; is that right?

10       A.    Yes, I see that.

11       Q.    So the lawyers at 3M were aware

12    of whatever's discussed in this document; is

13    that fair?

14       A.    I see that an attorney was on

15    the cc list.  I guess, you know, I can't

16    speak to, you know, his review or his

17    knowledge.

18       Q.    Okay.  Let's read this

19    together.

20              It says, "Dr. Guy, who is

21    located at the University of Florida, was

22    calling from the University of Rochester,

23    New York, where he and the other author of

24    the paper entitled, quote, 'Characteristics

25    and Concentrations of Organic Fluorocompounds
```

1    Found in Human Tissues,' end quote, were

2    finalizing their preparations.  After

3    reviewing the background experimental

4    information, Dr. Guy indicated that they were

5    attempting to, quote, 'run down' the source

6    of organic fluorine so they could make a more

7    specific report when they give their paper at

8    the national ACS meeting in Chicago this

9    coming Tuesday."

10            Did I read that correctly, sir?

11    A.    Yes.

12    Q.    Okay.  The next paragraph, it

13    says, "I indicated to Dr. Guy that he was

14    asking me to speculate in an area where one

15    should definitely not speculate.  He asked me

16    if it would be possible for the residues that

17    he had found in 98 of a hundred people

18    sampled could have come from Scotchgard."

19            Did I read that correctly, sir?

20    A.    Yes.

21    Q.    And Scotchgard is one of those

22    POSF-derived products that can degrade or

23    metabolize to PFOS in blood, right?

24    A.    So this is one of the

25    clarifications that I wanted to make to my

Confidential -- Pursuant to Protective Order

1    earlier answer.

2         Q.     I need you to answer -- hang

3    on.  I need you to answer my question and not

4    give clarifications.  Okay?  This is

5    important.

6         A.     So, I'm sorry, could you repeat

7    the question?

8              MR. WOODS:  Can you repeat the

9         question?

10   QUESTIONS BY MR. MCWILLIAMS:

11        Q.     The question is whether or not

12   Scotchgard is a POSF-based product that we

13   already discussed previously can degrade or

14   metabolize to PFOS in blood.

15        A.     So my understanding is that

16   POSF derivatives were used in the manufacture

17   of Scotchgard products.

18              What I wanted to say earlier is

19   I am not familiar with the specific mixture

20   composition of the final Scotchgard product.

21        Q.     Okay.  That's fine.  Thank you.

22              It continues.  It says, "I told

23   him that Scotchgard contained no materials

24   that were likely to produce the

25   perfluorocarboxylic acid derivatives they

1    claim to have found.  He asked me if we

2    manufactured perfluorooctanoic acid.  I

3    indicated that we did.  He asked for chemical

4    identification of our overall product line.

5    I advised him that our products were

6    proprietary but referred him to Volume V of

7    Simons for chemical background.  He said he

8    had already read this, and it was not

9    specific enough."

10           Did I read that correctly, sir?

11    A.    Yes.

12           (Gerber 30(b)(6) Exhibit BB424

13    marked for identification.)

14   QUESTIONS BY MR. MCWILLIAMS:

15    Q.    Okay.  Let's go to the next

16   one.  This one is BB424.

17           MR. ROTTENBERG:  173, Jon.

18           THE WITNESS:  Okay.  I have

19    that.

20   QUESTIONS BY MR. MCWILLIAMS:

21    Q.    All right.  Sir, do you

22   recognize Exhibit BB424 as a document you

23   reviewed in preparation for your deposition

24   today?

25    A.    Yes.

Confidential - Pursuant to Protective Order

```
1        Q.     Okay.  And is this another memo
2   memorializing a telephone call between
3   Dr. Taves and people within 3M?
4        A.     Yes.
5        Q.     And this is dated September 22,
6   1975; is that right?
7        A.     That's correct.
8        Q.     And again, this is regarding
9   fluorochemicals in blood, right?
10       A.     Yeah.  It says at the beginning
11  he's part of Dr. Taves' -- one of the members
12  of the research team that is working on the
13  analysis of fluorochemicals in blood.
14       Q.     Okay.  Yeah, in the top right
15  corner, you can see it's regarding -- there's
16  a little regarding line -- fluorochemicals in
17  blood?
18       A.     Oh, yes, I see that.
19       Q.     Let's read the substance.
20              It says, "Dr. Taves is one of
21  the members of the research team that is
22  working on the analysis of fluorochemicals in
23  blood.  He called to ask several questions
24  and solicit our help.  He claims that their
25  findings to date indicate that the 20 part
```

Confidential - Pursuant to Protective Order

1    per billion of fluorochemicals they have

2    found in human blood is either a derivative

3    or a perfluorocarboxylic acid or a

4    perfluorosulphonic acid.  They are trying to

5    determine specifically which compound or

6    compounds are involved.  He wants to know if

7    he could submit a sample to us for evaluation

8    by our analytical people."

9              Did I read that correctly, sir?

10   A.     Yes.

11   Q.     Okay.  So based on this, this

12   researcher is providing information to 3M

13   that they believe two chemicals manufactured

14   by 3M could be the organic fluorine that

15   they've observed in the blood of the general

16   population, correct?

17   A.       I don't read in the request

18   that they've identified 3M as the

19   manufacturer, but they have two potential

20   structures that it could be that they're

21   asking for further analysis.

22   Q.     Right.

23            And you're absolutely right,

24   this document does not state that 3M made

25   these chemicals.  But it is true that 3 -- at

1  this point in time, 3M made those chemicals,

2  correct?

3       A.     My understanding is that 3M did

4  manufacture PFOS and POSF-based chemistry at

5  this time.

6       Q.     Okay.  And PFOA, which is

7  perfluorooctanoic acid, right?

8       A.     Yes, that's my general

9  understanding.

10      Q.     Okay.  Let's keep reading.

11             It says, "Dr. Taves and his

12  group have been studying the various FDA

13  petitions based, I presume, on the

14  supposition that the fluorochemical found in

15  the blood might be coming from paper or

16  paperboard.  He wanted to know if we would

17  open up the contents of our FDA petition to

18  him.  I gave him a very firm no in this

19  regard based on the fact that the petition

20  contains our confidential method of

21  manufacturing and yield information."

22             Did I read that correctly, sir?

23      A.     Yes.

24      Q.     And you're aware, sir, that at

25  this point in time 3M manufactured a product

1    called FC-807, tradename was Scotchban, which

2    had been FDA approved for food contact

3    packaging, correct?

4         A.    That's my general understanding

5    based on the documents I've reviewed.

6         Q.    Okay.  And, sir, you understand

7    now it is well-established that FC-807 was a

8    major source of PFOS in the blood of the

9    general population?

10        A.    I -- I'm sorry, I don't have

11   that understanding based on the documents

12   that I've reviewed.  FDA-regulated

13   applications are not subject to the scope of

14   TSCA, and so I really didn't get into that

15   information.

16        Q.    Well, what is your

17   understanding of the source of PFOS in the

18   blood of the general population?

19        A.    And I think, you know, 3M's

20   toxicology, environmental experts could best

21   speak to that.

22        Q.    And we'll speak to them, but

23   right now I'm speaking to you.

24              So I need you, Mr. Gerber, to

25   tell me:  What is your understanding of the

Confidential - Pursuant to Protective Order

```
 1   source of PFOS in the blood of the general

 2   population?

 3        A.    My understanding is that

 4   industrial emissions and POSF-based chemistry

 5   in products can degrade to PFOS and that

 6   that's a source of exposure.

 7        Q.    And when you say "products,"

 8   does that include the paper packaging

 9   material FC-807?

10        A.    My understanding is FC-807 was

11   one of the POSF-based chemistries.

12        Q.    Do you have any reason to

13   believe FC-807 was not a source of PFOS in

14   the blood of the general population?

15        A.    Again, I'm not the best person

16   to speak to that, so I don't have -- I guess

17   I don't have a -- a basis for -- for

18   answering that yes or no.  But I -- I'm

19   sorry, could you -- can you repeat the

20   question?

21        Q.    Yeah, sir, and I -- listen,

22   you're right, there's always better people

23   that know more things, but today is my chance

24   to talk to you --

25        A.    Yes.
```

Confidential - Pursuant to Protective Order

1      Q.      -- so I need you just to give

2   me your best answers.

3              Okay?

4              Do you have any reason today to

5   dispute that a source of PFOS in the blood of

6   the general population was 3M's product

7   FC-807?

8      A.      Yeah.  Since this is not my

9   area of expertise, I do not have a reason to

10  dispute that.

11     Q.      Okay.  That works.

12             (Gerber 30(b)(6) Exhibit LP231

13        marked for identification.)

14  QUESTIONS BY MR. MCWILLIAMS:

15     Q.      Let's go to LP231, please.

16             MR. ROTTENBERG:  122, Jon.

17             MR. WOODS:  And, Ned, when you

18        get done with this document, can we

19        take another break?

20             MR. MCWILLIAMS:  Yeah, sure.

21             THE WITNESS:  What was the tab

22        number?  Sorry.

23             MR. ROTTENBERG:  122.  122.

24             THE WITNESS:  Okay.  Thank you.

25        I have that.

Confidential - Pursuant to Protective Order

```
1    QUESTIONS BY MR. MCWILLIAMS:

2         Q.    Okay.  Do you have the document

3    in front of you, sir?

4         A.    Yes, I do.

5         Q.    And is this one of the

6    documents you reviewed in preparation for

7    your deposition?

8         A.    I believe so, yes.

9         Q.    Okay.  And you see the top

10   right corner?  Its subject is fluorochemicals

11   in blood, dated August 9, 1977; is that

12   right?

13        A.    Yes.

14        Q.    And it's from Mr. Belisle

15   within 3M sending a memo to others within 3M;

16   is that correct?

17        A.    Yes.

18        Q.    Including a Mr. Scheuerman, who

19   was kind enough to save this for us.

20              Do you see his stamp on there

21   in the top -- in the right corner?

22        A.    Yes, I do.

23        Q.    Okay.  And he's a lawyer at 3M,

24   or he was a lawyer at 3M.

25              Do you know that?
```

```
 1        A.    I did not.

 2        Q.    Okay.  Well, let's look at what

 3   was written to him that he kindly saved.

 4              "Since my letter on July 29,

 5   1977, on the published report of

 6   perfluorooctanoic acid in human plasma, we

 7   have purchased and received a tape recording

 8   of Guy's presentation, and I quote."

 9              Did I read that correctly, sir?

10        A.    Yes.

11        Q.    Okay.  And this referred -- the

12   published report is referring to the Guy and

13   Taves publication you told me earlier that

14   you thought the EPA probably read, right?

15        A.    I didn't say that I thought EPA

16   read it.  I noted that it was in the public

17   literature at the time.

18        Q.    Okay.  But in this 3M document,

19   they characterize that publication as a

20   report of perfluorooctanoic acid in blood.

21   PFOA, not PFOS, right?

22        A.    So I see here from the quote,

23   "The fluorine-containing part of the

24   compounds in the isolate from human plasma

25   resemble perfluorooctanoic acid."
```

Confidential - Pursuant to Protective Order

1        Q.      And then I'm also talking about

2    above that where 3M -- 3M, who characterized

3    this report by Guy and Taves, that it was

4    about PFOA, not PFOS, right?

5        A.      I read that there.  That seems

6    to be, you know, the summary of the

7    information in the quote below.

8        Q.      Okay.  So let's read what the

9    quote says.

10              It says, "From analysis of the

11   F/NMR spectrum, the fluorine-containing part

12   of the compound in the isolate, from human

13   plasma, resembled perfluorooctanoic acid."

14              Which is PFOA, right?

15       A.      Correct.

16       Q.      "Derivatives of this compound

17   are widely used as surfactants.  No

18   toxicological studies of these compounds

19   appear to have been published.  A complete

20   list of all 11 products in which these

21   compounds are presently being incorporated is

22   not generally available.  At least in the

23   past, these have been used in floor waxes,

24   wax paper, leather conditioning agents and

25   fabric conditioning agents.  Two tradenames

Confidential - Pursuant to Protective Order

```
 1   which may come to mind are Scotchgard and
 2   Zepel.  Compounds of this nature might be
 3   expected to bind to plasma albumin because of
 4   the resemblance to fatty acid normally
 5   bound."
 6               Did I read that correctly,
 7   except for my butchering of albumin?
 8       A.     Yes.
 9       Q.     Okay.  And at the very end it
10   says -- well, let's keep reading.  It says,
11   "Human plasma may contain a number of types
12   of organic fluorocompounds, each distinct
13   from the one characterized.  We found
14   multiple fluorine-containing peaks in silicic
15   acid chromatograms.  That the major part of
16   organic fluorine in human plasma is a
17   widespread environmental contaminant is
18   consistent with our findings."
19               Did I read that correctly, sir?
20       A.     Yes.
21       Q.     And these authors of this paper
22   specifically identified Scotchgard as a
23   potential product responsible for the
24   chemical they're finding in the blood of the
25   general population, right?
```

Confidential - Pursuant to Protective Order

```
 1       A.      They've identified it as
 2  products using that class of chemistry.
 3       Q.      Right.  Okay.
 4               So once again, 3M has provided
 5  information where outside researchers believe
 6  a 3M product is responsible for widespread
 7  environmental contamination, right?
 8       A.      Well, and here -- you know, the
 9  summary statement there is organic fluorine.
10  The paragraph before that talks about a
11  number of types of organic fluorocompounds,
12  each distinct from the one characterized, so
13  that the conclusion appears to be kind of
14  general with respect to organic fluorine.
15       Q.      The conclusion is that there is
16  a widespread environmental contamination in
17  human blood, right?
18       A.      So I see the conclusion from
19  the Guy -- Guy's presentation, the major part
20  of organic fluorine in human plasma is a
21  widespread environmental contaminant, and
22  that was consistent with their findings.
23       Q.      Okay.  And again, this is the
24  type of information that the EPA says is
25  reportable, right?  Information you obtained
```

```
 1    at a meeting, right?

 2         A.    So I guess I want to be

 3    specific with the response there.

 4               So, you know, information

 5    that's received at a meeting or information

 6    that's provided verbally can be reportable

 7    for TSCA 8(e).  It should be considered and

 8    evaluated for reporting.

 9               MR. MCWILLIAMS:  And I'm sorry,

10         Craig, we were supposed to take a

11         break, and I just kind of plowed

12         through, so let's --

13               MR. WOODS:  I thought we were

14         done with the document.  Why don't we

15         take a break now.

16               MR. MCWILLIAMS:  Yeah.  And

17         again, can we keep it short, like six,

18         seven minutes?

19               MR. WOODS:  Yeah, that sounds

20         good.

21               VIDEOGRAPHER:  The time is

22         11:39 a.m.  We're off the record.

23          (Off the record at 11:39 a.m.)

24               VIDEOGRAPHER:  We're back on

25         the record.  The time is 11:47 a.m.
```

1    QUESTIONS BY MR. MCWILLIAMS:

2        Q.     Mr. Gerber, are you -- can we

3    continue?

4        A.     Yep.

5        Q.     Did you have an opportunity to

6    meet with 3M's counsel over the break?

7        A.     No.

8        Q.     Okay.  So there's none of your

9    prior testimony you'd like to change?

10       A.     Not at this time.

11       Q.     Okay.  Okay.  So we've been

12   discussing that 3M was notified by outside

13   researchers that they believed they found a

14   manmade chemical in the blood of the general

15   population, and it may be a manmade chemical

16   made by 3M; is that fair?

17       A.     Yeah.  My understanding based

18   on the documents is that, you know, they had

19   reviewed -- yeah, or they had data from

20   pooled blood samples in the general

21   population, they had tentatively identified

22   substances, and some of those communications

23   specifically referenced Scotchgard.

24       Q.     Okay.  And then those

25   researchers published their findings; is that

Confidential -- Pursuant to Protective Order

```
 1   correct?
 2        A.    That's my understanding, yes.
 3        Q.    And in the publication, it
 4   contained what's called an NMR spectra.  It's
 5   a visual depiction of the chemical structure
 6   that they observed in the -- in the pooled
 7   blood samples, correct?
 8        A.    That's my understanding, yes.
 9        Q.    And the outside researchers
10   supplied a copy of that paper and the spectra
11   to 3M; is that correct?
12        A.    I believe so, based on the
13   documents I've reviewed.
14        Q.    And then in response,
15   researchers within 3M, specifically
16   Dr. Richard Newmark, took the spectra of what
17   those outside researchers found in the blood
18   of the general population and then compared
19   it with the NMR spectra of various 3M
20   products; is that correct?
21        A.    Yeah.  Based on my review of
22   that memo, Dr. Newmark had specific
23   structures or 3M substances that he reviewed
24   against that NMR spectra from Guy and Taves.
25                (Gerber 30(b)(6) Exhibit DL9
```

Confidential - Pursuant to Protective Order

```
 1           marked for identification.)

 2    QUESTIONS BY MR. MCWILLIAMS:

 3         Q.    Okay.  And let's pull that up.

 4    That's DL9.

 5               Do you recognize DL9, sir, as

 6    the document we were just discussing?

 7               MR. ROTTENBERG:  Tab 114, Jon.

 8               THE WITNESS:  Just a moment

 9         while I find that.

10               I don't think that's the

11         correct tab.  Did you say 113?

12    QUESTIONS BY MR. MCWILLIAMS:

13         Q.    119.

14         A.    119.  Sorry.

15               MR. ROTTENBERG:  I said 114.

16               MR. MCWILLIAMS:  Oh, well,

17         let's see if it's 119.  You guys

18         should be scared.

19               THE WITNESS:  114.  Got it.

20    QUESTIONS BY MR. MCWILLIAMS:

21         Q.    All right.  Sir, do you

22    recognize this as a document you reviewed in

23    preparation for your deposition today?

24         A.    Yes, I do.

25         Q.    Okay.  And this is relevant to
```

Confidential - Pursuant to Protective Order

```
 1   the topic you've been asked to discuss with

 2   us today?

 3        A.    Yes.

 4        Q.    Okay.  And so let's look at

 5   this.

 6              So this is dated November 6,

 7   1975; is that right?

 8        A.    Yes.

 9        Q.    And it's -- the title is

10   "Central Analytical Laboratory."

11              That's a laboratory within 3M;

12   is that correct?

13        A.    Yes, that's correct.

14        Q.    Okay.  And it's signed by

15   Richard Newmark.

16              He's a 3M employee, right?

17        A.    That's my understanding, yes.

18        Q.    Okay.  And it says, "The

19   following samples were submitted for analysis

20   by fluorine NMR spectroscopy."

21              Did I say that right?

22        A.    Yes.

23        Q.    Okay.  And we don't have to get

24   into each of them, but the ten samples, the

25   ten samples were of -- samples of 3M product;
```

Confidential - Pursuant to Protective Order

```
1    is that correct?
2         A.    I -- I recognized some of those
3    formulas and code names as being 3M -- 3M
4    chemicals.
5         Q.    Including PFOS; is that
6    correct?
7         A.    Yes.
8         Q.    Okay.  And so essentially what
9    Dr. Newmark did was he took -- he took the
10   same machine, the NMR machine that those
11   outside researchers ran on pooled blood, and
12   then he ran that same machine on ten
13   different 3M products, right?
14        A.    That's my understanding.
15        Q.    And then he compared the
16   results of the NMR -- he generated an NMR
17   spectra for each of those ten products,
18   right?
19        A.    Yeah.  Based on this summary,
20   that's what I would infer that he had done.
21        Q.    Okay.  And then he compared the
22   result, that spectra, for each those ten
23   products with the spectra of what those
24   outside researchers found in the blood of the
25   general population, correct?
```

1     A.     Again, that appears to be what

2  this document summarizes.

3     Q.     And based on that analysis,

4  Dr. Newmark concluded that the spectra for

5  PFOS most closely resembles the spectra of

6  what's found in the blood of the general

7  population, fair?

8     A.     Yeah, his conclusion is of --

9  of the substances that he compared, it was

10  PFOS that most closely resembled the NMR

11  spectrum from Guy and Taves, which was based

12  on their analysis of pooled samples from the

13  general population.

14     Q.     And that's the same PFOS that

15  3M told the EPA in 1998 was in the blood of

16  the general population, right?

17     A.     It is the same substance.

18     Q.     Yeah.

19     A.     PFOS is -- yeah, that's the

20  C8F17SO3H formula mentioned here.

21     Q.     So as of November 6, 1975, 3M

22  possessed information indicating a chemical

23  it made, PFOS, had been reported to be in the

24  blood of the general population, fair?

25     A.     So I -- you know, I guess --

Confidential - Pursuant to Protective Order

```
 1          Q.     Is that fair?  I don't want --
 2          A.     I'm not sure -- I'm not sure
 3     that's entirely accurate.
 4                You know, Dr. Newmark here is
 5     saying that this is -- was the closest match
 6     of the substances that he identified, but I
 7     guess I can't speak to the analytical
 8     chemistry as to how definite that conclusion
 9     was.
10                I have reviewed other documents
11     as part of my preparation, one coming from
12     DuPont where they had done their own analysis
13     and concluded that it was PFOA.
14                MR. MCWILLIAMS:  Move to strike
15          as nonresponsive.
16     QUESTIONS BY MR. MCWILLIAMS:
17          Q.     Sir, according to this
18     document, as of November 6, 1975 -- and I
19     understand that all data has its strengths
20     and weaknesses.  That's true for science,
21     right?
22                But as of November 6, 1975, 3M
23     was in possession of information indicating a
24     chemical it made, PFOS, had been found in the
25     blood of the general population; true or
```

1    false?

2        A.    And I guess the way that that

3    question is phrased, I think I'd have to say

4    false because I can't say that that was a

5    definitive conclusion at that point.

6        Q.    Okay.

7        A.    There were issues with the Guy

8    and Taves study, and then, again, I can't

9    speak to the certainty of the conclusion in

10   this memo.

11       Q.    Okay.  So listen carefully.

12   I'm not asking if it was a definitive

13   conclusion.

14            This was a data point, it was

15   an indication, that a chemical 3M made, PFOS,

16   had been found in the blood of the general

17   population.  It may have been wrong, they may

18   have been completely wrong, but there was

19   still information provided to 3M at this date

20   indicating that, right?

21       A.    I guess I would say there's

22   information that was provided to 3M that

23   suggested the possibility.

24       Q.    Okay.  Thank you.

25            Let's go on to LP1389, please.

Confidential - Pursuant to Protective Order

```
 1    1389.  I'm sorry, LP1389.  I may have said
 2    DL.
 3              JOE WILLS:  I don't have an
 4         LP1389.  I do have a DL.
 5              MR. MCWILLIAMS:  Yeah, pull
 6         that up.  Let's see what it looks
 7         like.  Maybe I -- yeah, that's it.
 8              I stand corrected.  So DL1389,
 9         please.
10              MR. ROTTENBERG:  Tab 38.
11              THE WITNESS:  Okay.  I have
12         that.
13              (Gerber 30(b)(6) Exhibit DL1389
14         marked for identification.)
15    QUESTIONS BY MR. MCWILLIAMS:
16         Q.    Okay.  And do you recognize
17    this as a document you reviewed in
18    preparation for your deposition today?
19         A.    Yes.
20         Q.    Okay.  And is this a technical
21    report summary dated -- it's two dates, but
22    the first date is May 4, 1977?
23         A.    I see that in the upper right
24    corner.
25         Q.    Okay.  And then there's a stamp
```

```
 1   date dated June 8, 1977; is that correct?

 2        A.    Yes.

 3        Q.    Okay.  And it says, "The

 4   current objective" -- and I'm sorry, this is

 5   by Drs. Belisle and Hagan.

 6              They're laboratory folks at 3M;

 7   is that right?

 8        A.    That's my understanding.

 9        Q.    And the project title is

10   "Determination and Characterization of Trace

11   Fluorochemicals."

12              Did I read that correctly?

13        A.    Yes.

14        Q.    Okay.  And the objective

15   number 1 to develop method of analysis for

16   PFOS in blood, right?

17        A.    Yes.

18        Q.    Okay.  If you go to the next

19   page, please.  And you can read whatever you

20   want, but if you skip down to the bottom, you

21   can see Dr. Belisle and Dr. Hagan write, "In

22   brief, very little data exists in the

23   literature on fluorochemical levels in humans

24   and animals.  One report does suggest the

25   presence of PFOS in humans, and it is our
```

Confidential - Pursuant to Protective Order

1   purpose to substantiate or refute this

2   observation."

3            Did I read that correctly, sir?

4       A.     Yes.

5       Q.     Okay.  And was that observation

6   ever refuted, to your knowledge?

7       A.     Based on the documents I've

8   reviewed -- I guess I can't speak to, you

9   know, all of the science on that, but I have

10  not seen that in the documents that I have

11  reviewed.

12      Q.     Okay.  So you've seen no

13  evidence of this observation of PFOS in the

14  blood of the general population being

15  refuted?

16      A.     I have not seen that within the

17  documents that I've reviewed.

18      Q.     Okay.  So as of 1977 through

19  all times up to 1998, you saw no evidence

20  refuting this observation that was made

21  available to 3M in 1977 that PFOS was in the

22  blood of the general population, fair?

23      A.     I have not, during -- in the

24  documents that I have reviewed and, you know,

25  not knowing the totality of the science, but

Confidential -- Pursuant to Protective Order

1    I have not seen any information that, you

2    know, absolutely refuted that or would, I

3    guess, how would you say that, affirmatively

4    refuted that observation.

5         Q.    And you made your best efforts

6    to -- to review all the documents relevant to

7    this topic, right?

8         A.    With respect to 3M's

9    understanding and obligations under TSCA,

10    yes.

11         Q.    Right.

12              Specific to what it knew and

13    when it knew it about PFOS in the blood of

14    the general population and when to report it,

15    right?

16              Well, strike that.  I'll

17    withdraw that.

18              Let's move along.  Let's go to

19    DL349.

20              And actually, if we go back to

21    the Newmark document for a second, the

22    November 6, 1975, if we can pull that up.

23              MR. WOODS:  That was 114, if

24         you recall, the tab.

25              THE WITNESS:  Yeah, I still

Confidential - Pursuant to Protective Order

1       have that.

2   QUESTIONS BY MR. MCWILLIAMS:

3       Q.    One of the ten products that 3M

4   compared the spectra to was PFOA, right?

5       A.    I believe that's correct based

6   on the structures -- or the formulas listed

7   here.

8       Q.    Okay.  So Dr. Newmark looked at

9   the visual depiction of PFOA and PFOS in

10  others and compared it with the visual

11  depiction of whatever chemical was in the

12  blood of the general population and

13  determined it looked most -- it most closely

14  resembled PFOS and not PFOA, right?

15      A.    I see that that's his

16  conclusion in this memo.

17      Q.    Okay.  Thank you.

18            All right.  Let's go to DL349,

19  please.

20            Now, before we get into this

21  document, upon this report from Dr. Guy and

22  Taves, 3M went out and obtained blood from

23  blood banks around the United States,

24  correct?  From the Red Cross specifically?

25      A.    I'm sorry, which -- which tab

1    is this?

2                    MR. ROTTENBERG:  It's --

3                    MR. MCWILLIAMS:  I'm not asking

4         about a document right now.

5                    THE WITNESS:  Oh.

6                    MR. WOODS:  Maybe reask your

7         question, Ned.

8    QUESTIONS BY MR. MCWILLIAMS:

9         Q.    Yeah.

10                   So, sir, subsequent to this

11   report by Guy and Taves that there's this

12   manmade organic fluorine in people's blood,

13   did 3M go out and acquire blood from other

14   blood banks around the country, specifically

15   from the Red Cross?

16        A.    Based on the documents I've

17   reviewed, I do recall mention of that.  I

18   don't recall off the top of my head when that

19   occurred.

20        Q.    Okay.  And 3M did analysis of

21   that blood, correct?

22                   You're on mute.  You're on

23   mute.

24        A.    Sorry about that.

25                   That's my understanding.  I'd

1    want to go back to those specific studies to

2    be able to speak more specifically to them.

3         Q.    So 3M -- but the point is, 3M's

4    understanding of what chemicals was in the

5    blood of the general population was not

6    limited to the work done by Guy and Taves.

7    3M went out and obtained blood banks from

8    other cities than those used by Guy and

9    Taves, right?

10        A.    That's my understanding.

11              Again, I don't remember the

12   specifics of those or the timing off the top

13   of my head, but I do recall that 3M initiated

14   additional investigation.

15        Q.    And 3M also obtained blood from

16   what they described as rural villagers in

17   China, correct?

18        A.    I do recall that from the

19   documents I reviewed.

20        Q.    And 3M laboratory folks did

21   analysis of that blood as well, correct?

22        A.    I believe that's correct.

23        Q.    Okay.  Then let's look at --

24   let's look at what they found in the blood of

25   the rural Chinese.

Confidential - Pursuant to Protective Order

```
 1              Can you pull up DL349, please?

 2              MR. ROTTENBERG:  115.  1-1-5.

 3              THE WITNESS:  All right.  I

 4         have that.

 5              (Gerber 30(b)(6) Exhibit DL349

 6         marked for identification.)

 7    QUESTIONS BY MR. MCWILLIAMS:

 8         Q.    And, sir, is this a document

 9    you reviewed in preparation for your

10    deposition today?

11         A.    Yes.

12         Q.    Okay.  And you'll see that this

13    is an internal 3M memo dated February 6,

14    1979; is that right?

15         A.    Yes.

16         Q.    And this is -- came from that

17    same lab we had been talking about, Dr. Jon

18    Belisle; is that correct?

19         A.    Yes.

20         Q.    And the subject is "fluoride

21    analysis of China serum," right?

22         A.    Yes.

23         Q.    Serum is just another word for

24    blood, right?

25         A.    That's my understanding, yes.
```

Confidential - Pursuant to Protective Order

1        Q.    Okay.  Let's read this

2    together.

3              It says, "Eight human serum

4    samples were received from donors understood

5    to live in rural China.  All samples have

6    been analyzed for organic and inorganic

7    fluoride, reported below, and sufficient

8    sample remains to characterize, at a later

9    date, for FC-95."

10              Did I read that correctly?

11        A.    Yes.

12        Q.    And FC-95 is an internal code

13    within 3M for PFOS, correct?

14        A.    That's my understanding, yes.

15        Q.    Okay.  Let's go to the next

16    page, please.

17              It says, "In addition to the

18    organic and inorganic fluoride values, the

19    samples will be analyzed by the FC-95 method

20    after we refine the FC-95 analysis.  You will

21    recall that past samples of Red Cross plasma

22    have analyzed to contain trace levels of

23    FC-95, but we are not sure if the level seen

24    is truly FC-95 or an artifact of sample

25    preparation and analysis."

Confidential -- Pursuant to Protective Order

```
 1                 Did I read that correctly, sir?
 2         A.      Yes.
 3         Q.      So as of 1979, separate and
 4  apart from the report of Guy and Taves
 5  finding organic fluorine in blood samples, 3M
 6  did its own analysis of Red Cross blood
 7  samples and determined that there's PFOS
 8  present, correct, according to this
 9  document -- or excuse me, let me -- that PFOS
10  may be present.
11                 There's some uncertainty with
12  the lab, fair?
13         A.      Yeah, so I see that they wanted
14  to reanalyze samples after they had refined
15  their methods for FC-95.
16                 So, yeah, I would say that the
17  possibility had been recognized from the Guy
18  and Taves information.
19         Q.      Okay.  The possibility had been
20  recognized from the Guy and Taves
21  information.
22                 But separate and apart from
23  that, 3M went out and got Red Cross blood,
24  did whatever lab tests they thought would
25  tell them whether or not PFOS was in the
```

Confidential -- Pursuant to Protective Order

```
1    blood or not, and the lab test said, yeah,
2    there's PFOS in there.
3              They're not sure if the lab was
4    right, but that's what the lab results were
5    according to this document, right?
6         A.    The document -- I guess in the
7    table, as the results are presented, it's
8    presented as organic fluoride and inorganic
9    fluoride.
10        Q.    Sir, sir, your job is not to
11   defend the company today.  Okay?  I'm not
12   talking about the results for the fluoride.
13   I'm talking about this reference to Red Cross
14   blood plasma.  Okay?
15             The table is about the Chinese
16   samples.  I'm not talking about that.  I'm
17   talking about Red Cross American blood.
18   Okay?
19             Does this document not indicate
20   to you that 3M was in possession of
21   additional information indicating the
22   presence of PFOS in the blood of Americans?
23        A.    I guess phrased that way, I
24   guess I would say no, because what was
25   measured here was organic and inorganic
```

Confidential - Pursuant to Protective Order

1    fluorine, and the method to identify FC-95 or

2    analyze that more specifically was still in

3    development at this point.  That's my

4    understanding of this document.

5        Q.    Okay.  You said what's measured

6    here.

7              You were talking about the

8    Chinese samples?

9        A.    So -- well, and -- so at the

10   bottom of this page, one would conclude

11   there's a very low level of organic fluoride

12   present, with the inorganic fluoride levels

13   higher than generally seen in past Red Cross

14   samples.

15       Q.    Sir --

16       A.    I -- can I have just a moment

17   to read this a little bit further?

18       Q.    Sure.

19       A.    Thank you.

20       Q.    And, Joe, if you would

21   underline that sentence that begins with "You

22   will recall that past samples," that whole

23   sentence, please.

24       A.    So, I'm sorry, can you ask your

25   question again now?

1          Q.     Yes, sir.

2               Do you see the document

3     highlighted and underlined on the screen in

4     front of you, sir?

5          A.     I do.

6          Q.     Does that sentence make

7     reference to Red Cross blood that 3M had

8     analyzed in its laboratory?

9          A.     That's my understanding of this

10    reference.

11         Q.     Okay.  Does that sentence make

12    reference to testing that blood for PFOS?

13         A.     It does refer to FC-95, which

14    is PFOS.

15         Q.     And does that sentence indicate

16    that the laboratory results -- strike that.

17              And does that underlined

18    sentence indicate that a 3M laboratory

19    observed PFOS, or what they believed to be

20    PFOS, in the blood of the Red Cross samples?

21         A.     So I haven't reviewed those

22    study results, and, you know, I guess I can't

23    speak to those within this summary --

24         Q.     I'm asking you about that

25    sentence --

Confidential - Pursuant to Protective Order

1      A.      Yeah.

2      Q.      -- and only that sentence, sir.

3              Does that sentence indicate to

4   you that 3M analyzed Red Cross blood for

5   PFOS, and the lab reported that there was

6   indeed PFOS in that blood?

7      A.      This sentence states that it

8   was analyzed for PFOS, and it was uncertain

9   whether the level seen was truly PFOS or an

10  artifact of sample preparation and analysis.

11     Q.      Right.  I can take that.

12             All right.  Let's move on to

13  LP68.

14             MR. ROTTENBERG:  Tab 78.

15             THE WITNESS:  All right.  I

16         have that document.

17             Can I have just a moment to

18         scan through it, please?

19             (Gerber 30(b)(6) Exhibit LP68

20         marked for identification.)

21  QUESTIONS BY MR. MCWILLIAMS:

22     Q.      Yes, sir.

23     A.      Okay.

24     Q.      Sir, is this a document you

25  reviewed in preparation for your deposition?

Confidential - Pursuant to Protective Order

```
 1        A.    I don't recall this one
 2   specifically.
 3        Q.    Okay.  Let's go through it
 4   together.  Let's see if this refreshes your
 5   recollection.
 6              Do you see this is a timeline
 7   of sorts beginning in November '75?
 8        A.    Yes.
 9        Q.    Okay.
10              And, Joe, if you could just not
11   blow up the whole document.  We can just kind
12   of blow up just the top paragraph and then we
13   can move down?
14              There we go.  Okay.
15              So let's look at this together.
16   It says, "In 1975, using a preconcentration
17   method and NMR, Guy and Taves report presence
18   of organic fluorine compounds in blood bank
19   blood from around the country."
20              Did I read that correctly, sir?
21        A.    Yes.
22        Q.    "As an average concentration of
23   about .03 part per million organic fluorine,
24   which corresponds to about 45 parts per
25   billion PFOS."
```

```
 1                    Did I read that correctly, sir?

