**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | MDL No.  2:18-mn-2873-RMG<br><br>**PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT 3M COMPANY**<br><br>**This Document relates to ALL CASES** |

NOW COME Plaintiffs, by and through the Plaintiffs Executive Committee ("PEC"), and move this Honorable Court, pursuant to Rules 26, 34 and 37 of the Federal Rules of Civil Procedure and Local Civil Rules 7.04 and 37.01, for an order compelling Defendant 3M Company to produce the custodial file of former 3M Chief Executive Officer ("CEO") and Chairman of the Board, Lewis Lehr.

Mr. Lehr was CEO of 3M from 1979-1986 and member of its board of directors from 1974-1991, a time when 3M was aware of the potential for litigation involving widespread environmental contamination from its PFAS chemicals. Indeed, at that time, 3M was aware that a PFAS chemical it manufactured was in the blood of non-occupationally exposed people across the United States. Despite this knowledge, 3M, through its executives, including Mr. Lehr, undertook multiple efforts to conceal these facts and ultimately delayed for decades outside scientific inquiry[1] as well as litigation.

---

[1] *See generally* Grandjean, P. *Delayed discovery, dissemination, and decisions on intervention in environmental health: a case study on immunotoxicity of perfluorinated alkylate substances.* ENVIRON HEALTH 17, 62 (2018), attached to the Declaration of Michael A. London ("London Decl.") as Exhibit A.

It is against this backdrop that Plaintiffs file this motion relating to Mr. Lehr's custodial file. As a 3M executive, Mr. Lehr played a central role in business decisions related to investigating and reporting potential effects associated with 3M's fluorochemical products. It is undisputed that 3M has not produced Mr. Lehr's custodial file despite repeated requests, including protracted meet and confers. As a result, Plaintiffs seek an order from the Court requiring production of Mr. Lehr's custodial file.

**Procedural Background**

In this MDL, 3M has agreed to produce the custodial files of numerous individuals who were involved in the company's fluorochemical business. As the PEC has reviewed 3M's ongoing productions in this litigation, it has identified additional individuals who it believes may possess relevant information and has requested production of those individuals' custodial files. In October 2021, the PEC identified Lewis Lehr as an additional custodian and requested that 3M produce his custodial file. 3M agreed to conduct a reasonable search of Mr. Lehr's documents.[2] After almost a month without any updates on 3M's search and production of Mr. Lehr's custodial file, the PEC requested a date by which the PEC could expect to receive the completed production.[3] Two days later, 3M responded that it "has not identified a custodial file, nor documents associated with a custodial file (whether hard copy or electronic), for Lewis Lehr whose employment tenure at 3M ended in 1986, aside from a single nonresponsive lab notebook."[4] 3M reiterated its findings, or lack thereof, during a subsequent telephonic meet and confer on November 30, 2021, explaining that while certain documents produced in this litigation mention Mr. Lehr, 3M was unable to

---

[2] *See* Email correspondence dated Oct. 20, 2021 and Oct. 25, 2021, attached to the London Decl. as Exhibit B, at pp. 2-3.

[3] *Id.* at p. 1.

[4] *Id.*

2

identify a custodial file with respect to the agreed-upon search terms because of the timeframe of Mr. Lehr's employment with 3M.

Through its review, however, the PEC has identified 283 documents in 3M's productions referencing Mr. Lehr, many of which appear to have been created while Mr. Lehr was a 3M employee, which are highly relevant to the core issues in this case. As a result, the PEC requested that 3M search its records once again to confirm the existence of Mr. Lehr's custodial file.[5] During the Parties' second telephonic meet and confer on this topic on December 16, 2021, 3M indicated that after a subsequent search, it had still only identified Mr. Lehr's technical lab notebook.

Despite the Parties' extensive meet and confer efforts, 3M has failed to produce these documents or otherwise provide a reasonable explanation as to why some historical documents from the same timeframe were preserved, while the custodial file of Mr. Lehr was not.

