UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG<br><br>This Document relates to:<br>ALL CASES |

**PLAINTIFFS' MOTION TO COMPEL DISCOVERY
FROM E.I. DU PONT DE NEMOURS AND COMPANY, THE
<u>CHEMOURS COMPANY AND CHEMOURS COMPANY FC, LLC</u>**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................. 1

II.   FACTUAL BACKGROUND ........................................................................... 4

      A.    OLD DUPONT DESIGNED THE SPIN TO SHED BILLIONS OF
            DOLLARS IN ENVIRONMENTAL AND TORT LIABILITIES ONTO
            CHEMOURS ............................................................................................ 4

      B.    THE SPINOFF OF CHEMOURS WAS A FRAUDULENT TRANSFER........... 7

      C.    OLD DUPONT AND CHEMOURS WERE ADVERSE THROUGHOUT
            THE SPINOFF ........................................................................................ 9

III.  PROCEDURAL HISTORY .............................................................................. 11

IV.   ARGUMENT .................................................................................................. 13

      A.    THE ATTORNEY-CLIENT PRIVILEGE AND COMMON INTEREST
            DOCTRINE DO NOT APPLY TO COMMUNICATIONS AMONG OLD
            DUPONT, CHEMOURS AND THEIR RESPECTIVE COUNSEL
            RELATING TO THE SPINOFF ................................................................ 13

      B.    THE CRIME-FRAUD EXCEPTION APPLIES TO ALL
            COMMUNICATIONS REGARDING THE SPIN ........................................... 19

      C.    THE ATTORNEY-CLIENT PRIVILEGE DOES NOT APPLY TO
            COMMUNICATIONS BETWEEN DEFENDANTS AND THIRD-
            PARTY PROFESSIONALS ....................................................................... 24

      D.    DEFENDANTS HAVE ENGAGED IN ABUSIVE REDACTION
            TACTICS ................................................................................................ 27

      E.    COMMUNICATIONS THAT MERELY COPY COUNSEL ARE NOT
            PRIVILEGED ........................................................................................... 30

      F.    DEFENDANTS HAVE NOT PROVIDED SUFFICIENT
            INFORMATION TO SUBSTANTIATE THEIR ASSERTION OF
            PRIVILEGE OVER LARGE SWATHS OF DOCUMENTS ............................. 31

      G.    DEFENDANTS HAVE NOT PROVIDED SUFFICIENT
            INFORMATION TO SUBSTANTIATE THEIR ASSERTIONS OF
            WORK PRODUCT .................................................................................... 33

V.    CONCLUSION ............................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Black & Decker Corp. v. United States*,
219 F.R.D. 87 (D. Md. 2003) ................................................................24

*Brainware, Inc. v. Scan-Optics, Ltd.*,
No. 3:11CV755, 2012 WL 2872812 (E.D. Va. Jul. 12, 2012) ................................................30

*Brown-Thomas v. Hynie*,
No. 1:18-CV-02191-JMC, 2020 WL 6737757 (D.S.C. Nov. 17. 2020).....................18, 24, 33

*Bush Ranch v. E. I. du Pont de Nemours & Co.*,
918 F. Supp. 1524 (M.D. Ga. 1995), *rev'd & remanded* 99 F.3d 363 (11th Cir.
1996) ................................................................................................1

*Byrnes v. Jetnet Corp.*,
111 F.R.D. 68 (M.D.N.C. 1986) ................................................................32

*In re C-8 Pers. Inj. Litig.*,
204 F. Supp. 3d 962 (S.D. Ohio 2016) ................................................................2

*Cendant Corp. v. Shelton*,
246 F.R.D. 401 (D. Conn. 2007)................................................................19, 20

*In re ConAgra Peanut Butter Prods. Liab. Litig.*,
No. 1:07 MD 1845 TWT, 2009 WL 799422 (N.D. Ga. Mar. 23, 2009) ................................13

*E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*,
No. 3:09CV58, 2010 WL 1489966 (E.D. Va. Apr. 13, 2010)................................................33

*Earhart v. Elder*,
No. 5:18-CV-01000, 2019 WL 455221 (S.D.W. Va. Feb. 5, 2019)........................................34

*Est. of Page v. Slagh*,
No. 106-CV-245, 2007 WL 1385957 (W.D. Mich. May 8, 2007) ............................19, 20, 21

*Husky Int'l Elecs., Inc. v. Ritz*,
578 U.S. 355 (2016)................................................................19

*Kawamata Farms v. United Agri. Prods.*,
948 P.2d 1055 (Hawaii 1997) ................................................................1

*MA Equip. Leasing I, LLC v. Tilton*,
980 N.E.2d 1072 (Ohio Ct. App. 2012)................................................................15

*Martin v. McEvoy*,
    No. 34254-1-I, 1996 WL 335996 (Wash. Ct. App. June 17, 1996)...................................19, 21

*In re Methyl Tertiary Butyl Ether "MTBE" Prods. Liab. Litig.*,
    180 F. Supp. 3d 273 (S.D.N.Y. 2016)...............................................................................19, 20

*Monsanto Co. v. E. I. du Pont de Nemours & Co.*,
    2011 U.S. Dist. LEXIS 158214 (E.D. Mo. Dec. 21, 2011) ........................................................2

*Montgomery v. CSX Transp. Inc.*,
    No. SAG-14-1520, 2015 WL 6560447 (D. Md. Oct. 28, 2015)............................................33

*Mr. Dee's, Inc. v. Inmar, Inc.*,
    No. 1:19CV141, 2021 WL 3861839 (M.D.N.C. Aug. 30, 2021) ...........................................30

*Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Tr. No. 1B*,
    230 F.R.D. 398 (D. Md. 2005).......................................................................................... *passim*

*Ohio Atty. Gen. v. E. I. du Pont de Nemours & Co.*,
    No. 21CA000022 (Ohio Ct. App. Mar. 25, 2022) ....................................................................2

*Oppenheimer v. Williams*,
    No. 2:20-CV-4219-DCN, 2021 WL 5359283 (D.S.C. Nov. 17, 2021) ...................................32

*Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*,
    738 F.3d 95 (4th Cir. 2013) .....................................................................................................13

*Prowess, Inc. v. Raysearch Labs. AB*,
    No. WDQ-11-1357, 2013 WL 509021 (D. Md. Feb. 11, 2013) .............................................32

*Riggs Nat'l Bank v. Andrews (In re Andrews)*,
    186 B.R. 219 (Bankr. E.D. Va. 1995)...............................................................................19, 21

*Solis v. Food Emplrs. Labor Relations Ass'n*,
    644 F.3d 221 (4th Cir. 2011) ...................................................................................................13

*State Farm Fire & Cas. Co. v. Admiral Ins. Co.*,
    225 F. Supp. 3d 474 (D.S.C. 2016).....................................................................................13, 33

*Strong v. E. I. du Pont de Nemours & Co.*,
    968 So.2d 410 (Miss. 2007).......................................................................................................1

*Suggs v. Whitaker*,
    152 F.R.D. 501 (M.D.N.C. 1993) .............................................................................................31

*Teleglobe Communs. Corp. v. BCE, Inc. (In re Teleglobe Communs. Corp.)*,
    493 F.3d 345 (3d Cir. 2007).....................................................................................................15

*Under Seal v. United States (In re Grand Jury Subpoena: Under Seal)*,
   415 F.3d 333 (4th Cir. 2005) ............................................................12, 13

*United States v. Ballard*,
   779 F.2d 287 (5th Cir. 1986) ............................................................19, 20

*United States v. Under Seal #4 (In re Grand Jury Subpoena #06-1)*,
   274 Fed. Appx. 306 (4th Cir. 2008)...........................................................15

*United States v. Under Seal (In re Grand Jury Proceedings #5)*,
   401 F.3d 247 (4th Cir. 2005) ......................................................18, 19, 20

*In re Vereen*,
   No. 96-78369-W, 1999 WL 33485642 (Bankr. D.S.C. Sept. 7, 1999)............19, 21

*In re Vioxx Prods. Liab. Litig.*,
   501 F. Supp. 2d 789 (E.D. La. 2007)........................................................24, 29

*In re Warner*,
   87 B.R. 199 (Bankr. M.D. Fla. 1988) ....................................................19, 21

*Westchester Surplus Lines Ins. Co. v. Clancy & Theys Const. Co.*,
   No. 5:12-CV-636-BO, 2013 WL 6058203 (E.D.N.C. Nov. 15, 2013)....................30

*Williams v. Big Picture Loans, LLC.*,
   303 F. Supp. 3d 434 (E.D. Va. 2018) ................................................24, 26, 34

**Statutes**

Uniform Fraudulent Transfer Act § 4(b) ................................................19, 21, 22, 23

Pursuant to Federal Rules of Civil Procedure 26 and 37 and Local Civil Rules 7.04 and 37.01, and consistent with the schedule set forth in Case Management Order ("CMO") 23, the Plaintiffs' Executive Committee ("PEC") moves this Court for an Order compelling defendants E.I. du Pont de Nemours and Company ("Old DuPont"), the Chemours Company and Chemours Company FC, LLC (together, "Chemours," and collectively with Old DuPont, "Defendants") to produce communications and documents over which they have improperly asserted attorney-client privilege and attorney work product protection.

