UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG<br><br>This Document relates to:<br>ALL CASES |

**DEFENDANTS E. I. DU PONT DE NEMOURS AND COMPANY'S,
THE CHEMOURS COMPANY'S AND THE CHEMOURS COMPANY FC, LLC'S
<u>RESPONSE TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY</u>**

# TABLE OF CONTENTS

FACTUAL BACKGROUND ............................................................................................ 3

    A.    The Creation of Chemours ................................................................... 3

    B.    The Separation Agreement Details the Terms of the Spinoff .............. 5

    C.    Historic DuPont and Chemours Settle Their Dispute and Set Up an Escrow Account for Future PFAS Judgments or Settlements ............. 7

    D.    Plaintiffs Conducted Extensive Discovery on the Fraudulent Transfer Claims ................................................................................................ 8

ARGUMENT ............................................................................................................. 11

I.    The Attorney-Client Privilege Protects Pre-Spinoff Communications Among Historic DuPont, Chemours, and Their Lawyers ............................................... 11

    A.    Historic DuPont and Chemours Shared a Joint Privilege ................... 12

    B.    Any Later "Adversity" That Developed Between Historic DuPont and Chemours in 2019 Does Not Destroy Privilege of Pre-Spinoff Documents ....... 15

    C.    Plaintiffs' "Adversity" Theory Is Unworkable .................................... 18

II.    The Attorney-Client Privilege Applies to Communications Between Chemours and Attorneys from the Skadden Law Firm .................................................... 19

III.    Plaintiffs' Challenge to Post-Spin Communications Ignores the Common Interest Doctrine that Protects Co-Defendants' Communications to Aid Their Defense ............. 21

IV.    The Crime-Fraud Exception Does Not Apply to Pre-Spinoff Communications ............. 23

V.    Plaintiffs' Remaining Category-Based Challenges Lack Merit ........................................ 30

    A.    The At-Issue Communications with Historic DuPont's Advisors Are Protected by the Attorney-Client Privilege, the Work-Product Doctrine, or Both ....... 31

        1.    The work-product doctrine protects the at-issue communications with Historic DuPont's advisors ............................................... 33

        2.    The attorney-client privilege also protects the at-issue communications with Historic DuPont's advisors ................................. 35

        3.    Chemours's log entries on Exhibit 29 are privileged .............................. 36

    B.    Defendants Have Not Engaged in Abusive Redaction Tactics ........................... 37

C.    Defendants Have Properly Withheld Communications Between Their In-House Counsel and Employees Concerning Legal Advice ................................. 38

    1.    Historic DuPont's log entries in Exhibit 32 are privileged..................... 39

    2.    Chemours's log entries in Exhibit 32 are privileged .............................. 40

D.    Defendants' Privilege Logs Adequately Substantiate Their Privilege and Work Product Claims......................................................................................... 41

    1.    Defendants need not identify a specific lawyer or litigation for each entry to claim attorney-client privilege or work-product protection ...................................................................................................... 41

    2.    Historic DuPont's log entries in Exhibit 33 are protected by attorney-client privilege......................................................................... 45

    3.    Historic DuPont's log entries in Exhibit 34 are protected by the work-product doctrine.............................................................................. 47

    4.    Chemours's log entries in Exhibit 33 are privileged .............................. 48

    5.    Chemours's log entries in Exhibit 34 are work product ......................... 48

POTENTIAL *IN CAMERA* REVIEW ....................................................................... 49

CONCLUSION............................................................................................................... 49

# TABLE OF AUTHORITIES

## CASES

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*,
  545 A.2d 1171 (Del. 1988) ............................................................................ 14

*Ball v. USAA Life Ins. Co.*,
  No. 2:16-cv-00041-DCN, 2016 WL 11513321 (D.S.C. May 16, 2016) ............................ 42

*Brown-Thomas v. Hynie*,
  No. 1:18-CV-02191-JMC, 2020 WL 6737757 (D.S.C. Nov. 17, 2020) ............................ 22

*Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. of Mont.*,
  408 F.3d 1142 (9th Cir. 2005) ...................................................................... 43

*Calvin Klein Trademark Tr. v. Wachner*,
  198 F.R.D. 53 (S.D.N.Y. 2000) ..................................................................... 34

*Cendant Corp. v. Shelton*,
  246 F.R.D. 401 (D. Conn. 2007).................................................................. 27, 30

*Chaudry v. Gallerizzo*,
  174 F.3d 394 (4th Cir. 1999) ....................................................................... 24

*Clark v. United States*,
  289 U.S. 1 (1933)............................................................................... 25, 26

*Companion Prop. & Cas. Ins. Co. v. U.S. Bank Nat'l Ass'n*,
  No. 3:15-cv-01300-JMC, 2016 WL 6539344 (D.S.C. Nov. 3, 2016) ............................ 43

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984).............................................................................. 14

*Crabb v. KFC Nat'l Mgmt. Co.*,
  No. 91-5474, 1992 WL 1321 (6th Cir. Jan. 6, 1992) (per curiam) ...................... 13

*Duplan Corp. v. Deering Milliken, Inc.*,
  397 F. Supp. 1146 (D.S.C. 1974)............................................................... 14, 32

*Earhart v. Elder*,
  No. 5:18-CV-01000, 2019 WL 455221 (S.D. W.Va. Feb. 5, 2019)........................... 43, 44

*Est. of Page v. Slagh*,
  No. 1:06-CV-245, 2007 WL 1385957 (W.D. Mich. May 8, 2007).......................... 27, 28, 30

*Frank Betz Assocs., Inc. v. Jim Walter Homes, Inc.*,
  226 F.R.D. 533 (D.S.C. 2005) ............................................................ 33, 36, 46, 47

*Glidden Co. v. Jandernoa*,
  173 F.R.D. 459 (W.D. Mich. 1997) .............................................................. 14

*Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLP*,
  80 A.3d 155 (Del. Ch. 2013)..................................................................... 13

*Hanwha Azdel, Inc. v. C & D Zodiac, Inc.*,
  617 F. App'x 227 (4th Cir. 2015) ............................................................... 22

*Hepburn v. Workplace Benefits, LLC*,
No. 5:13-CV-00441-BO, 2014 WL 12623294 (E.D.N.C. Apr. 18, 2014) .................... 39, 42

*Hickman v. Taylor*,
329 U.S. 495 (1947) ...................................................................................................... 32

*Husky Int'l Elecs., Inc. v. Ritz*,
578 U.S. 356 (2016) ...................................................................................................... 26

*In re Allen*,
106 F.3d 582 (4th Cir. 1997) ......................................................................................... 32

*In re Andrews*,
186 B.R. 219 (Bankr. E.D. Va. 1995) ............................................................................. 30

*In re Chemours Co. Deriv. Litig.*,
No. 2020-0786-SG, 2021 WL 5050285 (Del. Ch. Nov. 1, 2021) .................................... 2, 25

*In re Crescent Res., LLC*,
457 B.R. 506 (Bankr. W.D. Tex. 2011) ........................................................................... 17

*In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*,
401 F.3d 247 (4th Cir. 2005) ..................................................................................... 26, 30

*In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*,
33 F.3d 342 (4th Cir. 1994) ........................................................................................... 25

*In re Grand Jury Proceedings Under Seal v. United States*,
947 F.2d 1188 (4th Cir. 1991) ....................................................................................... 45

*In re Grand Jury Subpoena*,
870 F.3d 312 (4th Cir. 2017) ......................................................................................... 32

*In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129*,
902 F.2d 244 (4th Cir. 1990) ......................................................................................... 23

*In re Infinity Bus. Grp., Inc.*,
530 B.R. 316 (Bankr. D.S.C. 2015) ................................................................................ 32

*In re Kellogg Brown & Root, Inc.*,
756 F.3d 754 (D.C. Cir. 2014) ....................................................................................... 32

*In re New York Renu With Moistureloc Prod. Liab. Litig.*,
No. 766,000/2007, 2009 WL 2842745 (D.S.C. July 6, 2009) .......................................... 32

*In re Pfizer Inc. Sec. Litig.*,
No. 90 Civ. 1260 (SS), 1993 WL 561125 (S.D.N.Y. Dec. 23, 1993) ................................ 33

*In re Sealed Case*,
107 F.3d 46 (D.C. Cir. 1997) ................................................................................ 25, 29, 30

*In re Teleglobe Commc'ns Corp.*,
493 F.3d 345 (3d Cir. 2007) ..................................................................................*passim*

*In re The Chemours Co. Sec. Litig.*,
No. 19-1911-CFC, 2022 WL 610671 (D. Del. Feb. 24, 2022) ......................................... 2, 25

*In re Vereen*,
    No. 96-78369-W, 1999 WL 33485642 (Bankr. D.S.C. Sept. 7, 1999)................................ 30

*In re Warner*,
    87 B.R. 199 (Bankr. M.D. Fla. 1988) ..................................................................... 30

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    No. 2:18mb2836, 2020 WL 1593544 (E.D. Va. Feb. 6, 2020)...................................... 39

*In re: Caesars Entmt. Operating Co., Inc.*,
    No. 15 B 1145, 2016 WL 7477566 (Bankr. N.D. Ill. Sept. 21, 2016)................................ 25

*In re: Fin. Oversight and Mgmt. Bd. for P. R.*,
    392 F. Supp. 3d 244 (D.P.R. 2019)...................................................................... 27

*In re: Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
    180 F. Supp. 3d 273 (S.D.N.Y. 2016)...................................................... 26, 29, 30

*Johnson v. Ford Motor Co.*,
    No. 3:13-cv-06529, 2016 WL 1241538 (S.D. W.Va. Mar. 28, 2016) ............... 24, 26, 42, 44

*JPMorgan Chase & Co. v. Am. Century Cos.*,
    C.A. No. 6875-VCN, 2013 WL 1668393 (Del. Ch. Apr. 18, 2013)............................. 33, 47

*Martin v. McEvoy*,
    No. 34254-1-I, 1996 WL 335996 (Wash. Ct. App. June 17, 1996)................................ 28, 30

*Md. Restorative Just. Initiative v. Hogan*,
    No. 16-01021-ELH, 2018 WL 5295825 (D. Md. Oct. 25, 2018) ........................................ 42

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.*,
    967 F.2d 980 (4th Cir. 1992) ............................................................................. 32

*Neuberger Berman Real Est. Income Fund, Inc. v. Lola Brown Tr. No. 1B*,
    230 F.R.D. 398 (D. Md. 2005)........................................................................... 22

*S'holder Representative Servs. LLC v. RSI Holdco LLC*,
    No. 2018-0517-KSJM, 2019 WL 2290916 (Del. Ch. May 29, 2019) ........................... 12, 13

*Santrade, Ltd. v. Gen. Elec. Co.*,
    150 F.R.D. 539 (E.D.N.C. 1993) .............................................................. 39, 42, 45

*Simon v. G.D. Searle & Co.*,
    816 F.2d 397 (8th Cir. 1987) ............................................................................. 47

*Stardock Sys., Inc. v. Reiche*,
    No. 4:17-CV-07025-SBA (KAW), 2018 WL 6259536 (N.D. Cal. Nov. 30,
    2018) ........................................................................................................... 34

*United States v. Ballard*,
    779 F.2d 287 (5th Cir. 1986) ...................................................................... 27, 30

*United States v. Deloitte LLP*,
    610 F.3d 129 (D.C. Cir. 2010) .................................................................... 32, 34

*United States v. Farrell*,
    921 F.3d 116 (4th Cir. 2019) ............................................................................. 19

*United States v. McPartlin*,
   595 F.2d 1321 (7th Cir. 1979) ........................................................ 22

*United States v. Newell*,
   315 F.3d 510 (5th Cir. 2002) ......................................................... 16

*United States v. Zolin*,
   491 U.S. 554 (1989) ................................................................... 2, 24

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981) ...................................................................... 16

*Varuzza by Zarrillo v. Bulk Materials, Inc.*,
   169 F.R.D. 254 (N.D.N.Y. 1996) ................................................ 16

*Wagafe v. Trump*,
   334 F.R.D. 619 (W.D. Wash. 2020) ............................................ 44

**RULES**

Adv. Comm. Notes to Fed. R. Civ. P. 26 ................................ 42, 43, 44, 46

Fed. R. Civ. P. 26 ...................................................... 42, 43, 44, 46

Fed. R. Civ. P. 26(b)(5) ....................................................... 41

Local Civ. Rule 7.02 (D.S.C.) ................................................. 37

**OTHER AUTHORITIES**

3 Fletcher Cyc. Corp. § 844.30 ............................................... 14

Edna Selan Epstein, The Attorney-Client Privilege and the Work-Product
   Doctrine (6th ed. 2017) ..................................................... *passim*

Rest. 3d of the Law Governing Lawyers § 73 cmt. E (2000) .................. 16

Rest. 3d of the Law Governing Lawyers § 75 (2000) ........................ 15

Rest. 3d of the Law Governing Lawyers § 76 (2000) ........................ 23

The attorney-client privilege protects thousands of documents from the files of E. I. du Pont de Nemours and Company ("Historic DuPont's") and its former wholly owned subsidiaries, The Chemours Company and the Chemours Company FC, LLC's (together, "Chemours"). To pierce the privilege, Plaintiffs first claim that at some point the relationship between Historic DuPont and Chemours became adverse, thereby retroactively destroying the joint privilege they shared. Plaintiffs then argue that their unproven allegation that Historic DuPont and Chemours engaged in a fraudulent transfer is a sufficient basis for this Court to find that the crime-fraud exception to the attorney-client privilege applies. Finally, Plaintiffs make a series of hodgepodge attacks on Historic DuPont's and Chemours's privilege logs, asking that the Court order these companies to provide more than what the rules require and more than what Plaintiffs have provided in their logs. None of these arguments have merit.

