**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | MDL No. 2:18-mn-2873-RMG<br><br>**This Document relates to<br>ALL CASES** |

**TELOMER MILSPEC AFFF MANUFACTURERS' REPLY MEMORANDUM IN
SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON THE SECOND AND THIRD ELEMENTS OF THE
GOVERNMENT CONTRACTOR IMMUNITY DEFENSE**

## TABLE OF CONTENTS

ARGUMENT ................................................................................................................... 2

I.    The Telomer MilSpec AFFF Manufacturers meet the second element of the GCD as a matter of law. ................................................................................................... 2

II.    The Telomer MilSpec AFFF Manufacturers satisfy the third element of the GCD as a matter of law. ....................................................................................................... 5

    A.    Plaintiffs concede that the Telomer MilSpec AFFF Manufacturers satisfy the third element of the GCD for all pre-2001 MilSpec AFFF. .................................. 5

    B.    The government knew of degradation to PFOA before the Telomer MilSpec AFFF Manufacturers did, and the third element is satisfied as a matter of law. ... 6

    C.    Plaintiffs concede that the government's knowledge about PFOA's potential hazards always exceeded that of the Telomer MilSpec AFFF Manufacturers. ... 11

    D.    Plaintiffs' other arguments are unsupported and inapplicable. ........................... 14

CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

## CASES

*Beard v. Banks*,
548 U.S. 521 (2006) ................................................................................................6

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ....................................................................... *passim*

*Brinson v. Raytheon Co.*,
571 F.3d 1348 (11th Cir. 2009) ...........................................................15

*Dowd v. Textron, Inc.*,
792 F.2d 409 (4th Cir. 1986) .........................................................3, 5, 12, 14, 15

*Getz v. Boeing Co.*,
654 F.3d 852 (9th Cir. 2011) .................................................................10

*Guerinot v. Rockwell Int'l Corp.*,
923 F.2d 862, 1991 WL 4105 (9th Cir. 1991) ........................................15

*Haltiwanger v. Unisys Corp.*,
949 F. Supp. 898 (D.D.C. 1996) ...........................................................10

*In re Agent Orange Prod. Liab. Litig.*,
818 F.2d 187 (2d Cir. 1987) ..................................................................15

*In re Agent Orange Prod. Liab. Litig.*,
304 F. Supp. 2d 404 (E.D.N.Y. 2004) ..............................................12, 15

*In re Agent Orange Prod. Liab. Litig.*,
517 F.3d 76 (2d Cir. 2008) .................................................................12, 14

*Kase v. Metalclad Insulation Corp.*,
212 Cal. Rptr. 3d 198 (Cal. Ct. App. 2016) ..........................................15

*Kerstetter v. Pac. Sci. Co.*,
1999 U.S. Dist. LEXIS 22536 (S.D. Tex. May 25, 1999) .....................10

*Kerstetter v. Pac. Sci. Co.*,
210 F.3d 431 (5th Cir. 2000) .................................................................10

*Kleemann v. McDonnell Douglas Corp.*,
890 F.2d 698 (4th Cir. 1989) .............................................................3, 15

*Lewis v. Babcock Indus., Inc.*,
    1992 WL 142751 (S.D.N.Y. June 8, 1992) .........................................................3, 15

*Lewis v. Babcock Indus., Inc.*,
    985 F.2d 83 (2d Cir. 1993)....................................................................................3, 14

*Md. Highways Contractors Ass'n v. Maryland*,
    933 F.2d 1246 (4th Cir. 1991) ..................................................................................10

*Miller v. Diamond Shamrock Co.*,
    275 F.3d 414 (5th Cir. 2001) ...............................................................................7, 15

*Ramey v. Martin-Baker Aircraft Co.*,
    874 F.2d 946 (4th Cir. 1989) .............................................................2, 10, 12, 15

*Sommers Oil Co. v. Sand Hill Stations of Bluffton LLC*,
    2017 WL 3054503 (D.S.C. July 18, 2017) ..................................................................6

*Tozer v. LTV Corp.,*
    792 F.2d 403 (4th Cir. 1986) ...............................................................................8, 15

## RULES

Fed. R. Civ. P. 56.............................................................................................................5

Plaintiffs suggest that the Department of Defense was unsophisticated and powerless to decide how to procure and use mission-critical life-safety equipment without the Environmental Protection Agency's input. But that, of course, is not how the military operates. Every day, DoD personnel must make difficult discretionary decisions regarding national security, "including specifically the trade-off between greater safety and greater combat effectiveness." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 511 (1988). As with a helicopter rotor or ejection seat assembly, the acquisition and use of MilSpec AFFF involves precisely that discretionary balance, and the GCD prevents juries from second-guessing those judgments.

