DUFFY & YOUNG LLC

96 BROAD STREET, CHARLESTON SC 29401

*telephone* 843-720-2044    *facsimile* 843-720-2047

ATTORNEYS AT LAW

December 14, 2022

***Via E-Mail (gergel_ecf@scd.uscourts.gov; Cary_Kotcher@scd.uscourts.gov)***

The Honorable Richard M. Gergel
U.S. District Court for the District of South Carolina
J. Waties Waring Judicial Center
83 Meeting Street
Charleston, South Carolina 29401

Re:    *In re Aqueous Film-Forming Foams Products Liability Litigation* (MDL No. 2873)

Dear Judge Gergel:

Since the August letter submissions on the personal injury bellwether litigation track,[1] the Parties have engaged in extensive additional meet and confer efforts. Those submissions laid out the many agreements reached by that time, and Defendants are gratified to report that the Parties have made further progress since then. However, the Parties have now reached an impasse on several critical issues that require Court intervention.

***Included Injuries***. The first area of disagreement between the Parties is the specific injuries to be included within the initial personal injury bellwether pool. Although the Court already decided this issue at the September 2022 case management conference, the PEC refuses to abide by the Court's decision, reviving an impasse the Court already settled.

As the Court will recall from the Parties' August letter briefs, the PEC contended that the Parties should focus initially on plaintiffs alleging five of the six so-called "*Leach*" injuries (kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, and pregnancy-induced hypertension),[2] while Defendants argued to also include non-*Leach* injury categories, given the prevalence of such claims and the need for the bellwether process to be representative of the MDL docket as a whole. At the September 2022 conference, the Court agreed with the PEC and directed the Parties to submit a proposal to address the five "*Leach*" injuries other than high cholesterol as part of an initial bellwether process (*see* Sept. 23, 2022 Hearing Tr. at 36:13–18).

---

[1] *See* Dkt. Nos. 2533 (DCC), 2534 (PEC) (Aug. 18, 2022).

[2] As previously noted, describing just the five injuries identified above and high cholesterol as "*Leach* injuries" overlooks the dozens of other "*Leach* injuries" that the *Leach* panel studied and for which it found no "probable link," a lower standard than the more-familiar general medical causation standard.

The Honorable Richard M. Gergel
December 14, 2022
Page 2

Nevertheless, the PEC has reneged on its own Court-accepted proposal, and instead insists on limiting the first personal injury bellwether pool to plaintiffs alleging kidney and testicular cancer.

The reason for the PEC's change of heart is obvious: Plaintiffs believe claims alleging these two cancers are their best, likely to radically skew the bellwether process in their favor. The PEC may also believe the other injuries are not worth their time and effort to litigate. But even if that is Plaintiffs' belief, the solution is not to ignore them or delay them and thereby distort the important and useful information the bellwether process should provide as to the MDL as a whole.

Indeed, the PEC's proposal would leave out the single most commonly-alleged disease in this MDL ("*Leach*" or otherwise)—thyroid disease. Based on the Plaintiff Fact Sheets ("PFSs") to date, nearly *one third* of all personal injury plaintiffs (nearly 1,400 plaintiffs) allege thyroid disease. The bellwether process should provide the Parties information about the merits and value of claims across the MDL docket as a whole, not a cherry-picked subset of that docket. *See* Manual for Complex Litigation (Fourth), at 360 § 22.315 ("If individual trials, sometimes referred to as bellwether trials or test cases, are to produce reliable information about other mass tort cases, the specific plaintiffs and their claims should be representative of the range of cases."). Unsurprisingly, then, Defendants are unaware of any personal injury MDL where an injury comprising such a large percentage of the docket was excluded from the initial bellwether process. Given their prevalence, thyroid disease claims must be part of that process now, not at some unspecified future time.

Aside from thyroid disease, Defendants' proposal also follows the Court's directive to include ulcerative colitis and pregnancy-induced hypertension. This further improves the representativeness of the pool by including at least one disease alleged by nearly 60% of the personal injury plaintiffs in the MDL (more than 2,600 plaintiffs).[3] In contrast, the PEC's proposal to artificially limit the pool just to kidney and testicular cancer would address claims asserted by fewer than 25% of personal injury plaintiffs.[4]

To expeditiously advance this important aspect of the MDL and provide the Parties valuable information on a significant pool of pending cases, the Court should enforce its prior directive to the Parties by ordering that the first pool of personal injury bellwethers include plaintiffs alleging the five "*Leach*" injuries other than high cholesterol. Working up these claims

---

[3] Relatively few plaintiffs allege pregnancy-induced hypertension, and so if the Court decides those should be excluded from the pool, the remaining four categories should still remain in the initial bellwether process.

