IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | MDL No. 2:18-mn-2873-RMG  **This Document relates to:**  *City of Stuart, FL, v. 3M Company et al.*, No. 2:18-cv-03487 |

**DEFENDANTS' OMNIBUS REPLY
IN SUPPORT OF THEIR MOTION TO EXCLUDE
PLAINTIFF'S EXPERTS' TESTIMONY**

## TABLE OF CONTENTS

                                                                        Page

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................... ii

I.      Plaintiff's Experts' Opinions On A "Public Health" Standard Of Care Should Be Excluded. ........................................................................................................... 1

II.     Plaintiff's Experts' Opinions On Defendants' Mental States Should Be Excluded. ......... 2

III.    Mr. Brown's Opinions, Adopted By Dr. Higgins, That The Primary And Secondary Source Of The PFAS Detected In Stuart's Wells Is AFFF, Are Not Reliable. ................................................................................................................. 3

IV.    Dr. Martin's Opinions Allocating PFOA To 3M Through His B/L/T-Based Method Are Inadmissible. ........................................................................................ 4

V.     Mr. Brown, Dr. Higgins And Dr. Martin Cannot Testify That C8 Fluorotelomer Surfactants In Fluorotelomer AFFF Transformed Into PFOA At Stuart. .......................... 5

VI.    Mr. Brown's And Mr. Berryhill's Persistence Opinions Are Inadmissible. ...................... 7

VII.   Mr. Johnson's Opinions Are Neither Helpful Nor Reliable. .......................................... 10

CONCLUSION ........................................................................................................................ 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Cooper v. Meritor, Inc.*,
  2019 WL 545187 (N.D. Miss. Feb. 11, 2019) ............................................................................4

*Cooper v. Smith & Nephew, Inc*.,
  259 F.3d 194 (4th Cir. 2001) ....................................................................................................3

*Downs v. DSM Food Specialties USA Inc.*,
  2021 WL 6133743 (S.D. Iowa Oct. 28, 2021) ..........................................................................6

*In re E. I. Du Pont de Nemours & Co. C8 Pers. Injury Litig.*,
  MDL 2433 (S.D. Ohio) .............................................................................................................2

*Gen. Elec. v. Joiner*,
  522 U.S. 136 (1997) ..................................................................................................................8

*Gerawan Farming, Inc. v. Rehrig Pac. Co.*,
  2013 WL 1982797 (E.D. Cal. May 13, 2013) ........................................................................10

*Good v. Am. Water Works Co.*,
  2016 WL 6024426 (S.D.W. Va. Oct. 13, 2016) ........................................................................2

*Heineman v. Am. Home Prod. Corp*.,
  2015 WL 1186777 (D. Colo. Mar. 12, 2015) ...........................................................................3

*Hines v. Wyeth*,
  2011 WL 2680842 (S.D.W. Va. July 8, 2011) .........................................................................3

*Judy v. Mako Marine Int'l, Inc.*,
  422 F. Supp. 3d 1062 (D.S.C. 2019).........................................................................................7

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*,
  150 F. Supp. 3d 644 (D.S.C. 2015).......................................................................................1, 6

*In re Lipitor*,
  2016 WL 2940784 (D.S.C. May 6, 2016)........................................................................1, 2, 3

*Middlesex Water Co v. 3M Co*.,
  No. 2:18-cv-15366 (D.N.J.) ......................................................................................................2

*Oglesby v. Gen. Motors Corp*.,
  190 F.3d 244 (4th Cir. 1999) ....................................................................................................5

**Other Authorities**

40 C.F.R. § 141.24(f) ........................................................................................................................9

Fla. Admin. Code. Ann. R. 62-550.500(5)(a) ..................................................................................9

Fed. R. Evid. 702 ........................................................................................................................1, 3

Expert witnesses must assist the jury, not confuse or mislead it. They must do so through careful work to gather relevant data, analysis of that data using reliable scientific methods, and opinion testimony that is connected to the data and methods they used.

On every one of those counts, Plaintiff's experts fail to pass muster. They declined to do the work to gather data necessary to their conclusions. They used scientific methods that courts reject as unreliable. And they drew conclusions that have no data behind them, are not connected to reliable scientific methods, or supplant the jury's role.

