## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

|  |  |
|---|---|
| ) | |
| IN RE: AQUEOUS FILM-FORMING ) | MDL No. 2:18-mn-2873-RMG |
| FOAMS PRODUCTS LIABILITY ) | |
| LITIGATION ) | **ORDER AND OPINION** |
| ) | |
| ) | **This Order Relates to** |
| ) | *City of Stuart, Fl. v. 3M Co., et al.,* |
| ) | **Case No. 2:18-cv-3487-RMG** |
| ) | |
| ) | |

Before the Court is Defendants' Co-Lead Counsel's omnibus motion for summary judgment. (Dkt. No. 2695). For the reasons set forth below, the Court rules as follows.

### I.    Background

Plaintiff the City of Stuart ("Plaintiff," "Stuart" or the "City) alleges that various Defendants manufactured and distributed aqueous film-forming foam ("AFFF") and/or fluorosurfactant additives for use in AFFF that contaminated the City's water supply with PFAS, including PFOS and PFOA. (*City of Stuart, Fl. v. 3M Co., et al.*, 2:18-cv-3487-RMG, Dkt. No. 54, ¶ 1).

Defendants filed an omnibus motion for summary judgment. (Dkt. No. 2695). Plaintiff filed a response in opposition, (Dkt. No. 2799), to which Defendants filed a reply, (Dkt. No. 2850). With the Court's leave, Plaintiff filed a sur-reply. (Dkt. No. 2879).

Defendants' motion is fully briefed and ripe for disposition.

### II.    Legal Standard

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

A dispute is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *See id.* Therefore, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).

"In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The movant bears the initial burden of demonstrating that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment must demonstrate that specific, material facts exist that give rise to a genuine issue. *See id.* at 324. Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

## III.    Discussion

First, Defendants argue they are entitled to summary judgment on Plaintiff's private nuisance claim. Defendants argue that, under Florida law, nuisance claims do not apply to the sale of defective products. (Dkt. No. 2695-1 at 17). Plaintiff disagrees, citing Fla. Stat. § 768.81(d), and arguing that 2011 amendments to § 768.81 modified Florida's common law to permit nuisance actions be brought for allegedly defective products. (Dkt. No. 2799 at 22).

Section 768.81 concerns "Comparative fault" and was adopted in 2011.   Section 768 was passed to overrule *D'Amario v. Ford Motor Co.*, 806 So. 2d 424 (Fla. 2001), which held "that principles of comparative fault concerning apportionment of fault as to the cause of [an] underlying crash will not ordinarily apply in crashworthiness or enhanced injury cases." 2011 Fla. ALS 215, 2011 Fla. Laws ch. 215, 2011 Fla. SB 142. Section 768's purpose was therefore to ensure "in a products liability action as defined in this act, fault [] be apportioned among all responsible persons." *Id.*   The Legislature reiterated that the statute "affect[ed] only remedies." *Id.* Accordingly, § 768.81(d) now reads "'Products liability action' means a civil action based upon a theory of strict liability, negligence, breach of warranty, *nuisance*, or similar theories for damages caused by the manufacture, construction, design, formulation, installation, preparation, or assembly of a product. . . . The substance of an action, not the conclusory terms used by a party, determines whether an action is a products liability action." *Id.* (emphasis added).

The Court grants Defendants summary judgment on this point.  "[N]uisance does not apply to the design, manufacture, and distribution of a lawful product." *Penelas v. Arms Tech.*, No. 99-1941 CA-06, 1999 WL 1204353, at *4 (Fla. Cir. Cit. Dec. 13, 1999) (noting "[a] separate body of law (strict product liability and negligence) has been developed to apply to the manufacture and design of products"); *Karpel v. Knauf Gips KG*, No. 21-24168-CIV, 2022 WL 4366946, at *7 (S.D. Fla. Sept. 21, 2022) (finding "no precedent in Florida" for allowing plaintiff to sue a drywall manufacturer "on a private nuisance theory by reason of the [drywall's] alleged defects"). Plaintiff's argument the 2011 amendments to § 768.81(d) changed Florida's common law of nuisance is unpersuasive given the unambiguous statutory text and legislative history discussed above.  At best, the cited language makes clear that the formal label a plaintiff places on a claim

does not control whether a case is subject to comparative fault principles. Accordingly, the Court grants Defendants summary judgment on Plaintiff's private nuisance claim.

Second, Defendants contend that Plaintiff's claim for $105 million in damages related to the "future operation, expansion, and maintenance of [the City's] PFAS treatment system" is purely speculative and that Defendants are entitled to summary judgment for any such damages. (Dkt. No. 2695-1 at 20). Defendants argue this point on two specific bases.

