# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) Master Docket No.: <br> ) 2:18-mn-2873-RMG |

| | |
|---|---|
| CITY OF CAMDEN, et al., <br><br> *Plaintiffs,* <br><br> -vs- <br><br> E.I. DUPONT DE NEMOURS AND COMPANY (n/k/a EIDP, Inc.), et al., <br><br> *Defendants.* | ) <br> ) Civil Action No.: <br> ) 2:23-cv-03230-RMG <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**DECLARATION OF PAUL J. NAPOLI IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT, FOR CERTIFICATION OF SETTLEMENT CLASS AND FOR PERMISSION TO DISSEMINATE CLASS NOTICE**

I, Paul J. Napoli, declare, pursuant to 28 U.S.C. §1746, as follows:

**I.      INTRODUCTION**

1.      I am an attorney licensed to practice in all courts in the States of New York and Illinois.  I make this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class and for permission to disseminate Class Notice under Federal Rule of Civil Procedure 23(e).  I have personal knowledge of the following facts, and if called as a witness, I could and would testify competently to them.

2.      I am a Founder and Partner in the law firm of Napoli Shkolnik, where I lead the firm's Environmental Department.

3.      My work in Napoli Shkolnik's Environmental Contamination Department focuses primarily on representing public water suppliers whose water supplies are contaminated with

1

chemical substances.  In that capacity, I have represented a wide range of public water suppliers,

spanning from those operating hundreds of drinking water production wells to small towns that

draw water from rivers.  Through my work representing water providers over the past thirty years,

I have developed a sophisticated understanding of their operations, and have worked with

engineering and scientific experts to understand both how contaminants affect Public Water

Systems and the equipment and techniques necessary to reduce or remove those contaminants from

drinking water.

## II.     QUALIFICATIONS AND EXPERIENCE

4.     I have a significant amount of experience serving in leadership positions in complex

environmental and mass tort litigation cases, including representing numerous public entities and

individuals in environmental tort cases similar to the proposed class action at issue here.  These

cases have resulted in billions of dollars in recoveries for my clients, and include but are not limited

to the following:

   a. *In re Flint Water Cases*, No. 5:16-cv-10444 (E.D. Mich.) – Our firm served as
      Co-Liaison Counsel overseeing the individual personal injury, property damage,
      and wrongful death lawsuits brought by thousands of victims of the Flint water
      crisis.  The lawsuits alleged that Flint residents suffered ruinous damages to their
      health and property when defendants recommended, approved, and caused Flint's
      water supply to become contaminated with corrosive lead and bacteria.  Although
      litigation is still ongoing, our firm was instrumental in negotiating a landmark
      settlement with certain defendants in the case and establishing a victims
      compensation fund of over $600 million for injured Flint residents.

   b. *In re: MTBE (Methyl Tertiary Butyl Ether) Products Liability Litigation*, MDL
      1358 (S.D.N.Y.) – Our firm represented more than two dozen public entities and
      hundreds of individuals across the country in litigation against the major oil
      companies who made the decision to add MTBE to gasoline.  Many of these cases
      were transferred to the MDL, while others were litigated in state courts across the
      country.  Our firm successfully negotiated settlements totaling more than $50
      million with ExxonMobil Corporation and other defendants on behalf of our
      clients whose potable drinking water sources were endangered and contaminated
      by leaks of petroleum additive.

c.  *In re: World Trade Center Disaster Site Litigation*, 21 MC 100 (AKH) (S.D.N.Y.) – I served as Plaintiffs' Liaison Counsel and helped negotiated a historic settlement of more than ten thousand workers' claims against the City of New York, its contractors and other defendants in the mass tort litigation involving first responders, construction workers, and laborers who became ill as a result of toxic exposures suffered during the debris removal and clean-up operations at the World Trade Center and related sites following the September 11, 2001 attacks.

5.      In addition to the environmental matters listed above, I have extensive experience representing municipalities and individuals in complex mass tort litigations similar to the present case.  Those litigations include but are not limited to the following:

a.  *In re New York Opioid Cost Recovery Litigation*, Index No. 400000/2017 (N.Y. Sup. Ct., Suffolk Cty.) – I was appointed Co-Lead Counsel in this litigation where our firm represented more than two dozen municipalities in New York against certain pharmaceutical manufacturers for harm allegedly caused by false and misleading marketing campaigns promoting semi-synthetic, opium-like pharmaceutical pain relievers and the synthetic opioid prescription pain medication fentanyl as safe and effective for long-term treatment of chronic pain. In December 2021, our firm obtained a jury verdict against Teva Pharmaceuticals USA, Inc. and five other companies on behalf of our client, Nassau County, New York, for causing a public nuisance by minimizing the addictiveness of opioids with misleading marketing.  Prior to the verdict, our firm was instrumental in brokering a $1.1 billion settlement between the nation's three largest drug distributors and the State of New York, as well as a $50 million settlement between Endo Pharmaceutical and the State of New York.

b.  *In re: Diet Drug (Phentermine, fenfluramine, dexfenfluramine) Products Liability Litigation*, MDL No. (E.D.P.A.) – I helped negotiate a half-billion-dollar settlement on behalf of thousands of plaintiffs injured as a result of their ingestion of defective diet medications.

c.  *In re Rezulin Litigation*, Index No. 121762/00 (N.Y. Sup. Ct., N.Y. Cty.) – I was appointed Plaintiffs' Liaison Counsel in this litigation concerning a defective medication for Type II diabetes that was removed from the market due to adverse health effects in March 2000.  Federal and state court litigation over the drug eventually resulted in Pfizer, Inc. paying out settlements totaling approximately $750 million.

