IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG<br><br>**This Document Relates to:**<br><br>*City of Camden, et al. v. 3M Company*<br>No. 2:23-cv-03147-RMG |

**JOINDER TO SOVEREIGNS' OMNIBUS OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL, CERTIFICATION OF SETTLEMENT CLASS, AND PERMISSION TO DISSEMINATE CLASS NOTICE**

I. **Introduction**

The Port Authority of New York and New Jersey ("Port Authority"), a defendant in two water provider actions in this multi-district litigation ("MDL") and prospective cross-claimant against its co-defendant 3M Company ("3M"), joins in the Sovereigns' Omnibus Opposition to the Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class and for Permission to Disseminate Class Notice ("Sovereigns' Opposition") (Dkt. No. 3462).[1] Port Authority joins in the Sovereigns' Opposition because the proposed class settlement (the "Settlement Agreement"), as currently drafted, could unfairly affect its rights, despite purporting to only affect claims of water provider class members ("Class Members") while compensating them for a portion of their costs to treat the water they supply to customers for per- and polyfluoroalkyl substances ("PFAS").

Port Authority is a bi-state agency that operates ports, bridges, airports, and other critical transportation infrastructure. The claims asserted against Port Authority in the MDL arise from its leasing and operating the New York Stewart International Airport in New Windsor, New York (the "Airport"), at which Aqueous Film-Forming Foam ("AFFF") must be used for firefighting purposes. Evidence indicates that a significant amount of AFFF deployed at the Airport and the adjacent Stewart Air National Guard Base ("ANGB") was manufactured by 3M. The City of Newburgh and Town of New Windsor, each of which operates an "Active Public Water System"[2] as defined in the Settlement Agreement, have sued Port Authority, claiming losses related to storage and use of 3M products at the Airport.

---

[1] A group of municipal and quasi-municipal water providers, including the City of Newburgh and the Town of New Windsor, has separately joined in the Sovereigns' Opposition (Dkt. No. 3531).

[2] Capitalized terms used without definition here have the meanings given to them in the Settlement Agreement.

1

Port Authority is not a party to the class action case (*City of Camden, et al. v. 3M Company*), and was not invited to, and did not, participate in the negotiation of the proposed Settlement Agreement. Notwithstanding its limited interaction in this matter, Port Authority faces claims from Class Members, and the Settlement Agreement as proposed could cut off Port Authority's ability to pursue crossclaims and/or separate claims against 3M because of its expansive protection of 3M.

Port Authority has three significant concerns with the Settlement Agreement: first, the definition of "Public Water System" is sufficiently broad so as to arguably encompass Port Authority, even though Section 11.1 of the Settlement Agreement states that claims of airport operators and for non-drinking water remediation costs are not being resolved by the Settlement Agreement, and it provides no means for compensating entities other than water providers; second, the overbroad indemnification provisions would foreclose recovery against 3M for costs that Port Authority may have to incur to comply with injunctive relief sought by Class Members; and third, the requirement that a defendant settling with a Class Member after the Settlement Agreement must also release 3M will discourage settlement by other parties. Provisions such as a broad "most favored nation" clause to the benefit of 3M add to the unfair results which may occur in the future.

These provisions could have significant repercussions for Port Authority's rights. Specifically, Port Authority is current facing claims for injunctive relief that would require Port Authority and others to incur potentially millions of dollars in costs to investigate and remediate contamination in soil and water upstream of the drinking water supply, but which is alleged to be a source of contamination to drinking water. These costs are distinct from the water providers' costs of treatment of the raw water that is the source of drinking water. The Settlement Agreement does not provide for compensating entities responsible for site remediation, while still seeming to

release their claims against 3M. The proposed indemnity provision would purport to absolve 3M of liability for such upstream remediation costs by imposing an indemnity obligation on settling class members whose water supplies are allegedly or actually threatened by upstream contamination. As a result, Port Authority could be left responsible for significant non-treatment remediation costs without recourse to 3M. This outcome unfairly burdens parties such as Port Authority against which water providers are seeking injunctive relief. Moreover, the release provisions of the Settlement Agreement would further impact the ability of Port Authority to reach a settlement in which it would agree to undertake the sought remediation, as its ability to recoup costs from a principal wrongdoer would be foreclosed.

