IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | MDL No. 2:18-mn-2873-RMG |
| | **This Document Relates to:** |
| | *City of Camden, et al. v. 3M Company* Case No. 2:23-cv-03147-RMG |

MEMORANDUM OF LAW IN SUPPORT OF
WHOLESALERS' MOTION TO INTERVENE FOR LIMITED PURPOSE

## I.    INTRODUCTION

The Metropolitan Water District of Southern California ("Metropolitan") and the North Texas Municipal Water District ("NTMWD") (collectively, the "Wholesalers") move to intervene in *City of Camden, et al. v. 3M Company*, No. 2:23-cv-03147-RMG for the limited purpose of seeking additional time to obtain clarification on several significant terms and provisions in the proposed settlement between 3M and public water providers ("3M Agreement" or "Agreement"), and their potential impacts on the Wholesalers, their member agencies, the millions of people they serve, and potentially thousands of other wholesale water agencies and their related public water systems and millions of customers across the country. Key terms of the Agreement could be interpreted to affect the Wholesalers' potential claims for an allocated share of the award, as well as future claims—possibly in ways not intended by the drafters and not clear to eligible wholesalers and other eligible Class Members. The exhibits to the 3M Agreement indicate that the drafters of the Agreement apparently did not conceive of wholesalers as Class Members—nearly two thirds of the 3,270 active wholesalers listed in EPA's Safe Drinking Water System ("SDWIS") database

1

were *not* included in the 3M Agreement's exhibits of known Class Members to whom notices were mailed.[1] Yet the Agreement's definitions would appear to encompass many such wholesalers. The Wholesalers' intervention is necessary to protect their interests—and clarify those of their member and customer agency public water systems ("Member Systems"), as well as the 21 million people they collectively serve—in addressing PFAS in their water resources and drinking water.[2]

As drafted, the 3M Agreement is ambiguous and creates incongruous results for complex water systems that involve wholesalers and retailers. For one, it is unclear whether wholesalers are intended Class Members. Moreover, rather than consistently provide funds to the entities that treat water, the 3M Agreement appears to, in commonplace scenarios, allocate funds to entities that do not and likely will not incur PFAS remediation costs—while nevertheless requiring all participating entities to broadly release their claims against 3M. *See generally infra*, Part IV.A.3. These results cast doubt on whether the 3M Agreement was drafted with wholesalers in mind.

Due to serious ambiguities in the 3M Agreement as applied to wholesalers and the stakes at issue, the Wholesalers are currently unable to make informed decisions about whether to participate, object, or opt out. While they seek clarification of several significant settlement terms and provisions that affect these important decisions, the Wholesalers should be granted leave to intervene for the limited purpose of seeking extended objection and opt-out deadlines, and a

---

[1] *See* U.S. EPA, *SDWIS Federal Reports Advanced Search* (last visited Oct. 18, 2023), https://ordspub.epa.gov/ords/sfdw_rest/r/sfdw/sdwis_fed_reports_public/1. A search in SDWIS for all active public water systems classified as wholesalers results in 3,270 systems. When cross-referenced with the 3M Agreement Phase I and Phase II designations (Amended Exhibits E and F), 236 match to Phase I, while 976 match to Phase II. That leaves 2,058—or more than 60 percent of active wholesalers—that are unlisted and likely never received a 3M settlement notice.

[2] Approximately one in seventeen people in the United States receives water originating from Metropolitan, based on the total population divided by the number of consumers in the service area. *See* U.S. CENSUS BUREAU, *U.S. Population Estimated at 334,233,854 on Jan. 1, 2023* (Dec. 29, 2022), https://www.census.gov/library/stories/2022/12/happy-new-year-2023.html.

corresponding extension of the fairness hearing. These extensions would provide necessary time for: (1) Plaintiffs' Co-Lead Counsel and 3M to clarify the 3M Agreement; (2) wholesalers to evaluate whether they should participate and submit allocation claims, object, or opt out; and (3) entities in complex wholesale networks to each obtain any necessary governing board or municipal approvals for participation in, or opting out of, the 3M Agreement. Ultimately, allowing intervention and an extension of time would also facilitate orderly administration of the proposed settlement.

