IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | MDL No. 2:18-mn-2873-RMG <br><br> **This Document Relates to:** <br><br> *City of Camden, et al. v. E.I. du Pont de Nemours & Company et al.*, Case No. 2:23-cv-03230-RMG |

OBJECTION OF CITY OF VANCOUVER

## I.     INTRODUCTION

The City of Vancouver, Washington, by and through its below-signed counsel, respectfully submits these objections to the proposed settlement between Defendants DuPont de Nemours, Inc., the Chemours Company, Corteva, Inc., and E.I. DuPont de Nemours and Company ("DuPont") and public water providers ("DuPont Agreement" or "Agreement"), as well as the Interpretive Guidance on Interrelated Drinking-Water Systems ("Interrelated Guidance"), Dkt. No. 3858-1, and the Interpretative Guidance on Entities That Own and/or Operate Multiple Public Water Systems ("Multiple System Guidance"), Dkt. No. 3919-1, in *City of Camden, et al. v. E.I. du Pont de Nemours & Company et al.*, Case No. 2:23-cv-03230-RMG. Vancouver objects to the Agreement as presented by Proposed Class Counsel ("Class Counsel") because it does not meet the standard for approval under Federal Rule of Civil Procedure 23(e)(2). Vancouver reserves the right to withdraw this objection at any time before the opt-out deadline of December 4, 2023, rendering it null and void, and to opt out of the Agreement. DuPont Agreement §§ 9.6.5, 9.7.4.

The DuPont Agreement includes simultaneous, material deficiencies with respect to core requirements of Rule 23, each of which should be central to a determination of the fairness and adequacy of the proposal, and many of which courts have deemed sufficient, individually, as a basis for rejecting a settlement. The proposed release is overbroad, encompassing both alleged and unalleged claims, including claims addressing wastewater, stormwater, and real property cleanup damages and even extending to unknown and unasserted personal injury claims that are nowhere even considered in the damages calculation in this proposed settlement. Section 12.7 of the proposed settlement operates as an indemnity in many foreseeable instances and would significantly increase the Releasing Persons' potential exposure to further losses. The proposal is grossly unfair to interconnected water distribution systems and seeks to require those entities, including scores of subsidiary systems whose decisions require complex public processes, to satisfy deadlines that all know to be impossible. That outcome would be additionally unfair due to last-minute amendments cobbled onto the proposed settlement to address inadequacies previously identified by parties who fall into that category.

While the DuPont Agreement acknowledges some conflicts among class members by identifying a representative for Phase Two claims, that minimal gesture cannot begin to address the fact that, despite a modest number of common legal issues, the case presents class member factual and legal conflicts that are dominant and overwhelming, starting with the inadequately narrow and atypical claims of those presented as class representatives. The funds proposed are grossly inadequate even to address the small number of Class Member claims currently supported by factual estimates, and consequently never could be deemed sufficient to address the thousands of additional claims possessed by retail and wholesale water systems across the country. Such deficiencies would have been made clear by a bellwether case, the absence of which, alone, should

prove fatal to the proposed settlement. Finally, in a case in which water systems were readily identifiable using publicly available information, thousands of water systems, including many that had publicly acknowledged PFAS contamination in their systems, were apparently not notified of the settlement, depriving those entities of a fundamental due process protection. As described in detail below, the Court should reject the proposed settlement and direct the Parties to address the deficiencies identified.

## II.    STANDARD OF REVIEW

The Court may only approve a class settlement when it determines that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Court must examine whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal;
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

*Id.*

Under Rule 23(e), courts play the role of fiduciary to absent class members, zealously scrutinizing the proposed settlement to combat the omnipresent "danger that the parties and counsel will bargain away the interests of the unnamed class members in order to maximize their own." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 715 (6th Cir. 2013); *see also Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983) ("Careful scrutiny by the court is necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense

of the absent class members."); *Sharp Farms v. Speaks*, 917 F.3d 276, 293–94 (4th Cir. 2019)

("When the court reviews a proposed class-action settlement, it acts as a fiduciary for the class.").

The Court's role far exceeds a mere rubberstamp. *See* Manual for Complex Litigation,

Fourth, § 21.61 ("[T]he judge must adopt the role of a skeptical client and critically examine the

class certification elements, the proposed settlement terms, and procedures for implementation.").

The Court has an affirmative duty to protect the interests of the "class members whose rights may

not have been given adequate consideration during the settlement negotiations." *In re Jiffy Lube*

*Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

### III.    ARGUMENT

The DuPont Agreement as drafted is not "fair, reasonable, and adequate." Fed. R. Civ. P.

23(e)(2). Vancouver is a member of the settlement class because it is an active public water system

("PWS") in the United States of America that has detected PFAS in one or more water sources as

of the settlement date. *See* DuPont Agreement § 5.1; *see also* Ex. A (Aff. of Tyler Clary); Ex. B

(Aff. of Counsel) (certifying information as required under Agreement); *Gould v. Alleco, Inc.*, 883

F.2d 281, 284 (4th Cir. 1989).

### A. Objection Topic: Release

#### 1. The release is overbroad.

There is no identical factual predicate among the released future contamination and cleanup

claims and the claims alleged in litigation. *See* DuPont Agreement § 12.1. A court can approve a

release only of claims that share an "identical factual predicate" with claims alleged in the case at

issue. *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015); 4 Newberg and Rubenstein on Class

Actions § 13:61 (6th ed.) ("[C]ourts often police a proposed settlement agreement to ensure that

the release is not overly broad, that is, that it does not release claims outside the factual predicate

of the class's claims"). "Claims have an 'identical factual predicate' when they depend upon the *very same* set of facts." *McAdams v. Robinson*, 26 F.4th 149, 160 (4th Cir. 2022) (internal quotation marks and brackets omitted) (emphasis added).

The DuPont Agreement would release a wide range of unalleged claims that lack an identical factual predicate with claims alleged by Class Members. Those claims cannot be extinguished. The release is so overbroad as to render the Agreement unfair and unreasonable.

**a. The release seeks to include almost all wastewater, stormwater, and real property cleanup claims.**

The release encompasses claims for "PFAS that entered" a Class Member's "facilities or real property," unless (1) such claims involve facilities or real property that are "separate from and not related to a Public Water System" or (2) the U.S. Environmental Protection Agency ("EPA") or a State establishes new more stringent requirements on stormwater or wastewater cleanup. *See* DuPont Agreement §§ 12.1.1, 12.1.2. Under the first exception, the required absolute and total separation of such cleanup claims from drinking water poses what in many instances would be an insurmountable barrier. For example, even if wastewater is treated and recycled to make up just a fraction of a Class Member's drinking water supplies, under the applicable definition, the Class Member could be held to have released a wastewater cleanup claim in full. Putting aside recycled wastewater, arguments could be made that a wastewater or stormwater system is marginally "related" to a Class Member's PWS—or even any remote relationship between the two would be sufficient to foreclose a claim under the release as written. Such a broad release of wastewater, stormwater, and real property claims diverges from the factual predicate of the claims asserted and is patently unfair.

