**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS<br>PRODUCTS LIABILITY LITIGATION | )<br>) | Master Docket No.:<br>2:18-mn-2873-RMG |

| | | |
|---|---|---|
| | ) | |
| CITY OF CAMDEN, et al., | ) | Civil Action No.: |
| | ) | 2:23-cv-03230-RMG |
| *Plaintiffs,* | ) | |
| | ) | |
| *-vs-* | ) | |
| | ) | |
| E. I. DUPONT DE NEMOURS AND COMPANY (n/k/a | ) | |
| EIDP, Inc.), et al., | ) | |
| | ) | |
| *Defendants.* | ) | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF CLASS COUNSEL'S MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT, FOR FINAL CERTIFICATION OF THE SETTLEMENT CLASS, AND IN RESPONSE TO OBJECTIONS</u>

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................ 2

      A.    Defendants' Role in the AFFF MDL ........................................................ 2

      B.    History of the Proceedings ....................................................................... 3

      C.    History of the Settlement Negotiations and Mediation ............................ 5

      D.    The Class Action Complaint ..................................................................... 7

      E.    Preliminary Approval Order and Motion for Attorneys' Fees and Costs. .............. 7

      F.    Notice to the Class Complied with this Court's Preliminary Approval Order and
            Due Process. .............................................................................................. 8

      G.    The CAFA Notice Requirement Has Been Satisfied by Defendants. ...................... 9

III.  MATERIAL TERMS OF THE SETTLEMENT ................................................. 9

      A.    Consideration ............................................................................................ 9

      B.    Class Definition ........................................................................................ 10

      C.    Allocation of Settlement Amount between Phase One and Phase Two Qualifying
            Settlement Class Members ........................................................................ 11

            1.    Breakdown of Funds and Claims Forms ........................................ 13

                  a)    The Very Small Public Water System Payments ......................... 14

                  b)    The Phase One Inactive Impacted Water System Payment .......... 15

                  c)    The Action Funds .............................................................. 15

                  d)    The Supplemental Funds ..................................................... 18

                  e)    The Special Needs Fund ..................................................... 19

                  f)    The Phase Two Baseline Testing Payments ................................ 20

            2.    Breakdown of Settlement Funds Paid by Defendants ..................... 20

      D.    Establishment of a Qualified Settlement Fund and Payment by Defendants ....... 21

      E.    Court Appointments .................................................................................. 22

1.      Notice Administrator ................................................................ 22

1.      Claims Administrator ............................................................... 23

2.      Special Master ........................................................................ 23

3.      Escrow Agent .......................................................................... 24

F.      Notice of Settlement ........................................................................ 24

1.      Identification of Potential Members of the Settlement Class ................... 24

1.      The Notice Plan ...................................................................... 25

G.      Objections and Exclusion Rights ...................................................... 28

1.      Objections .............................................................................. 28

1.      Requests for Exclusion ("Opt-Outs") ...................................... 29

H.      Termination of the Settlement .......................................................... 30

I.      Release of Claims, Covenants Not to Sue, and Dismissal .................... 30

J.      Payment of Attorneys' Fees and Litigation Costs and Expenses ......... 31

IV.    ARGUMENT .............................................................................................. 31

A.      Settlements of Complex Class Actions Are Favored ........................... 32

B.      Standards for Approval of Class Settlements. ..................................... 33

C.      The Requirements of Rule 23(a) and 23(b)(3) Are Satisfied ............... 35

1.      The Requirements of Rule 23(a) Are Met. ............................... 35

a)      The Settlement Class Members Are Readily Ascertainable. ........ 36

b)      Rule 23(a)'s Numerosity Requirement Is Satisfied. .................... 36

c)      Rule 23(a)'s Commonality Requirement Is Satisfied. ................. 37

d)      Rule 23(a)'s Typicality Requirement Is Satisfied. ....................... 38

e)      Rule 23(a)'s Adequacy of Representation Requirement Is Satisfied. ................................................................................. 40

2.      Rule 23(b)(3) is Satisfied. ....................................................... 41

D.    Rule 23(e)(2) and the *Jiffy Lube* Factors Support Granting Final Approval of the Settlement. .......................................................................................... 43

    1.    The Class Representatives and the Undersigned Class Counsel Have Adequately Represented the Class (Rule 23(e)(2)(A)). .......................... 44

    2.    The Proposal Was Negotiated at Arm's Length (Rule 23(e)(2)(B)) and There is No Existence of Fraud or Collusion Behind the Settlement (*Jiffy Lube* Fairness Factor 3). .......................................................................... 47

    3.    The Relief Provided is Fair, Reasonable, and Adequate, Taking Into Account the Costs, Risks, and Delays of Trial and Appeals (Rule 23(e)(2)(C)(i)). .......................................................................................... 49

        a)    The Strength of Plaintiffs' Case on the Merits and Defendants' Defenses Weigh in Favor of Approval of the Settlement (*Jiffy Lube* Adequacy Factors 1&2). ............................................................. 50

        b)    The Complexity, Expense, and Likely Duration of the Litigation Weigh in Favor of Approval of the Settlement (*Jiffy Lube* Adequacy Factor 3). ....................................................................... 51

        c)    The Posture of the Case at the Time of the Settlement Supports Approval of the Settlement (*Jiffy Lube* Fairness Factor 1). .......... 54

        d)    The Extent of Discovery Conducted Supports Approval of the Settlement (*Jiffy Lube* Fairness Factor 2). ................................... 55

        e)    Counsel's Experience in this Type of Case and Opinions Supporting the Settlement Weigh in Favor of Approval of the Settlement (*Jiffy Lube* Fairness Factor 4). ................................... 56

        f)    The Insolvency Risk of the Defendants and Likelihood of Recovery on a Litigated Basis Supports Approval of the Settlement (*Jiffy Lube* Adequacy Factor 4) .................................................... 58

    4.    The Relief Provided is Adequate, Taking Into Account the Effectiveness of the Proposed Method of Distributing Relief to the Class (Rule 23(e)(2)(C)(ii)). ...................................................................................... 59

    5.    The Relief Provided is Adequate, Taking Into Account the Terms of Any Proposed Award of Attorneys' Fees, Including Timing of Payment (Rule 23(e)(2)(C)(iii)). ..................................................................................... 60

    6.    The Relief Provided is Adequate, Taking Into Account Any Agreement Required to be Identified Under Rule 23(e)(3) (Rule 23(e)(2)(C)(iv)). ... 60

    7.    The Settlement Treats Class Members Equitably Relative to Each Other (Rule 23(e)(2)(D)). ...................................................................................... 61

E.    Given the Small Number of Objections, and Their Lack of Validity, the Overall Reaction of the Class Overwhelmingly Supports Approval (*Jiffy Lube* Adequacy Factor Five). ..................................................................................... 62

    1.    The Small Number of Objections Supports a Finding of Fairness. .......... 62

    2.    The Small Number of Objections is Especially Significant Because Virtually All are Cut-and-Paste Objections. .............................................. 65

    3.    The Objections Actually Raised are Meritless. ......................................... 71

        a)    Objections Relating to Fairness ................................................... 71

            i.    Amount of Settlement and Relationship to Recovery at Trial. ................................................................................. 71

            ii.    Settlement Value Versus Defendants' PFAS-Related Damages. ........................................................................... 76

            iii.    Allocation of Funds Between Phase One and Phase Two Class Members. ............................................................. 77

            iv.    The Release is not Overbroad ........................................... 80

            v.    Class Members Have Sufficient Time to Consider the Terms of the Settlement. ................................................... 96

            vi.    Challenges to the Adequacy of Notice are Misplaced ...... 98

            vii.    Notice to Phase Two Class Members Comports with Due Process. ........................................................................... 101

            viii.    The Agreement Need Not Specify a Set-Off. ................. 103

            ix.    The Claims-Over Provision. ........................................... 104

        b)    Objections Relating to Class Certification. .................................. 105

            i.    The Class representatives' claims are typical of the Class members. ......................................................................... 105

            ii.    Plaintiffs are adequate because the Settlement Agreement was crafted to avoid any appreciable conflict of interests. ....................................................................................... 107

            iii.    Questions of law and fact predominate· ........................ 115

V.    CONCLUSION. ........................................................................................... 117

v

# TABLE OF AUTHORITIES

**Cases**

*1988 Trust for Allen Children Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513 (4th Cir. 2022) ..................................................................................................................... passim

7AA Wright & Miller, Fed. Practice and Procedure § 1779 (3d ed. 2005) .................................. 42

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).......................................... 33, 43, 102, 115

*Armstrong v. Bd. Of School Directors,* 616 F.2d 305 (7th Cir. 1980).......................................... 32

*Ashley v. GAF Materials Corp. (In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.)*, No. 8:11-mn-02000, 2014 U.S. Dist. LEXIS 183679 (D.S.C. Oct. 15, 2014) ..................................................................................................................... 97

*Bass v. 817 Corp.,* 2017 U.S. Dist. LEXIS 225380 (D.S.C. Sept. 19, 2017) .............................. 56

*Berry v. Schulman*, 807 F.3d 600 (4th Cir. 2015).................................................................... 34, 76

*Boger v. Citrix Sys., Inc.*, No. 19-CV-01234-LKG, 2023 WL 3763974 (D. Md. June 1, 2023).. 72

*Brooks v. GAF Materials Corp.*, 301 F.R.D. 229 (D.S.C. 2014)............................................... 116

*Case v. French Quarter III LLC*, 2015 WL 12851717 (D.S.C. July 27, 2015)...................... 50, 117

*Caudle v. Sprint/United Management Company*, 2019 WL 2716291 (N.D. Cal., 2019) ............. 91

*Central Wesleyan College v. WR Grace & Co.*, 6 F.3d 144 (4th Cir. 1993) ............................. 115

*Cheng Jiangchen v. Rentech, Inc.,* No. CV 17-1490, 2019 WL 5173771 (C.D. Cal. Oct. 10, 2019) ................................................................................................................... 101

*Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am, AFL-CIO*, 803 F.2d 878 (6th Cir.1986) ..................................................................................................................... 113

*Clark v. Experian Information Solutions, Inc.,* No. 8:00-1217-22, 1991 U.S. Dist. LEXIS (D.S.C. Jan. 14, 2004)......................................................................................................... 63

*Commissioners of Pub. Works of City of Charleston v. Costco Wholesale Corp. (Commissioners I)*, 340 F.R.D. 242 (D.S.C. 2021) (Gergel, J.)................................................................. passim

*Commissioners of Pub. Works of City of Charleston v. Costco Wholesale Corp. (Commissioners II)*, No. 2:21-cv-42, 2022 WL 214531 (D.S.C. Jan 24, 2022) (Gergel, J.) ....................... passim

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977)............................................................. 32

*Crandell v. U.S.*, 703 F.2d 74 (4th Cir. 1983) ................................................................ 32

*DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171 (8th Cir. 1995) ......................................... 39

*Decohen v. Abbasi, LLC*, 299 F.R.D. 469 (D. Md. 2014) ............................................... 54

*Deiter v. Microsoft Corp.,* 436 F.3d 461 (4th Cir. 2006)............................................ 38, 39, 105

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ........................................... 104

*Eisen v. Carlisle and Jacquelin*, 417 U.S. 156 (1974)......................................... 9, 97, 99

*Eisen v. Porsche Cars N. Am., Inc.,* No. 2:11-CV-09405-CAS, 2014 WL 439006 (C.D. Cal. Jan. 30, 2014) ......................................................................................................................... 93

*Feinberg v. T. Rowe Price Grp.*, 610 F. Supp. 3d 758 (D. Md. 2022) ............................. 72, 114

*Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975) .......................................................... passim

*Garber v. Office of the Comm'r of Baseball*, 12-cv-03704 (VEC), 2017 U.S. Dist. LEXIS 27394 (S.D.N.Y. 2017)....................................................................................................................... 67

*Gray v. Talking Phone Book*, 2012 U.S. Dist. LEXIS 200804 (D.S.C. Aug. 10, 2012) .......... 50, 54

*Gunnells v. Healthplan Servs.,* 348 F.3d 417 (4th Cir. 2003)............................... 43, 111, 115, 116

*Haney v. Genworth Life Ins. Co.*, Civil Action 3:22cv55, 2022 WL 17586016 (E.D. Va. Dec. 12, 2022) .......................................................................................................................................... 111

*Haney v. Genworth Life Ins. Co.*, No. 3:22cv55, 2023 U.S. Dist. LEXIS 15589 (E.D. Va. Jan. 30, 2023) .......................................................................................................................................... 63

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ............................................. 40

*Herrera v. Charlotte Sch. of Law, LLC*, 818 Fed. Appx. 165 (4th Cir. 2020)........................... 63

*In re All-Clad Metalcrafters, Cookware Mktg. & Sales Practices Litig.*, MDL 2988, 2023 WL 2071481 (W.D. Pa. Feb. 17, 2023) .................................................................................... 106

*In re Allura Fiber Cement Siding Litig.*, Civil Action No.: 2:19-mn-02886-DCN, 2021 U.S. Dist. LEXIS 96931 (D.S.C. May 21, 2021). .................................................................................. 73

*In re Anthem, Inc. Data Breach Litig.,* 327 F.R.D. 299 (N.D. Cal. 2018)................................. 106

*In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000, 2020 WL 8256366 (N.D. Ala. Nov. 30, 2020) .................................................................................................................. 107

*In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751 (S.D. Ohio 2008) .......................... 70

*In Re Cathode Ray Tube (CRT) Antitrust Litigation*, No. 4:07-cv-05944 (N.D. Cal. Jul 13, 2020), ECF No. 5786 .................................................................................................................... 66

*In re Cendant Corp. Sec. Litig.*, 404 F.3d 173 (3d Cir. 2005) .................................................... 112

*In re Cmty. Bank of N. Virginia*, 622 F.3d 275 (3d Cir. 2010), *as amended* (Oct. 20, 2010)..... 107

*In re Diet Drugs Prods. Liab. Litig.*, No. 99-20593, 2010 U.S. Dist. LEXIS 66879 (E.D. Pa. July 2, 2010) ............................................................................................................................. 96

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ................................................................................................................................. 64

*In re Hydroxycut Mktg. & Sales Pracs. Litig.*, No. 09CV1088 BTM KSC, 2013 WL 5275618 (S.D. Cal. Sept. 17, 2013) ................................................................................................. 70

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3rd Cir. 2009) .......................................... 114

*In re Integra Realty Resources, Inc.*, 262 F.3d 1089 (10th Cir. 2001) ......................................... 96

*In re Jiffy Lube Secs. Litig.,* 927 F.2d 155 (4th Cir. 1991) .................................................... passim

*In re LandAmerica 1031 Exch. Servs. Inc. Internal Revenue Service §1031 Tax Deferred Exch. Litig. (MDL 2054)*, 2012 U.S. Dist. LEXIS 97933 (D.S.C. July 12, 2012)........................ 32, 51

*In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016)39, 64, 93

*In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351 (E.D. Pa. 2015)64

*In re Oil Spill by Oil Rig Deepwater Horizon,* 910 F. Supp. 2d 891 (E.D. La. 2012)........ 110, 112

*In re Orthopedic Bone Screw Products Liability Litigation*, 176 F.R.D. 158 (E.D. Pa. 1997) .. 104

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010),................................................ 112

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355 (3d Cir.2001) .................... 92

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216 (D.N.J. 1997).............. 97

*In re Serzone Products Liab. Litig.*, 231 F.R.D. 221 (S.D.W. Va. 2005).......................... 111, 117

*In re U.S. Oil & Gas Litig.*, 967 F.2d 489 (11th Cir. 1992) ........................................................... 33

*In re UnitedHealth Group, Inc. PSLRA Litig.*, 643 F. Supp. 2d 1107 (D. Minn. 2009) ......... 67, 70

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Prods. Liab. Litig.*, 2018 WL
    1588012 (N.D. Cal., 2018) ...................................................................................................... 87

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Prods. Liab. Litig.,* MDL
    2672, 2016 WL 6248426 (N.D. CA. October 25, 2016) ....................................................... 59

*In re Wachovia Corp. Erisa Litig.*, No. 2-cv-03707, 2011 U.S. Dist. LEXIS 123109 (W.D.N.C.
    Oct. 24, 2011) ........................................................................................................................ 64

*In re Wireless Tele. Fed. Cost Recovery*, 396 F.3d 922 (8th Cir. 2005) .................................. 64, 86

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.,* No. 16-MD-02752, 2020 WL 4212811
    (N.D. Cal. July 21, 2020) ..................................................................................................... 106

*In re: Lumber Liquidators Chinese Manufactured Flooring Prods. Marketing, Sales Pract. and
    Prods. Liab. Litig.*, 952 F.3d 471 (4th Cir. 2020) ....................................................... 44, 58, 63

*In re: Mi Windows & Doors Inc. Prod. Liab. Litig.*, No. 2:12-MN-00001, 2015 WL 12850547
    (D.S.C. July 22, 2015), *aff'd sub nom. In re MI Windows & Doors, Inc., Prod. Liab. Litig.*,
    860 F.3d 218 (4th Cir. 2017) .............................................................................................. 106

*International Union, United Automobile, Aerospace, & Agricultural Implement Workers of
    America v. General Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) ......................................... 113

*Jabbari v. Farmer*, 965 F.3d 1001 (9th Cir. 2020) .................................................................... 117

*Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir. 2019) ................................................ 36

*Krakauer v. Dish Network, L.L.C.*, No. 14-cv-333, L.L.C., 2018 U.S. Dist. LEXIS 203725
    (M.D.N.C. Dec. 3, 2018) ........................................................................................................ 64

*Lachance v. Harrington*, 965 F. Supp. 630 (E.D. Pa. 1997) ....................................................... 65

*Lightbourn v. County of El Paso*, 118 F.3d 421 (5th Cir. 1997) ................................................. 39

*Matamoros v. Starbucks Corp.*, 699 F.3d 129 (1st Cir. 2012) ................................................... 110

*Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072 (2d Cir. 1995) ............................... 34

*McAdams v. Robinson*, 26 F.4th 149 (4th Cir. 2022) ..................................................... 63, 72, 76

*Millwood v. State Farm Life Ins. Co.,* No. C/A No. 7:19-cv-01445-DCC, 2022 U.S. Dist. LEXIS 173928 (D.S.C. Sept. 23, 2022) ........................................................................................ 115

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004). .................................................. 73

*Morris v. S. Concrete & Constr., Inc.,* Case No.: 8:16-cv-01440-DCC, 2019 U.S. Dist. LEXIS 80429 (D.S.C. May 13, 2019) ...................................................................................................... 60

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306  (1950) ................................................ 9

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ............................ 9, 97, 100

*Mullinax v. Parker Sewer & Fire Subdistrict*, No. 12-cv-01405, 2014 U.S. Dist. LEXIS 199340 (D.S.C. Mar. 11, 2014) ........................................................................................................ 55, 56

*Nat'l Treasury Employees Union* v. U.S., 54 Fed. Cl. 791 (2002) .............................................. 64

*Neuberger v. Shapiro*, 110 F. Supp. 2d 373 (E.D. Pa. 2000) ..................................................... 65

*Newbanks v. Cellular Sales of Knoxville, Inc.*, No. 12-1420, 2015 U.S. Dist. LEXIS 191550 (D.S.C. Feb. 4, 2015) ........................................................................................................... 55, 56

*Parker v. Asbestos Processing, LLC*, No. 0:11-cv-01800-JFA, 2015 U.S. Dist. LEXIS 1765 (D.S.C. Jan. 8, 2015) ................................................................................................................ 41

*Peters v. Aetna Inc.*, 2 F.4th 199 (4th Cir. 2021) ....................................................................... 36

*Postawko v. Mo. Dep't of Corrs.*, 910 F.3d 1030 (8th Cir. 2018) ............................................... 39

*Reed v. Big Water Resort, LLC*, 2016 U.S. Dist. LEXIS 187745 (D.S.C. May 26, 2016) .......... 32

*Rieckborn v. Velti PLC*, 2015 WL 468329 (N.D. Cal., 2015) ..................................................... 91

*Robinson v. Carolina First Bank NA*, 2019 U.S. Dist. LEXIS 26450 (D.S.C. Feb. 14, 2019).... 48, 56

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) ............................................ 64

*Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259 (3d Cir. 2021) ................. 39

*Russell v. Ray Klein, Inc.,* No. 1:19-CV-00001, 2022 WL 1639560 (D. Or. May 24, 2022) ..... 101

*S.C. Nat. Bank v. Stone*, 139 F.R.D. 335 (D.S.C. 1991) ....................................................... 48, 51

*S.C. Nat. Bank v. Stone,* 749 F. Supp. 1419 (D.S.C. 1990) ............................................. 32, 51, 64

*Scott v. Family Dollar Stores, Inc.*, No. 308CV00540MOCDSC, 2018 WL 1321048 (W.D.N.C. Mar. 14, 2018) ........................................................................................................... 64

*Sharp Farms v. Speaks*, 917 F.3d 276 (4th Cir. 2019) ........................................................... 34, 76

*Shaw v. Toshiba Am. Info Sys., Inc.,* 91 F. Supp 2d 942 (E.D. Tex. 2000) ................................. 70

*Silva v. Miller*, 307 F. App'x 349 (11th Cir. 2009) .................................................................. 60

*Soutter v. Equifax Info. Servs., LLC*, 498 F. App'x 260 (4th Cir. 2012) ..................................... 39

*Spark v. MBNA Corp.,* 289 F. Supp. 2d 510 (D. Del. 2003) ..................................................... 70

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ................................................................ 40

*Stayler v. Rohoho, Inc.*, Case No.: 2:16-cv-1235-RMG, 2019 U.S. Dist. LEXIS 58025 (D.S.C. Apr. 4, 2019) ...................................................................................................................... 60

*Stillmock v. Weis Markets, Inc.,* 385 Fed. Appx. 267 (4th Cir. 2010) ............................ 42, 43, 115

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011) ......................................................... 116

*Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830 (E.D. La. 2007) ...................................... 49

*UFCW Loc. 880-Retail Food Emps. Joint Pension Fund v. Newmont Mining Corp.*, No. CIVA05CV01046-MSKBNB, 2008 WL 4452332 (D. Colo. Sept. 30, 2008) .................. 67, 70

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ............................................................ 37

*Williams v. First National Bank,* 216 U.S. 582 (1910) ........................................................... 32

*Williams v. Henderson*, 129 Fed. App'x 806 (4th Cir. 2005) .................................................... 37

*Wolfert ex rel. Est. of Wolfert v. Transamerica Home First, Inc*., 439 F.3d 165 (2d Cir. 2006) 100

*Wong v. Accretive Health, Inc.*, 773 F.3d 859 (7th Cir. 2014). .................................................. 74

*Wren v. RGIS Inventory Specialists*, No. 06-05778, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) ................................................................................................................................................ 64

*Yates v. NewRez LLC*, No. CV TDC-21-3044, 2023 WL 5108803 (D. Md. Aug. 9, 2023) ....... 105

*Zapeda v. Paypal, Inc*., No. 10-2500, 2017 WL 1113293 (N.D. Cal. Mar. 24, 2017) ................. 64

*Zimmer Paper Prod., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86 (3d Cir. 1985) ............... 100

**Other Authorities**

4 *Newberg on Class Actions* § 11.50 (4th ed.).................................................................. 51

6 Alba Conte Herbert B. Newberg, *Newberg on Class Actions* § 18:14 (4th ed. 2002) ............. 111

*Eisen v. Carlisle & Jacqueline*,
    417 U.S. 156 (1974)............................................................................................. 9

*In re Nissan Motor Corp. Antitrust Litig.*,
    552 F.2d 1088 (5th Cir. 1977) .............................................................................. 9

Manual for Complex Litigation § 21.321 (4th ed. 2021)............................................. 97

Manual for Complex Litigation, (Fourth), § 21.62 ..................................................... 65

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)............................................................................................. 9

**Rules**

Adv. Committee Notes, 2018 Amendments to Fed. R. Civ. 23.................................. 46, 47, 50, 61

Fed. R. Civ. 23 ............................................................................................. passim

**Regulations**

18 U.S.C § 1711............................................................................................... 9

28 U.S.C. § 1715(b) ......................................................................................... 9

## I.    __INTRODUCTION__

This Class Action Settlement Agreement ("Settlement Agreement" or "SA") [ECF No. 3393-2], along with the related 3M Settlement, resolves what is likely the most important environmental litigation in U.S. history. It is without question the largest drinking water settlement ever. If approved, it will help Public Water Systems ("PWS") protect the health and safety of millions of individuals throughout the United States for generations. Given the significant value of the Settlement Agreement ($1,185,000,000) ("Settlement Amount"), the vigorous litigation by skilled counsel, years of contentious mediation and ultimate resolution for PWS, final approval of the settlement is appropriate. Indeed, the tiny number of Objections to the settlement (about 0.16% of the class)— more than three quarters of which consist of mainly copy-and-paste documents filed by a single law firm—confirms that the Settlement Class Members overwhelmingly support this settlement. Accordingly, Plaintiffs and Defendants[1] urge the Court to grant final approval. As demonstrated below, the Settlement Agreement satisfies the class certification requirements of Rule 23(a) and (b) and the fairness requirements of Rule 23(e) and *Jiffy Lube.* Moreover, the few Objections lodged either misconstrue the Settlement Agreement or are legally flawed.

The Settlement Agreement was reached only after approximately 4½ years of sustained, hard-fought litigation, including the production of over 4.6 million documents totaling over 37 million pages, 82 depositions of corporate witnesses, 7 government witness depositions, 12 defense expert witness depositions, 14 Plaintiffs' expert depositions, service of over 20 expert

---

[1] The Chemours Company, the Chemours Company, FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., and E. I. DuPont de Nemours and Company n/k/a EIDP, Inc. (collectively, "Defendants").The term "Defendants" is used throughout this brief for purposes of drafting convenience only and is not intended to imply that all Defendants were involved with the manufacture or sale of products alleged to have contributed to PFAS contamination.

reports, extensive legal briefing including defeating multiple summary judgment and *Daubert* motions, preparation of the *Stuart* bellwether case for trial, and approximately three years of contentious and vigorous arms-length settlement negotiations by highly-skilled counsel, overseen by a skilled mediator. As set forth below, following any deductions for any forthcoming Court-approved attorneys' fees and costs (as to which no objection has been lodged), the Settlement Amount will be allocated equitably among the Settlement Class Members pursuant to the Allocation Procedures.[2]  There is no valid reason to delay the implementation of this settlement.

## II.    FACTUAL BACKGROUND

### A.    Defendants' Role in the AFFF MDL

Although Defendants never manufactured AFFF concentrates, Defendants were nonetheless dually situated within the AFFF marketplace.[3] Specifically, at various times, Defendants manufactured and sold raw materials, called telomer iodides, that were incorporated into fluorosurfactants used in various AFFF concentrates.[4] Subsequently, beginning in 2002, as a result of its acquisition of the Forafac line of fluorosurfactants from Atochem f/k/a Atofina, Defendants likewise began to manufacture fluorosurfactants themselves and did so until 2015.[5] Certain of Defendants' fluorosurfactants that were incorporated into AFFF concentrates contained C8 telomer iodides (PFOA precursors), which degrade to PFOA in the environment, including

---

[2] Settlement Agreement, at Ex. C [ECF No. 3393-2]("Allocation Procedures").

[3] Motion for Summary Judgment of Defendants E. I. du Pont de Nemours and Co., the Chemours Company, and the Chemours Company FC, LLC, at 1 [ECF No. 2693]("DuPont MSJ").

[4] *Id.*; *see also*, Declaration of Scott Summy, Esq., in Support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class and For Permission to Disseminate Class Notice [ECF No. 3393-3] ("Summy Prelim. App. Decl."), at ¶ 19; Declaration of Michael A. London, Esq. in Support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class and for Permission to Disseminate Class Notice [ECF No. 3393-4] ("London Prelim. App. Decl."), at ¶¶ 27-29 (noting sales of raw materials from 1974-2015).

[5] DuPont MSJ at 1; *see also* Summy Prelim. App. Decl., at ¶ 19.

most notably Forafac 1157N, which was incorporated into AFFF concentrates manufactured by various AFFF concentrate manufacturers.[6]

## B.     History of the Proceedings

As the Court is aware, litigation involving per- and polyfluoroalkyl substances ("PFAS") has been ongoing for nearly 25 years. Over the course of the last two-plus decades, public awareness and concern over PFAS contamination nationwide has greatly increased. In 2016, the first AFFF-specific PFAS cases were filed in federal courts across the country, and in the following years the number of these pending lawsuits ballooned. This resulted in the need for coordination and consolidation of these cases to serve "the convenience of the parties and witnesses and [to] promote the just and efficient conduct" of these cases.[7] On December 7, 2018, the Judicial Panel on Multidistrict Litigation ("JPML") transferred the AFFF MDL to the District of South Carolina.[8]

Following the creation of the MDL, pursuant to Case Management Orders ("CMO") 2 and 3, the Court appointed Plaintiffs' Co-Lead Counsel, the first slate of Plaintiffs' Executive Committee ("PEC") members, and Advisory Counsel to the PEC.[9] As the MDL progressed, certain lawyers were added to leadership while others resigned, bringing the total number of PEC firms for the 2022-2023 Term to twenty-eight (28) firms.[10] On August 22, 2023, the Court added one additional Co-Lead Counsel and appointed the now four Co-Lead Counsel—Michael A. London of Douglas & London, Scott Summy of Baron and Budd, Paul J. Napoli of Napoli Shkolnik and

---

[6] *See* London Prelim. App. Decl., at ¶¶ 27-29.
[7] 28 U.S.C. § 1407.
[8] MDL Transfer Order No. 2873 [ECF No. 1].
[9] CMO 2 and 3 [ECF Nos. 28 & 72]. CMO 3 added four (4) additional firms to the initial slate of PEC firms.
[10] CMO 24 [ECF No. 2259].

