IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG <br><br> **This Document Relates to:** <br><br> *City of Camden et al. v. E.I. du Pont de Nemours & Company et al.,* <br> Case No. 2:23 cv-03230-RMG |

**REPLY TO CLASS COUNSEL'S RESPONSE TO OBJECTIONS**

Below-signed counsel ("Counsel to Objectors") file this consolidated brief in reply to Class Counsel's "Memorandum of Law . . . in Response to Objections" (Dkt. No. 4080-1, "Response") on behalf of the Brazos River Authority ("BRA"), City of Airway Heights, City of Dallas, City of DuPont, City of Fort Worth, City of Las Cruces, City of Moses Lake, City of Vancouver, Eagle River Water & Sanitation District, Lakehaven Water & Sewer District, Lakewood Water District, Lower Colorado River Authority ("LCRA"), the Metropolitan Water District of Southern California, North Texas Municipal Water District, Upper Eagle Regional Water Authority (collectively, "Objectors").

**I.     INTRODUCTION**

This litigation is unusual, even in the context of multi-district and class action environmental claims. The proposed settling class members are not purchasers of consumer products, *see, e.g., Thomas v. Louisiana-Pacific Corp.*, 246 F.R.D. 505 (D.S.C. 2007), or victims of inadequate online data security systems, *In re Wawa, Inc. Data Security Litig.*, 85 F.4th 712 (3rd Cir. 2023), or victims of defective medical devices, *Brown v. C.R. Bard, Inc.*, 942 F.Supp.2d

1

549 (E.D. Penn. 2013). They are neither individuals nor private businesses, in the commonly understood use of those terms. Rather, the proposed class members here are public or quasi-public entities whose principal function is to provide safe drinking water to their customers and members. The outcome of this case, including this Court's decisions on pending issues, will implicate the interests of the more than 300 million people who rely on those public water systems ("PWSs") to provide clean and safe drinking water daily. *See* U.S. EPA, *Population Served by Community Water Systems with No Reported Violations of Health-Based Standards* (2022), https://cfpub.epa.gov/roe/indicator.cfm?i=45; *see also* Response at 13 (describing the settlement as "without question the largest drinking water settlement ever").

Equally as noteworthy as the safety and health implications for those water consumers is the undisputed fact that PWSs are subject to mandatory, prescriptive processes for timely notice, public involvement, public disclosure, and other mechanisms intended to protect decisions related to a resource fundamental to human existence. In this context, the millions of people who consume and ultimately must pay costs relating to that water, but are not represented by Class Counsel, are a constituency this Court must consider as it evaluates this Agreement. Objections were filed to the Agreement not to undermine settlement, but to encourage amendments in order to ensure an appropriately crafted, legally sound Agreement that would allow for greater participation by PWSs. The fact that the decisions made here will implicate the financial resources available to provide drinking water to millions of people is at the core of this case.

The Court plays a critical role in class action settlements—the role of fiduciary to protect absent class members who have had their rights negotiated by class counsel. *Sharp Farms v. Speaks*, 917 F.3d 276, 293–94 (4th Cir. 2019) ("judges provide the primary oversight of class counsel"). The procedures of class settlements provide limited avenues for input by parties that are

not represented directly by class counsel. The only mechanism for meaningful input is by objections, which provide a record the Court may use in conducting its assessment, as well as an opportunity for class counsel and defendants to understand challenges posed by settlements as drafted. "Good-faith objections can assist the court in evaluating a proposal under Rule 23(e)(2)." Rule 23(e) Comm. Notes—2018 Amendment. Further, "objections[] may reveal divergent interests of class members and demonstrate the need to redefine the class or to designate subclasses." Rule 23(e) Comm. Notes—2003 Amendment.

