

28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
**o.** 843.216.9000  **f.** 843.216.9450

**Fred Thompson III**
*Licensed in South Carolina*
direct:  843.216.9118
fthompson@motleyrice.com

www.motleyrice.com

"I will stand for my client's rights.
I am a trial lawyer."
–Ron Motley (1944–2013)

December 5, 2023

**VIA ECF**
Hon. Richard Mark Gergel
U.S. District Court for the District of South Carolina
J. Waites Waring Judicial Center
83 Meeting Street
Charleston, South Carolina 29401

Re: *In re AFFF Products Liability Litigation*, MDL No. 2:18-mn-2873-RMG

Dear Judge Gergel:

On behalf of the Plaintiffs' Executive Committee ("PEC"), we write to provide the Court with the PEC's position regarding their: (1) Telomer Water Provider Tier Two case proposals; and (2) proposed plan for depositions in Tier Two fact discovery under CMO 27 ("The Telomer AFFF Bellwether Plan").[1]

## I.      INTRODUCTION

Pursuant to CMO 27, the parties selected four (4) Telomer Water Provider Cases. These include:

(1)  *Village of Farmingdale v. 3M Company et al.*, No. 2:19-cv-00564 ("*Farmingdale*");
(2)  *City of Watertown v. 3M Company et al.*, No. 2:21-cv-01104 ("*Watertown*");
(3)  *Southeast Morris County Municipal Utilities Authority v. 3M Company et al.*, No. 2:22-cv-00199 ("*SMCMUA*"); and
(4)  *Bakman Water Company v. 3M Company et al.*, No. 2:19-cv-02784 ("*Bakman*").[2]

The parties were instructed to present to the Court their proposed plan for the number of Tier Two fact discovery depositions and, additionally, either submit an agreed upon slate of Telomer Water Provider Tier Two cases (that would advance through Tier Two discovery and ultimately trial prep) or present competing slates.[3]

---

[1] Case Management Order ("CMO") No. 27C, Telomer Water Provider Tier Two Cases and Number of Depositions in Telomer Water Provider Tier Two Fact Discovery [ECF No. 4108].
[2] CMO No. 27, Telomer AFFF Bellwether Program [ECF No. 3665], at 2.
[3] CMOs 27A-C [ECF Nos. 3892, 4089, and 4108]

MotleyRice®
ATTORNEYS AT LAW

December 5, 2023
Page 2

In furtherance of these directives, the parties met and conferred multiple times, including most recently on November 27 and 28, 2023. Over the course of these meet and confers, the PEC recommended that the parties select *Bakman* and *SMCMUA* as the two (2) candidates to become the Telomer Water Provider Tier Two cases, because, as set forth in greater detail below, both are highly representative and, therefore, appropriate bellwether cases.

While the Defense Coordinating Committee ("DCC') was willing to accept *SMCMUA* as a Tier Two case, and thus presumably agrees that the case is representative, seemingly, it was only willing to do so if the PEC agreed to include *Farmingdale.*[4] Water sampling data collected during Tier One fact discovery revealed, however, that Farmingdale's wells are not *presently* contaminated with telomer-derived PFOA or PFOS based on this round of sampling.[5] *Farmingdale* therefore is not an eligible Telomer-AFFF bellwether case, let alone representative. The Tier One discovery simply illustrates that there is zero telomer PFOA or PFOS in Farmingdale's water sample, which is *atypical*, as exemplified by the fact that the other three (3) Tier One cases in the pool all have telomer-derived PFOA in their respective wells.

Given the current absence of any telomer-derived PFOA, this case is incapable of providing guidance with respect to telomer-derived PFOA liability. The DCC is aware of the PEC's position but has insisted on *Farmingdale*'s inclusion.[6]

Thus, the parties are unable to submit agreed upon Tier Two cases. As such, the PEC submits that *SMCMUA* and *Bakman* are the most appropriate Telomer Water Provider Tier Two Cases, and that *Watertown*, although representative, is a less ideal candidate. Moreover, given that neither the DCC nor the PEC are opposed to *SMCMUA*, the PEC submits that its inclusion should not be in dispute, nor, for that matter should *Farmingdale's* ineligibility.

## II.    THE FOUR TIER ONE TELOMER WATER PROVIDER CASES

### A.    SMCMUA

#### (1)    Background

SMCMUA is a New Jersey Municipal Utilities Authority that provides drinking water to customers in the Town of Morristown, the Township of Morris, the Township of Hanover, and the Borough of Morris Plains, New Jersey. SMCMUA also provides water to some customers outside the

---

[4] Email from Liam Montgomery, Esq. to Michael London, Esq., Gary Douglas, Esq. and Ned McWilliams, Esq., dated November 28, 2023 ("Montgomery Email"), attached as Ex. 1.

[5] *See generally,* Declaration of Jonathan W. Martin, Ph.D. ("Martin Decl."), attached as Ex. 2.

[6] Ex. 1, Montgomery Email.



December 5, 2023
Page 3

district in the Townships of Chatham, Mendham, Harding, Randolph, Parsippany-Troy Hills, and the Borough of Florham Park, New Jersey. In total, SMCMUA serves approximately 62,000 people in suburban New Jersey, with approximately 17,500 accounts, and distributes surface water from the Clyde Potts Reservoir and from nine (9) drinking water supply wells.

As is common with most water providers, SMCMUA also has interconnections with Morris County Municipal Utilities Authority (groundwater) and New Jersey American Water, from which it purchases water to meet high demand periods. Those additional sources have PFAS contamination as well, therefore underscoring the vital importance of treating SMCMUA's supply wells so it can continue to provide clean, safe water in compliance with federal and state regulations to its customers and in adequate volume.

