December 5, 2023

*Via E-Mail (gergel_ecf@scd.uscourts.gov; Cary_Kotcher@scd.uscourts.gov)*

The Honorable Richard M. Gergel
U.S. District Court for the District of South Carolina
J. Waties Waring Judicial Center
83 Meeting Street
Charleston, South Carolina 29401

Re:     *In re Aqueous Film-Forming Foams Products Liability Litigation* (MDL No. 2873)

Dear Judge Gergel:

Tier One Core Discovery for the Telomer Water Provider cases concluded on November 17, 2023. Pursuant to Case Management Order 27, the parties have met and conferred regarding the two cases to become Telomer Water Provider Tier Two Cases, one of which ultimately will be selected for the August 2024 trial date. After extensive discussions, Plaintiffs' Leadership and the Telomer Defendants have been unable to reach agreement on this issue. Pursuant to Paragraph II.C of CMO 27, Telomer Defendants respectfully propose that the Court select the following two cases to proceed to Tier Two Discovery:

1. *Village of Farmingdale v. 3M Company et al.* (No. 2:19-cv-00564), a case filed by the Napoli Shkolnik firm.

2. *City of Watertown v. 3M Company et al.* (No. 2:21-cv-01104), a case filed by the Baron & Budd and Cossich, Sumich, Parsiola & Taylor firms.

Telomer Defendants understand that the Court is looking to the parties to advance the two cases a) that are representative of the water provider case docket as a whole in that they raise broadly applicable issues that are instructive as to one or more Telomer Defendants, and b) that reasonably allow the parties to meet CMO-27's accelerated deadlines. Tier 1 discovery has revealed that Plaintiffs' two proposed candidates—*Southeast Morris County Municipal Utilities Authority v. 3M Company et al.* (No. 2:22-cv-00199) and *Bakman Water Company v. 3M Company et al.* (No. 2:19-cv-02784)—do not fairly advance these goals.

Specifically, it has become clear that Plaintiffs' goals are instead: (1) to select a case that maximizes potential damages, (2) to focus on what Plaintiffs call "C8-based" chemistries rather than all telomer chemistries; and (3) to select sites with underdeveloped records as to the potential sources of PFAS, whether from AFFF or otherwise. In short, Plaintiffs focus not on representativeness, but rather on maximizing their perceived advantage.

They do so by attempting to sidestep at least two of the Telomer Defendants' critical defenses in many (if not nearly all) of the water provider cases: (i) that the PFAS detected has nothing to do with AFFF generally and/or with Telomer AFFF specifically, and/or (ii) that the Telomer AFFF manufacturers' non-PFOS-based and non-PFOA-based chemistries have always

The Honorable Richard M. Gergel
December 5, 2023
Page 2

been the safer alternative required by the law. These defenses need to be tested in bellwether cases so that water providers around the country, who may consider whether to participate in any global settlements that may be reached, can see what risks they face in continuing to litigate their cases rather than resolving them.

Based on the records developed to date, *Farmingdale* (initially proposed by the Telomer Defendants) and *Watertown* (initially proposed by Plaintiffs) are the most appropriate Tier Two candidates. In contrast, advancing *Southeast Morris* and *Bakman* will only hinder, rather than help, future efforts to resolve this important part of the overall MDL docket.

*Village of Farmingdale*

Plaintiff Village of Farmingdale is a municipal water provider located in Nassau County, New York serving approximately 2,300 metered accounts (including 89 multi-family/apartment buildings). Initial sampling evidence indicates the presence of PFOA in all three of Plaintiff's wells, with no PFOS (one of the PFAS compounds associated solely with 3M's AFFF and other non-AFFF products) in two of the wells and minimal PFOS in the third. Plaintiff also has its own fire department and appears to have purchased Ansul and other telomer brands of AFFF. This case is a good candidate for Tier Two Discovery for several reasons.

*First*, Farmingdale is located in New York, the single most represented geographic area in the water provider case pool: Of the over 650 water provider cases currently pending in the MDL, nearly **one quarter** (approximately 160) were filed in or involve water providers located in New York State, a number of which are, like Farmingdale, located on Long Island. Decisions that implicate New York law—including New York's PFAS MCLs—would thus be instructive as to a substantial portion of the water provider pool.

*Second*, this case involves accrued damages that Plaintiff alleges to be specific to PFAS treatment, rather than the hypothetical or prospective damages at issue in both *Southeast Morris* and *Bakman*. Tier One discovery revealed that Plaintiff claims that it has already installed PFAS treatment technology at one location and is installing additional PFAS treatment at a second.

