**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS | ) | Master Docket No.: |
| PRODUCTS LIABILITY LITIGATION | ) | 2:18-mn-2873-RMG |

| | | |
|---|---|---|
| | ) | |
| CITY OF CAMDEN, et al., | ) | Civil Action No.: |
| | ) | 2:23-cv-03147-RMG |
| *Plaintiffs,* | ) | |
| | ) | |
| *-vs-* | ) | |
| | ) | |
| 3M COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**CLASS COUNSEL'S RESPONSE TO OBJECTIONS TO 3M SETTLEMENT**

i

## **Table of Contents**

I.  INTRODUCTION ........................................................................................................... 1

II.  ARGUMENT ................................................................................................................. 2

  A.  The Objections Relating to Fairness Should be Overruled............................................. 2

    1.  The Amount of Settlement and Relationship to Recovery at Trial Support Approval. ... 2

      a.  Objectors' Argument is Contrary to Controlling Fourth Circuit Law........................ 2

      b.  The Law Outside the Fourth Circuit Likewise Does Not Support Objectors. ............ 3

      c.  Objectors' Argument That No Settlement can be Approved Without a Bellwether Trial Fails. ........................................................................................................................ 8

    2.  The Settlement Value is Adequate Compared to Defendant's PFAS-Related Damages. 9

    3.  The Allocation of Funds Between Phase One and Phase Two Class Members is Fair. 100

    4.  The Settlement Allocations Do Not Place Disproportionate Risks on Phase Two Claimants. ..................................................................................................................... 14

    5.  The Release is Not Overbroad. ...................................................................................... 15

      a.  Broad Releases are Appropriate in Massive Settlements Like This One. ................. 15

      b.  The Release was Carefully Designed to Effectuate the Purposes of the Settlement. 166

      c.  The Release is Not Overboard Because it Expressly Excludes Claims Arising from Real Property, Stormwater and Wastewater. .................................................................. 18

      d.  The Release is Not Overbroad Because it Includes Claims as to PFAS That May Reasonably be Expected to Enter Drinking Water or any Releasing Party's Public Water System. ............................................................................................................................ 19

      e.  The Release is Not Overbroad on the Basis That it Applies to all Property Damage Caused by a PWS's Drinking Water........................................................................... 211

      f.  The Release is Not Overbroad in its Inclusion of all PFAS Compounds................. 22

      g.  The "Releasing Parties" Definition Does Not Render the Release Overbroad by Including Non-Parties. ................................................................................................... 23

      h.  The Release is Not Overbroad in its Application to Personal Injury Claims............ 25

    6.  The Objections Regarding the Interrelated Guidance are Invalid. ................................ 27

      a.  Clarifications of Class Settlements Prior to Final Approval are Appropriate. ........ 277

      b.  The Interrelated Guidance Clarifies how Joint Claims of Wholesalers and Retail Customers Will be Evaluated in the Allocation Process. .............................................. 28

      c.  The Interrelated Guidance Satisfied the Objector's Request for Clarification and Detail.............................................................................................................................. 30

d. The Settlement Considers PFAS Treatment at Scale. ................................. 31

7. Notice Meets Constitutional Requirements. ................................................... 32

8. Notice to Phase Two Class Members Comports with Due Process. ............................ 33

9. Sufficient Time Was Provided to Class Members to Evaluate the Settlement. .............. 35

10. The Settlement Agreement Appropriately States that the Set-Off Method Will Be Determined Under "Applicable Law." ....................................................... 38

11. The Claims-Over Provision is Not Improper. ............................................. 40

12. The Agreement Does Not Affect Class Members' Rights as to Non-Settling Defendants. ............................................................................. 42

13. Objections Related to Amended Exhibit P and Settlement Agreement § 11.1.5. .... 433

B. Objections Relating to Class Certification .................................................... 47

1. Questions of Law and Fact Predominate. ................................................... 47

2. The Class Representatives' Claims are Typical of the Class Members. ...................... 49

3. Plaintiffs are Adequate Because the Settlement Agreement was Crafted to Avoid any Appreciable Conflict of Interests. ............................................................ 52

III. CONCLUSION ................................................................................ 60

**Table of Authorities**

**Cases**

*1988 Trust for Allen Children Dated 8/8/88 v. Banner Life Ins. Co.,* 28 F.4th 513 (4th Cir. 2022) ........................................................................................................................... 2, 7-8

*Abramson v. Pennwood Inv. Corp.*, 392 F.2d 759 (2d Cir. 1968) ................................. 16

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). ....................................35, 47, 52-54

*Ashley v. GAF Materials Corp. (In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.*), No. 8:11-mn-02000, 2014 U.S. Dist. LEXIS 183679 (D.S.C. Oct. 15, 2014) ........................................................................................................................... 35

*Berry v. Schulman*, 807 F.3d 600 (4th Cir. 2015)......................................................... 7, 8

*Boger v. Citrix Sys., Inc.*, No. 19-CV-01234-LKG, 2023 WL 3763974 (D. Md. June 1, 2023).... 3

*Brooks v. GAF Materials Corp.*, 301 F.R.D. 229 (D.S.C. 2014)................................... 48

*Campbell v. Geren*, 353 Fed. Appx. 879 (4th Cir. 2009) ........................................... 42

*Case v. French Quarter III LLC*, No. 2:12-CV-02518-DCN, 2015 WL 12851717 (D.S.C. July 27, 2015) ...................................................................................................................... 49

*Caudle v. Sprint/United Management Company*, 2019 WL 2716291 (N.D. Cal., 2019) ............. 26

*Central Wesleyan College v. WR Grace & Co.*, 6 F.3d 144 (4th Cir. 1993). .............................. 47

*City of Long Beach v. Monsanto Company*, 2:16-cv-03493-FMO-AS, 2022 U.S. Distr. LEXIS 21099 (C.D. Cal. Nov. 19, 2022)........................................................................................ 21

*City P'ship Co. v. Atl. Acquisition Ltd. Partnership*, 100 F.3d 1041 (1st Cir. 1996)................. 16

*Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am, AFL-CIO*, 803 F.2d 878 (6th Cir. 1986) ................................................................................................................... 57

*Dalton v. Alston & Bird*, 741 F. Supp. 157 (S.D. Ill.1990). ........................................ 41

*Deiter v. Microsoft Corp.*, 436 F.3d 461 (4th Cir. 2006)............................................. 49

*DeLoach v. Lorillard Tobacco* Co., 391 F.3d 551 (4th Cir. 2004)................................................ 42

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ................................................ 39-41

*Does 1-2 v. Déjà vu Servs., Inc.*, 925 F.3d 886 (6th Cir. 2019)...................................................... 30

*Faught v. Am. Home Shield Corp.*, 2010 WL 10959223 (N.D. Ala. Apr. 27, 2010) ................. 16

*Feinberg v. T. Rowe Price Grp.*, 610 F. Supp. 3d 758 (D. Md. 2022) ..................................... 3, 58

*Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975) ..........................................................4, 6, 8-9

*Franklin v. Kaypro Corp.*, 884 F.2d 1222 (9th Cir. 1989) ............................................................ 41

*Franklin v. Peat Marwick Main & Co.*, 498 U.S. 890 (1990) ...................................................... 41

*Geissler v. Stirling*, No. 4:17-cv-01746-MBS, 2019 WL 3561875 (D.S.C. Aug. 5, 2019)........... 9

*Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553 (3d Cir. 1994)............................................... 16

*Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417 (4th Cir. 2010). ................................. 47, 48, 55

*Haney v. Genworth Life Ins. Co.*, No. 3:22-cv-55, 2022 WL 17586016 (E.D. Va. Dec. 12, 2022) ....................................................................................................................................................... 56

*In re All-Clad Metalcrafters, Cookware Mktg. & Sales Practices Litig.*, MDL 2988, 2023 WL 2071481 (W.D. Pa. Feb. 17, 2023) ............................................................................................. 50

*In re Allura Fiber Cement Siding Litig.*, Civil Action No.: 2:19-mn-02886-DCN, 2021 U.S. Dist. LEXIS 96931 (D.S.C. May 21, 2021) ............................................................................................ 9

*In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299 (N.D. Cal. 2018).................................... 51

*In re Art Materials Antitrust Litig.*, 100 F.R.D. 367 (N.D. Ohio 1983) ....................................... 34

*In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000, 2020 WL 8256366 (N.D Ala. Nov. 30, 2020). ........................................................................................................................... 51

*In re Cendant Corp. Sec. Litig.*, 404 F.3d 173 (3d Cir. 2005) ...................................................... 57

*In re CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199 (E.D. Pa. 2014) .................. 28, 33

*In re Cmty. Bank of N. Virginia*, 622 F.3d 275 (3d Cir. 2010) ..................................................... 51

*In re Diet Drugs*, No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000)............................ 21, 39

*In re Exxon Valdez*, 1993 WL 649104 (D. Alaska 1993) ............................................................. 41

*In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020) ................................................................. 34

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394 (S.D.N.Y. 2018) ........ 34

*In re Flint Water Cases*, 571 F. Supp. 3d 746 (E.D. Mich. 2021) ............................................... 49

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3rd Cir. 2009) ........................................... 59

*In re Integra Realty Resources, Inc.*, 262 F.3d 1089 (10th Cir. 2001) ........................................ 33

*In re Jiffy Lube Securities Litig.*, 927 F.2d 155 (4th Cir. 1991) ......................................... 10, 40-42

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997 (E.D. Wis. Aug. 16, 2010) ............................................................................................................ 31

*In re Literary Works in Elec. Databases*, 654 F.3d 242 (2d Cir. 2011) ...................................... 16

*In re: Mi Windows & Doors Inc. Prod. Liab. Litig.*, No. 2:12-MN-00001, 2015 WL 12850547 (D.S.C. July 22, 2015) ............................................................................................................... 51

*In re MI Windows & Doors, Inc., Prods. Liab. Litig.*, 860 F.3d 218 (4th Cir. 2017) ............. 15, 51

*In re Nat. Football League Players Concussion Inj. Litig.*, 307 F.R.D. 351 (E.D. Pa. 2015) ...... 21

*In re Nucorp Energy Securities Litig.*, 661 F. Supp. 1403 (S.D. Cal. 1987) ............................... 41

*In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 910 F. Supp. 2d 891 (E.D. La. 2012) . 55, 57

*In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158 (E.D. Pa. 1997) ......... 39, 40-41

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010) ................................................. 56

*In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 227 F.R.D. 553 (W.D. Wash. 2004) ....... 21

*In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 U.S. Dist. LEXIS 23482, 2015 WL 1639269 (N.D. Ohio Feb. 26, 2015) .......................................................................... 5

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355 (3d Cir.2001) ................... 26

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216 (D.N.J. 1997) .............. 35

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450 (D.N.J.1997) ............ 28

*In re Remeron End–Payor Antitrust Litig.*, No. 02–2007, 2005 WL 2230314 (D.N.J. Sept. 13, 2005) ........................................................................................................................ 28

*In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001) ........................................ 5

*In re Serzone Prod. Liab. Litig.*, 231 F.R.D. 221 (S.D.W. Va. 2005) .................................... 49, 56

*In re Silicone Gel Breast Implant Prods. Liab. Litig.*, 1994 WL 578353 (N.D. Ala. 1994) ........ 39

*In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.,* 268 F. Supp. 2d 907, 918 n. 17 (N.D. Ohio 2003) .................................................................................................................... 33

*In re U.S. Oil and Gas Litig.*, 967 F.2d 489 (11th Cir. 1992) ...................................................... 41

*In re Vitamin Antitrust Litig.*, Misc. No. 99-197 (TFH) ALL CASES MDL No. 1285 (D.D.C. Mar. 31, 2000) .................................................................................................................... 16

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Prods. Liab. Litig.*, 2018 WL 1588012 (N.D. Cal., 2018) ...................................................................................... 23, 24

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752, 2020 WL 4212811 (N.D. Cal. July 21, 2020 ...................................................................................................... 51

*International Union, United Automobile, Aerospace, & Agricultural Implement Workers of America v. General Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) ........................................... 57

*Jabbari v. Farmer*, 965 F.3d 1001 (9th Cir. 2020) ...................................................................... 49

*Jones v. Dominion Transmission, Inc.*, No. 06-00671, 2009 WL 10705321 (S.D.W. Va. Jan. 30, 2009) .................................................................................................................................. 33

*Kaufman v. Am. Express Travel Related Servs. Co.*, 877 F.3d 276 (7th Cir. 2017) ...................... 3

*Lienhart v. Dryvit Sys.,* 255 F.3d 138, at 146 n.4 (4th Cir. 2001) ................................................ 47

*Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471 (4th Cir. 2020) ...................................................................................... 5

*Manners v. Am. Gen. Life Ins. Co.*, No. 98-0266, 1999 WL 33581944 (M.D. Tenn. Aug. 11, 1999) .................................................................................................................................. 33

*Matamoros v. Starbucks Corp.*, 699 F.3d 129 (1st Cir. 2012) ............................................... 54-55

*Maybank v. BB&T Corp.*, 787 S.E.2d 498, 516 (S.C. 2016) ........................................................ 43

*McAdams v. Robinson,* 26 F.4th 149 (4th Cir. 2022) ...................................................... 2, 7-8, 15, 30

*MFS Mun. Income Trust v. American Medical Int'l, Inc.*, 751 F. Supp. 279 (D. Mass.1990) 39, 41

*Millwood v. State Farm Life Ins. Co*., No. C/A No. 7:19-cv-01445-DCC, 2022 U.S. Dist. LEXIS 173928 (D.S.C. Sept. 23, 2022) .......................................................................................... 47

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004). ...................................................... 3

*Olden v. Gardner*, 294 F. App'x 210 (6th Cir. 2008) .................................................................. 16

*Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922 (E.D. Mich. 2007) ................................................ 7

*Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339, 162 N.E. 99 (1928). .................................. 25

*Parker v. Byrd*, 309 S.C. 189, 420 S.E.2d 850 (S.C. 1992) .......................................................... 43

*Rieckborn v. Velti PLC*, 2015 WL 468329 (N.D. Cal., 2015) ...................................................... 26

*Rikos v. Procter & Gamble Co.,* No. 11-226, 2022 WL 175972 (S.D. Ohio Mar. 10, 2022) ...... 33

*S.C. Nat. Bank v. Stone*, 749 F. Supp. 1419 (D.S.C.1990) ........................................................... 41

*S.C. Nat. Bank v. Stone*, 139 F.R.D. 335 (D.S.C. 1991) ......................................................... 40-42

*Saccoccio v. JP Morgan Chase Bank, N.A.,* 297 F.R.D. 683 (S.D. Fla. 2014) ........................... 31

*Sharp Farms v. Speaks,* 917 F.3d 276 (4th Cir 2019) ............................................................... 7, 8

*Slaven v. BP America, Inc.*, 958 F. Supp. 1472 (C.D. Cal. 1997)) ............................................... 39

*Sims v. BB&T Corp.,* No. 1:15-CV-732, 2019 U.S. Dist. LEXIS 75837 (M.D.N.C. May 6, 2019) .......................................................................................................................................... 4

*Speaks v. U.S. Tobacco Coop., Inc.*, 324 F.R.D. 112 (E.D.N.C. 2018) ....................................... 16

*Sterling v. Velsicol Chem. Corp*., 855 F.2d 1188 (6th Cir. 1988)). ............................................. 49

*Stillmock v. Weis Markets, Inc.,* 385 Fed. App'x 267 (4th Cir. 2010) .................................... 47, 48

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2001) ............................................................. 48

*Thomas-McCain, Inc. v. Siter*, 268 S.C. 193 (S.C. 1977) ........................................................... 43

*Ward v. Dixie Nat. Life Ins. Co*., 257 F. App'x 620 (4th Cir. 2007) ........................................... 48

*Warshawsky v. CBDMD, Inc.*, 20-cv-00562 (W.D.N.C. Aug. 9, 2022) ......................................... 8

*Wong v. Accretive Health, Inc.*, 773 F.3d 859 (7th Cir. 2014). ..................................................... 3

*Yates v. NewRez LLC*, No. CV TDC-21-3044, 2023 WL 5108803 (D. Md. Aug. 9, 2023)......... 50

**Rules**

Fed. R. Civ. P. 23(a)(4).......................................................................................................... 52, 54

Fed. R. Civ. P. 23(b)(3)............................................................................................................. 2, 47

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................................................... 32

Fed. R. Civ. P. 23(e)(2) ................................................................................................................ 30

**Statutes**

New York General Obligations Law § 15-108 ............................................................................. 42

**Other Authorities**

Manual for Complex Litigation § 13.21 .................................................................................. 9, 35

Note, Alex Raskolnikov, *Is There a Future for Future Claimants After Amchem Products, Inc. v. Windsor*, 107 Yale L.J. 2545, 2553 (1998)............................................................................. 54

x

# I.    **INTRODUCTION**

Following the close of the opt-out period, there now remain seven (7) pending Objections to the Settlement Agreement[1] filed on behalf of nine (9) objectors.[2] Critically, there were *zero* oppositions filed to Class Counsel's Motion for Final Approval and *zero* Objections and *zero* oppositions filed to Class Counsel's Motion for Attorneys' Fees and Costs [ECF No. 4269]. The reaction of the Class to this historic settlement, valued up to $12.5 billion, is stunningly favorable: less than one (1) percent of the Class of approximately 12,000 filed Objections to the Settlement Agreement. Thus, the Settlement Agreement should be given final approval, and the Settlement Class finally certified for the reasons set forth both herein and in Class Counsel's Memorandum of Law in Support of Class Counsel's Motion for Final Approval of Class Settlement and for Final Certification of the Settlement Class ("Motion for Final Approval")[4273-1]. Given the paucity of filed oppositions, in lieu of any Reply briefing, Class Counsel submit only their responses to the remaining Objections to the Settlement Agreement, which are without merit.

