**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) Master Docket No.:<br>) 2:18-mn-2873-RMG |

| | |
|---|---|
| CITY OF CAMDEN, *et al.*, | ) Civil Action No.:<br>) 2:23-cv-3230-RMG |
| *Plaintiffs,* | ) |
| | ) |
| *-vs-* | ) |
| | ) |
| E.I DUPONT DE NEMOURS AND COMPANY (n/k/a EIDP, Inc.), *et al.*, | ) |
| | ) |
| *Defendants.* | ) |

**ORDER AND OPINION**

Before the Court is Class Counsel's motion for final approval of class settlement and final certification of the settlement class. (Dkt. No. 4080). On August 8, 2023, the Court preliminarily approved the Settlement Agreement reached between Plaintiffs the City of Camden, City of Brockton, City of Sioux Falls, California Water Service Company, City of Del Ray Beach, Coraopolis Water & Sewer Authority, Township of Verona, Dutchess County Water & Wastewater Authority and Dalton Farms Water System, City of South Shore, City of Freeport, Martinsburg Municipal Authority, Seaman Cottages, Village of Bridgeport, City of Benwood, Niagara County, City of Pineville, and City of Iuka (collectively "Plaintiffs") and Defendants The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., and E.I. DuPont de Nemours and Company n/k/a EIDP, Inc. (collectively "Defendants" and together with Plaintiffs the "Parties"). (Dkt. No. 3603). The Court conducted a Fairness Hearing on December 14, 2023 regarding the proposed Settlement Agreement. For the reasons set forth

below, the Court grants Class Counsel's motion.

**Background[1]**

On December 7, 2018, the Judicial Panel on Multidistrict Litigation (the "JPML") centralized in this Court approximately 90 civil actions from eight judicial districts involving claims that aqueous film-forming foams ("AFFF") had contaminated local ground water and drinking water supplies in numerous communities across the United States. In its transfer order, the JPML noted:

> These actions thus share factual questions concerning *the toxicity of PFOA and PFOS and their effects on human health; the chemical properties of these substances and their propensity to migrate in groundwater supplies; the knowledge of the AFFF manufacturers regarding the dangers of PFOA and PFOS; their warnings, if any, regarding proper use and storage of AFFFs; and to what extent, if any, defendants conspired or cooperated to conceal the dangers of PFOA and PFOS in their products.*

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1394 (JPML 2018).

Following the creation of this multidistrict litigation ("MDL"), and pursuant to Case Management Orders 2 and 3, the Court appointed Plaintiffs' Co-Lead Counsel, the initial slate of Plaintiffs' Executive Committee ("PEC") members, and Advisory Counsel to the PEC. (Dkt. No. 4080-1 at 15). Over the next four and half years, Plaintiffs in this MDL, led by Plaintiffs' Co-Lead Counsel and the PEC, conducted approximately "414,000 hours of work . . . includ[ing], *inter alia*, MDL oversight and administration, bellwether efforts, general liability efforts, significant legal briefing efforts including successfully overcoming the government contractor defense, service of nine (9) general expert reports and twelve (12) case-specific expert reports, and one (1) expert report with a general sub-part and three (3) case-specific sub-parts, as well as multiple supplemental reports." (*Id.* at 16-17) (describing additional discovery undertaken).

Plaintiffs in the MDL also prepared *City of Stuart, Fla. v. 3M Company, et al.*, Case No.

---

[1] Unless otherwise noted, capitalized terms have the same meaning as in the Settlement Agreement and all citations are to the docket in 2:18-mn-2873-RMG.

2:18-cv-3487-RMG for trial, which the Court stayed on June 5, 2023, to allow Plaintiffs and Defendant 3M Company, the sole remaining Defendant in said matter, to work towards a global resolution. (Dkt. No. 3256); (Dkt. No. 4080-1 at 17) ("[T]he City of Stuart's claims against Defendants were severed from the *City of Stuart* trial when Defendant Kidde filed for Chapter 11 bankruptcy, given that the liability as between these two entities was so intertwined.").

On June 1, 2023—four days before trial—with the assistance and oversight of Court-appointed mediator Judge Layn Phillips (Ret.), the Parties signed a memorandum of understanding. (Dkt. No. 4080-1 at 18); *see* (Dkt. No. 2658) (October 26, 2022 Order appointing mediator). As the Parties note, however, settlement discussions had begun between Defendants and the MDL Plaintiffs years prior in the Summer of 2020. (Dkt. No. 4080-1 at 17).

On July 12, 2023, on behalf of themselves and all other similarly situated-situated Public Water Systems ("PWS"), Plaintiffs filed a class action complaint against Defendants claiming one or more of the following types of damages: (1) the costs of testing and monitoring of the ongoing contamination of their Drinking Water wells and supplies; (2) the costs of designing, constructing, installing and maintaining a filtration system to remove or reduce levels of PFAS detected in Drinking Water; (3) the costs of operating that filtration system; and (4) the costs of complying with any applicable regulations requiring additional measures. (*City of Camden, et al. v. E.I. duPont de Nemours and Company (n/k/a EIDP, Inc.), et al.*, C.A. No. 2:23-cv-03230, Dkt. No. 7, ¶¶ 15-16, 246-252, 265). Plaintiffs and Defendants intended that the complaint be used as the mechanism for a class-wide settlement and the complaint identifies each Class Representative, defines the Settlement Class, and states the claims intended to become Released Claims and concluded by the Final Judgment. *See* (Dkt. No. 4080-1 at 19).

On August 22, 2023, the Court granted preliminary approval of the Parties' proposed settlement. (Dkt. No. 3603) (the "PAO") (finding that the requirements of Fed. R. Civ. P. 23(a)(1)-

(4), 23(b), and 23(e) were satisfied for the purposes of preliminary approval and directing that notice be sent to putative settlement class members and a Final Fairness Hearing be set). The PAO established that the objection period would end on November 4, 2023 and that the last day of the opt-out period would be December 4, 2023. Class Counsel were directed to file its motion for attorneys' fees and costs by October 15, 2023—which Class Counsel duly did. Class Counsel's papers in support of Final Approval were originally due by November 14, 2023, though this deadline was extended to November 21, 2023. (Dkt. Nos. 3891, 3935). The Final Fairness Hearing was set for December 14, 2023.

Shortly after the Court issued the PAO, the Court granted the Parties' motion to amend paragraph 29 of the Settlement Agreement. (C.A. No. 2:23-cv-3230, Dkt. No. 36) (finding Parties' original intent was to conform the PAO's stay order with that "used in the Court's order granting preliminary approval to a settlement reached between Public Water Systems and the 3M Company").

On October 26, 2023, the Court granted the Parties' motion to supplement the Settlement Agreement with their "Joint Interpretative Guidance on Interrelated Drinking-Water Systems." (C.A. No. 2:23-cv-3230, Dkt. No. 47) (the "Interrelated Guidance"). The Court likewise extended the deadline by which to file objections to November 11, 2023.

On November 7, 2023, the Court granted the Parties' motion to supplement the Settlement Agreement with the Parties' "Joint Interpretive Guidance on Entities that Own and/or Operate Multiple Public Water Systems." (C.A. No. 2:23-cv-3230, Dkt. No. 54) (the "Multiple PWS Guidance").

On November 17, 2023, the Court granted the Parties' motion to supplement the Settlement Agreement with the Parties' "Joint Interpretative Guidance on Federally Recognized Indian Tribes and Public Water Systems." (C.A. No. 2:23-cv-3230, Dkt. No. 105) (the "Tribal Guidance").

On November 10, 2023, the Court granted the Parties' motion to supplement the Settlement Agreement with "Interpretive Guidance on Certain Release Issues." (C.A. No. 2:23-cv-3230, Dkt. No. 110) (the "Release Guidance").

On December 7, 2023, the Court granted the Parties' motion to supplement the Settlement Agreement with "Interpretative Guidance on How to Withdraw an Opt-Out Election After It Was Submitted Specific to the DuPont Settlement." (C.A. No. 2:23-cv-3230, Dkt. No. 144) (noting a Settlement Class Member that opted-out could withdraw its Request for Exclusion at any time on or before March 1, 2024).

On December 14, 2023, the Court conducted a Fairness Hearing. The City of Newburgh presented objections as did, collectively, the Cities of Vancouver, Washington, DuPont, Washington, Tacoma, Washington, and the North Texas Municipal Water District. Class Counsel provided responses to said objections. *See* Transcript of Fairness Hearing, (Dkt. No. 4262).

On January 3, 2024, the Notice Administrator filed a declaration regarding objections to and requests for exclusion from the Settlement Agreement. (C.A. No. 2:23-cv-3230, Dkt. No. 165).

On January 22, 2024, the Court issued guidance to the Notice Administrator for reviewing requests for exclusion for compliance with the Settlement Agreement. (C.A. No. 2:23-cv-3230, Dkt. No. 169).

