**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | MDL No. 2:18-mn-2873-RMG<br><br>**This Document Relates to<br>ALL CASES** |

**MEMORANDUM OF POINTS AND AUTHORITES SUPPORTING UNITED STATES'
GLOBAL MOTION TO DISMISS FOR LACK OF JURISDICTION
BASED ON CERCLA SECTION 113(h)**

Dated: February 26, 2024

TODD KIM
Assistant Attorney General

ANDREW D. KNUDSEN
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 353-7466
Andrew.Knudsen@usdoj.gov

*Counsel for the United States*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

GLOSSARY ........................................................................................................... ix

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 2

I.    Statutory and Regulatory Background ................................................................ 2

      A.    Authority to Respond to Releases under CERCLA Section 104 ................. 2

      B.    Remedial and Removal Actions Led by the DoD under the National
            Contingency Plan .................................................................................... 4

      C.    Selection of Cleanup Standards ................................................................ 7

      D.    State and Public Input ............................................................................. 8

      E.    Limits on Federal Court Jurisdiction under Section 113(h) of CERCLA .... 9

II.   Factual Background ........................................................................................ 10

      A.    The DoD's Response to PFOS and PFOA Contamination......................... 10

      B.    CERCLA Response Actions at Specific Facilities .................................... 13

III.  Procedural Background.................................................................................... 18

STANDARD OF REVIEW ....................................................................................... 19

ARGUMENT .......................................................................................................... 20

I.    The United States is Carrying Out CERCLA Response Actions under Section 104
      at Every Facility at Issue in the Remedial Claims. .......................................... 20

II.   The Remedial Claims for Which the United States Is Seeking Dismissal Challenge
      the United States' CERCLA Response Actions. ............................................... 25

CONCLUSION....................................................................................................... 32

APPENDIX A ...................................................................................................... A-1

## TABLE OF AUTHORITIES

**Cases**

*Alabama v. EPA,*
   871 F.2d 1548 (11th Cir. 1989) ................................................................. 9

*Anacostia Riverkeeper v. Wash. Gas & Light Co.,*
   892 F. Supp. 2d 161 (D.D.C. 2012) ............................................... 26, 30, 31

*Atl. Richfield Co. v. Christian,*
   140 S. Ct. 1335 (2020) ............................................................................. 20

*Batture Fleet, Inc. v. Browner,*
   No. 00-cv-0205, 2000 WL 748094 (E.D. La. June 8, 2000) ................... 24

*Belmora LLC v. Bayer Consumer Care AG,*
   987 F.3d 284 (4th Cir. 2021) *cert. denied*, 142 S. Ct. 483 (2021)........... 19

*Boarhead Corp. v. Erickson,*
   923 F.2d 1011 (3d Cir. 1991)............................................................... 2, 23

*Bradley v. United States,*
   161 F.3d 777 (4th Cir. 1998) ................................................................... 20

*Broward Gardens Tenants Ass'n v. EPA,*
   311 F.3d 1066 (11th Cir. 2002) ................................................... 25, 27, 29

*Cannon v. Gates,*
   538 F.3d 1328 (10th Cir. 2008) ................................... 3, 22, 23, 24, 25, 30

*Clayton v. Warlick,*
   232 F.2d 699 (4th Cir. 1956) ................................................................... 20

*CTS Corp. v. Waldburger,*
   573 U.S. 1 (2014)........................................................................................ 2

*El Paso Nat. Gas Co. v. United States,*
   750 F.3d 863 (D.C. Cir. 2014).................................................... 22, 24, 28, 30

*In re AFFF Prods. Liab. Litig.,*
   357 F. Supp. 3d 1391 (J.P.M.L. 2018).................................................... 18

*Jach v. Am. Univ.,*
   245 F. Supp. 2d 110 (D.D.C. 2003)........................................................ 24

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ........................................................................................... 19

*Long Island Pure Water Ltd. v. Cuomo*,
    375 F. Supp. 3d 209 (E.D.N.Y. 2019) ................................................................ 24

*McClellan Ecological Seepage Situation v. Perry*,
    47 F.3d 325 (9th Cir. 1995) ............................................... 2, 20, 25, 29, 30

*N. Shore Gas Co. v. EPA*,
    930 F.2d 1239 (7th Cir. 1991) ............................................................................ 9

*New Mexico v. Gen. Elec. Co.*,
    467 F.3d 1223 (10th Cir. 2006) ............................................................ 20, 25, 31

*Owens-Illinois, Inc. v. Meade*,
    186 F.3d 435 (4th Cir. 1999) ............................................................................ 19

*R.E. Goodson Constr. Co. v. Int'l Paper Co.*,
    No. 4:02-cv-4184-RBH, 2005 WL 2614927 (D.S.C. Oct. 13, 2005) .................... 23, 24, 28, 31

*Razore v. Tulalip Tribes of Wash.*,
    66 F.3d 236 (9th Cir. 1995) ................................................... 23, 25, 27, 30

*Redland Soccer Club, Inc. v. Dep't of Army of U.S.*,
    801 F. Supp. 1432 (M.D. Pa. 1992) ................................................................. 31

*Reynolds v. Lujan*,
    785 F. Supp. 152 (D.N.M. 1992) ..................................................................... 31

*S. Pines Assocs. v. United States*,
    912 F.2d 713 (4th Cir. 1990) ............................................................................ 20

*S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*,
    660 F. Supp. 3d 469 (D.S.C. 2023) .................................................................. 19

*Senior Ride Connection v. ITNAmerica*,
    225 F. Supp. 3d 528 (D.S.C. 2016) .................................................................. 19

*Shea Homes Ltd. P'ship v. United States*,
    397 F. Supp. 2d 1194 (N.D. Cal. 2005) ........................................................... 27

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    981 F.3d 251 (4th Cir. 2020) ............................................................................ 19

*Wash. Env't Council v. Mount Baker-Snoqualmie Nat'l Forest*,
No. C06-cv-1249-JCC, 2009 WL 1543452 (W.D. Wash. June 2, 2009) ............................... 24

*Williams v. Allied Auto., Autolite Div.*,
704 F. Supp. 782 (N.D. Ohio 1988) ......................................................................................... 23

**Statutes**

10 U.S.C. §§ 2700-2710 ............................................................................................................ 4

10 U.S.C. § 2701(a) .................................................................................................................... 4

10 U.S.C. § 2701(c)(1) ............................................................................................................... 4

10 U.S.C. § 2701(c)(1)(A) .......................................................................................................... 4

10 U.S.C. § 2703(a) .................................................................................................................... 4

10 U.S.C. § 2703(c) .................................................................................................................... 4

10 U.S.C. § 2705 ........................................................................................................................ 4

33 U.S.C. § 1365(a) .............................................................................................................. 26, 30

42 U.S.C. § 300g-1(b)(1)(F) ...................................................................................................... 12

42 U.S.C. § 300i(a) ............................................................................................................... 26, 30

42 U.S.C. § 6972(a) ................................................................................................................... 26

42 U.S.C. § 6972(a)(1)(B) .......................................................................................................... 30

42 U.S.C. § 6972(b)(2)(B)(ii) ..................................................................................................... 30

42 U.S.C. § 9601(23) ............................................................................................................. 3, 21

42 U.S.C. § 9601(24) ................................................................................................................... 3

42 U.S.C. § 9601(25) ................................................................................................................... 3

42 U.S.C. § 9604(a)(1) ................................................................................................ 3, 4, 10, 21, 24

42 U.S.C. § 9604(b)(1) ........................................................................................................... 3, 21

42 U.S.C. § 9604(c)(2) ................................................................................................................. 8

42 U.S.C. § 9605 ......................................................................................................................... 4

42 U.S.C. § 9613(h) ................................................................. 2, 9, 19, 20

42 U.S.C. § 9613(h)(1)-(5) ........................................................ 10, 20

42 U.S.C. § 9615 ............................................................................ 3

42 U.S.C. § 9621 ............................................................................ 7

42 U.S.C. § 9621(d) ...................................................................... 6

42 U.S.C. § 9621(d)(1) ................................................................. 7, 8

42 U.S.C. § 9621(d)(2)(A) ........................................................... 8

42 U.S.C. § 9621(d)(4) ................................................................. 8

**State Statutes**

NJSA § 58:12A-6 ........................................................................... 26

NMSA § 74-4-13 ............................................................................ 26

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................. 2

**Code of Federal Regulations**

40 C.F.R. pt. 300 ........................................................................... 4

40 C.F.R. pt. 300, subpt. E ........................................................... 5

40 C.F.R. § 300.400(g) ................................................................. 8

40 C.F.R. § 300.415 ...................................................................... 6

40 C.F.R. § 300.415(b)(1) ............................................................. 7

40 C.F.R. § 300.415(b)(3) ............................................................. 7

40 C.F.R. § 300.415(b)(4) ............................................................. 7

40 C.F.R. § 300.415(d) ................................................................. 7

40 C.F.R. § 300.415(e) ................................................................. 7

40 C.F.R. § 300.415(n) ................................................................................ 9

40 C.F.R. § 300.420(a) ................................................................................ 5

40 C.F.R. § 300.420(b)(1) ........................................................................... 5

40 C.F.R. § 300.420(b)(2) ........................................................................... 5

40 C.F.R. § 300.420(b)(3) ........................................................................... 7

40 C.F.R. § 300.420(b)(4) ........................................................................... 5

40 C.F.R. § 300.420(c)(1) ........................................................................... 5

40 C.F.R. § 300.420(c)(2) ........................................................................... 5

40 C.F.R. § 300.420(c)(3) ........................................................................... 7

40 C.F.R. § 300.420(c)(5) ........................................................................... 5

40 C.F.R. § 300.430 ............................................................................... 6, 22

40 C.F.R. § 300.430(d)(1) ........................................................................... 6

40 C.F.R. § 300.430(d)(3) ........................................................................ 6, 8

40 C.F.R. § 300.430(e) ................................................................................ 6

40 C.F.R. § 300.430(e)(2)(i)(A) .................................................................. 8

40 C.F.R. § 300.430(e)(9)(iii) ..................................................................... 9

40 C.F.R. § 300.430(f)(1)(i) ........................................................................ 9

40 C.F.R. § 300.430(f)(1)(ii) ....................................................................... 9

40 C.F.R. § 300.430(f)(2) ........................................................................ 6, 9

40 C.F.R. § 300.430(f)(3) ............................................................................ 9

40 C.F.R. § 300.430(f)(4) ............................................................................ 6

40 C.F.R. § 300.430(f)(4)(i) ........................................................................ 9

40 C.F.R. § 300.435 .................................................................................... 7

40 C.F.R. § 300.515(e)...................................................................................................... 9

