# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTIONS LIABILITY LITIGATION | ) ) ) ) ) | MDL No. 2:18-mn-2873-RMG<br><br>This Document Relates to:<br>ALL CASES |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S OMNIBUS MOTION TO DISMISS BASED ON THE DISCRETIONARY-FUNCTION EXCEPTION

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND OF EXEMPLAR CASE ........................................................ 7

ARGUMENT ...................................................................................................................... 11

I.      SUBJECT-MATTER JURISDICTION EXISTS OVER ALL THE CASES,
AS EACH COMPLAINT ALLEGES AT LEAST ONE VIOLATION OF
STATE LAW RESPECTING WATER POLLUTION, AS TO WHICH
IMMUNITY HAS BEEN CATEGORICALLY WAIVED ...................................... 11

II.     SUBJECT-MATTER JURISDICTION EXISTS OVER THE
19 CASES ALLEGING TRESPASS, AS TO WHICH
IMMUNITY HAS BEEN CATEGORICALLY WAIVED ...................................... 18

III.    THE DISCRETIONARY-FUNCTION EXCEPTION DOES NOT APPLY TO
THE GOVERNMENT'S FAILURE TO CONTROL DISCHARGES OF AFFF
FROM MILITARY SITES ACROSS THE COUNTRY ........................................ 25

       A.     The Principal Legal Authority Cited by the Government, Focusing
On the Government as the Regulator of Private Conduct or the
Provider of Public Goods and Services, is Inapposite ................................. 26

       B.     The Government Cannot Pass the Two-Step Test under *Gaubert* ............................ 32

            1.     *Gaubert* Step 1: The Government's Violation
of Mandatory Policies and Directives ............................................. 33

            2.     *Gaubert* Step 2: The Discretion Exercised by Environmental Safety
Employees Pursuant to Federal Statutes and Regulations Involves
Scientific and Professional Matters, and Not "Policy" Analysis ................... 37

            3.     Garden-Variety Negligence Is Not Subject
to the DFE Under *Gaubert* Step 2 ................................................. 42

IV.    THE COURT SHOULD ORDER JURISDICTIONAL DISCOVERY
AND DENY THE GOVERNMENT'S DFE MOTION AS TO THE
23 COMPLAINTS PERTAINING TO NON-CAFB SITES ................................. 51

V.     THE GOVERNMENT'S OTHER ARGUMENTS LACK MERIT ....................... 59

CONCLUSION ................................................................................................................... 65

## TABLE OF AUTHORITIES

**Cases**

*Aleutco Corp. v. United States*, 244 F.2d 674 (3d Cir. 1957)..........................................62

*Allen-Fillmore v. United States*, 2023 U.S. Dist. LEXIS 153035
   (E.D. Pa. Aug. 30, 2023)...........................................................................................45

*Andrulonis v. United States*, 593 F. Supp. 1336 (N.D.N.Y. 1984)................................40

*Anestis v. United States*, 749 F.3d 520 (6th Cir. 2014) .................................................39

*Aragon v. United States*, 146 F.3d 819 (10th Cir. 1998) ...........................................48-49

*ARA Leisure Services v. United States*, 831 F.2d 193 (9th Cir. 1987)...........................40

*Aslakson v. United States*, 790 F.2d 688 (8th Cir. 1986)...............................................39

*Berkovitz v. United States*, 486 U.S. 531 (1988)........................................... 27, 39, 46-47

*Billups v. United States*, 854 Fed. Appx. 514 (4th Cir. 2021) .................................. 23-24

*Birnbaum v. United States*, 588 F.2d 319 (2d Cir. 1978) ...............................................23

*Black v. Sheraton Corp. of America*, 564 F.2d 531 (D.C. Cir. 1977).......................22-23

*Bolt v. United States*, 509 F.3d 1028 (9th Cir. 2007) ................................................29-30

*Branch v. Smith*, 538 U. S. 254 (2003) .........................................................................13

*Bulger v. Hurwitz*, 62 F.4th 127 (4th Cir. 2023)............................................................52

*Bunting v. United States*, 2020 U.S. Dist. LEXIS 210416
   (E.D.N.C. Nov. 10, 2000) ......................................................................................43

*Burrows v. United States*, 120 F. App'x 448 (4th Cir. 2005) (per curiam)....................24

*California ex rel. State Water Resources Control Bd. v. EPA*,
   511 F.2d 963 (9th Cir. 1975) ..................................................................................34

*Carney v. United States*, 368 F. Supp. 2d 439 (D. Md. 2005).......................................45

*Cestonaro v. United States*, 211 F.3d 749 (3d Cir. 2000)........................................43-44

*Chow v. Wash. Metro. Area Transit Auth.*, 391 F. Supp. 3d 37 (D.D.C. 2019).............51

*ChoPP Computer Corp. v. United States*, 5 F.3d 1344 (9th Cir. 1992) .........................................23

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992)............................................................. 14-16

*Cohen v. United States*, 813 F. App'x 864 (4th Cir. 2020) (per curiam).......................................24

*Conrad v. United States*, 2017 U.S. Dist. LEXIS 41985 (D.S.C. Mar. 22, 2017) .......................56

*Cook Inlet Drift Assoc. v. Trinidad Corp. (In re Glacier Bay)*,
    71 F.3d 1447 (9th Cir. 1995) .......................................................................................39

*Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199 (2d Cir. 2009)..............................................13

*Dalehite v. United States*, 346 U.S. 15 (1953) .............................................20-23, 27-28, 32, 43-44

*Duke by Duke v. Department of Agric.*, 131 F.3d 1407 (10th Cir. 1997)......................................45

*Elmore v. Estate of Norman L. Gilbreath*, 2016 U.S. Dist. LEXIS 184402
    (D. N.M. Mar. 30, 2016) ...............................................................................................9

*EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200 (1976) ........................14, 34

*Faber v. United States*, 56 F.3d 1122 (9th Cir. 1995) ..................................................................39

*Fabend v. Rosewood Hotels & Resorts*, 174 F. Supp. 2d 356 (D.V.I. 2001) ................................45

*Farmer v. Employment Sec. Comm'n*, 4 F.3d 1274 (4th Cir. 1993)..............................................13

*Fed. Bus. Ctrs., Inc. v. United States*, 2014 U.S. Dist. LEXIS 95915
    (D. N.J. July 15, 2014).................................................................................................45

*Fitzmaurice v. United States*, 2013 U.S. Dist. LEXIS 126735
    (M.D. Pa. Sept. 5, 2013)..............................................................................................45

*Gibson v. United States*, 809 F.3d 807 (5th Cir. 2016) ................................................................45

*Gonzalez v. United States*, 690 F. Supp. 251 (S.D.N.Y. 1988).....................................................30

*Gotha v. United States*, 115 F.3d 175 (3d Cir. 1997) ......................................................... 30, 43-45

*Gray v. Bell*, 712 F.2d 490 (D.C. Cir. 1983) ................................................................................24

*Green v. United States*, 630 F.3d 1245 (9th Cir. 2011) ................................................................41

*Griffin v. United States*, 500 F.2d 1059 (3d Cir. 1974) ................................................................39

*Hartman v. Texaco Inc.*, 937 P.2d 979 (N.M. App. 1997) ................................................. 9

*Hatahley v. United States*, 351 U.S. 173 (1956) .................................................... 20-23

*Hinson v. United States*, 2017 U.S. Dist. LEXIS 4440
    (E.D.N.C. Jan. 12, 2017) ........................................................................... 45

*Hopi Tribe v. United States*, 782 F.3d 662 (Fed. Cir. 2015) .................................. 63-64

*In re Flint Water Cases*, 482 F. Supp. 3d 601 (E.D. Mich. 2020) ........................... 39-40

*Jacque v. Steenberg Homes*, 563 N.W.2d 154 (Wis. 1997) ..................................... 20

*Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018 (9th Cir. 1994) ............... 39

*Kerns v. United States*, 585 F.3d 187 (4th Cir. 2009) ......................................... 51, 55

*Kohl v. United States*, 699 F.3d 935 (6th Cir. 2012) ............................................ 48

*Laird v. Nelms*, 406 U.S. 797 (1972) ............................................................... 22

*Levin v. United States*, 568 U.S. 503 (2013) ..................................................... 23

*Lewis v. United States*, 2024 U.S. Dist. LEXIS 50208
    (D. La. Mar. 21, 2024) ............................................................................. 34

*Limone v. United States*, 579 F.3d 79 (1st Cir. 2009) .......................................... 46

*Loughlin v. United States*, 286 F. Supp. 2d 1 (D.D.C. 2003),
    *aff'd*, 393 F.3d 155 (D.C. Cir. 2004) ........................................................... 60

*Loughlin v. United States*, 393 F.3d 155 (D.C. Cir. 2004) .................................... 49

*Love v. United States*, 915 F.2d 1242 (9th Cir 1990) .......................................... 62

*Maalouf v. Swiss Confederation*, 208 F. Supp. 2d 31 (D.D.C. 2002) ....................... 30

*Maghen v. United States*, 2021 U.S. Dist. LEXIS 174651
    (E.D.N.Y. Sept. 14, 2021) ......................................................................... 45

*Marchiona v. United States*, 2023 U.S. Dist. LEXIS 48104
    (C.D. Cal. Jan. 26, 2023) .......................................................................... 45

*Mathison v. United States*, 2014 U.S. Dist. LEXIS 23680
    (D. Colo. Feb. 24, 2014) ........................................................................... 45

v

*McAdams v. United States*, 2023 U.S. Dist. LEXIS 145987
(E.D. Pa. Aug. 21, 2023) ...........................................................................................45

*McKay v. United States*, 703 F.2d 464 (10th Cir. 1983) ...........................................23

*McNeill v. Rice Eng'g & Operating Inc*., 128 P.3d 476 (N.M. App. 2005) .....................9

*Medina v. United States*, 259 F.3d 220 (4th Cir. 2001) .............................................24

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ...........................................................16

*Menkin v. United States*, 99 F. Supp. 3d 577 (E.D. Pa. 2015) ...................................45

*Mogollon Gold & Copper Co. v. Stout*, 91 P. 724 (N.M. 1907)....................................9

*Mulcahey v. Columbia Organic Chems. Co*., 29 F.3d 148 (4th Cir. 1994) ...................34

*New Mexico v. General Electric Co.*, 335 F. Supp. 2d 1185 (D.N.M. 2004)............ 9-10

*North Carolina ex rel. Cooper v. TVA*, 515 F.3d 344 (4th Cir. 2008) ..................... 15-16

*OSI, Inc. v. United States*, 285 F.3d 947 (11th Cir. 2022) ..........................................49

*O'Toole v. United States*, 295 F.3d 1029 (9th Cir. 2002) ...........................................45

*Oxendine v. United States*, 2009 U.S. Dist. LEXIS 104450
(D.S.C. Oct. 15, 2009) .............................................................................................24

*Pieper v. United States*, 2016 U.S. Dist. LEXIS 106007
(D. Md. Aug. 11, 2016), *aff'd*, 713 Fed. Appx. 137 (4th Cir. 2017)......................24, 31

*Pieper v. United States*, 713 Fed. App'x 137 (4th Cir. 2017) (unpublished) ........... 47-48

*Pride v. Murray*, 595 F. Supp. 3d 453 (W.D.N.C. 2022) ...........................................43

*Raymond v. United States*, 923 F. Supp. 1419 (D. Kan. 1996) ...................................30

*Reynolds v. United States*, 2015 U.S. Dist. LEXIS 184062 (D.S.C. Aug. 14, 2015)... 42-43, 45, 50

*Ridge Seneca Plaza, LLC v. BP Prod. N. Am*.,
2012 U.S. Dist. LEXIS 189443 (W.D.N.Y. July 26, 2012)....................................18

*Robinson v. Resolution Trust Corp. (In re Landmark Land Co.)*,
1997 U.S. App. LEXIS 6476 (4th Cir. Apr. 7, 1997) .............................................13

*Rich v. United States*, 811 F.3d 140 (4th Cir. 2015)................................43, 51-52, 55-56

*Roman v. Velarde*, 428 F.2d 129 (1st Cir. 1970) ..................................................22

*Ross v. United States*, 641 F. Supp. 368, 376 (D.C. Cir. 1986)...........................62

*Sanchez ex rel D.R.-S v. United States*, 671 F.3d 86 (1st Cir. 2012)....................34

*Sanders v. Callender*, 2018 U.S. Dist. LEXIS 3488 (D. Md. Jan. 9, 2018)..................59

*Schwartzman, Inc. v. Atchison, T. & S.F. Ry.*, 857 F. Supp. 838 (D.N.M. 1994) ..........................9

*Seaside Farm, Inc. v. United States*, 842 F.3d 853 (4th Cir. 2016)................... 27, 51-52

*Simons v. United States*, 413 F.2d 531 (5th Cir. 1969) ..........................................20, 22

*Snyder Ranches, Inc. v. Oil Conservation Comm'n of New Mexico*,
  798 P.2d 587 (N.M. 1990)......................................................................9

*Soldano v. United States*, 453 F.3d 1140 (9th Cir. 2006) .....................................39

*Sutton v. United States*, 819 F.2d 1289 (5th Cir. 1987)......................................24

*Terbush v. United States*, 516 F.3d 1125 (9th Cir. 2007) ....................................45

*Torres-Estrada v. Cases*, 88 F.4th 14 (1st Cir. 2023) ........................................43

*TVA v. Hill*, 437 U.S. 153 (1978) .........................................................35

*Tucker v. Cascade Gen., Inc.*, 2011 U.S. Dist. LEXIS 120298
  (D. Ore. Oct. 17, 2011) .................................................................45

*United States v. Com. of Puerto Rico*, 721 F.2d 832 (1st Cir. 1983)...........................14

*United States v. Empresa de Viacao Aerea Rio Grandense
  (Varig Airlines)*, 467 U.S. 787 (1984)................................................26, 27, 29

*United States v. Artieri*, 491 F.2d 440 (2d Cir. 1974)........................................22

*United States v. Gaubert*, 499 U.S. 315 (1999)..............................................25

*Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637 (4th Cir. 2018) ...........13

*Walen v. United States*, 246 F. Supp. 3d 449 (D.D.C. 2017)..................................45

*Washington v. Dep't of the Navy*, 446 F. Supp. 3d 20 (E.D.N.C. 2020)........................43

vii

*Waverley View Invs., LLC v. United States*, 79 F. Supp. 3d 563 (D. Md. 2015) ..................24, 31

*Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005) ........................................30

*Wood v. United States*, 777 F.3d 123 (4th Cir. 2017) ........................................ 28-29, 47

*Wu Tien Li-Shou v. United States*, 777 F.3d 175 (4th Cir. 2015) ................................35

*Xi v. Haugen*, 68 F.4th 824 (3d Cir. 2023) ............................................................40, 43

*Ziglar v. Abbasi*, 582 U.S. 120 (2017) .....................................................................1

## Statutes, Executive Orders, and Regulations

28 U.S.C. § 1346(b)(1) ................................................................ 1, 19, 20-21

28 U.S.C. § 2674 ...................................................................... 1-2, 4, 19

28 U.S.C. § 2680(a) ........................................................... 1-2, 11-12, 22, 40

33 U.S.C. § 1323(a) ................................................... 2, 5, 12-17, 30-39, 41, 48

Comprehensive Environmental Response, Compensation and Liability Act
     (CERCLA), 42 U.S.C. § 9620(a)(4) ..............................................17

Federal Facilities Compliance Act of 1992,
     Pub. L. 102-386, Oct. 6, 1992, 106 Stat. 1505.....................................17

Federal Water Pollution Control Act of 1972,
     Pub. L. No. 92-500, 86 Stat. 816, 28 U.S.C. § 2674......................................12, 14

Federal Water Pollution Control Act Amendments of 1977
     (Clean Water Act of 1977), Pub. L. No. 95–217,
     91 Stat. 1566 (1977) (codified at 33 U.S.C. § 1323(a))...................................12, 14

New York Environmental Conservation Law § 37–0107....................................... 17-18

Executive Order 10014 (1948)..................................................................48

Executive Order 12088 (1978)............................................................... 34-36

Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6961 ........................17

6 N.Y.C.R.R. § 597.3 ...........................................................................18

## Other Authorities

138 Cong. Rec. H9135 (daily ed. Sept. 23, 1992) (statement of Rep. Beilenson) ......................17

138 Cong. Rec. H9136 (daily ed. Sept. 23, 1992) (statement of Rep. Dingell) ..........................17

Assistant Sec'y Def. Energy Installations & Env't, *Per- and Polyfluoroalkyl*
    *Substances in Groundwater* (2023) ...........................................................................................4

Guido Calabresi & A. Douglas Melamed, *Property Rules, Liability Rules, and*
    *Inalienability: One View of the Cathedral*, 85 Harv. L. Rev. 1089 (1972) ...........................20

R.L. Darwin, *Estimated Inventory of PFOS-based Aqueous Film*
    *Forming Foam (AFFF): Update to the 2004 Report Entitled*
    *"Estimated Quantities of Aqueous Film Forming Foam (AFFF)*
    *In The United States* (2011) ....................................................................................................4

Department of Defense, *PFAS Data: Cleanup of PFAS*,
    https://www.acq.osd.mil/eie/eer/ecc/pfas/data/cleanup-pfas.html..............................................4

Keith N. Hylton, *Duty in Tort Law: An Economic Approach*,
    75 Fordham L. Rev. 1501 (2007).............................................................................................20

Inspector General, U.S. Dept. of Defense, (U) Evaluation of the Department of
    Defense's Actions to Control Contaminant Effects from Perfluoroalkyl and
    Polyfluoroalkyl Substances at Department of Defense Installations
    (Report No. DODIG-2021-105), July 22, 2021 .......................................................................42

Henry E. Smith, *Property and Property Rules*, 78 N.Y.U. L. Rev. 1719 (2004) ..........................20

> *"[N]ational-security concerns must not become a talisman used to*
> *ward off inconvenient claims—a label used to cover a multitude of sins."*
>
> ~ *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) (cleaned up)

## INTRODUCTION

The Government's motion to dismiss alleges an absence of subject-matter jurisdiction to sustain the claims brought under the Federal Tort Claims Act ("FTCA") in 27 of the cases in this MDL, listed in its Motion (ECF No. 4548) and in Appendix A (ECF 2548-4) to its Memorandum of Law (ECF 4548-1) ("Gov't Mem."). These lawsuits have been brought by individuals and entities (companies, states, and municipalities) that own, live, and/or conduct operations on property adjacent to property owned or leased by the Government, on which the Government engaged for many years in operations using Aqueous Film-Forming Foam (AFFF). Plaintiffs, alleging various violations under state law, have brought suit pursuant to 28 U.S.C. § 1346(b)(1), by which Congress conveyed on the federal courts jurisdiction over claims

> for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

The Government's argument is simple and all encompassing: that despite this provision and 28 U.S.C. § 2674 (generally waiving immunity against suit on "tort claims, in the same manner and to the same extent as a private individual under like circumstances"), the Government has immunity on *all* the claims in *all* 27 complaints, based on the discretionary-function exception ("DFE") to immunity set out in 28 U.S.C. § 2680(a). The Government's theory here is that all the state-law claims in Plaintiffs' complaints attack discretionary decisions

1

made by the military regarding the "use and handling" of AFFF, and therefore none of them can be permitted to go forward.

