# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) | MDL No. 2:18-mn-2873-RMG **This Document Relates to** **ALL CASES** |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**UNITED STATES' OMNIBUS MOTION TO DISMISS**
**FOR LACK OF JURISDICTION BASED ON CERCLA SECTION 113(h)**

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................ ii

GLOSSARY ........................................................................................................................ xi

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 4

STANDARD OF REVIEW .................................................................................................. 9

ARGUMENT ....................................................................................................................... 10

I.   SECTION 113(h) DOES NOT APPLY TO THE CLAIMS AT ISSUE IN THE
     GOVERNMENT'S MOTION .......................................................................................... 10

     A.   Section 113(h) Does Not Apply to Cleanups Conducted Under Section 120 or Under DERP ...... 11

          1.   Section 113(h) does not apply to cleanups conducted under Section 120 ................................. 14

          2.   Section 113(h) does not apply to cleanups conducted under DERP ........................................... 21

     B.   Section 113(h) Does Not Apply to Claims Under State Laws Which Are Applicable
          or Relevant and Appropriate ...................................................................................................... 26

          1.   *New Jersey Department of Environmental Protection v. United States*,
               No. 2:21-cv-00146-RMG ........................................................................................................... 31

          2.   *New Mexico et al. v. United States*, No. 2:20-cv-02115-RMG ................................................ 32

          3.   *Lakewood Water District v. United States*, No. 2:20-cv-02889-RMG ...................................... 34

          4.   *City of Newburgh v. United States, et al.*, No. 2:18-cv-03358-RMG;
               *Town of New Windsor v. United States, et al.,* No. 2:21-cv-01496-RMG;
               *County of Suffolk v. United States*, No. 2:19-cv-01181-RMG ................................................. 35

          5.   *Elsinore Valley Municipal Water District v. 3M Company, et al.*,
               No. 2:21-cv-03699-RMG ........................................................................................................... 37

II.  PLAINTIFFS' CLAIMS DO NOT CONSTITUTE A "CHALLENGE" ................................. 38

     A.   Claims Under State Environmental Laws: *United States v. Colorado* ...................................... 39

     B.   Claims for Monetary Relief .......................................................................................................... 45

     C.   Claims for Nuisance ..................................................................................................................... 49

     D.   Claims Addressing Contamination Outside the Scope of DoD's Response
          and Removal Actions .................................................................................................................... 51

          1.   Claims addressing locations outside the scope of DoD's response and removal
               actions are not barred .............................................................................................................. 51

          2.   Claims addressing chemicals outside the scope of DoD's response and removal
               actions are not barred .............................................................................................................. 59

III. ABSENT GLOBAL JURISDICTIONAL DISCOVERY, DISMISSAL OF
     PLAINTIFFS' CLAIMS WOULD BE UNJUST ............................................................ 62

CONCLUSION .................................................................................................................... 64

i

**TABLE OF AUTHORITIES**

Page(s)

## Federal Cases

*Alabama v. EPA*,
871 F.2d 1548 (11th Cir. 1989) ................................................................................. 40

*Alprof Realty LLC v. Corp. of the Pres. Bishop of Church of Jesus Christ of Latter-Day Saints*,
No. 09-CV-5190 CBA RER, 2012 WL 4049800 (E.D.N.Y. Sept. 13, 2012) ........................... 54

*Anacostia Riverkeeper*,
892 F. Supp. 2d 161 (D.C. Cir. 2012) ........................................................................ 44

*Ark. Peace Ctr. v. Ark. Dept. of Pollution Control and Ecology*,
999 F.2d 1212 (8th Cir. 1993) .................................................................................. 43

*Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*,
305 U.S. 315 (1938) ................................................................................................. 27

*Atl. Richfield Co. v. Christian*,
140 S. Ct. 1335 (2020) ......................................................................... 27, 39, 47, 51

*Beck v. Atlantic Richfield Co.*,
62 F.3d 1240 (9th Cir. 1995) ............................................................................... 46, 49

*Brooklyn Union Gas Co. v. Exxon Mobil Corp.*,
480 F. Supp. 3d 430 (E.D.N.Y. 2020) ........................................................................ 54

*Burlington N. & Santa Fe Ry. Co. v. United States*,
556 U.S. 599 (2009) ................................................................................................. 47

*Cabot Corp. v. EPA*,
677 F. Supp. 823 (E.D. Pa. 1988) ............................................................................. 14

*Cannon v. Gates*,
538 F.3d 1328 (10th Cir. 2008) ..................................................................... 4, 25, 26, 64

*Chestnut v. AVX Corp.*,
No. 4:07-CV-4152-TLW-TER, 2009 WL 10678827 (D.S.C. Mar. 25, 2009) ....................... 46

*City of Fresno v. United States*,
709 F. Supp. 2d 888 (E.D. Cal. 2010) .................................................................. 25, 26

*City of Moses Lake v. United States*,
416 F. Supp. 2d 1015 (E.D. Wash. 2005) .................................................................. 18

*City of Salina, Kan. v. United States,*
  No. 10-2298-CM-DJW, 2011 WL 1107107 (D. Kan. Mar. 25, 2011) ............................... 25, 26

*Clinton Cnty. Comm'rs v. EPA,*
  116 F.3d 1018 (3d Cir. 1997) .......................................................................................... 51

*Colorado v. U.S. Dep't of the Army,*
  707 F. Supp. 1562 (D. Colo. 1989) ................................................................................ 14

*Colorado v. United States,*
  867 F. Supp. 948 (D. Colo. 1994) .................................................................................. 15

*Colten v. Kentucky,*
  407 U.S. 104 (1972) ........................................................................................................ 29

*Crumbling v. Miyabi Murrells Inlet, LLC,*
  192 F. Supp. 3d 640 (D.S.C. 2016) ................................................................................ 10

*Diamond X Ranch, LLC v. Atl. Richfield Co.,*
  51 F. Supp. 3d 1015 (D. Nev. 2014) .............................................................................. 53

*El Paso Natural Gas Co. v. U.S.,*
  750 F. 3d 863 (D.C. Cir. 2014) .................................................................................. 4, 43

*Figueroa v. Napolitano,*
  772 F. Supp. 2d 741 (D.S.C. 2010) ................................................................................ 10

*Fort Ord Toxics Project, Inc. v. CEPA,*
  189 F.3d 828 (9th Cir. 1999) ....................................................................... 15, 17, 18, 26

*Frey v. EPA,*
  403 F.3d 828 (7th Cir. 2005) ................................................................................... passim

*Giovanni v. United States Dep't of Navy,*
  906 F.3d 94 (3d Cir. 2018) ....................................................................... 18, 20, 49, 55

*Holland v. Pardee Coal,*
  269 F. 3d 424 (4th Cir. 2001) ........................................................................................ 22

*In re Gold King Mine Release in San Juan Cty., Colorado, on Aug. 5, 2015,*
  No. 1:18-MD-02824-WJ, 2019 WL 999016 (D.N.M. Feb. 28, 2019) ...................................... 64

*Kaiser v. Trofholz Techs., Inc.,*
  935 F. Supp. 2d 1286 (M.D. Ala. 2013) ........................................................................ 10

*Kalamazoo River Study Group v. Rockwell Int'l Corp.,*
  171 F.3d 1065 (6th Cir.1999) ........................................................................................ 54

*La Loma Grande LLC v. United States*,
  No. CV-11-00476-TUC-RCC, 2013 WL 11834724 (D. Ariz. Jan. 3, 2013) ............................ 47

*LongIsland Pure Water Ltd. v. Cuomo*,
  375 F. Supp. 3d 209 (E.D.N.Y. 2019) ................................................................. 24, 25

*Mach Mining, LLC v. E.E.O.C.*,
  575 U.S. 480 (2015) ............................................................................................. 22

*Manu'd Hous. Inst. v. EPA*,
  467 F.3d 391 (4th Cir. 2006) ............................................................................. 43

*Maracich v. Spears*,
  570 U.S. 48 (2013) ............................................................................................... 27

*Martin Sales & Processing, Inc. v. W. Va. Dep't of Energy*,
  815 F. Supp. 940 (S.D. W. Va. 1993) ............................................................... 51

*Marx v. General Revenue Corp.*,
  568 U.S. 371 (2013) ........................................................................................... 27

*McClellan Ecological Seepage Situation v. Perry*,
  47 F.3d 325 (9th Cir. 1995) .......................................................................... *passim*

*Nance v. AVX Corp.*,
  No. 4:08–cv–515–TLW–TER, 2009 WL 10678182 (D.S.C. Mar. 25, 2009) .................... 47, 49

*Nat. Res. Def. Council v. EPA*,
  806 F. Supp. 275 (D.D.C. 1992) ...................................................................... 42

*Nat. Res. Def. Council, Inc. v. NVF Co.*,
  No. CIV. A. 97-496-SLR, 1998 WL 372299 (D. Del. June 25, 1998) .................. 53, 55, 63, 64

*Nurad, Inc. v. William E. Hooper & Sons Co.*,
  966 F.2d 837 (4th Cir. 1992) ........................................................................... 55

*OSI, Inc. v. United States*,
  510 F. Supp. 2d 531 (M.D. Ala. 2007) ............................................................ 19

*OSI, Inc. v. United States*,
  525 F.3d 1294 (11th Cir. 2008) ....................................................................... 19

*Payne v. Fed. Land Bank of Columbia*,
  916 F.2d 179 (4th Cir. 1990) ........................................................................... 50

*Pollack v. United States Department of Defense*,
  507 F.3d 522 (7th Cir. 2007) ........................................................................... 19

*Pulsifer v. United States*,
   144 S. Ct. 718 (2024) ............................................................................ 20

*R.E. Goodson Construction Co. v. International Paper Co.*,
   No. 4:02-cv-4184-RBH, 2005 WL 2614927 (D.S.C. Oct. 13, 2005) ................................ 18, 44

*Redland Soccer Club, Inc. v. Dep't of Army of U.S.*,
   801 F. Supp. 1432 (M.D. Pa. 1992) .................................................................. 27

*Reynolds v. Lujan*,
   785 F. Supp. 152 (D.N.M. 1992) ..................................................................... 44

*Roman v. Guapos III, Inc.*,
   970 F. Supp. 2d 407 (D. Md. 2013) .................................................................. 10

*Samples v. Conoco, Inc.*,
   165 F. Supp. 2d 1303 (N.D. Fla. 2001) .............................................................. 51

*Shea Homes Ltd. P'ship v. United States*,
   397 F. Supp. 2d 1194 (N.D.Cal. 2005) .............................................................. 19, 43

*Shenango Inc., v. Apfel*,
   307 F.3d 174 (3rd Cir. 2002) ........................................................................ 22

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) .................................................................................... 10

*Talarico Bros. Building Corp. v. Union Carbide Corp.*,
   73 F. 4th 126 (2d Cir. 2023) ........................................................................ 4, 53

*Texas v. Interstate Commerce Comm'n*,
   258 U.S. 158 (1922) .................................................................................. 51

*Town of Acton v. W.R. Grace & Co. Conn., Techs.*,
   No. CIV.A. 13-12376-DPW, 2014 WL 7721850 (D. Mass. Sept. 22, 2014) ........................ 51

*United States v. Akzo Coatings of Am., Inc.*,
   949 F.2d 1409 (6th Cir. 1991) .................................................................. 28, 29, 34

*United States v. Colorado*,
   990 F.2d 1565 (10th Cir. 1993) ............................................................... *passim*

*United States v. E.I. Dupont De Nemours & Co. Inc.*,
   432 F.3d 161 (3d Cir. 2005) .......................................................................... 13

*United States v. W.R. Grace & Co.*,
   429 F.3d 1224 (9th Cir. 2005) ........................................................................ 19

v

*Uzzolino v. Corriveau,*
    No. 9:22-CV-01738-RMG-MHC, 2022 WL 18635181 (D.S.C. Nov. 15, 2022) ..................... 10

*Village of DePue v. Exxon Mobil Corp.,*
    537 F.3d 775 (7th Cir. 2008) ...........................................................................11, 39, 51

*W. Virginia State Univ. Bd. of Governors for & on behalf of W. Virginia State Univ. v. Dow Chem. Co.,*
    No. 2:17-CV-3558, 2020 WL 2842057 (S.D. W. Va. June 1, 2020) ................................... 45, 46

*Werlein v. United States,*
    746 F. Supp. 887 (D. Minn. 1990) .................................................................... *passim*

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) .................................................................................................. 20

## Federal Statutes

10 U.S.C. § 2700 .......................................................................................................2, 11, 22

10 U.S.C. § 2701(a)(1) ............................................................................................... 22, 55

10 U.S.C. § 2701(a)(3) ..................................................................................................... 13

10 U.S.C. § 2701(b) ........................................................................................................ 24

10 U.S.C. § 2701(b)(2)-(3) ............................................................................................. 23

10 U.S.C. § 2701(c)(1) ................................................................................................... 23

10 U.S.C. § 2703 ............................................................................................................. 24

10 U.S.C. § 2704(e) ........................................................................................................ 24

40 U.S.C. § 9621(d)(2)(A)(i) ......................................................................................... 32

42 U.S.C. § 300f ............................................................................................................. 31

42 U.S.C. § 300g-2 ..................................................................................................... 42, 43

42 U.S.C. § 300i .............................................................................................................. 44

42 U.S.C. § 300i(a) ......................................................................................................... 48

42 U.S.C. § 300j-6(a)(2) ................................................................................................. 43

42 U.S.C. § 6972(a)(1)(A) .............................................................................................. 45

42 U.S.C. § 6972(a)(1)(B) .............................................................................................. 44

42 U.S.C. § 9601(9)(B) ........................................................................................................ 54

42 U.S.C. § 9601(14) ........................................................................................................... 49

42 U.S.C. § 9604 ............................................................................................................. *passim*

42 U.S.C. § 9604(b) ............................................................................................................. 18

42 U.S.C. § 9604(a)(1) ......................................................................................................... 13

42 U.S.C. § 9605(a)(8)(B) .................................................................................................... 12

42 U.S.C. § 9606(a) ............................................................................................................. 17

42 U.S.C. § 9607(a) ........................................................................................................ 49, 50

42 U.S.C. § 9607(a)(4)(A) ............................................................................................... 25, 48

42 U.S.C. § 9611(e)(3) ......................................................................................................... 13

42 U.S.C. § 9613(b) ............................................................................................................. 21

42 U.S.C. § 9613(g) ........................................................................................................ 17, 18

42 U.S.C. § 9613(h) ........................................................................................................ *passim*

42 U.S.C. § 9614(a) ........................................................................................................ 41, 42

42 U.S.C. § 9617(a) ........................................................................................................ 16, 18

42 U.S.C. § 9618 ................................................................................................................. 36

42 U.S.C. § 9620 ............................................................................................................... 2, 11

42 U.S.C. § 9620(a)(4) ......................................................................................................... 38

42 U.S.C. § 9620(d)(1) ......................................................................................................... 16

42 U.S.C. § 9620(e) .......................................................................................... 13, 16, 18, 19

42 U.S.C. § 9620(e)(1) ................................................................................................ 13, 16, 21

42 U.S.C. § 9620(f) ............................................................................................................. 20

42 U.S.C. § 9620(g) ............................................................................................................. 18

42 U.S.C. § 9620(h)(3)(B) .................................................................................................... 13

42 U.S.C. § 9621 .................................................................................................. 27, 30, 31, 32

42 U.S.C. § 9621(d)(1) ................................................................... 28

42 U.S.C. § 9621(d)(2)(A) ................................................. 28, 30, 33

42 U.S.C. § 9621(d)(2)(A)(ii) ............................................. 28, 32, 35

42 U.S.C. § 9621(f)(1) ................................................................... 40

42 U.S.C. § 9621(f)(2)(B) ............................................................. 27

42 U.S.C. § 9621(f)(3)(B) ....................................................... 27, 28

42 U.S.C. § 9652(d) ..................................................................... 41

42 U.S.C. § 9659 ......................................................................... 64

## State Statutes

N.J.S.A. § 58:12A-1 ..................................................................... 31

N.J.S.A. § 58:12A-6 .............................................................. 44, 48

N.M.S.A. § 74-4-1 ....................................................................... 33

N.M.S.A. § 74-4-13 ..................................................................... 44

N.M.S.A. § 74-4-13(A) ................................................................. 48

## Federal Rules

Fed. R. Civ. P. 12(b)(1) ................................................................. 31

Fed. R. Civ. P. 12(b)(6) ................................................................. 31

Fed. R. Civ. P. 15(a)(2) .......................................................... 35, 50

## Federal Regulations

40 C.F.R. § 142.10 ....................................................................... 43

40 C.F.R. § 261 ........................................................................... 61

40 C.F.R. § 271 ........................................................................... 61

40 C.F.R. § 300 ........................................................................... 24

40 C.F.R. § 300, App. B ............................................................... 15

40 C.F.R. § 300.400(g)(1) ............................................................. 30

40 C.F.R. § 300.400(g)(2) .................................................................................. 30

40 C.F.R. § 300.400(g)(4) .................................................................................. 28

40 C.F.R. § 300.430(d) ...................................................................................... 52

**State Regulations**

10 NYCRR § 5-1.52 ........................................................................................... 36

6 NYCRR § 597.3 .............................................................................................. 49

20.6.2.3103 NMAC ....................................................................................... 33, 34

20.6.2.7(T)(2)(s) NMAC ................................................................................... 34

N.J.A.C. § 7:10-5.1 ........................................................................................... 32

N.J.A.C. § 7:10-5.2(a)(5) .................................................................................. 32

Wash. Admin. Code 246-290-315 ...................................................................... 35

**Other Authorities**

44 Fed. Reg. 69003 (Nov. 30, 1979) ....................................................... 31, 42, 43

50 Fed. Reg. 1515 (Jan. 11, 1985) ................................................................... 33

52 Fed. Reg. 2923 (Jan. 23, 1987) .............................................................. 19, 20

52 Fed. Reg. 32496 (Aug. 27, 1987) ........................................................... 28, 30

53 Fed. Reg. 51394 (proposed Dec. 21, 1988) ................................................ 29

81 Fed. Reg. 33250 (May 25, 2016) ................................................................. )4

87 Fed. Reg. 36848 (June 21, 2022) ............................................................ 4, 60

87 Fed. Reg. 54415 (Sept. 6, 2022) ........................................................... 49, 50

88 Fed. Reg. 18638 (March 29, 2023) ............................................................... 5

89 Fed. Reg. 8606 (Feb. 8, 2024) ..................................................................... 61

H.R. Rep. No. 99–962, 1986 U.S.C.C.A.N. 3276 ............................................ 51

H.R. Rep. No. 253, 1986 U.S.C.C.A.N. 2835 .............................................. 1, 39

H.R. Rep. No. 253(I), 1986 U.S.C.C.A.N. 2835 ............................................. 14

132 Cong. Rec. H9561-03, 1986 WL 787183 ................................................................ 4

132 Cong. Rec. S 14,915 (Oct. 3, 1986) ..................................................................... 30

## GLOSSARY

AFFF                    aqueous film-forming foam (containing PFAS)

ARAR                    applicable or relevant and appropriate requirement

Cannon AFB              Cannon Air Force Base, New Mexico (at issue in *New Mexico v. United States*, No. 2:20-cv-02115-RMG)

CERCLA                  Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*

DERP                    Defense Environmental Restoration Program, 10 U.S.C. §§ 2700, *et seq.*

DoD                     Department of Defense

DoD facilities          Cannon Air Force Base (New Mexico); Francis S. Gabreski Air National Guard Base (New York); Holloman Air Force Base (New Mexico); Joint Base Lewis-McChord Air Force Base (Washington); Joint Base McGuire-Dix-Lakehurst (New Jersey); March Air Force Base (California); Naval Air Warfare Center Trenton (New Jersey); Naval Weapons Station Earle (New Jersey); and Stewart Air National Guard Base (New York).

