IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) MDL No. 2:18-mn-2873-RMG ) ) **ORDER AND OPINION** ) ) **This Order Relates to:** ) **2:23-cv-3147-RMG** ) **2:23-cv-3230-RMG** |

Before the Court are Class Counsel's motions for attorneys' fees and costs in *City of Camden, et al. v. E.I. DuPont de Nemours and Co. (n/k/a EIDP, Inc), et al.*, 2-23-cv-3230-RMG and *City of Camden, et al. v. 3M Company*, 2:23-cv-3147-RMG. (Dkt. Nos. 3795, 4269). Both motions are unopposed. For the reasons set forth below, the motions are granted.

**I.    Background**

On December 7, 2018, the Judicial Panel on Multidistrict Litigation (the "JPML") centralized in this Court approximately 90 civil actions from eight judicial districts involving claims that aqueous film-forming foams ("AFFF") had contaminated local ground water and drinking water supplies in numerous communities across the United States. In its transfer order, the JPML noted:

> These actions thus share factual questions concerning *the toxicity of PFOA and PFOS and their effects on human health; the chemical properties of these substances and their propensity to migrate in groundwater supplies; the knowledge of the AFFF manufacturers regarding the dangers of PFOA and PFOS; their warnings, if any, regarding proper use and storage of AFFFs; and to what extent, if any, defendants conspired or cooperated to conceal the dangers of PFOA and PFOS in their products.*

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1394 (JPML 2018).

Following the creation of this multidistrict litigation ("MDL"), and pursuant to Case Management Orders 2 and 3, the Court appointed Plaintiffs' Co-Lead Counsel, the initial slate of Plaintiffs' Executive Committee ("PEC") members, and Advisory Counsel to the PEC. (Dkt. No. 4080-1 at 15). Over the next four-and-a-half years, Plaintiffs in this MDL, led by Plaintiffs' Co-Lead Counsel and the PEC, conducted approximately "414,000 hours of work . . . includ[ing], *inter alia*, MDL oversight and administration, bellwether efforts, general liability efforts, significant legal briefing efforts including successfully overcoming the government contractor defense, service of nine (9) general expert reports and twelve (12) case-specific expert reports, and one (1) expert report with a general sub-part and three (3) case-specific sub-parts, as well as multiple supplemental reports." (*Id.* at 16-17) (describing additional discovery undertaken).

On July 12, 2023, on behalf of themselves and all other similarly situated Public Water Systems ("PWS"), Plaintiffs the City of Camden, City of Brockton, City of Sioux Falls, California Water Service Company, City of Del Ray Beach, Coraopolis Water & Sewer Authority, Township of Verona, Dutchess County Water & Wastewater Authority and Dalton Farms Water System, City of South Shore, City of Freeport, Martinsburg Municipal Authority, Seaman Cottages, Village of Bridgeport, City of Benwood, Niagara County, City of Pineville, and City of Iuka (collectively "Plaintiffs") filed a class action complaint against 3M Company ("3M") claiming one or more of the following types of damages: (1) the costs of testing and monitoring of the ongoing contamination of their Drinking Water wells and supplies; (2) the costs of designing, constructing, installing and maintaining a filtration system to remove or reduce levels of PFAS detected in Drinking Water; (3) the costs of operating that filtration system; and (4) the costs of complying with any applicable regulations requiring additional measures. (*City of Camden, et al. v. 3M Co.*,

C.A. No. 2:23-cv-3147-RMG, Dkt. No. 2) (the "3M Action"). The Parties intended that the complaint be used as the mechanism for a class-wide settlement and the complaint identifies each Class Representative, defines the Settlement Class, and states the claims intended to become Released Claims and concluded by the Final Judgment. *See* (Dkt. No. 4273-1 at 17).

