

28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
**o.** 843.216.9000  **f.** 843.216.9450

**Fred Thompson III**
*Licensed in South Carolina*
direct: 843.216.9118
fthompson@motleyrice.com

www.motleyrice.com

"I will stand for my client's rights.
I am a trial lawyer."
–Ron Motley (1944–2013)

July 16, 2024

**VIA ECF**
The Honorable Richard Mark Gergel
U.S. District Court for the District of South Carolina
J. Waites Waring Judicial Center
83 Meeting Street
Charleston, South Carolina 29401

Re: *In re AFFF Products Liability Litigation*, MDL No. 2:18-mn-2873-RMG

Dear Judge Gergel:

Pursuant to Case Management Order ("CMO") 26D, the Plaintiffs' Executive Committee ("PEC") submits this letter-brief in support of its Group A and Group B Tier 2 personal injury bellwether selections.[1] Below is a description of each case selection and the PEC's reasons for each such selection.

However, as an initial matter, the PEC respectfully submits that for the many compelling reasons fully explained herein, Group A Tier 2 personal injury bellwether cases should all come from one alleged exposure site, namely Pennsylvania,[2] while Group B Tier 2 personal injury bellwether cases should all come from Colorado. Consolidation under this protocol would substantially ease the burden on the Court, the parties, and especially the U.S. Government while promoting judicial economy.

CMO 26D requires that discovery for all Group A bellwether selections (kidney cancer and testicular cancer) take place concurrently, with both cancers having the same deadlines for fact discovery, expert reports and expert discovery, dispositive motions, *Daubert* motions, and the *extensive* third-party discovery. For Group B, the Order provides that thyroid disease cases have different extended deadlines for expert reports and expert discovery, dispositive motions, *Daubert*

---

[1] Pursuant to CMO 26D, Group A is to consist of three (3) plaintiffs who allege kidney cancer and three (3) plaintiffs who allege testicular while Group B is to consist of two (2) plaintiffs who allege ulcerative colitis and three (3) plaintiffs who allege thyroid disease. Notably, only the Pennsylvania group of plaintiffs has at least three (3) kidney cancer cases while there is only one (1) amongst the Colorado plaintiffs.

[2] With respect to the Pennsylvania plaintiffs, the alleged source of contamination of the implicated water districts includes AFFF use at Naval Air Station Joint Reserve Base Willow Grove and/or Naval Air Warfare Center Warminster. In Colorado, the alleged contamination is as a result of use of AFFF at Peterson Air Force Base and/or Colorado Springs Municipal Airport.

MT. PLEASANT, SC | MORGANTOWN, WV | CHARLESTON, WV | PROVIDENCE, RI | WASHINGTON, DC | CHERRY HILL, NJ
PHILADELPHIA, PA | HARTFORD, CT | NEW ORLEANS, LA | KANSAS CITY, MO | NEW YORK, NY



July 16, 2024
Page 2

motions, and the *extensive* third-party discovery.[3] Limiting discovery efforts to a single geographical location for Group A and subsequently a single geographical location for Group B will reduce by at least half the unnecessary burden of conducting discovery for two geographical locations simultaneously. Selecting cases in Group A, where there are concurrent deadlines for both injuries, from *two* separate locations would unnecessarily double that effort and result in wasteful time, expense, and overall burden placed upon the Court, the litigants, the U.S. Government, and additional third parties.[4]

Proceeding in the fashion proposed by the PEC should lessen the Court's burden of addressing the many substantive and procedural motions the Defense Coordinating Committee ("DCC") would likely file, including *Daubert* (as two sites would require many more expert reports) and summary judgment motions. This, of course, would be in addition to adjudicating a myriad of other likely evidentiary issues generated by the additional site. The parties would also need to take many more third-party depositions, review additional documentary productions, and the government would be required to produce witnesses and documents from not one but two (or more) military sites. This chaotic scenario can be avoided or minimized by selecting all Group A and then all Group B Tier 2 selections from a single site. As it is not possible to select enough kidney cancer cases from Colorado alone, or enough thyroid disease or ulcerative colitis cases from Pennsylvania alone, the PEC's proposal – to select the Group A cases from Pennsylvania and the Group B cases from Colorado – is the only workable approach.

Thus, there exist compelling reasons why all Group A Tier 2 bellwether selections should come from the Pennsylvania group of plaintiffs, the only location where there are enough representative bellwether cases to populate Group A. Similarly, all Group B Tier 2 bellwether selections should come from Colorado also the only location where there are enough cases to populate Group B. Because Group B discovery takes place after Group A discovery, the burden of doing discovery for a second geographical location will be inherently lessened. Staggering the discovery between Group A and Group B (as the parties already agreed in CMO 26D) in this way

---

[3] Ulcerative colitis does not currently have a deadline for expert disclosures.

[4] As discussed more fully herein, should Group A Tier 2 include bellwether selections from both sites at the same time (the mix and match approach preferred by the DCC), it would require discovery from as many as five (5) public water systems, including depositions, large document productions, fate and transport analyses of greater than 60 individual wells, well sampling, and water and soil sampling from surrounding areas. In addition to discovery from the Government, which will include document productions and depositions of former and current Department of Defense ("DoD") witnesses from *two* as opposed to one military site, creating an unnecessary burden given that a fully representative group of both kidney and testicular cancers can be culled from Pennsylvania alone. Such is not true with respect to Colorado. Selecting Group A cases from both Colorado and Pennsylvania would therefore require a virtual doubling of the already daunting task of conducting Group A Tier 2 discovery of even a single site.



