# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

|  |  |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG<br><br>**THIS DOCUMENT RELATES TO:**<br>*Bien v. 3M Company,* 2:20-cv-00257<br>*Braun et al v. 3M Company,* 2:18-cv-03370<br>*DeMaio v. 3M Company,* 2:20-cv-00291<br>*Donnelly v. 3M Company,* 2:20-cv-00209<br>*Feite v. 3M Company,* 2:20-cv-00521<br>*Field v. 3M Company,* 2:20-cv-00301<br>*Gokey v. 3M Company,* 2:18-cv-03385<br>*Gordon v. 3M Company,* 2:18-cv-03371<br>*Gutierres v. 3M Company,* 2:18-cv-03381<br>*Hartman v. 3M Company,* 2:20-cv-00302<br>*Helm v. 3M Company,* 2:18-cv-03401<br>*Hutchison v. 3M Company,* 2:18-cv-03395<br>*Kahler v. 3M Company,* 2:18-cv-03391<br>*Mola v. 3M Company,* 2:20-cv-00428<br>*Niskern et al v. 3M Company,* 2:18-cv-03417<br>*Padilla et al v. 3M Company,* 2:18-cv-03404<br>*Sarvey v. 3M Company,* 2:20-cv-00278<br>*Smith et al v. 3M Company,* 2:18-cv-03372<br>*Speers et al v. 3M Company,* 2:21-cv-03181<br>*Thompson et al v. 3M Company,* 2:18-cv-03390<br>*Voelker v. 3M Company,* 2:18-cv-03438 |

**MEMORANDUM IN SUPPORT OF ENTRY OF DEFENDANTS' PROPOSED TIER 2
PERSONAL INJURY BELLWETHER SELECTIONS**

**INTRODUCTION**

In CMO 26 (Dkt. 3080) and related orders, the Court established a thoughtful and deliberate process for assessing personal injury bellwether cases, informed by the structure developed and refined in the water provider bellwether cases. Tier 1 of that process allowed the Parties to begin to understand (1) four different diseases (kidney and testicular cancer, thyroid disease, and ulcerative colitis) and (2) two of the most prominent locations in this MDL (Colorado and Pennsylvania) by selecting 25 out of more than 500 plaintiffs eligible for initial fact discovery.

The next stage of the process is for the Parties to narrow the bellwether candidates from 25 to 11 to identify those cases that may be appropriate to advance to potential trial selections, pursuant to CMO 26D (Dkt. 4964), which directs the Parties to "make their best efforts to select representative cases," *id.* ¶ 5. Just as with the water provider bellwether cases, the purpose of this stage is to allow more in-depth fact and expert discovery of a subset of the bellwether pool. The CMOs contemplate later opportunities to further narrow the pool and, at that time, decide on the next steps for these cases beyond Tier 2 discovery.

Following the Parties' exchange of proposed Tier 2 selections, both sides identified one plaintiff in common in each of the four injury categories (bolded in the chart below). Subject to further direction from the Court, those plaintiffs presumably would move forward into Tier 2. That leaves seven plaintiffs on which the Parties disagree and require the Court's guidance.

Defendants propose that the following slate comprise the Initial Personal Injury Bellwether Trial Pool. Selecting these cases will allow the Parties to better understand not just the four diseases at issue, but also the two geographic areas in which the large majority of individual personal injury MDL drinking water cases are located. These plaintiffs are also more representative of the broader pool of eligible plaintiffs than the PEC's selections with regard to gender, age, and alleged exposure period while avoiding extraneous medical and exposure issues that could overcomplicate

1

the cases for further litigation and potential jury presentation.

