## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) | Master Docket No.: 2:18-mn-2873-RMG |

| | | |
|---|---|---|
| CITY OF CAMDEN, et al., | ) ) ) | Civil Action No.: 2:24-cv-02321-RMG |
| *Plaintiffs,* | ) ) | |
| *-vs-* | ) ) | |
| TYCO FIRE PRODUCTS LP, individually and as successors in interest to The Ansul Company, and CHEMGUARD, INC. | ) ) ) ) | |
| *Defendant.* | | |

| | | |
|---|---|---|
| CITY OF CAMDEN, et al., | ) ) ) | Civil Action No.: 2:24-cv-03174-RMG |
| *Plaintiffs,* | ) ) | |
| *-vs-* | ) ) | |
| BASF CORPORATION, individually and as successor in interest to Ciba Inc., | ) ) ) | |
| *Defendant.* | ) | |

## CLASS COUNSEL'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR ATTORNEYS' FEES AND COSTS

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................. 1

II.    THE SETTLEMENTS ........................................................................................ 8

    A.  PROCEDURAL BACKGROUND................................................................... 8

        1. Tyco........................................................................................................... 8

        2.  BASF ....................................................................................................... 9

        3.  Similarities of Settlements ..................................................................... 9

    B.  MECHANISM OF PAYMENT..................................................................... 10

        1.  Tyco ....................................................................................................... 10

        2. BASF ...................................................................................................... 10

        3. Class Fee and Class Costs ..................................................................... 11

            a. Class Fees and Class Costs Are Appropriate for a Class Action Settlement .............. 12

            b. Class Fee and Class Costs Allocation and Administration ........................................ 16

III.    BACKGROUND AND OVERVIEW OF COMMON BENEFIT EFFORTS DIRECTED SPECIFICALLY TO DEFENDANTS BASF AND TYCO INCLUDING THE TELOMER BELLWETHER PROGRAM ........................................ 19

    A.  A BRIEF HISTORY OF PRE-MDL LITIGATION AND EFFICIENCY OF THE MDL AND COUNSEL. ........................................................................... 19

        1. This Court Appointed Skilled Counsel with Institutional Knowledge of the Subject Matter Who Were Fully Capable of Performing Their Legal Services Efficiently.......20

        2. Plaintiffs' Counsel Conducted Discovery on a Massive Scale Efficiently Despite a Global Pandemic........................................................................................ 22

    B.  THE COMMON BENEFIT WORK UNDERTAKEN FROM THE ESTABLISHMENT OF THE AFFF MDL THROUGH MAY 31, 2024, DIRECTED SPECIFICALLY TO THE TELOMER DEFENDANTS SURMOUNTED A MYRIAD OF NOVEL AND DIFFICULT LEGAL QUESTIONS. ................................................................ 23

IV.    LEGAL STANDARD AND ARGUMENT ....................................................... 39

    A.  CLASS COUNSEL HAVE EARNED A PERCENTAGE FEE AWARD OF  8% OF THE COMMON FUND. ........................................................................... 39

    B.  THE PRINCIPLES GOVERNING THE DETERMINATION OF AN APPROPRIATE FEE AWARD UNDER <i>BARBER</i> SUPPORT THE PROPOSED 8% AWARD PLUS OUT-OF-POCKET COSTS.................................................................... 42

        1. The Time and Labor Required........................................................................ 42

2. The Novelty and Difficulty of the Questions Involved…………………………………43

3. The Skill Requisite to Perform the Legal Service Properly……………………………..47

4. The Preclusion of Other Employment by the Attorneys Due to Acceptance of the Case………………………………………………………………………………………47

5. The Customary Fee…………………………………………………………………………48

6. Whether the Fee is Fixed or Contingent……………………………………………………49

7. Time Limitations Imposed by the Client or the Circumstances………………………50

8. The Amount Involved and the Results Obtained…………………………………...…51

9. The Experience, Reputation, and Ability of the Attorneys……………………………52

10. The "Undesirability" of the Case…………………………………………………………52

11. The Nature and Length of the Professional Relationship with the Client…………...53

12. Awards in Similar Cases…………………………………………………………………53

C.    THE LODESTAR CROSS-CHECK CONFIRMS THAT CLASS COUNSEL'S FEE REQUEST IS REASONABLE........................................................................... 55

D.    PLAINTIFFS' COUNSEL ARE ENTITLED TO REIMBURSEMENT OF OUT-OF-POCKET COSTS ....................................................................................... 61

V.    CONCLUSION ................................................................................................ 61

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Barber v. Kimbrell's Inc.,* 577 F.2d 216 (4th Cir. 1978) ......................................................... *passim*

*Beesley v. Int'l Paper Co.,* No. 3:06-CV-703-DRH-CJP, 2014 WL 375432 (S.D. Ill. Jan. 31, 2014 ............................................................................................................................................ 61

*Berry v. Wells Fargo & Co.,* No. 3:17-CV-00304-JFA, 2020 WL 9311859 (D.S.C. July 29, 2020) .................................................................................................................. 14, 40, 56

*Binotti v. Duke University,* 1:20-cv-470, 2021 WL 5366877 (M.D. N.C. August 30, 2021) ...... 59

*Blum v. Stenson,* 465 U.S. 886 (1984) .......................................................................................... 40

*Boeing Co. v. Van Gemert,* 444 U.S. 472 (1980) .................................................................... 17, 39

*Boyle v. v. United Technologies Corp.,* 487 U.S. 500 (1988) ....................................................... 44

*Brodziak v. Runyon,* 145 F.3d 194 (4th Cir. 1998) ...................................................................... 51

*Brundle ex rel. Conestellis Employee Stock Ownership Plan v. Wilmington Tr., N.*A., 919 F.3d 763 (4th Cir. 2019) .................................................................................................................. 40

*Bruner v. Sprint/United Mgmt. Co.,* Nos. 08-2133-KHV, 08-2149-KHV, 2009 WL 2058762 (D. Kan. July 14, 2009). ................................................................................................................... 53

*Burford v. Cargill, Inc.,* No. 05-0283, 2012 WL 5471985 (W.D. La. Nov. 8, 2012) ................... 53

*Cantu-Guerrero v. Lumber Liquidators,* 952 F.3d 471 (4th Cir. 2020)……………….....………55

*Fickinger v. C.I. Planning Corp.,* 646 F. Supp. 622 (E.D. Pa. 1986) ........................................... 14

*Harman v. Lyphomed, Inc.,* 945 F.2d 969 (7th Cir. 1991) ............................................................ 49

*Hensley v. Eckerhart,* 461 U.S. 424 (1983). ............................................................................... 51

*In re Actos (Pioglitazone) Prods. Liab. Litig.,* 274 F. Supp. 3d 485 (W.D. La. 2017) ................ 56

*In re Air Crash Disaster at Florida Everglades on December 29, 1972,* 549 F.2d 1006 (5th Cir. 1977) ............................................................................................................................................ 13

*In re Allura Fiber Cement Siding Litig.*, No. 19-2886, 2021 WL 2043531 (D.S.C. May 21, 2021) ................................................................................................................ 40, 55

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 18-2873, 2021 WL 5822993 (D.S.C. Aug. 4, 2021)...........................................................................................39-41

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391 (U.S. Jud. Pan. Mult. Lit. 2018) .................................................................................................... 50

*In re Automotive Parts Antitrust Litig.,* 2020 WL 5653257 (E.D. Mich. Sept. 23, 2020) .......... 60

*In re Capacitors Antitrust Litig.*, No. 3:14-CV-03264-JD, 2018 WL 4790575 (N.D. Cal. Sept. 21, 2018) .......................................................................................................... 11, 59, 60

*In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir. 2001) ............................................... 41

*In re Continental Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) .................................................. 48

*In re Cook Medical, Inc., Pelvic Repair Systems Prods. Liab. Litig.,* 365 F. Supp. 3d 685 (S.D. W.Va. 2019). ................................................................................................... 56

*In re Diet Drugs*, 582 F.3d 524 (3d Cir. 2009) ...................................................................... 14, 41

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008)............................................................................. 41

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ........ 41, 49

*In re LandAmerica 1031 Exchange Svcs.*, No. 2054, 2012 WL 5430841 (D.S.C. Nov. 7, 2012). ................................................................................................................ 48, 49

*In re Mills Corp. Sec. Litig.*, 265 F.R.D. 246 (E.D. Va. 2009). ................................................... 49

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005) ............................................. 55

*In re Southeastern Milk Antitrust Litig.,* 2013 WL2155387 (E.D. Tenn. May 17, 2013) ........... 60

*In re Transpacific Passenger Air Transportation Antitrust Litig.,* No. 07-5634, 2019 WL 6327363 (N.D. Cal. Nov. 26, 2019) ......................................................................... 60

*In re Vioxx*, 760 F. Supp.2d 640 (E.D. La. 2010) ........................................................ 55

*In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, No. 2179, 2016 WL 6215974 (E.D. La. Oct. 25, 2016) ........................................................ 51, 55

*Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d 714 (5th Cir. 1974) .......................... 40, 53

*Lobatz v. U.S. West Cellular of California,* 222 F.3d 1142 (9th Cir. 2000) ............................. 60

*McAdams v. Robinson*, 26 F.4th 149 (4th Cir. 2022). .................................................... 39

*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970) .................................................... 13

*Morris v. Bland*, 2015 WL 12910631 (D.S.C. 2015) .................................................... 57

*National Wildlife Federation v. Hanson*, 859 F.2d 313 (4th Cir.1988) ................................. 57

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014) ............................... 41

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-cv-42, 2015 WL 6964973 (E.D.N.Y. Nov. 10, 2015) ........................................................................ 60

*Rum Creek Coal Sales, Inc v. Caperton*, 31 F.3d 169 (4th Cir. 1994) ................................... 57

*Savani v. URS Pro. Sols. LLC,* 121 F. Supp. 3d 564 (D.S.C. 2015) .......................... 14, 49, 55-56

*Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939) .......................................... 13, 14

*Torrisi v. Tucson Elec. Power Co.*, 83 F.3d 1370 (9th Cir.1993) ........................................ 49

## Rules

FED. R. CIV. P. 23(h) ........................................................................................ 17, 39

Local Rule 54.02(A) ...................................................................................... 4, 40

## I.    INTRODUCTION

Drinking water consumed by the American public will become safer due to two additional successes in the ongoing efforts to secure settlement funds to treat PFAS contamination in water supplies nationwide. Plaintiffs' counsel first secured two historic settlement funds for Public Water Suppliers ("PWS")—$1.185 billion from DuPont[1] and between $10.5 and $12.5 billion from the 3M Company ("3M")—in June 2023, which were both granted final approval by this Court.[2] Now, Plaintiffs' counsel have secured two additional settlements in the amounts of $750 million ("Tyco Settlement Amount") from Tyco Fire Products LP ("Tyco") and $316.5 million ("BASF Settlement Funds") from BASF Corporation ("BASF")—to further aid PWS in their efforts to provide PFAS-free water. After years of intensely adversarial litigation, Class Counsel now petition the Court for an award of attorneys' fees commensurate with the exceptional result they labored tirelessly for years to bring about. Class Counsel again request an award of only 8% of the combined total of the Tyco and BASF Settlement Amounts, or $85,320,000 ("Class Fee"),[3] plus reimbursement of expenses and costs ("Class Costs") in the amount of $10,471.081.51.[4] Class Counsel's fee request represents an amount well below the approximate 25% benchmark permissible under Fourth Circuit precedent and is appropriate given the enormity of the work performed to obtain these results.[5]

---

[1] DuPont includes The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., and E. I. DuPont de Nemours and Company n/k/a EIDP, Inc. (collectively herein, "DuPont").

[2] *See* 3M Final Approval Order and Opinion [ECF No. 4754]; *see also* DuPont Final Approval Order and Opinion [ECF No. 4471].

[3] With the exception of the terms "Class Fee" and "Class Costs," which are defined herein, all other capitalized terms have the same definition as in the Class Action Settlement Agreements [ECF No. 4911-3] ("Tyco Settlement Agreement") and [ECF No. 5053-3] ("BASF Settlement Agreement").

[4] Together, the Class Fee and Class Costs constitute the "Class Award."

[5] *See* Diagram, *infra*.

Over the last five-plus years, Plaintiffs' counsel—including Co-Lead Counsel, preliminarily-approved Class Counsel, the Plaintiffs' Executive Committee ("PEC"), and the colloquially named Strike Force—have spent over 480,000 hours[6] working on "intertwined" tasks that synergistically yielded the largest drinking water settlements in United States history.[7] This colossal achievement was the result of a sustained and concerted effort directed against *all* Defendants, whose liability is undeniably intertwined and interrelated. Under the Court's watchful oversight and various scheduling orders, Plaintiffs conducted common discovery against all Defendants simultaneously, defeated common defenses (*e.g.,* government contractor defense), traced the exchange of research and knowledge as between and amongst the Defendants, and engaged in other analyses that revealed the interplay among the various Defendants and the United States government.

These efforts were nothing short of exceptional. Every hour devoted to this litigation advanced the liability case against all Defendants; the cumulative time expended by Plaintiffs' counsel to obtain the initial two PWS Settlements was necessarily common to the cause and indivisible across settlements with individual Defendants.[8] At the time Plaintiffs' counsel petitioned the Court for attorneys' fees related to the landmark settlements involving both 3M and DuPont, they had already accumulated 431,158.9[9] hours of common benefit work devoted to the resolution of the claims of all PWS, with the first trial focused primarily on 3M.[10] Since then,

---

[6] Declaration of John W. Perry, Jr.  ("Perry Decl."), attached hereto as Ex. A, at  ¶¶ 20-21.

[7] *See* Apr. 23, 2024, Fee Order and Opinion [ECF No. 4885] ("Fee Order"), at 6.

[8] *See* Fee Order at 6 (noting the "interconnected relationship" of these cases).

[9] Class Counsel's Memorandum of Law in Support of their Motion for Attorneys' Fees and Costs in the 3M PWS Settlement [ECF No. 4269-1] ("3M Fee Petition"), at 1; *see also*, Perry Decl., at ¶ 20.

[10] As the Court will recall, the *Stuart* trial was focused primarily on 3M because 3M was responsible for approximately 90% of the combined PFOA and PFOS contamination of Stuart's wells. *See* Declaration of Gary J. Douglas in Support of Class Counsel's Motion for Final Approval of Class Settlement and for Final Certification of the Settlement Class [ECF No. 4273-21], at ¶ 6.

Plaintiffs' counsel have accumulated an additional 50,182.7 of common benefit time devoted to the continued prosecution of this MDL.[11]

Thus, as Class Counsel previously indicated in their Motions for Attorneys' Fees and Costs associated with the DuPont and 3M PWS Settlements,[12] Class Counsel respectfully request that this Court view the settlements reached to date in the aggregate when analyzing the Class Fee—just as the Court approached the overall management of this case with all Defendants in concert, beginning with Science Day, through the government contractor defense briefing and argument, the first water provider bellwether process, right up until the eve of the first bellwether trial involving the City of Stuart, Florida. And, most recently, through the Telomer Water Provider Bellwether Program, as set forth in Case Management Orders ("CMOs") 27-27H,[13] which focused heavily on Telomer Defendants,[14] including primarily Tyco and BASF (by design) and was crucial and instrumental to the successful negotiations of the Tyco and BASF PWS Settlements.

Courts regularly award percentage fees from a common fund in cases such as these, in amounts far greater than 8%. Given this Court's intimate familiarity with how cohesively this litigation was conducted, Class Counsel again ask the Court to approve an 8% Class Fee award in

---

[11] It is important to note that Plaintiffs' counsel, with the oversight of Special Master John Perry, have been careful to segregate from the current time submission now before the Court, all work devoted to the administration of the existing 3M and DuPont Settlements, which time will be the subject of a separate fee petition from the funds held back from those two settlements for this purpose. *See* Fee Order, at 8 (describing the filing date as the first Thursday in November, *i.e.*, November 7, 2024); *see also* Perry Decl., at ¶ 21.

