**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| IN RE: AQUEOUS FILM-FORMING | ) | No. 2:18-mn-2873-RMG |
| FOAMS PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | |
| | ) | **This Document Relates to** |
| | ) | *Dorene Dairy Gen. P'Ship*, 2:20-cv-04263 |
| | ) | *Schaap*, 2:19-cv-03288 |
| | ) | *Teune*, 2:19-cv-03290 |
| | ) | *Vander Dussen*, 2:20-cv-04191 |
| | ) | *New Mexico*, 2:20-cv-02115 |
| | ) | |

**UNITED STATES OF AMERICA'S REPLY BRIEF
IN SUPPORT OF ITS SITE-SPECIFIC MOTION TO DISMISS PURSUANT TO
<u>FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 3

ARGUMENT ...................................................................................................................... 6

I.     The DFE Bars Plaintiffs' Claims. .................................................................................. 6

    A.  The DFE Bars Plaintiffs' Claims Related to Releases or Discharges of AFFF from Fire-Suppression Systems in Hangars. ........................................................................ 6

    B.  The Air Force Utilized the Many Options Contained in OI 32-11............................. 14

    C.  Plaintiffs' Failure-to-Warn Claims Are Barred by the DFE. ........................................ 15

II.   New Mexico's Claims Impermissibly Challenge the CAFB CERCLA Response............ 17

III.  No Further Discovery Should Be Permitted....................................................................... 19

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

<u>Cases</u>

*Abbott v. United States,*
    78 F.4th 887 (6th Cir. 2023) ................................................................ 10

*Aragon v. United States,*
    146 F.3d 819 (10th Cir. 1998) ............................................................... 9

*Berkovitz v. United States,*
    486 U.S. 531 (1988) ......................................................................... 9, 10

*Borden v. United States,*
    593 U.S. 420 (2021) ............................................................................ 11

*Bulger v. Hurwitz,*
    62 F.4th 127 (4th Cir. 2023) ..................................................... 1, 10, 20

*Clendening v. United States,*
    19 F.4th 421 (4th Cir. 2021) ........................................................... 2, 16

*Holbrook v. United States,*
    673 F.3d 346 (4th Cir. 2012) ............................................................... 11

*In re Camp Lejeune N.C. Water Contamination Litig.,*
    263 F. Supp. 3d 1318 (N.D. Ga. 2016) ............................................... 16

*In re Katrina Canal Breaches Litig.,*
    616 F. App'x 659 (5th Cir. 2015) (per curiam) .................................... 13

*Indem. Ins. Co. of N. Am. v. United States,*
    569 F.3d 175 (4th Cir. 2009) ....................................................... 6, 7, 10

*Loughlin v. United States,*
    286 F. Supp. 2d 1 (D.D.C. 2003) ......................................................... 6

*Myers v. United States,*
    17 F.3d 890 (6th Cir. 1994) ................................................................ 10

*Parrish v. United States,*
    157 F. Supp. 3d 434 (E.D.N.C. 2016) ................................................. 16

*Razore v. Tulalip Tribes of Wash.,*
    66 F.3d 236 (9th Cir. 1995)...................................................................17

*River Vill. W. LLC v. Peoples Gas Light & Coke Co.*,
    618 F. Supp. 2d 847 (N.D. Ill. 2008) ................................................................. 19

*Sánchez v. United States*,
    671 F.3d 86 (1st Cir. 2012) ................................................................................ 13

*Seaside Farm, Inc. v. United States*,
    842 F.3d 853 (4th Cir. 2016) ....................................................................... 11, 16

*Suter v. United States*,
    441 F.3d 306 (4th Cir. 2006) .............................................................................. 6

*United States v. Colorado*,
    990 F.2d 1565 (10th Cir. 1993) ................................................................. *passim*

*United States v. Gaubert*,
    499 U.S. 315 (1991) ........................................................................................... 6

*Washington v. Dep't of the Navy*,
    446 F. Supp. 3d 20 (E.D.N.C. 2020) ............................................................... 16

*Waverley View Invs., LLC v. United States*,
    79 F. Supp. 3d 563 (D. Md. 2015) ............................................................. *passim*

## Statutes

CERCLA, 42 U.S.C. § 9613 (Section 113) ......................................................... *passim*

CERCLA, 42 U.S.C. § 9614 ........................................................................................ 19

CERCLA, 42 U.S.C. § 9652 ........................................................................................ 19

Colo. Rev. Stat. § 25-15-308 ...................................................................................... 18

N.M. Stat. Ann. § 74-4-10 ........................................................................................... 18

N.M. Stat. Ann. § 74-4-13 ........................................................................................... 18

RCRA, 42 U.S.C. § 6928 ............................................................................................ 18

RCRA, 42 U.S.C. § 6972 ...................................................................................... 18, 19

## Rules

Fed. R. Civ. P. 12 ......................................................................................................... 2

## Regulations

SDWA, 40 C.F.R. Subpart A §§ 143.1, 143.3 ............................................................ 4

**INTRODUCTION**

Plaintiffs have not met their burden of proving that the FTCA's Discretionary Function Exception ("DFE") does not bar their claims against the United States. *Bulger v. Hurwitz*, 62 F.4th 127, 142 (4th Cir. 2023). Plaintiffs fail to identify *any* mandatory and specific directives that governed the challenged conduct at Cannon Air Force Base ("CAFB"). As a threshold matter, Plaintiffs do not challenge the discretionary nature of the Air Force's use and handling of AFFF for (1) fire training; (2) pre-June 1, 2002, releases or discharges of AFFF from fire-suppression systems in hangars; (3) fire emergency responses; and (4) equipment testing for preparedness. Opp'n to Site-Specific Mot. (ECF No. 4851), *passim* (hereafter, "Opp'n"). Nor do Plaintiffs challenge that these categories of conduct were imbued with sensitive policy considerations. *Id.* Because Plaintiffs do not even attempt to argue—let alone prove—that claims relating to fire training; pre-June 1, 2002, hangar discharges; fire emergency responses; and equipment testing for preparedness are outside the scope of the DFE, these claims must be dismissed. *Bulger*, 62 F.4th at 142.

