IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

|  |  |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG<br><br>This Document Relates to:<br><br>*City of Camden, et al. v. Tyco Fire Products LP*, Case No. 2:24-cv-02321-RMG |

**OBJECTIONS OF THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA, LAKEWOOD WATER DISTRICT, CITY OF AIRWAY HEIGHTS, AND CITY OF VANCOUVER**

**I.     INTRODUCTION**

The Metropolitan Water District of Southern California ("Metropolitan"), Lakewood Water District ("Lakewood"), City of Airway Heights ("Airway Heights"), and City of Vancouver ("Vancouver") (collectively, "Objectors") by and through below-signed counsel, respectfully submit these objections to the proposed settlement between Defendant Tyco Fire Products LP and related entities ("Tyco") and public water systems in *City of Camden v. Tyco Fire Products LP*, No. 2:24-cv-02321-RMG ("Tyco Agreement"). As described below, the Court should direct the parties to address the deficiencies identified. The sub-headings under Section III denote who among the Objectors are asserting each specific objection.

**II.     STANDARD OF REVIEW**

The Court may only approve a class settlement when it determines that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Under Rule 23(e), courts play the role of fiduciary to absent class members, zealously scrutinizing the proposed settlement to combat the omnipresent "danger that the parties and counsel will bargain away the interests of the unnamed

1

class members in order to maximize their own." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 715 (6th Cir. 2013); *see also Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983) ("Careful scrutiny by the court is necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of the absent class members."); *Sharp Farms v. Speaks*, 917 F.3d 276, 293–94 (4th Cir. 2019) ("When the court reviews a proposed class-action settlement, it acts as a fiduciary for the class."). The Court has an affirmative duty to protect the interests of the "class members whose rights may not have been given adequate consideration during the settlement negotiations." *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

### III.   ARGUMENT

The Tyco Agreement as drafted contains several features that are not "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Objectors are members of the Settlement Class because they are public water systems ("PWSs") with one or more Impacted Water Sources as of May 15, 2024. *See* Tyco Agreement ¶¶ 5.1, 9.4, 9.5; Ex. A (Aff. of Mickey Chaudhuri); Ex. B (Aff. of Marshall Meyer); Ex. C (Aff. of Albert Tripp); Ex. D (Aff. of Cary Driskell); Ex. E (Aff. of Counsel) (certifying information as required under Agreement); *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989).

#### A.   Release

##### 1.   The release is overbroad – Metropolitan, Lakewood, Airway Heights, Vancouver

A court can approve a release only of claims that share an "identical factual predicate" with claims alleged in the cases at issue. *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015); 4 Newberg and Rubenstein on Class Actions § 13:61 (6th ed.) ("[C]ourts often police a proposed settlement agreement to ensure that the release is not overly broad, that is, that it does not release claims outside the factual predicate of the class's claims"). "Claims have an 'identical factual

predicate' when they depend upon the *very same* set of facts." *McAdams v. Robinson*, 26 F.4th 149, 160 (4th Cir. 2022) (internal quotation marks and brackets omitted) (emphasis added).

The Tyco Agreement would release unalleged claims that lack an identical factual predicate with claims alleged by Class Members. Those claims should not be extinguished.

### a. The release includes claims as to PFAS that have not yet entered drinking water and PFAS in newly established or yet-to-be-developed water sources.

The release encompasses claims related to PFAS that "*may reasonably be expected* to enter Drinking Water or any Releasing Party's Public Water System." Tyco Agreement ¶ 12.1.1 (emphasis added). But PFAS that "may reasonably be expected" to enter water supplies in the future fall outside of the factual and temporal predicate of the claims alleged against Tyco. No Class Member has asserted claims against Tyco in the related litigation regarding PFAS impacts that have not yet come to pass; if a Class Member tried to do so, the claim would be subject to dismissal as speculative. In addition, the Agreement's allocation procedures do not seem to provide a methodology to compensate for Class Members' newly operational Water Sources, let alone their *future* Water Sources. Dkt. No. 4911-3 at 53–54 (adjusted flow rate for calculating allocated award for a Water Source takes three inputs from 2014-2023, but not later, and does not account for situations where the Water Source was first established in, e.g., 2023 or 2024). Yet, the release encompasses claims for new and future Water Sources. In other words, if a Class Member expects to purchase or develop a new Water Source, and that Water Source is found to contain PFAS, the release appears to encompass a claim as to that Water Source—even though no claims as to future Water Sources have been or presently could be asserted in litigation, and the allocation procedures do not appear to compensate for new or future Water Sources. Thus, there is a temporal disconnect between the claims released in the Tyco Agreement, on the one hand, and the claims actually compensated by the Agreement or alleged in litigation, on the other. *See Raquedan v. Centerplate*

