**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG |

| | |
|---|---|
| ART SCHAAP AND RENEE SCHAAP d/b/a HIGHLAND DAIRY, | This Document Relates to: No. 2:24-cv-07040-RMG |
| *Plaintiffs,* | |
| *-vs-* | |
| UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF DEFENSE, and UNITED STATES AIR FORCE, | |
| *Defendants.* | |

**MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON LIABILITY AND RECOVERY
OF CERCLA RESPONSE COSTS INCURRED TO DATE**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................... 1

LEGAL STANDARD.............................................................................................. 3

FACTUAL BACKGROUND .................................................................................. 4

ARGUMENT .......................................................................................................... 7

I.   DEFENDANTS ARE LIABLE UNDER CERCLA § 107(a)
     FOR ALL RESPONSE COSTS INCURRED TO DATE................................... 7

     A.  Defendants Are "Responsible Parties" ............................................ 9

     B.  Cannon AFB is a "Facility" ............................................................ 9

     C.  "Hazardous Substances" Were Released From Cannon AFB........................ 9

     D.  Plaintiffs Have Incurred Recoverable Response Costs .................................. 9

     E.  Plaintiffs' Removal Costs Are Consistent
         With the National Contingency Plan .............................................. 10

II.  PLAINTIFFS ARE ENTITLED TO A DECLARATORY JUDGMENT
     REQUIRING DEFENDANTS TO REIMBURSE THEM FOR ALL
     FUTURE RESPONSE COSTS THAT ARE CONSISTENT WITH
     THE NATIONAL CONTINGENCY PLAN........................................................ 16

CONCLUSION....................................................................................................... 16

## TABLE OF AUTHORITIES

*Cases:*                                                                                    *Page:*

*A & W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107 (9th Cir.1998) .............. 2, 7

*Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69 (1st Cir.1999).................................... 2, 7

*American Nat'l Bank and Trust Co. of Chicago as Trustee for Illinois Land*
    *Trust No. 120658-01*, 1997 WL 281295 (N.D. Ill., May 20, 1997)...................... 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 3

*Artesian Water Co. v. Government of New Castle County*,
    851 F.2d 643 (3d Cir. 1988) ................................................................ 12

*Artesian Water Co. v. New Castle Cnty.*, 659 F. Supp. 1269 (D. Del. 1987),
    *aff'd*, 851 F.2d 643 (3d Cir. 1988)............................................................ 13

*Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 191 F.3d 409 (4th Cir. 1999)............ 8

*Bowen Engineering v. Estate of Reeve*, 799 F.Supp. 467 (D.N.J.1992) ...................... 13

*Brooklyn Union Gas Co. v. Exxon Mobil Corp.*,
    554 F.Supp.3d 448 (E.D.N.Y. 2021) ...................................................... 12

*Carlson v. Bos. Sci. Corp.*, 856 F.3d 320 (4th Cir. 2017)............................................ 3

*Carlyle Piermont Corp. v. Federal Paper Bd. Co.*,
    742 F.Supp. 814 (S.D.N.Y. 1990)........................................................... 13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........................................................... 3

*City of New York v. Chemical Waste Disposal Corp.*,
    836 F.Supp. 968 (S.D.N.Y. 1993).......................................................... 12

*City of Toledo v. Beazer Materials and Services*,
    923 F.Supp. 100 (N.D. Ohio 1996) ....................................................... 12

*CNH America, LLC v. Champion Environmental Servs., Inc.*,
    863 F.Supp.2d 793 (E.D. Wis. 2012) .................................................... 12

*County Line Inv. Co. v. Tinney*, 933 F.2d 1508 (10th Cir. 1991)................................ 10

*Courtland Co. Inc. v. Union Carbide Corp.*, 2023 WL 6331069
    (S.D. W.Va., Sept. 28, 2023) ................................................................ 12

*Crofton Ventures L.P. v. G & H Partnership*, 258 F.3d 292 (4th Cir. 2001)............... 8

*Dant & Russell, Inc. v. Burlington Northern Railroad*
    *(In re Dant & Russell, Inc.)*, 951 F.2d 246 (9th Cir. 1991) .................................. 2

*Foster v. United States*, 926 F.Supp. 199 (D.D.C. 1996) ........................................... 12

