# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

|                                      |   |                                   |
|--------------------------------------|---|-----------------------------------|
| In Re: AQUEOUS FILM-FORMING          | \| | No. 2:18-MN-2873-RMG              |
| FOAMS PRODUCTS LIABILITY             | \| |                                   |
| LITIGATION                           | \| | ***This Document Relates To:***   |
|                                      | \| | Do-Rene, 2:20-CV-4263             |
|                                      | \| | New Mexico, 2:20-CV-2115          |
|                                      | \| | Schaap, 2:19-CV-3288              |
|                                      | \| | Teune, 2:19-CV-3290               |
|                                      | \| | Vander Dussen, 2:20-CV-2115       |

## AFFIDAVIT OF ARTHUR F. SCHAAP

I, Arthur F. Schaap, present this Affidavit of facts in the above-captioned matter under oath and subject to the penalty of perjury:

1. My name is Art Schaap (pronounced "Skop"). I am an American citizen and a resident of New Mexico. I am over the age of 18 and make this Affidavit of facts known personally to me. Where indicated I have made statements that are believed to be true based upon information made available to me which I consider to be reliable.

### Background

2. I was raised in Orange County, California and Portales, New Mexico. My father and his dad were dairy farmers, a tradition that passed to my two brothers and brother-in-law as well as to me. My son Ryan is now a 4th generation dairy farmer in our family.

3. I graduated from Portales High School and attended Eastern New Mexico University in Portales, New Mexico but left school at the age of 22 when I had the opportunity to go into the dairy business with my dad. In 1992, my father helped me launch "Highland Dairy" ("Highland") on an initial 320 acres that my wife and I purchased adjacent to Cannon Air Force Base near Clovis, New Mexico. I chose this piece of land because of the position of the dairy in what was then becoming a substantial dairy market about 15 miles from my hometown and because of the abundant, high quality water supply available on that property. We invested in and built groundwater wells and a milking barn facility, a feed lot and a storage complex to accommodate some 5,812 head of cattle, including ideally 2,350 head of milking cows. In 1993, my wife and I acquired another 320 neighboring acres, and we eventually expanded to 3,593 acres that are generally adjoining properties with some tracts that are non-contiguous, but all within one to two miles of the Southeastern corner of Cannon Air Force Base. Each of these acquisitions was undertaken before 2018 when we had no idea about PFAS contamination.

4. Highland Dairy acquired and developed Holstein and Cross-Jersey cows. We were issued a Grade A Dairy Permit from the New Mexico Department of Agriculture (NMDA). We secured contracts for the delivery of milk each day and we were in business. A map of Highland

at Ex. A(1) overlays the Air Force's known and suspected areas of contamination with my acreage (A(2)) and another shows the locations and proximity of my neighbors.[1]

5. During my years spent operating Highland prior to 2018, my wife and I opened a second dairy in Portales, NM, and then a third dairy operation known as Native Pastures Dairy in Roosevelt County, NM. In 2012, Native Pastures adopted organic dairying practices. We also invested in a small cheese plant in Tucumcari, NM.

6. Highland Dairy was built to use irrigation on about 71% of the total land, and dry land farming on 4.4%. We have about 43 groundwater wells on the property. Our water rights and our good network of production wells meant that we had all the water we needed to have a thriving dairy and acreage growing crops to feed our cows.

7. As mentioned, the milking barn is capable of milking 2,350 cows twice per day (morning and evening) and the feeding area incorporates stanchion-equipped feed lanes for about 2,632 mature cows. Highland also has pen space for 3,180 heifers and calves under an open lot design. We also have commodity barns and hay sheds. We have a wastewater containment and treatment facility. The property includes a main house, where my wife and I live after years of living in a manufactured home on the property, and six other residences generally used as employee housing. One of these is used as my office where my office staff works.

8. As of August 2018, the dairy had some volume production challenges, but was operating normally and I employed 40 full time staff at the dairy and as drivers. I had another 40-50 employees at my two other dairy facilities.

9. Shortly after we got our start, Highland retained the accounting services of Genske Mulder & Co. LLP in Ontario, California. Their reports to me showed that the dairy was consistently a high performing dairy from the mid-1990s until about 2008. Genske Mulder has for years represented many large-scale dairies in New Mexico and armed with market data, created a standard for our industry of the "Top 25%" of dairies in the State. In fact, based on reports that I've seen, we were able to produce 102.7% of the Top 25% of New Mexico dairies in those years, so we were quite successful with our production at this location.

10. Beginning in 2009, however, we started to notice that our milk production was tapering off. In the years that followed, we searched in vain for an explanation of the cause of this lack of production. The problem got worse and worse. We hired nutritionists and consultants to help us figure out the reason for the shortfall in milk production. One of the experts was Robert Hagevoort, New Mexico State University's leading expert on dairy production and operations.

11. By 2017 – the year before the PFAS contamination on my dairy was revealed – Highland's cows were only producing some 59 pounds of milk per day while the Top 25% of New Mexico dairies' cows were producing 74 pounds. The cows were getting the same food (or so we thought), the same water (or so we thought), and they were exposed to the same climate. We hired the same veterinarians, used the same health protocols as our neighbors, and the cows

---

[1] Rajen #1 Dairy, north of Highland occupies about 1,450 acres and has 9,900 head of cattle. Do-Rene Dairy, located to my East, has 960 acres and 3,030 head. DayStar Dairy is about one mile to the East and has 640 acres with about 4,000 cattle. Rajen #2 Dairy has 1,450 acres and 2,750 head of cattle. (See Ex. A(2).)

were milked twice a day using the same technology as our neighbors, but our cows were producing less milk. We later realized that the PFAS deficit in production (and my income) was accounted for almost 14% of my customary production and 11.5% when compared to my peers.

12. Immediately upon it being revealed by the Air Force that PFAS contamination was in my water, Dr. Robert Hagevoort, determined that the cows were producing less milk because of the PFAS, which on a pounds of milk per day basis were determined to be as follows:



13. Based on my accounting records comparing this production loss to Top 25% NM dairies, prior to the time the Air Force finally disclosed my water contamination and us shutting down sales, we lost 174,098,958 pounds of milk production of 2,300 cows as follows:

| | | | |
|---|---|---|---|
| 2009: | 13,021,060 | 2014: | 16,002,510 |
| 2010: | 12,674,031 | 2015: | 21,156,504 |
| 2011: | 16,222,536 | 2016: | 21,333,790 |
| 2012: | 13,815,748 | 2017: | 26,121,620 |
| 2013: | 14,478,856 | 2018 (Jan.- Oct.): | 19,272,303 |

14. On information and belief, this loss was directly attributed to the presence of PFAS from Cannon Air Force Base in my cows from my well water – the same water my family and I had been drinking this entire time.

15. In my view, this is the strongest possible evidence that as discussed below, even while the Air Force concealed its knowledge of the PFAS contamination in the Ogallala Aquifer for years, the water was in fact contaminating my herd, was impacting Highland Dairy, reaching my family, and was also being shipped without my knowledge – but with the Air Force's knowledge – as an unsafe food product to my customers across the country.

**The Air Force Had Reason to Know and Knew**
**of PFAS in Highland Dairy Water**

16. In June 2017, two male civilians in street clothes approached one of my employees, Joe Black, at Highland purporting to represent Cannon Air Force Base. They said that they wanted to test the water on my dairy and at my home. I was called by Mr. Black and instructed him to decline the offer. This happened again a few months later, in September or October 2017, and this time we were visited by two men & one woman who stated they represented the Air Force and wanted to test our water. Again, we declined their offer, not knowing what reason they could have for this request. They withheld the reason; if they had said I was drinking poison I would have let them test.

17. I find it shocking that these two visits occurred even prior to the period of time in which the Air Force says that it tested the water on Cannon Air Force Base. According to the AMEC Foster Wheeler Site Inspection report dated August 24, 2018, they first began testing the water on Cannon Air Force Base in November 2017 and concluded their testing on the base in January 2018.

18. I am left to conclude that the Air Force believed and either knew or had reason to know that that they had more than likely contaminated the water supply on my dairy property as of June 2017. Yet, they concealed this knowledge and waited more than a year to reveal that they – and I – had a problem. To this day the Air Force still has not done anything to remedy the problem; it has only been made worse.

19. Representatives of the Air Force paid a third visit to my property and made yet another request on the same day that they published the Foster Wheeler Site Inspection report about on-base contamination and also sent letters from Col. Hammons to me and my neighbors as "Dear Property Owners" about possible PFAS exposure, August 24, 2018. (Ex. B, Hammons Letter of August 24, 2018.) This time, still without telling me the reason for the request – I had not received their letter of that date – I agreed to allow them to test the water at the dairy well and at my home.

20. The next day, on or about August 25, 2018, I received the "Dear Property Owners" letter from Col. Steward T. Hammons indicating that they had found PFOS and PFOA at the Air Force Base and *"initial results indicate detectable levels of contaminants in some groundwater monitoring sites."* I spoke to my neighbors of some of them also received this letter. The letter went on to say that the Air Force and the EPA *"recommend your water well be sampled for PFOS and PFOA in concentrations above the EPA's lifetime health advisory levels."* At the time, the Air Force knew full well about the presence of PFAS in my water and had known about it for more than a year, but I had no idea what were these things called PFOS and PFOA. The letter provided a form that could be submitted to them for well testing – as they had done on that day, August 24th - and a point of contact.

21. The Air Force's test results from their visit on August 24th were provided to me in a letter from Col. Hammons dated September 13th and showed that the drinking water at our kitchen tap was 671 ppt (PFOA + PFOS) and the water used to feed my 4,000+ cows was 1,649 ppt (PFOA + PFOS). (Ex. C, Hammons Letter of September 13, 2018.) The colonel stated, *"we recommend that your well water not be used for drinking, cooking, brushing teeth, or any other*

4

*purposes in which the water is likely to be ingested."* The Air Force offered to provide my wife and I each with one gallon of bottled water per day. Col. Hammons stated, *"PFOA and PFOS can come from other industrial sources"* but, in reality there was no other possible source of PFAS remotely close to my farm and my home. Col. Hammons' letter stated, *"we appreciate your cooperation in allowing us to test your water wells and your patience as we work to fix this problem."*

22. I came to realize that as of September 2018, the Air Force had allowed me to continue to place my dairy's milk production and cheese products into the American food supply chain for months and months on end without doing anything to protect the public or to protect me. They had reason to believe that the PFAS was in my dairy water and as a result in my cows and in my own blood stream as of June 2017 – this is the only reason that I have ever been contacted by the Air Force about testing my water. From June 2017 to October 2018, I had unknowingly shipped some 41,400,000 pounds of contaminated milk to be processed for American consumers. At the very latest, they knew about the PFAS contamination in the Ogallala aquifer in November 2017 and during months during which they knew, I had unknowingly shipped more than 27,000,000 pounds of milk to be processed for consumers across the country.

23. My lawyer in Portales, New Mexico wrote a letter to Cannon Air Force Base on October 5, 2018 requesting at least four semi truckloads of fresh water per day from a clean in order to provide the cows with clean water. (Ex. D, R. Knudson Letter of Oct. 5, 2018.) As stated below, within days my milk cooperative wanted answers. We started doing our own testing on the milk. Within a week, we had not heard any response from the Air Force and facing an impending financial and human health disaster, realized that we – and our neighbors – would need a more permanent filtration solution of our own water supply. Knudson's law partner Steve Doerr wrote again, stating,

> *Our clients, and I believe a majority of the other dairy's (sic) in this immediate area are in need of professional assistance to remediate the problems associated with PFOA and PFOS contamination. Our preliminary research has found that there are perhaps three (3) different filtration systems that could be used by landowners on their ground water pumps to remove the PFOA's and PFOS's. If the land owners and dairy operators within the zone of contamination can use filters or find other ways to clean their water and continue their operation, it would be a tremendous relief to them and a benefit to Curry County's economy.*

(Ex. E, S. Doerr Letter of October 12th.)

24. Separately from the lawyers, I wrote to Mr. Kottkamp at the Air Force Base on October 8th and requested an in-person meeting that week. Kottkamp said that they would respond and that he would be "setting up a meeting through my leadership". I was encouraged that the Air Force would respond quickly. But after the letters from my lawyers and my personal requests were delivered to the Air Force, nothing happened for weeks. This was the first sign that the Air Force would not do anything to address the threat they had created to my dairy.

25. In fact, when I was looking for answers in October as to how long it would take for the PFAS in the milk to be eliminated from my cows, one of my consultants found a research report from 2013 that showed that it would take one year to clean the milk – and that was for

cows that had been exposed to PFAS in their water for only 30 days. I realized that I could not keep the animals alive for one year with no milk sales and that if they were contaminated, they would have been so for their entire lives – not just 30 days. I also realized that the science on this issue had been settled five years earlier.

26. Eventually the Air Force responded and refused to provide clean water for the dairy cattle. (Ex. F, J. Conrad Letter of October 25th.) In spite of committing to doing nothing whatsoever, this letter said, *"the Air Force takes PFOS and PFOA contamination very seriously and is working hard to ensure humans are protected from drinking water that contains PFOS and PFOS in concentrations that are above lifetime health advisory levels."*

27. The Air Force lawyer's letter went on to say that as a matter of policy, they did not care at all about protecting the human food chain. The letter writer blathered on about how science could not be certain about when human health could be impacted from *"indirect ingestion by humans of PFOS and PFOA through, for example, the consumption of meat, milk, or fish."* (Ex. F.) Given that I learned within a matter of days that the FDA had already developed a precise standard for when PFAS in milk was a threat to humans, this was particularly insulting and a what I perceived as blatant lie. See ¶ 41 below and Ex. I attached there of discussions between FDA and NMDA. The FDA had communicated their established health standard for milk (400 ppt) to the NMDA on the very day – October 25, 2018 – that the Air Force brass was denying that this could possibly exist, justifying them taking no action. So at the very same moment in time, one agency of the federal government (FDA) was shutting me down because of the science, and another agency (USAF) was telling me that there was no science available to judge my dairy as contaminating the food chain – and that as a result they refused to be held responsible for the dairy being obliterated.

28. On about November 8th, a town hall meeting was called for residents in Clovis by the public affairs officers at Cannon and the Air Force Civil Engineering Center ("AFCEC"). Many neighbors were present and we were informed that the firefighting chemicals acquired and used by the Air Force were responsible for the contamination of the Ogallala Aquifer which runs directly under Cannon and also under my dairy operation. The AFCEC offered no solutions to the impacted dairies, but the representative did admit that it was their fault and their responsibility.

29. Eventually I was given a meeting with Col. Hammons, the commanding officer at the base, to discuss the issue that they had brought to my attention. I was given an appointment and went to his office at Cannon on December 12, 2018. We talked about my problem, and it was obvious that the issues I was facing seemed familiar to the colonel. I asked the Colonel about insurance that the Air Force might have like I had in the event that I had a nationwide recall on my cheese. He said, "Oh no, we don't have insurance. We're self-insured." Then he told me that during the cheese making process, the PFAS moved from the cow's milk into the whey, a byproduct. For a military man, he seemed to know a lot about milk and cheese.

30. Col. Hammons had several points to make to me. First, he explained that the Air Force would have to wait until the EPA established a standard for drinking water purification instead of the then-current health advisory number before action could be taken. He then said that once the EPA acted, the FDA could come up with numbers for milk, meat and cheese. He said that once the EPA water standard is given, they could be able to go under what he called "RCRA".

31. He also said that Congress would have to appropriate funds for the Air Force to have money to purchase farmland. He talked about the fact that at the base they had been in discussions about expanding the footprint of the base in my direction. He talked about how if they were to acquire my property, they could move the fuel storage facility away from the road and highway that is situated on the northern end of the base, and that they were considering moving the state highway 467 (which runs between much of my property and the base) to the other (far) side of my property to Curry Road 6 which is located East of my property.

32. Fortunately, I took notes of the conversation with the colonel. (Ex. G, Schaap Notes of Meeting with Col. Hammons.) It was amazing to me that as of that moment in time, the Colonel seemed to know all about the impacts of PFAS in contaminated milk. I asked myself why did they study PFAS in milk? When? I was surprised to learn that someone in the Air Force had taken the time to study the impacts of their firefighting foam being in milk and cheese, and that the Air Force had made sure that the colonel had been briefed on this issue prior to my meeting.

33. It seemed to me that the Air Force had known about the problem long enough to consider that one solution would be to acquire the property, expand the base, and to know that in the colonel's opinion, cheese produced from contaminated milk should be okay for the public because of what happens in the cheese making process.

### 2018 Suspension of Dairy Permit & Disruption of Contract Rights

1. Milk Sales Contract Terminated

34. Back in November 2014, I entered into a contract with a large regional milk purchasing co-op called Dean's Dairy Holdings, LLC and Suiza Dairy Group, LLC (known in the industry as "Dean's Foods") to purchase "all milk produced" at Highland. (Ex. H, Nov. 2014 Dean's Foods contract (attachment).) From that time forward, I generally delivered between 92,000 and 108,000 pounds of milk to Deans Foods daily from 2014 through October 2018.

35. On October 3rd, I received the results of the first study I commissioned to GEL Labs on my milk showing 21 ppt in PFOA and 675 in PFOS in my milk first tank, and 13.4 ppt in PFOA and 416 ppt in PFOS in my milk tank. I shared this information with the NM Department of Agriculture. At that time, I didn't know whether these test scores were high, or low, or whether they were a problem. But the government knew.

36. Because there were some news stories that appeared about Cannon Air Force Base's disclosure of their contamination of the water supply, Dean's Foods first wrote to me to ask for details about my milk, and then on October 8, 2018 advised that they had learned about the contamination in my water supply and indicated that they wanted more information about the milk. By October 15th, I received a notice that Dean's Foods was formally terminating my contract with what they indicated would allow me a 90-day period of adjustment, but in reality they stopped accepting my milk right away. (Ex. H.) I was left with no contract for my Highland operation. What's more, they terminated the contract based purely on the "stigma" of the potential of PFAS in my milk. I don't believe that as of the time they cut me off, they had received any PFAS test results on the milk or knew the significance of any scores.

37. I shipped milk to the cheese plant in Tucumcari but only until October 28th.

38. We requested more tests on our milk and also the liver of one cow to see if PFAS was in the organs. A second set of test samples were taken on October 17th. A local veterinarian conducted an autopsy on of my cows that had been sick. He provided the lab with a sample of tissue from the cow's liver. (I didn't receive these results until November 29th and had already stopped shipping milk.) The first test showed that the milk had 3,820 ng/L of PFOS. The second test showed a score of 3,200 ng/L of PFOS. The liver tissue sample showed 228 ng/g for PFOS.

39. Sometime in 2020, Dean's Foods went into bankruptcy in Houston, Texas and on information and belief, the Dairy Farmers of America ("DFA") were authorized by the court to affirm or reject contracts from dairy producers. My 2014 contract was listed by Dean's Foods as an asset of the company. Based on the court records I've seen, I was the only producer in New Mexico whose contract with Dean's Foods was not acquired by DFA in the bankruptcy proceeding. Based on my conversations with DFA board members, the reason given to me for being singled out was the presence of the PFAS in my milk.

## 2.  Milk Permit Suspended

40. As I recall, after losing my Dean's Foods contract, I contacted the NMDA about the possibility of testing the milk for PFAS in my dairy milk. I remember that I was warned by the NMDA that if the milk tested positive, it could mean that I would not be able to sell and would have to start dumping milk. I felt it was the right thing to do to protect the public from contaminated milk if that were the case. I was aware that I had delivered milk through Deans Foods to the cheese plant in Tucumcari, NM and could be obligated to commence a recall of the milk and/or cheese and could be sued by the cheese plant. I felt that the worst-case scenario would be that I would need to either temporarily stop selling milk and have the cow's water filtered, or that I would need to get new cows on the dairy to overcome the problem being described to me.

41. The NMDA performed another PFAS test on my milk at Highland Dairy on either October 30 or 31, 2018. I started a New Mexico public records request about FDA standards and I learned that the FDA had informed NMDA that the "screening level" for milk for six-year old children would be equal to 400 ppt of PFOS alone. (Ex. I, Oct. 31, 2018 Record of Corresp. between NMDA and FDA regarding milk PFAS standards.) If our milk measured more than 400 ppt for PFAS, we would have to dump the milk. If it measured lower than 400 ppt, we would be able to sell the milk.

42. Nonetheless, I had to continue to milk the cows twice a day. I started the daily routine of pumping some 92,000 pounds of contaminated milk either into the dairy barn trenches or out of the dairy barn and into milk trucks, then dumping the milk from the trucks into my washout system and my dairy lagoon. (This continued for the remainder of 2018, all of 2019, all of 2020 and into the first quarter of 2021, so that between 60,000,000 and 80,000,000 pounds of contaminated milk were dumped on the Highland property.)

43. These are some pictures of the dumping of milk that went on for more than 800 days:

  

44. A few days later, on November 5th, NMDA received their test results and I was informed by Dustin Cox, the Division Director, that because *"milk samples collected tested above the level of concern set by the FDA"*, my Grade A Dairy Permit was being immediately suspended. I was advised that the PFOS score was 1,620 ppt and the PFOA score was 36 ppt. This PFOS figure was more than four times higher than the FDA's allowable limit of 400 ppt. The total PFAS measurement was 2,009 ppt.

