

**NELSON MULLINS RILEY & SCARBOROUGH LLP**
ATTORNEYS AND COUNSELORS AT LAW

1320 Main Street, 17th Floor
Columbia, SC 29201
T: 803.799.2000  F: 803.256.7500
nelsonmullins.com

Amanda S. Kitts
T: 803.255.9594
amanda.kitts@nelsonmullins.com

May 6, 2025

*Via CM/ECF and E-Mail*

The Honorable Richard M. Gergel
U.S. District Court for the District of South Carolina
J. Waties Waring Judicial Center
83 Meeting Street
Charleston, South Carolina 29401

Re:   *In re AFFF Products Liability Litigation*, MDL No. 2:18-mn-2873-RMG (D.S.C.) –
       Group A Personal Injury Bellwether Trial

Dear Judge Gergel:

      Pursuant to Case Management Order ("CMO") 26G, Defense Co-Lead Counsel submit this letter-brief in support of their proposed Group A personal injury bellwether case(s) to move forward with motions practice and trial.  Defendants respectfully submit that, consistent with longstanding practice in products liability MDLs, the first bellwether trial should be a single-plaintiff, single-cancer trial, and believe the *Voelker* kidney cancer case is the most appropriate to move forward.

      Defendants heard the Court's comments at the April 4 status conference suggesting a preference for trying a kidney cancer case first.  Status Conference Tr. (April 4, 2025), at 24:16–21.  The Defense Co-Leads are following the Court's suggestion and proposing that a kidney cancer trial be scheduled first.[1]  But the PEC's suggestion that the initial bellwether trial should include multiple plaintiffs should be rejected, for numerous reasons.

      To start, a multi-plaintiff trial would not provide meaningful information to the Court or the parties as an aid for case management and potential resolution of the personal injury cases in this MDL.  Indeed, Defendants have not found *any* products liability MDL court that conducted a multi-plaintiff trial under the circumstances present here: (1) the first bellwether trial in a mass tort litigation, (2) involving plaintiffs' personal injury claims from chemical exposure, and (3) against multiple defendants allegedly liable for different products.  To the contrary, in all recent products liability MDLs, including several MDLs over which Judge Fallon and other leading MDL judges

---

[1] Although all Defendants do not necessarily agree that the initial trial pick should be a kidney cancer rather than a testicular cancer case, in light of the Court's comments, the Defense Co-Leads are proposing that a kidney cancer case be tried first.

The Honorable Richard M. Gergel
May 6, 2025
Page 2

presided, the courts have ruled that the first bellwether trial should involve only one plaintiff. Accordingly, only one of the three kidney cancer cases—*Donnelly*, *Speers*, or *Voelker*—should be set for trial first.[2]

The nature of Plaintiffs' claims (based on drinking water exposure and brought against multiple Defendants) makes them uniquely ill-suited for multi-plaintiff trials. Each of the three kidney cancer Plaintiffs alleges different facts regarding their exposure to PFAS from AFFF— including where they lived, when, and for how long—which affect their alleged exposure pathways, timing, and amounts of exposure. These different doses, pathways, and time periods of exposure affect, among other things, (1) general and specific causation,[3] (2) product identification, *i.e.,* which Defendants are even potentially implicated (because Defendants sold different products at different times), and (3) relevant Defendant knowledge of potential hazards. Furthermore, Plaintiffs necessarily have distinct medical histories, staging and prognoses of their diseases, damages, and fact witnesses (including treating physicians). These different facts make it a certainty that a multi-plaintiff trial would be materially longer than a single-plaintiff one and would present a significant risk of jury confusion. As many MDL courts have found, this is an undue (and unnecessary) burden on jurors.

The significant dangers of jury confusion and unfair prejudice to defendants have led judges to reject multi-plaintiff trials even in non-MDL personal injury cases: The cumulative effect of the testimony of multiple plaintiffs risks confusing jurors into believing that plaintiffs' injuries were caused by the alleged exposure without regard to the evidence on general and specific causation demonstrating otherwise. This results in unfair prejudice to Defendants that cannot be remedied through such things as jury instructions. A trial consolidation also would be contrary to Defendants' decisions to waive their *Lexecon* rights. CMO 26 (Dkt. No. 3080) at 6.[4]

As to which of the kidney cancer cases should be tried first, representativeness is a core element of a bellwether trial. "The more representative the test case[], the more reliable the information about similar cases will be." Manual for Complex Litigation (4th) § 22.315 (2004). Conversely, the less representative the test case, the less information will be gained about the overall pool. *See id.* As explained in Section III below, both Mr. Speers and Mr. Donnelly are unrepresentative outliers unsuitable to serve as the first test case in this MDL. By contrast and also as explained in detail below, a trial of Mr. Voelker's claims would give the jury a far more representative set of circumstances to evaluate, resulting in a fairer and more useful initial

---

[2] As the Court has indicated, under no circumstances would it make sense to try both a kidney cancer and a testicular cancer case together as that would be "very confusing" for the jury and massively increase the overall complexity of any trial. Status Conf. Tr. 23:6–8, 24:2–6, Apr. 4, 2025.

[3] As the Court knows from its *Lipitor* experience, for almost all diseases and substances, dose matters. Here, Plaintiffs claim to have had different amounts of PFAS in their blood at diagnosis and to have been exposed to different PFAS sources and concentrations in drinking water.

[4] Defendants' *Lexecon* waivers stated that their agreement to waive their rights under *Lexecon Inc. v. Milberg, Weiss, Bershad, Hynes & Lerach*, 523 U.S. 26 (1998), in the Group A cases did not apply in the event that a Plaintiff's case was "consolidated with any other action for trial." Dkt. No. 4211 at 11.

The Honorable Richard M. Gergel
May 6, 2025
Page 3

bellwether for both sides, which serves the very purpose for bellwether trials in a mass tort MDL setting. This is underscored by the fact that both sides chose Mr. Voelker for Tier 2 discovery, which is not the case for the other two.

