# EXHIBIT A

# The Consolidation Prize:
# An Analysis of Multi-Plaintiff
# Product Injury Trials

*Christopher E. Appel*[†]

## Introduction

In mass tort product injury cases, judges are often asked to consolidate in a joint trial the claims of multiple plaintiffs who are strangers to one another but allege injury from the same product.  For example, two or more unrelated plaintiffs that allege injury from a consumer product, prescription drug, or medical device may try to combine their individual lawsuits so that the same jury hears cumulative evidence in deciding issues of liability and damages.  Over the past two decades, some courts have obliged these requests.  This Article looks at those results.  It finds that trial consolidation of unrelated plaintiffs' product injury cases appears to substantially skew trial outcomes.  Multi-plaintiff joint trials tend to significantly increase the frequency and size of plaintiff verdicts unrelated to claims' merits, denying defendants fair trial rights.[1]

To this end, courts have found that "[u]nfair prejudice [to defendants] as a result of consolidation is a broadly recognized principle."[2]  Specifi-

---

[†] B.A. (2003), the University of Virginia's McIntire School of Commerce; J.D. (2006), Wake Forest University School of Law.  Christopher E. Appel is a Senior Counsel in Shook, Hardy & Bacon L.L.P.'s Washington, D.C.-based Public Policy Group.

[1] *See, e.g.*, Janssen Pharm., Inc. v. Bailey, 878 So. 2d 31, 48 (Miss. 2004) (finding "little doubt" that a consolidated trial "created unfair prejudice for the defendants by overwhelming the jury with this testimony, thus creating a confusion of the issues"); Grayson v. K-Mart Corp., 849 F. Supp. 785, 790 (N.D. Ga. 1994) ("There is a tremendous danger that one or two plaintiff's unique circumstances could bias the jury against [the] defendant generally, thus, prejudicing [the] defendant with respect to the other plaintiffs' claims.").

[2] *See, e.g.*, Agrofollajes, S.A. v. E.I. Du Pont de Nemours & Co., 48 So. 3d 976, 988 (Fla. Dist. Ct. App. 2010) ("Unfair prejudice as a result of consolidation is a broadly recognized principle."); Hasman v. G.D. Searle & Co., 106 F.R.D. 459, 461 (E.D. Mich. 1985) ("If the unique circumstances of the cases are considered together in one trial, the jury's verdict might not be based on the merits of the individual cases but could potentially be a product of cumulative confusion and prejudice.").

cally, courts have stated that consolidation can allow evidence used to prove one plaintiff's case to mask weaknesses in another plaintiff's case, blur important individual legal issues, or simply overwhelm jurors with information they cannot reasonably be expected to keep straight.[3] Also, by joining together multiple individuals' cases for trial, a jury may unjustly believe that if each plaintiff is making similar accusations, they must be true. This belief can lead jurors to fill factual gaps on major issues in product injury cases, including whether the defendant engaged in wrongdoing, the product was defective, and that scientific evidence proves causation. It can also trigger greater animosity against a defendant than had the same cases been tried individually, which may potentially subject that defendant to greater liability and damages for reasons unrelated to the individual claims.[4]

In looking at the "real world" effects of consolidation on trial outcomes in product injury cases, this Article builds upon previous studies. It incorporates data from studies that have focused on comparatively discrete contexts that include federal court multi-district litigation (MDL)[5] and the New York City Asbestos Litigation (NYCAL).[6] This

---

[3] *See, e.g.*, Bower v. Wright Med. Tech. Inc., No. 2:17-cv-03178, 2019 WL 3947088, at *3 (C.D. Cal. Aug. 19, 2019) ("[T]he differences between the factual circumstances in both cases . . . pose a substantial risk of prejudicing defendants at trial and confusing the jury"); Rubio v. Monsanto Co., 181 F. Supp. 3d 746, 758 (C.D. Cal. 2016) ("[B]y trying the two claims together, one plaintiff, despite a weaker case of causation, could benefit merely through association with the stronger plaintiff's case."); Malcolm v. Nat'l Gypsum Co., 995 F.2d 346, 348-49, 352, 354 (2d Cir. 1993) (reversing the trial court's decision to consolidate asbestos trials because "the jury was presented with a dizzying amount of evidence" that would not have been admissible had the cases been tried separately and recognizing that the "liability [award] amounted to the jury throwing up its hands in the face of a torrent of evidence").

[4] *See* Irwin A. Horowitz & Kenneth S. Bordens, *The Consolidation of Plaintiffs: The Effects of Number of Plaintiffs on Jurors' Liability Decisions, Damage Awards, and Cognitive Processing of Evidence*, 85 J. APPLIED PSYCH. 909, 915-16 (2000) (finding that "[j]urors' ability to understand the evidence [is] significantly affected by the number of plaintiffs in the trial," with the result that juries in consolidated trials are significantly more likely to find for the plaintiff and render a larger damages award than if the cases were tried individually).

[5] John Beisner et al., *Trials and Tribulations: Contending with Bellwether and Multi-Plaintiff Trials in MDL Proceedings* (U.S. Chamber Inst. for Legal Reform, Oct. 2019).

[6] Peggy L. Ableman et al., *The Consolidation Effect: New York City Asbestos Verdicts, Due Process and Judicial Efficiency*, 30 MEALEY'S LITIG. REP.: ASBESTOS 1, 1 (2015).

analysis is more comprehensive in its coverage, examining as many multi-plaintiff consolidated product injury cases tried to verdict across the nation during the past two decades as the author could identify and reasonably verify with the help of research assistants.[7] (A more detailed discussion of how this analysis was developed is set forth in the Methodology section below). The patterns seen nationally in the outcomes of multi-plaintiff product injury trials can, in turn, lead to a fuller understanding of how joint trials impede courts' ability to administer justice.

# I. Overview of Key Findings

This Article examines forty-two multi-plaintiff product injury cases tried to verdict over the past two decades. The trial outcomes, which are laid out in the Appendix below, add greater support to concerns that have long been raised about the potential of joint trials to distort the resolution of individual cases. These trial outcomes illustrate starkly why plaintiffs' lawyers often pursue a consolidated trial and why defendants vigorously oppose it as a fundamentally unjust and highly prejudicial litigation tactic.

Five takeaways stand out from the data:

(1) Multi-plaintiff trials resulted in high success rates for plaintiffs.

(2) Most multi-plaintiff trials resulted in large verdicts.

(3) Numerous juries awarded identical or similar amounts to dissimilar plaintiffs in the same case.

(4) Post-trial reversal or modification of plaintiffs' verdicts undercuts trial accuracy and efficiency claims.

(5) Consolidated multi-plaintiff product injury trials are rarely held.

These findings all point to the same conclusion: the risks of unfair prejudice from a multi-plaintiff trial are significant and do not outweigh any claimed efficiency. A consolidated trial appears to substantially change trial outcomes and tilt the scales of justice in a manner unrelated to the merits of individual plaintiff's claims. Courts should recognize these unsound effects on the fair and impartial administration of justice.

---

[7] The author would especially like to thank Amina Sadural for her research assistance.

# II. Methodology

The methodology for this analysis included several approaches to identify multi-plaintiff cases tried to verdict. We initially compiled case examples from existing studies of multi-plaintiff trials, similar to a meta-analysis. Specifically, we examined a 2019 study of all MDL product liability trials during a ten-year period[8] and a 2015 study of NYCAL trials between 2010 and 2014,[9] each of which identified seven multi-plaintiff trials.

In addition, we used legal search tools available on LexisNexis and Westlaw to research trial court orders and appellate court decisions discussing verdicts in multi-plaintiff trials. These efforts were complemented by researching articles reporting on multi-plaintiff trials in mainstream legal publications such as Law360 as well as more targeted publications such as Mealey's Litigation Reports.

We also surveyed the membership of various organizations, including the Product Liability Advisory Council (PLAC), Lawyers for Civil Justice (LCJ), Defense Research Institute (DRI), and International Association of Defense Counsel (IADC). The responses received helped facilitate additional research regarding specific cases.

The objective of each of these approaches was to identify as many examples of multi-plaintiff trials as possible over the past twenty years to build a data set for analysis. Once cases were identified, additional research was conducted to verify the trial outcome and to ascertain what occurred post-trial or as a result of appellate review. All of these cases are included in the table below; none were excluded.

The study period extends a few years beyond a strict twenty-year period to account for the COVID-19 pandemic, which effectively halted jury trials in America in 2020. Jurisdictions resumed trials at different times, sometimes only to start and stop again due to a rise in virus cases.[10]

Identifying product injury cases in which the claims of multiple, unrelated plaintiffs have been consolidated for a joint trial presents

---

[8] *See* Beisner et al., *supra* note 5, at 2.

[9] *See* Ableman et al., *supra* note 6, at 1, 6.

[10] *See, e.g.*, *Court Operations During COVID-19: 50-State Legal Resources*, JUSTIA, https://www.justia.com/covid-19/50-state-covid-19-resources/court-operations-during-covid-19-50-state-resources (last visited Sept. 4, 2024).

significant research challenges. The vast majority of jurisdictions do not have online searchable court dockets at the trial court level that can readily identify consolidated product injury cases. Even where comparatively advanced searches can be performed, there is generally no mechanism to distinguish claims of related plaintiffs, such as a husband and wife each asserting claims for one spouse's alleged injury, and unrelated plaintiffs (that is, plaintiffs who have no connection other than alleging injury from the same or similar product).[11]

Given these research challenges, there are undoubtedly examples of multi-plaintiff trials that were not captured. This analysis is the product of reasonable efforts to do something that does not appear to have been done before, which is to broadly survey the landscape of multi-plaintiff product injury trials and report on the data that could be captured through the various research approaches discussed.

## III. Why Multi-Plaintiff Product Injury Trials Present Unique Challenges for the Judicial System

Those unfamiliar with multi-plaintiff trial consolidation may wonder why the procedure raises fairness and due process concerns. After all, courts adjudicate class actions involving multiple claimants when the requirements of Federal Rule of Civil Procedure 23 or its state equivalent are met, and courts in MDL and other situations regularly consolidate cases for pre-trial purposes. What makes a *joint trial* of unrelated plaintiffs alleging injury from the same product so different?

