**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | MDL No. 2:18-mn-2873-RMG<br><br>**This Document relates to:**<br><br>*Donnelly v. 3M, et al.*, No. 2:20-cv-00209-RMG<br>*Speers v. 3M, et al.*, No. 2:21-cv-03181-RMG<br>*Voelker v. 3M, et al.*, No. 2:18-cv-03438-RMG |

**DEFENDANTS TYCO FIRE PRODUCTS LP'S AND CHEMGUARD, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................................1

STATEMENT OF UNDISPUTED FACTS ....................................................................................1

ARGUMENT ...................................................................................................................................5

I.     Plaintiffs have no expert opinions that Tyco/Chemguard products were a substantial cause of Plaintiffs' kidney cancer. ..................................................................5

    A.     No expert proof of causation as to Tyco/Chemguard's products. ............................5

    B.     No causation for Chemguard as to Mr. Donnelly. ....................................................7

II.     Plaintiffs concede that Tyco's products at issue are not defective. ....................................8

    A.     Plaintiffs concede that C6-based AFFF products are not defective..........................8

    B.     AFC-5 and AFC-5A are C6-based AFFF products and therefore not defective under Plaintiffs' own theory.......................................................................9

III.     Tyco is entitled to summary judgment under the government contractor defense. ...........11

    A.     Prong 1: The MilSpec dictated AFC-5 and AFC-5A's formulation.......................11

    B.     Prong 2: AFC-5 and AFC-5A conformed to the MilSpec. ....................................12

    C.     Prong 3: Tyco meets the knowledge requirement of the government contractor defense. .................................................................................................13

CONCLUSION................................................................................................................................15

# TABLE OF AUTHORITIES

## CASES

*Ayo v. 3M Co.*, 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) ..................................................... 11

*Barton v. Lowe's Home Ctrs., Inc.*, 124 A.3d 349 (Pa. Super. Ct. 2015) ......................................... 8

*Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988) .................................................... 11, 12, 13, 14

*Dowd v. Textron, Inc.*, 792 F.2d 409 (4th Cir. 1986) (per curiam) ................................................. 12

*Getz v. Boeing Co.*, 654 F.3d 852 (9th Cir. 2011) ........................................................................ 13

*Goodie v. United States*, 2013 WL 968198 (D. Md. Mar. 12, 2013) ............................................ 10

*Gregg v. V-J Auto Parts, Co.*, 943 A.2d 216 (Pa. 2007) ................................................................. 5

*Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978) ................................................................................ 5

*Hoefling v. U.S. Smokeless Tobacco Co.*, 576 F. Supp. 3d 262 (E.D. Pa. 2021) ............................. 5

*In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76 (2d Cir. 2008) ............................................... 12

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357 (D.S.C. Sept. 16, 2022) ................................................................................................................................. 2, 11

*In re Asbestos Prods. Liab. Litig. (No. VI)*, 801 F. Supp. 2d 342 (E.D. Pa. 2011) ...................... 5, 7

*Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431 (5th Cir. 2000) .............................................................. 13

*McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 869 F.3d 246 (3d Cir. 2017) .......... 7

*Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946 (4th Cir. 1989) ............................................. 12

*Robinson v. Delta Int'l Mach. Corp.*, 274 F.R.D. 518 (E.D. Pa. 2011) ......................................... 10

*VFG Labar, LLC v. Simpson House, Inc.*, 2024 WL 3106181 (E.D. Pa. June 24, 2024) .............. 10

*Warnick v. NMC-Wollard, Inc.*, 512 F. Supp. 2d 318 (W.D. Pa. 2007) .......................................... 5

## OTHER AUTHORITIES

Restatement (Second) of Torts § 402A(1) (1965) ........................................................................... 10

INTRODUCTION

Defendants Tyco Fire Products LP and Chemguard, Inc. are entitled to summary judgment on all claims in these bellwether cases for three independent, defendant-specific reasons. ***First***, Plaintiffs have no expert opinions that any Tyco or Chemguard product caused any Plaintiff's kidney cancer. ***Second***, Plaintiffs concede that C6-based (as opposed to C8-based) AFFF products are not defective, and the two Tyco AFFF products at issue in these bellwether cases—Ansulite AFC-5 and AFC-5A MilSpec AFFF—are indisputably C6-based. ***Third***, the government contractor defense immunizes Tyco and Chemguard on the facts specific to these cases.

