# JX52



SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| CITY OF NORWALK, a municipal corporation, <br><br> Plaintiff, <br><br> v. <br><br> FIVE POINT U-SERVE, INC., a California corporation; J.V. SHANNON, INC., a California corporation; SUNDANCE SERVICES, INC., a California corporation; EQUILON ENTERPRISES LLC, a Delaware corporation; WELLS FARGO BANK, N.A., as trustee or agent for the FRANCIOSI TRUST; UNION OIL COMPANY OF CALIFORNIA, a California corporation; JULIUS FRANCIOSI, an individual; JOSEPH FRANCIOSI, an individual; UNITED OIL COMPANY, a California corporation; ATLANTIC RICHFIELD COMPANY, a California corporation; NORWALK CAR WASH, a California corporation, <br><br> Defendants. | LASC Case No: VC038298 <br><br> COURT'S RULING AND ORDER RE: DEFENDANT FIVE-POINT U-SERVE'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF ANTHONY BROWN |

1  The Court has read and considered Defendant Five Point U-Serve's Motion in Limine to
2  excluce the testimony and opinions of Plaintiff's expert, Anthony Brown. The Court has further
3  taken testimony from Anthony Brown, Walter Hamonn, and Brenden Harley at a hearing
4  conducted pursuant to Evidence Code §§ 402(b) and 802.[1] Though not formally received in
5  evidence, the Court has considered the trial exhibits referred to by these experts in their
6  testimony.[2]

7  For purposes of this Order, the Court accepts the expert qualifications of Anthony Brown,
8  Walter Hamonn, and Brendan Harley.

9  In granting this motion, the Court finds that the opinions offered by Mr. Brown lack
10 factual foundation, are conclusory, and are speculative. Mr. Brown's opinion regarding the
11 pathway of contamination from the Five Point site to the City's Well No. 8 is based on factual
12 assumptions that lack evidentiary support or are based on speculative or conjectural factors, and
13 thus has no evidentiary value. As explained below, Mr. Brown's opinion is unaccompanied by a
14 reasoned explanation connecting the factual predicates to the ultimate conclusion.

15 As a starting point, the Court has read and considered the Assessment of 1,2-DCA
16 Contamination which constitutes Mr. Brown's expert report submitted pursuant to the Court's
17 Expert Discovery Order entered April 22, 2005 (Trial Exhibit No. 130; and provided as an
18 exhibit in the Motion papers). As stated in his report, Mr. Brown reaches the following
19 conclusions regarding the Five Point U-Serve site at issue in this case:

---

[1] The Official Court Reporters are directed to file with the Clerk of the Court transcripts of the proceedings held on March 27, 2006 and March 28, 2006, thus providing the testimony of Mssrs. Brown, Hamonn, and Harley as part of the official court file.

[2] At Plaintiff's request, the Court notes that Defendant's objection to Plaintiff's request to examin Mr. Brown concerning the test analysis data contained in Trial Exhibit 329 was sustained and reference to the test results contained in the Del Mar Analytical Laboratory Report was not permitted. This report purports to contain analytical data on additional soil and/or groundwater sampling performed at Plaintiff's request during the week of March 13, 2006. The Court excluded reference to this data on the grounds that it constituted expert discovery conducted after the expert discovery cutoff, was violative of the Court's Expert Discovery Order entered April 22, 2005, and further would result in substantial prejudice to the Defendant if permitted. It should be noted that Trial Exhibit 329 was not identified or provided to the Court or counsel prior to the commencement of the 402 hearing.

1.   Based on the time the gasoline service station was in operation and the date that the soil was determined to be impacted with gasoline it can be concluded that a release of leaded gasoline, that contained 1,2-DCA, has occurred at this facility.
2.   A 1,2-DCA concentration of 16 ppb (parts per billion) was detected in soil close to the water table at WGR-7. This well is located on the western sidewalk of Pioneer Boulevard approximately 100 feet west of the facility.
3.   The identification of a considerable thickness of LNAPL at on- and off-site wells suggests that a significant release of gasoline occurred at this facility.
4.   LNAPL analyzed from a Shell WIC monitoring well located adjacent to the Five Point U-Serve facility was determined by Shell Oil Company to be leaded gasoline likely produced prior to 1980.
5.   No data regarding the quality of groundwater conditions beneath the facility was presented in the reports for review by Komex, and no data have been provided for review by the defendant, despite sampling episodes being conducted since 1998 when the first wells were installed.
6.   First groundwater beneath the facility does not appear to have been analyzed for 1,2-DCA.
7.   Shell WIC monitoring well BH-27 is located approximately 50 feet northeast of the Five Point U-Serve USTs. The 1,2-DCA detected in groundwater sampled from this well is likely to have been released at the Five Point U-Serve facility.
8.   Based on the facilities close proximity to the Shell WIC facility it can be assumed that similar groundwater conditions would occur beneath this facility. Therefore, it is likely that, as with the Shell WIC facility, groundwater beneath the facility is in hydraulic communication with City Well No. 8 and or other production wells in the vicinity.[3]

In addition to Mr. Brown's specific conclusions concerning the Five Point site, and recognizing that his report provided opinions concerning sites owned and/or operated by settled defendants Shell Oil Company and Wells Fargo/Franciosi Trust, Mr. Brown provides the following Conclusions concerning his overall investigation:

> A significant release(s) of gasoline occurred at the Shell WIC facility. 1,2-DCA has been detected in first groundwater adjacent to the Shell WIC facility. Shell concluded that contamination detected in monitoring well BH-26 was the result of a release of leaded gasoline prior to 1980. 1,2-DCA has also been detected in KB-1, 2 and 6 drilled close to [Norwalk] Well No. 8 in the direction of the WIC facility. 1,2-DCA has been detected in Well No 8 on numerous occasions.
>
> A significant release(s) of gasoline occurred at the Wells Fargo/Franciosi facility. 1,2-DCA and PCE have been detected in first groundwater beneath this facility. 1,2-DCA and PCE have been detected in Well No. 8.

