```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF SOUTH CAROLINA
                     CHARLESTON DIVISION


     *******************************
     IN RE:  AQUEOUS FILM-FORMING  *  MDL No. 2:18-mn-2873
     FOAMS PRODUCTS LIABILITY      *
     LITIGATION                    *  June 20, 2025
     *******************************

             TRANSCRIPT OF STATUS CONFERENCE

         BEFORE THE HONORABLE RICHARD M. GERGEL
          UNITED STATES DISTRICT JUDGE, presiding


     A P P E A R A N C E S:

     For the Plaintiffs:      Motley Rice LLC
                              BY:  FRED THOMPSON III, ESQ.
                                   JOSEPH F. RICE, ESQ.
                              28 Bridgeside Boulevard
                              Mt. Pleasant, SC 29464

                              Douglas and London PC
                              BY:  MICHAEL A. LONDON, ESQ.
                              59 Maiden Lane, 6th Floor
                              New York, NY 10038

                              Napoli Shkolnik PLLC
                              BY:  PAUL J. NAPOLI, ESQ.
                              1301 Avenue of the Americas
                              10th Floor
                              New York, NY 10019

                              Baron and Budd
                              BY:  SCOTT SUMMY, ESQ.
                              3102 Oak Lawn Avenue, Suite 1100
                              Dallas, TX 75219

     For the Defendants:      Duffy and Young LLC
                              BY:  BRIAN C. DUFFY, ESQ.
                              96 Broad Street
                              Charleston, SC 29401

                              Nelson Mullins
                              BY:  DAVID E. DUKES, ESQ.
                              1320 Main Street, 17th Floor
                              Columbia, SC 29201
```

```
                          Williams & Connolly LLP DC
                          BY:  JOSEPH G. PETROSINELLI, ESQ.
                          725 12th Street NW
                          Washington, DC 20005

                          Mayer Brown LLP
                          BY:  MICHAEL A. OLSEN, ESQ.
                               DAN RING, ESQ.
                          71 S. Wacker Drive
                          Chicago, IL 60606

For the United States     US Department of Justice
of America:               BY:  HAROON ANWAR, ESQ.
                               SHARI HOWARD, ESQ.
                               MICHELE GREIF, ESQ.
                          Environmental Torts, Civil Div.
                          175 N Street NE
                          Washington, DC 20002

Court Reporter:           KAREN E. MARTIN, RMR, CRR
                          PO Box 835
                          Charleston, SC 29402


   Proceedings reported by stenographic court reporter.
   Transcript produced with computer-aided transcription
                          software.
```

1                        Friday, June 20, 2025

2        (WHEREUPON, court was called to order at 9:22 AM)

3            THE COURT:  Good morning.  Please be seated.

4            Okay.  I figured we must be giving something

5    away today with everybody here.  Everybody heard what a

6    great city Charleston is to visit.

7            Okay.  We're going to, sort of the order of

8    things, I think we mostly know this.  We're going to go

9    through the status conference first.  And then we're going

10   to break.  I understand y'all want to do a little setup

11   here.  And then we'll proceed to the Science Day.  And

12   just for everyone's information, we'll do liver cancer

13   first, plaintiff, defendant.  Then we'll do thyroid

14   cancer, plaintiff, defendant.

15           Okay.  Could counsel for the plaintiff who will

16   be speaking identify for the record?

17           MR. LONDON:  Good morning, Your Honor.  Michael

18   London for the PEC.

19           MR. SUMMY:  Scott Summy, Your Honor.

20           MR. RICE:  Joe Rice, Your Honor.

21           THE COURT:  Thank you.

22           Okay.  And for the defense?

23           MR. RING:  Good morning, Your Honor.  Dan Ring

24   on behalf of the defense and 3M.  And with me is Mr. Duffy

25   standing in for Mr. Olsen and Mr. Petrosinelli and

4

1   Mr. Dukes today.

2          THE COURT:  He's got big shoes to fill.

3          MR. DUFFY:  Battlefield promotion, Your Honor.

4          THE COURT:  Yes.  You know, those are the first

5   guys that get shot. (Laughter)

6          MR. RING:  Thank you for that, Your Honor.

7          THE COURT:  But you're second, you know.

8   Revolutionary War they look for the generals, and then

9   they got the brigadiers next.

