UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL NO: 2:18-mn-2873-RMG<br><br>Hon. Richard M. Gergel |

**DEFENDANTS HISTORIC DUPONT, CORTEVA, AND NEW DUPONT'S
RESPONSE TO PLAINTIFFS' EXECUTIVE COMMITTEE STATUS REPORT**

**TABLE OF CONTENTS**

BACKGROUND ................................................................................................................................ 1

ARGUMENT .................................................................................................................................... 3

    I.     Corporations Should Create Value, and Divestitures Do Just That ....................................... 4

    II.    Plaintiffs Need Not Pursue the Pending Fraudulent Transfer Claims ................................... 7

    III.   Discovery on Unfiled Fraudulent Transfer Claims Is Irrelevant and Unnecessary .............. 10

CONCLUSION ............................................................................................................................... 10

Defendants EIDP, Inc. ("Historic DuPont"), Corteva, Inc. ("Corteva") and DuPont de Nemours, Inc. ("New DuPont") (together, "Defendants") respectfully submit this response to the Plaintiffs' Executive Committee's Status Report regarding Corteva's and New DuPont's recent and proposed upcoming corporate transactions. (Dkt. No. 8266.)

In that Status Report, Plaintiffs criticize Defendants for pursuing the primary goal of all American corporations: to act in the best interest of and create long-term value for their shareholders. Defendants are Fortune 500 companies that remain solvent, strong, viable entities today. Corporate transactions like the ones Plaintiffs now bemoan have helped these companies grow in value over the last decade. Defendants have also worked together to responsibly share any potential liabilities they may face in this MDL. In fact, one member of the Plaintiffs' Executive Committee stated in writing that he does not think Defendants are insolvent, and that Defendants are managing "their liabilities in a systematic way." The recent and proposed future transactions raised in the Status Report do not change any of that. So, no discovery or other action is necessary, especially given these transactions do not relate to any claims pending in this MDL.

## BACKGROUND

Plaintiffs claim to be concerned about three recent or upcoming corporate transactions:

(1) Corteva's recently announced plans to divest its Seeds business. This transaction will not be completed until the second half of 2026 and will leave behind the Crop Protection business with an estimated revenue of $7.8 *billion* in 2025 alone.[1]

(2) New DuPont's separation of its electronics business into a new independent, public company called Qnity Electronics, Inc. ("Qnity"), which occurred on November 1, 2025. Plaintiffs have known about New DuPont's plans to separate its electronics business since May 2024.[2] And New DuPont has provided public updates since then,

---

[1] Press Release, Corteva, Inc., Corteva Announces Plan to Separate into Two Industry-Leading Public Companies, https://tinyurl.com/yckcwyb6 (Oct. 1, 2025).

[2] Press Release, DuPont de Nemours, Inc., DuPont Announces Plan to Separate into Three Independent, Publicly Traded Companies, https://tinyurl.com/mpevucvj (May 22, 2024).

1

including in January 2025.[3] New DuPont and Qnity agreed to share legacy liabilities, like those at issue in this AFFF MDL, pro-rata based on their relative pro forma operating EBITDAs at the time of the transaction.[4]

(3) New DuPont's sale of its Aramids business to a third party. This sale was announced two months ago on August 29, 2025, and is expected to close in early 2026. In this sale, New DuPont will receive approximately $1.2 billion in pre-tax proceeds and a note receivable of $300 million, and New DuPont will retain equity interest in the future company valued at the time of signing at $325 million.[5]

Without justification, Plaintiffs attempt to cast these normal business transactions as "nefarious." Plaintiffs do not claim that New DuPont's last two transactions will constitute fraudulent transfers—nor could they given that New DuPont will profit from both. Instead, Plaintiffs claim there is a "substantial likelihood" that New DuPont "intends to distribute the proceeds of these transactions to shareholders." (Dkt. No. 8266 at 5.) In fact New DuPont plans to use the $4.1 billion dividend it received from Qnity to repay approximately $4 billion of its outstanding debt plus associated fees and costs.[6] New DuPont has separately announced a share repurchase authorization of *up to* $2 billion,[7] and has not announced any additional intentions with respect to the proceeds of the Aramids sale. Regardless, the insinuation that a public company cannot or should not issue shareholder distributions while in litigation is unsupportable.

