**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | ) <br> ) **Master Docket No. 2:18-mn-2873** <br> ) <br> ) **This Document relates to:** <br> ) *City of Camden, et al. v. Amerex Corporation*, <br> ) No. 2:26-cv-02798-RMG |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT, FOR CERTIFICATION OF SETTLEMENT CLASS AND FOR PERMISSION TO DISSEMINATE CLASS NOTICE**</u>

i

# Table of Contents

I.    INTRODUCTION .................................................................................................1

II.   STATEMENT OF THE CASE...........................................................................5

III.  PROCEDURAL HISTORY..................................................................................7

    A.    The AFFF MDL.........................................................................................7

    B.    The Mediation and Settlement ................................................................12

    C.    The Class Action Complaint ...................................................................14

IV.   MATERIAL TERMS OF THE PROPOSED SETTLEMENT.......................14

    A.    Consideration ...........................................................................................14

    B.    Proposed Settlement Class Definition.....................................................15

    C.    Establishment of a Qualified Settlement Fund and Payment by Amerex............16

    D.    Court Appointments.................................................................................17

        1.    Notice Administrator...................................................................17

        2.    Claims Administrator ..................................................................17

        3.    Opt Out Administrator .................................................................18

        4.    Special Master..............................................................................19

        5.    Escrow Agent...............................................................................19

    E.    Notice of Settlement................................................................................20

        1.    Identification of Potential Class Members...................................20

        2.    The Notice Plan............................................................................21

    F.    Allocation of Settlement Funds to Qualifying Class Members ...............22

        1.    Breakdown of Funds and Claims Forms......................................23

            a.    The Action Fund .............................................................24

        b.   The Testing Compensation Fund ...................................................27

        c.   The Supplemental Fund ....................................................27

      2. Payment of Funds by Amerex……………………………….……28

G.     Objections and Exclusion Rights .........................................................28

      1.   Objections...........................................................................28

      2.   Requests for Exclusion ("Opt Outs") .......................................29

H.     Termination of the Settlement – Amerex's Walk-Away Right ..........................30

I.      Release of Claims, Covenant Not to Sue and Dismissal....................................30

J.     Payment of Attorneys' Fees and Litigation Costs and Expenses........................31

V.    ARGUMENT....................................................................................................31

A.     The Proposed Settlement Should Be Preliminarily Approved.............................32

      1.   The Settlement Negotiations Were Fair....................................................33

        a.   The Litigation as to Public Water Systems Was in a Trial-Ready Posture at the Time of the Settlement. ...........................................34

        b.   Before Reaching Settlement, the Parties Conducted Extensive Investigation and Discovery. .........................................................35

        c.   The Proposed Settlement Was Negotiated at Arm's-Length. ........36

        d.   Class Counsel and Counsel for Amerex Have Decades of Experience Litigating Complex Cases, Including Environmental and Class Actions. ..........................................................37

      2.   The Settlement Provides Adequate Consideration to the Class. .............38

        a.   The Settlement is Reasonable Given the Strength of Plaintiffs' Case on the Merits and Amerex's Existing Defenses...........................39

        b.   The Settlement is Reasonable Given the Anticipated Duration and Expense of Additional Litigation.................................................41

B.     The Proposed Settlement Class Should Be Preliminarily Certified Under Federal Rule of Civil Procedure 23. ...............................................................43

1.  The Requirements of Rule 23(a) Are Satisfied. .....................................43

    a.  The Settlement Class Members are Readily Ascertainable............44

    b.  Rule 23(a)'s Numerosity Requirement is Satisfied. .......................44

    c.  Rule 23(a)'s Commonality Requirement is Satisfied.....................45

    d.  Rule 23(a)'s Typicality Requirement is Satisfied. ........................46

    e.  Rule 23(a)'s Adequacy of Representation Requirement is Satisfied. ...................................................................................................47

2.  The Requirements of Rule 23(b)(3) are Satisfied. ....................................48

C.  Upon Certifying the Settlement Class, the Court Should Appoint Class Counsel and Class Representatives. ...................................................................................50

    1.  Appointment of Class Counsel...................................................................50

    2.  Appointment of Class Representatives......................................................50

D.  The Court Should Commence the Notice Process by Approving the Proposed Form of Notice and Notice Plan, and by Appointing the Notice Administrator. ...................................................................................................51

E.  The Court Should Appoint the Claims Administrator, the Opt Out Administrator, and Special Master Matthew Garretson. ....................................52

F.  The Court Should Establish a Qualified Settlement Fund, Appoint the Escrow Agent, and Approve the Escrow Agreement......................................................52

G.  The Court Should Schedule a Final Fairness Hearing. ........................................53

VI.  CONCLUSION.....................................................................................................54

**Table of Authorities**

**Cases**

*1988 Trust for Allen Children Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513 (4th Cir. 2022) . 31, 33, 47

*Amchem Prod., Inc. v. Windsor,* 521 U.S. 591 (1997)....................................................................50

*Case v. French Quarter III LLC*, 2015 WL 12851717 (D.S.C. July 27, 2015).......................39, 41

*Commissioners of Public Works of City of Charleston v. Costco Wholesale Corp.*, 340 F.R.D. 242 (D.S.C. 2021). ...................................................................................................... *passim*

*Crandell v. U.S.*, 703 F.2d 74 (4th Cir. 1983) ...............................................................32

*Decohen v. Abbasi, LLC*, 299 F.R.D. 469 (D. Md. 2014) .............................................................43

*Deiter v. Microsoft Corp.,* 436 F.3d 461 (4th Cir. 2006)..................................................46

*Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975) ....................................................34, 37, 41, 44

*Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147 (1982) ...................................................47

*Gray v. Talking Phone Book*, 2012 U.S. Dist. LEXIS 200804 (D.S.C. Aug. 10, 2012). .......39, 43

*Gunnells v. Healthplan Servs.,* 348 F.3d 417 (4th Cir. Oct. 30, 2003)........................................50

*Homeservices of Am., Inc.* is instructive. 2009 U.S. Dist. LEXIS 72654 (W.D. Ky. Aug. 17, 2009) ["*Hyland I*"]; ...................................................................................3,4

*Hyland v. Homeservices of Am., Inc.*, 2012 U.S. Dist. LEXIS 4818 (W.D. Ky. Jan. 17, 2012)["*Hyland II*"];..................................................................................3, 4

*Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 855 F. Supp. 825 (E.D.N.C. 1994)........33

*In re Aqueous Film-Forming Foams Prod. Liab. Litig.*, No. 2:18-MN-2873-RMG, 2021 U.S. Dist. LEXIS 16470 (D.S.C. Jan. 25, 2021) ...................................................... *passim*

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 168634 (D.S.C. Sep. 16, 2022)..............................................................................................8

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.,* 357 F. Supp. 3d 1391 (J.P.M.L. 2018) ..7

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 18-2873, 2024 WL 489326 (D.S.C. Feb. 8, 2024)................................................................................................ *passim*

*In re Jiffy Lube Sec. Litig.*, 927 F.2d 155 (4th Cir. 1991)...............................................5, 33, 35, 39

*In re LandAmerica 1031 Exch. Servs. Inc. Internal Revenue Service §1031 Tax Deferred Exch. Litig. (MDL 2054)*, 2012 U.S. Dist. LEXIS 97933 (D.S.C. July 12, 2012). ...................32, 33, 40

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088 (5th Cir. 1977) ......................................4

*In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227 (4th Cir. 2021) .............................................45

*In re: Lumber Liquidators Chinese Manufactured Flooring Prods. Marketing, Sales Pract. and Prods. Liab. Litig.*, 952 F.3d 471 (4th Cir. 2020) .......................................................................33

*Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir. 2019)..................................................44

*Mullinax v. Parker Sewer & Fire Subdistrict*, No. 12-cv-01405, 2014 U.S. Dist. LEXIS 199340 (D.S.C. Mar. 11, 2014) .................................................................................................35

*Newbanks v. Cellular Sales of Knoxville, Inc.*, No. 12-1420, 2015 U.S. Dist. LEXIS 191550 (D.S.C. Feb. 4, 2015)..................................................................................................................35

*Parker v. Asbestos Processing, LLC*, No. 0:11-cv-01800-JFA, 2015 U.S. Dist. LEXIS 1765 (D.S.C. Jan. 8, 2015) ................................................................................................................47

*Peters v. Aetna Inc.*, 2 F.4th 199 (4th Cir. 2021)...........................................................................43

*Robinson v. Carolina First Bank NA*, 2019 U.S. Dist. LEXIS 26450 (D.S.C. Feb. 14, 2019).....37, 50

*S.C. Nat. Bank v. Stone*, 139 F.R.D. 335 (D.S.C. 1991) .......................................................37, 40

*In re Domestic Airline Travel Antitrust Litig.,* 378 F. Supp. 3d 10 (D.D.C. May 9, 2019).............4

*Sharp Farms v. Speaks*, 917 F.3d 276 (4th Cir. 2019) ..................................................................33

*State of Rhode Island v. Boeing Co.,* __ F.4th ___, 2026 WL 2083048, at *2 (4th Cir. July 20, 2026)…………………………………………………………………………………………..43

*Stillmock v. Weis Markets, Inc.,* 385 Fed. App'x 267 (4th Cir. 2010)..........................................49

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). .................................................................45

*Williams v. Henderson*, 129 Fed. App'x 806 (4th Cir. 2005). ......................................................44

**Statutes**

Safe Drinking Water Act, 42 U.S.C. § 300f, *et. seq.* (1974); ...........................................................6

**Rules**

Fed. R. Civ. P. 5……………………………………………………………………………….29

Fed. R. Civ. P. 23 ...............................................................................................5, 22, 49, 51

Fed. R. Civ. P. 23(a). .................................................................43, 45, 46, 48, 50

Fed. R. Civ. P. 23(a)(1)...........................................................................................44

Fed. R. Civ. P. 23(a)(2)...........................................................................................45

Fed. R. Civ. P. 23(a)(3)...........................................................................................46

Fed. R. Civ. P. 23(a)(4) ..........................................................................................47

Fed. R. Civ. P. 23(b) ...............................................................................................48

Fed. R. Civ. P. 23(b)(3)...........................................................................................48, 49

Fed. R. Civ. P. 23(e). ..............................................................................................5

Fed. R. Civ. P. 23(e)(1)...........................................................................................31, 32, 44

Fed. R. Civ. P. 23(e)(1)(B) .....................................................................................51

Fed. R. Civ. P. 23(e)(2).................................................................................. *passim*

Fed. R. Civ. P. 23(e)(2)(A). ....................................................................................37

Fed. R. Civ. P. 23(e)(2)(B). ....................................................................................37

Fed. R. Civ. P. 23(e)(2)(C) .....................................................................................39

Fed. R. Civ. P. 23(e)(2)(D) .....................................................................................39

Fed. R. Civ. P. 23(e)(2)(C)(iii). ..............................................................................43

Fed. R. Civ. R. 23(e)(3) ..........................................................................................53

**Treatises**

7AA Wright & Miller, Fed. Practice and Procedure § 1779 (3d ed. 2005)………………………49

*Manual for Complex Litigation* (4th Ed.) ...........................................................................4

## I.    **INTRODUCTION**

After extensive and prolonged settlement negotiation, Amerex Corporation ("Amerex") has agreed to settle and resolve claims against it and certain Released Parties,[1] regarding the contamination of Drinking Water across the country with chemicals known as per- and polyfluoroalkyl substances ("PFAS").  PFAS contamination impacts thousands of Public Water Systems ("PWS"), resulting in substantial costs for them to test and treat to remove these chemicals before they reach their customers' taps. PWS will now obtain compensation from Defendant Amerex, as it has agreed to pay $4 million dollars, to be distributed pursuant to the terms of the Settlement.

Plaintiffs seek preliminary approval of the Class Action Settlement Agreement[2] between Class Plaintiffs ("Plaintiffs"), and Amerex—a settlement that is intended to provide compensation for Amerex's contribution to the largest Drinking Water contamination threat in history. With this filing and the contemporaneous filings of motions for preliminary approval of settlements with Carrier Global Corporation ("Carrier"), Archroma U.S., Inc. ("Archroma") and Nation Ford Chemical Company ("Nation Ford"), Plaintiffs move this Court to allow them to take another major step in helping PWS to ameliorate this nationwide crisis.

Plaintiffs filed the present lawsuit against Amerex on behalf of themselves and other members of the proposed Settlement Class alleging PFAS contamination of their Drinking Water, including both groundwater wells and surface water sources. The proposed Settlement Class is defined as "Every Active Public Water System in the United States of America that (i) has one or more Impacted Water Sources as of July 31, 2026, or (ii) was required to test for certain PFAS under UCMR-5, or otherwise serves

---

[1] All capitalized terms herein have the same meaning as provided for in the Master Class Action Settlement Agreement, Ex. 2, cited to as "S.A.," and/or in the Allocation Procedures, Ex. 2-A.
[2] Attached hereto as Exhibit 1 is a proposed Preliminary Approval Order.

more than 3,300 people according to SDWIS."[3]   The proposed Settlement is intended to resolve Plaintiffs' and the other Settlement Class Members' claims against Amerex arising from PFAS contamination. In exchange for releasing those claims, Amerex has agreed to pay $4 million (the "Settlement Amount") into a Qualified Settlement Fund ("QSF") to be distributed to Qualifying Class Members across the United States pursuant to the terms of the Settlement.[4] The total Settlement Amount is to be paid within ten (10) calendar days of Preliminary Approval, of which a portion not to exceed 10% shall be non-refundable to cover the administrative costs and expenses.[5] This payment from Amerex, inclusive of any interest that accrues thereon when deposited in the QSF, constitute the "Settlement Funds."[6]

This Settlement with Amerex reflects the Plaintiffs' relentless pursuit through continuous, sustained, and hard-fought litigation against all the manufacturers of aqueous film-forming foam ("AFFF") and its component parts. The Honorable Layn Phillips (ret.)'s appointment as Mediator by the Court in October 2022 was instrumental in advancing resolution discussions generally.[7] Nevertheless, and after initial discussions, these discussions cooled off, and throughout 2023 the focus was on the initial PWS Bellwether cases and the *Stuart* Bellwether trial looming on the horizon. In the spring of 2024, following Final Approval of the settlements reached with 3M and DuPont, discussions picked back up, albeit slowly. The Parties met to mediate over the summer of 2024, and then several times later that year towards the end of 2024 and in early 2025. Throughout 2025, negotiations were ongoing and the idea of resolving multiple Defendants' liability through individual settlements that would be announced and administered contemporaneously began to coalesce. This structure and approach was

---

[3] S.A. § 5.1.

