**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | **MDL No. 2873**<br><br>**Master Docket No. 2:18-mn-2873**<br><br>**This Document Relates to:**<br><br>***The People of the State of California, ex rel. Rob Bonta, Attorney General of California v. 3M Company et al.***<br><br>**Case No. 2:23-cv-01531-RMG** |

**DECLARATION OF ADAM DOMANSKI IN SUPPORT OF THE PEOPLE OF THE STATE OF CALIFORNIA'S MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION**

I, Adam M. Domanski, Ph.D., declare as follows:

1. I am the founding principal economist at Enduring Econometrics, a Seattle-based economic consulting firm, and an Adjunct Professor in the Department of Economics at Seattle University.

2. In these roles, I serve as an economist on interdisciplinary teams that examine issues relevant to public policy, publish research papers on topics related to applied microeconomics, teach graduate and undergraduate courses in applied econometrics and environmental economics, and routinely prepare natural resources damages assessments ("NRDA") on behalf of public and private clients.

3. In addition to these duties, I also serve as an economist on litigation-related cases involving injuries to public-trust resources, employment earnings, and other topics that require statistical expertise. I have been with Enduring Econometrics since 2021 and Seattle University since 2019.

4. I hold a B.A. in economics from the College of William and Mary and an M.E. and a Ph.D. in economics from North Carolina State University, with a focus in applied econometrics and nonmarket valuation.

5. Prior to founding Enduring Econometrics, I was a Senior Economist and Project Director with ECONorthwest, a Portland-based economic consulting firm. Prior to that role, I was an economist with the National Oceanic and Atmospheric Administration's ("NOAA") Office of Response and Restoration headquartered in Silver Spring, Maryland. While at NOAA, I worked as an Economist on large-scale natural resource damages ("NRD") litigation, served as the Acting Deputy Director of NOAA's Marine Debris Program, and conducted research and published studies related to public economics. Prior to joining NOAA, I was a research associate with the Center for Environmental and Resource Economic Policy at North Carolina State University.

6. I am a member of the American Economic Association and the Association of Environmental and Resource Economists. I have served as a reviewer for *The Journal of Environmental Economics and Management*; *The Journal of Choice Modeling*; *Resource and Energy Economics*; *Marine Resource Economics*; *Informational Processing in Agriculture*; *Ocean and Coastal Management*; *Marine Pollution Bulletin*; *Coastal Management*; and *Ecological Economics*.

7. My own research has been published in *The Journal of Survey Statistics and Methodology*; *The Journal of Environmental Economics and Management*; *Marine Resource Economics*; *Marine Policy*; *Marine Pollution Bulletin*; *Environmental Management*; and *Environmental Research Letters.*

8. My professional and academic qualifications are described in my curriculum vitae, which is attached as **Exhibit A**.

## I. SCOPE OF WORK

9. I was asked by counsel for the Plaintiff to calculate natural resource damages to the State of California from environmental contamination of groundwater resources associated with per- and polyfluoroalkyl substances ("PFAS"), specifically perfluorooctanoic acid ("PFOA").

10. I reviewed datasets and documents provided by counsel for the Plaintiffs and other documents that are publicly available.

## II. SUMMARY OF OPINION

11. The State of California has incurred economic damages as a result of past, present, and projected future contamination of groundwater resources by PFOA. The present value estimated cost necessary to compensate the State of California for these injuries to groundwater resources through compensatory restoration totals approximately $24.5 billion.

12. This calculation is conservative: for reasons explained below, the true amount of damages to ecological resources likely far exceeds the NRD I calculated.

## III. NRD FRAMEWORK AND LIMITATIONS ON ANALYSIS

13. Environmental contamination from PFAS compounds can affect many natural resources managed by the State of California in its role as a natural resource trustee. NRDs are determined by the actions required to restore injured natural resources to baseline and to compensate the public for the resource services lost between the onset of injury and recovery. The objective of this framework is restorative, and the measure of damages corresponds to the amount of restoration required to make the public whole, or as nearly whole as practicable, for losses attributable to the contamination. Losses can occur from several categories of value, including:

(a) Groundwater resources used or potentially available for drinking-water supply, irrigation, drought reserves, or other beneficial uses,

(b) Groundwater-dependent wetlands, springs, riparian areas, and other ecosystems sustained in whole or in part by groundwater, and

(c) Fish, aquatic invertebrates, amphibians, birds, mammals, and other biological resources exposed through surface water, sediment, prey, or other food-web pathways.

14. These categories may represent distinct resource-service losses, and, where the underlying services do not overlap, may appropriately be evaluated separately and combined without double counting. For example, treatment of contaminated groundwater at the point of

extraction may restore the immediate usability of the treated water, but it does not necessarily restore the condition of the aquifer itself, compensate for water that remains unavailable or requires treatment, restore a wetland dependent on contaminated groundwater, replace biological production lost through food-web exposure, or compensate for past restrictions on public use.

15. The scientific literature concerning the ecological effects of PFAS is rapidly developing. While recent peer-reviewed studies have substantially expanded the available information concerning PFAS toxicity, bioaccumulation, trophic transfer, and effects across aquatic and terrestrial organisms, a comprehensive understanding of PFAS ecotoxicity remains incomplete, limiting the ability to perform a comprehensive characterization of the full ecological injury from PFAS in California.[1]

16. Available research also demonstrates that PFAS contamination cannot be characterized adequately from water concentrations alone. PFAS may be transferred among groundwater, surface water, sediment, soil, plants, and wildlife, and exposure may occur through both direct contact and ingestion pathways. Studies have found substantial variation in reported bioaccumulation depending on PFAS concentration and have emphasized the importance of site-specific analyses.[2]

17. Accordingly, a complete assessment of all NRD associated with PFAS contamination in California would require additional, dedicated investigation and information development beyond the data presently available for my analysis. My analysis is therefore limited to quantifying the groundwater-resource injury that can presently be evaluated using available data and the methodology described below.

18. For some resources and pathways, the presently available information is insufficient to reliably determine the spatial extent, magnitude, duration, and resulting

[1] Wang, L., Yang, T., Liu, X., Liu J., & Liu, W. (2024). Critical evaluation and meta-analysis of ecotoxicological data on per- and polyfluoroalkyl substances (PFAS) in freshwater species. *Environmental Science & Technology, 58*(40), 17555–17566.

