**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | **MDL No. 2873**<br><br>**Master Docket No. 2:18-mn-2873**<br><br>**This Document Relates to:**<br><br>***The People of the State of California, ex rel. Rob Bonta, Attorney General of California v. 3M Company et al.***<br><br>**Case No. 2:23-cv-01531-RMG** |

**DECLARATION OF CHIARA TRABUCCHI IN SUPPORT OF THE PEOPLE OF THE STATE OF CALIFORNIA'S MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION**

I, Chiara Trabucchi, declare and state as follows:

1. I am a Principal with Industrial Economics, Incorporated ("IEc"), a 126-person financial economics and environmental policy consultancy located in Cambridge, Massachusetts. My expertise is in finance and economics, with specific focus on environmental risk management and the design of environmental financial assurance frameworks.

2. I submit this declaration in support of the State of California's Motion for Temporary Restraining Order and for Preliminary Injunction.

3. I have been employed with IEc since 1995. I was elected to Principal in 2003. I served as Chief Financial Officer of the firm from 2010 to 2014, and as a Director of the firm from 2005 to 2018. Prior to joining IEc, I was employed by the Cadmus Group, Inc. as an Associate. In 2022, I formed Fiori LLC, a professional services firm focused on carbon capture and storage initiatives. I received a Bachelor's degree in Government (Comparative Politics) and a Bachelor's

degree in Foreign Languages (French) from Clark University (1991). I received a Master's degree in Business Administration with a focus in corporate finance from Simmons University (1999).

4. As a Principal with IEc, I provide consulting services and expert support in the assessment of corporate financial statements, environmental financial assurance, and long-term financial compensation models. My clients include private entities, various State Attorneys General, non-governmental organizations, the U.S. Department of Justice, the U.S. Department of Energy, and the U.S. Department of the Interior.

5. I have worked on analyses involving corporate entities of all types. Specifically, during my tenure at IEc, I have analyzed the financial performance of numerous publicly traded and closely-held corporate entities with substantial environmental exposure. I have provided expert support on aspects of financial management of public and private resources, including assessment of financial assurance trust models. I have published papers on financial assurance and risk management; and, I have served as a peer reviewer for articles addressing these topics.

6. I have delivered presentations on finance and risk management at various professional conferences. I have testified before the U.S. Senate Committee on Energy and Natural Resources on issues related to financial risk management, and before the U.S. Senate Permanent Subcommittee on Investigations, Committee on Homeland Security & Governmental Affairs on issues related to Wall Street Bank involvement in physical commodities. I have served as a member of the U.S. Environmental Protection Agency's Environmental Financial Advisory Board. I am a member of the American Institute of Certified Public Accountants member section for Forensic and Valuation Services. I am an Adjunct Professor at the Roger Williams University School of Law. I have been qualified in the Superior Court of the District of Columbia (Civil Division) as an expert in the field of financial management and the implementation of trusts to fund organizations in perpetuity.

7. My Curriculum Vitae is provided as **Exhibit A** to this declaration.

8. The opinions contained in this declaration are based on my professional knowledge, training, and experience. I am competent to testify thereto at any trial or evidentiary hearing in this matter.

9. In forming my opinions, I relied on the documentation listed in Annex 2.

**Assignment**

10. I was asked to evaluate whether certain financial transactions involving DuPont de Nemours, Inc. ("New DuPont") and Corteva, Inc. ("Corteva") may dissipate, diminish, or otherwise imperil the availability of financial resources to satisfy long-tailed environmental obligations attributable to New DuPont, Corteva, and EIDP, Inc. ("EIDP").[1] As I understand, such obligations include those relating to current and future per- and polyfluoroalkyl substances ("PFAS") liabilities arising from, and environmental remediation costs associated with, legacy E.I. DuPont de Nemours and Company ("EID" or "Historical DuPont") businesses and sites.

**Opinion**

11. This declaration summarizes my findings in Figures 1 through 7 and Table 1. Additional supporting tables are included in Annex 1. As shown therein, I find that the persistent separation and divestiture of assets by New DuPont, and the impending separation of Corteva's seed operating segment, undermines the public's interest to ensure that sufficient funds remain available to redress environmental harm. In my opinion, the separation of Corteva's seed segment will shield profitable assets, increasing the risk that "New" Corteva (post-separation) will be thinly capitalized and have fewer resources to respond to financial consequences arising from EID's long-tailed, legacy liabilities.

[1] Throughout this declaration, I refer to Corteva's current, wholly-owned subsidiary as EIDP.

12. The following circumstances inform my opinion: Over the last seven years, New DuPont has engaged in a successive series of separations and divestitures which have resulted in a materially smaller asset base with substantially fewer resources to address near- and long-term liabilities. If allowed to proceed as purportedly structured, the calculated separation of Corteva's seed operating segment will push Corteva down a similar path as New DuPont. Post-separation, New Corteva will be a materially smaller company with far fewer resources available to pay its debts and redress environmental harm.

13. The cash distribution that EIDP reportedly expects to receive in exchange for the highly profitable seed operating segment is de minimis in size relative to the earnings growth, and growth in enterprise value,[2] enjoyed by Corteva since 2019. When coupled with the apparent lack of guardrails on how the funds may be used, the cash distribution appears insufficient to mitigate concerns regarding New Corteva's ability to pay for the long-tailed, legacy liabilities that will be intentionally stranded within its capital structure.

## I. Figures 1–3: New DuPont's separations and divestitures have resulted in a materially smaller asset base with substantially fewer resources to address near- and long-term liabilities.

14. My evaluation reveals that New DuPont shed approximately $48.3 billion (69.6 percent) in total assets and approximately $27.7 billion (66.6 percent) in net worth[3] between fiscal year end 2019 and June 30, 2026. Over the same time period, New DuPont returned $18.175 billion

---

[2] Enterprise Value (EV) is a measure of a company's total value. An alternative to market capitalization, enterprise value offers a more comprehensive measure of the value of a business, because it considers capital from all sources. *See* Jonathan Law, *A Dictionary of Finance and Banking* (University Oxford Press, 6th ed.). Enterprise value calculated as: [market capitalization + total debt + minority (noncontrolling) interests) – cash and cash equivalents], where total debt is the sum of short- and long-term borrowings reported on the SEC Form 10-K or Form 10-Q, as applicable.

[3] Net worth is the value that would remain *if* all of a company's assets could be converted to cash at their balance sheet values and then used to satisfy all existing liabilities at their balance sheet values. *See* Mark Haskins et al., *Financial Accounting and Reporting* (2d ed. 1997).

to shareholders. As a result of its decisions and actions, there are substantially fewer assets available today to address long-tailed environmental obligations.

15. The diminution realized to date reflects New DuPont's persistent separation and divestiture of businesses, business units, and operating segments. At fiscal year-end 2019, New DuPont's balance sheet reflected a large, diversified company with several, varied business lines[4] contributing to annual operating EBITDA of $5.6 billion.[5] Since 2019, New DuPont has separated and/or divested at least 10 such business lines, using much of the consideration received to reduce its debt exposure and return substantial value to shareholders through dividends and share repurchase programs.[6]

16. By December 2025, New DuPont's balance sheet had shrunk to two reportable segments,[7] contributing annual operating EBITDA of $1.6 billion – diminution of more than 70 percent (or $4 billion) when benchmarked against its 2019 performance. New DuPont's seven-

---

[4] *See* New DuPont 2019 Form 10-K at p. 7 ("DuPont's worldwide operations are managed through global businesses, which are reported in five reportable segments: Electronics & Imaging; Nutrition & Biosciences; Transportation & Industrial; Safety & Construction, and Non-Core."); *see also id.* at pp. 8–15 for the "major product lines" aligned by reportable segment.

