**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | **MDL No. 2873**<br><br>**Master Docket No. 2:18-mn-2873**<br><br>**This Document Relates To:**<br><br>***The People of the State of California, ex rel. Rob Bonta, Attorney General of California v. 3M Company et al.***<br><br>**Civil Action No. 2:23-cv-01531-RMG** |

**DECLARATION OF PAUL HINTON IN SUPPORT OF THE PEOPLE OF THE STATE OF CALIFORNIA'S MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


**I. Introduction ..... 1**

A. Assignment ..... 1

B. Qualifications ..... 1

**II. Summary of Opinions ..... 4**

**III. Mass Tort Liability Estimation Methodology ..... 9**

A. Exposed Population ..... 10

1. Population Exposed Through Public Water System ..... 10

2. PFAS Blood Levels ..... 11

B. Incidence of Kidney Cancer ..... 15

1. Increased Relative Risk of Kidney Cancer due to PFAS Blood Levels ..... 16

2. Latency of Cancer Risk ..... 16

3. Forecast of Kidney Cancer from 2026 in the Affected Population ..... 18

C. Estimated Number of Future Tort Claims ..... 19

1. Propensity to Sue ..... 21

2. Scale-Up for Other Injuries with a "Probable Link" Finding ..... 22

D. Estimate per Claim Values ..... 23

1. Relative Exposure Adjustments ..... 27

E. Defense Costs ..... 28

F. DuPont Entities' Liability Share ..... 28

G. Inflation and Discounting ..... 32

H. Total Estimated Liabilities ..... 32

**IV. Net Present Value of Certain Costs ..... 34**

# I. INTRODUCTION

## A. ASSIGNMENT

1. I have been retained by counsel for the Attorney General of California on behalf of the People of the State of California in connection with their litigation concerning PFAS[1] contamination in California: *The People of the State of California, Ex Rel. Rob Bonta, Attorney General of California, v. 3M Company et al.*, No. 22-CV-021745 Cal. Super. Ct. (Alameda); No. 2:23-CV-01531-RMG (D.S.C.). I have been asked to develop an estimate of the contingent mass tort personal injury claim liabilities of DuPont and its successor entities (defined below), including the pending personal injury claims transferred to the Aqueous Film-Forming Foam Products Liability Multidistrict Litigation ("AFFF MDL").[2]

2. I have also been asked to perform Net Present Value ("NPV") calculations using a risk-free interest rate to convert the nominal value of another expert's annual cost calculations to the corresponding NPV. I report these results in Section IV.

3. For the purposes of this assignment, DuPont and its successor entities ("Dupont entities") are those are identified on the AFFF MDL public-water settlement website as the "DuPont" settling defendants.[3] These entities are: E.I. du Pont de Nemours and Company (now EIDP, Inc.), DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc.

## B. QUALIFICATIONS

4. I am a Principal of The Brattle Group in New York City. I earned a B.A. in Engineering Science in 1988 from New College, Oxford University, and a Masters in Public Policy in 1994 from the John F. Kennedy School of Government at Harvard University, where my studies included economics, statistics, and finance. A focus of my practice and professional experience in economic consulting has been the forecasting of mass tort claims and analysis of mass tort risk exposures.

---

[1] Per- and polyfluoroalkyl substances.

[2] Aqueous Film-Forming Foam (AFFF) Products Liability Litigation (MDL 2873), United States District Court for the District of South Carolina, Master Docket No. 2:18-mn-2873-RMG, https://perma.cc/7G6K-XCST (last accessed on Sept. 12, 2026).

[3] *Id.*

5. I have assisted U.S. and multinational industrial companies in estimating, modeling and valuing mass tort liabilities and providing expert testimony in related disputes. This work has involved advisory projects in merger and acquisition due diligence, insurance coverage litigation, bankruptcy estimation hearings, bankruptcy plan confirmation and Federal Rule of Bankruptcy 9019 hearings, fraudulent conveyance actions, and commercial disputes.

6. During the period from 2000 through 2009, I was engaged in asbestos claims liability estimation on behalf of asbestos defendants that chose to use bankruptcy restructuring to resolve a flood of asbestos personal injury claims against them. These asbestos-related bankruptcies included: W.R. Grace & Co., Owens Corning, Combustion Engineering, Armstrong World Industries, Federal Mogul, and Babcock & Wilcox, in which the solvency implications of contingent liability valuations were litigated.

7. I performed expert analysis for Dow Corning in connection with the fairness hearing on the Breast Implant Personal Injury Compensation Trust. Over the approximately 20-year life of the Trust, I analyzed the Trust's performance in accordance with Trust Distribution Procedures and testified in litigation over contingent funding obligations.

8. In relation to the public policy issues posed by mass torts, I have conducted analyses of pharmaceutical mass tort liability risk and no-fault compensation alternatives to the tort system. I have also analyzed trends in U.S. tort costs, putative legislative reforms, and challenges to global settlement strategies, including the role of third-party releases.

9. In recent cases, I testified in the Diocese of Camden, Boy Scouts of America, and Rite Aid bankruptcies. In the Diocese of Camden case, I testified on issues including the reasonableness of proposed insurer settlements and insurance neutrality concerns arising from the features of proposed trust distribution procedures. In the Rite Aid confirmation hearing, my report on moral hazard implications for insurers of the proposed plan was admitted as direct testimony.

10. I developed PFAS personal injury claims liability valuation opinions in connection with the fraudulent conveyance litigation against DuPont entities arising from their spin-off of The Chemours Company in 2015 in three separate proceedings on behalf of the Attorneys General of the States of Ohio, North Carolina and New Jersey. I provided deposition testimony in the North Carolina proceeding.

11. In recent asbestos related bankruptcies, I was retained as a claims estimation and valuation expert in the Aldrich and Whittaker proceedings. I filed direct and rebuttal reports on the

valuation of tort claim liabilities against Aldrich and Murray on behalf of the Futures Claimants Representative.

12. Since 2005, I have presented at industry conferences, testified before Congress, and published on mass tort liability valuation topics, including, but not limited to, the following:

(a) "Outlook on Mass Tort Reform - The history of Asbestos litigation as a precedent for PFAS" Perrin Conferences, Environmental Risk & PFAS Litigation Conference, June 17 - June 18, 2025, New York City Bar Association, New York, NY.

(b) "Third-Party Releases, Is there a fair price to pay?" ABI, AIRA, VALCON conference panel with Matthew Dundon, Hon. Melanie L. Cyganowski (ret.), Chad Husnick, March 18-20, 2024, New Orleans.

(c) "Mass Torts Gap in Contingent-Liability Valuation Guidance," *ABI Journal*, Value & Cents, with Dr. Adrienna Huffman, March 2024.

(d) "The Verdict Valuation Paradox: Implications for Mass Torts," *ABI Journal*, Value & Cents, with David McKnight and Pietro Grandi, April 2023.

(e) Testimony before the U.S. House of Representatives Committee on the Judiciary, Subcommittee on the Constitution, hearing on "Can We Sue Our Way to Prosperity? Litigation's Effect on America's Global Competitiveness," May 2011.

(f) "Forecasting Product Liability by Understanding the Driving Forces," *The International Comparative Legal Guide to Product Liability 2006: A Practical Insight to Cross-Border Product Liability Work*, with Lucy Allen, Denise Martin, Simona Heumann, and Faten Sabry, June 2006.

(g) "Estimating Future Asbestos Claims, Lessons from Owens Corning," Mealey's Asbestos Bankruptcy Conference, Chicago, June 9, 2005.

13. More generally, I have testified previously as an expert witness on matters of economics and finance. I have testified in federal court, state court, and before arbitration tribunals as an economic expert. The types of cases in which I have testified include mass tort litigation, securities litigation, commercial disputes, and white-collar criminal proceedings. My curriculum vitae, including testimony given over the last four years and publications over the last ten years, is attached hereto as **Exhibit A.**

## II. SUMMARY OF OPINIONS

14. This report provides an estimate of PFAS personal injury claim liability from public water system contamination. Contaminated drinking water is one of the most significant sources of general population exposure to PFAS.[4] It is also the source of exposure that has resulted in a significant number of personal injury claims, many of which are now pending in the AFFF MDL.[5]

15. The $670.7 million settlement of the *Leach* Class by DuPont entities in 2017 was a seminal case of drinking water contamination cancer injury litigation relevant to PFAS.[6] Since that settlement, epidemiologists have measured incremental contributions to cancer risk from PFAS blood levels that are elevated in populations served by water systems with lower detectable levels of PFAS than the 50 part per trillion (ppt) level that defined the *Leach* Class. These findings can

---

[4] Plaintiffs have alleged PFAS-related injuries due to multiple sources of exposure principally from direct product use or exposure to environmental contaminants. The AFFF MDL court identifies drinking water contamination as one of the three main categories giving rise to personal injury claims and that contamination from many products contribute to exposures through ground water: "whether a plaintiff alleges exposure to drinking water, direct exposure to AFFF, firefighter turnout gear or other products allegedly containing PFAS, or some combination. Personal injury plaintiffs may have lived in many locales over their lifetimes, consume water daily, and, in many of the cases before this Court, allege that any type of AFFF has the potential to, and do, spread through groundwater, surface water, or other media well beyond the locations where they were initially used. The record in this MDL and its related discovery has demonstrated that plaintiffs cannot, at the pleading stage, easily isolate personal injuries allegedly caused by AFFF as opposed to personal injuries allegedly caused by non-AFFF PFAS." AFFF MDL, Case Management Order ("CMO") No. 36 at 1 (Aug. 22, 2025).

[5] According to Chemours, "[f]or non-water provider cases [*i.e.*, where water providers are not the plaintiffs] in the AFFF MDL (approximately 11,300), the parties are now proceeding with discovery in certain personal injury cases, with Tier One discovery completed in June 2024. […] Since the Court entered the August 2025 case management orders, a significant number of new claims asserting personal injury have been filed or transferred to the AFFF MDL. As of December 31, 2025, the Company believes that a loss is reasonably possible but is not estimable with respect to this category of cases, including on the basis that these new cases and submitted information will be further evaluated as part of the above-referenced litigation and mediation." The Chemours Company, SEC 10-K filing December 31, 2025, at F-59. *See also*, AFFF MDL CMO No. 36.

[6] A class of residents of those whose primary source of drinking water was from within six water districts surrounding Washington Works contaminated with PFOA at levels at or above 50 ppt was certified in connection with the case: *Leach v. E.I. Du Pont de Nemours & Co.*, No. 01-C-608, 2002 WL 1270121 (W. Va. Cir. Ct.) (Apr. 10, 2002) ("*Leach* Class").

be used to estimate the number of people from the general population who were exposed to PFAS-contaminated drinking water, have PFAS blood levels above public health thresholds that pose health risks, and are likely to develop kidney cancer.

16. My analysis provides a range of reasonable estimates of liability for current and future personal injury claims arising from exposure to PFAS-contaminated public drinking water, covering a time period through approximately the next 60 years. This analysis also estimates a liability share reasonably expected to be assessed against DuPont entities. This approximated share of liability is between $12 billion and $73 billion. The wide range of estimates reflects current uncertainty in the epidemiology (including latency), in the level of future litigation activity, in how the tort system will adjudicate specific causation, and in how a court or jury may impose liability on particular defendants in these cases. Notwithstanding these uncertainties, these estimates are conservative in that they only account for potential liability from injuries with a causal connection to PFAS reported by the "Ohio MDL C8 Science Panel" more than a decade ago,[7] and only from individuals served by contaminated public water systems at the point in time they were tested.

17. Thus, I calculated a range of estimates that reflect uncertainty around: the average values that will be paid for kidney cancer claims (rows [1], [2] and [3] in Table 1 below); the potential attributable liability share for which DuPont entities will be held liable (columns [A], [B], and [C] in Table 1 below); and the amount of excess relative cancer risk posed by PFAS in the blood estimated from published studies (Panel A uses a lower excess relative risk per ng/mL than panel B).

[7] MDL 2433 was established in the United States District Court in the Southern District of Ohio, to coordinate the litigation of the claims arising from the PFOA personal injury litigation: *Leach* Class. The Science Panel was previously funded as result of an initial 2005 settlement between DuPont and a class of approximately 80,000 persons who consumed water from certain drinking water sources, including six water districts allegedly contaminated by C-8 (including PFOA) from the Washington Works Plant. The Science Panel later issued "probable link" findings that provided a basis for subsequent personal injury claims. United States District Court for the Southern District of Ohio, "Introduction," *In re E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation*, MDL No. 2433, https://perma.cc/2GSE-WBEM (last accessed on Sept. 12, 2026).

