**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | **MDL No. 2873**<br><br>**Master Docket No. 2:18-mn-2873**<br><br>**This Document Relates to:**<br><br>***The People of the State of California, ex rel. Rob Bonta, Attorney General of California v. 3M Company et al.***<br><br>**Case No. 2:23-cv-01531-RMG** |

**DECLARATION OF TRAVIS ARMSTRONG IN SUPPORT OF THE PEOPLE OF THE STATE OF CALIFORNIA'S MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**I. INTRODUCTION ..... 1**

A. Assignment ..... 1

B. Qualifications ..... 4

**II. 2015 CHEMOURS SPIN-OFF ..... 5**

A. Old DuPont Explicitly Sought to Minimize Its Exposure to Legacy Liabilities Through the Chemours Spin-Off. ..... 5

B. The Chemours Spin-Off Placed All of Old DuPont's Legacy PFAS Liabilities on Chemours. ..... 7

C. The Value Exchanged in the Chemours Spin-Off Did Not Fully Account for Looming PFAS Liabilities. ..... 9

D. The Key Inputs and Assumptions Provided by Old DuPont for Chemours' Solvency Tests Significantly Understated Chemours' Ultimate Costs and Overstated Its Future Financial Performance. ..... 10

1. [redacted] ..... 14

2. Post-Spin Developments Demonstrate [redacted], [redacted] Was Materially Below the Cost of Resolving the [redacted] MDL Claims. ..... 15

3. Environmental Liability Estimates Did Not Fully Capture Chemours' PFOA/PFAS Exposure. ..... 18

4. Management's Financial Projections Overestimated Chemours' Near-Term Recovery and Cash Flow Capacity. ..... 21

E. Chemours' Actual Capacity to Absorb Incremental Liabilities at the Time of Spin-Off Was Significantly Less Than Projected. ..... 25

**III. 2017-2019 DOWDUPONT TRANSACTIONS AND EMERGENCE OF CORTEVA AND NEW DUPONT ..... 28**

A. Old DuPont's Transformation into Corteva and New DuPont ..... 28

B. Relevant Agreements to Corteva's Separation and Split of PFAS Costs ..... 30

C. Corteva's Initial Capital Structure ..... 31

D. The Key Inputs and Assumptions for [redacted] Solvency Tests Contain[redacted]. ........................................ 32

**IV. 2019-2026 TRANSACTIONS, DISPUTES, SETTLEMENTS, AND CASH RETURNED TO SHAREHOLDERS ........................................ 36**

A. The 2021 MOU Establishing PFAS Cost-Sharing Capped Corteva's and New DuPont's Collective Contribution Towards PFAS Liabilities at $2 Billion........................................ 36

B. The AFFF MDL Public Water Systems Settlement Required a $1.185 Billion Payment from the DuPont Entities. ........................................ 37

C. The 2025 New Jersey Settlement and Related Insurance Proceeds Arrangement ........................................ 37

D. 2025 Spin-Off of Qnity from New DuPont ........................................ 38

E. 2026 U.S. DOJ, EPA, and WVDEP Proposed Settlement........................................ 39

F. Current Disclosures Regarding Indemnification and PFAS Exposure ................ 40

G. The DuPont Entities Have Returned Nearly $29 Billion to Shareholders Through Stock Buybacks and Dividends in the Past Seven Years. ..................... 41

1. New DuPont – Cash Returned to Shareholders ........................................ 43

2. Chemours – Cash Returned to Shareholders ........................................ 45

3. Corteva – Cash Returned to Shareholders ........................................ 46

4. Qnity – Cash Returned to Shareholders........................................ 47

**V. 2026 PLANNED VYLOR SPIN-OFF ........................................ 48**

A. Corteva's Planning of the Spin-Off ........................................ 48

B. The Vylor Spin-Off Reduces Corteva's Capacity to Satisfy Legacy PFAS/PFOA Liabilities by Billions of Dollars........................................ 52

1. Solvency and Capital Adequacy Analyses ........................................ 52

2. Purpose and Scope of Sensitivity Analysis........................................ 52

3. Financial Metrics Evaluated ........................................ 53

4. Estimated Post-Spin Financial Position of New Corteva ........................ 55

5. Other Inputs to the Sensitivity Analysis ........................................ 57

6. Results of Comparative Sensitivity Analysis .......................................... 57

C. The Vylor Spin-Off Reduces the Combined DuPont Entities' Capacity to Satisfy Legacy PFAS/PFOA Liabilities by Billions of Dollars....................... 61

1. Purpose and Scope of Sensitivity Analysis ............................................. 61

2. Pre- and Post-Spin Financial Inputs to the Analysis................................ 62

3. Results of Comparative Sensitivity Analysis .......................................... 63

# I. INTRODUCTION

1. I, Travis Armstrong, CPA/CFF, CFE, declare as follows:

## A. Assignment

2. The State of California, Office of the California Attorney General, has retained me through my employer, Hemming Morse, LLC. I was asked to use available data and information to analyze the impact of the Vylor spin-off on Corteva's (*i.e.*, New Corteva's) ability to satisfy potential future PFAS-related liabilities. Additionally, I was asked to use available data and information to analyze the impact of the Vylor spin-off on the combined financial position of New DuPont, Qnity, Chemours, and Corteva and their collective ability to satisfy potential future PFAS-related liabilities.

3. The following table describes the current publicly traded DuPont entities relevant to this declaration, including their common names, period of public listing, and a brief description.

| Company Name | Common Name(s) | Stock Symbol | Period of Public Listing | Description |
|---|---|---|---|---|
| E. I. du Pont de Nemours | EIDP, EID, DuPont, or Old DuPont | NYSE:DD (pre-2017) | 1904 – Aug. 31, 2017 | Legacy DuPont prior to 2017 DowDuPont merger; now primarily EIDP, Inc. under Corteva |
| The Chemours Company | Chemours | NYSE:CC | Jul. 1, 2015 – Present | Created via July 1, 2015 spin-off from E. I. du Pont de Nemours |
| Dow Chemical Company | Old Dow | NYSE:DOW (pre-2017) | 1924 – Aug. 31, 2017 | Merged with DuPont in 2017 to form DowDuPont Inc. |
| DowDuPont Inc | DowDuPont | NYSE:DWDP | Sep. 1, 2017 – Jun. 1, 2019 | Holding company formed from 2017 merger; later separated into Dow, New DuPont, and Corteva in 2019 |
| Corteva, Inc. | Corteva | NYSE:CTVA | Jun. 1, 2019 – Present | Created via 2019 separation of agricultural business from DowDuPont |
| DuPont de Nemours, Inc. | New DuPont | NYSE:DD | Jun. 1, 2019 – Present | Specialty products company formed from 2019 DowDuPont separation |
| Qnity Electronics, Inc. | Qnity | NYSE:Q | Nov. 3, 2026 – Present | Created via 2025 spin-off from DuPont de Nemours, Inc. |

4. My opinions are as follows:

(a) The key inputs and assumptions provided by Old DuPont and Chemours management to Houlihan Lokey in 2015 for Chemours' solvency tests:

i. Did not fully capture Chemours' ultimate costs associated with PFOA/PFAS litigation liabilities assigned to Chemours;

ii. Did not fully capture Chemours' actual and potential future environmental remediation costs associated with legacy PFAS-related sites; and

iii. Overstated Chemours' future financial performance.

(b) Following its spin-off from Old DuPont, Chemours had limited cash flow capacity to absorb additional liabilities, faced continued weak operating performance and liquidity pressure, and by early 2016, Chemours required amendments to its credit agreements and additional liquidity support from Old DuPont in order to address existing cash flow needs.

(c) The key inputs and assumptions for Corteva's solvency tests performed by Houlihan Lokey in 2019 capital adequacy contained minimal amounts of PFOA/PFAS exposure.

(d) Collectively, as of June 30, 2026, New DuPont and Corteva had $862 million in remaining obligated spend contributions under the January 2021 MOU before they reach their share of the $4 billion cap of that MOU, after which Chemours would bear any additional PFAS-related costs and obligations.

(e) From 2019 to 2026, New DuPont, Chemours, Corteva, and Qnity returned significant amounts of cash to shareholders through dividends and stock buybacks. Specifically, these DuPont entities collectively repurchased over $19 billion of their common stock and paid over $9.9 billion in dividends, for a total of approximately $29 billion returned to shareholders.

(f) I estimate the impact of the Vylor spin-off on Corteva's (*i.e.*, the remaining "New Corteva's") ability to satisfy potential future PFAS-related liabilities using three different metrics as follows:

i. **Total Indebtedness to Total Capitalization.** The Vylor spin-off reduces the amount of additional PFAS-related liabilities or judgments that New Corteva

could absorb before reaching its 0.60 total indebtedness to total capitalization debt covenant. The amount of this reduction is approximately $6.6 billion, or approximately 50%, from $13.3 billion pre-spin to $6.7 billion post-spin.

ii. **Net Debt to EBITDA.** The Vylor spin-off reduces the amount of additional PFAS-related liabilities or judgments that New Corteva could absorb before reaching 3.2 times net debt to EBITDA. The amount of this reduction is approximately $4.6 billion, or approximately 42%, from $10.7 billion pre-spin to $6.2 billion post-spin.

iii. **Market-Based Equity Cushion.** The Vylor spin-off reduces the amount of additional PFAS-related liabilities or judgments that New Corteva could absorb before reaching the 59% equity cushion reference point. The amount of this reduction is approximately $12.8 billion, or approximately 68%, from $18.9 billion pre-spin to $6.1 billion post-spin.

(g) I estimate the impact of the Vylor spin-off on the combined financial position of New DuPont, Qnity, Chemours, and Corteva (the "Combined DuPont Entities") and their collective ability to satisfy potential future PFAS-related liabilities using three different metrics as follows:

i. **Total Indebtedness to Total Capitalization.** The Vylor spin-off reduces the amount of additional PFAS-related liabilities or judgments that could be absorbed before reaching the total indebtedness to total capitalization covenant of 0.60. The amount of this reduction is approximately $6.6 billion, or approximately 31%, from $21.7 billion pre-spin to $15.1 billion post-spin.

ii. **Net Debt to EBITDA.** The Vylor spin-off reduces the amount of additional PFAS-related liabilities or judgments that the Combined DuPont Entities could absorb before reaching 3.1 times net debt to EBITDA. The amount of this reduction is approximately $4.5 billion, or approximately 32%, from $14.2 billion pre-spin to $9.7 billion post-spin.

iii. **Market-Based Equity Cushion.** The Vylor spin-off reduces the amount of additional PFAS-related liabilities or judgments that the Combined DuPont Entities could absorb before reaching the 59% equity cushion reference point. The amount of this reduction is approximately $12.8 billion, or approximately 40%, from $31.7 billion to $18.9 billion post-spin.

5. I have reviewed documents that were provided to me by counsel, as well as documents obtained from the public domain and financial research platforms. All documents referenced herein which I obtained from counsel are listed in **Appendix 1** to my declaration and attached hereto as exhibits. I understand that the documents I received from counsel were produced by the defendants in this action, and each document has a corresponding Bates number.

6. I am performing my analysis in this declaration in accordance with the American Institute of Certified Public Accountants' ("AICPA") Statement on Standards for Forensic Services. These standards require me to be impartial, intellectually honest, and free of conflicts of interest.

**B. Qualifications**

7. I am a Certified Public Accountant ("CPA"), licensed in California. I hold the Certified in Financial Forensics ("CFF") certification from the AICPA and the Certified Fraud Examiner ("CFE") certification. I obtained my B.A. degree in Business Economics with an emphasis in Accounting from University of California, Santa Barbara. I am a Partner in the Forensic and Financial Consulting Services Group at Hemming Morse.

8. My work in the accounting profession includes over 20 years of experience as a forensic accountant and consultant. I have worked on many investigations, complex litigation matters, and consulting projects. My work has involved analysis of financial and non-financial data, assessment of lost profits and other forms of economic damage, and investigations into and monitoring of possible corrupt or illicit payments and transactions. My experience spans across a diverse range of industries, such as retail, education, financial services, health care, medical device,

pharmaceutical, and technology. Additionally, I have testified as an expert and have been retained as a forensic accounting consultant by governmental agencies for various investigations and litigation.

9. I am a member of the California Society of Certified Public Accountants ("CalCPA"), where I currently serve as the Chair of the Steering Committee of CalCPA's Forensic Services Section ("FSS"). I previously served as the Chair of the Economic Damages sub-section of CalCPA's FSS. Additionally, I previously served on the AICPA's Forensic and Litigation Services ("FLS") Committee. This committee provides technical and educational guidance to CPA practitioners who perform forensic accounting services, including investigations, economic damage analyses such as lost profits calculations, and a variety of other services. I regularly teach continuing education courses in forensic accounting, data analytics, and other relevant topics.

10. My expert qualifications, including the publications I have authored, are described in my C.V., attached hereto as **Appendix 2.**

## II. 2015 CHEMOURS SPIN-OFF

### A. Old DuPont Explicitly Sought to Minimize Its Exposure to Legacy Liabilities Through the Chemours Spin-Off.

11. In October 2013, Old DuPont announced its intention to separate its Performance Chemicals Business from its other business via a spin-off transaction.[1] [redacted]:[2]

[1] *See, e.g.*, The Chemours Company, Exhibit 99.1 to Form 10, at 9 (Dec. 18, 2014), https://perma.cc/P7UY-UJWE (last accessed on Sept. 1, 2026).

[2] AFFF-MDL-EID-FT-00073415 at 3419 (attached as Exhibit 1).

[redacted]

12. [redacted][3] [redacted].[4] [redacted].[5]

13. [redacted]:[6]

[3] *Id.* at 3420–3422.

[4] *Id.* at 3445.

[5] *Id.* at 3420–3421.

[6] *Id.* at 3458.

[redacted]

14. [redacted].[7] [redacted].[8]

**B. The Chemours Spin-Off Placed All of Old DuPont's Legacy PFAS Liabilities on Chemours.**

15. In 2014, Old DuPont formed Chemours as a wholly owned subsidiary and then, through a series of internal reorganizations, Old DuPont transferred to Chemours assets associated

[7] *See* AFFF-MDL-EID-FT-00217589 (attached as Exhibit 2); AFFF-MDL-EID-FT-00217591 (attached as Exhibit; *see also* AFFF-MDL-CHE-FT-00000363 (attached as Exhibit 28) [redacted]).

[8] AFFF-MDL-EID-FT-00217591 (Attached as Exhibit 38). [redacted]

with its Performance Chemicals Segment, including industrial sites such as Chambers Works, Fayetteville Works, and Washington Works.[9]

16. On May 12, 2015, Chemours paid a $3.9 billion dividend to Old DuPont, primarily funded by new third-party debt raised by Chemours.[10] This consisted of $3.4 billion of cash and $500 million of in-kind (cancellation of Old DuPont debt) payments from Chemours to Old DuPont.[11]

17. On June 26, 2015, Chemours and Old DuPont entered into a separation agreement ("Chemours Separation Agreement") that required Chemours to assume Old DuPont's liabilities related to its Performance Chemicals Segment, including liabilities from Old DuPont's historical use, manufacturing, and discharge of PFAS.[12] The Chemours Separation Agreement also required Chemours to indemnify Old DuPont in connection with these liabilities, an obligation which is uncapped and does not end at a specific date.[13]

18. On July 1, 2015, Old DuPont completed the spin-off transaction by distributing to Old DuPont shareholders one share of Chemours common stock for every five shares of Old

---

[9] *Supra* note 1 (Chemours Exhibit 99.1 to 2014 Form 10).

[10] *See, e.g.*, The Chemours Company, Amendment No. 4 to Form 10-12B/A, at 9–10, 52 (June 5, 2015), https://perma.cc/8Q49-2EBR (last accessed on Sept. 1, 2026). ("We have issued senior unsecured notes and entered into a credit agreement with a syndicate of banks to provide two senior secured credit facilities. Specifically, we issued senior unsecured notes in multiple tranches with terms and maturities of 2023 and 2025, and entered into a credit agreement providing a seven-year $1.5 billion senior secured term loan (the Term Loan Facility) and a five-year $1.0 billion senior secured revolving credit facility (the Revolving Credit Facility and together with the Term Loan Facility, the Senior Secured Credit Facilities). As a result, at the time of the spin-off, we will have approximately $4.0 billion of indebtedness, of which approximately $3.9 billion has been distributed, in cash or in-kind, to DuPont in recognition of the contribution of assets to us by DuPont in connection with the separation.").

[11] *See supra* note 1 (Chemours Exhibit 99.1 to 2014 Form 10), at 47.

[12] *See* The Chemours Company, Exhibit 2.1 to Form 8-K (Separation Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company), at 6–9, 11–12, 19, 23, 25, 28 (June 26, 2015), https://perma.cc/NC22-7F8N (last accessed on Sept. 1, 2026); *see also* AFFF-MDL-EID-FT-00221023 at 1137–1139, 1147–1152 (attached as Exhibit 6).

[13] *Supra* note 12 (Chemours Exhibit 2.1 to Form 8-K, at 52–55 & AFFF-MDL-EID-FT-00221023 at 1137–1139, 1147–1152 (attached as Exhibit 6)).

DuPont common stock held.[14] After this date, Chemours became an independent, publicly traded company.

**C. The Value Exchanged in the Chemours Spin-Off Did Not Fully Account for Looming PFAS Liabilities.**

19. [redacted][15] [redacted][16]

20. [redacted].[17]

21. At the time of the spin-off, Chemours reported total assets of $6.7 billion and total liabilities of $6.3 billion.[18] Chemours' total liabilities at that time included $3.9 billion of new long-term debt and $100 million of dividends payable, but did not include any off-balance sheet, contingent liabilities that it assumed from Old DuPont.[19]

---

[14] *See, e.g.*, The Chemours Company, Form 10-Q/A, at 31 (Aug. 6, 2015), https://perma.cc/CX9F-CHS7 (last accessed Sept. 1, 2026).

