**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | **MDL No. 2873**<br><br>**Master Docket No. 2:18-mn-2873**<br><br>**This Document Relates To:**<br><br>***The People of the State of California, ex rel. Rob Bonta, Attorney General of California v. 3M Company et al.***<br><br>**Civil Action No. 2:23-cv-01531-RMG** |

**DECLARATION OF STEPHANIE D. BIEHL IN SUPPORT OF THE PEOPLE OF THE STATE OF CALIFORNIA'S MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746, I, Stephanie D. Biehl, declare as follows:

1. I am a partner with Sher Edling LLP, outside litigation counsel for the People of the State of California, ex rel. Rob Bonta, Attorney General of California ("People" or "the State"), in *The People of the State of California, ex rel. Rob Bonta, Attorney General of California v. 3M Company, et al.*, Case No. 2:23-cv-01531-RMG, in this MDL, No. 2873, and in connection with the People's Motion for Temporary Restraining Order and for Preliminary Injunction ("Motion") against Corteva, Inc. ("Corteva").

2. This declaration, consistent with Federal Rule of Civil Procedure 65, (1) certifies efforts made to provide notice to Corteva and the reasons why notice should not be required; (2) discusses specific facts in the People's expert declarations filed concurrently in support of the People's Motion, which clearly show that immediate and irreparable injury, loss, and damage will result to the People (and all MDL plaintiffs) before Corteva can be heard in opposition to the

People's request for a temporary restraining order; and (3) provides information about Exhibits[1] referenced in the People's Motion. Where applicable, this declaration also provides descriptions of the People's Exhibits and the grounds for admissibility of each Exhibit.

3. I have personal knowledge of the following facts, and if called as a witness, I could and would testify competently to them.

4. Sher Edling LLP does have and has had its attorneys on the Plaintiffs' Executive Committee ("PEC") since the inception of this MDL.

5. I conferred with Plaintiffs' Co-Lead Counsel, and Co-Lead Counsel has not consented to the filing of the People's Motion. Accordingly, pursuant to Case Management Order ("CMO") No. 2.A, ¶ 3 and Federal Rule of Civil Procedure 65, the People have concurrently moved the Court for leave to file their Motion.[2]

**I. Notice To Corteva Would Be Fruitless.**

6. I hereby certify that, over the last 6 months, the People have conferred via email and virtual meetings with counsel for Corteva regarding the issues addressed in the People's Motion.

7. Beginning at least in April of 2026 and through the summer of 2026, the People and I met virtually with counsel for Corteva, Inc., including Michael Reynolds. Michael London, a member of the Plaintiffs' Executive Committee, also attended at least one conferral.

8. Additionally both Corteva's counsel and the People discussed the issues addressed in the People's Motion with the Court-appointed mediator, but the parties were not able to reach a resolution.

9. Corteva rejected the People's requests to resolve the issues related to the transaction detailed in the People's motion, so the People proceed with the filing of the instant Motion. During

---

[1] Defendants agreed to de-designate the prior confidentiality designations of certain Exhibits. All "confidential" or "highly confidential" Exhibits which no defendant has yet agreed to de-designate are concurrently filed under seal with the People's Motion to Seal in Support of the People's Motion for Temporary Restraining Order and Preliminary Injunction.

[2] *See* Motion for Leave to File Motion for Temporary Restraining Order and for Preliminary Injunction and Motion to Shorten Time.

conferral and upon this rejection, the People repeatedly advised Corteva, through its counsel, that absent resolution of the transaction issues, the People would be forced to seek relief from the Court, including requesting any and all available relief to remedy Corteva's conduct related to the transaction.

10. Additionally, I hereby certify that, for the reasons set forth in section II below, notice to the DuPont Defendants[3] should not be required. Corteva imminently plans to dissipate billions of dollars, and the DuPont Defendants have demonstrated a consistent pattern of immediately dissipating assets to maximize corporate and shareholder wealth at the expense of creditors and the greater public interest.

## II. Immediate and Irreparable Injury, Loss, and Damage Will Result to The People—and All MDL Plaintiffs—Before Corteva Can Be Heard.

