# EXHIBIT 1

**Defendant has designated this document as Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 2

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 3

**Defendant has designated this document as Highly Confidential and therefore the State submits it to the Court for in-camera review in Compliance with CMO 17**

# EXHIBIT 4

## XII. EMERGING CONTAMINANTS FUNDABLE LIST

State Fiscal Year 2026-2027

* Based on applications received and level of completeness as of April 1, 2026.

(Sort Order: Water System Size <25,000, Degree of Disadvantage, Contaminant, Applicant)

| Project Number | District Number | Project Type | Applicant | Project Title / Description | Contaminant | Project Category | Population | Service Connections | Degree of Disadvantage | System SAFER Status | Estimated Project Costs | Estimated PF/Grant Amount | Estimated DWSRF Loan | Application Projected to be Completed FY 26/27?* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Water Systems Serving Populations <25,000 and/or Disadvantaged Communities = 46% of EC Funding Request / 32% of Total Funding Request | | | | | | | | | | | | | | |
| 1000316-001C | 23 | Construction | Kings Canyon Unified School District | KCUSD Water Supply and Treatment Project for Alta, Riverview, and Kings Canyon High | 1,2,3-TCP | C | 985 | 6 | Severely Disadvantaged | Failing | $ 10,136,844 | $ 10,136,844 | $ - | Yes |
| 5410017-004P | 12 | Planning | London Community Services District | 1,2,3-TCP Compliance Improvements | 1,2,3-TCP | C | 2,134 | 431 | Severely Disadvantaged | Failing | $ 1,147,100 | $ 1,147,100 | $ - | No |
| 2400079-001C | 11 | Construction | McSwain Elementary School | McSwain Planning Project | 1,2,3-TCP | C | 1,046 | 24 | Severely Disadvantaged | Failing | $ 4,146,000 | $ 4,146,000 | $ - | No |
| 5410009-001C | 12 | Construction | Pixley Public Utility District | Pixley TCP Treatment Design | 1,2,3-TCP | C | 2,772 | 870 | Severely Disadvantaged | Failing | $ 15,147,656 | $ 15,147,656 | $ - | Yes |
| 1503475-002C | 19 | Construction | Western Acres Mutual Water Company | Western Acres Water Company TCP Treatment Design Project | 1,2,3-TCP | C | 380 | 238 | Severely Disadvantaged | Failing | $ 366,132 | $ 366,132 | $ - | No |
| 3310003-002C | 20 | Construction | Blythe, City of | CoB - Birch Street Manganese Treatment | Manganese | E | 9,798 | 3,399 | Severely Disadvantaged | Failing | TBD | TBD | $ | No |
| 3301630-001C | 20 | Construction | Blythe, City of | Hidden Beaches Water System Treatment, Filtration, and Storage Project | Manganese | E | 393 | 124 | Severely Disadvantaged | Failing | $ 4,617,600 | $ 4,617,600 | $ - | Yes |
| 1910160-010C | 7 | Construction | Tract 349 Mutual Water Company | Tract 349 Water Quality Improvement Project | Manganese | E | 8,500 | 920 | Severely Disadvantaged | Failing | $ 11,427,000 | $ 11,427,000 | $ - | No |
| 2410010-001P | 11 | Planning | Winton Water and Sanitary District | Well 16 Project | Manganese | D | 9,745 | 2,714 | Severely Disadvantaged | Failing | $ 525,000 | $ 525,000 | $ - | Yes |
| 1910108-001C | 15 | Construction | Bell Gardens, City of | Bell Gardens Water Reservoir construction | PFAS | C | 11,437 | 1,624 | Severely Disadvantaged | Potentially At-Risk | $ 4,205,000 | $ 4,205,000 | $ - | No |
| 1510033-003C | 19 | Construction | California Water Service Company - Kernville | PFAS Wellhead Treatment Project for Well ARD-W-018-01 | PFAS | C | 2,572 | 1,882 | Severely Disadvantaged | At-Risk | $ 2,220,180 | $ 2,220,180 | $ - | No |
| 0410005-001C | 21 | Construction | California Water Service Company - Oroville | Oroville District Station 17 & 18 New Well and Treatment | PFAS | C | 11,106 | 3,528 | Severely Disadvantaged | Potentially At-Risk | $ 10,896,895 | $ 10,896,895 | $ - | No |
| 2710013-001C | 5 | Construction | California Water Service Company | Johnson, McGinnis, Live Oak Road Area Consolidation | 1,2,3-TCP | C | 2,084 | 624 | Disadvantaged | Potentially At-Risk | $ 34,000,000 | $ 34,000,000 | $ - | Yes |
| 2410004-004C | 11 | Construction | Livingston, City of | Livingston 1,2,3-TCP Removal Treatment System Project | 1,2,3-TCP | C | 14,894 | 3,593 | Disadvantaged | Failing | $ 27,000,000 | $ 27,000,000 | $ - | Yes |
| 2410004-005C | 11 | Construction | Livingston, City of | Well No. 19 and Wellhead Treatment | 1,2,3-TCP | C | 14,894 | 3,593 | Disadvantaged | Failing | $ 10,000,000 | $ 10,000,000 | $ - | No |
| 5010019-001C | 10 | Construction | Turlock, City of | Well 35 Treatment Project- Emerging Contaminants Funding Application | 1,2,3-TCP | C | 72,682 | 19,716 | Disadvantaged | Failing | $ 15,361,000 | $ 15,361,000 | $ - | Yes |
| 3410006-001C | 9 | Construction | Citrus Heights Water District | Palm Well Relocation Planning Project | Manganese | E | 67,818 | 20,700 | Disadvantaged | Not At-Risk | $ 5,708,000 | $ 5,708,000 | $ | No |
| 3210011-007C | 2 | Construction | Plumas Eureka Community Services District | Water Treatment Facility | Manganese | E | 1,534 | 557 | Disadvantaged | Not At-Risk | $ 7,700,000 | $ 7,700,000 | $ - | No |
| 2410018-004C | 11 | Construction | Santa Nella County Water District | Santa Nella County Water District Surface Water Treatment Plant Improvements | Manganese | F | 2,211 | 671 | Disadvantaged | At-Risk | $ 8,631,699 | $ 8,631,699 | $ - | Yes |
| 5310002-001C | 1 | Construction | Trinity County Waterworks District #1 | Water Treatment Plant Upgrade Project | Manganese | D | 2,324 | 601 | Disadvantaged | Potentially At-Risk | $ 28,835,648 | $ 28,835,648 | $ | No |
| 5310002-003P | 1 | Planning | Trinity County Waterworks District #1 | Manganese Mitigation Waterline Replacement Project | Manganese | E | 2,324 | 601 | Disadvantaged | Potentially At-Risk | $ 1,710,000 | $ 1,710,000 | $ - | No |
| 3701837-001P | 14 | Planning | Wynola Water District | Wynola Estates Drinking Water Treatment and Supply | Manganese | E | 140 | 74 | Disadvantaged | Failing | $ 778,000 | $ 778,000 | $ - | Yes |
| 3410006-002C | 9 | Construction | Citrus Heights Water District | Sylvan Well Relocation Planning Project | Perchlorate | C | 67,818 | 20,700 | Disadvantaged | Not At-Risk | TBD | TBD | $ - | No |
| 0410002-003C | 21 | Construction | California Water Service Company - Chico | Chico District Well 071-01 PFAS Treatment | PFAS | C | 114,925 | 30,396 | Disadvantaged | Not Assessed | $ 9,926,289 | $ 9,926,289 | $ | No |
| 1010026-002P | 12 | Planning | Pinedale County Water District | Pinedale County Water District-Well 5 Treatment and Well 10 Construction | PFAS | C | 16,736 | 2,120 | Disadvantaged | Potentially At-Risk | $ 1,556,000 | $ 1,556,000 | $ - | Yes |
| 3710025-002P | 14 | Planning | Sweetwater Authority | Sweetwater Authority PFAS Mitigation | PFAS | C | 191,282 | 33,614 | Disadvantaged | Not Assessed | $ 2,200,000 | $ 2,200,000 | $ - | No |
| 1910026-013C | 22 | Construction | Compton-City, Water Dept. | Wells 16, 18 and 19 - Treatment Plants | PFAS, 1,4-Dioxane | C | 74,877 | 14,562 | Disadvantaged | Not At-Risk | $ 23,385,000 | $ 23,385,000 | $ - | No |
| 5010017-002C | 10 | Construction | Patterson, City of | City of Patterson-Water Well Mitigation for 1,2,3-Trichloropropane Contamination | 1,2,3-TCP | C | 24,977 | 7,367 | Not Disadvantaged | Potentially At-Risk | $ 11,900,000 | $ 11,900,000 | $ - | No |

## XII. EMERGING CONTAMINANTS FUNDABLE LIST

State Fiscal Year 2026-2027

* Based on applications received and level of completeness as of April 1, 2026.

(Sort Order: Water System Size <25,000, Degree of Disadvantage, Contaminant, Applicant)

| Project Number | District Number | Project Type | Applicant | Project Title / Description | Contaminant | Project Category | Population | Service Connections | Degree of Disadvantage | System SAFER Status | Estimated Project Costs | Estimated PF/Grant Amount | Estimated DWSRF Loan | Application Projected to be Completed FY 26/27?* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3500581-001P | 5 | Planning | Rancho San Joaquin MWC | Filtration System required to remove Arsenic and Manganese | Manganese | C | 914 | 30 | Not Disadvantaged | Failing | $ 200,000 | $ 200,000 | $ - | Yes |
| 3500581-001C | 5 | Construction | Rancho San Joaquin MWC | Design & Construction of an Arsenic and Manganese Removal Treatment System | Manganese | C | 914 | 30 | Not Disadvantaged | Failing | $ 550,000 | $ 550,000 | $ - | No |
| 3310033-001C | 20 | Construction | Santa Ana River Water Company | 66th Street Water Main Replacement Project | PFAS | C | 5,848 | 1,772 | Disadvantaged | Potentially At-Risk | $ 1,500,000 | $ 1,500,000 | $ | No |
| 3610005-001C | 13 | Construction | Lake Arrowhead CSD | PFAS Removal | PFAS | C | 7,038 | 7,940 | Not Disadvantaged | At-Risk | $ 15,952,000 | $ 15,952,000 | $ - | Yes |
| | | | | | | | | **Subtotals:** | **32 Projects** | | **$ 271,729,043** | **$ 271,729,043** | **$ -** | **12** |

-

# XII. EMERGING CONTAMINANTS FUNDABLE LIST

State Fiscal Year 2026-2027

* Based on applications received and level of completeness as of April 1, 2026.

(Sort Order: Water System Size <25,000, Degree of Disadvantage, Contaminant, Applicant)