 2        A.      Yes.

 3        Q.      And it says, "Their work was

 4   first reported at a conference, the ACS, and

 5   subsequently published in 1977."

 6                    Correct?

 7        A.      Yes, I see that written there.

 8        Q.      And it says, "Guy and Taves'

 9   hypothesis was that it was PFOA," is the

10   organic fluorine compound, right?

11        A.      I see that in the summary.

12        Q.      Okay.  And it says, "This is

13   never satisfactorily verified by mass spec or

14   NMR."

15                    Right?

16        A.      I see that.

17        Q.      Okay.  So 3M never verified the

18   preliminary findings of Guy and Taves that it

19   was PFOA in the blood of the general

20   population and not PFOS, fair?

21        A.      I guess I'm not -- excuse me.

22   I'm not sure who this is referring to that

23   this is never satisfactorily verified.

24                    I can't speak to analytical

25   capability, but I would -- I would guess that
```

Confidential - Pursuant to Protective Order

```
 1    that played a factor in that.
 2         Q.    All right.  Let's keep going.
 3               And so the next entry, 1975,
 4    probably in September.  "According to Richard
 5    Newmark" -- and that's the same gentleman who
 6    did the NMR that confirmed -- that found
 7    PFOS, right?
 8         A.    He found that it most closely
 9    resembled the spectra in the Guy and Taves
10    paper.
11         Q.    And then "Dallas Zimmerman" --
12               A 3M'er, right?
13         A.    Yes.
14         Q.    -- "obtained copy of the NMR
15    spectra at the meeting and spoke with CAL
16    about the possibility of 3M-produced
17    contaminant."
18               Right?
19         A.    I see that.
20         Q.    And CAL is Central Analytical
21    Laboratory.  That's where Richard Newmark
22    worked, right?
23         A.    I believe that's correct.
24         Q.    Okay.  1976.  "By October, 3M
25    Central Analytical Laboratory has the ability
```

1    to measure PFOS in blood using NMR."

2              Right?

3        A.    I see that here.

4        Q.    Okay.  "According to Richard

5    Newmark, Central Analytical Laboratory team

6    led by Don Hagan and Jon Belisle confirmed

7    that Guy and Taves' spectra reflects the

8    presence of PFOA" -- excuse me, "of PFOS, not

9    PFOA, as the major organic fluorine

10   compound."

11             Right?

12             You're on mute.

13       A.    I'm sorry.  I see that in the

14   summary here.

15       Q.    Okay.  Let's skip that next

16   entry, and then it says, "According to

17   Richard Newmark, Newmark analyzes samples he

18   receives from Hagan that he believes are

19   blood bank samples but does not know for

20   sure."

21             Did I read that correctly, sir?

22       A.    I'm sorry, I'm --

23       Q.    You can always look on the

24   screen.

25       A.    Yeah.  Okay.

Confidential - Pursuant to Protective Order

1          Q.      Okay?

2          A.      Yes.

3          Q.      And we've already established

4    that 3M obtained blood bank samples from the

5    Red Cross around this time, right?

6          A.      I believe that's correct.

7          Q.      Okay.  Let's keep going.  Let's

8    go down to 1979.

9                  "Guy and Taves author a paper

10   speculating that PFOA is the main organic

11   fluorine in human blood.

12                 "According to Richard Newmark,

13   Guy and Taves send this paper to Central

14   Analytical Laboratory for review.

15                 "According to Richard Newmark,

16   3M lawyers urge Central Analytical Laboratory

17   not to release the true identity, PFOS, of

18   the organic fluorine compound."

19                 Did I read that correctly, sir?

20         A.      You read that correctly.

21         Q.      Okay.  Now that we've read

22   through the document, do you remember seeing

23   that in preparation for your deposition?

24         A.      I don't remember this in

25   detail.

```
 1        Q.    But does it look like a
 2   document you reviewed?
 3              I mean, I understand you might
 4   not know it in detail, but now that we've
 5   gone through it, does it -- does it refresh
 6   your recollection, like, oh, yeah, that was
 7   one of the ones I looked at?
 8        A.    I believe so.
 9        Q.    Yeah.
10        A.    But, again, I don't recall the
11   specifics of this document.
12        Q.    I believe so, too.
13              Okay.  So let's look -- let's
14   go to DL564.
15              MR. ROTTENBERG:  Tab 17.
16              THE WITNESS:  All right.  I
17        have that.
18              (Gerber 30(b)(6) Exhibit DL564
19        marked for identification.)
20   QUESTIONS BY MR. MCWILLIAMS:
21        Q.    Okay.  And you'll see this is
22   a -- well, first of all, do you recognize
23   this as a document you reviewed in
24   preparation for your deposition?
25        A.    Yes, I do.
```

1        Q.      Okay.  And is this an internal

2    3M memo?

3        A.      I believe so.

4        Q.      Okay.  And is the subject

5    fluorochemicals in blood?

6        A.      Yes, that's correct.

7        Q.      And it's dated October 18,

8    1977; is that right?

9        A.      Yes.

10        Q.      And TSCA 8(e) regulation was in

11    effect at this point in time, right?

12        A.      That's correct.

13        Q.      Okay.  And this is marked

14    "confidential"; is that right?

15        A.      Yes, it is.

16        Q.      And it says, "We have been

17    asked to report to the corporate

18    responsibility committee on our progress in

19    the fluorochemicals in blood studies, the

20    associated medical examination and our

21    possible obligation to report to the EPA

22    under TSCA."

23                Right?

24        A.      Yes, I see that.

25        Q.      Okay.  And who is the corporate

Confidential - Pursuant to Protective Order

```
 1   responsibility committee?

 2        A.    The corporate responsibility

 3   committee, my understanding at the time,

 4   would have had responsibility for evaluating

 5   information for potential reporting under

 6   TSCA 8(e), among other responsibilities.

 7        Q.    But were they -- I mean, how

 8   would you characterize -- were they -- were

 9   they executives within the company?

10        A.    So -- and I guess I'm not

11   familiar with the details of the makeup of

12   that committee at the time.  It's not a --

13   3M's organization has changed substantially

14   over the years.

15        Q.    Right.

16              But let's look at the name.  We

17   can see Scheuerman again.

18              That's the in-house counsel at

19   3M, right?  Lawyer?

20        A.    I believe so.

21        Q.    Okay.  And J.D. LaZerte?  He

22   was a high-ranking executive at 3M, right?

23        A.    I don't know his specific

24   position.

25        Q.    Okay.  We'll get there.
```

Confidential - Pursuant to Protective Order

```
 1                But so let me ask you this:
 2   Based on your review of the documents in this
 3   case, was the corporate responsibility
 4   committee made aware that 3M was of the
 5   opinion that the organic fluorine found in
 6   the blood of the general population was PFOS?
 7        A.     My understanding based on the
 8   documents that I've reviewed is that, you
 9   know, this information, the investigations of
10   fluorochemicals in blood, was sent to the
11   corporate responsibility committee for
12   evaluation for TSCA 8(e).
13        Q.     Okay.  I asked a slightly
14   different question.
15                Based on your review of the
16   documents in this case, was the corporate
17   responsibility -- strike that.  Let me try
18   that again.
19                Based on your review of the
20   documents in this case, was the corporate
21   responsibility committee made aware that
22   scientists within 3M were of the opinion that
23   the organic fluorine found in the blood of
24   the general population was PFOS?
25        A.     My expectation is that all of
```

Confidential - Pursuant to Protective Order

```
 1    the relevant information that 3M had would

 2    have been evaluated by the corporate

 3    responsibility committee for TSCA 8(e)

 4    purposes.

 5         Q.    Including Dr. Newmark's

 6    assessment that the organic fluorine in the

 7    blood of the general population was PFOS,

 8    fair?

 9         A.    That he had identified the

10    spectra as best resembling that, yes, I

11    believe that's correct.

12         Q.    Okay.  Well, let's just confirm

13    this.  Let's pull up DL350.

14              MR. ROTTENBERG:  Tab 107.  107.

15              THE WITNESS:  I have that.

16              (Gerber 30(b)(6) Exhibit DL350

17         marked for identification.)

18    QUESTIONS BY MR. MCWILLIAMS:

19         Q.    Okay.  Do you recognize this as

20    a document you reviewed in preparation for

21    your deposition today?

22         A.    I do.

23         Q.    Okay.  And you see that this is

24    a cover letter dated October 19, 1977?

25         A.    Yes.
```

Confidential - Pursuant to Protective Order

1          Q.     Again, this is an internal 3M

2     document; is that correct?

3          A.     I believe so.

4          Q.     And it's again marked

5     "confidential"?

6          A.     Yes.

7          Q.     And it's -- and it's to 3M's

8     lawyer, Scheuerman; is that right?

9                 And it looks like he's the one

10    who saved this copy for us, again, helping

11    out.

12                Do you see that's his stamp?

13         A.     Yes, I guess that's what I

14    would understand that to be.

15         Q.     Okay.  And then it's written,

16    "In order to help you with your preparations

17    for the presentation on November 7th to the

18    corporate responsibility committee, I am

19    enclosing copies of the transparencies used

20    in the last report."

21                Did I read that correctly, sir?

22         A.     Yes.

23         Q.     And then if you flip to the

24    next page, you'll see there's a timeline

25    attached to this material -- to this letter

```
 1   that is meant to assist these gentlemen in

 2   the report to the corporate responsibility

 3   committee, correct?

 4        A.    Yes.

 5        Q.    And let's just go through this

 6   together.  So it's -- again, it's the Organic

 7   Fluorine Compounds in Blood Chronology,

 8   right?  That's the title?

 9        A.    Yes.

10        Q.    And the first entry is

11   August 22, 1975.  That's the initial phone

12   call from Dr. Guy calling Mr. LaZerte at 3M,

13   right?

14        A.    That's my understanding based

15   on the documents I've reviewed.

16        Q.    Okay.  Three days later,

17   Dr. Guy and Dr. Taves present their findings

18   at that meeting in Chicago, right?  The ACS

19   meeting where 3M attended?

20        A.    That's my understanding.

21        Q.    Okay.  And in that meeting they

22   presented their findings, which included

23   their spectra, this unknown chemical they

24   found in everyone's blood, right?

25        A.    I believe that's correct.
```

Confidential - Pursuant to Protective Order

```
 1   Although they didn't -- they presented their
 2   spectra, they had identified organic
 3   fluorine.  And in their paper, at least, they
 4   had postulated the potential structures of
 5   that compound.
 6        Q.    Right.
 7              And that's when they then
 8   reached out to 3M, because they knew 3M was
 9   in the business of making these types of
10   chemicals.  And they sought 3M's assistance
11   in identifying the precise chemical; is that
12   fair?
13        A.    Yes, that's consistent with my
14   understanding.
15        Q.    Okay.  And then -- so you go
16   down, you see "October '75, Central
17   Research" -- that's CAL, right? --
18   "Analytical agrees to determine the quantity
19   and character of organic fluorine compounds
20   in human blood."
21              Did I read that correctly?
22              You might have been muted.  I
23   didn't hear your answer.
24        A.    I'm sorry.  Yes.
25        Q.    Okay.  And by character,
```

Confidential - Pursuant to Protective Order

```
 1   that's -- also referred to as

 2   characterization, that's -- so it identified

 3   the specific chemical at issue, right?

 4        A.     That would be my general

 5   understanding of the aim of those types of

 6   investigations.

 7        Q.     Okay.  And then on November 6,

 8   1975 -- that's the same date that Richard

 9   Newmark issued his report, right?

10        A.     I believe so.

11        Q.     November 6, 1975, Central

12   Research reports that PFOS spectra matches

13   that presented by Guy, et al., right?

14        A.     That's what's captured in the

15   summary here.  The memo talked about it most

16   closely resembling PFOS of the ten substances

17   he had compared.

18        Q.     Okay.  But the verbiage used to

19   communicate this information to the corporate

20   responsibility committee was matched, right?

21   It matches with PFOS, right?

22        A.     My understanding and, you know,

23   my experience with the TSCA 8(e) committee,

24   this would be summary-type information that

25   would inform a fuller discussion of the
```

1  facts.

2      Q.    Sir, what word was used to

3  describe Dr. Newmark's finding?  Was it "most

4  closely resembled," or do they use the word

5  "match" on the screen?

6          If you could please underline

7  the word "matches."

8          What word do they use, sir?

9      A.    I see that the word that they

10  use in this summary is "matches."

11     Q.    Okay.  Let's keep going.

12          If you go to the next page,

13  November -- February 17, 1976, the top one.

14  It says, "Central Research Analytical

15  develops an accurate analytical method for

16  determining part per billion quantities of

17  organic fluorine compounds in human blood.

18  The method tested on blood from American Red

19  Cross and value agrees with those in the

20  literature."

21          Did I read that correctly, sir?

22     A.    Yes.

23     Q.    Okay.  And that indicates to

24  you that 3M had -- separate and apart from

25  the analysis that Guy and Taves did on blood

Confidential - Pursuant to Protective Order

1    bank blood, 3M acquired its own blood bank

2    blood from the Red Cross, right, and did

3    laboratory analysis?  Is that fair?

4          A.     That's my understanding based

5    on this summary.

6          Q.     Okay.  Well, let's go down to

7    September 9, '76.

8                 It's "mice fed Scotchban."

9                 Do you see that, sir?

10         A.     Yes.

11         Q.     And Scotchban is FC-807.

12   That's the food packaging material, right?

13         A.     I believe that's correct.

14         Q.     It was used in things like

15   fast-food food wrappers, dog food bags,

16   right?

17         A.     I believe that's correct.

18         Q.     Okay.  And so they took that

19   substance that was in the -- touching

20   people's food all around the world, and they

21   fed it to mice, right?

22         A.     That's what I understand based

23   on this summary.

24         Q.     Again, go to the next entry.

25   September 17, 1976, they then analyzed the

Confidential -- Pursuant to Protective Order

1    blood in those mice that were fed Scotchban,

2    and what they did find?

3              You're on mute again.

4         A.    I'm sorry, I keep doing that.

5              It says, "C8F17SO3H identified

6    as organic fluorine compound in mice fed

7    Scotchban."

8         Q.    Is that PFOS?

9         A.    It is.

10        Q.    Okay.  So all this information

11   was made available to the corporate

12   responsibility committee in 1977, right?  The

13   same individuals responsible for determining

14   whether or not to report this information to

15   the environmental -- to the United States

16   Environmental Protection Agency, right?

17        A.    That's my understanding, yes.

18        Q.    And the decision was made not

19   to report it, right?

20        A.    Based on the documents I've

21   reviewed, I believe that's correct.

22              (Gerber 30(b)(6) Exhibit DL8

23        marked for identification.)

24   QUESTIONS BY MR. MCWILLIAMS:

25        Q.    Okay.  Let's pull up one more,

```
 1   DL8.

 2               MR. ROTTENBERG:  Tab 77.

 3               THE WITNESS:  All right.  I

 4        have that.

 5   QUESTIONS BY MR. MCWILLIAMS:

 6        Q.    And do you recognize this as a

 7   document you reviewed in preparation for your

 8   deposition?

 9        A.    Yes, I believe so.

10        Q.    Okay.  And this is a similar

11   timeline but different from the document we

12   looked at previously?

13        A.    Yes, it's also a chronology

14   document.

15        Q.    Okay.  And I guess let's just

16   look at the very first entry, August 22nd.

17   This is a little bit more detail than the

18   last one, but, again, it's talking about how

19   these outside researchers contacted 3M about

20   this mystery chemical they found in

21   everyone's blood, and they wanted to know if

22   it was from 3M, right?  Specifically whether

23   or not it was from Scotchgard, right?

24        A.    And I'm sorry, can you rephrase

25   the question?
```

1        Q.    Right.  I'm just trying to

2   orient the jury that's going to hopefully

3   watch this video one day that the initial

4   entry on here is August 22, 1975, and that's

5   when 3M was first contacted by these outside

6   researchers that found this mystery chemical

7   in everyone's blood, and they wanted 3M's

8   help figuring out exactly what it was; in

9   particular whether or not it was from

10  Scotchban -- Scotchgard, excuse me.  Right?

11       A.    That's what's reflected in this

12  summary.

13       Q.    Okay.  And let's skip down to

14  November 6, 1975.  Let's see what verbiage is

15  used to describe Dr. Newmark's findings in

16  this separate chronology document.

17            It says, "Of the ten samples

18  submitted on September 21, 1975, Central

19  Research reports that the F/NMR analysis

20  shows that the spectrum of PFOS or its salts

21  matches that presented by Guy and Taves."

22            Right?

23       A.    I see that in the summary.

24            (Gerber 30(b)(6) Exhibit DL1425

25       marked for identification.)

```
 1   QUESTIONS BY MR. MCWILLIAMS:

 2        Q.    Okay.  Let's go to DL1425,

 3   please.

 4             MR. ROTTENBERG:  Tab 9.

 5             THE WITNESS:  All right.  I

 6        have that.

 7   QUESTIONS BY MR. MCWILLIAMS:

 8        Q.    Do you recognize this document

 9   as a document you reviewed in preparation for

10   your deposition?

11        A.    I believe so.

12        Q.    Okay.  And you see up on the

13   top right-hand corner it's marked "Attorney

14   work product, privileged and confidential,

15   draft, January 5, 2003"?

16        A.    Yes.

17        Q.    Okay.  And this is a document

18   titled "Decatur Worker Communication Timeline

19   Concerning Fluorochemicals Health and Safety

20   Issues."

21             Right?

22        A.    Yes, I see that.

23        Q.    And if we go down to the

24   bottommost entry, late '75, early '76.

25             And again, you see -- so
```

1    there's three cells.  There's the time, the

2    date, there's a description of the event, and

3    then on the far right is the documentary

4    basis for that summary of the events; is that

5    fair?

6         A.    Yes, I think so.

7         Q.    Okay.  And let's look at how

8    Dr. Newmark's finding was characterized by

9    3M's lawyers in 2003.  Okay?

10              They said, "3M Central Research

11   Analytical Laboratory investigates organic

12   fluorine compounds, identifies PFOS in blood,

13   with qualitative analysis, and develops new

14   analytical method."

15              Did I read that correctly, sir?

16        A.    Yes.

17        Q.    Do you have any reason to

18   dispute that characterization that between

19   19 -- late '75 and early '76 scientists

20   within 3M Central Research Analytical

21   Laboratory identified PFOS as the organic

22   fluorine compound in the blood of the general

23   population?

24        A.    Yeah, analytical chemistry is

25   beyond my area of expertise, so I -- I would

Confidential - Pursuant to Protective Order

1    not have a reason to dispute that.

2         Q.    Well, separate and apart from

3    your lack of expertise in chemistry,

4    notwithstanding the fact you have a chemical

5    engineering degree, in your preparation for

6    today's deposition -- and this is my

7    opportunity to discuss with 3M, the company,

8    what it knew and when on this topic -- have

9    you seen anything that would dispute this

10   characterization?

11        A.    I've not seen anything to

12   dispute the characterization of a qualitative

13   analysis, and then it discusses the ongoing

14   developments in analytical capability.

15              (Gerber 30(b)(6) Exhibit DL13

16        marked for identification.)

17   QUESTIONS BY MR. MCWILLIAMS:

18        Q.    Okay.  Let's go to DL13,

19   please.

20              MR. ROTTENBERG:  Tab 8.

21              THE WITNESS:  I have that.

22   QUESTIONS BY MR. MCWILLIAMS:

23        Q.    Okay.  And if you would -- I

24   don't have this page marked.  If you go --

25   there's a -- it's probably 15, 20 pages in,

1    Joe.  It's titled "Chronology of Events

2    Leading to the Initiation of 90-Day Studies."

3            Actually, I'm sorry, before I

4    even jump there, do you recognize this

5    document as a document you reviewed in

6    preparation for today?

7        A.    Yes, I believe so.

8        Q.    Okay.  Okay.  So if we could go

9    to that page, please.  Or if any of my team's

10   watching can help me find that page.

11           Okay.  It's Bates number ending

12   in 700.  Yeah, you found it.  Great.

13           Are you there, sir?

14       A.    I am.

15       Q.    Okay.  And you see this is

16   titled "Chronology of Events Leading to the

17   Initiation of 90-Day Studies."

18           Right?

19       A.    Yes, I see that.

20       Q.    And the 90-day studies is a

21   reference to the subchronic toxicology tests

22   that 3M performed with PFOS and others on

23   laboratory animals, correct?

24       A.    I believe that's correct.

25       Q.    Okay.  And so what's the first

Confidential -- Pursuant to Protective Order

1  event that's identified as what initiated

2  these studies?

3       A.    So the first event in the

4  chronology, "1971, D.R. Taves reports organic

5  and inorganic forms of fluorine in human

6  serum."

7       Q.    Okay.  And what's the second

8  entry, sir?

9       A.    "1975, Taves presents F19 NMR

10 spectra data to 3M.  CRL identifies F19 NMR

11 spectrum as C8F17SO3H or its salts."

12      Q.    Okay.  And that's a reference

13 to Dr. Newmark -- Dr. Newmark's finding that

14 the organic fluorine in the blood of the

15 general population presented by Dr. Guys and

16 Taves was PFOS, correct?

17      A.    I would understand that to be a

18 reference to Dr. Newmark's memo, that that

19 closely resembles PFOS, based on his

20 analysis.

21      Q.    Okay.  But they don't use "most

22 closely resembles" here.  They use

23 "identifies," right?

24      A.    That's the word that they've

25 chosen for this summary.

1      Q.     Okay.  And is this consistent

2   with your understanding that it was this

3   finding by Dr. Newmark that a 3M product was

4   in the blood of the general population, was

5   the initiating event for these subchronic

6   toxicology tests?

7      A.     There are a number of events in

8   this chronology, and I would -- I would -- I

9   would understand that to mean that those were

10  all factors in that consideration.

11     Q.     Okay.  But one of the factors

12  was finding a chemical made by 3M in the

13  blood of the general population, fair?

14     A.     So -- and again, I want to be

15  precise about -- about the finding, that it

16  most closely resembled PFOS from those

17  general -- from those pooled samples from the

18  general population.

19            (Gerber 30(b)(6) Exhibit DL1356

20      marked for identification.)

21  QUESTIONS BY MR. MCWILLIAMS:

22     Q.     Right.  Okay.  Let's go one

23  more.  Let's go to DL1356, please.

24            MR. ROTTENBERG:  Tab 64.

25            Sorry, I might have been muted.

1    QUESTIONS BY MR. MCWILLIAMS:

2         Q.    Do you have the document in

3    front of you, sir?

4         A.    I do.

5         Q.    Okay.  And do you recognize

6    this as a meeting minutes of a meeting held

7    on May 25, 1979?

8         A.    Yes, I do.

9         Q.    Okay.  And do you see that --

10   let's just jump right into it.

11             It says, "This meeting was

12   called by R.A. Prokop to discuss regulatory

13   and scientific issues involved in decisions

14   related to FC-807 studies."

15             Right?

16        A.    Yes, I see that.

17        Q.    And again, FC-807 is Scotchban.

18   That's the product that was used for food

19   packaging materials, in contact with people's

20   food, right?

21        A.    My understanding is that FC-807

22   refers to Scotchban.

23        Q.    Okay.  Let's read the next

24   sentence.

25             It says, "Prokop cited Taves'

1    results, as well as the results of 3M Central

2    Laboratory labs, indicating the presence of

3    PFOS in pooled plasma samples from the

4    general public."

5             Did I read that correctly, sir?

6    A.    Yes.  It goes on --

7    Q.    Go ahead, I'm sorry.

8    A.    Sorry.

9          And --

10   Q.    I know it goes on --

11   A.    Yes, it goes on to -- yeah, to

12   discuss the uncertainty in those findings.

13   Q.    Okay.  Well let's talk about

14   this first sentence, and then we'll talk

15   about the uncertainty.

16             Okay?

17             Now, does this indicate to you,

18   sir, that separate and apart from Guy and

19   Taves conducting analysis on pooled blood and

20   characterizing it, 3M also acquired pooled

21   blood from blood banks, and it characterized

22   it -- characterized the organic fluorine and

23   identified it as PFOS?

24   A.    So the way it's summarized

25   here, it is Taves' results as well as the

Confidential -- Pursuant to Protective Order

```
 1    results of 3M Research Labs, indicating the
 2    presence of C8F17SO3 minus in pooled plasma
 3    samples from the general public.
 4         Q.    So that's two different sets of
 5    results, right?
 6         A.    That would be my understanding
 7    of that.
 8         Q.    Okay.  And again, the word used
 9    to describe it, the finding, was "indicating
10    the presence," right?
11         A.    Yes, that's the words -- those
12    are the words they used.
13         Q.    Okay.  And in fairness, I
14    know -- just to deprive Craig of this moment,
15    the next sentence says, "There is uncertainty
16    as to whether the PFOS is present in all the
17    samples pooled or whether it is a result of
18    one or few persons involved having been
19    exposed to fluorochemicals."
20               Right?
21         A.    Yes.
22         Q.    Okay.  And like everything in
23    science, there's always some uncertainty.
24               But are you aware -- have you
25    seen any documents where 3M was able to
```

Confidential - Pursuant to Protective Order

1    refute this finding of PFOS present in the

2    blood of everyone in the general population?

3          A.    Based on my review of the

4    documents, I haven't seen anything able to

5    refute that.  I believe that that depends

6    heavily on the analytical capability at the

7    time.  But someone in the analytical

8    chemistry would be better able to speak to

9    that.

10               (Gerber 30(b)(6) Exhibit DL1571

11         marked for identification.)

12   QUESTIONS BY MR. MCWILLIAMS:

13         Q.    Okay.  If we could go to

14   DL1571.  This is just a demonstrative I made,

15   and I was hoping you could just go through

16   it -- we can just go through it slide by

17   slide, and you just tell me if you agree with

18   the way I described the documents.

19               Okay?

20               So the first one you're

21   familiar with.  That's Dr. Newmark, right?

22         A.    Yes.

23         Q.    If we go to the next page,

24   please, I pulled a quote.  "Of the compounds

25   submitted, PFOS resembled most closely the

Confidential - Pursuant to Protective Order

 1    fluorine NMR spectrum by W.S. Guy."

 2             Is that a fair characterization

 3    of Exhibit DL9?

 4        A.    Yes, I think that's an accurate

 5    summary.

 6        Q.    Okay.  Let's go to the next

 7    page, please.  This is DL8.

 8             And you see this document, sir?

 9    We looked at this a few minutes ago; is that

10    right?

11        A.    Yes.

12        Q.    Okay.  Let's go to the next

13    page.

14             And do you see up -- and

15    the quote I pulled, sir, is, "Of the ten

16    samples submitted on September 21, 1975, CRL,

17    Central Research Laboratory, reports that the

18    F/NMR analysis shows that the spectrum of

19    PFOS matches that presented by Guy and

20    Taves."

21             Right?

22        A.    Yes, I see that.

23        Q.    Is that a fair characterization

24    of that document?

25        A.    I do recall that's the language

Confidential - Pursuant to Protective Order

1    the document used.

2         Q.    Okay.  Let's go to the next

3    one, please.

4              This is DL1425.  We just looked

5    at that.

6              Do you remember that, sir?

7         A.    Yes.

8         Q.    Okay.  Let's go to the next

9    page.

10             You see the quote I made?

11   Quote, "3M CRL investigates organic fluorine

12   compounds, identifies PFOS in blood with

13   qualitative analysis, NMR spectra."

14             Is that a fair characterization

15   of DL1425, sir?

16        A.    I believe that's an accurate

17   excerpt from that document.

18        Q.    Let's go to the next page,

19   please.

20             Do you recognize this?  This is

21   the timeline we looked at a few minutes ago?

22        A.    Yes.

23        Q.    Okay.  Go to the next page.

24             Quote, "CAL team led by Don

25   Hagan and Jon Belisle, Richard Newmark, NMR,

1    confirm that Guy and Taves' spectra reflects

2    the presence of PFOS, not PFOA, as the major

3    organic fluorine compound."

4            Is that a fair characterization

5    of that document?

6        A.    I do recall that -- that

7    statement from that document.

8        Q.    Great.  Let's go to the next

9    one, please.

10           And this is DL13.  We just

11   looked at that a few minutes ago, right?

12       A.    Yes.

13       Q.    Okay.  And let's go to the next

14   page, please.

15           Quote, "Taves presents F/NMR

16   spectra data to 3M.  CRL identifies F/NMR

17   spectrum as PFOS."

18           Is that a fair characterization

19   of DL13, sir?

20       A.    I believe that's an accurate

21   excerpt from that document.

22       Q.    Okay.  Let's go to the next

23   page, please.

24           This is DL1389.  Go -- you

25   recognize that, sir?  We looked at that

1   towards the beginning of this module.

2        A.     Yes.

3        Q.     Okay.  Let's go to the next

4   page.  DL1389.

5              The quote I pulled is, quote,

6   "One report does suggest the presence of PFOS

7   in humans, and it is our purpose to

8   substantiate or refute this observation."

9              Is that a fair characterization

10  of DL1389, sir?

11       A.     I believe that's an accurate

12  excerpt from that document.

13       Q.     Okay.  One more, and then we'll

14  be done and we'll take a lunch break.

15             Okay?

16             Do you recognize this, sir?

17  This is the last one we looked at, I believe.

18  This is DL1356.

19       A.     Yes.

20       Q.     Okay.  And let's pull -- go to

21  the next page.  Okay.  And DL1356, the quote

22  I pulled is, quote, "Prokop cited Taves'

23  results, as well as the results the 3M's CRL,

24  indicating the presence of PFOS in pooled

25  plasma samples from the general public."

1           Did I read that correctly, sir?

2           Or, excuse me, is that a fair

3    characterization of DL1356?

4        A.    I believe that's an accurate

5    excerpt from that document.

6           MR. MCWILLIAMS:  Okay.  All

7        right.  I'm at a good stopping point.

8        Is this a good time for lunch for you

9        guys?

10           Well, let's go off the record

11        and then we'll talk about it.

12           VIDEOGRAPHER:  The time is

13        12:45 p.m.  We're off the record.

14        (Off the record at 12:45 p.m.)

15           VIDEOGRAPHER:  The time is

16        1:33 p.m.  We are back on the record.

17    QUESTIONS BY MR. MCWILLIAMS:

18        Q.    Mr. Gerber, back -- welcome

19    back from lunch.

20           Are you ready to proceed?

21        A.    Yes, I am.

22        Q.    Okay.  So let me see.  We're

23    talking about TSCA, TSCA today, and one of

24    the components of TSCA is whether or not the

25    chemical at issue is widespread in the

Confidential - Pursuant to Protective Order

```
1   environment, right -- we talked about that --
2   in the general population's blood; is that
3   fair?
4        A.    That's one consideration under
5   TSCA 8(e).
6        Q.    Okay.  Another consideration of
7   TSCA is bioaccumulation, right?
8        A.    Yes, that is another
9   consideration under TSCA 8(e).
10       Q.    Let's unpack that a little bit.
11             Bioaccumulation just means that
12  a chemical can build up in your body over
13  time.  Basically it doesn't leave your body
14  fast enough, that more is coming in than
15  going out.
16             Is that a fair, eighth grade
17  description of bioaccumulation?
18       A.    That is my general
19  understanding of that term.
20       Q.    Okay.  And again, one of the
21  ways of measuring bioaccumulation is
22  measuring the half-life of a compound in an
23  individual or organism, right?
24       A.    I believe that's correct.  And
25  EPA has established other criteria for that
```

Confidential -- Pursuant to Protective Order

1    end point as well.

2         Q.    Okay.  So let's talk about

3    bioaccumu -- let's talk about PFOS and

4    bioaccumulation and what 3M knew and when

5    they knew it.

6              Okay?

7         A.    Okay.

8         Q.    You with me?

9         A.    Yes.

10        Q.    And that's one of the topics

11   you researched in preparation for today's

12   deposition, right?

13        A.    As it relates to 3M's TSCA 8(e)

14   obligations.

15        Q.    Right.  Okay.

16              So let's pull up, for example,

17   DL1391, please.

18              MR. ROTTENBERG:  Tab 55.

19              THE WITNESS:  All right.  I

20        have that.

21              (Gerber 30(b)(6) Exhibit DL1391

22        marked for identification.)

23   QUESTIONS BY MR. MCWILLIAMS:

24        Q.    Okay.  And do you recognize

25   this as one of the documents you reviewed in

1    preparation for your deposition?

2         A.    Yes.

3         Q.    Okay.  And these are internal

4    3M meeting minutes dated September 19, 1977;

5    is that correct?

6         A.    That is correct.

7         Q.    And the first paragraph reads,

8    "The above persons met on September 2, 1977,

9    to discuss results showing that certain 3M

10   employees who work directly with

11   fluorocarbons have a higher-than-normal level

12   of organically bound fluorine in their blood.

13   These high levels appear to be the result of

14   exposure to industrial fluorochemicals

15   produced by 3M."

16              Did I read that correctly?

17        A.    Yes.

18        Q.    Okay.  If you go to the next

19   page, please.  The very top.

20              It's written, "The persistence

21   of organically bound fluorine in human blood

22   was discussed.  There is some evidence that

23   the organically bound fluorine caused by

24   exposure to industrial fluorochemicals

25   persists in the blood over a considerable

```
 1    period."

 2               Did I read that correctly, sir?

 3        A.    Yes.

 4        Q.    And what that's making

 5    reference to is how long it takes for

 6    fluorochemicals such as PFOS to leave the

 7    human body, correct?

 8        A.    I -- I believe that that --

 9    that's what they're referring to.

10        Q.    And what they're talking about

11    specifically is that they can persist in the

12    blood over a considerable period, correct?

13        A.    That's what they've stated

14    there.

15        Q.    And compounds that can persist

16    in the blood or in the body for a

17    considerable period of time are known to be

18    bioaccumulative compounds, correct?