**Factual Background**

In order to appreciate the relevance and importance of Mr. Lehr's custodial file, the following factual and historical context is important.

On May 15, 1998, 3M notified the Environmental Protection Agency ("EPA") that it had determined that its proprietary chemical, perfluorooctane sulfonate ("PFOS"), of which 3M was the primary U.S. manufacturer, was widespread in the environment and present in the blood of virtually every man, woman and child.[6] Shortly after this discovery,[7] 3M discontinued

---

[5] *See* Letter from David Hoyle to Daniel L. Ring, dated Dec. 7, 2021, attached to the London Decl. as Exhibit C.

[6] *See* 3M_BELL02796621, attached to the London Decl. as Exhibit D.

[7] On May 4, 2000, 3M provided the EPA with copies of 149 internal 3M studies dating from 1975 which filled "several boxes." *See* Document #448, attached to the London Decl. as Exhibit E, at #448.2. These internal 3M studies addressed the physical and chemical properties, environmental fate and transport, environmental monitoring, ecotoxicity, acute toxicity, genotoxicity, repeated-dose toxicity, pharmacokinetics, teratology, medical surveillance, and epidemiology of PFOS. Subjects of these toxicity studies included rats, monkeys, rabbits, albatross, goats, fish, bald eagles,

3

manufacturing this family of chemicals, which was responsible for more than $300 million in annual sales.[8] Similarly, the EPA effectively banned others from making or importing these same chemicals stating that "these chemical substances may be hazardous to human health and the environment."[9] In statements to the press, 3M claimed they were only able to make this discovery due to recent advancements in analytical techniques, and further claimed that the discovery of PFOS in the blood of the general population in the late 1990s was "a complete surprise."[10] Contrary to this carefully crafted narrative, the truth was that 3M possessed this knowledge for more than *20 years*, and had spent two decades actively hiding, distracting or misleading those outside of 3M about this important public health matter.

In the summer of 1975, Dr. Warren Guy, a toxicologist and professor at the University of Florida, called 3M's corporate headquarters concerning research he and Dr. Donald Taves, a toxicologist and professor at the University of Rochester, were going to present at a symposium organized by the American Chemical Society ("ACS"). Dr. Guy and Dr. Taves had discovered the presence of an unidentified organic fluorine chemical compound in human blood obtained from blood banks in five U.S. cities. According to an internal 3M memorandum documenting these phone calls, Dr. Guy called 3M to see if it knew of the "possible sources" as Dr. Guy correctly "got the information that 3M's fluorocarbon carboxylic acids are used as surfactants and wanted

---

mice, guinea pigs, quail, mallard ducks, mink, river otters, and oysters. Twelve days later, and following "negotiations" with the EPA, 3M announced that it was "voluntarily" phasing out production of PFOS. *See* 3M_BELL00848209, attached to the London Decl. as Exhibit F, at 3M_BELL00848209; *see also* 3M_AFFF_MDL00207575, attached to the London Decl. as Exhibit G.

[8] *See* Olsen Deposition Exhibit LP193, attached to the London Decl. as Exhibit H, at p. 3.

[9] https://www.federalregister.gov/documents/2002/12/09/02-31011/perfluoroalkyl-sulfonates-significant-new-use-rule.

[10] *See* Exhibit H, Olsen Deposition Exhibit LP193, at p. 3.

4

to know if they were present in 'Scotchgard' or other items in general use by the public." Incredulously, 3M chose to "plead ignorance" and instead "adopted a position of scientific curiosity and desire to assist in any way possible..."[11]

In another phone call, Dr. Taves specifically asked 3M if the "fluorochemical they have found in human blood is either a derivative of a perfluorocarboxylic acid or a perfluorosulphonic acid," and whether "the fluorochemical found in the blood might be coming from [3M's] paper or paperboard" products.[12] On August 26, 1975, Dr. Guy and Dr. Taves presented their research at an ACS symposium in Chicago. Shortly thereafter, on October 16, 1975, Dr. Guy sent 3M a copy of the paper presented in Chicago.[13] Dr. Guy asked in return that: "[i]f you or other interested parties at 3M have any ideas on how we can better characterize these fluorocompounds please let either Dr. Taves or me know."[14]