## I.    <u>INTRODUCTION</u>

Rather than complying with this Court's admonition to "play it straight" and avoid withholding documents that "are plainly or likely not [subject to the] attorney/client" privilege, Defendants have withheld scores of relevant documents based on privilege assertions that do not withstand scrutiny.[1] The withheld documents are relevant to Plaintiffs' fraudulent transfer claims arising from Old DuPont's July 2015 spinoff of Chemours (the "Spinoff" or "Spin"). In total, Old DuPont withheld or redacted approximately 8,500 documents, accounting for more than one-third of its responsive documents, on purported privilege grounds,[2] and Chemours withheld or

---

[1] *See* Ex. 1 at 15-17, 19. All references to "Ex. __" refer to the Exhibits attached to the Declaration of Levi Downing, dated April 25, 2022 ("Downing Decl.").

[2] DuPont's repeated corporate pattern and practice of willful misconduct in litigation, including discovery abuses, is well-documented. *See, e.g., Bush Ranch v. E. I. du Pont de Nemours & Co.*, 918 F. Supp. 1524, 1530 (M.D. Ga. 1995) (imposing criminal sanction finding "DuPont's conduct to be the ***most serious abuse*** [this Court has seen] in its years on the bench and the most serious abuse reflected in the legal precedents") (emphasis added), *rev'd & remanded* 99 F.3d 363, 369 (11th Cir. 1996) (reversing trial court's imposition of criminal sanctions, because "even though DuPont and its counsel may very well have engaged in ***criminal acts***, we must reverse the contempt order because the district court did not afford DuPont the procedural protections the Constitution requires for the imposition of criminal contempt sanctions") (emphasis added); *Strong v. E. I. du Pont de Nemours & Co.*, 968 So.2d 410, 414 (Miss. 2007) (trial court acted within its discretion by sanctioning DuPont for its "***abuse of the discovery process***") (emphasis added); *Kawamata Farms v. United Agri. Prods.*, 948 P.2d 1055, 1098 (Hawaii 1997) (affirming trial court's $1.5 million sanction against DuPont for ***unprecedented discovery fraud***") (emphasis added); *Monsanto Co. v. E. I. du Pont de Nemours & Co.*, 2011 U.S. Dist. LEXIS 158214 (E.D. Mo. Dec. 21, 2011) (Court found that DuPont "***perpetrated a fraud against the Court***," "knowingly

1

redacted over 27,000 documents, accounting for more than 40 percent of its responsive

documents. Defendants' sweeping privilege claims fail for several independent reasons.

First, as set forth in Section IV.A below (*infra* at p. 13), Defendants have claimed

attorney-client privilege and common interest to shield communications between Old DuPont

and Chemours relating to the Spinoff. Defendants, however, were counterparties in connection

with the Spinoff and, thus, their interests were adverse. In fact, Old DuPont designed the Spinoff

to be so detrimental to Chemours that Chemours sued Old DuPont, and asserted in a verified

pleading that Old DuPont "unilaterally dominat[ed]" the Spinoff process so that it could both:

(i) extract a nearly $4 billion dividend from Chemours; and (ii) dump billions of dollars in

environmental and other liabilities on Chemours. Chemours accused Old DuPont of intentionally

"lowballing" these liabilities to create the false appearance that Chemours would be a viable

enterprise following the Spinoff and verified that if Chemours was required to satisfy the "true

value" of the liabilities, Chemours "would have been insolvent" upon the Spinoff. Oddly,

Defendants have even withheld documents they produced to each other in that plainly adversarial

proceeding. Given their adversarial relationship, however, Defendants could not be represented

by the same counsel, and the documents they exchanged related to the Spinoff are not privileged.

---

and in bad faith ***made false representations*** to the Court that are clearly refuted by internal documents
produced by" DuPont, showed "no remorse for their wrongdoing" but to compound the seriousness of
their behavior, insist on maintaining their bogus arguments, despite the overwhelming evidence that those
arguments are directly contradicted by the facts," thereby making "a mockery of this proceeding,"
"compromise[ing] the integrity of the case and ***abused the judicial process***" amounting "to ***vexatious
conduct***," with "***behavior … so egregious*** that only the most severe sanctions will deter future
misconduct") (emphasis added); *In re C-8 Pers. Inj. Litig.*, 204 F. Supp. 3d 962, 966-67, 974, 1119 (S.D.
Ohio 2016) (finding that DuPont's legal arguments are "not based on any fact," "untenable," "untrue and
disingenuous," and "frivolous and patently false"); Ex. 36, *Ohio Atty. Gen. v. E. I. du Pont de Nemours &
Co.*, No. 21CA000022 (Ohio Ct. App. Mar. 25, 2022) (finding DuPont's appeal "frivolous" and putting
DuPont on notice "that ***they will subject themselves to sanctions*** . . . should they attempt to appeal the
same issue again") (emphasis added).

In fact, the interests of Chemours and Old DuPont were so adverse that Old DuPont's outside counsel, Skadden Arps ("Skadden"), expressly *disclaimed* any attorney-client relationship with Chemours seven months before the Spinoff. And Skadden represented Old DuPont *against* Chemours in the action that Chemours later filed against Old DuPont. Communications involving Skadden, Old DuPont and Chemours—regardless of subject matter—are not privileged because Skadden never had an attorney-client relationship with Chemours.

Second, as set forth in Section IV.B below (*infra* at 18), no documents or communications relating to the Spinoff can be shielded from discovery for the independent reason that all such materials fall under the crime-fraud exception. The evidence, including Chemours's verified allegations regarding the Spinoff, establishes a *prima facie* case of fraudulent transfer. Communications in furtherance of a fraudulent transfer are not privileged, and must be produced.

Third, as set forth in Section IV.C below (*infra* at 24), Defendants improperly assert attorney-client privilege over communications with dozens of third-parties—including financial institutions, accountants, consultants, and public relations firms—without establishing that any of these third-parties were retained to assist counsel in providing legal advice. Chemours has even claimed privilege over communications with *plaintiffs' counsel in these cases*, government agencies, and the news publication Law 360, none of which are privileged. Defendants should be required to produce all communications involving these third-parties.

Fourth, as set forth in Section IV.D below (*infra* at 27), even on documents Defendants have produced, they have redacted non-privileged information that supports Plaintiffs' allegations. The PEC knows this because Chemours also produced non-redacted versions of some of the same documents they redacted. Chemours even redacted *public documents* that are

available on its website. Defendants' abusive redaction tactics are plainly improper, and the Court should therefore require Defendants to produce *all* of their documents without redactions.

Fifth, as set forth in Section IV.E below (*infra* at 30), Defendants have asserted attorney-client privilege over business communications that, upon information and belief, do not seek or provide legal advice, but merely copied an attorney among many non-attorneys. Such documents are not privileged and must be produced.

Sixth, as set forth in Section IV.F below (*infra* at 31), Defendants fail to carry their burden to assert privilege over large swaths of documents because Defendants failed to provide sufficient information to establish privilege, such as the identity of the attorney whose advice was sought (and who retained that attorney) or the nature of the alleged common interest shared by the parties to the communications.

Finally, as set forth in Section IV.G below (*infra* at 32) Defendants have asserted work product protection over documents that, based on Defendants' own descriptions, were prepared for business purposes and not in anticipation of litigation. Indeed, Defendants do not even identify the litigation that the materials were prepared in anticipation of. Defendants cannot satisfy their burden of establishing work product.

## II.    FACTUAL BACKGROUND

### A. Old DuPont Designed The Spin To Shed Billions Of Dollars In Environmental And Tort Liabilities Onto Chemours

As Plaintiffs allege, Old DuPont knew for decades that it faced unprecedented environmental and tort liabilities associated with its use of per- and polyfluoroalkyl substances ("PFAS").[3]

---

[3] *See, e.g.*, N.J. Compl., ¶¶ 153-54; Ayer Compl., ¶¶ 15(e), 56–58; Stuart Compl., ¶¶ 123–40; Hampton Bays Compl., ¶¶ 151–52.

For more than 50 years, beginning in 1951, Old DuPont discharged PFOA into the environment from manufacturing sites around the country, exposed tens of thousands of people to PFOA, and contaminated drinking water supplies.[4] Throughout this time, Old DuPont conducted studies of PFOA and determined that it is extremely resistant to degradation, persists indefinitely in the environment, bioaccumulates in humans and animals, and poses a substantial threat to human health and the environment.[5] Despite this knowledge, Old DuPont falsely claimed that PFOA poses no health risks and continued to use PFOA and discharge it into the environment.[6] In November 2000, Old DuPont's in-house counsel expressed alarm about the company's growing liabilities:

> We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head … Our story is not a good one, *we continued to increase our emissions* into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical.[7]

For the next fifteen years, Old DuPont faced increasing exposure related to its use of PFOA, including:

- In 2005, Old DuPont settled a class action filed on behalf of 70,000 individuals who had been exposed to PFOA for $343 million. Under the terms of the settlement, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to determine if any diseases were linked to PFOA exposure and to set aside $235 million for ongoing medical monitoring of the affected community.[8]

---

[4] *See e.g.* N.J. Compl., ¶ 149.