*First*, Plaintiffs' argument that Historic DuPont and Chemours could not have shared a joint privilege conflates two distinct time periods: (1) the period from Chemours's 2014 formation as a wholly owned subsidiary until its spinoff in July 2015, and (2) the period after the spinoff when Chemours operated as an independent public company. The privilege analysis is different for each. As to the pre-spinoff communications, Historic DuPont and Chemours held a joint privilege, both by operation of law given their parent-subsidiary relationship and contractually as memorialized in their 2015 Separation Agreement. The post-spinoff disputes between Historic DuPont and Chemours have no bearing on whether the pre-spinoff communications are privileged. The companies' post-spinoff communications are privileged for a different reason: the common-interest doctrine shields the communications because they relate to the two companies' efforts to defend themselves as codefendants in various lawsuits, including this one.

*Second*, Plaintiffs misapply the crime-fraud exception both procedurally and substantively. Procedurally, Plaintiffs ignore a key step in the analysis and contend that "[w]here the moving party has made a *prima facie* showing of fraudulent transfer, courts order disclosure of the full scope of communications made in furtherance of the transfer." (Mot. at 20.) But Plaintiffs must first establish "a factual basis adequate to support a good faith belief by a reasonable person, that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989) (internal citations omitted). Plaintiffs have not cleared the first hurdle. Instead, they simply demand *in camera* review to make that showing. Substantively, Plaintiffs' crime-fraud argument fails because it rests on allegations that Chemours was insolvent as soon as it separated from Historic DuPont. But this is insufficient to show fraud for purposes of the crime-fraud exception, or else the privilege would be waived whenever a plaintiff asserts a fraudulent transfer claim. Regardless, allegations are not enough, and Plaintiffs have not submitted evidence. Instead, they rely solely on Chemours's complaint in the Delaware Court of Chancery against Historic DuPont. But two separate Delaware courts have held that Chemours did not allege that it was insolvent at the time of the spinoff.[1] And Chemours's public filings since then confirm that it remains solvent. Today, Chemours is a publicly traded company with a market value of roughly six billion dollars.

*Third*, Plaintiffs assert by category several supposed deficiencies with Defendants' privilege logs. For starters, Plaintiffs miscategorize large swaths of documents that Plaintiffs claim fit into one of their categorical complaints but do not. Beyond that, Plaintiffs' challenges to these documents fail on the merits as discussed below.

---

[1] *See In re Chemours Co. Deriv. Litig.*, No. 2020-0786-SG, 2021 WL 5050285, at *18 (Del. Ch. Nov. 1, 2021); *In re The Chemours Co. Sec. Litig.*, No. 19-1911-CFC, 2022 WL 610671, at *13 (D. Del. Feb. 24, 2022).

## FACTUAL BACKGROUND

This MDL concerns allegations that aqueous film-forming foam containing per- and poly-fluoroalkyl substances ("PFAS") caused a variety of damages. In addition, some Plaintiffs assert fraudulent transfer claims focused on some corporate transactions. This privilege dispute relates to one of those—Historic DuPont's spinoff of its performance chemicals business into Chemours on July 1, 2015.[2] Although this is a discovery dispute, Plaintiffs have put the substance of their fraudulent transfer claims at issue by arguing that the crime-fraud exception applies. They allege the Chemours spinoff was an attempt to "limit[] the availability of funds arising out of DuPont's liability." (*See, e.g.*, No. 2:18-cv-3487, Dkt. 54 ¶ 178.)

### A.     The Creation of Chemours

"In October 2013, [Historic] DuPont announced its intention to separate its Performance Chemicals segment through a U.S. tax-free spinoff to shareholders" to increase shareholder value by providing shareholders with equity investments in two separate companies. (Ex. A, 2013 Historic DuPont 10-K at AFFF-MDL-EID-00175294; *see* Ex. B, 2014 Historic DuPont 10-K at AFFF-MDL-EID-00174574, -174583 (noting that Historic DuPont announced that Chemours would be the name of the new public company).) Chemours was formed in February 2014 as a wholly owned subsidiary of Historic DuPont, a status it maintained until its separation on July 1, 2015. (*See, e.g.*, No. 2:18-cv-3487, Dkt. 54 ¶¶ 159–60.) Between 2013 and 2015, Historic DuPont worked to achieve this separation by separating its facilities, operations, and personnel into two separate companies. Given that complexity, Historic DuPont relied on third party advisors

---

[2] Some of the cases consolidated in this MDL contain fraudulent transfer claims related to a second transaction. At the end of 2015, Historic DuPont merged with The Dow Chemical Company. Then in 2019, that merged company separated into three distinct entities: (1) Corteva, Inc., (2) DuPont de Nemours, Inc. ("New DuPont"), and (3) Dow Inc. Plaintiffs' motion does not relate to that transaction.

(including Goldman Sachs, Evercore, PricewaterhouseCoopers, and Ernst & Young) to ensure that the transaction went smoothly.

In addition, Historic DuPont hired Skadden Arps Slate Meagher and Flom LLP to prepare the corporate transactional documents and to oversee a solvency analysis that considered potential liabilities along with potential revenues of the new company. To estimate potential liabilities, Skadden hired Deloitte to estimate the values of Historic DuPont's known and unknown litigation and environmental contingencies related to the performance chemicals business—including PFOA—that would go to Chemours. (*See* Ex. C, Deloitte Contingent Liabilities Rpt.) Finally, Historic DuPont hired Houlihan Lokey to perform a solvency analysis of Chemours based on the combined work of Historic DuPont, Skadden, Deloitte, and other third-party advisors.

During this time, a different MDL involving PFOA-related personal injury claims was pending in Ohio (the "Ohio MDL"). (Ex. A, 2013 Historic DuPont 10-K at AFFF-MDL-EID-00175384; Ex. B, 2014 Historic DuPont 10-K at AFFF-MDL-EID-00174637.) Historic DuPont publicly reported that its potential liability in the Ohio MDL was uncertain. (Ex. A, 2013 Historic DuPont 10-K at AFFF-MDL-EID-00175384 (explaining "DuPont believes that it is reasonably possible that it could incur losses related to" PFOA matters, but that "a range of such losses, if any, cannot be reasonably estimated at this time" given uncertainties); Ex. B, 2014 Historic DuPont 10-K at AFFF-MDL-EID-00174637 (same).)

At the time when Houlihan Lokey performed its work, the expected liabilities associated with the Ohio MDL remained uncertain. The first bellwether trial in the Ohio MDL did not occur until after the July 2015 spinoff. (Ex. D, 2015 Historic DuPont 10-K at AFFF-MDL-EID-00175241.) It was not until two years after the Chemours separation, in 2017, that Historic DuPont settled the Ohio MDL litigation. Historic DuPont and Chemours split the cost of that settlement

equally. (Ex. E, 2017 Historic DuPont 10-K at AFFF-MDL-EID-00173837.) And as Plaintiffs acknowledge, the two companies have paid all judgments and settlements associated with that litigation in full. (Mot. at 22.)

### B.    The Separation Agreement Details the Terms of the Spinoff

Historic DuPont and Chemours memorialized the terms of the spinoff in a Separation Agreement dated June 26, 2015. (*See* Ex. F, Separation Agreement.) The Separation Agreement contains several privilege-related provisions. First, Section 7.7 expressly governs privileges related to "legal and other professional services" rendered in connection with the spinoff transaction. (*Id.* § 7.7.) The agreement affords separate treatment to "Pre-Distribution Services," *i.e.*, those rendered before the July 1, 2015 separation, and "Post-Separation Services," *i.e.*, those rendered afterward. (*See id.*) With respect to "Pre-Distribution Services," the Separation Agreement memorializes the companies' understanding that certain services, including legal services, were rendered for the benefit of both Historic DuPont and Chemours. Further, it recognizes that the two companies were joint clients with respect to those services:

> Pre-Distribution Services. The Parties recognize that legal and other professional services that have been and will be provided prior to the Effective Time have been and will be rendered for the collective benefit of each of the members of the DuPont Group and the Chemours Group, and that *each of the members of the DuPont Group and the Chemours Group should be deemed to be the client* with respect to such pre-distribution services for the purposes of asserting all privileges, immunities, or other protections from disclosure which may be asserted under applicable Law, including attorney-client privilege, business strategy privilege, joint defense privilege, common interest privilege, and protection under the work-product doctrine ("Privilege").

(*Id.* § 7.7(a) (emphasis added).) The same provision provides that the two companies are joint holders of the privileges associated with those services:

> *The Parties shall have a shared Privilege* with respect to all Information subject to Privilege ("Privileged Information") which relates to such pre-distribution services. For the avoidance of doubt, Privileged Information within the scope of this Section 7.7 includes, but is not limited to, services rendered by legal counsel retained or

5

> employed by any Party (or any member of such Party's respective Group),
> including outside counsel and in-house counsel.

(*Id.* (emphasis added).) This provision encompasses the legal services of both inside and outside counsel, irrespective of which company retained or employed the counsel. (*Id.* ("[T]he scope of this Section 7.7 includes, but is not limited to, services rendered by legal counsel *retained or employed by any Party* . . . , including outside counsel and in-house counsel." (emphasis added).))

Second, the Separation Agreement reflects Historic DuPont's and Chemours' intent that their exchange of any material "within the attorney-client or attorney work product privileges shall not operate as a waiver of any potentially applicable privilege." (*Id.* § 7.1(c).) To further protect the shared privilege, the Separation Agreement requires both parties to keep privileged information confidential. (*See id.* § 7.7(d).)

In addition, the Separation Agreement prohibits either party from waiving any shared privilege without the written consent of the other. (*Id.* § 7.7(c)(i) ("[N]o Party may waive, nor allege or purport to waive, any Privilege . . . in which the other Party has a shared Privilege . . . .").) The anti-waiver provision has a carveout for litigation and disputes between the parties. The carveout allows either party to use privileged material for purposes of the dispute between them, but explicitly explains that doing so does not waive privilege as to third parties:

> In the event of any litigation or dispute between the Parties, . . . either such Party
> may waive a Privilege in which the other Party . . . has a shared Privilege, without
> obtaining the consent of the other Party; Provided that such waiver of a shared
> Privilege shall be effective only as to the use of Privileged Information with respect
> to the litigation or dispute between the Parties . . . , and *shall not operate as a
> waiver of the shared Privilege with respect to third parties*.

(*Id.* § 7.7(c)(iv) (emphasis added).)

A different set of provisions apply to "Post-Separation Services." The Separation Agreement acknowledges that certain such services "will be rendered solely for the benefit of DuPont or Chemours." (*Id.* § 7.7(b).) Any Post-Separation Services rendered solely for one party

or the other "shall not be deemed to be shared between the Parties," unless the Parties enter into a further agreement to that effect. (*Id.* § 7.7(b)(ii).) On the other hand, Post-Separation Services relating to "claims, proceedings, litigation, disputes, or other matters which involve both DuPont and Chemours shall be subject to a shared Privilege." (*Id.* § 7.7(b)(i).)

Both sets of provisions are relevant here because Plaintiffs challenge communications made before and after the spinoff. As to Pre-Distribution Services from before the spinoff on July 1, 2015, Historic DuPont and Chemours were joint clients of both in-house and outside counsel. (*E.g.*, Ex. G, ███████████████████████████████████████ ███████████████████████████████████).) Regarding Post-Separation Services, Historic DuPont and Chemours were jointly represented by counsel in certain matters, such as pending litigation in which they had a common interest (*e.g.*, the Ohio MDL), just as the Separation Agreement contemplated. (*See* Ex. F, Separation Agreement at § 7.7(b)(i).)

### C. Historic DuPont and Chemours Settle Their Dispute and Set Up an Escrow Account for Future PFAS Judgments or Settlements

Separate from this case, in mid-2019, Chemours brought claims in Delaware Chancery Court (the "Delaware Litigation") concerning the indemnification obligations between Historic DuPont and Chemours in the Separation Agreement. (*See* Pls.' Ex. 35, Del. Litig. Compl.) Chemours did not allege fraud, and the Chancery Court dismissed the case and referred it to arbitration.

In January 2021, Historic DuPont and Chemours settled the related arbitration. As a part of the settlement, the parties established a $4 billion cost-sharing arrangement and escrow account "to be used to support and manage any potential future legacy PFAS liabilities arising out of pre-July 1, 2015 conduct." (Ex. H, Press Release (Jan. 22, 2021); *see also* Ex. I, Memorandum of

Understanding) (detailing the provisions of the escrow account and how it will be funded). These funds are available to satisfy a judgment Plaintiffs may obtain in this MDL.