*First*, the government exercised its discretionary judgment by listing telomer MilSpec AFFF on the Qualified Products List. This is not—as Plaintiffs would have the Court believe—a mere rote technicality. On behalf of DoD, the Navy conducted rigorous testing to ensure that QPL-listed telomer AFFF conformed with the MilSpec. Plaintiffs cannot dispute that fact but claim it is unimportant. The Fourth Circuit cases hold otherwise—both QPL listing and DoD's continuing use of the products after questions were raised, independently establish that the products met the government's specifications, satisfying the second element of the GCD.

*Second*, the GCD requires the United States' knowledge of a product's hazards to be compared to each individual defendant's actual knowledge. Plaintiffs do not dispute that the Telomer MilSpec AFFF Manufacturers did not even know, before 2001, that PFOA was present in or formed by degradation of their products. As to products sold before 2001, therefore, it is conceded that the third element of the GCD is met—these Defendants could not have warned of hazards they did not know existed. As to all other products, Plaintiffs admit that the government knew by no later than 2000 that telomer fluorocarbon surfactants in MilSpec AFFF could degrade to PFOA. Obviously, the Telomer MilSpec AFFF Manufacturers deny the repeated accusations

1

that they ever attempted to "mislead" the government about the presence of PFOA in or resulting from their products, but for present purposes that dispute is irrelevant—it is undisputed fact that the government knew by 2000 that so-called "PFOA precursors" were present, but it nevertheless continued to use the products.  And with regard to potential health hazards of PFOA, not even Plaintiffs claim that the Telomer MilSpec AFFF Manufacturers had any more knowledge, at *any* time, than the government.  Accordingly, there is no dispute of material fact that these Defendants have satisfied the third element of the GCD.

In light of this and the first round of GCD briefing, the Telomer MilSpec AFFF Manufacturers respectfully request that the Court grant summary judgment to each company.

## ARGUMENT

**I.    The Telomer MilSpec AFFF Manufacturers meet the second element of the GCD as a matter of law.**

Plaintiffs acknowledge that "the QPL is a list of products deemed to have met the requirements stated in the applicable specification."  Opp. 12 n.53, Dkt. No. 2409.  There is good reason for that:  Telomer AFFF products must pass the Navy's rigorous MilSpec qualification tests to be listed on the QPL, and they have done so multiple times over several decades.  TMM Mem. 10–15, Dkt. No. 2348.  ██████████████████████████████ ███████████████████████████████  Pl. Ex. 2 (Darwin Dep.) 42:13–19.  Because it is not a court's "province . . . to make . . . a finding [of nonconformance on] the Navy's behalf," *Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946, 951 (4th Cir. 1989), the fact of QPL listing establishes, as a matter of law, that the Telomer MilSpec AFFF Manufacturers' products conformed to the AFFF MilSpec, TMM Mem. 8; Omnibus Br. 3, Dkt. No. 2346-1.

It is not just the QPL listing that establishes the second element; the continuing use doctrine does, too.  TMM Mem. 9–15; Omnibus Br. 4.  ██████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ Opp. 62.  That

statement contradicts Fourth Circuit law establishing that, even when the government has

identified "actual and potential problems during design and production," as happened with some

telomer MilSpec AFFF, a contractor is still entitled to the GCD if the government continues to use

the product.  *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 704 (4th Cir. 1989); *Dowd v.

Textron, Inc.*, 792 F.2d 409, 412 (4th Cir. 1986) (per curiam); TMM Mem. 9.

    Plaintiffs are also factually and legally incorrect that "the government's lack of actual

knowledge of the contents of the products or the ability to fully appreciate the dangers . . . negates

any argument that acceptance of the product after testing to meet the QPL was in any way proof

of its conformance with the MilSpec."  Opp. 34.  As shown below and in Defendants' briefs on

element 1, the government *did* "fully appreciate the dangers" of MilSpec AFFF for decades, and

Plaintiffs cannot dispute that the government continued using telomer MilSpec AFFF  (both C8-

and C6-based) long after even Plaintiffs concede such knowledge.  Def. Element 1 Br. 32–35, 42–

50, Dkt. No. 1965-1; Pl. Element 1 Opp. 35–39, Dkt. No. 2063.  Regardless, "a product's failure

to perform safely does not constitute failure to conform to specifications."  *Lewis v. Babcock

Indus., Inc.*, 1992 WL 142751, at *8 (S.D.N.Y. June 8, 1992), *aff'd*, 985 F.2d 83 (2d Cir. 1993).