[4] The numbers are even more stark within the pool of all personal injury plaintiffs alleging exposure to PFAS from AFFF use at the sites suggested by Defendants for this bellwether pool. Defendants' proposal includes at least one disease alleged by over 70% of such plaintiffs, while fewer than 10% of the plaintiffs relating to these sites allege a disease covered by the PEC's proposal.

The Honorable Richard M. Gergel
December 14, 2022
Page 3

in a tiered discovery process enables the Parties and the Court to gain considerable insight prior to narrowing the pool for Tier 2 discovery.

**_Number of Plaintiffs_**.  The Parties' second area of disagreement, largely derivative of the first, is the number of plaintiffs in Tier 1 of the initial personal injury bellwether pool.  Mindful of the Court's concerns regarding the initial suggestion of a 50-plaintiff pool (*see* Sept. 23, 2022 Hearing Tr. at 25:2–31:24), Defendants propose a smaller Tier 1 pool of 36 plaintiffs: eight for each of the "*Leach*" injuries most prevalent in the pool (kidney cancer, testicular cancer, ulcerative colitis, thyroid disease) and four for pregnancy-induced hypertension, due to the smaller number of plaintiffs alleging that injury.[5]  The PEC proposes a Tier 1 pool of 16 plaintiffs, with eight plaintiffs alleging kidney cancer and eight plaintiffs alleging testicular cancer.

Thus, the Parties agree that the Tier 1 discovery pool should include approximately eight plaintiffs per injury, which, in turn, will allow the Parties to identify appropriate plaintiffs for further trial workup in Tier 2.  *See id.* at 25:2–5 (recognizing the likelihood that the Parties will learn in discovery that certain cases are "not appropriate" for a bellwether trial).  The only disagreement here stems entirely from the PEC's deviation from the Court's directive to propose a plan bellwether plan that would address the five "*Leach*" injuries other than high cholesterol.  Simply by reiterating its already-clear guidance, the Court can also apply the Parties' de facto agreement on plaintiffs-per-injury to order a Tier 1 discovery pool of 36 plaintiffs, as Defendants propose.

**_Included Sites_**.  Early in discussions of the personal injury bellwether process, the Parties agreed to focus on plaintiffs alleging exposure from AFFF use at a discrete number of sites to help facilitate a manageable discovery process.  However, the Parties have now reached an impasse regarding what sites should be included in the initial bellwether pool.  Throughout much of the discussions, the Parties seemed to recognize that these sites would include at least (i) Peterson Air Force Base and/or Colorado Springs Municipal Airport in Colorado and (ii) Naval Air Station Joint Reserve Base Willow Grove and/or Naval Air Warfare Center Warminster in suburban Philadelphia, Pennsylvania.[6] However, the PEC recently informed Defendants that was not its view, and the Parties have been unable to reach agreement.

---

[5] Further, and related to the Parties' disagreement on the categories to include, is a dispute on how to account for plaintiffs that allege multiple "*Leach*" injury claims. The best way to avoid distorting the pool selected by either side is to count an individual having multiple "*Leach*" injuries against the total for each disease alleged by the selected plaintiff. Thus, a plaintiff alleging both kidney cancer and ulcerative colitis would count towards the total selections for both disease categories, since both issues would be litigated in that case.

[6] Peterson AFB is immediately adjacent to the Colorado Springs Municipal Airport.  Former Naval Air Station Joint Reserve Base Willow Grove and former Naval Air Warfare Center Warminster are located several miles apart; many plaintiffs from that area allege exposure to PFAS from AFFF use at both sites.