For the reasons explained below and in Defendants' opening brief, the Court should exclude these opinions under Rule 702.

I. **Plaintiff's Experts' Opinions On A "Public Health" Standard Of Care Should Be Excluded.**

Plaintiff attempts to distinguish *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Products Liability Litigation* ("*Lipitor*")—which excluded testimony about a corporation's purported ethical requirements or its legal "duties" and "obligations"—because that testimony was "not based on any particular legal standard." ECF No. 2798 ("Opp.") 4, 6 (quoting *In re Lipitor*, 2016 WL 2940784, at *5 (D.S.C. May 6, 2016)). But Dr. Siegel concedes the same failing: ▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀ He also concedes that ▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀ Thus, it is clear that rather than assist the jury—as expert testimony must—Plaintiff intends these experts to confuse the jury into believing "that such statements are based on legal duty." *Lipitor*, 2016 WL 2940784, at *6.

Notwithstanding these concessions, Plaintiff relies on a few cherry-picked documents and its experts' say-so to argue that ▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀

1

██████████ But the Chemical Manufacturers Association—on which Plaintiff and its experts rely in claiming the precautionary principle applies to industry (Opp. 3)—has made clear that its standards are *not* binding, and courts agree. *See Good v. Am. Water Works Co.*, 2016 WL 6024426, at *7-8 (S.D.W. Va. Oct. 13, 2016). Nor does a single quote from 3M's May 2000 PFAS phaseout announcement, Opp. 3, suffice to establish that *anybody* in the industry believed that companies had to conform with the (hopelessly vague) precautionary principle in order to comply with generally accepted (and thus potentially relevant) standards over the *decades* at issue in this case.

Unable to distinguish *Lipitor* or to demonstrate that these invented standards are accepted industry standards, Plaintiff is left with two district court orders that—unlike *Lipitor*—incorrectly admitted such testimony. *In re E. I. Du Pont de Nemours & Co. C8 Pers. Injury Litig.*, MDL 2433 (S.D. Ohio) ("*DuPont*") and *Middlesex Water Co v. 3M Co*., No. 2:18-cv-15366 (D.N.J.). Those cases did not apply Fourth Circuit law, are contrary to the weight of authority outlined in Defendants' opening brief, and are not persuasive. Plaintiff has provided the Court no justification for gutting the rule that standards must be widespread and actually observed in the industry to be relevant. Def. Br. 6–7. These standard of care opinions should be excluded.

**II.     Plaintiff's Experts' Opinions On Defendants' Mental States Should Be Excluded.**

Whereas Plaintiff's public health standards would mislead the jury, its mental state opinions would supplant the jury's role entirely. Plaintiff offers no authority that would justify such a startling overthrow of the jury's sole province to judge mental state. Indeed, Plaintiff does not and cannot refute the cases holding that experts cannot draw conclusions about corporate knowledge, motive, or other mental states. Def. Br. 10–11.

It is entirely beside the point that experts are permitted to "provide the factual basis underlying their opinions" (Opp. 7) or that "Defendants can point to no statement made by Plaintiff's experts that is unsupported by evidence" (*id.* at 8). If there are *facts* relevant to the jury's

2

consideration of the issues, they can be entered in the form of admissible evidence. But whatever that evidence may be, it cannot lay the foundation for inadmissible testimony on Defendants' mental state. The jury can (indeed, must) determine for itself what Defendants knew and when based on what Plaintiff claims are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Opp. 9.

That is why expert testimony that "merely regurgitates factual information that is better presented directly to the jury rather than through the testimony of an expert witness" is improper. *Hines v. Wyeth*, 2011 WL 2680842, at *5 (S.D.W. Va. July 8, 2011). As one court put it well, "it may be necessary for [an expert] to explain the meaning or significance of certain words or concepts" in corporate records, but once the jury is "armed with such records and [the expert's] explanations," the jury should be capable of "reach[ing] a conclusion about the Defendants' knowledge . . . without [the expert's] say-so." *Heineman v. Am. Home Prod. Corp.*, 2015 WL 1186777, at *12 (D. Colo. Mar. 12, 2015). *Lipitor* made clear that it would "not allow" "any opinions about [the defendant's] state of mind or the intentions or motivations of any author of any documents." 2016 WL 2940784, at *4 n.3. The Court should do the same here.