To begin, Defendants argue that Plaintiff's expert Ronald K. Berryhill bases his future damages estimation on the assumption that "all of Stuart's drinking water for the next 40 years will come from the Surficial Aquifer—requiring PFAS treatment—and that water demand will increase over that time." (*Id.* at 21). But, Defendants continue, Plaintiff plans to move to the Floridan Aquifer, "a new source that will not require treatment for PFAS." (*Id.*). Thus, Defendants conclude, Berryhill's "theory that Stuart will expand its PFAS treatment system from a capacity of 4-MGD [million gallons a day] to 6-MGD is entirely contradicted" by the record. (*Id.*). Additionally, Defendants argue that because Plaintiff's Consumptive Use Permit expires in 2029, Plaintiff's future right to use the surficial aquifer beyond then is speculative and cannot form the basis of a claim for damages. (*Id.* at 22). Defendants cite *Davey Compressor Co. v. City of Delray Beach*, 613 So. 2d 60 (Fla. Dist. Ct. App. 1993) ("*Delray Beach*") in support of this second argument. *See Delray Beach*, 613 So. 2d at 62 (trial court erred in awarding city future damages beyond expiration of its consumptive use permit where it put forth at trial only "one witness who could speculate as to whether the SFWMD [South Florida Water Management District] governing body will renew appellee's water consumptive use permit when it expires"); *see id.* (noting the Florida Water Resources Act makes "all waters in the state subject to regulation," that a "permitting system is established which requires permits for consumptive use of water," and that

"without a permit," a city does not generally have "property right[s] to the use of water beneath its lands").

On April 27, 2023, the Court held its monthly Case Management Conference in this matter. (Dkt. No. 3048). At this conference, in response to various concerns raised by Defendants, the Court questioned Plaintiff as to whether the City intended to remain on the Surficial Aquifer or "argue something else." (*Id.* at 43). Counsel for the City indicated that Stuart had "filed an amended CUB application to amend its consumptive use permit to specifically stay on the Surficial Aquifer." (*Id.* at 43-44). The City further stated:

> And I made it very clear in the deposition that the only damages we're seeking with respect to the Floridan are consistent with our remediation expert Kevin Berryhill's opinions, which was once the city knew in 2019 that the ion exchange system was effective at removing PFAS, any further expenses incurred in building out a Floridan well, the water treatment plant for reverse osmosis, the interconnect to be able to get rid of the waste from the RO, those expenses are not something that we're pursuing. And we're not pursuing that at trial.

(*Id.* at 44).

The Court rejects Defendants' argument that Berryhill's future damages theory rests on speculative grounds. As made clear in the above exchange, the City does intend to rely in the future solely on the surficial aquifer. Thus, the Court denies Defendants' motion on this point. As to the question of whether Plaintiff has sufficiently established its legal interest in the groundwater beneath its well field beyond the expiration date of its consumptive use permit, the Court also denies Defendant's motion. Reading all facts in a light most favorable to Plaintiff, the nonmoving party, a question of material fact exists on this point. *See* Alternative Water Supply Conceptual Plan, (Dkt. No. 2806-10 at 75) (dated July 23, 2018 and noting that "the City could continue to use the SAS [surficial aquifer system] exclusively for its water supply to meet the demand of its current customer base through the year 2040"); Expert Report of Ronald K. Berryhill (Dkt. No.

2711-1 at 33) (noting that "renewal of the permit is also contingent on the City's evaluation of long-term water supply alternatives. A long-term water supply plan would need to be submitted to SFWMD prior to further permit renewal. As of the 2009 permit renewal, the City was meeting this requirement by entering into a 20-year bulk water and wastewater service agreement with Martin County, which constituted an alternative source of supply. . . . [T]hat agreement covers the period of 2008 – 2028 and allows the City to take up to 1-MGD of treated water from the Martin County system. . . . [W]hen the City entered into its bulk water supply agreement with Martin County in 2013, it appeared that the City was reaching the limit of its permitted supply capacity from the Surficial Aquifer. However, the City was able to implement a water conservation program and wastewater reuse program and has not yet had to take any water from Martin County other than in short term emergency situations involving well O&M or water main breaks") (internal citations omitted and filed under seal).

Third, Defendants argue that Plaintiff may not recover the $851,729 it spent around 2018 for costs related to "certain initial studies and reports pertaining to moving to the Floridan Aquifer" because "the studies took place for reasons unrelated to PFAS." (Dkt. No. 2695-1 at 23).

The Court denies Defendants' motion on this point. Before 2014, as Defendants contend, the record does appear to show Stuart was asked to contemplate alternate water supplies besides the Surficial Aquifer. *See* (Dkt. No. 2967-50 at 3) (August 8, 2007 email from David Peters noting that "[o]ur relationship with the South Florida Water Management district is somewhat strained due to our insistence that our water supply will meet future demands without going straight to an alternative water supply" such as the Floridan Aquifer); Upper East Coast Water Supply Plan Update, (Dkt. No. 2697-52 at 85) (South Florida Water Management District 2016 report noting Stuart was a utility at risk in both 2007 and 2015 because it had "SAS wellfields near the saltwater