6.      In the last few years, several public water providers have become concerned about new chemicals including PFOA and PFOS that were detected in their water systems.  Given our

experience in this area, we agreed to investigate the potential sources of PFAS contamination and research potential legal remedies that could provide relief to these clients. Based on that investigation, we believed it was viable to bring tort claims (products liability, negligence, nuisance, and trespass) against the manufacturers of AFFF that contained PFAS.

7.    My firm first became involved in this litigation when we filed a lawsuit in February 2018 alleging AFFF-related PFAS contamination on behalf of Hampton Bays Water District, a municipal drinking water provider located in Southampton, New York. Shortly thereafter, my firm filed additional lawsuits asserting claims for injuries resulting from AFFF-related PFAS contamination on behalf of individual and municipal clients in Colorado, Delaware, Massachusetts, New York, Pennsylvania, and Washington. At the time, our largest docket of cases was in the District of Colorado, where I was appointed to serve as Co-Liaison Counsel in the *Colorado PFOA / PFOS Toxic Tort Litigation (Bell, et al. v. The 3M Company, et al., No. 1:16-cv-02351-RBJ)* (the "Colorado AFFF Litigation") by the Honorable R. Brooke Jackson of the United States District Court for the District of Colorado. Eventually, all of these cases were transferred to MDL 2873, created in the United States District Court for the District of South Carolina for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* 357 F.Supp.3d 1391, 1394 (J.P.M.L. December 18, 2018). Since that time, we have filed a number of similar cases arising from AFFF-related PFAS contamination that have also been transferred to MDL 2873, including more than one hundred cases on behalf of public water suppliers across the country.

8.    On March 20, 2019, Judge Gergel appointed me to be Co-Lead Counsel for MDL 2873. In that capacity, I am a Co-Chair of the Plaintiffs' Executive Committee and, along with my two Co-Leads, have been appointed to serve as Settlement Counsel on behalf of all Plaintiffs

in this litigation.  In addition, I am the Co-Chair of the PEC's Discovery and Personal Injury

Committees and a member of the PEC's Science, Legislative, and Public Water Supplier

Committees.  My firm also has members on the PEC's Document Review and Law & Briefing

Committees.  As Co-Lead Counsel, both my firm and I have been heavily engaged in practically

all aspects of the prosecution of this litigation. My Partner Coral M. Odiot Rivera was actively

involved in the settlement negotiations. She was also actively involved in the selection of class

representatives and in the revision of settlement documents in the present class action. Further

information on the individual contributions made by each team member to the case will be

provided in subsequent filings, offering comprehensive details.

### III.    THE PEC'S DISCOVERY EFFORTS

9.    Starting in the Summer of 2019, the PEC served Master Sets of Interrogatories and

Requests for Production of documents on approximately thirty (30) core MDL defendants that cut

across the majority of the cases in this MDL. These MDL defendants included the DuPont

Defendants, as well as the telomer AFFF manufacturers, the suppliers of fluorosurfactants used in

telomer AFFF, and the suppliers of the raw fluorochemicals that went into the fluorosurfactants

used in telomer AFFF, as well as the United States and various departments and agencies.  To date,

these discovery requests have resulted in the production of over 4.64 million documents totaling

more than 37.4 million pages, have been produced by the various defendants and third parties.

10.    The PEC also conducted 162 depositions of fact and expert witnesses.

### IV.    LEGAL COSTS

11.    The costs associated with litigating MDL 2873 have been significant.  In addition

to all of the legal work outlined above (which was performed by dozens of lawyers, paralegals,

and staff), the PEC advanced litigation costs for trial preparation, experts, depositions, filing fees,

travel, and the document repository needed to review the voluminous discovery produced in this case.

12.    My firm, and the other PEC firms, spent thousands of hours over 4-5 years engaged in discovery, fact development, and motions practice.  It was a massive undertaking that required highly skilled lawyers with experience in complex litigation.  Further, notwithstanding that it coincided with the COVID-19 pandemic, general liability discovery of the DuPont Defendants was substantially completed before the Settlement was finalized.

## V.    LEGAL RISK

13.    Both my firm and the other firms on the PEC were at all times cognizant that there was a substantial risk of not being able to recover damages on behalf of our clients.  For one thing, all of the manufacturer defendants claimed that the government contractor defense shielded them from liability because the government required the use of PFAS in the design of any AFFF manufactured for U.S. military use.  And while our preliminary factual and legal research supported a strong opposition to this defense, there remained a substantial risk that the Court would rule for defendants as a matter of law.  Even after Judge Gergel denied the defendants' respective motions for summary judgment based on that defense, there remained potential factual disputes that could present a triable issue for certain defendants in individual cases.  Further, the manufacturer defendants have vigorously contested all of Plaintiffs' factual and legal allegations, meaning that in any particular case, a jury could find for the defense.