As the Sovereigns have pointed out, it is unlikely that Class Members (whether those specifically identified in the Settlement Agreement or those arguably swept into its intentionally broad class definition) will fully understand the scope of the indemnity and release provisions unless they are explicitly disclosed (as is not currently the case in the proposed Notice). Moreover, like the personal injury liability for which the proposed settlement would also absolve 3M, remediation costs for which 3M would be released and indemnified could overcome the value of any settlement funds issued even to successful claimants against the Settlement Fund. The Settlement Agreement should be limited to 3M's liability to the water providers for their costs of treatment, as it was presented to the Court and the MDL parties at the July 14, 2023 case management conference. *See* Exhibit A, Transcript 27:22-25, 28:1-3.[3]

---

[3] Port Authority did not initially join the Sovereigns' Opposition to the Settlement or file separate opposition because the Sovereigns raised similar concerns, and reportedly, the parties were working to resolve these issues. Movants and 3M requested extensions to their deadline to reply to the Sovereigns' Opposition and represented that discussions with Sovereigns regarding the terms of the Settlement were ongoing. *See, e.g.*, Dkt. No. 3552. However, given that a resolution has not yet emerged, and with further review and analysis of the complex and vague Settlement

3

Fundamentally, the Settlement Agreement invokes a distinction between PFAS contamination damages that relate to drinking water and those that do not. However, Port Authority's circumstances reveal that this distinction will in most cases be impossible to make, given the interconnectivity of soil, stormwater, non-potable surface water and drinking water supplies in many locations. The Settlement Agreement is drafted so as to resolve all ambiguity in favor of releasing 3M from liability for remediation costs at thousands of sites contaminated by AFFF throughout the country, while only partially compensating water providers for costs of treatment.

## II.     Statement of Facts

Port Authority is currently a defendant in a total of ten cases in the AFFF MDL, all of which arise from PFAS contamination allegedly emanating from the Airport and/or the adjacent Stewart ANGB. Two of these actions are brought by municipal water providers, the City of Newburgh and Town of New Windsor, which neighbor the Airport/ANGB site.[4]  Since 2007, Port Authority has operated the Airport pursuant to a lease with the New York State Department of Transportation. The allegations in these two actions involve contamination of two bodies of water on or adjacent to the Airport/ANGB site which flow into the drinking water supply of the plaintiffs in the actions,

---

Agreement, Port Authority now joins in the Sovereigns' opposition to the Settlement Agreement. Alternatively, Port Authority requests that the Court grant, *nunc pro tunc*, an extension of time for Port Authority to submit this opposition to the motion for preliminary approval of the Settlement Agreement. Good cause exists for this requested extension because upon detailed examination, the Settlement Agreement is inconsistent with its portrayal at the July 14th case management conference as settling only claims of certain water providers. To the contrary, as explained herein, the Settlement Agreement may have major consequences for the potential claims of numerous site operators faced with crushing cleanup costs that may be swept into the class definition and/or otherwise foreclosed from recovery from 3M.

[4] *City of Newburgh v. Port Authority of New York & New Jersey and United States of America, et al.*, 2:18-cv-03358; *Town of New Windsor et al. v. United States of America et al.*, 2:21-cv-01496.

allegedly as a result of the storage and use of AFFF materials for firefighting as required by the Federal Aviation Administration ("FAA").[5] It is also possible that additional claims may be raised in the future by other water providers against Port Authority in connection with other facilities Port Authority operates or has operated.

In *City of Newburgh v. Port Authority of New York & New Jersey and United States of America, et al*., the City of Newburgh asserts a claim for injunctive relief against New York State, the United States, Port Authority, National Express (a prior operator of the Airport, which is being provided defense by Port Authority), and Federal Express (one of whose aircraft was involved in a fire at the Airport) pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6901 *et seq*., demanding that these defendants undertake investigatory and remedial actions to remove contamination in and threatening to enter the City of Newburgh's water supply. Evidence indicates that a significant portion of AFFF deployed at the Airport was manufactured by 3M. Therefore, Port Authority has long intended to pursue derivative claims against 3M to compensate it for costs it may incur as the result of the City's claims.[6]

To the knowledge of its counsel, Port Authority is the sole current commercial airport operator that has been named as a defendant in the MDL, although given the required use of AFFF for airport firefighting pursuant to FAA certification requirements, additional actions against airports can be expected, especially if the product manufacturers have settled the claims against them. Moreover, many airports have already filed actions as plaintiffs in the MDL; as explained

---

[5] All firefighting services at the Airport have been and are provided by the New York Air National Guard pursuant to a longstanding arrangement between the Airport and the ANGB.