The Wholesalers satisfy the four requirements to intervene as of right under Rule 24(a)(2). First, this Motion is timely, as it comes before the objection deadline. Second, the Wholesalers have a significant stake in protecting their interests for the sake of public health and the environment. Third, denial of this Motion would impair the Wholesalers' ability to protect those interests. Fourth, the Wholesalers' interests are not adequately protected by Plaintiffs' Co-Lead Counsel, who created the ambiguities in the 3M Agreement and apparently did not have large wholesalers such as Metropolitan and NTMWD in mind when drafting the proposed settlement.

The Wholesalers respectfully request expedited review of this Motion and the concurrently filed Motion for Extension of Deadlines to Seek Settlement Clarification ("Motion for Extension"), in order to receive the Court's ruling before the objection deadline on November 11, 2023.

## II.    BACKGROUND

### A. Drinking Water System Designs and Interrelationships Vary Widely

While some public water systems operate through simple inputs—groundwater wells or a surface water diversion—larger systems, particularly in dry regions, are often far more complicated. Water that begins in a stream may travel hundreds of miles, passing through dozens of entities, before being blended with water from local groundwater supplies and landing in a glass

of water. Wholesalers play many important roles in that chain. They may draw water from a source, treat water, and sell water to another entity that could be a retailer or could *itself* be a wholesaler. Even that basic picture oversimplifies the matter. For instance, water drawn from a stream may have already been previously drawn, consumed, treated, and ultimately returned to the stream before it enters the next wholesaler system.

The Wholesalers exemplify such complexities. Metropolitan, the largest wholesale drinking-water provider in the United States, owns and operates an extensive water system, including the Colorado River Aqueduct, and imports water from the Colorado River and Northern California to supplement regional drinking water supplies. *See infra* Figure A. Metropolitan diverts about half of this water for treatment at its five water treatment plants—including some of the largest facilities in the nation, with a capacity to treat more than two billion gallons of water per day. It then wholesales raw and treated drinking water to its 26 public member agencies. Some of Metropolitan's member agencies are themselves water wholesalers, meaning they purchase water from Metropolitan, may themselves treat that water, and ultimately sell that water to their own retail member agencies. Metropolitan represents a critical component of the complex water system—a component almost entirely separated from end water users.

Figure A illustrates the complexity of Metropolitan's operations.[3] A drop of water that originates in the Colorado River passes through a variety of entities before it arrives at Metropolitan—and it travels through yet more after Metropolitan.

---

[3] Additional figures, included along with Ex. B (Decl. of Mickey Chaudhuri), illustrate the operations of Metropolitan's system. The accompanying declaration of Mickey Chaudhuri provides further details.



FIGURE A

NTMWD provides treated water to over two million people in approximately 70 communities in a 10-county region of North Texas—a region expected to double in population by 2050. NTMWD obtains its water primarily from Lavon Lake, Lake Jim Chapman, Lake Texoma, Trinity River, and Bois d'Arc Lake in the Trinity, Sulphur, and Red River Basins in Texas. NTMWD comprises 13 member cities, supplies treated water to 34 direct customer contracts, and provides treated water to 32 retail customers. In all these relationships, NTMWD serves as a treatment provider, diverting source water supplies to seven water treatment plants, with a capacity of nearly one billion gallons of water per day, and sending potable water to its customers.[4] Like

---

[4] This and all other facts regarding NTMWD's systems are matters of public record. *See generally* North Texas Municipal Water District, *About Us* (last visited Oc. 20, 2023), https://www.ntmwd.com/services/; *see also* Ex. C (Decl. of Billy George).

Metropolitan, NTMWD serves a vital role in a complex water provision system and is largely separated from end users.