5

###### b. The release includes claims for unknown PFAS for which no claims are asserted in litigation.

The DuPont Agreement releases claims as to PFAS in drinking water. It in turn defines PFAS as those PFAS on the EPA's Fifth Unregulated Contaminant Rule ("UCMR 5"), "any substance asserted to be PFAS in Litigation," *and*:

> per- and polyfluoroalkyl acids (and any salts thereof), per- and polyfluoroalkyl halides, per- and polyfluoroalkyl alcohols, per- and polyfluoroalkyl olefins, per- and polyfluoroalkane sulfonyl fluorides (including any acids and salts thereof), perfluoroalkyl iodides, per- and polyfluoroalkyl ether-based substances, fluoropolymers, perfluoropolyethers, per- and polyfluoroalkanes, side-chain fluorinated aromatics, per- and polyfluorinated phosphates and phosphonates, per- and polyfluorinated sulfonamides, per- and polyfluorinated urethanes, and chemical precursors and degradation products of all such substances, including fluorinated monomers, polymers and side-chain fluorinated polymers and metabolites of all such substances . . . .

DuPont Settlement § 2.38. This definition then states its "intention" that it "be as broad, expansive, and inclusive as possible." *Id*. Because this PFAS definition is based partly on chemical structures, the release could encompass claims relating to up to 15,000 different chemicals. *See* Nat'l Institute of Env't Health Sciences, *PFAS*, https://www.niehs.nih.gov/health/topics/agents/pfc (last accessed Nov. 1, 2023). Water providers will only know, at most, about contamination by the 29 PFAS within UCMR-5, and the water providers in litigation with DuPont have only sought damages for the few PFAS they have tested for and detected—not 15,000 different chemicals. Accordingly, by seeking to encompass claims for thousands of chemicals, more than 99% of which are not subject to a single claim in this litigation, the release is entirely untethered from the required identical factual predicate. *Cf. Canter v. Midland Credit Mgmt., Inc.*, No. 3:14-cv-02939-MMA-MDD, 2017 WL 2817065, at *4 (S.D. Cal. June 28, 2017) (ruling that even if there was some "overlap" in subject matter between consumer-protection claims asserted in litigation and released claims that included different consumer-protection claims, there was no identical factual predicate

between them, rendering release overbroad).

### c.  The release includes personal-injury claims.

Personal-injury claims relating to PFAS in drinking water fit within "any and all Claims . . . that arise from or relate to PFAS that entered Drinking Water of a Public Water System . . . at any time before the Settlement Date." DuPont Agreement § 12.1.1. No water providers have alleged or could allege personal-injury claims in litigation against DuPont, nor have they sought recovery for such claims advanced against them by third parties. The claims proposed to be released and the litigated claims lack the required identical factual predicate. Thus, the release is overbroad and cannot meet the standard required by Rule 23.

The lack of any carve out in the release for personal-injury claims matters a great deal. Customers are already beginning to sue water providers for personal injury. *See, e.g.*, Compl, *Vincent v. Aquarion Water Co.*, No. FBT-CV23-6128205-S (Conn. Sup. Ct. Oct. 16, 2023); Compl., *Hoffnagle v. Conn. Water Co.*, No. HHD-CV-23-6175540-S (Conn. Sup. Ct. Oct. 31, 2023). Water providers are facing, and will continue to face, considerable exposure to liability arising from conditions for which they likely bear no responsibility. If they participate in a settlement with the current release language, they would have no contribution recourse against DuPont, a major tortfeasor. *See* AFFF MDL FAQs at 3, https://afff-mdl.com/wp-content/uploads/PFAS-FAQ.pdf (last accessed Nov. 1, 2023) (stating that DuPont is responsible for 3–7% of PFAS liabilities). In stark contrast to the breathtaking scope of the release, the DuPont Agreement's structure, the method supposedly used to support the damages calculation, and the relatively small dollar amount of the proposed settlement (when compared to the scope of the problem and likely range of damage recovery at trial), *see infra* Part III.F.1, individually and collectively signal that the Agreement was not intended to cover personal injury claims. If such

claims were intended to be included in the release, then the settlement amount is even more inadequate than explained herein, considering just the personal injury decisions to date. *See, e.g.*, *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 54 F.4th 912, 921 (6th Cir. 2022) (affirming jury verdicts of $40 million and $250,000 for just one plaintiff and his wife in personal-injury action involving long-chain PFAS).

### 2. The Releasing Persons definition binds parties that never assented to settlement.

The definition of Releasing Persons purports to bind not just the Class Member, but an array of other entities, including any "in privity with" the Class Member and "any person . . . seeking recovery on behalf of a Settlement Class Member or seeking recovery for harm to a Public Water System within the Settlement Class or the Public Water System's ability to provide safe or compliant Drinking Water." *See* DuPont Agreement § 2.45. A so-called interpretive guidance issued by the parties advancing the settlement confirms that the Releasing Persons provision applies, notwithstanding whether those Releasing Persons can or want to participate in the DuPont Settlement. *See* Dkt. No. 3858-1 at 5 ("In general, by participating in the Settlement, a Settlement Class Member releases claims on behalf of itself and its Releasing Persons (as defined in the Settlement Agreement) with respect to the water provided to (or supplied by) the Settlement Class Member.").

A "settlement agreement is a contract and must be interpreted as such." *Cox v. Shah*, 187 F.3d 629 (4th Cir. 1999); *Sadighi v. Daghighfekr*, 66 F. Supp. 2d 752, 759 (D.S.C. 1999). "This applies to class settlements as well as to the resolution of litigation between individual parties." *Dahingo v. Royal Caribbean Cruises, Ltd.*, 312 F. Supp. 2d 440, 445 (S.D.N.Y. 2004). It is axiomatic that one cannot be bound by a contract without assenting to it. *See, e.g.*, *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 236 (4th Cir. 2019) ("Under South Carolina law, a

contract is formed between two parties when there is, inter alia, a mutual manifestation of assent to its terms." (internal quotation marks and brackets omitted)). But binding parties that have refused the Agreement or could not assent to it—those that have affirmatively requested exclusion from the class or those that are not Class Members in the first place—is exactly what the DuPont Agreement attempts to do. The Releasing Persons definition purports to bind even entities over which a Class Member has no control, such as contractual counterparties that expressly opted out of the DuPont Agreement. Whatever the merits of the parties' goal of preventing "double recovery," Dkt. No. 3858-1 at 5, that goal may not be accomplished through an unfair means that also violates a fundamental tenet of contract law—that all bound parties must have assented.