Joseph F. Rice of Motley Rice—as Class Counsel.[11] In addition, Elizabeth Fegan of Fegan Scott LLC was appointed as a fifth Class Counsel.[12]

The enormous amount of work conducted throughout the course of this MDL since its inception is thoroughly detailed in Class Counsel's Memorandum in Support of their Motion for Attorneys' Fees and Costs ("Mot. for Attorneys' Fees").[13] Nonetheless, Class Counsel will briefly reiterate some of the efforts undertaken over the course of the last 4 ½ plus years. These efforts, which required approximately 414,000 hours of work conducted by approximately 40 law firms and 650 timekeepers,[14] included, *inter alia*, MDL oversight and administration,[15] bellwether efforts,[16] general liability efforts, significant legal briefing efforts including successfully overcoming the government contractor defense,[17] service of nine (9) general expert reports and twelve (12) case-specific expert reports, and one (1) expert report with a general sub-part and three (3) case-specific sub-parts, as well as multiple supplemental reports.[18]

In addition, master sets of document demands were served on the many predominant defendants, including the United States, and significant third-party discovery was likewise

---

[11] Order Regarding Appointment of Joseph Rice of Motley Rice ("Rice Appointment Order") [ECF No. 3602] and Preliminary Approval Order ("Preliminary Approval Order" or "PAO")[ECF 3603 as amended by ECF No. 3684].

[12] PAO, at 4-5.

[13] Mot. for Attorneys' Fees [ECF No. 3795-1].

[14] Declaration of John W. Perry, Jr. in Support of Mot. for Attorneys' Fees ("Perry Fee. Decl."), at ¶¶ 10, 20 [ECF No. 3795-4].

[15] Declaration of Michael A. London in Support of Mot. for Attorneys' Fees ("London Fee Decl."), at ¶ 12, 20-44 [ECF No. 3795-6].

[16] London Fee Decl., at ¶ 54-63, 74-83; Declaration of Gary J. Douglas in Support of Mot. for Attorneys' Fees ("Douglas Fee Decl."), at ¶ 31-36 [ECF No. 3795-8].

[17] Declaration of Rebecca G. Newman in Support of Mot. for Attorneys' Fees ("Newman Fee Decl."), at ¶ 14-17 [ECF No. 3795-13]; Douglas Fee Decl., at ¶ 22-30.

[18] Douglas Fee Decl., at ¶ 21; *see also*, Declaration of Wesley Bowden in Support of Mot. for Attorneys' Fees ("Bowden Fee Decl."), at ¶ 15 [ECF No. 3795-12].

undertaken, including service of over one hundred-seventy (170) subpoenas.[19] In total, Plaintiffs coded over 4.65 million documents (totaling over 37 million pages),[20] conducted 82 depositions of corporate witnesses, seven (7) depositions of United States' witnesses, twelve (12) defense expert witness depositions, defended fourteen (14) Plaintiff expert witnesses in their depositions and defended fifty-six (56) depositions of bellwether Plaintiff witnesses.[21] Finally, Plaintiffs prepared the *City of Stuart* bellwether case for trial, including through dispositive and *Daubert* briefing, preparation of exhibit lists, deposition designations, witness lists, arguing of evidentiary motions, preparing direct examinations, opening statements and other pretrial briefings.[22]

Ultimately, the City of Stuart's claims against Defendants were severed from the *City of Stuart* trial when Defendant Kidde filed for Chapter 11 bankruptcy, given that the liability as between these two entities was so intertwined.[23] Thereafter, on June 5, 2023, the *City of Stuart* trial was stayed for 21 days to allow Plaintiffs and Defendant 3M, the sole remaining Defendant in the *City of Stuart* case following Defendants' severance, to work towards a global resolution.[24]

## C.    History of the Settlement Negotiations and Mediation

As set forth in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement and for Permission to Disseminate Class Notice ("Prelim. App. Mot.")[ECF No. 3393], the parties began preliminary settlement discussions with Defendants in the Summer of 2020.[25] From the outset, it was readily

---

[19] London Fee Decl., at ¶ 117.
[20] Declaration of Staci J. Olsen in Support of Mot. for Attorneys' Fees ("Olsen Fee Decl."), at ¶ 18 [ECF No. 3795-11].
[21] Douglas Fee Decl., at ¶¶ 16, 21.
[22] *Id.* at ¶¶ 38-50.
[23] Severance Order [ECF No. 3183].
[24] Continuance Order [ECF No. 3256].
[25] Summy Prelim. App. Decl., at ¶¶ 9-10.

5

apparent that Defendants would only settle PWS claims on a nationwide basis in order to maximize finality.[26] Further, right from the start, these settlement negotiations were extremely complicated,[27] which resulted in the discussions continuing throughout 2020, into 2021 and then into 2022.[28] These discussions took place both remotely and in-person, and included various document exchanges, multiple presentations, and formal mediation sessions.[29] In addition, numerous experts were retained to assist in the exploration of a proposed global settlement.[30]

On October 26, 2022, this Court appointed Judge Layn Phillips (ret.) as the Court-appointed Mediator.[31] Following Judge Phillips's appointment, the parties routinely met in-person and by both Zoom and telephone.[32] There can be little doubt that Judge Phillips's appointment was instrumental to the furtherance of the settlement negotiations.[33] Further, and in tandem with the intensive negotiation sessions, the *City of Stuart* trial team was preparing that bellwether case for trial, which added significant pressure and urgency to the resolution of these claims.[34] After approximately eight months of difficult, all-consuming arms-length mediations[35] with the assistance and oversight of Judge Phillips, on June 1, 2023, the parties signed a memorandum of understanding ("MOU"),[36] four days before the *City of Stuart* trial was scheduled to begin.[37]

---

[26] *Id*. at ¶ 21.
[27] London Prelim. App. Decl., at ¶ 17.
[28] Summy Prelim. App. Decl., at ¶ 9-10.
[29] *Id*. at ¶ 10; *see also*, London Prelim. App. Decl., at ¶ 18.
[30] Summy Prelim. App. Decl., at ¶ 12.
[31] CMO 2.B [ECF No. 2658].
[32] Summy Prelim. App. Decl., at ¶ 17; *see also*, London Prelim. App. Decl., at ¶ 22.
[33] London Prelim. App. Decl., at ¶ 22.
[34] *Id*. at ¶¶ 19-20.
[35] *See* PAO, at ¶ 9 (noting that the "proposed Settlement Agreement is the product of intensive, arm's-length, non-collusive negotiations overseen by the Court-appointed mediator, Honorable Layn Phillips; has no obvious deficiencies; does not improperly grant preferential treatment to the Class Representatives; and is fair, reasonable and adequate.").
[36] Summy Prelim. App. Decl., at ¶ 23.
[37] London Prelim. App. Decl., at ¶ 21 (noting trial to start on June 5, 2023).

### D.    The Class Action Complaint

On July 12, 2023, Plaintiffs filed a Class Action Complaint ("Complaint") against Defendants on behalf of themselves and all other similarly-situated PWS claiming one or more of the following types of damages: (1) the costs of testing and monitoring of the ongoing contamination of their Drinking Water wells and supplies; (2) the costs of designing, constructing, installing and maintaining a filtration system to remove or reduce levels of PFAS detected in Drinking Water; (3) the costs of operating that filtration system; and (4) the costs of complying with any applicable regulations requiring additional measures.[38]

This Complaint, which was designed to be used as the mechanism for a class-wide settlement, identifies each Class Representative,[39] defines the Settlement Class, and states the claims intended to become Released Claims and concluded by the Final Judgment. None of the issues identified in the Complaint are new; however, as each has been extensively litigated through this MDL to the eve of trial.

### E.    Preliminary Approval Order and Motion for Attorneys' Fees and Costs.

As noted above, on August 22, 2023, this Court granted Plaintiffs' Motion for Preliminary Approval. In its PAO, the Court found that "the requirements of Rules 23(a)(1)-(4), 23(b), and 23(e) of the Federal Rules of Civil Procedure have been satisfied for the purposes of preliminary approval of the Settlement Agreement as modified by (C.A. No. 2:23-3230, ECF No. 30), such that notice of the Settlement Agreement should be directed to Settlement Class Members and a

---

[38] Complaint, Case No.2:23-cv-03230 [*Camden* ECF No. 7], at ¶¶15-16, 246-252, 265.

[39] The Class Representatives include: (1) City of Camden, (2) City of Brockton, (3) City of Sioux Falls, (4) California Water Service Company, (5) City of Delray Beach, (6) Coraopolis Water & Sewer Authority, (7) Township of Verona, (8) Dutchess County Water and Wastewater Authority and Dalton Farms Water System, (9) City of South Shore, (10) City of Freeport, (11) Martinsburg Municipal Authority, (12) Seaman Cottages, (13) Village of Bridgeport, (14) City of Benwood, (15) Niagara County, (16) City of Pineville and (17) City of Iuka. *Id.* at ¶¶ 6-64.

Final Fairness Hearing should be set."[40] The Court further noted that "it will likely be able to certify the Settlement Class for purposes of judgment of the proposed Settlement Agreement," and that "[t]he Settlement Class is likely to meet the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a)(1)-(4) of the Federal Rules of Civil Procedure."[41]

Likewise pursuant to the PAO, the Court ordered that the last day of the objection period would be November 4, 2023,[42] which was subsequently extended to November 11, 2023.[43] Moreover, the Court set the last day of the opt-out period as December 4, 2023,[44] and Class Counsel was directed to (and did) file its motion for attorneys' fees and costs by October 15, 2023.[45] Class Counsel's papers in support of Final Approval of the Settlement Agreement and any responses to any objections were originally due November 14, 2023;[46] however, these deadlines were later extended to November 21, 2023.[47] Finally, the Final Fairness hearing was set for December 14, 2023.[48]

**F.    Notice to the Class Complied with this Court's Preliminary Approval Order and Due Process.**

In conjunction with preliminary approval of the Settlement, this Court ordered that Notice be disseminated to the Class. As set forth in detail above, the parties complied with the Court's order. Notice was disseminated *via* USPS certified mail, with tracking and signature required, to

---

[40] PAO, at ¶ 1.

[41] PAO, at ¶ 5.

[42] PAO, at ¶ 21.

[43] Order Granting Joint Motion to Supplement the Preliminarily Approved Allocation Procedures [ECF No. 3862], at 3-4.

[44] PAO, at ¶ 16.

[45] PAO, at ¶ 27.

[46] PAO, at ¶ 28.

[47] Order on Joint Motion to Extend Time to Respond to Class Action Settlement Objections [ECF No. 3891]; *see also*, Order on Parties' Motion to Extend Time for Plaintiffs' Motion for Final Approval [ECF No. 3935].

[48] PAO, at ¶ 26.

14,019 identified Settlement Class Members.[49] In addition, the Notice administrator established a settlement website, www.PFASWaterSettlement.com, and a toll-free hotline devoted to this case to apprise Settlement Class Members of their rights and options in the Settlement. Further, the Notice Administrator provided email notification of the Settlement to 9,129 identified Settlement Class Members and implemented a media campaign involving both publication notice and digital notice.[50]

The Notices that have been disseminated and published comply with Due Process. *See Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 173 (1974); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Beyond first-class mailing, an extensive publication Notice Plan was implemented to ensure that every reasonable effort to provide notice to identified class members of the pendency of this class action was made. Conducting this Notice Plan supports approval of the Settlement.

### G. The CAFA Notice Requirement Has Been Satisfied by Defendants.

The Class Action Fairness Act, 18 U.S.C § 1711 et seq. ("CAFA"), requires settling defendants to serve notice of a proposed settlement on the "appropriate" state and federal officials after a proposed class action settlement is filed with the court. 28 U.S.C. § 1715(b). Defendants satisfied this CAFA notice requirement.[51]

### III.    MATERIAL TERMS OF THE SETTLEMENT

### A.    Consideration

---

[49] *See* Declaration of Steven Weisbrot, Esq. of Angeion Group, LLC Regarding Notice Plan Implementation, at ¶¶ 8, 11 attached as Ex. A ("Weisbrot Final Approval Decl."), being filed concurrently herewith.
[50] *Id.* ¶¶ 9-10, 20-21, 26-31.
[51] *Id.* at ¶¶ 4-5.

Defendants have agreed to pay or cause to be paid the Settlement Amount of one billion one hundred eighty- five million dollars ($1,185,000.00) in exchange for receiving releases, covenants not to sue, and dismissals from Settlement Class Members as provided for in the Settlement Agreement.[52]

### B.    Class Definition

The preliminarily approved Settlement Class consists of:

(a)    All Public Water Systems in the United States of America that draw or otherwise collect from any Water Source that, on or before the Settlement Date, was tested or otherwise analyzed for PFAS and found to contain any PFAS at any level; and

(b)    All Public Water Systems in the United States of America that, as of the Settlement Date, are (i) subject to the monitoring rules set forth in UCMR 5 (*i.e.*, "large" systems serving more than 10,000 people and "small" systems serving between 3,300 and 10,000 people), or (ii) required under applicable state or federal law to test or otherwise analyze any of their Water Sources or the water they provide for PFAS before the UCMR 5 Deadline.[53]

Subsection (a) Settlement Class members are referred to as "Phase One" Class members and subsection (b) Settlement Class members are referred to as "Phase Two" Class members, discussed further below in Section III.C.

Further, as identified in the PAO, the following are excluded from the Settlement Class:

(a)    Any Public Water System that is located in Bladen, Brunswick, Columbus, Cumberland, New Hanover, Pender, or Robeson counties in North Carolina; provided, however, that any such system otherwise falling within clauses (a) or (b) of Paragraph 3 of this Order will be included within the Settlement Class if it so requests.

(b)    Any Public Water System that is owned and operated by a State government and cannot sue or be sued in its own name, which systems within clauses (a) and (b)(i) of Paragraph 3 of this Order are listed in Exhibit I to the Settlement Agreement.

---

[52] SA, at §§ 2.50, 3.2, 12.1-12.9.
[53] PAO, at ¶ 3(a)-(b).

(c)    Any Public Water System that is owned and operated by the federal government and cannot sue or be sued in its own name, which systems within clauses (a) and (b)(i) of Paragraph 3 of this Order are listed in Exhibit J to the Settlement Agreement.

(d)    Any privately owned well or surface water system that is not owned by, used by, or otherwise part of, and does not draw water from, a Public Water System within the Settlement Class.[54]

## C.    Allocation of Settlement Amount between Phase One and Phase Two Qualifying Settlement Class Members

The Allocation Procedures provide that the Settlement Amount, subject to the requisite fees, costs and holdbacks as set forth in the SA, will be divided among Phase One and Phase Two Qualifying Class Members.[55] Subject to final approval by the Court, Phase One Qualifying Class Members will be allocated 55% of the Settlement Amount, and Phase Two Qualifying Class Members will be allocated 45% of the Settlement Amount.[56]

This division of funds between Phase One and Two Class Members was arrived upon based on the analysis of Timothy G. Raab.[57] Mr. Raab is the Managing Director at Alvarez and Marsal, a global professional services firm.[58] He is an expert in the field of liability forecasting, which is a field that requires building statistical and mathematical models to forecast liability and assets for, among other things, settlement negotiations and complex settlement programs.[59]

Mr. Raab was tasked with determining a methodology to be used to estimate the likely ratio between the Phase One and Phase Two members of the Settlement Class.[60] Mr. Raab's analysis was based upon public information provided by Class Counsel and included: (a) state data showing

---

[54] *Id*. at ¶ 4(a)-(d).

[55] Allocation Procedures, at p.1, p. 3, § 1(a).

[56] *Id.* at p. 3, § 1(a).

[57] *See generally*, Declaration of Timothy G. Raab [ECF No. 3393-12]("Raab Prelim. App. Decl.")

[58] *Id*. at § I, ¶ 1.

[59] *Id.* at § I, ¶ 4.

[60] *Id.* at § II, ¶ 1.

PFAS detections and non-detections in certain PWS; (b) the EPA's Third Unregulated Contaminant Monitoring Rule (UCMR 3) data showing PFAS detections and non-detections of the PWS that were subject to UCMR 3; (c) information regarding the PWS that are currently subject to UCMR 5 and applicable state or federal laws; and (d) PWS identified in SDWIS.[61] Based on this information, Mr. Raab identified the known Phase One members of the Settlement Class and compared them to the number of PWS that either have not yet tested for PFAS or have not reported a PFAS detection and would also meet the proposed Phase Two Class definition.[62] From this analysis, Mr. Raab determined that based on mathematical principles it is more likely than not that 64% of the members of the Settlement Class would meet the Phase One Class definition and 36% would meet the Phase Two Class definition.[63] To be conservative and account for any discrepancies in data, he then concluded that it would be fair, reasonable and adequate to estimate that 55% of the members of the Settlement Class would fall under the Phase One Class definition and 45% would fall under the Phase Two Class definition.[64] This division of funds between Phase One and Phase Two members of the Settlement Class is fair, reasonable and adequate, and is based upon Mr. Raab's analysis as described herein and the Raab Prelim. App. Decl.[65, 66]

The Phase One and Phase Two Funds will be allocated among Phase One and Phase Two Qualifying Settlement Class Members by the Court-appointed Claims Administrator, under the oversight of the Court-appointed Special Master, in accordance with the Allocation Procedures.[67]

---

[61] *Id.* at § III, *generally*.

[62] *Id.*

[63] *Id.* at § III, ¶ 11.

[64] *Id.* at ¶ 12.

[65] *Id., generally.*

[66] It is also worth noting that the data that has been released by EPA to date with respect to UCMR 5 has thus far only identified that approximately 20% of PWS have PFAS detection, which fully supports Mr. Raab's analysis.

[67] Allocation Procedures, at p. 1.

The Allocation Procedures are the culmination of a tremendous effort by Class Counsel, including negotiations between Class Counsel with Phase One clients and Class Counsel with Phase Two clients, to develop a protocol to fairly, reasonably and adequately allocate the Settlement Amount to Qualifying Settlement Class Members. As part of this massive effort, Class Counsel engaged two highly qualified experts – Dr. J. Michael Trapp[68] and Dr. Prithviraj Chavan[69] – to provide their expertise and technical support to develop an objective formula that can score a Qualifying Settlement Class Member's Impacted Water Source(s) using factors considered when calculating the real-world costs for the installation of PFAS treatment systems.[70] After applying the mathematical formula, the Impacted Water Source scores can be used to allocate the Settlement Amount among Qualifying Settlement Class Members (the "Allocated Amount"). Below are some of the most prominent aspects of the Allocation Procedures.

### 1. Breakdown of Funds and Claims Forms

The Phase One Funds are broken down into five separate payment sources: the Phase One Very Small Public Water System Payments, the Phase One Inactive Impacted Water System Payments, the Phase One Action Fund, the Phase One Supplemental Fund and the Phase One Special Needs Fund.[71] Similarly, the Phase Two Funds will be separated into five separate payment sources: the Phase Two Very Small Public Water System Payments, the Phase Two Baseline Testing Payments, the Phase Two Action Fund, the Phase Two Supplemental Fund, and the Phase Two Special Needs Fund.[72]

---

[68] Summy Prelim App. Decl., at ¶¶ 12, 14.
[69] *Id.*
[70] *Id.* at ¶¶ 12, 14-16.
[71] Allocation Procedures, at p. 3, § 1(c)(ii), pp. 7-20.
[72] *Id.* at p. 4, § 1(c)(v), pp. 20-24.

The initial step for establishing membership in the Settlement Class and eligibility for compensation from any of the Settlement Funds is the completion of the appropriate Claims Form(s).[73] Four Claims Forms are available, the completion and submission of which are dependent upon the compensation being sought by the Qualifying Settlement Class Member.[74] These Claims Forms, along with all verified supporting documentation, must be timely submitted by the applicable deadlines set forth in the Allocation Procedures.[75] The Claims Administrator has made these Claims Forms electronically accessible on the Settlement Website, with a paper copy also available upon request.[76]

### a)    The Very Small Public Water System Payments

The Phase One and Phase Two Action Funds will provide a one-time payment to Qualifying Settlement Class Members with Impacted Water Sources that qualify as Very Small PWS.[77] Very Small PWS are those that are listed in the SDWIS as Transient Non-Community Water Systems and Non-Transient Non-Community Water Systems serving less than 3,300 people.[78] Under the Allocation Procedures, Transient Non-Community Water Systems will

---

[73] *Id.* at p. 4, § 1(d).

[74] All four Claims Forms are contained in Exhibit D to the SA. The Public Water System Settlement Claims Form is to be completed by those seeking either: (1) a Phase One or Phase Two Very Small Public Water System Payment; (2) a Phase One Inactive Impacted Water System Payment; or (3) compensation from the Phase One or Phase Two Action Funds. Public Water System Settlement Supplemental Claims Form is to be completed by those seeking compensation from either the Phase One or Phase Two Supplemental Fund. The Public Water System Settlement Special Needs Claims Form is to be completed by those seeking compensation from either the Phase One or Phase Two Special Needs Funds as discussed. The Public Water System Settlement Testing Compensation Claims Form is to be completed by those seeking a Phase Two Baseline Testing Payment.

[75] Allocation Procedures, at p. 1, § 4(c)(iv), 4(d)(iv), 4(e)(i), 5(c)(ii), 5(d)(iii), 5(e)(iii), 5(f)(i).

[76] Allocation Procedures, at p. 1; Declaration of Dustin Mire [ECF No. 3393-9], at ¶ 9 ("Mire Prelim. App. Decl.").

[77] Allocation Procedures, at p. 10, § 4(f), p. 23, § 5(g).

[78] *Id.* at p. 10, § (f)(i), p. 23, § 5(g)(i).

receive a one-time payment of $1,250, and Non-Transient Non-Community Water Systems serving less than 3,300 people will receive a one-time payment of $1,750.[79] Recipients of the Very Small Public Water System Payments are not eligible for payment from any other funds, except that a Phase Two Qualifying Settlement Class Member may also receive a Phase Two Baseline Testing Payment.[80]

The Claims Forms submission deadline for the Phase One Very Small Public Water System Payment is sixty (60) days after the Effective Date.[81] The submission deadline for the Phase Two Very Small Public Water System Payment is June 30, 2026, which is six months after the UCMR 5 testing deadline.[82]

### b)    The Phase One Inactive Impacted Water System Payment

Phase One Qualifying Settlement Class Members that are classified as Inactive in the SDWIS and that own one or more Impacted Water Source(s) tested before June 30, 2023 will receive a one-time payment of $500.00.[83] Recipients of this payment are not eligible for payment from any other funds.[84] Because Inactive PWS should not be required to test under UCMR 5 or other federal or state law, a similar payment is not available from the Phase Two Fund. The Claims Forms submission deadline for the Phase One Inactive Impacted Water System Payment is sixty (60) days after the Effective Date.[85]

### c)    The Action Funds

---

[79] *Id.* at p. 10, § 4(f)(ii), p. 23, § 5(g)(ii).
[80] *Id.* at p. 10, § 4(f)(iii), p. 23, § 5(g)(iii).
[81] *Id.* at p. 9-10, § 4(e)(i).
[82] *Id.* at p. 23, § 5(f)(i).
[83] *Id.* at p. 10, § 4(g)(i).
[84] *Id.* at p. 10, § 4(g)(ii).
[85] *Id.* at p. 9- 10, § 4(e)(i).

The Phase One and Phase Two Action Funds will compensate all other Qualifying Settlement Class Members with Impacted Water Sources that have timely submitted a Claims Form and performed the requisite testing for each of its Impacted Water Source(s).[86] The Claims Administrator will enter the test results and relevant information provided on the Claims Form into the mathematical formula set forth in the Allocation Procedures to score each Impacted Water Source owned and/or operated by a Qualifying Settlement Class Member.[87]

Phase One Qualifying Settlement Class Members (*i.e.*, those that have detected a measurable concentration of PFAS before June 30, 2023) are not required to retest their Impacted Water Source(s), but they are required to perform Baseline Testing of each of their Water Sources that either have never been tested for PFAS or were tested for PFAS before December 7, 2021, and the test did not result in a measurable concentration of PFAS.[88] Failure to test and submit Qualifying Test Results for Water Sources will disqualify Water Sources from consideration for present and future payments.[89] By contrast, all Phase Two Qualifying Settlement Class Members will have to perform Baseline Testing.[90]

Those Qualifying Settlement Class Members with a detection will receive compensation from the appropriate Action Fund for each Impacted Water Source.[91]   While a Qualifying Settlement Class Member may use any laboratory, Class Counsel made great efforts to arrange for

---

[86] *Id*., pp. 11-20, § 4(h), pp. 23-24, § 5(h).
[87] *Id.* at pp. 11-16, §§ 4(h)(i)-4(h)(iv), p. 24, § 5(h)(ii).
[88] *Id.* at pp. 7-8, §§ 4(b)(i)- 4(b)(iii).
[89] *Id.* at p. 8, § 4(b)(v).
[90] *Id.* at pp. 20-21, § 5(b).
[91] *Id.* at pp. 11-20, § 4(h), pp. 23-24, § 5(h).

expedited analysis at reduced rates from Eurofins Environmental Testing, which is a network of laboratories that currently has North America's largest capacity dedicated to PFAS analysis.[92]

Both Drs. Trapp and Chavan agree that capital costs and operation and maintenance ("O&M") costs are the most important factors to consider when calculating the cost of treating PFAS-containing Drinking Water.[93] Capital costs are primarily driven by the flow rate of the Impacted Water Source, while O&M costs are primarily driven by the flow rate of the Impacted Water Source *and* PFAS concentrations.[94] Thus, the flow rates and PFAS concentrations of each Impacted Water Source, obtained from the Qualifying Class Settlement Members' Claims Forms and supporting documentation, can and will be used by the Claims Administrator to formulaically calculate a Base Score for each Impacted Water Source based on the Allocation Procedures.[95] These Base Scores will then be adjusted or "bumped," depending on whether the Impacted Water Source's concentration levels exceed the proposed federal or applicable state MCLs, whether the Qualifying Settlement Class Member had Litigation relating to the Impacted Water Source pending at the time of Settlement, and whether the Qualifying Settlement Class Member was one of the Public Water Provider Bellwether Plaintiffs.[96]

The Claims Administrator will then divide an Impacted Water Source's Adjusted Base Score by the sum of all Adjusted Base Scores for the respective Action Fund to arrive at each

---

[92] Declaration of Robert Mitzel, President of TestAmerica Laboratories, Inc. d/b/a Eurofins TestAmerica.[ECF No. 3393-15], at ¶¶ 1, 3-4. 7.

[93] Declaration of J. Michael Trapp, PhD in Support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class and For Permission to Disseminate Class Notice [ECF No. 3393-13] ("Mitzel Prelim. App. Decl."), at pp. 3-8; Declaration of Dr. Prithviraj Chavan, PhD in Support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class and For Permission to Disseminate Class Notice [ECF No. 3393-14]("Prithviraj Prelim. App. Decl."), at pp. 5-10.

[94] *Id.*

[95] Allocation Procedures, at pp. 11-16, §§ 4(h)(i)-4(h)(iv), p. 24, § 5(h)(ii).

[96] *Id.* at pp. 16-19, § 4(h)(v), p. 24, § 5(h)(ii).

Impacted Water Source's percentage of the respective Action Fund.[97] This percentage will be multiplied by the total respective Action Fund to provide the Allocated Amount for each Impacted Water Source.[98]

Because the Allocation Procedures require the information solicited in the Claims Forms to calculate Base Scores and all Base Scores are required to calculate individual Allocated Amounts, each Qualifying Settlement Class Member's Allocated Amount will not be determinable until all applicable Claims Forms are submitted, analyzed, and processed by the Claims Administrator. When these Allocated Amounts are determined and notification of the Allocated Amount is provided, each Qualifying Settlement Class Member may submit a request for reconsideration to the Special Master within the applicable deadlines, if an error in calculation can be established.[99]

The Claims Forms submission deadline for the Phase One Action Fund is sixty (60) calendar days after the Effective Date.[100] The deadline for the Phase Two Action Fund is June 30, 2026, which is six months after the UCMR 5 testing deadline.[101]

### d)    The Supplemental Funds

The Supplemental Funds were created to compensate Qualifying Settlement Class Members that have an Impacted Water Source that did not exceed the proposed federal or an applicable state MCL at the time they submitted their Claims Forms, but because of subsequent testing, obtain a

---

[97] *Id.* at p. 19, § 4(h)(v)(a), p. 24, § 5(h)(ii).
[98] *Id.*
[99] *Id.* at pp. 19-20, §§ 4(h)(vi)-4(h)(vii).
[100] *Id.* at pp. 9-10, § 4(e)(i).
[101] *Id.* at p. 23, § 5(f)(i).

Qualifying Test Result that either: (1) exceeds the proposed federal PFAS MCLs or an applicable state MCL; or (2) exceeds a future state or federal PFAS MCL.[102]

For each Impacted Water Source, the Claims Administrator will approximate, as closely as is reasonably possible, the Allocated Amount that each Impacted Water Source would have been allocated had it been in the Action Fund with an MDL exceedance, and shall issue funds from the Supplemental Funds in amounts that reflect the difference between the amount the Impacted Water Source would have been allocated had it been in the Phase One Action Fund with an MCL exceedance and what the Qualifying Settlement Class Member has already received, if anything.[103]

Given the nature of the claims being submitted, the deadline for Claims Form submission for both the Phase One and Phase Two Supplemental Funds is December 31, 2030.[104]

### e)    The Special Needs Fund

The Phase One and Phase Two Special Needs Funds will compensate Qualifying Settlement Class Members who have already spent money to address PFAS detections in their Impacted Water Sources, such as by taking wells offline, reducing flow rates, drilling new wells, pulling water from other sources and/or purchasing supplemental water.[105]

A Phase One Special Needs Fund Claims Form must be submitted no later than 45 days after the deadline for submission of the PWS Phase One Action Fund Claims Form.[106]  Once all Phase One Special Needs Fund Claims Forms are timely received, the Claims Administrator will review them and determine which Phase One Qualifying Settlement Class Members shall receive

---

[102] *Id.* at p. 8, § 4(c)(ii)-4(c)(iii); p. 21, §§ 5(d)(ii).
[103] *Id.* at pp. 8-9, §§ 4(c)(v)-4(c)(vi), p. 22, §§ 5(d)(v)-5(d)(vi).
[104] *Id.* at p. 8, § 4(c)(iv), p. 21, § 5(d)(iii).
[105] *Id.* at p. 9, §§ 4(d)(ii)-4(d)(iii), p. 22, § 5(e)(ii).
[106] *Id.* at p. 9, § 4(d)(iv).

additional compensation and the amount of compensation.[107] The Claims Administrator will recommend the awards to the Special Master who must review and ultimately approve or reject them.[108] Phase Two Special Needs Funds claims will employ an identical process except that the deadline for submissions is August 1, 2026.[109]

### f)    The Phase Two Baseline Testing Payments

The Phase Two Baseline Testing Payment system was created to allow PWS with no evidence of PFAS contamination prior to June 30, 2023, to conduct Baseline Testing that could help them establish eligibility for payments from the Phase Two Action Fund.[110] Although UCMR 5 requires a PWS to test for PFAS, the rule requires only that a PWS test once in its *distribution system*. The Phase Two Baseline Testing Payment system allows for more thorough testing: it allows for Phase Two Qualifying Settlement Class Members to receive a payment in the amount of $200 for *each Water Source* identified in the Phase Two Testing Compensation Claims Form.[111] Thus, Phase Two Qualifying Settlement Class Members will be able to gather far more data regarding PFAS and, critically, will be able to seek compensation for those new detections in Phase Two. Again, Eurofins Environmental Testing will provide this testing and analysis at significantly reduced rates.[112] The deadline for submitting Phase Two Testing Compensation Claims Forms is January 1, 2026, which coincides with the UCMR 5 testing deadline of December 31, 2025.[113]

### 2.    Breakdown of Settlement Funds Paid by Defendants

---

[107] *Id.* at p. 9, § 4(d)(v).
[108] *Id.*
[109] *Id.* at p. 22, § 5(e)(iii).
[110] *Id.* at p. 21, § 5(c)(i).
[111] *Id.* at p. 21, § 5(c)(iii).
[112] Mitzel Prelim. App. Decl., at ¶ 4.
[113] Allocation Procedures, at p. 21, § 5(c)(ii).