The Objectors collectively provide treated and untreated water to approximately 30 million customers. They pointed out via objections ("Objections")[1] several issues they consider critical to their specific water systems under the proposed settlement agreement between Defendants DuPont de Nemours, Inc., the Chemours Company, Corteva, Inc., and E.I. DuPont de Nemours and Company (collectively, "DuPont") and PWSs ("Agreement"). Objectors did so because they saw significant problems in the operation of certain settlement provisions, including in the likely event of future environmental litigation, and out of hope that Class Counsel would amend the settlement language to address identified issues and make the proposed settlement one that could allow for participation, as applicable, without reservation. Ignoring the opportunity the Objections presented, the Response instead raises unsupported, ad hominem attacks on Counsel to Objectors.[2]

The Response seeks to discount the Objections as few in number. Other, perhaps more probable, ways to interpret the fact that so few water providers objected is that many had too little

---

[1] Dkt. Nos. 3953–56, 3959–63, 3965–66, 3968–75, 3977–91.
[2] *See, e.g.*, Response at 68, 71 (alleging Objections were filed for "personal gain," in an "organized campaign to recruit potential objectors by disparaging the settlement . . . in a transparent effort to secure fees…"). Those unsubstantiated assertions are, without exception, totally false. This Reply will not respond in kind. We object to those personal attacks; they are not relevant to any issue before this Court. The undersigned counsel stands ready to address Class Counsel's false statements, should the Court so request.

time to fully analyze, comprehend, and respond to what on first reading is a labyrinthine agreement, or they have simply elected to opt out rather than object. The Court has a duty to protect the interests of those not able to be present at the negotiating table. The inexplicably hostile Response to those Objections serves to emphasize that critical judicial role here.

## II.    FACTUAL BACKGROUND

The Response describes years of negotiations and litigation in the multi-district litigation ("MDL") that culminated in the Agreement. Response at 14–21. The narrative suggests that entertaining any objections would disrupt a long-winding process of resolving the PFAS claims at issue. But those PFAS claims were commenced individually, not as a class action. As a result, the PWSs whose interests are implicated here have had little time to learn about this litigation.

As a result, absent from the Response's description are the positions of the approximately 14,000 PWSs not represented by Class Counsel who could not sit at the negotiating table. Those absent class members have been forced to engage in a rushed assessment and decision-making process regarding a complicated proposed settlement that continued to change not only in the weeks before objections were due, but even more than a week *after* the Objections had been filed. *See, e.g.*, Dkt. Nos. 3858-1 (Interpretive Guidance on Interrelated Drinking-Water Systems) ("Interrelated Guidance"); 3919-1 (Interpretative Guidance on Entities That Own and/or Operate Multiple [PWSs]); 3967 at 5–8 (Interpretive Guidance on Federally Recognized Indian Tribes and [PWSs] that They Own or Operate); 4064-1 (Interpretive Guidance on Certain Release Issues) (filed from October 25, 2023 to November 19, 2023).

While trade-offs are made in any settlement and particularly in class actions, the Agreement's impacts on PWSs are unique, and the diversity of their experiences could provide value to Class Counsel in shaping the settlement to the benefit of all PWSs. It is in that light that

4

Objectors filed their individual objections.[3]

### III. LEGAL BACKGROUND

The Court may only approve a proposed class action settlement after finding the agreement as drafted meets the requirements of Rule 23. Class settlement proponents bear the burden of demonstrating that the settlement is "fair, reasonable, and adequate." *1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 521 (4th Cir. 2022). In its role as "fiduciary," *Sharp Farms*, 917 F.3d at 293–94, the Court should "adopt the role of a skeptical client and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation." Manual for Complex Litig. Fourth, § 21.61. In that way, the Court exercises its affirmative duty to protect the interests of the "class members whose rights may not have been given adequate consideration during the settlement negotiations." *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

### IV. ANALYSIS

#### A. The Release is Unreasonable Because it is Overbroad.

##### 1. The release encompasses unalleged wastewater and stormwater claims.

The Agreement releases claims for "PFAS that entered" a Class Member's "facilities or real property," unless (1) such claims involve facilities or real property that are "separate from and