SMCMUA was first advised of the presence of a PFAS chemical (PFNA) in one of its supply wells in early 2010 by the New Jersey Department of Environmental Protection ("NJ DEP"), which was conducting a statewide study on the presence of PFAS chemicals in drinking water. Since that time, SMCMUA has regularly monitored the presence of PFAS in its wells to ensure compliance with the state and federal drinking water guidance levels. As a result of that proactive monitoring program, in November 2020, SMCMUA took the Littleton Well out of service as its PFOA levels approached the impending NJ DEP MCL. The remaining wells are also at levels that would violate the EPA's proposed MCL of 4 ppt for PFOS and PFOA combined. Regarding SMCMUA's policy as it pertains to PFAS contamination, during Tier 1 discovery, SMCMUA indicated its goal is to "provide the highest quality water to [its] customers with non-detect for all contaminants."[7] Accordingly, SMCMUA engaged the services of Corona Environmental Consulting to provide a preliminary assessment of potential treatment options. This preliminary assessment report explored a number of potential PFAS treatment alternatives, including granular activated carbon ("GAC") and ion exchange and other options, all of which, as the Court knows, are expensive treatment alternatives.

### (2)    Probable Sources of Contamination

#### a.    *Morris County Public Safety Training Academy*

For almost 50 years, firefighters from all around northern New Jersey have conducted training exercises at the Morris County Public Safety Training Academy (the "Academy"), formerly known as the Morris County Fire Fighters' Training Academy. The Academy first opened in 1975 where, over the following decades firefighters trained with AFFF at various locations, including a vehicle

---

[7] Dep. Tr. of Fed. R. Civ. 30(b)(6) witness Andrew Saskowitz, dated Nov. 17, 2023 ("Saskowitz Dep. Tr."), relevant excerpts attached hereto as Ex. 3, at 168:11-13; *see also* 167:18-22.

MotleyRice® LLC
ATTORNEYS AT LAW

December 5, 2023
Page 4

fire area, a spill pad used to simulate a flammable liquid spill from tanker trucks, and a fire pad. A 2014 video taken of AFFF training at the Academy shows a Chemguard AFFF bucket in use.[8]

### b.    The Morristown Airport

The Morristown Airport (the "Airport") is located in Morris County, New Jersey, in the Whippany Section of the Town of Hanover, New Jersey. The Airport is publicly owned by the Town of Morristown and privately operated by DM Airports, Ltd. As of 2012, 34 aviation companies housed 101 planes at the Airport, in addition to another 100 private aircraft. The Airport and its various hangar buildings are listed as the purchaser and/or receiver (through distributors) of several telomer AFFF products, as detailed in sales records discussed below.

### (3)    Defendants' Sales Records Support Telomer AFFF Use

Numerous sales to the Airport, the Academy, and various fire departments that conducted training or operations in the vicinity of Plaintiff's wellfields concretely establish that Telomer Defendants' products were present at locations where AFFF was utilized and eventually contaminated SMCMUA's water supply.

### a.    Tyco Defendants' Sales

Records from the Defendants Tyco Fire Products LP and Chemguard, Inc ("Tyco/Chemguard") reflect sales of Ansul and Chemguard AFFF products to both the Airport and the Academy. These records reflect shipments to the Airport totaling 2,380 gallons, occurring between July 1996 and February 2020, and shipments to the Academy totaling 3,520 gallons, occurring between August 2015 and December 2017. Notably, since AFFF products were typically purchased from intermediary distributors, these sales records likely do not reflect the totality of Tyco and Ansul AFFF products shipped to or used at the Airport and Academy.

The Chemguard AFFF products shipped to the Airport and Safety Academy include: C301, C301MS, C302, Blizzard Freeze-Protected AFFF, C306-MS-C, C364 AR-AFFF, and Ultraguard AR-AFFF. The Ansul products shipped to these entities include: Ansulite AFC-3A, Ansulite AFC-3B, Ansulite A364 AR-AFFF, and Ansulite ARC AR-AFFF.

Blend records produced by the Tyco Defendants reflect that Chemguard C301, C301MS, C302, and Blizzard AFFF concentrates were C8-based products. These records indicate that: C301 and C301MS were manufactured using FS-100 and Lodyne K78'220B fluorosurfactants, both of which contain a high percentage of C8; C302 was manufactured using FS-221 and/or FS-220B

---

[8] https://www.youtube.com/watch?v=b7Br2DWc8DU at 3:16.



December 5, 2023
Page 5

fluorosurfactants; and Chemguard Blizzard AFFF was manufactured using FS-100 and FS-221 fluorosurfactants.

Blend records also reflect that Ansulite AFC-3A and Ansulite ARC AR-AFFF were both C8-based foams, manufactured using the DX-1020 fluorosurfactant.[9]

Notably, while several of the Tyco Defendants' AFFF products shipped to the Airport and the Academy may have been C6-based foams, internal communications reflect that the Tyco Defendants would routinely alter the composition of their C6 fluorosurfactants to include a higher percentage of C8, and/or spike their C6-based foams with C8 fluorosurfactants.

### b.    *Defendant Buckeye Sales*

Defendant Buckeye's sales records reflect three shipments of Buckeye 3% Platinum AR-AFFF made to the Morristown Fire Department between 2004 and 2009, totaling 275 gallons. Defendant Buckeye's blend sheets indicate that the 3% Platinum AR-AFFF concentrate was manufactured using DX3001, a C8-based fluorosurfactant sold by Dynax.[10]

Additionally, Defendant Buckeye's sales records reflect AFFF sales totaling 670 gallons to several nearby fire departments and municipal entities that frequently operated in or around Plaintiff's wellfields, and/or trained at the Academy. These include: the Boonton Department of Public Works (80 gallons); the Township of Edison (80 gallons); the Elizabeth Fire Department (100 gallons); the Englewood Cliffs Police Department (50 gallons); the Green Township Fire Department (50 gallons); the Hillsdale Fire Department (40 gallons); the Newton Police Department (80 gallons); the Northvale Fire Department (30 gallons); Franklin Township Fire District No. 3 (100 gallons); and the West Orange Fire Department (60 gallons).