Plaintiffs may contend that 1,4-dioxane contamination in Farmingdale's water renders the case unrepresentative. But, in fact, this makes the case **more** representative, because water providers around the United States similarly must deal with a range of contaminants, including 1,4 dioxane. Thus, Plaintiff's efforts to simultaneously address both PFAS and 1,4-dioxane represent a fact pattern broadly applicable to many water provider cases.

*Third*, initial discovery in *Farmingdale* indicates that multiple Telomer AFFF Defendants may be at issue in this case, whether by way of Plaintiff's purchases of AFFF or through several surrounding fire departments, thereby increasing the likelihood that this case will be instructive as to multiple Telomer Defendants. For example, Tier 1 discovery appears to indicate that Plaintiff purchased at least 40 gallons of AFFF products manufactured by Tyco in 2010 and that nearby fire departments purchased AFFF products manufactured by, among others, Tyco, Buckeye Fire Equipment Company, and National Foam, Inc. There also exists the potential for additional AFFF

The Honorable Richard M. Gergel
December 5, 2023
Page 3

use at the nearby Republic Airport and Nassau County Fire Training Center, which would be the subject of Tier Two discovery.

*Finally*, Plaintiffs' factual contentions as to *Farmingdale* miss the mark. For example, Plaintiffs may suggest that Tyco's sales are too recent and therefore supposedly implicate predominately C6 chemistries. But this ignores (1) that Plaintiffs' evidence as to AFFF usage in *Southeast Morris* appears to involve even more recent Tyco formulations and (2) that, by Plaintiffs' own admission, Tyco has used predominantly C6-based chemistries for decades, before 3M even withdrew from the market, making this an issue that is likely present in a significant portion if not majority of the water provider cases in the MDL.[1] Plaintiffs may also contend that sampling results suggesting non-AFFF PFAS sources in Farmingdale render it non-representative. But given the ubiquity of PFAS throughout the world (including in rainwater),[2] the presence of such non-AFFF-based PFAS makes the case *more* representative, not less, as this will be a primary argument the Telomer Defendants will advance in nearly every case on the water provider docket.

*City of Watertown*

Plaintiff City of Watertown is a municipal water provider located in Codington County, South Dakota serving more than 9,800 commercial and residential metered accounts. Initial sampling evidence indicates the presence of PFOA in a wellfield next to the Watertown Regional Airport—a Part 139 airport owned by Plaintiff. Plaintiff has its own fire department that provides both civilian and airport fire services. This case is a strong candidate for Tier Two Discovery, as well.

*First*, and most importantly, the discovery to date in *Watertown* has elicited documents and Rule 30(b)(6) testimony regarding the Watertown Fire Department's purchase of Tyco products over at least the last decade, and initial evidence indicates that the at-issue wells are located near an AFFF training area. (Initial evidence also indicates that the Watertown Fire Department may have used National Foam branded and 3M AFFF products in the past.)

---

[1] *See* Pls.' Opp'n re First Element of GCD at 28 & n.110 (Dec. 22, 2021) (Dkt. No. 2063) ("Defendants, in fact, had the ability to manufacture AFFF that complied with the MilSpec but did not contain PFOA and/or PFOS as an active ingredient that impacted the foam's performance . . . . [A Tyco/Ansul-manufactured] non-C8 derived AFFF product, which consists of over 95% C6-based fluorosurfactants (i.e., 95% C6, 4% C4, and 1% C8) was on the DoD's QPL in 1982 . . . .").

[2] *See, e.g.*, Johnson et. al, *Global distributions, source-type dependencies, and concentration ranges of per- and polyfluoroalkyl substances in groundwater*, J. Sci. & Total Env. at 10 (2022) ("The presence of PFAS has been reported for all environmental media in all regions tested including areas that are far removed from specific PFAS sources. This indicates that PFAS are pervasive and widely distributed throughout the environment globally. This gives rise to the existence of a 'background' concentration of PFAS. . . . This background must be accounted for in both regional and site-specific risk assessments."); *see also id.* at 8 ("PFAS are present in precipitation at significant levels.").

The Honorable Richard M. Gergel
December 5, 2023
Page 4

*Second*, *Watertown* is representative of another cross-section of the water provider pool—namely, those cases where there is no current state-issued MCL (South Dakota follows the EPA's standards). Thus, *Watertown* will allow the parties to test the converse of *Farmingdale*, which involves an existing state MCL.