---

[1] ECF No. 3370-3, as amended by ECF Nos. 3620, 3697, 3793 and 3976, and as supplemented by ECF Nos. 3856, 3918, 3964 and 4107. All capitalized terms herein have the same meaning as provided for in the Settlement Agreement (unless otherwise defined herein), and all provisions of the Settlement Agreement as preliminarily approved by this Court control.

[2] These objectors include: (1) Broward County ("Broward") [ECF No. 3996], represented by the Broward County Attorneys' Office; (2) The Santa Clarita Valley Water Agency ("Agency") [ECF No. 4074], whose *pro se* Objection was filed on November 17, 2023, six (6) days **after** the November 11, 2023, deadline set forth for Objections in the Preliminary Approval Order ("PAO") [ECF No. 3626], at § IV.A; (3) City of Vancouver ("Vancouver") [ECF No. 3961], represented by Marten Law; (4) City of DuPont ("DuPont") [ECF No. 3966], represented by Marten law; (5) The Town of East Hampton ("East Hampton") [ECF No. 3999], represented by Rigano LLC ("Rigano"); (6) Town of Islip ("Islip") [ECF No. 3999], represented by Rigano; (7) Town of Harrietstown ("Harrietstown") [ECF No. 3999], represented by Rigano (collectively with East Hampton and Islip referred to as "the Towns"); (8) Widefield Water and Sanitation District ("Widefield") [ECF No. 4010]; and (9) Little Hocking Water Association, Inc. ("Little Hocking") [ECF No. 4009], represented by AltmanNewman Co., LPA.

## II.     ARGUMENT

The pending Objections address both the fairness of the settlement and the issue of whether a settlement class can be certified under Rule 23(b)(3). The discussion below first considers fairness objections and then focuses on Rule 23(b)(3).

### A.     The Objections Relating to Fairness Should be Overruled.

#### 1.     The Amount of Settlement and Relationship to Recovery at Trial Support Approval.[3]

Two objectors complain that the Settlement Agreement must be rejected because Class Counsel do not compare the value of the settlement to the damages that could have been obtained at trial.[4] For several reasons, this argument is flawed.

##### a.     Objectors' Argument is Contrary to Controlling Fourth Circuit Law.

The short answer to objectors' argument is that it is flatly contrary to controlling Fourth Circuit law, which objectors fail to even acknowledge. For instance, in *McAdams v. Robinson,* 26 F.4th 149 (4th Cir. 2022), the Fourth Circuit considered an objector's contention that a magistrate judge "failed to make a rough estimate of what class members would have received had they prevailed at trial." 26 F.4th at 160 (cleaned up). In upholding the settlement, the court noted that it has "never required such an estimate" and was "not persuaded to impose t[hat] new requirement..." *Id. Accord, e.g., 1988 Trust for Allen Children Dated 8/8/88 v. Banner Life Ins. Co.,* 28 F.4th 513, 527 (4th Cir. 2022) (explaining that, in evaluating a settlement agreement, a court "need not decide the merits of the case nor substitute its judgment of what the case might be

---

[3] Objections from: DuPont [ECF No. 3966], at 18-19; Vancouver [ECF No. 3961], at 26-27.
[4] *See, e.g.*, DuPont Obj. [ECF No. 3966], at 18 ("The 3M Agreement failed to compare the value of the settlement to the damages the class could have obtained at trial.").

2

worth for that of class counsel;" rather "the court must simply satisfy itself that the class settlement is within the 'ballpark' of reasonableness" (cleaned up)); *Boger v. Citrix Sys., Inc.*, No. 19-CV-01234-LKG, 2023 WL 3763974, at *6, n.5 (D. Md. June 1, 2023) (noting that "[t]he Fourth Circuit has never required an estimate of what the class members would have received had they prevailed at trial") (cleaned up)); *Feinberg v. T. Rowe Price Grp., Inc.*, 610 F. Supp. 3d 758, 769 (D. Md. 2022) (to the same effect). This clear and unambiguous authority dispositively refutes objectors' argument.

>    **b.    The Law Outside the Fourth Circuit Likewise Does Not Support Objectors.**

Even in Circuits that require some showing of the potential value of the cases at trial, the standard is flexible and is easily satisfied here. For instance, in the Seventh Circuit, courts are instructed to evaluate the settlement in relation to the value of class claims. *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004). Yet, all that is required is an "estimate" or "reasonable approximation" of the value of the claims. *Id.* at 786. And even in the Seventh Circuit, "evaluation of potential outcomes *need not always be quantified*, particularly where there are other reliable indications that the settlement reasonably reflects the relative merits of the case." *Kaufman v. Am. Express Travel Related Servs. Co.*, 877 F.3d 276, 285 (7th Cir. 2017) (emphasis added) (citing *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864. (7th Cir. 2014)). Other reliable indicators of a settlement's reasonableness may include the involvement of an "experienced third-party mediator after an arm's-length negotiation where the parties' positions on liability and damages were extensively briefed and debated." *Wong*, 773 F.3d at 864. The facts here more than satisfy these non-binding criteria of the Seventh Circuit.

To begin, Plaintiffs have in fact assessed the value of the claims in myriad ways. Plaintiffs prepared the *Stuart* case for trial and, as part of that preparation, retained an expert to opine on the

capital and operation and maintenance ("O&M") costs that would be required for the City of Stuart to treat its Drinking Water such that the PFAS levels were nondetectable. As a result, Plaintiffs had a clear understanding of the value of the claims in the *Stuart* bellwether trial, which the Court selected as a representative case, with all parties' agreement.

For illustrative purposes only, assuming Plaintiff was fully successful at the *Stuart* trial then, as it pertains to Drinking Water claims only, Plaintiff could have expected $76,750,290.00 in compensatory damages.[5] This represents the combined total of Plaintiff's compensatory damages across all of the named defendants against whom Plaintiff intended to proceed to trial, which included, DuPont, National Foam, Inc., Kidde-Fenwal, Inc., and the 3M Company ("3M").[6] Testimony at trial would have sought to establish that 3M's contribution in *Stuart* was at a minimum 89.4% ("3M Contribution"),[7] which (if accepted) would have resulted in 3M being responsible for $68,614,759.26 in compensatory damages for Stuart's Drinking Water claims.[8]

Pursuant to the 3M Allocation Procedures, it is estimated that Stuart is entitled to $17,400,000.00,[9] which represents approximately 25% of Stuart's estimated actual compensatory damages as to 3M. This alone represents a significant portion of the amount expected at trial, and it is well-settled law that even where a cash settlement amounts to only a "fraction of the potential recovery" at trial, that will not render a settlement inadequate or unfair. *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173-74 (4th Cir. 1975); *see also, Sims v. BB&T Corp.,* No. 1:15-CV-732, 2019 U.S. Dist. LEXIS 75837, at *19 (M.D.N.C. May 6, 2019) (approving class action settlement where the

---

[5] Declaration of Gary J. Douglas in Support of Class Counsel's Motion for Final Approval of Class Settlement and for Final Certification of the Settlement Class ("Douglas Final App. Decl.") [ECF No. 4273-21], at ¶ 7.
[6] *Id*. at 3, n.1.
[7] *Id*. at ¶¶ 6, 8.
[8] *Id*. at ¶ 8.
[9] *Id*. at ¶ 10.

monetary recovery represented 19% of the total investment and recordkeeping damages sought by the plaintiffs); *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 U.S. Dist. LEXIS 23482, 2015 WL 1639269, at *5 (N.D. Ohio Feb. 26, 2015) ("A settlement figure that equates to roughly 18 percent of the best-case-scenario classwide [damages] is an impressive result in view of these possible trial outcomes."); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses").

Moreover, through preparation of the *Stuart* case for trial, Plaintiffs gained a clear appreciation for which defenses 3M considered to be their strongest, including through extensive motion practice with respect to both summary judgment and *Daubert*, along with evidentiary rulings that involved letter-briefing, and formal hearings even days before trial. All these trial preparation efforts provided additional insight and were very instructive as to the relative merits of each parties' positions and their likelihood of prevailing at trial. *Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471, 484 (4th Cir. 2020) ("[B]y the time of the settlement, the parties in the Formaldehyde MDL had litigated a motion to dismiss and a motion for summary judgment, and discovery had been completed. And, at the time of settlement, the parties in the Durability MDL had litigated a motion to dismiss and also conducted significant discovery by deposing thirteen witnesses and reviewing vast quantities of documents."). Thus, Plaintiffs were able to consider not only the value in numerical terms, but also weigh that value against the defenses raised.

In addition, settlement was reached only after the involvement of an experienced mediator (retired Judge Layn Phillips), during which time the parties extensively discussed their relative positions on liability and damages. In this regard, 3M strongly contended that the AFFF it

manufactured was a life-saving and essential product that reflected the best medical, industrial, and scientific knowledge available at the time it was made, and that during its manufacture, 3M acted reasonably in studying PFAS, appropriately and routinely sharing PFAS information with the EPA, and acting as a good corporate steward in phasing out C8 chemistries. Moreover, 3M asserted a government-contractor defense and claimed that end-users were contributorily negligent in their use of AFFF, which could have resulted in lesser damages valuations at trial.

Conversely, Plaintiffs alleged that 3M knew for decades that PFOS was in the blood of the general population and failed to inform the EPA until 1998, when it was discovered by a scientist outside of 3M. Moreover, Plaintiffs claimed that despite being aware of adverse toxicity studies as early as the 1970s, 3M nonetheless told the public that its AFFF was safe to use even after it phased out of the AFFF business. Finally, Plaintiffs claimed that the warnings affixed to 3M's AFFF were inadequate and thus failed to inform end-users of how to train with, use, and dispose of its AFFF properly.

The mediator carefully analyzed the parties' competing cases and ultimately blessed this settlement as fair and reasonable.[10] Put another way, the settlement process ensured that Class Counsel achieved a valuable settlement of $10.5 billion to $12.5 billion. Objectors' underlying premise, that Class Counsel could have demanded a blank check from 3M ignores the realities of this contentious settlement process. *Accord Flinn*, 528 F.2d at 1173-74 (the fact that a cash "settlement 'may only amount to a fraction of the potential recovery' will not per se render the settlement inadequate or unfair").

---

[10] Declaration of Court-Appointed Mediator Layn Phillips in Support of Plaintiffs' Motion for Preliminary Approval of the Class Action Settlement ("Phillips Prelim. App. Decl.")[ECF No. 3370-7], at ¶ 21.

In any event, what is ultimately critical is not a theoretical assessment of the claims'
maximum value, but a realistic analysis of the risks of litigation—an analysis that the objectors
ignore. *See, e.g.*, *McAdams*, 26 F.4th at 159 (noting that, in reviewing the adequacy of a settlement,
courts "must consider" factors including "the costs, risks, and delay of trial and appeal"); *1988 Tr.*,
28 F.4th at 526 (affirming class certification and settlement approval and noting that "the district
court comprehensively addressed the prongs involving the costs and risks of litigation," including
"the existence of defenses which raised obstacles to recovery" (cleaned up)); *Sharp Farms v.
Speaks*, 917 F.3d 276, 299 (4th Cir. 2019) (noting that the "most important factors in this analysis
are the relative strength of the plaintiffs' claims on the merits and the existence of any difficulties
of proof or strong defenses.") (citing *Berry v. Schulman*, 807 F.3d 600, 614-15 (4th Cir. 2015));
*Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 933 (E.D. Mich. 2007) ("dollar amount of the
settlement by itself is not decisive in the fairness determination. The fact that the settlement amount
may equal but a fraction of potential recovery does not render the settlement inadequate. Dollar
amounts are judged not in comparison with the possible recovery in the best of all possible worlds,
but rather in light of the strengths and weaknesses of plaintiffs' case.")

Here, the risks of this litigation were substantial. As explained in detail in Class Counsel's
Motion for Final Approval, these risks range from litigation risks such as the alleged merits of
3M's defenses and the uncertainty of jury trials generally and drawn-out appeals, to significant
scientific hurdles, not to mention the ever-looming possibility of bankruptcy.[11] In light of these
serious risks, objectors cannot plausibly contend that a historic settlement of at least $10.5 billion
against 3M is deficient. The settlement was achieved on the basis of overwhelming evidence
regarding the strength of the claims and the risks involved. This record easily satisfies the standard

---

[11] Motion for Final Approval, at 51-56, 61.

of the Seventh Circuit and every other Circuit in the country. And, as noted, in the Fourth Circuit,

the court is not even required to consider an estimate of the value at trial.

> **c.    Objectors' Argument That No Settlement can be Approved Without a Bellwether Trial Fails.[12]**

Finally, objectors assert that nothing short of an actual bellwether trial will suffice to justify

a classwide settlement.[13] That assertion is flatly contrary to precedent and the reality of class action

settlements. Class Counsel have conducted a rigorous search of the case law and have found *no*

authority, in any Circuit, for the proposition that a bellwether trial is *required* to demonstrate the

reasonableness of a settlement. Nor do objectors cite anything that even arguably supports this

position.

In fact, the case law makes clear that exactly the opposite is true: no trial on the merits is

required prior to settlement. *See, e.g.*, *Flinn*, 528 F.2d at 1174 (noting that there is "no requirement

for a trial on the merits as a prerequisite to approval of a settlement"); *Warshawsky v. CBDMD,

Inc.*, 20-cv-00562, at *2 (W.D.N.C. Aug. 9, 2022) (in its order granting final approval, the court

noted that it was not required "to conduct a trial on the merits of the case or determine with

certainty the factual and legal issues in dispute when determining whether to approve a proposed

class action settlement"). Not surprisingly, there are countless court-approved class settlements

(no doubt the overwhelming majority) that involved no bellwether trial, and the Fourth Circuit has

affirmed myriad class action settlements where no bellwether trial took place.[14] Any requirement

of a bellwether trial prior to settlement would defeat the whole purpose of settlement, which is to

---

[12] *See* Objections from: DuPont [ECF No. 3966], at 19-21; Vancouver [ECF No. 3961], at 27-29.
[13] DuPont Obj. [ECF No. 3966], at 19-20 ("The lack of a bellwether trial renders the 3M Agreement unfair and inadequate.").
[14] For just a few examples, *see, e.g., 1988 Tr.*, 28 F.4th at 518; *McAdams, supra*; *Sharp Farms, supra*; *Berry, supra*.

provide "an efficient alternative" to the risk and expense of protracted litigation. *In re Allura Fiber Cement Siding Litig.*, Civil Action No.: 2:19-mn-02886-DCN, 2021 U.S. Dist. LEXIS 96931, at *6 (D.S.C. May 21, 2021). In short, objectors' bellwether argument should be rejected.