On February 1, 2024, the Court granted the Parties' joint motion to amend preliminary approval order. (C.A. No. 2:23-cv-3230, Dkt. No. 172) (amending paragraphs 24 and 29 of the PAO).

On February 6, 2024, the Notice Administrator filed a revised affidavit. (C.A. No. 2:23-cv-3230, Dkt. No. 173).

### Summary of Settlement Agreement

Defendants have agreed to pay or cause to be paid the Settlement Amount of one billion

one hundred eighty-five million dollars ($1,185,000.00) in exchange for receiving releases, covenants not to sue, and dismissals from Settlement Class Members as provided for in the Settlement Agreement. (Dkt. No. 4080-1 at 22).

The preliminarily approved Settlement Class consists of:

(a) All Public Water Systems in the United States of America that draw or otherwise collect from any Water Source that, on or before the Settlement Date, was tested or otherwise analyzed for PFAS and found to contain any PFAS at any level; and (b) All Public Water Systems in the United States of America that, as of the Settlement Date, are (i) subject to the monitoring rules set forth in UCMR 5 (i.e., "large" systems serving more than 10,000 people and "small" systems serving between 3,300 and 10,000 people), or (ii) required under applicable state or federal law to test or otherwise analyze any of their Water Sources or the water they provide for PFAS before the UCMR 5 Deadline.

Subsection (a) Settlement Class Members are referred to as "Phase One" Class Members and subsection (b) Settlement Class Members are referred to as "Phase Two" Class Members. (*Id.* at 22). For reasons explained *infra*, the Parties have allocated 55% of the Settlement Amount to Phase One Class Members and 45% to Phase Two Class Members.

As identified in the PAO, the following are excluded from the Settlement Class:

(a) Any Public Water System that is located in Bladen, Brunswick, Columbus, Cumberland, New Hanover, Pender, or Robeson counties in North Carolina; provided, however, that any such system otherwise falling within clauses (a) or (b) of Paragraph 3 of this Order will be included within the Settlement Class if it so requests.

(b) Any Public Water System that is owned and operated by a State government and cannot sue or be sued in its own name, which systems within clauses (a) and (b)(i) of Paragraph 3 of this Order are listed in Exhibit I to the Settlement Agreement.

(c) Any Public Water System that is owned and operated by the federal government and cannot sue or be sued in its own name, which systems within clauses (a) and (b)(i) of Paragraph 3 of this Order are listed in Exhibit J to the Settlement Agreement.

(d) Any privately owned well or surface water system that is not owned by, used by, or otherwise part of, and does not draw water from, a Public Water System within the Settlement Class.

(*Id.* at 22-23).

The Phase One Funds are broken down into five separate payment sources: the Phase One Very Small Public Water System Payments, the Phase One Inactive Impacted Water System Payments, the Phase One Action Fund, the Phase One Supplemental Fund and the Phase One Special Needs Fund. Similarly, the Phase Two Funds will be separated into five separate payment sources: the Phase Two Very Small Public Water System Payments, the Phase Two Baseline Testing Payments, the Phase Two Action Fund, the Phase Two Supplemental Fund, and the Phase Two Special Needs Fund. (*Id.* at 25-31).

The Phase One and Phase Two Action Funds will provide a one-time payment to Qualifying Settlement Class Members with Impacted Water Sources that qualify as Very Small PWS. Very Small PWS are those that are listed in the SDWIS as Transient Non-Community Water Systems and Non-Transient Non-Community Water Systems serving less than 3,300 people. (*Id.* at 26). Under the Allocation Procedures, Transient Non-Community Water Systems will receive a one-time payment of $1,250, and Non-Transient Non-Community Water Systems serving less than 3,300 people will receive a one-time payment of $1,750.79. Recipients of the Very Small Public Water System Payments are not eligible for payment from any other funds, except that a Phase Two Qualifying Settlement Class Member may also receive a Phase Two Baseline Testing Payment. (*Id.* at 26-27). The Claims Forms submission deadline for the Phase One Very Small Public Water System Payment is sixty (60) days after the Effective Date. The submission deadline for the Phase Two Very Small Public Water System Payment is June 30, 2026, which is six months after the UCMR 5 testing deadline. (*Id.* at 27).

Phase One Qualifying Settlement Class Members that are classified as Inactive in the SDWIS and that own one or more Impacted Water Source(s) tested before June 30, 2023 will receive a one-time payment of $500.00. Recipients of this payment are not eligible for payment from any other funds. Because Inactive PWS should not be required to test under UCMR 5 or other federal or state

law, a similar payment is not available from the Phase Two Fund. The Claims Forms submission deadline for the Phase One Inactive Impacted Water System Payment is sixty (60) days after the Effective Date. (*Id.* at 27).

The Phase One and Phase Two Action Funds will compensate all other Qualifying Settlement Class Members with Impacted Water Sources that have timely submitted a Claims Form and performed the requisite testing for each of its Impacted Water Source(s). The Claims Administrator will enter the test results and relevant information provided on the Claims Form into the mathematical formula set forth in the Allocation Procedures to score each Impacted Water Source owned and/or operated by a Qualifying Settlement Class Member. Phase One Qualifying Settlement Class Members (i.e., those that have detected a measurable concentration of PFAS before June 30, 2023) are not required to retest their Impacted Water Source(s), but they are required to perform Baseline Testing of each of their Water Sources that either have never been tested for PFAS or were tested for PFAS before December 7, 2021, and the test did not result in a measurable concentration of PFAS. By contrast, all Phase Two Qualifying Settlement Class Members will have to perform Baseline Testing. (*Id.* at 28).

Those Qualifying Settlement Class Members with a detection will receive compensation from the appropriate Action Fund for each Impacted Water Source. (*Id.*).  Class Counsel explains:

> [C]apital costs and operation and maintenance ("O&M") costs are the most important factors to consider when calculating the cost of treating PFAS-containing Drinking Water. Capital costs are primarily driven by the flow rate of the Impacted Water Source, while O&M costs are primarily driven by the flow rate of the Impacted Water Source and PFAS concentrations. Thus, the flow rates and PFAS concentrations of each Impacted Water Source, obtained from the Qualifying Class Settlement Members' Claims Forms and supporting documentation, can and will be used by the Claims Administrator to formulaically calculate a Base Score for each Impacted Water Source based on the Allocation Procedures. These Base Scores will then be adjusted or "bumped," depending on whether the Impacted Water Source's concentration levels exceed the proposed federal or applicable state MCLs, whether the Qualifying Settlement Class Member had Litigation relating to the Impacted Water Source pending at the time of Settlement, and whether the Qualifying Settlement Class Member was one of the Public Water Provider Bellwether Plaintiffs.

The Claims Administrator will then divide an Impacted Water Source's Adjusted Base Score by the sum of all Adjusted Base Scores for the respective Action Fund to arrive at each Impacted Water Source's percentage of the respective Action Fund. This percentage will be multiplied by the total respective Action Fund to provide the Allocated Amount for each Impacted Water Source.

(*Id.* at 29-30) (footnotes omitted). The Claims Forms submission deadline for the Phase One Action Fund is sixty (60) calendar days after the Effective Date. The deadline for the Phase Two Action Fund is June 30, 2026, which is six months after the UCMR 5 testing deadline. (*Id.* at 30).

The Supplemental Funds will compensate Qualifying Settlement Class Members that have an Impacted Water Source that did not exceed the proposed federal or an applicable state MCL at the time they submitted their Claims Forms, but because of subsequent testing, obtain a Qualifying Test Result that either: (1) exceeds the proposed federal PFAS MCLs or an applicable state MCL; or (2) exceeds a future state or federal PFAS MCL. (*Id.* at 30-31). For each Impacted Water Source, the Claims Administrator will approximate, as closely as is reasonably possible, the Allocated Amount that each Impacted Water Source would have been allocated had it been in the Action Fund with an MDL exceedance, and shall issue funds from the Supplemental Funds in amounts that reflect the difference between the amount the Impacted Water Source would have been allocated had it been in the Phase One Action Fund with an MCL exceedance and what the Qualifying Settlement Class Member has already received, if anything. (*Id.* at 31). The deadline for Claims Form submission for both the Phase One and Phase Two Supplemental Funds is December 31, 2030. (*Id.*).

The Phase One and Phase Two Special Needs Funds will compensate Qualifying Settlement Class Members who have already spent money to address PFAS detections in their Impacted Water Sources, such as by taking wells offline, reducing flow rates, drilling new wells, pulling water from other sources and/or purchasing supplemental water. (*Id.*). A Phase One Special Needs Fund Claims Form must be submitted no later than 45 days after the deadline for submission of the PWS Phase

One Action Fund Claims Form. Once all Phase One Special Needs Fund Claims Forms are timely received, the Claims Administrator will review them and determine which Phase One Qualifying Settlement Class Members shall receive additional compensation and the amount of compensation. The Claims Administrator will recommend the awards to the Special Master who must review and ultimately approve or reject them. Phase Two Special Needs Funds claims will employ an identical process except that the deadline for submissions is August 1, 2026. (*Id.* at 31-32).