**Federal Registers**

Exec. Order No. 12580, 52 Fed. Reg. 2923 (Jan. 23, 1987)................................... 3, 4, 24

Exec. Order No. 13308, 68 Fed. Reg. 37691 (June 20, 2003) ....................................... 3

87 Fed. Reg. 54415 (Sept. 6, 2022) ............................................................................. 10

88 Fed. Reg. 18638 (Mar. 29, 2023) ............................................................................ 12

## GLOSSARY

| | |
|---|---|
| AFFF | Aqueous Film-Forming Foam |
| ARAR | Applicable or Relevant and Appropriate Requirement |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CWA | Clean Water Act |
| DERP | Defense Environmental Restoration Program |
| DoD | U.S. Department of Defense |
| EPA | U.S. Environmental Protection Agency |
| MDL | Multidistrict Litigation |
| NCP | National Contingency Plan |
| PFAS | Perfluoroalkyl Substances |
| PFOA | Perfluorooctanoic Acid |
| PFOS | Perfluorooctane Sulfonic Acid |
| ppt | Parts Per Trillion |
| RCRA | Resource Conservation and Recovery Act |
| SDWA | Safe Drinking Water Act |

## INTRODUCTION

The United States Department of Defense ("DoD") is engaged in a decades-long, multi-billion dollar initiative to investigate and clean up potential contamination from the military's use of aqueous film-forming foam ("AFFF") to fight fires at its facilities.  Through its efforts, the DoD has identified releases of emerging contaminants known as perfluoroalkyl substances ("PFAS") from its use of AFFF at over 400 facilities nationwide.  Acting pursuant to its authorities under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the DoD has taken action to promptly address any immediate risks to human health while proceeding with detailed investigations at each facility to determine the appropriate long-term remedy, giving the greatest priority to those facilities that present the greatest expected risks.

In the present multidistrict litigation ("MDL"), plaintiffs in 30 cases have brought claims against the United States, contending that the military's use of AFFF contaminated their water.  In the seven cases that are the subject of this Motion to Dismiss, plaintiffs are asserting claims for injunctive relief seeking to compel the United States to immediately investigate and remediate PFAS contamination from a total of nine specific facilities, notwithstanding the CERCLA response efforts currently underway at these facilities and the DoD's own assessment of nationwide priorities.  These claims, hereafter referred to as the "Remedial Claims," are specifically identified in Appendix A to this Motion.  Plaintiffs assert these Remedial Claims under various federal and state environmental statutes and under tort law.

The Remedial Claims in these cases must be dismissed for lack of subject matter jurisdiction.  In enacting CERCLA, Congress placed considerable weight on the need for prompt, uninterrupted cleanup of releases, and concluded that "peripheral disputes, including those over 'what measures actually are necessary to clean-up the site and remove the hazard,' may not be

1

brought while the cleanup is in process." *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 329 (9th Cir. 1995) ("*MESS*") (quoting *Boarhead Corp. v. Erickson*, 923 F.2d 1011, 1018-19 (3d Cir. 1991)).  To that end, section 113(h) of CERCLA explicitly strips federal courts of jurisdiction over any claim that challenges an agency's response actions under that statute, without regard to the legal theory that might be said to support the claim.  42 U.S.C. § 9613(h).

Pursuant to Federal Rule of Civil Procedure 12(b)(1), and as provided by the Court in Case Management Order 25, the United States moves to dismiss the Remedial Claims under CERCLA section 113(h).  At each of the facilities targeted by the Remedial Claims, the DoD is engaged in removal or remedial actions addressing releases of PFAS under its CERCLA authority.  Because the Remedial Claims are seeking injunctive relief to alter, supplement, speed up, or otherwise dictate the DoD's efforts to investigate and remediate these releases, they are "challenges" to CERCLA response actions within the meaning of section 113(h).  Accordingly, the Court must dismiss the Remedial Claims for lack of subject matter jurisdiction.[1]

## BACKGROUND

### I.    Statutory and Regulatory Background

#### A. Authority to Respond to Releases under CERCLA Section 104

CERCLA was enacted "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts [are] borne by those responsible for the contamination."  *CTS Corp. v. Waldburger*, 573 U.S. 1, 4 (2014) (citation and internal quotation marks omitted).  To that end, Congress granted the federal government broad authority to

---

[1] Pursuant to Case Management Order 25, this Motion is limited to seeking dismissal of the Remedial Claims under CERCLA section 113(h), 42 U.S.C. § 9613(h).  By filing this Motion, the United States does not waive any other defense that may be available to it under Rule 12, including arguments that the state law claims are barred by sovereign immunity, and reserves its right to assert those defenses at an appropriate time.

investigate and respond to releases while shielding those response activities from collateral attacks that could threaten to delay the ultimate cleanup.

Section 104 of CERCLA authorizes the President to respond whenever there is a release or threatened release of any "hazardous substance" or "any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare." 42 U.S.C. § 9604(a)(1). In such cases, the President may conduct "removal" action, "remedial" action, or "any other response measure … which the President deems necessary" to address those releases. *Id.*; *see also id.* § 9601(25) (defining "response"). "Removal" actions are generally short-term responses to mitigate threats, but also include preliminary efforts to identify and assess the nature, extent, and threat of release. *Id.* § 9601(23); *see Cannon v. Gates*, 538 F.3d 1328, 1333-34 (10th Cir. 2008). "Remedial" actions are those "taken instead of or in addition to removal actions" to provide a permanent remedy. 42 U.S.C. § 9601(24). Actions taken under section 104 may also include:

> such investigations, monitoring, surveys, testing, and other information gathering … necessary or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the … pollutants or contaminants involved, and the extent of danger to the public health or welfare or to the environment.

*Id.* § 9604(b)(1); *see also id.* § 9601(23) (defining "removal" to include "action taken under section 9604(b)").

The President has delegated his CERCLA section 104 response authority to the heads of various executive branch agencies. *See* Exec. Order No. 12580, 52 Fed. Reg. 2923 (Jan. 23, 1987), *as amended by* Exec. Order No. 13308, 68 Fed. Reg. 37691 (June 20, 2003); 42 U.S.C. § 9615 (authorizing delegation). As relevant here, the Secretary of Defense exercises CERCLA section 104 response authority on behalf of the President in cases where the release is on, or the sole source of the release is from, any facility or vessel under the DoD's jurisdiction, custody, or

control.  Exec. Order No. 12580 § 2(d), 52 Fed. Reg. at 2924.  For releases where responsibility is not delegated to the Secretary of Defense or the heads of other agencies, the President's response authority is delegated to the Administrator of the U.S. Environmental Protection Agency ("EPA").  *Id.* § 2(g).

Concurrent with its delegated authority under CERCLA section 104, the DoD conducts its environmental restoration activities through the Defense Environmental Restoration Program ("DERP"), which was established as part of the 1986 amendments to CERCLA.  10 U.S.C. §§ 2700-2710.  DERP establishes accounts that the DoD must use for environmental restoration projects.  *Id.* § 2703(a), (c).  DERP authorizes the Secretary of Defense to carry out response actions under CERCLA addressing releases of hazardous substances, pollutants, and contaminants from, among other facilities, those "owned by, leased to, or otherwise possessed by the United States and under the jurisdiction of the Secretary [of Defense]."  *Id.* § 2701(c)(1)(A).  These responses must be conducted in consultation with EPA and state authorities.  *See id.* §§ 2701(a), (c)(1), 2705.  The Secretary of Defense has delegated his response authorities under CERCLA and DERP to the heads of the relevant military departments (*i.e.*, the Departments of the Army, Air Force, and Navy).  Dep't of Def. Instruction 4715.07, Encl. 2 ¶ 7.a.

## B. Remedial and Removal Actions Led by the DoD under the National Contingency Plan

Response actions under CERCLA section 104 must be consistent with the National Contingency Plan ("NCP").  42 U.S.C. § 9604(a)(1).  The NCP is a set of regulations promulgated by EPA establishing procedures and standards for undertaking CERCLA remedial and removal actions in response to releases.  *Id.* § 9605; 40 C.F.R. pt. 300.  As implemented by the DoD, the NCP provides a detailed, stepwise process for conducting remedial action, including evaluating potential releases at a site, investigating the extent of contamination,

evaluating and selecting among potential remedies, and designing and carrying out the remedial action. *See* 40 C.F.R. pt. 300, subpt. E.

At the outset of the remedial action process, once a release is identified, the lead agency conducts a preliminary assessment and (as appropriate) a site inspection. *Id.* § 300.420(a). For both a preliminary assessment and site inspection, the goals include eliminating sites that pose no threat to public health or the environment from further consideration, determining any potential need for removal action, and gathering data for use in subsequent or related evaluations under the NCP. *Id.* §§ 300.420(b)(1), 300.420(c)(1). During the preliminary assessment, the lead agency reviews existing information about the release such as pathways of exposure, exposure targets, and the source and nature of the release. *Id.* § 300.420(b)(2). The lead agency may also conduct on- and off-site reconnaissance as appropriate. *Id.* The preliminary assessment culminates in a report that contains a description of the release and a recommendation on whether further action is warranted, including whether to undertake a site inspection, removal action, or both. *Id.* § 300.420(b)(4).

A site inspection under the NCP can proceed simultaneously with the preliminary assessment or after its completion. The site inspection builds on information collected in the preliminary assessment and involves both on- and off-site field investigatory efforts and sampling, as appropriate. *Id.* § 300.420(c)(2). Upon completion of the site inspection, the lead agency prepares a report that includes: a description of waste handling; descriptions of known contaminants and their migration pathways; an identification and description of human and environmental targets; and a recommendation on whether further action is warranted. *Id.* § 300.420(c)(5).

Where further action is appropriate, the next steps under the NCP are a remedial investigation and feasibility study, which may be performed in tandem. *Id.* § 300.430. The remedial investigation involves gathering and analyzing data to characterize site conditions, determine the nature and extent of contamination, and evaluate risks to human health and the environment in order to develop and evaluate effective remedial alternatives. *Id.* § 300.430(d)(1). This process may include field investigations, treatability studies, and a baseline risk assessment. *Id.* As part of the remedial investigation, the lead agency also identifies any "applicable or relevant and appropriate requirements" under federal or state law that will be used to determine cleanup standards for the remedial action. *Id.* § 300.430(d)(3); *see* 42 U.S.C. § 9621(d). Meanwhile, the feasibility study develops and assesses the performance of different remedial options based on criteria outlined in the NCP, to inform selection of an appropriate permanent solution for the site. 40 C.F.R. § 300.430(e).