But the Government's simplistic framing of this case is mistaken, both in the narrow legal framework it employs and in its particular factual focus.

Regarding the legal framework, the Clean Water Act of 1972 ("CWA") expressly subjects the United States to liability under state tort law for water pollution. *See* 33 U.S.C. § 1323(a). This specialized waiver of immunity is entirely independent from the general waiver of immunity in 28 U.S.C. § 2674 (a waiver which is then modified by the DFE in 28 U.S.C. § 2680(a)). That this specialized waiver of immunity is *not* subject to the earlier-enacted DFE is explicitly stated in § 1323(a) itself, which controls "notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law." Yet the Government entirely overlooks this specialized waiver of immunity regarding tort suits based on water pollution.

Likewise overlooked is the fact that in enacting the FTCA in 1946, although with respect to most intentional torts it did not waive immunity, Congress *did* categorically waive immunity to lawsuits alleging common-law trespass. That the DFE has no application to Plaintiff's trespass claims is clear from an unbroken line of appellate court precedent over the past seven decades, including four Supreme Court decisions and a recent decision of the Fourth Circuit.

Even setting aside these specialized categorical waivers of immunity, in making its DFE argument the Government is also mistaken in its factual framing of the issues. The Government's argument is based on the idea that Plaintiffs' lawsuits must be construed as constituting a challenge to the Government's decisions on military matters, specifically, its "use and handling" of AFFF over the years. To the contrary: looking beyond occasional passages in Plaintiffs'

2

complaints quoted by the Government in support of this narrative, the lawsuits brought by the individuals and entities that have sued the Government on the account of its use and handling of AFFF on property owned or leased by it, which impacted its neighbors, do not hinge on second-guessing *any* element of the Government's military policy. In particular, these lawsuits can proceed on the merits without any need for Plaintiffs to criticize any of the military's past decisions regarding *which* fire-suppressant products to use (that is, the chemical composition of the products), *how often* to use them (e.g., the frequency of their use for training purposes), or *how many years* to keep using them, while exploring alternatives. Nor have Plaintiffs sought injunctive relief to regulate the military's future use or handling of AFFF. The references in the complaints to the military's use of AFFF are relevant not as a critique of the military justification for such activity, but rather because they show the impact of these activities on Plaintiffs' own interests, caused by inadequacies in the containment of AFFF, an adverse impact that can be redressed through the state-law tort remedies invoked in Plaintiffs' complaints.

Plaintiffs' lawsuits are predicated on the principle—which the Government nowhere contests—that when operating not as a regulator of the conduct of private individuals, but *as an owner or occupier of property, carrying out its own operations*, the Government enjoys no special immunity from state law regarding one's obligations toward one's neighbors (here, in a particular, the obligation not to pollute the water sources relied on by one's neighbors). Like any other entity, the Government must conduct its operations on property it controls in a way that conforms with the legal requirements imposed by tort law in the relevant States.

The Government is free, of course, to make whatever decisions of a military nature it feels appropriate regarding *activity on its own land*, but that freedom of latitude does not diminish its obligation as a landowner to take the precautions required by state tort law to avoid

adverse *impact on its neighbors' land*. If the Government fails to meet its obligations in this respect, assuming that there is no applicable exception to the waiver of immunity, Congress mandates that the Government "shall be liable . . . for [torts] in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674.

Thus, all these lawsuits seek to do is hold the Government liable for its pollution of the water flowing to its neighbors on account of its failure to adequately contain the AFFF used on its property *after* its use, in exactly the same way private persons or companies would be held accountable under state law if they were the source of the AFFF contamination—nothing more and nothing less.

Although the scope of liability asserted by these lawsuits is narrow, the importance of this litigation for the public is broad. The U.S. military is the largest purchaser and user of AFFF in United States history.[1] As of last year, the Department of Defense (DoD) had identified nearly 600 defense facilities—in nearly every state and in several territories—that have released PFAS into the environment, necessitating further risk assessment and cleanup.[2] Nearly 90 percent of military installations at which PFAS-driven remedial investigations are underway are "estimated to be in the proximity of groundwater aquifers that serve as a primary or secondary source of drinking water[.]"[3]

---

[1] *See, e.g.,* R.L. Darwin, *Estimated Inventory of PFOS-based Aqueous Film Forming Foam (AFFF): Update to the 2004 Report Entitled "Estimated Quantities of Aqueous Film Forming Foam (AFFF) In The United States* at 16 (2011) (https://perma.cc/L6JV-RLES).

[2] Department of Defense, *PFAS Data: Cleanup of PFAS*, https://www.acq.osd.mil/eie/eer/ecc/pfas/data/cleanup-pfas.html (https://perma.cc/CEK5-7ZLV).

[3] Assistant Sec'y Def. Energy Installations & Env't, *Per- and Polyfluoroalkyl Substances in Groundwater* at 4 (2023), https://www.acq.osd.mil/eie/eer/ecc/pfas/docs/reports/Briefing-on-PFAS-in-Groundwater.pdf (https://perma.cc/XU7L-E7Z5).

Although this omnibus opposition brief will reference the claims set forth in a number of complaints, as warranted on particular points, prior to launching into a legal analysis of the motion this brief will begin with a factual overview focusing on one exemplar complaint, involving a dairy farm in New Mexico (adjacent to Cannon Air Force Base), which has brought tort claims alleging negligence, nuisance, and trespass. Following that concrete factual framing, Plaintiffs then set out a four-part argument.

**Part I** examines the specialized, categorical waiver of immunity enacted by Congress in the CWA. 33 U.S.C. § 1323(a) mandates that if the Government engages "in any activity resulting, or which may result, in the discharge or runoff of pollutants," it must comply with all "requirements" of state law—language which has been construed, in controlling precedent from the Supreme Court and Fourth Circuit, as including the requirements of *state tort law*. The text of § 1323(a) makes explicit that this waiver, as most recently amended in 1977, overrides any immunity the Government might otherwise enjoy under the FTCA, enacted in 1946—thereby rendering the Government's briefing of the DFE irrelevant to the decision of its motion. Further, § 1323(a) makes clear how any tension between this waiver of immunity and military necessity is to be moderated: the President may exempt the military "from compliance with any such requirement if he determines it to be in the paramount interest of the United States to do so."

**Part II** then demonstrates that there is no basis for dismissing the complaints that include a claim for trespass. As the Supreme Court explicated twice in the decade after enactment of the FTCA, in enacting the FCTA Congress clearly intended to effect a *categorical* waiver of immunity concerning common-law trespass claims. More than half a century of appellate court decisions since then, including a recent Fourth Circuit decision, have adhered to that statutory construction, which precludes applying the DFE to Plaintiffs' trespass claims.

5

Although Parts I and II are sufficient to dispose of the Government's motion, **Part III** then demonstrates that even if that were not so, the Government's motion would still have to be denied based on an application of the two-part test controlling the discretionary-function exception set out in *United States v. Gaubert*, 499 U.S. 315 (1999). The Government enjoys no immunity where the federal employees whose acts, or failure to act, caused the harm alleged by Plaintiffs, thereby violated mandatory policies and directives (**Part III-A**). Further, to the degree that environmental safety employees exercised any discretion, it involved relatively mundane matters of scientific and professional analysis in the specific field of water-pollution control, not matters of public policy (**Part III-B**). Moreover, under Fourth Circuit precedent, the Government has no immunity from claims alleging specific acts of so-called "garden-variety negligence," such as equipment leaks, accidents, failures to maintain machinery, and other unintentional releases of AFFF rooted in human error, because such acts do not involve policy considerations and cannot be portrayed as the deliberately intended product of a "policy" choice (**Part II-C**).

**Part IV** then addresses the 23 complaints other than those involving Cannon Air Force Base (the site selected for site-specific discovery). Even if all of the above arguments were found by this Court to be an insufficient basis for rejecting the Government's motion, it would still be inappropriate for those complaints to be dismissed without first permitting site-specific discovery. Discovery would be needed to allow Plaintiffs a full and fair opportunity to compile a factual record sufficient to show, as to each site, the existence of mandatory requirements; a focus by environmental protection employees on the application of scientific and professional analysis rather than on policy analysis; and/or specific examples of garden-variety negligence.

**Part V** then concludes with a brief explanation of why the Government's other arguments lack merit.

## FACTUAL BACKGROUND OF EXEMPLAR CASE

Plaintiffs Art and Renee Schaap ("the Schaaps") own and manage Highland Dairy, founded as a family business in 1992 on a 320-acre plot near Clovis, New Mexico, to take advantage of an abundant supply of clean water. **Ex. 1,** Affidavit of Art Schaap ("Schaap Aff.") ¶¶ 2-6. The Government admits that AFFF was first introduced at Cannon Air Force Base (CAFB) in 1970 and was in widespread use at the Base in the ensuing decades. Gov't CAFB Br. at 2-4. Expert analysis of environmental test results has established that: (1) the AFFF products used at CAFB included per- and polyfluoroalkyl substances ("PFAS"), which are highly toxic, easily dissolve in water, and linger in the environment for many years, **Ex. 2**, Affidavit of James P. Bearzi ("Bearzi Aff."), ¶¶ 14-16; (2) the PFAS was released into the environment at over a dozen locations on base as the result of many activities and numerous accidents, *id*., ¶¶ 7, 25-27, 32-38; and (3) the PFAS severely contaminated the groundwater used by nearby landowners, for at least four miles surrounding CAFB, including the groundwater relied on by Highland Dairy and the other Dairy Plaintiffs. *Id*., ¶¶ 8-12, 17-24, 39-58.

By the mid-1990s, Highland Dairy was producing milk with a productivity putting it in the top 25% of all milk producers in New Mexico—success that continued growing into the late 2000s, allowing the Schaaps to expand the size of their dairy farm more than ten-fold, to 3,593 acres. Schaap Aff. ¶¶ 3, 9. Removing PFAS from the equation, the fair market value of the property was determined in April 2022 to be approximately $18 million. Schaap Aff. ¶ 99. When the Schaaps filed their complaint in 2019, their dairy farm was the home of approximately 6,000

cattle, employed approximately 40 people, and generated about $2.6 million in annual revenues. Complaint (Dkt. 1) ¶¶ 18-20; *see also* Schaap Aff., ¶¶ 3, 8.

In the several years prior to 2018, the Schaaps had witnessed a substantial decline in the productivity of their dairy cattle, and a million-dollar annual revenue drop, which experts brought in to assess the situation were unable to explain. Complaint ¶¶ 21-22; Schaap Aff. ¶¶ 10-11. The mystery was solved in September 2018, when the Air Force informed the Schaaps that testing of their wells had revealed PFOA and PFOS contamination greatly exceeding the EPA's Health Advisory Levels. Complaint ¶¶ 23-24; Schaap Aff. ¶¶ 12-21. The Air Force reported that combined PFOA/PFOS levels of 671 ppt and 1,649 ppt had been detected in the family's drinking water and the water fed to their livestock, respectively. Schaap Aff. ¶ 21. Additional testing performed at Highland Dairy found PFAS levels in the dairy's water of more than 41,000 ppt. Schaap Aff. ¶ 93.

The contamination of their water has brought the Schaaps' dairy business to financial ruin. Their Grade A Dairy Permit was cancelled, so their milk could not be sold, which led to the termination of their output contract with Dean's Foods, causing $37 million in operating losses (despite participation in the U.S Department of Agriculture's ("USDA") Dairy Indemnity Payment Program ("DIPP")). Regulators excluded the dairy cows from the beef-processing market, so they could not even be slaughtered to recoup some of the losses. In the end the Schaaps were forced to euthanize more than 3,600 cows sickened with PFAS poisoning. Schaap Aff. ¶¶ 34-39, 44-46, 52-66, 79-92.

An April 2022 appraisal of Highland Dairy's property estimated that it is now worthless. Schaap Aff. ¶ 99. The cost of remediating the existing PFAS contamination would likely be about $570,000 per acre which, when applied to the entire property, puts the estimate of

Highland Dairy's total remediation costs at a minimum of $2 billion. *Id.*, ¶ 100. The total

business loss suffered by the Schaaps exceeds $65 million. *Id.*, ¶ 101.

The Schaaps' Complaint alleges four causes of action: negligence (Count I), nuisance

(Count II), trespass (Count III), and failure to warn (Count IV).

The allegations regarding trespass, Complaint ¶¶ 136-150, closely track New Mexico

law, under which it is settled that a property owner's intentional acts on its property, while

knowing its acts will likely contaminate the water supply of neighboring tracts, constitute an

intentional trespass. The New Mexico Supreme Court held more than a century ago that a

landowner's pollution of a stream with "mineral poisons," rendering the water "unfit for the uses

and purposes for which it had been appropriated" by an adjoining landowner, made out "a good

declaration in trespass on the case . . . ." *Mogollon Gold & Copper Co. v. Stout*, 91 P. 724, 724-

26 (N.M. 1907).[4] In particular, the Schaaps have alleged the Government's liability for trespass

based on its interference with their "rights to appropriate and use groundwater from its wells for

---

[4] That holding remains good law in New Mexico. In *Snyder Ranches, Inc. v. Oil
Conservation Comm'n of New Mexico*, 798 P.2d 587, 590 (N.M. 1990), the court held that an oil
company's injection of salt water into an underground formation impinging on adjacent water
rights may constitute a trespass, even if licensed by the state. In *Schwartzman, Inc. v. Atchison,
T. & S.F. Ry.*, 857 F. Supp. 838, 844-46 (D.N.M. 1994), a federal district court applying New
Mexico law held groundwater contamination actionable as a trespass if the contamination
reached the neighbor's property and damaged it. In *Hartman v. Texaco Inc.*, 937 P.2d 979, 983
(N.M. App. 1997), *Schwartzman* was ratified as a correct statement of New Mexico law. In *New
Mexico v. General Electric Co.*, 335 F. Supp. 2d 1185 (D.N.M. 2004), the court, relying on
*Snyder*, *Schwartzman* and *Hartman*, concluded that a plaintiff "alleging a physical intrusion by
hazardous substances onto lands or into groundwater located directly beneath lands owned by"
can sue in trespass. *Id.* at 1233-34. *McNeill v. Rice Eng'g & Operating Inc.*, 128 P.3d 476, 479,
482, 495 (N.M. App. 2005), upheld a suit for trespass premised on the intrusion of salt water
reinjected into geological formations impinging on plaintiffs' land. *McNeill* also permitted the
plaintiffs to seek damages for a continuing trespass reaching back decades if they were able to
satisfy the discovery rule. *Id.* at 485-86. *See also Elmore v. Estate of Norman L. Gilbreath*, 2016
U.S. Dist. LEXIS 184402, *21-*24 (D. N.M. Mar. 30, 2016), discussing statute-of-limitations
analysis in *McNeill*).

the dairy production." Complaint ¶ 138.[5] *See also* Complaint ¶¶ 139-150 (alleging the remaining elements of trespass, including lack of permission to trespass, knowledge and intent that trespass would occur, causation, and damages).

The allegations regarding negligence, Complaint ¶¶ 94-114, also match New Mexico law, alleging that the Government owed a duty to the Schaaps, Complaint ¶¶ 100-106; breached that duty by failing to exercise reasonable care under the circumstances, Complaint ¶¶ 107-110; and proximately caused their injuries. Complaint ¶¶ 111-113. The negligence count includes a failure-to-warn claim, Complaint ¶ 103, which overlaps with the failure-to-warn allegations of Count IV. Complaint ¶¶ 151-166.

Finally, the nuisance claim, Complaint ¶¶ 115-135, also comports with New Mexico law, which follows the majority approach of authorizing private parties to obtain judicial relief to curb both private and public nuisances. Complaint ¶¶ 116-117. It alleges that the Schaaps utilize drinking water on their property for both family consumption and for watering their cattle and irrigating their crops, Complaint ¶¶ 118-120; that through the intentional use of harmful chemicals on its land which it failed to prevent from leaving the land, the Government contaminated the groundwater supplies on which the Schaaps rely, Complaint ¶¶ 121-127; and that as a result the Government has created both a public and a private nuisance, causing the Schaaps enormous losses. Complaint ¶¶ 128-35.