Elsinore                Elsinore Valley Municipal Water District, California (at issue in *Elsinore Valley Municipal Water District v. 3M Company*, No. 2:21-cv-03699-RMG)

EPA                     Environmental Protection Agency

Gabreski ANGB           Francis S. Gabreski Air National Guard Base, New York (at issue in *Town of New Windsor v. United States*, No. 2:21-cv-01496-RMG)

GAC                     granular activated carbon

Holloman AFB            Holloman Air Force Base, New Mexico (at issue in *New Mexico v. United States*, No. 2:20-cv-02115-RMG)

HFPO                    hexafluoropropylene oxide-dimer acid

Interim Guidance        EPA, *Superfund Program; Interim Guidance on Compliance with Applicable or Relevant and Appropriate Requirements;*

|  | *Notice of Guidance,* 52 Fed. Reg. 32496, 32498 (Aug. 27, 1987) |
|---|---|
| JBLM | Joint Base Lewis-McChord Air Force Base, Washington (at issue in *Lakewood Water District v. United States*, No. 2:20-cv-02899-RMG) |
| Lakewood | Lakewood Water District, Washington (at issue in *Lakewood Water District v. United States*, No. 2:20-cv-02899-RMG) |
| March AFB | March Air Reserve Base (formerly March Air Force Base) and appurtenant facilities, California |
| MCL | maximum contaminant level |
| MTCA | Washington Model Toxics Control Act |
| NJDEP | New Jersey Department of Environmental Protection |
| NJSDWA | New Jersey Safe Drinking Water Act, N.J.S.A. 58:12A-1, *et seq.* |
| NMED | New Mexico Environment Department |
| NMHWA | New Mexico Hazardous Waste Act, N.M.S.A. 74-4-1, *et seq.* |
| NPL | National Priorities List, 40 C.F.R. § 300, App. B. |
| NYSDEC | New York State Department of Environmental Conservation |
| PFAS | per- and polyfluoroalkyl substances |
| PFBS | perfluorobutane sulfonate |
| PFHxS | perfluorohexanesulphonic acid |
| PFNA | perfluorononanoic acid |
| PFOA | perfluorooctanoic sulfonic acid |
| PFOS | perfluorooctane sulfonic acid |
| ppm | parts per million |
| ppt | parts per trillion |

| | |
|---|---|
| RCRA | Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, *et seq.* |
| RI/FS | remedial investigation and feasibility study |
| SAC | Second Amended Complaint |
| SALs | State Action Levels |
| SARA | Superfund Amendments and Reauthorization Act of 1986, Pub.L. 99-499, October 17, 1986. |
| SDWA | Safe Drinking Water Act, 42 U.S.C. § 300(f), *et seq.* |
| Section 104 | 42 U.S.C. § 9604 (CERCLA) |
| Section 113(h) | 42 U.S.C. § 9613(h) (CERCLA) |
| Section 120 | 42 U.S.C. § 9620 (CERCLA) |
| Section 121 | 42 U.S.C. § 9621 (CERCLA) |
| SPDES | New York State Pollutant Discharge Elimination System |
| Stewart ANGB | Stewart Air National Guard Base, New York (at issue in *City of Newburgh v. United States*, No. 2:18-cv-03358-RMG) |

## **INTRODUCTION**

In its Global Motion to Dismiss Based on Section 113(h) of CERCLA ("Global 113(h) Mot."), the United States ("Government") attempts to improperly expand the reach of the "timing of review" provision contained in the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613(h) ("Section 113(h)"). However, Section 113(h) does not operate as a "get out of jail free" card wherever and whenever the Government asserts that it is engaged in response actions under CERCLA particularly given that that its Department of Defense ("DoD")—the nation's largest polluter—is the very party responsible for the contamination at issue. For context, Section 113(h) provides, in relevant part, that:

> No Federal court shall have jurisdiction under Federal law other than under section 1332 of title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except…

42 U.S.C. § 9613(h). Congress intended this provision to "prevent **private responsible parties** from filing dilatory, interim lawsuits which have the effect of slowing down or preventing [the Environmental Protection Agency's ("EPA")] cleanup activities." H.R.Rep. No. 253(I), at 266 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2941 (emphasis added). Moreover, by its own terms Section 113(h) does not apply to the claims at issue here.

***First***, Section 113(h) only bars federal courts from reviewing challenges to CERCLA "removal or remedial action selected under **section 9604** . . ." (42 U.S.C. § 9604) ("Section 104").[1] The Government improperly construes this provision to mean that "[S]ection 113(h) of CERCLA explicitly strips federal courts of jurisdiction over **any** claim that challenges an agency's response

---

[1] Section 113(h) also deprives federal courts of jurisdiction to review challenges to "any order issued under section 9606(a)" of CERCLA. 42 U.S.C. § 9613(h). However, this provision is not at issue in these cases.

actions under" CERCLA. Global 113(h) Mot. at 2 (emphasis added). But not all response and remedial actions are performed under Section 104. In fact, the authority for DoD cleanup activities at the sites at issue here stems not from Section 104, but rather from 42 U.S.C. § 9620 ("Section 120") governing cleanups at federal facilities (conspicuously absent from the Government's detailed overview of CERCLA) and/or the Defense Environmental Restoration Program ("DERP"), 10 U.S.C. §§ 2700, *et seq.*, governing cleanups performed by the DoD. Removal and remedial actions conducted under these other authorities are not subject to Section 113(h)'s limitation on this Courts' jurisdiction by the plain words of the statute. Furthermore, Section 113(h) does not apply to claims under "State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards)"—an express limitation in Section 113(h) which makes many of the claims at issue fall outside of its bounds.

***Second***, even assuming, *arguendo*, that Section 113(h) applies to the claims at issue, this Court still has subject matter jurisdiction because many of Plaintiffs' claims do not constitute "challenges" to removal or remedial actions. Claims under state hazardous waste laws and other state environmental laws—which were intended to work in conjunction with CERCLA, as CERCLA's provisions expressly recognize—do not constitute a "challenge" under Section 113(h). Additionally, claims for monetary relief do not constitute a "challenge" because they do not interfere with CERCLA response actions, and the Supreme Court has specifically held that claims (like Plaintiffs') for response costs do not constitute a "challenge" because they are exempted by Section 113(h) itself. Finally, where Plaintiffs' claims are applicable outside the geographic or pollutant-specific scope of the DoD's response action, such claims do not constitute a "challenge" because there is nothing with which Plaintiffs' claims could interfere.

Clearly, the issues raised by the Government's Motion are not nearly as simple as it would have this Court believe.[2] As shown by the specific discoveries made at Cannon Air Force Base pursuant to Case Management Order 25 ("CMO 25"), the facts of any particular cleanup can, should, and do matter. *See* Plaintiffs' Opposition to Government's Site-Specific Motion to Dismiss ("Site-Specific Opposition"). This fact is also apparent from the Government's reliance on evidence in its Motion (contrary to prior assertions that **any** discovery was "unnecessary to consider *global* issues surrounding subject-matter jurisdiction", DOJ Ltr. Br. at 1, Dkt. 2684 (Nov. 25, 2022) (emphasis in original)). Plaintiffs maintain that full discovery, or at the very least jurisdictional discovery not limited to a single site, is necessary prior to the adjudication of the Governments' Motion and any wholesale dismissal of Plaintiffs' claims.

Finally, when Congress enacted Section 113(h), it did so in the hopes that this Court would be able to distinguish between dilatory lawsuits and legitimate suits—like Plaintiffs' here—which are aimed at environmental and safety concerns:

> The legislation intends that the courts will draw appropriate distinctions between dilatory lawsuits by potentially responsible parties . . . and legitimate citizen suits representing irreparable injury that can only be addressed during the course of implementing a cleanup.

132 Cong. Rec. H9561-03, 1986 WL 787183 (Statement of Rep. Robert A. Roe). Rather than the dilatory and interim lawsuits typically brought by responsible parties, which Section 113(h) was

---

[2] Indeed, the fact that the Government believes it can dispense with Plaintiffs' claims via a single self-serving affidavit (from a Government employee with admittedly no direct involvement in the activities at issue, Declaration of Alexandria Long, Gov't Ex. 1 ¶ 28) is troubling. Plaintiffs also note that the Declaration of Alexandria Long was first produced to them on January 12, 2024, two weeks before the close of the site-specific jurisdictional discovery period ordered by this Court in Case Management Order 25 ("CMO 25"). Thus, Plaintiffs' were deprived of a meaningful opportunity to depose Ms. Long, which would have been allowed under CMO 25 because her Declaration addresses Cannon Air Force Base, the site selected for jurisdictional discovery.

intended to preclude, Plaintiffs' claims are brought by state, municipal, and water providers seeking to protect the public welfare. The Government's Motion should be denied.[3]

## **BACKGROUND**

The Government moves to dismiss the claims of seven Plaintiffs based on Section 113(h). Each Plaintiff either neighbors or regulates a DoD facility that has released aqueous film-forming foam ("AFFF") into the environment, contaminating drinking water supplies with per- and polyfluoroalkyl substances ("PFAS"). In all cases, the DoD has long known that its actions caused off-base contamination but has refused to assist Plaintiffs, instead invoking an inadequate 70 parts per trillion ("ppt") threshold for contamination which it will address (citing a 2016 Lifetime Health Advisory published by EPA, *see* 81 Fed. Reg. 33250 (May 25, 2016)), as well as DoD's arbitrary limitation of its response actions to two specific PFAS, namely perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"). DoD's refusal is in spite of more stringent state contaminant levels, EPA's updated 2022 Lifetime Health Advisory Levels for PFAS,[4] and years-long indications that EPA will regulate PFAS in drinking water at far lower concentrations. *See* EPA, Preliminary Regulatory Determination and Proposed

---

[3] Should this Court determine dismissal of Plaintiffs' claims is appropriate (through a broad reading of Section 113(h)), the dismissal should only apply to Plaintiffs' claims for injunctive relief, and **such dismissal must be without prejudice.** *Cannon v. Gates*, 538 F.3d 1328, 1332 (10th Cir. 2008) ("Section 9613(h), however, does not preclude actions to challenge a remedial plan *after* that plan has been completed.") (emphasis in original); *Talarico Bros. Building Corp. v. Union Carbide Corp.*, 73 F. 4th 126, 136 (2d Cir. 2023) ("Still, EPA activity does not bar access to the courts indefinitely: jurisdiction is restored upon the conclusion of the removal or remedial work."); *see also Werlein v. United States*, 746 F. Supp. 887, 894 (D. Minn. 1990) *vacated in part*, 793 F. Supp. 898 (D. Minn. 1992) (dismissing without prejudice); *El Paso Natural Gas Co. v. U.S.*, 750 F. 3d 863, 882 (D.C. Cir. 2014) (same).

[4] 87 Fed. Reg. 36848 (June 21, 2022) (superseding 2016 Lifetime Health Advisory Levels and setting new levels of .004 ppt for PFOA, .02 ppt for PFOS, 10 ppt for PFBS, and 2,000 ppt for hexafluoropropylene oxide ("HFPO") dimer acid and its ammonium salt (together referred to as "GenX chemicals")).

Rule, 88 Fed. Reg. 18638 (proposed March 29, 2023) (proposing to regulate PFAS at levels lower than 70 ppt). The DoD's lack of foresight has now materialized, as the MCLs recently finalized by EPA under the Safe Drinking Water Act impose 4 ppt limits for PFOS and PFOA, 10 ppt limits for three additional PFAS (perfluorohexanesulphonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), and hexafluoropropylene oxide-dimer acid "HFPO-DA" or "GenX chemicals"), and limit PFAS mixtures containing two or more of PFHxS, PFNA, HFPO-DA, and perfluorobutane sulfonate ("PFBS"), using a Hazard Index MCL.[5] There is a stark divide between these enforceable levels (and similar state standards) and the outdated 70 ppt screening level that DoD has employed to delineate sites and assess the health risks posed by its pollution. The new MCLs accord with EPA's determination that "there is no level of exposure" to certain PFAS (PFOS and PFOA) without "risk of health impacts," and that other compounds similarly endanger human health and the environment.[6] DoD cannot claim ignorance: EPA has advised DoD to implement the MCLs, which as previously noted were first proposed in 2023. *See* EPA Comments to *Cannon AFB PFOS/PFOA Pilot Study Design Package*, **Ex. 1**, at 2. While the Government states that "[w]hen EPA promulgates final standards, DoD components will incorporate those standards into the CERCLA process", Global 113(h) Mot. at 12 n.4, it has not yet committed to revisiting investigative efforts and conclusions already made, which were all premised on a 70 ppt screening level.

---

[5] While the EPA's MCLs under the Safe Drinking Water Act have not yet been published in the federal register, a pre-publication version is available at https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_prepubfederalregisternotice_4.8.24.pdf. *See also* EPA, Fact Sheet, PFAS National Primary Drinking Water Regulation, available at https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_fact-sheet_general_4.9.24v1.pdf.

[6] EPA, *Biden-Harris Administration Finalizes First-Ever National Drinking Water Standard to Protect 100M People from PFAS Pollution* (April 10, 2024), available at https://www.epa.gov/newsreleases/biden-harris-administration-finalizes-first-ever-national-drinking-water-standard.

DoD has continually disregarded the best science available, and now attempts to walk away from any liability. Relying on loosened standards and legal technicalities that do not apply in the circumstances at issue, DoD seeks not only dismissal of these particular Plaintiffs' claims, but also to set precedent to preclude other communities from holding it accountable. But its defense is inapplicable, and DoD's pollution, which has had devastating consequences on real communities, should not be allowed to escape all review.

The City of Newburgh, New York, neighbors the Stewart Air National Guard Base ("Stewart ANGB"). 2d Am. Compl. ¶¶ 2, 184, 195, *City of Newburgh v. United States*, No. 2:18-cv-03358-RMG (D.S.C. Aug. 21, 2019). Newburgh is located downgradient of the base, in the same watershed, and the Government's uncontrolled disposal of AFFF at Stewart ANGB has caused significant PFAS contamination of Newburgh's drinking water sources. *Id.* ¶¶ 186–87, 281. Since 2016, the City has repeatedly requested that Stewart ANGB implement Interim Remedial Measures to remediate the contamination of the city's property and halt the discharge of contaminants. *Id.* ¶¶ 277, 282. In 2019, the United States Army Corps of Engineers advised that it would only seek to treat PFAS contamination above 70 ppt. *Id.* ¶ 284. Additionally, the timeline for DoD's response activities stretches to the end of the decade. Press Release, Riverkeeper, *Advocates call for expedited PFAS cleanup, including repair and upgrade of filter, at Stewart Air National Guard Base,* **Ex. 2**.

The Town of New Windsor, New York, located directly south of Newburgh, has likewise suffered injury from the Government's uncontrolled disposal of AFFF from Stewart Air National Guard Base. Compl. ¶¶ 314, 322–23, 338, 350–53, *Town of New Windsor v. United States*, No. 2:21-cv-01496-RMG (D.S.C. May 4, 2021). "To date, DOD has not even acknowledged PFAS

6

contamination of the Town's drinking water supplies, let alone investigate[d] and/or [sought] to remedy it." *Id.* ¶¶ 438, 458.

Suffolk County, New York, has leased property to the United States Air Force that has been used since 1969 as the Francis S. Gabreski Air National Guard Base ("Gabreski ANGB"). Compl. ¶¶ 3, 27, *County of Suffolk v. United States*, No. 2:19-cv-01181-RMG (D.S.C. Feb. 14, 2019). County and state regulators have confirmed, and the National Guard Bureau has acknowledged, that the uncontrolled disposal of AFFF from Gabreski ANGB has contaminated the County's land and water sources. *Id.* ¶¶ 38–40, 73–77, 83. In September 2016, the County sent the National Guard a letter to discuss the need for the connection of public water lines to structures downgradient from Gabreski ANGB. *Id.* ¶ 90. Negotiations ensued and, in October 2016, the Air Force sent a draft cooperation agreement to the County. *Id.* ¶ 91. However, on March 13, 2017, the Air Force issued a memorandum that all negotiations involving the cooperation agreement would cease. *Id.* ¶ 93. The National Guard has not responded to the County's further communications seeking investigation and remediation of the County's property and water sources. *Id.* ¶ 96.

The State of New Mexico is home to both Cannon and Holloman Air Force Bases. Am. Compl. ¶¶ 2, 58, 97, *New Mexico v. United States*, No. 2:20-cv-02115-RMG (July 24, 2019). Improper disposal and unlawful failure to contain or address contaminants and hazardous wastes at the bases have resulted in contamination of the Ogallala Aquifer and migration of PFAS along the known hydraulic gradient near the city of Alamogordo. *Id.* ¶¶ 2, 77, 94, 111. In 2018, the New Mexico Environment Department ("NMED") expressed its concern that the Air Force's Site Investigation Report for Cannon Air Force Base ("Cannon AFB") showed PFAS levels in drinking water wells near the base that far exceeded EPA's (since superseded) Lifetime Health Advisory level of 70 ppt. *Id.* ¶¶ 76, 79, 87. NMED advised the Air Force that its report was subject to several

conditions, as well as corrective actions, but the Air Force declined to make any revisions required by NMED. *Id.* ¶¶ 88–89. NMED has also issued Cannon AFB a permit under the New Mexico Hazardous Waste Act which requires the cleanup of PFAS contamination under NMED oversight, a permit the Air Force has completely ignored. *See* Site Specific Opposition at 8-9, 18-19. The Site Investigation of Holloman AFB also identified exceedingly high levels of PFAS in nearby Lake Holloman, a water source that serves as a popular recreational resource to the local community. The Air Force has taken no action to prevent further contamination. *Id.* ¶¶ 108, 109, 116.

Lakewood Water District ("Lakewood") supplies drinking water to approximately 115,000 customers around Joint Base Lewis-McChord Air Force Base ("JBLM") near Tacoma, Washington. Compl. ¶¶ 7, 8, 35, *Lakewood Water District v. United States*, No. 2:20-cv-02899-RMG (D.S.C. July 16, 2020). Studies have connected the Government's use of AFFF to PFAS groundwater contamination at and in the vicinity of JBLM—contamination that has since migrated into Lakewood's downgradient wells. *Id.* ¶ 9. Despite its own discovery of contamination and decision to shut down drinking water wells at JBLM in March 2016, the Government has taken no action to prevent PFAS from migrating to Lakewood's wells, nor to treat PFAS in the groundwater. *Id.* ¶ 10, 244, 246. In June 2016, DoD merely notified Lakewood of the presence of PFOS and PFOA in JBLM wells—it was up to Lakewood alone to test, discover, and respond to the spreading contamination. *Id.* ¶ 247.