On July 12, 2023, on behalf of themselves and all other similarly situated PWS, Plaintiffs filed a separate class action complaint against The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., and E.I. DuPont de Nemours and Company n/k/a EIDP, Inc. (collectively "DuPont") claiming one or more of the following types of damages: (1) the costs of testing and monitoring of the ongoing contamination of their Drinking Water wells and supplies; (2) the costs of designing, constructing, installing and maintaining a filtration system to remove or reduce levels of PFAS detected in Drinking Water; (3) the costs of operating that filtration system; and (4) the costs of complying with any applicable regulations requiring additional measures. (*City of Camden, et al. v. E.I. DuPont de Nemours and Company (n/k/a EIDP, Inc.), et al.*, C.A. No. 2:23-cv-03230-RMG, Dkt. No. 7) (the "DuPont Action"). Plaintiffs and DuPont intended that the complaint be used as the mechanism for a class-wide settlement and the complaint identifies each Class Representative, defines the Settlement Class, and states the claims intended to become Released Claims and concluded by the Final Judgment. *See* (Dkt. No. 4080-1 at 19).

On October 15, 2023, Class Counsel moved for attorneys' fees and costs in the DuPont Action. (Dkt. No. 3795). No party opposes the motion.

On December 18, 2023, Class Counsel moved for attorneys' fees and costs in the 3M Action. (Dkt. No. 4269). No party opposes the motion.

On February 8, 2024, the Court approved Plaintiffs' settlement with DuPont. Order and Opinion, (C.A. No. 2:23-cv-3230-RMG, Dkt. No. 175). Under the Settlement Agreement with DuPont, DuPont agreed to pay or cause to be paid $1.185 billion. (*Id.* at 4).

On March 29, 2024, the Court approved Plaintiffs' settlement with 3M. Order and Opinion, (C.A. 2:23-cv-3147-RMG, Dkt. No. 228). Under the Settlement Agreement with 3M, 3M agreed to pay or cause to be paid between $10.5 and $12.5 billion. *See* (*id.* at 8) (explaining the Settlement Agreement's Phase Two Cap and Floor).

Class Counsel's motions for attorneys' fees and costs are fully briefed and ripe for disposition.

## II.     Legal Standard

For well over a century, the United States Supreme Court has recognized the "common fund" exception to the general rule that a litigant bears his or her own attorney's fees. *Trustees v. Greenough*, 105 U.S. 527 (1882). The rationale for the common fund principle was explained in *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980), "that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole." In *Blum v. Stevenson*, the Supreme Court expressed its preference for determining reasonable fees as a percentage of the fund under the common fund doctrine. 465 U.S. 886, 900, n.16 (1984).

Within this Circuit, the percentage of the fund approach is not only permitted, but is the preferred approach to determining attorneys' fees. *See Goldenberg v. Marriott PLP Corp.*, 33 F. Supp. 2d 434, 438 (D. Md. 1998) (noting endorsement of percentage-of-recovery method by several courts in the Fourth Circuit); *In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 786–87 (E.D. Va. 2001); *Strang v. JHM Mortgage Sec. Ltd. Partnership*, 890 F. Supp. 499, 503 (E.D. Va. 1995)

4

("the percentage method is more efficient and less burdensome that the traditional lodestar method, and offers a more reasonable measure of compensation for common fund cases"); *Jones v. Dominion Res. Servs.*, 601 F. Supp. 2d 756, 760 (S.D.W. Va. 2009).

The common fund method is particularly appropriate where, as here, the settlement confers a substantial benefit on members of a class. *Boeing Co.,* 444 U.S. at 479. *See also Teague v. Bakker*, 213 F. Supp. 2d 571, 584 (W.D.N.C. 2002) ("an award of attorneys' fees from a common fund depends on whether the attorneys' specific services benefitted the fund—whether they tended to create, increase, protect or preserve the fund").

Accordingly, this Court determines the reasonableness of the requested fee using the percentage of the fund approach.

Under Local Civil Rule 54.02(A) D.S.C., "[a]ny petition for attorney's fees shall comply with the requirements set out in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978)," which specifies the following factors for analysis:

> (1) The time and labor expended;
> (2) The novelty and difficulty of the questions raised;
> (3) The skill required to properly perform the legal services rendered;
> (4) The attorney's opportunity costs in pressing the instant litigation;
> (5) The customary fee for like work;
> (6) The attorney's expectations at the outset of the litigation;
> (7) The time limitations imposed by the client or circumstances;
> (8) The amount in controversy and the results obtained;
> (9) The experience, reputation and ability of the attorney;
> (10) The undesirability of the case within the legal community in which the suit arose;
> (11) The nature and length of the professional relationship between attorney and client; and
> (12) Attorneys' fees awards in similar cases.