July 16, 2024
Page 3

will substantially reduce the burden on the Court, the parties, the Government and the many third-parties from whom discovery will be sought, providing for maximum efficiency.

Should the Court later be inclined to conduct multi-plaintiff trials, this protocol would allow for a multi-plaintiff trial that involves plaintiffs with common factual and legal issues decided using only *one* state's law. Having a uniform choice of law removes one of the DCC's objections to a multi-plaintiff trial and would also make it less burdensome and complex for the Court to instruct a jury. On the contrary, utilizing the mix and match approach proposed by the DCC, where plaintiffs would be selected from *both* geographical locations, a multi-plaintiff trial would be far more challenging for a jury and the possibility of such a trial could even be precluded.

Finally, although the parties have proposed four (4) mutually agreed upon bellwether selections, with respect to those where there is no agreement, the PEC's proposed Tier 2 bellwether selections are by far more representative bellwether selections than those selected by the DCC. Furthermore, as noted below, the composition of the already existing Tier 1 discovery pool naturally favors the PEC's approach, *i.e.*, eight (8) of the thirteen (13) Group A cases allege exposure in Pennsylvania, including four (4) of the five (5) kidney cancers, while ten (10) of the twelve (12) Group B cases are from Colorado. Thus, in addition to the efficiency and legal arguments supporting why each Group should focus on a singular state, the practical reality is that the Groups were also naturally populated in a way that supports this approach (by agreement).

For these reasons, Group A Tier 2 cases should come from Pennsylvania and the Group B Tier 2 cases should come from Colorado, and further the Court should adopt the PEC's slate of Group A and Group B Tier 2 bellwether candidates.

## I.     PROCEDURAL AND FACTUAL BACKGROUND

For approximately the last six (6) months the parties have engaged in Tier 1 discovery with respect to twenty-five (25) Tier 1 bellwether cases, which include five (5) kidney cancer cases, eight (8) testicular cancer cases, eight (8) thyroid disease cases, and four (4) ulcerative colitis cases.[5] A full list of the twenty-five (25) eligible Tier 1 personal injury bellwether cases, including each plaintiff's alleged injury and exposure site, is attached as Ex. A.

Consistent with CMO 26D, the parties exchanged their respective proposed Tier 2 personal injury bellwether candidates. Following this exchange, the parties met and conferred to reach agreement on the composition of both Group A and Group B. However, after meeting and conferring on several occasions, the parties remain largely at an impasse with a few exceptions.[6]

---

[5] Joint Submission Regarding Proposed Initial Personal Injury Bellwether Discovery Pool Plaintiffs [ECF No. 4211], at 2-3.

[6] The parties agree on one (1) case from each injury category. The mutual selections include: *Voelker* (kidney cancer/PA); *Hartman* (testicular cancer/PA); *Slagle* (thyroid disease/CO); and



July 16, 2024
Page 4

A full list of the PEC's proposed Tier 2 personal injury bellwether candidates, including each plaintiff's injury, source of contamination, and implicated water district(s), is attached as Ex. B.

In making their selections, in addition to selecting representative cases, the PEC intentionally selected cases with like injuries whose alleged exposure from AFFF was derived from only one geographic location. To illustrate, every cancer case (both testicular and kidney) selected by the PEC alleges that the AFFF-contaminated water that they consumed was contaminated by AFFF used at Naval Air Station Joint Reserve Base Willow Grove and/or Naval Air Warfare Center Warminster ("Willow Grove"), one of the two eligible bellwether sites.[7] Similarly, every ulcerative colitis and every thyroid disease case proposed by the PEC alleges that the AFFF-contaminated water that they consumed was contaminated by AFFF use at Peterson Air Force Base and/or Colorado Springs Municipal Airport ("Peterson").

Most fundamentally, Plaintiffs made their selections taking into consideration the gargantuan Tier 2 discovery burden that will befall all parties and the DOJ if Tier 2 bellwethers, especially for Group A where deadlines for both injuries are concurrent, come from more than one location. Knowing this, the PEC limited its Group A selections to Pennsylvania and its Group B selections to Colorado. As discussed below, litigating only one contamination site at a time will serve the best interests of the parties and the Court by decreasing the expense and time necessary to prepare these cases for trial. Moreover, as noted above, should the Court be inclined to do multi-plaintiff trials, which it has expressed a willingness to consider,[8] one geographic location helps to alleviate disparate issues of fact and avoids conflicts of law. By contrast, the DCC's proposed Tier 2 bellwether candidates include plaintiffs from both eligible sites within every injury group. Further, every single water district is implicated in the DCC's proposed Tier 2 selections, which would make the Tier 2 discovery burden impossibly high. A full list of the DCC's proposed Tier 2 personal injury bellwether candidates, including each plaintiff's injury, source of contamination, and implicated water district(s), is attached as Ex. C.