| Plaintiff Name | Case Number | Alleged Injury | Alleged Exposure Site |
|---|---|---|---|
| Consepcion Hines | 2:18-cv-03381 | Kidney Cancer | Colorado |
| John Mola | 2:20-cv-00428 | Kidney Cancer | Pennsylvania |
| **Kevin Voelker** | **2:18-cv-03438** | **Kidney Cancer** | **Pennsylvania** |
| James Belarde | 2:18-cv-03390 | Testicular Cancer | Colorado |
| **Rodney Hartman** | **2:20-cv-00302** | **Testicular Cancer** | **Pennsylvania** |
| Denny Scheiler | 2:18-cv-03390 | Testicular Cancer | Colorado |
| Dolores Carlson | 2:18-cv-03401 | Thyroid Disease | Colorado |
| Carole DeMaio | 2:18-cv-00291 | Thyroid Disease | Pennsylvania |
| **John Slagle** | **2:18-cv-03391** | **Thyroid Disease** | **Colorado** |
| Michael Feite | 2:20-cv-00521 | Ulcerative Colitis | Pennsylvania |
| **James Zajicek** | **2:18-cv-03385** | **Ulcerative Colitis** | **Colorado** |

The Court should select for Tier 2 the four cases the Parties mutually selected and the Defendants' proposed slate of seven cases.

## ARGUMENT

**I.    Defendants' Proposed Tier 2 Selections Better Represent The Eligible Pool.**

    **A.    Both Colorado and Pennsylvania should be reflected in the Tier 2 selections for each disease**.

The Court structured the personal injury bellwether program not just to learn about a handful of plaintiffs across four disease categories, without regard to where those plaintiffs lived. Rather, the program was designed to include plaintiffs alleging all four diseases from both Colorado and Pennsylvania, which hold, by far, the largest number of individual drinking water personal injury cases in this MDL. Those locations were also chosen because they (like many other locations in the MDL) include different state law, a diverse set of potential AFFF use locations, other environmental sources of PFAS, and numerous other factors that need to be litigated to understand the docket as a whole. In short, the personal injury bellwether program is intentionally built on two pillars: developing information regarding four diseases and two geographic locations.

Defendants' proposed slate allows this process to continue as intended by selecting at least

one plaintiff each from Colorado and Pennsylvania in each of the four disease categories. This will allow the Parties to accomplish the twin goals of the personal injury bellwether program. First, the Parties will be able to better understand these 11 cases in their own right by conducting more in-depth fact and expert discovery. But cases like these do not arise in a vacuum, they necessarily are situated within specific locations. By continuing to develop cases in both locations, the Parties will also be able to understand the history of AFFF in each place; what brands and types of AFFF were potentially used by the Air Force (primarily as to Colorado), the Navy (as to Pennsylvania), or civilian authorities; and how PFAS from AFFF and from other local sources may or may not have been transported to the locations where plaintiffs lived. Each location also presents differing potential exposure histories as to other potential causes of the diseases at issue.

Artificially narrowing any of the four diseases to a single location would short circuit that approach. Yet, this is precisely what the PEC proposes. As it attempted unsuccessfully to do at the outset of the personal injury bellwether process, Dkt. No. 2722 at 2-3, the PEC seeks to eliminate Colorado plaintiffs from the first set of personal injury cases to prepare for trial despite the fact that Colorado is one of the most significant jurisdictions for the Parties in evaluating the inventory of personal injury drinking water claims. Indeed, the PEC's proposed Group A consists of exclusively white men from Pennsylvania.

This makes no sense. Even today, *half* of the personal injury plaintiffs in the MDL alleging PFAS exposure from drinking water have identified at least one prior Colorado residence in their plaintiff fact sheets (PFSs).[1] There can therefore be no doubt that the inclusion of Colorado

---

[1] Based on Defendants' data from 14,713 personal injury PFSs processed as of July 1, 2024, there are 2,630 personal injury plaintiffs in the MDL whose claims are not subject to dismissal or expert disclosure requirements under CMO 28 and do not allege exposure to PFAS from direct contact with AFFF. Of those, 1,315 plaintiffs identified one or more Colorado residences in their PFS responses, and 331 identify one or more Pennsylvania residences.

plaintiffs in the first set of personal injury cases to be prepared for trial will advance the purpose of the bellwether process for the Parties and the Court.