[12] 3M Fee Petition, at 2; *see also* Class Counsel's Memorandum of Law in Support of their Motion for Attorneys' Fees and Costs for the DuPont PWS Settlement [ECF No. 3795-1] ("DuPont Fee Petition"), at 2.

[13] CMO 27-27H [ECF Nos. 3665, 3892, 4089, 4108, 4275, 4464, 4829, 4878, 5007].

[14] Telomer Defendants includes those Defendants whose AFFFs incorporate fluorosurfactants manufactured using the telomerization process (*e.g.*, Tyco), and fluorosurfactant manufacturers themselves who utilized the telomerization process to manufacture their fluorosurfactants (*e.g.*, BASF).

the context of the Tyco and BASF PWS Settlements,[15] as it did for the 3M and DuPont Settlements.[16] This is justified given that the hours and work collectively accumulated were equally important to achieving all PWS Settlements to date.

As discussed below, a thorough analysis of the *Barber* factors[17] illustrates that the requested Class Fee is reasonable, especially given the daunting governmental contractor defense that loomed over this litigation like the sword of Damocles. Thanks to this Court's oversight, Plaintiffs' counsel skillfully faced and surmounted well-resourced defense counsel who energetically pressed their novel and difficult governmental immunity arguments, as well as other challenges at every turn. Notably, a jury trial was imminent prior to the settlements achieved with DuPont and 3M, which was set to take place beginning in June 2023.

More recently, significant trial pressure was likewise placed on both Defendants BASF and Tyco who faced a quickly approaching water provider trial originally slated for the Fall of 2024.[18] With the situation fraught with adversity, Plaintiffs' counsel were obliged to rise to each occasion, sweating through thousands of hours of document review over the course of now more than five years of significant motion practice, contentious discovery, complex research, evidentiary presentations, and more. While this may have appeared seamless to the unknowing outside observer, it came about only through countless sleepless nights and exacting preparation by seasoned counsel whose ability matched their well-deserved reputations and judicial

---

[15] Class Counsel believe an 8% Class Fee request is appropriate with respect to the Tyco and BASF PWS Settlements, and such request is consistent with legal precedent, but any future settlements will need to be analyzed separately, if, and when, they occur.

[16] *See* Fee Order at 5, 12 (approving the percentage of fund approach and approving as "reasonable" an 8% award).

[17] *See generally* Local Civil Rule 54.02(A) D.S.C., adopting *Barber v. Kimbrell's Inc.,* 577 F.2d 216, 226 n.28 (4th Cir. 1978).

[18] CMO 27G, Telomer Bellwether Program [ECF No. 4878]. This date was later extended first to January 27, 2025, and then later to March 3, 2025. *See* CMOs 27H and 27I, respectively [ECF No. 5007 and 5362].

4

appointments. The result achieved for the Settlement Class Members—considering all the significant litigation risks that were ever-present and only overcome after two rounds of pre-trial bellwether work-up by Plaintiffs' counsel, who went uncompensated for years as they labored on a contingent basis—is nothing short of exceptional. Where such extraordinary results are achieved, courts in similar cases do not hesitate to justly compensate counsel for their contributions.

As the diagram below depicts, the 8% fee request represents a small portion of the total combined Tyco and BASF PWS Settlements—and notably, the same percentage was approved by the Court as reasonable in the DuPont and 3M PWS Settlements—as well as representing a much lower percentage-method award than is supported by Fourth Circuit precedent.[19]

**$1.0665 Billion Total Settlement Amounts**



---

[19] Declaration of Brian T. Fitzpatrick, attached hereto as Ex. B ("Fitzpatrick Decl."), at ¶ 2 (opining that 8% is lower than the norm and easily justified).

In addition to the request for 8% in attorneys' fees, Class Counsel likewise seek reimbursement of Class Costs in the amount of $10,471,081.51, their total out-of-pocket costs expended to fund the prosecution of this litigation since August 30, 2023, to June 30, 2024, all of which contributed to the success of the Class's claims.[20] No incentive awards are being sought for the Class Representative Plaintiffs.

A comprehensive description of the massive scope and nature of the work performed by PEC firms and other common benefit attorneys, up to and including August 29, 2023, is thoroughly detailed in Class Counsel's memorandums in support of their Fee Petitions with respect to both the DuPont and 3M PWS Settlements and relevant supporting exhibits, which are incorporated by reference as if fully set forth herein.[21] To avoid duplication, the instant petition focuses on both Tyco- and BASF-specific discovery and related efforts leading to these PWS Settlements, including most recently the work performed in the Telomer Bellwether Program. In addition to the extensive efforts detailed below, Plaintiffs' counsel support the instant motion with additional declarations, including the Declaration of Michael A. London ("London Decl."), which addresses the administration of this complex and multi-track MDL, and details the efforts related to the Telomer Defendants and specifically to Tyco and BASF; the Declaration of Scott Summy ("Summy Decl."), which describes the settlement process, its complex details, and the history of negotiations with Tyco and BASF; the Declaration of Gary J. Douglas ("Douglas Decl."), which details the substantive litigation efforts historically undertaken with respect to Defendants Tyco and BASF, as well as the more recent Telomer Bellwether Program contributions; the Declaration

---

[20] Perry Decl., at ¶ 24 (reporting total unreimbursed costs submitted to date of $10,471,081.51); *see also* Fitzpatrick Decl., at ¶ 2 (noting that Plaintiffs' reimbursement request is well below average for class action litigation).

[21] DuPont Fee Petition and relevant supporting declarations [ECF Nos. 3795-1, 3795-4, 3795-6 to 3795-9, 3795-11 to 3795-13]; *see also* 3M Fee Petition and relevant supporting declarations [ECF Nos. 4269-1, 4269-3, 4269-5 to 4269-12].

of Paul J. Napoli ("Napoli Decl."), which details the work performed to defeat the government contractor immunity defense; and the Declaration of Joe Rice ("Rice Decl."), which details the negotiations with Tyco and BASF. The supporting declarations are being filed concurrently herewith and are attached as Exs. C, D, E, F, and G, respectively.

All the efforts described in the new declarations, coupled with the efforts set forth in the prior Fee Petitions, combined to achieve these remarkable PWS Settlements, including those involving Tyco and BASF which, if finally approved, will bring significant additional benefits to the Settlement Class.

Finally, Class Counsel provide input from leading professionals to assist the Court in evaluating the reasonableness of Class Counsel's fee request under the *Barber* standards, including the Declaration of Brian Fitzpatrick ("Fitzpatrick Decl."), summarizing the legal framework governing fee awards; the Declaration of John Perry ("Perry Decl."), attesting to the number of hours of work performed by PEC firms and other common benefit attorneys from August 30, 2023 through May 31, 2024[22] and the expenses submitted by PEC firms through June 30, 2024,[23] and the Declaration of Steven J. Herman ("Herman Decl."), regarding an appropriate hourly rate for attorney time in this MDL (for the purpose of a Lodestar cross-check, in the event the Court chooses to perform one), which are attached as Exs. B, A, and H, respectively.

The Tyco and BASF PWS settlements are the result of a years-long, multitrack effort by Plaintiffs' counsel who expended hundreds of thousands of hours on multiple fronts, including litigation efforts, MDL case administration and settlement negotiations, without any guarantee of

---

[22] Under CMO 3, common benefit reporting time is accounted for on a monthly basis. Class Counsel is using May 31, 2024, as the time reporting deadline for this fee petition because it is the last reporting deadline for which all relevant timekeepers reported time in a timely fashion.

[23] Class Counsel is using June 30, 2024, as the expense reporting deadline for this fee petition as law firms have submitted relevant expenses through this date.

a recovery. This three-pronged approach was necessary given the highly complex nature of this MDL involving so many defendants, and to meet the challenges and obstacles presented by this MDL, including, of course, litigating amid a global pandemic, and then subsequently in the midst of newly promulgated EPA regulations announcing the strictest drinking water standards in U.S. history.

All attorneys, working together towards the same goal, enhanced the efforts of the others, and their combined efforts, as described more fully below and in the supporting declarations, as well as in prior fee petitions, along with existing legal precedent, demonstrate that the requested 8% Class Fee of $85,320,000.00 and $10,471,081.51 in Class Costs is reasonable.

## II.    THE SETTLEMENTS
### A.    PROCEDURAL BACKGROUND

#### 1.    Tyco

On April 12, 2024, the Tyco Class Action Settlement Agreement was executed.[24] On June 13, 2024, the $750 million proposed class settlement with Tyco was preliminarily approved.[25] The preliminarily approved settlement is for the Settlement Class consisting of:

> Every Active Public Water System in the United States of America that has one or more Impacted Water Sources as of May 15, 2024.[26]

In its Tyco Preliminary Approval Order, the Court noted "that it will likely be able to certify the proposed Settlement Class…"[27] Moreover, pursuant to the Tyco Preliminary Approval Order, the Court likewise instructed Class Counsel to file a motion for attorneys' fees and/or litigation

---

[24] Summy Decl., at ¶ 18; *see also*, London Decl., at ¶ 28
[25] Preliminary Approval Order for Settlement Between Public Water Systems and Tyco [ECF No. 5147] ("Tyco Preliminary Approval Order" and/or "Tyco PAO").
[26] *Id.* at ¶ 3.
[27] *Id.* at ¶ 5.

costs,[28] which now occasions this request for a reasonable Class Fee and Class Costs award in accordance with the methodology set forth in Section II.B.3 below.

### 2.     BASF

The BASF Class Action Settlement was executed on May 20, 2024,[29] and on July 3, 2024, the $316.5 million proposed class settlement with BASF was preliminarily approved.[30] The preliminarily approved BASF Settlement Class is defined identically to the Tyco Settlement Class, and includes:

> Every Active Public Water System in the United States of America that has one or more Impacted Water Sources as of May 15, 2024.[31]

In its BASF Preliminary Approval Order, the Court noted "that it will likely be able to certify the Settlement Class…"[32] Moreover, pursuant to the Preliminary Approval Order, the Court likewise instructed Class Counsel to file a motion for attorneys' fees and/or litigation costs,[33] which now likewise occasions this request for a reasonable Class Fee and Class Costs from the BASF PWS Settlement in accordance with the methodology set forth in Section II.B.3 below.

### 3.     Similarities of Settlements

Notably, the definitions of the preliminarily approved Settlement Classes for both the Tyco and BASF PWS Settlements are identical. Specifically, both include Settlement Classes for PWS that have *current* PFAS detections.[34] Both PWS Settlements require those detections to be present

---

[28] *Id*. at ¶ 27.
[29] Summy Decl., at ¶ 20; *see also*, London Decl., at ¶ 33.
[30] Preliminary Approval Order for Settlement Between Public Water Systems and BASF ("BASF Preliminary Approval Order" and/or "BASF PAO") [ECF No. 5253], at ¶ 3.
[31] *Id*., at ¶ 3; *see also* BASF Settlement Agreement, at § 5.1.
[32] BASF PAO, at ¶ 5.
[33] *Id*. at ¶ 26.
[34] Tyco PAO, at ¶ 3; *see also* BASF PAO, at ¶ 3 (emphasis added).

prior to **May 15, 2024**.[35] That these PWS settlements include only those PWS with current detections partially accounts for the settlement values as compared to the DuPont and 3M PWS Settlements, which in addition to including those PWS with current detections likewise included Phase Two claimants, i.e., PWS that did not yet have PFAS detections but that may have future detections.

### B.   MECHANISM OF PAYMENT

#### 1.   Tyco

Class Counsel respectfully request Tyco Class Fees and Class Costs, broken down as follows:

- Tyco Class Fee: $60,000,000.00 (8% of the total Settlement Funds) to be awarded for attorneys' fees (e.g., for the legal work performed for the common benefit of all litigants, all of which helped achieve this impressive result); and

- Tyco Class Costs: $7,329,757.06 to be awarded for reimbursement of costs (70% of total Class Costs requested of $10,471,081.51—e.g., Tyco's proportional share, based on its settlement value's contribution to the total aggregate settlement value for the Tyco and BASF PWS Settlements combined, of out-of-pocket costs expended from August 30, 2023, to June 30, 2024 by PEC and Class Counsel for the common benefit of all litigants).

#### 2.   BASF

Class Counsel respectfully request BASF Class Fees and Class Costs, broken down as follows:

- BASF Class Fee: $25,320,000.00 (8% of the total Settlement Funds) to be awarded for attorneys' fees (e.g., for the legal work performed for the common benefit of all litigants, all of which helped achieve this impressive result); and

- BASF Class Costs: $3,141,324.45 to be awarded for reimbursement of costs (30% of total Class Costs requested of $10,471,081.51—e.g., BASF's proportional share, based on its settlement value's contribution to the total aggregate settlement value for the Tyco and BASF PWS Settlements combined, of out-of-pocket costs

---

[35] *Id.*

expended from August 30, 2023, to June 30, 2024 by PEC and Class Counsel for the common benefit of all litigants).

### 3. Class Fee and Class Costs

Together, the Tyco and BASF Class Fee request totals $85,320,000 (Tyco Class Fee of $60,000,000 + BASF Class Fee of $25,320,000—or alternatively, 8% of the combined total Settlement Funds (0.08*($750,000,000 + $316,500,000))).

Class Counsel's intention to submit this fee and cost reimbursement request was set forth in the DuPont and 3M Fee Petitions.[36] Of note, there was not a single objection filed as to this percentage and mechanism challenging either the DuPont or the 3M Fee Petitions; not a single objection regarding fees was lodged at the Final Fairness Hearing held on December 14, 2023; nor a single objection to the Court's approval of such Motions.[37] This positive reaction by Class Members corroborates the reasonableness of this modest percentage award and reimbursement of expenses, especially when put into context of other comparable litigation awards.[38] Of note as well, the PEC previously approved this 8% Class Fee framework following an in-person meeting and vote of the PEC, without objection.[39] Moreover, on July 2, 2024, during a PEC-wide conference call, the PEC once again unanimously confirmed their support of an 8% fee request with respect to the Tyco and BASF PWS Settlements.[40]

---

[36] DuPont and 3M Fee Petitions, at 2; *see also*, Declaration of Brian Fitzpatrick in Support of DuPont Fee Petition ("Fitzpatrick DuPont Fee Decl.") [ECF 3795-5], at ¶ 23 (citing *In re Capacitors Antitrust Litig.*, No. 3:14-CV-03264-JD, 2018 WL 4790575, at *6 (N.D. Cal. Sept. 21, 2018) for the proposition that "[b]ecause the total work performed by counsel from inception of the case makes each settlement possible, courts typically base fee awards in subsequent settlements on all work performed in the case.").

[37] London Decl., at ¶ 37.

[38] While this fee request is being made by Class Counsel, it is for the work performed over the course of the litigation by Lead Counsel, Class Counsel, PEC firms and other common benefit attorneys (collectively referred to as "Plaintiffs' counsel" or "counsel"), as set forth in III.B, *infra*.

[39] Summy Decl., at ¶ 27.

[40] London Decl., at ¶ 37.

As explained in detail by Mr. Summy, Co-Lead Counsel analyzed and determined that resolution of this matter on a class-wide basis would be the optimal means of ensuring that all PWS had the opportunity to benefit from any proposed resolution.[41] Pursuant to Rule 23 and the principles of the common benefit doctrine, counsel are entitled to seek a reasonable fee and out-of-pocket costs from the Settlement Amount. Class Counsel seek an 8% Class Fee here, as they did and as was approved from the DuPont and 3M PWS Settlements, both of which were granted final approval by this Court.