Plaintiffs' only remaining tort claims relate to: (1) "accidental discharges" or releases of AFFF from fire-suppression systems in hangars after June 1, 2002, and (2) the timing of the warnings provided by CAFB when the public CERCLA investigation began. Plaintiffs do not dispute that the challenged conduct related to accidental discharges was policy-based and therefore satisfies DFE step two. As for step one, the only federal directive that Plaintiffs identify is Operating Instruction 32-11 ("OI 32-11"), which CAFB first issued on June 1, 2002, and which addressed discharges of AFFF from hangars. OI 32-11 concerned excess foaming—not PFAS contamination. Nonetheless, Plaintiffs contend that "OI 32-11 Was a Mandatory Directive Prohibiting AFFF from Entering CAFB's Sanitary Sewer System." Opp'n at 10; *id.* at

1

11 (arguing that OI 32-11 prohibited AFFF from entering the sanitary sewer system at CAFB "in all circumstances"). The opposite is true. OI 32-11's plain language shows that it was a discretionary, policy-based guidance document that allowed for AFFF to enter the sanitary sewer system in various circumstances, as determined by base personnel. Further, although irrelevant to the two-step DFE analysis, there is no evidence to support Plaintiffs' allegation that the Air Force failed to follow OI 32-11's guidance.

With respect to their failure-to-warn claim, Plaintiffs do not identify any mandatory and specific directive at all. Opp'n at 15–16. Instead, Plaintiffs argue that the Air Force's decisions related to warnings provided at CAFB did not implicate policy considerations, ignoring binding Fourth Circuit authority in *Clendening v. United States*, 19 F.4th 421, 436 (4th Cir. 2021), which held that "the Government's decision of how and when to warn implicates policy decisions." Because Plaintiffs have not proven that the United States violated a relevant, mandatory and specific federal directive for their post-2002 hangar discharge and failure-to-warn claims, and because all of the relevant decisions were grounded in policy considerations, these claims must also be dismissed for lack of subject-matter jurisdiction under the DFE. Fed. R. Civ. P. 12(b)(1).

Finally, the Court should dismiss the first and second counts of New Mexico's complaint with respect to CAFB for lack of jurisdiction under Section 113(h) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") because they challenge the Air Force's ongoing cleanup actions.[1] New Mexico's sole argument is that its claims are permitted by the Tenth Circuit's decision in *United States v. Colorado*, 990 F.2d 1565 (10th Cir.

---

[1] New Mexico amended its complaint to include a third cause of action after the United States filed its Site-Specific Motion. *New Mexico v. United States*, No. 2:20-cv-2115-RMG (July 11, 2024), 2d Am. Compl. (ECF No. 115) ("NM Compl."). The United States is not seeking dismissal of New Mexico's third cause of action in this Site-Specific Motion.

1993).  But New Mexico's claims here are not the type of "enforcement" claims contemplated in *Colorado*; in fact, they are precisely the kind of "imminent hazard" claims that the Tenth Circuit explicitly recognized cannot proceed in the face of a CERCLA cleanup.  *Id.* at 1578.

After five years of discovery (and 120 additional, targeted days for discovery specific to CAFB), Plaintiffs remarkably claim that additional discovery is needed.  Any further discovery would amount to a fishing expedition, which the law does not permit.  Rather than allowing additional discovery, the Court should dismiss all of Plaintiffs' FTCA claims and New Mexico's first and second causes of action against the United States.

## FACTUAL BACKGROUND

In 1998, CAFB constructed a new wastewater treatment plant ("WWTP") for its sanitary sewer system.  Memo. ISO Site-Specific Mot. to Dismiss (ECF No. 4551-1), at 4 (hereafter, "Site-Specific Motion").  After the new WWTP opened in 2000, CAFB obtained a National Pollutant Discharge Elimination System ("NPDES") permit from the Environmental Protection Agency ("EPA") that allowed for the discharge of AFFF foam.  *See* CAFB NPDES Permit (Sept. 24, 1999) (ECF No. 4551-15), § 16.1.5 (hereafter, "the NPDES permit").  The NPDES permit allowed for certain discharges to the North Playa Lake outfall following treatment through the WWTP, limiting them only as follows: "There shall be no discharge of floating solids or visible foam in other than trace amounts."  *Id.*[2]  Plaintiffs do not dispute that the NPDES permit did not

---

[2] In opposition to the Omnibus Motion to Dismiss, Plaintiffs unremarkably note that two other facilities in the late 2000s had identical language in their NPDES permits.  *See* Opp'n to Omnibus Mot. (ECF No. 4849) at 54–55.  However, vague regulatory language that does not tell the military exactly what to do to achieve the goal is not a mandatory and specific directive.  *See* Omnibus Reply (ECF No. 5621) at 18–19; *infra* at 12–13.

tell the Air Force how to achieve that goal; nor do Plaintiffs dispute that the permit was concerned only with excess foaming.[3]

CAFB issued OI 32-11 on June 1, 2002, to address excess foaming from hangar releases of AFFF, *including "accidental release[s]*," consistent with the NPDES permit. OI 32-11 (2002) (ECF No. 4551-13), ¶ 1 (emphasis added). Namely, under a paragraph entitled "PURPOSE," OI 32-11 stated that "[t]his Operating Instruction (OI) addresses environmental concerns and ramifications, *if any*, with AFFF releases and provides *guidance* to minimize or eliminate environmental consequences." *Id.* (emphases added). Those "environmental consequences" centered on excess foaming because "AFFF entering the sanitary sewer system can upset the biological treatment process of the Cannon [WWTP] due to its foaming characteristic." *Id.* ¶ 4.d; *see also* Memo. ISO Omnibus Mot. to Dismiss (ECF No. 4548-1) at 9–10 (hereafter, "Omnibus Motion"); Decl. of Robert Darwin (ECF No. 4548-10) ¶¶ 29, 36. Consistent with this objective, OI 32-11 established "*policy* and *guidance* associated with the release of AFFF" at CAFB hangars. OI 32-11 (2002) ¶ 1 (emphases added). OI 32-11 included guidance for handling hangar releases because many of the hangars were connected to CAFB's sanitary sewer system. *See, e.g.*, *id.* ¶¶ 1, 4.h; ECF No. 4551-7 §§ 2.5.3, 3.5.4; Site-Specific Mot. at 6. Importantly, OI 32-11 did not specify a course of conduct for Air Force personnel to meet the objectives of the "guidance," and it provided several options for releasing spent AFFF from hangars to various locations, including to the sanitary sewer system. Site-Specific Mot. at 6–9; *infra* at 7–10.