*of Delaware Inc.*, No. 17-CV-03828-LHK, 2018 WL 3368820, at *8 (N.D. Cal. July 10, 2018) (no identical factual predicate between released wage-and-labor claims in 2015–2016 and wage-and-labor claims outside that time period); *McKinney-Drobnis v. Massage Envy Franchising, LLC*, No. 16-CV-06450-MMC, 2017 WL 1246933, at *5 (N.D. Cal. Apr. 5, 2017) (no identical factual predicate between released breach-of-contract claims and claims that "necessarily occurred at different times"); *Rivera v. Marriott Int'l, Inc.*, No. 2:19-CV-05050-ODW-KSX, 2023 WL 3766504, at *9 (C.D. Cal. June 1, 2023) (approving release "of all claims brought or that could have been brought based on the factual predicate in the action" that was temporally limited to a given "Class Period").

### b. The release seeks to include wastewater, stormwater, and real property cleanup claims.

The release excludes claims involving wastewater and stormwater systems and real property that are entirely "unrelated to Drinking Water or a Class Member's Public Water System or Water Sources" and involve facilities or real property that are "separate from and not related *in any way* to the Class Member's Public Water System." *See* Tyco Agreement ¶ 12.1.2 (emphasis added). An attached guidance states: "It is the parties' joint understanding that the words 'separate from' and 'not related in any way to' in the two clauses italicized above mean 'separate from and not *physically* related to.'" Dkt. 4911-3 at 178 (emphasis added). The required total "physical" separation of such cleanup claims from drinking water poses what in many instances would be an insurmountable barrier. For example, even if wastewater is treated and recycled to make up just a fraction of a Class Member's drinking water supplies, under the applicable definition, the Class Member arguably has released a wastewater cleanup claim in full. In approving an identical wastewater, stormwater, and real property release in the 3M Agreement, the Court reasoned that the release provision was necessary to "bar[] double recovery." Dkt. No. 4754 at 27. But this

4

provision is not tailored to merely prevent double recovery; its text may be read to release the *entire* cleanup claim if there is *even a remote* physical relationship with a drinking water system. Such a broad release of wastewater, stormwater, and real property claims diverges from the factual predicate of the claims asserted and is unfair.

The related guidance does not cure the issue. Any "physical" relationship between a wastewater or stormwater facility and a PWS—for example, pipes rerouting some wastewater from a wastewater treatment facility to a PWS for treatment and reuse as drinking water—would apparently trigger the release of those wastewater and stormwater claims. Yet, the Class Action Complaint contains not one claim for wastewater or stormwater cleanup. The integral facts needed to prove causation are different between wastewater/stormwater and drinking water contamination. For drinking water systems, the facts largely focus on how PFAS from AFFF linked to a given defendant has migrated to drinking water supplies. For wastewater and stormwater systems, PFAS contamination will likely concern PFAS from industrial sources and consumer products. Thus, the guidance lacks an identical factual predicate with the claims asserted in litigation. *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 725 F. App'x 560, 561 (9th Cir. 2018) (despite some shared facts of defendants' anticompetitive conduct, two sets of antitrust claims lacked identical factual predicate where claims "depend[ed] on proof of different facts to establish a different injury" and there were "facts which [plaintiff] must prove in [second] action . . . which would have been unnecessary in the [prior action]").