*Gache v. Town of Harrison, N.Y.*, 813 F.Supp. 1037 (S.D.N.Y. 1993) ...................... 13

*Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85 (2d Cir. 2000) ................................ 10

*Hatco Corp. v. W.R. Grace & Co.*, 836 F.Supp. 1049 (D.N.J. 1994) .......................... 12

*Marriott Corp. v. Simkins Indus.*, 825 F.Supp. 1575 (S.D. Fla. 1993) ...................... 13

*Morrison Enterprises v. McShares, Inc.*, 302 F.3d 1128 (10th Cir. 2002)............ 10, 15

*New York State Elec. and Gas Corp. v. FirstEnergy Corp.*,
    766 F.3d 212 (2d Cir. 2014) .................................................................. 8

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
    596 F.3d 112 (2d Cir. 2010) .......................................................... 2, 7, 10, 15, 16

*Nutrasweet Co. v. X-L Engineering Co.*, 227 F.3d 776 (7th Cir. 2000) ...................... 15

ii

*Cases (continued)*                                                           ***Page:***

*PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.2d 161 (4th Cir. 2013)....... 8

*Provence v. United States*, 661 F.Supp.3d 459 (D.S.C. 2023)...................................... 3

*South Carolina Dept. of Health v. Commerce & Industry Ins. Co.*,
    372 F.3d 245 (4th Cir. 2004)................................................................................. 8

*Union Carbide Corp. v. Thiokol Corp.*, 890 F.Supp. 1035 (S.D. Ga. 1994) .............. 12

*United States v. Akzo Coatings of America, Inc.*,
    949 F.2d 1409 (6th Cir. 1991)........................................................................... 10

*United States v. Alcan Aluminum Corp.*, 990 F.2d 711 (2d Cir. 1993)..................... 17

*Von Duprin LLC v. Major Holdings, LLC*, 12 F.4th 751 (7th Cir. 2021) ...... 10, 11, 15

*Young v. United States*, 394 F.3d 858 (10th Cir. 2005) .......................................... 11, 12

*Village of Milford v. K-H Holding Corp.*, 390 F.3d 926 (6th Cir. 2004).................... 12

*Vine Street, LLC v. Keeling*, 460 F.Supp.2d 728 (E.D. Tex. 2006) ............................ 12

*Walnut Creek Manor, LLC v. Mayhew Center, LLC*,
    622 F.Supp.2d 918 (N.D. Cal. 2009)................................................................. 12

*Weyerhaeuser Corp. v. Koppers Co., Inc.*, 771 F. Supp. 1406 (D. Md. 1991)............. 13

*Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887 (9th Cir. 1986)..................... 12

***Statutes, Regulations, and Rules:***

28 U.S.C. § 2201(a) ...................................................................................... 1, 16

42 U.S.C. § 9601(9) ......................................................................................... 8, 9

42 U.S.C. § 9601(14) ........................................................................................... 9

42 U.S.C. § 9601(22) ........................................................................................... 8

42 U.S.C. § 9601(23) ............................................................ 5, 10, 12, 14, 15

42 U.S.C. § 9601(24) ............................................................................. 11, 12, 15

42 U.S.C. § 9607(a) ............................................................ 1, 8, 9, 10, 16

42 U.S.C. § 9607(b) ........................................................................................... 16

42 U.S.C. § 9613(g)(2) ................................................................................... 1, 16


40 C.F.R. § 300.415(b)(2)(i)........................................................................... 14

40 C.F.R. § 300.6 ............................................................................................... 11


Fed. R. Civ. P. 56(a) ............................................................................................ 3

Fed. R. Civ. P. 56 advisory committee's note to 1946 amendment............................ 3

4

## INTRODUCTION

Defendants the United States of America, the United States Department of Defense, and the United States Air Force (collectively, "Defendants," or "the Government") released hazardous substances while operating Cannon Air Force Base ("Cannon AFB"). Plaintiffs Art and Renee Schaap d/b/a Highland Dairy ("Plaintiffs" or "the Schaaps") brought this action seeking the CERCLA response costs they incurred as a result. *See generally* Complaint, *Schaap v. United States et al.*, No. 2:24-cv-07040-RMG (D.S.C.), ECF No. 1 ("Compl."), ¶¶ 32–52.