45. The NMDA letter indicated, *"all milk produced by Highland Dairy, permit number 085990, must not enter the food chain until samples show that the levels of PFOS and PFOA are below the level of concern."* (Ex. J, Suspension Notice of Nov. 5, 2018.)

46. In summary, the first milk test results I secured in late September showed a PFOS average score of 546 ppt. My second test taken October 17th averaged 3,510 ppt of PFOS in the milk. The NMDA tests from Oct. 31 would show a PFOS score of 1,620 ppt. The FDA standard was 400 ppt.

47. I started to realize that I had been unknowingly shipping contaminated milk that reached consumers all over the country. I didn't know how long or how many customers had been exposed to this hazardous waste! For years, my milk had gone into cheese, into milk jugs, into cream, into condensed milk, etc. and it had threatened the health and lives of thousands and possibly hundreds of thousands of people.

### 3. Beef Sales Blocked

48. A few days later, I received from my beef broker a copy of an undated memo sent by Gary A. Davis, DVM of the USDA Food Safety Inspection Service (FSIS) in Dallas to what appeared to be the entire beef processing industry in the Southwestern USA indicating, *"the dairy cattle from Highland Dairy near Clovis New Mexico is not eligible to be slaughtered and processed for human food."* The memo states that the FSIS informed Meat Institute staff that PFOS and PFOA "chemical contamination of a water source" were responsible. At this point there had been no testing of my animals or their tissue, only the milk that they had produced.

49. Without ever contacting me, my lawyer, or anyone affiliated with Highland – and without any test results to base this decision on, the industry was told, *"the dairy is under strict orders not to ship animals to any federally-inspected [slaughterhouse]. At this point, the agency considers the cows, and therefore any meat derived from them, "adultered" and FSIS has informed state animal health officials the cattle should not be shipped to a federally-inspected establishment." (*Ex. K, Davis Memo to SW Beef Industry.)

50. Another memo was issued by North American Meat Institute on November 20th and addressed to *"Members with Cattle Slaughter Establishments in Arizona, California, Colorado, New Mexico, Texas, and Utah"*, confirming that no facility would accept our beef. (Ex. L, NAMI memo to industry of Nov. 20, 2018.) At this time there had been no tissue studies, and no testing at all had been performed.

51. Large-scale dairies typically sell for beef about 30% of their adult herd each year in order to keep a more youthful and productive milking stock and to generate needed income. We lost this valuable avenue to generate revenue for our family purely as a result of the PFAS "stigma" attached to the dairy and the actions of the USDA.

### Contaminated Milk, Cows, and the DIPP Program

1. Milk DIPP Program Benefits & Losses

52. As I said in ¶ 42 above, when cows produce unsellable milk, you can't simply stop milking them. Unless you take steps to interfere with the lactations, dairies are required to keep milking twice a day, every day throughout their 9-month lactation period. In November 2018, I learned about a program run by the USDA Farm Service Agency ("FSA") called the Dairy Indemnity Payment Program ("DIPP"). Congress had authorized this program in the early 1970s to allow the USDA to pay for both milk and cows that were contaminated by chemicals or radiation, but as of that time only the milk component had been put in place by the USDA FSA.

53. We had to continue to care for the quarantined herd at tremendous personal cost to our family. It costs a minimum of $3.00 and up to $5.00 per day to keep a dairy cow alive and healthy. With some 4,200 head on hand, this implies a minimum daily cost of $12,600 or $378,000 per month for the bare necessities. Three months with no access to income implied a complete financial disaster – a direct out-of-pocket expense in excess of $1 million.

54. The DIPP is not a grant program, but instead works as an advance payment on a portion of lost sales in the event of a poisoning or contamination when it is not the fault of the farmer. To be eligible, the USDA made sure that I signed an agreement obligating me to pay back all of the proceeds if another responsible party is ever found and is successfully sued to recover the losses covered by the DIPP.

55. The DIPP milk payment turned out to be cumbersome, costly, and an unreliable source of funds. The payments were subject to federal budget deficit "sequestration" on what is supposed to afford the dairy farmer the fair market value of the milk. That meant that about 5% to 8% of every check would be slashed from the amount paid. We first applied for the month of October 2018, and again for November and December. With a government shut-down that

Winter, we did not receive any proceeds until well into 2019. At other times there were disruptions and payments were undervalued, and later minimized completely with no explanation or totally arbitrarily, and eventually these payments terminated. Given the lack of funding in the beginning of this period and the drops in funding from time to time, we were always operating at a loss since the costs of the dairy were constant and consumed more than the amounts we were able to recover from time to time under the DIPP milk program. This is to say nothing of the lost income from beef sales which we traditionally counted on as part of our dairy operations.

56. In order to qualify for the program, we were required to continue to milk the cows and quantify the amount of milk we were dumping on the dairy. We were required to show the USDA what we would have received had the milk been marketed with pricing following the market price for Class 3 milk in the Southwest.

57. We installed a very costly PFAS water filtration system to purify the contaminants from the groundwater at a rate of 150 gpm on the well relied upon to deliver drinking water to the dairy herd. We were required to produce routine PFAS tests on the water and the milk. A catalog of Highland's milk PFAS test scores from October 2018 to April 2021 from NMDA is attached as Ex. M and the results are as shown in the following chart, comparing the milk as tested (both "PFOS" and "Total PFAS") to the 400 ppt standard (the red line) established by the FDA:



58. These results continued to show that the milk produced by my cows at Highland was consistently five times higher than the allowable FDA limit of 400 ppt for PFOS for the first full year. Even after two years, the milk was two to three times higher. The highest test result received for PFOS was 5,681. On 23 occasions, the score exceeded 1,000 ppt for PFOS and in all of the first 25 tests over the first two years, the total PFAS score exceeded 1,000 ppt. Until the cows were dried out in 2021, it was always above the FDA limit. (Ex. M, Catalog of milk tests.)

59. I learned that the amount that I was eligible for each month was nearly as much as the USDA had budgeted to spend over the course of a year for the entire nation. Other DIPP

applicants had apparently needed the funding for just a few days here and there before their cows were rehabilitated from other chemicals. But in response to my PFAS problem and the scale of benefits we were applying for, the USDA said that they had to go to the OMB at the White House to get approval for each installment. The law said that once eligible you would remain so until the milk was able to go back on the market. But as mentioned in ¶ 71 below, the USDA developed a rule to limit DIPP benefits to an 18-month period from the designation of the contaminants in the milk. FSA agreed at that time that I would be 'grandfathered' into the program and accordingly, the clock would run out 18 months later, in December 2020.

60. In the end, the program was administered in a way that created massive losses for me, requiring us to incur practically all of the operating expenses of a fully functioning dairy, but with limited "program revenue" from the USDA. Occasionally we broke even, but for most, we fell far short of our expectation and potential.

61. During COVID, we applied for benefits that other dairies were eligible to receive because of a massive drop in the market price of Class 3 Milk. Our application was rejected by the FSA because they concluded that since I didn't have a dairy permit, I didn't have access to market prices. So we incurred declines in DIPP benefits during 2020, but were deprived DMC benefits made available to every other dairy in the nation.

62. The losses continued to mount, and I ran up tremendous obligations with my trade creditors – suppliers and vendors. I petitioned my bank for the opportunity to pay only the debts associated with my other working dairies. Eventually I was allowed to pay interest-only on some of the Highland debt. My bank really had very little choice.

63. I retained bankruptcy lawyers and provided them with the information they would need to commence a bankruptcy for me at any moment if the bank seized my assets.

64. The stress I came under as a consequence of the PFAS nightmare I was facing resulted in me developing Bell's palsy and for months I had nerve damage on one side of my face, was unable to keep one eye lid open, and that eye wept uncontrollably during this time.

65. The following chart reflects the annualized losses that I incurred during the period of October 2018 to April 2022 from milk operations totaling more than $37 million:

| Period | Cows | Lost Milk Sales (lbs) | Market Price (cwt) | Lost Income |
|---|---|---|---|---|
| Oct.-Dec. '18 | 2,300 | 10,382,200 | $ 14.61 | $ 1,516,839 |
| 2019 | 2,300 | 61,283,500 | $ 16.96 | $10,393,682 |
| 2020 | 2,300 | 59,767,800 | $ 18.16 | $10,853,832 |
| 2021 | 2,300 | 58,765,000 | $ 17.08 | $10,037,062 |
| Jan.-Apr. '22 | 2,300 | 19,320,000 | $ 21.96 | $ 4,242,672 |
| Total: | | | | $37,044,087 |

66. These figures don't take into consideration USDA COVID price supports available to normal dairies in 2020 and 2021. The extent of losses incurred since April 2022 are not final.

## 2. Dairy as USDA Science Laboratory

67. In early 2019, I was contacted by a representative of the FDA and another from the USDA FSIS. They indicated that they felt that they could commence a scientific study on the prospect of rehabilitating the Highland cow herd.

68. Beginning in approximately March 2019, FDA/FSIS developed a testing regimen, conducted blood testing and acquired 30 contaminated cows from me. The FSIS paid me $1,800 a head which is what we agreed was their fair market value. The animals selected were of different ages and gestational phases and were transported to New Mexico State University's Las Cruces campus. I understood that 20 were killed immediately so that their tissues could be tested at a FSIS facility at North Dakota State University. The remaining 10 cows were placed on clean water and either died during the course of 2019 or were monitored throughout the year.

69. Meanwhile our cows were aging poorly. I tried desperately to get a meeting with the USDA and in May 2019 did get the opportunity to meet with some of the bureau chiefs and their staff at their Independence Avenue offices in Washington. I begged the agency to just allow us to replace the cows and get rid of the ones that were "adultered". I told them that I wanted out and that they should take control of what I considered were "their" cows. I left the meeting with a stack of gold-embossed US government business cards but no commitments to help us further. They said that they were working to develop a program to buy the cows under the DIPP.

70. Even though I had seen the study showing that it took a year to clean-up a cow that had been exposed to PFAS for just one month and doubted the likelihood of my dairy cows being rehabilitated, I felt that I had no choice other than to participate in their study. I was concerned that they could cut me off at any time if they felt that I appeared to be uncooperative.

71. The next month USDA hosted a conference call with some of the policy makers. I expected that they would advise that they were going to give me a value for the cows at the dairy so that I could purchase new, clean cows and move on. Instead, they informed us that the previous day they had published a new rule in the federal register allowing for the DIPP milk benefits for 18 months more. They said that there were ongoing internal discussions about the possibility of buying the cows, so that I could in theory, get back into business, but that they had no rule to announce. They said that USDA Secretary Purdue wanted me to continue to work with Dr. Emilio Esteban, the chief scientist at FSIS, to see if the animals could be rehabilitated.

72. My milk was testing at five or six or seven times the allowable limit and I was being told to just hold on to and keep milking the cows; the scientists might be able to rehabilitate them.

73. I felt at the time that the USDA refused to take responsibility for my cows because the Department of Defense was against it doing so. I felt that the issue then was a political football, and I was paying the price for the political infighting. In fact, in July 2019, President Trump threatened to veto the entire defense budget for fiscal year 2020 if a provision were included in that bill requiring the DoD to be responsible for its contamination of properties. My dairy was featured in the story about the entire defense budget being placed at risk. (Ex. N, July 10, 2019 Article in The Hill.)

74. On November 19, 2019, initial guidance from FSIS came in the form of a personal visit to Highland from Dr. Esteban, who along with his team, stated their confidence based on their studies, the animals could be rehabilitated and sold for beef. Dr. Esteban left behind some notes about their findings that they found encouraging. (Ex. O, meeting images and FSIS Notes on Highland Cattle tests – some of these pages may have been given to me by FSIS at a later time.)

75. Eventually, on December 5, 2019, a "Protocol" allowing the animals to be sold to slaughterhouses under very detailed conditions was communicated to the Secretary of the NMDA by the FDA and the FSIS. (Ex. P, Protocol Letter from FDA and FSIS to NMDA Sec. Jeff Witte.)

76. We continued to work with the FSIS and NMDA for ongoing blood testing of the dairy herd at Highland during the rest of 2019 and 2020. In the meantime, milk was tested every month. As referenced in ¶ 57 above, we spent approximately $250,000 on a water purification system to help with the rehabilitation of the animals.

77. Armed with the FSIS "Protocol", I tasked my beef broker to find a market for the cows and learned that the Gary Davis memo referenced in ¶ 48 above had utterly destroyed the market for Highland's cows. I could not find anyone willing to consider processing the beef, particularly under the sales terms and conditions identified by the FSIS and FDA bureaucrats. I tried to find a way to sell the cows to rendering plants for dog meat and encountered the same reaction. We tried to sell to a rendering plant that makes biofuel from animal waste and byproducts with the same result. We explored exporting the cows to Mexico and other countries that do not regulate PFAS in milk or the cows and were advised by the NMDA that doing so would likely be met with criminal prosecution.

78. Cows that would otherwise have been sold for beef and those that became sick remained quarantined until FSA/NMED allowed us to kill the survivors in April 2022.

### 3. Cow DIPP Program Benefits & Losses

79. I worked very hard to secure the adoption of a rule providing for the "cow buy-out" component of the DIPP beginning in early 2019 and 2020 with USDA Sec. Sonny Perdue's team during President Trump's term. But by the end of 2020, there was no program. After the election, we had to start all over with the Biden administration and incoming USDA Sec. Tom Vilsack.

80. Throughout the three-and-a-half year period from 2018 to 2022, we requested over and over for the opportunity to put the cows out of their misery and remain eligible for the forthcoming program benefit, but were repeatedly denied this cost-cutting measure by the USDA.

81. We were also required to keep the herd alive as best as possible. The USDA later pretended that we were not required to keep the animals alive in an argument presented to avoid having to deliver me a realistic value for the cow indemnity payment, but in a recent appeal of the determination of DIPP benefits for the cows, USDA National Appeals Division Administrative Law Judge James Gibson found that the agency's attempt to recant this position was unjustified and that I had, in fact, been required by the USDA to keep the animals alive for three and a half years in order to be eligible for the DIPP cow buy-out program. This was also confirmed on yet another appeal to the USDA NAD Director, Frank Wood.

82. I lost access to DIPP milk funds in December 2020, yet I still had thousands of cows quarantined on my dairy. For an additional 16 months during the period of January 2021 to April 2022, I had to do my best to keep these cows alive, even as they were wasting away and dying one-by-one in their tracks on the dairy. As shown in the chart attached at ¶ 65 above, I lost hundreds of thousands of milk revenue each month and contemplated declaring bankruptcy over and over again.

83. As a consequence of the animals being quarantined and either aging-out on the dairy or falling ill due to conditions that might have been related to PFAS contamination, we started witnessing the deaths of cows on the dairy. We lost 65 cows in the last two months of 2018, 505 cows in 2019, 522 cows in 2020, 1,167 cows in 2021, and 869 cows in early 2022. Finally, the remaining 514 cows were systematically euthanized over three days in April 2022. We had to buy a lot of .22 cartridges in order to shoot the cows at point blank range and then haul them to the composting trench we established on-site. The death of a cow at a commercial dairy is supposed to be a rare thing. The scene pictured below became an everyday occurrence – eventually we lost three or four adult cows every day. It became a killing field. Here is a chart of the number of dead cows that we dealt with over the three and a half years before we were finally allowed to shoot the animals:



84. The DIPP Cow Buy-Out program announced by the USDA in December 2021 was finally implemented in April 2022. I immediately applied. At the end of June 2022, I finally received word that I would receive DIPP benefits for the cows. I noted several errors and successfully appealed the award, but still haven't been paid what's due.

85. The USDA fought to have the cows valued at about $1,100 each and to avoid paying for 233 head. On appeal, the value of every cow – when the quarantine was put in place – was

said to be $1,622.50.[2] The actual fair market value of each cow was $1,800. The value of the poisoned herd was $6,597,000.

86. As stated above, in order to comply with FSIS and FSA, I had to do my best from November 2018 to April 2022 to keep the herd alive. As the cows were poisoned by the Air Force (and their chemical companies) and the market destroyed by FSIS, the cows only had value that might come through the DIPP. I had to keep them alive so that my bank would not have its collateral decimated and push me into bankruptcy. The costs of doing this were just overwhelming - $9.9 million wasted on what we called "dead cows walking".

87. Together my losses on my cows alone during this period were $16.5 million. The final amounts that I expect to be awarded under the DIPP Cow Buy-Out program have still not been determined by the USDA but whatever it is, it will not be enough.

88. The benefits issued by the FSA are supposed to be private and protected from publication by the Privacy Act of 1974. In this case, adding insult to injury, the government has trampled all over my right to privacy by having one of the administrators of the FSA, Mr. Marlow, provide an Affidavit (Ex. J) to their Site-Specific brief at p. 5) – who, I might add, made all the errors we had correct on appeal and fought me every step of the way – state what I received from the DIPP program. The only reason that I can think that this would be used by the government under the heading, "DoD Clean-Up Efforts at CAFB under CERCLA" is to try to persuade the court that I have no reason to seek recourse against the government, which is insulting after incurring something close to $100 million in damages and all the aggravation and pain that they have caused. My attorney, Mr. Napoli, asked that the government take down the Marlow affidavit and they refused until the last minute, agreeing to have their irrelevant and unlawful affidavit sealed – not redacted, but sealed.

89. One of the conditions placed upon me by the USDA to become eligible for the DIPP Cow Buy-Out program was to establish a plan and facility for the "depopulation" and removal of the dairy herd onto a designated trench at Highland. The plan and facility were required to be approved by the N.M. Environment Department (NMED) and the NM State Veterinarian. It is presently composting the remains of 3,665 carcasses.

90. NMED determined it wouldn't be cost effective – or permitted – for me to transport them to a hazardous waste containment facility or to incinerate the carcasses and send the ash to such a facility. As a consequence, I had to establish the dedicated PFAS carcass containment zone and composting facility on the dairy. This facility measures approximately the size of a football field and is some 20 feet deep in the center. Here are some pictures of the scenes created by the government's refusal to deal with its contamination of my dairy:

---

[2] This is the value stated in the USDA's Livestock Indemnity Program. https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/2018/livestock_indemnity_program_fact_sheet-may_2018.pdf

**2018**



**2019**



**December 2020**



**June 2021**



**December 2021:**
**Cannon AFB is in the Background**



**April 2022:**
**3,665 Adult Holstein and Cross-Jersey Cows**



91. The personal toll and the costs placed on my wife and me have been extraordinary. We found we had this stuff in our blood. Also, the burdens imposed on me and what remains of my work crew to handle the herd in this manner have been almost intolerable. The animal cruelty caused by the Air Force has been beyond the pale.

92. As of April 2023, my best estimate on what I have had to spend on just the management of the dead cows and the establishment and maintenance of the carcass composting facility on the dairy was $1,606,442. NMED was able to pay me about half this amount from the State's Hazardous Waste Fund. (Ex. Q, June 30, 2022 invoice and April 7, 2023 draft invoice to NMED for Hazardous Waste Fund payments.)  The costs continue to mount.

**Destruction of My Real Property**

93. Beginning with a series of tests performed on the water supplies at Highland in September and October 2018, I began to realize that the water at my home and on my dairy was seriously contaminated and likely will be for the rest of my life. I have had many, many water tests performed since this started. The record shows that my water tested over a total of more than 41,000 ppt for total PFAS in 2018 and was so contaminated that the dairy tank sludge tested at 1,897,000 ppt. Both my drinking water and my agricultural water were destroyed.

94. The cost of purifying this water is very high. As mentioned, we have already spent nearly $250,000 on a purification system for the dairy well which pumps about 150 gallons per minute. Generally speaking for GAC or resin purification vessels and piping, my understanding is

that current capital costs average at least $1,500 for every 1 gallon per minute of well capacity. Operating expenses are in addition to that.

95. However, all the costs of water purification overlook the fact that the soils on Highland are also highly contaminated. We have conducted tests on several quarter-sections of land and determined that the soil was contaminated from both irrigation and the spreading of cow manure over the soil since the start of the dairy. (See Bearzi Affid. at ¶ 56 and the exhibit attached there.) The cow manure was relied upon for years as a fertilizer, but in this case, it carried the PFAS to fields where the water used for irrigation was clean, so even those fields show the presence of PFAS.

96. The water and the soil managed to bring PFAS to the corn, wheat and other crops grown on the dairy. Tests performed on the crops grown for silage in several fields throughout the dairy came back positive for PFAS. (See Bearzi Affid. at ¶ 60.)

97. The water in the residences and office on the Highland property also tests positive for PFAS. I installed my own filtration system on the house well and when the Air Force learned of this, they immediately stopped bringing water to the house. I requested compensation for the cost of the water purification system for "human drinking water" but was denied any relief whatsoever.

98. The dairy facility has been unused since 2021. It is wasting away in the elements. It took me a lifetime to build this enterprise and it is a rusting hulk of steel, motors, pumps, tanks, sheds, and milking equipment.