The Court should reject the PEC's efforts to pack as many plaintiffs as possible into a single trial—the *first* trial in this massive MDL—in order to unfairly prejudice Defendants and confuse the jury, all in the name of achieving a plaintiff verdict leveraged on jury confusion rather than the merits. For six years, the parties and the Court have proceeded in an organized and deliberate fashion to ensure fair and defensible results for all—now is not the time to change course. The first trial in this MDL should not involve the claims of multiple Plaintiffs, regardless of disease type.

## ARGUMENT

### I.     The first trial in this MDL should be a single plaintiff trial.

In circumstances such as this—the first trial in a massive MDL against multiple defendants and alleging highly fact-specific chemical exposure products liability claims—MDL judges, including some of the most experienced ones such as Judge Fallon, have repeatedly and consistently found that the only fair way to proceed is with a single-plaintiff trial. Only later in the proceedings, if no overall resolution is reached after a sufficient number of single-plaintiff trials, are multi-plaintiff trials considered appropriate.

Federal Rule of Civil Procedure 42(a) authorizes courts to consolidate separate actions for trial, but consolidation is not permitted if "the risks of prejudice and jury confusion" outweigh the procedure's "practical benefits to judicial economy." *Greene v. 4520 Corp., Inc.*, 2023 WL 3513306, at *1 (E.D.N.C. May 17, 2023) (citing *Arnold v. E. Air Lines, Inc.*, 681 F.2d 186, 193 (4th Cir. 1982)). Indeed, "regardless of efficiency concerns, consolidation is not appropriate if it would deny a party a fair trial." *Id.* "The benefits of efficiency can never be purchased at the cost of fairness." *Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350 (2d Cir. 1993).

Plaintiffs, as the parties who would be moving for consolidation, bear the burden of proof as to why consolidation would be appropriate. *In re Injectafer Prods. Liab. Litig.*, 2021 WL 3145729, at *1 (E.D. Pa. Jul. 26, 2021). Although many complaints share a "common question of law or fact" such that Rule 42 "may" allow for consolidation, that does not mean they *should* be tried together. "Consolidation is not justified or required simply because the actions *include* a common question or fact." *Hasman v. G.D. Searle & Co.*, 106 F.R.D. 459, 460 (E.D. Mich. 1985) (emphasis in original). The operative question is whether trying two or more cases together would yield enough rewards in judicial economy to outweigh the risk of prejudice, confusion, or new delays. *In re Injectafer*, 2021 WL 3145729, at *1. Here, the answer is a resounding no.

The Honorable Richard M. Gergel
May 6, 2025
Page 4

Courts have repeatedly found that the claims of more than one plaintiff should not be tried together:

> (1) in personal injury products liability matters generally, where individual causation issues often predominate over common issues (compared to single accident or disaster cases like airplane crashes);[5]
> (2) in chemical exposure personal injury products liability matters in particular, where causation issues are even more plaintiff-specific, as "location and duration of exposure to toxic substances vary across plaintiffs";[6] and
> (3) for the first bellwether trial in mass tort litigation, because separate trials "help define 'the exact factual and legal contours' of the claims and defenses" and allow the parties "to better assess the value and strength of the remaining matters," thus better informing any potential resolution.[7]

The presence of just one of these circumstances would counsel against a multi-plaintiff trial. Here, all are present. In the circumstances of this massive and important MDL, consolidation would prevent a fair trial by confusing the jury and placing the Plaintiffs at a very unfair advantage, not least because they are certain to leverage potential jury confusion to their benefit. *See Malcolm*, 995 F.2d at 350 (citation omitted). The end result would be the opposite of what a bellwether program should accomplish: rather than provide the parties with datapoints on the case's merit, the preeminence of jury confusion and unfairness would be the parties' focus after any verdict, regardless of who prevails.

### A. A multi-plaintiff trial would result in jury confusion and unfair prejudice, without promoting judicial economy.

Multi-plaintiff trials "tempt imputation of the life and circumstances of one [plaintiff] for the benefit of the other, regardless of the individual character of each claim." *Greene*, 2023 WL 3513306, at *2. These concerns are particularly acute in mass-tort cases, where proof of specific causation is critical to the issue of liability. When two cases are tried together, "one plaintiff, despite a weaker case of causation, could benefit merely through association with the stronger plaintiff's case." *Rubio*, 181 F. Supp. 3d at 758. Jurors may "fill factual gaps on major issues" like causation because they may "unjustly believe that if each plaintiff is making similar accusations, they must be true." *See* Christopher E. Appel, *The Consolidation Prize: An Analysis of Multi-Plaintiff Product Injury Trials*, 47 Am. J. Trial Advoc. 225, 226 (2024) (Ex. A). Jury confusion inevitably leads to unfair prejudice to the defendants, as the jury resolves the confusion

---

[5] *E.g.*, *In re Injectafer*, 2021 WL 3145729, at *1–2; *Leeds v. Matrixx Initiatives, Inc.*, 2012 WL 1119220, at *2 (D. Utah Apr. 2, 2012).

[6] *E.g.*, *Vance v. Safety-Kleen Sys., Inc.*, 2022 WL 22352487, at *5 (N.D. Tex. Oct. 7, 2022) (collecting cases); *Rubio v. Monsanto Co.*, 181 F. Supp. 3d 746, 758–59 (C.D. Cal. 2016).

[7] *E.g.*, *Crabtree v. Livanova, PLC*, 2022 WL 19517407, at *4 (E.D. La. Mar. 30, 2022); *In re Injectafer*, 2021 WL 3145729, at *1.

The Honorable Richard M. Gergel
May 6, 2025
Page 5

by simply considering all the evidence to pertain to all the plaintiffs' claims, even when it is relevant to only one plaintiff's case. *See id.*; *Malcolm*, 995 F.2d at 352; *Hasman*, 106 F.R.D. at 461.