As many courts have recognized, there is a fundamental difference in having evidence required to prove two or more unrelated individuals' personal injury lawsuits heard together by the same jury.[12] Each plaintiff's personal injury lawsuit necessarily involves individualized factual

---

[11] This analysis categorizes plaintiffs as related or unrelated. For simplicity, and to avoid confusion, multiple claims by related plaintiffs, such as a spouse or other relative asserting a claim arising out of the same product purchase, use or incident, are included in the accompanying table under a single plaintiff's name.

[12] *See, e.g.*, Bower v. Wright Med. Tech. Inc., No. 2:17-cv-03178, 2019 WL 3947088, at *3 (C.D. Cal. Aug. 19, 2019); Rubio v. Monsanto Co., 181 F. Supp. 3d 746, 758 (C.D. Cal. 2016).

and legal questions that arise from their own unique circumstances, including alleged exposures to the product that "differ in intensity and duration," varied uses or misuses of the product, "different medical histories and preexisting risk factors," different doctors and treatment, and different alleged types or extent of injuries.[13]   Combining these individual lawsuits in a joint trial creates significant risks of juror confusion, bias, and consideration of prejudicial "spill-over" evidence.

## A.  Juror Confusion

The differences among unrelated plaintiffs' personal injury claims can confuse jurors by conflating dissimilar claims and evidence and by overloading jurors with information.  Jurors may improperly rely upon information relevant to one plaintiff's claims but not another's, which can bolster comparatively weaker claims merely by association with a stronger plaintiff's case.  This confusion can result in unfair prejudice from the so-called "perfect plaintiff problem" where jurors "combin[e] the strongest aspects of unrelated claims" into a composite that does not reflect reality.[14]

## B.  Juror Bias

Juror bias can occur in several ways.  When presented with multiple plaintiffs claiming injury from the same product, jurors may improperly *assume* that a defendant did something wrong, that the product is defective, or that the product can cause the harm alleged, even when overwhelming evidence contradicts this assumption.[15]  Consequently,

---

[13] *See* James M. Beck, *Little in Common: Opposing Trial Consolidation in Product Litigation*, 53 DRI FOR THE DEF. 28, 33 (Sept. 2011) ("No two mass tort plaintiffs are alike.  Even if they suffer similar injuries, they will have exposures that differ in intensity and duration.  They will have different medical histories and preexisting risk factors.").

[14] *See* Ill. Cent. R.R. Co. v. Gregory, 912 So. 2d 829, 835, 837 (Miss. 2005) (citing Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 343-45 (4th Cir. 1998) (ordering severance of asbestos exposure claims because "there is a danger of defendants being prejudiced").

[15] *See* David B. Sudzus et al., *More Plaintiffs, More Problems: The Prejudice of Multi-Plaintiff Trials*, 15 IN-HOUSE DEF. Q. 20 (Winter 2020).

consolidation risks a jury finding against a defendant based on strength in numbers of plaintiffs alone or other improper considerations unrelated to the actual merits of each plaintiff's individual claims.[16]  Further, hearing evidence of multiple plaintiffs' alleged wrongdoing in a single trial can generate greater juror animosity against defendants, leading to higher awards that may include the imposition of punitive damages, than if the cases were tried separately.

## C.  Prejudicial Spill-Over Evidence

A joint trial can further result in a jury considering evidence presented by one plaintiff that clearly would be inadmissible in another plaintiff's case.[17]  For example, the very fact that other lawsuits exist is generally inadmissible, but a jury would necessarily hear allegations of multiple other lawsuits in a consolidated trial.[18]  Other evidence, such as a defendant's subsequent remedial measures or state of knowledge of product risks at specific times, may be admitted for one plaintiff but not others, allowing the "wrong evidence considered for the wrong plaintiff."[19]

Courts have long recognized that these concerns regarding joint trials are well-founded, "mak[ing] it more likely that a defendant will be found liable and [that the trial] results in significantly higher damage awards."[20]  These effects have been shown in previous studies of multi-plaintiff trial outcomes.[21]

---

[16] *See In re* Van Waters & Rogers, Inc., 145 S.W.3d 203, 211 (Tex. 2004).

[17] *See, e.g.*, Cantrell v. GAF Corp., 999 F.2d 1007, 1011 (6th Cir. 1993) (finding in a joint trial involving two unrelated plaintiffs that "the potential for prejudice resulting from a possible spill-over effect of evidence . . . was obvious").

[18] *See, e.g.*, Davenport v. Goodyear Dunlop Tires N. Am., Ltd., No. 1:15-cv-03752-JMC, 2018 WL 833606, at *3 (D. S.C. Feb. 13, 2018) ("Evidence of other lawsuits . . . is inadmissible under [Federal Evidence] Rule 403. . . . Evidence of other lawsuits is likely to confuse and mislead the jury . . . and it is highly prejudicial." (quoting *In re* Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig., No. 2:12-MD-02327, 2014 WL 505234, at *6 (S.D.W. Va. Feb. 5, 2014))).

[19] Sudzus et al., *supra* note 15, at 20.

[20] Castano v. Am. Tobacco Co., 84 F.3d 734, 746 (5th Cir. 1996).

[21] *See* Beisner et al., *supra* note 5, at 12-13 (finding that joinder may cause jurors to confuse the evidence, and that when four or more plaintiffs are joined, it is more

In the 1990s, when courts confronted mass tort claims related to industrial uses of products such as asbestos, several courts initially embraced consolidated trials as a potential means to more efficiently manage crowded dockets.[22]  Over time, however, courts increasingly recognized problems with multi-plaintiff trials, both with respect to the fair and impartial administration of justice and with respect to any purported efficiency gain.[23]

As a result, the clear trend over the past several decades has been to bar or sharply limit multi-plaintiff trial consolidation.  Several jurisdictions have adopted general restrictions on trial consolidation.[24]  In addition, a number of states specifically ban the consolidation of cases alleging injury from exposure to asbestos unless the parties consent or the claims relate to members of the same household.[25]

---

likely the jury will be confused by the evidence, find in favor of the plaintiffs, and give a higher award to each plaintiff); Ableman et al., *supra* note 6, at 8 (stating that "consolidation creates a pro-plaintiff bias in the jury's consideration of damages").

[22] *See* Victor E. Schwartz & Leah Lorber, *A Letter to the Trial Judges of America: Help the True Victims of Silica Injuries and Avoid Another Litigation Crisis*, 28 AM. J. TRIAL ADVOC. 296, 326-27 (2004) ("[Consolidation] was initially appealing, and seemed logical . . . . Unfortunately, in lowering the barriers to litigation, courts unintentionally encouraged the filing of more claims.").

[23] *See* Eduardo C. Robreno, *The Federal Asbestos Product Liability Multidistrict Litigation (MDL-875): Black Hole or New Paradigm?*, 23 WIDENER L.J. 97, 108 (2013) (recognizing that claims aggregation practices "raised concerns regarding due process issues"); Linda S. Mullenix, *Reflections of a Recovering Aggregationist*, 15 NEV. L.J. 1455, 1477 (2015) ("For old-school aggregationists who have begun a process of rethinking (or re-education about) the virtues of aggregation, perhaps a good starting point is an appreciation of the fact that—contrary to received wisdom—it is not impossible to adjudicate large-scale dispersed litigation on an individualized basis.").

[24] *See* GA. CODE ANN. § 9-11-42(a) (requiring parties' consent to consolidation); LA. CODE CIV. PROC. ANN. art. 1561(B) (disallowing joinder if it will "[c]ause jury confusion, [p]revent a fair and impartial trial, [g]ive one party an undue advantage, [or] [p]rejudice the rights of any party"); MISS. R. CIV. P. 20 Advisory Committee Note (requiring "a distinct litigable event linking the parties"); Prohibition on "Bundling" Cases, Michigan Supreme Court Administrative Order No. 2006-6 (Aug. 9, 2006) ("The Court has determined that trial courts should be precluded from 'bundling' asbestos-related cases for settlement or trial."); MO. ANN. STAT. § 507.040(1) (West 2019).

[25] *See* Standing Order No. 1 at 67, *In re* Asbestos Litig., No. 77C-ASB-2 (Del. Super Ct. Oct. 13, 2006) ("Each asbestos action filed hereafter shall consist of one plaintiff . . . ."); GA. CODE ANN. § 51-14-11 (2007); IOWA CODE § 686B.7(4)(a) (2017); KAN. STAT. ANN. § 60-4902(j); N.D. CENT. CODE ANN. § 32-46.2-06(4) (2021); OHIO

Nevertheless, plaintiffs' lawyers have remained dogged in seeking consolidated trials. They likely recognize the potential for a multi-plaintiff trial to drive a more favorable litigation outcome in a manner untethered to individual claims' merits. The table in the Appendix below contains case examples where they were successful in persuading a court to hold a multi-plaintiff product injury trial.

# IV. Analysis

The Appendix lists forty-two cases in which a court authorized a multi-plaintiff product injury trial and the case proceeded to a jury verdict. These cases included as few as two unrelated plaintiffs and as many as twenty-seven. They involved a range of products, including earplugs, dust masks, talcum powder, grout sealer, glyphosate, fungicide, PCBs, lead paint, tobacco, and various prescription drugs and medical devices. The trial outcomes ranged from defense verdicts on one end to two plaintiffs' verdicts exceeding $1 billion on the other, one of which far surpassed all other plaintiffs' verdicts at $4.69 billion.[26]

Despite differences in the number of plaintiffs, products at issue, and trial outcomes, the data reveal a number of remarkable similarities. Below are five key takeaways.

## 1. Multi-Plaintiff Trials Resulted in High Success Rates for Plaintiffs

Juries returned a plaintiffs' verdict in thirty-six of the forty-two cases contained in the data set, reflecting an 85.7% success rate. A defense verdict was reached in five of the cases and the jury deadlocked in another case, resulting in a mistrial.[27]

Some of the plaintiffs' verdicts were not total victories because the jury did not award damages to every plaintiff whose claims were

---

REV. CODE ANN. § 42(A)(2); TENN. CODE ANN. § 29-34-306(b) (2012); TEX. CIV. PRAC. & REM. CODE ANN. § 90.009 (2005); W. VA. CODE ANN. § 55-7G-8(d)(1) (2015).