STATEMENT OF UNDISPUTED FACTS

Tyco (and Chemguard) AFFF products use telomer surfactants that do not contain or degrade into sulfonates like PFOS or PFHxS, they were not formulated using PFOA, and they do not degrade into branched PFOA. *See, e.g.*, Dkt. No. 2409 at 2 n.13. There are only two ways in which telomer AFFF could contain or produce PFOA (and it would be only linear PFOA). First, PFOA can be created in trace amounts in telomer AFFF as an unintended manufacturing byproduct. Plaintiffs have conceded that these trace amounts do not render telomer AFFF products defective. *See id.* at 16. Second, in some circumstances C8-based surfactants used in certain telomer AFFF formulations could ultimately degrade into linear PFOA. That is Plaintiffs' theory of defect against all telomer manufacturer defendants.

The two Tyco AFFF products at issue in these bellwether cases, however, were manufactured using C6-based (not C8-based) surfactants, and it is undisputed that C6-based surfactants cannot degrade into PFOA. *See id.* at 17; *see also* TCX 1 (Siegel Rep.) at 11; TCX 2

1

(Petty Rep.) at 11.[1]  Plaintiffs concede that C6-based AFFF products represent a safer, non-defective design.  *See* Dkt. No. 2409 at 16–17.  In fact, the Court will recall that Plaintiffs previously avoided summary judgment on the government contractor defense in part by touting the safety of the exact Tyco AFFF products at issue here—Ansulite AFC-5 and AFC-5A MilSpec AFFF—which they conceded were primarily C6-based and contained only minor amounts of C8.  *See id.*; Dkt. No. 2063 at 28–30; *see also* TCX 3 (Walton Rep.) at 17–18; *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *7 & n.11 (D.S.C. Sept. 16, 2022).  In that same briefing, Plaintiffs conceded that the only telomer AFFF products that are defective are those containing meaningful quantities of C8 that can degrade to PFOA, which they characterized as products with C8 content of at least 25%.  *See* Dkt. No. 2409 at 16.

Plaintiffs' claims in these proceedings are based on AFFF usage at two Naval bases in Pennsylvania: Naval Air Station Joint Reserve Base Willow Grove ("Willow Grove") and Naval Air Warfare Center Warminster ("Warminster").  Willow Grove and Warminster closed in 2011 and 1996, respectively.  TCX 4 (Gravel Tyco Rep.) at 11–12, 15–16; TCX 5 at '207.  Plaintiffs' product identification evidence as to Tyco consists of testimony from four retired Navy firefighters who worked on the bases decades ago.  Even accepting this testimony, Plaintiffs have, at most, identified Tyco products at these bases between the late 1980s and 2008 (Willow Grove) and between 1986 and 1995 (Warminster).

Only one of these Navy firefighters, Wesley Maugans, worked at Warminster.  He testified that Ansulite AFFF (a Tyco product) was present at that base between 1986 and 1995.  *See* TCX 6 (Maugans Dep.) 54:17–55:2.  Mr. Maugans later worked at Willow Grove, as did the other three

---

[1] "TCX" denotes exhibits filed by Tyco/Chemguard in support of this motion.  "JX" denotes joint exhibits filed in connection with Defendants' Omnibus Summary Judgment Motion on this date.

2

Navy firefighters. Two of these four Navy witnesses did not recall *any* Ansulite AFFF usage at Willow Grove. *See id.* at 60:17–61:14; JX 57 (Steere Dep.) 31:9–14. Instead, the witnesses testified that the Navy firefighters used an ECF AFFF and a telomer AFFF made by different manufacturers. *See, e.g.*, JX 57 (Steere Dep.) 31:9–14. The other two Navy witnesses recalled that the Air National Guard, housed on a different part of the base, utilized Ansulite AFFF (and that the Navy sometimes borrowed their trucks). *See* JX 56 (King Dep.) 82:11–23; TCX 7 (Gilliam Dep.) 127:14–128:6. These two witnesses both placed Ansulite AFFF at Willow Grove as of the late 1980s. *See* JX 56 (King Dep.) 27:10–19 (first recalled AFFF in general "in the late '80s"); TCX 7 (Gilliam Dep.) 21:23–22:4 (although giving contradictory testimony, first recalled Ansulite AFFF "in the late '80s–early '90s"). No Air National Guard witnesses were deposed.