---

[3] Trial Exhibit 130/Brown Expert Report at p. 23.

> A significant thickness and extent of LNAPL is present beneath the Five Point U-Serve facility. Elevated concentrations of 1,2-DCA (1700 ug/L) have been detected in first groundwater beneath this facility. A significant release(s) of leaded gasoline occurred at the Five Point U-Serve facility. 1,2-DCA has also been detected in KB-1, 2 and 6 drilled close to Well No. 8 on numerous occasions.
>
> Based on the data received, releases of gasoline at one or more of the above facilities contributed to the 1,2-DCA contamination detected at Well No. 8.[4]

Mr. Brown supplemented and supported his opinions and conclusions in his deposition and during the course of his testimony at the hearing. Generally stated, Mr. Brown has concluded that the presence of 1,2-DCA detected in shallow groundwater (40-50 feet below ground surface) at a test site immediately adjacent to the Five Point U-Serve facility (KCPT-2) and the presence of 1,2-DCA in Well No. 8 at levels from approximately 160 below ground surface to 350 feet below ground surface are connected and that it is his opinion that it is more likely than not that the 1,2-DCA found near the Five Point site is the source of the 1,2-DCA found in Well No. 8. The fatal flaw in this conclusion is that Mr. Brown has failed to establish how the contaminant found near the Five Point site moved upgradient to Well No. 8 in a north-northwest direction (as Mr. Brown contends) against the known groundwater flow patterns in the area while simultaneously dropping vertically from a shallow aquifer through a known barrier to such migration. Though he suggests a hypothesis, he has no empirical data to support his speculation. The only test wells between the Five Point site and Well No. 8 dug by Mr. Brown's investigators, Well Nos. KB-7 and KB-8 do not detect the presence of 1,2-DCA. Mr. Brown cannot connect the dots. While Mr. Brown may reasonably conclude that the presence of 1,2-DCA immediately adjacent to the Five Point site supports his belief that a release of the contaminant occurred on the Five Point site, he acknowledges that he has no information

---

[4] Trial Exhibit 130/Brown Expert Report at p .34.

4

concerning the volume of any such release or when it occurred (though he "thinks it occurred prior to 1980). Similarly, Mr. Brown acknowledges in his report that he has no information regarding the direction of groundwater flow beneath the Five Point site (Exhibit 130 at p.22).

Even assuming for the purpose of argument that Mr. Brown's hypothetical hole in the Bellflower aquiclude existed, the factual assumptions on which he determined the Well No. 8 capture zone are not supported by historical production data for Well No. 8 contained in governmental filings relied upon by all experts in the case. Specifically, Mr. Brown testified that his conclusions were based on historical pumping rates at Well No. 8 of 750 gallons per minute (later corrected to 650 gallons per minute on cross-examination). In fact, historical production data as evidenced by the DWSAP (Drinking Water Source Assessment Program) and the WRD (Water Replenishment District) documents establish historical production that evidences much lower pumping rates. Similarly, Mr. Brown also assumed that the Park 29 well to the southeast of Well No. 8 was not pumping while Well No. 8 was in operation, however the WRD data clearly indicates that Park 29 well was in operation.

Mr. Brown indicates that capture zones are generally determined (1) through hydrologic interpretation, (2) through analytical techniques, and (3) through computer modeling; yet he fails to explain that his capture zone conclusions are based on any of these approaches.

Perhaps most devastating to the *ipse dixit* opinion given by Mr. Brown, is his inability to explain why, if the groundwater beneath the Five Point site is in hydrological communication with the deep groundwater from which Well No. 8 draws, the static levels of first groundwater are so different. Groundwater is first encountered at the Five Point site at approximately 40 feet below ground surface, while groundwater at Well No. 8 is first encountered at approximately 90 feet below ground surface. Just as water will not generally move up hill (which Mr. Brown

5

suggests)[5], two connected bodies of water will find equilibrium—that is there levels will generally be the same.

At best, as noted in Mr. Brown's report Conclusions sited above, if Mr. Brown's hypothetical contaminant pathway was a source of 1,2-DCA contamination in Well No. 8, he has done no more than identify three *possible* sources, "one or more" of which contributed to the 1,2-DCA contamination in the City's well. Such an opinion does not aid the trier of fact, but rather will lead only to speculation concerning the source of contamination. Mr. Brown is bound by the opinions contained in his report and cannot now magically claim that it is more likely than not that the source of contamination was the Five Point site. His current opinions relating to the Five Point site are dependent on his assumptions or beliefs that 1,2-DCA emanating from the that site moved around, over or under known non-detect soil and groundwater samples to reach Well No. 8, though he has no factual basis to support those assumptions and beliefs. Such opinions are speculative and are not admissible.

Dated: March 30, 2006

_____
Carl J. West
Judge of the Superior Court

---

[5] "Groundwater elevation data provided is insufficient to conclusively establish the groundwater flow direction in individual aquifers in the vicinity of Well No. 8. However, the regional topographic slope is to the south or southwest at a gradient of 17 feet per mile (0.003 feet/foot) in the area of Well No. 8, and it is a reasonable assumption that the local-scale groundwater flow in the upper aquifers will reflect this topographic slope...." (Trial Exhibit 130/Brown's Expert Report at p.8)

6