10          And for the United States?

11          MR. ANWAR:  Good morning, Your Honor.  Haroon

12   Anwar.  I'm here with my colleague, Michele Greif, and my

13   ENRD colleague Shari Howard, who is here in place of

14   Mr. Knudsen.

15          THE COURT:  Well, first of all, welcome.

16          MR. ANWAR:  Thank you.

17          THE COURT:  And if you hide at the back row,

18   we'll still find you.

19          MR. ANWAR:  Noted.

20          THE COURT:  Okay.  Let me just for a moment talk

21   a little bit about our calendar.  Most of these things are

22   known, but a few may not be.

23          Of course, we received the summary judgment

24   motions and Daubert motions.  And the responses are due on

25   July 17 and replies are due on July 31.  Now, folks, let

1   me just make it very clear.  At that point, if this case

2   is not resolved, I'm digging in to those motions and I am

3   going to decide them.  Okay?  We're not messing around

4   with this.  So I know y'all are in active discussions.  I

5   would not dither.  Okay?  Because we're going to -- I've

6   got a trial in October and I've got to make -- get in

7   through those documents and make rulings.

8           I'm going to schedule oral argument on the

9   Daubert and summary judgment motions on September 18.  And

10  my goal is to have orders out by September 29 or earlier,

11  so four weeks out from trial.  And at that point I will

12  designate whether we're doing one, two, or three kidney

13  cancer cases and which ones we will be doing.

14          And I'm holding off for the obvious reasons, I

15  need to get through Daubert to see if anything survives.

16  And then I've got to sort out, I'll have a deeper

17  understanding of the cases and the appropriateness of it

18  by then.  And then we're going to have a pretrial

19  conference on October 16.  And I draw a jury on

20  October 20.

21          Now, I know there is this request for

22  supplemental jury questionnaires.  And maybe it is the

23  backwardness of our court, but I don't think it's just

24  that.  I'm not going to send out questionnaires and let me

25  tell you why.  I've only done supplemental questionnaires

1    in 15 years on one case, the United States vs. Dylann

2    Roof, for obvious reasons.  I brought the jurors to the

3    courthouse to fill out the questions because I wanted some

4    control over them because I was worried everybody would

5    start doing Google searches.  If I send out questionnaires

6    relating to PFAS, we're going to have everybody doing

7    Google searches.  And the last I checked, that does not

8    meet the legal standards for admission.  And I'm just not

9    going to do it.

10           We'll do voir dire.  Let me say, do not try

11    proposed voir dire questions to do what I call push

12    polling where you're trying to get the jurors to think a

13    certain way.  I'm very familiar with how to scratch

14    through those.  Okay?  And use a little proportionality.

15    I'm not going to let you do a colonoscopy on my jurors.

16    We're looking for general -- we're looking for neutral

17    people, people who don't have a dog in the fight.  So I

18    will ask questions that get to that.

19           But most people, if you -- I'm sure all of you

20    who are involved in this will say -- friends will say what

21    are you working on?  I'm working on this thing with AFFF

22    or PFAS.  And they look at you bewildered.  Okay?  They

23    have no idea what you're talking about.  Maybe if you say

24    forever chemicals they go, oh, I've heard about that.  So

25    we're not talking about people who are carrying around I

1    think a lot of baggage on these issues, unlike my death

2    penalty case which was loaded with all kinds of potential

3    issues.

4              So we're going to do it, voir dire.  You'll

5    submit your voir dire to me.  I will have my red pencil

6    out.  And I will often rephrase questions so they are not

7    push polling.  But there are issues y'all will point out

8    to me that I think are useful to issues that are useful

9    for further juror inquiry.

10             Now, with that Mr. London, please proceed.

11             **MR. LONDON:**  Good morning, Your Honor.  Michael

12   London.  And I'm going to run through the Joint Status

13   Report for Your Honor.

14             **THE COURT:**  Yes.

15             **MR. LONDON:**  I trust those binders are not

16   too -- not related to our status report.

17             **THE COURT:**  Well, you know, they're not.  But

18   let me make a small comment about these binders.  I've

19   done multiple Science Days.  And I've always done ten

20   articles on each side.  Thoroughly digestible, right?