Plaintiffs threaten that they "may" seek relief related to these transactions, asking this Court to insert itself into Defendants' boardrooms. *Id.* at 6. Plaintiffs' complaints about Defendants legally

---

[3] Press Release, DuPont de Nemours, Inc., DuPont Provides Update on Separation Plans, Reaffirms Financial Guidance, https://tinyurl.com/87t3sc29 (Jan. 15, 2025).

[4] Qnity Electronics, Inc., *Form 10 (Registration Statement) Am. 4*, (filed Sep. 29, 2025) at Ex. 2.1 (Separation and Distribution Agreement) § 7.1, https://tinyurl.com/2s3a5yz6.

[5] Press Release, DuPont de Nemours, Inc., DuPont Announces Agreement to Divest Aramids Business to Arclin, https://tinyurl.com/4jet4w5x (Aug. 29, 2025).

[6] DuPont de Nemours, Inc., *Form 8-K* (filed Nov. 3, 2025) at Ex. 99.1 p. 1–2 https://tinyurl.com/ynn5c3bv.

[7] DuPont de Nemours, Inc., *Form 8-K* (filed Nov. 6, 2025) at Ex. 99.1 p. 2, https://tinyurl.com/mryfs2ym.

pursuing corporate transactions and issuing appropriate distributions to their shareholders should be ignored for three reasons.

## ARGUMENT

First, the proposed transactions are in line with a goal shared by all American corporations: to create value for shareholders. Divestitures like the ones being proposed by Corteva and New DuPont are common business practice. Prior corporate transactions by these defendants have benefitted shareholders *and* plaintiffs nationwide by continuing to *increase* the collective value of these companies.

Second, Plaintiffs' false urgency is belied by the history of the existing fraudulent transfer claims in this MDL and Defendants' track record of corporate responsibility with respect to sharing the costs of PFAS liabilities. Plaintiffs have repeatedly voluntarily dismissed fraudulent transfer claims against these Defendants in the run-up to trial. These Defendants have entered multiple settlements and have never failed to pay. And these Defendants have established robust agreements among themselves to allocate financial responsibility for potential PFAS liabilities at issue in this MDL and elsewhere. In the *ten years* since the spinoff of The Chemours Company ("Chemours") which is the focus of Plaintiffs' pending fraudulent transfer claims, no fraudulent transfer remedy has been necessary in this MDL or anywhere else.

Finally, these new proposed transactions are separate from, and not relevant to, the fraudulent transfer claims currently pending in the MDL—let alone the claims that are the heart of the MDL. Two of the three transactions have not yet occurred, and there is no reason to believe that any Defendant will be rendered insolvent or unable to pay a judgment as a result. Allowing discovery and litigation on these transactions would not only waste the parties' and Court's resources but would also set a concerning precedent for all the corporate defendants in this MDL.

**I.    Corporations Should Create Value, and Divestitures Do Just That**

Plaintiffs criticize Corteva and New DuPont for planning and carrying out divestitures, describing these transactions as "plotting" and "schemes" to "deplete billions" of the companies' assets. (Dkt. No. 8266 at 4.) But divestitures are a well-known strategy for creating value.

For much of U.S. history, corporations sought to increase value through expansions. But in the 1980s, economists discovered that diversification does not necessarily maximize value. Researchers identified something called a "diversification discount."[8] Put simply, companies with diverse businesses can be prone to operational inefficiencies that lead them to be valued at less than the sum of their parts. Once economists discovered the diversification discount, many corporations focused more on strategic divestiture than expansion. Divestitures help reduce diversification discounts by allowing a company to split off business units that are unrelated to the company's core focus or that are no longer a strategic fit based on the company's objectives.[9] Recognizing the value of this kind of transaction, companies like General Electric and Kellogg's divested some of their more unique businesses to focus on their core companies, to great success.[10]

Considering how effective divestitures can be in increasing value, it is neither surprising nor nefarious that Defendants have used them. In 2015, Historic DuPont spun off Chemours because it believed—correctly—that it faced a diversification discount.[11] The spin increased both companies' collective value. The graph below shows how Defendants' and Chemours's collective enterprise value has increased significantly over the last fifteen years, even with significant divestiture activity (some

---

[8] *See, e.g.*, Philip G. Berger & Eli Ofek, *Causes and Effects of Corporate Refocusing Programs*, 12 Rev. Fin. Stud. 311, 311–45 (1999).