[4] S.A. §§ 2.65, 3.1, 3.3, 6.1, 11.

[5] S.A. §§ 6.1-2.

[6] S.A. § 2.68.

[7] *See* CMO 2B (ECF 2658), appointing Judge Phillips as Mediator.

attractive to Amerex and to Proposed Class Counsel, and discussions picked up through the fall and winter of 2025 as the Shared Dates framework—one that would allow for a joint and bundled process with multiple settling defendants that would minimize costs, streamline administration of the settlement, and preserve judicial resources—took shape. In early 2026 and throughout the spring, the Parties believed they had reached an agreement in principle and continued to work through timing elements. Once those were agreed upon, the documents then underwent multiple further rounds of line editing and alignment with the three other defendants for whom Plaintiffs are also seeking Preliminary Approval of a Class Action PWS Settlement.[8]

The Parties conducted negotiations via virtual meetings, convening repeatedly on their own in order to accomplish this resolution. By all accounts, the negotiations were hard fought. Notwithstanding the sometimes-extreme adversarial postures presented by the Parties, the oversight provided by this Court, along with the guidance offered by Judge Phillips and his team who were kept apprised at all times of the status of discussions, steered the adverse Parties into reaching the compromises memorialized in the Settlement Agreement dated March 27, 2026.

The three other MDL defendants—Carrier, Archroma, and Nation Ford—that have also reached agreements to resolve their AFFF/PFAS liability for water provider claims, along with Amerex, have agreed to the administration of the settlements on a bundled and joint basis to minimize costs, aid in streamlining administration, and to preserve judicial resources. Such a bundled settlement concept is not novel, and courts regularly allow for notices of multiple class action settlements to be combined. This "Shared Dates" approach means that the Parties intend to use this cost-efficient process for

---

[8] *See, e.g.*, *Hyland v. Homeservices of Am., Inc.*, 2009 U.S. Dist. LEXIS 72654 (W.D. Ky. Aug. 17, 2009) ["*Hyland I*"]; 2012 U.S. Dist. LEXIS 4818 (Jan. 17, 2012) ["*Hyland II*"], involving a class settlement on behalf of 70,000 plaintiffs whose recovery would have been less than one dollar per class member before notice and administration costs, wherein the court deferred consideration of preliminary approval in light of the potential to bundle the settlement with other soon-to-settle defendants and ordering combined notice when those settlements came to fruition.

administration of many elements of the settlements. While the Shared Dates basis will provide for efficient and economically sound administration of these PWS settlements, such structure was not without its challenges during the drafting and execution process, given the number of stakeholders. Substantial efficiency will be gained here where Notices of all four settlements with Amerex, Carrier, Archroma and Nation Ford will be mailed together, conserving class resources.[9]

Plaintiffs and Proposed Class Counsel—Scott Summy of Baron & Budd, Michael London of Douglas & London, P.C., and Joseph Rice of Motley Rice LLC—believe the Settlement to be fair, reasonable, and adequate. They further believe that participation in the Settlement would be in the best interests of the Class.

In determining whether Preliminary Approval is warranted, the critical issue is whether the Court will likely be able to approve the Settlement under Rule 23(e)(2) and certify the Settlement Class for

---

[9] The *Manual for Complex Litigation* (4th Ed.) acknowledges that, in some instances, waiting to present certain settlements for preliminary approval until settlements with multiple defendants are reached may best serve class members. *Manual*, § 21.651 ("If several such settlements are being negotiated, it is ordinarily wise to defer consideration until all are submitted, thereby saving the time and expense of successive notices and hearing and allowing the judge and class members to assess the adequacy of the settlements as a whole."). The Manual explains that this approach allows class members to understand the relative exposure of the settling defendants as well as the resources of the parties in relation to one another. *Id.* Moreover, courts regularly combine notices of multiple class action settlements together in order to conserve settlement proceeds, as well as to allow class members to make informed decisions. The court's analysis in *Hyland v. Homeservices of Am., Inc.* is instructive. 2009 U.S. Dist. LEXIS 72654 (W.D. Ky. Aug. 17, 2009) ["*Hyland I*"]; 2012 U.S. Dist. LEXIS 4818 (Jan. 17, 2012) ["*Hyland II*"]. In *Hyland I*, the plaintiffs reached an early settlement on behalf of a class of 70,000 members with a defendant for cooperation together with a payment of $46,250, which would have resulted in a gross recovery of less than one dollar per class member before notice and administration costs. The court therefore deferred preliminary approval until other settling defendants had also reached agreement, allowing for combined and cost-efficient notice. *Hyland I*, 2009 U.S. Dist. LEXIS 72654, *10-11. *See also*, *In re Domestic Airline Travel Antitrust Litig.,* 378 F. Supp. 3d 10, 30 (D.D.C. May 9, 2019) (noting approval of a combined notice plan for two class action settlements with different defendants). "Combining [] notices will substantially reduce the costs of the litigation and thereby prevent an unnecessary depletion of the settlement proceeds. This is a legitimate factor which the district court must consider when devising the 'best notice practicable under the circumstances[.]" *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1106 (5th Cir. 1977) (quotations and citations omitted).

purposes of settlement.[10] Because of the thoughtful accommodations made throughout the Settlement Agreement, Plaintiffs and Proposed Class Counsel submit that the Settlement satisfies each of the elements of Rule 23(e)(2), as well as the factors set forth by the Fourth Circuit in *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155 (4th Cir. 1991). Further, certifying the Settlement Class proposed here would be consistent with established precedent on Rule 23's requirements for certifying a class.

Accordingly, Plaintiffs now move this Court for an Order: (1) preliminarily approving the proposed Settlement; (2) preliminarily certifying, for settlement purposes only, the Settlement Class; (3) approving the form of Notice; (4) approving and directing implementation of the Notice Plan; (5) appointing Class Counsel; (6) appointing Class Representatives; (7) appointing the Notice Administrator; (8) appointing the Claims Administrator; (9) appointing the Opt-Out Administrator; (10) appointing the Special Master; (11) appointing the Escrow Agent and approving the Escrow Agreement; (12) establishing a Qualified Settlement Fund; (13) scheduling the Final Fairness Hearing; and (14) ordering a stay of all proceedings brought by Releasing Parties in the MDL and other Litigation in any forum as to Amerex and an injunction against the filing of any such new proceedings.

## II.    <u>STATEMENT OF THE CASE</u>

Plaintiffs' claims against Amerex arise from the contamination of Drinking Water with PFAS, a family of chemical compounds that includes perfluorooctanoic acid ("PFOA"), among other compounds. PFAS are not naturally occurring compounds; rather, they are stable, man-made chemicals. They are highly water soluble, persist in the environment, tend to stay in the water column and can be transported long distances. As relevant here, PFAS have been found in public groundwater wells and surface water sources ("Impacted Water Sources") that supply Drinking Water to the public, where they remain until remediated or filtered out.[11]

---

[10] Fed. R. Civ. P. 23(e).
[11] *See* S.A. § 2.33 and *City of Camden, et al. v. Amerex Corporation,* Case No. 2:26-cv-02798-RMG,

Given the expense of removing PFAS, and potential health risks associated with exposure to them, PFAS levels in Drinking Water are now highly regulated by the Environmental Protection Agency ("EPA"). As science has evolved, the EPA has continued to impose stricter regulations and guidelines for PWS Drinking Water—including the Fifth Unregulated Contaminant Monitoring Rule ("UCMR-5") requiring all PWS nationwide that serve populations over 3,300 persons, as well as a representative sampling of PWS serving 25 to 3,299 persons, to test for 29 PFAS. That process of sample collection began on January 1, 2023, and ended on December 31, 2025. On March 14, 2023, the EPA published a notice of proposed rulemaking seeking public comments on its plan to set Maximum Contaminant Levels ("MCLs") under the Safe Water Drinking Act ("SDWA")[12] for PFOA and PFOS at 4 parts per trillion ("ppt") individually, which would require additional monitoring and remediation by Class Members. On April 10, 2024, the EPA finalized the enforceable MCL of 4 ppt for PFOA and PFOS in public Drinking Water.[13]

As a result of both growing public awareness about the dangers of PFAS and the EPA regulations, PWS across the country began to test for the presence of PFAS in their Drinking Water. Many PWS that discovered PFAS in their supplies responded by taking actions to limit the levels of PFAS in their Drinking Water, such as taking wells offline, installing water treatment systems, reducing flow rates, drilling new wells, pulling water from other sources and/or purchasing supplemental water. Given the EPA's now enforceable MCLs, many more PWS have been required to take similar actions

---

Compl. ("Amerex Compl.") at ¶ 68 (defining "Impacted Water Source"); *see also* Agency for Toxic Substances and Disease Registry, Per- and Polyfluoroalkyl Substances and Your Health, available at https://atsdr.cdc.gov/pfas/index.html (last accessed July 19, 2026).

[12] *See* Safe Drinking Water Act, 42 U.S.C. § 300f, *et. seq.* (1974); *see also* EPA, *Safe Drinking Water Act (SDWA)*, available at https://www.epa.gov/sdwa (last accessed July 19, 2026).

[13] EPA, Per- and Polyfluoroalkyl Substances (PFAS) Final PFAS National Primary Drinking Water Regulation, available at https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (last accessed July 19, 2026). The EPA also set MCLs of 10 ppt each for PFHxS, PFNA, and HFPO-DA; mixtures containing two or more of these are limited by a Hazard Index. Because of the ongoing threat posed by PFAS, these standards are still being enforced by the EPA to this day.

to limit the levels of PFAS in their Drinking Water. To this end, because most PWS do not have filtration systems capable of filtering PFAS, many will have to spend significant amounts of money on capital investments and operation and maintenance expenses for filtration systems that can meet these new standards.

Amerex is a manufacturer of firefighting products founded in 1971, including hand portable and wheeled fire extinguishers for commercial and industrial applications. In 2011, Amerex formed an unincorporated division called The Solberg Company ("Solberg"), through which it manufactured and distributed fluorine-free firefighting foam and short-chain AFFF until Amerex sold Solberg in 2018. Both through and separate from Solberg, Amerex has marketed, distributed, and/or sold AFFF products throughout the United States.

## III.     PROCEDURAL HISTORY

### A.  The AFFF MDL

As evidence emerged showing the environmental prevalence and persistence of PFAS, municipalities, private companies, and individuals all brought actions against Amerex and other manufacturers of AFFF (or its component parts) and/or other responsible entities for damages arising from actual or threatened contamination of Drinking Water with PFAS. A majority, but not all, of these actions have included allegations relating to AFFF's impact on the environment. Relevant here are the claims that have been brought against Amerex by PWS, which generally allege that remedial action is needed to remove PFAS to protect the quality of their Drinking Water.

On December 7, 2018, the Judicial Panel on Multi-district Litigation ("JPML") created MDL 2873 and consolidated all federal actions alleging that AFFF caused PFAS contamination of groundwater.[14] Within a few months of this consolidation, the Court appointed Plaintiffs' and

---

[14] *In re Aqueous Film-Forming Foams Prods. Liab. Litig.,* 357 F. Supp. 3d 1391, 1392 (J.P.M.L. 2018).

7

Defendants' leadership via CMOs 2 and 3, and the parties began discovery in earnest. Over the course of the MDL, leadership evolved leaving Proposed Class Counsel—Scott Summy, Michael A. London, and Joseph Rice—as appointed Co-Lead Counsel over the entire leadership committee.[15]

Since its inception, the AFFF MDL has prioritized two primary parallel tracks—one addressing defendants' general liability and general defenses, including the government contractor defense, and the second addressing a bellwether process for selecting a pool of representative PWS cases and preparing a subset of them for trial.[16] As noted, the first track focused on certain general discovery regarding the liability of the MDL defendants, and their bases for asserting the government contractor defense. Over a two-plus year discovery period, substantial document production by all defendants—including by the U.S. Department of Justice, who was a third-party to the litigation and produced many millions of pages of discovery—occurred, followed by depositions of defense witnesses and federal employees on the merits of the parties' claims and defenses. Thereafter, following exhaustive briefing, supplemental briefing, and an evidentiary hearing, the determination of the government contractor defense culminated in denial of certain MDL defendants' motions for summary judgment[17]—thereby paving the way for Plaintiffs to tell the liability story of each defendant to a jury.

The other track focused on selecting a pool of representative bellwether PWS cases and completing the necessary case-specific discovery to winnow them down to a subset of cases for jury trials.[18] All of the ten originally selected bellwether PWS cases underwent some level of fact discovery

---

[15] *See* CMO 2 and Order of August 22, 2023 (ECF 3602). In support of this motion, attached hereto as Exhibits 3, 4, and 5 are the Declarations of Scott Summy, Michael London, and Joseph Rice, respectively.

[16] *See* CMOs 13-13A, 16-16D, 19-19G, 27A-I.

[17] *In re Aqueous  Film-Forming Foams Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 168634 (D.S.C. Sep. 16, 2022) (denying the following defendants' motion – 3M Company, Tyco Fire Products LP, Chemguard Inc., National Foam, Inc., Buckeye Fire Equipment Company, and Kidde-Fenwal, Inc. and related entities). Amerex was not permitted to participate in this process, creating an additional ongoing risk of litigation for Plaintiffs here.

[18] Importantly, and despite these primary dual tracks, the litigation also has other tracks and categories

and, thereafter, expert discovery was performed in three of these original ten bellwether cases. Ultimately, *City of Stuart, Florida v. 3M Company, et al.*, 2:18-cv-03487-RMG ("*Stuart*"), was selected to serve as the first bellwether trial case, and significant dispositive and *Daubert* motion practice ensued.[19] Trial was scheduled to begin on June 5, 2023, but was adjourned to allow 3M—the sole remaining trial defendant in the *Stuart* case—to continue negotiating a potential resolution with Plaintiffs. Settlements of the water provider cases were announced shortly thereafter with settling defendants 3M and DuPont-related entities (herein, "DuPont").

Preparation of the general liability discovery, the bellwether cases and the *Stuart* trial case provided great insight, knowledge and understanding as to the claims surrounding other defendants in the MDL.

Following the resolutions with 3M and DuPont, and the stay of the *Stuart* trial, the MDL Court issued Orders pivoting the focus of the litigation to the remaining non-settling defendants, including Amerex.