[2] Lewis, A. J., Yun, X., Spooner, D. E., Kurz, M. J., McKenzie, E. R., & Sales, C. M. (2022). Exposure pathways and bioaccumulation of per- and polyfluoroalkyl substances in freshwater aquatic ecosystems: Key considerations. *Science of the Total Environment, 822*, 153561.

compensatory restoration requirement. The absence of sufficient sampling or toxicological information to quantify a particular category of injury should not be interpreted as evidence that no injury occurred. PFAS are present in California's environment – including in surface waters and biota – as demonstrated by available environmental data, and such PFAS can be toxic and/or injurious to environmental receptors. It is therefore reasonable to conclude that additional natural resource injuries are present in California. This analysis is, accordingly, an inherently conservative valuation of those injuries because it only assesses groundwater NRD.

19. Furthermore, the damages quantified in this report arise only from groundwater concentrations of PFOA exceeding the California threshold used in this analysis. Other PFAS detected in California's environment may also be causing groundwater and ecological injuries. Because those injuries are not assessed in this report, my opinion as to groundwater NRD in California attributable to PFAS is necessarily conservative.

## IV. BASES OF OPINION

### A. Groundwater Resource Equivalency Analysis

20. I used Resource Equivalency Analysis ("REA"), to quantify NRD in California resulting from PFAS contamination. REA is a well-established method that is commonly used for NRDA in both litigation and non-litigation contexts.[3] It is used for determining the amount of compensatory restoration necessary to offset natural-resource or ecological-service losses over time.

21. Groundwater is both a natural resource in its own right and a medium through which ecological functions are supplied to other resources. Groundwater natural-resource services are the physical and biological functions that arise from the groundwater's physical, chemical, and biological quality. Groundwater provides beneficial services that are lost when it is contaminated.

---

[3] REA is so widely used that multiple government agencies have published overviews of the method. For example, *see Damage Assessment, Remediation, and Restoration Program*, available on the NOAA website at https://perma.cc/3P87-WJQK (last accessed on Sept. 10, 2026). The Department of Interior has published an animated video explaining REA to the general public. It is available at https://www.doi.gov/restoration/hearea (last accessed on Sept. 10, 2026).

For example, it may no longer be usable for drinking water or irrigation. However, the beneficial services of groundwater, including nutrient cycling, biodiversity, support of habitat and food webs, along with a broader set of provisioning, regulating, and cultural services, accrue regardless of whether the groundwater is extracted for use.[4]

22. The economic value of groundwater is not limited to the value generated through its current use. The published economic literature has long recognized "option value" associated with preserving a natural resource so that it remains available for possible future use, as well as the concept of "non-use values" associated with the preservation of environmental resources independent of any direct use of its services.[5] Federally funded research has also found that the public holds non-use value for maintaining or restoring clean groundwater, including bequest and existence values that arise independent of any direct use.[6]

23. The State of California manages groundwater resources as a natural resource trustee. Any contamination of these resources that restricts the flow of any beneficial services represents a loss in value that is incurred by the State.

24. Groundwater, as a unique resource managed by the State, can be defined using standard ecological service frameworks.[7] In this manner, the public can be compensated for injuries to groundwater through the construction of a range of restoration project types.[8]

[4] Griebler, C., & Avramov, M. (2015). Groundwater ecosystem services: a review. *Freshwater Science*, *34*(1), 355-367.

[5] Krutilla, J. V. (1967). Conservation reconsidered. *The American Economic Review, 57*(4), 777–786.

[6] McClelland, G. H., Schulze, W. D., Lazo, J. K., Waldman, D. M., Doyle, J. K., Elliott, S. R., & Irwin, J. R. (1992, October). *Methods for measuring non-use values: A contingent valuation study of groundwater cleanup* (USEPA Cooperative Agreement No. CR-815183). Center for Economic Analysis, University of Colorado.

[7] Connor, J. A., Paquette, S., McHugh, T., Gie, E., Hemingway, M., & Bianchi, G. (2017). Application of natural resource valuation concepts for development of sustainable remediation plans for groundwater. *Journal of Environmental Management*, *204*, 721-729.

[8] Lane, D., Carney, K., & Chapman, D. (2009). Identifying, scaling, and evaluating groundwater restoration projects as compensation for groundwater injuries. *International Journal of Soil, Sediment and Water, 2*.

Groundwater contamination may impair a range of beneficial services and the restoration should be evaluated according to the services restored, not solely according to the cost of remediation or treatment.[9]

25. Damages to lost groundwater resource services are quantified using REA. REA is an established restoration-scaling method used to determine the amount of compensatory restoration necessary to offset natural-resource or ecological-service losses over time.[10,11,12,13] The application of REA utilizes service metrics, characterization of the injury and recovery trajectories, and demonstration that restoration gains are sufficiently comparable to the services lost – all of which are available for a groundwater injury in California resulting from PFOA contamination.

26. The damages quantified through a groundwater REA are distinct from the costs of treating groundwater after it has been extracted. The REA measures the loss of groundwater resource services caused by contamination during the entire period in which the aquifer is impaired. Those losses may include reductions in the groundwater resource's availability, reliability, quality, ecological function, and capacity to support current or future public uses. The analysis therefore addresses the diminution in value of the natural resource itself, and the compensation required to offset the interim loss of services until the resource returns to baseline conditions (which may be a function of future remedial actions).

27. By contrast, groundwater treatment costs are expenditures incurred to make extracted water suitable for a particular use, such as drinking-water supply, irrigation, or industrial

---

[9] Paleologos, E. K. (2008). The lost value of groundwater and its influence on environmental decision making. *Risk Analysis: An International Journal*, *28*(4), 939-950.

[10] Unsworth, R. E., & Bishop, R. C. (1994). Assessing natural resource damages using environmental annuities. *Ecological Economics*, *11*(1), 35-41.

[11] Desvousges, W. H., Gard, N., Michael, H. J., & Chance, A. D. (2018). Habitat and resource equivalency analysis: A critical assessment. *Ecological Economics*, *143*, 74-89.

[12] Zafonte, M., Hampton S. (2007). Exploring welfare implications of resource equivalency analysis in natural resource damage assessments. *Ecological Economics*, *61*(1),134–145.

[13] Baker, M., Domanski, A., Hollweg, T., Murray, J., Lane, D., Skrabis, K., Taylor, R., Moore, T., & DiPinto, L. (2020). Restoration scaling approaches to addressing ecological injury: The habitat-based resource equivalency method. *Environmental Management*, *65*(2), 161–177.

use. Treatment may allow certain uses to continue despite contamination, but it does not necessarily restore the aquifer or fully replace the broader flow of beneficial services provided by uncontaminated groundwater. Treatment costs are therefore a mitigation cost associated with a specific use of extracted water, whereas the groundwater REA damages compensate for the loss of all resource services attributable to the contamination.