[5] EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) is a financial metric used to evaluate a company's core profitability from operations. *See* Jonathan Law, *A Dictionary of Finance and Banking* (University Oxford Press, 6th ed.); *see also* New DuPont 2019 Form 10-K at p. 45 ("The Company's measure of profit/loss for segment reporting purposes is pro forma Operating EBITDA as this is the manner in which the Company's chief operating decision maker ('CODM') assessed performance and allocates resources.").

[6] A share repurchase, or stock buyback program refers to a corporate distribution policy whereby a company "repurchases" or "buys back" shares of its own stock from shareholders. The company's shareholders receive a distribution, commonly cash, in return for their shares. *See* Stephen A. Ross et al., *Corporate Finance* 471 (Irwin, 5th ed. 1999); *see also, e.g.*, New DuPont 2025 Form 10-K at p. F-58 ("Note 18 – Stockholders' Equity, Share Repurchase Programs.").

[7] *See* New DuPont 2025 Form 10-K at p. 6 ("Effective in the fourth quarter of 2025, following the Electronics Separation, the Company realigned its management and reporting structure. This realignment resulted in a change in reportable segments which changed the manner in which the Company reports its financial results (the 'Q4 2025 Segment Realignment'), creating two new reportable segments: Healthcare & Water Technologies and Diversified Industrials."); *see also id.* at pp. F-78–F-80 ("DuPont is comprised of two operating segments: Healthcare & Water Technologies and Diversified Industrials.")

year pattern of shedding nearly all its business lines has resulted in a compound annual rate of diminution in reportable segment operating EBITDA from 2019 through 2025 of negative 18.7 percent. In fact, New DuPont's repeated pattern of separations and divestitures has resulted in a materially smaller capital structure. With less assets available and substantially diminished operating EBITDA, New DuPont evinces fewer resources today to address near- and long-term liabilities.

17. Benchmarking New DuPont's enterprise value as of June 2026 ($19.8 billion) against its enterprise value as of December 2019 ($64.0 billion) affirms that the diminution in New DuPont's financial resources is not limited to book value – the "market" also perceives a firm with diminished value. *See* Figures 1–3.

*(continued next page)*

**Figure 1. New DuPont Diminution in Balance Sheet Measures[8]**
**$M**




[8] *See* New DuPont 2019 Form 10-K, 2020 Form 10-K, and Form 10-Q for the quarterly period ended June 30, 2026. New DuPont market capitalization as of December 31, 2019 and June 30, 2026 is as reported by S&P Capital IQ (accessed on Sep. 10, 2026). Values are as reported then-year, unless restated in a subsequent reporting year. *See* Annex Table 1 for supporting table and details.

**Figure 2. New DuPont Diminution in Reportable Segment Operating EBITDA**
**FY 2019 – FY 2025 [9]**
**$M**




[9] *See* New DuPont 2019 through 2025 Form 10-Ks. Reportable segment operating EBITDA is as reported then-year inclusive of corporate operating EBITDA. *See* Annex Table 2 for supporting table and details.

Compound Annual Rate of Diminution calculated as: $\left(\frac{EBITDA_{2025}}{EBITDA_{2019}}\right)^{\frac{1}{(2025-2019)}} - 1$

**Figure 3. Select Separations and Divestitures of New DuPont Business, Business Unit, and Operating Segment FY 2019 – Q2 2026[10] $M**




| New DuPont Separations, Divestitures (FY 2019 – Q2 2026) | Approximate Consideration Received ($M) | Source Reference |
|---|---|---|
| DuPont Sustainable Solutions business unit | $28 | New DuPont 2020 Form 10-K at p. F-22, F-23 |
| Compound Semiconductor Solutions business unit | $420 | New DuPont 2020 Form 10-K at p. F-22, F-23 |
| TCS/HSC Disposal Group | $1,075 | New DuPont 2020 Form 10-K at p. F-22, F-23 |
| Nutrition & Biosciences business | $7,300 | New DuPont 2021 Form 10-K at p. 30, F-21-F23 |
| Solamet® business unit | $190 | New DuPont 2021 Form 10-K at p. F-25 |
| Clean Technologies business unit | $510 | New DuPont 2021 Form 10-K at p. F-25 |
| Biomaterials business unit | $240 | New DuPont 2022 Form 10-K at p. F-25 |
| Mobility & Materials segment | $11,000 | New DuPont 2022 Form 10-K at p. F-22, F-23 |
| Delrin® Acetal Homopolymer (H-POM) business | $1,280 | New DuPont 2023 Form 10-K at p. F-22 |
| Aramids business | $1,800 | New DuPont Jun. 30 2026 Form 10-Q, p. 14,16 |
| **Approximate Total** | **$23,843** | |

[10] "Approximate Consideration Received" reflects reported consideration to the extent such is differentiated in New DuPont's Forms 10-K and Form 10-Q filings. Consideration received is not always reported for every business, business unit, and/or operating segment separation or divestiture; "Approximate consideration received" likely is underestimated. Separations and divestitures without reporting of consideration received in New DuPont's Form 10-K or Form 10-Q filings are omitted from Figure 3.

## II. Figures 4 & 5: Corteva has realized substantial earnings growth along with a near threefold growth in enterprise value since 2019.

18. Since 2019, Corteva has maintained a relatively consistent asset base, ranging from $41.6 billion (June 2026) to $42.4 billion (December 2019). Notwithstanding a relatively small decline of approximately 1.8 percent in total assets since 2019, Corteva has experienced substantial earnings growth. Specifically, Corteva has realized compound annual growth in operating EBITDA of 11.22 percent—from $2.1 billion in 2019 to nearly $4 billion by the end of 2025.[11,12] Over the last seven years, Corteva has realized total operating EBITDA of $21.3 billion, with the seed operating segment reportedly accounting for nearly 60 percent (or $12.4 billion) of these earnings.

19. Corteva's enterprise value affirms the market's perception of a profitable, efficient business. Notably, Corteva's enterprise value as of June 30, 2026 ($59.4 billion) is nearly three times its enterprise value as of December 31, 2019 ($20.7 billion).[13] At June 30, 2026, Corteva's enterprise value *exceeded* its asset book value by approximately 43 percent (or $17.8 billion).

20. Since 2019, Corteva has returned $8.596 billion to shareholders in the form of dividends and share repurchases. *See* Figures 4 & 5.

---

[11] Per its 2019 Form 10-K, Corteva's sole operating subsidiary is EIDP (f/k/a E. I. du Pont de Nemours and Company ("EID")). *See* Corteva 2019 Form 10-K at p. F-110 ("There are no differences in reporting structure or segments between Corteva, Inc. and EID. In addition, there are no differences between Corteva, Inc. and EID segment net sales, segment operating EBITDA or pro forma segment operating EBITDA, segment assets, or significant items by segment."); *see also* Corteva 2025 Form 10-K at p. F-82 (same).

[12] *See* Corteva 2025 Form 10-K at p. 44 ("The company presents certain financial measures that do not conform to U.S. GAAP and are considered non-GAAP measures. These measures include operating EBITDA and operating earnings (loss) per share. Management uses these measures internally for planning and forecasting, including allocating resources and evaluating incentive compensation. Management believes that these non-GAAP measures best reflect the ongoing performance of the company during the periods presented and provide more relevant and meaningful information to investors as they provide insight with respect to ongoing operating results of the company and a more useful comparison of year-over-year results.").

[13] As of Jun. 30, 2026, Corteva's market capitalization was $56.6 billion; as of Sep. 9, 2026, Corteva's market capitalization was $56.5 billion. S&P Capital IQ (accessed on Sep. 10, 2026).