**TABLE 1: RANGE OF DUPONT ENTITIES' ATTRIBUTED LIABILITY ESTIMATES**

| *$ in millions* | | Attributable Liability Share Estimates | | |
|---|---|---|---|---|
| | Benchmark 2026 Cancer per Claim Value | Primary Manufacturer Liability Share | Liability Share Adjusted for Secondary/Other | |
| | | [A] | [B] | [C] |
| **Panel A: Excess Relative Risk (ERR) of Kidney Cancer 0.0378 per ng/mL** | | | | |
| | | 12% | 17% | 24% |
| **Range of Cancer Claim Values** | | | | |
| Lower bound [1] | $0.63 | $11,995 | $16,273 | $23,433 |
| Mid-point [2] | $1.19 | $22,737 | $30,845 | $44,417 |
| Upper bound [3] | $1.76 | $33,479 | $45,418 | $65,402 |
| **Panel B: Excess Relative Risk (ERR) of Kidney Cancer 0.0563 per ng/mL** | | | | |
| | | 12% | 17% | 24% |
| **Range of Cancer Claim Values** | | | | |
| Lower bound [4] | $0.63 | $13,422 | $18,260 | $26,294 |
| Mid-point [5] | $1.19 | $25,443 | $34,612 | $49,841 |
| Upper bound [6] | $1.76 | $37,463 | $50,964 | $73,388 |

Notes (Table 1):

[A] Primary Manufacturer Liability Share is estimated by attributing responsibility for specific PFAS chemicals manufactured by either 3M or DuPont based on the average blood levels of those chemicals in the relevant population.

[B]-[C] Liability Share Adjusted for Secondary/Other is based on the reported share of DuPont PFOA chemical products estimated by equity analysis ranging from 25% to 36% adjusted down to account for 1/3 liability share attributed to secondary manufacturers or other defendants (see discussion below).

18. This analysis employs the well-established mass torts valuation framework that involves modeling the evolution of an exposed population over time and uses published epidemiology to estimate the incidence of kidney cancer. The propensity for injured persons from the exposed population to bring lawsuits—also referred to as the propensity to sue—is used to forecast claims from estimated incidence and per claim values are developed from mass tort settlement benchmarks.

19. The empirical basis available to develop these estimates draws from: data on PFAS testing of drinking water by public water systems, and PFAS blood serum testing in a nationwide, repeated sample through the National Center for Health Statistics, National Health and Nutrition

Examination Survey ("NHANES") survey. This cross-sectional survey conducts both health exams and laboratory testing on participants and provides approximately biannual data on blood levels of a nationwide sample of participants and has PFAS blood serum results for the years 1999 through 2017. Recently published research measuring higher PFAS blood levels in populations with contaminated drinking water compared to other populations is used to estimate the increase in average blood levels associated with drinking water exposure. The corresponding associated higher cancer risk is computed by epidemiologists from the California Office of Environmental Health Hazard Assessment ("OEHHA") for each ng/mL of PFOA in the blood.

20. Incidence of kidney cancer is estimated using general population age-specific cancer risk, increased by the relative risk due to PFAS blood levels above the NASEM threshold level for health risks of 2 ng/mL among the population served by contaminated public water systems.

21. Future PFAS blood levels in the exposed population are projected to decline based on the published half-life of the seven relevant PFAS chemicals (used to establish public health exposure risk thresholds by NASEM).[8] This results in a declining number of claims in each future year as the exposed population with blood levels above the NASEM health risk threshold is likely to decline over time. However, due to latency, past exposure to PFAS in the blood continues to increase the risk of cancer for years. This effect is incorporated by using a ten-year look-back in calculating the relative risk of cancer in each forecast year. The last year of forecast claims is 2086.[9]

22. The propensity to claim is estimated based on the experience observed for ovarian cancer claiming over the first ten years of the Johnson & Johnson Talc MDL ("Talc MDL").[10] The

---

[8] National Academy of Science, Engineering, and Medicine guidelines calculate blood serum PFAS concentrations representing the sum of Me-PFOSA-AcOH, PFHxS, PFDeA, PFUnDA, PFNA, PFOA, and PFOS. *Guidance on Exposure, Testing, and Clinical Follow-Up*, THE NAT'L ACAD. PRESS (2022), https://doi.org/10.17226/26156. *See also* Toki Fillman et al., *Associations between PFAS in Public Water System Drinking Water and Serum among Southern California Adults*, 36 J. OF EXPOSURE SCI. & ENV'T EPIDEMIOLOGY 311–21 (2026) ("Fillman et al.").

[9] *See* note 35 *infra*.

[10] Johnson & Johnson Talcum Powder Litigation MDL 2738, Master Docket 3:16-md-02738, United States District Court, District of New Jersey.

forecast claims are presumed to include the actual claims filed in the AFFF MDL but for which cancer claims data are not available.

23. Nine benchmark mass torts settlement values are identified for serious cancer claims (or other similarly serious injuries). These historical values are adjusted to equivalent 2026 values using social inflation through 2022 (the last year the estimates by Swiss Re. Institute were available)[11] and the Consumer Price Index ("CPI") thereafter. The range of values used for the forecasted kidney cancer claims is between $0.63 million and $1.76 million per claim. The lower bound is the median of the benchmark settlement values. The upper bound is the upper 90 percent confidence interval around the mean benchmark settlement value.

24. In addition to kidney cancer indemnity (the amount paid in damages to claimants, from which their attorney fees are deducted), liability for other injury claims is estimated by scaling up the kidney cancer estimate to account for the fraction of the *Leach* Class settlement that was attributed to non-kidney cancer claims for which the Ohio MDL C8 Science Panel established a "probable link." Estimated defense costs are also added. Aggregate liabilities are the sum of indemnity amounts and defense costs.

25. The liability shares attributable to DuPont entities is estimated as proportional to the relative contribution to the PFAS blood levels forecast in each future year due to PFOA the DuPont entities manufactured since 2002, compared to the contribution from PFOS and PFhxS, and shared liability for PFOA manufactured before 2002 by 3M.[12]

26. The nominal liability for future claims in each future year is inflated by CPI and discounted at the risk-free rate to express the net present value of the liabilities.

---

[11] *Litigation costs drive claims inflation: indexing liability loss trends*, SWISS RE. INST., sigma No 4/2024.

[12] *See, e.g.,* E. I. du Pont de Nemours and Company, Form 10-K for the Fiscal Year Ended December 31, 2024, F-42; Cheryl Hogue, "Governments agree to eliminate the PFAS chemical PFHxS," Chemical & Engineering News, 100(23), June 22, 2022.

In this declaration I express no opinions as to the volumes, amounts, shares, or other characterizations of PFAS or PFAS products manufactured by defendants, of which I have no independent knowledge. I adopt values from unverified sources as assumptions made for purposes of my analyses. I use them as inputs to my analyses, and to the extent that I identify alternative sources that provide more reasonable inputs, my analysis can be revised accordingly by substituting these modified values.

27. The liability estimates resulting from this analysis are necessarily qualified by the modeling choices and assumptions made. The modeling choices and assumptions in this analysis include, but are not limited to, the following:

(a) Injuries arising from private well drinking water contamination are not included;

(b) Testicular cancer claims are not separately modeled;

(c) The incidence and propensity to sue for injuries other than kidney cancer found by the Ohio MDL C8 Science Panel to have a "probable link" to PFAS exposure, are proportional to the incidence and propensity to sue for kidney cancer.

(d) Liabilities for injuries other than those with a "probable link" finding by the Ohio MDL C8 Science Panel are not valued;

(e) Any effect of social inflation above or below CPI after 2022 is not included;

(f) Average increased blood serum levels in contaminated water districts depend on the reported average effect in Fillman et al., 2025.[13]

(g) Blood serum levels after the 2017–2020 NHANES cycle are not included.[14]

(h) The analysis cannot be calibrated to actual cancer claim experience in the AFFF MDL because no data were available to me.

(i) Liability shares are assumed based only on public information and reported settlements.[15]

## III. MASS TORT LIABILITY ESTIMATION METHODOLOGY

28. The mass tort valuation framework provides an empirical basis to estimate the value of future claims as they are expected to resolve in the tort system. This framework originated in the seminal paper *Occupational Exposure to Asbestos: Population at Risk and Projected Mortality*

[13] Fillman, et al. (2025), *supra,* note 8.

[14] The NHANES 2021–2023 PFAS data has recently been released: this analysis could be updated to incorporate theses data. *See* Center for Disease Control, "August 2021-August 2023 Laboratory Data - Continuous NHANES," https://perma.cc/DA3R-VJ9V (last accessed on Sept. 12, 2026).

[15] In this declaration, I do not and cannot make any representations about DuPont's ultimate market or liability share to be proven at trial in any jurisdiction. Furthermore, I do not have an opinion as to what the right market or liability share is for the Dupont entities. The liability shares attributable to the DuPont entities in this analysis are developed as assumptions to provide a reasonable range of their possible aggregate contingent personal injury litigation liabilities.

– *1980-2030* authored by Dr. Nicholson and others.[16] In the paper, Dr. Nicholson forecasted future instances of asbestos-related mesothelioma from populations with past occupational exposures using an asbestos dose-response relationship. This method for estimating future incidence of mesothelioma was extended to estimate future tort claims filed by persons with mesothelioma, and to value those tort claims. For decades, this has been the accepted framework for forecasting future tort claims from preexisting exposures—and, consequently, for valuing associated contingent litigation liabilities. Economic valuation experts testifying in mass tort bankruptcy cases regarding contingent litigation liability estimates apply this mass tort valuation framework.[17]

29. The mass tort valuation framework entails identifying (i) an exposed population, (ii) the incidence of injuries in that population, (iii) the claiming rates among those contracting injuries, (iv) and the per-claim expected value (*i.e.*, the product of the probability of being paid and the average settlement value).[18] The framework is depicted below in Figure 1.

**FIGURE 1: MASS TORT VALUATION FRAMEWORK**




### A. EXPOSED POPULATION

#### 1. Population Exposed Through Public Water System

30. I use public water system ("PWS") testing data from 2023 through 2025 to estimate the size of the population served by water systems with PFAS above reporting thresholds.[19]

---

[16] William J. Nicholson, PhD, George Perkel, MA, and Irving J. Selikoff, MD, *Occupational Exposure to Asbestos: Population at Risk and Projected Mortality - 1980-2030*, 3 AMERICAN JOURNAL OF INDUSTRIAL MEDICINE 259-311 (1982).

[17] Paul Hinton and Adrienna Huffman, *Value & Cents: Mass Torts Gap in Contingent-Liability Valuation Guidance*, ABI J. (March 2024).

[18] Lucy P. Allen et al., *Forecasting Product Liability by Understanding the Driving Forces*, 37–43, THE INT'L COMPARATIVE LEGAL GUIDE TO: PRODUCT LIABILITY (2006).

[19] The EPA's UCMR5 data summary lists the minimum reporting levels (MRLs) of the chemicals in question as 0.004 µg/L for PFOS, PFOA, and PFNA, 0.003 µg/L for PFHxS and PFDeA, 0.002 µg/L for PFUnDA, and 0.006 µg/L for N-MeFOSAA (also referred to as PFOSA). U.S. Environmental Protection Agency. (2026, July). *The Fifth Unregulated Contaminant Monitoring*

Starting in 2012, the U.S. EPA mandated testing of public water systems for several PFAS chemicals pursuant to an Unregulated Contaminant Monitoring Rule ("UCMR") promulgated in accordance with the Safe Drinking Water Act.[20] Subsequent periodic UCMR testing provides data that can be used to identify the number of people served by public water systems with treated water containing PFAS chemicals. I find that at least 26% of the US population were served by a public water system with at least one PFAS chemical above the reporting threshold ("Affected Population").

31. This Affected Population does not include those served by private wells that may have been contaminated nor by people who previously lived in an area served by a contaminated public water system but moved elsewhere. For these reasons, the Affected Population estimate is conservative.

**2. PFAS Blood Levels**

32. Individuals with PFAS-linked injuries such as kidney cancer must prove specific causation in order to prevail in litigation. Personal injury claimants may succeed in proving specific causation through a variety of means. In order to estimate the proportion of individuals that would be able to establish specific causation, I estimate the Affected Population that also have blood serum concentrations (hereafter, "blood levels") above the NASEM threshold levels that pose potential health risks.

33. Most individuals do not regularly test their blood for PFAS levels, and such testing is not included in routine medical examinations.[21] Consequently, I assume that individuals will only test their blood for PFAS at the time of diagnosis with kidney cancer. To account for latency between PFAS exposure and disease, however, I assess whether an individual's estimated blood

---

*Rule (UCMR 5) Data Summary: July 2026* (EPA 815-S-26-007), https://perma.cc/S97U-28VC (last accessed on Sept. 12, 2026).

[20] Under the Safe Drinking Water Act, the U.S. EPA is required to issue lists of unregulated contaminants to be monitored by public water systems. UCMR 3, published on May 2, 2012, required monitoring of PFOA at 20 ppt or above, between 2013 and 2015. *See, id., see also,* U.S. Environmental Protection Agency, "Third Unregulated Contaminant Monitoring Rule," https://perma.cc/H4P2-U6E5 (last accessed on Sept. 12, 2026).