[15] [redacted]. *See* AFFF-MDL-EID-FT-00214272 at 4281 (attached as Exhibit 3).

[16] *See* AFFF-MDL-EID-FT-00030975 at 0015 (attached as Exhibit 4) [redacted]).

[17] [redacted] AFFF-MDL-EID-FT-00212427 at 2428 (attached as Exhibit 5); *see also, e.g.*, Jones Dep. 102:5–15 (Nov. 18, 2021) (attached as Exhibit 37) [redacted].

[18] *See supra* note 14 (Chemours Q2 2015 Form 10-Q/A), at 4.

[19] *Id.*

22. Through the spin-off, Chemours assumed, and indemnified Old DuPont for, the future expenses associated with certain contingent (*i.e.*, off-balance sheet) liabilities, including expenses associated with defense costs, settlement amounts, and judgments.[20] Most of Chemours' indemnification obligations to Old DuPont were uncapped.[21]

23. The value of these contingent liabilities was analyzed by Old DuPont and Chemours, along with their advisors, prior to the spin-off transaction. [redacted].[22] [redacted]

24. [redacted].

**D. The Key Inputs and Assumptions Provided by Old DuPont for Chemours' Solvency Tests Significantly Understated Chemours' Ultimate Costs and Overstated Its Future Financial Performance.**

25. [redacted] was engaged by Old DuPont's Board of Directors as an "independent appraisal firm"[23] [redacted]

---

[20] *See supra* note 10 (Chemours June 5, 2015 Amendment No. 4 to Form 10-12B/A), at 168–69.

[21] *Id.*

[22] *See* AFFF-MDL-EID-FT-00212427 at 2429 (attached as Exhibit 5); *see also* AFFF-MDL-HLokey00000799 (attached as Exhibit 7); AFFF-MDL-EID-FT-00097018 at 7018, 7022 (attached as Exhibit 8).

[23] *See supra* note 10 (Chemours June 5, 2015 Amendment No. 4 to Form 10-12B/A), at 16.

(a) [redacted]

(b) [redacted]

(c) [redacted].[24]

26. The [redacted] described above are consistent with the three traditional tests of solvency.[25]

27. [redacted].[26]

28. [redacted].[27] [redacted]f.[28] [redacted]

---

[24] *See* AFFF-MDL-HLokey00000799 (attached as Exhibit 7); AFFF-MDL-EID-FT-00097018 at 7018, 7022–7023 (attached as Exhibit 8).

[25] *See, e.g.*, Roman L. Weil, Daniel G. Lentz & Elizabeth A. Evans, *Litigation Services Handbook: The Role of the Financial Expert* § 25.3(c)(ii) 28–30 (6d ed. 2017).

[26] AFFF-MDL-EID-FT-00097018 at 7022 (attached as Exhibit 8).

[27] *Id.* at 7032.

[28] *Id.* at 7021, 7052.

[redacted].[29]

29. [redacted]"[30] [redacted] [redacted].[31] [redacted] [redacted][32]

30. [redacted][33] [redacted][34]

[29] *Id.*

[30] *Id.* at 7042–7043.

[31] *Id.* at 7045, 7050.

[32] *Id.* [redacted]. *See id.* at 7043, 7045.

[33] AFFF-MDL-EID-FT-00096942 (attached as Exhibit 9).

[34] *See id.*; *see also* AFFF-MDL-EID-FT-00221023 at 1026 (attached as Exhibit 6) [redacted] AFFF-MDL-EID-FT-00183585 (attached as Exhibit 11) [redacted].

31. [redacted].[35] [redacted].[36]

32. [redacted].[37] [redacted] [redacted].[38]

33. [redacted].[39] [redacted]

---

[35] *See* AFFF-MDL-EID-FT-00096942 at 6958 (attached as Exhibit 9).

[36] *Id.* [redacted]. *Id.* at 6979.

[37] *Id.* at 6971, 6977. [redacted].

[38] *Id.* [redacted]. *See id.* at 6969.

[39] *See* AFFF-MDL-EID-FT-00097018 at 7018, 7020–7021 (attached as Exhibit 8) [redacted] AFFF-MDL-EID-FT-00205500 at 5503 (attached as Exhibit 29).

[redacted].[40]

**1.** [redacted]

34. [redacted].[41] [redacted][42]

35. [redacted].[43] Additionally, [redacted].[44]

36. [redacted] [redacted].[45] [redacted]

[40] *See* AFFF-MDL-EID-FT-00205500 at 5503 (attached as Exhibit 29).

[41] *See* AFFF-MDL-EID-FT-00212427 at 2429 (attached as Exhibit 5).

[42] *See* AFFF-MDL-EID-FT-00123352 at 3353, 3357 (attached as Exhibit 12).

[43] *Id.*

[44] *Id.* at 3355.

[45] *Id.* at 3368. [redacted]. *See, e.g.*, *id.* at 3382–3383.

[redacted].[46]

37. [redacted][47] Subsequent events demonstrate that [redacted] did not capture the exposure Chemours was assigned.

**2. Post-Spin Developments Demonstrate [redacted] Was Materially Below the Cost of Resolving the [redacted] MDL Claims.**

38. In October 2015, the first bellwether trial associated with the Ohio PFOA MDL resulted in a plaintiff's verdict against Old DuPont, including an award of approximately $1.6 million in damages related to claims involving kidney cancer associated with C-8 exposure.[48]

39. [redacted].[49] [redacted] of

[46] *Id.* at 3382–86. [redacted] DeRose Dep. 117:15–119:9 (Oct. 19, 2023) (attached as Exhibit 33).

[47] AFFF-MDL-EID-FT-00205500 at 205511 (attached as Exhibit 29). I understand from counsel that 3,550 represents the approximate number of pending PFOA claims in the Ohio MDL at that time.

[48] *See* The Chemours Company, Form 8-K, at 3 (Nov. 12, 2015), https://perma.cc/VD9S-VKYC ("Litigation Q&A") (last accessed Sept. 1, 2026).

[49] AFFF-MDL-CHE-FT-00261644 (attached as Exhibit 30).

[redacted][50] [redacted]

40. [redacted][51] [redacted][52]

41. In July 2016, the jury in the second bellwether trial of the Ohio PFOA MDL determined that Old DuPont was liable for $5.1 million of compensatory damages and $500,000 in punitive damages and attorneys' fees to the plaintiff related to his testicular cancer.[53] In its public disclosure of the trial outcome, Chemours emphasized that Old DuPont was the named defendant and "directly liable for any judgment," while stating that if Old DuPont sought indemnification from Chemours, Chemours would "retain[] its defenses to such claims."[54] [redacted].[55]

---

[50] *Id.*

[51] AFFF-MDL-CHE-FT-00261938 (attached as Exhibit 31).

[52] *Id.*

[53] *See* The Chemours Company, Form 8-K (July 6, 2016), https://perma.cc/NC8T-DAZY ("Chemours Statement on Freeman PFOA Trial Outcome") (last accessed on Sept. 1, 2026).

[54] *Id.*

[55] *See* AFFF-MDL-CHE-FT-00262260 (attached as Exhibit 13); AFFF-MDL-CHE-FT-00262263 (attached as Exhibit 14).

42. [redacted].

43. In December 2016 and January 2017, the jury in another individual trial in the Ohio PFOA MDL determined that Old DuPont was liable for $2 million in compensatory damages and $10.5 million in punitive damages, plus attorneys' fees.[56]

44. In February 2017, Chemours disclosed that Old DuPont agreed to settle the remaining claims in the Ohio PFOA MDL for a total cash settlement of $670.7 million.[57] Chemours and Old DuPont agreed to split the settlement equally, with each company paying $335.35 million, and Old DuPont's share was not subject to indemnification or reimbursement by Chemours.[58]

45. Chemours and Old Dupont also agreed to a five-year tiered-costs sharing arrangement for any potential future PFOA costs, where Chemours would pay the first $25 million annually of any future PFOA costs, Old DuPont would pay the next $25 million annually, and Chemours would bear any further excess costs, after which Chemours indemnification obligations under the Chemours Separation Agreement would continue unchanged.[59]

46. On August 24, 2017, Chemours and Old DuPont executed Amendment Number 1 to the Chemours Separation Agreement, which formalized the parties' agreement concerning the Ohio PFOA MDL settlement and certain future PFOA-related costs.[60]

---

[56] *See* The Chemours Company, Form 8-K (Jan. 5, 2017), https://perma.cc/BZ82-PUG2 ("Chemours Statement on Vigneron PFOA Trial - Punitive Phase") (last accessed Sept. 1, 2026).

[57] *See* The Chemours Company, Form 8-K (Feb. 13, 2017), https://perma.cc/Y6DE-ZD3L ("Settlement of PFOA Litigation") (last accessed on Sept. 1, 2026).

[58] *Id.*

[59] *Id.*

[60] *See* The Chemours Company, Form 8-K, at 2 (Aug. 24, 2017), https://perma.cc/EQ4A-M4Y4 ("Entry into a Material Definitive Agreement") (last accessed on Sept. 1, 2026), *see also id.* at Exhibit 2.1 ("Amendment Number 1 to Separation Agreement").

47. These events, culminating in the settlement of the Ohio PFOA MDL, indicate that [redacted] $671 million cost of the ultimate settlement in February 2017.[61] This outcome indicates that liability assumptions used in connection with the spin-off materially understated the actual costs of the PFOA litigation exposure assumed by Chemours, and, as a result, overstated Chemours' projected capacity to absorb the liabilities allocated to it while maintaining adequate liquidity and capital.

48. After the February 2017 settlement, approximately 170 additional cases were filed in the Ohio PFOA MDL which resulted in further settlements of approximately $83 million in 2021 and $59 million 2024.[62]

**3. Environmental Liability Estimates Did Not Fully Capture Chemours' PFOA/PFAS Exposure.**

49. [redacted].[63] Mr. Newman's certification contained a listing of the identified environmental remediation exposures by site and grouped the sites by status, including "Never Owned," "Operating," "Owned-Not Operating," "Previously Owned," and a "Special Case" for Washington Works Fluoroproducts.[64]

---

[61] [redacted] Chemours' $335 million share of the settlement. [redacted]

[62] *See, e.g.*, DuPont de Nemours, Inc. ("New DuPont"), Form 10-Q, at 32 (June 30, 2026), https://perma.cc/7A6U-E6UY (last accessed on Sept. 1, 2026).

[63] AFFF-MDL-EID-FT-00205500 at 5503, 5512–5513 (attached as Exhibit 29).

[64] *Id.* at 5513. [redacted]

50. [redacted].[65] [redacted][66]

51. [redacted].[67] [redacted].[69]

---

[redacted]. *Id.*

[65] AFFF-MDL-EID-FT-00097086 (attached as Exhibit 15).

[66] *Id.*

[67] *See, e.g.*, Telford Dep., 106:20–109:16, 121:3–20 (Nov. 2, 2023) (attached as Exhibit 34); *see also id.* at 213:21–214:3 [redacted]

[68] *Id.* at 119:7–120:3 [redacted].

[69] *Id.* at 111:6–112:1, 204:17–20.

52. [redacted].[70] [redacted].[71]

53. Subsequent events demonstrate that Chemours' actual and potential future costs associated with the PFOA-related sites discussed above are _*orders of magnitude higher*_ than the figures Old DuPont provided to Houlihan Lokey for purposes of the Chemours' spin-off.

54. [redacted].[72] In 2018, Chemours recorded $75 million of accrued costs for on-site and off-site remediation activities, fines, and penalties associated with its Fayetteville, North Carolina site.[73] In 2019, Chemours incurred $150 million of costs for environmental remediation activities and accrued an additional $132 million of costs for on-site remediation at its Fayetteville Works site.[74] As of year-end 2019, Chemours' environmental remediation liabilities included $201 million for Fayetteville.[75] During 2021,

---

[70] AFFF-MDL-EID-FT-00205500 at 5512–5513 (attached as Exhibit 29). [redacted] *See* Telford Dep. 256:6–258:5 (attached as Exhibit 34).

[71] AFFF-MDL-EID-FT-00205500 at 5512–5513 (attached as Exhibit 29).

[72] *Id.* at 5512.

[73] *See* The Chemours Company, Form 10-K, at 50, 54 (2018), https://perma.cc/4ZS4-FJVX (last accessed on Sept. 8, 2026).

[74] *See* The Chemours Company, Form 10-K, at 34, 36, 51, 54 (2019), https://perma.cc/UQ83-UD8V (last accessed on Sept. 8, 2026).

[75] *Id.* at 50–51.

Chemours incurred $193 million of on-site environmental remediation costs, and as of December 31, 2021, Chemours reported $359 million of on-site remediation and off-site groundwater remediation liabilities related to its Fayetteville Works site.[76]

55. As of June 30, 2026, Chemours reported $795 million of environmental remediation liabilities, including $311 million for Fayetteville Works, $104 million for Chambers Works, $174 million for Washington Works, and $29 million for Dordrecht Works.[77]

56. Since entry of the February 25, 2019 consent order with the North Carolina Department of Environmental Quality, Chemours has incurred approximately $1.193 billion to address PFAS impacts associated with Fayetteville Works, and anticipates it will incur additional expenditures to carry out its remaining obligations under that consent order.[78]

### 4. Management's Financial Projections Overestimated Chemours' Near-Term Recovery and Cash Flow Capacity.

57. [redacted].[79] [redacted] [redacted][80] [redacted]

---

[76] *See* The Chemours Company, Form 10-K, at 40, 60 (2021), https://perma.cc/YK4V-X95F (last accessed on Sept. 8, 2026).

[77] *See* The Chemours Company, Form 10-Q, at 51 (June 30, 2026), https://perma.cc/L73X-NQ6L (last accessed on Sept. 1, 2026).

[78] *See* Corteva, Inc. and EIDP, Inc., Exhibit 10.1 to Form 8-K (Sept. 9, 2026), https://perma.cc/9WPK-CZHQ.

[79] *See* AFFF-MDL-EID-FT-00205500 at 5502, 5506–5510 (attached as Exhibit 29). [redacted]. *Id.* at 5502.

[80] *Id.*

[redacted][81] [redacted].[82]

58. Chemours' post-spin performance quickly showed that the projections provided to Houlihan Lokey overestimated Chemours' financial performance and recovery in 2015. Specifically, on August 6, 2015, Chemours reported its second quarter 2015 earnings which came short of the projections provided to Houlihan Lokey on June 5, 2015.[83] Similarly, for full year 2015, Chemours reported net sales of $5.7 billion, [redacted].[84] More significantly, [redacted], while Chemours' actual 2015 adjusted EBITDA was only $573 million [redacted][85]

59. In summary, within months of the spin-off Chemours' reported financial results and outlook differed substantially from the projections relied upon by [redacted]. As seen in **Figure 1** below, subsequent projections and actual 2015 EBITDA were substantially lower than the assumptions relied upon by [redacted].

---

[81] *Id.*

[82] *Supra* note 10 (Chemours June 5, 2015 Amendment No. 4 to Form 10-12B/A), at 35; AFFF-MDL-EID-FT-00203062 [redacted] (attached as Exhibit 32); AFFF-MDL-EID-FT-00073415 at 3445 [redacted] (attached as Exhibit 1).

[83] *See* The Chemours Company, "The Chemours Company Reports Second Quarter 2015 Results and Announces Transformation Plan" Press Release (Aug. 6, 2015), https://perma.cc/9RK7-5RN9 (last accessed on Sept. 8, 2026). Management's projections provided to Houlihan Lokey projected Q2 2015 net sales of $1.6 billion and Adjusted EBITDA and $153 million, while Chemours' actual results were $1.5 billion and $127 million, respectively. *See* AFFF-MDL-EID-FT-00205500 at 5507 (attached as Exhibit 29).

[84] *See* The Chemours Company, "The Chemours Company Reports Fourth Quarter and Full Year 2015 Results" Press Release (Feb. 23, 2016), https://perma.cc/9NK9-FR6M (last accessed on Sept. 8, 2026); AFFF-MDL-EID-FT-00205500 at 5506 (attached as Exhibit 29).

[85] *See supra* note 84 (both sources).

[redacted]

**Figure 1**

60. [redacted].[86] Therefore, on June 9, 2015, Chemours' Board of Directors, consisting of Old DuPont employees, declared a quarterly dividend of $100 million to be paid on September 11, 2015.[87]

61. [redacted][88] and publicly disclosed Chemours' inability to sustain the dividend almost immediately after separation from Old DuPont.[89] Specifically, in its August 6, 2015 earnings release, Chemours stated that it "expect[ed] the dividend from the fourth quarter [2015] forward to be significantly less than the $100 million third quarter dividend and

---

[86] *See* AFFF-MDL-EID-FT-00010648 at 0658 (attached as Exhibit 10).

[87] *See* The Chemours Company, Form 10-Q, at 12 (June 30, 2015), https://perma.cc/LE2V-D374 (last accessed on Sept. 10, 2026).

[88] *See* AFFF-MDL-CHE-FT-00016389 at 6389 (attached as Exhibit 16).

[89] The Chemours Company, Tr. of Second Quarter Earnings Call (Aug. 6, 2015), https://perma.cc/H7ZB-35QP (last accessed on Sept. 1, 2026).

expect[ed] to announce a sustainable dividend in the third quarter."[90] Further, Chemours' Chief Executive Officer ("CEO") acknowledged that the dividend declared while Chemours was controlled by Old DuPont employees and Chemours capital structure at spin-off was based on assumptions that Chemours' financial performance would improve in the near-term, which was not the case.[91]

62. This sequence of events is significant because it indicates that, almost immediately after becoming independent, Chemours publicly acknowledged that its operating performance and cash flow profile could not support the dividend expectations established at separation.

63. [redacted][92] [redacted][93]

[90] *Id.* at 3–4.

[91] *Id.* at 4; *see also id.* at 15 (Mr. Vergnano also stated that "the dividend in the capital structure that were really put in place by DuPont were done at a concept they were using as mid cycle. Obviously, we're not at mid cycle.").