11. For more than two decades, the DuPont Defendants have engaged in a series of incredibly complex, sophisticated, and meticulously planned spinoffs, mergers, reorganizations, separations, and divestitures to shield valuable business lines and assets from their massive, known PFAS-related liabilities. Through these transactions, the DuPont Defendants have demonstrated a consistent pattern of dissipating assets to maximize corporate and shareholder wealth at the expense of creditors and the greater public interest. Corteva imminently plans to dissipate billions more—and isolate Old DuPont's historic PFAS liabilities in a shrinking, undercapitalized entity—through yet another spinoff transaction within this same fraudulent scheme, and has already taken concrete steps toward consummation. Absent Court intervention, this planned transaction, the "Vylor Spinoff," will therefore cause the People and all MDL plaintiffs to suffer immediate and irreparable harm by eliminating a massive and critical source of potential relief for their equitable claims.

[3] The DuPont Defendants include Corteva, Inc., E.I. du Pont de Nemours and Company (a/k/a EIDP, Inc. and referred to herein as "Old DuPont"), the Chemours Company, the Chemours Company FC, LLC ("Chemours"), and DuPont de Nemours, Inc. (f/k/a DowDuPont Inc. and referred to herein as "New DuPont"). The DuPont Defendants also include Qnity Electronics Inc., which is subject to this Court's jurisdiction based on their contractual assumption of Old DuPont's liabilities, as set forth in ECF 8266 ("PEC Status Report"), and as discussed in the People's Second Amended Complaint.

12. The People's expert declarations filed in support of their Motion provide specific facts clearly demonstrating that immediate and irreparable injury, loss, and damage will result to the People and all MDL plaintiffs before Corteva can be heard in opposition to the People's request for a temporary restraining order.

13. In particular, the People's expert declarations provide specific facts showing that the Vylor Spinoff, if permitted to close as currently structured, will immediately create a New Corteva[4] that is insufficiently capitalized to satisfy its massive PFAS liabilities, and dissipate billions of dollars from the reach of PFAS creditors. Those facts are summarized below.

14. The declaration of Chiara Trabucchi ("Trabucchi Decl.") provides specific facts clearly showing that Corteva will shed roughly $22 billion in assets and $17 billion in net worth by spinning off its most profitable business segment (the Seed Business) to Vylor through the Vylor Spinoff. Trabucchi Decl. ¶¶ 24, 32. This will create a New Corteva—at its inception—with just half the assets and one third the net worth of Corteva's former self. *Id.* ¶ 24, fig. 7; *see also id.* ¶¶ 22–23.[5]

15. Yet, New Corteva will also be stuck with all historic PFAS (and pension) liabilities. *E.g. id.* ¶¶ 23, 25–27. Trabucchi demonstrates that the billions of dollars Corteva plans to siphon off for Vylor will therefore be unavailable to the DuPont Defendants' PFAS creditors, who will be left to reckon with an undercapitalized and unstable New Corteva. *Id.* ¶¶ 21–27, figs. 6 & 7.

16. Indeed, the declaration of Travis Armstrong ("Armstrong Decl.") sets forth specific facts clearly showing that post-spin, New Corteva will only be able to withstand between $6.1 and

---

[4] Corteva as it is known today plans to remain under the same name post-Vylor Spinoff, but "New Corteva" is referred to herein (and in Corteva's and Vylor's public filings) as the post-separation company—a "new" Corteva stripped of its profitable Seed business, yet saddled with Old DuPont's historic PFAS and pension liabilities and Corteva's pesticide liabilities.

[5] As Trabucchi lays out, Corteva will follow in the footsteps of New DuPont if the Vylor Spinoff goes through. New DuPont has shed roughly $48.3 billion in assets and $27.7 billion in net worth since 2019. Trabucchi Decl. ¶ 14. This has resulted in an astounding 70 percent diminution in assets, 67 percent diminution in net worth, and nearly 70 percent diminution in enterprise value. Trabucchi Decl. ¶¶ 14–17, figs. 1–3.

$6.7 billion in additional PFAS-related judgments before becoming unstable. Armstrong Decl. ¶¶ 131–36, figs. 7–9.[6]

17. Creditors like the People cannot afford to take such a risk. The declarations of Graham Fogg ("Fogg Decl."), Issam Najm ("Najm Decl."), Adam Domanski ("Domanski Decl."), and Craig Steinmaus ("Steinmaus Decl."), together provide specific facts clearly demonstrating that contamination caused by the DuPont Defendants' PFAS products has resulted in widespread harm to California's natural resources and public health, and that it will cost between $88.3 and $166 billion to address just a subset of these harms. *See generally* Fogg Decl.; Najm Decl.; Domanski Decl.; Steinmaus Decl.