| Project Number | District Number | Project Type | Applicant | Project Title / Description | Contaminant | Project Category | Population | Service Connections | Degree of Disadvantage | System SAFER Status | Estimated Project Costs | Estimated PF/Grant Amount | Estimated DWSRF Loan | Application Projected to be Completed FY 26/27?* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Water Systems Serving Populations >25,000 and Non-Disadvantaged Communities = 54% of EC Funding Request / 68% of Total Funding Request** | | | | | | | | | | | | | | |
| 3010001-005C | 8 | Construction | Anaheim, City of | City of Anaheim Wells 39 and 47 PFAS Treatment Systems | PFAS | C | 348,593 | 62,288 | Not Disadvantaged | Not Assessed | $ 8,300,000 | $ 8,300,000 | $ - | Yes |
| 3010001-006C | 8 | Construction | Anaheim, City of | City of Anaheim Wells 48 and 53 PFAS Treatment Systems | PFAS | C | 348,593 | 62,288 | Not Disadvantaged | Not Assessed | $ 18,660,000 | Maximum EC Funding Limit Reached | $ | No |
| 3310037-011C | 20 | Construction | Corona, City of | PFAS Removal Project | PFAS | C | 168,575 | 44,981 | Not Disadvantaged | Not Assessed | $ 11,891,000 | $ 5,945,500 | $ 5,945,500 | Yes |
| 1910034-001C | 16 | Construction | Downey, City of | Northerly Water Supply Treatment Improvements | PFAS | C | 108,816 | 23,459 | Not Disadvantaged | Not Assessed | $ 50,000,000 | $ 25,000,000 | $ 25,000,000 | No |
| 1910034-002C | 16 | Construction | Downey, City of | Southerly Water Supply Treatment Improvements | PFAS | C | 108,816 | 23,459 | Not Disadvantaged | Not Assessed | $ 60,000,000 | $ 25,000,000 | $ 35,000,000 | No |
| 0910001-024C | 5 | Construction | El Dorado Irrigation District | El Dorado Hills Water Treatment Plant Improvements Project | Cyanotoxins | E | 132,171 | 43,404 | Not Disadvantaged | Not Assessed | $ 240,000,000 | $ 25,000,000 | $ 50,000,000 | Yes |
| 3310012-019C | 20 | Construction | Elsinore Valley Municipal Water District | Canyon Lake Water Treatment Plan Phase 1 Improvements (PFAS) | PFAS | C | 161,578 | 45,232 | Not Disadvantaged | Not Assessed | $ 75,000,000 | $ 25,000,000 | $ 50,000,000 | Yes |
| 3010010-003C | 8 | Construction | Fullerton, City of | City of Fullerton Well 10 PFAS Treatment | PFAS | C | 139,461 | 31,185 | Not Disadvantaged | Not Assessed | $ 8,600,000 | $ 4,300,000 | $ | Yes |
| 3010022-001C | 8 | Construction | Golden State Water Company | Golden State Water Company West Orange PFAS Treatment Systems | PFAS | C | 114,379 | 28,224 | Not Disadvantaged | Not Assessed | $ 10,000,000 | $ 10,000,000 | $ - - | Yes |
| 3010022-002C | 8 | Construction | Golden State Water Company | Golden State Water Company La Jolla Wells 2 and 3 and Fern Well 1 PFAS Treatment Systems | PFAS | C | 114,379 | 28,224 | Not Disadvantaged | Not Assessed | $ 8,000,000 | $ 4,000,000 | $ - | No |
| 3010053-001C | 8 | Construction | Huntington Beach, City of | City of Huntington Beach PFAS Treatment Systems | PFAS | C | 201,000 | 53,348 | Not Disadvantaged | Not Assessed | $ 12,000,000 | $ 6,000,000 | $ | No |
| 1910090-001C | 22 | Construction | Monrovia, City of | COM PFAS Treatment System | PFAS | C | 37,931 | 9,425 | Not Disadvantaged | Potentially At-Risk | $ 5,435,800 | $ 5,435,800 | $ | No |
| 3310025-001C | 20 | Construction | Norco, City of | PFAS Groundwater Remediation Project | PFAS | C | 27,500 | 7,288 | Not Disadvantaged | Failing | $ 4,358,050 | $ 2,179,025 | $ - | No |
| 3010027-002C | 8 | Construction | Orange, City of | City of Orange Wells 25 and 27 PFAS Treatment Plant | PFAS | C | 120,770 | 35,551 | Not Disadvantaged | Not Assessed | $ 6,966,930 | $ 6,966,930 | $ | Yes |
| 3010027-003C | 8 | Construction | Orange, City of | City of Orange Well 29 PFAS Treatment Systems | PFAS | C | 120,770 | 35,551 | Not Disadvantaged | Not Assessed | $ 3,000,000 | $ 3,000,000 | $ | Yes |
| 0110008-001C | 4 | Construction | Pleasanton, City of | Per- and Polyfluoroalkyl (PFAS) Treatment and Wells Rehabilitation Project | PFAS | C | 76,689 | 22,334 | Not Disadvantaged | Failing | $ 31,400,000 | $ 15,700,000 | $ 8,400,000 | No |
| 3310031-001C | 20 | Construction | Riverside, City of | Site Modifications for PFAS Removal at the Palmyrita Water Treatment Plant | PFAS | C | 298,398 | 66,567 | Not Disadvantaged | Not Assessed | $ 42,000,000 | $ 21,000,000 | $ 21,000,000 | Yes |
| 3010038-005C | 8 | Construction | Santa Ana, City of | City of Santa Ana Walnut Pump Station PFAS Treatment | PFAS | C | 310,539 | 45,743 | Not Disadvantaged | Not Assessed | $ 15,000,000 | $ 15,000,000 | $ - | No |
| 1910240-002C | 15 | Construction | Santa Clarita Valley Water Agency | S6, S7, and S8 Wells PFAS Treatment Facility Improvements Project | PFAS | C | 294,090 | 75,864 | Not Disadvantaged | Not Assessed | $ 27,745,000 | $ 13,000,000 | $ - | Yes |
| 4410010-003C | 5 | Construction | Santa Cruz, City of | Graham Hill Water Treatment Plant Facility Improvements Project (PFAS) | PFAS | C | 94,626 | 25,465 | Not Disadvantaged | Potentially At-Risk | $ 157,966,793 | $ 25,000,000 | $ 50,000,000 | Yes |
| 1910174-001C | 7 | Construction | Suburban Water Systems | Suburban Water Systems Plant 201 PFAS Treatment System | PFAS | C | 66,045 | 18,072 | Not Disadvantaged | Not At-Risk | $ 21,197,103 | $ 21,197,103 | $ - | Yes |
| 4810008-003C | 4 | Construction | Vacaville, City of | Alternative Water Supply Project | PFAS | C | 99,650 | 30,935 | Not Disadvantaged | Not Assessed | $ 100,000,000 | $ 25,000,000 | $ | No |
| 1910173-001C | 7 | Construction | Whittier, City of | Whittier Groundwater Treatment System (WGTS) Expansion (PFAS) | PFAS | C | 49,954 | 12,037 | Not Disadvantaged | Not At-Risk | $ 4,000,000 | $ 4,000,000 | $ - | No |
| 0110010-004C | 2 | Construction | Zone 7 Water Agency (Alameda County Flood Control and Water Conservation District) | Mocho PFAS Treatment Plant | PFAS | C | 274,771 | | Not Disadvantaged | Not Assessed | $ 54,400,000 | $ 25,000,000 | $ - | Yes |
| | | | | | | | | **Subtotals:** | **24 Projects** | | **$ 975,920,676** | **$ 321,024,358** | **$ 245,345,500** | **13** |
| | | | | | | | | **Total Emerging Contaminant Fundable List:** | **56 Projects** | | **$ 1,247,649,719** | **$ 592,753,401** | **$ 245,345,500** | **25** |

# EXHIBIT 5

# APPENDIX L: Emerging Contaminants Supplemental Intended Use Plan

California
State Water Resources Control Board
Division of Financial Assistance

Drinking Water State Revolving Fund (DWSRF)
& Clean Water State Revolving Fund (CWSRF)

Infrastructure Investment and Jobs Act – Emerging Contaminants Funding

Emerging Contaminants in Small or Disadvantaged Communities Grant Funding

# SUPPLEMENTAL INTENDED USE PLAN

## STATE FISCAL YEAR 2025-26

# I. BACKGROUND AND PURPOSE

President Biden signed the Infrastructure Investment and Jobs Act (IIJA) of 2021, (P.L. 117-58) on November 15, 2021. IIJA includes $50 billion to the U.S. Environmental Protection Agency (EPA) to strengthen the nation's drinking water and wastewater systems – the single largest investment in clean water and safe drinking water that the federal government has ever made.

The IIJA provides $5 billion through the Clean Water and Drinking Water State Revolving Funds (SRFs) to reduce people's exposure to perfluoroalkyl and polyfluoroalkyl substances (PFAS) and other emerging contaminants (EC) through their drinking water and to help address discharges through wastewater and, potentially, nonpoint sources. This is a unique opportunity to prioritize investment to local communities that are on the frontlines of PFAS contamination and that have few options to finance solutions through traditional programs. The IIJA provides EC funding through the SRFs that must be distributed to communities entirely as forgivable loans and grants.

PFAS are not the only EC that threaten our water supplies and environment. Water projects that address other EC will also be eligible for funding under this program.

The State Water Resources Control Board (State Water Board) intends to apply for the full FFY 2025 DWSRF EC Capitalization Grant of $82,428,000 that is allotted to the California DWSRF and the full FFY 2025 CWSRF EC Capitalization Grant of $15,208,000 allotted to the California CWSRF. In addition, the State Water Board intends to apply for $2,360,000 in reallotted DWSRF FY 2023 IIJA funds that were declined by other states. This Supplemental Intended Use Plan describes the State Water Board's plan for administering the funds in accordance with current U.S. EPA guidance; DFA has the discretion to modify the requirements if allowed by subsequent guidance to be consistent with federal requirements.

# II. TRANSFER OF CLEAN WATER STATE REVOLVING FUND

The State Water Board will transfer California's entire $15,208,000 CWSRF EC allocation from the CWSRF program to the DWSRF program. The DWSRF statutes and regulations allow for the transfer of an amount that is up to thirty-three percent (33%) of the amount of the DWSRF capitalization grant from the CWSRF to the DWSRF or vice versa. Therefore, the resulting total amount of available EC supplemental funds for the DWSRF program in SFY 2025-26 will be $99,996,000, including the reallotted DWSRF FY 2023 IIJA funds that were declined by other states. The Deputy Director of DFA has the discretion to request that the U.S. EPA transfer all or a portion of the CWSRF EC

allocation back to the CWSRF program if the Deputy Director of DFA deems such transfer appropriate considering the applications received for those funds under both the DWSRF and CWSRF programs. If such a transfer occurs, eligibility for EC funds under the CWSRF program shall be consistent with all applicable state and federal rules, and the Deputy Director of DFA shall have discretion to determine the funding limit for each CWSRF EC project or applicant.

# III. COMPLEMENTARY FUNDING

The IIJA also includes a total of $5 billion in FFY 2022-2026 for the Emerging Contaminants in Small or Disadvantaged Communities (EC-SDC) grant program, which focuses on addressing EC, including PFAS, in drinking water served by public water systems in small communities (population less than 10,000 and unable to incur debt sufficient to finance the project) and/or disadvantaged communities. For FFY 2022 and 2023, U.S. EPA awarded the State Water Board a combined $169,115,000 in federal EC-SDC grant funds; for FFY 2024 $82,961,000 was awarded in federal EC-SDC grant funds to the State Water Board. The state intends to apply for the FFY 2025 EC-SDC allotment, anticipated to be $80,895,000. The State Water Board will administer the funds as authorized by Health and Safety Code, sections 116774-116774.1, and provide grants to eligible public water systems with no cost share or match required. The EC-SDC program is intended to complement the DWSRF program and DWSRF EC funding to support disadvantaged communities' and small communities' development of projects to address emerging contaminants in drinking water.

# IV. PROGRAM GOALS

The DWSRF EC funds will "address emerging contaminants in drinking water with a focus on perfluoroalkyl and polyfluoroalkyl substances through capitalization grants under section 1452(t) of the Safe Drinking Water Act for the purposes described in section 1452(a)(2)(G) of such Act." The EC-SDC funds will provide grants to public water systems in small and/or disadvantaged communities to address emerging contaminants, including PFAS.

The EC program goals are in concert with the long-term and short-term goals listed in the SFY 2025-2026 DWSRF IUP (Outcomes, Goals, Activities, and Measures), including public health benefits and expeditious use of funds.

# V. PROGRAM REQUIREMENTS

## A. In General

To receive funding under this EC IUP, projects must meet the eligibility requirements set forth below and established by the applicable funding program. Projects must be

included on the EC Fundable List (see Section XII). The Deputy Director of DFA may add to the EC Fundable List any additional eligible projects that request DWSRF EC funding for which applications are deemed substantially complete.[1] DFA may periodically post an updated Emerging Contaminants Fundable Project List on the DWSRF website that identifies all projects for which complete applications are received by DFA after the development of this Supplemental IUP.

Projects administered under this supplemental IUP will generally be implemented in accordance with the base DWSRF IUP except to the extent inconsistent with this supplemental EC IUP or the applicable funding program requirements. In addition, projects receiving DWSRF EC funds must meet the specific requirements noted in U.S. EPA's March 8, 2022, memorandum "Implementation of the Clean Water and Drinking Water State Revolving Fund Provisions of the Bipartisan Infrastructure Law" as modified by the U.S. EPA's May 15, 2025, Memorandum "State Revolving Funds: Back to Basics, Back to Business" and in any other applicable guidance.

Eligible DWSRF EC and EC-SDC projects are not subject to DWSRF priority categories A-F, or the DWSRF PF/grant project type and Failing Status criteria provided in the base DWSRF IUP, but certain guidelines from the DWSRF Policy and IUP regarding eligible costs do apply, at the discretion of the Deputy Director or designee. Certain provisions in the DWSRF IUP, such as limitations on PF/grant funding for work on private property, and limitations on industrial/commercial use, may not be applicable to funding administered under this supplemental IUP.

## B. DWSRF EC Funding

Under the IIJA and SDWA, one hundred percent (100%) of the EC capitalization grant, net of set-asides taken, must be provided as forgivable loans or grants.[2] Not less than twenty-five percent (25%) of the DWSRF EC funds must be provided to disadvantaged communities or public water systems serving fewer than 25,000 people.

For a project or activity to be eligible for funding from the DWSRF EC Capitalization Grant, it must be otherwise DWSRF eligible. All existing requirements for implementation of the DWSRF program and execution of a DWSRF funding agreement, and the provisions of the DWSRF IUP and DWSRF Policy, apply to projects receiving DWSRF EC Funding as required by the IIJA, unless inconsistent with the IIJA or this supplemental EC IUP. Applicants' EC projects receiving DWSRF EC funds must meet the requirements of the DWSRF program, including all federal cross-cutting

[1] Projects requesting funding through another DWSRF program in addition to EC funding will need to meet the requirements for that other specific DWSRF program. Inclusion on the EC Fundable List is not a guarantee of any other DWSRF funding.
[2] The State Water Board directs that 100% of DWSRF EC project funding be provided as forgivable loans (principal forgiveness).

requirements and Build America, Buy America (BABA) requirements.[3] In addition, projects receiving DWSRF EC funds must meet the current U.S. EPA guidance, and DFA has the discretion to modify the requirements if allowed by subsequent guidance to be consistent with federal requirements. Only costs incurred after November 15, 2021 may be eligible for DWSRF EC funds.