19        A.    So, you know, I guess the

20    answer to that is not satisfying, but it

21    depends.  And it depends on the definitions

22    of those terms.  What is a considerable

23    period.  What is the threshold for

24    bioaccumulation.

25        Q.    Okay.  But the words that
```

Confidential - Pursuant to Protective Order

```
 1   are -- as they appear on this meeting minutes

 2   from 1977 indicates that 3M was in possession

 3   of information indicating that

 4   fluorochemicals manufactured by 3M, which

 5   would include PFOS, potentially

 6   bioaccumulate, correct?

 7        A.     It talks about the persistence

 8   in blood over a considerable period.

 9        Q.     Okay.

10        A.     And then --

11        Q.     I can use that.  Thank you.

12               Let's go to the next one, which

13   is DL1398.

14               MR. ROTTENBERG:  Tab 32.

15               THE WITNESS:  All right.  I

16        have that.

17               (Gerber 30(b)(6) Exhibit DL1398

18        marked for identification.)

19   QUESTIONS BY MR. MCWILLIAMS:

20        Q.     Okay.  Do you recognize this

21   document as a document you reviewed in

22   preparation for your deposition?

23        A.     Yes, I do.

24        Q.     Okay.  And is this an internal

25   3M document dated October 20, 1978?
```

1        A.     October 20, 1978.

2        Q.     Okay.  And the subject is

3    fluorochemicals technical review committee --

4    or I guess that's who it's to.  These are the

5    members of the fluorochemical technical

6    review committee; is that correct?

7        A.     That is my understanding.

8        Q.     Okay.  Okay.  Let's look at

9    this together.

10             This is -- the first paragraph

11   says, "Over the past several months, several

12   discussions, memos and meeting presentations

13   have dealt with the general topic of

14   metabolic studies with fluorochemicals.  The

15   purpose of this memo is to outline our

16   specific proposals which have evolved from

17   these previous discussions.  These proposals

18   were outlined in a more general way in my

19   slides presented to the committee at its

20   August 31, 1978 meeting."

21             Did I read that correctly?  I

22   don't know if you --

23       A.     Yes, I'm sorry.

24       Q.     Okay.  The next paragraph

25   continues.  It says, "Some of the broad

1    aspects of the metabolic properties of some

2    of 3M fluorochemicals in animals and man,

3    i.e., their absorption, distribution to

4    tissues, chemical biotransformation and

5    elimination, have been roughly defined by

6    previous work.  For example, it is clear

7    that, 1, these chemicals are present in human

8    plasma and probably urine; 2, at least some

9    of them are slowly eliminated from human

10   plasma, perhaps very slowly."

11            Did I read that correctly to --

12   did I read that correctly?

13       A.    Yes.

14       Q.    Okay.  So this October 1978

15   memo indicates that at least these members of

16   the fluorochemical technical review committee

17   were aware of information that would allow

18   them to state that it is clear that some of

19   these chemicals are slowly eliminated from

20   human plasma, right?

21       A.    Yes, I think that that is what

22   is reflected in that section.

23       Q.    And the more slowly chemicals

24   are eliminated from the blood, the more

25   likely they are to bioaccumulate, fair?

Confidential - Pursuant to Protective Order

1        A.      Based on my understanding, yes,

2    that's one factor of bioaccumulation, you

3    know, and uptake would be the other

4    primary --

5                (Gerber 30(b)(6) Exhibit DL1408

6        marked for identification.)

7    QUESTIONS BY MR. MCWILLIAMS:

8        Q.      Okay.  Let's go to 1979 now.

9    Let's go to DL1408.

10                MR. ROTTENBERG:  Tab 39.

11                THE WITNESS:  All right.  I

12        have that.

13    QUESTIONS BY MR. MCWILLIAMS:

14        Q.      Okay.  And do you recognize

15    this document as a document you reviewed in

16    preparation for your deposition?

17        A.      Yes.

18        Q.      Okay.  And is this an internal

19    3M memo dated May 4, 1979?

20        A.      Yes, it is.

21        Q.      Okay.  And do you see the

22    subject line is "Recommendations of H.C.

23    Hodge and J.R. Mitchell"?

24        A.      Yes.

25        Q.      Do you recognize those names as

1    outside consultants that 3M consulted with on

2    the fluorochemicals in blood issue?

3        A.    I believe that's correct.

4        Q.    Okay.  Let's see here.  So it

5    reads, "In response to your memo of April 30,

6    1979, regarding recommendations by Drs. Hodge

7    and Mitchell on the fluorochemical program, I

8    have the following comments."

9            Okay?  See where I'm reading

10   from?

11       A.    Yes, I do.

12       Q.    Okay.  And there's some

13   comments listed for Dr. Hodge, and then

14   there's -- you go on the next page at the

15   bottom, it's from Dr. Mitchell.  And I want

16   to look at the very last paragraph in the

17   section for Dr. Hodge where it says,

18   "Although we agree the animal studies are

19   expensive."  Let's go to this last sentence

20   in that paragraph from this meeting minutes

21   of 1979.

22            "Certainly, we as a company

23   should have some chronic toxicity data on at

24   least one and preferably several of the

25   fluorochemicals for which we have evidence of

1   persistence in humans."

2          Did I read that correctly, sir?

3      A.     Yes.

4      Q.     So at least the members who

5   attended this meeting were of the belief that

6   3M was in possession of evidence that

7   fluorochemicals 3M manufactured persist in

8   humans, fair?

9      A.     I see that reflected in the

10  summary, that there's evidence of persistence

11  in humans.

12     Q.     Okay.  And persistence in

13  humans is another reference to biological

14  half-life, correct?

15         If they persist in humans,

16  they're not leaving, right?

17     A.     I believe that that's one

18  measure of persistence.

19     Q.     Okay.

20     A.     Yeah.

21     Q.     Okay.  So that's 1977, 1978,

22  1979.  We've seen multiple references now to

23  3M being in possession of some information

24  indicating to them that fluorochemicals they

25  made, including PFOS, have long half-lives

Confidential - Pursuant to Protective Order

```
 1    and, therefore, potential to bioaccumulate,

 2    fair?

 3         A.    They appear, based on the

 4    documents that I've reviewed, to have

 5    identified slow elimination and the potential

 6    persistence of those substances.

 7                  (Gerber 30(b)(6) Exhibit DL1416

 8         marked for identification.)

 9    QUESTIONS BY MR. MCWILLIAMS:

10         Q.    Okay.  Let's go to one more,

11    1980.  This is DL1416.

12                  MR. ROTTENBERG:  Tab 80.

13                  THE WITNESS:  All right.  I

14         have that.

15    QUESTIONS BY MR. MCWILLIAMS:

16         Q.    Do you recognize this document

17    as a document you reviewed in preparation for

18    your deposition?

19         A.    Yes, I believe so.

20         Q.    Okay.  And is this an internal

21    3M memo dated June 25, 1980?

22         A.    Yes.

23         Q.    And is the subject

24    "Fluorochemical testing, 1980 to 1981"?

25         A.    Yes, it is.
```

Confidential — Pursuant to Protective Order

```
 1        Q.     Okay.  If you flip through
 2  this, please, you'll see the first page it
 3  talks about toxicology services recommended
 4  the following animal studies be considered
 5  for testing under the fluorochemical program,
 6  right?
 7               And the first one is a -- is
 8  three 21-day repeat dermal toxicity tests on
 9  Scotchgard carpet, fabric treatment and Light
10  Water AFFF and FC-95, right?
11        A.     Yes, I see that.
12        Q.     And those are all POSF-based
13  products that have the ability to transform
14  to PFOS either in the environment or in
15  people's bodies, right?
16        A.     My understanding is those
17  products are POSF-based chemistry, and POSF
18  was recognized to have the ability to
19  hydrolyze to PFOS.
20        Q.     Okay.  Now let's go to page 4,
21  please.
22               Down at the bottom, number 4,
23  it says, "The two-year lifetime oral study -
24  rats."
25               This is important.  "It has
```

Confidential - Pursuant to Protective Order

1    been determined and well-documented that

2    certain fluorochemicals are stable compounds

3    with very long biological half-lives and

4    uncertain biological effects."

5              Did I read that correctly?

6      A.    Yes.

7      Q.    Okay.  So as of 1980, 3M was of

8    the belief that it was well-documented that

9    certain fluorochemicals they made had very

10   long biological half-lives, right?

11     A.    That's what this section

12   appears to summarize and represent.

13     Q.    And you've already testified

14   that the longer the half-life, the more

15   likely it is to bioaccumulate, correct?

16     A.    And again, I would defer to my

17   toxicology colleagues for a full explanation

18   of that, but I -- I have a general

19   understanding.

20     Q.    And is your general

21   understanding consistent with how I framed it

22   to you, sir?

23     A.    That a longer half-life --

24   again, based on my general understanding, a

25   longer half-life would be an indication of a

Confidential - Pursuant to Protective Order

```
 1    potential to bioaccumulate.
 2              (Gerber 30(b)(6) Exhibit DL1570
 3         marked for identification.)
 4    QUESTIONS BY MR. MCWILLIAMS:
 5         Q.    Right.
 6              Okay.  So let's look -- let me
 7    do a little summary slide here again.
 8    Let's -- DL1570, I believe, are trial
 9    demonstratives.
10              And again, if you would go
11    through each of these, sir, and tell me if
12    you agree with the way I characterize the
13    quote from those documents.
14              So DL1391, that's the first
15    document we looked at from 1977.  The quote,
16    "There is some evidence that the organically
17    bound fluorine caused by exposure to
18    industrial fluorochemicals persists in the
19    blood over a considerable period."
20              Do you remember that document,
21    sir, in DL1391?
22         A.    Yes.
23         Q.    Is that a fair
24    characterization?
25         A.    I believe that's an accurate
```

Confidential -- Pursuant to Protective Order

```
1   excerpt.
2        Q.    Okay.  Next one is DL1398.
3   Quote -- and this is from the document from
4   1978.  Quote, "It is clear that" -- excuse
5   me.  "It is clear that at least some of them
6   are slowly eliminated from human plasma,
7   perhaps very slowly."
8              Did I read that correctly?
9        A.    Yes.
10       Q.    And is that a fair
11  characterization of DL1398?
12       A.    I believe that's an accurate
13  representation of that document.
14       Q.    Okay.  The next one from 1979,
15  DL1408.  Quote, "Certainly, we as a company
16  should have some chronic toxicity data on at
17  least one, and preferably several, of the
18  fluorochemicals for which we have evidence of
19  persistence in humans."
20             Did I read that correctly, sir?
21             You're on mute again.
22       A.    I'm sorry.  Yes.
23       Q.    And is that a fair
24  characterization of DL1408?
25       A.    I believe that is an accurate
```

Confidential - Pursuant to Protective Order

1    excerpt.

2         Q.    Okay.  The next one from 1980,

3    DL1416.  Quote, "It has been determined and

4    well-documented that certain fluorochemicals

5    are stable compounds with very long

6    biological half-lives and uncertain

7    biological effects."

8              Did I read that correctly?

9         A.    Yes.

10        Q.    And is that a fair

11   characterization of DL1416, sir?

12        A.    I believe that's an accurate

13   excerpt.

14        Q.    Great.

15              Okay.  So to recap a little

16   bit, 3M is getting reports that a chemical

17   they make is being found in the blood of the

18   general population, right?

19        A.    From pooled samples.

20        Q.    Whatever the source, they're

21   getting reports, right?

22        A.    They received the information

23   from Guy and Taves, and then we discussed

24   additional pooled blood samples that 3M

25   apparently analyzed.

1    Q.    Right.

2          Okay.  And we've now

3    established that 3M, as early as 1977, was in

4    possession of information indicating the

5    bioaccumulative potential of

6    fluorochemicals -- of fluorochemicals,

7    including PFOS, fair?

8    A.    So the slow elimination and the

9    persistence of those compounds were noted.

10   Q.    Thank you.

11         All right.  So now let's move

12   into DL13.  And we talked about this briefly

13   before, but I just want to make sure I heard

14   your testimony correctly.

15         You understand that this

16   document clearly indicates that one of the

17   initiating factors, one of the events that

18   caused 3M to go out and perform certain

19   toxicological tests on PFOS and other

20   fluorochemicals, was the observation of PFOS

21   in the blood of the general population,

22   right?

23   A.    I'm sorry, which tab was this?

24         MR. ROTTENBERG:  8.

25

1    QUESTIONS BY MR. MCWILLIAMS:

2        Q.    8.

3        A.    Okay.  Just a moment, please.

4              So -- and I'm sorry, could you

5    repeat your question?

6        Q.    Yeah.

7              If you turn to the Bates number

8    ending in 700.

9        A.    Yes, the chronology of events?

10       Q.    Yes, sir.

11       A.    I have that.

12       Q.    Okay.  You going to go there,

13   Joe?

14             Thank you.

15             If you look at the second

16   event, sir, you see that the observation of

17   PFOS in the blood of the general population

18   is identified as one of the events that

19   initiated 3M conducting those 90-day

20   toxicology studies on rats and mice and

21   monkeys, correct?

22       A.    Yes, I see that that's listed

23   in the chronology of events.

24       Q.    Okay.  And then let's look at

25   what these results, the animals -- the

Confidential -- Pursuant to Protective Order

```
 1    toxicology results show.  Okay?
 2              If you flip a page forward
 3    to -- stand by.  If you go to page 703,
 4    please.  And this is the results listed for
 5    the 90-day oral studies for FC-95.
 6              That's PFOS, right?
 7       A.    Yes.
 8       Q.    And on the left-hand column are
 9    the different doses that the rats were given;
10    is that right?
11       A.    I believe that's correct.
12       Q.    And the next column is the
13    outcome, how many of the rats died, right?
14       A.    Yes, I believe that's correct.
15       Q.    And the next column is a
16    description of the pharmacotoxic signs and
17    pathology; is that correct?
18       A.    Yes, I believe that's correct.
19       Q.    And 3M designed these studies,
20    right?
21       A.    That -- that's my
22    understanding.  I have not reviewed the
23    design of those studies myself.
24       Q.    Okay.  But 3M decided to do
25    studies, and 3M decided on the doses that
```

Confidential - Pursuant to Protective Order

1    were selected, right?

2              So they -- the purpose of the

3    study was to inform 3M as to the toxicology

4    of these compounds, right?

5              You're on mute again.

6         A.    I'm sorry, yes, I believe

7    that that was the purpose of these studies.

8         Q.    Okay.  And 3M selected doses

9    that they thought would be informative to 3M

10   with respect to that topic?  Is that fair?

11        A.    You know, I can't speak to the

12   dose selection for these particular studies.

13   In general, I would agree that it's a goal to

14   select informative dose levels to provide the

15   information that you're -- that you want to

16   get from that study.  Or to get meaningful

17   results from that study.

18        Q.    And so at least with respect to

19   the rats and the lowest dose, they all

20   survived, thank goodness, but they did notice

21   liver effects in the lowest dose group,

22   correct?

23        A.    I see that they list some minor

24   liver effects, but the summary doesn't

25   indicate what those might be.

Confidential – Pursuant to Protective Order

```
 1        Q.    Okay.  And you go one more
 2   level, you go to 100 part per million, and
 3   50 percent of the rats died, right?  Five out
 4   of ten died; is that fair?
 5        A.    That's what I see in the
 6   summary.
 7        Q.    And they reported convulsions;
 8   is that right?
 9        A.    Yes.  There appears to be a
10   typo there.
11        Q.    CNS effects, that's central
12   nervous system effects; is that correct?
13        A.    That's my understanding.
14        Q.    Liver necrosis?
15        A.    Yes.
16        Q.    Right?
17              Bleeding of the GI tract?
18   That's what hemorrhaging means, right?
19        A.    Yes.
20        Q.    And the next dose, 300 parts
21   per million, all the rats died, right?  Ten
22   out of ten?
23        A.    Yes, I see that.
24        Q.    They reported emaciation and
25   convulsions; is that right?
```

Confidential - Pursuant to Protective Order

```
1          A.      I see that in the summary.

2          Q.      And then the next two dose

3    groups, they all died, right?

4          A.      Yes.

5          Q.      None of the rats survived that

6    were given the doses that were selected by 3M

7    that was meant to inform 3M as to the

8    toxicology of PFOS, right?

9          A.      I'm sorry, could you repeat

10   your question?

11         Q.      Yes, sir.

12                 None of the rats survived, of

13   those that were exposed to the doses that

14   were selected by 3M that was meant to inform

15   3M as to the toxicology of PFOS, fair?

16         A.      At the 1,000 PPM and 3,000 PPM

17   levels, yes.

18         Q.      Okay.  If you turn to the next

19   page, please.

20                 And this is the -- similar

21   results, similar study, but this time rather

22   than rats, they're doing it with monkeys,

23   right?

24         A.      Yes.

25         Q.      And monkeys are often -- I know
```

Confidential - Pursuant to Protective Order

```
1    you're not a toxicologist, neither am I, but

2    we both know that monkeys are considered to

3    be most similar to humans, right, in terms of

4    all the other mammals out there?

5         A.    And I would defer to my

6    toxicology colleagues to answer that

7    question.

8         Q.    Okay.  And let's see here.  So

9    if you look at the lowest group, the lowest

10   dose group -- and again, these were doses

11   selected by 3M, right?

12        A.    That's my understanding.

13        Q.    Okay.  And at the lowest dose

14   group selected by 3M, how many of the monkeys

15   died?

16        A.    It says that four out of four.

17        Q.    So all of the monkeys died at

18   the lowest amount that they were exposed to,

19   correct?

20        A.    That's -- that's what this

21   summary appears to indicate.

22        Q.    And they also reported

23   anorexia, right?

24        A.    Yeah.

25        Q.    Body tremors, twitching,
```

Confidential - Pursuant to Protective Order

```
 1   convulsions, liver discoloration, right?

 2       A.    I see those.

 3       Q.    In all the -- and then if you

 4   go up higher -- higher doses, all of the

 5   monkeys died, right?

 6       A.    That's my understanding of this

 7   summary.

 8       Q.    Some of them died as quickly as

 9   two days after being exposed to PFOS, right?

10       A.    That's how I understand this

11   summary, yes.

12            (Gerber 30(b)(6) Exhibit DL1394

13            marked for identification.)

14   QUESTIONS BY MR. MCWILLIAMS:

15       Q.    Now, let's move on to another

16   exhibit, please.  Let's go to DL1394, please.

17            MR. ROTTENBERG:  Tab 121.

18            THE WITNESS:  All right.  I

19            have that.

20   QUESTIONS BY MR. MCWILLIAMS:

21       Q.    Okay.  Sir, do you recognize --

22   do you recognize this as one of the documents

23   you reviewed in preparation for your

24   deposition?

25       A.    Yes.
```

Confidential - Pursuant to Protective Order

```
1        Q.     Okay.  And is this an internal

2    3M memo dated April 12, 1978?

3        A.     Yes.

4        Q.     And this is meeting minutes of

5    the fluorochemicals technical review

6    committee; is that correct?

7        A.     I believe so.

8        Q.     And is this exhibit -- is this

9    document marked as confidential within 3M?

10       A.     Yes, it is.

11       Q.     Let's go to the second page,

12   please, where these meeting minutes are

13   discussed.

14              Second paragraph, please, if

15   you blow that up.

16              You see where it's written that

17   "Recent animals studies have shown that FC-95

18   was more toxic than was previously believed"?

19              Did I read that correctly?

20       A.     Yes.

21       Q.     And again, FC-95 is PFOS,

22   right?

23       A.     That's my understanding.

24       Q.     Okay.  It continues.  It says,

25   "Some chemical workers are exposed to this
```

Confidential - Pursuant to Protective Order

```
 1   material and are known to have PFOS in their

 2   blood.  It was suggested that this

 3   information might constitute a substantial

 4   risk under the Toxic Substances Control Act."

 5              Did I read that correctly, sir?

 6        A.    Yes.

 7        Q.    It says, "However, during the

 8   discussion it was pointed out that PFOS is

 9   present in some employees' blood in trace

10   amounts, and there is no evidence of ill

11   effects from its presence.  Furthermore, the

12   fact that FC-95 is toxic in animals gives us

13   no indication that it is harmful at trace

14   levels in man.  The committee therefore

15   decided that the currently available

16   information on the toxicity of FC-95 in

17   animals did not constitute a substantial risk

18   under the Toxic Substances Control Act."

19              Did I read that correctly?

20        A.    Yes.

21        Q.    Okay.  So help me figure

22   something out.

23              If the goal of these toxicology

24   studies was to determine whether or not it

25   was toxic at the level people were exposed
```

Confidential - Pursuant to Protective Order

1    to, why didn't 3M test those doses?

2         A.    That really goes beyond my

3    expertise.  I would defer to 3M's

4    toxicologists to answer that question.

5         Q.    But this ultimate conclusion to

6    not report this information to the EPA, that

7    conclusion could have been reached without

8    the benefit of any of the data, right?

9              Because you knew the doses

10   going in.  You knew the doses were much

11   higher than what your employees or the

12   general public was exposed to, right?

13        A.    I'm sorry, can you -- can you

14   rephrase the question?

15        Q.    Yeah.

16             The way I understand this

17   decision to not report this toxicology

18   information to the EPA is that the doses that

19   those monkeys received and died from were

20   higher than the doses of exposure among 3M

21   employees or the general public, right?

22        A.    In the -- what I read in this

23   section is that, you know, the doses for 3M's

24   workers had been identified, and there were

25   no adverse effects that had been identified

Confidential -- Pursuant to Protective Order

1    associated with those dose levels.

2          Q.    Okay.  But not in the animals,

3    right?

4          A.    But -- I'm sorry?

5          Q.    But you never -- 3M never

6    tested these -- those same doses in animals,

7    did they?  In controlled experiments?

8          A.    Based on the documents that

9    I've reviewed, I have not seen those studies,

10   but I don't have the full testing history.

11         Q.    Well, the doses you did test

12   showed toxicity in animals, right?

13         A.    The studies that we just

14   reviewed, those 90-day studies, did have

15   deaths of animals at certain dose levels and

16   other effects noted.

17         Q.    And as of 1978, 3M was of the

18   opinion that PFOS was more toxic than they

19   had previously believed, right?  That's what

20   this document says?

21         A.    I see that in the summary here.

22         Q.    Yet it was the decision of 3M

23   to not disclose this information to the EPA,

24   nor the fact that their chemical was in the

25   blood of the general population at this time,

Confidential - Pursuant to Protective Order

```
 1    right?

 2         A.     That is the conclusion of the

 3    TSCA 8(e) committee at that time.

 4               (Gerber 30(b)(6) Exhibit DL1395

 5         marked for identification.)

 6    QUESTIONS BY MR. MCWILLIAMS:

 7         Q.     Okay.  Let's go to another

 8    document.  Let's go to DL1395.

 9               MR. ROTTENBERG:  Tab 120.

10               THE WITNESS:  All right.  I

11         have that.

12    QUESTIONS BY MR. MCWILLIAMS:

13         Q.     Okay.  And is this a document

14    you reviewed in preparation for your

15    deposition?

16         A.     Yes.

17         Q.     Okay.  And is this an internal

18    confidential memo dated May 10, 1978?

19         A.     Yes.

20         Q.     And it says, "Those present met

21    on May 8, 1978, to discuss results of the

22    90-day animal studies carried out at the

23    International Research and Development

24    Corporation.  The dosing phase of the studies

25    on rats using FC-95, FM-3422 and FC-143 have
```

Confidential - Pursuant to Protective Order

1    been completed.  Results indicate that FC-95,

2    FM-3422 and FC-143 are toxic."

3                Right?

4        A.      I see that.

5        Q.      Those were the words that were

6    used by 3M to describe the data they

7    possessed at that point in time with respect

8    to the toxicity of PFOS, right?

9        A.      That is the summary in this

10   document, yes.

11       Q.      Right.

12               And that's -- the term they

13   chose, the word choice that they chose, was

14   that it's toxic, right?

15       A.      That is the word they chose.

16       Q.      Then it goes on.  It says,

17   "After review of the data and a review of the

18   March 16, 1978 EPA guidelines" --

19               Which we looked at earlier

20   today, right?

21       A.      Yes.

22       Q.      Okay.

23               -- "for reporting substantial

24   risk under TSCA, it was decided that the

25   toxicity of PFOS does not constitute a

Confidential - Pursuant to Protective Order

1  substantial risk and should not be reported

2  at this time."

3           Did I read that correctly?

4       A.     Yes.

5       Q.     So once again, 3M considered

6  its obligations under the law, once again

7  reviewed the toxicology data, and once again

8  decided not to disclose this information to

9  the United States Environmental Protection

10  Agency, correct?

11      A.     Yes, they reviewed the results

12  of the studies, they reviewed the guidance

13  available from the Agency, and they concluded

14  that it did not constitute a substantial risk

15  that required reporting.

16           (Gerber 30(b)(6) Exhibit DL1396

17      marked for identification.)

18  QUESTIONS BY MR. MCWILLIAMS:

19      Q.     Okay.  Let's go to another one.

20  Let's go to DL1396.

21           MR. ROTTENBERG:  Tab 18.

22           THE WITNESS:  All right.  I

23      have that.

24  QUESTIONS BY MR. MCWILLIAMS:

25      Q.     And do you recognize this as a

Confidential - Pursuant to Protective Order

```
 1    document you reviewed in preparation for your

 2    deposition?

 3         A.    Yes.

 4         Q.    Okay.  And is this an internal

 5    3M memo dated July 14, 1978?

 6         A.    Yes.

 7         Q.    Is the subject fluorochemicals

 8    in blood?

 9         A.    Yes.

10         Q.    Okay.  And so this is a memo of

11    the meeting that occurred on July 12, 1978;

12    is that correct?

13         A.    Yes.

14         Q.    The first paragraph says, "The

15    review was called to bring everyone up to

16    date on the present program and status of

17    medical examination of employees, recent

18    investigations of the level of

19    fluorochemicals in blood of employees,

20    information sessions held for concerned plant

21    and laboratory animal" -- "employees, and

22    other recent data which had been made

23    available."

24               Did I read that correctly?

25         A.    Yes.
```

Confidential - Pursuant to Protective Order

```
 1        Q.    Okay.  If we go down to the
 2   very bottom paragraph, please.
 3             You see where it's written,
 4   "There was a discussion as to the preferred
 5   method of informing industry, the public and
 6   the appropriate government agencies about our
 7   findings, recognizing that there is no need
 8   to report these directly to the EPA under
 9   interpretation of the regulations concerning
10   the TSCA."
11             Right?
12             "This is so since we have
13   uncovered no adverse health effects through
14   physical examinations of employees or
15   toxicity tests run on animals."
16             Did I read that correctly?
17        A.    Yes.
18        Q.    Now, that may have been true
19   with respect to the toxicity tests on animals
20   in 1978, but subsequently you did run tox --
21   you did get results on toxicity tests, and 3M
22   determined it was toxic, right?  PFOS?
23        A.    That was the previous document
24   we reviewed, correct?
25        Q.    Right.
```

Confidential - Pursuant to Protective Order

```
 1                 But in this document, the
 2       rationale for again choosing to not disclose
 3       this information to the EPA is that you had
 4       no animal toxicology data, right?
 5            A.     In part.  It says, "This is so
 6       since we have uncovered no adverse health
 7       effects through physical examinations of
 8       employees or toxicity tests run on animals."
 9            Q.     Right.
10                 But subsequent to this memo, in
11       this same decade of the 1970s, 3M did obtain
12       toxicology data demonstrating that PFOS was
13       indeed toxic to animals, the mice, the rats
14       and the monkeys, right?
15            A.     There were effects observed at
16       the doses administered in those studies.
17            Q.     Okay.  But nonetheless, 3M
18       decided not to report this information to the
19       EPA, specifically that this chemical they
20       determined to be toxic was present in the
21       blood of the general population, right?
22            A.     I'm sorry, can you -- can you
23       rephrase the question?
24            Q.     Well, let me just ask it again.
25                 But nonetheless, 3M decided not
```

Confidential - Pursuant to Protective Order

1  to report this information to the EPA,

2  specifically that this chemical they

3  determined to be toxic was present in the

4  blood of the general population.  Correct?

5        A.     So 3M, based on the documents

6  I've reviewed, did not at that time report

7  information on the presence of PFOS in the

8  blood of the general population, if I'm

9  understanding your question correctly.

10             (Gerber 30(b)(6) Exhibit DL1507

11        marked for identification.)

12  QUESTIONS BY MR. MCWILLIAMS:

13        Q.     Okay.  Let's go to the next

14  document, please.  DL1507.

15             MR. ROTTENBERG:  Tab 102.

16             THE WITNESS:  All right.  I

17        have that.

18  QUESTIONS BY MR. MCWILLIAMS:

19        Q.     And do you recognize this, sir,

20  as a document you reviewed in preparation for

21  your deposition?

22        A.     Yes.

23        Q.     And are these internal 3M

24  meeting minutes dated November -- excuse me,

25  December 19, 1978?

Confidential - Pursuant to Protective Order

```
 1        A.    Yes.

 2        Q.    Okay.  And it's written:  "At

 3   the request of F.A. Ubel, a meeting was held

 4   on November 22, 1978, to discuss results of

 5   the subacute rat toxicity studies on PFOS and

 6   others."

 7              Right?

 8        A.    Yes, I see that.

 9        Q.    It says, "The relationship of

10   fluorochemical levels in the blood of rats

11   was discussed to determine whether there was

12   cause for concern.  In the subacute rat

13   studies using FC-95 and FM-3422, the amount

14   of fluorochemical level in rat serum ranged

15   from 100 to 550 parts per million."

16              Did I read that correctly, sir?

17        A.    Yes.

18        Q.    Okay.  And it goes on.  It

19   says, "Since this is at least ten times less

20   than the levels observed in the animal

21   studies, and no adverse human effects have

22   been observed, there does not appear to be a

23   problem with these two chemicals."

24              Right?

25        A.    Yes, I see that.
```

1      Q.     Even though the dose of PFOS in

2   the blood of the general population had never

3   been tested in animal studies, right?

4      A.     That -- you're asking -- I'm

5   sorry.  Can you repeat the question?

6      Q.     Even though the dose of PFOS in

7   the blood of the general population had never

8   been tested in animal studies, correct?

9      A.     I guess I can't speak to the

10  full testing history of these substances or

11  whether that level for the general population

12  was -- was known precisely at that time.

13     Q.     Okay.  Let's go to the next

14  page, please, sir, the second paragraph,

15  reading "After discussion."

16            It's written, "After

17  discussion, those present agreed that the

18  information we now have concerning PFOS and

19  others does not reasonably support the

20  conclusion that a substantial risk exists

21  under Section 8(e) of TSCA as interpreted by

22  the EPA in their policy statement published

23  on March 16, 1978, Federal Register."

24            Right?

25     A.     Yes, I see that.

Confidential - Pursuant to Protective Order

```
 1        Q.     And that's the same Federal
 2   Register we looked at this morning that
 3   talked about extreme persistence, talked
 4   about bioaccumulative potential and
 5   nontrivial adverse effects, or even
 6   widespread in the environment, right?  Talked
 7   about all four of those things?
 8        A.     Yes.
 9               And to clarify, nontrivial
10   adverse effects applies to evaluation of
11   environmental end points, looking at human
12   health end points.  EPA in its later guidance
13   talks about serious adverse effects.
14        Q.     Including death, the outcome
15   experienced by most of those monkeys, right?
16        A.     Death is a serious adverse
17   effect, but again, dose level is important,
18   and EPA has additional guidance on how to
19   interpret that information.
20        Q.     Okay.  But those were the doses
21   that were selected by the scientists at 3M,
22   right?
23        A.     That's my understanding.
24        Q.     Okay.  So once again, 3M
25   considers disclosing this information to the
```

1    EPA, right?

2         A.    Yes.  They've recorded that

3    that information was evaluated and considered

4    against EPA's guidance.

5         Q.    And once again, they decided

6    not to report?

7         A.    Yes, that's my understanding

8    based on this document.

9         Q.    And you remember the EPA

10   meeting that 3M attended where it said, if in

11   doubt, report?

12        A.    I do recall that document.

13        Q.    So 3M was having a lot of

14   meetings about all this data and all this

15   information, right?

16        A.    Yes.  Based on my review of the

17   documents, they were evaluating information

18   as it was received against EPA's guidance.

19        Q.    And the reason for all these

20   meetings and all these meeting minutes is

21   because there were concern within the company

22   that this potentially could be toxic.

23             That's why they did the

24   studies, right?

25        A.    I guess I can't -- I can't

Confidential - Pursuant to Protective Order

1  speak to, you know, the concern, but as far

2  as the evaluation of this information, there

3  was a process in place to evaluate it as it

4  came in for potential reporting obligations.

5              (Gerber 30(b)(6) Exhibit DL1399

6         marked for identification.)

7  QUESTIONS BY MR. MCWILLIAMS:

8         Q.    Okay.  Now let's go to one

9  more.  Let's go to DL1399.

10              MR. ROTTENBERG:  Tab 20.

11              THE WITNESS:  All right.  I

12        have that.

13  QUESTIONS BY MR. MCWILLIAMS:

14        Q.    Do you recognize this, sir, as

15  a document you reviewed in preparation for

16  your deposition?

17        A.    Yes.

18        Q.    And are these confidential

19  meeting minutes dated May 17, 1978?

20        A.    Yes.

21        Q.    And it says, "Meeting minutes

22  review of animal studies."

23              Right?

24        A.    Yes.

25        Q.    And the second paragraph says,

```
1    "After a very brief discussion of the most

2    recent results from the animal studies,

3    M.T. Case, J.E. Long and R.A. Nelson and

4    R.E. Ober agreed that PFOS in others should

5    be regarded as toxic, although the degree of

6    toxicity was left undefined."

7              Did I read that correctly?

8         A.    Yes.

9         Q.    So once again another meeting

10   was held within 3M, once again the animal

11   toxicology data was reviewed, and once again

12   it was concluded that PFOS should be regarded

13   as toxic, correct?

14        A.    And I guess it's not clear to

15   me what standard they're using for that --

16   that determination.  And they do note that

17   the degree of toxicity is left undefined,

18   which is important for TSCA 8(e) purposes,

19   but I do see that that is the conclusion

20   recorded there.

21        Q.    Okay.  Go to the last page,

22   please.

23              And that last paragraph says,

24   "As concluded previously by the full

25   committee."
```

Confidential - Pursuant to Protective Order

```
 1                    Do you see that, sir?

 2        A.     Yes.

 3        Q.     It says, "As concluded

 4   previously by the full committee, available

 5   data in man indicates that no substantial

 6   risk exists under the Toxic Substances

 7   Control Act.  However, those present urgently

 8   recommended that all reasonable steps be

 9   taken immediately to reduce exposure of

10   employees to these compounds."

11                    Did I read that correctly, sir?

12        A.     Yes.

13        Q.     So 3M decided that even though

14   they felt there was no potential harm from

15   exposure to these chemicals, in an abundance

16   of caution, those at this meeting urgently

17   recommended that all reasonable steps be

18   taken to immediately reduce exposure, right?