The manuscript detailed the methods used by Drs. Guy and Taves to conclude that organic fluorine had been found on average at 30 parts per billion in the blood of the general population.[15] Dr. Guy and Dr. Taves stated that based on their analysis, "the fluorine containing part of the compounds in the isolate (from human plasma) resemble perfluorooctanoic acid ("PFOA")."[16] The manuscript further posited: "These findings suggest that there is widespread contamination of human tissues with trace amounts of organic fluorocompounds derived from commercial products. All available information on this subject is in accordance with this

---

[11] *See* 3M_AFFF_MDL00419718, attached to the London Decl. as Exhibit I.

[12] *See* 3M_BELL00054741, attached to the London Decl. as Exhibit J, at 3M_BELL00054741.

[13] *See* 3MA00257421, attached to the London Decl. as Exhibit K.

[14] *Id*. at 3MA00257421.

[15] *Id*. at 3MA00257423.

[16] *Id.* at 3MA00257430.

5

interpretation."[17] Included within this manuscript was the below spectra, based upon nuclear magnetic resonance (NMR) analysis, of the organic fluorine found by Drs. Guy and Taves in blood bank blood[18]:



Figure 5. NMR Spectrum of Organic Fluorocompound(s) Isolated from Human Plasma

In response to the manuscript authored by Drs. Guy and Taves, 3M's Commercial Chemicals Division Laboratory submitted samples of ten different "perfluorocarboxylic and perfluorosulfonic acid derivatives [made by 3M] to Central Research Analytical for 19F NMR analysis in an attempt to identify the material found by Guy and Taves in human blood."[19] On November 6, 1975, 3M scientist Richard Newmark, of the Central Analytical Laboratory ("CAL"), authored a report which compared the ten chemical compounds made by 3M to the chemical discovered by Drs. Guy and Taves.[20] Dr. Newmark concluded that the chemical spectrum presented by Drs. Guy and Taves "resembled most closely" PFOS, the PFAS compound manufactured exclusively by 3M and <u>not PFOA</u>.[21] Despite this conclusion, 3M never provided Dr. Guy or Dr. Taves with this information. Instead, an internal 3M timeline indicates that,

---

[17] *Id.*

[18] *Id.* at 3MA00257442.

[19] *See* 3M_BELL00054589, attached to London Decl. as Exhibit L.

[20] *See* 3MA00967400, attached to the London Decl. as Exhibit M.

[21] *Id.*

6

"[a]ccording to Richard Newmark, 3M lawyers urge CAL not to release the true identity (PFOS) of the [organic fluorine] compound."[22] Without this information, Drs. Guy and Taves published their manuscript in the *Proceedings of the American Chemical Society* documenting their continued search for the source of organic fluorine in the blood bank blood – a source identified and kept secret by 3M.

In light of this startling discovery, namely that their proprietary chemical was found in the blood of the general population, 3M attempted to identify which specific 3M products could be responsible for the presence of PFOS in the blood of the general population. While 3M manufactured pure PFOS for use as an industrial surfactant, it represented a tiny fraction of their PFAS production and surfactants were not believed to be in routine contact with the public at large.[23] However, two of 3M's chemically-related (PFOS precursor) products were in contact with the general public – Scotchgard stain repellant and Scotchban food packing paper. In 1977, 3M fed Scotchban and Scotchgard to rats and mice and discovered that both 3M products metabolize to PFOS in the blood.[24] The study author told his colleagues that this was a "significant finding," and concluded that "the public health issue [is] simply one of frequency and type of exposure to 3M products."[25]

Internal 3M documents indicate that Drs. Guy and Taves' finding of PFOS in the blood of the general population was the initiating "event" that led to toxicology studies conducted on rats,

---

[22] *See* 3M_BELL00054594, attached to the London Decl. as Exhibit N.