[5] *See e.g.* N.J. Compl., ¶¶ 117–125, 149; Ayer Compl., ¶ 56; Stuart Compl., ¶¶ 130, 133; Hampton Bays Compl., ¶ 140–42.

[6] *See e.g.* N.J. Compl., ¶¶ 126–32, 151; *see also* Ayer Compl., ¶ 57.

[7] *See* N.J. Compl., ¶ 151; Ex. 37 (emphasis added).

[8] *See e.g.* N.J. Compl., ¶ 153; City of Stuart Compl., ¶¶ 165–66; Ex. 35, ¶ 83.

- Also in 2005, Old DuPont paid the US EPA $10.25 million to resolve alleged violations of federal law arising from Old DuPont's failure to report risks associated with PFOA exposure. Old DuPont was required to commit an additional $6.25 million to supplement environmental projects.[9]

- Between 2005 and 2012, the Science Panel confirmed links between PFOA exposure and at least six human diseases, including two forms of cancer.[10]

- In 2013, more than 3,500 personal injury suits were filed against Old DuPont by plaintiffs with one or more of the linked diseases, including approximately 250 plaintiffs with kidney or testicular cancer. The claims were consolidated in a multidistrict litigation in Ohio federal court and the initial bellwether trials were scheduled for September 2015.[11]

It is against this backdrop that Old DuPont began to consider options to insulate its valuable assets from the avalanche of claims Old DuPont knew it would face related to PFOA and other PFAS.[12] In October 2013, Old DuPont announced that it would spin-off its Performance Chemicals segment—which included its business lines giving rise to its PFAS liabilities—into a separate public company, and subsequently formed Chemours in 2014 for that purpose.[13]

---

[9] *See, e.g.*, N.J. Compl., ¶ 152; City of Stuart Compl., ¶ 163; *see also* Reference News Release EPA: Settles PFOA Case Against DuPont for Largest Environmental Penalty in Agency History, available at https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental.

[10] *See, e.g.*, N.J. Compl., ¶ 154; City of Stuart Compl., ¶ 167; Ex. 35, ¶ 83.

[11] *See, e.g.*, N.J. Compl., ¶ 155; Ex. 35, ¶ 83; Ex. 38, ¶¶ (A)(2)-(6); *see also* Old DuPont 2015 10-K at F-33, available at https://www.sec.gov/Archives/edgar/data/0000030554/000003055416000106/dd-12312015x10k.htm (documenting Old DuPont's mounting liabilities from this time period).

[12] *See e.g.* N.J. Compl., ¶¶ 157–58; Ex. 35, ¶ 15.

[13] *See* Ex. 35, ¶ 27; *see also* Old DuPont Oct. 24, 2013 Form 8-K at 2, available at https://www.sec.gov/Archives/edgar/data/0000030554/000003055413000044/dd1025138-k.htm.

### B. The Spinoff of Chemours Was A Fraudulent Transfer

Old DuPont designed the Spinoff with two primary objectives: (i) foist onto Chemours its massive environmental and tort liabilities by imposing assumption and indemnity obligations that would require Chemours to bear the brunt of those liabilities; and (ii) extract from Chemours a nearly $4 billion dividend that was pre-ordained before the full analysis of its capital structure was even conducted.[14] Achieving both objectives at once was challenging, as Old DuPont had to calibrate several factors. Delaware law required that Chemours be solvent and viable at its inception as an independent company.[15] But the market for one of Chemours's main products, titanium dioxide, was in a trough, so revenue was constrained.[16] And the liabilities that Old DuPont planned to foist onto Chemours were growing rapidly, with bellwether trials scheduled to begin in the Ohio multidistrict litigation shortly after the target Spin date.[17] If Old DuPont estimated the value of those liabilities realistically, Chemours's insolvency would have been exposed and the scheme would have been thwarted.[18]

To avoid that result, Old DuPont "systematically and spectacularly underestimated [Chemours's] actual exposure."[19] As Chemours itself alleges, this approach "suited [Old DuPont]'s purpose" because it enabled Old DuPont to maximize the liabilities offloaded onto Chemours without disturbing the delicate balance necessary to secure the transaction terms most favorable to itself—including the coveted $4 billion dividend.[20]

---

[14] *See* Ex. 35, ¶¶ 19, 22–23.

[15] *See id.*, ¶ 47.

[16] *See* Ex. 35, ¶ 16; Ex. 39.

[17] *See* Ex. 35, ¶ 4; Ex. 38, ¶¶ (A)(2)-(6).

[18] *See* Ex. 35, ¶¶ 149–50.

[19] *See id.*, ¶¶ 1, 51, 56.

[20] *See id.*, ¶ 59.

In the course of structuring the Spin, Old DuPont commissioned Houlihan Lokey, a multinational investment bank and financial services company, to prepare an opinion of Chemours's solvency—ostensibly to fulfill Old DuPont's legal obligation to ensure the same.[21] But Houlihan Lokey did not conduct its own valuation of Chemours's liabilities. Rather, it relied on certificates prepared by Old DuPont that contained purported "Low" and "High End (Maximum)" exposure numbers associated with (i) eighty-seven contingent environmental remediation liabilities; and (ii) separate litigation liabilities—including, for example, the PFOA cases pending in the Ohio multidistrict litigation.[22] Even though Old DuPont knew that the accuracy and reliability of the maximum exposure numbers were critical to assessing Chemours's solvency, Old DuPont intentionally engineered the numbers in a way that massively understated Chemours's true exposure.[23]

Old DuPont completed the Spinoff on July 1, 2015, and Chemours became a separate public entity.[24] Unsurprisingly, the certified maximum liability numbers that Old DuPont used to create the false appearance that Chemours was solvent at the time of the Spin proved to be "regularly and radically" false.[25] For example, Old DuPont certified the maximum exposure for the 3,500 PFOA cases consolidated in the Ohio multidistrict litigation, including defense costs, to be $128 million.[26] Notwithstanding, Old DuPont then settled the 3,500 PFOA cases in that litigation for $671 million—more than five times the certified maximum.[27]

---

[21] See id., ¶ 49.

[22] See id., ¶¶ 52–55; Ex. 40.

[23] See Ex. 35, ¶¶ 51, 56.

[24] See id., ¶ 11.

[25] See id., ¶ 78.

[26] See id., ¶ 84; Ex. 40 at 12.

[27] See id., ¶¶ 4, 90.

With respect to remediation liabilities, Old DuPont certified the maximum exposure from its Fayetteville site in North Carolina to be $2.09 million. After the Spinoff, Old DuPont entered into a consent order with North Carolina requiring Chemours to undertake extensive remediation with a combined cost of more than $200 million—nearly *one hundred* times the certified maximum.[28] In New Jersey, Old DuPont certified the maximum exposure among three different sites in the state to be $337 million.[29] Just three years later, Old DuPont valued the same liabilities at $620 million.[30]

Saddled with the debt that funded the nearly $4 billion dividend paid to Old DuPont, holding both direct and indemnity exposure for massive liabilities, and facing an unfavorable market for its key product, titanium dioxide, Chemours faced a severe financial squeeze immediately after the Spin.[31] It sought and received some temporary relief from Old DuPont, but the liabilities continued to mount and Old DuPont insisted that Chemours had to bear them.[32]

### C. Old DuPont And Chemours Were Adverse Throughout the Spinoff

Upon information and belief, in or before July 2014, Old DuPont designated a management team for Chemours that included ████████████████████████ ████████ General Counsel David Shelton, among others (collectively, the "Chemours Representatives").[33] As detailed in Chemours's verified complaint, Chemours and Old DuPont were immediately in an adversarial relationship because of the inequity of the transaction. The

---

[28] *See* Ex. 35, ¶ 99; *see also* Ex. 40 at 13 (Fayetteville Works).

[29] *See* Ex. 35, ¶ 101; *see also* Ex. 40 at 13-14 (Chambers Works, Repauno and Pompton Lakes).

[30] *See* Ex. 35, ¶ 101.

[31] *See id.*, ¶¶ 74–77.

[32] *See id.*, ¶¶ 77–80.

[33] *See* Ex. 41 at AFFF-MDL-CHE-FT-00022917; Ex. 35, ¶¶ 26–28; Ex. 85, p. 2; Ex. 86, p. 2; Ex. 42, p. 1.