### D.    Plaintiffs Conducted Extensive Discovery on the Fraudulent Transfer Claims

Although the fraudulent transfer claims are ancillary to the claims at the heart of this MDL, Plaintiffs have conducted extensive discovery about them. To date, Plaintiffs have served 57 fraudulent-transfer-related requests for production on Historic DuPont and 56 requests for production on Chemours. Historic DuPont has produced more than 17,000 documents, totaling over 270,000 pages, related to the fraudulent transfer claims. Chemours has produced over 40,000 documents, totaling over 250,000 pages. This discovery does not include any of the more than 1.4 million documents, totaling more than 7.5 million pages, produced by Historic DuPont and Chemours related to the underlying claims.

At the Court's direction, Defendants' productions include the documents Historic DuPont and Chemours produced to each other in arbitration. On January 24, 2022, Historic DuPont produced its privilege log relating to those arbitration documents, and on February 3, 2022, Historic DuPont produced its privilege log relating to its main production. On January 27, 2022, Chemours produced its privilege log relating to its main production, and on February 7, February 16, and March 3, 2022, Chemours produced on a rolling basis its privilege log relating to the arbitration documents. (*See* Declaration of Margaret Raymond-Flood ("Raymond-Flood Decl.") ¶ 2.) Plaintiffs sent an email to Historic DuPont on February 3 identifying only broad categories of objections to Historic DuPont's log. After Historic DuPont requested that Plaintiffs identify what log entries they intended to challenge so it could address Plaintiffs' concerns, Plaintiffs sent lists of "example privilege log entries" falling into each of Plaintiffs' categories of complaints. (Pls.' Ex. 5, Pls. Email & Attachment (Feb. 7, 2022) (cleaned up); *see also* Pls.' Ex. 8, Pls. Email & Attachment (Feb. 16, 2022).) Chemours received similar emails with broad categories of

objections with exemplar entries relating to its logs on February 8, February 17, February 26, and March 14, 2022. (Raymond-Flood Decl. ¶¶ 3–6.) These lists were by design overinclusive and often misclassified documents among the categories Plaintiffs had established. For example, for the category "Entries that [Defendant] has failed to establish are Attorney Work Product," Plaintiffs listed every single document over which Historic DuPont and Chemours had asserted work product (1,293 documents on Historic DuPont's logs and over 3,000 documents on Chemours' logs). (*See* Pls.' Ex. 6, Historic DuPont Ltr. at 4 (Feb. 8, 2022); Pls.' Ex. 7, Historic DuPont Ltr. at 5–6 (Feb. 11, 2022); Pls.' Ex. 9, Historic DuPont Ltr. at 5–6 (Feb. 25, 2022); Pls.' Ex. 19, Chemours Ltr. at 6–11 (Mar. 3, 2022).) As another example, Plaintiffs challenged 145 entries on Historic DuPont's main log as being communications with third parties that waived privilege, but 19 of the 145 challenged entries listed no third parties. (*See* Pls.' Ex. 9, Historic DuPont Ltr. at 3 (Feb. 25, 2022).) And in another 9 of the challenged log entries, the only third party included was an attorney for Historic DuPont. (*Id.*) Similarly, Plaintiffs challenged numerous entries on Chemours' logs as being communications with third parties waiving privilege, but hundreds of the entries challenged involved Chemours' retained outside counsel, and dozens of additional entries involved only Chemours personnel. (*See* Pls.' Ex. 19, Chemours Ltr. at 4–5 (Mar. 3, 2022).)

Historic DuPont and Chemours sent responses to Plaintiffs providing additional information about their privilege assertions, pointing out Plaintiffs' multiple errors, and producing documents and updated logs where appropriate. The parties engaged in conferrals on March 23, March 28, and April 19, 2022, as well as a conferral related to procedure on May 3. (Roin Decl. ¶ 23; Raymond-Flood Decl. ¶¶ 7–12; Pls.' Ex. 2, Downing Decl. ¶ 36.) During these conferrals, Defendants repeatedly requested that Plaintiffs review the information Defendants provided and

narrow their list to those log entries over which Plaintiffs had remaining concerns so that Defendants could give individualized responses to dozens of entries instead of hundreds or thousands. Plaintiffs refused to provide Defendants with a complete list of the documents they intended to challenge in their motion to compel. (Roin Decl. ¶ 23; Raymond-Flood Decl. ¶¶ 8–9, 11; Pls.' Ex. 2.) Additionally, Plaintiffs refused to identify any log entries *at all* that they claimed should be produced pursuant to the crime-fraud exception.

Because of that, Plaintiffs' motion was the first time Historic DuPont and Chemours saw the complete list of log entries Plaintiffs are challenging. These new lists *still* contain inaccuracies and documents that do not belong in Plaintiffs' categories at all. (*See, e.g.*, *infra* at Section V.) Such issues could have been resolved without the Court's attention if Plaintiffs had provided their final lists in advance of filing this motion.[3] These new lists also include more than 250 Historic DuPont documents and numerous Chemours documents that Plaintiffs never raised during the conferral process. (Ex. J, List of Log Nos. Not Previously Raised by Plaintiffs; Roin Decl. ¶¶ 25–26; Raymond-Flood Decl. ¶ 15.) In addition, Plaintiffs' motion was the very first time Plaintiffs claimed that Historic DuPont and Chemours engaged in "abusive redaction tactics." (*See* Mot. at 27–29.) These shifting and new challenges defeat the purpose of the meet and confer process. With the help of a team of contract reviewers, Historic DuPont and Chemours engaged in a large-scale review of tens of thousands of documents. Historic DuPont and Chemours worked diligently to respond to Plaintiffs' challenges to thousands of privileged documents. To the extent Plaintiffs identified unintentional errors or discrepancies in Historic DuPont's or Chemours's productions

---

[3] Even after receipt of the motion with the updated lists, Historic DuPont and Chemours have reviewed the challenges and intend to supplement their productions in good faith. Plaintiffs' failure to provide these lists prior to filing the motion resulted in unnecessary disputes which could have been narrowed and/or resolved.

for the first time in their motion to compel, Historic DuPont and Chemours will review, and as appropriate, fix those issues. (Ex. K, List of Challenged Log Nos. Historic DuPont Will Correct/Produce; Roin Decl. ¶ 28; Raymond-Flood Decl. at Ex. B.)

## ARGUMENT

## I.   THE   ATTORNEY-CLIENT   PRIVILEGE   PROTECTS   PRE-SPINOFF COMMUNICATIONS AMONG HISTORIC DUPONT, CHEMOURS, AND THEIR LAWYERS

Plaintiffs argue that no communication between Historic DuPont and Chemours is protected by the attorney-client privilege because their "interests in connection with the transaction were adverse." (Mot. at 13.) According to Plaintiffs, 237 documents on Historic DuPont's privilege logs[4] and 77 documents on Chemours's logs are not privileged because of this supposed adversity. (*See* Pls.' Exs. 25, 27.)[5] Plaintiffs do not identify when this supposed "adversity" first arose. Instead, they dwell on the Delaware Litigation, which Chemours filed four years after the July 1, 2015 spinoff and even longer after the communications at issue.

Plaintiffs' argument suffers from at least three critical flaws. *First*, Plaintiffs are wrong that Historic DuPont's and Chemours's pre-spinoff interests were adverse. The two companies agreed to just the opposite in the Separation Agreement, expressly stating that all "Pre-Distribution Services" were protected under a shared privilege. *Second*, Chemours as a subsidiary shared a "common interest" with its parent Historic DuPont. *Third*, Plaintiffs' "adversity" theory is

---

[4] Of the 237 documents Plaintiffs challenge, only 191 were sent or created before the spinoff. The other 46 are dated after July 1, 2015, despite Plaintiffs including them in this category, and are subject to a completely different analysis, which Defendants address below. *See infra* at Section III.

[5] Plaintiffs separate out documents Historic DuPont and Chemours produced to each other in arbitration. (*See* Pls.' Ex. 27.) But the analysis is the same. Historic DuPont and Chemours produced documents to each other in arbitration because they shared a joint privilege as to all documents before July 1, 2015, and a limited set of documents for which they shared a common interest after July 1, 2015. But such a production does not waive their shared privilege as to third parties. (*See* Ex. F, Separation Agreement § 7.7(c)(iv).)

unworkable on its face. Without providing any timeframe, Plaintiffs would have the Court analyze each privileged document and make an individualized determination whether there is some "adversity," or perhaps even some "perceived adversity," lurking half a decade before there was any actual adverse litigation. Plaintiffs do not cite a single case that endorses this approach in a spinoff scenario.

### A.     Historic DuPont and Chemours Shared a Joint Privilege

This Court should first determine whether a joint privilege protects pre-spinoff communications. If so, there must be some evidence of waiver to strip the communications of that privilege. The parties' intentions are the starting point for the joint privilege analysis. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 362–63 (3d Cir. 2007) ("The keys to deciding the scope of a joint representation are the parties' intent and expectations, and so a district court should consider carefully (in addition to the content of the communications themselves) any testimony from the parties and their attorneys on those areas.").

First, there is no doubt what Historic DuPont and Chemours intended—they spelled it out in the Separation Agreement. Delaware courts routinely enforce such contractual provisions establishing ownership of privilege in corporate transactions so as to protect against waiver. *See, e.g.*, *S'holder Representative Servs. LLC v. RSI Holdco LLC*, No. 2018-0517-KSJM, 2019 WL 2290916, at *1 (Del. Ch. May 29, 2019). Section 7.7 of the Separation Agreement states the parties' intent that pre-distribution legal services provided to Historic DuPont and Chemours were "rendered for the[ir] collective benefit . . . ." (Ex. F, Separation Agreement § 7.7(a).) The agreement further states that Historic DuPont and Chemours were both "deemed to be the client" with respect to pre-spinoff legal services and that they "shall have a shared Privilege." (*Id.* ("[T]he Dupont Group and the Chemours Group should be deemed to be the client with respect to such pre-distribution services for the purpose of asserting all privileges . . . .").) This provision sets out

12

the parties' ownership of privilege in connection with the spinoff in order to protect against waiver, and it is exactly the type of provision encouraged and enforced as written by Delaware courts. *See S'holder Representative Servs.*, 2019 WL 2290916, at *1, *3 (parties "should 'use their contractual freedom' to avoid waiver"; for example, by "us[ing] their contractual freedom . . . to exclude from the transferred assets the attorney-client communications they wish to retain as their own" (quoting *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLP*, 80 A.3d 155, 161 (Del. Ch. 2013)). The fact that Historic DuPont and Chemours deemed both entities to be "the client" and treated legal advice as subject to "a shared Privilege," shows that they intended themselves to be joint clients until the spinoff. By comparison, the Separation Agreement contemplates that *after* the spinoff, each company would have the need for legal services "rendered solely for the benefit of [Historic] DuPont or Chemours, as the case may be . . . ." (*Id.* § 7.7(b).) The parties' express distinction between pre- and post-distribution services further confirms their pre-spinoff unity of interest as joint clients and their intention to prevent any waiver vis-à-vis third parties.

Further, Historic DuPont and Chemours's joint privilege for "Pre-Distribution Services" aligns with well-established corporate law principles. Courts have held that communications among parent/subsidiary corporations and their attorneys are generally privileged under the rationale that the two corporations are joint clients. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d at 362–63, 366–67 ("Delaware courts have recognized that parents and their wholly owned subsidiaries have the same interests because the duties owed to the subsidiaries flow back to the parent" and "*the only interest of a wholly owned subsidiary is in serving its parent.* That doing so may not always involve maximizing the subsidiary's economic value is of little concern." (citations omitted) (emphasis added)); *Crabb v. KFC Nat'l Mgmt. Co.*, No. 91-5474, 1992 WL 1321, at *3 (6th Cir. Jan. 6, 1992) (per curiam) ("It is well settled that attorney-client privilege is

not waived merely because the communications involved extend across corporate structures to encompass parent corporations, subsidiary corporations, and affiliated corporations.").

Because their interests are identical, courts generally treat parent corporations and their wholly owned subsidiaries as joint clients. *See, e.g.*, *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) ("A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one."); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146, 1184 (D.S.C. 1974) ("Although an interest of a third party corporation from a commercial standpoint would not establish a sufficient community interest, the fact that the communications are among formally different corporate entities which are under common ownership or control leads this court to treat such inter-related-corporate communications in the same manner as intra-corporate communications."); *Glidden Co. v. Jandernoa*, 173 F.R.D. 459, 472 (W.D. Mich. 1997) ("The universal rule of law, expressed in a variety of contexts, is that the parent and subsidiary share a community of interest, such that the parent (as well as the subsidiary) is the 'client' for purposes of the attorney-client privilege."); *see also* 3 Fletcher Cyc. Corp. § 844.30 ("A wholly owned subsidiary has only one shareholder, the parent corporation, so there is only one interest to be protected and hence no opportunity for divided loyalties.").

These same identity-of-interest principles apply in spinoff situations. The Delaware Supreme Court has held that when a parent corporation announces its intent to spin off a subsidiary, the parent and subsidiary's legal interests remain identical until they complete the spinoff. *See Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1172, 1174 (Del. 1988) (holding that "prior to the date of distribution," *i.e.*, the spinoff, the interests of prospective shareholders in the subsidiary corporation "were insufficient to impose fiduciary obligations on

the parent"). Thus, until July 1, 2015, Historic DuPont and Chemours had identical legal interests and were joint clients.