The Telomer MilSpec AFFF Manufacturers meet the second element on the independent ground

of continuing use.

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████ Opp.  60 ████████████████████████



TMM Mem. 10–15.

*Id.*

Opp. 58–68.  Each Telomer MilSpec AFFF Manufacturer satisfies the second element of the GCD.

Having fallen short on the second element, Plaintiffs try to reargue the first element: whether the AFFF MilSpec was "reasonably precise."  Assuming their own conclusion, they argue that because, in their view, the AFFF MilSpec was not reasonably precise, the "government [could not have] found Defendants' AFFF conformed with MilSpec."  Opp. 33.  But whether a MilSpec is "quantitative" (Plaintiffs' term)  or, rather, "reasonably precise" (the actual legal standard) is irrelevant to whether Defendants' products conformed to that MilSpec.

In fact, this reprise of element 1 only further undermines Plaintiffs' arguments that the AFFF MilSpec is not reasonably precise.  Placing excerpts from the AFFF and Agent Orange MilSpecs next to each other, Plaintiffs insist that the AFFF MilSpec is not as precise because the Agent Orange MilSpec "*does* specify a precise chemical within a larger family of chemicals" whereas the AFFF MilSpec supposedly does not.  Opp. 27 (emphasis in original).

But Plaintiffs miss the key point:  Just as the AFFF MilSpec does not explicitly require PFOS, PFOA, or "PFOA precursors," the Agent Orange MilSpec did not explicitly require dioxin.  The Agent Orange MilSpec specified certain chemicals, but *not dioxin*; dioxin was a byproduct of

---

[1] ███████████████████████████████ Opp. 68, ██████████
███████████████████████████████ Pl. Ex. 211 (Vegso Dep.) at 263:16–264:2.
There is no evidence the Navy ever found Buckeye's MilSpec AFFF nonconforming.

the defendants' manufacturing process. Thus, on the relevant point, the AFFF MilSpec is as reasonably precise as the specification the Second Circuit addressed in *Agent Orange*—if not more so, given that for the last five years, the government has *explicitly permitted* PFOS and PFOA in MilSpec AFFF and acknowledged the impossibility of creating MilSpec AFFF completely free of one of those two chemicals or their "precursors." Def. Ex. 11 (2017 MilSpec) § 6.6 & tbl.I; Def. Ex. 12 (2019 MilSpec) § 6.6 & tbl.I; Def. Ex. 13 (2020 MilSpec) § 6.6 & tbl.I.

The Telomer MilSpec AFFF Manufacturers' products satisfy element 2 as a matter of law because they conformed to the AFFF MilSpec, *Boyle*, 487 U.S. at 512, and because the military continued to use the products after learning of alleged hazards, *Dowd*, 792 F.2d at 412.

## II.    The Telomer MilSpec AFFF Manufacturers satisfy the third element of the GCD as a matter of law.

Plaintiffs concede that the Telomer MilSpec AFFF Manufacturers meet the third element of the GCD for all telomer MilSpec AFFF sold before 2001. As to products sold after 2001, Plaintiffs attempt to create a dispute of material fact as to whether the Telomer MilSpec AFFF Manufacturers knew before the United States either that (1) telomer MilSpec AFFF could contain or degrade to PFOA or (2) such PFOA posed a potential hazard to human health or the environment. On both points, Plaintiffs fail.

### A.    Plaintiffs concede that the Telomer MilSpec AFFF Manufacturers satisfy the third element of the GCD for all pre-2001 MilSpec AFFF.

The Telomer MilSpec AFFF Manufacturers proffered uncontroverted evidence that they did not know before 2001 that their products contained or degraded to PFOA, and Plaintiffs do not dispute that fact. *See* Opp. 30–31, 73–74, 78, 79, 83 (alleging industry knowledge only by 2001, at the earliest). As a result, as to all telomer MilSpec AFFF sold to the government before 2001, Plaintiffs concede that Defendants satisfy the third GCD element as a matter of law—they could not have warned about a potential hazard they did not know existed. Fed. R. Civ. P. 56(e)(2); *see*

5

*Beard v. Banks*, 548 U.S. 521, 527 (2006) (unchallenged facts in summary judgment motion deemed admitted); *Sommers Oil Co. v. Sand Hill Stations of Bluffton LLC*, 2017 WL 3054503, at *3 (D.S.C. July 18, 2017) (facts not addressed by nonmovant undisputed at summary judgment).