The Honorable Richard M. Gergel
December 14, 2022
Page 4

Defendants propose that the initial personal injury bellwether pool consist of plaintiffs alleging exposure to PFAS from AFFF use at the Colorado Springs and Willow Grove/Warminster sites. According to PFS data, plaintiffs alleging exposure from AFFF use at these sites comprise over *half* of the pool of plaintiffs alleging any of the five "*Leach*" injuries other than high cholesterol. These statistics make AFFF use at these sites by far the most commonly-alleged source of PFAS exposure in the MDL. Indeed, roughly 40% of all personal injury plaintiffs in this MDL allege exposure from AFFF use at the Colorado Springs sites alone. In addition, the Colorado Springs and Willow Grove/Warminster sites were the first with cases filed in this MDL, some as early as September 2016. In fact, over 90% of the plaintiffs alleging exposure from the Colorado Springs sites filed their claims before the JPML ordered the creation of this MDL. Moreover, both sets of sites have been the subject of prior (albeit limited) discovery among some of the Parties, with class discovery conducted in the Colorado *Bell* matter prior to transfer to the MDL and Tier 1 bellwether discovery relating to two water providers (Warminster and Warrington) alleging contamination from AFFF use at the Willow Grove/Warrington sites. In addition, an extensive administrative record exists for the military sites at issue in these locations, enabling the parties to leverage this existing source of information regarding AFFF use and the operations at these facilities.

The PEC, however, proposes to limit the initial personal injury bellwether pool to plaintiffs alleging exposure to PFAS from AFFF use at only the Willow Grove/Warminster site in Pennsylvania. While AFFF use at these sites is the second most commonly-alleged source of PFAS exposure in the MDL (after the Colorado Springs sites), fewer than 10% of the plaintiffs alleging the five "*Leach*" injuries claim exposure from AFFF use at Willow Grove/Warminster. In addition to excluding hundreds of plaintiffs who allege exposure from the most commonly-alleged site of PFAS exposure in this MDL, the PEC's proposal undermines the goals of the bellwether process in several important respects.

First, by severely limiting the pool of plaintiffs eligible for selection in Tier 1 to a small fraction of all plaintiffs in the MDL, the PEC's proposal greatly limits the Parties' ability to identify suitable plaintiffs for bellwether discovery and potential trials. For example, based on PFS data currently available to Defendants, limiting selection to just kidney or testicular cancer claims relating to the Willow Grove/Warminster sites would leave the Parties with only approximately 55 eligible plaintiffs from which to select the PEC's proposed 16. That is, out of the gate, the Parties will have included nearly one third of eligible plaintiffs with kidney or testicular cancer in Tier 1 discovery, leaving limited room for the Parties to adjust based on dismissals or other events that happen during Tier 1 (and Tier 2). By including just one more site—Colorado Springs—the Parties can select from a broader pool of eligible plaintiffs, thereby increasing the chances that initial discovery will identify acceptable cases for Tier 2 and subsequent trial.

Second, limiting the selection pool to plaintiffs alleging exposure from just one set of sites in one state substantially increases the likelihood that unique issues of site-specific facts or state law may limit the ultimate utility of the bellwether process. One side may argue that results from such a narrow process provide little insight into the claims brought by the more than 90% of plaintiffs who allege exposure from other sites.

The Honorable Richard M. Gergel
December 14, 2022
Page 5

Finally, the Colorado Springs plaintiffs overwhelmingly are represented by Co-Lead Counsel, Mr. Napoli, who would presumably be hard-pressed to argue that these cases are somehow not potentially representative and not viable bellwether candidates. Indeed, given Plaintiffs' inherent information asymmetry at this stage, one can only conclude that Plaintiffs' abrupt about-face excluding Colorado Springs results from the PEC's examination of the plaintiffs available in Colorado and Pennsylvania that concluded there were significant advantages for Plaintiffs in Pennsylvania, significant disadvantages for Plaintiffs in Colorado, or both.

Fortunately, the Court can easily address both of these issues while still limiting the number of sites at issue by simply ordering that plaintiffs alleging exposure to PFAS from AFFF use at the Colorado Springs sites be included in the pool of plaintiffs eligible for Tier 1 discovery, as Defendants propose.

***Timing of Tier 1 Bellwether Discovery***. Although the Parties have resolved many deadline disputes in the attached proposed CMO, they have been unable to agree on the time necessary to complete Tier 1 discovery. As explained below, given the work required to select and prepare these matters for Tier 2 discovery, Defendants' proposed discovery closure date of November 17, 2023, is aggressive but reasonable. The PEC's proposed date—May 12, 2023, just six months hence and less than a month before the start of the *Stuart* trial—leaves just ***two months*** for fact discovery after the plaintiffs are selected and is, therefore, wholly unrealistic.

Tier 1 discovery is critically important because it provides the insights necessary to winnow these plaintiffs down to a Tier 2 trial-eligible pool. But because this initial discovery depends so heavily on third parties, it inherently takes time, no matter how quickly the Parties might hope it would progress.