**III.    Mr. Brown's Opinions, Adopted By Dr. Higgins, That The Primary And Secondary Source Of The PFAS Detected In Stuart's Wells Is AFFF, Are Not Reliable.**

Whether under Rule 702 (which governs the reliability of Mr. Brown's opinions) or under Florida's causation standard (which does not), Mr. Brown's failure to consider and eliminate alternative sources of PFAS renders his opinions unreliable and inadmissible. *See* Opp. 13 (attempting to sidestep Rule 702 by arguing AFFF was "a concurring cause" under Florida law). Under Rule 702, Mr. Brown must consider other causes and eliminate them. *See, e.g.*, *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001). He did not. And he similarly runs afoul of Florida's substantive rule that "the expert must eliminate the obvious alternative explanations

3

'as highly improbable.'" *Cooper v. Meritor, Inc.*, 2019 WL 545187, at *22 (N.D. Miss. Feb. 11, 2019) (citations omitted). Under either regime, Mr. Brown cannot mislead the jury into finding AFFF the sole cause of Plaintiff's injury.

Plaintiff attempts to save these shortcomings by claiming that



Failing to test for "obvious and significant alternative explanations" renders Mr. Brown's opinions "essentially worthless." *See, e.g.*, *Meritor*, 2019 WL 545187, at *19. In fact, ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ Mr. Brown gave up the game. His primary and secondary source opinions should be excluded. *See* Def. Br. 15–16.

## IV.     Dr. Martin's Opinions Allocating PFOA To 3M Through His B/L/T-Based Method Are Inadmissible.

Dr. Martin's opinion that the percentage of branched isomers found in Stuart water samples shows that the PFOA in question came from 3M was not based on a reliable method and must be excluded. Def. Br. 16–21. Defendants rest on their opening brief, except as to two points.

*First*, Plaintiff misleadingly argues that Defendants did not challenge two "independent" methods that Dr. Martin used to conclude that the PFOA came from 3M. Opp. 15–16. But the two

4

methods are not independent; they suffer from precisely the same flaw Defendants raised in their motion—the instrument was not properly calibrated to quantify the percentage of branched PFOA isomers. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████,

which, as Defendants pointed out, "suffers from the same limitation" as the B/L/T method. In Dr. Martin's words, ███████████████████████████

███████████████████████████████████████

█████████████████████████████.

*Second*, Plaintiff fails to rebut Defendants' showing that Dr. Martin did not reliably account for fractionation—the process by which the percentage of branched and linear isomers will change as PFAS moves through environmental media. Plaintiff claims that ████████████████

████████████████████████ Opp. 18. He did not; he states simply that ██████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████ Thus, Dr. Martin's own analysis eviscerates the central assumption underlying his opinions—that fractionation in groundwater is insubstantial. That renders his methods unreliable. *See Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250-51 (4th Cir. 1999) (affirming exclusion of expert opinion "premised" on a false assumption).

**V.    Mr. Brown, Dr. Higgins And Dr. Martin Cannot Testify That C8 Fluorotelomer Surfactants In Fluorotelomer AFFF Transformed Into PFOA At Stuart.**

No one disputes that compounds in FT-AFFF *can* under certain very specific laboratory

5

conditions transform to PFOA. But a fundamental question the jury must answer is whether PFAS in FT-AFFF actually *did* transform into PFOA in Stuart's groundwater, not simply whether it *can*. That requires analyzing the conditions at Stuart to determine whether they foster the necessary conditions to cause such transformations. Plaintiff's experts openly acknowledged they did not do this analysis. That ends the argument: These opinions are not admissible. *See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 150 F. Supp. 3d 644, 661 (D.S.C. 2015) (excluding opinion based on "no data or facts to make the leap from a possibility to a probability").