6

interface that do not have an inland wellfield, ha[d] not developed alternate sources of water, or ha[d] limited ability to meet user needs through interconnects with other utilities"). That same year, however, Stuart discovered PFAS in its water. At the time, this discovery was not a "cause for alarm." (Dkt. No. 2711-34 at 6) (filed under seal). On May 13, 2016, however, that changed when the City learned that its "point of entry water exceed[ed] the new health advisory the EPA had issued." (*Id.* at 4). In an April 27, 2017 email, Paul Nicoletti, City Manager, while discussing the need to do further research on an "Alternative Water Source Processing Plant," stated PFAS was a reason for exploring alternate water sources: "We lost availability from 3 wells due to TurboCombuster contamination, *and another 3 wells this past year due to PFOA/PFOS contamination* that EPA announced in 2016." (Dkt. No. 2697-67 at 2) (noting the "only major Capital Budget item that I know about is the need to construct an Alternative Water Source Processing Plant during the next 3 or 4 years for about $9.5 Million. I know that we have discussed 'if' and 'when' this would become necessary, but our professional assessment is that we are wearing out the surficial aquifer"). Considering the above evidence and reading all facts in a light most favorable to Plaintiff, the nonmoving party, a reasonable jury could find that the City's challenged 2018 expenses—initial studies and reports pertaining to moving to the Floridan Aquifer—were due to PFAS contamination. (Dkt. No. 2695-1 at 15). Accordingly, Defendants' motion is denied on this point.

Last, Defendants argue they are entitled to summary judgment on Stuart' claims for $31 million dollars for soil remediation. (*Id.* at 25). Defendants argue Stuart may not recover such damages because "(1) there is no indication that Stuart has taken any steps or has any plans to remediate soil; (2) no regulatory body has required Stuart to remediate the soil; (3) there is no statute or regulation requiring Stuart to remediate the soil; (4) Stuart has not established that both

soil remediation and groundwater treatment are needed; [and] (5) Stuart has not established that

there is a health risk requiring remediation of the soil . . . ." (*Id.* at 25-26).  Defendants also argue

that Stuart's experts' calculations regarding remediation would provide Stuart a "double recovery"

in violation of Florida law. Defendants contend:

> Florida law is clear that "a double recovery based on the same element of damages
> is prohibited." *Martinez v. Ascensores Servs., S.A.*, 89 So. 3d 956, 959 (Fla. Dist.
> Ct. App. 2012). Stuart's estimates for treating the groundwater from the Surficial
> Aquifer at the water treatment plant do not consider the impact of Mr. Brown's
> proposed soil and groundwater remediation at the Public Safety Complex and Fire
> Station 2 sites. Although Mr. Berryhill briefly acknowledges in his report that Mr.
> Brown has stated that "remediation of the contaminated soil and/or water at the
> Public Safety Complex and at Fire Station 2 will be required," Mr. Berryhill does
> not factor in such remedial efforts in estimating the length of time the treatment of
> Stuart's wells purportedly will be required. JX 1 (Berryhill Rpt.) at 10.2. . . . Adding
> Mr. Brown's soil and groundwater remediation damages would impermissibly
> allow Stuart to obtain damages for remediation of PFAS and treating the water
> twice—once in the soil and groundwater near that soil and again at the ion exchange
> treatment system.

(*Id.* at 27-28).

The Court denies Defendants' motion on these final points.  As to Defendants' argument

that Plaintiff must meet its above described six-part test for damages, Plaintiff correctly observes

Defendants cite no case law showing Plaintiff must make such a showing.  Defendants do not

dispute that "Plaintiff's soil is contained with PFAS." Thus, the question of remedial damages is

one for the jury alone. (Dkt. No. 2799 at 34-35); *Middlesex Water Co. v. 3M Co.*, No. 18cv15366

(EP) (ESK), 2022 U.S. Dist. LEXIS 198068, at *20-23 (D.N.J. Oct. 31, 2022) (rejecting argument

that plaintiff should be "limited to the reasonable costs of treating the water . . . to comply with

New Jersey MCLs" because state regulations are "not determinative of what constitutes a safe

level of any chemical" and "[d]etermining the scope of Plaintiffs' remediation costs is precisely"

an issue of fact for a jury to determine); *see also* (Dkt. No. 2806-20 at 3) (June 1, 2017 letter from

Florida Department of Environmental Protection to Stuart finding "contaminants have been

released or discharged" within the City and that Stuart may be responsible for "assessment and remediation"); (Dkt. No. 2806-60 at 3) (July 16, 2021 letter from Florida Department of Environmental Protection stating that Stuart "may have legal responsibility for site assessment and rehabilitation").  As to Defendants' "double recovery argument," reading all facts in a light most favorable to Plaintiff, the nonmoving party, the Court denies Defendants' motion on this point as Plaintiff has put forth evidence from which a reasonable factfinder could find that long-term treatment of the City's water is necessary while, concurrently, remediation efforts are undertaken to abate ongoing and future PFAS contamination of groundwater. *See* Expert Report of Anthony Brown, (Dkt. No. 2711-2 at 65-80); (*Id.* at 65) (providing time ranges for persistence of contamination in the vadose zone and groundwater at primary and secondary source areas).

## IV.   **Conclusion**

For the foregoing reasons, Defendants' omnibus motion for summary judgment is **GRANTED IN PART AND DENIED IN PART** (Dkt. No. 2695) as detailed herein.

**AND IT IS SO ORDERED.**

  s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

May 5, 2023
Charleston, South Carolina