## VI.    SETTLEMENT NEGOTIATIONS AND BENEFITS

14.    The parties began preliminary and exploratory settlement discussions in the second quarter of 2021.  After more than a year of stalemated negotiations, the Court appointed Hon. Layn Phillips (retired) as mediator on October 26, 2022.  Judge Phillips, of Phillips ADR in Corona Del Mar, California, scheduled mediation sessions and the parties met regularly, both in-person and

remotely over Zoom.  The frequency of these mediation sessions steadily increased starting in early 2023 and for the past several months have occurred on an intense—and sometimes daily—basis.

15.    Following months of intensive mediation sessions and negotiations, on June 30, 2023, the parties executed the Settlement Agreement.

16.    Having litigated and settled similar cases on behalf of Public Water Systems before, I expected that the DuPont Defendants would seek to settle on a class basis.  To prepare for an eventual settlement of these cases, my Co-Leads and I retained Dr. Michael Trapp and Mr. Rob Hesse as consulting experts to advise on class member identification and settlement allocation projects.

17.    Each Public Water System in the United States is an entity permitted and regulated by the EPA.  The EPA assigns a unique identification number called a "PWSID" to each Public Water System and maintains the Safe Drinking Water Information System ("SDWIS"), a centralized database that contains an inventory of all Public Water Systems in America as well as administrative contact information for each.  Thus, all Public Water Systems can be readily ascertained based on their registration and the system-specific information provided in EPA's SDWIS database.  Determining which of those Public Water Systems meets the Settlement Class definition depends on their status ("Active" vs "Inactive") on SDWIS, as well as on other objective factors such as population served and whether or not such System is subject to UCMR-5.

18.    Class Notice will be delivered to all Public Water Systems in EPA's SDWIS database that meet the Class definition, after which those Systems will submit a Claims Form and provide, and attest to, the information that Form requires.

19.    Another major challenge in brokering this Settlement was the creation of an allocation formula that would distribute the Settlement funds to Class Members fairly and efficiently, a task that has collectively required hundreds of hours of research and analysis.  To address this issue, the PEC's consulting experts considered the primary factors that drive a Public Water System's PFAS-related treatment costs: capital costs (which are a function primarily of the amount of PFAS-contaminated water) and operation and maintenance, or "O&M" costs (which are a function primarily of the relative concentration of PFAS contamination in the water).  The experts then identified scientific and EPA-derived formulas that could numerically score the respective Class Members' contaminated water sources, which could then be used to proportionally compensate those Class Members for PFAS-related treatment of those water sources.  Based on my experience litigating complex environmental cases and other mass torts, and my understanding of the calculation of Settlement benefits to compensate prospective Class Members, this allocation formula objectively divides the Settlement funds based on real-world cost parameters.

20.    Several water provider Plaintiffs in this MDL have agreed to serve as Class Representatives for purposes of this Settlement (the "Proposed Class Representatives").  These Proposed Class Representatives are not only longstanding participants in the process that led to this Settlement but also fully understand their role in representing the interests of the absent Class Members. They have accepted this role enthusiastically and have no interests that conflict with those of the absent Class Members.

21.    The Settlement confers substantial relief on all putative Class Members and resolves allegations that, over the course of five decades, the DuPont Defendants manufactured,

sold, and supplied PFAS-containing products that contaminate Plaintiffs' and putative Class Members' Public Water Systems, requiring costly treatment and/or remediation.

## VII.    CLASS CERTIFICATION REQUIREMENTS

23.    In my opinion, all the requirements for class action certification are met here, and class resolution of the claims in this MDL is far more sensible than individual litigation.  I take this moment only to mention that the Proposed Class Representatives have informed me and my Co-Leads that they understand their duties as representatives of the proposed Class and in that capacity will consider the interests of absent Class members in seeking Court approval of the proposed Settlement.  The Proposed Class Representative have actively participated in discussions with me and my Co-Leads throughout this litigation and will continue to do so.  Lastly, none of the Proposed Class Representatives has been promised a service award nor have any of them conditioned their agreement to serve as a Class Representative on the expectation of such an award.

## VIII.    PROFESSIONAL OPINIONS.

24.    I have a detailed understanding of the cases involved in this MDL and the proposed Settlement with the DuPont Defendants.  Based on my extensive experience litigating similarly complex environmental and mass tort cases and my personal involvement with these cases since the inception of this MDL, I believe this Settlement is not only fair, reasonable, and adequate, but is also in the best interests of all Class Members in light of all the known facts and circumstances. As such, it should be approved by the Court.  It could take up to a decade for individual Public Water Systems to fully litigate their case and even then, the outcome is not guaranteed.  In my opinion, the proposed Settlement maximizes the recovery that the putative Class Members could achieve in light of the known risks while avoiding costly and time-consuming litigation.

25.    I declare under penalty of perjury under the laws that the foregoing is true and correct.

9

Executed this 10th day of July 2023.

_____

Paul J. Napoli

10