[6] As directed by Case Management Order ("CMO") 20 (Dkt. No. 2003), Port Authority has not submitted answers, in which it would assert crossclaims against 3M, to any of the complaints against Port Authority in the MDL. Consistent with that CMO, Port Authority has instead filed a Preliminary Statement of Affirmative Defenses applicable to all actions in which Port Authority is a party (Dkt. No. 256).

herein, their recourse against 3M may be foreclosed by the Settlement Agreement. Another distinctive aspect of Port Authority's position in this MDL is the City of Newburgh's assertion of claims for injunctive relief pursuant to RCRA. If such injunctive relief is granted, this claim could cause Port Authority to incur many millions of dollars in costs resulting from historic deployment of 3M AFFF for firefighting and training purposes that resulted in contamination either at the Airport itself, or which has entered the watershed through stormwater conveyance systems flowing through Airport property.

On July 3, Movants and 3M introduced the Settlement Agreement and made a motion for preliminary approval of the settlement. The Settlement Agreement contains the following provisions relevant to Port Authority's opposition:

> 2.15. "Class Member" means an Eligible Claimant that does not opt out of the Settlement Class.... It is the intention of this Agreement that the definition of "Class Member" be as broad, expansive, and inclusive as possible.
>
> 2.24. "Eligible Claimant" means an Active Public Water System that qualifies as a member of the Settlement Class. Each Eligible Claimant is either a Phase One Eligible Claimant or a Phase Two Eligible Claimant, but not both. "Phase One Eligible Claimant" means an Eligible Claimant with one or more Impacted Water Sources as of the Settlement Date. "Phase Two Eligible Claimant" means an Eligible Claimant that does not have one or more Impacted Water Sources as of the Settlement Date. It is the intention of this Agreement that the definition of "Eligible Claimant" be as broad, expansive, and inclusive as possible.
>
> 2.4. "Active Public Water System" means a Public Water System whose activity-status field in [the U.S. Environmental Protection Agency Safe Drinking Water Identification System ("SDWIS")] states that the system is "Active."
>
> 2.54: "Public Water System" means a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen (15) service connections or regularly serves an average of at least twenty-five (25) individuals daily at least sixty (60) days out of the year,

consistent with the use of that term in the Safe Drinking Water Act, 42 U.S.C. § 300f(4)(A), and 40 C.F.R. Part 141. The term "Public Water System" includes (i) any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with such system, and (ii) any collection or pretreatment storage facilities not under such control which are used primarily in connection with such system. Solely for purposes of this Settlement Agreement, the term "Public Water System" refers to a Community Water System of any size or a Non-Transient Non-Community Water System that serves more than 3,300 people, according to SDWIS; <u>or any Person (but not any financing or lending institution) that has legal authority or responsibility (by statute, regulation, other law, or contract) to fund or incur financial obligations for the design, engineering, installation, operation, or maintenance of any facility or equipment that treats, filters, remediates, or manages water that has entered or may enter Drinking Water or any Public Water System</u>; but does not refer to a Non-Transient Non-Community Water System that serves 3,300 or fewer people, according to SDWIS, or to a Transient Non-Community Water System of any size. <u>It is the intention of this Agreement that the definition of "Public Water System" be as broad, expansive, and inclusive as possible.</u> (Emphasis added).

11.1.2: [The release] does not apply to the following: a Class Member's Claim related to the remediation, testing, monitoring, or treatment of real property to remove or remediate PFAS where (i) the Class Member owns or possesses real property and has legal responsibility to remove contamination from or remediate contamination of such real property; (ii) such real property is separate from and not related in any way to the Class Member's Public Water System (such as an airport or fire training facility); (iii) the Class Member seeks damages or other relief unrelated to Drinking Water or a Class Member's Public Water System or Water Sources; and (iv) if the Class Member seeks remediation, testing, monitoring, or treatment of groundwater under such real property, the Class Member either (a) identifies Non-Class Potable Water that may be adversely affected by the fate and transport of PFAS released into the groundwater under such real property or (b) is subject to a state or federal directive, order, or permit condition requiring groundwater remediation or treatment to the extent that the directive, order, or permit condition is not premised on a need to protect a Class Member's Public Water System or Water Sources. If a Class Member pursues such a Claim against any Released Party, the Class Member's Claim and damages shall be limited to the costs of remediating or removing PFAS from the property or groundwater under the property, in accordance with