### B. The Wholesalers Have Detected PFAS in Their Systems

Since 2013, Metropolitan has voluntarily tested for PFAS using methods provided under UCMR 5 and has infrequently detected four PFAS at trace levels in its source waters. *See* Metropolitan, *Annual Drinking Water Report* (June 2023),

https://www.mwdh2o.com/media/acbgotdg/wq_final.pdf. Two compounds, PFHxA and PFPeA, have been detected at trace levels in Metropolitan's treated water, including at the Mills Plant and the Weymouth Plant. *See id.* NTMWD also voluntarily tested for PFAS using EPA UCMR 5 methods this year and detected trace levels of multiple PFAS compounds in its source waters and treated water.

### C. The Wholesalers Have Worked Diligently to Understand the 3M Agreement and Confer with its Drafters

The 3M Agreement was filed on July 3, 2023, MDL Dkt. No. 3370-3, with amendments published August 28, 2023, Dkt. No. 3620-1. These complex documents implicate an estimated 12,000 public water systems. *See* MDL Dkt. No. 3370-1 at 20. By order issued August 29, 2023, the Court preliminarily approved the 3M Agreement and set deadlines for objecting to and opting out of the same on November 11, 2023, and December 11, 2023, respectively. *See* MDL Dkt. No. 3626 at 10–11. The Wholesalers acted swiftly to evaluate the settlement and promptly conferred with Plaintiffs' Co-Lead Counsel in an effort to resolve their concerns. Because these concerns were not resolved within the truncated timeframes afforded, the Wholesalers now seek essential clarification in the minimally invasive form of a limited intervention and an extension of time.

On October 9, 2023, the Wholesalers sent a letter to Plaintiffs' Co-Lead Counsel requesting clarification and a definitive statement as to how the 3M Agreement's drafters intended for

wholesalers and retailers to be treated. *See generally* Ex. A (Letter from Metropolitan and NTMWD to Plaintiffs' Co-Leads (Oct. 9, 2023) [hereinafter "Letter to Co-Leads"]). The Wholesalers sought a response by October 13. *See id.* at 11. Plaintiffs' Co-Lead Counsel discussed the contents of the letter with Wholesalers' counsel on October 13, and confirmed on October 16 that they were discussing the matter with 3M's counsel. Wholesalers' counsel requested an update on October 18, and apprised Co-Lead Counsel that they would file this motion on October 20, and the accompanying Motion for Extension, if the issues raised in the Letter to Co-Leads had not been resolved by then. Based on another conversation on October 19 with Co-Lead Counsel, Wholesalers' counsel understand that Co-Lead Counsel are continuing negotiations toward a resolution of the Wholesalers' concerns. But as of the date of this filing, Wholesalers' counsel understand that a resolution has not yet been reached.

Given the fast-approaching deadlines to object and opt out, the Wholesalers seek additional time so that Co-Leads and 3M may provide clarity and certainty as to the intended applicability and potential ramifications of the 3M Agreement on Wholesalers and their Member Systems, and how the rights of each under the Agreement are intended to interrelate.

## III.    STANDARD OF REVIEW

On a timely motion, the Court "must permit anyone to intervene" who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2); *see also Houston Gen. Ins. Co. v. Moore*, 193 F.3d 838, 839 (4th Cir. 1999). Further, the Court "may permit anyone to intervene" who "has a claim or defense that shares with the main action a common question of law or fact," considering whether the intervention will "unduly delay or

prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B), 24(b)(3).

Absent Class Members must generally intervene before filing papers in an action. *See Good v. Am.*

*Water Works Co., Inc.*, No. CV 2:14-01374, 2016 WL 5746347, at *3 (S.D.W. Va. Sept. 30, 2016);

*United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977).

The decision whether to grant permissive intervention typically "lies within the sound discretion of the trial court." *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003) (citation omitted). The Fourth Circuit has long recognized that "liberal intervention is desirable to dispose of as much of a controversy involving as many apparently concerned persons as is compatible with efficiency and due process." *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986).

The Wholesalers meet all requirements to intervene in this action as of right under Rule 24(a)(2) and, in the alternative, for permissive intervention under Rule 24(b). And, although the Court has stayed certain proceedings, the stay binds an "Eligible Claimant or Releasing Party . . . that asserts a Released Claim," a group that does not include the Wholesalers. MDL Dkt. No. 3626 at 15–16.