### B. Objection Topic: Third-Party Claims

#### 1. The Claims-Over provision functions as an indemnity.

The DuPont Agreement provides a "contribution bar" and a "Claims-Over" provision. DuPont Agreement §§ 12.7.1, 12.7.2. The DuPont Agreement contains a "Protection Against Claims-Over," which, taken with the contribution bar, essentially would function like an indemnity provision in many instances. To the extent  the Claims-Over provision functionally operates as an indemnity,, it may contravene state constitutions and statutes that regulate the circumstances and procedures under which municipalities and other political subdivisions may assume debt. *See, e.g.*, Cal. Const. art. XVI, § 18; Tex. Const. art. III, § 52; Wash. Const. art. VIII, § 6; RCW 39.36.020(2)(a)(ii). In that event, the settlement agreement—which is a contract, *see Cox*, 187 F.3d at 629—would be void. *See Starr v. City & Cnty. of San Francisco*, 72 Cal. App. 3d 164, 167, 140 Cal. Rptr. 73, 74 (Cal. Ct. App. 1977) (contracts violating constitutional provision on municipal indebtedness void); *Galveston, H. & S. A. Ry. Co. v. Uvalde Cnty.*, 167 S.W.2d 305, 306 (Tex. Civ. App. 1942) (construing county contract as containing indemnity and refusing to enforce it

because it was entered into in violation of state law regulating indebtedness of municipalities); *Whatcom Cnty. Water Dist. No. 4 v. Century Holdings, Ltd.*, 29 Wash. App. 207, 211, 627 P.2d 1010, 1012 (Wash. Ct. App. 1981) (agreement construed as creating municipal debt and accordingly was "void as beyond the power of the Water District and contrary to the state constitution").

The contribution bar prevents any non-Released Person (i.e., non-settling defendants in the MDL) from suing DuPont for contribution or indemnity. DuPont Agreement § 12.7.1. Such contribution bars are widely used in multi-party litigations to facilitate partial settlements. But such contribution bars do not bar claims by non-parties to the litigation, as such a bar would violate basic due process. *See Jiffy Lube*, 927 F.2d at 158 ("If the proposed settlement is intended to preclude further litigation by absent persons, due process requires that their interests be adequately represented.") (citing Manual for Complex Litig. 2d, § 23.14 at 166 (1985)). Section 12.7.1 cannot apply to either direct actions against DuPont or contribution actions against DuPont by non-parties to the MDL.

Because myriad, as-yet-unknown parties that are not subject to the contribution bar may bring actions against Releasing Persons and DuPont, under the settlement as proposed, Releasing Persons may lose the benefits of any settlements they receive from DuPont. Section 12.7.2 of the DuPont Agreement requires that if an action by a Releasing Person against a non-party gives rise to a contribution award against DuPont by the non-party (a Claim-Over), the Releasing Person must, in effect, indemnify DuPont by reducing the amount of the Releasing Person's judgment in any amount required to fully extinguishes any Claim-Over—that is, to pay DuPont's entire share of liability for contribution to the non-party.

10

An example illustrates the unfairness inherent in the proposed settlement structure. Consider the scenario where a PWS participates in the DuPont Agreement and receives $100,000. It is later sued for cleanup by its state environmental agency and for personal injury and property damage by its customers, after EPA discovers PFAS in the PWS's wells at concentrations exceeding the applicable cleanup level. The PWS ultimately is found liable to clean up its water supply at a cost of $100 million. Its customers win a judgment of $200 million for personal injury and property damages. The PWS then learns that the source of the PFAS in its water supply is AFFF applied during firefighting training exercises over a 30-year period at a local airport. The PWS provides water to a small community. It can ill afford to pay damages, so it sues the airport in contribution. It cannot sue DuPont because it has released DuPont. The airport, also small, cannot bear a large damage award, so it sues DuPont, which it can do because it is a non-party to the settlement with DuPont. After five years of litigation, a court allocates 50% of the cleanup costs and 50% of the damages suffered by the customers to DuPont, 50% to the airport, and nothing to the PWS. DuPont then tenders its damages under the Claims-Over provision of the settlement to the PWS. Had the PWS not settled with DuPont, its share of cleanup liability and customer damages would have been zero. Instead, it is $150 million—the 50% share the court allocated to DuPont. That such a result is possible renders the settlement unacceptable under applicable Rule 23 standards.

The result for the PWS would be even worse if the court determines the airport to be only 10% liable and DuPont to be 90% liable—a potentially more realistic scenario. In that event, the PWS would be required to reduce the $300 million judgment "by whatever amount is necessary . . . to fully extinguish the Claim-Over under applicable law." DuPont Agreement § 12.7.2. The PWS, who settled with DuPont for $100,000, would be responsible for DuPont's $270 million

share. Here, instead of having to pay zero had it not settled with DuPont, the PWS would have to pay $270 million.

Such hypothetical third-party suits are neither remote nor unlikely. They are already occurring. *See supra* Part III.A.1.c. And because the DuPont Agreement defines a Released Claim that could trigger the Claims-Over provision so broadly as to include far more than just PFAS contamination to the water supply, the universe of potential defendants, plaintiffs, and claims that could trigger the provision is immense.

### 2. The Agreement fails to name a settlement crediting method.

The Fourth Circuit has held that a failure to name a settlement crediting method "may deprive the plaintiff class members of information affecting their ability to assess fairly the merits of the settlement." *Jiffy Lube.*, 927 F.2d at 161. "The plaintiff class's interest in the choice of setoff method is such that at least one court has held that the decision on setoff method must be considered by the class and its representatives before the settlement can be approved pursuant to Rule 23(c)." *Id.* (citing *In re Atl. Fin. Mgmt., Inc. Sec. Litig.*, 718 F. Supp. 1012, 1018 (D. Mass. 1988)). "Delaying final determination of the amount of the set-off deprives the plaintiff class of one of the chief inducements to settle: certainty. Particularly in class actions, this method generates significant practical difficulties as well, in that the indeterminate impact of any partial settlement would make it difficult to frame a notice to the class which fairly presents the merits of the proposed settlement." *In re Atl. Fin. Mgmt., Inc. Sec. Litig.*, 718 F. Supp. at 1018. The DuPont Agreement never identifies a settlement crediting method. *See generally* DuPont Agreement § 12.7. Accordingly, Class Members are unable to fairly assess the merits of the Agreement.

### C. Objection Topic: Interconnected Drinking Water Systems

**1. The Interrelated Guidance constitutes an improper late amendment to the DuPont Agreement.**

On October 25, 2023, Class Counsel filed a Joint Motion to Supplement the Preliminarily Approved Allocation Procedures ("Motion to Supplement") seeking to amend the underlying DuPont Agreement through incorporating the Interrelated Guidance by reference. Dkt. No. 3858. The Court granted that motion the next day. Dkt. No. 3862.