As noted above, Defendants made a payment of the Settlement Amount into the Qualified Settlement Fund ("QSF") described below, which is to be divided between Phase One and Phase Two Qualifying Settlement Class Members, after deductions for all appropriate fees and costs, at a 55% /45% ratio.

After the Effective Date, the QSF Escrow Agent shall transfer five percent (5%) of the total Settlement Funds into the Supplemental Funds for the respective phases, and five percent (5%) of the total Settlement Funds into the Special Needs Funds for the respective phases.[114]

The Claims Administrator will calculate the total amount for the Phase One Action Fund after the Escrow Agent has transferred the amounts for the Phase One Special Needs Fund, the Phase One Supplemental Fund, the Inactive Impacted Water System Payments, and the Phase One Very Small Public Water System Payments into those funds.[115]  The Claims Administrator will calculate the amount for the Phase Two Action Fund after the Escrow Agent has transferred the amounts for the Phase Two Special Needs Fund, the Phase Two Supplemental Fund, the Phase Two Very Small Public Water System Payments, and the Phase Two Baseline Testing Payments into those funds.[116]

### D.    Establishment of a Qualified Settlement Fund and Payment by Defendants

In accordance with the SA, in their Mot. for Prelim. App., Class Counsel moved for the establishment of a QSF as defined in the Defendants MSA.[117] Such Motion was granted by the Court and the QSF was established by the Escrow Agent and Special Master who were authorized

---

[114] Allocation Procedures, at p. 8, § 4(c)(i), p. 9, § 4(d)(i), p. 21, 5(d)(i), p. 22, 5(e)(i); *see also,* Decl. of Matthew L. Garretson, Esq. in Support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class and For Permission to Disseminate Class Notice [ECF No. 3393-10] ("Garretson Prelim. App. Decl."), at ¶ 7.
[115] Allocation Procedures, at p. 11, § 4(h)(i).
[116] *Id.* at pp. 23-24, § 5(h)(i).
[117] SA, at §§ 2.41, 6.2, 7.

to take all actions required and/or permitted by the SA.[118] Consistent with the SA[119] and the PAO,[120] Defendants tendered the Settlement Amount into the QSF, titled PWS-1 PFAS Water Provider Settlement Trust (hereinafter, "PWS-1 QSF"). These funds are being maintained in the PWS-1 QSF,[121] and assuming final approval, will be administered by the Special Master.[122]

### E.     Court Appointments

The SA contemplated that the Court would appoint four independent neutral Persons to administer the Settlement: (1) a Notice Administrator;[123] (2) a Claims Administrator;[124] (3) a Special Master;[125] and (4) an Escrow Agent.[126] Consistent with the SA's provisions, as part of the PAO, the Court ordered the following appointments:

#### 1.     Notice Administrator

The Court appointed Steven Weisbrot, of Angeion Group, LLC ("Angeion"), 1650 Arch Street, Suite 2210, Philadelphia, PA 19103, to serve as the Notice Administrator.[127] Mr. Weisbrot is the President and Chief Executive Officer of Angeion, which is a class action and claims administration firm.[128]

As set forth in his attached declaration being filed concurrently herewith as Ex. A, Mr. Weisbrot has executed the Notice Plan, which is more particularly described below.

---

[118] PAO, at ¶¶ 34, 38
[119] *See* SA, at § 6.1 (noting that within ten (10) Business Days after Preliminary Approval, Settling Defendants shall pay or cause to be paid the Settlement Amount in full).
[120] PAO, at ¶ 34.
[121] *See* Huntington Private Bank Account Statement [ECF No. 3795-14]
[122] SA, at pp. 28-29, §§ 11.3-11.5.
[123] *Id*. at §§ 2.31, 8.1.
[124] *Id*. at §§ 2.7, 8.3.
[125] *Id.* at §§ 2.57, 8.7.
[126] *Id*. at §§ 2.17, 7.1.2.
[127] PAO, at ¶ 33.
[128] Declaration of Steven Weisbrot, Esq. of Angeion Group, LLC ("Weisbrot Prelim. App. Decl.")[ECF No. 3393-8], at ¶ 1.

### 1. Claims Administrator

Likewise, pursuant to the PAO, the Court appointed Dustin Mire of Eisner Advisory Group, 8550 United Boulevard, Suite #1001, Baton Rouge, LA 70809, to serve as Claims Administrator.[129] As the Court knows, Mr. Mire is a Partner at Eisner Advisory Group ("EisnerAmper") and in that position is responsible for the operations of EisnerAmper's settlement administration program, which includes class action administration services.[130]

Pursuant to the Notice Plan, Mr. Mire was also tasked with creating and maintaining the Settlement Website and toll-free hotline for the Settlement.[131] Consistent with these directives, Mr. Mire has set up the Settlement Website at the following URL: https://www.pfaswatersettlement.com/. Moreover, this website contains a 24-hour toll free hotline available at the following telephone number: **1-855-714-4341**. To date, the website has had over 11,500 unique visitors.

### 2. Special Master

In addition, the Court appointed Matthew Garretson of Wolf/Garretson LLC, P.O. Box 2806, Park City, UT 84060 to serve as the Special Master and further to be the "administrator" of the Qualified Settlement Fund escrow account within the meaning of Treasury Regulations §1.468B-2(k)(3).[132] Mr. Garretson is the co-founder of Wolf Garretson, LLC, and an attorney licensed to practice law in the State of Ohio.[133]

Generally, Mr. Garretson's role will be to supervise the Settlement, which includes overseeing the work of both the Notice Administrator and the Claims Administrator, and to

---

[129] PAO, at ¶ 31.
[130] Mire Prelim. App. Decl., at ¶ 1.
[131] Id., at ¶ 9.
[132] PAO, at ¶ 30.
[133] Garretson Prelim. App. Decl., at ¶ 1.

administer the QSF.[134] Mr. Garretson will also provide quasi-judicial intervention if and/or when necessary, such as for determinations (if any) related to appeals of Allocated Amounts.[135]

### 3.    Escrow Agent

Finally, the Court appointed Robyn Griffin of Huntington National Bank, One Rockefeller Center, 10th Floor, New York, NY 10020 to serve as the Escrow Agent.[136] Ms. Griffin has over 25 years of experience in the financial sector and her Settlement Team at Huntington National Bank has over 20 years of experience acting as escrow agent on various cases, handling more than 4,500 settlements for law firms, claims administrators and regulatory agencies.[137]

In her role as Court-appointed Escrow Agent, Ms. Griffin, consistent with the PAO, has established the QSF and received and deposited the Settlement Funds.[138] Going forward, and consistent with the terms of the SA, Ms. Griffin will be responsible for: (1) maintaining the QSF; (2) ensuring all legal responsibilities are met with respect to the QSF; (3) disbursing funds from the QSF pursuant to the terms of the SA; and (4) investing the funds.[139]

### F.    Notice of Settlement

### 1.    Identification of Potential Members of the Settlement Class

---

[134] SA, at §§ 2.57, 7.1.1, 8.8.

[135] *Id*. at § 8.8.

[136] PAO, at ¶ 32; *see also*, SA, at ¶¶ 6.2.1, 7.2.2; SA, at Ex. H, Escrow Agreement [ECF No. 3393-2]("Escrow Agreement"), *generally*.

[137] Declaration of Huntington National Bank in Support of Plaintiffs' Motion for Preliminary Approval of Settlement with Defendants the Chemours Company, the Chemours Company, FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., and E. I. DuPont de Nemours and Company m/k/a EIDP Inc. for Conditional Certification of the Proposed Settlement Class, for Approval to Notify the Settlement Class, and for Related Relief. [ECF No. 3393-16], at ¶¶ 1-3.

[138] PAO, at ¶ 34.

[139] *Id.; see also,* Escrow Agreement, § 9.

Class Counsel have endeavored to provide publicly available information identifying potential members of the Settlement Class to the Notice Administrator.[140] To this end, Class Counsel retained Rob Hesse, an environmental consultant, to assist in identifying potential members of the Settlement Class.[141]

As Mr. Hesse attests in his Declaration submitted in support of Plaintiffs' Mot. for Prelim. App., that all PWS in the United States are permitted entities that are regulated by the EPA.[142] The EPA assigns a unique identification number called a "PWSID" to each PWS and maintains a centralized database that contains an inventory of all PWS in America.[143] This database, called the Safe Drinking Water Information System ("SDWIS"), is regularly updated with classifying information about all PWS, such as the population served, activity status, owner type and primary Water Source, and it also maintains administrative contact information for each PWS.[144]

Not every PWS in the SDWIS is a member of the Settlement Class; rather, only a smaller subset of PWS falls within the Settlement Class definition based on either: (1) PFAS detection in their Drinking Water before June 30, 2023; or (2) being subject to the monitoring rules set forth in UCMR 5, or other applicable federal or state laws.[145]

Based on the publicly available information, Class Counsel and Mr. Hesse created a list of 14,165 potential Settlement Class members (the "Class List")[146]

### 1.    The Notice Plan

---

[140] Weisbrot Prelim App. Decl., at ¶ 12.
[141] Summy Prelim. App. Decl., at ¶¶ 12-13.
[142] Declaration of Rob Hesse in Support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class and For Permission to Disseminate Class Notice [ECF No. 3393-11] ("Hess Prelim. App. Decl."), at p. 2.
[143] *Id.*
[144] *Id.*
[145] *Id.* at pp. 2-4; *see also*, SA, at § 5.1.1.
[146] Summy Prelim. App. Decl., at ¶ 13; *see also*, SA, at Ex. G, Notice Plan [ECF No. 3393-2]("Notice Plan"), *generally*.

As noted above, Mr. Weisbrot of the firm Angeion was appointed as the Notice Administrator.[147] On August, 2, 2023, as outlined in Mr. Weisbrot's accompanying Declaration, Angeion "received the Class List of 14,165 eligible Settlement Class Members," which included water district's and sewage plant's contact information obtained from U.S. EPA's Safe Drinking Water Information System ("SDWIS").[148] On September 11, 2023, two additional entities were provided to Angeion that were added to the Class List of Eligible Settlement Class Members.[149]

Using the contact information provided, "Angeion analyzed the Class List and processed the mailing addresses through the United States Postal Service's ("USPS") National Change of Address database and Coding Accuracy Support System ("CASS"), which provides updated addresses for entities that have moved in the previous four years and filed a change of address with USPS and standardizes address information to maximize mailed Notice deliverability."[150]

In addition to mail being posted by way of USPS, Angeion likewise employed email notice to 9,129 Settlement Class Members.[151]

Consistent with the Notice Plan, Angeion also employed a media campaign strategy in both print and digital media.[152] In particular, Angeion caused the Summary Notice to be published in key industry-specific titles, such as Journal AWWA, The Municipal, Water Environment & Technology, AWWA Opflow, and the AWWA Source Book,[153] and in national publications such as the Wall Street Journal, USA Today National Edition and the New York Times.[154] The

---

[147] PAO, at ¶¶ 33.
[148] Weisbrot Final App. Decl., at ¶ 4.
[149] *Id*. at ¶ 7.
[150] *Id*. at ¶ 8.
[151] *Id*. at ¶¶ 20-21.
[152] *Id*. at ¶ 26.
[153] *Id*. at ¶ 27.
[154] *Id*. at ¶ 28.

Summary Notice was also published digitally via the websites and digital circulars of key industry-specific organizations and publications, such as the American Water Works Association, National Rural Water Association, The Municipal, Water Environment & Technology, and Water Quality Association.[155]

In addition, Angeion worked with the Court-appointed Claims Administrator to establish the Settlement website and a toll-free hotline for Settlement Class members.[156] Angeion also "caused a paid search campaign on Google to help drive Settlement Class Members who are actively searching for information about the Settlement to the dedicated Settlement website."[157] Finally, "[o]n September 5, 2023, Angeion caused a press release to be distributed over PR Newswire's national and public interest circuits to further disseminate information about the Settlement." "A second press release was issued on October 18, 2023, before the Objection and Opt Out deadlines."[158]

In sum, "Angeion analyzed the Notice delivery results and determined that as of October 31, 2023, of the 14,167 Settlement Class Members; 7,966 (56.2%) had Notice successfully delivered by certified mail and email, 4,226 (29.8%) had Notice successfully delivered through certified mail only and, 1,328 (9.4%) had Notice successfully delivered through email only."[159] "Collectively, this represents 95.4% of the 14,167 Settlement Class Members included on the Class List, having Notice successfully delivered."[160] These efforts, combined with the "comprehensive media plan," "reminder postcard and email notice along with 2 nationwide press

---

[155] *Id*. at ¶ 29.
[156] *Id*. at ¶¶ 7-8.
[157] *Id*. at ¶ 30.
[158] *Id*. at ¶ 31.
[159] *Id*. at ¶ 32.
[160] *Id*.

releases is the best notice that is practicable under the circumstances and fully comports with due process,"[161] pursuant to FED. R. CIV. P. 23.

### G.    Objections and Exclusion Rights

#### 1.    Objections

Any Settlement Class Member had the right to file an Objection to the Settlement or to an award of fees or expenses to Class Counsel with the Clerk of the Court.[162] The requirements for the written and signed Objection and service obligations are set forth in the Settlement Agreement in the PAO and on the www.pfaswatersettlement.com website, including the requirement that the person objecting be legally authorized to object on behalf of the Settlement Class Member.[163] Any Settlement Class Member who fails to comply with the provisions of SA 9.6, as approved in the PAO, waives and forfeits any and all objections to the Settlement Class Member may have asserted.[164]

Pursuant to the PAO, the original final date for the objection period was November 4, 2023;[165] however, that date was then extended to November 11, 2023.[166] As discussed below, there were only twenty-three (23) filed Objections to the Settlement, which includes seventeen (17) filed by the same law firm.

---

[161] *Id.*
[162] SA §§ 2.33, 9.6-9.6.5; *see also*, PAO, at ¶¶ 19-24.
[163] SA § 9.6.1; *see also*, PAO, at ¶ 20.
[164] *Id.* at 9.6.4; *see also*, PAO, at ¶ 23.
[165] PAO, at ¶ 21.
[166] Order Related to Civil Action No. 2:23-cv-3230-RMG, dated Oct. 26, 2023 [ECF No. 3862], p. 3.

Importantly, the filing of an Objection does not "opt out" or exclude a Settlement Class Member from the Settlement Class, which can only be accomplished by filing and serving a "Request for Exclusion" as discussed in the next section.[167]

### 1.    Requests for Exclusion ("Opt-Outs")

Any Settlement Class Member may opt out of the Settlement by serving a written and signed "Request for Exclusion" on the Notice Administrator, Claims Administrator, Defendants' Counsel, and Class Counsel.[168] The requirements for the Request are set forth in the Settlement Agreement and the PAO and included on the Settlement website. "To be effective, the Request for Exclusion must certify, under penalty of perjury in accordance with 28 U.S.C. § 1746, that the filer has been legally authorized to exclude the Person from the Settlement and must: (a) provide an affidavit or other proof of the standing of the Person requesting exclusion and why they would be a Settlement Class Member absent the Request for Exclusion; (b) provide the filer's name, address, telephone and facsimile number and email address (if available); (c) provide the name, address, telephone number, and e-mail address (if available) of the Person whose exclusion is requested; and (d) be received by the Notice Administrator no later than the date specified in Paragraph 15 of the PAO.[169] No "mass," "class," "group," or otherwise combined Request for Exclusion shall be valid, and no Person within the Settlement Class may submit a Request for Exclusion on behalf of any other Settlement Class Member.[170]

Any person that submits a timely and valid Request for Exclusion shall not: (i) be bound by any orders or judgments effecting the Settlement; (ii) be entitled to any of the relief or other benefits provided under the Settlement Agreement; (iii) gain any rights by virtue of the Settlement

---

[167] SA § 9.6.5; *see also*, PAO, at ¶ 24.
[168] SA §§ 2.46, 9.7-9.7.5; *see also*, PAO, at ¶¶ 15-17.
[169] PAO, at ¶ 17; *see also*, SA, at § 9.7.1.
[170] SA § 9.7.5; *see also*, PAO, at ¶ 17.

Agreement; or (iv) be entitled to submit an Objection.[171]  Any Settlement Class Member that fails to submit a timely and valid Request for Exclusion submits to the jurisdiction of the Court and, unless the Settlement Class Member submits a valid Objection, shall waive and forfeit any and all objections the Settlement Class Member may have asserted.[172]

Pursuant to the PAO, the Court set the deadline for submission of Requests for Exclusion to be ninety (90) calendar days after commencement of dissemination of Notice.[173] "The last day of the opt out period is December 4, 2023."[174]

### H.    Termination of the Settlement

Defendants have the option to withdraw from the proposed Settlement and terminate the Settlement Agreement if a certain percentage of Settlement Class Members—broken down by PWS category—decide to opt out of the Settlement.[175]  Defendants must notify Class Counsel of their intent to exercise this termination right within fourteen (14) business days after the deadline for submitting Requests for Exclusion.[176] If Defendants do not provide notice before this deadline, their right to terminate shall be waived.[177]  Any disputes about Defendants' termination right will be submitted to the Court for a final, binding, and non-appealable decision.[178]

### I.    Release of Claims, Covenants Not to Sue, and Dismissal

After Settlement Class Members are notified and the time period for Opt-Out requests and Objections expires, if the Court grants Final Approval of the Settlement, then all Settlement Class

---

[171] SA § 9.7.3.
[172] SA § 9.7.4; *see also*, PAO, at ¶ 17.
[173] PAO, at ¶ 16.
[174] *Id*.
[175] SA §§ 10.1-10.5; *see also*, PAO, at ¶ 18.
[176] SA § 10.3; *see also*, PAO, at ¶ 18.
[177] SA § 10.3.
[178] SA § 10.5.

Members who do not request exclusion from the Settlement Class will be deemed to have released all claims as set forth in the Settlement Agreement against Defendants that fall within the definition of Released Claims in SA 12.1.1, agree not to institute any Released Claims in the future, and, for those Settlement Class Members with pending Litigation, agree to dismiss their Released Claims with prejudice.[179] Notably, the parties have provided a Joint Interpretive Guidance document describing the appropriate interpretation of the release provisions in the Settlement Agreement.

### J.    Payment of Attorneys' Fees and Litigation Costs and Expenses

On October 15, 2023, Class Counsel filed its Motion for Attorneys' Fees and Costs. Pursuant to that motion, Class Counsel requested 8% of the Settlement Amount, or $94,800,000 in Class Counsel Fees.[180] In addition, Class Counsel requested $2,136,213.21 in Class Costs, which represents approximately 10% of the total Class Costs to date. Moreover, Class Counsel requested that the CMO 3 holdback not apply to the Defendants' PWS Settlement, but rather that the Class Fee and Class Costs be granted.[181] No Objections were filed regarding Class Counsel's request for attorneys' fees and costs.

### IV.    <u>ARGUMENT</u>

Plaintiffs respectfully submit that the Court should grant certification of the Settlement Class and grant final approval of the Settlement. This section first discusses the policy favoring settlements and the standards for approval of class settlements. It then demonstrates that the

---

[179] Should a Settlement Class Member believe it has a claim that is preserved under SA § 12.1.2(a) or 12.1.3(y), it shall execute a stipulation of partial dismissal with prejudice in the form annexed as Exhibit L to the Settlement Agreement within thirty (30) calendar days of the Effective Date of the Settlement. SA § 12.1-12.3. Failure to do so will result in the dismissal of such Litigation by operation of the Order Granting Final Approval with prejudice to the extent it contains a Released Claim and without prejudice to the extent it contains a claim that is preserved under SA § 12.1.2(a) or 12.1.3(y). *Id.*

[180] Mot. for Attorneys' Fees, at 1-3, 7-8, 12-14, 58, 76-78.

[181] *Id*. at 8-9, 78.

requirements for certification of a settlement class have been met. Next, it explains why the proposed Settlement is fair, reasonable, and adequate. Finally, it demonstrates that the small number of Objections supports approval of the Settlement and that, in any event, the Objections are meritless.

### A.    Settlements of Complex Class Actions Are Favored.

In determining whether to approve the Settlement, the Court should be guided by the strong judicial policy favoring pretrial settlement of claims in complex class action lawsuits. *See, e.g.*, *S.C. Nat. Bank v. Stone,* 749 F. Supp. 1419, 1423 (D.S.C. 1990) ("The voluntary resolution of litigation through settlement is strongly favored by the courts."), citing *Williams v. First National Bank,* 216 U.S. 582 (1910); *Reed v. Big Water Resort, LLC*, 2016 U.S. Dist. LEXIS 187745, at *14 (D.S.C. May 26, 2016) (same); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). The policy favoring settlement exists, in part, because of the complexity and size of class actions:

> In the class action context in particular, "there is an overriding public interest in favor of settlement" [ ] of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strains such litigation imposes upon already scarce judicial resources.

*S.C. Nat. Bank,* 749 F. Supp. at 1424, (quoting, *Armstrong v. Bd. Of School Directors,* 616 F.2d 305, 313 (7th Cir. 1980)); *In re LandAmerica 1031 Exch. Servs. Inc. Internal Revenue Service §1031 Tax Deferred Exch. Litig. (MDL 2054)*, 2012 U.S. Dist. LEXIS 97933 at *13-14 (D.S.C. July 12, 2012) ("'[t]he voluntary resolution of litigation through settlement is strongly favored by the courts and is 'particularly appropriate' in class actions."); *Cotton*, 559 F.2d at 1331 ("In these days of increasing congestion within the federal court system, settlements contribute greatly to the efficient utilization of our scarce judicial resources."). *See also Crandell v. U.S.*, 703 F.2d 74, 75 (4th Cir. 1983) ("Public policy, of course, favors private settlement of disputes.").

32

This preference for settlement also exists, in part, because of the enormous time and resources necessary to resolve complex cases.

> Complex litigation – like the instant case – can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly evasive. Accordingly, the Federal Rules of Civil Procedure authorize district courts to facilitate settlements in all types of litigation, not just class actions.... Although class action settlements require court approval, such approval is committed to the sound discretion of the district court.

*In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493-94 (11th Cir. 1992) (citations omitted). The Eleventh Circuit's analysis is directly applicable here; this complex case has been ongoing for almost 5 years.

### B.    Standards for Approval of Class Settlements.

Initially, for a class action settlement to be approved, the class settlement must satisfy the requirements of class certification pursuant to Fed. R. Civ. 23(a) and (b). Specifically, Rule 23(a) requires that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." As determined by *Amchem*, the issue of class management is not relevant for purposes of certifying the Class in the context of a settlement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Because the Settlement Class satisfies all the criteria under Rule 23(a) and Rule 23(b)(3), the instant motion should be granted.

In addition, the class action settlement must be fair, reasonable and adequate. *See 1988 Trust for Allen Children Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 521 (4th Cir. 2022). Determining the fairness of class settlements is left to the sound discretion of the district court. *Id*. In the Fourth Circuit, "the court 'act[s] as a fiduciary of the class.'" *Id*., quoting *Sharp Farms v. Speaks*, 917 F.3d 276, 293 (4th Cir. 2019). As a fiduciary, the district court has a "responsibility to ensure that the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately." *Farms*, 917 F.3d at 294 (quoting *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995) (cleaned up)). "The fairness analysis is intended primarily to ensure that a 'settlement [is] reached as a result of good-faith bargaining at arm's length, without collusion.'" *Berry v. Schulman*, 807 F.3d 600, 614 (4th Cir. 2015), quoting, *In re Jiffy Lube Secs. Litig.,* 927 F.2d 155, 159 (4th Cir. 1991). In addition to this procedural consideration of the fairness of the negotiations, the Court also considers the "adequacy of the consideration to the class." *Commissioners of Pub. Works of City of Charleston v. Costco Wholesale Corp. (Commissioners II)*, No. 2:21-cv-42, 2022 WL 214531, at *4 (D.S.C. Jan 24, 2022) (Gergel, J.). *See generally*, Fed. R. Civ. P. 23(e)(2), Advisory Committee Note to 2018 Amendment (noting that each circuit "has developed its own vocabulary for expressing these concerns" which are not "displaced," but should focus on the "core concerns" addressing "primary procedural considerations and substantive qualities").

The proponents of the class settlement bear the burden of demonstrating that the settlement is fair, reasonable, and adequate. *1988 Trust*, 28 F.4th at 521 (recognizing that parties propounding settlement bear "the initial burden to show that the proposed class meets the Rule 23(a) requirements for certification and that a proposed settlement is fair, reasonable, and adequate").

However, in the absence of contrary evidence, there is a "presumption of fairness" after preliminary approval. *Commissioners*, 2022 WL 214531, at *2.

To analyze a class settlement for fairness in the Fourth Circuit, this Court applies the criteria of Rule 23(e)(2) as well as the *Jiffy Lube* factors, which substantially overlap with Rule 23(e). *Commissioners II*, 2022 WL 214531, at *5. "The Fourth Circuit has set forth the factors to be used in analyzing a class settlement for fairness: (1) the posture of the case at the time the proposed settlement was reached, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the settlement negotiations, and (4) counsel's experience in the type of case at issue." *Id*. (citing *Jiffy Lube*, 927 F.2d at 158-59). The *Jiffy Lube* court also provided an additional five factors to evaluate the adequacy of the settlement: "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." *Id*. at 159.[182]

As discussed below, the proposed Settlement satisfies the elements of Rule 23 (a) and (b)(3) and each of the Rule 23(e)(2) *Jiffy Lube* factors.

C.    **The Requirements of Rule 23(a) and 23(b)(3) Are Satisfied**

1.    **The Requirements of Rule 23(a) Are Met.**

The Settlement Class satisfies the requirements for final class certification under Rule 23(a), because it meets the following requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. 23(a). The Fourth Circuit also recognizes that "Rule 23 contains an implicit threshold requirement that the members of a

---

[182] The Rule 23(e)(2) factors are set forth *infra* at §§ IV.B and D.

proposed class be readily identifiable" or ascertainable. *Peters v. Aetna Inc.*, 2 F.4th 199, 241–42 (4th Cir. 2021) (internal citations omitted); *see also, Commissioners of Pub. Works of City of Charleston v. Costco Wholesale Corp. (Commissioners I)*, 340 F.R.D. 242, 247 (D.S.C. 2021) (Gergel, J.).

   **a)**   **The Settlement Class Members Are Readily Ascertainable.**

   The Fourth Circuit has imposed a non-textual condition that "a class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654–55 (4th Cir. 2019). This requirement is often called "ascertainability" where "[t]he goal is not to identify every class member at the time of certification, but to define a class in such a way as to ensure that there will be some administratively feasible [way] for the court to determine whether a particular individual is a member at some point." *Id.* at 658 (internal quotation marks omitted). This requirement will be met so long as the putative class is able to be "identified on a large-scale basis, and notified of the class action accordingly." *Id*.

   As detailed above, the proposed Settlement Class meets this requirement because the putative Settlement Class Members are objectively described, and many are readily identifiable, ascertainable by reference to publicly available information and, if necessary, confirmatory testing results.

   **b)**   **Rule 23(a)'s Numerosity Requirement Is Satisfied.**

   Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While this requirement was "easily satisfied" for a class of 14,000 public sewer system operators, *Commissioners I,* 340 F.R.D. at 247, the Fourth Circuit has also found it satisfied for much smaller classes. *See, e.g., Williams v. Henderson*, 129 Fed.

App'x 806, 811 (4th Cir. 2005) (30 class members). The large number of PWS and their disparate locations alone make joinder an unrealistic option in this case, thereby confirming the impracticality of resolving their claims without use of the class action device.

Thus, the proposed Settlement Class, projected to be over 14,000 PWS, easily satisfies Rule 23(a)'s numerosity requirement, and no objector has argued otherwise. The Court should confirm its preliminary finding of numerosity. *See Commissioners II*, 2022 WL 214531, at *3.

### c)    Rule 23(a)'s Commonality Requirement Is Satisfied.

Under Rule 23(a)(2), a district court may certify a class only when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The key inquiry for evaluating commonality is whether a common question can be answered in a class-wide proceeding such that it will "drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "The commonality requirement – at least as it relates to a settlement class – is 'not usually a contentious one: the requirement is generally satisfied by the existence of a single issue of law or fact that is common across all class members and thus is easily met in most cases.'" *Commissioners I*, 340 F.R.D. at 247-248. "What matters to class certification … is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S at 350 (emphasis in original). Thus, even a single common question is sufficient to meet this Rule 23(a) requirement. *Id.* at 359.

This Court found the commonality requirement was met in a class action where public sewer operators alleged that the manufacturers of flushable wipes knew that their wipes were not actually "flushable," failed to warn consumers, and caused harm to sewer systems. *Commissioners I,* 340 F.R.D. at 247. In that case, this Court found that common questions existed "such as whether

'Defendants mislabel their flushable wipes so as to have consumers believe that their flushable wipes will not cause harm to sewer systems in their area' and 'whether Defendants' flushable wipes cause adverse effects on STP Operators' systems.'" *Id.*

The same analysis supports a finding of commonality here. All of Plaintiffs' claims arise from the same allegations that Defendants knew of the environmental and potential human health risks associated with exposure to PFAS, yet continued to develop, manufacture, distribute, and sell PFAS and products containing PFAS.[183] Likewise, Plaintiffs and the preliminarily approved Settlement Class Members have all alleged that Defendants failed to warn users, bystanders, or public agencies of these risks associated with their products that contained PFAS.[184] Plaintiffs and the Settlement Class Members' claims arise out of a common core of salient facts relevant to Defendants, and Defendants' potential liability to Plaintiffs. Moreover, the preliminarily approved Settlement Class is grounded in substantially similar legal theories. For this reason, Rule 23(a)'s commonality requirement is satisfied here. The Court should confirm its preliminary finding of commonality. *See Commissioners II*, 2022 WL 214531, at *3.