---

[3] The Response argues incorrectly that the objections are somehow invalid due to their overlapping content and alleged failure to specify on whose behalf those objections were filed. Response at 77–78. The Objections were based on the individual needs of each PWS and filed individually per Court Order. *See* Dkt. No. 3603 at 9–11 (granting preliminary approval of the proposed settlement and providing the process by which a singular "Settlement Class Member" could file objections). Those objections were filed only on behalf of the signed objector, just as the caption of each objection specified. *See, e.g.*, Dkt. No. 3962 ("Objection of City of Vancouver"). The objections met both the letter of Rule 23(e)(5)(A) and the purpose of the rule, which is to ensure that objections are sufficiently specific that parties and the Court may evaluate their merits. *See* Fed. R. Civ. P. 23(e)(5)(A) Advisory Comm. Note to 2018 Amendment. Class Counsel were able to respond to each objection without issue. This reply collectively addresses Class Counsel's contentions, which were advanced collectively, and not with respect to any individual Objector.

not related to a [PWS]," or (2) EPA or a State establishes new more stringent requirements on stormwater or wastewater cleanup. *See* Agreement §§ 12.1.1, 12.1.2. After the Objections were filed, the parties issued a joint interpretive guidance stating: "It is the parties' joint understanding that the words 'separate from and not related to' in the two clauses italicized above mean 'separate from and not physically related to.'" Dkt. No. 4064-1 at 1. The Response argues that this guidance moots any argument that the release is overbroad due to wastewater, stormwater, and other cleanup claims. *See* Response at 95.

The guidance does not sufficiently narrow the release, however, which continues to lack an identical factual predicate with the claims asserted in litigation. Any "physical" relationship between a wastewater or stormwater facility and a PWS—for example, pipes rerouting some wastewater from a wastewater treatment facility to a PWS for treatment and reuse as drinking water—would seemingly trigger the release of those wastewater and stormwater cleanup claims. Yet, the Class Action Complaint contains not even one claim against DuPont for wastewater or stormwater cleanup. *See generally* Case No. 2:23 cv-03230-RMG, Dkt. No. 7.

The identical factual predicate test is not a "close enough" test. There must be identity between the facts underlying the claims asserted and those released. Even if both sets of facts involve "the same . . . conduct by Defendants," there is no identical factual predicate if the released claims require proof of additional and different facts, such as modes of injury and other "follow-on questions of when, and where, and how." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 725 F. App'x 560, 561 (9th Cir. 2018) (despite shared facts of defendants' anticompetitive conduct, two sets of antitrust claims lacked identical factual predicate where claims "depend[ed] on proof of different facts to establish a different injury" and there were "facts which [plaintiff] must prove in [second] action . . . which would have been unnecessary in the [prior action]"). Likewise, here,

6

the asserted PWS contamination claims and released waste- and stormwater claims involve different facts on where and how the injury occurred. There is no identical factual predicate.

### 2. The release covers too many types of PFAS.

The release also is overbroad because it would resolve claims for thousands of PFAS—beyond the 29 PFAS to be tested for under UCMR 5 and any other PFAS for which Class Members have asserted claims. Rather than respond to this lack of an identical factual predicate, the Response assures the court without evidentiary support that treatment for one PFAS will suffice for every other PFAS. Response at 102. There may in fact be important differences in how PFAS can be treated. *See, e.g.*, Marcel Riegel, et al., *Sorptive removal of short-chain perfluoroalkyl substances (PFAS) during drinking water treatment using activated carbon and anion exchanger*, 35 ENV'T SCI. EUR. (2023) (detailing "significant" differences between responsiveness of long- and short-chain PFAS to activated carbon filtration and ion exchange treatments); Allyson Chiu, *New tech could one day scrub 'forever chemicals' from your tap water*, WASH. POST (Apr. 16, 2023), https://www.washingtonpost.com/climate-solutions/2023/04/16/pfas-water-treatment-filter/ ("Activated carbon, for example, can filter what is known as long-chain PFAS but does not as effectively trap the shorter-chain variants of the chemicals."); *PFPRA AND OTHER ULTRA-SHORT-CHAIN PFAS*, Cape Fear Public Utility Auth., https://www.cfpua.org/835/PFPRA-and-other-Ultra-Short-Chain-PFAS (last visited Nov. 27, 2023) ("Smaller PFAS are often the hardest to remove during water treatment. Since bringing our new Granular Activated Carbon . . . filters online in 2022, CFPUA has seen some PFAS breaking through the filters, particularly two ultra-short-chain PFAS called PFMOAA and PFPrA."). Given the critical nature of these assertions for the Agreement to be valid, the release and its real-world implications merit scrutiny.