### (4)    Sampling Data Confirms Telomer PFAS

As part of Tier One discovery, on October 25-26, 2023, the parties conducted split sampling of SMCMUA's water sources. The results were analyzed by Plaintiffs' expert Dr. Jonathan Martin using the B/L/T method.[11] Overall, the dominant contaminant was PFOA, a significant portion of

---

[9] Based on discovery previously provided in the MDL, these AFFF products would potentially implicate the following fluorosurfactant manufacturers at various times: Dynax Corporation ("Dynax"), a BASF Corporation, as successor-in-interest to Ciba-Geigy Corporation ("BASF") and/or EIDP, Inc. f/k/a E. I. DuPont de Nemours and Company ("DuPont").

[10] Based on discovery previously provided in the MDL, these AFFF products would potentially implicate the following fluorosurfactant manufacturers at various times: Dynax and/or BASF.

[11] Previously, this Court denied a Daubert motion direct to Dr. Martin's use of the B/L/T method. *See* Order Regarding Defendants' Co-Lead Counsel's omnibus motion to exclude Plaintiff's testimony. [ECF No.



December 5, 2023
Page 6

which was telomer-derived, in comparison to PFOS and all other detected PFAS chemicals. The Littleton Well had the highest proportion of telomer-derived PFOA, which, as noted above, SMCMUA took offline due to PFAS contamination.

### (5) SMCMUA's 30(b)(6) Deposition Testimony Regarding AFFF Use

On November 17, 2023, Mr. Andrew Saskowitz, the Acting Executive Director for SMCMUA, provided testimony as the corporate representative on a variety of topics. Two of those topics included the use or release of AFFF within the vicinity of SMCMUA's water sources. Mr. Saskowitz testified that, in preparing for his testimony on those AFFF topics, he spoke with Joe Mihalko, an employee of SMCMUA and a volunteer firefighter for the Whippany Fire Department. In his testimony, Mr. Saskowitz related that Mr. Mihalko recalled training with AFFF at the Academy several times over the last 12-18 years and with a burning fuselage at the Airport on at least one occasion, witnessed the use of AFFF to extinguish an overturned truck near the wellfield, and relayed an incident where AFFF was released to completely fill an Airport hangar.[12]

### B.    Bakman Water Company

### (1)    Background

Bakman is a fourth generation, privately-owned water provider located in Fresno, California providing water to disadvantaged customers. In total, Bakman serves approximately 20,000 people with approximately 2,500 metered accounts, 97 flat rate connections, and 350 fire hydrants. Bakman Water Company has 17 wells in total; 14 of which are in use with 8 having tested positive for PFAS. The affected wells are in the immediate vicinity of the Fresno Airport and a military installation (Fresno ANG). Records and witness interviews conducted by the Air National Guard and Bakman's counsel document historical use of AFFF in fire training at Fresno ANG base and the adjacent Fresno Airport. The PFAS "areas of concern" identified in the Fresno Airport and Fresno ANG investigations are in the immediate vicinity of the Bakman water wells which have tested positive for PFAS, including Well 7 discussed below.

In 2019, Bakman performed California State mandated testing for PFAS, which revealed the presence of PFAS in several of its wells. Following successive rounds of testing, Bakman identified eight PFAS contaminated wells: 6, 7, 8, 8A, 13A, 14, 15A, and 16. Several of these wells exceeded the California MCLs for PFAS. When Bakman Water Company identified PFAS contamination in a well, it immediately took steps to address the contamination, including taking some of the affected wells out of service (e.g., Well 7), the results for which were as follows:

---

3059].

[12] Ex. 3, Saskowitz Dep. Tr., at 24:1-25:16, 260:17-270:5.

MotleyRice® LLC
ATTORNEYS AT LAW

December 5, 2023
Page 7

- Sampled 6/6/2019 - 9.5 PFBS, 1.8 PFHxS, 28 PFOS, 3.4 PFHpA, 6 PFHxA, 3.8 PFNA, 13 PFOA
- Sampled 9/4/2019 - 14 PFBS, 4.1 PFHpA, 7.2 PFHxA, 3 PFHxS, 3.4 PFNA, 17 PFOA, 32 PFOS
- Sampled 11/26/2019 - 10 PFBS, 28 PFOS, 4.9 PFHxA, 13 PFOA
- Sampled 2/3/2020 - 9.9 PFBS, 25 PFOS, 3.5 PFHpA, 5.2 PFHxA, 3.6 PFNA, 14 PFOA

Bakman does not have the flexibility to rely on other sources of groundwater or surface water, so the affected wells are critical to Bakman's ability to service its customers, particularly during peak demand. Bakman set out to search for solutions to maintain compliance with California's state mandated PFAS MCLs, and with that aim, Bakman Water Company has been working for several years with a PFAS remediation expert, Kevin Berryhill, P.E., to develop treatment plans for its PFAS contamination. These treatment options and/or plans will require each affected well to be treated separately with carbon filtration and/or ion exchange.

Furthermore, and as discussed more fully below, testing performed to date has confirmed that the concentrations of PFAS in Bakman's Well 7 can be identified as conclusively derived from Telomer AFFF sources.

### (2)     Probable Sources of Contamination

The Fresno ANG 144 Fighter Wing is co-located with the Fresno-Yosemite International Airport in Fresno, California (collectively referred to as "the Airport"). Starting in the 1960s or 1970s, AFFF was used for fire training activities at the Airport by both the City Fire Department and the ANG. The Fresno ANG used approximately 15 gallons of AFFF per month until 1989. However, an environmental investigation performed at the Airport on behalf of the Air National Guard documented 9 potential sites of suspected historical AFFF release. Furthermore, as part of that same investigation, Ansul and 3M AFFF were identified as the source of the foams used during the relevant period. Soil sampling completed on behalf of the Air National Guard show significant concentrations of PFOA in the groundwater in former fire training areas and base boundary wells, indicating that the PFOA was migrating off base.

### (3)     Defendants' Sales Records Support Telomer AFFF Use

Sales and/deliveries to the Air National Guard, the City of Fresno Fire Department and the relevant geographic area document historical records pointing to foam sales by 3M and Chemguard.

Further, records from the Tyco Defendants reflect sales and deliveries of Ansul and Chemguard AFFF products to both the Air National Guard and the Fire Department. Although the sales records



December 5, 2023
Page 8

are clearly incomplete, they show sales of Chemguard C301MSD-3% AFFF delivered to the Air National Guard and sales of Chemguard ARC-Alcohol Resistant 3-6% foam.