*Third*, Watertown may be able to address PFAS through alternative remediation options besides installing a treatment system (e.g., blending water or pursuing other raw water sources). Plaintiffs have argued that this makes the case not representative because the damages could be lower or even zero—but again, the opposite is true: The fact pattern where a water provider can remediate its PFAS issues short of installing a high-cost treatment system is common across a large number of water providers. A jury's assessment of the parties' respective damages arguments in such a case would be highly instructive for the entire docket.

*Fourth*, Defendants also have a potential Government Contractor Defense in *Watertown*, making this case instructive as to numerous other water provider cases located near Part 139 airports and/or military bases. Both Plaintiff's documents and deposition testimony indicate that much of the Tyco AFFF at issue was purchased and used based on express directives from the FAA that applied to all Part 139 airports. Unlike the prior bellwether trial case, *City of Stuart*, this case could allow the Court to consider this defense in a discrete factual context.

*Finally*, the current discovery record in *Watertown* presents the most straightforward factual picture of any of the Tier One cases, with minimal (if any) additional third-party discovery required in Tier Two. This is true even accounting for the fact that, in addition to its water provider claims, Plaintiff is also pursuing property damage claims against all of the named defendants, including 3M and DuPont. Plaintiffs have represented to Defendants that they would pursue procedural mechanisms that would permit the case to move forward as to the Telomer Defendants (i.e., severing parties or claims). The Telomer Defendants have agreed that they will work closely with Plaintiff to address this issue moving forward. In any event, procedural issues like this—which Plaintiffs have known about since they first proposed *Watertown* for inclusion in Tier One—are not unique to *Watertown* and should not be a bar to Tier Two eligibility.

*Remaining Tier One Cases*

The other two Tier One cases—*Southeast Morris* and *Bakman*—are not representative and present complications not present in either *Farmingdale* or *Watertown*.

*Southeast Morris County Municipal Utilities Authority*: Plaintiff Southeast Morris County Municipal Utilities Authority is a private water provider located in Morris County, New Jersey that serves approximately 17,500 accounts and also buys and sells water through wholesale agreements with other water providers. Preliminary sampling results indicate the presence of PFAS in most of Plaintiff's water sources.

Given its size and the complexity of its water system, *Southeast Morris County* is the most impractical of the four cases, particularly given the existing timelines. Plaintiff utilizes surface water from a local reservoir, groundwater from a geographically disparate series of wells, and

The Honorable Richard M. Gergel
December 5, 2023
Page 5

finished water that it receives through interconnections with multiple other water providers. Plaintiff also wholesales finished water to other water providers, which—as the Court is aware from the ongoing 3M and DuPont settlements—introduces an additional layer of complexity to this case, one that is not present in the others. In fact, Plaintiff admitted in Tier 1 that it has not even investigated the source or sources of this widely dispersed PFAS contamination (nor, it appears, has any regulatory body or third party). In essence, the parties will be starting from scratch on a highly complicated fate-and-transport assessment that would otherwise require months of work and third-party discovery to fairly develop the necessary conceptual site models.

This assessment is all the more complicated given that—in contrast to *Farmingdale* and *Watertown*—Plaintiff itself did not purchase or use AFFF, meaning that significant third-party discovery will be required. The difficulties inherent in a case where the plaintiff was not a purchaser or user of AFFF is highlighted by how discovery has progressed in *Southeast Morris* in Tier One. For example, although there is some evidence that Tyco AFFF products were purchased by third parties in the surrounding geographic area, Plaintiff claimed to be unaware of the source of the PFAS in its water and stated in interrogatory responses that it had "not undertaken any actions to investigate or determine the source of PFAS contamination of [its] water system"—whether from AFFF or one of the multiple alternative sources of PFAS in the surrounding area. Then, in its Rule 30(b)(6) testimony, on the last day of Tier One and in contrast with its interrogatory responses submitted just five weeks earlier, the Southeast Morris representative offered multi-layered hearsay regarding "foam" usage by parties other than Southeast Morris itself (but could not identify which brand of foam was used). And, ***after*** the close of Tier One, Southeast Morris produced a number of Facebook posts and other videos purportedly showing AFFF use—but without specifying the source, location, or timing of such usage. The belated nature of these disclosures, reminiscent of the late-breaking allegations of telomer foam usage in *Stuart*—raise the specter that claims of telomer AFFF use may ultimately not bear out.