### 2.    The Settlement Value is Adequate Compared to Defendant's PFAS-Related Damages.[15]

Certain objectors claim that the total Settlement Amount is not adequate because it "pales in comparison to the PFAS-related damages that 3M has caused across the country while controlling over 70% of the historical PFAS market."[16] Another objector claims, in essence, that it is not enough money because the Settlement Amount does not include funds for Superfund Plaintiffs.[17] As set forth above, "the fact that a cash settlement 'may only amount to a fraction of the potential recovery' will not per se render the settlement inadequate or unfair." *See, e.g., Flinn*, 528 F.2d at 1173-74; *see also* Manual for Complex Litigation § 13.21; *Geissler v. Stirling*, No. 4:17-cv-01746-MBS, 2019 WL 3561875, at *6 (D.S.C. Aug. 5, 2019). As the Court held in ruling on these same Objections posed at the preliminary approval stage[18] non-settling parties do not have standing to challenge a class settlement unless the agreement results in "plain legal prejudice" to the non-settling party. Likewise, it is not valid for an objector to simply argue that a settlement could have been better; as noted, the Court must consider the dynamics of this settlement. A better deal for Class Members, going beyond the already historic payment, was not available.

---

[15] *See* Objections from: DuPont [ECF No. 3966], at 17-18; Vancouver [ECF No. 3961], at 25; Little Hocking [ECF No. 4009], at 2; the Towns [ECF No. 3999], at 14-17.
[16] *See e.g.*, DuPont Obj. [ECF No. 3966], at 17-18.
[17] The Towns Obj. [ECF No. 3999], at ¶¶ 50-56.
[18] PAO, at 8.

Similarly, and as discussed at length in Class Counsel's Motion for Final Approval,[19] the five factors[20] to be considered in determining the adequacy of the Settlement Amount have been satisfied here, and objectors have failed to make a cogent argument explaining why they believe any of those factors have not been met. Absent such a showing, it is irrelevant that the objector may wish for more.

Moreover, although the Towns are not included in the Settlement as Class Members, and they bring legal claims that are not intended to be compensated by the present settlement, they nonetheless raised Objections regarding 3M's ability to pay other types of claims. Importantly, the Settlement is structured for payments over time to enhance protections against bankruptcy.[21] This means the Settlement will not strip 3M of its "limited assets" as the Towns erroneously suggest,[22] thereby enhancing the likelihood that 3M will be able to resolve other claims in the future, like those of the Towns, among others.

> **3.  The Allocation of Funds Between Phase One and Phase Two Class Members is Fair.[23]**

The Vancouver objector, represented by Marten Law, argues that the Settlement Agreement does not treat "class members equitably relative to each other."[24] In particular, Vancouver identifies four circumstances where Class Members are allegedly treated differently,

---

[19] Motion for Final Approval, at 52-56, 61, 64-68.
[20] *Jiffy Lube* identifies five factors for assessing the adequacy of a settlement: "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." *In re Jiffy Lube Securities Litig.*, 927 F.2d 155, 159 (4th Cir. 1991).
[21] *See* § II.A.4, *infra*.
[22] The Towns Obj. [ECF No. 3999], at ¶¶ 54-55.
[23] Vancouver Obj. [ECF No. 3961], at 29-30
[24] *Id.* at 29-30.

which center around the allegedly disparate treatment between Phase One and Phase Two Class

Members:

> (1) The objector alleges that when a retail water supplier obtains treated water from a wholesale supplier, it may not obtain funds, even if PFAS enters their system;

> (2) The objector alleges that when a retailer treats the water they may receive the full potential allocation even though the wholesaler may face costs related to contamination;

> (3) The objector alleges that the allocation between Phase One and Phase Two claimants provides more funding for Phase One, even if Phase Two claimants discover greater contamination; and

> (4) The objector alleges that the methodologies used by Class Counsel may have vastly undercounted and therefore undercompensated Phase One claimants.[25]

Regarding number (1), the Parties' Joint Interpretative Guidance on Interrelated Drinking

Water Systems ("Interrelated Guidance"),[26] which the Court approved as a supplement to the

Settlement Agreement,[27] resolves this Objection. In particular, the Interrelated Guidance makes

clear that there is no categorical bar to a retailer obtaining funds if PFAS enters its system; rather,

the amount allocated as between the retailer and the wholesaler will be apportioned by the Claims

Administrator "based on relative capital and O&M costs of PFAS treatment borne by the wholesale

and the retail customer, respectively."[28] In other words, the Interrelated Guidance addresses the

when and how of retailers receiving settlement funds, and absent agreement between the

wholesaler and the retailer, how the retailer will be able to do so based on the extent to which it

---

[25] *Id.*

[26] The Parties' Joint Interpretative Guidance on Interrelated Drinking-Water Systems ("Interrelated Guidance") [ECF No. 3856-1], *generally.*

[27] Order Granting Joint Motion to Supplement the Preliminarily Approved Allocation Procedures [ECF No. 3861].

[28] Interrelated Guidance, at 2.

bears PFAS treatment costs.[29] This includes whether the retail customer shows that the water was re-contaminated with PFAS after sale by the wholesaler.[30]

Number (2) above is essentially the opposite of number (1); that is, that to the extent that the retailer obtains the full Allocated Amount to treat its PFAS-contaminated water, such claim would supposedly extinguish the rights of the wholesaler who may have PFAS-related treatment costs. Again, the same response applies: the Interrelated Guidance provides that the "Claims Administrator will divide the Allocated Amount based on relative capital and O&M costs of PFAS treatment borne by the wholesale and the retail customer, respectively."[31] In short, no entity's rights usurp those of the other; rather, absent agreement, the Claims Administrator is charged with apportioning the Allocated Amount in a way that is consistent with each entity's treatment costs so as to avoid double recovery for any one Water Source.[32] By expressly dictating equity in the allocation process, there is no basis to find the Settlement Agreement unfair.[33]

Marten Law's point (3) is supported by nothing other than the *ipse dixit* of counsel. The Claims Administrator's allocation determination will be a fact-based determination which has little to do with Class Counsel's approach to allocating the Settlement Amount on a 55%/45% basis[34] between Phase One and Phase Two. Of course, the determination to allocate between Phase One and Phase Two on 55%/45% basis was a conservative estimate based on an evidentiary analysis

---

[29] *Id*. at 3.
[30] *Id*. at 3, n 3.
[31] *Id*. at 2.
[32] *Id*.
[33] In fact, the Claims Administrator developed a Joint Claims Form submission process to assist the retailers and wholesalers—as well as any other interrelated Drinking Water partners—to proceed jointly and receive an apportionment of any award that results.
[34] Settlement Agreement, at §§ 2.50, 6.7.2, 2.53, 6.8.2, 6.8.6, 6.8.9-6.8.11.

of a highly-esteemed expert in liability forecasting.[35] And, in the event the allocation later turns out to be inequitable, Section 6.8.11 authorizes the Claims Administrator to promote equity between Phase One and Phase Two Qualifying Class Members by shifting portions of the amounts designated in the Payment Schedule. Because this allocation is the result of a sound methodological analysis, there are no grounds to support the contention that the Settlement Agreement is unfair.

Finally, regarding number (4), Marten Law is incorrect in suggesting that the methodologies used by Class Counsel undercounted and would undercompensate Phase One claimants. Marten Law claims, "the estimate of Phase One members used data from UCMR 3, which tested a far more limited set of active PWSs,"[36] whereas UCMR 5 data would allow for more PWS to "qualify under Phase One than previously understood."[37] But again, the differences between UCMR 3 and 5 were already accounted for by Plaintiffs' expert,[38] and Marten Law offers no evidence to contradict his findings. The Settlement Agreement fairly and reasonably accommodates differences between Phase One and Phase Two claimants, and it allows settlement proceeds to be deployed and shifted to promote equitable treatment of all Class Members. There is no support for Marten Law's contention that the settlement is unfair.[39]

---

[35] Declaration of Timothy G. Raab ("Raab Decl.") [ECF No. 3370-13] at ¶¶ 16-18 (declaration submitted by Timothy G. Raab explaining that while his analysis called for 31% of the total Settlement amount to be allocated to Phase Two, in "an effort to be conservative," he recommended "adjusting the ratio" to allocate 45% of those funds to Phase Two).

[36] PWS means Public Water System(s).

[37] *See e.g.*, Vancouver Obj. [ECF No. 3961], at 29, n.6.

[38] Raab Decl.*,* at ¶ 14 (stating that "[t]o approximate the impact of the[]differences between UCMR 3 and ECMR 5, I used detections from the state data for large PWS.").

[39] Moreover, to date, the EPA has released approximately 7% of the total anticipated UCMR 5 data, and based on the data thus far, only approximately 20% of the PWS had PFAS detections. As such, Mr. Raab's assumption of a 31% detection rate for UCMR5 is supported by the testing data, which to date shows only a 20% detection rate.

More generally, Objectors ignore the fact that the two Phases were represented by different Class Counsel and Class Representatives. As discussed in Class Counsel's Motion for Final Approval, Class Counsel, Elizabeth Fegan, participated in the settlement process specifically with an eye towards the interests of the Phase Two Class Members.[40] As a result, the Settlement Agreement incorporates structural protections to ensure fair treatment as between Phase One and Phase Two Class Members. Similarly, Phase Two Class Members were separately represented by Phase Two Class Representatives to further ensure the fairness, reasonableness, and adequacy of the Settlement as it pertains to Phase Two Class Members. They declared the Settlement to be fair, reasonable and adequate in Declarations supporting Class Counsel's Motion for Final Approval.[41] Vancouver has not contested these Declarations, nor challenged their veracity.

These structural assurances foreclose objectors' argument that Phase Two was treated inequitably relative to Phase One (or vice versa).

> **4.    The Settlement Allocations Do Not Place Disproportionate Risks on Phase Two Claimants.[42]**

As noted above, the designation of separate Class Counsel and Class Representatives ensured that neither Phase was treated inequitably. It is not surprising, therefore, that there is no merit to objectors' contention that the 13-year payment schedule in the 3M Settlement[43] shifts insolvency risk to Phase Two Class Members. Indeed, the opposite is true. The 13-year payment schedule actually protects all Class Members from insolvency concerns. Specifically, given the

---

[40] Motion for Final Approval, at 12, 40-41.
[41] *See* Declaration of Niagara County in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement [ECF No. 4273-19], at ¶ 10 and Declaration of the City of Pineville in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement [ECF No. 4273-20], at ¶ 7 (both declaring that the 3M Settlement is fair, reasonable and adequate).
[42] Vancouver Obj. [ECF No. 3961], at 30-31.
[43] Settlement Agreement, Amended Exhibit K, Payment Schedule [ECF No. 3620-10].

14

2:18-mn-02873-RMG     Date Filed 01/09/24     Entry Number 4319     Page 25 of 72

13-year payment schedule, 3M is able to pay more money over time, decreasing any bankruptcy risk, and the schedule is specifically aimed at preserving funds for Phase Two Class Members. There are also other bankruptcy protections built into the Settlement Agreement.[44]

Moreover, from a practical standpoint, Phase Two Class Members, by definition, do not currently have PFAS detections and, as such, they may have no current viable cause of action against 3M. Thus, irrespective of the Settlement, there would always be a bankruptcy risk and without current PFAS detections, any Phase Two Class Member would have to wait for its damages, if any, to be incurred. Finally, the Settlement Agreement also provides specific bankruptcy protections for Class Members should 3M commence bankruptcy proceedings, including scheduling all "Qualifying Class Members' claims under this agreement as liquidated, non-contingent, and undisputed."[45] Accordingly, the payment schedule and other settlement terms actually help shield Class Members from bankruptcy risk.

### 5.     The Release is Not Overbroad.[46]

#### a.     Broad Releases are Appropriate in Massive Settlements Like This One.

Objectors make a number of arguments attacking the release. But most of those arguments erroneously assume releases must be narrow and rigid, even in the context of multi-billion-dollar settlements. But the law is to the contrary. Instead, the case law demonstrates that courts routinely approve broad release provisions. *See, e.g.*, *McAdams,* 26 F.4th at 160 (4th Cir. 2022) (approving a broad release "tied to cases arising out of a set action and time frame"); *In re MI Windows & Doors, Inc., Prods. Liab. Litig.*, 860 F.3d 218, 225 (4th Cir. 2017) (concluding that the "breadth

---

[44] Settlement Agreement, at § 6.11 (regarding Late Payments and solvency certificates), and §§ 12.1.2-12.1.2.4 regarding bankruptcy, generally.
[45] Settlement Agreement, at §§ 12.1.2-12.1.2.1.
[46] The specific objectors are identified below within each subsection.

of the final judgment undoubtedly captured" other claims related to the defendant's allegedly defective products); *Speaks v. U.S. Tobacco Coop., Inc.*, 324 F.R.D. 112, 135 (E.D.N.C. 2018) (rejecting argument that a release was overbroad); *Olden v. Gardner*, 294 F. App'x 210, 219-20 (6th Cir. 2008) (approving a broad release that covered "all claims against [the defendant]—even those that were unknown or had not accrued at the time of settlement—relating to any alleged emissions from [the defendant's] plant that were, or could have been, pleaded"); *In re Literary Works in Elec. Databases*, 654 F.3d 242, 248-49 (2d Cir. 2011) (finding an objectors' narrow interpretation of a release to be "unavailing")*; In re Vitamin Antitrust Litig.*, Misc. No. 99-197 (TFH) ALL CASES MDL No. 1285, at *1 (D.D.C. Mar. 31, 2000) (noting that "a court may permit a broad release of claims based on *overlapping* factual predicates" (emphasis added) (citing *City P'ship Co. v. Atl. Acquisition Ltd. Partnership*, 100 F.3d 1041, 1044 (1st Cir. 1996)); *see also, Faught v. Am. Home Shield Corp.*, 2010 WL 10959223, at *15 (N.D. Ala. Apr. 27, 2010) (noting that courts may approve a broad release, even encompassing "claims over which the court lack[s] jurisdiction" ), *aff'd*, 668 F.3d 1233 (11th Cir. 2011); *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1563 (3d Cir. 1994) (same); *Abramson v. Pennwood Inv. Corp.*, 392 F.2d 759, 762 (2d Cir. 1968) (same). The entire premise of Objectors' argument—that releases must be exceedingly narrow even in multi-billion-dollar settlements—is flatly contrary to law.

> **b.    The Release was Carefully Designed to Effectuate the Purposes of the Settlement.**

A central purpose of the Settlement is to provide funds to PWS to address PFAS in their Drinking Water. The Agreement opens with a recital that it "is intended to address Public Water Systems' Claims regarding alleged PFAS-related harm to Drinking Water and associated financial burdens, including Public Water Systems' potential costs of monitoring, treating, or remediating

PFAS in Drinking Water."[47] The damages compensated by and through participation in the Settlement are treatment costs to Drinking Water within PWS. Keeping this central tenet in mind, the Release is appropriately scoped. It releases claims that relate to or involve PFAS that "has entered or may reasonably be expected to enter Drinking Water or any Releasing Party's Public Water System" and certain other PFAS-related claims, subject to exceptions for certain real-property, stormwater, and wastewater claims unrelated to the Drinking Water and the Public Water System.[48] And, with certain exceptions, the Releasing Parties are Public Water Systems and those with an interest in their claims.[49]

Another related tenet of the Settlement is the prohibition against double recovery. Indeed, an underlying theme of the negotiated Release was to avoid double recovery of compensation for treatment of PFAS in PWS' Drinking Water. One of 3M's primary interests was to reach a resolution that would be final and avoid endless ongoing litigation, so necessarily both the Release and the relief had to be broad. 3M insisted that it would not pay twice (or more) for damages from costs to PWS of treating Drinking Water. Class Counsel strategically addressed that interest by negotiating the carve-outs of claims *unrelated* to treatment costs for Drinking Water— namely, certain stormwater and wastewater claims that relate to a facility or real property that is physically separate from PWS and does not provide Drinking Water. Such claims are *not* subject to the Release. Objectors overlook this point.