The Phase Two Baseline Testing Payment system was created to allow PWS with no evidence of PFAS contamination prior to June 30, 2023, to conduct Baseline Testing that could help them establish eligibility for payments from the Phase Two Action Fund. The Phase Two Baseline Testing Payment system allows for Phase Two Qualifying Settlement Class Members to receive a payment in the amount of $200 for each Water Source identified in the Phase Two Testing Compensation Claims Form. The deadline for submitting Phase Two Testing Compensation Claims Forms is January 1, 2026, which coincides with the UCMR 5 testing deadline of December 31, 2025.

## Analysis

### I. Class Action Fairness Act of 2005

The Class Action Fairness Act, 28 U.S.C § 1711 *et seq.* ("CAFA"), requires settling defendants to serve notice of a proposed settlement on the "appropriate" state and federal officials after a proposed class action settlement is filed with the court. 28 U.S.C. § 1715(b). The Court finds Defendants have satisfied CAFA's notice requirement. (Dkt. No. 4080-3 at 12-21).

### II. Settlement Class Certification

Under Federal Rule of Civil Procedure 23, to certify a class action, the class must meet the four Rule 23(a) prerequisites and fit within one of the three Rule 23(b) categories. *See Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 457–58, (D. Md. 2014). The parties seek certification under Rule 23(b)(3). (Dkt. No. 4080-1 at 47).

When parties seek certification for settlement under Rule 23(b)(3), although the "district court need not inquire whether the case, if tried, would present intractable management problems" under Rule 23(b)(3)(D), the other Rule 23 requirements "demand undiluted, even heightened, attention." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620 (1997).

### a.  **Ascertainability**

Although not self-evident on the face of Fed. R. Civ. P. 23, it is inherent in the concept of class certification that there must be a "readily identifiable" set of putative class members. *EQT Prod. Co. v. Adair,* 764 F.3d 347, 358 (4th Cir. 2014). This is referred to as the "ascertainability" requirement. *Id.* Plaintiffs need not be able to identify each and every class member at the time of class certification, but class members must be identifiable by reference to objective criteria without "extensive and individualized fact-finding or 'mini-trials[.]'" *Id.* (citation omitted).

Here, the proposed Settlement Class meets this requirement because the putative Settlement Class Members are objectively described, and many are readily identifiable, ascertainable by reference to publicly available information and, if necessary, confirmatory testing.

### b.  **Numerosity**

Numerosity exists when the proposed class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no set minimum number or "mechanical test for numerosity." *Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984) (citing *Kelley v. Norfolk & Western Ry. Co.*, 584 F.2d 34 (4th Cir. 1978)).

The numerosity requirement is easily met by the putative Settlement Class, which is projected to include over 14,000 PWS. (Dkt. No. 4080-1 at 49). *See, e.g.*, *Gunnells v. Healthplan Servs., Inc*., 348 F.3d 417, 425 (4th Cir.2003) (noting with approval the district court's observation that "1400 employees plus their families" "easily" satisfied Rule 23(a)(1)'s numerosity requirement).

### c. **Commonality**

Commonality exists when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires that a proposed class action have "the capacity...to generate answers" that "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011). Minor factual variances will not necessarily preclude commonality, so long as the claims arise from the same general set of facts and "the class members share the same legal theory." *Mitchell–Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 557 (D. Md. 2006); *see also Jeffreys v. Commc'ns Workers of Am., AFL–CIO*, 212 F.R.D. 320, 322 (E.D. Va. 2003). Plaintiffs certifying a class under Rule 23(b) carry a related, but more demanding, burden of proving that these common questions of law or fact not only exist, but also "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Because the predominance inquiry is "more stringent," that analysis may "subsume[ ]... or supersede[ ]" the Rule 23(a)(2) commonality analysis. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting *Windsor*, 521 U.S. at 609).

The Court finds that the putative Settlement Class meets this requirement. Plaintiffs' claims arise from similar, if not identical, allegations that Defendants knew of the environmental and potential human health risks associated with exposure to PFAS, yet continued to develop, manufacture, distribute, and sell PFAS and products containing PFAS. (Dkt. No. 4080-1 at 50). Likewise, Plaintiffs and the preliminarily approved Settlement Class members have all alleged that Defendants failed to warn users, bystanders, or public agencies of the risks associated with their products that contained PFAS. (*Id.*). Plaintiffs and the Settlement Class Members' claims arise out of a common core of salient facts relevant to Defendants which, for reasons stated *infra*, predominate over any questions concerning only individual members such as damages.

### d. **Typicality**

The typicality prerequisite requires that the class representative "be part of the class and possess the same interest and suffer the same injury as the class members." *Lienhart*, 255 F.3d at 146 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). "Nevertheless, the class representatives and the class members need not have identical factual and legal claims in all respects." *Fisher v. Va. Elec. and Power Co.*, 217 F.R.D. 201, 212 (E.D. Va. 2003). The key inquiry is whether the "class representatives assert claims that fairly encompass those of the entire class, even if not identical." *Id.* To satisfy typicality, the plaintiff seeking to certify the class must show: "(1) that their interests are squarely aligned with the interests of the class members; and (2) that their claims arise from the same events and are premised on the same legal theories as the claims of the class members." *Jeffreys*, 212 F.R.D. at 322.

The Court finds that the Plaintiffs' claims are typical of those of the putative Settlement Class Members. Plaintiffs, like the Settlement Class Members, are PWS that have asserted claims for actual or threatened injuries caused by PFAS contamination. (Dkt. No. 4080-1 at 52). In addition, Plaintiffs and the Settlement Class Members rely on the same common core of facts to allege that Defendants knowingly sold defective PFAS and failed to warn of those defects, leading to the actual or threatened contamination of their respective Water Sources. (*Id.*). Plaintiffs and the Settlement Class Members also assert a common damages theory that seeks recovery of the costs incurred in testing, monitoring, remediating and/or treating their Water Sources, either to monitor for PFAS contamination or to remediate existing PFAS contamination from their Drinking Water. (*Id.*). Last, like the Settlement Class members, Plaintiffs allege that Defendants engaged in a scheme to fraudulently transfer assets to avoid potential liability for their role in manufacturing and selling PFAS and products containing PFAS. (*Id.*).

Certain class members object that the Class Representatives' claims are not typical for a variety of reasons, none of which the Court finds convincing. *See* (Dkt. No. 4080-1 at 117). First,

certain parties object that because only four of 17 Class Representatives "include wholesale water supply as part of their business," the Class Representatives' claims are atypical. The argument is unsound, however, because objectors admit the Class Representatives *include* wholesalers. *See Yates v. NewRez LLC*, No. CV TDC-21-3044, 2023 WL 5108803, at *7 (D. Md. Aug. 9, 2023) (certifying class where a single representative was sufficient to meet typical requirement of Rule 23(a)); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006) (noting that Rule 23 does not require that "the plaintiff's claims and the claims of class members be perfectly identical or perfectly aligned"). Further, the Court rejects objectors' contention that the Class Representatives' claims are atypical because they "only" represent 13 states and drinking water regulations vary. (Dkt. No. 4080-1 at 118). National classes are commonly settled without requiring representatives from all 50 states. *See, e.g.*, *In re All-Clad Metalcrafters, Cookware Mktg. & Sales Practices Litig.*, MDL 2988, 2023 WL 2071481 (W.D. Pa. Feb. 17, 2023); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752, 2020 WL 4212811 (N.D. Cal. July 21, 2020); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299 (N.D. Cal. 2018). Moreover, variations in state law do not preclude a finding of typicality. *In re: Mi Windows & Doors Inc. Prod. Liab. Litig.*, No. 2:12-MN-00001, 2015 WL 12850547, at *6 (D.S.C. July 22, 2015), *aff'd sub nom. In re MI Windows & Doors, Inc., Prod. Liab. Litig.*, 860 F.3d 218 (4th Cir. 2017) ("[D]espite possible state-by-state variations in the elements of these claims, they arise from a single course of conduct by [defendant] and a single set of legal theories."). Plaintiffs' claims are typical of those of Class Members, and the Court overrules objections to the contrary.

e. **Adequacy of Representation**

Last, the adequacy requirement is met when: (1) the named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are "qualified, experienced, and generally able to conduct the litigation." *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 238

14

(S.D.W. Va. 2005). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Windsor*, 521 U.S. at 625.

Plaintiffs meet this requirement. The Court finds that the Class Representatives have no interests antagonistic to those of the class, (Dkt. No. 4080-1 at 53) (noting that Plaintiffs, like the Settlement Class Members, "are PWS that have asserted claims for actual or threatened injuries caused by PFAS contamination") and Class Counsel are easily qualified, experienced, and able to conduct this litigation. (Dkt. No. 4080-1 at 53).