Based on the information developed in the remedial investigation and feasibility study, the lead agency identifies a preferred alternative and presents it to the public in a proposed plan for review and comment. *Id.* § 300.430(f)(2). After considering public comments (including any relevant input from the state), a final remedy is selected, which must be documented in a publicly available record of decision. *Id.* § 300.430(f)(4). The lead agency then proceeds to the remedial design and remedial action phases, which include development of the actual design of the selected remedy and implementation of that remedy. *Id.* § 300.435.

The NCP also sets forth procedures for removal actions under CERCLA section 104. 40 C.F.R. § 300.415. Removal actions may take place on a separate timeline from any remedial action for the site, and the lead agency can initiate removal at any time during the preliminary assessment or site inspection process if the information developed indicates it is warranted. *Id.*

§ 300.420(b)(3), (c)(3). There are generally fewer steps necessary under the NCP to consider
and select an appropriate removal action, to allow for faster action to protect human health. The
lead agency may take appropriate removal action whenever it determines, based on enumerated
criteria, that "there is a threat to public health or welfare of the United States or the
environment." *Id.* § 300.415(b)(1). The removal action must "begin as soon as possible to
abate, prevent, minimize, stabilize, mitigate, or eliminate the threat." *Id.* § 300.415(b)(3). If the
lead agency has at least six months to plan the removal before beginning on-site activities, it
must conduct an engineering evaluation/cost analysis to analyze removal alternatives. *Id.*
§ 300.415(b)(4).

   The NCP provides a non-exhaustive list of possible removal actions that may be
appropriate depending on the circumstances of a release, including: fencing and warning signs;
drainage controls, including run-off diversion; capping or excavation of contaminated soils;
containment, treatment, disposal, or incineration of hazardous materials; and provision of
alternative water supply. *Id.* § 300.415(e). Any removal action must "to the extent practicable,
contribute to the efficient performance of any anticipated long-term remedial action with respect
to the release concerned." *Id.* § 300.415(d).

### C. Selection of Cleanup Standards

   Section 121 of CERCLA specifies the level of cleanup to be attained through remedial
action. 42 U.S.C. § 9621. At a minimum, remedial actions must attain a degree of cleanup and
control that assures protection of human health and the environment. *Id.* § 9621(d)(1). For any
hazardous substance, pollutant, or contaminant that will remain onsite, the remedial action
generally must at least attain (1) any federal environmental standard or (2) any timely-identified,
more stringent state standard promulgated under a state environmental law or facility siting law,
if such federal or state standard is "legally applicable" or "relevant and appropriate under the

circumstances of the release." *Id.* § 9621(d)(2)(A).  These "applicable or relevant and appropriate requirements," or "ARARs," are identified during the remedial investigation phase. 40 C.F.R. § 300.430(d)(3).  The NCP spells out the factors that agencies must consider in determining whether a requirement is "applicable" to the release or is otherwise "relevant and appropriate." *Id.* § 300.400(g).

The lead agency may waive compliance with an ARAR for a specific remedy in certain circumstances enumerated by the statute.  42 U.S.C. § 9621(d)(4).  For example, an ARAR may be waived if compliance would be technically impracticable; if compliance would result in greater risk than alternative options; or (for a state ARAR) if the state has not consistently applied the requirement in similar circumstances.  *Id.*  Even in such circumstances, the remedial action selected must, at a minimum, assure protection of human health and the environment.  *Id.* § 9621(d)(1).

In cases where ARARs are not available, are not sufficiently protective, or are waived, the NCP specifies factors for the agency to consider as part of a site-specific risk assessment to establish cleanup standards that are sufficiently protective.  40 C.F.R. § 300.430(e)(2)(i)(A).

### D.  State and Public Input

CERCLA and the NCP provide opportunities for state officials, as well as the public, to provide input at specific points in the response process.[2]  CERCLA explicitly requires consultation with "the affected State or States before determining any appropriate remedial action to be taken" under section 104.  42 U.S.C. § 9604(c)(2).  The NCP provides for state involvement in preliminary discussions of the remedial alternatives to be discussed in a site's

---

[2] DoD policy also instructs the military branches to make drafts of final reports prepared under the NCP available to state and federal regulators for comment before they are finalized.  Decl. of Alexandria Long ¶ 13 ("Long Decl.") (attached as Exhibit 1).

feasibility study.  40 C.F.R. § 300.515(e); *see id.* § 300.430(f)(1)(ii) (providing selection of remedial action "shall proceed in accordance with § 300.515(e)").  Prior to remedy selection, the lead agency must publish a proposed plan identifying its preferred alternative and provide an opportunity for public review and comment.  *Id.* § 300.430(f)(2), (f)(3).  In selecting its preferred alternative (as well as the ultimate remedy), the lead agency must consider input from the state, including the state's position regarding the remedial alternatives and any state comments on the ARARs identified for the site.  *Id.* § 300.430(e)(9)(iii), (f)(1)(i).  After reviewing public comments on the proposed plan, the lead agency again consults with the state before making a final remedy selection decision.  *Id.* § 300.430(f)(1)(ii), (f)(4)(i).

The NCP also provides a role for the public in removal actions.  The degree of public involvement for removal actions varies based on the length of time before on-site activity must begin and the expected duration of on-site action.  *See id.* § 300.415(n).  The agency must notify state and local officials, as well as immediately affected citizens, about actions taken and information concerning the release.  *Id.*

### E.  Limits on Federal Court Jurisdiction under Section 113(h) of CERCLA

The "primary purpose of CERCLA is the prompt cleanup of hazardous waste sites." *Alabama v. EPA*, 871 F.2d 1548, 1557 (11th Cir. 1989) (cleaned up).  In order to prevent litigation from delaying the cleanup of contaminated sites, Congress enacted section 113(h) of CERCLA, which serves as a "blunt withdrawal of federal jurisdiction" over cases that might interfere as a practical matter with selection or implementation of any response action.  *N. Shore Gas Co. v. EPA*, 930 F.2d 1239, 1244 (7th Cir. 1991).  Specifically, section 113(h) provides that "[n]o Federal court shall have jurisdiction … to review any challenges to removal or remedial action selected under" section 104.  42 U.S.C. § 9613(h).  CERCLA enumerates five limited

exceptions to this withdrawal of jurisdiction, none of which are relevant here.  *Id.* § 9613(h)(1)-(5).

## II.    Factual Background

### A.  The DoD's Response to PFOS and PFOA Contamination

It is DoD policy to reduce risk to human health and the environment resulting from DoD activities.  Long Decl. ¶ 8 (citing DoD Instruction 4715.07).  The DoD has taken a proactive approach to identifying and addressing releases of PFAS—and particularly the two most studied compounds, perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA")—from its facilities through a coordinated, nationwide initiative.  *Id.* ¶ 21.  Consistent with its authorities under CERCLA and DERP, the DoD uses a science- and evidence-based process to fully investigate releases, prioritize responses, and determine the appropriate response actions based on the release's risk to human health and the environment.  *Id.* ¶ 9.  Through these efforts, the DoD has already spent billions of dollars—and plans to spend billions more—in response to PFOS and PFOA contamination from its facilities.

In 2010, DoD components began to identify locations where PFOS and PFOA may have been released at their facilities, such as from the use of AFFF.  *Id.* ¶ 16.  PFOS, PFOA, and other PFAS were not then (and are not now) designated as "hazardous substances" under CERCLA.[3] However, once sufficient toxicity information was available (in approximately 2016), the DoD determined that PFOS and PFOA are "pollutants or contaminants" that "may present an imminent and substantial danger to the public health or welfare" within the meaning of CERCLA section 104.  *Id.* ¶ 19; *see* 42 U.S.C. § 9604(a)(1).  This determination enabled the DoD to investigate and respond to releases of PFOS and PFOA pursuant to its authorities under section

---

[3] EPA has proposed to designate PFOS and PFOA as hazardous substances under CERCLA, but has not yet taken final action.  87 Fed. Reg. 54415 (Sept. 6, 2022).

104 of CERCLA and DERP.  In 2016, the DoD began testing the drinking water it was supplying, while also investigating where DoD activities may have contributed to elevated PFOS and PFOA in drinking water in nearby communities.  Long Decl. ¶ 17.

The DoD is currently proceeding under CERCLA at every facility with suspected releases of PFOS or PFOA.  *Id.* ¶ 20.  Consistent with section 104, for each of these facilities, the DoD is following the NCP process.  *Id.* ¶ 10.  In managing this nationwide effort, the DoD has adopted a risk-based "worst first" approach to prioritizing its resources.  *Id.* ¶ 15.  Under this approach, DoD components address sites that pose a relatively greater potential risk to public safety, human health, or the environment before addressing sites that pose a lesser risk.  *Id.*

The DoD has identified 715 facilities that are proceeding through the CERCLA response process.  *Id.* ¶ 21.  As of September 30, 2023—the most recent date for which the DoD has comprehensive information—the preliminary assessment and site evaluation had already been completed at 570 facilities and were still underway at 145 facilities.  *Id.*  Of the 570 facilities that had completed the preliminary assessment and site evaluation process, the DoD determined that 118 facilities require no further action.  *Id.*  The remaining 445 facilities are either proceeding to or currently in the remedial investigation and feasibility study phase of the CERCLA process. *Id.*

In addition, DoD components have taken numerous removal actions to expeditiously prevent or mitigate risks to human health while the investigative process proceeds.  *Id.* ¶ 22.  In particular, DoD components have taken action with the goal that no one—on or off the 715 DoD installations identified—is exposed to PFOS or PFOA in drinking water at concentrations of concern if DoD is the source.  *Id.* ¶¶ 22, 26.  DoD components have offered expedited removal actions to any individual or business whose drinking water (whether from a private well or

11

public water system) contains more than 70 parts per trillion ("ppt") of PFOS and/or PFOA.[4]  *Id.* ¶ 26.  DoD components may also carry out removal actions for drinking water wells that are currently below 70 ppt if site-specific hydrogeological conditions are expected to result in a future exceedance of that level without a removal action.  *Id.*  In practice, these removal actions have generally included (1) immediate provision of bottled water, (2) installation of filtration systems or public water connections to private well users, and/or (3) building or funding new treatment plants.  *Id.*  These removal actions generally achieve levels of PFOS and PFOA well below 70 ppt.  *Id.*