---

[5] Under New Mexico law, water rights are real property, and a vested right to use water is a protected property right which can be sold, leased or transferred. *See New Mexico v. General Electric Co.*, *supra* note 4, 335 F. Supp. at 1234 n.103.

**ARGUMENT**

**I.    SUBJECT-MATTER JURISDICTION EXISTS OVER ALL THE CASES, AS EACH COMPLAINT ALLEGES AT LEAST ONE VIOLATION OF STATE LAW RESPECTING WATER POLLUTION, AS TO WHICH IMMUNITY HAS BEEN CATEGORICALLY WAIVED**

The Government is mistaken in focusing solely on 28 U.S.C. § 2680(a)—the

discretionary-function exception to the FTCA's general immunity waiver—for its argument that

it enjoys immunity on the state-law claims alleged in the complaints.[6] The reason is that *even if*

---

[6] For simplicity, references to the 27 complaints at issue will use the numbering system set forth in the Government's motion (ECF 4548). The counts of the various complaints alleging negligence (including negligent failure to warn and negligence per se) or nuisance are as follows:

# 1, *B&B Inv. Props. v. U.S.*, Counts 1, 3, 5.
# 2, *Cal. Am. Water v. U.S.*, Count 1, 2, 3, 4.
# 3, *City of Airway Heights v. U.S.*, Counts 2, 3.
# 4, *City of Dayton v. U.S.*, Count 1.
# 5, *City of DuPont v. U.S.*, Counts 2, 3.
# 6, *City of Newburgh v. U.S.*, Counts 4 and 10.
# 7, *City of Westfield v. U.S.*, Count 3.
# 8, *County of Suffolk v. U.S.*, Counts 7, 8, 11.
# 9, *County of Westchester v. U.S.,* Count 2.
# 10, *Dorene Dairy Gen. P'ship v. U.S.*, Counts 2, 4, 7.
# 11, *Elsinore Vall. Mun. Water Dist. v. U.S.*, Counts 2, 3, 5.
# 12, *Fiattarone v. U.S.*, Counts 1, 2, 3.
# 13, *H54b Inc. DBA Moose Creek v. U.S.*, Count 1.
# 14, *Kalispel Tribe v. 3M Co.*, Counts 6, 7.
# 15, *Lakewood Water Dist. v. U.S.*, Counts 2, 3.
# 16, *Newkirk v. U.S.*, Counts 1, 2.
# 17, *New York v. 3M Co.* ("*New York I*"), Counts 5, 6.
# 18, *New York v. 3M Co.* ("*New York II*"), Counts 5, 6.
# 19, *Nyvchik v. U.S.*, Count 1.
# 20, *O'Brien v. U.S.*, no specific substantive counts set forth, but the complaint, alleging contamination of the groundwater serving plaintiff's residential properly, liberally construed would appear to support, at minimum, a claim for trespass.
# 21, *Schaap v. U.S.*, Counts 3, 4.
# 22, *Security Water Dist. v. U.S.*, Counts 2, 3.
# 23, *Teune v. U.S.*, Counts 3, 4.
# 24, *Town of New Windsor v. U.S.*, Counts 2, 3.
# 25, *Vander Dussen v. U.S.*, Counts 2, 4, 7.
# 26, *Village of Waterloo v. U.S.*, Count 2.
# 27, *Wash. State Dep't of Corrs. v. U.S.*, Count 5.

*every argument in the Government's motion is credited*, 28 U.S.C. § 2680(a), enacted in 1946, cannot be decisive of the immunity issue if there is *a later-enacted*, more specific, statute displacing the effect that Section 2680(a) might otherwise have.

That is precisely the situation here. A provision in the Clean Water Act of 1972,[7] as most recently amended in 1977,[8] saves Plaintiffs' state-law claims from any immunity that would otherwise exist under the DFE, to the extent that Plaintiffs' claims allege harm from water pollution. Section 1323(a) reads in relevant part:

> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government, 1) having jurisdiction over any property or facility or, 2) engaged in **any activity resulting**, or which may result, **in the discharge or runoff of pollutants**, and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, **all** Federal, **State**, interstate, and local **requirements**, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and **to the same extent as any nongovernmental entity** including the payment of reasonable service charges. The preceding sentence shall apply, A) to any requirement whether substantive or procedural, including any recordkeeping or reporting requirement, **any requirement** respecting permits and any other requirement, **whatsoever**), B) to the exercise of any Federal, State, or local administrative authority, and C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. **This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law**.[9]

---

[7] Federal Water Pollution Control Act of 1972, Pub. L. No. 92-500, 86 Stat. 816.

[8] Federal Water Pollution Control Act Amendments of 1977 (Clean Water Act of 1977), Public Law 95–217, 91 Stat. 1566 (Dec. 27, 1977) (codified at 33 U.S.C. 1251 et seq.).

[9] 33 U.S.C. § 1323(a) (emphasis added).

Obviously, the final sentence, in this later-enacted, specific statute, displaces any immunity that the Government could otherwise assert under the DFE[10]—if, that is, Plaintiffs' state-law claims fall under the protection of § 1323(a), as claims based on a "requirement" of state law.

Presumably, if the Government had not overlooked this statutory provision conferring special protection from immunity on certain claims involving water pollution arising under state law,[11] it would have argued that Plaintiffs' common-law tort claims do not involve a "requirement" within the meaning of § 1323(a)—suggesting, perhaps, that the word "requirement" connotes an objectively ascertainable metric, such as in a regulation, rather than a more subjective standard of the sort reflected in a common-law tort standard under state law.

However, such an argument would be inconsistent with the amendment history of the Clean Water Act. As originally enacted in 1972, the scope of the waiver of immunity was narrower. Section 1323(a) read:

---

[10] "[I]t is, of course, the most rudimentary rule of statutory construction . . . that courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes." *Branch v. Smith*, 538 U. S. 254, 281 (2003) (plurality opinion of Scalia, J.) (citation omitted). *See also Farmer v. Employment Sec. Comm'n*, 4 F.3d 1274, 1284 (4th Cir. 1993) ("It is a basic principle of statutory construction that when two statutes are in conflict, a specific statute closely applicable to the substance of the controversy at hand controls over a more generalized provision."); *Robinson v. Resolution Trust Corp. (In re Landmark Land Co.)*, 1997 U.S. App. LEXIS 6476, *8-*9 (4th Cir. Apr. 7, 1997) ("Generally, a court assumes that a later-enacted, more specific statute supersedes a more general, earlier statute.").

[11] The legislative history of the Clean Water Act makes clear that in mandating that federal facilities comply with state-law requirements concerning the "runoff of pollutants," Congress was reserving to the States broad authority to regulate all nonpoint sources of pollution, which constitute at least 90% of the pollution at issue in these cases (*see* Govt. Mem. at 10-11 (citing Walker Dep., Ex. L), 115:205). *See generally Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 219-21 (2d Cir. 2009); *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 654-56 & n.1 (4th Cir. 2018) (Floyd, J., dissenting).

> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants shall comply with Federal, State, interstate, and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements, including the payment of reasonable service charges.

Federal Water Pollution Control Act of 1972, Pub. L. No. 92-500, 86 Stat. 816, 875.

Interpreting this language, the Supreme Court in 1976 held that federal dischargers did not need to obtain a permit from states with federally approved permit programs. *See EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 226-27 (1976). "Congress, plainly disenchanted with this pronouncement, the following year enacted 33 U.S.C. § 1323(a) as a part of the CWA." *United States v. Com. of Puerto Rico*, 721 F.2d 832, 834 (1st Cir. 1983). In this new Section 1323(a), Congress clarified that federal facilities were subject to "any . . . requirement, whatsoever," "notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law." The Federal Water Pollution Control Act Amendments of 1977 (Clean Water Act of 1977), Pub. L. No. 95–217, 91 Stat. 1566, 1598 (1977) (codified at 33 U.S.C. § 1323(a)). Any argument that "requirement" should be read narrowly would thus ignore Congress's plain intent as expressed through the amendment history of § 1323(a).

Any such argument would also fail under controlling Supreme Court and Fourth Circuit precedent.

The Supreme Court specifically addressed whether a state common-law standard of conduct constitutes a "requirement" within the meaning of a statute enacted by Congress, in *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992). *Cipollone* was a lawsuit brought by a smoker against a cigarette company, in which the company argued preemption on the basis of a statute which mandated that "[n]o requirement or prohibition based on smoking and health shall

be imposed under State law" on any theory related "to the advertising or promotion" of cigarettes carrying warning labels. *Id*. at 515. In analyzing what constitutes a "requirement" under state law, the Court discerned no basis for drawing a "distinction between positive enactments and common law"—noting that the word "easily encompass[es] obligations that take the form of common-law rules" and, further, that "'[t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.'" *Id*. at 521 (plurality opinion) (quoting *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247 (1959)).

Relying on *Cipollone,* the Fourth Circuit has held that language identical to the language of § 1323(a) at issue in this case strips away the Government's immunity from suit for pollution, based on state common-law theories.

In *North Carolina ex rel. Cooper v. TVA*, 515 F.3d 344 (4th Cir. 2008), the Court was faced with the question of whether the TVA enjoyed immunity from suit on a common-law nuisance claim brought by the State of North Carolina against it, seeking abatement of air pollution emitted by the TVA's coal-fired power plants. *Id*. at 347. In response to the TVA's claim of immunity, North Carolina invoked the provision of the Clean Air Act, twin to § 1323(a) of the Clean Water Act (relied on by Plaintiffs here), stating in relevant part that "federal facilities such as the TVA: '[S]hall be subject to, and comply with, all . . . State . . . requirements . . . respecting the control and abatement of air pollution in the same manner, and to the same extent as any nongovernmental entity.'" *Id*. at 350-51 (quoting 42 U.S.C. § 7418(a)).

TVA argued that a "requirement" must be "based on objective, quantifiable standards subject to uniform application," and on that basis it "maintain[ed] that a common-law nuisance action is not a 'requirement' within the meaning of the CAA." *Id*. at 351. The Court made short

shrift of this argument, relying on the ordinary meaning of the word "requirement," as well as the Supreme Court's decisions in *Cipollone* and *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996). *Id*. at 351-52. Indeed, the Court noted that there was ample ground for reading the term "requirement" in the CAA *at least* as broadly as in *Cipollone* and *Medtronic*. For one thing, Congress had included "the phrases 'all requirements' and 'any requirement'"—even amending the statute to emphasize its breadth. *Id*. at 352 & n.7. (CWA § 1323(a) also contains this language.) The Court also noted that the *Cipollone* and *Medtronic* decisions involved preemption, with the Supreme Court therefore operating "under a presumption that favored a narrow reading of the term 'requirement,'" and that "[t]he absence of a narrowing presumption in this case seems to us to indicate that 'requirement' retains at least the breadth of meaning ascribed to it in *Cipollone* and *Medtronic*." *Id*. at 352 n.8.

Congress, in § 1323(a) of the CWA involved in this case, included language identical to the language eliminating immunity used in Section 7418(a) of the Clean Air Act analyzed by the Fourth Circuit in *North Carolina ex rel. Cooper v. TVA*. Because this statutory interpretation is the law of the Circuit, it therefore follows that the Government can enjoy no immunity from *any* of the state common-law claims brought by Plaintiffs in these lawsuits—not simply common-law nuisance claims (the specific claim that happened to be brought by North Carolina), but *all* the state-law claims, as they all involve claims by Plaintiffs that the Government engaged in an activity that resulted "in the discharge or runoff off pollutants" in violation of the "requirements" of state law—i.e., "law or rule of law"—within the meaning of § 1323(a).[12]

---

[12] We note one possible implication of the Government's waiver of immunity under the CWA for the pleadings in this litigation. Plaintiffs' complaints may be interpreted to plead causes of action under state law, independent of the Federal Tort Claims Act. However, if the Court were to find waiver under the CWA, but no waiver under the FTCA (based on application of the discretionary-function exception), *and* were to find that the claims of one or more

One further aspect of § 1323(a) deserves mention. A theme pervading the Government's brief is the concern that to subject the Government to liability for the failure of its environmental safety employees to implement precautions to adequately protect neighbors from pollution caused by use of AFFF on military bases could compromise the national defense. But Congress mandated that a national defense concern will displace state-law requirements *only* when the President himself "determines it to be in the paramount interest of the United States to do so . . . ."[13] Given the policy choice made by Congress as to the sole means by which exemptions to the waiver of immunity could be created, there is no basis for the Government to ask this Court to second guess that policy choice.[14]

---

Plaintiffs have been pleaded only under the FTCA, then the proper course would be for this Court to grant the affected Plaintiffs leave to amend, so that they could re-plead all FTCA claims as standalone state-law claims.

[13] 33 U.S.C. § 1323(a), sixth and tenth sentences.

[14] The Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6961, is another later-enacted statute which deprives the Government of immunity for violations of certain state-law "requirements," those relating to solid and hazardous waste management. This section of RCRA was amended by the Federal Facilities Compliance Act of 1992. Pub. L. 102-386, Oct. 6, 1992, 106 Stat. 1505. The FFCA was part of an effort to end the "hypocritical double standard" under which the federal government was simultaneously violating and enforcing environmental laws. 138 Cong. Rec. H9135 (daily ed. Sept. 23, 1992) (statement of Rep. Beilenson). *See also* 138 Cong. Rec. H9136 (daily ed. Sept. 23, 1992) (statement of Rep. Dingell).
    Similarly, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) provides that: "State laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action at facilities owned or operated by a department, agency, or instrumentality of the United States or facilities that are the subject of a deferral under subsection (h)(3)(C) when such facilities are not included on the National Priorities List." 42 U.S.C. § 9620(a)(4). For example, one of the sites implicated in this litigation, Stewart ANG Base, is not included on the National Priorities List, and therefore New York State laws concerning removal and remedial action apply at Stewart. The State of New York has listed the Stewart ANG Base as an "Inactive Hazardous Waste Disposal Site" pursuant to the State's Superfund program due to the presence of PFOS. New York Environmental Conservation Law § 37–0107, states: "No person shall store or release to the environment substances hazardous or acutely hazardous to public health, safety or the environment in contravention of rules and regulations promulgated pursuant hereto." In 2017, the New York

## II.    SUBJECT-MATTER JURISDICTION EXISTS OVER THE 19 CASES ALLEGING TRESPASS, AS TO WHICH IMMUNITY HAS BEEN CATEGORICALLY WAIVED

In addition to overlooking this Court's undoubted subject-matter jurisdiction over all of Plaintiffs' state-law claims in all 27 cases, based on the Clean Water Act, the Government has also overlooked the specialized waiver of immunity for common-law trespass claims contained in the FTCA as originally enacted in 1946. Under a line of appellate court precedent stretching back more than 70 years, including four Supreme Court decisions and a recent Fourth Circuit decision, as a matter of law there can be no immunity defense to trespass claims such as the one alleged by the Schapps and by the Plaintiffs in 18 other cases, because Congress in 1946 made clear its intent to categorically waive immunity on common-law trespass claims.[15]

_____

State Department of Environmental Conservation added PFOA and PFOA to the list of hazardous substances at 6 N.Y.C.R.R. §597.3.  The ECL does not provide a private cause of action for violations of ECL § 37–0107.  *Ridge Seneca Plaza, LLC v. BP Prod. N. Am.*, 2012 U.S. Dist. LEXIS 189443, *43 (W.D.N.Y. July 26, 2012). Instead, parties impacted by violations of ECL § 37–0107 may bring actions under CERCLA or common law claims against violators. The City of Newburgh has asserted that, among other things, DoD's violation of § 37–0107, specifically the ongoing release of the hazardous substances PFOA and PFOS, constitutes negligence per se.

[15] Using the numbering system referenced in note 6, *supra*, trespass claims are alleged as follows:
- # 2, *Cal. Am. Water v. U.S.*, Count 5.
- # 3, *City of Airway Heights v. U.S.*, Count 1.
- # 4, *City of Dayton v. U.S.*, Count 2.
- # 5, *City of DuPont v. U.S.*, Count 1.
- # 8, *County of Suffolk v. U.S.*, Count 12.
- # 10, *Dorene Dairy Gen. P'ship v. U.S.*, Count 8.
- # 11, *Elsinore Vall. Mun. Water Dist. v. U.S.*, Count 4.
- # 12, *Fiattarone v. U.S.*, Count 4.
- # 14, *Kalispel Tribe v. 3M Co.*, Count 5.
- # 15, *Lakewood Water Dist. v. U.S.*, Count 1.
- # 16, *Newkirk v. U.S.*, Count 4.
- # 19, *Nyvchik v. U.S.*, Count 2.
- # 21, *Schaap v. U.S.*, Count 5.
- # 22, *Security Water Dist. v. U.S.*, Count 1.