New Jersey has taken an active role in enacting its own regulations of PFAS in its waters. Compl. ¶¶ 3, 5, *New Jersey v. United States*, No. 2:21-cv-00146-RMG (D.S.C. Jan. 14, 2021). Investigations have revealed PFAS contamination at several military facilities, including Joint Base McGuire-Dix-Lakehurst, Naval Weapons Station Earle, and the Naval Air Warfare Center Trenton. *Id.* ¶ 28. Elevated levels of PFOS and PFOA in groundwater have been discovered at each

of these three facilities. *Id.* ¶¶ 56, 63, 65. PFAS from these facilities has since migrated to wells in the surrounding communities. *Id.* ¶¶ 60, 62–63, 65. DoD has followed the outdated 70 ppt threshold in determining what off-base contamination requires a response.

Elsinore Valley Municipal Water District ("Elsinore") includes within its service area March Air Reserve Base, formerly March Air Force Base, and appurtenant facilities (collectively "March AFB"). Am. Compl. ¶¶ 9, 64, *Elsinore Valley Municipal Water District v. 3M Co., et al.*, No. 2:21-cv-03699 (D.S.C. July 19, 2023). Elsinore is located in the same basin as March AFB, and the Government's use and release of AFFF at March AFB has caused and continues to cause PFAS contamination of Elsinore's drinking water sources and its water system. *Id.* ¶¶ 9, 29–31, 37, 64, 69, 306, 307, 322–23.

Together, the DoD facilities responsible for contaminating these Plaintiffs' nearby water sources and properties ("DoD Facilities") engaged in a pattern and practice of delay in the face of imminent and substantial danger to public health. The message has been clear: Plaintiffs are on their own. At the motion to dismiss stage, the Court may reasonably infer from Plaintiffs' Complaints, and DoD's refusal to acknowledge more stringent state and federal limits and guidance for purposes of site delineation at the DoD Facilities, that DoD intends to avoid, minimize, and/or delay off-base responses to the PFAS contamination the facilities have caused and continue to cause.

**STANDARD OF REVIEW** [7]

_____

[7] It should be made clear that the Government's Global 113(h) Motion is limited to the injunctive requests of the seven Plaintiffs it identifies in its brief (two states, three municipalities, and two quasi-governmental entities). Global 113(h) Mot. at App. A. Nowhere in its Motion does the Government contend that Section 113(h) applies to deny this Court of jurisdiction over state-law tort claims brought by various **private** entities or individuals (or by states and municipalities *not* identified in the Government's Motion) under the Federal Tort Claims Act, **even where those**

Dismissal of a federal claim for lack of jurisdiction "is proper only when the claim is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 89 (1998) (internal quotations omitted). The Court's task in resolving a Rule 12(b)(1) motion is a relatively limited one; at issue is only "whether a court has authority to adjudicate the matter before it." *Figueroa v. Napolitano*, 772 F. Supp. 2d 741, 747 (D.S.C. 2010). A Rule 12(b)(1) motion is not a vehicle for deciding the merits of a cause of action. *Uzzolino v. Corriveau*, No. 9:22-CV-01738-RMG-MHC, 2022 WL 18635181 at *5 (D.S.C. Nov. 15, 2022) (quoting *Kaiser v. Trofholz Techs., Inc.*, 935 F. Supp. 2d 1286, 1292 (M.D. Ala. 2013)). "[Q]uestions of subject matter jurisdiction must be decided 'first, because they concern the court's very power to hear the case.'" *Crumbling v. Miyabi Murrells Inlet, LLC*, 192 F. Supp. 3d 640, 643 (D.S.C. 2016) (quoting *Roman v. Guapos III, Inc.*, 970 F. Supp. 2d 407, 411 (D. Md. 2013)).

## **ARGUMENT**

## I.    **SECTION 113(h) DOES NOT APPLY TO THE CLAIMS AT ISSUE IN THE GOVERNMENT'S MOTION**

Section 113(h) is not all-encompassing. "Section 113(h) is limited . . . in that, under the express terms of the statute, it applies only to bar jurisdiction over challenges to *certain* cleanups . . . ." *Village of DePue v. Exxon Mobil Corp.*, 537 F.3d 775, 784 (7th Cir. 2008) (emphasis added). For the reasons discussed below, Section 113(h) does not apply to the cleanups being performed

---

claims also include requests for injunctive relief, such as abatement of public nuisance. Aside from straining the meaning of the word "global," the extremely narrow—and seemingly arbitrary—scope of the Motion is also notable because it contradicts earlier assertions by the Government that it would apply to "the relief sought by **many** Plaintiffs" and that "[t]he answer to these global issues will not—and indeed, cannot—vary by base." DOJ Ltr. Br. at 2-3, Dkt. 2924 (Mar. 24, 2023) (emphasis added).

by the DoD in these cases. Specifically, Section 113(h) only applies to actions selected under Section 104. 42 U.S.C § 9613(h).[8] The Government's motion should be denied because the relevant cleanups are being conducted under different authorities (namely, CERCLA § 120, 42 U.S.C. § 9620 ("Section 120") and/or DERP, 10 U.S.C. §§ 2700 *et seq.*. Thus, the Court need not even reach the issue of whether the claims that are subject to the Motion constitute "challenges" to removal or remedial actions under Section 104 (they do not).

Additionally, Section 113(h) also contains numerous exceptions, both in enumerated provisions, 42 U.S.C. §§ 9613(h)(1)-(5), and in the body of Section 113(h) itself, including claims raised under "state laws which are applicable or relevant and appropriate" requirements for the cleanup ("ARARs")—a exception applicable to numerous cases as described below. 42 U.S.C. § 9613(h).

### A.      Section 113(h) Does Not Apply to Cleanups Conducted Under Section 120 or Under DERP

As the Government concedes, its response actions at the DoD facilities at issue are taken under the authority granted to the DoD in DERP. Global 113(h) Mot. at 4 ("[T]he DoD conducts its environmental restoration activities through [DERP] . . . DERP authorizes the Secretary of Defense to carry out response actions."). Additionally, at the four DoD Facilities which have been placed on the National Priorities List ("NPL"),[9] the Government's response actions are taken under the authority granted to federal departments, agencies, and instrumentalities by Section 120

---

[8] Section 113(h) also deprives federal courts of jurisdiction to review challenges to "any order issued under section 9606(a)" of CERCLA. 42 U.S.C. § 9613(h). However, this provision is not at issue in these cases.

[9] The NPL is an informational and management tool maintained by the EPA and lists sites that are the "national priorities among the known releases or threatened releases throughout the United States." 42 U.S.C. § 9605(a)(8)(B).

(relating to "Federal facilities"), a provision of CERCLA conspicuously absent from the Government's brief despite being applicable in at least four of the cleanups at issue here.

By its plain language, Section 113(h) only deprives courts of jurisdiction to hear "challenges to removal or remedial action **selected under [Section 104]**." 42 U.S.C. § 9613(h) (emphasis added). Likewise, neither DERP nor Section 120 contain a provision analogous to Section 113(h). These omissions are no accident: DERP and Section 120 were both enacted in the very same legislative act as Section 113(h), as part of the Superfund Amendments and Reauthorization Act of 1986. Pub.L. 99-499, October 17, 1986 ("SARA"). Thus, Congress had every opportunity to make those connections, but purposefully chose not to do so.

Indeed, Congress had very good reasons not to include federal facility or DoD facility cleanups in Section 113(h)'s jurisdictional bar: the EPA does not provide oversight under Section 120 nor under DERP, and cleanups conducted under their authority typically target contamination caused by the federal agencies themselves. The jurisdictional bar in Section 113(h) operates to prevent litigation from interrupting response plans developed under the guidance of government agencies following the CERCLA process. No government agency is providing the third-party monitoring role outlined in Section 104, which directs the government to extensively manage and review cleanups conducted by potentially responsible parties. 42 U.S.C. § 9604(a)(1); *see also United States v. E.I. Dupont De Nemours & Co. Inc.*, 432 F.3d 161, 164–66 (3d Cir. 2005) (describing CERCLA's broad grant of power to the executive branch to oversee cleanup actions).

*First*, under both DERP and Section 120, there is a notable and concerning lack of oversight by the EPA, or any other agency charged with environmental protection. Cleanup activities by the DoD under DERP are carried out "in consultation" with the EPA, but not under its oversight. 10 U.S.C. § 2701(a)(3); *see also* Site Specific Opposition at 18-19; Excerpts from Deposition of

12

Sheen Kottkamp, **Ex. 3**, at 36:2-9 ("We take EPA consultation and direction quite seriously, **but the Air Force is the lead agency** . . .") (emphasis added); Excerpts from Deposition of Chris Gierke, **Ex. 4**, at 68:5-10 (confirming EPA does not have oversight over the Air Force's DERP cleanup at Cannon AFB). While Section 120 does provide for limited EPA authority, *see* 42 U.S.C. § 9620(e)(4)(A), like DERP, Section 120 more generally puts EPA in the role of a mere consultant. *E.g.,* 42 U.S.C. §§ 9620(e)(1) and (h)(3)(B) (authorizing federal agencies to take actions in consultation with EPA). The EPA is also deprived of substantial leverage over cleanups at federal facilities because it is restricted from using Superfund money at federal facilities, 42 U.S.C. § 9611(e)(3), depriving it of "the power of the purse." Multiple scholars have noted the EPA's comparative lack of authority over cleanups at federal facilities, as compared to cleanups at private facilities.[10] Courts have also noted that even EPA's limited "input" for federal facility cleanups is not effective:

> Were I to dismiss this action, the Army's cleanup efforts would go unchecked by any parties whose interest are in any real sense adverse to those of the Army. . . The Army, in effect, seeks full and unbridled discretion, subject only to E.P.A.'s input through the same attorneys who represent the Army. . . Having the State actively involved as a party would guarantee the salutary effect of a truly adversary proceeding that would be more likely, in the long run, to achieve a thorough cleanup.

*Colorado v. U.S. Dep't of the Army*, 707 F. Supp. 1562, 1570 (D. Colo. 1989)

**Second**, when a federal agency such as the DoD is performing a cleanup at one of its facilities, it is more often than not cleaning up its own mess. This is undeniably the case at the DoD facilities at issue here. Global 113(h) Mot. at 1 (DoD's response actions are being taken to clean up "contamination from the military's use of [AFFF]"). As previously noted, Section 113(h)

---

[10] *See* Andrew M. Gaydosh, *The Superfund Federal Facility Program: We Have Met the Enemy and It Is U.S.,* NAT. RESOURCES & ENV'T., Winter 1992 at 21, 22; Robert C. Davis, Jr. and R. Timothy McCrum, *Environmental Liability for Federal Lands and Facilities,* NAT. RESOURCES & ENV'T., Summer 1991 at 31.

was enacted "to prevent **private responsible parties** from filing **dilatory, interim lawsuits** which have the effect of slowing down or preventing **EPA's cleanup activities**." H.R.Rep. No. 253(I), at 266 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2941 (emphasis added). *See also Cabot Corp. v. EPA*, 677 F. Supp. 823, 829-30, 829 n.7 (E.D. Pa. 1988) (distinguishing between dilatory challenges brought by liable parties under CERCLA and "bona fide citizen suits" raising genuine environmental and safety concerns, based on Section 113(h)'s legislative history). Here, the responsible party at issue is the DoD itself, rather than any of the Plaintiffs with claims against DoD. Where the federal agency responsible for the contamination is performing the cleanup itself, with little or no oversight from the EPA, lawsuits filed by concerned citizens—or, as here, States, municipalities, and quasi-governmental entities—serve as an essential check to the agency's otherwise unbridled power:

> The need for oversight activities to enforce removal and remedial actions is particularly acute in situations where the United States is a CERCLA defendant. If only the Environmental Protection Agency were granted oversight authority, the State would be forced to leave the interests of its people in the hands of a law enforcement agency with an **inherent conflict of interest**. There is no reason to believe that the United States is immune from the conflicts that arise when a liable party is responsible for enforcing its own cleanup activities.

*Colorado v. United States*, 867 F. Supp. 948, 953 (D. Colo. 1994) (emphasis added).

Because the Government's response actions at the DoD facilities are being conducted under the authority of Section 120 and/or DERP, Section 113(h) does not apply. The Court need not go any further in its analysis; this fact requires denial of the Government's Motion.

### 1. Section 113(h) does not apply to cleanups conducted under Section 120

As the Ninth Circuit has held, Section 120 is a stand-alone Congressional grant of authority for CERCLA cleanups at federal facilities which appear on the NPL, and Section 113(h) does not apply to actions taken under its authority. *Fort Ord Toxics Project, Inc. v. CEPA*, 189 F.3d 828, 834 (9th Cir. 1999). Section 120 does not contain a provision analogous to section 113(h), nor does

14

Section 113(h) bring into its ambit response actions selected under Section 120. Because the authority for DoD's response activities at the four NPL-listed federal facilities at issue in the Government's Motion stems from Section 120, rather than Section 104, Section 113(h) does not apply to lawsuits which arguably challenge those response activities. Accordingly, Section 113 does not apply to the claims in *Elsinore Valley Municipal Water District v. 3M Company*, No. 2:21-cv-03699-RMG (D.S.C. July 19, 2023),[11] *Lakewood Water District v. United States*, No. 2:20-cv-02899-RMG (D.S.C. July 16, 2020),[12] and *New Jersey Department of Environmental Protection v. United States*, No. 2:21-cv-00146-RMG (D.S.C. Jan. 14, 2021).[13]

Section 120, which unequivocally waives the federal government's sovereign immunity for CERCLA claims, requires the EPA to evaluate federal facilities for inclusion on the NPL. 42 U.S.C. § 9620(d)(1). For facilities placed on the NPL, Section 120 authorizes "the department, agency, or instrumentality which owns or operates such facility" to conduct response actions at the facility in consultation with the EPA. *Id.* at §9620(e). Specifically, Section 120 authorizes and requires owners/operators of federal facilities to "commence a remedial investigation and feasibility study for such facility," *id.* at § 9620(e)(1), and to "enter into an interagency agreement with the [EPA] for the expeditious completion **by such department, agency, or instrumentality** of all necessary remedial action at such facility," *id.* at § 9620(e)(2) (emphasis added). Thus, in contrast to CERCLA cleanups at non-federal facilities, which are either overseen by the EPA or performed directly by the EPA itself, Section 120 authorizes federal agencies owning facilities on

---

[11] This action involves March AFB in California, which is on the NPL. 40 C.F.R. § 300, App. B.

[12] This action involves JBLM in Washington. A portion of JBLM is made up of McChord Air Force Base, which is on the NPL. *Id.*

[13] This action involves Joint Base McGuire-Dix-Lakehurst and Naval Weapons Station Earle, both in New Jersey. A portion the joint base is made up of McGuire Air Force Base, which is on the NPL. *Id.* Naval Weapons Station Earle is also on the NPL. *Id.*

the NPL to conduct their own CERCLA remediation activities in mere *consultation* with the EPA. Cleanups under Section 120 are also performed on a much stricter timeframe than those performed under Section 104, to which Section 113(h) applies.[14]

Notably, other CERCLA provisions similarly identify Section 120 as an independent grant of authority for conducting response actions. Section 117 of CERCLA references Section 120 cleanups as distinct from cleanups under Section 104: "Before adoption of any plan for remedial action to be undertaken by the President, by a State, or by any other person, under section 9604, 9606, 9620, or 9622 of this title, the President or State, as appropriate, shall take both of the following actions . . ." 42 U.S.C. § 9617(a). Even more tellingly for present purposes, Section 113 itself indicates that some response actions are conducted under Section 120 while others are conducted under Section 104. *See* 42 U.S.C. § 9613(g) (". . . if the President is diligently proceeding with a remedial investigation and feasibility study under section 104(b) **or** section 120 . . .") (emphasis added).

While courts have applied Section 113(h) to cleanups being performed at federal facilities, they almost universally do so without discussion. Relatively few courts have considered the issue of whether the legal authority for a federal facility cleanup stems from the President's authority under Section 104, or from the more specific authority granted to federal departments, agencies, and instrumentalities in Section 120. Those courts that have considered the issue(by congress are divided, and the Fourth Circuit has not weighed in. Significantly, no court has held that Section

---

[14] 42 U.S.C. § 9620(e)(1) (requiring commencement of a remedial investigation and feasibility study within six months of being placed on the NPL); *id.* at § 9620(e)(2) (requiring the federal department, agency, or instrumentality which owns or operates the facility to enter into an interagency agreement with EPA within six months of EPA's review of the remedial investigation and feasibility study); *id.* at § 9620(e)(3) (requiring the completion of remedial actions "as expeditiously as practicable").

16

113(h) applies to response activities at NPL-listed sites that are actually conducted under the authority of Section 120.

In *Fort Ord*, the United States Court of Appeals for the Ninth Circuit held that "section 113(h) is inapplicable" where the cleanup is "conducted pursuant to [Section] 120." 189 F.3d at 834. Noting that no other circuit courts had (yet) reached the issue, the Ninth Circuit concluded that "the Army's position [that Section 113(h) applies to cleanups conducted under Section 120] does not seem to be supported by the statutory text."[15] *Id.* at 833. Specifically, the court noted that "CERCLA's jurisdictional bar only removes jurisdiction 'to review any challenges to removal or remedial action selected under [Section 104] of this title, or to review any order issued under section 9606(a) of this title....'" *Id.* at 832-33 (quoting Section 113(h)). The court observed that "[i]f § 120 creates a grant of authority separate from § 104, then the plain language of § 113(h) would exempt § 120 cleanups from its jurisdictional bar." *Id.* at 833. Because "[d]etermining which provision governs a particular cleanup requires a close look at the different types of CERCLA cleanups and at the specific grants of authority in § 120," the court then performed that statutory analysis and concluded that the authority for cleanups at federal facilities listed on the NPL stems from Section 120, rather than from Section 104:

> [Section 120] does seem to create a grant of authority separate from §§ 104 and 106. "[N]o authority vested in the Administrator under this section may be transferred, by executive order of the President or otherwise, to any other officer or employee of the United States or to any other person." 42 U.S.C. § 9620(g). Other CERCLA provisions also identify § 120 as a grant of authority separate from § 104. In fact, § 117, which was passed in the same bill as §§ 113 and 120, discusses § 120 cleanups as separate from § 104 cleanups. "Before adoption of any plan for remedial action to be undertaken by the President, by a State, or by any other person, under section 9604, 9606, 9620, or 9622 of this title, the President or State, as appropriate, shall take both of the following actions...." 42 U.S.C. § 9617(a). **Even other parts of § 113 seem to imply that some remedial actions are**

---

[15] *Fort Ord* acknowledged that it was departing from the decisions of district courts that, as of 1999, had considered the issue of Section 113(h)'s applicability to cleanups arguably conducted under Section 120. *Fort Ord*, 189 F.3d at 833.