*Barber*, 577 F.2d at 226, n.28.

### III.     Discussion

Because they are intertwined, the Court analyzes Class Counsel's motions for attorneys' fees in the 3M and DuPont Actions jointly. In their motions, Class Counsel recount how the PEC undertook extensive, coordinated discovery to advance the claims consolidated in this MDL. Class Counsel explain, *inter alia*, the vigorous motion practice the PEC mounted to oppose the Defense Coordinating Committee's motion for summary judgment on the government contractor defense and the discovery and robust motion practice the PEC conducted to prepare the *City of Stuart, Fla. v. 3M Co., et al.*, C.A. No. 18-cv-3847-RMG for trial as the first PWS bellwether. *See, e.g.*, (Dkt. No. 3795-1 at 22-66).

Pertinent here, Class Counsel explain the common benefit work undertaken by the PEC. Class Counsel point out the interconnected relationship of the discovery obtained by Plaintiffs in this MDL as between all Defendants:

> For proper context, it is imperative to underscore that the liability efforts with respect to each Defendant helped make the liability case as against the other Defendants. There is such inextricable interplay between each Defendant's liability that it would be impossible to parse specific efforts that relate only to one Defendant and played no role in the larger overall liability picture. In fact, documents and other evidence produced by one Defendant often helped buttress the liability case as against another Defendant.
>
> For example, in one email correspondence between DuPont witness Dr. Stephen Korzeniowski and his DuPont colleague, Charles K. Taylor, they discussed their perspective that 3M's market withdrawal from C8-chemistries was not voluntary, but rather, "staged." This correspondence between Dr. Korzeniowski and Mr. Taylor provided a liability theme that the PEC fully discovered and prosecuted; that is, that 3M's withdrawal from the C8-chemistry market was not as voluntary as 3M suggested. This allowed Plaintiffs to undercut 3M's argument that it had acted as an exemplary environmental steward in phasing out C8 chemistries. Similarly, congressional testimony from DuPont witness, Daryl Roberts, solidified the PEC's general understanding that "the vast majority of PFAS contamination in the United States is caused by the discharge of firefighting foams containing PFOS." Testimony from 3M's long-time chief toxicologist, John Butenhoff, Ph.D., helped shore up the liability case against DuPont by making clear that 3M always shared its historic toxicology data regarding PFOS and PFOA with DuPont.

> . . .
>
> Liability with respect to AFFF concentrate manufacturers, like Kidde, National Foam, Tyco/Chemguard and Buckeye, was also clearly intertwined with the liability of fluorosurfactant suppliers, such as DuPont, Dynax, Chemguard, and BASF as successor-in-interest to Ciba-Geigy, among others, who manufactured the C8-based fluorosurfactants that were incorporated into these companies' respective AFFFs. Adding even more layers to this complicated amalgam, the liability of every AFFF fluorosurfactant manufacturer who purchased PFOA precursor intermediates from companies such as Daikin, Clariant Corporation, AGC Chemicals and Archroma was likewise inextricably interlinked. In fact, even toll manufacturers' liability was similarly immersed with the Defendants at every other level of the AFFF market channels.
>
> Finally, the AFFF-industry group—the Fire Fighting Foam Coalition ("FFFC")—acted as a collaborative mouthpiece and combined knowledge center for all Telomer-Defendants, which further intertwined the Telomer-Defendants' liability with one another, illustrating how these Defendants' liabilities were not separate and distinct but rather had to be considered collectively. In short, the development of both the science and liability evidence as it pertains to each of the various Defendants cannot reasonably be separated.

(Dkt. No. 4269-1 at 32-34).

With the above in mind, the Court turns to the motions at hand.