## II.     ARGUMENT

### A.     Limiting Tier 2 Discovery to One Location at a Time Will Substantially Reduce the Burden on the Court, the Parties, and the Government.

The first issue that remains unresolved between the parties concerns whether all Tier 2 personal injury bellwether plaintiffs for each respective injury category should *all* allege exposure

---

*Zajicek* (ulcerative colitis/CO).

[7] CMO 26, at § A(1).

[8] *See e.g.*, Oct. 21, 2022, H'ring Tr., at 6:7-11 (Court noting that one representative location is "an ideal model"); *see also*, *id.*, at 6:22-25 (Court stating that "…this is just sort of my instinctive thing: To have maybe five plaintiffs with fairly similar claims from a common alleged contamination source, that is a particular venue.").



July 16, 2024
Page 5

to AFFF-contaminated water from use of AFFF at the same contamination site. The PEC submits that this should undoubtedly be the case and, as noted above, has selected its Tier 2 candidates based on this foundational framework.

The reasons why one geographical location is preferable are plentiful. First, the number of depositions, documentary evidence, expert reports and expert discovery, and likely dispositive and *Daubert* motions will be substantially reduced if only one contamination site is selected. Specifically, one contamination site means that the parties will only need to conduct third-party depositions of both water provider personnel and DoD witnesses in one location, which will greatly decrease the expense and time of conducting third-party discovery. Further, concentrating attention on one site will also reduce the burden on the DOJ, who will likely need to produce both current and/or former employees stationed at the relevant contamination site(s) to testify, at a minimum, as to the different types of AFFFs that were used at each of these bases.

In addition, both contamination sites implicate multiple water districts. In Pennsylvania, four (4) water districts are potentially implicated in the bellwether selections.[9] Similarly, in Colorado, three (3) water districts are potentially implicated in the bellwether selections.[10] Importantly, each of these water districts has a minimum of nine (9) wells, with the exception of the City of Fountain which has six (6), totaling a minimum of at least 60 wells that would each require sampling, fate and transport analyses, inspection, and expert analyses. This work up requires significant time and will be extraordinarily expensive, especially if all water districts are implicated. In addition to sampling of wells, it is also probable that sampling will be required of soil and/or surface water bodies around the relevant water districts. In Pennsylvania alone potentially nine (9) such sampling sites have already been identified. Presumably, this number of sampling sites could easily double if a second contamination site is added. Focusing on just one geographic location will greatly reduce this burden by limiting the number of relevant water districts. The PEC's proposed Group A Tier 2 selections involve only three (3) water districts. Conversely, the DCC's Group A selections implicate five (5) water districts from two (2) entirely separate contamination sites, which will require different hydrology and sampling proofs.

The PEC's Group B thyroid disease Tier 2 candidates also implicate two (2) water districts, however, the expert report deadline for thyroid disease is six (6) months after the Group A expert deadline, and thus the parties have significantly more time to complete expert analyses for these cases. Further, under CMO 26D, there is no current expert report deadline for Group B ulcerative colitis cases, and thus the parties will only be preparing expert reports for one injury when they proffer Group B expert reports, which inherently decreases what is a very heavy lift.[11]

---

[9] These include: (1) Horsham Water & Sewer Authority; (2) Borough of Ambler; (3) Warrington Township; and (4) and Warminster Municipal Authority.

[10] These include: (1) City of Fountain; (2) Widefield Water and Sanitation; and (3) Security Water District.

[11] The DCC's thyroid selections likewise involve three (3) water districts, but more importantly,

July 16, 2024
Page 6

The more water districts implicated by bellwether selections, the more fate and transport analyses and opinions that Plaintiffs' experts will be required to proffer. Of course, attendant to expert analyses and opinions are inevitable *Daubert* and dispositive motions. Thus, the more water districts implicated, the greater burden on the Court in ruling on the DCC's likely barrage of *Daubert* motions and accompanying dispositive motions. Selecting only one site will limit these fate and transport analyses and opinions, and thus likely decrease the number of evidentiary rulings needed from the Court.

In sum, selecting one geographical location is far less burdensome on the Court and the parties, and, importantly, the U.S. Government, who will be able to sequence the discovery needs of the parties between the two contamination sites rather than all at once. Further, by selecting Tier 2 bellwether cases from a single geographic location, not only will there be preservation of time and expense, but also as noted above, it will remove one argument in the DCC's likely objection to a multi-plaintiff trial, namely, there will be unitary state law. For these reasons, it is respectfully submitted that selecting only one contamination site within each Group is the prudent course.

**B.     Pennsylvania Should be the Site Selected for Both *Leach* Cancers (Group A) and Colorado for Ulcerative Colitis and Thyroid Disease (Group B).**

Assuming the Court agrees that preceding with one contamination site is preferable, then the PEC respectfully submits that for several reasons Pennsylvania is the more appropriate site for Group A, while Colorado is the more appropriate site for Group B.

First, the mathematical reality is that there are not enough kidney cancer cases in the eligible bellwether pool that allege exposure to AFFF-contaminated water from AFFF use in Colorado to select that site for the kidney cancer cases. Specifically, there is only one (1) kidney cancer case[12] in the bellwether pool alleging AFFF exposure from use at Peterson, and CMO 26D dictates that three (3) kidney cancer cases are required for Group A. This disqualifies the DCC's selection because Colorado plaintiffs alone cannot populate the Group A kidney cancer pool, selecting the one (1) Colorado kidney cancer case would necessarily require adding plaintiffs from Pennsylvania, which defeats the purpose of the substantial advantages gained by limiting the Tier 2 Group A cases to one location.