To date, the PEC has been unable to explain why Colorado cancer plaintiffs are somehow unrepresentative or unimportant to evaluating the broader inventory of MDL personal injury claims. Instead, the PEC has repeated the same arguments the Court already rejected when establishing the personal injury bellwether program: that two sets of sites unnecessarily complicate and increase the expense of the workup and trial of these bellwethers.

The PEC's arguments make even less sense now that Tier 1 discovery has been completed than when first raised. First, Defendants have already invested significant resources in understanding the relevant aspects of both sets of locations; Plaintiffs presumably have done the same. Second, even under the PEC's proposal, the Parties would have to continue to develop cases in both Colorado and Pennsylvania. The PEC's proposal just segregates those cases between Group A (which it proposes all be from Pennsylvania) and Group B (which it proposes all be from Colorado). However, because the timing of fact discovery in Groups A and B largely overlaps (*see* CMO 26D ¶¶ 6,12), fact and expert discovery in both locations will have to proceed under both proposals. The PEC's proposal will therefore have little impact on the amount of site-specific work required of the Parties, but would deprive the Parties of the ability to evaluate any cancer cases in Colorado. That undermines the purpose of a bellwether program and should be rejected.

> **B.  The PEC's Proposal Should Be Rejected Because It Would Not Lead to Representative Cases Being Prepared for Trial.**

Plaintiffs lack any compelling logic for prematurely narrowing the bellwether pools to a single state per disease, let alone limiting all cancer cases to exclusively white, male plaintiffs from Pennsylvania. The PEC's primary motivating factor in selecting this narrow group of cases appears to be maximizing the chances for a joint trial of multiple plaintiffs. But this is not the purpose of

4

the bellwether case selection and trial program as set forth by the Court. Furthermore, as Defendants have explained on a number of occasions, joint trials are not appropriate in these circumstances and, when the time comes to address it, Defendants should be given a full and fair opportunity to brief the issue. But now is not that time. The Court already decided that this is to be decided in January 2025, when the Parties advocate to the Court "which of the Group A cases shall move forward with motion practice and trial, as well as proposed trial dates." CMO 26D ¶ 10(b).

The Court's decision to structure the bellwether cases in this way made sense at the time, and that decision should not be undermined surreptitiously by means of careful bellwether plaintiff selection. Whether to conduct a joint trial in any circumstance "is a fact-bound question best determined after the close of discovery." *Park v. McCabe, Trotter & Beverly, P.C.*, 2018 WL 9649500, at *2 (D.S.C. May 14, 2018) (Gergel, J.). These cases involving differently situated plaintiffs "claiming different diseases, different exposure periods," and other disparate facts that raise potential due process issues, will cause jury confusion, and are ill-suited for consolidation. *In re Fibreboard Corp.*, 893 F.2d 706, 710–711 (5th Cir. 1990). That is why other courts have rejected requests for multi-plaintiff trials in similar products liability cases. *See, e.g.*, *In re Levaquin Prods. Liab. Litig.*, 2009 WL 5030772, at *3 (D. Minn. Dec. 14, 2009) (denying consolidation of cases for bellwether purposes because "this is a large—and still growing—MDL, the exact factual and legal contours of which are still undefined…. Further, the stakes are high: the initial bellwether trials in this MDL may serve as the basis for the parties' resolution of remaining, pending cases."); *In re Injectafer Prods. Liab. Litig.*, 2021 WL 3145729, at *1 (E.D. Pa., July 26, 2021) (holding that "[s]eparate trials" are much "better" than consolidated trials at "defin[ing] the exact factual and legal contours of the claims and defenses" and "allow[ing] the parties to … assess the value and strength of the remaining matters."); *Hines v. Sanofi S.A.*, "Reconsideration Order

5

Re Pretrial and Trial Schedules," Dkt. No. 47, Case No. 2:23-cv-04074-HDV-KS (C.D. Cal. Aug. 21, 2023) (declining to consolidate several actions concerning the same cancer medication because "Plaintiffs will likely each present at trial different medical diagnoses, different combinations of prescription medications, different causation arguments and expert opinions, and different damages models."). And this Court has already expressed concerns that multi-plaintiff cases could confuse and overwhelm a jury struggling to comprehend already complicated science.