Just like in the DuPont and 3M Fee Petitions, the instant motion seeks the same percentage for Class Fees as was sought in those PWS Settlements and seeks reimbursement of Class Costs on the same proportionate basis approach, which means reimbursement of the remaining class costs expended through June 30, 2024, in the amount of $10,471,081.51. Thereafter, additional fees and/or costs would be compensated from future judgments or settlements.[42] More specifically, with regards to Class Costs, Class Counsel would seek to apportion the costs incurred between the Tyco and the BASF PWS Settlements in accordance with each Settlement's proportional contribution to the combined total of $1.0665 billion ($750 million + $316.5 million). The Tyco PWS Settlement represents approximately 70% of the combined total, while the BASF PWS Settlement represents approximately 30%.

> a.  **Class Fees and Class Costs Are Appropriate for a Class Action Settlement**

CMO 3, which issued on April 26, 2019, contemplated a common benefit holdback for settlements in individual cases in the amount of 9% (6% for common benefit attorneys' fees and

---

[41] Summy Decl., at ¶¶ 18-20.

[42] Regarding private attorney-client agreements as to fees and costs, Class Counsel submits that those be paid in accordance with their private contract terms and the Class Fee will be deducted from the private attorneys' portion of any settlement funds.

3% for common benefit costs and expenses).[43] Notably, CMO 3 contemplated that its application would be "subject to modification depending on the future course of litigation."[44] Due to the class action mechanism under which these resolutions were reached, CMO 3's holdback should not apply to these settlements. Instead, CMO 3 should continue to apply in the context for which it was originally designed—namely, for individual or private case settlements[45]—while here, Class Counsel's reasonable request for a Class Fee and Class Costs should be granted due to certain additional distinguishing factors which must be considered. Rather than employ the MDL assessment applicable to individual case settlements under CMO 3, which is designed to prevent "free riders,"[46] the Class Fee and Class Costs requests spread the fee amongst *all* Class Members, *i.e.,* absent Class Members (some of whom are not represented by counsel) as well as the Class Representative Plaintiffs, as is appropriate in a class action settlement under FED. R. CIV. P. 23.

In addition, the current motion requests *less than* CMO 3's 9% holdback, since the Class Fee request is only 8% and Class Counsel only seek reimbursement of proportional costs of $10,471,081.51, which represent the still unreimbursed expenses since the Fee Order, *i.e.,* between August 30, 2023 (the cut-off date from Class Counsel's previous request for Class Costs) and June 30, 2024 (the last reporting deadline for which all relevant timekeepers have submitted common

---

[43] CMO 3 [ECF No. 72], at ¶ 19.
[44] *Id.* at ¶ 21.
[45] Plaintiffs recognize that CMO 3 will likely apply in future individual or private case settlements. For example, if a cluster of personal injury or property damage cases were to settle with one lawyer (or small group of lawyers), as occurred in *Campbell v. Tyco Fire Prods., et al.,* 19-cv-00422 or *City of Stuart v. 3M, et al.,* 18-cv-3487, then the requirements of CMO 3 would likely apply.
[46] *See Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977).

benefit expenses).[47] The Class Costs sought were expended to achieve the recovery in the Tyco and BASF PWS Settlements and have been certified by Special Master John Perry's office.[48]

The PEC spent $31,858,642.26 for all litigation expenses from the origin of the litigation, through June 30, 2024, of which $21,387,560.75 has already been reimbursed through the DuPont and 3M PWS Settlements.[49] Time and expense reports were required to be submitted to the Court-appointed CPA, Mr. Jeremy Betsill.[50] Special Master John Perry and his office, with his partner Mr. Dan Balhoff, reviewed the submissions to ensure they complied with CMO 3. These professionals categorized the expenses as either Held Expenses or Shared Expenses.[51] Mr. Perry confirmed that Plaintiffs' expenses have been received in accordance with CMO 3.[52] Because the PEC intends to treat PWS Settlements as presenting a virtually unified common fund due to how the cases were jointly prosecuted against all Defendants and how the work was inextricably intertwined, Class Counsel intend to seek reimbursement of all costs from work performed to achieve such settlements from each PWS Settlement, as had been previewed in the 3M and DuPont Fee Petitions.[53] In addition to litigation costs, certain costs of providing notice to the class, and the

---

[47] Perry Decl., at ¶ 10.

[48] *See generally* Perry Decl.

[49] Fee Order, at 11, 14; *see also*, Perry Decl., at ¶ 23.

[50] CMO 3, at ¶ 12.d.

[51] *Id.*, at ¶ 14; *see also* Perry Decl. at ¶¶ 23-25.

[52] Perry Decl., at ¶ 9.

[53] DuPont and 3M Fee Petitions, at 2; *see also* Fitzpatrick DuPont Fee Decl., at ¶ 23. Courts are authorized to award payment of out-of-pocket costs expended to achieve a common benefit recovery or to advance the common goals of plaintiffs in MDL litigation. *See Sprague*, 307 U.S. at 166-67 (recognizing a federal court's equity power to award costs from a common fund); *Savani v. URS Pro. Sols. LLC,* 121 F. Supp. 3d 564, 576 (D.S.C. 2015) ("Reimbursement of reasonable costs and expenses to counsel who create a common fund is both necessary and routine"). "The prevailing view is that expenses are awarded in addition to the fee percentage." *Berry v. Wells Fargo & Co.,* No. 3:17-CV-00304-JFA, 2020 WL 9311859, at *15 (D.S.C. July 29, 2020) (citations omitted). Notably, CMO 3's holdback assessment serves the underlying purpose of the common fund doctrine: "avoid[ing] the unjust enrichment of those who would otherwise benefit from the fund without paying the litigation costs necessary to produce the fund." *Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622, 632 (E.D. Pa. 1986); *see also In re Diet Drugs*, 582 F.3d 524,

currently invoiced costs of the Notice Administrator, Escrow Agent, and Special Master, are to be taken from the QSF even before the Effective Date in accordance with the Settlement Agreements.[54] Should final approval be granted, future costs of the Notice Administrator, Escrow Agent and Special Master shall be paid directly from the QSF in accordance with the Settlement Agreements.[55]

The Class Fee sought from the Tyco PWS Settlement is calculated as 8% of the Settlement Amount of $750,000,000, for a total of $60,000,000. Class Counsel respectfully seek disbursement of the requested Tyco Class Fee, if awarded, in the amount of $60,000,000 after Tyco's last payment is made in mid-October 2024 and upon entry of a Court Order granting the instant request.[56]

The Class Fee sought from the BASF PWS Settlement is calculated as 8% of the Settlement Funds of $316,500,000, for a total of $25,320,000.[57] Together, the Class Fee sought from both the Tyco and the BASF PWS Settlements is 8% of their combined gross totals of $1,0665,000,000, for a total Class Fee in the amount of $85,320,000. Assuming the Court approves the 8% Class Fee award, the chart below summarily depicts the requested Class Fee and disbursement schedule:

| CLASS FEE REQUEST AND DISBURSEMENT | | |
|---|---|---|
| EVENT | CLASS FEE AWARD | DESCRIPTION |
| Court Order granting Tyco Class Fee Award requested | $60,000,000 | Tyco PWS Settlement 8% Class Fee Award |

---

550 n.52 (3rd Cir. 2009) (noting that fee awards in common fund cases include "[b]asic concerns for fairness and due process"). Coinciding with this principle, the equitable considerations addressing reimbursement of costs from a common fund created by virtue of a class action apply to ensure that all class members, whether or not represented by counsel, contribute to pay for the recovery.

[54] Tyco Settlement Agreement, at §§ 6.2-6.3, 6.12; BASF Settlement Agreement at § 6.1.1.

[55] *Id.*

[56] London Decl., at ¶¶ 40-42.

[57] London Decl., at ¶ 37.

| | | |
|---|---|---|
| Court Order granting BASF Class Fee Award requested | $25,320,000 | BASF PWS Settlement 8% Class Fee Award |
| **TOTAL** | **$85,320,000** | |

Finally, as noted above, while the Class Fee would be paid from the common fund, Class Counsel propose, in consultation with Plaintiffs' expert, that the Class Fee be treated like a common benefit assessment as was requested in the previous Fee Petitions, which also previewed Class Counsel's intent to request such an approach be applicable to future settlements such as these with Tyco and BASF.[58] Thus, the contingency fee set forth in represented Plaintiffs' individual contingency fee agreements would be reduced to account for the Class Fee of 8%. For example, a Class Member who hired a private lawyer on a 25% contingency agreement will have their contingency agreement reduced to 17% because the Class Fee will have already come off the top. The PEC uniformly agreed to this mechanism for the 3M and DuPont Settlements, and have again confirmed their endorsement of the same treatment for these Settlements. It is proposed that this procedure should therefore apply.

In sum, the total attorneys' fees being sought at this time from the Tyco PWS Settlement is $60,000,000. The total attorneys' fees being sought at this time from the BASF PWS Settlement is $25,320,000. When aggregated, the total Class Fee award requested from the Tyco and BASF PWS Settlements is $85,320,000.

### b.     Class Fee and Class Costs Allocation and Administration

Pursuant to CMO 3, and in accordance with the Settlement Agreement, common benefit awards are to be deducted from any settlement monies paid by Defendants.[59] As noted above, the

---

[58] DuPont and 3M Fee Petitions, at 2 and 15 respectively.
[59] CMO 3; *see also* Tyco Settlement Agreement, at §§ 2.68, 3.1, 6, and BASF Settlement Agreement at §§ 2.16, 3.1, 6.

proposed Class Fee and Class Costs would be deducted the same way; namely, taken from the settlement fund itself. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). *See also* FED. R. CIV. P. 23(h).

The following chart delineates the calculation and transfer destinations of the funds to be paid from the Settlement Amount for the Class Fee and Class Costs:

| | CALCULATION | AMOUNT | TRANSFERRED TO |
|---|---|---|---|
| | **Tyco and BASF PWS Settlement Funds** | | |
| A | Tyco total Settlement Funds | $ 750 million | Tyco Qualified Settlement Fund |
| B | BASF total Settlement Funds | $ 316.5 million | BASF Qualified Settlement Fund |
| C | Combined Tyco & BASF total Settlement Funds (A + B) | $ 1.0665 billion | N/A |
| | **Plaintiff Costs** | | |
| D | Total costs expended between August 30, 2023, and June 30, 2024 | $ 10,471,081.51 | N/A |
| E | Tyco proportion of combined total (A / C * 100) | ~70% | MDL 2873 Expense QSF[60] |
| F | BASF proportion of combined total (B / C * 100) | ~30% | MDL 2873 Expense QSF |
| | **Class Award Sought for the Tyco and BASF PWS Settlements** | | |
| G | Tyco Class Fee (8% of A) | $ 60,000,000.00 | MDL 2873 Fee Fund QSF[61] |
| H | Tyco Class Costs requested (of D * E) | $ 7,329,757.06 | MDL 2873 Expense QSF |
| I | BASF Class Fee (8% of B) | $ 25,320,000.00 | MDL 2873 Fee Fund QSF |
| J | BASF Class Costs requested (D * F) | $ 3,141,324.45 | MDL 2873 Expense QSF |

---

[60] The "MDL 2873 Expense QSF" refers to the previously established interest-bearing common benefit expense QSF, the MDL 2873 COMMON BENEFIT FEE – EXPENSE FUND Huntington Bank (Acc#: … 9872).

[61] The "MDL 2873 Fee Fund QSF" refers to the previously established interest-bearing common benefit fee QSF, the MDL 2873 COMMON BENEFIT FEE – FEE FUND Huntington Bank (Acc# …9885).

Pursuant to the Tyco Settlement Agreement, Tyco is required to tender the Settlement Amount over time.[62] Pursuant to the BASF Settlement Agreement, BASF is required to tender the Settlement Funds over two payments.[63] Further, in accordance with both MSAs and Plaintiffs' Motions for Preliminary Approval, Co-Lead Counsel moved for the establishment of a Qualified Settlement Fund ("QSF") for each PWS Settlement, as defined in both the Tyco and the BASF Settlement Agreements.[64] Such Motions were granted by the Court and the QSFs for each PWS Settlement were established.[65] In accordance with both MSAs, costs incurred by the Court-approved Claims Administrator, Notice Administrator, and Settlement Special Master are to be paid from the Settlement Funds throughout the course of the litigation.[66]

Class Counsel propose to administer the Class Fee and Class Costs sought from the PWS Settlements as below. The Class Award would be deposited as follows:

- Tyco Class Fee: $60,000,000.00 (8% of the gross settlement amount of $750M) would be wired (upon the issuance of a Court Order granting the Tyco Class Fee request) to the Class Fee account/common benefit fee account: MDL 2873 COMMON BENEFIT FEE – FEE FUND Huntington Bank (Acc#: …9885).

- Tyco Class Costs: $ 7,329,757.06 (70% of total reimbursable MDL costs incurred between August 30, 2023, and June 30, 2024) would be wired to the Class Expense account/common benefit expense account: MDL 2873 COMMON BENEFIT FEE – EXPENSE FUND Huntington Bank (Acc#: … 9872).

- BASF Class Fee: $25,320,000.00 (8% of the gross settlement amount of $316.5M) would be wired on March 1, 2025, to the Class Fee account/common benefit fee account: MDL 2873 COMMON BENEFIT FEE – FEE FUND Huntington Bank (Acc# …9885).

---

[62] Tyco Settlement Agreement, at Exhibit H.
[63] BASF Settlement Agreement, at § 6.1, detailing the Initial Payment of $4 million, due within 10 Business Days after Preliminary Approval, or on July 15, 2024, whichever is later, as well as the final Second Payment of $312.5 million, due on March 1, 2025.
[64] Tyco Settlement Agreement, at §§ 3.1, 6, as granted by ECF Nos. 3888, 3812, 3886, and 5147, respectively; BASF Settlement Agreement, at §§ 3.1, 6,  7, as granted by ECF No. 5253.
[65] Id.
[66] Tyco Settlement Agreement, at §§ 6.2-6.3, 6.12; BASF Settlement Agreement, at §§ 6.2-6.3, 7.12.

- <u>BASF Class Costs</u>: $3,141,324.45 (30% of total reimbursable MDL costs incurred between August 30, 2023, and June 30, 2024) would be wired to the Class Expense account/common benefit expense account: MDL 2873 COMMON BENEFIT FEE – EXPENSE FUND Huntington Bank (Acc#: …9872).

## III.    BACKGROUND AND OVERVIEW OF COMMON BENEFIT EFFORTS DIRECTED SPECIFICALLY TO DEFENDANTS BASF AND TYCO INCLUDING THE TELOMER BELLWETHER PROGRAM

### A.    A BRIEF HISTORY OF PRE-MDL LITIGATION AND EFFICIENCY OF THE MDL AND COUNSEL.

Plaintiffs' counsel's work in this MDL should be commended and compensated for the extraordinary skill and efficiency demonstrated therein, made possible by both counsel's institutional knowledge with respect to PFAS litigation specifically and their decades of experience in water contamination cases generally, as well as their ability to adapt to the challenging circumstances presented by a global pandemic, including carrying out discovery of a complex subject matter despite a nationwide lockdown. As the history below recounts, all of the *Barber* factors support Class Counsel's fee request. Counsel's expertise and commitment to the litigation allowed them to overcome a myriad of complex and novel questions of law and difficulties in proving factual culpability. The government contractor defense, which loomed as an existential threat from the inception of the litigation, tempered the expectations of lawyers viewing this litigation, and made the case undesirable to many. It was defeated through hard work and careful attention to detail by insightful, high-caliber lawyers who had the gumption and know-how to accomplish their mission. Plaintiffs' counsel's work was never made easy, due to the incredibly talented and resourced opposition attorneys, who regularly presented strong defenses and challenged virtually all of Plaintiffs' efforts, leaving no stone unturned given the magnitude of liability their clients had at stake.  All these factors justify the award sought.