---

[3] Under the Safe Drinking Water Act ("SDWA"), the EPA viewed "foaming" as a characteristic affecting the "aesthetic qualities" of drinking water—not its safety. 40 C.F.R. Subpart A §§ 143.1, 143.3. These SDWA regulations "are not Federally enforceable"; they are "guidelines." *Id.* § 143.1.

OI 32-11 mirrored global Air Force policy, operative at the time, concerning the management of AFFF wastewater.  As discussed in the United States' Omnibus Motion to Dismiss, the Air Force's Fire Protection Engineer, Frederick Walker, drafted and co-authored Engineering and Technical Letter ("ETL") 1110-3-481, entitled "Engineering and Design, Containment and Disposal of Aqueous Film-Forming Solution (March 31, 1997)."  Omnibus Mot. at 12–14; Decl. of Frederick Walker (ECF No. 4548-67), ¶ 28; ETL 1110-3-481 (ECF No. 4548-85).  The 1997 ETL's primary concern related to excess foaming and identified several "AFFF Disposal and Treatment Options" applicable to new construction of sanitary sewer facilities, such as the CAFB system (which was constructed in 1998), and noted that sending AFFF wastewater to the sanitary sewer is "[t]he most common method of dispos[al] . . . [and] is generally accepted as the **preferred method of disposal**."[4]  ETL 1110-3-481, at A-12, § 7.1 (emphasis added), & p. A-14, § 7.4; *see* Walker Decl. ¶ 28.[5]

Because OI 32-11 had nothing to do with PFAS contamination, it cannot provide the source of a relevant, mandatory and specific federal directive governing accidental discharges of AFFF from hangars post-June 1, 2002.  *See Waverley View Invs., LLC v. United States*, 79 F.

---

[4] The ETL applied to bases undergoing new construction and suggested multiple solutions for the problem of excess foaming, including underground storage tanks for the "storage of foam-water solution . . . prior to controlled release . . . by metered pumping to the [WWTP]."  ETL 1110-3-481 at A-10, § 6.1; *see* Omnibus Mot. at 13–14.  Consistent with the ETL, CAFB's new sanitary sewer system included a new WWTP with a 9-million-gallon, lined storage basin.  As part of the system, the hangar floor drains and trenches were equipped with valves that held the AFFF in place, where it could either be pumped out onto the ground or diverted to the storage basin, diluted further, sent through the WWTP, and ultimately discharged to the North Playa Lake outfall.  OI 32-11 (2014) (ECF No. 4551-14), ¶ 4.e; USAF Final Preliminary Assessment of PFAS at CAFB (Oct. 2015) (ECF 4851-6), at p.161 (of 1492).

[5] Plaintiffs assert that OI 32-11 required AFFF wastewater from a hangar release to be "disposed [of] off base in an approved fashion."  Opp'n at 14.  OI 32-11 says no such thing.  Plaintiffs cite an irrelevant email exchange regarding a contractor working on a tank of AFFF "concentrate," which is undiluted AFFF that cannot be reused.  ECF No. 4851-27.

Supp. 3d 563, 571 (D. Md. 2015) (questioning the relevancy/applicability of the Clean Water Act but determining that it was unnecessary because the provisions were neither mandatory or specific); *Loughlin v. United States*, 286 F. Supp. 2d 1, 18 (D.D.C. 2003) ("[T]he federal government only loses its ability to rely on the [DFE] where the conduct that is the subject of the underlying tort claim is also the subject of the mandatory directive."), *aff'd*, 393 F.3d 155 (D.C. Cir. 2004). Regardless, even if OI 32-11 (1) were relevant and (2) did not expressly allow for discharges to the sanitary sewer system, the DFE would still bar Plaintiffs' claims because OI 32-11 was a discretionary, policy-based guidance document, and discharge to the sanitary sewer system was one of many choices available to CAFB base personnel.

## ARGUMENT

### I.     The DFE Bars Plaintiffs' Claims.

"The DFE analysis proceeds in two steps." *Waverley View*, 79 F. Supp. 3d at 569. First, "a court must determine whether the challenged conduct involves an element of judgment or choice." *Id*. (quotation marks omitted). To meet their burden, Plaintiffs must point to a federal directive that "'specifically prescribes a course of action for an employee to follow.'" *Id*. (quoting *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180 (4th Cir. 2009)). Second, a court must determine "whether the challenged action is 'based on considerations of public policy.'" *Id*. (quoting *Suter v. United States*, 441 F.3d 306, 311 (4th Cir. 2006)). "This inquiry focuses 'not on the agent's subjective intent in exercising the discretion . . . but on the nature of the actions taken and on whether they are susceptible to policy analysis.'" *Id*. (quoting *United States v. Gaubert*, 499 U.S. 315, 325 (1991)).

   A.     The DFE Bars Plaintiffs' Claims Related to Releases or Discharges of AFFF from Fire-Suppression Systems in Hangars.

Plaintiffs contend that "at least forty-five (45) separate accidental discharges of AFFF

occurred at CAFB leading to the release of more than 4,500 gallons of AFFF across the Base,"

and they offer an "expert" affidavit from James P. Bearzi in support.  Opp'n at 5 (emphasis

omitted); Bearzi Aff. (ECF No. 4581-5), ¶ 27.  *But see* Omnibus Reply (ECF No. 5621) at 4 n.2

(reserving the right to challenge Bearzi expertise and opinions).  However, a closer examination

of Mr. Bearzi's "Appendix A" reveals that only ***one*** discharge reached the sanitary sewer outfall

after 2002, while OI 32-11 was in effect.  *See* App'x A to Bearzi Aff. (ECF No. 4851-5).[6]  That

release occurred on January 7, 2005.  *Id*.  In any event, whether one discharge or 45 discharges

of AFFF from the hangars to the sanitary sewer system occurred, what matters is that OI 32-11

provided base personnel at CAFB with discretion to allow hangar discharges of AFFF to enter

the sanitary sewer system.  Plaintiffs fail to identify any other mandatory and specific federal

directives applicable to their claims.  Thus, Plaintiffs' claims against the United States are barred

by DFE.