    **c. The release includes claims for unknown PFAS for which no claims are asserted in litigation.**

The Tyco Agreement releases claims as to *all* PFAS in drinking water. It defines PFAS as "any per- or poly-fluoroalkyl substance that contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen, chlorine, bromine, or iodine atom attached to it),"

stating also its "intention" that the definition "be as broad, expansive, and inclusive as possible." Tyco Agreement ¶ 2.47. Because this is a structural definition of PFAS, the release encompasses claims relating to up to 15,000 different chemicals. *See* Nat'l Institute of Env't Health Sciences, *PFAS*, https://www.niehs.nih.gov/health/topics/agents/pfc (last accessed Aug. 7, 2024). Most water providers will know, at most, about contamination by the 29 PFAS within the U.S. Environmental Protection Agency's ("EPA's") Fifth Unregulated Contaminant Monitoring Rule ("UCMR 5"), and the water providers in litigation with Tyco can only seek damages for the PFAS they have tested for and detected—not 15,000 different chemicals. Accordingly, by seeking to encompass claims for thousands of chemicals, more than 99% of which are not subject to a single claim in this litigation, the release is untethered from the required identical factual predicate.

In approving a similarly broad PFAS definition in the 3M Agreement, the Court observed that treatment of all PFAS is "by the same method." Dkt. No. 4754 at 29. That is not settled, however,[1] and is not a reason to allow manufacturers to bypass the identical factual predicate limitation on releases.

### d. The release includes indemnity and contribution for personal-injury claims.

The release improperly encompasses contribution and indemnity claims arising out of

---

[1] *See, e.g.*, Marcel Riegel, et al., *Sorptive removal of short-chain perfluoroalkyl substances (PFAS) during drinking water treatment using activated carbon and anion exchanger*, 35 Env't Sci. Eur. (2023) (detailing "significant" differences between responsiveness of long- and short-chain PFAS to activated carbon filtration and ion exchange treatments); Allyson Chiu, *New tech could one day scrub 'forever chemicals' from your tap water*, Wash. Post (Aug. 14, 2024), https://bit.ly/3RZg84K ("Activated carbon, for example, can filter what is known as long-chain PFAS but does not as effectively trap the shorter-chain variants of the chemicals."); *PFPRA AND OTHER ULTRA-SHORT-CHAIN PFAS*, Cape Fear Public Utility Auth., https://bit.ly/3O0xD3C (last visited Aug. 15, 2024) ("Smaller PFAS are often the hardest to remove during water treatment. Since bringing our new Granular Activated Carbon . . . filters online in 2022, [Cape Fear] has seen some PFAS breaking through the filters, particularly two ultra-short-chain PFAS called PFMOAA and PFPrA.").

personal-injury judgments. Tyco Settlement ¶ 12.1.1; Dkt. No. 4319 at 36 (recognizing the identical release provision of the 3M Settlement "would release contribution and indemnity claims the PWS might have against 3M if *the PWS* is the subject of suits by injured individuals for personal injury claims."); Dkt. No. 4080-1 at 103 (same for DuPont Settlement). In response to this prior objection to the 3M and DuPont Settlements, Class Counsel asserted that it is "common for indemnity and contribution to be released in a class settlement." *Id.* But the issue is whether the settlement may release indemnity and contribution claims that significantly diverge from the factual basis of claims Class Members have actually asserted. No water providers have alleged personal-injury indemnity or contribution claims in litigation against Tyco. Thus, the claims proposed to be released and the litigated claims lack the required identical factual predicate.

The lack of any carve-out in the release for personal-injury indemnity and contribution claims matters. Class Counsel have previously asserted that the risk of such suits is low, Dkt. No. 4319 at 36, but customers are already suing water providers for personal injury. *See, e.g.*, Compl., *Vincent v. Aquarion Water Co.*, No. UWY-CV24-6076640-S (Conn. Sup. Ct. Mar. 14, 2024); Compl., *Hoffnagle v. Conn. Water Co.*, No. HHD-CV-23-6175540-S (Conn. Sup. Ct. Oct. 31, 2023); *Hamilton v. City of Newburgh*, 2:19-cv-2219-RMG (D.S.C.) (settled Mar. 11, 2024). The existing personal-injury verdicts relating to PFAS have been staggering. *See, e.g.*, *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 54 F.4th 912, 921 (6th Cir. 2022) (affirming jury verdicts of $40 million and $250,000 for just one plaintiff and his wife in a personal-injury action involving long-chain PFAS). The Court previously overruled a similar objection as to the 3M Agreement, finding it "a qualitative disagreement" rather than a "legal objection." Dkt. No. 4754 at 30. Respectfully, this objection is more than a "qualitative disagreement." While Class Members have sued Tyco for contaminating their water supplies with PFAS, they have not sued Tyco in