Given the design of CERCLA and the obvious role of Defendants as owners and operators of Cannon AFB, there can be no factual dispute regarding Plaintiffs' entitlement, under Count I of the Complaint, to a finding of liability against the Government for these releases, and recovery of their costs of response incurred to date, pursuant to 42 U.S.C. § 9607(a). In addition, Plaintiffs are entitled as a matter of law, under Count II of the Complaint, to a declaratory judgment holding the Government responsible for all response costs incurred in the future that are consistent with the National Contingency Plan, pursuant to 42 U.S.C. §§ 9607(a)(4)(B) & 9613(g)(2), and 28 U.S.C. § 2201(a).

Because it is clear that the Government owned and operated a facility (Cannon AFB) that over a period of many years discharged hazardous substances, which have contaminated the water supply and soil of the land on which the Schaaps have long operated Highland Dairy, indisputably causing them to incur response costs, the Schapps are entitled to summary judgment on the Government's

1

liability to them under CERCLA. Once liability is established, at the very least the Schaaps are entitled to recover the portion of their well-documented response costs that the Government either does not dispute or cannot credibly challenge, with the resolution of any factual issues regarding disputed response costs to be determined at a later date.

In *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112 (2d Cir. 2010), the Second Circuit summarized the common practice in CERCLA cases of entering an early, "Phase I," grant of summary judgment when liability is clear:

> In practice, courts generally bifurcate a CERCLA proceeding, determining liability in Phase I, and then apportioning recovery in Phase II. During Phase I, courts have engaged in a very limited liability inquiry. We have previously commented on the "breadth" of CERCLA, and have held even a minimal amount of hazardous waste brings a party under the purview of the statute as a PRP.

*Id.* at 131 (citing *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 77 (1st Cir.1999); *A & W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1110 (9th Cir.1998)). As the Ninth Circuit long ago observed in explaining the rationale for this practice, CERCLA "envison[s] that, before suing, CERCLA plaintiffs will spend some money responding to an environmental hazard. They can then go to court and obtain reimbursement for their initial outlays, as well as a declaration that the responsible party will have continuing liability for the cost of finishing the job." *Dant & Russell, Inc. v. Burlington Northern Railroad (In re Dant & Russell, Inc.)*, 951 F.2d 246, 249-50 (9th Cir. 1991).

That is precisely how the Schaaps are proceeding here. An early grant of summary judgment on liability, and on the undisputed response costs to date, in

2

this case—and perhaps other cases now pending, or that may soon be filed—will likely help prioritize such cases for quick, orderly, and final settlement, in the eyes of the responsible Government decisionmakers.

## LEGAL STANDARD

A party may move for partial summary judgment under Rule 56 to obtain a "pretrial adjudication that certain issues shall be deemed established for the trial of the case." Fed. R. Civ. P. 56 advisory committee's note to 1946 amendment. Like full summary judgment, partial summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 324 (4th Cir. 2017).

Summary judgment is appropriate where the evidence, viewed in the light most favorable to the non-moving party, shows "that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a) The burden is on the movant to show that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" only where it will affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

For there to be a "genuine" issue about a fact, the evidence must be "such that a reasonable jury could return a verdict for the non-moving party." *Provence v. United States*, 661 F.Supp.3d 459, 463 (D.S.C. 2023) (Gergel, J.) (citing *Anderson*, 477 U.S. at 242). In determining whether there is a genuine issue of material fact,

3

the Court is required to "interpret all inferences and ambiguities against the movant and in favor of the non-moving party." *Id*. (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## FACTUAL BACKGROUND

**The Plaintiffs and Their Dairy Farm**

Plaintiffs Art and Renee Schaap ("the Schaaps," husband and wife) are general partners in Highland Dairy ("Highland"), a New Mexico General Partnership they started in 1992. Through titular interests, real estate purchase contracts, and lease / option agreements, the Schaaps control 3,593 acres of land (the "Highland Property") with improvements including residences, offices, wells, farm buildings, and the like.  The Highland Property is currently designed to accommodate 5,300 cows and cattle. Compl., ¶ 12. The Highland Property is also adjacent to Cannon AFB, touching the Southern fence line and Southeastern corner of Cannon AFB and stretching nearly 2.5 miles to the South and Southeast. *Id*.