99. Last year I secured a "Yellow Book" appraisal of the Highland Dairy property. The appraiser found that had there been no PFAS contamination, my property would have been valued at $18 million. However, with the reality of the PFAS in the water, the soil, the cow carcass composting facility, and the crops grown throughout almost the entire 3,593 acres, and because the dairy had been shuttered for a long period of time, the appraiser concluded that as of April 2022, the entire property had no value. I spent 30 years building this place and thanks to PFAS it is worthless.

100.   In the process of studying the current fair market value of the real property, the cost of remediating the property to a usable state became an issue. Here is what we found:

a) <u>Soil</u>: In order to deal with contaminated soil on the property you have to remove and replace at a minimum the top 12" of soil on the farmland. Our investigation showed that this would cost about $570,398 per acre. To remove 24" of soil, it would cost about $1,140,000 per acre. Based on the overall value of the property ($18,000,000) a person could only afford to remediate 31 acres (out of 3,593) before approaching the property's fair market value. If we would need to go to 24", one could only remediate 16 acres. On the other hand, the cost to remediate the soil on the shallow basis would be $2.048 billion and on the deeper basis almost $4.1 billion. (<u>Ex. R(1)</u>, Clean Harbors proposal for soil remediation dated March 17, 2023.)

b) <u>Cow Carcass Composting Pile</u>: The volume of cow carcass was calculated as 2,800 tons. After composting, the cost to remove the PFAS tissue composting pile once the

moisture content is reduced to 20%, cremate an estimated 620 tons of animal remains over a 35 day period, and ship 62 tons of carcass ash and 440 tons of contaminated soil to a suitable land fill in Waynoka, Oklahoma was estimated at $573,856. (Ex. R(2), Clean Harbors proposal for carcass cremation and removal dated Jan. 31, 2022.)

101.  As a result my damages for the destruction of my dairy real property are likely either best measured as $18 million, plus damages for the business interruption and the costs of relocation, or for an amount equal to the replacement cost of the dairy in order to acquire another comparable property that has the features and attributes of Highland, but without the PFAS. Based upon my experience and knowledge of the market in my area, that cost would be about $65 million plus the losses from business interruption and the relocation costs. I still have substantial mortgage debt on Highland owed to the bank and under the purchase contracts that were put in place on portions of the land prior to this nightmare beginning.

### Destruction of My Water and Water Rights

102.  We have about 11,000 acre feet of water rights at Highland. With the wells we have permitted, and those that can be established, we have the authority and capacity to produce approximately 6,000 gallons per minute. The duration of time needed to attempt to purify the groundwater on the dairy is assumed to be 50 years based on what I learned about what 3M is paying for at other locations. Purification systems are available, but they generally are warranted for much less than that, so one could expect to incur capital expenses two to three times during the course of a 50-year purification project. What's more, in order to treat the water from the wells relied upon for irrigation, we would require the creation of large storage tanks and back-up pumps for purified water in order to replicate the pressure that my artesian wells produce to operate the pivots. These are other costs that you cannot recover from the market and would effectively be a 'tax' on operating this dairy as compared to a PFAS-free, functioning dairy. Based on information available to me, I estimate that it would cost about $30-$40 million to purify the water on my property for the coming 50 years, assuming no further contamination.

103.  Instead of trying to fix the problems caused off the base, the Air Force initiated a "pilot project" at Cannon Air Force Base reported to cost in excess of $110 million in an attempt to "contain" future contamination on the base at the Southeast corner and at the North Playa Lake.

104.  The Air Force is doing absolutely nothing to address the existing contamination which has already traveled through the water table and onto Highland or at Rajen Dairy, Do-Rene Dairy, Daystar Dairy, and those further downgradient.

105.  Based upon my experience working this land for 30 years and the information available to me, the pilot project cannot possibly capture 100% of the contaminants still emanating from the base in either of the two locations the AFCEC sees as the sources of the contamination, which is their claim.

106.  The official story from the Air Force for years has been that PFAS contamination travels through groundwater at a rate of 50 feet per year, but we have seen evidence that the plume is already more than three miles from the Air Force Base, implying that if they are correct about the transit rate, the PFAS has been in the aquifer for more than 300 years. On the other

hand, if the water has covered three miles in twenty years, it has moved at a rate of nearly 800 feet per year (1/4 mile) and can be expected to continue to do so. Based on what I have observed, I have had the contamination in the groundwater on my dairy for at least 15 years.

107. In eastern New Mexico, where we get about 15" of rain per year, access to water is extremely crucial to our ability to function. If you have access to the aquifer, you might be able to make sense of farming in the desert. Normally, agricultural wells are positioned by the NM Office of the State Engineer (OSE) with a 660' radius buffer from other wells used for agriculture production so that the cone of depression of water flowing into a well deep in the earth is not seriously compromised by wells competing for the same water source. All of this is controlled by the OSE that oversees the rights of landowners to harvest water to use on farms, etc.

108. As part of their 'pilot project', The Air Force determined to establish a series of four (4) extraction wells within 90 to 500 feet of four of my own irrigation wells at Highland fields number 5 and 6 near the Air Base fence line. All my wells are permitted by the OSE. The Air Force has advised the OSE last year that they are not bound by New Mexico laws pertaining to water rights and that they intended to extract water at a volume of 800 gallons per minute (four @ 200 gpm) at this location. I believe that this will seriously and negatively impact my access to water at fields 5 and 6 – whether it is contaminated or purified. The Air Force has asserted that the extraction will be compensated by its reinjection of purified water at a point on the base approximately 1,500 feet to the North. They call it a "net zero" calculus. In about August 2023, the OSE advised the Air Force that pumping 800 gallons per minute will compromise my water and my water rights. The AFCEC then rejected the findings and conclusions of the OSE. I have no idea whether the Air Force will comply with instructions given by OSE since the Air Force already said that it is not bound by anything that the State of New Mexico decides.

109. More than a year after the Air Force first approached me to check my water, and long before the lawsuits began, the Air Force presented their mapping of the region's Ogallala Aquifer in the Foster Wheeler Site Inspection report that showed the water was coming onto my dairy barn property (not fields 5 and 6, but a mile further East) from the North Playa Lake (next to Rajen Dairy) and from another area further to the West of the Fire Training Areas. (Ex. S.) The Air Force admitted that they have PFAS coming from the North Playa Lake area, across Rajen Dairy right toward my dairy. Based on this older data and the new discoveries about the North Playa Lake, and based on what Mr. Bearzi has determined, I believe that this northern contamination area is actively transmitting PFAS to the portion of my property where my cows were, where my dairy barn is located, and to other adjacent fields and wells, including those dairies downgradient from Highland.

110. In October 2023, the Air Force attempted to bypass me and my neighbors when it approached Curry County and the OSE to secure authorizations to occupy and build additional wells on the properties of Highland Dairy, Rajen Dairy, Do-Rene Dairy, DayStar Dairy, and Desert Sun Dairy along county road easements. To the best of my knowledge, the Air Force has not secured access to any of these dairy properties and is without the means of measuring the success or failure of its on-site pilot project.

111. Next, they went to the NM Department of Transportation and secured the state's "authority" to start drilling wells on my property and also on the property of Rajen Dairy along state highway 467 without any authorization or communication at all, other than what we've been

able to learn from public records requests made to the OSE. They drilled wells on my property and my neighbor's property without our consent or any notice.

### Failure to Commence Any Off-Site Remediation

112. The Air Force has not commenced any off-site remediation of the dairy properties that have been impacted by PFAS contamination from Cannon Air Force Base. In early 2019, the Foster Wheeler Site Inspection report for Cannon was supplemented with a thinly researched guess of the scope and scale of the PFAS contamination plume off of the base.

113. At the time of its August 24, 2018 "Dear Property Owner" letter announcing the presence of the PFAS on the base, the Air Force solicited other neighbors' interest in having their drinking water wells tested. On information and belief, no systematic or good-faith investigation was performed, and resulted in only a handful of positive tests off of the base. I have neighbors who were never contacted by the Air Force and they are directly in the PFAS plume. The Air Force's 2019 testing came from a small enough sample so that it was in my opinion invalid and they claimed that only three drinking water wells had any PFAS. In reality there were 31 different wells that have tested positive for PFAS but the Air Force has not updated any of their original 2019 findings.

114. Based on the representations of the Air Force, the Air Force engineers intend to change the course of the Ogallala Aquifer with their "pilot project" and depart from the original contaminated aquifer paleochannel beneath the base. What's more, their plan puts the 'clean' water right on top of their extraction wells so that they will be purifying and repurifying the same water over and over until they can report that there is no more PFAS on the Air Force Base. The pilot project is widely viewed as an absolute joke in Clovis.

115. Given that they are planning to change the course of this underground river to new, unknown locations, it appears to me that they have no idea or plan on how to address stopping contamination off of the Air Base – and cannot for years after their pilot project is in the works.

116. To the best of my knowledge, one day of water and soil testing was done in December 2021 at Highland, testing was done on another day in the same time frame at Daystar Dairy. Having taken no action in the intervening years, the AFCEC no longer has access to any of these properties and has nothing going on with respect to cleaning up our water off the base.

### Disregard of the Community

117. The failure of the Air Force to address this problem on my dairy and the dairies of my neighbors before the EPA has published its MCL has resulted in the fact that I might be liable and my neighbors might be liable for the further spread of their PFAS and liable under the CERCLA law as a polluter. As I understand, it doesn't matter if the current administration's EPA decides that as a matter of policy they won't take steps to penalize me, the law has universal application, a policy can be waived by another administration, and even other people downgradient could sue me for having used the Ogallala water on my dairy that might have spread to their properties. Also, people who acquired manure from my dairy to spread on their farms could also sue me if their land is polluted. This is to mention nothing of the risk created to consumers of milk products.

118.  I estimate that the region that is likely to be named as a Superfund Site in Curry County will measure about 15,000 acres with almost all of Highland Dairy in its midst. The Superfund Site could even include the Southwestern Cheese plant located about 5 miles from the Air Force base. After they've supposedly been working at this for years, there is nothing stopping the flow of these chemicals toward the cheese plant upon which our entire dairy industry relies.

119.  In 2021, we requested that a Restoration Advisory Board ("RAB") be established at Cannon Air Force Base in order to afford the community better access to information about the health and environmental threats posed by the PFAS plume emanating from Cannon.

120.  Following the submission of what I believe was more than 100 requests for the RAB from residents and businesses (50+ by email and facebook submissions and 50+ on sign-up sheets), the Air Force contacted some of those local people requesting the RAB forum and proceeded to challenge their "understanding" of the RAB before dismissing the request. They wrote in a report rejecting the RAB that the people didn't know what they were talking about. They had no business asking for a RAB for a single issue – PFAS – and didn't realize all of the legal ramifications of the RAB. The Air Force disregarded entirely the interest of the community in clean water and refused to organize a RAB.

121.  In 2022, we requested that the new commanding officer on the base tour Highland and Rajen dairies, so we could discuss possible solutions. The colonel accepted our invitation and scheduled a time to meet in my offices and tour the dairy facility. I told Col. Taylor about what his predecessor, Col. Hammons, made me aware of back in 2018. Then his project manager drove the colonel and I around the Highland Dairy property in the dark at a high rate of speed and when inside my office, turned the event into an absurd "photo op". Nothing came of the visit. Images of this brief visit are on the Cannon web site but there has been absolutely no follow up at all.

122.  In the Spring of 2023, at the time of the installation of a yet another new base commander at Cannon Air Force Base, the public affairs office at the base again requested input from the community in support of establishing a RAB. Many of the submissions from 2021 were resubmitted, and again the Air Force refused this mechanism for community input. At a public meeting in November 2023, when asked about the RAB, the project manager repeated that they had no interest in pursuing this mechanism to communicate and inform the community.

123.  The Air Force adopted a "COVID-sensitive" quarterly video meeting protocol, which amounted to a Zoom call conducted by their project manager. They since changed that to holding this twice a year. In order to participate (including just listening in) you have to register in advance. Since the initial meeting when the representative told Clovis that the Air Force would be responsible for clean-up back in 2018, the Air Force has not had a single in-person public meeting and has refused several calls for public town-hall meetings.

124.  As of this time, there has been no widespread water testing, no water treatment, no plan for purification of drinking water or private well water (except for one under-sink unit at Rajen Dairy), and there has been no blood testing for contamination in the population of 50,000 that has been consuming the water from the Ogallala Aquifer contaminated by Cannon Air Force Base.

## Multiple Misrepresentations and Abuses
## Caused by the Air Force

125. In 2015, Cannon Air Force Base produced a Preliminary Assessment Report[3] ("PAR") about PFAS getting into the groundwater around Cannon. The CAFB water system was said to serve 9,284 persons and that the combined on- and off-base population within the 4-mile radius from the former sewage lagoons is 6,540 residents. (PAR at 2-3.) Based on the PAR study, there are multiple misrepresentations about their knowledge of PFAS entering the groundwater:

**North Playa Lake:**

- This is a 9 million gallon basis where, "several releases of AFFF from hangars entered the sanitary sewer system and were routed to the WWTP. There is no accepted wastewater treatment process for AFFF or PFCs" and no investigations had been done on AFFFs or PFCs. (PAR at 3-24.)
- "The potential exists for PFC groundwater contamination at North Playa Lake as a result of historical and current wastewater disposal practices. Treated effluent discharges to North Playa Lake from WWTP may have contained AFFF" and "may allow deep percolation to the Ogallala Aquifer." (PAR at 3-34 to 3-25.)
- "The closest drinking water well is Well #5 located approximately one-half mile northwest of North Playa Lake." (PAR at 3-25.) Well #5 also provided water to some 8,000 cows and drinking water to 48 employees of Rajen Dairy.

The Preliminary Assessment Report then made the following false statements about PFAS escaping from North Playa Lake:

- "there are no residential areas located downgradient of North Playa Lake." (PAR at 3-25.) There are actually 48 employees at Rajen Dairy within half a mile and at least four residences within 1.5 miles, directly downgradient of the North Playa Lake. There are another six locations within two miles of the lake where many people, including me and my 40 employees and neighbors, have for decades drunk the contaminated well water and some who continue to do so because they have never been approached by the Air Force. Not to mention Do-Rene and Daystar employees.
- There was zero potential for PFAS surface water pathways from North Playa Lake to neighbors relying on the impacted groundwater: "water exits the lake only via evaporation and possibly infiltration. Therefore, the surface water pathway is considered incomplete." (Id. at 3-25.) However, for the period of 1977 to 1996, contaminated water from North Playa Lake was unknowingly used to irrigate farmland immediately to the East of CAFB. From there, the surface water joined that which was entering the groundwater pathways.
- Based on what I have learned from my neighbors who lived here before I came in 1992, this information is incomplete and inaccurate. On information and belief, the Air Force for years used an area south of the North Playa Lake as a garbage dump –

---

[3] See https://ar.afcec-cloud.af.mil/Search. Select Cannon Air Force Base from Installation List and apply AR #: 1941.

these are currently referred to as "burn pits" – and the Air Force would routinely douse the garbage in the formation with fuel or an accelerant, set it on fire, let it burn and then extinguish the fire with AFFF chemicals. See also Installation Restoration Program, Phase II, Confirmation / Quantification, Stage 1 Final Report for Cannon AFB, New Mexico prepared by Radian Corporation, September 1986 at xvii: https://apps.dtic.mil/sti/tr/pdf/ADA175451.pdf.)

**Fire Training Areas # 2[4] and # 3:**

- Both were used from 1968 to 1974 where the practice was to "presaturate the ground surface with water, apply the starter fuel, ignite, preburn for 30 to 45 seconds, and extinguish with AFFF." (PAR at 2-2 and 2-4; Installation Restoration Program, Phase II, Confirmation / Quantification, Stage 1 Final Report for Cannon AFB, New Mexico prepared by Radian Corporation, September 1986 at xviii - xix: https://apps.dtic.mil/sti/tr/pdf/ADA175451.pdf.)
- "There was no lining or other containment in place" at either spot. (PAR at 2-2, 2-4.)
- As to FTA-2 and FTA-3, "because ground depressions were unlined, any substance used there would have permeated into the soil." (PAR at 2-2 and 2-4.)
- "As such, there is a high probability that AFFF was released to the environment (between 1970 and 1974)…. Any AFFF used there would have permeated the soil and been released to the environment." (PAR at 2-2 and 2-4.)
- With respect to FTA-2, prior testing had proven that there were detections of oil, grease, lead, benzene, toluene, ethylbenzene and total xylenes. (PAR at 2-2.)
- On information and belief, jet fuel was known to escape Cannon Air Force Base and in fact was found in my well water at Highland Dairy when I first established my groundwater wells there.
- According to the 1986 Radian Corporation Phase II environmental report, there is 300' of caliche beneath FTA-2 and 340' of caliche beneath FTA-3 and at the time the report stated that the caliche "separates the zone of potential hydrocarbon contamination from the ground water" and "serves to isolate the contaminants from the ground water and reduce the potential for interaction between surface contaminants and the ground water system." Installation Restoration Program, Phase II, Confirmation / Quantification, Stage 1 Final Report for Cannon AFB, New Mexico prepared by Radian Corporation, September 1986 at 5-5: https://apps.dtic.mil/sti/tr/pdf/ADA175451.pdf.)
- Since the Air Force was aware that these other contaminants were in the Ogallala Aquifer, and there was a "high probability" that PFAS dumped on the bare ground would likely follow the same channels to off-site groundwater wells, the Air Force had to know in 2015 that the AFFF and PFAS were also being conveyed to my farm and other locations where wells were next to the Air Base.

**Fire Training Area # 4: ("FTA-4"):**

[4] The use of Fire Training Area # 1 predates AFFFs at Cannon (1959-1968). Installation Restoration Program, Phase II, Confirmation / Quantification, Stage 1 Final Report for Cannon AFB, New Mexico prepared by Radian Corporation, September 1986 at xviii - xix: https://apps.dtic.mil/sti/tr/pdf/ADA175451.pdf.)

- This was a huge circular fire drill site said to measure 400 feet in diameter that the Preliminary Assessment Report states was used eight times per year with mock aircraft at its center from 1974 to 1995. Fire Training Area #4 had no lining whatsoever, allowing AFFF to absorb straight into the soil. (PAR at 2-6; Installation Restoration Program, Phase II, Confirmation / Quantification, Stage 1 Final Report for Cannon AFB, New Mexico prepared by Radian Corporation, September 1986 at xix: https://apps.dtic.mil/sti/tr/pdf/ADA175451.pdf.)
- This training area was too massive to ever expect that contaminants could be contained in order to protect the environment. A 400' diameter burn area has an area of 125,000 square feet. All of this was unlined, as was the so-called run-off collection area for more than a decade. The oil separator they installed was broken and removed.
- The PAR states that in total, there were at least 176 applications of AFFFs over the years to soils on the unlined pit. Per the 1986 Radian Corporation report relied upon by the writers of the PAR and cited here, as of that time, "soil provided some natural filtration but did not prohibit downward migration of liquid waste." (PAR at 2-6; Installation Restoration Program, Phase II, Confirmation / Quantification, Stage 1 Final Report for Cannon AFB, New Mexico prepared by Radian Corporation, September 1986 at 5-4: https://apps.dtic.mil/sti/tr/pdf/ADA175451.pdf.)
- "Because the training area and original runoff pit at FTA-4 were unlined, any substances used there would have permeated into the soil. As such, there is a high probability that AFFF was released to the environment at FTA-4." (PAR at 2-6.)
- The fire drill procedure at Cannon was to: "presaturate the ground surface with water, apply the starter fuel, ignite, preburn for 30-45 seconds, and extinguish with AFFF."
- Fire drill equipment on the base included 500-gallon tanks for hangers and a 1,000 gallon tank for mobile placement at the Fire Training Area filled with AFFF concentrate and blended at a 3% mixture with water from tanker trucks. (PAR at 103 and 106.)
- According to the government's witness, AFFF concentrates were mixed at 3% with water. Defendant's Omnibus Brief, Walker Declaration, Ex. I at 12.
- Also, according to the 1986 Radian Corporation Phase II Report, "the extensive, thick caliche layer beneath the site effectively limits downward percolation of any contaminant materials that may be present in the surface soils." Installation Restoration Program, Phase II, Confirmation / Quantification, Stage 1 Final Report for Cannon AFB, New Mexico prepared by Radian Corporation, September 1986 at 5-5: https://apps.dtic.mil/sti/tr/pdf/ADA175451.pdf.)
- Based on the foregoing, I have to conclude that the Air Force was aware of the problems that were reaching my groundwater but chose to do nothing to prevent it.

**Active Fire Training Area:**

- This 100' diameter burn pit area is said to be lined and connected to a lined evaporation pond some 300' away from the burn area where liquid in the pond was left to evaporate. (PAR at 2-8.)
- In the final S.I. report, it was noted that "this facility had breaches in its liner which would allow AFFF to infiltrate into the soils beneath the liner." (Final S.I. Report at 31.)
- Additionally, a flash flood episode in 2015 due to storms caused "residual AFFF located in the evaporation pond to overflow and be released to the surrounding

environment." (Final S.I. Report at 31.) In 2017, testing revealed PFAS in the "subsurface soil" samples collected West and South of the evaporation pond site (outside the fence surrounding the complex). (Final S.I. Report at 31.)