For these reasons, courts strongly disfavor consolidated trials in products liability personal injury actions. *E.g.*, *Crabtree*, 2022 WL 19517407 at *4; *Hasman*, 106 F.R.D. at 460–61; *Michael v. Wyeth, Inc.*, 2011 WL 1527581, at *3 (S.D.W. Va. Apr. 20, 2011); Appel, *supra*, at 242–43, 244 n.78 (collecting cases) (Ex. A). A fair trial can be lost to jury confusion and unfair prejudice with the mixing of highly specific facts, allegations, and defenses. *See Crabtree v. Livanova, PLC*, 2:18-cv-04588 (E.D. La.), Dkt. No. 28-1 (Declaration of Steven Penrod) (Ex. B).

Chemical exposure cases like the AFFF MDL, in particular, are filled with individualized questions and do not lend themselves to multi-plaintiff trials. *E.g.*, *In re Van Waters & Rogers, Inc.*, 145 S.W.3d 203, 211 (Tex. 2004). Proving liability in chemical exposure cases requires a "dizzying amount of evidence," *Malcolm*, 995 F.2d at 349, including evidence "regarding the timing, location, and therefore the *degree*" of exposure, *Ellis v. Evonik Corp.*, 604 F. Supp. 3d 356, 378 (E.D. La. 2022) (emphasis in original). In *Ellis*, for example, in granting defendants' motion to sever, the court recognized the "significant differences in the timing and length of each plaintiff's alleged exposure to" the chemical at issue, EtO:

> These distinct periods of exposure mean that each plaintiff's case will require and yield differing facts regarding, for instance, the actual emissions of EtO over various years, and the respective responsibilities, knowledge, and acts of [defendants] during these various periods of time. The distinct periods of exposure will also bear on each plaintiff's showing of fault and causation, thereby affecting the legal viability of each plaintiff's case.

*Id.* at 377. The plaintiffs in *Ellis* also lived varying distances from the exposure site, which weighed "heavily on the causation element" for each plaintiff. *Id.*

All of these differences exist here. Each kidney and testicular cancer Plaintiff has a different alleged exposure profile. Plaintiffs resided at different addresses, which Plaintiffs' experts claim were serviced by different primary wells in different water districts at different times. Based on the wells allegedly serving their residences and the realistic possible hydrogeologic pathways, certain Plaintiffs were impacted by AFFF use at entirely different military bases—with the alleged AFFF use at the two Bases at issue (Warminster Base and Willow Grove Base) implicating different AFFF products and time periods. And, of course, Plaintiffs all have widely varying medical histories, requiring different medical witnesses and disparate proof.

Consolidation risks brushing over these considerations, which are essential in proving causation, product identification, and knowledge. *Vance v. Safety-Kleen Sys., Inc.*, 2022 WL 22352487 (N.D. Tex. Oct. 7, 2022), illustrates the importance of keeping factually distinct cases separate. In granting defendants' motion to sever, the court recognized that, although all the plaintiffs claimed they were exposed to the same allegedly carcinogenic solvents while working

The Honorable Richard M. Gergel
May 6, 2025
Page 6

at the same plant, the alleged exposure happened in different locations within the plant, at different time frames, with numerous combinations of different products, and the plaintiffs had unique medical histories, risk factors, diagnoses, and prognoses. *Id.* at *6. The same is true here. Plaintiffs' expert reports intimate that Messrs. Donnelly, Speers, and Voelker were exposed to different combinations of AFFF products (with different chemical compositions, including different amounts of C8 fluorosurfactants) in varying degrees due to their different exposure locations and time periods.

*Vance* addressed other reasons why consolidation of cases could lead to jury confusion and introduction of irrelevant evidence: (1) the chemical composition of products changed over time,[8] and (2) what the defendant knew or reasonably should have known about the safety of its products varied among the plaintiffs due to the different time periods of alleged exposure.[9] 2022 WL 22352487, at *4. The same is true here, particularly given the different PFAS from AFFF alleged exposure periods (Mr. Donnelly alleges pre-diagnosis exposure 1979-2005; Mr. Voelker 1985-2015; and Mr. Speers 1995-2019). As Plaintiffs' own experts recognize, those differing exposure time periods and locations implicate different exposure patterns, different products, different product formulations, and different Defendants.

### B. Initial bellwether trials in several recent MDLs and mass tort litigations have involved a single plaintiff.

Numerous MDL and mass tort judges have ruled that initial bellwether trials should be single-plaintiff trials:

**1. *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*,** Case No. 2:14-md-02592-EEF (E.D. La.), is an instructive example. In this products liability MDL, over 30,000 plaintiffs alleged that the prescription medication Xarelto caused uncontrollable bleeding. Judge Fallon presided over the MDL and in 2017 conducted the first three trials as single-plaintiff trials. Dkt. No. 3856 at 1–2. A fourth single-plaintiff trial was set but settled.

As the Court knows, Judge Fallon also was the lead author on an important article aptly titled *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323 (2008) (Ex. C), which is viewed as the leading authority on conducting bellwether trials in MDLs. It described the purpose of bellwether trials, including their use in informing potential resolution of the cases. *Id.* at 2332, 2337. It discussed two pharmaceutical MDLs that effectively utilized bellwether trials "to provide meaningful information and experience to everyone involved," both of which involved single plaintiffs: *In re Vioxx Prods. Liab. Litig.* (2:05-md-01657) and *In re Propulsid Prods. Liab. Litig.* (2:00-md-01355), both in the Eastern District of Louisiana. *Id.*

---

[8] "Rayven Richards's claims require no information about the chemical makeup of [defendant's] solvents in 1971 because he did not begin working at Carrier until 2005." 2022 WL 22352487, at *4.