[26] *See infra* Appendix.

[27] *Id.*

consolidated. Nevertheless, in every instance, these partial victories resulted in multi-million dollar verdicts.[28]

This data suggests that multi-plaintiff trials overwhelmingly favor plaintiffs in terms of likelihood of success. One basis for comparison for this observational analysis of multi-plaintiff trials across the United States is to look at trial success rates across the United States. The U.S. Department of Justice (DOJ) has conducted several studies of civil trial success rates in tort cases, finding plaintiff win rates ranging from fifty-one to fifty-three percent.

Specifically, in 1995, the U.S. Department of Justice Bureau of Statistics published a study of tort cases from the nation's seventy-five largest counties, finding plaintiffs won 53% of trials.[29] A follow-up study published in 2004 found that plaintiffs won 51.6% of trials across all tort cases but had significantly lower success rates in product liability cases (44.2%).[30] Another study published in 2008 similarly found that plaintiffs won 51.6% of trials across all tort cases, except that plaintiffs had a slightly higher success rate in product liability cases alleging injury from exposure to asbestos (54.9%) and a substantially lower success rate (19.6%) for other product liability cases.[31]

None of these benchmarks approaches the plaintiffs' success rate seen in the multi-plaintiff trial data. Although these DOJ-reported trial success rates are imperfect benchmarks, it is unlikely the gap between the trial success rates for plaintiffs can be fully explained by chance alone. Rather, it appears trial consolidation augments litigation outcomes in plaintiffs' favor, even if other factors are at work.

This data also closely comports with earlier studies of multi-plaintiff trials. The previously referenced 2019 study of all MDL product liability trials during a ten-year period found that plaintiffs won more than 78% of the time in multi-plaintiff MDL trials, compared to less than 37% in

---

[28] *Id.*

[29] Steven K. Smith et al., *Special Report: Tort Cases in Large Counties*, U.S. Dep't of Just., Bureau of Just. Stat., NCJ-153177 (Apr. 1995), at 1, 5.

[30] Thomas H. Cohen & Steven K. Smith, *Bulletin: Civil Trial Cases and Verdicts in Large Counties, 2001*, U.S. Dep't of Just., Bureau of Just. Stat., NCJ-202803 (Apr. 2004), at 4.

[31] Lynn Langton & Thomas H. Cohen, *Civil Bench and Jury Trials in State Courts, 2005*, U.S. Dep't of Just., Bureau of Just. Stat., NCJ-223851 (Oct. 2008), at 4.

single-plaintiff MDL trials.[32]  The referenced NYCAL study found that plaintiffs alleging injury from exposure to asbestos won 88% of the time in a consolidated trial compared to 50% in individual trials.[33]

As a practical matter, it may make sense that trial success rates for plaintiffs and defendants would hover around 50%.  Only a small percentage of cases proceed to trial, with the inability of parties to reach a settlement providing a common reason.  Failure to settle is often the product of each side having widely divergent positions and believing they have a strong case and will prevail in a trial.  But, if plaintiffs can expect a far greater probability of success if the claims of multiple unrelated plaintiffs are heard together in a joint trial, it turns consolidation into a prize for plaintiffs to unbalance the playing field unrelated to claims' merits.

## 2. Most Multi-Plaintiff Trials Resulted in Large Verdicts

Equally as stark as plaintiffs' success rates in multi-plaintiff trials were the amounts of the verdicts.  They included some of the largest tort awards in the nation over the past two decades.  The data showed that 32 of the 36 cases in which plaintiffs prevailed (88.9%) resulted in a total verdict of $10 million or more, 25 (69.4%) resulted in a total verdict of $20 million or more, and 19 (52.8%) resulted in a total verdict of $50 million or more.[34]

There were also multiple nine-figure verdicts.  Fifteen of the cases (41.7%) resulted in a total verdict of $100 million or more, seven (19.4%) resulted in verdict of $200 million or more, and five (13.9%) resulted in a verdict of $500 million or more. In addition, two cases (5.6%) resulted in a total verdict of $1 billion or more.[35]

These large total verdicts, in turn, produced large awards on a per plaintiff basis (calculated by dividing the total verdict by the number of non-settling unrelated plaintiffs).  Twenty-seven of the 36 cases in which plaintiffs prevailed (75%) resulted in an average per plaintiff award of

---

[32] *See* Beisner et al., *supra* note 5, at 2.

[33] Ableman et al., *supra* note 6, at 1-2.

[34] *See infra* Appendix.

[35] *Id.*

$5 million or more, 25 (69.4%) resulted in an average per plaintiff award of $10 million or more, and 19 (52.8%) resulted in an average per plaintiff award of $20 million or more.[36]

A significant portion of plaintiffs included in this group obtained even larger average awards. Thirteen of the cases (36.1%) resulted in average per plaintiff awards of $30 million or more, nine (25%) resulted in average per plaintiff awards of $50 million or more, and five (13.8%) resulted in average per plaintiff awards of $100 million or more.[37]

These awards appear significantly larger than in comparable single-plaintiff product injury trials. Although comparisons are challenging with respect to sprawling litigations such as asbestos or ongoing MDLs, a few litigations involving a mix of multi-plaintiff and single-plaintiff trials illustrate the stark disparity.

For example, in an MDL alleging defective combat earplugs, sixteen bellwether trials were held. Fourteen of these trials involved a single plaintiff. The plaintiff prevailed in eight of these trials, and the jury returned a defense verdict in six of them. Four of the eight successful plaintiffs recovered $8.2 million or less. One recovered approximately $13 million. Two other plaintiffs recovered substantial awards of $50 million and $77.5 million, respectively.[38] In other words, six of the plaintiffs in single-plaintiff trials recovered nothing, another six recovered up to around $13 million, and the remaining two recovered extraordinary awards.

By comparison, in the two multi-plaintiff trials listed in the Appendix, plaintiffs prevailed in both cases and recovered more than $117 million, resulting in an average per plaintiff award of $23.4 million.[39]

Another example is the Pinnacle® hip implant litigation, which—like the earplug litigation—has largely concluded via mass settlement.[40] Four of the MDL cases were tried to verdict before settlement: one in a single-

---

[36] *Id.*

[37] *Id.*

[38] Jerin Jose Nesamony, *3M Earplugs Lawsuit Settlement Update 2024: What's New?*, LEZDO TECHMED (Sept. 4, 2024), https://www.lezdotechmed.com/blog/3m-earplug-lawsuit (providing summary chart of Bellwether verdicts).

[39] *See infra* Appendix.

[40] *See* Conor Hale, *J&J's Pinnacle Hip Settlements Total About $1B: Bloomberg*, FIERCE BIOTECH (May 8, 2019, 10:25 AM), https://www.fiercebiotech.com/medtech/j-j-s-pinnacle-hip-settlement-total-tops-1-billion-bloomberg.

plaintiff trial and the others in multi-plaintiff trials.[41]  The single-plaintiff trial resulted in a defense verdict.[42]  The three multi-plaintiff trials listed in the Appendix resulted in verdicts of $247 million, $502 million, and $1.04 billion, with an average per-plaintiff award of more than $105 million.[43]

Other bases of comparison show similarly sharp differences.  The DOJ Bureau of Statistics studies discussed above produced comparisons across different types of product injury cases.  The 2004 study reported a median award of $450,000 to a prevailing plaintiff in a product liability action, with a significantly higher median award of $1.65 million in cases alleging injury from exposure to asbestos.[44]  The study also reported a median award of $2 million in successful product liability actions claiming wrongful death.[45]  The 2008 study reported a median award of $567,000 to a prevailing plaintiff in a product liability action, with a higher median award of $682,000 in cases alleging injury from exposure to asbestos.[46]

Even adjusting for inflation, these amounts do not approach the verdicts seen in multi-plaintiff trials.  More recent data reported by the Insurance Information Institute pegged the median award in a product liability action in 2020 at $3.9 million.[47]  By way of comparison, the median award for prevailing plaintiffs in the Appendix is approximately $56.8 million.  The median per plaintiff award is about $20.6 million.[48]

Another basis for comparison is the sheer number of multi-plaintiff trial verdicts totaling $100 million or more.  A 2022 study of 1,376 jury verdicts of $10 million or more in personal injury and wrongful death

---

[41] *See Johnson & Johnson Wins First DePuy Pinnacle Hip Implant Trial*, POPE MCGLAMRY ATTORNEYS AT LAW, https://www.pmkm.com/johnson-johnson-wins-first-depuy-pinnacle-hip-implant-trial (last visited Sept. 21, 2024) [hereinafter *Johnson & Johnson Wins*] (stating that Johnson & Johnson won against a single plaintiff); *see also* Appendix (detailing in part the results of multi-plaintiff hip implant trials).

[42] *Johnson & Johnson Wins*, *supra* note 41.

[43] *See infra* Appendix.

[44] *See* Cohen & Smith, *supra* note 30, at 5.

[45] *See id.* at 10.

[46] *See* Langton & Cohen, *supra* note 31, at 5.

[47] *Facts + Statistics: Product Liability*, INS. INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-product-liability (last visited Sept. 19, 2024).

[48] *See infra* Appendix.

cases between 2010 and 2019 identified 101 verdicts nationally totaling more than $100 million.[49]  The data set in the Appendix below includes fifteen cases in which a jury awarded $100 million or more.[50]

The data also included two cases with verdicts exceeding $1 billion. In 2016, a jury awarded $1.04 billion to six plaintiffs in one of the Pinnacle® hip implant trials referenced, and in 2018, a jury awarded $4.69 billion to twenty-two plaintiffs alleging injury from exposure to asbestos in talcum powder.[51]  These awards also produced average awards of $173 million and $213 million per plaintiff.  By comparison, the same 2022 study of large jury verdicts identified nine total verdicts exceeding $1 billion over a ten-year period across all personal injury and wrongful death cases.[52]

Based on these comparisons, it appears reasonably clear that the consolidation of unrelated plaintiffs' product injury claims for a joint trial plays a role in the large total and per-plaintiff verdicts seen in so many of the cases.  The potential for consolidation—a procedural device that has nothing to do with claims' merits—to have *any* impact on a trial's outcome by inflating verdicts provides reason enough for courts to reject the practice.