The key question, therefore, is what specific formulations of Ansulite AFFF products could have been used at the bases during this time period. To be available for military procurement, an AFFF product must meet detailed military specifications and be placed on the Qualified Products List. *See* Dkt. No. 1965-1 at 9. The witnesses testified that any AFFF on the bases was MilSpec foam. *See, e.g.*, TCX 7 (Gilliam Dep.) 22:17–23:3. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* TCX 8 (Higgins Rep.) at 32 tbl.4. Even assuming Plaintiffs are right that Ansul AFFF products were actually used at the bases, then, the only products implicated necessarily would have been Ansulite AFC-5 and AFC-5A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ , *see id.* at 45, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ , *see, e.g.*, TCX 3 (Walton Rep.) at 18.

The only other potential Ansul product that any firefighter identified was a so-called "twin agent unit" ("TAU"), which one of them claimed was used at Willow Grove once a year starting

3

in the 1970s.  JX 56 (King Dep.) 241:14–242:13, 245:7–19.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See* TCX 4 (Gravel Tyco Rep.) at 14–24.

Chemguard AFFF is not at issue in these cases.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮.  *See* TCX 8 (Higgins Rep.) at 35–38, 42, 48.[2]

To establish that Plaintiffs' kidney cancer was caused by exposure to PFAS from AFFF used at Willow Grove and/or Warminster, Plaintiffs proffer opinions from two expert witnesses who give Plaintiff-specific opinions.  Dr. Robert Bahnson is Plaintiffs' sole specific causation expert and the only medical professional to opine regarding whether PFOA or PFOS caused the specific Plaintiffs to develop kidney cancer.  And Dr. David MacIntosh offers opinions regarding whether AFFF was the source of PFOA and PFOS seen in Plaintiffs' blood serum samples.  Neither of these experts opine that PFOA specifically from Tyco/Chemguard products caused any Plaintiff's kidney cancer.  Three other Plaintiffs' experts offer different testimony regarding certain aspects of Plaintiffs' causation chain:  Dr. Christopher Higgins (which AFFF products were used at the bases), Mr. Anthony Brown (whether AFFF used at the bases could have reached municipal wells), and Dr. Jonathan Martin (chemical composition of PFAS in samples from the wells).  But none of those experts opines (or even could opine) as to the cause of Plaintiffs' kidney cancer.

---

[2] As a surfactant supplier to Tyco, Chemguard is entitled to summary judgment on the same bases as Tyco.  *See, e.g.*, Section II.A of BASF/Ciba's Motion for Summary Judgment.

4

# ARGUMENT

**I.  Plaintiffs have no expert opinions that Tyco/Chemguard products were a substantial cause of Plaintiffs' kidney cancer.**

Not one of Plaintiffs' experts opines that any Tyco/Chemguard product (as opposed to AFFF products generally) caused Plaintiffs' kidney cancer, let alone was a "substantial" cause. To the contrary, the only experts who offered opinions regarding Plaintiffs' exposure to PFOA expressly disclaimed finding causation as to *any* telomer AFFF, let alone Tyco/Chemguard's specifically. Plaintiffs' failure to proffer expert causation evidence specific to Tyco/Chemguard products requires summary judgment for these defendants.

**A.  No expert proof of causation as to Tyco/Chemguard's products.**

"Pennsylvania law requires that a 'plaintiff must establish that the injuries sustained were *caused by* the product of a *particular manufacturer or supplier*.'" *Warnick v. NMC-Wollard, Inc.*, 512 F. Supp. 2d 318, 330 (W.D. Pa. 2007) (quoting *Payton v. Pa. Sling Co.*, 710 A.2d 1221, 1225–26 (Pa. Super. Ct. 1998)). To do so, a plaintiff must show that each specific defendant's product was a "substantial" factor in causing the alleged injury. *See, e.g.*, *In re Asbestos Prods. Liab. Litig. (No. VI)*, 801 F. Supp. 2d 342, 346–47 (E.D. Pa. 2011); *Gregg v. V-J Auto Parts, Co.*, 943 A.2d 216, 226–27 (Pa. 2007).[3] "Showing that a defendant's product was among several products which *could* have caused the injury is simply 'too speculative to be submitted to a jury.'" *Warnick*, 512 F. Supp. 2d. at 332 (quoting *Payton*, 710 A.2d at 1226).