21   Even very complicated issues.  That's been fine.  Somehow

22   these morphed out into 22 articles per cancer.

23   Eighty-eight articles.  Ridiculous, folks.  Ridiculous.

24   And at least the defendants gave me some mercy.  They

25   attached on some of their 22 supplemental data relating to

1    articles they thought particularly important.

2             Thank y'all for that.

3             I still read over 80 articles.  I am convinced

4    having read them now y'all could have given me ten total

5    each side and been just fine.  Okay?  But they are done.

6    The good news is I've read them.  The bad news is I've

7    read them.  Okay?

8             Okay.  But so the answer, Mr. London, is yes,

9    all these are related to this monstrous production y'all

10   have given me.  And this is my total notebook for the

11   status conference.  Very typical.  Okay.  Please proceed.

12             **MR. LONDON:**  Thank you, Your Honor.  To move to

13   the Joint Status Report relatively quickly, the updates

14   since the last case management conference in April,

15   document production continues, depositions continue.  I

16   believe there were 19 taken since last April.

17             Moving on to the settlement report, we are happy

18   to report that the 3M first payments, the Phase One Action

19   Fund, have started to go out.

20             **THE COURT:**  The check's cleared?

21             **MR. LONDON:**  Checks have cleared, checks have

22   gone out, and they're rolling out to the Phase One class

23   members, which is terrific.  The Dupont payments are

24   following very shortly behind, very, very soon.  The Tyco

25   and BASF claim forms have been submitted and are done.

1    The special needs form deadline was extended until August.

2    But the special master and claims administrator believe

3    that they are on target to be paid this year as well.  So

4    that's really terrific news.  And they have worked

5    expeditiously and incredibly to oversee a really complex

6    claims form.  This is not just simple do you have an

7    injury or did you use a product?  So it's really been a

8    Herculean task and they've done it efficiently and

9    effectively I think.

10            Moving forward, Your Honor, the bellwether

11   report in the Joint Status Report I think Your Honor is

12   well abreast on the Group A cases and has --

13           **THE COURT:**  More than I want to know.

14           **MR. LONDON:**  -- addressed everything that I

15   would have commented on including the dates of the

16   oppositions and the replies.  And thank you for telling us

17   when Your Honor will be winnowing the cases from below

18   three, if at all.

19           The Group B cases, which is the thyroid disease

20   and ulcerative colitis, those are still moving forward

21   through discovery.  The Court added a few more ulcerative

22   colitis cases.  We'll work with the defense to get expert

23   dates probably in the late fall for those.

24           And lastly, the Group C cases we are remiss, the

25   high cholesterol and pre-eclampsia.  We owe the Court --

1  we, the royal we here, plaintiffs and defendants, the

2  Court a CMO on how to address those.  We'll get something

3  to the Court.  If we can't, we'll get a proposal from each

4  side to the Court in short order.

5        **THE COURT:**  Let me just say, folks, sitting here

6  without a dog in the fight, just trying to make sure

7  everyone has a fair field to fight on, I think y'all would

8  be extremely prudent to be flexible enough to look for a

9  global settlement.  You really want to spend the rest of

10  your life litigating these claims?  I mean, really?  I

11  think it's like your grandchildren's lives.  This thing is

12  going go on forever unless you folks have the vision and

13  imagination and flexibility to find some path that

14  everyone feels like it may not be the perfect deal, but

15  it's the most reasonable under the circumstances.  I know

16  y'all are working towards that.

17        And I just think the highlight when we're

18  sitting there going through all these -- we've still got

19  testicular cancer.  We've got sovereign claims.  We've got

20  other claims.

21        I'm just saying to you, folks, making some

22  incremental progress is going to end up being -- at some

23  point, let me just say, guys, at some point this goes back

24  to the district court that sent me these cases.  And that

25  is not a good situation for anyone.  In fact, it's a

1    disaster for everyone, right?  Including my colleagues who

2    are going to get all these cases.  Okay?  But it is going

3    to be, I think, financially ruinous to everyone.

4          The one propitious moment I view in getting this

5    done might be in the next 60 days.  I really do.  And I

6    know some of y'all are warriors.  You're used to fighting

7    and litigating.  That's why y'all were hired by your

8    clients.  But you need some negotiators and diplomats in

9    this as well because y'all need to find a path to get this

10   done.  And that's my two cents worth.