[9] *See* Amy Dittmar & Anil Shivdasani, *Divestitures and Divisional Investment Policies*, 58 J. Fin. 2711, 2711–43 (2003).

[10] *See, e.g.*, Chewing Over the Kellogg Co. Split: Why Now?, Marketplace (June 21, 2022), https://tinyurl.com/yc6tx97h.

[11] *See, e.g.*, *DD: Performance Chemicals Strategic Alternatives Conversation Trumps Earnings*, Barclays, July 23, 2013, at 1.

examples of which are included below).[12] What started as one company with an enterprise value of $49.7 billion in 2010 has grown into a group of companies with an enterprise value of well over $90 billion.



The Defendants' businesses continue to perform well because they are always looking for ways to increase value, including through further divestitures. In the transactions Plaintiffs now target, Corteva and New DuPont seek to increase the value of both the parent companies and their divested businesses. New DuPont spun off its electronics business to "unlock[] new opportunities for both organizations to thrive independently."[13] And it will sell its Aramids business—which focuses on producing high-performance synthetic fibers—to Arclin, "to maximize value for our shareholders by providing significant cash proceeds at close which will be re-deployed to further drive value creation,

---

[12] The enterprise values for New DuPont for 2017–2018 represent the estimated value for the portion of DowDuPont attributable to New DuPont (and exclude the estimated enterprise value attributable to Dow).

[13] Press Release, DuPont de Nemours, Inc., DuPont Board of Directors Approves Qnity Distribution, Oct. 15, 2025, https://tinyurl.com/4vykxp67.

5

while also allowing DuPont shareholders to participate in Arclin's growth potential through our retained equity interest."[14] And Corteva recently announced its intention to separate its Seeds business to allow its businesses "to maximize long-term value," including by unifying each business by "a single vision, with a focused strategy and priorities" and by making decision making "simpler and faster."[15]

Because divestitures are so effective for reducing diversification discounts, they are very common. For each year from 2000 to 2019, on average approximately 30% of the Fortune 500 went through at least one divestiture.[16] Unsurprisingly, many defendants in this MDL have undertaken divestitures while the litigation has been pending. In fact, excluding these Defendants and Chemours, there are 15 other U.S. Fortune 500 parent companies of defendants in this MDL. Just that group of Fortune 500 companies have undertaken 161 divestitures since the JPML formed this MDL on December 7, 2018. More broadly than the Fortune 500, all the public parent companies of defendants in this MDL other than the Defendants at issue in this Status Report and Chemours have undertaken 340 divestitures since this MDL was formed. Plaintiffs have not informed the Court of a single one of those hundreds of other divestitures, perhaps recognizing the transactions for the ordinary corporate conduct they are. Yet now Plaintiffs target Corteva's and New DuPont's recent and upcoming transactions for special scrutiny with no explanation for what makes them different.

Plaintiffs' desire to hinder these transactions makes little sense. From a practical standpoint, this MDL has been pending for close to seven years and could continue for years to come. Defendants are public companies with obligations to shareholders. They cannot freeze strategic decisions and

---

[14] Press Release, DuPont de Nemours, Inc., DuPont Announces Agreement to Divest Aramids Business to Arclin, https://tinyurl.com/4jet4w5x (Aug. 29, 2025).

[15] *See* Corteva, Inc. Business Update Call, https://tinyurl.com/2r28vk24 (Oct. 1, 2025) ("We strongly believe that in the long term, the value these businesses are able to create for our shareholders as two standalone companies will be greater than the value we would be able to create as an integrated company.").

[16] Emilie R. Feldman, Divestitures: Creating Value Through Strategy, Strict, and Implementation 2–3 (1st ed. McGraw Hill 2022).

ignore those obligations while this litigation runs its course. If none of the dozens of corporate defendants in this MDL could undertake transactions or provide shareholder distributions in the normal course of business for more than a decade, it could impact the entire U.S. economy.