Amerex had always maintained that it had little to no liability and litigation risk due to the difficulty of proving it was responsible for the PFOA in any specific PWS's water supply. In particular, Amerex maintains that it never intentionally added PFOA to its AFFF and did not use long-chain perfluoro compounds that have the potential to degrade to PFOA. These arguments presented uphill battles for plaintiffs litigating against Amerex, despite the fact that AFFF using shorter chains are not

---

of cases that have emerged. These cases continue to move forward and have been triaged by the Court following the advancement of the general causation work and governmental contractor determinations. These include: the already noted PWS cases, as well as personal injury cases; property damage claims (which included property damages claims of municipal and private landowners, although there are far more and larger municipal claims); sovereign and natural resource damage claims; medical monitoring claims; and CERCLA and Federal Tort Claims Act environmental remediation claims.

[19] *See* Order dated September 23, 2022 (ECF 2613). *See also* Summary Judgment Order dated March 27, 2023 (Case No. 2:18-cv-03487, ECF 241); *Daubert* Order dated May 2, 2023 (ECF 3059); Summary Judgment Orders dated May 5, 2023 (ECFs 3081 and 3082); and Summary Judgment Order dated May 18, 2023 (ECF 3142).

100% PFOA-free. The PEC, nevertheless, challenged these claims and defenses.

To maintain the focus on all non-settling parties, the Court entered CMO 27 on September 13, 2023.[20] This Order paved the way for the PEC's prosecution of four (4) water provider cases involving telomer-based AFFF through the Tier One discovery process. Those cases were the *Village of Farmingdale v. 3M Company et al.* (No. 2:19-cv-00564) (in which Amerex was a named defendant), the *City of Watertown v. 3M Company et al.* (No. 2:21-cv-01104) ("*Watertown*"), the *Southeast Morris County Municipal Utilities Authority v. 3M Company et al.* (No. 2:22-cv-00199) ("*SMCMUA*"), and the *Bakman Water Company v. 3M Company et al.* (No. 2:19-cv-02784). Tier One discovery involved extensive document discovery, responses to discovery requests and depositions of Plaintiff representatives.

This was followed by a paring down of the CMO 27 cases to go through Tier Two discovery.  The parties presented to the Court their competing Tier Two proposals on December 5, December 6 and December 7, 2023.[21] On December 19, 2023, the Court issued CMO 27D which selected the final two cases for Tier Two discovery, the *Watertown* and *SMCMUA* cases.[22] Trial was scheduled for September 23, 2024, per CMO 27E issued on February 6, 2024.[23] On May 20, 2024, the Court issued CMO 27H extending the deadlines for Tier Two discovery and setting trial for January 27, 2025.[24] On July 19, 2024, CMO 27I was issued, setting trial for March 3, 2025.[25]

The Tier Two telomer bellwether discovery was unrelenting. In a matter of approximately seventy-five (75) days, both cases went through tremendous discovery that ordinarily would have taken two or more years. There were several multi-day field sampling events with both the Plaintiffs' and Defendants'

---

[20] ECF 3665.
[21] ECFs 4152, 4153, 4179, 4187.
[22] ECF 4275.
[23] ECF 4464.
[24] ECF 5007.
[25] CMO 27I (ECF 5362).

experts that included groundwater sampling, soil sampling and pore water sampling.[26]  There were site investigations at airports, fire training centers, and each and every water supply well, all of which had to be coordinated by and attended to by counsel for the Plaintiffs.[27] Additionally, several dozen subpoenas were served on third parties in the Tier Two cases, almost all of which provided responsive documents that had to be reviewed and developed further.[28] Perhaps most substantial and impressive, over twenty-five (25) fact depositions were conducted in Tier Two, all of which required significant preparation and effort by some of the most skilled litigators in the country for these types of groundwater contamination cases.[29]

The telomer bellwether process brought to bear the same formidable forces of Plaintiffs' leadership that pushed DuPont and 3M to the brink, onto the other remaining Defendants.[30] During Tier Two discovery, Plaintiffs were also simultaneously working on expert reports which were due only 21 days after the close of fact discovery. Then, on April 12, 2024, the first settlement with telomer Defendants was announced between Tyco Fire Products LP, individually and as successor in interest to The Ansul Company, and Chemguard, Inc. (collectively, "Tyco") and PWS. Shortly thereafter, on May 20, 2024, another settlement was announced between BASF Corporation ("BASF") and PWS.

Through the unparalleled efforts of Plaintiffs' counsel, and despite Amerex not being a defendant in the final Tier Two cases, it became readily apparent to Amerex that the PEC intended and had the ability to aggressively pursue any and all manufacturers of AFFF and/or its component parts, and that Amerex would continue to face liability for its alleged role in contributing to PFAS contamination.[31] Like the prior bellwether processes, this second round of PWS bellwethers, as well as the continued

---

[26] Declaration of Michael London ("London Dec."), Ex. 4 at ¶ 18.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] London Dec., Ex. 4 at ¶¶ 17-19.
[31] *Id.*

liability discovery being conducted, informed the Plaintiffs (and likely defendants) greatly about the claims, issues of proof, scope and extent of damages, and available/viable defenses.

This risk ultimately led to the Settlement with Amerex and the settlements with Carrier, Archroma and Nation Ford currently pending before the Court.[32]

## B. The Mediation and Settlement

Although Judge Phillips had been appointed as the Court-appointed Mediator to oversee settlement discussions with MDL defendants in October of 2022,[33] it was not until after the 3M and DuPont PWS Settlements reached in the summer of 2023 received their Final Approval in the spring of 2024 that settlement negotiations with Amerex began to take more concrete shape.[34] While these discussions were taking place, the PWS litigation continued unabated against the non-settled or non-bankrupt  Defendants (i.e. everyone except 3M, DuPont and Kidde-Fenwal, Inc., or "KFI," which entity filed for bankruptcy in May of 2023).[35] As noted above, Judge Phillips and his team were involved initially and were kept apprised throughout on the status of negotiations and all substantive developments.[36] Notwithstanding the Mediator's oversight, the Parties maintained their discussions separately through multiple meetings and telephonic calls.[37] Multiple virtual mediation sessions with Amerex occurred, as well as an in-person mediation in New York, and discussions between the parties also continued separately on many occasions in-person, telephonically and via Zoom.  Towards the later part of 2025 and throughout early 2026, the Parties spoke regularly and at times daily in order to come to an agreement and finalize the documents.

From the outset, Amerex made it clear that—much like the settling defendants before it, 3M,

---

[32] *Id.*
[33] CMO 2B (ECF 2658).
[34] Declaration of Scott Summy ("Summy Dec."), attached hereto as Ex. 3, at ¶¶ 10-11.
[35] London Dec., Ex. 4 at ¶¶ 17-19.
[36] *See generally* Declaration of Judge Layn Phillips ("Judge Phillips Dec."), Ex. 6.
[37] London Dec., Ex. 4 at ¶ 21.

DuPont, Tyco, and BASF—it would only settle PWS claims on a national class basis to obtain as much closure and finality as legally possible.[38] As a result, in these negotiations, Co-Lead Counsel served as quasi-settlement counsel,[39] and the Parties began to focus their efforts on Class structure, the identification of Class Members and, ultimately, on allocation and timing.[40]

Throughout 2025, the discussions continued to evolve in light of the impending UCMR-5 testing deadline of December 31, 2025. As has been the case throughout this MDL, developments with regards to regulatory standards and enforceable MCLs were taking place in real time and informed both litigation and negotiation. The UCMR-5 testing deadline ultimately ended up shaping the discussions around timing, testing cut-off dates, and Class definition. As part of the negotiations, the Parties contemplated that the Class Members would be only those PWS with a current detection in at least one of their Water Sources. The proposed Settlement Class as ultimately negotiated by the Parties includes every active PWS in the U.S. that has one or more Impacted Water Sources as of July 31, 2026, where "Impacted Water Source" means a water source, as such term is defined in the Settlement Agreement, with a Measurable Concentration of PFAS, *or* those PWS that were required to test for certain PFAS under UCMR-5, or otherwise serves more than 3,300 according to SDWIS. Although settlement negotiations went on for years—a long drawn-out and at times frustrating process—the delay in reaching resolution ended up being something that ultimately helped the Parties craft creative solutions to capture the correctly scoped Settlement Class.

Following the Parties' agreement on all material terms and conditions and commitment to the execution of the documents, the Settlement Agreement and supporting exhibits were finalized.[41] Amerex

---

[38] *Id.* at ¶ 22.

[39] In the same CMO in which the Court appointed Judge Phillips as mediator (CMO 2B), the Court also granted the three Co-Lead Counsel unequivocal and exclusive authority to engage in such negotiations (ECF 2658).

[40] Summy Dec., Ex. 3 at ¶ 11-14.

[41] London Dec., Ex. 4 at ¶¶ 20-21; *see also generally* Judge Phillips Dec., Ex. 6.

executed its Settlement Agreement on March 27, 2026, after which time signatures were held in escrow to allow for the finalization of the other Shared Dates defendant documents.

As discussed herein, this Settlement provides direct and significant benefits to PWS confronting the threat of PFAS in their Drinking Water. It will allow them to access compensation for the capital investments and operation and maintenance costs associated with PFAS remediation and treatment.[42] By providing these benefits, the many risks and delay associated with further litigation are also eliminated.

### C.   The Class Action Complaint

On July 13, 2026, Plaintiffs filed a Class Action Complaint against Amerex on behalf of themselves and all other similar situated PWS, seeking damages for: (1) the costs of testing and monitoring of the contamination of their Drinking Water well and supplies; (2) the costs of designing, constructing, installing and maintaining a filtration system to remove or reduce levels of PFAS detected in Drinking Water; (3) the costs of operating that filtration system; and/or (4) the costs of complying with any applicable regulations requiring additional measures.[43]

The Complaint identifies each Class Representative,[44] defines the Settlement Class,[45] and states the claims intended to become Released Claims and concluded by the Final Judgment.[46] All issues identified in the Complaint have been extensively litigated through this MDL.

### IV.   MATERIAL TERMS OF THE PROPOSED SETTLEMENT

### A.   Consideration

---

[42] *See generally* the Allocation Procedures, Ex. 2-A.

[43] Amerex Compl. at ¶ 11-12; *see also* Prayer for Relief, Amerex Compl. at p. 32-33.

[44] The proposed Class Representatives are City of Camden (NJ), California Water Service Company (CA), City of Sioux Falls (SD), Coraopolis Water & Sewer Authority (PA), and Township of Verona (NJ). *See* Amerex Compl. at ¶¶ 15-34.

[45] *Id.* at ¶ 65.

[46] *See id.*, Causes of Action and Prayer for Relief, at pp. 18, 21-24, 26, 28-29, 31, 33.

Amerex has agreed to pay or cause to be paid $4 million (the "Settlement Amount") in exchange for receiving releases, covenants not to sue, and dismissals from Class Members.[47] A portion of the Settlement Amount, not to exceed ten percent (10%), shall be non-refundable to cover the administrative costs and expenses associated with obtaining the class approval necessary to effectuate the Settlement.[48] The one-time payment of the Settlement Amount, inclusive of any interest that accrues thereon when deposited in the QSF, constitute the "Settlement Funds."[49] Amerex will tender the Settlement Amount of $4 million within ten (10) calendar days of an Order Granting Preliminary Approval.[50]

### B.       Proposed Settlement Class Definition

The proposed Settlement Class includes "Every Active Public Water System in the United States of America that (i) has one or more Impacted Water Sources as of July 31, 2026, or (ii) was required to test for certain PFAS under UCMR-5, or otherwise serves more than 3,300 people according to SDWIS."[51]

In defining the proposed Settlement Class, the Parties adopted definitions consistent with those promulgated by the EPA in the SDWA, the act established by the EPA to provide Drinking Water standards for certain contaminants which, as of today, include PFAS. As defined in the Settlement Agreement, a "Public Water System" is "a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen (15) service connections or regularly serves an average of at least twenty-five (25) individuals daily at least sixty (60) days out of the year[.]"[52] A PWS "includes (i) any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with

---

[47] S.A. §§ 2.65, 3.1, 6.1.
[48] *Id.* at § 6.2.
[49] *Id.* at § 2.68.
[50] *Id.* at § 6.2.
[51] *Id.* at § 5.1.
[52] S.A. § 2.53.

15

such system, and (ii) any collection or pretreatment storage facilities not under such control which are used primarily in connection with such system."[53] In addition, "Water Source" is defined as "a groundwater well, a surface water intake, or any other intake point from which a Public Water System draws or collects water for distribution as Drinking Water and the raw or untreated water that is thus drawn or collected."[54] An "Impacted Water Source" means a Water Source that has a Qualifying Test Result showing a Measurable Concentration of PFAS.[55]

Excluded from the definition of the proposed Settlement Class are: (a) any PWS that is solely owned by a State government and lacks independent authority to sue or be sued;[56] (b) any PWS that is solely owned by the federal government and lacks independent authority to sue or be sued;[57] and (c) any privately owned well that provides water only to its owner's (or its owner's tenant's) individual household and any other system for the provision of water for human consumption that is not a PWS.[58] The proposed Settlement Class comprises over 15,000 PWS.[59]

## C. Establishment of a Qualified Settlement Fund and Payment by Amerex

Together, the payment made by Amerex into the QSF, inclusive of any interest that accrues thereon, make up the Settlement Funds.[60] The Settlement Funds are to be deposited by Amerex into a QSF to be administered by the Court-appointed Escrow Agent.[61] Once payment is made by Amerex in accordance with the Settlement Agreement, Amerex shall have no liability whatsoever with respect to the Settlement Funds.[62]

---

[53] *Id.*
[54] *Id.* at § 2.82.
[55] *Id.* at § 2.33.
[56] *Id.* at § 5.1-A.
[57] *Id.* at § 5.1-B.
[58] *Id.* at § 5.1-C.
[59] Declaration of Rob Hesse ("Hesse Dec."), attached hereto as Ex. 11, at p. 3.
[60] S.A. § 2.68.
[61] *Id.* at §§ 3.1, 6.1; *see also* Escrow Agreement, Ex. 2-C.
[62] S.A. §§ 3.1, 6.2.

**D.**     **Court Appointments**

The Settlement Agreement contemplates the Court's appointment of five independent neutral third parties to administer the Settlement: (1) a Notice Administrator;[63] (2) a Claims Administrator;[64] (3) an Opt Out Administrator;[65] (4) a Special Master;[66] and (5) an Escrow Agent.[67] All fees, costs, and expenses incurred in the administration and/or work by the Notice Administrator, the Claims Administrator, the Opt Out Administrator, the Special Master and the Escrow Agent—including the fees, costs, and expenses of the Notice Administrator, Claims Administrator, Opt Out Administrator, Special Master or Escrow Agent—shall be paid from the Settlement Funds.[68] To effectuate the proposed Settlement, this motion requests their appointment.