28. I understand the State will be presenting a drinking water treatment cost estimate alongside this NRD estimate. To avoid double-counting damages attributable to PFOA contamination in the State's aquifers, and as discussed below, I have subtracted from my calculations the volume of groundwater that would be treated under the drinking water treatment cost expert's assumptions. Counsel has directed me to assume that 1.255 million acre-feet per year will be treated for the next thirty years under those assumptions.

29. Damages determined via REA are calculated using a series of equations, which are explained below.

30. The first equation[14] identifies the present value of the sum of lost groundwater services, determined by the magnitude and extent of groundwater contamination across time, discounted to present value:

$$PV(Debit) = \sum_t (InjuredGroundwater_t) * (1 + r)^{(t_{base} - t)} \quad (1)$$

Where:

- $PV(Debit)$ is the present value loss of groundwater services over time, quantified as Discounted Service Acre Feet Years ("DSAFYs"). This is the quantification of the services provided by an acre foot of groundwater and are the basic units used in NRDA to quantify the cumulative injury related in present value terms.
- $InjuredGroundwater_t$ is the volume of injured groundwater at time *t*,
- $r$ is the economic discount rate used to relate a flow of services over time to present value, and

[14] See: Unsworth, R. E., & Bishop, R. C. (1994). Assessing natural resource damages using environmental annuities. *Ecological Economics*, *11*(1), 35-41.

- $t_{base}$ is the current year to which services are discounted.

31. The debit is calculated for the entire duration of the injury, from the initiation of injuries at $t_0$, to the cessation of injuries at some point in the future. If long-lived contaminants are expected to cause harm for the foreseeable future, the debit can be calculated as the limit of Equation 1 as *t* approaches infinity. In practice, it is standard for NRDA practitioners to calculate damages over 100-year forward analytical horizons when injuries are expected to persist for many decades.[15,16,17]

32. Lost groundwater services would be compensated through a restoration project that would provide beneficial services equivalent to those that were lost, be implemented at some point in the future, and be operated for some time period. Any future remediation or treatment is accounted for by netting out the volume treated in a given year from the total injured available groundwater in that year. This ensures that the REA does not include any service losses during periods in which those groundwater services have been restored through remediation or treatment. Injuries end at the point in time at which groundwater is no longer expected to be contaminated above threshold levels.

33. The present value sum of groundwater services provided by a given restoration project is calculated as the following:

$$PV(Credit) = \sum_t (RestoredGroundwater_t) * (1 + r)^{(t_{base} - t)}, \qquad (2)$$

[15] See, e.g., National Oceanic and Atmospheric Administration, U.S. Fish and Wildlife Service, & California Department of Fish and Game. (2010, June). *Castro Cove/Chevron Richmond Refinery final damage assessment and restoration plan/environmental assessment*.

[16] DelVecchio, R., & Unsworth, R. (2009, March). *Oak Ridge Reservation natural resource damage assessment: Evaluation of contaminant-related losses in Watts Bar Reservoir and gains from the Black Oak Ridge Conservation Easement* (Final draft report). Industrial Economics, Incorporated. Prepared for the Watts Bar Reservoir Trustee Council.

[17] Stratus Consulting (2010, April). *Restoration Plan and Environmental Assessment for the Upper Arkansas River Watershed*. Prepared for the U.S. Department of the Interior, U.S. Fish and Wildlife Service, U.S. Bureau of Land Management, U.S. Bureau of Reclamation, State of Colorado.

Where:

- $PV(Credit)$ is the present value gain of groundwater services from a given project over time, quantified as DSAFYs,
- $RestoredGroundwater_t$ is the volume of groundwater restored at time $t$.

34. Restoration projects can be explicitly defined or conceptual in nature, so long as there is a clear understanding of the volume of groundwater restored per year, the year the project begins operating, and the year at which the project no longer provides benefits. The restoration needed (in terms of number of restoration projects represented in Equation 2, the crediting equation) is then the ratio of the lost to restored services:

$$Units\ of\ Restoration\ Needed = \frac{PV(Debit)}{PV(Credit)}\ (3)$$

35. Dollar-denominated damages are then determined by the expected cost of equivalent restoration:

$$Damages = Units\ of\ Restoration\ Needed * Cost\ per\ Unit\ of\ Restoration,\ (4)$$

36. The cost per unit of restoration is determined by the type of project explicitly evaluated in Equation 2. For example, if the present value credit is evaluated for a project that restores one acre-foot of groundwater per year, damages are calculated as the cost to build that project, times the number of acre-feet of groundwater per year needed to be restored, calculated from Equation 3.

37. All damages are converted to present value using an economic discount rate that reflects the social rate of time preference for environmental goods and is commonly applied across NRDAs. Discounting is a calculation by which damages that were incurred in the past or will be incurred in the future are adjusted to reflect the value of those damages today. The use of discounting reflects two key economic principles: a) time preference, meaning individuals generally prefer benefits sooner rather than later, and b) opportunity cost, meaning resources invested today could generate benefits elsewhere. When groundwater injury persists over time, the associated welfare losses accumulate annually. Conversely, restoration projects generate streams

of ecological benefits over time, often beginning years after implementation. The application of a discount rate allows the comparison between these temporal streams of losses and gains on a consistent basis.

38. Discounting in public policy analysis has deep roots in economic theory and is a standard practice in federal benefit-cost and regulatory analysis.[18] Within the context of environmental damages, a technical analysis produced by NOAA specifically evaluated discounting in the context of NRDA and recommended the use of a three percent discount rate.[19] This rate has been widely applied in NRDA analyses and settlements and is supported by recent published research.[20,21,22,23] Consistent with standard NRDA practice, I apply a three percent discount rate in this analysis.

**B. Calculation of Damages**

39. The calculation of NRD to California from PFAS contaminated groundwater using a REA relies on publicly available data and a series of data processing and analytical steps common in groundwater NRDAs. In sum, the steps are: (1) establish the spatial extent and magnitude of PFOA contamination in California groundwater using publicly available data; (2) interpolate that data to project the total volume of California groundwater with PFOA ecological injury; (3) quantify the lost services using a REA, both forwards and backwards in time; and (4) calculate the

[18] Ramsey, F. P. (1928). A mathematical theory of saving. *The Economic Journal*, *38*(152), 543-559.

[19] Damage Assessment and Restoration Program, NOAA (1999, February). *Discounting and the Treatment of Uncertainty in Natural Resource Damage Assessment* (Technical Paper 99-1).

[20] Montana Natural Resource Damage Program (2024, March). *Natural Resource Damage Assessment Plan for the Burlington Northern Livingston Shop Complex*.