**Figure 4. Corteva Growth in Balance Sheet Measures**[14]
**$M**




[14] *See* Corteva 2019 Form 10-K, 2020 Form 10-K, and Form 10-Q for the quarterly period ended June 30, 2026. Corteva's market capitalization at December 31, 2019 and June 30, 2026 is as reported by S&P Capital IQ (accessed on Sep. 10, 2026). Values are as reported then-year, unless restated in a subsequent reporting year. *See* Annex Table 3 for supporting table and details.

**Figure 5. Corteva Growth in Total Reportable Segment Operating EBITDA FY 2019 – FY 2025[15] $M**




---

[15] *See* Corteva 2019 through 2025 Form 10-Ks. Reportable segment operating EBITDA are as reported then-year. *See* Annex Table 4 for supporting tables and details.

Compound Annual Rate of Growth calculated as : $\left(\frac{EBITDA_{2025}}{EBITDA_{2019}}\right)^{\frac{1}{(2025-2019)}} - 1$

## III. Figures 6 & 7, Table 1: As purportedly structured, the planned separation of Corteva's seed operating segment will push Corteva down a similar path as New DuPont—"New" Corteva will be a materially smaller company with far fewer resources available to pay its debts and redress environmental harm.

21. In October 2025, Corteva announced the separation of its seed operating segment into an independent, publicly-traded company;[16] in May 2026, Corteva branded the company, Vylor Inc. ("Vylor").[17] Corteva and Vylor's SEC filings refer to the post-separation, remaining crop protection operating segment as "New Corteva."

22. Evaluation of Corteva's October 2025 "investor" presentation and Vylor's Form 10 filed with the SEC in June 2026 (collectively, "information statements") reveals Corteva intends to shield its seven-year earnings growth by separating its seed operating segment from its crop protection operating segment.[18,19] Pro forma representations included in the information

[16] *See* Corteva 2019 Form 10-K at p. 3 ("Corteva combines the strengths of EID's Pioneer and Crop Protection businesses and the DAS business to create a leading global provider of seed and crop protection solutions focused on the agriculture industry."). This representation suggests that Corteva's seed operating segment (Pioneer) originates from E.I. du Pont de Nemours and Company's (historical DuPont's) Pioneer product line.

[17] *See* Corteva, Inc., *Corteva Announces Plan to Separate into Two Industry-Leading Public Companies,* Corteva (Oct. 1, 2025), https://www.corteva.com/resources/media-center/corteva-announces-plan-to-separate-into-two-industry-leading-public-companies.html; *see also* Corteva Inc., *Introducing Vylor: Corteva Spinoff to Propel Agriculture Further,* Corteva, (May 4, 2026), https://www.corteva.com/resources/media-center/introducing-vylor.html

[18] *See* Corteva Inc., Investor Presentation, *Corteva announces plan to separate into two public companies,* slide 8, Corteva (Oct. 1, 2025), https://investors.corteva.com/static-files/bbf320c6-217b-45a4-a711-6ad667c9f718 ("Legacy liabilities, including historical DuPont pension plan and PFAS obligations, will be retained by New Corteva."); *see also* Vylor Form 10-12B, Exhibit 99.1, at p. 167 (June 29, 2026); Vylor Amendment No. 1 to Form 10, Exhibit 99.1, at p. 163 (Aug. 14, 2026) ("New Corteva will retain certain liabilities to the extent Corteva is responsible under the Prior Transaction Agreements, including obligations relating to historical PFAS and other environmental liabilities associated with legacy EIDP businesses, other than any such liabilities that are primarily related to the Seed Business, which will be contractually allocated to us [Vylor].").

[19] *See* Vylor Form 10-12B, Exhibit 99.1 at p. 43; Vylor Amendment No. 1 to Form 10, Exhibit 99.1 at p. 39 ("Following the internal reorganization, EIDP will contribute to Vylor all of its interest in Pioneer (the 'Vylor contribution')."). Per this representation, in a manner similar to the contribution of EID (including its Pioneer (seed) business) to Corteva in 2019, Corteva's wholly-owned operating subsidiary, EIDP, will contribute the Pioneer (seed) business to Vylor.

statements suggest that 63 percent of Corteva's fiscal year end 2025 operating EBITDA will align with Vylor.[20,21] These representations lead one to conclude that New Corteva (without the seed operating segment) will realize a material diminution in annual reportable segment operating EBITDA. When benchmarked against Corteva's fiscal year end 2025 annual operating EBITDA, New Corteva's diminished share is estimated to be approximately 37 percent. *See* Figure 6.

23. In addition to a substantially reduced share of operating EBITDA, virtually all of historical Corteva's legacy liabilities will remain behind, with New Corteva.[22] The substantial decline in annual operating EBITDA arising from the separation of Corteva's seed business will depress the ability of New Corteva to leverage the financial resources necessary to address these known long-tailed obligations.

---

[20] Corteva's 2025 Form 10-K at p. F-66, reports that Corteva's total segment operating EBITDA is $3,986 million for FYE 2025. Vylor's Form 10-12B, Exhibit 99.1 at p. 61, and Vylor's Amendment No. 1 to Form 10, Exhibit 99.1 at p. 59, report that Vylor's pro forma "share" of Corteva's FYE 2025 operating EBITDA is $2,503 million—62.8 percent of $3,986 million. Absent information to the contrary, it can be assumed that the remaining $1,483 million (or 37.2 percent) of Corteva's FYE 2025 operating EBITDA reflects New Corteva's "share" of Corteva's FYE 2025 operating EBITDA, post-separation.

[21] The Vylor Amendment No. 1 to Form 10, Exhibit 99.1 includes several EBITDA values relative to fiscal year ended December 31, 2025 that inform Vylor's prospective profitability, including: $2,503 million in "pro forma operating EBITDA – Vylor" on p. 59; $2,636 million in Seed "segment operating EBITDA" on pp. 76 and F-101; and, $2,423 million in what appears to be Seed segment-related "operating EBITDA (non-GAAP)" on p. 108. This declaration relies on the $2,503 million value, which Amendment No. 1 to Form 10, Exhibit 99.1 affirmatively identifies as a pro forma value specific to Vylor, rather than profitability measures attributable to historical Corteva's seed segment.

[22] *See* Vylor Form 10-12B at p. 167 and Vylor Amendment No. 1 to Form 10 at p. 163 ("New Corteva will retain certain liabilities to the extent Corteva is responsible under the Prior Transaction Agreements, including obligations relating to historical PFAS and other environmental liabilities associated with legacy EIDP businesses…"); *see also* Vylor Form 10 and Amendment No. 1 to Form 10, Exhibit 2.1, "Separation and Distribution Agreement by and among Corteva, Inc., Vylor Inc.," at p. 11 ("'Legacy Liabilities' shall mean (i) any and all DWDP RemainCo Liabilities, (ii) any and all Liabilities of RemainCo (before giving effect to the Distribution) or EIDP under the DWDP PFAS MOU, including with respect to the funding of the escrow account thereunder . . . ," and *id.* at pp. 21-22, "'RemainCo Liabilities' shall mean any and all liabilities of (x) any member of the SpinCo Group as constituted at the Effective Time and/or (y) any member of the RemainCo Group as constituted at the Effective Time, in the following categories . . . (ix) Legacy Liabilities. any and all Legacy Liabilities.").

24. Further, per representations made in Vylor's Amendment No. 1 to Form 10, New Corteva's balance sheet is forecasted to be materially smaller, post-separation.[23] When benchmarked against Corteva's balance sheet as of June 30, 2026, it appears that Corteva plans to shed approximately $22 billion in total assets and approximately $17 billion in net worth, representing a diminution in assets of 52.7 percent and a diminution in net worth of 67.2 percent. Vylor's Amendment No. 1 to Form 10 offers pro forma estimates for the separation of the crop protection business at $19.7 billion in total assets and $11.3 billion in total liabilities, resulting in $8.3 billion in net worth.[24] By these measures, New Corteva will be a much smaller enterprise with far fewer resources available to redress environmental harm. *See* Figure 7.