[21] Meghan T. Lynch, et al., *Community-Facing Toxicokinetic Models to Estimate PFAS Serum Levels Based on Life History and Drinking Water Exposures*, 176 ENVIRONMENT INTERNATIONAL 107974 (2023).

level exceeded the NASEM threshold ten years prior to diagnosis. Thus, an individual is included as a potential claimant if their blood level at that earlier point exceeded the threshold. This approach is conservative because it does not account for the possibility that more individuals may test their blood for PFAS in the future, particularly those living in locations with known contamination, or that evidence of long-term exposure to contaminated drinking water may itself be sufficient to demonstrate harm in the tort system. I discuss the relevancy of latency in further detail in Section III.B.2 below. To estimate blood levels at the time of diagnosis, I first rely on the NHANES.[22]

34. Using the NHANES data, I estimate Equation 1 for blood levels in individuals' blood:

**EQUATION 1**

$$PFAS_{i,j} = \left[PFAS_{i,j-1} \times 0.5^{\frac{1}{Half-life_i}}\right] + \left[Continuing\ Exposure \times (1-\delta)^{j-1999}\right]$$

(a) $PFAS_{ij}$ is the predicted mean blood level for a given PFAS chemical for an individual in birth cohort i in year j, and $\delta$ represents the rate of decline in continuing exposure, compounding from 1999 (the first year that PFAS blood levels were measured in NHANES) to year j. I forecast future blood levels by cohort separately for each of the seven PFAS chemicals reported in NHANES.[23]

(b) The first component of the equation captures the decline in blood levels due to the body's natural process of removing these chemicals over time. I rely on the existing literature to estimate half-lives — the time it takes for the body to remove half of the initial amount — separately by chemical and age of study participants.[24] First,

---

[22] "National Health and Nutrition Examination Survey," https://perma.cc/QL82-C9UR (last accessed on Sept. 12, 2026).

[23] Perfluorooctanoic acid (PFOA), perfluorooctane sulfonic acid (PFOS), perfluorohexanesulfonic acid (PFHxS), perfluorononanoic acid (PFNA), perfluorodecanoic acid (PFDeA), perfluoroundecanoic acid (PFUnDA), N-methyl perfluorooctanesulfonamidoacetic acid (PFOSA).

[24] *See* Isabella Rosato, Tiziano Bonato, Tony Fletcher, Erich Batzella, Cristina Canova, *Estimation of per- and polyfluoroalkyl substances (PFAS) half-lives in human studies: a systematic review and meta-analysis*, 242 ENV'L RESEARCH, 0013-9351, 117743, (2024), https://doi.org/10.1016/j.envres.2023.117743. Lewis-Michl, E.L., Forand, S.P., Hsu, WH., et al., *Perfluorooctanoic acid serum concentrations and half-lives in a community exposed to contaminated drinking water in New York State,*. 35 J EXPO SCI ENVIRON EPIDEMIOL, at 403–413

I rely on Rosato et al. (2024) to estimate general population half-lives for PFOA, PFOS, and PFHxS. I rely on Zhang et al. (2013) to estimate general population half-lives for PFNA, PFDeA, and PFUnDA.[25]

(c) Half-life varies with age. Younger individuals process PFAS more quickly than older individuals. The literature does not provide age-varying half-life estimates for each of the seven chemicals. I therefore rely on Lewis-Michl, et al. (2025),26 which reports half-life estimates by age group for PFOA and apply this age-based ratio to the half-lives of the remaining chemicals. Table 2 presents these estimates.

(d) The second component of the equation measures new accumulation of PFAS in the blood through continuing exposure. The term *Continuing Exposure* represents the beginning level of continuing exposure – as measured by blood level – in 1999. I include a $\delta$ term to reflect decreasing new exposure over time as legacy PFAS chemicals are phased out and both water systems and individual households implement remediation and filtration systems. I calibrate both *Continuing Exposure* and $\delta$ for each PFAS chemical separately based on a best fit to the full NHANES blood level data from 1999 through 2017.

---

(2025), https://perma.cc/5D6T-CTWW ("Lewis-Michl et al. (2025)") (last accessed on Sept. 12, 2026).

[25] Yifeng Zhang et al., *Biomonitoring of Perfluoroalkyl Acids in Human Urine and Estimates of Biological Half-Life*, 47 ENVIRONMENTAL SCI. & TECH., , (2013), dx.doi.org/10.1021/es401905e. As Me-PFOSA-AcOH breaks down into PFOS in the human body, I use the half-life of PFOS for Me-PFOSA-AcOH. *See,* Wouter A. Gebbink et al.,*Temporal changes (1997–2012) of perfluoroalkyl acids and selected precursors (including isomers) in Swedish human serum*, 199 ENV'L POLLUTION, 0269-7491, at 166-173, (2015). , https://perma.cc/TD76-LRAQ (last accessed on Sept. 12, 2026).

[26] Lewis-Michl, et al. (2025), *supra,* note 24.

## TABLE 2: PFAS HALF-LIVES

| | | PFOA Half-Life [A] | PFOA Half-Life Age Adjustment [B] | PFOA [C] | PFOS [D] | PFHxS [E] | PFNA [F] | PFDeA [G] | PFUnDA [H] | PFOSA [I] |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | [A] ÷ [3][A] | [3][C]× [B] | [3][D]× [B] | [3][E]× [B] | [3][F]× [B] | [3][G]× [B] | [3][H]× [B] | [D] |
| | | Lewis-Michl et al | | Rosato et al | | | Zhang et al | | | |
| Females under 50 | [1] | | | | | | **2.5** | **4.5** | **4.5** | |
| Females over 50 and All Males | [2] | | | | | | **4.3** | **12** | **12** | |
| Overall | [3] | **2.86** | 1.00 | **2.73** | **4.70** | **5.31** | 3.73 | 9.62 | 9.62 | 4.70 |
| 0-17 | [4] | **1.96** | 0.69 | 1.87 | 3.22 | 3.64 | 2.56 | 6.59 | 6.59 | 3.22 |
| 18-39 | [5] | **2.65** | 0.93 | 2.53 | 4.35 | 4.92 | 3.46 | 8.91 | 8.91 | 4.35 |
| 40-59 | [6] | **3.23** | 1.13 | 3.08 | 5.31 | 6.00 | 4.21 | 10.86 | 10.86 | 5.31 |
| 60+ | [7] | **3.55** | 1.24 | 3.39 | 5.83 | 6.59 | 4.63 | 11.94 | 11.94 | 5.83 |

Notes and Sources (Table 2):
Bolded values are directly sourced from the studies below; remaining values are approximated based on chemical-specific half-lives and PFOA age-based half-life ratios.

[A]: Lewis-Michl, et al., *supra,* note 24, at 403–413.

[3][C]-[3][E]: Rosato, et al., *supra,* note 24, at 117743.

[1][F]-[2][H]: Zhang, et al., *supra,* note 25, at 10619−10627.

[3][F]-[3][H]: US population-weighted average of [1][F]-[2][H].

35. To forecast the distribution of PFAS blood levels across the population through the end of the forecast period, I apply the NHANES 2017-2020 data as a starting year in Equation 1. Because individuals living in contaminated water systems have higher levels of PFAS in their blood, relying on the general population distribution of PFAS would underestimate PFAS levels in the Affected Population. I therefore apply an upward adjustment to the general population blood levels based on the findings in Fillman et al. (2025) that individuals living in contaminated water districts have higher PFAS blood levels than those in non-contaminated districts. The estimated magnitudes range from a 30% increase for PFOA to an 80% increase for PFHxS.[27] I assume that

[27] Fillman et al. *supra,* note 8, Figure 3 reports elevated blood levels by chemical: PFOS levels are 31.2% higher among individuals in contaminated districts, PFOA levels are 30.4% higher, and PFHxS are 80% higher. I apply the average value of these results to estimate that blood levels are 47% higher for PFNA, PFDeA, PFUnDA, and PFOSA. Fillman et al. express the higher effects in contaminated vs. non-contaminated areas. I adjust these values downward to express the same effects in contaminated areas relative to the average in all areas to allow them to be applied to the

the distribution of blood levels for the exposed population is proportionate to that of the general population. This is likely a conservative assumption because populations with contaminated water supplies are more likely to have more extreme levels of PFAS exposure.

36. For each year in the forecast, I estimate the share of the population with blood levels above NASEM thresholds. I consider two NASEM thresholds: a low threshold of 2 ng/mL and a "increased risk" threshold of 20 ng/mL. These thresholds are set based on the epidemiological literature that establishes 2 ng/mL as the threshold for "potential for adverse effects" and 20 ng/mL as the threshold for "increased risk."[28] Because PFAS levels are observed to vary substantially by age, consistent with higher historical exposures, I forecast the population share above the thresholds separately by birth cohort.

### B. INCIDENCE OF KIDNEY CANCER

37. I first estimate the Affected Population residing in a contaminated PWS area and exposed to at least one PFAS chemical at a concentration above the reporting threshold. I estimate this population by applying the 26% Affected Population discussed in Section III.A to the 2017 U.S. Census population aged 12 and older, after excluding foreign-born individuals who had not resided in the U.S. for the required exposure period. I use 2017 and age 12 as the starting year and age respectively, in order to align the forecast population with the NHANES blood level data.

38. I then apply age-specific kidney cancer incidence rates reported by the Centers for Disease Control and Prevention (CDC) and National Cancer Institute (NCI) to estimate the expected incidence of kidney cancer in the starting population.[29]

---

general population estimates of blood levels reported in NHANES. For example, for PFOA the 30.4% higher level in contaminated areas relative to non-contaminated areas is equivalent to a 21% increase relative to the general population based on the observation that 25.9% of the general population are in contaminated areas.

[28] National Academy of Science, Engineering, and Medicine, *Guidance on PFAS Exposure, Testing, and Clinical Follow-Up* THE NAT'L ACAD. PRESS, at 11–12, 134 (2022),. https://doi.org/10.17226/26156.

[29] U.S. Cancer Statistics Working Group. U.S. Cancer Statistics Data Visualizations Tool. U.S. Department of Health and Human Services, Centers for Disease Control and Prevention and National Cancer Institute; https://perma.cc/FUQ7-2V6T, released in June 2026 (last accessed on Sept. 12, 2026).

### 1. Increased Relative Risk of Kidney Cancer due to PFAS Blood Levels

39. As described above, I forecast PFAS blood levels and calculate the percent of each cohort with serum above the low (2 ng/mL) and high (20 ng/mL) NASEM thresholds. Using the estimated blood level for each age and exposure cohort, lagged ten years to account for latency as described below, I calculate the corresponding relative risk of kidney cancer as:

**EQUATION 2**

$$RR = 1.00 + Serum\ Concentration\ x\ ERR\ per\ ng/mL\ PFAS$$

40. Where the excess relative risk ("ERR") per ng/mL of serum PFOA. I have been instructed by counsel that the State's epidemiologist expert estimated excess relative risk per 1 ng/mL serum PFOA for kidney cancer based on an assessment of Vieira et al. (2013) (0.0146)[30] and Shearer et al. (2021) (0.098)[31] and adopted the geometric mean of 0.037826 in their analyses. I use this value as the estimate for all seven PFAS chemicals included in this analysis. In an alternative scenario, I use the arithmetic mean.

### 2. Latency of Cancer Risk

41. The latency between when an individual is exposed to a carcinogen and when they develop cancer can be many years. Therefore, the cancer risk in an exposed population will remain elevated for many years after exposure to the carcinogen ends. The ability to prove that a future cancer diagnosis occurred due to exposure to PFOA, rather than in accordance with background risks for the general population, depends on the latency. While the latency of PFOA cancer risk is not yet known, I develop an estimate of expected latency by comparing the latency observed in kidney and other cancers caused by other toxic exposures. This review of toxicity latency periods reveals a range of expected cancer latency of between 10 and 40 years after last exposure. These estimates and the studies in which they are reported are listed in Table 3. Based on these

---

[30] Verónica M. Vieira et. al., *Perfluorooctanoic Acid Exposure and Cancer Outcomes in a Contaminated Community: A Geographic Analysis*, 121 ENV'L HEALTH PERSPECTIVES, 3 (Mar. 2013).

[31] Joseph J. Shearer et al., *Serum Concentrations of Per- and Polyfluoroalkyl Substances and Risk of Renal Cell Carcinoma*, 113 JNCI J NAT'L CANCER INST. 5 (2021).

comparable benchmarks, I use 20 years as a reasonable estimate of the time period of past exposures to PFAS that could result in an increased risk of cancer today.

**TABLE 3: STUDIES OF CANCER LATENCY**

| Study | | Year | Cancer(s) | Latency | Carcinogen | Notes |
|---|---|---|---|---|---|---|
| Yuan et al. | [A] | 2010 | Kidney | 25+ | Arsenic | Kidney cancer mortality rates remained elevated 25 years after high exposure levels to arsenic began to decline. |
| Smith et al. | [B] | 2018 | Kidney, Bladder, Lung | 40+ | Arsenic | In a follow up to Yuan (2010) cancer mortality rates remained elevated 40 years after high exposure levels to arsenic began to decline. |
| Review of Health Effects of Vietnam Veterans' Exposure to Herbicides | [C] | 1999 | Lung | 20+ | Herbicides | Evidence suggests elevated risks of lung cancer following exposure for 20+ years (p. 425). |
| | | | Prostate | 10-15 | | Evidence suggests little risk of prostate cancer, between 10 and 15 years after the end of exposure (p. 428). |
| | | | non-Hodgkin's Lymphoma | 20+ | | The effect of herbicide exposure on the risk of non-Hodgkin's lymphoma lasts for more than 20 years (p. 430). |

Notes and Sources (Table 3):

[A]: Yan Yuan, et al., *Kidney cancer mortality: fifty-year latency patterns related to arsenic exposure* 1 EPIDEMIOLOGY 21, 103–08 (2010).