[92] AFFF-MDL-CHE-FT-00023036 (attached as Exhibit 17) [redacted]

[93] *See, e.g.*, AFFF-MDL-EID-FT-00076374 (attached as Exhibit 18).

64. By February 2016, Chemours required amendments to its debt covenants and liquidity support arrangements involving Old DuPont.[94] Specifically, Old DuPont waived certain payments due from Chemours associated with the spin-off and provided Chemours $190 million in advance payment for future goods and services.[95] These disclosures indicate that, within months of the spin-off, Chemours required covenant relief and liquidity accommodations from Old DuPont to support its operations and financial position.

65. Overall, these events indicate that, within months of the spin-off, Chemours' actual operating performance, leverage profile, and liquidity position had deteriorated materially from the near-term recovery assumed in the projections provided to [redacted].

**E. Chemours' Actual Capacity to Absorb Incremental Liabilities at the Time of Spin-Off Was Significantly Less Than Projected.**

66. [redacted].[96] Any material incremental accrued or contingent liabilities beyond what was represented to Houlihan Lokey, or material negative deviations from the financial projections provided to Houlihan Lokey, would directly reduce Chemours' excess asset cushion.

67. [redacted]

[94] *See supra* note 84 (Feb. 23, 2016 Chemours Press Release); *supra* note 89 (Chemours Tr. of Second Quarter Earnings Call), at 7.

[95] *Id.*

[96] AFFF-MDL-EID-FT-00096942 at 6958 (attached as Exhibit 9).

[redacted]:[97]

[redacted]

**Figure 2**

68. Similarly, Chemours' excess asset cushion is significantly lower than that modeled by Houlihan Lokey when Chemours' market-implied enterprise value after spin-off is used as a basis for the balance sheet test, as shown in **Figure 3** below:[98]

[97] Based on AFFF-MDL-EID-FT-00096942 at 6958, 6961 (attached as Exhibit 9), [redacted].

[98] Market capitalization, Cash and short-term investments, and total debt per S&P Capital IQ, Market Data, Market Capitalization (Daily), last accessed on September 8, 2026. Other figures per AFFF-MDL-EID-FT-00096942 at 6958 (attached as Exhibit 9).

[redacted]

**Figure 3**

69. Once Chemours traded at a materially lower market-implied enterprise value in the months after the completion of separation, the residual cushion available to absorb incremental liabilities was substantially smaller than the amount reflected in the June 5, 2015 balance sheet test. Illustrated in **Figure 4** below, Chemours' actual balance sheet cushion was substantially lower in the months after the spin-off than the one developed by [redacted] with assumptions from Chemours' management.

[redacted]

**Figure 4**

70. Chemours' ability to absorb incremental liabilities was also constrained from a cash flow perspective. The post-spin developments discussed above further support my conclusion that Chemours had limited cash flow capacity to absorb additional liabilities at or shortly after the spin-off. Immediately after the separation, Chemours faced continued weak operating performance and liquidity pressure, and by early 2016, Chemours required amendments to its credit agreements and additional liquidity support from Old DuPont in order to address existing cash flow needs.[99]

## III. 2017-2019 DOWDUPONT TRANSACTIONS AND EMERGENCE OF CORTEVA AND NEW DUPONT

### A. Old DuPont's Transformation into Corteva and New DuPont

71. In December 2015, Old DuPont announced that it would engage in an all-stock "merger of equals" with Old Dow to form DowDuPont with the expectation that DowDuPont would ultimately separate into three independent, publicly traded companies focused on

[99] *See supra* note 84 (Feb. 23, 2016 Chemours Press Release); *see also* AFFF-MDL-EID-FT-00011534 at 1535 (attached as Exhibit 36).

Agriculture (Corteva), Performance Materials (New Dow), and Specialty Products (New DuPont), as shown in **Figure 5** below:[100]




**Figure 5**

72. Corteva was separated from DowDuPont on June 1, 2019 through a pro rata distribution of Corteva common stock to DowDuPont shareholders.[101] As shown above, Corteva became the standalone Agriculture Business (including Crop Protection and Seed segments), with Old DuPont serving as its primary operating subsidiary and accounting predecessor.[102]

---

[100] *See* Dupont de Nemours, Inc., "DuPont and Dow To Combine In Merger Of Equals" Press Release (Dec. 11, 2015), https://perma.cc/3NLU-6TPA (last accessed on Sept. 8, 2026); DowDuPont, Inc., Form S-4, at 64 (March 1, 2016). [redacted]. *See, e.g.*, AFFF-MDL-EID-FT-00022980 at 2984 (attached as Exhibit 35) [redacted].

[101] *See* Corteva, Inc., Form 10-K, at 3 (2019), https://perma.cc/CZP5-ZEM4 (last accessed on Sept. 1, 2026). This means that DowDuPont shareholders received one share of Corteva for each share of DowDuPont they held.

[102] *Id.* Due to this reorganization, Corteva's Agriculture Business is comprised of legacy Old DuPont business segments. *See, e.g.*, E. I. du Pont de Nemours and Company, Form 10-K, at 2

### B. Relevant Agreements to Corteva's Separation and Split of PFAS Costs

73. In connection with the 2019 separation of Corteva from DowDuPont, Corteva, Dow, and New DuPont entered into a Separation and Distribution Agreement which identified the separation-related structure and transfer mechanics, including the transfer of assets, assumption of liabilities, and indemnifications.[103] Additionally, New DuPont and Corteva entered into a separate letter agreement (the "2019 Letter Agreement") whereby New DuPont and Corteva assumed 71% and 29%, respectively, of Old DuPont's historic PFAS-related liabilities.[104]

74. In August 2019, Corteva's executives explained how the 2019 Letter Agreement would integrate with the terms of the Chemours Separation Agreement regarding PFAS-related liabilities.[105] Specifically, Corteva's CFO, Gregory Friedman, stated the following:[106]

> For obligations associated with other discontinued or divested businesses, Corteva will assume up to $200 million in cost related to these stray liabilities overall, and any additional costs over this threshold will be assumed by New DuPont up to their $200 million threshold. Any amounts over the collective $400 million threshold will be shared based on the split of 29% Corteva, 71% New DuPont.
>
> Under the Chemours separation agreement, Chemours is obligated to indemnify the company for PFAS liabilities, subject to the limited sharing arrangement. Under the agreement, for a 5-year period beginning July 6, 2017, Chemours will annually be responsible for the first $25 million of any future liabilities. Then Corteva will be

---

(2013), https://perma.cc/R5MR-LFK7 (Old DuPont's "agricultural businesses" consisted of "DuPont Pioneer [*i.e.*, Seed] and DuPont Crop Protection") (last accessed on Sept. 1, 2026).

[103] *See* Corteva, Inc., Amendment No. 3 to Form 10-12B/A, Exhibit 2.1 (Apr. 15, 2019), https://perma.cc/QG9N-Q22B ("Separation and Distribution Agreement by and among Corteva, Inc., Dow Inc., and DowDuPont Inc. Dated as of April 1, 2019.") (last accessed on Sept. 1, 2026).

[104] *See* Corteva Inc., Form 8-K, Item 1.01, Exhibit 10.2 (June 3, 2019), https://perma.cc/WAJ5-4T8S ("Letter Agreement") (last accessed on Sept. 3, 2026).

[105] *See* Corteva, Inc., "Guidance/Update Call," at 7–8 (Aug. 15, 2019).

[106] *Id.*

> responsible for the next $25 million, with Chemours responsible for any amounts beyond that amount.
>
> …
>
> For PFAS, any cost not subject to Chemours indemnification, including the $25 million I discussed under the limited sharing arrangement, are shared on a 50-50 basis between Corteva and New DuPont, starting from the first $1 and up to $300 million. Once the $300 million threshold is met, then the companies will share proportionately based on a 29% Corteva and 71% New DuPont split.

75. The 2019 Letter Agreement also imposed transfer-related protections on New DuPont or Corteva which generally restricted specified transfers (*i.e.*, business sales, spin-offs, etc.) unless certain conditions were satisfied, including minimum EBITDA, credit rating, indemnification, and qualifying deposit conditions.[107]

### C. Corteva's Initial Capital Structure

76. At the time of its separation from DowDuPont, Corteva was established with the assets and liabilities, including off-balance sheet liabilities, associated with the agricultural business of Old DuPont and Old Dow.[108] As of December 31, 2018, these assets totaled $42.9 billion, which consisted of $20.6 billion in tangible assets and $22.2 billion of goodwill and other intangible assets.[109] At the same date, total liabilities equaled $19.1 billion.[110] Following the separation, as of September 30, 2019, Corteva reported total assets of $43.2 billion, consisting of

---

[107] *Supra* note 104 (Corteva Q2 2019 Form 8-K), at Exhibit 10.2 § 4.01. Specifically, New DuPont and Corteva had minimum EBITDA thresholds of $2.5 million and $0.83 million, respectively, and both companies had to maintain a credit ratings equal to or higher than BB+ (of the equivalent) by Fitch, Ba1 (or the equivalent) by Moody's, BB+ (or the equivalent) by S&P. *Id.* § 4.01(f)(xii).

[108] *Supra* note 104 (Corteva Q2 2019 Form 8-K), at 3–4; *see also* DuPont de Nemours, Inc., Form 10-K at 6 (2019), https://perma.cc/9CNW-RPUY (last accessed on Sept. 3, 2026).

[109] *See* Corteva, Inc., Amendment No. 4 to Form10-12B/A, at 63–66 (May 6, 2019), https://perma.cc/9NXA-DV8X. Corteva's May 6, 2019 Form 10B/A contained a pro forma balance sheet which reported the value of Corteva's assets and liabilities as of December 31, 2018, assuming the spin-off had occurred on that date (last accessed on Sept. 3, 2026).

[110] *Id.*

$21.4 billion of tangible assets and $21.8 billion of goodwill and other intangible assets, and total liabilities of $18.0 billion.[111]

### D. The Key Inputs and Assumptions for [redacted] Solvency Tests Contain [redacted].

77. [redacted].[112] [redacted]

(a) [redacted];[113]

(b) [redacted][114]

(c) [redacted];[115]

[111] *See* Corteva, Inc., Form 10-Q at 5 (Sept. 30, 2019), https://perma.cc/BH28-GNAJ (last accessed Sept. 3, 2026).

[112] *See* AFFF-MDL-EID-FT-00201537 (attached as Exhibit 19); AFFF-MDL-EID-FT-00201949 (attached as Exhibit 20); AFFF-MDL-EID-FT-00201619 (attached as Exhibit 21). As with the Chemours spin-off analysis, [redacted] work was organized around the three traditional solvency tests: a balance sheet test, a cash flow test, and a reasonable capital test. *See supra* note 25 (*Litigation Services Handbook*).

[113] *See* AFFF-MDL-EID-FT-00201949 at 1954–1959 (attached as Exhibit 20). [redacted]

[114] *Id.* at 1968–1971. [redacted]

[115] *Id.* at 1962–1966, 1984. [redacted]

(d) [redacted];[116]

(e) [redacted][117] [redacted]

(f) [redacted].[118]

78. [redacted].[120]

79. [redacted].[121] [redacted]

---

[redacted]).

[116] *See* AFFF-MDL-EID-FT-00201619 at 1626 (attached as Exhibit 21).

[117] *Id.* at 1623, 1636.

[118] *Id.* at 1623, 1633, 1652.

[119] *See, generally*, AFFF-MDL-EID-FT-00201537 (attached as Exhibit 19); AFFF-MDL-EID-FT-00201949 (attached as Exhibit 20); AFFF-MDL-EID-FT-00201619 (attached as Exhibit 21).

[120] *See* AFFF-MDL-EID-FT-00201537 at 1538–1540 (attached as Exhibit 19); AFFF-MDL-EID-FT-00201949 at 1958, 1991–1992 (attached as Exhibit 20); AFFF-MDL-EID-FT-00201619 at 1626, 1658–1659 (attached as Exhibit 21).

[121] *See* AFFF-MDL-EID-FT-00201379 (attached as Exhibit 26). *See also* AFFF-MDL-EID-FT-00201949 at 1958, 1959 (attached as Exhibit 20); AFFF-MDL-EID-FT-00201619 at 1626 (attached as Exhibit 21).

[redacted].[122] [redacted][123] [redacted].[124]

80. [redacted].[125] [redacted].[126] [redacted]

81. [redacted]

[122] AFFF-MDL-EID-FT-00201379 (attached as Exhibit 26). [redacted].

[123] *Id.* [redacted]

[124] [redacted]. *See* AFFF-MDL-EID-FT-00187498 at 7498 (attached as Exhibit 22); AFFF-MDL-EID-FT-00187504 (attached as Exhibit 23); AFFF-MDL-EID-FT-00210258 (attached as Exhibit 24); AFFF-MDL-EID-FT-00210261 (attached as Exhibit 25); AFFF-MDL-EID-FT-00210262 (attached as Exhibit 27).

[125] *See* AFFF-MDL-EID-FT-00201379 (attached as Exhibit 26); AFFF-MDL-EID-FT-00210261 (attached as Exhibit 25) [redacted]

[126] *See* AFFF-MDL-EID-FT-00210261 (attached as Exhibit 25) [redacted]

[redacted].[127] [redacted][128]

82. [redacted] In May 2019, however, Chemours filed a lawsuit in the Delaware Court of Chancery against Old DuPont, Corteva, and New DuPont seeking to limit its indemnification obligations under the Separation Agreement.[129] Specifically, Chemours sought to limit its indemnification obligations or order the return of the $3.91 billion dividend it paid to Old DuPont.[130] [redacted][131]

[127] *See* AFFF-MDL-EID-FT-00201379 at 1380 (attached as Exhibit 26); *see also supra* note 109 (Corteva May 6, 2019 Amendment No. 4 to Form10-12B/A), at 117, 126 ($193 million of accrued liabilities and $310 million of contingent (off-balance sheet) exposure was fully offset via a recorded indemnification asset and indemnification adjustment, respectively).

[128] *Id.*; *see also* AFFF-MDL-EID-FT-00210262 (attached as Exhibit 27), tabs [redacted]

[129] *See, e.g.*, The Chemours Company, Form 10-Q, at 60 (June 30, 2019), https://perma.cc/4G7K-8RGA (last accessed Sept. 3, 2026); Corteva, Inc., Form 10-Q, at 37 (June 30, 2019), https://perma.cc/AR6Z-U3T8 (last accessed on Sept. 3, 2026).

[130] *Id.*

[131] *See* AFFF-MDL-EID-FT-00201379 at 1380 (attached as Exhibit 26). [redacted]

## IV. 2019-2026 TRANSACTIONS, DISPUTES, SETTLEMENTS, AND CASH RETURNED TO SHAREHOLDERS

### A. The 2021 MOU Establishing PFAS Cost-Sharing Capped Corteva's and New DuPont's Collective Contribution Towards PFAS Liabilities at $2 Billion.

83. In January 2021, Chemours, New DuPont, Corteva, and Old DuPont entered into a binding memorandum of understanding ("January 2021 MOU") to resolve Chemours' claims regarding the process and manner in which Old DuPont structured the Chemours separation and claims that challenged the assumption of certain liabilities by Chemours pursuant to the Chemours Separation Agreement.[132] The January 2021 MOU established a cost-sharing framework for potential PFAS liabilities arising from conduct before the Chemours spin-off (*i.e.*, July 1, 2015).[133]

84. The January 2021 MOU established an equal sharing of PFAS-related costs between Chemours and collectively, New DuPont and Corteva, up to a $4 billion cap or a 20-year term.[134] After the $4 billion total cap, responsibility for additional costs reverts back to Chemours under the original 2015 Chemours Separation Agreement.[135] New DuPont and Corteva agreed to equally split the first $300 million of their collective share, whereas New DuPont and Corteva will be responsible for 71% and 29%, respectively, for costs beyond the first $300 million.[136] Therefore, for amounts beyond the initial $300 million and subject to the overall cap, the effective allocation of qualifying PFAS costs is 50% to Chemours, 35.5% to New DuPont, and 14.5% to Corteva.

---

[132] *See e.g.,* Chemours, Inc. "DuPont, Corteva, and Chemours Announce Resolution of Legacy PFAS Claims," Press Release (Jan. 22, 2021), https://perma.cc/2NUN-ALJ6 (last accessed on Sept. 8, 2026).

[133] *Id.*

[134] *Id.* In other words, for up to $4 billion of costs, Chemours is responsible for $2 billion and Corteva and New DuPont, collectively, are responsible for the other $2 billion.

[135] *Id.* The arrangement also established a jointly funded escrow mechanism, with each side contributing $500 million through scheduled deposits, to prefund and manage these liabilities, along with a contingent replenishment obligation to maintain a minimum escrow balance.

[136] *Id.*

### B. The AFFF MDL Public Water Systems Settlement Required a $1.185 Billion Payment from the DuPont Entities.

85. In June 2023, Chemours, New DuPont, Corteva, and Old DuPont entered into an agreement to resolve PFAS-related drinking water claims of a defined class of U.S. public water systems.[137] The companies agreed to establish a $1.185 billion settlement fund consistent with the terms of the January 2021 MOU, where Chemours, New DuPont, and Corteva would contribute $592 million (or 50%), $400 million (or 35.5%), and $193 million (or 14.5%), respectively.[138] The respective amounts were funded by the companies in full through deposit into the qualified settlement fund on September 6, 2023.[139]

### C. The 2025 New Jersey Settlement and Related Insurance Proceeds Arrangement

86. In August 2025, Chemours, New DuPont, Corteva, and Old DuPont entered into a settlement with the State of New Jersey to resolve pending PFAS-related claims.[140] Payment allocation of the settlement was consistent with the January 2021 MOU, while certain remediation funding obligations are allocated 71% to New DuPont and 29% to Corteva.[141]

87. Separately, Chemours, New DuPont, and Corteva entered into an insurance proceeds MOU ("2025 Insurance Proceeds MOU"), where Chemours assigned its rights of its

---

[137] *See, e.g.*, Corteva, Inc., Form 10-Q, at 27 (June 30, 2023), https://perma.cc/YQP7-6FGE (last accessed on Sept. 3, 2026) ("Contribution rates will be consistent with the settling companies' 2021 MOU and the Letter Agreement, with Chemours contributing 50 percent, and DuPont and Corteva collectively contributing the remaining 50 percent.").