18. Armstrong further shows that these massive liabilities dwarf the total assets of all the DuPont Defendants—let alone those of New Corteva. Armstrong Decl. ¶ 138.

19. The Vylor Spinoff will therefore cause immediate and irreparable harm by eliminating critical source of potential relief for the People (and all the DuPont Defendants' creditors).

20. Trabucchi, moreover, clearly demonstrates that the $3.56 billion cash consideration Vylor plans to pay New Corteva in exchange for the Seed Business is woefully insufficient to remedy this harm. Trabucchi Decl. ¶¶ 30–36.

21. First, Trabucchi shows that this cash consideration is exceedingly inadequate when benchmarked against Corteva's $38.7 billion growth in enterprise value and $21.3 billion in total operating earnings before interest, taxes, depreciation, and amortization ("EBITDA") over the last seven years—growth and earnings which have primarily been driven by the very business segment (the Seed Business) Corteva now plans to spin off for just $3.56 billion in consideration. *Id.* ¶¶ 18–19, 31–32, figs. 4 & 5.

[6] Armstrong also shows that, after the Vylor Spinoff, the DuPont Defendants collectively will only be able to withstand a judgment between $9.7 and $18.9 billion before becoming unstable. Armstrong Decl. ¶¶ 142–46, figs. 10–12. This represents a material diminution of up to 40 percent in ability to pay as compared to pre-spin financials. *Id.* Additionally, under binding memoranda of understanding the DuPont Defendants entered in 2021 and 2025, Chemours must indemnify the other DuPont Defendants for any PFAS liabilities above just $4 billion (and will only be entitled to 50% of any insurance proceeds)—yet will not be able to shoulder this burden. *Id.* ¶¶ 83–84, 87.

22. Second, based on an evaluation of Corteva's investor presentation and Vylor's Form 10 filed with the Securities and Exchange Commission, Trabucchi demonstrates a total lack of guardrails in place to prevent EIDP, Inc. (the current wholly-owned subsidiary of Corteva), Corteva, or New Corteva from immediately dissipating the $3.56 billion Vylor distribution. *Id.* ¶¶ 33–35. Nothing prevents EIDP, Inc., Corteva, or New Corteva from either (1) using the $3.56 billion cash distribution to pay down Vylor's debt, including debt related to the Vylor Spinoff (debt that is assumed or secured by Corteva, Vylor, or New Corteva), or (2) immediately returning the entire $3.56 billion cash distribution to Vylor, Vylor's shareholders, Corteva, or New Corteva's shareholders through stock buybacks or dividends. *Id.* Shareholder returns are particularly concerning because they place funds permanently out of reach of creditors. *E.g.*, *id.* ¶ 35.

23. Even more troubling, Trabucchi and Armstrong set forth specific facts clearly demonstrating the DuPont Defendants' consistent history of siphoning previous cash distributions to shareholders immediately after divesting various assets and business lines. Armstrong Decl. ¶¶ 96–114; *see also* Trabucchi Decl. ¶¶ 14, 20, 29, 35–37. Armstrong shows that the DuPont Defendants have collectively returned nearly $29 billion to shareholders since 2019. Armstrong Decl. ¶ 96 & fig. 6. That money is gone—forever unavailable to satisfy potential PFAS judgments. *E.g.*, Trabucchi Decl. ¶ 35. The People cannot afford to lose more.

24. Additionally, Armstrong shows that since the 2015 Chemours spinoff, Chemours has divested certain assets it inherited from Old DuPont and then funneled the cash generated from those sales to shareholders, placing that cash forever beyond the reach of the DuPont Defendants' creditors. *See* Armstrong Decl. ¶ 106. Chemours has even stated publicly that it is committed to returning "the majority of [its] free cash" to shareholders. *Id.* ¶ 107. Chemours has shed approximately $2.1 billion through shareholder dividends and stock buybacks since 2019 alone. *Id.* ¶ 105 & fig. 6.