## C. EC-SDC

The EC-SDC program provides grants to public water systems in small communities (population less than 10,000 and unable to incur debt sufficient to finance the project) and/or disadvantaged communities to address EC/PFAS. EC-SDC projects must be consistent with the workplan (approved by U.S. EPA) for the state's EC-SDC program. Projects receiving EC-SDC funds must meet the requirements of the DWSRF IUP, generally including all federal cross-cutting requirements[4] and Build America, Buy America (BABA) requirements, unless otherwise provided in this supplemental IUP or the applicable federal guidance. Projects receiving only EC-SDC funds do not need to satisfy the Davis-Bacon requirements.

Additionally, projects receiving EC-SDC funds are subject to U.S. EPA's grant implementation document, "Implementation Manual for FY 2024 Funding," issued in November 2024, as well as the regulations of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards at 2 CFR Part 200 (the Uniform Grant Guidance), and any other applicable federal rules. The Uniform Grant Guidance is a government-wide framework of specific requirements for federal grants management and is comprised of several parts:

- Subparts B through D set forth the administrative requirements for federal grants, including the requirements for U.S. EPA's management of grant programs before awards are made and the requirements U.S. EPA may impose on recipients.
    - Included within subpart D ("post federal award requirements"; when the U.S. EPA has awarded the grant to a non-federal entity) are several procurement standards, prohibitions, and requirements that grant recipients and subrecipients must follow. Such procurement standards and requirements do not apply when the State Water Board awards repayable financing or principal forgiveness under its DWSRF program.

[3] See Section X.14. Federal Cross-Cutters of the DWSRF IUP for more details on the list of federal cross-cutting requirements. Tier II environmental review as set forth in Appendix F of the DWSRF IUP does not apply to projects that receive DWSRF EC funding.

[4] See Section X.14. Federal Cross-Cutters of the DWSRF IUP for more details on the list of federal cross-cutting requirements. Tier II environmental review as set forth in Appendix F of the DWSRF IUP does not apply to projects that receive EC-SDC funding.

- Subpart E establishes principles for determining the allowable costs incurred by grant recipients and subrecipients. The principles are for the purpose of cost determination only and are not intended to identify the circumstances or the extent of U.S. EPA participation in the financing of a particular project.
- Subpart F sets forth standards for audits of grant recipients. Most relevant to the grant recipients and subrecipients are the provisions that lay out the responsibilities and other requirements of entities being audited.

The EC-SDC funding program is similar to the DWSRF EC funding in many ways; however, there are at least a few key differences between the two funding sources:

- EC-SDC funding is limited only to community water systems and non-profit non-community water systems that serve small and/or disadvantaged communities. The DWSRF EC funding is not limited to systems that serve small and/or disadvantaged communities.
- EC-SDC funding may only be provided as grants, subject to the federal Uniform Grant Guidance; whereas DWSRF EC funding may be provided as principal forgiveness.
- EC-SDC funding may be used to pay for research and testing projects; whereas such projects are not eligible for DWSRF EC funding.
- EC-SDC may only be used to reimburse eligible costs incurred after July 1, 2023; whereas DWSRF EC funding may be used to reimburse eligible costs incurred after November 15, 2021.

# VI. ELIGIBLE PROJECTS AND ACTIVITIES

Below is a non-exhaustive list of eligible projects and activities under this supplemental IUP. In addition to satisfying the program requirements discussed above, for a project or activity to be eligible for funding from the DWSRF EC Capitalization Grant and EC-SDC grant, the primary[5] purpose must be to address PFAS or EC in drinking water. Funding for projects with a focus on PFAS will be prioritized. Projects are potentially eligible for DWSRF EC funding if they address any contaminants listed on any of EPA's Contaminant Candidate Lists (i.e., CCL1 – CCL5 and any future CCL).[6] Examples of eligible projects include, but are not limited to:

[5] For the purpose of determining EC-SDC eligible projects, "primary" means the components of the project that address ECs exceed 50% of the total project costs or level of effort.

[6] In accordance with U.S. EPA guidance, if U.S. EPA has promulgated a NPDWR for a contaminant, then a project whose primary purpose is to address that contaminant is not eligible for DWSRF Emerging Contaminants funding, unless the contaminant is

- Construction of a new treatment facility or upgrade to an existing treatment facility that addresses EC/PFAS.
- Development of a new source (i.e., new/replacement well or intake for a public water system) that addresses an EC/PFAS issue [Note: for DWSRF EC funding, water rights purchases must still meet the criteria in the Class Deviation for Water Rights].
- Consolidation with another water system that does not have EC/PFAS present or has removal capability.
- Infrastructure related to pilot testing for treatment alternatives.
- Planning and design for small DACs
- Creation of a new community water system to address unsafe drinking water provided by individual (i.e., privately-owned) wells or surface water sources.
- Connection of private wells to an existing public water system.

Eligible construction projects may include costs for planning and design.

# VII. PROGRAM SCHEDULE AND FUNDING APPROACH

The schedule for public comment, application to the U.S. EPA, State Water Board adoption of this EC Supplemental IUP, and award of the EC funds is the same as the schedule for the SFY 2025-2026 DWSRF IUP as presented in the SFY 2025-26 DWSRF IUP.

Applications for funding under this supplemental IUP will be accepted on a continuous basis. Applicants for funding under this supplemental IUP shall follow the existing DWSRF application process. Applicants can refer to the State Water Board's website https://www.waterboards.ca.gov/drinking_water/services/funding/SRF.html and the FAAST portal https://faast.waterboards.ca.gov/ where details of the application and supporting documentation are described in order to complete the DWSRF application. The EC Fundable List in Section XII was developed to determine how best to allocate the EC funds.

Federal rules also require that at least 15 percent (15%) of available DWSRF funding be provided to PWSs that serve less than 10,000 people to the extent that projects for these PWSs are eligible and ready to proceed to a funding agreement (Small Water System Reserve). Based on the anticipated FFY 2025 DWSRF EC award and the reallotted DWSRF FY 2023 IIJA funds that were declined by other states, the amount of

---

PFAS, which is eligible regardless of whether NPDWR has been promulgated. Projects addressing contaminants for which a NPDWR has been promulgated may be eligible for other DWSRF funding.

DWSRF EC available as PF for projects (after set-asides) is $77,951,120 and the minimum available for small water system projects that serve less than 10,000 people is $11,692,668.

The Deputy Director of the Division of Financial Assistance (DFA) is authorized to bypass any project with a complete application if the applicant is non-responsive to DFA's request for information or consultation after notifying the applicant and giving the applicant a reasonable opportunity to respond, and instead to fund any other eligible project on the Fundable List that is ready to proceed to an agreement.

### A. Recent Financing Activity

The table below shows recent financing from DWSRF EC and EC-SDC and is inclusive of funds committed through amendments.

**Table 1: Number of Executed Agreements and Total Financing per SFY**

| SFY | Number of Agreements | $ of Executed EC Program Funds (in millions) | $ of Co-Funding through non-EC Program Sources (in millions) |
|---|---|---|---|
| 2023-24 | 3 | $19.2 | $68.4 |
| 2024-25* | 11 | $97.2 | $11.9 |

* The numbers for 2024-25 reflect agreements executed as of June 30, 2025.

## VIII. FUNDING AVAILABILITY AND TERMS

The State Water Board will provide one hundred percent (100%) of the funding available under this supplemental IUP for eligible PWS as principal forgiveness (PF) or grants in accordance with the limits shown in Table 2 below, consistent with funding source requirements. After reserving $22.0 million for set-aside activities, there will be $78.0 million in FFY 2025 DWSRF EC funds available as PF for projects. IIJA requires that "not less" than twenty-five percent (25%) of the DWSRF EC funds go to DACs or systems with populations less than 25,000.

**Table 2: Breakdown of Funding Availability for Projects ($ in millions)**

| | DWSRF EC (FFY 2022-2024) | DWSRF EC (FFY 2025)* | EC-SDC (FFY 2022-2024) | EC-SDC (FFY 2025) | Total |
|---|---|---|---|---|---|
| **Total Allotment** | **$268.6** | **$100.0** | **$252.1** | **$80.9** | **$701.6** |
| Set-Asides | $60.2 | $22.0 | $3.3 | $3.3 | $88.8 |
| PF/Grant | $208.4 | $78.0 | $248.8 | $77.7 | $612.8 |
| Executed Agreements** | $63.7 | $0 | $52.6 | $0 | $116.4 |
| **Total Funding Available for Projects** | **$144.7** | **$78.0** | **$196.1** | **$77.7** | **$496.4** |

* Includes $2,360,000 in reallotted DWSRF FY 2023 IIJA funds that were declined by other states.

** Reflects total agreements executed as of June 30, 2025.

The DWSRF EC and EC-SDC funds will be subject to the limits in Table 3. DWSRF EC and EC-SDC funds do not have cost per connection limits, but DFA will review project costs for reasonableness.

**Table 3: Maximum Emerging Contaminants PF or EC-SDC per Water System**

| Type of Community | Percentage of Total Eligible Project Cost | Maximum Amount of DWSRF EC PF/EC-SDC grant[2,3] |
|---|---|---|
| DAC Systems and/or Systems That Serve a Population Under 25,000 | up to 100% | No maximum |
| Non-DAC Systems That Serve a Population of 25,000 or greater | up to 50%[1] | $25,000,000 |

Notes:
1. Funding amount will be determined by DFA based on percentage of project cost and incorporated into the agreement between the State Water Board and Recipient.
2. The Deputy Director of DFA may increase the funding that eligible projects/systems have received under previous EC supplemental IUPs to the current EC supplemental IUP maximum funding amounts.
3. The Deputy Director of DFA may increase the maximum EC PF/EC-SDC grant amount up to $50 million if sufficient additional applications for eligible projects are not complete by March 31, 2026.

The maximum grant/PF limit will be applied on a per public water system basis. Some applicants may have jurisdiction over multiple public water systems and wish to implement a program that will address multiple public water systems within their jurisdiction. Multiple projects proposed by an applicant may be funded, provided that the projects would have otherwise been recommended for funding had they been submitted individually and the per-water system limit has not been exceeded. The State Water Board may enter into a single agreement with an applicant for multiple projects, if it is administratively expedient to do so, or may have separate funding agreements for individual projects (e.g., if the projects have significantly different timelines for completion; or legal issues may hold up one project, but not another). To the extent permitted by statute, the Deputy Director of DFA has the authority to streamline application requirements and structure agreements as appropriate for the purposes of funding programmatic applications. The Deputy Director of DFA may approve modified financial application requirements for projects funded under this supplemental IUP.

The State Water Board may offer DWSRF Base Program or other funding in addition to funding administered under this supplemental IUP to fund EC/PFAS projects or projects that have both EC/PFAS components as well as components that are eligible for Base Program or other funding. To be eligible for DWSRF Base Program funding, projects must also be placed on the Base Program Fundable List in accordance with the provisions of the DWSRF IUP.

DFA will also establish a goal of using at least fifty percent (50%) of the EC Capitalization Grant to fund PFAS projects, with highest priority going to projects addressing PFAS concentrations that exceed the new federal MCL or Division of Drinking Water (DDW) Response Level (consistent with DDW's criteria for evaluating exceedances). Eligible DWSRF EC and EC-SDC projects that protect a greater number of households per dollar may also be prioritized if funding is limited.

Section XII provides a summary table of the EC Fundable List. Currently, the list includes projects from entities for total project costs of $760.8 million. Based on the current EC Fundable List, DFA will be able to commit one hundred percent (100%) of the EC funds available, after set-asides, to eligible projects. However, DFA anticipates a continued increase in demand as prospective applicants become aware of the funding terms. Table 4 below summarizes the status of applications requesting EC funding.

**Table 4: EC Application Funding Request Summary ($ in millions)**

| | Application Status | No of Applications | Estimated Funding Requested |
|---|---|---|---|
| Population < 25,000 and/or DAC | Complete | 2 | $31.4 |
| | Incomplete | 20 | $134.8 |
| Non-DAC systems serving > 25,000 | Complete | 3 | $60.0 |
| | Incomplete | 14 | $249.9 |
| **Total Requests** | | **39** | **$476.1** |

# IX. ADMINISTRATION AND SET-ASIDE FUNDS

The IIJA allows each state to set aside up to thirty-one percent (31%) of its DWSRF EC capitalization grant to support various DWSRF and Division of Drinking Water (DDW) program activities, including (1) the administration of the DWSRF, (2) small water system (SWS) technical assistance, (3) public water system (PWS) supervision by DDW and (4) other technical assistance to PWSs in support of technical, managerial, and financial capacity development. The Set-Asides are especially beneficial to SWSs serving SDACs and DACs.

The IIJA allows each state to use up to four percent (4%) of its CWSRF EC capitalization grant to support administration of the CWSRF.