19        A.     I see that recorded here.

20        Q.     And that's like as a

21   precaution, better safe than sorry, right?

22        A.     I guess I can't speak to

23   their -- their thought process there, but

24   that would be generally consistent with my

25   understanding of good industrial hygiene
```

Confidential -- Pursuant to Protective Order

```
 1    practices.
 2         Q.    Right.
 3               So let me ask you this.  What
 4    steps, if any, did 3M take to reduce the
 5    general public's exposure to PFOS?
 6               I see you're taking care of
 7    your employees, right?
 8               What did you guys do to help
 9    the general public who have this chemical in
10    their blood?
11         A.    I guess those types of product
12    stewardship actions, I haven't reviewed
13    documents based on that, and I'm not prepared
14    to speak to that.
15         Q.    Well, are you aware of anything
16    3M did in the '70s or '80s to reduce the
17    general public's exposure to PFOS?
18         A.    And again, that's not something
19    that I've specifically investigated in
20    preparation for today, so I -- I -- I can't
21    cite anything that I'm aware of.
22         Q.    Okay.  But so sitting here
23    today, you're not aware of any steps 3M took
24    to help reduce the public health exposure to
25    PFOS, even though at the same time,
```

Confidential -- Pursuant to Protective Order

1    simultaneously, it was taking steps to reduce

2    employee exposure, right?

3         A.    Based on the documents that

4    I've reviewed, I have not seen any steps with

5    respect -- you know, product stewardship

6    actions with respect to the general public.

7         Q.    Well, let me ask you this.

8    Between 1970 -- this is 1978 -- and you

9    remember that chart I showed you this

10   morning, the graph of POSF production over

11   time?

12        A.    Yes.

13        Q.    And it looked like an Apple

14   stock graph, right?  It went up, up, up?

15        A.    In general, it was increasing

16   over that period.

17        Q.    All right.  So while you guys

18   were decreasing exposure to 3M employees, you

19   were increasing it to the general public by

20   creating more of these chemicals and putting

21   more of them into the stream of commerce and

22   into people's bodies, right?

23        A.    I guess I wouldn't agree with

24   that characterization, and that goes beyond

25   kind of my area of expertise.  I think that

Confidential – Pursuant to Protective Order

1    would depend on, you know, the

2    characteristics and use patterns of those

3    products.

4         Q.    Okay.  But sitting here today,

5    are you aware of any change in character --

6    but you are aware that the production of

7    these chemicals went up, right?  Over time?

8         A.    Based on -- on the chart we

9    reviewed earlier today, the production volume

10   increased.

11        Q.    Okay.  And isn't it just

12   therefore common sense that if you had a

13   certain amount in your blood in 1975 and then

14   you only just increased it by like a thousand

15   percent, I think, between 1975 and 2000,

16   isn't it just common sense that the levels in

17   people's blood are also going to go up?

18        A.    Again, I think that goes beyond

19   my area of expertise.  My understanding is

20   that production volume is just a general

21   surrogate for exposure, and there are a lot

22   more factors that need to be considered.

23        Q.    Well, sir, are you aware that

24   3M, specifically Dr. Geary Olsen at 3M, went

25   out and obtained historic blood samples and

Confidential – Pursuant to Protective Order

1   confirmed that exactly what I suggested did

2   indeed happen, that the concentrations of

3   PFOS in the blood of the general population

4   increased concurrent with 3M's manufacturing

5   increase?

6        A.    I did not review that study as

7   part of my preparation for today.

8        Q.    Okay.  So you didn't review --

9   you haven't reviewed the various studies that

10  3M has done on PFOS and the concentrations of

11  PFOS in the blood of the general population

12  in preparation for your deposition today?

13       A.    I have not reviewed all of the

14  studies available, you know, the totality of

15  the science in this area.  I have reviewed

16  the materials that are relevant to 3M's

17  obligations and considerations under TSCA.

18            (Gerber 30(b)(6) Exhibit DL1353

19       marked for identification.)

20  QUESTIONS BY MR. MCWILLIAMS:

21       Q.    All right.  Let's go to one

22  more.  Let's go to DL1353.

23            MR. ROTTENBERG:  Tab 61.

24            THE WITNESS:  All right.  I

25       have that.

1    QUESTIONS BY MR. MCWILLIAMS:

2         Q.    Okay.  And do you recognize

3    this as a document you reviewed in

4    preparation for your deposition?

5         A.    Yes, I believe so.

6         Q.    Okay.  And do you see that this

7    is a review of final reports and summary of

8    the toxicology testing we've been discussing

9    here this last session?

10        A.    Yes.

11        Q.    Okay.  And can you please read

12   to the jury the very first sentence under

13   Overall Summary and Recommendations?

14        A.    "FC-95 was the most toxic of

15   the three compounds studied and certainly

16   more toxic than anticipated."

17        Q.    Okay.  So my question to you,

18   sir:  Are you aware of any communication from

19   the EPA -- excuse me, from 3M to the EPA

20   disclosing 3M's opinion that PFOS is toxic,

21   and more toxic than anticipated, and present

22   in the blood of the general population prior

23   to the disclosure in 1998?

24        A.    I'm not aware of the disclosure

25   that it contains, you know, all of those

Confidential — Pursuant to Protective Order

1    elements, you know, prior to 1998.

2        Q.    Are you aware of any disclosure

3    that contains any of those elements that

4    occurred prior to 1998, where 3M told the EPA

5    that PFOS was toxic or that it was present in

6    the blood of the general population or that

7    it was more toxic than anticipated?

8        A.    Based on the documents that

9    I'm -- that I've reviewed, I am aware of 8(e)

10   reports that 3M did submit regarding some

11   teratology studies.  And as part of that, 3M

12   also provided information on blood levels

13   that had been measured in its workers.

14       Q.    Okay.  And you're talking about

15   the 1980 8(e) report where you disclosed the

16   lens -- the birth defect in rats study?

17       A.    Yes.

18       Q.    And in that disclosure, you --

19   3M told the EPA that about 150 people were

20   exposed to those chemicals -- to PFOS, right?

21       A.    It was describing the worker

22   exposure in that case and the levels that had

23   been measured in its workers.

24       Q.    Right.

25             But it made no mention

1    whatsoever of the -- of the fact that 3M was

2    aware that PFOS was present in the blood of

3    the general population, right?

4        A.    That report did not discuss

5    PFOS in the general population.  And again,

6    my understanding is that, you know, that --

7    the specifics of that understanding has

8    evolved over time.

9        Q.    You keep saying that, and that

10    doesn't make it any more true, but good on

11    you.

12            But you agree with me that -- I

13    mean -- and I believe you agreed to this

14    earlier today, that it's not just disclosing

15    the adverse effect, but you also have to

16    disclose the extent of exposure, right?

17    Because of that sliding scale thing we talked

18    about?

19        A.    No, not -- not necessarily.

20            So in EPA's reporting guidance,

21    it's -- you know, it's the information that

22    you've received that's disclosed.  So in the

23    case of like a toxicology study, it would be

24    disclosure of the results of that toxicology

25    study.

Confidential - Pursuant to Protective Order

1    Q.    Why would you -- why did you

2  tell the EPA that 150 employees were exposed

3  if they don't need -- if they don't care

4  about expo -- how many people are exposed?

5    A.    I guess I can't speak to the

6  reasoning of the people who prepared that

7  notice at the time.

8    Q.    Okay.  But it was a deliberate

9  decision by someone at 3M to tell EPA that

10  150 people -- employees were exposed, but not

11  tell them that the 200 million Americans in

12  existence at the time were also exposed,

13  right?  That was a deliberate decision?

14    A.    Based on the documents that

15  I've reviewed, I would not characterize it

16  that 3M knew that 200 million people had been

17  exposed to these substances.

18    Q.    Okay.  I can't get y'all's

19  story straight.

20          So either -- so did 3M -- did

21  Guy and Taves put 3M and the EPA on notice

22  that PFOS was in the blood of the general

23  population or not?

24    A.    So they had noted the results

25  of organic fluorine from pooled blood samples

Confidential – Pursuant to Protective Order

```
 1   from the general population.  Based on the
 2   documents that we've reviewed, 3M recognized
 3   the possibility that that involved PFOS.
 4              Because they were pooled
 5   samples and there were certain methodological
 6   issues with the study, the incidence rate and
 7   the concentrations in individuals were
 8   unknown at that time.
 9              MR. MCWILLIAMS:  Move to strike
10       as nonresponsive.
11   QUESTIONS BY MR. MCWILLIAMS:
12       Q.     Sorry, I need you to answer
13   this question.
14              Did the publication by Guy and
15   Taves put the EPA and 3M -- well, strike
16   that.
17              Sir, did the publication by Guy
18   and Taves put 3M on notice that PFOS may be
19   present in the blood of the general
20   population; yes or no?
21              Either you do think it put them
22   on notice or you don't, and I need you to
23   answer that one way or the other, please.
24       A.     Right.
25              So my understanding based on
```

Confidential - Pursuant to Protective Order

1  the review of the documents is that 3M

2  recognized the possibility from that

3  information.

4      Q.    So that's a yes, it did put 3M

5  on notice of the possibility?

6      A.    Yes.  The possibility was

7  recognized, based on the work of Newmark and

8  others.

9      Q.    Okay.  Have you seen any

10  evidence that EPA was made aware of that

11  notice, as you call it, prior to May of 1998?

12      A.    And, I'm sorry, which notice

13  are you referring to?

14      Q.    Of the presence of PFOS in the

15  blood of the general population that you said

16  came from Guy and Taves.

17      A.    So the Guy and Taves paper

18  would be in the -- in -- published in

19  literature, and so that could be considered

20  known to the administrator.  So the extent of

21  the information that was in that study would

22  potentially be available to the EPA.

23      Q.    Okay.  Now, have you seen any

24  documentation of that, that 3 -- that EPA was

25  aware that PFOS was present in the blood of

Confidential - Pursuant to Protective Order

1    the general population prior to May of 1998?

2         A.    I'm sorry, I'm trying to think

3    back through the documents I've reviewed.

4              Not that I recall.

5         Q.    Okay.  Thanks.  I haven't seen

6    that either.

7              (Gerber 30(b)(6) Exhibit LP190

8         marked for identification.)

9    QUESTIONS BY MR. MCWILLIAMS:

10        Q.    Let's go to one more.  Let's go

11   to LP190.

12             MR. ROTTENBERG:  Tab 42.

13             THE WITNESS:  All right.  I

14        have that.

15   QUESTIONS BY MR. MCWILLIAMS:

16        Q.    Okay.  And is this a document

17   you reviewed in preparation for your

18   deposition?

19        A.    Yes, I believe so.

20        Q.    Okay.  And this is -- and this

21   is a -- meeting minutes of the fluorochemical

22   technical advisory committee, right?

23        A.    That's correct.

24        Q.    And this is a meeting that

25   occurred on June 27, 1994, correct?

Confidential - Pursuant to Protective Order

```
 1        A.     Yes.

 2        Q.     Okay.  And the executive

 3   summary states, "The fluorochemical technical

 4   advisory committee met to review the draft

 5   health hazard summary which has been

 6   completed for PFOS."

 7               Right?

 8        A.     Yes, it notes that, yeah, FC-95

 9   may be technical grade or a purified

10   material, and that refers to PFOS.

11        Q.     Okay.  And let me ask you this.

12   What is a data gap?

13        A.     A data gap?

14        Q.     Yeah.

15        A.     So I guess there is, you know,

16   a list of identified data gaps that explains

17   specifically what they were looking at on the

18   following page, but in general, my

19   understanding is a data gap is information

20   that's not available.

21        Q.     Okay.  And so -- and in

22   toxicology there are -- you go about trying

23   to determine what level causes adverse

24   effects, right?  That's one goal of

25   toxicology studies, right?
```

1        A.      That's my understanding, yes.

2        Q.      Another goal of toxicology is

3    to determine what dose does not cause adverse

4    effects, right?

5        A.      Yes.  And this is outside my

6    area of expertise, but that's my general

7    understanding.

8        Q.      Right.

9                And that's defined as the

10   NOAEL, N-O-A-E-L, the nonobserved-adverse-

11   effect level, right?  That's the level at

12   which you know people can be exposed that's

13   safe, right?

14       A.      So my understanding of that

15   term is -- you know, it refers to, you know,

16   specific studies that -- the dose level at

17   which no adverse effects were identified.

18       Q.      Right.

19               And go to the next page,

20   please, sir.  Go to page -- bullet point

21   number 7.  And as of 1994, as late as 1994,

22   3M identified this as a data gap, meaning 3M

23   did not know what level of PFOS was safe,

24   right?

25               And would -- excuse me.  Joe,

```
 1   would you also blow up the very top of that

 2   document, the identified data gaps, so it's

 3   clear what we're all talking about here?

 4   Yeah.

 5              This is one of many data gaps

 6   identified, and the number 7 data gap was the

 7   no-observed-adverse-effect level, NOAEL, is

 8   not known for PFOS, right?

 9        A.    I see that recorded here.

10        Q.    Okay.

11        A.    I would rely on my toxicology

12   colleagues to unpack the significance of

13   that.

14        Q.    But do you have any reason to

15   disagree with my interpretation of that?

16        A.    I'm sorry, could you restate

17   your interpretation?

18        Q.    Yeah.

19              That as of 1994, 3M had not

20   established what a safe level of exposure to

21   PFOS was.

22        A.    I don't know that I'd agree

23   with that characterization.  I think that --

24        Q.    Can you tell me why not?

25        A.    So -- because 3M had been
```

1   operating under information that it had based

2   on, you know, historical usage and its

3   investigation of worker exposure and health

4   outcomes.  So I think, you know, 3M was

5   operating based on information there, based

6   on the documents that I've reviewed.

7                 Beyond that, with specific

8   toxicology end point data gaps, that's kind

9   of beyond my area, and I'd refer to 3M

10  toxicologists to address those questions.

11                (Gerber 30(b)(6) Exhibit DL1574

12      marked for identification.)

13  QUESTIONS BY MR. MCWILLIAMS:

14      Q.    Okay.  Well, let's go to

15  DL1574.  I'm going to make a little

16  demonstrative with you again, if that's okay.

17                Okay.  And again, these are

18  documents we've just reviewed.  DL1394, the

19  quote I pulled is, "Recent animal studies

20  have shown that PFOS is more toxic than was

21  previously believed."

22                Is that a fair characterization

23  of DL1394, sir?

24      A.    I do recall that excerpt from

25  that document.

Confidential - Pursuant to Protective Order

```
 1        Q.     Okay.  The next one is DL1395.
 2   And I'm missing a quote, but it should say,
 3   quote, "Those present met to discuss results
 4   of the 90-day animal studies.  Results
 5   indicate that PFOS, FC-3422 and PFOA are
 6   toxic."
 7                Is that a fair characterization
 8   of that document, DL1395?
 9        A.     I believe that's an accurate
10   excerpt.
11        Q.     Okay.  And the next one is
12   DL1353.  Quote, "PFOS was the most toxic of
13   the three compounds studied and certainly
14   more toxic than anticipated."
15                Is that a fair characterization
16   of Exhibit DL1353, sir?
17        A.     I do recall that statement from
18   that document, sir.
19        Q.     The next one is DL1399.  Quote,
20   "After a brief discussion of the most recent
21   results from the animal studies, 3M
22   scientists agreed that PFOS, FM-3422 and PFOA
23   should be regarded as toxic, although the
24   degree of toxicity was left undefined."
25                Is that a fair characterization
```

Confidential - Pursuant to Protective Order

1    of Exhibit DL1399, sir?

2        A.    I believe that that's an

3    accurate excerpt from that document.

4        Q.    Okay.  So 3M has reports of a

5    chemical they make being widespread in the

6    blood of the general population, 3M has

7    evidence of the potential for

8    bioaccumulation, and now 3M has concluded

9    that PFOS is toxic, right?

10            As of 1978, all three of those

11   things had occurred, right?

12       A.    I'm sorry, can you -- can you

13   step back through those questions?

14       Q.    Yeah.

15            As of 1978, 3M had determined

16   or -- strike that.

17            As of 1978, 3M was in

18   possession of information indicating that a

19   chemical it made, PFOS, was present in the

20   blood of the general population, had the

21   potential to bioaccumulate, and was toxic in

22   animals, fair?

23       A.    So I guess to rephrase based on

24   my understanding of the documents that --

25       Q.    I need you to answer my

Confidential -- Pursuant to Protective Order

```
1    question, not rephrase it and repackage it.
2            Okay?  Can you try to answer my
3    question, please?  Do you want me to ask it
4    again?
5        A.    Sure.
6        Q.    Sir, is it true that as of
7    1978, 3M was in possession of information
8    indicating that a chemical it made, PFOS, was
9    present in the blood of the general
10   population, had the potential to
11   bioaccumulate, and was toxic in animals?  Is
12   that fair?
13       A.    I would say 3M had information
14   about the possibility of all three of those
15   things.
16       Q.    Okay.  I can take that.
17             But -- and -- never mind.
18             All right.  So in light of
19   evidence of those three things, are you aware
20   that 3M went outside of the company and
21   sought outside consultants, external
22   consultants, specifically to help 3M
23   determine whether or not they should report
24   this information to the EPA?
25       A.    Is there a specific time that
```

Confidential - Pursuant to Protective Order

1    you're referring to?

2         Q.    Yes, sir.  1978.

3         A.    1978.  I -- I don't recall

4    reviewing that in my documents.

5         Q.    All right.  Well, let's see if

6    this refreshes your recollection.  Pull up

7    DL1553, please.

8              And I don't think we disclosed

9    this, guys, but this was on his list of

10   documents he considered, I believe.

11             MR. WOODS:  Okay.

12   QUESTIONS BY MR. MCWILLIAMS:

13        Q.    So it's just a one-page

14   document.  Can we just look at this together,

15   sir, on the screen?

16        A.    Would it be possible to put a

17   link up so I can put this on my larger

18   screen?

19        Q.    Yeah, we can do that.

20             Lara, would you be so kind as

21   to do that for the witness?

22             JOE WILLS:  This has been added

23        to the marked exhibits folder as well.

24             MR. MCWILLIAMS:  Thank you very

25        much.

Confidential - Pursuant to Protective Order

```
 1                    Lara, your voice has changed.
 2                    JOE WILLS:  And I'm sorry, what
 3          was the DL number for it?
 4                    MR. MCWILLIAMS:  1553.
 5                    JOE WILLS:  There it is.
 6                    (Gerber 30(b)(6) Exhibit DL1553
 7          marked for identification.)
 8  QUESTIONS BY MR. MCWILLIAMS:
 9          Q.    All right.  So do you recognize
10  this document as a document you reviewed in
11  preparation for your deposition?
12          A.    Not -- not specifically.
13          Q.    Okay.  Well, let's go through
14  it together.
15                You see this is an internal 3M
16  memo dated June 1, 1978?
17          A.    Yes.
18          Q.    Okay.  And it's the same group
19  of individuals we've seen on lots of these
20  documents from this time frame; is that fair?
21          A.    Yes.
22          Q.    Okay.  And you see that it's
23  written -- and again, this is marked
24  "confidential"; is that right?
25          A.    Yes, I see that.
```

Confidential - Pursuant to Protective Order

```
 1          Q.     Okay.  And it says, "This

 2   meeting is being called to consider the use

 3   of an outside consultant to review our

 4   results to date in the fluorochemicals in

 5   blood program."

 6               Did I read that correctly, sir?

 7          A.     Yes.

 8          Q.     Okay.  And the fluor -- okay.

 9   And it goes on.  It says, "Mr. Lehr has

10   specifically requested that an outside

11   consultant review our results and render an

12   independent opinion as to whether we are

13   correct in our assumption that we do not have

14   a reportable situation under Section 8(e) of

15   TSCA."

16               Right?

17          A.     I see that.

18          Q.     Okay.  And do you remember the

19   EPA guidance that we looked at -- excuse me,

20   from the meeting minutes from the meeting at

21   EPA?

22               What was the -- remember they

23   said the whole afternoon could be summed up

24   in four words?  Do you remember those --

25          A.     I remember that summary.
```

1      Q.     Do you remember what those four

2   words were?

3      A.     I believe you're referring to

4   "when in doubt, report."

5      Q.     Yeah, I think "if in doubt,

6   report."

7             Okay.  And does this document,

8   DL1553, indicate to you there was perhaps

9   some doubt within 3M as to whether or not

10  they were supposed to report this information

11  to the EPA?

12     A.     I guess I can't speak to the

13  state of mind of the people that prepared

14  this document.  They talk about they have an

15  assumption that they do not have a reportable

16  situation, and it appears to me that they're

17  looking for independent validation of that

18  view.

19     Q.     Okay.  You don't usually need

20  independent validation if you're confident in

21  a decision you make, right?

22     A.     I guess speaking from my own

23  experience with TSCA, there are cases where

24  we do want to independently validate our

25  decisions because we want to be sure we're

Confidential -- Pursuant to Protective Order

1    correct.

2         Q.    Okay.  You don't just err on

3    the side of disclosure?

4         A.    It depends on the situation,

5    but there are times where we seek independent

6    validation of our views because we want to be

7    correct.

8         Q.    Okay.  But generally in your

9    experience at 3M, does 3M err on the side of

10   disclosure?

11        A.    So I know that it has at

12   certain times, that that would include during

13   the TSCA 8(e) audit, and I would say in our

14   current practices in the 8(e) committee, that

15   there is a bias toward reporting.

16             (Gerber 30(b)(6) Exhibit DL898

17        marked for identification.)

18   QUESTIONS BY MR. MCWILLIAMS:

19        Q.    Okay.  Let's go on to DL898,

20   which is meeting minutes from -- with one of

21   these outside consultants.

22             Do you recognize Dr. H.C. Hodge

23   as one of the outside consultants that 3M

24   utilized in helping it determine whether or

25   not to report this information to the EPA?

Confidential - Pursuant to Protective Order

```
 1       A.     Yes, I recall Mr. Hodge from
 2  one of the previous documents we discussed.
 3       Q.     I think it's Dr. Hodge, but I
 4  won't -- I won't tell him you called him
 5  mister.
 6              Do you have this document?  I'm
 7  sorry, we're waiting on --
 8       A.     Yeah, Dan.
 9              MR. ROTTENBERG:  Yeah, it looks
10       like it's 178.
11              THE WITNESS:  All right.  Just
12       a moment, please.
13              All right.  I have that.
14  QUESTIONS BY MR. MCWILLIAMS:
15       Q.     Okay.  And is this one of the
16  documents you reviewed in preparation for
17  your deposition?
18       A.     I believe so.
19       Q.     Okay.  And is this internal --
20  is this labeled "Draft Meeting Minutes with
21  H.C. Hodge," dated April 26, 1979?
22       A.     Yes.
23       Q.     Okay.  And it says, "Those
24  present met on April 12, 1979, at the Hilton
25  Hotel in San Francisco, California, to review
```

Confidential - Pursuant to Protective Order

1    recent results which are relevant to the

2    fluorochemicals in blood program and to

3    discuss future plans."

4            Did I read that correctly, sir?

5    A.    Yes.

6    Q.    Now based on your review of

7    other documents in this case, did you see

8    that these representatives from 3M traveled

9    to San Francisco from Minnesota on 3M's

10   private jet?

11   A.    No, I did not.

12   Q.    Have you ever been on 3M's

13   private jet?

14   A.    I have not.

15   Q.    Okay.  Is it usually reserved

16   for higher-ranking executives?

17           And I don't mean that in a

18   disparaging way to you, but is it typically

19   reserved for the higher-ranking executives

20   within 3M?

21   A.    Yeah, I guess I don't have

22   visibility who gets to use the private jet.

23   That would be my assumption.

24   Q.    Okay.  Mine as well.  Thank

25   you.

Confidential - Pursuant to Protective Order

```
 1                So let's go on here.  So let's

 2      just -- if you go to the third page, please,

 3      down at the bottom.

 4                You can see where it says,

 5      "R.A. Nelson reviewed results of the 90-day

 6      subacute toxicity studies using PFOS."

 7                Do you see where I'm reading

 8      from, sir?

 9           A.    Yes.

10           Q.    And these are the same toxicity

11      studies we've been talking about now for a

12      good hour now after lunch; is that right?

13           A.    Yes.

14           Q.    Okay.  Second sentence says,

15      "Of these compounds, PFOS was the most

16      toxic."

17                Right?

18           A.    I see that there.

19           Q.    Okay.  It says, "It produced

20      deaths in the monkeys at 4.5 milligrams per

21      kilogram."

22                So that's 4.5 parts per

23      million, right?

24           A.    Doing the math quick, I believe

25      that's correct.
```

1      Q.    Yeah.

2            And it says, "Target organs in

3      the rat were liver, hemopoietic tissue" --

4      I'm sure I butchered that -- "stomach and

5      small intestine.  In monkeys, the apparent

6      target organ was the upper GI tract."

7            Did I read that correctly?

8      A.    Yes.

9      Q.    Okay.  Go to the next page,

10     please, the third paragraph.  It says, "H.C.

11     Hodge also presented his summary of results

12     of the 90-day studies."  And it says, "These

13     levels" -- hang on.  Okay.  I skipped a page.

14     Hang on.  Let's go down to the bottom of the

15     page.

16            You see at the very bottom it

17     says, "Dr. Hodge recommended the following,"

18     and then there's a colon.

19            And if you go to the next

20     page --

21     A.    Sorry.  Catching up here.  I

22     think I might have skipped the same page.

23            What -- what's the Bates number

24     there?

25     Q.    You know, I'll tell you what.

Confidential — Pursuant to Protective Order

1    Let's just skip to the very last page to move

2    this along.

3              You see there's an addendum?

4    A.       Yes, I have that.

5    Q.       And it says, "I called

6    Dr. Hodge on April 20."

7              So this is an addendum to these

8    meeting minutes.  It sounds like there was a

9    telephone call subsequent to the meeting in

10   San Francisco.

11             Is that a fair reading?

12   A.       Yes, I believe so.

13   Q.       Okay.  He says, "I called

14   Dr. Hodge on April 20, 1979, to give him the

15   acute oral toxicity data on PFOS, which was

16   generated at IRDC prior to the 90-day

17   studies."

18             Did I read that correctly?

19   A.       Yes.

20   Q.       So it sounds like not all

21   toxicity data had been shared with Dr. Hodge

22   at the meeting.  Some had been sent to him

23   subsequent to the meeting, and then that's

24   what prompted this phone call; is that fair?

25   A.       That appears to be what this

Confidential -- Pursuant to Protective Order

1    reflects.

2         Q.    Okay.  And then -- so he asked

3    for these -- he asked that the following be

4    added to the meeting minutes, right?

5         A.    Yes, I see that.

6         Q.    And meeting minutes are meant

7    to accurately reflect what occurs at a

8    meeting, right?

9         A.    That's my understanding of the

10   general purpose of meeting minutes.

11        Q.    Right.

12              And this outside consultant

13   that 3M was asking help on whether or not to

14   disclose certain information to the EPA asked

15   for this particular information to be added

16   to the meeting minutes, right?

17        A.    Yes.

18        Q.    And he -- the information he

19   wanted added to the meeting minutes were,

20   quote, "The study of levels of FC-807 or its

21   metabolites is of utmost importance in

22   determining possible future problems."

23              Now, 807, that's Scotchban.

24   That's the food packaging stuff, right, we've

25   talked about previously?

Confidential — Pursuant to Protective Order

```
1        A.      Yes, that's my understanding.

2        Q.      It comes in contact with

3   people's food, right?

4        A.      That's my understanding.

5        Q.      And/or its metabolites, which

6   we know includes PFOS, right?

7        A.      Based on the documents I've

8   reviewed, I believe that's correct.

9        Q.      Okay.  So Dr. Hodge is saying

10  that the study of levels of this food

11  packaging chemical "or its metabolites is of

12  utmost importance in determining possible

13  future problems.  It should be determined if

14  FC-807 or its metabolites are present in

15  man."

16              Did I read that correctly, sir?

17       A.      Yes.

18       Q.      Does that indicate to you that

19  at this point in time 3M did not disclose to

20  Dr. Hodge that they in fact had information

21  indicating that PFOS was present in man?

22       A.      You know, I guess I can't speak

23  to the full scope of what 3M disclosed to

24  Dr. Hodge, but I think that that's a

25  reasonable reading of --
```

Confidential -- Pursuant to Protective Order

```
 1         Q.     Right.

 2         A.     -- that sentence.

 3         Q.     And he goes on.  He says, "and

 4    also what levels they are present and the

 5    degree of persistence, or the half-life, of

 6    these materials."

 7                Right?

 8                So Dr. Hodge is saying, we need

 9    to go out and figure out if this chemical is

10    in people's blood and if it's there for a

11    long time, right?

12         A.     And the levels at which they

13    are present.

14         Q.     Right.

15                Three things that 3M already

16    knew, right?

17         A.     Again, and, you know, the

18    degree of knowledge, I think, is important

19    there, you know, the levels at which things

20    were present, the prevalence in the

21    population, you know, the degree of

22    persistence, those things.

23         Q.     Okay.  But this -- the plain

24    reading of this document indicates that 3M

25    did not disclose this information about --
```

```
 1    all the information that was available to 3M,

 2    they did not share that with Dr. Hodge.

 3              Is that a fair reading?

 4        A.    And again, I can't speak to

 5    what was shared.  That appears to be what's

 6    reflected in this section.

 7        Q.    Okay.  And let's read this last

 8    sentence.  And this is what Dr. Hodge wanted

 9    added to the meet minutes, remember?  Right?

10        A.    Yes.

11        Q.    And Dr. Hodge wanted the people

12    who attend this to know that "If the levels

13    are high and widespread and the half-life is

14    long, we could have a serious problem."

15              Right?

16              That was the outside

17    consultant.  That was his assessment of the

18    information provided to him, right?

19              You're on mute.

20        A.    Sorry.  Sorry about that.

21              Yes, I see that that's what he

22    asked be added to the minutes.

23              (Gerber 30(b)(6) Exhibit DL1365

24        marked for identification.)

25
```

Confidential - Pursuant to Protective Order

```
 1    QUESTIONS BY MR. MCWILLIAMS:

 2         Q.    Okay.  Now, let me show you

 3    another document.  This is DL1365.

 4              MR. WOODS:  And, Ned, can we

 5         take a break when you get to a

 6         stopping point?

 7              MR. MCWILLIAMS:  Sure.

 8              MR. WOODS:  If you want to do

 9         this document, that's fine.

10              MR. MCWILLIAMS:  Yeah, let's

11         finish this document if that's okay.

12              MR. ROTTENBERG:  Tab 40.

13              THE WITNESS:  All right.  I

14         have that.

15    QUESTIONS BY MR. MCWILLIAMS:

16         Q.    Okay.  And so you see that this

17    is -- again appears to be an almost identical

18    document, only it's not labeled "draft,"

19    right?

20              It's got a different date,

21    dated June 7, 1979, right?  And it says,

22    meeting minutes.  Meeting with H.C. Hodge,

23    right?

24         A.    Yes.

25         Q.    And the first sentence again
```

Confidential - Pursuant to Protective Order

```
 1    says, "Those present met on April 12, 1979,

 2    at the Hilton Hotel in San Francisco."

 3              Right?

 4    A.    Yes.

 5    Q.    Okay.  And so do me a favor --

 6    and, Joe, if you could help me, if we could

 7    just put the draft meeting minutes next to

 8    the final meeting minutes.  And again, the

 9    draft is DL898, and the final is DL1365.

10              And, Mr. Gerber, I want you to

11    turn to the last page where -- the section

12    that Dr. Hodge wanted added to the official

13    meeting minutes of this meeting, and I want

14    you to tell me if you see anything different,

15    if you see anything missing.

16              And, Joe, just blow up that

17    last paragraph on both of them, of the

18    addendum.

19              Yeah, so that's the draft on

20    the left.  If you could do just the last

21    paragraph.  Yeah.  And that's the draft.

22              If you cold do the same thing

23    with the final.  Tell me if you see anything

24    missing.

25              No.  No.  Last page of that
```

Confidential -- Pursuant to Protective Order

1   one.

2              Do you see it's word for word

3   verbatim, except that last sentence is

4   missing?

5              Do you see that, sir?

6       A.    I do.

7       Q.    So Dr. Hodge wanted the company

8   to know and wanted the official meeting

9   minutes to reflect that if this chemical is

10  in everyone's blood, and if the half-life is

11  long, you have a serious problem.

12             And that was removed from the

13  official meeting minutes, wasn't it, sir?

14      A.    I -- I don't see that final

15  statement in the second copy of the meeting

16  minutes.

17      Q.    And Dr. Hodge was the expert

18  that you guys wanted this independent

19  evaluation as to whether or not to disclose

20  certain information to the EPA, right?

21      A.    I'm sorry, can we go back to

22  the note about Dr. Hodge?

23             Was it -- was it to get his

24  opinion generally on the fluorochemicals in

25  blood program, or was it specifically looking

1    at reportability for TSCA purposes?

2        Q.    That's a great question.  Let's

3    pull back up DL1553, and then we'll take our

4    break, Craig.

5            MR. WOODS:  Okay.

6    QUESTIONS BY MR. MCWILLIAMS:

7        Q.    Mr. Lehr has specifically

8    requested an outside consultant review our

9    results and render independent opinion of

10   whether we are correct in our assumption that

11   we do not have to report this to the EPA

12   under TSCA, right?

13       A.    Thank you.  Yeah, I wanted to

14   double-check that.

15       Q.    And he -- okay.  And we'll take

16   a break.

17            MR. MCWILLIAMS:  Let's go off

18       the record.

19            VIDEOGRAPHER:  The time is

20       2:53 p.m.  We are off the record.

21        (Off the record at 2:53 p.m.)

22            VIDEOGRAPHER:  The time is

23       3:03 p.m.  We're back on the record.

24   QUESTIONS BY MR. MCWILLIAMS:

25       Q.    Looking back -- Mr. Gerber, did

Confidential - Pursuant to Protective Order

1    you get a chance to use the restroom and

2    everything?

3          A.    I did.

4          Q.    Okay.  Good.

5                In TSCA, one of the explicit

6    things that must always be reported is

7    cancer, right?

8          A.    That must always be reported?

9          Q.    Yes, sir.

10         A.    That's one of those end points

11   that EPA says is of high concern, and little

12   to no weight is given to exposure.

13         Q.    Right.

14               And so therefore you should

15   pretty much always report it, fair?

16         A.    Yeah, that's a strong bias

17   towards reporting in those cases.

18         Q.    Got it.

19               And in the -- and the 1978

20   guidance also says that if you -- it's

21   possible that effects less serious than those

22   described in part 5A may be preliminary

23   manifestations of the most serious effects,

24   right?  And therefore reportable?

25         A.    I'm sorry, can you -- can you

Confidential -- Pursuant to Protective Order

```
1    repeat the question?