[23] As of 1980 3M manufactured 16,000 pounds a year of pure PFOS while manufacturing several million pounds of PFOS precursors.

[24] *See* Exhibit L, 3M_BELL00054589.

[25] *See* 3MA10035579, attached to the London Decl. as Exhibit O, at 3MA10035580.

mice and monkeys.[26] These studies, which were concluded in 1979, reported that "[PFOS] was the most toxic of the three compounds studied and certainly more toxic than anticipated."[27] The 90-day monkey study, for example, reported "GI tract toxicity, lipid depletion of adrenals, atrophy of pancreatic exocrine cells and serous alveolar cells of the salivary glands."[28] In total, 20 of the 28 rhesus monkeys in the study died as a result of their exposure to PFOS.[29]

**3M CEO and Chairman of the Board, Lewis Lehr**

News that a proprietary chemical made exclusively by 3M was toxic and present in the blood of the general population attracted the attention of 3M's highest-ranking executives, including Mr. Lehr. The incomplete production of Mr. Lehr's file clearly demonstrates his active involvement in this burgeoning crisis within 3M. For example, a May 26, 1978 memo states, "[t]his will confirm arrangements made for a meeting at 9:30am July 12 in Mr. Lehr's conference room […] on the subject of fluorochemicals in blood."[30] Importantly, it was Mr. Lehr who decided to seek advice from experts outside of 3M to determine whether 3M was required to inform the EPA of their discovery:

> This meeting is being called to consider the use of an outside consultant to review our results to date in the fluorochemicals in blood program. Mr. Lehr has specifically requested that an outside consultant review our results and render an independent opinion as to whether we are correct in our assumption that we do not have a reportable situation under Section 8(e) of the Toxic Substances Act.[31]

---

[26] *See* 3M_AFFF_MDL00080683, attached to the London Decl. as Exhibit P, at 3M_AFFF_MDL00080700.

[27] 3M_AFFF_MDL02174949, attached to the London Decl. as Exhibit Q, at 3M_AFFF_MDL02174949.

[28] *See* 3M_AFFF_MDL00080683, Ex. P, at 3M_AFFF_MDL0080705.

[29] *Id.* at 3M_AFFF_MDL0080704-05.

[30] 3M_AFFF_MDL02342766, attached to the London Decl. as Exhibit R.

[31] 3M_AFFF_MDL02342749, attached to the London Decl. as Exhibit S.

In response to Mr. Lehr's directive, 3M sought consultation from two outside scientists: Dr. Jerry R. Mitchell, M.D., Ph.D., a Professor of Chemical Toxicology at the Baylor College of Medicine and Harold C. Hodge, Ph.D., a Professor of Pharmacology and Oral Biology at the University of California San Francisco who was the first president of the Society of Toxicology.

On April 12, 1979, nine 3M employees, including Les Krogh, a 3M Division Vice President, as well as the company's Medical Director, Dr. Frank Ubel, traveled on a 3M Company Gulfstream II jet to San Francisco to meet with Dr. Hodge.[32] After presenting data from the 90-day toxicology studies performed on rats, mice, and monkeys, Dr. Hodge encouraged 3M to perform metabolism studies on its Scotchban paper packaging product, stating this was of the "utmost importance," and to then determine if those metabolites are present in the blood of the general population. Dr. Hodge's initial assessment was that: "we could have a serious problem."[33] Most troubling, and quite revealing as to 3M's state of mind at this time, is the fact that this stark assessment by Dr. Hodge was deleted from the draft meeting minutes prepared by 3M and thus do not appear in the official report from this meeting.[34]

Similarly, one day after the meeting with Dr. Hodge, the same nine 3M employees traveled on a 3M Company plane to Houston, Texas, to meet with another external expert, Dr. Jerry R. Mitchell.[35] 3M representatives presented the same toxicology data they presented to Dr. Hodge the prior day. Like Dr. Hodge, Dr. Mitchell provided 3M with a stark assessment of the data. Dr. Mitchell told 3M that "some of the symptoms in animals from these 90-day studies are similar to

---

[32] *See* 3M_AFFF_MDL00435666, attached to London Decl. as Exhibit T, at 3M_AFFF_MDL00435666; 3M_BELL03185972, attached to London Decl. as Exhibit U.