Chemours management team knew that they would be managing a financially crippled company.[34] Old DuPont deprived Chemours of information and ordered Chemours to comply with Old DuPont's directives, without its own counsel.[35]

The existence of this adversarial relationship was documented on December 10, 2014, seven months prior to the Spinoff, when Old DuPont arranged for its outside counsel, Skadden, to send Chemours an "extraordinary" letter (the "Skadden Letter").[36] In the letter, Skadden explicitly disclaimed any attorney-client relationship with Chemours, and declared that Skadden had never represented Chemours and █████████████████████████████

████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████[37]

Chemours filed a lawsuit against Old DuPont in Delaware Chancery Court in May 2019 and the action was subsequently referred to arbitration ("Delaware Action"). Chemours's complaint, verified by its current CEO, Mr. Newman, asserted that Old DuPont deliberately

---

[34] *See* Ex. 35, ¶¶ 17, 19, 22, 23–24.

[35] *See id.*, ¶¶ 25–27, 29–36.

[36] *See id.*, ¶ 28; Ex. 42.

[37] *See* Ex. 42 at 2 (emphasis added); *see also* Ex. 35, ¶ 28.

underestimated the liabilities Chemours assumed so that the Spin could be carried out, and then, when the liabilities predictably exploded, argued that Chemours's indemnity obligations were unlimited, thereby threatening its viability.[38] Skadden defended Old DuPont against Chemours in the Delaware Action.[39]

## III.     <u>**PROCEDURAL HISTORY**</u>

At the December 17, 2021 status conference, the parties raised a dispute with the Court over Old DuPont's and Chemours's refusal to produce to the PEC documents that they produced to each other in the Delaware Action, and the Court established a procedure to resolve the dispute.[40]

The Court Ordered Defendants to produce non-privileged documents that they produced in the Delaware Action and a detailed log identifying documents over which they claimed privilege by January 24, 2022.[41] The Court Ordered the PEC to provide Defendants with objections to the privilege log within 10 days and for Defendants to respond to those objections five days later.[42] The Court authorized the PEC to then file a motion to compel, which would be briefed on an expedited schedule.[43] The Court explained that the PEC could identify a limited number of documents for the Court to review *in camera* and make privilege determinations.[44]

---

[38] *See* Ex. 35, ¶¶ 1–5.

[39] *See* Ex. 89.

[40] *See* Ex. 1 at 10:8–19; Ex. 2.

[41] *See* Ex. 1 at 9:23-10:24; Ex. 2.

[42] *See* Ex. 2.

[43] *Id.*

[44] *See* Ex. 1 at 10:8–19.

Between January 2022 and April 2022, Defendants collectively produced six different privilege logs and amended versions of those logs.[45] Old DuPont produced a privilege log that identifies documents that it produced to Chemours in the Delaware Action, and over which it now claims privilege, and a separate general privilege log that identifies documents responsive to other document requests the PEC has served. Old DuPont produced its first privilege log on January 24, 2022, and produced final amended log on April 6, 2022.[46]

Chemours has produced three privilege logs that identify documents that it produced to Old DuPont in the Delaware Action, and over which it now claims privilege, and another separate general privilege log that identifies documents that are responsive to other document requests the PEC has served.[47] Chemours produced its first privilege log on January 27, and produced its final amended log on April 12, 2022.[48]

The PEC has made good faith efforts to resolve the parties' disputes over Defendants' refusal to produce the categories of documents at issue in this motion and those efforts have been unsuccessful.[49] To facilitate the Court's resolution of these disputes, the PEC has identified representative samples of privilege log entries that fall into each of these categories. Those entries are listed in Exhibits 25 through 34 of the Downing Declaration. The PEC is hopeful that the Court's rulings with respect to some of these samples will provide sufficient guidance for the parties to resolve their dispute over the remaining documents that fall within the same categories.

---

[45] *See* Downing Decl. ¶¶ 2, 7.

[46] *See id.*, ¶¶ 8, 13.

[47] *See id.*, ¶¶ 8, 19.

[48] *See id.*, ¶¶ 22, 34

[49] *See id.*, ¶¶ 8–37.

## IV.     ARGUMENT

The attorney-client privilege protects "confidential disclosures by a client to an attorney made in order to obtain legal assistance." *Under Seal v. United States (In re Grand Jury Subpoena: Under Seal)*, 415 F.3d 333, 338 (4th Cir. 2005) (omitting internal quotations). Accordingly, "the person seeking to invoke the privilege must prove that he is a client or affirmatively sought to become a client." *Id.* But the attorney client privilege is an exception to the general rule that the law is entitled to every man's evidence. As an exception to the rule, it is construed narrowly and the burden of demonstrating that the privilege applies rests on the party who invokes it. *See Solis v. Food Emplrs. Labor Relations Ass'n*, 644 F.3d 221, 231 (4th Cir. 2011).[50] Defendants have not carried their burden.

### A.     The Attorney-Client Privilege And Common Interest Doctrine Do Not Apply To Communications Among Old DuPont, Chemours And Their Respective Counsel Relating To The Spinoff

Communications between Old DuPont and Chemours concerning the Spinoff are not privileged because their interests in connection with the transaction were adverse and they therefore were not—and could not be—jointly represented by the same counsel. Skadden's letter to Chemours is unequivocal: Old DuPont and Chemours did not share a joint representation privilege with respect to their communications related to the Spinoff. The letter, dated nearly seven months before the Spin, states that Skadden ████████████████████████

---

[50] Plaintiffs' fraudulent transfer claims arise under state law. Ordinarily, state law governs the attorney-client privilege where state law supplies the rule of decision on the claim. *State Farm Fire & Cas. Co. v. Admiral Ins. Co.*, 225 F. Supp. 3d 474, 480–81 (D.S.C. 2016). However, choice of law analysis is only necessary if it would make a difference to the outcome. *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013). Because plaintiffs challenge "well-known and fundamental" elements of the attorney-client privilege, the Court need not resolve choice of law. *In re ConAgra Peanut Butter Prods. Liab. Litig.*, No. 1:07 MD 1845 TWT, 2009 WL 799422, at *1 (N.D. Ga. Mar. 23, 2009).

██████████████████████████████████████████████ [51] The letter further explains that:

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████ [52] Skadden confirmed that

Defendants' interests were adverse and disclaimed any attorney-client relationship with

Chemours in order to avoid the ethical dilemma of representing two clients with conflicting

interests. In fact, Skadden later acted as Old DuPont's litigation counsel *against* Chemours in the

Delaware Action.[53] No joint privilege exists under these circumstances.

Separate and apart from the Skadden Letter, Chemours's verified allegations against Old

DuPont establish that Defendants' interests were adverse with respect to "every aspect of the

[Spinoff] transaction," including, among other things, the estimation of the liabilities Old DuPont

foisted onto Chemours, the valuation of Old DuPont's assets, and any analysis of Chemours's

capital adequacy and solvency.[54] As Chemours explained, in order for Old DuPont to effectuate

the Spin, it was required to determine "that Chemours was solvent and viable at the time."[55] Old

DuPont was looking to "shift as much liability onto Chemours as possible" and "extract for

DuPont a multi-billion-dollar dividend payment from the new company."[56] By intentionally

---

[51] *See* Ex. 42 at 2.

[52] *Id.* (emphasis added).

[53] *See* Ex. 89.

[54] *See* Ex. 35, ¶¶ 1–3, 23–25, 56.

[55] *See id.*, ¶ 1.

[56] *See id.*, ¶ 3.

"lowballing the valuation of the liabilities, DuPont's management could heap more liabilities on Chemours and withdraw more cash for DuPont—while still calling the spin-off appropriate and Chemours solvent."[57] These facts demonstrate an undeniable conflict between Chemours's and Old DuPont's interests in connection with the Spinoff.

Notwithstanding the complete absence of a joint attorney-client relationship and any common interest, Defendants assert blanket privilege over their pre-Spin communications merely because Chemours was Old DuPont's subsidiary prior to July 1, 2015.[58] That is baseless. Regardless of their affiliation, communications between separate corporate entities are privileged only when they are jointly represented by the same counsel with respect to a matter of common interest. *Teleglobe Communs. Corp. v. BCE, Inc. (In re Teleglobe Communs. Corp.)*, 493 F.3d 345, 362–63 (3d Cir. 2007).

In *Teleglobe*, the Third Circuit held that parent and subsidiary entities could not be considered co-clients simply based on their corporate relationship. *Id.* at 357, 380. As the court explained, "treating members of a corporate family as one client fails to respect the corporate form" and the "bedrock principal" of entity separateness. *Id.* at 371. Moreover, there are scenarios in which the interests of parents and subsidiaries will inevitably diverge, including "spin-off … situations." *Id.* at 373. Thus, "the majority—and more sensible view—is that even in the parent-subsidiary context a joint representation only arises when common attorneys are affirmatively doing legal work for both entities on a matter of common interest." *Id.* at 379. In *Grand Jury Subpoena #06-1*, for example, the Fourth Circuit held that communications between parent and subsidiary entities were not privileged where the subsidiary failed to show that the

---

[57] See id.