The consequence of the joint client relationship between Historic DuPont and Chemours is that the communications between the two companies and their attorneys are protected from disclosure to third parties. *See also* Rest. 3d of the Law Governing Lawyers § 75 (2000) ("If two or more persons are jointly represented by the same lawyer in a matter, a communication of either co-client that otherwise qualifies as privileged . . . and relates to matters of common interest is privileged against third persons . . . .").

Recognizing the contractually expressed intent of Historic DuPont and Chemours, the Court should first find that the pre-spinoff communications are presumptively privileged. Absent waiver, that ends the analysis. Plaintiffs offer no evidence that Historic DuPont and/or Chemours have jointly agreed to waive that privilege, as is required under their Separation Agreement. Contrary to Plaintiffs' argument, disclosure of privileged material between joint clients does not waive the privilege as to third parties. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d at 369 ("Recognizing that any other result would wreak havoc on corporate counsel offices, courts almost universally hold that intra-group information sharing does not implicate the disclosure rule. This result is unquestionably correct."). The opposite conclusion would lead to an absurd result— parties could create privileged information but then be prevented from discussing or sharing it amongst themselves. Historic DuPont and Chemours's status as joint clients should alone dispose of Plaintiffs' challenge of pre-spinoff communications between Historic DuPont and Chemours.

### B.    Any Later "Adversity" That Developed Between Historic DuPont and Chemours in 2019 Does Not Destroy Privilege of Pre-Spinoff Documents

Just because Historic DuPont and Chemours became "adverse" in 2019 does not mean that they were "adverse" at the time of the disputed communications. Plaintiffs' entire argument rests

on a temporal sleight of hand regarding the alleged "adversity" between Historic DuPont and Chemours. Plaintiffs' brief draws extensively from allegations that Chemours made in the Delaware Litigation. But Plaintiffs ignore the four-year gap between the July 2015 spinoff and the 2019 Delaware Litigation. Plaintiffs also cannot explain how post spinoff allegations can destroy the privilege over documents created years earlier. In sum, the later "adversity" is of no moment in the privilege analysis.

Whether a communication is privileged depends on the facts at the time it was made—not on subsequent developments. *See, e.g.*, *Varuzza by Zarrillo v. Bulk Materials, Inc.*, 169 F.R.D. 254, 256 (N.D.N.Y. 1996) (whether privilege exists depends on whether "an attorney-client relationship existed at the time of the communication"); *see also, e.g.*, *United States v. Newell*, 315 F.3d 510, 525 (5th Cir. 2002) (common-interest privilege applies if there is a "threat of litigation at the time of the communication"); Rest. 3d of the Law Governing Lawyers § 73 cmt. E (2000) ("[A] person making a privileged communication to a lawyer for an organization *must then be acting* as agent of the principal-organization." (emphasis added)); Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 372 (6th ed., vol. 1, 2017) ("[C]ourts will look to issues of timing to determine at what point in time a joint representation would be deemed to have come into being."). Were the rule otherwise, few parties could count on the protections afforded by privilege, as many privileged communications would lose their protection due to later events like changes in the relationship between relevant parties. That result would be antithetical to the purpose of attorney-client privilege, to encourage free communication of legal advice. *See Upjohn Co. v. United States*, 449 U.S. 383, 389, 393 (1981) (explaining that the purpose of the privilege "is to encourage full and frank communication between attorneys and their clients," and that "if the purpose of the attorney-client privilege is to be served, the attorney and

client must be able to predict with some degree of certainty whether particular discussions will be protected").

Beyond failing to grapple with the fact that the Delaware Litigation arose years after the at-issue communications, Plaintiffs ignore Historic DuPont and Chemours's definitive contemporaneous agreement that their communications were privileged. (*See* Ex. F, Separation Agreement § 10.1 (explaining that the Separation Agreement is the "entire agreement between the Parties with respect to the subject matter hereof and shall supersede all previous negotiations, commitments, course of dealings and writings with respect to such subject matter").) The Separation Agreement expressly forecloses any argument that documents exchanged in the subsequent arbitration between the two companies waived the privilege as to third parties:

> In the event of any litigation or dispute between the Parties, . . . either such Party may waive a Privilege . . . ; Provided that such waiver of a shared Privilege shall be effective only . . . between the Parties . . . , and *shall not operate as a waiver of the shared Privilege with respect to third parties.*

(*Id.* § 7.7(c)(iv) (emphasis added).) This provision is consistent with the default rules governing shared privileges. *See In re Crescent Res., LLC*, 457 B.R. 506, 529–30 (Bankr. W.D. Tex. 2011) (rejecting argument that "if co-client communication is then used in an adversary [proceeding] between the former co-clients, it would then waive the privilege as to third parties," because such a rule "would effectively make the privilege superfluous"); *see also* Epstein, *supra* at 410 (vol. 1) ("After a falling out between parties with a common interest, any privileged communication[] exchanged between them . . . retains its privileged character in respect to litigation with third parties.").

To illustrate, consider a scenario where an employee has privileged communications with ABC Company while employed, leaves ABC Company, and develops interests adverse to her former employer. The privilege that attached at the time of the communications is not nullified by

the fact that employee is no longer employed or now has adverse interests to her former employer. *See* Epstein, *supra* at 223 (vol. 1) (noting that "[w]hatever communications were privileged communications during the course of the former employee's employment should clearly remain privileged" after the employee's termination).

This Court should not indulge Plaintiffs' efforts to use the Delaware Litigation from 2019 to conduct a post-hoc reexamination of whether Historic DuPont and Chemours's communications between 2013 and 2015 are privileged, especially given that doing so would rewrite the terms of the parties' Separation Agreement.

### C.    Plaintiffs' "Adversity" Theory Is Unworkable

Even if the Court were inclined to consider a post-hoc reexamination of the privilege, which is inconsistent with the law, Plaintiffs have not offered the Court any workable way to do so. Plaintiffs do not identify any standard for the Court to determine what constitutes "adversity" between Historic DuPont and Chemours. Assume, for example, that before the spinoff someone designated to work for Chemours wrote a harsh email to someone designated to remain at Historic DuPont. Would such correspondence be enough to determine the corporate entities were then adverse? The Court would first have to know whether those individuals speak for their respective designated companies, and presumably make other findings surrounding the level of adversity more broadly. To make matters worse, the "how, when, what" of such a significant transaction would naturally be the subject of discussion, debate, and even at times disagreement among the executives involved in a spinoff of this magnitude.[6] Under the Plaintiffs' theory, the Court would

---

[6] Nor are Plaintiffs' cherry-picked references to Chemours employees' LinkedIn pages identifying themselves as employees of Chemours prior to July 1, 2015 of any moment. As Plaintiffs allege, Chemours, the wholly-owned subsidiary of Historic DuPont, has existed since 2014. (*See* Dkt. 54 ¶¶ 159–60). It is common for employees who work for subsidiary corporations to identify primarily with the subsidiary entity, but that has no bearing on any purported "adversity" analysis.

have to look at each privileged document and decide whether there is some "adversity," and then decide how much is enough. Without any guideposts, this type of post-hoc analysis would be ripe for error.

For example, Plaintiffs argue that there was adversity in the log entries related to Houlihan Lokey that was conducting a solvency analysis (*see* Mot. at 16), but many of those documents were produced with redactions. And the unredacted portions of the documents show that no such "adversity" existed. (*See* Pls.' Ex 45, Historic DuPont Arbitration Log No. 761 at AFFF-MDL-EID-FT-00141567 (unredacted portion of document showing DuPont and future Chemours employees working together to respond to questions from Houlihan Lokey).)[7] Rather, Historic DuPont and future Chemours employees provided information that Houlihan Lokey had requested. This example demonstrates the complexity of Plaintiffs' proposed post-hoc analysis of the state of adversity between Historic DuPont and Chemours.

## II. THE ATTORNEY-CLIENT PRIVILEGE APPLIES TO COMMUNICATIONS BETWEEN CHEMOURS AND ATTORNEYS FROM THE SKADDEN LAW FIRM

Plaintiffs next take aim at communications between Chemours and Skadden Arps Slate Meagher & Flom LLP, a law firm Historic DuPont retained for legal advice related to the spinoff. According to Plaintiffs, 41 documents on Historic DuPont's privilege log and 80 documents on Chemours's log are not subject to the privilege for this reason. (*See* Pls.' Ex. 26.)

Plaintiffs incorrectly frame the "Skadden Letter" as a repudiation of the joint representation of Historic DuPont and Chemours. First, it is important to recognize that Historic DuPont and Chemours, not Skadden, own their own respective attorney-client privileges. *United States v.*

---

[7] Further complicating Plaintiffs' theory of "adversity," there are no Chemours emails listed on the document to potentially aid the Court in determining whether this supposed adversity existed.

*Farrell*, 921 F.3d 116, 135–36 (4th Cir. 2019) (explaining that attorney-client privilege "belongs to the client, not the lawyer" (citation omitted)). Even if Skadden had wanted to disclaim the privilege it could not. Further, Historic DuPont later signed the Separation Agreement, which "deemed" Historic DuPont and Chemours to be joint clients "for the purpose of asserting all privileges" and that this "shared Privilege" applied, "to[] services rendered by legal counsel retained or employed by any Party . . . including outside counsel and in-house counsel." (Ex. F, Separation Agreement § 7.7(a).) The Separation Agreement therefore transformed any potential separate privilege held by Historic DuPont into a shared privilege, settling this issue. So, despite Plaintiffs' characterization of the Skadden Letter, it does not control whether the clients—Historic DuPont and Chemours—had a privilege and at any point waived it.

Plaintiffs also omit the critical setup for the statements Skadden made in the letter, which frames its prospective nature. At the outset, the letter states



(Pls.' Ex. 42, Skadden Ltr. at 1 (emphasis added).) The Skadden Letter thus makes clear that Skadden represented Historic DuPont in its efforts to spinoff assets from its Performance Chemicals Division, among other assets, to eventually form what would become or what was ▉▉▉▉▉▉▉▉▉▉ Chemours.

Fairly read, the statements that follow about "Chemours" and Skadden's relationship vis-à-vis that entity refer to Chemours *after the separation*—the independent publicly traded company—not Chemours the Historic DuPont subsidiary. After the separation, Chemours did

indeed become distinct from Historic DuPont, and Skadden did not and has not represented Chemours from that point forward. Skadden was careful and told the " ███████████████

████████████████████████████████████████

███████████████  which makes sense because Chemours was going to " ███████████

███████████████  (*Id.* at 1–2.)

Plaintiffs also ignore that Skadden made clear that " ████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████  (*Id.* at 2 (emphasis added).) The Skadden

Letter makes clear its " █████████████████████████████

████████████████████████████████████████

███████████████████████████  after the separation. In sum,

Skadden was being careful to make its representation clear. Plaintiffs read the entire Skadden

Letter, without noting ████████████████████████████████████

████████████████████████████████████████

████████████████  But such a reading is wrong.[8]

## III.    PLAINTIFFS' CHALLENGE TO POST-SPIN COMMUNICATIONS IGNORES THE COMMON INTEREST DOCTRINE THAT PROTECTS CO-DEFENDANTS' COMMUNICATIONS TO AID THEIR DEFENSE

Plaintiffs challenge certain post-spinoff communications between Historic DuPont and

Chemours, arguing that the documents relate to the "financial impact of the transaction on

Chemours" or Defendants' "dispute over Chemours's indemnification obligations." (Mot. at 17–

---

[8]   To the extent the Court seeks further information related to Skadden's pre-spinoff representation of Chemours, Historic DuPont will offer the document corresponding to Arbitration Log No. 912 for *in camera* review.

18.) The documents Plaintiffs challenge from after the spinoff actually relate to the companies' ongoing defense of cases in which they were both named as defendants, like the Ohio MDL and this AFFF MDL. Therefore, the common-interest doctrine protects these communications.

Parties' interests need not be identical in all respects for the common-interest privilege to apply; it is enough that the at-issue communication relates to a common interest. *See, e.g.*, *United States v. McPartlin*, 595 F.2d 1321, 1336 (7th Cir. 1979) ("Ingram argues that the co-defendants' defenses must be in all respects compatible if the joint-defense privilege is to be applicable. The cases do not establish such a limitation, and there is no reason to impose it."); *see also* Epstein, *supra* at 404 (vol. 1) ("When clients have adverse as well as common interests, the question of whether a particular communication is privileged depends on whether it relates to the common or adverse interests."). Because these documents all relate to Historic DuPont and Chemours's common interests in defending cases against them, they remain protected.[9]

For example, Plaintiffs include 16 entries from Historic DuPont's logs that are post-spinoff communications. Upon further review, Historic DuPont will correct redactions for three of these documents. (Ex. K, List of Challenged Log Nos. Historic DuPont Will Correct/Produce.) The remaining 13 reflect, request, or discuss legal advice about potential liabilities or reserves for ongoing litigation, such as the Ohio MDL. *See Hanwha Azdel, Inc. v. C & D Zodiac, Inc.*, 617 F. App'x 227, 243 (4th Cir. 2015) ("The joint defense privilege, an extension of the attorney-client

---

[9] The two cases Plaintiffs rely on are not to the contrary. In each, the parties offered blanket assertions of privilege but "ma[de] no attempt to establish" that "communications were shared among individuals with common legal interests" or "that the act of sharing was part of an ongoing legal enterprise." *Neuberger Berman Real Est. Income Fund, Inc. v. Lola Brown Tr. No. 1B*, 230 F.R.D. 398, 416 (D. Md. 2005); *see Brown-Thomas v. Hynie*, No. 1:18-CV-02191-JMC, 2020 WL 6737757, at *7 (D.S.C. Nov. 17, 2020) (holding that parties—who were not corporations in the first place—were not entitled to privilege where they made no showing of common interest beyond a "scant, general statement" and where the documents at issue arose out of "past, adverse settlement negotiations").

privilege, protects communications between parties who share a common interest in litigation."); *In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129*, 902 F.2d 244, 249 (4th Cir. 1990) ("[T]he need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter."); Rest. 3d of the Law Governing Lawyers § 76 (2000).