**B.    The government knew of degradation to PFOA before the Telomer MilSpec AFFF Manufacturers did, and the third element is satisfied as a matter of law.**

Plaintiffs also fail to demonstrate any genuine dispute that the government knew that fluorocarbon surfactants in telomer MilSpec AFFF could degrade to PFOA in the environment—in Plaintiffs' phraseology, that telomer MilSpec AFFF contained "PFOA precursors"—by no later than 2000. *Compare* TMM Mem. 6–7, *with* Opp. 69–72.

The Telomer MilSpec AFFF Manufacturers identified numerous documents objectively establishing this knowledge, including, among others, an October 2000 internal memorandum from an Air Force toxicologist to the Air Force fire operations program manager and chief fire engineer explaining that the "primary degradation products of [telomer MilSpec] AFFF compositions are perfluorooctanoic acid (PFOA) and perfluorodecanoic acid (PFDA)," TMM Mem. 7 (Def. Ex. 100 at '773), and a January 2001 government white paper titled "AFFF Environmental and Toxicity Issues" stating that fluorocarbon compounds in telomer MilSpec AFFF "degrade to PFOA" and that "most, if not all, qualified [i.e., QPL-listed] AFFF contain fluorinated compounds which degrade to PFOA," *id.* (TMM Ex. 5 at '777); Def. Ex. 127.

Attempting to avoid the import of this undisputed evidence, Plaintiffs attempt to recharacterize the alleged defect at issue. They argue that apart from unintended, "trace" amounts of PFOA as such in telomer MilSpec AFFF, there were "much *larger* percentages of *intended* PFOS, PFOA, and/or PFOA precursors (ranging from 25% to 100% of the fluorosurfactant)" in MilSpec AFFF. Opp. 16. PFOS, of course, has nothing to do with telomer AFFF products, Opp. 7 n.34, and it is undisputed that PFOA is "not . . . intentionally added to telomer-based AFFFs,"

6

Pl. Element 1 Opp. 42.  Plaintiffs concede that the only alleged defect in telomer MilSpec AFFF is manufacturers' "intentionally add[ing] fluorosurfactants containing C8 molecules . . . that can degrade to PFOA in the environment," i.e., "PFOA precursors."  Opp. 2 n.13.  Whether the alleged defect is the presence of PFOA or the presence of "PFOA precursors," the government knew of both by January 2001, and the Telomer MilSpec AFFF Manufacturers knew of neither before the government did.  TMM Mem. 6–8, 15–26.

Plaintiffs then argue that testimony of individual government employees creates issues of fact regarding government knowledge.  As an initial matter, whether any particular government employee knew or did not know about certain facts is immaterial; the question is what *the government institutionally*, through all of its responsible agencies and employees, knew.  *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 422–23 (5th Cir. 2001).  As shown in Defendants' briefs, there is no dispute about the government's institutional knowledge of the relevant facts.

Plaintiffs mischaracterize the few pieces of testimony they cite.  Curtis Bowling, who retired from DoD in 2013, simply testified as to certain documents from the early 2000s, "I don't remember."  *See* Opp. 70 (citing testimony by Mr. Bowling that he did not "remember [a March 2001] email" and could not "recall any reaction" to that email more than twenty years later).



Opp. 71–72.

Pl. Ex. 35 (Farley Dep.) 40:11–17, 166:15–167:10, 167:17–168:20.

Finally, Robert Darwin's testimony about what he knew in 2004 or 2005 says nothing at all about what the government knew in 2000.  *See* Opp. 71 & n.278.  In 2004, Mr. Darwin was no longer employed by the Navy.  He had been working in private industry since 1999, which is prior to the dates of the documents cited by the Telomer MilSpec AFFF Manufacturers that demonstrate the government knew by 2000 that fluorocarbon surfactants in telomer MilSpec AFFF could degrade to PFOA.  *See* Def. Ex. 17 (Darwin Dep.) at 31:5–12.