At the threshold, once the Parties select the Tier 1 plaintiffs, they must collect their medical records. This involves requesting medical records from numerous third-party providers for each plaintiff, which in turn can reveal deficiencies in what was produced and reveal other medical providers who must be approached for records. Needless to say, after the last several years in particular, medical providers bear heavy burdens, meaning that obtaining medical records often takes significant time. In fact, in the *Bell* litigation in Colorado, prior to the formation of this MDL, the collection of medical records alone took *several months* to accomplish. Here, Defendants' schedule allots approximately four months; the PEC's, a mere couple of weeks, at most.

For plaintiffs who also allege a loss of property value, the Parties will have to collect relevant real estate data and other records. This again depends on third parties over whom neither side has control.

As just one final example, the Parties will need to conduct similar fate and transport and forensic chemistry factual discovery in these cases as was necessary in the water provider bellwether cases. That is, just as in the water provider cases, one important question in these

The Honorable Richard M. Gergel
December 14, 2022
Page 6

cases will be whether PFAS associated with Defendants' products could have, and in fact did, reach the drinking water source used by each plaintiff.

Although the Parties have somewhat managed this burden by agreeing to narrow the eligible sites, it is highly unlikely that every plaintiff will have lived and worked in one place for his or her entire life. That means that this type of discovery will not necessarily be limited to just two sites, no matter how much the Parties have tried to simplify and streamline these processes.

All the while, Plaintiffs enjoy several advantages that Defendants inherently do not have. For one, each plaintiff already knows his or her own medical history and likely provided medical and property records to their counsel months ago. Defendants are still at the starting line in this respect, given the thousands upon thousands of individual cases Plaintiffs have filed.

Although Plaintiffs decry the expense of having to litigate enough of these cases to achieve the aims of a bellwether process, Defendants expect they will unfairly suggest that Defendants should have nonetheless spent years incurring a massive discovery burden and expense by collecting medical records in every case for a future and unknowable bellwether process that is only now materializing. It would have been a colossal waste of monetary and human resources to burden countless non-party medical providers for more than 4,300 individual personal injury plaintiffs in order to have medical records at the outset of a process that will involve less than 1% of those plaintiffs. Defendants should be given appropriate time to manage this third-party document discovery and should not be penalized for their efforts thus far to streamline discovery and avoid unnecessarily burdening thousands of medical providers.

At the end of these document collection processes, to be able to intelligently select plaintiffs for Tier 2, the Parties will then have to take sufficient depositions, of both the plaintiffs themselves, as well as of third parties, like doctors, real estate agents, and water provider personnel, whose schedules must be accommodated. No matter the number of plaintiffs selected by the Parties, this step, too, will require time.

Finally, these tasks will be occurring as the Parties prepare the *Stuart* case for trial (a task the PEC recently described to the Court as "gargantuan" (Dkt. 2719, at 6)), mediate the Water Provider cases, and continue to accomplish the other tasks attendant to this complex MDL. In the PEC's view, the critically important and complex tasks inherent in Tier One discovery for the personal injury bellwethers can be completed in just *two months*, even as the Parties balance everything else going on in this MDL. Defendants are prepared to roll up their sleeves and, in fact, are eager to put Plaintiffs to their proof in these personal injury cases. But allocating two months for that process (as opposed to Defendants' proposed nine months, which is itself aggressive) is not even in the realm of reasonable or practicable.

_**Limits on Discovery**_. Even as Plaintiffs propose to restrict discovery to an unrealistic period of just two months, they also propose to declare open season on Defendants by enabling each and every individual bellwether plaintiff to serve its own Tier 1 discovery on each and every Defendant, to include each and every Plaintiff having the right to depose Defendants.

The Honorable Richard M. Gergel
December 14, 2022
Page 7

This, too, has no basis in reality or the longstanding practice in this litigation, where master discovery has been efficiently overseen by leadership on both sides.

Plaintiffs have had four years to take discovery of Defendants. Indeed, that is a core purpose of any MDL, and it has appropriately been one of this MDL's primary focuses to date. That process has borne significant fruit for Plaintiffs, in the form of millions of pages of documents, scores of interrogatory responses, and dozens of depositions. That discovery also includes site-specific information from Defendants in the form of Defendant Fact Sheet ("DFS") responses and associated documents regarding every site at issue in this litigation, tailored to whether the Defendant supplied AFFF itself or the chemical components of AFFF.