Plaintiff's failure to address the factors required for transformation concedes the issue. *See* Def. Br. 25 tbl. A. For example, if the Court were to ask these experts whether oxygen is required to complete the transformation to PFOA, they would have to answer "yes." But having done no evaluation of the actual conditions at Stuart, if asked whether there was sufficient oxygen in the aquifer at Stuart to support the transformation to PFOA, they would have to answer, at best, "I don't know."

The Mejia-Avendaño study, Opp. 21, returns Plaintiff to the same dead end, because that study relies on the very same lab studies for the proposition that FT-AFFF *can*, under certain conditions, transform into carboxylates like PFOA. *See* Opp. Ex. 102 (Mejia-Avendaño) at 8313–23. Just as Drs. Higgins and Martin and Mr. Brown did not show that lab conditions are similar to Stuart, they did not assess whether Stuart's conditions are comparable to those in Mejia-Avendaño.[1] Thus, Plaintiff's reliance on this study fails for the same reason as its experts' reliance on lab studies fails. *See In re Lipitor*, 150 F. Supp. 3d at 661; *see also Downs v. DSM Food*

---

[1] Indeed, the study "highlights the need for specific studies related to the effect that hydrocarbon contamination remediation efforts could have on PFAS originating from AFFFs." *See* Opp. Ex. 102 (Mejia-Avendaño) at 8321.

6

*Specialties USA Inc.*, 2021 WL 6133743, at *7 (S.D. Iowa Oct. 28, 2021) (finding expert's opinion inadmissible where he assumed that the level of diacetyl in the air at one plant was the same at another plant).

Attempting to save this point, Plaintiff claims that  (Opp. 22). Not so: The two ends of this spliced quotation come from two different paragraphs. Those two paragraphs

Finally, Plaintiff's concession that "technical questions may exist as to the exact rate of transformation," Opp. 21, also dooms these opinions. Plaintiff's theory is that *all* linear PFOA not attributable to 3M comes from FT-AFFF and not some other, non-AFFF source. But if the transformation rate is 50 years, for example, then AFFF used in the 2000s, 1990s, and even some of the 1980s could not be the source of linear PFOA in Plaintiff's wells today. A "mere possibility" of "causation is not enough." Def. Br. 24–27; *see also Judy v. Mako Marine Int'l, Inc.*, 422 F. Supp. 3d 1062, 1067 (D.S.C. 2019). Plaintiff's all-or-nothing strategy on FT-AFFF leaves its experts no reliable basis for attributing PFOA at Stuart to FT-AFFF.

**VI.     Mr. Brown's And Mr. Berryhill's Persistence Opinions Are Inadmissible.**

*The PFOS Persistence Opinions Are Inadmissible*. Plaintiff offers no serious defense of Mr. Brown's conclusion that the *average* of the broad ranges he found is a reliable estimate of PFOS persistence. Mr. Brown concluded that

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ That approach has no scientific (or logical) validity. Def. Br. 30–32. Plaintiff's response concedes that Defendants' cases "condemn experts' use of averages," but claims they do not hold that "an expert may never use averages in any context." Opp. 29. But that strawman does not rebut the fact that the cases prohibit an expert from doing precisely what Mr. Brown has done here: using an *average* to opine on what *actually* happened or will happen. See *Gen. Elec. v. Joiner*, 522 U.S. 136, 144 (1997).

Mr. Brown's unsupported assumption that ████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ also render his opinions unreliable and unhelpful to the jury. Plaintiff ignores a central issue: just because PFOS levels in the vadose zone are above detection limits does not mean that levels in the ground water generally or the drinking water derived from that ground water will be above those limits. That is why Mr. Brown had to admit that ████████████████████████████████

█████████████████████████████████████████████████ But it is the levels in drinking water that matter, not the vadose zone.