7

> applicable or relevant state or federal regulatory cleanup standards and in a cost-effective manner.
>
> 11.6.1.2: A Claim by a Releasing Party against any non-Party should not result in any additional payment by any Released Party.
>
> 11.6.2: To the extent that on or after the Effective Date any Releasing Party settles any Claim it may have against any non-Released Party arising out of, relating to, or involving the Released Claims and provides a release to such non-Released Party, the Releasing Party shall include in that settlement a release from such non-Released Party in favor of the Released Parties in a form equivalent to the Release contained in this Settlement Agreement.
>
> 11.6.3: By this Agreement, each Releasing Party hereby covenants and agrees to indemnify and hold each and every Released Party harmless of and from . . . (ii) any Claim arising out of, related to, or involving PFAS that has entered or may enter Drinking Water or any Releasing Party's Public Water System. . ..

Despite the very broad and vague definition of Public Water System, not limited to entities that directly provide drinking water to users, the Settlement Agreement only provides a mechanism for compensating actual water providers, according to a scoring system based on their "flow rate" and the concentrations of PFAS detected in their water sources. Settlement Agreement at Exhibit B, Q (describing how compensation will be allocated).

When 3M and Movants introduced the Settlement Agreement during the July 14, 2023 case management conference, counsel for Movants stated that claims against 3M for personal injury and public and private property damages, as well the Sovereigns' claims, would remain intact after the settlement and would not be waived as part of the release. Exhibit A, Transcript 27:22-25, 28:1-3; 40:5-11 ("Careful consideration was taken… to not waive any of those claims for anybody so that no one's soil, groundwater contamination claims are prejudiced."). Upon the objection of counsel for municipal entities who have sued to recover remediation costs, counsel for Movants also stated that claims by non-water providers that would be remediating soil and groundwater

8

"have not been released… waived . . . [or] impacted by this [Settlement Agreement]." Exhibit A, Transcript 39:6-8.

Thereafter, the Sovereigns raised concerns with the terms of the Settlement Agreement, moved to intervene (Dkt. No. 3460) and submitted their Opposition. (Dkt. No. 3462). A subset of Sovereigns filed a supplemental opposition to the motion for preliminary approval of class settlement. (Dkt. No. 3464). Other parties, including the City of Newburgh and Town of New Windsor, joined in the Sovereign's Opposition. (Dkt. No. 3531). Movants and 3M requested extensions to their deadline to reply to the Sovereigns' Opposition and represented that discussions with Sovereigns regarding the terms of the Settlement Agreement were ongoing. (*See, e.g.*, Dkt. No. 3552). Given that a resolution has not yet emerged, and with increasing concern over the breadth of the Settlement Agreement notwithstanding the description of it presented in court, Port Authority submits this joinder.

### III. Argument

Port Authority, as a co-defendant with 3M in these cases, would not ordinarily be placed at a disadvantage in litigation because a co-defendant and the plaintiff have agreed to settle their claims. Under New York law, it is clear that Port Authority would not have to cover 3M's equitable share of a plaintiff's damages. N.Y. General Obligations Law § 15-108. However, given the distinct injunctive relief sought against Port Authority, the Settlement Agreement could be read to release 3M from liability to Port Authority beyond its share of water providers' damages, without Port Authority having an ability to participate or consent.

First, the definition of "Public Water System" is broad enough to encompass Port Authority, even though Section 11.1 of the Settlement Agreement states that claims of airport operators and remediation claims are not being resolved by the Settlement Agreement, and Class Members are

9

defined based on "active" status in the SDWIS, raising the question of why the definition of Public Water System is so broad if irrelevant to the class definition.

Second, the requirement that Class Members indemnify 3M for claims brought against it by other parties results in a recursive loop, where crossclaims which otherwise should be asserted against 3M (by Port Authority) to recoup costs of complying with injunctions sought by water providers can instead only be asserted *against the water providers* for damages under the indemnity suffered by the plaintiffs. In other words, the overbroad indemnification provisions would foreclose recovery against 3M for costs that Port Authority may have to incur to comply with injunctive relief sought by Class Members, and instead impose that liability onto the Class members themselves, while the Settlement Agreement will only partially compensate them for drinking water treatment costs. Third, the requirement that a defendant settling with a Class Member after the Settlement Agreement must also release 3M discourages settlement, because it prevents the defendant from recouping any of its expenditures from 3M.