## IV.    ARGUMENT

The Wholesalers seek intervention as of right, or in the alternative permissive intervention, for the limited purpose of requesting that the court extend the objection and opt-out deadlines and subsequent hearing. The Wholesalers are not parties to this litigation but have rights that may be implicated by the 3M Agreement, either directly as potential settlement Class Members, or indirectly through their Member Systems as potential settlement Class Members.

### A.  The Wholesalers May Intervene as of Right

The Wholesalers satisfy the four requirements to intervene as of right under Rule 24(a)(2). Their intervention now—before the objection deadline—will promote efficiency and judicial

economy consistent with the U.S. Court of Appeals for the Fourth Circuit's guidance that "liberal intervention is desirable to dispose of as much of a controversy involving as many apparently concerned persons as is compatible with efficiency and due process." *Feller*, 802 F.2d at 729 (internal quotations omitted).

### 1.  The Wholesalers' Motion to Intervene is Timely

To decide if a motion to intervene is timely, the Court must weigh three factors: (1) "how far the underlying suit has progressed"; (2) "the prejudice any resulting delay might cause the existing parties"; and (3) "why the movant was tardy." *Alt v. U.S. EPA*, 758 F.3d 588, 591 (4th Cir. 2014) (citation omitted). The timeliness of intervention is subject to the Court's discretion. *See Gould*, 883 F.2d at 286.

This Motion is timely because it comes weeks before the objection deadline (November 11), and almost two months before the opt-out deadline (December 11). *Cf. Alt*, 758 F.3d at 591 (denying intervention sought after several rounds of court-ordered motion deadlines). The Wholesalers sought to intervene "as soon as it became clear" that the Agreement could impair their interests. *United Airlines*, 432 U.S. at 386; *see also United States v. Carpenter*, 298 F.3d 1122, 1125 (9th Cir. 2002) (intervention timely where proposed intervenors "acted as soon as they had notice" that settlement terms were "contrary to their interests"). The Wholesalers did not receive settlement class notice, *see* Exs. B (Decl. of Mickey Chaudhuri) & C (Decl. of Billy George), are not listed in the 3M Agreement exhibits that note potential Class Members, *see* 3M Agreement Exs. E & F, and are not clearly accounted for in the structure of the Agreement.

Intervention will not cause undue delay or prejudice; on the contrary, intervention will facilitate judicial economy and orderly administration of the 3M Agreement. The Wholesalers filed this motion before the key deadlines passed. They seek to intervene to obtain clarification of

their own rights, those of their Member Systems, and those of thousands of similarly situated wholesalers and their related public water systems across the country that may be unaware of the impact the 3M Agreement may have on their present and future claims. The Wholesalers' intervention would promote judicial economy by providing wholesalers with information and time needed to make sound and informed business decisions on a large, complicated, and consequential settlement. The Wholesalers did not receive settlement notices, and our analysis indicates that they may not be alone. *See supra* n.1. If thousands of active wholesalers discover after the key deadlines have passed that they are in fact Eligible Claimants, they may seek leave to opt out after the deadline (or even litigate against 3M years down the line), swelling the docket and possibly even implicating the walk-away threshold. The better path is to fully apprise wholesalers and retailers of their rights, options, and obligations under the 3M Agreement before any key deadlines.

Altogether, the minor costs of a delay to clarify the 3M Agreement pale in comparison to the potential costs of failing to clarify the Agreement. Additional time spent now will afford all potential claimants the ability to make an informed, reasoned decision. It would also provide 3M with the certainty it seeks from the negotiated settlement.