With this entirely new document, Class Counsel announced for the first time that the proposed settlement class was intended to include water wholesalers, created anew joint claims submission process for interrelated water systems, and took the position that the releases would operate to rely on the language of the water sale agreements within those interrelated systems. Together, those pronouncements operate as material substantive amendments to the underlying DuPont Agreement because they alter both the distribution of settlement monies and the claims process, and significantly expand the scope of entities covered. These changes fundamentally contradict the Court's preliminary approval findings, the notice process, and the notice timeline.[1]

**2. The Interrelated Guidance changes the DuPont Agreement and fails to resolve related ambiguity.**

Some form of amendment or guidance was and remains necessary to clarify several ambiguous aspects of the DuPont Agreement.[2] In their Motion to Supplement (Dkt. No. 3858), Class Counsel equivocates on whether the Interrelated Guidance substantively altered the Agreement with regard to interrelated systems. They argued, for instance, that the Interrelated

---

[1] This same argument similarly applies to the Multiple System Guidance, Dkt. No. 3918-1.

[2] Of note, two separate groups have raised questions regarding the scope of the Agreement as proposed: two large wholesalers raising concerns regarding the status of wholesale water providers, Dkt. No. 40; and the Leech Lake Band of Ojibwe with respect to Tribes and Tribe-run water systems, Dkt. No. 50.

Guidance did not require additional time for eligible class members to analyze because it "adheres to existing principles" in the DuPont Agreement. Dkt. No. 3859 at 3. Yet, the Interrelated Guidance conjured a heretofore unmentioned process to address joint claims, and mandated that such claims be addressed on forms that do not yet exist. In other sections, the Interrelated Guidance backsteps from providing substantive clarity. The "Scope of Release" section, for example, describes how the claims release should operate, but concludes that "[u]ltimately, whether claims are released will turn on the application of the release provisions of the Settlement Agreement." Dkt. No. 3858-1. That caveat in essence invalidates the entire related portion of the exercise apparently mischaracterized as a clarification.

### 3. Eligible class participants have not received adequate notice of this Guidance.

The Interrelated Guidance is a substantive change to the DuPont Agreement that requires notice.[3] Class Counsel failed to provide notice to large portions of eligible claimants that are directly implicated by the Interrelated Guidance. As a result, wholesalers may unknowingly be bound by the settlement, and have potential claims waived by their customers, due to fast-approaching deadlines for opt-out that do not allow for coordination with customers or approval by relevant governing bodies. Such a result would violate fundamental due process, especially when wholesalers could easily have been identified and informed of their potential claims through a public database search. *See Ashok Babu v. Wilkins*, No. 22-15275, 2023 WL 6532647, at *1 (9th Cir. Oct. 6, 2023) (noting that due process requires notice to be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an

---

[3] This same argument similarly applies to the Multiple System Guidance, Dkt. No. 3918-1.

opportunity to present their objections."); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).

    **4. There is not enough time for interrelated systems to meaningfully evaluate and implement the Interrelated Guidance.**

The Interrelated Guidance sets out a new joint claims process by which interrelated water systems may together submit a unified claim or may separately file submissions for assessment and division by the Claims Administrator. This would require time to implement, as interrelated water systems must now convene, analyze their water sales agreements, negotiate allocations based on treatment practices as well as potential claims, decide whether to join or opt out, and ultimately seek approval of those decisions from the relevant governing bodies. *Cf. Pearson*, 893 F.3d at 986 (material alteration of settlement requires new notice). The operative deadlines will allow for none of those steps. The Guidance puts the onus on wholesalers and their customers to determine the fairest application of the Settlement as between their systems, yet fails to provide adequate time to do so, and potentially pit entities within an interrelated water system against one another as they navigate monetary claims and the implications of the proposed releases.

Wholesalers the Metropolitan Water District of Southern California ("Metropolitan") and the North Texas Municipal Water District ("NTMWD") provide illustrative examples of the unfairness of what has been proposed here. Metropolitan wholesales raw and treated drinking water to its 26 public member agencies. Some of Metropolitan's member agencies are themselves water wholesalers, meaning they purchase water from Metropolitan, may themselves treat that water, and ultimately sell that water to their own retail member agencies. NTMWD comprises 13 member cities, supplies treated water to 34 direct customer contracts, and provides treated water to 32 retail customers. In all these relationships, NTMWD serves as a treatment provider, diverting

source water supplies to seven water treatment plants, with a capacity of nearly one billion gallons per day, and sending potable water to its customers. Under the Guidance, Metropolitan and NTMWD would have to meet with each of their customers, analyze and negotiate claims, and seek approval from the various elected bodies in short order.

Discussions between and among at least 50 government agencies cannot happen overnight. The Agreement seeks to settle the liability of an entity with one of the greatest responsibilities for PFAS contamination in the world. Under the DuPont Agreement and Guidance, the provider would waive most future claims against that company, potentially add liability through the claims-over provision (requiring the settling party to absorb DuPont's share), and thus reduce recoveries against other polluters in the future. Each entity has its own elected councilmembers and boards that must ultimately approve the joint claim. Reaching agreement will take more time than the 30 business days afforded.

**5. The Interrelated Guidance fails to address fundamental issues unique to wholesalers and their customers.**

A variety of issues unique to wholesalers and their retailer customers are not addressed by the Agreement. Wholesalers process massive quantities of water that far exceed that processed by the typical PWS. They may sell treated or raw water to their members. Members that may *themselves* be wholesalers. Wholesalers represent a critical part of the PWS. The Agreement and Guidance both fail to address and appear to have been drafted without appreciation for many features of these interconnected systems.

The Interrelated Guidance does not address how settlement funds will be allocated when a related wholesaler and retail purchaser disagree on opt-out decisions, even though it recognizes that wholesalers and retailers may make conflicting decisions regarding whether to join the

Agreement. In such circumstances, the Guidance leaves to the Claims Administrator to decide how to "divide the Allocated Amount based on relative capital and O&M costs of PFAS treatment." Dkt. No. 3858-1 at 2–3. Ignoring for the moment the fact that neither the Agreement nor the Claims Administrator properly has any role or authority with respect to a party once it has opted out of the settlement, until the Administrator acts, the Interrelated Guidance confesses there is no way to assess how much money either entity would receive in such a circumstance. It is not clear what happens to the remaining funds that would have been designated to the opted-out entity. Nor is it clear how funds will be allocated from different Phases if the wholesaler and retail purchaser are members of different phases of the disbursement. The potential resulting confusion and unfairness render the DuPont Agreement untenable.