### d)     Rule 23(a)'s Typicality Requirement Is Satisfied.

Typicality requires that the proposed class representatives' claims be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied if a proposed class representative's claim is not "so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Deiter v. Microsoft Corp.,* 436 F.3d 461, 466–67 (4th Cir. 2006). Still, courts have emphasized that this "is not to say that typicality requires that the plaintiff's claim and the claims of class members be perfectly identical

---

[183] Compl. at ¶¶ 103-134.
[184] *Id*. at ¶¶ 106, 121, 262, 289, 308, 322-347.

or perfectly aligned." *Id*. at 467. Rather, typicality is satisfied where there is "a sufficient link" between a representative plaintiff's claims and those of absent class members where both allegedly suffered damages caused by the same product, arise out of the same alleged course of conduct by defendant, and are based on identical legal theories. *Commissioners I,* 340 F.R.D. at 247-48. At bottom, the requirement of typicality is not difficult to satisfy. *See, e.g., Souter v. Equifax Info. Servs., LLC*, 498 F. App'x 260, 264 (4th Cir. 2012) (noting that while a representative's "interest in prosecuting her own case must … tend to advance the interests of the absent class members"); *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 272 n.4 (3d Cir. 2021) (noting that there is "a low threshold for typicality" (quoting *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016)); *Postawko v. Mo. Dep't of Corrs.*, 910 F.3d 1030, 1039 (8th Cir. 2018) (typicality "is fairly easily met so long as other class members have claims similar to the named plaintiff") (quoting *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995)); *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997) (noting that the test for typicality "is not demanding"). As all class members have the same basic interest, a class representative's claims do not need cover every type of claim that the class could bring and "need not be perfectly identical to the claims of the class." *Souter*, 498 F. App'x at 264 (cleaned up); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006) (same).

In *Souter*, the Fourth Circuit explained that the typicality analysis involves examining the elements of a class representative's claims, the facts supporting those elements, and "the extent to which those facts would also prove the claims of the absent class members." 498 F. App'x at 264 (cleaned up). Again, the representative's claim "need not be perfectly identical." *Id.* Instead, under Rule 23's "permissive standards," typicality will be satisfied where the representative's claims are

"reasonably coextensive with those of absent class members." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)).

Here, Plaintiffs have asserted claims that are undoubtedly typical of those of the Settlement Class Members they seek to represent. To start, Plaintiffs, like the Settlement Class Members, are PWS that have asserted claims for actual or threatened injuries caused by PFAS contamination.[185] In addition, Plaintiffs and the Settlement Class Members rely on the same common core of facts to allege that Defendants knowingly sold defective PFAS and failed to warn of those defects, leading to the actual or threatened contamination of their respective Water Sources.[186] Plaintiffs and the Settlement Class Members also assert a common damages theory that seeks recovery of the costs incurred in testing, monitoring, remediating and/or treating their Water Sources, either to monitor for PFAS contamination or to remediate existing PFAS contamination from their Drinking Water.[187] Lastly, like the Settlement Class Members, Plaintiffs allege that Defendants engaged in a scheme to fraudulently transfer assets to avoid potential liability for their role in manufacturing and selling PFAS and products containing PFAS.[188]

Because Plaintiffs' and the Settlement Class Members' claims arise out of the same course of conduct by Defendants, are based on identical legal theories, and assert similar damages, Rule 23(a)'s typicality requirement is satisfied. *Commissioners I*, 340 F.R.D. at 247. The Court should confirm its preliminary finding of typicality. *See Commissioners II*, 2022 WL 214531, at *3.

             e)        **Rule 23(a)'s Adequacy of Representation Requirement Is Satisfied.**

---

[185] Compl. at ¶¶ 14-16, 246-252; SA § 5.1.1.
[186] *Id.* at ¶¶ 103-134, 246-252, 262-264, 289, 308, 322-347.
[187] *Id.* at ¶¶ 14-16.
[188] *Id.* at ¶¶ 135-228, 381-407.

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Determining adequacy of representation, therefore, requires the Court to determine: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the entire class." *Parker v. Asbestos Processing, LLC*, No. 0:11-cv-01800-JFA, 2015 U.S. Dist. LEXIS 1765, at *24 (D.S.C. Jan. 8, 2015) (citations omitted). The adequacy-of-representation requirement is satisfied here because the Class Representatives have no interests antagonistic to the interests of the Settlement Class. With respect to counsel, this Circuit has expressed, "in terms of adequacy of representation, there are two requirements, lack of conflicts and class counsel's competency." *1988 Trust for Allen Children v. Banner Life Ins. Co*., 28 F.4th 513, 524 (4th Cir. 2022). Class Counsel Michael London, Scott Summy, Joseph Rice, and Elizabeth Fegan have no conflicts of interest with the Class, and a single absent class member alleges Class Counsel Paul Napoli might have a conflict of interest.[189] Further, Plaintiffs and Class Counsel have demonstrated a willingness and ability to vigorously prosecute the class claims as set forth in detail above. Lastly, Class Counsel have extensive experience in class actions, have zealously prosecuted the class claims in this litigation, and obtained impressive results in this MDL by way of this Settlement. *See, e.g.*, *Campbell,* 2021 U.S. Dist. LEXIS 16470, at *16. For all these reasons, the proposed Settlement satisfies Rule 23(a)'s adequacy of representation requirement.

### 2.    Rule 23(b)(3) is Satisfied.

---

[189] Attached as Ex. B is Class Counsel Paul Napoli's declaration addressing the City of Newburgh's objection ("Napoli Newburgh Decl.").

In addition to the requirements of Rule 23(a), the Settlement Class must also satisfy the predominance and superiority requirements of Rule 23(b)(3), other than manageability for trial. "An acceptable type of class provided for by Rule 23(b) is where the class is superior to other methods of adjudication because common questions of law or fact predominate over those of individual class members ('superiority requirement')." *Campbell*, 2021 U.S. Dist. LEXIS 16470, at *5.

Because a chief justification for class actions is efficiency, courts "must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." *Campbell*, 2021 U.S. Dist. LEXIS 16470 at *5-6 (citing 7AA Wright & Miller, Fed. Practice and Procedure § 1779 (3d ed. 2005)). Where common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." *Stillmock v. Weis Markets, Inc.,* 385 Fed. Appx. 267, 273 (4th Cir. 2010) (cleaned up).

Here, the common questions discussed above clearly predominate over any individual questions that the Settlement Class Members may have. Again, Plaintiffs and the Settlement Class Members are PWS that claim to have been injured by a common course of conduct that resulted in substantially similar damages to Plaintiffs and the putative Settlement Class Members. It would make no sense to decide these identical, overarching issues 14,000+ times. And while certain individual issues, such as damages, may exist for some Settlement Class Members, the nature and scope of the common questions in this case satisfy Rule 23(b)(3)'s predominance requirement.

In addition to efficiency, the Fourth Circuit recognizes other factors that favor class treatment over individual cases. These factors include the absence of a strong interest for the

Settlement Class Members to pursue individual litigation, particularly when considering the expense, burden, risk, and length of trial and appellate proceedings involved. *See Stillmock,* 385 Fed. Appx. at 275. Here, these concerns favor class treatment—and thus satisfy Rule 23(b)(3)'s superiority requirement—because there is a "sufficient desirability to concentrate the litigation in the forum given its familiarity with the relevant issues as the transferee Court." *Campbell*, 2021 U.S. Dist. LEXIS 16470, at *13. Another factor considered by the Fourth Circuit is whether class certification promotes consistency of results, which is not only applicable here but provides Defendants with the finality and repose they desire in pursuing a global resolution of its liability to PWS. *Gunnells v. Healthplan Servs.,* 348 F.3d 417, 429 (4th Cir. 2003) (in contrast to a class action proceeding, individual actions make a defendant vulnerable to the asymmetry of collateral estoppel). Finally, manageability concerns that would arise at trial are irrelevant because this is a settlement. *Amchem,* 521 U.S. at 620.  All of these salutary benefits of a class action apply here.

* * *

In sum, the Settlement satisfies all the criteria necessary for class certification under Rules 23(a) and (b)(3).

### D.    Rule 23(e)(2) and the *Jiffy Lube* Factors Support Granting Final Approval of the Settlement.

Federal Rule of Civil Procedure 23(e)(2) requires that the district court determine a proposed class settlement is fair, reasonable and adequate prior to granting approval of the settlement. To that end, in 1991 the Fourth Circuit in *Jiffy Lube* articulated four factors that a court should consider when making a fairness determination. *Jiffy Lube*, 927 F.2d at 158-59 (quoted above). It also articulated an additional five factors to evaluate the adequacy of the settlement. *Id.* at 159 (quoted above).

In 2018, Rule 23(e)(2) was amended to specify factors (in addition to those articulated by each Circuit) that a court should consider when determining if a proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Specifically, a court should consider whether:

(A)     the class representatives and class counsel have adequately represented the class;

(B)     the proposal was negotiated at arm's length;

(C)     the relief provided for the class is adequate, taking into account:

(i)     the costs, risks, and delay of trial and appeal;

(ii)     the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)     the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)     any agreement [made in connection with the proposal, which is] required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.[190]

An analysis of these relevant factors overwhelmingly favors final approval of the Settlement before the Court.[191]

1.     **The Class Representatives and the Undersigned Class Counsel Have Adequately Represented the Class (Rule 23(e)(2)(A)).**

---

[190] Fed. R. Civ. P. 23(e)(2) ; s*ee also, In re: Lumber Liquidators Chinese Manufactured Flooring Prods. Marketing, Sales Pract. and Prods. Liab. Litig*., 952 F.3d 471, 484 n. 8 (4th Cir. 2020) (reaffirming the *Jiffy Lube* factors while noting that the elements listed in the 2018 amendment to Rule 23(e)(2) differ from the Court's considerations but "almost completely overlap").
[191] Because the Rule 23(e)(2) factors overlap to a great extent with the *Jiffy Lube* factors, Plaintiffs have grouped together those factors that overlap or are interrelated.

As discussed above, the Class Representatives and Class Counsel are highly qualified to represent the interests of the Settlement Class. The Class Representatives are familiar with the Claims in this Litigation and they strongly support its approval as fair, reasonable, and adequate. In particular, and as attached hereto, Phase One Class Representatives declared that "the proposed settlement is fair, adequate, and reasonable and recommend[] that the Court approve[s]" the settlement because it "provides appropriate relief for Phase One Class members."[192] Phase Two Class Representatives likewise declare that "the proposed settlement is fair, adequate, and reasonable and recommend[] that the Court approve[s]" the settlement because it "provides appropriate relief for Phase Two class members."[193] The mediator, retired Judge Layn Phillips, has also confirmed the excellent results achieved due to Class Counsel's effective representation.[194]

Further, Class Counsel not only possess the experience with which to conduct the litigation and assess any settlement resolution; having been so intimately involved with the litigation for such a long time, they were fully apprised of all the relevant facts necessary to meaningfully and intelligently negotiate a class resolution of Plaintiffs' Claims. *See generally* Adv. Committee

---

[192] *See e.g.*, Phase One Class Representative Declarations in Support of Class Counsel's Motion for Final Approval of Class Action Settlement, including: Declaration of California Water Service Company, at ¶ 8; Declaration of the City of Camden, at ¶ 8; Declaration of City of Freeport, Illinois, at ¶¶ 8-9; Declaration of the City of Sioux Falls, at ¶ 8; Declaration of Coraopolis Water and Sewer Authority, at ¶ 8; Declaration of Dalton Farms Water System Owned and Operated by the Dutchess County Water and Waste Water Authority, at ¶ 8; Declaration of Martinsburg Municipal Authority, at ¶ 8; Declaration of Seaman Cottages, at ¶¶ 8-9; Declaration of the Township of Verona, at ¶ 8; Declaration of Village of Bridgeport, at ¶ 8; Declaration of City of Brockton, Massachusetts; and Declaration of City of Benwood, at ¶ 8, being filed concurrently herewith as Exs. C, D, E, F, G, H, I, J, K, L, M, and N, respectively.

[193] *See e.g.*, Phase Two Class Representative Declarations in Support of Class Counsel's Motion for Final Approval of Class Action Settlement, including: Declaration of Niagara County, at ¶ 8; Declaration of Pineville, at ¶ 7, being filed concurrently herewith as Exs. O and P, respectively.

[194] Declaration of Court-Appointed Mediator Layn Phillips in Support of Prelim. App. Mot. [ECF No. 3393-6] ("Phillips Prelim. App. Mot. Decl."), at ¶¶ 20-23.

Notes, 2018 Amendments to Rule 23(e)(2)(A), (B) (court should consider, in part, "whether counsel negotiating on behalf of the class had an adequate information base"). This is strongly supported by the fact that Plaintiffs were fully prepared to try the first bellwether trial when the Settlement was announced. Given this timing, Plaintiffs had extensive information with respect to the value of the Settlement and the Allocated Amounts and were able to weigh those amounts against any potential recovery at trial[195] while taking into consideration all relevant risks associated with continuing litigation, including the uncertainty of jury verdicts, trials generally, appeals and solvency issues. In addition, continued litigation would likely also include significant scientific and evidentiary hurdles, including challenges in establishing product identification given PFOA's ubiquitous nature, and overcoming the telomer Defendants' general defense that telomer AFFFs do not degrade to PFOA in the environment. As the Court knows, these were among the linchpin defenses of the Telomer Defendants.

For illustrative purposes only, at the *Stuart* trial, Plaintiff's counsel intended to proffer evidence that the compensatory damages associated with Stuart's Drinking Water claims were $76,750,290.00.[196] Assuming Plaintiff was fully successful at trial, then as it pertains to Drinking Water claims only, Plaintiff could have expected $76,750,290.00 in compensatory damages. Of course, this represents the combined total of Plaintiff's compensatory damages across all of the named defendants against whom Plaintiff intended to proceed to trial, which included, DuPont, National Foam, Inc., Kidde-Fenwal, Inc. and the 3M Company.[197] Moreover, testimony at trial would have established that the total Telomer Defendant contribution in *Stuart* was approximately

---

[195] Douglas of Gary J. Douglas in Support of Class Counsel's Motion for Final Approval of Class Settlement, for Final Certification of the Settlement Class, and in Response to Objections, at ¶¶ 6-13, being filed concurrently herewith, attached as Ex. Q.
[196] *Id*. at ¶ 9.
[197] *Id*. at ¶ 6.

4.5% ("Telomer Contribution").[198] Even assuming Defendants were held 100% responsible for the Telomer Contribution,[199] this would have resulted in Defendants being responsible for $3,453,763.05 in compensatory damages for Stuart's Drinking Water claims.[200] The allocation of fault attributable to Defendants is information to which Class Counsel was privy when negotiating the Settlement.[201]

Given the foregoing, this consideration weighs in favor of finding that the Settlement is fair, reasonable and adequate.

### 2. The Proposal Was Negotiated at Arm's Length (Rule 23(e)(2)(B)) and There is No Existence of Fraud or Collusion Behind the Settlement (*Jiffy Lube* Fairness Factor 3).

The Settlement is the product of vigorous arm's-length negotiations between Settlement Class Counsel and Defendants. The Settlement was achieved through court-ordered mediation that was conducted by an experienced mediator.[202] *See generally* Adv. Committee Notes, 2018 Amendments to Rule 23(e)(2)(A), (B) ("[T]he involvement of a neutral or court-affiliated mediator ... may bear on whether [negotiations] were conducted in a manner that would protect and further the class interests").

From the time the parties first began to informally discuss settlement in the Summer of 2020, Class Counsel continued to vigorously prosecute the PWS claims brought against Defendants and the other MDL defendants, which led to negotiations between the parties that were

---

[198] *Id*. at ¶ 7.
[199] *Id*. at ¶ 10.
[200] *Id*.
[201] *Id*. at ¶ 11.
[202] *See generally* Phillips Prelim. App. Mot. Decl.; *see also* Summy Prelim. App. Mot. Decl., at ¶¶ 17-23.

difficult, protracted, and often highly contentious.[203] With ups and downs, there was rarely longer than ninety (90) days that went by without some negotiations going forward.[204]

This continued after Judge Phillips was appointed by the Court in October 2022 to mediate the parties' negotiations, and Judge Phillips played a crucial role in supervising the negotiations, assisting in evaluating the strengths and weaknesses of the parties' respective positions and bridging the wide gaps in said positions.[205] And even as Judge Phillips oversaw multiple telephone, video conference and in-person mediation sessions, the negotiations remained difficult and contentious.[206] Indeed, it was the mediator's own proposal that finally resulted in a meeting of the minds after protracted, intensive negotiations. And even after the parties reached the MOU, the negotiations continued as the parties worked to hammer out the details of the final SA.

The adversarial nature of the negotiations and the aid provided by Judge Phillips are factors that weigh in favor of final approval. *S.C. Nat. Bank v. Stone*, 139 F.R.D. 335, 345-46 (D.S.C. 1991) (although supervision "is not mandatory in order to determine a settlement is fair, such participation can insure that the parties will negotiate in good faith without collusion."); *Robinson v. Carolina First Bank NA*, 2019 U.S. Dist. LEXIS 26450, *27 (D.S.C. Feb. 14, 2019) ("supervision by a mediator lends an air of fairness to agreements that are ultimately reached"); Fed. R. Civ. P. 23(e)(2)(B).

---

[203] *See generally* Summy Prelim. App. Mot. Decl., London Prelim. App. Mot. Decl., and Phillips Prelim. App. Mot. Decl.
[204] Summy Prelim. App. Mot. Decl., at ¶ 18.
[205] *Id*. at ¶¶ 10, 17, 23; *see also* London Prelim. App. Mot. Decl., at ¶ 22, and Phillips Prelim. App. Mot. Decl., at ¶¶ 9-19.
[206] Phillips Prelim. App. Mot. Decl., at ¶ 19.

In addition, courts have held that where "the amount of the [attorneys'] fee is left entirely to the Court's discretion," as is the case here,[207] "the possibility of collusion among counsel" is "exponentially decrease[d]." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 845 (E.D. La. 2007). As Judge Fallon explained in *Murphy Oil*, "[b]ecause the parties have not agreed to an amount or even a range of attorneys' fees, and have placed the matter entirely into the Court's hands for determination, there is no threat of the issue explicitly tainting the fairness of settlement bargaining." *Id.* (citation omitted.").

For these reasons, this consideration weighs in favor of finding that the Settlement is fair, reasonable and adequate.

### 3. The Relief Provided is Fair, Reasonable, and Adequate, Taking Into Account the Costs, Risks, and Delays of Trial and Appeals (Rule 23(e)(2)(C)(i)).

Under the terms of the Settlement Agreement and the PAO, Defendants paid $1,185,000,000, which was deposited into a Court-approved QSF to be distributed to Settlement Class Members.[208] Following appropriate deductions for any forthcoming Court-approved fees and costs, those funds will be allocated equitably among the Settlement Class Members under the Allocation Procedures, which rely principally on flow rates and degree of PFAS contamination in each system to calculate the final Allocated Amount.[209] The Settlement Amount will help, in part, to ameliorate the costs faced by PWS in developing and implementing necessary, cost-effective systems to treat the water sources contaminated by Defendants' PFAS. Whether the Settlement Agreement is adequate requires weighing "the cost and risk involved in pursuing a litigated

---

[207] Mot. for Attorneys' Fees, §§ IV.A and V; *see also* Declaration of Brian T. Fitzpatrick in Support of Mot. for Attorneys' Fees [ECF 3795-5] ("Fitzpatrick Fee Decl."), at ¶ 12, and SA § 11.2.
[208] SA §§ 2.41, 2.50, 3.2, 6.1; Mot. for Attorneys' Fees, Ex. K (providing proof of deposit).
[209] *See generally* Allocation Procedures.

outcome." Adv. Committee Notes, 2018 Amendments to Rule 23(e)(2)(C), (D). In making that assessment, "courts may need to forecast the likely range of classwide recoveries and the likelihood of obtaining such results." *Id.* Several of the *Jiffy Lube* Fairness and Adequacy Factors, discussed herein, address these considerations.

> a)     **The Strength of Plaintiffs' Case on the Merits and Defendants' Defenses Weigh in Favor of Approval of the Settlement (*Jiffy Lube* Adequacy Factors 1&2).**

Plaintiffs are confident in the strength of their allegations and supporting evidence, but success is never guaranteed. As is true with any case, "[p]laintiffs' ability to prevail on the merits is uncertain. The Settlement confers relief that might well not be achievable through continued litigation." *Gray v. Talking Phone Book*, 2012 U.S. Dist. LEXIS 200804, at *16 (D.S.C. Aug. 10, 2012). When reviewing the adequacy of a proposed settlement, "the court can assess the relative strengths and weaknesses of the settling parties' positions to evaluate the various risks and costs that accompany continuation of the litigation." *Case v. French Quarter III LLC*, 2015 WL 12851717, at *8 (D.S.C. July 27, 2015).

Before the Settlement was reached, the *Stuart* case was trial ready and Class Counsel believed, and continue to believe, that they have a strong case against Defendants. Class Counsel submit that Defendants were fully cognizant of all this credible evidence and that the strength of Plaintiffs' position is what drove the Settlement Amount agreed to by Defendants.

Of course, the outcome of any case that is tried on the merits is uncertain and, for its part, Defendants have taken the position that it has substantial legal and factual arguments, which also impacted the parties' negotiations. As Judge Phillips attests in his declaration, "[t]o the extent that the settlement negotiations were difficult and contentious, that was because all involved held firm to their convictions that they had the stronger factual and legal arguments on issues relevant to liability,

damages and otherwise, leading to robust debates on virtually every aspect of the settlement, including the ultimate outcome of motions, trials, and appeals, if a negotiated agreement was not achieved."[210]

As in many cases, uncertainty favors settlement because "hurdles to proving liability, such as proving proximate cause would remain and would necessitate expensive expert testimony." *Commissioners I*, 340 F.R.D. at 250 (internal quotation marks omitted); *LandAmerica*, 2012 U.S. Dist. LEXIS 97933, at *11-12 (where defendants "vigorously dispute the Plaintiffs' claims on numerous grounds," "their dispute underscores … the uncertainty of the outcome[.]"); *S.C. Nat. Bank*, 139 F.R.D. at 340 (settlement favored because the legal and factual issues posed a risk to both sides).

Notably, as detailed above, it is estimated that Defendants are responsible for only three to seven percent of the MDL defendants' total alleged PFAS-related liabilities. Correspondingly, notwithstanding Plaintiffs' confidence in the strengths of their proofs against Defendants, this is a factor that could have potentially reduced any favorable jury award. It was therefore a consideration in agreeing to the Settlement Amount. *See e.g. Flinn*, 528 F.2d at 1173-74 (the fact that a cash settlement "'may only amount to a fraction of the potential recovery' will not per se render the settlement inadequate or unfair.").

Accordingly, these factors confirm that the Settlement is reasonable.

**b)     The Complexity, Expense, and Likely Duration of the Litigation Weigh in Favor of Approval of the Settlement (*Jiffy Lube* Adequacy Factor 3).**

"In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *See* 4 *Newberg on Class Actions* § 11.50 (4th ed.). *Accord, e.g., South Carolina Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1426 (D.S.C. 1990) (finding that the "likely duration and associated expenses of continued

---

[210] Phillips Prelim. App. Mot. Decl., at ¶ 19.

litigation likewise favor approval of the settlement") (citing *Warren v. City of Tampa*, 693 F. Supp. 1051, 1059 (M.D. Fla. 1988)).

Under the Settlement Agreement, Defendants did not admit liability and expressly declined to waive any affirmative defenses. If the Settlement Agreement is terminated, the parties agree to return to their pre-settlement litigation positions. Only the *Stuart* case has been prepared for trial, so the vast majority of water providers would restart their years-long litigation – after four-and- a-half years have already passed in the MDL. It could easily have taken many additional years for Settlement Class Members to make similar progress in their own cases. And there would have been the risk of recovering nothing or recovering an uncertain amount only after years of trial and appeals. Adding years of litigation for PWS runs counter to having to expend funds in the near term to comply with the pending EPA MCLs for PFAS. This concern about the need for a timely resolution is especially relevant here, because the settlement addresses important public safety concerns. In the context of opt-outs, this Court presciently cautioned about the years of delay that would ensue in the absence of a settlement:

> Let me be honest for folks who are considering opting out. Let me just be honest. We are probably several years away from me returning cases that aren't resolved to my colleagues in the district court. My goal is to get it all resolved, but if I can't do it, I'm going to send it back to my 675 colleagues. *** So, realistically, we're talking about years before it would ever be remanded. And then you know your case of your individual dockets, likely years more before you'd actually get to a trial. *** I would think if there were appeals and so forth, you're probably talking about a decade before it would all be over. So you just need to weigh that.[211]

Indeed, although the claims alleged by the Settlement Class Members involve straightforward tort principles, litigating their cases would involve sophisticated factual, expert,

---

[211] *See* Transcript of July 14, 2023 CMC, at 17:10-18:7.

and legal analysis that in many cases will require hiring multiple consulting and testifying experts. A liability determination may turn on resolution of complex fact questions based on sophisticated scientific evidence, including analyses of the PFOA at a particular site to determine whether it is branched or linear or both, and if both, in what proportions. Further complicating the matter is the fact that Defendants did not manufacture AFFF directly, so it could be more difficult for plaintiffs to prove that it is the Defendants' PFOA in their PWS.[212] And looming over all of this is the possibility that a jury could find that the government contractor defense applied in a particular case. All of these uncertainties make settlement especially desirable.

This complexity translates into time-consuming and expensive litigation. Preparing the PWS cases for potential bellwether trials alone required that Plaintiffs engage numerous expert witnesses at a cost totaling hundreds of thousands of dollars, and that is before a single trial has even been conducted. Developing these specific expert opinions for hundreds of PWS presents the real potential for enormously exorbitant costs.

Class Counsel has also expended time and effort in other ways to put the PWS cases into the best position possible for negotiating a potential settlement. For the *Stuart* trial, a core trial team was prepared to present the best evidence against Defendants in a precise, cogent and persuasive manner, as Plaintiffs have done on prior occasions. The firms involved invested extraordinary amounts of time in these efforts without any guarantee of future recovery due to the contingency nature of the litigation. These risks and costs were also part of the parties' calculus in negotiating the proposed Settlement and should be considered by the Court.

Moreover, any judgment would likely be subject to lengthy appeals, whereas the Settlement provides more immediate results and benefits to Settlement Class Members. As one

---

[212] Summy Prelim. App. Mot. Decl., at ¶ 19; London Prelim. App. Mot. Decl., at ¶¶ 26-30.

court in this Circuit noted: "[E]ven after three and a half years of litigation, the road to recovery—particularly for the class as a whole—likely would be protracted and costly if the settlement were not approved." *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 480 (D. Md. 2014).

In brokering the proposed Settlement, Class Counsel carefully evaluated all the hurdles involved in establishing Defendants' liability, including getting past *Daubert* and summary judgment in cases beyond *Stuart*, as well as the possibility of a future trial and appeal. Based on these considerations, Class Counsel submit that it is in the best interest of all Settlement Class Members to resolve the claims through the proposed Settlement in order to avoid such risks. *See Gray*, 2012 U.S. Dist. LEXIS 200804, at *5-6, 15 (settlement negotiations involved consideration of avoiding the significant risk and burden of continuing litigation).

For these reasons, this factor weighs heavily in favor of granting final approval to the Settlement.

> c)    **The Posture of the Case at the Time of the Settlement Supports Approval of the Settlement (*Jiffy Lube* Fairness Factor 1).**

As set forth in detail above, the parties entered into the MOU on June 1, 2023, only four days before the first PWS bellwether trial – the *Stuart* trial – was set to begin on June 5, 2023. Prior to that, for four-and-a-half years – since this MDL's inception in December 2018 – the parties engaged in extensive, non-stop fact and expert discovery, as well as motion practice in an effort to move this MDL forward efficiently and effectively, and they did not let a global pandemic stop them, with the first of over 150 depositions in this MDL being taken remotely in the earliest days and months of the pandemic. The culmination of their efforts resulted in trial counsel for both parties being ready to present the *Stuart* case to a jury, a process that included, among other things, analyzing and evaluating hundreds of thousands of documents and paring them down to the final core exhibit list, arguing evidentiary objections, securing live witnesses, identifying deposition cuts,

and engaging in motion practice (i.e., summary judgment motions, *Daubert* motion*s,* and motions *in limine*). In this instance "all discovery ha[d] been completed and the cause [was] ready for trial" which is "important" because it ordinarily assures sufficient development of the facts to permit a reasonable judgment on the possible merits of the case." *Flinn v. FMC Corp*., 528 F.2d 1169, 1173 (4th Cir. 1975).[213]

Notably, the PWS cases, in and outside of this MDL, were much further along than those in other settlements that are routinely approved. Indeed, the Fourth Circuit has affirmed approval of a class settlement "reached so early in the litigation that no formal discovery had occurred, [because] the court found that documents filed by plaintiffs and evidence obtained through informal discovery yielded sufficient undisputed facts" to enable a decision regarding the merits of the claims. *Jiffy Lube*, 927 F.2d at 159 (vacated and remanded on other grounds).[214]

This factor supports final approval of the Settlement.

> **d)    The Extent of Discovery Conducted Supports Approval of the Settlement (*Jiffy Lube* Fairness Factor 2).**

Preliminary informal exploratory settlement discussions began in the Summer of 2020. By that time, the parties were already well along in the development of their positions and had gathered a substantial cache of relevant evidence on critical elements of the claims at issue. In fact, the PEC had by that point already served voluminous discovery requests on approximately twenty (20) core

---

[213] Ten (10) days before the *Stuart* trial was set to begin, Defendants were severed from the trial primarily due to the bankruptcy filing of co-Defendant, Kidde-Fenwal, Inc. *See* Order dated May 26, 2023, 2:18-mn-02873-RMG [ECF No. 3183].