### 3. The release includes unalleged personal-injury contribution claims.

The release is also overbroad because it includes future contribution claims asserted by Class Members for potential personal-injury liabilities. The Response dismisses releasing such claims as simply one of many tradeoffs a Class Member must accept. Response at 104–05. After all, the Response argues, only a few personal-injury lawsuits have been filed in the MDL. *Id.* That position is nothing more than speculation. For a variety of reasons, including still-developing public knowledge of PFAS and the investment needed to prove causation, it is not surprising that there may have been delays in filings of personal-injury lawsuits *en masse*. But such suits have begun. *See, e.g.*, Compl, *Vincent v. Aquarion Water Co.*, No. FBT-CV23-6128205-S (Conn. Sup. Ct. Oct. 16, 2023); Compl., *Hoffnagle v. Conn. Water Co.*, No. HHD-CV-23-6175540-S (Conn. Sup. Ct. Oct. 31, 2023); Compl., *Reeves, et al., v. City of Newburgh*, Index No. EF007713-2017 (N.Y. Sup. Ct. Sept. 27, 2017) (complaint for personal injury filed by Class Counsel against city for alleged water contamination). And the release would in this way further force ratepayers and taxpayers alike to take on the burden of claims arising from DuPont's activities.

A court can only approve a release of claims that share an "identical factual predicate" with claims alleged in the case at issue. *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015) ("Any released claims not presented directly in the complaint, however, must be based on the identical factual predicate as that underlying the claims in the settled class action." (internal citation and quotations omitted)). It is not enough that the released personal injury-based contribution claims share certain common facts with claims actually asserted; they must "depend upon the *very same* set of facts." *McAdams v. Robinson*, 26 F.4th 149, 160 (4th Cir. 2022) (internal quotations and brackets omitted) (emphasis added). While Class Members have sued DuPont for contaminating their water supplies with PFAS, they have not sued DuPont in contribution for causing personal

injury to their customers, claims that rely on different facts regarding, *inter alia*, illness information, individual consumption patterns, and causation questions. Accordingly, there is no identical factual predicate here. *See Canter v. Midland Credit Mgmt., Inc.*, No. 3:14-cv-02939, 2017 WL 2817065, at *4 (S.D. Cal. June 28, 2017) (ruling that some "overlap" in subject matter between consumer protection claims did not constitute an identical factual predicate, rendering release overbroad); *Boyd v. Avanquest N. Am. Inc.*, No. 12-CV-04391, 2015 WL 4396137, at *5 (N.D. Cal. July 17, 2015) ("This release is overly broad because it covers more causes of action than the Complaint alleges.").

### 4. The opt-out "remedy" is not sufficient to protect class members whose rights could still be affected by the overbroad release.

The Response admits "[i]t is true that recovery under the Settlement would release contribution and indemnity claims the PWS might have against Defendants if *the PWS* is the subject of suits by injured individuals for personal injury claims." Response at 91. Rather than address this concern, the Response's solution is for Class Members which "believe that giving up rights to indemnification and contribution are a deal breaker, . . . [to] opt[] out." *Id.* at 93. In support, the Response cites *Eisen v. Porsche Cars N. Am., Inc.,* No. 2:11-CV-09405-CAS, 2014 WL 439006, at *7 (C.D. Cal. Jan. 30, 2014) (collecting cases). *Id.* According to *Eisen*, "Federal courts routinely hold that the opt-out remedy is sufficient to protect class members who are unhappy with the negotiated class action settlement terms." 2014 WL 439006 at *7. That may be so in certain cases, but not in this case. The Response overlooks the fact that opting out of this Settlement does not protect Class Members from the far-reaching effects of the overbroad release provisions and unilateral extensions of those releases. The Interrelated Guidance expressly states: "In general, if a wholesaler opts out of the Settlement Class and its retail customer is a Settlement Class Member, the release would extend to the wholesaler as to the water it provided to the Settlement Class

Member except to the extent the wholesaler shows it had the obligation for and bore unreimbursed PFAS-treatment costs for that water independent of the retail customer." Dkt. No. 3858-1 (emphasis added). Thus, even if a wholesaler opts out, it could still be subject to the release. As a result, the opt-out remedy here is not sufficient to protect Class Members—and non-Class Members—whose rights stand to be prejudiced even if they opt out.