Notably, since AFFF products were typically purchased from intermediary distributors, these sales records likely do not reflect the totality of Tyco and Ansul AFFF products shipped to the City and the Airport. Sales in the relevant geographic area were shipped through Jorenseon Company, Halprin Supply, and Wildfire Pacific throughout the 1980s and 1990s and included multiple shipments of MilSpec 3% AFC 5A, Chemguard AFFF 6%, and Ansul 3% AFC 3A.

Based upon information and belief, the concentrates supplied by Tyco/Chemguard utilized C8-based surfactants and implicate the following raw material and surfactant suppliers: Dynax, BASF and DuPont.

### (4)    Sampling Data Confirms Telomer PFAS

As part of Tier One discovery, on November 2, 2023, the parties conducted split sampling of Bakman's wells. The results were analyzed by Dr. Martin using the B/L/T method. Of the three wells with detectable PFOA, Well 7 had the highest levels, more than half of which were of telomer origin.

### (5)    Bakman's 30(b)(6) Deposition Testimony regarding AFFF Use

The Bakman 30(b)(6) deposition was taken of Richard Shaymus Bakman (Bakman Vice President) and Steven Keith Pickens (Bakman Operations Manager) on September 23, 2021, and September 24, 2021, respectively. These depositions were taken during the prior round of bellwether cases and did not directly address the use or sale of AFFF. An updated 30(b)(6) deposition was coordinated after Bakman was also selected as a bellwether case on the Telomer claims; however, shortly before the deposition was to take place, counsel for Defendants unilaterally cancelled it.

Therefore, the use and sale of AFFF in the areas around the Bakman well will be dependent upon third parties and the documents produced in discovery.

### C.    City of Watertown

### (1)    Background

Watertown is a municipal water provider located in South Dakota. In total, Watertown serves approximately 22,000 people with approximately 1,400 commercial and 8,000 residential accounts. Watertown distributes groundwater from three well fields. Of the City's thirty-one wells, the four wells comprising the Town Well Field have tested positive for PFOA and PFOS. These

MotleyRice® LLC
ATTORNEYS AT LAW

December 5, 2023
Page 9

four (4) wells (Wells 3, 3B, 3A and 10) are near the City's airport and fire training center where AFFF has been historically discharged.

PFOA and PFOS were first detected in the four (4) Town Well Field wells in 2020 when the City's wells were tested for PFAS. The 2020 PFOA and PFOS results in parts per trillion for the City's Town Well Field were as follows:

| | | | | |
|---|---|---|---|---|
| Well 3 | PFOA | 12.9 | PFOS | 1.21 |
| Well 3B | PFOA | 13.5 | PFOS | 1.36 |
| Well 3A | PFOA | 2.07 | PFOS | 0.809 |
| Well 10 | PFOA | 1.4 | PFOS | 0.498 |

Watertown's various well fields are blended upon entering the City's water treatment plant. To date, PFOA and PFOS have not been detected in the City's finished water. Since the Town Well Field detections in 2020, Watertown has conducted periodic sampling for PFAS in its wells as it works to determine the scope of the problem and what steps, if any, must be taken in response to the contamination. In this sampling, the City's Town Well Field has consistently tested positive for PFOA and PFOS. This Town Well Field contamination complicates the City's planning for future water capacity increases. Because the City is blending its water at the treatment plant, any issues with the City's other wells increase the risk of PFAS contamination in its finished water. Furthermore, Watertown has lost the opportunity and ability to drill new wells in its Town Well Field, which has historically been its cheapest, most productive wells.

Importantly, the City of Watertown was the recipient of communications from Tyco/Chemguard condoning the continued use of C8 based foams well after it knew of the risks, and even after it had ceased manufacturing C8-based foams. Specifically, Tyco/Chemguard provided the following guidance in 2016 to the Watertown Fire Rescue Department: "The EPA is not telling people to discontinue using what they have on hand, only to discontinue manufacturing the C8 product – so the department can use what they have until it's all consumed. If they have a few dollars in their budget it may be an opportunity to save a little on this order."[13]

---

[13] *See* Email from Tyco Fire Protection Products Territory Manager Glenn McClanahan to Roger Deibert of M & T Fire and Safety, Inc., then forwarded to Watertown Fire Rescue personnel Scott Jongbloed on April 11, 2016, attached as Ex. 4. Of note, this communication was conspicuously absent from Tyco/Chemguard's own productions over the course of the MDL despite its clearly responsive nature. Plaintiffs continue to meet and confer with counsel for Tyco/Chemguard to understand why this communication was not produced by them. Its absence is notable, especially given that it highlights their profit-driven motivation to continue pushing its C8 products, its refusal to issue supplemental guidance regarding C8-based AFFF use, and its encouragement to end users to continue using C8 products to their detriment.



December 5, 2023
Page 10


### (2)    Probable Sources of Contamination

The City of Watertown Airport ("Airport") is located just adjacent to the City's Town Well Field and water treatment plant. The Airport is publicly owned by Watertown. Because the Airport is a Part 139 airport, FAA regulations require it to maintain certain minimum aircraft rescue and firefighting ("ARFF") standards. These standards include regular testing of firefighting foam equipment. The City of Watertown is responsible for firefighting at the Airport. As a result, the City of Watertown Fire Rescue Department annually tested the foam proportioning systems for its two crash trucks, which resulted in a discharge of approximately 10 gallons of AFFF per year. Since 2001, the City has exclusively used Chemguard and Ansulite products for its ARFF systems and proportioning tests. Additionally, the City of Watertown conducted training during this same period which included the discharge of 205 gallons of Chemguard C301 C8 firefighting foam. Although there are records of 3M products and some other telomer-based foam products, discovery to date points to Tyco/Chemguard products as the primary AFFF used around the Airport. This AFFF use around the Airport and near the Town Well Field is the probable source of Watertown's contamination. This is underscored by the fact that only the City's wells in the vicinity of the Airport have tested positive for PFOA and PFOS.