Additionally, although Defendants have worked closely with Plaintiff to meet the aggressive Tier One discovery deadlines, Plaintiff produced only around 300 documents by the Court's October 20, 2023 deadline for substantial completion of document production and produced over 300,000 documents in the last ten days of Tier One Discovery, between November 7 and 16. This will further complicate efforts to meet the Court's Tier Two discovery deadlines.

*Bakman Water Company*: Plaintiff Bakman Water Company is a private water provider located in Southeast Fresno, California that serves approximately 2,600 metered and flat-rate connections. Plaintiff draws its water from a series of groundwater wells, eight of which are purportedly active and five of which are purportedly in "standby" at this time. Thus far, Plaintiff is claiming PFAS contamination in eight wells, although it recently sampled additional active and standby wells which may result in Plaintiff alleging that additional wells are contaminated.

Selection of *Bakman* for Tier Two Discovery would run counter to the Court's directive that the next bellwethers focus on the Telomer Defendants. Indeed, based on the discovery to date, it appears that much of the PFAS at issue stems from 3M chemistry (PFOS-based products that also contain a large amount of PFOA). In the three wells with the highest PFAS detections, the PFOS levels exceed the PFOA levels by a factor of at least two, and two of Plaintiff's wells tested

positive for PFOS but negative for PFOA. In addition, the only evidence of AFFF product identification comes from one interview contained in a PFAS site investigation report commissioned by the United States Air Force, which indicated the historic use of 3M and Ansul products at the Fresno Air National Guard Base/Fresno Yosemite International Airport. Thus, it is possible that Tier Two and/or expert discovery will reveal that non-telomer AFFF may be the primary (if not exclusive) source of most of the PFAS at issue in *Bakman*.

*Bakman* also involves other, non-PFAS contamination that presents more significant challenges than the non-PFAS contamination at issue in *Farmingdale*. Specifically, Plaintiff has long been dealing with 1,2,3-TCP[3] contamination in many of its wells. It is this contamination— not PFAS contamination—that appears to be the primary focus of Plaintiff's water treatment efforts. Of the eight wells Plaintiff claims are contaminated with PFAS, at least five of those wells are also contaminated with 1,2,3-TCP. Moreover, the expert that Plaintiff has hired to assist with its 1,2,3-TCP contamination has recommended the installation of granular activated carbon (GAC) treatment on each of those five wells, and GAC is known to be effective at treating PFAS contamination, which will complicate the assessment of how much (if any) of the costs for this treatment can be considered to have been caused by PFAS rather than 1,2,3-TCP.[4] Further, the 1,2,3-TCP contamination has put a great deal of pressure on Plaintiff's ability to meet regulatory demand for water, entirely independent of PFAS. Thus, while non-PFAS contamination is an issue for many water providers, these facts make the other-contaminant issue in *Bakman* more complex as compared to the other-contaminant issue in *Farmingdale*.

\* \* \*

In sum, *Farmingdale* and *Watertown* are the Tier One cases most likely to achieve the Court's goals for the Telomer Water Provider Bellwether program. They are the only two cases where there is evidence of Telomer AFFF purchases by the Plaintiffs themselves, as opposed to by third parties. They both allege damages that, based on the existing Tier One Discovery record, they claim are traceable to Telomer AFFF. And they both present issues that are instructive as to the remaining water provider case pool and can be fairly and adequately addressed in Tier Two Discovery. In contrast, *Southeast Morris* and *Bakman* are cases with overly complex and/or underdeveloped factual and scientific issues, rendering them both not as representative of the water provider pool at large and more difficult and costlier to work up in Tier Two.

For all of these reasons, Defendants respectfully request that the Court select *Farmingdale* and *Watertown* as the cases proceeding to Tier Two Discovery.[5]

---

[3] 1,2,3-TCP is a man-made organic compound regulated by the State of California.

[4] In contrast, the treatment for 1-4 dioxane—which is the primary non-PFAS contaminant at issue in *Farmingdale*—is not known to be effective at treating for PFAS.

[5] The parties have been able to agree in principle on a plan for Tier 2 depositions and can incorporate this into a CMO following from the Court's order on case selection.

The Honorable Richard M. Gergel
December 5, 2023
Page 7

                                        Respectfully submitted,

/s/ *Liam Montgomery*
on behalf of:

/s/ *Joseph G. Petrosinelli*

Joseph G. Petrosinelli
Williams & Connolly LLP
680 Maine Avenue, S.W.
Washington, DC 20024
P: (202) 434-5547
F: (202) 434-5029
jpetrosinelli@wc.com

*Co-lead Counsel for Defendants*