---

[47] Settlement Agreement, at § 1.2.
[48] Settlement Agreement, at § 11.1.1.
[49] Settlement Agreement, at § 2.63 (defining "Releasing Parties" as Class Representatives and Class Members or "any Person, other than a State or the federal government," acting on their behalf).

The Parties' Joint Interpretive Guidance on Certain Release Issues ("Release Guidance"), approved as a supplement to the Allocation Procedures,[50] makes clear that the Release represents a bargained-for solution. The scope of the Release does not render the Settlement unfair or unreasonable when viewed under the two guiding principles described above—purpose of compensation, and prohibition on double recovery.

> **c.    The Release is Not Overboard Because it Expressly Excludes Claims Arising from Real Property, Stormwater and Wastewater.**[51]

Section 11.1.1 of the Settlement Agreement expressly releases claims arising from or related to "PFAS that has entered or may reasonably be expected to enter Drinking Water or any Releasing Party's Public Water System" and certain other PFAS-related claims. The paragraph details the various allegations and types of relief that are released and describes all as actions by the Released Parties against 3M for PFAS- related claims.

Sections 11.1.2.1 and 11.1.2.2 then exclude from "Released Claims" a few specific Claims by a Class Member related to treatment of a Class Member's PFAS-contaminated real property, stormwater system, or wastewater system that is physically separate from the Class Member's PWS, does not arise from PFAS in its PWS, and seeks relief unrelated to Drinking Water, its Public Water System, or its Water Sources. The parties also promulgated the Release Guidance, reiterating the preservation of real property, stormwater, and wastewater claims, where, among other things, the PFAS-contaminated property or system is "separate from and not physically

---

[50] Release Guidance and Order granting Consent Motion regarding same [ECF Nos. 4107-1 and 4132], respectively.

[51] *See* Objections from: DuPont [ECF No. 3966], at 6; Vancouver [ECF No. 3961], at 6; Broward [ECF No. 3996], at 1-4.

related to" the PWS.[52] Additionally, the Release Guidance makes clear that Class Members who retain excluded claims under §§ 11.1.2.1 or 11.1.2.2 of the Agreement do not release claims for contribution and indemnity that relate to these excluded claims.[53]

Some objectors read these exclusions as meaningless because water, in the global sense, is all hydrologically connected.[54] The Release Guidance renders moot any such argument.[55] To the extent that a Class Member operates a wastewater system that is physically separate from its PWS, that Class Member retains any otherwise valid claim for damage to that wastewater system. This grounding in physical connection also moots any concerns that the exclusion would be lost as to a wastewater or stormwater system that is organizationally "related" to a PWS. This logically avoids double recovery and explicitly preserves the excluded claims.

### d.    The Release is Not Overbroad Because it Includes Claims as to PFAS That May Reasonably be Expected to Enter Drinking Water or any Releasing Party's Public Water System.

The Marten Law objectors allege that the Release improperly encompasses claims for PFAS that may be reasonably expected to "enter water supplies in the future," which they state "fall[] outside of the factual and temporal predicate of the claims alleged against 3M."[56] That Objection is meritless.

First, it is not true that Released Claims lack a shared factual predicate with claims that were or could have been alleged against 3M in this case. All such claims arise from PFAS that has

---

[52] Release Guidance [ECF No. 4107-1], at ¶ 1; *see also*, Dec. 14, 2023, Fairness Hr'ing Tr., at 99:16-18 (regarding the "separate from and not physically related to" clarification in the Interrelated Guidance, the Court noted: "I thought I read the provisions and then I thought they were relatively clear myself. And then I thought the guidance was even clearer.").
[53] Release Guidance [ECF No. 4107-1], at ¶ 2.
[54] *See* Objections from: Vancouver [ECF No. 3961], at 6; DuPont [ECFF No. 3966], at 6; Broward [ECF No. 3966], at 4.
[55] Release Guidance [ECF No. 4107-1], at ¶ 1.
[56] *See* Objections from: Vancouver [ECF No. 3961], at 5; DuPont [ECF No. 3966], at 5.

entered the environment from the past manufacture, use, or disposal of PFAS and PFAS-containing products made by 3M (including as incorporated into products made by others). And all such claims involve PFAS contamination related to Drinking Water or Public Water Systems, whether currently detected or not.[57] The Released Claims thus do share the same factual predicate as the claims in this case. Significantly, the Agreement does not resolve (and therefore does not release) all claims alleged by Class Members. PWS may have any number of claims that do not fall within the ambit of the Release—such as storm- and wastewater damage claims which fall within the express exceptions to the Release (discussed *supra*, § II.5.C)—and indeed, those claims are preserved because they do *not* share the same factual predicate as the Released Claims.

Second, the Settlement Agreement, when read in its entirety—including the totality of the documents promulgated in connection therewith, its Exhibits, all Court-approved amendments thereto, and the Parties' Joint Interpretive Guidance documents (also Court-approved)—confirms that this Settlement provides PWS with compensation to treat PFAS-contaminated Drinking Water. Once a PWS has been compensated to treat its Drinking Water, it will have waived its right to make claims for damages to treat its Drinking Water. Despite the conclusory allegation by the Marten Law objectors that the Agreement "would release a wide range of unalleged claims that lack an identical factual predicate with claims alleged by Class Members,"[58] no example of this alleged "wide range" of claims is given. Indeed, under a proper reading of the Release provisions, no such example can be given because none exists. The Agreement releases claims

---

[57] Settlement Agreement, at § 1.2 ("this Settlement Agreement is intended to address [PWS]' Claims regarding alleged PFAS-related harm to Drinking Water and associated financial burdens, including [PWS]' potential costs of ***monitoring***, treating, or remediating PFAS in Drinking Water") (emphasis added), where monitoring may refer to testing in order to detect PFAS; *Id.* at § 5.1 (defining the Class as inclusive of both PWS with current PFAS detections and those without).
[58] *See* Objections from: Vancouver [ECF No. 3961], at 5; DuPont [ECF No. 3966], at 4.

with identical factual predicates, and exempts those without them. It therefore comports with Fourth Circuit (and all other Circuits') case law.

Third, courts regularly approve as reasonable and permissible a release of future claims. *In re Diet Drugs*, No. 1203, 2000 WL 1222042, at *28 (E.D. Pa. Aug. 28, 2000) (allowing for the release of future claims in capped settlement based on a conservative estimate of the future claims provided by expert testimony); *City of Long Beach v. Monsanto Company*, 2:16-cv-03493-FMO-AS, 2022 U.S. Distr. LEXIS 21099 (C.D. Cal. Nov. 19, 2022) (approving settlement involving release of future claims); *In re Nat. Football League Players Concussion Inj. Litig.*, 307 F.R.D. 351, 376 (E.D. Pa. 2015) (approving settlement involving two subclasses: one with present injuries and one with those whose injuries had not yet manifested); *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 227 F.R.D. 553 (W.D. Wash. 2004) (approving settlement which involved a class of drug users whose claims have not yet manifested).

Finally, 3M has not made PFOA/PFOS for approximately 20 years. 3M, moreover, has committed to exiting all PFAS production before the final Phase Two testing deadline. Future PFAS contamination not detected until after December 31, 2030 (the cutoff date for applying for supplemental funds) is unlikely to be attributable to 3M.

> **e.    The Release is Not Overbroad on the Basis That it Applies to all Property Damage Caused by a PWS's Drinking Water.**[59]

Broward correctly points out that the Settlement releases claims for damage to real property, stormwater, or wastewater caused by PFAS-contaminated Drinking Water.[60] Likewise, Broward may face liability to third parties for its use of PFAS-contaminated "reuse water" and

---

[59] Broward Obj. [ECF No. 3996], at 1.
[60] *Id.*

"biosolids" that are applied to real property.[61] As discussed above, the parties heavily negotiated the scope of the Release, and reached agreement on a full release of claims—including claims for contribution and indemnity— that fall within the definition of Released Claims. The extent of the Release with regard to damage to real property, stormwater, or wastewater caused by PFAS-contaminated Drinking is simply another manifestation of the prohibition against double recovery.

  **f.**   **The Release is Not Overbroad in its Inclusion of all PFAS Compounds.**[62]

  It is reasonable to address liability from new or unknown PFAS through the Release, because the damages necessary to remediate these new or unknown chemicals in PWS' Drinking Water are being provided through this Settlement since all chemicals within the PFAS family are treatable by similar means. The Objections' suggestion that additional damages should be available to remediate these other contaminants would result in double recovery.

  While PFAS as a chemical family consists of many different chemicals—including some that have yet to be developed—there are only approximately 200 commercially available, and by virtue of them being within the PFAS family, they are all treatable by the same methods, and by paying cash to Qualifying Class Members, they can use the funds received to pay for whatever treatment they choose to employ. It was not possible to reach an agreement that released only PFOA/PFOS claims and allowed unknown rounds of additional litigation if another type of PFAS were found in a PWS' Drinking Water. 3M's interest in an all-PFAS release was part of what allowed Class Counsel to negotiate such a large settlement amount.

---

[61] Broward Obj. [ECF No. 3996], at 4-5.
[62] *See* Objections from: Vancouver [ECF No. 2961], at 7; DuPont [ECF No. 3966], at 6-7; Little Hocking [ECF No. 4009], at 2; Widefield [ECF No. 4010], at 5-7.

It is further correct that Releasing Parties would be bound by § 11.1.1(ii) and would thereby release any Claim that "has arisen or may arise at any time in the future out of, relates to, or involves the development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application, or use of PFAS or any product (including AFFF) manufactured with or containing PFAS (to the extent such Claim relates to, arises out of, or involves PFAS)."  And the other release provisions likewise apply broadly to all PFAS. Again, this offers all parties finality in resolution and, because in real life all PFAS in Drinking Water is subject to the same treatment, the scope of the Release does not prejudice any claimant. By participating in the Settlement, Class Members will receive compensation for the costs to install and maintain treatment to their PFAS-contaminated Drinking Water, regardless of the specific PFAS contaminant.

### g. The "Releasing Parties" Definition Does Not Render the Release Overbroad by Including Non-Parties.[63]

Contrary to objectors' contention, the fact that "Releasing Parties" may be broader than the Class Members alone does not render the Release overbroad. In the *In re Volkswagen "Clean Diesel" Mktg, Sales Practices and Prods. Liab. Litig.*, the definition of releasing parties included not only the settlement class member Volkswagen dealers, but "any other legal or natural persons who may claim by, through, or under them." 2018 WL 1588012, at *8 (N.D. Cal. 2018) (emphasis added). Such scope—arguably much broader than the language here—was permissible, on the logic that "[b]ecause the Intervenor Plaintiffs each assert claims 'by, through, or under [the class members], they are Releasing Parties under the settlement agreement.'" *Id.* (internal citations omitted).

---

[63] *See* Objections from: Vancouver [ECF No. 3961], at 9-10; DuPont [ECF No. 3966], at 8-9; Broward [ECF No. 3966], at 6-7; Towns Obj. [ECF No. 3999], at 11-14.

Section 2.63 of the Agreement defines "Releasing Parties" to include Class Members, their representatives, any Person acting on behalf of a Class Member, including in a representative or derivative capacity, and any Person that has authority to bring a claim on behalf of the Class Member. As in the *In re Volkswagen* case, this definition includes non-parties whose claims are derivative of PWS Class Members' claims. Like the Release itself, the Releasing Parties definition follows from the relief secured, and fits within the framework of the two guiding principles: funds for treatment of PFAS in PWS' Drinking Water, and prohibition on double recovery. The Settlement compensates for harm to PWS' Drinking Water, and in order to avoid double recovery, the Releasing Parties must necessarily include any who may have a stake in recovery. As part of the overall exchange of promises, the parties reached agreement that 3M should not pay twice to remediate the same water.

The Towns object on the shaky grounds that "Releasing Parties" includes parties that are not "Class Members."[64] Putting aside the fact that they are not Class Members, and thus have not shown that they even have standing to object, the Towns stretch the definitions of Class Members and Releasing Persons beyond their reasonable limits to accommodate their Objections. The Towns acknowledge that they themselves do not have contaminated Drinking Water from PFAS; they "are cleaning up soil and groundwater and [they] are not remediating a public water source."[65] Only one of the Towns (Town of East Hampton) has contracted with and paid Suffolk County Water Authority ("SCWA") to extend the public water main to serve individual properties.[66]

---

[64] Towns Obj. [ECF No. 3999], at 2-3, 9, 11-14.

[65] Towns Obj. [ECF No. 3999-1], at 37-38 (citing their statement as made to the Court at the Dec. 14, 2023 Fairness Hr'ing Tr. in which they affirmed they "are not remediating a public water source.").

[66] Towns Obj. [ECF No. 3999], at 2-3. None of the other Rigano clients (Harrietstown or Islip) are alleged to be in a similar factual situation.

Based on this singular contract, all the Towns contend that they may be in "privity" with a Class Member and therefore fall within the definition of "Releasing Parties."[67] But read in context, not just any contract suffices to render one a "Releasing Party." The contract must relate to "prevent[ing] PFAS from entering a Class Member's Public Water System or to seek recovery for alleged harm to a Class Member, its Public Water System, or the Public Water System's ability to provide safe or complaint Drinking Water."[68] These particulars, as represented by the Towns, do not make East Hampton (or the other Towns) a "Releasing Party." Nowhere can East Hampton assert that its contract is designed to aid SCWA. Just the opposite is true: SWCA is aiding East Hampton to address its soil contamination. Such a tenuous relationship does not fit within the carefully constructed confines of the Settlement Agreement.[69] Thus, their Objections are misplaced.

### h.    The Release is Not Overbroad in its Application to Personal Injury Claims.[70]

Objectors' concern that the Settlement releases personal injury claims is a straw man. The Settlement does no such thing. The Class Members are made up entirely of PWS—*not* natural persons with personal injuries.[71] When read as a whole, in context, that is the only reasonable interpretation. Personal injury claims brought by individuals – who are not Class Members - continue in ongoing litigation. Such cases have been the subject of CMOs and bellwether orders

---

[67] *Id.*; *see also,* Settlement Agreement, at §2.63.

[68] *Id.; see also,* Settlement Agreement, at § 2.63.

[69] *Cf. Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339, 162 N.E. 99 (1928).

[70] *See* Objections from: Vancouver [ECF No. 3961], at 7-8; DuPont [ECF No. 3966], at 7-8; Little Hocking [ECF No. 4009], at 2-3.

[71] *See* Settlement Agreement, at § 5.1 (defining the Class as PWS, not natural persons). Furthermore, the Release Guidance makes clear that individuals who may be Releasing Persons due to their association with a PWS do not release their personal injury claims [ECF No. 4107-1], at ¶ 3.

since the filing of the Plaintiffs' Motion for Preliminary Approval and even since the grant of Preliminary Approval.[72]

It is true that recovery under the Settlement would release contribution and indemnity claims the PWS might have against 3M if *the PWS* is the subject of suits by injured individuals for personal injury claims. "Claims" are defined to include contribution and indemnity claims (§ 2.11) and claims by a PWS for contribution or indemnity related to PFAS in Drinking Water or the PWS are "Released Claims" under § 11.1.1. It is common for indemnity and contribution to be released in a class settlement. *E.g., Caudle v. Sprint/United Management Co.*, 2019 WL 2716291, at *4 (N.D. Cal., 2019) (approving release of indemnity claims with a nexus to claims released under the settlement); *Rieckborn v. Velti PLC*, 2015 WL 468329, at *10 (N.D. Cal., 2015) (same); *see also In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir. 2001) ("It is now settled that a judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action.") (emphasis added).