Certain objectors contend that conflicts exist between Class Representatives and Class Members, and within Phase One and Phase Two class members. (Dkt. No. 4080-1 at 121-22). For example, some objectors contend that conflicts *may* exist between various Phase Two class members depending on how much or the type of contamination each class member has. *See, e.g.*, (Dkt. No. 3960 at 22-23). The critique, however, ignores that *none* of the Phase Two class members (by definition) presently knows whether it has *any* contamination. Further, as described above, the Settlement Agreement is structured to ensure that all reasonable testing costs are covered for all class members, both those in Phase One and Phase Two, rendering this hypothetical conflict illusory. *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012) ("But perfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable. 'Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement.' Put another way, to forestall class certification the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole.") (internal citation omitted).

The Court rejects objectors' remaining arguments as they do not demonstrate a "conflict . . . so substantial as to overbalance the common interests of the class members as a whole." *See*

(Dkt. No. 4080-1 at 122) (noting some objectors contend conflicts exist "between retailers and wholesalers[2]; [] between class members with and without regulatory violations; [] between class members with well-researched or less-researched PFAS; and [] between class members that have PFAS with or without EPA-approved test methods."). These critiques ignore that the Allocation Procedures provide payment based on Impacted Water Sources. And as it concerns wholesalers and retailers, these critiques ignore that the Parties' Interrelated and Multiple PWS Guidance provide for recovery for Impacted Water Sources while preventing double recovery. (Dkt. No. 4080-1 at 91) (noting "the Claims Administrator is charged with apportioning the Allocated Amount in a way that is consistent with each entity's treatment costs so as to avoid double recovery for any one Water Source"); (C.A. No. 2:23-3230-RMG, Dkt. No. 45-1 at 1-6) (noting that the Settlement Agreement provides for one payment for each respective water supply, "not a double recovery by both the wholesaler and the retail customer" and that the Claims Administrator, subject to the Special Master's oversight, will "allocate and distribute the Settlement Funds" equitably, taking into account whether the wholesaler and retailer have come to an agreement as to how to divide the Settlement Amount or the manner by which relative capital and O&M costs of PFAS are borne by the entities respectively); (*Id.* at 3) (nothing that if the wholesaler opts out or is not in the settlement class but the retailer customer is, the retailer customer receives the recovery for the water if it is shown that it bears the PFAS treatment cost or vice-versa if the retail customer opts out or is not in the Settlement Class but the wholesaler is). At bottom, the allocation procedures described above in detail are "reasonable and rationale," *Feinberg v. T. Rowe Price Grp., Inc.*, 610 F. Supp. 3d 758, 769 (D. Md. 2022), as they compensate the entity responsible for treating PFAS while preventing double recovery.

---

[2] Wholesalers loosely define themselves as entities which "draw water from a source, treat water, and sell water to another entity that could be a retailer or could itself be wholesaler." (C.A. No. 2:23-3230-RMG, Dkt. No. 40-1 at 3-4).

Plaintiffs meet Rule 23's adequacy requirement.

### III.    Rule 23(b)(3)

In addition to meeting the threshold requirements of Rule 23(a), a plaintiff seeking class certification must prove the case qualifies as one of the three Rule 23(b) class types. In this case, Plaintiffs seek to qualify as a Rule 23(b)(3) class, which requires proof that: (1) common questions of law or fact predominate, and (2) a class action is the superior method of adjudication.

The Court finds that common questions of law or fact predominate because Plaintiffs and Settlement Class Members are PWS that claim to have been injured by a common course of conduct that resulted in substantially similar damages to Plaintiffs and the Putative Class Members. (Dkt. No. 4080-1 at 54). While damages may differ as to individual claimants, these differences pale in comparison to the otherwise common questions of law and fact that concern Defendants and which the Court described above.

Certain objectors claim that "individual claims dominate" because putative Class Members have varying amounts and types of PFAS and because some Class Members purchase water from wholesalers, while others do not. *See, e.g.*, (Dkt. No. 3690 at 19, 22-23) (also arguing Class Members are in all 50 states with "varying state laws and remedies"). These critiques, however, ignore that "[c]ritically[] Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." *See Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 273 (4th Cir. 2010) (observing that "while courts have properly denied class certification where individual damages issues are especially complex or burdensome, where, as here, the qualitatively overarching issue by far is the liability issue" commonality-predominance was met).    Further, objectors ignore that while variations in rights and remedies available to injured class members under different states' respective laws may represent a challenge to certification of a *litigation class*, those considerations dissipate in the face of a settlement. *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 301 (3d Cir. 2011)

(noting "variations in rights and remedies available to injured class members under the various laws of the fifty states [do] not defeat commonality and predominance" and "state law variations are largely 'irrelevant to certification of a settlement class'"); *Id.* at 304 & n.29 (observing the settlement "obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws" and "[u]nsurprisingly, we are not alone in recognizing the 'key' distinction between certification for settlement purposes versus litigation, and 'courts are more inclined to find the predominance test met [in the settlement context], even when there are differences in applicable state laws'"); *Smilow v. Southwestern Bell Mobile Systems, Inc.,* 323 F.3d 32, 40 (1st Cir. 2003) ("The individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3). Where ... common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.").

The Court further finds a class action to be the superior method of settling this case. (Dkt. No. 4080-1 at 54-55). The alternative to the efficiency achieved through the proposed settlement would be for federal judges in 94 judicial districts to adjudicate—over 14,000 times—claims concerning Defendants' alleged common course of conduct. *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2021 U.S. Dist. LEXIS 16470, *6 (D.S.C. Jan. 25, 2021) ("*Campbell*") ("The court must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court. Where . . . common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.") (internal quotation marks and citations omitted). Other factors strongly favor class wide resolution, including the expense, burden, risk, length of trial, and appellate proceedings were Settlement

Class Members to pursue individual litigation. *Stillmock*, 385 F. App'x at 275; *Campbell*, U.S. Dist. LEXIS 16470, at \*13 ("Similarly, there is a sufficient desirability to concentrate the litigation in the forum given its familiarity with the relevant issues as the transferee Court.").

## IV.    Settlement Agreement

Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class ... may be settled, voluntarily dismissed, or compromised only with the court's approval" and Rule 23(e)(2) requires that the Court find that a proposed settlement is "fair, reasonable, and adequate." Under Rule 23(e)(2), as amended in 2018, the Court considers whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;
(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
(iii) the terms of any proposed award of attorney's fees, including timing of payment; and
(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Rule 23(e)(2).    The primary concern addressed by this requirement is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations. *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

The Fourth Circuit "has developed multifactor standards for assessing whether a class-action settlement is 'fair, reasonable, and adequate' under Rule 23(e)(2)." *In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471, 484 (4th Cir. 2020).[3]    The Fourth Circuit has specified the following factors for assessing

---

[3] The Fourth Circuit's "factors for assessing class-action settlements almost completely overlap with

fairness: (1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the area of [the] class action litigation. *Id.* While the Fourth Circuit has "not enumerated factors assessing a settlement's reasonableness," it has specified factors for assessing its adequacy, including: (1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendant[ ] and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement." *Id.*

The Court first articulates its reasoning for finding that the Settlement Agreement satisfies Rule 23(e)(2) and *Jiffy Lube* before addressing objections on these points.

### a. **Fairness**

In determining a settlement's fairness, the Court considers: "(1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the area of [the] class action litigation." *Lumber Liquidators*, 952 F.3d at 484 (citing *Jiffy Lube*, 927 F.2d at 159). "The fairness analysis is intended primarily to ensure that a 'settlement [is] reached as a result of good-faith bargaining at arm's length, without collusion.'" *Berry v. Schulman*, 807 F.3d 600, 614 (4th Cir. 2015) (citing *Jiffy Lube*, 927 F.2d at 159); *see also Edelen v. Am. Residential Servs., LLC*, Civ. No. DKC 11-2744, 2013 WL 3816986, at *8 (D. Md. July 22, 2013) ("The 'fairness' prong

---

the new Rule 23(e)(2) factors." *In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471, 484 & n.8 (4th Cir. 2020); *see also Herrera v. Charlotte Sch. of L., LLC*, 818 F. App'x 165, 176 n.4 (4th Cir. 2020) ("Federal Rule of Civil Procedure 23(e)(2) has been amended and now sets forth factors for the district court to assess in evaluating fairness, reasonableness, and adequacy. Recognizing that, this Court continues to apply its own standards as they almost completely overlap with the new Rule 23(e)(2) factors, rendering the analysis the same.").

is concerned with the procedural propriety of the proposed settlement agreement."); Rule 23(e)(2)(B).