In addition to providing alternative drinking water, DoD components also have taken or are currently taking other removal actions to prevent further migration of PFOS and PFOA or to otherwise address imminent threats.  Per DoD policy, components are directed to prioritize prompt implementation of interim actions, such as removal of soil or sediment hot spots and installation of groundwater extraction systems, where supported by site-specific information. *See id.* ¶ 27 n.2 (citing July 2023 policy memo).  At numerous facilities, DoD components have installed or paid for groundwater or surface water treatment systems for removal of PFOS and PFOA.  *Id.* ¶ 27.  These treatment systems serve a dual purpose: beyond the immediate benefit they offer by containing and addressing any imminent threat, they can also serve as "pilot projects" to inform the eventual selection and design of a final remedy for the site.  *Id.*

---

[4] There are currently no federal standards for PFOS or PFOA in drinking water.  The DoD uses 70 ppt of PFOS and PFOA, individually or combined, in drinking water as a benchmark for taking short-term removal actions.  Long Decl. ¶ 24.  This level is consistent with EPA's 2016 lifetime health advisory for these contaminants.  *Id.* ¶ 17.  Health advisories are non-binding informational documents that EPA issues under the Safe Drinking Water Act.  42 U.S.C. § 300g-1(b)(1)(F) (stating health advisories "are not regulations").  In March 2023, EPA proposed national primary drinking water standards for PFOS and PFOA.  88 Fed. Reg. 18638 (Mar. 29, 2023).  When EPA promulgates final standards, DoD components will incorporate those standards into the CERCLA process.  Long Decl. ¶ 25.

The federal government has committed substantial resources to these CERCLA efforts. Nationwide, the DoD has spent over $2.5 billion on PFAS investigation and cleanup actions at and near United States military bases through the end of fiscal year 2023. *Id.* ¶ 23. As of the end of fiscal year 2022, the estimate for future investigation and cleanup was $7 billion. *Id.* Moreover, those future expenditures are likely to increase substantially due to further investigations and anticipated regulatory developments. *Id.*

**B. CERCLA Response Actions at Specific Facilities**

The Declaration of Alexandria Long, attached as Exhibit 1 to this Motion, contains information about the status of CERCLA investigations and cleanup actions at a number of DoD facilities that are the subject of cases against the United States in this multidistrict litigation. *See* Long Decl. ¶¶ 31-121 & App'x A. The present Motion seeks dismissal of specific claims in seven cases involving nine different DoD facilities. A brief summary of the status of CERCLA investigation and cleanup activities at those nine facilities is provided below.

1.  <u>Cannon Air Force Base</u>: The Air Force completed its preliminary assessment in October 2015 and its site inspection in March 2019. Long Decl. ¶¶ 36, 37. The Air Force also conducted additional sampling of offsite groundwater. *Id.* ¶ 37. These investigations established the presence of PFOS and PFOA in groundwater in the vicinity of the fire training pit and several other locations on the base, and indicated potential offsite migration. *Id.* ¶ 38. The Air Force is currently conducting a remedial investigation and feasibility study, which began in August 2020 and is scheduled for completion in August 2026. *Id.* ¶ 39.

Sampling of offsite wells identified some residents with PFOS and/or PFOA concentrations above 70 ppt. *Id.* ¶ 38. The Air Force immediately offered bottled water to residents with drinking water above these levels, and subsequently offered filtration systems for those residents. *Id.* ¶ 38, 40. The Air Force has also begun construction of a full-scale

13

groundwater treatment system at Cannon Air Force Base near the installation boundary, adjacent

to the primary on-site source of releases and upgradient of the affected drinking water wells.  *Id.*

¶ 38, 41; "Cannon AFB PFAS Southeast Corner Pilot Study Design Package" (June 5, 2023)

(attached as Exhibit 2).  This treatment system will be used to test treatment technologies and to

address off-base migration by intercepting and capturing PFAS-impacted water.  Long Decl. ¶

41.  The Air Force has also entered a contract for construction of a second groundwater treatment

system to be built at another location within the base.  *Id.* ¶ 42.  Together, these treatment

systems are expected to cost approximately $50,000,000.  *Id.* ¶¶ 41-42.

Overall, the Air Force has spent and/or obligated $67,379,000 to investigate and perform

removal actions in response to PFAS at Cannon Air Force Base through fiscal year 2023, with

estimated obligations beyond fiscal year 2023 of $44,670,000.  *Id.* ¶ 43.

2.    <u>Frances S. Gabreski Air National Guard Base</u>:  The Air Force completed its

preliminary assessment in March 2016 and its site inspection in July 2019.  *Id.* ¶¶ 58, 59.  The

Air Force also conducted additional sampling of offsite groundwater.  *Id.* ¶ 59.  The Air Force is

currently conducting a remedial investigation and feasibility study, which began in September

2022 and is scheduled for completion in September 2027.  *Id.* ¶ 61.

Sampling of offsite groundwater identified some residents with PFOS and/or PFOA

concentrations above 70 ppt.  *Id.* ¶ 60.  The Air Force immediately provided bottled water to

residents with drinking water above these levels, and subsequently installed filtration systems on

their wells or secured access to municipal water.  *Id.*

Overall, the Air Force has spent and/or obligated $8,835,000 to investigate and perform

removal actions in response to PFAS at Gabreski Air National Guard Base through fiscal year

2023, with estimated obligations beyond fiscal year 2023 of $189,627,000.  *Id.* ¶ 63.

3.    <u>Holloman Air Force Base</u>:  The Air Force completed its preliminary assessment in September 2015 and its site inspection in November 2018.  *Id.* ¶¶ 64, 65.  The Air Force is currently conducting a remedial investigation and feasibility study, which began in November 2021 and is scheduled for completion in November 2027.  *Id.* ¶ 67.

Onsite testing identified PFOS and/or PFOA at levels exceeding 70 ppt in surface water and groundwater at some areas of the base.  *Id.* ¶ 66.  However, the Air Force concluded that there is no potential exposure pathway for drinking water (whether on-base or off-base) because the impacted groundwater and surface water are not suitable for human consumption.  *Id.*; "Final Site Inspection Report: Holloman Air Force Base, New Mexico," at 37 (Nov. 2018) (attached as Exhibit 3).

Overall, the Air Force has spent and/or obligated $3,898,000 to investigate and perform removal actions in response to PFAS at Holloman Air Force Base through fiscal year 2023, with estimated obligations beyond fiscal year 2023 of $25,037,000.  *Id.* ¶ 68.

4.    <u>Joint Base Lewis McCord</u>: The Army completed a preliminary assessment and site inspection in December 2020, including sampling of offsite groundwater.  *Id.* ¶ 70.  The Army is currently conducting a remedial investigation and feasibility study, which began in June 2020 and is scheduled for completion in June 2025.  *Id.* ¶ 71.  Sampling of offsite groundwater did not identify PFOS and/or PFOA in excess of 70 ppt in any off-base samples.  *Id.* ¶ 70.

Overall, the Army has spent and/or obligated $4,317,000 to investigate and perform removal actions in response to PFAS at Joint Base Lewis-McChord through fiscal year 2023, with estimated obligations beyond fiscal year 2023 of $3,412,000.  *Id.* ¶ 72.

5.    <u>Joint Base McGuire-Dix-Lakehurst</u>:  The Air Force completed its preliminary assessment in August 2015 and its site inspection in May 2018.  *Id.* ¶¶ 73, 74.  The Air Force

also conducted additional sampling of offsite groundwater. *Id.* ¶ 74. The Air Force is currently conducting a remedial investigation and feasibility study, which began in September 2020 and is scheduled for completion in September 2026. *Id.* ¶ 76.

Sampling of offsite groundwater identified some residents with PFOS and/or PFOA concentrations above 70 ppt. *Id.* ¶ 75. The Air Force immediately provided bottled water to residents with drinking water above these levels, and subsequently installed filtration systems on their private wells. *Id.* The Air Force also identified some residents for whom the data indicated a potential to exceed 70 ppt in the future and either installed filtration systems or provided municipal water connections for those residents. *Id.*

Overall, the Air Force has spent and/or obligated $33,318,000 to investigate and perform removal actions in response to PFAS at Joint Base McGuire-Dix-Lakehurst through fiscal year 2023, with estimated obligations beyond fiscal year 2023 of $276,636,000. *Id.* ¶ 72.

6.    <u>March Air Force Base</u>: The Air Force's CERCLA response at this facility consists of two components proceeding in parallel that are funded by different sources: one for the Former March Air Force Base, and one for the March Air Reserve Base. The Air Force completed preliminary assessments for March Air Reserve Base and Former March Air Force Base in September 2015 and December 2015, respectively, and completed the corresponding site inspections in December 2017 and July 2018. *Id.* ¶¶ 80, 81. The Air Force also conducted additional sampling of offsite groundwater. *Id.* ¶ 81. The Air Force is currently conducting a combined remedial investigation and feasibility study, which began in September 2020 and is scheduled for completion in September 2025. *Id.* ¶ 83.

Sampling of offsite groundwater identified some residents and a municipal well with PFOS and/or PFOA concentrations above 70 ppt. *Id.* ¶ 82. The Air Force immediately provided

bottled water to residents with drinking water above these levels. *Id.* The Air Force subsequently connected impacted residences to municipal water and provided the municipal well with a wellhead treatment system. *Id.*

Overall, across the two funding sources for this site, the Air Force has spent and/or obligated a total of $25,056,000 to investigate and perform removal actions in response to PFAS at March Air Force Base through fiscal year 2023. *Id.* ¶ 85. Across both funding sources, the total estimated obligations beyond fiscal year 2023 are $63,920,000. *Id.*

7.    <u>Former Naval Air Warfare Center Trenton</u>: The Navy completed its preliminary assessment in December 2018 and its site inspection in October 2022. *Id.* ¶¶ 97, 98. The Navy also conducted additional sampling of offsite groundwater. *Id.* ¶ 98. The Navy is currently conducting a remedial investigation and feasibility study, which was scheduled for completion in December 2023. *Id.* ¶ 99.

Overall, the Navy has spent and/or obligated $3,059,000 to investigate and perform removal actions in response to PFAS at Former Naval Air Warfare Center Trenton through fiscal year 2023, with estimated obligations beyond fiscal year 2023 of $2,320,000. *Id.* ¶ 100.