The FTCA, in 28 U.S.C. § 2674, provides that, in general, the Government is liable on tort claims "in the same manner and to the same extent as a private individual under like circumstances"— a waiver of immunity implemented by 28 U.S.C. § 1346(b)(1), which vests jurisdiction in the district courts to hear lawsuits seeking damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

As a matter of statutory interpretation, to determine whether a waiver of immunity for trespass claims remains in effect, one would logically consult the section of the FTCA in which Congress set forth exceptions to the waiver of immunity on claims asserting "wrongful," that is, intentional, acts. Those exceptions are listed in 28 U.S.C. § 2680(h), which lists a whole host of tort claims for which immunity is retained. With some exceptions (particular to law enforcement), they are: "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights . . . ." Notably missing from this list is the intentional tort of *trespass*. That § 2680(h)'s waiver of liability on common-law trespass claims is *categorical* (that is, not dependent on the facts of the case) is obvious given that unlike negligence doctrine, which is based on a "liability rule,"

---

# 23, *Teune v. U.S.*, Count 5.
# 24, *Town of New Windsor v. U.S.*, Count 4.
# 25, *Vander Dussen v. U.S.*, Count 8.
# 26, *Village of Waterloo v. U.S.*, Count 2.
# 27, *Wash. State Dep't of Corrs. v. U.S.*, Count 5.
It should be noted that case # 20, *O'Brien v. U.S.*, could be liberally construed as alleging a trespass claim. See note 6, *supra*.

trespass doctrine sets down a bright-line "property rule" that accords no range of discretion to the defendant.[16]

That construction of the statute is also reflected in two early Supreme Court decisions concluding that § 1346(b)(1) effects a waiver of immunity on common-law trespass claims. In *Dalehite v. United States*, 346 U.S. 15 (1953), the Court upheld a grant of immunity to the government in a lawsuit focused on government negligence which had led to the explosion of a fertilizer plant. *Id*. at 31-33, 42-44. In analyzing the function of the word "wrongful" in § 1346(b)(1), the Court concluded based on the legislative history of the FTCA that Congress

---

[16] *See generally* Guido Calabresi & A. Douglas Melamed, *Property Rules, Liability Rules, and Inalienability: One View of the Cathedral*, 85 Harv. L. Rev. 1089, 1090-93 (1972). The point is elemental. As the Fifth Circuit noted in denying the Government's claim of immunity from a lawsuit alleging that it had committed trespass by authorizing drilling for oil on land owned by plaintiffs, the discretionary-function exception "would be of no avail to the Government, if in fact a trespass was committed, since the Government has *no authority or discretion* over land not under its control." *Simons v. United States*, 413 F.2d 531, 534 (5th Cir. 1969) (emphasis added) (citing *Hatahley v. United States*, 351 U.S. 173 (1956)).

As *Simons* illustrates, the rule against trespass is a paradigmatic example of a "property rule" which operates in bright-line fashion, stripping the defendant of discretion to impinge on the property owned by the plaintiff (unlike a "liability rule" such as negligence, which employs a balancing standard). *See, e.g.*, Henry E. Smith, *Property and Property Rules*, 78 N.Y.U. L. Rev. 1719, 1723 (2004) ("Basic actions like trespass protect entitlements by means of injunctions and punitive damages in the civil law and penalties in the criminal law."); *id*. at 1750 ("The remedies for trespass, including punitive damages and injunctions, are sanctions that kick in only when a boundary has been crossed."); *id*. at 1760 ("Trespass law and much of nuisance law thus need not evaluate the uses that plaintiff and defendant are proposing; many cases will be mechanically decided on the basis of an invasion by defendant of plaintiff's asset. There is no need to balance uses and no need to specify them beforehand."); *id*. at 1768 ("The law of negligence and parts of nuisance law are paradigm cases of the use of standards," in contrast to the "bright-line rules of trespass"); Keith N. Hylton, *Duty in Tort Law: An Economic Approach*, 75 Fordham L. Rev. 1501, 1510 (2007) ("Trespass law is a property rule in the sense that it permits the landowner to enjoin the trespasser and to seek damages. The power to enjoin forces the would-be trespasser to bargain for access to the landowner's property."). *See, e.g.*, *Jacque v. Steenberg Homes*, 563 N.W.2d 154, 160 (Wis. 1997) (upholding $100,000 in punitive damages, on $1 in nominal damages, awarded to residential landowners against a company that committed an intentional trespass by moving a mobile home across their land, without permission, despite the absence of any damage to the land, based on society's "interest in punishing and deterring intentional trespassers beyond that of protecting the interests of the individual landowner.").

intended, at minimum, to waive immunity for suits based on common-law trespass. *Id*. at 45

(citing Hearings before a Subcommittee of the Senate Committee on the Judiciary on S. 2690,

76th Cong., 3d Sess. 43-44)).[17]

Although that analysis was *obiter dictum* (the plaintiffs in *Dalehite* had asserted no

trespass claim), two years later the Court, in *Hatahley v. United States*, 351 U.S. 173 (1956),

unanimously rejected the Government's claim of immunity on a trespass claim, in permitting a

lawsuit against federal officials who had committed trespass in carrying out a federal program.

*Hatahley* involved agents of the Department of the Interior who, in implementing the Taylor

Grazing Act, had rounded up and killed free-range horses owned by the Navajo Indians,

believing that this was in accord with federal policy, and also believing that their actions were

lawful because the horses could be treated as "abandoned" under Utah law. *Id*. at 177-80.

Despite the agents' good intentions, citing *Dalehite*'s construction of Section 1346(b), the Court

held that these were "wrongful trespasses" which thus "give rise to a claim compensable under

the Federal Tort Claims Act." *Id*. at 181.

Numerous decisions, including two subsequent Supreme Court decisions, have reiterated

and even extended the *Hatahley* holding.

---

[17] Even before the Supreme Court's decision in *Dalehite*, the Tenth Circuit reached the same result, in holding that the Air Force had been properly subjected to a lawsuit sounding in trespass that had been brought by homeowners who suffered property damage and personal injuries when a low-flying jet crashed near them shortly after takeoff. Noting that the jet had been flying at an altitude of 100 feet, far below navigable airspace, the court in *United States v. Gaidys*, 194 F.2d 762 (10th Cir. 1952), observed that "[t]here can be no doubt that under the law of Colorado a private individual would be liable in damages for injuries occurring under circumstances comparable to those shown here," so that the plaintiffs' injuries "constituted a redressable wrong in the nature of trespass for which the United States is similarly liable under the Tort Claims Act." *Id*. at 764-65.

In *Simons v. United States*, 413 F.2d 531 (5th Cir. 1969), the Fifth Circuit summarized past precedents and secondary authority uniformly concluding that the Government has no immunity from trespass suits, and found a waiver of immunity on plaintiffs' claim that the Interior Department had tortiously authorized drilling for oil in violation of plaintiffs' property rights. *Id*. at 533-34. In particular, it held that "the discretionary function exception to the Tort Claims Act, 28 U.S.C.A. § 2680(a), . . . would be of no avail to the Government, if in fact a trespass was committed, since the Government has no authority or discretion over land not under its control." *Id*. at 534.

The First Circuit, in *Roman v. Velarde*, 428 F.2d 129 (1st Cir. 1970), citing *Dalehite*, concluded, with respect to claims asserted "under a 'continuing trespass' theory," that "there could be no objection to a FTCA suit." *Id*. at 132-33.

In *Laird v. Nelms*, 406 U.S. 797 (1972), the Supreme Court reaffirmed *Hatahley*, and the ability of plaintiffs to sue the Government for "common-law trespass," although the Court declined to extend its holding in *Hatahley* to authorize "claims based on strict liability for ultrahazardous activity" (in that case, damage caused by sonic booms created by a government aircraft). *Id*. at 802-03.

In *United States v. Artieri*, 491 F.2d 440 (2d Cir. 1974), the Second Circuit noted that "Congress intended the Government to be liable for trespasses." *Id*. at 446 n.2 (citing *Dalehite*, 346 U.S. at 45).

In *Black v. Sheraton Corp. of America*, 564 F.2d 531, 539 (D.C. Cir. 1977), the D.C. Circuit considered the FBI's assertion of immunity in a case brought by a Washington lobbyist who had been the victim of a concededly illegal eavesdropping operation. *Id*. at 535. The court

rejected the argument, observing that trespass and invasion-of-privacy claims are not among the intentional torts for which the Government enjoys immunity under the FTCA. *Id*. at 539.

Similarly, in *Birnbaum v. United States*, 588 F.2d 319, 328 (2d Cir. 1978), the Second Circuit considered the CIA's assertion that it was immune from a lawsuit against it for having covertly opened and copied, over a two-decade period, more than 215,000 pieces of first-class mail "which American citizens sent to, or received from, the Soviet Union." *Id*. at 321. The court rejected the CIA's immunity assertion, agreeing with the D.C. Circuit "that the torts of trespass and invasion of privacy do not fall within the exception of § 2680(h)." *Id*. at 328.

In *McKay v. United States*, 703 F.2d 464 (10th Cir. 1983), the Tenth Circuit, citing *Dalehite*, *Hatahley*, and *Nelms*, reiterated its conclusion in *Gaidys* that "trespass is a redressible wrong under the FTCA." *Id*. at 472.

In *ChoPP Computer Corp. v. United States*, 5 F.3d 1344 (9th Cir. 1992), the Ninth Circuit extended the holding in *Hatahley* to conclude that the Government does not enjoy immunity under the FTCA on claims alleging conversion. *Id*. at 1347.

Agreeing with that result, in *Levin v. United States*, 568 U.S. 503 (2013), the Supreme Court observed 28 U.S.C. § 2680(h) "does not remove from the FTCA's waiver all intentional torts, *e.g.*, conversion and trespass . . . ." *Id*. at 507 n.1.

*Levin*'s observation that the Government enjoys no immunity against claims sounding in conversion or trespass was recently noted by the Fourth Circuit, in *Billups v. United States*, 854 Fed. Appx. 514, 516 n.2 (4th Cir. 2021). (In *Billups* the Court held the Government immune from suit because the plaintiff's complaint sounded not in negligence, but in battery, *id*. at 517-18, and the Court quoted *Levin* as part of its clarification that to describe 28 U.S.C. § 2680(h) "as

the 'intentional-tort exception' to the FTCA" is "not entirely accurate," given that trespass and

conversion are not included in the exception.)

In sum, four decisions of the Supreme Court, and decisions of the First, Second, Fourth,

Fifth, Ninth, Tenth, and D.C. Circuits, all conclude that under the Federal Tort Claims Act, any

claim by the Government that it enjoys immunity from trespass claims is without merit, as a

matter of law.[18] The Government has not contended otherwise. Therefore, its motion to dismiss

---

[18] It should be noted that although it is settled law that Congress, in enacting the FTCA in 1946, effected a categorical, bright-line waiver of immunity to lawsuits alleging common-law trespass (to which the discretionary-function exception has no application), there exists a circuit split over the intent of Congress in enacting a 1974 amendment to the FTCA, which waived immunity to certain lawsuits alleging certain intentional torts committed by federal law enforcement agents. Unlike the bright-line tort of trespass, violations of the intentional torts addressed by the 1974 amendment—assault and battery, malicious prosecution, and false arrest—typically involve decisions by government employees made on the spot, which may well involve the exercise of discretion. This reality has led some courts, most notably the D.C. Circuit, to conclude that Congress intended its particularized waiver of immunity in 1974 to be subject to the discretionary-function exception. *Gray v. Bell*, 712 F.2d 490, 507 (D.C. Cir. 1983). Other courts, led by the Fifth Circuit, have declined to read into the 1974 amendment any such implied exception. *Sutton v. United States*, 819 F.2d 1289, 1295 (5th Cir. 1987). Two decades ago the Fourth Circuit, addressing the circuit split, sided with the D.C. Circuit. *Medina v. United States*, 259 F.3d 220, 224-26 (4th Cir. 2001). But no court, including the Fourth Circuit, has suggested that this disagreement over Congress's intent in passing the 1974 amendment to the FTCA affects settled precedent establishing that Congress intended, in enacting the FTCA in 1946, to categorically waive immunity to common-law trespass claims. Indeed, just three years ago the Fourth Circuit cited the Supreme Court's most recent reiteration of settled law on this point. *Billups*, *supra*, 854 Fed. Appx. at 516 n.2.

Nor is there any basis for concluding that the occasional decisions in this Circuit granting the Government immunity against toxic tort lawsuits predicated, in part, on trespass claims undermine the argument Plaintiffs advance here, as the plaintiffs in those cases failed to make this argument. *E.g.*, *Cohen v. United States*, 813 F. App'x 864, 869 (4th Cir. 2020) (per curiam) (plaintiffs alleged flood damage due to flaw in dam on military reservation); *Burrows v. United States*, 120 F. App'x 448, 450 (4th Cir. 2005) (per curiam) (plaintiffs alleged excessive noise emanating from post office across the street); *Pieper v. United States*, 2016 U.S. Dist. LEXIS 106007 (D. Md. Aug. 11, 2016), *aff'd*, 713 Fed. Appx. 137 (4th Cir. 2017) (plaintiffs alleged personal injuries due to toxic waste dump at Fort Detrick); *Waverley View Invs., LLC v. United States*, 79 F. Supp. 3d 563, 568 (D. Md. 2015) (plaintiff alleged business loss due to same); *Oxendine v. United States*, 2009 U.S. Dist. LEXIS 104450, *10-*14 (D.S.C. Oct. 15, 2009) (pro se plaintiff alleged groundwater contamination from the use of TCE at Shaw Air Force Base, but declined to brief the jurisdictional issue).

these nineteen cases for lack of subject-matter jurisdiction must fail, because plainly this Court has subject-matter jurisdiction over at least the trespass claim in each case.

In sum, given the enactments of Congress separate from the DFE emphasized by the Government—both its categorical waiver of immunity for claims involving water pollution enacted in the Clean Water Act, as most recently amended in 1977, and its categorical waiver of immunity for common-law trespass claims enacted in the 1946 FTCA—this Court need not address the Government's arguments concerning the DFE. As long as there exists a waiver of immunity as to at least one claim in each complaint, subject-matter jurisdiction exists as to that case.

Nonetheless, in the event that this Court were to discern some basis for addressing the DFE, we now turn to an analysis of both the legal and factual flaws in the Government's argument concerning the DFE.

## III.    THE DISCRETIONARY-FUNCTION EXCEPTION DOES NOT APPLY TO THE GOVERNMENT'S FAILURE TO CONTROL DISCHARGES OF AFFF FROM MILITARY SITES ACROSS THE COUNTRY

Even if the Court were to reach the issue, based on the Government's current briefing and factual record there is no basis for the Court to find that the DFE immunizes the Government from the state-law claims asserted by Plaintiffs, or that could be asserted by Plaintiffs via amendment (in the event that their pleadings might be regarded as somehow incomplete or formally deficient). There are two principal reasons: **A)** the Government is relying on inapposite legal authority; and **B)** the actions (or inaction) of federal environmental safety employees that caused the Plaintiffs' injuries do not pass the two-step test under the Supreme Court's decision in *United States v. Gaubert*, 499 U.S. 315 (1999), in that they **1)** violated mandatory policies and directives pertaining to controlling discharges of AFFF; **2)** any discretion they exercised

25

involved relatively mundane matters of scientific and professional analysis in the specific field of water-pollution control, not matters of public policy; and **3)** in any event, the Government has no immunity on the many claims alleging specific acts of so-called "garden-variety negligence."

### A. The Principal Legal Authority Cited by the Government, Focusing on the Government as the Regulator of Private Conduct or the Provider of Public Goods and Services, is Inapposite

The principal decisions cited by the Government applying the DFE involve a context entirely different from the context of these cases. They involve the Government as the *regulator* of private conduct, or the *provider* of public goods or services—contexts in which it is inevitable that multiple policy factors will be taken into account by federal employees carrying out these public functions, so that the DFE is routinely found applicable.

Consider, for example, *United States v. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 787 (1984) (cited in Gov't Mem. 31, 45), which involved lawsuits filed against the Federal Aviation Administration following fatal airplane crashes, alleging that the FAA had negligently authorized the aircraft designs based only on spot checks of the manufacturers' safety analysis. *Id.* at 799-803. The Court noted that the DFE "plainly was intended to encompass the discretionary acts of the Government acting in its role as a *regulator of the conduct of private individuals*." *Id.* at 813-14 (emphasis added). Examining the legislative history of the FTCA, the Court noted Congress's "emphasis upon protection for regulatory activities" in the "early tort claims bills" (which "specifically exempted two major regulatory agencies by name"), concluding: "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814. Accordingly, the Court unanimously held

26

that the FAA's discretionary decision to employ spot checks as part of the process of regulating aircraft safety fell within the protection of the DFE. *Id*. at 816-20.

Another "government as regulator" decision relied on by the Government is *Gaubert* (cited in Gov't Mem. at 29-31, 33, 44, 49). This was a lawsuit against bank regulators alleging that they had negligently regulated the assets of a failed savings and loan. *Id*. at 319-20. The Court unanimously held that "each of the regulatory actions in question involved the kind of policy judgment that the discretionary function exception was designed to shield." *Id*. at 332.

Another case, *Berkovitz v. United States*, 486 U.S. 531 (1988) (cited in Gov't Mem. at 2, 34, 43), was a lawsuit against federal vaccine regulators alleging injury from a defective lot of polio vaccine, in which the Court unanimously observed that "[g]iven this regulatory context, the discretionary function exception bars any claims that challenge the Bureau's formulation of a policy as to the appropriate way in which to regulate the release of vaccine lots." *Id*. at 546 (citing *Varig Airlines*, 467 U.S. at 819-20).

*Seaside Farm, Inc. v. United States*, 842 F.3d 853 (4th Cir. 2016), also emphasized by the Government (Gov't Mem. at 3, 28, 30, 44), was a lawsuit by a tomato farm against the FDA, alleging $15 million in damages due to a health warning erroneously blaming tomatoes for a salmonella outbreak. In holding the DFE applicable, the Fourth Circuit observed that "contamination warnings . . . are a prototypical discretionary function," *id*. at 860, and concluded that it would put the FDA "between a rock and a hard place" to deny it immunity for mistakes in "safeguarding the public health and welfare." *Id*. at 862.