**conducted pursuant to § 104 while others are conducted pursuant to § 120**. See 42 U.S.C. § 9613(g) ("... if the President is diligently proceeding with a remedial investigation and feasibility study under section 104(b) or section 120 [42 U.S.C. § 9604(b) or § 9620] (relating to Federal facilities).").

*Id.* at 833 (emphasis added); *cf. Giovanni v. United States Dep't of Navy*, 906 F.3d 94 (3d Cir. 2018) (holding that cleanups by federal agencies are performed under the authority of Section 104, delegated by the President via Executive Order 12,580, rather than the more specific grant of authority (by **Congress**) contained in Section 120) (relying on *Werlein*, 746 F. Supp. 887) (finding Section 120 was merely "procedural").

*Fort Ord* has been subsequently applied by courts in the Ninth Circuit. *See, e.g., City of Moses Lake v. United States*, 416 F. Supp. 2d 1015, 1025 (E.D. Wash. 2005).[16] Additionally, at least one district court outside the Ninth Circuit has adopted its reasoning. *OSI, Inc. v. United States*, 510 F. Supp. 2d 531, 539 (M.D. Ala. 2007).[17] Importantly, several Plaintiffs with claims against the Government subject to the Global 113(h) Motion hale from jurisdictions where *Fort*

---

[16] It must be noted that *Fort Ord* and its progeny have incorrectly limited Section 120's authority to "remedial actions." *Fort Ord*, 189 F.3d at 834 ("There is no analogous authority under § 120 for the commencement of removal actions."); *Moses Lake*, 416 F. Supp. 2d at 1025 ("Since the proposed plan is not a § 104 'removal' action, but a § 120 'remedial action,' Moses Lake is not jurisdictionally barred from seeking relief."). However, *Fort Ord* and *Moses Lake* fail to appreciate that Section 120 authorizes and requires federal agencies to "commence a remedial investigation and feasibility study." 42 U.S.C. § 9620(e)(1). This Court has held that a remedial investigation and feasibility study constitutes a "removal action." *R.E. Goodson Construction Co. v. International Paper Co.*, No. 4:02-cv-4184-RBH, 2005 WL 2614927, at *24 (D.S.C. Oct. 13, 2005). Because Section 120 authorizes federal agencies to conduct remedial investigations and feasibility studies, and because such investigation and study constitute "removal actions" under CERCLA, *Fort Ord* was incorrect in limiting its holding to "remedial actions." The Ninth Circuit's error is understandable; courts have noted that "[t]he tangled language of CERCLA hardly lends itself to clearcut distinctions between the two types of actions." *United States v. W.R. Grace & Co.,* 429 F.3d 1224, 1232 (9th Cir. 2005). The issue for this Court, however, is clarified by the parties' agreement that "removal actions" include remedial investigations and feasibility studies, which are clearly authorized and required by Section 120 to be performed by the federal agency that owns or operates the federal facility in question. 42 U.S.C. § 9620(e)(1).

[17] While the Eleventh Circuit decided on appeal that the *Fort Ord* reasoning did not apply to the facts of *OSI* because the facility at issue was not listed on the NPL, it did not disturb *Fort Ord*'s holding. *OSI, Inc. v. United States*, 525 F.3d 1294, 1298-99 (11th Cir. 2008).

*Ord* is controlling. The Seventh Circuit, while factually distinguishing and therefore not reaching the issue, discussed *Fort Ord* and acknowledged that cleanups at federal facilities on the NPL may be under Section 120(e)'s independent grant of authority and therefore not limited by Section 113(h):

> Section 120 may create authority to clean up a certain type of federally owned property that does not include the landfill that is the subject of this lawsuit. As noted above, the nastiest sites in the country are listed on the National Priorities List (NPL) and are to be cleaned up first thing. Section 120(e) requires the administrators of federal agencies that own property on this list to perform a remediation study and then to undertake any necessary remediation. Cleanup efforts of federal NPL Superfund sites therefore arguably are initiated under § 120, rather than §§ 104 or 106."

*Pollack v. United States Department of Defense*, 507 F.3d 522, 526 (7th Cir. 2007).[18]

As noted, the Third Circuit reached a contrary conclusion, but its conclusion that Section 120 was procedural, rather than a substantive grant of authority, cannot be reconciled with the plain language of the relevant statutes. However, the Third Circuit nevertheless acknowledged inconsistency in its own ruling, conceding that Section 120 "suggests that some authority has been granted to the federal government under § 120" and that the ruling creates a "tension with a logical reading of § 104." *Giovanni*, 906 F.3d at 116-17. Even the court in *Werlein* found that the issue was a close one. *Werlein*, 746 F. Supp at 892 ("Plaintiffs' argument is interesting. On balance, though, the Court must conclude . . .").

Both the Third Circuit's reasoning and holding are incorrect. Whatever legal effect Executive Orders may hold, they cannot countermand the express or implied will of Congress in

---

[18] Other courts have similarly read *Fort Ord* narrowly, for example by refusing to apply it to cleanups at facilities not listed on the NPL. *See, e.g., Shea Homes Ltd. P'ship v. United States*, 397 F. Supp. 2d 1194 (N.D.Cal. 2005). However, as noted above, four of the DoD facilities at issue are on the NPL, *see supra* at 15-16 n. 11-13. For the remainder, DoD's authority for the cleanup still does not stem from Section 104, but rather from DERP. *See infra* at 22-27. Therefore, Section 113(h) still does not apply. *See id.*

the enactment of Section 120 (and DERP) without a provision analogous to Section 113(h). *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."). Further, reliance on Executive Order No. 12,580 also overlooks the fact that Section 120 (and DERP) was enacted **prior** to the Executive Order. *Compare* Pub.L. 99-499, October 17, 1986 *with* Executive Order No. 12,580, 52 Fed. Reg. 2923 (Jan. 23, 1987). It would make little sense for Congress to provide federal agencies with a "procedure" for cleanups at federal facilities listed on the NPL *before* those agencies had even been delegated the authority to do so. Rather, Section 120 was an affirmative grant of the authority to conduct those cleanups.

Indeed Section 120 was enacted as a substantive and independent grant of authority. If Section 120 was merely "procedural," there would be no reason to include many of its provisions, which are often duplicative of CERCLA's other provisions. *E.g.,* 42 U.S.C. §§ 9620(f) (dictating state and local participation) and 9620(a)(2) (providing that CERCLA's "guidelines, rules, regulations, and criteria" are applicable to cleanups at federal facilities). *See Pulsifer v. United States*, 144 S. Ct. 718, 731–32 (2024) ("When a statutory construction thus 'render[s] an entire subparagraph meaningless,' this Court has noted, the canon against surplusage applies with special force." (citation omitted)). *Giovanni*'s characterization of Section 120 as procedural is also inconsistent with the law as written, which imposes substantive obligations on federal agencies. *See*, *e.g.*, 42 U.S.C. § 9620(e) ("Required action by department").

Because the authority for the DoD's cleanup activities at NPL-listed sites stems from Section 120, not Section 104, and because Section 120 contains no provision analogous to Section 113(h), this Court is not barred from exercising jurisdiction to review claims allegedly challenging those activities. In fact, it is explicitly authorized to do so. 42 U.S.C. § 9613(b) ("Except as

provided in subsections (a) and (h) of this section [neither of which apply to the cases at issue in the Government's Motion], the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter [(CERCLA)]."). Regardless, at the very least, whether the DoD's cleanup activities at such sites are being conducted under Section 104 or under Section 120 are questions of fact that are in dispute among the parties and are thus inappropriate for disposition at this time.

### 2. Section 113(h) does not apply to cleanups conducted under DERP

As previously mentioned, the Government concedes that its response actions at the DoD facilities at issue are conducted under the authority of DERP. Global 113(h) Mot. at 4. While Section 120 applies to any facility owned or operated by a federal department, agency, or instrumentality, DERP is specific to the DoD but is not limited to sites listed on the NPL. Like Section 120, the statutory provisions governing DERP provide an independent grant of authority for DOD to conduct cleanups at facilities under its jurisdiction. Accordingly, cleanups conducted by DOD under DERP are not taken under the authority of Section 104, and therefore are not subject to Section 113(h).

DERP provides that "[t]he Secretary of Defense **shall** carry out a program of environmental restoration at facilities under the jurisdiction of the Secretary and at National Guard facilities." 10 U.S.C. § 2701(a)(1) (emphasis added). *See also* Global 113(h) Mot. at 4 ("[T]he DoD conducts its environmental restoration activities through [DERP] . . . DERP authorizes the Secretary of Defense to carry out response actions."); Long Decl. ¶¶ 4-5 ("DERP authorizes the Secretary of Defense to carry out response actions addressing DoD releases of hazardous substances, pollutants, and contaminants.").[19] Tellingly, DoD's own instructions for DERP state unequivocally that "10 USC

---

[19] Notably, the Long Declaration (which the Government relies on almost exclusively in its Motion) does not so much as mention Section 104 nor Executive Order 12,580.

§§ 2700 – 2711, *Environmental Restoration*, also defined in DoDM 4715.20, **is the statutory authority** that establishes an [Environmental Restoration Program] of hazardous substances, pollutants and contaminants for DoD [sic]." Air Force Instruction 32-7020, *Environmental Restoration Program* (March 12, 2020), available at https://static.e-publishing.af.mil/production/1/af_a4/publication/afi32-7020/afi32-7020.pdf.

DERP's use of the word "shall" clearly indicates an independent grant of authority. Courts generally agree that usage of the word "shall" in the statutory context is construed to be an imposition of a mandatory duty.[20] Inherent within this mandate is the implicit conferral of authority to execute the commanded action. Many courts in their analysis of the usage of "shall" have expressed the understanding that, where Congress directs an agency to perform an action, it also implicitly grants the authority to do so. *See Holland v. Pardee Coal*, 269 F. 3d 424, 431 (4th Cir. 2001) (holding the failure to adhere to the deadline of its "shall" directive does not "depriv[e] the agency of its authority to act after that date"). Thus, Congress' use of "shall" in DERP amounts to a nondiscretionary mandate and authorization of DoD to perform cleanup actions.

While DERP is carried out in "accordance" with CERCLA requirements generally, 10 U.S.C. § 2701(c)(1), it also contains independent and supplemental requirements for such a cleanup. For instance, when conducting a cleanup under DERP, the DoD is subject to special notice requirements that exceed those in CERCLA. *Id.* at § 2705. Additionally, DERP authorizes cleanups beyond the scope of those authorized by CERCLA. *See id.* at §§ 2701(b)(2)-(3). Finally, DERP has been tailored, through amendment, to specifically address PFAS, further indicating that the DoD's PFAS response actions are pursuant to DERP's specific authority. *Id.* at §§ 2714-16

---

[20] *Holland v. Pardee Coal*, 269 F. 3d 424, 431 (4th Cir. 2001); *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015) (noting that the language that the Commissioner "shall" indicates a command, and the directive is mandatory); *Shenango Inc., v. Apfel*, 307 F.3d 174, 193 (3rd Cir. 2002) ("Admittedly, 'shall' is generally mandatory when used in a statute.").

(requiring DoD to test for PFAS at all military facilities where a release has occurred; to establish a PFAS Task Force to research and remediate military-linked PFAS releases; and to submit yearly budgets to Congress regarding all DoD's PFAS activities). DERP itself characterizes its provisions as creating a structure for response actions separate from the CERCLA process: "The Secretary of Defense or the Secretary of a military department may carry out an environmental restoration project if that Secretary determines that the project is necessary to carry out **a response under this chapter or CERCLA**." *See id.* at § 2707(a) (emphasis added).

Furthermore, DERP is far more than a "procedural." *See Werlein*, 746 F. Supp. at 891. DERP's provisions span sixteen sections of Title 10 of the United States Code,[21] and its scope exceeds that of CERCLA. 10 U.S.C. § 2701(b) (DERP's goals include "[the] cleanup of contamination from a hazardous substance or pollutant or contaminant" **as well as** "[t]he correction of **other** environmental damage" and "demolition and removal of unsafe buildings and structures . . . at sites formerly used by or under the jurisdiction of the [DoD].") (emphasis added); *compare with* 42 U.S.C. § 9604 (only authorizing removal and remedial actions to address the release of hazardous substances, pollutants, or contaminants).

In fact, DERP goes out of its way to specify which portions of CERCLA apply to cleanups conducted under its authority. *E.g., id.* at § 2700(2) (various CERCLA definitions apply); *id.* at § 2701(a)(2) (Section 120 of CERCLA applies); *id.* at § 2701(e) (Section 119 of CERCLA applies). In particular, 10 U.S.C. § 2704(e) dictates that Section 104(i) of CERCLA, which creates obligations to report health-related data, applies to federal facilities cleaned up by DoD under DERP, implying that Section 104 does not govern DERP cleanups except for as expressly provided. DERP also contains its own independent funding scheme, a strong indication that its

---

[21] It is also significant that DERP is not located in Title 42 of the United States Code, alongside CERCLA, indicating that it is a wholly independent program under separate authority.

enactment was an affirmative grant of independent authority. 10 U.S.C. § 2703. Finally, it is telling that, while the EPA has already published rules and regulations for CERCLA cleanups in the form of the National Contingency Plan, 40 C.F.R. § 300, the DoD felt it necessary to establish its own rules and procedures for DERP. Dep't of Def. Instruction 4715.07; Dep't of Def. Manual 4715.20. Put simply, cleanups under DERP are not cleanups under CERCLA Section 104—and therefore, Section 113(h) does not prevent this Court from exercising jurisdiction over the challenged claims.

Few cases address the confluence of DERP and Section 113(h), and none provide persuasive analysis of the authority granted to DoD by DERP. In *Long Island Pure Water Ltd. v. Cuomo*, the District Court for the Eastern District of New York, in dicta, stated that "the DERP statute implicates § 104" and thus concluded that Section 113(h) applied. 375 F. Supp. 3d 209, 221 (E.D.N.Y. 2019). *Long Island*, however, primarily concerned the issue of whether the DoD's authority extended to the cleanup of off-site contamination. *Id.* at 219. *Long Island* also ignores the plain language of Section 113(h), which narrowly prohibits federal courts from reviewing "challenges to removal or remedial action **selected under section 104**" of CERCLA—not cleanups that simply "indicate" or are done "consistent with" CERCLA. *Compare with* 42 U.S.C. § 9607(a)(4)(A) (authorizing the recovery of costs for removal or remedial action performed "not inconsistent[ly] with" CERCLA's implementing regulations, the National Contingency Plan). Nowhere in *Long Island* was there a finding that the claims challenged removal or remedial actions "selected under section 104," or even a reasoned explanation for why a cleanup performed under DERP "consistent with" the National Contingency Plan should be considered a removal or remedial action selected under Section 104. In essence, *Long Island* and the authority it relies on have confused a DERP cleanup operating consistent with CERCLA as a "removal or remedial

24

action selected under Section 104" of CERCLA—an error which improperly expands the application of the narrow text in Section 113(h).

Moreover, *Long Island* relied on three cases to reach its conclusion, each of which is inapposite. *Id.* at 221 ("[T]he Court is persuaded by the case law in other Circuits.") (citing *Cannon*, 538 F.3d 1328 (10th Cir. 2008); *City of Fresno v. United States*, 709 F. Supp. 2d 888 (E.D. Cal. 2010); and *City of Salina, Kan. v. United States,* No. 10-2298-CM-DJW, 2011 WL 1107107 (D. Kan. Mar. 25, 2011)). In *Cannon*, the court did not address whether DERP, rather than section 104, governed the cleanup at issue, and with good reason: the parties had conceded that Sections 104 and 113(h) applied. 538 F.3d at 1333 n.4. Thus, the court decided nothing. Additionally, *Cannon* was reviewing dismissal at the summary judgment stage. In *Fresno*, the facility at issue was privately owned by the City of Fresno rather than the DoD, a fact which the court held "points to the applicability of § 104." 709 F. Supp. at 905. Finally, *Salina* merely relied on *Cannon* and *Fresno* without meaningful analysis. *Salina*, 2011 WL 1107107 at *4 (The court has reviewed *Cannon* and *City of Fresno* and finds them to be persuasive.").

Further, both *Cannon* and *Salina* recognized that cleanups by the DoD are authorized by DERP. *Cannon*, 538 F.3d at 1333 n.4 ("the Secretary cleans up 'formerly used defense sites' pursuant to [DERP]"); *Salina*, 2011 WL 1107107 at *5 ("Removal and remediation programs of formally owned defense sites are authorized under DERP."). And yet, neither of those cases, nor *Cannon*, nor *Long Island*, conducted a statutory analysis of DERP. This distinguishes those cases from *Fort Ord*, which faithfully (even reluctantly) performed that analysis and found that Section 113(h) did not apply. *Fort Ord*, 189 F.3d at 833-34.

For the same reasons noted by the court in *Fort Ord*, because the DoD's cleanup activities are conducted pursuant to authority granted to it in DERP, and because DERP contains no

provision analogous to CERCLA Section 113(h), this Court is not barred from exercising jurisdiction to review claims allegedly challenging those activities. At the very least, whether the DoD's cleanup activities are being conducted under Section 104 or under DERP are again questions of fact that are in dispute among the parties, and are thus inappropriate for disposition at this time. *See Fresno*, 709 F. Supp. at 905 (relying on factual evidence to determine the applicability of 42 U.S.C. § 9604).

**B.      Section 113(h) Does Not Apply to Claims Under State Laws Which Are Applicable or Relevant and Appropriate**

Section 113(h) deprives federal courts of jurisdiction to review challenges to removal or remedial action under federal law "**other than** under section 1332 of Title 28 (relating to diversity of citizenship) **or under State law which is applicable or relevant and appropriate under section 9621 of this title** (relating to cleanup standards)." 42 U.S.C. § 9613(h) (emphasis added). Thus, in addition the enumerated exceptions set forth in 42 U.S.C. § 9613(1)-(4), Section 113(h) also explicitly excepts from its application a claim under ARARs. *Id.*

A few district courts have held that Section 113(h) operates to bar challenges brought under state law. *Werlein*, 746 F. Supp. at 892-93 ("The statute by its very terms states that the Court has no subject matter jurisdiction to hear 'any challenges' 'under Federal law ... or under state law.'") (ellipse in original); *Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 801 F. Supp. 1432, 1436 (M.D. Pa. 1992) ("The plain language of the statute divests federal courts of jurisdiction over actions '... under State law ...'") (ellipses in original). However, the Supreme Court has clarified that "[Section 113(h)] permits federal courts [when sitting in diversity] and state courts alike to entertain state law claims, including challenges to cleanups." *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1351 (2020).

26

Furthermore, reading Section 113(h) to except from its application claims which arise under ARARs is also more consistent with the statute as a whole. *See Maracich v. Spears,* 570 U.S. 48, 65 (2013). ("[I]nterpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning.").  In fact, it is the only reading which gives effect to 42 U.S.C. § 9621 ("Section 121"), since that section itself unquestionably authorizes suits to enforce ARARs, as Section 113(h) references. 42 U.S.C. §§ 9621(f)(2)(B), (f)(3)(B). *See Marx v. General Revenue Corp.,* 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."). These provisions of Section 121, which authorize suit to enforce state ARARs, would make little sense if they could only be applied after completion of the cleanup. *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 333 (1938) ("[T]o construe statutes so as to avoid results glaringly absurd, has long been a judicial function.") (footnoted citations omitted).