In the DuPont Action, Class Counsel ask for a Class Fee of 8% of the Settlement Amount, or $94,800,000.00. Class Counsel ask for $2,136,213.21 in Class Costs. This represents 10% of total costs to date. (Dkt. No. 3795-1 at 13) (defining the Class Fee as the "legal work performed for the common benefit of all litigants" and Class Costs as those costs and expenses incurred by the PEC and Class Counsel for the benefit of all litigants). Class Counsel state the Class Fee will "be allocated to those whose work was performed for the common benefit of all litigants from October 1, 2018 up through to August 22, 2023." (*Id.* at 16). Class Counsel state that Class Costs "will be allocated to reimburse counsel whose expenses and costs were incurred for the common benefit of the ligation through to August 22, 2023." (*Id.*). Class Counsel seek reimbursement of 10% of Class Costs from the DuPont Settlement Agreement because 10% "represents DuPont's

7

approximate proportionate contribution of one-tenth [] [of] the combined [3M and DuPont] settlement proceeds." (*Id.* at 17). Class Counsel request "that the Class Fee be treated like a common benefit assessment, such that for represented Plaintiffs, it shall be deducted from the total amount of counsel fees payable under individual Plaintiffs' counsel's retainer agreements. . . . In other words, for class settlements, the 8% Class Fee will be credited against any individual counsel's retainer fee such that any private contract will be reduced by 8%. For example, a class member who has hired a private lawyer at a 25% contingency agreement will have its contingency agreement reduced to 1[7]% because the Class Fee will have already come off the top." (*Id.* at 18-19). Five percent of the Class Fee will be held back so that "fees incurred in the post-settlement administration are compensated." (*Id.* 21). Class Counsel propose that "claims for legal fees incurred by Class Counsel in the ongoing administration of the settlement . . . be made by Class Counsel one time per year with the first request due November 7, 2024 and then all future requests for attorney fees (for settlement administration) due on the first Thursday of November for each year thereafter through 2030." (*Id.* at 21-22).

No party objected to Class Counsel's motion for attorneys' fees and costs in the DuPont Action.

In the 3M Action, Class Counsel ask for a Class Fee of 8% of the Settlement Amount, or $840,000,000.00. (Dkt. No. 4269-1) (noting the Class Fee is sought "using only the 'guaranteed' floor of $10.5 billion"). Class Counsel ask for $19,251,347.54 in Class Costs. This represents 90% of costs to date. (*Id.* at 16-17) (defining the Class Fee as the "legal work performed for the common benefit of all litigants" and Class Costs as those costs and expenses incurred by the PEC and Class Counsel for the benefit of all litigants). Class Counsel state the Class Fee will "be allocated to those whose work was performed for the common benefit of all litigants from October 1, 2018 up

8

through to August 22, 2023." (*Id.* at 16). Class Counsel state that Class Costs "will be allocated to reimburse counsel whose expense and costs were incurred for the common benefit of the ligation through to August 22, 2023." (*Id.*). Class Counsel seek reimbursement of 90% of Class Costs from the 3M Settlement Agreement because 90% "represents 3M's approximate proportionate contribution of nine-tenths [] [of] the combined [Dupont and 3M] settlement proceeds." (*Id.* at 17). Class Counsel request "that the Class Fee be treated like a common benefit assessment. Thus, the contingency fee set forth in represented Plaintiffs' individual contingency fee arrangements will be reduced to account for the Class Fee of 8%." (*Id.* at 21).

Class Counsel articulate a payment schedule for their 8% award derived from the Phase One Funds and Phase Two Funds under the 3M Settlement Agreement. (*Id.* at 18-19).[1] As to the Phase One Class Fee, Class Counsel will be awarded 8% from the Phase One Funds with fees to be taken on July 1, 2024 and July 1, 2025, with a holdback of 5% for future settlement administration. (*Id.* at 18). For the Phase Two Class Fee, Class Counsel will be awarded 8% of the floor of Phase Two Funds with fees to be taken on July 1, 2027 and July 1, 2028, with a holdback of 5% for future settlement administration. (*Id.* at 18-19) (noting that if Class Members are awarded more than $10.5 billion in the 3M Settlement, Class Counsel "reserve their right to petition for fees from any Phase Two Funds received in excess of the Phase Two Floor up to the Phase Two Cap"); (*Id.* at 21) ("Nearly 50% of the total attorneys' fee sought are payable over time (2025-2036) such that the attorneys' fees payments continue for much of the lifetime of the

---

[1] A complete discussion of Phase One and Phase Two Class members is found at (C.A. No. 2:23-cv-3147, Dkt. No. 228 at 5-10, 21) and the Court incorporates those sections of its prior order by reference. As explained therein, 55% of the Settlement Amount has been allocated to Phase One Class Members and 45% has been allocated to Phase Two Class Members.