Notably, the same is true of Group B and Colorado. That is, there is only one (1) thyroid disease case from Pennsylvania and only one (1) ulcerative colitis case from Pennsylvania, the rest of the potential Group B cases are all plaintiffs from Colorado. Thus, Pennsylvania does not have enough plaintiffs to populate Group B consistently with CMO 26, which requires two (2) ulcerative colitis selections and three (3) thyroid disease selections. These mathematical realities seem to

---

both eligible contamination sites are implicated.

[12] There is also a strong argument that this one (1) kidney cancer plaintiff is not representative as discussed in §II.D.3(a), *infra*.



July 16, 2024
Page 7

make the choice rather obvious, *i.e.*, that all Group A bellwether cases should be Pennsylvania plaintiffs, while all Group B bellwether cases involve Colorado plaintiffs.

Second, two (2) of the water districts implicated in Pennsylvania are water districts that were Tier 1 cases in the first Water Provider Bellwether Program,[13] and thus substantial discovery was already completed in that context, including some AFFF product identification discovery, water sampling, and fate and transport analyses. Additionally, depositions of water district personnel from both water providers were conducted during Tier 1 discovery in the first Water Provider Bellwether Program. That significant third-party discovery has already been undertaken enhances the reasons for selecting the Plaintiffs' plan as it will provide cost and time savings for the parties, and likely render any additional Tier 2 discovery needed with respect to these two (2) water providers far more truncated. Finally, as noted above, Group B includes virtually all Colorado plaintiffs, thus it necessarily means that the Colorado contamination site will be litigated and worked up on a schedule following the Group A cases.

    **C.    The PEC's Proposed Tier 2 Selections from One Location Lend Themselves to and Support a Multi-Plaintiff Trial.**

As noted above, the Court has on occasion indicated that there may be an opportunity for multi-plaintiff trials with respect to the *Leach* bellwether plaintiffs.[14] Rule 42(a) permits consolidation and a single trial of several cases on the court's docket, or of issues within those cases. *See generally Moore v. BPS Direct, LLC*, No. 2:17-cv-03225, 2019 WL 7762196, at *1 (D.S.C. Feb. 8, 2019) (consolidating cases involving the same factual predicates to promote judicial economy and efficient use of the parties' resources).

The Rule "…provides the following: (a) Consolidation. If actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a) "[C]ourts are allowed broad discretion to consolidate cases pending in the same district." *Moore, supra* (citation omitted). *See Arnold v. E. Air Lines, Inc.*, 681 F.2d 186, 192 (4th Cir. 1982) ("The decision whether to sever or to consolidate whole actions or sub-units for trial is necessarily committed to trial court discretion."); *Henderson v. United States*, No. 6:07-cv-00009, 2008 WL 1711404, at *5 (W.D. Va. Apr. 11, 2008) ("The decision to consolidate is committed to Court's discretion and consolidation may be initiated sua sponte.").

---

[13] Joint Submission Regarding Water Provider Bellwether Discovery Pool Cases [ECF No. 1222], at 2 (identifying Warminster Township Municipal Authority and Warrington Township as two of the water providers that Co-Lead counsel for Plaintiffs and Defendants agreed to include in the Water Provider Bellwether Discovery Pool).

[14] *See* fn. eight (8), *supra*.



July 16, 2024
Page 8

Although Plaintiffs are not presently requesting a multi-plaintiff trial, the PEC's Tier 2 proposed bellwether plan lays the necessary and appropriate groundwork for future multi-plaintiff trials by increasing the number of common facts and law across plaintiffs. With respect to commonality of facts, clearly with only one geographic location, evidence related to AFFF product identification and use at Willow Grove will be the same across all plaintiffs. Similarly, many of the Group A Tier 2 personal injury plaintiffs selected by the PEC share the same water district, which will make fate and transport analyses largely common to those plaintiffs (*e.g*., two testicular cancer cases, *Field* and *Bien*, both allege consumption of AFFF-contaminated drinking water from Horsham Water and Sewer Authority). These common predicates support consolidated trials and minimize the risk of jury confusion caused by disparate factual issues.

As it pertains to commonality in law, all Group A Tier 2 PEC bellwether selections allege exposure in the State of Pennsylvania while all Group B Tier 2 PEC bellwether selections allege exposure in the State of Colorado. This grouping by State will ensure there is no conflicting state law or jury instructions in any potential multi-plaintiff trial, thereby reducing the risk of jury confusion.

Against these facts, the DCC's proposed Tier 2 bellwether selections implicate two (2) separate geographic locations and every single water district in the pool, which frustrates the potential for any future multi-plaintiff trial by injecting too many disparate factual issues for a multi-plaintiff trial to be workable. Similarly, given the two geographic locations, instructions of state law for both Pennsylvania and Colorado are implicated, which heightens the potential to cause jury confusion.

### D.    The PEC's Bellwether Selections are More Appropriate and Representative Bellwether Selections than Those of the DCC.