At present, the Court has the Parties' descriptions of the proposed Tier 2 plaintiffs based on initial written discovery and record collection, and a handful of threshold depositions. By January, the Court will have the benefit of full briefing on trial selection and structure (if the Parties cannot agree), including additional discovery, such as (1) in-depth fact discovery on the plaintiffs, (2) depositions of other fact witnesses and treating physicians, (3) discovery as to the military bases and water providers at issue, and (4) critical expert discovery on the many issues underlying these cases, such as general and specific causation, fate and transport within the two locations, and other potential environmental causes of the disease in question, just to name a few.

Defendants' proposal leaves the Court's field of options open and flexible, in favor of making well-informed decisions based on a more complete record. Plaintiffs' proposal would narrow that field at the expense of advancing the goals of the Court's bellwether program.

## II. Defendants' Proposed Selections Are Reasonable and Should Be Chosen Over Plaintiffs' Selections.

### A. Kidney Cancer.

Kidney cancer is one of the most common types of cancer, and the most common form is renal cell carcinoma (RCC), with clear cell RCC being the most common subtype. The risk of kidney cancer increases with age: the average age of diagnosis is 64 and kidney cancer is an uncommon diagnosis in people under age 45. Other risk factors associated with kidney cancer

include, but are not limited to, smoking, hypertension, obesity, and family history of kidney cancer. Kidney cancer can be treated in a variety of ways, including removal of the entire affected kidney or the portion of the kidney that contains the tumor, and is responsive to treatment if detected early. Less than 20% of individuals with kidney cancer experience a recurrence, and risk of recurrence falls as more time passes since treatment.

The Parties agree on one kidney cancer plaintiff, **Mr. Kevin Voelker**, who was initially proposed by the PEC as a Tier 1 plaintiff.[2] Mr. Voelker is a 62-year-old resident of Warminster, Pennsylvania, who was diagnosed with and treated for Stage 1, clear cell RCC kidney cancer in 2016. He has not experienced any metastasis or recurrence and did not require any other treatments besides surgery.

In addition to Mr. Voelker, Defendants also propose **Ms. Consepcion Hines** and **Mr. John Mola**. Ms. Hines, originally a defense proposal for Tier 1, is the only female and only Colorado resident among the Tier 1 kidney cancer cases. As such, she is the only plaintiff proposed for Tier 2 that is potentially representative of the bellwether-eligible female kidney cancer plaintiffs (who make up over a third of the eligible pool of kidney cancer plaintiffs) and kidney cancer plaintiffs from Colorado (who make up almost half of the kidney cancer pool). Ms. Hines was diagnosed in 2002 with clear cell RCC Stage 2, which was treated with a radical nephrectomy. She has had no recurrence or metastases. She has resided in Colorado Springs for her entire life, so fact and expert discovery of her case should be more straightforward than others who have had multiple sources of drinking water throughout their lifetimes. Ms. Hines is also the only non-Caucasian kidney

---

[2] To begin the process of selecting Tier 1 bellwether plaintiffs, the Parties initially exchanged lists including plaintiffs from each of the four diseases across both geographic locations. The Parties used that initial exchange of proposals to arrive at a final proposed pool for the Court, which ended up being a mix of mutual initial proposals, PEC initial proposals, and Defense initial proposals.

cancer plaintiff proposed by either of the Parties for Tier 2.