      **1.**      **This Court Appointed Skilled Counsel with Institutional Knowledge of the Subject Matter Who Were Fully Capable of Performing Their Legal Services Efficiently.**

Litigation involving per- and polyfluoroalkyl substances ("PFAS") has been ongoing for nearly 25 years. This extensive history is part of what makes PFAS litigation unique. Early litigations acted as the catalyst[67] that led to the 2009 provisional Health Advisory Levels for PFOA and PFOS,[68] the 2016 Lifetime Health Advisory Level for PFOA and PFOS of 70 ppt (parts per trillion) combined,[69] the 2022 Interim Health Advisories,[70] and, finally, the enforceable National Primary Drinking Water Regulations (NPDWRs) that were proposed by EPA in March 2023 of 4 ppt for each PFOA and PFOS, then formally adopted and published in the Federal Register on April 26, 2024.[71] The EPA has concluded that these regulatory actions "will prevent thousands of deaths and reduce tens of thousands of serious PFAS-attributable illnesses."[72]

Driven by a growing public awareness of PFAS contamination, brought to light, in part, as a result of high profile PFAS verdicts[73] and settlements,[74] public water systems and other entities

---

[67] Letter from Robert A. Bilott, Esq. to the United States Environmental Protection Agency, dated March 6, 2001, EPA01-00171880 (informing government officials including EPA that DuPont was emitting PFOA which "may pose an imminent and substantial threat to health or the environment"), relevant pages attached as Ex. K to the 3M Fee Petition [ECF No. 4269-13].

[68] EPA's website, Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS), *available at*: https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf.

[69] [69] EPA's website, FACT SHEET, PFOA & PFOS Drinking Water Health Advisories, *available at*:https://www.epa.gov/sites/default/files/2016-05/documents/drinkingwaterhealthadvisories_pfoa_pfos_5_19_16.final_.1.pdf.

[70] EPA's website, Drinking Water Health Advisories for PFOA and PFOS, 2022 Interim Updated PFOS and PFOS Health Advisories, *available at*: https://www.epa.gov/sdwa/drinking-water-health-advisories-pfoa-and-pfos.

[71] *See* April 26, 2024, Federal Register, Vol. 89, No. 82, *available at*: https://www.govinfo.gov/app/details/FR-2024-04-26/context.

[72] *Id.*

[73] *See e.g., Vigneron v. E. I. DuPont de Nemours & Co*., 13-cv-136 (S.D.O.H.) (plaintiff's verdict in 2017 of $2 million in compensatory damages and $10.5 million in punitive damages).

[74] *See e.g*., approximately $671 million-dollar settlement with DuPont in 2017 in the *In re E. I. DuPont de Nemours and Co. C8 Personal Injury Litig*., (S.D.O.H.) ("C8 MDL") (global resolution

began filing cases against a variety of PFAS and AFFF manufacturers.[75] As the number of AFFF-specific PFAS cases piled up in federal courts, a growing chorus for consolidating these disparate cases before the Judicial Panel on Multidistrict Litigation ("JPML") ensued.[76] Consolidation served the best interests of individual clients, but also established a pathway to advance the prosecution of PFAS-related claims nationwide.

Discovery and expert efforts in this MDL benefitted from work conducted in PFAS litigation prior to the formation of the MDL.[77] Rather than duplicate existing discovery efforts that had previously been undertaken in PFAS cases outside of the AFFF MDL, Plaintiffs' counsel devised novel ways to draw on that discovery in this AFFF MDL.

Similarly, legacy expert discovery from the C8 MDL benefitted this MDL. This is because many of the experts who provided testimony in that litigation likewise proffered expert opinions in this MDL and brought their prior PFAS knowledge to bear in this MDL.[78] Of course, the same is true for counsel in the C8 MDL who are also counsel in this case. Not surprisingly, much of that prior litigation was conducted by counsel who attained leadership positions in this MDL as well as lead critical committee and other litigation roles. The cumulative effect of this prior PFAS litigation, and the institutional knowledge garnered from it, was to make the prosecution of this case more efficient than it otherwise would have been, which undoubtedly saved thousands of hours of additional attorney time that would have been necessary had these prior efforts not been undertaken and then capitalized on.

---

of approximately 3500 cases alleging harm from PFOA exposure emitted from DuPont's Washington Works plant).

[75] Declaration of Michael A. London, Esq. in Support of Class Counsel's Motion for Attorneys Fees and Costs ("London 3M Fee Decl.")[ECF No. 4269-5], at ¶14.

[76] *Id.* at ¶¶ 14-19.

[77] *Id.*

[78] The following disclosed Plaintiffs' experts likewise served as experts in the C8 MDL: Dr. Michael Siegel, Dr. Barry Levy, Dr. David MacIntosh, Mr. Robert Johnson and Mr. Stephen Petty.

Other counsel also brought invaluable depth of experience in environmental litigation. For almost three decades, some of these attorneys have represented public water providers in cases against the manufacturers of chemical products whose release contaminated water supplies. These lawyers' fluency in the language of water system operation, contaminant treatment, and complex products liability litigation efficiently gave the PEC an appreciation of the claims and context that would otherwise have taken years to acquire. They also shared established relationships with leading environmental experts, who are well-versed in designing treatment systems for public water providers. And, critically, they contributed to the PEC's advanced understanding of water provider Plaintiffs, their damages, and how to structure a settlement that reflects these Plaintiffs' needs.

In sum, having knowledgeable and experienced counsel appointed by the Court to leadership roles clearly benefited the overall conduct of this litigation and accelerated its successful resolution.

### 2. Plaintiffs' Counsel Conducted Discovery on a Massive Scale Efficiently Despite a Global Pandemic.

Surprisingly, the global COVID-19 pandemic, horrific and life-altering in so many ways, created an opportunity for efficiency in time spent conducting common benefit work, and resulted in significant cost savings for the PEC and all Plaintiffs. Specifically, shortly after the pandemic and ensuing lockdown began, this Court issued one of the nation's first protocols for remote depositions, without which this litigation might have to come to a complete halt.[79] Although navigating largely uncharted waters in this regard, and as is described more fully below and in declarations in support of Plaintiffs' counsel's DuPont and 3M Fee Petitions, pursuant to CMO

---

[79] CMO 11, as amended by CMOs 11A-B, ("Remote Deposition Protocol")[ECF Nos. 680, 1173 and 1778]; *see also* ("London 3M Fee Decl.") at ¶¶ 45-47.

11, the PEC demonstrated an exceptional ability to effectively and efficiently conduct dozens of complex depositions remotely, which required the review of millions of pages of documents. CMO 11 provided a protocol that largely avoided any undue delays and enabled the PEC to prosecute the case expeditiously on behalf of the entire MDL despite the pandemic. It is indisputable that the remote format saved countless of hours of attorney time and extraordinary expense.[80]

**B.    THE COMMON BENEFIT WORK UNDERTAKEN FROM THE ESTABLISHMENT OF THE AFFF MDL THROUGH MAY 31, 2024, DIRECTED SPECIFICALLY TO THE TELOMER DEFENDANTS SURMOUNTED A MYRIAD OF NOVEL AND DIFFICULT LEGAL QUESTIONS.**

As discussed above, the totality of Plaintiffs' common benefit work from the inception of this MDL through August 29, 2023, has been thoroughly detailed in Plaintiffs' prior fee petitions and supporting declarations with respect to the 3M and DuPont PWS Settlements, which are fully incorporated by reference as if set forth fully herein.[81] It is of the utmost importance, however, to underscore again that the liability efforts with respect to each Defendant has continuously helped make the liability case as against *all other* Defendants. There is such inextricable interplay between each Defendant's liability that it would be impossible to parse specific efforts that relate to only one Defendant and played no role in the larger overall liability picture. This has been true throughout the course of the MDL, including with respect to both Defendants Tyco and BASF, and has remained a constant truth.

As discussed in Plaintiffs' 3M and DuPont Fee Petitions, documents and other evidence produced by one Defendant often helped buttress the liability case as against another Defendant. For example, one 3M-produced phone report dated 2002 noted that Gregg Ublacker, who started with Tyco in 2014:

---

[80] London 3M Fee Decl., at ¶ 47.
[81] *See* DuPont and 3M Fee Petitions, *generally*.

…was very well versed in the PFOS public file at the EPA. He knew of our children's blood report, the liver tumor statistics in our 2-uear rat PFOS study, along with the 3 bladder cancers reported at Decatur and many other details. He indicated that he found the PFOS "story" very interesting from a professional view point and had "poured over" the CDs he had received from the EPA.

***

[Ublacker] indicated that he was concerned about the future information that would show some kind of health effects from PFOS.[82]

However, despite having this purported concern as of 2002, Tyco continued to sell C8 chemistry in certain products through 2015.

Similarly, testimonial evidence elicited from one Defendant often shored up liability as against other Defendants and/or helped to illustrate the interplay of the liability as between other Defendants. By way of example, recent depositions taken of FED. R. CIV. 30(b)(6) witnesses of both Tyco and BASF demonstrate clearly that BASF's liability is fully woven into Tyco's liability fabric. Specifically, one Tyco FED. R. CIV. 30(b)(6) witness testified that prior to Chemguard purchasing Lodyne fluorosurfactants in 2003, Tyco/Ansul[83] primarily purchased only Lodyne fluorosurfactants from Ciba-Geigy ("Ciba"),[84, 85] that Tyco/Ansul relied on Ciba to manufacture fluorosurfactants that would meet AFFF specifications, and that Ciba always had more knowledge than it with respect to the dangers and risks posed by fluorosurfactants.[86] Such testimony demonstrates that Ciba/BASF was a partner to Tyco/Ansul in bringing Tyco/Ansul's AFFFs to market, and played an integral role in the development of Tyco/Ansul's AFFF despite not being an AFFF manufacturer.

---

[82] 3M_BELL01477954, attached hereto as Ex. I.
[83] Ansul was acquired by Tyco in 1990 and even today makes AFFF under the brand name Ansulite.
[84] BASF is successor in interest to Ciba-Geigy Corporation ("Ciba").
[85] Douglas Decl., at ¶ 17.
[86] *Id*.

Liability with respect to fluorosurfactant manufacturers like BASF/Ciba is also intertwined with the liability of producers of the raw materials who source the fluorosurfactant manufacturers. In this regard, and to come full circle, one BASF corporate designee recently testified that when 3M phased out of perfluorooctanyl chemistries in 2000, BASF/Ciba was almost exclusively purchasing its raw materials, primarily perfluoro-ethyl iodides, from DuPont.[87] BASF/Ciba would incorporate these raw materials into its Lodyne fluorosurfactants, which were intended to be used in AFFF[88]—thus, further blurring the liability as between the different actors within the AFFF market channels.[89] Such similar relationships likewise exist between other manufacturers of raw materials, including Daikin, Clariant Corporation, AGC Chemicals and Archroma. In fact, even toll manufacturers'[90] liability was similarly immersed with the other Defendants at every other level of the AFFF market.

Finally, the AFFF-industry group—the Fire Fighting Foam Coalition ("FFFC")—acted as a collaborative mouthpiece and combined knowledge center for all Telomer Defendants, which further ensconced the Telomer Defendants' liability with one another, illustrating how these Defendants' liabilities were not separate and distinct but rather had to be considered collectively. As it pertains specifically to Tyco, its role in the FFFC made it a leader in disseminating the false narrative that telomer-based AFFF neither contained nor degraded to PFOA–a half-truth that permeated the FFFC narrative and helped keep the wool over the eyes of the EPA for over a decade with respect to the dangerous propensities of telomer-based AFFF.[91] In short, the development of

---

[87] *Id*. at ¶ 16.
[88] *Id*.
[89] *Id.*
[90] A toll manufacturer is a manufacturer who manufactures large scale production of AFFF in accordance with the specific instructions of an AFFF manufacturer.
[91] Douglas Decl., at ¶ 14.

both the science and liability evidence as it pertains to each of the various Defendants cannot reasonably be separated.[92]

*Exemplar Case Management/Leadership and Law & Briefing-Related Efforts Directed Specifically Towards Advancing the Telomer Bellwether Program*

Throughout the pendency of this MDL, Co-Lead Counsel organized, coordinated, and oversaw the various committees, advocated on behalf of the PEC at each CMC, liaised with defense counsel to negotiate CMOs, advised all PEC and other counsel of litigation developments, and worked to establish the administrative protocols and foundational frameworks for the litigation.[93] Again, the totality of these efforts are extensively detailed in prior briefing; however, since that briefing, Co-Lead Counsel also additionally oversaw a number of recent CMOs directed at the advancement of the Telomer Bellwether Program, which was specifically intended to put trial pressure on the Telomer Defendants, including Tyco and BASF, with the hope of achieving resolution. Given these preliminarily approved settlements, these efforts have seemingly been a success.

During the July 14, 2023, Case Management Conference ("CMC"), the Court directed the parties to work-up a second round of water provider bellwether plaintiffs that specifically involved Telomer Defendants.[94] In carrying out this directive, right on the heels of the prior two historic settlements, and while in the throes of defending those settlements, Co-Lead Counsel negotiated and oversaw the September 13, 2023, entry of CMO 27, which established the parameters and protocols for the Telomer Bellwether Program. While the bellwether teams quickly sought to implement this governing Order, Co-Lead Counsel continued to modify and negotiate amendments to its scope and directives as the bellwether cases were being worked up.

---

[92] *Id.*, at ¶¶ 9, 11; *see also*, Perry Decl., at ¶ 26.
[93] London Decl., at ¶11.
[94] Jul. 14 Hearing Transcript, at 44:14-20.