    ***OI 32-11.***  OI 32-11 was discretionary, policy-based guidance containing multiple

choices for base personnel at CAFB to select.  For example, it provided only that base personnel

at CAFB should "generally" keep AFFF out of the storm water and sanitary sewer systems as

much as possible.  *See* OI 32-11 (2002) ¶ 5.a ("***Generally***, AFFF must be kept out of storm drain

---

[6] The other discharges either predated OI 32-11 (which was, according to Plaintiffs, the earliest applicable federal directive) or did not result in any AFFF entering CAFB's sanitary sewer system.  App'x A to Bearzi Aff.; *cf. Waverley View*, 79 F. Supp. 3d at 570 ("[P]rovisions [] adopted after the Army had stopped disposing of waste" are "irrelevant" to DFE analysis); *Indem. Ins. Co*., 569 F.3d at 180 (using only administrative guidance "in existence" at the time of the conduct in analyzing DFE).

    Because Plaintiffs' DFE argument is predicated on one accidental release, on January 7, 2005, this Reply focuses on the 2002 version of OI 32-11 and does not address the 2014 version of the OI.  Like the 2002 version, however, the 2014 version of OI is a discretionary, policy-based guidance document.  *See* Site-Specific Mot. at 7–8.  Indeed, the 2014 version is nearly identical to the 2002 version, including the same decision matrix that called for base personnel to consider mission constraints, and the same general guidance that allowed for AFFF to enter the sanitary sewer system.  *Id*.

inlets and the sanitary sewer system.") & ¶ 10 ("*Generally*, AFFF *should* be kept from entering the storm and wastewater sewer systems." (emphases added)).  OI 32-11's use of the term "generally" demonstrates that it was not mandatory and was discretionary.

Contrary to Plaintiffs' contention that AFFF from hangar releases never could permissibly enter the sanitary sewer system, Opp'n at 10–13, OI 32-11 identified multiple instances where base personnel were permitted to assess the situation, use their discretion, and discharge AFFF to the sanitary sewer system at CAFB.  *See, e.g.*, OI 32-11 (2002) ¶ 4.e & f (if the problem is deemed "uncontrollable" send to sanitary sewer and notify contractor to use anti-foaming agent); ¶ 4.h (certain hangars have manual valves with floor trenches that "can be manually opened to allow accumulated AFFF (combined with water) to enter the sanitary sewer system"); ¶ 6.f ("If measures are ineffective in keeping AFFF out of these inlets, discharge to the sanitary sewer system is **preferred.**" (emphasis added)).  The language in OI 32-11 ¶ 6.f echoes the language in the global Air Force Instruction ETL 110-3-481, which indicated that sending AFFF wastewater to the sanitary sewer was "[t]he **most common method of dispos[al]** . . . [and] is generally accepted as the **preferred method of disposal**."  ETL 1110-3-481 (ECF No. 4548-85), at A-12, § 7.1 (emphasis added).  Thus, CAFB's disposal of AFFF released from hangars in instances of uncontrolled or "accidental" releases was the preferred manner of disposal—not only at CAFB but at Air Force bases nationwide.

Moreover, the Decision Matrix allowed base personnel to consider mission constraints—in **every instance**—when deciding whether to release AFFF to the sanitary sewer system, which further belies any suggestion that OI 32-11 sets out a mandatory and specific prohibition on discharge of AFFF wastewater to the sanitary sewer system and also serves as the unequivocal policy-based decision-making in addressing hangar releases.  *See* OI 32-11 (2002) ¶ 8 ("Mission

8

Permitting").[7]  John Rebman, the Water Quality Program Manager at CAFB from 1994 to 2017

and primary author of OI 32-11, explained at his deposition that "Mission Permitting" was a

subjective, fact-specific assessment ultimately made by the Wing Commander:

> A. . . . I can tell you the wing commander will tell me what "mission permitting"
> means.  It means different things under different circumstances.  I don't think I
> could list every "mission permitting" example.  I gave you one, and that's if a
> plane needs to be hangared but what's preventing that aircraft from being
> hangared is these full trenches, then, yes, we [re]lease that to the sanitary sewer
> system.

Dep. Tr. of John Rebman (ECF No. 4551-16), 27:24–28:9; 217:10–19.

The Decision Matrix reflects OI 32-11's policy-based nature and the discretion vested

with base personnel to assess the situation and act accordingly.[8]  *Waverley View*, 79 F. Supp. 3d

at 571 (directive that states "Army activities 'must not adversely affect neighboring civilian

---

[7] Plaintiffs assert that interpreting the phrase "Mission Permitting" in OI 32-11 to be
discretionary "would allow the U.S. military to categorically avoid inquiry into whether its
directives are mandatory simply by adding this phrase when it issued them."  Opp'n at 11 n.7.
But none of the cases they cite support disregarding discretionary language in a federal directive
for purposes of defeating the DFE.  That would undermine Congress's intent in enacting the
DFE, which was "to prevent [j]udicial intervention in . . . the political, social, and economic
judgments of governmental—including regulatory—agencies."  *Berkovitz v. United States*, 486
U.S. 531, 536, 539 (1988) (quotation marks omitted); *see also Aragon v. United States*, 146 F.3d
819, 826 (10th Cir. 1998) ("The military recognized it needed flexibility to weigh its
groundwater protection policies against broader public and military policies; thus, it allowed the
Air Force to place security and military concerns above any other concerns.").  CAFB is home to
a special operations wing that is "one of the most deployed wings in the Air Force", fighting in
many storied missions including "some missions that cannot be talked about even to this day."
CAFB, *The Steadfast Line*, https://www.cannon.af.mil/About/ (last visited Aug. 16, 2024) (*click
on*: "Mission Video Script" to view quoted text).