7

contribution for causing personal injury to their customers, claims that rely on different facts regarding, *inter alia*, illness information, individual consumption patterns, and causation. In accord, this Court all along has dealt with personal-injury cases and water-provider cases separately in this MDL. *See* Dkt. No. 3080 (CMO 26). Accordingly, there is no identical factual predicate here, as the Fourth Circuit requires. *See McAdams*, 26 F.4th at 160; *see also Canter v. Midland Credit Mgmt., Inc.*, No. 3:14-cv-02939, 2017 WL 2817065, at *4 (S.D. Cal. June 28, 2017) (ruling that some "overlap" in subject matter between consumer protection claims did not constitute an identical factual predicate, rendering release overbroad); *Boyd v. Avanquest N. Am. Inc.*, No. 12-CV-04391, 2015 WL 4396137, at *5 (N.D. Cal. July 17, 2015) ("This release is overly broad because it covers more causes of action than the Complaint alleges.").

### 2. The Releasing Parties definition would bind parties that never assented to settlement – Metropolitan, Lakewood, Airway Heights, Vancouver

The definition of "Releasing Parties" purports to bind not just the Class Member, but an array of other entities, including any "in privity with" the Class Member and "any person . . . acting on behalf of or in concert with a Class Member to prevent PFAS from entering a Class Member's Public Water System or to seek recovery for alleged harm to a Class Member, its Public Water System, or the Public Water System's ability to provide safe or compliant Drinking Water." Tyco Agreement ¶ 2.55. The associated Interrelated Guidance indicates that the Releasing Parties provision applies, notwithstanding whether those Releasing Parties can or want to participate in the Tyco Settlement. *See* Dkt. No. 4911-3 at 170 ("In general, by participating in the Settlement, a Class Member releases claims on behalf of itself and its Releasing Parties (as defined in the Settlement Agreement) with respect to the water provided to (or supplied by) the Class Member.").

A "settlement agreement is a contract and must be interpreted as such." *Cox v. Shah*, 187 F.3d 629 (4th Cir. 1999); *Sadighi v. Daghighfekr*, 66 F. Supp. 2d 752, 759 (D.S.C. 1999). "This applies to class settlements as well as to the resolution of litigation between individual parties." *Dahingo v. Royal Caribbean Cruises, Ltd.*, 312 F. Supp. 2d 440, 445 (S.D.N.Y. 2004). It is axiomatic that one cannot be bound by a contract without assenting to it. *See, e.g.*, *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."); *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 236 (4th Cir. 2019) ("Under South Carolina law, a contract is formed between two parties when there is, inter alia, a mutual manifestation of assent to its terms." (internal quotation marks and brackets omitted)). But binding parties that have refused the agreement or could not assent to the agreement—those that have affirmatively requested exclusion from the class or those that are not Class Members in the first place—is exactly what the Tyco Agreement attempts to do. The Releasing Parties definition purports to bind even entities over which a Class Member has no control, such as contractual counterparties that expressly opted out of the Tyco Agreement. Whatever the merits of the parties' goal of preventing "double recovery," Dkt. No. 4911-3 at 167, that goal may not be accomplished through an unfair means that also violates a fundamental tenet of contract law—that all bound parties must have assented.

The Association of California Water Agencies ("ACWA"),[2] Association of Metropolitan

---

[2] ACWA is the largest statewide coalition of public water agencies in the United States; this organization has over 460 public water agency members, including cities and municipal utilities departments, municipal water districts, irrigation districts, water districts, water storage districts, and county water districts. Dkt. No. 4442 at 4.