**The Government's Ownership and Operation of Cannon AFB**

Cannon AFB is, of course, owned and operated by Defendants, as part of the Government's military operations. Compl., ¶¶ 13-14, 33.

**Hazardous Substances Released From Cannon AFB**

During the Government's operation of Cannon AFB, perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA")[1] —two types of per- and

---

[1] *See* "Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances," 89 Fed.

poly-fluoroalkyl substances ("PFAS") designated by the Environmental Protection Agency (EPA) as "hazardous substances" under CERCLA—were released from Cannon AFB, contaminating adjoining properties. Compl., ¶¶ 32, 34–35, 51–52.

**Response Costs Incurred by Plaintiffs to Date**

The Government's release of these hazardous substances in the course of operating Cannon AFB has caused the Schaaps to incur response costs, specifically "removal" costs under 42 U.S.C. § 9601(23). Compl.,¶¶ 53–61; Affidavit of Arthur F. Schaap ("Schaap Aff."),[2] ¶¶ 34–66, 76–78, 82–83, 87, 89-90, 94; Declaration of Arthur F. Schaap ("Schaap Decl.") ¶¶ 4–20.[3]  These include both initial testing and other investigatory costs and, subsequently—based on directives of relevant state and federal health authorities issued after that initial investigation—further costs of removal necessary to protect human health.

The initial testing and other investigatory costs to date, which were incurred in connection with the Schaaps' need to monitor, assess, and evaluate the release of

---

Reg. 39124 (May 8, 2024) (available at: https://www.govinfo.gov/app/details/FR-2024-05-08/2024-08547).

[2] Citations to the Shaap. Aff. are to Exhibit 6 (Affidavit of Arthur F. Schaap, Apr. 15, 2024) filed in support of Plaintiffs' Opposition to the United States of America's Site-Specific Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1) (MDL ECF No. 4851-20), which is reproduced in full (including Exhibits A through T) as Exhibit 1 to this motion.

[3] Exhibit 2 to this motion is the Declaration of Arthur F. Schaap, dated December 23, 2024.

hazardous substances, Compl.,¶ 54, and its impact on Highland, total $80,290.25. Schaap Decl., ¶ 19.

As a result of the testing data documenting the extensive contamination of groundwater used by Highland—which for years had been contaminated with PFOS and PFOA due to the Government's operations at Cannon AFB—the Schaaps also incurred substantial removal costs. Those costs were incurred in undertaking actions ordered by both federal and state regulators as necessary to prevent, minimize, or mitigate damage to the public health and included quarantining their dairy cattle, dumping their milk rather than selling it, and eventually killing their cattle rather than selling them for slaughter. These initial removal measures also involved the installation and operation of a standard water-filtration system to mitigate the continuing impact of the PFOS and PFAS contamination of the groundwater. Compl.,¶¶ 28–30, 53–61; Schaap Aff., ¶¶ 34–51, 52–66, 77–78, 82–83, 89–90. The removal cost incurred by the Schaaps in this regard involved dumping 324 million pounds of milk generated by the contaminated cows, to prevent damage to the public health. Compl.,¶¶ 27–28.

The Schaaps also incurred an enormous removal cost in killing their 3,665 beef cows, leaving them to rot on the ground, and tending to their gradual decomposition, rather than selling them for slaughter—all as necessary to prevent damage to the public health, as directed by regulatory authorities. See Compl.,¶¶ 27, 29, 59-61; Schaap Aff., ¶¶ 48–51, 77–78, 82–83, 89–90.

The Schaaps also incurred substantial costs in implementing standard removal measures, such as the installation and operation of water filtration systems as a means of both protecting humans who used the water and of potentially rendering the cattle and their milk again safe for human consumption. Compl.,¶¶ 54-56. These costs totaled a minimum of $250,000. Schaap Aff., ¶¶ 57, 76, 94.

Finally, the Schapps incurred substantial overhead costs, in continuing to operate their farm while overseeing the dumping of the milk and—once it became clear that despite the installation of water filtration systems, the cattle remained contaminated and unsafe for human consumption—overseeing the killing of the cattle and the gradual decomposition of their carcasses. Compl.,¶¶ 57–58, 61.