- This location is also the place where annual foam checks are to be conducted on fire trucks from across Cannon Air Force Base, including those with turrets. (See PAR at 3-19 (the current fire station has fire trucks holding 2,470 gallons of AFFF concentrate), 3-20 (trucks from the former fire station are also checked annually).

- In my view, it is not credible for the Air Force to report that FTA-4 was closed in 1995 and the new Active FTA was not opened until sometime in 1997. (PAR at 2-8.) I cannot believe that Cannon had no fire training area available to it for any drills to be conducted for more than an entire year. If so, any drills or as many as 20 annual truck checks that were necessarily conducted would have been done either on paved runways or on the bare earth and neither were reported.

- I also cannot believe that the Air Force has operated as negligently as they have considering that they have known about the PFAS in the water since at least 2015 and possibly longer.

126.  In June 2017, the Air Force started an investigation and knew or had reason to know that PFAS was in my drinking water and in my dairy water. My office is right on the dairy property; it's the first building you come to when you are approaching the dairy. But the Air Force employees didn't come to me as the owner directly. Instead, they went to a dairy employee who they used to ask me permission. They kept the information they had about PFAS to themselves and did not advise me that there was a possibility of contamination until August 2018. This deception was repeated later in September or October 2017 and also in August 2018 when they came for the second and third times to my farm. They never stated the reason that they wanted to test my water. I was left to assume that there was something that perhaps my dairy operation had done to contaminate their water; I didn't know. In my opinion, they had a duty to warn me about the likelihood of PFAS being in my drinking water and in my agriculture water, both of which they wanted to test. I know that if I had a toxic dairy product on the store shelves and I stood by and watched customers buy the milk or cheese for their kids but said nothing and remained silent, I would be violating a duty to protect the public.

127.  By November 2017, the Air Force had confirmed the fact that PFAS was in the same water source that I was relying on but did nothing but wait another nine months before notifying me in August 2018.

128.  On August 24, 2018, the Air Force commander claimed that there were multiple sources of PFAS that could be responsible for the contamination, but this was completely false – there was only one source – the Air Base itself.

129.  Also on August 24, 2018, the Air Force issued the Foster Wheeler report falsely stating that there had been only eight discharges of PFAS on the base, in reality they had records later shared with my lawyers that showed they had 45 such discharges. They chose to ignore those records. I have to conclude that they were actively covering up the scale of their contamination of the North Playa Lake where the groundwater was discharged right in the direction of my dairy barn.

130.  In September 2018, the Air Force advised, *"we recommend that your well water not be used for drinking, cooking, brushing teeth, or any other purposes in which the water is likely to be ingested"* but the Air Force took the position that they would not do a single thing to protect Americans from the "ingestion" of milk and food that contained high amounts of PFAS.

131.  In October 2018, an Air Force lawyer stated that there was no scientific understanding about how human health could be impacted from "indirect ingestion by humans of PFOS and PFOA through, for example, the consumption of meat, milk, or fish." Meanwhile, the FDA had already discerned this with precision and informed NMDA staff, making it common knowledge to the government and in the industry.

132.  In November 2018, the Air Force representative at the one and only live public meeting on this issue assured the residents of Clovis that the Air Force would be responsible for the PFAS contamination in the area and the Air Force would be responsible for cleaning or fixing PFAS in our water but they have done nothing but cause financial chaos to me and threatened the devastation of the local economy, particularly with the EPA's listing of these compounds as hazardous substances.

133.  In December 2018, I met with Col. Hammons at Cannon. It was clear that he and his people had studied the issue of PFAS in dairy milk for a long time before I ever learned about the problem. The Air Force had conducted enough research to advise that the whey in the cheese acts as a repository for PFAS in the cheesemaking process, while at the same time one of the people in their legal office was saying that there was no evidence available about health consequences from 'indirect ingestion' of PFAS from meat and milk. This indicates how opaque and disingenuous the Air Force has been with the public about how much they knew and when they knew it.

134.  In January 2019, the Air Force reported that only three wells have PFAS contamination in drinking water near the base, but in reality, according to Mr. Bearzi, there are 31 wells that show PFAS contamination, and the Air Force has never corrected the record so the public does not know the extent of the problem.

135.  In December 2019, President Trump signed the 2020 NDAA into law. Section 343 authorized the Air Force to treat agricultural water exactly the same as drinking water and either purify my dairy water or provide me with a pure alternative source of water. The law imposed was triggered if the FDA set a PFAS standard for milk. (P.L. 116-92, § 343(a)(2)(B).) In a Guidance Memorandum dated August 4, 2020, the Defense Department falsely asserted that the FDA had not set a standard saying, "The FDA has not established such a standard at this time. The Department will update this memorandum if the FDA establishes a standard for PFOS and PFOA in raw agricultural commodities and milk." (Ex. T, August 4, 2020 Memorandum of W. Jordan Gillis, Assistant Sec. of Defense for Sustainment at fn. 2.) As I well know, the FDA set a standard of 400 ppt in milk not later than October 2018. (Ex. I and ¶¶ 27 and 41 above). This FDA standard compelled the NMDA to suspend my Grade A dairy permit. They therefore ignored their duty and did not correctly evaluate their conduct as required under the statute, in the face of a public health crisis.

136.  In 2021, I agreed to allow the Air Force to conduct testing on my property if they would adhere to criteria I established to test wells known to be contaminated and also to share the

results with me. They conducted tests in early December 2021, but it took two years for me to see the results.

137. At a 'quarterly meeting' of the AFCEC and Cannon held on a Zoom® platform that the Air Force initiated, Air Force personnel wrongly accused me before the public of sabotaging the meeting when someone – either an Air Force employee or someone else – commandeered the Zoom® meeting and started posting lewd images on the screen visible to the public. I have never seen a Zoom® meeting taken over or "hacked" by someone who was not the host of such a meeting.

138. In the course of this litigation, the government and its witness Scott Marlow have wrongly published protected, private information about benefits from the USDA's DIPP program in order to try to deceitfully persuade the court that I don't have a claim. They say that the funds paid were part of the "Clean-Up" conducted by Cannon Air Force Base which is a further misrepresentation. In fact, adherence to the USDA's DIPP program led to the required dumping of 80 million gallons of contaminated milk on the dairy property and another 2,800 tons of contaminated cow carcasses in the composting trench on the property. Further, the DoD has consistently refused to purify any dairy well water.

139. In December 2023, the AFCEC tested a PFAS filter at an undercounter purification unit placed at Rajen Dairy, but they waited some six weeks before finally reporting back to Rajen's owners that the filter was not working – so they exposed the workers there to PFAS during the weeks that they failed to warn them.

140. In December 2023, the Air Force's contractor falsely claimed when applying to the OSE for monitoring well permits that I and my neighbors did not own the land where they wanted to drill monitoring wells. Instead, they claimed to the OSE that the land was owned by Curry County. Even when the OSE corrected this misstatement, they tried to go behind our backs to get permission without our knowledge or an opportunity to object.

Further Affiant Sayeth Naught!

SWORN TO under penalty of perjury:

ARTHUR F. SCHAAP

Date: 15 April 2024
Denver, Colorado

Exhibits incorporated by reference:

A. (1) Aerial Map of Highland Dairy with Air Force Acknowledgements Overlay, and
   (2) Aerial Map of the Plaintiff Dairies in Curry County next to Cannon Air Force Base
B. Col. Hammons "Dear Property Owner" Letter of Aug. 24, 2018
C. Col. Hammons test results Letter of Sept. 13, 2018

D.  R. Knudson Letter to Col. Hammons of Oct. 5, 2018
E.  S. Doerr Letter to Col. Hammons of Oct. 12, 2018
F.  J. Conrad (Air Force Env. Law Ctr.) Reply Letter of Oct. 25, 2018
G.  Schaap Notes of Meeting with Col. Hammons on Dec. 12, 2018
H.  Dean's Foods Cancellation Notice of Oct. 15, 2018 and Nov. 19, 2014 Milk Purchase Agreement with Highland Dairy (attachment)
I.  Record of Correspondence between FDA and NMDA regarding milk PFAS standard delivered Oct. 31, 2018
J.  NMDA Grade A Permit Suspension Notice of Nov. 5, 2018
K.  Davis/FSIS Memo to SW Beef Industry of approximately Nov. 10, 2018
L.  NAMI Memo to SW Beef Industry of Nov. 20, 2018
M.  Catalog of NMDA's Highland Dairy milk PFAS test scores from Oct. 2018 to Apr. 2021
N.  Article in The Hill entitled, "Trump threatens veto of defense bill that targets 'forever chemicals'" dated July 10, 2019 (copies and printed April 15, 2024)
O.  FSIS Notes on findings regarding Highland Dairy cattle dated Sept. 30, 2019
P.  Protocol Letter from FDA and FSIS to NMDA Sec. Witte dated Dec. 5, 2019
Q.  Invoices to NMED Hazardous Waste Fund
R.  (1) Clean Harbors proposal for soil remediation dated March 17, 2023
    (2) Clean Harbors proposal for carcass compost incineration and removal dated January 31, 2022
S.  AFCEC Ogallala Aquifer map of July 23, 2018
T.  Memorandum of W. Jordan Gillis, Ass't Sec. of Defense for Sustainment dated August 4, 2020

Charts and Images embedded in Affidavit:

Page 3:   Chart of eras of Highland Dairy milk production;
Page 8:   Three images of milk dumping operations at Highland Dairy;
Page 11:  Chart showing Highland Dairy testing from 2018 to 2021 and reflecting scores in parts per trillion for PFOS, Total PFAS and the FDA Standard of 400 ppt in milk;
Page 12:  Chart of the calculation of losses from milk sales for the period of October 2018 to April 2022;
Page 15:  Chart reflecting the losses of cattle from November 2018 to April 2022 totaling 3,665 head with image of deceased dairy cow;
Page 17:  Images of cow carcasses from 2018, 2019 and 2020;
Page 18:  Images of cow carcasses from June and December 2021; and,
Page 19:  Images of cow carcasses and composting trench from April 2022.

**Arthur F. Schaap Affidavit**
**Exhibit A**

# Overlay of USAF Acknowledgements of PFAS Plume
## and 2018-2023 Highland Dairy Test Results Evidencing Contamination



**PFAS Plume on Highland Acknowledged by the US Air Force:**

- Well Water on 711 Highland Dairy acres has tested above 70 ppt (Red Zone)

- Water on 1,200 acres has tested positive for PFAS (below 70 ppt) (Orange Zone)

- Current Combined Total (Red & Orange) acreage per Air Force: 1,911 acres

- 207 additional acres are within the "Zone of Concern" identified by the Air Force in 2018 (Yellow Zone)

- Total per USAF: 2,117 acres

**Highland Dairy Testing Evidencing Further PFAS Contamination:**

- Soil & Silage testing reveals further Contamination from Irrigation & Barn Yard Spread on 264 acres

- PFAS Contamination from Barn Yard Spread Alone: 1,212 Acres

- Total Acknowledged & Tested Contamination Acreage: 3,593 Acres

Legend:
Highland Dairy Acreage
USAF Testing > 70 ppt
USAF Testing < 70 ppt
2018 "Zone of Concern"

# Curry County Plaintiff Dairies & CAFB



**Arthur F. Schaap Affidavit**
**Exhibit B**



**DEPARTMENT OF THE AIR FORCE**
**27TH SPECIAL OPERATIONS WING (AFSOC)**
**CANNON AIR FORCE BASE NEW MEXICO**

Colonel Stewart A. Hammons                                             24 August, 2018
Commander
27th Special Operations Wing
1 Air Commando Way
Cannon Air Force Base, NM 88103

Dear Property Owner,

The Air Force is sampling drinking water wells in your area for the presence of perfluorooctanesulfonic acid (PFOS) and perfluorooctanoic acid (PFOA) as part of a service-wide program to determine if PFOS/PFOA contamination from our past mission activities poses a risk to drinking water supplies.

The Air Force recently completed a site inspection at Cannon Air Force Base and initial results indicate detectable levels of contaminants in some groundwater monitoring sites.  The United States Air Force and the United States Environmental Protection Agency recommend your water well be sampled for PFOS and PFOA in concentrations above the Environmental Protection Agency's lifetime health advisory levels.  Further sampling of off-base groundwater wells will be conducted at no cost to you by the Air Force Civil Engineer Center and your participation in the private well survey is very important to determine if your drinking water has been affected.

The sampling will take place within land inside the vicinity of Highway 467, Roosevelt Road and Highway 6, encompassing a four mile radius from the base boundary.

Upon completion of the sample-collection process and laboratory analysis, which is estimated to take approximately two months, results will be made available for your review.

Please find enclosed a Private Well Inventory Survey Form, as well as an information fact sheet about PFOS and PFOA.  As part of this effort, we are requesting you review the enclosed materials, fill out the survey and respond as soon as possible.

If you have any general questions about the information presented in this correspondence, please contact Cannon AFB Public Affairs at (575) 784-4131.  For any questions about the Air Force's water sampling program, please contact Mr. Sheen Kottkamp, Remedial Project Manager at (505) 846-7674.  Should you not be able to provide a completed survey upon receipt, you may mail the survey back to:

**AIR COMMANDOS**

*1*



Wood Environmental & Infrastructure Solutions
ATTN: Emma Driver
800 Marquette Ave, Suite 1200
Minneapolis, MN 55402

Cannon Air Force Base values its role in this community and sincerely appreciates your cooperation.

STEWART A. HAMMONS,
Colonel, USAF
Commander

2 Attachments:
1. PFOS / PFOA Fact Sheet
2. Cannon Well Inventory Survey Form



# PRIVATE WELL INVENTORY SURVEY

### Cannon Air Force Base

Date: _____

Map_____    Parcel_____    Town: _____

Name (Owner): _____

Name (Occupant): _____

Physical Address: _____

Mailing Address: _____

Contact Number: (owner) _____ (occupant) _____

Number of persons residing at this location:
Adults (18 and over)_____ Teenagers (13 to 17)_____ Children (12 and under) _____
Years at this residence: _____ Full-Time ☐    Seasonal ☐

1) From where do you obtain your drinking water?
   a) Municipal Water Supply ☐
   b) Well Water ☐

2) If you have a water well, please answer the following questions:
   a) Where is the well located on the property? _____
   b) Is the well in use?    Yes ☐    No ☐
   c) If yes, please check all that apply regarding the usage of your well water:
      Drinking ☐    Irrigation ☐    Livestock ☐    Other _____

   d) If no, is the well usable, unusable, or properly decommissioned?
      Usable ☐    Unusable ☐    Abandoned ☐ Method _____

   e) When was the well installed? _____
   f) What is the well depth? _____
   g) What is the well diameter? _____
   h) Do you have a copy of the well construction form or boring log?  Please attach a copy if you are able.
   i) Do you have any treatment on your well (e.g. softener)?  Please describe. _____

3) Sample Permission
   i) Does the Air Force have your permission to sample your private water supply well? Yes ☐    No ☐

_____          _____
Signature                                                          Date



**U.S. AIR FORCE**

### PRIVATE DRINKING WATER WELLS TO BE TESTED FOR
### PERFLUOROOCTANE SULFONATE (PFOS) AND PERFLUOROOCTANOIC ACID (PFOA)

The United States Air Force recently collected groundwater samples from a former fire training area near the Cannon Air Force Base property line as part of a base-wide site inspection for PFOS and PFOA. Sampling results showed PFOS and PFOA in the groundwater. Several factors are evaluated to determine additional locations for sampling, such as depth to groundwater, potential for the compounds to migrate off the base, and potential pathways for the contaminant to reach drinking water sources. The Air Force is now conducting an additional sampling effort in your area.

PFOS and PFOA are used in a variety of household and industrial products, including firefighting foam. PFOS and PFOA are components of legacy Aqueous Film Forming Foam (AFFF) — a firefighting agent the Air Force began using in the 1970s to extinguish petroleum fires; use of AFFF provides the United States Air Force with an essential firefighting capability to protect human lives, aircraft and facilities. Presently, a firefighting agent that contains no PFOS and only trace levels of PFOA is being used. The Air Force launched a comprehensive approach -- identify, respond, prevent -- to assess the potential for PFOS/PFOA contamination of drinking water, on and off installations, and respond appropriately. The USAF is coordinating closely with the United States Environmental Protection Agency (EPA).

PFOS and PFOA are not regulated under the Safe Drinking Water Act (SDWA), but EPA issued lifetime health advisory (LHA) levels for these chemicals in 2016. Using the EPA's guidance to assess contamination risks, the Air Force identified 200 installations where releases may have occurred, to include Cannon Air Force Base where the firefighting agent was historically used for fire training, equipment testing and emergency response incidents.

Upon receipt of sampling results, the Air Force will make yours available to you for your review. In the event the test results show levels above the EPA's LHA, the Air Force will take action to ensure you are provided clean water to drink, while actions will continue over the longer term to address the PFOS and PFOA sources. If PFOS or PFOA are detected, but at levels below the LHAs, the Air Force may request your permission to conduct further sampling, as needed, to evaluate concentrations. If the test results show no PFOS or PFOA, then no further sampling will be required.

## Questions and Answers

**Q: How do I get my drinking water well tested?**

A: Your drinking water well has been identified by the United States Air Force (USAF) within the four-mile radius for further sampling to ensure your drinking water well has not been affected. The four mile radius was derived from EPA guidance on Federal Facilities Remedial Site Inspection Summary Guide.

3

Review of the enclosed materials and signature of the private well survey authorizes the USAF to conduct sampling at no cost to you. Sampling is scheduled to begin during the week of August 27th, 2018.

**Q: Do I have to get my well tested?**

A: You are not required to have your private well tested; however, your well is located within the four-mile radius identified for further sampling to ensure your drinking water well has not been affected. The USAF, in consideration of the EPA health advisory, recommend that your well be tested to ensure the health and safety of your family. The testing process is quick and offered at no cost to residents.

**Q: What are PFOS and PFOA?**

A: PFOS and PFOA are manmade chemicals used for a wide variety of residential, commercial and industrial purposes. In 2016, the Environmental Protection Agency established health advisory levels for PFOS and PFOA at 70 parts per trillion (ppt) because of a potential risk to human health. Although PFOS/PFOA are unregulated and commonly used, the Air Force is taking aggressive measures to reduce the risk of mission-related PFOS/PFOA contamination to installation and supporting communities' drinking-water sources. More information can be found at the EPA website listed below.

## Additional Information

**Air Force PFOS/PFOA Web site:**
http://www.afcec.af.mil/Home/Environment/Perfluorinated- Compounds/

**EPA Website:**
https://www.epa.gov/ground-water-and-drinking-water/drinking-water-health-advisories-pfoa-and-pfos

**Agency for Toxic Substances and Disease Registry (ATSDR) Website:**
https://www.atsdr.cdc.gov/pfc/index.html

## Contact Us

**CAFB Public Affairs:**
JP Rebello, GS-11, DAF, Cannon Air Force Base Public Affairs
john.rebello@us.af.mil
(575) 784-4131 or email 27SOWPA.publicaffairs@us.af.mil

**CAFB Well Sampling Program:**
Mr. Sheen Kottkamp, GS-12, DAF, CAFB Remedial Project Manager (AFCEC)
sheen.kottkamp.1@us.af.mil  (509) 846-7674

4

**Arthur F. Schaap Affidavit**
**Exhibit C**



# DEPARTMENT OF THE AIR FORCE
## 27TH SPECIAL OPERATIONS WING (AFSOC)
## CANNON AIR FORCE BASE NEW MEXICO

Colonel Stewart A. Hammons                                    13 September 2018
Commander
27th Special Operations Wing
100 Air Commando Way
Cannon Air Force Base, NM 88103

Art Schaap
650 Curry Road O
Clovis, NM 88103

Dear Mr. Schaap,

    Thank you for allowing the Air Force to test the water from your wells for the compounds PFOA and PFOS. Below is a summary of the results for the samples collected at your property on August 24, 2018, designated as Sample IDs:

        CANNON-RES650-01-SP
        **PFOA (ppt): 539**
        **PFOS (ppt): 1,110**

        CANNON-RES650-02-SP
        **PFOA (ppt): 267**
        **PFOS (ppt): 404**

    According to the results, PFOA and PFOS were detected in your wells at a combined concentration at site 1 of 1,649 parts per trillion (ppt) and at site 2 of 671 ppt. The level in your water is above the Lifetime Health Advisory of 70 ppt issued by the U.S. Environmental Protection Agency (EPA) for these chemicals. Consistent with the EPA advisory, we recommend that your well water not be used for drinking, cooking, brushing teeth, or any other purposes in which the water is likely to be ingested. The Air Force standard is to provide you with one gallon of bottled water per resident per day until a more viable option can be put in place. Our team will work with you to facilitate delivery amounts, timelines and locations.

    PFOA and PFOS can come from other industrial sources, but in the absence of other known contributors, the Air Force intends to take these actions to protect your health because we

believe activities in national defense may have contributed to the contamination affecting your well. You can find more information about PFOA and PFOS at the EPA's website.

We appreciate your cooperation in allowing us to test your water wells and your patience as we work to fix this problem. If you have any questions or concerns regarding this matter, or if you would like additional information, please contact Mr. Sheen Kottkamp, Remedial Project Manager, Air Force Civil Engineer Center (AFCEC) at (505) 846-7674.