[9] "What [defendant] knew or should have known about its solvents' alleged health risks in 2007 is irrelevant to Plaintiff Stephnie Gee, who was employed . . . from 1973 to 1975." *Id.*

The Honorable Richard M. Gergel
May 6, 2025
Page 7

In *Vioxx*, Judge Fallon conducted six bellwether trials, each involving a single plaintiff, to test the core allegation that Vioxx caused their heart attacks. *Id.* at 2334–37; *see also In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 791 (E.D. La. 2007). After those six individual plaintiff trials, the parties reached a settlement of over 25,000 claims. Likewise, in *Propulsid*, another prescription drug MDL, Judge Fallon conducted one individual trial and had intended to conduct two additional, single-plaintiff bellwether trials, but ultimately granted summary judgment for the defendants. Fallon, 82 Tul. L. Rev. at 2332–34 (Ex. C). The parties then reached a global settlement. *Id.* at 2333.

    **2. *In re Ranitidine Cases***, Case No. 21-cv-002172 (Cal. Super. Ct. 2023), a recent coordinated proceeding in California state court (with a parallel MDL before Judge Rosenberg in the Southern District of Florida), is also instructive as it involved chemical exposure claims. Plaintiffs sued numerous manufacturers of Zantac (ranitidine), a heartburn medication, claiming that it degrades to a carcinogen known as NDMA and caused their cancers. *See* Dec. 5, 2023 Order on Mot. of Plaintiff Regarding Scheduling and Consolidation of 14 Bellwether Trials (Ex. D). In rejecting plaintiffs' request to consolidate the first bellwether cases for trial, the court recognized that "[r]egarding exposure, each plaintiff consumed ranitidine manufactured by different defendants at different times in different doses, and the ranitidine consumed by each plaintiff was exposed to different levels of heat and humidity that might have caused the degradation of the ranitidine into NDMA." *Id.* at 6. As has become apparent through expert discovery here, the Group A plaintiffs likewise claim to have been exposed to different amounts of different chemicals made by different Defendants at different times, and those chemicals do not degrade into PFOA in the same way or at the same rate.

Regarding specific causation, the *Ranitidine* court explained that "each plaintiff has their own personal history of potential alternate exposures, family medical history, and other issues," and regarding damages, "each plaintiff has suffered different symptoms, incurred different medical expenses, and suffered different other consequences from the cancer diagnosis." *Id.* So too here.

Moreover, the court commented that bellwethers are test cases, and "[i]f a case is a test case in the [MDL], then the management of the [MDL] suggests that it be tried with a single plaintiff so that the parties may brief legal issues that are focused on the single plaintiff." *Id.* "It is best that the bellwether cases are simple so that the legal issues are clearly presented without undue complication and the resulting orders can then be used as templates in other cases in the [MDL]." *Id.*

    **3. *In re E.I. DuPont De Nemours and Company C-8 Personal Injury Litig.*,** Case No. 2:13-md-2433 (S.D. Ohio), of course, is another relevant example. There, many single-plaintiff trials were held, and a global settlement reached, before any multi-plaintiff trials were permitted. In that MDL, as the Court knows, plaintiffs brought claims against DuPont alleging that exposure to PFOA from a DuPont manufacturing plant that entered their drinking water caused their injuries. The MDL court planned to conduct six single-plaintiff trials selected from the bellwether pool. *In re E.I. Du Pont De Nemours and Company C-8 Personal Injury Litig. ("DuPont C-8")*, 2019 WL 2088768, at *8 (S.D. Ohio May 13, 2019). Some settled before trial. Ultimately, the court

The Honorable Richard M. Gergel
May 6, 2025
Page 8

conducted four trials, three of which went to the jury; they were all single-plaintiff trials. *DuPont C-8*, 2019 WL 2088768, at *3, *9–10. The MDL court also planned to try 260 cancer cases, all as individual trials. *Id.* at *3, *9; *see also* Dkt. No. 4294. During this process, plaintiffs on "numerous occasions" moved the Court to hold multi-plaintiff trials, and the MDL court "each time denied [Plaintiffs'] request." *DuPont C-8*, 2019 WL 2088768, at *13.

During the fourth single-plaintiff trial, the parties reached a global resolution of the MDL, settling thousands of cases. *Id.* at *10. Following the global settlement, about 40-50 post-settlement cases were filed. *Id.* at *11. Only at this mature state of the trial proceedings did the MDL court permit five-plaintiff consolidated trials to take place, in order to move through these straggler post-settlement cases in a timely manner. *See id.* at 20. Obviously, allowing multi-plaintiff trials following several individual-plaintiff trials—and a global settlement—is quite different from the procedural posture currently before the Court in determining the parameters of the first bellwether trial in this MDL.

**4. *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices, and Prods. Liab. Litig.*,** Case No. 3:16-md-02738 (D.N.J.): This MDL includes over 58,000 plaintiffs who claim talc-based baby powder caused their ovarian cancer. In setting bellwether trials, the then-presiding MDL judge, Chief Judge Wolfson, was firm in stating, "I'm not trying multi-plaintiff cases. They are going to be single-plaintiff cases. So let's put aside that idea." Dkt. No. 16483 at 13:19–21. After Chief Judge Wolfson retired, the new MDL judge, Judge Shipp, likewise denied plaintiffs' request for consolidated bellwether trials. *See* Dkt. No. 33279 at 1–2.

**5. *In re Taxotere (Doceteaxel) Prods. Liab. Litig.*,** Case No. 2:16-md-02740 (E.D. La.): This MDL involved over 15,000 plaintiffs' claims that the chemotherapy drug, Taxotere, caused permanent hair loss. At least the first two bellwether trials were single-plaintiff trials. Dkt. No. 8253 at 1; Dkt. No. 13364 at 1.

These are just a few examples. Many other courts, MDL and otherwise, have similarly conducted single plaintiff trials for the first bellwether trial in complex litigation involving personal injury claims.[10] The rationale of all these cases is the same: as an initial matter at least, courts ought to avoid multi-plaintiff trials to avoid jury confusion and unnecessarily lengthy trials, and to get results that will promote resolution of the rest of the docket.