### 3.  Numerous Juries Awarded Identical or Similar Amounts to Dissimilar Plaintiffs in the Same Case

More than one-third of the verdicts in the thirty-six cases in which plaintiffs prevailed raise an eyebrow because the jury awarded unrelated plaintiffs identical, or nearly identical, damages.  Such awards may evidence juror confusion or bias, or both, because the jury, after hearing different evidence pertaining to each plaintiff's unique claims, resolved to treat these dissimilar plaintiffs the same, or virtually the same, when determining liability and awarding damages.

The first two cases listed in the Appendix illustrate this concern. In the first case, the jury awarded $100 million to ten unrelated plaintiffs

---

[49] Cary Silverman & Christopher E. Appel, *Nuclear Verdicts: Trends, Causes, and Solutions,* 6, 8-9 (U.S. Chamber of Com., Inst. for Legal Reform, Sept. 2022).

[50] *See infra* Appendix.

[51] *See infra* notes 103 & 105 and accompanying text.

[52] Silverman & Appel, *supra* note 49, at 8-9.

alleging injury from a pharmaceutical product, with each plaintiff being awarded an identical $10 million.[53]  In the second case, the jury awarded $150 million to six unrelated plaintiffs, alleging that respirators failed to provide adequate protection, with each plaintiff being awarded an identical $25 million.[54]

In another case, *Agrofollajes, S.A. v. E.I. Du Pont De Nemours & Co., Inc.*, the jury awarded $113,486,696 split equally among twenty-seven plaintiffs alleging injuries from a fungicide used to protect crops from pests and disease.[55]  In the case involving the largest plaintiffs' verdict in the data set, *Ingham v. Johnson & Johnson*, the jury split a $4.69 billion award equally among twenty-two plaintiffs alleging injuries from exposure to asbestos in talcum powder.[56]  The plaintiffs included individuals who passed away from ovarian cancer, individuals who were undergoing treatment, and those whose cancer was in remission, each of whom had vastly different family histories of cancer and were "exposed to different amounts of [talcum powder], from different sources, during different time periods."[57]  Even so, each plaintiff was awarded $213.18 million, with the identical awards comprising $25 million in compensatory damages and $188.18 million in punitive damages.[58]

Other verdicts involving nearly identical damage awards appear similarly suspect.  For example, in *Eghnayem v. Boston Scientific Corp.*, the jury awarded $26,788,887 to four unrelated plaintiffs alleging injuries from an implanted medical device—surgeries necessarily unique to each plaintiff—with two plaintiffs being awarded identical damages of $6,722,222 and the two other plaintiffs being awarded similar sums of $6,533,333 and $6,766,666.[59]  In *Andrews v. DePuy Orthopaedics, Inc.*, the jury awarded $1.04 billion to six unrelated plaintiffs who alleged hip

---

[53] *See infra* note 80 and accompanying text.

[54] *See infra* note 81 and accompanying text.

[55] 48 So. 3d 976, 980-81, 983 (Fla. Dist. Ct. App. 2010); *see infra* note 83 and accompanying text.

[56] *See infra* note 105 and accompanying text.

[57] *See* Brief of Appellants at *24-25, Ingham v. Johnson & Johnson, No. ED 107476, 2019 WL 4696636 (Mo. Ct. App. Sept. 6, 2019) (discussing differences among plaintiffs).

[58] *See infra* note 105 and accompanying text.

[59] *See infra* note 100 and accompanying text.

implant injuries, with each plaintiff's award falling within the narrow range of $172 million to $174 million.[60]

Similarly, in *Barden v. Brenntag North America, Inc.*, which resulted in one of the largest verdicts on a per plaintiff basis, the jury awarded $787.3 million to four unrelated plaintiffs, alleging injury from exposure to asbestos in talcum powder, with each award falling within a narrow range. The jury awarded plaintiffs amounts of $193.4 million, $194.75 million, $196.95 million, and $202.2 million.[61]

In several of the cases involving identical or nearly identical verdicts, the verdict was ultimately vacated because joinder or consolidation of the unrelated plaintiffs' claims for trial was found improper. With respect to the first two cases listed in the Appendix and discussed above, the Mississippi Supreme Court specifically held in reviewing each case that "the identical amounts of damages awarded to each plaintiff," given each plaintiff's unique circumstances, demonstrated improper joinder.[62] Similarly, in *Agrofollajes*, the Florida District Court of Appeals found consolidation improper because, "[d]espite the diverse experiences of the twenty-seven plaintiffs, all were awarded the same exact percentage of their claimed damages," which resulted in the jury awarding "identical damages."[63] These decisions underscore what many other courts have long appreciated, namely that "confusion and prejudice is manifest in the identical damages awarded."[64]

## 4. Post-Trial Reversal or Modification of Plaintiffs' Verdicts Undercuts Trial Accuracy and Efficiency Claims

Most of the plaintiffs' verdicts from a multi-plaintiff trial did not withstand post-trial and appellate court scrutiny. The very different final case outcomes appear to undercut claims that consolidated trials produce

---

[60] *See infra* note 103 and accompanying text.

[61] *See infra* note 108 and accompanying text.

[62] 3M Co. v. Johnson, 895 So. 2d 151, 159 (Miss. 2005); Janssen Pharmaceutica, Inc. v. Bailey, 878 So. 2d 31, 48 (Miss. 2004).

[63] Agrofollajes, S.A. v. E.I. Du Pont de Nemours & Co., 48 So. 3d 976, 988 (Fla. Dist. Ct. App. 2010).

[64] Cain v. Armstrong World Indus., 785 F. Supp. 1448, 1455 (S.D. Ala. 1992).

correct outcomes as well as the principal rationale of judicial economy that has been used to justify holding a joint trial.

In eleven of the thirty-six cases in which plaintiffs prevailed at trial (30.6%), the trial court reduced or reversed the verdict, most often by remittitur.[65] Although remittitur standards vary by jurisdiction, remittitur is generally reserved for "the unusual case in which the jury's award is so patently excessive, so pervaded by a sense of wrongness, that it shocks the judicial conscience."[66] In addition, the trial court was required in several cases (separate from the eleven noted above) to reduce the verdict pursuant to state statutes placing maximum limits on noneconomic or punitive damage awards.[67]

In ten of the cases in which plaintiffs prevailed at trial (27.8%), an appellate court vacated or otherwise reversed the judgments in their entirety. In several other cases, an appellate court partially reversed damage awards or reduced the awards. Sometimes, the appellate court further reduced awards that had already been reduced by the trial court.[68]

In total, only five verdicts (13.9%) appeared to survive post-trial and appellate court scrutiny unscathed where the data was available. That figure may also be inflated because in several of the cases, there was no appellate court scrutiny due to a post-trial settlement. In eight of the more recent cases, an appeal is pending, so the data is not available to know whether the verdict withstands appellate court scrutiny.[69]

The reality that so few multi-plaintiff verdicts remain unchanged raises questions about the claimed accuracy and efficiency of a multi-plaintiff trial, especially when compared to the countervailing fairness concerns discussed. To be sure, verdicts were reversed or reduced for a variety of reasons, including reasons unrelated to trial consolidation,[70] but the

---

[65] See infra Appendix.

[66] Cuevas v. Wentworth Grp., 144 A.3d 890, 893 (N.J. 2016).

[67] See infra Appendix.

[68] Id.

[69] Id.

[70] See, e.g., Barden v. Brenntag N. Am., Inc., Nos. A-0047-20, A-0048-20, A-0049-20, A-0050-20, 2023 WL 6430088, at *2 (N.J. Super. Ct. App. Div. Oct. 3, 2023) (reversing and remanding because the trial court erroneously admitted expert testimony).

overall takeaway from the data is that multi-plaintiff trials are prone to modification for excessive verdicts and reversible error.

When awards are reversed, it means judicial time and resources were exhausted in the pursuit of an improper trial. For multi-plaintiff trials, this may entail lost weeks or even months of time for the court, jurors, and parties. The greater inherent complexity of a joint trial also likely entails greater lost time and resources than a single-plaintiff trial, although the limited information available for many cases here did not permit an in-depth analysis of multi-plaintiff trial times. At the very least, however, the data shows no observable efficiency gain that might support a trial court's decision to hold a joint trial.

## 5. Consolidated Multi-Plaintiff Product Injury Trials Are Rarely Held

The fact that the data set consists of only forty-two multi-plaintiff cases tried to verdict over the course of two decades is noteworthy in itself. It suggests many courts are attune to the concerns discussed about unfair prejudice resulting from joint trials and exercise restraint or skepticism toward procedural mechanisms that risk distorting trial outcomes.

Courts across the nation have expressed various rationales when rejecting a multi-plaintiff product injury trial. For example:

• "It would be practically impossible for a jury to keep track of all of the facts and applicable law regarding each of the [numerous] Plaintiffs," and therefore, "the purpose behind [consolidation]—to enhance judicial economy—would not be furthered by allowing all of the Plaintiffs to join together in a single action and single trial."[71]

• "[C]onsolidation risks the jury finding against a defendant based on sheer numbers, on evidence regarding a different plaintiff, or out of reluctance to find against a defendant with regard to one plaintiff and not another."[72]

---

[71] Adams v. Alliant Techsystems, Inc., No. 7:99CV00813, 2002 WL 220934, at *2 (W.D. Va. Feb. 13, 2002).

[72] In re Van Waters & Rogers, Inc., 145 S.W.3d 203, 211 (Tex. 2004).