In cases like these where complex medical causation is at issue, it is axiomatic that expert proof is required. *See, e.g.*, *Hamil v. Bashline*, 392 A.2d 1280, 1285 (Pa. 1978); *Hoefling v. U.S. Smokeless Tobacco Co.*, 576 F. Supp. 3d 262, 285 (E.D. Pa. 2021). Not one of Plaintiffs' experts

---

[3] *See also* Section I.C of Defendants' First Omnibus Motion to Exclude (collecting cases).

5

provides an opinion that exposure to PFOA specifically *from Tyco/Chemguard products* was a "substantial factor" in causing any Plaintiff's kidney cancer. To the contrary, both relevant experts specifically disclaimed having done so.

Dr. Bahnson is the only expert to offer a specific medical causation opinion. But his opinions regarding medical causation cannot satisfy Pennsylvania causation law as to Tyco/Chemguard. █████████████████████████████████████████████████████████████████████████████████████████████████████. *See, e.g.*, JX 21 (Bahnson Rep. – Voelker) at 4. He goes no further, offering no opinion on whether (1) PFOA itself, (2) PFOA from telomer products generally, or (3) PFOA from Tyco/Chemguard products was a "substantial factor" in causing each individual plaintiff's cancer. ████████████████████ ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ JX 26 (Bahnson Dep.) 612:17–24, 758:10–21.

Dr. MacIntosh—████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ JX 45 (MacIntosh Dep.) 274:10–275:10, 283:3–8. That is wholly insufficient to carry Plaintiffs' burden under controlling Pennsylvania law.

6

Although three other Plaintiffs' experts framed their opinions as related to "causation"—Dr. Higgins, Mr. Brown, and Dr. Martin—none of them provided the medical causation opinion necessary to satisfy Plaintiffs' burden. Dr. Higgins is not a medical professional, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* JX 55 (Higgins Dep.) 155:12–157:11. Mr. Brown is a hydrogeologist and also not a medical professional; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* TCX 9 (Brown Rep.) at tbl.18.8. And Dr. Martin, again not a medical professional, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* JX 51 (Martin Dep.) 209:19–210:14, 366:12–23. Even assuming these opinions are admissible, they are entirely irrelevant if Drs. Bahnson and MacIntosh did not offer a specific causation opinion that Tyco/Chemguard products (as opposed to any other AFFF product) were a "substantial factor" in causing Plaintiffs' cancer. They did not, as demonstrated above, which requires dismissal. *See, e.g., In re Asbestos Prods.*, 801 F. Supp. 2d at 346–47; *McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 869 F.3d 246, 271, 273 (3d Cir. 2017).[4]

### B. No causation for Chemguard as to Mr. Donnelly.

The evidence regarding Mr. Donnelly illustrates the importance of ensuring Plaintiffs

---

[4] The opinions of Plaintiffs' experts suffer from other fatal defects, as discussed in Section I.B of Defendants' Omnibus Motion for Summary Judgment, Section I of BASF/Ciba's Motion for Summary Judgment, and Defendants' two Omnibus Motions to Exclude Expert Testimony, which are incorporated by reference.

complete the chain of causation to each individual Plaintiff. Mr. Donnelly was diagnosed in 2005. JX 60 (Donnelly Dep.) 202:14–203:9. Mr. Brown opines that ████████████████████████ ████████████████████████████████████████████████████████████████████. *See* TCX 9 (Brown Rep.) at tbl.18.8. This admission concedes that Chemguard products could not possibly have caused Mr. Donnelly's cancer and is an independently sufficient basis for granting summary judgment for Chemguard on all of Mr. Donnelly's claims. Yet, despite requests, Mr. Donnelly inexplicably has refused to dismiss Chemguard.

## II. Plaintiffs concede that Tyco's products at issue are not defective.

Tyco and Chemguard further are entitled to summary judgment for the separate and independent reason that Plaintiffs have conceded that the Tyco products at issue in these bellwether cases are not defective. "The threshold inquiry in all products liability cases is whether there is a defect." *Barton v. Lowe's Home Ctrs., Inc.*, 124 A.3d 349, 355 (Pa. Super. Ct. 2015). In the absence of evidence that the product was defective or breached the standard of care, summary judgment is required as a matter of law.

### A. Plaintiffs concede that C6-based AFFF products are not defective.

Plaintiffs concede that C6 surfactants cannot degrade into PFOA; their challenge to telomer-based AFFF hinges on the use of C8 surfactants. In order to stave off summary judgment on the government contractor defense, Plaintiffs previously claimed that only AFFF with meaningful quantities of C8 precursors was defective: "Plaintiffs claim that the defect at issue with respect to C8-containing AFFFs is the much *larger* percentages of *intended* PFOS, PFOA, and/or PFOA precursors (ranging from 25% to 100% of the fluorosurfactant) . . . ." Dkt. No. 2409 at 16.