11         **MR. LONDON:**  Thank you, Your Honor.  Noted and

12   we'll work towards that.

13         I think then moving forward, Your Honor,

14   somewhat apropos to that but not moving forward on the

15   CMO 32 cases, those are the dirt cases, the product ID

16   cases, those are -- parties have served written discovery

17   back and forth, that's being answered.  I believe

18   depositions are on target to start being noticed soon, but

19   July and August, those are the property damage cases.  The

20   parties have a bit of an ongoing dispute over the scope of

21   two of the plaintiffs that are in the cases.  We met last

22   night.  Again --

23         **THE COURT:**  What do you mean the scope of the

24   two plaintiffs?

25         **MR. LONDON:**  So there are two plaintiffs, Palm

1    Beach Airport and Fire Training Center, and it's at both

2    entities, and Shreveport Airport Fire Training Center, and

3    it's at both entities.  We are not -- it is not ripe I

4    think for the Court.  We spoke last night.  We spoke again

5    this morning.  And we'll try and come to agreement of how

6    that scope works out.  And if we can't agree, we have --

7    if we cannot agree, we have agreed to submit our proposals

8    to the Court by next Thursday.

9         **THE COURT:**  That's fine.  I know how to say no.

10   I'm a parent.

11        **MR. LONDON:**  Well, good, now I know how to

12   phrase the request.  (Laughter)

13        Your Honor, moving forward, I don't think

14   there's much to talk about beyond the Joint Status Report

15   other than defendant discovery status for the Turnout Gear

16   and the other foam defendants.

17        Which then brings us, Your Honor, to the United

18   States section.  There are a few issues to update there.

19   Haroon Anwar is here from the United States.  Okay.  Your

20   Honor, I could start basically with --

21        **THE COURT:**  Let me hear what you've got to say.

22   Let me just say, when I heard there were 400 -- is it 400

23   interrogatories and 400 requests to produce or are they

24   800 total?

25        **MR. LONDON:**  It's 400 and 400.

THE COURT:  Somebody hadn't read my order.
Okay?  This is a narrow issue of discovery.  Are there
policies at other bases like the one we had in our
principal case?  You know, are there -- is there -- do we
have information in other places for accidental
discharges?  Mistaken neglectful discharges?

I thought this was a fairly limited scope we
were looking at.  You know, as we dug into this issue, it
was more nuanced I think than all of us appreciated.
There's a lot of baggage in the case law, difficult for
the plaintiffs.  I confront this all the time in cases
about discretionary review and discretionary decisions and
so forth.

So I wasn't expecting -- I thought this was a
pretty discrete set of issues.  And so here's what I'm
saying to you is, Joint Status Reports aren't ways to
resolve issues if we've got to -- if we have a real
dispute that can't be resolved.  I've read -- both sides
are saying we are optimistic about it.  We're working on
it.  We're optimistic about it.  I'm hoping my statements
here will give some guidance.

But somebody needs to file either from the
plaintiff's side a motion to compel, from defense side a
motion for protective order and I'll rule on it.  But I
don't even have the discovery requests.  It's just when I

1    hear there are 800 out there, it just seems to me, hold on
2    a minute, that's way overboard.
3            And we're not relitigating the issue.  We spent
4    an exhaustive amount of time -- and I want y'all to
5    remember Ms. Falk, our issues about causation, we're not
6    even there yet that are really, really complicated if you
7    have, say, some accidental discharges and a lot of ones
8    that wouldn't -- that wouldn't be -- that wouldn't fall
9    within the Tort Claims Act.  And how do you sort all that
10   out?  I'm just saying we've got lots of issues in this
11   case.  And I just think y'all do not, despite the fact
12   you've packed a couple courtrooms, you don't have enough
13   resources endlessly to litigate things.
14           And I just say to you, Mr. London, you'll
15   remember at our first status conference in this case I
16   said to y'all, all this talent in the room and y'all are
17   going to be trying to tear each other's eyes out.  You
18   need to be working together to educate Congress the issues
19   here.  Because the Tort Claims Act is really a challenge
20   to get the kind of relief that the water districts in
21   particular need.  And that something like a 9/11 kind of
22   structure with Congress seems like a particularly
23   appropriate approach.  I've thought that then from the
24   beginning of this.  And I'm sure y'all have made some
25   efforts.  I understand there were some efforts with

1    firefighters and some early efforts with that, which is a

2    very sympathetic group and a group that's had a lot of

3    exposure.