From a strategic standpoint, if Plaintiffs are concerned that the companies they are suing may not have sufficient funds to pay judgments, then it is in Plaintiffs' best interest to allow Defendants' assets to grow. If value-maximizing transactions are halted, there will be fewer resources available for any potential judgment. If anything, the *absence* of strategic divestitures should be more concerning to Plaintiffs than the existence of the transactions they challenge here. Overall, corporate transactions and divestitures like the ones Plaintiffs complain about benefit all the parties involved.

## II.     Plaintiffs Need Not Pursue the Pending Fraudulent Transfer Claims

There are two sets of fraudulent transfer claims relating to the Defendants currently pending in this MDL. The first relates to Historic DuPont's 2015 spinoff of Chemours. Over ten years ago, on July 1, 2015, Historic DuPont spun off its performance chemicals business into Chemours. In exchange for this business, Chemours issued a dividend to Historic DuPont of approximately $3.9 billion. As part of the spinoff, Chemours was assigned certain of Historic DuPont's liabilities, and agreed to indemnify Historic DuPont for those liabilities. To be clear, Historic DuPont and Chemours's agreement as to who would be financially responsible for historic PFAS liabilities had no effect on third parties' ability to sue Historic DuPont directly for damages caused by Historic DuPont's conduct. And Historic DuPont has consistently recognized that it remains directly liable to third parties.[17] In other words, the Chemours spinoff did not move assets out of the reach of potential PFAS judgment creditors. Plaintiffs nevertheless filed fraudulent transfer claims alleging that the

---

[17] *See* Sharon Lerner, *DuPont May Dodge Toxic Lawsuits By Pulling a Disappearing Act*, THE INTERCEPT, https://tinyurl.com/58ru24ev (June 15, 2016) ("The indemnification provision we agreed to with Chemours does not take away any valid legal claims that plaintiffs have against DuPont for pre-spin operations or the right to collect from DuPont if DuPont is found liable in any related action.").

7

Chemours spinoff rendered Chemours—still a successful public company over ten years later—insolvent and that the spinoff somehow hindered Plaintiffs' ability to recover on their future potential PFAS judgments.

The second set of fraudulent transfer claims relates to the "DowDuPont transaction." In December 2015, the Dow Chemical Company and Historic DuPont announced that they would combine and then separate into three public companies, each focusing on a different business. The parties completed the DowDuPont transaction on June 1, 2019, leaving: Dow Inc., focusing on material science products; Corteva, focusing on agricultural products and taking with it Historic DuPont as a subsidiary; and New DuPont, focusing on specialty products. Corteva and New DuPont also agreed to share financial responsibility for Historic DuPont's legacy liabilities (to the extent those liabilities are not already indemnified by Chemours).[18] And in January 2021, Historic DuPont, Corteva, New DuPont, and Chemours entered a Memorandum of Understanding governing how they will split responsibility for any future payments to potential PFAS judgment-creditors.

The parties—and the Court—have already spent considerable time and resources litigating the fraudulent transfer claims relating to these two transactions. Defendants produced tens of thousands of documents relating to the fraudulent transfer claims, and Plaintiffs deposed eighteen fraudulent transfer fact witnesses (the vast majority of whom were third-party former employees, including former CEOs, CFOs and GCs). The parties completed fact discovery about the Chemours spinoff and DowDuPont transaction in July 2024. *See* Dkt. No. 8266 at 7–8.

Contrary to Plaintiffs' suggestion, the allegations that these transfers were anything other than ordinary corporate divestitures have not been proven in *any* jurisdiction. In fact, Plaintiffs have never followed through to even seek adjudication of these claims on their merits. Instead, in this MDL,

---

[18] Defendants dispute the PEC's assertion that Corteva and New DuPont assumed Historic DuPont's PFAS liabilities, Dkt. No. 8266 at 3–4.