**1.**     **Notice Administrator**

Subject to Court approval, the Settlement Agreement provides for the engagement of Patrick J. Ivie of Simpluris as the Notice Administrator.[69] In his capacity as Notice Administrator, Mr. Ivie will be responsible for providing Notice to all potential Eligible Class Members pursuant to the Notice Plan, discussed in Section IV(E)(2), *infra*,[70] which mandates that Notice dissemination begin no later than 14 days after Preliminary Approval.[71]

**2.**     **Claims Administrator**

The Settlement Agreement also provides for the engagement, subject to Court approval, of Dustin Mire of the Eisner Advisory Group ("EisnerAmper") as the Claims Administrator.[72] Mr. Mire is a

---

[63] *Id.* at §§ 2.41, 8.1-8.2.
[64] *Id.* at §§ 2.13, 8.3-8.4.
[65] *Id.* at §§ 2.45, 8.5-8.6.
[66] *Id.* at §§ 2.70, 8.7-8.8.
[67] *Id.* at §§ 2.27, 7.1.2-7.1.4; *see also* Escrow Agreement, Ex. 2-C.
[68] *Id.* at §§ 6.3, 8.2.6, 8.4.7, 8.6.7, 8.8.8, 8.9.
[69] *Id.* at § 8.1; *see also* Declaration of Patrick J. Ivie ("Ivie Dec."), attached hereto as Ex. 7.
[70] S.A. §§ 2.42, 8.2, 9.2; *see also* Notice Plan, Ex. 2-E.
[71] S.A. § 9.2.1; *see also* Ex. 2-E.
[72] S.A. §§ 2.13, 8.3; *see also* Declaration of Dustin Mire ("Mire Dec."), attached hereto as Ex. 8.

partner with EisnerAmper and, in this role, he is responsible for the operations of EisnerAmper's settlement administration programs.[73] Mr. Mire currently serves as Claims Administrator for the 3M, DuPont, Tyco, and BASF PWS Settlements.[74]

As the Claims Administrator, Mr. Mire will be primarily responsible for administration of the proposed Settlement, which includes: (1) reviewing, analyzing, and approving submitted Claims Forms, including all supporting documentation, to determine if the submitting entity falls within the definition of a Qualifying Class Member and if the information provided is complete; and (2) allocating and overseeing the distribution of the Settlement Funds fairly and equitably amongst all Qualifying Class Members in accordance with the Allocation Procedures.[75] Mr. Mire will also be responsible for maintaining the Settlement Website and toll-free hotline as discussed in the Notice Plan.[76]

### 3.     Opt Out Administrator

The Settlement Agreement further provides for the engagement, subject to Court approval, of Edward J. Bell of Rubris, Inc., as the Opt Out Administrator.[77] Mr. Bell is the Chief Executive Officer of Rubris and leads complex litigation administration services by building software platforms for sophisticated data management and analytics.[78] Mr. Bell's role will be to process and report on Requests for Exclusion, or "Opt Outs," received, as well as processing and reporting on any withdrawals of same.[79] Mr. Bell served as the Opt Out Administrator for the Tyco and BASF PWS Settlements.[80]

---

[73] Mire Dec., Ex. 8 at ¶ 1.

[74] *See* 3M PWS Settlement Final Approval Order (ECF 4754), DuPont PWS Settlement Final Approval Order (ECF 4543), Tyco PWS Settlement Final Approval Order (ECF 6406), and BASF PWS Settlement Final Approval Order (ECF 6407).

[75] S.A. §§ 2.13, 8.4; *see also* Allocation Procedures, Ex. 2-A and Mire Dec., Ex. 8, *generally*.

[76] Mire Dec., Ex. 8 at ¶ 11; *see also* Allocation Procedures, Ex. 2-A.

[77] S.A. §§ 2.45, 8.5.

[78] Declaration of Edward Bell ("Bell Dec."), attached hereto as Ex. 9 at ¶ 1.

[79] S.A. § 8.6.

[80] *See* Orders Granting Preliminary Approval of the Tyco and BASF PWS Settlements (ECF 5147 and 5253, respectively).

### 4. Special Master

The Settlement Agreement provides for the engagement, subject to Court approval, of Matthew Garretson of Garretson LLC as the Special Master.[81] Mr. Garretson is the co-founder of Garretson LLC, and for more than 25 years, he has been designing and overseeing claims processing operations for settlement programs in litigations involving product liability and environmental hazard claims.[82] Mr. Garretson currently serves as Special Master in the 3M, DuPont, Tyco, and BASF PWS Settlements.[83]

Generally, Mr. Garretson's role will be to supervise the Settlement, which includes overseeing the work of the Notice Administrator, the Claims Administrator, and the Opt Out Administrator.[84] Mr. Garretson will also provide quasi-judicial intervention if and/or when necessary.[85]

### 5. Escrow Agent

Finally, the Settlement Agreement proposes that Robyn Griffin of Huntington National Bank serve as the Escrow Agent, whose duties are set forth in the Escrow Agreement.[86] Ms. Griffin has nearly 30 years of experience in the financial sector and her Settlement Team at Huntington National Bank has over 20 years of experience acting as escrow agent on various cases, handling more than 5,500 settlements for law firms, claims administrators and regulatory agencies.[87] Ms. Griffin currently serves as the Escrow Agent for the DuPont, Tyco, and BASF PWS Settlements, while her Huntington National

---

[81] S.A. §§ 2.70, 8.7-8.8; *see also* Declaration of Matthew Garretson ("Garretson Dec."), attached hereto as Ex. 10.

[82] Garretson Dec., Ex. 10 at ¶ 1.

[83] *See* 3M PWS Settlement Final Approval Order (ECF 4754), DuPont PWS Settlement Final Approval Order (ECF 4543), Tyco PWS Settlement Final Approval Order (ECF 6406), and BASF PWS Settlement Final Approval Order (ECF 6407).

[84] S.A. §§ 2.70, 8.8.

[85] *Id.*

[86] S.A. §§ 2.27, 7.1.2; *see also* Escrow Agreement, Ex. 2-C.

[87] *See* National Settlement Funds, Huntington National Bank, available at https://www.huntington.com/Commercial/industries/settlement-funds-services (last accessed July 19, 2026).

Bank colleague Christopher Ritchie currently serves as the Escrow Agent for the 3M PWS Settlement.[88]

As the Escrow Agent, Ms. Griffin will be responsible for, *inter alia*: (1) establishing and maintaining the QSF; (2) ensuring that all legal responsibilities are met with respect to the QSF; (3) receiving, depositing and disbursing funds from the QSF pursuant to the terms of the Settlement Agreement; and (4) investing the funds.[89]

### E.     Notice of Settlement

#### 1.     Identification of Potential Class Members

Proposed Class Counsel retained Rob Hesse, an environmental consultant, to assist in identifying potential Eligible Claimants through publicly available information—namely, those active PWS that meet the Class definition and have one or more Impacted Water Sources as of July 31, 2026, or were required to test for certain PFAS under UCMR-5 or otherwise serve more than 3,300 people—and to devise a Class List of potential Eligible Claimants for the dissemination of Notice.[90]

As Mr. Hesse attests in his Declaration, each PWS in the United States is a permitted entity that is regulated by the EPA.[91] The EPA assigns a unique identification number called a "PWSID" to each PWS and maintains a centralized database that contains an inventory of all PWS in America.[92] This database, called the Safe Drinking Water Information System ("SDWIS"), is regularly updated with classifying information about all PWS, such as the population served, activity status, owner type and primary Water Source. It also contains administrative contact information for each PWS.[93] Not every

---

[88] *See* 3M PWS Settlement Final Approval Order (ECF 4754), DuPont PWS Settlement Final Approval Order (ECF 4543), Tyco PWS Settlement Final Approval Order (ECF 6406), and BASF PWS Settlement Final Approval Order (ECF 6407); *see also* Order Granting Plaintiffs' Unopposed Motion for Establishment of Qualified Settlement Fund and Appointment of a QSF Administrator and an Escrow Agent (ECF 3888) in the 3M PWS Settlement.

[89] S.A. § 7.2; *see also* Escrow Agreement, Ex. 2-C.

[90] Summy Dec., Ex. 3 at ¶ 19; *see also* Hesse Dec., Ex. 11 at pp. 1-3.

[91] Hesse Dec., Ex. 11 at p. 2.

[92] *Id.* at pp. 1-2.

[93] *Id.* at p. 2.

PWS in the SDWIS is an Eligible Claimant; rather, only a smaller subset of PWS falls within the Settlement Class definition based on whether or not the PWS has a PFAS detection before July 31, 2026, as defined in the Settlement Agreement, as well as on certain other size and classification characteristics.[94]

Mr. Hesse's review of the publicly available SDWIS data was then also supplemented by review of information provided by the Claims Administrator. Such review involved cross-referencing the list prepared by Mr. Hesse against the PWS who registered in the Claims Administrator's Settlement claims portal to determine whether any additional PWS met the Settlement Class definition that would be otherwise unidentifiable by publicly available information. Any such PWS were then added to the Class List.

Of course, the Class List is illustrative only.[95] Whether a PWS on the Class List is eligible and qualifies for the Settlement must be determined in accordance with the Settlement Agreement and the Allocation Protocol.[96]

### 2.     The Notice Plan

Mr. Ivie intends to employ the following methods to provide Notice to each potential Class Member: (1) mailed Notice; (2) reminder postcard; (3) emailed Notice; (4) personalized outreach; (5) publication Notice; (6) digital Notice; (7) paid search campaign; (8) press release; (9) Settlement website; and (10) toll-free telephone support.[97] The Notices for the settlements with Carrier, Archroma and Nation Ford will be combined with the Notice of the settlement with Amerex to save costs and provide the opportunity to Class Members to consider these settlements together.

---

[94] *Id.* at pp. 1-2; *see also* S.A. § 5.1.
[95] Hesse Dec., Ex. 11 at p. 3.
[96] *See generally* Allocation Procedures, Ex. 2-A.
[97] *See generally* Exs. 2-D (Long Form Notice), 2-E (Notice Plan), and 2-F (Summary Notice); *see also* Ivie Dec., Ex. 7 at ¶¶ 6-25.

The Notice Plan will employ both a Long Form Notice and Summary Notice. The Long Form Notice: (1) advises Class Members of the general terms of the proposed Settlement; (2) provides an overview of the proposed Settlement's Allocation Procedures and Claims Form Process (described in more detail in Section IV(F), *infra*); (3) informs Class Members of their right to both object to and opt out of the proposed Settlement; (4) discloses that administrative fees and costs will be paid out of the Settlement Funds; and (5) discloses that Class Counsel will be filing a motion for an award of attorneys' fees and costs that will request a Class award of attorneys' fees and costs, to be paid from the Qualified Settlement Fund, in lieu of the Common-Benefit Holdback Assessment provided for under CMO 3.[98] The Summary Notice is a condensed version of the Long Form Notice.[99]

It is Mr. Ivie's professional opinion, based upon his extensive qualifications and that of his firm, that the proposed Notice Plan is the best notice practicable under the circumstances and fully comports with due process requirements and Fed. R. Civ. P. 23.[100]

### F.     Allocation of Settlement Funds to Qualifying Class Members

The Settlement provides that the Settlement Funds will be divided among Qualifying Class Members. Qualifying Class Members will be allocated awards from the Settlement Funds, subject to the requisite fees, costs and holdbacks as set forth in the Settlement Agreement and Allocation Procedures.[101] A Class Member will neither be allocated nor receive its share of the Settlement Funds unless it timely submits a complete Claims Form. The Settlement Funds will then be allocated among Qualifying Class Members by the Court-appointed Claims Administrator, under the oversight of the Court-appointed Special Master, in accordance with the Allocation Procedures.[102]

---

[98] Ex. 2-D; *see also* S.A. § 9.10.
[99] Ex. 2-F.
[100] Ivie Dec., Ex. 7 at ¶¶ 6, 43-44.
[101] S.A. §§ 3.1, 6.1, 8.4, 8.10; *see also* Allocation Procedures, Ex. 2-A.
[102] *Id.*

The Allocation Procedures are a significant aspect of the Settlement. These Procedures were the culmination of a tremendous effort by both Proposed Class Counsel and Amerex to develop a protocol to fairly, reasonably, and adequately allocate the Settlement Funds to Qualifying Class Members. As part of this massive effort, Proposed Class Counsel originally engaged two highly qualified experts—Dr. J. Michael Trapp[103] and Dr. Prithviraj Chavan—to provide their expertise and technical support to develop an objective formula that would score a Qualifying Class Member's Impacted Water Source(s) using factors considered when calculating the real-world costs for the installation of PFAS treatment systems. After applying the mathematical formula, the Impacted Water Source scores can be used to allocate the Settlement Funds among Qualifying Class Members, each of whom would receive an "Allocated Amount."

The Allocation Procedures governing distribution of funds to PWS were finalized by the time the 3M and DuPont deals were signed. Notwithstanding, and particularly in the context of this present PWS Settlement with Amerex, their functionality here was discussed at length and played a role in helping scope the Settlement Class definition, in that the Parties had to determine both a detection and a testing cut-off date. To maximize the benefits of utilizing existing Allocation Procedures that have become familiar to many putative Class Members, Plaintiffs spent many hours with Dr. Trapp and his team running different scenarios through the Allocation Procedures and discussing the best way to ensure they would apply properly to the proposed Settlement.

Below are some of the most crucial aspects of the Allocation Procedures.

### 1.     <u>**Breakdown of Funds and Claims Forms**</u>

The Claims Administrator will separate the Settlement Funds into three distinct funds: the Action Fund, the Testing Compensation Fund, and the Supplemental Fund.[104] The Action Fund Claims Form

---

[103] *See* Declaration of Dr. J. Michael Trapp, attached hereto as Ex. 12 ("Trapp Dec.").
[104] S.A. §§ 2.55, 6.5.3, 6.5.5, 6.7; *see also* Allocation Procedures, Ex. 2-A at §§ II(3-6), and Claims

also services claims for reimbursement from the Testing Compensation Fund. There is also a Claims Form for the Supplemental Fund.[105] Additionally, in order for the Claims Administrator to evaluate Claims from Qualifying Class Members who share an interest in a Water Source with another PWS in accordance with the Parties' Joint Interpretive Guidance on Interrelated Drinking Water Systems, the additional Interrelated Drinking Water System Claims Form addendum will also be available.[106] These Claims Forms, along with all verified supporting documentation, must be timely submitted by the applicable deadlines set forth in the Allocation Procedures.[107] The Claims Administrator will make these Claims Forms electronically accessible on the Settlement website; a paper copy will also be available upon request.[108]

Additionally, and in order to maximize efficiency as well as provide significant savings of time and costs, any Qualifying Class Member who has submitted information to the Claims Administrator in connection with another PWS Settlement may choose to submit that same information to the Amerex PWS Settlement in order to allow the Claims Administrator to process verification as efficiently and consistently as possible. Qualifying Class Members will have the opportunity to update previously provided information as needed.