[21] NOAA (2013, June). *Final Lower Duwamish River NRDA Restoration Plan and Programmatic Environmental Impact Statement*.

[22] Hyde, J. M., Jones, J. W. (2021, August). Evaluation of the Certus, Inc. and Lone Mountain Processing, Inc. Natural Resource Damage Assessment and Restoration Cases to Restore Mussels in the Clinch and Powell Rivers in Virginia and Tennessee. Virginia Tech and U.S. Fish and Wildlife Service. Prepared for the Department of the Interior.

[23] Horsch, E., Phaneuf, D., Giguere, C., Murray, J., Duff, C., & Kroninger, C. (2023). Discounting in natural resource damage assessment. *Journal of Benefit-Cost Analysis 14*(1), 141-161.

cost of restoration activities necessary to provide substitute services equivalent to those provided by the injured groundwater.

**1. Groundwater Sampling Data Analysis**

40. The spatial extent of groundwater PFOA contamination is derived from the California Groundwater Ambient Monitoring and Assessment ("GAMA") Program's Groundwater Information System.[24] This dataset contains 1,318,619 records covering 42 PFAS compounds at 12,640 locations from 2016 through 2026. The GAMA database is maintained by the California State Water Resources Control Board. The monitoring program is designed to provide "comprehensive groundwater monitoring" statewide,[25] and reflects the best available source of comprehensive groundwater data in the state.

41. Consistent with the scope of work, data were filtered to retain records containing only PFOA. Within the PFOA data, all non-detect values are represented as one half the applicable detection limit for the study. This represents a reporting-limit substitution method for non-detects rather than treating non-detects as zero or excluding them, and is consistent with EPA guidance and a common approach in ecotoxicology research. [26,27,28,29]

---

[24] California State Water Resources Control Board. (2026). *Ground water—water quality results* [Data set]. GAMA Groundwater Information System. Retrieved July 12, 2026, from https://gamagroundwater.waterboards.ca.gov/gama/datadownload.html (last accessed on Sept. 10, 2026).

[25] State Water Resources Control Board, GAMA: Groundwater Ambient Monitoring and Assessment Program, https://perma.cc/CNR6-66GQ (last accessed on Sept. 10, 2026).

[26] U.S. Environmental Protection Agency, Region 3. (2026, July). *Regional guidance on handling chemical concentration data near the detection limit in risk assessments*.

[27] Sakurai, T., Serizawa, S., Isobe, T., Kobayashi, J., Kodama, K., Kume, G., Lee, J.-H., Maki, H., Imaizumi, Y., Suzuki, N., Horiguchi, T., Morita, M., & Shiraishi, H. (2010). Spatial, phase, and temporal distributions of perfluorooctane sulfonate (PFOS) and perfluorooctanoate (PFOA) in Tokyo Bay, Japan. *Environmental Science & Technology, 44*(11), 4110–4115.

[28] Méndez, M. A., Davis, J., Miller, E. L., Grace, R., & Sutton, R. (2025). Spatial trends and health risks of per- and polyfluoroalkyl substances in San Francisco Bay fish from 2009 to 2019. *ACS ES&T Water, 5*(6), 2903–2913.

[29] Shaffer, K. W., Lee, C.-S., Ye, X., Graffam, M., Paulsen, R. J., McDonough, C. A., Venkatesan, A. K., & Gobler, C. J. (2026). Fate and transport of per- and polyfluoroalkyl substances (PFAS)

(continued…)

42. The data were then reduced to one record for each unique latitude and longitude with concentration represented as the natural logarithm of the mean of all grouped samples. The use of the log mean concentration across all available observations reduces the impact of anomalously high readings in subsequent analytical steps.

**2. Spatial Processing and Interpolation**

43. The spatial extent of groundwater contamination was projected through a series of spatial processing and interpolation steps. Groundwater sample points that are located in defined groundwater basins in California[30] were converted into estimated continuous concentration surfaces using a spatial interpolation approach known as inverse distance weighting ("IDW"). IDW estimates values at unsampled locations from nearby observed data, calculating the predicted value as a weighted average of surrounding observations, with weights declining as distance increases. A separate IDW concentration map was generated for each compound and converted to polygons for the purposes of area calculations. Each of these polygons was intersected with California groundwater basin polygons, and the area of each concentration-contour polygon was calculated for each spatial unit. Essentially, this process created a "heat map" of the concentrations of PFOA that was overlaid with groundwater basin boundaries.

44. Subsequent to the spatial analysis for the purposes of calculating injury, I applied a statistical calibration model to evaluate and adjust systematic differences between interpolated contour values and measured concentrations. Specifically, I modeled the logged mean measured concentration for each sample location as a function of its intersecting contour's minimum IDW-derived logged and linear concentrations.[31] I then used predictions from this fitted model to

across the groundwater-to-estuary continuum in an aqueous film forming foam (AFFF)-impacted watershed. *Environmental Pollution*, *390*, 127486.

[30] California Department of Water Resources. (2026). *i08 B118 CA Groundwater Basins* [Data set]. California Open Data. Retrieved July 14, 2026, from https://perma.cc/P7MX-537Q (last accessed on Sept. 10, 2026).

[31] $\ln\left(\overline{concentration_{Site}}\right) = \beta_0 + \beta_1 \ln(concentration_{contour}) + \beta_2 concentration_{contour} + \varepsilon$

identify the expected concentration for each contour. This step calibrated the IDW spatial results to actual contaminant values and corrected for smoothing inherent in IDW results.

45. I then calculated groundwater injury across two time periods using PFOA-specific California-issued regulatory criteria that determine the usability of groundwater. The two time periods correspond to the initial PFOA drinking-water response level issued by the California State Water Resources Control Board in place from 2018 through 2019, and the period corresponding to the time following 2020 when an updated, more restrictive PFOA drinking-water response level was issued.

46. For purposes of this analysis, I use these PFOA-specific drinking-water response levels as operational injury thresholds. These thresholds provide an objective, State-established benchmark for identifying groundwater whose quality is sufficiently impaired to trigger specified management responses. In 2018, a response level of 0.000070 milligrams per liter (70 nanograms per liter ("ng/L")) was issued for PFOA.[32] This was subsequently reduced to 0.000010 milligrams per liter (10 ng/L) in 2020.[33] Thus, the two relevant periods for the injury analysis are as follows:

(a) 2018–2019 injury period: A polygon was classified as injured during this period when predicted PFOA concentration exceeded 70 ng/L.