25. When considered through the lens of Corteva's stated intention to leave behind (with New Corteva) all historical PFAS and numerous other legacy environmental liabilities, the Vylor spin is likely to result in a material misalignment between assets and liabilities.

26. In fact, available information suggests much of the profitable assets will rest with Vylor, and much of the legacy liabilities will rest with New Corteva. The substantially smaller collection of assets, and accompanying reduction in reportable segment operating EBITDA, is likely to hinder New Corteva's access to financial resources. In my opinion, without appropriate guardrails, the intended separation of Corteva's seed operating segment imperils New Corteva's financial wherewithal and introduces substantial uncertainty with respect to its ability to remedy EID's legacy environmental liabilities.

27. As noted above, information statements underpinning the Vylor spin indicate that obligations associated with historical PFAS and virtually all other environmental liabilities

---

[23] *See* Vylor Amendment No. 1 to Form 10, Exhibit 99.1 at p. 49.

[24] *See id.*

associated with legacy EID business lines will remain with New Corteva. The practical implication of Corteva's actions will be to isolate known legacy environmental liabilities from the profitable growth enjoyed by Corteva's seed operating segment, thereby reducing the amount of—and importantly access to—financial resources available to satisfy its long-tailed environmental obligations.

28. If the Vylor transaction proceeds as represented, New DuPont and Corteva (post-separation) will have shed approximately $70 billion in combined total assets and approximately $45 billion in combined net worth over the last seven years (since 2019). Further, following separation of Corteva's seed operating segment, the combined diminution in annual operating EBITDA of New DuPont and New Corteva could be as much as $6.5 billion. *See* Table 1.

29. Notably, New DuPont and Corteva have returned a combined $26.771 billion to shareholders through June 2026. *See* Table 1.

*(continued next page)*

**Figure 6. Pro Forma Diminution in New Corteva Annual Reportable Segment Operating EBITDA, Post-Separation[25]**
**$M**




[25] *See* Corteva 2019 through 2025 Form 10-Ks; *see also* Vylor Form 10, Exhibit 99.1; Vylor Amendment No. 1 to Form 10-12B; Corteva and EIDP Form 8-K, Exhibit 99.1 (Aug. 6, 2026), "Excerpts from the Offering Memorandum Dated August 6, 2026." Reportable segment operating EBITDA are as reported then-year. *See* Annex Table 4 for supporting tables and details.

**Figure 7. Pro Forma Diminution in New Corteva Balance Sheet Measures, Post-Separation[26]**
**$M**




---

[26] *See* Corteva 2019 Form 10-K, 2020 Form 10-K, and Form 10-Q for the quarterly period ended June 30, 2026; *see also* Vylor 2026 Form 10, Amendment No. 1, Exhibit 99.1 (Aug. 14, 2026); Corteva's market capitalization as of December 31, 2019 and June 30, 2026 is as reported by S&P Capital IQ (accessed on Sep. 10, 2026). Values are as reported then-year, unless restated in a subsequent reporting year. *See* Annex Table 3 for supporting table and details.

**Table 1. Change in Combined New DuPont and Corteva Financial Measures Pre- and Post-Separation of Corteva's Seed Operating Segment[27]**
**$M**

| | Corteva (Pre-Separation) | New Corteva (Post-Separation) *Pro Forma* |
|---|---|---|
| **Combined Diminution in Total Assets** | **($49,043)** | **($70,252)** |
| New DuPont Δ FYE 2019, Q2 2026 | *($48,288)* | *($48,288)* |
| Corteva Δ FYE 2019, Q2 2026 | *($755)* | -- |
| New Corteva Δ Corteva Q2 2026, Pro Forma Separation of Crop Business Q2 2026 | -- | *($21,964)* |
| **Combined Diminution in Total Net Worth** | **($26,827)** | **($44,741)** |
| New DuPont Δ FYE 2019, Q2 2026 | *($27,675)* | *($27,675)* |
| Corteva Δ FYE 2019, Q2 2026 | *$848* | -- |
| New Corteva Δ Corteva Q2 2026, Pro Forma Separation of Crop Business Q2 2026 | -- | *($17,066)* |
| **Combined Diminution in Annual Reportable Segment Operating EBITDA** | **($2,132)** | **($6,515)** |
| New DuPont Δ FY 2019, FY 2025 | *($4,012)* | *($4,012)* |
| Corteva Δ FY 2019, FY 2025 | *$1,880* | -- |
| New Corteva FY 2025 Pro Forma Operating EBITDA - Vylor | -- | *($2,503)* |
| **Total Wealth Transfer, Shareholder Returns** | **$26,771** | |
| New DuPont Σ FYE 2019 - Q2 2026 | *$18,175* | |
| Corteva Σ FYE 2019 - Q2 2026 | *$8,596* | |

[27] *See* Annex Tables 1–4.

**IV. The cash distribution that EIDP reportedly expects to receive from Vylor in exchange for the seed operating segment is *de minimis* in size relative to past earnings growth. When coupled with the apparent lack of guardrails on its use, the cash distribution appears insufficient to mitigate concerns regarding New Corteva's ability to pay for long-tailed, legacy liabilities that will be intentionally stranded within its capital structure.**

30. Per Vylor's Form 10: "… EIDP will contribute to Vylor all of its interest in Pioneer (the "Vylor contribution") in exchange for … the payment of a cash distribution by Vylor to EIDP in an aggregate amount equal to $ [sic] the "Vylor cash distribution")."[28] Per Vylor's Amendment No. 1 to Form 10, Exhibit 99.1, the Vylor cash distribution is estimated at $3.56 billion.[29]

31. The size of the Vylor cash distribution informs whether New Corteva is appropriately compensated for the loss in earnings (and implied enterprise value) associated with the seed operating segment – a cornerstone of which is EIDP's Pioneer seed brand.[30] The amount of consideration is particularly important in light of Corteva's stated intention to strand long-tailed environmental liabilities with New Corteva.

32. The anticipated Vylor cash distribution ($3.56 billion) equates to a mere 16.7 percent of total reportable segment operating EBITDA realized by Corteva since 2019. The distribution appears disproportionately sized considering: (1) the seed operating segment accounts for approximately $12.4 billion (58 percent) of Corteva's total operating EBITDA since 2019; (2) New Corteva stands to realize diminution in assets of nearly $22 billion (53 percent) relative to its

[28] *See* Vylor Form 10-12B, Exhibit 99.1 at p. 43; Vylor Amendment No. 1 to Form 10, Exhibit 99.1 at p. 39.

[29] *See* Vylor Amendment No. 1 to Form 10, Exhibit 99.1 at p. 47. *See also id.* at 53, Note 2, "Other Transaction Accounting Adjustments" ("The calculated distribution to New Corteva represents management's current estimate . . . The actual amount distributed may fluctuate . . . .").

[30] *See* Vylor Form 10-12B; *see also* Vylor Amendment No. 1 to Form 10, Exhibit 99.1, letter to "Future Vylor Stockholder" ("Vylor's business has a long heritage of success, including its Pioneer seed brand, which celebrated its 100th anniversary this year…"), and at p. 5. . . ("'Pioneer' refers to Pioneer Hi-Bred International, Inc., an Iowa corporation and a direct, wholly-owned subsidiary of EIDP (immediately prior to the Vylor contribution) and Vylor (immediately following the Vylor contribution).").

most recent (June 2026) balance sheet; and (3) New Corteva faces corresponding diminution in net worth of approximately $17 billion (67 percent). Further, when benchmarked against Corteva's $38.7 billion *growth* in enterprise value between December 2019 and June 2026, the Vylor cash distribution appears particularly *de minimis*. In my view, the disproportionately small Vylor cash distribution is insufficient to mitigate uncertainty as to whether New Corteva will be left adequately capitalized to respond to the long-tailed, legacy liabilities intentionally left behind, post-separation.