[B]: Allan H. Smith, et al. *Lung, bladder, and kidney cancer mortality 40 years after arsenic exposure reduction*. 110 JNCI: J. OF THE NAT'L CANCER INST. 3, 241–49 (2018).

[C]: Committee to Review the Health Effects in Vietnam Veterans of Exposure to Herbicides (Second Biennial Update). Veterans and Agent Orange: Update 1998. National Academies Press, 1999.

42. Due to latency, increased risks of kidney cancer resulting from elevated PFAS in the blood continues after PFAS exposure drops below health risk threshold levels. One way to model this latency effect is to look back at past levels of exposure and use these past levels of exposure to estimate current risk. For the Affected Population that has declining levels of PFAS in their blood, the average level of PFAS exposure over the estimated twenty-year latency period can be approximated by looking back ten years to the PFAS blood levels. I implement a 20-year latency assumption using a ten-year look back to estimate current increases in kidney cancer risk to evaluate the individuals with potentially viable claims.[32] By way of example, in the year 2027,

[32] I look back 10 years to approximate the average blood levels across a 20-year latency period, rather than re-calculating the average PFAS blood level across each new 20-year span, each year.

I look back to 2017 blood levels[33] to determine which people in the Affected Population had blood levels above the threshold for health effects and to calculate the excess relative risk. And in subsequent years, I continue to look back ten years, (in 2028, I would use 2018 blood levels to do these same calculations).[34]

43. For each birth cohort (that experiences age-varying blood level half-lives), I forecast the projected 20-year trajectory of blood levels for an individual with a concentration of 20 ng/mL in 2017, using the methodology described above. Because blood levels are projected to decline over time, an individual whose concentration is 2 ng/mL or less at the end of the period may nevertheless have had a concentration at or above 20 ng/mL earlier in the period. Accordingly, reliance solely on blood levels at the time of diagnosis could exclude individuals whose earlier PFAS exposure was sufficiently elevated to be relevant to their subsequent kidney-cancer diagnosis. The ten-year look back adjustment also allows forecasting cancer incidence to incorporate the effects of past PFAS exposure.

### 3. Forecast of Kidney Cancer from 2026 in the Affected Population

44. For the time period 2017–2100, I project each age cohort accounting for natural mortality as the population ages.[35] I use publicly available cohort life tables to estimate annual mortality rates based on sex, attained age, and forecast year and apply these rates to the surviving population in each year.[36] Because the analysis follows a closed population beginning in 2017, I do not add individuals who enter the population after 2017. As each cohort ages, I apply the kidney cancer incidence rate corresponding to its attained age to estimate expected kidney cancer incidence in each forecast year. I rely on the blood level forecast to estimate the share of individuals with kidney cancer who have evidence of PFAS exposure over the NASEM thresholds, and who therefore potentially have a valid claim.

---

[33] NHANES surveys are conducted in multi-year cycles; I assign each cycle to its first year.

[34] The first year of NHANES data used for the forecast is 2017, consequently for 2026 a nine-year look-back period is used.

[35] Exposed population is projected through 2100 however, the claims forecast extends through 2086 based on the applicable model parameters.

[36] Social Security Administration, Office of the Chief Actuary, 2026 OASDI Trustees Report: Period Life Tables, https://perma.cc/7USZ-Z3N7 (last accessed on Sept. 12, 2026).

45. I then apply the relative risk associated with the estimated blood level for each age and exposure cohort to estimate my final future kidney cancer incidence forecast among populations exceeding the specified thresholds. *See* Figure 2 below.

**FIGURE 2: KIDNEY CANCER INCIDENCE FORECAST**
> 2 ng/mL < 20 ng/mL, ERR = 0.0378 per ng/ML




### C. ESTIMATED NUMBER OF FUTURE TORT CLAIMS

46. Liabilities associated with future tort claims are contingent liabilities. Although some individual claims are yet to be filed, contingent liability valuation methods allow the expected value of future claims liability to be quantified taking into account the number and timing of claims that can reasonably be expected to be filed based on a factual history of tort incidence (such as exposure to carcinogens) and litigation. Contingent liabilities associated with potential new targets of litigation, when there is a track record of litigation against similar targets, can be modeled by estimating the event probability of litigation target by target. In litigation against

existing targets, future claims can be estimated using a claiming rate representing the proportion of injured persons expected to bring a claim.

47. The contingent liability being estimated here arises from expected future claims by persons exposed to PFAS through PWS drinking water across the United States, at levels recognized to pose a risk of certain cancers, and with blood levels at which increased risk of certain cancers are expected. Litigation has already been filed by similarly impacted persons for personal injuries due to drinking water contamination against PFAS manufacturers, among others, that in part was alleged to have been caused by pollution from AFFF usage.[37] Many of these cases have been transferred to the AFFF MDL.[38]

48. The AFFF MDL is currently managing drinking water contamination personal injury cases transferred from around the country, however the number of individual claimants and the number of cancer claimants in particular have not been disclosed and are not otherwise publicly available. Personal injury cases have been transferred from every state, indicating that claims related to drinking water contamination by PFAS is nationwide and that future claims can be expected for any contaminated public water system.[39] Consequently, the estimates developed in this analysis use a claiming rate for cancer cases expected in the relevant exposed population and encompass both claims already filed in the AFFF MDL to date and future claims expected to arise from these exposed populations.

---

[37] Over 37,000 claims were reportedly filed in response to the AFFF MDL CMO 35 Claim Filing Facilitation Window in August 2025. *See Firefighter Foam Cancer Lawsuit Settlement Prospects*, Miller & Zois, https://perma.cc/YSF7-E2AN (last accessed on Sept. 12, 2026). However, CMO 35 authorized group filings of up to 150 claimants per case. *See* LegalClarity Team, *AFFF Lawsuit Mass Tort Case Leads: Pricing and Ethics*, LegalClarity (June 17, 2026) https://perma.cc/7AX4-GGW9 (last accessed on Sept. 12, 2026). Because of bulk filing, the estimate of 37,000 claims may represent a significantly higher number of claimants.

[38] *See, e.g.*, *City of Fresno v. 3M Company et al.*, AFFF MDL Transfer Order, April 2, 2026. *See also* Transfer order for State of Maryland, Corinth Gas & Water, and City of Dayton, Ohio, AFFF MDL(June 4, 2026).

[39] According to the MDL court, "this is an expansive MDL that encompasses many, if not most, water providers across the country." *City of Fresno v. 3M Company et al.*, Transfer Order AFFF MDL, (Apr. 2, 2026).

**1. Propensity to Sue**

49. The number of cancer claims filed in the AFFF MDL would provide the most direct basis for an estimate of the claiming rate for this liability estimation, however, in the absence of this data, the Talc MDL provides a historical benchmark of claiming experience that could be expected for cancer claimants in PFAS drinking water contamination litigation generally.

50. Johnson & Johnson has disclosed the number of ovarian cancer claims filed in the LTL Talc Litigation Bankruptcy proceedings.[40] The number of ovarian cancer claimants filing cases in each year, starting from the year the Talc MDL was established, can be compared with government estimates of U.S. incidence of ovarian cancer to estimate a propensity-to-sue. The prevalence of ovarian cancer is more than ten times the annual incidence so, at least initially, the pool of potential claimants is much larger than the number of newly diagnosed persons. However, in the long run, new claim filings are expected from claims diagnosed within the statute-of-limitations window. Ten years after the Talc MDL was established, the total number of ovarian cancer claims reached over 74,000, a level representing an annual average incidence over ten years of approximately 35 percent.[41] I use this ten-year average as the propensity to sue to forecast PFAS claims.

51. The annual propensity to sue is used to estimate the number of claimants related to PFAS expected to: (1) file kidney cancer personal injury claims due to public water system PFAS contamination starting in 2026; (2) from among the population served by contaminated water systems; (3) with at-risk PFAS blood levels; and (4) after diagnosis with kidney cancer.

52. As described above, the latency of kidney cancer risk due to past PFAS exposures means that the Affected Population with increased risk due to PFAS exposure includes many individuals whose current blood levels are below the "Increased Risk" threshold but over the estimated 20-year latency period. Their blood levels would have declined from above the

---

[40] *In re: LTL Management LLC*, U.S. Bankr. Ct., W.D.N. C., Case No. 21-30589 (MBK), 318 at n. 10 (Feb. 25, 2022). *See also, e.g.*, Daniel Lapinski, *Talcum Powder Lawsuit Case Overview*, Motley Rice, https://perma.cc/6AQM-J633 (Sept. 2, 2026); Ronald V. Miller, Jr., *Talc Powder Ovarian Cancer Lawsuit*, Lawsuit Information Center, https://perma.cc/2L8B-P7ZA (Sept. 1, 2026).

[41] Approximately 74,000 cumulative claims over a ten-year period is equivalent to an annual average of roughly 7,400, out of an annual incidence of approximately 21,000 cancer cases, yields an annual average propensity to sue of 35 percent.

threshold. Consequently, the Affected Population from which claims are expected to arise is estimated as the fraction of the population served by contaminated water systems that had blood levels above the "Increased Risk" threshold ten years ago. One third of the cancer incidence in the Affected Population in each of the prior three years is multiplied by the propensity to claim representing a one-to-three-year lag between incidence and claiming.

### 2. Scale-Up for Other Injuries with a "Probable Link" Finding

53. A simplifying assumption made in this liability estimation is that liabilities for injuries other than kidney cancer are proportional to the relative liability share estimated to be paid in the *Leach* Class Action against DuPont entities. In that case, the Ohio MDL C8 Science Panel established by the parties to study general causation established a "probable link" between PFOA drinking water exposure and the risk of certain cancer and non-cancer injuries. Equity analysts covering DuPont entities at the time, including those at Barclays, estimated the relative value of cancer and non-cancer claims. Using these estimates and the information disclosed regarding the mix of cancer and non-cancer claims in the *Leach* Class, the relative fraction of liability attributed to kidney cancer claims can be computed. Based on this analysis, reported in Table 4, the aggregate liability for claims for which the Ohio MDL C8 Science Panel established a probable link was just over double the liability attributable to the kidney cancer claims alone. This scalar is used here to extrapolate the estimated kidney cancer claim liability to an overall liability for all injuries with a probable link finding.

**TABLE 4: KIDNEY CANCER SHARE OF LIABILITY**

| Injury | | Leach Class Claims [1] | Claim Mix [2] [1]/[1][B] | Barclays Analyst: Number of Claims [3] | Barclays Analyst: Value per Claim ($M) [4] | Attributable Liability ($M) [5] [3]x[4] | Relative Liability [6] [5]/[5][B] |
|---|---|---|---|---|---|---|---|
| **Cancer** | [A] | 280 | | 500 | $1.50 | $750.0 | |
| Kidney Cancer | [B] | 210 | 1.00 | | | $562.5 | **1.00** |
| Testicular Cancer | [C] | 70 | 0.33 | | | $187.5 | **0.33** |
| **Non-Cancer** | [D] | 3,270 | 15.57 | 3,000 | $0.15 | $450.0 | **0.80** |
| **Total** | [E] | 3,550 | | 3,500 | | | **2.13** |

Notes and Sources (Table 4):

[1]: E. I. du Pont de Nemours and Company, Form 10-K for the Fiscal Year Ended Dec. 31, 2016, at F-33.

[3]&[4]: Duffy Fischer and Michael Leithead, "PFOA jury decision in-line; Bloomberg buyout article underscores value proposition," Barclays Equity Research at 1 (Oct. 8, 2015).

### D. ESTIMATE PER CLAIM VALUES

54. I estimate the indemnity value of each cancer claim by using comparable benchmarks from other mass tort settlements. I define comparable mass tort benchmarks based on the following criteria:

(a) The claims were settled since the 1982 Manville Trust bankruptcy to resolve asbestos personal injury mass tort liabilities.

(b) The claims were predominantly for cancer or similarly serious injuries,

(c) The value of claims reflected that exposure-related causation of the injuries could be contested in the tort system.