[138] *Id.*

[139] The Chemours Company, Form 10-K, at 56–57 (2023), https://perma.cc/93DH-G3FT (last accessed on Sept. 10, 2026). Chemours disclosed that it funded its $592 million contribution from the proceeds of new term loans, funds available under the January 2021 MOU escrow account, and available cash.

[140] *See, e.g.*, DuPont de Nemours, Inc. "Chemours, DuPont and Corteva Reach Agreement with the State of New Jersey to Comprehensively Resolve All Environmental Claims Including PFAS," Press Release (Aug. 4, 2025), https://perma.cc/6CES-V7UG (last accessed on Sept. 3, 2026); *see also* Corteva, Inc., Form 10-K, at F-42 (2025), https://perma.cc/S2NX-JX6N (last accessed on Sept. 9, 2026).

[141] *Id.*

portion of certain insurance proceeds of approximately $375 million to New DuPont and Corteva in exchange for $150 million in cash consideration ($106 million from New DuPont and $44 million from Corteva) which was put towards Chemours' share of the New Jersey settlement.[142] Any insurance proceeds recovered by New DuPont and Corteva beyond $150 million, plus an accrued fee, will be split 50% to Chemours and 50% to New DuPont and Corteva.[143]

**D. 2025 Spin-Off of Qnity from New DuPont**

88. In November 2025, New DuPont completed the separation of its electronics business into an independent, publicly traded company, Qnity Electronics, Inc. ("Qnity") via a spin-off.[144] As part of the separation, Qnity paid a cash distribution of approximately $1.4 billion to New DuPont.[145]

89. Following the Qnity separation, Qnity became responsible for 44% of New DuPont legacy liabilities, including current and future PFAS-related funding obligations and other legacy PFAS liabilities.[146] Therefore, under the terms of the 2019 Letter Agreement and the terms of Qnity's separation, PFAS-related costs are now shared approximately 39.8% to New DuPont,

---

[142] *See* "PFAS Insurance Proceeds Memorandum of Understanding among The Chemours Company, Corteva, Inc., and DuPont de Nemours, Inc." (Aug. 4, 2025), https://perma.cc/7CSH-7ERY (last accessed on Sept. 3, 2026). The purchase price paid to Chemours and insurance proceeds recovered were subject to the sharing percentages (*i.e.*, 71% New DuPont and 29% Corteva) under the 2019 Letter Agreement.

[143] *Id.*

[144] DuPont de Nemours, Inc, "DuPont Completes Separation of Qnity Electronics," Press Release (Nov. 3, 2025), https://perma.cc/9J6M-QKKM (last accessed on Sept. 3, 2026).

[145] DuPont de Nemours, Inc., Form 10-K, at F-23–F-25 (2025), https://perma.cc/LN36-8AJX (last accessed on Sept. 3, 2026).

[146] *See* Qnity Electronics, Inc., Form 10-K, at 36, F-30 (2025), https://perma.cc/B9AV-UDRY (last accessed on Sept. 3, 2026) (Qnity's 44% indemnification allocation of New DuPont's legacy and PFAS-related obligations was determined based on the portion of New DuPont's trailing twelve-month pro forma operating EBITDA attributable to the Qnity business immediately before the separation).

31.2% to Qnity, and 29% to Corteva.[147] Further, costs, up to the $4 billion cap, under the terms of the January 2021 MOU are now shared as follows: 50% to Chemours, 19.9% to New DuPont, 15.6% to Qnity, and 14.5% to Corteva.[148]

**E. 2026 U.S. DOJ, EPA, and WVDEP Proposed Settlement**

90. In June 2026, Chemours and the U.S. Department of Justice ("U.S. DOJ"), U.S. Environmental Protection Agency ("EPA"), and West Virginia Department of Environmental Protection ("WVDEP") entered into a proposed settlement to resolve certain PFAS-related civil claims resulting from activities at Chemours' Washington Works, Fayetteville Works, and Chambers Works sites.[149] In the proposed settlement, Chemours agreed to pay $22.5 million in civil penalties and spend $90 million over 15 years for mitigation projects.[150]

91. U.S. DOJ and EPA described the total settlement value as exceeding $450 million, including an estimated $280 million for alternative drinking water relief and other injunctive relief, although the Consent Decree itself fixes only certain components, including the civil penalty and $90 million mitigation commitment.[151]

[147] New DuPont's share is calculated as 71% x 54%, while Qnity's share is calculated as 71% x 44%.

[148] Revised allocations presented above for the 2019 Letter Agreement for New DuPont, Qnity, and Corteva are multiplied by 50% to account for their collective share of 50% of the costs up to the $4 billion cap.

[149] *See, e.g.*, The Chemours Company, Form 8-K, Item 1.01 and Exhibits 10.1, 99.1 (June 24, 2026), https://perma.cc/3ZP8-AL7N (last accessed on Sept. 3, 2026).

[150] *Id.* at Exhibit 99.1 (Chemours Consent Decree).

[151] *See* U.S. EPA, "EPA Obtains Over $450 Million In Penalties and Relief in Agreement with Chemours to Settle Claims Over PFAS Pollution in Three States" (June 24, 2026), https://perma.cc/HG4E-NCDQ (last accessed on Sept. 3, 2026); U.S. DOJ, "Chemours Agrees to $450M Landmark Settlement Agreement for Releases of PFAS 'Forever Chemicals' in West Virginia, North Carolina, and New Jersey" (June 24, 2026), https://perma.cc/73HP-STRS (last accessed on Sept. 3, 2026).

**F. Current Disclosures Regarding Indemnification and PFAS Exposure**

92. As discussed above, the January 2021 MOU is a cost-sharing and funding framework, not a broader release of Chemours from its indemnification obligations under the 2015 Chemours Separation Agreement.[152] Therefore, upon either expiration of the 20-year term on December 31, 2040, or upon reaching the $2 billion collective spend by New DuPont, Qnity, and Corteva, Chemours' indemnification obligations under the Chemours Separation Agreement would continue unchanged.[153]

93. As of June 30, 2026, New DuPont had paid approximately $745 million of its approximately $1.4 billion portion under the January 2021 MOU.[154] Therefore, New DuPont's remaining obligation under the January 2021 MOU is approximately $612 million.[155]

94. It does not appear that Corteva publicly discloses its cumulative spend towards its approximately $643 million portion of the January 2021 MOU.[156] Based on New DuPont's disclosed spend and assuming that New DuPont and Corteva have shared the costs according to

---

[152] *See supra* note 62 (New DuPont Q2 2026 Form 10-Q), at 30–32

[153] *Id.*; *see also supra* note 77 (Chemours Q2 2026 Form 10-Q), at 28–29.

[154] *Supra* note 62 (New DuPont Q2 2026 Form 10-Q), at 30–32, 34. New DuPont's total obligation is calculated as $150 million (50% of the first $300 million) plus $1.207 billion (71% of the remaining $1.7 billion) which equals $1.357 billion million.

Additionally, the companies agreed to count the net present value of the New Jersey settlement against the $4 billion MOU limit. For the three months ended June 30, 2026, the net present value of New DuPont's share of the $311 aggregate cash payment was $188 million. It is unclear whether this $188 million is included in New DuPont's $745 million of spend through June 30, 2026. The $745 million spend by New DuPont includes any amounts that it incurred which were indemnified by Qnity. *See also* Qnity Electronics, Inc., Form 10-Q at 23 (June 30, 2026), https://perma.cc/L4NJ-VUGT (last accessed on Sept. 3, 2026).

[155] This estimate assumes the net present value of New DuPont's share of the New Jersey settlement is included in its disclosed cumulative spend of $745 million through June 30, 2026. If it is not, New DuPont's remaining obligation under the January 2021 MOU is approximately $424 million.

[156] *See* Corteva, Inc., Form 10-Q, at 21 (June 30, 2026), https://perma.cc/72BD-GCR3 (last accessed on Sept. 3, 2026). Corteva's total obligation is calculated as $150 million (50% of the first $300 million), plus $493 million (29% of the remaining $1.7 billion), which equals $643 million.

the agreements between them, however, I estimate Corteva's cumulative spend towards its portion under the January 2021 MOU to be $393 million through June 30, 2026.[157] Therefore, Corteva's estimated remaining obligation of spend under the January 2021 MOU is approximately $250 million.

95. Based on the figures presented above, it is my estimation that as of June 30, 2026, New DuPont and Corteva collectively have remaining obligated spend under the January 2021 MOU of $862 million. After this collective amount is exhausted, it is my understanding that under the January 2021 MOU, Chemours would bear any additional PFAS-related costs and obligations.

### G. The DuPont Entities Have Returned Nearly $29 Billion to Shareholders Through Stock Buybacks and Dividends in the Past Seven Years.

96. From 2019 to 2026, New DuPont, Chemours, Corteva, and Qnity have returned significant amounts of capital to equity holders through dividends and stock buybacks. Specifically, these entities combined repurchased over $19 billion of their common stock and paid over $9.9 billion in dividends, for a total of roughly $29 billion returned to shareholders during this period. These distributions represent uses of available cash and reduction of assets and

---

[157] New DuPont's disclosed cumulative spend is $745 million, which presumably consists of $150 million of the first $300 million collective spend between New DuPont and Corteva, along with $595 million of incremental spend at New DuPont's share of 71%. New DuPont's $595 million of incremental spend implies a combined incremental spend of $838 million ($595 million divided by 71%). Therefore, assuming Corteva is aligned with New DuPont, it has spent $150 million (50% of the first $300 million), plus $243 million of incremental spend at Corteva's share of 29% for a total cumulative spend of $393 million.

Additionally, on September 9, 2026, Corteva, New DuPont, and Chemours announced a $455 million settlement with the State of North Carolina for statewide PFAS claims and other claims related to the Fayetteville Works site, stating that "the aggregate settlement payments made to North Carolina will be applied against the MOU cap in the amount of $210 million." *See* Corteva, Inc. and EIDP, Inc., Form 8-K (Sept. 9, 2026), https://perma.cc/6PFK-NAFU (last accessed on Sept. 10, 2026). I did not factor this settlement into my estimates for Corteva's (or New DuPont's) remaining qualified spend obligations under the January 2021 MOU because the settlement has not been approved. I will provide updated estimates in any supplemental declaration to the extent the North Carolina settlement is approved by that time.

available liquidity. **Figure 6** below lists the total stock buybacks and dividends paid for each entity from 2019 through June 30, 2026.

| *(in millions of USD)* | | | | | | | | | | FY2019 to |
|---|---|---|---|---|---|---|---|---|---|---|
| ***Repurchase of Common Stock*** | **FY2019** | **FY2020** | **FY2021** | **FY2022** | **FY2023** | **FY2024** | **FY2025** | **Q1 2026** | **Q2 2026** | **Q2 2026** |
| New DuPont | $ 2,329 | $ 232 | $ 2,143 | $ 4,375 | $ 2,000 | $ 500 | $ 500 | $ - | $ 275 | **$ 12,354** |
| Chemours | $ 322 | $ - | $ 173 | $ 495 | $ 69 | $ - | $ - | $ - | $ - | **$ 1,059** |
| Corteva | $ 25 | $ 275 | $ 950 | $ 1,000 | $ 756 | $ 1,009 | $ 1,071 | $ 250 | $ 250 | **$ 5,586** |
| Qnity | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 25 | $ 25 | **$ 50** |
| **Total Repurchase of Common Stock** | **$ 2,676** | **$ 507** | **$ 3,266** | **$ 5,870** | **$ 2,825** | **$ 1,509** | **$ 1,571** | **$ 275** | **$ 550** | **$ 19,049** |
| | | | | | | | | | | |
| ***(in millions of USD)*** | | | | | | | | | | **FY2019 to** |
| ***Common Dividends Paid*** | **FY2019** | **FY2020** | **FY2021** | **FY2022** | **FY2023** | **FY2024** | **FY2025** | **Q1 2026** | **Q2 2026** | **Q2 2026** |
| New DuPont | $ 1,611 | $ 882 | $ 630 | $ 652 | $ 651 | $ 635 | $ 597 | $ 82 | $ 81 | **$ 5,821** |
| Chemours | $ 164 | $ 164 | $ 164 | $ 154 | $ 149 | $ 148 | $ 78 | $ 13 | $ 13 | **$ 1,047** |
| Corteva | $ 194 | $ 388 | $ 397 | $ 418 | $ 439 | $ 458 | $ 475 | $ 121 | $ 120 | **$ 3,010** |
| Qnity | $ - | $ - | $ - | $ - | $ - | $ - | $ 13 | $ 17 | $ 17 | **$ 47** |
| **Total Commons Dividends Paid** | **$ 1,969** | **$ 1,434** | **$ 1,191** | **$ 1,224** | **$ 1,239** | **$ 1,241** | **$ 1,163** | **$ 233** | **$ 231** | **$ 9,925** |
| | | | | | | | | | | |
| ***Total Repurchase of Common Stock and Common Dividends Paid*** | ***$ 4,645*** | ***$ 1,941*** | ***$ 4,457*** | ***$ 7,094*** | ***$ 4,064*** | ***$ 2,750*** | ***$ 2,734*** | ***$ 508*** | ***$ 781*** | ***$ 28,974*** |

**Figure 6**[158]

---

[158] New DuPont Form 10-Ks: 2019 at 36, F-12, F-46; 2020 at 36, F-12; 2021 at 34, F-11; 2022 at 33, F-10; 2023 at 33, F-9; 2024 at 35, F-9; 2025 at 34, F-9. New DuPont Form 10-Qs: Q1 2026 at 9; Q2 2026 at 9, 37. New DuPont's SEC filings are publicly available at the following website: https://www.investors.dupont.com/investors/dupont-investors/filings-and-reports/default.aspx (archive link available at https://perma.cc/822W-D8HV, last accessed on Sept. 3, 2026).

Chemours Form 10-Ks: 2019 at 31, F-10; 2020 at 36, F-10; 2021 at 36, F-9; 2022 at 35, F-10; 2023 at 42, F-10; 2024 at 42, F-9; 2025 at 42, F-9. Chemours Form 10-Qs: Q1 2026 at 6; Q2 2026 at 6, 103. Chemours' SEC filings are publicly available at the following website: https://investors.chemours.com/financial-information/sec-filings (archive link available at https://perma.cc/8EBW-LYN9, last accessed on Sept. 3, 2026).

Corteva Form 10-Ks: 2019 at 64, F-12; 2020 at 66, F-10; 2021 at 59, F-8; 2022 at 50, F-8; 2023 at 50, F-8; 2024 at 50, F-8; 2025 at 50, F-8. Corteva Form 10-Qs: Q1 2026 at 6, 30; Q2 2026 at 6, 30. Corteva's SEC filings are publicly available at the following website: https://investors.corteva.com/financial-information/sec-filings (archive link available at https://perma.cc/Q5NN-AQ9U, last accessed on Sept. 8, 2026).

Qnity 2025 Form 10-K at F-7. Qnity Form 10-Qs: Q1 2026 at 9, 21; Q2 2026 at 9, 24. Qnity's SEC filings are publicly available at the following website: https://ir.qnityelectronics.com/sec-filings/all-sec-filings (archive link available at https://perma.cc/97M2-XR3X, last accessed on Sept. 8, 2026).

### 1. New DuPont – Cash Returned to Shareholders

97. From 2019 to 2026, New DuPont repurchased over $12 billion of its own common stock and spent nearly $6 billion of its cash on shareholder dividends, for a total of approximately $18.2 billion returned to shareholders during this period. *See* **Figure 6**.

98. On June 1, 2019, for example, New DuPont's Board of Directors approved a $2 billion stock buyback program.[159] On June 3, 2019, New DuPont's CFO Jeanmarie Desmond acknowledged the timing of this program—noting that it was occurring "immediately upon our stand up as an independent company."[160]

99. As shown in **Figure 6** above, from 2021 through 2025, New DuPont's dividends paid were around $600 million per year. On a per share basis, however, its dividend increased during this period due to its share repurchases. In fact, New DuPont increased its per share regular quarterly dividend every year between 2022 through 2025, ranging between 6% and 10%.[161]

100. New DuPont divested many of its business units from 2019 to 2025 which resulted in significant cash proceeds that were used to return capital to shareholders through stock buybacks and dividends and create shareholder value through paying down debt. Certain examples are discussed generally below. These examples are not meant to be exhaustive.

---

[159] DuPont De Nemours, Inc., Form 10-K, at 34 (2021), https://perma.cc/5J27-MKC7 (last accessed on Sept. 8, 2026).

[160] Alex Vuocolo, "DuPont Board Approves $2 Billion Share Buyback," Delaware Business Times (June 3, 2019), https://perma.cc/FHA4-UCVA (last accessed on Sept. 8, 2026).

[161] DuPont de Nemours, Inc., "DuPont Reports Fourth Quarter and Full Year 2021 Results," Press Release (Feb. 8, 2022), https://perma.cc/99TT-ASPR (last accessed on Sept. 9, 2026); DuPont de Nemours, Inc., "DuPont Reports Fourth Quarter and Full Year 2022 Results," Press Release (Feb. 7, 2023), https://perma.cc/B2PC-KPAQ (last accessed on Sept. 9, 2026); DuPont de Nemours, Inc., "DuPont Reports Fourth Quarter and Full Year 2023 Results," Press Release (Feb. 6, 2024), https://perma.cc/T7WE-U58T (last accessed on Sept. 9, 2026); DuPont de Nemours, Inc., "DuPont Announces Increase in Quarterly Dividend on Common Stock," Press Release (Feb. 21, 2025), https://perma.cc/H464-MGUW (last accessed on Sept. 9, 2026).