25. Armstrong also sets forth facts demonstrating that on June 1, 2019, "immediately upon [its] stand up as an independent company," New DuPont approved a $2 billion share buyback

program and noted that "[t]his action by our board demonstrates our commitment to creating value for our shareholders." *Id.* ¶ 98.

26. Trabucchi further demonstrates that since 2019, New DuPont has continuously and systematically divested the business segments it inherited from Old DuPont. Trabucchi Decl. ¶¶ 15–17, figs. 2 & 3. Armstrong shows that each of these divestitures (*i.e.*, spinoffs) was followed by an immediate siphoning of cash to shareholders—putting billions of dollars permanently out of reach of creditors. Armstrong Decl. ¶¶ 96–104, fig. 6. For instance, New DuPont spun off its Mobility & Materials business on November 1, 2022, and announced a $5 billion share repurchase program just a week later, on November 8. *Id.* ¶ 102. New DuPont then spun off its Electronics business to Qnity Electronics, Inc. on November 1, 2025, and immediately announced a $2 billion share repurchase program on November 6. *Id.* ¶ 103. New DuPont has even touted its "strong history of returning cash to shareholders," and noted that shareholder returns are "central to New DuPont's model." *Id.* ¶ 104. Indeed, Trabucchi and Armstrong both show that New DuPont has shed a total of $18.2 billion to shareholders through stock buyback programs and dividends from 2019 through June 30, 2026. Trabucchi Decl. ¶¶ 14, 35; Armstrong Decl. ¶ 97 & fig. 6.

27. Armstrong shows that Corteva, too, announced a $1 billion share repurchase program less than a month after it was spun off as a separate publicly traded company. Armstrong Decl. ¶ 109. Trabucchi and Armstrong both show that Corteva has shed a total of $8.6 billion to shareholders through stock buyback programs and dividends from 2019 through June 30, 2026. Trabucchi Decl. ¶¶ 20, 35; Armstrong Decl. ¶ 108 & fig. 6. And like New DuPont, Corteva has publicly expressed that share repurchases are a company priority. Armstrong Decl. ¶¶ 109–11.

28. The People's expert declarations therefore set forth specific facts clearly demonstrating that, absent Court intervention, the Vylor Spinoff will result in immediate and irreparable harm to the People by eliminating a massive and critical source of potential relief. Not only will Corteva immediately cut off the majority of its assets and value from all its historic PFAS liabilities—but it will likely continue shedding its remaining assets through shareholder

repurchases and other means. This will put all MDL plaintiffs and DuPont Defendant creditors, not just the People, at serious risk.

29. As of the date of this filing, Corteva has already taken concrete steps to consummate the Vylor Spinoff. It has "completed key leadership appointments, publicly filed the Form-10, appointed both boards of directors and engaged with credit rating agencies regarding [its] planned capital structures." Biehl Decl., Ex. 51 at 3. On August 14, 2026, Corteva filed Amendment No. 1 to the Form-10. *E.g.*, Armstrong Decl. ¶ 116 n.187.

30. However, "several important steps remain." Biehl Decl., Ex. 51 at 4. For example, Corteva has yet to file additional amendments to the Form-10, "finaliz[e] the capital structures, [or] complet[e] the remaining IT separation activities." *Id.* Corteva will also hold "Investor Day" events on_September 15, 2026—tomorrow—where it plans to "provide investors with a deeper look at each company's strategy, innovation pipeline, long-term financial framework and capital allocation priorities." *Id.* at 6. Corteva plans to complete the Vylor Spinoff on October 1, 2026. *Id.*

31. Accordingly, the Court still has time to intervene to prevent irreparable harm—but it must act now.

32. For the foregoing reasons, the People respectfully request a temporary restraining order to maintain the status quo until a hearing can be held on the People's requested preliminary injunction. Specifically, the People request that the Court restrain Corteva from effectuating the October 1 closing of the Vylor Spinoff, including pausing any asset transfers away from Corteva and forbidding any distributions, share repurchases, or other disposition of assets related to the Vylor Spinoff. The People also request an asset-freezing injunction for the duration of this MDL covering at least the estimated diminution in total assets Corteva will likely realize immediately following the Vylor Spinoff (roughly $22 billion). Additional and alternative relief is set forth in the People's Motion and Order to Show Cause.