For SFY 2025-26, the State Water Board will set-aside twenty-six percent (26%) of the 2025 DWSRF EC Capitalization Grant, four percent (4%) of the 2025 EC-SDC, and bank four percent (4%) of the 2025 CWSRF EC Capitalization Grant for set-aside activities as further described below.

**Table 5: FFY 2025 DWSRF EC, CWSRF EC, and EC-SDC Set-Aside Budget**

| Set-Aside Category | Max Allowed | Budgeted from FFY 2025 Grant | Estimate |
|---|---|---|---|
| **DWSRF EC** | | | |
| Administration | 4% | 4% | $3,391,520 |
| SWS Technical Assistance | 2% | 2% | $1,695,760 |
| PWS Supervision | 10% | 10% | $8,478,800 |
| Other Local Assistance | 15% | 10% | $8,478,800 |
| **FFY 2025 DWSRF EC Set-Aside** | | **26%** | **$22,044,880** |
| | | | |
| **CWSRF EC** | | | |
| Administration | 4% | 0% | $0 |
| | | | |
| **EC-SDC** | | | |
| Administration | 4% | 4% | **$3,318,440** |
| | | | |

* Includes $2,360,000 in reallotted DWSRF FY 2023 IIJA funds that were declined by other states.

The 2025 DWSRF EC Capitalization Grant set-aside work plans will contain information about the specific tasks, contracts and full-time equivalent personnel that will be supported in DFA and DDW by the 2025 DWSRF EC Capitalization Grant set-aside budgets. The Deputy Director of DFA is authorized to submit initial workplans to USEPA Region 9 or otherwise amend existing workplans for DWSRF EC Capitalization Grants. The Deputy Director of DFA may adjust DWSRF EC Capitalization Grant budgets for good cause. The Deputy Director of DFA is also authorized to make grants, enter into contracts, including multi-year contracts, and establish in-kind funding from USEPA to accomplish work covered by the set-aside budgets for the DWSRF EC Capitalization Grants. The Deputy Director of DFA is also authorized to request from USEPA the transfer of any unspent DWSRF EC set-aside funds to DWSRF principal forgiveness for expenditure on eligible DWSRF EC projects.

## A. Administration Set-Aside

The Administration Set-Aside may fund the State Water Board's administration of the DWSRF EC program. This may include the review and processing of drinking water funding applications, project management and general oversight of DWSRF construction and planning projects. The DWSRF Administration Set-Aside may also

cover the costs for accounting, legal, budgetary, and general management and oversight of the DWSRF EC/EC-SDC funds.

### B. Small Water System Technical Assistance Set-Aside

The SWSTA Set-Aside may fund DFA technical assistance to small PWS applicants with 10,000 or fewer persons to help establish eligibility for DWSRF EC funds and provide other technical assistance necessary for project development.

### C. State Program Management Set-Aside

The State Program Management Set-Aside may be used to partially fund DDW's administration of the State Water Board's PWSS program as it relates to ECs. The Set-Aside may provide funds for DDW's inspection, compliance, and monitoring activities related to ECs in accordance with the SDWA and PWSS responsibilities delegated by U.S. EPA.

### D. Local Assistance Set-Aside

The Local Assistance Set-Aside may be used for contracts and the personnel costs of DFA and DDW working with PWSs addressing ECs. These contract and staff costs are associated with the State Water Board's implementation of its Capacity Development Strategy and providing direct technical assistance to PWSs in support of this strategy.

## X. EC CAPITALIZATION GRANT PAYMENTS AND DRAWS

**1. Federal EC Capitalization Payments**

Based upon the State Water Board's cash flow for SFY 2025-26, the State Water Board has requested the following federal payment schedule from U.S. EPA for the 2025 EC Capitalization Grant, as detailed in Table 6.

**Table 6: 2025 EC Capitalization Grant Payment Schedule***

| FFY | Payment Date | Percentage of Cap Grant | Estimated Amount | Description | Site Code ** |
|---|---|---|---|---|---|
| **2025** | Award Date | 4% | $3,391,520 | DWSRF Administration Set-Aside | DD |
| **2025** | Award Date | 2% | $1,695,760 | DWSRF SWS Technical Assistance Set-Aside | DE |
| **2025** | Award Date | 10% | $8,478,800 | DWSRF State Program Management Set-Aside | DF |
| **2025** | Award Date | 10% | $8,478,800 | DWSRF Local Assistance & Other Programs Set-Aside | DG |
| **2025** | Award Date | 74% | $62,743,120 | DWSRF Loan Fund | DA |

*Amounts and percentages include the reallotted DWSRF FY 2023 IIJA funds that were declined by other states but do not include the transfer of the FFY 2025 CWSRF EC Capitalization Grant ($15,362,000) to the DWSRF for the sole purpose of funding DWSRF EC eligible projects. The requested payment date for the additional transferred EC funds from the CWSRF is also the award date of the FFY 2025 DWSRF EC Capitalization Grant.
**Site Codes reference the federal accounts in which the various loan and set-aside funds of a capitalization grant are deposited and made available for liquidation by the State Water Board.

2. **EC Federal Draw Schedule and Estimated EC Project Disbursements**

Section XIII represents the State Water Board's anticipated federal draw schedule of the 2025 EC Capitalization Grant, subject to the timely commitment of available funds to eligible projects and plans for the eligible use of 2025 DWSRF EC set-aside funds per forthcoming workplans.

# XI. REPORTING

The State Water Board's DFA will report on EC projects, including project characteristics and milestone information as well as the public water system(s) receiving federal funding, to the U.S. EPA through the Office of Water State Revolving Fund (OWSRF) system and to the U.S. General Services Administration's SAM.gov reporting system.

## XII. EMERGING CONTAMINANTS FUNDABLE LIST

(Sort Order: Water System Size <25,000, Degree of Disadvantage, Contaminant, Applicant)

| Project Number | District Number | Project Type | Applicant | Project Title/ Description | Contaminant | Priority Class | Population | Service Connections | Water System Size <25,000 Population | Degree of Disadvantage | Complete Application | Estimated Total Project Costs | Requested Funding | Estimated Maximum PF/ Grant Amount | Estimated DWSRF Loan Funding Requested |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Water Systems Serving Populations <25,000 and/or Disadvantaged Communities = 37% of Funding Request/ 45% of Estimated Maximum PF/Grant Amount** | | | | | | | | | | | | | | | |
| 1010039-005C | 23 | Construction | Caruthers Community Services District | Caruthers Well 5 TCP Treatment | 1,2,3-TCP | C | 1,620 | 748 | Yes | Disadvantaged | No | $3,900,000 | $3,900,000 | $3,900,000 | $0 |
| 5410021-001C | 24 | Construction | Earlimart Public Utility District | Front Street Well Improvement Project | 1,2,3-TCP | C | 6,971 | 1,545 | Yes | Severely Disadvantaged | No | $2,200,000 | $2,200,000 | $2,200,000 | $0 |
| 1000316-001C | 23 | Construction | Kings Canyon Unified School District | KCUSD Water Supply and Treatment Project for Alta, Riverview, and Kings Canyon High | 1,2,3-TCP | C | 985 | 3 | Yes | Disadvantaged | No | $9,463,000 | $9,463,000 | $9,463,000 | $0 |
| 2410004-004C | 11 | Construction | Livingston, City of | Livingston 1,2,3-TCP Removal Treatment System Project | 1,2,3-TCP | C | 14,894 | 72 | Yes | Disadvantaged | No | $27,000,000 | $27,000,000 | $27,000,000 | $0 |
| 5410017-004P | 12 | Planning | London Community Services District | 1,2,3-TCP Compliance Improvements | 1,2,3-TCP | C | 1,785 | 431 | Yes | Severely Disadvantaged | No | $1,147,100 | $1,147,100 | $1,147,100 | $0 |
| 5010017-002C | 5 | Construction | Patterson, City of | City of Patterson-Water Well Mitigation for 1,2,3-Trichloropropane Contamination | 1,2,3-TCP | C | 23,304 | 7367 | Yes | Not Disadvantaged | No | $11,900,000 | $11,900,000 | $11,900,000 | $0 |
| 5410009-001C | 12 | Construction | Pixley Public Utility District | Pixley TCP Treatment Design | 1,2,3-TCP | C | 4,137 | 841 | Yes | Severely Disadvantaged | No | $8,342,200 | $3,675,200 | $3,675,200 | $0 |
| 5010019-001C | 10 | Construction | Turlock, City of | Well 35 Treatment Project- Emerging Contaminants Funding Application | 1,2,3-TCP | C | 72,682 | 19,332 | No | Disadvantaged | Yes | $15,461,000 | $15,461,000 | $15,461,000 | $0 |
| 1503475-002C | 19 | Construction | Western Acres Mutual Water Company | Western Acres Water Company TCP Treatment Design Project | 1,2,3-TCP | C | 380 | 110 | Yes | Not Disadvantaged | No | $366,132 | $366,132 | $366,132 | $0 |
| 1910026-013P | 22 | Construction | Compton-City, Water Dept. | Wells 16, 18 and 19 - Treatment Plants | PFAS, 1,4-Dioxane | C | 380 | 110 | Yes | Not Disadvantaged | No | $23,385,000 | $23,385,000 | $23,385,000 | $0 |

| Project Number | District Number | Project Type | Applicant | Project Title/ Description | Contaminant | Priority Class | Population | Service Connections | Water System Size <25,000 Population | Degree of Disadvantage | Complete Application | Estimated Total Project Costs | Requested Funding | Estimated Maximum PF/ Grant Amount | Estimated DWSRF Loan Funding Requested |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1910026-012C | 22 | Construction | Compton-City, Water Dept. | City of Compton Water Improvement Project | 1,4-Dioxane | C | 93,597 | 14,500 | No | Disadvantaged | No | unknown | unknown | unknown | unknown |
| 3301630-001C | 20 | Construction | Blythe, City of | Hidden Beaches Water System Treatment, Filtration, and Storage Project | Manganese | E | 17,358 | 123 | Yes | Small Severely Disadvantaged | No | $5,215,684 | $4,617,600 | $4,617,600 | $0 |
| 3500581-001C | 5 | Construction | Rancho San Joaquin MWC | Design & Construction of an Arsenic and Manganese Removal Treatment System | Manganese | E | 914 | 30 | Yes | Not Disadvantaged | No | unknown | $550,000 | $550,000 | $0 |
| 1910160-010C | 7 | Construction | Tract 349 Mutual Water Company | Tract 349 Water Quality Improvement Project | Manganese | C | 8,500 | 920 | Yes | Small Severely Disadvantaged | No | $11,427,000 | $11,427,000 | $11,427,000 | $0 |
| 3701837-001P | 26 | Planning | Wynola Water District | Wynola Estates Drinking Water Treatment and Supply | Manganese | C | 120 | 74 | Yes | Small Severely Disadvantaged | No | $650,000 | $650,000 | $650,000 | $0 |
| 1910108-001C | 15 | Construction | Bell Gardens, City of | Bell Gardens Water Reservoir Construction | PFAS | C | 44,000 | 1,666 | No | Severely Disadvantaged | No | $4,205,000 | $4,205,000 | $4,205,000 | $0 |
| 0410002-003C | 21 | Construction | California Water Service Company - Chico | Chico District Well 071-01 PFAS Treatment | PFAS | C | 110,512 | 30,050 | No | Disadvantaged | No | $9,926,289 | $9,926,289 | $9,926,289 | $0 |
| 1510033-003C | 19 | Construction | California Water Service Company - Kernville | PFAS Wellhead Treatment Project for Well ARD-W-018-01 | PFAS | C | 5,501 | 4,003 | Yes | Severely Disadvantaged | No | $2,220,180 | $2,220,180 | $2,220,180 | $0 |
| 0410005-001C | 21 | Construction | California Water Service Company - Oroville | Oroville District Station 17 & 18 New Well and Treatment | PFAS | C | 5,501 | 3,547 | Yes | Small Severely Disadvantaged | No | $10,896,895 | $10,896,895 | $10,896,895 | $0 |
| 3610005-001C | 27 | Construction | Lake Arrowhead CSD | PFAS Removal | PFAS | C | 7,038 | 7,927 | Yes | Not Disadvantaged | Yes | $15,952,000 | $15,952,000 | $15,952,000 | $0 |
| 3310025-001C | 20 | Construction | Norco, City of | PFAS Groundwater Remediation Project | PFAS | C | 24,909 | 3,550 | Yes | Not Disadvantaged | No | $4,358,050 | $4,358,050 | $2,179,025 | $0 |
| 3310033-001C | 20 | Construction | Santa Ana River Water Company | Well 9 PFAS Removal Project | PFAS | C | 5,405 | 2,075 | Yes | Not Disadvantaged | No | $2,951,000 | $2,951,000 | $1,500,000 | $0 |
| **Subtotal Projects =** | | | **22** | | | | | | | **Subtotal =** | | **$170,966,530** | **$166,251,446** | **$162,621,421** | **$0** |