2         Q.    Yes, sir.

3               The 19 -- the March 1978

4    guidance that we discussed this morning also

5    says that -- again, talking about those most

6    serious effects like cancer or birth defects,

7    that it's also reportable if you -- if you

8    find preliminary manifestations of those more

9    serious effects, that those should be

10   reported as well, right?

11        A.    Yeah, I remember that reference

12   with respect to neurotoxicity in particular.

13        Q.    Okay.  Yeah.

14              But it would make sense if

15   it's -- if you see early preliminary

16   indications of neurotoxicity, it should be

17   reportable, the same would be true for those

18   other very serious adverse effects like

19   cancer and birth defects, right?

20        A.    If they reasonably supported a

21   conclusion of a substantial risk.

22        Q.    Right.  Okay.

23              And so let's -- and so we

24   talked about the outside consultant,

25   Dr. Hodge, that was brought in, who you
```

Confidential - Pursuant to Protective Order

1    guys -- certain people at 3M flew out to San

2    Francisco to meet with him at the Hilton

3    Hotel, right?

4              We just looked at those

5    documents?

6        A.    Yes.

7        Q.    Okay.  And that meeting

8    occurred on April 12, 1979; is that right?

9        A.    Yes.

10       Q.    Okay.  And, sir, are you aware

11   that one day later, on April 13, 1979, those

12   same individuals that flew on the 3M jet to

13   San Francisco flew to Houston, Texas, to meet

14   with another external consultant?

15       A.    I don't -- I don't recall that

16   document specifically.

17             (Gerber 30(b)(6) Exhibit DL1227

18        marked for identification.)

19   QUESTIONS BY MR. MCWILLIAMS:

20       Q.    Okay.  Well, let me pull it up.

21   Let's see if this refreshes your

22   recollection.  Pull up DL1227.

23             MR. ROTTENBERG:  That's

24        Tab 116.

25

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. MCWILLIAMS:
 2        Q.    You're on mute again, sir.
 3        A.    Yes, I have that document.
 4        Q.    Okay.  And do you recognize
 5   this as a document you reviewed in
 6   preparation for your deposition?
 7        A.    I believe so.
 8        Q.    Okay.  And you see these are
 9   draft meeting minutes with a Dr. J.R.
10   Mitchell; is that right?
11        A.    Yes.
12        Q.    And it says, "Those present met
13   on April 13, 1979, at the Host International
14   Hotel in Houston, Texas, to review recent
15   results which are relevant to the
16   fluorochemicals in blood program and to
17   discuss future plans."
18              Did I read that correctly, sir?
19        A.    Yes.
20        Q.    Okay.  And this -- you can look
21   back at the -- Dr. Hodge.  You can see that
22   this is one day later.  Same individuals, one
23   day later, different consultant, different
24   city, right?
25        A.    Yes.
```

1        Q.      Okay.  And you understand that

2    Dr. Mitchell was a toxicologist, right?

3        A.      I'm not familiar with

4    Dr. Mitchell's background.

5        Q.      Would you accept my

6    representation that he was a toxicologist at

7    Baylor University?

8        A.      Yes.

9        Q.      Okay.  And I want you to look

10   at these draft meeting minutes, and you can

11   see -- if you turn to page 4, it says, "J.R.

12   Mitchell then summarized the meeting in the

13   form of a slide as follows."

14              Right?

15              And this is Dr. Mitchell

16   summarizing the meeting he just had with

17   representatives from 3M, right?

18       A.      That's my understanding.

19       Q.      Okay.  Do you see that he has a

20   list of -- he -- of what he's identified as

21   people at risk?

22       A.      Yes.

23       Q.      Okay.  And do you see where

24   public health and the environment are

25   identified as people at risk?

1          A.     I see that.  I guess I'm not
2    sure what -- what he means by that phrase.
3          Q.     Okay.  Well, I guess we'll let
4    the jury figure out what they think.
5                 And do you see he also
6    discussed legal issues?  Right?
7          A.     Yes.
8          Q.     And specifically, one of the
9    legal issues they discuss was TSCA
10   Section 8(e), the topic you were -- what
11   today is all about, right?
12         A.     Yes.
13         Q.     Okay.  And so does this refresh
14   your recollection that Dr. Mitchell is one of
15   the outside consultants that 3M consulted
16   with in determining whether or not it should
17   report to the EPA what it knew about PFOS?
18         A.     Yes, I believe so.
19         Q.     Okay.  Now, do me a favor.
20   Turn to page 3.  And you can see in the
21   middle of the page it says, "R.A. Nelson
22   reviewed results of 90-day subacute toxicity
23   studies using PFOS and others."
24                Right?
25         A.     Yes.

Confidential - Pursuant to Protective Order

1     Q.     And these are the same toxicity

2  studies we've been talking -- we've been

3  discussing now for the last couple hours; is

4  that fair?

5          You're on mute.

6     A.     I'm sorry.

7          I believe so.

8     Q.     Okay.  And it says, "J.R.

9  Mitchell made the following comments."

10         And J.R. Mitchell is the

11 outside consultant.  He doesn't work at 3M,

12 right?

13    A.     That's my understanding.

14    Q.     Okay.  And then what is the

15 third comment he provides to these

16 individuals at 3M?

17    A.     "Some of the symptoms in

18 animals from these 90-day studies are similar

19 to those observed with carcinogens."

20    Q.     And again, carcinogens are one

21 of those things you always have to report.

22 There's a very strong bias in favor of

23 reporting under TSCA Section 8(e); is that

24 correct?

25    A.     If there's information

1    sufficient to reasonably support a

2    conclusion.

3              (Gerber 30(b)(6) Exhibit DL1372

4         marked for identification.)

5    QUESTIONS BY MR. MCWILLIAMS:

6         Q.    Okay.  And I want you to now --

7    now, these are the draft meeting minutes.  I

8    now want you to look at the final meeting

9    minutes, and I want you to see if you see any

10   interesting comments that have been removed.

11             Let's go to DL1372.

12             MR. ROTTENBERG:  That's Tab 83.

13             THE WITNESS:  All right.  I

14        have that.

15   QUESTIONS BY MR. MCWILLIAMS:

16        Q.    Okay.  Now, in this -- do you

17   recognize this as a document you reviewed in

18   preparation for your deposition?

19        A.    I believe so.

20        Q.    Okay.  And can you agree -- do

21   you agree with me, sir, that these are the

22   final version of the meeting minutes we've

23   been discussing in DL1227?

24        A.    I believe so.

25        Q.    They both make reference to a

Confidential -- Pursuant to Protective Order

```
 1    meeting that occurred on April 13, 1979, with

 2    J.R. Mitchell, right?

 3         A.    That's correct.

 4         Q.    Okay.  Now the draft meeting

 5    minutes, Dr. Mitchell commented to

 6    individuals at 3M that, quote, "Some of the

 7    symptoms in animals from these 90-day studies

 8    are similar to those observed with

 9    carcinogens."

10              Right?

11         A.    I recall that from the draft

12    minutes.

13         Q.    Okay.  Now look at the final,

14    and I want you to tell me if that has been

15    removed from the final meeting minutes.  The

16    bottom of page 2, the top of page 3.

17         A.    I see earlier on the first

18    page --

19         Q.    I'm talking about specifically

20    that -- where J.R. Mitchell made the

21    following comments, 1, 2 and 3.

22              You see 1, 2 and 3 in the

23    draft, and you only see 1 and 2 in the final.

24    And comment number 3, talking about his

25    observation that these are -- these symptoms
```

Confidential - Pursuant to Protective Order

 1   are consistent with carcinogens, has been

 2   removed.

 3           Can you confirm that for me,

 4   please, sir?

 5       A.    5, 6.  Sorry.  I'm sorry, can

 6   you give me just a minute?  I want to make

 7   sure I'm in the right place here.

 8       Q.    Yes, please.

 9       A.    So I do see at the bottom of

10   page 2 and the top of page 3 there are

11   numbers 1 and 2.  There's not a number 3.

12       Q.    Right.

13           So the comments from

14   Dr. Mitchell that "Some of the symptoms in

15   animals from these 90-day studies are similar

16   to those observed with carcinogens" has been

17   removed from the official meeting minutes.

18           Is that accurate?

19       A.    It appears that that particular

20   statement was reviewed.  There are additional

21   statements on the first page about C7F15COF

22   might be an excellent alkylating agent and

23   thus a potential carcinogen, and that appears

24   to be consistent between the draft and the

25   final.

Confidential - Pursuant to Protective Order

```
1        Q.     Okay.  I think you misspoke.
2   You said it appears this statement was
3   reviewed.  I think you meant was it removed.
4        A.     Oh, I --
5        Q.     So my question specifically --
6   sir, listen carefully.
7               Is this statement of this -- of
8   the comment by Dr. Mitchell specifically
9   that, quote, "Some of the symptoms in animals
10  from these 90-day studies are similar to
11  those observed with carcinogens," was that
12  particular statement removed from the final
13  meeting minutes?
14       A.     I do not see that statement in
15  the final meeting minutes.
16       Q.     Okay.  So 3M gets reports that
17  a chemical they make is in the blood of the
18  general population.  They get reports that
19  its potential to bioaccumulate.  They do
20  toxicology testing.  They conclude it's toxic
21  in animals in the doses studied.  They then
22  decide they need to talk to outside
23  consultants that say whether or not they
24  should report this to the EPA.  And the
25  consultants tell them that these results are
```

Confidential - Pursuant to Protective Order

```
1   similar to carcinogens and that if this
2   chemical is in the blood of the general
3   population, you could have a serious problem.
4              And all those statements are
5   removed, and ultimately 3M does not disclose
6   this information to the EPA for another
7   20 years.
8              Is that fair?
9       A.   Would you be able to break that
10  question down?
11      Q.   No, it's okay.  I'll withdraw
12  it.  That was a bad question.
13             Okay.  Let's go to one more
14  document, and then I'll have one module left
15  and we'll be coasting out of here.
16             (Gerber 30(b)(6) Exhibit DL1411
17      marked for identification.)
18  QUESTIONS BY MR. MCWILLIAMS:
19      Q.   Let's go to DL1411.  Do you
20  have the tab, guys?
21             MR. WOODS:  Daniel?
22             MR. ROTTENBERG:  Yeah, sorry.
23      Yeah, 23.
24             If you could not cover the
25      date.  I've got them in chronological.
```

1        Some of the Bates aren't matching up

2        with what we received.  Just FYI to

3        you, Joe.  Thanks.

4    QUESTIONS BY MR. MCWILLIAMS:

5        Q.     You're on mute, sir.

6        A.     Boy, you think I'd catch on.

7               Did you say 23?

8               MR. WOODS:  Yeah.

9               THE WITNESS:  All right.  I

10   have it.

11   QUESTIONS BY MR. MCWILLIAMS:

12       Q.     Okay.  You have DL1411 in front

13   of you?

14       A.     Yes, I have that document.

15       Q.     And is this a document you

16   reviewed in preparation for your deposition?

17       A.     I believe so.

18       Q.     Okay.  And are these draft

19   meeting minutes of a meeting that was held on

20   May 7th and 11th in 1979?

21       A.     Yes.

22       Q.     And the date of the minutes

23   themselves is July 26, 1979; is that right?

24       A.     That's correct.

25       Q.     Okay.  And it says, "These

1    meetings of the fluorochemical technical

2    review committee were convened by R.A. Prokop

3    to discuss the recommendations of H.C. Hodge

4    and J.R. Mitchell and to make its own

5    recommendations for future work."

6              Did I read that correctly, sir?

7        A.    Yes.

8        Q.    And it makes references to two

9    different dates, and those are the dates --

10   those are two days in a row.  Those are the

11   dates of the meeting of the minutes we've

12   just discussed that occurred in San Francisco

13   and Houston, Texas; is that correct?

14       A.    I believe so.

15       Q.    Okay.  Let's flip over -- a few

16   pages into it.  If you go to page 3, please.

17             I'm sorry.  You know, page 1,

18   importantly, at this particular meeting,

19   neither Dr. Hodge nor Dr. Mitchell were

20   present.  They were just discussing what had

21   been discussed at the prior meetings where

22   they were present, correct?

23       A.    Based on the list of who's

24   present, I believe that's correct.

25       Q.    Okay.  So with that said, turn

1    to page 3, please.

2            You see there's a number 3,

3    carcinogenicity studies?

4        A.    Yes, I see that.

5        Q.    Okay.  It says, "Hodge

6    suggested that carcinogenicity testing would

7    start with Ames testing and gradually

8    progress into more sophisticated testing as

9    required.  On this point, Nelson and Case

10   remarked that teratogenic, reproduction and

11   mutagenic studies would not be adequate for

12   carcinogenicity evaluation.  They" --

13           And "they" is Nelson and Case,

14   right, who are the 3M employees?

15       A.    I can't say for sure, but I

16   think that's a reasonable reading.

17       Q.    Okay.  It says, "They feared

18   that when FC-807" --

19           That's the Scotchban food

20   packaging product, right?

21       A.    That's my understanding, yes.

22       Q.    "They feared that when FC-807

23   gets publicity for any reason, the

24   carcinogenicity issue will assume

25   considerable significance in light of

```
 1    possible long-term persistency of

 2    fluorocarbons in blood."

 3                  Did I read that correctly, sir?

 4        A.     Yes.

 5        Q.     Okay.  Go to the next page,

 6    please.

 7                  Go to page 5, actually.  In the

 8    middle of the page, you see where it's

 9    written, "Nelson and Case together

10    expressed"?

11                  Do you see where I am, sir?

12        A.     Yes.

13        Q.     Okay.  It says, "Nelson and

14    Case" -- those are both 3M employees, right?

15        A.     I believe so.

16        Q.     Okay.  It says, "Nelson and

17    Case together expressed that if we do not

18    carry out long-term animal studies, and if

19    anything goes wrong, all kinds of prices may

20    have to be paid by the committee members and

21    the corporation."

22                  Did I read that correctly?

23        A.     Yes.

24        Q.     And "the corporation" in this

25    context is 3M Corporation, right?
```

Confidential - Pursuant to Protective Order

1      A.      That's my understanding.

2      Q.      "On the other hand, even if no

3   3M fluorochemicals were found in the blood of

4   the general population, all our studies would

5   be a clear demonstration of the diligence on

6   the part of 3M in caring for public health

7   and sharing the goals envisioned in TSCA."

8           Right?

9      A.      Yes, I see that.

10     Q.      Okay.  So 3M is acutely aware

11  of the public health goals and the sharing of

12  information envisioned by TSCA, right?

13     A.      Based on my review of the

14  documents, 3M was actively engaged in

15  monitoring the implementation of TSCA and

16  understanding its requirements.

17          MR. MCWILLIAMS:  Okay.  All

18      right.  We're on to the last module.

19      I bet we'll be done in -- well, I'll

20      be done in 30, 45 minutes.  Okay,

21      guys?

22          MR. WOODS:  That sounds good.

23  QUESTIONS BY MR. MCWILLIAMS:

24     Q.      All right.  So shifting gears a

25  little bit here, Mr. Gerber, I know you're --

Confidential - Pursuant to Protective Order

```
1    one of the other things that you've been

2    asked to be prepared to discuss today is this

3    thing called the Interagency Testing

4    Committee; is that right?

5         A.    Yes.

6         Q.    Okay.  And the Interagency

7    Testing Committee is a -- is a -- a function

8    of TSCA as well, right?  Section 4?

9         A.    Yes.  My understanding is that

10   the committee would recommend substances to

11   the Agency for further testing under

12   Section 4 of TSCA.

13        Q.    So TSCA has at least two

14   different parts.  On one hand, if a company

15   learns -- obtains information that a chemical

16   they use or make or import can cause injury

17   to person or the environment, they have to

18   report.  That's Section 8(e).

19              But also in Section 4, in those

20   chemicals where we don't know yet if it

21   causes injury to person or the environment,

22   the EPA has the authority to require the

23   companies who make that chemical or use that

24   chemical to perform certain toxicology tests.

25              Is that a fair synopsis?
```

Confidential - Pursuant to Protective Order

```
 1        A.     Yes.  3M has authority under
 2   Section 4 of TSCA to issue test rules.
 3        Q.     You mean EPA has authority?
 4        A.     I am sorry, yes.  Thank you.
 5        Q.     Okay.  And so -- and then the
 6   entity that helps determine which company --
 7   which chemicals should be tested for
 8   toxicology to determine if it's a risk to
 9   health or the environment is the Interagency
10   Testing Committee; is that correct?
11        A.     Yes.  My understanding is the
12   function of that committee is to provide
13   recommendations to EPA for further action.
14        Q.     And the Interagency Testing
15   Committee involves components of the federal
16   government that's much broader than just the
17   EPA; is that right?
18        A.     I believe so.
19        Q.     Right.
20               The Interagency Testing
21   Committee involves the Occupational Safety
22   and Health Administration, also known as
23   OSHA; is that right?
24        A.     Yes.
25        Q.     It involves the National
```

1    Science Foundation; is that right?

2        A.    I believe so.

3        Q.    It involves the National

4    Institute for Occupational Safety and Health.

5    That's NIOSH; is that right?

6        A.    I believe so.

7        Q.    The National Cancer Institute?

8        A.    I believe so.

9        Q.    The Department of Commerce?

10       A.    I -- I'd have to double-check,

11   but --

12              (Gerber 30(b)(6) Exhibit DL1228

13        marked for identification.)

14   QUESTIONS BY MR. MCWILLIAMS:

15       Q.    Okay.  Well, let's pull up

16   DL1228 so it's not a memory test and we can

17   look at it together.

18              And right now we're not -- I'm

19   not going to get into the document yet, but

20   if you could just blow up the header, please,

21   just the -- just the top fifth of the

22   document so we can see -- I want to see all

23   of those entities.

24              So we -- yeah, thank you.

25              So we talked about this.  So it

Confidential - Pursuant to Protective Order

```
 1    involves Council for Environmental Quality;
 2    is that right?
 3         A.    Yes.
 4         Q.    The EPA, of course?
 5         A.    Yes.  I'm sorry, tab?
 6               MR. ROTTENBERG:  50.  5-0.
 7               THE WITNESS:  Thank you.  Okay.
 8    QUESTIONS BY MR. MCWILLIAMS:
 9         Q.    Okay.  And then there's also
10    liaison agencies which includes the
11    Department of Defense; is that right?
12         A.    Yes.
13         Q.    And the National Toxicology
14    Program, NTP, right?
15         A.    Yes.
16         Q.    And they get together every
17    couple of years, and they look -- well, let
18    me back up.
19               Another component of TSCA is
20    that companies are required to report to the
21    EPA chemicals they make or import, correct?
22    And the volume, right?
23         A.    Are you referring to the
24    inventory update reporting rule?
25         Q.    Yes, sir.
```

Confidential - Pursuant to Protective Order

```
 1          A.      At that time?

 2          Q.      Yes, sir.

 3          A.      Yes.  So that -- that would

 4   apply to a subset of substances.

 5          Q.      Okay.  But the ITC is this

 6   group of all these governmental agencies that

 7   get together every couple years, and they

 8   look at the inventory reporting data, and

 9   they look for chemicals that are made in

10   large quantity where they're not sure if

11   they're safe or not.

12                  Is that a fair synopsis?

13                  And they consider them for

14   listing, which would potentially result in

15   them being -- the makers of those chemicals

16   being required to test them for toxicology,

17   right?

18          A.      So let me try and step through

19   your question.

20          Q.      Yes.

21          A.      So my understanding is that in

22   this ITC notice, substances were prioritized

23   based on production volume, which would have

24   been derived from that IUR reporting.  And

25   from that list, the ITC was attempting to
```

1   develop a list of priorities to forward on to

2   EPA.

3           Q.    Right.  Okay.

4                 And so then in 1982, the

5   Interagency Testing Committee looked at the

6   production data for POSF and determined that

7   they wanted to learn more about POSF and

8   whether or not it was potentially harmful to

9   human health or the environment; is that

10  fair?

11          A.    So their purpose, as I

12  understand it, was to determine whether it

13  should be listed as a priority to recommend

14  to EPA for further testing.

15          Q.    Right.

16                And that occurred for POSF in

17  1982; is that right?

18          A.    Yes, POSF was one of the

19  substances in that list.

20          Q.    And POSF is that substance we

21  looked at on the chart, the graph, that 3M

22  made, over the totality, more than 100

23  million pounds; is that right?

24          A.    Yes, 3M was a manufacturer of

25  POSF.

1          Q.     And that's the chemical that

2    can convert to PFOS either in the environment

3    or a -- a metabolism in organism, right?

4          A.     I understand based on the

5    documents that I've reviewed that POSF can

6    hydrolyze to PFOS.

7          Q.     Okay.  We've also looked at the

8    documents that talk about metabolism, right?

9          A.     I believe so.

10         Q.     Yeah.  Okay.

11                So let's look at DL1228.

12                Is this a document you reviewed

13   in preparation for your deposition?

14         A.     Yes, it is.

15         Q.     And is this the formal notice

16   that 3M received when the ITC identified POSF

17   as a chemical it was interested in

18   potentially listing?

19         A.     I guess the formal notice would

20   be the Federal Register notice, but then 3M

21   also received this -- this document from the

22   ITC.

23         Q.     Okay.  And let's read this

24   together.

25                This is dated March 23, 1982;

```
 1   is that right?

 2        A.     Yes.

 3        Q.     Okay.  And it's addressed to

 4   the manager of government relations for

 5   health and environment at the 3M Company

 6   located in St. Paul, Minnesota; is that

 7   right?

 8        A.     Yes.

 9        Q.     And the reference is to

10   307-35-7 for POSF, right?

11        A.     Yes.

12        Q.     And it says, "Dear sir, this

13   letter is a follow-up to the enclosed notice

14   published in the Federal Register on

15   February 25, 1982."

16               Do you see that, sir?

17        A.     Yes.

18        Q.     And it says, "I am requesting

19   on behalf of the TSCA Interagency Testing

20   Committee, ITC, information on the referenced

21   chemical reported in the TSCA chemical

22   substance inventory as being manufactured by

23   your company.  This chemical has been

24   selected in a screening and scoring exercise

25   for in-depth review by the ITC.  The purpose
```

Confidential - Pursuant to Protective Order

1    of the review is to determine whether or not

2    the chemical warrants designation to the EPA

3    administrator for priority consideration for

4    health and environmental effects testing."

5              Did I read that correctly, sir?

6         A.    Yes.

7         Q.    "Although you are under no

8    legal obligation, the committee would

9    appreciate receiving any relevant information

10   you may have that has not been published in

11   the open literature.  The kinds of

12   information that would be most helpful in

13   assessing the need for testing are outlined

14   in the enclosed Federal Register notice."

15             Did I read that correctly, sir?

16        A.    Yes.

17             (Gerber 30(b)(6) Exhibit DL1554

18        marked for identification.)

19   QUESTIONS BY MR. MCWILLIAMS:

20        Q.    Okay.  Now, let's -- and I

21   found a copy of the registered -- of the

22   Federal Register you guys got, but I did not

23   disclose it.  But let's -- maybe we can just

24   pull it -- it's only one page.  It's DL1554.

25             Can we put that in his download

Confidential - Pursuant to Protective Order

```
 1   folder or whatever it's called?
 2            Are you able to access that,
 3   Mr. Gerber?
 4        A.    I am refreshing the page.
 5            DL1554?
 6        Q.    Correct.
 7        A.    All right.  I have that up.
 8        Q.    Okay.  And do you recognize
 9   this as a Federal Register notice that was
10   referenced and actually attached to DL1228,
11   the March 23, 1982 letter?
12        A.    Yes, I recognize this document.
13        Q.    Okay.  Did you review this
14   document in preparation for your deposition?
15        A.    Yes, I did.
16        Q.    Okay.  So let's go through this
17   together.
18            And it says, "Chemicals to be
19   reviewed by the Toxic Substances Control Act
20   Interagency Testing Committee public meeting
21   and request for information."
22            Did I read that correctly, sir?
23        A.    Yes.
24        Q.    Okay.  And under the summary it
25   says, "TSCA Interagency Testing Committee
```

Confidential - Pursuant to Protective Order

```
 1   will hold a public meeting to receive

 2   comments and information on a new list of

 3   chemicals selected for review by the ITC."

 4             Do you see where I'm reading

 5   from, sir?

 6      A.     I do.

 7      Q.     And then there's a background

 8   section where it describes the authority

 9   under TSCA, right?

10             And then you go over to the

11   right-hand column, it says, "Eight federal

12   agencies are specified of TSCA, statutory

13   members of ITC," and then it identifies those

14   members; is that correct?

15      A.     Yes.

16      Q.     And then it goes on to say the

17   ITC has invited five other federal agencies

18   and one national program to basically assist

19   them in this endeavor?

20      A.     Yes, I see that.

21      Q.     And then it goes -- finally, at

22   the bottom right corner, if you just blow

23   this up, it says, "In developing its

24   designations."

25             Yeah, okay.  This is important.
```

1    This is where they lay out the type of

2    information they were requesting from 3M.

3                 Is that fair?

4          A.    Yes, this is the information

5    that they've identified as being priority

6    factors.

7          Q.    Right.

8                 And the type of information

9    they were seeking from 3M, right?

10         A.    That is my understanding.

11         Q.    Okay.  It says, "In developing

12    its designations, the ITC is directed by

13    Section 4(e)(1)A of TSCA to consider,

14    together with all other relevant information,

15    the following priority factors with respect

16    to chemicals under consideration."

17                Number 1 is the quantity

18    manufactured, number 2 is the quantity which

19    will enter the environment, 3 is occupational

20    exposure, and 4 is nonoccupational human

21    exposure.

22                And it goes on.  5 is

23    similarity in chemical structure to other

24    substances that are known to present an

25    unreasonable risk of injury to health or the

1  environment.

2            6 is the existence of data

3  concerning health and environment effects.

4            7 is the extent to which

5  testing will develop useful data on the risk

6  of injury to health or the environment.

7            Did I read those seven

8  considerations accurately?

9       A.    Yes.

10      Q.    Okay.  And let's focus on

11 number 3, for example.  That's occupational

12 exposure.

13            So the ITC is requesting

14 information from 3M as to what they know

15 about 3M employees that are exposed to POSF,

16 right?

17      A.    Based on the documents I've

18 reviewed, that appears to be 3M's

19 understanding of the request.

20      Q.    And number 4 is the

21 nonoccupational human exposure.  That will

22 include the general public, right?

23      A.    Yes, the general --

24      Q.    You're on mute again.

25      A.    I'm sorry.

Confidential - Pursuant to Protective Order

```
1              Yes, the general public would
2    be included in nonoccupational human
3    exposure.
4         Q.    Okay.  And so -- and again,
5    that -- and number 6 is the existence of data
6    concerning health and environmental effects,
7    right?
8         A.    Yes.
9         Q.    Okay.  So data concerning
10   health would include animal toxicology data
11   we've been discussing this afternoon, right?
12             That would be an example of
13   health effects, right?
14        A.    Yes.
15        Q.    That would be an example of
16   data concerning health effects, right?
17        A.    Yes.  Animal toxicology studies
18   would be -- would be included in information
19   related to health effects.
20        Q.    Okay.  And 3M's knowledge of
21   the potential for bioaccumulation would be an
22   example of environmental effects, right?  And
23   health effects, for that matter.  Fair?
24        A.    Yeah, it could -- that end
25   point could fall into, you know, one of those
```

Confidential -- Pursuant to Protective Order

```
 1   categories.
 2        Q.     Okay.  So again, just to recap,
 3   at this point in time in 1982, 3M had been
 4   provided information suggesting that a
 5   metabolite of POSF was present in the blood
 6   of the general population, right?
 7        A.     Information suggesting that
 8   from the Guy and Taves articles and 3M's
 9   blood bank analysis.
10        Q.     Yes, sir.
11               And 3M was in possession of
12   information -- and also, 3M was aware of the
13   metabolism studies, right, that POSF-based
14   products metabolized to PFOS.  We saw that in
15   rats, and we saw that in the chronology
16   timeline document, right?
17        A.     Yeah, I'd want to double-check
18   the timing of those, but I know that -- that
19   the potential for POSF to hydrolyze to PFOS
20   was recognized at this time and provided to
21   the ITC.
22        Q.     Okay.  You keep talking about
23   hydrolyzing, and that's in the environment,
24   and I appreciate that.  But I'm talking
25   specifically about metabolism and that you --
```

Confidential – Pursuant to Protective Order

1   3M was in possession of information from rat

2   studies that POSF-based products,

3   specifically FC-807, the food packaging

4   material, metabolizes to PFOS, right?

5       A.    So my understanding is those

6   metabolite studies, like you said, were based

7   on FC-807, not on POSF itself.

8       Q.    Right.

9             But that was a POSF-based

10  product, right?

11      A.    FC-807 is a downstream product

12  of POSF chemistry, is my understanding.

13      Q.    Right.

14            And you already testified this

15  morning that you would agree with Dr. Olsen

16  that PFOS in the blood of an individual would

17  be evidence of exposure to a POSF-based

18  product, right?

19      A.    I would rely on Dr. Olsen's

20  judgment.

21      Q.    Okay.  And so if Dr. Olsen said

22  PFOS in the blood of the general population

23  is evidence of exposure to POSF, you would

24  have no reason to disagree with him, right?

25      A.    I'm sorry, can you repeat that

Confidential -- Pursuant to Protective Order

```
 1   question?
 2       Q.    Right.
 3             If Dr. Olsen said PFOS in the
 4   blood of the general population is evidence
 5   of exposure to POSF, you would have no reason
 6   to disagree with him, right?
 7       A.    So is that what Dr. Olsen said
 8   or --
 9       Q.    Yes, sir.
10             Well, if he said that, you
11   would have no reason to disagree with him,
12   right?
13       A.    I would rely on Dr. Olsen as an
14   epidemiology expert for 3M.
15       Q.    Okay.  And so here we have --
16   therefore, that means that the reports of
17   PFOS in the blood of the general population
18   is really a report of exposure to POSF,
19   right?  Nonoccupational exposure.  Exactly
20   what the ITC is requesting, right?
21       A.    Based on the documents that
22   I've reviewed, I don't think that was 3M's
23   understanding of the request.
24       Q.    Okay.  Well, that's based on --
25   okay, we'll get to that.
```

Confidential -- Pursuant to Protective Order

```
 1                    And what's the basis of your
 2    understanding?  Is it the actual response?
 3         A.     Yes, and I've seen 3M's
 4    response to the request.  I've also seen
 5    documentation of discussions, attending
 6    meetings and discussions with EPA personnel
 7    regarding the purpose behind the request.
 8         Q.     Okay.  Have you seen any
 9    discussions about whether or not they should
10    disclose the evidence they have of PFOS in
11    the blood of the general population?
12         A.     Let's see, I don't recall
13    seeing discussion of that.
14         Q.     Okay.  But now 3M did
15    disclose -- okay.  Well, let's look at what
16    3M's response was.
17                    Just so we're clear, the ITC is
18    asking for evidence of nonoccupational
19    exposure to POSF and any data concerning
20    health or environmental effects, right?
21         A.     Yes.
22                    (Gerber 30(b)(6) Exhibit DL1230
23         marked for identification.)
24    QUESTIONS BY MR. MCWILLIAMS:
25         Q.     Okay.  So let's look at what 3M
```

Confidential - Pursuant to Protective Order

1    responded.  Let's see what information 3M

2    provided the ITC.  Let's pull up DL1230.

3                MR. ROTTENBERG:  It's Tab 35.

4                THE WITNESS:  All right.  I

5        have that.

6    QUESTIONS BY MR. MCWILLIAMS:

7        Q.    Okay.  And do you recognize

8    this?

9                Is this a document you reviewed

10   in preparation for your deposition?

11       A.    Yes.

12       Q.    Okay.  And is this the formal

13   response from EPA -- I mean, excuse me, from

14   3M to the ITC?

15       A.    I believe so.

16       Q.    Okay.  And is this dated

17   July 15, 1982?

18       A.    Yes, it is.

19       Q.    Okay.  Let's go through this

20   together.

21                So it says, "This memorandum is

22   in response to the notice published in the

23   Federal Register of February 25, 1982,

24   concerning the fourth scoring exercise of ITC

25   of chemicals to be given consideration for

1    the promulgation of testing rules pursuant to

2    Section 4(a) of TSCA.  Among the chemicals

3    listed is POSF, a chemical substance

4    submitted for the TSCA inventory by 3M.  We

5    hope the information provided herein is

6    sufficient to satisfy ITC that inclusion of

7    this substance in the list of chemicals

8    designated for priority consideration is

9    unnecessary."

10            Did I read that correctly, sir?

11       A.    Yes.

12       Q.    So it was 3M's desire for the

13   ITC -- well, for the EPA to not conduct

14   additional investigation into the toxicity

15   and exposure for POSF, right?

16            You feel it was unnecessary, is

17   the words 3M used, right?

18       A.    Yeah, 3M used the words

19   "unnecessary," that they had provided

20   information that they felt was sufficient to

21   address the questions and therefore that the

22   chemical did not need to be designated as a

23   priority.

24       Q.    So 3M did -- expressly desired

25   that EPA not exercise its authority in

Confidential - Pursuant to Protective Order

1    requiring additional testing in 1982, right?

2         A.    My understanding of this

3    response is that, yes, 3M felt that the

4    information they had provided was sufficient

5    and that POSF did not need to be designated

6    as a priority for further testing.

7         Q.    Okay.  Let's keep reading.

8               It says, "POSF is a chemical

9    intermediate manufactured and processed in

10   significant quantities by 3M for almost

11   30 years.  During this period, there has been

12   no indication of unreasonable risk of injury

13   to health or the environment or chronic

14   hazard.  So far as we are aware, 3M is the

15   sole commercial manufacturer of this

16   substance in this country and uses it

17   entirely for internal manufacturing."

18              Did I read that correctly, sir?

19        A.    Yes.

20        Q.    Okay.  Let's go to the next

21   paragraph.

22              It says, "The material is

23   manufactured, stored and processed in a

24   closed system with potentially significant

25   exposures to the atmosphere only at open

1    manhole covers and drum-filling stations.

2    Approximately 100 employees are potentially

3    exposed to the material on a regular basis.

4    In the plant, air containing less than .5

5    part per million POSF is encountered.  Small

6    amounts, about 100 55-gallon drums of POSF,

7    are shipped to other manufacturing units of

8    3M where an additional 30 employees are

9    potentially exposed less than five days a

10   year."

11              Did I read that correctly, sir?

12       A.    Yes.

13       Q.    So with respect to the -- to --

14   so the ITC wants to know who's exposed to

15   this chemical, right?

16              And 3M told them, no more than

17   130 people, right?

18       A.    They've described the

19   occupational exposure to this substance,

20   POSF.

21       Q.    And it makes no mention

22   whatsoever of nonoccupational exposure,

23   right?