[33] *See* 3MA00967775, attached to London Decl. as Exhibit V, at 3MA00967780.

[34] *See* 3M_AFFF_MDL00647433, attached to London Decl. as Exhibit W.

[35] *See* 3M_BELL01440050, attached to London Decl. as Exhibit X.

9

those observed with carcinogens."[36] Incredulously, this statement by Dr. Mitchell was also removed from the final draft of the meeting minutes.[37] This statement by Dr. Mitchell takes on additional significance when one considers another element that was discussed in their meeting: legal liability. At the conclusion of the meeting, Dr. Mitchell prepared a slide to summarize the meeting. In his slide summary, Dr. Mitchell identified "[p]ublic health" and "[e]nvironmental (fish, fowl, etc.)" as categories of "People at Risk." Further, under a heading titled "Legal Issues," Dr. Mitchell enumerated both "Human Injury" as well as "TSCA Sec. 8(e)."[38]

The Toxic Substances Control Act ("TSCA")[39] was passed by Congress in 1976 to protect the public from chemicals that present an "unreasonable risk of injury to health or the environment." One of the primary ways that TSCA implements this mandate is a requirement under section 8(e) that a chemical manufacturer must "immediately inform" the EPA of "information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." "Substantial Risk" has been defined by the EPA as "any non-trivial adverse effect, heretofore unknown to the administrator, associated with a chemical known to have bioaccumulated to a pronounced degree or to be widespread in the environment."[40] Indeed, 3M invoked TSCA 8(e) when it finally reported the widespread presence of PFOS in the blood of the general population to the EPA in 1998.[41] As the evidence and record

---

[36] *See* 3MA10034826, attached to London Decl. as Exhibit Y, at 3MA10034828.

[37] *See* 3M_BELL01440050, Ex. X.

[38] *See* 3MA10034826, Ex. Y, at 3MA10034829.

[39] As the Court may recall from prior Joint Status Reports, the PEC has had to threaten 3M with motion practice in order to obtain documents from 3M related to TSCA.

[40] *See* 3M_AFFF_MDL00410829, attached to London Decl. as Exhibit Z, at 3M_AFFF_MDL00410830.

[41] *See* 3M_BELL02796621, Ex. D.

is clear, this is almost twenty years after Mr. Lehr consulted with colleagues within 3M and consultants external to 3M, and Mr. Lehr made the decision to not inform the EPA and instead to keep this important matter of public health a secret.[42]

As set forth above, multiple documents reveal that as early as 1979, 3M was on notice of a profound threat to public health posed by their products. Accordingly, 3M actively contemplated litigation and regulatory implications resulting from its knowledge of this significant threat to public health, which, Plaintiffs submit, triggered its duty to preserve documentary and related evidence. However, rather than preserve evidence as a result of a clear contemplation of anticipated litigation, 3M appears to have actively attempted to re-write its history and/or purge incriminating evidence from its files.

It is against this factual backdrop[43] that the instant motion is before the Court.

---

[42] *See* August 19, 2021, Deposition Transcript of Fed. R. Civ. 30(b)(6) witness John Gerber, at 90:23-91:25, attached to the London Decl. as Exhibit AA.

> Q:   True or false: By 1980, 3M was in possession of information that PFOS was a bioaccumluative compound, that it was widespread in the blood of the general population, and that it killed rhesus monkeys that were exposed to it. […]
>
> A:   Based on my review of the documents, **3M had all of** – **had those pieces of information** […] but […] all of that information needs to be put together and judgment applied to making a TSCA 8(e) reporting decision.
>
> Q:   Right. And 3M did that. 3M had all of that information and **decided not to disclose** it at that time in 1980, right?
>
> A:   **Yes**. I've reviewed documents that – you know, after the – those studies were conducted, that information was reviewed against EPA's reporting criteria, and the company made the determination that the information was not substantial risk information under TSCA 8(e).