[58] *See* Ex. 7 at 1–2; Ex. 17 at 1–2.

communications at issue pertained to a matter of common interest. *United States v. Under Seal #4 (In re Grand Jury Subpoena #06-1)*, 274 Fed. Appx. 306, 311–12 (4th Cir. 2008).[59] This is particularly true here where Chemours did not exist as a normal operating subsidiary; it was specifically created as a vessel into which Old DuPont would dump its massive environmental liabilities and a "cash cow" to fund the nearly $4 billion dividend.[60]

Defendants have nonetheless used the pretense of joint representation to withhold communications from the critical period before the Spin relating to, for example, the ███



[61] These topics are highly relevant and plainly not privileged given the conflict between Old DuPont and Chemours. Indeed, Defendants have withheld communications that Mr. Newman (Chemours's then CFO) specifically identified as areas of conflict between Old DuPont and Chemours.[62] Mr. Newman stated, for example, that in June 2015, Old DuPont castigated him for putting in an email that Chemours needed an additional $200-300 million in cash to function on day one.[63] Defendants, however, claim privilege over ████████████████████████████████████████[64]

---

[59] *See also MA Equip. Leasing I, LLC v. Tilton*, 980 N.E.2d 1072, 1084 (Ohio Ct. App. 2012) (finding communications between parent and subsidiary not privileged because they "sometimes had adverse interests").

[60] *See* Ex. 35, ¶ 19.

[61] *See, e.g.*, Ex. 10 at Entry 1554, 1575, 1585; Ex. 12 at Entry 1942, 2124, 2528–30, 2534, 2923, 2972, 3006, 3022; Ex. 23 at Entry 720–21, 4617; Ex. 45 (Ex. 12 at Entry 761); Ex. 43 (Ex. 12 at Entry 2975); Ex. 44 (Ex. 22 at Entry 2087).

[62] *See, e.g.*, Ex. 12 at Entry 911–12, 2209, 2972, 2975, 3005, 3015, 3019–20; Ex. 46 (Ex. 12 at Entry 2891); Ex. 47 (Ex. 22 at Entry at 2510).

[63] Ex. 35 ¶ 32.

[64] Ex. 48 (Ex. 22 at Entry 2090).

Defendants have also redacted communications in email chains where ████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████ [65] Old DuPont's and Chemours's
interests were plainly adverse in these communications.

Defendants' assertion that no employees worked for Chemours prior to the Spinoff is
patently false.[66] ████████████████████████████████████████████████████
████████████████████████ [67] Chemours also expressly alleged in a verified complaint that it
had a designated management team by 2014 and that Old DuPont refused to share information
with it.[68] Public profiles on Chemours's website and Linkedin also show that Chemours had
employees starting in 2014.[69] Regardless of whether these individuals also held titles with Old
DuPont, they plainly were working on behalf of Chemours in connection with the Spinoff.[70]

Defendants also assert common interest privilege over post-Spin communications
concerning, among other subjects, ████████████████████████████████████
████████████████████████████████████████████████████ [71] The common
interest doctrine is an exception to waiver that applies to communications shared between parties
with "common legal interests" as part of "an ongoing legal enterprise." *Neuberger Berman Real*

---

[65] Ex. 49 (Ex. 22 at Entry 2363).

[66] *See* Ex. 7 at 1–2.

[67] *See* Ex. 41.

[68] *See* Ex. 35, ¶ 27.

[69] *See* Exs. 84 ("Mark Newman joined Chemours in 2014"); 85 ("Sameer joined Chemours in 2014"); 86 ("designate for Chemours" starting in May 2014); 87 (Chemours employee starting May 2014); 88 (Chemours's "Head of Investor Relations" starting in May 2015).

[70] *See, e.g.* Ex. 48, 49.

[71] *See, e.g.*, Ex. 12 at Entry 3926–27 (concerning ████████████); Ex. 23 at Entry 149–50, 155–58 (concerning ████████████).

*Estate Income Fund, Inc. v. Lola Brown Tr. No. 1B*, 230 F.R.D. 398, 416 (D. Md. 2005). But

Defendants' interests were not aligned in connection with discussions over the ramifications of

the Spinoff and each company's respective responsibility for liabilities related to the

Performance Chemicals segment. Defendants' interests on these subjects were adverse and

resulted in litigation between them. For example, Defendants withheld ████████████████

concerning ███████████████████████████████████████████████████████████

████████████████████[72] Within a month of this exchange, Chemours sued Old DuPont

based on ██████████ indemnification demands, alleging that the demands were unlawful and

threatened Chemours's solvency.[73] No common interest protection applies to these adversarial

communications, and they must be produced. *Brown-Thomas v. Hynie*, No. 1:18-CV-02191-

JMC, 2020 WL 6737757, at *7 (D.S.C. Nov. 17, 2020).[74]

　　　For the same reasons, Defendants must also produce all internal communications—i.e.

communications among Chemours and its lawyers or Old DuPont and its lawyers—that they

produced to each other in the Delaware Action concerning any matter where they did not share a

common interest and joint representation. Even if any of these communications were otherwise

privileged, any such privilege was waived when Defendants produced them to each other.[75]

---

[72] *See* Ex. 12 at Entry 3982–83; *see also* Ex. 23 at Entry 3371, 3379.

[73] *See* Ex. 35, ¶ 101.

[74] In addition to demands for indemnification (*see, e.g.*, Ex. 12 at Entry 3926–27, 3930, 3933–34, 3938, 3967, 4008–09), Defendants have withheld post-Spin communications between them concerning ██████████ and ██████████████ (*See, e.g.*, Ex. 23 at Entry 149–52, 155–58, 1379–80.) These generic descriptions are inadequate to establish common interest, especially given the conflict between Defendants over Chemours's indemnification responsibilities in relation to those liabilities and litigations.

[75] *See, e.g.*, Ex. 27.

**B.     The Crime-Fraud Exception Applies To All Communications Regarding The Spin**

Even if Defendants could otherwise establish the elements of attorney-client privilege, all communications made in furtherance of the Spinoff are nevertheless subject to disclosure under the crime-fraud exception to privilege. Privilege is lost where a client seeks legal advice in furtherance of a crime or fraud. *United States v. Under Seal (In re Grand Jury Proceedings #5)*, 401 F.3d 247, 251 (4th Cir. 2005). Thus, a party may obtain otherwise privileged material by making a *prima facie* showing that: (i) the client was engaging in or planning a fraudulent scheme when it sought the advice of counsel in furtherance of the scheme; and (ii) the withheld material is closely related to the scheme. *Id.*

Fraudulent transfers fall squarely within the broad definition of "fraud" to which the crime-fraud exception applies. Indeed, "[c]ourts and legislatures have [long] used the term 'fraud' to describe a debtor's transfer of assets that … impairs a creditor's ability to collect debt." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016). Courts routinely hold that the crime-fraud exception removes protection from communications where there is a *prima facie* showing of an intentional fraudulent transfer in violation of the Uniform Fraudulent Transfer Act or the bankruptcy code. *See, e.g.*, *United States v. Ballard*, 779 F.2d 287, 293 (5th Cir. 1986); *In re Methyl Tertiary Butyl Ether "MTBE" Prods. Liab. Litig.,*180 F. Supp. 3d 273, 283 (S.D.N.Y. 2016); *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405 (D. Conn. 2007); *Est. of Page v. Slagh*, No. 106-CV-245, 2007 WL 1385957, at *2 (W.D. Mich. May 8, 2007); *In re Vereen*, No. 96-78369-W, 1999 WL 33485642, at *2 (Bankr. D.S.C. Sept. 7, 1999); *Martin v. McEvoy*, No. 34254-1-I, 1996 WL 335996, at *2-3 (Wash. Ct. App. June 17, 1996); *Riggs Nat'l Bank v. Andrews (In re Andrews)*, 186 B.R. 219, 222 (Bankr. E.D. Va. 1995); *In re Warner*, 87 B.R. 199, 201-02 (Bankr. M.D. Fla. 1988) (all applying the crime-fraud exception to fraudulent transfers).

In *In re MTBE*, for example, the court held that the crime-fraud exception applied where the state of Pennsylvania alleged that the defendant had fraudulently stripped its subsidiary of valuable assets before spinning off the subsidiary in an attempt to escape liabilities arising from environmental contamination. 180 F. Supp. 3d at 276-77. The corporation inadvertently produced communications wherein its general counsel imparted advice related to the restructuring. *Id.* at 282-83. Although the communications were otherwise privileged, the court did not permit the defendant to claw them back because the purpose of the restructuring was to remove profitable assets from the reach of creditors. *Id.* at 283.[76]

Where the moving party has made a *prima facie* showing of fraudulent transfer, courts order disclosure of the full scope of communications made in furtherance of the transfer. In *Ballard*, for example, the Fifth Circuit affirmed the admission of testimony by an attorney regarding conversations with his client relating to an allegedly fraudulent transfer and the "continuation" of the client's scheme to shield his assets from creditors. *Ballard*, 779 F.2d at 292-93. In *Cendant Corp.*, the court likewise permitted depositions of the transferor's former attorneys as to the "formation and operation" of the trusts, partnerships, and corporations that allegedly held the transferred assets. *Cendant Corp.*, 246 F.R.D. at 404, 407. And in *Page*, the court compelled an attorney to provide testimony "regarding his representation" of the transferor. *Page*, 2007 WL 1385957 at *1, 3.