Plaintiffs' argument that the Delaware Litigation shows that Historic DuPont and Chemours could not have a common interest with respect to ongoing litigation is misplaced. Historic DuPont and Chemours indisputably have a common interest in cases involving alleged PFAS contamination, such as the Ohio MDL, this MDL, or other individual cases like those alleging natural resources damages in New Jersey. (*See, e.g.*, Mot. at 18 n.72 (flagging concerns about Log No. 3982, which is a document related to pending litigation in New Jersey about the Pompton Lakes natural resource damages ("NRD") directive).)

## IV.    THE CRIME-FRAUD EXCEPTION DOES NOT APPLY TO PRE-SPINOFF COMMUNICATIONS

Plaintiffs seek to compel "[a]ll communications made in furtherance of the Spinoff" on Defendants' privilege logs under the crime-fraud exception. (Mot. at 19; *see* Pls.' Ex. 28.) Throughout the meet-and-confer process, Plaintiffs demanded that Defendants produce such documents but refused to identify even a single entry on Defendants' logs that Plaintiffs believe is subject to the crime-fraud exception. (*See* Pls.' Ex. 3, Pls. Email (Feb. 3, 2022); Pls.' Ex. 5, Pls. Email & Attachment (Feb. 7, 2022); Pls.' Ex. 8, Pls. Email & Attachment (Feb. 16, 2022); Pls.' Ex. 16, Pls. Email & Attachment (Feb. 17, 2022); Pls.' Ex. 18, Pls. Email & Attachment (Feb. 26, 2022); Pls.' Ex. 20, Pls. Email & Attachment (Mar. 14, 2022).) Putting aside Plaintiffs' failure to provide notice about what documents they would challenge on this ground, Plaintiffs' attempt to invoke the crime-fraud exception fails in both form and substance.

Plaintiffs ask this Court to compel production of all privileged documents from two publicly traded companies relating to a multi-billion dollar transaction, without even making the requisite showing to trigger *in camera* review in the first instance. At this stage, Plaintiffs cannot rely only on their allegations that the spinoff was fraudulent, but that is all they cite to. Even if the Court had a basis to conclude that Plaintiffs had made the required showing—which Plaintiffs have not provided—it would still have to conduct an *in camera* review before ordering production under the crime-fraud exception.

Deciding whether the crime-fraud exception applies to privileged documents requires two steps. The challenging party must *first* establish "a factual basis adequate to support a good faith belief by a reasonable person, that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572; *see Chaudry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999) (explaining the challenger "must make a prima facie showing that the privileged communications fall within the exception"). If the challenger makes the requisite showing, the Court may review the documents *in camera* to determine whether the exception applies. *Zolin*, 491 U.S. at 572; *see Johnson v. Ford Motor Co.*, No. 3:13-cv-06529, 2016 WL 1241538, at *12 (S.D. W.Va. Mar. 28, 2016) ("If the requisite showing is made by the invoking party, the court must decide whether to conduct an *in camera* review of the allegedly privileged and protected documents to determine if the exception applies.").

Plaintiffs have failed to make a *prima facie* showing of fraud. The basis for their claim is Chemours's complaint against DuPont in the Court of Chancery. Relying on the allegations of a since settled dispute is not evidence. And Plaintiffs misread that complaint. As two courts in Delaware have since held, Chemours did not allege it was insolvent in the Delaware suit, which sought to enforce indemnification obligations at certain "maximum" estimates used for purposes

of the spin. *In re Chemours Co. Deriv. Litig.*, 2021 WL 5050285, at *18; *In re The Chemours Co. Secs. Litig.*, 2022 WL 610671, at *13 ("Chemours, however, did not admit in the Chancery Court Complaint that it was or had been insolvent.").[10] Chemours has never said it was insolvent following the spin—as confirmed by its 10-Ks—and remains a thriving company.

It is not enough for Plaintiffs simply to assert a fraudulent transfer claim. Contrary to Plaintiffs' suggestion, the crime-fraud exception does not vitiate the attorney-client privilege or work-product doctrine in their entirety in every case in which a plaintiff alleges fraud. *See Clark v. United States*, 289 U.S. 1, 15 (1933) ("It is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud."). The burden lies "on the party invoking the crime-fraud exception." *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997); *see also In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 352 (4th Cir. 1994) ("[T]he party invoking the crime-fraud exception to the privilege bears the initial burden of making a prima facie showing of fraud or crime."). And the crime-fraud exception does not apply in every case in which a plaintiff alleges "fraudulent transfer," as "fraudulent transfer is an umbrella term for a variety of claims, some of which involve fraud in the usual sense and some which do not." *In re: Caesars Entmt. Operating Co., Inc.*, No. 15 B 1145, 2016 WL 7477566, at *3 (Bankr. N.D. Ill. Sept. 21, 2016) ("Even so-called fraudulent transfer claims based on actual as opposed to constructive fraud may not involve fraud, since those claims can be premised on an intent to hinder or delay creditors."). Instead, Plaintiffs must show that (1) Defendants engaged in a "fraudulent scheme when [they] sought the advice of counsel to further the scheme," and (2) the

---

[10] The District of Delaware dismissed the shareholder suit against Chemours reveals the flaws in Plaintiffs' theory. As is relevant here, in dismissing that suit, the district judge explained that "none of [Plaintiff's] allegations plausibly imply that Chemours believed any loss for PFOA and PFAS litigation liabilities beyond any accrued loss would have a material impact on the Chemours's consolidated financial position, results of operation, or cash flows." *In re The Chemours Co. Secs. Litig.*, 2022 WL 610671, at *12.

challenged documents "bear a close relationship to the client's existing or future scheme to commit a crime or fraud." *In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005). Plaintiffs have failed to make a *prima facie* showing of fraud. Accordingly, the Court should decline to review the privileged documents listed in Plaintiffs' Exhibit 28 *in camera*. *See Johnson*, 2016 WL 1241538, at *14 (declining to review withheld documents *in camera* because plaintiffs failed to meet their burden).[11]

Defendants have each produced tens of thousands of documents in response to Plaintiffs' discovery requests, but rather than point to anything in those documents that would make out a case of fraud, Plaintiffs rely on allegations.[12] (*See* Mot. at 19–23.) Indeed, Plaintiffs merely parrot Chemours's allegations in the Delaware Litigation, ignoring that Chemours neither alleged that the spinoff was fraudulent nor that it rendered Chemours insolvent, as two Delaware courts have since recognized. (*See id.* at 21–23 (citing Pls.' Ex. 35, Del. Litig. Compl.) (arguing the Delaware Litigation complaint "sets forth ample facts" evidencing the spinoff was fraudulent).)

But allegations are not facts. *See Clark*, 289 U.S. at 15 ("To drive the privilege away, there must be 'something to give colour to the charge'; there must be 'prima facie evidence that it has some foundation in fact.'"). Even the case law cited by Plaintiffs holds that a party must present evidence, not allegations, to make a *prima facie* case of fraud. *See, e.g.*, *In re: Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 180 F. Supp. 3d 273, 281–83 (S.D.N.Y. 2016) (holding that parties "must demonstrate a factual basis for a showing of probable cause" and relying on both

---

[11] Plaintiffs cite *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 360 (2016), for the proposition that "[f]raudulent transfers fall squarely within the broad definition of 'fraud' to which the crime-fraud exception applies." (Mot. at 19.) That case did not address the crime-fraud exception and says nothing about what a party must do to carry its burden of making a *prima facie* case of fraud.

[12] Plaintiffs cite Exhibit 40, which is letter dated June 4, 2015, from Chemours to Houlihan Lokey regarding Chemours's financial statements and projections but does not identify any aspect of the letter that shows purported fraud. (*See* Mot. at 22 n.83.)

documents and witness testimony to conclude that the party met its burden) (internal quotation mark omitted); *United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986) (relying on witness testimony and concluding that illegality was apparent even under the defendant's version of events); *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 406 (D. Conn. 2007) ("Cendant has produced *evidence* that the Trust and SCIP were formed and operated by Shelton as vehicles for carrying out the fraud." (emphasis added)); *Est. of Page v. Slagh*, No. 1:06-CV-245, 2007 WL 1385957, at *1 (W.D. Mich. May 8, 2007) ("To satisfy its prima facie showing, *the evidence presented* by the [moving party] must be such that 'a prudent person [would] have a reasonable basis to suspect the perpetration of a crime or fraud.'" (emphasis added)).

Public information and documents already produced confirm that the spinoff was anything but the secretive fraudulent scheme Plaintiffs try to make it out to be. Far from being "concealed" (Mot. at 23), Historic DuPont publicly announced the proposed spinoff as early as 2013, included updates in its SEC filings over the two years the company worked to complete the spinoff, and issued a press release when it was completed. (*See* Ex. A, 2013 Historic DuPont 10-K at AFFF-MDL-EID-00175294; Ex. B, 2014 Historic DuPont 10-K at AFFF-MDL-EID-00174574, -174583; Ex. L, Press Release (July 1, 2015); *see also, In re: Fin. Oversight and Mgmt. Bd. for P. R.*, 392 F. Supp. 3d 244, 258 (D.P.R. 2019) (finding that allegation that creation of entity was a fraudulent transfer meant to hinder creditors' security interest "does not present the requisite prima fac[i]e showing of criminal or deceptive activity where, as here, the fiscal plan and legislation disclosed the basic structure, cash flow, and economic effects of the reorganization.").)

Moreover, the only "threatened or pending litigation" that Plaintiffs identify as a "badge of fraud" from the time of the spinoff was the Ohio MDL. (Mot. at 21.) The claims at issue in the AFFF MDL were not filed until years later, against a drastically different landscape than the PFAS-

27

related litigation that existed before the spinoff in 2015. (*Compare* Ex. B, 2014 Historic DuPont 10-K at AFFF-MDL-EID-00174636–37, *with* Ex. M, 2021 Historic DuPont 10-K at 27–29.) As Historic DuPont disclosed in its SEC filings, the value of any potential losses from the Ohio MDL and any future liabilities were uncertain before and at the time of the spinoff. (*See* Ex. A, 2013 Historic DuPont 10-K at AFFF-MDL-EID-00175384; Ex. B, 2014 Historic DuPont 10-K at AFFF-MDL-EID-00174637.) That uncertainty is why Historic DuPont's outside counsel Skadden hired financial professionals like Deloitte to estimate both known and unknown litigation contingencies for the transaction. (*See* Ex. C, Deloitte Contingent Liabilities Rpt.) Those valuations were part of the information Houlihan Lokey considered in connection with its Solvency Analysis. (*See* Pls.' Ex. 40, Houlihan Lokey Certificate; Ex. N, Houlihan Lokey Solvency Analysis.) Historic DuPont produced these valuations to Plaintiffs.

Plaintiffs do at least acknowledge that both Chemours and Historic DuPont fully paid the judgments and settlements from the Ohio MDL after the spinoff was completed. (*See* Mot. at 22.) The spinoff was thus unlike the cases cited by Plaintiffs, which included efforts to avoid judgments. *See Est. of Page*, 2007 WL 1385957, at *1 (alleged fraudulent transfers conducted by individuals "to avoid the monetary obligations of a civil judgment in Michigan state court resulting from the fatal [car] accident"); *Martin v. McEvoy*, No. 34254-1-I, 1996 WL 335996, at *1 (Wash. Ct. App. June 17, 1996) (alleged fraudulent transfers conducted by individual after a decision but before the court entered "a judgment for approximately $600,000"). Notably, Historic DuPont has never used the separation of Chemours to attempt to be dismissed from this litigation or any other involving PFAS. Both Historic DuPont and Chemours remain as Defendants in this MDL and remain solvent.

Plaintiffs recognize that they must prove that Chemours was "insolvent at the time of the transfer," but fall short of even claiming that Chemours was insolvent at the time of the spinoff. (Mot. at 22.) For good reason. Chemours's SEC filings since the spinoff confirm that it was and remains solvent.[13] (*See, e.g.*, Ex. O, 2021 Chemours 10-K at F-7 (reflecting book equity of over $1 billon); Ex. P, S&P Capital IQ Rpt. (reflecting Chemours' market value of over $6 billion as of May 3, 2022).)