In short, testimony from (1) someone who did not work for the government at the relevant time (Mr. Darwin), ██████████████████████████████ and (3) someone who did not remember the time at all (Mr. Bowling) does nothing to undermine the objective, documentary evidence.  That unrebutted evidence establishes that the government knew by October 2000 that fluorocarbon surfactants in telomer MilSpec AFFF could degrade to PFOA. TMM Mem. 6–7, 25.  There is no genuine dispute of material fact on this point.

Plaintiffs concede that none of the Telomer MilSpec AFFF Manufacturers knew that their MilSpec AFFF contained "PFOA precursors" before October 2000.  The earliest document they claim establishes such knowledge for any of those Manufacturers is a Kidde/National Foam email from March 2001, which refers generally to potential "break down to carboxylates" (the family of PFAS that includes PFOA), and nowhere suggests that Kidde or National Foam withheld information about a danger "known to the supplier but not to the United States."  *Tozer v. LTV Corp.,* 792 F.2d 403, 408 (4th Cir. 1986) (citation omitted); *see* Opp. 74 n.289.

As to Tyco/Ansul, Plaintiffs cite documents that, if they have relevance to the question at all, demonstrate that Tyco openly *shared* its knowledge with the government.  Opp. 82–83.  For example, Plaintiffs cite a 1982 document in which Ansul explicitly disclosed teratogenicity data in animals that Ansul had generated.  *Id.* at 82.  Plaintiffs claim Ansul "reassured" the Navy about

this data but never claim the data was incorrect or false.  (It was not.)  *See* TMM Mem. 19. █████



████████████████████████ Opp. 82–83, ████████████████████

████████████████████████████████████████████████████████

████████████████████████ Pl. Ex. 244; *see* TMM Ex. 1 at 2806 (published

paper thanking Mr. Hubert for his assistance).  The authors of that paper hypothesized (but did not

actually conclude) that "carboxylates" found at these sites "may be combustion, biological, or

nonbiological degradation products of the principal perfluorinated components in AFFF

mixtures."  TMM Ex. 1 at 2805.  Given that the government by 1998 had already internally studied

the potential for telomers to break down to PFOA, TMM Ex. 4 at '350–51 (describing 1998 Air

Force research finding "results consistent with the degradation of telomer surfactants to

perfluorocarboxylic acids"), and the objective state of its knowledge about this issue by 2000,

TMM Br. 6–7, █████████████████████████████████████████████

██████████████████████ Opp. 83 n.321, █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

As to the remaining Manufacturers, Plaintiffs only cite materials dated much later.  *See id.*

at 78–79 & nn.304, 306 ████████████████ 80–81 & nn.312–13 (Buckeye: 2008, ████).

In the final analysis, Plaintiffs have no evidence that any Telomer MilSpec AFFF Manufacturer

knew that telomer MilSpec AFFF surfactants would degrade to PFOA before the government.

This is fatal to Plaintiffs' arguments.  Although the Telomer MilSpec AFFF Manufacturers

dispute Plaintiffs' characterizations of the evidence, the Court could accept every obfuscation,

conspiracy theory, and "fact" in Plaintiffs' brief, and the Telomer MilSpec AFFF Manufacturers

still would be entitled to summary judgment under *Boyle* because the military "was independently

aware of the defect" or "at least as aware as the contractor." *Haltiwanger v. Unisys Corp.*, 949 F. Supp. 898, 904 (D.D.C. 1996); *see also Boyle*, 487 U.S. at 512–13; *Ramey*, 874 F.2d at 951 (rejecting plaintiff's "most substantial argument" on the contractor's failure to warn because "the Navy was well aware of the seat's harmful propensities before Ramey's mishap").

There are many other problems with Plaintiffs' arguments. They claim the degradation of telomer surfactants to PFOA was "common industry knowledge," based on a *single email* from March 2001 (which, as shown above, is still after the government knew). Opp. 15–16 & n.65, 74 & n.289, 78 & n.305; Pl. Ex. 147; *see also* TMM Ex. 1 at 2805. But there is no such thing as "common industry knowledge" for purposes of the GCD, a point most obviously demonstrated by Plaintiffs' inability to cite even a single case to support this contention. *See, e.g.*, Opp. 15–16, 31, 69, 73–76, 79–81. This is because, of course, the third element requires defendant-by-defendant proof of actual knowledge. TMM Mem. 24; Omnibus Br. 5; *Kerstetter v. Pac. Sci. Co.*, 1999 U.S. Dist. LEXIS 22536, at *45–46 (S.D. Tex. May 25, 1999) (granting summary judgment on GCD based on defendant-specific-knowledge analysis), *aff'd*, 210 F.3d 431 (5th Cir. 2000).