In light of this mountain of discovery already served and answered, it strains the imagination what additional information could be necessary for all of these separate plaintiffs. In discussions with Defendants, the PEC has never articulated what they would ask for or why they need it within 45 days of service. Nor have they explained how they would prevent duplicative discovery requests from dozens of plaintiffs serving discovery simultaneously or organize a group of plaintiffs to take depositions fairly and efficiently. They just want the discovery, without justification, out of some inchoate desire to preserve an individual plaintiff's right to seek discovery untethered from the years of hard work that has already occurred.

In contrast, Defendants have proposed reasonable limitations that recognize the significant investment the Parties have already made into discovery relevant to every case, including these. First, Defendants propose that the bellwether Plaintiffs—as a group—can serve one set of master discovery on each defendant. Second, those requests would have subject limits on them. Third, Plaintiffs cannot serve discovery duplicative of what has already been accomplished in the MDL to date. For this process, Defendants would give both sides 14 weeks, with the goal, of course, of finishing it as quickly as possible. And finally, Plaintiffs—again, as a group—could have up to two depositions per Defendant to clean up any case or plaintiff-specific information they do not already have (if anything), such as sales or communications for particular locations.

_**Tier 2 Pool Size**_. While the Parties agree that many of the details regarding the timing and conduct of Tier 2 should be deferred until Tier 1 discovery is well underway, Defendants propose that the most fundamental element of Tier 2—the size of the Tier 2 plaintiff pool—be defined now. Doing so now will allow the Parties to better focus and direct Tier 1 discovery, analyze and assess the Tier 1 plaintiffs for potential inclusion in Tier 2, and prepare for expert discovery. To this end, Defendants propose that the Tier 2 pool be comprised of no fewer than two and no more than four plaintiffs per included injury type. The PEC agrees that no fewer than two plaintiffs per injury type should be included in Tier 2; however, they would place no limit on the maximum number of plaintiffs in Tier 2.

There is no sensible reason to leave the size of the Tier 2 plaintiff pool unresolved. To the contrary, numerous benefits follow from deciding the issue now. The PEC's limitless Tier 2 apparently stems from their long-held desire to overburden juries with multi-plaintiff trials of unknown size. But the PEC's ambitions regarding unfettered multi-plaintiff trials are not

The Honorable Richard M. Gergel
December 14, 2022
Page 8

sufficient to justify a total lack of limits on Tier 2. The Court and Parties should have the benefit of a full record before assessing what case warrants selection as the first trial and, if the PEC persists in seeking a multi-plaintiff trial (something Defendants strongly oppose), justifying that argument based on the record then available.

*__Timeframe and Tasks for Follow-On Bellwether Processes__*. Finally, the Parties disagree on the timing for further discussions and proposals regarding claims not addressed in the initial personal injury bellwether pool. Consistent with the Court's comments during the September hearing, recognizing the need to begin addressing this large volume of claims (at 32:5–34:21), Defendants believe the Parties should make proposals to the Court by February 2023. To that end, Defendants have already sent the PEC a proposal, which reiterates their verbal proposal to the PEC more than six months ago and reduced to writing in July 2022—a proposal the PEC has assiduously avoided addressing.

Rather than at least start this long overdue conversation, the PEC seeks to further delay this process until May 2023, even as they take no steps of their own to eliminate cases that should not be on file in this MDL (or anywhere). Whatever process the Parties ultimately propose to the Court (jointly or separately) is not going to resolve these claims overnight, so the basic foundational work of establishing such a process should begin sooner rather than later. Indeed, Defendants' proposal is all the more reasonable given that Plaintiffs and the PEC have long had the power and ability to shape the docket before this Court by voluntarily dismissing claims they know have no merit, with or without Defendants' participation.

Defendants look forward to receiving the Court's guidance on these issues.

Respectfully submitted,

s/ Brian C. Duffy
*Defense Liaison Counsel*
on behalf of:

s/ *Joseph G. Petrosinelli*

Joseph G. Petrosinelli
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005
P: (202) 434-5547
F: (202) 434-5029
jpetrosinelli@wc.com

s/ *Michael A. Olsen*

Michael A. Olsen

The Honorable Richard M. Gergel
December 14, 2022
Page 9

Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
P: (312) 701-7120
F: (312) 706-8742
molsen@mayerbrown.com

*Co-lead Counsel for Defendants*

cc:    Lead and Liaison Counsel on Record