Thus, Plaintiff is not saved by Mr. Brown's baseless testimony that ███████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Indeed, even if there were a federal MCL for PFOS, compliance would be measured at the entry to the distribution

8

system (i.e., drinking water), not at each of the groundwater wellheads or in the vadose zone around any of them. 40 C.F.R. § 141.24(f). *See also* Fla. Admin. Code Ann. r. 62-550.500(5)(a) (requiring compliance sampling at the entry point to the distribution system). But again, Mr. Brown conceded that █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*The PFOA Persistence Opinions Are Inadmissible.* Mr. Brown chose to model only the persistence of PFOS, not PFOA, and so should not be permitted to testify about the persistence of PFOA at Stuart. By failing to model for PFOA, Mr. Brown ignored the actual conditions at Stuart, including the pumping rates and starting concentrations of PFOA. For example, ████████

████████████████████████████████████████████████████████████████

███████████ It defies belief to suggest the persistence will be similar for those two compounds under those circumstances. Indeed, the *arguendo* modeling[2] performed by defense expert Steven Hart shows that ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Plaintiff suggests that Mr. Brown did not need to model PFOA persistence because it is PFOS persistence that drives how long remediation is needed. But, at most, that would just mean that Mr. Brown's testimony should be confined only to PFOS. It is not license for Plaintiff to offer wholly unsupported "expert" testimony about PFOA persistence, including that ███████████

████████████████████████████████████████████████████████ Opp.

---

[2] Contrary to Plaintiff's suggestion, and as Mr. Hart's report expressly states, ████████████
████████████████████████████████████████████████████████ Plaintiff also incorrectly argues that ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

9

at 33. Such testimony lacks the necessary scientific and factual underpinnings and will mislead the jury. It must be excluded. And because Mr. Berryhill's opinions rely solely on that modeling, his opinions on the need for ▇▇▇▇▇▇▇▇▇▇ fall, too.

## VII.   Mr. Johnson's Opinions Are Neither Helpful Nor Reliable.

In opining on the Defendants' "financial condition," Mr. Johnson offers no opinions about the financial data in his PowerPoint slides (and only addresses some Defendants). Instead, he merely repeats the contents of public reports. That is not expert testimony. Def. Br. 38–39.

What limited opinions he does offer—on the present value of capital and future maintenance costs—are unreliable and unsupported. Put simply, Mr. Johnson did not do the economic work necessary to reliably estimate the appropriate discount rate. *See Gerawan Farming, Inc. v. Rehrig Pac. Co.*, 2013 WL 1982797, at *4 (E.D. Cal. May 13, 2013), *aff'd*, 587 F. App'x 654 (Fed. Cir. 2014) (excluding damages testimony because, *inter alia*, "the empirical work required to estimate a valid discount rate that is fully consistent with finance theory has not been conducted" (cleaned up)). This is not a matter of a "battle of experts" or "weight versus admissibility." It is a matter of pure junk "science," ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇ These opinions should be excluded.

## CONCLUSION

For these reasons, the Court should exclude the foregoing opinions of Plaintiff's experts.[3]

---

[3] Defendants rest on their opening brief and the accompanying Declaration of Professor Joseph Thrasher as to the unsupported and inadmissible opinions of Mr. Walton. Def. Br. 34–38; JX 19 (Thrasher Decl.).

10

Dated: February 10, 2023                                  Respectfully submitted,

/s/ *Michael A. Olsen*

| | |
|---|---|
| Michael A. Olsen | Brian Duffy |
| Mayer Brown LLP | Duffy & Young LLC |
| 71 South Wacker Drive | 96 Broad Street |
| Chicago, IL 60606 | Charleston, SC 29401 |
| P: (312) 701-7120 | P: (843) 720-2044 |
| F: (312) 706-8742 | F: (843) 720-2047 |
| molsen@mayerbrown.com | bduffy@duffyandyoung.com |
| | |
| Joseph G. Petrosinelli | David E. Dukes |
| Williams & Connolly LLP | Nelson Mullins Riley & Scarborough LLP |
| 680 Maine Ave., S.W. | 1320 Main Street, 17th Floor |
| Washington, DC 20024 | Columbia, SC 29201 |
| P: (202) 434-5547 | P: (803) 255-9451 |
| F: (202) 434-5029 | F: (803) 256-7500 |
| jpetrosinelli@wc.com | david.dukes@nelsonmullins.com |
| | |
| *Co-Lead Counsel for Defendants* | *Co-Liaison Counsel for Defendants* |

11

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 10, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record in this case via transmission of Notice of Electronic Filing generated by CM/ECF.

*/s/ Michael A. Olsen*
Michael A. Olsen