A class action settlement may only be approved upon a finding that the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Where the rights of third parties are affected by the proposed class action settlement, "it is not enough to evaluate the fairness of the settlement to the settling parties; the interests of such third parties must be considered." *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995); *cf. Bahatia v. Peidrahita*, 756 F.3d 211, 218 (2d Cir. 2014) (non-settling defendant has standing to object to court order approving settlement "where it can demonstrate that it will sustain some formal legal prejudice as a result of the settlement").

Moreover, courts have rejected class action settlements that bar the claims of persons or entities who are not parties to the case. *See, e.g.*, *City of Long Beach v. Monsanto Company*, Case

10

No. CV 16-3493, 2020 WL 7060140 (C.D. Cal. Nov. 25, 2020) (denying approval of settlement agreement because agreement "seeks or suggests that the claims of persons or entities who are not parties to this case are barred"); *see also* Newberg on Class Actions § 13:15 (5th ed. 2014) ("courts [have] rejected preliminary approval when the proposed settlement contain[s] obvious substantive defects such as . . . overly broad releases of liability.") (citing cases). As explained in the Sovereigns' Opposition, the Settlement Agreement is not fair or reasonable because it contains a perpetual, overbroad indemnity clause that could effectively shift 3M's liability to non-settling co-defendants, including Port Authority, and eventually, the public. In addition, the release sections of the Settlement Agreement would limit the ability of the remaining parties to settle their claims because, in order to enter into a settlement with water providers, Port Authority would have to give up its derivative claims against 3M, which disincentivizes settlement.

**A. Definition of "Public Water System"**

Under Section 11.1 of the Settlement Agreement, and as represented at the case management conference, the claims of entities engaging in site remediation are supposedly expressly excluded from the class of losses that would be compensated under the Settlement Agreement; however, the definition of "Public Water System" (which is the basis for defining "Eligible Claimant" and is intended to be "as broad, expansive and inclusive as possible") includes "any Person … that has legal authority or responsibility … to fund… any facility or equipment that …*manages water that has entered or may enter any Public Water System*". It is unclear at this time whether Port Authority will be required to take action with respect to activities upstream of the physical plant of the public water systems (which may include remediation of AFFF), but, as written, the definition of "Public Water System" does not reflect the exemption stated in Section

11 and thus could encompass these activities.[7] Indeed, any site operator holding or subject to a Clean Water Act permit requiring it to limit effluent of pollutants to a water body with any hydrologic connection to drinking water could be interpreted as a "Person … that has legal authority or responsibility (by statute, regulation, other law, or contract) to fund or incur financial obligations for the design, engineering, installation, operation, or maintenance of any facility or equipment that treats, filters, remediates, or manages water that has entered or may enter Drinking Water or any Public Water System." Port Authority has a permit governing its effluent from stormwater outfalls at the Airport, through which plaintiffs allege PFAS-contaminated water has entered the drinking water supply. Yet Port Authority has no ability to seek compensation under the Settlement Agreement. While the class is only defined to include "Active Public Water Systems" identified in the SDWIS, the reason for the incredibly broad definition of "Public Water System" is unclear and raises concerns about the intended effect. The Settlement Agreement should be revised to make it clear that Port Authority is not a Class Member and its potential claims against 3M are not being released.

**B. Indemnity Provision**

Under the Settlement Agreement, Class Members would commit to indemnifying 3M as to "any Claim arising out of, related to, or involving PFAS that has entered or may enter Drinking Water or any Releasing Party's Public Water System . . ." Settlement Agreement § 11.6.3. This overbroad indemnity appears to mean that water provider class members would be indemnifying 3M for personal injury and property damages claims, and claims of state sovereigns, both within

---

[7] Section 11 also purports to exempt Class Member's claim related to real property "not related in any way to the Class Member's Public Water System (such as an airport or fire training facility)." The Settlement should be clarified that this exemption is not defeated by the definition of "Public Water System" as described above.

and outside of the MDL, and also that Class Members would indemnify 3M for third party costs of remediating PFAS contamination that may enter a Class Member's water system – exactly the type of costs Port Authority would incur if the City of Newburgh prevails on its RCRA claim.