### 2. The Wholesalers Have Significant Protectable Interests in This Action

An applicant for intervention as of right must show that it possesses a "significantly protectable interest." *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir 1991) (citation omitted). An interest is significant and protectable if a party "stand[s] to gain or lose by the direct legal operation of [a] judgment" in that action. *Id.* An interest can be "significantly protectable" even though it is "contingent upon the outcome of other pending litigation." *Id.*

The Wholesalers "stand to gain or lose" their ability to participate in the 3M Agreement, and in turn their ability to raise claims against—and recover from—3M. Metropolitan and

NTMWD are not currently parties to litigation against 3M, but both entities have identified PFAS contamination in their water systems that may be traceable to 3M. Further, as testing methods continue to develop for additional PFAS chemicals, at greater levels of accuracy, the Wholesalers may identify future contamination. When paired with growing regulatory interest in PFAS drinking water standards, the Wholesalers may face significant cleanup costs in the future.[5] The Wholesalers seek to protect their potential claims for an allocated share of the settlement, as well as future potential claims against 3M to provide for cleanup activities. Unfortunately, the operation of the terms of the 3M Agreement could be interpreted to impact those future claims—possibly in ways not intended by the drafters and not clear to either eligible wholesalers or member systems. *See infra*, Part IV.A.3. For these reasons, the Wholesalers may "stand to . . . lose" recoveries they seek. *See Ohio Valley Env't Coal., Inc. v. McCarthy*, 313 F.R.D. 10, 23 (S.D. W. Va. 2015) ("The economic injury directly threatened by one possible outcome of the litigation gives rise to a significantly protectable interest.").

In addition, the Wholesalers have a strong interest in ensuring the 3M Agreement's terms are fair, adequate, and reasonable for themselves as well as for their Member Systems. The 3M Agreement appears to exclude retailers from a potential settlement allocation when they purchase water from a wholesaler—even if they purchase and treat raw water from a wholesaler. *See infra*, Part IV.A.3.i. Member Systems deserve access to funds needed to treat PFAS contamination in their water supplies, particularly when they purchase raw water or if PFAS contamination is introduced to their system after the water leaves the Wholesalers' systems.

---

[5] *See, e.g.*, CALIFORNIA OFFICE OF ENVIRONMENTAL HEALTH HAZARD ASSESSMENT, *Proposed Public Health Goals for Perfluorooctanoic Acid and Perfluorooctanoic Sulfonic Acid in Drinking Water* (July 2023) (setting proposed public health goals for two PFAS, the first step in developing enforceable standards); PFAS National Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638 (Mar. 29. 2023) (proposing national drinking water standards for six PFAS).

### 3. Denial of the Motion Would Impair the Wholesalers' Ability to Protect Their Interests

The Wholesalers' interests will be impaired if intervention is denied because "disposing of the action may as a practical matter impair or impede the [Wholesalers'] ability to protect [their] interest[s]." Fed. R. Civ. P. 24(a)(2). Intervention is justified where "disposition of the action would put the movant at a 'practical disadvantage' in protecting its interest" or the settlement could be interpreted to "preclude" the "would-be intervenor from protecting its interest later." *McCarthy*, 313 F.R.D. at 26 (citation omitted). This "requires a practical analysis, rather than a legal one." *Id.*

Because of the significant problems identified and the lack of substantive response to the Wholesalers' concerns, the Wholesalers are unable to meaningfully evaluate the 3M Agreement and inform—and receive approvals from—relevant decision-makers in the time allotted before the objection and opt-out deadlines. If intervention to seek an extension of time is denied, the Wholesalers could be forced to make critical decisions as to the 3M Agreement without adequate knowledge and in the face of crippling uncertainty and ambiguity—indisputably amounting to a "practical disadvantage" in protecting their interests. *Id.*

### i. Wholesalers and retailers are treated unclearly and potentially illogically under terms of settlement

First, the 3M Agreement as drafted produces counterintuitive outcomes in complex water systems. For example, retailers that participate may risk releasing their claims without being able to seek an allocation award if: (1) the wholesale supplier constitutes a Public Water System; or (2) the water provided is treated as opposed to raw. *See* Ex. A at 5–6 (Letter to Co-Leads).