The Agreement also failed to address, and the Interrelated Guidance ignores, the potential introduction of PFAS at different points along interconnected systems, PFAS may be introduced into the water system at multiple points along a system. Water is not protected from contamination as soon as it is channeled, treated, or sold to another entity. As a result, the claims of a wholesaler may be distinct from the claims of a retailer further along the water system. The Interrelated Guidance, as well as the underlying Agreement, do not offer a mechanism to cope with those circumstances and might be wielded to foreclose such claims.

**6.  The Agreement ignores the challenges of PFAS treatment at scale.**

The Agreement's focus on treatment ignores the challenges posed by treatment at the scales required for wholesalers and large water systems. For example, Metropolitan has a program to develop one of the largest water recycling plants in the world. The Pure Water Southern California ("PWSC") program would purify treated water for 1.5 million people. *See* Metropolitan, *Fact Sheet: Pure Water Southern California Program Benefits* (Mar. 2023),

https://www.mwdh2o.com/media/wrfpnkwl/purewater_programbenefits_digital032023.pdf.

Among other technologies, the plant will utilize reverse osmosis, which has been identified as a technology that can effectively remove PFAS from water. The project budget "including construction, engineering, and other costs" is estimated to cost more than $3 billion, and these costs are being updated. *See* Los Angeles Economic Development Corporation, *Metropolitan Water District: Regional Recycled Water Program* at ES-1, https://www.mwdh2o.com/media/21765/laedc_mwd_rrwp_20210902.pdf. Although the plant will serve all Metropolitan customers (its 26 member agencies), the PWSC water will be delivered at only a few connections. Implementing the limited set of technologies available to treat PFAS— like filtration or reverse osmosis—at scale requires a cost that goes far beyond what is contemplated under the settlement. The settlement is inadequate for largescale water systems.

### D. Objection Topic: Consultation Requirement

The DuPont Agreement Claims Form requires that the Class Member declare under penalty of perjury that it "has authority to release all Released Claims on behalf of itself and all other Persons who are Releasing Persons by virtue of their relationship or association with it." *See* DuPont Agreement Claims Form. But as explained previously, *see supra* Section III.A.2, the definition of Releasing Persons includes persons (like those in contractual relationships with Class Members) over which Class Members lack any authority to bind and with which Class Members do not have a principal-agent relationship. The definition also facially encompasses persons that may have opted out. Nonetheless, the Claims Form language would appear to require a Class Member to identify and consult with all such entities, and ultimately make claims *on their behalf*. A Class Member cannot reasonably certify that it has authority to release on behalf of Releasing

Persons when the Class Member does not have such authority as a matter of law. Accordingly, the certification in the DuPont Claims Form is flawed and unfair in operation.

### E. Objection Topic: Class Conflicts

#### 1. Common questions of law and fact do not predominate across the class.

Although Class Counsel contends 16 common questions of law or fact sufficiently unite the class, "the predominance criterion is far more demanding." *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997) (ruling that putative class members' common exposure to asbestos products supplied by defendants may have been enough to satisfy commonality but not predominance). The proposed class is too broad, with too diffuse an array of individual questions of law and fact, claims and defenses, for common questions to predominate. Indeed, in this matter, individual claims dominate.

For example, putative Class Members have varying amounts and types of PFAS in their systems, some of which are regulated and some of which are not. Many have not detected PFAS. Some Class Members purchase treated water from a wholesaler, others purchase raw water, while still others supply raw and/or treated water they distribute—some to consumers, others to retailers. Some have claims against the federal government. Class Members are located in all 50 states, with varying state laws and remedies. These numerous and different factual and legal circumstances significantly affect the strength of each Class Member's claim and thus the potential damages and recovery. These individual and subgroup questions predominate over the relatively few common questions of fact alleged by Class Counsel. Only a settlement with appropriate subclasses could address the predominance issue. *See* Fed. R. Civ. P. 23(c)(5) ("[A] class may be divided into subclasses that are each treated as a class under this rule.").

#### 2. Proposed Class Representatives have claims atypical of many Class Members.

Class Counsel and DuPont offer a thin argument that Class Representatives have asserted claims "undoubtedly typical of those of the Settlement Class Members" because they "have asserted claims for actual or threatened injuries caused by PFAS contamination[,]" they have alleged that the DuPont Entities "knowingly sold defective PFAS and failed to warn of those defects[,]" and they have asserted a "common damages theory that seeks recovery of the costs incurred in testing, monitoring, remediating and/or treating" their drinking water. *See* Dkt. No. 3393 at 51–52. Class Representatives' claims are atypical because their claims lack many of the nuances of the Class Members they seek to represent, including: (1) large, interrelated water systems; and (2) Class Members whose claims are affected by variations in state law.[4]

> **a. No Class Representatives own or operate large, complex water systems that wholesale drinking water to multiple entities.**

Of the 17 Class Representatives, only four include wholesale water supply as a part of their business. *See* Dkt. No. 7 at 6–16. The largest wholesaler of the group—Martinsburg Municipal Authority—has a maximum flow of 375,000 gallons *per month*, *see* Penn. Dep't of Envtl. Prot., *Drinking Water State Revolving Fund Project Priority List* at 13 (June 2, 2022), https://files.dep.state.pa.us/Water/BPNPSM/InfrastructureFinance/StateRevolvFundIntendUsePlan/2022/DRINKING_WATER_Federal-FY_2022_PPL_JUN_REV_1.pdf, whereas wholesaler Class Members can have systems that provide an average of 730 million gallons of treated water *per day*. *See* Dkt. No. 3829 at 17 n.1. In large systems, a PWS may be entirely separated from end water users through the sale of water to intermediaries. In litigating claims for these large systems, numerous questions of law and fact inapplicable to class representatives would arise, including:

---

[4] As explained in the Memorandum of Law in Support of Leech Lake Band of Ojibwe's Motion to Intervene for Limited Purpose to Clarify Settlements, none of the Class Representatives are Tribes, and Tribes have interests "beyond those of the Plaintiff Water Providers." Dkt. No 50-1.

who would constitute necessary parties under Rule 19; which of these various entities have claims for damages against the manufacturers; what claims and defenses these water providers have against each other; whether retailers have claims for increased rates; whether manufacturers have defenses to claims for increased rates; whether wholesalers or retailers have contractual authority to release claims on behalf of each other, and more. These questions significantly affect the claims and interests of water providers within complex systems. Class Representatives have not had to grapple with these complex issues and cannot adequately represent the interests of water providers that do.