[214] *See also Newbanks v. Cellular Sales of Knoxville, Inc.*, No. 12-1420, 2015 U.S. Dist. LEXIS 191550, at *4-5, 14 (D.S.C. Feb. 4, 2015) (discovery was sufficient to allow evaluation of the merits of the case where parties exchanged thousands of pages of documents during the discovery process); *Mullinax v. Parker Sewer & Fire Subdistrict*, No. 12-cv-01405, 2014 U.S. Dist. LEXIS 199340, at *16 (D.S.C. Mar. 11, 2014) (approving settlement "reached after nearly 10 months of litigation that had narrowed and defined the legal and factual issues as clearly as possible").

defendants in the MDL, including Defendants, and Science Day (October 4, 2019) had already convened, at which the parties presented their respective positions regarding some of the key scientific issues at issue in this case. Before reaching settlement, over 4.6 million documents had been produced in discovery, which amount to over 37.4 million pages. The parties also collectively completed 162 depositions of fact and expert witnesses.

Accordingly, as the extensive and highly contentious settlement discussions unfolded between the parties over the next couple of years, general liability discovery as to all of the core MDL defendants, including Defendants, was substantially completed and available for use, including in the *Stuart* trial. To this end, both sides, along with Judge Phillips, were armed with this extensive discovery and primed to make well-informed and intelligent decisions regarding the credibility of liability and its impact on any proposed Settlement. These facts and circumstances support final approval of the proposed Settlement. *See, e.g., Newbanks,* 2015 U.S. Dist. LEXIS 191550, at *4-5, 14; *Mullinax*, 2014 U.S. Dist. LEXIS 199340, at *16.

> **e)** **Counsel's Experience in this Type of Case and Opinions Supporting the Settlement Weigh in Favor of Approval of the Settlement (*Jiffy Lube* Fairness Factor 4).**

Because Plaintiffs and Defendants are represented by capable counsel who are experienced in complex, large-scale environmental litigation, their opinions supporting the proposed Settlement weigh in favor of granting final approval. *Robinson,* 2019 U.S. Dist. LEXIS 26450, at *13-14, 18-19; *Flinn*, 528 F.2d at 1173 (the opinion and recommendation of experienced counsel "should be given weight in evaluating the proposed settlement."); Fed. R. Civ. P. 23(e)(2)(A).

Indeed, courts have recognized that class counsel's experience in similar litigation allows for a realistic assessment of the merits of a claim and the desirability of a settlement. *Bass v. 817 Corp.,* 2017 U.S. Dist. LEXIS 225380, *5-6 (D.S.C. Sept. 19, 2017). This Court has previously

56

given consideration to the "parties' history of litigating similar, if not identical issues, combined with Plaintiff's counsel's extensive experience of the same" as "indicat[ing] the settlement was negotiated at arm's length." *Commissioners I*, 340 F.R.D. at 249.

Here, Class Counsel has extensive experience in complex environmental litigation, class actions, and settlements of large, nationwide cases. Indeed, this Court appointed four of them as Co-Lead Counsel to oversee the prosecution of this MDL out of recognition of their experience. Their recommendation of the Settlement is informed by their acquired knowledge.

Scott Summy has litigated and resolved several large-scale cases involving water providers who sought the costs of removing chemicals from their water.[215] As just one example, in 2009, he successfully settled MDL-wide claims brought by water suppliers against the nation's major oil companies for contaminating their drinking water supplies with the gasoline additive, MTBE.[216]

Michael London has devoted his entire legal career to representing consumers and injury victims, primarily in complex litigation settings involving mass torts.[217] As just one example, Mr. London led the seminal PFAS litigation – *In re: E.I. du Pont de Nemours and Company C-8 Pers. Injury Litig.*, MDL No. 2433 (S.D. Ohio).[218] To this precise end, he has previously negotiated two other PFOA settlements with Defendants, the first for $671 million and the second for over $70 million. *Id.* at ¶ 12.

Joseph Rice, who was appointed Class Counsel after Plaintiffs' Mot. for Prelim. App. was filed,[219] has litigated and resolved some of the largest complex cases in history. He is routinely touted as the one of the foremost strategic minds in the country when it comes to settlement

---

[215] *See generally* Summy Prelim. App. Mot. Decl.
[216] *Id.*
[217] S*ee generally* London Prelim. App. Mot. Decl.
[218] *Id.*
[219] Rice Appointment Order.

negotiations and end-stage litigation and has been integrally involved in structuring some of the most significant and complex deals in the country.

Elizabeth Fegan, who was appointed Class Counsel, has litigated and resolved complex class actions involving consumers, third party payors, and other victims of fraud, defective products, and environmental contamination.[220] As a result of her track record, two courts have recently *sua sponte* appointed her lead counsel in large class actions, i.e. *In re TikTok, Inc., Consumer Privacy Litigation*, MDL No. 2948 (N.D. Ill.) (second largest biometric privacy class settlement); *In Re: Kia Hyundai Vehicle Theft Marketing, Sales Practices, and Prods. Liab. Litigation*, MDL 3052 (recently announced class settlement valued at more than $750 million).[221]

Considering proposed Class Counsel's broad knowledge of the facts surrounding this litigation, coupled with their extensive experience in class actions and resolving litigations involving similar issues, their endorsement of the Settlement supports final approval.[222]

> **f)    The Insolvency Risk of the Defendants and Likelihood of Recovery on a Litigated Basis Supports Approval of the Settlement (*Jiffy Lube* Adequacy Factor 4).**

Although DuPont has not indicated any plans to pursue bankruptcy protection (like its co-defendant in the MDL, Kidde-Fenwal, Inc.), it is always a possibility. The potential inability to pay litigated judgments weighs in favor of the adequacy of finally approving the billion-dollar settlement. *See Lumber Liquidators*, 952 F.3d at 485; *see also In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Prods. Liab. Litig.,* MDL 2672, 2016 WL 6248426, at *11 (N.D.

---

[220] Declaration of Elizabeth A. Fegan in Support of Prelim. App. Mot. [ECF No. 3393-7] ("Fegan Prelim. App. Decl.").
[221] *Id.*
[222] *See also* Ex. B, Napoli Newburgh Decl.

CA. October 25, 2016) (noting that a settlement class could also receive nothing not only "'because of the risks of litigation *but also because of the solvency risks*…") (emphasis added).

### 4.    The Relief Provided is Adequate, Taking Into Account the Effectiveness of the Proposed Method of Distributing Relief to the Class (Rule 23(e)(2)(C)(ii)).

The parties agreed to the Allocation Procedures which are Exhibit C to the Settlement Agreement.[223]  This protocol will be used to calculate Base Scores, which are objectively derived from flow rates of Impacted Water Sources and PFAS concentrations, and was made available to all class members through the Notice Program, including the Court-approved website.[224] Class Counsel employed an expert in the field of liability forecasting (Timothy G. Raab) to analyze public information provided by Class Counsel, which included: (a) state data showing PFAS detections and non-detections in certain PWSs; (b) the EPA's Third Unregulated Contaminant Monitoring Rule (UCMR 3) data showing PFAS detections and non-detections of the PWSs that were subject to UCMR3; (c) information regarding the PWSs that are currently subject to UCMR5 and applicable state or federal laws; and (d) PWS identified in the SDWIS.[225]  Mr. Raab's analysis permitted class counsel to divide the fund between Phase One and Phase Two members of the Settlement Class. The Allocation Procedures will then be employed to allocate funds under the guidance of the Court-Appointed Claims Administrator (Dustin Mire), under the oversight of the Court-appointed Special Master (Matt Garretson).

The Allocation Procedures were developed to allocate and distribute the Settlement Funds equitably among Eligible Class Members based on objective criteria under the supervision of a

---

[223] ECF No. 3393-2, at pp. 76-99.
[224] *See* DuPont-Allocation-Procedures-Updated.pdf (pfaswatersettlement.com).
[225] Raab Prelim. App. Decl., at § III.

neutral master. This method of distribution more than adequately distributes the Settlement Fund and therefore supports final approval of the Settlement.

### 5. The Relief Provided is Adequate, Taking Into Account the Terms of Any Proposed Award of Attorneys' Fees, Including Timing of Payment (Rule 23(e)(2)(C)(iii)).

As discussed above, Settlement Class Counsel filed a Motion for Attorneys' Fees and Costs [ECF No. 3795] seeking an award of attorneys' fees equal to only 8% of the Settlement in the amount of $94,800,000 (with 5% of that amount, or $4,740,000 held back for future administration), and expense reimbursements totaling $2,136,213.21. The parties did not negotiate a particular fee amount. The award of any attorneys' fees or reimbursement of any cost, including the allocation between and amongst the Attorneys, shall be determined by the Court.

The parties did not negotiate any set attorneys' fee amount or even any range of fees. Rather, the attorneys' fee issue is left entirely to the Court's discretion. This Court will thus determine an appropriate fee award and the timing of any payment of fees. As Class Counsel's fee request is below the median of fee awards in class actions of this magnitude,[226] the relief provided to class members is adequate. *See, e.g., Stayler v. Rohoho, Inc.*, Case No.: 2:16-cv-1235-RMG, 2019 U.S. Dist. LEXIS 58025, at *4 (D.S.C. Apr. 4, 2019) ("The settlement amount, independent of the attorneys' fees and costs, is . . . fair and reasonable[.]" ) (citing *Silva v. Miller*, 307 F. App'x 349, 351 (11th Cir. 2009); *Morris v. S. Concrete & Constr., Inc.,* Case No.: 8:16-cv-01440-DCC, 2019 U.S. Dist. LEXIS 80429, at *5 (D.S.C. May 13, 2019) (same); Notably, not a single one of the 14,000+ class members has voiced any objection to the attorneys' fees sought by class counsel.

### 6. The Relief Provided is Adequate, Taking Into Account Any Agreement Required to be Identified Under Rule 23(e)(3) (Rule 23(e)(2)(C)(iv)).

---

[226] Fitzpatrick Fee Decl., at ¶ 16.

Under Rule 23(e)(3), the parties to a proposed class settlement "must file a statement identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3). The only agreement entered into by the parties here is the Settlement Agreement. One exhibit thereto was filed under seal and relates to the Walk-Away Right in SA § 10.1. The parties did not enter into any other agreements, and the Settlement contains all terms agreed to by the parties. Therefore, there are no additional agreements for the Court to consider.

### 7. The Settlement Treats Class Members Equitably Relative to Each Other (Rule 23(e)(2)(D)).

The question raised by this consideration is "whether the apportionment of relief among class members takes appropriate account of difference among their claims . . . ." Adv. Committee Notes, 2018 Amendments to Rule 23(e)(2)(C), (D). As discussed at length above, the parties developed Allocation Procedures to allocate the Settlement Fund among all members of the Settlement Class taking into consideration objective criteria focused on flow rates of Impacted Water Sources and PFAS concentrations. The Court-appointed Claims Administrator is experienced and adept at administering the Allocation Procedures neutrally and fairly. Taking the numerous relevant, objective considerations into account, the Allocation Procedures apportion the relief in an equitable fashion among differently situated members of the Settlement Class.

Moreover, the entire structure of having both Phase One and Phase Two Class Members identified in the Settlement was designed to take into account the difference amongst the claims of the Class Members and thereby ensure equitable treatment for all. In particular, the Settlement allocates 55% of the Settlement Funds for Phase One Class Member while 45% is allocated to Phase Two Class Members. Again, this was specifically fashioned in order to ensure equality as between Class Members with varying types of claims.

### E. Given the Small Number of Objections, and Their Lack of Validity, the Overall Reaction of the Class Overwhelmingly Supports Approval (*Jiffy Lube* Adequacy Factor Five).

In a case of this magnitude, involving large individual claims asserted by sophisticated entities, one would expect a large number of objections were there any concerns about the Settlement. In fact, there are only a handful of objections, and most are filed by a single law firm. These facts strongly support the fairness of the Settlement. In any event, the objections themselves are meritless.

### 1. The Small Number of Objections Supports a Finding of Fairness.

With respect to the fairness of the Settlement, under *Jiffy Lube*, a court is to consider "the degree of opposition to the settlement." Of the over 14,000 PWS identified as Class Members, only twenty-five (25) parties lodged objections,[227] and, of those, two (2) objectors do not even claim to be Class Members.[228] This means that only approximately 0.16% of the known Settlement Class Members lodged objections. Moreover, seventeen (17) of the twenty-three (23) – three quarters of the total - filings were filed as cut-and-paste Objections by a single law firm, Marten Law.[229] As explained in detail below, canned objections by a single law firm (the "Marten Law

---

[227] This includes twenty-three (23) filed Objections, however, three (3) plaintiffs are included in the Objection filed by the law firm Rigano, LLC.

[228] These include Brazos River Authority and Lower Colorado River Authority.

[229] *See* the redlines comparing Marten Law Objection on behalf of City of Fort Worth [ECF No. 3954] to their Objection on behalf of North Texas Municipal Water District ("NTMWD") [ECF No. 3960], and to their Objection on behalf of City of Vancouver [ECF No. 3962], attached hereto as Ex. R. These are but two examples illustrating that Marten Law's Objections are near identical copies of each other, with redlines showing changes only to the name of the objecting entity. Some of the Marten Law Objections contain other slight differences as well, but these add to rather than resolve the confusion, because the reason for their inclusion in some but not others is seemingly random. For example, the NTMWD Objection adds a paragraph asserting (incorrectly) that the release might cover claims for air pollution (*see* ECF No. 3960, at p. 6). Presumably all objectors represented by Marten Law are as exposed to air as NTMWD, yet such allegation is not made in all Marten Law Objections. Additionally, some changes are not only random but so devoid of purpose that they invite the question of why they were made at all. For example, the City of

Objectors") should not be separately counted as unique objections. But even taking the number of objectors at face value, 25 out of more than 14,000 is a miniscule fraction. That small percentage is powerful evidence that the settlement is fair, reasonable, and adequate. Notably, there were *zero* objections to Class Counsel's request for attorneys' fees and costs.

The Fourth Circuit has consistently found that the existence of only a small number of objections supports settlement. *See, e.g., McAdams v. Robinson*, 26 F.4th 149 (4th Cir. 2022) (affirming district court's approval of a settlement where only 0.04% of the class objected); *Herrera v. Charlotte Sch. of Law, LLC*, 818 Fed. Appx. 165 (4th Cir. 2020) (affirming district court's approval of settlement where only 4% of the class objected); *Lumber Liquidators* , 952 F.3d at 485 (finding support for the settlement's adequacy where objecting members equated to about 0.006% of total members); *1988 Tr.*, 28 F.4th at 527 (affirming approval of a class settlement where only one class member objected).

District courts within the Fourth Circuit have likewise held that a small number of objections strongly supports the fairness of a settlement. *See, e.g., Clark v. Experian Information Solutions, Inc.,* No. 8:00-1217-22, 1991 U.S. Dist. LEXIS, at *19 (D.S.C. Jan. 14, 2004) (noting in support of fairness that "only a very small percentage of potential Class Members either opted out of inclusion in the Class or objected" to the settlement); *Haney v. Genworth Life Ins. Co.*, No. 3:22cv55, 2023 U.S. Dist. LEXIS 15589, at *19 (E.D. Va. Jan. 30, 2023) ("The small number of objections teach that the settlement is viewed favorably by the Class. Accordingly, this factor

---

Vancouver Objection [ECF No. 3962] and several others switch references from "U.S. Environmental Protection Agency" to "EPA," along with other similarly meaningless edits. Although the motive underlying these differences is unknown, some of the differences—of which there are, generally speaking, very few between the Marten Law Objections—appear to have been made simply to avoid a redline that would show *no* changes (other than to the objecting entity names).

weighs in favor of finding that the award of attorneys' fees is reasonable."); *Krakauer v. Dish Network, L.L.C.*, No. 14-cv-333, L.L.C., 2018 U.S. Dist. LEXIS 203725, at *10 (M.D.N.C. Dec. 3, 2018) ("The absence of a significant number of objections to the settlement indicates that 'counsel have achieved a superior result for the class and weighs in favor of their requested award.'" (citation omitted)); *Scott v. Family Dollar Stores, Inc.*, No. 308CV00540MOCDSC, 2018 WL 1321048, at *2 (W.D.N.C. Mar. 14, 2018) (finding the settlement to be fair where there were only 50 objections); *In re Wachovia Corp. Erisa Litig.*, No. 2-cv-03707, 2011 U.S. Dist. LEXIS 123109, at *20 (W.D.N.C. Oct. 24, 2011) ("The relatively few number of objections demonstrates the satisfaction of Class Members with the settlement result, as well as their implicit approval of its terms" (citation omitted)); *Kay Co. v. Equitable Production Co.*, 749 F. Supp. 2d 455, 465 (S.D.W. Va. 2010) ("[T]he minute number of objections and exclusions among a large class, almost all of whom were individually notified, suggests that the class members are overwhelmingly pleased with the settlement result.").[230]

---

[230] Cases from elsewhere in the country are in accord. *See, e.g., Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (low number of objections compared to putative class members supported fairness of settlement); *In re Wireless Tele. Fed. Cost Recovery*, 396 F.3d 922, 933 (8th Cir. 2005) (affirming district court's finding that the small number of objectors in favor of settlement, noting that "[t]he district court has a duty to the silent majority as well as the vocal minority" (citation omitted)); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 812 (3d Cir. 1995) ("In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors."); objectors did not "favor derailing settlement" and articulating an assumption that "silence constitutes tacit consent to the agreement"); *Zapeda v. Paypal, Inc.*, No. 10-2500, 2017 WL 1113293, at *15 (N.D. Cal. Mar. 24, 2017) ("Given the relatively small number of objections and opt-outs, the Court finds that the reaction of the class to the settlement is positive, which favors approving the settlement."); *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 389 (E.D. Pa. 2015) (that "only approximately 1% of Class Members filed objections" deemed "impressive" and "weigh[ed] in favor of approving the settlement"), *aff'd*, 821 F.3d 410 (3d Cir. 2016); *Wren v. RGIS Inventory Specialists*, No. 06-05778, 2011 WL 1230826, at *11 (N.D. Cal. Apr. 1, 2011) (0.020% objection rate "strongly support[ted] approval of the settlement"); *Nat'l Treasury Employees Union* v. U.S., 54 Fed. Cl. 791, 798 (2002) ("[T]here is no question that the small number of objections weighs in favor of the court's approval.").

The paucity of Objections is particularly telling in a case, like this one, in which substantial dollars are at issue for each class member. *See, e.g., Neuberger v. Shapiro*, 110 F. Supp. 2d 373 (E.D. Pa. 2000) (finding that the lack of objection "may be read to favor approval" where the "plaintiff class members [had] strong economic incentives to object"); *Lachance v. Harrington*, 965 F. Supp. 630, 645 (E.D. Pa. 1997) (giving weight to low number of objections from class members, "who certainly had sufficient [financial] incentive to object"); Manual for Complex Litigation, (Fourth), § 21.62 ("The court should interpret the number of objectors in light of the individual monetary stakes involved in the litigation . . . .When the recovery for each class member is high enough to support individual litigation, the percentage of class members who object may be an accurate measure of the class's sentiments toward the settlement.").

Here, of course, each Settlement Class Member has a huge stake in the litigation, and thus has every incentive to object if the Settlement Class Member were to deem the settlement to be inadequate. Again, this infinitesimal number of objectors strongly supports the fairness of the Settlement.

### 2. The Small Number of Objections is Especially Significant Because Virtually All are Cut-and-Paste Objections.

Out of 23 Objections filed (by 25 objectors) in connection with the Settlement with Defendants, 17 were filed by a single law firm, Marten Law. These filings should be stricken or heavily discounted for multiple reasons.

**First**, the Marten Law Objectors failed to comply with the 2018 amendment to Rule 23, which states in relevant part that any objection "*must* state whether it applies only to the objector, to a specific subset of the class, or to the entire class . . . ." Fed. R. Civ. P. 23(e)(5)(A) (emphasis added). The italicized language of the Rule makes clear that this requirement is mandatory. Moreover, the mandatory nature of the requirement is confirmed by the Advisory Committee

Notes, which state that "[o]ne feature *required* of objections is specification whether the objection asserts interests of only the objector, or of some subset of the class, or of all class members." (Emphasis added.) Not only do the Marten Law Objectors not comply with the Rule; their multiple filings make it impossible for the Court or the parties to determine if a particular class member's objection applies just to it, to a subset of class members, or to the entire class.

As discussed below, many of the specific objections are verbatim in most (but not all) of the Objections. Do those arguments only apply to the specific objectors who made them? Do they apply to a larger subset of the class? Or do they apply to the whole class? The myriad objections provide no clue. Based on this failure to comply with the Rule 23(e)(5)(A)'s mandatory requirement, all of the Marten Law Objectors' objections should be stricken. *See, e.g.,* Order Granting Final Approval at 13, *In Re Cathode Ray Tube (CRT) Antitrust Litigation*, No. 4:07-cv-05944 (N.D. Cal. Jul 13, 2020), ECF No. 5786 (striking objections for, *inter alia,* failing to comply with Rule 23(e)(5)(A) in that the objections "do not specify whether they apply 'only to the objector, to a specific subset of the class, or to the entire class'"), attached as Ex. S.

**Second**, the Marten Law Objectors' objections represent an egregious cut-and-paste job, with many but not all arguments appearing verbatim or virtually verbatim.[231] As just one example, nearly all of the objections contain the frivolous argument that the settlement cannot be approved because there was no prior bellwether trial and verdict.[232] As discussed below, no case requires a

---

[231] *See also supra*, Section IV.E.1, n.229, and Exhibit R attached hereto, containing redlines comparing three Marten Law Objectors' filings.

[232] *See* Objections from: City of Fort Worth [ECF No. 3954 at 25-26]; Metropolitan Water District [ECF No. 3955 at 26-27]; NTMWD [ECF No. 3960 at 26-27]; City of Vancouver [ECF No. 3962 at 26-27]; Lakewood Water District [ECF No. 3965 at 26-27]; City of DuPont [ECF No. 3968 at 19-20]; City of Airway Heights [ECF No. 3970 at 22-23]; City of Tacoma [ECF No. at 26-27]; Hannah Heights Owners Association [ECF No. 3974 at 17-18]; City of Las Cruces [ECF No. 3978 at 26-27]; City of Dallas [ECF No. 3979 at 25-26]; Lakehaven Water & Sewer [ECF No. 3983 at

bellwether trial prior to settlement, and many thousands of settlements have been approved without bellwether trials. Such specious (and repetitive) objections, especially filed by attorneys (and not *pro se* by objectors), are unacceptable.[233]

Indeed, in many instances, the objections regarding the lack of a bellwether trial even appear on the exact same pages from one filing to another, confirming the cut-and-paste and essentially verbatim nature of the filings.[234] As another example of sloppy cut-and-paste work, Metropolitan included a section in its objection entitled "The Agreement ignores the challenges of PFAS treatment at scale."[235] In its objection, Metropolitan Water District describes the $3 billion water recycling program it is building.[236] But four other Marten Law Objectors (Vancouver, Lakewood Water Dist., Tacoma, and Las Cruces) inexplicably include the identical language about Metropolitan's program. The discussion of *Metropolitan's* water recycling program is irrelevant (indeed, nonsensical) for objectors having no connection with Metropolitan.[237]

---

22-23]; City of Moses Lake [ECF No. 3986 at 20-21]; Eagle River Water & Sanitation [ECF No. 3987 at 16-17]; and Upper Eagle Regional Water [ECF No. 3989 at 17-19].

[233] *See, e.g., Garber v. Office of the Comm'r of Baseball*, 12-cv-03704 (VEC), 2017 U.S. Dist. LEXIS 27394, at *9 n. 9 (S.D.N.Y. 2017) ("these baseless objections waste judicial time and energy that should be spent on more productive matters"); *In re UnitedHealth Group, Inc. PSLRA Litig.*, 643 F. Supp. 2d 1107, 1108–09 & n.1 (D. Minn. 2009) (characterizing position of objector counsel as "disingenuous," "preposterous," and "laughable," among other criticisms); *UFCW Loc. 880-Retail Food Emps. Joint Pension Fund v. Newmont Mining Corp.*, No. CIVA05CV01046-MSKBNB, 2008 WL 4452332, at *4 (D. Colo. Sept. 30, 2008) (noting that an objector had raised same objection as another, was "general in nature, largely unsupported by specific citation to the record or to supporting caselaw," and "lacking in meaningful analysis"), *aff'd*, 352 F. App'x 232 (10th Cir. 2009).

[234] *See* n.229, *supra*.

[235] Metropolitan Water District [ECF No. 3955] ("Met Obj."), at 16-17.

[236] *Id*.

[237] As another example, the Objection of the City of Las Cruces [ECF No. 3978] ("Las Cruces Obj."), at 1, erroneously refers to Las Cruces as being located in Washington rather than in New Mexico.

**Third**, there is no reason why Marten Law could not have filed a single objection on behalf of all 17 objectors. That is commonly done when a law firm files an objection for multiple class members.[238]  Indeed, Rigano LLC filed one objection here on behalf of *three* objectors:  the Town of East Hampton, the Town of Islip, and the Town of Harrietstown. The only possible explanation for Marten Law's tactic of generating hundreds of unnecessary pages of duplicative objections is to inflate the total number of objections. Of course, such a tactic is ultimately futile; even with the law firm's approach of filing multiple objections, the combined Class Member objections represent only about 0.16% of the identified Class Members. *See supra.* Indeed, in the entire batch of filed settlement objections, only five were *not* filed by Marten Law.

**Fourth**, Marten Law undertook an organized campaign to recruit potential objectors by disparaging the settlement, all in a transparent effort to secure fees. Its campaign is decidedly *not* the culmination of a sustained, dedicated effort to protect the nation's water supply. Unlike Class Counsel, who spent many thousands of hours developing and investigating the case—and ultimately bringing Defendants to the settlement table—Marten Law sat on the sidelines and spent a grand total of *twelve* common-benefit hours, all of which occurred in August 2023, working on this litigation. Only after settlement was reached—when Marten Law saw a pathway to recover fees—did it suddenly become active.

---

[238] *See, e.g.,* Objections of Class Members Lott, Lutz, Olivant, Slomine, and Woloszyn, *Omar Vargas v. Ford Motor Co.,* No. 2:12-cv-08388 (C.D. Cal. Sep 28, 2012) (No. 151); *Saltzman v. Pella Corp.*, No. 1:06-cv-04481 (N.D. Ill. Aug 18, 2006) (objections for three class representative objectors); *Polyurethane Foam Antitrust Litigation*, Objection of Melissa Holyoak and John Tabin, No. 1:10-md-02196 (N.D. Ohio Dec 02, 2010) (No. 1960). Even pro se objectors have filed one objection listing the names of multiple objecting parties rather than filing carbon copies. *E.g., Bickley v. Schneider National, Inc. et al*, No. 4:08-cv-05806 (N.D. Cal. Dec 31, 2008) (No. 277).

Moreover, its campaign did not involve an objective effort to educate Settlement Class Members. Rather, it was a distorted, one-sided effort to round up dissenters. In one slide show presentation, for example, the firm displayed a scale, with one side representing "what you get" and the other side representing "what you give up." The thrust of the slide, depicted below,[239] is the settlement is essentially all cost and no benefit. It is difficult to imagine a more blatant distortion of the Settlement. This should not be surprising. Never having participated in the litigation in a meaningful way, Marten Law could not possibly have adequately or accurately informed Settlement Class Members of potential objections and/or the risks of opting out. Yet, this was Marten Law's device to recruit objectors.



Moreover, Marten Law also published multiple articles on their website with loaded titles such as, "Water Utilities Must Decide Whether to Give Up PFAS Claims Against 3M, DuPont" and "PFAS Settlements: How Much is Enough?" These articles contain what can only be described as blatant fear-mongering aimed at potential class members, such as the statement: "Few if any know what claims they may face from government regulators, their customers, neighbors, or other

---

[239] Marten Law PowerPoint presentation, attached hereto as Ex. T.

third parties in the future. Nevertheless, all settlement-eligible water suppliers who do not 'opt out' of the proposed settlement will be bound by the agreements, including the agreements' release of their claims….Water providers will soon receive class settlement notices that they will be forced to act upon…."[240]

Importantly, all of the presentations and articles prominently urged class members to follow up with Marten Law, even providing a fillable form to "Request Marten Law's Preliminary Analysis on 3M and DuPont Settlements," and going so far as to confirm that even PWS with current legal representation are invited to reach out.[241] Not surprisingly, courts have condemned efforts to "try[] to recruit other people to be objectors," *In re Hydroxycut Mktg. & Sales Pracs. Litig.*, No. 09CV1088 BTM KSC, 2013 WL 5275618, at *3 (S.D. Cal. Sept. 17, 2013), and to use the objection process as "an attempt to receive attorneys' fees," *Spark v. MBNA Corp.,* 289 F. Supp. 2d 510, 514 (D. Del. 2003). *Accord, e.g., Shaw v. Toshiba Am. Info Sys., Inc.,* 91 F. Supp 2d 942, 973 (E.D. Tex. 2000) (criticizing use of the objection process and use of "obviously 'canned' objections" to "extract a fee" from the parties); *In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751, 754 (S.D. Ohio 2008) (raising concern about "opportunistic objectors" who "contribute[d] nothing to the class"); *In re UnitedHealth Group, Inc. PSLRA Litig.,* 643 F. Supp. 2d 1107, 1109 (D. Minn. 2009) ("[Objector counsel's] goal was, and is, to hijack as many dollars for themselves as they can wrest from a negotiated settlement."); *UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Mining Corp.*, No. 05-cv-01046, 2008 WL 4452332, at *3 (D. Colo. Sept. 30, 2008) (attacking objectors "who challenge fee requests largely in the

---

[240] Marten Law article, attached hereto as Ex. U.
[241] *See e.g.,* Ex. T at slide 18 (providing contact information for the Marten Law firm for any questions).

hopes of obtaining their own personal payout"), *aff'd,* 352 F. App'x 232 (10th Cir. 2009). Indeed, the whole purpose of the 2018 amendments to Rule 23 governing objectors was to prevent this sort of abuse. Marten Law's deliberate campaign to undo the settlement for personal gain provides a further reason to view their objections with skepticism.