### 5. The release could be extended to non-Class Members, without notice.

The Response also fails to address concerns raised about the overbreadth of the release insofar as it could purportedly be extended not only as between members of interrelated systems, but even when one member is not a Class Member. *See* Dkt. No. 3991 at 15–16.[4]

### B. The Claims-Over Provision is Unreasonable Because it Functions as an Indemnity.

The Agreement contains a "contribution bar" and a "Claims-Over" provision. The Claims-Over Provision requires the Settlement Class Member to "reduce the amount of any judgment it obtains against the Non-Released Person who is asserting the Claim-Over by whatever amount is necessary, or take other action as is sufficient, to fully extinguish the Claim-Over under applicable law." Agreement § 12.7.2. Combined, these provisions operate as a functional indemnity because of the way core environmental cleanup laws allocate damages. Environmental laws like the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and state hazardous cleanup laws equitably allocate cleanup costs among those responsible for the contamination. *See generally* 42 U.S.C. § 9601, *et seq.*; Chapter 173-340 WAC, *et seq.* The contribution bar will not preclude claims by non-parties to the litigation, as such a bar

---

[4] LCRA and BRA filed Objections and this brief in an abundance of caution to address the ambiguities and overbreadth of the Agreement and related guidance. They will also serve Requests for Exclusion for the same reason if necessary. By taking these actions, neither LCRA nor BRA concede that they are Class Members, nor that they could be held to be so in the future.

10

would violate basic due process. *See Jiffy Lube*, 927 F.2d at 158 (citing Manual for Complex Litigation 2d, § 23.14 at 166 (1985)). The contribution bar in Section 12.7.1 cannot apply to either direct actions against DuPont or contribution actions against DuPont by non-parties to the MDL. But someone will pay the costs of cleanup. CERCLA and state cleanup laws impose strict, joint and several liability. If a PWS has signed away contribution, should another responsible party seek contribution from DuPont, the provision functions as an indemnity that shifts future costs that would otherwise be attributable to DuPont and exceed the settlement allocation back to the PWS and the public. This shift fits squarely within the definition of indemnity (*see* Indemnity, BLACK'S LAW DICTIONARY, 2d ed. (1910) ("to secure against loss or damage"))—a term to which many public and quasi-public bodies cannot agree under state constitutions. *See, e.g.*, Dkt. No. 3991 at 11–12.

The Response claims that "[n]o tortured reading of § 12.7 can significantly increase the Releasing Persons' potential exposure to further losses." Response at 117 (internal quotation marks omitted). Yet that is exactly what section 12.7 would not only allow, but would mandate in order to ensure any Claim-Over against DuPont is "fully extinguish[ed]" by whatever means necessary (i.e., by absorbing DuPont's share of liability in a future contribution action that far exceeds the amount the Class Member received from DuPont, should applicable law require that result). The shift of liability inherent in the application of these provisions means that the value of the Settlement, in aggregate and to individual claimants, is incapable of calculation. These uncapped indemnity obligations would include—as the Response acknowledges—obligations covering unknown PFAS, newly discovered contamination, personal-injury cases, as well as cleanup contribution. *Id.* at 97, 102–05. PWSs and their ratepayers should not be asked to bear the brunt of such a massive transfer of economic liability from DuPont to the public.

**C. Failure to Name a Settling Crediting Method Renders the Settlement Unfair.**

The Agreement provides no settlement credit method. The Response claims that the settlement credit method will be determined under state law. *Cf.* Agreement § 12.7 (stating that contribution bar order would be effective depending on "applicable law"). The Agreement is not limited to state law—the releases, contribution bar, and other material elements will encompass federal claims and laws. *See generally id.* §§ 12.1, 12.7.