### (3)    Defendants' Sales Records Support Telomer AFFF Use

Numerous sales and deliveries of Telomer Defendant products to the Watertown Airport and Fire Rescue Department are documented. Moreover, Watertown's corporate deponent testified that the City has exclusively used Chemguard and Ansulite products for its ARFF needs for over the last twenty years.

The first documented sale of Tyco foam to the City dates back to a 1996 sale of C361P-AR 3%-6% AFFF (170 gallons). The first documented purchase of C301P-3% Mil Spec AFFF was documented in 2001 (50 gallons), and based on testimony to date, the City used this C301 product exclusively in one of its two ARFF crash trucks until the product changeover in approximately 2017. The last documented sale of C301 was a sale of C301MSP which took place in 2015, but based in part on guidance from Tyco, the City continued to use and maintain stocks of the product until 2020. These records reflect shipments to the Airport totaling 660 gallons, occurring between July 1996 and February 2020, and shipments of an additional 1290 gallons of Chemguard products after the changeover to C306MS AFFF at the Airport.

Notably, since AFFF products were typically purchased from intermediary distributors, these sales records likely do not reflect the totality of Tyco and Ansul AFFF products shipped to the Watertown Fire Rescue Department and Airport.



December 5, 2023
Page 11

The Chemguard products used by the City include the following: C361P-AR 3%-6%, C301P-3% Mil Spec AFFF, C301MSP-3% AFFF, C-306MS-C, CHEMGUARD 3x3 AR-AFFF LV 265G (C334-LV), Ansulite 3%, T-Storm, and potentially others.

Based upon information and belief, the concentrates supplied by Tyco/Chemguard utilized C8-based surfactants and implicate the following raw material and surfactant suppliers: Dynax, BASF and DuPont.

Notably, while several of the Tyco Defendants' AFFF products shipped to the Airport and the Fire Rescue Department may have been C6-based foams, internal communications reflect that the Tyco Defendants would routinely alter the composition of their C6 fluorosurfactants to include a higher percentage of C8 and/or spike their C6-based foams with C8 fluorosurfactants.

### (4)    Sampling Data Confirms Telomer PFAS

As part of Tier One discovery, on November 1, 2023, the parties conducted split sampling of contaminated Watertown wells. The results were analyzed by Dr. Martin using the B/L/T method. Dr. Martin found that PFOA and PFOS concentrations were present in a similar range, with a significant proportion of telomer derived PFOA present in at least one of the contaminated wells (Well 3).

### (5)    Watertown's 30(b)(6) Deposition Testimony regarding AFFF Use

Deposition testimony of Watertown Battalion Chief and Airport liaison Craig Kruse indicates that since 2001 the Watertown Fire Rescue Department has exclusively used Ansulite and Chemguard AFFF. In its current fire trucks and most recent history, Watertown has used Chemguard 3%, 6% AR-AFFF.[14] Watertown also trained with T-Storm (a Tyco/Chemguard product), 3M foam, and Ansulite.[15] Watertown has documented the use of hundreds of gallons of Chemguard and/or Ansulite AFFF products in the vicinity of the Airport since 2001.

### D.    Farmingdale

### (1)    Background

Plaintiff Village of Farmingdale ("Farmingdale" or the "Village") owns and operates a Community Water System with roughly 2,350 metered connections that provides drinking water to approximately 9,250 residents in Nassau County, New York. Farmingdale obtains its water supply

---

[14] Dep. Tr. of Fed. R. Civ. 30(b)(6) witness Craig Kruse, dated Nov. 16, 2023 ("Kruse Dep. Tr."), relevant excerpts attached hereto as Ex. 5, at 55:8-24.
[15] Ex. 5, Kruse Dep. Tr., Ex., at 55:25-56:8.



December 5, 2023
Page 12

from the Magothy Aquifer through three (3) active wells located at 2 different sites. Drinking water from Well No. 1-3 receives treatment at Plant 1, while drinking water from Well 2-2 and Well 2-3 is treated at Plant 2.

Farmingdale maintains five emergency interconnections with three neighboring water suppliers. These include one interconnection with the Bethpage Water District, two interconnections with the South Farmingdale Water District, and two interconnections with Suffolk County Water Authority (formerly East Farmingdale Water District).

On August 26, 2020, the New York State Department of Health ("NYSDOH") established a new MCL of 1.0 ppb for 1-4-Dioxane and 10.0 ppt for PFOS and PFOA each. In March 2021, sampling from Well 1-3 showed a 1,4-Dioxane concentration of 0.92 ppb, which nearly exceeded the newly established MCL. On June 23, 2021, the Nassau County Department of Health ("NCDOH") issued a letter instructing Farmingdale to implement corrective measures to mitigate the level and impact of the 1,4-Dioxane found in Well 1-3. Upon receiving NCDOH's letter, Farmingdale promptly switched the sequencing for operating its wells to place Well 1-3 in a "last on, first off" position. Consequently, Farmingdale has been forced to rely more heavily on Well 2-2 and Well 2-3 to supply drinking water to its residents.

Since placing Well 1-3 in a "last on, first off" position, however, detections for both 1,4-Dioxane and PFOA have been reported for Well 2-2 and Well 2-3, though neither has exceeded the MCLs currently in place in New York for those contaminants. Specifically, Well 2-2 reported a peak concentration of 6.3 ppt for PFOA in September 2022, while the peak concentration for PFOA reported for Well 2-3 was 3.0 ppt in September 2021.

An advance oxidation process ("AOP") and GAC system that provides treatment for both 1,4-Dioxane and PFAS has been installed at Plant 1 and is currently under construction at Plant 2.