Such a release does not render the Settlement unfair or unreasonable. All settlements involve complex decisions and each would-be participant will need to make its own calculus. Here, the definition of Claims is one of many bargained-for terms, and while it must be assessed carefully, it should not be afforded disproportionate weight—a conclusion reached by virtually all other class members, who did not lodge this or any other Objection. When evaluated in the correct context, the risk of consumer suits for personal injury is low, especially given that so few are pending in this massive MDL that comprises over 15,000 cases, and many robust defenses to such claims exist. In short, the Release is not overbroad.

---

[72] July 14, 2023, H'ing Tr., at 47:23-48:3; 51:18-24.

### 6.    The Objections Regarding the Interrelated Guidance are Invalid.[73]

One of the Marten Law objectors, Vancouver, raises several objections about the impact of the "Joint Interpretative Guidance on Interrelated Drinking-Water Systems" (the "Interrelated Guidance") [ECF No. 3856] on the Settlement Agreement. Vancouver, however, omits the fact that, in response to the motion of their counsel's wholesaler clients—the Metropolitan Water District of Southern California and the North Texas Municipal Water Districts ("Wholesalers")— to extend time and to intervene,[74] Class Counsel submitted the Interrelated Guidance and acceded to the Wholesaler's motion to intervene for the limited purpose of seeking clarification. This Court granted the parties' joint motion to supplement and, considering the Guidance, denied the Wholesalers' motion for extension to seek clarification and motion to extend time. Notwithstanding these rulings, Vancouver now asserts that 1) the Interrelated Guidance is untimely, 2) the Interrelated Guidance remains ambiguous, 3) there is inadequate notice, 4) insufficient time was allowed to consider the Interrelated Guidance, 5) the Interrelated Guidance fails to address fundamental issues related to Wholesalers and their customers, and 6) the Interrelated Guidance ignores the challenges of PFAS treatment at scale.  None of these arguments have merit.

### a.    Clarifications of Class Settlements Prior to Final Approval are Appropriate.

Vancouver objects that the Interrelated Guidance is an improper late amendment to the Agreement. It provides no authority for the proposition that a class settlement agreement cannot be clarified between the time of preliminary approval and final approval. To the contrary, ample

---

[73] Vancouver Obj. [ECF No. 3961], at 13-18.
[74] Wholesalers' motions to intervene [ECF No. 3829] and seek clarification [ECF No. 3830].

authority recognizes the appropriateness of allowing such clarification. For example, in *In re CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199, 215 (E.D. Pa. 2014), an objector argued that the settlement improperly eliminated certain paid for warranties.  Responding to that Objection, class counsel addressed the concern through a stipulation and addendum to the settlement agreement. The *CertainTeed* court approved this alteration, holding: "[m]inor modifications may be necessary to a settlement agreement (indeed may be favorable to the class), and additional class notice is not always required because, e.g., of the cost of notice that would take recovered money from the class." *In re Remeron End–Payor Antitrust Litig.*, No. 02–2007, 2005 WL 2230314, at *19 (D.N.J. Sept. 13, 2005), citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 473 n. 10 (D.N.J.1997) ("Class members need not be informed of the [amendment to the settlement agreement] because the [settlement] is only more valuable with these changes")."  *Id.*

The same reasoning applies here, where the Interrelated Guidance simply clarified the always intended application of the Settlement to particular fact patterns and thus disadvantaged no Class Member.

> **b.    The Interrelated Guidance Clarifies how Joint Claims of Wholesalers and Retail Customers Will be Evaluated in the Allocation Process.**

In response to the Wholesalers' earlier motion for clarification, Class Counsel and 3M provided their Interrelated Guidance to aid the Claims Administrator, under the Special Master's oversight, about how to evaluate each interrelated Drinking Water system's unique facts.[75] The October 26, 2023, Order accepted the Interrelated Guidance as a supplement to the Allocation

---

[75] Parties' Joint Motion to Supplement the Allocation Procedures with the Interrelated Guidance [ECF No. 3856] and Order granting same [ECF No. 3861].

Procedures. "After careful review" of the Guidance, the Court held that "the Parties clarify" that the "'Settlement Agreement applies to Public Water Systems that operate as wholesalers,' that 'wholesalers and their retail customers' are Class Members if they fall within the definition of the 'Settlement Class,' and that purchased water is 'covered by the Settlement and will be taken into account by the Claims Administrator under the Allocation Procedures.'"[76] Contradicting the current Objection, this Court held: "[t]he Guidance further details how wholesalers and retail customers may allocate recovery ("Operation of Allocation Procedures"), the 'Mechanics for Submission of Claim Forms' relative to wholesaler-retailer relationships and addresses the 'Scope of the Release' and the Definition of 'Water Source.'"[77]

"Some form of amendment or guidance was," according to Vancouver's Objection, "necessary to clarify several ambiguous aspects of the 3M Agreement."[78] However, after obtaining the relief requested, which was approved by the Court, Vancouver still objects. The Interrelated Guidance addressed the concerns that the Settlement Class definition included both wholesalers and their retail customers by detailing the process for dividing the unitary payment for each respective water supply in a way that avoids double recovery. Vancouver contends that the Interrelated Guidance does not "resolve" the ambiguity but fails to identify any ambiguity that still allegedly exists regarding the Allocation Procedures. Nor does the Objection provide grounds to contradict this Court's finding that the Guidance "clarifies" and "further details" the workings of the Allocation Procedures. Absent specificity supported by new facts or law, this Objection is meritless on its face and should be rejected.

---

[76] Order [ECF No. 3861], at 2.
[77] *Id.*
[78] Vancouver Obj. [ECF No. 3961], at 14.

c.    **The Interrelated Guidance Satisfied the Objector's Request for Clarification and Detail.**

Contrary to Vancouver's contention, the Interrelated Guidance provides sufficient information about the allocation procedure for any PWS to evaluate whether the terms are adequate or not, and whether to participate in the settlement or instead opt-out.[79] Vancouver floats a few queries about how the Claims Administrator is to divide settlement funds between potentially competing interests of wholesalers and their retail customers. Vancouver complains that "there is no way to assess how much money either entity would receive[.]"[80] But this analysis will be case-specific and dependent on the unique facts presented at the time. The Claims Administrator is directed to allocate the money taking into consideration which entity is responsible to treat the water. In circumstances like this, the Fourth Circuit has determined that such uncertainties are insufficient to render notice of a class settlement inadequate.[81]

Notwithstanding Vancouver's hypothetical, this Court's admonition remains constant: "there's nothing going to be perfect in a settlement."[82] Thus, perfection should not be the enemy of good. This is especially valid when the standard for final approval of a settlement is that it only needs to be fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e)(2). That explains why, in connection with the DuPont settlement, Mr. Kray (Vancouver's counsel) declined to ask the Court to reject the settlement.[83]

---

[79] Vancouver Obj., at 13-18.

[80] Vancouver Obj., at 17-18.

[81] *McAdams,* 26 F.4th at 159 (4th Cir. 2022) ("Objectors cite no authority that requires a notice to state how much money each class member would receive, nor do they explain how the notice could have accurately stated the amount each [class member] was eligible to receive from the cash pool."), quoting *Does 1-2 v. Déjà vu Servs., Inc.*, 925 F.3d 886, 901 (6th Cir. 2019).

[82] Dec. 14, 2023, Fairness Hr'ing Tr., at 89:23-24.

[83] *Id.* at 89:24-25-90:1. When asked directly by the Court: "[A]re you recommending I reject the settlement?" Mr. Kray responded: "We are not, Your Honor."

Under these circumstances, the Objections should be overruled.[84]

### d. The Settlement Considers PFAS Treatment at Scale.

Vancouver contends that "[t]he settlement is inadequate for largescale water systems" because it "ignores" their predicament.[85] Pointing to the costs for a new treatment plant being developed by a client that opted-out of the Settlement (Metropolitan), once again, Vancouver provides no evidence to support its contention that Class Counsel were derelict in negotiating the Settlement Agreement without largescale water systems in mind. In fact, the record contradicts that assertion as the record is replete with information that makes clear that the methodologies employed by Class Counsel in structuring the Settlement, including the Allocation Procedures, were reasonable and took into consideration real-life costs for PFAS treatment for all water system sizes.[86]

---

[84] Marten Law also objects to the Public Water System Settlement Claims Form as "unfair" because it requires PWS to certify they have consulted with necessary "other Persons" to confirm that they have authority to release their claims. Vancouver Obj. [ECF No. 3961], at 19. Mandating that the signatory to the Claims Form has binding authority to act for the Class Member is hardly unfair. *See In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1010 (E.D. Wis. Aug. 16, 2010) (a claims process may "strike a proper balance between, on the one hand, avoiding fraudulent claims and keeping administrative costs low, and on the other hand, allowing as many class members as possible to claim benefits."); *Saccoccio v. JP Morgan Chase Bank, N.A.,* 297 F.R.D. 683, 698 (S.D. Fla. 2014) ("Objectors cannot derail a settlement because the members of the class are being asked to provide a tiny fraction of the information they would be required to prove at trial in a claims form."). This Objection is not valid.

[85] Vancouver Obj. [ECF No. 3961], at 19.

[86] *See, e.g.,* Phillips Prelim. App. Decl., ¶ at 21 ("I am generally familiar with the parties' methodology for allocating funds among class members, and I believe the planned allocation is reasonable and fair in light of the different relevant circumstances presented by class members."); Declaration of Scott Summy, Esq., In Support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class and for Permission to Disseminate Class Notice [ECF No. 3370-4], at ¶¶ 14-15 (describing how the parameters for the allocation procedure to take into account "factors that real-world engineers would consider in calculating treatment costs for PFAS compounds," including "the amount of contaminated water (capital costs measured by flow rate) and the degree of contamination (Operation & Maintenance costs measured by concentrations of individual PFAS chemicals).").

This Objection should be overruled.[87]

### 7.    Notice Meets Constitutional Requirements.[88]

Vancouver asserts two Objections to class notice both of which are misplaced. First, Vancouver argues that notice was insufficient because direct mailing was not issued to every active wholesaler listed on SDWIS.[89] The Notice Administrator confirms that the reach of the Notice exceeded 95%,[90] which is exceptional by all recognized standards.[91] Because this level of notice is rarely achieved, the Notice Plan performed far in excess of Rule 23's minimum requirement of "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Against this extraordinary achievement in notice, Vancouver implicitly argues that some undisclosed and unknown PWS that conducted voluntary testing and whose results were never reported under UCMR 3 or UCMR 5 should have received individual notice. Vancouver does not offer any reasonable method for identifying such unknown PWSs, likely because none exist. For that reason, the Notice Plan included publication notice. As only reasonable efforts are required to satisfy the notice requirements, those provided here amply satisfied Class Counsel's obligation.

Vancouver's second contention – notice of the Interrelated Guidance should have issued – is equally incorrect and unsupported. First, the Interrelated Guidance was prominently posted on

---

[87] Vancouver's Objection concerning lack of sufficient time to evaluate the Settlement is considered in § II.A.9, *infra*.

[88] Vancouver Obj. [ECF No. 3961], at 15. This discussion also responds to Section G of Vancouver's Objections regarding Notice.

[89] Vancouver Obj. [ECF No. 3961], at 15. SDWIS, of course refers to the EPA's Safe Drinking Water Information System, and is part of the Class Definition (Settlement Agreement, at § 5.1).

[90] Declaration of Steven Weisbrot, Esq. of Angeion Group, LLC Regarding Notice Plan Implementation [ECF No. 4273-5], at ¶ 34.

[91] *See generally*, FJC, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (2010), at 1, 3 (finding a reach of only 70% to be reasonable).

the settlement website and was the subject of extensive communication efforts by Class Counsel and prominent industry educational efforts about the settlement. Moreover, as the *CertainTeed* court recognized, no class needs to be informed of clarifications to a settlement that only make it better. *CertainTeed*, 303 F.R.D. at 215.[92]

As the Notice exceeded Constitutional requirements, this Objection should be overruled.

### 8.    Notice to Phase Two Class Members Comports with Due Process.[93]

Vancouver objects that Phase Two Class members "will be forced to decide whether to participate or opt out, without understanding whether they have PFAS in their water systems."[94] This Objection is fundamentally an attack on whether a Settlement for Phase Two Class members is fair, adequate and reasonable given that they have not yet tested for PFAS.

Phase Two Class members are sophisticated entities subject to governmental testing requirements for which they will be required to expend monies in the short term to comply. Neither this Settlement, nor the Notice thereof, is the Phase Two Class members' introduction to an

---

[92] *See also, In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1111 (10th Cir. 2001) ("In this case, the addition of opt-out rights merely expanded the rights of class members. . . . Accordingly, we hold the district court did not abuse its discretion by failing to notify class members of their opt-out rights prior to conducting a fairness hearing of the settlement's terms."); *Manners v. Am. Gen. Life Ins. Co.*, No. 98-0266, 1999 WL 33581944, at *13 (M.D. Tenn. Aug. 11, 1999) ("Because these amendments enhance the relief provided to Class Members, the Court finds that additional notice was not and is not necessary."). *Cf. Jones v. Dominion Transmission, Inc.*, No. 06-00671, 2009 WL 10705321, at *3 (S.D.W. Va. Jan. 30, 2009) (two amendments to class action settlement "did not change the value of the settlement but only clarified the release provisions and the method of calculating the settlement proceeds distributed to Flat Rate Subclass Members," and thus a second round of notice under CAFA to state and federal officials was not required). Similarly, "[w]here amendments are 'either minor and technical in nature' or 'do[] not materially alter the Settlement Agreement, and do[] not change the Court's fairness analysis,' courts often summarily approve an amendment without clearing the procedural hurdles of Rule 23(e)," *i.e.*, without requiring additional notice. *Rikos v. Procter & Gamble Co.*, No. 11-226, 2022 WL 715972, at *1 (S.D. Ohio Mar. 10, 2022) (quoting *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 918 n.17 (N.D. Ohio 2003)).
[93] Vancouver Obj. [ECF No. 3961], at 33.
[94] *Id.*

unknown problem. Rather, as sophisticated systems subject to governmental regulation, the PWS are well aware of the PFAS problem through notice and education from federal and state governments[95] and national water associations.[96] *See In re Art Materials Antitrust Litig.*, 100 F.R.D. 367, 372 (N.D. Ohio 1983) (noting that "[b]ecause the class approaches 19,000 members and includes some of the largest and most sophisticated business and retail organizations in the nation, some with their own antitrust departments, this unanimous approval of the proposed settlements by the class members [in price-fixing antitrust case] is entitled to nearly dispositive weight in this court's evaluation of the proposed settlements"); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 409 (S.D.N.Y. 2018), *aff'd sub nom. In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020) ("[S]ettlement negotiations were carried out under the direction of Lead Plaintiffs, sophisticated institutional investors whose involvement suggests procedural fairness.").

Thus, Phase Two Class members are able to determine— based on the Notice described above— whether to participate in the Settlement and be eligible for costs to cover that testing. Moreover, the Settlement, as explained in the Notice, provides Phase Two Class members with

---

[95] *See, e.g.*, https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (last visited January 8, 2024); https://dec.vermont.gov/water/drinking-water/water-quality-monitoring/pfas (last visited January 8, 2024); https://www.waterboards.ca.gov/drinking_water/certlic/drinkingwater/pfas.html (last visited January 8, 2024); https://www.in.gov/idem/resources/nonrule-policies/per-and-polyfluoroalkyl-substances-pfas/ (last visited January 8, 2024); https://doh.wa.gov/community-and-environment/drinking-water/contaminants/pfas-drinking-water (last visited January 8, 2024).