The Court finds the settlement is fair, and all factors weigh in favor of this finding. The settlement was reached through good faith bargaining at arm's length without collusion; there is nothing in the record to suggest otherwise. The posture of the MDL and the extent of discovery weigh in favor of this finding: this MDL has been, and continues to be, vigorously litigated by all parties, and Plaintiffs and Defendants only reached a settlement regarding PWS after extensive discovery was completed and motions for summary judgment and motions in limine were ruled on in *City of Stuart*. Further, settlement only occurred with the help of a court-appointed mediator, Judge Layn Phillips (Ret.), and only after years of negotiation. Last, Class Counsel are undoubtedly experienced and highly qualified mass tort litigators.

### b. **Adequacy**

In assessing the adequacy of a proposed settlement, the Court must consider: "(1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendant[ ] and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement." *Lumber Liquidators*, 952 F.3d at 484 (citing *Jiffy Lube*, 927 F.2d at 159). "The most important factors in this analysis are the relative strength of the plaintiffs' claims on the merits and the existence of any difficulties of proof or strong defenses." *Sharp Farms v. Speaks*, 917 F.3d 276, 299 (4th Cir. 2019). The focus of the adequacy prong is "the agreement's substantive propriety." *Edelen*, 2013 WL 3816986, at *8 (citations and quotations omitted); Rule 23(e)(2)(C).

The Court concludes that the proposed settlement is adequate. The first two factors—the relative strength of Plaintiffs' case on the merits and the existence of any difficulties of proof or

strong defenses the Plaintiffs are likely to encounter if the case goes to trial—weigh in favor of such a finding. While Plaintiffs are "confident" in the strength of their allegations and supporting evidence, they acknowledge that Defendants are responsible for "only three to seven percent of the MDL defendants' total alleged PFAS-related liabilities," (Dkt. No. 4080-1 at 63); (*Id.* at 14) (explaining Defendants did not produce AFFF but either "manufactured and sold raw materials . . . that were incorporated into fluorosurfactants used in various AFFF concentrates" or, beginning in 2002, "began to manufacture fluorosurfactants themselves" until 2015, certain of which were incorporated into AFFF concentrates manufactured and sold by third-parties), and that success at trial is far from secured. *S.C. Nat. Bank v. Stone*, 139 F.R.D. 335, 340 (D.S.C. 1991) (settlement favored because "the ultimate resolution of the numerous and significant factual and legal issues poses risks to both sides"); (Dkt. No. 4262 at 23-24) (Class Counsel admitting that determining "whether a particular manufacturer used a DuPont product" "gets very complicated" and that the "beauty of this settlement is you don't have to prove … causation." Class Counsel also acknowledged that statutes of limitations and repose presented serious challenges for individual claimants electing to litigate their claims outside of the Settlement Agreement.).

The third and fourth factors—the anticipated duration and expense of additional litigation and Defendants' solvency—also weigh in favor of settlement. If not approved, Settlement Class Members would be years, if not a decade, away from litigating and reaching finality in their own cases despite the likely need to soon "comply with the pending EPA MCLs for PFAS." *See* (Dkt. No. 4080-1 at 64). Further, preparing an individual case for trial would require engaging expert witnesses "at a cost totaling hundreds of thousands of dollars," and any judgment for a Class Member would likely be subject to lengthy appeals while the Settlement Agreement provides "immediate results and benefits to Settlement Class Members." (*Id.* at 64-65). Additionally, though there is no indication Defendants are insolvent, this MDL has caused other defendants to file for

bankruptcy. *See* (Dkt. No. 3122) (Suggestion of Bankruptcy for Kidde-Fenwal, Inc., claiming assets in the $100-$500 million range and liabilities in the $1,000,000,001 to $10 billion range).

The lack of substantive opposition to the Settlement Agreement also weighs in favor of finding it adequate.  Regarding opt-outs, of the roughly 14,000 Settlement Class Members, approximately 924 PWS properly opted out, representing but 6.6% of the class. (Dkt. No. 4467 at 2-3).[4]  Additionally, only 25 parties filed objections. (Dkt. No. 4080-1 at 74) (noting two objectors do not even claim to be Class Members).  As discussed *infra*, said objections are largely duplicative and, more importantly, lack merit.  The Court thus finds the degree of opposition to the Settlement Agreement small.  Accordingly, this factor weighs in favor of approval. *See, e.g.*, *McAdams v. Robinson*, 26 F.4th 149 (4th Cir. 2022) (affirming district court's approval of a settlement where only 0.04% of the class objected); *Herrera v. Charlotte Sch. of Law, LLC*, 818 Fed. Appx. 165 (4th Cir. 2020) (affirming district court's approval of settlement where only 4% of the class objected); *In re The Mills Corp. Securities Litigation*, 265 F.R.D. 246, 257 (E.D. Va. 2009) (noting that "an absence of objections and a small number of opt-outs weighs significantly in favor of the settlement's adequacy.").

c.  **Reasonableness**

The Fourth Circuit has not enumerated factors for assessing reasonableness. *1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 527 (4th Cir. 2022). However, it has "suggested that assessing whether a class settlement is 'reasonable' involves examining the amount of the settlement." *Id.* (citing *Sharp Farms v. Speaks*, 917 F.3d 276, 303–04 (4th Cir. 2019)). "To the extent that reasonableness does any work not already performed by one of the other Rule 23(e)(2) requirements, [ ] it at least ensures that the amount on offer is commensurate

---

[4] Because PWS may withdraw their election to opt out on or before March 1, 2024, (C.A. No. 2:23-cv-3230, Dkt. No. 144), this figure may decrease in the following weeks.

with the scale of the litigation and the plaintiffs' chances of success at trial." *Id.* The Fourth Circuit has "never required [ ] an estimate" of what the class members would have received had they prevailed at trial. *McAdams v. Robinson*, 26 F.4th 149, 160 (4th Cir. 2022). Further, the Court is not required to "decide the merits of the case nor substitute its judgment of what the case might be worth for that of class counsel," rather "the court must at least satisfy itself that the class settlement is within the 'ballpark' of reasonableness." *Id.* (quotations and citations omitted).

The pertinent agreement is the Settlement Agreement, Rule 23(e)(2)(C)(iv), under which Defendants will pay $1.185 billion to settle the claims of roughly 14,000 PWS across the United States. The only other agreement between the Parties concerns Defendants' Walk-Away rights and this document was filed under seal. (C.A. No. 2:23-cv-3230, Dkt. Nos. 10, 12). As described in detail above, putative Class Members are divided between Phase One and Phase Two Class Members. Phase One Qualifying Class Members will be allocated 55% of the Settlement Amount while Phase Two Qualifying Class Members will be allocated 45% of the amount. (Dkt. No. 4080-1 at 23).

The Parties arrived at this division with the assistance of Timothy G. Raab, specialist in Disputes and Investigation, and a Managing Director at Alvarez and Marsal. (Dkt. No. 3393-12 at 2-6). Raab's analysis was based upon public information provided by Class Counsel and included: (a) state data showing PFAS detections and non-detections in certain PWS; (b) the EPA's Third Unregulated Contaminant Monitoring Rule (UCMR 3) data showing PFAS detections and non-detections of the PWS that were subject to UCMR 3; (c) information regarding the PWS that are currently subject to UCMR 5 and applicable state or federal laws; and (d) PWS identified in SDWIS. Based on this information, Raab identified the known Phase One members of the Settlement Class and compared them to the number of PWS that either have not yet tested for PFAS or have not reported a PFAS detection and would also meet the proposed Phase Two Class

definition. From this analysis, Raab determined that based on mathematical principles it is more likely than not that 64% of the members of the Settlement Class would meet the Phase One Class definition and 36% would meet the Phase Two Class definition. To be conservative and account for any discrepancies in data, he then concluded that it would be fair, reasonable and adequate to estimate that 55% of the members of the Settlement Class would fall under the Phase One Class definition and 45% would fall under the Phase Two Class definition. (*Id.*).

The Settlement Amount will be distributed through the Allocation Procedures. (Dkt. No. 4080-1 at 25); *see* Rule 23(e)(2)(C)(ii). The Allocation Procedures represent an "objective formula that [will] score a Qualifying Settlement Class Member's Impacted Water Source(s) using factors considered when calculating the real-world costs for the installation of PFAS treatment systems"— namely flow rate and the degree of PFAS concentration. (Dkt. No. 4080-1 at 29); (C.A. No. 2:23-3230, Dkt. No. 4-3 at 8-10) (describing the development of the Allocations Procedures with Drs. Michael Trapp and Prithviraj Chavan of Atkins Global, an engineering firm specializing in water supply infrastructure).

As to attorneys' fees, Class Counsel has moved by separate motion for 8% of the Settlement Amount in Class Counsel Fees. (Dkt. No. 3795). Though the Court will address an award of attorneys' fees at a later date, it bears noting that no party objected to Class Counsel's request for attorneys' fees and that the Settlement Agreement itself does not provide a set amount or even a range of attorneys' fees, placing the matter entirely into the Court's hands for determination.