8.    <u>Naval Weapons Station Earle</u>: The Navy completed its preliminary assessment in January 2020 and its site inspection in June 2023. *Id.* ¶¶ 92, 93. The Navy also conducted additional sampling of offsite groundwater. *Id.* ¶ 93. The Navy is currently conducting a remedial investigation and feasibility study, which is scheduled for completion in February 2035. *Id.* ¶ 95.

Sampling of offsite groundwater identified some residents with PFOS and/or PFOA concentrations above 70 ppt. *Id.* ¶ 94. The Navy immediately provided bottled water to

residents with drinking water above these levels, and subsequently connected impacted residents to municipal water. *Id.*

Overall, the Navy has spent and/or obligated $3,225,000 to investigate and perform removal actions in response to PFAS at Naval Weapons Station Earle through fiscal year 2023, with estimated obligations beyond fiscal year 2023 of $3,684,000. *Id.* ¶ 96.

9. <u>Stewart Air National Guard Base</u>: The Air Force completed its preliminary assessment in March 2016 and its site inspection in October 2018. *Id.* ¶¶ 109, 110. The Air Force also conducted additional sampling of offsite groundwater. *Id.* ¶ 110. The Air Force is currently conducting a remedial investigation and feasibility study, which began in September 2021 and is scheduled for completion in September 2026. *Id.* ¶ 111.

Overall, the Air Force has spent and/or obligated $9,838,000 to investigate and perform removal actions in response to PFAS at Stewart Air National Guard Base through fiscal year 2023, with estimated obligations beyond fiscal year 2023 of $90,577,000. *Id.* ¶ 113.

## III. Procedural Background

On December 7, 2018, the Judicial Panel on Multidistrict Litigation created this MDL to centralize cases "alleg[ing] that AFFF products used at airports, military bases, or certain industrial locations caused the release of PFOA or PFOS into local groundwater and contaminated drinking water supplies." *In re AFFF Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1394 (J.P.M.L. 2018). Thirty complaints in this MDL name the United States as a defendant. Five of these 30 cases include claims for injunctive relief under federal environmental statutes, including the Resource Conservation and Recovery Act ("RCRA"), Clean Water Act ("CWA"), or Safe Drinking Water Act ("SDWA"), or analogous state statutes. *See* App'x A (listing cases and claims addressed by this Motion). Two additional cases asserting tort claims against the United States pursuant to the Federal Tort Claims Act include requests for injunctive relief

18

ordering the United States to take specific remedial actions in response to PFAS contamination. *Id.* These seven cases all assert claims that effectively challenge, and threaten to disrupt, CERCLA response actions at the nine DoD facilities that are the subject of those cases.

On April 24, 2023, the Court issued Case Management Order No. 25. ECF No. 3030. That Order established a schedule for the United States to file two global motions to dismiss on jurisdictional grounds, including a motion to dismiss based on the timing of review provision of CERCLA, 42 U.S.C. § 9613(h). ECF No. 3030 ¶ F. In this Motion, the United States is moving to dismiss some or all of the claims in the seven cases identified in Appendix A under CERCLA section 113(h), 42 U.S.C. § 9613(h).

## STANDARD OF REVIEW

The United States files this Motion under Federal Rule of Civil Procedure 12(b)(1). "[Q]uestions of subject matter jurisdiction must be decided first, because they concern the court's very power to hear the case." *Senior Ride Connection v. ITNAmerica*, 225 F. Supp. 3d 528, 530 (D.S.C. 2016) (quoting *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 442 n.4 (4th Cir. 1999)). Plaintiffs bear the burden to establish that this Court has subject matter jurisdiction over their claims. *Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 257 (4th Cir. 2020) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 660 F. Supp. 3d 469, 472 (D.S.C. 2023) (Gergel, J.) (stating "the burden of establishing jurisdiction falls squarely upon the plaintiff").

In this MDL, Fourth Circuit precedent governs the interpretation of federal law. *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 293 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 483 (2021) ("[E]very Circuit ... has concluded that when one district court transfers a case to another, … the transferee court applies its own Circuit's cases on the meaning of federal law."

(quotation marks omitted)); *see also Bradley v. United States*, 161 F.3d 777, 782 n.4 (4th Cir. 1998); *Clayton v. Warlick*, 232 F.2d 699, 706 (4th Cir. 1956).

## ARGUMENT

In enacting CERCLA, Congress "intended to allow [agencies] to act to address environmental problems quickly and without becoming immediately entangled in litigation." *S. Pines Assocs. v. United States*, 912 F.2d 713, 716 (4th Cir. 1990). In order to "insulate cleanup plans from collateral attack," section 113(h) of CERCLA withdraws federal courts' jurisdiction over claims challenging response actions under section 104. *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1346 (2020). Here, such response actions are underway at all of the DoD facilities targeted by the Remedial Claims. At each targeted facility, the relevant DoD components are currently in the remedial investigation / feasibility study phase of the CERCLA process and have performed several removal actions. The Remedial Claims all seek to alter the CERCLA response at these facilities in some way, and thus constitute "challenges" within the meaning of section 113(h). As a result, the Court lacks subject matter jurisdiction over the Remedial Claims, and they must be dismissed.[5]

## I.    The United States is Carrying Out CERCLA Response Actions under Section 104 at Every Facility at Issue in the Remedial Claims.

Section 113(h) strips the federal courts of jurisdiction over "any challenges to removal or remedial action selected under" section 104 of CERCLA. 42 U.S.C. § 9613(h). This provision "protects the execution of a CERCLA plan *during its pendency* from lawsuits that might interfere with the expeditious cleanup effort." *New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1249 (10th Cir. 2006) (quoting *MESS*, 47 F.3d at 329). Here, CERCLA response actions are underway at

---

[5] None of the five narrow exceptions to section 113(h) could plausibly be invoked for the Remedial Claims here. *See* 42 U.S.C. § 9613(h)(1)-(5).

each of the DoD facilities at issue in the Remedial Claims.  Accordingly, section 113(h) bars any claims that challenge those responses.

The response activities covered by section 104 are broad: the President (or here, the DoD exercising delegated authority) may "remove or arrange for the removal of, and provide for remedial action relating to" releases of pollutants or contaminants, "or take any other response measure consistent with the [NCP] which the President deems necessary to protect the public health or welfare or the environment."  42 U.S.C. § 9604(a)(1).  Measures authorized by this provision include monitoring, investigating, planning, information gathering, and other steps "necessary or appropriate to plan and direct response actions."  *Id.* § 9604(b)(1).  Further, the statute defines "removal" broadly to include "such actions as may be necessary to *monitor, assess, and evaluate* the release or threat of release."  *Id.* § 9601(23) (emphasis added).

The Remedial Claims seek relief relating to releases of PFOS and/or PFOA at or from nine DoD facilities: (1) Cannon Air Force Base; (2) Francis S. Gabreski Air National Guard Base; (3) Holloman Air Force Base; (4) Joint Base Lewis McChord; (5) Joint Base McGuire-Dix-Lakehurst; (6) March Air Force Base; (7) Former Naval Air Warfare Center Trenton; (8) Naval Weapons Station Earle; and (9) Stewart Air National Guard Base.  At all nine of these facilities, the relevant DoD components acting as lead agencies for the sites are investigating and responding to PFOS and PFOA as "pollutant[s] or contaminant[s]" under CERCLA section 104. *Supra* pp. 10-11.  The lead agencies have already completed preliminary assessments and site inspections for these facilities under the NCP.  *Supra* pp. 13-18.  All nine facilities are now in the remedial investigation / feasibility study phase of the NCP process, in which the federal government will perform detailed investigations of the site conditions, contamination, and risks, identify potential federal and state ARARs, and develop and evaluate various remedial

21

alternatives, as appropriate.  *Supra* pp. 13-18; 40 C.F.R. § 300.430.  This phase is the last step

prior to determination of whether a remedy is appropriate and, if so, publication of a proposed

plan and then final remedy selection.

Removal actions are also currently underway at several of these facilities.  For example,

at Cannon, Gabreski, Joint Base McGuire-Dix-Lakehurst, March, and Earle, the relevant DoD

components have taken removal actions to provide alternative drinking water where sampling

indicated that individuals or businesses were exposed to PFOS and/or PFOA in their drinking

water at concentrations of concern.  *Supra* pp. 13-18.  As part of those actions, the DoD

components immediately offered bottled water to affected residents and then provided longer-

term solutions, including filtration systems, connections to municipal water sources, or treatment

of affected municipal wells.  *Id.*  Moreover, the Air Force is currently undertaking two additional

removal actions at Cannon to reduce the potential for further off-base migration by intercepting

and treating PFAS-impacted groundwater from two areas of the facility.  As part of those

removal actions, the Air Force has already begun construction on one groundwater treatment

plant near the southeast boundary of the installation and is in the planning stages of another.

*Supra* pp. 13-14.

These CERCLA response actions are sufficient to trigger section 113(h)'s protection

from collateral attacks.  An agency does not need to make its final selection of a specific removal

or remedial action before section 113(h)'s withdrawal of jurisdiction attaches.  Such a reading

would "unduly restrict[] the plain language of" section 113(h).  *Cannon*, 538 F.3d at 1335.

Indeed, if CERCLA were read to allow lawsuits asking a court to dictate specific actions while

the response is still in its investigative phase, it would "threaten to *obviate the very point* of" the

investigative process.  *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 881 (D.C. Cir. 2014)

(emphasis in original).  Instead, the protection afforded by section 113(h) applies "even if the Government has only begun to 'monitor, assess, and evaluate the release or threat of release'" under section 104.  *Cannon*, 538 F.3d at 1334 (quoting *Razore v. Tulalip Tribes of Wash.*, 66 F.3d 236, 239 (9th Cir. 1995)).