The Government also cites decisions involving the Government acting as the provider of public goods and services, a context in which courts have relied on the DFE to accord the Government wide latitude to balance relevant policy factors. For example, *Dalehite v. United*

*States*, 346 U.S. 15 (1953) (cited in Gov't Mem. at 29, 31, 45), involved a project carried out by the U.S. Army, shortly after World War II, to produce and ship massive amounts of fertilizer overseas (to help avert famine, as part of the Marshall Plan). *Id*. at 19-22. Tort litigation followed a massive explosion. *Id*. at 22-23. The Court unanimously held that the DFE barred the lawsuits, *id*. at 26-44, relying on legislative history indicating that Congress did not intend to permit tort suits challenging "the execution of a Federal project," *id*. at 27 (citation omitted), and concluding: "That the cabinet-level decision to institute the fertilizer export program was a discretionary act is not seriously disputed." *Id*. at 37.

A decision involving the provision of public services, emphasized by the Government, in large part because it arose in the military context, is the decision in *Wood v. United States*, 777 F.3d 123 (4th Cir. 2017) (cited in Gov't Mem. at 29, 45-46). *Wood* involved the policy decision of Congress, as part of our system of cooperative federalism, to make military facilities "available to state and local civilian law enforcement officers for training purposes, . . . so long as the civilian training does not 'adversely affect the military preparedness of the United States' . . . ." *Id*. at 125 (quoting 10 U.S.C. § 376). The plaintiff in the case was a sheriff's deputy who was severely injured when she jumped off a "Ship Mockup" structure that had been constructed solely for military training, but featured no warnings to that effect. *Id*. at 126. She filed suit based on a premises-liability theory, as an invitee. *Id*. at 129. The Fourth Circuit held that the Navy was shielded from liability based on the DFE, because, in exercising "its statutory discretion to allow civilian agencies to use its facilities, it must take into account in exercising its judgment military preparedness, the safety of the civilian agencies, and costs," striking a "complicated balance" illustrated by the facts of the case. *Id*. at 130. *See also id*. at 131 (the Navy's decisions leading up

to the incident "each fall comfortably within that overarching policy of balancing open civilian use, civilian safety, military preparedness, and costs").

Plaintiffs' lawsuits, of course, involve neither context. Plaintiffs are not challenging the Government as a regulator of private conduct. Nor are Plaintiffs challenging any decisions made by the Government in providing public goods or services. Plaintiffs are not seeking to second-guess any element of the Government's military policy. In particular, nothing in Plaintiffs' lawsuits requires that they take issue with the Government's past decisions regarding *which* fire-suppressant products to use (that is, the chemical composition of the products), *how often* to use them (e.g., the frequency of their use for training purposes), and *how many years* to keep using them, while exploring alternatives. Nor do Plaintiffs seek injunctive relief to regulate the Government's future use or handling of AFFF.

Plaintiffs' inclusion in their complaints of references to the Government's use of AFFF does not function as a critique of the military *justification* for such activity, but rather demonstrates the *impact* of these activities on their own interests, as persons or entities who own land, and/or who live or conduct operations, near where the Government deployed the AFFF which subsequently migrated off the land owned or leased by the Government.

The relevant authority, therefore, is the line of cases holding that where the Government is acting neither as a regulator of private conduct, e.g., regulating airplane safety (as in *Varig*) or providing public goods or services, e.g., permitting civilians to train using military facilities (as in *Wood*), and instead is acting as *the owner or lessee of property*, in the realm of tort law the Government is held to the same standard as a private actor that must refrain from tortious activity harming others in the normal course of life. *See, e.g.*, *Bolt v. United States*, 509 F.3d 1028, 1031, 1035 (9th Cir. 2007) (personal injury suit brought by apartment resident; Army, in capacity of

landlord of an apartment complex, was subject to the obligation of any landlord under state statute to remove snow and ice); *Whisnant v. United States*, 400 F.3d 1177, 1183 (9th Cir. 2005) (personal injury suit brought by weekly supplier of seafood to Coast Guard, sickened due to toxic mold infestation; "the government's duty to maintain its grocery store as a safe and healthy environment for employees and customers is not a policy choice of the type the discretionary function exception shields"); *Gotha v. United States*, 115 F.3d 175, 178 (3d Cir. 1997) (personal injury suit brought by government contractor injured in a fall; "Navy's failure to provide routine safeguards on a footpath leading to a structure under its control does not implicate the discretionary function exception"); *Maalouf v. Swiss Confederation*, 208 F. Supp. 2d 31, 36 (D.D.C. 2002) (denying Swiss government immunity under parallel discretionary-function provision in the FSIA, given that plaintiff was injured due to dangerous condition created by defendant "acting as a private landowner"); *Raymond v. United States*, 923 F. Supp. 1419, 1423 (D. Kan. 1996) (post office patron fell due to "alleged negligence in failing to provide a handrail or a mat" at entrance; suit not barred by DFE). *See also Gonzalez v. United States*, 690 F. Supp. 251, 253 (S.D.N.Y. 1988) (Leval, J.) ("The United States is generally liable to the same extent as other property owners for personal injuries to invitees on federal property") (citing cases).

The lawsuits in those cases operated to control the conduct of federal employees on federal property, as a means of enforcing the Government's duty to those who *enter on its property.* By contrast, Plaintiffs in this litigation merely insist that the Government act *as a good neighbor*, taking the precautions incumbent on all owners or lessees of property to avoid tortious interference with the rights of adjoining property owners. The Government's obligation to act as a good neighbor to avoid polluting the water of adjoining property owners was long ago recognized by Congress in 33 U.S.C. § 1323(a), which requires that all federal facilities be

operated to "comply with" *all* "requirements" under state law regarding the "discharge or runoff

of pollutants"—which includes the requirements of state tort law imposed by the claims invoked

by Plaintiffs in these cases. See pp. 11-17, *supra*.[19]

In sum, the Government relies principally on decisions granting discretionary-function

immunity in situations involving the government as regulator, or the government as the provider

of public goods and services, that have no application to the cases brought by Plaintiffs,

involving the duty of government as a good neighbor. The Government's entire argument

proceeds from the premise that Plaintiffs' liability claim hinges on challenging the military's

"discretion to use and handle AFF," Gov't Mem. at 1—"specifically, the training with AFFF,

and the use of AFFF in hangers with known false activations . . . ." Gov't Mem. at 31. After

framing the case in this fashion, it then proceeds to knock down this straw man by showing that

---

[19] That § 1323(a) was enacted within two years of the Government's first use of AFFF (in 1970), so that the Government was on notice of its obligation to abide by state-law requirements regarding water pollution, sharply distinguishes this litigation from two decisions emphasized by the Government involving the cleanup of Fort Detrick.

The principal decision relied on by the Government is *Waverley View Invs., LLC v. United States*, 79 F. Supp. 3d 563, 570 (D. Md. 2015) (cited in Govt. Mem. at 35, 39, 41-42), in which the district court granted the Government's motion to dismiss, based on the DFE, a lawsuit brought by a developer which had bought land near Fort Detrick in 2012, aware that it had already been declared a Superfund site, but nevertheless complaining of contamination of the groundwater. *Id*. at 568. In holding that the developer had not satisfied *Gaubert* step one, the district court noted that "the majority of the provisions" it had suggested as imposing mandatory duties "were adopted after the Army had stopped disposing of waste" and "are, therefore, irrelevant for the present analysis." *Id*. at 570. (Because all the toxic waste at issue was dumped no later than 1972, *id*. at 566, CWA § 1323(a), in particular, was inapplicable in that case.)

The same district court judge who decided *Waverely View* also dismissed, likewise on DFE grounds, a personal injury class action brought by residents living near Fort Detrick, in *Pieper v. United States*, 2016 U.S. Dist. LEXIS 106007 (D. Md. Aug. 11, 2016), *aff'd*, 713 Fed. Appx. 137 (4th Cir. 2017) (cited in Govt. Mem. at 31, 33, 41, 43, 46). Of note, although a trespass claim was included in the complaint, the plaintiffs did not brief the FTCA's categorical waiver of immunity for common-law trespass claims, set forth at pp. 18-25, *supra*. Further, on appeal, in affirming dismissal the Fourth Circuit noted that in burying the toxic waste in the specific location it was buried, "the Army acted in compliance with a regulatory directive that expressly approved such disposal." 713 Fed. Appx. at 138.

"[a]s a matter of law, these activities are protected by the DFE." *Id.* (citing *Gaubert*, 499 U.S. at 324). But *Gaubert* has nothing to do with Plaintiffs' actual challenge. Plaintiffs are not challenging any regulation of private conduct. They are not even challenging the composition of the AFFF used by the Government, or how often it was used, or for how long it was used. Plaintiffs are merely suing, in tort under state law, based on the impact the Government, as the owner or lessee of land, had on them as a result of the failure of the environmental safety employees to adequately contain the AFFF that was used. Nowhere has the Government countered the basic point that, under both CWA § 1323(a) and a long line of appellate decisions beginning with *Dalehite*, in conducting its activities on its property the Government had an obligation to abide by state-law requirements concerning water pollution, including its obligation not to trespass on the water rights of its neighbors.

### B. The Government Cannot Pass the Two-Step Test under *Gaubert*

Plaintiffs next summarize an independent flaw in the Government's submission: the Government's failure to compile a factual record supporting its theory that holding the Government liable on Plaintiffs' claims would subject the Government to second-guessing of policy decisions regarding its use and handling of AFFF, under the two-step *Gaubert* test.

32

1. *Gaubert* Step 1: The Government's Violation
   of Mandatory Policies and Directives

Under the framework for analyzing the DFE set out by the Supreme Court in *Gaubert*, the first step in analysis is to ask whether the federal employees whose acts, or failure to act, caused the harm alleged by plaintiffs thereby violated a *mandatory* policy. As the Court concisely put it: "If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *Gaubert*, 499 U.S. at 324.

This Court need not proceed beyond the first step in *Gaubert*, because here it is clear that the employees responsible for environmental safety on the properties at which the Government deployed AFFF violated a mandatory policy—a policy reflected not merely in applicable regulations, but in legislation enacted by Congress directly administered by the President.

As earlier explained, there is no doubt as to the policy choice made by Congress, in 33 U.S.C. § 1323(a), enacted as part of the Clean Water Act amendments in 1977. Absent an exemption issued directly by the President, all parts of the Government have an absolute duty to "comply with" all "requirements" under state law regarding the "discharge or runoff of pollutants" which, the Fourth Circuit has made clear, includes the requirements imposed by the common-law claims invoked by Plaintiffs in these cases. See pp. 15-16, *supra*.[20] That this is an

---

[20] We pause briefly to clarify Plaintiffs' precise argument here. First, it is an argument in the alternative. It is a fallback in the event the argument in Part I were not credited, for example, if the Government's obligations under state tort law to avoid polluting the water of neighbors were held not to be "requirements" within the meaning of CWA § 1323(a). In that event, although § 1323(a) would not directly effect a categorical waiver of immunity, it would nonetheless constitute a mandatory policy, imposed by Congress, satisfying *Gaubert* step one.

Second, Plaintiffs here are not arguing a *violation* of the Clean Water Act that somehow creates a federal cause of action on which they may sue the Government for damages. Rather, Plaintiffs have brought suit under the tort law of various States and are citing § 1323(a) for Congress's recognition that federal facilities are obligated to comply with state-law requirements

33

*absolute* duty of the Government and its employees, absent a presidential exemption, is made

clear by the legislative history behind the precursor to § 1323(a), enacted in 1970, which

"removed any discretion based on the availability of appropriations, and thus required

compliance by federal agencies subject only to 'the paramount interest of the United States as

determined by the President." *California ex rel. State Water Resources Control Bd. v. EPA*, 511

F.2d 963, 965-66 (9th Cir. 1975) (citation omitted).

That § 1323(a) operates to impose a mandatory duty on all federal employees, stripping

them of any "policy" latitude to ignore state-law requirements bearing on water pollution, is

made clear by the presidential directive implementing this provision, Executive Order 12088

(1978).[21] Paragraph 1-605 confirms that no one besides the President has authority to alter the

mandatory duty to abide by state-law requirements regarding water pollution: "Except as

expressly provided by a Presidential exemption under this Order, nothing in this Order, nor any

action or inaction under this Order, shall be construed to revise or modify any applicable

pollution control standard."

Although, as noted in Paragraphs 1-702 and 1-703, federal officials below the President

may make *recommendations* as to whether exemptions to § 1323(a) are advisable, Paragraph 1-

701 states that exemptions "may only be granted . . . if the President makes the required

---

regarding water pollution. Thus, the Government's observation that the CWA does not *itself*
create a federal cause of action, Govt. Mem. at 40-41 (quoting *Sanchez ex rel D.R.-S v. United
States*, 671 F.3d 86, 94-96 (1st Cir. 2012)), is immaterial. *See, e.g.*, *Lewis v. United States*, 2024
U.S. Dist. LEXIS 50208, *6-*7 (D. La. Mar. 21, 2024) ("Plaintiffs are not alleging violations of
federal law; rather, they have pled allegations and pointed to evidence in the record that
Defendants breached a duty owed to them under *Louisiana* law."). *See also Mulcahey v.
Columbia Organic Chems. Co.*, 29 F.3d 148, 151-54 (4th Cir. 1994).

[21] Executive Order 12088 is archived here:
https://www.archives.gov/federal-register/codification/executive-order/12088.html

appropriate statutory determination: that such exemption is necessary, a) in the interest of

national security, or, b) in the paramount interest of the United States."

Plaintiffs submit that the actions of Congress in enacting § 1323(a), and of the President

in implementing it though Executive Order 12088, are a complete answer to the Government's

argument that for the Judicial Branch to hear the lawsuits brought by Plaintiffs, alleging

violations of state-law requirements regarding water pollution, would somehow raise concerns

about the separation of powers, or would involve interference by the Judiciary with military

matters. Gov't Mem. at 29-30, 32-33, 46. To the contrary, this Court should hold that § 1323(a)

imposes a mandatory duty on environmental safety employees at military bases to adopt

precautions to avoid violations of state-law requirements regarding water pollution, and this

Court should decline "to strike a balance of equities" where "Congress, exercising its delegated

powers, has decided the order of priorities in a certain area . . . ." *TVA v. Hill*, 437 U.S. 153, 194

(1978).[22]

---

[22] It is instructive to contrast this litigation with the litigation that resulted in the separation-of-powers decision cited by the Government, in warning of the danger posed by courts questioning "'actual, sensitive judgments' made by the military." Govt. Memo. at 30 (quoting *Wu Tien Li-Shou v. United States*, 777 F.3d 175, 180 (4th Cir. 2015)). That case was brought by the widow of a man held hostage by Somali pirates, who was tragically killed when members of the U.S. Navy, acting on orders from a NATO commander from the Netherlands, fired on the ship to force the pirates to surrender. The widow sought to second-guess numerous on-the-spot military decisions, arguing that Navy officers should have disobeyed the NATO commander's direct order, and have instead used alternate tactics to neutralize the pirate ship. 777 F.3d at 180-81. The Fourth Circuit, holding that the case presented a nonjusticiable political question, declined to permit such interference with the powers of the President as commander-in-chief, and Congress's plenary control over the framework of the military establishment. *Id.* at 179-82. In sharp contrast, having Plaintiffs' cases heard in this Court *advances* the Legislature's policy of holding the Government accountable for violating the state-law requirements concerning water pollution, a result that does not intrude on the powers of the President, who declined to exercise his power to create an exemption from § 1323(a) applicable to these military installations.

Although the directive of Executive Order 12088 was binding on all federal employees a soon as it was issued in 1978, it is worth noting that civil engineering employees at Air Force bases were specifically put on notice of it via Air Force Regulation 91-9, Exhibit Y to the Government's motion (ECF 4548-137). Paragraph 11(a) cited § 1323(a) and Executive Order 12088, and summarized them as "requir[ing] all federal agencies to comply with all federal, state, and local pollution control requirements the same as any nongovernmental entity." Paragraph 11(c) noted that the mandate extends to prevent pollution of both surface and underground waters. And Paragraph 11(c)(1) stripped civil engineers of any discretion to ease up on water-pollution control on the basis of concern about "a major conflict with Air Force capabilities or requirements," directing them to notify superiors with any such concerns, consistent with the fact that only the President has authority to exempt a federal facility from the requirements of § 1323(a).

In sum, it could hardly be clearer that a federal statute, an Executive Order, and an Air Force regulation all imposed a mandatory duty on Air Force civil engineers to implement whatever measures were necessary to ensure that the Air Force's use of AFFF would not violate state-law requirements relating to water pollution including, as noted on pp. 11-17, *supra*, the requirements of state common law.

None of these points are addressed in the Government's brief. The only argument the Government makes under *Gaubert* step one is that Plaintiffs have identified "no military policy restrict[ing] the military's use and handling of AFFF before 2016." Gov't Mem. at 34. Pointing to the "immense record" it has compiled, *id*. at 34, it then scours every source of federal law it can imagine in a search for some limitation on the use of AFFF, coming up empty. *Id*. at 35-44.

But again, Plaintiffs' lawsuits are not premised on any criticism of how the Government used AFFF on its military bases. Their contention is that the environmental safety employees responsible for complying with the mandate of § 1323(a) failed to take the steps necessary to avoid violations of the state-law requirements, including common-law tort principles, that were in place to protect neighbors of the Government from the aftereffects of its activities on base, including its use of AFFF. The extensive factual record that has been compiled by the Government is for that reason not sufficient to support the relief it seeks in its motion.