For context, Section 121 describes what cleanup standards will be employed in a CERCLA response. Generally, that section requires the cleanup to "attain a degree of cleanup . . . which assures protection of human health and the environment." 42 U.S.C. § 9621(d)(1).  More specifically, Section 121 requires the cleanup to satisfy "any standard, requirement, criteria, or limitation under any Federal environmental law" **and** "any promulgated standard, requirement, criteria, or limitation under a State environmental or facility siting law that is more stringent than any Federal standard" if it is "legally applicable to the hazardous substance or pollutant or contaminant concerned or is relevant and appropriate." 42 U.S.C. § 9621(d)(2)(A). Generally, the cleanup must satisfy state ARARs if they are (1) properly promulgated; (2) more stringent than federal standards; (3) applicable or relevant and appropriate; and (4) timely identified. 42 U.S.C.

§ 9621(d)(2)(A)(ii); 40 C.F.R. § 300.400(g)(4); *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1440 (6th Cir. 1991).

According to EPA, "promulgated" as used in Section 121(d) refers to "laws imposed by state legislative bodies and regulations developed by state agencies that are of general applicability and are legally enforceable." EPA, *Superfund Program; Interim Guidance on Compliance with Applicable or Relevant and Appropriate Requirements; Notice of Guidance,* 52 Fed. Reg. 32496, 32498 (Aug. 27, 1987) ("Interim Guidance"). Importantly for New Mexico's case (*see infra* at 33-34) an ARAR need not contain a numerical, quantifiable, or otherwise objective standard to be "properly promulgated." In *Akzo Coatings*, the defendants argued that Michigan's anti-degradation law, which prohibited "[the] discharge into the waters of the state any substance which is or may become injurious to the public health, safety, or welfare," was "not properly promulgated because its vagueness and lack of a quantifiable standard render it legally unenforceable." 949 F.2d at 1441. The court disagreed, finding that the state law was "sufficiently specific to provide a fair warning that certain kinds of conduct are prohibited," and thus constituted an ARAR for the cleanup. *Id.* (quoting *Colten v. Kentucky,* 407 U.S. 104, 110 (1972)). The court acknowledged that the Michigan law's reference to "injurious to the public health, safety, or welfare" might have "intended 'injurious' to mean concentrations of contaminants measurable only in parts per thousand rather than parts per billion or per trillion, as we are capable of measuring today," but nevertheless found it enforceable, analogizing to instances where legislatures have prohibited "immoral conduct," a standard for which necessarily changes over time. *Id.*

Regarding the second element (more stringent than federal standards), the court in *Akzo Coatings* accepted EPA's position that "'[w]here no Federal ARAR exists for a chemical, location, or action, but a State ARAR does exist, or where a state [sic] ARAR is broader in scope than the

28

Federal ARAR, the State ARAR is considered more stringent.'" *Akzo Coatings*, 949 F.2d at 1443

(quoting National Oil and Hazardous Substances Pollution Contingency Plan, 53 Fed. Reg. 51394,

51435 (proposed Dec. 21, 1988). The court also noted that this conclusion is supported by the

legislative history of Section 121. "Senator Mitchell, one of the principal authors of [Section 121],

similarly explained during the debate on SARA that a 'more stringent' state requirement within

the meaning of section 9621(d)(2)(A) 'includes *any* State requirement where there is no

comparable Federal requirement.' 132 Cong. Rec. S 14,915 (Oct. 3, 1986) (emphasis added)." *Id.*

Given that the federal government has not yet made effective any enforceable standards for PFAS,

any state law containing such enforceable standards will necessarily be more stringent. Global

113(h) Mot. at 12 n.4 ("There are currently no federal standards.").[22]

Regarding the third element, the National Contingency Plan provides that a state

environmental standard or requirement is "applicable" when it "specifically addresses a hazardous

substance, pollutant, contaminant, remedial action, location, or other circumstance found at a

CERCLA site." 40 C.F.R. § 300.400(g)(1). But even where a standard or requirement is not directly

applicable, it "may still be relevant and appropriate to the circumstances of the release." *Id.* at §

300.400(g)(2) (specifying factors to consider).

While CERCLA requires ARARs to be "timely identified" to be enforced in a CERCLA

cleanup, this element is not germane to this Court's jurisdiction under Section 113(h) to hear claims

arising under state laws which are ARARs, because the timeliness requirement does not concern

whether the state law constitutes an ARAR, but merely ensures that the EPA (or whomever is

---

[22] As noted above, the EPA has recently published a final rule under the federal Safe Drinking Water Act ("SDWA"), setting MCLs for six PFAS. *See supra* at 5 n.5. However, even assuming the MCLS survive legal challenges, they will not go into effect for several months. *Id.* at 2 (noting that the MCLs for these six PFAS will go into effect 60 days after being published in the federal register, which has not yet occurred).

performing the cleanup) has sufficient notice of what may be an ARAR. *Interim Guidance*, 52 Fed. Reg. at 32498 ("States are required by CERCLA to identify State ARARs 'in a timely manner,' that is, in sufficient time to avoid inordinate delay or duplication of effort in the remedial process."). Similarly, while CERCLA only allows states to challenge the selection of a remedial action which does not attain an ARAR, 42 U.S.C. § 9621(2) and (3), by its plain language Section 113(h) does not limit a federal court's jurisdiction to those types of claims, but merely authorizes federal courts' jurisdiction to hear claims "under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards)." 42 U.S.C. § 9613(h).

Any attempts by the Government to argue that ARARs can only be enforced at the remedy selection phase of a cleanup, or that an ARAR enforcement can only be brought by a state, have no place in this Court's present jurisdictional analysis. Again, arguments that do not address this Court's jurisdiction to hear Plaintiffs' claims are not viable under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Such arguments **may** be viable as a challenge to Plaintiffs' cause or right of action under Rule 12(b)(6), but the Government has brought no such motion and currently has no ability to do so under CMO 25, which only authorizes the Government to file a motion under Section 113(h) limited to purely jurisdictional issues.

Thus, if a claim at issue in the Government's Motion was brought under state law that is an ARAR (*i.e.,* it is applicable or relevant and appropriate to the cleanup, properly promulgated, and more stringent than federal standards or requirements), then this Court has jurisdiction to hear those claims. This applies to claims in numerous suits which the Government seeks to dismiss, as detailed below.

30

1.      ***New Jersey Department of Environmental Protection v. United States*,
No. 2:21-cv-00146-RMG**

The Government seeks to dismiss New Jersey Department of Environmental Protection's ("NJDEP") claims under the federal SDWA, 42 U.S.C. § 300f, *et seq.*, and the New Jersey Safe Drinking Water Act ("NJSDWA"), N.J.S.A. § 58:12A-1, *et seq.*, for contaminating drinking water at, or that has been impacted by, the relevant federal facilities at levels exceeding New Jersey MCLs for PFOS and PFOA. Global 113(h) Mot. at A-5 to A-6. Importantly, the EPA has authorized New Jersey to enforce the NJSDWA in lieu of the federal SDWA.[23]  New Jersey has promulgated MCLs under the NJSDWA applicable to PFAS. Specifically, New Jersey has promulgated MCLs for PFNA (at .013 micrograms per liter), PFOA (at .014 micrograms per liter), and PFOS (at .013 micrograms per liter). N.J.A.C. § 7:10-5.2(a)(5). Because these standards are promulgated under a state program (the NJSDWA) that the EPA has authorized New Jersey to enforce in lieu of the federal SDWA, they are ARARs under CERCLA. Therefore, claims arising under it are not barred from this Court's jurisdiction. *See* 42 U.S.C. § 9613(h) (exempting from the jurisdictional bar claims "under State law which is applicable or relevant and appropriate under section 9621 of this title").

As previously discussed, Section 121 of CERCLA states that cleanup standards include "any promulgated standard, requirement, criteria, or limitation under a State environmental or facility siting law that is more stringent than any Federal standard, requirement, criteria, or limitation." 42 U.S.C. § 9621(d)(2)(A)(ii). The provision goes on, however, to specify that such standards include "each such State standard, requirement, criteria, or limitation contained in a program approved, authorized or delegated by the Administrator under a statute cited in subparagraph (A)." *Id.* The referenced paragraph, in turn, lists the federal SDWA. *Id.* at §

---

[23] 44 Fed. Reg. 69003 (Nov. 30, 1979).

9621(d)(2)(A)(i). Further, there can be little doubt that the NJSDWA and its implementing regulations are applicable to the cleanups at the DoD facilities at issue in NJDEP's complaint.[24] And of course, they are more stringent than federal standards, since final MCLs for PFAS are not yet effective on the national level.[25]

### 2. *New Mexico et al. v. United States*, No. 2:20-cv-02115-RMG

New Mexico's complaint includes claims under the New Mexico Hazardous Waste Act ("NMHWA"), N.M.S.A. § 74-4-1, *et seq.*), which the Government seeks to dismiss. Global 113(h) Mot. at A-6 to A-7. Importantly, the EPA has authorized New Mexico to enforce the NMHWA in lieu of the Resource Conservation and Recovery Act ("RCRA"). 50 Fed. Reg. 1515 (Jan. 11, 1985). Because of this authorization, and for other reasons detailed below, the NMHWA is an ARAR under Section 121 of CERCLA, and claims arising under it are not barred from this Court's jurisdiction.

In addition to state programs which the EPA has authorized the state to enforce in lieu of the SDWA, CERCLA specifies that a state program authorized under the Solid Waste Disposal Act constitutes an ARAR. 42 U.S.C. § 9621(d)(2)(A). RCRA is an amendment to the Solid Waste Disposal Act, Pub.L. 94-580, § 2, Oct. 21, 1976, 90 Stat. 2796 (RCRA, amending the Solid Waste Disposal Act), and New Mexico has been authorized to enforce the NMHWA in lieu of RCRA. 50 Fed. Reg. 1515 (Jan. 11, 1985) (authorizing New Mexico to enforce the NMHWA in lieu of

---

[24] The facilities at issue in NJDEP's complaint are Joint Base McGuire-Dix-Lakehurst, Former Naval Air Warfare Center Trenton, and Naval Weapons Station Earle, all located in New Jersey.

[25] Although the EPA has recently finalized MCLs for PFAS under the SDWA, they are not yet in effect. *See supra* at 5 n.5. However, once they are promulgated, New Jersey law will incorporate them by reference.  *See* N.J.A.C. § 7:10-5.1.

RCRA). The NMHWA and RCRA are applicable to the cleanups at the DoD facilities at issue in New Mexico's complaint.[26] *See* Site-Specific Opposition at 8-9.

Indeed, prior to filing its complaint New Mexico issued the Air Force a RCRA permit for Cannon AFB which specifically requires the cleanup of PFAS. *Id.* Cannon AFB's RCRA permit specifies that the cleanup level for groundwater contaminants is "the New Mexico Water Quality Control Commission groundwater quality standards, 20.6.2.3103 NMAC." Excerpts from Cannon AFB RCRA Permit, **Ex. 5**, at § 3.3.1. That administrative code provision, in turn, contains promulgated enforceable standards that are more stringent than (nonexistent) federal standards, specifically that toxic pollutants such as PFAS "shall not be present at a concentration shown by credible scientific data" that "(1) unreasonably threatens to injure human health, or the health of animals or plants . . . or (2) creates a lifetime risk of more than one cancer per 100,000 exposed persons." 20.6.2.3103 NMAC; *see also* 20.6.2.7(T)(2)(s) NMAC (defining "toxic pollutants" to include PFOS, PFOA, and PHHxS). These enforceable standards, while not numerical, are nonetheless "promulgated" within the meaning of Section 121; indeed, they bare a strong resemblance to those in the Michigan anti-degradation law at issue in *Akzo Coatings*. *See Akzo Coatings*, 949 F.2d at 1441. Finally, EPA has determined that "RCRA Subtitle C requirements will frequently be ARARs for CERCLA actions, because RCRA regulates the same or similar wastes as those found at many CERCLA sites, covers many of the same activities, and addresses releases and threatened releases similar to those found at CERCLA sites." EPA/OSWER Directive 9234.2-04FS (October 1989).[27]

---

[26] These facilities include Cannon AFB and Holloman AFB, both located in New Mexico.
[27] Available at https://semspub.epa.gov/work/HQ/174498.pdf.

### 3.    *Lakewood Water District v. United States*, No. 2:20-cv-02889-RMG

The Government repeatedly cites 70 ppt as the threshold at which DoD will investigate and remediate PFAS in drinking water. *E.g.*, Global 113(h) Mot. at 12 n.4 ("DoD uses 70 ppt of PFOS and PFOA, individually or combined, in drinking water as a benchmark for taking short-term removal actions."). However, the State of Washington has promulgated State Action Levels ("SALs") for PFAS in drinking water and Cleanup Levels for PFAS under the Model Toxics Control Act ("MTCA"), Wash. Rev. Code 70A.305, *et seq.*[28] SALs are MCLs set to protect individuals from adverse health effects caused by lifetime exposure to drinking water, similar to but more stringent than EPA's lifetime health advisories. The Washington State Board of Health adopted SALs for five PFAS to govern drinking water standards: 15 pt for PFOS; 10 ppt for PFOA; 9 ppt for PFNA; 65 ppt for PFHxS; and 345 ppt for PFBS. Wash. Admin. Code 246-290-315. These standards are stricter than the 70 ppt level DoD is using, and they constitute ARARs because they were properly promulgated, are more stringent than current federal standards,[29] and are applicable or relevant and appropriate to the cleanup. 42 U.S.C. § 9621(d)(2)(A)(ii). Nevertheless, Joint Base Lewis-McChord has applied only the 70 ppt standard in site delineation despite the fact that the state's hazardous waste law, MTCA, would also require cleanup of PFOA and PFOS to levels below 70 ppt in most circumstances.

---

[28] The Washington State Department of Ecology has also issued preliminary Cleanup Levels for eight PFAS. Dep't of Ecology, *Guidance for Investigating and Remediating PFAS Contamination in Washington State*, Pub. No. 22-09-058 (June 2023) at 17–20. The preliminary groundwater cleanup levels for PFOA and PFOS are set at 48 ppt for "Method B" cleanups under MTCA, which is the default category for land that will return to unrestricted use after remediation. Additionally, as with the SALs, the MTCA cleanup levels set minimum cleanup requirements for six other PFAS as well. *Id.*

[29] As noted above, the EPA recently finalized MCLs under the SDWA applicable to PFAS. *See supra* at 5 n.5. However, those MCLs are not yet in effect. Until and unless they are, Washington's SALs will remain ARARs.

Lakewood's Complaint does not identify the MTCA as a cause of action or discuss Washington's SALs in its Complaint. However, this is because the SALs were adopted in 2021,[30] whereas Lakewood's complaint was filed in 2020. *See* Complaint (filed July 16, 2020). Lakewood reserves the right to amend its Complaint to state a claim under the MTCA. Fed. R. Civ. P. 15(a)(2) (The court should freely give parties leave to amend their pleadings "when justice so requires.")

4. *City of Newburgh v. United States, et al.*, No. 2:18-cv-03358-RMG; *Town of New Windsor v. United States, et al.*, No. 2:21-cv-01496-RMG; *County of Suffolk v. United States*, No. 2:19-cv-01181-RMG

Newburgh's Second Amended Complaint, filed in 2019 pointed out that New York was proposing to lower its own MCLs for PFOA and PFOS in drinking water standard, to 10 ppt, and complained that DoD was only planning to remediate to 70 ppt, but sought cleanup to non-detect levels. Second Am. Compl. ("SAC") ¶¶ 101, 284, 305, 319, 320, 326, 361. Then in 2020, New York State set MCLs of 10 ppt for both PFOS and PFOA. 10 NYCRR § 5-1.52 (Table 3). In 2023, the State set surface water standards for PFOS for a Class A drinking water source (like Lake Washington, which was Newburgh's water source, but which is not currently being used because PFOS was detected as high as 800 ppt, SAC ¶ 277) at 2.7 ppt, while the standard for PFOA is 6.7 ppt. Furthermore, the New York State Department of Environmental Conservation ("NYSDEC") has set interim soil cleanup objectives as low as 0.88 parts per million ("ppm") for PFOS and 0.66 ppm for PFOA. *Sampling, Analysis, and Assessment of Per-and Polyfluoroalkyl Substances (PFAS) Under NYSDEC's Part 375 Remedial Programs* (April 2023). These are ARARs applicable in New York but not being utilized by DoD.

CERCLA Section 118 provides that when taking action under Section 104, "the President shall give a high priority to facilities where the release of hazardous substances or pollutants or

---

[30] *See* https://doh.wa.gov/sites/default/files/2022-02/331-673.pdf

contaminants has resulted in the closing of drinking water wells or has contaminated a principal drinking water supply." 42 U.S.C. § 9618. However, DoD is not even trying to clean up the water to meet New York State surface water or drinking water standards, which are ARARs applicable due to the use of Washington Lake as Newburgh's drinking water supply. These same points also apply to New Windsor, whose water supply is also being contaminated by Stewart ANGB, as explained below.

Notwithstanding these MCLs, all efforts by the Government at the Francis S. Gabreski Airport (at issue in the County of Suffolk's suit)[31] have failed to acknowledge these levels and remain focused on identifying sites that are above the EPA's original Lifetime Health Advisory Levels. For example, during sampling efforts in the area surrounding the Airport, the Air National Guard insists on using the EPA's Regional Resident Soil levels as benchmarks to determine whether an area should be included in subsequent environmental evaluations. The Regional Soil level, however, is inappropriate when evaluating the impacts to groundwater from PFAS contaminated soils. The appropriate soil screening level for this type of concern is the EPA's Resident Soil to Groundwater screening level, which is lower than the Regional Soil screening level. This is compounded by the fact that The Air National Guard is also declining to utilize the NYSDEC Soil Guidance Values for the "Protection of Groundwater."

Moreover, as part of its Clean Water Act citizen's suit claim, Newburgh seeks injunctive relief, SAC ¶ 394, as well as civil penalties and attorneys' fees, SAC ¶¶ 395, 396, due to the continued violation of the New York State Pollutant Discharge Elimination System ("SPDES"), issued under New York's delegated Clean Water Act program, for Stewart ANGB, which pollutes the downstream City Watershed. DoD has failed to show how compliance with this state permit,

---

[31] *County of Suffolk v. United States*, No. 2:19-cv-01181-RMG.

or monetary sanctions, might "interfere with the expeditious cleanup effort" for the Base so as to invoke the CERCLA § 113(h) bar. *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 329 (9th Cir. 1995). Rather, DoD is not even trying to use CERCLA to comply with its SPDES permit. The only arguably significant action it has taken was conducted under the Clean Water Act, not CERCLA. *See* Excerpts from *Stewart Air National Guard Base PFOS and PFOA Mitigation Plan*, **Ex. 6**, at 2. Namely, the United States Army Corps of Engineers installed a largely ineffective and undersized GAC/Resin "Pilot" system to treat water in Recreation Pond before it was released, often untreated through a weir during storm events, into Silver Stream. *See, e.g.*, Excerpts from *US Army Corps of Engineers Baltimore District, Quarterly OM&M Report No. 14* **Ex. 7**, at 1 ("When precipitation events occur that exceed the ISWTS capacity the Recreation Pond fills up and both treated effluent and untreated stormwater go over the outfall weir.").