9

settlements and ensure that all counsel remain invested in delivering the best result for their clients and the administration of the settlements.").

No party objected to Class Counsel's motion for attorneys' fees and costs in the 3M Action.

With the above in mind, and after a review of the record and the parties' briefings, and given no party objected to the instant motions, the Court finds that all pertinent *Barber* factors weigh in favor of approving Class Counsel's request for attorneys' fees and costs in both the 3M and DuPont Actions.

1. **The Time and Labor Required**

This factor weights in favor of approving Class Counsel's motions. As noted above, the PEC expended roughly "431,158.0 hours by approximately 40 law firms and 650 timekeepers" to achieve the settlements negotiated in the 3M and DuPont Actions. (Dkt. No. 4269-1 at 69). The hours worked directly led to the results achieved here. This factor thus weighs in Class Counsel's favor.

2. **The Novelty and Difficulty of the Questions Involved, the Requisite Skill to Perform the Legal Service Properly, and the Experience, Reputation, and Ability of the Attorneys**

These three factors also weigh in favor of Class Counsel. The issues involved in this MDL are numerous and difficult, complicated by the large number of defendants sued. Class Counsel's motions highlight the varied and often complex questions raised in this litigation over the past nearly half-decade. *See, e.g.*, (*id.* at 70-72) (noting, *inter alia*, the difficulty of briefing and defeating Defendants' motion for summary judgment on the government contractor defense and, as it related to *Stuart*, the difficulty of proving the city's wells were contaminated by Defendants' products, establishing which companies' products were responsible for the alleged harm, establishing PFAS are toxic to humans and that the same was known or foreseeable to Defendants,

10

and that Defendants' AFFF products were in fact defectively designed). Additionally, only highly qualified counsel could have navigated these issues. Throughout this litigation the Court has praised the quality of lawyering on both sides. As it relates to the work performed by the PEC and at issue in Class Counsel's motions, Class Counsel correctly state that "[b]oth trial preparation and settlement negotiations required a thorough understanding of the scientific, legal, and factual issues, as well as a sophisticated familiarity with how PWS operate and how to compensate them for their PFAS contamination." (Dkt. No. 3795-1 at 71). Class Counsel and the PEC possess such attributes and are some of the most qualified mass tort litigators in America. A different group of lawyers may not have been able to achieve the same result. Accordingly, these factors weigh in favor of the requested fee award.

       3. **The Preclusion of Other Employment by the Attorneys Due to Acceptance of the Case and the "Undesirability" of the Case**

As Class Counsel explain in their briefing, "[m]any members of the firms leading the common benefit efforts on Plaintiffs' behalf, by necessity, had to forgo other cases and potential fees" to organize and prosecute this MDL. (*Id.* at 73-74) (noting that "[a]lmost all Plaintiffs prosecuted this litigation entirely on a contingent fee basis and self-funded the litigation through assessments on the PEC"). Further, given the complexity of this matter, which the Court described above, and the substantial litigation costs incurred without any guarantee of recovery—exceeding $21 million—the Court finds the case "undesirable" under *Barber*. *See Burford v. Cargill, Inc.*, No. 05-283, 2012 WL 5471985, at *5 (W.D. La. Nov. 8, 2012). Thus, these two factors weigh in favor of the fee award requested here.

       4. **The Customary Fee and Whether the Fee is Fixed or Contingent**

As Class Counsel establish in their briefing, relying on the affidavit of Professor Brian T. Fitzpatrick of Vanderbilt University, a review of attorneys' fees awards in billion-dollar class

11

actions reveals that the average and median percentages for attorneys' fee awards are 9.3% and 13.7%, respectively. (*Id.* at 74). Given these ranges, the requested fee of 8% in both the 3M and DuPont Actions is reasonable. Further, the contingent nature of the fee also weighs in favor of awarding the requested relief. *In re LandAmerica 1031 Exch. Servs., Inc. I.R.S. 1031 Tax Deferred Exch. Litig.*, No. 3:09-CV-00054, 2012 WL 5430841, at *5 (D.S.C. Nov. 7, 2012) ("Class Counsel could have lost their entire investment in out-of-pocket expenses. . . . Such 'burdens are relevant circumstances' that support the requested award.") (citing *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1377 (9th Cir.1993)).