The Manual for Complex Litigation states that the raison d'être of bellwether trials is to "produce a sufficient number of representative verdicts" to "enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis, and what range of values the cases may have if resolution is attempted on a group basis." MCL § 22.315 (2004).

Given this premise, for any bellwether process to be successful, the cases that populate the bellwether pool must be representative of the overall docket. *See In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig*., MDL No. 2100, 2010 U.S. Dist. LEXIS 108107, at *4, *6-7 (S.D. Ill. Oct. 8, 2010) (it is "critical to a successful bellwether plan that an honest representative sampling of cases be achieved" because "[l]ittle credibility will be attached to this process, and it will be a waste of everyone's time and resources, if cases are selected which do not accurately reflect the run-of-the-mill case"); *see also,* Guidelines & Best Practices for Large & Mass-Tort MDLs, Bolch Judicial Institute, Duke Law School 18-19 (2d ed 2018)("[T]he bellwether process will be valuable only if the cases selected for trial are truly



July 16, 2024
Page 9

representative of the whole (or of one or more distinct categories of cases that comprise the whole.")). Finally, "[t]he outcome of the bellwether trial can often be beneficial for litigants who desire to settle such claims by providing information on the value of the remainder of the case as reflected by the jury verdict in the bellwether trial." *United States ex rel. Michaels v. Agape Senior Community, Inc*., 12-cv-3466, 2015 U.S. Dist. LEXIS 82379, at *5 (D.S.C. Jun. 25, 2015).

    1. <u>The PEC's Group A Selections: Kidney and Testicular Cancer</u>

        a. <u>Kidney Cancer</u>

There are four (4) total kidney cancer cases in Pennsylvania, which, include one (1) mutual pick (*Voelker*). Because *Voelker* is a mutual selection, the PEC submits that it should be included in Group A. This leaves three (3) remaining Pennsylvania kidney cancer cases: (1) *Speers*; (2) *Donnelly*; and (3) *Mola*. As set forth below in § II.D.3.a, *infra*, *Mola* is unrepresentative and thus should not be included in Group A. However, *Speers* and *Donnelly* are appropriate and representative kidney cancer cases that further the purpose of the bellwether process:

- *Speers*: Plaintiff Speers was 59 years old when he was diagnosed with kidney cancer and underwent a partial nephrectomy after consuming AFFF-contaminated water from the Borough of Ambler at his residence for approximately 25 years. Like most kidney cancer plaintiffs, Mr. Speers had neither chemotherapy nor radiation, which renders his case representative. Moreover, Mr. Speers' case is likewise appropriate for bellwether inclusion because he does not have any known risk factors for kidney cancer that would complicate his case. This will allow the jury to focus on the specific causation question as between his PFAS exposure and kidney cancer diagnosis without being sidetracked with alternative causation arguments.[15]

- <u>Donnelly</u>: Plaintiff Donnelly is alleging AFFF exposure at one residential address that obtains water from one water system, the Warminster Municipal Authority. Mr. Donnelly had a retroperitoneal radical nephrectomy to treat his kidney cancer, but like most kidney cancer plaintiffs, had neither chemotherapy nor radiation. Mr. Donnelly's cancer-causing AFFF exposure began in 1979 and continued through 2005, and thus he has significant exposure spanning decades, which likely renders his exposure like most plaintiffs.

        b. <u>Testicular Cancer</u>

---

[15] During the Sept. 23, 2022, CMC, the Court sagaciously noted that in selecting bellwether candidates "…we try to eliminate some of the potential of those who have high associated complicating factors. Obesity might be one. History of diabetes. There might be things that you get into trying to eliminate just so you're distilling down to making the causation issue a little bit simpler for the jury." Sept. 23, 2022 H'ring Tr., at 30:18-25.

There are four (4) testicular cancer cases from Pennsylvania, which include: (1) *Sarvey*;[16] (2) *Hartman*; (3) *Field;* and (4) *Bien*. As in the kidney cancer context, there is one (1) mutual selection (*Hartman*). Because *Hartman* was a mutual selection, it should necessarily be included in Group A. This leaves three (3) remaining Pennsylvania testicular cancer cases: (1) *Sarvey* (2) *Field*; and (3) *Bien*.

The PEC submits that in addition to *Hartman*, Group A should consist of *Field* and *Bien* as both are appropriate and representative testicular cancer cases for the following reasons:

- <u>*Bien*</u>: Plaintiff Bien was 30 years old when he was diagnosed with testicular cancer and underwent an orchiectomy followed by a retroperitoneal lymph node dissection after consuming AFFF-contaminated water primarily at his relevant residences for approximately 6 years. Like many testicular cancer patients, Mr. Bien also required chemotherapy as an additional adjuvant treatment after his diagnosis. Further, Mr. Bien also experienced sterility/infertility as a result of his treatment, an unfortunate and common side effect, which affected his and his wife's ability to have children. These factors render his case representative. Moreover, Mr. Bien did not have any known risk factors for testicular cancer that could complicate the evaluation of his case and lead to credible alternative causation arguments, and therefore the jury would be able to focus on the issue of specific causation as it relates to PFAS and testicular cancer.