Mr. Mola was originally proposed by the PEC for Tier 1. Mr. Mola was diagnosed with clear cell RCC Stage 2 and was treated with a partial nephrectomy in 2012. He did not have to undergo any additional treatment and has not had any recurrence or metastasis. Mr. Mola has a history of being a heavy smoker, which is a risk factor for kidney cancer. Although the PEC has complained about defense picks with a history of smoking, 45% of the kidney cancer pool has a history of smoking so this should not be a disqualifying fact for Mr. Mola's case. Mr. Mola has resided in the Willow Grove/Warrington, Pennsylvania area for more than 43 years.

The PEC's two additional proposed plaintiffs, **Mr. Brock Donnelly** and **Mr. Clinton Speers**, provide less opportunity to gain meaningful information about the bellwether pool than Defendants' proposals. To start, neither is from Colorado. Mr. Donnelly is also from the same town as Mr. Voelker. By picking two plaintiffs from the same town, the Parties would be deprived of the opportunity to learn about different aspects of the Pennsylvania pool as a whole. In addition to his clear cell RCC, Mr. Donnelly alleges that PFAS exposure has caused vague, additional non-*Leach* injuries, like "inflammation" and gastrointestinal problems. If his case proceeds, the Parties and the Court will need to expend additional resources adjudicating general and specific causation on these other injuries, and it will be difficult to assess the bellwether injury independently.

Although Mr. Speers originally was a joint pick by the Parties for inclusion in Tier 1, discovery in his case has revealed that he is not a good candidate for Tier 2 because recent imaging suggests he may have a recurrence of his cancer, requiring significant additional medical workup over the coming months that may change the Parties' understanding of his case. This potential recurrence will complicate case workup, potentially necessitating ongoing collection of medical records, re-deposition of witnesses, and the modification of expert reports as Mr. Speers' case

evolves. These uncertainties make this case an unreasonable Tier 2 selection.

With Defendants' proposed slate of Messrs. Voelker (a mutual selection) and Mola, and Ms. Hines, the Court will achieve its bellwether program goals by gaining an understanding of both male and female plaintiffs from a variety of locations across both states, and will result in a better understanding of smoking as a risk factor in Mr. Mola's case. The PEC's slate in comparison is narrowed to one state, white male plaintiffs, and no smokers. Such a limited slate will prevent the Parties from effectively evaluating the inventory of kidney cancer cases as a whole.

### B.   Testicular Cancer.

Although testicular cancer is rare (accounting for only 1% of all cancers in men), it is the most commonly diagnosed cancer in younger men between the ages of 15 and 40. In addition to age, other risk factors for testicular cancer include, but are not limited to, race and ethnicity (it is most common among white men), undescended testicle(s), a family history of testicular cancer, and Klinefelter's syndrome. Approximately 95% of testicular cancers are "germ cell tumors" (GCTs), and all of the Tier 1 cases for which tumor type is known involve this type of tumor.[3] About two-thirds of all testicular cancers are diagnosed at Stage 1 (confined to the testes), and only 20% of testicular cancer patients experience metastatic disease. The most common treatment for testicular cancer is an orchiectomy (surgical removal of the affected testicle). Because the disease tends to be diagnosed early, the prognosis for testicular cancer patients is generally excellent.

The Parties agree on one testicular cancer plaintiff, **Mr. Rodney Hartman**, who was originally proposed by Defendants as a Tier 1 plaintiff. Mr. Hartman claims approximately 30 years of exposure in Pennsylvania. He was 36 when diagnosed in 2003 with a Stage 1 GCT, which was successfully treated by orchiectomy followed by adjuvant radiation therapy.

---

[3] One plaintiff, Mr. Alan Thein, has no records that confirm the histologic features of his tumor.