26

In total, following the entry of the initial CMO 27, Co-Lead Counsel met and conferred with defense counsel, negotiated, modified, extended and oversaw the entry of eight (8) amendments to CMO 27 alone,[95] as set forth below:

| CMO No. | Description |
|---------|-------------|
| 27A[96] | Number of depositions in Telomer water provider Tier Two fact discovery |
| 27B[97] | Telomer water provider Tier Two cases and number of depositions in Telomer water provider Tier Two fact discovery |
| 27C[98] | Telomer water provider Tier Two Cases and number of depositions in Telomer water provider Tier Two fact discovery |
| 27D[99] | Telomer AFFF Bellwether Program, selection of Tier Two cases |
| 27E[100] | Telomer AFFF Bellwether Program |
| 27F[101] | Protocol regarding filing Rule 12(b)(1), (b)(2) AND/OR 12(b)(5) defenses in Telomer water provider Tier Two cases |
| 27G[102] | Telomer AFFF Bellwether Program |
| 27H[103] | Telomer AFFF Bellwether Program |

Further, in connection with the implementation of the Telomer Bellwether Program, and because the parties were unable to agree, Co-Lead Counsel, the Strike Force (discussed below), and the Law & Briefing Committee[104] engaged in extensive briefing concerning the selection of

---

[95] Telomer AFFF Bellwether Program [ECF No. 3665].
[96] ECF No. 3892.
[97] ECF No. 4089.
[98] ECF No. 4108.
[99] ECF No. 4275.
[100] ECF No. 4464.
[101] ECF No. 4829.
[102] ECF No. 4878.
[103] ECF No. 5007.
[104] Co-chaired by Rebecca Newman of Douglas & London, Carla Burke Pickrel of Baron & Budd, Kevin Madonna of Kennedy Madonna, and Frederick Longer of Levin Sedran & Berman

the Tier Two bellwether candidates[105]—the ultimate outcome of that briefing being the selection of *City of Watertown v. 3M Company et al.* (No. 2:21-cv-01104) and *Southeast Morris County Municipal Utilities Authority v. 3M Company et al.* (No. 2:22-cv-00199) as the two Tier Two telomer bellwether cases.[106]

Finally, to assist the Court in administering this MDL, prior to August 29, 2023, Co-Lead Counsel advocated on behalf of the PEC at forty-five (45) CMCs, and prepared Joint Status Reports ("JSRs") in advance of each conference.[107] Since August 29, 2023, Co-Lead Counsel has advocated at three (3) additional CMCs and, as is custom, prepared monthly JSRs.[108] As the Court is well aware, the monthly JSRs provided the Court and every litigant a detailed analysis of the discovery status of each Defendant, including the United States, an update on the total number of documents produced in the litigation with respect to Defendants and third-parties, the total number of depositions taken (expert and fact), a report on both related and unrelated PFAS cases pending outside of the MDL, a status report on bellwether efforts, an outline of any arising disputes between the parties, and a status report on Fact Sheet production.[109] More recently, the JSRs included the status of settlement efforts, as well as updates on the Kidde-Fenwal, Inc.'s ("Kidde") bankruptcy proceedings. The benefits of preparing and presenting a JSR were plentiful. Not only did the regular gathering and reporting of information require Co-Lead Counsel to maintain open channels of communication on all fronts, but it also provided an efficient mechanism to keep the Court apprised of all litigation matters, both historically and in real time as they developed.[110]   Lastly, it

---

[105] Douglas Decl., at ¶ 24; *see also* Plaintiffs' Telomer Bellwether Selections Briefing [ECF Nos. 4152, 4153, 4179 and 4187].
[106] CMO 27D [ECF No. 4275].
[107] London 3M Fee Decl., at ¶ 104.
[108] These three conferences occurred on October 31, 2023, April 25, 2024 CMC, and July 19, 2024 CMC.
[109] London 3M Fee Decl., at ¶¶ 43, 104-105.
[110] *Id.*

provided the parties with a consistent mechanism to raise disputes related to discovery, bellwethers, case management, or anything litigation-related. The JSR process was an essential tool for the efficient management and advancement of this MDL.

***Exemplar Strike Force and Science Committee-Related Efforts Directed Specifically to the Telomer Defendants That Assisted in the Resolution of Novel and Difficult Questions Raised in this MDL and Greatly Impacted the Results Obtained.***

The Strike Force,[111] created in advance of the Court's Science Day, has been central and critical to the prosecution of this MDL because it was formed to oversee nearly all aspects of this MDL, including coordinating across all committees with respect to the overall liability picture, the briefing efforts, the bellwether efforts, the efforts to overcome the government contractor defense,[112] and trial preparation efforts.[113] Its pivotal role has been, and continues to be, a centerpiece to the seamless interactions of the various litigating committees to ensure consistency among positions and arguments made by all Plaintiffs' counsel across all aspects of the litigation.

Historically, the Strike Force has worked in tandem with the Science Committee to develop the science necessary to prosecute the case, and with the Discovery Committee to establish liability

---

[111] The members of this core team, a/k/a the Strike Force, are also members of other PEC-appointed committees such as the Science Committee, Law & Briefing Committee, and Discovery Committee and included (and continue to include), Gary Douglas, Rebecca Newman, Lara Say, Tate Kunkle and Anne Accettella of Douglas & London; Neil McWilliams and Wesley Bowden of Levin Papantonio; Christina Cossich, Brandon Taylor and Phillip Cossich of Cossich, Sumich, Parsiola & Taylor, LLC; Scott Summy, Carla Burke Pickrel, and Celeste Evangelisti of Baron & Budd; and Frederick Longer of Levin, Sedran & Berman, among others at different times. *See* Douglas Decl., at ¶ 6 n.1.

[112] Of course, the monumental efforts of the Strike Force in connection with multiple committees in overcoming the government contractor defense has been laid out in chapter and verse in Plaintiffs' prior Fee Petitions and is likewise incorporated by reference herein. However, in it is important to underscore that Tyco and BASF as successor- in- interest to Ciba hold unique positions with respect to Plaintiffs' overcoming the government contractor defense given that it was a 1982 Tyco AFFF formulation incorporating Ciba's Lodyne fluorosurfactant that together formed the basis of Plaintiffs' argument that the AFFF military specification did not require the use of C8-based AFFF, but rather a C6-dominant AFFF could meet military specification and constituted a safer design. *See* Douglas Decl., at ¶ 13.

[113] Douglas Decl., at ¶¶ 6-7.

with respect to each Defendant.[114] This same paradigm has rung true in the Telomer Bellwether Program context where once again the Science Committee and Strike Force's efforts were met with significant challenges. The totality of the Strike Force's and the Science Committee's critical involvement in this MDL has been previously outlined in detail and is incorporated herein; however, certain recent efforts undertaken by members of each committee were directly targeted to shoring up general liability as against Defendants Tyco and BASF.

In this regard, Rule 30(b)(6) notices were served on both Defendants Tyco and BASF, which each designated two (2) witnesses in response to each of the 30(b)(6) notices of deposition.[115] These notices sought critical information from each Defendant concerning, *inter alia*, the nature, extent, substance and timing of Defendants' knowledge of the chemical characteristics of PFOS, PFOA, PFOA precursors, and surfactants used in AFFF, the nature, extent, substance, and timing of any changes over time to any applicable industry standards that affected knowledge of potential hazards or risks, Defendants' membership in trade groups, the contents of training materials, and interactions with regulators.[116]

Important liability testimony elicited from these designees included, *inter alia*, that BASF as successor-in-interest to Ciba made no effort prior to 2003 to determine whether its Lodyne fluorosurfactant products for use in AFFF contained PFOA precursors, to ascertain whether PFOA was a possible carcinogen and/or to understand the degradation of the products.[117] On the Tyco side, one designee made clear that although Tyco/Ansul knew that certain components of its AFFF were not biodegradable, it nonetheless told its customers that its AFFF was biodegradable.[118]

---

[114] *Id.* at ¶ 6.
[115] Of note, a fifth Fed. R. Civ. 30(b)(6) notice of deposition was likewise served on Defendant Buckeye, Inc. as part of these efforts and a witness produced in response to same.
[116] Douglas Decl., at ¶¶ 14-15.
[117] *Id.* at ¶ 15.
[118] *Id.*

These additional pieces of evidence obtained during the Spring of 2024 assisted in placing maximum pressure on Defendants Tyco and BASF by making clear that Plaintiffs' liability case against them was strong. In total, an additional five (5) general liability witnesses' depositions were taken during the Spring of 2024.[119, 120]

Similarly, the Strike Force worked cohesively with the Science Committee to prepare and/or update both case-specific and general liability expert reports for the Tier Two telomer bellwether cases. As set forth below, although expert reports have not been submitted with respect to the Tier Two telomer bellwether cases given the resolutions with Tyco and BASF, and attendant CMO 27 extensions,[121] both Science Committee and Strike Force members spent hundreds of hours, meeting with experts, drafting expert reports and having integral meetings and discussions amongst counsel with regard to same.

***Exemplar Discovery Committee and Bellwether Committee-Related Efforts that Greatly Impacted the Labor and Time Expended in this MDL Especially Given the Novel and Complex Nature of Such Discovery***

Since the inception of this MDL, the PEC knew that discovery would be voluminous. Many factors contributed to this: (a) the 60-plus year history of evidence to review; (b) the vast number of Defendants named in Plaintiffs' various lawsuits; (c) the involvement of the United States and various of its agencies, including the Department of Defense ("DoD"), and the armed forces; and (d) the significant number of third parties whose evidence would be needed.[122] Given this complexity, robust discovery has been a linchpin of this MDL and the Discovery Committee,

---

[119] *Id*. at ¶ 15, n. 6 (noting four Tyco and BASF witnesses). As noted above, a Buckeye witness was likewise deposed. *See* n.116, *supra*.

[120] Of note, over the course of this MDL, the PEC conducted fifteen (15) depositions of Tyco/Chemguard witnesses and five (5) depositions of BASF witnesses. *See* Douglas Decl, at ¶ 12.

[121] *See* CMOs 27H-27I (extending deadlines to serve telomer bellwether expert reports).

[122] London 3M Fee Decl., ¶ 32.

in concert with the Strike Force, has left no stone unturned. Again, the historical aspects of these discovery efforts both with respect to general liability and bellwether discovery are set forth in the two prior fee petition briefings and incorporated herein.

However, in addition to the historical discovery, as discussed above, in the late Summer of 2023, a second round of water provider bellwethers was commenced, which focused specifically on identifying and prosecuting the Telomer Defendants, including specifically Defendants Tyco and BASF. Initially, the Strike Force and bellwether teams conducted a thorough investigation of all eligible pending cases in order to find those water provider cases the PEC was satisfied were sufficiently representative of the overall docket to be appropriate bellwether selections, and which involved AFFFs manufactured by Tyco and/or fluorosurfactants manufactured by BASF as successor in interest to Ciba.[123]

On September 13, 2023, this Court entered CMO 27, the Telomer Bellwether Program, which adopted the parties' slate of four (4) representative Tier One bellwether cases.[124] Over the course of Tier One discovery, Plaintiffs' counsel, *inter alia*, reviewed and produced thousands of pages of documents for each Telomer bellwether candidate and defended four (4) case-specific depositions.[125] As noted above, following Tier Two discovery, and because the parties were unable to agree on which cases would move to Tier Two discovery, the parties submitted competing Tier Two slates to the Court.[126] On December, 19, 2023, the Court selected the *City of Watertown v. 3M Company et al.* and *Southeast Morris County Municipal Utilities Authority v.3M Company et al.* as the two (2) Tier Two bellwether cases.[127]

---

[123] Douglas Decl., at ¶ 19
[124] *Id*. at ¶ 20.
[125] *Id*. at ¶¶ 21-22.
[126] *Id*. at ¶¶ 23-24.
[127] CMO 27D.

Once these cases became the Tier Two bellwether selections, the bellwether teams spent the next approximately five (5) months on a fast-paced discovery schedule that included additional document productions from Plaintiffs, further review of Defendants' document productions and subpoena responses, preparing witnesses for depositions and defending same. In total during Tier Two discovery, Plaintiffs' counsel defended sixteen (16) additional case-specific depositions, and conducted the depositions of six (6) party and non-party witnesses.[128] Additionally, the Telomer bellwether teams conducted site visits to each bellwether site, visiting both their wells and wastewater sites.[129] Site visits also occurred at fire training facilities and airports in close proximity to Plaintiffs' wells where AFFF use was documented.[130] In concert with the Science Committee, the bellwether teams likewise conducted extensive PFAS field sampling in and around Plaintiffs' wells.[131] Specifically, telomer isomer profiling was conducted in an effort to identify the manufacturer of the PFOA present in Plaintiffs' wells.[132] Finally, as noted above, the bellwether teams also spent hundreds of hours preparing expert reports in connection with Science Committee, meeting with experts and amongst counsel in anticipation of the submission of expert reports.[133] Although these expert reports have not been tendered, significant efforts have been expended to develop them.

### *BASF and Tyco Specific Settlement Negotiation Details that Required Implementation of Novel Settlement Concepts and Greatly Impacted the Results Obtained.*

While the Strike Force developed the liability case against the Telomer Defendants through the Telomer Bellwether Program, the Resolution Team (defined below) advanced settlement

---

[128] Douglas Dec., at ¶ 25.
[129] *Id*. at ¶ 26 .
[130] *Id*.
[131] *Id*. at ¶¶ 19, 21.
[132] *Id*. at ¶ 21.
[133] *Id*. at ¶ 27.

negotiations, which gained momentum as the 3M and DuPont Settlements went through the objections, opt out, appeal and Final Approval process.

As has been detailed in previous filings,[134] which Plaintiffs incorporate as if fully set forth herein, settlement discussions, and work geared toward facilitating any such discussions, developed incrementally over time. Although traction with the MDL Defendants was still a long way off, Scott Summy, along with Co-Lead Counsel, Michael London and Paul Napoli (the "Negotiation Team") and PEC member Christina Cossich and her partner Phil Cossich (the "Resolution Team"), began developing potential settlement frameworks in the Spring of 2020,[135] including by collecting the most robust set of PFAS detection data in existence in order to form the basis of a damages model, which was then used in early presentations with the MDL Defendants and various stakeholders such as their insurers.[136] The PFAS detection dataset and damages model then helped the Negotiation Team craft potential Class definitions and to assess the scope of the Claims that would be released in any given resolution structure. The Resolution Team was hard at work developing the conceptual compensation model that was based on the PFAS dataset collected and the damages model, and which would ultimately become the Allocation Procedures that could govern any water provider settlement. The conceptual model and Allocation Procedures were developed iteratively, and the Resolution Team continuously stress-tested the model with simulations and improving it with PFAS detection data as such data became available.[137]

---

[134] *See generally*, DuPont Fee Petition; *see also*, 3M Fee Petition.
[135] Summy Decl., at ¶ 9.
[136] Declaration of Scott Summy in Support of Class Counsel's Motion for Attorneys Fees and Costs ("Summy 3M Fee Decl.")[ECF No. 4269-6], at ¶¶ 11-14.
[137] Summy Decl., at ¶ 9.

These Allocation Procedures—along with concepts like Baseline Testing, the Supplemental and Special Needs Funds, and the Phase One versus Phase Two framework—were critical to the successes with the first two settling Defendants 3M and DuPont.[138] They would also prove to be seminal instruments for the negotiations with Tyco and BASF; the time and effort in developing them was well-spent, as their applicability was proven when they were able to form the basis of discussions with Tyco and BASF despite those negotiations ultimately resulting in a different Settlement Class definition.

Informal discussions with Tyco began in January of 2022.[139] Discussions with counsel for Tyco occurred in January, February, March, April and May of 2022,[140] some of these discussions included presentations based on the work of the Resolution Team.

Informal settlement discussions with BASF began in late August of 2022.[141] Those meetings involved many of the same conceptual discussions as those taking place with Tyco, including about Settlement Class definition, relevant exclusions therefrom, scope of resolution and release, and damages.[142] Much of the work being done with regards to the Tyco negotiations was also leveraged and utilized in the BASF negotiations. Both Tyco and BASF expressed that they were only interested in discussing settlement on a nationwide class basis.