[8] All decisions with respect to hangar releases of AFFF yielded to mission and policy
considerations.  The United States incorporates by reference its arguments from its Omnibus
briefs and Site-Specific Motion on relevant policy considerations, including that (1) the Air
Force chose to use AFFF in hangars with delicate sensors knowing of the risk of accidental
discharge to the environment, and (2) during this time period the Air Force identified discharges
to the sanitary sewer system as the "preferred method" of disposal and discouraged off-site
disposal as too costly.  *E.g.*, Omnibus Mot. at 13, 17, 32; ETL 1110-3-481, at A-14, § 7.4.

populations or the environment[,]' . . . does not 'specifically prescribe[ ] a course of action for [the Army] to follow' in disposing of TCE and PCE" (quoting *Berkovitz*, 486 U.S. at 536)); *Indem. Ins. Co. of N. Am.*, 569 F.3d at 181 (Coast Guard inspector who made "a mistake" in performing a particular seaworthiness test, resulting in many deaths when boat capsized, was protected by DFE because testing manual that provided "policies and guidance issued herein" and was "intended as a guide" did not tell inspector which test to select); *Bulger*, 62 F.4th at 142–43 ("A document that sets forth recommended actions or improvements does not demonstrate the absence of discretion.  Nor does a regulation that, although requiring adherence to a general standard, fails to dictate a course of action for achieving that standard." (citation omitted)); *see also Myers v. United States*, 17 F.3d 890, 895–96 (6th Cir. 1994) (holding that Decision Matrix in a mining regulation, providing that "*if*, during mandatory quarterly inspections, a safety violation is discovered, *then* inspectors *must* issue a citation and, if the violation poses an 'imminent danger,' a withdrawal order" must be issued, did not meet DFE's first step because the instructions "require[d] [the] inspectors [to] first determine that some predicate condition exists . . . . [A]n antecedent assessment or determination presents [the inspector] with a choice; does the condition exist or doesn't it?" (emphases original)); *accord Abbott v. United States*, 78 F.4th 887, 900–01 (6th Cir. 2023) (quoting *Myers*).

Plaintiffs do not address the specificity requirement and instead argue that OI 32-11 was "mandatory" based on a misconstruction of the express terms of the document, specifically, of OI 32-11 (2002) ¶ 5.a ("***Generally***, AFFF must be kept out of storm drain inlets and the sanitary sewer system." (emphasis added)).  Use of the term "generally" preceding the subsequent clause belies the alleged "mandatory nature of OI 32-11's policy against allowing AFFF to enter the Base's sanitary sewer system."  Opp'n at 11.  Plaintiffs' reading of OI 32-11 directly conflicts

with the conclusion in the same instruction.  OI 32-11 (2002) ¶ 10 ("***Generally***, AFFF ***should*** be kept from entering the storm and wastewater sewer systems" (emphases added)).  Plaintiffs' argument is also untenable given the number of instances where OI 32-11 specifically provided the option of sending AFFF from hangar releases to the sanitary sewer system.  *See supra* at 7–10.  Plaintiffs' effort to "delete inconvenient language" to reach their own "preferred meaning" of OI 32-11 underscores the OI's discretionary nature and that it is not sufficiently mandatory or specific to defeat the DFE.  *Borden v. United States*, 593 U.S. 420, 436 (2021) (plurality) ("A court does not get to delete inconvenient language and insert convenient language to yield the court's preferred meaning."); *Holbrook v. United States*, 673 F.3d 346, 347 (4th Cir. 2012) ("[I]nternal guidance . . . is insufficient to establish a mandatory requirement" and  "select passages from a lengthy and complex order" cannot "serve as the basis for government tort liability"); *see also Seaside Farm, Inc. v. United States*, 842 F.3d 853, 859 (4th Cir. 2016) ("It is our duty . . . to construe the nature of the statutory and regulatory regime as a whole.").

    ***Testimonial Evidence***.  Were the plain text of OI 32-11 not enough, the sworn testimony of John Rebman, the CAFB Water Quality Program Manager from 1994 to 2017 and OI 32-11's primary author, confirms not only that OI 32-11 provided personnel a "lot of latitude" in dealing with AFFF releases, but also that, contrary to Plaintiffs' argument that AFFF released from hangars could never be reach the sanitary sewer system, Mr. Rebman actually preferred that AFFF be discharged into the sanitary sewer system in certain situations:

> Q. And so they did not have discretion to decide whether or not . . . they complied with this operating instruction, correct?
> ****
> A. Well, there was discretion on how to handle certain situations depending on where the release occurred, where it was going to discharge to.  There was a lot of latitude if you look at the end of the document, it's full of discretion, it's full of options, it's full of ways of dealing with AFFF releases.

So I—I don't understand why you're going on and on about this. I think I've answered this before.

Q. Is there—can you point me to language in this operating instruction that says that it's okay to release AFFF into the sanitary sewer system at Cannon Air Force Base?

****

A: Yes, yes. Under certain situations *I would prefer it to go into the sanitary sewer system.*

Rebman Dep. 213:15–214:19 (emphasis added) (objections omitted); *see also* OI 32-11 (2002) ¶ 6.f (for uncontrolled hangar discharges, release to the sanitary sewer system is "preferred"). Mr. Rebman also repeatedly described the goal of OI 32-11 in limiting AFFF in the sanitary sewer system at CAFB as an "aspirational" goal under the NPDES permit, which permitted foam at or below "trace amounts." *See*, *e.g.*, Rebman Dep. 206:23-24; 207:21–22; 208:9–12; 209:7–18; 231:1–4; 233:12–14; 235:2–4; 246:24–247:17; 249:7–21.

Moreover, contrary to Plaintiffs' contention (Opp'n at 13), the testimony of Charles Robertson, CAFB's former Fire Inspector, does not negate OI 32-11's plain language. Mr. Robertson first came to serve as the Fire Inspector at CAFB in 2009, seven years *after* OI 32-11 was issued, and he confirmed that he was not involved in drafting OI 32-11 and has no personal knowledge about the intended purpose of OI 32-11. Dep. Tr. of Charles Robertson (ECF No. 4851-26), 26:16–19; 182:9–19. And he testified that decisions about whether AFFF could enter the sanitary sewer system at CAFB were made by Mr. Rebman and others. *Id*. 80:12–22.