Water Agencies ("AMWA"),[3] California Municipal Utilities Association ("CMUA"),[4] and the Western Urban Water Coalition ("WUWC")[5] raised this same issue in amici curiae briefs in prior cases, expressing concern that the Releasing Parties definition and Interrelated Guidance render the opt-out "remedy" insufficient to protect wholesaler class members who opt out but whose rights could still be affected by the overbroad release.[6] Dkt. No. 4442 at 10 (citing *Eisen v. Porsche Cars N. Am., Inc.,* No. 2:11-CV- 09405-CAS, 2014 WL 439006, at *7 (C.D. Cal. Jan. 30, 2014) ("Federal courts routinely hold that the opt-out remedy is sufficient to protect class members who are unhappy with the negotiated class action settlement terms.")).

Amici curiae agree that the release goes "well beyond the prohibition on double recovery" it is intended to serve. Dkt. No. 4442 at 16. As shown by the examples in amici curiae's brief, many Western water agencies are involved in the conveyance of water, water from multiple sources is routinely blended to create water supplies, and water may be treated at multiple points before it is delivered to the end user. "In this context, it is not clear what constitutes a 'Public Water System' that would be subject to the Release[]. Moreover, the Release[] appear[s] to incorrectly assume that a Member of the Settlement Class may properly release claims on behalf of other water agencies that rely on some of the same water sources or conveyance systems, even

---

[3] AMWA is a nonprofit, tax-exempt organization representing the largest publicly owned drinking water systems in the United States. AMWA's membership serves more than 160 million people across the United States with safe drinking water. Dkt. No. 4442 at 4.
[4] CMUA represents 78 publicly owned electric utilities, water agencies, and gas and oil services throughout California. Together, CMUA members provide water service to 75 percent of Californians and electric service to 25 percent of the state. Dkt. No. 4442 at 4.
[5] WUWC consists of the largest urban water utilities in the West, which together serve more than 40 million urban water consumers in twenty major metropolitan areas across seven states. Dkt. No. 4442 at 4–5.
[6] Accordingly, opting out should not be construed to moot objections to the Releasing Parties definition or Interrelated Guidance, as an Eligible Claimant that has opted out could still be subject to arguments that it has released Tyco.

though those other agencies have opted out and will likely experience different damages. That assumption is unreasonable and simply does not reflect the realities of water conveyance and management in California and other Western states." Dkt. No. 4442 at 16.

In approving the 3M and DuPont Settlements, which contained similar Releasing Parties definitions, the Court relied on another court's approval of a "Releasing Parties" definition that included not only the Volkswagen dealers comprising the settlement class, but "any other legal or natural persons who may claim by, through, or under them." *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2018 WL 1588012, at *8 (N.D. Cal. 2018). But the definition there was crucially limited by the phrase "by, through, or under them," reaching only persons who had authority to bring a class member's claim. *See, e.g., Fort Sumter Tours, Inc. v. Andrus*, 440 F. Supp. 914, 920 (D.S.C.) (injunction reached not only defendant but "all persons acting by, through and under him," i.e., defendant's agents). In contrast, the Tyco Agreement's definition of Releasing Parties goes far beyond persons with authority to bring Class Members' claims, reaching even those "in privity with" a Class Member or acting "in concert with" a Class Member. Tyco Agreement ¶ 2.55.

The other cases cited by the Court are inapposite because they address releases of *class members'* claims against *non-party defendants*, not—as here—releases of *non-class members'* claims against *settling defendants*. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 109 (2d Cir. 2005) (approving release of class members' claims against non-party banks); *In re Lloyd's Am. Tr. Fund Litig.*, No. 96 CIV.1262 RWS, 2002 WL 31663577, at *11 (S.D.N.Y. Nov. 26, 2002) (approving release of class members' claims against non-party corporation), *aff'd sub nom. Adams v. Rose*, No. 03-7011, 2003 WL 21982207 (2d Cir. Aug. 20, 2003); *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 160-165 (E.D.N.Y. 2000) (approving release of class members' claims

11

against non-party insurance companies, banks, and governmental entities). Courts have rejected as overbroad releases that extend to non-class members' claims against settling defendants. *See, e.g.*, *Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 554 (D. Colo. 1989) (court rejected a settlement that would affect the claims of non-parties, stating, "I cannot approve the proffered partial settlement because . . . I cannot bar potential claims of non-parties to this action.").