## ARGUMENT

### I.    DEFENDANTS ARE LIABLE UNDER CERCLA § 107(a) FOR ALL RESPONSE COSTS INCURRED TO DATE

When a CERCLA plaintiff establishes each of the five elements of a Section 107(a) claim, the plaintiff is entitled to summary judgment on the issue of liability, even when genuine issues of material fact remain as to the appropriate damages. *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 131 (2d Cir. 2010). "In practice," therefore, "courts generally bifurcate a CERCLA proceeding," engaging "in a very limited liability inquiry" during Phase I. *Id. See also Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 77 (1st Cir.1999); *A & W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1110 (9th Cir.1998).

Liability is imposed when a plaintiff establishes: (1) that the defendant falls within one of the four categories of "responsible parties" enumerated in 42 U.S.C. §

9607(a); (2) that the site of the cleanup is a "facility" within the meaning of 42

U.S.C. § 9601(9); (3) that there was a release, or is a threatened release, of

"hazardous substances" at the facility; (4) that as a result, plaintiff has incurred

response costs in responding to the release; and (5) that the response costs conform

to the National Contingency Plan under 42 U.S.C. §§ 9601(9), (22) & 9607(a).

*Crofton Ventures L.P. v. G & H Partnership*, 258 F.3d 292, 297 (4th Cir. 2001); *see
also PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.2d 161, 167-68 (4th

Cir. 2013).

CERCLA § 107(a) "establishes strict liability" that "is subject only to a few

narrow defenses and exemptions." *Id. See also Crofton Ventures*, *supra*, 258 F.3d at

296 ("The Act imposes broad and strict liability for the costs of cleaning up

hazardous waste sites without regard to whether the persons assigned liability

placed the waste material on the site or had knowledge of the waste materials'

presence"). Because a primary goal of Congress in enacting CERCLA was "the

promotion of prompt and effective cleanup of hazardous waste site," *South Carolina
Dept. of Health v. Commerce & Industry Ins. Co.*, 372 F.3d 245, 251 (4th Cir. 2004),

and "CERCLA is 'a comprehensive remedial statutory scheme, . . . courts must

construe its provisions liberally to avoid frustrating the legislature's purpose.'" *Axel
Johnson, Inc. v. Carroll Carolina Oil Co.*, 191 F.3d 409, 416 (4th Cir. 1999) (quoting

*Westfarm Associates Ltd. Partnership v. Washington Suburban Sanitary Comm'n*,

66 F.3d 669, 677 (4th Cir.1995)). *See also New York State Elec. and Gas Corp. v.
FirstEnergy Corp.*, 766 F.3d 212, 220 (2d Cir. 2014).

8

Based on the summary judgment record, all five requirements are met with regard to Defendants, entitling the Schaaps to the entry of partial summary judgment on liability, and recovery of their response costs incurred to date.

### A.  Defendants Are "Responsible Parties"

Defendants are obviously "responsible parties" within the meaning of 42 U.S.C. § 9607(a)(2), on the basis of having "owned or operated" Cannon AFB "at the time of disposal of any hazardous substance."

### B.  Cannon AFB is a "Facility"

Cannon AFB is obviously a "facility" within the meaning of 42 U.S.C. § 9601(9), a term that includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."

### C.  "Hazardous Substances" Were Released From Cannon AFB

The PFOS and PFAS chemicals of concern have been officially categorized as "hazardous substances" within the meaning of CERCLA (see 42 U.S.C. § 9601(14), as they have been so designated by the EPA. See note 1, *supra*. The Government's own testing data has confirmed that these hazardous substances were released from Cannon AFB and have contaminated both the groundwater and soil on which the Schaaps have operated Highland. Compl.,¶¶ 21, 23.

### D.  Plaintiffs Have Incurred Recoverable Response Costs

Proof that the Schaaps have incurred *any* response costs that are recoverable under CERCLA is sufficient to entitle them to a Phase I liability determination, so that the only remaining issues in the case will involve resolution of any factual

disputes concerning the precise amount of recoverable response costs, both now in the future. *See, e.g., Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 91 (2d Cir. 2000). Plaintiffs submit that there are no factual issues regarding the recoverability of, at minimum, the initial testing and other investigatory costs which were incurred in connection with the Schaaps' need to monitor, assess, and evaluate the release of hazardous substances. See pp. 5-6, *supra*.