Sincerely,

STEWART A. HAMMONS,
Colonel, USAF
Commander

Comal
Rossel Kesley
575-799-7738

**Arthur F. Schaap Affidavit**
**Exhibit D**

# DOERR & KNUDSON, P. A.

## ATTORNEYS AT LAW

STEPHEN DOERR
RANDY KNUDSON

212 WEST FIRST
PORTALES, NEW MEXICO 88130
PHONE (575) 359-1289
FAX (575) 359-1898
lawyers@yucca.net
www.doerrandknudsonpa.com

October 5th, 2018

Colonel Stewart A. Hammons
Commander
27th Special Operations Wing
1 Air Commando Way
Cannon Air Force Base, NM 88103
c/o
John Rebello
john.rebello@us.af.mil
and
Chris Segura
Chief Installation Support Section
AFCEC/CZOW
2050 Wyoming Blvd. SE, Ste. 124
Kirtland AFB, NM 87117-5270

VIA REGULAR MAIL & FAX

### Re:    Toxic Tort Claim (Art Schaap)

Gentlemen,

I'm writing you on behalf of my clients Art and Renee Schaap the owners and proprietors of Highland Dairy which is located south of Cannon Air Force Base. We acknowledge receipt of Colonel Hammons letter dated August 27th, 2018 wherein my clients were advised that Cannon Air Force Base requested testing of wells belonging to my clients and later determined as reflected in Colonel Hammons letter of September 13th, 2018 that dangerous concentrations of PFOA and PFOS were detected in the wells used by Highland Dairy which exceed the lifetime Health Advisory of 70 ppt issued by the US Environmental Protection Agency (EPA) for these chemicals.

Although the Air Force is now supplying my clients with potable drinking water, their large dairy herd continues to use affected water which we believe has directly contributed to significant decreases in milk production for these cattle over the last several years, has placed those animals and my clients at substantial health risk due to long term exposure to these hazardous chemicals and has otherwise damaged my clients to a catastrophic degree, which is on-going.

1

In addition to the foregoing my client's dairy herd has suffered repeated exposure to these chemicals at a time when their milk was being supplied to the commercial dairy industry thereby potentially subjecting the public as whole to this threat.

We have reason to believe based upon correspondence that the USAF has been aware of this dangerous situation since 2014 but has simply ignored the same.

The purpose of this letter is to insist that the USAF immediately begin supplying potable water to the Highland Dairy herd in the amounts sufficient to continue the substantial commercial operations that are ongoing there. By taking these steps the USAF will be mitigating the substantial damages to my clients that you have created and which you continue to inflict upon them. The herd needs a minimum of four (4) tanker trucks of water delivered daily until more long-term solutions are provided by the USAF including equipment to filter the Highland Dairy wells.

I look forward to receiving your response with an outline of your plan to begin to immediately remediate this catastrophic situation.

Thank You.

Most Sincerely Yours,

DOERR & KNUDSON, P.A.

Randy Knudson, Esq.

RK: ar
Cc: Client, Stephen Doerr, Esq., Ray Vargas, Esq., David Houliston, Esq.

2

**Arthur F. Schaap Affidavit**
**Exhibit E**

# DOERR & KNUDSON, P. A.
## ATTORNEYS AT LAW

STEPHEN DOERR
RANDY KNUDSON

212 WEST FIRST
PORTALES, NEW MEXICO 88130
PHONE (575) 359-1289
FAX (575) 359-1898
lawyers@yucca.net
www.doerrandknudsonpa.com

October 12ᵗʰ, 2018

Colonel Stewart A. Hammons
Commander
27ᵗʰ Special Operations Wing
1 Air Commando Way
Cannon Air Force Base, NM 88103
c/o
John Rebello
john.rebello@us.af.mil

and

Chris Segura
Chief Installation Support Section
AFCEC/CZOW
2050 Wyoming Blvd. SE, Ste. 124
Kirtland AFB, NM 87117-5270

VIA ELECTRONIC MAIL, REGULAR MAIL & FAX

> Re:    *Toxic Tort Claim (Art Schaap)*

Gentlemen,

I am writing this letter as a follow up on behalf of our clients Art & Renee Schaap and Highland Dairy.  Let me be very clear that at this time, our clients are not interested in litigation and this letter is not to be taken as a threat of litigation.  Last week, we made a demand that CAFB make arrangements to provide water to our clients cattle so they would be able to continue operating their dairy facility.  My clients were contacted Monday, October 8ᵗʰ, by Dean Foods which purchases the dairy products from the Schaap's.  Dean Foods is apparently aware of the contaminants in the water and are requesting additional information on the same.

In addition, our clients have obtained analysis reports showing that PFOA's and PFOS's have been discovered in the milk from their cattle.  Our clients have requested additional testing, and there is a high probability that the PFOA's and PFOS's will also show up in the cattle's blood stream. Highland Dairy has used one well to water all of the crops that have been and which are currently being fed to their cattle. Tests on the water from this well shows it has approximately 200 times the acceptable limits of both PFOA

1

and PFOS contamination for drinking water.  Our clients have discontinued use of this well and are in the process of trying to set up additional wells to water the crops. Unfortunately, the PFOA's and PFOS's in the water has more then likely been absorbed by the crops that are growing or which have been harvested.  Our clients are working on obtaining additional testing in this area.

As a result of the contamination, our clients plan to change wells and obtain a new source of water for the cattle.  However, since they had been using this well to water the crops, more than likely those crops will no longer be used as a source of feed for their dairy herd.  In addition, if the test results show that the feed has unacceptable levels of PFOA's and PFOS's they will not be able to sell it for any other use, and more then likely, will end up having to destroy the same.

If Dean Foods notifies our clients that it will no longer accept/purchase any of the contaminated milk, the entire source of income for our clients will immediately cease. With the PFOA and PFOS in the milk and blood of our client's herd, they will no longer be able to sell their milk or sell any of their herd for consumption.  Our client's immediate needs have changed from four (4) tanker trucks of water delivered daily, to professional assistance in order to enable them to survive this disaster.

Our clients, and I believe a majority of the other dairy's in this immediate area are in need of professional assistance to remediate the problems associated with the PFOA and PFOS contamination.  Our preliminary research has found that there are perhaps up to three (3) different filtration systems that could be used by landowners on their ground water pumps to remove the PFOA's and PFOS's.  If the land owners and dairy operators within the zone of contamination can use filters or find other ways to clean their water, and continue their operation, it would be a tremendous relief to them, and a benefit to Curry County's economy.

Our clients are reaching out and requesting the Department of Defense work with and assist them in locating and securing individuals and entities who have the knowledge and experience to work with them and other affected landowners in the area and properly address the immediate needs of remediation in this area.  On behalf of our clients I am requesting the Air Force provide this form of assistance not only for the Schaap's, but for other dairy's and individuals in the affected area.

I look forward to hearing from you on this matter.

2

Most Sincerely Yours,

DOERR & KNUDSON, P.A.

Stephen Doerr, Esq.

SD: ar
Cc: Client, Randy Knudson, Esq., Ray Vargas, Esq., David Houliston, Esq.

**Arthur F. Schaap Affidavit**
**Exhibit F**



**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS AIR FORCE LEGAL OPERATIONS AGENCY

October 25, 2018

Mr. James L. Conrad
Chief, Environmental Restoration Branch
Air Force Environmental Law Field Support Center
AFLOA/JACE-FSC
2261 Hughes Avenue, Suite 154
JBSA Lackland, TX 78236-9852

Mr. Randy Knudson, Esq.
Doerr & Knudson, P.A.
212 West First
Portales, NM 88130

Dear Mr. Knudson,

This letter responds to your letters dated October 5, 2018 and October 12, 2018 to
Colonel Stewart Hammons and Mr. Chris Segura on behalf of Mr. Art Schaap and Ms. Renee
Schaap. In your October 5th letter, you requested the Air Force immediately begin supplying
potable water to the Schaap's dairy (Highland Dairy) because the wells used to water the herd
exceed the U.S. Environmental Protection Agency's (EPA's) lifetime health advisory levels for
perfluorooctane sulfonate (PFOS) and perfluorooctanoic acid (PFOA). In that letter, you said the
dairy needs at least four tanker trucks of water delivered daily to meet its water need for the herd.
In your October 12th letter, you changed your request from providing at least four tanker trucks
of potable water per day to providing "professional assistance" to help the Schaaps and other
affected landowners in the area to "remediate the problems associated with the PFOA and PFOS
contamination." By "remediate," we assume you mean to identify (and probably procure and
install) filtration systems to remove PFOS and PFOA from the wells that supply water to the
herd.

Thank you for your letters. The Air Force takes PFOS and PFOA contamination
seriously and is working very hard to ensure humans are protected from drinking water that
contains PFOS and PFOA in concentrations that exceed the EPA lifetime health advisory levels.
When the Air Force determines a drinking water supply has PFOS or PFOA concentrations
above the lifetime advisory levels and determines the concentrations are probably attributable, at
least in part, to Air Force activities and operations, the Air Force takes action to ensure affected
humans have drinking water available that meets the lifetime health advisory levels. The Air
Force's efforts to identify, investigate, and mitigate PFOS and PFOA contamination at this time
are limited to providing potable water for human consumption and do not extend to water uses
for irrigation, agriculture, or animal care. This position is largely driven by the absence of

scientific studies and applicable numerical criteria that address the impact of PFOS and PFOA on plants and animals. In addition, there is an absence of scientific findings or studies that address the effects of indirect ingestion by humans of PFOS and PFOA through, for example, the consumption of meat, milk, or fish. The Air Force's actions to address PFOS and PFOA contamination in drinking water supplies are being taken in accordance with the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, 42 U.S.C. §§ 9601-9675) and the Defense Environmental Restoration Program statute (DERP, 10 U.S.C. §§ 2700-2711) based on unacceptable risk as gauged against applicable numerical criteria. In the absence of applicable numerical criteria to measure risk, the Air Force lacks a means to determine the existence and extent of any risk to plants and animals, and any risk from indirect ingestion by humans, and therefore lacks legal authority to expend Congressionally appropriated funds to respond to perceived risks from PFOA/PFOS to anything other than water that is used for human consumption.

Sincerely,

James L. Conrad, GS-15, DAF
Chief, Environmental Restoration Branch
Air Force Environmental Law Field Support Center

cc:
27 SOW/CC (Colonel Stewart Hammons)
AFCEC/CZOW (Mr. Chris Segura)
27 SOW/PA (Mr. John Rebello)
27 SOW/JA (Mr. Derek Hirohata)
AFLOA/JACE-FSC (Mr. Joseph Cole)
AFLOA/JACE-FSC (Mr. John McCune)

**Arthur F. Schaap Affidavit**
**Exhibit G**

NmED

& EID

1. EPA to comm Standard Ast of PFOS

2. Current we have Adviory of PFOs

3. then FDA milk, meat, cheese

4. Resorce Conservation Recovr Act

— RCRA — cant get there till standerd is Given

5. Congressional Appropriation For Land Purchase to happen - ??

**Arthur F. Schaap Affidavit**
**Exhibit H**

# **Dairy**DIRECT

2711 N. Haskell Avenue, Suite 3400, Dallas, TX 75204   (866) 313.9473   dairydirectsupport@deanfoods.com

October 15, 2018

Art Schaap
Highland Dairy
650 Curry Rd.
Clovis, NM  88101

Dear Mr. Schaap:

On November 19, 2014, you executed a Milk Purchase Agreement (the "Agreement") with Dean Dairy Holdings, LLC and Suiza Dairy Group, LLC ("Buyer").

Pursuant to paragraph three of the Agreement, Buyer exercises its right to terminate the Milk Purchase Agreement, effective 90 days from the date of this letter.

Respectfully,

Brent Bunce
Senior Director, Dairy Procurement
214.303.3767

Producer # 350008

# MILK PURCHASE AGREEMENT

This Milk Purchase Agreement is entered into by Dean Dairy Holdings, LLC and Suiza Dairy Group, LLC, together with their subsidiaries ("Buyer") and _Highland Dairy_ ("Dairy Producer") located at _650 Curry Rd O, Clovis, NM 88_ whereby Buyer agrees to buy and Dairy Producer agrees to sell all Milk produced at the above listed farm subject to the terms of this Agreement.

1. Milk shall be defined as Grade A raw milk meeting all requirements of United States laws and regulations, except the somatic cell count shall meet EU standards as set forth by USDA (<400,000 3 month average), produced from cows not treated with artificial growth hormones, including rBST, and conforming to Buyer's minimum quality standards, as follows:

   - No Antibiotics, Drug Residues or Other Inhibitors
   - DMC < 100,000
   - Standard Plate Count ≤ 50,000 / mL
   - Titratable Acidity ≤ .16
   - Cooled and maintained at ≤ 36° F at farm
   - No Added Water (cryoscope minus 0.530 Hortvet)
   - No off flavors / color / odors
   - Sediment less than Grade 3
   - Not Ropey
   - No more than 1 in 10 weekly PI counts > 100,000

2. Buyer shall have the right to reject milk, not meeting the definition of Milk set forth above. Buyer shall dispose of rejected milk in its possession in accordance with Dairy Producer's instructions, so long as Dairy Producer promptly provides such instructions. Dairy Producer agrees to indemnify Buyer for all costs related to rejected milk.

3. This Agreement shall continue in full force and effect through _11-19-14_, after which either party may terminate the Agreement at any time upon ninety (90) days prior written notice.

4. Buyer agrees to pay Dairy Producer at least Federal Order prices, plus competitive or incentive premiums, if any, offered by Buyer to Dairy Producer for Milk received by Buyer.

5. Dairy Producer agrees to execute and comply with the terms of Buyer's current Affidavit Regarding Non-Use of Artificial Growth Hormones, including rBST. Dairy Producer acknowledges and agrees that non-compliance is grounds for immediate termination of this Agreement.

6. Dairy Producer shall maintain a measuring device that will provide accurate measurement of Milk sold hereunder. Property, title and risk of loss for Milk (or milk) sold hereunder shall remain with Dairy Producer until it is pumped into Buyer's silos. However, Dairy Producer hereby agrees to indemnify and hold Buyer (and its parent, directors, employees, and agents) harmless from and against any and all liability, damages, actions, claims, demands, costs and expenses (including reasonable attorneys' fees) to which Buyer may become subject by reason of Dairy Producer's negligence or failure to comply with its obligations hereunder, or of the failure of Milk (or milk) sold hereunder to comply with all applicable laws, rules and regulations, or of the presence in such Milk (or milk) at the time of acceptance by Buyer of artificial growth hormones, antibiotics, drug residues, other inhibitors, other contaminants or latent defects.

7. Dairy Producer agrees throughout the term of this Agreement to secure and maintain farm liability insurance coverage (or similar coverage) with minimum limits of $250,000 and to provide Buyer with a certificate of insurance showing that such coverage is in full force and effect.

8. Dairy Producer agrees to keep the terms of this Agreement confidential and to not disclose any Milk payment information, including information in Buyer's checks or statements, without Buyer's prior written consent.

**[DAIRY PRODUCER]**

By: _____

Title: _____Owner_____

Date: _____11-19-14_____

**DEAN DAIRY HOLDINGS, LLC / SUIZA DAIRY GROUP, LLC "BUYER"**

By: _____

Title: _____Authorized Agent_____

Date: _____12-16-14_____

Dean Producer Milk Purchase Agreement updated May 8, 2012

**Arthur F. Schaap Affidavit**
**Exhibit I**



New Mexico Department of Agriculture
Office of the Director/Secretary
MSC 3189
New Mexico State University
P.O. Box 30005
Las Cruces, NM 88003-8005
575-646-3007

October 31, 2018

*Via email to art.schaap@icloud.com*

Mr. Art Schaap
Highland Dairy

RE: Request to Inspect Public Records/Case Number 1018-79

Dear Mr. Schaap:

We received your October 30, 2018, request for a copy of the correspondence from FDA concerning action/tolerance levels for PFOS/PFOA. Enclosed are the requested records.

If you have any questions, please call Mr. Dustin Cox, division director Agricultural Production Services, at (505) 841-9425.

Sincerely,

Anthony J. Parra
Custodian of Public Records

cc:        New Mexico State University, General Counsel
           Mr. Dustin Cox

Enclosed:   Requested Records

| From: | Cox, Dustin |
|---|---|
| To: | PublicRecords |
| Subject: | FW: PFOS/PFOA in NM dairy |
| Date: | Tuesday, October 30, 2018 2:30:12 PM |

This s the email received that is being requested.

## Dustin Cox

Division Director
Ag Production Services
NM Dept. of Agriculture
1101 Camino de Salud NE
Albuquerque, NM 87102
(505) 383-9299 Office
(505) 220-8251 Cell
dcox@nmda.nmsu.edu

**From:** South, Paul <Paul.South@fda.hhs.gov>
**Sent:** Thursday, October 25, 2018 11:58 AM
**To:** Cox, Dustin <DCox@nmda.nmsu.edu>; Parra, Anthony <AParra@nmda.nmsu.edu>; Witte, Jeff M. <JWitte@nmda.nmsu.edu>
**Cc:** Pillsbury, Laura <Laura.Pillsbury@fda.hhs.gov>; McDermott, Catherine <Catherine.McDermott@fda.hhs.gov>; Sheehan, John <John.Sheehan@fda.hhs.gov>; Jones, William <William.Jones@fda.hhs.gov>; Farrar, Jeff A. <Jeff.Farrar@fda.hhs.gov>; Metz, Monica <Monica.Metz@fda.hhs.gov>
**Subject:** RE: PFOS/PFOA in NM dairy

Dear Mr. Cox,

Below please find FDA's calculated levels (screening levels) for PFOS in milk which would be considered a public health concern. We note the following:

- We used the EPA Reference Dose for PFOS of 0.02 µg/kg/day that is based on decreased absolute pup weight (10-13%) in F2 pups [Postnatal day (PND) 7-14)] in a 2-generation rat reproduction study (EPA 2016). Therefore, there is concern for susceptible life stages (pregnant women and young children).

- Screening levels (SL) for PFOS are based on 2011-2014 WWEIA/NHANES data, using the 2011-2014 Food Pattern Equivalents Databases (FPEDs) to determine proportions of milk (or milk equivalents) in WWEIA/NHANES foods.

- For SLs we typically do not consider background dietary exposure because we do not have sufficient exposure data. However, in rare instances we have developed a level of concern (LOC) that considers background exposure from other food sources because we have reliable exposure estimates from the Total Diet Study (TDS). With additional time, we could consider

background exposure from all sources based on CDC biomonitoring data for PFOS in the development of a more refined LOC.

Screening Levels for PFOS in Milk

| Subpopulation | PFOS "screening level" (ppt) |
|---|---|
| MF 2+ y | 1900 |
| F 16-49 y | 3500 |
| MF 0-6 y | 400 |

We hope this is helpful and we are happy to discuss further. Please note that the calculation above reflects an estimate about how we might evaluate potential health risks posed by PFOS in a milk product if we received a sample from interstate commerce containing PFOS. We do not have any established guidance to industry or internal to FDA on PFOS in milk or milk products and ask that you not cite our calculation in any public or enforcement actions.

If you have any questions about our analysis, please contact John or me.

Paul

*Paul South, Ph.D.*
*Director, Division of Plant Products and Beverages*
*Office of Food Safety*
*Center for Food Safety and Applied Nutrition*
*U.S. Food and Drug Administration*
*Email: Paul.South@fda.hhs.gov*
*Phone: 240-402-1640*

**From:** Farrar, Jeff A.
**Sent:** Thursday, October 25, 2018 1:09 PM
**To:** Cox, Dustin <DCox@nmda.nmsu.edu>; Witte, Jeff M. <JWitte@nmda.nmsu.edu>; Parra, Anthony <AParra@nmda.nmsu.edu>; Metz, Monica <Monica.Metz@fda.hhs.gov>
**Cc:** Pillsbury, Laura <Laura.Pillsbury@fda.hhs.gov>; McDermott, Catherine <Catherine.McDermott@fda.hhs.gov>; Sheehan, John <John.Sheehan@fda.hhs.gov>; South, Paul <Paul.South@fda.hhs.gov>; Jones, William <William.Jones@fda.hhs.gov>
**Subject:** RE: PFOS/PFOA in NM dairy

Absolutely.  Thanks Dustin.  John and Paul are the best go-to folks for this explanation via email.

Looping them in here.

Thanks!

---

**From:** Cox, Dustin <DCox@nmda.nmsu.edu>
**Date:** October 25, 2018 at 9:57:05 AM PDT
**To:** Farrar, Jeff A. <Jeff.Farrar@fda.hhs.gov>, Witte, Jeff M. <JWitte@nmda.nmsu.edu>, Parra, Anthony <AParra@nmda.nmsu.edu>, Metz, Monica <Monica.Metz@fda.hhs.gov>, South, Paul <Paul.South@fda.hhs.gov>
**Cc:** Pillsbury, Laura <Laura.Pillsbury@fda.hhs.gov>, McDermott, Catherine <Catherine.McDermott@fda.hhs.gov>
**Subject:** RE: PFOS/PFOA in NM dairy

Mr. Farrar,

Thank you for your coordination on this issue.  Based on our call yesterday and with the understanding of NMDA collecting milk and water samples next week, can FDA provide the "screening level" what that level means?