The PEC may cite examples where multi-plaintiff trials occurred in mass tort matters, but those cases are distinguishable, for the reasons discussed above. For example, cases in "mature"

---

[10] *See In re Roundup Prods. Liab. Litig.*, Case No. 3:16-md-02741 (N.D. Cal.), Dkt. No. 2194 at 1; *In re General Motors LLC Ignition Switch Litig.*, Case No. 1:14-md-2543 (S.D.N.Y.), 1:15-cv-08958 (S.D.N.Y.), Dkt. No. 8 at 1; *In re Davol Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Liab. Litig.*, Case No. 2:18-md-2846 (S.D. Ohio), Dkt. No. 515 at 1, 2:18-cv-01509 (S.D. Ohio), Dkt. No. 504 at 1; *In re American Med. Sys., Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, Case No. 2:12-md-02325 (S.D.W.V.) Dkt. No. 1321 at 1; *In re C.R. Bard, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, Case No. 2:10-md-02187 (S.D.W.V.), Dkt. No. 524 at 2, Dkt. No. 2490 at 1, 2:11-cv-00195 (S.D.W.V.), Dkt. No. 336 at 1.

The Honorable Richard M. Gergel
May 6, 2025
Page 9

mass tort litigation where a number of trials have already been conducted are inapposite. *See DuPont C-8*, 2019 WL 2088768, at *16–18 (explaining differences in "immature" versus "mature" mass torts, and why multi-plaintiff trials should be avoided in "immature" litigation). Not a single AFFF case has been tried to date. Nor has any jury in any case determined that exposure to PFAS could be a general, or was a specific, cause of any disease. Consolidation in a first trial would be both inefficient and highly prejudicial. The "interests of efficiency" are served by letting cases proceed separately where a group of cases is being tried for the first time, as separate trials "help define the exact factual and legal contours of the claims and defenses" and "allow the parties to better assess the value and strength of the remaining matters." *In re Injectafer Prods. Liab. Litig.*, 2021 WL 3145729, at *1. Courts have warned that until enough trials have occurred so that the contours of various types of claims within the litigation are known, courts should "proceed with extreme caution when consolidating claims of immature torts." *See In re Van Waters & Rogers, Inc.*, 145 S.W.3d at 208.

Similarly, cases involving consolidation of a handful of matters that represent all (or nearly all) claims—as opposed to bellwether trials in massive MDLs—are also inapposite. While judicial economy might be served by trying two cases together where those are the only two cases with related facts to be tried, there are no meaningful efficiency gains to be had from trying one case versus two or three here, when this is the *first* bellwether trial in a litigation involving *tens of thousands* of claims. The goal here is not to make a meaningful dent in the number of pending cases, but to gain valuable information and guidance for the future of the MDL. As courts have explained, a main purpose of holding bellwether trials is "to provide meaningful information and experience to everyone involved in the litigations" to inform settlement discussions. *DuPont C-8*, 2019 WL 2088768, at *8 (quoting Fallon, 82 Tul. L. Rev. at 2332). That will not happen with a multi-plaintiff trial that would confuse the jury and prejudice Defendants. If the Court's first bellwether trial here were a multi-plaintiff trial, the findings from those proceedings would not be representative and would undermine the overall purpose of bellwether trials.

District courts can attempt to impose certain safeguards to mitigate risks of jury confusion or prejudice, like limiting jury instructions, but the threat of prejudice and jury confusion still looms large in environmental exposure cases like these. "Even with the aid of jury instructions, . . . there is a substantial risk that the jury will be unable to compartmentalize the evidence as it relates to each individual patient." *Crabtree*, 2022 WL 19517407, at *4; *Vance*, 2022 WL 22352487, at *6 ("the risk of jury confusion would be high if the claims were tried together, even if the Court gave a limiting instruction"). This is precisely why Judge Fallon and a parade of other MDL judges have insisted on single-plaintiff trials at the initial bellwether stage. The court should avoid these risks, particularly for the first bellwether trial in this MDL that already involves multiple *Defendants*, some of whom will need limiting instructions even in a single-plaintiff trial.

The Honorable Richard M. Gergel
May 6, 2025
Page 10

## II. To the extent a kidney cancer case is tried first, it should be a single-plaintiff kidney cancer trial.

As discussed above and below, if the first trial is limited to kidney cancer, the relevant facts among the three kidney cancer cases—*Donnelly*, *Speers*, and *Voelker*—vary widely, making a two- or three-plaintiff trial from this pool unfair and impossible, for at least the following reasons:

- **Different PFOS/PFOA blood levels, both estimated and measured.** Dose matters, for both general and specific causation. *In re Lipitor*, 227 F. Supp. 3d 452, 462–64 (D.S.C. 2017). Plaintiffs had their blood tested for PFOS and PFOA in 2023, and Plaintiffs' expert Dr. MacIntosh also attempted to retroactively estimate their PFOS and PFOA blood levels at the time of diagnosis. Even under Plaintiffs' framework, their purported PFAS blood results are all different. Differences in PFAS blood levels could complicate, *inter alia*, pre-trial *Daubert* and summary-judgment motion practice, and presentations to the jury.

- **Different methods used to estimate historical PFOS/PFOA blood levels.** Plaintiffs' expert Dr. MacIntosh put forth three "hindcasting" methods of calculating Plaintiffs' estimated PFOS/PFOA blood levels at diagnosis: calculations based on (1) Plaintiffs' blood draws in 2023; (2) municipal water testing results; and (3) an individual plaintiff's estimated exposure dose from drinking water. He bases his opinions for Mr. Voelker's and Mr. Speers's blood levels on the personal serum method, but for Mr. Donnelly, he uses the municipal method. Like the blood levels themselves, differences in how those blood levels were estimated will complicate pre-trial motion practice and arguments to the jury.