•"[L]itigation of . . . claims will involve extensive medical evidence that is sure to vary across plaintiffs . . . . Accordingly, the nature and extent of [the] defendants' liability will be unique to each plaintiff. The same is true for damages."[73]

•"Joinder 'of several plaintiffs who have no connection to each other *in no way* promotes trial convenience or expedites the adjudication of asserted claims.'"[74]

•"[T]he risks of prejudice and juror confusion substantially outweigh the benefits of consolidating . . . .[,] [a]lthough there are many overlapping witnesses and some common issues of law and fact . . . ."[75]

It is possible, of course, that the research challenges discussed of identifying more case examples proved too formidable, although several considerations suggest otherwise. First, the variety of research approaches used, including formal legal research and informal communications with practitioners, would appear likely to capture a greater swath of cases, or at least point in the direction of more examples, if multi-plaintiff trial consolidation was more commonplace in product injury cases. Instead, these efforts, which included surveying the memberships of major organizations (whose members are most likely involved in or aware of such cases), only reinforced how uncommon multi-plaintiff product injury trials appear to be throughout the United States.

Second, studies that have examined multi-plaintiff trial outcomes illustrate how rare these joint trials are. Two studies drawn upon to develop the data set here—one study examining all federal court MDL multi-plaintiff product liability trials over a ten-year period and another examining NYCAL multi-plaintiff trials over a five-year period—each identified only seven case examples.[76] The twenty-eight additional cases included in this analysis represents a sizable increase compared to these other studies, but the net was cast far wider to include the entire nation, and the duration extended beyond two decades.

---

[73] Ellis v. Evonik Corp., 604 F. Supp. 3d 356, 378 (E.D. La. 2022).

[74] *In re* Rezulin Prods. Liab. Litig., 168 F. Supp. 2d 136, 146 (S.D.N.Y. 2001) (emphasis added) (quoting *In re* Diet Drugs, No. Civ. A. 98-20478, 1999 WL 554584, at *3 (E.D. Pa. July 16, 1999)).

[75] Bowles v. Novartis Pharms. Corp., Nos. 3:12-cv-145, 3:12-cv-238, 2013 WL 663040, at *2 (S.D. Ohio Feb. 25, 2013).

[76] Beisner et al., *supra* note 5, at 2; Ableman et al., *supra* note 6, at 6.

AMERICAN JOURNAL OF TRIAL ADVOCACY    [Vol. 47:225

Third, the rarity of multi-plaintiff product injury trials is supported by the lack of legal scholarship discussing case examples. A number of articles have examined the fundamental fairness concerns regarding consolidated product injury trials, yet most cite only a few examples.[77]

The relative scarcity of multi-plaintiff product injury cases tried to verdict also did not appear to be from lack of effort by plaintiffs' lawyers. In researching cases to potentially include in the Appendix, it appeared clear that courts were often asked to consolidate product injury cases for trial and often rejected the request in light of concerns about jury confusion, bias, and unfair prejudice.[78]

# Conclusion

This analysis of multi-plaintiff product injury trial outcomes indicates that joint trials are relatively rare, for good reasons. Plaintiffs overwhelmingly win, and win big, in multi-plaintiff trials because aggregation outcomes often are not reflective of the individual claims. For that reason, these verdicts often do not withstand post-trial and appellate court scrutiny. Some of the verdicts are so large, and so similar among multiple plaintiffs of dissimilar circumstances, that it is hard to see how juror confusion or bias did not play a role. Each of these observations lends additional support to concerns that have been voiced by courts, and in other analyses, regarding the risks that a multi-plaintiff product injury trial will substantially prejudice defendants and deny due process. As a federal appellate court explained forty years ago when rejecting a joint trial, "considerations of convenience may not prevail where the inevitable consequence to another party is harmful and serious prejudice."[79] That concern appears manifest in the multi-plaintiff trials conducted over the past two decades.

---

[77] *See, e.g.*, Sudzus et al., *supra* note 15, at 20; Beck, *supra* note 13, at 31.

[78] *See, e.g.*, Rosewolf v. Merck & Co., Inc., Nos. 22-cv-02072-JSW, 22-cv-02263-JSW, 2022 WL 3214439, at *2-*4 (N.D. Cal. Aug. 9, 2022); Levi v. DePuy Synthes, No. 19L-10969 (Cir. Ct., Cook Cnty., Ill. Nov. 14, 2022); Bower v. Wright Med. Tech. Inc., No. 2:17-cv-03178-CAS, 2019 WL 3947088, at *3 (C.D. Cal. Aug. 19, 2019); Wanke v. Invasix, Inc., No. 2:19-cv-02978-RGK-KS, 2019 WL 7997250, at *3 (C.D. Cal. Aug. 7, 2019).

[79] Arnold v. E. Air Lines, Inc., 712 F.2d 899, 906 (4th Cir. 1983) (citing Molever v. Levenson, 539 F.2d 996, 1003 (4th Cir. 1976)).

# Appendix

| Trial Year | Case | Product | # of Unrelated Plaintiffs | Trial Outcome | Post-Trial and Appellate Review |
|---|---|---|---|---|---|
| 2001 | Bailey v. Janssen Pharm. Inc.[80] | Pharmaceutical (Propulsid) | 10 | **$100 million award** split among ten plaintiffs ($10 million each). | Award reversed on appeal – improper joinder of claims. |
| 2001 | Johnson v. 3M Co.[81] | Dust Mask /Respirator | 10 pre-trial (6 at time of verdict) | **$150 million award** split among six plaintiffs remaining at time of verdict ($25 million each). | Award reversed on appeal – improper joinder of claims. |
| 2004 | *In re* New York Asbestos Litig. (Marshall & Mayer)[82] | Asbestos | 2 | **$22 million award** split between two plaintiffs – $14 million (Mayer) and $8 million (Marshall). | Trial court approved remittitur of award to $4.5 million (Mayer) & $3 million (Marshall). |
| 2006 | Agrofollajes, S.A. v. E.I. Du Pont De Nemours & Co.[83] | Fungicide | 27 | **$113,486,696 award** split equally among 27 plaintiffs. | Trial court entered defense verdict with respect to seven plaintiffs; awards of 20 other plaintiffs reversed on appeal. |
| 2006 | Goforth & Quinn v. Lincoln Elec. Co.[84] | Manganese in welding fumes | 2 | **Defense verdict.** | |

---

[80] No. 2000-20 (Miss. Cir. Ct.-Jeff. Cnty), *rev'd*, 878 So. 2d 31 (Miss. 2004).

[81] No. 2000-181 (Miss. Cir. Ct.-Holms Cnty.), *rev'd*, 3M Co. v. Johnson, 895 So. 2d 151 (Miss. 2005).

[82] Nos. 119369/02, 590192/02 (N.Y. Sup. Ct. N.Y. Cnty.), *modified*, 812 N.Y.S.2d 514 (N.Y. App. Div. 2006).

[83] Super Helechos, S.A. v. E.I. Du Pont De Nemours & Co., Nos. 01-06932, 01-23796 (Fla. Cir. Ct. 2006), *rev'd*, Agrofollajes, S.A. v. E.I. Du Pont De Nemours & Co., 48 So. 3d 976 (Fla. Dist. Ct. App. 2010), *rev. denied*, 69 So. 3d 277 (Fla. 2011); *see also* Super Helechos S.A., 2006 WL 1889335 (Fla Cir. Ct. 2006) (verdict summary).

[84] Nos. 1:06-CV-17217, 1:06-CV-17218 (N.D. Ohio) (MDL 1535); Beisner et al., *supra* note 5, at 12 (reporting trial outcome).

| Trial Year | Case | Product | # of Unrelated Plaintiffs | Trial Outcome | Post-Trial and Appellate Review |
|---|---|---|---|---|---|
| 2007 | Humeston & Hermans v. Merck & Co.[85] | Pharma-ceutical (Vioxx) | 2 | **$47.5 million award** to prevailing plaintiff (Humeston) following split verdict in joint trial on negligence. | Global settlement reached. |
| 2007 | McDarby v. Merck & Co., Inc.[86] | Pharma-ceutical (Vioxx) | 2 | **$17.97 million award** split between two plaintiffs – $15.7 million (McDarby) and $2.27 million (Cona). | Compensatory damages award of $4.5 million (McDarby) affirmed, and awards of punitive damages and attorney fees reversed on appeal. |
| 2007 | Casale v. A.O. Smith Water Prods. Co. / Rosenberg v. Alpha Wire Co.[87] | Asbestos | 2 | **$9 million award** split between two plaintiffs – $5 million (Casale) and $4 million (Rosenberg). | Unclear. |
| 2008 | Sager v. Hoffman-La Roche, Inc.[88] | Pharma-ceutical (Accutane) | 3 | **$12,895,500 award** split among three plaintiffs – $8,642,500 (Speisman), $2,625,000 (Sager), and $1,628,000 (Mace). | Trial court remitted $1,628,000 award (Mace) to $578,000. Plaintiffs' judgments reversed on appeal. |
| 2010 | Bell v. Roanoke Cos. Grp., Inc.[89] | Grout sealer | 5 | **Defense verdict.** | |

---

[85] Nos. L-2271-03, L-5520-05 (N.J. Super. Ct.-Atl. Cnty.); *see also NJ Jury Splits Negligence Findings in Dual Vioxx Trial*, 10 No. 10 ANDREWS DRUG RECALL LITIG. REP. 2 (2007); 23 No. 2 Andrews Pharm. Litig. Rep. 2 (2007).

[86] Nos. L-3553-05-MT, L-1296-05-MT (N.J. Super. Ct.-Atl. Cnty.), *rev'd in part*, 949 A.2d 223 (N.J. Super. Ct. App. Div. 2008).

[87] Nos. 104299/06, 106697/06 (N.Y. Sup. Ct.); *see also* 2007 Jury Verdicts LEXIS 41538.

[88] Nos. L-197-05, L–196-05, L-199-05 (N.J. Super. Ct.-Atl. Cnty.), *remanded*, 2012 WL 967626 (N.J. Super. Ct. App. Div. Mar. 23, 2012), *opinion after remand*, 2012 WL 3166630 (N.J. Super. Ct. App. Div. Aug. 7, 2012), *cert. denied*, 65 A.3d 835 (N.J. 2013).