In fact, Plaintiffs specifically touted Ansulite AFC-5 and AFC-5A as the paradigmatic examples of safe C6-based AFFF—in Plaintiffs' words, "a non-C8 derived AFFF product, which consists of over 95% C6-based fluorosurfactants." Dkt. No. 2063 at 28 & n.110. Plaintiffs averred

8

that this proved "that, at all relevant times, [the military] did not require the use of PFOA, PFOS, or any other C8-based precursor product as an ingredient necessary for performance," *id.* at 28; *see also* Dkt. No. 2409 at 17, and that had other manufacturers utilized C6-based AFFF like Tyco's, "MilSpec AFFF could have saved lives without contaminating the nation's drinking water supply," Dkt. No. 2063 at 30; *see also* TCX 3 (Walton Rep.) at 17–18. ▮

▮ JX 54 (Siegel Dep.) 323:25–324:13, 369:5–371:24 ▮

▮

### B. AFC-5 and AFC-5A are C6-based AFFF products and therefore not defective under Plaintiffs' own theory.

Plaintiffs' prior admission that AFC-5 and AFC-5A are not defective is dispositive. And it is further reinforced by Plaintiffs' expert Dr. Higgins, ▮

▮. TCX 8 (Higgins Rep.) at 45; *see also id.* at 44 tbl.7, 44–46, Ex. B 10–15.

▮

*See id.* at 44 tbl.7, Ex. B 10–15 (collecting over 120 batch-specific records from this period, all of which ▮); TCX 10 (excerpting these records); *see also* TCX 11 (▮). All parties agree that ▮, *see* JX 55 (Higgins Dep.) 210:3–23; indeed, ▮

▮ *See* TCX

9

3 (Walton Rep.) at 18 (████████████████████████); Dkt. No. 2063 at 28 & n.110 (same).

████████████████████████████████████████████████████████████████

████████████████████████████████████████. *See* TCX 8 (Higgins Rep.) at 44 tbl.7. But that is of no moment. As an initial matter, Plaintiffs have identified no evidence that batches of Ansulite AFC-5 or AFC-5A allegedly containing >5% C8 content were ever sent to or used at Willow Grove or Warminster.[5] And even if they had, ████████ ████████████████████████████████████. *See* JX 55 (Higgins Dep.) 214:10–21. Absent such a quantification, Plaintiffs cannot show that any such batch exceeded the 25% C8 they previously conceded was the threshold for an alleged defect. Dkt. No. 2409 at 16. Summary judgment therefore is required.

Because Plaintiffs have no proof of defect and conceded that these products did not violate the standard of care, Tyco is entitled to summary judgment on all of Plaintiffs' claims. *See, e.g.*, Restatement (Second) of Torts § 402A(1) (1965) ("defective condition" required for strict liability claim); *Goodie v. United States*, 2013 WL 968198, at *5–6 (D. Md. Mar. 12, 2013) (granting summary judgment as to negligence claim where plaintiffs' own experts admitted no violation of the standard of care).[6]

---

[5] *See also* Section I.A of BASF/Ciba's Motion for Summary Judgment.

[6] Mr. Speers' tagalong tort claims also fail. The loss of consortium claim asserted by his wife is a "derivative" claim that cannot proceed absent a meritorious underlying claim. *See, e.g.*, *Robinson v. Delta Int'l Mach. Corp.*, 274 F.R.D. 518, 524 (E.D. Pa. 2011). And his fraud claim fails both because he (as opposed to an AFFF purchaser or user) was not the recipient of any allegedly false statements, *VFG Labar, LLC v. Simpson House, Inc.*, 2024 WL 3106181, at *5–6 (E.D. Pa. June 24, 2024), and because it is predicated on the alleged concealment of a defect Plaintiffs concede does not exist in AFC-5 and AFC-5A.