4          But I'm just saying to you, you know, there are

5    limits.  The law has put some practical limits on your

6    ability to recover, though the Government appears to have

7    some role and some hand in this.  But getting it and

8    you'll probably now move on to CERCLA, I think y'all are

9    having issues with CERCLA, right, getting progress in

10   CERCLA?

11         **MR. LONDON:**  That's right, Your Honor.  And that

12   is helpful.  And you have certainly made those statements

13   and views known from the beginning.  And I think we echo

14   them.  I think everybody does agree.

15         It is somewhat misleading to just cast that it's

16   800 demands and 400 and 400.  And I only say that because

17   there's about two dozen sites at play.  And 18

18   interrogatories per site per plaintiff were issued.  So 18

19   times 24, 430 something.  So that's where that comes from.

20   I will say -- and the Court's order said complete the

21   discovery in 90 days, which would have been May --

22         **THE COURT:**  Because I thought we were dealing

23   with give me all your policies in these -- I think we were

24   talking about 12 sites or something?

25         **MR. LONDON:**  It's a little bit more than that.

1     **THE COURT:** Okay. And give me all your

2     accidental discharges or mistaken or neglected -- that's

3     what I thought was coming. And I thought 90 days was

4     plenty. But that's not -- that doesn't sound like 18 per

5     site. That's a little beyond what I was talking about.

6     **MR. LONDON:** So what I think, though, Judge, the

7     good news is out of this, what the parties realize is it's

8     a lot. Whether it's ten interrogatories, 18

9     interrogatories, ten document demands, 18 document

10    demands, it's a lot. So the proposal of the CMO the Court

11    will be getting from the parties is to triage the sites.

12    Do four of them now.

13    **THE COURT:** Right. Four of them --

14    **MR. LONDON:** Four of them following that. If

15    necessary, four more.

16    **THE COURT:** But you need to narrow -- you need

17    to read my order and they need to be tailored to my order

18    whether there are four or 24. Okay?

19    **MR. LONDON:** And that's helpful, Your Honor.

20    The teams that are prosecuting those cases have heard

21    this.

22    **THE COURT:** For teams, that's their baby. Okay?

23    But there's got to be command and control in this thing.

24    And that's what I'm looking for my leadership to provide.

25    **MR. LONDON:** And I think the narrowing of the

1    four was very helpful. And we're glad -- that was a great

2    first step.

3            So, Your Honor, now pivoting to CERCLA, I guess

4    I'll start with the good news. I was going to finish with

5    this, that we've taken nine months but a tolling agreement

6    has been reached.

7            THE COURT: Good.

8            MR. LONDON: And I think will be submitted to

9    the Court shortly. The not so good news, and I'm sure

10   Your Honor saw from the Joint Status Report, we had picked

11   these four exemplar cases almost a year ago to issue

12   demands, do settlement discovery. That was the four

13   cases, the Bakman case, New Mexico Highland Dairy, and

14   Westfield. The pace of resolution or discussions was --

15           THE COURT: Drip, drip, drip.

16           MR. LONDON: Right. And the plaintiffs

17   complained about that in JSR after JSR after JSR.

18           THE COURT: And I've told you that they don't

19   have an obligation to settle with you. And y'all can

20   litigate it.

21           MR. LONDON: Unfortunately, Mr. Knudsen, who was

22   in charge of resolution has moved on within the DOJ. We

23   do not yet know his replacement. So at this point,

24   without somebody --

25           THE COURT: I think we have someone. I think we

1  were introduced to him.  You can go introduce yourself to

2  him in a minute.

3          MR. LONDON:  Certainly will.  We intend -- I

4  think some of the plaintiffs intend to file affirmative

5  motions for summary judgment --

6          THE COURT:  That's fine.

7          MR. LONDON:  -- shortly.

8          THE COURT:  I just sort of feel like, you know,

9  from time to time I have in my civil cases I have lawyers

10 complaining, you know, the guy won't settle with me.  And

11 I'll say, well, that's why we have juries.  We try cases

12 around here.  Nobody has to settle and make your motions.