Plaintiffs have dismissed the fraudulent transfer claims in the run-up to bellwether trials. *See* Stip. of Dismissal, Dkt. 181, *City of Stuart, Florida v. The 3M Company et al.*, No. 18-cv-3487 (D.S.C. Jan. 13, 2023) (dismissing fraudulent transfer claims in water provider bellwether case); Stip. of Dismissal, Dkt. 157, *Voelker v. 3M Co. et al.*, No. 18-cv-3438 (D.S.C. June 11, 2025) (dismissing fraudulent transfer claims in Personal Injury Group A bellwether case); Stip. of Dismissal, Dkt. 70, *Donnelly v. 3M Co. at al.*, No. 20-cv-209 (D.S.C. June 16, 2025) (same). And Kelley Drye, the Plaintiffs' firm taking the lead on the fraudulent transfer claims in the MDL, has twice dropped claims relating to the DowDuPont transaction in advance of trial in other jurisdictions. Joint Final Pretrial Order at 3 n.1, Dkt. 697, *New Jersey Dep't of Environmental Protection et al., v. E. I. du Pont de Nemours and Company, et al.*, No. 1:19-cv-14766 (D.N.J. June 24, 2025) (withdrawing claims based on the DowDuPont transaction in advance of bench trial); Pl. Opp. to Mot. for Partial Summary Judgment at 1 n.1, Dkt. 434, *State of North Carolina v. EIDP, Inc. et al.*, No. 20 CVS 5612 (N.C. Sup. Ct. June 11, 2025) (withdrawing same in response to defendants' motion for partial summary judgment).

As Plaintiffs' counsel's actions show, it is unnecessary to try the existing fraudulent transfer claims. Members of the PEC have confirmed in writing that Defendants are *not* insolvent. Ex. A, Email from S. Summy to N. Rigano (July 14, 2023) ("I did not say these companies are insolvent and I don't think they are. They are attempting to manage their liabilities in a systematic way and the 3M and DuPont settlements are the first step."). And as the Court is aware, these Defendants were involved in the Water Provider Settlement, about which Plaintiffs have not complained. This is also true of a proposed settlement in the New Jersey Department of Environmental Protection case, and cases in other jurisdictions. So, there is no reason to believe the existing fraudulent transfer claims (as to the 2015 and 2019 transactions) will ever need to be tried—let alone yet-to-be-filed claims relating to new transactions.

9

**III.     Discovery on Unfiled Fraudulent Transfer Claims Is Irrelevant and Unnecessary**

The parties should not waste more time by adding new transactions into the mix. First, the new transactions are not relevant to any pending claim in the MDL, so no discovery would be appropriate. The facts of the 2015 Chemours spinoff and the 2019 DowDuPont transaction have not changed, and discovery has been closed for over a year. These three recent and proposed transactions are separate from the 2015 and 2019 transactions.

In addition, the fraudulent transfer claims do not affect the outcome of the claims that are the focus of the MDL. Nor are the fraudulent transfer claims necessary to determine damages. Instead, fraudulent transfer law provides equitable remedies allowing plaintiffs to recover assets that have been transferred out of reach; it does not entitle plaintiffs to any additional damages. Now that the parties have completed fraudulent transfer discovery on the claims already filed, Defendants respectfully suggest that the parties' energy should be focused on the general and specific causation issues that will drive the progress of this MDL. Going through additional discovery about these new transactions is not necessary given the Plaintiffs' track record of dismissing fraudulent transfer claims voluntarily and given the Defendants' track record of managing their potential liabilities systematically.

## CONCLUSION

Plaintiffs' accusations of wrongdoing are baseless. No relief or discovery into the recent upcoming transactions is appropriate, in light of (1) the Defendants' track record of creating value through normal divestitures like the ones contemplated here; (2) the history of the fraudulent transfer claims in the MDL and the Defendants' proven commitment to systematically managing the potential liabilities at issue; and (3) the parties' and the Court's desire to focus on issues that will result in actual progress of this MDL.

Dated: November 6, 2025  Respectfully submitted,

*s/ Alice W. Parham Casey*
Alice W. Parham Casey (Fed. I.D. #9431)
WYCHE, P.A.
807 Gervais St., Suite 301
Columbia, South Carolina 29201
Telephone: (803) 254-6542
tcasey@wyche.com

Katharine A. Roin
Amy R. McCalib
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, Illinois 60654
Telephone: (312) 494-4400
kate.roin@bartlitbeck.com
amy.mccalib@bartlitbeck.com

Katherine L.I. Hacker
Daniel R. Brody
BARTLIT BECK LLP
1801 Wewatta St., 12th Floor
Denver, Colorado 80202
Telephone: (303) 592-3100
kat.hacker@bartlitbeck.com
dan.brody@bartlitbeck.com

*Attorneys for Defendants EIDP, Inc., Corteva, Inc. and DuPont de Nemours, Inc. on the fraudulent transfer claims only*