### a.     The Action Fund

The Action Fund will compensate Qualifying Class Members that have timely submitted a Claims Form and performed the requisite Baseline Testing for each of its Impacted Water Source(s).[109] The Claims Administrator will enter the test results and relevant information provided on the Claims

---

Forms, Ex. 2-B, which include the Action Fund Claims Form, the Addendum to the Action Fund Claims Form, the Supplemental Fund Claims Form, and the Interrelated Drinking Water System Claims Form.
[105] *Id.*
[106] Parties' Joint Interpretive Guidance, Exs. 2-M through P.
[107] Allocation Procedures, Ex. 2-A at p. 1.
[108] Mire Dec., Ex. 8 at ¶ 11.
[109] Allocation Procedures, Ex. 2-A at p. 1 and § II(2).

Form into the mathematical formula set forth in the Allocation Procedures to score each Impacted Water Source owned and/or operated by a Qualifying Class Member.[110]

Qualifying Class Members with an Impacted Water Source before July 31, 2026 are not required to retest their Impacted Water Source(s), but they are required to perform Baseline Testing of each of their Water Sources that either have never been tested for PFAS or were tested for PFAS before January 1, 2019, and such test did not result in a Measurable Concentration of PFAS.[111] Failure to test and submit Qualifying Test Results for Water Sources will disqualify Water Sources from consideration for present and future payments.[112]

Those Qualifying Class Members with a detection will receive compensation from the appropriate Action Fund for each Impacted Water Source.[113] Water Sources without a detection will remain eligible to receive compensation from the Supplemental Fund, discussed in the next subsection, through December 31, 2030, if later testing results in a PFAS detection.[114]

While a Qualifying Class Member may use any laboratory, Proposed Class Counsel have arranged for significantly expedited analysis at reduced rates from Eurofins Environmental Testing, which is a network of environmental labs that currently has North America's largest capacity dedicated to PFAS analysis.[115]

Both Drs. Trapp and Chavan agreed when crafting the Allocation Procedures that capital costs and operation and maintenance ("O&M") costs are the most important factors to consider when calculating the cost of treating PFAS-containing Drinking Water.[116] Capital costs are primarily driven

---

[110] *Id.* at § II.
[111] *Id.* at § II(2)(c).
[112] *Id.* at § II(2)(e).
[113] *Id.* at § II(6).
[114] *Id.* at § II(4).
[115] Declaration of Robert Mitzel, Senior Vice President of Eurofins Specialty Services, attached hereto as Ex. 13.
[116] Trapp Dec., Ex. 12 at pp. 3-9.

by the flow rate of the Impacted Water Source, while O&M costs are primarily driven by the flow rate of the Impacted Water Source <u>and</u> PFAS concentrations.[117] Thus, the flow rates and PFAS concentrations of each Impacted Water Source, obtained from the Qualifying Class Members' Claims Forms and supporting documentation, can be used by the Claims Administrator to formulaically calculate a Base Score for each Impacted Water Source.[118]

These Base Scores will then be adjusted, or "bumped," depending on whether the Impacted Water Source's concentration levels exceed any applicable federal or state MCLs; whether the Qualifying Class Member had litigation relating to the Impacted Water Source pending at the time of Settlement; and whether the Qualifying Class Member was one of the Public Water Provider Bellwether Plaintiffs.[119]

The Claims Administrator will then divide an Impacted Water Source's Adjusted Base Score by the sum of all Adjusted Base Scores for the Action Fund to arrive at each Impacted Water Source's percentage of the Action Fund.[120] This percentage will be multiplied by the total Action Fund to provide the Allocated Amount for each Impacted Water Source.[121]

Because the Allocation Procedures require the information solicited in the Claims Forms to calculate Base Scores and all Base Scores are required to calculate individual Settlement Awards, each Qualifying Class Member's Allocated Amount will not be determinable until all applicable Claims Forms are submitted, analyzed, and processed by the Claims Administrator. When these awards are determined and notification of the Allocated Amount is provided, each Qualifying Class Member, Proposed Class Counsel and/or Amerex may submit a request for reconsideration to the Special Master within the applicable deadlines, if an error in calculation can be established.[122] Proposed Class Counsel

---

[117] *Id.*

[118] *Id.*; *see also* Allocation Procedures, Ex. 2-A at § II.

[119] Allocation Procedures, Ex. 2-A at §§ II(6)(f)(iii)-(iv).

[120] *Id.* at § II(6)(d).

[121] *Id.*

[122] *Id.* at § II(6)(i).

request that the Claims Forms submission deadline for the Action Fund be set for sixty (60) calendar days after the Effective Date.[123]

### b.    The Testing Compensation Fund

The Testing Compensation Fund is intended to compensate Qualifying Class Members for any unreimbursed PFAS testing conducted between October 1, 2025 and July 31, 2026 that is required by federal or state law or which was performed to comply with Baseline Testing as part of this Settlement.[124] Reimbursement through the Testing Compensation Fund will not be provided to Qualifying Class Members who previously applied for such testing costs in other Public Water Settlements. Payments will be limited to the actual cost of testing that was performed, and absent extraordinary circumstances, will not exceed $800 per sample.[125] The Claims Administrator will determine the Testing Compensation Fund amounts that Qualifying Class Members may receive. The Claims Administrator shall also determine how much should be transferred from the Action Fund to fund the Testing Compensation Fund pursuant to the Allocation Procedures.  In no event shall the maximum amount for the Testing Compensation Fund exceed one hundred thousand dollars ($100,000.00).[126]

### c.    The Supplemental Fund

The Supplemental Fund was created to compensate Qualifying Class Members that: (1) have a Water Source with Qualifying Test Results showing no Measurable Concentration of PFAS and because of later testing obtain a Qualifying Test Result showing a Measurable Concentrations of PFAS; or (2) have an Impacted Water Source that did not exceed any applicable federal or state MCL at the time they submitted their Claims Forms and because of later testing obtain a Qualifying Test Result that exceeds

---

[123] *Id.* at § II(6)(a).
[124] S.A. § 6.5.4.
[125] *Id.* at § 6.5.6.
[126] *Id.* at §6.5.5.

an applicable MCL.[127]

For each Impacted Water Source, the Claims Administrator will approximate, as closely as is reasonably possible, the Allocated Amount that each Impacted Water Source would have been allocated had it been in the Action Fund with the later PFAS concentration, and shall issue funds from the Supplemental Fund in amounts that reflect the difference between the Impacted Water Source's Settlement Award and what the Qualifying Class Member has already received, if anything, for the Impacted Water Source.[128] Proposed Class Counsel request that the deadline for Claims Form submission for the Supplemental Fund be December 31, 2030.[129]

### 2.     Payment of Funds by Amerex

Amerex shall make one lump sum payment for the total Settlement Amount of $4 million as set forth in Section 6.1 of the Settlement Agreement. Within ten (10) calendar days after Preliminary Approval, Amerex shall tender said $4 million to the Qualified Settlement Fund either via wire transfer or check, a portion of which, not to exceed 10% or $400,000.00, shall be non-refundable in the event of termination as provided for under Sections 6.2 and 9.13 of the Settlement Agreement.

Upon Amerex's lump sum payment, the Escrow Agent shall transfer seven percent (7%) of the Settlement Amount into the Supplemental Fund.[130]

### G.     Objections and Exclusion Rights

### 1.     Objections

Any Class Member may file a written Objection to the Settlement or to an award of fees or expenses to Class Counsel with the Clerk of the Court.[131] The requirements for the written and signed

---

[127] Allocation Procedures, Ex. 2-A at § II(5).
[128] *Id.* at § II(5)(d).
[129] *Id.* at § II(5)(c).
[130] S.A. § 6.5.2.
[131] *Id.* at §§ 2.43, 9.4-9.5.

Objection and service obligations are set forth in the Settlement Agreement.[132] Any Class Member that fails to comply with requirements of Sections 9.4 through 9.5 of the Agreement waives and forfeits any and all objections the Class Member may have asserted.[133] Class Counsel asks that the Court set the deadline for submission of Objections to be sixty (60) calendar days after the date the Notice is mailed.[134]

### 2. Requests for Exclusion ("Opt Outs")

Any Eligible Claimant may opt out of the Settlement by submitting an electronic and duly executed "Request for Exclusion" via the Opt Out Administrator's portal, which will be accessible to the Notice Administrator, the Claims Administrator, the Special Master, Amerex's Counsel, and Class Counsel.[135] The requirements for the Request for Exclusion are set forth in the Settlement Agreement and Opt Out Form attached thereto as Exhibit H, including the requirement that the person submitting the Request for Exclusion have been legally authorized to do so on behalf of the Class Member.[136] No "mass" or "class" Opt Out shall be valid, and no Eligible Claimant may submit an Opt Out on behalf of any other Eligible Claimant.[137]

Any Person that submits a timely and valid Request for Exclusion shall not (i) be bound by the Settlement Agreement, or by any orders or judgments entered in the MDL Cases with respect to this Settlement Agreement (but shall continue to be bound by other orders entered in the Litigation, including any protective order); (ii) be entitled to any of the relief or other benefits provided under the Settlement Agreement; (iii) gain any rights by virtue of the Settlement Agreement; or (iv) be entitled to submit an Objection.[138] Any Class Member that fails to submit a timely and valid Request for Exclusion (or

---

[132] *Id.* at §§ 9.4-9.5.
[133] *Id.*
[134] *Id.* at § 9.5.
[135] *Id.* at §§ 2.44, 9.6-9.7. Submission of Requests for Exclusion pursuant to Fed. R. Civ. P. 5 is also available. *Id.* at § 9.6.
[136] *Id.* at § 9.5; *see also* Opt Out Form, Ex. 2-H.
[137] *Id.* at § 9.7.3.
[138] S.A. § 9.7.1.

submits and then withdraws its Opt Out) submits to the jurisdiction of the MDL Court and shall be bound by all the terms of the Settlement Agreement and by all proceedings, orders, and judgments with respect to the Settlement.[139]

Proposed Class Counsel asks that the Court set the deadline for submission of Requests for Exclusion to be ninety (90) calendar days after the date the Notice is mailed.[140]

## H.     Termination of the Settlement – Amerex's Walk-Away Right

Amerex has the option to withdraw from the Settlement, and terminate the Settlement Agreement, if certain numbers of Class Members opt out of the Settlement ("Required Participation Threshold").[141] The Special Master shall determine whether this threshold has been met and notify the Parties.[142] If the Special Master determines that the Required Participation Threshold has not been satisfied, or if Amerex in good faith disagrees with a determination by the Special Master that it has been satisfied, then, within twenty-one (21) calendar days of being notified by the Special Master, Amerex must notify Proposed Class Counsel, the Special Master and the Claims Administrator of its intent to either exercise or waive its right to terminate.[143]

## I.     Release of Claims, Covenant Not to Sue and Dismissal

After Class Members are notified and the time period for Opt Out requests and Objections expires, if the Court grants Final Approval of the Settlement, then all Class Members who do not request exclusion from the Class will be deemed to have released all claims as set forth in the Settlement Agreement against Amerex; will be deemed to have agreed not to institute any Released Claims in the future; and, for those Class Members with pending Litigation, will be deemed to have agreed to dismiss

---

[139] *Id.* at § 9.7.2.
[140] *Id.* at § 9.7.
[141] *Id.* at § 10.
[142] *Id.* at § 10.3.
[143] *Id.*

their Released Claims with prejudice.[144]

Any pending Litigation shall be dismissed with prejudice to the extent it contains Released Claims against Amerex.[145] However, should a Class Member believe that it has a preserved claim (*i.e.*, one that is not released under the terms of the Settlement Agreement), it must notify the Special Master, Class Counsel, and Amerex's Counsel within ninety (90) days of the Final Fairness Hearing if it intends to seek a limited Dismissal, and shall execute a stipulation of limited Dismissal with prejudice, in the form annexed to the Settlement Agreement as Exhibit K, within sixty (60) calendar days after the Effective Date.[146] Failure to do so will result in dismissal of the entire claim against Amerex in its entirety with prejudice.[147]

### J.      Payment of Attorneys' Fees and Litigation Costs and Expenses

Proposed Class Counsel intends to file a motion for fees and costs that will request a Class award of attorneys' fees of 8% and costs in lieu of the Common Benefit Holdbacks provisions of CMO 3, to be paid from the Qualified Settlement Fund, which shall not be paid before the Effective Date.[148]

### V.      ARGUMENT

Preliminary approval of a class action settlement is warranted if the two requirements of Rule 23(e)(1) are satisfied. Under the Rule, the issue is whether the Court will likely be able to: (1) approve the Settlement as being fair, reasonable and adequate under Rule 23(e)(2); and (2)  certify the Settlement Class for purposes of settlement and entering a judgment.[149]

---

[144] S.A. §§ 9.7.1-9.7.2, 12.

[145] *Id.* at §§ 10.4, 12.5.

[146] *Id.* at § 12.5; *see also* Dismissal, S.A. Ex. 2-J.

[147] *Id.*

[148] S.A. §§ 3.1, 9.10, 11.2. The motion will be due not less than twenty (20) calendar days before the deadline for Objections. *Id.* at § 9.9.

[149] *See also 1988 Trust for Allen Children Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 521 (4th Cir. 2022) (recognizing that parties propounding settlement bear "the initial burden to show that the proposed class meets the Rule 23(a) requirements for certification and that a proposed settlement is fair, reasonable, and adequate").