(b) 2020–2126 injury period.: A polygon was classified as injured during this period when predicted PFOA concentration exceeded 10 ng/L.

While the injury during the 2020-2126 injury period is assumed to be constant, this period is ultimately separated into three segments: 1) the period prior to 2026 before any drinking water treatment is assumed to begin, 2) between 2026 and 2056 where the assumed volume of treated drinking water is netted out of the estimated volume of injured ground water to eliminate double counting, and 3) 2057 through 2126 when no drinking water treatment is assumed to occur.

[32] California State Water Resources Control Board, Division of Drinking Water. (2018, July). *Notification level issuance: Perfluorooctanoic acid (PFOA)*. https://perma.cc/V45U-BUP4 (last accessed on Sept. 10, 2026).

[33] California State Water Resources Control Board, Division of Drinking Water. (2020, February). *Notification level issuance: Perfluorooctanoic acid (PFOA)* (Rev. 1, February 12, 2020). https://perma.cc/JG9V-4DTV (last accessed on Sept. 10, 2026).

47. Response levels represent the recommended chemical concentration level at which water systems should consider taking a water source out of service or adding treatment.[34] Accordingly, exceeding a response level constitutes a demonstrable impairment of the groundwater resources' beneficial services, thereby serving as the limiting factor that determines injury for the resource. Consistent with peer-reviewed ecological restoration scaling methodology, any decline in any single service metric results in a decline in the overall services of the resource. This loss occurs regardless of, and is not offset by, the quantity of any other service metrics.[35] The value of a resource is determined by its overall flow of services, which is jointly produced by the entire range of beneficial services in fixed proportion. In this manner, injury to any one service serves as a limiting factor determining overall service loss.[36] This joint-production model comports with the economic definition of a Leontief production function where total output is produced in fixed proportion to a set of factor inputs.[37,38]

48. In the absence of statewide information sufficient to estimate basin- and compound-specific recovery trajectories, the analysis assumes for restoration-scaling purposes that currently identified injuries persist for 100 years, consistent with standard NRDA practice and described earlier in paragraph 34.

49. My overall approach uses two conservative assumptions to calculate the scope of the injury: (1) holding the response level-based injury threshold constant from 2020 through the end of the period of interest is conservative because the current response levels are likely to be lowered in the future as knowledge of PFOA toxicity continues to develop; and (2) historic injury

---

[34] State Water Resources Control Board. (no date). *PFAS: Per- and Polyfluoroalkyl Substances*, https://perma.cc/Q3ZD-FHZM (last accessed Sept. 10, 2026).

[35] Baker, M., Domanski, A., Hollweg, T., Murray, J., Lane, D., Skrabis, K., Taylor, R., Moore, T., & DiPinto, L. (2020). Restoration scaling approaches to addressing ecological injury: The habitat-based resource equivalency method. *Environmental Management, 65*(2), 161–177.

[36] Ibid.

[37] Leontief, W. (1941). *The Structure of American Economy, 1919–1929*. Oxford University Press.

[38] See also Varian, H. R. (2014). *Intermediate Microeconomics: A Modern Approach* (9th ed.). W. W. Norton & Company.

is only calculated from the time at which the California drinking-water response levels were issued rather than an estimated time at which California groundwater became contaminated. Recent research using sediment cores, tritium-dated groundwater, and archived fish tissue samples indicates that PFAS has been present in the environment at high concentrations for many decades.[39,40,41,42]

50. The GAMA database did not provide sufficient information to calculate the volume of injured groundwater. To calculate that volume for use in the REA, a binary injury indicator was assigned to each spatial polygon in my interpolated map indicating whether its predicted concentration exceeded the applicable contamination threshold. Then, the injured proportion of each groundwater basin was calculated by dividing the surface area of the basin calculated as injured (by year) by the total surface area of the basin. This produces one area-weighted injury proportion for each basin and period. To convert this to a volume of injured groundwater, the estimated statewide groundwater volume (850 million to 1.3 billion acre-feet[43,44]) was divided by the total surface area of all groundwater basins to produce an average volume per acre. This was

[39] Strivens, J. E., Kuo, L.-J., Liu, Y., & Noor, K. L. (2021). Spatial and temporal baseline of perfluorooctanesulfonic acid retained in sediment core samples from Puget Sound, Washington, USA. *Marine Pollution Bulletin, 167*, 112381.

[40] Albers, C. N., & Sültenfuss, J. (2024). A 60-year increase in the ultrashort-chain PFAS trifluoroacetate and its suitability as a tracer for groundwater age. *Environmental Science & Technology Letters, 11*(10), 1090–1095.

[41] Balgooyen, S., Mahon, M. B., Krauss, A., Sluka, H., Backe, W. J., Ankley, G. T., & Lepak, R. F. (2026). Historical PFAS trends in the Great Lakes using four decades of archived fish. *Journal of Great Lakes Research, 52*(1), 102741.

[42] Thiebault, T., Foucher, A., Labadie, P., Baudin, F., Alliot, F., Grosbois, C., Evrard, O., Budzinski, H., & Ayrault, S. (2026). A multi-proxy sediment record of atmospheric contaminant deposition in the Paris Basin since the nineteenth century. *Environmental Monitoring and Assessment, 198*(6), 625.

[43] California Department of Water Resources. (no date). *Groundwater recharge*. Available at https://perma.cc/W866-LNL8 (last accessed on Sept. 10, 2026).

[44] California Department of Water Resources. (2023, March). *DWR and Partners Promote California's Hidden Water Resource During Groundwater Awareness Week 2023*. Available at https://perma.cc/E3W4-JQMK (last accessed on Sept. 10, 2026).

then multiplied by the basin- and period-specific area-weighted injury proportion to produce an estimated injured volume of groundwater by basin and year. I used both the lower and upper bound estimates of total groundwater in the state to estimate the volume of injured groundwater, which produces lower and upper bound DSAFY calculations, and ultimately, lower and upper bound NRD.

51. This injured volume of groundwater is then converted to DSAFYs lost for each of the injury periods. One DSAFY represents the services provided by one acre-foot of groundwater in a given year, converted to present value. The total DSAFYs lost is the sum of the present-value DSAFYs for all years. For example, for 2018-2019 using the lower estimate of the volume of injured groundwater, total DSAFYs lost are calculated using Equation 1 from above as follows: The total calculated DSAFYs lost across both periods are displayed in Table 1 below.