33. An additional concern with the Vylor transaction is the use of the estimated $3.56 billion consideration EIDP expects to receive for the seed operating segment. There does not appear to be any stated requirement in the information statements to suggest that the Vylor cash distribution will be reserved to offset known long-tailed environmental liabilities. There also does not appear to be anything preventing New Corteva from returning the distribution to shareholders either in the form of a dividend, or as part of a share repurchase program.

34. The specifics of Vylor's financing arrangements also remain unclear. Any pass back of the cash distribution received by EIDP to facilitate repayment of Vylor's financing arrangements (including debts incurred or secured by Corteva in connection with the separation) will undermine the strength of New Corteva's capital structure. If left thinly capitalized, New Corteva's access to financial resources post-separation will be impeded; and, its ability to satisfy known long-tailed environmental obligations compromised.

35. Once funds are returned to shareholders through dividends and/or share repurchase programs, they are no longer available. Collectively, since 2019, New DuPont and Corteva have returned nearly $27 billion to shareholders – New DuPont has returned $18.2 billion and Corteva has returned $8.6 billion. These returns represent a substantial wealth transfer to New DuPont and Corteva shareholders, placing financial resources permanently out of reach.

36. In the same manner, Corteva's calculated separation of its seed operating segment represents a wealth transfer, shielding profitable assets from the reach of Corteva's unsecured creditors. Importantly, if New Corteva is allowed to return to its shareholders the proceeds from the Vylor cash distribution, which serves as consideration for the 'separation' of the high-growth seed operating segment (comprising assets originating from EID), then the seven-years' long wealth transfer of historical E.I. du Pont de Nemours and Company assets away from public reach will be another step closer to completion.

## V. My findings support the conclusion that the pattern of persistent asset separations and divestitures exercised by New DuPont, as well as the impending Vylor transaction, undermine the public interest.

37. The pattern of calculated asset separations and divestitures exercised by New DuPont, and now Corteva, to maximize shareholder returns undermines the public's interest to the extent fewer financial resources are available to redress environmental harm and address known, long-tailed legacy liabilities. The impending separation orchestrated by Corteva to shield profitable assets from historical PFAS liabilities associated with legacy EID business lines is not only contrary to the public interest, but also adverse to the longer-term interests of unsecured creditors.

38. Failure to adequately capitalize New Corteva increases the likelihood of an inappropriate risk transfer to the public, particularly if New Corteva is unable to redress the financial consequences arising from EID's legacy liabilities, and Vylor remains insulated from financial responsibility.

39. The public has a vested interest in ensuring that businesses operating in commodity-related sectors evince adequate financial resources to pay for the consequences of their actions. In my opinion, absent appropriate guardrails, the impending Vylor transaction increases the risk that

states and municipalities, and by extension the taxpayer, will be left to shoulder unfunded liabilities arising from historical DuPont operations.

40. I, Chiara Trabucchi, have read the above declaration and certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 10th day of September, 2026 in Providence, Rhode Island.

______________________________
Chiara Trabucchi

**DECLARATION OF CHIARA TRABUCCHI**
**LIST OF EXHIBITS**

| | |
|---|---|
| Annex 1 | Supporting Tables and Schedules |
| Annex 2 | Documentation Reviewed |
| Exhibit A | Curriculum Vitae for Chiara Trabucchi |

# ANNEX 1
# SUPPORTING TABLES AND SCHEDULES

## Annex Table 1. New DuPont Balance Sheet Measures[31]
## $M

| | | FYE 2019 | FYE 2025 | | Q2 2026 | |
|---|---|---|---|---|---|---|
| [A] | Market Capitalization | $47,560 | $16,843 | | $18,314 | |
| [B] | Total Debt | $17,447 | $3,194 | | $3,125 | |
| [C] | Minority (Noncontrolling) Interests | $569 | $184 | | $112 | |
| [D] | Cash and Cash Equivalents | $1,540 | $715 | | $1,740 | |
| [E]=[A]+[B]+[C]-[D] | **Total Enterprise Value** | **$64,036** | **$19,506** | ▼-69.5% | **$19,811** | ▼-69.1% |
| | | | | | | |
| [F] | Total Assets | $69,349 | $21,575 | ▼-68.9% | $21,061 | ▼-69.6% |
| [G] | Total Liabilities | $27,793 | $7,472 | | $7,180 | |
| [H]=[F]-[G] | Net Worth | $41,556 | $14,103 | ▼-66.1% | $13,881 | ▼-66.6% |
| [I]=[B]-[D] | Net Debt | $15,907 | $2,479 | | $1,385 | |

[31] Sources: New DuPont 2019 Form 10-K at p. F-11 and F-80; New DuPont 2020 Form 10-K at p. F-11; New DuPont 2025 Form 10-K at pp F-8, F-80; Form 10-Q for the quarterly period ended June 30, 2026 at p. 8. Market capitalization as reported by S&P Capital IQ (accessed on Sep. 10, 2026). Values are as reported then-year, unless restated in a subsequent reporting year. Total Debt is the sum of short-term borrowings and long-term debt. Cash and Cash Equivalents excludes "Restricted Cash and Cash Equivalents" to the extent such is reported on the Consolidated Balance Sheets. Percentage change is relative to FYE 2019 values.

**Annex Table 2. New DuPont Financial Measures[32]**
**$M**

| | Fiscal Period | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| [A] | Cash from Operating Activities (Continuing Operations) | $1,409 | $4,095 | $1,846 | $1,249 | $845 | $765 | $560 | ▼-60.3% | $10,769 |
| [B] | Cash (Used For) Provided by Investing Activities | ($2,313) | ($202) | ($2,298) | $9,004 | $481 | ($562) | ($374) | | $3,736 |
| [C]=[A]+[B] | **Unlevered Cash Flow** | **($904)** | **$3,893** | **($452)** | **$10,253** | **$1,326** | **$203** | **$186** | | **$14,505** |
| [D] | **Reportable Segment Operating EBITDA** | **$5,640** | **$5,042** | **$4,170** | **$3,261** | **$2,942** | **$3,144** | **$1,628** | **▼-71.1%** | **$25,827** |

| | Fiscal Period | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Q2 2026 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| [E] | **Total New DuPont Shareholder Distributions** | **$3,940** | **$1,114** | **$2,773** | **$5,027** | **$2,651** | **$1,135** | **$1,097** | **$438** | **$18,175** |

32 Sources: New DuPont 2019 Form 10-K at p. F-80; New DuPont 2020 Form 10-K at p. F-75; New DuPont 2021 Form 10-K at pp. F-11, F-12, F-76; New DuPont 2022 Form 10-K at pp. F-10, F-11, F-69; New DuPont 2023 Form 10-K at pp. F-9, F-11, F-69; New DuPont 2024 Form 10-K at pp. F-9, F-11, F-66; New DuPont 2025 Form 10-K at pp. F-9, F-11, F-80, and New DuPont 2026 Form 10-Q for the period ended June 30, 2026 at p.9-11. Values are as reported then-year, unless restated in a subsequent reporting year. Reportable segment operating EBITDA are as reported then-year inclusive of corporate operating EBITDA. Total shareholder distributions are the sum of dividends, purchases of treasury stock, and forward contracts for share repurchases. For the six months ended June 30, 2026, an apparent misalignment exists between the Consolidated Statements of Equity and the Consolidated Statements of Cash Flows, whereby the sum of dividends paid to stockholders, purchases of common stock and forward contracts ($437M) under financing activities on the cash flow statement does not equal the sum of dividends, purchases of treasury stock, and forward contracts for share repurchase on the statement of equity ($519M). For the avoidance of doubt, Annex Table 2 relies on the values represented in the Consolidated Statements of Cash Flows. Percentage change in FYE 2025 values is relative to FYE 2019 values.