55. Using these criteria, I identify nine comparable benchmarks, as reported in Table 5. The per-claim values for the most serious injury category are used as the benchmark values. The values as of the settlement date are adjusted to 2026 using social inflation over the period 2014 to 2022 (the period for which this was estimated by Swiss Re. Institute) and CPI before 2014 and

after 2022. Social inflation estimates, which express inflation in tort awards, are adopted from a published analysis by Swiss Re. Institute that reports average annual indices from 2012 to 2022.[42]

**TABLE 5: MASS TORTS VALUATION BENCMARKS**

| Mass Tort | | Cancer/Injury | Valuation Year | Settlement Value per Claim ($M) | CPI Adjustment to 2011 | Social Inflation Adjustment to 2022 | CPI Adjustment from 2022 | 2026 Value per Claim ($M) |
|---|---|---|---|---|---|---|---|---|
| | | [1] | [2] | [3] | [4] | [5] | [6] | [7] [3]x[4]x[5]x[6] |
| Hexavalent Chromium | [A] | Lung Cancer | 1996, 2006, 2007 | $1.39 | 1.29 | 1.45 | 1.13 | $2.93 |
| PFOA (Leach Class) | [B] | Kidney/Testicular | 2015 | $1.50 | 1.00 | 1.40 | 1.13 | $2.36 |
| Asbestos | [C] | Mesothelioma | 2005, 2007 | $1.06 | 1.11 | 1.45 | 1.13 | $1.91 |
| Diet Drugs | [D] | Heart Value | 2003 | $0.80 | 1.24 | 1.45 | 1.13 | $1.63 |
| 911 VCF | [E] | Various | 2015 | $0.39 | 1.00 | 1.40 | 1.13 | $0.62 |
| Actos | [F] | Bladder | 2015 | $0.25 | 1.00 | 1.40 | 1.13 | $0.39 |
| Ethylene Oxide (EtO) | [G] | Hematopoietic | 2025 | $0.46 | 1.00 | 1.00 | 1.03 | $0.48 |
| Talc | [H] | Ovarian | 2024 | $0.25 | 1.00 | 1.00 | 1.06 | $0.27 |
| Roundup | [I] | NHL | 2026 | $0.17 | 1.00 | 1.00 | 1.00 | $0.17 |
| **Average** | | | | | | | | **$1.19** |
| Median | | | | | | | | $0.62 |
| 90% confidence interval - lower bound | | | | | | | | **$0.63** |
| 90% confidence interval - upper bound | | | | | | | | **$1.76** |

Notes and Sources (Table 5):

[A]: Pacific Gas & Electric Co., Form 10-K405 for the Fiscal Year Ended December 31, 1996, at 230; Pacific Gas & Electric Co, Form 10-K405 for the Fiscal Year Ended December 31, 1995 at 51; Pacific Gas & Electric Co, Form 10-K for the Fiscal Year Ended December 31, 2006 at 52; *Dorothy Adams, et al. v. Pacific Gas & Electric Co.*, 2007 Jury Verdicts LEXIS 37280.

[B]: Duffy Fischer and Michael Leithead, *PFOA jury decision in-line; Bloomberg buyout article underscores value proposition*, BARCLAYS EQUITY RESEARCH, Oct. 8, 2015, at 1.

[C]: Bates, E.C. and Mullin, H.C., *Show Me The Money*, MEALEY'S LITIGATION REPORT. Dec. 3, 2007; Based on Tables 4.1, 5.1a, 5.1b, 5.4, and 5.5 of Carroll, Stephen J., Deborah Hensler, Jennifer Gross, Elizabeth M. Sloss, Matthias Schonlau, Allan Abrahamse, J. Scott Ashwood, *Asbestos Litigation*,. RAND CORPORATION, 2005.

[D]: *In Re: Diet Drugs* (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation. Nationwide Class Action Settlement Agreement with American Home Products Corporation (Sixth Amendment). Jan. 10, 2003, at 38.

[42] *Litigation costs drive claims inflation: indexing liability loss trends*, SWISS RE. INST., sigma No 4/2024, at 23, Table 4.

[E]: *VCF Program Statistics (Represents activity through the end of the day on June 30, 2015)*, July 20, 2015. https://www.vcf.gov/sites/vcf/files/resources/VCFProgramStatistics07202015.pdf

[F]: *Lieff Cabraser Heimann & Bernstein, LLP, Firm Resume*, https://www.lieffcabraser.com/pdf/Lieff_Cabraser_Firm_Resume.pdf.

[G]: Sotera Health Company, Form 10-Q for the Quarterly Period Ended September 30, 2023; Sotera Health Company, Form 10-K for the Fiscal Year Ended December 31, 2025; *Closed Illinois Plant's Ex-Operator Settling Suits for $408M*, ASSOCIATED PRESS (Jan. 10, 2023), https://apnews.com/article/health-medical-technology-chicago-business-lawsuits-cbae4e5c2aefa186f5ebc38df187f052; *Sterigenics Settles 97 Ethylene Oxide Claims in Illinois,* SOTERA HEALTH COMPANY (April 3, 2025), https://investors.soterahealth.com/static-files/65ff7d5b-fc0a-4283-abd4-65ac85e68d52.

[H]: John K. Kim, "Declaration in Support of Chapter 11 Case and Certain First Day Pleadings," *In re Red River Talc LLC*, Case No. 24-90505 (CML), (Sept. 20 2024), https://documents.elevenflo.com/uuid_database_8_14_23/dff91ea0-5f80-4714-9a1d-01e6d8e11fb9.pdf, ¶13; Alison Frankel, *Can J&J Finally Put the Talc Litigation Behind It?*, REUTERS (July 29, 2026), https://www.reuters.com/business/healthcare-pharmaceuticals/can-jj-finally-put-talc-litigation-behind-it-2026-07-29.

[I]: Class Action Settlement Agreement, *King, et al. v. Monsanto Company*, Case No. 2622-CC00325, (Feb. 17, 2026), https://nationalaglawcenter.org/wp-content/uploads/2026/02/Roundup-proposed-settlement-2.17.26.pdf.

[3]&[6]: Consumer Price Index (CPI-U), July 2026 (XLSX), https://www.bls.gov/cpi/tables/supplemental-files/.

[5]: Swiss Re Inst., *Litigation Costs Drive Claims Inflation: Indexing Liability Loss Trends*, sigma No. 4/2024, 2024.

56. In mass tort litigations, the most valuable claims are those from claimants with the most serious injuries, often cancers, known to have a strong causal link to exposure. However, many plaintiffs file claims with less serious injuries and/or weaker proof of exposure or causation. The diversity of claims that are able to sustain litigation thus has an impact on the average per claim value implied by any aggregate settlement. The similarity of the type of case (*i.e.,* toxic chemical exposure); impact of exposures; activity that led to exposure; and alleged improper corporate conduct are all factors that can influence the suitability of a benchmark.

57. The 911 Victim Compensation Fund ("911 VCF")[43] differs from the other benchmarks because it is a no-fault alternative to litigation. The compensation structure and covered conditions of the 911 VCF balance inclusiveness and traditional elements of tort compensation against potential uncertainties in linking 9/11 exposures to subsequent health issues. The 911 VCF compensates a cancer claimant absent definitive proof of causation.[44] However, because the 911 VCF also caps non-economic damages and punitive damages are not available, the 911 VCF average cancer claim values represent a lower benchmark.

58. The most directly comparable claim value is the average cancer claim value implied by the *Leach* Class in 2017. This settlement for $670.7 million in 2017 resolved 280 cancer claims and an additional 3,270 other personal injury claims.[45] Using a contemporary estimate by an equity analyst at Barclays who was evaluating the liability of DuPont entities in this litigation, I estimate the per claim value for the kidney cancer claims as $1.5 million.[46] However, the members of the *Leach* Class did not have to prove general causation to sustain their claims as a consequence of an earlier stipulation agreed with DuPont entities when setting up the Ohio MDL C8 Science Panel, so my estimate represents a higher benchmark.

59. The range of values used to estimate liability for claims brought for kidney cancer due to PFAS drinking water contamination are reported on Table 5 between the median of $0.62 million and the upper bound of the confidence interval estimate for the mean of the benchmarks of $1.76 million.

---

[43] U.S. Department of Justice, *September 11th Victim Compensation Fund*, https://perma.cc/7KYN-5GF5 (last accessed on Sept. 12, 2026).

[44] Notwithstanding this somewhat relaxed causation requirement, cancer claimants in the 911 VCF are still required to provide a physician certification that "an individual's 9/11 exposure is substantially likely to be a significant factor in aggravating, contributing to, or causing the individual's condition." World Trade Center Health Program, "Instructions for Completing WTC-3 Package Requesting Certification for Types of Cancer," June 19, 2023, https://perma.cc/HV4T-CG3X (last accessed on Sept. 12, 2026).

[45] E. I. du Pont de Nemours and Company, Form 10-Q for the Quarterly Period Ended March 31, 2017, https://perma.cc/W4V2-EDGT, at 18 (last accessed on Sept. 12, 2026); E. I. du Pont de Nemours and Company, Form 10-K for the Fiscal Year Ended Dec. 31, 2016, https://perma.cc/V5KM-MVUS, at F-33 (last accessed on Sept. 12, 2026).

[46] Duffy Fischer and Michael Leithead, *PFOA jury decision in-line; Bloomberg buyout article underscores value proposition*, BARCLAYS EQUITY RESEARCH, Oct. 8, 2015.

### 1. Relative Exposure Adjustments

60. Over the time period since the *Leach* class was settled, environmental science, public health research, epidemiology, and regulation have all advanced the public understanding of the health risks of PFAS. At the time of the *Leach* class action, the threshold exposure level for inclusion in the class of individuals determined to have injuries with a "probable link" to PFOA was a drinking water PFOA concentration of 50 ppt; testing and action thresholds for PWS drinking water have since declined. Furthermore, public health research by Toki Fillman and collaborators has established that there is a correlation between drinking water above the UCMR reporting level for PFAS and elevated PFAS blood levels.[47] Relying on this finding, the exposed population of interest is determined by identifying persons served by a PWS with PFAS contamination. I further narrow this population to those with PFAS blood levels that pose health risks. This is the population that I compare to the *Leach* Class.

61. The National Academy of Science, Engineering, and Medicine ("NASEM") guidelines now distinguish two PFAS blood levels at which there are risks to health. Individuals with PFAS blood levels between 2 ng/mL and 20 ng/mL have the "potential for adverse effects," especially in sensitive populations. At blood levels above 20 ng/mL according to NASEM there is "increased risk" of adverse effects. I use these two thresholds to identify the proportion of the population in contaminated water districts (by age group) that would be able to use their blood levels as evidence to support a finding of individual causation for kidney cancer or other injuries with a "probable link" finding.

62. I use the valuation benchmarks described above to value claims forecast from the population with blood levels above the NASEM "Increased Risk" threshold. For claims arising from the fraction of the population with blood levels in the NASEM "potential for adverse effects" range, I adjust the claim values in proportion to the lower incremental risk of kidney cancer that their blood levels impose. As described in Paragraph 36 above, the excess kidney cancer relative risk of 0.037826 per ng/mL of PFOA in the blood is used in this analysis and is the geometric mean of the two estimates (*see* Paragraph 36 *supra*). An alternative measure is using the arithmetic

---

[47] Fillman et al., *supra* note 8.

mean of the two estimates, which is 0.0563. I use both these values in different valuation scenarios in estimating the range of possible liabilities.

63. Using this risk measure and NHANES data on PFAS blood levels, I translate the average PFAS blood levels of each group to estimate a lower average incremental risk of kidney cancer for the "potential for adverse effects" population. This calculation is presented in Table 6.

**TABLE 6: LOWER INCREMENTAL RISK IN "POTENTIAL FOR ADVERSE EFFECTS" POPULATION**

| Relative Exposure [1] | | Average Blood Level ng/mL [2] | Relative Risk [3] [2]x[C] | Excess Risk [4] [3]-1 | Relative Excess Risk [5] [4]/[4][B] |
|---|---|---|---|---|---|
| **>2 & <20** | [A] | 8.29 | 1.31 | 0.31 | **0.29** |
| **>20** | [B] | 28.91 | 2.09 | 1.09 | **1.00** |
| **ERR per ng/mL** | [C] | | 0.037826 | | |

Notes and Sources (Table 6):

[2]: NHANES 2017, data for all seven NASEM PFAS chemicals.

### E. DEFENSE COSTS

64. The liability costs to DuPont entities and its successors associated with drinking water-related personal injury claims arise from paying awards and settlements (*i.e.*, indemnity costs), but also their costs of defending these cases. The expected amount of defense costs is estimated as a proportion of the estimated indemnity costs. In studies of tort litigation, the proportion of costs associated with legal defense is estimated as about a third of the total costs; I rely on a RAND study estimate of 37 percent.[48] Thus, liabilities are increased by 0.37/(1 - 0.37), or 59 percent of the amounts paid in awards and settlements to claimants.

### F. DUPONT ENTITIES' LIABILITY SHARE

65. In tort litigation, court proceedings determine the liability share attributed to specific defendants. The share of liability attributed to a particular defendant in an individual PFAS

---

[48] James S. Kakalik, et al. *Variation in Asbestos Litigation Compensation and Expenses*, vii, RAND CORP.(1984).

water contamination personal injury case will depend on the facts of the case, including the defendants' conduct, the law in the state of jurisdiction, and how the finder of fact weighs the evidence. Despite these individual factors, the companies that produced the PFAS chemicals that are the source of contamination will generally be principal litigation targets because of the ubiquity of their PFAS products, the duration of their manufacturer of these products, and their prominence as producers. Joint and several liability rules may also increase the liability share of the chemical manufacturers, including the DuPont entities. I consider several methodologies to determine liability share.