101. On February 1, 2021, New DuPont completed the separation of its Nutrition & Biosciences business.[162] One month after this divestiture, on March 8, 2021, New DuPont announced a new $1.5 billion share buyback program.[163]

102. New DuPont divested its Mobility & Materials business on November 1, 2022, which provided $11 billion in cash, and announced a new $5 billion share repurchase program on November 8, 2022.[164] In New DuPont's earlier press release announcing the agreement on February 18, 2022, New DuPont stated that it would "us[e] the net proceeds from the divested M&M businesses to fund the previously announced acquisition of Rogers Corporation and further M&A opportunities in addition to continuing share repurchases."[165]

103. On November 3, 2025, New DuPont completed the separation of its electronics business into an independent company, Qnity.[166] New DuPont used the proceeds from the separation to reduce its debt and achieve a targeted capital structure, which included reducing its shares outstanding through share repurchases.[167] Indeed, the company announced a new $2 billion share repurchase program just three days after the spinoff closed, on November 6, 2025.[168]

---

[162] *Supra* note 159 (New DuPont 2021 Form 10-K), at F-21–F-24.

[163] DuPont de Nemours, Inc., "DuPont Announces Board Approval of $1.5 Billion Share Buyback Program," Press Release (Mar. 8, 2021), https://perma.cc/T7HG-FU8S (last accessed on Sept. 8, 2026).

[164] DuPont de Nemours, Inc., "DuPont Completes M&M Divestiture to Celanese," Press Release (Nov. 1, 2022), https://perma.cc/KX38-VW6W (last accessed on Sept. 8, 2026); DuPont de Nemours, Inc., "DuPont Reports Third Quarter 2022 Results," Press Release (Nov. 8, 2022), https://perma.cc/8CEY-TGBL (last accessed on Sept. 8, 2026).

[165] DuPont de Nemours, Inc., "DuPont Announces Agreement to Divest Majority of Mobility & Materials Segment to Celanese," Press Release (Feb. 18, 2022), https://perma.cc/LQ9A-WYPS (last accessed on Sept. 8, 2026).

[166] *Supra* note 144 ("DuPont Completes Separation of Qnity Electronics").

[167] DuPont de Nemours, Inc., Tr. of Third Quarter Earnings Call, at 6 (Nov. 6, 2025), https://perma.cc/NW8G-VZ6R (last accessed on Sept. 8, 2026).

[168] DuPont de Nemours, Inc., "DuPont Reports Third Quarter 2025 Results; Announces Plans to Return Cash to Shareholders," Press Release (Nov. 6, 2025), https://perma.cc/3U3R-37KG (last accessed on Sept. 8, 2026).

104. New DuPont's management frequently discusses their priority of returning value to shareholders. For example, during New DuPont's 2025 Investor Day presentation on September 18, 2025, New DuPont's executives provided both historical information and future expectations regarding cash returns provided to New DuPont's shareholders through dividends and share repurchases. Specifically, New DuPont's presentation highlighted its "strong history of returning cash to shareholders."[169] New DuPont's CFO, Antonella Franzen, added that New DuPont expects DuPont's metrics "to continue to grow, as return of capital to shareholders will remain central to New DuPont's model."[170]

**2. Chemours – Cash Returned to Shareholders**

105. From 2019 to 2026, Chemours repurchased approximately $1.1 billion of its own common stock and spent over $1 billion of its cash on shareholder dividends, for a total of $2.1 billion returned to shareholders during this period. *See* **Figure 6**.

106. Additionally, between 2019 and 2025, Chemours divested certain business units resulting in significant cash proceeds which were used for share repurchases, dividends, and to pay down debt. For example, on December 1, 2021, Chemours divested its Mining Solutions business, ultimately receiving net cash proceeds of $509 million.[171] The cash generated from this sale contributed to the large share repurchases the company completed in the following months.[172]

---

[169] DuPont Specialty Products USA, LLC, Tr. of Investor Day, at 26 (Sept. 18, 2025), https://perma.cc/RES5-8ZVC (last accessed on Sept. 8, 2026).

[170] *Id.*

[171] *Supra* note 139 (Chemours 2023 Form 10-K), at F-22.

[172] *See* The Chemours Company, "Fourth Quarter & Full Year 2021 Earnings Presentation," at 8–9 (Feb. 11, 2022), https://perma.cc/6TM8-6ULK (highlighting Chemours' liquidity position, which included $493 million in "[o]ther" cash generated which "primarily related to proceeds from Mining Solutions Sale." This other cash generated is the main driver increasing the company's cash balance from $1.031 billion at the end of the third quarter to $1.451 billion at the end of the year. Later in the presentation, Chemours restated its commitment to return "the majority of our free cash to shareholders") (last accessed on Sept. 8, 2026).

107. Notably, during a February 11, 2022 earnings call, Chemours Senior VP and CFO, Sameer Ralhan, specified the company's commitment to "return a majority of free cash flow to shareholders."[173] Mr. Newman also noted on that call, "we remain committed to returning greater than 50% of that free cash flow to our shareholders in the form of dividends and share repurchases."[174]

### 3. Corteva – Cash Returned to Shareholders

108. From 2019 to 2026, Corteva repurchased approximately $5.6 billion of its own common stock and spent over $3 billion of its cash on shareholder dividends, for a total of approximately $8.6 billion returned to shareholders during this period. *See* **Figure 6**.

109. On June 26, 2019, 25 days after Corteva was spun off from DowDuPont, Corteva announced its board authorized a $1 billion share repurchase program.[175] Corteva's CEO, James Collins, Jr., stated that this program "underscore[s] the Board's confidence in our growth strategy and further reinforce our commitment to building a shareholder-friendly company" and noted the company's "focus on consistently and continuously returning excess cash to shareholders."[176] Corteva continued to return significant cash to shareholders through additional stock buyback programs over the next several years.

110. From 2019 to 2025, Corteva steadily increased its total dividend and on a per share basis. In fact, Corteva increased its per share dividend every year from 2021 through 2025 with increases ranging between 5.9% and 7.7%.[177]

---

[173] The Chemours Company, Tr. of Fourth Quarter 2021 Earnings Call, at 11–12 (Corrected Tr., Feb. 11, 2022), https://perma.cc/PD5W-4DHB (last accessed on Sept. 8, 2026).

[174] *Id.* at 7.

[175] *See* "Corteva Announces $1 Billion Share Repurchase Program and Quarterly Dividend," PR Newswire (News provided by Corteva, Inc.) (June 26, 2019), https://perma.cc/6PMG-DH3Y (last accessed on Sept. 8, 2026).

[176] *Id.*

[177] Corteva, Inc., "Corteva Announces Increase to Common Stock Dividend," Press Release (July 21, 2021), https://perma.cc/4BJD-CFEM (last accessed on Sept. 9, 2026) ($0.14 per share dividend

111. Notably, Corteva has made many public statements related to its focus on and commitment to returning cash to its shareholders. For example, in its 2020 Form 10-K filing, Corteva stated that one of its priorities would be to "accelerate the return of cash to shareholders by executing on its authorized share repurchase programs…."[178] Corteva's 2021 Form 10-K filing similarly noted that its priorities include "providing attractive returns to shareholders via dividends and share repurchases."[179]

#### 4. Qnity – Cash Returned to Shareholders

112. As discussed, New DuPont spun off Qnity on November 3 2025.[180] From the start, it began returning cash to its shareholders through dividends and share repurchases. From its inception through June 30, 2026, Qnity repurchased approximately $50 million of its own common stock and spent over $47 million of its cash on shareholder dividends. In total, Qnity has returned $97 million to its shareholders from its inception through June 30, 2026. *See* **Figure 6**.

113. For example, Qnity declared its first dividend on November 12, 2025, about one week after the company was spun off, paying its shareholders $0.06 per share on December 15,

---

represents 7.7% increase over prior year $0.13 per share); Corteva, Inc., "Corteva Increases Quarterly Dividend," Press Release (July 22, 2022), https://perma.cc/K8TA-X2YP (last accessed on Sept. 9, 2026) ($0.15 per share dividend represents 7.1% increase over prior year $0.14 per share); Corteva, Inc., "Corteva Announces Increased Quarterly Dividend," Press Release (July 21, 2023), https://perma.cc/62YL-PXY2 (last accessed on Sept. 9, 2026) ($0.16 per share dividend represents 6.7% increase over prior year $0.15 per share); Corteva, Inc., "Corteva Increases Quarterly Dividend for Fourth Consecutive Year," Press Release (July 29, 2024), https://perma.cc/MH25-CDSV (last accessed on Sept. 9, 2026) ($0.17 per share dividend represents 6.3% increase over prior year $0.16 per share); Corteva, Inc., "Corteva Increases Quarterly Dividend for Fifth Consecutive Year," Press Release (July 29, 2025), https://perma.cc/XG7C-G7N4 (last accessed on Sept. 9, 2026) ($0.18 per share dividend represents 6% increase over prior year $0.17 per share).

[178] Corteva, Inc., Form 10-K, 38 (2020), https://perma.cc/9FBH-27G3 (last accessed on Sept. 8, 2026).

[179] Corteva, Inc., Form 10-K, 34 (2021), https://perma.cc/5GAB-TXMV (last accessed on Sept. 8, 2026).

[180] *Supra* note 144 ("DuPont Completes Separation of Qnity Electronics").

2025, totaling $13 million.[181] Qnity stated in a press release that the dividend "reflect[ed] Qnity's commitment to delivering value to shareholders."[182] As another example, on February 20, 2026, Qnity approved a share buyback of up to $500 million in common stock to be repurchased and retired, with no expiration date.[183]

114. Like the other DuPont entities, Qnity has made public statements relating to its commitment to returning cash to its shareholders.[184]

## V. 2026 PLANNED VYLOR SPIN-OFF

### A. Corteva's Planning of the Spin-Off

115. In October 2025, Corteva announced its intention to separate its Seed and its Crop Protection business segments into two independent public companies through a tax-free spin-off transaction in the second half of 2026.[185] Corteva has also announced that its Seed business segment ("Seed Business") will be spun-off as Vylor, Inc. ("Vylor"), while its Crop Protection business segment ("Crop Protection Business") will remain with Corteva, but is being referred to as "New Corteva" for purposes of the spin-off planning.[186]

116. In preparation for the spin-off, Corteva is completing an internal reorganization where its Seed Business is consolidated under Old DuPont's wholly owned subsidiary, Pioneer

---

[181] *Supra* note 146 (Qnity 2025 Form 10-K), at 43, F-7, F-33.

[182] Qnity Electronics, Inc., "Qnity Announces Declaration of Quarterly Dividend on Common Stock," (Nov. 12, 2025), https://perma.cc/FL4X-NRDH (last accessed on Sept. 8, 2026).

[183] *Supra* note 146 (Qnity 2025 Form 10-K), at F-46.

[184] *See, e.g.*, Qnity Electronics, Inc., Tr. of Fourth Quarter and Full Year 2025 Financial Results Earnings Webcast, at 5, 7 (Feb. 26, 2026), https://perma.cc/Q938-MT9P (last accessed on Sept. 8, 2026).

[185] Corteva, Inc., Form 8-K, Exhibit 99.1 (Oct. 1, 2025), https://perma.cc/PM2E-MQT2 (last accessed on Sept. 8, 2026).

[186] *See, e.g.*, Corteva, Inc., "Introducing Vylor: Corteva Spinoff to Propel Agriculture Further," Press Release (May 5, 2026), https://perma.cc/TH6D-WVTG (last accessed on Sept. 8, 2026).

Hi-Bred International, Inc. ("Pioneer").[187] Old DuPont will then contribute all of its interest in Pioneer to Vylor, a newly incorporated, wholly owned subsidiary of Corteva, in exchange for Vylor common stock and the payment of a $3.56 billion cash distribution.[188] Old DuPont will then distribute the Vylor common stock to Corteva, which will then distribute it to Corteva's shareholders to complete the spin-off of Vylor as an independent, public company.[189] After the spin-off of Vylor, New Corteva will continue operating the Crop Protection Business.[190]

117. Vylor's executive leadership team will be comprised of Corteva's current CEO, CFO, Chief Technology Officer, Chief Legal Officer, and Chief People Officer.[191] New Corteva's CEO will be Luke Kissam, who joined Corteva in June 2026, and its CFO will be Jeff Rudolph, who is currently Corteva's Chief Strategy Officer.[192]

118. Shortly following Corteva's October 2025 announcement of the proposed separation, S&P Global Ratings and Fitch Ratings each placed the credit ratings of Corteva and Old DuPont on negative watch.[193] S&P Global Ratings stated that the separation would reduce Corteva's scale and diversification, with the remaining Crop Protection Business representing approximately 44% of pre-separation revenue and 34% of pre-separation EBITDA, while also

---

[187] Vylor Inc., Amendment No. 1 to Form 10 (the "Vylor Amended Form 10"), Exhibit 99.1, at 5, 39 (Aug. 14, 2026), https://perma.cc/A2AW-THAR (last accessed on Sept. 8, 2026).

[188] *Id.* at Exhibit 99.1, at 3, 39, 52–54 (The Vylor Amended Form 10 estimates that Vylor will make a cash distribution of approximately $3.56 billion to EIDP/New Corteva in connection with the separation).

[189] *Id.* at Exhibit 99.1, at 7.

[190] *Id.* at Exhibit 99.1, at 13, 16. Old DuPont will continue to be a subsidiary of New Corteva.

[191] *Id.* at Exhibit 99.1, at 131–33.

[192] *See* Corteva, Inc., "Corteva Announces Executive Leadership Team of its Future Crop Protection Company," Press Release (Apr. 14, 2026), https://perma.cc/AG4W-49A5 (last accessed on Sept. 8, 2026).

[193] *See* S&P Global Ratings, "Corteva Inc. Ratings Placed on CreditWatch Negative on Announcement of Seed Business Separation" (Oct. 2, 2025), https://perma.cc/WL4K-BSVT (last accessed on Sept. 8, 2026); Fitch Ratings, "Fitch Places Corteva, Inc. on Rating Watch Negative," (Oct. 2, 2025), https://perma.cc/AU8E-YRN8 (last accessed on Sept. 8, 2026).

retaining all legacy PFAS obligations, the majority of Corteva's underfunded pension liabilities, as well as Corteva's pesticide liabilities related to its Crop Protection business.[194]

119. Certain accrued and contingent liabilities of Corteva will primarily remain with New Corteva, including Corteva's pension and other post-employment benefit (OPEB) obligations and Corteva's PFAS-related obligations. Specifically, $1.2 billion, or 94%, of Corteva's reported $1.3 billion of noncurrent pension and OPEB liabilities was attributed to New Corteva as of June 30, 2026.[195]

120. Similarly, $396 million, or 85%, of Corteva's $468 million accrued litigation liabilities as of June 30, 2026 was attributed to New Corteva.[196]

121. Corteva reported $580 million of accrued environmental liabilities and an additional $586 million of reasonably possible exposure above the $580 million (*i.e.*, off-balance sheet exposure) as of June 30, 2026.[197] It appears that $546 million, or 94%, of the accrued

[194] *Id.*; *see also supra* note 187 (Vylor Amended Form 10), at Exhibit 99.1, at 163 ("New Corteva will retain certain liabilities to the extent Corteva is responsible under the Prior Transaction Agreements, including obligations relating to historical PFAS and other environmental liabilities associated with legacy EIDP businesses . . . ."); *id.* at Exhibit 2.1, at 36 ("RemainCo . . . shall be Allocated all of the RemainCo Liabilities"); Mike Scarcella, "Corteva to pay $85 million to settle US farmers' lawsuit over pesticide prices" (June 11, 2026), https://perma.cc/RGL4-EV4B (last accessed on Sept. 8, 2026).

[195] *Supra* note 187 (Vylor Amended Form 10), at Exhibit 99.1, at 49, F-9. Corteva reported approximately $1.3 billion of pension and other post-employment benefit liabilities as of June 30, 2026. The reduction from the approximately $2.4 billion reported on March 31, 2026 primarily reflects Corteva's $1.061 billion discretionary contribution to its principal U.S. pension plan in June 2026. Corteva subsequently made an additional $399 million contribution in July 2026. *See id.* at Exhibit 99.1, at F-18.

[196] *Supra* note 156 (Corteva Q2 2026 Form 10-Q), at 23. Corteva reported current accrued litigation of $468 million as of June 30, 2026 and a related current indemnification asset of $185 million recorded within accounts and notes receivable. *See also supra* note 187 (Vylor Amended Form 10), at Exhibit 99.1, at F-116.

[197] *Supra* note 156 (Corteva Q2 2026 Form 10-Q), at 29. The $580 million accrual consisted of $294 million of Chemours-related obligations subject to indemnity, $73 million relating to other discontinued or divested businesses, $54 million of liabilities primarily related to DuPont and subject to indemnity from DuPont, $104 million of liabilities not subject to indemnity, and $55 million of indemnification liabilities related to the MOU. Corteva also reported approximately

environmental liabilities, and presumably a majority of the reasonably possible exposure, as of June 30, 2026 was attributed to New Corteva.[198]

122. In July 2026, Fitch maintained its "Rating Watch Negative" on Corteva and Old DuPont, noting the Seed Business represented approximately 57% and 66% of Corteva's 2025 revenue and segment EBITDA, respectively.[199]

123. In August 2026, Fitch downgraded Corteva's ratings from A to BBB+ and removed the Rating Watch Negative from Corteva's ratings.[200] In the same month, S&P Global Ratings stated that it will lower Corteva's issuer credit rating from A- to BBB+ and resolve the CreditWatch placement when it believes the Vylor spin-off is nearing a close as long as there are no material changes to Corteva's post-spin capital structure.[201]

---

$363 million of related environmental indemnification assets as of June 30, 2026, including $277 million associated with Chemours-related obligations, $36 million associated with other discontinued or divested businesses, and $50 million associated with environmental remediation liabilities primarily related to DuPont.