**III. Exhibits Referenced in the People's Motion**

33. I conferred with the DuPont Defendants and other relevant MDL defendants regarding the confidentiality designations of the Exhibits submitted in support of the People's

Motion. Following conferral, defendants agreed to de-designate the prior confidentiality designations of certain Exhibits. All "confidential" Exhibits for which any defendant has not yet agreed to de-designate are concurrently filed under seal.

34. Attached as **Exhibit 1** is a true and correct copy of [redacted]. This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-FT-00073415. It is sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and admissible under FRE 801(d)(2), 803(6), and 807.

35. Attached as **Exhibit 2** is a true and correct copy of a [redacted]. This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-FT-00199158. It is sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and admissible under FRE 801(d)(2), 803(6), and 807.

36. Attached as **Exhibit 3** is a true and correct copy of a [redacted] on page 1. This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-FT-00035473. It is sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and admissible under FRE 801(d)(2), 803(6), and 807.

37. Attached as **Exhibit 4** is a true and correct copy of a document titled "Emerging Contaminants Fundable List," dated as of April 1, 2026, and available at https://www.waterboards.ca.gov/drinking_water/services/funding/documents/srf/2026/emerging-contaminants-fundable-list-26-27.pdf. At my direction, an archive of this Exhibit was created on August 31, 2026, using the Perma.cc archiving service; the archive is available at the following

URL: https://perma.cc/6RMN-G63G. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4) and 901(b)(7) and admissible under FRE 803(8) and 807.

38. Attached as **Exhibit 5** is a true and correct copy of a California State Water Resources Control Board, Division of Financial Assistance document titled "Supplemental Intended Use Plan, State Fiscal Year 2025-26," available at https://waterboards.ca.gov/drinking_water/services/funding/documents/2025/revised-draft_2025-26-supp-iup-ec_final.pdf. At my direction, an archive of this Exhibit was created on August 31, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/DQY5-UV8H. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4) and 901(b)(7) and admissible under FRE 803(8) and 807.

39. Attached as **Exhibit 6** is a true and correct copy of an article titled "Teflon's Toxic Legacy," featured in the Winter 2016 edition of Earth Island Institute's *Earth Island Journal*, and available at https://www.earthisland.org/journal/index.php/magazine/entry/teflons_toxic_legacy. At my direction, an archive of this Exhibit was created on September 4, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/K39Q-RYWX. It is sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and self-authenticated under FRE 902(6). It is admissible under FRE 807.

40. Attached as **Exhibit 7** is a true and correct copy of an article titled "EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History," dated December 14, 2005, available at https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/fdcb2f665cac66bb852570d7005d6665.html. At my direction, an archive of this Exhibit was created on August 31, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/XF9X-W54C. It is sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and self-authenticated under FRE 902(6). It is admissible under FRE 807.

41. Attached hereto as **Exhibit 8** is a true and correct copy of a memorandum dated June 9, 1954, noting "[a]n inquiry has been received as to the possible toxicity of C-8." This

Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00295057. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

42. Attached hereto as **Exhibit 9** is a true and correct copy of a document titled "Amonium Perfluorocaprylate (C8APFC)," dated February 9, 1962, concluding on page 2 that "cumulative liver, kidney, and pancreatic changes can be induced in young rats by relatively low doses of C8APFC." This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00408342. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

43. Attached as **Exhibit 10** is a true and correct copy of a document titled "C-8 Toxicity Studies," discussing studies ranging from 1961 to 1982. This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00297735. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

44. Attached hereto as **Exhibit 11** is a true and correct copy of a document titled "Toxicity of Teflon Dispersing Agents," dated November 9, 1961, concluding on page 2 that C8 causes liver enlargement in rats at low doses and that it should be "handled with extreme care" due to its toxicity. This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00322304. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

45. Attached as **Exhibit 12** is a true and correct copy of a letter titled "Chambers Works Fluorosurfactant Study," dated March 15, 1979, stating on page 2 that "the data do suggest that the exposed group may be at an excess risk of developing liver disease, so continued surveillance

would be advisable." This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00164387. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

46. Attached as **Exhibit 13** is a true and correct copy of a memorandum titled "Investigation of Current Teflon Waste Disposal," dated May 13, 1975. This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00156559. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