| Project Number | District Number | Project Type | Applicant | Project Title/ Description | Contaminant | Priority Class | Population | Service Connections | Water System Size <25,000 Population | Degree of Disadvantage | Complete Application | Estimated Total Project Costs | Requested Funding | Estimated Maximum PF/ Grant Amount | Estimated DWSRF Loan Funding Requested |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Water Systems Serving Populations >25,000 and Non-Disadvantaged Communities = 50% of Funding Requests/ 52% of Estimated Maximum PF/Grant Amount** | | | | | | | | | | | | | | | |
| 3610012-008C | 27 | Construction | Chino, City of | State Street Water Treatment Plant | 1,2,3-TCP | C | 84,560 | 22,287 | No | Not Disadvantaged | Yes | $62,750,000 | $25,000,000 | $25,000,000 | $35,000,000 |
| 3310037-011C | 20 | Construction | Corona, City of | PFAS Removal Project | PFAS | C | 150,253 | 41,861 | No | Not Disadvantaged | No | $13,333,500 | $6,666,750 | $6,666,750 | $5,224,250 |
| 1910034-001C | 16 | Construction | Downey, City of | Northerly Water Supply Treatment Improvements | PFAS | C | 109,934 | 23,398 | No | Not Disadvantaged | No | $50,000,000 | $50,000,000 | $12,500,000 | $37,500,000 |
| 1910034-002C | 16 | Construction | Downey, City of | Southerly Water Supply Treatment Improvements | PFAS | C | 109,934 | 23,398 | No | Not Disadvantaged | No | $60,000,000 | $60,000,000 | $12,500,000 | $47,500,000 |
| 3310012-019C | 20 | Construction | Elsinore Valley Municipal Water District | Canyon Lake Water Treatment Plan Phase 1 Improvements (PFAS) | PFAS | C | 121,420 | 36,817 | No | Not Disadvantaged | Yes | $90,879,037 | $25,000,000 | $25,000,000 | $50,000,000 |
| 3010010-002C | 8 | Construction | Fullerton, City of | City of Fullerton Main Plant PFAS Treatment Project Phase 2 | PFAS | C | 137,367 | 31,359 | No | Not Disadvantaged | No | $12,830,000 | $6,415,000 | $6,415,000 | $0 |
| 3010062-001C | 8 | Construction | Garden Grove, City of | City of Garden Grove Wells 22, 26, and 27 PFAS Treatment Systems | PFAS | C | 174,226 | 34,420 | No | Not Disadvantaged | Yes | $20,000,000 | $10,000,000 | $10,000,000 | $0 |
| 3010022-001C | 8 | Construction | Golden State Water Company | Golden State Water Company West Orange PFAS Treatment Systems | PFAS | C | 114,185 | 28,175 | No | Not Disadvantaged | No | $20,000,000 | $10,000,000 | $10,000,000 | $0 |
| 3010053-001C | 8 | Construction | Huntington Beach, City of | City of Huntington Beach PFAS Treatment Systems | PFAS | C | 201,000 | 53,337 | No | Not Disadvantaged | No | $12,000,000 | $6,000,000 | $6,000,000 | $0 |
| 1910090-001C | 22 | Construction | Monrovia, City of | COM PFAS Treatment System | PFAS | C | 37,931 | 9,425 | No | Not Disadvantaged | No | $10,871,602 | $5,435,801 | $5,435,801 | $0 |
| 3010027-002C | 8 | Construction | Orange, City of | City of Orange Wells 25 and 27 PFAS Treatment Plant | PFAS | C | 117,150 | 35,528 | No | Not Disadvantaged | No | $14,156,060 | $7,156,060 | $7,156,060 | $0 |
| 0110008-001C | | Construction | Pleasanton, City of | Per- and Polyfluoroalkyl (PFAS) Treatment and Wells Rehabilitation Project | PFAS | C | 83,000 | 22,000 | No | Not Disadvantaged | No | $46,000,000 | $31,400,000 | $25,000,000 | $6,400,000 |

| Project Number | District Number | Project Type | Applicant | Project Title/ Description | Contaminant | Priority Class | Population | Service Connections | Water System Size <25,000 Population | Degree of Disadvantage | Complete Application | Estimated Total Project Costs | Requested Funding | Estimated Maximum PF/ Grant Amount | Estimated DWSRF Loan Funding Requested |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3010038-005C | 8 | Construction | Santa Ana, City of | City of Santa Ana Walnut Pump Station PFAS Treatment | PFAS | C | 308,189 | 45,561 | No | Not Disadvantaged | No | $30,000,000 | $10,000,000 | $15,000,000 | $0 |
| 1910240-002C | 22 | Construction | Santa Clarita Valley Water Agency | S6, S7, and S8 Wells PFAS Treatment Facility Improvements Project (Incentive) | PFAS | C | 134,541 | 32,789 | No | Not Disadvantaged | No | $15,136,104 | $7,568,052 | $7,568,052 | $0 |
| 4410010-003C | 5 | Construction | Santa Cruz, City of | Graham Hill Water Treatment Plant Facility Improvements Project (PFAS) | PFAS | C | 90,000 | 24,228 | No | Not Disadvantaged | No | $172,400,000 | $25,000,000 | $25,000,000 | $50,000,000 |
| 1910174-001C | 7 | Construction | Suburban Water Systems | Suburban Water Systems Plant 201 PFAS Treatment System | PFAS | C | 123,805 | 34,720 | No | Not Disadvantaged | No | $42,394,205 | $20,222,205 | $20,222,205 | $10,222,205 |
| 1910173-001C | 7 | Construction | Whittier, City of | Whittier Groundwater Treatment System (WGTS) Expansion (PFAS) | PFAS | C | 49,954 | 12,001 | No | Not Disadvantaged | No | $8,000,000 | $4,000,000 | $4,000,000 | $0 |
| **Subtotal Projects =** | | | **17** | | | | | | | **Subtotal =** | | **$589,871,471** | **$309,863,868** | **$223,463,868** | **$241,846,455** |
| **Total EC Fundable List Projects =** | | | **39** | | | | | | | **Total EC Fundable List =** | | **$760,838,001** | **$476,115,314** | **$386,085,289** | **$241,846,455** |

## XIII. FFY 2025 ESTIMATED EC CAPITALIZATION GRANT CASH DRAW SCHEDULE

| FFY 2025 DWSRF and CWSRF EC Capitalization Grant/ Accounts | Total Payment Amount (Date of Award) | SFY 2025-26 Federal Draws | SFY 2026-27 Federal Draws | | | | SFY 2027-28 Federal Draws | | | | SFY 2028-29 Federal Draws | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Project Loan Fund** | | | **Q1** | **Q2** | **Q3** | **Q4** | **Q1** | **Q2** | **Q3** | **Q4** | **Q1** | **Q2** | **Q3** | **Q4** |
| **2025 Loan Funds** | $76,204,720 | none | | | | | $9,525,590 | $9,525,590 | $9,525,590 | $9,525,590 | $9,525,590 | $9,525,590 | $9,525,590 | $9,525,590 |
| **Set-Aside Accounts** | | | | | | | | | | | | | | |
| **2025 DWSRF Administration** | $ 3,297,120 | | | | | | | | | | $824,280 | $824,280 | $824,280 | $824,280 |
| **2025 SWS Administration** | $1,648,560 | | | | | | | | | | | | $824,280 | $824,280 |
| **2025 PWSS** | $8,242,800 | | | | | | | | | | $2,060,700 | $2,060,700 | $2,060,700 | $2,060,700 |
| **2025 Local Assistance** | $8,242,800 | | | | | | | | | | $2,060,700 | $2,060,700 | $2,060,700 | $2,060,700 |

# EXHIBIT 6

≡

MAGAZINE : WINTER 2016 : FEATURE

# Teflon's Toxic Legacy

*For more than half a century DuPont hid information that a chemical it was using to make Teflon might be making people sick.*

Photos by Maddie McGarvey

SHARON KELLY

Almost two decades ago, Carla Bartlett, a then 41-year -old West Virginia secretary and mother of two, was first diagnosed with cancer – what her surgeon later labeled a "garden variety" type of kidney cancer.

"I was scared to death," Bartlett, now 59, told an Ohio federal jury this fall during hearings in the first of more than 3,500 personal injury and wrongful death suits by West Virginia and Ohio residents against the chemical giant DuPont. "And all I could think of was not being there, not being able to be there for my family." Bartlett's tumor and part of her rib were removed in a surgery in 1997 that, she said, involved cutting her "virtually in half." Though the cancer hasn't recurred since, for Bartlett, the harm, both physical and emotional, has lingered. "It's never out of my mind, because you worry constantly about it," she said. "And then I have the reminder of the scar, every day, that, you know, this… this is… this was cancer; this could come back."

On October 7, after less than a day of deliberations, the jury found DuPont liable for Bartlett's cancer, agreeing with the defendant that the company had for years negligently contaminated her drinking water supply in Tuppers Plain, Ohio with a toxic chemical formerly used to make its signature brand of nonstick coating: Teflon.

**GET THE *JOURNAL* IN YOUR INBOX.**

**Sign up for our weekly newsletter.**

Email Sign up

What makes the verdict remarkable is that unlike, say, mesothelioma – a form of lung cancer almost exclusively linked to asbestos exposure – the renal cell carcinoma that struck Bartlett is not usually considered the calling card of a specific carcinogen. So it was difficult for her doctors to definitively say what had first made Bartlett sick – it could have been virtually anything. The $1.6 million the jury awarded to Bartlett – the product of decades' worth of legal battles that unearthed reams of secret DuPont studies and internal emails – came despite the extreme difficulty of connecting common ailments to a specific chemical under the current United States legal system.

Proving that DuPont was legally culpable for Bartlett's kidney cancer required years of extraordinarily innovative lawyering – and at times some plain dumb luck. The very improbability of that verdict demonstrates much that is flawed about the way this country regulates potentially dangerous chemicals. With no mandatory safety testing for the vast majority of the tens of thousands of chemicals used daily in America, doctors and public health officials have little information to guide them as they seek to identify potential health hazards – including the chemical, called C8, that DuPont knowingly allowed to pollute Bartlett's drinking water. Bartlett's travails are also a cautionary tale about C8, which has become so pervasive today that it's found in virtually every American's blood.

**A federal jury has found DuPont liable for Carla Bartlett's kidney cancer.**

"Part of a diagnosis is: *Well, tell me what you've been around*," one of Bartlett's attorneys, Mike Papantonio, told the jury in opening arguments in the case. "*Well, I drank my water*. That doesn't sound like a problem. It was a problem"

Teflon was first created, as many miracle chemicals were, in a laboratory accident. In 1938, Roy J. Plunkett, a DuPont chemist, was experimenting with refrigerants when he discovered a white waxy material that seemed very slippery. The material turned out to be an inert fluorocarbon – Polytetrafluoroethylene (PTFE) – that had superior nonstick properties. In 1945, the company patented the chemical and registered it under the trademark "Teflon," touting it as "the most slippery material in existence." By 1948 DuPont was producing about 2 million pounds of Teflon a year at its Washington Works plant in Parkersburg, West Virginia. For DuPont, Teflon, which was used to coat pots and pans, proved to be a gold mine, with sales peaking at roughly a billion dollars a year in 2004, according to the company's SEC filings.

Starting around 1951, DuPont began using another laboratory-formed chemical known as Perfluorooctanoic (PFOA) acid, or C8 (so called because it contains eight carbon molecules), to smooth out the lumpiness of freshly manufactured Teflon. An unusually durable chemical, C8 first entered the world in 1947 and due to its nonstick and stain-resistant properties its use as a "surfactant" spread with extraordinary speed. The white, powdery compound, often said to look like Tide laundry detergent, would ultimately be used in hundreds of products including fast food wrappers, waterproof clothing,

electrical cables, and pizza boxes. (DuPont used to purchase C8 from another chemical company called 3M until 2002, when the company phased it out. DuPont then started manufacturing C8 on its own at a factory in Fayetteville, North Carolina.)



Buck Bailey, whose mother worked at the Teflon plant in Parkersburg, was born with just one nostril and other facial deformities.



Buck Bailey. Photos by Maddie McGarvey.

The trouble was that the compound – which has since been linked to a variety of health risks including cancer, liver disease, developmental problems, and thyroid disease – escapes into the air easily. In fact, C8 was often shipped to factories pre-mixed with water to keep the dust from worker's lungs.

Because it's an extremely stable chemical, C8 does not biodegrade. Instead, it bioaccumulates, building up in people's blood over time if they continue to drink water or breathe air laced with the substance. Due to its ubiquitous use, the chemical can now be found in trace amounts in the bloodstream of more than 98 percent of Americans, and even in umbilical cord blood and breast milk, according to the Centers for Disease Control. It's also been found in the blood of seals, eagles, and dolphins around the world, including in animals living in a remote wildlife refuge in the middle of the North Pacific. The chemical is expected to stay in the environment for thousands of years.

Concerns about the hazards posed by Teflon and C8 began to garner public attention only about 15 years ago. By 2003, DuPont had dispersed almost 2.5 million pounds of C8 from its Washington Works plant into the mid-Ohio River Valley area, according to a peer-reviewed study. The company's most egregious disposal practices occurred before US environmental laws were first written in the 1970s and included burying toxic waste in drums along the banks of the Ohio River and dropping barrels of it out into the open ocean (where it once caused a scandal when a local fisherman dredged a barrel up in his nets), and, in more recent decades, burying it in local "non-hazardous" landfills.