24       A.    So based on the information

25   that I've reviewed and has been described to

1    the ITC, this information was used solely as

2    an intermediate in the manufacture of other

3    chemicals.  And so the occupational exposure

4    would be the exposure to the chemical.  POSF

5    itself was not distributed as a product.

6              MR. MCWILLIAMS:  I move to

7        strike as nonresponsive.

8    QUESTIONS BY MR. MCWILLIAMS:

9        Q.    Sir, do you remember the

10   question I asked you?

11       A.    Could you repeat it, please?

12       Q.    Yeah.

13             And this makes no mention

14   whatsoever of nonoccupational exposure,

15   correct?

16       A.    So this -- this notice does not

17   address nonoccupational exposure to POSF.

18       Q.    What do you mean "this notice"?

19   You mean this letter?

20       A.    This letter, sorry.

21       Q.    Okay.  Thank you.

22             Let's keep reading.  It says,

23   "Primarily because of low solubility, POSF is

24   relatively unreactive and neutral in acidic

25   aqueous media and can be steam distilled

Confidential -- Pursuant to Protective Order

1  without significant hydrolysis.  It reacts

2  controllably with aqueous organic or

3  inorganic strong bases at 50 degrees Celsius

4  or slightly above to form the corresponding

5  salt.  In general, the salts have low

6  solubility in water.  In solution, POSF

7  reacts vigorously and strongly,

8  exothermically, with primary and secondary

9  amines, and readily" -- "readily with any

10  substance containing active hydrogen in the

11  presence of soluble base, even at room

12  temperature."

13            No idea what that means.  Let's

14  keep going.

15            It says, "The acute hazard from

16  POSF is relatively low.  When applied to the

17  skin of mice at the level of 200 milligrams

18  per kilogram body weight, no toxic

19  indications were observed.  Intravenous

20  injections of mice resulted in LD50 in excess

21  of 300 milligrams per kilogram.  Mutagenicity

22  tests, the Ames salmonella typhimurium

23  bacteria strains," blah, blah, blah, "and the

24  yeast recombinant assay using sac" --

25  whatever -- "strain were negative.  Each

1    strain was tested with and without a

2    metabolic step."

3              Did I butcher that correctly?

4        A.      That's correct.

5        Q.      Okay.  And it says, "Because of

6    the high cost of manufacturing POSF, every

7    effort is made to minimize losses to the

8    environment.  Tarry byproducts of its

9    manufacture containing no more than 1 or

10   2 percent POSF are landfilled or sent to the

11   plant biological wastewater treatment

12   facility.  Losses during purification,

13   principally fumes collected in water

14   scrubbers, also go to wastewater treatment,

15   as would the occasional inadvertent spill.

16   It is estimated that no more than

17   3,000 pounds go to landfill, no more than

18   7,500 pounds go to wastewater, and no more

19   than 2,500 pounds go to the atmosphere each

20   year.  POSF released to the environment can

21   be expected to hydrolyze slowly to water

22   soluble salt, more rapidly in strongly basic

23   soils.  As a salt of a completely fluorinated

24   acid, no significant biodegradation is

25   anticipated.  The small amount of salts so

1    formed are not expected to provide

2    significant environmental harm.  The

3    properties of similar sulfonates are

4    illustrated in the enclosed product

5    environmental data sheet for a typical 3M

6    product, FC-95."

7              That's PFOS, right?

8       A.    Yes, that's my understanding.

9       Q.    So in response to the ITC's

10   request for information about what 3M knew

11   about exposure, environmental harm and

12   human -- harm to human health, 3M chose to

13   include some information it knew about PFOS.

14             Is that accurate?

15      A.    That's consistent with my

16   review of the documents.

17      Q.    Okay.  And that's because in

18   3M's view when they wrote this letter, they

19   said the properties of POSF are similar to

20   PFOS, right?

21      A.    Sorry, I'm just trying to find

22   that.

23      Q.    Yeah, it's the very last big

24   paragraph.

25      A.    The properties of similar

1  sulfates are illustrated in the enclosed

2  product environmental data sheet.  Yes, I see

3  that.

4      Q.    And at this point in time, 3M

5  had information indicating that PFOS had the

6  potential to bioaccumulate, right?

7      A.    My understanding, based on the

8  documents I've reviewed, is that, you know,

9  at this point in time the slow elimination

10  had been -- had been viewed in -- in the

11  employee blood data.

12      Q.    Okay.  So -- and let's actually

13  pull up the two attachments that 3M provided

14  to the EPA.  Let's go to DL1346 and DL1347.

15          MR. ROTTENBERG:  Tab 52.

16          THE WITNESS:  All right.  I

17      have Tab 52, product environmental

18      data for FC-95.

19          (Gerber 30(b)(6) Exhibits

20      DL1346 and DL1347 marked for

21      identification.)

22  QUESTIONS BY MR. MCWILLIAMS:

23      Q.    Okay.  So whenever 3M decided

24  to provide environmental data -- strike that.

25          Whenever the ITC requested

Confidential - Pursuant to Protective Order

1   environmental data for POSF, 3M provided

2   environmental data for PFOS, right?

3        A.    That's part of the information

4   that 3M provided as part of its response to

5   the request.

6        Q.    Okay.  Do you see anywhere in

7   the information provided to the Environmental

8   Protection Agency Interagency Testing

9   Committee where 3M provided information for

10  PFOS, where 3M disclosed to the ITC that PFOS

11  was present in the blood of the general

12  population?

13       A.    Sorry, give me a moment to just

14  read through this again.

15       Q.    Okay.

16       A.    So I do not see discussion of

17  organic fluorine in the general population as

18  part of this document.

19       Q.    Okay.  I asked not about

20  organic fluorine.  I asked about PFOS, the

21  metabolite of POSF.

22            Do you see any mention of that,

23  of 3M's knowledge of either of those

24  chemicals in the blood of the general

25  population?

1        A.    I don't see any information

2    regarding PFOS in the blood of the general

3    population in this document.

4        Q.    Okay.  Do you see any

5    indication in this document that 3M

6    believed -- of the potential for PFOS, or

7    POSF, for that matter, to bioaccumulate?

8        A.    I do see information provided

9    on bioconcentration potential on page 3 of 3.

10       Q.    Uh-huh.  All right.  This is

11   using the -- the N-octanol-water partition

12   coefficient, which is a way to predict a

13   chemical's bioaccumulation potential, right?

14       A.    That's my general

15   understanding.

16       Q.    Okay.  And you agree with me

17   predictions are different than observations?

18       A.    In general, yes.

19       Q.    You can either look at the

20   weather forecast or you can feel the rain

21   coming down on your face, right?

22       A.    I'm sorry, could you rephrase

23   the question?

24       Q.    Sure.

25             You could -- if the question

1  is, is it -- does it -- is it raining, you

2  can look at the weather forecast, right?

3  That's a prediction of whether or not it's

4  going to rain, right?

5      A.    Yes.

6      Q.    Or you could feel the rain

7  hitting your face, right?

8      A.    Yes.

9      Q.    An actual observation of rain

10 versus a prediction if it's going to rain,

11 right?

12     A.    Yes.

13     Q.    And this N-octanol-water

14 partition coefficient is a prediction as to

15 bioaccumulation.  It's not an actual

16 observation of bioaccumulation, right?

17     A.    And I'd let our environmental

18 scientists speak to the strength of that type

19 of information.

20     Q.    We'll ask them, but today is my

21 opportunity to ask you.

22            You understand.  You and I both

23 know that this N-octanol-water partition

24 coefficient is a tool to predict whether or

25 not a substance can bioaccumulate.  It's not

1   an actual measurement of whether or not a

2   substance bioaccumulates, right?

3        A.      This is outside my area --

4   outside of my expertise, but that's my

5   general understanding.

6        Q.      Right.

7            Okay.  So rather than tell the

8   EPA about what you guys actually observed,

9   the rain hitting your face, you instead

10  presented them with a weather forecast,

11  right?

12       A.      You know, I don't know that I

13  would characterize it that way.  You know,

14  this seems to be, you know, a standard piece

15  of information with, you know, a defined test

16  method there, you know, versus the

17  observation from the employee blood studies.

18       Q.      All right.  Well, let's keep

19  this open, and let's also pull up DL1570.

20  And I want you to tell me, were any of these

21  observations by 3M about the potential for

22  PFOS to bioaccumulate was disclosed to the

23  EPA in response to requests for information.

24            You remember this exhibit,

25  right, DL1570?

Confidential - Pursuant to Protective Order

1        A.      Yes.

2        Q.      Is any of the information from

3    DL1570 that we obtained from internal

4    confidential 3M documents, was any of this

5    disclosed to the EPA in 1982 in response to

6    their very specific request for information

7    3M had about these chemicals?

8        A.      Well, to clarify, the request

9    was for information related to POSF.

10               But in response to your

11   question, the information that's referenced

12   on the slide here, I don't see that reflected

13   in the product environmental data sheet.

14       Q.      Okay.  Let's make sure we look

15   at the other attachment, DL1346.  I don't --

16   I want to be complete.

17               MR. ROTTENBERG:  That's Tab 51,

18        Jon.

19               THE WITNESS:  I have that.

20               (Gerber 30(b)(6) Exhibit DL1346

21        marked for identification.)

22   QUESTIONS BY MR. MCWILLIAMS:

23       Q.      Okay.  And that's the second

24   attachment that was provided to the EPA -- or

25   the ITC in response to this information

Confidential - Pursuant to Protective Order

1    request from the ITC, right?

2          A.    That's my understanding, yes.

3          Q.    Okay.  And do you see any

4    reference in there to PFOS being present in

5    the blood of the general population or the

6    bioaccumulation potential of PFOS or the fact

7    that PFOS had been characterized as toxic by

8    scientists within 3M?

9          A.    I see health hazards referenced

10   there.  I do not see information related to

11   bioconcentration potential and -- I'm sorry,

12   what was the third category you mentioned?

13         Q.    That PFOS -- that PFOS had been

14   characterized as toxic.

15         A.    So there are -- there are

16   references to animal tests indicate that the

17   sulfonyl fluorides by themselves to be of

18   relatively low hazard.

19         Q.    Okay.  There's no mention of

20   all the monkeys dying, is there?

21         A.    I don't see that specifically

22   reflected in this document.

23         Q.    And in fairness, they didn't

24   all die.  I think 20 out of 24 died.

25               Does that sound right?

1        A.      I would have to double-check

2    the study summary.

3        Q.      Okay.  But that sounds -- the

4    majority of them died, right?

5        A.      At the dose levels that were

6    administered.

7        Q.      Right.

8                The dose levels selected by 3M,

9    right?

10       A.      That's my understanding.

11       Q.      Okay.  You know, I just

12   realized I skipped a document this morning.

13   Let's go to LP203.

14               MR. ROTTENBERG:  Tab 119.

15               THE WITNESS:  Okay.  I have

16          that document.

17               (Gerber 30(b)(6) Exhibit LP203

18          marked for identification.)

19   QUESTIONS BY MR. MCWILLIAMS:

20       Q.      Do you recognize this as a

21   document you reviewed in preparation for your

22   deposition, sir?

23       A.      I believe so.

24       Q.      Okay.  And is this an internal

25   correspondence within 3M dated April 6, 1978?

1          A.     Yes.

2          Q.     Okay.  And it's from Jon

3    Belisle to many of the same individuals that

4    we've seen the same names on the documents

5    from this time period; is that fair?

6          A.     Yes, I believe so.

7          Q.     Okay.  And it's -- well, let's

8    just go to the second page, please, under

9    Discussion.

10                And this is Dr. Jon Belisle at

11    3M, right, writing this?

12          A.     I believe that's correct.

13          Q.     Okay.  It says, "Discussion.  I

14    would suggest that this study feeding FM-3422

15    and a previous study with mice feeding FC-807

16    in which both serums were found to contain

17    PFOS is a significant finding."

18                Did I read that correctly, sir?

19          A.     Yes.

20          Q.     Okay.  And those are both

21    POSF-based products, right?  FM-3422 and

22    FC-807?

23          A.     That is my understanding.

24          Q.     You can tell from the chemistry

25    that they include the POSF head group, right,

Confidential - Pursuant to Protective Order

1    the C8F17SO2?

2        A.     Yes.

3        Q.     Okay.  And it says -- now, this

4    is a significant finding.  "It implies that

5    any 3M product bearing the POSF head group,

6    upon exposure to rats or mice, would generate

7    PFOS."

8               Did I read that correctly?

9        A.     I see -- yes, I see that.

10       Q.     It says, "which accumulates in

11   the animal's blood and tissue."

12              It continues.  It says, "The

13   next step would be to extrapolate these

14   findings to man per Guy and Taves' research."

15              Right?

16       A.     Yes, I see that.

17       Q.     "Thus, I have suggested before

18   and will state again the significance of

19   characterizing those previous samples from 3M

20   employees exposed to 3M's skin protectants

21   and carpet treatment products."

22              That's like Scotchgard is a

23   carpet treatment product, a POSF-based

24   product, right?

25       A.     That's my -- my understanding

1    is that a POSF derivative was used in those

2    products.

3         Q.    It says, "If PFOS is found in

4    these person's blood, then the public health

5    issue becomes simply one of frequency and

6    type of exposure to 3M products."

7              Did I read that correctly, sir?

8         A.    Yes.

9         Q.    And this is entirely in the

10   context of POSF-based products, right?

11        A.    Sorry, I'm just going back to

12   review the introduction.

13             So the discussion involves

14   FM-3422 and FC-807, which were POSF

15   derivatives.

16        Q.    All right.  So now let's --

17   now, you understand as part of the ITC

18   process is they request this information from

19   3M, 3M submits whatever they want.  It's

20   voluntary.  You're not required -- you could

21   have just thrown away the letter, right?

22        A.    There's no obligation to

23   respond.

24        Q.    Right.

25             But would you agree with me a

Confidential - Pursuant to Protective Order

1    good corporate citizen has a duty to respond

2    and to respond thoroughly and accurately?

3         A.    Yes, I would agree that that

4    would be, you know, a productive approach.

5         Q.    Great.  I appreciate that.

6    That's probably the best question and answer

7    I got all day.

8              And then after all the

9    information is submitted to the ITC, the ITC,

10   in conjunction with some consultants,

11   generates a report.

12             Is that accurate?

13        A.    That's my understanding, yes.

14        Q.    All right.  Let's look at the

15   report they generated.  This is DL1428.

16             MR. ROTTENBERG:  160.  Tab 160.

17             THE WITNESS:  Okay.  I have

18        that.

19             (Gerber 30(b)(6) Exhibit DL1428

20        marked for identification.)

21   QUESTIONS BY MR. MCWILLIAMS:

22        Q.    All right.  And this is a

23   document you reviewed in preparation for your

24   deposition today, sir?

25        A.    Yes.

Confidential - Pursuant to Protective Order

```
 1        Q.     Okay.  I'll be done in five

 2   minutes, Gary.

 3              Okay.  So do you recognize this

 4   as the final report issued to the ITC by the

 5   consultants based on information provided by

 6   3M and others and publicly available

 7   information?

 8        A.     That's my understanding, yes.

 9        Q.     Okay.  And you see this is

10   dated September 22, 1983?

11        A.     Yes.

12        Q.     And it says it's prepared under

13   EPA contract, whatever, TSCA Interagency

14   Testing Committee, right?

15        A.     Yes.

16        Q.     Okay.  Now let's flip a few

17   pages into it.  And this is the information

18   reviewed for POSF, right?

19        A.     Yes.

20        Q.     And you go to page two little

21   Is.

22              Okay.  And you see under the

23   preface it says, "The authors wish to

24   acknowledge the contribution of data by W.H.

25   Pearlson of the 3M Company."
```

```
 1                    Right?

 2        A.     I see that.

 3        Q.     Okay.  And you've seen his name

 4   before on other documents we've looked at

 5   today; is that fair?

 6        A.     Yes, I have.

 7        Q.     Okay.  And he -- and

 8   Mr. Pearlson was aware of the reports of PFOS

 9   in the blood of the general population,

10   right?

11        A.     I'm sorry, POSF?

12        Q.     PFOS, yes, sir.

13        A.     PFOS?  I would have to

14   double-check the distribution lists.  I

15   believe that's correct, that he was aware of

16   the findings of Guy and Taves and the Newmark

17   analysis.

18        Q.     And the -- and 3M's analysis on

19   the Red Cross blood samples, right?

20        A.     Again, I'd have to double-check

21   distribution lists.  I believe that's

22   correct.

23        Q.     Okay.  Okay.  And let's flip a

24   couple more pages in.

25                    You see three little Is under
```

Confidential - Pursuant to Protective Order

1    Overview?

2              You see down at the bottom

3    where it says, "Summary Of Hazard Potential"?

4         A.    Yes.

5         Q.    It says, "Little information is

6    available on health and environmental effects

7    of the compound."

8              Do you see that, sir?

9         A.    Yes.

10        Q.    Is that an accurate statement,

11   that as of 1983 little information was

12   available on the health and environmental

13   effects of the compound, at least to 3M?

14        A.    I guess I can't speak to the

15   full scope of the science there.  I would

16   defer to my toxicology colleagues to

17   characterize the extent of that information.

18        Q.    Okay.  But clearly the EPA,

19   based on their -- the documents Mr. Pearlson

20   sent them and that 3M sent them, their

21   understanding is that there's little

22   information available, right?

23        A.    I see that that's the -- their

24   conclusion.

25        Q.    And you see where it says,

1    "Occupational and environmental exposure

2    appear to be low."

3              Right?

4         A.    Yes.

5         Q.    But at this point in time we

6    have evidence of widespread contamination of

7    the human blood supply with a POSF

8    metabolite, right?  PFOS?

9         A.    There's the information we

10   previously discussed regarding organic

11   fluorine in the general population blood and

12   the possibility that that's PFOS.

13             Based on the documents that

14   I've reviewed, I understand this evaluation

15   to be focused on POSF.

16        Q.    Okay.  Well, let's go to

17   page 4.

18             And see the section titled

19   "Biochemical Information"?  What does it say

20   under Metabolism?  We've talked about this,

21   you know, at length today.

22             3M was in possession of

23   information that POSF-based products

24   metabolized to PFOS, right?

25        A.    I -- I recall that from

Confidential - Pursuant to Protective Order

1   previous questions.

2        Q.     Okay.  And we saw no reference

3   of that data in 3M's submission to the EPA,

4   is that correct, from 1982 submission?

5        A.     Based on the documents that

6   I've reviewed, I have not seen the

7   information on the metabolites of those POSF

8   derivatives.

9        Q.     And based on this report, EPA

10  says no information found on this topic of

11  metabolism, right?

12       A.     With respect to POSF.

13       Q.     Okay.  Right.

14              But POSF metabolizes to PFOS,

15  right?

16       A.     I see it's noted that it

17  hydrolyzes to PFOS.

18       Q.     Yeah, that's not metabolism.

19              You keep trying to go there.

20  Metabolism is in an organism, a living

21  organism, right?

22       A.     And -- yeah.  And again, my

23  toxicology colleagues can speak better to

24  that.

25       Q.     And we will speak to them, I

Confidential - Pursuant to Protective Order

1   assure you, but today is my opportunity to

2   speak to you.  So, Mr. Gerber, if you could

3   just do your best to answer my questions, I

4   would greatly appreciate it.

5            Okay?

6       A.    I am trying.

7       Q.    Okay.  Go to page 4.  We

8   already did page 4.

9            Go to page 6 under

10  Bioconcentration.

11           What is written here, sir?

12      A.    "The low estimated log

13  octanol-water partition coefficient and its

14  slight suitability in organics indicate POSF

15  will not bioconcentrate to any appreciable

16  extent."

17      Q.    Okay.  And that's based on that

18  weather forecast, the octanol coefficient,

19  right?  The thing that predicts

20  bioaccumulation, not observes it, right?

21      A.    That's based on that test

22  result, yes, that predictive test.

23      Q.    Okay.  Now, as a result of

24  this, did the ITC recommend to the EPA that

25  they require testing of POSF?

Confidential - Pursuant to Protective Order

1         A.      I don't believe so.

2         Q.      Okay.  But subsequently the ITC

3  has made such a recommendation, haven't they?

4         A.      And can -- do we have the

5  specific recommendation --

6         Q.      Well, sir, you're aware --

7  you're aware that after 3M disclosed to the

8  EPA that PFOS was present in the blood of the

9  general population, subsequent to that, the

10  ITC recommended for listing, POSF and EPA

11  followed the recommendation.

12              Is that accurate?

13         A.      I'd have to review that notice.

14  I'm sorry, I don't have that front of mind.

15              MR. MCWILLIAMS:  Okay.  Well, I

16         don't have it either, so I think

17         that's all the questions I have.

18         Let's just take a quick break.

19              I know my colleague,

20         Mr. Douglas, has some questions, but I

21         believe that's all the questions I

22         have.  So thank you, guys.

23              VIDEOGRAPHER:  The time is --

24              MR. WOODS:  Yeah, this is

25         Craig.  Can we take a short break

Confidential -- Pursuant to Protective Order

```
1        here?

2                MR. MCWILLIAMS:  Yeah, let's do

3        ten minutes.  Is that okay?

4                MR. WOODS:  That's great.

5                And one other issue.  I just

6        want to check on time.

7                VIDEOGRAPHER:  You want this on

8        record, Craig?  Sorry.

9                MR. WOODS:  Let's go off the

10       record.

11               VIDEOGRAPHER:  The time is

12       4:10 p.m.  We're off the record.

13        (Off the record at 4:10 p.m.)

14               VIDEOGRAPHER:  The time is

15       4:22 p.m.  We are back on the record.

16               DIRECT EXAMINATION

17  QUESTIONS BY MR. DOUGLAS:

18       Q.    All right.  Good afternoon,

19  Mr. Gerber.  Thank you for your patience all

20  day.  I know it's been a long day.

21               I have only -- I promise you

22  I'm not going to be nearly as long as my

23  colleague, Mr. McWilliams.  This should be

24  brief.

25               But my name is Gary Douglas.
```

1    I'm from the law firm Douglas & London in New

2    York City, and I represent plaintiffs in this

3    action.  And I just have a few more questions

4    for you, and specifically with respect to

5    plaintiff water provider.

6              So my first question for you,

7    sir, is, you know what a water provider is?

8         A.    Yes.

9         Q.    Okay.  And you're here as a 3M

10   representative today to answer questions of

11   the plaintiff in this case?

12        A.    Yes.

13        Q.    Okay.  And you, I take it, know

14   that PFOS has been found in the drinking

15   water of millions of Americans across the

16   country to date.

17             You're aware of that, right?

18        A.    I'm aware of those general

19   results.

20        Q.    Okay.  And that from New York

21   City to California, from Key West to Alaska

22   and the -- and the US territories, you know

23   that it's been found in those, right?  In the

24   drinking water in those areas?

25        A.    I'm not familiar with all of

1    the results, but I have that general

2    understanding.

3         Q.    Okay.  And you know that PFOS

4    has been classified as a PBT, persistent,

5    bioaccumulative and toxic, right?

6         A.    I understand that EPA has

7    characterized it that way.

8         Q.    Yeah.

9              That's not good, right?  You

10   don't want to be drinking a PBT in your

11   water, do you?

12        A.    I personally do not.

13        Q.    Okay.  You think anybody does?

14        A.    I guess I can't speak for

15   everybody, but I would guess, you know, in

16   general, no.

17        Q.    Okay.  And if someone were to

18   put something in your drinking water you

19   didn't want to drink, would you -- would you

20   agree with me that it -- that maybe the right

21   thing, the decent thing, to do would be to

22   tell folks?

23        A.    Yes, I would.

24        Q.    Okay.  And you know that in

25   some of these cases -- I mean, even if I put

Confidential -- Pursuant to Protective Order

1    something, for example, in your water as

2    innocuous -- or perhaps you were drinking a

3    cup of tea during the break, and while you

4    were gone I put something as innocuous as

5    sweetener in your tea, you'd want me to let

6    you know that, wouldn't you?

7        A.    Yes, I would.

8        Q.    Okay.  And you know that in

9    some cases these levels of PFOS have been

10   found to be in excess of the EPA's health

11   advisory of 7 parts per trillion combined

12   PFOA and PFOS.

13            Do you know -- are you aware of

14   that?

15       A.    Yes, I'm not aware of all the

16   specific results.

17       Q.    But in some cases, indeed it

18   has found to be in excess of that level; is

19   that correct?

20       A.    I believe so, but I would -- I

21   would defer to the environmental scientists

22   who study that in more detail.

23       Q.    Okay.  So -- and so, for

24   example, why is your water -- whoever is

25   paying for it, we don't have to get into

1  that, but why is your water filtered to

2  remove PFOS, if you know?

3      A.    I'd have to go back to the

4  Cottage Grove water reports.  My

5  understanding, it's based on the detection of

6  PFAS substances in the water.

7      Q.    Okay.  And as a spokesperson

8  for 3M, is there any specific level that you

9  would agree poses a risk, a level of PFOS in

10  drinking water that poses a risk?

11      A.    That's really outside my area

12  of expertise.  I would defer to our

13  toxicologists for that.

14      Q.    Okay.  And we -- I think we

15  have agreed, PFOS and its precursors, like

16  POSF, was a compound that had been

17  manufactured by 3M.  This compound that's

18  been found in drinking water across the

19  country is a compound that has been

20  manufactured by 3M for decades, since the

21  1950s, in fact.

22          Do you agree with that?

23      A.    That's my understanding, yes.

24      Q.    Okay.  So the first document I

25  want to go to is just go back to one you

1  already discussed, which is DL1423.

2            Joe, if you could pull that up.

3            You recall my colleague,

4  Mr. McWilliams, went through this document

5  with you?

6      A.    I do.

7            Would it be possible if I can

8  pull it up again?

9      Q.    Whatever you need to do.

10           MR. WOODS:  What was that

11       again?

12           THE WITNESS:  I'm sorry, I

13       missed the number.

14           MR. ROTTENBERG:  167.

15           THE WITNESS:  Thank you.

16  QUESTIONS BY MR. DOUGLAS:

17      Q.    And I'm only going to ask you

18  about the same parts you were shown but a

19  different question.

20            Let me know when you're ready.

21  Take your time.

22      A.    I have that document.

23      Q.    Okay.  So what I want to do is

24  go to the page that you had discussed with

25  Mr. McWilliams earlier, which is page 4 of 7.

Confidential - Pursuant to Protective Order

```
 1                   And in the -- in those two
 2    paragraphs beneath the heading "EPA's
 3    Investigation of Perfluorooctanyl Sulfonate,
 4    PFOS, PFOA, and other Long-Chain PFAS."
 5                   Do you see that before you?
 6        A.     Yes, I do.
 7        Q.     Okay.  And it goes on to say,
 8    just for completeness -- I know this has been
 9    read to you before.  Let me just read it for
10    continuity sake, and then I'll have my
11    question about it.
12                   It says, "In the late 1990s,
13    EPA received information indicating that
14    perfluorooctanyl sulfonate, PFOS, was
15    widespread in" --
16                   I'm looking at my copy here.
17    Sorry if I'm not facing you.  I don't mean
18    any disrespect?
19                   -- "was widespread in the blood
20    of the general population and presented
21    concerns of persistence, bioaccumulation and
22    toxicity.  Following discussions between EPA
23    and 3M, the manufacturer of PFOS, the company
24    terminated production of these chemicals."
25                   Do you see where I'm reading
```

Confidential -- Pursuant to Protective Order

```
 1   from?

 2        A.     I do.

 3        Q.     You would agree -- could you

 4   just circle the word "the" where it says "the

 5   manufacturer"?

 6               Yeah, you would agree it

 7   doesn't say one of the manufacturers of PFOS.

 8   It says "the manufacturer of PFOS" in this

 9   paragraph, right?

10        A.     I see that in the section.

11        Q.     Okay.  Oh, and just to remind

12   our jurors -- could we just go quickly

13   back -- I'm sorry, I should have done this in

14   the first place -- quickly back to the first

15   page.

16               And you'll see, just to remind

17   our jurors, it says, "An official website of

18   the United States government."

19               Do you see that, sir?

20        A.     Yes, I do.

21        Q.     And beneath that it has the

22   official logo of the United States

23   Environmental Protection Agency.

24               Do you see that?

25        A.     Yes, I do.
```

Confidential - Pursuant to Protective Order

```
1         Q.     And in the upper right hand in
2    smaller print, you can see it was printed out
3    on August 19, 2021.  I don't know if it's in
4    this copy.  Yeah, okay.  It's on the left
5    side.  I don't know why it's on the right
6    side on my copy.
7                 So it was June 17, 2021.
8         A.     Yeah, I see that.
9         Q.     Okay.  Not too long ago.  Just
10   a couple of months ago, right?
11        A.     Right.
12        Q.     And so -- okay.  So let's get
13   back to where I was at page 407.
14                And we talked about 3M being
15   characterized as the manufacturer of PFOS.
16                Do you recall we just looked at
17   that?
18        A.     Yes.
19        Q.     All right.  And then the last
20   paragraph -- the last sentence of the
21   following paragraph you also read where it
22   said -- it begins, "Following."
23                "Following the voluntary
24   phaseout of PFOS by the principal worldwide
25   manufacturer, EPA took prompt regulatory
```

Confidential - Pursuant to Protective Order

```
 1    actions in 2002 and 2007 under the TSCA to

 2    limit any future manufacture or importation

 3    of 271 PFAS chemicals, essentially

 4    encompassing all PFAS chemicals on the US

 5    market."

 6              Did I read that correctly?

 7         A.    Yes.

 8         Q.    And that would include,

 9    obviously, PFOS, right?

10         A.    Yeah, PFOS was included in --

11    in that SNUR, which is, I believe, what they

12    are referring to.

13         Q.    Okay.  So here's my question.

14              It says, "Following the

15    voluntary" -- and we'll get to that in a

16    second -- "phaseout of PFOS by the principal

17    worldwide manufacturer."

18              Joe, could you underline those

19    three words in red, please?

20              What's your understanding of

21    who is being referred to here as the

22    principal worldwide manufacturer?

23         A.    So my understanding is that

24    that refers to 3M, which above was identified

25    as the manufacturer of PFOS.
```

Confidential - Pursuant to Protective Order

```
1        Q.     Okay.  Do you know of any other
2   makers of PFOS who, quote/unquote,
3   voluntarily phased out PFOS in the early
4   2000s?
5        A.     I guess I haven't investigated
6   that, but I'm not aware of any.
7        Q.     Okay.  Neither am I.
8              But and then following the
9   so-called voluntary phaseout, there were
10  severe restrictions placed on any future
11  manufacture or importation of PFOS; is that
12  right?
13       A.     So that was the Significant New
14  Use Rule, which would require notice to the
15  EPA prior to manufacture, import of that
16  substance.
17       Q.     And so -- and just so that's --
18  I don't think -- respectfully, I don't think
19  that was totally responsive, but I understand
20  what you're saying.
21             But there were restrictions to
22  limit any future manufacture or importation
23  of PFOS following the so-called voluntary
24  phaseout.  Would you agree with that?
25       A.     Yeah.  The notification
```

1   requirement gives the opportunity to evaluate

2   whether that activity can proceed and put

3   controls in place, if necessary.

4        Q.    Okay.  And which resulted in a

5   significant, if not complete, reduction in

6   the manufacture and import of PFOS relative

7   to the -- let me just rephrase that.  Let me

8   start that again.  I lost my train of

9   thought.

10            So -- and that resulted in

11  significant, if not near complete, reduction

12  in the manufacture and import of PFOS

13  following the phaseout in the United States.

14            Would you agree with that?

15       A.    I'm sorry.  If I'm

16  understanding the question, the SNUR

17  resulted?

18       Q.    Yeah.  In a significant limit

19  of any future manufacture or importation of

20  PFOS.

21       A.    Oh, so of future manufacture?

22  Yes, the SNUR -- the SNUR would apply to

23  future manufacture or importation of those

24  substances.

25       Q.    And it resulted in a severe

Confidential - Pursuant to Protective Order

```
 1    limitation of future manufacture or

 2    importation of PFOS, correct?

 3         A.    To my knowledge, yes, that

 4    there -- if there haven't been Significant

 5    New Use notices submitted for those

 6    substances.

 7         Q.    Right.  Okay.  Very good.

 8               (Gerber 30(b)(6) Exhibit DL1576

 9         marked for identification.)

10    QUESTIONS BY MR. DOUGLAS:

11         Q.    So you were asked by my

12    colleague -- can we just pull up there

13    DL1576?

14               I took a snapshot of your prior

15    testimony.  I hope you don't mind.

16               You were asked by my colleague:

17         "What is your understanding of why

18         we're here today?"

19               And you said:  "My

20         understanding is that I am representing

21         the company in this matter and speaking

22         to issues related to the company's

23         understanding of the Toxic Substances

24         Control Act in this matter and how it

25         carried out its obligations there."
```

1              Do you recall giving that

2     testimony?

3         A.    Yes.

4         Q.    Are you familiar -- I assume,

5     therefore, you're familiar with TSCA?

6         A.    Yes, I am.

7         Q.    Okay.  And you -- and I think

8     you were asked this before, but there are

9     several -- there are many sections to it, not

10    just 8(e), right?

11        A.    That's correct.

12        Q.    And you were, in fact, asked

13    about Section 4 as well, right?

14        A.    Yes.

15        Q.    Of which you have knowledge,

16    right?

17        A.    Yes.

18        Q.    Okay.  How many sections are

19    there?  There's -- I think you were asked

20    about 4(f), maybe more, but how many off the

21    top of your head can you name?

22        A.    It goes up at least through 21,

23    because I know the citizen petitions are

24    under Section 21.  So I think there might be

25    a couple more after that.

1          Q.      Okay.  So you're pretty well

2    familiar with TSCA; would that be fair to

3    say?  I guess that's why they picked you.

4          A.      Yes.

5          Q.      Okay.  And so I take it you're

6    familiar with the Section 4(f)?

7          A.      Yes.

8          Q.      Okay.  And what is your

9    understanding of what 4(f) is?

10         A.      So Section 4(f) gives EPA the

11   authority to conclude that there may be

12   unreasonable risks to human health or the

13   environment associated with a substance and

14   then to take regulatory action to restrict

15   that substance under Section 6.

16         Q.      Okay.  What do you mean by

17   "take regulatory action to restrict that

18   substance"?  Can you give -- can you give --

19   explain that our jurors, like what would such

20   action be.