[43] Parallel to 3M's internal studies on the toxicity and metabolism of their products that they knew were in the blood of the general population, 3M made efforts to conceal this very information from the public. For example, E. I. du Pont de Nemours ("DuPont") was a major customer of 3M's

**Legal Standard**

Rule 26 of the Federal Rules of Civil Procedure provides that a party may "obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case…." Fed. R. Civ. P. 26(b)(1). "[T]he discovery rules are given 'a broad and liberal treatment.'" *Harry v. Pilgrim's Pride Corp.*, No. 3:12-cv-2268-CMC-SVH, 2013 U.S. Dist. LEXIS 22700, at *2 (D.S.C. Feb. 20, 2013) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Murray Sheet Metal Co. Inc.*, 967 F.2d 980, 983 (4th Cir. 1992)). The scope of discovery permitted by Rule 26 is designed to provide a party with information reasonably necessary to afford a fair opportunity to develop its case. *Nat'l Union*, 967 F.2d at 983; *Ashmore v. Owens*, 2017 U.S. Dist. LEXIS 105543, at *2-3 (D.S.C. June 2, 2017). 3M, as the party resisting discovery, "bears the burden of persuading the court that the requested information is outside the scope of discovery." *Ashmore*, 8:15-cv-02373-JMC, 2017 U.S. Dist. LEXIS 105543, at *3. 3M cannot meet its burden.

As this Court has previously recognized, the Rule 26 standard "shifts heavily toward production" in this MDL, where there are more than 100 consolidated cases, important claims, and

---

PFOA – the chemical mis-identified by Drs. Guy and Taves as the mystery organic fluorine found in sera. According to a memo from a 1978 meeting between DuPont and 3M, after DuPont asked 3M about the findings of Drs. Guy and Taves, and whether or not they agreed that PFOA was the mystery compound in the blood of the general population, "they were told that we disagreed, but were given no further clarification." *See* 3M_AFFF_MDL00419874, attached to London Decl. as Exhibit BB. Even worse, in 1980, 3M published in the peer-reviewed literature that the mystery chemical observed by Guy and Taves was not a man-made chemical at all but was instead a naturally occurring substance. *See* Belisle, J. *Organic Fluorine in Human Serum: Natural Versus Industrial Sources*. Science, Vol. 212, 26 June 1981, attached to London Decl. as Exhibit CC.

significant amounts in controversy.[44] As the Court noted on April 3, 2020, "discovery in an MDL is robust."[45]

**Argument**

### I.    3M had an obligation to preserve these documents.

3M had a duty in 1979 to preserve the custodial file of Lewis Lehr as it knew or reasonably should have known that these documents were relevant to future litigation. *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Id*. at 591; *see also Struthers Patent Corp. Nestle Co.*, 558 F. Supp. 747, 765-66 (D.N.J. 1981) (holding the destruction of documents which a party knew or should have known would be relevant to a future lawsuit is sanctionable); *Cecil Corley Motor Co. v. Gen. Motors Corp.*, 380 F. Supp. 819, 859 (M.D. Tenn. 1974) ("When a litigant destroys, removes, or withholds records or documents while litigation is pending, or even while litigation is being contemplated, the strongest inferences may be drawn against that party which the opposing evidence in the record permits.")

While it is difficult to articulate a precise date when 3M was on notice of future litigation involving PFAS—because this notice goes back nearly as long as 3M has manufactured PFAS—certainly the requirement for notice was met by November 6, 1975, the date 3M scientist Dr. Newmark determined that a 3M proprietary chemical was in the blood of non-occupationally exposed Americans. Such a duty is only strengthened by the contemporaneous efforts by 3M attorneys and others within 3M to prevent the release of 3M's internal knowledge that its chemical

---

[44] *See* December 13, 2019 CMC Transcript at 6:7-15.