Here, plaintiffs have made a *prima facie* showing that the Spinoff constituted a fraudulent transfer, that Defendants sought the advice of counsel in relation to the transfer, and that Defendants have withheld documents relating to that transfer. *In re Grand Jury Proceedings #5*,

---

[76] The court also disregarded the contemporaneous opinion of Houlihan Lokey as to the fairness of the consideration received because, as here, the opinion was based on "unverified financial data" provided by the parties to the fraudulent transfer. *Id.* at 278, 283.

401 F.3d at 251. It is clear from Defendants' privilege logs that they claim to have sought the advice of counsel in connection with the Spin, and that the withheld documents relate to the transaction.[77] And the complaint that Chemours filed against Old DuPont—which is verified by Mr. Newman, Chemours's current CEO—sets forth ample facts establishing that Old DuPont: (i) designed the Spin to shield its valuable assets from its environmental and tort liabilities by dumping those liabilities onto Chemours; (ii) engineered a vastly understated valuation of those liabilities to heap more liabilities on Chemours and "take every last cent" for itself; and (iii) knowingly spun-off Chemours in a state of "financial disaster."[78]

The Uniform Fraudulent Transfer Act sets forth "badges" of fraud, *see* UFTA § 4(b)(1)-(11), which, if proven, constitute a *prima facie* showing of fraudulent transfer. Courts have found that the existence of even one of these badges may trigger the crime-fraud exception. *See, e.g.*, *In re Vereen*, 1999 WL 33485642 at *2; *Martin*, 1996 WL 335996 at *3; *In re Andrews*, 186 B.R. at 222-24; *In re Warner*, 87 B.R. at 202-03. Here, several apply.

One badge of fraud is whether litigation was threatened or pending before the transfer was made. UFTA § 4(b)(4). Courts have applied the crime-fraud exception to fraudulent transfers where the timing of a transaction in relation to litigation suggested fraud. *Page*, 2007 WL 1385957 at *1-2; *Martin*, 1996 WL 335996 at *1, 5. Here, Old DuPont announced the Spinoff in October 2013, shortly after the Science Panel found probable links between PFOA

---

[77] *See, e.g.*, Ex. 10 at Entry 493, 501, 504, 1570 (legal advice regarding ████████████████); Ex. 12 at Entry 414–17, 426 (legal advice regarding ██████████ and █████ ████████), 1050 (legal advice regarding ██████████████████████), 1965–69 (legal advice regarding ██████████████████████), 3648–49 (legal advice regarding ██████████████████).

[78] *See* Ex. 35, ¶¶ 3, 23 & p. 35.

exposure and at least six diseases, including two forms of cancer.[79] As a result of that finding, more than 3,500 personal injury suits were filed against Old DuPont and consolidated in the Ohio multidistrict litigation.[80] Old DuPont committed to completing the Spinoff by July 1, 2015—three months before the bellwether cases were scheduled for trials in which Old DuPont could not raise a causation defense.[81] The initial trials, predictably, resulted in significant judgments, totaling $19.7 million prompting Old DuPont to settle the remaining claims for $671 million (for which it sought indemnification from Chemours).[82] The Spinoff was thus conceived and completed when Old DuPont faced substantial liability that it attempted to shift to Chemours. These facts set forth a *prima facie* case for one badge of fraud.

The badges of fraud also include the related considerations of whether: (i) the debtor was insolvent at the time of the transfer; and (ii) the value of the consideration received was reasonably equivalent to the value of the asset transferred or obligation incurred. UFTA § 4(b)(8)-(9). On the first point, in Chemours's verified complaint, Mr. Newman identifies approximately $2.5 billion in exposure arising from enumerated environmental and tort liabilities—an amount that exceeds the total exposure Old DuPont certified across *all* liabilities.[83] According to Mr. Newman, "if Chemours had uncapped responsibility for the true potential maximum liabilities, [Chemours] would have been insolvent at the time of the spin, meaning the spinoff would have been effectuated in violation of Delaware law."[84] On the second

---

[79] *See e.g.* N.J. Compl., ¶ 153; Stuart Compl., ¶¶ 166–67; Ex. 35, ¶ 27.

[80] *See e.g.* N.J. Compl., ¶ 155; Ex. 35, ¶ 4, 82–83.

[81] *See* Ex. 38, ¶¶ (A)(2)-(6); *see also* Ex. 35, ¶ 35.

[82] *See* Ex. 35, ¶ 85.

[83] *See id.,* ¶¶ 90, 99, 101, 106, 108; Ex. 40 at 4, 12–14.

[84] *See* Ex. 35, ¶ 10; *see also id.,* ¶¶ 125, 141, 151, 119, 185, 192, 200.

point, Chemours's verified complaint explains that the Spinoff constituted an "outrageously lopsided" allocation of assets and liabilities, whereby Chemours was saddled with Old DuPont's massive liabilities—including liabilities that had nothing to do with its Performance Chemicals business—and the debt necessary to fund nearly $4 billion in dividends to Old DuPont.[85]

There can also be no serious dispute that the Spinoff constituted a transfer to an "insider," which is another badge of fraud. UFTA § 4(b)(1). Under the Uniform Fraudulent Transfer Act, an "insider" includes a corporation that controls the debtor. *Id.* at § 1(8)(ii)(C), (11). Here, Old DuPont, as Chemours's parent, controlled Chemours prior to the Spinoff.[86] As Mr. Newman alleges, Old DuPont unilaterally drafted the terms of the transaction, and ignored Chemours's protests that the terms were deeply unfair.[87] These transfers were made to an insider, constituting additional evidence that the transaction was fraudulent.

Still another badge of fraud is whether the transfer or obligation was concealed. UFTA § 4(b). Mr. Newman's verified allegations establish a multifaceted effort by Old DuPont to conceal the fraudulent nature of its restructuring, including by, among other things: (i) burying the scope of Chemours's assumed liabilities in non-public schedules and refusing to provide those schedules to Chemours during the parties' negotiations; (ii) cramming down, over Chemours's objection, one-sided confidential arbitration provisions that were designed to "shield [Old DuPont's] conduct from judicial and public scrutiny;" and (iii) including, a "patently false" clause in the Separation Agreement that the parties had participated jointly in its drafting.[88]

---

[85] *See id.*, ¶¶ 37–44, 67.

[86] *See id.*, ¶¶ 25–36.

[87] *See, e.g.*, *id.*, ¶¶ 31, 155, 168.

[88] *See* Ex. 35, ¶¶ 24, 29–31, 33, 60–67.

All this evidence establishes a *prima facie* showing that the Spinoff constituted a fraudulent transfer. Communications in which legal advice was sought or obtained in furtherance of the transaction are therefore not privileged and must be produced.

### C.    The Attorney-Client Privilege Does Not Apply To Communications Between Defendants And Third-Party Professionals

Defendants also assert attorney-client privilege over scores of communications with dozens of third-parties, without establishing the narrow circumstances under which such communications could be considered privileged.[89] The withheld communications involve banks and consulting firms retained by Old DuPont in connection with the Spinoff and its aftermath, including, for example, ████████████████ Deloitte, Ernst & Young ("E&Y"), ████████████ Houlihan Lokey, Evercore, ████████████████, KPMG International and PriceWaterhouse Coopers ("PwC").

Communications with non-lawyer third-party professionals, such as financial advisors and consulting firms, may be privileged under two circumstances. *See Williams v. Big Picture Loans, LLC.*, 303 F. Supp. 3d 434, 446–47 (E.D. Va. 2018). First, where the non-lawyer professional is acting as the agent of the attorney, its communications may be privileged if the professional was "translating" information between the attorney and the client. *Black & Decker Corp. v. United States*, 219 F.R.D. 87, 90 (D. Md. 2003) (omitting internal quotation). Second, where the non-lawyer professional is acting as the agent of the client, its communications may be privileged where the professional provides information "for the purpose of assisting in the rendition of legal services rather than merely for the purpose of receiving accounting [or other

---

[89] *See, e.g.*, Downing Decl. ¶ 36(e); Ex. 29–30. Defendants also did not identify third parties on their privilege log unless the third party appeared on the top email in an email chain. (*See e.g.* Ex. 44 (Ex. 22, Entry 2087)). Thus, it is unclear from Defendants' logs how many communications with third parties they are asserting privilege over.

business] advice." *Williams*, 303 F. Supp. at 446 (omitting internal quotation and alteration);

*Brown-Thomas*, 2020 WL 6737757, at *8; *see also In re Vioxx Prods. Liab. Litig.*, 501 F. Supp.

2d 789, 799 (E.D. La. 2007) ("[M]erely because a legal issue can be identified that relates to on-

going communications does not justify shielding them from discovery. The lawyer's role as a

lawyer must be primary to her participation").