Also, far from attempting to avoid paying future judgments related to PFAS, in 2021, Historic DuPont and Chemours set up and funded a $4 billion cost-sharing arrangement and escrow account to support and manage potential legacy PFAS liabilities (Ex. H, Press Release (Jan. 22, 2021); *see also* Ex. I, Memorandum of Understanding). Plaintiffs' alleged fear of securing a judgment and then not being able to collect—which is the only basis for asserting fraudulent transfer claims—is groundless.

Finally, Plaintiffs cite Defendants' logs themselves as if they demonstrate some indicia of fraud, but that is flat wrong. As Plaintiffs recognize, the logs show that Defendants unsurprisingly sought legal advice about various aspects of the spinoff, including "Chemours capital structure," "reserve estimates," "due diligence," and "agreement provisions." (Mot. at 21 n.77.) "Companies operating in today's legal and regulatory environments routinely seek legal advice about how to handle all sorts of matters," including transactions. *In re Sealed Case*, 107 F.3d at 50 (evidence that meeting "participants discussed campaign finance laws" was insufficient to "infer from the meeting that the Company was consulting its general counsel with the intention of committing a

---

[13] The facts of this case are thus distinguishable from *In re: MTBE*, where the court found that the "restructuring was a fraudulent scheme to deprive creditors of GPMI's profitable assets," where "GPMI was insolvent after the asset transfer," and "[t]he record was replete with facts that indicate the profitable assets of GPMI were stripped and then GPMI was sold for the express purpose of taking it into bankruptcy." 180 F. Supp. 3d 283.

crime"). "There is nothing necessarily suspicious" or nefarious about Historic DuPont and Chemours getting legal advice regarding a multi-billion-dollar transaction. *Id.* If anything, it would be suspicious if they had not sought legal advice about such a transaction.

Even if Plaintiffs had made the required *prima facie* showing—and they have not—the most that would get them is *in-camera* review. None of the cases Plaintiffs cite suggest that the Court may order production of documents under the crime-fraud exception without such a review—in most of them, the court conducted an *in camera* review.[14] *See In re: MTBE*, 180 F. Supp. 3d at 273, 276 (court conducted *in camera* review); *Est. of Page*, 2007 WL 1385957, at *2 (same); *Martin*, 1996 WL 335996, at *2 (same); *In re Warner*, 87 B.R. 199, 203 (Bankr. M.D. Fla. 1988) (same). Plaintiffs' other cases involved categorically different circumstances than those here, in which there was no document for the court to review *in camera* (and thus no need for an evidentiary threshold to justify *in camera* review). *See Ballard*, 779 F.2d at 287, 292–93 (analyzing whether district court erred in permitting defendant's former lawyer to testify as to privileged conversations at criminal trial); *Cendant*, 246 F.R.D. at 401, 407 (evaluating whether to permit the deposition of counsel); *In re Vereen*, No. 96-78369-W, 1999 WL 33485642, at *2 (Bankr. D.S.C. Sept. 7, 1999) (same); *In re Andrews*, 186 B.R. 219, 220–21 (Bankr. E.D. Va. 1995) (same).

## V.     PLAINTIFFS' REMAINING CATEGORY-BASED CHALLENGES LACK MERIT

Plaintiffs next attempt to compel the production of several categories of documents from Historic DuPont's and Chemours's privilege logs. Plaintiffs largely miscategorize the at-issue

---

[14] *In re Grand Jury* does not apply here. There, the Fourth Circuit explained that *Zolin*'s threshold requirement to trigger *in camera* review does not apply to situations like grand jury proceedings "in which a judge examines evidence from the opponent of the privilege, usually the government, *ex parte* and *in camera* without examining the allegedly privileged documents themselves." *In re Grand Jury*, 401 F.3d at 247, 253. Unlike in this MDL, in such cases, the district court can determine whether the crime-fraud exception applies by either "examin[ing] allegedly privileged documents (or summaries thereof) *in camera*" or other evidence, "such as through testimony or a reliable government professor." *Id.* at 255.

documents, making it difficult for Defendants to respond in a logical fashion. Adding to this complication, Plaintiffs also challenge individual documents that relate to only one Defendant and then try to extend their argument to the other Defendant. Plaintiffs' attempt to compel production of entire categories of hundreds of documents by extrapolating arguments about a handful of cherry-picked examples lacks merit and is improper.

### A.    The At-Issue Communications with Historic DuPont's Advisors Are Protected by the Attorney-Client Privilege, the Work-Product Doctrine, or Both

Plaintiffs argue that Historic DuPont's and Chemours's communications with certain third-party professionals are not privileged.[15] Plaintiffs' "one size fits all" argument overlooks that these professionals were working on behalf of either Historic DuPont's lawyers to facilitate the provision of legal advice regarding the spinoff or Historic DuPont or Chemours after the spinoff on other legal matters, such as potential litigation, ongoing litigation, or settlement.

Plaintiffs challenge 32 entries on Historic DuPont's privilege logs and 177 entries on Chemours's privilege logs on this ground. (*See* Pls.' Ex. 29.) In addition, Plaintiffs' Exhibit 30 lists 13 third parties from Historic DuPont's logs and 100 third parties from Chemours's logs, apparently in an attempt to persuade the Court to issue a blanket ruling that every communication involving one of the third parties is not privileged. For the reasons described below, these documents are subject to the attorney-client privilege, the work-product doctrine, or both.

The attorney-client privilege "applies to any communication that" is "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing

---

[15] Plaintiffs challenge several entries on this ground that either were not sent to any third parties (Historic DuPont AFFF Log Nos. 1983 and 2073) or were only sent to outside counsel (Historic DuPont Arbitration Log Nos. 563 and 1463). The Court should deny the motion as to these documents, which Plaintiffs mischaracterize as going to non-attorney third parties.

Plaintiffs also specifically call out communications with the law firm of Wachtell, Lipton, Rosen & Katz (*see* Pls.' Ex. 30), but do not explain how these attorney-client communications are not privileged.

legal assistance for the client." *In re Teleglobe Commc'ns Corp.*, 493 F.3d at 359. "'Privileged persons' include . . . any of [the] agents that help facilitate attorney-client communications or the legal representation." *Id.* "[T]he test boils down to whether obtaining or providing legal advice was one of the significant purposes of the attorney-client communication." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014). The privilege, therefore, extends to communications that are "incident to a request for or the rendition of legal advice." *In re Infinity Bus. Grp., Inc.*, 530 B.R. 316, 326 (Bankr. D.S.C. 2015) (quoting *Duplan*, 397 F. Supp. at 1165 (D.S.C. 1974)); *see also In re New York Renu With Moistureloc Prod. Liab. Litig.*, No. 766,000/2007, 2009 WL 2842745, at *8 (D.S.C. July 6, 2009) (applying New York law rejecting a "cramped view of attorney-client privilege" that "denies that an attorney can have any role in fact-gathering incident to the rendition of legal advice and services").

Attorney work product that "contains an attorney's 'mental impressions, conclusions, opinions or legal theories . . . concerning the litigation'" is "'absolutely immune from discovery' whether it was 'actually prepared by the attorney or another representative of the party.'" *In re Allen*, 106 F.3d 582, 607 (4th Cir. 1997) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.*, 967 F.2d 980 (4th Cir. 1992).) This includes any documents that "tend[] to reveal the attorney's mental processes." *In re Grand Jury Subpoena*, 870 F.3d 312, 317 (4th Cir. 2017) (quoting *Hickman v. Taylor*, 329 U.S. 495 (1947)). The work-product doctrine attaches to documents created "in anticipation of litigation." *In re Allen,* 106 F.3d at 607. In evaluating claims of work-product protection, it does not matter who created the document at issue; what matters is whether the document contains work product. *United States v. Deloitte LLP*, 610 F.3d 129, 136 (D.C. Cir. 2010) ("[T]he question is not who created the document or how they are related

to the party asserting work-product protection, but whether the document contains work product . . . .").

Courts routinely protect attorney work product even when used by non-attorneys for nonlitigation purposes. Among other contexts, courts have held that the work-product doctrine protects attorneys' assessments of litigation even when used for nonlegal purposes such as calculating accounting reserves. *See, e.g.*, *Frank Betz Assocs., Inc. v. Jim Walter Homes, Inc.*, 226 F.R.D. 533, 534–35 (D.S.C. 2005) (protecting work product used for calculating litigation reserves); *JPMorgan Chase & Co. v. Am. Century Cos.*, No. 6875-VCN, 2013 WL 1668393, at *3 (Del. Ch. Apr. 18, 2013) (same). Disclosure of work-product protected material to third parties for accounting or other purposes does not result in waiver of the protection, so long as the disclosure does not cause the material to fall into an adversary's hands. *See, e.g.*, *In re Pfizer Inc. Sec. Litig.*, No. 90 Civ. 1260 (SS), 1993 WL 561125, at *6 (S.D.N.Y. Dec. 23, 1993) ("The work product privilege is not automatically waived by any disclosure to third persons . . . . Rather, the courts generally find a waiver of the work product privilege only if the disclosure substantially increases the opportunity for potential adversaries to obtain the information." (cleaned up)); *see also* Epstein, *supra* at 1286 (vol. 2) ("[O]nly disclosures that are inconsistent with the adversary system are deemed to waive work-product protection." (cleaned up)).

### 1. The work-product doctrine protects the at-issue communications with Historic DuPont's advisors

The documents in this category are protected by the attorney work-product doctrine because they reflect attorneys' assessments of ongoing or anticipated litigation. Because Historic DuPont's decision to share this information with its advisors did not risk it falling into the hands of Historic DuPont's litigation adversaries, the mere fact that the advisors received them does not strip the documents of work-product protection.

Five entries on Plaintiffs' Exhibit 29 include litigation assessments prepared by Historic DuPont's attorneys that were later shared with third parties such as PricewaterhouseCoopers, Ernst & Young, and KPMG for accounting purposes. (Pls.' Ex. 29, Historic DuPont Arbitration Log Nos. 924, 1061, 1075, 2264, 3808.) These include calculations of reserves, indemnity accruals, and a letter regarding ongoing litigation prepared by Historic DuPont's lawyers for use by Historic DuPont's auditors. Because these litigation assessments contain the mental impressions of Historic DuPont's lawyers, they are subject to work-product protection. The fact that Historic DuPont shared these documents with its accountants does not strip them of work-product protection. *See, e.g.*, *Deloitte*, 610 F.3d at 140 (disclosure to third-party auditor did not constitute waiver).

Another five entries on Plaintiffs' Exhibit 29 are documents containing work product from Historic DuPont's in-house and outside lawyers related to a potential dispute with Chemours in late 2015. (*See* Pls.' Ex. 10, Historic DuPont AFFF Log Nos. 2130, 2287, 2291, 2308, 2332.) Historic DuPont shared these documents with Alix Partners and Goldman Sachs, professionals who provided financial expertise to assist the lawyers in evaluating the potential dispute and a potential resolution. These documents are accordingly subject to work-product protection.

Lastly, one additional entry from this category includes Historic DuPont's attorneys' mental impressions of ongoing PFOA-related litigation and settlement with a public relations consultant. (*See* Pls.' Ex. 10, Historic DuPont AFFF Log No. 2834.) A party does not waive "an otherwise valid assertion of work-product protection" merely by "provid[ing] the work-product to a public relations consultant whom he has hired and who maintains the attorney's work-product in confidence." *See Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000); *see also Stardock Sys., Inc. v. Reiche*, No. 4:17-CV-07025-SBA (KAW), 2018 WL 6259536, at *6 (N.D. Cal. Nov. 30, 2018) (holding that defendants did not waive protection by "shar[ing]

otherwise valid work product" to public relations firm where "communications would not have been created in substantially similar form but for the prospect of litigation" and where "the litigation purpose so permeates any [public relations] purpose of these communications . . . that the two purposes cannot be discretely separated").

### 2. The attorney-client privilege also protects the at-issue communications with Historic DuPont's advisors

Five entries on Plaintiffs' Exhibit 30 from Historic DuPont's privilege logs correspond to communications among Historic DuPont employees, their in-house and/or outside counsel, and individuals from Alix Partners. (Pls.' Ex. 10, Historic DuPont AFFF Log Nos. 2130, 2287, 2291, 2308, 2332.) These five documents are privileged. Historic DuPont's General Counsel retained Alix Partners to assist Historic DuPont and its counsel in responding to potential litigation and possible settlement with Chemours after the spinoff. (*See* Pls.' Ex. 51, Alix Partners Agreement.) Specifically, in late 2015 and the beginning of 2016, a small number of professionals at Alix Partners assisted Historic DuPont's General Counsel and outside counsel at Skadden and Jones Day in responding to correspondence from Chemours that raised the possibility of a dispute between the companies. Communications with agents like these are protected because they were for the purpose of "facilitat[ing] attorney-client communications or the legal representation." *In re Teleglobe Commc'ns Corp.*, 493 F.3d at 359.

The same is true of the six communications that involve individuals from Goldman Sachs, who worked with Alix Partners to facilitate the legal representation of Historic DuPont in this limited situation. (Pls.' Ex. 10, Historic DuPont AFFF Log Nos. 1984, 2002, 2013, 2020, 2023; Pls.' Ex. 12, Historic DuPont Arbitration Log Nos. 3218.)