Plaintiffs also claim that this single email is "far more than an email" because it purportedly "memorialized what was generally understood by industry at the time." Opp. 74 n.289. Plaintiffs cannot seriously contend that (1) this single email establishes knowledge for an entire industry, without adducing *any* evidence that *any* specific Telomer MilSpec AFFF Manufacturer shared this supposed "general understanding," or (2) the email reflects any greater knowledge on the part of any Defendant than what the government already knew.[2] *See* TMM Mem. 24 & Ex. 1 at 2805; *see also Getz v. Boeing Co.*, 654 F.3d 852, 865 (9th Cir. 2011); *Kerstetter v. Pac. Sci. Co.*, 210 F.3d

---

[2] This email is also inadmissible hearsay and "cannot be considered on a motion for summary judgment." *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991).

431, 436 (5th Cir. 2000) ("The [GCD] does not require a contractor to warn the government of defects about which it only should have known.").

Plaintiffs then retreat to a conspiracy theory, namely that "the knowledge of FFFC is imputed to each of its members" based on doctrines that no court has ever engrafted onto the GCD, such as principles derived from agency cases. Opp. 85–87. But Plaintiffs cannot muster a single GCD case in support of this assertion. Indeed, no GCD case has ever applied agency principles to impute knowledge to a manufacturer, and certainly not between a trade organization or other third party and a manufacturer. For good reason: This runs counter to binding GCD precedent that each defendant's *actual* knowledge—not imputed knowledge—must be weighed against that of the government. TMM Mem. 24; Omnibus Br. 5.

Furthermore, the FFFC was not founded until 2001, *after* the government already knew that fluorocarbon surfactants in telomer AFFF could degrade to PFOA. TMM Mem. 6–7; 25. The only document Plaintiffs cite to support their contention that the FFFC "knowingly omitt[ed] that the telomer-based AFFFs degrade to PFOA in the environment," Opp. 14, is the same March 2001 email they use to support "common industry knowledge." *Compare* Opp. 14 n.60, *with* Opp. 16 n.65 (both citing Pl. Ex. 147). There is no dispute that the government knew about the alleged defect before the Telomer MilSpec AFFF Manufacturers did.

### C.  Plaintiffs concede that the government's knowledge about PFOA's potential hazards always exceeded that of the Telomer MilSpec AFFF Manufacturers.

There is no dispute that the government knew about the potential hazards posed by PFOA before the Telomer MilSpec AFFF Manufacturers did. Plaintiffs' principal argument here relies on twisting *Boyle*'s requirements into something unrecognizable from the case itself. According to Plaintiffs, *Boyle* requires the government to have "actual knowledge of the dangers posed by the product," i.e., to have conclusively decided a danger exists. Opp. 37.

This is not the test, as Plaintiffs elsewhere acknowledge. *See, e.g.*, *id.* at 3 (relevant fact is "government's understanding of the potential risks" and the "government's actual knowledge of the potential harms"); *id.* at 6 ("potential harms"); *id.* at 29 ("potential risks").  As the Fourth Circuit and many other courts have repeatedly held, what matters is knowledge that the product poses a *potential* hazard.  *See, e.g.*, *Ramey*, 874 F.2d at 950 ("[T]he Navy had become aware of the *possible hazards* the seat posed . . . ." (emphasis added)); *Dowd*, 792 F.2d at 410–12 (repeatedly referring to the "alleged" defect); *In re Agent Orange Prod. Liab. Litig.*, 304 F. Supp. 2d 404, 409, 429 (E.D.N.Y. 2004), *aff'd*, 517 F.3d 76 (2d Cir. 2008) (referring to "possible hazards").  Not even Plaintiffs dispute that the government knew of the *potential* hazards of fluorocarbon surfactants generally and PFOA specifically by 2000.  *See* Opp. 90 (describing factors putting the government "on notice" of "toxicity concerns related to PFOA . . . in 2000").

Rather than confront this reality, Plaintiffs construct yet another Catch-22, claiming that "even in 2016 [when EPA issued its LHA,] the government, or the DoD more specifically, had insufficient knowledge."  Opp. 31.  Plaintiffs insinuate that the government *even today* lacks the requisite knowledge of human health effects because EPA has not issued "a final MCL."  *See id.*

But neither *Boyle* nor Fourth Circuit cases applying it establish this impossible-to-meet standard.  Indeed, in *Agent Orange*, knowledge of potential hazards of dioxin continued to evolve, and at a certain point, many years into the Vietnam War, the military made the decision to stop using it.  *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d at 82–83, 94–95 & n.17.  Yet the Second Circuit granted summary judgment on the GCD for all prior sales and uses of that product.  There is no material dispute here that the government knew of PFOA's *potential* hazards in 2000.