As noted above, but warranting repeating, when 3M and Movants introduced the Settlement Agreement on July 14, 2023, counsel for Movants stated that claims against 3M for personal injury and public and private property damages, as well as attorney generals' claims, would remain intact after the settlement and would not be waived as part of the release. Exhibit A, Transcript 27:22-25, 28:1-3; 40:5-11. However, the indemnity language of the Settlement Agreement is inconsistent with these representations, and unfairly and unreasonably limits the ability of non-settling parties to pursue crossclaims and/or separate claims against 3M for costs they may incur to prevent further water supply contamination and the need for the drinking water treatment the 3M settlement is intended to partially fund. In other words, the deal 3M appears to have struck with interim class counsel and representative Class Members, but not with any other MDL parties – including those entities responsible for remediating AFFF-contaminated sites – is that 3M would partially pay for treatment costs but avoid any liability to remediate the underlying contamination leading to the need for treatment. This language would foreclose recovery against 3M for costs that co-defendants, including Port Authority, may have to incur to comply with injunctive relief sought by Class Members. The intent is made even clearer by Section 11.6.1.2, which provides: "A Claim by a Releasing Party against any non-Party should not result in any additional payment by any Released Party."

As noted, in the *City of Newburgh* matter, the water provider City asserts a claim for injunctive relief against Port Authority pursuant to RCRA, seeking to require defendants to undertake investigative and remedial measures to address PFAS contamination at the Airport, the

13

adjacent ANBB, and in the watershed and water supply. Evidence indicates that a substantial portion of AFFF released at the Airport/ANGB site was manufactured by 3M, and 3M has produced documents that reflect sales, delivery, and/or tracking of AFFF products by 3M to the Airport/ANGB site. Evidence produced in the MDL has indicated 3M's liability under, *inter alia*, negligence and product liability theories for selling a product without adequate warnings related to its use, resulting in legacy contamination at thousands of sites around the country, including the Airport/ANGB site.

The overbroad language of the indemnity in the Settlement Agreement, however, would preclude Port Authority and its co-defendants from recouping upstream remediation costs from 3M in a crossclaim or separate action based on 3M's negligence and product liability. Instead, theoretically the City of Newburgh would be required to indemnify 3M for a derivative claim brought by Port Authority to compensate it for its costs in complying with an injunction sought by the City of Newburgh. This would leave either Port Authority, an airport operator that has never itself even engaged in firefighting or training activities at the airport, or the City of Newburgh itself, both public entities, along with the New York State and/or federal governments (also defendants to the City of Newburgh's RCRA claim), entirely responsible for these remediation costs without recourse to 3M, all as the result of a class settlement to pay for water treatment, not remediation of upstream contamination. In addition to unfairly burdening the states and the public taxpayers, as set forth in the Sovereigns' Opposition, this outcome unfairly burdens parties such as Port Authority against which water providers are seeking injunctive relief, and likely other site operators required to undertake remedial actions pursuant to environmental law. The Settlement should be limited to 3M's settling its liability to the water providers for their costs of treatment, and should not be expanded to settling all ancillary liability of other entities that may have resulted

from 3M's negligence and product defects and who are not eligible to receive compensation from the settlement.

**C. Release**

Finally, the release provisions of the Settlement Agreement require any settling co-defendant to give up its rights for contribution against 3M as the price for further settlements under a lawsuit (Section 11.6.2). In Port Authority's case, the City of Newburgh could not settle its claims for injunctive relief without requiring Port Authority to release 3M from any liability. Contrary to the evident hopes of this Court for resolutions of all claims in this MDL to effectuate cleanup of PFAS contamination, this provision severely discourages site operators from settling such claims and committing to remedial actions protective of water supplies if they have no ability to recover any of their costs from a principal manufacturer of AFFF.

Because of this and other defects in the Settlement Agreement as set forth in the Sovereigns' Opposition, Port Authority joins in the Sovereigns' Opposition, and respectfully requests that the Court deny the motion for preliminary approval or that the Settlement Agreement be modified to address these concerns.

Dated: August 28, 2023

                                            Respectfully submitted,

                                            /s/Mark A. Chertok
                                            Mark A. Chertok
                                            Elizabeth Knauer
                                            SIVE, PAGET & RIESEL P.C.
                                            560 Lexington Avenue
                                            New York, NY 10022
                                            Phone: (646) 378-7228
                                            mchertok@sprlaw.com
                                            eknauer@sprlaw.com

                                            *Counsel for Port Authority of New York & New Jersey*