The 3M Agreement provides that a Public Water System may make a valid claim for settlement monies based on its Impacted Water Sources. The Agreement further defines "Water Source" to include "a groundwater well, a surface-water intake, or any other intake point from

12

which a *Public Water System* draws or collects water for distribution as Drinking Water, *and the raw or untreated water that is thus drawn or collected*. Solely for purposes of the Allocation Procedures described in Exhibit Q, (i) *a purchased water connection from a seller that is a Water Source is not a Water Source*[.]" 3M Agreement Section 2.82 (emphasis added). This definition for "Water Source" appears to embed several important exclusions from allocation.

For example, a Public Water System that buys water from a wholesale water agency could not seek an allocation award for a purchased water connection where the wholesaler itself is a Public Water System. This would apparently result because, for allocation purposes, "a purchased water connection from a seller that is a Water Source is not a Water Source." *Id.* This clause appears to mean that, if a Member Agency purchases water from a wholesale water agency and the wholesale agency connection is a Water Source, then that purchased water is not a Water Source for the Member System buying the water. Thus, although a Public Water System buying water from a wholesale water agency may qualify as a Class Member, the purchased water that makes up its drinking water supply would not be considered a valid Water Source for purposes of allocation if the wholesale agency selling the water is itself a Water Source.

Further, if a Public Water System's purchased water connection from a wholesaler consists of treated water, as opposed to raw or untreated water, then the 3M Agreement appears to provide that a Public Water System cannot seek an allocation award as to that purchased connection. The "Water Source" definition comprises intake points "and the raw or untreated water that is thus drawn or collected." 3M Agreement Section 2.82. This suggests that an intake point and the *treated* water drawn there from are *not* a Water Source.

Finally, it is not clear whether a wholesaler can seek to recover Settlement Funds for raw water sold to a retailer—the flow rate calculations for allocation under the 3M Agreement require

13

flow rate measurement "of the water that enters the *treatment plant* of a surface water system." 3M Agreement Ex. Q at 4, MDL Dkt. No. 3370-3 at 543 (emphasis added).

The potential permutations between a wholesaler and a retail purchaser and associated outcomes under the 3M Agreement are depicted as follows:

**3M Agreement Outcomes**

| Seller | Water Type | Whole-saler's Status | Can Retail Purchaser Make Claim? | Retail Purchaser Releases (If No Opt-Out)? | Can Wholesaler Make Claim? | Wholesaler Releases (If No Opt-Out)? |
|---|---|---|---|---|---|---|
| Wholesaler 1 | Treated | PWS | No | Yes | Yes | Yes |
| Wholesaler 2 | Raw | PWS | No | Yes | Unclear | Yes |
| Wholesaler 3 | Raw | Not PWS | Yes | Yes | No | No |
| Wholesaler 4 | Treated | Not PWS | No | Yes | No | No |

The illogical result of these permutations is that the Wholesalers' rights may be directly linked to the rights of an independent retailer purchaser; and funds may well be allocated to entities that bear no actual PFAS treatment costs, while entities that bear such costs may not be eligible for an allocation—yet all these entities would be held to have released 3M. For example, a retail purchaser of raw water will apparently receive no allocation, even if it is the entity positioned to treat drinking water for PFAS, where the wholesaler is a Public Water System—it is not even clear that the wholesaler could make a claim for the raw water, which would not "[enter] the treatment plant of [the wholesaler's] surface water system." The raw and treated water distinction also appears to overlook that PFAS may be introduced into a water system at any point along that system—water is not protected from contamination as soon as it is channeled, treated, or sold to

another entity. The Wholesalers have outlined these concerns in greater detail in their Letter to Co-Leads. *See generally* Ex. A (Letter to Co-Leads).

ii.  **"Releasing Parties" definition, claims over provision, and certification could be read to bind independent entities**

Second, various defined terms and provisions make the potential impact of the 3M Agreement on the relationship between wholesalers and retail water purchasers potentially fraught with uncertainty, especially if wholesalers and retailers make different participation decisions. The Agreement defines "Releasing Parties" to include, among many others, "anyone in privity with" a Class Member. 3M Agreement Section 2.61. It also includes a "claims over" provision, which operates to protect the released parties from contribution and indemnification claims by any non-released party that would otherwise be released if they were brought by a releasing party. *See id.* Section 11.6. In addition, the claims forms for the settlement require the Class Member to certify that it has "consulted with any other entity that has incurred costs in connection with efforts to removed [sic] PFAS from, or prevent PFAS from entering, Settlement Class Member's Public Water System, and that Settlement Class Member's claim is on behalf of any such other entity." 3M Settlement Claims Forms.