### b. Class Representatives only represent 13 states.

Class Representatives present claims atypical to the class because each plaintiff's *prima facie* case is shaped by state law. While there may be similarities between states, the differences can be stark. Some states have adopted no regulations for PFAS, while others have adopted drinking water and cleanup standards. The Class Representatives only assessed the strength of the claims for the City of Stuart, Florida. *See* Dkt. No. 3393 at 42–44. Florida does not have state regulations for PFAS in drinking water. By contrast, many states have enforceable maximum contaminant levels ("MCLs") for multiple types of PFAS in drinking water. *See, e.g.*, 310 Code Mass. Regs. 22.07G (regulating six types of PFAS with a combined 20 ppt MCL); Mich. Admin. Code R. 325.10604g (regulating seven types of PFAS with individual MCLs); N.H. Code Admin. R. Env-Dw 705.06 (MCLs for four types of PFAS); N.J. Admin. Code 7:10-5.2 (MCLs for three types of PFAS). Washington State has both State Action Levels for 5 PFAS in drinking water and broad cleanup regulations that apply to *any* type of PFAS. WAC 246-290-315(4)(a), tbl.9; WAC 173-303-040, -100(6). Water providers in Washington and other states with such laws may be exposed to significantly more liability to investigate PFAS sources, treat drinking water, remediate

water supplies, and take other actions as required by state regulators. Further, unlike the federal Superfund law, Washington law holds liable any person who sells a hazardous substance. *Compare* 42 U.S.C. 9607(a), *with* RCW 70a.305.040(a)(5). Water providers in Washington and other states therefore have unique state law claims that are much stronger and broader than the claims available to the City of Stuart. These distinctions matter. Class Counsel have not adequately addressed the strength of the claims held by Class Members in states with drinking water regulations.

3.   **Several groups of Class Members have interests in direct conflict with other groups of Class Members.**

Class Representatives assert, without support, that "no indicia of conflicts of interest exists" among the proposed class and that "Plaintiffs allege the same or similar harms as the absent class members." Dkt. No. 3393 at 52–53. However, conflicts of interest are apparent on the face of the DuPont Agreement. The fact that Class Members are divided into two Phases—those with a current injury as of the Settlement Date and those with only a future injury—belies Class Counsel's assertion. The appointment of Ms. Elizabeth Fegan as separate counsel to represent the Phase Two Class Members further indicates conflict *among* the Class Representatives. *See* Dkt. No. 3393-4 at 9. That appointment fails to meet the general requirement for subclass designation, and it in no way addresses a variety of other conflicts, such as the following.

- **Within Phase Two**: Phase Two Class Members with little or no PFAS detections have an interest in recovering monitoring costs and maintaining an ample fund available long-term in case the PFAS levels increase over time, whereas Phase Two Class Members with high detections, particularly above regulatory limits, have an interest in obtaining the maximum amount of funding as soon as possible after detection.

- **Between Wholesalers and Retailers**: Wholesalers and their customers may have differing interests if they compete for the same allocation for the same water source. *See* Dkt. No. 3858-1 at 2–3.  Under the Guidance, the Claims Administrator will have broad authority to interpret contracts between wholesalers and their customers to determine who bears the treatment costs

"through the purchase price, under the contract, or otherwise." *Id*. Because the settlement fund is so inadequate, each party will have an interest in ensuring that it receives the full allocation amount. *See supra* Part III.C.1.

- **Between Class Members with or without Regulatory Violations**: Class Members with regulatory violations have both stronger claims and an interest in receiving the maximum amount of funding upfront to treat their water as soon as possible, whereas Class Members without such violations have weaker claims and an interest in recovering monitoring costs while ensuring that more funds are available later in case their detections increase over time.

- **Between Class Members with Well-Researched or Less-Researched PFAS**: Class Members with detections of relatively well researched PFAS such as PFOA and PFOS have an interest in basing allocation on the quantities of those chemicals in the water supply while other Class Members may not even be able to detect the types of PFAS in their systems. Other Class Members may have detections of PFAS chemicals for which there is currently no regulatory level (either enacted or proposed) but for which there may be in the future as PFAS research continues. Class Members with well-researched PFAS that have regulatory limits and health risks have an interest in recovering now based on those detections, while those without such detections have an interest in maximizing future funding as more is discovered about the types of PFAS in their systems. This conflict is shown by the bias in the allocation procedures for Class Members who have detections of PFOA and PFOS versus those who only have detections of other PFAS. *See* Dkt. No. 3393-2 at 86.

- **Between Class Members that have PFAS with or without EPA-approved Test Methods**: The Agreement allocates funds largely based on those PFAS that have EPA-approved test methods as applied through UCMR 5. Nonetheless, the Agreement releases claims for all types of PFAS, even those that are not yet detectable by water providers. Water providers with these types of potential future claims but no current claims have an interest in either restricting the release of claims to less types of PFAS or ensuring funding well into the future when they might be able to detect these types of PFAS in direct conflict with Class Members who have detectable PFAS and have an interest in compensation as soon as possible.

Extensive and material conflicts exist among Class Members and adequate procedures were not put in place to protect them against these conflicting interests; certification without such safeguards would not comply with Rule 23.

### F. Objection Topic: Money

#### 1. The settlement funds are insufficient to redress DuPont's harm to water providers.

Under the DuPont Agreement, DuPont will pay $1,185,000,000 to Eligible Claimants. *See* MDL Dkt. No. 3393-2 at 10. Even assuming this figure reflects the settlement's true value—and it does not—the settlement amount pales in comparison to the PFAS-related damages that DuPont has caused across the country while controlling between 3 and 7 percent of the historical PFAS market. *See* AFFF MDL FAQs at 3, https://afff-mdl.com/wp-content/uploads/PFAS-FAQ.pdf (last accessed Nov. 1, 2023). Estimates indicate the nationwide cost of drinking water treatment of PFAS may range between $3–6 billion *annually*. *See* Ass'n of Met. Water Agencies, *AMWA Reacts to Proposed PFAS Settlement*, https://www.amwa.net/press-releases/amwa-reacts-proposed-pfas-settlement*. Investigating, testing, purchasing and installing treatment infrastructure, and operating and maintaining equipment for decades will entail remediation costs orders of magnitude above what the Agreement provides from the predominant PFAS manufacturer. Simply put, the funds are inadequate.

#### 2. The DuPont Agreement failed to compare the value of the settlement to the damages the class could have obtained at trial.