In short, the Marten Law Objectors have failed to comply with Rule 23(e)(5)(A)'s express requirements for objecting, and offered sloppy, duplicative, and in some places nonsensical objections that have wasted the time of class counsel—and surely will waste the Court's time as well. And there can be no reasonable doubt that Marten Law's objective is to "hijack" as much money as possible to its law firm. Under these circumstances, the Marten Law objections should be stricken in their entirety or, at a minimum, should be given little weight.[242]

### 3. The Objections Actually Raised are Meritless.

#### a) Objections Relating to Fairness

##### i. Amount of Settlement and Relationship to Recovery at Trial[243]

---

[242] For example, the Brazos River Authority concedes it is not a Settlement Class Member [ECF No. 3981], at 2, 4, 6, 23 ("BRA is not a Class Member"), as does the Lower Colorado River Authority [ECF No. 3991], at 2, 4, 5, 13, 15. Yet both spend a collective 62 pages—36 and 26, respectively—attacking the "[n]onsensical and unjust results" that would occur upon application of the Settlement Agreement's provisions to it. *Id.* Such Objections are meritless on their face.

[243] *See* Objections from: City of Fort Worth [ECF No. 3954], at 23-25; Upper Eagle Regional Water Authority [ECF No. 3989], at 15-19; Eagle River Water & Sanitation District [ECF No. 3987], at 14-17; City of Moses Lake [ECF No. 3986], at 18-21; Lakehaven Water & Sewer District [ECF No. 3983], at 20-23; City of Dallas [ECF No. 3979], at 23-26; City of Las Cruces [ECF No. 3978], at 23-24; Hannah Heights Owners Association [ECF No. 3974], at 18-19; City of Tacoma [ECF No. 3972], at 24-27; City of Airway Heights [ECF No. 3970], at 20-23; City of DuPont [ECF No. 3968], at 17-20; Lakewood Water District [ECF No. 3965], at 25-27; City of Vancouver [ECF No. 3962], at 24-27; City of NTWD [ECF No. 3960], at 24-27; and The Metropolitan Water District of Southern California [ECF No. 3955], at 24-27.

Several objectors complain that the Settlement Agreement must be rejected because it does not compare the value of the settlement to the damages that could have been obtained at trial.[244] Objectors rely almost entirely on case law outside the Fourth Circuit. For several reasons, these objections are flawed.

First, objectors' argument is flatly contrary to controlling Fourth Circuit law, which objectors fail to even acknowledge. For instance, in *McAdams*, the Fourth Circuit considered an objector's contention that a magistrate judge "failed to make a rough estimate of what class members would have received had they prevailed at trial." 26 F.4th at 160 (cleaned up). In upholding the settlement, the court noted that it has "never required such an estimate" and was "not persuaded to impose t[hat] new requirement..." *Id. Accord, e.g., 1988 Tr.*, 28 F.4th at 527 (explaining that, in evaluating a settlement agreement, a court "need not decide the merits of the case nor substitute its judgment of what the case might be worth for that of class counsel;" rather "the court must simply satisfy itself that the class settlement is within the 'ballpark' of reasonableness" (cleaned up)); *Boger v. Citrix Sys., Inc.*, No. 19-CV-01234-LKG, 2023 WL 3763974, at *6, n.5 (D. Md. June 1, 2023) (noting that"[t]he Fourth Circuit has never required an estimate of what the class members would have received had they prevailed at trial") (cleaned up)); *Feinberg v. T. Rowe Price Grp.*, 610 F. Supp. 3d 758, 769 (D. Md. 2022) (to the same effect).

Second, even among Circuits that require some analysis of the potential value of the claims in relation to the settlement, the analysis is far less rigorous than objectors suggest. Objectors assert that nothing short of an actual bellwether trial will do.[245] That assertion is so flatly contrary to precedent that it can only be characterized as frivolous. Class Counsel have conducted a rigorous

---

[244] *See, e.g.,* City of Fort Worth Obj. [ECF No. 3954] at 23 ("The DuPont Agreement failed to compare the value of the settlement to the damages the class could have obtained at trial.").

[245] *Id.* at 25 ("The lack of a bellwether trial renders the DuPont Agreement unfair and inadequate.").

search of the case law and have found *no* authority in any Circuit for the proposition that a bellwether trial is *required* to demonstrate the reasonableness of a settlement.

Indeed, cases make clear that exactly the opposite is true: no trial on the merits is required prior to settlement. *See, e.g., Flinn*, 528 F.2d at 1174 (noting that there is "no requirement for a trial on the merits as a prerequisite to approval of a settlement"); *Warshawsky v. CBDMD, Inc.*, 20-cv-00562, at *2 (W.D.N.C. Aug. 9, 2022) (in its order granting final approval, the court noted that it was not required "to conduct a trial on the merits of the case or determine with certainty the factual and legal issues in dispute when determining whether to approve a proposed class action settlement"). Not surprisingly, there are countless court-approved settlements (no doubt the overwhelming majority) that involved no bellwether trial, and the Fourth Circuit has affirmed myriad class action settlements where no bellwether trial took place.[246] Any requirement of a bellwether trial prior to settlement would defeat the whole purpose of settlement, which is to provide "an efficient alternative" to the risk and expense of protracted litigation. *In re Allura Fiber Cement Siding Litig.*, Civil Action No.: 2:19-mn-02886-DCN, 2021 U.S. Dist. LEXIS 96931, at *6 (D.S.C. May 21, 2021).

Far from requiring a bellwether trial, even in Circuits that require some showing of the value of the cases at trial, the standard is flexible and easily satisfied here. For instance, in the Seventh Circuit, courts are instructed to evaluate the settlement in relation to the value of class claims. *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004). Yet, all that is required is an "estimate" or "reasonable approximation" of the value of the claims. *Id.* at 786. And even in the Seventh Circuit, "evaluation of potential outcomes *need not always be quantified*, particularly

---

[246] For just a few examples, *see, e.g., 1988 Tr.*, 28 F.4th at 518; *McAdams, supra*; *Lumber Liquidators, supra*; *Sharp Farms, supra*; *Berry, supra*.

where there are other reliable indications that the settlement reasonably reflects the relative merits of the case." *Kaufman v. Am. Express Travel Related Servs. Co.*, 877 F.3d 276, 285 (7th Cir. 2017) (emphasis added) (citing *Wong*, 773 F.3d at 864.). Other reliable indications of a settlement's reasonableness may include the involvement of an "experienced third-party mediator after an arm's-length negotiation where the parties' positions on liability and damages were extensively briefed and debated." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864 (7th Cir. 2014). The facts here more than satisfy these criteria.

To begin, Plaintiffs have in fact assessed the value of the claims in a myriad of ways.  As discussed at length above, Plaintiffs prepared the *Stuart* case for trial and as part of that preparation, retained an expert to opine on the capital and O&M costs that would be required for the City of Stuart to treat its Drinking Water such that the PFAS levels were nondetectable. As noted above, this resulted in *Stuart* seeking $76,750,290.00 in compensatory damages in relation to its Drinking Water claims. As such, Plaintiffs had a clear understanding of the value of the claims in the *Stuart* bellwether trial, which the parties agreed was a representative case.[247]

Pursuant to the Allocation Procedures, with respect to the Settlement, it is estimated that *Stuart* is entitled to $1,686,581.00[248] This represents a significant portion of the amount expected at trial, and it is well-settled law that even where a cash settlement amounts to only a "fraction of the potential recovery" at trial, that will not render a settlement inadequate or unfair. *Flinn*, 528 F.2d at 1173-1174.

---

[247] Douglas Final App. Decl. at ¶¶ 9-12.
[248] *See* Estimated Allocation Range Tables, available at
https://www.pfaswatersettlement.com/wp-content/uploads/2023/08/DuPont-Estimated-Allocation-Range-Table.pdf.

Moreover, through preparation of the *Stuart* case for trial, Plaintiffs gained a clear appreciation for which defenses Defendants (and the other Telomer Defendants) considered to be their strongest, including resulting from extensive motion practice with respect to both summary judgment and *Daubert*, along with evidentiary rulings that involved letter-briefing, and formal hearings even days before trial. All these trial preparation efforts provided additional insight and were very instructive as to relative merits of each parties' positions and their likelihood of prevailing at trial. Thus, Plaintiffs were able to consider not only the value in numerical terms, but also weigh that value against the defenses raised by Defendants.

In addition, this case was settled only after the involvement of an experienced mediator (retired Judge Layn Phillips), during which time the parties extensively discussed their relative positions on liability and damages. In this regard, and as noted above, Defendants strongly contended that it would be difficult for Plaintiffs to prove that the PFOA found in Stuart's drinking water wells emanated came from Defendants, thereby raising proximate causation concerns. Moreover, as a component part manufacturer rather than an AFFF concentrate manufacturer, Defendants contended that had it little or no duty to warn end-users of risks associated with AFFF use. Finally, Defendants also contended that end-users were contributorily negligent in their use of AFFF, which could have resulted in lesser damages valuations.

Conversely, Plaintiff contended that through methodologically-sound fate and transport analyses coupled with testimony from AFFF end-users in *Stuart*, it would be able to establish that some of the PFOA in Stuart's wells emanated from Defendants and thus prove proximate causation. Similarly, with respect to Defendants' duty to warn, Plaintiff argued that because the component part manufactured by Defendants —that is, the C8 telomer iodide containing fluorosurfactants—was the defective aspect of AFFF, that it did, in fact, have a duty to warn of the

75

defect, and further, that because it failed to adequately do so, end users were unaware of how and when to properly use, train and/or dispose of AFFF.

In any event, what is ultimately critical is not a theoretical assessment of the claims' maximum value but an analysis of the risks of litigation—an analysis that the Marten Law Objectors essentially ignore. *See, e.g.*, *McAdams*, 26 F.4th at 159 (noting that, in reviewing the adequacy of a settlement, courts "must consider" factors including "the costs, risks, and delay of trial and appeal"); *1988 Tr.*, 28 F.4th at 526 (affirming class certification and settlement approval and noting that "the district court comprehensively addressed the prongs involving the costs and risks of litigation," including "the existence of defenses which raised obstacles to recovery" (cleaned up)); *Sharp Farms*, 917 F.3d at 299 (noting that the "most important factors in this analysis are the relative strength of the plaintiffs' claims on the merits and the existence of any difficulties of proof or strong defenses.") (citing *Berry v. Schulman*, 807 F.3d 600, 614-15 (4th Cir. 2015)). Indeed, noticeably lacking from the Marten Law's presentations is any recognition of the serious risks and delay from continuing to litigate. The presentations instead focus entirely on trying to derail the settlement, using inaccurate and misleading arguments.

Here, the risks of this litigation were substantial. As noted above, these risks range from litigation risks such as the uncertainty of jury trials generally and drawn-out appeals to significant scientific hurdles, including the difficulty Plaintiffs may face in tracing PFOA in contaminated Water Sources back to Defendants. In light of these serious risks, objectors cannot plausibly contend that a historic settlement of more than $1 billion against Defendants is deficient.

       ii.      **Settlement Value Versus Defendants' PFAS-Related Damages.[249]**

---

[249] *See* Objections from: Widefield Water & Sanitation [ECF No. 4010], at 6; Upper Eagle Regional Water Authority [ECF No. 3989], at 15; Eagle River Water & Sanitation District [ECF No. 3987], at 13-14; City of Moses Lake [ECF No. 3986], at 17-18; Lakehaven Water & Sewer

The Marten Law Objectors claim that the total Settlement Amount is not adequate because it "pales in comparison to the PFAS-related damages that Defendants have caused across the country while controlling between 3 and 7 percent of the historical PFAS market."[250] As set forth above, "the fact that a cash settlement 'may only amount to a fraction of the potential recovery' will not per se render the settlement inadequate or unfair." *See e.g. Flinn*, 528 F.2d at 1173-74. Similarly, and also discussed above, the five factors[251] to be considered in determining the adequacy of the Settlement Amount have been satisfied here, and the Marten Law Objectors have failed to establish a cogent argument explaining why it believes any of those factors have not been satisfactorily satisfied here.

### iii.       Allocation of Funds Between Phase One and Phase Two Class Members.[252]

Certain objectors represented by Marten Law argue that the Settlement Agreement does not treat "'class members equitably relative to each other.'" Fed. R. Civ. P. 23(e)(2) .[253] In particular, these objectors identify four circumstances where Settlement Class Members are

---

District [ECF No. 3983], at 20; City of Dallas [ECF No. 3979], at 22-23; City of Las Cruces [ECF No. 3978], at 24-27; Hannah Heights Owners Association [ECF No. 3974], at 24; City of Tacoma [ECF No. 3972], at 24; City of Airway Heights [ECF No. 3970], at 20; City of DuPont [ECF No. 3968], at 16-17; Lakewood Water District [ECF No. 3965], at 23-24; City of Vancouver [ECF No. 3962], at 24; City of NTMWD [ECF No. 3960], at 23-24; Metropolitan Water District of Southern California [ECF No. 3955], at 23-24; and City of Fort Worth [ECF No. 3954], at 22-23.

[250] *See e.g.*, Lakewood Water District Objection [ECF No. 3965], at 23-24.

[251] *Jiffy Lube* identifies five factors to adequacy of a settlement: "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." *Jiffy Lube*, 927 F.2d at 159.

[252] *See* Objections from: City of Moses Lake [ECF No. 3986], at 21-22; the City of Dallas [ECF No. 3979], at 22-23; and the City of Las Cruces [ECF No. 3978], at 27-28.

[253] *See e.g.*, Lakewood Water District Obj. [ECF No. 3965], at 28-29.

allegedly treated differently, which center around the alleged disparate treatment between Phase One and Phase Two Class Members. Specifically:

(1) When a retail water supplier obtains treated water from a wholesale supplier, it many not obtain funds, even if PFAS enters their system;

(2) When a retailer treats the water they may receive the full potential allocation even though the wholesaler may face costs related to contamination;

(3) The allocation between Phase One and Phase Two Claimants provide more funding for Phase One, even if Phase Two claimants discover greater contamination; and

(4) The methodologies used by Class Counsel may have vastly undercounted and therefore undercompensated Phase One.[254]

As it pertains to number 1 above, the Parties' Joint Interpretative Guidance on Interrelated Drinking-Water Systems ("Interrelated Guidance"),[255] which the Court approved as a supplement to the Settlement Agreement,[256] is clearly instructive. In particular, the Interrelated Guidance makes clear that there is no categorical bar to a retailer obtaining funds if PFAS enters its system; rather, the amount allocated as between the retailer and the wholesaler will be apportioned by the Claims Administrator "based on relative capital and O&M costs of PFAS treatment borne by the wholesale and the retail customer, respectively."[257] In other words, the Interrelated Guidance clearly contemplates retailers receiving settlement funds, and absent agreement between the wholesaler and the retailer, the retailer will be able to do so based on the extent to which it bears PFAS treatment costs.[258]

---

[254] *Id.*

[255] The Parties' Joint Interpretative Guidance on Interrelated Drinking-Water Systems [ECF No. 3858-1].

[256] Order Granting Joint Motion to Supplement the Preliminarily Approved Allocation Procedures [ECF No. 3862].

[257] Interrelated Guidance, at 2.

[258] *Id.* at 2-3.

Number two above is essentially the opposite claim as number one; that is, that to the extent that the retailer obtains the full Allocated Amount to treat its PFAS-contaminated water, such claim will extinguish the rights of the wholesaler who may have PFAS-related treatment costs. Again, the same response applies: the Interrelated Guidance provides that the "Claims Administrator will divide the Allocated Amount based on relative capital and O&M costs of PFAS treatment borne by the wholesale and the retail customer, respectively."[259] In short, neither entities' rights usurp those of the other; rather, absent agreement, the Claims Administrator is charged with apportioning the Allocated Amount in a way that is consistent with each entity's treatment costs so as to avoid double recovery for any one Water Source.[260] As such, neither of these issues provide any basis to find the Settlement Agreement unfair.[261]

As it pertains to number 3 above, the Marten Law Objectors provide very little support for this argument other than a bald assertion. However, it goes without saying that simply because a greater proportion of the Settlement Amount is allocated to Phase One than to Phase Two on a 55/45% basis,[262] that does not bear directly on the Allocated Amount that any particular Settlement Class Member may receive. Moreover, as discussed at length above, this determination to allocate on 55/45% basis is actually a conservative estimate as to the proper allocation between Phase One and Phase Two based on the analysis of a highly-esteemed expert in liability forecasting.[263]

---

[259] *Id*. at 2-3

[260] *Id*. at 2-3.

[261] In fact, the Claims Administrator developed a Joint Claims Form submission process to assist the retailers and wholesalers—as well as any other interrelated Drinking Water partners—to proceed jointly and receive an apportionment of any award that results.

[262] SA, at Ex. E.

[263] Raab Prelim. App. Decl., at ¶ 5 (declaration submitted by Timothy G. Raab explaining that while his analysis called for 36% of the total Settlement amount to be allocated to Phase Two, in "an effort to be conservative," he recommended "adjusting the ratio" to allocate 45% of those funds to Phase Two).

Because this allocation is the result of a sound methodological analysis, this scenario does not provide any basis to support the contention that the Settlement Agreement is unfair.

Finally, as it pertains to number 4 above, the Marten Law Objectors are incorrect in suggesting that the methodologies used by Class Counsel undercounted and undercompensated Phase One claimants, because, they claim, "the estimate of Phase One members used data from UCMR 3, which tested a far more limited set of active PWSs," whereas UCMR 5 data would allow for more PWS to "qualify under Phase One than previously understood."[264] But again, the differences between UCMR 3 and 5 were already accounted for by Plaintiffs' expert.[265] Clearly, this situation has already been addressed in the Settlement Agreement, and it thus provides no support for the Marten Law Objectors' contention that the settlement is unfair.[266]

### iv.        The Release is not Overbroad

Marten Law and the few other objectors[267] write at length attacking the scope of the Release. Yet, their arguments are based on a *misreading* in an effort to create dire hypothetical consequences.

As an initial matter, in an effort to eliminate the confusion engendered by these flawed objections, the parties recently promulgated the Joint Interpretative Guidance on Certain Release Issues ("Release Guidance"), which was Court-approved:

---

[264] *See e.g.*, Objection of Lakewood Water District, at p. 28.

[265] Raab Decl*.*, at ¶ 4 (stating that "[t]o approximate the impact of the[]differences between UCMR 3 and ECMR 5, I used detections from the state data for large PWS.").

[266] Moreover, as noted above, to date, the EPA has released approximately 7% of the total anticipated UCMR 5 data, and based on the data thus far, only approximately 20% of the PWS had PFAS detections. As such, Mr. Raab's assumption of a 39% detection rate for UCMR5 is supported by the testing data to date which shows only a 20% detection rate.

[267] In total, 25 parties lodged objections related to the issues addressed in the Parties' Joint Interpretive Guidance on Certain Release Issues ("Release Guidance")[ECF No 4064-1].

(1) with respect to certain language in Paragraph 12.1.2, namely, the words "separate from and not related to…," it is the "joint understanding that those words mean "separate from and not *physically* related to;"[268]

(2) with respect to Paragraph 2.6, it is the parties' understanding that "Claims" for "contribution" and "indemnity" are only released to the extent that they fall within the definition of Released Claims, but such "contribution" and "indemnity" is not released for Claims that are not released;[269] and

(3) with respect to Paragraph 2.45 of the Settlement Agreement, that although "Releasing Persons" includes a broad definition, "i[t] is the parties' joint understanding that this language does not mean that such individual persons release personal Claims (i.e., for personal injury").[270]

Within the context of this guidance, it is clear that the Release is only as broad as the relief secured. The scope of the Release does not render the Settlement unfair or unreasonable; instead, it represents the nature of a bargained-for solution.

The purpose of the Settlement is to provide funds to PWS to address PFAS in their Drinking Water. The Agreement opens with a recital that Plaintiffs "have suffered harm resulting from the presence of PFAS in Drinking Water" and allege that "Settling Defendants are liable for damages and other forms of relief to compensate for such harm."[271] The damages compensated by and through participation in the Settlement are treatment costs to Drinking Water within PWS. Keeping this central tenet in mind, the Release is appropriately scoped: it releases *only* those claims of PWS whose Drinking Water was contaminated before the Settlement Date, and *only* those entities with an interest in those claims are Releasing Parties.

Another related tenet of the Settlement is the prohibition against double recovery. Indeed, the underlying theme of the negotiated Release was to avoid double recovery of compensation for

---

[268] Release Guidance, at p. 1 (emphasis added).
[269] *Id*. at p. 2.
[270] *Id*. at p. 2
[271] SA § 1.2.

treatment of PFAS in PWS' Drinking Water. One of Defendants' primary interests was to reach a resolution that would be final and avoid endless ongoing litigation, so necessarily both the Release and the relief had to be broad. Defendants insisted they would not pay twice (or more) for damages from costs to PWS of treating Drinking Water. Class Counsel was able to leverage this interest to strategically negotiate the carve-outs of claims *unrelated* to treatment costs for Drinking Water; namely, certain stormwater and wastewater claims that relate to facilities or real property that is separate from PWS and does not provide Drinking Water. Such claims are *not* subject to the Release. Objectors completely miss this point.

- **Objection: the Release is overbroad because it includes almost all wastewater and stormwater relating to separate facilities or real property.[272]**

The Settlement Agreement provides for an exception to the Release "where a Settlement Class Member also owns real property or owns or operates a facility that is separate from and not related to a Public Water System and does not provide Drinking Water (*e.g.*, a separate wastewater or stormwater system or airports or fire training facilities that are not related to a Public Water System)." In such instance "Claims relating to the discharge, remediation, testing, monitoring, treatment or processing of stormwater and wastewater at or by such separate real property or facility" are "preserved to the extent such Claims seek damages not arising from or relating to

---

[272] *See* Objections from Broward County [ECF No. 3997], at 1-5; the City of Newburgh [ECF No. 3995], at 4-6; Lower Colorado River Authority [ECF No. 3991], at 8-9; Upper Eagle Regional Water Authority [ECF No. 3989], at 5; Eagle River Water & Sanitation District [ECF No. 3987], at 4; City of Moses Lake [ECF No. 3986], at 5; Lakehaven Water & Sewer District [ECF No. 3983], at 5; Brazos River Authority [ECF No. 3981], at 10; City of Dallas [ECF No. 3979], at 5; Hannah Heights Owners Association [ECF No. 3974], at 4-5; City of Tacoma [ECF No. 3972], at 5; City of Airway Heights [ECF No. 3970], at 5; City of DuPont [ECF No. 3968], at 5; Lakewood Water District [ECF No. 3965], at 5; City of Vancouver [ECF No. 3962], at 5; City of North Texas Municipal Water District [ECF No. 3960], at 5-6; The Metropolitan Water District of Southern California [ECF No. 3955], at 5; and City of Fort Worth, [ECF No. 3954], at 5.

alleged harm to Drinking Water."[273] When viewed under the two guiding principles described above—purpose of compensation, and prohibition on double recovery—these exceptions make sense. A "separate wastewater or stormwater system or airports or fire training facilities" (§ 12.1.2(a)) contaminated with PFAS will require different treatment than will PWS' Drinking Water. And so long as such Claims "seek damages not arising from or relating to alleged harm to Drinking Water," double recovery is avoided.[274]

Some objectors read these exclusions as meaningless because water, in the global sense, is all hydrologically connected. Rainwater runs off streets as stormwater, which may fill surface water systems or recharge groundwater aquifers to one day emerge as water for drinking; such water, in turn, is consumed and becomes wastewater. Wastewater or stormwater, the objectors argue, can therefore never be "separate from and not related to" Drinking Water. The Release Guidance moots any such argument, explaining that this phrase means "separate from and not physically related to a Public Water System."[275] To the extent that a Settlement Class Member operates a wastewater system that is not physically connected to its PWS, that Settlement Class Member retains its claim for damage to that wastewater system. This grounding in physical connection also moots any concerns that the exclusion would be lost as to a wastewater or stormwater system that is organizationally "related" to a PWS. This logically avoids double recovery and explicitly preserves the excluded claims.

---

[273] SA § 12.1.2.
[274] *Id.*
[275] Release Guidance, at p. 1.

Additionally, the Release Guidance makes clear that Settlement Class Members who retain excluded claims under 12.1.2 do not release claims for contribution and indemnity that relate to these excluded claims.[276]

Section 12.1.2(b) then goes on to provide an additional protection for storm- and wastewater claims, stating that "if the EPA or a State establishes additional requirements […] after the Settlement Date with respect to the discharge, remediation, testing, monitoring, treatment or processing of PFAS-containing stormwater or wastewater are preserved to the extent they seek to recover for additional compliance costs imposed on the Settlement Class Member by such new requirements…" This is in the *alternative* to the requirements for exceptions to the Release laid out in § 12.1.2(a), rather than in addition to, meaning that in its totality § 12.1.2 offers multiple potential avenues for preservation of storm- and wastewater as well as real property damage claims.

Finally, the Agreement even preserves claims for PFAS-related damages to Drinking Water where the contamination has yet to occur—a major advantage for Settlement Class Members, and a hard-fought (and heavily contested) term. Section 12.1.3(x) provides that "Released Claims shall not include Claims that arise from or relate to a Test Site as to which PFAS is deemed […] to have entered the water or facilities or real property of the Public Water System after the Settlement Date."

Although the parties believed such language describing the exceptions to the Release to be clear in a plain reading, it should still be read within the full context of all Release provisions. Indeed, applying the same two guiding principles—purpose of compensation and no double recovery—to § 12.1.1 illustrates how the Release maps on to the conceptual framework.

---

[276] *Id.*

It is correct that Releasing Parties would be bound by § 12.1.1, which states that Claims "that arise from or relate to PFAS that entered Drinking Water of a Public Water System within the Settlement Class, its Water Sources, its facilities or real property, or any of its Test Sites at any time before the Settlement Date" are released (§ 12.1.1(i)). But there are several limiting factors that must be properly understood.

First, such release applies only to PFAS that *has already entered* a PWS before the Settlement Date.

It is also correct that Releasing Parties would be bound by § 12.1.1(iii) and would thereby release Claims "for any type of relief with respect to the installation, maintenance, or operation of, and cost associated with any kind of treatment, filtration, remediation, testing, or monitoring of PFAS by any Settlement Class Member with respect to PFAS that has entered Drinking Water of a Public Water System within the Settlement Class, its Water Sources, its facilities or real property, or any of its Test Sites at any time before the Settlement Date." Taken within the context of the prohibition on double recovery, this makes perfect sense and is reasonably described. The "installation, maintenance, or operation of, and cost associated with […] PFAS that has entered Drinking Water of a Public Water System" is exactly what the Settlement was designed to compensate, so of course that would be subject to release.

The last clause of the Release provision, § 12.1.1(iv), releases all Claims "that were or could have been asserted in the Litigation." The clause merely acts as a reiteration of what has already been stated: that Released Claims are released, and unreleased Claims are not. The term "Litigation" is defined to mean "collectively the MDL and all other pending litigation brought by or on behalf of a Releasing Person against a Released Person involving Released Claims" (§ 2.26). Critically, "Litigation" is ***not*** as broad as all cases in the MDL, which includes many thousands of

claims that are brought by plaintiffs other than PWS who are not "Releasing Persons." Such cases are thus not within the definition of "Litigation," and § 12.1.1(iv) does not release claims that could not have been asserted by the Releasing Persons here.

The Release is plainly not overbroad, and specifically not with regards to storm- and wastewater claims, which are preserved under § 12.1.2.

- **Objection: the Release is overbroad because Releasing Parties includes parties that never assented to settle.** [277]

The fact that "Releasing Parties" may be broader than the Settlement Class Members alone does not render the Release overbroad. "Class action settlements have in the past released claims against non-parties where, as here, the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against the parties to the action being settled." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 109 (2d Cir. 2005) (*see also In re WorldCom, Inc*., 347 B.R. at 156 (noting that fiber optic cable settlements have released claims against the railroads, which "ensure[s] the final resolution so critical to Defendants' agreeing to settle"). In the *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Prods. Liab. Litig.*, the definition of releasing parties included not only the settlement class member

---

[277] *See* Objections from: Broward County's [ECF No. 3997], at 6; Lower Colorado River Authority [ECF No. 3991] at 5-6, 17; Upper Eagle Regional Water Authority [ECF No. 3989], at 7-9; Eagle River Water & Sanitation District [ECF No. 3987], at 7-9; City of Moses Lake [ECF No. 3986], at 7-9; 12; Lakehaven Water & Sewer District [ECF No. 3983], at 8-9, 14-15; Brazos River Authority [ECF No. 3981] at 8-9, 22-23; City of Dallas [ECF No. 3979], at 8-9, 17; City of Las Cruces [ECF No. 3978], at 8-9, 18; Hannah Heights Owners Association [ECF No. 3974], at 7-8; City of Tacoma [ECF No. 3972], at 8-9, 18-19; City of Airway Heights [ECF No. 3970], at 7-8; 14-15; City of DuPont [ECF No. 3968], at 7-9, 12-13; Lakewood Water District [ECF No. 3965], at 8-9; City of Vancouver [ECF No. 3962], at 8-9, 18-19; City of North Texas Municipal Water District [ECF No. 3960, at 8-9, 17]; The Metropolitan Water District of Southern California [ECF No. 3955], at 8-9, 18; and City of Fort Worth [ECF No. 3954], at 8, 17.

Volkswagen dealers, but "any other legal or natural persons who <u>may claim by, through, or under</u> <u>them</u>." 2018 WL 1588012, at *8 (N.D. Cal., 2018) (emphasis added). Such scope—arguably much broader than the language here—was permissible, on the logic that "[b]ecause the Intervenor Plaintiffs each assert claims 'by, through, or under [the class members], they are Releasing Parties under the settlement agreement." *Id.* (internal citations omitted).

In the Settlement Agreement, the Releasing Parties definition can be thought of as including, much as in the *In re Volkswagen* case, non-PWS Settlement Class Members whose claims are derivative of PWS Settlement Class Members' claims. Like the Release, the Releasing Parties definition is married exactly to the relief secured, and fits within the framework of the two guiding principles: funds for treatment of PFAS in PWS' Drinking Water, and prohibition on double recovery.

First, section 12.1.3(y) lays out key language limiting the extent of Releasing Parties' release, stating that "any Releasing Person that is not a Public Water System but that is legally responsible for funding (by statute, regulation, other law, or contract) or that has authority to bring a Claim on behalf of, or to seek recovery for harm to, a Public Water System in the Settlement Class […] *gives the release only to the extent of Claims that seek to recover for alleged harm to* *such Public Water System*" (emphasis added). This language limits the extent of the release given by Releasing Parties that are legally responsible for funding or that have authority to bring a Claim or seek recovery for harm to a PWS to just those damages for alleged harm to the PWS Settlement Class Member. It is, therefore, plainly for the purpose of ensuring that such Releasing Persons do not release their own claims that are not derivative of the PWS claims.