The Response argues in conclusory fashion that the Fourth Circuit has approved deferring determination of the settlement credit method by stating that such method will turn on "applicable law." Response at 115 (citing *Jiffy Lube*, 927 F.2d at 160). Yet the case cited reveals the exact opposite—the Fourth Circuit held that uncertainty around settlement credit methods across federal and state jurisdictions *requires* specification of a credit method. *Jiffy Lube*, 927 F.2d at 161 (vacating and remanding settlement for "failure to designate a setoff method").[5] Put differently, failure to name a setoff method constitutes a blackletter failure under Fourth Circuit precedent. *See id.* at 160 ("[W]e determine as a matter of law that the district court should have specified the method of setoff to be used in the federal claims."); *see also S.C. Nat. Bank v. Stone*, 139 F.R.D. 335, 342 (D.S.C. 1991) ("Deferral of a decision on what credit method to adopt prejudices both absent class members, whose decision of whether to remain a member of the settlement class or to 'opt out' of a Rule 23(b)(3) class could be affected by the credit method adopted, and non-settling defendants, whose trial preparation and strategy might be affected by the credit method used." (citing *Jiffy Lube*, 927 F.2d at 160–61 n.3)).[6]

---

[5] In *Jiffy Lube*, "[n]otices were sent to approximately 12,000 purchasers of JLI stock during the class period; only one shareholder expressed opposition to the settlement terms." 927 F.2d at 158. Thus, while less than 0.1% of known class members objected, the Fourth Circuit vacated and remanded the district court's approval of the settlement.

[6] The Response cites a district court and Second Circuit case to attempt to justify the Agreement's violation of this precedent. Response at 103-104 (citing *In re Orthopedic Bone Screw Products*

12

### D. Commonality-Predominance Has Not Been Satisfied.

The Response dismisses Objectors' commonality-predominance arguments as "quantitative" rather than "qualitative" in nature. However, Objectors have pointed to complex individual issues that substantively affect DuPont's liability. At the core of the quantitative-qualitative distinction is courts' observation that the need for many individualized damages calculations will not *on its own* defeat commonality-predominance, so long as the issue of the defendants' liability is "overarching," i.e., capable of similar resolution as to each claimant. *Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 273 (4th Cir. 2010). The commonality-predominance requirement is qualitative in that it depends not on the number, but on the complexity and importance, of common versus individual issues. *See Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 429 (4th Cir. 2003) (finding commonality-predominance where "liability issues" common to the class "far exceed in complexity the more mundane individual damages issues" (quoting *In re Honda Motor Co.*, 979 F. Supp. 365, 367 (D. Md. 1997))).

Objectors have raised individual qualitative differences relevant to defendants' liability, including wholesaler versus retailer status, purchase of raw versus treated water, the presence of regulated or unregulated PFAS analytes, groundwater, surface water, or mixed water sources, riparian or prior appropriation laws governing water rights, and other factors. Moreover, almost every claim in the Class Action Complaint is based in tort and requires resolving claimant-specific questions affecting liability. Dkt. No. 7 at 63–85; *see Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("[M]ass tort" cases "call for caution [as to class certification] when individual stakes are high and disparities among class members great.").

---

*Liability Litigation*, 176 F.R.D. 158 (E.D. Pa. 1997) and *Denney v. Deutsche Bank AG*, 443 F.3d 253, 276 (2d Cir. 2006)). Both are factually distinguishable and in any event do not control here.

13

The predominance of these individual issues reveals the overbreadth of the proposed class and the resulting difficulty of protecting absentee class members' rights, to which courts must give "undiluted, even heightened, attention in the settlement context." *Id.* at 620. The Response mistakenly concludes that because these factors affect the damages each Class Member could obtain, they only address commonality-predominance in a "quantitative" sense. But these same individual factors are equally relevant to DuPont's liability. For example, a Class Member's purchase of treated water raises a causation question as well as other complex and as yet unresolved individualized liability issues. To argue that individuation among the Class Members is only relevant to damages confesses a fundamental lack of familiarity with how water systems function.