### (2)     Probable Sources of Contamination

All three (3) of Farmingdale's wells are located downgradient from multiple historical contamination sites. For PFAS specifically, Farmingdale has identified AFFF use at the Nassau County Fireman's Training Center ("NCFTC") as the primary source of contamination.  NCFTC disputes this, however, having denied that AFFF was ever stored or used in trainings at its facilities in response to third-party subpoenas and inquiries from state regulators.[16]

---

16   These denials notwithstanding, testing performed at the NCFTC has found high levels of both PFOS and PFOA on the property, the two PFAS that plaintiffs in this litigation allege were either components or degradation products of AFFF manufactured and sold by the defendants. Furthermore, a site map for NCFTC identifies a building on the property as a "Foam House" which further suggests past use of AFFF at the facility. These inconsistencies would cause any trial involving Farmingdale to devolve into a series

MotleyRice® LLC
ATTORNEYS AT LAW

December 5, 2023
Page 13

> **(3)     Records Support Two Direct Sales of AFFF to Farmingdale in 2010 and 2021**

The DCC has identified two records showing that Farmingdale directly purchased eight (8) 5-gallon pails of Ansulite 3%, 3x3 LV on April 20, 2010, and ten (10) 5-gallon pails of ARCTIC 3X3 ATC AR-AFFF on April 13, 2021.[17] However, as discussed below, given that the sampling data identifies *zero evidence* of telomer-derived PFAS in Farmingdale's wells, this sales record is largely irrelevant, and, moreover, given the date of the sale, would likely have incorporated a fluorosurfactant that was at least 95% C6 rather than C8.  And while other records show sales of AFFF to a regional airport and multiple fire departments and fire equipment distributors located in Nassau County, there was no evidence uncovered during Tier One fact discovery linking the use of that AFFF to the subject contamination.

> **(4)     Sampling Data Confirms *NO* Telomer PFAS**

Perhaps most importantly, as discussed below and in the accompanying declaration from PEC's s expert Jonathan Martin, Ph.D., Dr. Martin's review of sampling data does not identify *any* evidence of telomer-derived PFOA or PFOS as a contributor to the PFOA contamination present in Farmingdale's wells in current sampling conducted during Tier 1 discovery.[18]

> **(5)     Farmingdale's 30(b)(6) Deposition Testimony Regarding AFFF Use**

As discussed below, Farmingdale's 30(b)(6)  testimony to date did not establish AFFF use in locations that could have contributed to the PFAS contamination in Farmingdale's wells.

## III.    LEGAL STANDARD

The Manual for Complex Litigation states that the raison d'être of bellwether trials is to "produce a sufficient number of representative verdicts" to "enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis, and what range of values the cases may have if resolution is attempted on a group basis." MCL § 22.315 (2004).

---

of mini-trials on minimally related fact disputes regarding the NCFTC. This further demonstrates Farmingdale's unsuitability to serve as a bellwether trial Plaintiff.

[17] Sales Record, bearing bates number FM00005 ("Sales Record"), attached as Ex. 6.

[18] Of course, any single sampling is at most a single snapshot in time and does not guarantee similar results in the past or future. But it would nevertheless be extremely speculative to advance Farmingdale into Tier 2 given the results of this recent testing.

MotleyRice®
LLC
ATTORNEYS AT LAW

December 5, 2023
Page 14

Given this premise, for any bellwether process to be successful, the cases that populate the bellwether pool must be representative of the overall docket. *See In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 2100, 2010 U.S. Dist. LEXIS 108107, at *4, *6-7 (S.D. Ill. Oct. 8, 2010) (it is "critical to a successful bellwether plan that an honest representative sampling of cases be achieved" because "[l]ittle credibility will be attached to this process, and it will be a waste of everyone's time and resources, if cases are selected which do not accurately reflect the run-of-the-mill case"); *see also, In re Zimmer M/L Taper Hip Prosthesis,* 18-md-2859-PAC, 18-mc-2859-PAC, 2022 U.S. Dist. LEXIS 11866, at *32-33 (S.D.N.Y. Ja. 21, 2022) (holding that "bellwether cases should be 'representative' of the overarching issues with the overall MDL to aid the development of the parties' disputes and put a value on the litigation."); *Guidelines & Best Practices for Large & Mass-Tort MDLs,* Bolch Judicial Institute, Duke Law School 18-19 (2d ed 2018)("[T]he bellwether process will be valuable only if the cases selected for trial are truly representative of the whole (or of one or more distinct categories of cases that comprise the whole.")).

Finally, "[t]he outcome of the bellwether trial can often be beneficial for litigants who desire to settle such claims by providing information on the value of the remainder of the case as reflected by the jury verdict in the bellwether trial." *United States ex rel. Michaels v. Agape Senior Community, Inc*., 2015 U.S. Dist. LEXIS 82379, at *5 (D.S.C. Jun. 25, 2015).

## IV.    ARGUMENT

With these standards in mind, it is clear that *SMCMUA* and *Bakman* are the two most appropriate Tier Two bellwether selections given their representative nature. However, should the Court not be inclined to include either of these cases, then *Watertown* is the third best Tier Two bellwether candidate.  *Farmingdale* should not be selected because sampling data has revealed that that it is simply not an eligible Tier Two bellwether candidate.

### A.    SMCMUA is Representative and Should be Selected

During the parties' meet and confer efforts, counsel for Tyco/Chemguard indicated their willingness to include *SMCMUA*,[19] and, as such, it is the PEC's position that SMCMUA's inclusion in the pool as representative is not in dispute.

In addition to the parties' agreement in this regard, *SMCMUA* is also highly representative of other water providers in the MDL for several reasons, which include, but are not limited to, the following:

---

[19] Ex. 1, Montgomery Email.

December 5, 2023
Page 15

- SMCMUA is a medium-sized water provider serving approximately 62,000 people;
- SMCMUA operates nine (9) groundwater wells, all of which are contaminated with PFAS above the EPA's proposed MCL of 4 ppt. That impending federal regulatory standard will be commonly applicable to a large number of filed water provider cases as most states have either not yet implemented their own state-specific regulatory levels, or to the extent they have, those levels are currently higher than the proposed EPA regulation;
- SMCMUA is also located in a state with its own MCL for PFAS in drinking water (i.e., 14 ppt for PFOA, 13 ppt for PFOS), as is the case with many public water providers nationwide, which is applicable until the implementation of the new proposed EPA standard, and would be instructive for many other municipalities with filed cases subject to current state-specific regulatory levels;
- SMCMUA has already incurred damages due to the PFAS contamination, namely the removal of one (1) well from service due to PFAS levels above the New Jersey MCL that requires treatment. Additionally, SMCMUA has planned treatment for all wells due to the widespread PFAS contamination in light of the forthcoming EPA regulation;
- As is typical of so many other locales, the probable sources of the PFAS contamination in SMCMUA's wells include the use of C8-containing AFFF at a fire training academy and a local airport;
- Importantly, expert isomer analysis of sampling data from SMCMUA's wells confirms that a significant portion of the PFAS contamination in the most impacted wells is, in fact, of telomer origin; and
- The PEC is unaware of any novel issues of law or fact unique to SMCMUA and/or the State of New Jersey that would render the case atypical.