[96] *See, e.g.*, National Water Rural Association, https://nrwa.org/issues/pfas/ (last visited January 8, 2024); American Water Works Association, https://www.awwa.org/Resources-Tools/Resource-Topics/PFAS (last visited January 8, 2024); Water Environment Foundation, https://www.wef.org/pfas (last visited January 8, 2024); Association of Metropolitan Water Agencies, https://www.amwa.net/press-release/amwas-statement-epas-and-polyfluoroalkyl-substances-pfas-action-plan (last visited January 8, 2024).

access to the same benefits provided to Phase One Class members if the testing reveals certain PFAS detections. Thus, this case is not like *Amchem* where "those without current afflictions" could not make intelligent decisions about participating or opting out of the Settlement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 628 (1997). Rather, the government's testing requirements already burden Phase Two Class members; the Settlement provides relief to Phase Two Class members through reimbursement of costs associated with that testing and provides a known path to address the outcome of that testing without years of litigation risks. This Objection should be overruled.

### 9.    Sufficient Time Was Provided to Class Members to Evaluate the Settlement.[97]

Certain objectors claim that class members needed more time to evaluate the Settlement Agreement than the 105 days already provided. They also maintain that even more time should have been provided following the approval of the Interrelated Guidance.

With respect to the attack on the 105 days, that period is entirely reasonable under established law. The Manual for Complex Litigation states that class members need only be given a "reasonable time" to opt out, with courts usually establishing "a period of thirty to sixty days (or longer if appropriate) following mailing or publication of notice." Manual for Complex Litigation § 21.321 (4th ed. 2021).[98]

---

[97] *See* Objection from: Vancouver [ECF No. 3961], at 33-35; DuPont [ECF No. 3966], at 21-22; Little Hocking [ECF No. 4009], at 3-5.

[98] *See also In re Prudential Ins. Co. of Am. Sales Practices* Litig., 177 F.R.D. 216, 240-41 (D.N.J. 1997) (rejecting argument that the opt out period of 46 days was too short, precluding class members of meaningful review of the Proposed Settlement and collecting cases holding that an opt-out period of thirty to sixty days is appropriate); *Ashley v. GAF Materials Corp. (In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.*), No. 8:11-mn-02000, 2014 U.S. Dist. LEXIS 183679, at *34-35 (D.S.C. Oct. 15, 2014) (stating that "[p]eriods of approximately two (2) months for opting out have been approved in other cases.").

As to the argument directed at the Interrelated Guidance, it was already rejected by this Court's Order of October 26, which specifically addressed these concerns:

> The requested 60-day extension is unnecessary because the Guidance directly addresses the concerns the Wholesalers have raised. Further, Settlement Class Members have over two weeks—until November 11, 2023—to consider the Guidance and lodge objections. And Settlement Class Members have nearly 47 days before the December 11, 2023 Opt-Out deadline. See also (Dkt. No. 3857 at 3-4) (noting Settlement Class Members have had access to the Settlement Agreement since July 3, 2023 and that a 60-day extension of pertinent deadlines is potentially prejudicial in that it would delay payment to class members and potentially sow confusion among class members leading to "premature or duplicative objection, opt-out, and claims submissions").[99]

Proof that sufficient time existed to evaluate the Settlement Agreement and the Interrelated Guidance is borne out by the fact that Marten Law has since opted out several clients that had previously raised the same Objection since the Guidance was approved. Maintaining this argument under such circumstances is indefensible. Surely, if Marten Law had time to digest the Settlement and Interrelated Guidance to advise one client, it had adequate time to do that for all clients.

Relatedly, Little Hocking claims that if it accepts the 3M settlement funds, it will likely lose its tax-exempt status because it would receive too much money to remain tax exempt, and that, at a minimum, it requires more time to assess the tax implications of accepting the settlement funds.[100] None of the other thousands of class members have raised such a concern. Confusingly, Little Hocking also argues that the Settlement is monetarily insufficient.[101] In other words, Little Hocking is simultaneously complaining that the Settlement is too robust (because of the tax implications), yet not robust enough, even though it is perhaps the largest settlement in history. Putting aside the inherently conflicting positions, Class Counsel have provided ample time for

---

[99] Order [ECF No. 3861], at 3.
[100] Little Hocking Obj. [ECF No. 4009], at 3-5.
[101] Id. at 2.

Class Members to make their decision as to whether they want to opt-out for whatever reason, including due to potential tax implications. All Class Members had from August 29, 2023 until the opt-out deadline of December 11, 2023, to consider whether to exclude themselves from the Settlement, which is a total of 105 days. Further, many settlements require class members to consider tax consequences, but Little Hocking cites no case law supporting the proposition that the need to assess tax consequences of a settlement should trigger a longer than normal period to consider whether to opt out.

Further, providing context with respect to the Little Hocking objector is also important. Little Hocking is one of the public water districts impacted by PFOA contamination emanating from DuPont's Washington Works plant in West Virginia. As such, as part of the 2004 *Leach* Class Action Settlement Agreement, DuPont agreed to "design or procure and install state-of-the art water treatment technology or its functional equivalent at Defendant's sole cost and expense for each of the Public Water Districts[102] to reduce the levels of C-8 from the affected water supply to the lowest practicable levels…"[103] In the mid-2000s, Little Hocking elected to participate and received granular activate carbon ("GAC") treatment paid for by DuPont. Moreover, once the C8 Science Panel made their Probable Link determinations beginning in 2012, DuPont became obligated to pay for the PFOA treatment systems for affected water districts, including Little Hocking, forever.[104] Resultantly, for over 15 years, Little Hocking has had GAC treatment in place paid for by DuPont.

---

[102] This term is defined in one of the Schedules to the *Leach* Class Action Settlement Agreement and includes Little Hocking as one of the water systems at issue.
[103] *Leach* Class Action Settlement Agreement, at § 11.1, attached as Ex. A.
[104] *Id*. at § 11.2.

Separately, under a 2005 Consent Order between DuPont and USEPA (amended in 2009 and again in 2017), DuPont is required to pay for testing and monitoring of Little Hocking's water to ensure that its PFOA levels remain below regulatory limits even as those levels change over time. Finally, in 2009, Little Hocking sued DuPont in the Southern District of Ohio for PFOA contamination of its wellfields, and a confidential settlement was reached in 2015. Presumably, additional settlement monies relating to PFOA treatment and/or remediation were likewise received by Little Hocking as a result of that settlement.

Given this long history, Little Hocking already has access to settlement funds from DuPont to treat its PFAS contamination. While Class Counsel fully supports Little Hocking's inclusion in the 3M Settlement, Little Hocking's concern is unique in that 3M recoveries are likely a windfall. To this end, if the trade-off of losing its tax-exempt status (assuming that would occur) does not outweigh the benefit of this windfall, then Little Hocking does not have to submit a claim under the 3M Settlement, and likewise had the option to opt out. But Little Hocking has offered nothing to support its argument that the Settlement should be struck down with respect to the thousands of other Class Members who are not similarly situated.

### 10.    The Settlement Agreement Appropriately States that the Set-Off Method Will Be Determined Under "Applicable Law."[105]

Two objectors fault the Settlement for not specifying a methodology for settlement payment credits. The mechanics of the reduction in damages under the claims-over provision depend on whether the settlement involves federal or state law claims. In a products liability case consolidated in an MDL, the set off is made according to state law:

> Regardless of the applicable jurisdiction, under this agreement, non-settling defendants will receive, at a minimum, a set-off or judgment reduction consistent with state law. Allowing non-settling

---

[105] *See* Objections from: DuPont [ECF No. 3966], at 12-13; Vancouver [ECF No. 3961], at 13.

> defendants the benefit of whatever judgment reduction that is
> required under state law is fair and reasonable. The court concludes
> that the bar order is essential to the settlement and is within the
> court's powers to approve it, and because all parties are adequately
> protected by its application, the order will be approved.

*In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 182 (E.D. Pa. 1997). Similar

language— leaving the method of setoff to be determined by state law —has been approved in

other cases. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 276 (2d Cir. 2006) ("Moreover, there

would be no need to specify a judgment credit methodology if the bar on claims for contribution

or indemnity was likewise left to "applicable law," instead of being defined under the court-

approved settlement agreement"); *In re Diet Drugs*, 2000 WL 1222042, at *64 (E.D. Pa. 2000)

("In the event that non-settling defendants' rights are not extinguished by operation of law, any

class member who recovers a judgment against such a non-settling defendant "shall reduce his

judgment against the Non Settling Defendant by the amount, percentage, or share of such judgment

necessary, under applicable law, to relieve AHP and the Released Parties of liability for

contribution or non-contractual indemnity."); *Slaven v. BP America, Inc.*, 958 F. Supp. 1472,

1478–79 (C.D. Cal., 1997) ("Neither the settling nor the non-settling parties dispute either that

state settlement law should generally be applied to state causes of action or that the federal

settlement law must be applied to the specific federal causes of action before the court."); *In re*

*Silicone Gel Breast Implant Prods. Liab. Litig.*, 1994 WL 578353, at *18 (N.D. Ala. 1994)

(approving bar order that allows setoff or judgment credit available under applicable state law);

*MFS Mun. Income Trust v. American Medical Intern., Inc.*, 751 F. Supp. 279, 281 (D. Mass. 1990)

(state law determines parties' set off rights).[106]

---

[106] To the extent that Marten Law raises the same CERCLA-related issues as in the DuPont
Fairness Hearing, Class Plaintiffs rely on and adopt them herein by reference. Class Counsel's
Reply Brief in Support of Motion for Final Approval [ECF No. 4232].

## 11.    The Claims-Over Provision is Not Improper.[107]

The Claims-Over provision of Paragraph 11.6 is not an indemnity provision as some objectors claim. Rather, the provision merely codifies Defendant's rights to contribution under state law. As described in Paragraph 11.6.4, a non-settling defendant that is ordered to pay a Class Member cannot seek to recover that amount from 3M, who will have already paid per this Settlement Agreement. The paragraph preserves a Class Member's right to sue a non-settling defendant, but recovery is reduced by the amount it has already received from 3M. This provision is entirely consistent with the Settlement's overall goal (discussed above) of ensuring there is no double recovery. Such provisions are standard and non-controversial in class settlements. *See Denney*, 443 F.3d at 276; *Orthopedic Bone Screw*, 176 F.R.D. at 182. Nothing in this provision requires a Class Member to pay any money out-of-pocket or to incur debt. The language operates only to limit 3M's payment under the Settlement.

"Claims-over" or "contribution bar" clauses are a common feature in partial multi-party settlements. In multi-defendant actions, "the right to contribution removes the incentive to settle since non-settling defendants could still file claims for contribution against a joint tortfeasor who has been discharged of direct liability through settlement." *In re Jiffy Lube Securities Litig.*, 927 F.2d 155, 160 n. 2 (4th Cir. 1991). "Understandably, the settling defendants have no desire to pay money to the plaintiffs to settle their claims only to be brought back into the case to defend themselves on contribution or other cross-claims asserted by the non-settling defendants." *S.C. Nat. Bank v. Stone*, 139 F.R.D. 335, 341 (D.S.C. 1991). "In essence, a bar order constitutes a final discharge of all obligations of the settling defendants and bars any further litigation of claims made

---

[107] *See* Objections from: DuPont [ECF No. 3966], at 9-12; Vancouver [ECF No. 3961], at 10-12.

by nonsettling defendants against settling defendants." *Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1225 (9th Cir.1989), cert. denied, 498 U.S. 890 (1990).

Citing *In re Jiffy Lube*, the Eleventh Circuit observed that "[m]odern class action settlements increasingly incorporate settlement bar orders such as the one at issue in this case" because "bar orders play an integral role in facilitating settlement" by assuring settling defendant that it "will be protected against codefendants' efforts to shift their losses through cross-claims for indemnity, contribution, and other causes related to the underlying litigation." *In re U.S. Oil and Gas Litig.*, 967 F.2d 489, 494 (11th Cir. 1992)*; Denney*, 443 F.3d at 276 ("a district court may properly bar claims of nonsettling defendants against settling defendants for contribution or indemnification . . . ."). Many courts have approved contribution bars to facilitate partial settlements. *See, e.*g., *Jiffy Lube*, 927 F.2d 155; *Orthopedic Bone Screw*, 176 F.R.D. at 182–83 ("The court concludes that the bar order is essential to the settlement and is within the court's powers to approve it, and because all parties are adequately protected by its application, the order will be approved."); *S.C. Nat. Bank,* 139 F.R.D. at 341; *MFS Mun. Income Trust v. American Medical Int'l, Inc.*, 751 F. Supp. 279 (D. Mass.1990); *Franklin v. Kaypro Corp.*, 884 F.2d 1222 (9th Cir.1989), cert. denied sub nom, *Franklin v. Peat Marwick Main & Co.*, 498 U.S. 890 (1990); *S.C. Nat. Bank v. Stone*, 749 F. Supp. 1419 (D.S.C.1990); *Dalton v. Alston & Bird*, 741 F. Supp. 157 (S.D. Ill.1990). Indeed, "[a]nyone foolish enough to settle without barring contribution is courting disaster." *In re Exxon Valdez*, 1993 WL 649104, at *1 (D. Alaska 1993) (quoting *In re Nucorp Energy Securities Litig.*, 661 F. Supp. 1403, 1408 (S.D. Cal. 1987)).

Such a provision also allows for a set off of the amount paid by the settling defendant: "if a judgment is entered against non-settling defendants, those non-settling defendants would be entitled to a credit against that judgment, which shall be determined at the time of trial or judgment

based on controlling legal principles in effect at that time." *S.C. Nat. Bank*, 139 F.R.D. at 338. Indeed, this principle is codified in many states' laws. "Many states have enacted 'settlement bar statutes' which allow the bar to the right of contribution, on condition that the settlement is made in good faith and that non-settling defendants are entitled to setoff against any judgment ultimately entered against them." *Jiffy Lube*, 927 F.2d at 160 n. 2.

The Towns argue that the claims-over provision violates the New York Constitution, which prohibits a municipality from assuming liability or contracting for indebtedness to a public corporation. [108] As explained above, however, the provision does not require a Class Member to incur costs; it simply reduces the amount of recovery from the non-settling defendants so that the Class Member is not paid twice (and 3M does not pay twice) for the same contamination in a PWS. This principle is also codified in New York General Obligations Law § 15-108. These objectors cite no authority holding that municipalities are immune from the operation of this statute.

### 12. The Agreement Does Not Affect Class Members' Rights as to Non-Settling Defendants.

Broward County asserts that the release may impinge on Class member rights against non-Released Parties.[109] Not so. The plain language quoted by Broward County reflects only that "future additions, modifications, or improvements to [the Releasing Party's] Public Water System due to PFAS will be the sole responsibility of the Releasing Party and not the Released Parties." *Id.* (quoting Settlement Agreement, § 11.4).

A settlement agreement, like all contracts, must be interpreted according to its plain meaning. *DeLoach v. Lorillard Tobacco* Co., 391 F.3d 551, 557 (4th Cir. 2004). *See also Campbell v. Geren*, 353 Fed. Appx. 879, 882 (4th Cir. 2009) ("Where a contract is clear and unambiguous

---

[108] The Towns Obj. [ECF No. 3999], at ¶ 48.
[109] Broward Obj. [ECF No. 3996], at 8.

on its face, courts must interpret the contract according to the plain meaning of its terms."). Under South Carolina law,[110] "[t]he cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Maybank v. BB&T Corp.*, 787 S.E.2d 498, 516 (S.C. 2016). "When the contract's language is clear and unambiguous, the language alone determines its force and effect." *Id.* Because the language quoted above is clearly limited to a Releasing Party's rights vis-à-vis Released Parties, the contract does not affect the Releasing Party's rights as to non-settling Defendants.