The Court finds that the Settlement Agreement is reasonable. *See* Rule 23(e)(2)(C)(i). As discussed at length above, success against Defendants, which "are responsible for only three to seven percent of the MDL defendants' total alleged PFAS-related liabilities," (Dkt. No. 4080-1 at 63), is not guaranteed and would only come, if ever, after years of protracted, expensive, complex litigation. The Settlement Agreement provides money not only to parties already affected by

PFAS, but to those which may be affected soon. The Settlement Agreement utilizes Allocation Procedures objectively derived from flow rates of Impacted Water Sources and PFAS concentrations which will be employed to allocate funds among Eligible Class Members under the guidance of the Court-Appointed Claims Administrator, himself under the oversite of the Court-appointed Special Master. (*Id.* at 71). The Settlement Agreement treats class members equitably relative to each other based on objective criteria, *see* Rule 23(e)(2)(D), and the fact the parties did not set attorneys' fees or even a range of fees weighs in favor of finding the Settlement Agreement is reasonable. *See Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 845 (E.D. La. 2007) (noting that "[b]ecause the parties have not agreed to an amount or even a range of attorneys' fees, and have placed the matter entirely into the Court's hands for determination, there is no threat of the issue explicitly tainting the fairness of settlement bargaining").

### d.   Objections to the Settlement Agreement

The Court now addresses objections regarding whether the Settlement Agreement satisfies Rule 23(e).[5] *See, e.g.*, (Dkt. Nos. 3995, 3960, 3962, 3968, 3972, 3997). Said objections overlap substantially. The Court further notes that the principal objections to the Settlement Agreement were most fully expressed in the Cities of Vancouver, Washington, DuPont, Washington, Tacoma, Washington, and the North Texas Municipal Water District (the "Cities")'s filings—entities all represented by the Marten Law Firm. Attorneys from the Marten Law Firm appeared at the Fairness Hearing on behalf of the Cities. Counsel for the Marten Law Firm clarified that the Cities were not asking the Court to reject the Settlement Agreement. (Dkt. No. 4262 at 89-90) ("The Court: And the question is, are you recommending I reject the settlement? Mr. Kray: We are not, Your Honor. We are recommending that there a few things that should be addressed.").

---

[5] As Plaintiffs note, 17 of the 25 objections lodged were by filed by a single law firm on behalf of 17 individual clients and said objections were, for the most part, nearly identical. (Dkt. No. 4080-1 at 74).

First, objectors contend that the Settlement Agreement must be rejected because it does not compare the value of the settlement to the damages that could have been obtained at trial. *See* (Dkt. No. 3960 at 23, 26) ("The lack of a bellwether trial renders the DuPont Agreement unfair and inadequate.").

The Court rejects this argument because Fourth Circuit case law does not require a trial on the merits as a prerequisite to settlement. *See, e.g.*, *McAdams v. Robinson*, 26 F.4th 149, 160 (4th Cir. 2022) (affirming approval of settlement and rejecting objector's contention that because a magistrate judge "failed to make a rough estimate of what class members would have received had they prevailed at trial" the settlement was not adequate); *Id.* (noting the court had "never required such an estimate" and was "not persuaded to impose this new requirement"); *Boger v. Citrix Sys., Inc.*, No. 19-CV-01234-LKG, 2023 WL 3763974, at *6 n.5 (D. Md. June 1, 2023) (noting the Fourth Circuit has never required an estimate of what class members would have received had they prevailed at trial); *see also McAdams*, 26 F.4th at 160 (noting that even in circuits which purportedly require an estimate of what class members would have received at trial, such proof is not "require[d] . . . in every case) (citing *Lusk v. Five Guys Enters. LLC*, No. 17-cv-00762, 2019 WL 7048791, at *7 (E.D. Cal. Dec. 23, 2019) (explaining that a rough estimate of a plaintiff's recovery is "meaningless" when one of its components lacks "factual and evidentiary foundation")).

Second, objectors claim that the Settlement Amount is not adequate because "it pales in comparison to the PFAS-related damages that Defendants have caused across the country while controlling between 3 and 7 percent of the historical PFAS market." (Dkt. No. 3960 at 23-24).

The argument fails for a few reasons. As noted above, the Settlement Agreement satisfies all *Jiffy Lube* factors related to adequacy. Further, as the Fourth Circuit has stated, the fact that a cash settlement "'may only amount to a fraction of the potential recovery' will not per se render

the settlement inadequate or unfair." *Flinn*, 528, F.2d at 1173-74. Additionally, by way of example, Class Counsel notes that the City of Stuart sought $1.7 million against Defendants at trial and would be entitled to $1,686,581.00 under the Settlement Agreement, (Dkt. No. 4080-1 at 86); (Dkt. No. 4262 at 63), emphasizing the adequacy of the Settlement Agreement.

Third, objectors contend that the Settlement Amount is not properly allocated between Phase One and Phase Two Class members or between wholesalers and retailers. *See, e.g.*, (Dkt. No. 3960 at 27). Objectors claim that: (1) when a retail water supplier obtains treated water from a wholesale supplier, it may not obtain funds, even if PFAS enters their system; (2) when a retailer treats the water they may receive the full potential allocation even though the wholesaler may face costs related to contamination; (3) the allocation between Phase One and Phase Two Claimants provide more funding for Phase One, even if Phase Two claimants discover greater contamination; and (4) the methodologies used by Class Counsel may have vastly undercounted and therefore undercompensated Phase One. (Dkt. No. 4080-1 at 90). As to the first two objections, the contentions ignore the above discussed interpretative guidance and allocation procedures implemented by the Settlement Agreement. As to the third point, Plaintiffs correctly note that objectors provide no empirical support for their argument and that the current 45% allocation to Phase Two Class Members is based on a conservative estimate regarding allocation by a "highly-esteemed expert in liability forecasting," refuting any basis for finding the Settlement Agreement unfair. Last, as to point (4), Plaintiffs note their expert considered the specific criticism lodged on this point and estimated a 39% detection rate for UCMR5, even though the EPA has only released 7% of the total anticipated UCMR 5 data which, to date, demonstrates a 20% detection rate.

Fourth, objectors argue the Release is overbroad. (Dkt. No. 4080-1 at 92 & n. 267); *e.g.*, (Dkt. No. 3997). Objectors contend the release is overbroad because it: (a) includes almost all wastewater and stormwater relating to separate facilities or real property; (b) includes parties that

never assented to settle; (c) releases claims that do not share an "identical factual predicate"; (d) releases claims for unknown PFAS; and (e) release personal injury claims.

As to point (a), the Settlement Agreement states that Plaintiffs have "suffered harm resulting from the presence of PFAS in Drinking Water" and allege that "Settling Defendants are liable for damages and other forms of relief to compensate for such harms." (Dkt. No. 4080-1 at 93). The Settlement Agreement then provides an exception to the Release "where a Settlement Class Member also owns real property or owns or operates a facility that is separate from and not related to a Public Water System and does not provide Drinking Water (e.g., a separate wastewater or stormwater system or airports or fire training facilities that are not related to a Public Water System)." (*Id.*). In such instances, "[c]laims relating to the discharge, remediation, testing, monitoring, treatment or processing of stormwater and wastewater at or by such separate real property or facility" are "preserved to the extent such Claims seek damages not arising from or relating to alleged harm to Drinking Water." (*Id.*). The Parties have clarified that the phrase "separate real property or facility" means "*separate from and not physically related to.*" (C.A. No. 2:23-cv-3230-RMG, Dkt. No. 10-7-1 at 1-2) (emphasis added). Given the types of claims the Settlement Agreement aims to resolve, the above definition of "separate real property or facility," and the fact the release applies only to PFAS that had already entered a PWS before the Settlement Date, *see* (Dkt. No. 4080-1 at 96-97), it is clear objectors' contention on this point is factually incorrect, and the Court overrules it.

As to point (b), the pertinent language is Section 12.1.3(y), which states that "any Releasing Person that is not a Public Water System but that is *legally responsible for funding (by statute, regulation, other law, or contract) or that has authority to bring a Claim on behalf of, or to seek recovery for harm to, a Public Water System in the Settlement Class* [...] gives the release only to the extent of Claims that seek to recover for alleged harm to such Public Water System." (Dkt. No.

4080-1 at 99) (emphasis added).

 "[C]lass action settlements have in the past released claims against non-parties where, as here, the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against the parties to the action being settled." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 109 (2d Cir. 2005) (citing *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *11 (S.D.N.Y. Nov. 26, 2002)); *see, e.g., In re Holocaust Victim Assets Litig.,* 105 F.Supp.2d 139, 143, 160–65 (E.D.N.Y.2000) (approving class settlement with broad releases against non-parties, including insurance carriers, other banks, and Swiss governmental entities); *see also* 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 12:16, at 318 (4th ed. 2002) ("A settlement may ... seek to discharge parties who have not been served with process and are therefore not before the court.").