This Court reached the same conclusion in *R.E. Goodson Construction Co. v. International Paper Co.*, No. 4:02-cv-4184-RBH, 2005 WL 2614927 (D.S.C. Oct. 13, 2005). There, the U.S. Army Corps of Engineers had completed a preliminary assessment and site inspection for a former DoD facility, as well as an engineering evaluation / cost analysis to inform its selection of various removal alternatives.  *Id.* at *3-4.  The plaintiffs argued that the Corps' "preliminary study" of response actions did not bar their RCRA citizen suit because section 113(h)'s protection would not apply until the Corps actually selected a remedy.  *Id.* at *24.  This Court disagreed, endorsing the views of other courts finding that CERCLA's definition of removal "clearly contemplates such actions as are necessary to making a reasoned determination whether physical removal of hazardous contaminants is necessary in a given situation."  *Id.* (quoting *Williams v. Allied Auto., Autolite Div.*, 704 F. Supp. 782, 784 (N.D. Ohio 1988)).  The Court specifically held that an agency's preparation of a remedial investigation / feasibility study constitutes "removal or remedial action" for purposes of section 113(h).  *Id.*

This Court's holding in *R.E. Goodson* is in accord with decisions of numerous other courts finding that an agency's investigative efforts under the NCP satisfy CERCLA's definition of "removal" as actions to "monitor, assess, and evaluate the release."  *See, e.g.*, *Razore*, 66 F.3d at 239 (holding preparation of remedial investigation / feasibility study triggers section 113(h)); *Cannon*, 538 F.3d at 1334 (holding section 113(h) barred challenge where government had completed preliminary assessment and was planning site inspection); *Boarhead Corp.*, 923 F.2d

23

at 1014 (holding 113(h) barred challenge where EPA had sent a letter giving notice of its intent to prepare remedial investigation / feasibility study); *El Paso Nat. Gas. Co.*, 750 F.3d at 875 (holding 113(h) applied where agency had committed to perform remedial investigation / feasibility study); *Jach v. Am. Univ.*, 245 F. Supp. 2d 110, 116 (D.D.C. 2003); *Wash. Env't Council v. Mount Baker-Snoqualmie Nat'l Forest*, No. C06-cv-1249-JCC, 2009 WL 1543452, at *5 (W.D. Wash. June 2, 2009); *Batture Fleet, Inc. v. Browner*, No. 00-cv-0205, 2000 WL 748094, at *1 (E.D. La. June 8, 2000).

Nor does it matter that the DoD, rather than EPA, is the federal agency taking action here. Nothing in CERCLA limits section 113(h)'s protection to removal or remedial actions taken by EPA. Rather, section 113(h) prohibits challenges to responses under section 104 of CERCLA, which authorizes *the President* to take action in response to releases. 42 U.S.C. § 9604(a)(1). Thus, section 113(h) may be implicated wherever an agency is taking removal or remedial action pursuant to its Presidentially delegated section 104 authority. Here, because the relevant releases are from DoD facilities, the Secretary of Defense is authorized to take CERCLA response actions on behalf of the President. Exec. Order No. 12580 § 2(d), 52 Fed. Reg. at 2924.

Moreover, several courts have found that section 113(h) applies where the DoD is responding to releases pursuant to DERP and its delegated authority under CERCLA section 104. *See Cannon*, 538 F.3d at 1333 n.4; *Long Island Pure Water Ltd. v. Cuomo*, 375 F. Supp. 3d 209, 221 (E.D.N.Y. 2019). Indeed, this Court has previously applied section 113(h) in cases challenging CERCLA responses undertaken by the DoD. *See R.E. Goodson*, 2005 WL 2614927 at *26 (noting "the US, through the Corps, is engaging in a removal action under CERCLA § 104").

24

In sum, DoD components are engaged in removal or remedial actions under CERCLA at all nine of the facilities identified in Appendix A. Any claims challenging those actions therefore must be dismissed for lack of jurisdiction.

## II. The Remedial Claims for Which the United States Is Seeking Dismissal Challenge the United States' CERCLA Response Actions.

Each of the Remedial Claims presents a "challenge" to a CERCLA removal or remedial action within the meaning of section 113(h). These claims seek relief that would alter, add to, speed up, or otherwise dictate the DoD's response to PFOS and PFOA releases at its facilities. Because each of these Remedial Claims "calls into question the [DoD's] remedial response plan," they all warrant dismissal under section 113(h). *Gen. Elec. Co.*, 467 F.3d at 1249.

Courts take a pragmatic approach to determining whether a claim challenges removal or remedial action under CERCLA. As a general matter, "[a]n action constitutes a challenge if it is related to the goals of the cleanup," *Razore*, 66 F.3d at 239, or if "the relief requested will impact the remedial action selected," *Broward Gardens Tenants Ass'n v. EPA*, 311 F.3d 1066, 1072 (11th Cir. 2002). Thus, an action requesting "injunctive relief ordering the remediation of" a particular property "would undoubtedly interfere with the Government's ongoing removal efforts" and constitute a challenge under section 113(h). *Cannon*, 538 F.3d at 1335. Likewise, section 113(h) bars claims that would "dictate specific remedial actions and … alter the method and order for cleanup." *Razore*, 66 F.3d at 239; *see also MESS*, 47 F.3d at 330 (dismissing RCRA and CWA citizen suit claims seeking to create "new requirements for dealing with the inactive sites that are now subject to the CERCLA cleanup").

The Remedial Claims assert a variety of causes of action, including claims under federal environmental statutes (RCRA, CWA, and SDWA), analogous state environmental statutes, and tort claims. *See* Appendix A. But the common thread between the Remedial Claims is that they

all seek injunctive relief requiring the United States to take specific measures to address releases of PFAS.  The Remedial Claims variously include requests for relief ordering the United States to: perform specific investigations and studies (*City of Newburgh*; *Cnty. of Suffolk*; *Lakewood Water Dist.*); take "interim remedial measures" or otherwise prevent offsite migration (*City of Newburgh*; *Town of New Windsor*; *Lakewood Water Dist.*); provide alternative water supplies and/or install treatment systems at water sources (*Cnty. of Suffolk*; *N.J. Dep't of Env't Prot.*); provide for cleanup down to specific PFAS concentrations; (*City of Newburgh*; *Cnty. of Suffolk*; *Town of New Windsor*); or generally abate contamination (*City of Newburgh*; *Elsinore Valley Municipal Water Dist.*; *N.J. Dep't of Env't Prot.*; *New Mexico*).

These claims plainly constitute "challenges" to CERCLA response actions under section 113(h).  Any injunctive relief granted pursuant to these broad requests would necessarily interfere with the DoD's ongoing CERCLA responses at the relevant facilities.[6]  *See Anacostia Riverkeeper v. Wash. Gas Light Co.*, 892 F. Supp. 2d 161, 173 (D.D.C. 2012) (where plaintiffs sought an order directing defendant to "take all such actions as may be necessary to eliminate any endangerment," court held that any relief "would most certainly interfere with implementation of the proposed CERCLA remedies").  The Remedial Claims all seek actions that are "related to the goals of the cleanup" being carried out by the DoD at each facility.

---

[6] Some of the Remedial Claims under federal and state environmental laws are seeking both injunctive relief *and* recovery of various past and future costs related to investigating, monitoring, and abating PFAS releases.  In this Motion, the United States is not arguing that the plaintiffs' requests for monetary relief constitute "challenges" to removal or remedial action under section 113(h).  Nonetheless, if the Court finds that section 113(h) bars the Remedial Claims' requests for injunctive relief, it should dismiss those claims in their entirety rather than retaining jurisdiction over any associated requests for monetary relief.  Those requests for relief are subject to dismissal on the separate grounds that on their face, none of the federal or state environmental statutes at issue authorize plaintiffs to recover any costs.  *See* 42 U.S.C. § 6972(a) (RCRA); 33 U.S.C. § 1365(a) (CWA); 42 U.S.C. § 300i(a) (SDWA); NMSA § 74-4-13 (N.M. Hazardous Waste Act); NJSA § 58:12A-6.

*Razore*, 66 F.3d at 239; *Shea Homes Ltd. P'ship v. United States*, 397 F. Supp. 2d 1194, 1204 (N.D. Cal. 2005) (holding RCRA claim seeking injunctive relief was "plainly related to the goals of the clean up" and "would likely require some interference with on-going clean up plans"). Likewise, the requested relief would "impact [any] remedial action selected" for each facility by binding the United States to specific remedial measures or cleanup standards, independent of the normal NCP process. *Broward Gardens*, 311 F.3d at 1072.

For example, the plaintiffs in *City of Newburgh v. United States* and *Town of New Windsor v. United States* both seek injunctive relief ordering the United States to, *inter alia*, "investigate and remediate" the groundwater and various surface waters in the vicinity of Stewart Air National Guard Base, including Silver Stream, Rec Pond, and Lake Washington.[7] These waters are all within the scope of the Air Force's ongoing CERCLA investigations for the site. *See* "Final Expanded Site Inspection Report for Per- and Polyfluoroalkyl Substances," at 7-1 to 7-3 (Sept. 2020) (attached as Exhibit 4) (discussing results of investigation into PFAS presence and pathways in specified waters and recommending issues for further study in remedial investigation phase). The plaintiffs' requested relief would interfere with the CERCLA response by predetermining the outcome of the Air Force's evaluation as to the scope of the contamination, whether remediation of these areas is appropriate, and (if so) what action to take. *See Razore*, 66 F.3d at 239 (dismissing claims that would "dictate specific remedial actions").

Likewise, the plaintiffs in several cases seek orders establishing specific concentrations of PFAS as either the trigger levels for providing alternative drinking water[8] or as the cleanup

---

[7] *City of Newburgh v. United States*, No. 2:18-cv-03358-RMG, ECF 226 ¶ 394 & pp. 82-83; *Town of New Windsor v. United States*, No. 2:21-cv-01496-RMG, ECF 2 ¶¶547, 554 & pp. 101-02.

[8] *N.J. Dep't of Env't Prot. v. United States*, No. 2:21-cv-00146-RMG, ECF 1 pp. 23, 26.

standards for any interim or final remedial actions.[9]  The former of these is a direct challenge to the removal actions taken at Joint Base McGuire-Dix-Lakehurst and Naval Weapons Station Earle, where the Air Force and Navy relied on a different level (specifically, 70 ppt) as the benchmark for provision of alternative drinking water.[10]  And the latter relief would predetermine the outcome of the NCP process at the relevant facilities, in which lead agencies develop cleanup standards by identifying ARARs, evaluating site-specific risks, and considering other enumerated factors.  *See El Paso Nat. Gas*, 750 F.3d at 881 (dismissing RCRA claim that "would threaten to preempt [agency's] ability to choose the best remedial action among a panoply of remedial alternatives that have been analyzed in a completed remedial investigation and feasibility study according to criteria articulated in CERCLA").