2. ***Gaubert* Step 2: The Discretion Exercised by Environmental Safety Employees Pursuant to Federal Statutes and Regulations Involves Scientific and Professional Matters, and Not "Policy" Analysis**

Even if *Gaubert* step one was somehow insufficient to reject the Government's assertion of discretionary-function immunity, given the record of this case, *Gaubert* step two resolves any doubt. It triggers discretionary-function immunity only if the Government agent's acts are "grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 324-25. Under this test, "a choice is shielded from liability by the discretionary function exception if the choice is, under the particular circumstances, one that ought to be informed by considerations of social, economic, or political policy and is made by an officer whose official responsibilities include assessment of those considerations." *Id*. at 335 (Scalia, J., concurring in part and concurring in the judgment). The analysis of the record evidence focuses "not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id*. at 325 (majority decision).

Of course, on the record of this case, it is clear that the Government agents responsible for environmental safety precautions at military bases wholly lack authority to consider matters of military necessity, or any other matters bearing on social, economic, or political policy that

37

might be susceptible to policy analysis. Congress itself has constrained military officials, barring them from engaging in any policy debate about the relative importance of military needs versus the need to avoid polluting the water sources of neighbors, in mandating in CWA § 1323(a) that federal facilities must meet all state-law requirements regarding water pollution, and that the only person empowered to make policy-based exceptions is the President. See p. 17, *supra*. That policy choice is reflected in military regulations, such as Air Force Regulation 91-9, directing the responsible environmental safety employees at each base to take the steps mandated by § 1323(a) to ensure that base activities do not violate state-law requirements.

Any discretion exercised by base-level bureaucrats like John Rebman was not the sort of discretion susceptible to policy analysis within the meaning of *Gaubert*. Mr. Rebman, a civilian water quality employee at Cannon Air Force Base from 1994 to 2017, was "in charge of ensuring that we were in compliance with all federal, state, and local regulations . . . ." ECF 4551-15 at 20:8-24. Mr. Rebman explained that his work, as a civil engineer focused on environmental protection, was unconnected to policy decisions about "the use of" AFFF, which "was beyond my control." His work "was designed to mitigate any impacts to the environment" posed by that usage. *Id*. at 29:14-23. *See also id.* at 135:23 to 136:2 ("We spent a lot of money building that 9 million gallon storage basin for the express purpose of mitigating environmental and human health issues."). That Mr. Rebman's work was of a scientific and professional nature, not susceptible to public policy analysis, is illustrated by detailed operating instructions that he drafted to ensure that various scenarios involving the use of AFFF "do not cause environmental harm." ECF 4551-13 (CE Operating Instruction 32-11). *See also* ECF 4551-16 at 188-219 (discussing same).

Thus, on this record, the Government is incorrect in trying to suggest that the actions or omissions by CAFB' civilian environmental safety employees that are challenged by Plaintiffs' lawsuits somehow involved matters of public policy. There is nothing to the suggestion, Gov't Memo. at 46, that these employees were involved in weighing environmental concerns against military concerns (a weighing Congress had entrusted to the President). To the contrary, as such employees endeavored to meet the mandate of the Clean Water Act, 33 U.S.C. § 1323(a), to satisfy state-law requirements regarding water pollution, of necessity their work involved the application of scientific and professional principles within the specific field of water-pollution control. It is well established that when the work of federal employees involves scientific and professional matters, *Gaubert* step two is satisfied, so that the DFE does not immunize the Government from suit if their actions, or inaction, violate state tort law.[23]

---

[23] *See Berkovitz*, 486 U.S. at 545 (finding that "the parties framed the issue appropriately," where plaintiffs argued that the challenged action "involve[d] the application of objective scientific standards," so that the discretionary function exception did not apply, whereas the Government argued that the action "incorporate[d] considerable 'policy judgment'"; Court ultimately declined to decide issue given "scanty record"); *Anestis v. United States*, 749 F.3d 520, 529 (6th Cir. 2014) ("determination of a healthcare professional or an in-take clerk as to the emergency state of a patient would not involve a consideration of public policy" because it was a medical decision); *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1030 (9th Cir. 1994) ("Decisions involving the application of objective scientific standards . . . are not insulated by the discretionary function exception because they do not involve the weighing of economic, political and social policy."); *Griffin v. United States*, 500 F.2d 1059, 1066 (3d Cir. 1974) (no immunity "[w]here the conduct of Government employees in implementing agency regulations requires only performance of scientific evaluation"). *See, e.g.*, *Soldano v. United States*, 453 F.3d 1140, 1148 (9th Cir. 2006) (no immunity for negligence in setting speed limit on national park road too high, as "doing so is essentially a matter of scientific and professional judgment"); *Cook Inlet Drift Assoc. v. Trinidad Corp. (In re Glacier Bay)*, 71 F.3d 1447, 1451-53 (9th Cir. 1995) (no immunity for a mistaken "scientific hydrographic judgment" in the preparation of a nautical chart partly at fault for ship running aground); *Faber v. United States*, 56 F.3d 1122, 1125 (9th Cir. 1995) (no immunity for failure to warn of diving hazards in national park, as employees do not consider "social, economic, and political circumstances in the course of making judgments related to safety"); *Aslakson v. United States*, 790 F.2d 688, 693 (8th Cir. 1986) (no immunity for negligence in stringing power lines "dangerously low," as setting a safe height does not involve "the kind of judgment that involves the weighing of public policy considerations"); *In re*

The caselaw on this point is faithful to the original public meaning of the discretionary-function exception. When the FTCA was enacted, the exception codified a preexisting common-law immunity for public officers that involved categorizing challenged activities as either "ministerial" or "discretionary." The words "function or duty" in 28 U.S.C. § 2680(a) "suggest that courts should look at the kind of activity the officer was performing when the challenged action occurred, not the action itself." *Xi v. Haugen*, 68 F.4th 824, 843 (3d Cir. 2023) (Bibas, J., concurring) (emphasis in original). "Courts categorized certain kinds of government activities as either 'ministerial' or 'discretionary.' For example, the 'care of prisoners' and 'driving of vehicles' were ministerial. So a public officer could be held liable for any negligence or wrongdoing in their performance. Other activities, like the 'routing of a highway' or 'assessment of property for taxation,' were discretionary. So an officer was immune from suit even if he did those activities negligently." *Id.* (citations omitted). Of course, the prosaic task of managing waste products, the activity at issue here, would fall on the ministerial end.

A clear illustration of the difference between government decisions that are susceptible to policy analysis, and thus protected by the discretionary-function immunity, and government decisions that involve the exercise of professional and scientific judgment and therefore are not protected, is provided by the Ninth Circuit decision in *ARA Leisure Services v. United States*, 831 F.2d 193 (9th Cir. 1987). That case involved a tour bus that went off the road in a national park, causing five fatalities. The lawsuit challenged both the *design* of the road (the lack of guardrails) and its *maintenance* (its edges had badly eroded, narrowing it from 28 feet to 14.6

---

*Flint Water Cases*, 482 F. Supp. 3d 601, 634 (E.D. Mich. 2020) ("EPA's decisions in Flint involved professional and scientific judgments, not multiple and competing policy considerations"); *Andrulonis v. United States*, 593 F. Supp. 1336, 1338 (N.D.N.Y. 1984) (no immunity because government scientist's conduct involved "the exercise of professional and scientific judgment rather than policymaking").

feet, and the edges were dangerously soft). The court held that the Government's "decision to design" the road "without guardrails was grounded in social and political policy" (to enhance the scenic drive), but that there was no immunity for "the failure to maintain" the road "in a safe condition," as maintenance work is not a policy-based activity. *Id*. at 195. The court held that the Government could not immunize its failure to maintain the road by citing budget constraints, as "[t]o hold otherwise would permit the discretionary function exception to all but swallow the Federal Tort Claims Act." *Id.* at 195-96.[24]

It is worth noting that the absence of immunity when the decisions of federal employees concerning safety precautions are based on scientific and professional judgments extends beyond *physical* precautions to protect members of the public, to situations involving the need to provide *information* necessary to protect them from danger. For example, in *Green v. United States*, 630 F.3d 1245 (9th Cir. 2011), although the court held that the Forest Service was immune from suit for its multi-factor decision to light a backfire as a means of fighting a fire, it could be sued for its *failure to warn* residents of that decision, both before and, particularly, after the backfire raged out of control, as there was no evidence that the provision of warnings involve policy analysis. *Id.* at 1251-52. The Government asserts that there was nothing to warn Plaintiff about (Gov't Mem. at 48-50), but it ignores the conclusion of the Inspector General that the military was plainly aware no later than 2006 of risks posed by AFFF, but no warnings were issued to

---

[24] Plaintiffs' understanding is that the Government is not asserting that it made a budget-based "policy" decision to refrain from adopting measures needed to protect its neighbors from water pollution. Any such assertion would be futile, given the legislative determination reflected in CWA § 1323(a) that federal departments and agencies may not invoke cost concerns as a justification for failing to comply with requirements to protect water quality. See pp. 33-34, *supra*.

those living and working near its military bases for over a decade.[25] Such factual matters are, in any event, not ripe for decision on this threshold motion and obviously will require further discovery.

### 3. Garden-Variety Negligence Is Not Subject to the DFE Under *Gaubert* Step 2

Additionally, certain allegations in Plaintiffs' complaints satisfy *Gaubert* step two, and thus avoid immunity under the DFE, because they allege *garden-variety negligence* on the part of federal employees, whose lack of care resulted in releases of large amounts of AFFF, contaminating neighbors' property—releases which, because of their accidental nature, cannot plausibly be portrayed as the deliberately intended product of a "policy" choice.[26] Indeed, the Department of Defense has previously acknowledged that almost half of AFFF system activations are driven by "human error"—not policy judgments. AF04-00773696 (DOD chart showing 45% of fire suppression system activations are caused by human error). As this Court has noted, relying on well-reasoned Third Circuit decisions, there is no basis for concluding that such garden-variety negligence involves matters of "policy" that could convey immunity under *Gaubert* step two. *Reynolds v. United States*, 2015 U.S. Dist. LEXIS 184062, *13 (D.S.C. Aug.

---

[25] *See* Inspector General, U.S. Dept. of Defense, *(U) Evaluation of the Department of Defense's Actions to Control Contaminant Effects from Perfluoroalkyl and Polyfluoroalkyl Substances at Department of Defense Installations* (Report No. DODIG-2021-105), July 22, 2021, at 3-4, 24-43 (https://media.defense.gov/2021/Jul/23/2002809965/-1/-1/1/DODIG-2021-105.PDF) (https://perma.cc/7HD3-8NQL).

[26] For example, the lawsuit brought by the Schaaps alleges the release of AFFF at CAFB due to "false alarms, malfunctions, and other incidental releases in the hanger, fire stations, and other locations." Schaap Complaint ¶ 6. That such entirely accidental releases of AFFF are hardly trivial in impact is revealed by site-specific discovery at CAFB, which to date has documented at least 45 accidental AFFF discharges since 1995, totaling thousands of gallons of AFFF released into the environment. *See* Pltfs. Site-Specific DFE Br. at 5.

14, 2015) (Gergel, J.) (citing *Gotha v. United States*, 115 F.3d 176, 181 (3d Cir. 1997);

*Cestonaro v. United States*, 211 F.3d 749, 755 (3d Cir. 2000)).

Several months after this Court's decision in *Reynolds*, the Fourth Circuit reached the

same conclusion, that the Government has no immunity from claims alleging garden-variety

negligence. *Rich v. United States*, 811 F.3d 140 (4th Cir. 2015), involved a prisoner who, after

being placed in a closed recreation area with other prisoners, had been stabbed by another

prisoner using a nine-inch-long knife. *Id*. at 141. He alleged negligence, both in the decision to

place him with those specific prisoners (who turned out to be members of a prison gang he'd

refused to join) and in officers' failure to detect the knife in their search of the prisoners. While

finding immunity on the first claim, *id*. at 145-46, the court declined to find immunity on the

claim of a negligent search, agreeing with the Second Circuit that "discretionary conduct cannot

be grounded in a policy decision when that conduct is marked by individual carelessness or

laziness." *Id*. at 147 (citing *Coulthurst v. United States*, 214 F.3d 106 (2d Cir. 2000)).[27]

The justification for denying immunity in cases in which the Government's conduct

involves garden-variety negligence long predates this Court's decision in *Reynolds* and the

Fourth Circuit's decision in *Rich*. Shortly after the FTCA's enactment, the U.S. Supreme Court

noted that "[u]ppermost in the collective mind of Congress" in waiving immunity "were the

---

[27] Although a circuit split exists on this issue, the Fourth Circuit has been recognized by other circuits as clearly on the side that rejects immunity for conduct involving garden-variety negligence. *E.g*., *Torres-Estrada v. Cases*, 88 F.4th 14, 22 n.5 (1st Cir. 2023); *Xi v. Haugen*, 68 F.4th 824, 843 (3d Cir. 2023) (Bibas, J., concurring). Following *Rich*, district judges in the Fourth Circuit have, like this Court in *Reynolds*, denied claims of immunity involving garden-variety negligence. *See, e.g.*, *Washington v. Dep't of the Navy*, 446 F. Supp. 3d 20, 28-29 (E.D.N.C. 2020) (applying *Rich* to deny immunity, conclusion that "[t]here are simply no policy considerations to balance or weigh in [the Government's] failure to provide uncontaminated water at [a military base] over a period of several decades."); *Pride v. Murray*, 595 F. Supp. 3d 453, 462 (W.D.N.C. 2022) (same); *Bunting v. United States*, 2020 U.S. Dist. LEXIS 210416, *8-*11 (E.D.N.C. Nov. 10, 2000) (same).

ordinary common-law torts," and that the immunity waiver was "centered on granting relief for the run-of-the-[mill] accidents, as distinguished from injury from performing discretionary governmental functions . . . ." *Dalehite*, 346 U.S. at 28 & n.19. Relying on *Dalehite*, the Third Circuit concluded in one decision cited by this Court: "That torts stemming from garden variety decisions fall outside the discretionary function exception is consistent with a primary motive behind the FTCA." *Cestonaro*, 211 F.3d at 755-56.

The Third Circuit's analysis in *Gotha* (the other decision cited by this Court) helps distinguish between cases like those of the Dairy Plaintiffs that involve mere garden-variety negligence and others involving the exercise of discretion which may involve matters of policy, as to which immunity can attach. *Gotha* was a personal injury lawsuit brought against the Navy by a government contractor who was injured in a fall at night, on an unpaved path leading to a trailer because there was no railing, lighting, or other precaution. 115 F.3d at 393. The Third Circuit held that the district court had erred "[i]n concluding that policy considerations were present in the Navy's action (or inaction)," because that the accident had been caused by "a mundane, administrative, garden-variety, housekeeping problem" and did not involve matters reasonably susceptible to policy analysis. *Id*. at 398-99. Similarly, the failure of employees at CAFB and other military bases to exercise due care in executing existing safety protocols, which caused unplanned, entirely accidental discharges of AFFF, amounts to garden-variety negligence that cannot be a basis for immunity under the DFE.

That conclusion is buttressed by the *Gotha* court's summary of cases identified by the United States that *did* involve matters of policy, and thus to which immunity properly attached. The Third Circuit distinguished the garden-variety negligence that injured the plaintiff in *Gotha* from the following policy-based decisions: 1) by the Air Force's "deliberate choice" to omit a

44

safety railing at a missile launch site, "to provide maximum flexibility in the event of a nuclear

attack"; 2) by a federal agency's choice to use one material, instead of another, for guardrails, in

designing a highway, as part of "a discretionary decision of resource allocation"; 3) by the

National Park Service's choice "not to place a guardrail alongside the Blue Ridge Parkway," in

balancing aesthetic and other factors; 4) by the National Park Service's choice to delay

resurfacing a particular stretch of road "in preference to others in need of repair"; and 5) by the

United States Postal Service's choice "to limit security measures during hours when the post

office was closed . . . ." *Id.* at 400 (citations omitted).

  Puzzlingly omitting any mention of this Court's decision in *Reynolds*, *Gotha*, and other

Third Circuit decisions cited in *Gotha*, and the many other federal court decisions that are in

accord,[28] the Government nonetheless insists that it enjoys immunity against suit even as to

matters involving the negligent failure of its military base personnel to carry out established

safety protocols to prevent the accidental release of AFFF. According to the Government, this

Court may not focus on such obvious negligence at the operational level; rather, this Court must

---

[28] *E.g.*, *Gibson v. United States*, 809 F.3d 807, 813-16 (5th Cir. 2016); *Terbush v. United States*, 516 F.3d 1125, 1132-35 (9th Cir. 2007); *O'Toole v. United States*, 295 F.3d 1029, 1035-37 (9th Cir. 2002); *Duke by Duke v. Department of Agric.*, 131 F.3d 1407, 1410-12 (10th Cir. 1997); *Allen-Fillmore v. United States*, 2023 U.S. Dist. LEXIS 153035, *13-*21 (E.D. Pa. Aug. 30, 2023); *McAdams v. United States*, 2023 U.S. Dist. LEXIS 145987, *3-*11 (E.D. Pa. Aug. 21, 2023); *Marchiona v. United States*, 2023 U.S. Dist. LEXIS 48104, *11-*18 (C.D. Cal. Jan. 26, 2023); *Maghen v. United States*, 2021 U.S. Dist. LEXIS 174651, *5-*9 (E.D.N.Y. Sept. 14, 2021); *Walen v. United States*, 246 F. Supp. 3d 449, 464-66 (D.D.C. 2017); *Hinson v. United States*, 2017 U.S. Dist. LEXIS 4440, *6-*13 (E.D.N.C. Jan. 12, 2017); *Menkin v. United States*, 99 F. Supp. 3d 577, 580-84 (E.D. Pa. 2015); *Fed. Bus. Ctrs., Inc. v. United States*, 2014 U.S. Dist. LEXIS 95915, *28-*33 (D. N.J. July 15, 2014); *Mathison v. United States*, 2014 U.S. Dist. LEXIS 23680, *2-*10 (D. Colo. Feb. 24, 2014); *Fitzmaurice v. United States*, 2013 U.S. Dist. LEXIS 126735, *27-*35 (M.D. Pa. Sept. 5, 2013); *Tucker v. Cascade Gen., Inc.*, 2011 U.S. Dist. LEXIS 120298, *15-*29 (D. Ore. Oct. 17, 2011); *Carney v. United States*, 368 F. Supp. 2d 439, 445-48 (D. Md. 2005); *Fabend v. Rosewood Hotels & Resorts*, 174 F. Supp. 2d 356, 359-61 (D.V.I. 2001).

attach blanket immunity to *everything* federal employees do with respect to AFFF, no matter how mundane, quotidian, and removed from actual policy decisions, by focusing on "the original, high-level decision that gave rise to the FTCA claims." Gov't Mem. at 45. "The Court," it urges, "must assess the *overarching* decision at issue in Plaintiffs' FTCA Complaints, not each and every subsidiary act that followed." *Id*. at 46 (emphasis in original). Any garden-variety negligence, according to the Government, was "encompassed within the overarching, programmatic, policy-based decision to use AFFF for firefighting in the first place," and thus there must be blanket immunity. *Id*.