Additionally, Section 120 provides that "[s]tate laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action at facilities owned or operated by a department, agency, or instrumentality of the United States . . . when such facilities are not included on the National Priorities List." 42 U.S.C. § 9620(a)(4). Stewart ANGB is not included on the National Priorities List, so therefore New York State laws concerning removal and remedial action apply at Stewart. The State of New York has listed Stewart ANGB as an "Inactive Hazardous Waste Disposal Site" pursuant to the State's Superfund program due to the presence of PFOS. Newburgh SAC ¶ 301. Therefore, New York State cleanup standards apply and must be enforced as ARARs.

### 5. *Elsinore Valley Municipal Water District v. 3M Company, et al.*, No. 2:21-cv-03699-RMG

Because of the risks that PFAS pose to human health, California regulates several of them in drinking water at very low levels. *Elsinore Valley Municipal Water District v. 3M Company, et.*

*al*, No. 2:21-cv-03699-RMG (D.S.C. July 19, 2023), Am. Compl. ¶ 81. Specifically, California has

set "response levels" for PFOA at 10 ppt; for PFOS at 40 ppt; and for PFHxS at 20 ppt. *Id.* These

levels are below the EPA's outdated 70 ppt standards for PFOA and PFOS, and the EPA does not

yet have any effective standard for PFHxS in drinking water. But the Government acknowledges

that its investigative and remedial actions for contaminated water near the March AFB sites are

limited to EPA's 70 ppt standard for PFOA and PFOS. Global 113(h) Mot. at 16-17 (identifying

remedial actions for "offsite groundwater . . . with PFOS and/or PFOA concentrations above 70

ppt"). The Government does not identify any investigative or remedial actions at March AFB sites

that address PFHxS. *See id.* It follows that Elsinore's claims against the Government, which seek

"investigation, clean-up, [and] abatement . . . to comply with California's PFAS-specific

regulations," Am. Compl. Prayer for Relief at (B), are not barred by Section 113(h) because such

claims are made under state laws which are ARARs because they were properly promulgated, are

more stringent than current federal standards, and are applicable or relevant and appropriate to the

cleanup at issue.


## II.    PLAINTIFFS' CLAIMS DO NOT CONSTITUTE A "CHALLENGE"

Even if Section 113(h) did apply to the claims at issue, the Government's Motion still fails.

Section 113(h) only bars claims that constitute a "challenge" to a CERCLA cleanup. 42 U.S.C. §

9613(h); *Atl. Richfield Co.*, 140 S. Ct. at 1352 (acknowledging that not all claims involving a

CERCLA cleanup constitute a challenge); *United States v. Colorado*, 990 F.2d 1565, 1576 (10th

Cir. 1993) (Section 113(h) "does not bar federal courts from reviewing a CERCLA response action

prior to its completion; rather, it bars federal courts from reviewing any 'challenges' to CERCLA

response actions."); *Village of DePue*, 537 F.3d at 784 ("Section 113(h) . . . applies only to bar

jurisdiction over **challenges** to certain cleanups . . . ." (emphasis added). Courts have recognized that not all claims implicating a cleanup constitute challenges, for various reasons. As detailed below, claims under state environmental laws, claims for monetary relief, claims for nuisance, and claims addressing contamination outside the scope of the cleanup do not constitute a "challenge," and thus are not barred by Section 113(h).

### A.    Claims Under State Environmental Laws: *United States v. Colorado*

As previously discussed, Congress enacted Section 113(h) "to prevent **private responsible parties** ["PRPs"] from filing dilatory, interim lawsuits which have the effect of slowing down or preventing **EPA's** cleanup activities." H.R.Rep. No. 253(I), at 266 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2835, 2941 (emphasis added). Certainly, Congress never intended for the provision to be used **by** PRPs to escape state hazardous waste and/or other state environmental requirements. Yet the Government attempts to do exactly that in seeking to dismiss the claims brought by New Mexico and the NJDEP.[32] *Contra* 42 U.S.C. § 9621(f)(1) (ensuring "substantial and meaningful involvement by each State in initiation, development, and selection of remedial actions" under CERCLA). A state's environmental laws are even more important where, as here, the cleanup is being conducted by the PRP itself, without any oversight at all. *See* Site-Specific Opposition at 8-9; *see supra* at 12-15. None of the cases relied on by the Government addresses the problem the Court must face regarding the claims brought by New Mexico and the NJDEP: a conflict between the federal government and a state enforcing applicable environmental laws as part of a cleanup within its jurisdiction.[33] Only *United States v. Colorado* addresses that circumstance. 990 F.2d 1565.

---

[32] *New Mexico, et al. v. United States*, No. 2:20-cv-02115-RMG; *New Jersey Dep't of Envt'l Prot. v. United States*, No. 2:21-cv-00146-RMG.

[33] While the Government does cite to *Alabama v. EPA*, 871 F.2d 1548 (11th Cir. 1989), it does not cite to *Alabama* in an attempt to grapple with the issue of a state's rights to participate in

In *Colorado*, the Army was performing a CERCLA response action at the Rocky Mountain Arsenal, a federal facility owned and operated by the Army. *Id.* at 1572. The Government filed suit seeking to nullify a compliance order issued under the Colorado Hazardous Waste Management Act, *id.* at 1573, which Colorado had been authorized to carry out in lieu of RCRA. *Id.* at 1571. Unlike the cases relied on by the Government, the express issue in *Colorado* was "whether a state which has been authorized by the EPA to carry out the state's hazardous waste program in lieu of RCRA is precluded from doing so . . . where a CERCLA response action is underway." *Id.* at 1569-70 (cleaned up). Following a close examination of "the relationship between [RCRA] and [CERCLA]", *id.* at 1568, the Tenth Circuit concluded that "enforcement actions under state hazardous waste laws . . . do not constitute 'challenges' to CERCLA response actions" under Section 113(h). *Id.* at 1579.

The court based its decision on Congress' "intent that CERCLA should work in conjunction with other federal and state hazardous waste laws in order to solve this country's hazardous waste cleanup problem." *Id.* at 1576. The court reasoned that to rule, as the Government argues here, that the court's review of the claims was barred under Section 113(h) would be tantamount to "find[ing] that CERCLA implicitly repealed RCRA's enforcement provisions contrary to Congress' expressed intentions." *Id.* at 1575. Specifically, the court relied on CERLCA's "savings provision" and "relationship to other laws" provision. CERCLA's "savings provision" provides that "[n]othing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants." 42 U.S.C. § 9652(d). Even more

---

or oversee a CERCLA cleanup. Global 113(h) Mot. at 9. Moreover, the cleanup at issue in *Alabama* was not within Alabama's jurisdiction, making it distinguishable from *Colorado* and inapplicable to the issue before this Court. *Alabama*, 871 F.2d at 1551 (CERCLA cleanup at issue was located in Texas).

importantly to the issue before the court in *Colorado* (and this Court), CERCLA's "relationship to other laws" provision provides that "[n]othing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614(a).

Taking these CERCLA provisions at face value, the Tenth Circuit concluded that "[i]n light of §§ 9652(d) and 9614(a), which expressly preserve a state's authority to undertake such action, we cannot say that Colorado's efforts to enforce its EPA-delegated RCRA authority is a challenge to the Army's undergoing CERCLA response action." *Id.* The court also noted the fact that Colorado had been delegated primary responsibility by the EPA to enforce the Colorado Hazardous Waste Management Act in lieu of EPA's enforcement of RCRA and that, as a result, "[a]ny action taken by [Colorado] . . . [has] the same force and effect as action taken by the [EPA]." *Id.* at 1575. Moreover, the court reaffirmed that RCRA "unambiguously subjects federal instrumentalities to state and local regulation." *Id.* (citations omitted). The court also held that Colorado's enforcement action was "not seeking to delay the cleanup, but merely seeking to ensure that the cleanup is in accordance with state laws which the EPA has authorized Colorado to enforce." *Id.* at 1576.[34] This critical fact is equally true in the cases brought by New Mexico and NJDEP.

New Mexico's complaint, like Colorado's, is an enforcement action under a state hazardous waste law (the NMHWA) which the EPA has authorized New Mexico to administer and enforce in lieu of RCRA. As discussed more fully in Plaintiffs' Site-Specific Opposition, New

---

[34] It must be noted that the Ninth Circuit reached the opposite result in *McClellan*, cited *infra* for other purposes. 47 F.3d 329-31. However, *McClellan* is devoid of the detailed statutory analysis of the relationship between RCRA and CERCLA performed in *Colorado*, and moreover did not concern an action brought by a state seeking to enforce its own state environmental laws. Nor did *McClellan* discuss the CERCLA provisions relied on by *Colorado*.

41

Mexico's case is essentially indistinguishable from *Colorado*, and thus its claims do not constitute a "challenge" to DoD's cleanup activities.

    *Colorado*'s holding applies equally to NJDEP's claims under the NJSDWA, which are also on all fours. Like Colorado with respect to RCRA enforcement responsibility, EPA has authorized New Jersey to administer and enforce the NJSDWA in lieu of the federal statute. *See* 44 Fed. Reg. 69003 (Nov. 30, 1979). As such, its actions similarly have the same force and effect as actions taken by EPA.[35] Moreover, similar to RCRA's waiver of sovereign immunity, noted in *Colorado*, in Section 300j-6(a)(2) of the federal SDWA, Congress provided that federal agencies "shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or **any provisions for injunctive relief** . . ." 42 U.S.C. § 300j-6(a)(2) (emphasis added). The same section creates a broad waiver of immunity for any "department, agency, and instrumentality of the . . . Federal Government" that is "engaged in any activity at [any] facility [in a wellhead protection area] resulting, or which may result, in the contamination of water supplies in any such area." *Id*. For the same reasons cited by the Tenth Circuit, New Jersey's enforcement of its authorities under the

---

[35] The federal SWDA recognizes that the states play an important part in administering and enforcing drinking water standards. *See Nat. Res. Def. Council v. EPA*, 806 F. Supp. 275, 277 (D.D.C. 1992) ("[I]t is clear from the plain language of the Safe Drinking Water Act that the states play a critical and independent role of implementation."). Indeed, a state may obtain "primary enforcement responsibility for public water systems" if EPA determines that the state meets certain requirements. *See* 42 U.S.C. § 300g-2. To obtain such authority, a state must (1) adopt its own "drinking water regulations that are no less stringent than . . . [EPA's] regulations," (2) adopt and implement adequate procedures to enforce such regulations, and (3) keep records and make reports required by EPA. *See id.* § 300g-2(a); *see also* 40 C.F.R. § 142.10 (setting forth the requirements for determination of primary enforcement responsibility). New Jersey has met those requirements and has received authorization from EPA to enforce SDWA program, and the State is therefore empowered by SDWA to enforce both the federal and its own drinking water standards. *See* 44 Fed. Reg. 69003 (Nov. 30, 1979). Thus, while SDWA "is administered by the EPA[,] . . . [it] establishes a joint federal-state system for assuring compliance with national standards." *Manu'd Hous. Inst. v. EPA*, 467 F.3d 391, 401 (4th Cir. 2006).

federal SDWA and the NJSDWA do not constitute a "challenge" to DOD's CERCLA cleanup of the New Jersey sites in question.

Cases decided after *Colorado* have observed that the Tenth Circuit's ruling regarding the inapplicability of Section 113(h) to state environmental law claims is unique because the case involved a state plaintiff. *See El Paso Natural Gas Co. v. U.S.*, 750 F.3d 863, 882 (D.C. Cir. 2014); *Ark. Peace Ctr. v. Ark. Dept. of Pollution Control and Ecology*, 999 F.2d 1212, 1217-1218 (8th Cir. 1993); *Shea Homes Ltd. P'ship v. U.S.*, 397 F. Supp. 2d 1194, 1204 (N.D. Cal. 2005). Thus, *Colorado*, and the "relationship to other laws" provision it relies on, have special persuasive force regarding the claims brought by New Mexico and NJDEP. However, nothing in *Colorado* explicitly limits its holding to actions brought by states. Indeed, the "savings provision" relied on in *Colorado* is equally applicable to the RCRA citizen suits brought by non-state Plaintiffs here, particularly since they are local governments and quasi-governmental entities.[36]

The Government notes, and will likely do so again on reply, that RCRA prohibits citizen suits under 42 U.S.C. § 6972(a)(1)(B), such as those brought by Plaintiffs, where "the Administrator [of EPA] . . . is actually engaging in a removal action under section 104 of [CERCLA]," 42 U.S.C. § 6972(b)(2)(B)(ii).[37] However, the citizen suit prohibition in RCRA says

---

[36] *City of Newburgh v. United States, et al.*, No. 2:18-cv-03358-RMG; *County of Suffolk v. United States*, No. 2:19-cv-01181-RMG (also bringing citizen suit under the Clean Water Act); *Lakewood Water District v. United States*, No. 2:20-cv-02899-RMG.

[37] Of course, the prohibition in RCRA applies only to RCRA citizen suits. New Mexico's cause of action under the NMHWA, which contains no analogous prohibition, would be unaffected. N.M.S.A. § 74-4-13. Likewise, NJDEP's claims under the federal SDWA and the NJSDWA are equally unaffected, since neither statute contains an analogous prohibition. 42 U.S.C. § 300i; N.J.S.A. § 58:12A-6. The Government's reliance on the prohibition in RCRA is also inappropriate, given that its motion is limited to jurisdictional issues under Section 113(h). CMO 25 at 2 ("The United States will file . . . one Memorandum of Law to support its Motion to Dismiss Plaintiffs' claims based on the timing of review provision of CERCLA, 42 U.S.C. § 9613(h)."); Global 113(h) Mot. at 2 n.1 ("Pursuant to Case Management Order 25, this Motion is limited to seeking dismissal of the Remedial Claims under CERCLA section 113(h)").

nothing regarding a bar on citizen suits during the pendency of cleanups performed by entities other than the EPA. *Id*. While this Court has applied the prohibition to removal actions taken by agencies other than the EPA, it did so without discussion and in apparent disregard of the plain statutory language. *See R.E. Goodson,* 2005 WL 2614927 at \*25-26; *see also Anacostia Riverkeeper*, 892 F. Supp. 2d 161, 170 (D.C. Cir. 2012) (applying the prohibition without analysis).[38] Additionally, where EPA (or, *arguendo*, another federal agency) "has incurred costs to initiate a Remedial Investigation and Feasibility Study," the agency is required to be "diligently proceeding with a remedial action" for the prohibition to apply. 42 U.S.C. § 6972(b)(2)(B)(iii). Where the EPA (or, *arguendo*, another federal agency) has incurred such costs, this more specific provision applies. The Government goes to great pains to show that it has indeed incurred costs to initiate Remedial Investigations and Feasibility Studies at every DoD Facility. Global 113(h) Mot. at 13-18. But given the inadequacy of the DoD's cleanups (for instance, the DoD's use of an outdated and superseded screening level, *see supra* at 4-5), Plaintiffs dispute that they are proceeding "diligently," which is a question of fact inappropriate for disposition at this time.

Finally, given the specific discoveries made during jurisdictional discovery at Cannon AFB, it seems likely that, if given the opportunity to pursue discovery, other Plaintiffs will be able to allege causes of action under 42 U.S.C. § 6972(a)(1)(A) (authorizing citizen suits to enforce RCRA permit conditions), which contains no such prohibition. For example, Air Force personnel responsible for the cleanup at Cannon AFB have openly admitted that the Air Force is not complying with its state-issued RCRA permit, and has no intent to do so, despite numerous admonitions from the EPA. *See* Site-Specific Opposition. Plaintiffs reserve their right to amend

---

[38] Another court reasoned that applying the prohibition only to cleanups performed by the EPA would "thwart the intent of Congress." *Reynolds v. Lujan*, 785 F. Supp. 152, 154-55 (D.N.M. 1992). However, this overlooks the fact that the EPA, unlike other agencies, is an environmental agency with superior subject matter expertise.

their complaints to allege such permit violations and assert a cause of action under 42 U.S.C. § 6972(a)(1)(A).

Because enforcement of state environmental laws does not constitute a "challenge" to the cleanup, Plaintiffs' claims under RCRA, the NMHWA, the SDWA, or the NJSDWA, alleging an imminent and substantial endangerment which may pose a threat to human health or the environment, are not barred by Section 113(h). The claims of New Mexico and the NJDEP, which constitute a state's enforcement of its own environmental laws in the interest of protecting its citizens fall squarely under the facts of *Colorado*. To dismiss those claims would offend principles of federalism which lie at the heart of federal environmental law and policy. *See W. Virginia State Univ. Bd. of Governors for & on behalf of W. Virginia State Univ. v. Dow Chem. Co.*, No. 2:17-CV-3558, 2020 WL 2842057 at *8 (S.D. W. Va. June 1, 2020) ("The court must . . . respect the federal-state balance.") (citation omitted). Furthermore, *Colorado*'s analysis of the relationship between RCRA and CERCLA apply with equal force to RCRA suits brought by other Plaintiffs, and thus do not constitute a "challenge" under Section 113(h).

B.    **Claims for Monetary Relief** [39]

---

[39] It should be noted that the Government's Motion is unclear as to whether it seeks dismissal of Plaintiffs' claims for monetary relief, specifically claims for response costs. On the one hand, the Government states that "this Motion is limited to seeking dismissal of the Remedial Claims under CERCLA section 113(h)," Global 113(h) Mot. at 2 n. 1, which the Government identifies as "claims for injunctive relief seeking to compel the United States to immediately investigate and remediate PFAS contamination from a total of nine specific [DoD] facilities," *id.* at 1, and admits that "requests for monetary relief are not "challenges" under Section 113(h), *id.* at 26 n.6. *See also id.* at App. A (identifying claims the Government seeks to dismiss, which does not include claims for response costs). On the other hand, however, the Government states that this Court should dismiss Plaintiffs' claims "in their entirety," including claims for response costs, on "separate grounds." *Id.* at 26 n.6. While Plaintiffs believe that the Government's Motion is strictly limited to Section 113(h) pursuant to CMO 25, in an abundance of caution this brief will address the Government's (incorrect) assertions regarding, and its apparent attempt to dismiss, such response costs.