### 5. Time Limitations Imposed by the Client or the Circumstances

To the extent relevant here, this factor weighs in favor of granting Class Counsel's motions. As Class Counsel note, despite the COVID pandemic which began at a crucial juncture in this MDL, the PEC continued to prosecute this case vigorously and was ready to try the first bellwether PWS case, *City of Stuart*, within four-and-a-half years. (Dkt. No. 4269-1 at 75-76). Despite the challenging circumstances and breadth of work to be done, the PEC achieved settlements in the 3M and DuPont Actions. Accordingly, this factor weighs in favor of the requested fee.

### 6. The Amount Involved and the Results Obtained, and Awards in Similar Cases

This "most critical factor" weighs in favor of the requested fee. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *see also Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir. 1998). The settlements Class Counsel have obtained are large—in the case of 3M, the settlement amount of $10.5-12.5 billion represents nearly 20% of 3M's current market capitalization. (Dkt. No. 4269-1 at 76). Further, the 3M and DuPont Actions provide timely relief to nearly 26,000 PWS facing PFAS contamination. (*Id.* at 77) (noting the 3M and DuPont "Settlement[s] benefit[] over 100 million Americans); (Dkt. No. 3975-1 at 74). The results obtained—including the Allocation

12

Procedures in both Settlement Agreements—are finely tuned to the present and future needs of Class Members. Relatedly, Class Counsel have established that the fee award they request is on the smaller end as "mean and median percentage-method awards were around 25%" in the Fourth Circuit, far great than the requested 8% fee here. (Dkt. No. 4269-1 at 80-81); (Dkt. No. 3795-5 at 13) (noting that even "in settlements above $1 billion . . . the average and median fee percentage were 13.7% and 9.5%, respectively").

In sum, all relevant *Barber* factors clearly weigh in favor of granting Class Counsel's motions in both the 3M and DuPont actions.

7. **Lodestar Cross-Check**

Under the "lodestar" method, a district court identifies a lodestar figure by multiplying the number of hours expended by class counsel by a reasonable hourly rate. *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008). The court may then adjust the lodestar figure using a "multiplier" derived from a number of factors, including the benefit obtained for the settlement class, the complexity of the case, and the quality of the representation. *See The Kay Company v. Equitable Prod. Co.*, 749 F.Supp.2d 455, 462 (S.D.W. Va. 2010); *see also In re Microstrategy, Inc. Sec. Litig.*, 172 F.Supp.2d 778, 786–87 (E.D. Va. 2001).

The purpose of a lodestar cross-check is to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiplier of the lodestar. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005) ("The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method."); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ( "[T]he lodestar may provide a useful perspective on the reasonableness of a given percentage award."). Importantly,

13

"where the lodestar fee is used 'as a mere cross-check' to the percentage method of determining reasonable attorneys' fees, 'the hours documented by counsel need not be exhaustively scrutinized by the district court.'" *In re Royal Ahold N.V. Sec.*, 461 F.Supp.2d 383, 385 (D. Md. 2006) (quoting *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000)).

A lodestar crosscheck confirms the reasonableness of the fee request. The lodestar calculated here ranges between $312,590,202.50 and $355,706,092.50 based on the 431,158.9 hours worked by the PEC. (Dkt. No. 4269-1 at 85) (applying blended hourly rates of $725-$825). This yields a multiplier range between 2.7 to 3 when considering the combined 8% aggregate from the DuPont and 3M actions. (*Id.*).

### IV. Conclusion

For the foregoing reasons, Class Counsel's motions for attorneys' fees and costs (Dkt. Nos. 3795, 4269) are **GRANTED**.

**AND IT IS SO ORDERED.**

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

April 23, 2024
Charleston, South Carolina

14