- <u>*Field*</u>: Plaintiff Field was 27 years old when he was diagnosed with testicular cancer and underwent an orchiectomy after consuming AFFF-contaminated water primarily at his relevant residences for approximately 24 years. Like many testicular cancer patients, Mr. Field also required chemotherapy as an additional adjuvant treatment after his diagnosis. Further, Mr. Field also experienced infertility as a result of his treatment, an unfortunate and common side effect, which affected his and his wife's ability to have children. These factors render his case representative. Moreover, Mr. Field did not have any known risk factors for testicular cancer that could complicate the evaluation of his case and lead to credible alternative causation arguments, and therefore the jury would be able to focus on the issue of specific causation as it relates to PFAS and testicular cancer.

The PEC anticipates that the DCC will argue that if the Group A kidney cancer cases are all Pennsylvania plaintiffs, then the Group A testicular cancer cases should all be Colorado plaintiffs. This argument is without merit. First, as set forth below, there are many reasons why the DCC's testicular cancer Colorado plaintiffs are unrepresentative and thus not appropriate bellwethers. Second, as discussed, it is unrealistic to mix and match two sites at the same time.

> 2. The PEC's Group B Selections: Thyroid Disease and Ulcerative Colitis

---

[16] As neither the PEC nor the DCC selected *Sarvey* for Group A Tier 2, the PEC submits further discussion of his case is not pertinent and Mr. Sarvey's case should not be included in Group A.



July 16, 2024
Page 11

    a. <u>Thyroid Disease</u>

The PEC selected the following three (3) thyroid disease cases for inclusion in Group B: (1) *Frazier*; (2) *Jordan*; and (3) *Slagle*. *Slagle* is a mutual selection and thus should be included in Group B. However, in addition to *Slagle*, both *Frazier* and *Jordan* are appropriate and representative bellwether cases that should be included in Group B for the following reasons:

- <u>*Frazier*</u>: Plaintiff Karen Frazier alleges exposure to AFFF-contaminated drinking water at her current home in Colorado, where she lived from 1974-1986, and then from 1991 to present. She receives municipal water serviced by Widefield Water and Sanitation. Ms. Frazier suffers from hypothyroidism, first reflected in medical records in June of 2007. Ms. Frazier takes a thyroid hormone replacement medication to control her condition, which is typical for most patients diagnosed with hypothyroidism. Thus her damages are representative of most plaintiffs alleging hypothyroidism.

- <u>*Jordan*</u>: Plaintiff Denise Jordan alleges exposure to AFFF-contaminated drinking water at her current home in Colorado, where she has lived since 1998. Her home receives municipal water serviced by the Security Water District. Ms. Jordan was diagnosed with hypothyroidism in 2013 at age 55. Ms. Jordan takes a thyroid hormone replacement medication to control her symptoms as is typical for most patients diagnosed with hypothyroidism. Thus her damages are representative of most plaintiffs alleging hypothyroidism.

    b. <u>Ulcerative Colitis</u>

The PEC has selected both *Smalley* and *Zajicek* as appropriate and representative Group B ulcerative colitis Tier 2 bellwether selections. Again, because *Zajicek* is a mutual selection, it should be included in Group B. Further, the PEC submits that *Smalley* is an appropriate and representative bellwether case for the following reasons:

- <u>*Smalley*</u>: Plaintiff Anthony Smalley alleges exposure to AFFF-contaminated drinking water at his childhood home in Colorado, where he lived from 1997 to 2007, and where he received municipal water serviced by the City of Fountain. He also alleges exposure at his current address, also within the geographical boundaries of Fountain, CO, but where he receives private well water. In August of 2016, Mr. Smalley was diagnosed with ulcerative colitis. He was simultaneously diagnosed with a salmonella infection. Mr. Smalley's doctor testified that such concurrent diagnoses are common and thus likely representative of other pending ulcerative colitis cases. Further, Mr. Smalley's ulcerative colitis has been treated with anti-inflammatory drugs, which is the most common treatment for ulcerative colitis and thus likely reflective many of the pending ulcerative colitis cases.

    3. <u>The DCC's Group A: Kidney Cancer and Testicular Cancer</u>

MotleyRice
ATTORNEYS AT LAW

July 16, 2024
Page 12

### a. Kidney Cancer

The DCC's Group A kidney cancer cases include: (1) *Voelker*; (2) *Mola*; and (3) *Hines*. As discussed above, because *Voelker* is a mutual selection, it should be included in Group A. However, neither *Mola* nor *Hines* should be included in Group A as neither is a representative bellwether selection for the following reasons:

- *Hines*: Plaintiff Hines alleges she was exposed to AFFF-contaminated drinking water from 1991 to 2001 during which time her home was serviced by Widefield Water and Sanitation in Colorado. She later developed renal cell carcinoma, diagnosed in October 2002. Ms. Hines has certain ambiguities in her medical records, which render her case unrepresentative. For example, various medical records represent different information as to whether Ms. Hines has a family history of kidney cancer, with some suggesting a maternal history. Ms. Hines does not believe she has such a family history and believes the records may be a mistaken reference to her grandmother's history of kidney disease. Complicating these matters, Ms. Hines has never had a relationship with and has no communication with her biological mother, and her grandmother is deceased. Thus, the people who could speak to this issue are not available. Similarly, while Ms. Hines reports only smoking a few cigarettes per day before quitting at age 18, her medical records are inconsistent. Some medical records confirm her account, while others suggest she is an active smoker with nicotine dependency. The uncertainty present in her records will make it difficult for a jury to evaluate her claim, making her a less ideal candidate than those proposed by Plaintiffs.