9

In addition to Mr. Hartman, Defendants also propose **Mr. James Belarde** and **Mr. Denny Scheiler**. Mr. Belarde, a mutual selection by Defendants and the PEC for Tier 1, alleges approximately 20 years of exposure from Fountain, Colorado municipal water. He was diagnosed in 2006 at age 38 with a Stage 1 GCT and was successfully treated with an orchiectomy and adjuvant radiation. Mr. Belarde, who identifies as Hispanic, is the only non-Caucasian testicular cancer plaintiff proposed by either of the Parties for Tier 2. Mr. Scheiler, a defense Tier 1 proposal, claims approximately 21 years of exposure from municipal water in Colorado Springs, Colorado. He was diagnosed with a Stage 1 GCT in 2007, at age 33, and was successfully treated by orchiectomy and one dose of adjuvant chemotherapy.

The PEC's two additional proposed plaintiffs, **Mr. Michael Bien**, originally a mutual selection for Tier 1, and **Mr. Alex Field**, originally a PEC selection, both come from Pennsylvania, meaning that the PEC proposes Pennsylvania-only Tier 2 testicular cancer (and kidney cancer) plaintiffs. Messrs. Bien and Field represent two of the more outlier cases in terms of diagnosis, prognosis, histology, metastases, treatment, and alleged infertility. Both had Stage 2 GCTs and metastases to lymph nodes, despite metastases occurring in only 20% of testicular cancer patients generally. Mr. Bien was diagnosed with a much less common and more aggressive type of GCT known as pure embryonal cell carcinoma and also had an additional surgical procedure known as a retroperitoneal lymph node dissection to remove affected lymph nodes—both unique features within the Tier 1 pool. Further, both men allege damages related to infertility, including costs associated with assistive reproductive methods. Such claims are not representative of the bellwether-eligible pool. Finally, Mr. Field is the only Tier 1 plaintiff to allege *in utero* PFAS exposure, and he is one of only four cases in the testicular cancer bellwether pool to allege exposure from use of a private well.

By contrast, Defendants' plaintiff selections comport with the Court's intended approach. Defendants' selections are most representative, reflecting the nearly even division in the bellwether-eligible testicular cancer pool (with 20 eligible plaintiffs from Colorado and 29 from Pennsylvania) as well as in the Tier 1 slate (in Tier 1, four of the testicular cancer plaintiffs came from Colorado and the other four from Pennsylvania). Defendants' selections also permit the Parties to learn more about the specific locations at issue within these two geographic areas. Additionally, Defendants' proposed plaintiffs are largely consistent with the disease presentation, treatment, and prognosis of those within the bellwether-eligible pool and with testicular cancers generally. Defendants' proposed slate thus furthers the Court's goals of the bellwether program by allowing the Parties to gather the type of information necessary to effectively evaluate the pool of testicular cancer cases as a whole.

C.    **Thyroid Disease.**

The majority of thyroid diseases manifest in women after the age of 40, with the risk continuing to increase with age. However, 35% of thyroid disease plaintiffs in the bellwether-eligible pool are men. Aside from age and gender, there are many other risk factors for thyroid disease, including but not limited to family history of thyroid disease, personal or family history of other autoimmune diseases, iodine deficiency, and certain medications (such as lithium).

The Parties agree on one thyroid disease plaintiff, **Mr. John Slagle**, who was originally proposed by Defendants as a Tier 1 plaintiff. Mr. Slagle comes from Colorado Springs, Colorado and is the only male in the Tier 1 thyroid disease pool.

In addition to Mr. Slagle, Defendants also propose **Ms. Dolores Carlson** and **Ms. Carol DeMaio**. Ms. Carlson is an 80-year-old Colorado plaintiff who was diagnosed with hypothyroidism in approximately 1997 at the age of 54. Ms. Carlson's treating physician testified that her thyroid disease and course of treatment are typical for a hypothyroidism patient. As is

11

fairly typical of thyroid disease patients, she has her thyroid levels checked on a regular basis and has been prescribed a relatively stable dose of medication since being diagnosed. Ms. Carlson's personal injury claims are limited to thyroid disease, and therefore this case is less likely to be overcomplicated or confuse a jury compared to other cases in which plaintiffs are alleging multiple injuries or diseases as a result of their exposure to AFFF.