Important developments in the Fall of 2022 then spurred discussions with Tyco to re-ignite after several months of relative quiet; namely, the denial of Defendants' motion for summary

---

[138] *Id*.; *see also*, Summy Decl., at ¶ 9 n.5.
[139] Summy Decl., at ¶ 13.
[140] Decl. of Scott Summy, Esq., In Support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class and For Permission to Disseminate Class Notice "Summy Tyco Prelim. App. Motion Decl.") [ECF No. 4911-4], at ¶ 10.
[141] Summy Dec., at ¶ 13.
[142] Decl. of Scott Summy, Esq., In Support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class and For Permission to Disseminate Class Notice "Summy BASF Prelim. App. Motion Decl.") [ECF No. 5053-4], at ¶ 10.

judgment on grounds of government contractor immunity defense on September 16, 2022,[143] and the appointment of Judge Layn Phillips (ret.) as mediator on October 26, 2022.[144] Additionally, trial preparations for the first PWS bellwether trial for the *City of Stuart* case were picking up in both speed and intensity, with a start date scheduled for June 5, 2023.[145] Under the oversight of Judge Phillips and his staff, the Negotiation Team met regularly with Tyco throughout the Spring of 2023 and monthly through August, with numerous and ongoing sessions occupying substantial time.[146]

Discussions with both Tyco and BASF cooled as the *Stuart* trial date was approaching.[147] All parties were rapt with the developments surrounding that trial; most specifically, Tyco, which had been a Defendant in the *Stuart* case, was dismissed from the case approximately one month prior to the trial start date, due to the fact that the AFFF at issue in the City of Stuart's contamination was largely manufactured by 3M and National Foam.[148]

The *Stuart* case was itself ultimately stayed given the announcements of the water provider settlements reached with 3M and DuPont.[149] Those settlements were granted preliminary approval by the Court in late August of 2023,[150] and throughout the Fall of 2023, the non-settling Defendants followed along with related developments, watching the flurry of activity generated by the Settlements[151]—including objections from State sovereigns and others, requiring extensive briefing and meet and confers to arrive at a negotiated solution for amendments to the Settlement

---

[143] Order and Opinion [ECF No. 2601]; *see also*, Summy Tyco Prelim. App. Motion Decl., at ¶ 19.
[144] CMO 2B [ECF No. 2658].
[145] CMO 19G [ECF No. 2887], at § VIII (confirming June 5, 2023 trial date).
[146] Summy Tyco Prelim. App. Motion Decl., at ¶ 17.
[147] Summy Decl., at ¶ 14; *see also*, London Decl., at ¶ 32.
[148] Summy Decl., at ¶ 14.
[149] *Id*., at ¶ 15.
[150] DuPont PAO [ECF Nos. 3603]; *see also*, 3M PAO [ECF No. 3626].
[151] London Decl., at ¶ 32.

Agreements, as well as a complex opt-out process and the issuance of multiple Joint Interpretive Guidance documents that were promulgated after lengthy and at times contentious collaboration between Class Counsel and counsel for the settling Defendants 3M and DuPont, as well as amongst various interested parties such as the State Attorneys General and would-be objectors.

As objections were litigated and defeated, and with final approval on the horizon, settlement discussions with both Tyco and BASF returned in early 2024.[152] The DuPont PWS Settlement received final approval on February 8, 2024,[153] and negotiations with Tyco and BASF kicked off with renewed vigor.[154]

Converging with the developments related to the 3M and DuPont PWS Settlements was the mounting trial pressure brought upon the Telomer Defendants, including Tyco and BASF, through the Telomer Bellwether Program, discussed *supra*. Plaintiffs—despite devoting significant time and energy to the settlement negotiations—were also putting non-stop pressure on Defendants, including through intense and condensed discovery, which included complex, multi-day field sampling events in and around the wells of each Tier 1 bellwether Plaintiff.[155] The review and production of thousands of pages of documents relating to each telomer bellwether plaintiff and hours of witness preparation for Tier 1 depositions alone.[156] Over the course of approximately five (5) months as discussed above, the Telomer Bellwether Program was on a fast-paced discovery schedule that included additional document productions from Plaintiffs, further review of Defendants' document production and subpoena responses, preparing witnesses for depositions and defending same.[157] In total during Tier Two discovery, Plaintiffs' counsel defended sixteen

---

[152] *Id.*
[153] Order and Opinion [ECF No. 4471].
[154] London Decl., at ¶ 27.
[155] Douglas Decl., at ¶¶ 19, 21.
[156] *Id.* at ¶ 22.
[157] *Id.* at ¶ 25.

(16) additional case-specific depositions, and conducted the depositions of six (6) party and non-party witnesses.[158]

Plaintiffs could not take their foot off the gas for even a moment; continuous and considerable pressure needed to be consistently applied reaching fever pitch even as the negotiations with BASF and Tyco were nearing conclusion.

Although Tyco and BASF were both interested in a national classwide resolution, they both had different appetites as to finality than had 3M or DuPont before them—specifically, they were interested in a more narrowly defined Settlement Class, and wanted to resolve only those claims by PWS that showed a current PFAS detection in their drinking water supplies.

Discussing and defining the scope of such a potential Settlement Class was not, however, a simple matter of disregarding any PWS that had been identified as a 3M or DuPont Phase Two eligible claimant, i.e., a Settlement Class Member without a current PFAS detection. In the relatively short span of time between the negotiations of the 3M and DuPont PWS Settlements and the negotiations with Tyco and BASF, the world as it pertains to PFAS in drinking water already looked quite different. On April 10, 2024, the EPA announced its newly enforceable drinking water standards—the lowest in U.S. history—of 4 ppt for PFOA and PFOS. These standards necessarily result in much more information about contaminated water providers becoming available. Additionally, many of the PWS that were eligible to participate in the 3M and DuPont PWS Settlements, administration for which was well under way in early 2024, were performing the required Baseline Testing and those results were being assessed by the parties when publicly available.[159]

---

[158] *Id.*
[159] Summy Decl., at ¶ 19.

The parties worked incredibly hard to agree on a structure that would fairly compensate PWS with known PFAS detections by a cutoff date certain, which was no easy task given the uncertainty generated by the new regulatory framework and the rapidly shifting reality on the ground. The damages figure, as well as an appropriate cutoff date, were all hotly contested topics of discussion in the negotiations, almost to the very end.[160] Additionally, the Negotiation Team spent considerable time working through payment schedule considerations with defense counsel for Tyco and BASF.

Judge Phillips and his team continued to moderate multiple discussions with counsel for the parties to resolve the outstanding issues.[161] With the help of Judge Phillips and his incredible team, the parties reached agreement on the remaining issues and executed the Settlement Agreement on April 12, 2024, for Tyco and on May 20, 2024, for BASF.[162]

## IV.    LEGAL STANDARD AND ARGUMENT

### A.    CLASS COUNSEL HAVE EARNED A PERCENTAGE FEE AWARD OF 8% OF THE COMMON FUND.

Class Counsel who create a common fund are entitled to receive from it a reasonable fee. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 18-2873, 2021 WL 5822993, at *2 (D.S.C. Aug. 4, 2021) ["Campbell"]; *Boeing*, 444 U.S. at 478; FED. R. CIV. 23(h). "The common fund method is particularly appropriate where, as here, the settlement confers a substantial benefit on members of a class."[163] The Fourth Circuit authorizes "two main methods for calculating the reasonableness of attorneys' fees—the lodestar method and the percentage-of-recovery method." *McAdams v. Robinson*, 26 F.4th 149, 162 (4th Cir. 2022). District courts have

---

[160] *Id.*, at ¶¶ 18-20; *see also*, *generally*, Rice Decl., at ¶¶ 14-18.
[161] Summy Decl., at ¶¶ 29-31.
[162] *Id.* at ¶¶ 18, 20.
[163] Fee Order at 5.

discretion to choose between the two methods based on their "judgment and the facts of the case." *Id*. "The vast majority of courts use the percentage of recovery method, which is advantageous because it ties the attorneys' award to the overall result achieved rather than the number of hours worked*." In re Allura Fiber Cement Siding Litig*., No. 19-2886, 2021 WL 2043531, at *4 (D.S.C. May 21, 2021).[164] This is especially true where, as here, Plaintiffs' counsel prosecuted the case on a contingency fee basis with the risk of nonpayment. *See e.g., Brundle ex rel. Conestellis Employee Stock Ownership Plan v. Wilmington Tr., N.*A., 919 F.3d 763, 785-86 (4th Cir. 2019) (noting that fees based on a percentage of the common fund "hold[s] beneficiaries of judgment responsible for compensating the counsel who obtained the judgment or settlement for them"). Not surprisingly, this Court applied the percentage of fund approach when awarding fees for the 3M and DuPont PWS Settlements.[165]

To assess the reasonableness of a class fee, this Court employs the guiding principles announced in *Barber*, 577 F.2d at 226 n.28, which reprise the factors announced by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d 714 (5th Cir. 1974). *See Campbell*, 2021 WL 5822993, at *2. The District of South Carolina Local Rule 54.02(A) mandates the application of *Barber*'s principles to the percentage-fee method. These twelve guiding principles include: "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's

---

[164] *See also Berry v. Wells Fargo & Co*., No. 17-304, 2020 WL 9311859, at *12 (D.S.C. July 29, 2020) ("Within the Fourth Circuit, district courts prefer the percentage method in common fund cases."); *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("a reasonable fee is based on a percentage of the fund bestowed on the class."). *See generally, In re Lumbar Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig*., 952 F.3d 471, 491 (4th Cir. 2020) (vacating fee award because it failed to apply CAFA's coupon settlement provisions, 28 U.S.C. §1712).

[165] Fee Order at 5.

expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases." *Campbell*, 2021 WL 5822993, at *2 (citing *Barber, supra*).

Even at the megafund level (> $100 million cases),[166] basic fee award principles still apply. *See, e.g., In re Enron Corp. Sec., Deriv. & ERISA Litig*., 586 F. Supp. 2d 732, 754 (S.D. Tex. 2008) ("the megafund [$1B+] rule is contrary to the Fifth Circuit's approach that the district court scrutinize each case for the particular facts that will determine what constitutes a reasonable fee award."). Each case must be evaluated pursuant to uniform standards to determine what constitutes a reasonable fee award.

As demonstrated both above and below, and through the various declarations filed in support hereof, the work performed by counsel to obtain this megafund settlement – on top of the landmark settlements involving 3M and DuPont—is, by definition, exceptional. The Supreme Court has defined "exceptional" in the patent realm as "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case)." *Octane Fitness, LLC v. ICON Health & Fitness, Inc*., 572 U.S. 545, 554 (2014). Class Counsel's work continues to "stand out" under the *Barber* standards, which fully justify the requested 8% award.

---

[166] *See In re Cendant Corp. PRIDES Litig*., 243 F.3d 722, 737 (3d Cir. 2001) (referring to "large settlement cases" as "cases in which the common fund exceeded $100 million."); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig*., 553 F. Supp. 2d 442, 480 (E.D. Pa. 2008), as corrected (Apr. 9, 2008), judgment entered, No. 99-20593, 2008 WL 2890878 (E.D. Pa. July 21, 2008), and aff'd sub nom. *In re Diet Drugs*, 582 F.3d 524 (3d Cir. 2009) (defining "super-mega-fund settlements," as "settlements of one billion dollars or more.").

**B.     THE PRINCIPLES GOVERNING THE DETERMINATION OF AN APPROPRIATE FEE AWARD UNDER *BARBER* SUPPORT THE PROPOSED 8% AWARD PLUS OUT-OF-POCKET COSTS.**

### 1.     The Time and Labor Required

In connection with the 3M and DuPont Fee Petitions, the PEC reported expending a collective 431,158.9 hours by approximately 40 law firms and 650 timekeepers (including partners/members, senior associates, associates, paralegals, and law clerks) from the beginning of this MDL through August 29, 2023.[167] This is an impressive number of hours, which would have been even larger but for the time saved due to the efficiencies of telephonic conferences and Zoom depositions, mediations and meetings, which proved to be effective virtual substitutes for in-person events.[168]

Since then, the PEC has accumulated even more time prosecuting claims against the telomer manufacturers in anticipation of the Telomer Water Provider Bellwether trial, which necessarily included efforts against Tyco and BASF that led to these PWS Settlements. The PEC expended an additional 50,182.7 hours by more than 40 law firms law firms and 650 timekeepers between August 30, 2023, and May 31, 2024. Combined, these 481,341.6 hours reflect the tremendous effort put forth by the PEC to achieve yet another excellent result for the Settlement Class. This enormous collective effort of time and labor, as outlined above and detailed in the attached Declarations of Perry, Douglas, Summy, London, Napoli, Rice, both of the prior Fee Petitions and declarations in support thereof, "directly led to the results achieved here."[169] The Court should confirm this factor supports the requested 8% fee award.

---

[167] Perry Decl., at ¶¶ 10, 20.
[168] London 3M Fee Decl., at ¶ 47.
[169] Fee Order at 10.

As set forth in the 3M and DuPont Fee Order, a lodestar crosscheck previously confirmed the reasonableness of the 8% fee request.[170] In particular, based on the prior 431,158.9 reported hours, and using an hourly blended rate of between $725-$825, the lodestar ranged between $312,590,590,202.50 and $355,706,092.50. This yielded a multiplier range of between 2.7 and 3.[171] As before, the instant 8% fee request results in a multiplier below 3 without even including the additional 50,182.7 hours expended in this litigation since August 29, 2023 through May 31, 2024.[172]

### 2.    The Novelty and Difficulty of the Questions Involved

Throughout this litigation, the Court has repeatedly been reminded of the complex nature and uniqueness of this multidistrict, multi-party litigation.[173] In the context of the prior PWS Settlements, the Court specifically recognized "[t]he issues involved in this MDL are numerous and difficult, complicated by the large number of defendants sued,"[174] as a factor supporting approval of an 8% fee.[175] As part of its efforts, from the outset the PEC sought to establish liability stories with respect to each Defendant. This approach was critical because the liability of each Defendant in this case is inextricably intertwined with each of the other Defendants.[176] Moreover, many of the Defendants have unique positions in the AFFF market, Tyco and BASF included, which required the PEC to understand the varying AFFF market channels, including the

---

[170] *Id.* at 14.

[171] *Id.*

[172] Of note, and in full transparency, the additional 50,182.7 hours expended since August 29, 2023, include hours not only on PWS cases but also on other categories of work, including personal injury, Kidde bankruptcy and even State/Sovereign claims.

[173] London 3M Fee Decl., at ¶¶ 11-13.

[174] Fee Order at 10.

[175] *See also*, London Decl., at ¶ 12.

[176] Douglas Decl., at ¶¶ 9-10, 15-18; *see also*, London Decl., at ¶¶ 11-12; London 3M Fee Decl., at ¶¶ 91-94.

relationships between the Defendants. This litigation has also been difficult given the complex science involved.[177]

At the outset of the MDL, the Defendants insisted that the government contractor defense announced in *Boyle v. v. United Technologies Corp.*, 487 U.S. 500 (1988), would prove to be a cross-cutting issue that would preclude the capacity of Plaintiffs to prosecute their claims.[178] Those predictions proved themselves fallible. The issue was originally scheduled to be resolved on just the first *Boyle* element—whether the MIL-Spec was "reasonably precise"—but after extensive briefing over the course of several months (November 2021 to January 2022), the Court determined that supplemental briefing covering the entire controversy was necessary to resolve the matter.[179] Over the next four months (April to June 2022), Plaintiffs responded to all of Defendants' arguments with excellent briefing that established the fallacy of Defendants' defense.[180] Plaintiffs proved that the Defendants' novel application of the doctrine to this situation —where the government's continued use of the product occurred notwithstanding its fundamental ignorance of the environmental defect presented by AFFF—was flawed. And the Court noted the excellence of the arguments presented by the Plaintiffs to counter Defendants' elaborate efforts.[181] Notably, discovery from Defendants Tyco and BASF played a crucial role in assisting Plaintiffs with overcoming the government contractor defense. Specifically, discovery against these two Defendants uncovered that two of Tyco's AFFF formulations contained C6-dominant fluorosurfactants manufactured by Ciba that met the AFFF military specification, thereby

---

[177] Douglas Decl., at ¶ 6-7.

[178] Declaration of Gary J. Douglas in Support of Class Counsel's Motion for Attorneys' Fees and Costs ("Douglas 3M Fee Decl.")[ECF No. 4269-7], at ¶ 21; *see also,* Napoli Decl., at ¶ 15.

[179] London 3M Fee Decl., at ¶¶ 71-73; *see also*, Douglas 3M Fee Decl., at ¶¶ 24-25.

[180] London 3M Fee Decl., at ¶¶ 72-73; *see also*, Douglas 3M Fee Decl., at ¶¶ 26-27.