**_CAFB's NPDES Permit_**. Plaintiffs argue that Mr. Rebman's testimony confirms there was "a mandatory regulatory requirement that AFFF not enter the sanitary system." Opp'n at 13–14 (emphasis omitted). Plaintiffs do not identify any particular "mandatory regulatory requirement" but appear to be referring to CAFB's NPDES permit concerning excess foaming. *Id*. at 4, 14. The unenforceable aesthetic goal of limiting foam in discharges to trace amounts is insufficient for DFE purposes because the permit did not tell the Air Force how to achieve the

12

regulatory goal. *Waverley View*, 79 F. Supp. 3d at 571 (even if CWA provision were relevant and mandatory, it is not specific because the statute identifies *what* federal agencies are to achieve, generally, but not *how* the agencies are to achieve it); *accord In re Katrina Canal Breaches Litig.*, 616 F. App'x 659, 660–661, 661 n.2 (5th Cir. 2015) (per curiam) (dismissing claims premised on CWA regulations under the DFE; observing that the plaintiffs did not cite any language "that ordered the government to dredge in a particular manner" and concluding that the CWA's regulations "exhort but do not compel").

In any event, Mr. Rebman's testimony confirms that when CAFB was subject to the CWA, he would report any potential excess foaming issues to EPA in so-called "noncompliance" reports, along with the "corrective action" taken to address the issues. Rebman Dep. 129:2–12, 129:14–130:1, 132:20–133:11; *see also* CAFB Non-Compliance Report to EPA (ECF No. 4551-17). Mr. Rebman explained that only regulators—here, the EPA—had the ability to determine if any reported noncompliance issues rose to the level of a "violation" of CAFB's permits. Notably, EPA never issued a notice of violation to CAFB for any issues relating to foam. *Id.* 129:14–130:1. Moreover, the response measures that Mr. Rebman reported to EPA mirror the panoply of options provided in OI 32-11. *Compare* OI 32-11 (2002) ¶ 4.e & f, *with* CAFB Non-Compliance Report to EPA (ECF No. 4551-17). Even if CAFB had been cited for a violation, Plaintiffs would not be entitled to recovery under the FTCA. *See Sánchez v. United States*, 671 F.3d 86, 94–95 (1st Cir. 2012) (refusing to consider 102 notices of permit violation issued by EPA as evidence of violation of a mandatory and specific directive under the DFE).[9]

*__Air Force Instruction ("AFI") 33-360__*. Finally, Plaintiffs point to AFI 33-360 as

---

[9] The CWA does not save Plaintiffs' state law tort claims, nor does the DFE contain a carveout for trespass claims under the FTCA. *See* Opp'n at 9–10. The United States incorporates by reference its legal arguments on these issues from its Omnibus Motion and Omnibus Reply.

"proof" that OI 32-11 was a mandatory directive.  Opp'n at 12 & nn.8–9.  AFI 33-360 classifies

operating instructions, such as OI 32-11, as "directive publications" and states that "Air Force

personnel must comply with these publications."  AFI 33-360 (May 6, 2002) (ECF No. 4851-24),

at 17 (§ 2.2), 20 (§ 2.2.8) (internal pagination).  However, AFI 33-260 also states that "[t]he

language used *within* the individual publication describes the nature of compliance required."

*Id*. at 17 (§ 2.2) (emphasis added). For all the reasons already discussed, OI 32-11's language

makes clear that it provided discretion and options for base personnel to choose from in dealing

with AFFF hangar releases.

  B.  <u>The Air Force Utilized the Many Options Contained in OI 32-11.</u>

  According to Plaintiffs' putative expert, Mr. Bearzi, the only post-June 1, 2002, hangar

discharge resulting in AFFF entering the sanitary sewer system at CAFB while OI 32-11 was in

effect occurred on January 7, 2005.  *See supra* at 7 & n.6.  The event illustrates the many options

available to personnel under OI 32-11, including the option selected at the time.  It occurred at

12:45 AM, during off-duty hours**,** when an employee performing a system check fell and broke a

pipe, releasing foam into a floor trench.  Opp'n at 5; CAFB Non-Compliance Report to EPA at 1.

The sanitary sewer system operator then used antifoaming agent to reduce the foam entering the

system.  CAFB Non-Compliance Report to EPA at 1.  In responding to this event, OI 32-11

contained multiple choices from which base personnel at CAFB could select, including the very

choice taken.

  Specifically, OI 32-11 provided:

> [T]he names and home phone numbers of contractor personnel to be contacted **in the event AFFF activations (whether due to mechanical failure or to actually extinguish a fire) occur after WWTP duty hours**.
>      ****
> 6. AFFF SYSTEM CHECK (MAINTENANCE, TESTING, OR PURGING) **GUIDANCE**:

**** 

f. Regardless of how AFFF entered the hangar floor trench, pumping the contents onto the surrounding area, rather than discharging solution into the sanitary sewer, **should be considered.** . . . **If measures are ineffective in keeping AFFF out of inlets, discharge to the sanitary sewer is preferred.**

OI 32-11 (2002) ¶¶ 4.f, 6.f (emphases added).  Pursuant to the discretion afforded under OI 32-11, personnel at the hangar closed the hangar trench and sanitary sewer personnel then used defoaming agent to contain the AFFF discharge.  CAFB Non-Compliance Report to EPA at 1.  Contrary to Plaintiffs' assertions, base personnel had numerous choices for addressing the release, including sending the spent AFFF to the sanitary sewer system.[10]

The circumstances surrounding the January 7, 2005, release illustrates that Plaintiffs' argument—i.e., that AFFF was never permitted to enter the sanitary sewer system (Opp. Mem. at 10–11)—is contrary to OI 32-11's plain language.  OI 32-11 was a discretionary, policy-based guidance document that allowed for AFFF to enter the sanitary sewer system in several circumstances, including the January 7, 2005, discharge.  Regardless, the Air Force's actions were consistent with the permissible choices available under OI 32-11.