## B. Interconnected Drinking Water Systems

### 1. The Interrelated Guidance exacerbates the overbroad release and Releasing Parties definition – Metropolitan, Lakewood, Airway Heights

As discussed in Section III.A, *infra*, the release and Releasing Parties definition are overbroad. The Interrelated Guidance compounds that problem by explicitly stating that the release could indeed extend to water providers that have opted out: "In general, if a wholesaler opts out of the Settlement Class and its retail customer is a Class Member, the release would extend to the wholesaler as to the water it provided to the Class Member except to the extent the wholesaler shows it had the obligation for and bore unreimbursed PFAS-treatment costs for that water independent of the retail customer." Dkt. No. 4911-3 at 170. But again, a contractual relationship between a Class Member and another entity that has not assented to settlement does not suffice to bind the latter under the Agreement's release. *Berkeley Cnty. Sch. Dist.*, 944 F.3d at 236. Even if the goal of the Interrelated Guidance is to avoid double recoveries for the same water, that goal may not be accomplished by purporting to bind independent entities under one another's releases.

As explained above, amici curiae ACWA, AMWA, CMUA, and WUWC provide the following examples that illustrate some of the problems with the Interrelated Guidance and the overbroad release provisions:

> For example, Retail Agency A may receive its water from a wholesaler that treats water for four other agencies within the region. If Retail Agency A participates as a Settlement Class Member, but the wholesaler that treated the water delivered to

12

> Retail Agency A opts out, the Guidance suggests that release signed by Retail Agency A would preclude the wholesaler from recovering the costs associated with treating water it delivers to Retail Agency A – but there is no way for the wholesaler to apportion its PFAS-treatment costs where it has the obligation to treat the same water for *all* its customers (not just Retail Agency A). The release by Retail Agency A in this context cannot be read to limit the rights of the wholesaler, notwithstanding the language in the Guidance that may suggest otherwise. Similarly, the Guidance fails to explain how the release will apply when a retail agency treats water for another retail agency and the recipient is a Settlement Class Member but the treating agency opts out. In both of these examples, the retail agency that opted to participate as a Settlement Class Member is a separate legal entity than the agency treating the water, and the treating agency does not receive the benefit of any recovery obtained by the retail agency. The release provisions and the Guidance should not read to undermine the rights of wholesalers or retailers that treat water conveyed to other agencies, as in the above examples, because such an interpretation would raise grave fairness concerns about the settlement.

Dkt. No. 4442 at 11.

Amici curiae also explain that the Interrelated Guidance does not squarely answer how the claims payment should be allocated among multiple agencies, each of whom has some legal responsibility to treat the water:

> The Guidance suggests the Claims Administrator should divide the Allocated Amount 'based on relative capital and O&M costs of PFAS treatment borne by the wholesaler and the retail customer, respectively,' and the Claims Administrator should determine these costs 'by assessing and taking into account which entity does, or has responsibility for, the PFAS treatment and, to the extent it is the wholesaler, whether the retail customer paid all or part of the costs indirectly through the purchase price, under the applicable contract, or otherwise.' ECF #78-1, p. 2. In reality, though, this proposed standard will likely prove very challenging to apply, as it will be functionally equivalent to a mini-ratesetting procedure.

*Id.*

For these reasons, the Interrelated Guidance exacerbates issues with the overbroad release provision and Releasing Parties definition and is unfair.