### E. Plaintiffs' Removal Costs Are Consistent With the National Contingency Plan

Under CERCLA § 107(a), Defendants are liable for cleanup costs that are incurred consistent with the National Contingency Plan ("NCP"). 42 U.S.C. § 9607(a)(4)(A)-(B). The NCP is "essentially the federal government's toxic waste playbook, detailing the steps the government must take to identify, evaluate, and respond to hazardous substances in the environment." *Niagara Mohawk*, 596 F.3d at 136. Only "substantial compliance" with the NCP (not perfection) is required. *Von Duprin LLC v. Major Holdings, LLC*, 12 F.4th 751, 771 (7th Cir. 2021). *See also Morrison Enterprises v. McShares, Inc.*, 302 F.3d 1128, 1136 (10th Cir. 2002).[4]

At this stage of the case, the Schaaps are seeking to recover only "removal" costs, pursuant to 42 U.S.C. § 9601(23).  For present purposes, that includes only

---

[4] That only "substantial compliance" is required reflects a deliberate policy choice. Prior to 1991, strict compliance with the NCP was required. To advance Congress's goals in enacting CERCLA, the "substantial compliance" standard was promulgated by the EPA in order to allow private parties additional latitude in their response to hazardous wastes. *See County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1514 (10th Cir. 1991); *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1444 n.34 (6th Cir. 1991).

10

the initial investigation of contamination and measures ordered by health regulators to protect public health.  Those costs automatically satisfy any scrutiny applicable under the NCP.  The procedural requirements of the NCP will have greater significance when it comes to remediation measures, the costs of which are recoverable under 42 U.S.C. § 9601(24).  But there can be no material dispute that the removal costs the Schaaps seek to recover through this motion are consistent with the NCP.

**First**, the Schaaps have incurred substantial **initial testing and investigatory costs**, with a total cost to date of $80,290.25. See pp. 5-6, *supra*. They are entitled to reimbursement of these expenses because they are costs of "removal" within the meaning of 42 U.S.C. § 9601(23), that is, "actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." *Id*.; *see also* 40 C.F.R. § 300.6 (definition of "removal" actions).

There is a consensus among the federal courts that have addressed the matter that such initial expenses are *automatically* held to be recoverable under CERCLA, as they are an *essential first step*, taken prior to any further evaluation of what further "removal" actions (§ 9601(23)) or "remediation" actions (§ 9601(24)) may be warranted.  That is true regardless of whether the *subsequent* actions directed at removal or remediation are taken consistent with the NCP. All five circuits that have considered the matter follow this rule. *Von Duprin*, *supra*, 12 F.4th at 770-71; *Young v. United States*, 394 F.3d 858, 863-64 (10th Cir. 2005);

11

*Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 934-35 (6th Cir. 2004);

*Artesian Water Co. v. Government of New Castle County*, 851 F.2d 643, 651 (3d Cir.

1988); *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir. 1986).[5]

District court decisions applying this rule, and explicating its rationale,

include *Courtland Co. Inc. v. Union Carbide Corp.*, 2023 WL 6331069, at *68-*69

(S.D. W.Va., Sept. 28, 2023); *Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 554

F.Supp.3d 448, 467 (E.D.N.Y. 2021); *CNH America, LLC v. Champion*

*Environmental Servs., Inc.*, 863 F.Supp.2d 793, 809 (E.D. Wis. 2012); *Vine Street,*

*LLC v. Keeling*, 460 F.Supp.2d 728, 759 (E.D. Tex. 2006); *American Nat'l Bank and*

*Trust Co. of Chicago as Trustee for Illinois Land Trust No. 120658-01*, 1997 WL

281295, at *9 (N.D. Ill., May 20, 1997); *Foster v. United States*, 926 F.Supp. 199,

203-04 (D.D.C. 1996); *City of Toledo v. Beazer Materials and Services*, 923 F.Supp.

1001, 1008 (N.D. Ohio 1996); *Union Carbide Corp. v. Thiokol Corp.*, 890 F.Supp.

1035, 1045 (S.D. Ga. 1994); *Hatco Corp. v. W.R. Grace & Co.*, 836 F.Supp. 1049,

1089 (D.N.J. 1994); *City of New York v. Chemical Waste Disposal Corp.*, 836 F.Supp.