I am also finalizing the water sampling protocol and will be requesting approval soon.

Thank you,

# Dustin Cox

Division Director
Ag Production Services
NM Dept. of Agriculture
1101 Camino de Salud NE
Albuquerque, NM  87102
(505) 383-9299 Office
(505) 220-8251 Cell
dcox@nmda.nmsu.edu

**From:** Farrar, Jeff A. <Jeff.Farrar@fda.hhs.gov>
**Sent:** Wednesday, October 24, 2018 10:31 AM
**To:** Witte, Jeff M. <JWitte@nmda.nmsu.edu>
**Cc:** Cox, Dustin <DCox@nmda.nmsu.edu>; Pillsbury, Laura <Laura.Pillsbury@fda.hhs.gov>; McDermott, Catherine <Catherine.McDermott@fda.hhs.gov>
**Subject:** PFOS/PFOA in NM dairy

Secretary Witte,

Just wanted to circle back with you on the above issue, as per discussion last week.

CFSAN program and lab staff have had a couple of conversations with your staff over the last few days, to clarify our "screening level" for PFOS/PFOA and to review the NMDA sample collection protocol. Our dairy program staff will likely be contacting Dustin today to discuss specifics and timing for NMDA's sampling of water and bulk tank milk on the affected dairies.

It will be important for us both to have clarity on next steps and timing. We look forward to continuing to work with you and your staff.

Let me know if you have questions or want to discuss further. Thanks!


Jeff Farrar, DVM, MPH, PhD
Director of Intergovernmental Relations and Partnerships
Office of Foods and Veterinary Medicine
U.S. Food and Drug Administration
240-401-4926



Confidentiality Notice: New Mexico has a very broad public records law. Most written communications to or from state employees are public records. Your e-mail communications may therefore be subject to public disclosure. This e-mail, including all attachments is for the sole use of the intended recipients. Any unauthorized review, use, disclosure or distribution is prohibited unless specifically provided under the New Mexico Inspection of Public Records Act.


Confidentiality Notice: New Mexico has a very broad public records law. Most written communications to or from state employees are public records. Your e-mail communications may therefore be subject to public disclosure. This e-mail, including all attachments is for the sole use of the intended recipients. Any unauthorized review, use, disclosure or distribution is prohibited unless specifically provided under the New Mexico Inspection of Public Records Act.

**Arthur F. Schaap Affidavit**
**Exhibit J**



**New Mexico Department of Agriculture**
Dairy Division
2604 Aztec Rd. NE
Albuquerque, NM 87107-4222
505-841-9425, fax: 505-841-9426

November 5, 2018

Highland Dairy
Art Schaap
650 Curry Road O
Clovis, NM  88101

### NOTICE – GRADE A PERMIT SUSPENSION

Dear Mr. Schaap;

Samples collected from Highland Dairy on October 30, 2018 were sent to the Food and Drug Administration (FDA) laboratory for analysis for the presence of Per- and polyfluoroalkyl substances, specifically PFOS and PFOA.  Milk from your dairy was diverted from the human food chain starting on this date.

The milk samples collected tested above the level of concern set by the FDA making this permit suspension necessary.  All milk produced by Highland Dairy, permit number 085990, must not enter the food chain until samples show that the levels of PFOS and PFOA are below the level of concern.

Please do not hesitate to contact me at 505-220-8251 should you have any questions.

Sincerely,

Dustin Cox
Division Director
New Mexico Department of Agriculture

CC:      File

**Arthur F. Schaap Affidavit**
**Exhibit K**

Good morning all,

*This was sent out last November but just want to remind you of the issue*

Please be aware of dairy cattle from Highland Dairy near Clovis New Mexico is not eligible to be slaughtered and processed for human food.

The Food Safety and Inspection Service (FSIS or the agency) informed Meat Institute staff that the agency is working with the Food and Drug Administration and New Mexico state animal health officials on a case involving chemical contamination of a water source on a dairy operation, the Highland Dairy, near Clovis, New Mexico. Click here for recent media coverage of the contamination issue.

The water source is contaminated with the chemicals perfluorooctane sulfonate (PFOS) and perfluorooctanoic acid (PFOA). These chemicals are used as foaming agents for fire repellant, particularly at airports and Air Force bases. These chemicals bioaccumulate in humans and other animals, and can cause reproductive and developmental issues and possibly cancer.

The dairy has dumped all milk since state animal health officials became aware of the contamination (approximately 10 days ago), and the dairy is under strict orders not to ship animals to any federally-inspected establishments for slaughter for food. At this point, the agency considers the cows, and therefore any meat derived from them, "adulterated" and FSIS has informed state animal health officials the cattle should not be shipped to a federally-inspected establishment.

Gary A. Davis, DVM

Deputy District Manager

Dallas District Office

1100 Commerce St., Rm 516

Dallas, TX 75242

Gary.davis@usda.gov

Office: 214-767-9116

Cell: 214-763-7201

Fax: 844-622-0080

*WE ARENT ACCEPTING ANY CATTLE FROM HIGHLAND ARE WE?*

*THEY CALLED FOR A BID YESTERDAY.*

*UNTIL FSIS ISSUES A RELEASE WE CANT ACCEPT ANYTHING. IF THE CATTLE ARE DEEMED ADULTERATED, THEY ARE GOING TO BE CONDEMNED RIGHT?*

**Arthur F. Schaap Affidavit**
**Exhibit L**

**Joe Harris**

| | |
|---|---|
| **From:** | Tiffany Lee <americanmeat@meatinstitute.ccsend.com> on behalf of Tiffany Lee <americanmeat@meatinstitute.org> |
| **Sent:** | Tuesday, November 20, 2018 2:12 PM |
| **To:** | joe@southwestmeat.org |
| **Subject:** | Water Contamination on a New Mexico Dairy Operation and Implications Regarding Cattle Slaughter |



**NORTH AMERICAN
MEAT INSTITUTE**

**November 20, 2018**

**TO:**      **Members with Cattle Slaughter Establishments in Arizona,
California, Colorado, New Mexico, Texas, and Utah**

**FROM:**   **Tiffany Lee**

**SUBJECT:**   **Water Contamination on a New Mexico Dairy Operation and
Implications Regarding Cattle Slaughter**

The Food Safety and Inspection Service (FSIS or the agency) informed Meat Institute staff that the agency is working with the Food and Drug Administration and New Mexico state animal health officials on a case involving chemical contamination of a water source on a dairy operation, the Highland Dairy, near Clovis, New Mexico. Click here for recent media coverage of the contamination issue.

The water source is contaminated with the chemicals perfluorooctane sulfonate (PFOS) and perfluorooctanoic acid (PFOA). These chemicals are used as foaming agents for fire repellant, particularly at airports and Air Force bases. These chemicals bioaccumulate in humans and other animals, and can cause reproductive and developmental issues and possibly cancer.

The dairy has dumped all milk since state animal health officials became aware of the contamination (approximately 10 days ago), and the dairy is under strict orders not to ship animals to any federally-inspected establishments for slaughter for food. At this point, the agency considers the cows, and therefore any meat derived from them, "adulterated" and FSIS has informed state animal health officials the cattle should not be shipped to a federally-inspected establishment.

The agency's Office of Field Operations has instructed the Dallas district to inform inspectors in establishments in that district of this situation. NAMI is making members aware of the situation so they can work with in-plant FSIS personnel.

If you have questions about this memorandum or anything else regarding this matter, please contact me at tlee@meatinstitute.org or 202-587-4248.

CC:    Julie Anna Potts

       Barry Carpenter

       Mark Dopp

North American Meat Institute,
1150 Connecticut Ave NW, 12th Floor, Washington, DC 20036

SafeUnsubscribe™ joe@southwestmeat.org
Forward this email | Update Profile | About our service provider
Sent by americanmeat@meatinstitute.org in collaboration with

**Constant Contact**

Try it free today

**Arthur F. Schaap Affidavit**
**Exhibit M**

### Samples

| Average concentration ng/L (ppt) | PFOS | PFOA | PFBA | PFHpS | PFPeA | PFHxA | PFHxS | PFHpA | PFBS | PFPeS | NaDONA | HFPO-DA | PFDA | PFNA | 11Cl-PF3OUdS | 9Cl-PF3ONs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Milk method detection limit** | **24** | **42** | **29** | **13** | **15** | **7** | **17** | **27** | **14** | **17** | **22** | **24** | **28** | **39** | **28** | **23** |
| milk 85990 received 10.31.18 | 1620 | 36 | <MDL | 48 | 9.2 | <MDL | 295 | <MDL | 1.2 | <MDL | <MDL | <MDL | <MDL | <MDL | <MDL | <MDL |
| milk 085990 #1 received 11.8.18 | 5441 | <MDL | 148 | 239 | <MDL | <MDL | 1135 | <MDL | 0.98 | 8.6 | <MDL | <MDL | <MDL | <MDL | <MDL | <MDL |
| milk 085990 #2 received 11.8.18 | 3671 | <MDL | 14 | 151 | <MDL | <MDL | 734 | <MDL | 0.18 | 6.3 | <MDL | <MDL | <MDL | <MDL | <MDL | <MDL |
| milk 085990 #3 received 11.8.18 | 5681 | <MDL | 70 | 202 | <MDL | <MDL | 1168 | <MDL | 1.4 | 7.7 | <MDL | <MDL | <MDL | <MDL | <MDL | <MDL |
| milk 085990 #4 received 11.8.18 | 5211 | <MDL | 86 | 210 | <MDL | <MDL | 1110 | <MDL | 1.9 | 6.0 | <MDL | <MDL | <MDL | <MDL | <MDL | <MDL |
| milk 085990 #5 received 11.8.18 | 5331 | <MDL | 79 | 235 | <MDL | <MDL | 1085 | <MDL | 0.32 | 8.0 | <MDL | <MDL | <MDL | <MDL | <MDL | <MDL |
| milk 085990 received 12.14.19 | 2773 | 14 | < MDL | 108 | 20 | 25 | 551 | < MDL | 7.7 | 4.1 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| milk 085990 received 1.25.19 | 4920 | 169 | 220 | 181 | 89 | 108 | 1268 | 30 | 69 | 76 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| milk 085990 received 3.6.19 | 2218 | 53 | < MDL | 88 | < MDL | 15 | 704 | 4.3 | 4.4 | 3.9 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 5/7/19 | 4710 | 99 | < MDL | 195 | < MDL | 59 | 1938 | 9.9 | 28 | 31 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 6/12/19 | 2640 | 102 | < 0 | 97 | 42 | 42 | 822 | 15 | 15 | 20 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 8/8/19 | 2430 | 36 | < MDL | 62 | 40 | 44 | 753 | < MDL | 16 | 22 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 9/17/19 | 1926 | 26 | 32 | 59 | 23 | 22 | 457 | 6.2 | 9.4 | 9.3 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 10/9/19 | 2950 | 21 | 172 | 84 | < MDL | 23 | 546 | 1.3 | 14 | 11 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 11/17/19 | 1979 | < MDL | < MDL | 45 | < MDL | 14 | 394 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 12/13/19 | 2915 | < MDL | < MDL | 111 | < MDL | < MDL | 368 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 1/16/20 | 1635 | < MDL | 126 | 79 | < MDL | < MDL | 248 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 2.20.20 | 1610 | < MDL | < MDL | < MDL | < MDL | < MDL | 24 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 3.25.20 | 881 | < MDL | < MDL | 50 | < MDL | 23 | 177 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 6.11.20 | 2092 | 54 | 32 | 106 | 59 | 43 | 726 | < MDL | 15 | 45 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 7.29.20 | 1931 | 47 | 25 | 97 | < MDL | 55 | 465 | < MDL | < MDL | 36 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085900 milk received 9.3.20 | 1748 | < MDL | < MDL | < MDL | < MDL | < MDL | 367 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk 10.15.20 | 889 | < MDL | 29 | 38 | < MDL | < MDL | 97 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk 11.12.20 | 1176 | < MDL | < MDL | 55 | < MDL | 35 | 337 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk 12.10.20 | 1264 | < MDL | < MDL | 84 | < MDL | < MDL | 397 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 2/25/21 | 464 | 30 | 102 | < MDL | 30 | 40 | 130 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |
| 085990 milk received 4/1/21 | 532 | 43 | < MDL | < MDL | < MDL | 50 | 153 | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL | < MDL |

**Arthur F. Schaap Affidavit**
**Exhibit N**

# THE HILL

ENERGY & ENVIRONMENT

# Trump threatens veto on defense bill that targets 'forever chemicals'

BY REBECCA BEITSCH AND MIRANDA GREEN - 07/10/19 5:40 PM ET



One day after President Trump delivered a speech preaching of his administration's environmental achievements, he threatened to veto a military spending bill in part due to provisions that aim to clean up a toxic, cancer-linked chemical found near military bases.

"If H.R. 2500 were presented to the President in its current form, his advisors would recommend that he veto it," the White House wrote in a statement Tuesday night.

The House has not yet voted on its version of the National Defense Authorization Act (NDAA) but Trump on Tuesday highlighted among its various sticking points two provisions that would address the clean up of a class of chemicals abbreviated as PFAS.

PFAS is used in a variety of non-stick products as well as firefighting foams frequently utilized by the military. The chemical is known for its slow breakdown process, denoting it as a "forever chemical," making it particularly concerning as it leaches into the water supply.

Contamination has spread to as many as 43 states, according to the Environmental Working Group, and there are at least 400 military sites with known or suspected PFAS contamination. The military is facing $2 billion in clean up costs for PFAS.

While the Environmental Protection Agency has promised to release a new standard for PFAS found in drinking water by the end of the year, lawmakers on both sides of the aisle have been pushing forward with legislation to address what they consider a public health issue.

Some of those measures are already part of the NDAA. But the president highlighted two in his veto threat. One would phase out military use of firefighting foam with PFAS by 2025 while the other would require the Department of Defense (DOD) to treat contaminated water near bases that are used for agricultural purposes.

"At potentially great cost to and significant impact on DOD's mission, the legislation singles out DOD, only one contributor to this national issue," the White House statement said.

PFAS also enters the environment through manufacturing and municipal airports that likewise use firefighting foam.

"If the President wants to veto this bill because he thinks the PFAS provisions go too far, I invite him to drink, bathe, or swim in some of the water our communities do," Rep. Debbie Dingell (D-Mich.), whose state has several PFAS contamination sites, said in a statement. "Congress needs to act to address PFAS contamination wherever it exists and stop kicking the can down the road."

Democrats have pushed a variety of measures that would require the military to take greater action to stem the spread of PFAS and clean up

contamination, including requiring a Government Accountability Office review of the Department of Defense's (DOD) response to PFAS contamination and making DOD to enter into cooperative agreements with states for contamination cleanups.

It also includes a measure from Sen. Tom Udall (D-N.M.) requiring military assistance for farmers impacted by PFAS.

A Food and Drug Administration study presented abroad but leaked to U.S. media in June did testing from a dairy farm near an Air Force base in New Mexico and found that water contamination from the base had reached the cows and the milk they produced.

Udall said he has tried over and over again to get DOD to take accountability for damage to nearby farms.

"But how are New Mexicans repaid? With a veto threat from a president who bragged this week about his environmental record. It's totally disgraceful," Udall said on a call with reporters. "The livelihood of dairy farmers in New Mexico have been threatened or even ruined by toxins from neighboring Air Force bases and this administration will do nothing."

Some provisions are beyond the scope of the military, including a requirement for the Environmental Protection Agency (EPA) to regulate PFAS levels for drinking water and another that would make Superfund cleanup funds available for cleaning up PFAS contamination.

"With this veto threat, President Trump has said he would hold up funding for our troops because his administration does not want to act swiftly to eliminate toxic PFAS chemicals to protect service members and the communities that support them," Rep. Dan Kildee (D-Mich.), who authored several PFAS amendments for the NDAA, said in a statement.

The Senate has also passed its version of the NDAA with largely similar PFAS provisions, though it lacks the Superfund provision the House will vote on.

Facing the possibility that Congress might need to have enough votes to override Trump's veto, Udall said it was about putting community first.

"Congress must stand up to this president and override this veto," he said. "This is an extremely bipartisan issue, Republicans have already sponsored legislation, there should be overwhelming support for these amendments to

overturn a veto…Both sides need to organize to give these communities help."

**TAGS** <u>DAN KILDEE DAN KILDEE DEBBIE DINGELL DEBBIE DINGELL DEPARTMENT OF DEFENSE DOD DONALD TRUMP ENVIRONMENTAL PROTECTION AGENCY EPA NDAA PFAS PFOA TOM UDALL TOM UDALL</u>

Copyright 2024 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

**Arthur F. Schaap Affidavit**
**Exhibit O**

**Dr. Esteban's FSIS Visit to Highland Dairy**
**November 19, 2019**



**Driving Past Cattle Pens with Dairy Barn and Water Tanks in View**



**Highland Employees Milking Cows During Evening Shift**



**Still Shot from Video of Milking Operation**



**FSIS Staff Touring Dairy**



**Dr. Esteban (Right, Front) with Me (in Ball Cap) and FSIS Staff**

September 30, 2019

As part of the exposure assessment conducted to support regulatory action regarding the dairy herd exposed to PFAS in New Mexico, FSIS, in collaboration with ARS, APHIS, and the New Mexico State University, obtained blood samples from 179 animals, representative of different ages and phases. The samples were tested for the presence of PFAS (data previously shared with OMB and the Technical Working Group). In addition, we procured a subset of these animals (30 in total) and removed them from exposure to contaminated water/feed by transporting them to a facility at the New Mexico State University in Las Cruces.

Two weeks after resettling, we slaughtered 20 of the procured animals and performed necropsies to determine if there was any remarkable pathology that could be a consequence of the exposure to PFAS. After detailed evaluation, we did not observe any consequential pathologies. At the time of necropsy, we also collected muscle and blood samples.

The rest of the cohort, 10 animals, were monitored over the course of ~20 weeks and plasma samples were collected bi-weekly. The average plasma concentration of PFOS declined from the original 62 ppb at the farm to 19 ppb by the 18th week post removal from exposure. The average PFOS muscle concentration of the 20 animals slaughtered at 2 weeks post removal was 3.6 ppb, whereas the average PFOS muscle concentration of the animals that were slaughtered between 19 and 22 weeks post removal was 1.4 ppb.

We can document that PFOS depleted significantly in both plasma and muscle, after removal from the exposure source. This suggests there are potential risk mitigation options that could be considered for this and other situations.