- **Different Defendant knowledge.** Notice of the potential risks of PFOA and PFOS has changed over time. Plaintiffs' exposure end dates are different. Evidence that is admissible in one Plaintiff's case regarding Defendants' knowledge of the risks of PFOA/PFOS may be inadmissible or admissible for only a limited purpose in another Plaintiff's case.[11] Combining *Donnelly* with *Voelker* (or *Speers*), for example, would lead to the introduction of irrelevant evidence that likely would confuse the jury and ultimately bias the jury in Mr. Donnelly's favor, given Mr. Donnelly's earlier diagnosis date.

Putting aside the differing alleged amounts of PFOS or PFOA in Plaintiffs' blood, Plaintiffs must prove—on a Defendant-by-Defendant basis—that a legally and scientifically-relevant amount of that PFOS or PFOA came from Defendants' products, as opposed to another source.[12] The evidence Plaintiffs will use to establish that they were potentially exposed to PFOS or PFOA from particular Defendants' products varies by Plaintiff and Defendant, primarily as a factor of where the Plaintiff lived and when (and how much water he drank):

---

[11] *See e.g.*, *Ellis*, 604 F. Supp. 3d at 377; *Vance*, 2022 WL 22352487, at *4.

[12] Defendants do not endeavor to articulate here the level of proof required, or the legal standard for substantial contributing factor, which will be part of Defendants' forthcoming summary judgment briefs.

The Honorable Richard M. Gergel
May 6, 2025
Page 11

- **Different exposure time periods.** Plaintiffs allege exposure to Defendants' products at different time periods, depending on when they moved to the area and when they were diagnosed with kidney cancer (*Voelker:* 1985-2015; *Speers*: 1995-2019; and *Donnelly*: 1979-2005). According to Plaintiffs' expert Dr. Higgins, different AFFF products (manufactured by different Defendants) were potentially used at the Warminster and Willow Grove Bases at different periods of time. These different time periods affect exposure source (and amount). For example, Mr. Donnelly's pre-diagnosis exposure ended in 2005. Products that were not potentially used at the Bases before 2005 (or earlier, as it takes time for PFAS to degrade and/or move) could not have impacted Mr. Donnelly.

- **Different addresses mean (1) different water systems, (2) different wells within the same water system, & (3) different sources of AFFF use at the Bases.** One Plaintiff (*Speers*) received his water from a different water system (Ambler), located in an entirely separate watershed than the other two Plaintiffs. Even for the two Plaintiffs who lived within the same water district (*Voelker* and *Donnelly*), Plaintiffs lived at different addresses. Those different addresses received water from different wells within the water system. Plaintiffs' own expert Dr. MacIntosh opined that each Plaintiff primarily received his water from different wells.[13] And Plaintiffs' expert Mr. Brown, opines that AFFF usage at different locations within the Bases would impact different wells at different times.[14]

    Likewise, Plaintiffs' expert Dr. Martin claims each well had a different amount and ratio of types of PFAS in it, affecting his opinions regarding exposure and source of the PFAS. And Plaintiffs' expert Dr. Higgins opines that different AFFF products—and different underlying formulations of those products—were used in different locations at different times at the Willow Grove and Warminster Bases.[15] In short, Plaintiffs' theories as to how they were exposed to PFAS from AFFF used at Willow Grove and Warminster—and *whose* AFFF they were exposed to—necessarily vary based upon where they lived and when and are highly plaintiff-specific factual questions.

- **Different potentially relevant Defendants.** Many Defendants will have summary judgment product identification and causation arguments that differ depending upon the Plaintiff selected for trial. Consolidation of more than one case for trial would cause jury

---

[13] For Mr. Voelker, Plaintiffs' expert asserts that his "primary contributing wells" to his residences were Warminster Wells 6, 10, 36, and 45. For Mr. Donnelly, he asserts Warminster Wells 4, 9, 15, and 45. So there is only one well of overlap between Mr. Voelker and Mr. Donnelly's residences.

[14] For example, Plaintiffs' expert opines that use of AFFF at certain areas within the Warminster Base may have impacted Mr. Voelker's primary contributing wells, but not Mr. Donnelly's. In fact, based on Defendants' expert's evaluation of the possible hydrogeologic pathways, Dr. MacIntosh's "primary contributing wells" for the residential addresses at issue for different plaintiffs were impacted by entirely separate military bases (Mr. Voelker: Warminster Base only; Mr. Donnelly: Willow Grove Base only).

[15] Plaintiffs' expert Dr. Higgins addresses different formulations and how they changed over time, including with respect to their fluorosurfactant components and C8 versus C6 content, in his report.

The Honorable Richard M. Gergel
May 6, 2025
Page 12

> confusion and unfair prejudice to Defendants if they are dismissed from some cases but not others as the jury faces the "impossible task" of keeping straight which Defendants are still involved in which cases, and which evidence applies to which Defendants. *See Malcolm*, 995 F.2d at 350.
>
> - **Different named Defendants.** Similarly, Defendants Arkema Inc. and AGC Chemicals Americas Inc. ("AGC") are not named Defendants in *Voelker* or *Donnelly*. Combining those cases with *Speers* would require Arkema and AGC to defend themselves in a trial much broader than their alleged liability which would be confusing to a jury, prejudicial to these two Defendants and cause logistical difficulties (and would bring subject matter jurisdiction issues into play, as discussed, *infra*).
>
> - **Different case-specific legal defenses.** Defendants have individual case-specific defenses that are different for each Plaintiff. Defendants' alternative cause defenses and damages defenses too will vary between cases. For example, in declining to conduct multi-plaintiff trials, courts have recognized that evidence regarding "common risk factors for the development of cancer" and exposure to other carcinogens can vary among plaintiffs. *See Ellis*, 604 F. Supp. 3d at 377. The cases require "witnesses and documentary proof [that] vary widely across plaintiffs, as each plaintiff will need to submit their own medical records, as well as testimony from their treating physicians, family members, and other witnesses unique to them." *Id.* at 378. Here, Messrs. Donnelly, Speers, and Voelker have different medical histories, fact witnesses, and treating physicians, and Defendants have different specific causation experts for each.