[89] No. 1:07-cv-00687 (N.D. Ga.) (MDL 1804); Beisner et al., *supra* note 5, at 12 (reporting trial outcome).

| Trial Year | Case | Product | # of Unrelated Plaintiffs | Trial Outcome | Post-Trial and Appellate Review |
|---|---|---|---|---|---|
| 2011 | *In re* New York City Asbestos Litig. (Konstantin & Dummitt)[90] | Asbestos | 7 pre-trial (2 at time of verdict) | **$51,550,157 award** split between two non-settling plaintiffs – $32 million (Dummitt) & $19,550,157 (Konstantin). | Parties stipulated to reduced damages award and judgment affirmed on appeal. |
| 2011 | *In re* New York City Asbestos Litig. (Koczur & McCarthy)[91] | Asbestos | 2 | **$21,150,000 award** split between two plaintiffs – $13.65 million (Koczur) and $8.5 million (McCarthy). | Trial court approved remittitur of $13.65 million award to $6.5 million (Koczur) and sustained $8.5 million award (McCarthy). |
| 2011 | Gaghan v. Hoffman-La Roche Inc.[92] | Pharmaceutical (Accutane) | 3 | **$2,125,617 award** to one plaintiff (Gaghan) and defense verdict for two others (Greenblatt & Andrews). | Judgment for prevailing plaintiff (Gaghan) reversed on appeal – claim time-barred. |
| 2012 | Rossitto v. Hoffman-La Roche Inc.[93] | Pharmaceutical (Accutane) | 4 | **$18 million award** split between two prevailing plaintiffs (Rossitto & Wilkinson - $9 million each), and defense verdict for two others (Reynolds & Young). | Judgments for prevailing plaintiffs (Rossitto & Wilkinson) vacated on appeal. |

---

[90] Nos. 11498, 11499, 11500, 190134/10, 190196/10 (N.Y. Sup. Ct.-N.Y. Cnty.), *aff'd*, 990 N.Y.S.2d 174 (N.Y. App. Div. 2014), *appeal denied*, 28 N.E.3d 33 (N.Y. 2015); *see also In re* New York City Asbestos Litig. (Dummitt), 59 N.E.3d 458 (N.Y. 2016) (discussing post-trial outcome).

[91] Nos. 122340/99, 122304/99 (N.Y. Sup. Ct.-N.Y. Cnty.); *see also* Konstantin v. 630 Third Ave. Assocs., No. 190134/10, 2012 WL 4748316, at *15 (N.Y. Sup. Ct.-N.Y. Cnty. Sept. 20, 2012); *In re* New York City Asbestos Litig. (Peraica), No. 190339/2011, 2013 WL 6003218 (N.Y. Sup. Ct.-N.Y. Cnty. Nov. 6, 2013) (discussing *Koczur & McCarthy* trial outcome).

[92] Nos. A-2717-11, A-3211-11, A-3217-11 (N.J. Super. Ct.-Atl. Cnty.), *aff'd & rev'd in part*, 2014 WL 3798338 (N.J. Super. Ct. App. Div. Aug. 4, 2014).

[93] Nos. L-7481-10, L-1311-08 (N.J. Super. Ct. Law Div.-Atl. Cnty.), *vacated*, 2016 WL 3943335 (N.J. Super Ct. App. Div. July 22, 2016), *cert. denied*, 157 A.3d 839 (N.J. 2016) (Wilkinson) & 157 A.3d 841 (N.J. 2016) (Rossitto).

| Trial Year | Case | Product | # of Unrelated Plaintiffs | Trial Outcome | Post-Trial and Appellate Review |
|---|---|---|---|---|---|
| 2012 | *In re* New York City Asbestos Litig. (Paolini)[94] | Asbestos | 2 | **Defense verdict** | |
| 2013 | *In re* New York City Asbestos Litig. (Assenzio)[95] | Asbestos | 5 | **$190 million award** split among five plaintiffs. $30 million (Assenzio), $60 million each to two others (Levy & Serna), and $20 million each to two others (Brunck & Vincent). | Trial court approved remittitur of award to $29.85 million: $6 million (Assenzio), $3.2 million (Brunck), $8.15 million (Levy), $7.5 million (Serna) & $5 million (Vincent). |
| 2013 | *In re* New York City Asbestos Litig. (Peraica)[96] | Asbestos | 7 pre-trial (1 at time of verdict) | **$35 million award** to remaining plaintiff at time of verdict (other plaintiffs settled). | Trial court approved remittitur of award to $18 million, and award reduced further on appeal. |
| 2014 | *In re* New York City Asbestos Litig. (Sweberg & Hackshaw)[97] | Asbestos | 2 | **$25 million award** split between two plaintiffs – $15 million (Sweberg) and $10 million (Hackshaw). | Trial court approved remittitur of award to $16 million: $10 million (Sweberg), $6 million (Hackshaw), and award reduced further on appeal. |

[94] Ableman et al., *supra* note 6, at 14 (reporting trial outcome).

[95] *See id.*; Assenzio v. A.O. Smith Water Prods. Co., No. 190008/12, 2015 WL 667907 (N.Y. Sup. Ct.-N.Y. Cnty. Feb. 5, 2015).

[96] *See* Ableman et al., *supra* note 6, at 5, 14 (reporting trial outcome); Peraica v. A.O. Smith Water Prod. Co., 39 N.Y.S.3d 392 (N.Y. App. Div. 2016).

[97] Nos. 190022/13, 190017/13 (N.Y. Sup. Ct.-N.Y. Cnty.), *modified*, 2015 WL 246547 (N.Y. Sup. Ct.-N.Y. Cnty. Jan. 7, 2015), *modified further*, 143 A.D.3d 483 & 143 A.D.3d 485 (N.Y. App. Div. 1st Dept. 2016); *see also* Ableman et al., *supra* note 6, at 5, 14 (reporting trial outcome).

| Trial Year | Case | Product | # of Unrelated Plaintiffs | Trial Outcome | Post-Trial and Appellate Review |
|---|---|---|---|---|---|
| 2014 | *In re* New York City Asbestos Litig. (Juni, Fersch & Middleton)[98] | Asbestos | 3 pre-trial (1 at time of verdict) | **$11 million award** to remaining plaintiff (Juni) at time of verdict – one plaintiff (Fersch) settled and another (Middleton) discontinued case. | Trial court granted defense motion to set aside verdict, which appellate courts affirmed due to improper expert evidence. |
| 2014 | *In re* New York City Asbestos Litig. (McCloskey, Brown & Terry)[99] | Asbestos | 3 | **$12.5 million award** split among three plaintiffs – $6 million (McCloskey), $3.5 million (Brown), and $3 million (Terry). | Trial court approved remittitur of award. |
| 2014 | Eghnayem v. Boston Scientific Corp.[100] | Medical Device (Pelvic mesh) | 4 | **$26,744,443 award** split among four plaintiffs – $6,722,222 each to two plaintiffs (Eghnayem & Betancourt), $6,533,333 to another (Nunez), and $6,766,666 to another (Dotres). | Judgment affirmed on appeal. |
| 2014 | Tyree v. Boston Scientific Corp.[101] | Medical Device (Pelvic mesh) | 4 | **$18.5 million award** split among four plaintiffs – $4.75 million (Wilson), $4.25 million (Tyree & Campbell), and $5.25 million (Blankenship). | Post-verdict settlement with two plaintiffs. Judgments affirmed on appeal for remaining two plaintiffs. |

[98] Nos. 190315/12, 190468/12, 190367/12, 11 N.Y.S.3d 416 (N.Y. Sup. Ct.-N.Y. Cnty.), *aff'd*, 148 A.D.3d 233 (1st Dept. 2017), *aff'd*, 116 N.E.3d 75 (N.Y. 2018); *see also* Ableman et al., *supra* note 6, at 5 (reporting trial outcome).

[99] Nos. 190441/12, 190415/12, 190403/12 (N.Y. Sup. Ct.-N.Y. Cnty.), *modified*, 2014 WL 4311725 (N.Y. Sup. Ct.-N.Y. Cnty. Aug. 29, 2014) (McCloskey), 2014 WL 8509004 (N.Y. Sup. Ct.-N.Y. Cnty. Aug. 29, 2014) (Brown), *aff'd*, 146 A.D.3d 461 (App. Div. 2017); *see also* Ableman et al., *supra* note 6, at 5, 14 (reporting trial outcome); Brief for Defendant-Appellant, *In re* New York City Asbestos Litig. (Konstantin), No. APL-2014-00317, 2015 WL 11120461, at *26 (N.Y. Apr. 24, 2015) (reporting trial outcome of Terry).

[100] Nos. 1:14-cv-024061, 1:14-cv-24064, 1:14-cv-24065, 1:14-cv-24066, 2016 WL 4051311 (S.D. Fla. Mar. 17, 2016), *aff'd*, 873 F.3d 1304 (11th Cir. 2017); *see also* 2014 WL 10356487 (S.D. Fla. Nov. 13, 2014) ("Reading of the Verdict").

[101] Nos. 2:12-cv-08633 (lead case), 2:13-cv-18786, 2:13-cv-22906, 2:14-cv-05475, 2014 WL 10356506 (verdict), 2016 WL 5796906 (S.D. W. Va.), *aff'd sub nom.* Campbell v. Boston Sci. Corp., 882 F.3d 70 (4th Cir. 2018).

| Trial Year | Case | Product | # of Unrelated Plaintiffs | Trial Outcome | Post-Trial and Appellate Review |
|---|---|---|---|---|---|
| 2016 | Aoki v. DePuy Orthopaedics Inc.[102] | Medical Device (Hip implant) | 5 | **$502 million award** split among five plaintiffs – total award comprised of $536,514 in economic damages, $141.5 million in noneconomic damages, and $360 million in punitive damages: $74 million (Aoki), $90 million (Greer), $75 million (Christopher), $92 million (Peterson), and $170 million (Klussmann). | $360 million punitive damages award reduced to $9.6 million pursuant to statutory cap. Remaining judgments reversed and vacated on appeal. |
| 2016 | Andrews v. DePuy Orthopaedics, Inc.[103] | Medical Device (Hip implant) | 6 | **$1.04 billion award** split among six plaintiffs – total award of $28.3 million compensatory damages and $1.008 billion punitive damages: $173.36 million (Andrews), $173.33 million (Davis), $173.27 million (Metzler), $174 million (Rodriguez), $174 million (Standerfer), & $173.28 million (Weiser). | Punitive damage awards ($168 million per plaintiff) reduced by trial court to $36.225 million for each of four plaintiffs (Andrews, Davis, Metzler & Weiser), and to $54.552 million for each of two other plaintiffs (Rodriguez & Standerfer). Global settlement reached while appeal pending. |

---

[102] Nos. 3:13-cv-1071-K, 3:14-cv-1994-K, 3:12-cv-1672-K, 3:11-cv-2800-K, 3:11-cv-1941-K, 2016 WL 4423417 (N.D. Tex.) (MDL 2244) (verdict), *rev'd*, 888 F.3d 753 (5th Cir. 2018).