### III. Tyco is entitled to summary judgment under the government contractor defense.

As a separate and independent ground for dismissal, Tyco also is entitled to summary judgment under the government contractor defense. *See Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *In re AFFF*, 2022 WL 4291357, at *4–5 (collecting cases). In its prior ruling, the Court left open fact issues to be decided in the context of specific cases. These cases involve two specific facts that show Tyco is entitled to summary judgment: (1) the unique AFC-5 and AFC-5A AFFF products at issue and (2) the time periods involved.[7]

#### A. Prong 1: The MilSpec dictated AFC-5 and AFC-5A's formulation.

The first prong of the defense is met where the government approves "reasonably precise specifications." *Boyle*, 487 U.S. at 512. This can either be approval of the alleged defect itself or of specifications that implicitly require a certain product design. Put differently, "the government approves reasonably precise specifications when it, among other things, issues performance requirements that significantly constrain the contractor's design choices." *Ayo v. 3M Co.*, 2018 WL 4781145, at *10 (E.D.N.Y. Sept. 30, 2018).

As Defendants previously argued, the MilSpec's demanding physical, chemical, and performance standards dictated the use of PFOS, PFOA, or other C8 chemicals. *See* Dkt. No. 1965-1 at 2, 12–19, 38–43; Dkt. No. 2141 at 8–9. Plaintiffs concede that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see* TCX 3 (Walton Rep.) at 16 (acknowledging that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"), meaning that government contractors like Tyco ***must*** use some amount of C8 to satisfy the MilSpec's demanding performance requirements. As explained above, to prevail in earlier briefing Plaintiffs pointed to AFC-5 and

---

[7] For efficiency, Tyco incorporates by reference and renews its government contractor defense briefing. *See* Dkt. Nos. 1965-1, 2141, 2346-1, 2348, 2438.

11

AFC-5A as non-defective MilSpec AFFF products with low (but not zero) C8 content that still met the MilSpec's stringent requirements. *See, e.g.*, Dkt. No. 2063 at 28 & n.110.

Plaintiffs' own prior arguments concede that, at least as to AFC-5 and AFC-5A, the MilSpec is "reasonably precise" as a matter of law, thus satisfying prong one.

### B. Prong 2: AFC-5 and AFC-5A conformed to the MilSpec.

The second prong of the government contractor defense is satisfied where a product "conformed to" the government's specifications. *Boyle*, 487 U.S. at 512. As explained in prior briefing, the government's testing and acceptance of a product against stated specifications is powerful evidence of conformance and should not be second-guessed. *Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946, 951 (4th Cir. 1989); *see* Dkt. No. 2346-1 at 1–4; Dkt. No. 2348 at 8–12; Dkt. No. 2438 at 2–5. The military's listing of AFC-5 and AFC-5A on the QPL for the entire relevant period satisfies prong 2.[8]

Alternatively, prong 2 is met because the government continued to purchase and use AFC-5 and AFC-5A even as its knowledge about the potential dangers of AFFF evolved. *See* Dkt. No. 1965-1 at 32–35, 43–50; Dkt No. 2141 at 11–20; Dkt. No. 2348 at 6–8. The government's choice to continue using an allegedly hazardous product (even while knowing of those allegations) simultaneously both sets implicit specifications (prong 1) and satisfies those specifications (prong 2). *See Dowd v. Textron, Inc.*, 792 F.2d 409, 412 (4th Cir. 1986) (per curiam); *Ramey*, 874 F.2d at 950; *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 94–95 (2d Cir. 2008).

---

[8] Plaintiffs previously made much of the fact that these products were removed from the QPL ██████ TCX 12 at '571. As explained in prior briefing, this argument fails on its own terms. *See* Dkt. No. 2348 at 11–12; Dkt. No. 2438 at 3–4. It is also irrelevant here given that the delisting post-dated the base closures of both Warminster (1996) and Willow Grove (2011).

   C.   **Prong 3: Tyco meets the knowledge requirement of the government contractor defense.**

*Boyle*'s third prong requires that "the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States," such that non-disclosure does not "cut[] off information highly relevant to the [government's] discretionary decision." *Boyle*, 487 U.S. at 512–13. Tyco can satisfy this test in three independently sufficient ways: (1) if Tyco lacked *actual* knowledge of the alleged danger, (2) if the government's knowledge of the alleged defect equaled or exceeded Tyco's, or (3) if any alleged failure to warn was not material to the government's decision-making. *Id.* Tyco is entitled to judgment on the government contractor defense on all three grounds.