13         So, yeah, I know y'all are frustrated.  And I

14 know that it's disappointing that when you finally felt

15 like you had at least a working model with Mr. Knudsen,

16 he's moved on.  Okay?  But let me say this, about half the

17 DOJ lawyers have either left or moved on to other

18 departments.  So everybody's facing this when litigating

19 against DOJ.

20         MR. LONDON:  We just wish they didn't take

21 Mr. Knudsen.  He had the checkbook.

22         THE COURT:  Yes.

23         MR. LONDON:  Well, be that as it may, we'll be

24 -- two plaintiffs I believe will be filing motions for

25 summary judgment.  I think a few others may need some

1    affirmative discovery before they file.

2         And Your Honor, I think that concludes the PEC's

3    comments.  I don't know if --

4         **THE COURT:**  Tell me on the bellwethers, I saw

5    y'all were dismissing -- and I'll bring the Government up

6    after I do the defense.  Y'all were dismissing certain

7    parties from the bellwether.  Where does that stand?

8         **MR. LONDON:**  So moving back to the personal

9    injury, the leach cases?

10        **THE COURT:**  Yeah, specifically our three kidney

11   cancer bellwethers.  I saw that there was -- there was a

12   mention to stipulations of dismissal, which doesn't

13   surprise me because there are probably going to be product

14   ID issues on a number of these defendants.  But who looks

15   like they're still sort of look like going to be in the

16   case?

17        **MR. LONDON:**  So, Your Honor, there are five that

18   are still in the case.  3M, Tyco, Chemguard, Dupont

19   Chemours family, BASF, Ciba Geigy defendants, and I guess

20   technically the Kidde, KFI defendants, they're stayed but

21   they're in.

22        **THE COURT:**  That's it?

23        **MR. LONDON:**  That's it.  The others have been

24   either previously dismissed or dismissed recently.

25        **THE COURT:**  Are you in discussions about

1    narrowing that further?

2         MR. LONDON:  You know, Your Honor, I talked to

3    Mr. Douglas, I don't believe so.  That looks like that's

4    the folks that will be there.

5         THE COURT:  Okay.  Because I've got to figure

6    out space in courtrooms and all that stuff for that many

7    parties.  I don't think these lawyers are going to come

8    just like one solo practitioner for each defendant.

9    Somehow I don't think that's happening.

10         MR. LONDON:  That's fine.

11         Absent anything from the United States on the

12    United States section, Your Honor, that probably -- the

13    rest of the Joint Status Report absent any comments from

14    Mr. Ring, I don't think there's anything to supplement.

15         THE COURT:  Very good.

16         Let me hear from the defense.

17         MR. RING:  Briefly, Your Honor, on the jury

18    questionnaire issue you raised at the beginning.  The

19    parties did not intend to ask the Court to send it out in

20    advance.  It was only a suggestion to use it with the

21    panel once they're here --

22         THE COURT:  Very good.

23         MR. RING:  -- to screen.  And we'll submit

24    those.  And we do think --

25         THE COURT:  Y'all are a little lengthy.  Okay?

1    And think about this issue that the jurors don't sign up

2    for this gross invasion of their privacy.  Okay?

3         And by the way, the questionnaire we use

4    standard is pretty good.  I mean, it's -- I did a lot

5    of -- I always liked litigating in federal court because I

6    thought the questionnaire was so good.  And most state

7    judges wouldn't give me the -- let me do all I needed to

8    do.  So it's a pretty good start.  A lot of times people

9    submit questions as if they hadn't read the questionnaire.

10        **MR. RING:**  And we'll bear that in mind, Your

11   Honor.  I think we thought that there may be some things

12   that would be helpful to have in advance that may actually

13   expedite the process in cancer cases where in an open

14   setting that may be more difficult for people to deal

15   with.

16        **THE COURT:**  Let me tell you how I normally do

17   that.  Rather than saying do you have kidney cancer?  I

18   don't ask that question.  But I do say this, something to

19   the effect of this case involves issues related to kidney

20   cancer.  If there's anything about that subject that

21   troubles you one way or the other in which you don't think

22   you could be a fair and impartial juror, please stand.