In determining whether to approve a Settlement, the Court should be guided by the principle that "[t]here is a strong judicial policy in favor of settlements, particularly in the class action context."[150] Indeed, "[t]he voluntary resolution of litigation through settlement is strongly favored by the courts and is 'particularly appropriate' in class actions."[151]

Additionally, and as presented in more detail in the Motions for Preliminary Approval of the Carrier, Archroma, and Nation Ford PWS Settlements which are being filed contemporaneously with this instant Motion for Preliminary Approval of the Amerex PWS Settlement, Plaintiffs are presenting four PWS Settlements simultaneously so that Class Members can evaluate the collective merits of these smaller settlements (as compared to, e.g., 3M and DuPont), while also considering the benefits of the additional contributions made by each to the Class Members' overall potential recovery. These filings are simultaneous but still separate, to allow each settling defendant's circumstances, liability, and PWS Settlement terms to be addressed; Plaintiffs would nonetheless respectfully request that the Court consider all contemporaneous PWS Settlements presented and take their intended combined administration into account when evaluating whether to grant Preliminary Approval.[152]

### A.    <u>The Proposed Settlement Should Be Preliminarily Approved.</u>

Preliminary approval of a proposed class settlement begins with the important determination "that the court will likely be able to approve the proposal under [the factors enumerated in Fed. R. Civ. P.] 23(e)(2)."[153] As the arbiter of fairness and adequacy, the district court "acts as a fiduciary of the

---

[150] *Reed v. Big Water Resort, LLC*, 2016 U.S. Dist. LEXIS 187745, at *14 (D.S.C. May 26, 2016); *see also Crandell v. U.S.*, 703 F.2d 74, 75 (4th Cir. 1983) ("Public policy, of course, favors private settlement of disputes.").

[151] *In re LandAmerica 1031 Exch. Servs. Inc. Internal Revenue Service §1031 Tax Deferred Exch. Litig. (MDL 2054)*, 2012 U.S. Dist. LEXIS 97933 at *13-14 (D.S.C. July 12, 2012).

[152] *See supra* at 4-5 & n.9.

[153] *See* Fed. R. Civ. P. 23(e)(1). *See also, In re Aqueous Film-Forming Foams Prod. Liab. Litig.*, No. 2:18-MN-2873-RMG, 2021 U.S. Dist. LEXIS 16470, at *1 (D.S.C. Jan. 25, 2021) (preliminarily approving the *Campbell* class action settlement) ("*Campbell*"); Preliminary Approval Orders issued by this Court in *City of Camden, et al., v. 3M Company*, No. 2:23-cv-03147 (ECF 3626) and *City of*

class" to "ensure that the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately."[154] The Court is obliged to review the Settlement Agreement and "determine whether it is 'within the range of possible approval' or, in other words, whether there is 'probable cause' to notify the class of the proposed settlement."[155] For preliminary approval purposes, a court "is not required to undertake an in-depth consideration of the relevant factors for final approval."[156]

Here, Plaintiffs and Proposed Class Counsel submit that both the form and substance of the proposed Settlement are fair, reasonable, and adequate, and thus preliminary approval by the Court is warranted. The proposed Settlement satisfies each of the elements for assessing the reasonableness of the settlement under Rule 23(e)(2), as well as the factors set forth in *Jiffy Lube,* 927 F.2d at 158-59.[157] Importantly, the *Jiffy Lube* factors, while not identical to the Rule 23(e)(2) factors, "almost completely overlap" with the rule-based factors.[158] Thus, for simplicity, this brief focuses primarily on the *Jiffy Lube* factors.

### 1.    The Settlement Negotiations Were Fair.

The Fourth Circuit uses the following *Jiffy Lube* factors to analyze the fairness of a proposed class settlement to ensure it was reached as a result of good-faith bargaining at arm's length, without collusion: (1) the posture of the case at the time the proposed settlement was proposed, (2) the extent of

---

*Camden, et al., v. E.I. du Pont de Nemours and Company (n/k/a EIDP, Inc.), et al.*, No. 2:23-cv-03230 (ECF 3603).

[154] *1988 Trust*, 28 F.4th at 521 (quoting *Sharp Farms v. Speaks*, 917 F.3d 276, 293-294).

[155] *In re LandAmerica*, 2012 U.S. Dist. LEXIS 97933, at *5 (quoting *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 855 F. Supp. 825, 827 (E.D.N.C. 1994)).

[156] *Id.* at *6.

[157] *See also In re: Lumber Liquidators Chinese Manufactured Flooring Prods. Marketing, Sales Pract. and Prods. Liab. Litig.*, 952 F.3d 471, 484 n. 8 (4th Cir. 2020) (reaffirming the *Jiffy Lube* factors while noting that the elements listed in the 2018 amendment to Rule 23(e)(2) differ from the Court's considerations but "almost completely overlap").

[158] *Id.* (confirming that "the outcome [in the *Lumber Liquidators* case] would be the same under both [the *Jiffy Lube* factors] and the Rule's factors.").

discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) counsel's experience in the type of case at issue.[159]

### a. The Litigation as to Public Water Systems Was in a Trial-Ready Posture at the Time of the Settlement.

As set forth in detail *supra* in Section III(B), the Parties agreed to a proposed Settlement only after the resolution of Drinking Water claims with water providers with other MDL defendants—namely 3M, DuPont, Tyco, and BASF—as well as after the issuance of Court Orders teeing up trial for the non-settling defendants that remained in the MDL.

Prior to reaching agreement, for nearly eight years since this MDL's inception in December 2018, the Parties had engaged in extensive, non-stop fact and expert discovery and motion practice in an effort to move this MDL forward efficiently and effectively. Nor did they let a global pandemic stop them, with the first of the now approximately 365 depositions in this MDL being taken remotely in the earliest months of lockdown. The culmination of their efforts resulted in trial counsel being ready to present the *Stuart* case in June 2023, a process that included, among other things, analyzing and evaluating hundreds of thousands of documents and paring them down to the final core exhibit list; arguing evidentiary objections; securing live witnesses; identifying deposition cuts; and engaging in motion practice (i.e. summary judgment motions, *Daubert* motions, and motions *in limine*). The parties also conducted discovery to prepare for trial against the telomer Defendants as discussed *supra* in Section III(B). Here, "the cause [was] ready for trial," which ordinarily assures "sufficient development of the facts to permit a reasonable judgment on the possible merits of the case."[160] This work and preparation, despite no bellwether cases being tried, demonstrated Plaintiffs' willingness and ability to pursue any and all potentially liable defendants, and as such, were invaluable in producing the result

---

[159] *Id*.; *see also Commissioners of Public Works of City of Charleston v. Costco Wholesale Corp.*, 340 F.R.D. 242, 249 (D.S.C. 2021).

[160] *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975).

with Amerex described herein, as well as with the other settling defendants.

Notably, the PWS cases were much farther along than cases in other litigations in which a proposed class settlement has received preliminary approval in the Fourth Circuit. Indeed, the Fourth Circuit has affirmed preliminary approval of a class settlement "reached so early in the litigation that no formal discovery had occurred, [because] the court found that […] evidence obtained […] yielded sufficient undisputed facts" to enable a decision regarding the merits of the claims.[161] Thus, the first *Jiffy Lube* factor for evaluating fairness supports preliminary approval of the proposed Settlement.

### b.     Before Reaching Settlement, the Parties Conducted Extensive Investigation and Discovery.

Preliminary informal exploratory settlement discussions began in earnest in 2023. By this time, the parties were already well along in the development of their positions and had gathered a substantial cache of relevant evidence on critical elements of the claims at issue. In fact, the PEC had by that point already served voluminous discovery requests on approximately twenty (20) core defendants in the MDL, and Science Day (October 4, 2019) had already convened, at which the parties presented their respective positions regarding some of the key scientific issues at issue in this case. Before reaching settlement with Amerex, over 6 million documents were produced in this MDL, amounting to over 47.5 million pages.[162] To date the parties have also completed approximately 365 fact and expert witness depositions,[163] including approximately 150 since the most recent PWS settlement with BASF.

Accordingly, as the extensive and highly contentious settlement discussions unfolded between

---

[161] *Jiffy Lube*, 927 F.2d at 159 (vacated and remanded on other grounds); *see also Newbanks v. Cellular Sales of Knoxville, Inc.*, No. 12-1420, 2015 U.S. Dist. LEXIS 191550, at *4-5, *14 (D.S.C. Feb. 4, 2015) (discovery was sufficient to allow evaluation of the merits of the case where parties exchanged thousands of pages of documents during the discovery process); *Mullinax v. Parker Sewer & Fire Subdistrict*, No. 12-cv-01405, 2014 U.S. Dist. LEXIS 199340, at *16 (D.S.C. Mar. 11, 2014) (approving settlement "reached after nearly 10 months of litigation that had narrowed and defined the legal and factual issues as clearly as possible.").
[162] London Dec., Ex. 4 at ¶ 16.
[163] *Id.*

the parties, general liability discovery as to all of the core MDL defendants was substantially completed and available for use. Both sides, along with Judge Phillips and his team, were armed with extensive discovery and primed to make well-informed and intelligent decisions regarding the strength of Plaintiffs' liability case and its impact on any proposed Settlement. Accordingly, the second *Jiffy Lube* factor for evaluating fairness also supports preliminary approval of the proposed Settlement.

### c.    The Proposed Settlement Was Negotiated at Arm's-Length.

As described in the Declarations of Judge Phillips and Proposed Class Counsel, the proposed Settlement arose out of serious and informed negotiations conducted at arms' length. From the time the Parties first began to informally discuss a potential settlement, Proposed Class Counsel continued to vigorously prosecute the PWS claims brought against all non-settled and non-bankrupt MDL defendants, which led to negotiations between the Parties that were difficult and often highly contentious.

These discussions were greatly aided by Judge Phillips' appointment by the Court in October 2022 to mediate the Parties' negotiations. His appointment and subsequent involvement helped shape any potential resolution discussions the Plaintiffs, by and through the PEC Co-Leads who acted as negotiating counsel, had with *any* MDL defendant, including Amerex. Judge Phillips was heavily involved in the mediation between Plaintiffs and Carrier, which negotiations informed the discussions with Amerex, and he was a crucial sounding board as the Parties navigated the delicate balance of concurrent but separate discussions with the other Shared Dates defendants.[164] Indeed, even after the Parties reached agreement on the material terms of the Settlement, the negotiations continued as the Parties worked to hammer out the details of the final Settlement Agreement.[165]

The adversarial nature of the negotiations, and the aid provided by Judge Phillips in overseeing

---

[164] Summy Dec., Ex. 3 at ¶¶ 10-11, 25; London Dec., Ex. 4 at ¶¶ 13, 21.
[165] *See generally* Judge Phillips Dec., Ex. 6.

the multiple agreements with the four Shared Dates defendants, meet the Fourth Circuit's third factor for evaluating fairness and support preliminary approval.[166]

### d.     Class Counsel and Counsel for Amerex Have Decades of Experience Litigating Complex Cases, Including Environmental and Class Actions.

Because Plaintiffs and Amerex are represented by competent counsel who are experienced in complex, large-scale environmental litigation, their opinions supporting the proposed Settlement weigh in favor of granting preliminary approval.[167] Indeed, Courts have recognized that class counsel's experience in similar litigation allows for a realistic assessment of the merits of a claim and the desirability of a settlement.[168] This Court has previously given consideration to the "Parties' history of litigating similar, if not identical issues, combined with Plaintiff's counsel's extensive experience of the same" as "indicat[ing] the settlement was negotiated at arm's length."[169]

Here, Proposed Class Counsel have extensive experience in complex environmental litigation, class actions, and settlements of large, nationwide cases. Indeed, this Court appointed each as Co-Lead Counsel to oversee the prosecution of this MDL out of recognition of their experience. Most recently, this Court applauded Proposed Class Counsel as being "some of the most qualified mass tort litigators in America."[170] Their recommendation of the Settlement is informed by their acquired knowledge.

Scott Summy has litigated and resolved several large-scale cases involving water providers who

---

[166] *Id.*; *see also S.C. Nat. Bank v. Stone*, 139 F.R.D. 335, 345–46 (D.S.C. 1991) (although supervision "is not mandatory in order to determine a settlement is fair, such participation can insure that the parties will negotiate in good faith without collusion."); *Robinson v. Carolina First Bank NA*, 2019 U.S. Dist. LEXIS 26450, *27 (D.S.C. Feb. 14, 2019) ("supervision by a mediator lends an air of fairness to agreements that are ultimately reached"); Fed. R. Civ. P. 23(e)(2)(B).

[167] *Robinson,* 2019 U.S. Dist. LEXIS 26450, at *13- 14, 18-19; *Flinn*, 528 F.2d at 1173 (the opinion and recommendation of experienced counsel "should be given weight in evaluating the proposed settlement."); Fed. R. Civ. P. 23(e)(2)(A).

[168] *Bass v. 817 Corp.,* 2017 U.S. Dist. LEXIS 225380, *5-6 (D.S.C. Sept. 19, 2017).

[169] *Commissioners*, 340 F.R.D. at 249.

[170] *See* Order and Opinion (ECF 4885), granting Class Counsel's Motion for Attorneys' Fees and Costs in the 3M and DuPont PWS Settlements, at p. 11.

sought the costs of removing chemicals from their water.[171] As just one example, in 2009, he successfully settled MDL-wide claims brought by water suppliers against the nation's major oil companies for contaminating their Drinking Water supplies with the gasoline additive, MTBE.[172]

Michael London has devoted his entire legal career to representing consumers and injury victims, primarily in complex litigation settings involving mass torts.[173] As just one example, Mr. London led the seminal PFAS litigation, *In re: E.I. du Pont de Nemours and Company C-8 Pers. Injury Litig.*, MDL No. 2433 (S.D. Ohio).[174]

Joseph Rice has served as negotiator in some of the largest civil actions over the past several decades. He has been involved in asbestos litigation, acted as Co-Lead Counsel in the National Prescription Opiate MDL and helped negotiate settlements in the BP oil spill on behalf of the Plaintiffs' Steering Committee for that litigation.[175]

Furthermore, Proposed Class Counsel's experience as Class Counsel for the 3M, DuPont, Tyco, and BASF PWS Settlements had direct bearing on their expertise in these negotiations and was a highly relevant factor in helping usher in this Agreement with Amerex.

Considering Proposed Class Counsel's broad knowledge of the facts surrounding this litigation, coupled with their extensive experience resolving litigations involving similar issues, the fourth *Jiffy Lube* factor is met and supports preliminary approval of the proposed Settlement.

### 2. The Settlement Provides Adequate Consideration to the Class.

Amerex will pay the Settlement Amount of $4 million into a Court-approved QSF to be distributed to Class Members.[176] Together with any interest that accrues thereon when deposited in the

---

[171] *See* Summy Dec., Ex. 3.
[172] *Id.*
[173] *See* London Dec., Ex. 4.
[174] *Id.*
[175] *See* Declaration of Joseph Rice ("Rice Dec."), Ex. 5.
[176] S.A. §§ 2.65, 3.1, 6.1, 7; *see also* Escrow Agreement, Ex. 2-C.

QSF, these monies constitute the Settlement Funds.[177] Following appropriate deductions for fees and costs as set forth in the Settlement Agreement, the Settlement Funds will be allocated equitably among Qualifying Class Members in accordance with the Allocation Procedures.[178] The Settlement will help ameliorate the costs faced by PWS in developing and implementing necessary, cost-effective systems to treat the water sources allegedly contaminated by Amerex's PFAS-containing products.