**Table 1: Groundwater Injury Calculation Results**

| Period | Injury Threshold | Acres Exceeding Threshold | Volume Injured (acre-feet) | | DSAFYs Lost | |
|---|---|---|---|---|---|---|
| | | | Lower | Upper | Lower | Upper |
| **2019-2019** | PFOA > 70 ng/L | 232,753 | 4,986,251 | 7,626,031 | 12,448,893 | 19,039,484 |
| **2020-2025** | PFOA > 10 ng/L | 1,254,990 | 26,885,560 | 41,119,093 | 179,124,027 | 273,954,402 |
| **2026-2056** | PFOA > 10 ng/L excluding treated drinking water | 1,254,990 | 25,630,560 | 39,864,093 | 528,000,848 | 821,217,910 |
| **2057-2126** | PFOA > 10 ng/L | 1,254,990 | 26,885,560 | 41,119,093 | 322,585,423 | 493,365,957 |
| **Total** | | | | | 1,042,159,192 | 1,607,577,753 |

**C. Restoration Benefits Calculation Using Resource Equivalency Analysis**

52. To assign a dollar-value to PFOA groundwater DSAFYs in California, I referred to documented costs of managed aquifer recharge ("MAR") projects. MAR can serve as compensatory groundwater restoration by increasing the quantity of usable groundwater stored in an aquifer, thereby restoring groundwater-related services that have been lost or impaired. These projects replenish aquifers using water that would otherwise remain in surface systems, flow

downstream, or be discharged.[45] MAR supplements groundwater basins' function as underground reservoirs: water available during unusually wet periods can be stored below ground and subsequently relied upon during dryer periods.

53. In California, MAR is increasingly used as part of a broader strategy in which surface water is relied upon more heavily during wet periods and groundwater is conserved or replenished for use during dry periods.[46] A common approach involves diverting available surface water to recharge basins, spreading ponds, floodplains, or other suitable lands, where the water infiltrates through the soil and percolates to the underlying aquifer.[47] Water can also be introduced directly into aquifers through injection wells.

54. For purposes of restoration scaling, MAR costs are expressed as capital costs per acre-foot-per-year ("AFY") of incremental annual recharge capacity.

55. California has already implemented recharge at a substantial scale and is funding these projects using state funds, providing ample data by which to calculate typical AFY costs. In 2021 and 2022, the California Department of Water Resources awarded $68 million to 42 groundwater recharge projects that provided almost 117,000 acre-feet of additional annual recharge capacity, at an average cost of $649 per acre-foot of capacity in 2026 U.S. dollars.[48] This cost reflects the amount the State has contributed in capital expenditures to achieve increases in recharge capacity but is not necessarily inclusive of all costs to operate these MAR projects; many of these funds are distributed as grants for projects that are also funded by contributions from other sources. Other evaluations of these types of projects in California have identified median costs

---

[45] Institute for Water Resources. (2020, April). *Managed aquifer recharge and the U.S. Army Corps of Engineers: Water security through resilience* (Report No. 2020-WP-01). U.S. Army Corps of Engineers. https://perma.cc/C5U4-FUBF (last accessed on Sept. 10, 2026).

[46] California Department of Water Resources. (2024, October). *Conjunctive water management resource management strategy: California Water Plan Update 2023*.

[47] Ibid.

[48] $68 million / 117,000 AFY = $581 per AFY in 2023 U.S. Dollars ("USD"). Converted to 2026 USD using the U.S. Bureau of Labor Statistics' Consumer Price Index for Urban Consumers ("CPI-U") equals $649. Source: California Department of Water Resources. (2023, January). *Groundwater recharge—Capturing water from storms to replenish stressed groundwater basins*.

ranging between $457 to $585 per AFY of capacity in 2026 U.S. dollars, with the lower end of the range reflecting median costs for projects where MAR was the primary goal.[49] For purposes of this analysis, damages are estimated using the lower Perrone and Rohde (2016) estimate of $457 per AFY of capacity and the California State average of $649 per AFY of capacity. I selected these two values because they represent a reasonable range of costs to the State of California to implement MAR projects at scale. The lower value is calculated through a review of 106 applications for grant funds to build MAR projects submitted in California from 2000 through 2006.[50] The upper value represents the actual cost the State spent on groundwater recharge projects from 2021 through 2022.

56. Evaluations of individual projects in California indicate that MAR costs can be much higher, as shown in Table 2 below.

[49] Median cost of $320 per AFY for projects where MAR was the primary goal and a median cost of $410 for all MAR projects in 2015 USD. Converted to 2026 USD using the CPI-U equals $457 and $585 respectively. Source: Perrone, D., & Rohde, M. M. (2016). Benefits and economic costs of managed aquifer recharge in California. *San Francisco Estuary and Watershed Science, 14*(2), Article 4.

[50] Ibid.

**Table 2: MAR Project-Specific Costs in California**

| Project | Summary | Total Cost | Added Capacity | Cost per AFY |
|---|---|---|---|---|
| Turnipseed Water Bank Phase VI – Delano-Earlimart Irrigation District[51] | 148-acre aquifer recharge facility | $4,094,066 (2021) | 4,315 AFY | $949/AF-yr (2021) $1,211 in 2026 USD |
| Carter-Bybee Recharge Basin – Fresno Irrigation District[52] | New 40-acre recharge basin | $4,147,000 (2023) | 840 AFY | $4,937/AF-yr (2023) $5,510 in 2026 USD |
| Branford Spreading Basin / Tujunga Spreading Grounds[53] | Basin, pump station and pipeline improvements | $1,100,000 (2016) | 600 AFY | $1,833/AF-yr (2016) $2,584 in 2026 USD |

57. Calculation of the DSAFY benefits from a given MAR project requires assumptions about when the project will be constructed and the duration for which it will provide benefits. It is likely that even if funding were available today, the design, construction, and activation of any MAR projects designed to compensate for PFAS groundwater injuries would take several years to complete. Thus, for the purposes of this analysis, it is assumed that any compensatory MAR projects would not start producing benefits until 2030. It is further assumed that these projects will continue to operate and provide benefits into the foreseeable future. Thus, consistent with the standard 100-year injury timeline used in NRDA, it is assumed that these compensatory MAR projects will operate and provide benefits through 2126. Applying this framework to Equation 2, a MAR project that increases annual recharge capacity by one acre-foot generates 28.77 DSAFYs in present value for the purposes of restoration scaling. That is, addition of one additional acre-foot of recharge per year pursuant to a MAR project offsets 28.77 DSAFYs attributable to PFOA contamination.

---

[51] 2021 application estimate. Source: Delano-Earlimart Irrigation District. (2021, October). *Turnipseed Water Bank Phase VI: WaterSMART Drought Response Program* (Funding Opportunity No. R22AS00020).