**Annex Table 3. Corteva Balance Sheet Measures[33]**
**$M**

| | | Corteva Pre-Separation | | | Separation of Crop Protection business "New Corteva" | |
|---|---|---|---|---|---|---|
| | | **FYE 2019** | **FYE 2025** | **Q2 2026** | **Q2 2026** *Pro Forma* | |
| [A] | Market Capitalization | $22,123 | $45,294 | $56,642 | | |
| [B] | Total Debt | $122 | $2,580 | $4,875 | $4,774 | |
| [C] | Minority (Noncontrolling) Interests | $246 | $242 | $244 | $238 | |
| [D] | Cash and Cash Equivalents | $1,769 | $4,530 | $2,365 | $1,905 | |
| [E]=[A]+[B]+[C]-[D] | **Total Enterprise Value** | **$20,722** | **$43,586** | **$59,396** | | |
| [F] | Total Assets | $42,397 | $42,845 | $41,642 | $19,678 | ▼-52.7% |
| [G] | Total Liabilities | $17,842 | $18,459 | $16,239 | $11,341 | |
| [H]=[F]-[G] | Net Worth | $24,555 | $24,386 | $25,403 | $8,337 | ▼-67.2% |
| [I]=[B]-[D] | Net Debt | ($1,647) | ($1,950) | $2,510 | $2,869 | |

[33] Sources: Corteva 2020 Form 10-K at p. F-9; Corteva 2025 Form 10-K at p. F-7; Corteva Form 10-Q for the quarterly period ended June 30, 2026 at p. 5; Vylor Amendment No. 1 to Form 10, Exhibit 99.1, at p. 49. Market capitalization as reported by S&P Capital IQ (accessed on Sep. 10, 2026). Values are as reported then-year, unless restated in a subsequent reporting year. Total Debt is the sum of short-term borrowings and long-term debt. Cash and cash equivalents reflect the sum of "Cash and cash equivalents and "Marketable securities." Percentage change reflects New Corteva Q2 2026 pro forma measures, accounted for as "Separation of Crop Protection business," relative to "Historical Corteva" Q2 2026 values.

**Annex Table 4. Corteva Financial Measures[34]**
**$M**

| | Fiscal Period | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | | Total | Vylor Pro Forma FY 2025 [a] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [A] | Cash from Operating Activities (Continuing Operations) | $1,070 | $2,064 | $2,769 | $912 | $1,809 | $2,296 | $3,457 | ▲ 223% | $14,377 | |
| [B] | Cash Used For Investing Activities | ($904) | ($674) | ($362) | ($632) | ($1,987) | ($589) | ($543) | | ($5,691) | |
| [C]=[A]+[B] | **Unlevered Cash Flow** | **$166** | **$1,390** | **$2,407** | **$280** | **($178)** | **$1,707** | **$2,914** | | **$8,686** | |
| [D]=[E]+[G] | **Reportable Segment Operating EBITDA** | **$2,106** | **$2,212** | **$2,714** | **$3,340** | **$3,491** | **$3,491** | **$3,986** | ▲ 89% | **$21,340** | |
| [E] | *Seed* | *$1,040* | *$1,208* | *$1,512* | *$1,656* | *$2,117* | *$2,219* | *$2,636* | ▲ 153% | *$12,388* | ***$2,503*** |
| [F]=[E]/[D] | *Percentage Share* | *49%* | *55%* | *56%* | *50%* | *61%* | *64%* | *66%* | | *58%* | *63%* |
| [G] | *Crop Protection* | *$1,066* | *$1,004* | *$1,202* | *$1,684* | *$1,374* | *$1,272* | *$1,350* | ▲ 27% | *$8,952* | *$1,483* |
| [H]=[G]/[D] | *Percentage Share* | *51%* | *45%* | *44%* | *50%* | *39%* | *36%* | *34%* | | *42%* | *37%* |

| | Fiscal Period | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Q2 2026 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| [I] | **Total Corteva Shareholder Distributions** | **$219** | **$663** | **$1,347** | **$1,418** | **$1,195** | **$1,467** | **$1,546** | **$741** | **$8,596** |

[34] Sources: Corteva 2019 Form 10-K at p. F-89; Corteva 2020 Form 10-K at p. F-79; Corteva 2021 Form 10-K at pp. F-8, F-75; Corteva 2022 Form 10-K at pp. F-8, F-66; Corteva 2023 Form 10-K at pp. F-8, F-68; Corteva 2024 Form 10-K at pp. F-8, F-66; Corteva 2025 Form 10-K at pp. F-8, F-66; and Corteva 2026 Form 10-Q for the period ended June 30, 2026 at p. 6. Vylor Amendment No. to Form 10, Exhibit 99.1 at p. 59, as filed with the SEC on August 14, 2026. Market capitalization as reported by S&P Capital IQ (accessed on Sep. 10, 2026). Values are as reported then-year, unless restated in a subsequent reporting year. Reportable segment operating EBITDA are as reported then-year. Total shareholder distributions are the sum of dividends, purchases of common stock, and forward contracts for share repurchases. Percentage change in FYE 2025 values is relative to FYE 2019 values.

[a] = Crop Protection (New Corteva) pro forma FY 2025 EBITDA of $1,483 = FY 2025 Corteva EBITDA of $3,986, less reported FY 2025 pro forma EBITDA for Vylor (Seed) of $2,503. *See* Vylor Amendment No. 1 to Form 10, Exhibit 99.1 at p. 59, as filed with the SEC on August 14, 2026. *See* also Corteva and EIDP, Inc. Form 8-K. Exhibit 99.1, Excerpts from the Offering Memorandum dated August 6, 2026, as filed with the SEC.

**ANNEX 2**
**DOCUMENTATION REVIEWED**

In forming my opinions, I considered the following information:

1. Corporate filings with the U.S. Securities and Exchange Commission (SEC), accessed via the Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system, including:

   DuPont de Nemours, Inc. ("New DuPont")

   a. Form 10-K for the fiscal year ended December 31, 2019, DuPont de Nemours, Inc., as filed with the SEC on February 14, 2020, https://www.sec.gov/Archives/edgar/data/1666700/000166670020000006/dupont201910-k.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/62UE-KQSE.

   b. Form 10-K for the fiscal year ended December 31, 2020, DuPont de Nemours, Inc., as filed with the SEC on February 12, 2021, https://www.sec.gov/Archives/edgar/data/1666700/000166670021000005/dd-20201231.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/7SKA-4JGF.

   c. Form 10-K for the fiscal year ended December 31, 2021, DuPont de Nemours, Inc., as filed with the SEC on February 11, 2022, https://www.sec.gov/Archives/edgar/data/1666700/000166670022000009/dd-20211231.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/D6WM-2AKQ.

d. Form 10-K for the fiscal year ended December 31, 2022, DuPont de Nemours, Inc., as filed with the SEC on February 15, 2023, https://www.sec.gov/Archives/edgar/data/1666700/000166670023000008/dd-20221231.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/NHX4-PUK8.

e. Form 10-K for the fiscal year ended December 31, 2024, DuPont de Nemours, Inc., as filed with the SEC on February 14, 2025, https://www.sec.gov/Archives/edgar/data/1666700/000166670025000005/dd-20241231.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/76DK-3CRL.

f. Form 10-K for the fiscal year ended December 31, 2025, DuPont de Nemours, Inc., as filed with the SEC on February 17, 2026, https://www.sec.gov/Archives/edgar/data/1666700/000166670026000013/dd-20251231.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/9LXC-PB78.

g. Form 10-Q for the quarterly period ended June 30, 2026, DuPont de Nemours, Inc., as filed with the SEC on August 4, 2026, https://www.sec.gov/Archives/edgar/data/1666700/000166670026000053/dd-20260630.htm. My counsel created an archive of this website on September 9,

2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/K77L-2WLZ.