66. First, in 2015, after DuPont entities had stopped manufacturing PFOA, DuPont entities had a reported market share between 25% and 36% in the U.S. market for fluoropolymers, which can be manufactured utilizing PFOA.[49] I use these market share estimates as one source of possible reasonable liability share estimates.

67. Liability for PFAS personal injury claims in some cases could reasonably be expected to be shared with defendants that used products from 3M and DuPont entities in their own operations, such as in cases in which secondary manufacturers improperly disposed of chemical waste or otherwise used the DuPont entities' PFAS products that were then released PFAS into the environment. Under such a scenario, an allocation approach can be used based on the similar allocation developed in asbestos mass tort litigation. The proposed Fairness in Asbestos Injury Resolution ("FAIR") Act of 2005 was employed to determine contributions to a proposed federally legislated trust fund to pay industry-wide asbestos liabilities. The FAIR Act provides a precedent here to determine the allocation between top tier asbestos product manufacturers and lower tier companies that used top tier asbestos company products in their operations. The FAIR Act included a tiered schedule of annual contributions for companies with different levels of involvement in asbestos related industries. The top tiers of solvent companies in the asbestos

---

[49] *Chemours: We Initiate Coverage with an Underweight Rating*, JP MORGAN, June 24, 2015, at 13; *Chemours: Deep Value Beats Weak Fundamentals; Initiating with OW Rating*, BARCLAYS, July 6, 2015, at 12; *The Chemours Company: Leader in Opaqueness—how bright is the future?* UBS, July 6, 2015, at 21.

litigation (Tiers II and III)[50] represented the vast majority of expected contributions, with the lower-tier company contributions expected to amount to about half the amount contributed by companies in the top tiers. Thus, the result of allocating this fraction of liability to "downstream" parties, such as secondary manufacturers or others responsible for exposure, would be to reduce the top tier liability share by a third. Following this approach, I reduce the estimated DuPont entities' liability share by a third.

68. Second, I develop liability share estimates based on the contribution of DuPont entities' PFOA production to the blood levels observed in the relevant population exposed to contaminated drinking water. I attribute liability based on the relative concentration of PFOS, PFOA, and PFHxS in the exposed population's blood. I assume that DuPont entities share no responsibility for PFOS or PFHxS, and that its liability for PFOA is shared with 3M for exposures related to the years that 3M produced PFOA for DuPont entities,[51] and after that point, the DuPont entities are responsible for PFOA related exposure liability. Over the period 1970 to 2013 this results in an allocation of liability shares between 3M and DuPont entities for PFOA production of 59 percent to DuPont entities and calculated in Table 7.

---

[50] Tier I companies were already insolvent at the time of the FAIR Act, and many had resolved their liabilities via bankruptcy trusts outside the tort system and so are not a useful point of comparison for assessing how the tort system would attribute responsibility.

[51] Historically, DuPont purchased PFOA from the Minnesota Mining and Manufacturing Company ("3M"). Although 3M announced in May 2000 that it would stop making PFOA, DuPont continued to use PFOA—and, then began producing its own PFOA at a North Carolina DuPont facility. *Leach v. E. I. du Pont de Nemours & Co.*, 2002 WL 1270121, at *3 (W. Va. Cir. Ct. Apr. 10, 2002).

**TABLE 7: PFOA PRODUCTION BY 3M AND DUPONT ENTITIES**

| Beginning Year | Production Estimate (lbs) [A] | Assigned DuPont Share [B] | Number of Years [C] | Aggregate DuPont Attributable Volume [D]: [A] × [B] × [C] |
|---|---|---|---|---|
| 1970 | 500,000 | 50% | 32 | 8,000,000 |
| 2002 | 300,000 | 63% | 1 | 187,500 |
| 2003 | 300,000 | 100% | 11 | 3,300,000 |
| Total: | 19,600,000 | | | 11,487,500 |
| **Liability Share ([D][Total] ÷ [A][Total]):** | | | | **59%** |

Notes and Sources (Table 7):

[A] Conservative attribution to 3M production period based on 3M reported maximum production level. *See* 3M Company SEC Form 8-k, May 12, 2025, at 39. Production estimate during period of DuPont entities' production based on maximum production capacity as reported in Letter from Allen Weidman, Society of the Plastics Industry, Inc., to Mary Dominiak, Apr. 26, 2002, Slide 16, https://cdn.toxicdocs.org/Da/DaYmG5zGaewJ7GX1rZq80124/DaYmG5zGaewJ7GX1rZq80124.pdf.

[B] Attribution of 50% during the period 3M manufactured input material for DuPont entities. DuPont entities are attributed 100% share beginning in Q4 2002 to reflect 3M's phase-out and DuPont entities' new manufacturing capabilities. *See, e.g.,* Sharon Kelly, *DuPont's deadly deceit: The decades-long cover-up behind the "world's most slippery material,"* SALON, Jan. 4, 2016, https://www.salon.com/2016/01/04/teflons_toxic_legacy_partner/.

[C] I consider the period beginning in 1970, the period for which 3M reports production amounts, and ending in 2013 when DuPont entities stopped producing PFOA. *See* Greg Barnes, "County lawsuit revisits DuPont entities' decades of alleged deceit," *City View*, March 25, 2022.

69. I then use the relative blood levels of each of the three PFAS used for this liability attribution calculation to determine the responsibility of DuPont entities for the PFOA share of current PFAS blood levels (using a ten-year look-back to account for latency). Under this

methodology, I estimate a weighted average liability share for DuPont entities starts at approximately 11% in 2026 and over the entire forecast period is of 12%. [52]

### G. INFLATION AND DISCOUNTING

70. To calculate the net present value (NPV) of future liabilities associated with the PFAS claims, I first adjust projected future payments for expected inflation and then discount those payments to present value. I assume that claims are paid two years after they are filed. Claims are inflated according to the long run Federal Reserve's 2.0% yearly inflation projection.[53] I then discount the resulting nominal future payments to present value using the average monthly discount rate in August 2026 of 4.7%, reflecting the risk-free rate on ten-year constant maturity treasury bonds.[54]

### H. TOTAL ESTIMATED LIABILITIES

71. The aggregate liability estimate is computed in Table 8 for claims arising from the population with blood levels above the "Potential for Effect" threshold (in Column [A]) and claims arising from the population with blood levels above the "Increased Risk" threshold (in Column [B]). In this scenario I use the mid-point benchmark claim value for kidney cancer of $1.19 million per claim;[55] I estimate DuPont's liability share based on the relative blood levels of the chemicals for which it has responsibility for contributing to exposure.

72. The calculation begins with the number for forecast kidney cancer claims in each group. The benchmark claim values for each group are then used to compute nominal liability, using a lower claim value for the "Potential for Effect" group, to reflect their lower excess risk of cancer (Column [A]). The corresponding NPV is computed in Row [5] after accounting for inflation in claim values paid in future years and discounting these future payments back to 2026.

---

[52] This calculation includes the latency effect that is modeled using a ten year look back and described above.

[53] Federal Reserve Bank of St. Louis, *Longer Run FOMC Summary of Economic Projections for the Personal Consumption Expenditures Inflation Rate, Central Tendency, Midpoint* (PCECTPICTMLR), (June 17, 2026), https://perma.cc/TD6P-YC5R (last accessed on Sept. 12, 2026).

[54] Federal Reserve Bank of St. Louis *Market Yield on U.S. Treasury Securities at 10-Year Constant Maturity, Quoted on an Investment Basis* (DGS10), (Sept. 11, 2026), https://perma.cc/X5JA-F4DK https://perma.cc/TD6P-YC5R (last accessed on Sept. 12, 2026).

[55] *See* Table 5, *supra* at 26.

The liability for other injuries with a "probable link" to PFAS are then added along with defense costs in rows [6] and [7]. The DuPont entities' liability share is then applied in row [8] and the liabilities for the two populations are summed in cell [C][9] to give an aggregate liability of $23 billion.

### TABLE 8: AGGREGATE ESTIMATED LIABILITY

| *$ in millions* | | "Potential for Effect" 2ng/mL < 20ng/mL [A] | "Increased Risk" 20ng/mL [B] | Total [C]:[A]+[B] |
|---|---|---|---|---|
| Forecast Kidney Cancer Claims | [1] | 162,390 | 12,669 | 175,059 |
| Relative Excess Risk | [2] | 0.29 | 1.00 | 0.34 |
| Benchmark 2026 Claim Value | [3] | $0.34 | $1.19 | $0.40 |
| Inflation and Discount Factor | [4] | 0.74 | 0.88 | |
| NPV of Liabilities | | | | |
| Indemnity - Kidney Cancer | [5]:[1]x[3]x[4] | $41,353 | $13,301 | $54,654 |
| Idemnity - All Injuries | [6]:[5]x[10] | $88,219 | $28,376 | $116,595 |
| Indemnity - All Injuries + Defense Costs | [7]:[6]x(1+[11]) | $140,030 | $45,042 | $185,072 |
| DuPont Liability Share % | [8] | 12% | 12% | 12% |
| DuPont Liability Share | **[9]** | **$17,483** | **$5,254** | **$22,737** |
| Other Injury Liability Scaling Factor | [10] | 2.13 | | |
| Defense Costs/Indemnity (RAND 1984) | [11] | 59% | | |

73. The same corresponding calculations can be performed for each of the scenarios that adopt different benchmark cancer claim values, liability share percentages and propensity to sue estimates, as reported in Table 1. I have performed these calculations for each scenario, and the results are in Table 1 (reproduced as Table 9 below):

**TABLE 9: RANGE OF DUPONT ENTITIES' ATTRIBUTED LIABILITY ESTIMATES (REPEATED FOR CONVENIENCE)**

| *$ in millions* | | | Attributable Liability Share Estimates | | |
|---|---|---|---|---|---|
| | | Benchmark 2026 Cancer per Claim Value | Primary Manufacturer Liability Share | Liability Share Adjusted for Secondary/Other | |
| | | | [A] | [B] | [C] |
| **Panel A: Excess Relative Risk (ERR) of Kidney Cancer 0.0378 per ng/mL** | | | | | |
| | | | 12% | 17% | 24% |
| **Range of Cancer Claim Values** | | | | | |
| Lower bound | [1] | $0.63 | $11,995 | $16,273 | $23,433 |
| Mid-point | [2] | $1.19 | $22,737 | $30,845 | $44,417 |
| Upper bound | [3] | $1.76 | $33,479 | $45,418 | $65,402 |
| **Panel B: Excess Relative Risk (ERR) of Kidney Cancer 0.0563 per ng/mL** | | | | | |
| | | | 12% | 17% | 24% |
| **Range of Cancer Claim Values** | | | | | |
| Lower bound | [4] | $0.63 | $13,422 | $18,260 | $26,294 |
| Mid-point | [5] | $1.19 | $25,443 | $34,612 | $49,841 |
| Upper bound | [6] | $1.76 | $37,463 | $50,964 | $73,388 |

## IV. NET PRESENT VALUE OF CERTAIN COSTS

74. I have been provided with a schedule of PFAS related costs estimates developed by another expert (Craig Steinmaus) and asked to convert these nominal amounts into their net present value as of 2026. I use the annual interest rates on U.S. Treasury 10-Year Constant Maturity Securities, from the Federal Reserve.[56] For historical costs, the net present value calculation effectively adds interest at the U.S. Treasury rates over the relevant period. For future cost estimates, the net present value calculation applies a discount factor to account for the time value of money that effectively lowers the cost of expenditures in the future. These costs in their original nominal amounts and the computed net present values are reported in Table 10.

[56] The use of risk-free discount rates to value mass tort contingent liabilities is widely accepted by courts in contested valuation proceedings. *See* Paul Hinton & Adrienna Huffman, *Value & Cents: Mass Torts Gap in Contingent-Liability Valuation Guidance*, ABI JOURNAL, (Mar. 16, 2024).

### TABLE 10: NET PRESENT VALUE OF CERTAIN COSTS

| *$ in millions* | Overall NPV Factor [A] | Calif total costs kidney cancer [B] | Calif total costs testis cancer [C] | Calif total costs low birth weight [D] | Calif total costs ulcerative colitis [E] | **Total** [F] |
|---|---|---|---|---|---|---|
| Nominal Costs | | | | | | |
| 1960-2025 | | $9,425 | $146 | $5,452 | $1,473 | $16,496 |
| 2026-2050 | | $3,954 | $52 | $0 | $0 | $4,005 |
| 1960-2050 | | $13,379 | $198 | $5,452 | $1,473 | **$20,501** |
| Net Present Value of Costs | | | | | | |
| 1960-2025 | 1.81 | $18,131 | $317 | $8,984 | $2,427 | $29,859 |
| 2026-2050 | 0.66 | $2,613 | $35 | $0 | $0 | $2,648 |
| 1960-2050 | | $20,744 | $353 | $8,984 | $2,427 | **$32,507** |

Notes and Sources (Table 10):

[1] Federal Reserve Economic Data, Federal Reserve Bank of St. Louis, Market Yield on U.S. Treasury Securities at 10-Year Constant Maturity, Quoted on an Investment Basis, Percent, Monthly, Not Seasonally Adjusted.