[198] *Supra* note 187 (Vylor Amended Form 10), at Exhibit 99.1, at F-117. The Vylor Amended Form 10 reports that the Seed Business had approximately $34 million of accrued environmental remediation obligations as of June 30, 2026, substantially all of which related to the AltEn facility matter. Accordingly, the remainder, $546 million, of Corteva's $580 million recorded environmental accrual appears to have been attributed to New Corteva.

[199] *See* Fitch Ratings, "Fitch Maintains Corteva on Rating Watch Negative" (July 21, 2026), https://perma.cc/C8JV-J34S (last accessed on Sept. 9, 2026). Fitch reported that Corteva's EBITDA leverage was approximately 0.7 times at year-end 2025 and identified sustained EBITDA leverage above 2.0 times, sustained net leverage above 1.0 times, or annual free cash flow below $300 million as factors that could contribute to a downgrade.

[200] *See* Fitch Ratings, "Fitch Downgrades Corteva's Ratings to 'BBB+'; Removes from Negative Watch; Outlook Stable" (Aug. 6, 2026), https://www.fitchratings.com/research/corporate-finance/fitch-downgrades-corteva-ratings-to-bbb-removes-from-negative-watch-outlook-stable-06-08-2026 (last accessed on Sept. 8, 2026).

[201] *See* S&P Global Ratings, "Corteva Inc. Ratings Affirmed, Remain on CreditWatch Negative on Vylor Inc. Spin-Off" (Aug. 6, 2025), https://perma.cc/X9F7-REHC (last accessed on Sept. 8, 2026).

### B. The Vylor Spin-Off Reduces Corteva's Capacity to Satisfy Legacy PFAS/PFOA Liabilities by Billions of Dollars.

#### 1. Solvency and Capital Adequacy Analyses

124. In connection with the proposed transaction, Vylor, Old DuPont, and New Corteva are required to receive an opinion from an independent financial advisor that, after giving effect to the spin-off transactions, each would be solvent, adequately capitalized, and able to pay debts as they come due.[202] [redacted][203] [redacted][204]

#### 2. Purpose and Scope of Sensitivity Analysis

125. Corteva has not publicly disclosed its contingent liabilities estimates or financial projections that will be used for the Vylor, Old DuPont, and Corteva solvency analyses, or its financial advisor's results from the solvency tests being performed. Therefore, I have been asked to use available data and information to analyze the impact of the Vylor spin-off on Corteva's (*i.e.*, New Corteva's) ability to satisfy potential future PFAS-related liabilities. Specifically, the analysis below compares Corteva's pre-spin financial position with the estimated post-spin financial position of New Corteva. The analysis also presents the effect of additional PFAS-related liabilities

---

[202] *Supra* note 187 (Vylor Amended Form 10), at Exhibit 99.1, at 8, 15, 43.

[203] *See, e.g.*, AFFF-MDL-EID-FT-00096942 (attached as Exhibit 9); AFFF-MDL-EID-FT-00221023 at 1095 (attached as Exhibit 6); AFFF-MDL-EID-FT-00201949 (attached as Exhibit 20); AFFF-MDL-EID-FT-00201619 (attached as Exhibit 21).

[204] *Id.*

or judgments ranging from $2 billion to $20 billion on selected leverage and capitalization metrics, based on the assumption that such amounts would be funded through additional indebtedness.[205]

### 3. Financial Metrics Evaluated

126. I assessed the impact of the Vylor spin-off on Corteva's ability to absorb the assumed PFAS-related liabilities using selected financial measures which are, or were, used by Corteva, its lenders, credit-agencies, and [redacted] to evaluate Corteva's capitalization, leverage, and liquidity. The principal metrics I evaluated in the sensitivity analysis are:

(a) **Total Indebtedness to Total Capitalization.** This ratio measures total indebtedness as a percentage of total capitalization, generally defined as total indebtedness plus shareholders' equity.[206] It measures the proportion of an entity's capital structure funded by debt and the amount of equity capitalization remaining to absorb losses. Corteva's revolving credit facilities contain a single financial covenant requiring total indebtedness to total capitalization for Corteva and its consolidated subsidiaries not to exceed 0.60.[207] [redacted]

---

[205] As of June 30, 2026, Corteva reported approximately $5.4 billion of available committed credit facilities and approximately $6.1 billion of committed and uncommitted unused credit lines which is described as being available for the "settlement of litigation and environmental remediation." *See supra* note 187 (Vylor Amended Form 10), at Exhibit 99.1, at 83, F-16. Treating the illustrative amounts as additional indebtedness is an assumption I used to measure their effect on leverage and capitalization on a comparable basis. The modeled amounts are hypothetical and not intended to demonstrate that Corteva or New Corteva could borrow the full amount under existing revolving facilities or issue additional notes at any one point in time. *See, e.g.*, S&P Global Ratings, *Corporate Methodology: Ratios and Adjustments*, at 26–27 (Apr. 1, 2019), https://perma.cc/6CD6-N6XP (last accessed on Sept. 8, 2026).

[206] *See* AFFF-MDL-EID-FT-00201949 at 1966 (attached as Exhibit 20).

[207] *See supra* note 187 (Vylor Amended Form 10), at Exhibit 99.1, at 83, 85, F-16, F-68, F-177–178, F-127. Vylor's revolving credit facilities disclosed in the Amended Form 10 similarly require its total indebtedness to total capitalization ratio not to exceed 0.60.

[redacted][208]

(b) **Net Debt to EBITDA (also referred to as Net Leverage Ratio)**. This ratio measures financial debt, less available cash, relative to earnings before interest, taxes, depreciation, and amortization (EBITDA). It indicates the relationship between an entity's net debt burden and the operating earnings available to support and repay that debt; a higher ratio generally reflects greater leverage and reduced financial flexibility.[209] [redacted][210] Corteva also publicly provided initial and long-term outlooks of debt to EBITDA leverage ratios for New Corteva and Vylor.[211]

(c) **Market-Based Equity Cushion**. Equity cushion generally measures the proportion of a company's asset or enterprise value that remains attributable to equity after satisfaction of liabilities and other claims. It provides an indication of the capacity available to absorb additional liabilities or reductions in value. [redacted]

---

[208] *See* AFFF-MDL-EID-FT-00201949 at 1966, 1971, 1984 (attached as Exhibit 20).

[209] *See supra* note 199 ("Fitch Maintains Corteva on Rating Watch Negative"); *supra* note 200 ("Fitch Downgrades Corteva's Ratings to 'BBB+'; Removes from Negative Watch; Outlook Stable").

[210] *See supra* note 208 (AFFF-MDL-EID-FT-00201949) at 1954–1955, 1963, 1966, 1971, 1984, 1986–1987 (attached as Exhibit 20).

[211] *See* Corteva, Inc., Form 8-K, at 5 (Aug. 6, 2026), https://perma.cc/ZXH9-MDJH (last accessed on Sept. 8, 2026) (Corteva disclosed that, following the separation, New Corteva will target a longer-term credit profile a with debt to EBITDA ratio not exceeding 2.0x); *supra* note 187 (Vylor Amended Form 10), at Exhibit 99.1, at 175 (Corteva also expects Vylor's debt to EBITDA leverage ratio to be approximately 0.8x to 1.1x at December 31, 2026, with a longer-term target not to exceed 2.5x).

[redacted][212] My analysis applies the same general equity cushion concept using a market-based approach, calculating market-based equity cushion as market capitalization divided by total capital claims.[213]

**4. Estimated Post-Spin Financial Position of New Corteva**

127. Certain financial transactions associated with the proposed separation were not reflected in Corteva's reported assets and liabilities attributed to New Corteva as of June 30, 2026.[214] Therefore, I adjusted Corteva's reported assets and liabilities attributed to New Corteva based on information available from Corteva's public disclosures about the spin-off, which includes the following transactions:

(a) Corteva's July 2026 discretionary pension contribution of approximately $399 million;[215]

(b) Vylor's exchange of up to approximately $1.6 billion of outstanding EIDP debt;[216] and

[212] *See* AFFF-MDL-EID-FT-00097018 at 7021, 7052, 7053 (attached as Exhibit 8); AFFF-MDL-EID-FT-00096942 at 6979, 6980 (attached as Exhibit 9); AFFF-MDL-EID-FT-00201949 at 1968–1971 (attached as Exhibit 20); AFFF-MDL-EID-FT-00201619 at 1623, 1633, 1652 (attached as Exhibit 21). [redacted]

[213] Market capitalization is used as the measure of equity value, and debt, pension and OPEB obligations, and other identified debt-like and contingent obligations, net of related indemnification assets, are added to determine an adjusted measure of total capital claims.

[214] *See supra* note 187 (Vylor Amended Form 10), at Exhibit 99.1, at 49, 52–55.

[215] *Id.* at Exhibit 99.1, at 88, F-28.

[216] *Id.* at Exhibit 99.1, at 53–54; *see also* Corteva, Inc., "Corteva Announces Early Tender Results and Extension of Expiration Date in Private Exchange Offers and Consent Solicitations for EIDP's [Notes]" Press Release (Aug. 20, 2026), https://perma.cc/9Z55-N9CG (last accessed on Sept. 8, 2026).

(c) Vylor's estimated $3.56 billion cash distribution to New Corteva in connection with the separation.[217]

128. Together, these adjustments increase New Corteva's cash, and total assets, by approximately $3.2 billion and reduce its liabilities by approximately $1.8 billion.[218] Accordingly, New Corteva's equity increases by approximately $5.0 billion to maintain the balance sheet relationship between assets, liabilities, and equity.[219]

129. After giving effect to these adjustments, New Corteva's estimated June 30, 2026 post-spin financial position reflects approximately $22.8 billion of total assets, including $5.1 billion of cash and equivalents, $9.5 billion of total liabilities, including $3.3 billion of indebtedness, and $13.3 billion of equity.[220]

---

The Vylor Amended Form 10 assumes that approximately 80% of each series will be exchanged, resulting in approximately $1.28 billion of EIDP indebtedness exchanged for Vylor debt. Corteva's August 20, 2026 press release disclosed that a total of $1.42 billion of EIDP notes were validly tendered and not validly withdrawn by the early tender deadline. Corteva also announced that it extended the expiration date of the exchange offer to September 29, 2026.

The Vylor Amended Form 10 also states that a portion of the outstanding borrowings under EIDP's commercial paper program will be paid down using Pioneer's loan facility, which would reduce New Corteva's post-spin short-term debt, however, such amount is not disclosed. Therefore, I have not modeled this reduction of debt into New Corteva's post-spin financial structure, however, at most it would reduce New Corteva's short-term debt balance as of June 30, 2026 by approximately $2.4 billion. *See supra* note 187 (Vylor Amended Form 10), at 178, F-15.

[217] *See supra* note 187 (Vylor Amended Form 10), at Exhibit 99.1, at 52–54.

[218] New Corteva's cash is increased by the proposed $3.56 billion distribution from Vylor, less $399 million for paydown of the pension liability in July 2026 (*i.e.,* net increase of $3.16 billion). New Corteva's total liabilities are reduced by $399 million for the paydown of pension liabilities, plus $1.42 billion for the estimated impact from the exchange of EIDP debt for Vylor debt (*i.e.,* total increase to liabilities of $1.82 billion).

[219] This is the sum of the cash distribution received from Vylor and the estimated debt assumed by Vylor in the exchange.

[220] This is a result of adjusting the amounts listed as the "Separation of Crop Protection business" column of Vylor's unaudited pro forma consolidated balance sheet as of June 30, 2026 as presented in the Vylor Amended Form 10 for the transactions described above.

### 5. Other Inputs to the Sensitivity Analysis

130. For the market-based equity cushion, I estimated New Corteva's market capitalization following the Vylor spin-off based on an allocation of Corteva's total enterprise value to Vylor and New Corteva based on their relative projected 2026 segment operating EBITDA contributions, as discussed above.[221] This approach implies the same enterprise value to EBITDA multiple to both businesses and likely over values New Corteva's enterprise value, and therefore, is conservative for purposes of the analysis.[222] New Corteva's estimated market capitalization is then calculated as its estimated enterprise value of $19.6 billion, less approximately $238 million of noncontrolling interest and $3.3 billion of indebtedness, plus approximately $5.1 billion of cash and cash equivalents, resulting in estimated market capitalization of approximately $21.1 billion.

### 6. Results of Comparative Sensitivity Analysis

131. The findings below demonstrate how additional PFAS-related liabilities or judgments ranging from $2 billion to $20 billion would affect the discussed financial metrics of Corteva before the Vylor spin-off as compared to Corteva after the Vylor spin-off, *i.e.*, New Corteva.

132. **Total Indebtedness to Total Capitalization.** As illustrated in **Figure 7** below, Corteva's total indebtedness to total capitalization ratio <u>before the spin-off</u> is approximately 0.16

---

[221] Corteva's total enterprise value as of August 26, 2026 was approximately $58.0 billion. S&P Capital IQ, Market Data, Market Capitalization (Daily) as of August 26, 2026.

As discussed above, based on Corteva's guidance, I estimate full-year 2026 segment operating EBITDA for Vylor and New Corteva will be approximately $2.8 billion (~66%), and $1.4 billion (~34%), respectively. Applying those percentages to Corteva's total enterprise value resulted in estimated enterprise values of approximately $38.4 billion for Vylor and $19.6 billion for New Corteva. This allocation applies the same implied enterprise value to EBITDA multiple of approximately 13.7 times to both segments.

[222] Recently, market analysts have assigned higher enterprise value to EBITDA multiples to Vylor than to New Corteva. For example, J.P. Morgan's June 2026 report, *Corteva, Inc. Deep Dive*, at 12, applied multiples of 13.5 times to Vylor and 10.1 times to New Corteva. Deutsche Bank's June 22, 2026 report, *Meeting with CEO: Seeds Valuation is Growing*, at 3, applied multiples of 18.0 times to Vylor and 9.0 times to New Corteva.

before any additional modeled obligation and reaches the 0.60 covenant after approximately $13.3 billion of additional modeled PFAS-related liabilities or judgments. New Corteva's estimated ratio after the spin-off is approximately 0.20 before any additional modeled obligation but reaches the 0.60 covenant after approximately $6.7 billion of additional modeled obligations. Accordingly, the Vylor spin-off reduces the amount of additional modeled PFAS-related liabilities or judgments that New Corteva could absorb by approximately $6.6 billion, or approximately 50%.[223]

| | **Total Indebtedness to Total Capitalization** | |
|---|---|---|
| **Illustrative Additional PFAS-Related Liability/Judgment ($s in millions)** | **Corteva before Vylor Spin-off** | **Corteva Adjusted for Vylor Spin-off** |
| $0 | 0.16 | 0.20 |
| $2,000 | 0.23 | 0.32 |
| $4,000 | 0.29 | 0.44 |
| $6,000 | 0.36 | 0.56 |
| $8,000 | 0.43 | 0.68 |
| $10,000 | 0.49 | 0.80 |
| $12,000 | 0.56 | 0.92 |
| $15,000 | 0.66 | 1.10 |
| $20,000 | 0.82 | 1.40 |

**Figure 7**

133. **Net Debt to EBITDA.** For comparison purposes in the sensitivity analysis, I evaluated Corteva's and New Corteva's net debt to EBITDA ratios against Corteva's peers, which have a 75th-percentile net debt to EBITDA ratio of approximately 3.2 times.[224]

[223] 50% reduction calculated as $6.6 billion reduction in capacity divided by Corteva's capacity of $13.3 billion.

[224] Peer companies of Corteva had a 75th-percentile net debt to EBITDA ratio of approximately 3.2 times. This threshold is higher than Corteva's projected longer-term credit profiles of Vylor and New Corteva with debt to EBTIDA targets of 2.0 times and 2.5 times, respectively.

The selected peers are: Air Products and Chemicals, Inc. (NYSE: APD); Archer-Daniels-Midland Company (NYSE: ADM); BASF SE (XTRA: BAS); Bayer Aktiengesellschaft (XTRA: BAYN); Celanese Corporation (NYSE: CE); CF Industries Holdings, Inc. (NYSE: CF); Eastman Chemical Company (NYSE: EMN); Ecolab Inc. (NYSE: ECL); FMC Corporation (NYSE: FMC);

134. As shown in **Figure 8** below, Corteva's net debt to EBITDA ratio before the spin-off is approximately 0.6 times before any additional modeled obligation, and reaches 3.2 times after approximately $10.7 billion of additional modeled PFAS-related liabilities or judgments. New Corteva's estimated net debt to EBITDA ratio after the spin-off is approximately negative 1.2 times before any additional modeled obligation and reaches 3.2 times after approximately $6.2 billion of additional modeled obligations. Accordingly, the Vylor spin-off reduces the amount of additional modeled PFAS-related liabilities or judgments that New Corteva could absorb before reaching 3.2 times by approximately $4.6 billion, or approximately 42%.[225]

| | Net Debt to EBITDA | |
|---|---|---|
| Illustrative Additional PFAS-Related Liability or Judgment ($s in millions) | Corteva before Vylor Spin-off | Corteva Adjusted for Vylor Spin-off |
| $0 | 0.6 | (1.2) |
| $2,000 | 1.1 | 0.2 |
| $4,000 | 1.6 | 1.6 |
| $6,000 | 2.0 | 3.0 |
| $8,000 | 2.5 | 4.4 |
| $10,000 | 3.0 | 5.9 |
| $12,000 | 3.5 | 7.3 |
| $15,000 | 4.2 | 9.4 |
| $20,000 | 5.4 | 12.9 |

**Figure 8**

International Flavors & Fragrances Inc. (NYSE: IFF); The Mosaic Company (NYSE: MOS); Nutrien Ltd. (TSX: NTR); and PPG Industries, Inc. (NYSE: PPG).

The peer group was developed from three principal sources: (1) the S&P Capital IQ Peer Comps list for Corteva (accessed on July 23, 2026); (2) companies identified by Corteva as key competitors; and (3) companies identified by Corteva as peer companies for purposes of evaluating executive compensation, as disclosed on pages 131 and 146 of the Vylor Initial Form 10. [redacted] *See* AFFF-MDL-EID-FT-00201949 at 1976 (attached as Exhibit 20).