47. Attached as **Exhibit 14** is a true and correct copy of a meeting packet titled "C-8 Communications Meeting – Outline, Talk & Charts," dated July 31, 1980, acknowledging that "[p]eople working with C-8 generally accumulate organic fluorine in the blood, and levels generally correlate with job exposure potential" on page 2. This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00163302. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

48. Attached as **Exhibit 15** is a true and correct copy of a memorandum titled "Estimate of Human C-8 Exposure Resulting from Drinking Ohio River Water," dated October 19, 1982. This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00167138. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

49. Attached as **Exhibit 16** is a true and correct copy of [redacted]. This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00139998. It is sufficiently

authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

50. Attached as **Exhibit 17** is a true and correct copy of a memorandum titled "Community Protection CMA Air Toxics Control Policy 'Fenceline Screening' Survey," dated January 30, 1987. This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00150949. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

51. Attached as **Exhibit 18** is a true and correct copy of a meeting packet titled "C-8 Reduction & Control Programs Status," dated June 11, 1987. This Exhibit was produced in this action bearing the bates number 3M_AFFF_MDL00320876. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

52. Attached as **Exhibit 19** is a true and correct copy of [redacted]. This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-01453499. It is sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and admissible under FRE 801(d)(2), 803(6), and 807.

53. Attached as **Exhibit 20** is a true and correct copy of [redacted] This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-04772271. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

54. Attached as **Exhibit 21** is a true and correct copy of a document titled "C-8 Project Phase Ib Review, Presentation to C-8 PAC," dated October 31, 1997, stating "[t]he only sure way to achieve no detectable C-8 [in human blood] is to stop using C-8." This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00163870. Following conferral, defendants

have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

55. Attached as **Exhibit 22** is a true and correct copy of [redacted] This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-02758435. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), and 807.

56. Attached as **Exhibit 23** is a true and correct copy of a presentation titled "DuPont: A Heritage of Technological & Marketplace Innovation in Teflon Fluoropolymers," showing DuPont's global fluoropolymers revenue share position in the year 2000. This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00387077. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. This Exhibit is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), and 807.

57. Attached as **Exhibit 24** is a true and correct copy of a document titled "Engineering Pre-Project Authorization," dated July 12, 2001, seeking authorization to produce PFOA at Fayetteville Works following 3M's phase-out "in support of Dupont's total APFO need for maintaining the Fluoropolymer business." This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00348968. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), and 807.

58. Attached as **Exhibit 25** is a true and correct copy of a memorandum titled "C-8 Meeting Summary," dated May 23, 1984, acknowledging that Old DuPont was "already liable for the past 32 years of operation." This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00152493. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE

901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

59. Attached as **Exhibit 26** is a true and correct copy of meeting minutes dated August 28, 1979, stating on page 3 that "DuPont is considering an 8E notification under TSCA on their fluorochemicals because of their potential for bioaccumulation." This Exhibit was produced in this action bearing the bates number 3M_AFFF_MDL00435649. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

60. Attached as **Exhibit 27** is a true and correct copy of [redacted]. This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00159071. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

61. Attached as **Exhibit 28** is a true and correct copy of internal correspondence dated January 3, 1997, stating that "DuPont decided they did not want a carcinogen warning on FC-143 because they use it in food contact and medical products." This Exhibit was produced in this action bearing the bates number 3M_AFFF_MDL00579318. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), 803(16), and 807.

62. Attached as **Exhibit 29** is a true and correct copy of [redacted] This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00762078. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6) and 807.

63. Attached as **Exhibit 30** is a true and correct copy of [redacted] This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-01146378. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), and 807.

64. Attached as **Exhibit 31** is a true and correct copy of [redacted] This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-03518565. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), and 807.

65. Attached as **Exhibit 32** is a true and correct copy of [redacted] These Exhibits were produced in this action bearing the bates numbers AFFF-MDL-CHE-00473571 and AFFF-MDL-CHE-00473570. They are sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and admissible under FRE 801(d)(2), 803(6), and 807.

66. Attached as **Exhibit 33** is a true and correct copy of [redacted] These documents were produced in this action bearing the bates numbers AFFF-MDL-EID-03248655 and AFFF-MDL-EID-03248640, respectively. They are sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), and 807.