Now, information emerging from millions of pages of internal company reports reveals that several DuPont scientists and senior staff members had for many years either known, or at least suspected, that C8 was harmful. Yet DuPont continued to use the chemical, putting its own workers, local residents, and the American public at risk.

The documents show that signs of C8's toxicity began to emerge very quickly as DuPont scaled up its Teflon production in the 1950s. The company funds its own safety-testing laboratory – the Haskell Laboratory of Industrial Toxicology – in part to screen workers for signs of illnesses that might be tied to DuPont products. In 1961, company lab tests linked C8 exposure to enlarged livers in rats and rabbits. DuPont scientists then conducted tests on humans, asking a group of volunteers to smoke cigarettes laced with C8. "Nine out of ten people in the highest-dosed group were noticeably ill for an average of nine hours with flu-like symptoms that included chills, backache, fever, and coughing," the researchers noted.

"Concerns about the potential toxicity of C8 had been raised internally within DuPont by at least 1954, leading DuPont's own researchers to conclude by at least 1961 that C8 was toxic and, according to DuPont's own Toxicology Section Chief, should be 'handled

with extreme care,'" Bartlett's February 2013 suit against DuPont alleged.

But it wasn't until the 1970s that DuPont's researchers began to understand that C8 was building up in the bloodstreams of workers, and soon after, they began to see troubling signs that the chemical could pose serious health risks. The stakes were high: The Washington Works plant where Teflon is manufactured was one of the biggest employers in the region. The plant currently employs more than 2,000 people – 3,000 if you include sub-contractors – in a sparsely populated Appalachian community alongside the Ohio River separating West Virginia from Ohio.

In 1981, the company ordered all female employees out of the Teflon division after two out of seven pregnant workers gave birth to children with birth defects. One of those children, Bucky Bailey, was born with just one nostril and other facial deformities that required many painful surgeries to fix.

**In 1981, two out of seven pregnant workers at the Teflon plant gave birth to children with birth defects.**

"I've never, ever felt normal. You can't feel normal when you walk outside and every single person looks at you. And it's not that look of He's famous or He's rich," he told ABC News in 2003. "It's that look of He's different. You can see it in their eyes."

In 1984, DuPont began to secretively collect local tap water, asking employees to bring in jugs of water from their own homes, schools, and local businesses, and discovered that C8 was making its way into public drinking water supplies in both Ohio and West Virginia at potentially dangerous levels. Minutes recorded at a meeting at DuPont's corporate headquarters in Delaware that year suggest a high level of concern regarding how this could affect the company's image and bottom line. "Legal and medical will likely take the position of total elimination," notes from the meeting read. The company executives present, however, concluded the available methods for cutting pollution were not "economically attractive."

In the years following that meeting, instead of slashing its use of C8, DuPont escalated production, while keeping much of what it knew about the chemical's dangers secret. The company's Washington Works factory continued with its usual practice of dumping C8-laden sludge in unlined landfills, allowing it to enter the Ohio River, and pumping out C8-laced vapors from its smokestacks.

None of this would have come to light had it not been for a West Virginia cattle rancher named Wilbur Tennant who, along with four other members of his family, sued DuPont in 1998 claiming he had lost hundreds of head of cattle because of pollution from a landfill next to his farm. DuPont had purchased the patch of land, which included a creek that ran directly into the Ohio River, from Tennant in the 1980s, telling him that it would be used as a non-hazardous landfill.

But soon after the landfill got underway, the creek started to turn black and smelly. Sometimes there would be a layer of foam on the water. Within a few years, about 280 of Tennant's cattle, which drank water from the creek, had died. When the Tennants cut open a cow to investigate the cause of its death, they discovered that its internal organs had turned bright, neon green, video footage recorded by the rancher shows. Tennant and his family members, too, suffered breathing difficulties and cancers.

Tennant's attorney, Robert Bilott, forced DuPont to turn over tens of thousands of pages of internal company documents as part of the legal process. Buried in those materials was a single mention of a chemical Bilott had never heard of before: PFOA (C8). The chemical sounded similar to another one, called PFOS, which had just been pulled off the market by its maker 3M (which, if you recall, supplied C8 to DuPont for decades). So Bilott made another request to DuPont. This time he asked the company to turn over all documents related to C8.

"I did not immediately recognize the significance [of C8]," Bilott told *Earth Island Journal*, "but we came to."

The trove of documents ultimately uncovered during the ensuing legal battles offered up incriminating evidence about the company's decades-long cover-up. In addition to research findings, copies of internal emails and documents included in this cache were especially illuminating. One 2001 email describes a scientist warning that when airborne, C8 is so hard to deal with that "it might require the public to wear 'gas masks.'"

Another, by DuPont's in-house counsel, Bernard Reilly, shows that company officials planned to push regulators to allow the public to be exposed to higher levels of the chemical than DuPont itself had recommended. In an October 2001 email to his son, Reilly wrote:

"So far DuPont has been saying there are safe levels, we need to have an independent agency agree, we are hoping that it will agree to higher levels than we have been saying. If for no other reason than we are exceeding the levels we say we set as our own guideline, mostly because no one bothered to do air monitoring until now, and our water test has been completely inadequate."

Reilly's personal emails, written mostly to family members between late 1999 and mid-2001 using his work email address, give an unfiltered insight into the company's legal efforts to cover up C8's risks. In one August 2000 email he writes: "The shit is about to hit the fan in WV (West Virginia). The lawyer for the farmer finally realizes the surfactant issue. He is threatening to go to the press to embarrass us to pressure us to settle for big bucks. Fuck him."

This information not only helped the Tennant case – which DuPont settled in 2001 for an undisclosed amount – it would eventually lead to one of the most significant class-action lawsuits in the history of environmental law (which culminated in the landmark October ruling in Carla Bartlett's case). Sadly, Tennant didn't live to see the ripple effect of his lawsuit. He died of cancer in 2009 at age 67.

By 2001, while still working on the Tennant case, Bilott came to realize that the C8 contamination wasn't isolated to the Tennant property, but extended across a large swath of the mid-Ohio River Valley. The chemical had seeped into the water supply of at least six public water systems in West Virginia and Ohio. That year, Bilott filed a class action lawsuit against DuPont, *Leach, et al. v E.I. du Pont de Nemours and Co.*, on behalf of about 80,000 people in the six water districts. He also reported his findings to the US Environmental Protection Agency and sent along copies of some 900 pages of DuPont's internal documents, after which the agency launched a "priority review" of C8.

In 2004 the US EPA, too, filed a lawsuit against DuPont, charging it with concealing evidence about C8's risks for more than two decades. In 2005 the company agreed to pay $16.5 million as part of a settlement agreement with the EPA – the largest civil penalty ever in the agency's history. But environmental groups argue that the fine was little more than a slap on the wrist to a company where a single division sold more than that amount in a single day.

> *"We also learned that not only do we have people drinking our famous surfactant, but levels in the ambient air are above our guidelines... we should have checked this years ago and taken steps to remedy, guess the hills on the other side of the river cause great conditions for high ambient levels, the plume hits them before it can disperse more fully. Ugh. "*
>
> *Bernard J. Reilly, DuPont lawyer 08/09/2001*

"Under the terms of the settlement, the company wasn't even obliged to pull C8 from the market... the best the agency could negotiate was a voluntary phase-out by 2015," the watchdog organization Environmental Working Group says in its May 2015 report "Poisoned Legacy."

The same year, DuPont settled the class-action suit filed by Bilott's firm for over $100 million – plus another $235 million *if* research funded by the settlement turned up evidence that people might be getting sick. Under the settlement, DuPont promised to install filtration systems in contaminated water districts and put $70 million into a community health and education project. And, in a rather unusual move, the company also agreed to fund a multimillion dollar health study, overseen by independent, court-appointed scientists, to determine whether exposure to C8 had actually harmed people. Moreover, DuPont agreed that if the study did prove that the C8 had caused certain diseases, those who suffered from diseases connected to C8 would be entitled to sue individually for personal injury.

It's not quite clear why DuPont agreed to the independent study. Perhaps it was the knowledge that most medical monitoring programs fail to attract enough participants, which usually makes it almost impossible to draw reliable inferences about disease clusters. But in this case, nearly 80 percent of the surrounding community in West Virginia and Ohio showed up at makeshift medical clinics in trailers around the region to have their blood drawn and a health care questionnaire completed. Community members were, more often than not, drawn by the $400 checks (pulled from the DuPont settlement) that the enterprising team of medical researchers offered to each man, woman, and child who participated.

> *"The shit is about to hit the fan in WV. The lawyer for the farmer finally realizes the surfactant issue. He is threatening to go to the press to embarrass us to pressure us to settle for big bucks. Fuck him."*
>
> *Bernard J. Reilly, 08/13/2000*

"We have families of five dragging their three kids kicking and screaming, and the parents are saying, 'Yes, you're going to get stuck in the arms – that's $2,000!'" one local resident told The Huffington Post.

The C8 science panel, which took seven years to complete its research, ultimately linked C8 exposure to six diseases: ulcerative colitis; pregnancy-induced hypertension; high cholesterol; thyroid disease; testicular cancer; and kidney cancer. The panel's findings, published in several peer-reviewed journals, were remarkable because they proved that the chemical pretty much affected the entire body, even at low exposure levels. The researchers concluded that C8 posed health threats at just 0.05 parts per

billion in drinking water for people who drank that water for a single year. They found that the average C8 level in blood samples from the mid-Ohio Valley was 83 parts per billion. The average C8 level for those living closest to the plant – whose drinking water came from Ohio's Little Hocking water district – was more than 224 parts per billion compared to 4 parts per billion for average Americans.

Once the connection between C8 exposure and the diseases was established, more than 3,500 Ohio Valley residents, including Carla Bartlett, filed personal injury cases against DuPont. Bartlett's case was the first to go on trial this past September. The court's verdict in her favor might just set the tone for the rest of cases that will come to trial.



*Photo by Maddie McGarvey.*
"When this all started, I did not think it would get out of hand like it has," says Joe Kiger, a lead plaintiff in the 2005 class action lawsuit against DuPont.

Still, there are many who feel the company will keep trying to wriggle its way out of its responsibilities. (During Bartlett's trial, for instance, DuPont attorneys argued that her cancer was triggered by her obesity rather than C8, even though, as per terms of the class action suit settlement, DuPont isn't permitted to dispute the fact that C8 can cause the kind of cancer she endured.)

"I've been at it 16 years, if that tells you anything," Joe Kiger, a local gym teacher and lead plaintiff in the original 2005 class action suit, told the *Journal*. "When this all started, I did not think it would get out of hand like it has, but we kept finding out more and more of what DuPont did, what the cover-ups were, them knowing full well that this stuff was toxic." Kiger – who suffers from numerous kidney and liver problems and and had to have surgery following a heart attack in May – is a member of Keep Your Promises DuPont, a community-based organization working to hold the company accountable for its actions. "Our biggest faith and trust we have is in our utilities," he said. "We flip that light switch on, we expect it to come on. We don't think anything about it. You turn on your tap to get water, you expect that water to be clean and not have all these chemicals in it. I think now, people are starting to find out that someone has lied to them."

To understand how C8 managed to remain in use for so long requires a look back at the history of chemical regulation in the US, and the role that DuPont itself played in crafting those laws.

Since the early 1970s, pressure had been growing to regulate the rising use of chemicals in almost every aspect of post-World War II American life. And few companies were as responsible for – or as dependent on – that expansion as DuPont.

---

*from: Bruce Karrh,*
*DuPont's medical director,*
*1982 from internal company document*

***"There is obviously great potential for current or future exposure of members of the local community from emissions leaving the plant perimeter."***

---

In 1930, DuPont created Freon, making mass-market refrigerators and air conditioners possible for the first time. In 1935, a DuPont scientist invented nylon, a synthetic fiber that proved invaluable during World War II. Cellophane, Mylar, Tyvek, Rayon, Lycra – household names to this day – were all developed by DuPont in the past century. The company also made artificial fertilizers, fungicides, pesticides, plastics, and paints. "We have been proud to publicize the fact that more than 60 percent of our sales in 1950 resulted from products that were unknown, or at least were only laboratory curiosities, as recently as 1930," a DuPont rep told a group of financiers in 1955. But as thousands of new chemical innovations entered the daily lives of Americans, pressure was also rising to find out what health risks many of them posed.

---

*from may 1984 DuPont corporate managers meeting minutes:*

***"None of the options developed are … economically attractive and would essentially put the long term viability of this business segment on the line."***

---

One of the first acts of the White House Council on Environmental Quality, after it was established in 1969, was to highlight the need for federal chemical controls – a system that would let regulators figure out which substances could pose public health risks before people got sick. "The Council's study indicates the high-priority need for a program of testing and control of toxic substances," it said as it released a 1971 report

calling for new chemical rules. "We should no longer be limited to repairing damage after it has been done; nor should we continue to allow the entire environment to be used as a laboratory."