21         A.      Sure.

22                 So Section 6 gives EPA

23   authority to regulate, manufacture, import,

24   process and use of substances, and there are

25   a range of actions the EPA can take under

Confidential -- Pursuant to Protective Order

```
 1    that section to manage unreasonable risks.

 2         Q.     Okay.  Do you know Thomas

 3    DiPasquale?

 4         A.     Tom DiPasquale, yes.

 5         Q.     DiPasquale, okay, he is

 6    pronounced.

 7                And who is he?

 8         A.     He was an attorney at 3M.

 9         Q.     Okay.  Have you read the

10    deposition he gave in the Minnesota case, by

11    any chance?

12         A.     I can't recall off the top of

13    my head.

14                (Gerber 30(b)(6) Exhibit DL1577

15         marked for identification.)

16    QUESTIONS BY MR. DOUGLAS:

17         Q.     Okay.  So let me show you the

18    cover page to see if it refreshes your

19    recollection, but let's use DL1577 for that

20    purpose, please.

21                You'll see here it's -- it says

22    State of Minnesota, by its Attorney General,

23    Lori Swanson, yada-yada-yada, versus 3M.

24                Do you see where I'm referring

25    to?
```

Confidential - Pursuant to Protective Order

```
 1        A.     Yes, I think I do remember this
 2   one.
 3        Q.     Okay.  So you did read it?
 4        A.     I believe so.
 5        Q.     Okay.  And so just if we could
 6   scroll down for the benefit of our jurors,
 7   you'll see it says, "Confidential Videotaped
 8   Deposition of Thomas DiPasquale, JD."
 9               You know JD stands for juris
10   doctorate; in other words, he's a lawyer?
11        A.     Yes.
12        Q.     Okay.  And it was taken just
13   short of four years ago, December 1, 2017.
14               Do you see that?
15        A.     Yes.
16               And I'm sorry to interrupt.  Do
17   I have this in my binders --
18        Q.     No, you don't.
19        A.     -- to -- hard copy?  Okay.
20        Q.     No, you don't.  I'm just going
21   to read a passage from this and ask you if
22   you agree.
23               And if you go to page 155 --
24   and it's only going to be on your screen, so
25   I apologize for that.
```

Confidential - Pursuant to Protective Order

```
 1          A.     I just -- I'm going to move --
 2   sorry, move this window to a larger screen,
 3   so I'll be looking to the side.
 4          Q.     Just let me know when you're
 5   ready to go.
 6                 MR. WOODS:  Gary, let me just
 7          say, I mean, that's fine.  If the
 8          witness needs to read -- continue to
 9          read the rest of the dep or a little
10          bit around that or something, I think
11          it's fair that he be allowed to do
12          that.
13                 MR. DOUGLAS:  Yeah, okay.  And
14          I don't expect any issues.  I think
15          he's going to agree, but...
16   QUESTIONS BY MR. DOUGLAS:
17          Q.     You see where the question is
18   by the counsel for Minnesota?  It says:
19                 "Okay.  Do you know what TSCA
20          4(f) is referring to generally?  I know
21          this isn't your document.
22                 "Answer:  Yeah, the Toxic
23          Substances Control Act Section 4(f).
24                 "Question.  Okay.
25                 "Answer:  That's reference to
```

Confidential - Pursuant to Protective Order

```
1            the part of the statute that gives EPA
2            authority to take remedial action when
3            it determines that a chemical is
4            present that presents significant risk,
5            and there's other statutory criteria.
6                    "Question:  Okay.
7                    "Answer:  I think the EPA has
8            only done that a handful of times in
9            its history."
10                   A handful of times in its
11   history.
12                   "There's other less restrictive
13           remedies that the EPA has."
14                   Do you agree with that general
15   characterization of 4(f) as the attorney for
16   3M, Mr. DiPasquale, so attested?
17        A.    Yes, I would agree Section 4(f)
18   gives EPA the authority to take action when
19   it determines that a chemical presents
20   significant risk.
21        Q.    And it has only done so on very
22   few occasions because it's a very
23   complicated, long, drawn-out, expensive
24   procedure funded by taxpayers.
25                   Would you agree with that?
```

Confidential - Pursuant to Protective Order

1      A.     My understanding, that it has

2  been infrequently used in the history of

3  TSCA.

4      Q.     Okay.  Sometimes it's just the

5  threat of using that that will get a chemical

6  company to voluntarily, so to speak, take

7  action to either remove a product or do

8  something to limit exposure.

9          Would you agree with that

10 generally?

11     A.     I'm sorry, can you rephrase the

12 question?

13     Q.     In light of this statement that

14 it's infrequently used, that's because just

15 the mere threat of a 4(f) remedial action

16 sometimes is impetus for chemical companies

17 to so-called voluntarily take their own

18 action before the EPA does and, say, remove

19 it from the market or limit exposure.  Agree?

20     A.     No, I don't think I agree with

21 that.  I guess I can't speak for other

22 companies.  I'm not aware of the Agency, you

23 know, threatening companies, to use those

24 words, with this authority.

25     Q.     Well, considering maybe

Confidential - Pursuant to Protective Order

1  "threatening" is too strong of a word for

2  you, but even when EPA is considering to take

3  action under 4(f), it can sometimes motivate

4  a chemical company to take so-called

5  voluntary action to remove and/or limit

6  exposure of the subject chemical, agree?

7        A.    Yeah.  Well, again, I'm not

8  sure I -- I agree with that because it -- it

9  seems to be, you know, a hypothetical; you

10  know, that the cases where we have

11  documentation that EPA has considered using

12  this authority, as you've described, are few.

13        Q.    Yeah.

14              Okay.  And I'm just saying that

15  the reason it's used is because the mere --

16  the mere threat or contemplation by EPA of

17  using such an action is enough to get

18  chemical companies to act before the EPA

19  does, so to speak?

20        A.    I guess I can only speak to my

21  experience at 3M and the documentation that

22  I've reviewed related to this matter, but

23  that -- that does not seem to be the case in

24  my experience.

25        Q.    Okay.  So you're not aware that

1    the EPA had been contemplating 4(f) action

2    with respect to PFOS when 3M announced its

3    so-called voluntary phaseout of PFOS; is that

4    fair to say?

5         A.    I was not directly involved in

6    those discussions.  My understanding based on

7    the testimony that I've reviewed of

8    individuals that were involved in those

9    discussions is that that was not a factor in

10   the decision to phase out.

11             MR. DOUGLAS:  Okay.  But that's

12        not my question.  I'll move to strike.

13   QUESTIONS BY MR. DOUGLAS:

14        Q.    Are you aware that the EPA had

15   been contemplating 4(f) action in the weeks

16   and months right before 3M announced its PFOS

17   phaseout?

18        A.    That's not my understanding

19   based on the documents I've reviewed.

20        Q.    Okay.  So maybe I can enlighten

21   you in that regard.

22             Let's, first of all, go --

23   you've heard of DuPont, obviously?

24        A.    Yes, I have.

25        Q.    Major competitor of 3M.  Would

1   you characterize it that way?

2        A.    A competitor, I guess, yeah.  I

3   don't get into the business side of major

4   competitors and minor competitors.

5        Q.    Okay.  And we've had other

6   witnesses discuss this.

7              Are you familiar with Stephen

8   Korzeniowski, formerly of DuPont?

9        A.    No, I don't think so.

10       Q.    Well, I had the opportunity to

11   depose him and ask him some questions about

12   the 3M phaseout, and he -- and specifically

13   with regard to comments he memorialized in an

14   e-mail dated 7/15/2002.  And so I'd like to

15   show you those comments, which is DL262.

16             MR. ROTTENBERG:  That's

17        Tab 128.

18             (Gerber 30(b)(6) Exhibit DL262

19        marked for identification.)

20   QUESTIONS BY MR. DOUGLAS:

21       Q.    And if we can pull up -- I'm

22   just going to look at the first page,

23   literally the first paragraph.  Let me know

24   when you're ready.

25             And I would just -- I just --

1    I'm sure everybody is coming from the same

2    place.  Everybody's getting anxious.  We did

3    previously get permission to use this

4    document.

5              And it says, Stephen

6    Korzeniowski, DuPont, July 15, 2002.  And

7    it's to a number of folks, all of which, if

8    you'll look, have a DuPont e-mail address.

9              Do you see that?

10        A.    I do.

11        Q.    Okay.  And its subject is 3M

12   Re: FYI.

13             Do you see where I'm reading

14   from?

15        A.    Yes, I do.

16        Q.    And Mr. Korzeniowski goes on to

17   say, "I have said this many times, 3M knew

18   what was coming in the mid-'90s since they

19   had the data.  They began their replacement

20   work at that time, as we can see from their

21   patents.  They were clever enough to, quote,

22   'work,' end quote, a deal with the EPA and

23   appear" -- can you underline "appear" --

24   "appear to volunteer."

25             Do you see that?  Do you see

1    where I'm reading from?

2        A.    Yes, I do.

3        Q.    Okay.  So were you aware that

4    some of your colleagues and competitors and

5    other chemical companies viewed the so-called

6    voluntary phaseout of phaseout -- of 3M -- of

7    PFOS as just -- as a sharad -- you know, as a

8    charade -- sharad, where the hell did I get

9    that from? -- as a charade?

10       A.    I don't recall reviewing this

11   document in my preparation, so, no.

12       Q.    Well, I'm asking you as a

13   person who's here to talk about TSCA and

14   whether or not there was this looming threat

15   of EPA taking 4(f) action against EPA {sic}

16   when it announced its so-called volunteer

17   phaseout.

18             That's again my question.

19       A.    And I'm sorry, can you repeat

20   the question?

21       Q.    I'm asking you, as a person who

22   is here as a representative of 3M to talk

23   about TSCA, whether or not there was a

24   looming -- whether or not you're aware there

25   was a looming threat of EPA taking 4(f)

1   action against EPA -- again 3M, rather, when

2   it announced its so-called volunteer

3   phaseout.  That's my question.

4       A.    Yeah, so I was not directly

5   involved in those discussions.  Based on my

6   review of the 3M documents related to that

7   discussion, that's not my understanding, that

8   the decision was made based on a looming

9   threat of 4(f) regulation by EPA.

10      Q.    Oh, so now I'm confused because

11  you say you weren't involved in the

12  discussions, but yet you know what was

13  discussed.

14            So were you -- first of all,

15  what discussions are you talking about?

16      A.    So I've reviewed -- you know,

17  I've reviewed documentation of discussion

18  with 3M personnel and Charlie Auer at EPA

19  regarding information that was being provided

20  to him and 3M's follow-up actions there.

21            I've reviewed the testimony, I

22  believe, of Mr. Weppner and Mr. Reich

23  regarding their discussions with the Agency.

24            And if I recall correctly, they

25  said that the -- the phaseout decision was

Confidential - Pursuant to Protective Order

```
1   not based on the threat of regulation by EPA.

2        Q.    That's what --

3              MR. MCWILLIAMS:  Hey, Gary,

4        you're at 30 minutes.

5              MR. DOUGLAS:  Okay.  I've just

6        got like five minutes left.

7   QUESTIONS BY MR. DOUGLAS:

8        Q.    So that's what they told you?

9        A.    That's what I understand from

10  reviewing the testimony that's been provided.

11       Q.    Okay.  Well, and you know

12  Charles Auer is a paid 3M consultant.  After

13  he left EPA, he became a highly paid 3M

14  consultant.

15             Are you aware of that?

16       A.    I'm aware that he did do

17  consulting work for 3M.  I don't know the

18  specifics of those arrangements.

19             (Gerber 30(b)(6) Exhibit DL393

20        marked for identification.)

21  QUESTIONS BY MR. DOUGLAS:

22       Q.    Okay.  Well, so now I'm

23  confused.  Let's take a look at DL393.  Get

24  through these real quick.

25             And you'll see this is an
```

Confidential - Pursuant to Protective Order

1    e-mail -- I can get it.  You'll probably

2    know.  We can just flip it around.  Yeah,

3    thanks.

4              It's an e-mail to a lot of

5    folks at 3M, and the subject is EPA says it

6    pressed 3M for action on Scotchgard chemical.

7              Do you see that?

8    A.    I see that.

9    Q.    And then if you go to the next

10   page, you'll actually see that it forwards a

11   New York Times article dated 5/19/2000,

12   which, if I'm not mistaken, is within days

13   after the phaseout announcement.

14             Do you see that, sir, the date,

15   5/19/2000, New York Times, page 3, column 1?

16   A.    I do.

17             And I'm sorry, do we have a tab

18   number for this one?

19             MR. ROTTENBERG:  Yeah, this

20        e-mail appears to be 163.

21             THE WITNESS:  Okay.  Sorry.

22        Just give me one second here.

23             All right.  I have that.

24   QUESTIONS BY MR. DOUGLAS:

25   Q.    Okay.  And you can see -- I

Confidential - Pursuant to Protective Order

```
 1     just want to read to you --
 2          A.    Oh, I'm sorry.  I'm sorry to
 3     interrupt again.  I'm not sure this is the
 4     correct one.  It has a different subject
 5     line.
 6                MR. ROTTENBERG:  Can you remove
 7          the Zoom?
 8                MR. DOUGLAS:  What are we
 9          doing?  My clock is ticking.
10                Everybody ready to proceed to
11          my question?
12                MR. ROTTENBERG:  It's 140, Jon.
13          Sorry, it's not labeled in this.
14                THE WITNESS:  140.  Okay.
15                MR. WOODS:  I think those may
16          be copies of --
17                THE WITNESS:  Yeah, that's the
18          article itself.
19     QUESTIONS BY MR. DOUGLAS:
20          Q.    Okay.  So well, let's -- it's
21     no different than the e-mail that was
22     provided.
23                So you'll see it says, "May 15,
24     2000, New York Times, Chicago, May 18th, the
25     Environmental Protection Agency said today
```

Confidential - Pursuant to Protective Order

1  that it had pressed Minnesota Mining and

2  Manufacturing to come up with a solution

3  after the company's own tests had shown that

4  a chemical compound used in Scotchgard and an

5  array of household products could pose a risk

6  to human health and the environment."

7            Do you see that, sir?

8       A.    I do.

9       Q.    So were you aware of, sir, that

10  the EPA had been pressing 3M prior to its

11  so-called voluntary phaseout, just a week or

12  so before this article?

13      A.    Yeah, I guess I'm not clear on

14  what it means that EPA had pressed 3M.

15      Q.    Well, let's see if we can learn

16  some more from reading.

17            It says, "The EPA account

18  differs from that of 3M, which said on Monday

19  that it had voluntarily decided to" make the

20  chemical used in Scotchgard and many other

21  products -- "stop making the chemicals used

22  in Scotchgard and many other products by the

23  end of the year."

24            Do you see where I'm reading

25  from?

1       A.      Yes, I do.

2       Q.      And it says -- I guess to

3   deprive Mr. Woods the pleasure of having to

4   read this, it does say, however, that

5   "officials of 3M say they have no evidence

6   that the chemicals pose a long-term threat to

7   human health."

8               Do you see that?  Do you see

9   where I'm reading from?

10      A.      I'm sorry, I was on mute.

11              Yes, I do.

12      Q.      Okay.  And then the next

13  paragraph, just so we can be clear what they

14  meant by pressing, it says, "While the EPA

15  said it could not see an immediate safety

16  risk for consumers using products now on the

17  market, Agency officials said that if 3M had

18  not acted, they would have taken steps to

19  remove the product from the market."

20              Do you see that, sir?

21      A.      I do.

22      Q.      So you can see -- you had asked

23  me, I don't know what pressed means, but

24  clearly from this article, you can take it --

25  to take at face value, that the EPA had been

Confidential - Pursuant to Protective Order

1   threatening to remove the product from the
2   market before it announced its voluntary
3   phaseout; fair to say?
4           Or were you not privy to this
5   information by folks at the company telling
6   you about their discussions with EPA?
7       A.   You know, and again, in the
8   materials that I've reviewed based on -- from
9   the individuals that were involved in the
10  phaseout decision and the discussions with
11  the EPA, I have not seen a reference to
12  threats of EPA regulatory action.
13      Q.   So you've not seen them, but
14  you don't have any concrete -- something you
15  can point to to say that that statement's not
16  true as you sit here right now; fair to say?
17      A.   I was not involved in that
18  decision, so...
19      Q.   And it goes on to quote, the
20  next line, the next page, "The results raised
21  a number of concerns, said Stephen
22  Johnson" --
23           I'll let you -- they're quoting
24  Stephen Johnson.  Do you see that?
25      A.   Yes, I do.

Confidential -- Pursuant to Protective Order

```
 1        Q.     Okay.

 2               -- "who works in the Office of

 3    Prevention, Pesticides and Toxic Substances

 4    at the EPA.  What it suggests to us is that

 5    there are potentially long-term consequences,

 6    but we don't have evidence to say it is

 7    unsafe."

 8               Now, Stephen Johnson went on to

 9    become the head of the EPA for a number of

10    years, appointed by George W. Bush, former

11    president of the United States.

12               Did you know that?

13        A.     Yes, I am aware of that.

14        Q.     And did I read that paragraph

15    correctly?

16        A.     Yes.

17        Q.     Finally -- well, not finally.

18    Two more documents.  Boy, time is ticking.

19               (Gerber 30(b)(6) Exhibit DL1558

20          marked for identification.)

21    QUESTIONS BY MR. DOUGLAS:

22        Q.     Let's go to DL1558.  And you'll

23    see this is a 3M-produced document.  That's

24    what that means, 3M_AFFF, and then there's a

25    Bates number.
```

Confidential - Pursuant to Protective Order

```
 1                    Do you see that?
 2                    MR. ROTTENBERG:  69.  Tab 69,
 3          Jon.
 4                    THE WITNESS:  All right.  I
 5          have that document.
 6    QUESTIONS BY MR. DOUGLAS:
 7          Q.    Okay.  And I just want to go to
 8    Bates ending 878, please.
 9                    I think this was amongst the
10    documents that was just recently produced,
11    just for the record.
12                    So the Bates ending 878, and
13    there's a timeline.  And go to the
14    April 24-25th entry and blow that up, please,
15    Joe.
16                    And you'll see it says, "In
17    talks with" -- April 24-28, 2000, so that
18    would be about a month before the phaseout
19    announcement, correct?
20          A.    I believe that's correct.
21          Q.    And it says, "In talks with 3M,
22    the EPA stated that it was considering
23    whether to investigate PFOS under TSCA 4(f)."
24                    Do you see that?
25          A.    Just -- can you -- I'm sorry,
```

1    can you give me the Bates number of the page?

2              MR. ROTTENBERG:  878.

3    QUESTIONS BY MR. DOUGLAS:

4         Q.    It ends in 878.

5         A.    878.  Sorry, it's a lengthy

6    one.

7         Q.    I'm only reading this sentence

8    to you.  You don't need to read anything else

9    on redirect.

10        A.    Yes, I see that.

11        Q.    Okay.  Were you privy to these

12   discussions between 3M and EPA where EPA

13   stated it was considering whether to

14   investigate PFOS under TSCA 4(f)?

15        A.    I was not.

16              (Gerber 30(b)(6) Exhibit BB221

17        marked for identification.)

18   QUESTIONS BY MR. DOUGLAS:

19        Q.    Okay.  Let's move on to the

20   next document, BB221, and you'll see these

21   are handwritten notes.  We've had previous

22   testimony that these notes were drafted by

23   Bill Weppner.

24              Do you know who Bill Weppner

25   is?

1          A.      Yes, I do.

2          Q.      Okay.  And who is he?

3          A.      He was the former director of

4    regulatory affairs, I believe.

5          Q.      So he's --

6          A.      Might not have gotten his title

7    exactly correct.

8          Q.      Okay.  But he's a person that

9    would be meeting with EPA on regulatory

10   issues; fair to say?

11         A.      My understanding is he was

12   involved in -- in those discussions.

13         Q.      Okay.  And just in the middle

14   of the page, if we blow it up, it says, "Jim

15   Aidala, associate administrator of Pesticides

16   and Toxics Program."

17                 Are you familiar with Jim

18   Aidala from EPA?

19         A.      I am familiar with the name.

20                 MR. ROTTENBERG:  Jon, it's

21         Tab 132.

22   QUESTIONS BY MR. DOUGLAS:

23         Q.      It will be a two-page document.

24                 MR. MCWILLIAMS:  Gary, look at

25         your phone.

Confidential - Pursuant to Protective Order

```
 1                    MR. DOUGLAS:  What's that?

 2                    MR. MCWILLIAMS:  I said, look

 3          at your phone.

 4                    MR. DOUGLAS:  I don't know

 5          where it is, so I can't look at it.

 6   QUESTIONS BY MR. DOUGLAS:

 7          Q.    Gotcha.  So let's go to the

 8   second page, and it's dated 5/8/2000.

 9                    Do you see that?

10          A.    Yes.

11          Q.    Okay.  And so that would

12   literally be within days prior to the

13   so-called voluntary phaseout, right?

14          A.    Yes.

15          Q.    And it says, "Sussman meeting

16   with Jim Aidala," Aidala of the EPA, but do

17   you know who Sussman is?

18          A.    If I remember correctly, he

19   is -- he was an attorney at the law firm

20   Latham & Watkins.

21          Q.    Yes.

22                    And it says, Sussman, the

23   attorney, met with J.A. Aidala at his office

24   in Latham & Watkins.  "Aidala had just been

25   made aware of this last week.  Concerned over
```

Confidential -- Pursuant to Protective Order

1    staff slowness in response to this issue.

2    Very sensitive to the use of 4(f), he agrees

3    that this appears to meet the requirements of

4    4(f)."

5              Do you see that?

6         A.    I do.

7         Q.    Okay.  So this is all on the

8    heels, just prior to the announcement of the

9    voluntary phaseout, right?

10        A.    Yes.

11        Q.    And so were you privy to this

12   information, that there was this discussion

13   between counsel for 3M and officials at EPA

14   where apparently EPA felt that the --

15   appeared to meet -- PFOS appeared to meet the

16   requirements of 4(f)?

17        A.    I've reviewed this summary of

18   the discussion, and I was not involved

19   myself.

20        Q.    Okay.  But you can see that a

21   discussion of potential 4(f) action was

22   being -- was taking place, according to these

23   documents, just prior to the so-called

24   voluntary phaseout, right?

25        A.    I see Section 4(f) mentioned

1   there.  I would say I'm not -- I'm not clear

2   what it means that EPA is sensitive to the

3   use of 4(f).

4        Q.    Well, how about he agrees that

5   it appears to meet the requirements of 4(f).

6              Do you have -- any ambiguity

7   there for you?

8        A.    No, that seems to be clear.

9        Q.    Okay.  And then in exchange for

10  not taking this action, 4(f) action, 3M then

11  agreed to so-called voluntarily withdraw PFOS

12  and perfluorooctanyl substances right on the

13  heels of this discussion, correct?

14       A.    And again, I was not involved

15  in those discussions.  I have reviewed

16  testimony from others that were involved

17  that -- that take a contrary view, that that

18  was not the driving view.

19       Q.    I'm not taking about testimony

20  after someone is sued.  I'm talking about

21  notes that were taken before any lawsuit was

22  contemplated.

23            MR. DOUGLAS:  So I'll move to

24       strike that as unresponsive.

25

1    QUESTIONS BY MR. DOUGLAS:

2         Q.    But sometimes -- you know, the

3    company expression the Sword of Damocles?

4    Have you ever heard that?

5         A.    I've heard that expression.

6         Q.    Okay.  And so really, I mean,

7    just, you know, it's common sense.  It's

8    clear that the only reason 3M voluntarily,

9    so-called, withdrew is because they had the

10   Sword of Damocles hanging over their heads,

11   the concern that EPA might take action

12   against them and force them to stop

13   manufacturing PFOS; isn't that right?

14              I mean, there's the

15   circumstances.  It's clear as a bell to me.

16        A.    That's -- that's not consistent

17   with my understanding based on the documents

18   that I've reviewed.  I do recall other -- a

19   presentation or a meeting summary that

20   recognized EPA's authority under this section

21   of TSCA but concluded that that outcome was

22   unlikely.

23              MR. DOUGLAS:  Yeah, move to

24         strike.

25

1    QUESTIONS BY MR. DOUGLAS:

2        Q.    But you can see that there was

3    a vigorous discussion taking place and a very

4    real possibility expressed by EPA that PFOS

5    met the requirements of 4(a) {sic}.  That is

6    the context under which -- during which time

7    the company withdrew -- would voluntarily,

8    so-called -- withdrew manufacture of

9    perfluorooctanyl chemistries, including PFOS

10   at the time, correct?

11       A.    You know, I see recorded here

12   in the minutes that Mr. Aidala agreed that

13   this situation appeared to meet the 4(f)

14   criteria.  Beyond that, you know, I can't

15   speak to EPA's thinking.

16       Q.    Okay.  I'm just trying to put

17   context to our jurors so they understand the

18   context in which 3M then, within days,

19   voluntarily, so-called, announced a phaseout.

20             You appreciate -- you

21   appreciate the context?

22       A.    I'm sorry, can you rephrase the

23   question?

24       Q.    Can you appreciate that this is

25   part of the context, the circumstances that

Confidential -- Pursuant to Protective Order

1    were taking place right at the time that 3M

2    announced its phaseout?

3         A.    I -- I recognize that this is a

4    report of 3M discussions with EPA officials

5    shortly -- shortly before the announcement of

6    the voluntary phaseout.

7         Q.    Better to phase it out than to

8    be sued by -- sued by the EPA to force you to

9    phase it out.

10             Would you agree with that?

11        A.    No, I disagree with that

12   characterization.

13        Q.    That's something our jurors can

14   figure out for themselves.

15             (Gerber 30(b)(6) Exhibit DL49

16        marked for identification.)

17   QUESTIONS BY MR. DOUGLAS:

18        Q.    In any event, DL49, this is the

19   official press release announcing the

20   phaseout.  And they phased out, if you'll --

21   if you want to read this -- I'm just trying

22   to save some time.

23             They announced that -- the

24   phaseout of all perfluorooctanyl chemistries.

25             Is that your understanding?

Confidential - Pursuant to Protective Order

```
 1              If we could blow up that first
 2    paragraph, St. Paul, Minnesota, May 16th.
 3              MR. ROTTENBERG:  Tab 11, Jon.
 4    QUESTIONS BY MR. DOUGLAS:
 5         Q.    Do you see where it says that?
 6         A.    Sorry, yes, I see that
 7    statement.
 8         Q.    Okay.  Perfluorooctanyl
 9    chemistries, the oct means eight carbons.
10              You've got some chemical
11    background.  I'm sure you know that, right?
12         A.    That's correct.
13         Q.    Okay.  Perfluorooctanyl
14    chemistries would conclude -- would include
15    PFOS, PFOA and their precursors; fair to say?
16         A.    I'm sorry, can you repeat your
17    question?
18         Q.    Perfluorooctanyl chemistries
19    would include, therefore, PFOA and PFOS
20    and/or their precursors; fair to say?
21         A.    So PFOS, PFOA would be included
22    in perfluorooctanyl chemistry.
23         Q.    And you're aware that there
24    were other companies that made, after the
25    phaseout, made PFOA for use in things like
```

```
 1    fire foam and other products.
 2              Is that fair to say?
 3         A.    I'm not familiar with, you
 4    know, the other companies' production of
 5    those substances.  I didn't prepare for that.
 6         Q.    Okay.  But and one of the
 7    stated reasons for getting out of the
 8    perfluorooctanyl business is because the
 9    company expressed that it was in the public
10    interest to do so.
11              If you go a little further
12    down, last paragraph -- last sentence of the
13    first full big paragraph.
14              "While this chemistry has been
15    used effectively for more than 40 years,
16    principles of responsible environment
17    management."
18              Do you see that?
19              "And the phaseout is based on
20    principles of responsible environmental
21    management."
22         A.    Yes, I see that.
23         Q.    Anybody that used
24    perfluorooctanyl chemistries after that would
25    therefore be acting irresponsibly with
```

Confidential - Pursuant to Protective Order

```
 1    respect to environmental management; the

 2    opposite would be true.

 3              Would you agree with that?

 4       A.    I'd say that's -- that's

 5    outside of my area of expertise to speak to

 6    the risks of other companies' activities.

 7              (Gerber 30(b)(6) Exhibit DL1566

 8       marked for identification.)

 9    QUESTIONS BY MR. DOUGLAS:

10       Q.    Let's shoot up a few more

11    months, and this, I promise, is the last

12    document.  My colleagues are going to kill me

13    for wasting all this time.

14              August 21st, this is DL1566.

15              MR. ROTTENBERG:  Tab 164.

16    QUESTIONS BY MR. DOUGLAS:

17       Q.    And it says -- it's a letter

18    from 3M to Mr. Jesse Baskerville of the

19    Toxics and Pesticides Enforcement Division,

20    US EPA.

21              Do you see that?

22       A.    Yes.

23       Q.    And it says, "Regarding 3M TSCA

24    Section 8(e) compliance audit disclosure of

25    phase I findings pursuant to incentives for
```

Confidential - Pursuant to Protective Order

```
 1    self-policing, discovery, disclosure and

 2    correction and prevention of violations," and

 3    then it mentions the federal regulation at

 4    issue.

 5              Do you see that?

 6    A.    Yes.

 7    Q.    If you go to the first

 8    paragraph, "Dear Mr. Baskerville," of the

 9    EPA, "Pursuant to our recent conversations

10    with Gerry Stubbs and others from your staff,

11    3M is writing to disclose potential

12    violations of TSCA 8(e) substantial risk

13    reporting requirements pursuant to EPA's

14    self-audit policy."

15              Do you see that?

16    A.    Yes.

17    Q.    Okay.  What I want to draw your

18    attention to is the next page, and it talks

19    about phase I of this program.  And it goes

20    on to say, "3M completed the first phase of

21    the audit on July 31, 2000."

22              Do you see that?

23    A.    Yes.

24    Q.    And it goes on to say, "which

25    included the FYI submissions on various forms
```

```
 1    of perfluorooctane sulfonate, PFOS."

 2               Can you underline PFOS?

 3    A.    Yes.

 4    Q.    "On 11 compounds" -- "and on 11

 5    compounds related to PFOS and on

 6    perfluorooctanoic acid, PFOA."

 7               Do you see that?

 8    A.    Yes, I do.

 9    Q.    "From the over 600 studies or

10    pieces of information in these FYI

11    submissions, 3M identified 30 studies that

12    appear potentially to meet EPA's current TSCA

13    Section 8(e) reporting criteria."

14               Do you see that?

15    A.    Yes.

16    Q.    I'm just going to try to cut

17    some time down.

18    A.    Yes.

19    Q.    So at this time there was 600

20    new submissions or pieces of information in

21    2000 regarding PFOS, according to this

22    document, right?

23    A.    Yeah, in part.  And I

24    understand there were other phases of the

25    audit, and there was additional information
```

1    in that (AR)-226 docket, so I don't know if

2    600 is the total number.

3          Q.    But there was more?

4          A.    So there were additional phases

5    of the audit that covered additional

6    information.

7          Q.    So my point is that -- and this

8    is where I'll wrap up this.

9                My point is, it was in this

10   year 2000 is the first time 3M disclosed

11   hundreds and hundreds of studies, documents

12   and other information regarding PFOS; fair to

13   say?  That's what it says here.

14         A.    So those pieces of information

15   had been provided to EPA in an FYI submission

16   prior to that, and then the audit was

17   evaluating any of those studies --

18         Q.    When was that FYI?

19         A.    I'd have to go back and

20   double-check.  It might have been -- I know

21   it was at Charlie Auer's request.

22         Q.    Right.

23         A.    I'd have to go back and

24   double-check the dates on that.

25         Q.    But around that time?

Confidential - Pursuant to Protective Order

```
 1        A.    Around -- yeah, within a couple
 2   years of this time, I think.
 3        Q.    Okay.  And nonetheless, 3M had
 4   been studying PFOS and related compounds
 5   since the '50s and '60s and found effects in
 6   laboratory animals.
 7              Were you aware of that?
 8        A.    I don't recall the dates of the
 9   earliest acute tox studies.
10              MR. DOUGLAS:  Those are all the
11         questions.  I will reserve whatever
12         remaining time and, at your mercy,
13         some additional time, if necessary,
14         for our recross.
15              Want to take a break, Craig?
16              MR. WOODS:  Yeah, why don't we
17         take five minutes here.
18              THE WITNESS:  I'm sorry, I
19         think I -- I accidentally --
20              VIDEOGRAPHER:  The time is --
21         the time is 5:12 p.m.  We're off the
22         record.
23        (Off the record at 5:12 p.m.)
24              VIDEOGRAPHER:  The time is
25         5:27 p.m.  We are back on the record.
```

1           MR. MCWILLIAMS:  Craig, before

2      we get started, I just want to make

3      sure all objections are still

4      preserved for my side as well?

5           MR. WOODS:  That's fine.

6           MR. MCWILLIAMS:  Thanks.

7           CROSS-EXAMINATION

8  QUESTIONS BY MR. WOODS:

9      Q.    All right.  Jon, I have a few

10  questions for you.  I'm going to be skipping

11  around a little bit, so it might take me a

12  little bit of time to pull up a document or

13  something like that, but hopefully you'll

14  indulge me a little bit.

15           I want to start by asking you

16  about the TSCA reporting decisions in the

17  late 1970s and early 1980s.

18           Do you recall you were shown a

19  number of memos regarding reviews that a 3M

20  fluorochemical technical committee conducted

21  relating to information about fluorochemicals

22  in blood and the toxicology tests that had

23  been performed up until that time on organic

24  fluorine compounds such as PFOA and PFOS?  Do

25  you recall that?

Confidential - Pursuant to Protective Order

```
1        A.      Yes.

2        Q.      And I think you said that based

3   on the review of that material, the 3M

4   fluorochemical technical committee felt that

5   the information was not reportable under TSCA

6   8(e).

7                Do you recall that?

8        A.      That's my understanding from

9   the review of those documents.

10       Q.      Yeah.

11               What's your understanding why

12  the 3M fluorochemical technical committee

13  came to that conclusion at that time?

14       A.      What I recall seeing in those

15  deliberations is that 3M had information

16  about employee exposure to those substances

17  and blood levels in the employees who were

18  directly exposed to fluorochemicals, and that

19  no adverse effects had been seen in those

20  employees related to their exposure.

21               Thus, the lack of adverse

22  effects was a key determinant in the

23  reporting decision.

24       Q.      And in terms of your

25  understanding of 3M's obligations to report
```

1    under 8(e) in that time period based on the

2    guidance that EPA had provided, is that

3    decision consistent with your understanding

4    of 3M's obligations at that time?

5        A.    I have -- based on my review of

6    the documents, 3M was aware of EPA's guidance

7    at the time and that that -- belief that that

8    was consistent with the Agency's guidance,

9    that exposure without an observed adverse

10   effect was not reportable, substantial risk

11   information.

12       Q.    Well, you were shown some

13   documents by Mr. McWilliams that talked about

14   the fact that 3M {sic} was toxic, and in some

15   of the animal studies there were reported the

16   toxic effects.

17             Why would that not trigger a

18   reporting event under TSCA under the 8(e)

19   requirement?

20       A.    And those results would have

21   been evaluated based on the guidance

22   available at the time.  You know, my

23   understanding is that those -- those -- some

24   of those study results were range finder

25   studies where deaths may be expected as

1    you're dialing into correct dose ranges.  A

2    toxicologist could probably speak better to

3    that than I could.

4              But on top of that, 3M still

5    had the information on its directly exposed

6    workers where no adverse effects had been

7    seen at concentrations that were relevant to

8    human exposure.