[45] *See* April 3, 2020, CMC Transcript at 32:19-20.

compound PFOS was in the blood of non-occupationally exposed Americans. Similarly, in a document which has a "date received" stamp of August 15, 1980 by "3M Toxicology," 3M prepared 12 pages of "Some Probable Questions on 3M Fluorochemicals with Suggested Answers."[46] Section K of that document addressed "Legal Issues" as set forth below:

> K-1   What liability is 3M willing to accept for any ill effect that we, the customers, determine now or in the future?
>
> K-2   Does 3M face any law suits as a result of causing elevated levels of fluorine in anybody's blood?[47]

Notably, in 1980, 3M left the "suggested answers" for these specific "probable questions" concerning "legal issues" unanswered.[48]

In other words, by the time that 3M was certainly well aware of potential health effects (it was likely aware of these for at least 10 years), possible lawsuits, and potential environmental exposure, 3M *knew* that its chemical compound PFOS was in the blood of non-occupationally exposed Americans. As previously discussed, Mr. Lehr held a powerful position in the company at the time and played a key role in discussions related to what information 3M knew about fluorochemicals in blood versus what it would share with the industry, the public, and government agencies. Thus, there can be no question that 3M was under an obligation at that time to preserve his custodial file.

**II.    3M has produced documents from the same time period when Mr. Lehr was a 3M executive.**

---

[46] *See* 3M_BELL01939676, attached to London Decl. as Exhibit DD.

[47] *Id*. at 3M_BELL01939688.

[48] *Id*.

As of February 14, 2022, 3M has produced 756,797 documents in this litigation, approximately 29,209 of which were created during Mr. Lehr's tenure as CEO from 1979-1980 and CEO and Chairman of the Board from 1980-1986. The fact that 3M has produced other historical documents from this timeframe strongly suggests that the requested documents were maintained by 3M at least at some point in time. For example, 3M has produced seemingly irrelevant documentation authorizing the use of 3M's corporate airplane to facilitate its employees' meetings in 1979 with outside consultants, and yet claims that it did not preserve the files of its former CEO and Chairman of the Board because his employment with 3M ended in 1986.

Given the context surrounding 3M's investigations of fluorochemicals in blood and the potential impact those findings would have had on 3M's business when Mr. Lehr was CEO of the company, Plaintiffs are entitled to know what information was or was not available to him. The Federal Rules of Civil Procedure and the principles articulated by this Court concerning discovery in this MDL require nothing less than the immediate production of his custodial file.

**Conclusion**

For the reasons discussed above, Plaintiffs respectfully request that this Honorable Court enter an order compelling Defendant 3M Company to produce the custodial file of former 3M CEO and Chairman of the Board, Lewis Lehr, as well as such other and further relief that this Court deems appropriate.

Dated:  February 15, 2022                    /s/ Fred Thompson, III
                                             Motley Rice LLC
                                             28 Bridgeside Boulevard
                                             Mt. Pleasant, SC 29464
                                             P: (843) 216-9000
                                             Fax: 843-216-9440
                                             fthompson@motleyrice.com

*Plaintiffs' Liaison Counsel*

-and-

/s/ *Michael A. London*
Michael A London
Douglas and London PC
59 Maiden Lane
6th Floor
New York, NY 10038
P: (212)-566-7500
F: (212)-566-7501
mlondon@douglasandlondon.com
Paul J. Napoli
Napoli Shkolnik PLLC
1301 Avenue Of The Americas
10th Floor
New York, NY 10019
P: (212)-397-1000
F: (646)-843-7603
pnapoli@napolilaw.com

Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
P: (214)-521-3605
ssummy@baronbudd.com
*Co-lead Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

     I hereby certify that a true and correct copy of the foregoing was electronically filed with this Court's CM/ECF on this 15th day February, 2022 and was thus served electronically upon counsel of record.

/s/ Fred Thompson, III