Defendants have not satisfied their burden of establishing that any of the third-party

professionals at issue were agents of Old DuPont, Chemours or their respective counsel. In fact,

Chemours did not have *any* direct relationship with the third-party professionals that appear on

its privilege logs and whose services were retained in connection with the Spinoff. They were

each engaged by Old DuPont, whose interests were adverse to Chemours's in connection with

the Spinoff.[90] There is no basis for Chemours to have withheld or redacted its communications

with these entities.

Old DuPont produced engagement letters with a handful of these third-party entities that

confirm they were not the agents of Old DuPont or its counsel, either. Old DuPont's agreement

with ███████, for example, states that it had an ████████████████████

████████████████████████████[91] Old DuPont's engagement

letters with ███████ E&Y, ███████ Houlihan Lokey, ███████ Evercore,

KPMG and PwC disclaim any agency relationship and state that those entities were hired as

independent contractors.[92] Old DuPont has not otherwise provided any evidence that any of the

third party professionals were its agent or the agent of its attorneys.

---

[90] *See* Ex. 51–58.

[91] *See* Ex. 50 at 6.

[92] *See* Ex. 51–62.

The engagement letters also confirm that these entities were not retained to act as translator or otherwise assist in the rendition of legal services. For example, the letters show that Old DuPont hired:

1. ███████████████████████████████████████████[93]

2. E&Y to perform various tasks relating to the Spinoff;[94]

3. ██████████████████████████████████████[95]

4. Houlihan Lokey to provide an opinion on the fair value of Chemours's assets and liabilities after the Spinoff ██████████████████████[96]

5. ████████████████████████████████████████[97]

6. Evercore as "strategic and financial advisor;"[98]

7. KPMG to provide "carve-out financial support statement support" with respect to the Performance Chemicals segment;[99] and

8. PwC as "independent accountants."[100]

In *Williams*, *supra*, the court held that communications with a third-party analytics firm were not privileged where the firm's engagement letter similarly reflected that it was retained to perform business services. 303 F. Supp. 3d at 447. The same result is warranted here.

Chemours has further asserted privilege over communications with dozens of different

---

[93] *See* Ex. 51 at 1.

[94] *See* Ex. 58.

[95] *See* Ex. 52 at 1.

[96] *See* Ex. 53 at 3.

[97] *See* Ex. 55 at 1.

[98] See Ex. 54 at 1.

[99] *See* Ex. 58.

[100] *See* Ex. 56.

third-parties—including attorneys—without providing information necessary to establish

privilege, such as, the nature of the relationship between Chemours and the third-party; the

nature of the services provided by the third-party, including whether such services were provided

in connection with a legal matter; or the existence of an attorney-client relationship with

Chemours. Those third-parties include (among others) business and IT consulting firms, as well

as investment, lobbying and public relations firms.[101] The third-parties also include ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████[102] Chemours has also asserted privilege over communications with the ██████

████████████[103] These entries cast serious doubt on the integrity of Chemours's entire

privilege review.

 The Court should require Defendants to produce all communications with all of the third-

parties identified on Exhibit 30 to the Downing Declaration.

 **D.** **Defendants Have Engaged In Abusive Redaction Tactics**

 The reliability of Defendants' privilege review is also undermined by their strategic

redaction of patently non-privileged information. Defendants redacted scores of communications

with each other, with Skadden and third-parties that are plainly not privileged.[104] And Chemours

redacted financial data, mere references to PFOA and legal liabilities, and other material that was

shared with third-parties or made public. For example, Chemours redacted an ████████████

████████████████████████████████████████████████████████████████

---

[101] *See e.g.*, Ex. 22 at Entry 104; Ex. 23 at Entry 8128, 18487, 20914.

[102] *See* Ex. 23 at Entry 11314, 16360.

[103] *See* Ex. 23 at Entry 11799.

[104] *See, e.g.*, Ex. 25–26, 29; *see also, e.g.*, Ex. 59 (Ex. 10 at Entry 471).

████████████████████████████████ [105] This document is available on

Chemours's website and contains a "safe harbor" disclaimer—its public nature should have been

plain during the course of Chemours's privilege review.[106] Chemours redacted numerous other

presentations containing similar disclaimers, including presentations given to lenders.[107]

Chemours also appears to have engaged in rote redaction of references to PFOA and legal

liabilities transferred to it under the Separation Agreement. For example, ████████████████

████████████████████████████████████████████████████████████

██████████████████████████ [108] In an ██████████████████████████, Chemours

blacked out ████████████████████████████████ Due to Chemours's

sloppy review, this document was produced elsewhere in its production in un-redacted form and

is plainly not privileged:[109]



---

[105] *See* Ex. 60 (Ex. 23 at Entry 23803).

[106] *See* Ex. 61.

[107] *See* Ex. 63 (Ex. 23 at Entry 21810).

[108] *See* Ex. 62 (Ex. 23 at Entry 21507).

[109] *Compare* Ex. 64 (Ex. 23 at Entry 21504) *with* Ex. 65.

On its privilege logs, Chemours described this redaction as reflecting the ███████████ ███████████████████████████[110] The redacted sentence does not match Chemours's description. Chemours's systematic redactions of unfavorable information and misleading descriptions call into question the reliability of each and every entry on its logs.

Moreover, for numerous communications, Chemours logged only the top email but redacted subsequent communications in the chain—including the from, sent, cc and subject lines—such that plaintiffs are entirely unable to discern the basis for Chemours's assertion of privilege (or even how many communications have been withheld).[111] That is improper. *See Vioxx*, 501 F. Supp. 2d at 804 ("[s]imply because technology has made it possible to physically link . . . separate communications does not justify them as one communication and denying the demanding party a fair opportunity to evaluate privilege claims raised by the producing party"). For several documents, Chemours redacted headings and individuals' identities, obstructing The PEC's ability to meaningfully assess its privilege claims.[112] When the PEC provided Chemours with a non-exhaustive list of documents falling into this category, Chemours responded that it requires more information *from the PEC* in order to respond.[113]

Defendants have failed to meet their burden to provide sufficient information to demonstrate the information they redacted is privileged, and the Court should require them to produce all of their documents without redaction.

---

[110] *See* Ex. 23 at Entry 21504.

[111] *See, e.g.*, Ex. 66 (Ex. 23 at Entry 21813); Ex. 67 (Ex. 23 at Entry 22165).

[112] *See, e.g.*, Ex. 68 (Ex. 23 at Entry 21722); Ex. 69, at AFFF-MDL-CHE-FT-00205698-205699 (Ex. 23 at Entry 21690); Ex. 70 at AFFF-MDL-CHE-FT-00215991-00215993 (Ex. 23 at Entry 22334); Ex. 71 at AFFF-MDL-CHE-FT-00214868 (Ex. 23 at Entry 22183).

[113] *See* Ex. 20 at 3; Ex. 21 at 4, 6.

### E.    Communications That Merely Copy Counsel Are Not Privileged

Defendants have asserted privilege over numerous communications in which Old DuPont's or Chemours's respective in-house counsels are merely copied or otherwise included among numerous non-attorney recipients.[114] "[A] non-privileged communication containing business advice or information, or containing something other than legal advice, does not suddenly become cloaked with the privilege simply because the sender choose to copy an in-house lawyer on it." *Mr. Dee's, Inc. v. Inmar, Inc.*, No. 1:19CV141, 2021 WL 3861839, at *4 (M.D.N.C. Aug. 30, 2021); *see also Westchester Surplus Lines Ins. Co. v. Clancy & Theys Const. Co.*, No. 5:12-CV-636-BO, 2013 WL 6058203, at *6 (E.D.N.C. Nov. 15, 2013) (similar). Because in-house counsel often have legal and management roles, "it is necessary to apply the privilege cautiously and narrowly lest the mere participation of an attorney be used to seal off disclosure." *Brainware, Inc. v. Scan-Optics, Ltd.*, No. 3:11CV755, 2012 WL 2872812, at *3 n.3 (E.D. Va. Jul. 12, 2012) (omitting internal quotation); *see also Neuberger Berman*, 230 F.R.D. at 412 ("Defendants' sweeping reliance on the attorney status of [in-house and general counsel] and others to shield all communications is obviously out of sync with governing law").

Defendants have not met their burden to show that the withheld communications in fact seek or convey legal advice where in-house counsel is sprinkled among numerous non-attorney recipients. Indeed, several in-house counsel who appear on the communications, such as Mr. Shelton and Old DuPont corporate counsel John Ward, also held management roles. Moreover, the subject matters of the communications undermine Defendants' claim that the communications address a legal as opposed to a business concern. For example, Defendants have withheld communications with attorneys and non-attorneys concerning ██████████████

---

[114] *See* Ex. 32.

████████████████████████[115]████████████████[116] Additional

communications produced in redacted form are not even addressed to the attorneys from whom

Defendants claim legal advice was sought and instead are addressed to non-attorney

employees.[117] With respect to these and other similar communications, Defendants have failed to

show that they sought legal advice from counsel and the communications therefore must be

produced.