Four other entries correspond to communications with individuals from Deloitte who were hired by Historic DuPont's outside counsel, Skadden, to assist in the valuation of Historic

DuPont's litigation liabilities in preparation for the separation of its Performance Chemicals business. (Pls.' Ex. 10, Historic DuPont Arbitration Log Nos. 4, 380, 381, 388.) *See Frank Betz Assocs.*, 226 F.R.D. at 534–35 (explaining that litigation reserve numbers "recorded on the defendant's financial statements and disclosed to its outside accountants" are protected).

### 3.     Chemours's log entries on Exhibit 29 are privileged

As to Chemours, many of the entries challenged involved in-house or outside counsel only, and as to those actually involving third parties, many of the challenged log entries include Chemours's in-house or outside counsel with third parties acting as agent in the facilitation of legal advice and/or services, or in consideration of legal issues. For example, certain communications involving in-house counsel and third parties such as Marsh concern the provision of certain types of insurance and are appropriately privileged. (Pls.' Ex. 23, Chemours Arbitration Log No. 5801.) Likewise, KPMG appears on certain log entries where, as with Historic DuPont's log, that entity was involved for calculation of litigation reserves and/or accruals. (*See, e.g.*, Pls.' Ex. 22, Chemours AFFF Log Nos. 71, 101, 103.) Similarly, third-party PwC works with in-house counsel at Chemours in the preparation of audit materials and in this capacity, PwC assisted and acted with counsel and therefore such communications are appropriately privileged. And another third party worked directly with Chemours's in-house legal counsel relating to preparation of certain disclosures. (*Id*. at AFFF Log No. 14861.)

Other exemplars were included in Plaintiffs' challenges on the basis that they purportedly involved third party state personnel and/or Plaintiffs' counsel. However, as Chemours has previously advised Plaintiffs, all such log entries are enclosures to privileged communications between Chemours and its in-house or outside counsel relating to ongoing litigation and therefore are privileged attorney client communications and work product. By way of example only, this

includes the following challenged log entries: *Id.* at Chemours Arbitration Log Nos. 3099, 11312, 11314, 11318, 11332, 11548, 12535, 12546, 13622, 13877, 13899, 13901, 16243, 22696.

Finally, while Plaintiffs seemingly seek a blanket ruling as to all of the third parties it identifies (over 100 as to Chemours alone), each of these entities has a different role and relationship with Chemours and the context of each situation is individualized and cannot be appropriately described within the confines of these papers. To the extent the Court is inclined to rule that any privileged communications involving any third parties should be produced, Chemours respectfully requests an opportunity to supplement this briefing with a further submission addressing each third party implicated in Plaintiffs' submission in order to provide the Court with a full record on this issue prior to any determination.

### B.    Defendants Have Not Engaged in Abusive Redaction Tactics

There is no merit to Plaintiffs' contention that Defendants have engaged in "abusive redaction tactics." Plaintiffs never raised this issue with Defendants prior to filing their motion. (Roin Decl. ¶ 24.) Plaintiffs' failure to abide by Local Civ. Rule 7.02 (D.S.C.) is reason enough to deny this part of Plaintiffs' motion. But even if the Court is inclined to excuse Plaintiffs' failure to confer, Plaintiffs' argument fails on the merits.

As to Historic DuPont, Plaintiffs list 19 documents on Exhibit 31 that they claim qualify as "abusive redaction tactics." Plaintiffs do not describe a single example to the Court to explain how those documents were improperly redacted. Contrary to Plaintiffs' arguments, the portions of the documents that Historic DuPont produced show that the redactions are proper. For example, one document Plaintiffs complain about has no redactions at all. (*See* Pls.' Ex. 12, Historic DuPont Arbitration Log No. 3753.) In other instances, it is clear from the face of the unredacted portions of the document that the redacted portions contain privileged matter. (*See, e.g.*, Ex. Q, Listed as Historic DuPont Arbitration Log No. 385 (redacting only email in chain that went to large number

of DuPont's inside and outside counsel and no third parties); Ex. R, Listed as Historic DuPont Arbitration Log No. 3795 (redacting internal Historic DuPont email sent to inside counsel seeking advice on press inquiry); Ex. S, Listed as Historic DuPont AFFF Log No. 251 (outside counsel presentation to the board marked privileged on first page).)

Plaintiffs' complaint as to Chemours also lacks merit. The Chemours documents Plaintiffs included in Exhibit 31 show that contrary to Plaintiffs' arguments, Chemours's redactions are appropriate. By way of example, Chemours Log No. 174 from its AFFF Log (Plaintiffs' Exhibit 22) was produced in a redacted form, with only the top email in the chain redacted. The redacted portion of the document identifies an issue to be reviewed by Chemours' in-house counsel, David Shelton, Esq. and Kenneth Jones, Esq. That is all made clear on the log entry provided. Similarly, Log No. 360 from the same Chemours log appropriately redacts one email in a thread and the redacted portion of the email clearly includes advice from "legal." Also, Log No. 2037 from the same Chemours log redacts one email in a thread that was sent to Chemours in-house counsel David Shelton, Esq. and that includes an update to counsel about an issue with which counsel was involved. These few exemplars show that there is serious question about the scope of the documents Plaintiffs included in this category and further demonstrate that Chemours has taken care to narrowly tailor its redactions. When Plaintiffs raised issues with Chemours, Chemours has considered those issues in good faith and will continue to do so to comply with all discovery obligations. Accordingly, Plaintiffs' kitchen sink approach should be rejected because their allegation of "abusive redaction tactics" is simply incorrect.

### C. Defendants Have Properly Withheld Communications Between Their In-House Counsel and Employees Concerning Legal Advice

Plaintiffs seek to compel 59 documents from Historic DuPont's privilege logs and 56 from Chemours's privilege logs that Plaintiffs argue do not "seek or convey legal advice" because they

include or are addressed to "numerous non-attorney recipients" and merely copy in-house counsel. (Mot. at 30–31; *see* Pls.' Ex. 32.) Historic DuPont and Chemours did not withhold these documents as privileged simply because an attorney was in the "cc" line—they withheld these documents because they do indeed contain or relate to legal advice or a request for it.

"Corporations may communicate privileged information at various levels without waiving the attorney-client privilege." *Santrade, Ltd. v. Gen. Elec. Co.*, 150 F.R.D. 539, 545 (E.D.N.C. 1993); *see In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18mb2836, 2020 WL 1593544, at *4 (E.D. Va. Feb. 6, 2020) ("The fact that this information was conveyed to a relatively small group of non-lawyers acting for the company does not render it non-privileged."). "A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds." *Santrade*, 150 F.R.D. at 545. And "the fact that a corporate attorney is copied on an email, rather than appearing as a direct recipient, is not fatal to a claim of privilege." *Hepburn v. Workplace Benefits, LLC*, No. 5:13-CV-00441-BO, 2014 WL 12623294, at *4 (E.D.N.C. Apr. 18, 2014). "The ultimate question is not how the email is addressed but whether the substance of the communication involves receiving or acting upon legal advice, or otherwise providing information necessary to securing legal advice." *Id.*

### 1. Historic DuPont's log entries in Exhibit 32 are privileged

As is apparent from Historic DuPont's logs, the communications listed in Plaintiffs' Exhibit 32 all involved in-house counsel and other paralegals or legal assistants in Historic DuPont's legal department and primarily relate to legal advice. Historic DuPont's logs describe these emails as "discussing" or "reflecting" legal advice on specific matters. (*See, e.g.*, Pls.' Ex. 10, Historic DuPont AFFF Log No. 2270; Pls.' Ex. 12, Historic DuPont Arbitration Log No. 166.) For example, AFFF Log No. 2270 is described as an email sent to several internal Historic DuPont employees—including an in-house attorney James Allie—with the subject line "FW: Attorney-

Client Privilege." It was described as Attorney Client Privileged/Work Product because it is an email to counsel requesting legal advice regarding agreement negotiations. Similarly, Arbitration Log No. 166 is an email from Sheryl Telford, formerly a member of Historic DuPont's corporate remediation group, that she sent to six in-house attorneys and one non-attorney employee. The log notes that it reflects legal advice regarding "capital structure presentation." In both cases, the face of the log shows that the communications went to attorneys, in some cases several, and reflected legal advice.

Plaintiffs also specifically cite Arbitration Log Nos. 1924 and 1926 as entries that Historic DuPont improperly claimed as privileged. (Mot. at 31 n.115.) These two entries include two lawyers, a paralegal, a legal assistant, and a person from legal operations and are described in the log as "reflecting or discussing legal advice of counsel regarding a personal injury case list." (*See* Pls.' Ex. 12, Historic DuPont Arbitration Log at 137.) Plaintiffs' assertion that the document is a "list of PFOA cases assigned to Chemours pursuant to the Spin" is inaccurate. (Mot. at 30–31.) And even if that were true, the documents are privileged if they reflect or discuss the legal advice of counsel, which these do. In sum, Plaintiffs have no credible basis to challenge Historic DuPont's privilege claims over these documents given that the log descriptions show that the communications were circulated among lawyers and that the logs explain that the documents reflect or discuss legal advice.

### 2.     Chemours's log entries in Exhibit 32 are privileged

Plaintiffs similarly challenge documents listed on Chemours's privilege logs that, on their face, are privileged because they involve attorneys, reflect discussions with in-house or outside counsel, or request legal advice from counsel. Listed on Plaintiff's Exhibit 32 are documents that are undeniably privileged. For instance, Chemours's general production privilege Log No. 759 was produced redacting a discussion involving David Shelton, Esq. about litigation specific issues.

Log No. 1476 from the same log includes a specific question to attorney Nigel Pond, and Log. No. 2002 reflects a specific discussion among Chemours employees with in-house counsel David Shelton, Esq. Chemours's arbitration Log No. 4786 was produced in a redacted form regarding an update about regulatory issues and involving Chemours's in-house counsel David Shelton, Esq. and Kristine Wellman, Esq., who were clearly identified on Chemours' privilege log. Plaintiffs also specifically cite certain documents on the basis that they are addressed to non-attorneys. As is clear from the log descriptions, however, these documents are privileged. For example, arbitration Log No. 21538 discusses a specific conversation with in-house attorneys Brian Morrissey, Esq. and David Shelton, Esq. relating to a draft, and arbitration Log No. 21681 discusses specific legal concerns, with Chemours counsel Brian Morrissey, Esq. copied on the document and referenced on the log.

## D. Defendants' Privilege Logs Adequately Substantiate Their Privilege and Work Product Claims

Plaintiffs challenge 67 Historic DuPont documents and 28 Chemours documents, claiming that Defendants must identify a specific attorney's name for every document withheld as privileged. (*See* Pls.' Ex. 33.) Plaintiffs challenge another 22 Historic DuPont documents and 47 Chemours documents, claiming that Defendants must identify a specific litigation and the attorney whose work product is reflected for each document subject to work-product protection. (*See* Pls.' Ex. 34.) Plaintiffs are wrong about what the rules require and, in fact, did not provide this type of information on their own logs. Historic DuPont's and Chemours's logs demonstrate that these documents were appropriately withheld.

### 1. Defendants need not identify a specific lawyer or litigation for each entry to claim attorney-client privilege or work-product protection

Defendants' privilege logs need not list the individual name of an attorney whose legal advice is sought or reflected in the document underlying each log entry. Federal Rule of Civil

Procedure 26(b)(5) only requires that a party withholding information as privileged "describe the nature of the documents" in a manner that "will enable other parties to assess the claim." Plaintiffs' argument that Rule 26 requires parties to identify a specific attorney for each entry defies logic and does not comport with the case law. *See Ball v. USAA Life Ins. Co.*, No. 2:16-cv-00041-DCN, 2016 WL 11513321, at *4 (D.S.C. May 16, 2016) (finding emails were "protected by the attorney-client privilege" even though defendant did not "identify the specific attorney to which the [email] request was sent"); *see also Md. Restorative Just. Initiative v. Hogan*, No. 16-01021-ELH, 2018 WL 5295825, at *4 (D. Md. Oct. 25, 2018) ("failure to include a document's author or receiver is not *per se* insufficient" so long as enough information is provided "to determine whether a claimed privilege can be sustained"). Applying Plaintiffs' argument to other contexts reveals its flaws. For example, a communication can be privileged even if not sent by or to an attorney. *See Santrade*, 150 F.R.D. at 544; *Hepburn*, 2014 WL 12623294, at *4.

In addition, the Advisory Committee notes to Rule 26 explain that describing privileged documents by categories can be sufficient, especially when more detailed descriptions would be unduly burdensome due to the volume of the production. *See* Adv. Comm. Notes to Fed. R. Civ. P. 26 ("Details concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected, particularly if the items can be described by categories."). "Regardless of how the privilege log is designed," courts are primarily concerned with determining whether the description of "the nature of the withheld documents" is sufficient to establish their content is privileged. *Johnson*, 2016 WL 1241538, at *7.

Consistent with Rule 26 and that guidance, Plaintiffs' *own privilege logs* do not provide that level of detail they demand of Defendants. (*See, e.g.*, Ex. T, City of Ayer Privilege Log

No. 584 (Dec. 28, 2021) (

); Ex. U, City of Sioux Falls Privilege Log No. 136 (Feb. 1, 2022)

(

).)