The next step is to determine when the Telomer MilSpec AFFF Manufacturers each individually knew of PFOA's potential hazards.  On this, Plaintiffs say nothing at all, here or in

their brief on element 1. *See generally* Opp. 68–84; Pl. Element 1 Opp. In support of their speculative assertion that Telomer MilSpec AFFF Manufacturers "withheld information from the government," Opp. 29, Plaintiffs cite a public 2005 EPA enforcement action against DuPont (which is not a Telomer MilSpec AFFF Manufacturer) stating that data obtained by DuPont on or after July 29, 2004 "reasonably supports the conclusion that PFOA presents a substantial risk of injury to human health." Opp. 56–57 n.232 (citing Pl. Ex. 200). As evinced by Plaintiffs' silence with respect to any Telomer MilSpec AFFF Manufacturer's individual knowledge, such knowledge of PFOA's potential hazards in the early 2000s consisted of no more than contemporaneous reports in the public domain by government agencies and in published scientific literature—in part because the Manufacturers did not yet know there was PFOA or its precursors in their products. *See* TMM Mem. 15–23.

As a corollary to their (incorrect) legal argument that the GCD requires the government to finally conclude a hazard exists, Plaintiffs highlight that EPA did not issue a final LHA for PFOA in drinking water until 2016 and claim that DoD "defers" to EPA regarding environmental management decisions. Opp. 17–18. But Plaintiffs conflate absence of a *requirement* that DoD act with absence of DoD *discretion* to act. Def. Element 1 Reply 15–16, Dkt. No. 2141.

The obvious truth is that EPA dictates neither DoD's procurement and mobilization of military equipment nor the United States' broader defense strategy. Nothing in the law requires DoD—which oversees the world's most sophisticated military—to sit on its hands waiting for EPA to find definitive proof of a hazard or for EPA to tell it what to do with respect to procurement and use of military equipment. This is evident from Plaintiffs' own quote from the Undersecretary of Defense: "While the LHA is only guidance under the [Safe Drinking Water Act] and not a required or enforceable water standard[,] DoD began taking actions to address impact of drinking water."

Opp. 20. 

Def. Ex. 109 at '039, '041.

It is clear from *Boyle* that the GCD does not focus on what DoD does with its knowledge of potential hazards, but rather solely with the knowledge itself:  Once the government knows of a potential hazard, the judicial branch cannot interfere with the government's discretionary judgment as to what to do with that knowledge.  *See* 487 U.S. at 511–12.  By extension, a government contractor cannot be held liable for what the government does—or in this case does not do—with that knowledge.  *Dowd*, 792 F.2d at 412 ("[I]t is not up to the jury to second-guess this military judgment.").  To do otherwise "would be to impose liability without responsibility," which the GCD does not permit.  *Id.*; *see also Lewis v. Babcock Indus., Inc.*, 985 F.2d 83, 89 (2d Cir. 1993) ("Whether or not these decisions were ill-advised, or should have been made earlier, it is not our role to second-guess the Air Force's judgment."); *In re Agent Orange*, 517 F.3d at 95.

### D.     Plaintiffs' other arguments are unsupported and inapplicable.

Plaintiffs argue that there is a "question of fact" because Defendants deny that "C8-containing AFFFs are defective or have the potential to cause harm to people."  Opp. 2–3.  For the GCD to apply, their argument goes, Defendants must have admitted a defect "at the time of the events themselves."  Opp. 2 n.12.  They cite no case (and there is none) supporting the remarkable proposition that a defendant must admit to a defect, either before or during litigation, in order to satisfy *Boyle*.  In *Boyle* and every case in which the Fourth Circuit and other courts have granted summary judgment on the GCD, the defendant-contractor did not admit its product was defective.