The operation of the foregoing definitions could be troubling when wholesalers are involved. If a wholesaler opts out of the settlement, but a Public Water System that purchases water from that wholesaler participates, it is not clear how such an act might limit the potential for the wholesaler to seek damages against alleged polluters, as well as against 3M. In addition, the definition of "Releasing Parties" and the certification on the claims forms are so broad that they can be read to permit (or require) a Public Water System purchasing water from a wholesaler to release claims on behalf of a wholesaler. *See* 3M Agreement Section 2.61. The claims over provision, in combination with the certification and definition of "Releasing Parties," could be

used by 3M to argue that a Public Water System purchasing water from a wholesaler may release claims on behalf of the wholesaler and bind the wholesaler to the claims over provision.

The claims forms themselves raise several other questions in how they are framed. They require the certifying party to consult with "any other entity"—a boundless term not limited to water agencies. The Wholesalers' source waters are natural water courses. For example, for Metropolitan, the Colorado River goes through multiple states before it reaches Metropolitan's intake, many other water agencies use and treat water that flows through the Northern Sierras, and other agencies and entities bank, use, and exchange water from the State Water Project in the Central Valley. *See supra*, Figure A; *see also* Ex. B (Decl. of Mickey Chaudhuri). Would Metropolitan have to identify and consult with all entities that are upstream from Metropolitan on both the State Water Project and the Colorado River? What of state agencies? And those entities that bank in the same groundwater basin? And what are the consultation obligations of Wholesalers' member agencies? NTMWD faces similar challenges.

Other questions related to the claims forms' consultation requirements include: (1) Do the costs that are referenced have to be incurred specifically to address PFAS, or could removing PFAS be incidental to removing other contaminants? (2) Does the certification cover only past costs, or does it also apply to current and/or future costs? (3) What if the other entity/entities do not agree that the Class Member's claim is on behalf of the other entity/entities—does that mean the Class Member cannot file a claim for that source water (Source A) since it cannot certify its claim is on behalf of the other entity/entities? (4) If the answer to question (3) is "yes," and the Class Member still files a claim for other water sources (Source B) impacted by PFAS, does the Class Member release all claims it has as to both Source A and Source B, even though it cannot file a claim as to Source A?

### 4.  Wholesalers' Interests Are Not Adequately Represented by Plaintiffs

The fourth factor is satisfied where "representation of [the movant's] interest '*may be*' inadequate." *United Guar. Residential Ins. Co. of Iowa v. Phila. Sav. Fund Soc.*, 819 F.2d 473, 475 (4th Cir. 1987) (emphasis in original) (citation omitted). Representation may be inadequate where the "existing parties' interests are not completely identical to and may come into conflict with [the intervenor's] own interests." *Vision Church v. Vill. Of Long Grove*, No. 03 C 5761, 2004 WL 742133, at *4 (N.D. Ill. Apr. 6, 2004). The burden to make this showing is "minimal." *See Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976); *N.C. State Conf. of NAACP v. Cooper*, 332 F.R.D. 161,168 (M.D.N.C. 2019). The interest of the named class representatives ("Plaintiffs") in securing final approval of the 3M Agreement conflicts with the Wholesalers' interests in extending the time for Class Members to object and opt-out so that the Plaintiffs' Co-Leads may clarify the terms of the 3M Agreement.