The "most important factor in evaluating the fairness and adequacy of a proposed settlement is an analysis of the value of the settlement compared to the potential recovery if the case went to trial," and courts reject settlements that fail to sufficiently assess awards in this manner. *In re Force Prot., Inc. Derivative Litig.*, No. 2:08-1904-CWH, 2012 WL 12985420, at *10 (D.S.C. Mar. 30, 2012); *In re Corrugated Container Antitrust Litig.*, 634 F.2d 195, 212 (5th Cir. 1981) (approving settlement where expert opined on total damages to class); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("In determining the fairness, adequacy and reasonableness

24

of the proposed compromise, the . . . settlement terms should be compared with the likely rewards

the class would have received following a successful trial of the case."). While a "cash settlement

amounting to only a fraction of the potential recovery does not per se render the settlement

inadequate or unfair," *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d

615, 628 (9th Cir. 1982), "any fraction has a denominator, and without knowing what it is the

Court cannot balance plaintiffs' expected recovery against the proposed settlement amount,"

*Rollins v. Dignity Health*, 336 F.R.D. 456, 463 (N.D. Cal. 2020) (internal quotation marks

omitted). It is reversible error to approve a settlement without providing a quantification of the

alternative outcomes to a settlement. *See Reynolds v. Beneficial National Bank*, 288 F.3d 277, 285

(7th Cir. 2022) ("A high degree of precision cannot be expected in valuing a litigation, especially

regarding the estimation of the probability of particular outcomes. Still, much more could have

been done here without **. . .** turning the fairness hearing into a trial of the merits.").

The proposed settlement suffers a fundamental flaw because it fails to provide even a single

estimated range of aggregate damages or recovery for proposed class members. *Iris Connex, LLC

v. Dell, Inc.*, 235 F.Supp.3d 826, 849 (E.D. Texas 2017) ("To determine whether a settlement is

fair and made in good faith, it is not the absolute value of the settlement but rather the prospective

recovery that must be evaluated, i.e., how much is at stake."). The formula used to create the

settlement's allocation table is based on a combination of adjusted flow and PFAS levels. *See* Dkt.

No. 3393-2 at 86–94. Although this calculation relied on a theory of cost for PFAS filtration, it is

not a replacement for an estimate of aggregate damages to Class Members. Such calculations are

not impossible to conduct, and many courts have relied on expert testimony presenting methods

for estimating damages and theorizing different levels of recovery. *See In re Domestic Air Transp.

Antitrust Litigation*, 148 F.R.D. 297, 322 (N.D. Georgia, 1993) (providing that although there are

circumstances where a precise dollar valuation cannot be given to a settlement, an expert can provide an estimated range of value). This is reversible error. *See Reynolds*, 288 F.3d at 285. Although the circumstances, uncertainties, and complexities of the proposed settlement make it difficult to produce a single estimate of damages, a potential range is critical to determine whether the settlement award is fair, reasonable, and adequate. The Agreement is inadequate because it lacks even minimal foundational guidance.

### 3. The lack of a bellwether trial renders the DuPont Agreement unfair and inadequate.

No bellwether trial has occurred, leaving unaddressed what damages Class Members stood to potentially earn at trial against DuPont. Bellwether trials play a critical role in guiding parties toward an equitable and adequate settlement in several ways. They provide an opportunity to assess the underlying facts of disputes and the strengths of plaintiffs' and defendants' arguments, and form a bulwark against bias in settlement negotiations. The information provided by bellwether verdicts or settlements sheds light on a global settlement process that otherwise would be conducted exclusively between defendants and inherently self-interested lead plaintiffs' attorneys. *See* Alexandra D. Lahav, *Bellwether Trials*, 76 GEO. WASH. L. REV. 576, 593–94 (2008); Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2342 (2008) (bellwether trials give parties an "understanding of the litigation that is exponentially more grounded in reality"); *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 348–49 (5th Cir. 2017) ("Bellwether trials are meant to produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis, and what range of values the cases may have if resolution is attempted on a group basis."). In contrast, juries are disinterested parties with no financial stake in the outcome of the MDL, making them less susceptible to

26

influences that may warp a settlement in favor of a small segment of plaintiffs, their counsel, or even defendants. Introducing jury participation through bellwether trials protects the many parties that do not have direct input into settlement talks in MDLs.

The DuPont Agreement was negotiated without any reference to bellwether results. Only DuPont and Class Counsel weighed in on the value and structure of the settlement, behind closed doors. No jury served as an objective counterbalance to potential biases and no bellwether result shed light on what funds could actually be recovered from DuPont. Class Counsel has not otherwise attempted an "analysis of the value of the settlement compared to the potential recovery if the case went to trial." *In re Force Prot., Inc. Derivative Litig.*, 2012 WL 12985420, at \*10. Given the class of over 14,000 water providers, *see* Dkt. No. 3393 at 22, the potential impact on ratepayers and the public of blindly moving forward without the critical information bellwether results provide could be significant. Especially considering indications that the total settlement funds amount to a small fraction of expected nationwide PFAS remediation costs, *see supra* Part III.F.1, the lack of any bellwether result raises serious fairness and adequacy concerns.

### 4. The settlement funds are not allocated properly between wholesalers and retailers and between different Phases.

The Agreement fails to treat "class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). In order to assess this factor, the Court must consider "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of release may affect class members in different ways that bear on the apportionment of relief." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 808 (3d Cir. 1995).

Rather than consistently compensate entities that may incur costs associated with PFAS contamination, the Agreement appears to treat class members differently by limiting the number

of entities that may claim funds while nevertheless requiring all participating entities to broadly

release their claims against DuPont. For example: (1) when a retail water supplier obtains treated

water from a wholesale supplier, it may not obtain funds, even if PFAS enters their system, *see*

Dkt. No,. 3393-2 at 88, *but see* Dkt. No. 3856-1 at 2–3 (providing guidance to the contrary); (2)

when a retailer treats the water they may receive the full potential allocation even though the

wholesaler may face costs related to contamination, Dkt. No. 3858-1 at 2–3; (3) the allocation

between Phase One and Phase Two Claimants provides more funding for Phase One, even if Phase

Two claimants discover greater contamination, Dkt. No. 3393 at 28; and (4) the methodologies

used by Class Counsel may have vastly undercounted and therefore undercompensated Phase

One.[5] This differentiated treatment for proposed class members is a clear sign that the settlement

is not fair. *See Gen. Motors*, 55 F.3d at 808 ("[O]ne sign that a settlement may not be fair is that

some segments of the class are treated differently than others.").

### G.  Objection Topic: Notice

#### 1.  Notice is inadequate as to wholesalers and other water systems that are reasonably identifiable and should be given individual notice.

In the Guidance, Class Counsel asserted for the first time that the DuPont Agreement

applies to wholesale water providers and acknowledged that most wholesalers are registered as

PWSs with EPA. *See* Dkt. No. 3858-1 at 1. Class Counsel and DuPont were required to develop a

Notice Plan reasonably calculated to reach wholesalers who have detections of PFAS and qualify

as Phase One Class Members. *See* Fed. R. Civ. P. 23(c)(2)(B) (requiring "the best notice that is

---

[5] At a basic level, the estimate of Phase One members used data from UCMR 3, which tested a far more limited set of active PWSs. The use of UCMR 5 data to qualify for Phase One means that many more PWSs may qualify under Phase One than previously understood.

practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort"). That did not occur.