The Settlement compensates harm to PWS' Drinking Water, and in order to avoid double recovery, the Releasing Parties must necessarily include any who may have a stake in recovery, whether a Settlement Class Member themselves or not.

- **Objection: the Release is overbroad because it releases claims that do not share an "identical factual predicate."[278]**

It is not true, as alleged in certain objections, that the Defendants' Agreement "would release a wide range of unalleged claims that lack an identical factual predicate with claims alleged by Class Members."[279] As a starting premise, the Agreement does not resolve (and therefore does not release) all claims alleged by Settlement Class Members. Such PWS may have any number of other claims that do not fall within the ambit of the Release—such as storm- and wastewater claims falling within the express exception to the Release—and indeed, those claims are preserved because they do *not* have an identical factual predicate with the Released Claims.

Secondly, the Release is exactly scoped to release only those Claims that *do* have an identical factual predicate: claims relating to PFAS contamination of PWS. *See* §§ 12.1.1, 12.1.2 and 12.1.3 and analysis thereof, *supra*.

Section 12.1.3(x) even goes one step further, exempting *future* PFAS contamination ("the Released Claims shall not include Claims that arise from or relate to a Test Site as to which PFAS

---

[278] Objections from: Widefield Water and Sanitation District [ECF No. 4010], at 6; the City of Newburgh [ECF No. 3995], at 3; Lower Colorado River Authority [ECF No. 3991], at 8; Upper Eagle Regional Water Authority [ECF No. 3989], at 4-5; Eagle River Water & Sanitation District, [ECF No. 3987], at 4; City of Moses Lake [ECF No. 3986], at 4; Lakehaven Water & Sewer District [ECF No. 3983], at 4-5; Brazos River Authority [ECF No. 3981], at 9-10; the City of Dallas [ECF No. 3979], at 4-5; City of Las Cruces [ECF No. 3978], at 4-5; Hannah Heights Owners Association [ECF No. 3974], at 4; City of Tacoma [ECF No. 3972], at 4-5; City of Airway Heights, [ECF No. 3970], at 4-5; City of DuPont [ECF No. 3968], at 4; City of DuPont [ECF No. 3968], at 4-5; City of North Texas Municipal Water District [ECF No. 3960], at 4-5; The Metropolitan Water District of Southern California [ECF No. 3955], at 4-5; and City of Vancouver [ECF No. 3962], at 4-5.

[279] *Id*.

is deemed under Paragraph 12.6 to have entered the water or facilities or real property of the Public Water System after the Settlement Date"). Section 12.6.4 confirms that such claims are "outside the temporal scope of the release."

Further, the Settlement Agreement, when read in its entirety—including the totality of the documents promulgated in connection therewith, its Exhibits, all Court-approved amendments thereto and the Parties' Joint Interpretive Guidance documents, also Court-approved—confirms that this is a settlement that provides Public Water Systems compensation to treat their Drinking Water. Once a PWS has been compensated to treat their Drinking Water, it will have waived its right to make claims for damages to treat its Drinking Water. Despite the conclusory inclusion in the Marten Law objections that released claims lack an identical factual predicate, no example of this alleged "wide range" of claims is given. Indeed, under a proper read of the Release provisions, no such example can be given because none exists. The Agreement releases claims with identical factual predicates, and exempts those without.

- **Objection**: the Release is overbroad because it releases claims for unknown PFAS.[280]

Again, the only Released Claims are those that relate to PFAS contamination of PWS; the compensation is directly related to the real world costs of installing such treatment.[281] It is therefore

---

[280] *See* Objections from: Widefield Water and Sanitation District [ECF No. 3995]; City of Newburgh [ECF No. 3995], at 1-2; Lower Colorado River Authority [ECF No. 3991], at 9-10; Upper Eagle Regional Water Authority [ECF No. 3989], at 6-7; Eagle River Water & Sanitation District [ECF No. 3987], at 5-6; City of Moses Lake [ECF No. 3986], at 5-6; Lakehaven Water & Sewer District [ECF No. 3983], at 5-6; Brazos River Authority, ECF No. 3981 at 11-12; City of Dallas [ECF No. 3979 at 6; Objection of City of Las Cruces, ECF No. 3978 at 6; Hannah Heights Owners Association [ECF No. 3974], at 5-6; City of Tacoma [ECF No. 3972], at 6; Lakewood Water District [ECF No. 3965], at 6; City of Vancouver [ECF No. 3962], at 6; City of North Texas Municipal Water District [ECF No. 3960], at 6-7; and City of Fort Worth [ECF No. 3954], at 5-6
[281] SA §§ 1.2, 5.1, 11.3, 11.5 (*see* specifically, § 11.5.2(c), confirming "The payment of the Restitution Amount by Settling Defendants constitutes, and is paid (i) as restitution for alleged PFAS contamination, and/or (ii) for remediation by the Settlement Class Members of alleged

reasonable to address liability from new or unknown PFAS through the Release, because the damages necessary to remediate these new or unknown chemicals in PWS' Drinking Water are being provided through this Settlement. The objections' suggestion that additional damages should be available to remediate these other contaminants would result in double recovery.

While PFAS as a chemical family consists of many different chemicals—including some that have yet to be developed—there are only approximately 200 commercially available, and by virtue of them being within the PFAS family, they are all treatable by the same methods. The Defendants facing this existential threat were simply not willing to release only PFOA/PFOS and face litigation over and over again if a new PFAS chemical was to be found in a PWS's Drinking Water. That interest was part of what allowed Class Counsel to negotiate such a large settlement amount (especially so when taking into account Defendants' liability and market share, discussed *supra)*.

It is further correct that Releasing Parties would be bound by § 12.1.1(ii) and would thereby release Claims "that arise from or relate to the development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application, or use of PFAS alone or in products that PFAS as an active ingredient, byproduct, or degradation product, including AFFF." Again, this offers all parties finality in resolution and, because in real life all PFAS in Drinking Water is subject to the same treatment, the scope of the Release does not prejudice any claimant. By participating in the Settlement they will receive compensation for the costs to install and

---

PFAS contamination […], which restitution or remediation has had or will have a direct nexus or connection with the alleged harms described…"), 12. *See also* the Allocation Procedures, generally.

maintain treatment to their PFAS-contaminated Drinking Water, regardless of the PFAS contaminant.

- **Objection: the Release is overbroad because it includes personal injury claims.**[282]

It is not correct that Settlement Class Members' personal injury claims are released. The Settlement Class Members are entirely made up of PWS—*not* natural persons with personal injuries.[283] When read as a whole, in context, that is the only reasonable interpretation. Personal injury claims continue in ongoing litigation. Such cases have been the subject of CMOs and bellwether orders since the filing of the Plaintiffs' Motion for Preliminary Approval and even since the grant of Preliminary Approval.[284]

It is true that recovery under the Settlement would release contribution and indemnity claims the PWS might have against Defendants if *the PWS* is the subject of suits by injured individuals for personal injury claims.[285] "Claims" is defined to include contribution and indemnity claims (§ 2.6), and Released Claims, as defined in § 12.1, incorporates such definition. It is typical for indemnity and contribution to be released in a class settlement. *Caudle v. Sprint/United Management Company*, 2019 WL 2716291, at *4 (N.D. Cal., 2019) (approving

---

[282] *See* Objections from City of Newburgh [ECF No. 3995], at 2-3; Lower Colorado River Authority [ECF No. 3991], at 10-11; Upper Eagle Regional Water Authority [ECF No. 3989], at 7-8; Eagle River Water & Sanitation District [ECF No. 3987], at 6-7; Objection of Lakehaven Water & Sewer District, ECF No. 3983 at 6-7; Brazos River Authority [ECF No. 3981], at 12-13; City of Dallas [ECF No. 3979], at 7-8; City of Las Cruces [ECF No. 3978], at 6-7; Hannah Heights Owners Association  [ECF No. 3974 at 6-7]; City of Tacoma [ECF No. 3972], at 7-8; City of Airway Heights [ECF No. 3970], at 6-7; City of DuPont [ECF No. 3968], at 6-7; Lakewood Water District [ECF No. 3965], at 6-7; City of Vancouver [ECF No. 3962], at 7-8; City of North Texas Municipal Water District [ECF No. 3960 ], at 7-8; The Metropolitan Water District of Southern California [ECF No. 3955], at 7-8; and City of Fort Worth [ECF No. 3954], at 6.
[283] The Release Guidance makes clear that individuals who may be Releasing Persons due to their association with a PWS do not release their personal injury claims.
[284] Transcript of July 14, 2023 CMC, 47:24-48:3; 51:18-24.
[285] The Release Guidance makes clear that a PWS does <u>not</u> release contribution and indemnity claims arising from the claims excluded by SA § 12.1.2.

release of indemnity claims arising from claims that are part of settlement); *Rieckborn v. Velti PLC*, 2015 WL 468329, at *10 (N.D. Cal., 2015) (same); *see also*, *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir.2001) ("It is now settled that a judgment pursuant to a class settlement can bar later claims <u>based on the allegations underlying the claims in the settled class action</u>.")(emphasis added).

Such a release does not render the Settlement unfair or unreasonable. All settlements involve difficult tradeoffs. Here, it is one of many bargained-for terms, and while it must be assessed carefully, it should not be afforded disproportionate weight. When evaluated in the correct context, the risk of consumer suits for personal injury is low (only [2] have been filed in the MDL, which comprises over 15,000 filed cases), and many robust defenses to such claims exist. In short, the risk of personal injury lawsuits should not adversely confront would-be participants.

Arguably, this is not even an Objection for the Court to rule on but rather a choice each Class Member must make. In making that choice, each individual PWS is free to weigh the many risks of opting *out* in order out to preserve those rights. A decision to forgo much needed settlement funds in the face of looming federal regulation in order to simply preserve its rights of indemnification and contribution (for which it is receiving valuable consideration) may likely result in exposing a PWS to even *greater* liability and/or *delay* in obtaining funds. This would include: i) the likelihood of years of litigation before seeing its day in Court; ii) the time and cost of having to prove liability against Defendants with reliable and admissible evidence, when and if they do get that day in court; iii) the risk of losing at trial entirely and thus ending up with zero compensation; iv) the possibility of having no choice but to increase rates in order to pay for the cost of PFAS remediation now; v) the difficulty in justifying future rate increases before an appropriate rate board as a result of having failed to mitigate expenses (by opting out of the

opportunity to obtain settlement funds now); and vi) the potential for a consumer class ratepayer lawsuit against PWS for passing on the costs of PFAS remediation to its ratepayers.

Virtually all class action settlements reflect tradeoffs and difficult choices for class members. Yet, the fact that settlements necessarily require compromise does not render them unfair. An instructive precedent is the *NFL Concussion* litigation. There, the parties reached a settlement that provided, *inter alia,* compensation for players who suffered from specified neurological conditions, such as ALS, Parkinson's Disease, and Alzheimer's Disease. *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2015 U.S. Dist. LEXIS 52565 at *14 (E.D. Pa. Apr. 22, 2015), *aff'd*, 821 F.3d 410 (3d Cir. 2016), *cert. denied*, 580 U.S. 1030 (2016). With certain exceptions, class members were required to release claims for Chronic Traumatic Encephalopathy (CTE), a condition that allegedly affects mood and behavior. Although a number of objectors challenged the release of CTE claims, the district court approved the settlement. *Id.* at *78. Importantly, notwithstanding that release, only about 1 percent of the class opted out. *Id.* at *59 (noting that "an opt-out and objection rate of approximately 1% each reflects positively on the Settlement"). On appeal, the Third Circuit rejected objectors' challenge to the release of CTE claims, noting, in language directly applicable here: **"[Objectors] risk making the perfect the enemy of the good. ... Though not perfect, [the settlement] is fair."** 821 F.3d at 447 (emphasis added).

Finally, to the extent that Settlement Class Members believe that giving up rights to indemnification and contribution are a deal breaker, they have the option of opting out. "Federal courts routinely hold that the opt-out remedy is sufficient to protect class members who are unhappy with the negotiated class action settlement terms." *Eisen v. Porsche Cars N. Am., Inc.,* No. 2:11-CV-09405-CAS, 2014 WL 439006, at *7 (C.D. Cal. Jan. 30, 2014) (collecting cases).

- **Objection**: answers to questions about the effect of the Release on Indian tribes are still pending.[286]

There have been several Court-approved Parties' Joint Interpretive Guidance documents. The Leech Lake Band of Ojibwe (the "Band") first filed a Motion to Intervene and a Motion for Clarification, seeking responses to questions about the Release's effect on Indian tribes.[287] The parties promulgated the Parties' Joint Interpretive Guidance on Federally Recognized Indian Tribes ("Tribes Guidance"),[288] which was approved as a supplement to the Settlement Agreement.[289] Separately but related, the parties also filed the Release Guidance,[290] which was also approved by the Court and provides additionally responsive answers to the Band's questions.[291]

The Band objects that the Tribes Guidance is "too vague" with regards to natural resource damages, and lists five questions it alleges are still pending.[292] Three of the five questions (#5, 6, and 7) are based on an allegation that the language of certain claims being exempted if they are "unrelated" to a PWS or Drinking Water is unclear. But the Release Guidance is unambiguous: "the parties' joint understanding that the words 'separate from and not related to' [in the Release clauses] mean 'separate from and not physically related to.'"[293] The clarification confirms that Claims exempted from the Release are those that would require treatment of a facility or area that

---

[286] *See* Objections by Leech Lake Band of Ojibwe [ECF No. 3895].

[287] *See* Motion to Intervene for Limited Purpose to Clarify Settlements by Leech Lake Band of Ojibwe, Nov. 3, 2023 [ECF No. 3893].

[288] Parties' Joint Interpretive Guidance on Federally Recognized Indian Tribes ("Tribes Guidance"), Nov. 10, 2023 [ECF No.'s 3964 and 3967].

[289] Order on Motion to Intervene, Nov. 17, 2023 [ECF No. 4060].

[290] See Release Guidance [ECF No. 4064].

[291] Notwithstanding the more recently promulgated Release Guidance, Class Counsel maintains that the previously promulgated Tribes Guidance sufficiently addressed the Band's questions.

[292] Mem. in Supp. of Mot. for Reconsideration [ECF No. 4063-1].

[293] Consent Mot. to Amend/Correct [ECF No. 4064-1].

is *physically separate from* a PWS. Fish, game, and crops such as wild rice are not located within a PWS, so they are not subject to the Release. This was already confirmed by the Tribes Guidance ("a Release on behalf of a Tribe-owned Settlement Class Member […] would not release a Claim that the Tribe might bring […] for natural-resource damages that are wholly unrelated to Drinking Water or any Public Water System.").[294]

The Band also objects on the basis that its question about whether claims seeking "remediation, monitoring, and/or damages related to costs, such as supplying bottled water […] covered by the Releases and Covenants Not to Sue" is still pending (question #9).[295] This was never a question that needed to be answered by any additional guidance. Rather, a plain reading of the Settlement Agreement, the Allocation Procedures, and their description of the various funds within the QSF confirm that Qualifying Settlement Class Members may be eligible to submit a claim for costs expended in the course of addressing PFAS in Drinking Water through the Special Needs Funds.[296]

The Band further objects on the basis that its question about the Claims-Over provision was not resolved by the Tribes Guidance.[297] In advancing its objection, the Band answers its own question and confirms that previous documents were indeed responsive; namely, there is no difference between the application of the Claims-Over provision to the Band and its application to any other Settlement Class Member. The Band posits that "Tribes are protected from unconsented suits by tribal sovereign immunity" and cite case law in support of such proposition.[298] Nothing in the Settlement Agreement bars the defense of sovereign immunity, let alone tribal sovereign

---

[294] Tribes Guidance at p. 6.
[295] Mem. in Supp. of Mot. for Reconsideration [ECF No. 4063-1].
[296] Allocation Procedures at 84.
[297] Mem. in Supp. of Mot. for Reconsideration [ECF No. 4063-1], at p. 7.
[298] *Id*. at p. 8.

immunity. The absence of an affirmative statement to that effect is not a legitimate basis for an Objection to the Settlement's final approval.

Lastly, the Band's assertion that notice of the Tribes Guidance was required is mistaken.[299] The class was objectively defined and ascertainable. To the extent that the Tribes objected to the Class definition,[300] that challenge has been mooted by the Court's approval of the Tribes Guidance.[301] No further notice is necessary. *See In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1111 (10th Cir. 2001) (supplemental notice not required where a modification "expand[s] the rights of class members"); *In re Diet Drugs Prods. Liab. Litig.*, No. 99-20593, 2010 U.S. Dist. LEXIS 66879, at *6 (E.D. Pa. July 2, 2010) (a change requires supplemental notice only when it "would have a material *adverse* effect on the rights of class members.") (emphasis added). The Objection should be overruled.

**v.    Class Members Have Sufficient Time to Consider the Terms of the Settlement.[302]**

Without citation to any authority, the Marten Law Objectors contend they "were given insufficient time to consider whether to opt-out of the settlement."[303] Believing that only 60 days were afforded the opt-out decision, the Marten Law Objectors contend that because this settlement

---

[299] Objections by Leech Lake Band of Ojibwe, [ECF No. 3895], at 6.

[300] *Id.*

[301] Order on Motion to Intervene [ECF No. 4060].

[302] *See* Objections from: City of Fort Worth [ECF No. 3954], at 14-15; Metropolitan Water District of Southern California [ECF No. 3955], at 14-15; City of North Texas Municipal Water District, [ECF No. 3960], at 15-16; City of Vancouver [ECF No. 3962], at 15-16; Lakewood Water District [ECF No. 3965], at 15-16; City of DuPont [ECF No. 3968], at 14-15; City of Airway Heights [ECF No. 3970], at 27-28; City of Tacoma [ECF No. 3972], at 31-32; Hannah Heights Owners Association [ECF No. 3974], at 18-19; City of Las Cruces [ECF No. 3978], at 30-32; City of Dallas [ECF No. 3979], at 29-31; Brazos River Authority [ECF No. 3981], at 25-26; Lakehaven Water & Sewer District [ECF No. 3983], at 23-25; City of Moses Lake [ECF No. 3986], at 22-23; Eagle River Water & Sanitation District [ECF No. 3987], at 17-18; and Upper Eagle Regional Water Authority [ECF No. 3989], at 19-20.

[303] Objection of City of Fort Worth [ECF No. 3954], at 29.

is "uniquely complex," more than two months is necessary to allow PWS "to consult with internal authorities and external members."[304] But all class members had from September 5, 2023 until the opt-out deadline of December 4, 2023, to consider whether to exclude themselves from the Settlement. This makes their objection meritless on its face as all class members had **91** days to decide whether to opt out, well over the two-month period the Marten Law Objectors mistakenly contend to be insufficient.

Broadly speaking, the purpose of notice in a class suit is to present a fair recital of the subject matter and proposed terms, and provide an opportunity to be heard to all class members. *See Eisen v. Carlisle and Jacquelin*, 417 U.S. 156 (1974); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). Consistent with this authority, the Manual for Complex Litigation states that class members need only be given a "reasonable time" to opt out, with courts usually establishing "a period of thirty to sixty days (or longer if appropriate) following mailing or publication of notice." Manual for Complex Litigation § 21.321 (4th ed. 2021). *See also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 240-41 (D.N.J. 1997) (rejecting argument that the opt out period of 46 days was too short, precluding class members of meaningful review of the Proposed Settlement and collecting cases holding that an opt-out period of thirty to sixty days is appropriate); *Ashley v. GAF Materials Corp. (In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.*), No. 8:11-mn-02000, 2014 U.S. Dist. LEXIS 183679, at *34-35 (D.S.C. Oct. 15, 2014) (stating that "[p]eriods of approximately two (2) months for opting out have been approved in other cases."). Some federal courts have approved opt-out periods of even shorter than 60 days. *Id.* Moreover, the length of a notice period is "almost wholly an exercise in the Court's discretion." *Id.* at *34.

---

[304] *Id.* at 30.

Here, notwithstanding the complexity, all Settlement Class Members received 91 days to evaluate the settlement and determine whether to exclude themselves from the litigation. By any measure, all were afforded sufficient time to evaluate their opt-out rights. Moreover, many PWS have advocated to get their funds more quickly, which further underscores the meritless nature of this claim. This objection is unfounded and should be overruled.

### vi.    Challenges to the Adequacy of Notice are Misplaced[305]

The Marten Law Objectors contend that Notice was inadequate because certain wholesalers did not receive individual notice of the Settlement. To support their argument, the Marten Law Objectors assert that the Interrelated Guidance[306] "asserted *for the first time* that the Settlement Agreement applies to wholesale water providers."[307] This hyperbole, however, is contradicted by this Court's Order of October 26, 2023, and the Guidance itself, which was brought about by an earlier Motion for Extension of Time to Seek Settlement Clarification [ECF No. 3830] filed by the Marten Law Firm on behalf of the Metropolitan Water District of Southern California ("Metropolitan") and the North Texas Municipal Water District ("NTMWD") (collectively "Wholesalers").

---

[305] *See* Objections from: City of Fort Worth [ECF No. 3954], at 14; Metropolitan Water District of Southern California [ECF No. 3955], at 14; City of North Texas Municipal Water District [ECF No. 3960], at 14-15; City of Vancouver [ECF No. 3962], at 14-15; Lakewood Water District [ECF No. 3965], at 14-15; City of Airway Heights [ECF No. 3970], at 24-26; City of Tacoma [ECF No. 3972], at 28-30; City of Las Cruces [ECF No. 3978], at 28-30; City of Dallas [ECF No. 3979], at 27-29; Brazos River Authority [ECF No. 3981], at 23-25; and Town of East Hampton, Town of Islip and Town of Harrietstown [ECF No. 3998], at 16-17.

[306] *See* Order dated October 26, 2023 [ECF No. 3861].

[307] See Objections from: City of Fort Worth [ECF No. 3954], at 14 ; Metropolitan Water District of Southern California [ECF No. 3955], at 14; City of North Texas Municipal Water District [ECF No. 3960], at 14-15; City of Vancouver [ECF No. 3962], at 14-15; Lakewood Water District [ECF No. 3965], at 14-15; City of Airway Heights [ECF No. 3970], at 24-26; City of Tacoma [ECF No. 3972], at 28-30; City of Las Cruces [ECF No. 3978], at 28-30; City of Dallas [ECF No. 3979], at 27-29; Brazos River Authority [ECF No. 3981], at 23-25; and Town of East Hampton, Town of Islip and Town of Harrietstown [ECF No. 3998], at 16-17.

Now the Marten Law Objectors make the counterfactual argument that Wholesalers never received notice of the Settlement. That factual assertion is belied by Metropolitan and NTMWD's earlier motion to intervene—showing that they were well aware of the Settlement—as well as the record evidence describing the breadth of notice provided by the Notice Administrator. And their legal contentions are equally flawed. For starters, notice of a settlement class is governed by Rule 23 (e)(1)(B), which requires that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Here, Class Counsel employed Mr. Hesse to identify all potential members of the Settlement Class through publicly available information.[308] Mr. Hesse employed the methodology described in his Declaration to identify all PWS in the United States that were Phase One and Phase Two Class Members and included them in the Class List.[309] Although this Court approved the proposed Notice Plan, the Marten Law Objectors now contend that "individual notice should have gone to *every* active PWS in SDWIS."[310] However, not every PWS in the SDWIS is a member of the Settlement Class; rather, only a smaller subset of PWS falls within the Settlement Class definition based on either 1) PFAS detection in their drinking water before June 30, 2023; or 2) being subject to the monitoring rules set forth in UCMR 5, or other applicable federal or state laws. Consequently, Class Counsel candidly acknowledged "the Class List is not definitive."[311] Nevertheless, first class mail was employed to send notice to each reasonably identifiable potential class member on the Class List. That is all that due process requires.[312] Beyond USPS mailed notice, Class Counsel went to great effort to execute the Court-

---

[308] Hess Prelim. App. Decl., *generall*y.

[309] *Id*. at 1-4.

[310] *See, e.g.,* Objection of City of Fort Worth at 28 (emphasis in original).

[311] Memorandum in Support of Plaintiffs' Mot. for Prelim. App. of Class Settlement [ECF No. 3393], at p. 20.

[312] *See Eisen*, 417 U.S. at 175 ("Individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort."). The type of mailed direct notice

approved Notice Plan through Angeion, Inc. to provide emailed notices, email reminders, personalized outreach, print publication notice, digital publication notice, paid search campaigns, press releases, a settlement website and toll-free telephone support.[313] This notice effort itself generated secondary notice through other publications, which garnered national attention.[314] Thus, there is great likelihood that most PWS, including Wholesalers, are aware of the settlement either directly or indirectly.

Indeed, notice of a class action by first class mail is not a prerequisite for due process. *See, e.g., Zimmer Paper Prod., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 92–93 (3d Cir. 1985) (holding that notice procedure of first-class mail and publication satisfied due process); *Wolfert ex rel. Est. of Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165, 176 (2d Cir. 2006) (first class mail and publication notice sufficient). Rule 23 was amended in 2018 to expressly expand the

---

Class Counsel employed clearly satisfies these concerns. *See Commissioners I*, 340 F.R.D. at 251 (approving similar notice plan).  It certainly surpasses that required for unidentified class members by the Supreme Court in the seminal case of, 339 U.S. at 317 (recognizing that "in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights.").

[313] *See* SA at Exhibit E; *see also*, Weisbrot Prelim. App. Decl.

[314] *See* Ramishah Maruf, *Three companies agree to pay more than $1 billion to settle 'forever chemical' claims*, CNN Business (Jun. 3, 2023), https://www.cnn.com/2023/06/03/business/pfas-chemours-dupont-corteva-settlement/index.html; Pat Rizzuto, *Water Utilities' Settlement With DuPont, Chemours Passes Hurdle*, Bloomberg Law (Aug. 23, 2023), https://news.bloomberglaw.com/environment-and-energy/water-utilities-settlement-with-dupont-chemours-passes-hurdle; Stephanie Schlea, *Association of State Drinking Water Administrators, Dupont, Chemours, and Corteva Agree to Pay Nearly $1.2 Billion in Water Contamination Settlement*, ASDWA (Jun. 6, 2023), https://www.asdwa.org/2023/06/06/dupont-chemours-and-corteva-agree-to-pay-nearly-1-2-billion-in-water-contamination-settlement/; John Flesher, *Companies reach $1.18 billion deal to resolve claims from 'forever chemicals' water contamination* AP News, (Jun. 2, 2023), https://apnews.com/article/pfas-forever-chemicals-dupont-drinking-water-82516dfef51da45b389e00fa956cf8c5; Ben Casselman et al., *Three 'Forever Chemicals' Makers Settle Public Water Lawsuits*, The New York Times (Jun. 2, 2023) https://www.nytimes.com/2023/06/02/business/pfas-pollution-settlement.html.

methods by which notice is provided beyond first class mail. *See* Fed. R. Civ. P. 23 (C)(2)(B) ("The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means."). Thus, the Rule allows that electronic notice and other forms of media outreach of a class action settlement suffices to meet the constitutional requirements. Here, every effort was made to reach those reasonably identifiable class members by first class mail. To the extent that any were overlooked, the other forms of notice approved by this Court and implemented by the Notice Administrator, including the settlement website ([www.PFASWaterSettlement.com](www.PFASWaterSettlement.com)) which provides digital versions of the short and long form notice, the Settlement Agreement, and other important documents, amply satisfied every due process concern raised by the MLO. *See Cheng Jiangchen v. Rentech, Inc.,* No. CV 17-1490, 2019 WL 5173771, at *8 (C.D. Cal. Oct. 10, 2019) (approving notice that directed class members to a website); *Russell v. Ray Klein, Inc.,* No. 1:19-CV-00001, 2022 WL 1639560, at *7 (D. Or. May 24, 2022) (approving notice plan that included "a website accessible to all class members and containing extensive information and documents regarding the settlement.").

The objections to the Notice Plan should be overruled.

### vii.    Notice to Phase Two Class Members Comports with Due Process.[315]

The Marten Law Objectors object that Phase Two Settlement Class Members "will be forced to decide whether to participate or opt out, without understanding whether they have PFAS

---

[315] Objection from Brazos River Authority [ECF No. 3981], at 25; City of Dallas [ECF No. 3979], at 29; City of Las Cruces [ECF No. 3978], at 32; City of Tacoma [ECF No. 3972], at 30; City of Airway Heights [ECF No. 3970], at 25; Lakewood Water District [ECF No. 3965], at 30-31; City of Vancouver [ECF No. 3962], at 30; The Metropolitan Water District of Southern California [ECF No. 3955], at 30; City of Fort Worth [ECF No. 3954], at 29, and City of North Texas Municipal Water District [ECF No. 3960], at 30.

in their water systems."[316] Contrary to the Marten Law Objectors' categorization of their objection as being about notice, it is fundamentally an attack on whether a Settlement for Phase Two Class members is fair, adequate and reasonable given that they have not yet tested for PFAS.

Phase Two Settlement Class Members are sophisticated entities subject to governmental testing requirements for which they will be required to expend monies in the short term to comply. Neither this Settlement, nor the Notice thereof, is the Phase Two Class members' introduction to an unknown problem. Rather, as sophisticated systems subject to governmental regulation, the PWS are well aware of the PFAS problem through notice and education from federal and state governments[317] and national water associations.[318]

Thus, Phase Two PWS are able to determine—based on the Notice described above—whether to participate in the Settlement and be eligible for costs to cover that testing. Moreover, the Settlement, as explained in the Notice, provides Phase Two Settlement Class Members with access to the same benefits provided in Phase One if the testing reveals certain detections. Thus, this case is not like *Amchem* where "those without current afflictions" could not make intelligent decisions about participating or opting out of the Settlement. *Amchem*, 521 U.S. at 628. Rather,

---

[316] *See e.g.,* ECF 3970, at 26.

[317] *See, e.g.*, https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (last visited November 15, 2023); https://dec.vermont.gov/water/drinking-water/water-quality-monitoring/pfas (last visited November 15, 2023); https://www.waterboards.ca.gov/drinking_water/certlic/drinkingwater/pfas.html (last visited November 15, 2023); https://www.in.gov/idem/resources/nonrule-policies/per-and-polyfluoroalkyl-substances-pfas/(last visited November 15, 2023); https://doh.wa.gov/community-and-environment/drinking-water/contaminants/pfas-drinking-water (last visited November 15, 2023).