The present case is unlike *Stillmock*, which the Response cites for the "overarching liability" proposition. There, the defendant's liability was merely a question of "willful noncompliance" with a consumer protection statute—a question that did not turn on the individual circumstances of each class member. 385 F. App'x at 272. The "only substantive difference" between putative class members in *Stillmock* was the number of noncompliant receipts each one received from the defendant over an 18-month period; that was only relevant to damages. *Id.* at 273. Here, by contrast, DuPont's liability to any given water provider depends on numerous individual factors, which the Response incorrectly dismisses as "illusory." Response at 116.

### E. The Notice Plan Provided Inadequate Notice to PWSs.

Due process is not a burden to be shouldered or a bar that can be cleared through "mere gesture." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974). Rather, it is an expectation embedded in the U.S. Constitution that individuals be notified before they have their rights negotiated away. This settlement governs the provision of safe and healthy drinking water for the vast majority of people across the United States. Response at 13. Despite these high stakes, the Response defends a Notice Plan that was "not comprehensive" and at best reached "most PWS."

14

*Id.* at 111–12. That is not the standard the Court should accept when the entities were readily identifiable public and quasi-public bodies responsible for delivering safe drinking water.

The settlement defines the class to include any active PWS that conducted testing under UCMR 3, UCMR 5, or a comparable state program, as well as any system that had positive PFAS test results. Agreement § 5.1. The Notice Plan failed to account for this final category, and did not provide direct notice to systems like wholesalers and other PWSs that are not required to report under either UCMR, but conducted voluntary PFAS testing. The Response appears to assert a form of estoppel, arguing that the Court's previous approval of the Notice Plan should bind the Court's action going forward. But the design of a notice plan has inherent tradeoffs. When combined with an opt-out settlement, the decision to adopt an under-inclusive notice program has created an extraordinary risk of surprise that violates basic due process. Without notice, PWSs risk unknowingly losing essential rights, and potentially saddling their consumers with crippling corporate liabilities.

V.   **CONCLUSION**

To assist the Court in evaluating the Agreement, we respectfully submit these Objections.

Dated: November 28, 2023.

Respectfully submitted:

*/s/ Jessica K. Ferrell*
*/s/ Jeff B. Kray*
Jessica K. Ferrell, WSBA No. 36917
Jeff B. Kray, WSBA No. 22174
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jferrell@martenlaw.com
jkray@martenlaw.com

15

*Attorneys for Brazos Water Authority; City of Airway Heights, WA; City of Dallas, TX; City of DuPont, WA; City of Fort Worth, TX; City of Las Cruces, NM; City of Moses Lake, WA; City of Vancouver, WA; Eagle River Water & Sanitation District; Lakehaven Water & Sewer District; Lakewood Water District; Lower Colorado River Authority; Metropolitan Water District of Southern California; North Texas Municipal Water District; and Upper Eagle Regional Water Authority*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served upon all counsel of record in accordance with the Court's August 29, 2023 Preliminary Approval Order for Settlement Between Public Water Systems and DuPont (Dkt. No. 3603), the Settlement Agreement Between Public Water Systems and DuPont (Dkt. No. 3393-2), and Federal Rule of Civil Procedure 5.

Dated: November 28, 2023.

<u>/s/ Jessica K. Ferrell</u>
<u>/s/ Jeff B. Kray</u>
Jessica K. Ferrell, WSBA No. 36917
Jeff B. Kray, WSBA No. 22174
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jferrell@martenlaw.com
jkray@martenlaw.com

*Attorneys for Brazos Water Authority; City of Airway Heights, WA; City of Dallas, TX; City of DuPont, WA; City of Fort Worth, TX; City of Las Cruces, NM; City of Moses Lake, WA; City of Vancouver, WA; Eagle River Water & Sanitation District; Hannah Heights Owners Association; Lakehaven Water & Sewer District; Lakewood Water District; Lower Colorado River Authority; Metropolitan Water District of Southern California; North Texas Municipal Water District; and Upper Eagle Regional Water Authority*