B.    **Bakman is Representative and Should be Selected**

*Bakman* is representative and should be selected as a Telomer Water Provider Tier Two case for at least the following reasons:

- Bakman is a privately owned public water provider with eight (8) out of 14 groundwater wells contaminated with PFAS;

- The PFAS contamination in the wells arises out of the well-documented use of AFFF on a directly adjacent airport/military base property. Specifically, through the products identified in purchase and sales documents, witness statements related to the actual use of Ansul related AFFF products, and Air National Guard

environmental assessments, Well 7's contamination can be directly linked to the use of telomer-based AFFF at the ANG base and co-located Airport;

- Although Bakman was not a seller, purchaser, and/or user of AFFF, the Air National Guard's extensive review of the historical use of AFFF at the site shows the use of 3M and Ansul Products. Additionally, sales records show extensive historical purchases of Chemguard products by the California Air National Guard and the City of Fresno Fire Department and to distributors in the relevant area;

- Bakman is located in California, which has advanced tort litigation principles and a restrictive state MCL for PFAS. Specifically, although there is positive sales information pointing to the Telomer Defendants, coupled with conclusive chemical identification in Well 7, California law also allows for market share liability, which ensures that there is a path forward against the Telomer Defendants in this case;

- Importantly, expert isomer analysis of sampling data from Bakman's wells confirms that with respect to Well 7 there is a scientifically certain connection between the well's PFOA and the telomerization process;

- Bakman does not have a single treatment plant where all of the wells are blended and treated together, therefore each well can be evaluated separately for causation and damages; and

- Bakman intends to implement PFAS treatment for its PFAS contamination, which makes it more instructive than *Watertown* where the City does not have such current remediation plans.

C.    **Although Watertown is Representative, it Should Not Be Selected**

The following considerations attend *Watertown*:

- Watertown is a small municipality with four (4) groundwater wells contaminated with PFOA and PFOS at levels below the proposed EPA MCL of 4 ppt once blended with other wellfields. Therefore, it is similarly situated in this regard to many small water providers across the nation, although it has not actively treated or removed wells from its system due to PFAS;
- As with most states, South Dakota follows the EPA's regulatory standard for PFAS levels in drinking water, which is the most commonly applicable to the greatest number of water provider cases since most states have not yet implemented state-

specific regulatory levels and/or have MCL's that exceed the proposed EPA standard of 4 ppt;

- The PFAS contaminating Watertown's four (4) groundwater wells appear to have come exclusively from the use of AFFF at the Airport and near the Town Well Field;

- Expert isomer analysis of sampling data from Watertown's wells confirms that a substantial amount of the PFOA present in its most contaminated well is of telomer origin; and

- Watertown received communications from the Tyco Defendants condoning the continued use of C8-based AFFF in 2016, which exemplifies the communications and warnings provided to end users and affords an opportunity to make factual and legal determinations regarding the adequacy of such warnings.

Although *Watertown* is representative, there are several reasons why *Bakman* or *SMCMUA* are better positioned to serve as Tier Two bellwether cases.

First, as the Court is aware, during the first water provider bellwether program, the parties previously worked up a water provider plaintiff from South Dakota. Specifically, the *City of Sioux Falls v. 3M Company, et al.* case previously served as a Tier Two Water Provider Bellwether Trial Pool case and was likewise a South Dakota plaintiff.[20] Since the parties have already undertaken significant efforts with respect to South Dakota law given Sioux Falls' inclusion in the prior bellwether program as a Tier Two case, the PEC submits, therefore, it would be prudent to select a bellwether plaintiff from a state from which no other prior Tier Two bellwether plaintiffs have come. This will allow the parties to expand their understanding of these cases under different state laws.

Moreover, in the parties' prior briefing regarding the order of bellwether trials as between *Stuart*, *Ayer*, and *Sioux Falls*, the DCC noted that, at that time, *Sioux Falls* was not an ideal trial selection because there were only "two water provider cases involving South Dakota."[21] Accepting the DCC's premise, selecting the remaining South Dakota water provider is therefore even more attenuated.

Additionally, to date, because South Dakota does not have an MCL, and there is no currently enforceable federal regulatory limit, Watertown has not installed any treatment for PFAS and does not currently have any plans to treat its PFAS contamination. The fact that Watertown has yet to begin the process of considering PFAS treatment likewise renders the case less informative to the

---

[20] Order Selecting Tier Two Water Provider Bellwether Trial Pool Cases [ECF No. 1931].

[21] DCC Letter to the Court, dated September 9, 2022, regarding sequencing of bellwether trials [ECF No. 2591], at 4.



December 5, 2023
Page 18

parties than either SMCMUA or Bakman as a bellwether. As such, the PEC considers Watertown the third best selection.

### D.      Farmingdale is Not Eligible to be a Tier Two Bellwether Candidate.

Farmingdale should not be eligible as a Telomer Water Provider Tier Two case. As discussed in the Martin Decl., Dr. Martin's review of the data collected during Tier One discovery, in his expert opinion, fails to demonstrate any current telomer-derived PFOA in its wells.[22] Specifically, in his expert opinion, Dr. Martin opines that the "[t]he available data indicate that there is no evidence of *any* fluorotelomer-derived PFOA present in the drinking water in Farmingdale, NY. Rather, the available data indicates that *all* of the PFOA present in Farmingdale's water was manufactured utilizing electrochemical fluorination."[23] Given the lack of evidence of any telomer-derived PFOA, Farmingdale should not be eligible as a Tier Two bellwether candidate.