"A contract must be read as a whole document such that litigants may not create an ambiguity by pointing to a single sentence or clause." *Maybank*, 787 S.E.2d at 516. *See also Parker v. Byrd*, 309 S.C. 189, 420 S.E.2d 850, 852 (S.C. 1992) ("Where the agreement in question is a written contract, the parties' intention must be gathered from the contents of the entire agreement and not from any particular clause therein.'" (*quoting Thomas-McCain, Inc. v. Siter*, 268 S.C. 193, 232 S.E.2d 728, 729 (S.C. 1977)). Broward County's attempt to create an ambiguity—where none exists—because the Settlement Agreement does not mention the Class members' rights vis-à-vis the non-settling Defendants should be rejected.

### 13.    Objections Related to Amended Exhibit P and Settlement Agreement § 11.1.5.[111]

The Agency objects to the letter requirements set forth in § 11.1.5 as unnecessary and misleading.[112] The Agency argues that "[t]he form letter included as Exhibit P to the Settlement reflects a prior version of the settlement that required participating public water systems to

---

[110] The Settlement Agreement is to be interpreted under South Carolina law. Settlement Agreement, § 13.16.

[111] *See* Objections from: Broward [ECF No. 3996], at 6; The Agency [ECF No. 4074], at 2-8; Little Hocking [ECF No. 4009], at 3.

[112] The Agency Obj. [ECF No. 4074], at 1.

indemnify 3M," and that both Exhibit P and the § 11.1.5 "incorrectly suggest[] that public water suppliers agreed to guarantee that PFAS concentrations in drinking water will remain below 'regulatory limits.'"[113]

In particular, the Agency claims that subpart (ii) of § 11.1.5 "tracks indemnity provisions from a prior, now superseded, version of the Settlement that the Court preliminarily approved...."[114] This is inaccurate. Subpart (ii) of § 11.1.5 appears in § 11.1 of the Settlement Agreement, which contains the provisions related to the Release.[115] Simply put, this Section has *nothing* to do with indemnity, and the language found in subpart (ii) has consistently been in each version of § 11.1.5, including after the Settlement Agreement was revised to replace the now eliminated "Contribution and Indemnity" provisions with the current § 11.6, which contains the provisions concerning "Protection Against Claims-Over." The fact that similar language was also present in a now eliminated section, *i.e.*, the Contribution and Indemnity, does not have any bearing on its intentional inclusion in § 11.1.5, which always has been part of the Settlement Agreement's bargained for consideration, just like Amended Exhibit P itself.

Notably, although the Agency claims that Amended Exhibit P is misleading as it might suggest that the Settlement Agreement "immunizes numerous non-settling defendants involved in other PFAS-related litigation,"[116] it is the sole remaining objector to make such a claim. Moreover, and importantly, Amended Exhibit P simply does not state that any non-Released Parties other than 3M and its affiliates, which it defines as the "Released Parties," have been released from liability. In short, a plain language reading of the text does not support the proposition that

---

[113] *Id.* at 1, 3.
[114] *Id.* at 3.
[115] Settlement Agreement, at § 11, *generally*.
[116] The Agency Obj. [ECF No. 4074], at 3.

Amended Exhibit P releases entities beyond 3M and its affiliated entities and persons within the definition of Released Parties. The same is true of the contention that the letter suggests that 3M has no further duties or obligations to anyone. The letter specifically indicates that its purpose is "to provide information about the broad, inclusive, and expansive release that [*System*] has provided to 3M and certain entities affiliated with 3M as part of a Settlement between Public Water Systems across the country and 3M."[117] The language of the letter does not expand the Release beyond 3M and the affiliated Released Parties.

With respect to the language in Amended Exhibit P and § 11.1.5 relating to a public water supplier's purported guarantee concerning levels of PFAS concentrations, the Agency itself, in making this argument, actually relies on an old version of Exhibit P. In particular, the language cited by the Agency includes the following language in addition to redline changes later included in Amended Exhibit P:

- [System] Has Ensured that PFAS Concentrations Are Kept Below Regulatory Limits; and

- [*System*] has ensured that PFAS concentrations in its Drinking Water are below final federal and final state regulatory limits for PFAS.[118]

The above language— about ensuring that PFAS levels are kept below regulatory limits— was replaced in August 2023, to reflect the below redline changes, which removed the word "ensured" and replaced it with much milder language (invested or will invest, if warranted), and further replaced "regulatory limits" with "Maximum Contaminant Levels:"[119]

---

[117] Consent Motion to Amend Exhibits for Preliminary Approval, at Amended Exhibit P [ECF No. 3620-11] ("Amended Exhibit P"), at 1.
[118] Settlement Agreement, Exhibit P [ECF No. 3370-3], at 2.
[119] Amended Exhibit P [ECF No. 3620-11], at 2.

> **[*System*] Has ~~Ensured that~~Invested or Will Invest, if Warranted, in Keeping PFAS Concentrations ~~Are Kept~~ Below ~~Regulatory Limits~~Maximum Contaminant Levels**
>
> [*System*] has ~~ensured that~~invested or will invest, if warranted, in treatment to reduce PFAS concentrations in its Drinking Water ~~are~~to or below ~~final~~federal and ~~final~~state ~~regulatory limits~~Maximum Contaminant Levels for PFAS as they may be updated from time to time.

These redlines did not create a combined version of the original version of Exhibit P and the Amended Exhibit P; rather, the final language incorporates the redlines such that the word "ensured" no longer appears in the letter, nor does the allegedly undefined term "regulatory limits."

With these amendments, the Agency's Objection that the term "regulatory limits" is not defined should be mooted since it no longer appears in Amended Exhibit P; likewise mooted is any concern that the letter suggests that the Settlement Agreement includes a guarantee that PFAS concentrations will remain below allegedly undefined regulatory limits.

Although § 11.1.5(iii) of the Settlement Agreement was not updated to remove the "ensured" language to mirror the modifications made in Amended Exhibit P, it is Amended Exhibit P that manifests the obligation. Moreover, Class Counsel have met and conferred with 3M's counsel to confirm that such an amendment can be made to the Settlement Agreement in order to ensure that Amended Exhibit P and § 11.1.5(iii) have consistent language, and Class Counsel and counsel for 3M anticipate submitting such an amendment shortly. With this anticipated amendment, this Objection raised by both Broward and the Agency will be mooted.

**B.      Objections Relating to Class Certification**[120]

**1.      Questions of Law and Fact Predominate.** [121,122]

As demonstrated in Class Counsel's Motion for Final Approval, Rule 23(b)(3) predominance and superiority are satisfied here.[123] In arguing otherwise, Marten Law asserts that predominance is not met, because "individual claims dominate," listing a smattering of considerations that they allege "affect the strength of each Class Member's claim and thus the potential damages and recovery."[124] "Critically [however], Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." *Stillmock v. Weis Markets, Inc.,* 385 Fed. App'x 267, 273 (4th Cir. 2010)(citing *Gunnells v. Healthplan Servs., Inc.,* 348 F.3d 417, 429(4th Cir. 2010). *Central Wesleyan College v. WR Grace & Co.,* 6 F.3d 144 (4th Cir. 1993). Where, as here, "the qualitatively overarching issue by far is the liability issue of the defendant's" conduct,

---

[120] Notably, the Marten Law Objectors effectively withdrew all class certification challenges to the settlement when, at the DuPont Fairness Hearing on December 14, 2023, the Marten Law Objectors represented that they are not challenging the viability of a classwide settlement, but rather their objections address ways to make the settlement more attractive to class members (e.g., by clarifying and narrowing the releases). *See* Dec. 14, 2023 Fairness, Hr'ing Tr., at 89:24-90:5. Consistent with that representation, Marten Law did not argue at the hearing that class certification was inappropriate, an argument that, taken literally, would defeat any classwide settlement of this litigation. In this section, Class Counsel address the class certification Objections lodged by Marten Law even though it is difficult to imagine that Marten Law still intends to press them given its unambiguous representation to the Court.

[121] Rule 23(a)(2)'s requirement of commonality is subsumed within Rule 23(b)(3)'s predominance requirement. *Millwood v. State Farm Life Ins. Co.,* No. C/A No. 7:19-cv-01445-DCC, 2022 U.S. Dist. LEXIS 173928, at *11 (D.S.C. Sept. 23, 2022) (granting class certification and explaining "'the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate' over other questions. *Lienhart v. Dryvit Sys.,* 255 F.3d 138, 146 n.4 (4th Cir. 2001)(quoting *Amchem*, 521 U.S. at 609).").

[122] *See* Objections from: DuPont [ECF No. 3966], at 14; Vancouver [ECF No. 3961], at 20-21.

[123] Class Counsel's Motion for Final Approval [ECF No. 4273-1], at 41-43.

[124] DuPont Obj. [ECF No. 3966], at 14. *See, e.g.,* Vancouver Obj. [ECF No. 3961] (referring to levels of PFAS contamination, application of regulations, the purchase of treated or raw water, viability of claims against the federal government, and the class members' geographic location).

common questions of fact predominate for the purposes of settlement. *Stillmock*, 385 Fed. App'x at 273.

Contrary to Fourth Circuit law, Marten Law seeks to have this Court ignore the qualitative demonstration that has already occurred before this Court reflecting the predominance of common issues and defenses, and instead undertake a headcount of illusory differences among Class Members.

Marten Law also ignores that all class members suffered the same harm—PFAS exposure or risk of exposure to their Drinking Water—which may vary by degree. But "[t]he possibility that individualized inquiry into Plaintiffs' damages claims will be required does not defeat the class action because common issues nevertheless predominate." *Gunnells*, 348 F.3d at 429; *see also*, *Brooks v. GAF Materials Corp.*, 301 F.R.D. 229 (D.S.C. 2014). Individual questions of damages viewed in light of the overarching common harm should not defeat predominance for the purposes of settlement. *Stillmock*, 385 F. App'x at 273.

Marten Law's argument that PWS citizenship in all 50 states impedes predominance should be rejected; "variations in the rights and remedies available to injured class members under the various laws of the fifty states [do] not defeat commonality and predominance." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 301 (3d Cir. 2011). While multistate classes may face the challenge of applying multiple laws when seeking to certify a litigation class,[125] those considerations dissipate in the face of a settlement. *Sullivan*, 667 F.3d at 301 ("state law variations are largely 'irrelevant to certification of a settlement class[']"). This is so because the settlement "obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state

---

[125] *See, e.g.*, *Ward v. Dixie Nat. Life Ins. Co.*, 257 F. App'x 620, 628–29 (4th Cir. 2007) (identifying criteria for meeting predominance when seeking to certify a class action potentially governed by the laws of multiple states for trial).

laws[.]" *Id*. at 304. *See also Jabbari v. Farmer*, 965 F.3d 1001, 1007 (9th Cir. 2020) ("For purposes of a settlement class, differences in state law do not necessarily, or even often, make a class unmanageable" as could result in failure to meet predominance requirement); *In re Serzone Prod. Liab. Litig*., 231 F.R.D. 221, 240 (S.D.W. Va. 2005) (finding that differing state laws are "rendered irrelevant" in the context of settlement and "do not destroy class cohesion."). Here again, Marten Law simply ignores the overwhelming authority that refutes their argument.

A core tenet of the Settlement is the single recovery for each Impacted Water Source. Thus, Class Members include all qualifying PWS, including wholesalers and retailers, each of which may have responsibility to remediate an Impacted Water Source and thus each of which suffered the same type of harm. This common harm outweighs any individual considerations for minor variations between Class Members.[126]

In sum, none of the considerations identified by the objectors defeat the predominance of the common questions concerning Defendant's conduct for the purposes of settlement.

## 2. The Class Representatives' Claims are Typical of the Class Members.[127]

As discussed in Class Counsel's Motion for Final Approval,[128] typicality does *not* require that "the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned." *Deiter v. Microsoft Corp*., 436 F.3d 461, 467 (4th Cir. 2006). Here, typicality is satisfied

---

[126] *See e.g*., *Case v. French Quarter III LLC*, No. 2:12-CV-02518-DCN, 2015 WL 12851717, at *6 (D.S.C. July 27, 2015) (finding the predominance inquiry met in a mass tort class action where the claims arose from a uniform series of conduct and each class member suffered the same type of damage); *In re Flint Water Cases*, 571 F. Supp. 3d 746, 790 (E.D. Mich. 2021) ("In certain 'mass tort accidents,' plaintiffs may meet the predominance requirement even if 'questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved ... [such a finding] does not dictate the conclusion that a class action is impermissible.") (quoting *Sterling v. Velsicol Chem. Corp*., 855 F.2d 1188, 1197 (6th Cir. 1988)).
[127] *See* Objections from: DuPont [ECF No. 3966], at 14-15; Vancouver [ECF No. 3961], at 21.
[128] Class Counsel's Motion for Final Approval [ECF No. 4273-1], at 38-40.

for purposes of settlement because Class Members' claims arise from a single course of conduct—the contamination of Drinking Water with PFAS— and each Class Member has suffered contamination or the risk of contamination that differs only by degree.

Vancouver makes two attacks on typicality. Both are meritless.

First, it argues that Class Representatives' claims are not typical because only four of 17 Class Representatives "include wholesale water supply as a part of their business."[129] Yet just one class representative is required. *Yates v. NewRez LLC*, No. CV TDC-21-3044, 2023 WL 5108803, at *7 (D. Md. Aug. 9, 2023) (certifying class where a single class representative was sufficient to meet the typicality requirement of Rule 23(a)).

Second, despite acknowledging that wholesalers are included among the Class Representatives, Vancouver cites a vague litany of issues and speculates that the Class Representatives "cannot adequately represent the interests of water providers" that "grapple with these complex issues."[130] Whether Class Representatives are wholesalers or not, their claims are typical of the Class's claims for the purposes of settlement because they stem from a common harm in that their Drinking Water was or is at risk of being contaminated with PFAS through Defendant's conduct. Vancouver fails to explain, beyond vague posturing, why wholesaler claims do not arise from the common harm alleged.

Next, without citing a single case in support, both Vancouver and DuPont (Marten Law Objectors) assert that Class Representative claims are "atypical" because Class Representatives "only" represent 13 states and Drinking Water regulations vary.[131] But national classes are commonly settled without requiring representatives from all 50 states. *See, e.g.*, *In re All-Clad*

---

[129] Vancouver Obj. [ECF No. 3961], at 21-22.
[130] *Id*. at 22.
[131] *Id*. at 22-23; DuPont Obj. [ECF No. 3966], at 15.

*Metalcrafters, Cookware Mktg. & Sales Practices Litig.*, MDL 2988, 2023 WL 2071481 (W.D. Pa. Feb. 17, 2023); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752, 2020 WL 4212811 (N.D. Cal. July 21, 2020)*; In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299 (N.D. Cal. 2018). This is yet another example of the Marten Law Objectors advancing Objections that are contrary to settled law.

Moreover, variations in state law do not preclude a finding of typicality for settlement purposes. *In re: Mi Windows & Doors Inc. Prod. Liab. Litig.*, No. 2:12-MN-00001, 2015 WL 12850547, at *6 (D.S.C. July 22, 2015), *aff'd sub nom. In re MI Windows & Doors, Inc., Prod. Liab. Litig.*, 860 F.3d 218 (4th Cir. 2017) ("[D]espite possible state-by-state variations in the elements of these claims, they arise from a single course of conduct by [defendant] and a single set of legal theories."). In fact, "[t]here is no requirement that there be a class representative from each state to certify a national class." *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000, 2020 WL 8256366, at *20 (N.D. Ala. Nov. 30, 2020); *In re Cmty. Bank of N. Virginia*, 622 F.3d 275, 310 (3d Cir. 2010), *as amended* (Oct. 20, 2010) (agreeing with settling parties that there is no requirement to "appoint named class representatives from every state in order to approve a settlement that releases state law claims."). The Marten Law Objectors do nothing more than point out that states regulate Drinking Water differently— something the Allocation Procedures account for. Regardless of state regulations or contamination levels, the settlement provides relief to remediate the universal harm. Thus, Plaintiffs' claims are typical of the Class members' claims for purposes of the settlement and the Objections should be overruled.