In *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Prods. Liab. Litig.*, the definition of releasing parties included not only the settlement class member Volkswagen dealers, but "any other legal or natural persons who may claim by, through, or under them" to prevent against double recovery. 2018 WL 1588012, at *8 (N.D. Cal., 2018). Such scope— arguably broader than the language here—was permissible, on the logic that "[b]ecause the Intervenor Plaintiffs each assert claims 'by, through, or under [the class members], they are Releasing Parties under the settlement agreement." *Id.* (internal citations omitted).

The Court overrules objections on this point. As the above case law demonstrates, the fact the Release releases claims against nonparties does not render the Settlement Agreement per se unreasonable. Objectors put forth no case law to the contrary.  In sum, to avoid double recovery, the "Releasing Parties must necessarily include any who may have a stake in recovery". (Dkt. No. 4080-1 at 100).

As to points (c) and (d), objectors state that because the Settlement Agreement releases

claims for unknown PFAS, it is unreasonable. *See* (Dkt. No. 4080-1 at 101). Section 2.38 of the

Settlement Agreement reads:

> "PFAS" includes, for purposes of this Settlement Agreement only, any fluorinated
> organic substance that contains one or more carbon atoms on which at least one of the
> hydrogen substituents has been replaced by a fluorine atom, and which is included in
> the United States Environmental Protection Agency's list of "Per- and Polyfluoroalkyl
> Substances" to be monitored in its fifth Unregulated Contaminant Rule, codified at 40
> C.F.R. § 141.40(a)(3) or is a per- or polyfluoroalkyl ether-based substance. Solely for
> purposes of this Agreement, "PFAS" also includes, in addition to all substances
> described in the preceding sentence (along with each substance's conjugate acid and
> any salts, derivatives, isomers, or combinations thereof), perfluorooctanoic acid
> ("PFOA"), per- and polyfluoroalkyl acids (and any salts thereof), per- and
> polyfluoroalkyl halides, per- and polyfluoroalkyl alcohols, per- and polyfluoroalkyl
> olefins, per- and polyfluoroalkane sulfonyl fluorides (including any acids and salts
> thereof), perfluoroalkyl iodides, per- and polyfluoroalkyl ether-based substances,
> fluoropolymers, perfluoropolyethers, per- and polyfluoroalkanes, side-chain
> fluorinated aromatics, per- and polyfluorinated phosphates and phosphonates, per-
> and polyfluorinated sulfonamides, per- and polyfluorinated urethanes, and chemical
> precursors and degradation products of all such substances, including fluorinated
> monomers, polymers and side-chain fluorinated polymers and metabolites of all such
> substances, as well as any substance asserted to be PFAS in Litigation. It is the
> intention of this agreement that the definition of PFAS be as broad, expansive, and
> inclusive as possible.

(C.A. No. 2:23-cv-3230, Dkt. No. 4-2 at 7-8). The Releasing Parties are also bound by § 12.1.1(ii)

and release Claims "that arise from or relate to the development, manufacture, formulation,

distribution, sale, transportation, storage, loading, mixing, application, or use of PFAS alone or in

products that contain PFAS as an active ingredient, byproduct, or degradation product, including

AFFF." Objectors argue that the Settlement Agreement cannot release claims related to all forms

of PFAS because the released claims lack an identical factual predicate with this litigation.

A court can approve a release of claims that share an "identical factual predicate" with

claims alleged in a case. *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015). Claims have an

"identical factual predicate" when they "depend[ ] upon the very same set of facts." *TBK Partners,*

*Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982) (quoting *Nat'l Super Spuds, Inc. v. N.Y.*

*Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981)).

The Court finds that the release of claims for unknown PFAS shares an identical factual predicate with those for the release of PFOA. As a preliminary matter, it bears noting that the only Released Claims are those concerning PFAS contamination of PWS *before* the Settlement Date. (Dkt. No. 4080-1 at 96, 101).  It further bears noting, as discussed above, that the release of claims for all types of PFAS arises from allegations that Defendants knew of the environmental and potential human health risks associated with exposure to PFAS, yet continued to develop, manufacture, distribute, and sell PFAS and products containing PFAS.  Additionally, as Class Counsel observes, the compensation provided by the Settlement Agreement is directly tied to the cost of treating such contamination and, regardless of the type of PFAS present in a Water Supply, "treatment [is] by the same method[]." *See* (*id.* at 102) (further noting that while PFAS includes many different types of chemicals, only 200 are commercially available). The one case objectors cite in support of their argument is distinguishable, as it found no identical factual predicate between released Telephone Consumer Protection Act Claims ("TCPA") and Fair Debt Collection Practices Act and Florida Consumer Collection Practices Act claims. *Canter v. Midland Credit Mgmt., Inc.*, No. 314CV02939MMAMDD, 2017 WL 2817065, at *3 (S.D. Cal. June 28, 2017) (no identical factual predicate because non-TCPA claims did not require use of "an ATDS, artificial or prerecorded voice, or any automated technology").  Here, there is no fundamental element lacking between releasing claims for PFOA and all types of PFAS.  The broad release sought by the Parties is commensurate with both the Settlement Amount, the Parties' desire to avoid double recovery, and the Parties' need for finality.

As to point (e), the Court rejects the contention that the Settlement Agreement improperly "releases" personal injury claims. PWS are not natural persons and cannot have personal injury claims of their own. (Dkt. No. 4080-1 at 102). Further, the Settlement Agreement does not purport to release any individual's personal injury claims.  Contentions to the contrary knowingly ignore

the text of the Settlement Agreement and objections on this basis are overruled.

The Settlement Agreement does, however, require Releasing Parties to release contribution and indemnity claims against Defendants if the PWS is the subject of suits by injured individuals for personal injury claims. (*Id.* at 103.)  Such a release is common, however, in class action suits and objectors cite no case law holding that such a provision precludes a Court from finding a settlement is fair, adequate, or reasonable. *Caudle v. Sprint/United Management Company*, 2019 WL 2716291, at *4 (N.D. Cal., 2019) (approving release of indemnity claims arising from claims that are part of settlement); *Rieckborn v. Velti PLC*, 2015 WL 468329, at *10 (N.D. Cal., 2015) (same); *see also In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir.2001) ("It is now settled that a judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action."). At bottom, the instant objection is less a challenge to the Settlement Agreement under Rule 23(e)(2) than a qualitative disagreement with the Settlement Agreement couched as a legal objection.

Fifth, the Leech Lake Band of Ojibewe (the "Band") raises certain objections concerning federally recognized Indian tribes. (Dkt. No. 4080-1 at 108.)  The Band objects that the Parties' Tribal Guidance is "too vague" and contends the following questions remain unanswered:

> (1) Are claims for remediation and/or damages resulting from PFAS contaminated natural resources, such as fish, game, and crops (including wild rice) covered by the Releases?; (2) If a Tribe opts out some Public Water Systems but has others remain in the Class, does the Tribe release all the Tribe's claims, for fish, game, crop, and soil remediation and/or damages?; (3) Do the release provisions excluding real property claims also exclude releases of natural resource claims in connection with real property?; (4) Are claims seeking remediation, monitoring, and/or damages related to costs, such as supplying bottled water, incurred by Tribes and Tribal Health Organizations as a result of PFAS contamination in a Public Water System, covered by the Releases and Covenants Not to Sue?; and (5) How does the Claims-Over provision of each Settlement impact Tribal Class Members? Tribal Class Members? (As sovereign nations, federally recognized Tribes are more akin to states or the federal government than to cities, counties, or water districts. Sovereign nations have different responsibilities, needs, and concerns than a city, county, or water district. If a Tribe remains in a settlement class, it is unclear whether the Claims-Over provisions shift liability from DuPont onto the Tribe.

(Dkt. No. 4063-1 at 2-7).

The answers to questions 1-3 are explicitly treated by the Release Guidance, (C.A. No. 2:23-cv-3230-RMG, Dkt. No. 107-1 at 1-2) (noting that the words "separate from and not related to [in the Release clause]" means "separate from and not physically related to"). As to question 4, the Settlement Agreement's establishment of the Special Needs Funds, discussed in detail *supra*, again answers the Band's inquiry.  Last, as to question 5, Plaintiffs correctly note that in "advancing its objection, the Band answers its own question . . .  namely, there is no difference between the application of the Claims-Over provision to the Band and its application to any other Settlement Class Member." (Dkt. No. 4080-1 at 107) (further noting that nothing in the Settlement Agreement bars the defense of sovereign immunity or tribal sovereign immunity).  At bottom, the Band's objections concern questions explicitly answered by the Settlement Agreement itself or the Parties' joint guidance and do not come close to undermining the Court's finding the Settlement Agreement is fair, reasonable, or adequate.