Further, the Remedial Claims challenge the DoD's response actions in a different way—by affecting decisions about the pace, timing, and allocation of resources at each facility that reflect the DoD's prioritization among the hundreds of facilities at which the DoD is currently proceeding through the CERCLA investigation and cleanup process.  In *R.E. Goodson*, this Court dismissed RCRA citizen suit claims that challenged a removal action by "demanding that it be completed more quickly or in a manner different than the Corps is presently able to complete it."  2005 WL 2614927 at *23.  Granting the requested relief would have required the Corps to "immediately dedicate more resources to [the plaintiffs'] properties, at the expense of other areas of the Site and other sites that exist around the country."  *Id.*  The Court dismissed the

---

[9] *City of Newburgh v. United States*, No. 2:18-cv-03358-RMG, ECF 226 ¶ 361 & p. 83; *Cnty. of Suffolk v. United States*, No. 2:19-cv-01181-RMG, ECF 1 ¶ 119; *Town of New Windsor v. United States*, No. 2:21-cv-01496-RMG, ECF 2 p. 101.

[10] *Compare* Long Decl. ¶¶ 75, 94 (referencing 70 ppt as benchmark); *with N.J. Dep't of Envt. Prot.*, No. 2:21-cv-00146-RMG, ECF 1 ¶ 5 (identifying New Jersey standards of 13 ppt and 14 ppt for PFOS and PFOA, respectively).

plaintiff's claims because they would interfere with the Corps' "nationally prioritized and coordinated approach," noting that allowing the claim to proceed would incentivize other property owners to file similar actions to bypass the Corps' prioritization. *Id.* at 25.

Here, the DoD is utilizing a "worst first" prioritization approach to address sites that pose a greater potential risk before addressing sites that pose a lesser risk. Long Decl. ¶ 15. Many of the Remedial Claims seek relief ordering the United States to take "immediate" action with respect to specific properties or remedial tasks (*City of Newburgh*; *Cnty. of Suffolk*; *Lakewood Water Dist.*; *New Mexico*; *Town of New Windsor*). These claims would interfere with the DoD's "worst first" prioritization by demanding that DoD components address the plaintiffs' concerns on an expedited basis, without regard to constraints on the DoD's resources or the delay it may cause on other, higher-priority CERCLA responses. That would be particularly inappropriate here, where the DoD's removal actions have already addressed any immediate human health risks by providing access to alternative drinking water as appropriate.

Notably, even a claim that "seeks to improve on the CERCLA cleanup" qualifies as an impermissible challenge. *MESS*, 47 F.3d at 330. The merits of a plaintiff's claim are irrelevant to whether it is barred by section 113(h). *See Broward Gardens*, 311 F.3d at 1074 ("Successful challenges, as well as unsuccessful ones, and perhaps even more so, are forbidden by section 113(h) until the cleanup is complete."). This "blunt withdrawal of federal jurisdiction" reflects Congress's determination that the need for prompt cleanup under CERCLA outweighs any benefit that might be afforded by allowing "immediate judicial review of … compliance with RCRA, the Clean Water Act, and similar statutory requirements during the course of the cleanup program." *MESS*, 47 F.3d at 328, 329.

29

Likewise, it makes no difference whether the United States would normally be subject to suit under the federal environmental statutory claims that plaintiffs advance in the absence of a CERCLA response.  Regardless of whether RCRA, the CWA, or the SDWA contains an otherwise applicable waiver of sovereign immunity, section 113(h) strips federal courts of jurisdiction to hear such claims whenever they challenge a CERCLA response.  The case law is replete with decisions holding that citizen suits under RCRA, 42 U.S.C. § 6972(a)(1)(B), and the CWA, 33 U.S.C. § 1365(a), like the ones asserted in the Remedial Claims here, constitute challenges to CERCLA response actions.[11]  *See, e.g.*, *Anacostia Riverkeeper*, 892 F. Supp. 2d at 170 ("CERCLA 'trumps' RCRA and other statutes when CERCLA remediation is under question or attack."); *MESS*, 47 F.3d at 329-31 (dismissing RCRA and CWA citizen suit claims); *El Paso Nat. Gas*, 750 F.3d at 881 (dismissing RCRA citizen suit claims); *Cannon*, 538 F.3d at 1332 (dismissing RCRA citizen suit claims); *Razore*, 66 F.3d at 239 (dismissing RCRA and CWA citizen suit claims).  Because these claims seek injunctive relief that would interfere with the DoD's CERCLA response, they are barred by section 113(h) and must be dismissed.

Indeed, RCRA itself recognizes the inherent potential for conflict between citizen suits and CERCLA response actions, and includes limitations designed to avoid these conflicts.  Specifically, RCRA citizen suits under 42 U.S.C. § 6972(a)(1)(B) are prohibited where, *inter alia*, "the Administrator [of EPA] … is actually engaging in a removal action under section 104 of [CERCLA]."  42 U.S.C. § 6972(b)(2)(B)(ii).  Several courts, including this one, have held that this provision also bars RCRA citizen suits where other federal agencies are performing removal

---

[11] Although there do not appear to be any cases applying section 113(h) in the context of the SDWA claim asserted in *New Jersey Department of Environmental Protection*, that is likely because the relevant provision of SDWA only provides a cause of action for "the Administrator [of EPA]," not for states or individuals.  42 U.S.C. § 300i(a).

actions. *See R.E. Goodson*, 2005 WL 2614927 at *25-26 (holding RCRA citizen suit was barred where Corps was engaging in removal); *Reynolds v. Lujan*, 785 F. Supp. 152, 154-55 (D.N.M. 1992) (barring RCRA citizen suit where Bureau of Land Management was performing removal because "it would thwart the intent of Congress if the EPA's CERCLA activities are not to be tampered with but CERCLA activities by other agencies can be"); *Anacostia Riverkeeper*, 892 F. Supp. 2d at 170 (reading RCRA citizen suit prohibition to apply to federal government generally). This provision alone warrants dismissal of the RCRA claims against the United States in this MDL. But even if this Court does not read 42 U.S.C. § 6972(b)(2)(B)(ii) to directly prohibit the RCRA citizen suit claims here, at a minimum, that provision confirms that Congress did not intend to allow RCRA citizen suits to interfere with CERCLA response actions, and that such suits are properly barred by section 113(h).

The Remedial Claims asserted under state environmental laws and tort law are likewise challenges to CERCLA response actions and are subject to dismissal. Section 113(h) bars "*any challenges*" to responses under section 104, including challenges arising under state law, unless one of the statutory exceptions applies. *See, e.g.*, *Gen. Elec. Co.*, (applying section 113(h) to complaint alleging "various state statutory and common law claims"); *Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 801 F. Supp. 1432, 1436 (M.D. Pa. 1992) ("The plain language of the statute divests federal courts of jurisdiction over actions under state law.") (cleaned up). The state environmental law and tort claims listed in Appendix A seek injunctive relief that would impact any remedial action ultimately selected for the corresponding DoD facilities.[12] As such,

---

[12] This Motion only seeks dismissal of the Remedial Claims pleaded under tort law to the extent they seek injunctive relief. The United States is not seeking dismissal of those claims under CERCLA section 113(h) to the extent they seek recovery of damages. The United States is filing a separate motion to dismiss all of the tort claims against the United States in this MDL in their entirety based on the discretionary function exception of the Federal Tort Claims Act.

they are "challenges" to CERCLA response actions for the same reasons as the claims arising under federal environmental law.

Because all of the Remedial Claims seek relief that would interfere with CERCLA response actions, they must be dismissed for lack of jurisdiction under section 113(h).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Remedial Claims listed in Appendix A.

Respectfully submitted,

Dated: February 26, 2024                    TODD KIM
                                            Assistant Attorney General


                                            */s/  Andrew D. Knudsen*
                                            ANDREW D. KNUDSEN
                                            U.S. Department of Justice
                                            Environment & Natural Resources Division
                                            Environmental Defense Section
                                            P.O. Box 7611
                                            Washington, DC 20044
                                            (202) 353-7466
                                            Andrew.Knudsen@usdoj.gov

                                            *Counsel for the United States*

**APPENDIX A**

**List of Claims for Which United States Is Seeking Dismissal
under CERCLA Section 113(h)**

| Case Name / DoD Facility | Claims Subject to Dismissal | Relevant Relief Sought |
|---|---|---|
| *City of Newburgh v. United States, et al.*, No. 2:18-cv-03358-RMG<br><br>• Stewart Air National Guard Base (NY) | <u>Claim 1</u> – RCRA citizen suit, 42 U.S.C. § 6972(a)(1)(B) 2d Am. Compl. ¶¶ 346-62<br><br><u>Claim 2</u> – CWA citizen suit, 33 U.S.C. § 1365(a)(1) 2d Am. Compl. ¶¶ 363-96 | <u>Claim 1</u> – "This Court should issue an injunction, pursuant to 42 U.S.C. §6972(a), requiring the Federal Defendants … to immediately investigate and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake; set treatment standards to the lowest detectable levels for Washington Lake and all drinking water sources within the City Watershed for all PFAS prior to using the GAC to filter Washington Lake water; halt all use of PFAS on the Base Property and Airport Property and install an IRM to prevent PFAS from entering Washington Lake prior to using or requiring the use of the GAC to filter Washington Lake water …." 2d Am. Compl. ¶ 361.<br><br><u>Claim 2</u> – "This Court should issue an injunction, pursuant to 33 U.S.C. § 1365(a), requiring the Federal Defendants … to discontinue discharges of Pollutants in violation of the Airport and Base SPDES Permits and CWA, and to immediately investigate and remediate the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake." 2d Am. Compl. ¶ 394. |

| Case Name / DoD Facility | Claims Subject to Dismissal | Relevant Relief Sought |
|---|---|---|
| | | Prayer for Relief – requests judgment "Granting Permanent Injunctions to abate the public nuisance and imminent and substantial endangerment to health and the environment as follows: (a) Restraining Defendants from the use or storage of AFFF containing any form of PFAS at the Facilities; (b) Directing Defendants to immediately abate, contain, and remediate ongoing Disposals of all PFAS and other Contamination, including but not limited to PFOS and PFOA, that may present an imminent and substantial endangerment to health or the environment; (c) Directing Defendants to immediately install IRMs to prevent PFAS and other Contamination from entering the City Watershed, Washington Lake and the City Water Supply, including surface water, groundwater, and sediments; (d) Directing that all IRMs treat for all PFAS to Method Detection Limits; (e) Directing Defendants to fully investigate (including a hydrology study), identify sources of, remove, and remediate the Contamination of the groundwater, surface water, soil and sediments of the Facilities, Washington Lake, Silver Stream, and other related water bodies in the City Watershed …." 2d Am. Compl. pp. 82-83. |
| *County of Suffolk v. United States*, No. 2:19-cv-01181-RMG<br><br>• Frances S. Gabreski Air National Guard Base (NY) | Claim 1 – RCRA citizen suit, 42 U.S.C. § 6972(a)(1)(B) Compl. ¶¶ 107-20<br><br>Claim 2 – CWA citizen suit, 33 U.S.C. § 1365(a)(1) Compl. ¶¶ 121-37<br><br>Claim 8 – Negligence Compl. ¶¶ 187-99 | Claim 1 – "This Court should therefore issue an injunction, pursuant to 42 U.S.C. § 6972(a), requiring that the United States immediately investigate and remediate the Affected Property; set treatment standards to the lowest detectable levels for PFAS; [and] halt all use of PFAS on the Airport Property and install a GAC or other treatment or response system to filter the County Water Sources." Compl. ¶ 119.<br><br>Claim 2 – "This Court should issue an injunction, pursuant to 33 U.S.C. § 1365(a), requiring the United States to discontinue discharges of the Hazardous Substances in violation of the CWA, |