The Government is wrong. "Viewed from 50,000 feet, virtually any action can be characterized as discretionary. But the discretionary function exception requires that an inquiring court focus on *the specific conduct at issue*." *Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009) (citing *Berkovitz*, 486 U.S. at 546-47) (emphasis added). *See also In re Glacier Bay*, 71 F.3d at 1451 ("the proper level of inquiry must be act by act"; "The proper question to ask is not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance. Each separate action must be examined to determine whether the specific actor had discretion of a type Congress intended to shield.").

Thus, in *Berkovitz*, the Supreme Court focused on the individually alleged wrongful acts of the United States that caused the plaintiff's injury from a polio vaccine: licensing the vaccine manufacturer before receipt of all required testing data therefrom; licensing the manufacturer without otherwise first finding regulatory compliance; licensing the manufacturer after incorrectly finding regulatory compliance; formulating policy on the release of vaccine lots; and knowingly approving the release of a lot that did not meet mandatory safety policies. 486 U.S. at 539-48. It did so because it framed its task as one of "reviewing the applicable regulatory scheme

46

and petitioners' *specific allegations* of agency wrongdoing." *Id*. at 540 (emphasis added). The

Court *did not* ascend to the 50,000-foot level to survey the case at the extreme level of generality

urged by the Government here—that is, surveying the "overarching, programmatic, policy-based

decision," Gov't Mem. at 46 (in *Berkovitz*, regulating vaccine manufacturers and vaccine lots).

The cases the Government cites do not support its argument to the contrary. The Fourth

Circuit authority emphasized by the Government is *Wood v. United States*, 777 F.3d 123 (4th

Cir. 2017), to advocate for eviscerating the FTCA with a blanket immunity doctrine (see Gov't

Mem. at 45-46). But *Wood* did not hold that, as long as the Government can manage to define

the supposed "policy" at a high enough level of generality, the Government obtains blanket

immunity for the garden-variety negligence of employees in carrying out government functions

at the operational level. (If the DFE analysis turned on such definitional games, the cases cited in

footnote 28, *supra*, would all have come out the other way.) Rather, *Wood* was a special

circumstance involving the Navy's implementation of a policy decision made by Congress, to

make military facilities available for state and local law enforcement training purposes, provided

it did not adversely affect military needs. See pp. 28-29, *supra*. The balancing process inherently

involved in carrying out that specific statutory directive, the Fourth Circuit understandably held,

inevitably required a balancing of policy factors, mandated by Congress, which therefore fell

within the scope of *Gaubert* step two.

Nor do any of the other cases cited by the Government support its sweeping contention

that it should enjoy immunity even as to matters involving garden-variety negligence.

*Pieper v. United States*, 713 Fed. App'x 137 (4th Cir. 2017) (unpublished), involved an

*actual* government policy (not one artificially defined at a high level of generality): a specific

regulation directing that military personnel dispose of particular waste in a specific area of the

military base in question. *Id*. at 140-41. There was no claim that federal employees had been instructed to implement particular safety precautions and had committed garden-variety negligence by failing to exercise due care at the operational level.

In *Kohl v. United States*, 699 F.3d 935 (6th Cir. 2012), the Sixth Circuit *rejected* the Government's effort to arbitrarily define the relevant "conduct" at a high level, using a "broad characterization" under which *nothing* the federal employees could have done, no matter how negligent, could have subjected the Government to liability. *Id*. at 941. Noting that under the DFE, "run-of-the-mill torts" are not "shielded from liability," *id*. at 943, the court instead held on the particular facts of the case—in which the plaintiff alleged injury due to the use of a winch during an experiment concerning the recovery of evidence from a bomb scene—any liability for negligence involving the winch was shielded by immunity given the policy considerations involved. *Id*. at 943-45. There was no claim that federal employees had been instructed to implement particular safety precautions and had committed garden-variety negligence by failing to exercise due care at the operational level.

*Aragon v. United States*, 146 F.3d 819 (10th Cir. 1998), was a lawsuit brought by landowners impacted by trichloroethylene (TCE) that migrated off an Air Force base, polluting their groundwater. In holding that immunity attached under the DFE, the Tenth Circuit noted that the Air Force's actions were taken pursuant to Executive Order 10014 (1948), directing the military to take only "such action as may be practicable" to avoid water pollution," *id*. at 824,[29]

---

[29] The text of Executive Order 10014 is available online at: https://www.presidency.ucsb.edu/documents/executive-order-10014-directing-federal-agencies-cooperate-with-sate-and-local-authorities (https://perma.cc/28SE-7SHU).

Of course, Executive Order 10014, promulgated in 1948, was eclipsed by the much more sweeping protection against water pollution contained in the Clean Water Act of 1972, 33 U.S.C. § 1323(a). See pp. 11-17, *supra*.

48

and it concluded that in making decisions regarding the use of TCE, "the military recognized it needed flexibility to weigh its groundwater protection policies against broader public and military policies," and thus the plaintiffs could not satisfy *Gaubert* step two. *Id*. at 826-27. Here again, there was no claim that federal employees had been instructed to implement particular safety precautions and had committed garden-variety negligence by failing to exercise due care at the operational level.

*OSI, Inc. v. United States*, 285 F.3d 947 (11th Cir. 2022), was a case factually similar to *Aragon*, which the Eleventh Circuit cited in cursorily rejecting the plaintiff's argument under *Gaubert* step two. *Id*. at 953 (quoting *Aragon*, 146 F.3d at 826).

*Loughlin v. United States*, 393 F.3d 155 (D.C. Cir. 2004), involved a failure-to-warn lawsuit by owners of land that had been used eight decades earlier for research on munitions, some of which had been left buried on the land. The D.C. Circuit held that the plaintiffs had failed to satisfy *Gaubert* step two because the military was not "required to consistently and regularly to revisit its initial decision not to warn and rebalance the relevant factors . . . on a regular basis for over 80 years . . . ." *Id*. at 164. Here again, there was no claim that federal employees had been instructed to implement particular safety precautions and had committed garden-variety negligence by failing to exercise due care at the operational level.

Finally, *In re Camp Lejeune N. Carolina Water Contamination Litig.*, 263 F. Supp. 3d 1318 (N.D. Ga. 2016), *aff'd sub nom. In re Camp Lejeune, N. Carolina Water Contamination Litig.*, 774 F. App'x 564 (11th Cir. 2019), involving contaminated water consumed on a military base, relied on *Loughlin* to hold the DFE applicable, on the basis that the military was not required to reassess safety issues over the decades as science evolved. *Id*. at 1356. It also relied on *Aragon* and *OSI*, agreeing with the Tenth and Eleventh Circuits that "the direction of

49

resources on a military base during the Cold War is a classic illustration of the kind of balancing of national security and economic policies that should be protected by the discretionary function exception." *Id*. at 1354. Here again, there was no claim that federal employees had been instructed to implement particular safety precautions and had committed garden-variety negligence by failing to exercise due care at the operational level. As the district court noted, "nothing in the allegations made by the Plaintiffs can be characterized by individual carelessness or laziness." *Id*. at 1354.

Thus, the cases cited in the Government's briefing support, rather than undermine, this Court's reasoning in *Reynolds*, which drew on Third Circuit precedent that has been accepted by other circuits, including the Fourth Circuit (subsequent to *Reynolds*), holding that the Government has no immunity from suit based on garden-variety negligence of the sort involved in these cases, which has often led to the accidental release of AFFF on military bases due to employees' lack of care in implementing established safety protocols.

In summary, site-specific discovery at CAFB has confirmed that neither base-level decisionmakers like Mr. Rebman, who created directives like OI 32-11 while working in a scientific or technical capacity, nor the personnel that mishandled and released AFFF to sanitary sewers in violation of OI 32-11, exercised "policymaking" discretion under *Gaubert*'s second step. Thus, the Court can adjudicate the merits of tort claims based on their conduct without "question[ing] actual, sensitive judgments" of a policy nature. *Cf.* Gov't Mem. at 30. Because the Dairy Plaintiffs have identified at least *some* acts at CAFB falling outside of the DFE, the Motion must therefore be denied. *See In re Glacier Bay*, 71 F.3d at 1451 ("[T]he proper level of inquiry must be act by act. . . . Each separate action must be examined to determine whether the specific actor had discretion of a type Congress intended to shield.").

IV.     **THE COURT SHOULD ORDER JURISDICTIONAL DISCOVERY AND DENY THE GOVERNMENT'S DFE MOTION AS TO THE 23 COMPLAINTS PERTAINING TO NON-CAFB SITES**

Even if all of the above arguments were found by this Court to be an insufficient basis for rejecting the Government's motion, at a minimum the Court should permit the Plaintiffs in 23 other lawsuits to conduct site-specific discovery, for four independent reasons.

First, the Government cannot have it both ways. It cannot, on the one hand, argue that dismissal of certain Plaintiffs' claims is warranted because they failed to "even cite a federal directive that the United States supposedly violated in its use and handling of AFFF," Gov't Mem. at 36, while, on the other hand, obstructing Plaintiffs' efforts to obtain site-specific discovery by erroneously claiming "there is nothing left to discover" and that "[t]the record is complete." *Id.* at 27. Recognizing that this type of argument creates a "quandary" for FTCA plaintiffs—since alleging a "mandatory policy existed" without knowing whether or not it did "would risk violating Rule 11"—courts have "previously required that plaintiffs be given an opportunity for discovery of facts necessary to establish jurisdiction prior to decision of a 12(b)(1) motion." *Chow v. Wash. Metro. Area Transit Auth.*, 391 F. Supp. 3d 37, 42 (D.D.C. 2019).[30] This is consistent with Fourth Circuit precedent holding that plaintiffs who "may be able

---

[30] The Fourth Circuit has made clear that where "[d]iscovery could uncover" facts that would establish jurisdiction, discovery must be permitted as a "procedural safeguard" before dismissal. *Kerns v. United States*, 585 F.3d 187, 196 (4th Cir. 2009) (vacating dismissal of FTCA claims for lack of jurisdiction because district court did not permit discovery on jurisdictional facts); *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 861 (4th Cir. 2016) (upholding dismissal under discretionary-function exception only because plaintiff had received three years of jurisdictional discovery, 25,000 pages of relevant material, and opportunities to depose federal employees; and rejecting plaintiff's request for additional discovery on merits of negligence claim). Failure to permit adequate jurisdictional discovery is reversible error. *Rich v. United States*, 811 F.3d 140, 148 (4th Cir. 2015); *Kerns*, 585 F.3d at 196.

51

to establish jurisdiction" are "entitled to the safeguard of discovery before [their] complaint is dismissed" under the DFE.[31] *Rich v. United States*, 811 F.3d 140, 147-48 (4th Cir. 2015).

Second, in litigating whether the DFE applies, Plaintiffs are entitled to discover facts regarding challenged conduct that is not "inherently discretionary" or "facially protected by the [DFE]." *Bulger v. Hurwitz*, 62 F.4th 127, 145 (4th Cir. 2023). The imperative to allow discovery applies with special force where the record contains information "suggest[ing] that more specific directives exist[]" that federal employees may have violated, as those directives may defeat application of the DFE. *Id.*

*Rich* is instructive on this point. In that case, a prisoner alleged that prison officials had been negligent in failing to protect him from an attack, both because the officials placed him in

---

[31] Although the Fourth Circuit affirmed the district court's denial of a FTCA's plaintiffs request for discovery in *Seaside Farm, Inc. v. United States*, 842 F.3d 853 (4th Cir. 2016), the circumstances in that case were a far cry from those that exist here for Plaintiffs. In *Seaside Farms*, a tomato farm sued the Government under the FTCA claiming that its profits were devastated when the FDA negligently issued a contamination warning for a type of Salmonella that devalued its crop by more than $15 million. After the district court dismissed its claims pursuant to the DFE, the plaintiff appealed not only the dismissal decision but the district court's decision to limit the "scope of inquiry" during discovery solely to "jurisdictional issues." *Id.* at 858. Even with that limitation, however, the plaintiff received over 25,000 pages of documents focusing on "material relevant to FDA practices" and the Salmonella outbreak, and had the opportunity to take "multiple depositions of CDC and FDA employees." *Id.* at 861. That alone distinguishes *Seaside Farms* from this case, where the non-CAFB Plaintiffs have not had any opportunity to depose current or former personnel from their respective installations and/or bases and have (for the most part) received only a limited number of documents pertaining to their individual sites. Equally important, however, is that the discovery requested by the plaintiff in *Seaside Farms* addressed the merits of its claims against the Government, which the court determined were not "inextricably intertwined" with the jurisdictional issues that led to the dismissal of its case. *Id.* at 861. The circumstances here are far different because, first—for reasons discussed *infra*—the merits of Plaintiffs' claims are inextricably intertwined with the jurisdictional issues the Government has raised, and, second and more importantly, Plaintiffs are only seeking discovery relevant to the present jurisdictional issues. And while some of that discovery may also be relevant to the merits of their claims, unlike the plaintiff in *Seaside Farms*, Plaintiffs here are not requesting discovery that goes beyond the scope of the present jurisdictional issues such that the discovery addresses *only* the merits of their claims.

close proximity to his attackers and because they did not properly search his attackers. *Id.* at 142–43. Although the Fourth Circuit did not allow discovery into the allegations of improper prisoner placement, *id.* at 145-46, it did permit discovery into the allegations based on improper searches, because the Board of Prisons' Program Statement "suggest[ed] the existence of more specific directives" regarding search procedures that the prison officials may have violated. *Id.* at 147. Specifically, the Fourth Circuit held the plaintiff must be "permitted the opportunity for discovery of" both the specific directives themselves and whether the prison officials complied with them, as that information "would affect any analysis concerning whether the prison officials properly performed searches as required." *Id.*

Here, the Government has essentially conceded the "existence of more specific directives" by acknowledging that decisions about how best to contain and dispose of AFFF releases were left to the individual bases at each site. *See* Gov't Mem. at 13 ("The method of disposal for releases of AFFF from hangars was a decision delegated to the individual installations"); *id.* at 14 ("Through the 1990s, Air Force guidance allowed individual Air Force Bases discretion on how and where to contain the discharge from hangar fire protection systems."); *id.* at 20 ("The method of disposal of AFFF upon completion of testing was left to the discretion of the installation.").

But even if that were not the case, the site-specific discovery conducted for Cannon Air Force Base ("CAFB") demonstrates not only the "existence of more specific directives" but the critical role those directives served in defining how the military contained and disposed of AFFF releases. Since 2000, CAFB operated subject to an EPA-issued NPDES permit explicitly mandating that "[t]here shall be no discharge of floating solids or visible foam in other trace amounts" in the effluent discharged from CAFB. Gov't Ex. M (Dkt. 4551-15) at 4. As detailed in

Plaintiffs' Site-Specific Opposition, the CAFB discovery revealed that in June 2002, following a violation of the Base's NPDES permit during an accidental release of AFFF in an aircraft maintenance hangar, the Base adopted OI-32-11, an "operating instruction" that imposed a mandatory duty on base personnel to refrain from discharging AFFF into the base's sanitary sewer system—a duty that CAFB personnel routinely violated, thereby causing the Dairy Plaintiffs' injuries.[32] *See* Site-Specific Opp. at 10-15.

Moreover, there is reason to believe that mandatory policies similar to CAFB's operating instruction existed at the other sites at issue. In fact, the very person responsible for drafting CAFB's operating instruction, John Rebman, acknowledged during his deposition that "[o]ther Air Force Bases may have had something similar." **Ex. 3** at 28:5-9. This has already been proven correct at one of the other sites, as Plaintiffs have evidence—obtained through no help from Government—that a similar policy prohibiting AFFF releases from entering sanitary sewer drains existed at Eielson Air Force Base,[33] another of the sites at issue in the Government's omnibus DFE motion. *See* Compl., *H54B, Inc. et al v. United States et al*, No. 2:19-cv-01217-RMG (D.S.C. Nov. 11, 2018) (Dkt. 1). Plaintiffs also have evidence that at some of the other sites, the base was subject to EPA-issued NPDES permits governing discharges from the base's wastewater treatment system that included requirements similar to those that prompted Cannon

---

[32] Ironically, it was precisely these "situations where AFFF is piped to wastewater treatment plant" that the Government claimed could only support arguments that "belong in a global opposition." *See* Gov't Ltr. Br. at 3 (Dkt. 2924).