Plaintiffs' claims seeking to recover monetary relief are not barred by Section 113(h) because the simple expenditure of money does not in any way interfere with DoD's cleanup activities. Claims for compensatory damages have proceeded despite an ongoing CERCLA plan. In *Beck v. Atlantic Richfield Co.*, 62 F.3d 1240, 1242 (9th Cir. 1995) (per curiam), the Ninth Circuit held that a claim of compensatory damages from environmental damage could proceed because a damages claim "would not involve altering the terms of the cleanup order." In *Chestnut v. AVX Corp.*, No. 4:07-CV-4152-TLW-TER, 2009 WL 10678827, at *5-6 (D.S.C. Mar. 25, 2009), the court similarly held that the plaintiffs' claim for damages under negligence, nuisance, trespass, and strict liability theories were not barred by Section 113(h). The plaintiffs sought damages arising out of the defendants' contamination of their property, as recognized in a CERCLA consent decree, and did not seek any amendment to the planned remedial action. *Id.* at *5. *See also Nance v. AVX Corp.*, No. 4:08–cv–515–TLW–TER, 2009 WL 10678182, at *6–7 (D.S.C. Mar. 25, 2009) ("Plaintiffs do not seek any different remedial action . . . only the payment of money damages . . . [which] does not constitute a challenge to a CERCLA cleanup."). In *La Loma Grande LLC v. United States*, No. CV-11-00476-TUC-RCC, 2013 WL 11834724, at *1-6 (D. Ariz. Jan. 3, 2013), the court found plaintiffs' request for loss of profits and loss of use damages, which was allegedly caused by defendants' contamination of their property, did not alter cleanup requirements or environmental standards and was not barred by Section 113(h).

More specifically, costs which Plaintiffs expended in responding to PFAS contamination emanating from the DoD Facilities are specifically exempted from Section 113(h), and further do not constitute a "challenge" to DoD's cleanup activities. One of the primary goals of CERCLA is to "ensure that the costs of [] cleanup efforts [are] borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009)

46

(citations omitted). To that end, Section 113(h) specifically exempts actions "to recover response costs or damages or for contribution." 42 U.S.C. § 9613(h)(1). Accordingly, the United States Supreme Court has definitively held that claims "to recover response costs . . . are not challenges to cleanup plans." *Atl. Richfield Co.*, 140 S. Ct. at 1352.

Indeed, the Government admits that Section 113(h) is inapplicable to claims for response costs. Global 113(h) Mot. at 26 n.6 ("[T]he United States is not arguing that the plaintiffs' requests for monetary relief constitute 'challenges' to removal or remedial action under section 113(h)."). Despite the limited scope of its Motion and its concessions regarding monetary relief, the Government argues that if this Court "finds that section 113(h) bars the Remedial Claims' requests for injunctive relief, it should dismiss those claims in their entirety rather than retain jurisdiction over any associated requests for monetary relief" because, allegedly, "none of the federal or state environmental statutes at issue authorize plaintiffs to recover any costs." *Id.* But again, the Government's argument goes beyond the permissible scope of the Motion, which was supposed to be strictly limited to the issue of this Court's jurisdiction under Section 113(h). CMO 25 at 2 ("The United States will file . . . one Memorandum of Law to support its Motion to Dismiss Plaintiffs' claims based on the timing of review provision of CERCLA, 42 U.S.C. § 9613(h)."); Global 113(h) Mot. at 2 n.1 ("Pursuant to Case Management Order 25, this Motion **is limited to seeking dismissal of the Remedial Claims under CERCLA section 113(h)**") (emphasis added). Regardless, the Government's overbroad assertion that the federal and state statutes at issue do not authorize the recovery of costs is simply incorrect. *See* N.M.S.A. § 74-4-13(A) (Secretary of New Mexico Environment Department may sue to restrain or "take such other action as may be necessary"); 42 U.S.C. § 300i(a) (Administrator "may take such actions as he may deem necessary"); N.J.S.A. § 58:12A-6 (New Jersey Commissioner of Environmental Protection "may

47

take such actions as he may deem necessary"). Moreover, the argument does not provide a basis to dismiss the numerous claims at issue here that seek monetary relief but do not stem from federal and state statutes.

Finally, the Government's argument ignores the facts that CERCLA itself expressly authorizes the recovery of response costs. 42 U.S.C. § 9607(a)(4)(A)-(B). Despite admissions elsewhere in its brief that Section 113(h) does not apply to claims for response costs, *e.g.* Global 113(h) Mot. at 26 n.6, the Government contradictorily argues that "[n]one of the five narrow exceptions to Section 113(h) could plausibly be invoked." Global 113(h) Mot. at 20 n.5. This is untrue: every Plaintiff whose complaints are implicated by the Government's Motion have stated viable claims for recovery of costs they have expended or will expend in responding to the PFAS contamination created by the military's use of AFFF. Three Plaintiffs (the City of Newburgh, the Town of New Windsor, and the County of Suffolk) have already specifically alleged causes of action for response costs under 42 U.S.C. § 9607(a) for contamination of their properties and drinking water supplies due to releases from DoD facilities.[40, 41] Because Section 113(h) specifically exempts such actions, this Court has jurisdiction to review those claims as a matter of law. 42 U.S.C. § 9613(h)(1).

---

[40] Newburgh seeks response costs, including an alternative water supply, arising out of releases of PFOA and PFOS, which are listed in New York as "hazardous substances," 6 NYCRR § 597.3, meet the definition of "hazardous wastes" under RCRA (and thus are classified as hazardous substances under CERCLA, 42 U.S.C. § 9601(14)), and for which direct listing under CERCLA is imminent, 87 Fed. Reg. 54415 (Sept. 6, 2022). SAC ¶¶ 397-414, *City of Newburgh v. United States*, No. 2:18-cv-03358-RMG (D.S.C. Aug. 21, 2019). Additionally, Newburgh seeks response costs arising from releases of "other hazardous substances." *Id.* Similarly, New Windsor also seeks response costs for remediation of its own properties and water supplies, alternative water supplies, and related response costs for releases of the same hazardous substances. Compl. ¶¶ 481-498 *Town of New Windsor v. United States*, No. 2:21-cv-01496-RMG (D.S.C. May 4, 2021).

[41] The County of Suffolk seeks declaratory judgment for response costs incurred by the County with respect to Airport Property and County Water Sources, which the DoD has no plans to remediate. Compl. ¶¶ 176-179, *County of Suffolk v. United States*, No. 2:19-cv-01181-RMG.

While the other Plaintiffs' claims for response costs were not specifically brought under 42 U.S.C. § 9607(a), as discussed above they are nonetheless claims for monetary relief that do not constitute "challenges" to CERCLA response actions. *Giovanni*, 906 F.3d at 112; *Beck*, 62 F.3d at 1243; *Nance v. AVX Corp.*, No. 4:08-CV-515-TLW-TER, 2009 WL 10678182 at *6–7 (D.S.C. Mar. 25, 2009). Alternatively, given that they have incurred such costs since their complaints were filed—either in the first instance or as additional ongoing expenditures—they should be granted leave to amend their complaints to specifically allege them, along with causes of action under 42 U.S.C. § 9607(a).[42] Fed. R. Civ. P. 15(a)(2) (The court should freely give parties leave to amend their pleadings "when justice so requires."); *id.* at (b)(1). (Even at trial, "[t]he court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits.").

## C.    Claims for Nuisance

The Government's arguments are especially unpersuasive to the extent it asserts that Plaintiffs' state-law tort claims for interferences with their property[43] challenge ongoing removal

---

[42] Plaintiffs that have not yet pleaded cost-recovery claims have been waiting for the EPA's anticipated final rule listing PFOS and PFOA as hazardous substances. *See* EPA, *Comprehensive Environmental Response, Compensation, and Liability Act Hazardous Substances: Designation of Perfluorooctanoic Acid and Perfluorooctanesulfonic Acid*, 87 Fed. Reg. 54415 (September 6, 2022). The final rule is still under review by the Office of Management and Budget, which had projected a publication date in March 2024. Office of Inf. and Reg. Affairs, Office of Management and Budget, Exec. Office of the President, *Designating PFOA and PFOS as CERCLA Hazardous Substances*,     RIN:     2050-AH09     (accessed     Apr.     10,     2024), https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202310&RIN=2050-AH09 (providing an estimated Final Rule date of March 2024).

[43] The Government seeks dismissal of nuisance and other state-law tort claims brought by the Elsinore Valley Municipal Water District, the Town of New Windsor, and the County of Suffolk. Global 113(h) Mot., App. A, at A-3 to A-5, A-7 to A-8; *see* First Am. Compl., *Elsinor Valley Mun. Water Dist. v. 3M Co.*, No. 2:21-cv-03699-RMG (D.S.C. July 19, 2023); Compl., *Town of New Windsor v. United States*, No. 2:21-cv-01496-RMG (D.S.C. May 4, 2021); Compl., *Cnty. of Suffolk v. United States*, No. 2:19-cv-01181-RMG (D.S.C. Feb. 14, 2019).

To the extent the Government refers to a "2d Am. Compl." in *Elsinor Valley Municipal Water District*, that reference is a scrivener's error because the First Amended Complaint is the

or remedial actions. When passing Section 113(h) as part of SARA, Congress plainly contemplated that such state-law claims typically can be adjudicated without interfering with CERCLA cleanups.

For example, the conference report—"[t]he part of legislative history which is given the most weight," *Payne v. Fed. Land Bank of Columbia*, 916 F.2d 179, 182 (4th Cir. 1990)—stated that "[n]ew section 113(h) is not intended to affect in any way the rights of persons to bring nuisance actions under State law with respect to releases or threatened releases of hazardous substances, pollutants or contaminants," H.R. Rep. No. 99–962, at 224 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3276, 3317; *see Samples v. Conoco, Inc.*, 165 F. Supp. 2d 1303, 1315 (N.D. Fla. 2001) (summarizing other statements in the legislative history signaling Congress's intent that Section 113(h) should not preclude certain state-law tort claims). To ensure that Section 113(h) would not unduly interfere with plaintiffs' rights to bring nuisance and similar property-based tort claims under state law, Congress provided two broad exclusions to the provision's jurisdiction-stripping effect.

**First**, Congress made Section 113(h) "[inapplicable] to federal courts sitting in diversity." *See Village of DePue*, 537 F.3d at 784–85 & n.8; *see also* 42 U.S.C. § 9613(h) (provision is inapplicable where jurisdiction is proper under "section 1332 of title 28 (relating to diversity of citizenship jurisdiction)"). **Second**, Congress elected not to extend Section 113(h)'s jurisdiction-stripping effect to state courts. *See Atl. Richfield Co.*, 140 S. Ct. at 1362 ("[B]y its own terms, § 113(h) speaks of 'Federal court[s],' not state courts." (quoting 42 U.S.C. § 9613(h))); *Clinton Cnty. Comm'rs v. EPA*, 116 F.3d 1018, 1025 (3d Cir. 1997) (en banc) (observing that "Congress apparently left citizens the option of obtaining relief in state court nuisance actions"). While neither

---

operative complaint in that action. *See* Global 113(h) Mot., App., A, at A-4 to A-5. Notably, the Government does not seek dismissal of the City of Newburgh's state-law tort claims. *Compare* Global 113(h) Mot., App. A, at A-2 to A-3, *with* First Am. Compl., *City of Newburgh v. United States*, No. 2:18-cv-03358-RMG (D.S.C. Aug. 21, 2019).

exclusion applies here,[44] Congress's choice to cabin Section 113(h) to "*limited circumstance*[*s*]," *Town of Acton v. W.R. Grace & Co. Conn., Techs.*, No. CIV.A. 13-12376-DPW, 2014 WL 7721850, at *7 (D. Mass. Sept. 22, 2014) (emphasis in original), reflects its understanding that state-law tort claims like Plaintiffs' typically can proceed without colliding with CERCLA cleanups.

### D.    Claims Addressing Contamination Outside the Scope of DoD's Response and Removal Actions

The Government may not use Section 113(h) as a shield to block claims for injunctive relief where it denies responsibility to respond to the contamination at issue. The Government claims that the Plaintiffs' requested relief seeks to predetermine the scope of ongoing CERCLA response actions. Global 113(h) Mot. at 27-28. However, it is the Government that has predetermined the scope of contamination that it will address,[45] and under Section 113(h) caselaw, claims addressing contamination outside the scope of planned response actions are not barred. The cleanups at the DoD facilities do not cover the geographic area or address the targeted contaminants demanded by the Plaintiffs' requested relief. Therefore, such claims cannot interfere with or constitute challenges to cleanup actions that are not, in fact, even occurring.

### 1.    Claims addressing locations outside the scope of DoD's response and removal actions are not barred

---

[44] Plaintiffs' state-law tort claims are proceeding in federal court. Federal jurisdiction cannot be premised on the diversity jurisdiction statute because the Government's party status destroys complete diversity. *See Martin Sales & Processing, Inc. v. W. Va. Dep't of Energy*, 815 F. Supp. 940, 944 (S.D. W. Va. 1993) ("The United States and its agencies generally are not citizens of any state for jurisdictional purposes.") (citing, among other cases, *Texas v. Interstate Commerce Comm'n*, 258 U.S. 158, 160 (1922))).

[45] As an example, in the discussion of Cannon AFB in the Government's Motion, it notes that the Air Force has begun construction of a "full-scale groundwater treatment system at Cannon Air Force Base." Global 113(h) Mot. at 13-14. In effect, the Air Force has selected a remedy prior to its completion of a remedial investigation and feasibility study, which is the step in a CERCLA response where potential remedial actions are evaluated. 40 C.F.R. § 300.430(d)-(e).

Cases interpreting Section 113(h) hold that for a claim to challenge a CERCLA cleanup, the cleanup must occur at the locations addressed by the claim. In *McClellan*, 47 F.3d at 329-31, the Ninth Circuit held that Section 113(h) did not bar challenges to activities at a military facility's active waste disposal sites, where the cleanup only addressed inactive waste disposal sites. District courts have applied this precedent to curtail the reach of Section 113(h). One court, citing *McClellan*, denied a defendant's Section 113(h) motion to dismiss because it found the record insufficient to determine whether the plaintiff's actions would interfere with cleanup activities given a potential lack of geographic overlap between the areas targeted by plaintiff's claims and the EPA's cleanup. *Nat. Res. Def. Council, Inc. v. NVF Co.,* No. CIV. A. 97-496-SLR, 1998 WL 372299, at *14 (D. Del. June 25, 1998). Another court similarly interpreted *McClellan* to limit the reach of the Section 113(h) bar based on the geographic scope of the cleanup underway at the targeted site. *See Diamond X Ranch, LLC v. Atl. Richfield Co*., 51 F. Supp. 3d 1015, 1021 (D. Nev. 2014) (recognizing that "where certain sites on the Air Force base were clearly outside the scope of the CERCLA cleanup," the court in *McClellan* allowed plaintiffs to bring claims regarding activities at those sites). Rather, there must be a conclusive showing that jurisdiction is barred because DoD "is in fact actively engaged in removal or remedial work at" the locations in question. *Talarico Bros. Building Corp. v. Union Carbide Corp*., 73 F.4th 126, 136 (2d Cir. 2023).

Numerous Plaintiffs have claims for injunctive relief that are applicable outside the physical scope of DoD's response and are thus not barred by Section 113(h), as detailed below. At the very least, there are factual disagreements between the parties regarding the scope of DoD's response actions, and at present, the record is insufficient to determine whether and to what extend Plaintiffs' claims challenge response actions that are actually taking place or will take place, precluding dismissal at this time. *Nat. Res. Def. Council*, 1998 WL 372299 at *14.

- ***City of Newburgh v. United States, et al.*, No. 2:18-cv-03358-RMG:** Newburgh's Second Amended Complaint complains of PFAS released at the Stewart ANGB into surface waters, resulting in the contamination of downstream "City Property," including Washington Lake, its former drinking water supply. *See* SAC ¶¶ 1-3, 146-151, 407. Newburgh requests injunctive relief requiring the Government "to investigate . . . remove and remediate the Contamination of the groundwater, surface water, soil and sediments of . . . Washington Lake, Silver Stream, and other related water bodies in the City Watershed." SAC, Prayer for Relief ¶1(e). To date, while there has been investigation and limited off-base groundwater sampling, and DoD acknowledges that Washington Lake is the "receptor" of contamination, Gov't Ex. 4 (Dkt. No. 4550-4 at ES-3), it does not plan to remediate Washington Lake or other portions of the City Watershed like the Recreation Pond Tributary that feeds Silver Stream which in turn fed Washington Lake. SAC ¶¶138-151. Rather, the Government determined that there was "No need for action" in those locations, so they will not be remediated or studied further. *See Site Inspection Phase Closeout at Stewart Air National Guard Base, New York*, **Ex. 8**, at 3. Thus, the "Site" that DoD is conducting a remedial investigation and feasibility study ("RI/FS") for is only "Stewart Air National Guard Base." *See also* Excerpts from *Relative Risk Site Evaluation*, *Stewart Air National Guard Base, New York*, **Ex. 9**, at 3 (map showing only the Base). The Government is not conducting a Remedial Investigation or Feasibility Study for Washington Lake or any other portion of the City Property, or the City Watershed downstream from Stewart ANGB, so Section 113(h) is not applicable to bar Newburgh's claims.

The City Property is a separate CERCLA "facility" (defined at 42 U.S.C. § 9601(9)(B)) from the Base. Where contamination migrates from one site onto a second, the second site does not automatically become part of the first site, particularly where there is no common historical

ownership. *See Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir.1999); *Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 480 F. Supp. 3d 430, 442 (E.D.N.Y. 2020); *Alprof Realty LLC v. Corp. of the Pres. Bishop of Church of Jesus Christ of Latter-Day Saints*, No. 09-CV-5190 CBA RER, 2012 WL 4049800 at *8 (E.D.N.Y. Sept. 13, 2012) ("The cases cited ... do not establish that a CERCLA facility must always be defined to include the entire area of contamination, and they particularly do not stand for the proposition that an unrelated neighboring property onto which contamination spreads becomes part of the CERCLA *facility*."). Also, New York Stewart International Airport is a separate facility that DoD is not addressing, but Newburgh complains that it is also polluting the City Property with PFAS. SAC ¶¶ 1-3, 399, 407.

Further, "a defendant operates a 'facility' only if it has authority to control the area where the hazardous substances were located." *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 843 (4th Cir. 1992). DoD has authority to take actions on the Base, but it has not demonstrated it has received authority for response actions on the City Property. *See* Global 113(h) Mot. (DERP authorizes the Secretary of Defense to carry out response actions on facilities "owned by, leased to, or otherwise possessed by the United States and under the jurisdiction of the secretary [of defense]." 10 U.S.C. § 2701(a)(1)).

Finally, while Newburgh has specifically alleged unpermitted PFOS emissions from Outfalls A, 2, 3, 17K and 10, SAC ¶ 277, which along with other Outfalls are regulated by the SPDES Permit, the *Stewart Site Inspection Report* only calls for the Remedial Investigation and Feasibility Study to cover Outfalls 2 and 3, but no action at Outfalls A, 17K and 10, or any other Outfalls. Thus, these Outfalls are clearly outside the scope of the Remedial Investigation and Feasibility Study and the CERCLA § 113(h) jurisdictional bar. *See McClellan*, 47 F.3d at 331. Therefore, the City's Clean Water Act citizen suit claims should proceed. *Natural Resources*

*Defense Council,* 1998 WL 372299 at *14 (record insufficient to determine whether citizen suit enforcement of permit would interfere with any proposed cleanup); *see also Giovanni*, 906 F.3d at 110 (claim for medical monitoring fund not challenge to removal or remedial action barred by CERCLA § 113(h)). It is also notable that, even for response actions which the DoD **has** committed to, they are not expected to be complete until 2030, despite having initiated such responses a decade and a half prior, in 2015. *See* **Ex. 2** (noting that, based on the Air National Guard's estimates, remedial investigation is projected to conclude in 2026 and remedial design and action is projected to conclude as late as 2030). *See Frey*, 403 F.3d at 835 (7th Cir. 2005) (Section 113(h) does not apply where there is "no clear end in sight"). In short, absent these Plaintiffs' lawsuits and an order from this Court granting the above injunctive relief, the Government will continue to move at a glacial pace in its desultory investigation of its own facility and will do **nothing** to remediate Newburgh's drinking water supplies.