- *Mola*: Unlike other plaintiffs, Mr. Mola has alleged exposure at multiple residential locations impacted by PFAS contamination. From 1970 to 1989, Mr. Mola lived at three different addresses in Willow Grove, Pennsylvania. From 1995 to 1997, Mr. Mola lived in an apartment in Horsham, Pennsylvania. From 1999 to 2018, Mr. Mola lived at a house in Warrington, Pennsylvania. This will create complications for experts who will offer opinions on fate and transport. Furthermore, Plaintiffs have recently learned that although Mr. Mola's Warrington address has been serviced by Warrington Township, the water to that address was predominantly sourced from the North Wales Water Authority's Forest Park water treatment plant, rather than from Warrington's groundwater wells that are highly contaminated with PFOA and PFOS and linked to the use of AFFF at Willow Grove.[17] As such, Mr. Mola's case does not truly implicate one of the water districts impacted by AFFF use at Willow Grove. Moreover, Mr. Mola's smoking history is unusually heavy compared to other plaintiffs. Prior to his diagnosis in 2011, Mr. Mola smoked approximately one pack of cigarettes per day for 29 years.

---

[17] *See* Affidavit from Director of Operations for the North Wales Water Authority, attached as Ex. D. The address identified therein was that of Mr. Mola.



July 16, 2024
Page 13

b. <u>Testicular Cancer</u>

The DCC's Group A testicular cases include: (1) *Belarde*, (2) *Hartman*; and (3) *Scheiler*. Given that *Hartman* was selected by both parties, it should be included in Group A. Conversely, neither *Belarde* nor *Scheiler* should be included in Group A as neither is a representative bellwether for the following reasons:

- <u>*Belarde*</u>: Plaintiff Belarde alleges he was exposed to AFFF-contaminated drinking water from 1997 to 2016, while residing at four (4) different addresses, all serviced by the City of Fountain Water Department in Colorado. He developed testicular cancer in November 2006. Notably, Mr. Belarde served in the U.S. Army from 1989 to 1997, including service at Fort Leonard Wood from 1989 to 1990, and Fort Knox from 1992 to 1997. Army reports from both locations reveal use of AFFF and detections of PFAS.[18] As a result, inclusion of Mr. Belarde as bellwether plaintiff would require workup of at least three (3) water systems, in three (3) different sites, including at least three (3) military sites. This would triple the cost and the time devoted to establishing Mr. Belardes' exposure to AFFF beyond other candidates for Tier 2 selection.[19] Mr. Belarde was also questioned during his deposition about two (2) convictions for driving under the influence. While such incidents have no factual relation to his claims, it is likely that defendants will attempt to use these incidents to discredit Mr. Belarde's character. These unrelated character attacks demonstrate that Mr. Belarde's case is not representative. Finally, Mr. Belarde has a long smoking history. While smoking is not a risk factor for testicular cancer, it is nevertheless likely that defendants would try to introduce that smoking history to distract from the issues relevant to the litigation.

- <u>*Scheiler*</u>: Plaintiff Scheiler alleges exposure to AFFF-contaminated drinking water from 2000 to 2016, while residing at two (2) different addresses, both of which were serviced by Widefield Water and Sanitation in Colorado. He was diagnosed with testicular cancer in July 2007. Due to the length of time since his diagnosis and record retention policies in Colorado, very few contemporaneous records from his cancer treatment remain. The parties have been able to obtain an ultrasound from 2007 to confirm his testicular cancer diagnosis. Essentially, all other available records related to his cancer treatment are from 2012 or later, five years after he was diagnosed with testicular cancer and underwent an orchiectomy. The parties have been unable to obtain records from Mr. Scheiler's urologist or oncologist from around the time of diagnosis and treatment, a surgical or pathology report, or post-surgical treatment records, which have been described as a single session of chemotherapy. Without available records, it is likely experts from both sides would be reduced to speculation on key issues. A bellwether

---

[18] *See* https://aec.army.mil/application/files/5116/8979/7789/FLW_PFAS_PASI.pdf and https://aec.army.mil/application/files/8816/7779/1113/KnoxPASI.pdf

[19] To be clear, Mr. Belarde himself is not aware of whether he was exposed to AFFF during his military service and testified as such at his deposition. Nevertheless, a trial would need to account for that potential exposure.



July 16, 2024
Page 14

trial on such limited facts would provide little information to be extrapolated across other cases. Overall, the open and unanswerable questions regarding Mr. Scheiler's case makes him unsuitable for selection as a Tier 2 bellwether case.