Ms. DeMaio is a 78-year-old Pennsylvania plaintiff diagnosed with hypothyroidism in approximately 2000 at the age of 54. Importantly, Ms. DeMaio (originally a defense selection for Tier 1) is the only Tier 1 thyroid plaintiff from Pennsylvania, meaning she presents the only opportunity in this disease category to develop both aspects of the bellwether program—disease and location. This is important because 25% of the bellwether-eligible thyroid disease pool is from Pennsylvania. Ms. DeMaio's disease course and treatment also have been typical of most cases of thyroid disease. Her thyroid levels are regularly evaluated by her healthcare providers, and she has been prescribed a stable and moderate dose of medication to manage her condition since she was diagnosed. Like Ms. Carlson, Ms. DeMaio only alleges thyroid disease.

The PEC's two additional proposed cases, **Ms. Karen Frazier** (originally a PEC selection) and **Ms. Denise Jordan** (also originally a PEC selection), are less likely to yield meaningful information for the Parties based on certain unique characteristics present in their cases that would confuse a jury and make these cases outliers compared to the larger thyroid disease pool.

Ms. Frazier is a 59-year-old Colorado plaintiff who is claiming that exposure to AFFF caused both hypothyroidism and hyperlipidemia, meaning that the Parties will have to work up fact and expert discovery as to two different injuries related to her alleged PFAS exposure. Ms. Frazier's medical records are unclear as to her diagnosis date, suggesting that it is possible that she was diagnosed as young as 33, much younger than the average age of thyroid disease plaintiffs in

the pool and in the population overall.

Ms. Jordan is a 64-year-old Colorado plaintiff who was allegedly diagnosed with hypothyroidism in approximately 2010 at the age of 50. Ms. Jordan has a complicated medical history that is different from other plaintiffs. Ms. Jordan was exposed to Diethylstilbestrol (DES) *in utero*, and her treating physicians have attributed some of her medical conditions to that exposure. In addition to Hashimoto's Disease and hypothyroidism, she has been diagnosed with, or previously claimed to have, ulcerative colitis, high cholesterol, high blood pressure, eczema, Sjögren's syndrome, and Raynaud's disease. Ms. Jordan's DES exposure and her myriad other conditions are likely to confuse a jury and frustrate the ultimate purpose of this bellwether process. In addition to her alleged exposures in the Colorado area, it came to light in discovery that Ms. Jordan also worked at Hanscom Air Force Base and Fort Devens in Massachusetts, meaning her AFFF exposure history is also likely quite a bit more complex than any other thyroid plaintiff.

Defendants' proposed slate of Mr. Slagle, Ms. Carlson, and Ms. DeMaio would provide useful insight on the broader pool—across both genders and both geographic areas. Meanwhile, the PEC's thyroid picks introduce additional, unnecessary complications: in one case, a second *Leach* injury, and in the other, different chemical exposure to which healthcare providers have attributed some medical conditions. They also lack the geographic diversity of the defense slate, including plaintiffs only from Colorado. The goals of bellwether program would be better served by selection of Defendants' proffered plaintiffs.

**D.     Ulcerative Colitis.**

Ulcerative colitis is an autoimmune disease characterized by inflammation of the mucosal lining of the large intestine. Risk factors for ulcerative colitis include, but are not limited to, age (age at diagnosis generally peaks at around ages 15 to 30 and then again at ages 50 to 70), being white, and having a family history of inflammatory bowel disease. Unusually, although doctors do

not recommend smoking as a palliative for ulcerative colitis, it is one of the few known diseases for which smoking can alleviate disease severity and symptoms. Conversely, stopping smoking can also be a risk factor for the initial onset of ulcerative colitis. Ulcerative colitis is most commonly managed through a class of generally well-tolerated medications known as 5-aminosalicylate (5-ASA) drugs that includes mesalamines. Other medications used to treat this disease include corticosteroids, immunosuppressants, and biologics.