[181] *See e.g*., March 25, 2022 H'ring Tr., at 2:22-24 (noting "first-rate briefs"); *see also*, July 8, 2022 H'ring Tr., at 11:8-10 (noting that briefing was "excellent").

establishing that the AFFF manufacturers were not required to use C8-chemistry, i.e., PFOA and PFOS, in the manufacture of their AFFFs.[182]

The challenges to Plaintiffs never ceased as Defendants continued to defend against the *Stuart* bellwether trial by asserting *Daubert* motion practice on Plaintiffs' experts and summary judgment motions.[183] These motions presented a variety of complex issues that again required assembling, in conjunction with the Strike Force, a top-notch briefing team capable of addressing the many detailed factual issues as well as the capacity to fend off the difficult legal questions presented.[184] These efforts successfully moved the case forward to trial and, ultimately, towards resolution.

At trial, significant litigation risks also likely would have presented themselves, which Plaintiff would have had to overcome. These include, *inter alia*, establishing that:

- The PFOA and/or PFOS in Plaintiff's drinking water wells emanated from Defendants' AFFF products, a process that requires the application of complex principles of environmental science, including a fate and transport analysis and chemical fingerprinting;

- It was foreseeable to each of the Defendants that the chemicals in their products would contaminate drinking water generally and, more specifically, the Plaintiff's public drinking wells;

- Which Defendants' PFOA specifically contaminated Plaintiff's drinking water wells;

- PFOA and PFOS are toxic to humans and that same was known by, and/or foreseeable to, the Defendants;

- That the levels of PFOA/PFOS in Plaintiff's drinking water and wells exceeded regulatory limits, and as a reasonably prudent water utility, Plaintiff was required to and did expend capital costs to construct treatment facilities to remove PFAS from its wells;

---

[182] Douglas Decl., at ¶¶ 11-14.
[183] Douglas 3M Fee Decl., at ¶ 37; *see also* Declaration of Rebecca G. Newman in Support of Class Counsel's Motion for Attorneys' Fees and Costs ("Newman 3M Fee Decl.")[ECF No. 4269-11], at ¶¶ 18-19.
[184] Newman 3M Fee Decl., at ¶¶ 18-19.

- That the warnings and/or instructions affixed to Defendants' AFFF concentrates and/or fluorosurfactants failed to adequately warn and/or instruct firefighters on how to properly use, train with and/or dispose of AFFF;

- That despite knowledge of health risks associated with use, disposal and bioaccumulation of AFFF concentrates and/or fluorosurfactants, Defendants did not warn Plaintiff of same;

- That Defendants' AFFF concentrates and/or fluorosurfactants were defectively designed, and more specifically, that a safer alternative design existed that could have been utilized to make AFFF, which included the use of shorter chain fluorocarbons that do not contain nor degrade to PFOA or PFOS;

- That Plaintiff, as a user of AFFF, was not contributorily negligent with respect to the contamination of Plaintiff's drinking water wells with PFOA and/or PFOS;

- That the preponderance of the evidence established that Defendants conduct was unreasonable given their knowledge over time of the harms posed by PFOS and PFOA; and

- That Plaintiff established by clear and convincing evidence that Defendants acted with *intentional misconduc*t and had actual knowledge of the wrongfulness of their conduct, or that there was a high probability of injury to the Plaintiff, and/or that Defendants were *grossly negligent* in that they acted with a conscious disregard and/or indifference to the life, safety, or rights of others entitling Plaintiff to punitive damages.

Defendants have consistently had ample defenses with able counsel zealously pressing every one of them.[185] And, of course, there are general risks of jury trials, relitigating of issues before the transferor court, and various state law arguments and defenses such as statutes of limitations and the like that were in the mix and posed a serious threat. The presence of these issues would have impacted all Defendants at trial, including Tyco and BASF. This justification satisfies the *Barber* factor.[186]

The Court should confirm this factor favors a substantial fee award in this case.

---

[185] *See generally*, Douglas 3M Fee Decl., at ¶¶ 37-44.
[186] *See* Fee Order at 10-11.

### 3.    The Skill Requisite to Perform the Legal Service Properly

The Court regularly witnessed the high quality of Plaintiffs' counsel's legal work, which conferred an exceptional benefit on the Class in the face of daunting litigation obstacles and highly sophisticated defense counsel. As the Court is aware, it is a formidable and complicated challenge to successfully prosecute a case like this. Moreover, the orderly and effective management of this massive MDL, with claims against numerous Defendants on behalf of thousands of claimants, presented challenges that many law firms and lawyers simply would not have been able to meet, even if they were willing to take on the litigation despite the high level of risk. Indeed, litigation of a case like this requires counsel highly trained in class action law and procedure, as well as in the specialized subject matters that these cases involve. Previously, this Court acknowledged that Plaintiffs' counsel possess these attributes and even complimented Plaintiffs' counsel as "some of the most qualified mass tort litigators in America."[187] The Court also applauded Plaintiffs' counsel's accomplishment, by noting, "only, highly qualified counsel could have navigated these issues."[188]

Once again, the record before the Court establishes that the litigation involved a wide array of complex and novel challenges, which Plaintiffs' counsel met at every juncture based on their collective, extensive experience in complex and class action litigation. Trial preparation, bellwether efforts and settlement negotiations required a thorough understanding of the scientific, legal, and factual issues, as well as a sophisticated familiarity with how PWS operate and how to compensate them for their PFAS contamination. The Court should confirm that this *Barber* factor supports the requested fee.

### 4.    The Preclusion of Other Employment by the Attorneys Due to Acceptance of the Case

---

[187] Fee Order at 11.
[188] *Id.*

Many members of the firms leading the common benefit effort on Plaintiffs' behalf, by necessity, had to forego other cases and potential fees. Many lawyers involved in the common benefit effort expended the vast majority, if not all, of their available time to the pursuit of this litigation for a period of now more than five years. Almost all Plaintiffs prosecuted this litigation entirely on a contingent fee basis and self-funded the litigation through PEC assessments. Meeting the immense time and expense demands of the case limited the ability of Class Counsel to work on numerous other matters, all without any guarantee that such a substantial investment of the many years' worth of time and effort would ever be reimbursed. This significant risk of nonpayment or underpayment warrants the requested fee.[189]

Numerous cases recognize that contingent-fee risk is an important factor in determining the fee award. "In complex, multi-year class actions, the risks inherent in the litigation are immense and the risk of receiving little or no recovery is a major factor in awarding attorney fees." *In re LandAmerica 1031 Exchange Svcs.*, No. 2054, 2012 WL 5430841, at \*4 (D.S.C. Nov. 7, 2012); *see also In re Continental Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) (holding that when a common fund case has been prosecuted on a contingent basis, plaintiffs' counsel must be compensated adequately for the risk of non-payment). Therefore, the Court should confirm that this factor favors the requested fee award.

### 5. The Customary Fee

Class action percentage fee recoveries in the amount of 30% are typical. *Campbell, supra.* In *LandAmerica*, Judge Anderson relied on a survey of common fund fees in the Fourth Circuit and elsewhere approving "percentage awards that ranged from 18% to 30%, inclusive of mega-fund recoveries that reached into the nine-figure range." *LandAmerica 1031 Exchange Svcs.*, 2012

---

[189] *See id.* (finding this factor satisfied for the reasons stated).

WL 5430841, at *4, citing *In re Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 264 (E.D. Va. 2009). As Professor Fitzpatrick's Declaration makes clear, a review of every billion-dollar class action settlement demonstrates the average and median percentages for attorneys' fees awards were 9.3% and 13.7%, respectively.[190] Given these ranges in value, the amount requested in this water contamination case—8%—is eminently reasonable and well supported.[191] This Court agreed that "the requested fee of 8%," in light of the contingency presented by the litigation, "is reasonable."[192] The Court should confirm that this factor supports the percentage fee requested.

### 6.    Whether the Fee Is Fixed or Contingent

Virtually all Plaintiffs' counsel undertook this litigation on a contingent-fee basis, assuming a substantial risk that the litigation would yield no recovery and leave them uncompensated. Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees. *See, e.g., LandAmerica, supra; Enron,* 586 F. Supp. 2d at 791. The time in which to evaluate the risk is *ex ante, i.e.,* as of the time suit was initiated, not with the benefit of hindsight. *See Harman v. Lyphomed, Inc.,* 945 F.2d 969, 974 (7th Cir. 1991). Where counsel face such substantial risks and recover significant compensation for their clients, courts find this factor to favor the fee applicant. *See LandAmerica*, 2012 WL 5430841, at *4; *Enron*, 586 F. Supp. 2d at 796. "Class Counsel … worked for years with no payment, undertaking the risk of walking away with no fee at all. Such 'burdens are relevant circumstances' that support the requested award." *Savani v. URS Pro. Sols. LLC*, No. 06-02805, 2014 WL 172503, at *5 (D.S.C. Jan. 15, 2014), quoting *Torrisi v. Tucson Elec. Power Co.*, 83

---

[190] Fitzpatrick Decl., at ¶ 7.
[191] *Id.* at ¶¶ 2, 4, 7, 11.
[192] Fee Order at 12.

F.3d 1370, 1377 (9th Cir.1993). This Court should confirm that "the contingent nature of the fee also weighs in favor of awarding the requested relief."[193]

### 7.     Time Limitations Imposed by the Client or the Circumstances

This MDL was conducted during the height of the world-wide pandemic caused by COVID-19. In the face of logistical difficulties that COVID restrictions imposed on the parties, counsel and the Court, Class Counsel persevered and during this challenging period conducted enormous amounts of discovery, including document review and a multitude of significant depositions.[194] Under the aegis of this Court's regularly held monthly status conferences and "hands-on" management to see that discovery was being conducted promptly and that the litigation was progressing at an appropriate rate, time was efficiently used, not squandered. Notwithstanding the impediments presented by the pandemic, the first bellwether trial was ready to present to a jury on June 5, 2023, within four and a half years of the Transfer Order that initiated this MDL. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391 (U.S. Jud. Pan. Mult. Lit. 2018). At the same time, settlement negotiations had taken place over the course of two years, and those efforts were proceeding expeditiously, using the totality of time before trial to explore the prospects for resolution. Subsequently, the next bellwether trial was originally scheduled for Fall 2024,[195] and Plaintiffs' counsel was hard at work preparing for such trial when the Tyco and BASF PWS Settlements were reached.

The fact that all these enormous efforts were performed "[d]espite the challenging circumstances and breadth of work to be done,"[196] counsel dedicated themselves to fulfilling their

---

[193] *Id.*

[194] *See* §§ III.A.2, III.B, *supra.*

[195] This date has since been extended to March 2025. *See* CMO 2I.

[196] Fee Order at 12.

obligations to their clients and to the Court. The Court should confirm this "time" factor favors the requested fee.

### 8.    The Amount Involved and the Results Obtained

The eighth *Barber* factor—the amount involved and the results obtained—is entitled to arguably the most significant weight when, as in this case, the efforts of counsel were instrumental in realizing a high recovery on behalf of the Plaintiffs. Indeed, the Supreme Court and the Fourth Circuit have observed that "'the most critical factor' in determining the reasonableness of a fee award is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). *See also Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir. 1998) (recognizing that the degree of overall success must be considered for all claims raised by the plaintiff). A settlement amount of $750 million is clearly an outstanding result obtained for the class by Plaintiffs' counsel. Similarly, a settlement amount of $316.5 million is also an exceptional result. This is especially true for Defendants with limited market shares of the AFFF and fluorosurfactant markets. If outcome weighs as "the most critical" consideration, then surely the requested fee award should be deemed fair and appropriate.

As described above, the Tyco and BASF PWS Settlements provide significant economic value to PWS that have been damaged by Defendants' products. These settlements not only benefit Class Members, but also the customers/ratepayers of these water authorities who need and depend upon clean water in their daily lives. In *Deepwater Horizon*, Judge Barbier noted that "[s]uccess is determined not only by the gross amount of the recovery but also by the number of individuals who benefit from the class settlement, the degree to which it provides them with full compensation for their injuries, and the extent to which the settlement benefits the public at large." *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, No. 2179, 2016

51

WL 6215974, at *18 (E.D. La. Oct. 25, 2016). Here, the Tyco and BASF Settlements will "provide timely relief" to thousands of public water systems "facing PFAS contamination."[197]

By any measure, these Settlements are outstanding results. This Court should confirm that this factor supports the requested fee award.

### 9.    The Experience, Reputation, and Ability of the Attorneys

When this MDL litigation began, the Court underwent an arduous vetting and selection process to appoint experienced, reputable and able counsel to serve on the PEC.[198] Since then, because of the exceptional work-product performed, the Court has reappointed the PEC Members with twenty-eight (29) PEC firms being appointed for the 2024-2025 Term.[199] On August 22, 2023, the Court agreed to add a fourth Co-Lead Counsel to aid in the future prosecution of this MDL. Moreover, this Court appointed Class Counsel, which included both Co-Lead Counsel and additional counsel with specific class experience.

The PEC and common benefit attorneys prosecuting this MDL have far more experience both in PFAS litigation and in environmental law, by far, than any other law firms in the country, and the results and efficiency here demonstrate the impact of this prior experience.[200] "A different group of lawyers may not have been able to achieve the same result."[201] The Court should confirm this factor supports the fee request.

### 10.    The "Undesirability" of the Case

The risks of taking on such a massive case with so many Defendants were daunting at the inception of this litigation. "Cases may be deemed 'undesirable' when the defendant is a large

---

[197] *Id.*
[198] *See generally* CMO 2 [ECF No. 48].
[199] CMO 29 [ECF No. 4904].
[200] Herman Decl., at ¶¶ 8, 13.
[201] Fee Order at 11.

corporation with substantial resources, financial and otherwise, for a vigorous defense; and the legal and factual issues presented risks to recovery absent settlement. Where class counsel is a relatively small group of attorneys with limited resources pitted against … [a larger entity] with access to enormous legal resources, the tenth factor weighs in favor of a substantial fee." *Burford v. Cargill, Inc.,* No. 05-0283, 2012 WL 5471985, at *5 (W.D. La. Nov. 8, 2012) (citations omitted). Citing *Burford*, this Court ruled that "given the complexity of this matter" and "the substantial litigation costs incurred without any guarantee of recovery" that the matter was "'undesirable' under *Barber*."[202] The Court should confirm that this factor also supports the requested percentage.

### 11. The Nature and Length of the Professional Relationship with the Client

This *Barber* factor was designed to consider those instances when "a lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office." *Johnson*, 488 F.2d at 719. "The meaning of this factor, however, and its effect on the calculation of a reasonable fee has always been unclear …. Courts applying the [*Barber*] factors typically state this particular standard is irrelevant or immaterial." *Bruner v. Sprint/United Mgmt. Co*., Nos. 08-2133-KHV, 08-2149-KHV, 2009 WL 2058762, at *9 (D. Kan. July 14, 2009).

Here, many counsel have longstanding client relations with their PWS clients, having represented them in other contamination cases. "To the extent relevant here, this factor weighs in favor of granting Class Counsel's motion," Fee Order at 12, because the long-standing relationships that certain counsel have with established clients served as an additional motivation for them to provide high-quality representation so as to maintain these ongoing client relationships. The Court should confirm that this factor "weighs in favor of the requested fee." *Id*.