C.    Plaintiffs' Failure-to-Warn Claims Are Barred by the DFE.

Plaintiffs fail to identify any mandatory or specific directive related to the adequacy or timing of the warnings provided by CAFB when the public CERCLA investigation began.  Instead, Plaintiffs argue that DFE is inapplicable to failure-to-warn because "at a minimum, the [Air Force] knew enough in October 2015 to conclude the [Plaintiffs] were at risk of PFAS

---

[10] Since the January 7, 2005, hangar discharge of AFFF occurred at Hangar 208, other options available to base personnel included: (1) pumping the "contents [in the trench] onto the surrounding area"; (2) if hangar personnel were unable to close the valves, sending all of the contents in the hangar trench to the sanitary sewer (the "preferred" option); (3) allowing the contents to drain onto the ramp without blocking the drains; or (4) simply allowing the contents to enter the sanitary sewer system if "Mission Constraints" were involved.  OI 32-11 (2002) ¶¶ 6.f, 8.

contamination" but did not notify them "of PFAS detections in their respective water supplies" until September 2018. Opp'n at 15–16.[11] Plaintiffs rely entirely on two district court cases holding that the DFE did not bar the plaintiff's failure-to-warn claims related to water contamination at Marine Corps Base Camp Lejeune. *Id*.; *see Washington v. Dep't of the Navy*, 446 F. Supp. 3d 20, 28 (E.D.N.C. 2020); *Parrish v. United States*, 157 F. Supp. 3d 434, 447 (E.D.N.C. 2016). *But see In re Camp Lejeune N.C. Water Contamination Litig*., 263 F. Supp. 3d 1318, 1353 (N.D. Ga. 2016) (dismissing failure-to-warn claims based on DFE stemming from allegations that the Navy knew in 1982 of contamination in the water supply but did not warn users until 2008), *aff'd*, 774 F. App'x 564 (11th Cir. 2019) (per curiam).

In *Washington* and *Parrish*, the district court questioned the policy considerations at issue. However, subsequent to *Washington* and *Parrish*, in another case involving Camp Lejeune water contamination claims, the Fourth Circuit held that:

> [T]he Government's decision of how and when to warn implicates policy decisions. To issue warnings, the Government would need to "evaluate available information, assess the sufficiency and reliability of evidence, resolve conflicting data, determine the overall nature of a[ny] health threat[s]," consider how to identify potentially exposed individuals, decide what type of medium or combinations of mediums would be the best way to convey the risk to those exposed, and weigh practicality and economic constraints. All these decisions implicate public policy, health, and safety concerns.

*Clendening*, 19 F.4th at 435–36 (citation omitted) (quoting *Seaside Farm*, 842 F.3d at 859). The United States cited *Clendening* in both its opening Omnibus and Site-Specific Motions, and Plaintiffs fail to address this binding precedent. *See* Omnibus Mot. at 49–50; Site-Specific Mot. at 10–11. Under *Clendening* and current Fourth Circuit law, Plaintiffs' failure-to-warn claims

---

[11] To correct the record, the Air Force did not test Plaintiffs' wells in 2015. It tested for PFAS offsite in August 2018 and provided the results in September 2018. Site-Specific Mot. at 10–11; Notification Letters to Vander Dussens and Schaaps (ECF No. 4551-20).

are barred by the DFE.

## II.    New Mexico's Claims Impermissibly Challenge the CAFB CERCLA Response.

New Mexico itself admits that the Air Force is carrying out a CERCLA response action at CAFB; that this response is currently in the Remedial Investigation phase; and that the Air Force is constructing a full-scale groundwater treatment system as part of a CERCLA removal action to test treatment technologies and capture PFAS-impacted water while the investigative process is ongoing.  NM Compl. ¶¶ 99–101; Opp'n at 8–9; *see also* Opp'n at 12–13; 40 C.F.R. § 300.430(d), (e) (describing remedial investigation process).  Likewise, New Mexico does not dispute that the injunctive relief it seeks "is related to the goals of the cleanup" and would amount to a complete takeover of the Air Force's CERCLA response.  *See* Site-Specific Mot. at 14 (quoting *Razore v. Tulalip Tribes of Wash.*, 66 F.3d 236, 239 (9th Cir. 1995)).

New Mexico's only response is that it is purportedly pursuing an "enforcement" action against the United States, akin to the suit that the Tenth Circuit allowed to proceed in *United States v. Colorado*, 990 F.2d 1565 (10th Cir. 1993).  *See* Opp'n at 18–20.  But even if this Court were to follow the Tenth Circuit, *Colorado* does not save New Mexico's claims from dismissal.[12] To the contrary, that decision explicitly distinguished "enforcement" claims seeking to order compliance with specific federal or state requirements (which it found are not barred by Section 113(h)) from "imminent hazard" claims like the ones New Mexico asserts here (which are).

In *Colorado*, the state had issued an administrative compliance order to the Army requiring it to submit a new permit application for its facility addressing specific requirements of Colorado's state hazardous waste program.  990 F.2d at 1573.  Colorado then sought to enforce

---

[12] The United States addresses Plaintiffs' reliance on *Colorado* in greater detail at pp. 19–24 of its Reply in Support of the United States' Global Motion to Dismiss for Lack of Jurisdiction Based on CERCLA Section 113(h) (ECF No. 5614) ("113(h) Reply").

that order under the state law's enforcement provision.  *Id.* at 1579; *see* Colo. Rev. Stat. § 25-15-308(2)(a) (state enforcement provision authorizing claims in *Colorado*); 42 U.S.C. § 6928(a)(1) (analogous enforcement provision in RCRA).

Here, New Mexico makes much of the fact that CAFB is subject to a state hazardous waste permit with terms addressing PFAS,[13] and relies on a self-serving affidavit from one of its employees presenting his "opinion" that the Air Force is not complying with RCRA or the state HWA.[14]  Opp'n at 17–18; *id.* Ex. 7, Aff. of Frederic Shean ¶ 40.  But to this day—even after amending its complaint again just last month—New Mexico *has never asserted* any enforcement claims against the Air Force for alleged violations of the CAFB permit or any other requirement of RCRA or the HWA.  New Mexico's complaint includes no reference to the HWA's enforcement provision, N.M. Stat. Ann. § 74-4-10(a), or RCRA's citizen enforcement provision, 42 U.S.C. § 6972(a)(1)(A).