### 2. The Agreement overlooks the challenges of PFAS treatment at scale – Metropolitan

The Agreement's focus on treatment ignores the challenges posed by treatment at the scales

13

required for wholesalers and large water systems. For example, Metropolitan has a program to develop one of the largest water recycling plants in the world. The Pure Water Southern California ("PWSC") program would purify treated water for 1.5 million people. *See* Metropolitan, *Fact Sheet: Pure Water Southern California Program Benefits* (Mar. 2023), https://www.mwdh2o.com/media/wrfpnkwl/purewater_programbenefits_digital032023.pdf. Among other technologies, the plant will utilize reverse osmosis, which has been identified as a technology that can effectively remove PFAS from water. The project budget "including construction, engineering, and other costs" is estimated to cost more than $8 billion, and these costs are being updated. *See* https://www.mwdh2o.com/media/jupblcl5/pwscrc-3b-presentation.pdf. Although the plant will serve all Metropolitan customers (its 26 member agencies), the PWSC water will be delivered at only a few connections. Implementing the limited set of technologies available to treat PFAS—like filtration or reverse osmosis—at scale requires a cost that goes far beyond what is contemplated under the settlement. Class Counsel previously responded to a similar objection to the 3M Settlement by asserting, "the record is replete with information that makes clear that the methodologies employed by Class Counsel in structuring the Settlement, including the Allocation Procedures, were reasonable and took into consideration real-life costs for PFAS treatment for all water system sizes." Dkt. No. 4319 at 41. However, there is no evidence in the record that Class Counsel considered the real-life costs for PFAS treatment for a water system comparable in size to large wholesalers like Metropolitan.

### C. Claims Form Certification – Metropolitan, Lakewood, Airway Heights, Vancouver

The Tyco Agreement claims form requires that the Class Member declare under penalty of perjury that its "Authorized Representative *has authority* to submit a claim and to release all Released Claims on behalf of the Settlement Class Member and all other Persons who are

14

Releasing Persons by virtue of their relationship or association with the Settlement Class Member" and that it "has consulted with *any other entity* that has incurred costs in connection with efforts to removed [sic] PFAS from, or prevent PFAS from entering, Settlement Class Member's Public Water System, and that Settlement Class Member's claim is *on behalf of any such other entity*." Dkt. No. 4911-3 at 76 (emphases added). Along a single surface water source, there may be thousands of PWSs that draw, use, treat, and return water to that source. *See, e.g.*, Dkt. No. 3829-1 at 16 (describing the many entities that Metropolitan, a major wholesaler, would have to consult with under such a scenario); Dkt. No. 4442 at 15 (brief of amici curiae stating same concern). For groundwater sources, groundwater recharge from surface waters as well as general treatment by groundwater users may also implicate many different entities. The claims form language appears to require a Class Member to identify and consult with all such entities, and ultimately make claims *on their behalf*, even if they are wholly independent entities over which a Class Member has no authority. The logistical complexities involved in the mandated consultation, paired with the overbroad scope of the Releasing Parties definition, make this requirement unfair. As amici curiae previously requested, "[t]he court should clarify that the settlement terms do not require a Settling Class Member to release claims on behalf of other water agencies drawing water from the same source, or on behalf of any agency that conveys and treats water for multiple agencies even if that group includes the Settling Class Member." Dkt. No. 4442 at 16.

    **D. Effective Date – Metropolitan, Lakewood, Airway Heights, Vancouver**

Effective Date is defined as "the date that occurs five (5) Business Days after the date of Final Judgment." Tyco Settlement ¶ 2.21. Final Judgment occurs when, in relevant part, "if appealed, approval of this Settlement has been affirmed by the court of last resort to which such appeal (or petition for a writ of certiorari) has been taken and such affirmance has become no

15

longer subject to further review . . . or the appeal or petition is voluntarily dismissed." Tyco Agreement ¶ 2.28. The claims-form deadline and distribution of settlement funds are directly tied to the Effective Date and date of Final Judgment. Tyco Agreement ¶ 6.4; Dkt. 4911-3 at 52.