---

[5] The Tenth Circuit has articulated an exception to the general rule that initial investigatory expenses are automatically recoverable; on its view, such expenses *may* not be recovered in the unusual situation in which landowners make no "actual effort to respond to environmental contamination" and testify that "they do not intend to spend any money to cleanup" the hazard. *Young, supra*, 394 F.3d at 861, 864. *Compare Walnut Creek Manor, LLC v. Mayhew Center, LLC*, 622 F.Supp.2d 918, 929 (N.D. Cal. 2009) ("Unlike the plaintiffs in *Young*, [plaintiff here] has not testified that it does not intend to spend any money to clean up the contamination on its property. It seeks to recovery response costs for work performed in order to assist with and help plan the eventual remediation and cleanup efforts. . . . The Court concludes that the cost of the studies performed by [plaintiff] is a necessary response cost."). This exception is plainly inapplicable here.

968, 980 (S.D.N.Y. 1993); *Marriott Corp. v. Simkins Indus.*, 825 F.Supp. 1575, 1583 (S.D. Fla. 1993); *Gache v. Town of Harrison, N.Y.*, 813 F.Supp. 1037, 1046 (S.D.N.Y. 1993); *Bowen Engineering v. Estate of Reeve*, 799 F.Supp. 467, 477 (D.N.J.1992); and *Carlyle Piermont Corp. v. Federal Paper Bd. Co.*, 742 F.Supp. 814, 821 (S.D.N.Y.1990).

This rule recognizes the reality that "[t]he bulk of the NCP guidelines appear to apply to actual removal and remedial procedures but do not logically appear applicable to the initial assessment aspects of a cleanup." *Weyerhaeuser Corp. v. Koppers Co., Inc.*, 771 F. Supp. 1406, 1414 (D. Md. 1991). As one district judge put it, agreeing with the defendant's concession, "'the detailed NCP provisions governing other response actions cannot reasonably be applied to preliminary monitoring and evaluation of a release of hazardous substances.'" *Artesian Water Co. v. New Castle Cnty.*, 659 F. Supp. 1269, 1295 (D. Del. 1987), *aff'd*, 851 F.2d 643 (3d Cir. 1988).

**Second**, the Schaaps have also incurred substantial costs in complying with the orders of both federal and state health regulators to quarantine their cattle, dump their milk, and, when efforts to remove the contamination from the cattle over time (by filtering the water they drank) failed, kill them and leave their carcasses on the ground to rot, rather than selling them for slaughter. See p. 6, *supra*. These costs included not simply the foregone sales of milk and meat, but also the overhead costs of operating the farm while overseeing these measures to mitigate the public health threat. See p. 7, *supra*.

While the *amount* of these costs can be litigated later (likely on paper submissions, without the need for a bench trial), the entry of summary judgment on liability for this *category* of costs is appropriate at this stage because these costs likewise qualify for automatic recovery. The cost of complying with regulatory directives that are specifically designed to prevent the consumption of contaminated milk and meat necessarily constitute costs of "removal," because the responsible officials have already definitively deemed them "necessary to prevent, minimize, or mitigate damage to the public health or welfare." 42 U.S.C. § 9601(23). Simply put, these were the costs that Highland incurred in *removing* its contaminated cattle and milk from the food supply—costs that include not only Highland's foregone sales of milk and beef, but also the overhead costs of operating the farm to ensure compliance with orders from both federal and state health regulators.[6] Recovery of these costs is consistent with the NCP, which lists as the first factor to consider "when determining the appropriateness of a removal action" the "[a]ctual and potential exposure to . . . the food chain from hazardous substances or pollutants or contaminants." *See* 40 C.F.R. § 300.415(b)(2)(i)

Given the pervasive regulatory oversight of the removal measures undertaken by Highland, the Government cannot credibly challenge the necessity of the underlying response actions that led to these costs, as doing so would require

---

[6] These agencies included: (1) the U.S. Food & Drug Administration ("FDA"); (2) the U.S. Department of Agriculture ("USDA") (specifically, the USDA's Farm Service Agency ("FSA") and Food Safety & Inspection Service ("FSIS")); (3) the New Mexico Department of Agriculture ("NMDA"); and (4) the New Mexico Environment Department ("NMED").