## Samples taken from cows on farm (plasma)

| DRY Cows | | |
|---|---|---|
| | pg/uL PFOA | pg/uL PFOS |
| Mean | 0.19 | 70.97 |
| Minimum | 0.00 | 33.94 |
| Maximum | 1.02 | 130.00 |
| Count | 98 | 98 |

| LACTATING Cows | | |
|---|---|---|
| | pg/uL PFOA | pg/uL PFOS |
| Mean | 1.37 | 81.27 |
| Minimum | 0.44 | 37.92 |
| Maximum | 4.09 | 123.98 |
| Count | 30 | 30 |

| YOUNG Cows | | |
|---|---|---|
| | pg/uL PFOA | pg/uL PFOS |
| Mean | 0.37 | 36.41 |
| Minimum | 0.00 | 14.13 |
| Maximum | 1.72 | 62.83 |
| Count | 38 | 38 |

| Fetus | | |
|---|---|---|
| | pg/uL PFOA | pg/uL PFOS |
| Mean | 0.01 | 4.14 |
| Minimum | 0.00 | 2.72 |
| Maximum | 0.03 | 5.20 |
| Count | 4 | 4 |

| UNKNOWN Cows | | |
|---|---|---|
| | pg/uL PFOA | pg/uL PFOS |
| Mean | 0.10 | 47.70 |
| Minimum | 0.00 | 20.65 |
| Maximum | 0.33 | 61.92 |
| Count | 9 | 9 |

| OVERALL Cows | | |
|---|---|---|
| | pg/uL PFOA | pg/uL PFOS |
| Mean | 0.42 | 62.60 |
| Minimum | 0.00 | 2.72 |
| Maximum | 4.09 | 130.00 |
| Count | 179 | 179 |

## Subset of 20 cows that were purchased and sacrificed

| | Plasma pg/uL PFOS at farm | | | Plasma pg/uL PFOS at necropsy (2 weeks after removal) | | |
|---|---|---|---|---|---|---|
| | Average | Min | Max | Average | Min | Max |
| Dry | 69.25 | 56.32 | 87.36 | 62.30 | 55.64 | 68.57 |
| Lactating | 66.42 | 37.92 | 90.22 | 52.15 | 22.17 | 94.48 |
| Young | 31.16 | 14.13 | 55.65 | 31.50 | 15.42 | 54.99 |

| | Muscle pg/uL PFOS at necropsy (2 weeks after removal) | | |
|---|---|---|---|
| | Average | Min | Max |
| Dry | 3.71 | 2.81 | 4.42 |
| Lactating | 3.69 | 1.94 | 4.94 |
| Young | 3.21 | 1.99 | 4.15 |

## ON FARM DATA SUMMARY (PFOS) -- PLASMA

- 179 samples tested.  Samples were collected to be representative of the entire herd.
  - PFOS average 62.6 ppb, min 2.72 ppb, max 130 ppb
- 98 dry cows
  - PFOS average 70.97 ppb, min 33.94 ppb, max 130.0 ppb
- 30 lactating cows
  - PFOS average 81.27 ppb, min 37.92 ppb, max 123.98 ppb
- 38 young cows (less than one year of age)
  - PFOS average 36.41 ppb, min 14.13 ppb, max 62.83 ppb
- 9 Unknown age
  - PFOS average 57.88 ppb, min 20.65 ppb, max 61.92 ppb

## AT NECROPSY (approximately +2 weeks from removal) DATA SUMMARY (PFOS) --- PLASMA

- 5 dry cows
  - PFOS average 69.25 ppb, min 56.32 ppb, max 87.36 ppb
- 10 lactating cows
  - PFOS average 66.42 ppb, min 37.92 ppb, max 90.22 ppb
- 5 young cows (less than one year of age)
  - PFOS average 31.16 ppb, min 14.13 ppb, max 55.65 ppb

## AT NECROPSY (approximately +2 weeks from removal) DATA SUMMARY (PFOS) --- MUSCLE

- 5 dry cows
  - PFOS average 3.71 ppb, min 2.81 ppb, max 4.42 ppb
- 10 lactating cows
  - PFOS average 3.69 ppb, min 1.94 ppb, max 4.94 ppb
- 5 young cows (less than one year of age)
  - PFOS average 3.21 ppb, min 1.99 ppb, max 4.15 ppb



| Cow Number [a] | Category | Date of Birth [b] | # of Lactations | Estimated Age [c] | Days in Milk [d] | 15-03-19 0 Weeks | 29-03-19 2 weeks | 12-04-19 4 weeks | 26-04-19 6 weeks | 10-05-19 8 weeks | 24-05-19 10 weeks | 01-06-19 11 weeks | 07-06-19 12 weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | pg/uL PFOA [c,d,e] | pg/uL PFOA [c,d] | pg/uL PFOA [c,d] | pg/uL PFOA [c,d] | pg/uL PFOA [c,d] | pg/uL PFOA [c,d] | pg/uL PFOA [c,d] | pg/uL PFOA [c,d] |
| 1833 | Lactating | 15-11-14 | 3 | 5 | 110 | 0.38 | 0.47 | 0.17 | 0.19 | 0.19 | 0.47 | 0.24 | 0.20 |
| 7840 [f] | Lactating | 18-04-10 | 7 | 9 | 116 | 0.47 | 0.35 | 0.22 | 0.17 | 0.22 | | | |
| 23389 [g] | Lactating | 17-10-10 | 8 | 10 | 10 | 0.30 | 0.40 | 0.12 | 0.07 | 0.17 | | | |
| 33866 | Lactating | 23-01-14 | 4 | 6 | <10 | 0.40 | 0.38 | 0.13 | 0.17 | 0.16 | 0.24 | 0.29 | 0.31 |
| 38679 | Lactating | 02-04-15 | 2 | 4 | 62 | 0.37 | 0.32 | 0.14 | 0.14 | 0.17 | 0.23 | 0.22 | 0.26 |

a Purchased Animals.

b Only received date of birth for purchased animals.

c Estimated age based on number of lactations + 2 years. For young estimated age based on birthdate .

d Days in Milk on date of 3/19/2019.

e Red values are preliminary, extracts are being reanalyzed on LC-MS. Also, PFOA data have not been removed based on LOD or LOQ, so some of the low values might be removed later.

f 7840 Lactating cow died on 5/19/2019, received plasma, ear, feces samples. Necropsy sample, just shy of 10 weeks.

g 23389 Lactating cow died on 6/24/2019, received plasma, ear, muscle, kidney, and liver samples. Necropsy sample, just over 14 weeks.

PFOA levels appear to be background, similar concentrations are observed in the negative control milk samples.

PFOS Milk pg/uL

| Date | Weeks | Analyte | V1 | V2 | V3 | V4 | V5 |
|------|-------|---------|----|----|----|----|----|
| 21-06-19 | 14 weeks | pg/uL PFOA | 0.30 | 0.24 | 0.19 | | |
| 05-07-19 | 16 weeks | pg/uL PFOA | 0.25 | 0.22 | 0.25 | | |
| 19-07-19 | 18 weeks | pg/uL PFOA | 0.25 | 0.26 | 0.22 | | |
| 02-08-19 | 20 weeks | pg/uL PFOA | 0.20 | 0.20 | | | |
| 15-03-19 | 0 weeks | pg/uL PFOS | 3.09 | 3.26 | 1.08 | 1.84 | 0.89 |
| 29-03-19 | 2 weeks | pg/uL PFOS | 2.98 | 15.58 | 2.34 | 0.56 | 1.17 |
| 12-04-19 | 4 weeks | pg/uL PFOS | 1.72 | 5.55 | 0.54 | 0.68 | 0.29 |
| 26-04-19 | 6 weeks | pg/uL PFOS | 0.23 | 5.91 | 1.29 | 0.32 | 0.16 |
| 10-05-19 | 8 weeks | pg/uL PFOS | 1.58 | 11.05 | 2.46 | 0.23 | 0.48 |
| 24-05-19 | 10 weeks | pg/uL PFOS | 0.37 | 1.15 | 0.30 | 0.27 | |
| 01-06-19 | 11 weeks | pg/uL PFOS | 0.28 | 2.72 | 1.77 | 0.34 | |
| 07-06-19 | 12 weeks | pg/uL PFOS | 0.88 | 2.88 | 0.91 | 0.20 | |
| 21-06-19 | 14 weeks | pg/uL PFOS | 1.51 | 0.29 | 0.31 | | |
| 05-07-19 | 16 weeks | pg/uL PFOS | 0.92 | 1.44 | 0.16 | | |
| 19-07-19 | 18 weeks | pg/uL PFOS | 0.94 | 0.38 | 0.18 | | |
| 02-08-19 | 20 weeks | pg/uL PFOS | 0.51 | 0.32 | | | |

**Arthur F. Schaap Affidavit**
**Exhibit P**



**United States Department of Agriculture**

Food Safety and
Inspection Service

1400 Independence
Avenue, SW.
Washington, D.C.
20250

December 5, 2019

**RECEIVED**

**DEC 1 2 2019**

The Honorable Jeff M. Witte, Secretary
New Mexico Department of Agriculture
MSC 3189, Box 30005
Las Cruces, NM 88003-8005

Dear Secretary Witte,

On October 22, 2019, FDA and USDA sent you a letter stating that absent any further
action to mitigate herd exposure, the cattle at the Highland Dairy in Clovis, NM and the
milk produced by these animals are considered adulterated under applicable statutes and
should not enter the food supply. Since then, USDA scientists have developed the
enclosed protocol that mitigates the exposure of these animals to perfluorooctane
sulfonate (PFOS) and ensures that public health is fully protected with respect to any
meat derived from these cattle. The protocol involves providing only clean water to the
affected cattle for at least 45 days, followed by testing of blood samples from a subset of
the animals to ensure that PFOS concentrations have decreased to a level where meat
derived from the cattle would no longer be considered adulterated under the Federal
Meat Inspection Act.

Cattle from the Highland Dairy that successfully complete this protocol may be
presented for slaughter, and meat from these cattle may enter commerce, subject to the
same USDA regulations and inspection as other cattle presented for slaughter at USDA-
inspected establishments. Please note that the offal from the animals from this herd will
be considered adulterated, whether or not they successfully complete the mitigation
protocol. Questions related to the disposition of the milk produced by these animals
should be directed to FDA, as milk is not within the jurisdiction of USDA.

Successful implementation of this mitigation protocol will depend on support from the
State of New Mexico and your agency. As I discussed with Dr. Hanosh on November 19,
USDA and NMDA will need to collaborate closely to verify adherence to the protocol
and to ensure that individual animals are identified and tracked and that blood samples
from the affected cattle are properly collected and shipped to the USDA/FSIS laboratory
in St. Louis, MO. If you have questions about the protocol or its implementation, please
contact me at emilio.esteban@usda.gov. Thank you for your continued patience and
efforts in this matter.

Sincerely,

**JOSE ESTEBAN** Digitally signed by JOSE
ESTEBAN
Date: 2019.12.06 11:02:53
-05'00'

J. Emilio Esteban, DVM, PhD
Chief Scientist
USDA Food Safety and Inspection Service

Enclosure: Protocol
Copy to: Art Schaap, Highland Dairy

An Equal Opportunity Provider and Employer

**PROTOCOL**

**Scope**

This protocol allows affected cattle from the Highland Dairy ("the dairy") to be presented for slaughter at USDA-inspected establishments if the steps below are successfully completed and documented. Meat derived from affected cattle that complete this protocol will not be considered adulterated due to the animals' exposure to PFOS at the dairy, but the animals and meat products remain subject to all USDA regulations and inspection procedures.

This protocol does not apply to offal or milk from the affected cattle. USDA has determined that offal from affected cattle is adulterated, because PFOS may concentrate in the offal and because no screening level for PFOS in offal has been set by USDA or FDA. Milk is subject to the jurisdiction of FDA.

"Affected cattle" are defined as any cattle that, at any point in their lives, have been located at the dairy and have consumed the PFOS-contaminated water there. "Clean" water is water that has been documented to meet the EPA health advisory level of 70 parts per trillion (ppt) combined PFOS and PFOA. This protocol applies only to the current herd stock: replacement animals, if kept on clean water and feed from the moment they join the herd at the dairy, would not meet the definition of "affected cattle" and would not be subject to restrictions.

**Procedure**

1. Affected cattle intended for slaughter should be separated into lots. The animals in each lot must remain physically together and on the same water and feed sources throughout their remaining time at the dairy.

2. The dairy shall provide a list of unique identifiers, such as ear-tag numbers, for all animals in each lot to the New Mexico Department of Agriculture (NMDA). From this point forward, no animals may be added to or removed from a lot. If an animal dies, the animal's unique identifier and the date of death must be recorded.

3. When the dairy is ready to switch a lot of affected cattle to clean water, either by moving the lot to a different location or by providing clean water at the dairy, the dairy shall contact NMDA.

4. Before the dairy switches the lot(s) of affected cattle to clean water, NMDA shall:
    a. Collect samples of the replacement source water that will be provided to the affected cattle and document that it is clean.
    b. Verify the list of animals and identifiers provided by the dairy for each lot.
    c. Randomly select a subset of 70 animals from each lot using the verified list.
    d. Collect blood samples from each of these randomly selected animals and send the samples to the USDA/FSIS laboratory.
   The collection of water and blood samples can be performed by any qualified individual, but the collection must be supervised and verified by NMDA.

5. As soon as practical after step 4 is complete, the dairy shall switch the lot(s) of animals to the new clean water source. The dairy should also consider ensuring that the animal feed and forage are free of PFOS, as the presence of PFOS could extend the time it will take until the animals are ready to go to slaughter.

6. Once the lot(s) of affected animals has/have been continually on clean water for at least 45 days and the dairy is ready to send the lot(s) to slaughter, the dairy will contact NMDA to initiate the second round of sample collection.

7. Once the dairy has contacted NMDA, NMDA shall
   a. . Collect samples of the clean water that is being provided to the lot(s) of affected cattle and analyze these samples for PFOS.
   b. Verify that the list of animals and identifiers for each lot remains accurate and that no animals have been moved in or out of the established lots.
   c. Collect blood samples from the same animals from which samples were collected in step 4 and send these samples to the USDA/FSIS laboratory.
   As in step 4, the collection of water and blood samples can be performed by any qualified individual, but the collection must be supervised and verified by NMDA.

8. Within a week of receiving the blood samples, USDA will analyze them for PFOS and inform NMDA of the results. If the average PFOS level in the plasma of the sampled animals from a given lot exceeds 35 parts per billion (ppb), that lot of animals may not proceed to slaughter at that time. In this case, the dairy may request that NMDA repeat step 7 after additional time has passed (USDA recommends waiting at least two weeks before additional samples are collected from the animals).

9. If the average PFOS level in the plasma of the animals sampled from a given lot does not exceed 35 ppb, USDA will advise NMDA that the lot is cleared to proceed to slaughter.

10. NMDA will provide the USDA/FSIS Dallas District Office with the final list of animals in each cleared lot. Any changes to this list that occurred since the list was created in step 2 should be explained (for example, if an animal died).

11. The dairy must ensure that all animals in cleared lots remain on clean water until they leave the dairy.

12. The dairy shall inform any purchaser of cattle from cleared lots that the offal from these animals may not be used for human or animal food products. The dairy shall provide the name and contact information of each purchaser to the USDA/FSIS Dallas District Office. Before the animals are taken to slaughter, either the dairy or the purchaser(s) shall provide the name of the establishment where the cattle will be slaughtered and the expected slaughter date to the USDA/FSIS Dallas District Office. This will allow USDA inspection personnel to verify that the offal from these animals is destroyed and does not enter commerce. Any other questions on the suitability of these animals for slaughter should also be referred to the USDA/FSIS Dallas District Office.

**USDA Contacts**

| | |
|---|---|
| For general questions on this protocol: | Dr. Emilio Esteban, FSIS Chief Scientist emilio.esteban@usda.gov, 202-690-9058 |
| For questions on the preparation and shipping of blood samples: | Dr. Terry Dutko, Director of the Midwestern Laboratory terry.dutko@usda.gov, 314-263-2686 Ext. 344 |
| For questions on the slaughter of cleared lots of cattle: | Dr. Jennifer Beasley-McKean, Dallas District Manager Jennifer.mckean@usda.gov, 214-767-1253 |

**Arthur F. Schaap Affidavit**
**Exhibit Q**

**INVOICE**

## HIGHLAND DAIRY

*Family Owned and Operated since 1992*

**650 Curry Road O**
**Clovis, New Mexico  88101**

| | |
|---|---|
| **INVOICE NO.** | **22-NMED-01** |
| **DATE** | **6/30/2022** |
| **PERIOD** | **Current** |
| **CUSTOMER ID** | **NMED** |

Attn: Art Schaap
Tel (575) 760-6455

art.schaap@icloud.com

**TO**

**NEW MEXICO ENVIRONMENT DEPARTMENT**
**Resource Protection Division**
**Harold Runnels Building, Ste. 4050**
**1190 St. Francis Drive**
**Santa Fe, New Mexico  87502**
Attn: Chris Catechis, Acting Director
Bruce Baizel, Esq., General Counsel
chris.catechis@state.nm.us; bruce.baizel@state.nm.us

| TOPIC | PAYMENT TERMS |
|---|---|
| Hazardous Waste Disposal - PFAS in the Highland Dairy cattle herd (3,665 head of Adult Dairy Cows presently in compost pursuant to USDA FSA Disposal & Removal Plan approved by NMED on May 20, 2022, and as reflected in the NM Hazardous Waste Fund Application of May 12, 2022.) This application pertains only to services provided in FY '21-22, with 2,308 deaths recorded in that time frame, with 3,450.6 animal carcasses placed in compost in Disposal Trench 2C during this time frame (taking into consideration the diminution in carcass weights as a result of prior composting activities), and with calculations where applicable to the 3,665 animals composted in total. | Upon Receipt & Approval |

| DESCRIPTION | QUANTITY | RATE | TOTAL |
|---|---|---|---|
| **1. Establishment of Composting Facility.**  Disposal Trench 2C measuring 74' x 200' x 12' depth on the Highland Dairy Premises (costs measured in square footage per NRCS regulations) | 14,800 | $20.69 | **$306,212.00** |
| **2. Depopulation Exercise of PFAS Contaminated Cows.** Euthanization of 964 head of adult cows from December 2021 and April 2022 | 964 | $80.00 | **$77,120.00** |
| **3. Composting of Deceased Adult Cow Carcasses.** | | | |
| **3.a Materials.** | | | |

| | | | |
|---|---|---|---|
| **a.1 Pushout Feed.** Includes 4.8 tons per animal @ $165.00 per ton, discounted by 80% | 3,450.60 | $158.40 | **$546,575.04** |
| **a.2 Manure.** 500 lbs per animal @ $40.00 per ton | 3,450.60 | $10.00 | **$34,506.00** |
| **a.3 Monthly Water Applications** | 3,450.60 | $0.85 | **$2,933.01** |
| **a.4 Top-Layer of Manure. 500 tons** | 3,450.60 | $30.08 | **$103,794.05** |
| **a.5 Fencing Material. Surrounding Disposal Trench 2C (to be acquired in FY '22-'23)** | 1,477.00 | $0.00 | **$0.00** |
| | | | |
| **3.b Equipment** | | | |
| **b.1 July '21 - June '22 Cattle Composting Operations.** | | | |
| **1.a John Deere Front-End Loader.** Used daily for 50% of the operations, $3,000 per month for 10 months (July '21 to April '22) | 10.00 | $1,500.00 | **$15,000.00** |
| **1.b Loader Fuel.** $4.59 per gallon, 1.5 gallons per animal | 2,308.00 | $6.89 | **$15,890.58** |
| **1.c Loader Insurance.** $300 per month for 10 months | 10.00 | $300.00 | **$3,000.00** |
| **1.d Caterpillar Grader.** Used monthly for three days / 10 mo. grading the Disposal Trench. | 10.00 | $360.00 | **$3,600.00** |
| **1.e Grader Fuel.** $4.59 per gallon, 0.25 gallons per animal | 2,308.00 | $1.15 | **$2,648.43** |
| **1.f Grader Insurance.** | 10.00 | $300.00 | **$3,000.00** |
| **b.2 April 2022 Composting Operation** | | | |
| **2.a Four John Deere Front-End Loaders.** 17 days (55% of monthly cost) | 4.00 | $1,650.00 | **$6,600.00** |
| **2.b Loader Fuel.** $5.55 per gallon, 1.5 gallons per animal | 3,450.60 | $8.33 | **$28,726.25** |
| **2.c Caterpillar Grader / Pusher.** | 1.00 | $3,000.00 | **$3,000.00** |
| **2.d Grader / Pusher Fuel.** $5.55 per gallon, 0.5 gallons per animal | 3,450.60 | $2.78 | **$9,575.42** |
| | | | |
| **4. Mobilization** | | | |
| **4.a 10 Months of Operations (June '21 to April '22)** | | | |
| **a.1 Labor.** 1.8 hrs @ $22.50 per hour (including FICA, taxes, etc.) for individually deceased animals. Rate calculated per deceased animal and therefore incorporates costs for the 2,308 but excludes the 866 animals deceased prior to the 866 head depopulated in April 2022. | 1,442.00 | $40.50 | **$58,401.00** |
| **a.2 Management.** 2.5 / 40 hours per week, salary of $85,000 at an average of 2.05 cows dying per day for 10 months | 10.00 | $456.92 | **$4,569.18** |
| **a.3 Employer's Accounting, Overhead.** | 3,665.00 | $5.40 | **$19,791.00** |
| **4.b April 2022 Composting Operation.** | | | |
| **b.1 Labor.** Total of 136 hours per worker @ $22.50 (including FICA, taxes, etc.). Five workers. | 5.00 | $3,060.00 | **$15,300.00** |

| | | | |
|---|---|---|---|
| **b.2 Administrative Support.** Professional advisory and compliance services @ $300.00 / hr | 260.00 | $300.00 | **$78,000.00** |
| **b.3 Management.** Two managers, 150 hours each, based on salary of $85,000 p.a. | 300.00 | $42.50 | **$12,750.00** |
| **b.4 Employer's Accounting, Overhead.** | 3,665.00 | $1.00 | **$3,665.00** |
| **Grand Total for FY '21-'22 Only** | | | **$1,354,656.95** |
| **Reduction for Limitation of Haz. Waste Fund for FY '21-'22** | **-37.25%** | | **-$504,656.95** |
| **Adjusted Invoice Total** | | | **$850,000.00** |
| | | | |
| Finance Charge | $0.00 | 1.50% | **$0.00** |
| | | TOTAL | $    850,000.00 |

*Payable by Check to:  "Highland Dairy"*

***Thank You!***
*US Tax ID No.: 85-0359714*

# INVOICE

## HIGHLAND DAIRY

*Family Owned and Operated since 1992*

**650 Curry Road O**
**Clovis, New Mexico  88101**
   **Attn: Art Schaap**
   **Tel (575) 760-6455**
art.schaap@icloud.com

| | |
|---|---|
| **INVOICE NO.** | **23-NMED-01** |
| **DATE** | **4/7/2023** |
| **PERIOD** | **Current** |
| **CUSTOMER ID** | **NMED** |