Clearly, combining any two (or three) of these cases would undermine the purpose of the first bellwether trial by risking extreme jury confusion and prejudice to Defendants. Such a complicated, confusing trial would not aid in learning information about the overall MDL or how a jury might value an individual case. It would merely increase jury confusion and Plaintiffs' chances of winning. *See* Appel, 47 Am. J. Trial Advoc. at 225–26 (Ex. A).[16]

---

[16] These challenges would be even more pronounced were the Court to consolidate kidney and testicular cancer cases together. There are different bodies of scientific evidence of the association (if any) between PFAS exposure and kidney cancer versus testicular cancer, with different experts and issues to address. And the Plaintiffs with a medical history of testicular cancer—as compared to the Plaintiffs with a medical history of kidney cancer—lived in different water districts (Horsham) with different PFAS levels over time, received different diagnoses, underwent materially different treatment, and received different prognoses.

The Honorable Richard M. Gergel
May 6, 2025
Page 13

### III.     *Voelker* should move forward to motion practice/trial.

As between the three kidney cancer cases, Defendants submit that *Voelker* should move forward to summary judgment and *Daubert* motions and trial.

#### *Voelker* is the most appropriate case to advance.

Mr. Voelker lived in Warminster, Pennsylvania since 1985, was diagnosed with renal cell carcinoma (RCC) in December 2015 at the age of 54, and was treated with a partial nephrectomy in early 2016. His age of diagnosis is the median age of the rest of the eligible pool and within the typical age range for a kidney-cancer diagnosis. Mr. Voelker was chosen by both the PEC and Defendants for Tier 2 discovery. This consensus reflects that neither side considered the case to too strongly favor the other. As Judge Fallon pointed out, "if the sides can agree on the cases" for the trial-selection pool, "the cases will likely be representative and fair to both sides." *See* Fallon, 82 Tul. L. Rev. at 2350 (Ex. C). *Voelker* is the only case both sides agreed to for Tier 2 discovery. And having risk factors for RCC such as age, hypertension, and being overweight—common conditions as people grow older—does not make a plaintiff a unicorn. In fact, they make the plaintiff run-of-the-mill: by definition, risk factors are factors that occur with some regularity in patients diagnosed with the disease.[17]

If the Court does not dispose of general causation on motions practice and its goal is for the jury to address general causation prior to reaching plaintiff-specific causation, *see* Status Conference Tr. (April 4, 2025), at 23:22–25, this can be achieved in a single-plaintiff case. One option may be to use special interrogatories that require the jury to address general causation (*e.g.*, "Do you find that PFOA can cause kidney cancer at the dose level Plaintiff had before his diagnosis? Do you find that PFOS can cause kidney cancer at the dose level Plaintiff had before his diagnosis?").

#### *Speers* is not representative.

Although Defendants would certainly welcome having *Speers* proceed as the initial trial case given the unique strength of Defendants' summary judgment and *Daubert* arguments, there is a strong chance it would not reach trial and Plaintiffs undoubtedly would argue that such findings are not representative. And combining *Speers* with any other cases would cause significant juror confusion. Indeed, as compared to the other Group A plaintiffs, *Speers* is an extreme "outlier"— literally. He lives in Fort Washington, Pennsylvania, which lies outside the area arguably affected by the use of AFFF at Warminster and Willow Grove Bases. According to Plaintiff Fact Sheets,

---

[17] Additionally, the PEC *alone* picked *Voelker* for Tier 1. Any effort to disavow him as an appropriate trial pick now simply reflects a desire to choose the most plaintiff-favorable case for the first trial. The PEC may argue that Mr. Voelker's recent genetic testing results—that Plaintiffs chose to conduct in January 2025 and disclose as part of their expert reports—change his case, but Mr. Voelker's own expert excluded any familial genetic cause for his RCC, finding that his test was negative for any elevated risk for kidney cancer.

The Honorable Richard M. Gergel
May 6, 2025
Page 14

he was the only plaintiff in the entire bellwether eligibility pool to claim exposure from a residence in Fort Washington. His case should not be the first bellwether trial, and it should not be consolidated with any others for trial, for at least the following reasons:

***Subject Matter Jurisdiction Issues.*** *Speers* is not an appropriate bellwether trial selection because on its face there is no subject matter jurisdiction. Direct-filed in the MDL, the *Speers* Complaint asserts that this Court has subject matter jurisdiction "pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between Plaintiffs and Defendants . . . ." *See* 2:21-cv-03181-RMG, *Speers* Compl. (Dkt. No. 1) ¶ 2. This is wrong. There is no diversity jurisdiction because Plaintiffs Clinton and Gail Speers and Defendants Arkema Inc. and AGC are all residents of Pennsylvania. *Id.* ¶¶ 5, 10, 46, 49. Because there is no subject matter jurisdiction, *Speers* is not an appropriate bellwether trial selection. *See In re Lipitor*, 2:14-mn-02502-RMG, CMO 93 (Dkt. No. 1766) at 1-3 (D.S.C. Dec. 5, 2016) (dismissing multiple cases for lack of diversity jurisdiction).

***Different Water System.*** Mr. Speers lives in Fort Washington, Pennsylvania, part of the Ambler Borough Water Department ("Ambler WD"). Fort Washington and Ambler WD are several miles away from the Warminster and Willow Grove Bases. So far away that when the United States Geological Survey (USGS) mapped the hydrogeology of the area, it found that water from the Warminster and Willow Grove Bases could not migrate to Ambler WD. And so far away that when the Pennsylvania Department of Health (PADOH) did its PFAS-cancer study of the area, it did not include Fort Washington or Ambler. Below is a graphic showing the bounds of the Ambler WD in the bottom left corner, separate from the boundaries of the Horsham and Warminster bases. The two military Bases at issue—Willow Grove and Warminster—are outlined in purple. Willow Grove is in the center, and Warminster is on the right side. Ambler WD is more than four miles away from the border of Willow Grove Base and even farther from Warminster Base.