[103] Nos. 3:11-md-2244-K; 3:15-cv-3484-K; 3:15-cv-1767-K; 3:12-cv-2066-K; 3:13-cv-3938-K; 3:14-cv-1730-K; 3:13-cv-3631-K (N.D. Tex.) (MDL 2244); *see also* Opening Brief of Appellants, *In re* DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig., 2017 WL 3421222, at *31 (5th Cir. July 31, 2017) (providing verdict breakdown).

| Trial Year | Case | Product | # of Unrelated Plaintiffs | Trial Outcome | Post-Trial and Appellate Review |
|---|---|---|---|---|---|
| 2016 | Alicea v. DePuy Ortho-paedics, Inc.[104] | Medical Device (Hip implant) | 6 | **$247.49 million award** split among six plaintiffs – total award $79.49 million compensatory damages and $168 million punitive damages: $40.05 million (Alicea), $39.44 million (Barzel), $48.63 million (Kirschner), $44.06 million (Miura), $37.46 million (E. Stevens), & $37.83 million (M. Stevens). | Global settlement reached while appeal pending. |
| 2018 | Ingham v. Johnson & Johnson[105] | Talcum powder | 22 | **$4.69 billion award** split among 22 plaintiffs – total award of $550 million compensatory damages and $4.14 billion punitive damages. Each plaintiff awarded $213.18 million ($25 million compensatory damages & $188.18 million punitive damages). | Damages award reduced on appeal to $1.4 billion against one defendant ($500 million compensatory damages & $900 million punitive damages) and to $840.9 million for co-defendant ($125 million jointly liable compensatory damages & $715.9 million punitive damages). |
| 2018 | Gerald & Brown v. R.J. Reynolds Tobacco Co.[106] | Tobacco | 2 | **$113.3 million award** split between two plaintiffs – $31 million (Gerald) & $82.3 million (Brown). | Punitive damages award of $30 million (Gerald) reduced to $14.4 million, and $70 million compensatory damages award (Brown) vacated on appeal. |

[104] Nos. 3:15-cv-03489-K, 3:16-cv-01245-K, 3:16-cv-01526-K, 3:13-cv-04119-K, 3:14-cv-01776-K, 3:14-cv-02341-K (N.D. Tex.) (MDL 2244); *see also* Court's Charge to the Jury & Verdict, *In re* DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prods. Liab. Litig., No. 3:15-cv-03489-K, Doc. 237 (N.D. Tex. Nov. 16, 2017); 2017 LexisNexis Jury Verdicts & Settlements 76.

[105] No. 1522-CC10417-01 (Mo. Cir. Ct.-St. Louis Cty.), *modified*, 608 S.W.3d 663 (Mo. Ct. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021).

[106] Nos. ST-10-CV-631, ST-10-CV-692 (V.I.), *modified and rev'd in part*, 2022 WL 2528307 (V.I. July 7, 2022).

| Trial Year | Case | Product | # of Unrelated Plaintiffs | Trial Outcome | Post-Trial and Appellate Review |
|---|---|---|---|---|---|
| 2019 | Burton v. American Cyanamid Co.[107] | Lead paint | 3 | **$6 million award** split among three plaintiffs ($2 million each) | Judgments reversed on appeal. |
| 2020 | Barden v. Brenntag North Am., Inc.[108] | Talcum powder | 4 | **$787.3 million award** split among four plaintiffs – total award $37.3 million compensatory damages and $750 million punitive damages. $194.75 million (Barden), $196.95 million (Etheridge), $202.2 million (McNeill), & $193.4 million (Ronnig). | Punitive damages award of $750 million reduced by trial court to $187.5 million (5:1 ratio of punitive-to-compensatory damages for each plaintiff). Judgments reversed on appeal – improper expert evidence. |
| 2021 | *In re* 3M Combat Arms Earplug Prods. Liab. Litig. (Estes, Hacker, Keefer)[109] | Earplugs | 3 | **$7.1 million award** split among three plaintiffs – including $6.3 million in punitive damages split equally per plaintiff. | Appeal voluntarily dismissed. |

    [107] No. 2:07-cv-00303 (E.D. Wis. June 28, 2019 verdict), *rev'd sub nom.* Burton v. E.I. du Pont de Nemours & Co., Inc., 994 F.3d 791 (7th Cir. 2021); *see also* Cara Salvatore, *Sherwin-Williams, DuPont to Pay Millions in Lead Paint Cases*, LAW360 (June 6, 2019, 7:01 PM EDT), https://www.law360.com/real-estate-authority/articles/1165328/sherwin-williams-dupont-to-pay-millions-in-lead-paint-cases; Mike Curley, *Sherwin-Williams, DuPont Nab Win in Lead Paint Suits*, LAW360 (Mar. 4, 2022, 2:19 PM EST), https://www.law360.com/articles/1470506/sherwin-williams-dupont-nab-win-in-lead-paint-suits.

    [108] Nos. L-1809-17, L-0932-17, L-7049-16, L-6040-17 (N.J. Super. Ct. Law Div.), *rev'd*, Nos. A-0047-20, A-0048-20, A-0049-20, A-0050-20, 2023 WL 6430088 (N.J. Super. Ct. App. Div. Oct. 3, 2023); 2020 LexisNexis Jury Verdicts & Settlements 9 (providing verdict breakdown); 2019 Jury Verdicts LEXIS 108655 (also providing verdict breakdown).

    [109] No. 3:19-md-02885 (*Estes*, No. 7:20-cv-137, *Hacker*, No. 7:20-cv-131, *Keefer*, No. 7:20-cv-104) (N.D. Fla. Apr. 30, 2021 verdict), *appeal pending*, 3M Co. v. Estes, Nos. 21-13131, 21-13133, 21-13135 (11th Cir.) (oral argument held May 1, 2023); Cara Salvatore, *3M Hit with $7.1M Verdict in Earplug MDL Bellwether Trial*, LAW360 (Apr. 30, 2021, 9:39 PM EDT), https://www.law360.com/articles/1380107/3m-hit-with-7-1m-verdict-in-earplug-mdl-bellwether-trial.

| Trial Year | Case | Product | # of Unrelated Plaintiffs | Trial Outcome | Post-Trial and Appellate Review |
|---|---|---|---|---|---|
| 2021 | Forrest v. Johnson & Johnson[110] | Talcum powder | 3 | **Defense verdict** | |
| 2021 | Erickson v. Monsanto[111] | Polychlorinated Biphenyls (PCBs) | 3 | **$185 million award** – total award comprised of $50 million compensatory damages and $135 million punitive damages. $60 million (Erickson), $63 million (Leahy), & $62 million (Marquardt). | Judgment reversed on appeal – claims barred by statute of repose. Further appeal pending. |
| 2021 | Long v. Pharm. LLC[112] | PCBs | 3 | **$62 million award** to seven plaintiffs, five of whom are related (parent and four children) – total award of $27 million compensatory damages and $35 million punitive damages ($5 million per plaintiff). | Appeal pending. |

[110] No. 1522-CC00419-02 (Mo. Cir. Ct.-St. Louis City Sept. 27, 2021) (defense verdict); *see also* Magda Patitsas & Corey Schaecher, *Jury Returns Defense Verdict in Third Post-Pandemic Ovarian Cancer Talc Trial*, JD SUPRA (Oct. 8, 2021), https://www.jdsupra.com/legalnews/jury-returns-defense-verdict-in-third-9687311; David Siegel, *Johnson & Johnson Scores Cosmetic Talc Trial Victory in Missouri*, CVN (Sept. 27, 2021, 10:44 PM), https://blog.cvn.com/breaking-johnson-johnson-scores-cosmetic-talc-trial-victory-in-missouri.

[111] No. 18-2-11915-4 SEA (Wash. Super. Ct.-King Cnty. July 27, 2021 verdict), *rev'd* Erickson v. Pharmacia LLC, 548 P.3d 226 (Wash. Ct. App.), *review granted*, 2024 WL 4450637 (Wash. Oct. 9, 2024); *see also* Craig Clough, *Monsanto Hit with $185M Verdict over PCB Brain Damage*, LAW360 (July 27, 2021, 10:01 PM EDT), https://www.law360.com/articles/1407322/monsanto-hit-with-185m-verdict-over-pcb-brain-damage.

[112] No. 18-2-11915-4 SEA (Wash. Super. Ct.-King Cnty. July 27, 2021 verdict), *on appeal*, No. 84715-5-I (Wash. Ct. App.); *see also* Greg Lamm, *Monsanto Seeks to Undo 'Staggering' $62M PCBs Verdict*, LAW360 (Apr. 26, 2023, 7:55 PM EDT), https://www.law360.com/articles/1601089/monsanto-seeks-to-undo-staggering-62m-pcbs-verdict; David Siegel, *Bayer's Monsanto Hit with $62M Verdict over PCB Chemicals in WA State School*, CVN (Nov. 11, 2021, 10:41 PM), https://blog.cvn.com/bayers-monsanto-hit-with-62m-verdict-over-pcb-chemicals-in-wa-state-school.