   *Actual knowledge.* *Boyle* requires that Tyco must have had **actual** knowledge of any potential defect. *See Getz v. Boeing Co.*, 654 F.3d 852, 865 (9th Cir. 2011); *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 436 (5th Cir. 2000). As detailed in prior briefing, Tyco—an AFFF manufacturer and not a chemical supplier throughout this period—had no knowledge that any of its AFFF products could degrade to PFOA, *see* Dkt. No. 2348 at 16–19; Dkt. No. 2438 at 8–9, and more specifically for these bellwether cases, Tyco had no knowledge that the very low quantities of C8 in AFC-5 and AFC-5A could do so. For example, ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ TCX 13. ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ TCX 14 at '115. ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ TCX 15 at '290–91. And when Tyco submitted AFC-5A for PFOA testing in 2008, the results indicated that AFC-5A had no PFOA above the detectable threshold at that time. Dkt. No. 2348 at 17–18.

13

*Relative knowledge*. The military's knowledge of any hazards associated with AFFF consistently exceeded Tyco's. *See Boyle*, 487 U.S. at 512. For more than fifty years, the government has conducted and funded research regarding the risks of AFFF, including potential human and animal toxicity. For example, the government was researching the toxicity and persistence of AFFF in wastewater as early as the 1970s. *See* Dkt. No. 1965-1 at 20–23. Further studies in the 1980s examined potential health effects in mammals and humans, and reports in the 1990s weighed human health risks against AFFF's utility as a war-fighting and life-saving tool, concluding that the importance of AFFF outweighed the risks. *Id.* at 23–26. Tyco had nowhere near this breadth of knowledge—and what it did know, it consistently shared with the government. *See* Dkt. No. 2348 at 18–19.

The government's knowledge was equally superior with respect to the more specific question whether fluorocarbon surfactants in telomer-based AFFF could degrade to PFOA. It is undisputed that by no later than 1998, internal Air Force testing revealed "results consistent with the degradation of telomer surfactants to perfluorocarboxylic acids," i.e., PFOA and its homologues. TCX 16 at '350–51. Other internal government reports around this time are to the same effect. *See* Dkt. No. 2348 at 6–7. Thus, even assuming the ████████ document on which Plaintiffs previously relied, *see* Dkt. No. 2409 at 82–83, is sufficient to show Tyco's ***actual*** knowledge of its products' degradation potential to PFOA (it is not), Tyco still prevails because the government already knew. And disputes as to exactly when in the late 1990s or 2000s Tyco had actual knowledge are irrelevant to any Tyco AFFF used at Warminster, as the base closed in 1996. TCX 5 at '207.

*Materiality*. Finally, it is likewise undisputed that the government's knowledge that telomer AFFF could degrade to PFOA did not change any material decision it made during the

14

period relevant to these bellwether cases. The military did not materially alter the MilSpec requirements to address concerns related to PFOA until *2017*, when it added a maximum level of 800 ppb for PFOA. *See* TCX 17 at 5. Before that, not only did the government learn (before Tyco) that telomer AFFF could degrade to PFOA, but it also dealt with 3M's withdrawal from the market in 2000, the EPA's 2006 PFOA Stewardship Program, the EPA's 2009 Provisional Health Advisory for PFOA and PFOS, the Department of Defense's explicit statement in 2011 that AFFF "present[s] human health and environmental risks," and the EPA's 2016 Lifetime Health Advisory for PFOS and PFOA, among other developments. *See* Dkt. No. 1965-1 at 32–35; Dkt. No. 2141 at 16–18. Thus, even in a counterfactual world where Tyco knew its AFFF might degrade to PFOA before the government did, there can be no dispute of material fact that such knowledge would have changed the government's decision-making.

## CONCLUSION

For the foregoing reasons, Defendants Tyco Fire Products LP and Chemguard, Inc. respectfully request that the Court enter summary judgment in their favor on all claims.

Dated: June 17, 2025                    Respectfully submitted,

*/s/ David E. Dukes*

Joseph G. Petrosinelli
Williams & Connolly LLP
680 Maine Avenue, S.W.
Washington, DC 20024
P: (202) 434-5000
F: (202) 434-5029
jpetrosinelli@wc.com

David E. Dukes
Nelson Mullins Riley & Scarborough LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
P: (803) 255-9451
F: (803) 256-7500
david.dukes@nelsonmullins.com

*Counsel for Defendants Tyco Fire Products LP and Chemguard, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

  I HEREBY CERTIFY that on June 17, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record in this case via transmission of Notice of Electronic Filing generated by CM/ECF.

                */s/ David E. Dukes*
                David E. Dukes