23   And then they come up and they tell me privately, you

24   know, what the issue is.  And that's when it comes out, my

25   husband has kidney cancer, I have kidney cancer, my dad

1    died of kidney cancer, all that kind of stuff.  And then

2    we sort of inquire, you know, whether that fact would

3    affect you to be a fair and impartial juror.  So that's

4    normally the way I handle it, rather than ask, you know,

5    please publish to these strangers your health information.

6              MR. RING:  We appreciate that, Your Honor, and

7    will bear in mind as we think about the proposed voir dire

8    and see if we can work out an agreement.

9              THE COURT:  Why don't y'all submit it as sort of

10   voir dire rather than the juror questionnaire.  Because

11   it's going to be -- it's a little different when I'm doing

12   it to the group like that.

13             MR. RING:  We'll take that into account, Your

14   Honor, and we'll do that.

15             With respect to CMO 32 and the sites, we have

16   been going back and forth on that for awhile.  So we will

17   get that to resolution either by agreement, or if not,

18   we'll submit things next Thursday.  And we know where to

19   find you, Your Honor.

20             THE COURT:  Thank you.  Everyone else does, too,

21   apparently.

22             MR. RING:  And I think that's it.  No other

23   issues.

24             THE COURT:  Very good.

25             The United States, please?  Come forward.  I'm

1    not going to let you speak from the back row.

2              **MR. ANWAR:**  Good morning, Your Honor.

3              **THE COURT:**  Good morning.

4              **MR. ANWAR:**  As Mr. London stated, we have been

5    working hard with the --

6              **THE COURT:**  First of all, why don't you just

7    introduce again and have them stand up so these lawyers

8    can know who your new team is.

9              **MR. ANWAR:**  Sure.  My ENRD colleague, who will

10   be stepping in for Mr. Knudsen, Shari Howard.

11             **THE COURT:**  Good.

12             **MS. HOWARD:**  Good morning, everyone.

13             **THE COURT:**  And how about -- do you any others?

14             **MR. ANWAR:**  Yes.  My colleague who has worked on

15   this case as well with me for a number of years, Michele

16   Greif.

17             **THE COURT:**  Good to have you both here.

18             **MR. ANWAR:**  Thank you, Your Honor.  As

19   Mr. London stated, we've been working hard with the PEC to

20   come to an agreement on a CMO that would sort of

21   methodically move things forward.  Your guidance here

22   today is extremely helpful.  And I think it will go a long

23   way in resolving any remaining issues we have.  The

24   proposal we received earlier this week just before the

25   status conference did include withdrawing a number of the

1   discovery requests that had been served.  So we are moving

2   forward and getting closer and closer to an agreement.

3   And we will work very hard to have something submitted to

4   the Court by the end of next week.

5           THE COURT:  And I like y'all's idea about doing

6   a limited number, because not only does it make it more

7   manageable for you, but it might help you learn more

8   efficiently how to get to what's important.  And it might

9   resolve after sort of a sampling that we don't need more.

10  We've got enough.  I just think that all that is

11  worthwhile.

12          MR. ANWAR:  Thank you, Your Honor.  That was our

13  thinking as well.

14          THE COURT:  So what about the CERCLA stuff?

15  What's going on with CERCLA?

16          MR. ANWAR:  For that I would ask my colleague,

17  Ms. Howard.

18          THE COURT:  Ms. Howard, you thought you were

19  just going to come in and observe, come to Charleston and

20  have a good meal.  Come forward.

21          MS. HOWARD:  Thank you, Your Honor.  We are also

22  in the middle of completing the site-specific discovery

23  that you ordered on the CERCLA sites that are at issue.

24  We completed the first round of global discovery for the

25  written discovery on Wednesday the 18th.  So we've turned

1   that over to plaintiffs counsel.  And we have one other

2   set of written discovery that we are working on that is

3   specific to New Jersey.  We plan to start with other

4   depositions and further discovery very soon, as soon as we

5   can get it scheduled.

6         **THE COURT:**  You know, obviously, settlement's

7   always, if there's a path, is always good to explore.  But

8   at some point, if people -- if the parties can't work it

9   out, we litigate it.  Right?