At this stage, the Court need only find that the Settlement is within "the range of possible approval,"[179] considering "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants […] and (5) the degree of opposition to the settlement."[180] All such factors weigh in favor of preliminary approval.

a.     **The Settlement is Reasonable Given the Strength of Plaintiffs' Case on the Merits and Amerex's Existing Defenses.**

Although Plaintiffs are confident in the strength of their allegations and supporting evidence, "Plaintiffs' ability to prevail on the merits is uncertain. The Settlement confers relief that might well not be achievable through continued litigation."[181] When reviewing the adequacy of a proposed settlement, "the court can assess the relative strengths and weaknesses of the settling parties' positions to evaluate the various risks and costs that accompany continuation of the litigation."[182]

Before any Settlement was reached in the MDL, the *Stuart* case was trial-ready. Since *Stuart*

---

[177] *See* S.A. § 2.65 ("'Settlement Amount' means four million dollars ($4,000,000.00)") and S.A. § 2.68 ("'Settlement Funds' means the amount of funds in the Qualified Settlement Fund paid by Amerex pursuant to this Settlement Agreement and any interest that accrues thereon").

[178] Allocation Procedures, Ex. 2-A.

[179] *Commissioners*, 340 F.R.D. at 249.

[180] *Jiffy Lube*, 927 F.2d at 159; *Commissioners*, 340 F.R.D. at 250; *see also* Fed. R. Civ. P. 23(e)(2)(C & D).

[181] *Gray v. Talking Phone Book*, 2012 U.S. Dist. LEXIS 200804, at *16 (D.S.C. Aug. 10, 2012).

[182] *Case v. French Quarter III LLC*, 2015 WL 12851717, at *8 (D.S.C. July 27, 2015).

was stayed in light of the PWS settlements with 3M and DuPont, Proposed Class Counsel wasted no time preparing to try a case against the telomer Defendants pursuant to CMOs 27A-I, making clear that Plaintiffs' pursuit of justice would include holding any and all liable parties responsible. The telomer-specific discovery helped demonstrate the forces that would be brought to bear on any remaining non-settling MDL defendants, and confirmed Plaintiffs' commitment to continue vigorously litigating all water provider claims.

Proposed Class Counsel believed, and continue to believe, that they have a strong case against Amerex. Amerex is fully cognizant of the totality of this credible evidence. In fact, it is the strength of Plaintiffs' position that drove the Settlement Amount agreed to by Amerex.

Of course, the outcome of any case that is tried on the merits is uncertain and for their part, Amerex believes it had supportable legal and factual defenses which also impacted the Parties' negotiations. As Judge Phillips attests in his declaration, the settlement negotiations were "difficult and contentious . . . because all involved held firm to their convictions that they had the stronger factual and legal arguments on issues relevant to liability, damages, and otherwise, leading to robust debates on virtually aspect of the settlement, including the ultimate outcome of motions, trials, and appeals if a negotiated agreement was not achieved."[183]

As in many cases, uncertainty favors settlement because "hurdles to proving liability, such as proving proximate cause would remain and would necessitate expensive expert testimony."[184] Amerex also insisted that the benefits of its' allegedly PFAS-containing products outweighed the risks associated with their use. This issue, among others, would have been left in the hands of juries, where the outcome

---

[183] Judge Phillips Dec., Ex. 6 at ¶ 21.
[184] *Commissioners*, 340 F.R.D. at 250 (internal quotation marks omitted); *LandAmerica*, 2012 U.S. Dist. LEXIS 97933, at *11-12 (where defendants "vigorously dispute the Plaintiffs' claims on numerous grounds," "their dispute underscores . . . the uncertainty of the outcome[.]"); *S.C. Nat. Bank*, 139 F.R.D. at 340 (settlement favored by risk to both sides of ultimate resolution of the numerous and significant factual and legal issues).

is always uncertain.

Notwithstanding Plaintiffs' confidence in the strengths of their proofs against Amerex, establishing product identification for Amerex's AFFF is a factor that could have potentially reduced any favorable jury award. It was therefore a consideration in agreeing to the Settlement Amount.[185] Accordingly, this factor supports that the Settlement is reasonable.

### b. The Settlement is Reasonable Given the Anticipated Duration and Expense of Additional Litigation.

Under the Settlement Agreement, Amerex does not admit liability and expressly declines to waive any affirmative defenses. If the Settlement Agreement is terminated, the Parties agree to return to their pre-settlement litigation positions. In the absence of settlement, the vast majority of water providers would commence on a years-long litigation journey after nearly eight years have already passed in the MDL,[186] and there is the risk of recovering nothing, or recovering only after years of trial and appeals. Adding years of litigation for each PWS runs counter to having to expend funds in the near term to comply with the EPA's MCLs for PFAS. This factor—the need to comply with enforceable regulations—cannot be overstated.

Indeed, although the claims alleged by the Class Members involve straightforward tort principles, litigating their cases involves sophisticated factual, expert and legal analysis that in many cases would require hiring multiple consulting and testifying experts. A liability determination may turn on resolution of complex fact questions based on sophisticated scientific evidence, including analyses of the PFOA at a particular site to determine whether it is branched or linear or both and, if both, in what proportions. And looming over all of this is the possibility that a jury could assess discrete factual issues

---

[185] *See e.g. Flinn*, 528 F.2d at 1173-74 (the fact that a cash settlement "'may only amount to a fraction of the potential recovery' will not per se render the settlement inadequate or unfair.").
[186] *See Case*, 2015 WL 12851717, at *8 (settlement is appropriate after extensive discovery where trial would be lengthy and costly).

involving the government contractor defense and, however unlikely, find that it applies in a particular case. All these uncertainties make settlement all the more desirable.

This complexity translates into time-consuming and expensive litigation. Preparing the water provider cases for potential bellwether trials alone required that Plaintiffs engage numerous expert witnesses at a cost totaling over hundreds of thousands of dollars, and that is without a single trial having even been conducted. Developing these specific expert opinions for hundreds of PWS presents the real potential for enormously exorbitant costs.

Proposed Class Counsel have also expended time and effort in other ways in order to put the PWS cases into the best position possible for negotiating a potential settlement. For the *Stuart* trial, a core trial team was deployed to Charleston and was prepared to present the best evidence in a precise, cogent and persuasive manner, as Plaintiffs have done on prior occasions.[187]  The firms involved invested extraordinary amounts of time in these efforts, without any guarantee of future recovery due to the contingency nature of the litigation.[188] Then, upon the stay of the *Stuart* trial following resolution with certain MDL defendants, the parties pivoted to preparing cases to try against the telomer Defendants. Another bellwether selection process took place, with all the attendant efforts that entails. The parties then aggressively worked up first the four (4) Tier One cases, then the two (2) Tier Two cases. These risks and costs were also part of the parties' calculus in negotiating the proposed Settlement and should

---

[187] The *Stuart* trial team was led by Gary Douglas of Douglas & London and Wesley Bowden of Levin, Papantonio, Rafferty, with contributions and support by many plaintiff counsel from the PEC and various committees, including in particular the members of the Law & Briefing and Science Committees. As reflected in more fulsome detail in other previous motions filed before this Court in connection with prior PWS settlements, these historic clean drinking water resolutions truly took a village and would not have been possible without the tireless leadership and painstaking work of all those involved.

[188] The Settlement Agreement appropriately recognizes that all counsel will take their fees from the Settlement Funds. As discussed above, in Section IV(J), Proposed Class Counsel intend to file a motion for a Class award of attorneys' fees and costs, in lieu of the Common Benefit Holdback provisions of CMO 3, not less than twenty (20) calendar days before Objections. All fees and costs of Proposed Class Counsel would be paid from the Settlement Funds in the QSF. *See* S.A. §§ 3.1, 9.9-9.10.

be considered by the Court.[189]

Moreover, any judgments won following trial would likely be subject to lengthy appeals, whereas the Settlement provides more immediate results and benefits to Class Members.[190]

In brokering the proposed Settlement, Proposed Class Counsel carefully evaluated all the hurdles involved in establishing Amerex's liability, including getting past *Daubert* and summary judgment, as well as the possibility of a future trial and appeal. Based on these considerations, Proposed Class Counsel believe that it is in the best interest of all Class Members to resolve the claims through the proposed Settlement and avoid such risks.[191]

In summary, good cause for final approval of the Settlement has been amply demonstrated.

**B.      The Proposed Settlement Class Should Be Preliminarily Certified Under Federal Rule of Civil Procedure 23.**

**1.      The Requirements of Rule 23(a) Are Satisfied.**

A proposed settlement class satisfies the requirements for class certification under Rule 23(a) if it meets the following requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a).[192] The Fourth Circuit also recognizes that "Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable" or ascertainable.[193]

At this preliminary stage, this Court is not required to undertake an in-depth consideration of the relevant factors; nor does the Court need to decide the merits of the case or resolve unsettled legal

---

[189] *See* Fed. R. Civ. P. 23(e)(2)(C)(iii).

[190] *See Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 480 (D. Md. 2014) ("Accordingly, even after three and a half years of litigation, the road to recovery—particularly for the class as a whole—likely would be protracted and costly if the settlement were not approved.").

[191] *See Gray*, 2012 U.S. Dist. LEXIS 200804, at *5-6, *15 (settlement negotiations involved consideration of avoiding the significant risk and burden of continuing litigation).

[192] *See State of Rhode Island v. Boeing Co.,* __ F.4th ___, 2026 WL 2083048, at *2 (4th Cir. July 20, 2026).

[193] *Peters v. Aetna Inc.*, 2 F.4th 199, 241-42 (4th Cir. 2021) (internal citations omitted); *see also Commissioners*, 340 F.R.D. at 247.

questions. Rather, it should "limit its proceedings to whatever is necessary to aid it in reaching an informed, just and reasoned decision" that it will likely approve the settlement.[194]

### a.     The Settlement Class Members are Readily Ascertainable.

In analyzing any class action, the Fourth Circuit has imposed a non-textual condition that "a class cannot be certified unless a court can readily identify the class members in reference to objective criteria."[195] This requirement is often called "ascertainability," where "[t]he goal is not to identify every class member at the time of certification, but to define a class in such a way as to ensure that there will be some administratively feasible [way] for the court to determine whether a particular individual is a member at some point."[196] This requirement will be met so long as the putative class is able to be "identified on a large-scale basis, and notified of the class action accordingly."[197]

As detailed above in Section IV(E)(1), the proposed Settlement Class meets this requirement because the putative Class Members it includes are objectively described, readily identifiable, and ascertainable by reference to publicly available information and, if necessary, confirmatory testing results.[198] For this reason, the Fourth Circuit's ascertainability requirement is satisfied.

### b.     Rule 23(a)'s Numerosity Requirement is Satisfied.

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable."[199] While this requirement was "easily satisfied" for a class of 14,000 public sewer system operators,[200] the Fourth Circuit has also found it satisfied where the proposed class included only 30

---

[194] *Flinn*, 528 F.2d at 1173; Fed. R. Civ. P. 23(e)(1).
[195] *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654–55 (4th Cir. 2019).
[196] *Id.* at 658 (internal quotation marks omitted).
[197] *Id.*
[198] *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 18-2873, 2024 WL 489326, at *6 (D.S.C. Feb. 8, 2024) (Order and Opinion finally approving the DuPont Settlement) (hereafter "AFFF").
[199] Fed. R. Civ. P. 23(a)(1).
[200] *Commissioners,* 340 F.R.D. at 247.

members.[201] The large number of PWS in the proposed Class and their disparate locations alone make joinder an unrealistic option in this case, thereby confirming the impracticality of resolving their claims without use of the class action device.[202] Thus, the proposed Settlement Class, projected to number over 15,000, easily satisfies Rule 23(a)'s numerosity requirement.[203]

### c.      Rule 23(a)'s Commonality Requirement is Satisfied.

Under Rule 23(a)(2), a district court may certify a class only when "there are questions of law or fact common to the class."[204] The key inquiry for evaluating commonality is whether a common question can be answered in a class-wide proceeding such that it will "drive the resolution of the litigation."[205] Thus, even a single common question is sufficient to meet this Rule 23(a) requirement.[206]

This Court has found the commonality requirement was met in a class action where public sewer operators alleged, individually and on behalf of a putative class, that the manufacturers of flushable wipes knew that their wipes were not actually "flushable," failed to warn consumers, and caused harm to sewer systems.[207] In that case, this Court found that common questions existed, "such as whether 'Defendants mislabel their flushable wipes so as to have consumers believe that their flushable wipes will not cause harm to sewer systems in their area' and 'whether Defendants' flushable wipes cause

---

[201] *Williams v. Henderson*, 129 Fed. App'x 806, 811 (4th Cir. 2005).

[202] *See In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234-36 (4th Cir. 2021) (holding that when the proposed class is in the "gray area" between 20 to 40 members, "the district court should consider whether judicial economy favors *either* a class action or joinder."); Preliminary Approval Orders issued by this Court in the 3M PWS Settlement (ECF 3626) and in the DuPont PWS Settlement (ECF 3603).

[203] *See AFFF*, 2024 WL 489326 at *6.

[204] Fed. R. Civ. P. 23(a)(2).

[205] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). *See also Commissioners*, 340 F.R.D. at 247-248 ("The commonality requirement—at least as it relates to a settlement class—is 'not usually a contentious one: the requirement is generally satisfied by the existence of a single issue of law or fact that is common across all class members and thus is easily met in most cases.'"); *Dukes*, 564 U.S at 350 ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.").

[206] *Id.* at 359.

[207] *Commissioners,* 340 F.R.D. at 247.

adverse effects on STP Operators' systems.'"[208]

The same analysis supports the finding of commonality here. Plaintiffs' claims, individually and on behalf of the proposed Settlement Class, arise from allegations that Amerex knew of the environmental and potential human health risks associated with exposure to the PFAS in their AFFF products, yet continued to develop, manufacture, distribute, and sell AFFF products containing PFAS.[209] Likewise, Plaintiffs and the proposed Class Members have all alleged that Amerex failed to warn users, bystanders, or public agencies of these risks associated with their products that contained PFAS.[210] Plaintiffs and the Class Members relied on a common core of salient facts relevant to Amerex, and Amerex's potential liability to Plaintiffs and the proposed Settlement Class is grounded in substantially similar legal theories.[211] For this reason, Rule 23(a)'s commonality requirement is satisfied here.