[52] U.S. Bureau of Reclamation. (2023). *2023 WaterSMART Drought Resiliency Project Grants*. U.S. Department of the Interior.

[53] Los Angeles County Department of Public Works. (2016, February). *Memorandum of agreement between the Los Angeles County Flood Control District and the City of Los Angeles Department of Water and Power regarding the Branford Spreading Basin Project*.

58. Combining the calculated lost DSAFYs from Table 1 using Equation 1, the restoration credit in DSAFYs calculated using Equation 2, and a range of cost estimates leads to an estimate of damages that can vary on two dimensions: a) a range in injury due to differences in the estimated statewide volume of groundwater resources, and b) a range in the expected cost of MAR per acre-foot gain in capacity. This combination produces four different estimates of groundwater resource damages to California from PFOA contamination shown in Table 3 below.

**Table 3: Estimates of Groundwater Resource Damages to from PFOA Contamination**

| Scenario | *PV (Debit)* | *PV (Credit)* | *Restoration Needed* | *Cost/AFY* | *Damages* |
|---|---|---|---|---|---|
| **Lower Volume Estimate Lower Cost Estimate** | 1.042 billion | 28.77 | 36,223,446 AF | $457 | $16.55 billion |
| **Lower Volume Estimate Higher Cost Estimate** | 1.042 billion | 28.77 | 36,223,446 AF | $649 | $23.51 billion |
| **Upper Volume Estimate Higher Cost Estimate** | 1.608 billion | 28.77 | 55,876,306 AF | $457 | $25.54 billion |
| **Upper Volume Estimate Higher Cost Estimate** | 1.608 billion | 28.77 | 55,876,306 AF | $649 | $36.26 billion |

59. Total NRD attributable to PFOA contamination in California groundwater ranges from $16.55 billion to $36.26 billion. This range reflects uncertainty in the State's estimate of total groundwater in the State, which affects my assessment of total volume of impacted groundwater; and variability in historical MAR costs. This range coalesces around a midpoint estimate of approximately $24.5 billion, which serves as my primary estimate of natural resource damages attributable PFOA contamination in California's aquifers.

60. As previously stated, this is a conservative estimate due to the following factors:

(a) This analysis does not include natural resource damages resulting from habitats (such as groundwater-dependent wetlands) and biota (such as birds fish, and mammals) harmed by PFOA due to limited California-specific data and

continuously evolving ecotoxicological research on the ecological harms of exposure.

(b) The injury threshold used in this analysis is the State-issued drinking-water response level for PFOA, which is currently 10 ng/L and higher (i.e., less restrictive) than other reasonable injury thresholds, such as the federal Environmental Protection Agency's Maximum Contaminant Level for PFOA in drinking water, which is 4 ng/L.

(c) The injury threshold used in this analysis is projected to remain unchanged for the foreseeable future, when it is possible that evolving evidence of the cumulative harms and persistence of PFOA compounds may lead to the imposition of lower thresholds in the future.

(d) The duration of injury used in this analysis begins the year the State first issued any response level for PFOA in 2018, instead of a much earlier injury period corresponding to the time at which PFOA first became present in California groundwater, likely decades ago.

(e) The duration of restoration benefits is assumed to continue for the next 100 years without any additional capital or operational expenditure needed. It is likely that any MAR facility constructed would have a much shorter operational lifespan without substantial expenditure on operations and maintenance.

(f) The average cost per AFY for MAR projects used in this analysis is likely low considering the scale of restoration needed and evidence that many MAR projects are currently being constructed at a much higher cost.

61. I hold all opinions expressed herein to a reasonable degree of scientific certainty. I reserve the right to revise these opinions and analysis if presented with new information not available to me at the time of this analysis.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 11th day of September 2026, in Seattle, Washington.

By: ________________________________

Adam Domanski

# EXHIBIT A

**Adam M. Domanski, Ph.D.**
**Principal Economist**

**Enduring Econometrics**
1455 N.W. Leary Way
Seattle, WA 98107
domanski@enduringecon.com
206-590-1140

**Overview**

Dr. Adam Domanski has over 18 years of experience applying economic tools to aid in policy, business, and legal decisions. Dr. Domanski specializes in environmental and natural resource economics, natural resource damage assessment, applied econometrics, and nonmarket valuation. He has extensive experience valuing changes to public and environmental goods using quantitative methods and has applied these tools to evaluate impacts to housing, transportation, and environmental resources.

Dr. Domanski is the founding principal economist at Enduring Econometrics, a Seattle-based economic consulting firm, and an Adjunct Professor in the Department of Economics at Seattle University. In these roles he serves as an economist on interdisciplinary teams that examine issues relevant to public policy, publish research papers on topics related to applied microeconomics, and teach graduate and undergraduate courses in applied econometrics and environmental economics. In addition to these duties, he also serves as an expert on litigation-related cases involving injuries to public-trust resources, employment earnings, and other topics that require statistical expertise.

**Education**

- Ph.D. Economics - North Carolina State University (2010)
- M.E. Economics - North Carolina State University (2007)
- B.A. Economics - College of William and Mary (2005)

**Experience**

- 2021 – Current **Principal Economist**
  Enduring Econometrics
- 2019 – Current **Adjunct Professor**
  Seattle University - Albers School of Business and Economics - Department of Economics
- 2017 – 2021 **Senior Economist/Project Director**
  ECONorthwest
- 2017 **Acting Deputy Director**
  National Oceanic and Atmospheric Administration - Marine Debris Program
- 2011 – 2017 **Economist**
  National Oceanic and Atmospheric Administration - Office of Response and Restoration - Assessment and Restoration Division

- 2007 **Economist**
  National Institute of Standards and Technology - Office of Applied Economics

**Publications**


- Murphy, Erin, Marisa Morse, Kristy Wallmo, Ben Maurer, Kara Lavendar Law, Mary Ellen Ternes, Adam Domanski, Andrew Scheld, Levi Helm, Jenna Jambeck, Amy Uhrin. “The Hidden Cost of Plastic Pollution: A Call to Value Its Unpriced Externalities.” Environmental Research Letters 21, no.8 (2026).

- Domanski, Adam and Amanda Laverty. “Ecosystem-Service Scaling Techniques to Evaluate the Benefits of Marine Debris Removal.” Environmental Management 70, no. 1 (2022): 64-78.

- Meginnis, Keila, Adam Domanski, and Valeria M. Toledo-Gallegos. “Is it up to business, governments, or individuals to tackle the marine plastic problem? A Hybrid Mixed Logit Approach.” Marine Pollution Bulletin 174, (2022): 113-169.