Corteva, Inc. ("Corteva")

a. Form 10-K for the fiscal year ended December 31, 2019, Corteva, Inc., as filed with the SEC on February 14, 2020, https://www.sec.gov/Archives/edgar/data/1755672/000175567220000006/ctva-12x31x201910xk.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/7PZV-TERS.

b. Form 10-K for the fiscal year ended December 31, 2020, Corteva, Inc., as filed with the SEC on February 11, 2021, https://www.sec.gov/Archives/edgar/data/1755672/000175567221000008/ctva-20201231.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/UA9D-GSDM.

c. Form 10-K for the fiscal year ended December 31, 2021, Corteva, Inc., as filed with the SEC on February 10, 2022, https://www.sec.gov/Archives/edgar/data/1755672/000175567222000005/ctva-20211231.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/YS7M-EP83.

d. Form 10-K for the fiscal year ended December 31, 2022, Corteva, Inc., as filed with the SEC on February 9, 2023,

https://www.sec.gov/Archives/edgar/data/1755672/000175567223000005/ctva-20221231.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/JVB6-25JU.

e. Form 10-K for the fiscal year ended December 31, 2023, Corteva, Inc., as filed with the SEC on February 8, 2024, https://www.sec.gov/Archives/edgar/data/1755672/000175567224000004/ctva-20231231.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/QAW4-K28B.

f. Form 10-K for the fiscal year ended December 31, 2024, Corteva, Inc., as filed with the SEC on February 14, 2025, https://www.sec.gov/Archives/edgar/data/1755672/000175567225000005/ctva-20241231.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/9U5N-AX5V.

g. Form 10-K for the fiscal year ended December 31, 2025, Corteva, Inc., as filed with the SEC on February 12, 2026, https://www.sec.gov/Archives/edgar/data/1755672/000175567226000004/ctva-20251231.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/QBS3-R5YL.

h. Form 10-Q for the quarterly period ended June 30, 2026, Corteva, Inc., as filed with the SEC on July 31, 2026, https://www.sec.gov/Archives/edgar/data/1755672/000175567226000025/ctva-20260630.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/HC2P-PKHU.

i. Form 8-K, Exhibit 99.1, Excerpts from the Offering Memorandum dated August 6, 2026, https://www.sec.gov/Archives/edgar/data/1755672/000119312526338406/d140402dex991.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/9WYT-P328.

Vylor Inc. ("Vylor")

a. Exhibit 99.1 to Form 10-12B, Vylor Inc, as filed with the SEC on June 29, 2026, https://www.sec.gov/Archives/edgar/data/2128626/000119312526288697/ck0002128626-ex99_1.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/JW2B-6DW6.

b. Exhibit 99.1 to Amendment No. 1 to Form 10, as filed with the SEC on August 14, 2026, https://www.sec.gov/Archives/edgar/data/2128626/000119312526352605/ck0002128626-ex99_1.htm. My counsel created an archive of this website on September

9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/8PXS-R9HZ.

c. Exhibit 2.1 to Amendment No. 1 to Form 10, as filed with the SEC on August 14, 2026, https://www.sec.gov/Archives/edgar/data/2128626/000119312526352605/ck0002128626-ex2_1.htm. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/F449-RZRT.

2. S&P Capital IQ, Market Data, Market Capitalization (Daily) accessed on September 10, 2026, for:

   a. Corteva, Inc. (CTVA), June 3, 2019 through September 9, 2026.

   b. DuPont de Nemours, Inc. (DD), September 1, 2017 through September 9, 2026.

3. Corteva, Inc. Press Release, "Corteva Announces Plan to Separate into Two Industry-Leading Public Companies," October 1, 2025, accessible online at: https://www.corteva.com/resources/media-center/corteva-announces-plan-to-separate-into-two-industry-leading-public-companies.html. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/F82Y-6GGJ.

4. Corteva, Inc. Press Release, "Introducing Vylor: Corteva Spinoff to Propel Agriculture Further," May 4, 2026, accessible online at: https://www.corteva.com/resources/media-center/introducing-vylor.html. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/K6GF-4S6L.

5. Corteva, Inc. Investor Presentation, "Corteva announces plan to separate into two public companies," October 1, 2025, accessible online at: https://investors.corteva.com/static-files/bbf320c6-217b-45a4-a711-6ad667c9f718. My counsel created an archive of this website on September 9, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/BU87-UNNM.

# EXHIBIT A

Ms. Trabucchi's areas of expertise are corporate finance and economics. She is a nationally recognized expert in financial risk management and the design of financial frameworks and compensation schemas tailored for the protection of the public trust.

An expert in evaluating the financial integrity of business, non-profit, and governmental organizations, Ms. Trabucchi has 30 years of consulting experience assessing financial damages arising from mass torts and class action matters, lost profits, property diminution, economic benefit of noncompliance, fraudulent conveyance, and natural resource injuries. As a consultant to public- and private-sector clients, including litigators and in-house counsel, she regularly applies her expertise in the context of rigorous verification and auditing standards. Ms. Trabucchi has been qualified as an expert in financial management design and implementation of trusts to fund organizations in perpetuity by the Superior Court of the District of Columbia

## Congressional Testimony & Hearings

**U.S. SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS, COMMITTEE ON HOMELAND SECURITY & GOVERNMENTAL AFFAIRS.** Wall Street Bank Involvement with Physical Commodities. November 2014.

**U.S. SENATE COMMITTEE ON ENERGY AND NATURAL RESOURCES. SENATE BILL 699**, Department of Energy Carbon Capture and Sequestration Program Amendments Act of 2011. May 2011.

**U.S. SENATE COMMITTEE ON ENERGY AND NATURAL RESOURCES. SENATE BILL** 1013, Department of Energy Carbon Capture and Sequestration Program Amendments Act of 2009. May 2009.

Hearings before the **U.S. FEDERAL INTERAGENCY TASK FORCE ON CARBON CAPTURE AND STORAGE** established by President Obama on issues related to financial investment, indemnification, and financial responsibility. May 2010.

Invited expert on financial risk management related to the deployment of climate mitigation technologies before the **US SENATE ENERGY & NATURAL RESOURCES COMMITTEE** and the **US SENATE COMMERCE, SCIENCE, AND TRANSPORTATION COMMITTEE.** June 2010.

## Expert Witness Support (Depositions and Testimony)

The Narragansett Electric Company d/b/a Rhode Island Energy, In re: Proposal to Change Rate Accounting and Issue Bill Credits Relating to a Commitment to Hold Customers Harmless from an Acquisition-Related Increase in Rates. Docket No. 25-33-GE. 2026.

New Jersey Department of Environmental Protection, et al., v. E.I. du Pont de Nemours and Company, et al. Civil Action No. 1:19-cv-14766. 2025.

Water Works and Sewer Board of the Town of Centre v. 3M Company, et al. Case No. Civil Action No. 31-CV-2017-900049.00. 2023.

Water Works and Sewer Board of the City of Gadsden v. 3M Company, et al. Civ. No. 31-CV-2016-900676.00. 2022.

David Back, et al. v. Bayer Cropscience LP (Hold Service), et al. No. 18SL-CC03530, Division No.: 18. 2020.

In Re: Entergy Nuclear Operations, Inc., et al., Indian Point Nuclear Generating Station, Docket Nos.: 50-3, 50-247, 50-286, 72-051. 2019.