[2] Discount rate is the product of $(1+r)_t$ from 1960 through 2025 or the product of $1/(1+r)_t$ from 2027 through 2050.

[3] Annual rates are computed as averages of monthly rates. Future annual rates are fixed at the rate for August 2026.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 12th day of September, 2026, in Brooklyn, New York.

By: ______________________

Paul J. Hinton

# EXHIBIT A

# Paul Hinton

## PRINCIPAL

New York +1.212.789.3650 Paul.Hinton@brattle.com

Mr. Paul Hinton, a Brattle principal, has over 25 years of experience in litigation consulting directing projects and providing expert testimony in mass torts, product liability, financial and commercial disputes.

Mr. Hinton has assisted US and multinational industrial companies in estimating, modeling and valuing mass tort liabilities and providing expert testimony in related disputes. This work has involved advisory projects in M&A due diligence, insurance coverage litigation, bankruptcy estimation hearings, plan confirmation and 9019 hearings, fraudulent conveyance actions and commercial disputes.

During the period 2000 through 2009, Mr. Hinton was engaged in asbestos claims liability estimation on behalf of asbestos defendants that choose to use bankruptcy restructuring to resolve a flood of asbestos personal injury claims against them. These asbestos-related bankruptcies included: W.R. Grace & Co.; Owens Corning; Combustion Engineering; Armstrong World Industries; Federal Mogul, and Babcock and Willcox, in which the solvency implications of contingent liability valuation was litigated.

Mr. Hinton performed expert analysis for Dow Corning in connection with the fairness hearing on the Breast Implant Personal Injury Compensation Trust. Then over the approx. twenty year life of the Trust, Mr. Hinton analyzed the Trust performance in accordance with Trust Distribution Procedures and testified in litigation over contingent funding obligations.

In relation to the public policy issues posed by mass torts, Mr. Hinton conducted analysis of pharmaceutical mass torts liability risk and no-fault compensation alternatives to the tort system. He analyzed trends in US tort costs, proposed legislative reforms, and challenges to global settlement strategies including role of third party releases.

In recent cases, Mr. Hinton testified in the Diocese of Camden bankruptcy and Boy Scouts of America bankruptcy. He testified for the State of North Carolina in the PFAS fraudulent conveyance litigation against DuPont. He also analyzed future claims liabilities associated with Talc related injuries in the Whittaker bankruptcy and the Aldrich bankruptcy.

Since 2005, Mr. Hinton has presented at industry conferences and published on mass torts liability valuation topics including:

- “The Role Of Operational Data In Tech Platform Liability Suits,” Law360, with Farooq Javed and James Sappenfield, April 20, 2026.
- “Outlook on Mass Tort Reform - The history of Asbestos litigation as a precent for PFAS” Perrin Conferences, Environmental Risk & PFAS Litigation Conference, June 17 - June 18, 2025, New York City Bar Association, New York, NY.
- “Third-Party Releases, Is there a fair price to pay?” ABI, AIRA, VALCON Conference panel with Matthew Dundon, Hon. Melanie L. Cyganowski (ret.), Chad Husnick, March 18-20, 2024, New Orleans.
- “Mass Torts Gap in Contingent-Liability Valuation Guidance,” ABI Journal, Value & Cents, with Dr. Adrienna Huffman, March 2024.
- “The Verdict Valuation Paradox: Implications for Mass Torts,” with David McKnight and Pietro Grandi, ABI Journal, Value & Cents, April 2023.
- “Forecasting Product Liability by Understanding the Driving Forces,” with Lucy Allen, Denise Martin, Simona Heumann, and Faten Sabry, The International Comparative Legal Guide to Product Liability 2006: A Practical Insight to Cross-Border Product Liability Work, June 2006.
- “Where are Mesothelioma Claims Heading?” with Frederick C. Dunbar, Ronald Miller, and Faten Sabry, paper for Mealey’s Asbestos Conference, December 2006.
- “Use of Sample Surveys in Product Liability Litigation,” with Kent van Liere and Frances Barlas, The International Comparative Guide to: Product Liability, 2007.

Mr. Hinton also testifies in securities litigation, white collar proceedings and commercial disputes. His prior professional experience includes project finance at the London investment bank Morgan Grenfell.

## EDUCATION

- **Harvard University, John F. Kennedy School of Government**
  Master of Public Policy
- **Oxford University**
  BA in Engineering Science

---

## SELECTED CONSULTING EXPERIENCE

### EXPERT EVIDENCE

- **Mass Torts and Product Liability**
  - Reply Report of The Brattle Group on Behalf of Future Claimants' Representative, United States Bankruptcy Court, Western District of North Carolina, Charlotte Division, In re Aldrich Pump LLC, et al., Debtors, Chapter 11 Case No. 20-30608 (LMJ) (Jointly Administered), March 27, 2026.
  - Expert Report of The Brattle Group on Behalf of Future Claimants' Representative, United States Bankruptcy Court, Western District of North Carolina, Charlotte Division, In re Aldrich Pump LLC, et al., Debtors, Chapter 11 Case No. 20-30608 (LMJ) (Jointly Administered), September 15, 2025.
  - Deposition Testimony on PFAS personal injury valuation in connection with alleged fraudulent conveyance, State of North Carolina v. E. I. Dupont de Nemours and Company; The Chemours Company et al., State of North Carolina, Cumberland County, in the General Court of Justice, Superior Court Division, 20 CVS 5612, February 28, 2025.
  - Expert Report on PFAS personal injury valuation in connection with alleged fraudulent conveyance, New Jersey Department of Environmental Protection v. E. I. Dupont de Nemours and Company, United States District Court, District of New Jersey, 1:19-cv-14766, January 15, 2025.
  - Expert Reply Report on PFAS personal injury valuation in connection with alleged fraudulent conveyance, State of North Carolina v. E. I. Dupont de Nemours and Company; The Chemours Company et al., State of North Carolina, Cumberland County, in the General Court of Justice, Superior Court Division, 20 CVS 5612, January 14, 2025.
  - Commissioned study on "Tort Costs in America," U.S. Chamber of Commerce, Institute for Legal Reform, November 2024.
  - Declaration of Paul J. Hinton on the effects of the proposed stay lift motions, The Diocese of Buffalo, New York, Chapter 11, in the United States Bankruptcy Court for the Western District of New York, Case No. 20-10322 (CLB), October 29, 2024.

- Expert Report on PFAS personal injury valuation in connection with alleged fraudulent conveyance, State of North Carolina v. E. I. Dupont de Nemours and Company; The Chemours Company et al., State of North Carolina, Cumberland County, in the General Court of Justice, Superior Court Division, 20 CVS 5612, August 13, 2024.
- Deposition testimony on expert report regarding moral hazard to insurers in opposition to Plan of Reorganization, In re: Rite Aid Corporation, et al., Debtors, Chapter 11, United States Bankruptcy Court, District of New Jersey, Case No. 23-18993 (MBK), June 26, 2024.
- Declaration of Paul J. Hinton Addressing the Economic Effect of Early Plan Funding, In re: The Diocese of Camden, New Jersey Debtor, Chapter 11 Case No. 20-21257 (JNP), the United States Bankruptcy Court for the District of New Jersey, March 26, 2024.
- Declaration of Paul J. Hinton Addressing Modifications to the First Modified Eighth Amended Plan of Reorganization, In re: The Diocese of Camden, New Jersey Debtor, Chapter 11 Case No. 20-21257 (JNP), the United States Bankruptcy Court for the District of New Jersey, November 7, 2023.
- Declaration of Paul J. Hinton in Connection with Confirmation Hearing For Eighth Amended Chapter 11 Plan of Reorganization for The Diocese of Camden, NJ, in the United States Bankruptcy Court for The District of New Jersey, Case No. 20-21257 (JNP), September 28, 2022, Amended October 20, 2022.
- In re: The Diocese of Camden, New Jersey Debtor, Chapter 11 Case No. 20-21257 (JNP), the United States Bankruptcy Court for the District of New Jersey, November 7, 2023.
- Testimony of Paul J. Hinton, in Plan Confirmation hearing, In re: The Diocese of Camden, New Jersey Debtor, Chapter 11 Case No. 20-21257 (JNP), the United States Bankruptcy Court for the District of New Jersey, November 30, 2022.
- Testimony of Paul J. Hinton, in the 9019 hearing, In re: The Diocese of Camden, New Jersey Debtor, Chapter 11 Case No. 20-21257 (JNP), the United States Bankruptcy Court for the District of New Jersey, October 20, 2022.
- Rebuttal Report of Paul James Hinton, In re: The Diocese of Camden, New Jersey Debtor, Chapter 11 Case No. 20-21257 (JNP), the United States Bankruptcy Court for the District of New Jersey, August 5, 2022.
- Rebuttal Report of Paul James Hinton, In re: The Diocese of Camden, New Jersey Debtor, Chapter 11 Case No. 20-21257 (JNP), the United States Bankruptcy Court for the District of New Jersey, July 28, 2022.
- Declaration of Paul James Hinton, re. Plan Disclosure, In re: The Diocese of Camden, New Jersey Debtor, Chapter 11 Case No. 20-21257 (JNP), the United States Bankruptcy Court for the District of New Jersey, May 17, 2022.

- Deposition testimony of Paul James Hinton, In re: The Diocese of Camden, New Jersey Debtor, Chapter 11 Case No. 20-21257 (JNP), the United States Bankruptcy Court for the District of New Jersey, March 28, 2022.
- Expert Report of Paul J. Hinton, In re: The Diocese of Camden, New Jersey Debtor, Chapter 11 Case No. 20-21257 (JNP), the United States Bankruptcy Court for the District of New Jersey, March 18, 2022.
- Hearing testimony on damages in connection with the valuation of mass tort cases pledged as collateral in connection with litigation financing provided to a law firm, in commercial arbitration between a law firm and a litigation funding partner firm, February 2021.
- Testimony before Judge Laurie Selber Silverstein, Virtual Hearing, The United States Bankruptcy Court For The District of Delaware, In Re: Boy Scouts of America and Delaware BSA, LLC, Chapter 11, Case No. 20-10343 (LSS), February 17, 2021.
- Arbitration testimony on damages in connection with mass tort litigation financing dispute, American Arbitration Association Commercial Arbitration, February 23, 2021.
- Damages supplemental expert report in connection with mass tort litigation financing dispute, American Arbitration Association Commercial Arbitration, February 12, 2021.
- Damages expert report in connection with mass tort litigation financing dispute, American Arbitration Association Commercial Arbitration, December 18, 2020.
- Expert Briefing Paper for Scheme Adjudicator on potential exposure from future mass tort claims in connection with An Amending Scheme of Arrangement, between OIC Run-Off Limited, The London and Overseas Insurance Company Limited, and their Scheme Creditors, February 2018.
- Expert Report on valuation of a provision for future mass tort direct action claims in connection with An Amending Scheme of Arrangement, between OIC Run-Off Limited, The London and Overseas Insurance Company Limited, and their Scheme Creditors, October 2017.
- Declaration, In re: Dow Corning Corporation (United States District Court for the Eastern District of Michigan Southern Division), to assess claims estimation methods and uncertainty in personal injury claims forecasts for the Breast Implant Product Liability Settlement Trust, January 2012.
- Declaration, In re: Dow Corning Corporation (United States District Court for the Eastern District of Michigan Southern Division), to provide an economic expert opinion as to the enforcement of Time Value Credits in relation to the Breast Implant Product Liability Settlement Trust, November 2011.

- Testimony before the United States House of Representatives, Committee on the Judiciary, Subcommittee on the Constitution, Hearing on: Can We Sue Our Way to Prosperity? Litigation's Effect on America's Global Competitiveness. May 2011.
- Deposition and Expert report filed in the matter of Harmon, et al. v. Atlantic Richfield, et al., No. 08-LL-0005, regarding the estimation and funding of future medical monitoring costs accounting for inflation and typical participation rates, March 2011.
- Declaration, In re: Dow Corning Corporation (United States District Court for the Eastern District of Michigan Southern Division), to provide an economic expert opinion as to the calculation of Time Value Credits and adjustment of Annual Payment Ceilings in determining Dow Corning's ongoing payment obligations to the Breast Implant Product Liability Settlement Trust, January 2010.
- Report for ING Insurance N.V. on the potential exposure from future mass tort claims in connection with run-off of its UK insurance subsidiary and development of IBNR reserves, In re. An Amending Scheme of Arrangement, between OIC Run-Off Limited, The London and Overseas Insurance Company Limited, and their Scheme Creditors, July 2008.
- Witness statement (with Faten Sabry) In re: Kerr-McGee Chemical Worldwide LLC et al. v. Kemira Pigments OY et al., Arbitration No. 3439, on valuation of asbestos liabilities. December 2005.