[225] 42% reduction calculated as $4.56 billion reduction in capacity divided by Corteva's capacity of $10.75 billion.

135. **Market-Based Equity Cushion.** [redacted][226] This figure provides a Corteva-specific historical reference point for assessing the effect of additional modeled obligations to Corteva whereby as additional debt is added, the market-based equity cushion goes down.[227]

136. As shown in **Figure 9** below, Corteva's estimated market-based equity cushion before the Vylor spin-off is approximately 89% before any additional modeled obligation and reaches the 59% reference point after approximately $18.9 billion of additional modeled PFAS-related liabilities or judgments. New Corteva's estimated market-based equity cushion after the Vylor spin-off is approximately 83% before any additional modeled obligation and reaches the 59% reference point after approximately $6.1 billion of additional modeled obligations. Accordingly, the Vylor spin-off reduces the amount of additional modeled PFAS-related liabilities or judgments that New Corteva could absorb before reaching the 59% reference point by approximately $12.8 billion, or approximately 68%.[228]

[226] *See* AFFF-MDL-EID-FT-00201949 at 1954–1955, 1968–1969 (attached as Exhibit 20). [redacted]

[227] A similar metric which measures the inverse relationship is total debt to total enterprise value. The 75th percentile total debt to total enterprise value of Corteva's peers, discussed above, is approximately 43%, which would equate to approximately 57% equity cushion.

[228] 68% reduction calculated as $12.8 billion reduction in capacity divided by Corteva's capacity of $18.9 billion.

| | Market-Based Equity Cushion | |
|---|---|---|
| Illustrative Additional PFAS-Related Liability or Judgment ($s in millions) | Corteva before Vylor Spin-off | Corteva Adjusted for Vylor Spin-off |
| $0 | 89% | 83% |
| $2,000 | 86% | 75% |
| $4,000 | 83% | 67% |
| $6,000 | 80% | 59% |
| $8,000 | 76% | 51% |
| $10,000 | 73% | 44% |
| $12,000 | 70% | 36% |
| $15,000 | 65% | 24% |
| $20,000 | 57% | 4% |

**Figure 9**

### C. The Vylor Spin-Off Reduces the Combined DuPont Entities' Capacity to Satisfy Legacy PFAS/PFOA Liabilities by Billions of Dollars.

#### 1. Purpose and Scope of Sensitivity Analysis

137. In addition to the Corteva-specific sensitivity analysis presented above, I have been asked to use available data and information to analyze the impact of the Vylor spin-off on the combined financial position of New DuPont, Qnity, Chemours, and Corteva (the "Combined DuPont Entities") and their collective ability to satisfy potential future PFAS-related liabilities.[229] The analysis below compares the Combined DuPont Entities' pre-spin financial position with the estimated post-spin financial position and presents the effect of additional PFAS-related liabilities or judgments ranging from $2 billion to $35 billion on the same leverage and capitalization metrics used above, based on the assumption that such amounts would be funded through additional indebtedness.

[229] The combined analysis aggregates the financial resources and obligations of the entities for purposes of evaluating their collective capacity to absorb an additional PFAS-related liability or judgment. It does not consider how any modeled liability would be allocated or funded among the entities.

### 2. Pre- and Post-Spin Financial Inputs to the Analysis

138. As of June 30, 2026, New DuPont, Qnity, Chemours, and Corteva had combined cash and short-term investments of approximately $5.7 billion, total assets of $84.2 billion, total debt of approximately $15.9 billion, total liabilities of approximately $37.4 billion, and total book equity of approximately $46.8 billion.[230] For the twelve months ending June 30, 2026, the Combined DuPont Entities generated total EBITDA of approximately $7.8 billion.[231] The combined market capitalization and total enterprise value were approximately $102.7 billion and $114 billion, respectively, as of August 26, 2026.[232]

139. Total capitalization and net debt for the Combined DuPont Entities were calculated as approximately $62.7 billion and $10.2 billion, respectively.[233] Total capital claims of the Combined DuPont Entities were estimated to be $120.8 billion.[234]

140. Based on these amounts, before the Vylor spin-off, the Combined DuPont Entities had a total indebtedness to total capitalization ratio of approximately 0.25,[235] a net debt to EBITDA

---

[230] S&P Capital IQ financial data for each entity as of June 30, 2026 (last accessed on August 30, 2026). *See also* New DuPont Form 10-Q for the quarter ended June 30, 2026, at 8; Qnity Form 10-Q for the quarter ended June 30, 2026, at 8; Chemours Form 10-Q for the quarter ended June 30, 2026, at 4; and Corteva Form 10-Q for the quarter ended June 30, 2026, at 5. *See supra* note 158 (websites for all DuPont Entities' SEC filings). Total debt excludes operating-lease liabilities.

[231] S&P Capital IQ financial data for the twelve months ended June 30, 2026 (last accessed on August 30, 2026). EBITDA was approximately $1.6 billion for New DuPont, $1.5 billion for Qnity, $485 million for Chemours, and $4.2 billion for Corteva, resulting in combined EBITDA of approximately $7.8 billion.

[232] S&P Capital IQ market data as of August 26, 2026 (last accessed on September 8, 2026). Market capitalization was approximately $18.6 billion for New DuPont, $26.4 billion for Qnity, $2.4 billion for Chemours, and $55.3 billion for Corteva. Total enterprise value was approximately $20.2 billion for New DuPont, $30.3 billion for Qnity, $5.8 billion for Chemours, and $58.0 billion for Corteva.

[233] Total capitalization was calculated as total debt plus total book equity and net debt was calculated as total debt less cash and short-term investments.

[234] For New DuPont, Qnity, and Chemours capital claims reflects market capitalization plus debt and accrued pension and other post-employment benefits liabilities. For Corteva, this figure reflects market capitalization plus debt, pension and OPEB obligations, and other identified debt-like and contingent obligations, net of related indemnification assets.

[235] $15.9 billion / $62.8 billion = 0.25.

ratio of approximately 1.3 times,[236] and an estimated market-based equity cushion of approximately 85%.[237]

141. To estimate the Combined DuPont Entities' financial position and operating results after the Vylor spin-off, I substituted the estimated post-spin financial position and results of New Corteva, as described in the section above, for Corteva, while the financial information for New DuPont, Qnity, and Chemours remains unchanged.[238]

### 3. Results of Comparative Sensitivity Analysis

142. The findings below demonstrate how additional PFAS-related liabilities or judgments ranging from $2 billion to $35 billion would affect the discussed financial metrics of the Combined DuPont Entities before the Vylor spin-off as compared to after the Vylor spin-off.

143. **Total Indebtedness to Total Capitalization.** As shown in **Figure 10** below, before the Vylor spin-off, the Combined DuPont Entities would exceed the total indebtedness to total capitalization covenant after absorbing approximately $21.7 billion of modeled obligations.[239] After the Vylor spin-off (replacing Corteva with New Corteva), the Combined DuPont Entities reach the debt covenant after approximately $15.1 billion of additional obligations are modeled. Therefore, the Vylor spin-off reduces the amount of additional modeled obligations that could be absorbed before reaching the covenant by approximately $6.6 billion, or approximately 31%.

---

[236] $10.2 billion / $7.8 billion = 1.3.

[237] $102.7 billion / $120.8 billion = 85%.

[238] The New Corteva amounts incorporated into the Combined DuPont Entities' post-spin analysis include approximately $3.3 billion of total debt, approximately $5.1 billion of estimated post-spin cash, approximately $9.5 billion of total liabilities, approximately $13.3 billion of estimated book equity, approximately $1.4 billion of Crop Protection segment operating EBITDA for the twelve months ended June 30, 2026, and approximately $21.1 billion of estimated market capitalization.

[239] *See supra* note 187 (Vylor Amended Form 10), at Exhibit 99.1, at 83, 85, F-16, F-68, F-177-178, F-127; DuPont de Nemours, Inc., Form 10-Q, at 50 (Mar. 31, 2026), https://perma.cc/2JBB-53GB (last accessed on Sept. 8, 2026).

| | Total Indebtedness to Total Capitalization | |
|---|---|---|
| Illustrative Additional PFAS-Related Liability/Judgment ($s in millions) | Combined before Vylor Spin-off | Combined Adjusted for Vylor Spin-off |
| $0 | 0.25 | 0.29 |
| $2,000 | 0.29 | 0.33 |
| $5,000 | 0.33 | 0.40 |
| $10,000 | 0.41 | 0.50 |
| $15,000 | 0.49 | 0.60 |
| $20,000 | 0.57 | 0.70 |
| $25,000 | 0.65 | 0.80 |
| $30,000 | 0.73 | 0.90 |

**Figure 10**

144. **Net Debt to EBITDA.** For comparison purposes in the sensitivity analysis, I evaluated the Combined DuPont Entities' net debt to EBITDA ratio before and after the proposed Vylor spin-off against the 75th-percentile net debt to EBITDA ratio for selected peer companies of approximately 3.1 times.[240]

[240] The selected peer group includes the companies used in the Corteva analysis described in above, together with companies identified by S&P Capital IQ as Peer Comps of New DuPont, Qnity, or Chemours (last accessed on August 3, 2026). The selected peer companies are Air Products and Chemicals, Inc. (NYSE: APD); Albemarle Corporation (NYSE: ALB); Amkor Technology, Inc. (NasdaqGS: AMKR); Archer-Daniels-Midland Company (NYSE: ADM); Ashland Inc. (NYSE: ASH); ASM International N.V. (ENXTAM: ASM); Avient Corporation (NYSE: AVNT); Axalta Coating Systems Ltd. (NYSE: AXTA); Bayer Aktiengesellschaft (XTRA: BAYN); BASF SE (XTRA: BAS); Cabot Corporation (NYSE: CBT); Celanese Corporation (NYSE: CE); CF Industries Holdings, Inc. (NYSE: CF); Eastman Chemical Company (NYSE: EMN); Ecolab Inc. (NYSE: ECL); Element Solutions Inc. (NYSE: ESI); Entegris, Inc. (NasdaqGS: ENTG); FormFactor, Inc. (NasdaqGS: FORM); FMC Corporation (NYSE: FMC); Huntsman Corporation (NYSE: HUN); International Flavors & Fragrances Inc. (NYSE: IFF); LSB Industries, Inc. (NYSE: LXU); MKS Inc. (NasdaqGS: MKSI); Nutrien Ltd. (TSX: NTR); Olin Corporation (NYSE: OLN); ON Semiconductor Corporation (NasdaqGS: ON); Onto Innovation Inc. (NYSE: ONTO); PPG Industries, Inc. (NYSE: PPG); RPM International Inc. (NYSE: RPM); Teledyne Technologies Incorporated (NYSE: TDY); Teradyne, Inc. (NasdaqGS: TER); Tronox Holdings plc (NYSE: TROX); and The Mosaic Company (NYSE: MOS). The approximately 3.1 times reference point represents the 75th percentile of the net debt to EBITDA ratios of these companies as of June 30, 2026.

145. As shown in **Figure 11** below, the Combined DuPont Entities' net debt to EBITDA ratio before the spin-off reaches 3.1 times after approximately $14.2 billion of additional modeled PFAS-related liabilities or judgments. After the Vylor spin-off, the Combined DuPont Entities' estimated net debt to EBITDA ratio reaches 3.1 times after approximately $9.7 billion of additional modeled obligations. Accordingly, the Vylor spin-off reduces the amount of additional modeled PFAS-related liabilities or judgments that the Combined DuPont Entities could absorb before reaching 3.1 times by approximately $4.5 billion, or approximately 32%.

| | Net Debt to EBITDA | |
|---|---|---|
| **Illustrative Additional PFAS-Related Liability or Judgment ($s in millions)** | **Combined before Vylor Spin-off** | **Combined Adjusted for Vylor Spin-off** |
| $0 | 1.3 | 1.2 |
| $2,000 | 1.6 | 1.6 |
| $5,000 | 2.0 | 2.2 |
| $10,000 | 2.6 | 3.2 |
| $15,000 | 3.2 | 4.2 |
| $20,000 | 3.9 | 5.2 |
| $25,000 | 4.5 | 6.2 |
| $30,000 | 5.2 | 7.2 |

**Figure 11**

146. **Market-Based Equity Cushion.** Similar to the Corteva-specific sensitivity analysis above, I evaluated the impact of additional obligations on the Combined DuPont Entities' market-based equity cushion using the low-end of equity cushion ranges calculated for Corteva by Houlihan Lokey in connection with its 2019 spin-off, with approximately 59% as the reference point. The Combined DuPont Entities' estimated market-based equity cushion before the Vylor spin-off reaches the 59% reference point after approximately $31.7 billion of additional modeled PFAS-related liabilities or judgments. After the Vylor spin-off, the Combined DuPont Entities' estimated market-based equity cushion reaches 59% after approximately $18.9 billion of additional modeled obligations. Accordingly, the Vylor spin-off reduces the amount of additional

modeled PFAS-related liabilities or judgments that the Combined DuPont Entities could absorb before reaching the 59% reference point by approximately $12.8 billion, or approximately 40%.

| | **Market-Based Equity Cushion** | |
|---|---|---|
| **Illustrative Additional PFAS-Related Liability or Judgment ($s in millions)** | **Combined before Vylor Spin-off** | **Combined Adjusted for Vylor Spin-off** |
| $0 | 85% | 81% |
| $2,000 | 83% | 79% |
| $5,000 | 81% | 75% |
| $10,000 | 77% | 69% |
| $15,000 | 73% | 63% |
| $20,000 | 68% | 57% |
| $25,000 | 64% | 52% |
| $30,000 | 60% | 46% |
| $35,000 | 56% | 40% |

**Figure 12**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 11th day of September, 2026, in Chico, California.

By: ______________________________

Travis Armstrong, CPA/CFF, CFE

# Appendix 1

| Exhibit #: | Bates/File Name: |
|---|---|
| 1 | AFFF-MDL-EID-FT-00073415 |
| 2 | AFFF-MDL-EID-FT-00217589 |
| 3 | AFFF-MDL-EID-FT-00214272 |
| 4 | AFFF-MDL-EID-FT-00030975 |
| 5 | AFFF-MDL-EID-FT-00212427 |
| 6 | AFFF-MDL-EID-FT-00221023 |
| 7 | AFFF-MDL-HLokey00000799 |
| 8 | AFFF-MDL-EID-FT-00097018 |
| 9 | AFFF-MDL-EID-FT-00096942 |
| 10 | AFFF-MDL-EID-FT-00010648 |
| 11 | AFFF-MDL-EID-FT-00183585 |
| 12 | AFFF-MDL-EID-FT-00123352 |
| 13 | AFFF-MDL-CHE-FT-00262260 |
| 14 | AFFF-MDL-CHE-FT-00262263 |
| 15 | AFFF-MDL-EID-FT-00097086 |
| 16 | AFFF-MDL-CHE-FT-00016389 |
| 17 | AFFF-MDL-CHE-FT-00023036 |
| 18 | AFFF-MDL-EID-FT-00076374 |
| 19 | AFFF-MDL-EID-FT-00201537 |
| 20 | AFFF-MDL-EID-FT-00201949 |
| 21 | AFFF-MDL-EID-FT-00201619 |
| 22 | AFFF-MDL-EID-FT-00187498 |
| 23 | AFFF-MDL-EID-FT-00187504 |
| 24 | AFFF-MDL-EID-FT-00210258 |
| 25 | AFFF-MDL-EID-FT-00210261 |
| 26 | AFFF-MDL-EID-FT-00201379 |
| 27 | AFFF-MDL-EID-FT-00210262 |
| 28 | AFFF-MDL-CHE-FT-00000363 |
| 29 | AFFF-MDL-EID-FT-00205500 |
| 30 | AFFF-MDL-CHE-FT-00261644 |
| 31 | AFFF-MDL-CHE-FT-00261938 |
| 32 | AFFF-MDL-EID-FT-00203062 |
| 33 | Oct. 19, 2023 DeRose, Richard Depo Transcript |
| 34 | Nov. 2, 2023 Telford, Sheryl Depo Transcript |
| 35 | AFFF-MDL-EID-FT-00022980 |
| 36 | AFFF-MDL-EID-FT-00011534 |
| 37 | Nov. 18, 2021 Jones, Phillip Depo Transcript |
| 38 | AFFF-MDL-EID-FT-00217591 |

# APPENDIX 2

CURRICULUM VITAE

HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

SAN FRANCISCO OFFICE
315 Montgomery Street I Suite 900
San Francisco, CA 94104
T: 415.836.4000

# TRAVIS P. ARMSTRONG, CPA/CFF, CFE

HEMMING.COM

## Profile

Travis Armstrong is a partner at Hemming Morse and maintains offices in San Francisco and Chico. He has testified at trial and deposition as an expert in forensic accounting and economic damages. He regularly works on high-profile cases in the capacity of quantification of economic damages associated with breach of contract and theft of intellectual property, forensic accounting analyses associated with government-led investigations of consumer fraud, complex accounting analyses for securities litigation and post-acquisition disputes.

In 2016, Travis was appointed to the American Institute of CPA's (AICPA) Forensic and Litigation Services (FLS) Committee. This nine-member committee provides technical and educational guidance to CPA practitioners performing forensic accounting services, including investigations, economic damage analyses such as lost profits calculations, and a variety of other services. Additionally, Travis currently serves as one of three officers of California Society of CPA's (CalCPA) Forensic Services Section (FSS), previously served as the Chair of the Economic Damages section of CalCPA FSS, and served on CalCPA's Council.

His experience includes financial and accounting analyses associated with the restatement of quarterly and annual reports, development and management of complex economic damage models associated with breach of contract, intellectual property, antitrust and false claims litigation, and Foreign Corrupt Practices Act ( FCPA) due diligence and compliance testing for multi-national corporations in various foreign countries. Travis has also been engaged by government agencies to perform forensic accounting investigations in various industries, most notably, for-profit higher education and medical device.