67. Attached as **Exhibit 34** is a true and correct copy of [redacted] This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-03036338. It is sufficiently

authenticated under FRE 901(b)(1) and 901(b)(4) and admissible under FRE 801(d)(2), 803(6), and 807.

68. Attached as **Exhibit 35** is a true and correct copy of [redacted] This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-03175208. It is sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and admissible under FRE 801(d)(2), 803(6), and 807.

69. Attached as **Exhibit 36** is a true and correct copy of a memorandum titled "Epidemiology Review Board and PFOA," dated February 24, 2006, "strongly advis[ing] against any public statements asserting that PFOA does not pose any risk to health." This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-00139675. Following conferral, defendants have agreed to de-designate the prior confidentiality designation of this Exhibit. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(8) and admissible under FRE 801(d)(2), 803(6), and 807.

70. Attached as **Exhibit 37** is a true and correct copy of [redacted] This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-01061620. It is sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and admissible under FRE 801(d)(2), 803(6), and 807.

71. Attached as **Exhibit 38** is a true and correct copy of a public press release on New DuPont's corporate website titled "DuPont Announces New and Sustained Commitments Related to PFAS Chemicals," dated August 28, 2019, available at https://www.investors.dupont.com/news-and-media/press-release-details/2019/DuPont-Announces-New-and-Sustained-Commitments-Related-to-PFAS-Chemicals/default.aspx, showing that New DuPont was still using long-chain PFAS at least through the year 2019. At my direction, an archive of this Exhibit was created on August 31, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/52LM-KXWG. It is

sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and admissible under FRE 801(d)(2), 803(6) and 807.

72. Attached as **Exhibit 39** is a true and correct copy of a public page on New DuPont's corporate website titled "DuPont de Nemours, Inc. Statement on Poly and Per-Fluorinated Alkyl Substances (PFAS)," available at https://www.dupont.com/pfas.html, stating that New DuPont currently uses PFAS in "select industrial products." At my direction, an archive of this Exhibit was created on August 31, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/HD3K-398P. It is sufficiently authenticated under FRE 901(b)(1), and 901(b)(4) and admissible under FRE 801(d)(2), 803(6) and 807.

73. Attached as **Exhibit 40** is a true and correct copy of [redacted] This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-02967251. It is sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and admissible under FRE 801(d)(2), 803(6), and 807.

74. Attached as **Exhibit 41** is a true and correct copy of [redacted] This Exhibit was produced in this action bearing the bates number AFFF-MDL-EID-02958191. It is sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and admissible under FRE 801(d)(2), 803(6), and 807.

75. Attached as **Exhibit 42** is a true and correct copy of [redacted] This Exhibit was produced in this action bearing the bates number AFFF-MDL-CHE-00183483. It is sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and admissible under FRE 801(d)(2), 803(6), and 807.

76. Attached as **Exhibit 43** is a true and correct copy of Chemours' Form 10-K for the fiscal year ended December 31, 2024, available at https://investors.chemours.com/node/15436/html, stating on page F-68 that GenX "is

manufactured at Fayetteville," a Chemours-owned manufacturing facility in North Carolina. At my direction, an archive of this Exhibit was created on August 31, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/F9MN-MAXE. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(7) and is self-authenticated under FRE 902(4). It is admissible under FRE 801(d)(2), 803(6), 803(8), and 807.

77. Attached as **Exhibit 44** is a true and correct copy of the Judicial Panel on Multidistrict Litigation's public webpage titled "MDL Statistics Report - Distribution of Pending MDL Dockets by Actions Pending," dated December 2, 2024, available at https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-December-2-2024.pdf, showing that there were 7,370 pending cases in this MDL, and 11,163 total historic cases, as of the end of 2024. At my direction, an archive of this Exhibit was created on August 31, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/6FKR-CZM6. It is sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and self-authenticated under FRE 902(4) and 902(5). It is admissible under FRE 803(8) and 807.

78. Attached as **Exhibit 45** is a true and correct copy of a press release on the State of Delaware's official website titled "State Resolves Natural Resource Damage Claims," dated July 13, 2021, available at https://news.delaware.gov/2021/07/13/state-resolves-natural-resource-damage-claims/, stating that Delaware reached a $50 million settlement with the DuPont Defendants for damages caused by PFAS. At my direction, an archive of this Exhibit was created on August 31, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/2AAP-4U88. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(7) and self-authenticated under FRE 902(4) and 902(5). It is admissible under FRE 803(8) and 807.