For several years, the Manufacturing Chemists Association, an industry trade group that counted DuPont as a core member (known as the American Chemistry Council today), managed to block any attempt to regulate the industry. But as a growing list of chemicals like PCBs, asbestos, and vinyl chloride began to be linked to illness, so did the demand to regulate them. Foreseeing the inevitable, many chemical companies decided that it would be better to be involved in the drafting process than to risk the type of bans that barred the use of the notorious pesticide DDT in 1972.

*from:*
*DuPont internal document, 1995*

***"We are concerned about the potential long term human health effects of these materials considering they all appear to have long biological half lives."***

DuPont had a key seat at that drafting table.

Robert C. Eckhardt, a progressive Texas politician from a north Houston district packed with chemical and oil companies, is often described as the chief craftsman of the legislation that came out of this drafting process – the Toxic Substances Control Act (TSCA), which even today is the primary law regulating chemicals used in the US. First elected in 1966, Congressman Eckhardt was known for riding a bicycle to work at the Capitol – carrying his legislative files in a whisky case strapped to his bike – a habit that put him far ahead of the curve as an environmentalist and gained him support from early conservationists, especially after the 1970s' energy crisis. During his career in DC, which ended in 1980, the Democratic congressman championed civil rights, fought to tax oil and gas companies, and helped ensure that core environmental statutes like the Clean Air Act and Superfund laws passed.

TSCA, as it stands today, was the product of an unlikely collaboration between the iconoclastic Eckhardt and DuPont.

Early meetings between Eckhardt and DuPont had gone so badly that Eckhardt stormed out of the room during a March 1976 negotiation. But as a draft chemical control bill passed the Senate, DuPont reluctantly returned to the table. One of the biggest sticking points was whether safety tests should be required *before* companies were allowed to put new chemicals on the market – an effort that the industry successfully blocked. "No mandatory testing was a huge compromise," Rena Steinzor, University of Maryland School of Law professor and president of the Center for Progressive Reform, told the *Journal*.



*Photo by Maddie McGarvey.*

The Ohio River in Parkersburg, West Virginia that's been contaminated by C8-laden sludge.

The bill that "Bicycle Bob" Eckhardt ultimately produced was so packed with compromises that some of his early supporters opposed the law's final version. "I mean, it was [called] the *Heckert-Eckhardt* bill," Steven D. Jellinek, the EPA's first-ever

assistant administrator for toxic substances, told the Chemical Heritage Foundation's Oral History Project, referring to Richard Heckert, then a DuPont vice-president and the chair of the Manufacturing Chemists Association. "It was written by industry."

Eckhardt's good intentions might have been undermined by the fact that he was on the Senate Commerce Committee rather than the Environment and Public Works Committee. "The Senate Environment and Public Works Committee was composed of people who believed in the EPA's mission and knew a great deal about it," Steinzor says. "The Senate Commerce Committee, like its name, was focused on other concerns and not knowledgeable about toxic chemicals."

Under the toothless TSCA law that DuPont helped write, industrial chemicals – unlike pharmaceuticals or pesticides – do not have to be tested before they are put on the market. The law does require that the EPA keep a current list of all chemicals used commercially in the US, but it does not require that the chemicals be tested for environmental or human health impacts. Additionally, TSCA allows manufacturers to claim some information, including the chemical's identity, as a trade secret.

Though the law also requires manufacturers give the EPA some information necessary to assess a new chemical's safety, roughly 60,000 chemicals that were in use at the time TSCA was enacted were exempted from this rule. These chemicals include bisphenol A (BPA), formaldehyde and several flame retardants – all of which have since been found to present significant risks to human health and the environment. Today, there are more than 85,000 industrial chemicals in commercial use in the US – roughly 2,000 new chemicals are introduced every year in the US – but federal regulators have so far required only a tiny percentage of these to undergo any safety testing. You can literally count on one hand the number of chemicals that EPA has banned or widely restricted under TSCA: asbestos, PCBs, dioxin, CFCs, and hexavalent chromium (made famous in the movie *Erin Brockovich*). That's only five chemicals in nearly 40 years.

"In many ways, C8 is a poster child for the failures of US toxic chemical law," says Bill Walker, one of the authors of the Environmental Working Group (EWG) report on C8. "Between 3M and DuPont you have a increasingly damning cover-up. And yet the law is so toothless that neither company was really concerned about being caught by the EPA."

The lack of safety testing helps explain why, back in 1998 when the Tennants first contacted Bilott, virtually no one outside of DuPont and 3M – not EPA field inspectors, OSHA chemists, or state environmental testing laboratories – had ever heard of C8. The two companies essentially had a monopoly on information relating to this chemical. DuPont used that monopoly to illegally cover up its own research that showed that C8 was making its workers ill.

"But for the lawsuit, it is very likely that the EPA would be completely unaware of this chemical as well its toxicological profile," says Ned McWilliams, another plaintiff's attorney. "This lawsuit quite literally blew the whistle on this still unregulated chemical."

**C8 "is the poster child for the failures of US toxic chemical law."**

DuPont, unsurprisingly, plans to appeal the court's verdict. "The knowledge base around [C8], its environmental footprint, and its health profile has evolved," company spokesperson Dan Turner told the *Journal*. "Over the same period, the chemical industry and its regulators have also learned a great deal about how to operate more safely, sustainably and to reduce emissions." The company has, in the meantime, spun off its Teflon-related operations into another company, called Chemours, in a move that could limit the amount of compensation that plaintiffs can recover.

Over the past few years, DuPont, 3M, and other chemical firms have begun marketing C8-free Teflon, and recent studies show that the levels of C8 in most people's blood are dropping. Unfortunately, the new chemicals that have replaced C8 are also raising concerns. "These next generation PFCs [perfluorinated chemicals] are used in greaseproof food wrappers, waterproof clothing and other products," the EWG's "Poisoned Legacy" report says. "Few have been tested for safety, and the names, composition and health effects of most are hidden as trade secrets."

On a positive note, efforts to strengthen TSCA, which is the only major environmental law that has not been updated since it was first enacted, have gained steam in recent months. This fall, Congress was on the verge of passing TSCA reform measures. The House and the Senate introduced separate TSCA reform bills this year and while the House passed its bill (HR 2576) in June, and the Senate was yet vote on its bill (S 697) as this story went to press. Reforms proposed by these bills include speeding up the pace of the EPA's chemical assessments, changing how the agency prioritizes chemicals for safety review, and amending TSCA's definition of chemicals that may pose an "unreasonable risk" of harmful exposure.

Still, critics say these efforts fall short of what's needed and may be at risk of repeating the errors of the past.

"Neither bill provides the EPA with the resources to act quickly enough on reviewing and regulating the use of chemicals that can cause cancer and other serious health problems," Scott Faber, the Environmental Working Group's senior vice-president for government affairs told the *Journal*. "Neither clears away the legal hurdles that prevent the EPA from banning chemicals like asbestos, which we already know are dangerous." Faber is also concerned that the reforms might interfere with regulatory laws introduced by states and other local governments to make up for the lack of effective federal oversight of chemicals. (There are about 172 individual laws regulating chemicals in 35 US states, and another 100 or so similar bills have been under consideration in 28 states this year.)

In the end, it all comes down to the need for a strong political push that can override industry influence and introduce laws to regulate chemicals before they cause the kind of harm that C8 has wreaked. The history of C8, still unfolding, offers many lessons for those battles.

**Sharon Kelly**

***Sharon Kelly*** *is a Philadelphia-based lawyer and freelance writer. Her work has appeared in The New York Times, The Legal Intelligencer, and publications of the National Wildlife Federation.*


## You Make Our Work Possible

We don't have a paywall because, as a nonprofit publication, our mission is to inform, educate and inspire action to protect our living world. Which is why we rely on readers like you for support. If you believe in the work we do, please consider making a tax-deductible year-end donation to our Green Journalism Fund.

Donate

Share this article:

2 Comments Login ▾

Join the discussion…

LOG IN WITH

OR SIGN UP WITH DISQUS ?

Name

Share Best Newest Oldest




**Lovetorun**

7 years ago

Republicans and Fox News could care less. Why is that? What drives corruption and greed? What makes people support a lair and tax cheat like Trump? You can say stupidity but it's much deeper then that. Very sad situation.

0 0 Reply



**Matt**

8 years ago

"A Storyville documentary following a group of citizens in West Virginia who take on a corporation after they discover it has been dumping a toxic chemical into the water supply."
https://www.bbc.co.uk/progr...

0 0 Reply


Subscribe Privacy Do Not Sell My Data

Subscribe Now

Get four issues of the magazine at the discounted rate of $20.

Subscribe ›

**About the Journal**

- Who We Are
- Journal Editors
- Writers Guidelines
- Republication Guidelines

**Subscribe**

- Sign up for our newsletter
- Contact
- Donate

**Topics**

- Oil and Gas Pipelines
- Genetic Engineering
- Prisons and the Environment
- Food and Agriculture
- Plastic Pollution
- Deforestation
- Climate Change
- Biodiversity

**Our Work**

- Project Support Program
- Our Project Network
- Earth Island Journal
- New Leaders Initiative
- Earth Island Advocates

**Take Action**

- Signup for Islandwire
- Become a project
- Work with us
- More ways to give

**About us**

- Who we are
- David Brower Legacy
- Our People
- Our Resources

**Donate**

Contact Us

Privacy Policy

# EXHIBIT 7

# All News Releases By Date

## EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History

Release Date: 12/14/2005
Contact Information:

Contact: Dave Ryan, 202-564-4355 / ryan.dave@epa.gov

(Washington, D.C.-Dec. 14, 2005) DuPont will pay $10.25 million -- the largest civil administrative penalty EPA has ever obtained under any federal environmental statute -- to settle violations alleged by EPA over the company's failure to comply with federal law. Under the settlement, filed with the Agency's Environmental Appeals Board, Dupont is also committing to $6.25 million for Supplemental Environmental Projects (SEPs).

The settlement, which still must be approved by the EAB, would resolve DuPont's violations related to the synthetic chemical Perfluorooctanoic Acid (PFOA) under provisions of both the Toxic Substances Control Act (TSCA) and the Resource Conservation and Recovery Act (RCRA).

The settlement resolves the four violations alleged in the Agency's two complaints filed against DuPont in July and December 2004, and settles four additional counts involving information about PFOA that EPA obtained after initiating its action against DuPont. Seven of the eight counts involve violations of TSCA Section 8(e) -- the requirement that companies report to EPA substantial risk information about chemicals they manufacture, process or distribute in commerce.

"This is the largest civil administrative penalty EPA has ever obtained under any environmental statute. Not by a little, by a lot," said Granta Y. Nakayama, assistant administrator for the Office of Enforcement and Compliance Assurance. "EPA takes violations of toxic substances laws seriously and is committed to enforcing those laws. This settlement sends a strong message that companies are responsible for promptly informing EPA about risk information associated with their chemicals."

PFOA (also known as C8 or Ammonium Perfluorooctanoate [APFO]), is used in the manufacturing process of fluoropolymers, including some Teflon® products, at DuPont's Washington Works facility in Washington, W.Va. Fluoropolymers impart desirable properties, including fire resistance and oil, stain, grease, and water repellency. They are used to provide non-stick surfaces on cookware and waterproof, breathable membranes for clothing.

As part of this settlement, DuPont has voluntarily agreed to undertake two Supplemental Environmental Projects (SEPs) valued at $6.25 million. A SEP is an environmentally beneficial project that the violator agrees to undertake in exchange for mitigation of the penalty to be paid. SEPs are related to the environmental violation and further EPA's goal of protecting and enhancing public health and the environment.

The first SEP, valued at $5 million and to be completed in three years, is a project designed to investigate the potential of nine of DuPont's fluorotelomer-based products to breakdown to form PFOA. This SEP will help industry, scientists, the public and EPA examine the potential sources of PFOA in the environment and potential routes of human exposure to PFOA. The public will have an opportunity to nominate members to a Peer Consultation Panel, an independent group of scientists that will address specific charges identified in the SEP. DuPont has agreed to require the laboratories that it contracts with to perform work under the SEP to follow the agency's Good Laboratory Practices standards as well as prepare and follow a Quality Assurance Project Plan.

For the second SEP, DuPont will spend $1.25 million to implement over an expected three year period, the Microscale and Green Chemistry Project at schools in Wood County, West Virginia. This SEP will foster science laboratory curriculum changes to reduce risks posed by chemicals in schools. Using microscale chemistry, which reduces exposure to chemicals, and green chemistry, an approach that uses safer chemicals, the project will reduce risks to children's health and enhance science safety in all of the participating schools.

"We are pleased that as a direct result of this settlement with DuPont, valuable information will be produced for the scientific community to better understand the presence of PFOA in the environment and any potential risks it poses to the public," said Susan Hazen, EPA's principal deputy assistant administrator for the Office of Prevention, Pesticides, and Toxic Substances. "We are hopeful that today's action will serve as an important reminder of the importance of timely industry reporting of substantial risk information to EPA."