9        Q.    So in terms of drawing -- or

10   concluding not to report, did 3M consider the

11   fact that at concentrations relevant to human

12   exposure, they did not see adverse effects?

13       A.    That's my understanding based

14   on the review of the documents, that that was

15   the reason for the committee's decision, was

16   the lack of observed adverse effects in its

17   workers.

18       Q.    And is considering the exposure

19   level one of the considerations that you can

20   make in terms of determining whether to

21   report information to EPA under TSCA 8(e)?

22       A.    It can be, based on EPA's

23   guidance.  So, for example, substances

24   falling into the moderate toxicity category,

25   EPA would allow for the consideration of the

 1   degree of exposure.  Substances that would

 2   fall into like a low -- a low toxicity

 3   category are not reportable, regardless of

 4   exposure.

 5        Q.    And in terms of PFOS, do you

 6   have an understanding of where on the

 7   toxicity continuum it fell, based on the

 8   studies that were done at that time on --

 9   acute studies that were done on PFOS at that

10   time?

11        A.    Based on my review of the

12   documents, I do recall seeing acute toxicity

13   studies where PFOS was classified as

14   moderately toxic.

15             I would defer to my colleagues

16   in toxicology for more interpretation of

17   those studies.

18        Q.    And in terms of characterizing

19   PFOS as moderately toxic, under those

20   circumstances and the guidance that EPA

21   provided in determining whether to report

22   information to EPA on studies that were

23   performed, you could take into consideration

24   the exposure potential to that material,

25   correct?

1      A.    So EPA's guidance does allow

2  for exposure to tox -- I'm sorry, exposure

3  potential in the moderate acute toxicity

4  category.

5      Q.    And in fact, that's what 3M did

6  in determining whether to report these

7  studies back in the '70s.  They did consider

8  the exposure potential, right?

9      A.    I -- you know, I wasn't

10  involved in those discussions, but based on

11  my review of the documents, that -- that was

12  the -- a consideration, was the degree of

13  exposure and, again, looking to that employee

14  exposure data.

15      Q.    You were also provided -- or

16  you reviewed some information about specific

17  studies where a certain number of rats died

18  in those studies and a certain number of

19  monkeys died in those studies.

20          Do you recall that?

21      A.    Yes.

22      Q.    Does the death of rats or

23  monkeys automatically trigger a duty to

24  report those studies to EPA under EPA

25  guidance?

Confidential -- Pursuant to Protective Order

```
 1        A.     Again, EPA has issued guidance
 2   on, you know, degree of toxicity and when
 3   lethality -- whether exposure should be
 4   considered at various levels of lethality.
 5   So there are categories where EPA does allow
 6   for the consideration of exposure.
 7        Q.     And that would include
 8   substances that are only moderately toxic,
 9   correct?
10        A.     That includes the moderate
11   acute toxicity category.
12        Q.     All right.  Okay.  I want to
13   ask you a couple of questions about the ITC
14   submission that 3M made with respect to POFS
15   chemistries.
16               Do you recall those questions?
17        A.     Yes.
18        Q.     Okay.  And I'm going to ask --
19   I'm going to mark, if I can, as the next
20   exhibit -- I'll give a reference to the date
21   to the videographer to pull this one up and
22   put it in the exhibit binder.  This will be
23   3M 3.
24               (Gerber 30(b)(6) Exhibit 3M 3
25          marked for identification.)
```

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. WOODS:

 2        Q.     Hang on one second.  I got to

 3   get this one.

 4              Just give me one second here.

 5   I need to find the document.

 6              Okay.  And I'm -- this is a

 7   memo that I'm going to mark as 3M 3.  It's

 8   from April 22, 1982.  I think the file is

 9   1982422.  If we could pull that document up.

10              And -- yeah, perfect.  Okay.

11   Great.

12              And let me ask you this, Jon.

13   What we put on the screen as Exhibit

14   Number 3M 3 is an April 22, 1982 memo.  It

15   says, "Field letter of W.H. Pearlson."  And

16   it's Minnesota Mining and Manufacturing

17   Company at the top, Bates number 2174809

18   through 2174810.

19              Is this a document that you

20   reviewed as part of educating yourself on

21   3M's response to the ITC request for

22   information on POSF?

23        A.     Yes, it is.

24              And do you happen to have the

25   tab number for that one?
```

Confidential - Pursuant to Protective Order

```
1       Q.    Okay.

2       A.    Sorry.

3       Q.    I don't.  I don't know if we

4  have a tab number for that.  We may have to

5  just pull it up from the exhibit folder.

6             Here it is.  It's in there,

7  3M 3.

8             MR. ROTTENBERG:  And it is

9       Tab 59, Jon.

10            THE WITNESS:  Okay.  Thank you.

11      I've got it.

12 QUESTIONS BY MR. WOODS:

13      Q.    Okay.  And this is a -- well,

14 can you describe your understanding of what

15 this memo is once you pull it?

16      A.    Yeah.  So my understanding is

17 that this is, you know, a report after

18 Mr. Pearlson had attended a meeting with -- a

19 public meeting for the Interagency Testing

20 Committee request.  So it was an open meeting

21 to understand the requirements and what ITC

22 was looking for in its request.

23      Q.    Okay.  And did members -- or

24 people from 3M attend this meeting?

25      A.    Yes, that's my understanding.
```

```
 1          Q.    Okay.  And I want to direct
 2   your attention to the second page of this
 3   document, and the second paragraph, the
 4   first -- the first full sentence there.
 5               It says, "After the formal
 6   meeting was adjourned, about 10:30 {sic}, I
 7   went up and spoke to several members to
 8   determine more precisely the basis for
 9   selection of perfluorooctanesulfonyl
10   fluoride."
11               Do you see that?
12          A.    Yes.
13          Q.    So this is indicating that the
14   3M representative went up and talked to
15   several members of the committee regarding
16   POSF, right?
17          A.    Yes, that's my understanding.
18          Q.    Yeah.
19               And the 3M employee was told in
20   the next sentence, "I was assured from
21   several directions that the selection was
22   based solely on production volume."
23               Do you see that?
24          A.    I see that.
25          Q.    And then if you can look down
```

1   at the last sentence, it says, "Specifically,

2   they were not concerned with the previous

3   8(e) announcement, although several were

4   aware of it."

5            Do you see that?

6       A.   I do.

7       Q.   Do you know what that refers

8   to?

9       A.   My understanding is that's a

10  TSCA 8(e) submission related to teratology

11  study results on PFOS and other substances.

12      Q.   So this 8(e) announcement or

13  submission is a submission that 3M made to

14  EPA under Section 8(e) relating to PFOS; is

15  that right?

16      A.   That's my understanding, yes.

17      Q.   And it was based on certain

18  studies that 3M conducted on PFOS.

19           Is that your understanding?

20      A.   Yes, it is.

21      Q.   We can take that document down.

22           So what, if anything, does

23  that -- well, first of all, does it indicate

24  that the committee was aware of 3M's

25  submission on PFOS to EPA?

1    A.    So I read here that members of

2  the committee, several of the members of the

3  committee, were aware of 3M's 8(e)

4  submission, the teratology study results on

5  PFOS.

6    Q.    And does this indicate at all

7  whether the committee was interested in

8  receiving information about that submission?

9    A.    What I read as being recorded

10  here is that, you know, that report was not

11  of concern to the members of the committee

12  that Mr. Pearlson spoke with and that POSF

13  has been selected on the basis of its

14  production volume.

15         (Gerber 30(b)(6) Exhibit 3M 4

16      marked for identification.)

17  QUESTIONS BY MR. WOODS:

18    Q.    Okay.  If we could mark as the

19  next exhibit, which would be 3M 4, a memo

20  from 1980.  It will be a November 19, 1980.

21         This will also be in the

22  exhibit window once he gets it transferred

23  over.

24         And while we're getting it

25  transferred over, I'll just represent this is

Confidential - Pursuant to Protective Order

 1    a three-page document dated November 19,

 2    1980, Bates number 1296821 through 1296823.

 3              Do you have that document up

 4    there?

 5         A.    I have it on my other screen

 6    here.

 7         Q.    Okay.  And could you just

 8    indicate -- is this -- well, first, is this a

 9    document that you reviewed in connection with

10    your preparation to speak on behalf of the

11    company here today?

12         A.    Yes, it is.

13         Q.    And what is this document?

14         A.    This is a TSCA 8(e) submission

15    on study results on the potassium salt of

16    perfluoroalkyl sulfonates, and this is

17    preliminary information from a teratology

18    study in rats.

19         Q.    Okay.  And if you go down to

20    the second -- or last paragraph on this page,

21    it says, "As noted on page 584 of an article

22    published in the October 1980 American

23    Industrial Hygiene Journal entitled 'Health

24    Status of Plant Workers Exposed to

25    Fluorochemicals - A Preliminary Report.'"

Confidential - Pursuant to Protective Order

```
 1                    Do you see that?
 2        A.      I see that.
 3        Q.      And it says, "This publication
 4   and the attached information reflect, in
 5   part, 3M's testing and monitoring program
 6   designed to evaluate the overall impact of
 7   exposure of fluorochemicals to the health of
 8   workers."
 9                    Do you see that?
10        A.      Yes.
11        Q.      And do you have an
12   understanding as to what this publication
13   was?
14        A.      My understanding is that this
15   is 3M's published data on the blood levels of
16   organic fluorine in its workers exposed to
17   fluorochemicals during the manufacturing
18   process.
19        Q.      Okay.  And do you have an
20   understanding that this article was published
21   in the open scientific literature in 1980?
22        A.      Yes, that's my understanding.
23        Q.      And was this information
24   provided to EPA under the TSCA 8(e)
25   submission?
```

Confidential - Pursuant to Protective Order

```
 1        A.      Certainly as part of this
 2   submission, yes.
 3        Q.      And based on 3M's 8(e)
 4   submission, what did the data reflected in
 5   that 1980 publication indicate in terms of
 6   health effects?
 7        A.      At that time, no adverse health
 8   effects had been identified associated with
 9   the levels of exposure in 3M employees.
10              (Gerber 30(b)(6) Exhibit 3M 5
11        marked for identification.)
12   QUESTIONS BY MR. WOODS:
13        Q.      And I'm going to -- we can put
14   that document down.  I'm going to mark as the
15   next exhibit, 3M 5, an August 1980 -- 1980, I
16   think, dash 9 article.  When you get that, if
17   you can put that on the screen, that will be
18   3M 5.
19              Okay.  And once you pull that
20   document up, Jon, let me know.
21        A.      All right.  I have that.
22        Q.      And this is a August 1980
23   publication.  First author on the publication
24   is Ubel, and it's entitled, "Health Status of
25   Plant Workers Exposed to Fluorochemicals - A
```

1   Preliminary Report."

2             Does this document appear to be

3   the study that was referenced in 3M 5 -- I'm

4   sorry, 3M 4, which was the TSCA 8(e)

5   submission on PFOS?

6        A.    I believe that's correct.

7        Q.    Okay.  And this was information

8   that 3M provided to EPA; is that right?

9        A.    Yes, this information is

10  referenced in the TSCA 8(e) submission that

11  we just reviewed.

12       Q.    Okay.  All right.  If we could

13  go down to the -- I think it's the fourth

14  paragraph in the first column, I'm going to

15  ask you about the last sentence of that

16  paragraph where it says, "Perfluorooctanoic

17  acid or a similar compound of industrial

18  origin was believed to be present in a human

19  plasma fluorine fraction isolated from a

20  large pool of human plasma samples."

21            Do you see that?

22       A.    I do.

23       Q.    And then it cites a reference

24  number 6.

25            Do you see that?

Confidential - Pursuant to Protective Order

```
 1          A.     Yes.
 2          Q.     Okay.  And if we could --
 3                 MR. DOUGLAS:  Sorry to
 4          interrupt.  I sincerely apologize.  I
 5          lost my realtime, and I'm trying to
 6          pull -- what is the exhibit number on
 7          this?  I just wanted to print it out
 8          right now.  Sorry.
 9                 MR. WOODS:  Yeah, this is 3M 5.
10                 MR. DOUGLAS:  Thank you.
11   QUESTIONS BY MR. WOODS:
12          Q.     All right.  And if we could go
13   to the last page under References, number 6,
14   where it says Guy, W.S., D.R. Taves, and
15   W.S. Brey.
16                 Do you see that?
17          A.     I do.
18          Q.     And do you know what that
19   publication is?
20          A.     Yes, I believe I do.
21          Q.     What is that publication?
22          A.     That's another journal article
23   describing the results that Guy and Taves
24   discovered of organic fluorine in pooled
25   blood samples.
```

Confidential - Pursuant to Protective Order

```
 1        Q.    And that's the study that we've
 2   been talking about over the course of your
 3   deposition that was published in the
 4   literature relating to their findings of
 5   organic fluorine in general population pooled
 6   blood samples, correct?
 7        A.    Yes.
 8        Q.    And was the information
 9   regarding that study provided to EPA under
10   TSCA?
11        A.    By reference, yes, this study
12   was referenced in 3M's 8(e) submission, and
13   this study, in turn, references the Guy and
14   Taves study.
15        Q.    Can we pull up, if we can,
16   DL1424?  I'm sorry, DL1428.  I think it was
17   an exhibit that was already used earlier
18   today.  And that's Tab 160 in your binder,
19   Jon.
20             And I think we've already
21   discussed, this document is a summary that
22   was prepared by consultants for EPA -- or for
23   the ITC relating to the information they
24   gathered on POSF for purposes of the ITC
25   review; is that correct?
```

1        A.      That's my understanding, yes.

2        Q.      Okay.  And can we go over to

3    page -- can we go over to page 2 of the

4    document?  This will be at the bottom of the

5    page.  It says page 2.  I don't know, it

6    could be like the fifth or sixth actual page

7    of the document.

8        A.      Okay.  I have that.

9        Q.      And at the bottom under Use, do

10   you see that?

11             It says that "3M reported that

12   POSF is a chemical intermediate used in the

13   manufacture of 3M's fabric treatment and

14   surfactant fluorochemical lines."

15             Do you see that?

16       A.      Yes.

17       Q.      So what does this tell -- or

18   does this indicate that the Agency was aware

19   of the use of this chemical in consumer and

20   industrial products?

21       A.      I believe so, yes.

22             Based on my review, POSF

23   specifically is described as a chemical

24   intermediate, and it's used in the

25   manufacture of downstream products.  And the

Confidential - Pursuant to Protective Order

```
 1    uses of those products, in turn, are

 2    described in this section.

 3         Q.    And the next sentence it says,

 4    "Perfluorinated organic compounds are

 5    important industrial surfactants, textile

 6    treatment agents, surfactant intermediates,

 7    and oil and water-repellent lubricants."

 8         A.    Yes.

 9         Q.    And on page 6 of the document?

10         A.    I have it.

11         Q.    Under point 4 it says, "The

12    fluorine in POSF will inhibit

13    biodegradation."

14              Do you see that?

15         A.    Yes, I do.

16         Q.    It says, "Therefore,

17    biodegradation of POSF should occur slowly in

18    the environment."

19              Do you see that?

20         A.    Yes, I do.

21         Q.    And then under Summary, under

22    point 6 there, the middle of the page, it

23    says, "POSF is expected to partition to

24    water, soil and sediment, where it will

25    slowly hydrolyze and biodegrade."
```

Confidential - Pursuant to Protective Order

```
 1        A.     Yes, I see that.

 2        Q.     And what does this summary tell

 3   you about ITC's knowledge of the degradation

 4   of POSF-based products?

 5        A.     Based on my review of the

 6   documents, you know, the contractor that

 7   prepared this document understood the slow

 8   biodegradation of POSF.  The hydrolysis

 9   pathway to POSF was also recognized.

10        Q.     And 3M also provided the Agency

11   information relating to -- that it had on

12   POFS; is that right?

13        A.     Yes, there were -- there was

14   additional information provided on FC-95, or

15   PFOS.

16        Q.     And that information that they

17   provided included toxicity information

18   relating to the compound, correct?

19        A.     That's my understanding,

20   correct.

21        Q.     You can take that document

22   down.

23               I want to go back to -- let's

24   see.  I've got to find -- this was marked as

25   an exhibit.  I don't -- I didn't -- I don't
```

Confidential - Pursuant to Protective Order

 1    have written down what it is, but I can -- I

 2    think it's also in the materials we provided

 3    to the court reporter.

 4              This is a 1982, February 25th,

 5    Federal Register notice relating to the ITC

 6    review of POSF.

 7              If we could -- I don't know

 8    what document you have.  I'll go ahead and

 9    just mark this as 3M 6 so that -- since I

10    don't have the other exhibit number handy.

11              MR. MCWILLIAMS:  It was already

12        marked as DL1554, Craig.

13              MR. WOODS:  Okay.  That's fine.

14        Then we'll just keep it that, DL1554.

15    QUESTIONS BY MR. WOODS:

16        Q.    And you were asked some

17    questions about this notice relating to

18    requesting information on POSF, correct?

19        A.    Yes.

20        Q.    Yeah.

21              This was actually the

22    information relating on ITC's review of a

23    number of substances, right?

24        A.    That's my understanding, yes.

25        Q.    And in the bottom right-hand

Confidential - Pursuant to Protective Order

1    corner of this document, they have listed a

2    number of considerations that the Agency was

3    wanting to consider; is that right?

4         A.    Yes, that's correct.

5         Q.    You were asked about some of

6    these -- some of the information here, and

7    you were asked some questions about whether

8    POSF was similar to PFOS.

9              Do you recall that?

10        A.    Yes.

11        Q.    Yeah.

12             One of the criteria here of

13   these factors for consideration is number 5.

14   It says, "Similarity in chemical structure to

15   other known" -- "to other substances which

16   are known to present an unreasonable risk of

17   injury to health or the environment."

18             Do you see that?

19        A.    I do.

20        Q.    And is this standard that

21   they're talking about here, substances that

22   are known to prevent an unreasonable risk of

23   injury to health or environment?  Is that the

24   same standard as TSCA 8(e) reporting?

25        A.    No, it's not.  TSCA 8(e) uses a

1    substantial risk standard.

2        Q.      How is that different from

3    known to present an unreasonable risk of

4    injury under EPA TSCA guidance?

5        A.      I guess in my experience and

6    interpretation of EPA requirements,

7    substantial risk would be a lesser standard

8    than known to present an unreasonable risk of

9    injury to health or the environment.

10       Q.      And at the time that 3M was

11   responding to this TSCA, did they have an

12   understanding or belief as to whether the

13   chemical, PFOS, presented a substantial risk

14   to health or the environment based on the

15   data that it had obtained as of this time and

16   based on EPA guidance?

17       A.      Based on my review of the

18   documents, 3M had concluded that the

19   information it had did not represent a

20   substantial risk to human health or the

21   environment related to PFOS.

22       Q.      And specifically with respect

23   to the information that 3M had, did that

24   include -- I think you mentioned the

25   possibility that some portion of organic

Confidential - Pursuant to Protective Order

1    fluorine found in general population samples

2    included PFOS?

3         A.    My understanding is that 3M had

4    identified that possibility at the time.

5              VIDEOGRAPHER:  Can we go off

6         record?  It's the videographer.

7              MR. WOODS:  Sure.

8              VIDEOGRAPHER:  The time is

9         6:01 p.m., and we're off the record.

10        (Off the record at 6:01 p.m.)

11             VIDEOGRAPHER:  The time is

12        6:17 p.m., and we're on the record.

13   QUESTIONS BY MR. WOODS:

14        Q.    All right.  Mr. Gerber, I

15   apologize for the delay here.  I just have a

16   couple more questions for you.

17             You were asked some questions

18   by Mr. Douglas about a SNUR that was issued

19   by EPA in 2002 relating to perfluorooctanyl

20   chemistry.

21             Do you recall that?

22        A.    Yes.

23        Q.    And he asked you some questions

24   about the extent to which that SNUR limited

25   the production or import of those chemistries

Confidential - Pursuant to Protective Order

```
 1   into the United States.

 2             Do you recall that?

 3        A.    I do.

 4        Q.    And I recall that you said you

 5   weren't aware of a notice submitted under a

 6   SNUR relating to continued import or

 7   production of perfluorooctane sulfonate

 8   chemistries; is that right?

 9        A.    Yes, that's correct, with -- I

10   guess to be specific, with a notice with

11   respect to something that had been defined as

12   a new use under the SNUR.

13        Q.    And for purposes of your

14   deposition today, that's not a topic that you

15   researched to speak on behalf of the company;

16   is that right?

17        A.    That's correct.

18        Q.    And you haven't researched that

19   issue to determine whether, subsequent to the

20   issuance of the SNUR, there haven't been

21   companies that have continued to import or

22   produce perfluorooctane sulfonate

23   chemistries; is that fair?

24        A.    Yes, I did not research that as

25   part of my preparation.
```

Confidential – Pursuant to Protective Order

```
 1           Q.     And so you're not aware of it,
 2      but that doesn't mean that there weren't any
 3      producers of POSF-based products or importers
 4      of POSF-based products subsequent to 2002,
 5      correct?
 6           A.     Yeah, I -- I have not
 7      researched that.
 8                  MR. WOODS:  Okay.  That's all
 9           the questions I have.  Thank you very
10           much, Mr. Gerber, for your time.
11                  MR. MCWILLIAMS:  I just have a
12           few questions, Mr. Gerber, and I
13           promise this'll be over real soon.
14           You're doing to a great job.
15           Okay?
16                  THE WITNESS:  All right.
17                  REDIRECT EXAMINATION
18      QUESTIONS BY MR. MCWILLIAMS:
19           Q.     All right.  Did the lawyer for
20      3M, just in his questioning to you, did he
21      show you any documents indicating that 3M
22      notified the United States Environmental
23      Protection Agency prior to May of 1998 as to
24      the presence of PFOS in the blood of the
25      general population?
```

Confidential - Pursuant to Protective Order

```
 1       A.     So that specific finding, to my

 2   knowledge, is not -- not in the notices or

 3   the documents that we reviewed.

 4       Q.     Did the lawyer for 3M show you

 5   or discuss any documents that indicated to

 6   you that prior to May of 1998, that 3M

 7   notified the United States Environmental

 8   Protection Agency as to the potential for

 9   bioaccumulation with respect to PFOS?

10       A.     Sorry, I'm trying to think of

11   the documents we've reviewed.

12              So I know there was publication

13   of the blood data.  I don't -- I don't recall

14   that specific finding.

15       Q.     Okay.  Did Mr. Woods show you

16   or show the jury any evidence that prior to

17   May of 1998, 3M notified the United States

18   Environmental Protection Agency as to their

19   determination that PFOS was toxic to animals?

20       A.     So there was the 8(e) notice

21   regarding the preliminary teratology studies

22   related to PFOS.

23       Q.     I'm talking specifically with

24   respect to 3M's analysis of the rat, monkey

25   and mouse studies where they concluded that
```

Confidential -- Pursuant to Protective Order

 1   PFOS is to be considered toxic.

 2              Have you ever seen that

 3   determination communicated to the US EPA

 4   prior to May of 1998?

 5       A.    No.  My understanding is that

 6   3M determined that that was not substantial

 7   risk information under EPA's current

 8   guidance.

 9       Q.    And therefore did not report

10   that determination to the US EPA, fair?

11       A.    That is my understanding.

12       Q.    Okay.  Now, Mr. Woods did show

13   you, and we can pull up 3M 4, a TSCA -- a

14   TSCA 8(e) submission from 1980 with respect

15   to the birth defects study, right, in rats?

16   In the lens of their eyes; is that right,

17   sir?

18       A.    Yes.

19       Q.    And in the bottom paragraph of

20   the first page, it makes a reference to this

21   1980 publication; is that right?

22       A.    Yes.

23       Q.    Okay.  And the reason why 3M

24   sent this publication -- or brought the

25   publication to the attention of the US EPA

Confidential — Pursuant to Protective Order

1  was to assuage EPA any concerns they might

2  have with respect to the potential toxicity

3  of these chemicals, right?

4      A.     I guess I can't speak to the

5  state of the mind of the people that prepared

6  this notice.

7      Q.     Okay.  Well, let's look at it.

8  It says, "As noted on page 584 of this

9  article," and it gives the title, Preliminary

10  Report, "this publication and the attached

11  information reflects in part 3M's testing and

12  monitoring program."

13          Right?

14      A.     Yes, I see that.

15      Q.     "And to date, no human health

16  problems have been observed, nor disease

17  patterns detected."

18          Right?

19      A.     Yes, I see that.

20      Q.     It doesn't take a rocket

21  scientist to understand why 3M would have

22  sent that to EPA at that time, right?

23      A.     So, again, I won't speculate on

24  the motivations of the people that submitted

25  this information.

Confidential - Pursuant to Protective Order

```
 1        Q.    Okay.  But they're saying that
 2   this submission supports the fact that
 3   there's no evidence of harm due to exposure
 4   to these chemicals, right?
 5        A.    That's the conclusion that's
 6   described here based on the observations in
 7   workers.
 8        Q.    Okay.  And let's look at that
 9   paper.  That's Exhibit 3M 5.
10              That's the Ubel 1980 paper; is
11   that right?
12              3M 5.  There we go.
13              Do you see that, sir?
14        A.    All right.  I have that.
15        Q.    And Dr. Ubel, he's a 3M
16   employee.  He gets a paycheck every two weeks
17   from 3M.  He's not some independent
18   scientist, is he?
19        A.    My understanding is that he was
20   a 3M employee.
21        Q.    All right.  And he gets his
22   paycheck every two weeks, and he's going to
23   write a report on whether or not a 3M product
24   causes harm, right?
25        A.    That's my understanding, he was
```

1    the author of this paper.

2        Q.    Okay.  But now this paper

3    studied 3M employees who were exposed to

4    PFOA, not PFOS, right?

5        A.    Let -- let me review quick

6    here.

7        Q.    If you want to turn to

8    page 6 -- or actually, I'm sorry.

9             And this specifically looked

10   for incidence of cancers, right, to see if

11   there's more than expected?

12            If you go to page 1, sir, of

13   the -- of the top right, it says, "We believe

14   it is now appropriate to report in a

15   preliminary way on blood organic fluorine

16   levels and the health status of a group of

17   chemical production workers at one chemical

18   plant which produces" what?  What chemical

19   did they produce?

20       A.    Ammonium perfluorooctanoate.

21       Q.    That's PFOA, right?

22       A.    Yeah, APFO, yes.

23       Q.    Okay.  That's not PFOS, right?

24       A.    That's correct.

25       Q.    Okay.  Does this paper make any

Confidential - Pursuant to Protective Order

```
1    reference of any way in any kind to PFOS?
2         A.    As I discussed with Dr. Woods,
3    it does include by reference the study by Guy
4    and Taves that it identified organic fluorine
5    and identified -- you know, tentatively
6    identified those substances as PFOA or the
7    sulfonate salts.
8         Q.    Okay.  Sir, does the term
9    "PFOS" appear anywhere in this paper?
10        A.    I don't believe so.
11        Q.    Okay.  Now, 3M believes that
12   this paper supports the proposition that
13   these chemicals don't increase one's risk of
14   cancer, right?
15        A.    My understanding of the
16   conclusions of this study is that no adverse
17   health effects were observed.
18        Q.    Including cancer.  Cancers were
19   looked for, right?
20        A.    I believe so.
21        Q.    Okay.  Sir, let me show you an
22   internal 3M memo where they discuss this
23   paper and what its findings mean.
24             Do you want to do that with me?
25   Sir, will you do that with me?
```

1          A.      Sure.

2                  (Gerber 30(b)(6) Exhibit DL1407

3          marked for identification.)

4    QUESTIONS BY MR. MCWILLIAMS:

5          Q.      Okay.  Let's pull up DL1407.

6                  And I guess first, sir, do you

7    recognize this as a document you reviewed in

8    preparation for your deposition?

9          A.      If you could allow me just a

10   moment to --

11                 MR. ROTTENBERG:  Tab 87, Jon.

12                 THE WITNESS:  Thank you.

13                 Yes.

14   QUESTIONS BY MR. MCWILLIAMS:

15         Q.      Okay.  And so that was, yes,

16   this is a document you reviewed in

17   preparation for your deposition?

18         A.      I believe so.

19         Q.      And this is a memo dated --

20   internal 3M memo dated May 3, 1979?

21         A.      Yes, it is.

22         Q.      Again, they're talking about

23   the same two outside consultants we talked

24   about before, right?

25         A.      Dr. Hodge and Dr. Mitchell?

Confidential - Pursuant to Protective Order

```
 1        Q.     Uh-huh.
 2               Okay.  Let's go to the very
 3    bottom of this page, the paragraph that
 4    begins "Although Dr. Ubel's epidemiology
 5    study."
 6               Do you see that, sir?
 7        A.     Yes, I do.
 8        Q.     And Dr. Ubel is the author of
 9    the epidemiology study that Mr. Woods just
10    discussed with you in his examination, right?
11        A.     That's correct.
12        Q.     Okay.  Let's see what 3M -- how
13    3M characterized this paper internally.
14               They said, "Although Dr. Ubel's
15    epidemiology study is important and may tell
16    us if we are dealing with potent carcinogenic
17    chemicals - all evidence to date indicates we
18    are not - it will not be adequate to give
19    reasonable assurance that the fluorochemicals
20    are not carcinogenic because, 1, the database
21    is too small, only 1 to 200 deaths will be
22    tabulated; and 2, the exposure history, how
23    much, how many times, to what compounds, how
24    long ago, et cetera, is indefinite and can
25    really never be obtained."
```

Confidential - Pursuant to Protective Order

```
 1              Did I read that correctly, sir?

 2      A.      Yes.

 3      Q.      Now, and let's go back to 3M 4,

 4    the TSCA submission where 3M brought to EPA's

 5    attention this Ubel paper, this Ubel

 6    epidemiology study, 3M 4, yeah.

 7              And I want you to tell me, sir,

 8    where in here I can find 3M's assessment that

 9    this epidemiology study cannot give

10    reasonable assurance that these chemicals do

11    not cause cancer.

12              Tell me -- show the jury where

13    that was -- where that information was

14    provided to the United States Environmental

15    Protection Agency.

16      A.      I don't see 3M's internal

17    analysis reflected here, but the study itself

18    was available to the Agency to make its own

19    independent determination.

20      Q.      Okay.  But the company that

21    published the study itself felt it couldn't

22    be used to prove that the compounds were

23    safe, and they never told the EPA that, did

24    they?  Or any of the readers of the

25    publication, did they?
```

```
 1        A.      Based on the documents that
 2   I've reviewed, 3M's internal analysis of the
 3   study was -- was not -- was not published.
 4        Q.      Okay.
 5        A.      The study itself was.
 6        Q.      Okay.  One of the last things
 7   you discussed with Mr. Woods was that 3M may
 8   have known that PFOS was in the blood of the
 9   general population, but because you guys
10   didn't think it was harmful, you didn't have
11   an obligation to report it.
12             Is that fair?
13        A.      My understanding based on the
14   documents that I've reviewed is that the lack
15   of observed health effects was a key
16   determinant in 3M's 8(e) reporting decisions.
17        Q.      But, sir, don't people have a
18   right to know when a manmade chemical has
19   been put into their body without their
20   permission and the company that makes the
21   chemical has that information?  Doesn't 3M
22   have an obligation, a moral duty, to disclose
23   that information?
24        A.      That question is really outside
25   the scope of TSCA requirements.  TSCA itself
```

Confidential -- Pursuant to Protective Order

```
 1    is not a right-to-know law.

 2              I'm aware there are, you

 3    know -- that we rely on other frameworks for

 4    right-to-know requirements and community

 5    information.  Beyond that, it's, you know,

 6    individual company product stewardship

 7    judgments and --

 8        Q.    Right.  And I'm asking you for

 9    your judgment, Mr. Gerber.

10              Don't people have a right to

11    know when a foreign substance is in their

12    body and the company that happens to make

13    that substance is aware of that information?

14        A.    I think that -- and again, this

15    goes beyond, you know, the scope of my

16    responsibilities or my experience.

17              In my personal view, I think

18    that good risk communication is important and

19    that that's, you know, a situation-specific

20    determination.

21              MR. MCWILLIAMS:  All right.

22        Okay.  I agree.  Thank you.  That's

23        all the questions I have.

24              MR. WOODS:  Anybody else?

25              MR. MCWILLIAMS:  I think we're
```

Confidential - Pursuant to Protective Order

```
 1        done.

 2                MR. WOODS:  Okay.  I think

 3        we're done.  Thank you, Mr. Gerber.

 4                VIDEOGRAPHER:  The time is

 5        6:32 p.m., and we're off the record.

 6        (Deposition concluded at 6:32 p.m.)

 7                  - - - - - - -

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Pursuant to Protective Order

```
 1                    CERTIFICATE
 2
 3            I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 4   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 5   of the examination, Jon Gerber, was duly
     sworn by me to testify to the truth, the
 6   whole truth and nothing but the truth.
 7            I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10
             I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.
14
15
16
     _____
17   CARRIE A. CAMPBELL,
     NCRA Registered Diplomate Reporter
18   Certified Realtime Reporter
     Notary Public
19
20
21
22
23   Dated:  August 25, 2021
24
25
```

```
 1                INSTRUCTIONS TO WITNESS

 2

 3           Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8           After doing so, please sign the

 9    errata sheet and date it.  You are signing

10    same subject to the changes you have noted on

11    the errata sheet, which will be attached to

12    your deposition.

13           It is imperative that you return

14    the original errata sheet to the deposing

15    attorney within thirty (30) days of receipt

16    of the deposition transcript by you.  If you

17    fail to do so, the deposition transcript may

18    be deemed to be accurate and may be used in

19    court.

20

21

22

23

24

25
```

Confidential - Pursuant to Protective Order

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4          I,_____, do

    hereby certify that I have read the foregoing

 5  pages and that the same is a correct

    transcription of the answers given by me to

 6  the questions therein propounded, except for

    the corrections or changes in form or

 7  substance, if any, noted in the attached

    Errata Sheet.

 8

 9

10

11

12  _____

    Jon Gerber                           Date

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25
```

Confidential - Pursuant to Protective Order

```
1                   - - - - - - -

                        ERRATA

2                   - - - - - - -

3      PAGE    LINE    CHANGE/REASON

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25
```

Confidential - Pursuant to Protective Order

```
 1                   - - - - - - -

                   LAWYER'S NOTES

 2                   - - - - - - -

 3       PAGE    LINE

 4       _____   _____   _____

 5       _____   _____   _____

 6       _____   _____   _____

 7       _____   _____   _____

 8       _____   _____   _____

 9       _____   _____   _____

10       _____   _____   _____

11       _____   _____   _____

12       _____   _____   _____

13       _____   _____   _____

14       _____   _____   _____

15       _____   _____   _____

16       _____   _____   _____

17       _____   _____   _____

18       _____   _____   _____

19       _____   _____   _____

20       _____   _____   _____

21       _____   _____   _____

22       _____   _____   _____

23       _____   _____   _____

24       _____   _____   _____

25
```