### F.    Defendants Have Not Provided Sufficient Information To Substantiate Their Assertion Of Privilege Over Large Swaths Of Documents

For numerous documents, Defendants have not provided sufficient information to

substantiate their assertions of attorney-client and common interest protection.[118] As the parties

seeking to withhold responsive material, Defendants alone have the burden to set forth facts

sufficient to establish each element of the privileges asserted on a "document-by-document"

basis. *Neuberger Berman*, 230 F.R.D. at 405, 408-10; *see also Suggs v. Whitaker*, 152 F.R.D.

501, 505 (M.D.N.C. 1993). Defendants have failed to do so.

Defendants assert attorney-client privilege over many documents for which they have not

identified an attorney whose legal advice was sought or reflected. In *Companion Prop. & Cas.*

*Ins. Co. v. U.S. Bank Nat'l Ass'n*, the court granted the defendant's motion to compel where the

plaintiff similarly asserted attorney-client (and work product) protection over large swaths of

documents and provided privilege logs that failed "to specify which attorney was acting in

connection to [each] communication or document." No. 3:15-cv-01300-JMC, 2016 WL

---

[115] *See* Ex. 12 at Entry 1924–25.

[116] *See* Ex. 72 (Ex. 23 at Entry 21653).

[117] *See, e.g.*, Ex. 73 (Ex. 23 at Entry 8276); Ex. 74 (Ex. 23 at Entry 21538); Ex. 75 (Ex. 23 at Entry 21681); Ex. 76 (Ex. 23 at Entry 22569).

[118] *See* Ex. 33.

6539344, at *1, 3 (D.S.C. Nov. 3, 2016). Without this information, Defendants cannot establish privilege. Old DuPont, for example, erroneously asserts that its logs contain sufficient information because hundreds of communications were found in the custodial files of Michelle Olson, an accounting consultant, and Ms. Olson frequently communicated with lawyers.[119] This speculative argument is meritless. The fact that Ms. Olson, a non-lawyer, was involved in *some* privileged communications does not establish or create a presumption that *all* of her custodial documents are privileged. Such generalizations do not satisfy Defendants' obligation to factually support their claims "as to each document." *Oppenheimer v. Williams*, No. 2:20-CV-4219-DCN, 2021 WL 5359283, at *3 (D.S.C. Nov. 17, 2021). Defendants have also withheld documents that do not appear to have been shared in confidence with an attorney and pertain to business, rather than legal, matters.[120]

Chemours further claims common interest protection over many documents for which Chemours has not identified the parties who shared the common interest or the nature of the common interest.[121] Chemours cannot establish common interest by relying "solely on counsel's conclusory allegation that the communications were privileged based on [a] common [legal] interest . . . ." *Byrnes v. Jetnet Corp.*, 111 F.R.D. 68, 72 (M.D.N.C. 1986). Rather, Chemours "is obligated to specifically define the nature and scope of the interest (identical or merely similar) it allegedly has … and specify the extent any legal interests overlapped with commercial interests of other conversations." *Id.*; *see also Prowess, Inc. v. Raysearch Labs. AB*, No. WDQ-11-1357,

---

[119] *See* Ex. 9 at 4.

[120] *See, e.g.*, Ex. 77 (Ex. 23 at Entry 21950); Ex. 78 (Ex. 23 at Entry 22164); Ex. 79 (Ex. 23 at Entry 22317); Ex. 80 (Ex. 23 at 23879); Ex. 81 (Ex. 10 at Entry 2051); Ex. 82 (Ex. 12 at Entry 1725).

[121] *See* Ex. 33.

2013 WL 509021, at *5 (D. Md. Feb. 11, 2013) (same). Because Chemours has not carried its burden to establish common interest protection, this material must also be produced.

### G. Defendants Have Not Provided Sufficient Information To Substantiate Their Assertions of Work Product

Defendants have designated as work product documents that were not prepared in anticipation of litigation, but rather, in furtherance of the Spinoff—a business transaction. It is well-established that "work product generally does not apply unless the primary motivating purpose for creating the document is to assist in pending or impending litigation." *Neuberger Berman*, 230 F.R.D. at 418.[122] Defendants have asserted work product over documents concerning, for example, ███████████████████████████████████ ███████████████████████████████████████████████████ ████████[123] Such documents are not work product.

Moreover, Defendants have failed to identify: (i) the litigation in anticipation of which the documents were allegedly prepared, or (ii) the attorney whose work product is allegedly reflected. "Given the lenience and breadth of the discovery process … parties claiming work product protection [must] demonstrate by specific and competent evidence that the documents were created in anticipation of litigation," *Montgomery v. CSX Transp. Inc.*, No. SAG-14-1520, 2015 WL 6560447, at *10 (D. Md. Oct. 28, 2015)—meaning, "an *actual claim* following an actual event or series of events that reasonably could result in litigation." *Brown-Thomas*, 2020 WL 6737757, at *6 (emphasis added). Numerous courts have held the proponent of the privilege must specify the litigation in anticipation of which the material was prepared. *See, e.g.*, *E.I.*

---

[122] Federal law governs the work product doctrine regardless of whether state law otherwise supplies the rule of decision on plaintiffs' fraudulent transfer claims. *See, e.g.*, *State Farm Fire*, 225 F. Supp. at 483.

[123] *See* Ex. 10 at Entry 2221; Ex. 12 at Entry 436; Ex. 22 at Entry 206, 495, 1017, 1019, 2070.

*DuPont de Nemours & Co. v. Kolon Indus., Inc.*, No. 3:09CV58, 2010 WL 1489966, at *5 (E.D. Va. Apr. 13, 2010) (citing *Old DuPont*'s failure to "describe what 'litigation' was anticipated").[124] Courts have also held that the party asserting protection must specify the attorney whose work product is reflected in the withheld material. *See, e.g.*, *Earhart v. Elder*, No. 5:18-CV-01000, 2019 WL 455221, at *8 (S.D.W. Va. Feb. 5, 2019) ("… the privilege log contains no indication that the [withheld documents] were prepared for an attorney, or member of the bar of a court").

## V.     CONCLUSION

For the foregoing reasons, the PEC respectfully requests that the Court grant its Motion to Compel and Order Old DuPont and Chemours to produce the following categories of non-privileged documents that they have improperly withheld:

1. All communications between Old DuPont employees and Chemours employees concerning the Spinoff, including the drafting, negotiation and execution of the Separation Agreement, the estimation of the liabilities Chemours assumed, the value of the assets Chemours transferred to Old DuPont, Chemours's capital adequacy and solvency as a result of the Spinoff, and post-Spinoff communications relating to their respective rights and obligations under the Separation Agreement (*see* representative samples listed in Ex. 25);

2. All communications between Chemours employees and Old DuPont's outside counsel, Skadden, including documents allegedly reflecting or requesting legal advice from Skadden that were shared with Chemours (*see* representative samples listed in Ex. 26);

---

[124] *See also Neuberger Berman*, 230 F.R.D. at 406; *Williams*, 303 F. Supp. 3d at 449; *Companion Prop.*, 2016 WL 6539344, at *3.

3.  All communications that Old DuPont or Chemours produced in the Delaware Action concerning matters in which Old DuPont and Chemours did not share a common interest (*see* representative samples listed in Ex. 27);

4.  All communications in furtherance of the Spinoff and subject to disclosure under the crime-fraud exception to attorney-client privilege (*see* representative samples listed in Ex. 28)

5.  All communications and documents shared between Old DuPont or Chemours and third-parties listed in Ex. 30, including consultants, financial advisors and media or investor relations firms, among others (*see* representative samples listed in Ex. 29);

6.  All communications and documents from which Defendants have redacted non-privileged information (*see* representative samples listed in Ex. 31);

7.  All communications on which Defendants' respective in-house counsels were merely copied or otherwise included with several non-attorney employees (*see* representative samples listed in Ex. 32);

8.  All communications and documents for which Defendants have failed to provide sufficient information to establish privilege, such as the identity and affiliation of any attorney who is the source of the privilege and the nature of any alleged common interest (*see* representative samples listed in Ex. 33); and

9.  All non-privileged documents for which Defendants have failed to establish work product protection (*see* representative samples listed in Ex. 34).

Dated:  April 26, 2022

/s/ Fred Thompson, III
Motley Rice LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
P: (843) 216-9000
Fax: 843-216-9440
fthompson@motleyrice.com

*Plaintiffs' Liaison Counsel*

-and-

/s/ *Michael A. London*

Michael A London
Douglas and London PC
59 Maiden Lane
6th Floor
New York, NY 10038
P: (212)-566-7500
F: (212)-566-7501
mlondon@douglasandlondon.com

Paul J. Napoli
Napoli Shkolnik PLLC
1301 Avenue of The Americas
10th Floor
New York, NY 10019
P: (212)-397-1000
F: (646)-843-7603
pnapoli@napolilaw.com

Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
P: (214)-521-3605
ssummy@baronbudd.com

*Co-lead Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was electronically filed with this Court's CM/ECF on this 26th Day of April, 2022 and was thus served electronically upon counsel of record.

<u>/s/ Fred Thompson, III</u>