None of the cases cited by Plaintiffs support their argument that Historic DuPont needed to provide more information on its logs than it did. (*See* Mot. at 31–32.) Plaintiffs rely on *Companion Prop. & Cas. Ins. Co. v. U.S. Bank Nat'l Ass'n*, No. 3:15-cv-01300-JMC, 2016 WL 6539344 (D.S.C. Nov. 3, 2016), in arguing that Defendants were required to identify "an attorney whose legal advice was sought or reflected" for each withheld document. (Mot. at 31.) But Historic DuPont did far more than the plaintiff in *Companion Property*, who "submitted a categorical privilege log" with sixty-five entries that grouped withheld documents by category, rather than a document-by-document log. 2016 WL 6539344, at *1, *3 (noting that the entry for one category "holds 646 documents, spans three years, and names no less than 72 different people"). Thus, the court found "that Plaintiff's log d[id] not allow Defendant or the court to test the applicability of the attorney-client privilege and/or work product protection as to each document sought to be withheld" and ordered the plaintiff to provide "a metadata log for all documents withheld or redacted" before a certain date, among other information. *Id.* at *3.

Rule 26 likewise does not require Defendants to identify "the attorney whose work product is allegedly reflected." (Mot. at 33.) *See* Adv. Comm. Notes to Fed. R. Civ. P. 26; *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. of Mont.*, 408 F.3d 1142, 1148 (9th Cir. 2005) ("[T]he nature of [what Rule 26 requires] is explicitly left indeterminate. . . . [W]hile details may be appropriate under some circumstances, there are circumstances in which they would be unduly burdensome."). In arguing otherwise, Plaintiffs rely on *Earhart v. Elder*, No. 5:18-CV-01000,

2019 WL 455221 (S.D. W.Va. Feb. 5, 2019), a case that says nothing about whether specific attorneys must be named. The *Earhart* court merely held that a party must offer "more than a cursory assertion" that documents were "prepared in anticipation of litigation," with "no indication" of why the work-product doctrine applied. *Id.* at *8.

Nor should Defendants be required to identify "the litigation in anticipation of which the documents were allegedly prepared" for each work product entry on their logs. (Mot. at 33.) Rule 26 does not "attempt to define for each case what information must be provided when a party asserts a claim of privilege or work product protection." Adv. Comm. Notes to Fed. R. Civ. P. 26. "[D]ocuments prepared by an attorney in anticipation of litigation" are protected by the work-product doctrine if "the primary motivating purpose behind the creation of the document must have been to assist in pending or probable future litigation." *Johnson*, 2016 WL 1241538, at *8. The details necessary to assess the work product claim, such as the litigation to which the work product relates, "may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected." *Id.*; *Wagafe v. Trump*, 334 F.R.D. 619, 623 (W.D. Wash. 2020) ("Given the volume of documents at issue in this case, the Government cannot be expected to provide an individual explanation for every page containing a redaction or assertion of privilege."). Finally, similarly to Plaintiffs' failure to provide the information they now demand related to attorney-client privilege, Plaintiffs do not include this level of detail on their own privilege logs related to claims of work product protection either. (*See, e.g.*, Ex. T, City of Ayer Privilege Log No. 584 (Dec. 28, 2021) (███████████████████ ██████████████████████████████████); Ex. U, City of Sioux Falls Privilege Log No. 136 (Feb. 1, 2022) (███████████████████████████████████ █████████████████████████████████).)

### 2.    Historic DuPont's log entries in Exhibit 33 are protected by attorney-client privilege

The Historic DuPont documents identified in Plaintiffs' Exhibit 33 are privileged, and Historic DuPont has provided sufficient information in its logs to convey as much. (*See* Pls.' Ex. 6, Historic DuPont Ltr. at 3 (Feb. 8, 2022); Pls.' Ex. 7, Historic DuPont Ltr. at 4–5 (Feb. 11, 2022); Pls.' Ex. 9, Historic DuPont Ltr. at 4–5 (Feb. 25, 2022).)[16] For example, Plaintiffs argue that Historic DuPont improperly claimed all of Michelle Olson's files as privileged because she is not a lawyer. (Mot. at 32.) But Historic DuPont has not claimed that all of Michelle Olson's files as privileged; Historic DuPont produced approximately one thousand documents from Ms. Olson's files. (Roin Decl. ¶ 20.) Rather, Historic DuPont withheld and properly logged those of Ms. Olson's files that related to her work with Historic DuPont's legal department, namely her work on creating and maintaining Historic DuPont's litigation reserve. (Olson Affidavit ¶¶ 4, 6; Pls.' Ex. 9, Historic DuPont Ltr. at 4–5 (Feb. 25, 2022).)

Further, documents may be protected by the attorney-client privilege, even if the documents reflecting counsel's legal advice were shared between or among Historic DuPont or Chemours employees or with Historic DuPont's or Chemours' agents. *See In re Grand Jury Proceedings Under Seal v. United States*, 947 F.2d 1188, 1191 (4th Cir. 1991) (explaining that "communications by the client's agent to the attorney" and "between the client and his agent made for the purpose of facilitating the rendition of legal services would be covered by the privilege"); *Santrade*, 150 F.R.D. at 545 (explaining that documents "transmitted between non-attorneys to

---

[16] Several documents included in Plaintiffs' Exhibit 33 are miscategorized, as they were sent to or from an attorney, including emails from Historic DuPont's outside counsel, or to Historic DuPont's General Counsel, Erik Hoover. (*See* Pls.' Ex. 10, Historic DuPont AFFF Log Nos. 2347, 2390, 2408, 2492, 2486; Pls.' Ex. 12, Historic DuPont Arbitration Log Nos. 2400, 2407, 2408, 2410.) To the extent the Court grants any part of Plaintiffs' motion on this category, these nine entries should be excluded from that ruling.

relay information requested by attorneys" or "so that the corporation may be properly informed of legal advice and act appropriately" are privileged).

The specific log entries Plaintiffs challenge are Ms. Olson's documents related to that litigation reserve over which Historic DuPont asserts attorney-client privilege. (*See, e.g.*, Pls.' Ex. 10, Historic DuPont AFFF Log Nos. 10, 38, 166, and 943 ("Spreadsheet reflecting or discussing legal advice of counsel regarding litigation reserve.").) Moreover, the file name for nearly every one of these documents includes "legal reserve rollforward." (*Id.*) The fact that Ms. Olson works in the accounting department and is not a lawyer does not mean that her documents cannot be privileged. *See Frank Betz Assocs.*, 226 F.R.D. at 533–35.

Other entries Plaintiffs list in Exhibit 33 correspond to documents in which the attorney involved is apparent from the face of the redacted document, even though the attorney's name is not on the log. (*See, e.g.*, Ex. V (Listed as Historic DuPont Arbitration Log No. 2923); Ex. W (Listed as Historic DuPont AFFF Log No. 279); Ex. X (Listed as Historic DuPont AFFF Log No. 303).) Plaintiffs' motion does not claim that the redactions were improper. Nor does it meaningfully dispute the privileged nature of the redacted portions of these documents. Plaintiffs simply did not look at the documents produced by Historic DuPont to determine if Plaintiffs already had information about the attorneys involved.

Given the nature of the documents that were withheld for privilege and the volume of the review, it would by highly burdensome to identify the specific attorney whose advice was being discussed for every fully withheld or redacted document. It would also be unnecessary given that Historic DuPont's current privilege log contains the information required by Rule 26. *See* Adv. Comm. Notes to Fed. R. Civ. P. 26.

### 3. Historic DuPont's log entries in Exhibit 34 are protected by the work-product doctrine

Historic DuPont's privilege logs sufficiently establish that the log entries on Exhibit 34 constitute attorney work product prepared in anticipation of litigation. For example, of the 22 log entries Plaintiffs challenge, the log shows that at least 7 of the documents relate to tracking legal liabilities and assessing legal reserves and accruals in part because of litigation. (*See* Pls.' Ex. 12, Historic DuPont Arbitration Log Nos. 185, 1075; Pls.' Ex. 10, Historic DuPont AFFF Log Nos. 10, 28, 166, 943, 2992.) Courts consistently hold that such analysis constitutes attorney work product. *See, e.g.*, *Frank Betz Assocs.*, 226 F.R.D. at 533–35 (litigation reserve numbers "recorded on the defendant's financial statements and disclosed to its outside accountants" protected); *JPMorgan Chase*, 2013 WL 1668393, at *3 ("By their very nature [litigation reserve numbers] are prepared in anticipation of litigation and, consequently, they are protected from discovery as opinion work product." (alteration in original) (quoting *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987))).

Plaintiffs also claim that Historic DuPont asserted work product over documents concerning "the drafting of the Separation Agreement and certificate to Houlihan Lokey, Houlihan Lokey's due diligence, and Chemours's management, financials and capitalization." (Mot. at 33.) But Plaintiffs' very first example, Log No. 2221 on Historic DuPont AFFF Log (Pls.' Ex. 10), is dated *six months after* the spinoff, in January 2016. Rather, this log entry relates to Historic DuPont's discussions with outside counsel (clearly listed on the log), to the threat of litigation from Chemours, related to the parties' post-spin disagreements about certain terms of the Separation Agreement. Once again, Plaintiffs have the information they need in the logs, they just did not use it. But to be clear, there certainly were documents on Historic DuPont's logs that involve work product that were relevant to the spin. Historic DuPont has a litigation docket with

thousands of cases, many of which went to Chemours as part of the spinoff. Emails, communications, and documents related to those cases that were transferred to Chemours included work product and were marked as such on Historic DuPont's Privilege Logs. (*See e.g.*, Pls.' Ex. 10, Historic DuPont AFFF Log No. 656.)

Finally, now that Plaintiffs have given Historic DuPont a list with 22 Log Entries it seeks to challenge, and not nearly 1,300, it will update several log entries in effort to alleviate Plaintiffs' concern. (*See* Ex. K (List of Challenged Log Entries Historic DuPont Will Correct/Produce).)

### 4.    Chemours's log entries in Exhibit 33 are privileged

Plaintiffs challenge 28 documents listed in Exhibit 33 on the basis that Chemours did not identify the parties who shared a common interest or nature of the common interest. Not only do Plaintiffs mischaracterize a number of the documents listed, as they do not fall into this category, its analysis is incorrect in a number of instances. However, Chemours has removed 12 of the documents listed in Plaintiffs' Exhibit 33 as they were erroneously included on its log, and are no longer at issue as Chemours will produce them to Plaintiffs.

### 5.    Chemours's log entries in Exhibit 34 are work product

In Exhibit 34, Plaintiffs assert that Chemours has not substantiated its assertions of work product for 47 documents. However, at least 33 of the documents challenged in this category identify attorney-client privilege in addition to work product. Five documents cited also identify common interest and joint defense involving ongoing litigation, in addition to work product. (Pls.' Ex. 34, Log Nos. 13091, 13622, 13877, 13899, and 13901.) Furthermore, several of the documents, identified as work product and attorney-client privilege, are enclosed in email updates to clients about ongoing litigation. (Pls.' Ex. 34, Log Nos. 11314, 11318, 11322, 11324, 11326, 11328, 11330). Accordingly, Plaintiffs challenges to this category fail.

## POTENTIAL *IN CAMERA* REVIEW

The Court asked the parties to propose a process for *in camera* review of a limited selection of documents from Defendants' privilege logs. (Dkt. No. 2353). Defendants do not believe that the Court needs to engage in any *in camera* review on many of the categories Plaintiffs challenge because Plaintiffs have failed to meet the legal threshold to warrant an *in camera* review. But to the extent the Court wishes to review any documents on Defendants' logs, Defendants propose the following.

For any category that the Court wishes to review documents on Defendants' privileged log *in camera*, Plaintiffs will select up to five exemplars and each Defendant will select up to five exemplars per category. To the extent the Court agrees with Plaintiffs that documents on Defendants' logs are not protected or privileged, the Court's ruling is limited to the documents Plaintiffs challenge in their motion. If Plaintiffs believe the ruling should be extended to any other documents, the Plaintiffs will submit to Defendants the list of additional documents they seek to compel, and the parties will then meet and confer. If the parties are unable to reach resolution, the parties may seek additional assistance from the Court with full opportunity to be heard.

## CONCLUSION

For the foregoing reasons, Historic DuPont and Chemours respectfully request that the Court deny Plaintiffs' Motion to Compel Discovery.

Dated: May 24, 2022                              Respectfully Submitted,

/s/ Stephen M. Cox                               /s/ Alice W. Parham Casey
Stephen M. Cox                                   Alice W. Parham Casey (Fed. I.D. #9431)
ROBINSON BRADSHAW & HINSON                       WYCHE, P.A.
202 East Main Street, Suite 201                  807 Gervais St., Suite 301
Rock Hill, South Carolina                        Columbia, SC 29201
(803) 325-2900                                    (803) 254-6542
scox@robinsonbradshaw.com                        tcasey@wyche.com

*Counsel for Defendants The Chemours*            *Counsel for Defendant E. I. du Pont de*
*Company and The Chemours Company*               *Nemours and Company (as to the Fraudulent*
*FC, LLC (as to the Fraudulent Transfer*         *Transfer Claims)*
*claims)*