14

Plaintiffs' attempt to draw a distinction between "open and obvious" "mechanical defects" and "latent" defects falls similarly short. Opp. 36–37, 88–89. This conflates the notion of "hazard" with the legal concept of "defect." Given the nature of its mission, the military works with and around equipment that inherently creates "hazards" for its personnel or even the public, such as ejection seats (*Ramey* and *Guerinot*), helicopters (*Boyle* and *Dowd*), fixed-wing military aircraft (*Tozer*, *Kleemann*, *Lewis*, and *Brinson*), asbestos (*Kase*), and other chemicals (*Agent Orange*). A potential *hazard* posed by a product may be known to the military long before it is ever alleged (or proven) to be a legal *defect* of that product. The GCD grants the military wide discretionary latitude in balancing such hazards against military necessity by ensuring that it can, if it chooses, purchase such hazardous equipment from private contractors. *See Boyle*, 487 U.S. at 512–13. The GCD "shields defendant contractors from liability [even] where the hazard is wholly speculative." *In re Agent Orange*, 818 F.2d 145, 174 (2d Cir. 1987).

The decisions in *Agent Orange* once again are on point. Plaintiffs claim *Agent Orange* is distinguishable because there the government had "actual knowledge of the defect . . . *i.e.*, the presence of Dioxin, a known toxic agent to humans." Opp. 89–90. Not so: In *Agent Orange*, the government's knowledge of the "actual hazard, if any" caused by the presence of dioxin in the product was "somewhat speculative" when "it was used in Vietnam." *In re Agent Orange*, 304 F. Supp. 2d at 429; *see Miller*, 275 F.3d at 421 (noting that the "paucity" of available evidence that Agent Orange was hazardous did not create a genuine issue of material fact (citation omitted)). Here, too, element 3 is satisfied, notwithstanding evolving knowledge of the hazards at issue.

## CONCLUSION

Based on the grounds set forth above and in Defendants' overall briefing on the GCD, the Telomer MilSpec AFFF Manufacturers respectfully request that the Court hold that they each satisfy all elements of the GCD as a matter of law.

15

Dated: July 1, 2022                                 Respectfully submitted,

/s/ *Joseph G. Petrosinelli*                        /s/ *Jonathan I. Handler*
Joseph G. Petrosinelli                               Jonathan I. Handler
WILLIAMS & CONNOLLY LLP                               Keith H. Bensten
680 Maine Avenue, S.W.                                DAY PITNEY LLP
Washington, DC 20024                                 One Federal Street
T: (202) 434-5547                                    Boston, Massachusetts 02110
F: (202) 434-5029                                    T: (617) 345-4600
jpetrosinelli@wc.com                                 F: (617) 345-4745
                                                     jihandler@daypitney.com
                                                     kbensten@daypitney.com
/s/ *David E. Dukes*
David E. Dukes
NELSON MULLINS RILEY &                                John W. Cerreta
SCARBOROUGH LLP                                       DAY PITNEY LLP
1320 Main Street, 17th Floor                          242 Trumbull Street
Columbia, SC 29201                                    Hartford, Connecticut
T: (803) 255-9451                                     T: (860) 275-0665
F: (803) 256-7500                                     F: (860) 881-2517
david.dukes@nelsonmullins.com                         jcerreta@daypitney.com

*Counsel for Defendants Tyco Fire Products*          *Counsel for Defendants Kidde-Fenwal,*
*LP & Chemguard, Inc.*                               *Inc., Kidde PLC, Carrier Global*
                                                     *Corporation, Raytheon Technologies*
/s/ *Keith E. Smith*                                 *Corporation f/k/a United Technologies*
Keith E. Smith                                       *Corporation, and UTC Fire & Security*
Kaitlyn R. Maxwell                                   *Americas Corporation*
GREENBERG TRAURIG, LLP
1717 Arch Street, Suite 400                          /s/ *Michael L. Carpenter*
Philadelphia, PA 19103                               Michael L. Carpenter
T: (215) 988-7843                                    Christopher M. Whelchel
smithkei@gtlaw.com                                   Marshall P. Walker
maxwellk@gtlaw.com                                   GRAY, LAYTON, KERSH, SOLOMON,
                                                     FURR & SMITH, P.A.
*Counsel for Defendant*                              PO Box 2636
*National Foam, Inc.*                                Gastonia, NC 28053
                                                     T: (704) 865-4400
                                                     mcarpenter@gastonlegal.com

                                                     *Counsel for Defendant Buckeye Fire*
                                                     *Equipment Company*

16

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 1, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify the foregoing document is being served this day on all counsel of record in this case via transmission of Notice of Electronic Filing generated by CM/ECF.

/s/ *David E. Dukes*
David E. Dukes