The Wholesalers' interests are not adequately represented by Plaintiffs due to their unique position as wholesaler water providers. That position raises a set of questions and concerns that is entirely different from the water provider Class Members.[6] The Wholesalers are not listed as eligible Class Members in either Exhibit E or Exhibit F. *See generally* 3M Agreement Exs. E, F. Over 2,000 other wholesalers are similarly absent from those exhibits. *See supra* n.1. Moreover,

---

[6] A look at the class representatives is illustrative. A search of public records demonstrates that only four of the seventeen class representatives include wholesale as a part of their business. Even the largest public wholesale contract among the class representatives—an interconnection from Martinsburg Municipal Authority—was designed with a cumulative volume not to exceed 375,000 gallons **per month**. *See* PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, *Drinking Water State Revolving Fund Project Priority List* (June 2, 2022), https://files.dep.state.pa.us/Water/BPNPSM/InfrastructureFinance/StateRevolvFundIntendUsePl an/2022/DRINKING_WATER_Federal-FY_2022_PPL_JUN_REV_1.pdf. In stark contrast, Metropolitan's five treatment plants combined provide on average approximately 730 **million** gallons of treated water **per day**. *See* Ex. B (Decl. of Mickey Chaudhuri).

the settlement allocation tables as constructed fail to address entities as large and with as low concentrations of PFAS as found with Wholesalers. *See* Ex. A at 10 (Letter to Co-Leads). As raised in detail in the letter to Co-Leads, *see id.*, the Wholesalers' concerns go beyond a mere difference in litigation strategy. *See Stuart v. Huff*, 706 F.3d 345, 355 (4th Cir. 2013).

**B.  The Wholesalers Are Also Entitled to Permissively Intervene**

If the Court finds that the Wholesalers may not intervene as of right, it should nevertheless grant the Wholesalers' request for permissive intervention. "On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Permissive intervention "should be construed liberally in favor of intervention." *Savannah Riverkeeper v. U.S. Army Corps of Eng'rs*, No. 9:12-610-RMG, 2012 WL 13008326, at *2 (D.S.C. Aug. 14, 2012).

As noted, the Wholesalers' Motion is timely. Their potential PFAS contamination claims share common questions of law and fact with Plaintiffs' claims regarding drinking water contamination caused by PFAS manufactured by 3M. The Wholesalers have an interest in this action given their own potential claims, as well as the potential claims of their Member Systems that may implicate the Wholesalers' claims. Finally, an extension of the rapidly approaching deadlines would not prejudice Plaintiffs' rights because it would not affect their substantive claims in any way.

**V.    CONCLUSION**

For the foregoing reasons, the Wholesalers respectfully request that this Court grant leave to intervene in this action for the purpose of advancing their Motion for Extension of Time.

Wholesalers also request that the Court consider this Motion on an expedited basis, in light of the impending deadlines in this case.

Dated: October 20, 2023.

Respectfully submitted:

*/s/ Jeff B. Kray*
*/s/ Jessica K. Ferrell*
Jeff B. Kray, WSBA No. 22174
Jessica K. Ferrell, WSBA No. 36917
Marten Law, LLP
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jkray@martenlaw.com
jferrell@martenlaw.com

*Attorneys for the Metropolitan Water District of Southern California and North Texas Municipal Water District*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed with this Court's

CM/ECF system and was thus served electronically upon all registered counsel of record.

Dated: October 20, 2023.

*/s/ Jeff B. Kray*
*/s/ Jessica K. Ferrell*
Jeff B. Kray, WSBA No. 22174
Jessica K. Ferrell, WSBA No. 36917
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jkray@martenlaw.com
jferrell@martenlaw.com

*Attorneys for the Metropolitan Water*
*District of Southern California and North*
*Texas Municipal Water District*

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 7.02, counsel for the Wholesalers conferred with liaison counsel for Plaintiffs by letter dated October 9, 2023, by email dated October 18, 2023, and by phone on October 19, 2023, and attempted in good faith to resolve the matter contained in the motion.

Dated: October 20, 2023.

/s/ Jeff B. Kray
/s/ Jessica K. Ferrell
Jeff B. Kray, WSBA No. 22174
Jessica K. Ferrell, WSBA No. 36917
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jkray@martenlaw.com
jferrell@martenlaw.com

*Attorneys for the Metropolitan Water District of Southern California and North Texas Municipal Water District*