Individual notice is required for class members who are readily identifiable and whose contact information is easily ascertainable. *See Eisen v. Carlisle and Jackson*, 417 U.S. 156, 175 (1974). The proposed class was defined to include any active PWS that conducted testing under UCMR 3, UCMR 5, or a comparable state program, *as well as any system that had positive PFAS test results*. Class Counsel failed to construct a Notice Plan that accounted for this final category. The Notice Plan utilized public information to identify water systems that tested for PFAS through UCMR 3 or UCMR 5 testing or similar state programs. *See* Dkt. No. 3393-2 at 153. However, many of the nation's largest PWSs are wholesalers that were not required to test under these programs. Any of these wholesalers who tested for PFAS through voluntary self-initiative or through voluntary programs set by regulatory bodies were not captured by the Notice Plan. As Class Counsel's environmental consultant Mr. Rob Hesse noted in his declaration, other information regarding these water systems would have been publicly available through the Safe Drinking Water Information System ("SDWIS"), including their populations served and classification. *Id*. at 4. It was on that basis that Class Counsel and Mr. Hesse swore that Class Members were ascertainable from reasonably accessible records available to Class Counsel. *See* Dkt. No. 3393 at 26; Dkt. No. 3393-11 at 4–8. Yet the decision was made to only provide notice to those entities that tested under explicit testing programs. Because the proposed class includes PWSs that voluntarily tested for PFAS and the contact information for all such systems is readily available, individual notice should have gone to *every* active PWS in SDWIS. *See Eisen*, 417 U.S. at 175 (requiring individual notice to the 2,250,000 class members whose names and addresses were easily ascertainable). Individual notice to identifiable class members whose information is

easily ascertainable is not within the discretion of Class Counsel; it is a requirement of Rule 23. *See id.* at 176. Otherwise, those potential class members who held voluntary test results would unwittingly be forced into settlement, waiving their claims, and receiving no funds.

The Notice Plan should have included individual notice to all wholesalers to ensure that this large group of over 3,000 PWSs who very likely have tested for PFAS would receive notice. If Class Counsel should argue that such an amended Notice Plan would be overbroad and that these Class Members who voluntarily tested are not readily ascertainable and easily identifiable, then the Agreement should have been limited to encompass only those water systems required to test under UCMR 3, UCMR 5, and/or state law. After all, those were the only methods that Class Counsel chose to use to construct notices. *See* Dkt. No. 3393-11 at 4–5.

### 2. Notice to Phase Two Class Members violates due process.

Phase Two Class Members will be forced to decide whether to participate or opt out, without understanding whether they have PFAS in their water systems. Even if Phase Two Class Members test their water and find non-detects, these Class Members may still have PFAS contamination in the form of future releases, current releases that have not made it to test sites, and non-tested PFAS. The Supreme Court has cautioned that courts must defend such an "unselfconscious and amorphous" group when they cannot appreciate their potential future injuries. *See Amchem*, 521 U.S. at 628 ("Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out."). No amount of notice could sufficiently protect these water systems that simply do not know their potential claims.

**H. Objection Topic: Time**

The proposed Class Members have been given insufficient time to consider whether to opt out of the settlement. The DuPont Agreement was filed on July 10, 2023, Dkt. No. 3393-2, with amendments filed August 7, Dkt. No. 3521-1, and two further modifications styled as interpretive guidance documents filed more than two months after preliminary approval, Dkt. Nos. 3858-1, 3819-1. By order issued August 22, 2023, the Court preliminarily approved the DuPont Agreement and set the deadline for opting out on December 4, 2023. *See* Dkt. No. 3603 at 8–10. Notice of preliminary approval was sent to proposed Class Members on September 5, 2023. *Id.* at 8.

These complex documents implicate 14,000 PWSs, and the contamination of public drinking water on an unprecedented scale. *See* Dkt. No. 3393-11 at 6–7. There is a growing scientific consensus that many PFAS pose a threat to public health, ecosystems, and the broader environment. These chemicals have effectively spread through our drinking water system, and they do not abide by the clean divisions within that system. Although 60 days may be sufficient time in other class settlements, this case is uniquely complex. It requires a decision-making process that involves significant amounts of internal and external communication and assessment across staff, water system managers, governing bodies, engineers, environmental consultants, attorneys, and more. For only one example, Metropolitan is a wholesaler with multiple water sources with a network that spans over 200 miles, serves 26 Member Agencies that in turn provide water to over 300 retailers/utilities that serve 19 million consumers. *See* Dkt. No. 3829-1 at 5. Such an entity requires more than 2 months to consult with internal authorities and external members affected by such a critical and far-reaching decision.[6]

---

[6] This is particularly true for those wholesalers who did not receive notice. *See supra*, Part III.C.3.

Time continues to be an issue even after the settlement's approval. For Phase One Class Members, 60 days after the Effective Date likely will not be enough time to perform all the necessary consultations before submitting their Claims Forms. Pursuant to Class Counsel's Guidance, many proposed Class Members must consult with upstream and downstream parties on how to divide allocated awards. Further, the Claims Forms require consultation with yet further parties upstream. Assessing the available claims, reaching a division of any award, and preparing this supplementary form will require a great deal of communication, negotiation, and coordination between water suppliers that each has their own independent decision-making process.

These inherent complications exist alongside a shifting regulatory environment that makes future costs difficult to estimate, as well as an agreement that itself is complex. Due to serious ambiguities in the DuPont Agreement and the high stakes at issue, Class Members need more time to reach an informed decision.

## IV.    CONCLUSION

For the foregoing reasons, Vancouver respectfully objects to the DuPont Agreement.


Dated: November 10, 2023.


Respectfully submitted:

*/s/ Jeff B. Kray*
*/s/ Jessica K. Ferrell*
Jeff B. Kray, WSBA No. 22174
Jessica K. Ferrell, WSBA No. 36917
Marten Law, LLP
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601

jkray@martenlaw.com
jferrell@martenlaw.com

*Attorneys for City of Vancouver*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon all counsel of record in accordance with the Court's August 22, 2023 Order on Motion of Class Counsel for Preliminary Approval of Settlement Agreement regarding The Chemours Company, et al. (Dkt. No. 3603), the Class Action Settlement Agreement, (Dkt No. 3393-2), and Federal Rule of Civil Procedure 5.

Dated: November 10, 2023.

<div style="margin-left: 50%;">

*/s/ Jeff B. Kray*
*/s/ Jessica K. Ferrell*
Jeff B. Kray, WSBA No. 22174
Jessica K. Ferrell, WSBA No. 36917
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jkray@martenlaw.com
jferrell@martenlaw.com

*Attorneys for City of Vancouver*

</div>