[318] *See, e.g.,* National Water Rural Association, https://nrwa.org/issues/pfas/ (last visited November 15, 2023); American Water Works Association, https://www.awwa.org/Resources-Tools/Resource-Topics/PFAS (last visited November 15, 2023); Water Environment Foundation, https://www.wef.org/pfas (last visited November 15, 2023); Association of Metropolitan Water Agencies, https://www.amwa.net/press-release/amwas-statement-epas-and-polyfluoroalkyl-substances-pfas-action-plan (last visited November 15, 2023).

the government's testing requirements already burden Phase Two Settlement Class Members; the Settlement provides relief to them through reimbursement of costs associated with that testing and provides a known path to address the outcome of that testing without years of litigation risks. The Marten Law Objections should be overruled.

### viii.        The Agreement Need Not Specify a Set-Off.[319]

Paragraph 12.7 provides for a set off and judgment reductions in subsequent actions against non-settling defendants. This paragraph provides that the set off mechanism will operate "under applicable law." No more is required. In *In re Jiffy Lube Securities Litigation*, the Fourth Circuit approved of similar language that would apply to state-law claims. 927 F.2d at 160. Because different states require different forms for set off credits, it is appropriate to state only that they will be determined by applicable law and not try to describe which method will apply in a particular case:

> State statutes and court decisions differ as to what form the judgment credits should take. Certain states require a proportionate share reduction, others apply a pro tanto judgment credit and some states give a pro rata credit. See Ex. P–20a, 20b and 20c. Regardless of the applicable jurisdiction, under this agreement, non-settling defendants will receive, at a minimum, a set-off or judgment reduction consistent with state law. Allowing non-settling defendants the benefit of whatever judgment reduction that is required under state law is fair and reasonable. The court concludes that the bar order is essential to the settlement and is within the court's powers to approve it,

---

[319] *See* Objections from: Upper Eagle Regional Water Authority [ECF No. 3989], at 13; Eagle River Water & Sanitation District [ECF No. 3987], at 12; City of Moses Lake [ECF No. 3986], at 11-12; Lakehaven Water & Sewer District [ECF No. 3983], at 12; Brazos River Authority [ECF No. 3981], at 16; City of Dallas [ECF No. 3979], at 12-13; City of Las Cruces [ECF No. 3978], at 12; Hannah Heights Owners Association [ECF No. 3974], at 11-12; City of Tacoma [ECF No. 3972], at 12; City of Airway Heights [ECF No. 3970], at 11; City of DuPont [ECF No. 3968], at 12; Lakewood Water District [ECF No. 3965], at 12; City of Vancouver [ECF No. 3962], at 12; City of North Texas Municipal Water District [ECF No. 3960], at 12-13; The Metropolitan Water District of Southern California [ECF No. 3955], at 12; and City of Fort Worth [ECF No. 3954], at 12.

> and because all parties are adequately protected by its application, the order will be approved.

*In re Orthopedic Bone Screw Products Liability Litigation*, 176 F.R.D. 158, 182 (E.D. Pa. 1997).

*See also Denney v. Deutsche Bank AG*, 443 F.3d 253, 276 (2d Cir. 2006) ("Moreover, there would be no need to specify a judgment credit methodology if the bar on claims for contribution or indemnity was likewise left to "applicable law," instead of being defined under the court-approved settlement agreement.").

### ix.    The Claims-Over Provision.[320]

The Claim-Over provision of § 12.7 is not an indemnity provision as some objectors claim, rather, the provision merely codifies defendants' rights to contribution under state law; such provisions are standard and non-controversial in class settlements because they merely preserve the rights that non-settling defendants enjoy under state law. *See Denney*, 443 F.3d at 276; *Orthopedic Bone Screw*, 176 F.R.D. at 182. As described in § 12.7.1, a non-settling defendant who is ordered to pay a Settlement Class Member cannot seek to recover that amount from Defendants, who will have *already* paid per this Settlement Agreement. The paragraph preserves a Settlement Class Member's right to sue a non-settling defendant, but recovery is reduced by the amount it has

---

[320] *See* Objections from: the Lower Colorado River Authority [ECF No. 3991], at 11-13; City of Airway Heights [ECF No. 3970], at 8-11; Upper Eagle Regional Water Authority [ECF No. 3989], at 10-12; Eagle River Water & Sanitation District [ECF No. 3987], at 9-12; City of Moses Lake [ECF No. 3986], at 9-11; Lakehaven Water & Sewer District [ECF No. 3983], at 9-11; Brazos River Authority [ECF No. 3981], at 13-16; the City of Dallas [ECF No. 3979], at 9-12; City of Las Cruces, [ECF No. 3978], at 9-12; Hannah Heights Owners Association [ECF No. 3974], at 8-11; the City of Tacoma [ECF No. 3972], at 9-12; City of DuPont [ECF No. 3968], at 9-11; Lakewood Water District [ECF No. 3965], at 9-12; City of Vancouver [ECF No. 3962], at 9-12; City of North Texas Municipal Water District [ECF No. 3960], at 10-12; The Metropolitan Water District of Southern California [ECF No. 3955], at 9-11; and City of Fort Worth [ECF No. 3954], at 9-11.

already received from Defendants.[321] This provision is entirely consistent with the Settlement's overall central of tenant of ensuring there is no double recovery. No tortured reading of § 12.7 can "significantly increase the Releasing Persons' potential exposure to *further losses*."[322] The language operates only to limit Defendants' payment under the Settlement.

### b)    Objections Relating to Class Certification

### i. The Class representatives' claims are typical of the Class members.[323]

As discussed above, typicality does *not* require that "the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). Here, typicality is satisfied because Class Members' claims arise from a single course of conduct— the contamination of drinking water with PFAS— and each Class Member has suffered contamination or the risk of contamination that differs only by degree.

The Marten Law Objectors make two meritless attacks on typicality. First, they argue that Class Representatives' claims are not typical because only four of 17 Class Representatives "include wholesale water supply as part of their business."[324] Yet just one class representative is required. *Yates v. NewRez LLC*, No. CV TDC-21-3044, 2023 WL 5108803, at *7 (D. Md. Aug. 9, 2023) (certifying class where a single class representative was sufficient to meet the typicality requirement of Rule 23(a)).

---

[321] SA, at § 12.7.2.

[322] City of Fort Worth Obj., at 2 (emphasis added).

[323] *See* Objections from: City of Fort Worth [ECF No. 3954], at 18-20; Metropolitan Water District of Southern California [ECF No. 3955], at 19-21; City of North Texas Municipal Water District [ECF No. 3960], at 19-21; City of Vancouver [ECF No. 3962], at 19-22; Lakewood Water District [ECF No. 3965], at 19-21; City of DuPont [ECF No. 3968], at 14-15; City of Airway Heights [ECF No. 3970], at 16-18; City of Tacoma [ECF No. 3972], at 20-22; Hannah Heights Owners Association [ECF No. 3974], at 13-14; City of Las Cruces [ECF No. 3978], at 19-22; City of Dallas [ECF No. 3979], at 18-21; Lakehaven Water & Sewer District [ECF No. 3983], at 16-18; and City of Moses Lake [ECF No. 3986], at 13-16.

[324] *See, e.g.,* City of Fort Worth Obj., at 19.

Second, despite acknowledging that wholesalers are included among the Class Representatives, the Marten Law Objectors cite a vague litany of issues and speculate that the Class Representatives "cannot adequately represent the interests of water providers" that "grapple with these issues."[325] Whether Class representatives are wholesalers or not, their claims are typical of the Class's claims because they stem from a common harm in that their Drinking Water was or is at risk of being contaminated with PFAS through Defendants' conduct. The Marten Law Objectors fail to explain, beyond vague posturing, why wholesaler claims do not arise from the common harm alleged.

Next, without citing a single case in support, the Marten Law Objectors assert that Class Representative claims are "atypical" because Class Representatives "only" represent 13 states and drinking water regulations vary.[326] But national classes are commonly settled without requiring representatives from all 50 states. *See, e.g., In re All-Clad Metalcrafters, Cookware Mktg. & Sales Practices Litig.*, MDL 2988, 2023 WL 2071481 (W.D. Pa. Feb. 17, 2023); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.,* No. 16-MD-02752, 2020 WL 4212811 (N.D. Cal. July 21, 2020); *In re Anthem, Inc. Data Breach Litig.,* 327 F.R.D. 299 (N.D. Cal. 2018). This is yet another example of the Marten Law Objectors advancing objections that are contrary to settled law.

Moreover, variations in state law do not preclude a finding of typicality. *In re: Mi Windows & Doors Inc. Prod. Liab. Litig.*, No. 2:12-MN-00001, 2015 WL 12850547, at *6 (D.S.C. July 22, 2015), *aff'd sub nom. In re MI Windows & Doors, Inc., Prod. Liab. Litig.*, 860 F.3d 218 (4th Cir. 2017) ("[D]espite possible state-by-state variations in the elements of these claims, they arise from a single course of conduct by [defendant] and a single set of legal theories."). In fact, "[t]here is

---

[325] *See, e.g.,* City of Fort Worth Obj., at 19-20.
[326] *See e.g.,* City of Fort Worth Obj., at 20; City of Airway Heights Obj., at 17-18.

no requirement that there be a class representative from each state to certify a national class." *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000, 2020 WL 8256366, at *20 (N.D. Ala. Nov. 30, 2020); *In re Cmty. Bank of N. Virginia*, 622 F.3d 275, 310 (3d Cir. 2010), *as amended* (Oct. 20, 2010) (agreeing with settling parties that there is no requirement to "appoint named class representatives from every state in order to approve a settlement that releases state law claims."). The Marten Law Objectors do nothing more than point out that states regulate drinking water differently – which does not preclude typicality. Regardless of state regulations or contamination levels, the settlement provides relief to remediate the universal harm. Thus, Plaintiffs' claims are typical of the Class members' claims and the objections should be overruled.

### ii. Plaintiffs are adequate because the Settlement Agreement was crafted to avoid any appreciable conflict of interests.[327]

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). As discussed above, the class representatives' adequacy is plainly established.[328] The Marten Law Objectors' argument to the contrary is based on the erroneous contention that a multitude of subclasses are necessary in addition to the two classes already adopted.

Each of the proposed class representatives is either a Phase One or Phase Two Class Member and each shares the same overriding interests as absent class members in either Phase One or Phase Two respectively.[329]

---

[327] *See* Objections from: City of Fort Worth, at 21-22; Metropolitan Water District of Southern California, at 22-23; City of North Texas Municipal Water District, at 22-23; City of Vancouver, at 22-23; Lakewood Water District, at 22-23; City of DuPont, at 15-16; City of Airway Heights, at 18-20; City of Tacoma, at 22-23; City of Las Cruces, at 22-23; City of Dallas, at 21-22; Lakehaven Water & Sewer District, at 18-19; and City of Moses Lake, at 16-17.

[328] The objection raised by the City of Newburgh in its footnote 1 is addressed in the Napoli Newburgh Decl. *See* Ex. B.

[329] *See, generally*, Exs. C-P.

*Structure of the negotiations*. The structure of the negotiations provides assurance of adequate representation.

The uncontradicted record shows that Class Counsel did in "an exhaustive review" of the proposed settlement terms, conducted "an independent review of the experts' recommendations, and engaged in negotiations and numerous discussions" concerning the proposed allocation of funds to Phase Two class members, all of which led Class Counsel to conclude that "the proposed Settlement Agreement …provides fair, reasonable, and adequate compensation to Phase Two Class [M]embers and treats them equitably in relation to Phase One Class Members."[330] This careful vetting of the proposed settlement is ignored by the Marten Law Objectors.

While the Marten Law Objectors argue that this class action suffers from a conflict of interest between present and future injury plaintiffs, "simply put, this case is not *Amchem*. The most important distinction is that class counsel here took *Amchem* into account by creating the Phase One and Phase Two Class Members status

*Terms of the settlement*. The terms of the Settlement also reflect substantive fairness: the Settlement was crafted to ensure that all Class Members receive, to the extent practicable, *exactly the same* compensation regardless of when they make claims on the Settlement Fund. The Marten Law Objectors imply that the interests of the Phase Two class members in this litigation, like the interests of the exposure-only class members in *Amchem*, are being slighted, with an inequitable portion of the settlement funds flowing to the Phase One class members who, of course, already

---

[330] Fegan Prelim. App. Decl., at ¶ 12; *see also,* Prelim. App. Mot. at 12 (discussing Ms. Fegan's "exhaustive review of the proposed Settlement Agreement" and conclusion that the proposed Settlement was "fair, reasonable, and adequate"); London Prelim. App. Decl., at ¶ 24 (same).

know of their injury. This ignores the detailed showing to the contrary set forth in Plaintiffs' memorandum in support of the Motion For Preliminary Approval of the Settlement.[331]

An independent expert in the field of liability forecasting calculated that only 31% of eligible claimants would be Phase Two class members but, in an abundance of caution, and to ensure fairness, on his recommendation, 45% of the settlement funds have been initially reserved for Phase Two class members.[332] Thus, unlike in *Amchem*, it is undisputed that this Settlement Agreement was crafted to ensure that Phase Two class members "receive the same approximate Allocated Amount as a Phase One [class member] with the same Adjusted Base Score, except for an inflation adjustment."[333] By contrast, in the *Amchem* settlement, the exposure-only class members stood to receive only about *one third* the amount received by currently injured class members, with no inflation adjustment.[334]

The Marten Law Objectors posit hypothetical conflicts *between* various Phase Two class members, depending on how much or the type of contamination each class member has.[335] These arguments ignore that *none* of the Phase Two class members (by definition) presently knows whether or not it has *any* contamination. Thus, *ex ante*, during the settlement negotiations, no Phase Two class member could know whether it would be benefitted by more funds allocated

---

[331] Prelim. App. Mot., at 21-30.

[332] *Id*. at 21-22.

[333] *See, e.g.,* Allocation Procedures, at p. 24, § 5(h)(ii); *see generally*, SA, at § 11.5, *et seq.*; Allocation Procedures.

[334] *See* Note, Alex Raskolnikov, *Is There a Future for Future Claimants After Amchem Products, Inc. v. Windsor*, 107 Yale L.J. 2545, 2553 (1998). Obviously, a settlement crafted to ensure that both class members who are presently injured, and those whose injuries will manifest (if at all) only in the future, receive *the same* compensation is "intrinsically fair," satisfying even the fiercest critics of mass-tort settlements, *id*. at 2554 & nn. 60-62, and obviously meeting the adequacy-of-representation requirement set out in *Amchem*. *Id*. at 2555.

[335] *See, e.g.,* City of Airway Heights Obj., at 18-19.

toward testing costs, or more funds allocated to remediation costs. In any event, as this Court is aware, the Settlement has been crafted to ensure that *all* reasonable testing costs will be covered for *all* class members, both those in Phase One and those in Phase Two, meaning that the hypothetical conflicts sketched by the Marten Objectors are entirely illusory.

Indeed, illusory conflicts do not require separate representation, nor does the law on adequacy of representation demand perfect symmetry among class members. *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012).  As the *Matamoros* court explained:

> But perfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable. 'Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement.' 1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed. 2012). Put another way, to forestall class certification the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole.

*Matamoros*, 699 F.3d at 138 (additional citations omitted). *See also In re Oil Spill by Oil Rig Deepwater Horizon,* 910 F. Supp. 2d 891, 918 (E.D. La. 2012) ("Subclassing is but one of many available options for limiting the possibility of intraclass conflicts; it is not required as a matter of course. Rather, subclasses might only be needed when there is a 'fundamental' conflict among class members, but no such conflict exists here.")

Nonetheless, not satisfied with this carefully crafted structure, the Marten Law Objectors contend that myriad additional subclasses should have been created. For example, the City of Fort Worth objection lists five subclasses that purportedly are necessary:  (1) within Phase Two (those with little or no PFAS detections versus those with high detections); (2) between retailers and wholesalers; (3) between class members with and without regulatory violations; (4) between class members with well-researched or less-researched PFAS; and (5) between class members that have PFAS with or without EPA-approved test methods. According to the Marten Law Objectors, these

110

subclasses each required separate counsel, and "certification without such safeguards [does] not comply with Rule 23."[336] This argument—which the Marten Law Objectors fail to support with supportive case citations or compelling factual evidence—is meritless, as myriad cases within the Fourth Circuit and elsewhere demonstrate. Those authorities show that subclassing is not required unless there is a critical need.

For instance, in *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417 (4th Cir. 2003), the Fourth Circuit upheld the district court's conditional certification of a single class that included both employee and employer class members against an insurance claims administrator, rejecting arguments of a conflict of interest. The court held that a conflict "must be fundamental" and "go to the heart of the litigation," which they found to not apply in this case. *Id.* at 430-31 (quoting 6 Alba Conte Herbert B. Newberg, *Newberg on Class Actions* § 18:14 (4th ed. 2002)).

In *Haney v. Genworth Life Ins. Co.*, No. 3:22cv55, 2022 WL 17586016 (E.D. Va. Dec. 12, 2022), the district court rejected objections asserting the need for subclasses. The court reasoned that there was no conflict because there was "no allocation decision necessary to distribute the relief" between the two groups involved. *Id.* at *11. Additionally, the court rejected an argument that subclasses were needed because class members were located in various states, finding nothing "to suggest that [the] questions of law and fact" differed among the relevant states. *Id.* Likewise, in *In re Serzone Products Liab. Litig.*, 231 F.R.D. 221 (S.D.W. Va. 2005), the district court held that there was no conflict of interest among the members to justify subclasses. The court reasoned that the entire class sought to recover damages for immediate injury caused by the product and that the claims were all presently known. *Id.* at 238.

---

[336] City of Fort Worth Obj., at 21-22.

Numerous cases outside the Fourth Circuit are in accord. For example, in *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010), objectors asserted a conflict of interest between members with only purchase-related claims related to recalled pet food, and members with injured animals caused by consumption of the food. The Third Circuit rejected objector's arguments, upholding the district court's finding that there was no conflict of interest between the members because the claims were all for economic damages and members all had present claims. *Id.* at 344. The court reasoned that "objectors [had] not identified adverse interests that would require the establishment of subclasses." *Id.* Finally, the court rejected the argument that differences in state law would create conflicts, finding that representatives' interests aligned with other class members. *Id.* at 349.

Importantly, far from improving the state of affairs, courts have noted that too many subclasses can be counterproductive, leading to inefficiencies and undue complexities and thereby undermining the class action process. For instance, in *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, 910 F. Supp. 2d 891 (E.D. La. 2012), two class settlements were negotiated: one for economic injuries and one for personal injuries. Rejecting an argument that subclasses should have been created based upon the various types of injury to avoid conflicts of interest, the court reasoned that "[i]f subclasses were entertained, there would be no principled basis for limiting the number of subclasses." *Id.* at 919. The court concluded that creating subclasses for each type of injury, "each with separate class representatives and counsel . . . would have greatly complicated both the settlement negotiations and the overall administration of the litigation." *Id.* at 920.

Other cases have likewise made clear that the creation of multiple subclasses could well undermine any efficiencies from the class action device. *See, e.g., In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005) ("[I]f subclassing is required for each material legal or economic

difference that distinguishes class members, the Balkanization of the class action is threatened.") (internal quotation marks omitted); *International Union, United Automobile, Aerospace, & Agricultural Implement Workers of America v. General Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007) ("if every distinction drawn (or not drawn) by a settlement required a new subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk fragmenting the class beyond repair"); *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am, AFL-CIO*, 803 F.2d 878, 880 (6th Cir.1986) ("Subclassing . . . is appropriate only when the court believes it will materially improve the litigation" and is not always necessary because "subclassing often leads to more complex and protracted litigation"). Inexplicably, the Marten Law Objectors ignore all of the case law warning against too many subclasses.

Similarly, the Marten Law Objectors attempt to create conflicts between Class Members who may have incurred or will incur costs with respect to a single Water Source, arguing that the Settlement Funds are not properly allocated among them.[337] However, the Marten Law Objectors ignore that the Settlement provides recovery for each Impacted Water Source. This is consistent with a central tenet of the Settlement Agreement: the prohibition on double recovery.

Thus, the Allocation Procedures[338] provide for payments based on Impacted Water Sources. To the extent multiple entities have claims based on the same Impacted Water Source, their allocated award may be apportioned in the manner explained in the Settlement Agreement,[339] the Allocation Procedures,[340] and the Joint Interpretive Guidance on Entities that Own and/or

---

[337] *See, e.g.,* City of Airway Heights Obj., at 18-19. The 2 non-Class Members represented by Marten Law raise the same issue. *See, e.g.,* Brazos River Authority Obj., at 20-22.
[338] *See* Allocation Procedures, *generally*.
[339] SA § 11.5, *et seq*.
[340] *See* Allocation Procedures, *generally*.

Operate Multiple Public Water Systems.[341] Contrary to the Marten Law Objectors' arguments, "[t]he proposed allocation need not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis." *Feinberg v. T. Rowe Price Grp., Inc*., 610 F. Supp. 3d 758, 769 (D. Md. 2022) (internal quotations omitted). Here, an award for a single Impacted Water Source to be allocated among those with responsibility to remediate the source is reasonable and rational.

Moreover, the Settlement Administrator has the discretionary authority to consider all documentation submitted by Class members with respect to each Impacted Water Source, and to request additional documentation, analyze any and all relevant information, determine a fair and equitable apportionment of allocated awards amongst interrelated systems, and generally ensure an outcome that comports with the principles and terms of the Settlement Agreement.[342] Because the Allocation Procedures are reasonable and rational, and were "carefully devised to ensure a fair distribution of the settlement fund to the various types of claimants,"[343] the plan should be approved and the objections as to the Plaintiffs' adequacy should be overruled.

---

[341] *See* The Parties' Joint Interpretive Guidance on Entities that Own and/or Operate Multiple Public Water Systems [ECF No. 3919-1] ("Mutl. PWS Guidance"), *generally*.

[342] *See, e.g.*, the Parties' Joint Interpretive Guidance on Interrelated Drinking-Water Systems [ECF No. 3858-1], p. 5; SA § 3.3, 8.4.

[343] *See, e.g., In re Ins. Brokerage Antitrust Litig*., 579 F.3d 241, 273 (3rd Cir. 2009) ("…the Plan of Allocation was carefully devised to ensure a fair distribution of the settlement fund to the various types of claimants and was allocated in such a way that policyholders who likely incurred the most damage are entitled to a larger proportion of the recovery than those whose injuries were less severe. Even if some potential benefits may have been realized from utilizing subclasses, it is not at all clear that the advantages would have outweighed the disadvantages, and therefore it is difficult to say that the District Court abused its discretion by not taking this step. Consequently, we conclude that the District Court's decision not to certify separate subclasses or require separate representation did not constitute an abuse of discretion and likewise its approval of the Zurich Settlement Agreement and Plan of Allocation was also within its discretion.")

Under the case law, it was incumbent upon the Marten Law Objectors to demonstrate that the purported conflicts were so fundamental as to warrant separate subclasses. They have not done so. To the contrary, adopting the many subclasses urged by the Marten Law Objectors would lead precisely to the sort of "Balkanization" that courts fear when too many subclasses are created.

### iii.    Questions of law and fact predominate[344, 345]

As demonstrated above, Rule 23(b)(3) predominance and superiority are satisfied here.  In arguing otherwise, the Marten Law Objectors assert that predominance is not met because "individual claims dominate," listing a smattering of considerations that they allege "affect the strength of each class member's claim and thus the potential damages and recovery."[346] "Critically [however], Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." *Stillmock*, 385 Fed. Appx. at 273 (citing *Gunnells*, 348 F.3d at 429). *Central Wesleyan College v. WR Grace & Co.*, 6 F.3d 144 (4th Cir. 1993). Where, as here, "the qualitatively overarching issue by far is the liability issue of the defendant's" conduct, common questions of fact predominate.

---

[344] Rule 23(a)(2)'s requirement of commonality is subsumed within Rule 23(b)(3)'s predominance requirement. *Millwood v. State Farm Life Ins. Co.,* No. C/A No. 7:19-cv-01445-DCC, 2022 U.S. Dist. LEXIS 173928, at *11 (D.S.C. Sept. 23, 2022) (granting class certification and explaining "'the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate' over other questions. *Lienhart*, 255 F.3d at 146 n.4 (quoting *Amchem*, 521 U.S. at 609).").

[345] *See* Objections from: City of Fort Worth [ECF No. 3954], at 17-18; Metropolitan Water District of Southern California [ECF No. 3955], at 18-19; City of North Texas Municipal Water District [ECF No. 3960], at 18-19; City of Vancouver [ECF No. 3962], at 19; Lakewood Water District at [ECF No. 3965], at 18-19; City of DuPont [ECF No. 3968], at 13; City of Airway Heights [ECF No. 3970], at 15-16; City of Tacoma [ECF No. 3972], at 19; Hannah Heights Owners Association [ECF No. 3974], at 12-13; City of Las Cruces [ECF No. 3978], at 19; City of Dallas [ECF No. 3979], at 18; Lakehaven Water & Sewer District [ECF No. 3983], at 15-16; City of Moses Lake [ECF No. 3986], at 13; and Upper Eagle Regional Water [ECF No. 3989], at 14-15.

[346] City of Forth Worth Obj., at 18. *See, e.g., id.* (referring to levels of PFAS contamination, application of regulations, the purchase of treated or raw water, viability of claims against the federal government, and the class members' geographic location).

*Stillmock*, 385 Fed. Appx. at 273.

Contrary to Fourth Circuit law, the Marten Law Objectors seek to have this Court ignore the qualitative demonstration that has already occurred before this Court reflecting the predominance of common issues and defenses, and instead undertake a headcount of illusory differences among Class members.

The Marten Law Objectors also ignore that all class members suffered the same harm—PFAS exposure or risk of exposure to their drinking water—which may vary by degree. But "[t]he possibility that individualized inquiry into Plaintiffs' damages claims will be required does not defeat the class action because common issues nevertheless predominate." *Gunnells*, 348 F.3d at 429; *see also, Brooks v. GAF Materials Corp.*, 301 F.R.D. 229 (D.S.C. 2014). Individual questions of damages viewed in light of the overarching common harm should not defeat predominance. *Stillmock*, 385 F. App'x at 273.

The Marten Law Objectors' argument that PWS citizenship in all 50 states impedes predominance should be rejected; "variations in the rights and remedies available to injured class members under the various laws of the fifty states [do] not defeat commonality and predominance." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 301 (3d Cir. 2011). While multistate classes may face the challenge of applying multiple laws when seeking to certify a litigation class,[347] those considerations dissipate in the face of a settlement. *Sullivan,* 667 F.3d at 301 ("state law variations are largely 'irrelevant to certification of a settlement class[']"). This is so because the settlement "obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws[.]" *Id.* at 304. *See also Jabbari v. Farmer*, 965 F.3d

---

[347] *See, e.g., Ward v. Dixie Nat. Life Ins. Co.*, 257 F. App'x 620, 628–29 (4th Cir. 2007) (identifying criteria for meeting predominance when seeking to certify a class action potentially governed by the laws of multiple states for trial).

116

1001, 1007 (9th Cir. 2020) ("For purposes of a settlement class, differences in state law do not necessarily, or even often, make a class unmanageable" as could result in failure to meet predominance requirement); *In re Serzone Prod. Liab. Litig.*, 231 F.R.D. 221, 240 (S.D.W. Va. 2005) (finding that differing state laws are "rendered irrelevant" in the context of settlement and "do not destroy class cohesion."). Here again, the Marten Law Objectors simply ignore the overwhelming authority that refutes their argument.

As discussed *supra,* a core tenet of the Settlement is the single recovery for each Impacted Water Source. Thus, Settlement Class Members include all qualifying PWS, including wholesalers and retailers, each of which may have responsibility to remediate an Impacted Water Source and thus each of which suffered the same type of harm. This common harm outweighs any individual considerations for minor variations between Settlement Class Members.[348]

In sum, none of the considerations identified by the objectors defeat the predominance of the common questions concerning Defendants' conduct.

This Settlement meets every requirement for certification of a settlement class, and every factor relevant to assessing whether the settlement is fair, reasonable, and adequate. The paucity of objections reflect the overwhelming support by this sophisticated class, and the objections offered (most of which are by one law firm) are legally and factually meritless.

## V.    CONCLUSION

---

[348] *See e.g., Case v. French Quarter III LLC*, No. 2:12-CV-02518-DCN, 2015 WL 12851717, at *6 (D.S.C. July 27, 2015) (finding the predominance inquiry met in a mass tort class action where the claims arose from a uniform series of conduct and each class member suffered the same type of damage); *In re Flint Water Cases*, 571 F. Supp. 3d 746, 790 (E.D. Mich. 2021) ("In certain 'mass tort accidents,' plaintiffs may meet the predominance requirement even if 'questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved ... [such a finding] does not dictate the conclusion that a class action is impermissible.") (quoting *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988)).

For the foregoing reasons, Class Counsel respectfully request that the Court: (1) grant their Motion for Final Approval; (2) find the Settlement Agreement is fair, reasonable and adequate; (3) find that, for settlement purposes only,  the Settlement Class satisfies the requirements of Fed. R. Civ. P. 23; (4) grants their Motion for Attorneys' Fees and Costs ; (5) enter judgment dismissing Claims in the Litigation asserted by Settlement Class Members against Released Persons; (6) and enter a permanent injunction prohibiting any Settlement Class Member from asserting or pursuing any Released Claim against any Released Person in any forum.


Dated: November 21, 2023                        Respectfully submitted,

                                                /s/ Michael A. London
                                                Michael A. London
                                                Douglas and London P.C.
                                                59 Maiden Lane, 6th Floor
                                                New York, NY 10038
                                                212-566-7500
                                                212-566-7501 (fax)
                                                mlondon@douglasandlondon.com

                                                Paul J. Napoli
                                                Napoli Shkolnik
                                                1302 Avenida Ponce de León
                                                San Juan, Puerto Rico 00907
                                                Tel: (833) 271-4502
                                                Fax: (646) 843-7603
                                                pnapoli@nsprlaw.com

Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
214-521-3605
ssummy@baronbudd.com


Elizabeth A. Fegan
Fegan Scott LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
312-741-1019
beth@feganscott.com

Joseph Rice
Motley Rice LLC
28 Bridgeside Blvd.,
Mt. Pleasant, SC 29464
jrice@motleyrice.com

*Class Counsel*

   -and-
 Robert Klonoff*
 Lewis & Clark School of Law
 Jordan D. Schnitzer Professor of Law
 10101 S. Terwilliger Boulevard
 Portland, Oregon 97219
 503-768-6600
 klonoff@usa.net


*On the Brief (*pro hac forthcoming)*