The PEC anticipates that the DCC may argue that, despite the lack of any telomer PFOA in Farmingdale's wells, that it is, nonetheless, representative for that very reason; that is, *because* Farmingdale has so little or no telomer PFOA, they may argue that very fact illustrates the minor role of the Telomer Defendants in this MDL and with respect to PFOA contamination generally.

As support, the DCC may point to records showing that eight (8) 5-gallon pails of Ansulite 3%, 3x3 LV and ten (10) 5-gallon pails of ARCTIC 3X3 ATC AR-AFFF were sold to Farmingdale in April 2010 and April 2021, respectively.[24] The DCC may rely on these records to argue that Farmingdale has strong evidence of product identification and that the absence of telomer-derived PFOA in Farmingdale's wells despite these sales should lead to the conclusion that their AFFF does not cause PFOA contamination.

These arguments are meritless. First, simply because the sale was made does not mean the AFFF was used. And in fact, according to the testimony elicited in *Farmingdale* (cited below), AFFF was not used at the fire training facility initially believed to be the source of the PFAS contamination in Farmingdale's wells. Second, by 2010, pursuant to the PFOA Stewardship Program, telomer manufacturers were required to ensure that their products were at least 95% C6 (rather than C8), which would mean the products involved in both sales would have limited (if any) potential to degrade to PFOA in the environment. In particular, the Ansulite product that Farmingdale purchased in April 2010 is unlike many of the other AFFF products that

---

[22] Ex. 2, Martin Decl., at 1.

[24] Ex. 6, Sales Record.

MotleyRice® LLC
ATTORNEYS AT LAW

December 5, 2023
Page 19

Tyco/Chemguard manufactured with a much higher PFOA precursor content, including, for example, the many Tyco/Chemguard AFFF products identified in *SMCMUA*.[25]

Third, these few identified sales must be viewed in the larger context of PFAS contamination in the area. As explained above (see FN 16), Farmingdale continues to believe its water was contaminated by use of AFFF at the NCFTC. And while the facility has repeatedly denied use of AFFF and disclaimed having any records of AFFF use, there is evidence of a "Foam House" on the premises which suggests historic use of AFFF. To the extent a significant percentage of 3M product manufactured with the Electro-Chemical Fluorination process was used therein, it could minimize the impact of the limited amount of telomer based AFFF which defendants rely on. Relatedly, Farmingdale is within 3 miles of the Old Bethpage landfill, further complicating any analysis of the impact of any one source of PFAS on its water supply. All of this demonstrates that Farmingdale's' water contamination claims are complicated and faces unique issues in identifying the specific sources of contamination found there. This makes the Village unsuitable to serve as Bellwether plaintiff as any results achieved would be unique to this one case rather than instructive on others.

Fourth, and finally, it defies logic to suggest that the lack of present signs of telomer PFOA demonstrates representativeness when *Farmingdale* is the only of the four (4) telomer bellwether candidates where telomer-derived PFOA is absent. In short, *Farmingdale* appears to simply be an anomaly.

Even if one were to assume that the PEC's expert was incorrect in his assessment that there is no telomer PFOA in Farmingdale's wells, which he is not, *Farmingdale* is nonetheless unrepresentative for a number of other reasons as well.

For example, during Farmingdale's 30(b)(6)'s deposition, the witness testified that Farmingdale had no knowledge of AFFF use at the NCFTC. On further questioning, defense counsel represented to the witness that the NCFTC itself had represented to government entities that it did not use AFFF and the witness agreed with counsel's representation.[26] The witness further testified that he could not name one incidence of AFFF use by the Village of Farmingdale Fire Dept., did not know whether Farmingdale's volunteer fire department had AFFF or another kind of foam, nor he did he know if the nearby airport used AFFF or another type of foam.[27]

---

[25] *See* § II.A.3, *supra*.

[26] Dep. Tr. of Fed. R. Civ. 30(b)(6) witness Geary R. Gerhardt, dated Nov. 17, 2023 ("Gerhardt Dep. Tr."), relevant excerpts attached hereto as Ex. 7, at 55:8-24.at 144:24-145:24; 147:6-18.

**MotleyRice**®
ATTORNEYS AT LAW

December 5, 2023
Page 20

## V.    PEC'S PROPOSED PLAN FOR TIER TWO DEPOSITIONS

It is the PEC's position that depositions taken during Tier Two fact discovery should track the Federal Rules of Civil Procedure. Fed. R. Civ. P. 30(a)(2)(A)(i) limits the number of depositions to 10 "by the plaintiffs, or by the defendants, or by the third-party defendants." In other words, the limit is 10 depositions per each side, however, should either side need more, then the side requiring in excess of 10 depositions can move for leave of Court for additional depositions if special circumstances warrant same.

With respect to third-party depositions, as it pertains to Tier One discovery, CMO 27 states "[d]epositions of third-parties shall not count against the limits,"[28] and the PEC submits that this same rule should apply during Tier Two discovery.

## VI.    CONCLUSION

For the reasons set out above, the PEC respectfully submits that the Court should choose the following two cases—*SMCMUA* and *Bakman*—as its two selections for the Telomer Water Provider Tier Two cases. It bears repeating that, while we believe *SMCMUA*, *Bakman*, and *Watertown* are *all* representative cases, it is important to note that, unlike SMCMUA and Bakman, Watertown has no current plans for remediation since, as noted above, their finished water has no detection of PFAS. Therefore, of the three (3) candidates with a clear presence of telomer-derived PFOA contamination, *Watertown* would be the least instructive with respect to water treatment and remediation damages. Accordingly, the PEC respectfully submits that *SMCMUA* and *Bakman* should be selected.

We thank the Court for its continued time and courtesies,

Respectfully submitted,

Fred Thompson, III
*Plaintiffs' Liaison Counsel*

Encl.

cc:    All Counsel of Record (by ECF)
       Cary Kotcher (by email) (Cary_Kotcher@scd.uscourts.gov)

---

[28] CMO 27, at 4.