### 3. Plaintiffs are Adequate Because the Settlement Agreement was Crafted to Avoid any Appreciable Conflict of Interests.[132]

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). As discussed above, the Class Representatives' adequacy is plainly established for the purposes of settlement. The Marten Law Objectors' argument is based on the erroneous contention that a multitude of subclasses are necessary.

Each of the proposed Class Representatives is either a Phase One or Phase Two Class Member and each shares the same overriding interests as absent class members in either Phase One or Phase Two respectively.[133]

***Structure of the negotiations***. The structure of the negotiations provides assurance of adequate representation. The uncontradicted record shows that Class Counsel did "an exhaustive review" of the proposed settlement terms, conducted "an independent review of the experts' recommendations, and engaged in negotiations and numerous discussions" concerning the proposed allocation of funds to Phase Two class members, all of which led Class Counsel to conclude that "the proposed Settlement Agreement … provides fair, reasonable, and adequate compensation to Phase Two Class [M]embers and treats them equitably in relation to Phase One Class Members."[134] This careful vetting of the proposed settlement is ignored by the Marten Law Objectors.

---

[132] *See* Objections from: DuPont [ECF No. 3966], at 15-17; Vancouver [ECF No. 3961], at 23-25.

[133] *See, generally*, Class Counsel's Motion for Final approval, Exs. F-S [ECF Nos. 4273-7 through 4273-20].

[134] Declaration of Elizabeth A. Fegan in Support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Class Settlement and for Permission to Disseminate Class Notice [ECF No. 3370-8], at ¶ 12; *see also,* Memorandum of law in Support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class and for Permission to Disseminate Class Notice [ECF No. 3370-1] ("Prelim. App. Mot."), at 10 (discussing Ms. Fegan's "exhaustive review of the proposed Settlement Agreement" and conclusion that the proposed Settlement was "fair, adequate and reasonable."); Declaration of Michael A. London, Esq. in Support of Plaintiffs' Motion for Preliminary Approval of Class

While the Marten Law Objectors argue that this class action suffers from a conflict of interest between present and future injury plaintiffs, simply put, this case is not *Amchem*. The most important distinction is that Class Counsel here took *Amchem* into account by creating the Phase One and Phase Two Class Members status, providing separate representation of Phase Two Class Members, and establishing mechanisms for ensuring equitable treatment between and within the Phase One and Phase Two groups.

***Terms of the settlement***. The terms of the Settlement also reflect substantive fairness: the Settlement was crafted to ensure that all Class Members receive, to the extent practicable, *exactly the same* compensation regardless of when they make claims on the Settlement Fund. The Marten Law Objectors imply that the interests of the Phase Two class members in this litigation, like the interests of the exposure-only class members in *Amchem*, are being slighted, with an inequitable portion of the settlement funds flowing to the Phase One class members who, of course, already know of their injury. This ignores the detailed showing to the contrary set forth in Plaintiffs' memorandum in support of the Motion for Preliminary Approval of the Settlement.[135]

An independent expert in the field of liability forecasting calculated that only 31% of eligible claimants would be Phase Two class members but, in an abundance of caution, and to ensure fairness, on his recommendation, 45% of the settlement funds have been initially reserved for Phase Two class members.[136] Thus, unlike in *Amchem*, it is undisputed that this Settlement Agreement was crafted to ensure that Phase Two class members "receive the same approximate Allocated Amount as a Phase One [class member] with the same Adjusted Base Score, except for

---

Settlement, for Certification of Settlement Class and for Permission to Disseminate Class Notice [ECF No. 3370-5], at ¶ 22 (same).

[135] Prelim. App. Mot. [ECF No. 3370-1], at 20-29.

[136] *Id*. at 21.

an inflation adjustment."[137] By contrast, in the *Amchem* settlement, the exposure-only class members stood to receive only about one third the amount received by currently injured class members, with no inflation adjustment.[138]

The Marten Law Objectors posit hypothetical conflicts *between* various Phase Two class members, depending on how much or the type of contamination each class member has.[139] These arguments ignore that none of the Phase Two class members (by definition) presently knows whether or not it has any contamination. Thus, *ex ante*, during the settlement negotiations, no Phase Two class member could know whether it would be benefitted by more funds allocated toward testing costs, or more funds allocated to remediation costs. In any event, as this Court is aware, the Settlement has been crafted to ensure that all reasonable testing costs will be covered for all class members, both those in Phase One and those in Phase Two, meaning that the hypothetical conflicts sketched by the Marten Objectors are entirely illusory.

Indeed, illusory conflicts do not require separate representation, nor does the law on adequacy of representation demand perfect symmetry among class members. *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012). As the *Matamoros* court explained:

> But perfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable. 'Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement.' 1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed. 2012). Put

---

[137] *See, e.g.*, Settlement Agreement, Exhibit Q – Allocation Procedures [ECF No. 3370-3]("Allocation Procedures"), at p. 19, § 7(a); *see generally*, Settlement Agreement, at § 6.8, *et seq*.
[138] *See* Note, Alex Raskolnikov, *Is There a Future for Future Claimants After Amchem Products, Inc. v. Windsor*, 107 Yale L.J. 2545, 2553 (1998). Obviously, a settlement crafted to ensure that both class members who are presently injured, and those whose injuries will manifest (if at all) only in the future, receive the same compensation is "intrinsically fair," satisfying even the fiercest critics of mass-tort settlements, *id*. at 2554 & nn. 60-62, and obviously meeting the adequacy-of-representation requirement set out in *Amchem*. *Id*. at 2555.
[139] Vancouver Obj. [ECF No. 3961], at 24; DuPont Obj. [ECF No. 3966], at 16.

another way, to forestall class certification the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole.

*Matamoros*, 699 F.3d at 138 (additional citations omitted). *See also In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d 891, 918 (E.D. La. 2012) ("Subclassing is but one of many available options for limiting the possibility of intraclass conflicts; it is not required as a matter of course. Rather, subclasses might only be needed when there is a 'fundamental' conflict among class members, but no such conflict exists here.").

Nonetheless, not satisfied with this carefully crafted structure, the Marten Law Objectors contend that myriad additional subclasses should have been created. For example, Vancouver's Objection lists five subclasses that purportedly are necessary: (1) within Phase Two (those with little or no PFAS detections versus those with high detections); (2) between retailers and wholesalers; (3) between class members with and without regulatory violations; (4) between class members with well-researched or less-researched PFAS; and (5) between class members that have PFAS with or without EPA-approved test methods.[140] According to the Marten Law Objectors, these subclasses each required separate counsel, and "certification without such safeguards [does] not comply with Rule 23."[141] This argument—which the Marten Law Objectors fail to support with case citations or compelling factual evidence—is meritless, as myriad cases within the Fourth Circuit and elsewhere demonstrate. Those authorities show that subclassing is not required unless there is a critical need.

For instance, in *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417 (4th Cir. 2003), the Fourth Circuit upheld the district court's conditional certification of a single class that included both employee and employer class members against an insurance claims administrator, rejecting

---

[140] Vancouver Obj. [ECF No. 3961], at 23-25; *see also* DuPont Obj. [ECF No. 3966], at 15-17.
[141] DuPont Obj. [ECF No. 3966], at 17; Vancouver Obj. [ECF No. 3961], at 25.

arguments of a conflict of interest. The court held that a conflict "must be fundamental" and "go to the heart of the litigation," which they found to not apply in this case. *Id*. at 430-31 (quoting 6 Alba Conte Herbert B. Newberg, *Newberg on Class Actions* § 18:14 (4th ed. 2002)).

In *Haney v. Genworth Life Ins. Co*., No. 3:22-cv-55, 2022 WL 17586016 (E.D. Va. Dec. 12, 2022), the district court rejected objections asserting the need for subclasses. The court reasoned that there was no conflict because there was "no allocation decision necessary to distribute the relief" between the two groups involved. *Id*. at *11. Additionally, the court rejected an argument that subclasses were needed because class members were located in various states, finding nothing "to suggest that [the] questions of law and fact" differed among the relevant states. *Id*. Likewise, in *In re Serzone Prods. Liab. Litig*., 231 F.R.D. 221 (S.D.W. Va. 2005), the district court held that there was no conflict of interest among the members to justify subclasses. The court reasoned that the entire class sought to recover damages for immediate injury caused by the product and that the claims were all presently known. *Id.* at 238.

Numerous cases outside the Fourth Circuit are in accord. For example, in *In re Pet Food Prods. Liab. Litig*., 629 F.3d 333 (3d Cir. 2010), objectors asserted a conflict of interest between members with only purchase-related claims related to recalled pet food, and members with injured animals caused by consumption of the food. The Third Circuit rejected objectors' arguments, upholding the district court's finding that there was no conflict of interest between the members because the claims were all for economic damages and members all had present claims. *Id*. at 344. The court reasoned that "objectors [had] not identified adverse interests that would require the establishment of subclasses." *Id.* Finally, the court rejected the argument that differences in state law would create conflicts, finding that representatives' interests aligned with other class members. *Id*. at 349.

56

Importantly, far from improving the state of affairs, courts have noted that too many subclasses can be counterproductive, leading to inefficiencies and undue complexities and thereby undermining the class action process. For instance, in *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 910 F. Supp. 2d 891 (E.D. La. 2012), two class settlements were negotiated: one for economic injuries and one for personal injuries. Rejecting an argument that subclasses should have been created based upon the various types of injury to avoid conflicts of interest, the court reasoned that "[i]f subclasses were entertained, there would be no principled basis for limiting the number of subclasses." *Id*. at 919. The court concluded that creating subclasses for each type of injury, "each with separate class representatives and counsel . . . would have greatly complicated both the settlement negotiations and the overall administration of the litigation." *Id*. at 920.

Other cases have likewise made clear that the creation of multiple subclasses could well undermine any efficiencies from the class action device. *See, e.g., In re Cendant Corp. Sec. Litig*., 404 F.3d 173, 202 (3d Cir. 2005) ("[I]f subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened.") (internal quotation marks omitted); *International Union, United Automobile, Aerospace, & Agricultural Implement Workers of America v. General Motors Corp*., 497 F.3d 615, 629 (6th Cir. 2007) ("if every distinction drawn (or not drawn) by a settlement required a new subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk fragmenting the class beyond repair"); *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am, AFL-CIO*, 803 F.2d 878, 880 (6th Cir.1986) ("Subclassing . . . is appropriate only when the court believes it will materially improve the litigation" and is not always necessary because "subclassing often leads to more complex and protracted litigation"). Inexplicably, the Marten Law Objectors ignore all of the case law warning against too many subclasses and propose an approach that—taken literally—

could require hundreds of subclasses. Their argument is both unprincipled and legally unsupportable.

Similarly, Vancouver's Objection attempt to manufacture conflicts between Class Members who may have incurred or will incur costs with respect to a single Water Source, arguing that the Settlement Funds are not properly allocated among them.[142] However, the Marten Law Objectors ignore that the Settlement provides recovery for each Impacted Water Source. This is consistent with a central tenet of the Settlement Agreement: the prohibition on double recovery.

Thus, the Allocation Procedures[143] provide for payments based on Impacted Water Sources. To the extent multiple entities have claims based on the same Impacted Water Source, their allocated award may be apportioned in the manner explained in the Settlement Agreement,[144] the Allocation Procedures,[145] and the Joint Interpretive Guidance on Entities that Own and/or Operate Multiple Public Water Systems.[146] Contrary to the Marten Law Objectors' arguments, "[t]he proposed allocation need not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis." *Feinberg*, 610 F. Supp. 3d at 769 (internal quotations omitted). Here, an award for a single Impacted Water Source to be allocated among those with responsibility to remediate the source is reasonable and rational.

Moreover, the Settlement Administrator has the discretionary authority to consider all documentation submitted by Class members with respect to each Impacted Water Source, and to

---

[142] Vancouver Obj. [ECF No. 3961], at 24.
[143] *See* Allocation Procedures, *generally*.
[144] Settlement Agreement, at § 6.9, *et seq*.
[145] *See* Allocation Procedures, *generally*.
[146] *See* The Parties' Joint Interpretive Guidance on Entities that Own and/or Operate Multiple Public Water Systems [ECF No. 3918-1], *generally*.

request additional documentation, analyze any and all relevant information, determine a fair and equitable apportionment of allocated awards amongst interrelated systems, and generally ensure an outcome that comports with the principles and terms of the Settlement Agreement.[147] Because the Allocation Procedures are reasonable and rational, and were "carefully devised to ensure a fair distribution of the settlement fund to the various types of claimants,"[148] the plan should be approved and the Objections as to the Plaintiffs' adequacy should be overruled.

Under the case law, it was incumbent upon the Marten Law Objectors to demonstrate that the purported conflicts were so fundamental as to warrant separate subclasses. They have not done so. To the contrary, adopting the many subclasses urged by the Marten Law Objectors would lead precisely to the sort of "Balkanization" that courts fear when too many subclasses are created.

* * *

This Settlement meets every requirement for certification of a settlement class, and every factor relevant to assessing whether the settlement is fair, reasonable, and adequate. The paucity of objections reflects the overwhelming support by this sophisticated and well-informed class, and the objections offered (most of which are by one law firm) are legally and factually meritless.

---

[147] *See, e.g.*, the Parties' Joint Interpretive Guidance on Interrelated Drinking-Water Systems [ECF No. 3856-1], p. 6; Settlement Agreement, at §§ 6.9, 7.4.

[148] *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 273 (3rd Cir. 2009) ("the Plan of Allocation was carefully devised to ensure a fair distribution of the settlement fund to the various types of claimants and was allocated in such a way that policyholders who likely incurred the most damage are entitled to a larger proportion of the recovery than those whose injuries were less severe. Even if some potential benefits may have been realized from utilizing subclasses, it is not at all clear that the advantages would have outweighed the disadvantages, and therefore it is difficult to say that the District Court abused its discretion by not taking this step. Consequently, we conclude that the District Court's decision not to certify separate subclasses or require separate representation did not constitute an abuse of discretion and likewise its approval of the Zurich Settlement Agreement and Plan of Allocation was also within its discretion.").

III.     **CONCLUSION**

This Court should certify the settlement class and enter final approval after finding the settlement fair, reasonable, and adequate.

Dated: January 9, 2024                              Respectfully submitted,

/s/ Michael A. London
Michael A. London
Douglas and London P.C.
59 Maiden Lane, 6th Floor
New York, NY 10038
Tel: 212-566-7500
Fax: 212-566-7501 (fax)
Email: mlondon@douglasandlondon.com

Paul J. Napoli
Napoli Shkolnik
1302 Avenida Ponce de León
San Juan, Puerto Rico 00907
Tel: (833) 271-4502
Fax: (646) 843-7603
Email: pnapoli@nsprlaw.com

Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Email: ssummy@baronbudd.com

Elizabeth A. Fegan
Fegan Scott LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Tel: 312-741-1019
Email: beth@feganscott.com

Joseph Rice
Motley Rice LLC
28 Bridgeside Blvd.,
Mt. Pleasant, SC 29464
Email: jrice@motleyrice.com

*Class Counsel*

  -and-

Robert Klonoff
Lewis & Clark School of Law
Jordan D. Schnitzer, Professor of Law
10101 S. Terwilliger Boulevard
Portland, Oregon 97219
Tel: 503-768-6600
Email: klnoff@usa.net

*On the brief*

61

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was electronically filed with this Court's CM/ECF on this 9th day of January, 2024 and was thus served electronically upon counsel of record.

<div style="margin-left:50%">

<u>/s/ Michael A. London</u>
Michael A. London
Douglas and London PC
59 Maiden Lane, 6th Floor
New York, NY 10038
212-566-7500
212-566-7501 (fax)
mlondon@douglasandlondon.com

</div>