Sixth, objectors contend that because the Settlement Agreement does not "specify a set-off" method, it is per se invalid under Fourth Circuit law. *See, e.g.*, (Dkt. No. 4081-5 at 23). Objectors rely on *Jiffy Lube* in support of this argument.

In *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155 (4th Cir. 1991), the district court approved a settlement of federal Exchange Act claims which provided that the nonsettling defendant's judgment reduction would be "based on controlling legal principles in effect at the time." *Id.* at 160. The Fourth Circuit reversed, reasoning that the failure to determine a specific judgment reduction method at the time of settlement prejudiced the nonsettling defendant. *Id.* at 160–62. The court observed that the setoff formula "determines to a large extent the manner in which a defense should be made at trial." *Id.* at 161. For example, the settling defendants' extent of fault compared

to the nonsettling defendant's "is either highly relevant (under the proportionate rule), minimally important (under the pro rata rule), or not important at all (under the pro tanto rule)." *Id.* (internal quotation marks omitted). A nonsettling defendant "is entitled to know what the law of the case is in advance of trial, not on the eve, after discovery is concluded and witnesses have been prepared." *Id.* Further, the failure to designate a setoff formula "exposes [the nonsettling defendant] to the risk of receiving inadequate credit for the contribution bar imposed on it." *Id.* The court noted that while "there is certainly some risk involved under any of the [judgment reduction] methods the [district court] might have chosen, … choosing a method at least allows the parties to know what the nature of that risk is." *Id.*

The Court rejects objections on this point.  The Settlement Agreement provides at paragraph 12.7 for a set off and judgment reductions in subsequent actions against non-settling defendants which would operate "under applicable law." (Dkt. No. 4080-1 at 115).  The Fourth Circuit approved of similar language as it applied to state-law claims in *Jiffy Lube*. 927 F.2d at 160; *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 176 F.R.D. 158, 182 (E.D. Pa. 1997) ("State statutes and court decisions differ as to what form the judgment credits should take. Certain states require a proportionate share reduction, others apply a *pro tanto* judgment credit and some states give a *pro rata* credit. Regardless of the applicable jurisdiction, under this agreement, non-settling defendants will receive, at a minimum, a set-off or judgment reduction consistent with state law. Allowing non-settling defendants the benefit of whatever judgment reduction that is required under state law is fair and reasonable.").

Objectors also take issue with the Claim-Over provision and argue it functions as an unlimited indemnity for Defendants' benefit which would violate state constitutions and statutes "that regulate the circumstances and procedures under which municipalities and other political subdivision may assume debt." *See, e.g.*, (Dkt. No. 3960 at 10).

Sections 12.7.1 and -.2 read:

12.7.1. The Order Granting Final Approval will specify that the Settlement is a good-faith settlement that bars any Claim by any Non-Released Person against any Released Person for contribution, indemnification, or otherwise seeking to recover any amounts paid by or awarded against that Non-Released Person to any Releasing Person by way of settlement, judgment, or otherwise (a "Claim-Over") on any Claim that would be a Released Claim were such Non-Released Person a Settling Defendant, to the extent that a good-faith settlement (or release thereunder) has such an effect under applicable law.

12.7.2. If a Released Claim asserted by a Settlement Class Member gives rise to a Claim-Over against a Released Person and a court determines that the Claim-Over can be maintained notwithstanding the order referenced in Paragraph 12.7.1, the Settlement Class Member shall reduce the amount of any judgment it obtains against the Non-Released Person who is asserting the Claim-Over by whatever amount is necessary, or take other action as is sufficient, to fully extinguish the Claim-Over under applicable law. Nothing herein prevents a Settlement Class Member from pursuing litigation against a Non-Released Person and collecting the full amount of any judgment, except to the extent it is necessary to protect the Released Person to fully extinguish a Claim-Over under applicable law.

(C.A. No. 2:23-cv-3230-RMG, Dkt. No. 4-2 at 35); (C.A. No. 2:23-cv-3230-RMG, Dkt. No. 30-1 at 2).

The Court overrules objections on the above point. Section 12.7.1 precludes a non-settling defendant who is ordered to pay a Settlement Class member from recovering that amount from Defendants, who have already paid this Settlement Agreement. And while 12.7.2 permits a Settlement Class member to sue a non-settling defendant, recovery is reduced by the amount it has *already* received from Defendants. As objectors admit, such provisions are common and "widely used" in multi-party litigation. Further, these provisions are necessary to encourage settlement of complex litigation—such as the instant matter—which would otherwise linger for years. *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 176 F.R.D. 158, 182 (E.D. Pa. 1997). Objectors' reading of the above provisions distorts its plain language, and the Court rejects the contention that said provisions "significantly increase the Releasing Persons' potential exposure to further loses." (Dkt. No. 4080-1 at 117 & n. 322).

Last, objectors argue that the Notice provided to putative Class Members was insufficient and that they lacked adequate time to consider the terms of the Settlement Agreement. Specifically, objectors argue that the Parties' Interrelated Guidance constituted an improper late amendment, which required additional notice and an unquantified amount of additional time for putative Settlement Class Members to consider. *See, e.g.*, (Dkt. No. 3960 at 15); Interrelated Guidance, (Dkt. No. 2:23-cv-3230-RMG, Dkt. No. 45-1) (filed on October 25, 2023 and accepted by the Court on October 26, 2023).

Material alterations to a class settlement generally require a new round of notice to the class and a new Rule 23(e) hearing. *Pearson v. Target Corp.*, 893 F.3d 980, 986 (7th Cir. 2018) (citing *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 & n.10 (3d Cir. 2013)). This requirement "may be implicated when class counsel seeks to bargain away the right to enforce portions of a previously entered settlement." *Keepseagle v. Vilsack*, 102 F.Supp.3d 306, 313–14 (D.D.C. 2015).

As a preliminary matter, the Court finds that the Interrelated Guidance is not "substantive" in nature such that accepting said guidance "contradict[s]" the Court's preliminarily approval findings. The Interrelated Guidance instead confirmed what it appears wholesalers and retailers already understood to be true—that the Settlement Agreement applied to them. (2:23-cv-3230-RMG, Dkt. No. 40-2 at 4) ("The text of the Proposed Settlement[] appears to weigh in favor of binding qualifying wholesalers as settlement class members."). The Interrelated Guidance further confirmed that the Claims Administrator, already vested with discretionary authority under the Settlement Agreement, would allocate and distribute Settlement Funds amongst wholesalers and retailers in a manner consistent with the Allocation Procedures. (Dkt. No. 2:23-cv-3230-RMG, Dkt. No. 45-1 at 1-2). Objectors provide no concrete argument as to how said guidance "materially" altered the Court's preliminary approval analysis or "bargained away" their right to enforce any part of the preliminarily approved Settlement Agreement. Relatedly, the Court rejects

objectors' conclusory assertion that "eligible class participants have not received adequate notice of" the Interrelated Guidance. The assertion is belied by the fact that the Interrelated Guidance was drafted in direct response to Metropolitan Water District of Southern California and the North Texas Municipal Water District (collectively "Wholesalers")'s October 10, 2023 motion to intervene. (Dkt. No. 2:23-cv-3230-RMG, Dkt. No. 40).

Relatedly, the Court rejects the contention that there was not enough time for interrelated systems to meaningfully evaluate the Settlement Agreement.  The Settlement Agreement was filed on the docket on July 10, 2023 and the Notice Plan began on September 5, 2023.  The opt-out deadline was December 4, 2023, giving parties 91 days between the beginning of the notice period and the opt-out deadline to decide whether to accept the Settlement Agreement.  Wholesalers were clearly aware of the Settlement Agreement as they contacted Class Counsel in early October regarding it. (2:23-cv-3230-RMG, Dkt. No. 40-2 at 4). Thus, the Court rejects the argument that Wholesalers did not have enough time to evaluate the Settlement Agreement. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 240-41 (D.N.J. 1997) (rejecting argument that the opt out period of 46 days was too short, precluding class members of meaningful review of the Proposed Settlement and collecting cases holding that an opt-out period of thirty to sixty days is appropriate); *Ashley v. GAF Materials Corp. (In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.)*, No. 8:11-mn-02000, 2014 U.S. Dist. LEXIS 183679, at *34-35 (D.S.C. Oct. 15, 2014) (stating that "[p]eriods of approximately two (2) months for opting out have been approved in other cases.")

## Conclusion

For the reasons stated above, the Court **GRANTS** Class Counsel's motion for final approval of class settlement and final certification (Dkt. No. 4080).

**AND IT IS SO ORDERED**

February 8, 2024
Charleston, South Carolina

<u>s/Richard M. Gergel</u>
Richard M. Gergel
United States District Judge