| Case Name / DoD Facility | Claims Subject to Dismissal | Relevant Relief Sought |
|---|---|---|
| | <u>Claim 10</u> – Abnormally dangerous activity Compl. ¶¶ 204-11<br><br><u>Claim 11</u> – Public nuisance Compl. ¶¶ 212-16<br><br><u>Claim 12</u> – Trespass Compl. ¶¶ 217-22 | and to immediately investigate and remediate the sediment and waters of the County Water Sources." Compl. ¶ 136.<br><br><u>Claim 8</u> – "Further, this Court should issue an injunction requiring the United States to immediately investigate, remove all sources of Hazardous Substances, and remediate the Airport Property, County Water Sources and surrounding vicinity. … The United States should control and protect the County Water Sources from the contamination through implementation of a watershed protection or similar plan to protect the County's Water Sources, immediate abatement of the nuisances, and remediation of the County Water Sources." Compl. ¶¶ 196, 198.<br><br><u>Claims 10, 12</u> – "Further, this Court should issue an injunction requiring the United States to immediately investigate and remediate the Affected Property." Compl. ¶¶ 211, 222.<br><br><u>Claim 11</u> – "Further, this Court should issue an injunction requiring the United States to immediately halt all disposals, investigate and remove sources of contamination and remediate the Affected Property." Compl. ¶ 216.<br><br><u>Prayer for Relief</u>: see paragraphs (a), (b), (h), (j), (k), and (*l*) (repeating same requests for relief). Compl. pp. 33-35. |
| *Elsinore Valley Municipal Water District v. 3M Company*, No. 2:21-cv-03699-RMG<br><br>• March Air Force Base (CA) | <u>Claim 3</u> – Negligence 2d Am. Compl. ¶¶ 287-300<br><br><u>Claim 4</u> – Continuing trespass 2d Am. Compl. ¶¶ 301-12 | <u>Prayer for Relief</u> – demands judgment including "An order that Defendants are required to abate the nuisance Defendants have caused." 2d Am. Compl. pp. 69-70. |

| Case Name / DoD Facility | Claims Subject to Dismissal | Relevant Relief Sought |
|---|---|---|
| | <u>Claim 5</u> – Public and private nuisance<br>2d Am. Compl. ¶¶ 313-36 | |
| *Lakewood Water District v. United States*, No. 2:20-cv-02899-RMG<br><br>• Joint Base Lewis-McChord (WA) | <u>Claim 10</u> – RCRA citizen suit, 42 U.S.C. § 6972(a)(1)(B)<br>Compl. ¶¶ 386-98 | <u>Claim 10</u> – "This Court should issue an injunction, pursuant to 42 U.S.C. § 6972(a), requiring Federal Defendants to immediately investigate and remediate the District's contaminated property and groundwater, including but not limited to addressing all PFAS in same; to halt all use of PFAS on JBLM; and to prevent any PFAS from JBLM from entering the District's soil and groundwater." Compl. ¶ 397.<br><br><u>Prayer for Relief</u> – requests relief including "Permanent injunctions to abate the imminent and substantial endangerment to health and the environment as follows: (i) Restraining Federal Defendants from the use or storage of AFFF containing any form of PFAS at JBLM; (ii) Directing Federal Defendants to immediately abate, contain, and remediate ongoing use and disposal of all PFAS, including, but not limited to, PFOS and PFOA, that may present an imminent and substantial endangerment to health or the environment; [and] (iii) Directing Federal Defendants to prevent PFAS contamination from entering the District's soil and groundwater." Compl. p. 67. |
| *New Jersey Department of Environmental Protection v. United States*, No. 2:21-cv-00146-RMG<br><br>• Joint Base McGuire-Dix-Lakehurst (NJ) | <u>Claim 1</u> – SDWA "imminent and substantial endangerment" provision, 42 U.S.C. § 300i<br>Compl. ¶¶ 69-75<br><br><u>Claim 2</u> – New Jersey Safe Drinking Water Act "imminent | <u>Claim 1</u> – requests relief "Ordering, pursuant to 42 U.S.C. § 300i(a), the United States to provide, or pay for the provision of, an alternative water supply for any and all drinking water supplies that are presently contaminated in excess of New Jersey's MCLs for PFOA and/or PFOS at and around the United States' facilities throughout New Jersey;" and "Ordering, pursuant to 42 U.S.C. § 300i(a), the United States to abate or mitigate the PFOS and/or PFOA groundwater contamination affecting or which may affect |

| Case Name / DoD Facility | Claims Subject to Dismissal | Relevant Relief Sought |
|---|---|---|
| • Former Naval Air Warfare Center Trenton (NJ)<br><br>• Naval Weapons Station Earle (NJ) | and substantial endangerment" provision, N.J.S.A. § 58:12A-6 Compl. ¶¶ 76-80 | drinking water supplies that they caused at and around the United states' facilities throughout New Jersey." Compl. pp. 23-24.<br><br>Claim 2 – requests relief "Ordering, pursuant to N.J.S.A. § 58:12A-6, the United States to provide, or pay for the provision of, an alternative water supply for any and all drinking water supplies that are presently contaminated in excess of New Jersey's MCLs for PFOS or PFOA at and around the United States' facilities throughout New Jersey;" and "Ordering, pursuant to N.J.S.A. § 58:12A-6, the United States to abate or mitigate the PFOS and/or PFOA groundwater contamination affecting or which may affect drinking water supplies that they caused at and around the United States' facilities throughout New Jersey." Compl. pp. 26-27. |
| *New Mexico v. United States*, No. 2:20-cv-02115-RMG<br><br>• Cannon Air Force Base (NM)<br><br>• Holloman Air Force Base (NM) | Claim 1 – New Mexico Hazardous Waste Act imminent/substantial endangerment provision, NMSA 74-4-13 Compl. ¶¶ 135-41<br><br>Claim 2 – RCRA citizen suit, 42 U.S.C. § 6972(a)(1)(B) Compl. ¶¶ 142-50 | Claim 1 – "By reason of the foregoing acts and omissions of Defendants, the State is entitled to an order for such relief as may be necessary to remedy the results of Defendants' conduct. Such relief includes but is not limited to injunctive relief compelling Defendants to take all steps necessary to achieve permanent and consistent compliance with the HWA." Compl. ¶ 141.<br><br>Claim 2 – "By reason of the foregoing acts and of Defendant, the State is entitled to an order for such relief as may be necessary to remedy the results of Defendants' conduct. Such relief includes but is not limited to injunctive relief compelling Defendant to take all steps necessary to achieve permanent and consistent compliance with RCRA." Compl. ¶ 149.<br><br>Prayer for Relief – requests relief including "Immediate injunctive relief requiring the abatement of ongoing violations of the HWA and RCRA, [and] abatement of the conditions creating an imminent and substantial endangerment," and "A permanent injunction |

| Case Name / DoD Facility | Claims Subject to Dismissal | Relevant Relief Sought |
|---|---|---|
| | | directing Defendants to take all steps necessary to achieve permanent and consistent compliance with HWA and RCRA." Compl. p. 33. |
| *Town of New Windsor v. United States*, No. 2:21-cv-01496-RMG<br><br>• Stewart Air National Guard Base (NY) | Claim 2 – Negligence<br>Compl. ¶¶ 499-526<br><br>Claim 3 – Public nuisance<br>Compl. ¶¶ 527-36<br><br>Claim 4 – Trespass<br>Compl. ¶¶ 537-47<br><br>Claim 5 – Abnormally dangerous activities<br>Compl. ¶¶ 548-54 | Claim 2 – "Further, this Court should issue an injunction requiring the United States … to immediately investigate, remove all sources of Hazardous Substances and remediate the Base Property, the Airport Property, the Watershed and Town Property." Compl. ¶ 526.<br><br>Claim 3 – "Further, this Court should issue an injunction requiring DOD … to immediately … halt their disposals; investigate and remove sources of the contamination; and remediate the Base Property, the Airport Property, and the Town's drinking water supplies." Compl. ¶ 536.<br><br>Claim 4 – "Further, this Court should issue an injunction requiring the United States … to immediately investigate and remediate the Base Property, the Airport Property, and the Watershed, including, but not limited to, Rec Pond, Silver Stream, the Moodna Creek, and the groundwater sourcing the Town's drinking water wells." Compl. ¶ 547.<br><br>Claim 5 – "Further, this Court should issue an injunction requiring the United States … to immediately investigate and remediate the Base Property, the Airport Property, the Town's Property, the sediment and waters of the Watershed (including Rec Pond and Silver Stream), and the waters sourcing the Town's drinking water supplies." Compl. ¶ 554.<br><br>Prayer for Relief – requests relief:<br>"Granting Permanent injunctions to abate the public nuisance, and |

| Case Name / DoD Facility | Claims Subject to Dismissal | Relevant Relief Sought |
|---|---|---|
| | | imminent and substantial endangerment to health and the environment, as follows: (a) Restraining Defendants from the use or storage of AFFF containing any form of PFAS at the Facilities; (b) Directing Defendants to immediately abate, contain, and remediate ongoing disposals of all PFAS, including but not limited to PFOS and PFOA; (c) Directing Defendants to immediately install or implement IRMs to prevent PFAS from entering the Watershed, including surface waters, groundwater, and sediments; [and] (d) Directing that all IRMs, final remedies and treatment of the Town's drinking water supplies produce a result of drinking water that contains non-detectible limits for all PFAS;" and "To is implemented [*sic*] and an IRM is installed to prevent PFAS from entering the Watershed and the Town's drinking water supplies." Compl. pp. 101-02. |