[33] *See* 354th Fighter Wing Instruction 32-7003 § A.2.2(d), *Eielson AFB Wastewater Systems and Pretreatment Program Compliance* (Jan. 26, 2010) ("Users shall not intentionally introduce the following pollutants into the sanitary sewer system: . . . Any pollutant, including biological oxygen demand (BOD) or chemical oxygen demand pollutants, released in a discharge and at a flow rate and/or pollutant concentration that will cause interference with/at the WWTP and its conveyance system. These pollutants include, but are not limited to, aqueous film forming foams (AFFF)."

AFB to adopt the referenced operating instruction. *See, e.g.*, **Ex. 4** at 10 (February 2012 NPDES permit instructing Joint Base Lewis McChord that it "***must not discharge*** any floating solids, ***visible foam in other than trace amounts***, or oily wastes that produce a sheen on the surface of the receiving water." (emphasis added)); **Ex. 5** at 7 (February 2011 NPDES permit imposing the same requirement on Naval Air Station Whidbey Island).

The third reason the Court should permit site-specific discovery is that the jurisdictional facts needed to resolve whether the DFE applies are "inextricably intertwined with those central to the merits" of Plaintiffs' claims. *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009). In such a situation, "the court should resolve the relevant factual disputes only after appropriate discovery," to "afford the plaintiff the procedural safeguards . . . that would apply were the plaintiff facing a direct attack on the merits." *Id.*

Once again, *Rich* is instructive on this point. In that case, the Fourth Circuit held that the plaintiff's allegations that prison officials failed to properly search his attackers were "intertwined with the merits of [his] claim regarding the execution of the patdowns." *Rich*, 811 F.3d at 146. The court explained that whether the officials properly searched the attackers was "relevant not only to whether the [DFE] applies, and thus, whether we have subject matter jurisdiction over this claim, but also to the merits of [the plaintiff's] negligence allegation," which challenged the officials' failure to protect him from the attack. *Id.* Having found that the "jurisdictional inquiry would require the consideration of merits-based evidence," the court concluded the plaintiff was "entitled to the safeguard of discovery before his complaint [was] dismissed." *Id*. at 147-48.

The same reasoning applies here, as both the existence and content of base-specific directives governing AFFF use and handling, as well as the base's compliance with those directives, are issues relevant not only to the jurisdictional inquiry but also the merits of Plaintiffs' claims. Those issues are relevant to the jurisdictional inquiry because they inform whether the conduct that gave rise to Plaintiffs' injuries was an exercise of policy discretion and thus subject to the DFE. And, as in *Rich*, they are relevant to Plaintiffs' underlying tort claims because they inform "whether the Government owed [Plaintiffs] a duty of care and, if so, whether [the Government] breached that duty" under the relevant states' tort laws. *Conrad v. United States*, 2017 U.S. Dist. LEXIS 41985 (D.S.C. Mar. 22, 2017) (Gergel, J.). Thus, the Court should allow Plaintiffs a full opportunity to discover these site-specific facts to avoid dismissing Plaintiffs' claims on the merits without the "safeguard of discovery" required by the Federal Rules of Civil Procedure. *Rich*, 811 F.3d at 148.

Finally, site-specific discovery is required to uncover the history and circumstances of uncontrolled releases of AFFF into the environment from each military installation at issue. This release history is critical for two reasons. First, Plaintiffs require release information to establish whether mandatory policies, once identified, have actually been violated. This task would involve cross-referencing each known uncontrolled release of AFFF with both the general and the site-specific mandatory policies in place at the time of release. Second, as explained on pp. 42-50, *supra*, garden-variety negligence such as equipment leaks, accidents, failures to maintain machinery, and other unintentional releases rooted in human error, do not involve any policy considerations. *See Rich*, 811 F.3d at 145 ("[D]iscretionary conduct cannot be grounded in a policy decision when that conduct is marked by individual carelessness or laziness."). Site-specific release information is necessary to determine to what extent such garden-variety

56

negligence contributed to Plaintiffs' injuries. Of course, the complete universe of such information is solely within the custody and control of the United States. Although many Plaintiffs have obtained some such information through public records requests or personal knowledge, such informal means of gleaning information cannot substitute for formal discovery.

For all these reasons, discovery is needed to allow Plaintiffs a full and fair opportunity to compile a factual record sufficient to show, as to each site, the existence of mandatory requirements and/or the focus of base environmental safety employees on the application of scientific and professional analysis (rather than policy analysis). So that this Court will appreciate the paucity of discovery to date regarding each of the sites put at issue by the Government's omnibus DFE motion other than Cannon AFB, below is a chart summarizing the number of documents produced by the Government at each site:[34]

---

[34] Information about which cases correspond to the listed sites is provided in Appendix A to the Government's brief (ECF 2548-4).

| Site | Total Documents |
|---|---:|
| Fairchild AFB | 22,475 |
| Peterson AFB | 32,023 |
| Mather AFB | 115 |
| Wright-Patterson AFB | 5,236 |
| Eielson AFB | 1,587 |
| Barnes ANFB | 3,214 |
| Gabreski ANGB (in progress) | 5,415 |
| Stewart ANGB (in progress) | 3,005 |
| Plattsburgh AFB | 117 |
| Griffiss AFB | 55 |
| MacArthur Airport | 0 |
| Defense Fuel Support Point Verona | 0 |
| Calverton Naval Weapons Industrial Reserve Plant | 0 |
| Niagara Falls Air Reserve Stations/Int'l Airport | 0 |
| Fort Drum | 0 |
| Hancock Field ANGB | 0 |
| Stratton/Schenectady ANGB | 0 |
| Seneca Army Depot | 0 |
| Westchester County Aitport | 0 |
| March Air Reserve Base/March AFB | 0 |
| McConnell AFB | 0 |
| Joint Base Lewis-McChord | 0 |
| NAS Whidbey Island Ault Field | 0 |
| **Total** | **73,242** |

In sum, the Government has produced documents for less than half the sites at issue, and the volume varies widely for those sites for which productions have been made, raising questions about the completeness of these productions, all of which the Government made voluntarily and without input from Plaintiffs. And that is before we even concern ourselves with the fact that not a single deposition has gone forward at any of the sites other than Cannon AFB. This lack of discovery is made all the more distressing by an existing record which amply indicates that allowing site-specific discovery to proceed, as it did at CAFB, would uncover information

relevant to assessing whether the DFE applies to Plaintiffs' claims. The Court should permit discovery into the existence and content of base-specific directives regarding the use and handling of AFFF, and into base personnel's compliance (or lack thereof) with any applicable directives for its containment.

Like the Site-Specific Plaintiffs for Cannon AFB, the Plaintiffs asserting claims concerning these other sites should be allowed to propound written discovery seeking non-duplicative documents[35] and depose a limited number of witnesses on issues specific to their respective sites.

## V.    THE GOVERNMENT'S OTHER ARGUMENTS LACK MERIT

The Government raises an array of other, minor arguments, including in many one-off footnotes. None have merit, especially since arguments made only in the most cursory form should not be entertained. *See Sanders v. Callender*, 2018 U.S. Dist. LEXIS 3488, 17 n.5 (D. Md. Jan. 9, 2018) ("The United States Court of Appeals for the Fourth Circuit has explained that ruling on an issue minimally addressed is 'unfair to [opposing party] and would risk an improvident or ill-advised opinion on the legal issues raised.'") (quoting *Hunt v. Nuth*, 57 F.3d 1327, 1338 (4th Cir. 1995)).

First, the Government contends that Plaintiffs must show, in establishing subject-matter jurisdiction, a "causal nexus" between a non-discretionary act and their injury. Gov't Mem. at 33. Courts have roundly rejected that position, holding that "issues" of "proximate cause" are "irrelevant to the discretionary function inquiry." *In re Glacier Bay*, 71 F.3d at 1451. Indeed, the case cited by the United States, *Loughlin v. United States*, 286 F. Supp. 2d 1, 18 (D.D.C. 2003),

---

[35] These requests would, of course, only be served after Plaintiffs have done a detailed and fulsome review of the discovery the Government has already produced at each site.

*aff'd*, 393 F.3d 155 (D.C. Cir. 2004), carefully avoided any suggestion that causation plays any role in the DFE analysis. The court made only the unremarkable observation that "[t]o cancel discretionary function immunity, a directive must not only be specific and mandatory, it must also be relevant to the claims underlying the suit." *Id.*

Second, the Government emphasizes irrelevant facts such as its recent, belated efforts to begin investigating and cleaning up the grievous PFAS contamination it has caused, and the EPA's recent decisions to begin regulating PFAS. *E.g.*, Gov't Mem. at 20–25. Neither set of facts is relevant to the DFE inquiry, which focuses on the acts and omissions that give rise to Plaintiffs' claims, not the Government's untimely efforts to mop up the mess it made.

Finally, notwithstanding its omnibus nature, the Government's DFE brief is littered with footnotes raising arguments or issues that apply only to specific cases it seeks to dismiss through its motion. Setting aside the issue of whether this was proper under CMO 25's briefing protocol, Plaintiffs in those cases briefly respond to those arguments or issue as follows:

*Cal. Am. Water v. U.S.*, No. 2:20-cv-00834 (E.D. Cal.).

While California American Water ("Cal-Am") alleges in its complaint that the Air Force's historic use of AFFF at former Mather Air Force Base from the 1970s to 1984 contributed to the contamination of one of its groundwater supply wells, it also alleges that the Air Force's re-injection of groundwater, treated by air stripping from the late 1990s until 2018, resulted in the contamination of a groundwater supply well with PFAS. In a footnote, the Government acknowledges this portion of Cal-Am's claim as follows:

60

> *Cal. Am. Water v. United States* raises one unique claim, in addition to alleging that general installation operations caused PFAS contamination: It seeks damages in connection with the USAF's 1996 CERCLA cleanup of volatile organic chemicals ("VOCs"), the process for which allegedly inadvertently introduced PFAS in the cleanup area. Compl. ¶¶ 17, 28, 29. While plaintiff may eventually have a CERCLA claim against the USAF, its claim of negligent selection and operation of a CERCLA remedy are protected by DFE. *See, e.g., Daigle v. United States,* 972 F.2d 1527, 1541 (10th Cir. 1992) (explaining that cleanup decisions involve policy choices "of the most basic kind").

Gov't Mem. at 37, note 16.

For the reasons set forth in this memo, this "argument" is insufficient to warrant the broad grant of immunity the Government seeks. First, the Government's discussion is too cursory to merit consideration; it has done nothing beyond this footnote to advance any actual argument that any discretion it may have employed in this cleanup entitles it to immunity for this separate conduct.

Second, there has been no case-specific discovery specifically aimed at Cal-Am's claims generally, much less at this admittedly "unique" aspect of Cal-Am's claims.

Third, the footnote's characterization of the claim is inaccurate. Cal-Am has not claimed that the Air Force "inadvertently introduced PFAS in the cleanup area." *Id*. The conduct at issue appears to be deliberate, albeit negligent, and to have impacted far more than a "cleanup area." Even with the paucity of evidence available in discovery to date, there are documents reflecting this. As early as June 10, 2014, Air Force personnel expressed concern "that IF we're extracting PFCs and this has become an 'emerging contaminant' of great concern, then the last thing we'd want to be doing is RE-INJECTING it deep into the aquifer wherein drinking water is or could be taken." **Ex. 6** (FF_AF27-00223625); **Ex. 7** (FF_AF27-00223627).

Cal-Am is informed and believes this is precisely what was happening—that the Air Force was injecting PFAS contaminated water into groundwater that ultimately impacted Cal-

Am's supply well—and that continued to happen for several more years thereafter. At a minimum, further discovery on these "unique" issues is necessary before entertaining an omnibus motion to dismiss which is premised on factual and legal arguments related to entirely separate conduct.

*City of Westfield v. U.S.*, No. 2:18-cv-03435-RMG (D.S.C.). In a footnote, the Government incorrectly argues that Westfield's contract claim is within the exclusive jurisdiction of the Court of Federal Claims. United States Mem. at 36 n.15. The United States is wrong because if an action essentially sounds in tort, then it is a tort action and may proceed under the FTCA in any federal district court. *Love v. United States*, 915 F.2d 1242, 1246-48 (9th Cir 1990). In Westfield's case, "[a]lthough a breach of promise may be involved, the government's liability does not depend[] wholly upon the government's alleged promise," *id.* at 1246 (quoting *Woodbury v. United States*, 313 F.2d 291, 296 (1963)), to clean up contamination pursuant to its lease agreement, but instead on the tortious conduct of the United States which is Westfield's allegation that the United States is legally responsible for the PFAS in Westfield's drinking water supplies, which the United States denies. *See also Ross v. United States*, 641 F. Supp. 368, 376 (D.C. Cir. 1986) ("[w]here a claim contains elements of both contractual and tort relief, the party may elect whether to pursue a contract claim under the Tucker Act or a tort claim under the FTCA.") (citations omitted); *Aleutco Corp. v. United States*, 244 F.2d 674 (3d Cir. 1957) ("there is no policy in the law which requires that the forum of the district court be denied a plaintiff who pleads and proves a classic in tort.").

*County of Westchester v. U.S.*, No. 2:19-cv-01724-RMG (D.S.C.). In a footnote, the Government argues that the *Westchester* complaint "must be dismissed for lack of subject-matter jurisdiction because the County failed to exhaust its administrative remedies and does not plead

any basis for subject-matter jurisdiction for its tort claims against the United States." Gov't Mem. at 36, note 15 (citations omitted). Undersigned counsel for Plaintiffs understand that the Government, citing ECF 4548-139, has *asserted* a failure to exhaust, but are unaware of any discovery on the matter, and it would appear that this matter has nothing to do with the immunity issues that the Court directed the parties to brief, so that the Government should address the matter by separate motion in the individual case involved.

**Dorene Dairy Gen. P'ship v. U.S.**, No. 2:20-cv-04263-RMG (D.S.C.); **Vander Dussen v. U.S.**, No. 2:20-cv-04191-RMG (D.S.C.). In a footnote, the Government notes that Count 9 in the *Dorene Dairy* and *Vander Dussen* complaints, which both allege inverse condemnation, are claims within the exclusive jurisdiction of the Court of Federal Claims pursuant to 28 U.S.C. §§ 1346(a) & 1491. Should the Court agree, plaintiffs in these two cases are prepared to voluntarily dismiss their inverse condemnation claims without prejudice and/or amend their respective complaints to remove them.

**Kalispel Tribe v. 3M Co.**, No. 2:20-cv-01398-RMG (D.S.C.). The Government insinuates in a footnote (Gov't Mem. at 36-27, note 15) that the Kalispel Tribe plaintiffs assert a "Breach of Tribal Trust" claim that is only cognizable in the Court of Federal Claims pursuant to the Indian Tucker Act, 28 U.S.C. § 1505, and *Hopi Tribe v. United States*, 782 F.3d 662, 666 (Fed. Cir. 2015). The *Hopi Tribe* case sets forth a two-part test for determining jurisdiction under the Indian Tucker Act, which the DOJ does not address, apply, or even mention regarding the Kalispel Tribe's claim:

> First, the claimant "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed to faithfully perform those duties." *Navajo II*, 556 U.S. at 290. Second, "[i]f that threshold is passed, the court must then determine whether the substantive source of law can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the

63

governing law] impose[s]." *Id.* at 290-91 (alterations in original) (internal quotation marks omitted).

*Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015) (citing *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009)). The DOJ asserts no facts in evidence, nor argument, regarding the Tribe's claim and how it fits or fails to fit within the *Hopi Tribe* jurisdictional test. Therefore, this Court should disregard the DOJ's unfounded intimation concerning the Kalispel Tribe's claim about the USAF's violations of trust responsibility.

In a footnote, the Government notes that Count 9 of the *Vander Dussen* complaint, which alleges inverse condemnation, is within the exclusive jurisdiction of the Court of Federal Claims pursuant to 28 U.S.C. §§ 1346(a) & 1491. That is correct, and count 9 should be dismissed, without prejudice to it being asserted in the Court of Federal Claims.

## CONCLUSION

For all the reasons stated, the Government's motion should be denied.


Dated:  April 16, 2024                              Respectfully submitted,

                                                    */s/ Paul J. Napoli*
                                                    Paul J. Napoli
                                                    Napoli Shkolnik
                                                    1302 Avenida Ponce de León
                                                    Santurce, PR  00907
                                                    P: (833) 271-4502
                                                    F: (646) 843-7603
                                                    pnapoli@nsprlaw.com

                                                    Michael A. London
                                                    Douglas and London PC
                                                    59 Maiden Lane
                                                    6th Floor
                                                    New York, NY 10038
                                                    P: (212)-566-7500
                                                    F: (212)-566-7501
                                                    mlondon@douglasandlondon.com

                                                    Scott Summy
                                                    Baron & Budd, P.C.
                                                    3102 Oak Lawn Avenue
                                                    Suite 1100
                                                    Dallas, TX 75219
                                                    P: (214)-521-3605
                                                    ssummy@baronbudd.com

                                                    Joseph F. Rice
                                                    Motley Rice LLC
                                                    28 Bridgeside Blvd.
                                                    Mount Pleasant, SC  29464
                                                    P: (843) 216-9000
                                                    jrice@motleyrice.com

                                                    *Co-Lead Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing was electronically filed with this Court's CM/ECF on this 16th day of April, 2024, and was thus served electronically upon counsel of record.

*/s/Andrew W. Croner*