- ***Town of New Windsor v. United States, et al.,* No. 2:21-cv-01496-RMG:** Similar to the case of the City of Newburgh, the Town of New Windsor's Complaint alleges that contaminant releases from Stewart ANGB migrated off-Base into the Recreation Pond, flowed through the watershed (and continues to flow) into Silver Stream, into and past the City's Washington Lake, and finally into the Moodna Creek, whose waters source the Town's new Butterhill Wells groundwater supply well facility and plant. The Butterhill Wells plant, which is solely owned by the Town, had a rated supply capacity of 6.45 million gallons per day until contamination from the Base required it to be taken off-line, and it now operates at less than half its capacity following treatment by a temporary granular activated carbon ("GAC") treatment unit. The Town needs a permanent GAC treatment facility, and it has had to buy alternate water supplies because Butterhill Wells can no longer produce the New Windsor Consolidated Water District's

full daily demand, and the Town can no longer meet its contract obligations to supply the Town of Newburgh (not City) with drinking water during months-long periodic shutdowns of the Catskill Aqueduct, from which it customarily buys its drinking water.

New Windsor's complaint seeks injunctive relief ordering the Defendants, including the Government, "to abate the public nuisance…[caused by releases of PFAS] . . ." by "fully remediating and restoring [the Town's] Butterhill Wells and Kroll Well drinking water supplies…," Compl. ¶19, and for an order enjoining the Government to implement "final remedies and treatment of the Town's drinking water supplies to produce a result of drinking water that contains non-detectible limits for all PFAS…." Compl., Prayer for Relief at (1)(d).

As noted in the sections above regarding the City of Newburgh, the Government has conducted very limited off-base sampling of the watershed contaminated by releases of PFAS from the Base, but it has refused to conduct further investigations in the Watershed, including contamination of the Town's Butterhill Wells property and water supply. As with Newburgh, the Government plans no remediation of the Town of New Windsor's water supplies. Likewise, the glacial pace of the Air National Guard's response activities at Stewart ANGB makes *Frey* equally applicable to New Windsor's case. *See* **Ex. 2** (noting that, based on the Air National Guard's estimates, remedial investigation is projected to conclude in 2026 and remedial design and action is projected to conclude as late as 2030). *See Frey*, 403 F.3d at 835 (7th Cir. 2005) (Section 113(h) does not apply where there is "no clear end in sight").

- ***County of Suffolk v. United States of America*, No. 2:19-cv-00906-SJF-AKT**: Suffolk's Complaint includes claims that the Government's use of AFFF at the Air National Guard Base located on the Francis S. Gabreski Airport in Westhampton, New York, led to contamination on the County's property and surrounding areas, including navigable waters. The County has

undertaken several studies and sampling efforts in areas surrounding the Airport, including Quantuck Creek, which have led to consumption advisories in July 2019 due to PFAS contamination.  Since then, the County engaged in sampling efforts at the Connetquot River, Beaverdam Creek, Tiana Bay, Great South Bay and Moriches Bay, all locations downgradient to the Airport at its own expense.  Thus far, the Government has not participated in these efforts and has given no indication of any plans to study or remediate these surrounding areas, notwithstanding the Air National Guard's specific acknowledgment that "a release of PFCs from the [Airport] has occurred and is a contributor of PFC contamination to Suffolk County drinking water production wells."

• **_New Mexico v. United States_**, No. **2:20-cv-02115-RMG:** New Mexico's Complaint includes a request for injunctive relief requiring "abatement of the conditions creating an imminent and substantial endangerment." Am. Compl., Prayer for Relief at (b). While it is true that the Air Force has conducted a Site Investigation on-base and an expanded off-site investigation at one facility at issue in the Complaint (Cannon AFB), the Government fails to acknowledge that the Air Force has already closed out several sites at Cannon AFB (using a screening level which is inadequate under the NMHWA, the basis for New Mexico's suit, _see_ Site Specific Opposition at 17-18). Indeed, the Site Investigation Report for Cannon AFB states that there is "No Further Remedial Action Planned" for four sites at Cannon AFB. Excerpts from _Final Site Investigation Report Cannon Air Force Base, NM_, **Ex. 10**, at AF09-00001136 to 1138. An additional eleven sites were closed out at the Preliminary Assessment stage. Excerpts from _Final Preliminary Assessment Report for Perfluorinated Compounds at Cannon AFB, NM_, **Ex. 11**, at FF_AF15-00072273 to 72276 ("Close-out with no additional investigation"). Thus, any responses which the Air Force was conducting at those locations is over, and Section 113(h) no longer applies at those locations.

However, because the screening values used in the Site Investigation are inadequate under the NMHWA, New Mexico's claims have not been redressed.

At the other facility at issue in New Mexico's Complaint, Holloman AFB, "The Air Force has decided to perform no off-bases sampling for PFOS/PFOSA at this time . . .". *Final Site Inspection Addendum, Holloman Air Force Base, NM*, **Ex. 12**, at 1 (cover letter) ("Holloman SI Addendum"). Further, while the Government states in its brief that the Air Force is currently conducting a remedial investigation and feasibility study, Global 113(h) Mot. at 15, the Air Force has merely stated that such an investigation and study is planned. Holloman SI Addendum. *See Frey v. EPA*, 403 F.3d 828, 835 (7th Cir. 2005) (the government "cannot preclude review [through Section 113(h)] by simply pointing to ongoing testing and investigation, with no clear end in sight"). Notably, there is no work plan for such an investigation and/or study available in the administrative record for Holloman AFB; the most recent entry relating to PFAS in the administrative record is dated 2022.

- ***Lakewood Water District v. United States*, No. 2:20-cv-02899-RMG**: Lakewood Water District's Complaint includes a request for injunctive relief requiring the Government "to immediately abate, contain, and remediate ongoing use and disposal of all PFAS." Compl., Prayer for Relief at (d)(2), *Lakewood Water District v. United States*, No. 2:20-cv-02899-RMG. At JBLM, the base at issue in the complaint, sampling off-base occurred during the Preliminary Assessment/Site Investigation phase. However, the Army, which is conducting the cleanup at JBLM, has not committed to off-site response action. Further, as at Cannon AFB, the Army has already closed out several sites at JBLM using a screening level which is inadequate under the Model Toxics Control Act, Wash. Rev. Code 70A.305, *et seq.* (Washington's CERCLA analogue) and Washington's SAL for PFAS, *see supra* at 35-36. Indeed, the Final Preliminary

Assessment/Site Inspection Report for JBLM marks nine Areas of Potential Interest as: "Further Evaluation Not Required." Excerpts from *Final Preliminary Assessment/Site Inspection, Joint Base Lewis-McChord, Pierce County, WA,* **Ex. 13**. Thus, any response which the Army was conducting at those sites has concluded, and Section 113(h) no longer applies at those locations. Further, because the screening values used in the Preliminary Assessment and Site Investigation are inadequate under Washington state law, Lakewood Water District's claims have not been redressed.

### 2.    Claims addressing chemicals outside the scope of DoD's response and removal actions are not barred

Similarly, the Government cannot use Section 113(h) to block Plaintiffs' claims for injunctive relief applicable to chemicals which the Government has stated it has no current plans to address. *See McClellan,* 47 F.3d at 329-31. The Government's response is limited to two specific PFAS, namely PFOS and PFOA. Long Decl. ¶ 20 (The DoD is taking response actions "at every facility with suspected releases of PFOS and PFOA."); Global 113(h) Mot. at 10-13. The Government fails to explain why PFOS and PFOA are the only two PFAS which constitute "pollutants or contaminants" that may pose an imminent and substantial endangerment.

The Government's focus on PFOS and PFOA is inconsistent with the expanding set of federal regulations targeting PFAS compounds. The United States implies that it is utilizing EPA's superseded 2016 Lifetime Health Advisory. Global 113(h) Mot. at 12 n.4. But while the 2016 lifetime health advisory was limited to PFOS and PFOA, EPA updated the health advisory in 2022, both lowering the advisory level (drastically) for PFOS and PFOA with interim levels and publishing final health advisories for two additional PFAS. 87 Fed. Reg. 36848 (June 21, 2022). Yet the DoD's response actions remain, for unknown reasons, limited to PFOS and PFOA. This fact (as well as the fact that EPA has proposed to list no fewer than nine PFAS as "hazardous

constituents" under RCRA, *see* Listing of Specific PFAS as Hazardous Constituents, 89 Fed. Reg. 8606 (proposed Feb. 8, 2024) (to be codified at 40 C.F.R. pts. 261, 271)) is omitted from the Government's brief. In addition, the Government acknowledges that the EPA has proposed national primary drinking water standards for PFOS and PFOA, and states that when the EPA promulgates final standards, "DoD components will incorporate those standards into the CERCLA process." Global 113(h) Mot. at 12, n.4. However, the Government again fails to acknowledge relevant standards—the proposed drinking water standards for four other PFAS announced by the EPA at the same time, standards which have now been finalized. *See supra* at 5 n.5. DoD's narrow response scope fails to address the spectrum of PFAS compounds recognized by federal law as hazardous to human health.

DoD's piecemeal approach suggests that it plans to rely on the long timeline of CERCLA response actions to delay finalization of cleanup plans until the end of the investigative and planning process. Such a laissez-faire approach abuses the statutory design. *See Frey*, 403 F.3d at 835 (the government "cannot preclude review [through Section 113(h)] by simply pointing to ongoing testing and investigation, with no clear end in sight"). By failing to conduct comprehensive investigation into additional PFAS, DoD is failing to gather information necessary to inform its response actions. If the DoD does not compile the necessary data during the initial investigative phases, the DoD will inevitably need additional time to sample and gather data to determine how to remediate contamination from those additional PFAS, or may fail to remediate them at all. In the meantime, impacted parties like Plaintiffs herein are left uncertain as to whether and when the DoD will remediate contaminated water. If the DoD will not conduct comprehensive investigations, the Government should not receive any protection under Section 113(h) from claims for injunctive relief targeting those contaminants.

In reply, the Government may argue that any response action to remediate PFOA or PFOS will address other PFAS compounds as well. However, PFAS compounds are not interchangeable. A response action designed through the comprehensive CERCLA process to remediate PFOA and PFOS may not be equally effective against other compounds. A popular option for filtering PFAS in water, granular activated carbon, provides an illustrative example. As EPA recognizes, "GAC works well on longer-chain PFAS like PFOA and PFOS, but shorter chain PFAS like [PFBS] and perfluorobutyrate ("PFBA") do not adsorb as well." EPA, Reducing PFAS in Drinking Water with Treatment Technologies (Aug. 23, 2018), https://www.epa.gov/sciencematters/reducing-pfas-drinking-water-treatment-technologies. Therefore, Plaintiffs should be able to advance claims seeking relief from contaminants that have not and will not be remediated by the CERCLA response actions discussed in the Government's Motion.

Regardless, Plaintiffs' claims almost universally request injunctive relief to address PFAS contaminants beyond PFOS and PFOA.[46] *See* Global 113(h) Mot. at A-1 to A-8. Because the

---

[46] *E.g., City of Newburgh v. United States, et al.*, No. 2:18-cv-03358-RMG, SAC ¶ 361 (requesting injunctive relief requiring the Government to investigate and remediate "**all PFAS**") (emphasis added); *Lakewood Water District v. United States*, No. 2:20-cv-02899-RMG, Compl., Prayer for Relief (requesting injunctive relief "[r]estraining Federal Defendants from the use or storage of AFFF containing **any form of PFAS** . . . [and] immediately abate, contain, and remediate ongoing use and disposal or **all PFAS, including, but not limited to, PFOS and PFOA**") (emphasis added); *Town of New Windsor v. United States*, No. 2:21-cv-14496-RMG, Compl., Prayer for Relief (requesting injunctive relief requiring that "final remedies and treatment of the Town's drinking water supplies produce a result of drinking water that contains non-detectible limits **for all PFAS**) (emphasis added); *New Mexico v. United States*, No. 2:20-cv-02115-RMG, Am. Compl., Prayer for Relief (requesting injunctive relief "requiring abatement of the conditions creating an imminent and substantial endangerment), *see also id.* at ¶ 138 and 143 (alleging an imminent and substantial endangerment "[a]s a result of **the releases of PFAS** and other hazardous wastes") (emphasis added); *County of Suffolk v. United States of America*, No. 2:19-cv-00906-SJF-AKT, Compl. ¶¶ 83, 87, 114-115, 119, 147-151 (seeking redress based on the PFAS contamination in the affected areas contributed by the Air National Guard); *Elsinore v. 3M Co. et al.*, No. 2:21-cv-03699-RMG (D.S.C. July 19, 2023), Am. Compl. ¶ 2 (seeking "abatement of the ongoing nuisance that [PFAS] constitute in the environment" and defining "PFAS" to include not only PFOA and PFOS, but also PFBS).

Government's cleanup is arbitrarily limited to PFOS and PFOA, Section 113(h) does not bar these claims.

### III.     ABSENT GLOBAL JURISDICTIONAL DISCOVERY, DISMISSAL OF PLAINTIFFS' CLAIMS WOULD BE UNJUST

As the limited jurisdictional discovery ordered by this Court has proven, the equities and applicability of Section 113(h) is not a matter of pure law, but instead turns on the facts of each case. *See* Site-Specific Opposition. Without site-specific jurisdictional discovery, it is unknowable which of Plaintiffs' claims, like New Mexico's, may fall into recognized exceptions to Section 113(h). *E.g., Colorado*, 990 F.2d 1565; *McClellan*, 47 F.3d 325; *Frey*, 403 F.3d 828.

The caselaw does not support the Government's suggestion that discovery is severely constrained in the context of Section 113(h) motions to dismiss. Assuming Section 113(h) creates a threshold jurisdictional question, discovery on Section 113(h) may be limited, but cases establish that discovery is available and necessary. If prior discovery has not provided a factual record that establishes the extent of the cleanup plans at issue in the motion, the Government has presented no arguments that should prevent Plaintiffs from seeking such a factual record.

Decisions on Section 113(h) motions to dismiss recognize that discovery is necessary to inform dispute resolution. If the record is insufficient to evaluate the facts of a CERCLA cleanup, a court may deny a motion to dismiss. A Delaware federal district court denied a defendant's motion to dismiss on the grounds of lack of jurisdiction under Section 113(h) because it found the record insufficient to determine whether the plaintiff's actions would interfere with cleanup response given a potential lack of geographic overlap between the areas targeted by plaintiff's claims and EPA's cleanup. *Nat. Res. Def. Council*, 1998 WL 372299 at *14. In support of its

decision, the court provided a helpful overview of the type of record that must exist in order to

resolve a factual dispute on a Rule 12(b)(1) motion:

> Once jurisdiction is challenged, the party asserting subject matter jurisdiction has
> the burden of proving its existence. . . . Under Rule 12(b)(1), the court's jurisdiction
> may be challenged either facially (the legal sufficiency of the claim) or factually
> (sufficiency of jurisdictional fact). . . . Under a facial challenge to jurisdiction, the
> court must accept as true the allegations contained in the complaint. . . . Dismissal
> for a facial challenge to jurisdiction is proper only when the claim clearly appears
> to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is
> wholly insubstantial and frivolous. Under a factual attack, however, the court is not
> confined to allegations in the complaint, but can consider affidavits, depositions,
> and testimony to resolve factual issues bearing on jurisdiction… . . . Although the
> court should determine subject matter jurisdiction first, the truth of jurisdictional
> allegations need not always be determined with finality at the threshold of litigation.
> . . . At the outset of the case, a party establishes jurisdiction by means of a
> nonfrivolous assertion of jurisdictional elements, ... and any litigation of a contested
> subject-matter jurisdictional fact issue occurs in comparatively summary procedure
> before a judge alone (as distinct from litigation of the same fact issue as an element
> of the cause of action, if the claim survives the jurisdictional objection).

*Id.* at *7-8 (cleaned up, internal citations and quotations omitted).

Where there is a factual challenge to a plaintiff's assertion of subject matter jurisdiction, a

motion to dismiss should be denied to allow for discovery. *See In re Gold King Mine Release in*

*San Juan Cty., Colorado, on Aug. 5, 2015*, No. 1:18-MD-02824-WJ, 2019 WL 999016, at *8

(D.N.M. Feb. 28, 2019); *see also Cannon*, 538 F.3d at 1332 (deciding issues related to Section

113(h) at the summary judgment stage of the litigation). In *Gold King*, the plaintiffs filed a

declaration that EPA was not performing remedial and removal actions at the contaminated site,

which directly conflicted with the defendants' assertions. *Gold King*, 2019 WL 999016 at *7. In

light of the factual dispute, the court held that the defendants could file a motion for summary

judgment only after jurisdictional discovery was conducted. *Id.* at *8. The same is true here.

Furthermore, discovery is necessary to determine which plaintiffs may have claims under 42

U.S.C. § 9659 (CERCLA citizen suits). 42 U.S.C. § 9613(h)(4) (excepting from Section 113(h) a CERCLA citizen suit alleging that the cleanup is in violation of any requirement of CERCLA).

## **CONCLUSION**

For the reasons set forth above, the Government's Motion to Dismiss should be denied. Section 113(h) does not even apply to the cleanups at issue, because they are not performed under the authority of Section 104. Moreover, Plaintiffs' claims do not constitute "challenge[s]" to such cleanups as that term is used in Section 113(h).

Dated: April 16, 2024                     Respectfully submitted,

                                          */s/ Paul J. Napoli*
                                          Paul J. Napoli, Esq.
                                          Napoli Shkolnik
                                          1302 Avenida Ponce de León
                                          Santurce, Puerto Rico 00907
                                          P: (833) 271-4502
                                          F: (646) 843-7603
                                          pnapoli@nsprlaw.com

                                          Michael A London
                                          Douglas and London PC
                                          59 Maiden Lane
                                          6th Floor
                                          New York, NY 10038
                                          P: (212)-566-7500
                                          F: (212)-566-7501
                                          mlondon@douglasandlondon.com

                                          Scott Summy
                                          Baron & Budd, P.C.
                                          3102 Oak Lawn Avenue
                                          Suite 1100
                                          Dallas, TX 75219
                                          P: (214)-521-3605
                                          ssummy@baronbudd.com

Joseph F. Rice
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
P: (843) 216-9000
jrice@motleyrice.com

*Co-lead Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was electronically filed with this Court's CM/ECF on this 16th day of April, 2024, and was thus served electronically upon counsel of record.

Dated: April 16, 2024                                    */s/ Andrew Croner*