    4.    <u>The DCC's Group B Selections: Thyroid Disease and Ulcerative Colitis</u>

        a.    <u>Thyroid Disease</u>

The DCC's Group B thyroid disease cases include: (1) *DeMaio*; (2) *Slagle*; and (3) *Carlson*. The PEC agrees with the inclusion of *Slagle* in Group B, however, neither *DeMaio* nor *Carlson* should be included in Group B as neither is representative for the reasons below:

- <u>*DeMaio*</u>: Unlike other plaintiffs, Ms. DeMaio alleged AFFF and/or PFAS exposure at multiple residential locations. From 1973 to 1977, she lived at an address in Warminster, Pennsylvania, and from 1977 to 1996, she lived at an address in Hatboro, Pennsylvania. For the reasons explained above in regard to Mr. Mola's case, this will lead to complications if the case proceeds to Tier 2. In addition, unlike other plaintiffs, Ms. DeMaio's alleged exposure ceased in 1996, limiting the number of defendants potentially liable for her exposure. Further, Ms. DeMaio's smoking history is unusually heavy compared to other plaintiffs. Beginning at the age of 16, Ms. DeMaio smoked for approximately 30 years. Finally, Ms. DeMaio's medical history is unusual compared to other plaintiffs. Ms. DeMaio has suffered from numerous illnesses and injuries, including atrial fibrillation, congestive heart failure, and injuries from a car accident and fall, which have significantly affected her overall health and mobility in ways that eclipse the impact of her thyroid disease

- <u>*Carlson*</u>: Plaintiff Carlson alleges she was exposed to AFFF-contaminated drinking water from 1973 to 2016 during which time her home was serviced by Widefield Water and Sanitation in Colorado. She later developed hypothyroidism, first diagnosed in 1997. Serving as a bellwether trial plaintiff would create undue hardship for Mrs. Carlson. Mrs. Carlson is now 81 years old, and is showing signs of her age, including, most relevant to this process, memory issues. During her deposition she could not recall many specific details and was repeatedly frustrated by her inability to recall. But more importantly, Mrs. Carlson is now the full-time caretaker for her husband who suffers from severe dementia. She feeds him, helps him to shower and dress, provides his needed 24/7 oxygen treatments, and pushes his wheelchair for him. Requiring her to attend a long trial would be an unreasonable burden on both Mr. and Mrs. Carlson.

        b.    <u>Ulcerative Colitis</u>

The DCC's Group B ulcerative colitis cases include *Feite* and *Zajicek*. As noted above, *Zajicek* is a mutual selection and thus should be included in Group B. However, *Feite* should not be included as his case is not representative for the following reasons:

- *Feite*: Plaintiff Feite alleged exposure to AFFF-contaminated drinking water from 1973 to 2008, and 2012-2016, across ten (10) different addresses in Pennsylvania, serviced by five (5) different water providers. Mr. Feite was diagnosed with ulcerative colitis in 2010. First, the number of addresses and water providers involved in his case make Mr. Feite's case significantly more complicated and expensive than that of other plaintiffs, which and would result in a significantly longer trial than plaintiffs with more straight forward exposure histories. In addition, unlike most other Tier 1 bellwether plaintiffs, Mr. Feite's treating doctor was not deposed during Tier 1 discovery. This makes Mr. Feite's case more speculative without the benefit of his doctor's testimony. Finally, Mr. Feite's damages are unusual, non-representative, and raise significant complications, which are not present for other plaintiffs. Specifically, Mr. Feite is the owner, operator, and sole employee of a business consulting firm which assists in the buying and selling of companies. He has alleged that as a result of his ulcerative colitis he lost time at work, which corresponds to lost business opportunities. To the extent he is selected, a trial would require expert testimony and reports specific to the nature and extent of his business losses. Such evidence likely would not be germane to, or representative of, any other cases in the MDL and would tend to distract a jury.

### III.  CONCLUSION

The PEC has proposed a representative slate of plaintiffs from each of the four injury groups, while also proposing reasonable and appropriate divisions by exposure site. It is abundantly clear that limiting discovery to one geographic location is far more efficient and less burdensome to the Court, the parties, and the U.S. Government than mixing and matching plaintiffs from two sites. Thus, the PEC submits that the Court should adopt its proposed one site plan. Pennsylvania is the more appropriate geographic location for Group A while Colorado is far better-suited geographic location for Group B. This approach is also supported by the statistical lay out of the plaintiffs in each Group, *i.e*., eight of the thirteen Group A plaintiffs are from Pennsylvania while ten of the twelve Group B plaintiffs are from Colorado. Similarly, one contamination site offers a common factual predicate and the potential for a multi-plaintiff trial should the Court be inclined to conduct multi-plaintiff trials. The selection of cases from two disparate sites will so complicate the proofs needed as to render any potential multi-plaintiff trial practically impossible.

For the reasons set forth above, the PEC respectfully requests that the Court adopt the PEC's plan that the Group A cases come from Pennsylvania and Group B cases from Colorado, and further finds that the bellwether selections identified by the PEC are the most appropriately representative bellwether selections.

We thank the Court for its continued time and courtesies.

MotleyRice®
ATTORNEYS AT LAW

July 16, 2024
Page 16

        Respectfully submitted,

        */s/ Fred Thompson III*

        Fred Thompson III
        Plaintiffs' Liaison Counsel

        Enclosures

cc:    Plaintiffs' Co-Lead Counsel   (via electronic mail)
        Defense Liaison Counsel (via electronic mail)
        Cary Kotcher, Esquire