The Parties agree on one ulcerative colitis plaintiff, **Mr. James Zajicek**, who was originally proposed by the PEC as a Tier 1 plaintiff. Mr. Zajicek is a former smoker from Colorado Springs, Colorado. Mr. Zajicek's gastroenterologist prescribes him mesalamine (a 5-ASA) for his ulcerative colitis, which, as is typically the case for UC patients, when he takes it as prescribed, seems to manage his condition well. He also claims high cholesterol.

In addition, Defendants also propose **Mr. Michael Feite**, the only Tier 1 ulcerative colitis plaintiff from Pennsylvania. Because more than 40% of the bellwether-eligible ulcerative colitis plaintiffs are from Pennsylvania, his case provides the only vehicle to gain insight on a significant portion of the ulcerative colitis pool as a whole. Mr. Feite also takes a commonly prescribed 5-ASA. Unlike Mr. Zajicek, Mr. Feite is asserting ulcerative colitis without any ancillary conditions, so his case provides the Parties with the opportunity to assess an ulcerative colitis claim without other potential confounding factors.

In contrast, the PEC's additional selection, **Mr. Anthony Smalley**, introduces unnecessary complications while having little potential to deliver additional information about the broader pool. In fact, it appears that Mr. Smalley does not have ulcerative colitis in the first place. Mr. Smalley is a Colorado plaintiff and alleges a similar time period of exposure to Mr. Zajicek, upon whom both sides have already agreed. Most importantly, Mr. Smalley's medical records suggest that he

was incorrectly diagnosed and instead actually had infectious colitis, an acute (unlike ulcerative colitis, which is chronic) and entirely distinct condition with no alleged tie to PFAS exposure. Mr. Smalley had recognized acute infections at the time of his diagnosis, and his subsequent diagnostic tests have been normal. Mr. Smalley was diagnosed with no evidence of chronic colonic inflammation over time, which is the hallmark of ulcerative colitis. He also appears to have done well since stopping medications for ulcerative colitis in 2019. As a result, this case will revolve around whether Mr. Smalley even has ulcerative colitis, rather than on the causation and exposure issues that would be most instructive for a bellwether case.

With the Parties' mutual selection of Mr. Zajicek, Defendants' selection of Mr. Feite as the other ulcerative colitis case for Tier 2 fulfills the clear purpose of the bellwether program – assessing each of the four diseases through the dual lens of disease and geography. By contrast, the PEC proposes a Colorado-only set and, most problematically, the case of Mr. Smalley, who does not appear to have ulcerative colitis at all. Defendants' selections will provide more and better information about the bellwether pool as a whole.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court adopt the Defendants' Proposed Slate of Cases.

| | |
|---|---|
| Dated: July 16, 2024 | Respectfully submitted, |
| /s/ *Michael A. Olsen* | |
| Michael A. Olsen | Brian Duffy |
| Mayer Brown LLP | Duffy & Young LLC |
| 71 South Wacker Drive | 96 Broad Street |
| Chicago, IL 60606 | Charleston, SC 29401 |
| P: (312) 701-7120 | P: (843) 720-2044 |
| F: (312) 706-8742 | F: (843) 720-2047 |
| molsen@mayerbrown.com | bduffy@duffyandyoung.com |
| | |
| Joseph G. Petrosinelli | David E. Dukes |
| Williams & Connolly LLP | Nelson Mullins Riley & Scarborough LLP |
| 725 Twelfth Street, N.W. | 1320 Main Street, 17th Floor |
| Washington, DC 20005 | Columbia, SC 29201 |
| P: (202) 434-5547 | P: (803) 255-9451 |
| F: (202) 434-5029 | F: (803) 256-7500 |
| jpetrosinelli@wc.com | david.dukes@nelsonmullins.com |
| | |
| *Co-lead Counsel for Defendants* | *Co-liaison Counsel for Defendants* |