### 12. Awards in Similar Cases

---

[202] *Id.*

All but two of the *Barber* fee adjudication factors are abstract in that they do not purport to have any mathematical correlation to the computation of an appropriate percentage award. The final *Barber* factor provides guidance as to how to concretize abstract consideration of the other factors into a definitive percentage fee award. This factor prescribes consideration of "awards in similar cases." *Barber*, 577 F.2d at 226 n.28. Such consideration is a dominant feature of contemporary percentage-of-funds fee adjudication.[203]

To aid the Court in making this evaluation, as noted above, Plaintiffs retained Mr. Fitzpatrick, a renowned academician in this area of the law, to review the *Barber* factors and analyze whether Class Counsel's fee request is reasonable. He determined with respect to the factors relating to fee awards in other cases—that is, factors *five* (the customary fee) and *twelve* (awards in similar cases)—that counsel's fee request here is below the norm.[204] In fact, in this Circuit, this expert's empirical study found that the mean and median percentage-method awards were around 25%[205]—far greater than what is being requested here. Moreover, this same study found that across all percentage method fee awards considered, the fee request herein is at very low end of the spectrum, as depicted in Figure 1, included in Mr. Fitzpatrick's Declaration in Support of Class Counsel's DuPont Fee Petition, which is incorporated herein (the red arrow depicts the fee request here).[206] Using these same analyses in the prior PWS Settlements,[207] Class Counsel "established that the fee award they request is on the smaller end,"[208] so the Court went on to approve the 8% fee award.

---

[203] *See generally* Fitzpatrick Decl.
[204] Fitzpatrick Decl., at ¶¶ 2, 4, 7.
[205] Fitzpatrick DuPont Fee Decl., at ¶ 14; *see also* Fitzpatrick Decl., at ¶ 7.
[206] Fitzpatrick DuPont Fee Decl., at ¶¶ 14-15; *see also* Fitzpatrick Decl., at ¶¶ 2, 7.
[207] Fitzpatrick Decl., at ¶ 7; *see also* Herman Decl., generally.
[208] Fee Order at 13.

As demonstrated above, the requested fee percentage is well within the range of percentages that have been awarded in mega-fund cases and by courts in this Circuit. This Court should confirm that the "awards in similar cases" factor powerfully argues in support of the reasonableness of the 8% fee requested. As the other *Barber* factors fully endorse the requested fee, the fee requested should be awarded.

### C.    THE LODESTAR CROSS-CHECK CONFIRMS THAT CLASS COUNSEL'S FEE REQUEST IS REASONABLE

"The purpose of a lodestar cross-check is to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiplier of the loadstar."[209]  The first *Barber* principle (the time and labor expended) encourages this consideration. *See Allura*, 2021 WL 2043531, at *4. When undertaken as a "cross-check on the reasonableness of a percentage fee request," the Court need not "exhaustively scrutinize the hours documented by counsel and the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case." *Savani v. URS Professional Solutions LLC*, 121 F. Supp. 3d 564, 575–76 (D.S.C. 2015).[210]  Indeed, the cross-check is applied in a "broad," "rough," "abbreviated," "streamlined," and "imprecise" way.[211]

---

[209] *Id.* (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005)).

[210] *See also* Fee Order at 13-14.

[211] Herman Decl. at ¶¶ 19, 75 (citing *Cantu-Guerrero v. Lumber Liquidators*, 952 F.3d 471, 482 n.7 (4th Cir. 2020) (a so-called "lodestar cross-check" is the comparison of a calculation of attorney's fees using the percentage-of-recovery method to a "rough" or "imprecise" lodestar calculation); *In re Deepwater Horizon*, MDL No. 2179, Rec. Doc. 21849 [2016 U.S. Dist. LEXIS 147378] (E.D. La. Oct. 25, 2016) at p.30 ("the Court will perform an abbreviated lodestar analysis as a broad cross-check on the on the reasonableness of the fee arrived at by the percentage method") and at p.39 ("the lodestar cross-check is a streamlined process, avoiding the detailed analysis that goes into a traditional lodestar examination"); *In re Vioxx*, 760 F.Supp.2d 640, 652 (E.D. La. 2010) ("The lodestar analysis is not undertaken to calculate a specific fee, but only to provide a broad cross check on the reasonableness of the fee arrived at by the percentage method")).

To conduct the lodestar cross check, the Court multiplies the number of hours reasonably spent by a reasonable hourly rate.[212] A "reasonable hourly rate" is determined by the "customary fee for services by experienced counsel in a case like this," *Savani*, 121 F. Supp. 3d at 576, and "should be in line with the market rate for 'similar services by lawyers of reasonably comparable skill, experience, and reputation,'" *Berry v. Wells Fargo & Company*, 2020 WL 9311859, at *14 (D.S.C. 2020).

Because the MDL procedure consolidates cases filed by lawyers who typically practice in varied and disparate jurisdictions, district courts often look to a "national rate" rather than the market rate of the locality where the MDL happens to be. In the *Transvaginal Mesh Litigation*, Judge Goodwin, sitting in the Southern District of West Virginia, observed that "these MDLs encompass law firms from across the country and are national in scope" and therefore: "When selecting an hourly rate for determining legal fees the court cannot consider just one market because 'the relevant legal community' is national in nature."[213]

Although some MDL litigation may involve more localized parties, justifying giving great weight to the local "market," MDL 2873 reaches a national and international scope of Plaintiffs and Defendants and involves legal issues that turn on national security policy, national environmental regulations, nationwide contamination, nationwide and international product distribution, and universal health concerns. *See In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485, 520 (W.D. La. 2017) (where "plaintiffs and plaintiffs' counsel span the entire United States of America; the venue proper as to each individual claim spans the entire United

---

[212] Fee Order at 13.
[213] Herman Decl., at ¶¶ 33-34 (*citing In re Cook Medical, Inc., Pelvic Repair Systems Prods. Liab. Litig.*, 365 F. Supp. 3d 685, 701 (S.D. W.Va. 2019)).

States, and the PSC, PEC, and Participating Counsel comprise attorneys whose practices span the entire United States," the "relevant legal community […] is national in nature.").

The Fourth Circuit agrees with this approach. Although "[t]he relevant market for determining the prevailing rate is ordinarily the community in which the court where the action is prosecuted sits," *National Wildlife Federation v. Hanson*, 859 F.2d 313, 317 (4th Cir.1988), "[i]n circumstances where it is reasonable to retain attorneys from other communities, however, the rates in those communities may also be considered." *Rum Creek Coal Sales, Inc v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994); *Morris v. Bland*, 2015 WL 12910631, at *3 (D.S.C. 2015) ("Charleston is ordinarily the community that the Court would consider. However, because Plaintiff is a resident of York County, it was reasonable for her to obtain local counsel there, and the Court will consider the rates where counsel is located as well.").[214]

In the earlier PWS Settlements this Court applied a lodestar crosscheck to confirm the reasonableness of the 8% fee request.[215] The Court accepted the application of blended hourly rates of $725-$825 provided by Mr. Herman,[216] and applied those rates against the then existing cumulative time reported by Mr. Perry (431,158.9 hours),[217] to arrive at a lodestar ranging between $312,590,202.50 and $355,706,092.50. Because this lodestar merely required a lodestar multiplier ranging between 2.7 and 3, it easily fit within the precepts of the Fourth Circuit fee jurisprudence, and the Court was able to "confirm[] the reasonableness of the fee request."[218]

In the time elapsed since the first PWS fee petition, Class Counsel have expended an additional 50,182.7 hours, rendering a lodestar for the total cumulative work performed by Class

---

[214] *Id.* ¶ 35.
[215] Fitzpatrick Decl., at ¶ 9; Fee Order at 13-14.
[216] Declaration of Stephen J. Herman, Esq. [ECF No. 4269-12], at ¶ 11; Fee Order at 14.
[217] Declaration of John W. Perry, Jr. [ECF No. 4269-3], at ¶ 20; Fee Order at 14.
[218] Fee Order at 14.

Counsel (up to and including May 31, 2024) to range between $348,972,660.00 and $397,106,820.00, using the same blended hourly rates approved by Mr. Herman and in the Fee Order.[219] Employing a cross-check against this lodestar range again yields a multiplier range between approximately 2.56 and 2.92 depending on the blended rate employed ($348,972,660.00 x 2.92 = $1,019,000,167.20 and $397,106,820.00 x 2.567 = $1,019,373,206.94) akin to that previously accepted in the Fee Order.[220] This cross-check confirms that the 8% requested fee award is reasonable and not excessive.

Indeed, even under the reasoning of the Fee Order, the current fee request is still reasonable even without taking into account the additional time expended up to May 31, 2024. By adopting a multiplier of "3," the Fee Order necessarily accepted as reasonable a fee award of $1,067,118,277.50 ($355,706,092.50 x 3 = $1,067,118,277.50). Employing the same math to perform a new cross-check, the additional $85,320,000 Class Fee requested here is presumptively reasonable since the additional fee, in addition to the prior fee awarded, still falls below the $1,067,118,277.50 upper range of a "3" multiplier. The math follows. In the Fee Order, fees were awarded totaling $934,800,000 ($94,800,000 (DuPont) + $840,000,000 (3M) = $934,800,000). This allowed for an additional fee award in excess of $132 million ($1,067,118,277.50 - $934,800,000 = $132,318,277.50). Since the Tyco and BASF PWS Settlements request only $85,320,000, there still exists room to recover an additional approximately $46.9 million beyond the current fee request. And, of course, because the original lodestar supported a multiplier range between 2.7 and 3, the Court did not have to consider permissible multipliers in excess of "3." As previously noted, courts have allowed a range from 1.0 to 6.2, which would also further increase

---

[219] As explained above, these additional hours do not include time devoted to administering the existing settlements, which recorded time will be the subject of a separate fee petition to recover from the funds held back to compensate for that specific work effort.

[220] Fee Order at 14.

the allowance.[221] Since the current fee request of $85,320,000 falls far below the allowance afforded by the previous cross-check using either the additional hours expended until May 31, 2024 or just the hours submitted in the 3M and DuPont Fee Petitions, employing a larger multiplier remains theoretical. The fact that the requested $85,320,000 Tyco and BASF combined fee still falls below the "3" multiplier allowance again confirms the appropriateness of the already lower-than-normal fee request.[222] As always, even if additional settlements occur in this MDL, the Court can continue to do lodestar cross-check analyses, should it so choose, in order to.

As explained above, the Tyco and BASF settlements stemmed directly from work performed throughout the litigation in developing evidence and successful legal arguments against all Defendants. As a result, it is appropriate to calculate the lodestar and lodestar multiplier based not only on these two most recent settlements but also based on the prior DuPont and 3M settlements. As one court in the Fourth Circuit addressing  issue has explained, "[w]here a settlement is the result of successive cases or successive settlements within the same case, the proper method of performing a lodestar cross-check is to divide the total lodestar for the entire litigation campaign by the aggregate fees requested, including fee previously award." *Binotti v. Duke University*, 1:20-cv-470, 2021 WL 5366877, at *3 (M.D. N.C. August 30, 2021). "[C]ourts typically base fee awards in subsequent settlements on all work performed in the case," based on the reality—applicable here—that "the total work performed by counsel from inception of the case makes each settlement possible." *In re Capacitors Antitrust Litig.,* 2018 WL 4790575, at *6 (N.D. Cal. Sept. 21, 2018). Under this approach, when calculating fees, "courts typically calculate the lodestar multiplier by dividing (1) all past and requested fee awards by (2) all of counsel's time from inception of the case." *Id.*

---

[221] Fitzpatrick Decl., at ¶¶ 2, 9.
[222] *Id.*

Numerous other authorities are in accord. *See, e.g., Lobatz v. U.S. West Cellular of California,* 222 F.3d 1142, 1149-50 (9th Cir. 2000) (approving the district court's use of "the total hours class counsel spent on the entire litigation" and rejecting an objector's argument that the court should have focused solely on time spent subsequent to an earlier settlement); *In re Automotive Parts Antitrust Litig.,* 2020 WL 5653257, at *3 n.5 (E.D. Mich. Sept. 23, 2020) ("In calculating the lodestar for purposes of the cross-check, it would be impractical to compartmentalize and isolate the work that . . . Class Counsel did in any particular case at any particular time because all of their work assisted in achieving all of the settlements and has provided and will continue to provide a significant benefit to all of the . . . classes."); *In re Transpacific Passenger Air Transportation Antitrust Litig.,* No. 07-5634, 2019 WL 6327363 at *6 (N.D. Cal. Nov. 26, 2019)(relying on *In re Capacitors* and holding that "[t]he Court will consider the lodestar ratio with respect to the cumulative lodestar—for simplicity and consistency, and in recognition of counsel's work as a whole at this stage"); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-cv-42, 2015 WL 6964973, at *7 (E.D.N.Y. Nov. 10, 2015) (using total lodestar from outset of case and total settlement fund, including prior settlements).

This holistic approach to calculating fees in the context of successive settlements makes perfect sense from a policy standpoint. As one court has cogently stated: "[I]f an award of fees for a successive settlement were limited and calculated only on the basis of time and expenses incurred since the preceding settlement, counsel would have little or no incentive to vigorously or efficiently pursue litigation or settlement of claims with non-settling defendants . . . even though the remaining defendants might be equally as culpable or have greater culpability." *In re Southeastern Milk Antitrust Litig.,* 2013 WL2155387, at *7 (E.D. Tenn. May 17, 2013). Moreover, this approach provides an infrastructure that can be used for all future settlements, thus avoiding the need for the

Court and the parties to reinvent the wheel in figuring out how to calculate fees for each subsequent settlement while still ensuring that the multiplier remains within an appropriate range.

### D.    PLAINTIFFS' COUNSEL ARE ENTITLED TO REIMBURSEMENT OF OUT-OF-POCKET COSTS

Class Counsel also request that the Court grant Plaintiffs' application for reimbursement of their out-of-pocket costs incurred in prosecuting this litigation for Class Members. As discussed above, Plaintiffs' costs in the amount of $21,387,560.75 have already been reimbursed through the DuPont and 3M PWS Settlements.[223] At present, Plaintiffs seek the totality of the unreimbursed costs to date, in the amount of $10,471,081.51.[224] Costs incurred in the prosecution of claims against the remaining non-settling defendants would be paid from subsequent settlements, if any.

As courts have recognized, "Class Counsel had a strong incentive to keep expenses at a reasonable level due to the high risk of no recovery when the fee is contingent." *Beesley v. Int'l Paper Co.*, No. 3:06-CV-703-DRH-CJP, 2014 WL 375432, at *3 (S.D. Ill. Jan. 31, 2014). This is certainly true where, as here, Plaintiffs' counsel only expended what was reasonably necessary to prosecute and resolve the case for the Class Members, and, as discussed above, with the remote protocols that were put in place in this MDL, significant expenses were saved. As such, Plaintiffs respectfully submit that the cost reimbursement sought here is reasonable and appropriate and should be reimbursed.[225]

### V.    CONCLUSION

For the reasons set forth above, Class Counsel respectfully request that this Court recognize the exceptional work performed to achieve this historic settlement with Tyco by awarding them:

---

[223] Perry Decl., at ¶ 25.
[224] Fitzpatrick, at ¶¶ 4, 10.
[225] Fitzpatrick, at ¶ 10.

- 8% in fees of Tyco PWS Settlement ($750 million), which equals $60,000,000;

- 8% in fees of BASF PWS Settlement ($316.5 million), which equals $25,320,000; and

- Reimbursement of costs in the amount of $10,471,081.51.

Further, for this class settlement, Class Counsel request that the Court direct the 8% fee award to be credited against any individual counsel's retainer fee such that any private contract will be reduced by 8%.

Dated: July 22, 2024

Respectfully submitted,

/s/ Michael A. London
Michael A. London
Douglas and London P.C.
59 Maiden Lane, 6th Floor
New York, NY 10038
212-566-7500
212-566-7501 (fax)
mlondon@douglasandlondon.com

Paul J. Napoli
Napoli Shkolnik
1302 Avenida Ponce de León
San Juan, PR 00907
Tel: (833) 271-4502
Fax: (646) 843-7603
pnapoli@nsprlaw.com

Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
214-521-3605
ssummy@baronbudd.com

Joseph Rice
Motley Rice LLC
28 Bridgeside Blvd.,
Mt. Pleasant, SC 29464
jrice@motleyrice.com

*Class Counsel*