Instead, New Mexico is asserting claims under the "imminent hazard" provisions of RCRA and the HWA.  NM Compl. ¶¶ 219–34.  These claims do not seek to "enforce" any particular requirement of RCRA, the HWA, or the CAFB permit, but rather ask the Court to make its own free-standing judgment that the Air Force's activities "may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1)(B); N.M. Stat. Ann. § 74-4-13.  Thus, unlike the enforcement action in *Colorado*, New Mexico's claims do

---

[13] The Air Force has challenged the permit for CAFB, arguing that the permit's terms addressing PFAS exceed New Mexico's authority under state law.  That litigation is currently pending in the Tenth Circuit.  *United States v. N.M. Env't Dep't*, No. 22-2132 (10th Cir. *appeal docketed* Oct. 31, 2022).

[14] The United States expressly reserves the right to challenge Mr. Shean's opinions at the appropriate point in this case, including to argue that Mr. Shean (1) improperly opines on legal issues, (2) was not properly disclosed as an expert witness, (3) is not qualified to offer expert opinions, or (4) does not satisfy any other provision of Federal Rules of Evidence 702 or 703.

not implicate CERCLA's savings provisions preserving the state's authority to impose additional

obligations. *See Colorado*, 990 F.2d at 1575–76 (discussing 42 U.S.C. §§ 9652(d) and 9614(a)).

Rather, these "imminent hazard" suits ask *the Court* to independently "determine what

remediation is required and what standards should be applied." *River Vill. W. LLC v. Peoples

Gas Light & Coke Co.*, 618 F. Supp. 2d 847, 854 (N.D. Ill. 2008). Such suits are appropriately

barred by Section 113(h).

Indeed, the Tenth Circuit itself recognized this very distinction in *Colorado*. The court

clarified that "imminent hazard" suits under 42 U.S.C. § 6972(a)(1)(B) are not "enforcement"

actions and emphasized that Congress explicitly "prohibit[ed] [these] suits with respect to

hazardous waste sites where a CERCLA response action is underway."[15] *Colorado*, 990 F.2d at

1578 (citing 42 U.S.C. § 6972(b)(2)(B)). Consistent with that opinion, courts have uniformly

held that Section 113(h) bars "imminent hazard" suits like New Mexico's when they challenge a

CERCLA response. *See* Memo. ISO 113(h) Mot. to Dismiss (ECF No. 4550-1) at 30–31. This

Court should do the same.

### III. No Further Discovery Should Be Permitted.

After five years of discovery (and 120 additional days for discovery specific to CAFB),

Plaintiffs claim that additional discovery is needed. This is despite the fact that the evidence

Plaintiffs rely on has been in the record for years. Decl. of Haroon Anwar (ECF No. 4548-4) ¶ 9.

Notably, the United States produced both the 2002 and 2014 versions of OI 32-11 in August

2021. *Id.* Nevertheless, Plaintiffs assert that they "have provided proof of concept for how site-

specific facts can impact the applicability of the DFE and § 113(h) underscoring the need for

---

[15] Although the HWA's "imminent hazard" provision does not include the same explicit language regarding its relationship to CERCLA, the Court should read 42 U.S.C. § 6972(b)(2)(B) as evidence of Congress's view that "imminent hazard" suits are properly barred by Section 113(h).

similar, focused discovery at the other sites." Opp'n at 3. However, none of the evidence offered proves "proof of concept" of anything.[16] Plaintiffs' demand for even more discovery, without justification, "would permit a FTCA plaintiff to obtain discovery anytime they surmise, without basis, the existence of some unspecified mandatory policy or procedure that might have an unexplained bearing on the case." *Bulger*, 62 F.4th at 143. "Such free-ranging discovery would undermine the discretionary function exception and introduce the very litigation pressures that Congress meant to avoid when it developed the exception." *Id*. (quotation marks and citation omitted). Plaintiffs fail to show that further site-specific discovery or briefing is warranted, and their claims should be dismissed.

## CONCLUSION

In short, the Court should dismiss all of Plaintiffs' claims for lack of subject-matter jurisdiction. Plaintiffs abandon their FTCA claims except as to (1) "accidental discharges" from fire-suppression systems in hangars at CAFB after June 1, 2002, and (2) the timing of the warnings provided by CAFB. However, Plaintiffs fail to identify any mandatory and specific directive governing these remaining categories of challenged conduct, or show that the challenged conduct was not imbued with sensitive policy considerations. Thus, Plaintiffs fail to prove that the DFE does not bar their FTCA claims. Likewise, New Mexico's statutory claims with respect to CAFB are barred under CERCLA Section 113(h) because they challenge the Air Force's ongoing cleanup actions. New Mexico's claims here are precisely the kind of "imminent hazard" claims that cannot proceed in the face of a CERCLA cleanup.

---

[16] Indeed, the only purportedly "site-specific" issue that Plaintiffs could muster with respect to the United States' motion to dismiss under CERCLA Section 113(h) plainly does not support further discovery. It is clear from their complaints alone that no Plaintiff in this MDL is pursuing any enforcement claim within the meaning of *Colorado*. *See* 113(h) Reply at 19–24, 30.

Dated: August 16, 2024

J. PATRICK GLYNN
Director, Torts Branch
Environmental Tort Litigation Section

CHRISTINA FALK
Assistant Director, Torts Branch
Environmental Tort Litigation Section

HAROON ANWAR
MARIANNE F. KIES
MICHELE GREIF
DAVID HAMMACK
Trial Attorneys, Torts Branch
Environmental Tort Litigation Section


*/s/Christina Falk*
CHRISTINA FALK
Assistant Director, Torts Branch
Environmental Tort Litigation Section
Civil Division
United States Department of Justice


TODD KIM
Assistant Attorney General


*/s/  Andrew D. Knudsen*
ANDREW D. KNUDSEN
DC Bar No. 1019697
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 353-7466
Andrew.Knudsen@usdoj.gov

*Counsel for the United States*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 16, 2024, a copy of the foregoing was filed via the Court's

ECF system and served on counsel of record through the ECF system.


Dated:  August 16, 2024                              */s/Christina Falk*