The settlement could have been designed to allow claims administration to proceed as soon as the district court enters final judgment, with an appeal having an impact only if it results in a stay or reversal of final approval based on core issues like class certification. It is well established that a final judgment entered by a district court is effective pending appeal, absent a stay under Federal Rule of Appellate Procedure 8(a)(1). Wright & Miller, 18A Fed. Prac. & Proc. Juris. § 4433 (3d ed.); *Milliken & Co. v. Weiner*, No. 7:14-CV-4422-BHH, 2016 WL 11530304, at *4 (D.S.C. Sept. 23, 2016); *Belmont Partners, LLC v. Mina Mar Grp., Inc.*, 741 F. Supp. 2d 743, 750 n.5 (W.D. Va. 2010). Instead, as written, the Effective Date definition needlessly delays the claims administration process and distribution of funds in the event of an appeal—even if there is no stay, and even if the appeal concerns a relatively auxiliary issue that the parties and court could address through a non-material modification on remand. *Friske v. Bonnier Corp.*, 543 F. Supp. 3d 543, 545 (E.D. Mich. 2021) (describing common practice of "allow[ing] modifications of previously approved class settlement agreements under Rule 23(e) when the settlement will not be 'materially alter[ed]'" (citations omitted)); *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 313 (D.D.C. 2015) (same).

Another troubling effect of defining Effective Date in this way is to make it more difficult to object and press objections on appeal. *See Vaughn v. Am. Honda Motor Co.*, 507 F.3d 295, 300 (5th Cir. 2007) ("[I]mposing too great a burden on an objector's right to appeal may discourage meritorious appeals or tend to insulate a district court's judgment in approving a class settlement from appellate review."). Any potential appeal would be met by Class Counsel's accusation that

the appellant is "hold[ing] up significant payments to thousands of deserving Class Members." Dkt. 4696-1 at 7. Class Counsel followed this playbook this past March, when they moved to impose up to a $61 million appeal bond on Metropolitan for filing a notice of appeal of the DuPont Settlement in order to seek clarification of a conflict in the settlement provisions, which could have been easily fixed. *Id.* at 5. The premise of their requested bond was that Metropolitan's appeal "effectively stay[ed] the Effective Date of the DuPont Settlement and payments to every Class Member" given the DuPont Settlement's definitions of Effective Date and Final Judgment, which are identical to those of the Tyco Settlement. *Id.* at 6. Of course, the only reason the appeal "effectively stayed" payments to Class Members was because Class Counsel and DuPont had designed the DuPont Settlement that way.

The Tyco Agreement follows the same flawed design. It is unfair to define Effective Date in a manner that could delay distribution of settlement funds and discourage appeals on legitimate issues.

### E. Waiver of Objections – Metropolitan

The Tyco Agreement allows for the withdrawal of a Request for Exclusion before the fairness hearing, but it provides that the "withdrawal of a Request for Exclusion does not permit a Person to . . . revive previously asserted objections." Tyco Agreement ¶ 9.7. Withdrawing a Request for Exclusion should not prejudice the Eligible Claimant by forever waiving its previously asserted objections. It is unfair for the Tyco Agreement to waive Eligible Claimants' statutory and due-process rights to object to the settlement if they later decide to participate. If the Eligible Claimant has rejoined the Settlement Class, then it again has general standing to object and should be allowed to resume pursuing its previously asserted objections. *See* Fed. R. Civ. P. 23(e)(5)(A).

## IV.     CONCLUSION

For the foregoing reasons, the Metropolitan Water District of Southern California, Lakewood Water District, City of Airway Heights, and City of Vancouver each respectfully object to the Tyco Agreement on the grounds specified above.

Dated: August 23, 2024.

Respectfully submitted:

*/s/ Jeff B. Kray*
Jeff B. Kray, WSBA No. 22174
Marten Law, LLP
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jkray@martenlaw.com

*Attorney for the Metropolitan Water District of Southern California, Lakewood Water District, City of Airway Heights, and City of Vancouver*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon all counsel of record in accordance with the Court's Preliminary Approval Order (Dkt. No. 5147), the Settlement Agreement Between Public Water Systems and Tyco (Dkt. No. 4911-3), and Federal Rule of Civil Procedure 5.

Dated: August 23, 2024.

*/s/ Jeff B. Kray*
Jeff B. Kray, WSBA No. 22174
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
jferrell@martenlaw.com

*Attorney for the Metropolitan Water District of Southern California, Lakewood Water District, City of Airway Heights, and City of Vancouver*