second-guessing the decisions of health officials from multiple federal and state agencies. *See, e.g.*, *Von Duprin*, *supra*, 12 F.4th at 771 (noting plaintiff's cooperation with state regulators in finding substantial compliance with the NCP); *Niagara Mohawk*, 596 F.3d at 136-37 (landowner's response "under the monitoring, and with the ultimate approval, of the state's environmental agency" established compliance with NCP); *Morrison Enterprises*, *supra*, 302 F.3d at 1137-38 (applying rebuttable presumption of compliance with NCP when landowner's actions were taken in compliance with agreement with state regulators); *Nutrasweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 791 (7th Cir. 2000) (finding NCP satisfied because state regulators approved the landowner's actions and monitored its progress).

**Third** and finally, the Schaaps have incurred substantial costs in implementing standard water-filtration measures. See p. 7, *supra*. These measures, too, automatically qualify as consistent with the NCP because they were instituted at the behest of, and with oversight by, state regulators. Filtration is designed to immediately remove the harmful chemicals from the water supply, without regard to whether the environmental damage to the dairy farm can eventually be remedied. Accordingly, unlike long-term remediation actions taken pursuant to § 9601(24)—which require substantial compliance with various procedural requirements under the National Contingency Plan—removal actions taken pursuant to § 9601(23) are standard methods for protecting the public health and "subject to lesser requirements" under the NCP. *Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 934 (6th Cir. 2004). By following the directives of state

15

regulators in implementing water-filtration systems as a removal measure, the Schaaps substantially complied with the NCP and are entitled to recover the costs they incurred as a matter of law.

## II.   PLAINTIFFS ARE ENTITLED TO A DECLARATORY JUDGMENT REQUIRING DEFENDANTS TO REIMBURSE THEM FOR ALL FUTURE RESPONSE COSTS THAT ARE CONSISTENT WITH THE NATIONAL CONTINGENCY PLAN

Upon this Court's holding that Defendants are liable under CERCLA § 107(a) for *some* response costs, the Schapps will be entitled to entry of a declaratory judgment (sought in Count II of the Complaint) holding the Government responsible for all response costs incurred in the future that are consistent with the National Contingency Plan, pursuant to 42 U.S.C. §§ 9607(a)(4)(B) & 9613(g)(2), and 28 U.S.C. § 2201(a). *See Niagara Mohawk*, *supra*, 596 F.3d at 131.  Again, the precise extent of those costs can—and presumably will—be negotiated and/or litigated between the parties at a later stage, but there can be no dispute that, *to the extent* that any further removal or remediation costs are consistent with the NCP, Defendants will be liable for them.

## CONCLUSION

As the Second Circuit has observed, once a plaintiff "establishes each of these elements on undisputed facts and the defendant is unable to demonstrate by a preponderance of the evidence the existence of one of the three affirmative defenses set forth in [42 U.S.C.] § 9607(b) [act of God, act of war, or act or omission of an unrelated third party], the plaintiff is entitled to summary judgment on the issue of

16

liability, even when genuine issues of material fact remain as to appropriate damages." *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir. 1993). Accordingly, a partial summary judgment order to that effect, as well as a declaratory judgment, should be entered in favor of the Schaaps to permit them to recover the response costs they have incurred to date, after which the remainder of the case under the CERCLA § 107 will focus on the recovery of future response costs.

Dated:    New York, New York         Respectfully submitted,
          January 3, 2025

                                      **NAPOLI SHKOLNIK**

                                      By: */s/ Andrew W. Croner*
                                      Andrew Croner, Esq.
                                      Patrick Lanciotti, Esq.
                                      360 Lexington Avenue, 11th Fl.
                                      New York, NY 10017
                                      (212) 397-1000
                                      acroner@napolilaw.com
                                      planciotti@napolilaw.com

                                      Paul J. Napoli, Esq.
                                      1302 Avenida Ponce de León
                                      Santurce, PR 00907
                                      (833) 271-4502
                                      pnapoli@nsprlaw.com

                                      *Counsel for Plaintiffs Art and Renee*
                                      *Schaap d/b/a Highland Dairy*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was electronically filed with this Court's CM/ECF on this 3rd day of January, 2025, and was thus served electronically upon counsel of record.

<u>/s/ Andrew Croner</u>