DRAFT

**TO**

**NEW MEXICO ENVIRONMENT DEPARTMENT**
**Resource Protection Division**
**Harold Runnels Building, Ste. 4050**
**1190 St. Francis Drive**
**Santa Fe, New Mexico  87502**
   **Attn: Chris Catechis, Acting Director**
      **Bruce Baizel, Esq., General Counsel**
chris.catechis@state.nm.us; bruce.baizel@state.nm.us

| TOPIC | PAYMENT TERMS |
|---|---|
| Hazardous Waste Disposal - PFAS in the Highland Dairy cattle herd (3,665 head of Adult Dairy Cows presently in compost pursuant to USDA FSA Disposal & Removal Plan approved by NMED on May 20, 2022, and as reflected in the NM Hazardous Waste Fund Application of May 12, 2022.) This application supplements the June 30, 2022 Invoice (22-NMED-01) which was limited by HWD fund limitations; and includes the balance of $504,656.95 and a further $251,786.28 incurred (and to be incurred) in the course of FY '22-23 on this waste removal project. | Upon Receipt & Approval |

| DESCRIPTION | QUANTITY | RATE | TOTAL |
|---|---|---|---|
| **1. Balance Due from FY 2021-22.** | | | **$504,656.95** |
| | | | |
| **2. Composting of Deceased Adult Cow Carcasses.** | | | |
| **2a Materials.** | | | |
|    **1. 12 Monthly Water Applications (1000 glns)** | 720.00 | $0.85 | **$7,344.00** |
|    **2. Manure ($40.00 per ton)** | 1,500.00 | $40.00 | **$60,000.00** |
|    **3. Fencing Material. Surrounding Disposal Trench** | | | |
| **2C (to be acquired)** | | | |
|       **a. Fence Posts & Hardware** | 1,477.00 | $3.75 | **$5,538.75** |
|       **b. Wire Strand** | 7,385.00 | $0.25 | **$1,846.25** |
| | | | |
| **2b Equipment - July '22 to June '23 Cattle** | | | |
| **Composting Operation** | | | |

| | | | |
|---|---|---|---|
| **1. Two Caterpillar Graders / Pushers.** Used monthly for 12 months stirring and shifting the composted materials; blending new manure. $3,000 per month for 10 months (July '21 to April '22) | 24.00 | $1,500.00 | **$36,000.00** |
| **2. Cat Grader / Pusher Fuel.** $6.89 per gallon, 2 @ 50 gallons per month (18 hrs of operations, 2 gallons per hour) | 324.00 | $6.89 | **$2,230.74** |
| **3. Cat Grader / Pusher Insurance.** $300 per month for 12 months | 24.00 | $300.00 | **$7,200.00** |
| **4. John Deere Loader.** Used monthly to deliver manure to the Disposal Trench. | 12.00 | $720.00 | **$8,640.00** |
| **5. JD Loader Fuel.** 20 gallons / month, $6.89 per gallon. | 240.00 | $6.89 | **$1,652.40** |
| **6. JD Loader Insurance.** | 12.00 | $300.00 | **$3,600.00** |
| **7. Fencing Installation** | 1,477.00 | $3.35 | **$4,947.95** |
| | | | |
| **3. Mobilization** | | | |
| **3.a 12 Months of Operations (June '22 to July '23)** | | | |
| **a.1 Labor.** 36 hrs @ $22.50 per hour (including FICA, taxes, etc.) | 432.00 | $22.50 | **$9,720.00** |
| **a.2 Management.** 2.5 / 40 hours per week, annual salary of $85,000 | 12.00 | $1,903.65 | **$22,843.75** |
| **a.3 Employer's Accounting, Overhead.** | 12.00 | $1,007.81 | **$12,093.75** |
| **Grand Total** | | | **$688,314.54** |
| | | | |
| **Finance Charge** on 2021-22 balance through April 2023. | $504,656.95 | 1.50% | **$68,128.69** |
| | | **TOTAL** | **$   756,443.23** |

*Payable by Check to: "Highland Dairy"*

***Thank You!***
*US Tax ID No.: 85-0359714*

**Arthur F. Schaap Affidavit**
**Exhibit R**

Clean Harbors Environmental Services, Inc.
42 Longwater Drive, P.O. Box 9149
Norwell, MA 02061-9149
781.792.5000
www.cleanharbors.com

March 17, 2023

John B. Kern

**JBK International LLC**
-------------------------------------------
518 Old Santa Fe Trail # 600
Santa Fe, New Mexico 87505
+1 (505) 316-4066

**RE:    BUDGETARY: Highland Dairy Farm Remediation, Transportation and Disposal of PFAS Contaminated Soils**

Dear Mr. Kern,

Thank you for considering Clean Harbors Environmental Services, Inc. (Clean Harbors) for your waste management needs.  We are pleased to provide you with pricing for the following waste streams.  This quotation is based upon the information that you have provided.

We offer our clients a broad spectrum of environmental services and the ability to dispose of hazardous material at or through a Clean Harbors owned and operated facility.  In addition to managing your waste streams, a Clean Harbors professional can assist you with:

- Waste Transportation & Disposal
- Remedial and Engineering Services
- Fixed and Mobile Thermal Desorption
- Technical and Field Services
- 24-Hour Environmental Emergency Response
- Nationwide Truck and Rail Transportation
- RCRA-TSCA Incinerators and Landfills
- On-Site / Off-Site Water Treatment

I look forward to servicing your environmental needs. If you have any questions or need further assistance, you may reach me or at the number below.

Sincerely,

Chris Vidovich
VP Project Services
Phone:  724-980-2839

*"People and Technology Creating a Better Environment"*



Page 2



Page 3

**Scope of Work:  Transportation and Disposal of PFAS Contaminated Soils**

| Profile / Waste Code | Waste Description | Unit | Unit Rate |
|---|---|---|---|
| Transportation and Disposal | PFAS Soils | Ton | $200.00 |
| Back Fill | Delivered and Spread | Ton | $35.00 |
| Labor/Equipment | Excavation and remediation | Ton | $17.50 |
|  |  | TOTAL | $252.50 |
| Cost at 1 foot depth/acre | 1613.33 cubic yards X 1.4 Density: 2,259 tons/Acre | Extended | $570,397.50 |
| Cost at 2 foot depth/acre | 3226.67 cubic yards X 1.4 Density: 4,517 tons/acre | Extended | $1,140,542.50 |
| Cost at 3 foot depth/acre | 4840 cubic yards X 1.4 Density: 6776 tons/acre | Extended | $1,710,940 |
|  |  |  |  |
|  |  |  |  |

Page 4

## PROJECT SPECIFIC PRICING AND SERVICE CONDITIONS

1.  All pricing is pending an approved Clean Harbors profile, sample if requested and approval into final disposal facility.

2.  Pricing is for excavation of soils and does not include and demolition of buildings or vegetation removal, etc… This would be a Time and Materials Fee

3.  The rates above are based strictly on the limited data provided and are not sufficient for facility approval and acceptance; the rates are contingent on receiving an accurate Clean Harbors Waste Profiles for each waste material for facility evaluation and approval.

4.  Waste must be <u>solid</u> with no excessive moisture or free liquids at the time of delivery to the designated disposal facility.  Off-Specification fees will be applied based on the amount of handling and drying required.

5.  Clean Harbors' Recovery Fee (that fluctuates with the DOE national average diesel price), currently at 21.0%, will be FIXED at 12.0% for this project and will be applied to each invoice.  For more information regarding our recovery fee calculation please go to: www.cleanharbors.com/recoveryfee. If fuel costs increase more than 10% during the lifespan of the project, Clean Harbors is entitled to an equitable adjustment in pricing to recover these costs.

6.  Clean Harbors <u>does not</u> allow customer retainage or paid-when-paid; complete invoice payments are required.

7.  Clean Harbors will load the trucks for shipment and is responsible for ensuring each is loaded to achieve the quoted minimum weights and to not exceed legal DOT G.V.W.R. limits.

8.  Clean Harbors will supply end dump trailers to transport material from the project site to a rail transload yard, where the waste material will be emptied into a lined gondola car for rail transport to designated rail center and disposal facility.

9.  Pricing includes front end drayage, truck liner, truck fuel surcharge, truck transload, rail transportation, rail fuel surcharge, rail transload, rear drayage and disposal.

10. Transportation rates herein are standard service industry pricing; if the project becomes Prevailing Wage, then this quote is void and will require a revised transportation prevailing wage rate.

11. Shipping schedule must be determined 2 weeks prior to shipping.

12. Trucks ordered and then canceled without 24-hours prior notice will be charged full transportation unit rate based on the tonnage minimum.

13. Trucks ordered and then canceled without 24-hours prior notice will be charged full transportation load rate.

14. Clean Harbors is cautioning all our customers that the Over-The-Road Truck Transportation Service industry is presently overwhelmed and presently operating at 50% of service sector demand. This shortage has resulted in unreliable service, no-shows, equipment failure/stress,

Page 5

reductions in existing service levels and has forced scheduling into a real-time condition. Clean Harbors is making every effort to maintain transportation coverage for our projects but be advised that the demand and shortages could result in transportation delays or insufficient shipments.  It is important to be vigilant and flexible while our industry operates under these conditions.

15. PFAS/PFOA compounds are accepted into Clean Harbors landfills on a case-by-case basis with final approval by executive management.  Applicable analytical will need to be supplied prior to start of project to begin the approval process.

**GENERAL PRICING AND SERVICE CONDITIONS**

1. Except where superseded by an existing services agreement the following terms and conditions apply to this quoted business.

2. Prices firm for 30 days.

3. Payment Terms: Net 30 Days.

4. All currency is in US Dollars.

5. All pricing is based on prevailing regulatory requirements and conditions. Should regulatory agencies establish regulations, amend regulations or requirements all pricing is subject to change.

6. Disposal Surcharges are applied to the total quantity shipped, not to any prorated portion of the shipment.

7. Materials subject to additional charges if they do not conform to the approved profile.

8. Unscheduled shipments that require same day or next day service may be subject to additional charges.

9. Clean Harbors supports many invoice delivery options (E-mail, Electronic Invoicing, EDI). Pricing is based on Clean Harbors' standard invoice delivery method of E-mail.  If another delivery method is required there could be an additional service fee per invoice.  Any alternate delivery methods must be reviewed and approved by Clean Harbors prior to acceptance and implementation.

10. Interest will be charged at 1.5% per month or the maximum allowed by law for all past due amounts.

11. In the event that legal or other action is required to collect unpaid invoice balances, Customer agrees to pay all costs of collection, including reasonable attorneys' fees, and agrees to the jurisdiction of the Commonwealth of Massachusetts.



Page 6


**TAXES AND GOVERNMENT FEES**

1. Local, state and federal Service Fees, Taxes, or Sale Taxes applying to the generating / originating location are not included in pricing and will be added to each invoice as applicable.

2. Local, state and federal Environmental Remediation or Real Property taxes are not included in pricing and will be added to each invoice as applicable.

3. It shall be the customers' responsibility to provide notice and documentation of any applicable tax exemptions, tax reductions or resellers exemptions prior to the commencement of work. Failure to provide notice and documentation will result in taxes being added to each invoice.


**ACKNOWLEDGEMENT**

Your signature below indicates your acceptance of the pricing and terms detailed in the quote above. Thank you for the opportunity to be of service.


_____

Name (Print)                                    Signature


_____

Title                                           Date



Clean Harbors
42 Longwater Drive
P.O. Box 9149
Norwell, MA 02061-9149
781.792.5000
800.282.0058
www.cleanharbors.com

January 31, 2022

Mr. John Kern, Esq.
John B. Kern International Law LLC
518 Old Santa Fe Trail #600
Santa Fe, NM 87505
kern@jbkinternational.com

**RE:    On-site Crematorium and Soil Disposal – Highland Dairy Farm**

Dear Mr. Kern,

Clean Harbors Environmental Services, Inc. (Clean Harbors) is pleased to present our proposed pricing for the animal carcass removal project at the Highland Dairy Farm Property (Highland) in Clovis, NM. This proposal includes pricing for the operation of our mobile crematorium unit, disposal of the resulting ash, and disposal of PFAS impacted soil.

With our extensive experience on projects of similar scope, this project is a great fit for our remediation team. Clean Harbors has the experience and technical knowledge to execute this work in a safe and timely manner. Our project teams approach all work with the same degree of due diligence that has been the hallmark of excellence for Clean Harbors since its inception in 1980– with constant emphasis on quality, safety, project efficiency, and economical consciousness.

Attached please find our Pricing Form and Assumptions and Considerations. Thank you for considering Clean Harbors to support this scope of work. If you have any questions, please contact Chris Vidovich at 724-980-2839 or vidovich.christopher@cleanharbors.com.

Yours respectfully,

Lawrence Izzo
Manager
Project Services Organization

*"People and Technology Creating a Better Environment"*

# CleanHarbors®

| Pricing Form | | | | | | |
|---|---|---|---|---|---|---|
| Bid Item No. | Description | Unit | Estimated Quantity | Unit Price | Subtotal | |
| | *On-Site Crematorium Options* | | | | | |
| 1 | Mobilization | Each | 1 | $ 29,261.59 | $ | 29,261.59 |
| 2 | Mobile Cremtorium Operations | Day | 35 | $ 9,458.53 | $ | 331,048.55 |
| 3 | Demobilization | Each | 1 | $ 15,605.42 | $ | 15,605.42 |
| 4 | Transportation of Rolloff bins | Each | 3 | $ 6,113.71 | $ | 18,341.13 |
| 5 | Ash Disposal - Rolloff Bins | Bin | 3 | $ 2,301.85 | $ | 6,905.55 |
| | **TOTAL** | | | | $ | **401,162.24** |
| | | | | | | |
| | *Disposal of PFAS Impacted Soil* | | | | | |
| 6 | Excavation and Loading Soil | Day | 4 | $ 6,724.91 | $ | 26,899.64 |
| 7 | Transportation and Disposal Soil | Tons | 440 | $ 331.35 | $ | 145,794.00 |
| | **TOTAL** | | | | $ | **172,693.64** |
| | | | | | | |
| | | | | GRAND TOTAL: | $ | **573,855.88** |

## Assumptions and Considerations

1. This proposal is submitted contingent upon the right to negotiate mutually acceptable contract terms and conditions, which are reflective of the work contemplated in the Request for Proposal documents, and an equitable distribution of the risks involved therein. In the event that such agreement cannot be reached, Clean Harbors reserves the right to decline to enter into such an agreement without prejudice or penalty.

2. Clean Harbors has included a daily rate for our crew to run the crematorium with the following conditions:

   - The site crew includes one (1) Lead Supervisor, two (2) System Operators, and one (1) Laborer at for 12 hour per day.
   - The system would operate for 10 hours per day, allowing for 1 hour of warm up / cooldown each day.
   - The proposal assumes 35 days of operations, which includes 2 days of setup, 31 days of crematorium operations, and 2 days of dismantling and shutdown.
   - The daily rate also includes diesel fuel necessary for each day of operation.

*"People and Technology Creating a Better Environment"*



3. Clean Harbors will invoice the daily rates for all equipment once mobilized to the site at 7 days per week while the equipment remains onsite.

4. Any local or state permitting required for the operations of the crematorium, including air permitting, will be the responsibility of Highland Farms.

5. Clean Harbors assumes, for the purposes of this proposal, that a total of 620 tons of cows will be processed by the crematorium, with about 10% ash (62 tons) to be disposed of at the conclusion of the operation.  The ash will be contained in rolloff containers and shipped to Clean Harbors Lone Mountain Landfill in Waynoka, OK.

6. Clean Harbors has provided pricing for the excavation, transportation, and disposal of PFAS impacted soil on the site property.

   - The proposal assumes a volume of 440 tons of soil to be disposed of at Clean Harbors Lone Mountain Landfill in Waynoka, OK.
   - The daily rate for the removal and loading of the impacted soil is provided as stand-alone pricing, which includes mobilization and demobilization of personnel and equipment.  If Highland Farms elects perform this soil removal during or immediately after the crematorium operations, Clean Harbors expects the scope to only last 2 days.

*"People and Technology Creating a Better Environment"*

**Arthur F. Schaap Affidavit**
**Exhibit S**



**Air Force Civil Engineer Center**

2261 Hughes Ave., Suite 163
JBSA Lackland, Texas 78236

Project: 775303101.0006

By: M.Vavra    Date: 7/23/2018

0    3,000    6,000
Feet

**Symbol Key**

◈ Monitoring Well with PFAS Exceedance

◈ Monitoring Well

— Approximate Groundwater Elevation Contour - Summer (USGS July 2013)

→ Approximate Groundwater Flow Direction (USGS 2013)

▢ AFFF Release Area

▢ AFFF Release Area (Approximate)

▢ Cannon AFB Installation Boundary

▢ 1-Mile Installation Boundary

▢ 4-Mile Installation Boundary

Disclaimer: For general reference purposes only. This is not a survey product. DO NOT USE to determine, certify, or verify map features, scale and/or other information.

Service Layer Credits: Source: Esri, DigitalGlobe, GeoEye, Earthstar Geographics, CNES/Airbus DS, USDA, USGS, AeroGRID, IGN, and the GIS User Community

**FIGURE 4**
**2013 Groundwater Elevation Contours (Irrigation Season)**
**Cannon Air Force Base**
**Clovis, New Mexico**

**Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas Environmental Programs Worldwide Installation Specific Work Plan Addendum**

**Arthur F. Schaap Affidavit**
**Exhibit T**



**ASSISTANT SECRETARY OF DEFENSE**
3500 DEFENSE PENTAGON
WASHINGTON, DC 20301-3500

4 August 2020

SUSTAINMENT

MEMORANDUM FOR ASSISTANT SECRETARY OF THE ARMY (INSTALLATIONS,
                          ENERGY AND ENVIRONMENT)
                       ASSISTANT SECRETARY OF THE NAVY (ENERGY,
                          INSTALLATIONS AND ENVIRONMENT)
                       ASSISTANT SECRETARY OF THE AIR FORCE
                          (INSTALLATIONS, ENVIRONMENT AND ENERGY)
                       DIRECTOR, DEFENSE LOGISTICS AGENCY (INSTALLATION
                          MANAGEMENT)

SUBJECT: Guidance for Implementing Section 343 of the National Defense Authorization Act
               for Fiscal Year 2020, Provision of Water Uncontaminated with Perfluorooctanoic
               Acid and Perfluorooctane Sulfonate for Agricultural Purposes

      The Department has reviewed section 343 of the National Defense Authorization Act
(NDAA) for Fiscal Year (FY) 2020 providing the Department of Defense (DoD) the authority to
address water sources impacted by DoD releases of perfluorooctane sulfonate (PFOS) and
perfluorooctanoic acid (PFOA). This memorandum provides clarifying guidance regarding
implementation of this provision.

      Section 343 of the FY 2020 NDAA provides the DoD Components discretionary
authority to use Operation and Maintenance funds to provide alternative water or treat DoD
impacted surface water or well(s) used for agricultural purposes to create products destined for
human consumption. This authority may only be used if PFOS and/or PFOA is in agricultural
water above the 2016 Environmental Protection Agency (EPA) Safe Drinking Water Act lifetime
Health Advisory levels for PFOS and/or PFOA of 70 parts per trillion, or the PFOS/PFOA levels
in the raw agricultural commodities[1] and milk exceeds an applicable Food and Drug
Administration (FDA) standard.[2]

      Consistent with DoD's risk-based cleanup program, DoD may exercise this authority to
provide alternative water or treat agricultural water based on meeting two criteria. The first
criterion is a scientifically supportable determination of a need to take action due to an
unacceptable risk to human health or the environment based on the site-specific exposure. Such
a determination can be made in one of two ways.

                 ■  First, the DoD may assess the health risks from human consumption of food
                    produced using water impacted by PFOS/PFOA, as well as risks to ecological
                    receptors from consuming water impacted by PFOS/PFOA under the federal

---

[1] "The term 'raw agricultural commodity' means any food in its raw or natural state, including all fruits that are
washed, colored, or otherwise treated in their unpeeled natural form prior to marketing." Title 21, United States
Code, section 321(r).
[2] The FDA has not established such a standard at this time. The Department will update this memorandum if the
FDA establishes a standard for PFOS and PFOA in raw agricultural commodities and milk.

cleanup law, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). The need for a site-specific CERCLA cleanup action would be based on a determination that the release of PFOS/PFOA from DoD activities results in an unacceptable risk to human health or the environment following EPA's regulations and risk assessment policies. Alternatively, if the FDA establishes standards for PFOS and/or PFOA in raw agricultural commodities and milk, DoD can use these scientifically supportable standards in its cleanup process.

- The second criterion is a determination that the PFOS and/or PFOA concentrations, above the EPA or FDA levels, are from DoD activities ("contaminated with such compounds by reason of activities on a military installation"). Both these criteria must be met to determine a need to provide alternative water or treat agricultural water, and should be interpreted consistent with CERCLA and Defense Environmental Restoration Program authorities.

If a DoD Component plans to take action to address agricultural water based on the authority in section 343 of the FY 2020 NDAA, the DoD Component Deputy Assistant Secretary for Environment will forward an explanation in writing stating how the site meets the criteria in this memorandum along with supporting documentation to the Office of the Deputy Assistant Secretary of Defense for Environment (ODASD(Env)) for approval. ODASD(Env) will seek review by the DoD Office of General Counsel for Environment, Energy and Installations before providing a response to the requesting DoD Component.

My point of contact for this matter is Ms. Deborah Morefield, at 703-571-9067 or deborah.a.morefield.civ@mail.mil.

W. Jordan Gillis

cc:
Chief, National Guard Bureau

2