The Honorable Richard M. Gergel
May 6, 2025
Page 15



Figure 4.9.1. Summary of Einarson's analysis of possible hydraulic connections between water wells and alleged AFFF PFAS sources at Willow Grove and Warminster Bases

Although Plaintiffs' fate and transport expert stretches credibility to disregard the USGS and PADOH and argue that water from Willow Grove and Warminster Bases could have *jumped* over watersheds to reach Ambler WD, that opinion is not methodologically sound and will be challenged under Rule 702. While these arguments will be part of Defendants' pre-trial motion practice, selecting *Speers* as the trial case would complicate pre-trial workup and any bellwether trial.

**Different Causes of Action.** *Speers*'s complaint raises six causes of action not asserted in *Donnelly* or *Voelker*: (1) negligent failure to warn, *Speers* Compl. at ¶¶ 143-44, 146, 147(b), (d); (2) fraudulent concealment and misrepresentation, *id.* ¶¶ 157-74; (3) negligence per se, *id.* ¶¶ 175-78; (4) trespass and battery, *id.* ¶¶ 179-89; (5) negligent, intentional, and reckless infliction of emotional distress, *id.* ¶¶ 190-200; and (6) loss of consortium for his wife, *id.* ¶¶ 201-204 (Mr. Donnelly & Mr. Voelker are both unmarried). These additional claims will result in lengthier and more complicated motions for summary judgment and—to the extent any survive summary judgment—more complicated jury instructions. Proving the additional claims at trial would also

The Honorable Richard M. Gergel
May 6, 2025
Page 16

likely require Mr. Speers to present evidence that would otherwise not be necessary in Mr. Voelker's or Mr. Donnelly's trials.

In summary, *Speers* is not an appropriate or representative first bellwether trial case, either alone or with any other case.

### *Donnelly* is not representative.

*Donnelly* is also not representative, and therefore should not be the first bellwether trial.

Kidney cancer is one of the most common types of cancer, and the most common form is renal cell carcinoma (RCC), with clear cell RCC being the most common subtype. The risk of kidney cancer increases with age. The average age of diagnosis is 65 and kidney cancer is an uncommon diagnosis in people under age 45.[18] Indeed, less than 2.6% of kidney cancer cases occur in people under the age of 35.[19]

Mr. Donnelly was just 26 years old when he was diagnosed with kidney cancer. His age at diagnosis makes him an extreme outlier within both the general population and the pool of plaintiffs in this MDL. According to the Plaintiff Fact Sheets, only 3.7% of the bellwether eligibility pool was under age 30 when diagnosed with RCC; the average age at diagnosis for the pool was 52.9 years old, and the median was 54.

Mr. Donnelly's young age at diagnosis—and accompanying relative lack of other significant health issues, given his youth—has likely played into why he has long been a favorite PEC pick. But bellwether trials should help parties evaluate how jurors are likely to view individual cases remaining on the docket, and cases that most strongly favor one side do not achieve that goal. *Du Pont C-8*, 2019 WL 2088768, at *8; Fallon, 82 Tul. L. Rev. at 2349 (Ex. C). It is "critical" to a successful bellwether trial program that an "honest representative" sampling of cases be achieved. *See In re Yasmin & Yaz (Drospirenone) Mtkg., Sales Practices & Prods. Liab. Litig.*, MDL No. 2100, 2010 U.S. Dist. LEXIS 108107, at *4 (S.D. Ill. Oct. 8, 2010). "Little credibility will be attached" to the bellwether trial process, and "it will be a waste of everyone's time and resources," if the case selected does "not accurately reflect the run-of-the-mill case." *See id.* at *6-7. Indeed, "[i]f the very best case is selected, the defense will not base any settlement value on it as an outlier." *Id.* at *7.

*Donnelly* is not an "honest representative" of the run-of-the-mill kidney cancer case in this MDL. "[U]nrepresentative cases, even if they are successful at trial, will do little to resolve the entire litigation and will have little predictive value." Fallon, 82 Tul L. Rev. at 2349 (Ex. C). Selection of *Donnelly* as the first bellwether trial, either alone or with another case, would

---

[18] American Cancer Society, Key Statistics About Kidney Cancer, available at: https://www.cancer.org/cancer/types/kidney-cancer/about/key-statistics.html

[19] National Cancer Institute: Surveillance, Epidemiology, and End Results Programs, available at: https://seer.cancer.gov/statfacts/html/kidrp.html

The Honorable Richard M. Gergel
May 6, 2025
Page 17

undermine "the bellwether trial concept [which] is designed specifically to help [the parties] predict how the litigation may unfold and ultimately resolve the litigation." *Id.* at 2350.

## CONCLUSION

Defendants respectfully request that the first bellwether trial in this MDL be the trial of an individual plaintiff's claims. Anything else would confuse the jury, prejudice Defendants and prevent the parties from learning meaningful information about the MDL inventory writ large for the future of this MDL.

For the reasons discussed above, Defendants submit that it would make the most sense for *Voelker* to be the first case to go to trial.

Respectfully submitted,

/s/ *Amanda S. Kitts*
on behalf of:

/s/ *Joseph G. Petrosinelli*

Joseph G. Petrosinelli
Williams & Connolly LLP
680 Maine Ave S.W.
Washington, DC 20024
P: (202) 434-5547
F: (202) 434-5029
jpetrosinelli@wc.com

/s/ *Michael A. Olsen*

Michael A. Olsen
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
P: (312) 701-7120
F: (312) 706-8742
molsen@mayerbrown.com

*Co-lead Counsel for Defendants*