254                  AMERICAN JOURNAL OF TRIAL ADVOCACY                  [Vol. 47:225

| Trial Year | Case | Product | # of Unrelated Plaintiffs | Trial Outcome | Post-Trial and Appellate Review |
|---|---|---|---|---|---|
| 2022 | Wayman v. 3M Co.[113] | Earplugs | 2 | **$110 million award** split equally between two plaintiffs – each awarded $15 million compensatory damages and $40 million punitive damages. | Trial court reduced the verdict of one plaintiff (Wayman) from $55 million to $21.7 million based on Colorado's caps on noneconomic and punitive damages. |
| 2022 | Beutler v. Pharmacia LLC[114] | PCBs | 4 | **$21.37 million award** to four plaintiffs, three of whom are related (siblings) | Appeal pending. |
| 2022 | Soley v. Monsanto Pharmacia LLC[115] | PCBs | 3 | **Mistrial** – jury deadlocked. Trial included ten plaintiffs comprised of three groups of parents and their children. | |

---

[113] No. 7:20-cv-00149 & Sloan v. 3M Co., No. 7:20-cv-00001 (N.D. Fla. Jan. 27, 2022 verdict), 2022 WL 3703960 (N.D. Fla. May 24, 2022); Order, *In re* 3M Combat Arms Earplug Prods. Liab. Litig., No. 3:19-md-2885 (N.D. Fla. May 24, 2022) (reducing verdict); *see also* Grace Dixon, *3M Looks to Cut $55M Verdict in Veteran Bellwether Case*, Law360 (Mar. 9, 2022, 7:21 PM EST), https://www.law360.com/articles/1472191/3m-looks-to-cut-55m-verdict-in-veteran-bellwether-case; Lauren Berg, *3M Hit with $110M Verdict in Fla. Military Earplug Bellwether*, Law360 (Jan. 27, 2022, 10:41 PM EST), https://www.law360.com/articles/1459588/3m-hit-with-110m-verdict-in-fla-military-earplug-bellwether; Nate Raymond, *U.S. Judge Cuts $55 Million 3M Combat-Earplug Verdict by over Half*, Reuters (May 25, 2022, 10:40 AM CDT), https://www.reuters.com/legal/litigation/us-judge-cuts-55-million-3m-combat-earplug-verdict-by-over-half-2022-05-25.

[114] No. 21-2-14302-1 SEA (Wash. Super. Ct.-King Cnty. June 2, 2022 verdict), *on appeal*, No. 84715-5 (Wash. Ct. App.); *see also* David Siegel, *Jury Returns $21.4M Verdict Against Monsanto in 3rd Trial over PCB Contamination at Wash. State School*, CVN (June 5, 2022, 9:32 PM), https://blog.cvn.com/jury-returns-21.4m-verdict-against-monsanto-in-4th-trial-over-pcb-contamination-in-wash.-state-school#:~:text=Seattle%2C%20WA%20%2D%20A%20Washington%20State,Bayer%2Downed%20agrochemical%20giant%20Monsanto; Cara Salvatore, *Monsanto Knew of PCBs' Dangers, Jury Hears in Latest Trial*, Law360 (May 25, 2022, 11:14 PM EDT), https://www.law360.com/articles/1497130/monsanto-knew-of-pcbs-dangers-jury-hears-in-latest-trial.

[115] No. 18-2-33255-4 SEA (Wash. Super. Ct.-King Cnty., July 14, 2022) (deadlock/mistrial); *see also* Amanda Bronstad, *A 4th PCB Trial Against Monsanto Ended in a Mistrial. 'We Were a Little Chagrined.'*, Law.com (July 20, 2022, 4:23 PM), https://www.law.com/2022/07/20/a-4th-pcb-trial-against-monsanto-ended-in-a-mistrial-we-were-a-little-chagrined/?slreturn=20240029142803.

| Trial Year | Case | Product | # of Unrelated Plaintiffs | Trial Outcome | Post-Trial and Appellate Review |
|---|---|---|---|---|---|
| 2022 | Alesi v. Monsanto Co.[116] | Glyphosate (Roundup) | 3 | **Defense verdict** | |
| 2022 | Allison v. Monsanto Co.[117] | PCBs | 13 | **$275 million award** to thirteen plaintiffs comprised of three groups of parents and their children – total award of $55 million compensatory damages and $220 million punitive damages. | Appeal pending. |

---

[116] No. 19SL-CC03617 (Mo. Cir. Ct. Sept. 2, 2022) (defense verdict); *see also* Brendan Pierson, *Bayer on Winning Streak in Roundup Litigation After Huge Initial Losses*, REUTERS (Sept. 2, 2022, 1:38 PM), https://www.reuters.com/legal/litigation/bayer-winning-streak-roundup-litigation-after-huge-initial-losses-2022-09-02/; David Siegel, *Monsanto Prevails at 1st Multi-Plaintiff Roundup Herbicide Trial in Missouri*, CVN (Sept. 1, 2022, 11:06 PM), https://blog.cvn.com/breaking-monsanto-prevails-at-1st-multi-plaintiff-roundup-herbicide-trial-in-missouri.

[117] No. 18-2-26074-4 (Wash. Super. Ct.-King Cnty. Oct. 13, 2022 verdict); *see also* David Siegel, *Jury Hits Monsanto with $275M Verdict in Latest Trial over PCB Exposure in Washington State School*, CVN (Oct. 17, 2022, 12:56 PM), https://blog.cvn.com/jury-hits-monsanto-with-275m-verdict-in-latest-trial-over-pcb-exposure-in-washington-state-school; Taylor Blatchford, *$275M Verdict for Toxic Exposures at Monroe School, Adding to Swelling Cost*, SEATTLE TIMES (updated Oct. 17, 2022, 8:49 PM), https://www.seattletimes.com/seattle-news/times-watchdog/275m-verdict-for-toxic-exposures-at-monroe-school-adding-to-swelling-cost/; Greg Lamm, *Wash. Jury Awards $275M in Latest Verdict Against Monsanto*, LAW360 (Oct. 13, 2022, 10:23 PM EDT), https://www.law360.com/articles/1539878/wash-jury-awards-275m-in-latest-verdict-against-monsanto.

| Trial Year | Case | Product | # of Unrelated Plaintiffs | Trial Outcome | Post-Trial and Appellate Review |
|---|---|---|---|---|---|
| 2022 | Bard v. Monsanto Co.[118] | PCBs | 4 | **$82 million award** – total award of $20.5 million in compensatory damages and over $60 million punitive damages. However, the jury found Monsanto "not responsible for most of the plaintiffs [sic] injuries, with only one of the four plaintiffs awarded any damages." | Appeal pending. |
| 2023 | Clinger v. Pharmacia LLC[119] | PCBs | 2 | **$72 million award** to two plaintiffs (jury deadlocked with respect to claims of five related plaintiffs) – total award comprised of $12 million compensatory damages & $60 million punitive damages. | Appeal pending. |

---

[118] No. 18-2-00007-SEA (Wash. Super. Ct.-King Cnty., Dec. 20, 2022 verdict), No. 849824 (Wash. Ct. App.); *see also* Jonathan Capriel, *Washington Jury Awards $82M in Latest School PCB Trial*, LAW360 (Dec. 22, 2022, 8:59 PM EST), https://www.law360.com/articles/1560953/wash-jury-awards-82m-in-latest-school-pcb-trial; Emily Field, *Monsanto Doubles Down in Push to Undo $82M PCB Verdict*, LAW360 (July 15, 2024, 9:15 PM EDT), https://www.law360.com/articles/1858292/monsanto-doubles-down-in-push-to-undo-82m-pcb-verdict.

[119] No. 18-2-54572-2 (Wash. Super. Ct.-King Cnty. July 14, 2023 verdict); *see also* Greg Lamm, *Seattle Jury Awards $72M in Latest Monsanto PCB Trial*, LAW360 (July 14, 2023, 9:25 PM EDT), https://www.law360.com/articles/1700107/seattle-jury-awards-72m-in-latest-monsanto-pcb-trial; Greg Lamm, *Monsanto Tells Jury It's Not at Fault in Latest PCB Trial*, LAW360 (July 10, 2023, 9:02 PM EDT), https://www.law360.com/articles/1697935/monsanto-tells-jury-it-s-not-at-fault-in-latest-pcb-trial; Greg Lamm, *Jury Urged to Award $100M in Latest Monsanto PCB Trial*, LAW360 (May 15, 2023, 10:11 PM EDT), https://www.law360.com/articles/1677852/jury-urged-to-award-100m-in-latest-monsanto-pcb-trial.

| Trial Year | Case | Product | # of Unrelated Plaintiffs | Trial Outcome | Post-Trial and Appellate Review |
|---|---|---|---|---|---|
| 2023 | Heit v. Pharmacia LLC[120] | PCBs | 8 | **$165 million award** to eight plaintiffs – total award of $49.8 million compensatory damages & $115.3 million punitive damages. $20,976,500 (Heit), $29,571,500 (Johnson), $20,526,500 (Muller), $20,976,500 (Navone), $23,636,500 (Oestreich), $15,816,500 (Pierce), $14,251,500 (Rowe), & $19,326,500 (Toutonghi). | Appeal pending. |
| 2023 | Bard v. Pharmacia LLC[121] | PCBs | 7 | **$857 million award** to seven plaintiffs comprised of three groups of parents and children – total award of $73 million compensatory damages and $784 million punitive damages. $119 million to one parent (A. Bard), $127 million to daughter (J. L. Bard) & $124 million to son (J. D. Bard); $115 million to another parent (J. Savery) & $124 million to daughter (S. Savery) and $116 million to other daughter (M. Savery); and $132 million to another plaintiff (Califano). | Appeal pending. |

[120] No. 18-2-55641-4 (Wash. Super. Ct.-King Cnty., Dec. 18, 2023 verdict); Greg Lamm & Rachel Riley, *Monsanto Hit with $165M Verdict In Latest School PCB Loss*, LAW360 (Nov. 20, 2023, 5:37 PM EST), https://www.law360.com/articles/1764591/monsanto-hit-with-165m-verdict-in-latest-school-pcb-loss.

[121] No. 21-2-14305-5 (Wash. Super. Ct.-King Cnty. Dec. 18, 2023 verdict); Greg Lamm & Rachel Riley, *Jury Awards $857M in Yet Another Wash. Monsanto PCB Loss*, LAW360 (Dec. 18, 2023, 6:48 PM EST), https://www.law360.com/articles/1777498/jury-awards-857m-in-yet-another-wash-monsanto-pcb-loss.