10         **MS. HOWARD:**  Yes, Your Honor.

11         **THE COURT:**  And that's the next stage here.  And

12   we've got a lot on our plate here.  But I see it as a

13   plausible thing to litigate a CERCLA case at some point if

14   we can't find a path to -- I mean, I knew enough from our

15   review of the Federal Tort Claims Act and of the certain

16   things that led to my two orders.  There are some -- you

17   know, there are, obviously, folks like farmers adjacent to

18   military bases and so forth who have potentially very

19   serious claims.  And it just seems to me if there's a path

20   to work that out, y'all need to be looking for it because

21   that's the kind of case I'm going to try first, something

22   like that.

23         **MS. HOWARD:**  Yes, Your Honor.  And we are

24   reviewing the CERCLA settlement demand letters that we

25   received.  We have our experts also reviewing those

1    claims.  But we are aware that EPA has announced that they

2    are reviewing the PFOA and PFAS hazardous substance

3    designations under CERCLA.  So we are trying to consider

4    all of those things as we consider these demand letters

5    that have been submitted to us.

6         THE COURT:  So the EPA is considering

7    withdrawing the hazardous designation, is that what you're

8    telling me?

9         MS. HOWARD:  Yes, Your Honor.  And we don't have

10   knowledge whether they will or not.  So we are waiting to

11   learn what EPA's decision will be.

12        THE COURT:  I do remember, if my memory is

13   correct, that one of the leaders in Congress for PFAS

14   protection was the present EPA Director.  Is my memory

15   right about that?

16        MS. HOWARD:  Yes, Your Honor, I believe your

17   memory is correct.

18        THE COURT:  Y'all do what you've got to do,

19   obviously, and the parties will respond.  That is

20   something that materially affects the CERCLA claim,

21   obviously.

22        MS. HOWARD:  Yes, Your Honor.

23        THE COURT:  Mr. London, you've got something?

24        MR. LONDON:  And Your Honor, yes.  The EPA has

25   indicated that they would re-evaluate, but there's no

1   evidence -- and I think it's Mr. Zeldin you're referring

2   to?

3           THE COURT:  Yes.

4           MR. LONDON:  No evidence that they intend to

5   change this.  This is an EPA -- they sought a 60-day

6   abeyance, then a 30-day abeyance.  So it's just, in our

7   view, this is just one more opportunity, we think, to

8   delay assessment of the evaluation of these claims for

9   resolution.  They are assessing it, but they are not

10  changing, revoking, there's been no evidence to suggest

11  that except requests to delay.

12          THE COURT:  I thought there was some action in

13  which the water districts were given some additional time

14  to comply.  Am I remembering that right?

15          MR. LONDON:  Yes.

16          THE COURT:  But others actually were, other

17  families of chemicals related to PFAS were actually taken

18  off of a designation of some type.  Is my memory right

19  about that, too?

20          MR. LONDON:  That's correct.  That's correct.

21          THE COURT:  Okay.  Well, we'll stand by.  Okay?

22  But at some point, to the extent CERCLA has a viable

23  claim, I'm going to -- if y'all don't work it out, I am

24  going to set it on a course for trial.

25          MS. HOWARD:  Yes, Your Honor.  Thank you.

28

1      **THE COURT:**  Good to have you.

2      **MS. HOWARD:**  Thank you, Your Honor.

3      **THE COURT:**  Okay.  If there are not other

4  matters relating to the status report, I'm going to

5  adjourn.  I understand that there are some -- the what

6  kind of time do we need, Mr. London, to set up?

7      **MR. LONDON:**  Your Honor, I think five to ten

8  minutes max.

9      **THE COURT:**  Okay.  Good.  Well, I'll step out

10  for five or ten minutes.  Ms. Perry will let me know when

11  I need to return.  And we stand adjourned.

12      **MR. LONDON:**  Thank you.

13      (WHEREUPON, court was adjourned at 9:56 AM)

14                          ***

15  I certify that the foregoing is a correct transcript from

16  the record of proceedings in the above-entitled matter.

17      s/Karen E. Martin                    6/24/2025
    _____        _____
18  Karen E. Martin, RMR, CRR          Date

19

20

21

22

23

24

25