### d.      Rule 23(a)'s Typicality Requirement is Satisfied.

Typicality requires that the proposed class representatives' claims be "typical of the claims or defenses of the class."[212] Typicality is satisfied if a proposed class representative's claim is not "so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim."[213] Still, courts have emphasized that this "is not to say that typicality requires that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned."[214] Rather, typicality is satisfied where there is "a sufficient link" between a representative plaintiff's claims and those of absent class members in that they all allegedly suffered damages caused by the same product, arising out of the same alleged course of conduct by defendant, and based on

---

[208] *Id.*
[209] Amerex Compl. at ¶¶ 35-37, 62-63.
[210] *Id.* at ¶¶ 127-136.
[211] *See AFFF*, 2024 WL 489326 at *7.
[212] Fed. R. Civ. P. 23(a)(3).
[213] *Deiter v. Microsoft Corp.,* 436 F.3d 461, 466-67 (4th Cir. 2006).
[214] *Id.*

46

identical legal theories.[215]

Here, Plaintiffs, in their capacity as proposed Class Representatives, have asserted claims that are undoubtedly typical of those of the Class Members they seek to represent. To start with, Plaintiffs, like the Class Members, are PWS that have asserted claims for actual or threatened injuries caused by PFAS contamination.[216] In addition, Plaintiffs and the Class Members rely on the same common core of facts to allege that Amerex knowingly sold defective products containing PFAS and failed to warn of those defects, leading to the contamination of Class Members' respective Water Sources.[217] Lastly, Plaintiffs and the Class Members also assert a common damages theory that seeks recovery of the costs incurred in remediating and/or treating their Water Sources to remove PFAS contamination from their Drinking Water.[218]

Because Plaintiffs' and the Class Members' claims arise out of the same course of conduct by Amerex, are based on similar—if not identical—legal theories, and assert similar damages theories, Rule 23(a)'s typicality requirement is satisfied.[219]

### e.    Rule 23(a)'s Adequacy of Representation Requirement is Satisfied.

Rule 23(a)(4) requires that the "representative Parties will fairly and adequately protect the interests of the class."[220] This finding "requires the Court to determine: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the entire class."[221] This

---

[215] *Commissioners,* 340 F.R.D. at 247-248.
[216] Amerex Compl. at ¶ 1; S.A. § 5.1.
[217] Amerex Compl. at ¶¶ 69, 72-74.
[218] *Id.*, Prayer for Relief at p. 33.
[219] *Commissioners*, 340 F.R.D. at 247; *see also Campbell,* 2021 U.S. Dist. LEXIS 16470, at *11-12 ("Typicality exists if a plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory.") (citations omitted).
[220] Fed. R. Civ. P. 23(a)(4). *See also 1988 Trust*, 28 F.4th at 524.
[221] *Parker v. Asbestos Processing, LLC*, No. 0:11-cv-01800-JFA, 2015 U.S. Dist. LEXIS 1765, at *24 (D.S.C. Jan. 8, 2015) (citations omitted).

inquiry "tend[s] to merge" with the commonality and typicality criteria.[222]

The adequacy of representation requirement is satisfied here because Plaintiffs and Proposed Class Counsel have no interests "antagonistic to the interests of the Settlement Class," no indicia of conflicts of interest exists, and Plaintiffs allege the same or similar harms as the absent Class Members.[223] Further, Plaintiffs and Proposed Class Counsel have demonstrated a willingness and ability to vigorously prosecute the class claims as set forth in detail above.[224] Lastly, there is no basis to believe that Proposed Class Counsel will not adequately represent the interests of absent Class Members given their extensive experience in class actions, robust prosecution of the class claims in this litigation, and the impressive results they have secured in this MDL.[225]

For all these reasons, the proposed Settlement satisfies Rule 23(a)'s adequacy of representation requirement.

## 2.    The Requirements of Rule 23(b)(3) are Satisfied.

In addition to the requirements of Rule 23(a), the proposed Settlement Class must also satisfy the requirements of Rule 23(b)(3). "An acceptable type of class provided for by Rule 23(b) is where the class is superior to other methods of adjudication because common questions of law or fact predominate over those of individual class members ('superiority requirement')."[226] In making this determination, a court must consider: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the

---

[222] *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982). In part, these requirements determine whether "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.*
[223] *Commissioners,* 340 F.R.D. at 247-248.
[224] *Id. See also AFFF*, 2024 WL 489326 at *8.
[225] *See, e.g.*, Order and Opinion of this Court (ECF 4885), at 11 (noting that "Throughout this litigation the Court has praised the quality of lawyering on both sides.").
[226] *Campbell*, 2021 U.S. Dist. LEXIS 16470, at *5.

48

litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action."[227]

Because a chief justification for class actions is efficiency, courts "must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court."[228] Indeed, "[w]here . . . common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."[229]

Here, for the same reasons discussed in the preceding section, common questions clearly predominate over any individual questions that the Class Members may have. Again, Plaintiffs and the Class Members are PWS that have been injured by the course of conduct undertaken by Amerex that resulted in substantially similar injuries to Plaintiffs and the putative Class Members. While certain individual issues may exist for some Class Members, the nature and scope of the common questions in this case satisfy Rule 23(b)(3)'s predominance requirement.[230]

In addition, there are other factors the Fourth Circuit recognizes that favor class treatment over individual cases, including the absence of a strong interest for class members to pursue individual litigation, particularly when considering the expense, burden, risk, and length of trial and appellate proceedings involved.[231] Here, this factor clearly favors class treatment, and there is a "sufficient desirability to concentrate the litigation in the forum given its familiarity with the relevant issues as the

---

[227] Fed. R. Civ. P. 23(b)(3).

[228] *Campbell*, 2021 U.S. Dist. LEXIS 16470 at *5-6 (citing 7AA Wright & Miller, Fed. Practice and Procedure § 1779 (3d ed. 2005)).

[229] *Stillmock v. Weis Markets, Inc.,* 385 Fed. App'x 267, 273 (4th Cir. 2010) (internal quotations omitted).

[230] *See AFFF*, 2024 WL 489326 at *9-*10.

[231] *Id.* at 275.

transferee Court."[232]

Thus, the proposed Settlement satisfies all the criteria necessary for class certification under Rules 23(a) and (b)(3). Having met these criteria, the proposed Settlement Class should be preliminarily certified, and Notice of the Settlement should be issued.

### C. Upon Certifying the Settlement Class, the Court Should Appoint Class Counsel and Class Representatives.

#### 1. Appointment of Class Counsel.

Proposed Class Counsel all have substantial experience in prosecuting and settling complex class actions, including those that involve environmental contamination of public water supplies.[233] In this vein, all have been appointed and served as Class Counsel in many class actions and mass torts.[234] This Court has previously recognized their capacity to manage and oversee complex litigation by appointing all of them as Co-Lead Counsel. Proposed Class Counsel have the resources to oversee the Settlement for the Class Members.

Accordingly, because Proposed Class Counsel are well prepared to represent the Class Representatives and the interests of the Class,[235] Plaintiffs respectfully request that the Court appoint Scott Summy, Michael A. London, and Joseph Rice as Class Counsel.

#### 2. Appointment of Class Representatives.

As discussed above, Plaintiffs' claims are typical of the claims of the Class Members, and the

---

[232] *Campbell*, 2021 U.S. Dist. LEXIS 16470, at *13. Another factor considered by the Fourth Circuit is whether class certification promotes consistency of results, which is not only applicable here but also provides Amerex with the finality and repose it desires in pursuing a global resolution of its liability to PWS with PFAS contamination. *Gunnells v. Healthplan Servs.,* 348 F.3d 417, 429 (4th Cir. Oct. 30, 2003) (in contrast to class action proceeding, individual actions make a defendant vulnerable to the asymmetry of collateral estoppel). Additionally, manageability concerns are displaced by the potential settlement itself. *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 620 (1997).

[233] *See* Declarations of Class Counsel, Exs. 3-5.

[234] *Id.*

[235] *Commissioners*, 340 F.R.D. at 248-249; *Robinson*, 2019 U.S. Dist. LEXIS 26450, at *13-14.

claims share commonality. Plaintiffs are adequate representatives of the Class Members because no conflicts of interest exist between the two. Plaintiffs are interested in demonstrating that PFAS caused damages to their PWS, and these are the same interests as those of the Class Members. Plaintiffs have exhibited a commitment to prosecuting this matter on their own behalf and on behalf of the absent Class Members, and they remain committed to doing so.

As to the Settlement itself, the Class Representatives have carefully reviewed, know, and understand the full contents of the Settlement Agreement and they voluntarily entered into this Settlement Agreement after having consulted with Class Counsel. The Court should appoint these Class Representatives to represent the Settlement Class.

**D.      The Court Should Commence the Notice Process by Approving the Proposed Form of Notice and Notice Plan, and by Appointing the Notice Administrator.**

As discussed above in Section IV(E)(2), the Notice Plan was designed to provide the best notice that is practicable under the circumstances and to fully comport with due process requirements, and Fed. R. Civ. P. 23.[236] The Notice Plan provides for individual direct notice via mail and email to all reasonably identifiable Class Members, and includes outreach to national and local water organizations, a comprehensive media plan, and the implementation of a dedicated website and toll-free telephone line. This Notice Plan is substantially similar to the one that was confirmed as reasonable and adequate in the 3M, DuPont, Tyco, and BASF PWS Settlements.[237]

Accordingly, the Court should approve the appointment of Patrick J. Ivie of Simpluris as Notice Administrator; approve the Notice Plan; direct Notice to begin; and set a date no less than sixty (60)

---

[236] Fed. R. Civ. P. 23(e)(1)(B) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal."

[237] *See* ECFs 3603, 3626, 5147 and 5253, approving the Notice Plan and authorizing the dissemination of Notice in the DuPont, 3M, Tyco and BASF PWS Settlements, respectively; *see also Commissioners*, 340 F.R.D. at 249.

calendar days after commencement of the dissemination of Notice as the deadline for the filing of Objections, and a date no less than ninety (90) calendar days after commencement of the dissemination of Notice as the deadline for the filing of Requests for Exclusion. As noted (*supra* 4-5 & n.9), substantial efficiency will be gained here because—in line with well-established authority—Notices of all four settlements with Amerex, Carrier, Archroma and Nation Ford will be mailed together, conserving class resources.

**E.      The Court Should Appoint the Claims Administrator, the Opt Out Administrator, and Special Master Matthew Garretson.**

Plaintiffs request that the Court approve the appointment of Dustin Mire of Eisner/Amper as the Claims Administrator;[238] the appointment of Edward J. Bell of Rubris as the Opt Out Administrator;[239] and the appointment of Matthew Garretson of Garretson LLC as the Special Master.[240]

**F.      The Court Should Establish a Qualified Settlement Fund, Appoint the Escrow Agent, and Approve the Escrow Agreement.**

Plaintiffs seek the entry of an Order establishing a QSF, appointing Robyn Griffin of the Huntington National Bank as the Escrow Agent, and approving the Escrow Agreement.[241] This Order will greatly aid in the efficient processing and administration of the Settlement Agreement.

The QSF shall be a qualified settlement fund within the meaning of section 468B of the Internal Revenue Code of 1986, as amended, and Treasury Regulation sections 1.468B-1 *et seq.*, and shall be administered in accordance with the requirements of those Treasury regulations, as detailed in the Settlement Agreement and Escrow Agreement.[242] The establishment of the Fund as a "qualified settlement fund" under the Code and Regulations, subject to the Court's continuing jurisdiction, is vital

---

[238] *See* Mire Dec., Ex. 8.
[239] *See* Bell Dec., Ex. 9.
[240] *See* Garretson Dec., Ex. 10.
[241] S.A. §§ 2.27-2.28, 6.3, 7. *See also* Escrow Agreement, Ex. 2-C.
[242] *Id.*

to the satisfaction of these objectives of the Parties' Settlement.[243]

The Escrow Agent shall hold the QSF in one or more demand deposit accounts and shall invest the funds pursuant to the terms of the Escrow Agreement. No distributions shall be made from the QSF except as permitted by the terms of the Escrow Agreement between Proposed Class Counsel, Amerex, the Special Master, and the Escrow Agent and/or pursuant to the terms of the Parties' Settlement Agreement and Allocation Procedures. Upon final distribution of all Settlement Funds received into the QSF and allocated to Qualifying Class Members, the Escrow Agent and Special Master shall take appropriate steps to wind down the QSF and thereafter be discharged from any further responsibility with respect to the QSF.

Proposed Class Counsel request that the Court approve the appointment of Robyn Griffin of Huntington National Bank, a federally insured depository institution, and the appointment of the Special Master Matthew Garretson to serve as the QSF Administrator.

## G.     The Court Should Schedule a Final Fairness Hearing.

Assuming Preliminary Approval is granted, Plaintiffs respectfully request that the Court schedule a Final Fairness Hearing to consider the fairness, reasonableness, and adequacy of the Settlement Agreement under Federal Rule of Civil Procedure 23(e)(2), and to determine whether the Order Granting Final Approval should be entered.[244]

---

[243] Section 1.468B-1(c)(1) of the Regulations expressly requires that a qualified settlement fund be "established pursuant to an order of, or is approved by, the United States, any state (including the District of Columbia), territory, possession, or political subdivision thereof, or any agency or instrumentality (including a court of law) . . . and is subject to the continuing jurisdiction of that governmental authority."

[244] Rule 23(e)(2) provides: "If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each

53

If the Court schedules the Final Fairness Hearing, the date shall be communicated to the Class Members so as to provide the Class Members with sufficient notice.

## VI.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the instant motion and enter the Preliminary Approval Order, annexed hereto as Exhibit 1:

a.     preliminarily approving the proposed Settlement Agreement;

b.     preliminarily certifying, for settlement purposes only, the Settlement Class;

c.     approving the form of Notice of the Settlement Class;

d.     approving the Notice Plan, and directing the commencement of, the Notice Plan;

e.     appointing Class Counsel;

f.     appointing Class Representatives;

g.     appointing the Notice Administrator;

h.     appointing the Claims Administrator;

i.     appointing the Opt Out Administrator;

j.     appointing the Special Master;

---

other."

k.      scheduling the Final Fairness Hearing; and

l.      granting any other relief deemed necessary or appropriate by the Court.

Dated: July 24, 2026

Respectfully submitted,

s/ Michael A. London
Michael A. London
Douglas and London PC
One State Street, 35th Floor
New York, NY 10004
212-566-7500
212-566-7501 (fax)
mlondon@douglasandlondon.com


Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
214-521-3605
ssummy@baronbudd.com



Joseph F. Rice
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
843-216-9000
Jrice@motleyrice.com

*Proposed Class Counsel*