- Baker, Mary, Adam Domanski, Terill Hollweg, Jason Murray, Diana Lane, Kristin Skrabis, Robert Taylor, Tom Moore, and Lisa DiPinto. "Restoration scaling approaches to addressing ecological injury: the habitat-based resource equivalency method." Environmental management 65, no. 2 (2020): 161-177.

- English, Eric, Roger H. von Haefen, Joseph Herriges, Christopher Leggett, Frank Lupi, Kenneth McConnell, Michael Welsh, Adam Domanski, and Norman Meade. "Estimating the value of lost recreation days from the Deepwater Horizon oil spill." Journal of Environmental Economics and Management 91 (2018): 26-45.

- Leggett, Christopher G., Nora Scherer, Timothy C. Haab, Ryan Bailey, Jason P. Landrum, and Adam Domanski. "Assessing the economic benefits of reductions in marine debris at Southern California beaches: a random utility travel cost model." Marine Resource Economics 33, no. 2 (2018): 133-153.

- von Haefen, Roger H., and Adam Domanski. "Estimation and welfare analysis from mixed logit models with large choice sets." Journal of Environmental Economics and Management 90 (2018): 101-118.

- Tourangeau, Roger, Eric English, Kenneth E. McConnell, David Chapman, Ismael Flores Cervantes, Eric Horsch, Norman Meade, Adam Domanski, and Michael Welsh. "The Gulf recreation study: Assessing lost recreational trips from the 2010 Gulf Oil Spill." Journal of Survey Statistics and Methodology 5, no. 3 (2017): 281-309.

- Wellman, Emory, Ariana Sutton-Grier, Meg Imholt, and Adam Domanski. "Catching a wave? A case study on incorporating storm protection benefits into Habitat Equivalency Analysis." Marine Policy 83 (2017): 118-125.

- Domanski, Adam. Essays in nonmarket valuation with applications to environmental economics. North Carolina State University, 2010.

- Kranbuehl, David, and Adam Domanski. "In situ monitoring of coating polymerization, cure and aging using frequency dependent dielectric monitoring." JCT Coatings Tech 1 (2004): 48-55.

**Natural Resource Damage Assessments**

- Upper Columbia River (Washington)
- Oregon v. Monsanto
- Penobscot River (Maine)
- Hanford (Richland, WA)
- Quendall Terminals (Renton, WA)
- Lower Duwamish River (Seattle, WA)
- Hudson River (New York)
- LCP (Brunswick, GA)
- 68th Street Dump (Baltimore, MD)
- Raritan Bay Slag (Old Bridge, NJ)
- Bayou d'Inde (Lake Charles, LA)
- 2015 Refugio Oil Spill (Goleta, CA)
- 2014 Texas City Y Oil Spill (Galveston, TX)
- 2010 Enbridge Line 6B Oil Spill (Marshall, MI)
- 2010 Deepwater Horizon Oil Spill (Louisiana, Mississippi, Alabama, Florida, and Texas)

**Representative Projects**

- Evaluation of Critical Energy Infrastructure Hub Earthquake Impacts and Damages, City of Portland, Oregon, 2022
- Mid-Breton Sediment Diversion Restoration Planning, Louisiana Coastal Protection and Restoration Authority, Baton Rouge, Louisiana, 2021
- Pierce County Climate Change Planning, Washington, 2021
- Washington State School Seismic Safety Assessments, Washington Department of Natural Resources, 2020
- Economic Analysis of a Cascadia Subduction Zone Earthquake, Regional Disaster Preparedness Organization, Portland, Oregon, 2020
- Mid-Barataria Sediment Diversion Restoration Planning, Louisiana Coastal Protection and Restoration Authority, Baton Rouge, Louisiana, 2020
- Economic Value of Recreational Trails, Washington Recreation and Conservation Office, Washington 2019
- Roadmap to a Climate Action Plan, Port of Bellingham, Washington, 2019
- Designing a Carbon Policy in Oregon that Accounts for the Distribution of Costs and Benefits, Nature Conservancy of Oregon, 2019
- Economic Contributions of Oregon's Commercial Marine Fisheries, Oregon Department of Fish and Wildlife, 2019
- Southern Oregon Allied and Mental Health College Feasibility, Roseburg, Oregon, 2019

- Lower Snake River Dams – Economic Tradeoffs of Removal, Vulcan, Seattle, Washington, 2019

**Expert Reports, Declarations, and Testimony**

- Maddox v. UNOS and Swedish Health Services; United States District Court for the Western District of Washington.
  - May 1, 2026.
  - Deposition: June 2, 2026.
- Saunders et al. v. Sappi, et. al; State of Maine, Business and Consumer Coury, Somerset County.
  - August 24, 2025.
  - Deposition: November 19, 2025.
- Cumberland County, North Carolina v. The Chemours Company, et. al.; State of North Carolina, General Court of Justice, Superior Court Division.
  - January 21, 2025.
  - Deposition: August 14, 2025.
- Cape Fear Public Utility Authority, et. al. v. The Chemours Company, et. al.; United States District Court for the Eastern District of North Carolina.
  - January 15, 2024; May 20, 2024.
  - Deposition: September 19, 2024.
- Dew et al. v. E.I. duPont de Nemours & Company, et al.; United States District Court for the Eastern District of North Carolina.
  - July 25, 2023; October 5, 2023; February 29, 2024; February 25, 2026.
  - Deposition: November 10, 2023; April 1, 2026.
- Pakootas, et al. v. Teck Cominco Metals, Ltd.; Case No. CV-04-0256-LRS; United States District Court for the Eastern District of Washington.
  - August 31, 2022; April 6, 2023; April 12, 2023; August 25, 2023; September 14, 2023; October 29, 2023, October 31, 2023; February 2, 2024; May 20, 2024; May 21, 2024.
  - Deposition: May 31, 2023; June 30, 2023; August 13, 2025.
- SEIU 775 vs State of Washington, Department of Social and Health Services, and Cheryl Strange; Thurston County Superior Court, Washington.
  - September 8, 2020; January 15, 2021; April 7, 2022; June 27, 2023.

**Professional Affiliations**

- American Economic Association
- Association of Environmental and Resource Economists
- Seattle University Economics Department Advisory Board
- National Center for Ecological Analysis and Synthesis: Determining the Social Costs of Plastic Pollution working group Co-Chair (2023-present)
- Served as a journal referee for *Journal of Environmental Economics and Management, Journal of Choice Modeling, Resource and Energy Economics, Marine Resource Economics, Informational Processing in Agriculture, Ocean and Coastal Management, Marine Pollution Bulletin, Coastal Management,* and *Ecological Economics.*