United States / New Mexico Environment Department v. Chevron Mining, Inc., D.N.M., Civ. No. 1:16-cv-00904-WPL. 2017.

## Selected Consulting Engagements

- Providing expert advisory services to the Endo Public Opioid Trust, resulting from In re: Endo International plc and its Affiliated Debtors' under Chapter 11 of the Bankruptcy Code. Trust assets in excess of $250 million, involving 45 states and all trust territories.
- Providing expert advisory services to the National Opioid Abatement Trust II, resulting from In re: Mallinckrodt plc and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code. Trust assets in excess of $330 million, involving 50 states and all trust territories.
- Provided expert advisory services to the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants established in connection with the matter captioned In re: Purdue Pharma L.P., et al., Debtors, Jointly Administered Case No. 19-23649 (RDD).
- Provided expert financial analysis to the New York State Attorney General. Assessing the allocation structure and trust framework arising from settlement with national distributors and Janssen in connection with opioid product liability claims. Expert support involves trust assets in excess of $1.5 billion.
- Providing expert financial analysis to a team of federal attorneys in a litigation matter associated with unjust enrichment and illegal competitive advantage involving the sale of after-market emissions defeat devices. Analyses involve assessment of illegal competitive advantage, economic benefit of noncompliance, unjust enrichment, and restitution by disgorgement of excess profits, and ability-to-pay.
- Provided expert advisory services in a private litigation involving the design and implementation of a claims-based compensation fund for commercial fisheries impacted by the construction, operation, and decommissioning of offshore wind farms.
- Provided expert support to the U.S. Attorneys Office involving the audit of internal controls and administrative subaccounts underpinning a bankruptcy trust arising from a multi-district litigation involving a chemical manufacturer. Trust assets in excess of $1 billion, involving 31 states.
- Provided expert financial analysis to the New York State Attorney General. Assessing the allocation structure and attendant impact of market volatility on the performance of a perpetual trust in the nuclear decommissioning space with assets in excess of $2 billion.
- Provided expert support to a financial institution serving as Custodial Administrator to a revocable mitigation trust with assets in excess of $50 million. Support involves audit of allocation algorithms underpinning trust payments involving 568 federally-recognized Indian Tribes.
- Provided expert support to the New York State Attorney General, and by extension the National Association of Attorneys General. Designed the administrative framework for two revocable trusts (568 federally-recognized Indian Tribes, 50 states plus trust territories) with total assets in excess of $2.5 billion arising from *United States of America v. Volkswagen AG, et al.* Engagement involved the design and administration of an independent procurement process for the selection of the Custodial Administrator and Directed Trustee.
- For public- and private-sector clients directed the review of approximately 1,500 financial instruments associated with statutory and legislative financial assurance proposals. Reviews spanned 40 states, myriad federal agencies, and approximately 1,000 corporate entities for an estimated total face value of $6.2 billion in financial exposure across numerous sectors, including chemical manufacturing, waste management, energy and utility, air travel, auto manufacturing, oil and gas, pulp and paper, pharmaceutical, mining, lumber and wood products, agricultural, and metals mining.
- Provided expert analysis in a private, civil litigation involving the design of a perpetual endowment trust to support the operation of the Corcoran Gallery of Art.

- Provided expert support to the US Department of Justice on the design of a long-term financial management framework involving a phosphate fertilizer company in Chapter 11. Financial exposure in excess of $100 million.
- Directed an assessment of the economic impacts associated with the Securities and Exchange Commission's proposed proxy access rule for the CFA Institute. Analyzed the degree to which proxy access reform would be beneficial to market performance, stock performance, and board performance.
- Provided expert support, including the design of a long-term compensation trust, in support of settlement negotiations involving the phosphate and nitrogen fertilizer industries for the US Department of Justice. Financial exposure span claims in Florida and Louisiana in excess of $2 billion. Engaged in the design and administration of an independent procurement process for the selection of a Custodial Administrator. Providing beneficiaries with ongoing accounting and internal controls review of assets held in trust.
- Provided expert support in a private litigation associated with lost profit damages arising from tort claims in the Gulf Coast region arising from *United States v. BP Exploration & Prod., Inc. (In re Oil Spill by the Oil Rig "Deepwater Horizon")*. Designed a claims-based compensation model to address financial injuries suffered by claimants in the commercial fishing sector and support activities for the oil and gas operations sector.
- Directed a compliance and improper payments audit related to funds appropriated under the American Recovery and Reinvestment Act. Efforts involved designing and implementing a compliance audit framework to validate and verify management integrity and fiscal accountability associated with $7.18 billion in activities funded under ARRA. Structured audit verification protocols to align with audit objectives focused on identifying areas of fraud, waste and abuse with respect to appropriated funds across federally funded programs.

## Professional Societies/Affiliations

- Adjunct Professor of Law, **Roger Williams University, School of Law**
- Member, **American Institute of Certified Public Accountants**, Forensic and Valuation Services
- Director, **Massachusetts College of Art and Design**, Foundation Board, Retired
- Member, **U.S. EPA's Environmental Financial Advisory Board (EFAB)**, Retired

## Selected Publications (2010 to 2024)

Trabucchi, Chiara, Ian Havercroft. "Long-Term Stewardship and Liability: A Balanced Approach to Legal Certainty and Site Transfer for Geologic $CO_2$ Storage," Global CCS Institute, September 2024.

Eames, F., C. Trabucchi and D. McGarvey. "Online Feature: CCUS: Dispelling Myths about Risk," Hydrocarbon Processing, December 2022.

Trabucchi, Chiara, Michael Donlan, Vadim Spirt, Scott Friedman and Richard Esposito. "Application of a Risk-Based Probabilistic Model (CCSvt Model) to Value Potential Risks from Carbon Capture and Storage," Energy Procedia, Volume 63, 12th International Conference on Greenhouse Gas Control Technologies, GHGT-12 (2014) Pages 7608-7618, doi:10.1016/j.egypro.2014.11.795.

Trabucchi, Chiara, Ellen Fitzgerald, Matthew Orsagh, Robert W. Dannhauser, James Allen. "Proxy Access in the United States: Revisiting the Proposed SEC Rule." CFA Institute. Vol. 2014. No. 9. August 2014.

Trabucchi, Chiara, Michael Donlan, Michael Huguenin, Matthew Konopka and Sarah Bolthrunis. "Valuation of Potential Risks Arising from a Model, Commercial-Scale CCS Project Site." Global CCS Institute. June 2012.

Donlan, Michael and Chiara Trabucchi, Valuation of Consequences Arising from CO2 Migration at Candidate CCS Sites in the U.S., Energy Procedia, Volume 4, Proceedings of the 10th International Conference on Greenhouse Gas Control Technologies (GHGT-10) (2011) Pages 2222-2229.

Dooley JJ, C Trabucchi, and L Patton. 2010. "Design Considerations for Financing a National Trust to Advance the Deployment of Geologic CO2 Storage and Motivate Best Practices." International Journal of Greenhouse Gas Control 4(2):381-387. doi:10.1016/j.ijggc.2009.09.009.

Trabucchi C, M Donlan, and S Wade. 2010. "A Multi-Disciplinary Framework to Monetize Financial Consequences Arising from CCS Projects and Motivate Effective Financial Responsibility." International Journal of Greenhouse Gas Control 4(2):388-395. doi:10.1016/j.ijggc.2009.10.001.

## Professional Experience

Industrial Economics, Incorporated, 1995-Present

Fiori, LLC, 2022-Present

The Cadmus Group, 1991-1995

## Education

Masters Business Administration with Honors, Simmons University, 1999

Bachelor of Arts, Cum Laude, Clark University, 1991