- **Securities, Finance, and Economics**
  - Testimony in federal court white collar case on summary bank statement flows and intercompany agreements, U.S. v. Guo et al., Case No. 1:23-cr-00118 (ANT), in the U.S. District Court for the Southern District of New York, June 25-26, 2024.
  - Declaration on tracing of crypto mining business proceeds in support of a motion to revoke a detention order, United States of America, v. Sergei Potapenko and Ivan Turõgin, United States District Court, Western District of Washington, Case No. 2:22-CR-00185-RSL, July 12, 2024.
  - Supplemental Declaration of Paul J. Hinton In Opposition to Plaintiffs' Motion For Class Certification, Joseph Puddu et al. v 6D Global Technologies, Inc., NYGG (Asia), Ltd., Benjamin Tianbing Wei A/K/A Benjamin Wey, Et al. SDNY, Case No: 15-Cv-8061-DLC, June 6, 2022.
  - Declaration of Paul J. Hinton In Opposition to Plaintiffs' Motion For Class Certification, Joseph Puddu Et Al. V 6d Global Technologies, Inc., NYGG (Asia), Ltd., Benjamin Tianbing Wei A/K/A Benjamin Wey, Et al. SDNY, Case No: 15-Cv-8061-DLC, May 12, 2022.
  - Testimony in Federal Court in criminal securities fraud case US v. Blakstad on the tracing of investor funds in Midcontinental Petroleum Inc. fund controlled by the

defendant and use of proceeds of insider trading in Illumina Inc. stock options. Jury conviction before U.S. District Judge Edgardo Ramos, 1:19-cr-00486, in the U.S. District Court for the Southern District of New York, June 2021.

- Hearing testimony before Hon. Lorna G. Schofield on damages in connection with valuation of micro-cap restricted stock subject to dilution and delisting risks, in an illiquid market, in the case of John Cottam v. Global Emerging Capital Group, LLC, et al., 16 CV 4584(LGS), SDNY, March 2021.
- Deposition Testimony on tracing property pledged as the source of repayment of three billion dollars of bonds issued by the Puerto Rico public pension administration ("ERS"). In re: The Financial Oversight and Management Board of Puerto Rico, et al., Debtors, PROMESA Title III, Case No. 3:17-bk-03283 (LTS), August 2020.
- Deposition testimony on 10b-5 damages to bondholders in connection with alleged misleading statements and omissions concerning the terms of government support for BTA bank in connection with a restructuring, Atlantica Holdings, Inc. et al. v. BTA Bank JSC, SDNY, 1:13-cv-05790, April 2019.
- Trial testimony on damages for breach of contract and counterclaim for unjust enrichment in connection with repo lending dispute involving the valuation of restricted stock and the impact of lack of liquidity on securities prices in Lantau Holdings Ltd., v. General Pacific Group Ltd., and SVK Capital Management, Ltd, Supreme Court of New York State, Index No. 650085/2017, Hon. Barry Ostrager, October 2018.
- Deposition testimony on damages in Lantau Holdings Ltd., v. General Pacific Group Ltd., and SVK Capital Management, Ltd, Supreme Court of New York State, Index No. 650085/2017, June 2018.
- Trial testimony on the results of tracing transactions as evidence of the misappropriation and misuse of investor funds. U.S. v. David Bergstein, case number 1:16-cr-00746, before Judge Geoffrey S. Berman, in the U.S. District Court for the Southern District of New York, February 2018.
- Trial testimony on behalf of United States, on mechanics of a financial fraud, matched trading and tracing of proceeds, United States of America v. Jason Galanis, John Galanis, Jared Galanis, Gary Hirst, Derek Galanis, Ymer Shahini, and Gavin Hamels, before Judge P. Kevin Castel, United States District Court, SDNY, 15 Crim, 643, September 2016.
- Deposition testimony on behalf of Williams Capital, In re Lehman Brothers Securities and ERISA Litigation, The California Public Employees' Retirement System vs. Richard S. Fuld, Jr., Christopher M. O'Meara, Erin M. Callan, Michael L. Ainslie, John F. Akers, Roger S. Berlind, et al., U.S. District Court SDNY, No. 09-md-02017-LAK. May 2014.

- Hearing testimony in a FINRA arbitration concerning the risk and performance of a margin account versus a synthetic basket option structure for making leveraged investments in a custom hedge fund portfolio; quantification of alleged damages from alternative investment structure and leverage. October 2013 – April 2014.
- Testimony before a tribunal of the International Centre for Dispute Resolution of the American Arbitration Association on the profitability of a luxury cosmetics business and the value of a distribution contract in the context of restitution and lost profits claims. October 2010.
- Deposition Testimony, on behalf of Celgene Corporation in Cambrex Corporation Plaintiff v. Celgene Corporation Defendant on the lost profits from API manufacturing and patent rights (Superior Court of New Jersey Law Division: Bergen County). November 2009.
- Deposition Testimony, on behalf of IDEX in MARTIN RAPAPORT, et al. Plaintiffs v. IDEX Online Ltd., et al. Defendants, Index No. (United States District Court Southern District Of New York). August 2008.
- Deposition Testimony, on behalf of a defendant in IDT Telecom, Inc., and Union Telecard Alliance, LLC v. CVT Prepaid Solutions, Inc. et al. on Lanham Act false advertising claims (United States District Court for the District of New Jersey). May 2007.
- Deposition Testimony in William H. Wilkerson v. Centura Banks, Inc. et al., on executive compensation. January 2003.

## LITIGATION CONSULTING AND BANKRUPTCY PROCEEDING LIABILITY ESTIMATION

- Investigation for a tech platform into alleged failures in content moderation to prevent misuse from third parties engaged in illicit activity, 2025.
- Expert consulting on forecasting and valuation of Talc related personal injury claims, In re: Whittaker, Clark & Daniels, Inc., et al., Chapter 11, United States Bankruptcy Court, District of New Jersey, Case No. 23-13575 (MBK) October 2023-present.
- Insurance allocation of future asbestos claims in connection with determining the liability of an insurance carrier defendant in bankruptcy, 2007–2009.
- Economic consulting in connection with *In re: W.R. Grace & Co. et. Al.* (United States Bankruptcy Court for the District of Delaware), concerning the estimation of future allowable asbestos claim liabilities, 2007–2008.

- Economic consulting in connection with *In re: Owens Corning, et al.* (United States Bankruptcy Court for the District of Delaware), concerning the estimation of future allowable asbestos claim liabilities, 2004.
- Economic consulting in connection with trial in *Kelly Moore v. Union Carbide* regarding alleged commercial damages arising from asbestos liability, 2004.
- Economic consulting in connection with *In re: LTV Steel Corporation, Inc., et al.*, *Oil States International, Inc., et al. v. The LTV Corporation* (U.S. Bankruptcy Court for the Northern District of Ohio – Youngstown Division), on trends in asbestos litigation, 2003.
- Economic consulting in connection with *In re: Combustion Engineering, et al.* (United States Bankruptcy Court for the District of Delaware), concerning the indeterminacy in the estimation of future asbestos claim liabilities, 2003.
- Economic consulting in connection with *In re: Armstrong World Industries Corning, et al.* (United States Bankruptcy Court for the District of Delaware), concerning the estimation of future allowable asbestos claim liabilities, 2002.
- Asbestos tort claims liability valuation, Babcock & Wilcox Co. v. Babcock & Wilcox Co. United States Bankruptcy Court for the Eastern District of Louisiana, 2001.
- Economic consulting in connection with *Ezell Thomas and Owens Corning v. R.J. Reynolds Tobacco Company, et al.* (Circuit Court of Jefferson County, Mississippi) concerning damages arising from asbestos related diseases, 2000.
- Economic consulting in connection with *In re: Dow Corning Corporation* (United States Bankruptcy Court for the Eastern District of Michigan Northern Division), concerning the administrative and indemnity cost of liquidating personal injury claims allegedly caused by breast implants in the Dow Corning Plan of Reorganization, 1999.

**ADVISORY CONSULTING**

- Asbestos claims liability due diligence analysis; development and calibration of a model of the projected flow of future claims through the tort system including estimation of defense costs, on behalf of investor group, February 2019.
- Benchmarking Study on the number and average size of product liability losses in excess of $100 million for large US and European pharmaceutical companies in relation to their level of US sales, September 2010.
- Economic consulting in connection with an anticipated insurance coverage dispute to value disputed healthcare claims, November 2015.

- Insurance allocation analysis of asbestos related injury liability claims and valuation of liability exposure in connection with coverage-in-place negotiations, July 2013.
- Economic consulting in connection with due diligence review of an indemnification agreement for drug-related injury liability claims exposure, January 2013.
- Advisory work for Ace Group to develop a national forecast of mesothelioma incidence that accounts for SEER to assess background rates and develop a critique of the Stallard and Manton methodology, 2006.
- Due diligence advisory work to value liability exposures from asbestos personal injury claims in Australia, South Africa, U.S. and Europe. May 2005.
- Due diligence advisory work to value potential liability exposure from Manganese personal injury claims, December 2007.
- Advisory engagement on behalf of pharmaceutical companies, analyzing product liability costs, 2003–2005.
- Advisory engagement on behalf of Velsicol Chemical Corporation concerning the valuation product liability insurance rights, 2003.
- Advisory engagement *In re: Federal-Mogul Global, Inc., et al.*, regarding asbestos liabilities, 2001.

---

## PUBLIC POLICY RESEARCH

- "Tort Costs in America an Empirical Analysis of Costs and Compensation of the U.S. Tort System," US Chamber, Institute for Legal Reform, November 2024.
- "Tort Costs in America an Empirical Analysis of Costs and Compensation of the U.S. Tort System," US Chamber, Institute for Legal Reform, November 2022.
- Research study on small business tort costs commissioned by US Chamber Institute for Legal Reform, September 2020.
- Research study on "Costs and Compensation of the U.S. Tort System," commissioned by US Chamber Institute for Legal Reform, October 2018.
- "International Comparisons of Litigation Costs, Canada, Europe, Japan, and the United States," US Chamber, Institute for Legal Reform, June 2013 Update.
- Paul Hinton, David McKnight, and Ronald I. Miller, "Determinants of State Tort Costs: The Predictive Power of the Harris State Liability Systems Ranking Study," September 2012, SSRN-id2154124.

- "Creating Conditions for Economic Growth: The role of the legal environment," A study for the U.S. Chamber Institute for Legal Reform, (with David L. McKnight), October 2011.
- "Study of the Tort Liability Costs of Small Businesses," commissioned by the US Chamber Institute for Legal Reform (May 2010)
- "Tort Liability Costs for Small Business," with Judyth W. Pendell, in conjunction with the US Chamber of Commerce Institute for Legal Reform (2007)
- "Construction Defect Disputes: Getting to Yes without Going to Court," in conjunction with the National Association of Home Builders (June 2005)
- "Liability Costs for Small Business" with Judyth W. Pendell, in conjunction with the US Chamber of Commerce Institute for Legal Reform (June 2004)

---

## ARTICLES, PUBLICATIONS & PRESENTATIONS

- "Outlook for Mass Tort Reform," Perrin Conferences panel with Mark Eveland, Joe Hargraves, and Benjamin Nellans, Environmental Risk and PFAS Litigation Conference, The New York City Bar Association, June 17-18, 2025.
- "Third-Party Releases, Is there a fair price to pay?" ABI, AIRA, VALCON Conference panel with Matthew Dundon, Hon. Melanie L. Cyganowski (ret.), Chad Husnick, March 18-20, 2024, New Orleans.
- "Mass Torts Gap in Contingent-Liability Valuation Guidance," ABI Journal, Value & Cents, with Dr. Adrienna Huffman, March 2024.
- "The Verdict Valuation Paradox: Implications for Mass Torts," with David McKnight and Pietro Grandi, ABI Journal, Value & Cents, April 2023.
- "Use of Sample Surveys in Product Liability Litigation," with Kent van Liere and Frances Barlas, *The International Comparative Guide to: Product Liability* (2007)
- "Where are Mesothelioma Claims Heading?" with Frederick C. Dunbar, Ronald Miller, and Faten Sabry, paper for Mealey's Asbestos Conference (December 2006)
- "Forecasting Asbestos Liability After Recent Bankruptcy Decisions: How Forecasts Must Adjust for Changes in the Tort System" with Frederick C. Dunbar and Faten Sabry, paper for Mealey's Asbestos Bankruptcy Conference (June 2006)
- "Forecasting Product Liability by Understanding the Driving Forces," with Lucy Allen, Denise Martin, Simona Heumann, and Faten Sabry, *The International Comparative Legal Guide to Product Liability 2006: A Practical Insight to Cross-Border Product Liability Work* (June 2006)

- United States Senate Committee on the Judiciary, Hearing on Recent Developments in Assessing Future Asbestos Claims Under the Fair Act, work on behalf of National Association of Manufacturers (November 2005)
- "Costs of Asbestos Litigation and Benefits of Reform," with Denise Martin, Faten Sabry, Ron Miller, and Stephanie Plancich, prepared for National Association of Manufacturers Asbestos Alliance (April 25, 2005)
- "Non-Malignant Dose Response Models: A Basis for Forecasting Asbestos Related Non-Malignant Disease," with Lexis-Nexis, *Wall Street Forum: Asbestos* (February 2005)