Additionally, Travis actively supports legal services non-profits in the San Francisco Bay Area through his service on the Board of Legal Aid of Marin and past engagement with OneJustice.

HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

SAN FRANCISCO OFFICE
315 Montgomery Street I Suite 900
San Francisco, CA 94104
T: 415.836.4000

# TRAVIS P. ARMSTRONG, CPA/CFF, CFE



## Employment & Education

| | |
|---|---|
| 2008 – Present | **Hemming Morse**<br>**Forensic and Financial Consultants**<br>Partner, 2016-Present<br>Manager, 2011-2015<br>Senior Associate, 2008-2010 |
| 2006 – 2008 | **Freeman & Mills, Inc.**<br>Consultants to Counsel and Management<br>Forensic and Litigation Consulting<br>Senior Analyst, 2007-2008<br>Analyst, Forensic and Litigation Consulting, 2006-2007 |
| 2006 | **University of California, Santa Barbara**<br>B.A. Business Economics with an emphasis in Accounting |

HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

SAN FRANCISCO OFFICE
315 Montgomery Street I Suite 900
San Francisco, CA 94104
T: 415.836.4000

# TRAVIS P. ARMSTRONG, CPA/CFF, CFE



## Professional & Service Affiliations

- Certified Public Accountant, State of California, 2009
- Certified Fraud Examiner, 2011
- Certified in Financial Forensics, 2012
- American Institute of Certified Public Accountants
  - Forensic and Valuation Services Conference Committee, 2020 - 2024
  - Forensic and Litigation Services Committee, 2016 - 2020
  - Forensic and Litigation Services Case Law Task Force, 2014-2015
  - AICPA's Leadership Academy, 2012
  - 'Standing Ovation' Honors for Top Young CPAs in Forensics and Valuation
- California Society of Certified Public Accountants
  - Council 2019 - 2020
  - Forensic Services Section
  - State Steering Committee, 2016 - present
  - Officer, 2023 - present
  - Economic Damages, Chair, 2016 - 2019, Vice-Chair, 2014-2016
  - CalCPA Leadership Institute, 2011
  - CalCPA Emerging Leaders Certificate Program, Fall 2010
- Association of Certified Fraud Examiners
- Legal Aid of Marin
  - Board Member, 2014 - present
  - Financial Officer, 2021 - present
- OneJustice
  - Audit Committee, Chair, 2015 - 2021

## Publications

- "Communications in Litigation and Dispute Services" AICPA Practice Aid, 2019
- Economic Damages Section Column The Witness Chair, Fall 2016, Winter 2017, Summer 2017 and Summer 2018
- AICPA Alert Column The Witness Chair, Summer 2017
- Economic Damages Section column The Witness Chair, October 2016
- "A Look into Business Interruption Case Law Stem ming from Hurricane Katrina" AICPA FVS Consulting Digest, October 2014
- "You're a CPA. Now What? Recent YEPs Look Back and Give Advice Moving Forward" CalCPA's Emerging Pro- fessionals Newsletter and web site, Summer 2012

SAN FRANCISCO OFFICE
315 Montgomery Street I Suite 900
San Francisco, CA 94104
T: 415.836.4000



## Presentations

- "Following the Money: Exploring Forensic Accounting and Financial Investigations", CalCPA's Member Club Summit, July 2026
- "Data Analytics for Litigators: Excel's Capabilities, Limits, and Alternatives", Bar Association of San Francisco, February 2026
- "Data Crunching for Prosecutors", California District Attorneys Association (CDAA) Consumer Protection Committee, January 2025
- "Unlocking Trust & Estate Litigation: Litigators' Perspective", AICPA & CIMA Forensic & Valuation Services Conference, October 2024
- "Lightning Round/Micro-Topic – Empowering Business Growth: Strategies and Accountability", AICPA & CIMA Forensic & Valuation Services Conference, October 2024
- "Data Modeling Made Easy: Supercharge Your Excel Spreadsheets", AICPA & CIMA Forensic & Valuation Services Conference, November 2023
- "Litigation Talk Series – When Key Information or Data is Not Available", AICPA & CIMA Forensic & Valuation Services Conference, November 2023
- "Basics of Reading and Understanding Financial Statements for Attorneys", Bleichmar Fonti & Auld LLP, June 2023
- "Damages and Fraud Case Study: Amulet Estate LLC and NapVal LLP v. Andrew Tuck Beckstoffer," CalCPA FSS Steering Committee Meeting, January 2023
- "Post-acquisition Clean-up: Reps & Warranty Claims to Fraud Litigation", AICPA & CIMA Forensic & Valuation Services Conference, November 2022
- "Employee Information and Trade Secrets Theft: Working with Counsel to Identify Potential Damages", AICPA & CIMA Forensic & Valuation Services Conference, November 2022
- 33rd Annual ACFE Global Fraud Conference "In-House Forensics, Fraud and Compliance Career Paths", June 2022
- "Power Excel – Power Applications for the Forensic Accountant", AICPA & CIMA Forensic & Valuation Services Conference, November 2021
- "Insights Into the Work Product of a Forensic Accountant", CalCPA FSS Young and Emerging Professionals (YEP), October 2021
- "Perspectives From In-House Forensic Accountants and Risk Professionals", ACFE Global Fraud Conference, June 2021
- "Interactive Hands-On Techniques with Excel", AICPA Forensic & Valuation Services Conference, November 2020
- "Trade Secrets Damages - Customer Lists and Relationships", AICPA Forensic & Valuation Services Conference, November 2020
- "Forensic Accountants In (Da) House!", AICPA Forensic & Valuation Services Conference, November 2020

HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

SAN FRANCISCO OFFICE
315 Montgomery Street I Suite 900
San Francisco, CA 94104
T: 415.836.4000



## Presentations continued

- "Damages Case Study: Rebutting the Speculative Wrapped in an Academic Model", AICPA Forensic & Valuation Services Conference, November 2019
- "Investigation Report Writing (non R26)", AICPA Forensic & Valuation Services Conference, November 2019
- "FVS Forum: What's New for You?", AICPA Forensic & Valuation Services Conference, November 2019
- "Communicating in Litigation and Dispute Services – FVS Practice Aid Overview", AICPA Forensic & Valuation Services Webcast, April 2019
- "Hands on Data Analytics and Visualizations", AICPA Forensic & Valuation Services Conference, November 2018
- "Hands on Data Analytics and Visualizations", CalCPA Forensic Services Section Joint Sections Meeting, October 2018
- "Creating a Documents Considered Index", AICPA FVS Member Video Library, February 2018
- "Hand-on Data Analysis", AICPA Forensic & Valuation Services Conference, November 2017
- "Introduction to Forensic Accounting", San Francisco State University, March 2017
- "Software Nanos: Tools to Help Forensic Cases", AICPA Forensic & Valuation Services Conference, November 2016
- "Commercial Damages Case Study: Start to Finish - Part III", AICPA Forensic & Valuation Services Conference, November 2016
- "Identifying and Limiting Your Risks in a FVS Engagement", AICPA Webcast, June 2016
- "Case Law Update Relevant to Damages Issues", AICPA Forensic and Valuation Services Conference, November 2014
- "Forensic Accounting and the FCPA", Hemming Morse, LLP Internal Training, April 2014
- "Staff Development in a Forensic Accounting /Business Valuation Practice", AICPA Forensic and Valuation Services Conference, November 2012
- "Motivating and Training the Next Generation of Forensic CPAs", CALCPA Forensic Services Section Meeting, October 2012
- "How to Think Like a Leader", CalCPA's 2012 Emerging Leaders Certificate Program, July 2012
- "The Reasonable Certainty of Your Expert's Damages Analysis" Caldwell Leslie & Proctor, PC, Winter 2012

HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

SAN FRANCISCO OFFICE
315 Montgomery Street I Suite 900
San Francisco, CA 94104
T: 415.836.4000

# TRAVIS P. ARMSTRONG, CPA/CFF, CFE



## Testimony

Trial

- **Michael Prozan and My General Counsel PC v. Acuity Management Company, LLC; Acuity Ventures, II, LLC; and Acuity Ventures, III, LP (2026)** Superior Court of California, County of Santa Clara, Case No. 20CV374088
- **RL Liquidators, LLC v. First Property Realty Corporation, et al. (2025)** Superior Court of California, County of Sacramento, Case No. 34-2019-00270209
- **Melodi Zaret v. Charles Joseph Flynn, Jr.; Glenn Harvey Larsen; Flynn/MMB Mortgage Fund, LLC; and Marin Mortgage Bankers Corporation (2024)** Superior Court of California, County of Marin, Case No. CIV-2101421
- **In Re Robert D. Wolfe Living Trust as Amended and Restated (2023)** Superior Court of California, County of Marin, Case No. PRO 2002412
- **In the Matter of The Jack Lindquist and Ola Lindquist Living Trust (2022)** Superior Court of California, County of Mendocino, Case No. 21 PR00082
- **The People of the State of California v. Adir International, LLC; Ron Azarkman; et al. (2022)**, Superior Court of California, County of Los Angeles, Central District, Case No. BC680425
- **House of CB USA, LLC and Chinese Laundry Lifestyle, LLC v. PHWLV, LLC (2022)** District Court Clark County, Nevada, Case No. A-17-763334-C / A-18-768933-C
- **The People of the State of California v. Johnson & Johnson, et al. (2019)** Superior Court of California, County of San Diego Case No. 37-2016-00017229-CU-MC-CTL
- **Discharge Resource Group v. Behavioral Health Concepts, Inc., William Holcomb, and Does 1-50 And Related Cross-Action (2018)** Superior Court of California, County of San Mateo, Case No. CIV538214

## Testimony

Arbitration

- **Michael Messinger and 151 Partners, LLC v. Moana Restaurant Group LLC and Timothy Harmon (2022)** JAMS Reference No. 1110027267
- **Amulet Estate LLC and NapVal LP v. Andrew Tuck Beckstoffer (2022)** JAMS Reference No. 1100110900

HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

SAN FRANCISCO OFFICE
315 Montgomery Street I Suite 900
San Francisco, CA 94104
T: 415.836.4000

# TRAVIS P. ARMSTRONG, CPA/CFF, CFE



## Testimony continued

Deposition

- **Park Capital Management, LLC vs. Satya Chillara, et al. (2026)** Superior Court of California, County of Santa Clara, Case No. 22CV402044
- **Michael Prozan and My General Counsel PC v. Acuity Management Company, LLC; Acuity Ventures, II, LLC; and Acuity Ventures, III, LP (2026)** Superior Court of California, County of Santa Clara, Case No. 20CV374088
- **HWP ONE, LLC and APG De Soto-SPE, LLC v. Fitness International, LLC (2025)** Superior Court of California, County of Los Angeles, Case No. 23CHCV00792
- **North Peak Equestrian LLC v. S&J Stadtler, Inc., dba Re/Max Accord, et al. (2025)** Superior Court of California, County of Contra Costa, Case No. CIV-MSC-00060
- **RL Liquidators, LLC v. First Property Realty Corporation, et al. (2024)** Superior Court of California, County of Sacramento, Case No. 34-2019-00270209
- **Melodi Zaret v. Charles Joseph Flynn, Jr.; Glenn Harvey Larsen; Flynn/MMB Mortgage Fund, LLC; and Marin Mortgage Bankers Corporation (2024)** Superior Court of California, County of Marin, Case No. CIV-2101421
- **R.R. Donnelley & Sons v. John Pappas III, Meriliz Inc., PM Corporate Group, Inc., and Dome Printing and Packaging, LLC (2024)** United States District Court, Eastern District of California, Case No. 2:21-cv-00753 JAM
- **Michael Christopher London and Karen Ann London v. Citibank Mortgage Loan Trust, Inc. and Fay Servicing, LLC (2024)** Superior Court of California, County of Sonoma, Case No. SCV 259837
- **The Pinza Group v. 434 Central Avenue Apartments LP, WCGM Properties LLC, Colliers Parrish International Inc., and Gavin McDowell (2023)** Superior Court of California, County of Sonoma, Case No. SCV 267967
- **In Re Robert D. Wolfe Living Trust as Amended and Restated (2023)** Superior Court of California, County of Marin, Case No. PRO 2002412
- **Galderma Laboratories, L.P., v. Chad Tisckos (2023)** U.S. District Court, Central District of California Case No. 2:21-CV-05522-FLA (SKx)
- **In the Matter of The Jack Lindquist and Ola Lindquist Living Trust (2022)** Superior Court of California, County of Mendocino, Case No. 21 PR00082
- **Commonwealth of Kentucky, ex rel. Daniel Cameron, Attorney General v. Johnson & Johnson, et al. (2022)** Commonwealth of Kentucky, Franklin Circuit Court, Case No. 16-CI-00867
- **The People of the State of California v. Adir International, LLC; Ron Azarkman; et al. (2022)**, Superior Court of California, County of Los Angeles, Central District, Case No. BC680425
- **Monster Energy Company v. Shannon Troglia (2022)** JAMS Reference No. 1110026279
- **House of CB USA, LLC and Chinese Laundry Lifestyle, LLC v. PHWLV, LLC (2021)** District Court Clark County, Nevada, Case No. A-17-763334-C / A-18-768933-C

HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

SAN FRANCISCO OFFICE
315 Montgomery Street I Suite 900
San Francisco, CA 94104
T: 415.836.4000

# TRAVIS P. ARMSTRONG, CPA/CFF, CFE



## Testimony continued

Deposition

- **People of the State of California v Zovio, et al (2021)** Superior Court of California, San Diego, Case No. 37-2018-00046134-CU-MC-CTL
- **In Re The James J. and Rosella C. Kennedy Revocable Family Trust (2021)** Superior Court of California, County of San Francisco, Case No. PTR-16-300258
- **In Re the Matter of The Survivor's Trust Under The Farazian Family Trust (2021)** Superior Court of California, County of Santa Clara, Case No. 17PR180757
- **West Coast Waste Co., Inc., v. Global Ampersand, LLC (2019)** Superior Court of California, County of Fresno Case No. 17CECG03518
- **The People of the State of California v. Johnson & Johnson, et al. (2019)** Superior Court of California, County of San Diego, Case No. 37-2016-00017229-CU-MC-CTL
- **U.S. Ex Rel. Dooley v. Metic Transplantation Lab, Inc., et al. (2017)** U.S. District Court, Central District California, Case No. CV 13-7039-SJO
- **Discharge Resource Group v. Behavioral Health Concepts, Inc., William Holcomb, and Does 1-50 And Related Cross-Action (2017)** Superior Court of California, County of San Mateo, Case No. CIV538214

## Selected Experience

Litigation and Consulting Services

- Consultant for various investigations and litigation matters concerning post-secondary education institutions. Including, matters concerning recruiter compensation, graduate job placement rates, and quantification of damages associated with Federal grant and loan funding.
- Performed FCPA due diligence and training on Chinese vendors for consumer goods company.
- Part of consulting team for multinational pharmaceutical company related to its ethical and compliance program and related accounting controls in China.
- Assisted the appointed independent monitor in an evaluation of the compliance of a multinational corporation with the terms of its FCPA-related settlement arrangements with the U.S. Department of Justice and the SEC. Included testing of policies and transactions to ensure compliance with anti-bribery and accounting records provisions of the FCPA in various foreign countries, including, Italy, Mexico, China, and Russia.

SAN FRANCISCO OFFICE
315 Montgomery Street I Suite 900
San Francisco, CA 94104
T: 415.836.4000



## Selected Experience continued

### Litigation and Consulting Services

- Consultant for the SEC. Assisted the accounting expert in assessing whether the financial statements of a medical-technology company were prepared in accordance with Generally Accepted Accounting Principles (GAAP) and whether management adequately disclosed a systematic and fraudulent billing scheme in the Management Discussion and Analysis (MD&A) section of the company's public filings.

- Consultant to defendant in stock option accounting case. Assisted defense in relevant areas of GAAP (APB 25, FIN 44, EITF 00-23, FAS 123).

- Consulted as to whether the company's auditors had properly complied with relevant professional auditing standards during the firm's audit of the company's accounting and disclosure of reserves, retained interests and certain investments in accordance with GAAP (FAS 5, FAS 115, FAS 140).

- Consultant for the defendant. Assessed pre-acquisition accounting treatment related to software revenue recognition, deferred service revenue and contingent liabilities. Assisted the expert in determining the appropriate accounting treatment and implications to EBITDA in preparation for testimony at arbitration.

- Assisted damages expert in calculating lost profits for plaintiff related to a breach of contract in commodities sale.

- Created and managed complex damage models with multiple drivers and interest calculations associated with breach of contract litigation and royalty payments.

- Utilized government-compiled data to create a detailed analysis to demonstrate that defendants' business was substantially operated in California; analysis was used in a successful pretrial motion by plaintiffs' counsel for change of venue.

- Performed detailed qualitative and quantitative financial analysis of the restatements of quarterly and annual financial statements for several Fortune 500 companies. Analysis included complex GAAP issues, such as SFAS Nos. 91, 123R, 133 and APB No. 29, as well as non-GAAP performance measures, such as EBITDA, Free Cash Flows, Cash Revenues and Net Financial Debt.

- Consultant for class plaintiffs. Examined auditor and government regulator working papers related to internal controls in the financial services and mortgage industries. Drafted lines of questioning and accounting memos regarding complex accounting issues to prepare counsel for opposing experts' depositions.

- Performed a forensic investigation to determine the extent of misappropriation of assets from a charitable foundation.

# EXHIBIT 1

**Defendant has designated this document as Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 2

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 3

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 4

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 5

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 6

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 7

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 8

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 9

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 10

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 11

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 12

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 13

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 14

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 15

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 16

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 17

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 18

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 19

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 20

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 21

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 22

## Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17

# EXHIBIT 23

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 24

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 25

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 26

## Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17

# EXHIBIT 27

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 28

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 29

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 30

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 31

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 32

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 33

## Defendant has designated this document as Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17

# EXHIBIT 34

**Defendant has designated this document as Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 35

## Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17

# EXHIBIT 36

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 37

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 38

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**