79. Attached as **Exhibit 46** is a true and correct copy of a press release on the State of Delaware's official website titled "AG Jennings Secures Additional $25 Million Natural Resource Damage Settlement Payment," dated January 28, 2026, available at

https://news.delaware.gov/2026/01/28/ag-jennings-secures-additional-25-million-natural-resource-damage-settlement-payment/. At my direction, an archive of this Exhibit was created on August 31, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/CKE5-K84N. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(7) and self-authenticated under FRE 902(4) and 902(5). It is admissible under FRE 803(8) and 807.

80. Attached as **Exhibit 47** is a true and correct copy of a press release on the State of Ohio Attorney General's official website titled "State Secures $110 Million Settlement with DuPont for Environmental Restoration Along Ohio River," dated November 29, 2023, available at https://www.ohioattorneygeneral.gov/Media/News-Releases/November-2023/State-Secures-$110-Million-Settlement-with-DuPont. At my direction, an archive of this Exhibit was created on August 31, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/ZSW3-SFU2. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(7) and self-authenticated under FRE 902(4) and 902(5). It is admissible under FRE 803(8) and 807.

81. Attached as **Exhibit 48** is a true and correct copy of a press release on the State of New Jersey's official website titled "Federal Court Approves Historic PFAS Settlements Valued at Approximately $2.5 Billion," dated August 7, 2026, available at https://dep.nj.gov/newsrel/26_00807/.[7] At my direction, an archive of this Exhibit was created on August 31, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/VUU8-CR6Y. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(7) and self-authenticated under FRE 902(4) and 902(5). It is admissible under FRE 803(8) and 807.

82. Attached as **Exhibit 49** is a true and correct copy of a lodged Consent Decree between the United States (on behalf of the U.S. EPA and the West Virginia Department of

[7] *See also* Armstrong Decl. ¶ 86. The DuPont Defendants report this as an $875 million settlement to be paid over 25 years. That figure, however, does not include other funding the DuPont Defendants committed to, including remediation funding.

Environmental Protection) and Chemours, dated June 24, 2026, relating to the release of PFAS from three Chemours manufacturing facilities (Washington Works in West Virginia, Fayetteville in North Carolina, and Chambers Works in New Jersey), available at https://www.justice.gov/enrd/media/1449231/dl?inline, stating in relevant part on page 8 that "[Chemours] ha[d] a limited ability to pay the total civil penalty the United States could seek for the violations alleged in this case." At my direction, an archive of this Exhibit was created on August 31, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/5AB2-3AL7. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(7) and self-authenticated under FRE 902(4). It is admissible under FRE 803(8) and 807.

83. Attached as **Exhibit 50** is a true and correct copy of Corteva, Inc. and EIDP, Inc.'s Form 8-K filed with the Securities and Exchange Commission, dated September 9, 2026, available at https://www.sec.gov/Archives/edgar/data/30554/000119312526387254/d121501d8k.htm. At my direction, an archive of this Exhibit was created on September 10, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/BGX3-B8BX. It is sufficiently authenticated under FRE 901(b)(1), 901(b)(4), and 901(b)(7) and self-authenticated under FRE 902(4). It is admissible under FRE 801(d)(2), 803(6), 803(8) and 807.

84. Attached as **Exhibit 51** is a true and correct copy of a transcript of Corteva, Inc.'s Q2 2026 Earnings Call, dated July 31, 2026, available at https://investors.corteva.com/static-files/23ed820f-d985-4b89-9591-48cc033e337f. At my direction, an archive of this Exhibit was created on September 10, 2026, using the Perma.cc archiving service; the archive is available at the following URL: https://perma.cc/6JQ4-4FGK. It is sufficiently authenticated under FRE 901(b)(1) and 901(b)(4) and admissible under FRE 801(d)(2), 803(6), and 807.

85. I am informed that there are an estimated 40 Sovereigns with pending cases in the MDL. This count attempts to exclude Sovereign plaintiffs that have settled with the DuPont Defendants and to include additional U.S. Territories and sovereign tribes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of September, 2026, in San Francisco, California.

By: 

Stephanie D. Biehl