Search this collection of releases | or search all news releases

Get news releases by email

View selected historical press releases from 1970 to 1998 in the EPA History website.

### Recent additions

12/23/2014 EPA Announces Availability of $2.7 Million in Environmental Education Local Grants
12/23/2014 EPA, Coast Guard Extend Pollution Control Agreement with Royal Caribbean: New advanced technologies allow industry to comply with emission standards, reduce costs
12/23/2014 EPA to Hold Public Hearings in California, Texas and D.C. on Proposed Smog Standards
12/23/2014 Nominations for EPA New England's Annual Environmental Merit Awards- Deadline is January 30, 2015
12/22/2014 XTO Energy, Inc. to Restore Areas Damaged by Natural Gas Extraction Activities

The violations resolved in this settlement consist of multiple failures to report information to EPA about substantial risk of injury to human health or the environment that DuPont obtained about PFOA from as early as 1981 and as recently as 2004. The seven TSCA Section 8(e) counts fall within three types of categories: human health information, environmental contamination, and animal toxicity studies. More information on the violations is available at:
https://yosemite.epa.gov/opa/admpress.nsf/blab9f485b098972852562e7004dc686/826fe743d67d744685256f6200

The Consent Agreement and SEPs can be viewed at:
https://www.epa.gov/compliance/resources/cases/civil/tsca/dupont121405.html

The full record of EPA's case against DuPont is available to the public through EPA's Headquarters Hearing Clerk who is located in EPA's Office of Administrative Law Judges at 1099 14th St. N.W., Washington, D.C. and can be reached at 202-564-6263. Copies of the settlement are available to the public through the Board's Clerk who is located in the Colorado building, 1341 G St. N.W., Suite 600, Washington, D.C. 20005 and can be reached at 202-233-0122.

Additional information on PFOA is available at: https://www.epa.gov/opptintr/pfoa

Receive our News Releases Automatically by Email

# EXHIBIT 8

G-10

CC: D. R. Brandwell
H. P. Gilbert
K. A. Hall } In
R. R. Macy }
R. B. Rector } turn

June 9, 1954

3.61

TO: A. L. DOUGLAS
J. M. EVANS
C. D. McCUTCHEON
C. F. STEINBECK

An inquiry has been received as to the possible toxicity of C-8, ammonium perfluorocaprylate, dispersing agent. This has been checked with the Medical Department and the following information is supplied for your guidance and use.

1. C-8 is an organic fluorocarbon and as such should be handled with the same precautions used for any organic chemical compound; namely, avoid excessive exposure of the skin or respiratory system, wash thoroughly after any exposure or direct contact, and do not inhale the dust or fumes.

2. If the same precautions are followed with C-8 as are used for TFE granular powder no trouble should be experienced.

3. The exposure involved in preparing the normal amount for dispersion batch is not considered excessive and it is not necessary to wear a respirator while doing this work. However, a respirator should be worn whenever any excessive C-8 dust is present.

R. A. Dickison

R. A. DICKISON

RAD/rta

FILED

AJP003241

031-2009-0006082

# EXHIBIT 9

AMMONIUM PERFLUOROCAPRYLATE ($C_8$APFC)

MR-604 - H-5035 - P-62-173

## SUMMARY

Administration of ten successive doses of 6.7 mg/kg to six rats caused moderate enlargement of the liver and slight enlargement of the kidneys, adrenals and testes. Simultaneously there was slight depression of pancreatic weight and the lungs of the rats showed slightly enhanced pneumonitis.

G. W. H. Schepers, M.D.
Pathologist

GWHS/ah
2-9-62

HLAB003987

AMMONIUM PERFLUOROCAPRYLATE (C8APFC) (C-143)

Pathogenic Action Following Repeated Oral Administration

Male CRCD Rats

MR-604 - H-3135 - P-62-173

The chemical was administered by intragastric intubation as an aqueous solution. Each of 6 rats received 10 daily doses of 6.7 mg/kg over a period of 12 days. Three rats were killed 4 hours after receiving the 10th dose, and the remainder were killed 14 days later. Six undosed rats served as controls. The incidence and severity of lesions are supplied in Table 1 and organ weights are presented in Tables 2 and 3.

As could be predicted from the experiment with single doses (Report 62-172) the most prominent effect of the chemical again was enlargement of the liver, which, at the end of the dosage regimen, was about 45% heavier than the average liver weight of the control rats. This change persisted after cessation of dosage, but the weight discrepancy was somewhat less since 14 days later the livers were only 20% heavier than those of control rats. The increase in liver size was accompanied by slight discoloration in one rat in the group killed after the 10th dose and in one rat in the group killed 14 days later.

The renal weights were 20% heavier than those of the corresponding control rats, and this increase persisted after cessation of dosage, being 22% above that of the control rats 14 days later. These weight changes were not accompanied by morphological changes.

The pancreatic weights were slightly depressed, being 8% and 12% lower than those of controls at the end of the test and recovery phases, respectively. The adrenals and testes were slightly increased

HLAB003988

P-62-173

- 2 -

in weight after the last dose, +14% and +11%, respectively, but returned to normality 14 days later.

Comment

It is not clear why a dose of 6.7 mg/kg was selected for this repeated dosage experiment since decisive liver injury was demonstrable for mature rats after a single dose of 1.5 mg/kg . However, the experiment served the purpose of showing that cumulative liver, kidney and pancreatic changes can be induced in young rats by relatively low doses of C8APFC.

It may be worthwhile to extend the test to include rats killed at 30, 60, and 90 days after dosage, to determine the remote consequences of the various organ changes.

Carl Johnson, D.V.M.

G. W. H. Schepers, M.D.
Pathologist

CJ:mfs
2-7-62

TABLE 1

GROSS PATHOLOGY SUMMARY

Haskell No: 3035 Material: Ammonium Perfluorocaprylate Excipient: Water

MR No: 604 Test: Oral Repeated Dosage Species: Male CRCD Rats Procedure: Gastric Intubation

Report No: P-62-173 Experiment Period: 11-26-61 - 12-22-61 T.I. B.G. Prosectors: B.I., C.J., T.S., A.S., D.W.

| Group | Dose mg/kg x 10 | Animal No. | Survival Days Test | Survival Days After | Cause of Death | 1 | 2 | 3 | 4 | 5 | | [illegible]ology Possible |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 49988 | 12 | | K | - | ++ | - | +++ | ++ | Hydronephrosis, right ++ | Possible |
| | 0 | 50006 | 12 | | K | - | +++ | - | ++ | ++ | - | " |
| | 0 | 50009 | 12 | | K | - | ++ | ++ | + | ++ | - | " |
| | 6.7 | 49952 | 12 | | K | + | ++ | + | ++ | - | - | " |
| | 6.7 | 49954 | 12 | | K | - | ++ | + | ++ | - | - | " |
| | 6.7 | 50011 | 12 | | K | - | + | ++ | - | + | - | " |
| | 0 | 49964 | 12 | 14 | K | - | ++ | ++ | - | - | - | " |
| | 0 | 49989 | 12 | 14 | K | - | ++ | - | - | - | Hydronephrosis, bilateral ++ | " |
| | 0 | 50002 | 12 | 14 | K | - | + | + | - | - | - | " |
| | 6.7 | 49955 | 12 | 14 | K | - | - | - | - | - | Hydronephrosis, right +++ | " |
| | 6.7 | 49968 | 12 | 14 | K | + | ++ | - | - | - | - | " |
| | 6.7 | 49987 | 12 | 14 | K | - | ++ | ++ | - | - | - | " |

Comment:
1. Liver pale or brownish
2. Lungs irregular congestion
3. Lungs focal detelectasia
4. Lungs subpleural plaques
5. Lungs mediastinal lymph nodes enlarged

\+ = Slight reaction
++ = Moderate reaction
+++ = Marked reaction

Prepared by: Carl Johnson
Carl Johnson, D.V.M.

Approved by: [signature]
G. W. H. Schepers, M.D.
Pathologist
2-7-62

TABLE 2

ORGAN WEIGHTS

Haskell No: -- Material: Controls for H-3035 & 3036 Excipient:

MR No: 604 Species: Male CRCD Rats Test: (Control) - Subacute Procedure:

Report No: P-62-17 Experiment Period: T.I. B.G. Prosectors: B.L., D.W., A.S., C.J., T.S.

| ~~XXXXXX~~ No Exposure | Animal No. | Survival Days | Body Weight Init. | Body Weight Final | Age Days | Brain | Heart | Lungs | Liver | Pancreas | Stomach | Spleen | Kidneys | Testes | Adrenals | Thymus | Liver Body Wt. Ratio |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Test Phase | 49988 | 12 | 253 | 332 | | 1.91 | 1.18 | 1.55 | 14.72 | 0.6? | 1.70 | 0.65 | ?.60 | 2.75 | .048 | 0.75 | 4.43 |
| | 50006 | 12 | 254 | 316 | | 1.90 | 1.00 | 1.72 | 13.50 | 0.38 | 1.35 | 0.58 | 2.72 | 2.90 | .039 | 0.85 | 4.27 |
| | 50009 | 12 | 245 | 305 | | 1.80 | 1.22 | 1.38 | 12.20 | 0.50 | 1.58 | 0.70 | 2.48 | 2.80 | .051 | 0.64 | 4.00 |
| | Average | 12 | 251 | 318 | | 1.87 | 1.13 | 1.55 | 13.47 | 0.50 | 1.54 | 0.64 | 2.60 | 2.82 | .046 | 0.75 | 4.23 |
| Recovery Phase | 49964 | 26 | 249 | 370 | | 1.91 | 1.35 | 1.50 | 16.10 | 0.82 | 1.80 | 0.54 | 2.85 | 2.88 | .054 | 0.42 | 4.35 |
| | 49989 | 26 | 256 | 360 | | 1.99 | 1.30 | 1.83 | 14.95 | 0.79 | 1.65 | 0.75 | 2.81 | 3.30 | .052 | 0.70 | 4.15 |
| | 50002? | 26 | 250 | 385 | | 2.09 | 1.14 | 1.75 | 18.63 | 0.79 | 1.65 | 0.63 | 3.29 | 3.13 | .052 | 0.60 | 4.81 |
| | Average | 26 | 252 | 372 | | 2.00 | 1.26 | 1.69 | 1 .56 | 0.80 | 1.70 | 0.64 | 2.98 | 3.10 | .053 | 0.60 | 4.45 |

Comments:

Prepared by: August H. Stenholm

Approved by: G. W. H. Schepers, M.D.
Pathologist
2-7-62

HLAB003991

194-2009-0002690

TABLE 3

ORGAN WEIGHTS

Haskell No: 3035 Material: Ammonium Perfluorocaprylate Excipient:

MR No: 604 Species: Male CRCD Rats Test: Oral - Subacute Procedure:

Report No: R-62-173 Experiment Period: T.I. B.G. Prosectors: C.J. D.W. A.S. T.S. B.L.

| Dose Group 6.7 mg/kg x 10 | Animal No. | Sur-vival Days | Body Weight Init. | Body Weight Final | Age Days | Brain | Heart | Lungs | Liver | Pancreas | Stomach | Spleen | Kidneys | Testes | Adrenals | Thymus | Liver |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Test Phase | 49952 | 12 | 255 | 312 | | 1.80 | 0.98 | 1.72 | 19.91 | - | 1.54 | 0.50 | 2.85 | 3.00 | .054 | 0.61 | 6 |
| | 49954 | 12 | 250 | 303 | | 1.85 | 1.02 | 1.51 | 18.00 | 0.45 | - | 0.50 | 2.70 | 3.15 | .048 | 0.54 | 5 |
| | 50011 | 12 | 248 | 305 | | 1.89 | 1.08 | 1.42 | 18.25 | 0.42 | 1.51 | 0.72 | 3.51 | 2.91 | .044 | 0.72 | 5 |
| | Average | 12 | 251 | 307 | | 1.85 | 1.03 | 1.55 | 18.72 | 0.44 | 1.53 | 0.57 | 3.02 | 3.02 | .049 | 0.62 | 6 |
| Recovery Phase | 49955 | 26 | 255 | 364 | | 1.89 | 1.15 | 1.58 | 21.60 | 0.73 | 1.67 | 0.72 | 3.60 | 2.28 | .049 | 0.61 | 5 |
| | 49968 | 26 | 252 | 402 | | 2.03 | 1.51 | 1.80 | 20.80 | 0.81 | 1.91 | 0.68 | 3.94 | 3.23 | .062 | 0.70 | 5 |
| | 49987 | 26 | 245 | 377 | | 1.91 | 1.34 | 2.11 | 18.84 | 0.63 | 1.79 | 0.53 | 3.61 | 3.49 | .056 | 0.50 | 5 |
| | Average | 26 | 251 | 381 | | 1.94 | 1.33 | 1.83 | 20.41 | 0.72 | 1.79 | 0.64 | 3.72 | 3.00 | .056 | 0.60 | [illegible] |

Comments:

Prepared by: August H. Stenholm

Approved by: [signature]
G. W. H. Schepers, M.D.
Pathologist
2-7-62

HLAB003992