# EXHIBIT 43

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

**FORM 10-K**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2024**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number 001-36794**

Chemours™

## The Chemours Company
(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **Delaware** | **46-4845564** |
| (State or other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**1007 Market Street, Wilmington, Delaware 19801**
(Address of Principal Executive Offices)

Registrant's Telephone Number: **(302) 773-1000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Exchange on Which Registered |
|---|---|---|
| Common Stock ($0.01 par value) | CC | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ |
| Smaller reporting company ☐ | Emerging growth company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☒

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of common stock held by non-affiliates of the registrant as of June 28, 2024, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $3.4 billion. As of February 12, 2025, 149,440,788 shares of the company's common stock, $0.01 par value, were outstanding.

**Documents Incorporated by Reference**

Portions of the registrant's definitive proxy statement relating to its 2025 annual meeting of shareholders (the "2025 Proxy Statement") are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated. The 2025 Proxy Statement will be filed with the U. S. Securities and Exchange Commission within 120 days after the end of the fiscal year to which this report relates.

**The Chemours Company**

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| Part I | | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 17 |
| Item 1B. | Unresolved Staff Comments | 37 |
| Item 1C. | Cybersecurity | 37 |
| Item 2. | Properties | 38 |
| Item 3. | Legal Proceedings | 39 |
| Item 4. | Mine Safety Disclosures | 39 |
| | Information About Our Executive Officers | 40 |
| Part II | | |
| Item 5. | Market for Registrant’s Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 42 |
| Item 6. | Reserved | 43 |
| Item 7. | Management’s Discussion and Analysis of Financial Condition and Results of Operations | 44 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 74 |
| Item 8. | Financial Statements and Supplementary Data | 75 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 75 |
| Item 9A. | Controls and Procedures | 76 |
| Item 9B. | Other Information | 79 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 79 |
| Part III | | |
| Item 10. | Directors, Executive Officers, and Corporate Governance | 80 |
| Item 11. | Executive Compensation | 80 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 80 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 80 |
| Item 14. | Principal Accounting Fees and Services | 80 |
| Part IV | | |
| Item 15. | Exhibits and Financial Statement Schedules | 81 |
| Item 16. | Form 10-K Summary | 81 |
| Signatures | | 85 |

## Forward-looking Statements

This section and other parts of this Annual Report on Form 10-K contain forward-looking statements, within the meaning of the federal securities laws, that involve risks and uncertainties. Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to any historical or current fact. The words "believe", "expect", "anticipate", "plan", "estimate", "target", "project", and similar expressions, among others, generally identify "forward-looking statements", which speak only as of the date the statements were made. The matters discussed in these forward-looking statements are subject to risks, uncertainties, and other factors that could cause actual results to differ materially from those set forth in the forward-looking statements. Factors that could cause or contribute to these differences include, but are not limited to, the risks, uncertainties, and other factors discussed below and within *Item 1A – Risk Factors* in this Annual Report on Form 10-K.

Forward-looking statements are based on certain assumptions and expectations of future events that may not be accurate or realized. Forward-looking statements also involve risks and uncertainties, many of which are beyond our control. Important factors that may materially affect such forward-looking statements and projections include:

- fluctuations in energy and raw materials pricing;
- failure to develop and market new products and applications, and optimally manage product life cycles;
- increased competition, and increasing consolidation of our core customers;
- significant litigation and environmental matters, including indemnifications we were required to assume and cost-sharing arrangements into which we have entered;
- significant or unanticipated expenses, including, but not limited to, litigation or legal settlement expenses;
- our ability to manage and complete capital projects and/or planned expansions, including the start-up of capital projects;
- changes in relationships with our significant customers and suppliers;
- failure to manage process safety and product stewardship issues appropriately;
- global economic and capital markets conditions, such as inflation, interest and currency exchange rates, and commodity prices, as well as regulatory requirements;
- the effects of pandemics on customer demand for our products, our manufacturing operations, our supply chain effectiveness and efficiencies, the broader financial markets, and our financial results;
- currency-related risks;
- our current indebtedness and availability of borrowing facilities, including access to our revolving credit facilities;
- business or supply disruptions and security threats, such as acts of sabotage, terrorism or war, weather events, natural disasters, and cybersecurity incidents;
- uncertainty regarding the availability of additional financing in the future, and the terms of such financing;
- negative rating agency actions;
- changes in laws and regulations or political conditions;
- our ability to protect, defend, and enforce our intellectual property rights;
- our ability to predict, identify, and address changes in consumer preference and demand;
- our ability to complete potential divestitures or acquisitions and our ability to realize the expected benefits of divestitures or acquisitions if they are completed;
- our ability to meet our growth expectations and outlook;
- our ability to deliver cost savings as anticipated, whether or not on the timelines proposed;
- our ability to pay a dividend and the amount of any such dividend declared,
- disruptions in our information technology networks and systems;
- our ability to maintain effective internal control over financial reporting and disclosure controls and procedures; and
- regulatory inquiries, litigation, or liabilities that may result from the matters included in the Audit Committee Internal Review.

This report contains sustainability-related statements based on certain assumptions as well as estimates that are subject to a high level of uncertainty, and these statements should not necessarily be viewed as being representative of current or actual risk or performance, or forecasts of expected risk or performance. In addition, historical, current, and forward-looking environmental and social-related statements may be based on standards for measuring progress that are still developing, and internal controls and processes that continue to evolve. Forward-looking and other statements in this report may also address our corporate responsibility commitments and sustainability progress, plans, and goals, and the inclusion of such statements is not an indication that these matters are necessarily material for the purposes of complying with or reporting pursuant to the U.S. federal securities laws and regulations, even if we use the word “material” or “materiality” in this report.

Additionally, there may be other risks and uncertainties that we are unable to identify at this time or that we do not currently expect to have a material impact on our business. We assume no obligation to revise or update any forward-looking statement for any reason, except as required by law.

Unless the context otherwise requires, references herein to “The Chemours Company”, “Chemours”, “the Company”, “our company”, “we”, “us”, and “our” refer to The Chemours Company and its consolidated subsidiaries. References herein to “EID” refer to EIDP, Inc., formerly known as E.I. du Pont de Nemours and Company, which is our former parent company and is now a subsidiary of Corteva, Inc. (“Corteva”), a Delaware corporation, unless the context otherwise requires. References herein to “DuPont” refer to DuPont de Nemours, Inc., a Delaware Corporation.

The Chemours Company

PART I

## Item 1. BUSINESS

### Overview

The Chemours Company (herein referred to as “we”, “us”, or “our”) is a leading, global provider of performance chemicals that are key inputs in end-products and processes in a variety of industries. We deliver customized solutions with a wide range of industrial and specialty chemical products for markets, including refrigeration and air conditioning, paints and coatings, plastics, transportation, semiconductor and consumer electronics, general industrial, and oil and gas. Our principal products include refrigerants, titanium dioxide (“$TiO_2$”) pigment and industrial fluoropolymer resins. We manage and report our operating results through three principal reportable segments: Thermal & Specialized Solutions, Titanium Technologies, and Advanced Performance Materials. Our Thermal & Specialized Solutions segment is a leading, global provider of refrigerants, thermal management solutions, propellants, blowing agents, and specialty solvents. Our Titanium Technologies segment is a leading, global provider of $TiO_2$ pigment, a premium white pigment used to deliver whiteness, brightness, opacity, and protection in a variety of applications. Our Advanced Performance Materials segment is a leading, global provider of high-end polymers and advanced materials that deliver unique attributes, including low friction coefficients, extreme temperature resistance, weather resistance, ultraviolet and chemical resistance, and electrical insulation.

We operate 28 major production facilities located in eight countries and serve approximately 2,500 customers across a wide range of end-markets in approximately 110 countries. Many of our commercial and industrial relationships span decades. Our customer base includes a diverse set of companies, many of which are leaders in their respective industries. Our sales are not materially dependent on any single customer. As of December 31, 2024, no one individual customer represented more than 10% of our consolidated net sales, and one individual customer balance represented approximately 7% of our total outstanding accounts and notes receivables balance.

We are a different kind of chemistry company. Our world-class product portfolio enables the performance and convenience of everyday products, processes, and technologies people rely on in their daily lives, making our products and the solutions they enable both vital and essential. We are committed to creating value for our customers and stakeholders by leveraging strengths that we use to create competitive advantage: our innovation and technical expertise, our ability to operate complex manufacturing sites safely, our deep customer relationships based on trust and reliability, and our talented workforce. Every day our people bring our chemistry to life, guided by five core values that form the bedrock foundation for how we operate: (i) **Safety** – we are committed to protecting people and the environment; (ii) **Integrity** – we do what's right; (iii) **Partnership** – we win through collaboration with the right internal and external partners; (iv) **Ownership** – we are each accountable for the Company's success; (v) **Respect** – we treat people well, include others, and value diverse perspectives.

Our core values, in unison with our company vision of Trusted Chemistry, helping people live better lives and communities thrive, underpin our commitment to our stakeholders. Our values and vision cannot be separated from our business strategy.

*Our Strategy*

In 2024 we refreshed and introduced our corporate strategy, Pathway to Thrive. The strategy capitalizes on the fundamental strengths of our businesses, our incredible talent, and the competitive differentiators that make us the best owners and operators of Chemours. Pathway to Thrive provides a clear framework to create value for shareholders centered around four pillars:

- Operational Excellence - we run our business with a mindset of continuous improvement that allows us to adapt to changing market dynamics and challenges. Through standardization of key processes and operating best practices, we achieve consistent execution across our business and take unnecessary costs out.
- Enabling Growth - we strategically invest in high-return, low risk initiatives across our portfolio, prioritizing our expansion into rapidly growing end-markets, and concentrating on data center cooling, next generation refrigerant and semiconductor fabrication. We invest our capital using a disciplined capital allocation program and we expect these investment activities to be funded by organic cash flow generation and achieved cost-savings across all of our businesses.
- Portfolio Management - we are always assessing our performance to ensure we are strategically optimizing our existing businesses and assets. Our continued shift in focus from products to applications in higher-growth, higher-margin markets, paired with regularly revisiting the returns of our asset base with an emphasis on the specialty components of our business, will enhance shareholder value. In addition, we seek to evaluate the productivity and contributions of our existing asset footprint to ensure we have the optimal asset base for our future needs.
- Strengthening the Long Term - fortifying ourselves for the long-term means prioritizing key activities that are critical to our ability to deliver business performance and create value. The most critical areas are resolving legacy litigation matters, fulfilling our commitment to responsible manufacturing, and mounting successful advocacy efforts that create awareness and inform regulations and policies globally that recognize the criticality of our chemistries.

*Sustainability*

At Chemours, our approach to Sustainability begins with our vision to deliver Trusted Chemistry that helps people live better lives and communities to thrive. In 2018, we set forth ambitious Corporate Responsibility Commitment ("CRC") goals that we aim to achieve by 2030. These goals are designed to promote accountability and enable us to measure and transparently report the progress and impact of our sustainability commitment. Leveraging a robust governance framework, we are working to integrate sustainability across our organization and our business management processes. Our work in sustainability creates value for our shareholders by protecting our right to operate, meeting the needs of our customers, and advancing our corporate strategy, Pathway to Thrive. We understand that maintaining safe, sustainable operations has an impact on us, our communities, the environment, and our collective future. We deliver for our customers and society by designing sustainable offerings that perform at the highest level while minimizing impact on the environment. We are a leader in responsible manufacturing and we value partnership and collaboration to drive change. We are committed to continue working with policymakers, our value chain, and other organizations to find solutions that meet science-based regulations and address community needs.

## Corporate History

We began operating as an independent company on July 1, 2015 (the “Separation Date”) after separating from EID (the “Separation”). The Separation was completed pursuant to a separation agreement and other agreements with EID, including an employee matters agreement, a tax matters agreement, a transition services agreement, and an intellectual property cross-license agreement. These agreements, along with the Memorandum of Understanding (the “MOU”) that was entered into in January 2021, govern the relationship between us and EID following the Separation and provided for the allocation of various assets, liabilities, rights, and obligations at the Separation Date. On August 31, 2017, EID completed a merger with The Dow Chemical Company (“Dow”). Following their merger, EID and Dow engaged in a series of reorganization steps and, in 2019, separated into three publicly-traded companies named Dow Inc., DuPont, and Corteva. EID is now a subsidiary of Corteva, and, at this time, any agreements related to our Separation are between us and EID, Corteva, and DuPont. Effective January 1, 2023, E.I. du Pont de Nemours changed its name to EIDP, Inc.

## Segments

In our Thermal & Specialized Solutions segment, we are a leading, global provider of refrigerants, thermal management solutions, propellants, foam blowing agents, and specialty solvents. Our Thermal & Specialized Solutions segment has held a leading position in the refrigerants market since the commercial introduction of Freon$^{TM}$ in 1930. We are currently a leader in the development of sustainable technologies like Opteon$^{TM}$, one of the world’s lowest global warming potential (“GWP”) refrigerant brands, as governments around the world pass laws and regulations that make the use of low GWP refrigerants a requirement.

In our Titanium Technologies segment, we are a leading, global provider of $TiO_2$ pigment. Guided by decades of innovation, we are one of the largest global producers of $TiO_2$ pigment, using our proprietary chloride technology, and our network of manufacturing facilities allows us to efficiently and cost-effectively serve our global customer base. We believe our Titanium Technologies Transformation Plan (further described below), which supports our Pathway to Thrive corporate strategy, positions us as one of the lowest-cost high-quality $TiO_2$ pigment producers. At the same time, our unique go-to-market strategy provides our customers with three differentiated channels to buy Ti-Pure™ $TiO_2$. This combination of technology and commercial innovation allows us to continue to meet our customers’ needs around the world.

In our Advanced Performance Materials segment, we are a leading, global provider of high-end polymers and advanced materials that deliver unique attributes, including chemical inertness, thermal stability, low friction, weather and corrosion resistance, extreme temperature stability, and unique di-electric properties. Our Advanced Performance Materials segment has a diversified offering of products that includes various specialty product solutions, membranes, industrial resins, and coatings across our Teflon$^{TM}$, Viton$^{TM}$, Krytox$^{TM}$, and Nafion$^{TM}$ brand portfolios. These product offerings position the business to serve a breadth of markets, segments, and applications, including electronics, communications, transportation, wire and cable, energy, oil and gas, and medical, among others, and our product offerings are fundamental to the future of clean energy and advanced electronics.

Each of our three business segments leverage our state-of-the-art R&D facility, the Chemours Discovery Hub, a 312,000-square-foot R&D center located on the Science, Technology, and Advanced Research campus of the University of Delaware in Newark, Delaware to drive faster product development on a global scale.

Additional information on our segments can be found in *Item 7 – Management’s Discussion and Analysis of Financial Condition and Results of Operations* and “Note 29 – Geographic and Segment Information” to the *Consolidated Financial Statements*.

***Thermal & Specialized Solutions Segment***

*Segment Overview*

Our Thermal & Specialized Solutions segment is a leading, global provider of refrigerants, thermal management solutions, propellants, foam blowing agents, and specialty solvents. We have an industry-leading safety culture and apply world-class R&D and technical expertise to ensure that our operations run safely and reliably, and to improve our process technology.

Our Thermal & Specialized Solutions segment has held a leading position in the fluorochemicals market since the commercial introduction of Freon™ in 1930. Since the original chlorofluorocarbons (“CFC”)-based product was introduced, Thermal & Specialized Solutions has been at the forefront of new technology research for lower GWP and lesser ozone-depleting potential products, leading to the development of hydrochlorofluorocarbons (“HCFC”) and hydrofluorocarbons (“HFC”). We have a leading position in HFC refrigerants under the brand name Freon™, and we are a leader in the development of more sustainable technologies like Opteon™, a line of low GWP hydrofluoroolefin (“HFO”) refrigerants and specialty fluids, which also have a near-zero ozone-depletion footprint. Opteon™ was initially developed in response to the European Union’s (“EU”) Mobile Air Conditioning Directive. Today, our Opteon™-branded portfolio of products is used in a broad range of applications, including automotive, air conditioning, commercial refrigeration, and foam blowing agents. This patented technology offers similar functionality to current HFC products, and meets or betters currently mandated environmental standards and, in some cases, provides energy efficiency benefits.

Our Thermal & Specialized Solutions segment led the industry in the Montreal Protocol-driven transition in 1987 from CFCs to the lesser ozone-depleting HCFCs and non-ozone-depleting HFCs and, in 1988, committed to cease production of CFCs. Starting in the early 1990s, Thermal & Specialized Solutions began manufacturing non-ozone-depleting HFCs. Driven by the emerging megatrends of climate change, decarbonization, and energy efficiency, together with environmental legislation being enacted across the U.S., Europe, Latin America, and Japan, we commercialized Opteon™ in 2016. In 2023, we announced the initial commercialization of Opteon™ 2P50 which is targeted for the first half of 2026, pending appropriate regulatory approvals. Opteon™ 2P50 represents a critical step in positioning the Company to meet a growing challenge brought on by a new era of data transmission driving a dramatic increase in demands for faster computing, AI capabilities, and other cutting-edge applications, all of which are based in technologies requiring elevated cooling capacities. We will continue to invest in R&D in next generation refrigerants to drive long-term sustainable growth with low GWP solutions to meet the increasing regulatory requirements of the industry and the needs of our customers. Growth in our Thermal & Specialized Solutions segment is supported in part by the adoption of the American Innovation and Manufacturing Act ("AIM Act") in the US and the EU’s Fluorinated-Gas ("F-Gas") Directive. In 2022, we announced our plan to expand our Opteon™ YF capacity at our Corpus Christi, Texas facility by approximately 40% to help meet customer needs as they continue to transition to lower GWP refrigerants. Mechanical completion of this expansion plan was completed in the fourth quarter of 2024.

*Industry Overview and Competitors*

Our Thermal & Specialized Solutions segment competes against a broad variety of global manufacturers, as well as regional manufacturers in Asia Pacific. We have a leadership position in fluorine chemistry and materials science, a broad scope and scale of operations, market-driven applications development capabilities, and deep customer knowledge. Key competitors for the Thermal & Specialized Solutions segment include Honeywell International, Inc., Arkema S.A., Orbia, and Daikin Industries, Ltd, and, to a certain extent, other industrial gas producers.

Thermal & Specialized Solutions' historical demand growth has maintained alignment with broader economic trends. However, periods of intensified demand, linked to regulatory-driven transitions from HFCs to HFOs, as recently witnessed in the EU and US, have propelled an expansion rate within our segment surpassing GDP growth. Developed markets serve as the predominant consumers of fluorochemicals, with global middle-class growth and rising demands for automobiles, refrigeration, and air conditioning acting as pivotal drivers for increased demand across various fluorochemical applications.

*Raw Materials*

The primary raw materials required to support the Thermal & Specialized Solutions segment are fluorspar, sulfur, ethylene, chlorinated organics, chlorine, and hydrogen fluoride. These are available in many countries and are not concentrated in any particular region. We pursue maximum competitiveness in our global supply chains through competitive, flexible, and diversified sourcing of key raw materials. Our contracts typically include terms that span from two to ten years. Qualified fluorspar sources have fixed contract prices or freely-negotiated, market-based pricing. We diversify our sourcing through multiple geographic regions and suppliers to ensure a diversified and cost competitive supply.

*Sales, Marketing, and Distribution*

With approximately 90 years of innovation and development in fluorine science, our technical, marketing, and sales teams around the world have deep expertise in our products and their end-uses. We work with customers to select the appropriate solutions to meet their technical performance needs. We sell our products through direct channels and through resellers. Sales agreements vary by product line and markets served and include both spot-pricing arrangements and multi-year contracts with varying durations.

Our Thermal & Specialized Solutions segment maintains a large fleet of railcars, tank trucks, and containers to deliver our products and support our supply chain needs. For the portion of the fleet that is leased, the related lease terms are usually staggered, which provides us with a competitive cost position, as well as the ability to adjust the size of our fleet in response to changes in market conditions. A dedicated logistics team, along with external partners, works to optimize the assignment of our transportation equipment for each product line and geographic region to maximize utilization and flexibility of the supply chain.

*Customers*

Our Thermal & Specialized Solutions segment serves approximately 900 customers and distributors globally, and, in many instances, these commercial relationships have been in place for decades. No single Thermal & Specialized Solutions customer represented more than 10% of the segment's net sales in 2024.

*Seasonality*

Thermal & Specialized Solutions' refrigerant sales fluctuate by season, as sales in the first half of the year are generally higher than sales in the second half of the year due to increased demand in the northern hemisphere for residential, commercial, and automotive air conditioning in the spring, which peaks in the summer months, and then declines in the fall and winter. Mobile air conditioning demand is slightly higher in the first half of the year due to the timing of automotive production shutdowns in the second half of the year.

***Titanium Technologies Segment***

*Segment Overview*

Our Titanium Technologies segment is a leading, global manufacturer of high-quality $TiO_2$ pigment. This premium white pigment is used to deliver whiteness, brightness, opacity, durability, efficiency, and protection in applications, including architectural and industrial coatings, flexible and rigid plastic packaging, polyvinylchloride ("PVC"), laminate papers used for furniture and building materials, coated paper, and coated paperboard used for packaging. We sell our $TiO_2$ pigment under the Ti-Pure™ brand name. We operate three $TiO_2$ pigment production facilities: two in the U.S. and one in Mexico. In total, we have a $TiO_2$ pigment nameplate capacity of approximately 1.1 million metric tons per year. In addition, our network includes a large-scale repackaging and distribution facility in Belgium. We also operate mineral sands mining and/or separation operations in Starke, Florida, Nahunta, Georgia, Jesup, Georgia and Offerman, Georgia.

We are one of a limited number of manufacturers operating a chloride process to produce $TiO_2$ pigment. We believe that our proprietary chloride technology enables us to design and operate plants at a much higher capacity than other chloride technology-based $TiO_2$ pigment producers, uniquely utilize a broad spectrum of titanium-bearing ore feedstocks, and deliver industry-leading batch-to-batch consistency. We believe this technology, which is in use at all of our production facilities, provides us with the asset structure to deliver one of the industry's lowest manufacturing cost positions. Our R&D efforts focus on improving production processes to further improve our cost position, developing $TiO_2$ pigment grades that help our customers achieve optimal cost and product performance to enhance total end-user value and meeting our sustainability goals.

We sell over 20 different grades of $TiO_2$ pigment, with each grade tailored for targeted applications. Our full portfolio of premium performance $TiO_2$ pigment grades provide end-users with benefits beyond opacity, such as brighter colors, increased product durability and lifespan, improved efficiency for direct and downstream customers, and the brilliant whites achievable only through chloride-manufactured pigment.

We have operated a titanium mine in Starke, Florida since 1949. Additionally, in 2019, we acquired a titanium mine in Nahunta, Georgia, from which we source ore feedstock to be processed at its associated mineral sands separation facility in Offerman, Georgia, and in August 2020 we commenced mining operations at our surface mine in Jesup, Georgia to expand the flexibility and scalability of our internally sourced ore. Our mines provide us with high-quality domestic ilmenite ore feedstock and currently supply less than 15% of our ore feedstock needs, with expansion options that could further increase our in-sourced raw material base. Co-products of our mining operations, which comprised less than 5% of our total net sales in Titanium Technologies during 2024, include zircon (zirconium silicate), staurolite minerals, and monazite. We are a major supplier of high-quality calcined zircon in North America, primarily focused on the precision investment casting industry, foundry, specialty applications, and ceramics. Our staurolite blasting abrasives are used in a variety of surface preparation applications, including steel preparation and maintenance and paint removal. We are currently the only domestic producer of monazite, a key feed source of rare earth minerals. Our monazite is processed in the U.S., and the rare earth oxides extracted from the monazite are used in clean energy applications, such as permanent magnets for wind generation and electric vehicle batteries.

*Titanium Technologies Transformation Plan*

In the third quarter of 2023, in line with our strategic priorities for creating long-term shareholder value and building on the legacy of delivering high-quality Ti-Pure™ offerings, the Titanium Technologies segment commenced certain transformation initiatives to streamline our workforce, drive enhancements to our manufacturing processes, and optimize input costs under the Titanium Technologies Transformation Plan, which supports our Pathway to Thrive corporate strategy, and positions us as one of the lowest-cost high-quality $TiO_2$ pigment producers. As part of these efforts, in July 2023, we announced our decision to shut down our $TiO_2$ manufacturing facility in Kuan Yin, Taiwan. We fully completed the shut down in the fourth quarter of 2023 and completed decommissioning activities in the second quarter of 2024. Dismantling and removal activities are expected to be completed in the first quarter of 2025. We made total cash payments of $48 million and $25 million associated with the Titanium Technologies Transformation Plan during the years ended December 31, 2024 and 2023, respectively, inclusive of severance payments, decommissioning, and other third-party fees. As a result of efforts taken under the Titanium Technologies Transformation Plan, we achieved approximately $190 million in cost savings, of which $140 million and $50 million related to 2024 and 2023, respectively. We believe that our ongoing manufacturing optimization efforts, streamlined workforce initiatives, and additional measures, including our recently announced chlorine supply agreement with the PCC Group (described further below), will position us as one of the world's lowest-cost $TiO_2$ providers and ultimately improve the earnings quality of our Titanium Technologies segment.

*Industry Overview and Competitors*

Overall demand for $TiO_2$ pigment is highly correlated to growth in the global residential housing, commercial construction, and packaging markets. We continue to experience customers' preference for high-quality Ti-Pure™ offerings. After above-GDP trend $TiO_2$ demand growth in 2016 and 2017, the $TiO_2$ pigment market contracted below the GDP trend in 2018 and 2019. In 2020, the $TiO_2$ pigment market expanded, while global GDP contracted during the novel coronavirus disease ("COVID-19") pandemic. In 2021, the $TiO_2$ pigment market again grew at greater-than-global GDP growth rates. We saw robust demand in the first half of 2022, followed by a rapid market decline in the second half of 2022 as pigment demand declined below the long-term GDP trend. This low demand environment continued through 2023 and 2024 as global economic uncertainties persisted. In the longer-term, we expect global $TiO_2$ pigment demand to continue its historical correlation with global GDP growth rates.

We estimate that the worldwide demand for $TiO_2$ pigment in 2024 was approximately 7.3 million metric tons. Worldwide nameplate capacity in 2024 was estimated to be approximately 9.9 million metric tons. The products manufactured on this global capacity base are not fully substitutable due to pigment quality consistency and pigment product design. As future customer demand grows, we have the ability to incrementally increase our production capacity by approximately 15% through technology-enabled de-bottlenecking processes. We believe that unlocking this additional 15% of capacity is in line with our stated intention to grow with our customers' needs over the long-term.

Competition in the $TiO_2$ pigment market is based primarily on product performance (both product design and quality consistency), supply capability, technical service, and price. Our major competitors within premium performance pigment include Tronox Holdings plc, LB Group Co. Ltd., Venator Materials plc, Kronos Worldwide, Inc., and INEOS AG.

*Raw Materials*

The primary raw materials used in the manufacture of $TiO_2$ pigment are titanium-bearing ores, chlorine, calcined petroleum coke, and energy. We source titanium-bearing ores from multiple suppliers around the globe, primarily located in Australia, Africa, and Eastern Europe. We pursue a diversified procurement strategy, with long and medium-term supply contracts, as well as spot purchases. Where possible, we qualify or purchase multiple grades of ore from each supplier to limit our exposure to any single supplier for any single grade of ore. Our primary titanium feedstock is chloride ilmenite, and to a lesser extent, leucoxenes, slags, and natural and synthetic rutiles. Any of our titanium-bearing ores can be consumed at any of our operating sites, providing supply chain options in the event of supply disruptions. Historically, we have not experienced any problems renewing such contracts for raw materials or securing our supply of titanium-bearing ores. Our increased pigment production capacity will be supported by investments to extend our ilmenite mines and through contracts with our suppliers.

We play an active role in ore source development around the globe. Supply chain flexibility allows for ore purchase and use optimization to manage short-term demand fluctuations and provide a long-term competitive advantage. Our process technology and ability to use lower-grade ilmenite ore gives us the flexibility to alter our ore mix to low-cost configuration based on sales, demand, and projected ore pricing. Lastly, we have taken steps to optimize routes for ore distribution within our manufacturing asset base and increased storage capacity at our production facilities.

Chlorine is also a key raw material input to our process. Price and availability of chlorine are subject to cyclicality and regional market dynamics. In addition, transporting chlorine can be costly. To reduce our need to transport chlorine, we have a chlor-alkali production facility run by a third party that is co-located at our New Johnsonville, Tennessee site. In 2024, we announced that the PCC Group plans to build and operate a chlor-alkali facility on the grounds of our $TiO_2$ plant in DeLisle, Mississippi and that the PCC Group and Chemours have entered into a chlorine supply agreement which is subject to certain customary conditions precedent. The new facility will utilize state-of-the-art technology to maximize energy efficiency and provide up to an annual nameplate capacity of 340,000 metric tons once the plant is operational. Construction is expected to begin in early 2026 with the plant being operational in 2028.

Calcined petroleum coke is another important raw material input to our process. We source calcined petroleum coke from well-established suppliers in North America typically under contracts that run multiple years to facilitate materials and logistics planning through the supply chain. Raw materials distribution efficiency is enhanced through the use of bulk ocean, barge, and rail transportation modes.

Energy is a key input cost in the $TiO_2$ pigment manufacturing process, representing approximately 10% of the production cost. We have access to natural gas-based energy at our U.S. and Mexico $TiO_2$ pigment production facilities and our Florida and Georgia minerals plants, supporting advantaged energy costs given the low cost of natural gas in the U.S relative to most of the other parts of the world.

*Sales, Marketing, and Distribution*

We sell the majority of our products through a direct sales force. We continue to build on our commercial strategy to optimize our performance through $TiO_2$ market cycles while remaining closely connected to our customer needs. Our strategy establishes a commercial framework that allows us to focus on enhancing durable, value-oriented customer relationships, while providing customers access to a predictable and reliable supply of high-quality $TiO_2$. Customers can purchase Ti-Pure™ $TiO_2$ either through medium- to long-term contracts or through Ti-Pure™ Flex. Launched in 2019, Ti-Pure™ Flex is an innovative channel that provides customers the unique ability to purchase Ti-Pure™ $TiO_2$ via our web-based portal, the first of its kind in the industry. To further expand our reach beyond these sales channels, we also utilize third-party sales agents and distributors.

$TiO_2$ pigment represents a significant raw material cost for many of our customers, and as a result, purchasing decisions are often made by our customers' senior management teams. $TiO_2$ pigment, however, is only a small fraction of the cost when considering certain end-use applications, especially in segments with larger value chain players, such as specialty coatings, plastics, and laminates applications. Our sales organization works to develop and maintain close relationships with key decision makers in our value chain. In addition to close purchasing relationships, our sales and technical service teams work together to develop relationships with all layers of our customers' organizations to ensure that we meet our customers' commercial and technical requirements. When appropriate, we collaborate closely with customers to solve formulation or application problems by modifying product characteristics or developing new product grades.

To ensure efficient distribution, we maintain a fleet of railcars which are predominantly used for distribution of products in the U.S. and Canada and utilize third-party truck and ocean carriers. A dedicated logistics team along with external partners continually assess and optimize the assignment of our transportation equipment for each product line and geographic region to maximize utilization and maintain an efficient supply chain.

*Customers*

Globally, we serve approximately 500 customers through our Titanium Technologies segment. In 2024, our 10 largest Titanium Technologies customers accounted for approximately 41% of the segment's net sales, and one Titanium Technologies customer represented over 10% of the segment's net sales. Our larger customers are typically served through direct sales and tend to have medium-term to long-term contracts. We serve our small-size and mid-size customers through a combination of our direct sales and distribution network. Our direct customers in the Titanium Technologies segment are producers of decorative coatings, automotive and industrial coatings, polyolefin master batches, PVC, engineering polymers, laminate paper, coatings paper, and coated paperboard. We focus on developing long-term partnerships with key market participants in each of these sectors. We also deliver a high level of technical service to satisfy our customers' specific needs, which helps us maintain strong customer relationships.

*Seasonality*

The demand for $TiO_2$ pigment is subject to seasonality due to the influence of weather conditions and holiday seasons on some of our applications, such as decorative coatings. As a result, our $TiO_2$ pigment sales volume is typically highest in the second and third quarters. This pattern applies to the entire $TiO_2$ pigment market, but may vary by region, country, or application. The impacts of seasonality on demand for $TiO_2$ pigment may also be altered by economic factors, such as changes in global GDP, global supply chain and logistics issues, and other factors.

***Advanced Performance Materials Segment***

*Segment Overview*

Our Advanced Performance Materials segment draws on vast experience in fluoropolymer chemistry as a leading, global provider of performance solutions and advanced materials that solve challenging problems in emerging technologies and deliver unique capabilities in products and applications that people around the world use every day. The segment's diversified portfolio includes various specialty product solutions, membranes, industrial resins, and coatings. These product offerings position the business to serve a broad range of markets, including consumer electronics, semiconductors, digital communications, transportation, energy, oil and gas, and medical, among others.

Our products set the standard in a number of performance categories, including chemical inertness, thermal stability, low friction, weather and corrosion resistance, and di-electric properties. These performance advantages make our polymers a material of choice, especially in complex applications and extreme environmental conditions. Our performance solutions portfolio includes differentiated offerings such as those that are critical to many emerging technology areas, including hydrogen production and fuel cells, emerging battery technologies, advanced semi-conductor infrastructure, 5G data delivery, and connected electronic devices. Our advanced materials portfolio provides products which are essential to established technologies across a diverse range of markets and applications, including consumer goods, transportation, and chemical processing.

Our Advanced Performance Materials products are sold under the brand names Teflon™, Viton™, Krytox™, and Nafion™. Teflon™ coatings, resins, additives, and films serve as the key underpinning for a variety of industrial and commercial applications, including semiconductor infrastructure. Viton™ fluoroelastomers are used in automotive, consumer electronics, chemical processing, oil and gas, petroleum refining and transportation, and aircraft and aerospace applications. Our Krytox™-branded lubricants are used in a broad range of industrial applications, including bearings, automotive friction management, and electric motors. Nafion™ membranes are critical components in chlor-alkali processing and flow batteries, as well as the hydrogen electrolyzers and fuel cells which underpin the hydrogen economy. In 2023, we launched operations at THE Mobility F.C. Membranes Company as a part of Chemours' joint venture with BWT FUMATECH Mobility GmbH to elevate and accelerate the capacity to manufacture fuel cell and humidifier membranes for mobility applications for long-term customers.

Our Advanced Performance Materials segment is focused on technology development in its key markets. We also participate in a broad array of industry consortia and collaborate with leading academics across a variety of disciplines to drive fundamental R&D in the materials space.

The segment is well positioned to capture future growth through the combination of our unique product capabilities and market-driven product development process. Advanced Performance Materials will benefit long-term from secular growth in clean energy and advanced electronics.

*Industry Overview and Competitors*

Our Advanced Performance Materials segment competes against a broad variety of global manufacturers, as well as regional manufacturers in Asia Pacific. We have a leadership position in fluorine chemistry and materials science, a broad scope and scale of operations, a strong applications development competency, and deep customer knowledge. Key competitors for this segment include Daikin Industries, Ltd., 3M Company, Syensqo, S.A., AGC Inc., and Dongyue Group Co., Ltd.

The demand for products in the economically sensitive advanced materials portfolio is tied to regulatory developments, as well as the cyclicality of key end markets, such as industrial, chemical processing, consumer goods, and transportation, and is expected to grow in line with GDP. However, with growing demand for cleaner and faster technologies, demand for products in the performance solutions portfolio is expected to grow at a rate faster than GDP, driven by global middle-class growth and alignment between our market-driven product technology development process and emerging market technologies, such as 5G, fuel cells and electrolyzers, electronics, communications, and transportation.

*Raw Materials*

The primary raw materials required for the Advanced Performance Materials segment are chlorinated organics, hydrogen fluoride, and vinylidene fluoride. These are available in many countries and are not concentrated in any particular region. We pursue maximum competitiveness in our global supply chains through competitive, flexible, and diversified sourcing of key raw materials. Our contracts typically include terms that span from two to five years. We diversify our sourcing through multiple geographic regions and suppliers to ensure a diversified and cost competitive supply.

*Sales, Marketing, and Distribution*

With approximately 90 years of innovation and development in fluorine science, our technical, marketing, and sales teams around the world have deep expertise in our products and their end-uses. We work with customers to select the appropriate fluoropolymers or other advanced performance materials to meet their technical performance needs based on their intended performance-in-use requirements. We sell our products through direct and indirect channels, and the duration of our selling agreements vary by product line and markets served.

Our Advanced Performance Materials segment maintains a fleet of railcars, tank trucks, containers, and totes to deliver our products and support our supply chain needs. For the portion of the fleet that is leased, the related lease terms are usually staggered, which provides us with a competitive cost position, as well as the ability to adjust the size of our fleet in response to changes in market conditions. We manage our fleet to ensure it is appropriately sized to meet market demand while maintaining flexibility. A dedicated logistics team, along with external partners, works to optimize the assignment of our transportation equipment for each product line and geographic region to maximize utilization and flexibility of the supply chain.

*Customers*

Our Advanced Performance Materials segment serves approximately 1,000 customers and distributors globally and, in many instances, these commercial relationships have been in place for decades. No single Advanced Performance Materials customer represented more than 10% of the segment's net sales in 2024.

*Seasonality*

The Advanced Performance Materials segment has historically seen some seasonal effects with lower sales in the fourth quarter, with planned maintenance activities at our own sites and at certain customers typically occurring during this period.

## Intellectual Property

Intellectual property, including trade secrets, certain patents, trademarks, copyrights, know-how, and other proprietary rights, is a critical part of maintaining our technology leadership and competitive edge. Our business strategy is to file patent and trademark applications internationally for proprietary new product and application development technologies, and we work actively on a global basis to create, acquire, license, protect, and enforce our intellectual property rights. As of December 31, 2024, we owned approximately 4,050 granted patents and 1,420 pending applications in the U.S. and internationally, as well as approximately 1,680 trademark registrations and 24 pending trademark applications in the U.S. and internationally.

The protections afforded under our patents and trademarks vary based on country, scope of individual patent, and trademark coverage, as well as the availability of legal remedies in each country. Our patents, in the aggregate, are believed to be of material importance to our business. However, although certain proprietary intellectual property rights are important to our success, we do not believe that we are materially dependent on any single patent (or group of related patents) or trademark. We believe that securing our intellectual property is critical to maintaining our technology leadership and our competitive position, especially with respect to new technologies or the extensions of existing technologies. Our intellectual property can be a source of incremental income through licensing arrangements.

Our Thermal & Specialized Solutions segment is a technology leader in the markets in which it participates. We maintain a large fluorochemicals patent portfolio covering compositions, methods of making, and applications for refrigeration and air conditioning, foam expansion agents and propellants, specialty fluids, immersion cooling, and fluorochemical recycling, among other applications. With respect to our Opteon™ refrigerants we have composition patents covering R-1234yf having expiration dates through the end of the decade, and patents covering other aspects of our Opteon™ refrigerants including blend compositions containing R-1234yf, methods of making R-1234yf, and applications having varying expiration dates at least into the mid-2030s. We consider our Opteon™ and Freon™ trademarks used in the Thermal & Specialized Solutions segment to be valuable assets.

Our Titanium Technologies segment relies upon proprietary knowledge, continuing technological innovation, and trade secrets to develop and maintain our competitive position in this sector. Within this segment, we hold significant intellectual property in the form of trade secrets and patents, and, while we believe that no single trade secret is material in relation to our combined business as a whole, we believe that our trade secrets are material in the aggregate. Our proprietary chloride production process is an important part of our technology, and our business could be harmed if our trade secrets are not maintained in confidence. Within our Titanium Technologies segment's intellectual property portfolio, we consider our Ti-Pure™ trademark to be a valuable asset. We have registered the Ti-Pure™ trademark in a number of countries.

Our Advanced Performance Materials segment possesses extensive know-how and trade secrets related to manufacturing technologies for a broad range of specialized fluoropolymers, as well as application development technology for fluoropolymers based on comprehensive knowledge of customer applications. We hold patents relating to manufacturing for certain products with high quality, specifications and purity as required by the electronics, communications, automotive, wire and cable, battery, fuel cell, water electrolysis, and other industries. Additionally, our Advanced Performance Materials segment is a leader in and holds patents relating to non-fluorinated materials for use as durable water repellents for garments and other uses. In our Advanced Performance Materials segment's intellectual property portfolio, we consider our Teflon™, Viton™, Nafion™, and Krytox™ trademarks to be valuable assets.

## Environmental and Regulatory Matters

Information related to environmental matters is included in several areas of this Annual Report on Form 10-K, including: (i) *Item 1A – Risk Factors*; (ii) *Item 3 – Legal Proceedings*, under the heading "Environmental Proceedings"; (iii) *Item 7 – Management's Discussion and Analysis of Financial Condition and Results of Operations*; and, (iv) "Note 3 – Summary of Significant Accounting Policies" and "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements*.

*Climate Change*

Our sustainability work begins with our vision to deliver Trusted Chemistry. That vision calls on us to ensure that our decisions ultimately help people live better lives and communities thrive. We don't embrace sustainability for the sake of it, we ensure that our work is a fully integrated part of delivering our corporate strategy, Pathway to Thrive. Through sustainability we are actively protecting our license to operate our facilities, meeting the needs of our customers and differentiating our portfolio, advancing the work across the four pillars of our strategy — Operational Excellence, Enabling Growth, Portfolio Management, and Strengthening the Long-Term — to create value for our shareholders.

As part of delivering trusted chemistry, we focus on the responsible treatment of climate and water. Our 2030 goals include:

- 60% absolute reduction in Scope 1 and Scope 2 GHG emissions; and,
- 99% or more reduction of air and water process emissions of fluorinated organic chemicals ("FOCs").

In 2021, we updated our climate goals to better align our climate commitment with the Paris Accord and set us on a path to achieve net zero greenhouse gas emissions from our operations by 2050. In 2022, we signed a commitment with the Science Based Targets initiative ("SBTi") to establish science-based targets for scopes 1, 2, and 3 GHG emissions. In May 2024, the SBTi approved Chemours' near-term science-based emissions reduction targets. This includes our existing 2030 goal of a 60% absolute reduction and a new Scope 3 target of reducing emissions by 25% per ton of product by 2030. Beyond the progress we have made reducing our operational footprint through Scope 1 and 2 reductions, the reduction of our Scope 3 emissions will enable us to partner with our suppliers to further improve our Product Carbon Footprint by reducing upstream emissions, as well as reduce downstream emissions through the ongoing adoption of low carbon solutions enable by Chemours innovation, like our Opteon™ portfolio of low global warming potential refrigerants.

Making people's lives better centers on the essentiality of our products and the critical end markets they serve. From medical applications that save lives, to low global warming potential refrigerants, durable paints and coatings, and even semiconductor chips and clean energy technologies such as EV batteries, Chemours chemistries power products that the world needs. We believe that climate change is an important global issue that presents both opportunities and challenges for our company, our partners, our customers, and our communities. Climate change matters for our company are likely to be driven by changes in physical and transition risk, such as regulations and/or public policy, and changes in technology and product demand. Our operations and business results are increasingly subject to evolving climate-related legislation and regulations, inclusive of restrictions on GHG emissions, cap and trade emissions trading systems, and taxes on GHG emissions, fuel, and energy, among other provisions. Such regulatory matters have led, and are expected to continue to lead, to subsequent developments in product technology and demand. This helps guide our investment decisions and drive growth in demand for low-carbon and energy-efficient products, manufacturing technologies, and services that facilitate adaptation to a changing climate. Our business segments conduct market trend impact assessments, continuously evaluate opportunities for existing and new products and are well-positioned to take advantage of opportunities that may arise from increased market demand for and/or legislation mandating or incentivizing the use of products and technologies necessary to achieve a low-carbon economy.

In our Thermal & Specialized Solutions segment, global regulations driving the phase-down of HFCs, including the EU's F-Gas Directive, the EU's Mobile Air Conditioning Directive, and the AIM Act in the US, promote the adoption and sale of our high performing Opteon™ products, which have lower global warming potential ("GWP") and near-zero ozone-depletion footprint. Our Opteon™ portfolio has been developed to meet global regulations while maintaining or improving performance compared to the products they replace in refrigeration and cooling applications, such as food transportation, food and pharmaceutical/medical storage, food manufacturing and retail, automotive air conditioning, and residential and commercial building air conditioning. We are on track to achieve, by the end of 2025, our estimated goal that our low GWP products will result in 325 million tons of avoided emissions of carbon dioxide equivalents on a global basis.

We are a proponent of the AIM Act, that went into effect in 2022 and has begun the national phase-down of hydrofluorocarbons. We successfully completed an improvement project to significantly reduce emissions of HFC-23 at our Louisville, Kentucky manufacturing site. The project includes the design, custom-build and installation of proprietary technology to capture HFC-23 process emissions from the site. This project was operational as of October 2022 and validation of performance was completed prior to an extension period granted by the U.S. Environmental Protection Agency ("EPA") in the first quarter of 2023.

In our Titanium Technologies business, our Ti-Pure™ Sustainability ("TS") product series, is designed to advance our customers' sustainability goals. The product series includes enhanced product sustainability designations—including climate impact and resource efficiency. Going forward, our product portfolio will continue to be centered on the evolving needs of our customers.

In our Advanced Performance Materials segment, our growth prospects in fluoropolymers are also enhanced by regulation driving the increasing demand for electric vehicles and high-performance, low-emission vehicles. Our fluoropolymers are critical to delivering high performance over a wide range of harsh operating conditions, enhancing passenger safety, improving emission controls and fuel economy, enabling vehicle electrification and the shift to hydrogen-powered vehicles, and improving the sustainability footprint and performance of hybrid and electric car batteries. We expect the use of our fluoropolymers in vehicles to increase, driven by the automotive industry's trends toward energy efficiency and clean energy due to evolving emissions performance regulations and increasing adoption of electric vehicles. Our fluoropolymer technology supports growing market demand for clean hydrogen generation using water electrolyzers, energy storage in flow batteries, and hydrogen conversion to power fuel cell vehicles.

As an energy and emissions intensive company, our costs of complying with complex environmental laws and regulations, as well as internal and external voluntary programs, are significant and will continue to be significant for the foreseeable future. These laws and regulations may change and could become more stringent over time, which could result in significant additional compliance costs, increased costs of purchased energy or other raw materials, increased transportation costs, investments in, or restrictions on, our operations, installation or modification of GHG-emitting equipment, or additional costs associated with GHG emissions. Additionally, significant regional or national differences in approaches to the imposition of such regulations and restrictions could present competitive challenges or opportunities in a global marketplace. Currently, most of our global operating facilities are required to monitor and report their GHG emissions but may or may not be subject to programs requiring trading or emission controls. The EU Emission Trading System applies to our operating sites in that region. Furthermore, U.S. political administration could lead to changes to federal regulation with respect to GHG emissions limits and/or other legislation that could impact our operations. By tracking and taking action to reduce our GHG emissions footprint through energy efficiency programs, increased use of renewable energy and focused GHG emissions reduction programs, we can decrease the potential future impact of these regulatory matters.

## Human Capital

Meeting our commitment to responsible chemistry depends on our ability to create a vibrant workplace culture that attracts and retains the best and brightest in their fields to come work at Chemours. Our success depends on our ability to attract, retain and motivate employees, and to identify and develop high-performing talented personnel to succeed our senior management and other key roles. This success depends on creating a diverse, inclusive, equitable and thriving workplace culture – one that holds a multiplicity of viewpoints, stems from a variety of backgrounds, and brings an abundance of different life experiences to work. We believe our global workforce should reflect the viewpoints and diversity of the communities in which we operate. That combination of excellence and diversity is essential to continuing our strong track record of uncovering and delivering the innovative solutions society needs.

*Diverse and Inclusive Leadership and Workforce*

Our board of directors is comprised of eleven individuals with a diverse set of experiences, skills and credentials, selected for their business acumen and ability to challenge and add value to management. Our directors have held significant leadership positions and bring a depth of experience across a wide variety of industries, providing the Company with unique insights and fresh perspectives. Refer to *Item 10 – Directors, Executive Officers, and Corporate Governance* for further information related to our board of directors. As of the date of this Annual Report on Form 10-K, management of the Company is led by our Chief Executive Officer ("CEO") and 7 of her direct reports, which comprise our Chemours Executive Team ("CET"). Further information related to our CET is included under the caption "Information About Our Executive Officers" within this Part I of our Annual Report on Form 10-K.

As of December 31, 2024, we had approximately 6,000 employees globally, nearly all of which were full-time employees. As of December 31, 2024, we had approximately 77% of our employees in the Americas (67% of whom are in the United States), 16% in Europe, and 7% in Asia Pacific (4% are in China). Approximately 13% of our employees are represented by unions or works councils. Management believes that its relations with employees and labor organizations are good.

In addition to Chemours employees, our total global workforce also includes contract workers who are available to support our manufacturing sites. Our number of contract workers varies throughout the year due to business needs and seasonal plant activities. These on-site contract workers provide services for facility maintenance, engineering services and construction support, operations, research and logistics support, equipment service and maintenance, custodial services, and site security services. Management believes that its relations with contract workers are good.

*Corporate Responsibility Commitments ("CRC")*

Chemours is committed to creating and sustaining a diverse, inclusive, and safe workplace that reflects our diverse communities in which we operate and focuses on diversity of skills and diversity of experiences with a focus on creating a vibrant workplace culture that attracts, retains, and empowers the best and brightest in their fields.

In support of our commitment to foster a diverse and inclusive environment where all employees can contribute, thrive and grow, we have several Employee Resource Groups (“ERGs”): Chemours Asian Group, Chemours Black Employee Network, Chemours Latin American Resource Organization, Chemours Pride Network, Chemours Women’s Network, Early Career Network, Chemours Veterans' Network and Chemours Native American Employee Network. The objectives of these ERGs are to help foster a diverse, inclusive workplace by educating and building awareness across the Company on challenges underrepresented groups often face, how to be more inclusive, supporting career development efforts, and leading community outreach efforts. We also facilitate additional educational programs, workshops and discussions on a variety of diversity and inclusion topics for global, regional, and local employee groups. We continue to further our CRC goals through a range of tactics. To recruit top talent and broaden our local workforce pipeline, we virtually attended as well as attended fairs at various universities and conferences. Meanwhile, our manufacturing sites partnered with local trade schools and community colleges to create apprenticeship opportunities and develop degree programs that teach students the unique skills needed for a career in operations.

Ultimately, we believe that these efforts create a company culture that promotes individual differences, differences in experience and skills, a safety-focused mentality, and talent development initiatives which result in competitive strength.

*Safety*

Safety is one of our five core values and is deeply engrained throughout our culture. As an industry leader in Responsible Manufacturing, we operate our plant sites with a deep commitment to the health and safety of communities where we operate, our people, and our partners all along the value chain.

In February 2024, the board of directors established an Environmental, Health, Safety (“EHS”) and Operations Performance committee. The committee assists the board in overseeing the assessment and management of environmental, health, and safety risks by reviewing our programs for identifying, assessing, managing, and mitigating such risks.

At Chemours, our talented and dedicated people are one of our biggest strengths, and ensuring we have leaders who are committed to safety and manufacturing our products responsibly is foundational to our company's success. We believe our ability to keep our employees safe from harm and business performance are interconnected. As a part of our safety culture, every employee feels supported and empowered to exercise "stop work authority" and to participate openly in incident investigations which leads to operational learning focused on eliminating or reducing physical accidents. Around the world and at every site, the way in which we work is grounded in our Safety value, always.

*Professional Development*

We encourage and support our employees to own their careers by taking the lead in their respective professional development journeys. We actively support our employees in their professional development, providing multiple learning opportunities and trainings. We encourage and support employee participation in industry associations, professional organizations and other external resources to develop their skills and experience. We also provide our employees with the necessary tools and resources to develop and produce the next generation of innovative chemistry products, most notably, our Chemours Discovery Hub. Given our focus on experiential learning, we leverage special projects, short-term assignments, and cross-functional job rotations to further develop talent and support employees in meeting their professional aspirations. Semi-annual performance reviews, combined with annual career development planning and ongoing feedback, provide support in performance and development and help our people know where they excel and how they can improve.

*Equitable Employee Compensation*

We provide a total compensation package that is targeted to be competitive with the markets in which we compete for talent, while allowing individual employee pay to vary equitably based on performance, skills, and experience. Our compensation programs are globally aligned, and, where possible, our total rewards plans include base salary, incentives (short- and long-term), financial, physical, and mental well-being programs, and monetary and social recognition. We routinely review our total rewards practices in the markets in which we compete to ensure our plans allow us to recruit and retain the diverse talent we need to be successful. We are firmly committed to paying our employees in a fair and equitable manner, regardless of race or gender, and we have implemented global total rewards tools to promote equitable remuneration. To ensure we deliver on this commitment, we periodically engage with independent third-party consultants to review our compensation practices and recommend pay actions.

Additionally, we believe in pay transparency. In 2023, we became transparent with our pay practices in both North America and Europe. The extent to which we share will vary based on local country norms, but may include market position, base salary ranges, bonus and equity targets. We will continue to strive to bring transparency to all of our employees in the near future.

*Employee Attraction and Retention*

We believe that our workplace culture, as reinforced by our commitment to sustainability, corporate values, professional development opportunities, and competitive employee compensation, is critical in attaining a high offer acceptance rate and maintaining low levels of attrition, thereby enabling us to attract talented employees and retain and recognize the benefits of our investments in our employees' technical manufacturing capabilities, safety acumen, and professional development. For the year ended December 31, 2024, our voluntary attrition percentage was approximately 8%.

## Available Information

We are subject to the reporting requirements under the Securities Exchange Act of 1934 (the "Exchange Act"). Consequently, we are required to file reports and information with the U.S. Securities and Exchange Commission ("SEC"), including reports on the following forms: Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act.

Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to those reports are also accessible on our website at http://www.chemours.com by clicking on the section labeled "Investor Relations", then on "Financials" and "SEC Filings". These reports are made available, without charge, as soon as it is reasonably practicable after we file or furnish them electronically with the SEC at http://www.sec.gov.

## Item 1A. RISK FACTORS

*Our operations could be affected by various risks, many of which are beyond our control. Based on current information, we believe that the following identifies the material risk factors that could affect our business, results of operations, or financial condition. Past financial performance may not be a reliable indicator of future performance, and historical trends should not be used to anticipate results or trends in future periods. Refer to our "Forward-looking Statements" for more details.*

### Summary of Risk Factors

The following is a summary of the principal risks that could adversely affect our business, results of operations, financial condition, and cash flows.

***Risks Related to Legal Matters, Environmental Sustainability, and Regulations***

- Our results of operations could be adversely affected by litigation and other commitments and contingencies;
- We are subject to extensive environmental and health and safety laws and regulations that may result in unanticipated loss or liability related to our current and past operations, and that may result in significant additional compliance costs or obligations, which in either case, could reduce our profitability or liquidity;
- In connection with our Separation, we were required to assume, and indemnify EID for, certain liabilities. As we may be required to make payments pursuant to these indemnities or under the cost-sharing provisions of the MOU, we may need to divert cash to meet those obligations, and our liquidity or financial results could be negatively affected. In addition, the obligations of EID to indemnify us and/or the obligation of the DuPont Indemnitees to share costs for certain liabilities may not be sufficient to fund us against the full amount of the applicable liabilities for which it will be allocated responsibility, and EID and/or the DuPont Indemnitees may not be able to satisfy their obligations in the future;
- In connection with our Separation, we were required to enter into numerous Separation-related and commercial agreements with our former parent company, EID, which may not reflect optimal or commercially beneficial terms to us;
- If the distribution, in connection with the Separation, together with certain related transactions, were to fail to qualify for non-recognition treatment for U.S. federal income tax purposes, then we could be subject to significant tax and indemnification liability and stockholders receiving our common stock in the distribution could be subject to significant tax liability;
- As a result of the Audit Committee Internal Review that commenced in 2024, we may be exposed to civil or criminal litigation from investors and/or regulatory entities, which may adversely affect our reputation, results of operations, financial condition, and cash flows; and,
- Our failure to comply with the anti-corruption laws of the U.S. and various international jurisdictions could negatively impact our reputation and results of operations, financial condition and cash flows.

***Risks Related to Our Business Performance***

- Operating as a multi-national corporation presents risks associated with global and regional economic, political and global capital market conditions, as well as risks resulting from changes to regional regulatory requirements (including environmental standards);
- If significant tariffs or other restrictions continue to be placed on foreign imports by the United States and related countermeasures are taken by impacted foreign countries, our results of operations could be negatively affected:
- The businesses in which we compete are highly competitive. If our intellectual property were compromised or copied by competitors, or if our competitors were to develop similar or superior intellectual property or technology, our results of operations could be negatively affected;
- Effects of price fluctuations in energy and raw materials, our raw materials contracts, and our inability to renew such contracts, could have a significant negative impact on our earnings;
- Our reported results and financial condition could be adversely affected by currency exchange rates and currency devaluation could impair our competitiveness;
- If we are unable to innovate and successfully introduce new products, or new technologies or processes reduce the demand for our products or the price at which we can sell products, our profitability could be adversely affected;
- If our long-lived assets, including goodwill, become impaired, we may be required to record significant charges to earnings;
- We could be subject to changes in our tax rates and the adoption of tax legislation or exposure to additional tax liabilities that may adversely affect our results of operations, financial condition, and cash flows;
- We are subject to continuing contingent tax-related liabilities of EID;
- We are a holding company that is dependent on cash flows from our operating subsidiaries to fund our debt obligations, MOU escrow funding requirements, capital expenditures, and ongoing operations;
- Failure to meet some or all of our key financial and non-financial targets could negatively impact the value of our business and adversely affect our stock price; and

- A pandemic, epidemic, or other outbreak of infectious disease may have a material adverse effect on our business operations, results of operations, financial condition, and cash flows.

***Risks Related to Our Operations***

- Our ability to make future strategic decisions regarding our manufacturing operations are subject to regulatory, environmental, political, legal, and economic risks, and to a certain extent may be subject to consents or cooperation from EID under the agreements entered into between us and EID as part of the Separation. These could adversely affect our ability to execute our future strategic decisions and our results of operations, financial condition and cash flows;
- Hazards associated with chemical manufacturing, storage, containment, and transportation could adversely affect our results of operations;
- Our results of operations and financial condition could be seriously impacted by business disruptions, including environmental, weather, and natural disasters.
- We participate in certain business relationships where we may be adversely impacted by the actions of the joint venture, its participants, or other partners;
- Our results of operations and financial condition could be seriously impacted by business disruptions and security breaches, including cybersecurity incidents;
- Our operations could be materially impacted in the event of a failure of our information technology infrastructure;
- If we identify a material weakness in internal control over financial reporting, or if we fail to maintain an effective system of internal controls, we may not be able to accurately determine our financial results or prevent fraud, either of which could have a material effect on us; and
- We have incurred and expect to continue to incur significant expenses related to the Audit Committee Internal Review, and any resulting litigation.

***Risks Related to Our Indebtedness***

- Our current level of indebtedness could adversely affect our financial condition or liquidity, and we could have difficulty fulfilling our obligations under our indebtedness, which may have a material adverse effect on us;
- Despite our current level of indebtedness, we may incur substantially more debt and enter into other transactions, which could further exacerbate the risks to our financial condition described above;
- We may need additional capital in the future and may not be able to obtain it on favorable terms, or at all;
- The agreements governing our indebtedness restrict our current and future operations, particularly our ability to respond to changes or to take certain actions;
- Our variable rate indebtedness subjects us to interest rate risk, which could cause our indebtedness service obligations to increase significantly; and
- Adverse developments affecting the financial markets and currency exchange rates, including events or concerns involving liquidity, defaults or non-performance by financial institutions or transactional counterparties, could adversely affect our business, financial condition, results of operations, or cash flows.

***General Risk Factors***

- Our stock price could become more volatile and investments could lose value;
- We cannot guarantee the timing or amount of our dividends, if any, and/or our share repurchases, which are subject to a number of uncertainties that may affect the price of our common stock;
- A stockholder's percentage of ownership in us may be diluted in the future;
- Certain provisions in our amended and restated certificate of incorporation and amended and restated by-laws, and of Delaware law, may prevent or delay an acquisition of us, which could decrease the trading price of the common stock;
- Our success depends on our ability to attract and retain key employees, and to identify and develop talented personnel to succeed our senior management and other key employees; and
- We may experience a disruption of our business activities and our business could be adversely affected due to senior management transitions.

## Risks Related to Legal Matters, Environmental Sustainability, and Regulations

***Our results of operations could be adversely affected by litigation and other commitments and contingencies.***

We face risks arising from various unasserted and asserted legal claims, investigations, and litigation matters, such as product liability claims, patent infringement claims, anti-trust claims, and claims for third-party property damage or personal injury stemming from alleged environmental actions (which may concern regulated or unregulated substances) or other torts. We have noted a nationwide trend in purported mass tort and class actions against chemical manufacturers generally seeking relief, such as medical monitoring, property damages, off-site remediation, and punitive damages arising from alleged environmental actions (which may concern regulated or unregulated substances) or other torts without claiming present personal injuries. We also have noted a trend in public and private nuisance suits being filed on behalf of states, counties, cities, and utilities alleging harm to the general public and damages to natural resources. Various factors or developments in these nationwide trends or in the actions could result in future charges that could have a material adverse effect on us. We are also subject to requests for information, including those described below under "*As a result of the Audit Committee Internal Review, we may be exposed to litigation from investors and/or regulatory entities, which may adversely affect our reputation, results of operations, financial condition, and cash flows.*" An adverse outcome in any one or more of these matters could be material to our financial results, liquidity, and/or stock price, and could adversely impact the value of any of our brands that are associated with any such matters. As discussed below, we are a named defendant and/or cost-sharing and defending DuPont, Corteva, and EID (together, the "DuPont Indemnitees") in litigation related to the production and use of per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acids and its salts, including the ammonium salt ("PFOA"); hexafluoropropylene oxide dimer acid ("HFPO Dimer Acid", sometimes referred to as "GenX" or "C3 Dimer Acid") and other compounds; and products that are manufactured or use such compounds, including Aqueous Film Forming Foam ("AFFF"). Chemours does not, and has never, used PFOA as a polymerization aid nor sold it as a commercial product. Prior to the Separation, the performance chemicals segment of EID made PFOA at its Fayetteville Works site in Fayetteville, North Carolina ("Fayetteville") and used PFOA as a polymerization aid in the manufacture of fluoropolymers and fluoroelastomers at certain sites, including: Washington Works, Parkersburg, West Virginia; Chambers Works, Deepwater, New Jersey ("Chambers Works"); Dordrecht Works, Netherlands; Changshu Works, China; and, Shimizu, Japan. These sites are now owned and/or operated by Chemours.

We have received inquiries, government investigations, directives, multiple lawsuits, and other actions related to PFOA, HFPO Dimer Acid, AFFF, and PFAS. These or other governmental inquiries or lawsuits could lead to us incurring liability for damages or other costs, a criminal or civil proceeding, the imposition of fines and penalties, and/or other remedies, as well as restrictions on or added costs for our business operations going forward, including in the form of restrictions on discharges at our sites, such as Fayetteville, Dordrecht Works in Dordrecht, Netherlands or otherwise. In relation to remedies, these costs could be for both on-site and off-site issues, including additional on-site corrective action and off-site drinking water and other programs. Additional lawsuits or inquiries also could be instituted related to these or other compounds in the future. Accordingly, the existing lawsuits and inquiries, and any such additional litigation, relating to our existing operations, PFOA, HFPO Dimer Acid, AFFF, PFAS, or other compounds associated with our products or operations could result in us incurring additional costs and liabilities, which may be material to our financial position and results of operations.

In the ordinary course of business, we may make certain commitments, including representations, warranties, and indemnities relating to current and past operations, including those related to divested businesses, and issue guarantees of third-party obligations. Additionally, we may be required to indemnify EID with regard to liabilities allocated to, or assumed by, us under each of the separation agreement, the employee matters agreement, the tax matters agreement, and the intellectual property cross-license agreement that were executed prior to the Separation. These indemnification obligations to date have included defense costs associated with certain litigation matters, as well as certain damages awards, settlements, and penalties. In January 2021, we and the DuPont Indemnitees entered into a binding Memorandum of Understanding (the "MOU") addressing certain PFAS matters and costs. Disputes with or among the DuPont Indemnitees and others which may arise with respect to the MOU and PFAS matters, including disputes based on matters of law or contract interpretation, could materially adversely affect our results of operations, financial condition, and cash flows.

Refer to "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* for further details related to these matters.

***We are subject to extensive environmental and health and safety laws and regulations that may result in unanticipated loss or liability related to our current and past operations, and that may result in significant additional compliance costs or obligations, which in either case, could reduce our profitability or liquidity.***

Our operations and production facilities are dependent upon attainment and renewal of requisite operating permits and are subject to extensive environmental and health and safety laws, regulations, and enforcements, proceedings or other actions at national, international, and local levels in numerous jurisdictions, relating to pollution, protection of the environment, climate change, transporting and storing raw materials and finished products, storing and disposing of hazardous wastes, and product content and other safety or human rights concerns. Such laws include, but are not limited to:

- U.S.-based regulations, such as the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA", often referred to as "Superfund"), the Resource Conservation and Recovery Act ("RCRA") and similar state and global laws for management and remediation of hazardous materials, the Clean Air Act ("CAA") and Clean Water Act ("CWA") and similar state and global laws for the protection of air and water resources, and the Toxic Substances Control Act ("TSCA");
- Foreign-based chemical control regulations, such as the Registration, Evaluation, Authorization, and Restriction of Chemicals ("REACH") in the EU, the Chemical Substances Control Law ("CSCL") in Japan, MEP Order No. 7 in China, and the Toxic Chemical Substance Control Act ("TCSCA") in Taiwan for the production and distribution of chemicals in commerce and reporting of potential adverse effects;
- The EU Emissions Trading System and similar local and global laws for regulating GHG emissions; and,
- Numerous local, state, federal, and foreign laws, regulations, and enforcements governing materials transport and packaging.

If we are found to be in violation of these laws, regulations, or enforcements, which may be subject to change based on legislative, scientific, or other factors, we may incur substantial costs, including fines, damages, criminal or civil sanctions, remediation costs, reputational harm, loss of sales or market access, or experience interruptions in our operations. Our operations and production may also be subject to changes based on increased regulation or other changes to, or restrictions imposed by, any such additional regulations. Any operational interruptions or plant shutdowns may result in delays in production or may cause us to incur additional costs to develop redundancies in order to avoid interruptions in our production cycles, which could result in future asset impairments. In addition, the manner in which adopted regulations (including environmental and safety regulations) are ultimately implemented may affect our products, the demand for and public perception of our products, the reputation of our brands, our market access, and our results of operations. In the event of a catastrophic incident involving any of the raw materials we use or chemicals we produce, we could incur material costs to address the consequences of such event and future reputational costs associated with any such event.

Our costs to comply with complex environmental laws and regulations, as well as internal and external voluntary programs, are significant and will continue to be significant for the foreseeable future. These laws and regulations may change and could become more stringent over time, which could result in significant additional compliance costs, increased costs of purchased energy or other raw materials, increased transportation costs, investments in, or restrictions on, our operations, installation or modification of emission control equipment, or additional costs associated with emissions control equipment. As a result of our current and historic operations, including the operations of divested businesses and certain discontinued operations, we also expect to continue to incur costs for environmental investigation and remediation activities at a number of our current or former sites and third-party disposal locations. However, the ultimate costs under environmental laws and the timing of these costs are difficult to accurately predict. While we establish accruals in accordance with U.S. generally accepted accounting principles ("GAAP"), the ultimate actual costs and liabilities may vary from the accruals because the estimates on which the accruals are based depend on a number of factors (many of which are outside of our control), including the nature of the matter and any associated third-party claims, the complexity of the site, site geology, the nature and extent of contamination, the type of remedy, the outcome of discussions with regulatory agencies and other Potentially Responsible Parties ("PRPs") at multi-party sites, and the number and financial viability of other PRPs. We also could incur significant additional costs as a result of additional contamination that is discovered or remedial obligations imposed in the future. Refer to "Environmental Matters" within *Item 7 – Management's Discussion and Analysis of Financial Condition and Results of Operations* and "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* for further information.

As discussed in "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements*, we continue to have active dialogue with the North Carolina Department of Environmental Quality ("NC DEQ") and other stakeholders regarding potential remedies that are both economically and technologically feasible to achieve the objectives of the Consent Order ("CO") and Addendum ("Addendum") related to the discharge of HFPO Dimer Acid and PFAS from Fayetteville into the Cape Fear River, site surface water, groundwater, and air emissions. The Addendum establishes the procedure to implement specified remedial measures for reducing PFAS loadings from Fayetteville to the Cape Fear River, including construction of a barrier wall with a groundwater extraction system. The estimated liabilities of achieving the CO and Addendum objectives consist of several components, each of which may vary significantly and may exceed the recorded reserve estimates, which could be material.

There is also a risk that one or more of our manufacturing processes, key raw materials, or products may be found to have, or be characterized or perceived as having, a toxicological or health-related impact on the environment or on our customers or employees or unregulated emissions, which could potentially result in us incurring liability in connection with such characterization and the associated effects of any toxicological or health-related impact. If such a discovery or characterization occurs, we may incur increased costs in order to comply with new regulatory requirements or as a result of litigation. In addition, the relevant materials or products, including products of our customers incorporating our materials or products, may be recalled, phased-out, or banned. Changes in laws, science, or regulations, or their interpretations, and our customers' perception of such changes or interpretations, which may or may not be supported by scientific evidence, may also affect the marketability of certain of our products.

In June 2019, the Member States Committee of the European Chemicals Agency ("ECHA") also voted to list HFPO Dimer Acid as a Substance of Very High Concern. The vote was based on Article 57(f) – equivalent level of concern having probable serious effects to the environment. This identification does not impose immediate regulatory restriction or obligations, but may lead to a future authorization or restriction of the substance. In September 2019, we filed an application with the EU Court of Justice for the annulment of the decision of ECHA to list HFPO Dimer Acid as a Substance of Very High Concern. In February 2022, the General Court dismissed the annulment action and we appealed such decision. In November 2023, the EU Court of Justice dismissed our appeal.

In May 2020, five European countries began an initiative to restrict the manufacture, placing on the market and use of PFAS in the EU. In this regulatory process, more than 4,000 substances, including F-gases and fluoropolymers are being considered for potential broad regulatory action. On July 15, 2021, the countries submitted their restriction proposal, which informed ECHA of the intent to prepare a PFAS restriction dossier for fluorinated substances within a defined structural formula scope, including branched fluoroalkyl groups and substances containing ether linkages, fluoropolymers and side chain fluorinated polymers. The restriction dossier was submitted to ECHA in January 2023, and in February 2023 ECHA published a report and supporting annexes on the restriction proposal, which includes identified concerns for in-scope PFAS and their degradation products and the proposed restriction of a full ban with certain use-specific time-limited derogation periods. Comments were submitted from individuals and organizations during the consultation period in 2023 and the restriction dossier will be reviewed by the ECHA Risk Assessment Committee ("RAC") and Socio-economic Analysis Committees ("SEAC"). RAC and SEAC will focus on the different sectors that are affected and elements of the proposal, and further meetings will be held in 2025. In November 2024, ECHA and the five European countries issued a progress update on the PFAS restriction, indicating that alternative restriction options, besides a full ban or a ban with time-limited derogations, are being considered for uses including, but not limited to: batteries; fuel cells; and electrolysers, and that fluoropolymers have high stakeholder interest considering availability of alternatives for certain uses and potential socio-economic impacts of a ban. The five national authorities who prepared the proposal are also updating their initial report to address the consultation comments, which will then be assessed by ECHA committees. The estimated earliest entry into force of restrictions is 2026, contingent upon timely completion of the remaining steps in the EU REACH restriction process.

In January of 2024, the European Council adopted a regulation supporting the phase down of hydrofluorocarbons ("HFC") by 2050 and multiple bans on HFCs and hydrofluoroolefin ("HFO") in select applications. The new regulation entered into force on March 11, 2024, and includes both reviews and exemptions. No later than January 1, 2030, the European Commission will publish a report on the effects of the regulation and whether the bans are upheld based on technical feasibility and socioeconomic impact of alternatives.

In March 2024, ECHA published a registration update for trifluoroacetic acid ("TFA"). This update includes a self-classification, by TFA registrants, of Category 2 Reprotoxin. In parallel, Germany has announced its intention to submit a proposal to revise the existing harmonized (legally binding) classification to include reprotoxicity. The proposal will go through a 60-day consultation period to collect comments from interested parties. Next, ECHA's RAC will review the submission and all comments and adopt an opinion, which could take up to 18 months. Based on this opinion, the European Commission will prepare a legislative proposal in conjunction with Member State experts. If Member States and the European Parliament do not object, the final harmonized classification will then become legally binding after a transition period. There are many variables in this process, which could take years to complete.

The impacts of these various restrictions and regulatory measures in the EU as noted above, individually and in the aggregate, could lead to material adverse effects on our results of operations, financial condition, and cash flows.

In October 2021, the U.S. Environmental Protection Agency ("EPA") released its PFAS Strategic Roadmap, identifying a comprehensive approach to addressing PFAS. The PFAS Strategic Roadmap sets timelines by which EPA plans to take specific actions through 2024, including establishing a national primary drinking water regulation ("NPDWR") for PFOA and perfluorooctanesulfonic acid ("PFOS") and taking Effluent Limitations Guidelines actions to regulate PFAS discharges from industrial categories among other actions. As provided under its roadmap, EPA also released its National PFAS Testing Strategy, under which the agency will identify and select certain PFAS compounds for which it will require manufacturers to conduct testing pursuant to TSCA section 4. We have received various test orders and have formed consortia to jointly manage compliance with the test order requirements. We expect to receive future test orders, however the timing of the remaining TSCA orders is not determinable at this time. Additional costs could be incurred in connection with EPA's actions, which could be material. The draft Effluent Limitations Guidelines ("ELGs") for PFAS manufacturers as announced in the PFAS Strategic Roadmap were not proposed in the fourth quarter of 2024 and we continue to monitor and respond to information requests related to potential ELGs.

Also in October 2021, EPA published a final toxicity assessment for GenX compounds that decreased the draft reference dose for GenX compounds based on EPA's review of new studies and analyses. On March 18, 2022, we filed a petition to EPA requesting to withdraw and correct its toxicity assessment for GenX compounds, and this petition was denied by EPA on June 14, 2022. The next day, on June 15, 2022, EPA released health advisories for four PFAS, including interim updated lifetime drinking water health advisories for PFOA and PFOS, and final health advisories for GenX compounds, including HFPO Dimer Acid and another PFAS compound (PFBS). On July 13, 2022, we filed a Petition for Review of the GenX compounds health advisory. In July 2024, the Third Circuit dismissed the Company's petition for lack of subject matter jurisdiction, finding the health advisory was not a final agency action.

In March 2023, EPA proposed a NPDWR to establish Maximum Contaminant Levels (MCL's) for six PFAS, with PFOA and PFOS having MCLs as individual compounds (each proposed as 4 parts per trillion – ("ppt")) and four other PFAS compounds, including HFPO Dimer Acid, having a hazard index approach limit on any mixture containing one or more of the compounds. The proposed PFAS NPDWR was subject to public comment through May 30, 2023, and on April 10, 2024 EPA issued its final rule, which included promulgating individual MCLs for PFOA and PFOS at 4ppt and individual MCLs for PFHxS, PFNA and HFPO-DA at 10ppt. In addition, EPA finalized a hazard index of 1 (unitless) as the MCL for any mixture of PFHxS, PFNA, HFPO-DA and PFBS. The final rule became effective 60 days from publication in the Federal Register and the compliance date for public water systems in the U.S. to meet the MCLs is five years from the publication date. In June 2024, Chemours, as well as other organizations including the American Water Works Association and the American Chemistry Council, filed petitions for review of the final rule in the U.S. Court of Appeals for the D.C. Circuit. This appeal is now being held in abeyance until April 2025 to allow EPA to review the underlying rule. Also in April 2024, EPA issued a final rule designating PFOA and PFOS as hazardous substances under CERCLA, which has also been challenged in the same appeals court. EPA has moved to hold this appeal also in abeyance to allow review of the underlying rule. Depending on the ultimate outcome of EPA's actions, our estimated environmental remediation liabilities and accrued litigation could increase to meet any new drinking water standards, which could have a material adverse effect on our results of operations, financial condition, and cash flows.

***In connection with our Separation, we were required to assume, and indemnify EID for, certain liabilities. As we may be required to make payments pursuant to these indemnities or under the cost-sharing provisions of the MOU, we may need to divert cash to meet those obligations, and our liquidity or financial results could be negatively affected. In addition, the obligations of EID to indemnify us and/or the obligation of the DuPont Indemnitees to share costs for certain liabilities may not be sufficient to fund us against the full amount of the applicable liabilities for which it will be allocated responsibility, and EID and/or the DuPont Indemnitees may not be able to satisfy their obligations in the future.***

Pursuant to the separation agreement, the employee matters agreement, the tax matters agreement, and the intellectual property cross-license agreement we entered into with EID prior to the Separation, we were required to assume, and indemnify EID for, certain liabilities. These indemnification obligations to date have included, among other items, defense costs associated with certain litigation matters, as well as certain damages awards, settlement amounts, and penalties. In January 2021, we and the DuPont Indemnitees entered into a binding MOU addressing certain PFAS matters and costs.

Disputes with the DuPont Indemnitees and others, which may arise with respect to the MOU, PFAS matters, indemnification, and/or cost-sharing matters, including disputes based on matter of law or contract interpretation, could materially adversely affect our business, financial condition, results of operations, and cash flows. Multiple lawsuits have been filed by third parties containing allegations that EID's separation of Chemours was a fraudulent transfer.

Third parties could also seek to hold us responsible for any of the liabilities of the EID businesses. EID has agreed to indemnify us for such liabilities, but such indemnity from EID may not be sufficient to protect us against the full amount of such liabilities, and EID may not be able to fully satisfy its indemnification obligations. Moreover, even if we ultimately succeed in recovering from EID any amounts for which we are held liable, we may be temporarily required to bear these losses ourselves. Each of these risks could negatively affect our business, financial condition, results of operations, and cash flows.

Refer to "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* for further information.

***In connection with our Separation, we were required to enter into numerous Separation-related and commercial agreements with our former parent company, EID, which may not reflect optimal or commercially beneficial terms to us.***

Commercial agreements we entered into with EID prior to the Separation were formed in the context of the Separation while we were still a wholly-owned subsidiary of EID. Accordingly, during the period in which the terms of those agreements were formed, we did not have an independent board of directors or management independent of EID. Certain commercial agreements, having long terms and commercially-advantageous cancellation and assignment rights to EID, may not include adjustments for changes in industry and market conditions. There is a risk that the pricing and other terms under these agreements may not be commercially beneficial or able to be changed in the future. The terms relate to, among other things, the allocation of assets, liabilities, rights, and obligations, including the provision of products and services and the sharing and operation of property, manufacturing, office, and laboratory sites, and other commercial rights and obligations between us and EID.

***If the distribution, in connection with the Separation, together with certain related transactions, were to fail to qualify for non-recognition treatment for U.S. federal income tax purposes, then we could be subject to significant tax and indemnification liability and stockholders receiving our common stock in the distribution could be subject to significant tax liability.***

Generally, taxes resulting from the failure of the Separation and distribution or certain related transactions to qualify for non-recognition treatment under U.S. federal, state, and/or local tax law, and/or foreign tax law, would be imposed on EID or EID's stockholders and, under the tax matters agreement that we entered into with EID prior to the Separation, EID is generally obligated to indemnify us against such taxes to the extent that we may be jointly, severally, or secondarily liable for such taxes. However, under the terms of the tax matters agreement, we are also generally responsible for any taxes imposed on EID that arise from the failure of the distribution to qualify as tax-free for U.S. federal income tax purposes within the meaning of Section 355 of the Internal Revenue Code ("IRC") or the failure of such related transactions to qualify for tax-free treatment, to the extent such failure to qualify is attributable to actions, events, or transactions relating to our or our affiliates' stock, assets, or business, or any breach of our or our affiliates' representations, covenants, or obligations under the tax matters agreement (or any other agreement we enter into in connection with the Separation and distribution), the materials submitted to the U.S. Internal Revenue Service ("IRS") or other governmental authorities in connection with the request for the IRS Ruling or other tax rulings or the representation letter provided to counsel in connection with the tax opinion. Events triggering an indemnification obligation under the agreement include events occurring after the distribution that cause EID to recognize a gain under Section 355(e) of the IRC. Such tax amounts could be significant. To the extent we are responsible for any liability under the tax matters agreement, there could be a material adverse impact on our financial condition, results of operations, and cash flows in future reporting periods.

***As a result of the Audit Committee Internal Review that commenced in 2024, we may be exposed to civil and criminal litigation from investors and/or regulatory entities, which may adversely affect our reputation, results of operations, financial condition, and cash flows.***

The Audit Committee, with the assistance of outside counsel, conducted an internal review in the first quarter of 2024 in response to an anonymous report made to the Chemours Ethics Hotline. The scope of the review included the processes for reviewing reports made to the Chemours Ethics Hotline, our practices for managing working capital, including the related impact on metrics within our incentive plans, certain non-GAAP metrics included in filings made with the SEC or otherwise publicly released, and related disclosures. The Audit Committee completed its planned procedures with respect to its review and its findings determined that our then-Chief Executive Officer ("CEO"), then-Chief Financial Officer ("CFO"), and then-Controller engaged in efforts in the fourth quarter of 2023 to delay payments to certain vendors and accelerate the collection of receivables, in part to meet free cash flow targets that we had communicated publicly, and which also would be part of a key metric for determining incentive compensation applicable to executive officers. The Audit Committee Internal Review determined that there was a lack of transparency with our board of directors by the members of senior management who were engaging in these actions, and that these actions violated the Chemours Code of Ethics for the CEO, CFO, and the Controller. As a result, these individuals are no longer with the Company. We issued Current Reports on Form 8-K related to the Audit Committee Internal Review, including announcing the administrative leave determinations, announcing the appointment of a new CEO and Interim CFO, and providing a general update on the review. Chemours is cooperating with requests for information by the SEC and the United States Attorney's Office for the Southern District of New York concerning the results of the Audit Committee Internal Review and our SEC filings and in June 2024 received a subpoena from the SEC in respect of that review. In March 2024, two putative class actions were filed in Delaware federal court against us and former officers of the Company alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. The complaints allege claims on behalf of proposed classes of purchasers of Chemours stock beginning February 10, 2023 and ending February 28, 2024 and seek compensatory damages and fees. In September 2024, an Amended Complaint was filed, and the Company and former officers filed a motion to dismiss the Amended Complaint in October 2024. In April 2024, June 2024, July 2024, August 2024 and October 2024, we received seven stockholder demands for inspection of books and records under Section 220 of the General Corporation Law of the State of Delaware and the common law ("Section 220 Demand"), including in its purpose the investigation of possible wrongdoing, mismanagement or breach of fiduciary duties by the Board of Directors and/or senior management in connection with the compensation of executive officers and oversight over our accounting practices. In addition, we are aware of additional efforts by private law firms to solicit clients in regard to potential securities class action or derivative litigation. These matters could result in us incurring additional costs and liabilities, which may be material to our results of operations, financial condition, and cash flows.

Refer to Part II*, Item 9A* of this Annual Report on Form 10-K and "Note 2 – Basis of Presentation" and "Note 22 ─ Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* for further details related to these matters.

***Our failure to comply with the anti-corruption laws of the U.S. and various international jurisdictions could negatively impact our reputation and results of operations, financial condition and cash flows.***

Doing business on a global basis requires us to comply with the laws and regulations of the U.S. government and those of various international and sub-national jurisdictions, and our failure to successfully comply with these rules and regulations may expose us to liabilities. These laws and regulations apply to companies, individual directors, officers, employees, and agents, and may restrict our operations, trade practices, investment decisions, and partnering activities. In particular, our international operations are subject to U.S. and foreign anti-corruption laws and regulations, such as the U.S. Foreign Corrupt Practices Act ("FCPA"), the U.K. Bribery Act 2010 ("Bribery Act"), and other anti-corruption laws of the various jurisdictions in which we operate. The FCPA, the Bribery Act, and other laws prohibit us and our officers, directors, employees, and agents acting on our behalf from corruptly offering, promising, authorizing, or providing anything of value to foreign officials for the purposes of influencing official decisions or obtaining or retaining business or otherwise obtaining favorable treatment. Our global operations may expose us to the risk of violating, or being accused of violating, the foregoing or other anti-corruption laws. Such violations could be punishable by criminal fines, imprisonment, civil penalties, disgorgement of profits, injunctions, and exclusion from government contracts, as well as other remedial measures. Investigations of alleged violations can be very expensive, disruptive, and damaging to our reputation. Although we have implemented anti-corruption policies and procedures, there can be no guarantee that these policies, procedures, and training will effectively prevent violations by our employees or representatives in the future. In February 2025, the U.S. presidential administration issued an executive order pausing the U.S. Department of Justice's enforcement of the FCPA for 180 days until the attorney general issues revised FCPA enforcement guidance. Due to the changing nature of the regulatory environment and uncertainty about the priorities and direction of the U.S. presidential administration, we cannot be certain if or how the DOJ's enforcement of the FCPA will change or its impact on our business. Additionally, we face a risk that our distributors and other business partners may violate the FCPA, the Bribery Act, or similar laws or regulations. Such violations could expose us to FCPA and Bribery Act liability, and/or our reputation may potentially be harmed by their violations and resulting sanctions and fines.

## Risks Related to Our Business Performance

***Operating as a multi-national corporation presents risks associated with global and regional economic, political and global capital market conditions, as well as risks resulting from changes to regional regulatory requirements (including environmental standards).***

Our business and operating results may in the future be adversely affected by global and regional economic conditions, including instability in credit markets, declining consumer and business confidence, fluctuating commodity prices and interest rates, volatile exchange rates, and other challenges, such as tariffs on international trade, border adjustments for certain products, strikes or labor disruptions, and a changing financial regulatory environment that could affect the global economy. Such global and regional economic and political conditions may be further affected by physical risks that stem from a number of root causes, including natural disasters, climate change, and/or travel-based restrictions that may be driven by geo-political activities, military actions, terrorism, and the spread of pandemics, such as the COVID-19 pandemic. In addition, social and political concerns and divisions in the U.S. and throughout the world, including elections and political changes in various countries, may further exacerbate economic and geo-political risks.

Our customers may experience deterioration of their businesses, shortages in cash flows, and difficulty obtaining financing. As a result, existing or potential customers may delay or cancel plans to purchase products and may not be able to fulfill their obligations to us in a timely fashion. Further, suppliers could experience similar conditions, which could impact their ability to supply materials or otherwise fulfill their obligations to us. Because we have significant international operations, there are a large number of currency transactions that result from our international sales, purchases, investments, and borrowings. Future weakness in the global economy and failure to manage these risks could adversely affect our results of operations, financial condition, and cash flows in future periods.

In addition to the general risks associated with operating in the global economy and political conditions, our revenue and profitability are largely dependent on the $TiO_2$ pigment industry and the industries that are the end-users of our refrigerants and fluoropolymers. $TiO_2$ pigment, refrigerants, and fluoropolymers are used in many "quality of life" products for which demand historically has been linked to global, regional, and local GDP and discretionary spending, which can be negatively impacted by regional and world events or economic conditions. Such events, which may or may not impact all of our businesses at the same time or to the same degree, are likely to cause a decrease in the demand for our products and, as a result, may have an adverse effect on our results of operations and financial condition. The future profitability of our operations, and cash flows generated by those operations, will also be affected by the available supply of our products in the market. Further, our future demand growth may be below average global GDP growth rates if our sales into developed markets outpace our sales into emerging markets. In addition, because demand for certain of our products is driven in part by industry needs to comply with certain environmental regulations (such as markets for refrigerants and foams with low GWP), changes in, the elimination of, or lack of enforcement of such environmental regulations in the U.S., the EU, or other jurisdictions can also negatively impact demand for such products and, as a result, our results of operations and financial condition.

***If significant tariffs or other restrictions continue to be placed on foreign imports by the United States and related countermeasures are taken by impacted foreign countries, our results of operations could be negatively affected.***

If significant tariffs or other restrictions continue to be placed on foreign imports and related countermeasures are taken by impacted foreign countries, our results of operations, financial condition and cash flows may be negatively affected. For example, on February 1, 2025, the U.S. imposed a 25% tariff on imports from Canada and Mexico, which were subsequently suspended for a period of one month, and a 10% additional tariff on imports from China. Historically, tariffs have led to increased trade and political tensions. In response to tariffs, foreign countries have implemented retaliatory tariffs on U.S. goods. Political tensions as a result of trade policies could reduce trade volume, investment, technological exchange and other economic activities between major international economies, resulting in a material adverse effect on global economic conditions and the stability of global financial markets. If further tariffs are imposed on a broader range of imports, or if further retaliatory trade measures are taken by impacted foreign countries in response to additional tariffs, we may be required to raise our prices or incur additional expenses, which may result in the loss of customers and our results of operations could be negatively affected.

***The businesses in which we compete are highly competitive. If our intellectual property were compromised or copied by competitors, or if our competitors were to develop similar or superior intellectual property or technology, our results of operations could be negatively affected.***

Each of the businesses in which we operate is highly competitive. Competition in the performance chemicals industry is based on a number of factors, such as price, product quality, and service. We face significant competition from major international and regional competitors. Some of our competitors in the Titanium Technologies segment may have plans to expand their chloride capacity. Additionally, our Titanium Technologies business competes with numerous regional producers, including producers in China, who have expanded their readily available production capacity. The risk of substitution of these Chinese producers by our customers could increase as these Chinese producers expand their use of chloride production technology. Similarly, we compete with various producers in our Thermal & Specialized Solutions and Advanced Performance Materials businesses, and the risk of substitution of these producers by our customers could increase if these producers develop better capabilities to manufacture products similar to our specialty products.

Intellectual property rights, including patents, trade secrets, confidential information, trademarks, and tradenames are important to our business. We endeavor to protect our intellectual property rights in key jurisdictions in which our products are produced or used and in jurisdictions into which our products are imported. Our success depends to a significant degree upon our ability to protect and preserve our intellectual property rights. However, we may be unable to obtain protection for our intellectual property in key jurisdictions. Although we own and have applied for numerous patents and trademarks throughout the world, we may have to rely on judicial enforcement of our patents and other proprietary rights. Our patents and other intellectual property rights may expire or be challenged, invalidated, circumvented, and rendered unenforceable or otherwise compromised. A failure to protect, defend, or enforce our intellectual property could have an adverse effect on our financial condition and results of operations. Similarly, third parties may assert claims against us and our customers and distributors, alleging our products infringe upon third-party intellectual property rights.

We also rely upon unpatented proprietary technology, know-how, and other trade secrets to maintain our competitive position. While we maintain policies to enter into confidentiality agreements with our employees and third parties to protect our proprietary expertise and other trade secrets, these agreements may not be enforceable or, even if legally enforceable, we may not have adequate remedies for breaches of such agreements. We also may not be able to readily detect breaches of such agreements. The failure of our patents or confidentiality agreements to protect our proprietary technology, know-how, or trade secrets could result in significantly lower revenues, reduced profit margins, or loss of market share.

If we must take legal action to protect, defend, or enforce our intellectual property rights, any suits or proceedings could result in significant costs and diversion of resources and management's attention, and we may not prevail in any such suits or proceedings. A failure to protect, defend, or enforce our intellectual property rights could have an adverse effect on our financial condition and results of operations.

***Effects of price fluctuations in energy and raw materials, our raw materials contracts, and our inability to renew such contracts, could have a significant negative impact on our earnings.***

Our manufacturing processes consume significant amounts of raw materials and energy, the costs of which may be subject to worldwide supply and demand factors, global trade regulations and tariffs, GHG emissions-based regulations, and other factors beyond our control. Variations in the cost of energy, which primarily reflect market prices for oil and natural gas, and for raw materials may significantly affect our operating results from period to period. Additionally, to the extent climate change regulations and restrictions are not stringently imposed in the countries in which our competitors operate, our competitors could gain cost or other competitive advantages. Consolidation in the industries providing our raw materials may also have an impact on the cost and availability of such materials. To the extent we do not have fixed price contracts with respect to specific raw materials, we have no control over the costs of raw materials, and such costs may fluctuate widely for a variety of reasons, including changes in availability, major capacity additions or reductions, or significant facility operating problems.

When possible, we have purchased, and we plan to continue to purchase, raw materials, including titanium-bearing ores and fluorspar, through negotiated medium-term or long-term contracts to minimize the impact of price fluctuations. To the extent that we have been able to achieve favorable pricing in our existing negotiated long-term contracts, we may not be able to renew such contracts at the current prices, or at all, and this may adversely impact our profitability and cash flows from operations. However, to the extent that the prices of the raw materials that we utilize significantly decline, we may be bound by the terms of our existing long-term contracts and obligated to purchase such raw materials at higher prices as compared to other market participants.

We attempt to offset the effects of higher raw materials and energy costs through selling price increases, productivity improvements, and cost reduction programs. However, the outcome of these efforts is largely determined by existing competitive and economic conditions and may be subject to a time delay between the increase in our raw materials costs and our ability to increase prices, which could vary significantly depending on the market served. If we are not able to fully offset the effects of higher energy or raw materials costs, there could be a material adverse effect on our financial results.

***Our reported results and financial condition could be adversely affected by currency exchange rates and currency devaluation could impair our competitiveness.***

Due to our international operations, we transact in many foreign currencies, including, but not limited to, the euro, the Mexican peso, the Chinese yuan, the Japanese yen, and the Argentine peso. As a result, we are subject to the effects of changes in foreign currency exchange rates. During times of a strengthening U.S. dollar, our reported net sales and operating income will be reduced because the local currency will be translated into fewer U.S. dollars. During periods of local economic crisis, local currencies may be devalued significantly against the U.S. dollar, potentially reducing our margin. For example, depreciation of the euro against the U.S. dollar has historically negatively impacted our results of operations. We also have certain indebtedness and payables denominated in the euro, and, during times of a strengthening euro relative to the U.S. dollar, our overall debt obligations and payables in U.S. dollars equivalent will increase. Additionally, the Argentine peso has devalued significantly against the U.S. dollar in recent years, which has negatively impacted our results of operations and cash flows.

We enter into certain of our qualifying foreign currency forward contracts under a cash flow hedge program to mitigate the risks associated with fluctuations in the euro against the U.S. dollar for forecasted U.S. dollar-denominated purchases for certain of our international subsidiaries. There can be no assurance that any hedging action will lessen the adverse impact of a variation in currency rates. Also, actions to recover margins may result in lower volume and a weaker competitive position, which may have an adverse effect on our profitability. For example, in our Titanium Technologies segment, a substantial portion of our manufacturing is located in the U.S. and Mexico, while our $TiO_2$ pigment is delivered to customers around the world. Furthermore, our ore cost is principally denominated in U.S. dollars. Accordingly, in periods when the U.S. dollar or Mexican peso strengthen against other local currencies, such as the euro, our costs are higher relative to some of our competitors who operate largely outside of the U.S. and Mexico, and the benefits we realize from having lower costs associated with our manufacturing process are reduced, impacting our profitability.

***If we are unable to innovate and successfully introduce new products, or new technologies or processes reduce the demand for our products or the price at which we can sell products, our profitability could be adversely affected.***

Our industries and the end-use markets into which we sell our products experience periodic technological changes and product improvements, as well as changes in mandates on or regulation of products and services. Our future growth will depend on our ability to gauge the direction of commercial and technological progress in key end-use markets, our ability to fund and successfully develop, manufacture, and market products in such changing end-use markets, and our ability to adapt to changing regulations including climate change or environmental related regulations. We must continue to develop lower-emission manufacturing technologies and identify, develop, and market innovative products or enhance existing products on a timely basis to maintain our profit margins and our competitive position. We may be unable to develop new products or technologies, either alone or with third parties, or license intellectual property rights from third parties on a commercially competitive basis. If we fail to keep pace with the evolving technological innovations in our end-use markets on a competitive basis, including with respect to innovation related to the development of alternative uses for, or application of, products developed that utilize such end-use products, our financial condition and results of operations could be adversely affected. We cannot predict whether technological innovations will, in the future, result in a lower demand for our products or affect the competitiveness of our business. We may be required to invest significant resources to adapt to changing technologies, markets, customer behaviors and demands, competitive environments, and laws, regulations, or enforcements. We cannot anticipate market acceptance of new products or future products. In addition, we may not achieve the expected benefits associated with new products developed to meet new laws, regulations, or enforcements if the implementation of such laws, regulations, or enforcements is delayed, and we may face competition from illegal or counterfeit products in regulated markets.

***If our long-lived assets, including goodwill, become impaired, we may be required to record significant charges to earnings.***

We may be required to record a significant non-cash charge in our financial statements during the period in which any impairment of our long-lived assets, including goodwill, or other assets is determined, negatively impacting our results of operations. We have a significant amount of long-lived assets on our consolidated balance sheets. Under U.S. GAAP, we review our long-lived assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is tested for impairment on October 1 of each year, or more frequently if required. Factors that may be considered a change in circumstances, indicating that the carrying value of our long-lived assets and goodwill may not be recoverable, include, but are not limited to, changes in the industrial, economic, political, social, and physical landscapes in which we operate, a decline in our stock price and market capitalization, reduced future cash flow estimates, changes in discount rate, as well as competition or other factors leading to a reduction in expected long-term sales or profitability. Subsequent to December 31, 2023, after the announcement of the Audit Committee Internal Review, we experienced significant fluctuations in our stock price. A sustained decline in our stock price in the future could indicate the carrying value of our goodwill may not be recoverable.

In the third quarter of 2024, we concluded a triggering event was present for our Advanced Performance Materials reporting unit and associated goodwill. As a result of the quantitative goodwill impairment analysis performed, we concluded the carrying amount of the Advanced Performance Materials reporting unit exceeded its fair value, resulting in a non-cash goodwill impairment charge of $56 million. There can be no assurance that future events may not result in an impairment to the Advanced Performance Materials asset group or an impairment to any of our other reporting units' goodwill or long-lived assets.

***We could be subject to changes in our tax rates and the adoption of tax legislation or exposure to additional tax liabilities that may adversely affect our results of operations, financial condition, and cash flows.***

We are subject to taxes in the U.S. and non-U.S. jurisdictions where our subsidiaries are organized. Due to economic and political conditions, tax rates in various jurisdictions may be subject to significant change. Our future effective tax rates could be affected by and may fluctuate because of changes in the mix of earnings in countries with differing statutory tax rates, changes in the valuation of deferred tax assets and liabilities, changes in tax laws or their interpretations, and taxes associated with the repatriation of our non-U.S. earnings. Our tax returns and other tax matters are subject to examination by local tax authorities and governmental bodies. Additionally, we and our subsidiaries are engaged in intercompany transactions across multiple tax jurisdictions. Although we believe we have clearly reflected the economics of these transactions with proper local transfer pricing documentation in place, tax authorities could propose and sustain adjustments. We regularly assess the likelihood of an adverse outcome resulting from these examinations to determine the adequacy of our provision for taxes. There can be no assurance as to the outcome of these examinations. If our effective tax rates were to increase, or if the ultimate determination of the taxes owed by us is for an amount in excess of amounts previously accrued, our operating results, financial condition, and cash flows could be adversely affected. We, and our subsidiaries, are required to file certain tax returns and information reports with various tax authorities and government bodies. The failure to file returns or information reports could be punishable by civil penalties as well as other remedial measures which could adversely affect our operating results, financial condition, or cash flows.

The Organization of Economic Cooperation and Development, which represents a coalition of member countries globally, is supporting changes to numerous long-standing tax principles through its base erosion and profit shifting (“BEPS”) project. The BEPS project is focused on a number of issues, including the shifting of profits among affiliated entities located in different tax jurisdictions and a global minimum corporate income tax under "Pillar Two". Several jurisdictions in which we operated have enacted Pillar Two rules with an effective date of January 1, 2024. At this time we do not expect a material impact; however, given the scope of our international operations and uncertainty surrounding the impact of future legislation, it is difficult to assess how any changes in tax laws arising from BEPS would impact our income tax expense.

***We are subject to continuing contingent tax-related liabilities of EID.***

There are other significant areas where the liabilities of EID may become our obligations. For example, under the IRC and the related rules and regulations, each corporation that was a member of EID’s consolidated tax reporting group during any taxable period or portion of any taxable period ending on or before the effective time of the distribution is jointly and severally liable for the U.S. federal income tax liability of the entire consolidated tax reporting group for such taxable period. In connection with the Separation and distribution, we entered into a tax matters agreement with EID that allocates the responsibility for prior period taxes of EID’s consolidated tax reporting group between us and EID. If EID were unable to pay any prior period taxes for which it is responsible, however, we could be required to pay the entire amount of such taxes, and such amounts could be significant. Other provisions of federal, state, local, or foreign law may establish similar liability for other matters, including laws governing tax-qualified pension plans, as well as other contingent liabilities.

***We are a holding company that is dependent on cash flows from our operating subsidiaries to fund our debt obligations, MOU escrow funding requirements, capital expenditures, and ongoing operations.***

All of our operations are conducted, and all of our assets are owned, by our operating companies, which are our subsidiaries. We intend to continue to conduct our operations at the operating companies and any future subsidiaries. Consequently, our cash flows and our ability to meet our obligations, including our debt obligations, MOU escrow funding requirements, or make cash distributions depends upon the cash flows of our operating companies and any future subsidiaries, as well as the ability of our operating companies and any future subsidiaries to transfer funds in the form of dividends or otherwise.

Our debt is generally the exclusive obligation of The Chemours Company and our guarantor subsidiaries, as described in "Note 20 – Debt" to the *Consolidated Financial Statements*. Because a significant portion of our operations are conducted by non-guarantor subsidiaries, our cash flows and our ability to service indebtedness, including our ability to pay the interest on our debt when due and principal of such debt at maturity, are dependent to a large extent upon cash dividends and distributions or other transfers from such non-guarantor subsidiaries. Any payment of dividends, distributions, loans, or advances by our non-guarantor subsidiaries to us could be subject to restrictions on dividends or repatriation of earnings under applicable local law, monetary transfer restrictions, and foreign currency exchange regulations in the jurisdictions in which our subsidiaries operate, and any restrictions imposed by the current and future debt instruments of our non-guarantor subsidiaries.

Our subsidiaries are separate legal entities and, except for our guarantor subsidiaries, have no obligation, contingent or otherwise, to pay any amounts due on our debt or to make any funds available for those amounts, whether by dividends, loans, distributions, or other payments, and do not guarantee the payment of interest on, or principal of, our debt. Any right that we have to receive any assets of any of our subsidiaries that are not guarantors upon the liquidation or reorganization of any such subsidiary, and the consequent right of holders of the outstanding notes to realize proceeds from the sale of their assets, will be structurally subordinated to the claims of that subsidiary's creditors, including trade creditors and holders of debt issued by that subsidiary.

The ability of our operating companies and any future subsidiaries to make any payments to us depends on their earnings, the terms of their indebtedness, including the terms of any credit facilities, and legal restrictions regarding the transfer of funds.

***Failure to meet some or all of our key financial and non-financial targets could negatively impact the value of our business and adversely affect our stock price.***

From time to time, we may announce certain key financial and non-financial targets that are expected to serve as benchmarks for our performance or for our liquidity for a given time period, including goals for our future net sales growth, adjusted earnings before interest, taxes, depreciation, and amortization, adjusted earnings per share, free cash flows, return on invested capital, net leverage ratio, corporate responsibility commitments, and/or sustainability commitments. Our failure to meet one or more of these key targets may negatively impact our results of operations, stock price, and stockholder returns. The factors influencing our ability to meet these key targets include, but are not limited to, changes in the global economic environment, changes in our competitive landscape, including our relationships with new or existing customers, our ability to introduce new products, applications, or technologies, our undertaking of an acquisition, joint venture, or other strategic arrangement, the outcome of any new or existing litigation, our failure to comply with new or existing laws or regulations, and other factors described within this *Item 1A – Risk Factors*, many of which are beyond our control.

***A pandemic, epidemic, or other outbreak of infectious disease may have a material adverse effect on our business operations, results of operations, financial condition, and cash flows.***

Our operational and financial condition may be negatively impacted by the widespread outbreak of any illnesses or communicable diseases, as well as any associated public health crises that may ensue, such as the COVID-19 pandemic. To minimize transmission, social and economic restrictions have been or may be imposed in the U.S. and abroad, including travel bans, quarantines, restrictions on public gatherings, shelter-in-place orders, and/or safer-at-home orders. These restrictions, while necessary and important for public health, can have negative implications for our business and the U.S. and global economies.

The widespread outbreak of any illness or communicable disease could result in a significant health crisis that adversely affects local and global economies and financial markets. The effects of any significant health crisis have the potential to have a material adverse impact on our business operations, results of operations, financial condition, and cash flows, and may also exacerbate our other risks, as described within this *Item 1A – Risk Factors*, any of which could have a material effect on us, including among other things, risks associated with our indebtedness, such as available capacity and compliance with debt covenants, risks related to the adequacy of our cash flows and earnings or other conditions which may affect our liquidity, and risks related to our ongoing ability to pay dividends and repurchase common stock.

## Risks Related to Our Operations

***Our ability to make future strategic decisions regarding our manufacturing operations are subject to regulatory, environmental, political, legal, and economic risks, and to a certain extent may be subject to consents or cooperation from EID under the agreements entered into between us and EID as part of the Separation. These could adversely affect our ability to execute our future strategic decisions and our results of operations, financial condition and cash flows.***

One of the ways we may improve our business is through the expansion or improvement of our facilities. Construction of additions or modifications to facilities involves numerous regulatory, environmental, political, legal, and economic uncertainties that are beyond our control and are subject to various start-up risks and consent to operate. Difficulties in obtaining and maintaining any of the requisite licenses, permits, and authorizations from governmental or regulatory authorities could increase the total cost, delay, jeopardize, prevent the construction or opening of such facilities, or cause shutdowns of such facilities. Our expansion or improvement projects may also require the expenditure of significant amounts of capital, and financing may not be available on economically acceptable terms, or at all. As a result, these projects may not be completed on schedule, at the budgeted cost, or at all, which may adversely affect our results of operations, financial condition, and cash flows. Moreover, our revenue may not increase immediately upon the expenditure of funds on a particular project or may be negatively impacted by regulatory or other developments relating to the chemicals we use or manufacture. As a result, we may not be able to realize our expected investment return, which could also adversely affect our results of operations, financial condition, and cash flows.

We periodically assess our manufacturing operations in order to manufacture and distribute our products in the most efficient manner and to minimize the potential impacts of climate-related physical risks on our operations. Based on our assessments, we may make strategic decisions regarding our manufacturing operations, such as capital improvements to modernize certain units and/or improve structural resilience, move manufacturing or distribution capabilities from one plant or facility to another plant or facility, discontinue manufacturing or distributing certain products, or close or divest all or part of a manufacturing plant or facility, some of which have significant shared services and lease agreements with EID. These agreements may adversely impact our ability to make these strategic decisions regarding our manufacturing operations. Further, if such agreements are terminated or revised, we would have to assess and potentially adjust our manufacturing operations, the closure or divestiture of all or part of a manufacturing plant or facility that could result in future charges that could be significant.

***Hazards associated with chemical manufacturing, storage, containment, and transportation could adversely affect our results of operations.***

There are hazards associated with chemical manufacturing and the related storage, containment, and transportation of raw materials, products, and wastes, and the safety of our employees and communities. These hazards could lead to an interruption or suspension of operations and have an adverse effect on the productivity and profitability of a particular manufacturing facility or on us as a whole, which could result in potential impairments of assets. While we endeavor to provide adequate protection for the safety of our employees and the safe-handling of these materials, issues could be created by various events, including unforeseen accidents or defects, natural disasters, severe weather events, acts of sabotage, employees malfeasance, military actions, terrorism, and performance by third parties, including tenants at certain of our manufacturing facilities, and, as a result, we could face the following potential hazards, among others:

- piping and storage tank leaks and ruptures;
- mechanical failure;
- employee exposure to hazardous substances;
- fires and explosions; and,
- chemical spills and other discharges or releases of toxic or hazardous substances or gases.

These hazards may cause personal injury and loss of life, damage to property, contamination of the environment, and damage to natural resources, which could lead to government fines and penalties, remedial obligations, work stoppage injunctions, claims and lawsuits by injured persons, damage to our public reputation and brands, loss of sales and market access, customer dissatisfaction, and diminished product acceptance. If such actions are determined adversely to us or there is an associated economic impact to our business, we may have inadequate insurance or cash flows to offset any associated costs. Such outcomes could adversely affect our financial condition, results of operations and cash flows.

***Our results of operations and financial condition could be seriously impacted by business disruptions, including environmental, weather, and natural disasters.***

We and certain of our customers and suppliers have experienced business and/or supply chain disruptions, plant downtime, power outages, and other disruptions, caused by, among other things, environmental and natural disaster incidents. The nature of our business dictates that we maintain significant concentrations of physical assets, many of which are large users of water, in geographic locations which may be vulnerable to the impacts of climate change, including weather or geological events or natural disasters, such as, but not limited to, hurricanes, earthquakes, flood, prolonged droughts or wild fires (whether as a result of climate change or otherwise), significant changes in storm patterns and intensities, water shortages, increasing atmospheric and water temperatures, and rising sea levels. Such events could also seriously harm our operations, as well as the operations of our customers and suppliers, and accordingly, we continue to study the long-term implications of changing climate parameters on plant siting, operational issues, and water availability. For example, in June 2024, we had to temporarily pause production at our Altamira $TiO_2$ manufacturing facility in Mexico for approximately three weeks due to severe drought conditions. We may experience similar type disruptions in the future, which could have a material negative impact on our business, results of operations, financial condition, and cash flows in the future.

Preparedness plans pertaining to the physical aspects of our business have been developed with detailed actions needed in the event of unforeseen events or severe weather. We also engineer our facilities to better withstand these events and hold insurance coverage to protect against losses from physical damages and related business interruptions. These measures have historically been in place, and such activities and associated costs are driven by normal operational preparedness. However, there can be no assurance that such measures will be effective for a particular event that we may experience.

***We participate in certain business relationships where we may be adversely impacted by the actions of the joint venture, its participants, or other partners.***

We have investments in and commitments to certain unconsolidated joint ventures with unrelated parties. If the business relationships or their participants do not honor their obligations, or perform the way we expected them to, we may be required to expend additional resources or suffer losses, which could be significant. In addition, because we generally do not control these business relationships, our investments may be illiquid and we may not always agree with our partners on major decisions. Disputes between us and partners may result in litigation or arbitration that could increase our expenses and distract our management team.

***Our results of operations and financial condition could be seriously impacted by business disruptions and security breaches, including cybersecurity incidents.***

We and certain of our customers and suppliers have experienced business and/or supply chain disruptions, plant downtime, power outages, and/or information technology system and network disruptions. These types of disruptions may be caused by, among other things, acts of sabotage, employee error or other actions, geo-political activity, military actions, and terrorism (including cyberterrorism). Although none of the aforementioned disruptions and/or events has materially impacted us to date, we may experience similar type disruptions in the future, which could have a material negative impact on our business, results of operations, financial condition, and cash flows in the future.

Failure to effectively prevent, detect, and recover from security breaches, including attacks on information technology and infrastructure by hackers, viruses, breaches due to employee error or other actions, or other disruptions, could result in misuse of our assets, business disruptions, loss of property including trade secrets and confidential business information, legal claims or proceedings, reporting errors, processing inefficiencies, negative media attention, loss of sales, and interference with regulatory compliance. Such risks are particularly relevant in consideration of remote working arrangements utilized by our workforce where practicable. Like most major corporations, we have been, and expect to be, the target of industrial espionage, including cyberattacks, from time to time. We have determined that these attacks have resulted, and could result in the future, in unauthorized parties gaining access to certain confidential business information, and have included the obtaining of trade secrets and proprietary information related to the chloride manufacturing process for $TiO_2$ pigment by third parties. Although we do not believe that we have experienced any material losses to date related to these breaches, there can be no assurance that we will not suffer any such losses in the future. We actively manage the risks within our control that could lead to business disruptions and security breaches. As these threats continue to evolve, particularly around cybersecurity, we may be required to expend significant resources to enhance our control environment, processes, practices, and other protective measures. Despite these efforts, such events could materially adversely affect our business, financial condition, or results of operations.

Our information technology is provided by a combination of internal and external services and service providers, and we rely on information technology in many aspects of our business, including internal and external communications, and the management of our accounting, finance, and supply chain functions. Further, our business involves the use, storage, and transmission of information about customers, suppliers, and employees. As we become more dependent on information technology to conduct our business, and as the number and sophistication of cyberattacks increases, the risks associated with cybersecurity, information security, and data privacy also increases. In response to such risks, we provide our employees with cyber and information security training on a periodic and an annual basis. We have a comprehensive approach to cyber security which includes a robust cyber security education program focused on cyber risk and prevention measures, using online situational awareness training and continuous phishing simulations. Failure to maintain effective internal control over our information technology and infrastructure could materially adversely affect our business, financial condition, or results of operations, and/or have a material adverse impact on our stock price.

Preparedness plans pertaining to the cyber-related aspects of our business have been developed with detailed actions needed in the event of unforeseen events. These measures have historically been in place, and such activities and associated costs are driven by normal operational preparedness. However, there can be no assurance that such measures will be effective for a particular event that we may experience.

***Our operations could be materially impacted in the event of a failure of our information technology infrastructure.***

We currently use an enterprise resource planning (“ERP”) software platform that is no longer supported; however, we pay for extended, customer-specific support, which is costly. We are currently evaluating our options to upgrade or replace our existing platform. Any systems failure, accident, or security breach could result in significant costs or disruptions to our operations, which could have a material adverse effect on our business. Further, such improvements and upgrades or replacements are often complex, costly, and time-consuming. We may also experience challenges integrating any new ERP software platform with our existing technology systems, or may uncover problems with our existing technology systems. Any attempt to upgrade or implement a replacement could result in outages, a disruption to our operations, and our ability to serve our customers.

***If we identify a material weakness in internal control over financial reporting, or if we fail to maintain an effective system of internal controls, we may not be able to accurately determine our financial results or prevent fraud, either of which could have a material effect on us.***

Effective internal controls are necessary for us to provide reliable financial reports and effectively prevent fraud. Section 404 of the Sarbanes-Oxley Act of 2002 requires us to evaluate and report on our internal control over financial reporting. We cannot be certain that we will be successful in maintaining adequate internal control over our financial reporting and financial processes in the future. We may in the future discover areas of our internal controls that need improvement. Furthermore, to the extent our business grows or significantly changes, our internal controls may become more complex, and we could require significantly more resources to ensure our internal controls remain effective. As discussed further in Part II, *Item 9A* of this Annual Report on Form 10-K, in 2023 we identified certain material weaknesses in our internal control over financial reporting, all of which have been remediated as of December 31, 2024. If we identify material weaknesses in the future, it could negatively impact our operations or the market value of our common stock. Additionally, the existence of any material weakness may require management to devote significant time and incur significant expense to remediate any such material weaknesses and management may not be able to remediate any such material weaknesses in a timely manner.

***We have incurred and expect to continue to incur significant expenses related to the Audit Committee Internal Review and the remediation of the material weaknesses in our internal control over financial reporting.***

We have devoted substantial internal and external resources towards the Audit Committee Internal Review and expect to continue to devote substantial resources towards the implementation of enhanced procedures and controls over deficiencies and the remediation of material weaknesses in our internal control over financial reporting. Because of these efforts, we have incurred and expect that we will continue to incur significant fees and expenses for legal, accounting, financial and other consulting and professional services, as well as the implementation and maintenance of systems and processes that will need to be updated, supplemented or replaced. Additionally, we have indemnification and expense advancement obligations pursuant to our bylaws and indemnification agreements with respect to certain current and former members of senior management and our directors. In connection with the Audit Committee Internal Review, we have received requests from former members of senior management under such indemnification agreements and our bylaws to provide advances of funds for legal fees and other expenses, and we expect additional requests in connection with the Audit Committee Internal Review and any future related litigation, which could be significant. We have taken several remediation efforts in response to the Audit Committee Internal Review. However, there can be no assurance that these steps and future steps will be successful. To the extent these steps are unsuccessful or incomplete, or we identify additional matters requiring remediation, we may be required to devote significant additional time and expense to additional remediation efforts. The incurrence of significant additional expenses or the requirement that management devote substantial time to these efforts could reduce the time otherwise available to execute on our business strategies and could have a material adverse effect on our results of operations, financial condition, and cash flows.

## Risks Related to Our Indebtedness

***Our current level of indebtedness could adversely affect our financial condition or liquidity, and we could have difficulty fulfilling our obligations under our indebtedness, which may have a material adverse effect on us.***

As of December 31, 2024, we had approximately $4.1 billion of indebtedness. At December 31, 2024, together with the guarantors, we had approximately $1.5 billion of indebtedness outstanding under our senior secured credit facilities, and a net $640 million of revolving credit facility ("Revolving Credit Facility") availability after letters of credit, which would be senior secured indebtedness, if drawn (collectively, the "Senior Secured Credit Facilities"). Our current level of indebtedness increases the risk that we may be unable to generate cash sufficient to pay amounts due in respect of our indebtedness. The level of our indebtedness could have other important consequences on our business, including:

- making it more difficult for us to satisfy our obligations with respect to indebtedness;
- increasing our vulnerability to adverse changes in general economic, industry, and competitive conditions;
- requiring us to dedicate a significant portion of our cash flows from operations to make principal and interest payments on our indebtedness, thereby reducing the availability of our cash flows to fund working capital and other general corporate purposes;
- limiting our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;
- restricting us from capitalizing on business opportunities;
- placing us at a competitive disadvantage compared to our competitors that have less debt;
- limiting our ability to borrow additional funds for working capital, acquisitions, debt service requirements, execution of our business strategy, or other general corporate purposes;
- requiring us to provide additional credit support, such as letters of credit or other financial guarantees, to our customers, suppliers, or regulators, thereby limiting our availability of funds under our Revolving Credit Facility;
- limiting our ability to enter into certain commercial arrangements because of concerns of counterparty risks; and,
- limiting our ability to adjust to changing market conditions and placing us at a competitive disadvantage compared to our competitors that have less debt.

The occurrence of any one or more of these circumstances could have a material adverse effect on us.

Our ability to make scheduled payments on and to refinance our indebtedness, including on our outstanding notes, depends on and is subject to our financial and operating performance, which in turn is affected by general and regional economic, financial, competitive, business, and other factors (many of which are beyond our control), including the availability of financing in the international banking and capital markets. We cannot be certain that our business will generate sufficient cash flows from operations or that future borrowings will be available to us in an amount sufficient to enable us to service our debt, including the outstanding notes, to refinance our debt, or to fund our other liquidity needs.

If we are unable to meet our debt service obligations or to fund our other liquidity needs, we will need to restructure or refinance all or a portion of our debt, including the outstanding notes. Failure to successfully restructure or refinance our debt could cause us to default on our debt obligations and would impair our liquidity. Our ability to restructure or refinance our debt will depend on the condition of the capital markets, which is outside of our control, and our financial condition at such time. Any refinancing of our indebtedness could be at higher interest rates and may require us to comply with more onerous covenants that could further restrict our business operations.

Moreover, in the event of a default of our debt service obligations, if not cured or waived, the holders of the applicable indebtedness, including holders of our outstanding notes and the Senior Secured Credit Facilities, could elect to declare all the funds borrowed to be due and payable, together with accrued and unpaid interest. Our assets or cash flows may not be sufficient to fully repay borrowings under our outstanding debt instruments if accelerated upon an event of default. First, a default in our debt service obligations in respect of the outstanding notes would result in a cross-default under the Senior Secured Credit Facilities. The foregoing would permit the lenders under the Revolving Credit Facility to terminate their commitments thereunder and cease making further loans, and would allow the lenders under the Senior Secured Credit Facilities to declare all loans immediately due and payable and to institute foreclosure proceedings against their collateral. Second, any event of default or declaration of acceleration under the Senior Secured Credit Facilities or certain other agreements relating to our outstanding indebtedness could also result in an event of default under the indenture governing the outstanding notes, and any event of default or declaration of acceleration under any other of our outstanding indebtedness may also contain a cross-default provision. Any such default, event of default if not cured or waived, or declaration of acceleration could force us into bankruptcy, reorganization, insolvency, or liquidation.

Refer to "Note 20 – Debt" to the *Consolidated Financial Statements* for further discussion related to our indebtedness.

***Despite our current level of indebtedness, we may incur substantially more debt and enter into other transactions, which could further exacerbate the risks to our financial condition described above.***

Notwithstanding our current level of indebtedness, we may incur significant additional indebtedness and related interest expense in the future, including additional secured indebtedness (including the $900 million maximum capacity under the Revolving Credit Facility) that would be effectively senior to our outstanding notes. Although the indenture that governs the outstanding notes and the credit agreement that governs the Senior Secured Credit Facilities contain restrictions on our ability to incur additional indebtedness and to enter into certain types of other transactions, these restrictions are subject to a number of significant qualifications and exceptions. Additional indebtedness incurred in compliance with these restrictions, including additional secured indebtedness, could be substantial. These restrictions also do not prevent us from incurring obligations, such as trade payables, that do not constitute indebtedness as defined under our debt instruments. To the extent such new debt is added to our current debt levels, the substantial leverage risks described in the immediately preceding risk factor would increase.

***We may need additional capital in the future and may not be able to obtain it on favorable terms, or at all.***

Our industry is capital intensive, and we may require additional capital in the future to finance our growth and development, implement further marketing and sales activities, fund ongoing R&D activities, make investments driven by environmental compliance, and meet general working capital needs. Our capital requirements will depend on many factors, including acceptance of and demand for our products, the extent to which we invest in new technology and R&D projects, and the status and timing of these developments, as well as the general availability of capital from debt and/or equity markets. However, debt or equity financing may not be available to us on terms we find acceptable, if at all. If we are unable to raise additional capital when needed, our financial condition could be materially and adversely affected.

Additionally, our failure to maintain the credit ratings on our debt securities, including the outstanding notes, could negatively affect our ability to access capital and could increase our interest expense on future indebtedness. We expect the credit rating agencies to periodically review our capital structure and the quality and stability of our earnings, including environmental, social and governance-related impacts. Deterioration in our capital structure or the quality and stability of our earnings could result in a downgrade of our overall credit ratings and our debt securities. On June 3, 2024, Moody’s affirmed our Ba3 rating with stable outlook. On April 17, 2024, S&P Global affirmed our BB- credit rating with negative outlook. These negative rating agency actions could constrain the capital available to us, reduce or eliminate available borrowing to us, and could limit our access to and/or increase the cost of funding our operations. If, as a result, our ability to access capital when needed becomes constrained, our interest costs could increase, which could have material adverse effect on our results of operations, financial condition, and cash flows.

***The agreements governing our indebtedness restrict our current and future operations, particularly our ability to respond to changes or to take certain actions.***

The agreements governing our indebtedness, including the outstanding notes, contain, and the agreements governing future indebtedness and future debt securities may contain, significant restrictive covenants and, in the case of the Revolving Credit Facility, financial maintenance and negative covenants that will limit our operations, including our ability to engage in activities that may be in our long-term best interests. These restrictive covenants may limit us, and our restricted subsidiaries, from taking, or give rights to the holders of our indebtedness in the event of, the following actions:

- incurring additional indebtedness and guaranteeing indebtedness and other obligations;
- paying dividends or making other distributions in respect of, or repurchasing or redeeming, our capital stock;
- making acquisitions or other investments;
- prepaying, redeeming, or repurchasing certain indebtedness;
- selling or otherwise disposing of assets;
- selling stock of our subsidiaries;
- incurring liens;
- entering into transactions with affiliates;
- entering into agreements restricting our subsidiaries’ ability to pay dividends;
- entering into transactions that result in a change of control of us; and,
- consolidating, merging, or selling all or substantially all of our assets.

Our failure to comply with those covenants could result in an event of default that, if not cured or waived, could result in the acceleration of some or all of our indebtedness, which could lead us to bankruptcy, reorganization, or insolvency.

***Our variable rate indebtedness subjects us to interest rate risk, which could cause our indebtedness service obligations to increase significantly.***

Our borrowings under the Senior Secured Credit Facilities are at variable rates and expose us to interest rate risk. As a result, if interest rates increase, our debt service obligations under the Senior Secured Credit Facilities or other variable rate debt would increase, even though the amount borrowed would remain the same, and our net income and cash flows, including cash available for servicing our indebtedness, would correspondingly decrease. We may use, from time to time, derivative instruments to mitigate interest rate risk. However, there is no guarantee that derivative contracts may be available to us and/or if such contracts will provide the desired results. As of December 31, 2024, we had approximately $1.5 billion of our outstanding debt under the Senior Secured Credit Facilities at variable interest rates, which resulted in interest expense of $127 million.

Refer to “Note 26 – Financial Instruments” to the *Consolidated Financial Statements* for further details regarding our interest rate swaps designated as a cash flow hedge.

***Adverse developments affecting the financial markets and currency exchange rates, including events or concerns involving liquidity, defaults or non-performance by financial institutions or transactional counterparties, could adversely affect our business, financial condition, results of operations or cash flows.***

While we do not foresee any concerns around our liquidity, events involving limited liquidity, defaults, non-performance or other adverse developments that affect financial institutions, transactional counterparties or the financial services industry generally, or concerns about any events of these kinds or other similar risks, have in the past and may in the future lead to market-wide liquidity problems. Although we assess our banking and customer relationships as we believe necessary or appropriate, our access to funding sources and other credit arrangements in amounts adequate to finance our current and future business operations could be significantly impaired by factors that affect us, the financial services industry or economy in general. These factors could include, among others, events such as liquidity constraints or failures, the ability to perform obligations under various types of financial, credit or liquidity agreements or arrangements, disruptions or instability in the financial markets, or concerns or negative expectations about the prospects for companies in the financial services industry.

In addition, investor, regulatory, or other concerns regarding the U.S. or international financial systems could result in less favorable commercial financing terms, including higher interest rates or costs and tighter financial and operating covenants, or systemic limitations on access to credit and liquidity sources, thereby making it more difficult for us to acquire financing on acceptable terms or at all. Any decline in available funding or access to our cash and liquidity resources could, among other risks, adversely impact our ability to meet our operating expenses, financial obligations or fulfill our other obligations or result in breaches of our contractual obligations. Any of these impacts, or any other impacts resulting from the factors described above or other related or similar factors not described above, could have material adverse impacts on our liquidity and our business, results of operations, financial condition, and cash flows.

## General Risk Factors

***Our stock price could become more volatile and investments could lose value.***

The market price for our common stock may be affected by a number of factors, including, but not limited to:

- our quarterly or annual earnings, or those of other companies in our industry;
- actual or anticipated fluctuations in our operating results;
- changes in earnings estimates by securities analysts or our ability to meet those estimates or our earnings guidance;
- anticipated or actual outcomes or resolutions of legal or other contingencies;
- internal factors, such as the Audit Committee Internal Review, unplanned changes in senior management, and material weaknesses in internal control over financial reporting;
- the operating and stock price performance of other comparable companies;
- a change in our dividend or stock repurchase activities;
- changes in applicable rules and regulations and the reputation of our business;
- the announcement of new products by us or our competitors;
- overall market fluctuations and domestic and worldwide economic conditions; and,
- other factors described within this *Item 1A – Risk Factors*, and elsewhere within this Annual Report on Form 10-K.

A significant drop or rise in our stock price could expose us to costly and time-consuming litigation and may lead to an increase in shareholder activism and could adversely affect our relationship with shareholders, including employees receiving stock-based compensation, which could result in substantial costs and divert management's attention and resources, resulting in an adverse effect on our business. See also "*As a result of the Audit Committee Internal Review, we may be exposed to litigation from investors and/or regulatory entities, which may adversely affect our reputation, results of operations, financial condition, and cash flows*" for a discussion of recent requests for information and potential private litigation.

***We cannot guarantee the timing or amount of our dividends, if any, and/or our share repurchases, which are subject to a number of uncertainties that may affect the price of our common stock.***

The declaration, payment, and amount of any dividends, and/or the decision to purchase common stock under our share repurchase programs, are subject to the sole discretion of our board of directors and, in the context of our capital allocation strategy, will depend upon many factors, including our financial condition, operating results, cash flows, and relevant prospects, our capital requirements and access to capital markets, covenants associated with certain of our debt obligations, legal requirements, and other factors that our board of directors may deem relevant, and there can be no assurances that we will continue to pay a dividend or repurchase our common shares in the future.

The reduction or elimination of our dividends or share repurchase programs could adversely affect the price of our common stock. Additionally, any repurchases of our common stock will reduce the amount of our common stock outstanding. There can be no assurances that any share repurchase activity will increase stockholder value due to market fluctuations in the price of our common stock, which may reduce the price of our common stock to levels below the repurchase price. Although our share repurchase programs are designed to enhance long-term shareholder value, short-term fluctuations in the market price of our common stock could reduce the program's overall effectiveness.

***A stockholder's percentage of ownership in us may be diluted in the future.***

A stockholder's percentage ownership in our common stock may be diluted because of equity issuances for acquisitions, capital market transactions, or otherwise, including, without limitation, equity awards that we may be granting to our directors, officers, and employees. Such issuances may have a dilutive effect on our earnings per share, which could adversely affect the market price of our common stock.

In addition, our amended and restated certificate of incorporation authorizes us to issue, without the approval of our stockholders, one or more classes or series of preferred stock having such designation, powers, preferences, and relative participating, optional, and other special rights, including preferences over our common stock with respect to dividends and distributions, as our board of directors generally may determine. The terms of one or more classes or series of preferred stock could dilute the voting power or reduce the value of our common stock. For example, we could grant the holders of preferred stock the right to elect some number of our directors in all events or on the happening of specified events or to veto specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences we could assign to holders of preferred stock could affect the residual value of our common stock.

***Certain provisions in our amended and restated certificate of incorporation and amended and restated by-laws, and of Delaware law, may prevent or delay an acquisition of us, which could decrease the trading price of the common stock.***

Our amended and restated certificate of incorporation and amended and restated by-laws contain, and Delaware law contains, provisions that are intended to deter coercive takeover practices and inadequate takeover bids by making such practices or bids unacceptably expensive to the bidder and to encourage prospective acquirers to negotiate with our board of directors rather than to attempt a hostile takeover. These provisions include, among others:

- the inability of our stockholders to act by written consent;
- the limited ability of our stockholders to call a special meeting;
- rules regarding how stockholders may present proposals or nominate directors for election at stockholder meetings;
- the right of our board of directors to issue preferred stock without stockholder approval;
- the ability of our directors, and not stockholders, to fill vacancies (including those resulting from an enlargement of the board of directors) on our board of directors; and,
- the requirement that stockholders holding at least 80% of our voting stock are required to amend certain provisions in our amended and restated certificate of incorporation and our amended and restated by-laws.

In addition, we are subject to Section 203 of the Delaware General Corporations Law (“DGCL”). Section 203 of the DGCL provides that, subject to limited exceptions, persons that (without prior board of directors approval) acquire, or are affiliated with a person that acquires, more than 15% of the outstanding voting stock of a Delaware corporation shall not engage in any business combination with that corporation, including by merger, consolidation, or acquisitions of additional shares, for a three-year period following the date on which that person or its affiliate becomes the holder of more than 15% of the corporation’s outstanding voting stock.

We believe these provisions will protect our stockholders from coercive or otherwise unfair takeover tactics by requiring potential acquirers to negotiate with our board of directors and by providing our board of directors with more time to assess any acquisition proposal. These provisions are not intended to make us immune from takeovers. However, these provisions will apply even if an acquisition proposal or offer may be considered beneficial by some stockholders and could delay or prevent an acquisition that our board of directors determines is not in our and/or our stockholders’ best interests. These provisions may also prevent or discourage attempts to remove and replace incumbent directors.

Several of the agreements that we have entered into with EID require EID’s consent to any assignment by us of our rights and obligations, or a change of control of us, under the agreements. The consent rights set forth in these agreements might discourage, delay, or prevent a change of control that a stockholder may consider favorable.

***Our success depends on our ability to attract and retain key employees, and to identify and develop talented personnel to succeed our senior management and other key employees.***

Our success depends on the performance of our key employees, including our senior management team, which is currently led by a new Chief Executive Officer. If we are unable to identify, attract, retain, and develop a talented, diverse set of leaders, whether due to technical, geographical, social, or other differences, our results of operations, financial condition, and cash flows could be adversely affected. Further, if we are unable to effectively plan for the succession of our senior management team, our results of operations, financial condition, and cash flows could be adversely affected, as we may be unable to realize our business strategy. While our ongoing personnel practices identify a succession process for our key employees, we cannot guarantee the effectiveness of this process, the continuity of highly-qualified individuals serving in all of our key positions at particular moments in time, and/or the completeness of any knowledge transfer at the time of succession, including its impacts on our general operations and on our internal control over our financial reporting.

***We may experience a disruption of our business activities and our business could be adversely affected due to senior management transitions.***

We have had several unplanned senior management changes recently, including our then-Chief Executive Officer, then-Chief Financial Officer, and then-Controller being placed on administrative leave in February 2024, and the appointment of our current Chief Executive Officer and Chief Financial Officer. Leadership transitions and management changes can be difficult to manage, particularly if they are unplanned, inherently cause some loss of institutional knowledge and may cause uncertainties or a disruption to our business or increase the likelihood of turnover in key officers and employees. Our ability to execute our business strategies may be impacted by the uncertainty associated with these transitions and the time and attention of our board of directors and management may be required to dedicate to management transitions could disrupt our business. These factors could have a material adverse effect on our results of operations, financial condition, and cash flows.

## Item 1B. UNRESOLVED STAFF COMMENTS

None.

## Item 1C. CYBERSECURITY

Chemours recognizes the critical importance of maintaining a cybersecurity program to provide a secure and reliable computing environment protecting our information, systems and assets and to enable our digital transformation goals. Our cyber and information security program (the “Program”) is based upon standards published by the National Institute of Standards and Technology (“NIST”) in their Cybersecurity Framework. The goals of our Program are:

- identifying, preventing, and mitigating cybersecurity threats to the Company;
- preserving the confidentiality, security, and availability of the information that we collect and store to use in our business;
- protecting our intellectual property;
- maintaining the confidence of our customers, business partners and other stakeholders; and
- providing appropriate public disclosure of cybersecurity risks and incidents, when required.

The Chief Information Security Officer (“CISO”) is the Chemours executive principally responsible for managing and maintaining the Program, is accountable for managing risk, ensuring that the organization’s security posture is aligned with its business objectives, and providing timely updates to senior management on such efforts. The CISO reports to the Chief Information Officer. The current CISO has more than seven years with Chemours and over 25 years of total cyber and information security experience with multiple companies across both the private and public sector in CISO and other information security roles.

The CISO manages and is supported by a global team of risk managers, cyber defenders, architects, and engineers with the knowledge and experience to carry out day-to-day cybersecurity operations. They are also supported by third parties who provide threat intelligence, global infrastructure monitoring, and threat detection and response to cyber events. In addition, our Corporate Security team, a part of the Legal organization, has open lines of communication with various Federal, State and International law enforcement agencies to gain access to the latest cyber situational awareness.

We assess third-party cybersecurity controls through a cybersecurity questionnaire and include information security and privacy addendums to our contracts, where applicable. We also require that our vendors and other third parties report cybersecurity incidents to us so that we can assess the impact of the incident on us.

We educate our employees and contractors annually on cyber risks and prevention, monthly using online situational awareness training, active employee engagement, and ongoing phishing simulations.

The CISO has an incident response plan designed to address potential cybersecurity incidents and notify appropriate leadership while determining the material impact through a cyber sub-committee of management’s Disclosure Committee. The plan also includes implementing long-term strategies for recovery and prevention of future incidents.

A key part of our strategy for managing risks from cybersecurity threats is the ongoing assessment and testing of our processes and practices through auditing, assessments, tabletop exercises, threat modeling, and other exercises focused on evaluating the effectiveness of the Program.

The board of directors is responsible for oversight of our Enterprise Risk Management process ("ERM") and is informed of the risks associated with cybersecurity through periodic ERM updates. The Board has also delegated oversight of the cybersecurity and information security programs and processes for assessing, identifying and managing material risks from cybersecurity threats to the Audit Committee. The Audit Committee regularly meets with the CISO to review and discuss cybersecurity risks, the status of ongoing cyber initiatives and strategies, incident reports and learnings, as well as key performance indicators. The results of any cyber risk assessments, audits, and reviews are reported to the Audit Committee and, ultimately, the board of directors, and we adjust our cybersecurity policies, standards, processes and practices as necessary based on the information provided by the assessments, audits and reviews.

Although our Risk Factors include further details about the cybersecurity risks we face, we believe that risks from prior cybersecurity threats, including any previous cybersecurity incidents, have not materially affected our business to date. We can provide no assurance that there will not be incidents in the future or that they will not materially affect us, including our business strategy, results of operations, or financial condition.

## Item 2. PROPERTIES

### Our Production Facilities and Technical Centers

Our corporate headquarters is located in Wilmington, Delaware, and we maintain a global network of production facilities and technical centers located in cost-effective and strategic locations. We also use contract manufacturing and joint venture partners in order to provide regional access or to lower manufacturing costs, as appropriate.

The following chart sets forth our production facilities at December 31, 2024.

| | | Production Facilities | | |
|---|---|---|---|---|
| Region | Thermal & Specialized Solutions | Titanium Technologies | Advanced Performance Materials | Shared Locations |
| North America | Corpus Christi, Texas<br>El Dorado, Arkansas (1)<br>LaPorte, Texas (1)<br>Louisville, Kentucky (1) | DeLisle, Mississippi<br>New Johnsonville, Tennessee<br>Jesup, Georgia (Mine) (1)<br>Nahunta, Georgia (Mine) (1)<br>Offerman, Georgia (Mineral Separation)<br>Starke, Florida (Mine & Mineral Separation) | Deepwater, New Jersey<br>Elkton, Maryland (1)<br>Fayetteville, North Carolina<br>Louisville, Kentucky<br>Parlin, New Jersey (1)<br>Washington, West Virginia | Belle, West Virginia (3) |
| Europe, the Middle East, and Africa | | | Mechelen, Belgium<br>Villers St. Paul, France (1) | Dordrecht, Netherlands (4) |
| Latin America | Barueri, Brazil (1)<br>Manaus, Brazil (1)<br>Monterrey, Mexico (1) | Altamira, Mexico | | |
| Asia Pacific | Chiba, Japan (2) | | Shimizu, Japan (2)<br>Sichuan, China (2) | Changshu, China (2) (4) |

(1)Site is leased from a third party.

(2)Site with joint venture equity affiliates.

(3)Shared site between the Thermal & Specialized Solutions and Other segments.

(4)Shared site between the Thermal & Specialized Solutions and Advanced Performance Materials segments.

We have technical centers and R&D facilities located at a number of our production facilities. We also maintain stand-alone technical centers to serve our customers and provide technical support.

The following chart sets forth our stand-alone technical centers at December 31, 2024.

| | Technical Centers | | | |
|---|---|---|---|---|
| Region | Thermal & Specialized Solutions | Titanium Technologies | Advanced Performance Materials | Shared Locations |
| North America | | | | Newark, Delaware (1) (4)<br>Wilmington, Delaware (1) (3) |
| Europe, the Middle East, and Africa | | Kallo, Belgium (1) | | Meyrin, Switzerland (1) (3) |
| Latin America | | Mexico City, Mexico (1) | | |
| Asia Pacific | | | Shimizu, Japan (2) | Shanghai, China (1) (4) |

(1)Site is leased from a third party.

(2)Site with joint venture equity affiliates.

(3)Shared site between the Thermal & Specialized Solutions and Advanced Performance Materials segments.

(4)Shared site between the Thermal & Specialized Solutions, Titanium Technologies, and Advanced Performance Materials segments.

Our plants and equipment are maintained in good operating condition. We believe that we have sufficient production capacity for our primary products to meet demand in 2025. Our properties are primarily owned by us; however, certain properties are leased, as noted in the preceding tables.

We recognize that the security and safety of our operations are critical to our employees and communities, as well as our future. Physical security measures have been combined with process safety measures, administrative procedures, and emergency response preparedness into an integrated security plan. We conduct vulnerability assessments at our operating facilities in the U.S., as well as high-priority sites worldwide, and as a result, identify and implement the appropriate measures to protect these facilities from physical and cyberattacks. We also maintain preparedness plans that detail actions needed to recover from acute severe weather events, natural disasters, or other events that could disrupt our business. We engineer our facilities to better withstand these events and hold insurance coverage to protect against losses from physical damages and business interruptions. These measures have historically been in place, and these activities and associated costs are driven by normal operational preparedness.

## Item 3. LEGAL PROCEEDINGS

We are subject to various legal proceedings, including, but not limited to, product liability, intellectual property, personal injury, commercial, contractual, employment, governmental, environmental and regulatory, anti-trust, and other such matters that arise in the ordinary course of business. In addition, we, by virtue of our status as a subsidiary of EID prior to the Separation, are subject to or required under the Separation-related agreements executed prior to the Separation to indemnify EID against various pending legal proceedings. Discussion of all legal and environmental proceedings is incorporated by reference from Part II, Item 8, "Note 22 - Commitments and Contingent Liabilities" of this document, and should be considered an integral part of Part I, Item 3, "Legal Proceedings."

## Item 4. MINE SAFETY DISCLOSURES

Information regarding mine safety and other regulatory actions at our surface mines and/or mineral sands separation facilities in Starke, Florida, Jesup, Georgia, Nahunta, Georgia, and Offerman, Georgia, are included in *Exhibit 95* to this Annual Report on Form 10-K.

## INFORMATION ABOUT OUR EXECUTIVE OFFICERS

The following list sets forth our executive officers and a summary of their professional experience.

***Denise Dignam***, age 59, serves as our President and Chief Executive Officer. Ms. Dignam was appointed Chief Executive Officer in March 2024. Ms. Dignam joined Chemours in 2015 and has served as our President – Titanium Technologies, from 2023 to 2024; President – Advanced Performance Materials from 2021 to 2023; Vice President of Global Operations – Fluoroproducts, from 2019 to 2021; Global Senior Business Director – Fluoropolymers, from 2016 to 2019; and North American Business Director – Diversified Technologies and Industrial Resins, from 2015 to 2016. Previously, she worked at EID in various roles, including Director of Global Supply Chain – Fluoroproducts, from 2013 to 2014; Global Business Manager of Sulfur Products, from 2009 to 2013; and Global Sales Manager of Clean Technologies from 2007 to 2009. Ms. Dignam joined EID in 1988 as a design engineer.

***Shane Hostetter*****,** age 43, serves as our Chief Financial Officer. Mr. Hostetter was appointed to this role in July 2024. Prior to joining Chemours, Mr. Hostetter served as Executive Vice President, Chief Financial Officer of Quaker Chemical Corporation ("Quaker Houghton") since March 2023, and also served as Chief Accounting Officer from October 2023 to January 2024. Mr. Hostetter previously served as Quaker Houghton's Senior Vice President, Chief Financial Officer from April 2021 through February 2023. Prior to that role, he served as Vice President, Finance and Chief Accounting Officer from August 2019 until April 2021, and Global Controller and Principal Accounting Officer from September 2014 until July 2019. Prior to Quaker Houghton, Mr. Hostetter held several financial leadership roles at Pulse Electronics Corporation. Mr. Hostetter began his career at PricewaterhouseCoopers LLP ("PwC") within the assurance practice.

***Joseph T. Martinko***, age 57, serves as our President – Thermal & Specialized Solutions. Mr. Martinko was appointed to this role in July 2023. Mr. Martinko joined Chemours in 2015 and served as Global Business and Marketing Director – Opteon™ products from 2015 to 2019 and Senior Business Director, Americas, from 2019 to 2023. Previously, Mr. Martinko worked at EID in various roles in the fluorochemicals business including North America General Manager and various Global sales, business and marketing roles in Fluoroproducts. Mr. Martinko joined EID in 1995 and had Safety, Health and Environmental and Operations responsibility for several manufacturing units at EID's Chambers Works Facility.

***Gerardo Familiar***, age 49, serves as our President – Advanced Performance Materials. Mr. Familiar was appointed to this role in March 2023. Mr. Familiar joined Chemours in 2015 and has served as our General Manager - Chemours Hydrogen Venture from 2022 to 2023; Senior Director of TSS Global Strategy, Marketing, and Regulatory Affairs from 2020 to 2022; Director of Investor Relations from 2019 to 2020; Global Business Director and President - Chemours Mexico from 2016 to 2019; and Global Business Director - Coatings from 2015 to 2016. Previously, he worked at EID in various roles, including Global Business Manager from 2014 to 2015; and Business & Marketing Manager North America - APM & TSS from 2013 to 2014. Mr. Familiar joined EID in 2002 as a Sales and Marketing Leader - Mexico and Central America. Prior to joining EID, Mr. Familiar was a Senior Consultant at PwC from 2000 to 2002; and a Business Consultant at Decide MX from 1995 to 1999.

***Diane I. Picho***, age 64, serves as our Interim President - Titanium Technologies. Ms. Picho was appointed to this role in March 2024. Ms. Picho has been appointed to serve as our Chief Enterprise Enablement Officer, with an effective date of March 3, 2025. Ms. Picho joined Chemours in 2015 and has served as Vice President of Human Resources and Chief of Staff for Titanium Technologies from 2023 to 2024; Vice President of Commercial Operations for the Chemours Advanced Performance Materials business from 2022 to 2023; Senior Director of Commercial Operations for the Chemours Advanced Performance Materials business from 2020-2021; Senior Director of Global Strategy & Business Operating Systems for Chemours Fluoroproducts from 2017 to 2019; and Global Business Productivity Director for Chemours Fluoroproducts from 2015 to 2016. Prior to joining Chemours, Ms. Picho worked at EID in various roles including, North America Regional Business & Market Director for DuPont Chemicals & Fluoroproducts from 2013 to 2015; and Global Business Manager for Fluorochemicals Refrigerants from 2007 to 2012. Ms. Picho joined EID in 1983 as an R&D Engineer.

***Kristine Wellman***, age 55, serves as our Senior Vice President, General Counsel and Corporate Secretary. Ms. Wellman was appointed Senior Vice President, General Counsel & Corporate Secretary in October 2022. Ms. Wellman joined Chemours in December 2014 and has held several positions within the Company throughout her tenure. Ms. Wellman served as Associate General Counsel and Assistant Corporate Secretary from July 2015 through February 2019, and a Vice President from March 2018 through February 2019. Ms. Wellman joined business operations for the Fluoroproducts business in March 2019, serving as Plant Manager, Chambers Works, from March 2019 through November 2020. From December 2020 through November 2021, Ms. Wellman served as Vice President, Advanced Performance Materials, Sustainability. She next was appointed to Vice President, Strategic Planning until September 30, 2022. Prior to joining Chemours, Ms. Wellman held legal leadership positions at several financial institutions, including Senior Vice President and Chief Counsel, Capital One, from February 2012 through November 2014, General Counsel ING Bank, fsb, a U.S. subsidiary of ING Group, N.V., from August 2010 through February 2012, and positions of increasing responsibility within the legal department of Branch Banking & Trust Company (BBT) from June 2006 through July 2010, including Senior Vice President and Deputy General Counsel, July 2008 through July 2010. In 1995, Ms. Wellman began her legal career in private practice focusing on M&A, corporate and securities law, and corporate governance.

***Damián Gumpel**,* age 50, has been appointed to join Chemours and will serve as the President - Titanium Technologies, with an effective date of March 3, 2025. Previously, he worked at Olin Corporation from 2015 to 2025, where he most recently served as Vice President, Corporate Strategy, helping define new corporate strategy and executing several M&A transactions. Mr. Gumpel previously held positions as President of Olin's Epoxy and Chlor Alkali Products & Vinyls divisions. Mr. Gumpel also worked at The Dow Chemical Company from 2009 to 2015, where he held several commercial positions, and Accenture from 1998 to 2007.

***Brian Shay**,* age 52 serves as our Interim Chief Human Resources Officer. Mr. Shay was appointed to this role in September 2024. Mr. Shay joined Chemours in 2020 and has served in several Human Resources leadership roles including Vice President, Total Rewards, Human Resources Business Partner, and Human Resources Vice President with responsibility for Compensation & Benefits, Operations, and Talent & Culture. Prior to joining Chemours, Mr. Shay worked at PwC from 1997 to 2003, and SAP from 2003 to 2020, where he held positions of increasing responsibility within human resources.

***Alvenia Scarborough***, age 51, serves as our Senior Vice President, Corporate Communications and Chief Brand Officer. Ms. Scarborough was appointed to this role in October 2020, after serving as Senior Director of Corporate Communications and Brand Marketing since July 2015. Prior to Chemours, Ms. Scarborough held a variety of corporate communications and marketing communications positions with increasing responsibility across brand development, corporate reputation, media relations, employee communications, and digital marketing. Ms. Scarborough brings over two decades of communications experience with leading multinational companies, including: EID, where she served as the Corporate Leader, Brand Management, Protection and Licensing from 2013 to 2015 and Global Director, Business Communications from 2011 to 2013; Newell Rubbermaid, where she served as the Director, Business Communications and Brand Marketing, Global Technology Brands from 2009 to 2010; and Kodak Alaris, where she served as Director of Marketing & Communications, Consumer Imaging from 2000 to 2009, where she spent several years as a product management commercial leader. Ms. Scarborough's unique experience and modern approach to communications have resulted in multiple industry awards and recognition for breakthrough social media and advertising campaigns.

**PART II**

## Item 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS, AND ISSUER PURCHASES OF EQUITY SECURITIES

### Market for Registrant's Common Equity and Related Stockholder Matters

Our common stock is listed on the New York Stock Exchange ("NYSE") under the symbol, "CC". The number of record holders of our common stock was 34,180 at February 12, 2025. Holders of our common stock are entitled to receive dividends when they are declared by our board of directors, and dividends are generally declared and paid on a quarterly basis. Our stock transfer agent and registrar is Computershare Trust Company, N.A.

### Unregistered Sales of Equity Securities

None.

### Issuer Purchases of Equity Securities

***2022 Share Repurchase Program***

On April 27, 2022, our board of directors approved a share repurchase program authorizing the purchase of shares of our issued and outstanding common stock in an aggregate amount not to exceed $750 million, plus any associated fees or costs in connection with our share repurchase activity (the "2022 Share Repurchase Program"). Under the 2022 Share Repurchase Program, shares of our common stock can be purchased in the open market from time to time, subject to management's discretion, as well as general business and market conditions. Our 2022 Share Repurchase Program became effective on April 27, 2022 and is scheduled to continue through the earlier of its expiration on December 31, 2025 or the completion of repurchases up to the approved amount. The program may be suspended or discontinued at any time.

Through December 31, 2024, we purchased a cumulative 10,342,722 shares of our issued and outstanding common stock under the 2022 Share Repurchase Program, which amounted to $309 million at an average share price of $29.90 per share. There were no share repurchases under the 2022 Share Repurchase Program for the three months and year ended December 31, 2024. The aggregate amount of our common stock that remained available for purchase under the 2022 Share Repurchase Program at December 31, 2024 was $441 million, though we do not anticipate repurchases under the 2022 Share Repurchase Program.

## Stock Performance Graph

The following graph presents the five-year cumulative total stockholder returns for our common stock through December 31, 2024 compared with the Standard & Poor's ("S&P") MidCap 400 and the S&P MidCap 400 Chemical indices.




The graph assumes that the values of our common stock, the S&P MidCap 400 index, and the S&P MidCap 400 Chemical index were each $100 on December 31, 2019, and that all dividends were reinvested.

## Item 6. RESERVED

## Item 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*This Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") supplements the Consolidated Financial Statements and the related notes thereto included elsewhere herein to help provide an understanding of our financial condition, changes in our financial condition, and the results of our operations for the periods presented. For the year ended December 31, 2022, and changes from the year ended December 31, 2022 to the year ended December 31, 2023, management's discussion and analysis pertaining to our financial condition, changes in our financial condition, and the results of our operations have been omitted from this MD&A and may be found in Item 7 – Management's Discussion and Analysis of Financial Condition and Results of Operations as included in our Annual Report on Form 10-K for the year ended December 31, 2023. This MD&A should be read in conjunction with the Consolidated Financial Statements and the related notes thereto included elsewhere in this Annual Report on Form 10-K.*

*Our forward-looking statements are based on certain assumptions and expectations of future events that may not be accurate or realized. These statements, as well as our historical performance, are not guarantees of future performance. Forward-looking statements also involve risks and uncertainties that are beyond our control. Additionally, there may be other risks and uncertainties that we are unable to identify at this time or that we do not currently expect to have a material impact on our business. Factors that could cause or contribute to these differences include, but are not limited to, the risks, uncertainties, and other factors discussed within Item 1A – Risk Factors in this Annual Report on Form 10-K.*

### Overview

We are a leading, global provider of performance chemicals that are key inputs in end-products and processes in a variety of industries. We deliver customized solutions with a wide range of industrial and specialty chemical products for markets, including refrigeration and air conditioning, paints and coatings, plastics, transportation, semiconductor and consumer electronics, general industrial, and oil and gas. Our principal products include refrigerants, titanium dioxide ("$TiO_2$") pigment and industrial fluoropolymer resins. We manage and report our operating results through three principal reportable segments: Thermal & Specialized Solutions, Titanium Technologies, and Advanced Performance Materials. Our Thermal & Specialized Solutions segment is a leading, global provider of refrigerants, thermal management solutions, propellants, blowing agents, and specialty solvents. Our Titanium Technologies segment is a leading, global provider of $TiO_2$ pigment, a premium white pigment used to deliver whiteness, brightness, opacity, and protection in a variety of applications. Our Advanced Performance Materials segment is a leading, global provider of high-end polymers and advanced materials that deliver unique attributes, including low friction coefficients, extreme temperature resistance, weather resistance, ultraviolet and chemical resistance, and electrical insulation. Our Performance Chemicals and Intermediates business is presented under Other Segment.

### Recent Developments

***Senior Unsecured Notes Due January 2033***

In November 2024, we issued a $600 million aggregate principal amount of 8.000% senior unsecured notes due January 2033 (the "2033 Notes"). We received proceeds of $591 million, net of underwriting fees and other expenses of $9 million, which are deferred and amortized to interest expense over the term of the 2033 Notes. The net proceeds from the 2033 Notes were used in part to purchase or redeem, as applicable, the euro-denominated 4.000% senior notes of €441 due May 2026.

Further, concurrently with the offering of the 2033 Notes, we entered into a cross-currency swap to effectively convert the $600 million of the 2033 Notes into a euro-denominated borrowing of €567 million at prevailing euro interest rates, effectively converting the 8.000 USD rate to a fixed Euro rate of 6.160%. The cross-currency swap matures on January 15, 2030.

***Senior Secured Credit Facilities Due August 2028***

In November and December 2024, we completed the first and second amendments to the Credit Agreement, which repriced our Tranche B-3 U.S. Dollar-denominated and Euro-denominated Term Loans, respectively, under its senior secured term loan facility due in August 2028. The First Amendment reduces the applicable margin in respect of our senior secured U.S. dollar-denominated term loan facility from, at our election, adjusted Term SOFR + 3.50% to adjusted Term SOFR + 3.00%, or adjusted base rate plus 2.50% to adjusted base rate plus 2.00%. The Second Amendment reduces the applicable margin in respect of our Euro-denominated term loan facility from adjusted EURIBOR + 4.00% to adjusted EURIBOR + 3.25%. There are no changes to the maturity of the Tranche B-3 U.S. dollar term loan or the Tranche B-3 Euro term loan following these repricing activities, and all other terms are substantially unchanged.

## Results of Operations and Business Highlights

***Results of Operations***

The following table sets forth our results of operations for the years ended December 31, 2024 and 2023.

| *(Dollars in millions, except per share amounts)* | Year Ended December 31, 2024 | 2023 |
|---|---|---|
| Net sales | $ 5,782 | $ 6,078 |
| Cost of goods sold | 4,631 | 4,772 |
| Gross profit | 1,151 | 1,306 |
| Selling, general, and administrative expense | 585 | 1,290 |
| Research and development expense | 109 | 108 |
| Restructuring, asset-related, and other charges | 60 | 153 |
| Goodwill impairment charge | 56 | — |
| Total other operating expenses | 810 | 1,551 |
| Equity in earnings of affiliates | 43 | 45 |
| Interest expense, net | (264) | (208) |
| Loss on extinguishment of debt | (1) | (1) |
| Other income, net | 8 | 91 |
| **Income (loss) before income taxes** | 127 | (318) |
| **Provision for (benefit from) income taxes** | 41 | (81) |
| **Net income (loss)** | 86 | (237) |
| Less: Net income attributable to non-controlling interests | — | 1 |
| **Net income (loss) attributable to Chemours** | $ 86 | $ (238) |
| **Per share data** | | |
| Basic earnings (loss) per share of common stock | $ 0.58 | $ (1.60) |
| Diluted earnings (loss) per share of common stock | 0.57 | (1.60) |

***Net Sales***

The following table sets forth the impacts of price, volume, currency, and portfolio changes on our net sales for the year ended December 31, 2024.

| Change in net sales from prior period | Year Ended December 31, 2024 |
|---|---|
| Price | (4)% |
| Volume | —% |
| Currency | —% |
| Portfolio | (1)% |
| **Total change in net sales** | (5)% |

Our net sales decreased by $296 million (or 5%) to $5.8 billion for the year ended December 31, 2024, compared with net sales of $6.1 billion for the same period in 2023. The decrease in our net sales for the year ended December 31, 2024 was primarily attributable to a decrease in price of 4%. Price declined across all of our reportable segments. Portfolio change driven by the sale of our Glycolic Acid business in 2023 added a 1% headwind to our net sales.

The drivers of these changes for each of our reportable segments are discussed further under the “Segment Reviews” section within this *MD&A.*

***Cost of Goods Sold***

Our cost of goods sold ("COGS") decreased by $141 million (or 3%) to $4.6 billion for the year ended December 31, 2024, compared with COGS of $4.8 billion for the same period in 2023. The decrease in COGS for the year ended December 31, 2024 was primarily attributable to lower sales volume. For the year ended December 31, 2023, COGS included a $40 million charge relating to certain raw materials and stores inventories written off related to the Kuan Yin, Taiwan plant shutdown.

***Selling, General, and Administrative Expense***

Our selling, general, and administrative ("SG&A") expense decreased by $705 million (or 55%) to $585 million for the year ended December 31, 2024, compared with SG&A expense of $1.3 billion for the same period in 2023. The decrease in our SG&A expense was primarily attributable to the litigation-related charges of $592 million recorded in the year ended December 31, 2023 related to our portion of the U.S. public water system settlement agreement, along with the benefits recorded for insurance recoveries of $20 million during the year ended December 31, 2024. The decrease in our SG&A expense for the year ended December 31, 2024 was partially offset by $27 million of costs incurred related to the Audit Committee internal review process, along with third-party costs related to the Titanium Technologies Transformation Plan.

***Research and Development Expense***

Our research and development ("R&D") expense was relatively flat at $109 million for the year ended December 31, 2024, compared with R&D expense of $108 million for the year ended December 31, 2023.

***Restructuring, Asset-related, and Other Charges***

Our restructuring, asset-related, and other charges decreased by $93 million (or 61%) to $60 million for the year ended December 31, 2024, compared with $153 million for the same period in 2023.

For the year ended December 31, 2024, our restructuring, asset-related, and other charges were primarily attributable to $27 million of non-cash asset-related charges, $20 million of employee separation charges and $3 million of other charges related to the 2024 Restructuring Program initialed in the third quarter of 2024. In addition, for the year ended December 31, 2024, charges included $11 million of decommissioning and other charges related to the Titanium Technologies Transformation Plan.

For the year ended December 31, 2023, our restructuring, asset-related, and other charges were primarily attributable to $126 million of charges related to the Titanium Technologies Transformation Plan, consisting of $78 million of asset-related charges, employee separation charges of $21 million, $17 million of contract termination costs, and $10 million of decommissioning and other charges. In addition, for the year ended December 31, 2023, charges included $16 million resulting from our decision to abandon the implementation of a new enterprise resource planning ("ERP") software platform, $8 million asset impairment following the shutdown of a production line at our El Dorado site, and $4 million related to our 2023 severance program.

***Goodwill Impairment Charge***

In the third quarter of 2024, we concluded a triggering event was present for our Advanced Performance Materials reporting unit and associated goodwill. As a result of the quantitative goodwill impairment analysis performed, we concluded the carrying amount of the Advanced Performance Materials reporting unit exceeded its fair value. As a result of this analysis, we recognized a goodwill impairment charge of $56 million related to the Advanced Performance Materials reporting unit for the year ended December 31, 2024. For the year ended December 31, 2023, there was no goodwill impairment charge. Refer to "Critical Accounting Policies and Estimates within this *Item 7 – Management's Discussion and Analysis of Financial Condition and Results of Operations* as well as "Note 15 – Goodwill and Other Intangible Assets, Net" to the *Consolidated Financial Statements* in this Annual Report on Form 10-K for further details.

***Equity in Earnings of Affiliates***

Our equity in earnings of affiliates decreased by $2 million (or 4%) to $43 million for the year ended December 31, 2024, compared with equity in earnings of affiliates of $45 million for the same period in 2023. The decrease in our equity in earnings of affiliates for the year ended December 31, 2024 was primarily attributable to lower demand in the region where our investees operate.

***Interest Expense, Net***

Our interest expense, net increased by $56 million (or 27%) to $264 million for the year ended December 31, 2024, compared with interest expense, net of $208 million for the same period in 2023. The increase in our interest expense, net for the year ended December 31, 2024 was primarily attributable to higher interest rates on our variable rate debt, higher debt principal following issuance of new term loans in August 2023 and the 2033 Notes in November 2024.

***Loss on Extinguishment of Debt***

For the year ended December 31, 2024, we recognized a net loss on extinguishment of debt of $1 million in connection with the redemption of the euro-denominated 4.000% senior notes due May 2026.

For the year ended December 31, 2023, we recognized a net loss on extinguishment of debt of $1 million in connection with the refinancing of the tranche B-2 term loans in August 2023 under an amended and restated credit agreement.

***Other Income, Net***

Our other income, net decreased by $83 million (or 91%) to $8 million for the year ended December 31, 2024, compared with other income, net of $91 million for the same period in 2023. Our other income, net for the year ended December 31, 2023 includes a net pre-tax gain on sale of $106 million associated with the sale of the Glycolic Acid business. The decrease in our other income, net was partially offset by favorable changes in net exchange gains and losses.

***Provision for (Benefit from) Income Taxes***

We recognized a provision for income taxes of $41 million and a benefit from income taxes of $81 million for the years ended December 31, 2024 and 2023, respectively. Our provision for (benefit from) income taxes represented effective tax rates of 32% and 25% for the years ended December 31, 2024 and 2023, respectively.

The $41 million provision for income taxes for the year ended December 31, 2024 was primarily attributable to our geographic mix of earnings, a $10 million income tax expense associated with the filing of the US Tax return partially offset by a $7 million income tax benefit for the generation of U.S. research and development tax credits and by $9 million of income tax benefit related to the 2024 Restructuring Program. The impact of the enactment of the Organization for Economic Co-operation and Development Global Anti-Base Erosion Model Rules (“Pillar Two”) is included in our provision for the year ended December 31, 2024; however, the impact is not material.

For the year ended December 31, 2023, the benefit from income taxes was primarily attributable to the net pre-tax loss during the year driven by decreased profitability and certain discrete items in 2023. In 2023, we recorded a $131 million income tax benefit associated with various legal matters, along with a $22 million income tax benefit associated with the Kuan Yin, Taiwan shutdown, inclusive of a $13 million valuation allowance recorded on certain deferred tax assets of one of our Taiwanese subsidiaries and a $13 million benefit associated with a ruling received from Swiss tax authorities in the fourth quarter of 2023. This income tax benefit was offset by $26 million of income tax expense associated with the Glycolic Acid Transaction that occurred in 2023.

## Segment Reviews

We operate through three principal reportable segments, which were organized based on their similar economic characteristics, the nature of products and production processes, end-use markets, channels of distribution, and regulatory environments: Thermal & Specialized Solutions, Titanium Technologies, and Advanced Performance Materials. Other Segment includes our Performance Chemicals and Intermediates business.

Adjusted earnings before interest, taxes, depreciation, and amortization ("Adjusted EBITDA") is the primary measure of segment profitability used by our Chief Operating Decision Maker ("CODM") and is defined as income (loss) before income taxes, excluding the following:

- interest expense, depreciation, and amortization;
- non-operating pension and other post-retirement employee benefit costs, which represents the non-service component of net periodic pension (income) costs;
- exchange (gains) losses included in other income, net;
- restructuring, asset-related, and other charges;
- (gains) losses on sales of assets and businesses; and,
- other items not considered indicative of our ongoing operational performance and expected to occur infrequently, including certain litigation related and environmental charges and Qualified Spend reimbursable by DuPont and/or Corteva as part of our cost-sharing agreement under the terms of the Memorandum of Understanding (“MOU”) that were previously excluded from Adjusted EBITDA.

A reconciliation of Segment Adjusted EBITDA to our consolidated income (loss) before income taxes for the years ended December 31, 2024 and 2023 is included in “Note 29 – Geographic and Segment Information” to the *Consolidated Financial Statements*.

***Thermal & Specialized Solutions***

The following table sets forth the net sales, Adjusted EBITDA, and Adjusted EBITDA margin amounts for our Thermal & Specialized Solutions segment for the years ended December 31, 2024 and 2023.

| | Year Ended December 31, | |
|---|---|---|
| *(Dollars in millions)* | **2024** | **2023** |
| Segment net sales | $ 1,830 | $ 1,851 |
| Adjusted EBITDA | 576 | 685 |
| Adjusted EBITDA margin | 31 % | 37 % |

The following table sets forth the impacts of price, volume, currency, and portfolio changes on our Thermal & Specialized Solutions segment's net sales for the year ended December 31, 2024.

| **Change in segment net sales from prior period** | **Year Ended December 31, 2024** |
|---|---|
| Price | (3 )% |
| Volume | 2 % |
| Currency | — % |
| Portfolio | — % |
| **Total change in segment net sales** | (1 )% |

*Segment Net Sales*

Our Thermal & Specialized Solutions segment's net sales decreased by $21 million (or 1%) to $1.8 billion for the year ended December 31, 2024, compared with segment net sales of $1.9 billion for the same period in 2023. The decrease in segment net sales for the year ended December 31, 2024 was primarily attributable to a decrease in price of 3%, partially offset by an increase in volume of 2%. The decrease in price was primarily related to softer Freon™ Refrigerant portfolio pricing due to elevated hydrofluorocarbon ("HFC") market inventory levels, The decrease in price was primarily offset by stronger Opteon™ Refrigerants portfolio pricing. The increase in volume was primarily attributable to higher demand within the Opteon™ Refrigerants portfolio as a result of continued stationary and automotive end-market adoption, partially offset by declines in the Freon™ Refrigerant portfolio in connection with the step downs under the AIM Act and EU F-Gas regulation. Currency was flat for the year ended December 31, 2024 when compared to the prior year.

*Adjusted EBITDA and Adjusted EBITDA Margin*

Segment Adjusted EBITDA decreased by $109 million (or 16%) to $576 million and Segment Adjusted EBITDA margin decreased by approximately 600 basis points to 31% for the year ended December 31, 2024, compared with Segment Adjusted EBITDA of $685 million and Segment Adjusted EBITDA margin of 37% for the same period in 2023. The decreases in Segment Adjusted EBITDA and Adjusted EBITDA margin for the year ended December 31, 2024 were primarily attributable to the aforementioned decrease in price related to the Freon™ Refrigerants portfolio, increased costs related to near-term quota allowances, lower fixed cost absorption, higher input costs associated with purchasing non-Corpus based low GWP refrigerant, and decreases in volumes within the Freon™ Refrigerants portfolio, partially offset by higher demand within the Opteon™ Refrigerants portfolio as a result of continued stationary and automotive end-market adoption.

***Titanium Technologies***

The following table sets forth the net sales, Adjusted EBITDA, and Adjusted EBITDA margin amounts for our Titanium Technologies segment for the years ended December 31, 2024 and 2023.

| | Year Ended December 31, | |
|---|---|---|
| *(Dollars in millions)* | 2024 | 2023 |
| Segment net sales | $ 2,572 | $ 2,680 |
| Adjusted EBITDA | 312 | 290 |
| Adjusted EBITDA margin | 12 % | 11 % |

The following table sets forth the impacts of price, volume, currency, and portfolio changes on our Titanium Technologies segment's net sales for the year ended December 31, 2024.

| Change in segment net sales from prior period | Year Ended December 31, 2024 |
|---|---|
| Price | (5 )% |
| Volume | 1 % |
| Currency | — % |
| Portfolio | — % |
| **Total change in segment net sales** | (4 )% |

*Segment Net Sales*

Our Titanium Technologies segment's net sales decreased by $108 million (or 4%) to $2.6 billion for the year ended December 31, 2024, compared with segment net sales of $2.7 billion for the same period in 2023. The decrease in segment net sales for the year ended December 31, 2024 was primarily attributable to a 5% price decrease, partially offset by a 1% volume increase despite unplanned downtime at our Altamira, Mexico manufacturing site due to extreme drought in the region.

*Adjusted EBITDA and Adjusted EBITDA Margin*

Segment Adjusted EBITDA increased by $22 million (or 8%) to $312 million and Segment Adjusted EBITDA margin increased by approximately 100 basis points to 12% for the year ended December 31, 2024, compared with Segment Adjusted EBITDA of $290 million and Segment Adjusted EBITDA margin of 11% for the same period in 2023. The increases in Adjusted EBITDA and Segment Adjusted EBITDA margin were primarily driven by cost savings realized from the Titanium Technologies Transformation Plan, partially offset by the aforementioned decrease in price and the unplanned weather-related downtime at our Altamira, Mexico manufacturing site as mentioned above. The downtime resulted in a negative cost impact of $26 million across the second and third quarters of 2024, after which there were no further cost impacts.

***Advanced Performance Materials***

The following table sets forth the net sales, Adjusted EBITDA, and Adjusted EBITDA margin amounts for our Advanced Performance Materials segment for the years ended December 31, 2024 and 2023.

| | Year Ended December 31, | |
|---|---|---|
| *(Dollars in millions)* | 2024 | 2023 |
| Segment net sales | $ 1,326 | $ 1,462 |
| Adjusted EBITDA | 161 | 273 |
| Adjusted EBITDA margin | 12 % | 19 % |

The following table sets forth the impacts of price, volume, currency, and portfolio changes on our Advanced Performance Materials segment's net sales for the year ended December 31, 2024.

| Change in segment net sales from prior period | Year Ended December 31, 2024 |
|---|---|
| Price | (5 )% |
| Volume | (3 )% |
| Currency | (1 )% |
| Portfolio | — % |
| **Total change in segment net sales** | (9 )% |

*Segment Net Sales*

Our Advanced Performance Materials segment's net sales decreased by $136 million (or 9%) to $1.3 billion for the year ended December 31, 2024, compared with segment net sales of $1.5 billion for the same period in 2023. The decrease in segment net sales for the year ended December 31, 2024 was primarily attributable to a decrease in price of 5%, a decrease in volumes of 3% and unfavorable currency movements which added a 1% headwind to the segment's net sales. Volumes decreased primarily due to weaker demand in the hydrogen market and lower volumes in more economically sensitive end markets. The decrease in price was primarily due to softer market dynamics and product mix.

*Adjusted EBITDA and Adjusted EBITDA Margin*

Segment Adjusted EBITDA decreased by $112 million (or 41%) to $161 million and Segment Adjusted EBITDA margin decreased by approximately 700 basis points to 12% for the year ended December 31, 2024, compared with Segment Adjusted EBITDA of $273 million and Segment Adjusted EBITDA margin of 19% for the year ended December 31, 2023. The decreases in Segment Adjusted EBITDA and Segment Adjusted EBITDA margin for the year ended December 31, 2024 were primarily attributable to the aforementioned decreases in price and currency, along with lower volumes driving lower fixed cost absorption.

***Corporate and Unallocated Items***

In addition to our reportable segments, we assign certain costs to "Corporate expenses", which is presented separately in the segment reconciliation table below and in "Note 29 – Geographic and Segment Information" to the *Consolidated Financial Statements*. Corporate expenses include certain legacy-related legal and environmental expenses, stock-based compensation expenses and other corporate costs, but excludes segment unallocated items (described below).

Corporate expenses increased by $43 million (or 20%) to $255 million for the year ended December 31, 2024, compared with Corporate expenses of $212 million for the year ended December 31, 2023. The increase in Corporate expenses for the year ended December 31, 2024 was primarily attributable to costs associated with addressing material weaknesses in internal controls over financial reporting and the implementation of recommendations stemming from the Audit Committee Internal Review in 2024, along with an increase in certain legacy-related legal expenses (net of applicable MOU benefit).

Unallocated items are those items excluded from the determination of Segment Adjusted EBITDA measure used by our CODM as described in the segment overview section of this MD&A and further described below as well as in "Note 29 – Geographic and Segment Information" to the *Consolidated Financial Statements*.

The following table sets forth our corporate and unallocated items for the years ended December 31, 2024 and 2023.

| | Year Ended December 31, | |
|---|---|---|
| *(Dollars in millions)* | 2024 | 2023 |
| Corporate expenses | $ (255) | $ (212) |
| Unallocated items: | | |
| Interest expense, net | (264) | (208) |
| Depreciation and amortization | (301) | (307) |
| Non-operating pension and other post-retirement employee benefit income | 3 | — |
| Exchange losses, net (Note 8 to the *Consolidated Financial Statements*) | (9) | (38) |
| Restructuring, asset-related, and other charges (Note 7 to the *Consolidated Financial Statements*) | (58) | (153) |
| Goodwill impairment charge (Note 15 to the *Consolidated Financial Statements*) | (56) | — |
| Inventory write-offs (1) | — | (40) |
| Loss on extinguishment of debt | (1) | (1) |
| Gain on sales of assets and businesses, net (Note 4 to the *Consolidated Financial Statements*) | 3 | 110 |
| Transaction costs (2) | (18) | (16) |
| Qualified spend recovery (3) | 26 | 54 |
| Litigation-related charges (4) | 15 | (764) |
| Environmental charges (5) | (15) | (9) |
| **Corporate expenses and unallocated items** | $ (930) | $ (1,584) |

(1)Inventory write-offs for the year ended December 31, 2023 represents write-off of certain raw materials and stores inventories from the Kuan Yin, Taiwan plant closure, which was not allocated in the measurement of Titanium Technologies segment profitability used by the CODM.

(2)In 2024, transaction costs includes $16 million of third-party costs related to the Titanium Technologies Transformation Plan, which was not allocated in the measurement of Titanium Technologies segment profitability used by the CODM. In 2023, transaction costs includes $7 million of costs associated with the Senior Secured Credit Facilities, which is discussed in further detail in "Note 20 – Debt", and $9 million of third-party costs related to the Titanium Technologies Transformation Plan.

(3)Qualified spend recovery represents costs and expenses that were previously excluded from the determination of Segment Adjusted EBITDA, reimbursable by DuPont and/or Corteva as part of our cost-sharing agreement under the terms of the MOU. Terms of the MOU are discussed in further detail in "Note 22 – Commitments and Contingent Liabilities".

(4)Litigation-related charges pertains to litigation settlements, PFOA drinking water treatment accruals, and other related legal fees. For the year ended December 31, 2024, litigation-related charges primarily includes $44 million of benefit from insurance recoveries, along with the $29 million accrual associated with the Ohio MDL. For the year ended December 31, 2023, litigation-related charges includes the $592 million accrual related to the United States Public Water System Class Action Suit Settlement plus $24 million of third-party legal fees directly related to the settlement, $55 million of charges related to the our portion of Chemours, DuPont, Corteva, EID and the State of Ohio's agreement entered into in November 2023, $13 million related to our portion of the supplemental payment to the State of Delaware, $76 million for other PFAS litigation matters, and $4 million of other litigation matters.

(5)Environmental charges pertains to management's assessment of estimated liabilities associated with certain non-recurring environmental remediation expenses at various sites. For the year ended December 31, 2024, environmental charges primarily includes off-site remediation costs at Dordrecht Works. Refer to "Note 22 – Commitments and Contingent Liabilities" for further details.

## Liquidity and Capital Resources

Our primary sources of liquidity are cash generated from operations and available cash. We also periodically utilize various financing facilities, including our receivables securitization facility and supply chain financing arrangements with third-party financial institutions to provide working capital flexibility. Additionally, we have access to incremental liquidity, if needed, through borrowings under our debt financing arrangements, which includes borrowing capacity under our Revolving Credit Facility. We expect the liquidity from these sources will provide adequate funds to support the cash needs of our businesses through at least the end of February 2026.

At December 31, 2024, we had total unrestricted cash and cash equivalents of $713 million, of which $404 million is held by our foreign subsidiaries. The availability under our Revolving Credit Facility as of December 31, 2024 was $640 million, net of $56 million in outstanding letters of credit, and is subject to compliance with certain covenants, including those related to the last twelve months of our consolidated earnings before interest, taxes, depreciation, and amortization ("EBITDA") and senior secured net debt, both of which are defined under the Credit Agreement. At December 31, 2024, our availability under the Revolving Credit Facility decreased compared to prior periods due to a decline in our trailing twelve-month EBITDA. At December 31, 2024, we were in compliance with the applicable covenants under the Credit Agreement. Our debt financing arrangements are described in further detail in “Note 20 – Debt” to the *Consolidated Financial Statements*. Our Revolving Credit Facility matures in October 2026.

Subject to approval by our board of directors, we may raise additional capital or borrowings from time to time, or seek to refinance our existing debt. There can be no assurances that future capital or borrowings will be available to us, and the cost and availability of new capital or borrowings could be materially impacted by market conditions. Our borrowing costs can be impacted by short- and long-term debt ratings assigned by nationally recognized ratings agencies. On June 3, 2024, Moody's affirmed our Ba3 rating with stable outlook. On April 17, 2024, S&P Global affirmed out BB- credit rating with negative outlook. Our debt ratings could constrain the capital available to us and could limit our access to and/or increase the cost of funding our operation. Further, the decision to refinance our existing debt is based on a number of factors, many of which are beyond our control, including general market conditions and our ability to refinance on attractive terms at any given point in time. Any attempts to raise additional capital or borrowings or refinance our existing debt could cause us to incur significant charges, including an increase in interest expense as a result of higher interest rates on any new or refinanced borrowings.

In the ordinary course of business, we engage in normal and customary working capital management actions. Ordinary course working capital management actions may include managing the timing of payables or receivables where permitted in accordance with the payment terms, utilizing supply chain financing arrangements, and utilizing the accounts receivable securitization facility described in “Note 20 – Debt” to the *Consolidated Financial Statements*, among other actions, where appropriate and deemed to be in our commercial interest. Additionally, in the normal course of business, from time to time, we agree with our customers and, or, our suppliers, to a swap of terms, which can result in collecting from customers or paying suppliers earlier in one period in exchange for later in another period.

As disclosed in "Note 2 – Basis of Presentation" to the *Consolidated Financial Statements*, the Audit Committee, conducted with the assistance of independent outside counsel, an internal review, and determined, among other things, that former members of senior management engaged in efforts in the fourth quarter of 2023 to delay payments of up to approximately $100 million, primarily to certain vendors that were originally due to be paid in the fourth quarter of 2023 until the first quarter of 2024; and to accelerate the collection of up to approximately $260 million of receivables into the fourth quarter of 2023 that were originally not due to be received until the first quarter of 2024. The Audit Committee’s review also determined that similar actions, though to a lesser extent, were taken in the fourth quarter of 2022, resulting in a delay of up to approximately $40 million of payments to vendors that were originally due to be paid in the fourth quarter of 2022 until the first quarter of 2023 and the acceleration of the collection of up to approximately $175 million of receivables into the fourth quarter of 2022 that were originally not due to be received until the first quarter of 2023.

These working capital timing actions favorably impacted operating cash flows in the fourth quarters of 2023 and 2022 and had correspondingly adverse impacts on operating cash flows in the first quarters of 2024 and 2023. In the year ended December 31, 2024, we incurred a net $633 million usage of cash in operating activities, which included accounts and notes receivable and accounts payable uses of cash of $152 million and $9 million, respectively, as well as the release of $592 million of cash and cash equivalents that were deposited in the qualified settlement fund per the terms of the U.S. public water system settlement agreement following Final Judgment, as defined in the U.S. public water system settlement agreement. In the year ended December 31, 2023, cash provided by operating activities was $556 million, which included accounts and notes receivable and accounts payable uses of cash of $10 million and $72 million, respectively. Refer below and to the "Cash Flows" section for further details of the changes in operating cash flows in the year ended December 31, 2024 compared to the year ended December 31, 2023.

While we have historically generated operating cash flows through various past industry and economic cycles, we do have a historical pattern of seasonality with a working capital use of cash in the first half of the year, primarily driven by seasonal accounts receivable timing and, to a lesser extent, inventory builds, and a working capital source of cash in the second half of the year, as we sell product from inventory and collect receivables from customers. We expect working capital outflows in the first half of 2025 for the same historical reasons, as well as the settlement of higher levels of accounts payable as of December 31, 2024, due principally to the timing of higher purchases in the fourth quarter of 2024 for plant maintenance activity. We currently anticipate that we will remain in compliance with applicable covenants under the Credit Agreement through at least February 2026.

Throughout the year, we utilize supply chain financing arrangements with several third-party financial institutions to manage our working capital needs and enhance liquidity. We also participate in certain customers' supply chain financing and other early pay programs as a routine source of working capital. During the years ended December 31, 2024 and 2023, we utilized various customer facilitated supply chain financing facilities to accelerate the collection of $337 million and $457 million, respectively, of our accounts receivable, incurring a discount amount of $4 million and $7 million, respectively, for both periods. These actions included the acceleration of collection of $169 million and $156 million of our accounts receivable during the fourth quarter of 2024 and 2023, respectively, which based on contractual terms would have otherwise been collected in the first quarter of 2025 and 2024, respectively. See "Note 11 – Accounts and Notes Receivable, Net" to the Consolidated Financial Statements for further details regarding our supplier financing programs.

In November 2024, we issued $600 million aggregate principal amount of 8.000% senior unsecured notes due January 2033 (the "2033 Notes"). The net proceeds of the Offering were used to redeem all of our outstanding euro-denominated 4.000% Senior Notes due 2026, which was approximately €441 million (USD $463 million), plus accrued and unpaid interest to, but excluding, the date of redemption, and the remainder of the net proceeds for general corporate purposes.

In November and December 2024, we completed the first and second amendments to the Credit Agreement, which repriced our Tranche B-3 U.S. Dollar-denominated and Euro-denominated Term Loans, respectively, under its senior secured term loan facility due in August 2028. The First Amendment reduces the applicable margin in respect of our senior secured U.S. dollar-denominated term loan facility from, at our election, adjusted Term SOFR + 3.50% to adjusted Term SOFR + 3.00%, or adjusted base rate plus 2.50% to adjusted base rate plus 2.00%. The Second Amendment reduces the applicable margin in respect of our Euro-denominated term loan facility from adjusted EURIBOR + 4.00% to adjusted EURIBOR + 3.25%. There are no changes to the maturity of the Tranche B-3 U.S. dollar term loan or the Tranche B-3 Euro term loan following these repricing activities, and all other terms are substantially unchanged.

Further, concurrently with the offering of the senior unsecured notes due January 2033, we entered into a cross-currency swap to effectively convert the $600 million of the senior unsecured notes due January 2033 into a euro-denominated borrowing of €567 million at prevailing euro interest rates. The cross-currency swap matures on January 15, 2030. The cross-currency swap executed on the 2033 notes effectively converts our 8.000% USD rate to a fixed Euro rate of 6.160%.

Thereby, as a result of the recent debt activity as mentioned above, the anticipated annual interest expense is expected to increase approximately $10 million. For further details, see "Note 20 – Debt" to the Consolidated Financial Statements.

A substantial majority of the $404 million of unrestricted cash and cash equivalents held by our foreign subsidiaries at December 31, 2024, is available for local operations or is readily convertible into currencies used in our worldwide operations, including the U.S. dollar. We are subject to restrictions imposed by the local governments in certain jurisdictions where we operate, which impose certain limitations on our ability to exchange currencies, repatriate earnings or capital, or create cross-border cash pooling arrangements. During the year ended December 31, 2024, we received approximately $500 million of net cash in the U.S. through intercompany loans and dividends. We believe we have the ability to fund U.S. operations cash requirements for working capital, dividends, investments, and other financing requirements through a mixture of repatriations, intercompany loans, and other actions. For further information related to our income tax positions, refer to "Note 9 – Income Taxes" to the Consolidated Financial Statements.

In addition, we monitor the third-party depository institutions that hold our cash and cash equivalents. We diversify our cash and cash equivalents among counterparties to minimize exposure to any one of these entities.

Over the course of the next 12 months and beyond, we anticipate making significant cash payments for known contractual and other obligations, which we expect to fund through cash generated from operations, available cash (including the current portion of restricted cash), receivables securitization, and our existing debt financing arrangements. As of December 31, 2024, such obligations include:

- **Principal and interest obligations on long-term debt** – We are required to make quarterly principal payments related to our Dollar Term Loan, with the balance due at maturity. Principal payments are also due at maturity for our 5.375% senior unsecured notes due May 2027, the 5.750% senior unsecured notes due November 2028, the 4.625% senior unsecured notes due November 2029, and the 8.000% senior unsecured notes due January 2033 (collectively, the "Notes"). The earliest maturity date of our outstanding debt is scheduled in 2027. We anticipate that our scheduled debt principal maturities will be approximately $11 million, $11 million, $505 million, $2,239 million and $620 million for the years ended December 31, 2025, 2026, 2027, 2028, and 2029, respectively. For additional detail, refer to "Note 20 – Debt" to the *Consolidated Financial Statements*. Our interest obligations under our Senior Secured Credit Facilities may be paid monthly or quarterly, and our interest obligations in connection with the Notes (except for the 2033 Notes on which interest is paid semi-annually in arrears on January 15 and July 15 each year) are paid semi-annually in arrears on May 15 and November 15 of each year. We anticipate that our scheduled interest payments will be approximately $232 million, $242 million, $227 million, $175 million and $65 million for the years ended December 31, 2025, 2026, 2027, 2028, and 2029, respectively, subject to changes in variable interest rates.
- **Operating and finance leases** – We lease certain office space, laboratory space, equipment, railcars, tanks, barges and warehouses. The majority of our leases are operating leases, and the remaining terms on our total lease population varies, extending up to 22 years. We anticipate that our lease payments will be approximately $82 million, $68 million, $50 million, $40 million and $30 million for the years ended December 31, 2025, 2026, 2027, 2028 and 2029, respectively. For a schedule of our lease payments for the next five years and thereafter, refer to "Note 14 – Leases" to the *Consolidated Financial Statements*.
- **Purchase obligations** – As part of our normal, recurring operations, we enter into enforceable and legally-binding agreements to purchase goods and/or services that specify fixed or minimum quantities, fixed minimum or variable price provisions, and the approximate timing of the agreement. These agreements primarily pertain to our purchases of raw materials and utilities costs and may span multiple years. Based upon our currently executed agreements, we anticipate that our contractually obligated cash payments for raw materials and utilities will be approximately $459 million, $345 million, $208 million, $131 million and $131 million for the years ended December 31, 2025, 2026, 2027, 2028 and 2029, respectively. Renewal, modification, or execution of additional agreements for future purchasing obligations may increase or decrease these amounts in future years.
- **Environmental remediation** – We, due to the terms of our Separation-related agreements with EID, are subject to contingencies pursuant to environmental laws and regulations that in the future may require further action to correct the effects on the environment of prior disposal practices or releases of chemical substances, which are attributable to EID's activities before our spin-off. Much of this liability results from Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), Resource Conservation and Recovery Act ("RCRA"), and similar federal, state, local, and foreign laws. These laws may require us to undertake certain investigative, remediation, and restoration activities at sites where we conduct or EID once conducted operations or at sites where waste generated by us was disposed. At December 31, 2024, our consolidated balance sheets include $571 million for environmental remediation liabilities, of which $115 million was classified as current, and a portion is subject to recovery under the MOU. Of the current environmental liabilities of $115 million, $68 million relates to Fayetteville. Pursuant to the binding MOU that we entered into with DuPont, Corteva, and EID in January 2021, costs related to potential future legacy PFAS liabilities arising out of pre-July 1, 2015 conduct will subject to the cost-sharing arrangement, where we bear half of the cost of such future potential legacy PFAS liabilities and DuPont and Corteva will collectively bear the other half of the cost of such future potential legacy PFAS liabilities up to an aggregate $4 billion, of which approximately $2.0 billion is available after consideration of the funding of the payment to the State of Ohio and supplemental payment to the State of Delaware (discussed below). Refer to the "Environmental Matters" section within this *MD&A* for the anticipated environmental remediation payments over the next three years. Refer to "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* for further discussion of the MOU and Qualified Spend.

- **PFAS escrow funding requirements** – Pursuant to the binding MOU that we entered into with DuPont, Corteva, and EID in January 2021, the parties have agreed to establish an escrow account in order to support and manage the payments for potential future legacy PFAS liabilities. In September 2023, we entered into a supplemental agreement to the binding MOU with DuPont, Corteva, and EID, whereby the parties agreed to i) release funds held in escrow to fund, in part, the qualified settlement fund per the terms of the U.S. public water system settlement agreement, ii) waive the escrow funding obligation of each party due no later than September 30, 2023 and iii) waive the escrow funding obligation due no later than September 30, 2024 under certain conditions as agreed to by the parties. The parties agreed to fund the payments due by September 30, 2024, and we funded $50 million into the escrow account on September 30, 2024. As such, at December 31, 2024 and 2023, we had $50 million and $0 million deposited into the escrow account, respectively. The next escrow payment of $50 million is expected to be made on or before September 30, 2025 and on or before September 30 of each subsequent year through and including 2028. Additionally, if on December 31, 2028, the balance of the escrow account (including interest) is less than $700 million, the balance of the escrow is to be restored to such amount, with Chemours making 50% of the deposits and DuPont and Corteva together making 50% of the deposits. Such payments will be made in a series of five consecutive annual equal installments commencing on September 30, 2029 pursuant to the escrow account replenishment terms as set forth in the MOU. Refer to "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* for further discussion.
- **Other legal settlements** - In addition to the legal items noted above, we have other legal settlements that we expect to pay within the next 12 months and beyond. In November 2023, we, DuPont, Corteva, and EID entered into a settlement agreement with the State of Ohio to settle claims, including for environmental releases or sales of products containing PFAS or other known contaminants. Our share of this settlement is $55 million, representing our portion of the contribution consistent with the MOU entered into among the parties in January 2021. Following the settlement agreement with the State of Ohio and pursuant to the terms of the settlement agreement with the State of Delaware entered into in 2021, we will also contribute our portion, $13 million, of a supplemental payment owed to the State of Delaware and expect to pay these amounts in 2025. We have accrued litigation of $208 million at December 31, 2024, which is inclusive of the settlement agreements with Ohio and Delaware, of which $112 million is classified as current. Refer to "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* for further discussion.
- **Purchases of property, plant, and equipment** – As further discussed under the "Capital Expenditures" section within this *MD&A*, our operations are capital intensive, requiring ongoing investment to upgrade or enhance existing operations and to meet environmental and operational regulations. For the years ended December 31, 2024 and 2023, our purchases of property, plant, and equipment amounted to $360 million and $370 million, respectively. For the year ending December 31, 2025, we expect that our capital expenditures will be between $250 million and $300 million.

During 2024, we have begun taking actions aimed at improving near-term liquidity through targeted spending control measures. We have also focused on improving working capital through agreeing with vendors on longer standard accounts payable payment terms. We expect these measures will have a positive impact on operating cash flow and working capital levels during 2025.

We continue to believe our sources of liquidity are sufficient to fund our planned operations and to meet our principal, interest, dividend, income taxes, and contractual obligations through at least the end of February 2026. Our capital allocation strategy is consistent with our core values and our CRC goals and seeks to: (i) focus investments in growth initiatives to enhance our portfolio; (ii) improve our leverage profile; (iii) responsibly resolve contingent legal and/or accrued environmental liabilities on terms and bases deemed to be in the best interest of the Company and its stakeholders; and (iv) return cash to shareholders through regular quarterly dividends. Specific to our objective to return cash to shareholders, in recent quarters, we have previously announced quarterly dividends of $0.25 per share, amounting to approximately $150 million per year, and, on February 14, 2025, we announced our quarterly cash dividend of $0.25 per share for the first quarter of 2025. Under our 2022 Share Repurchase Program, as further discussed in Item 5 – Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities and in "Note 23 – Equity" in this Annual Report on Form 10-K, we have remaining authority to repurchase $441 million of our outstanding common stock, though we do not anticipate additional repurchases under the 2022 Share Repurchase Plan.

***Cash Flows***

The following table sets forth a summary of the net cash provided by (used for) our operating, investing, and financing activities for the years ended December 31, 2024 and 2023.

| | Year Ended December 31, | |
|---|---|---|
| *(Dollars in millions)* | 2024 | 2023 |
| Cash (used for) provided by operating activities | $ (633) | $ 556 |
| Cash used for investing activities | (353) | (229) |
| Cash (used for) provided by financing activities | (36) | 172 |

*Operating Activities*

We used $633 million in cash flows for our operating activities for the year ended December 31, 2024. Comparatively, we generated $556 million in cash flows from our operating activities during the year ended December 31, 2023. The increase in our operating cash outflows for the year ended December 31, 2024 was primarily attributable to the release of the $592 million of restricted cash and cash equivalents deposited in the qualified settlement fund per the terms of the U.S. public water settlement agreement following Final Judgment, as defined in the U.S. public water settlement agreement, the unwinding of 2023 year end net working capital actions (discussed further in the "Liquidity and Capital Resources" section above) and lower earnings in 2024.

*Investing Activities*

We used $353 million in cash flows from our investing activities during the year ended December 31, 2024. Our investing cash outflows were primarily attributable to purchases of property, plant, and equipment amounting to $360 million. For further information related to the capital projects driving our year-over-year decrease in purchases of property, plant, and equipment, refer to the “Capital Expenditures” section within this MD&A.

We used $229 million in cash flows from our investing activities during the year ended December 31, 2023. Our investing cash outflows were primarily attributable to purchases of property, plant, and equipment amounting to $370 million, primarily in growth capital expenditures in our Advanced Performance Materials and Thermal & Specialized Solutions segments, partially offset by cash proceeds of $138 million related to the Glycolic Acid Transaction.

*Financing Activities*

We used $36 million in cash flows from our financing activities during the year ended December 31, 2024. Our financing cash outflows were primarily attributable to $148 million of cash dividends, partially offset by $116 million of net proceeds received, following the repayment of the 2026 Euro Notes, in connection with the issuance of the 8.000% senior unsecured notes due January 2033, as further discussed in “Note 20 – Debt” to the *Consolidated Financial Statements.*

We generated $172 million in cash for our financing activities during the year ended December 31, 2023, which were primarily attributable to $367 million of net proceeds received in connection with the issuance of the Term Loans. Our cash flows from financing activities also includes $26 million of proceeds received from a customer's financing facility in December 2023 in advance of us meeting revenue recognition criteria with that customer and $9 million of net proceeds received in connection with one of our supplier financing programs, both of which are classified as financing activities based on the characteristics of the transactions. We also used cash for capital allocation activities, resulting in $69 million in purchases of our issued and outstanding common stock under our 2022 Share Repurchase Program and $149 million of cash dividends.

***Current Assets***

The following table sets forth the components of our current assets at December 31, 2024 and 2023.

| | December 31, | |
|---|---|---|
| *(Dollars in millions)* | **2024** | **2023** |
| Cash and cash equivalents | $ 713 | $ 1,203 |
| Restricted cash and restricted cash equivalents | — | 604 |
| Accounts and notes receivable, net | 770 | 610 |
| Inventories | 1,472 | 1,352 |
| Prepaid expenses and other | 71 | 66 |
| **Total current assets** | $ 3,026 | $ 3,835 |

Restricted cash and restricted cash equivalents decreased by $604 million (or 100%) to $0 million at December 31, 2024, compared with restricted cash and restricted cash equivalents of $604 million at December 31, 2023. The decrease in our restricted cash and restricted cash equivalents was primarily attributable to the release of cash and cash equivalents deposited in the qualified settlement fund per the terms of the U.S. public water system settlement agreement following Final Judgment, as defined in the U.S. public water system settlement agreement. This matter is further discussed in "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* in this Annual Report on Form 10-K.

Our accounts and notes receivable, net increased by $160 million (or 26%) to $770 million at December 31, 2024, compared with accounts and notes receivable, net of $610 million at December 31, 2023. The increase in our accounts and notes receivable, net at December 31, 2024 was primarily attributable to the acceleration of receivables collection in the fourth quarter of 2023 that were originally not due to be received until the first quarter of 2024.

Our inventories increased by $120 million (or 9%) to $1.5 billion at December 31, 2024, compared with inventories of $1.4 billion at December 31, 2023. The increase in our inventories at December 31, 2024 was primarily attributable to higher inventories within our Titanium Technologies business in line with seasonal demand patterns and higher inventories within our Thermal & Specialized Solutions business in advance of plant maintenance activity in the fourth quarter of 2024.

Our prepaid expenses and other assets increased by $5 million (or 8%) to $71 million at December 31, 2024, compared with prepaid expenses and other assets of $66 million at December 31, 2023. The increase in our prepaid expenses and other current assets at December 31, 2024 was primarily attributable to higher prepaid income taxes.

***Current Liabilities***

The following table sets forth the components of our current liabilities at December 31, 2024 and 2023.

| *(Dollars in millions)* | December 31, 2024 | 2023 |
|---|---|---|
| Accounts payable | $ 1,142 | $ 1,159 |
| Compensation and other employee-related costs | 99 | 89 |
| Short-term and current maturities of long-term debt | 54 | 51 |
| Current environmental remediation | 115 | 129 |
| Other accrued liabilities (1) | 393 | 1,058 |
| **Total current liabilities** | $ 1,803 | $ 2,486 |

(1)At December 31, 2023, other accrued liabilities includes $592 million for the United States Public Water System Settlement. Refer to "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* in this Annual Report on Form 10-K for further details.

Our accounts payable decreased by $17 million (or 1%) to $1.1 billion at December 31, 2024, compared with accounts payable of $1.2 billion at December 31, 2023. The decrease in our accounts payable at December 31, 2024 was primarily attributable to the timing of vendor payments in the first quarter of 2024, resulting from efforts to delay payments to certain vendors in the fourth quarter of 2023, partially offset by higher purchases in the fourth quarter of 2024 for plant maintenance activity.

Our compensation and other employee-related costs increased by $10 million (or 11%) to $99 million at December 31, 2024 compared with compensation and other employee-related costs of $89 million at December 31, 2023. The increase in our compensation and other employee-related costs at December 31, 2024 was primarily attributable to higher accruals for employee benefits and performance-related compensation in line with the expected payout.

Our current environmental remediation decreased by $14 million (or 11%) to $115 million at December 31, 2024, compared with current environmental remediation of $129 million at December 31, 2023. The decrease in our current environmental remediation at December 31, 2024 was primarily attributable to lower environmental remediation accruals at the USS Lead Superfund site following completion of the remaining obligations under the 2021 Record of Decision and Statement of Work. Refer to "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* in this Annual Report on Form 10-K for further information.

Our other accrued liabilities decreased by $665 million (or 63%) to $393 million at December 31, 2024, compared with other accrued liabilities of $1.1 billion at December 31, 2023. The decrease in our other accrued liabilities at December 31, 2024 was primarily attributable to the derecognition of the accrued liabilities related to the U.S. public water system settlement agreement following Final Judgment, as defined in the U.S. public water system settlement agreement. This matter is further discussed in "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* in this Annual Report on Form 10-K.

***Credit Facilities and Notes***

Refer to “Note 20 – Debt” to the *Consolidated Financial Statements* for a discussion of our credit facilities and notes.

***Guarantor Financial Information***

The following disclosures set forth summarized financial information and alternative disclosures in accordance with Rule 13-01 of Regulation S-X (“Rule 13-01”). These disclosures have been made in connection with certain subsidiaries' guarantees of the 5.375% senior unsecured notes due May 2027 (the “Registered Notes”), which are registered under the Securities Act of 1933, as amended. Each series of the Registered Notes was issued by The Chemours Company (the “Parent Issuer”), and was fully and unconditionally guaranteed, jointly and severally, on a senior unsecured basis by the existing and future domestic subsidiaries of the Parent Issuer (together, the “Guarantor Subsidiaries”), subject to certain conditions as set forth in “Note 20 – Debt” to the *Consolidated Financial Statements*. The assets, liabilities, and operations of the Guarantor Subsidiaries primarily consist of those attributable to The Chemours Company FC, LLC, our primary operating subsidiary in the United States, as well as certain U.S.-based operating subsidiaries included in *Exhibit 22* to this Annual Report on Form 10-K. Each of the Guarantor Subsidiaries is 100% owned by the Company. None of our other subsidiaries, either direct or indirect, guarantee the Registered Notes (together, the “Non-Guarantor Subsidiaries”). Pursuant to the indentures governing the Registered Notes, the Guarantor Subsidiaries will be automatically released from those guarantees upon the occurrence of certain customary release provisions.

Our summarized financial information is presented on a combined basis, consisting of the Parent Issuer and Guarantor Subsidiaries (collectively, the “Obligor Group”), in accordance with the requirements under Rule 13-01, and is presented after the elimination of: (i) intercompany transactions and balances among the Parent Issuer and Guarantor Subsidiaries, and (ii) equity in earnings from and investments in the Non-Guarantor Subsidiaries.

| *(Dollars in millions)* | Year Ended December 31, 2024 |
|---|---|
| Net sales (1) | $ 3,998 |
| Gross profit | 593 |
| Income before income taxes | 51 |
| Net income | 74 |
| Net income attributable to Chemours | 74 |

(1)Net sales includes intercompany sales to the Non-Guarantor Subsidiaries.

| | December 31, | |
|---|---|---|
| *(Dollars in millions)* | 2024 | 2023 |
| **Assets** | | |
| Current assets (1,2,3) | $ 1,510 | $ 2,013 |
| Long-term assets (4) | 3,285 | 3,302 |
| | | |
| **Liabilities** | | |
| Current liabilities (2) | $ 1,563 | $ 2,121 |
| Long-term liabilities | 4,995 | 4,931 |

(1)Current assets includes $308 million and $395 million of cash and cash equivalents at December 31, 2024 and 2023, respectively. Current assets at December 31, 2023 also includes $603 million of restricted cash and restricted cash equivalents related to qualified settlement funds under the U.S. public water system class action suit settlement.

(2)Current assets includes $365 million and $256 million of intercompany accounts receivable from the Non-Guarantor Subsidiaries at December 31, 2024 and 2023, respectively. Current liabilities includes $367 million and $285 million of intercompany accounts payable to the Non-Guarantor Subsidiaries at December 31, 2024 and 2023, respectively.

(3)As of December 31, 2024 and 2023, $112 million and $87 million of accounts receivable generated by the Obligor Group, respectively, remained outstanding with one of the Non-Guarantor Subsidiaries under the Securitization Facility.

(4)Long-term assets at December 31, 2024 includes $50 million of restricted cash and restricted cash equivalents related to an escrow account as per the terms of the MOU. Long-term assets at December 31, 2023 also includes $144 million of intercompany notes receivable from the Non-Guarantor Subsidiaries.

There are no significant restrictions that may affect the ability of the Guarantor Subsidiaries in guaranteeing the Parent Issuer’s obligations under our debt financing arrangements. While the Non-Guarantor Subsidiaries do not guarantee the Parent Issuer’s obligations under our debt financing arrangements, we may, from time to time, repatriate post-2017 earnings from certain of these subsidiaries to meet our financing obligations, as well.

***Supplier Financing***

We maintain supply chain finance programs with several financial institutions. The available capacity under these programs can vary at any point in time based on the outstanding obligations with each financial institution. We also participate in certain customers' supply chain financing and other early pay programs as a routine source of working capital. See "Note 18 – Accounts Payable" and "Note 20 – Debt" to the *Consolidated Financial Statements* for further details regarding supplier financing programs.

***Off-Balance Sheet Arrangements***

Information with respect to guarantees, including our securitization program, are included in "Note 20 – Debt" to the *Consolidated Financial Statements*. Historically, we have not made any payments to satisfy guarantee obligations; however, we believe we have the financial resources to satisfy these guarantees in the event required.

***Capital Expenditures***

Our operations are capital intensive, requiring ongoing investment to upgrade or enhance existing operations and to meet environmental and operational regulations. Our capital requirements have consisted, and are expected to continue to consist, primarily of:

- investments in our existing facilities to help support the introduction of new products, expand capacity, and grow our business;
- ongoing capital expenditures, such as those required to maintain equipment reliability, maintain the integrity and safety of our manufacturing sites, comply with environmental regulations, and meet our Corporate Responsibility Commitments; and,
- investments in projects to reduce future operating costs and enhance productivity.

The following table sets forth our ongoing and expansion capital expenditures, including certain environmental capital expenditures, for the years ended December 31, 2024 and 2023.

| | Year Ended December 31, | |
|---|---|---|
| *(Dollars in millions)* | **2024** | **2023** |
| Thermal & Specialized Solutions | $ 168 | $ 75 |
| Titanium Technologies | 55 | 83 |
| Advanced Performance Materials | 122 | 193 |
| Other Segment | 5 | 7 |
| Corporate | 10 | 12 |
| **Total purchases of property, plant, and equipment** | $ 360 | $ 370 |

Our capital expenditures decreased by $10 million (or 3%) to $360 million for the year ended December 31, 2024, compared with capital expenditures of $370 million for the same period in 2023. The decrease in our capital expenditures for the year ended December 31, 2024 was primarily attributable to a decrease in capital expenditures in Advanced Performance Materials following completion of capital investments related to PFA capacity expansion, partially offset by an increase in capital expenditures in Thermal & Specialized Solutions related to Opteon™ capacity expansion.

## Critical Accounting Policies and Estimates

Our significant accounting policies are more fully described in “Note 3 – Summary of Significant Accounting Policies” to the *Consolidated Financial Statements*. Management believes that the application of these policies on a consistent basis enables us to provide the users of our financial statements with useful and reliable information about our operating results and financial condition.

The preparation of our consolidated financial statements in conformity with U.S. generally accepted accounting principles (“GAAP”) requires management to make estimates and assumptions that affect the reported amounts, including, but not limited to, receivable and inventory valuations, impairment of tangible and intangible assets, long-term employee benefit obligations, income taxes, restructuring liabilities, environmental matters, and litigation. Management’s estimates are based on historical experience, facts, and circumstances available at the time, and various other assumptions that are believed to be reasonable. We review these matters and reflect changes in estimates as appropriate. Management believes that the following represents some of the more critical judgment areas in the application of our accounting policies, which could have a material effect on our financial position, results of operations, or cash flows.

### *Provision for (Benefit from) Income Taxes*

The provision for (benefit from) income taxes is determined using the asset and liability approach of accounting for income taxes. Under this approach, deferred taxes represent the future tax consequences expected to occur when the reported amounts of assets and liabilities are recovered or paid. The provision for (benefit from) income taxes represents income taxes paid or payable for the current year, plus the change in deferred taxes during the year. Deferred taxes result from differences between the financial and tax bases of our assets and liabilities and are adjusted for changes in tax rates and tax laws when changes are enacted. Valuation allowances are recorded to reduce deferred tax assets when it is more-likely-than-not that a tax benefit will not be realized. In evaluating the ability to realize deferred tax assets, we rely on, in order of increasing subjectivity, taxable income in prior carryback years, the future reversals of existing taxable temporary differences, tax planning strategies, and forecasted taxable income using historical and projected future operating results.

The breadth of our operations and the global complexity of tax regulations require assessments of uncertainties and judgments in estimating the taxes that we will ultimately pay. The final taxes paid are dependent upon many factors, including negotiations with taxing authorities in various jurisdictions, outcomes of tax litigation, and resolutions of disputes arising from federal, state, and international tax audits in the normal course of business. A liability for unrecognized tax benefits is recorded when management concludes that the likelihood of sustaining such positions upon examination by taxing authorities is less than more-likely-than-not. It is our policy to include accrued interest related to unrecognized income tax positions and income tax-related penalties in the provision for (benefit from) income taxes.

We account for the tax impacts of new provisions based on interpretation of existing statutory law, including proposed regulations issued by the U.S. Treasury, the IRS, and other authorities. While there can be no assurances as to the effect of any final regulations on our provision for (benefit from) income taxes, we will continue to evaluate the impacts as any issued regulations become final and adjust our estimates, as appropriate.

Refer to “Note 9 – Income Taxes” to the *Consolidated Financial Statements* for further information related to our income tax positions.

### *Long-lived Assets*

We evaluate the carrying value of our long-lived assets to be held and used when events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. For the purposes of recognition or measurement of an impairment charge, the assessment is performed on the asset or asset group at the lowest level for which identifiable cash flows are largely independent of the cash flows of other groups of assets and liabilities. To determine the level at which the assessment is performed, we consider factors such as revenue dependency, shared costs, and the extent of vertical integration. The carrying value of a long-lived asset is considered impaired when the total projected undiscounted cash flows from the use and eventual disposition of the asset or asset group are separately identifiable and are less than its carrying value. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset. The fair value methodology used is an estimate of fair market value, which is made based on prices of similar assets or other valuation methodologies, including present value techniques. Long-lived assets to be disposed of other than by sale are classified as held for use until their disposal. Long-lived assets to be disposed of by sale are classified as held for sale and are reported at the lower of their carrying amount or fair market value, less the estimated costs to sell. Depreciation and amortization are ceased for a disposal group upon it being classified as held for sale.

The testing for potential impairment of these assets is significantly dependent on numerous assumptions and reflects management's best estimates at a particular point in time. The dynamic economic environments in which our segments operate, and key economic and business assumptions with respect to projected selling prices, market growth, and inflation rates, can significantly impact the outcome of our impairment tests. Estimates based on these assumptions may differ significantly from actual results. Changes in the factors and assumptions used in assessing potential impairments can have a significant impact on the existence and magnitude of impairments, as well as the time in which such impairments are recognized. In addition, we continually review our diverse portfolio of assets to ensure that they are achieving their greatest potential and are aligned with our growth strategy. Strategic decisions involving a particular group of assets may trigger an assessment of the recoverability of the related assets. Such an assessment could result in impairment losses. For the year ended December 31, 2024, we recorded non-cash asset-related charges of $27 million primarily related to the write off of certain operating assets and associated construction-in-progress and other assets with no future intended use, as part of strategic footprint transformation initiatives within the Advanced Performance Materials business. For the year ended December 31, 2023, we recorded a pre-tax asset impairment charge of $78 million related to the shut down our $TiO_2$ manufacturing facility in Kuan Yin, Taiwan. Additionally, for the year ended December 31, 2023 we recorded a pre-tax asset-related impairment of $8 million resulting from the shutdown of a production line at our El Dorado site. Refer to "Note 7 – Restructuring, Asset-related, and Other Charges" to the Consolidated Financial Statements for further details related to these charges.

During the third quarter of 2024, we reviewed recently released third-party industry projections, which for hydrogen now reflect lower end-market demand, as well as slower market growth through 2030 and a more uncertain long-term growth trajectory beyond 2030. In response to these negative market outlook developments, as well as increased commercial headwinds due to limited cyclical end-market recovery and competitive intensity, we have revised our financial projections for the Advanced Performance Materials business which includes reductions to its investment plans, including putting our previously announced capacity expansion for Nafion™ ion exchange materials at our Villers St. Paul, France facility on long-term hold until the market conditions improve and require further polymer capacity expansion. We concluded that these market developments, as well as our revised financial projections to reflect these events, represented a triggering event for our Advanced Performance Materials reporting unit and associated goodwill, as well as the related asset group, during the third quarter of 2024. As a result of this conclusion, we completed an interim impairment assessment as of August 31, 2024 for its Advanced Performance Materials reporting unit and the related asset group. We concluded that the undiscounted cash flows exceeded the carrying value of the long-lived assets, and that an impairment did not exist.

Notwithstanding the results of our trigger-based interim impairment assessment during the third quarter of 2024, further negative market developments, notably as it relates to the hydrogen market or future strategic decisions involving a particular group of assets, may trigger an assessment of the recoverability of the related assets and such an assessment could result in future impairment losses.

***Goodwill***

The excess of the purchase price over the estimated fair value of the net assets acquired in a business combination, including any identified intangible assets, is recorded as goodwill. We test our goodwill for impairment at least annually on October 1; however, these tests are performed more frequently when events or changes in circumstances indicate that the asset may be impaired. Goodwill is evaluated for impairment at the reporting unit level, which is an operating segment or one level below an operating segment. A reporting unit is the level at which discrete financial information is available and reviewed by business management on a regular basis. An impairment exists when the carrying value of a reporting unit exceeds its fair value. The amount of impairment loss recognized in the consolidated statements of operations is equal to the excess of a reporting unit's carrying value over its fair value, which is limited to the total amount of goodwill allocated to the reporting unit.

The fair values of our reporting units were determined by using a combination of income-based and/or market-based valuation techniques. These valuation models incorporated a number of assumptions and judgments surrounding general market and economic conditions, short- and long-term revenue growth rates, gross margins, and prospective financial information surrounding future cash flows of the reporting units. Projections are based on internal forecasts of future business performance and are based on growth assumptions. Discount rate and market multiple assumptions were determined based on relevant peer companies in the chemicals sector.

As described further in "Note 15 – Goodwill and Other Intangible Assets, Net" to the Consolidated Financial Statements, we concluded that a triggering event was present for our Advanced Performance Materials reporting unit during the third quarter of 2024. As a result of the interim quantitative goodwill impairment analysis performed, we concluded that the carrying amount of the Advanced Performance Materials reporting unit exceeded its fair value resulting in a non-cash goodwill impairment charge of $56 million, which is recorded within "Goodwill impairment charge" on the Consolidated Statements of Operations for the year ended December 31, 2024. After this impairment charge, as of December 31, 2024, goodwill for the Advanced Performance Materials reporting unit was $0 million.

As of October 1, 2024, we performed our annual goodwill impairment tests for the Thermal & Specialized Solutions and Titanium Technologies reporting units. Based upon the results of our annual goodwill impairment tests, no further impairments to the carrying value of goodwill were necessary during the year ended December 31, 2024. For our Thermal & Specialized Solutions and Titanium Technologies reporting units, a qualitative assessment was performed in 2024, that indicated it is not more likely than not that the fair value of the reporting unit was less than the carrying value.

As of October 1, 2023, the date of the most recent quantitative impairment test for our Titanium Technologies reporting unit, the estimated fair value was 67% higher than the carrying value of the reporting unit. As of October 1, 2022, the date of the most recent quantitative impairment test for our Thermal & Specialized Solutions reporting unit, the estimated fair value was 335% higher than the carrying value of the reporting unit.

***Employee Benefits***

The amounts recognized in our consolidated financial statements related to pension and other long-term employee benefits plans are determined from actuarial valuations. Inherent in these valuations are assumptions including, but not limited to, the expected returns on plan assets, discount rates at which liabilities are expected to be settled, rates of increase in future compensation levels, and mortality rates. These assumptions are updated annually and are disclosed in “Note 27 – Long-term Employee Benefits” to the *Consolidated Financial Statements*. In accordance with GAAP, actual results that differed from the assumptions are accumulated and amortized over future periods and, therefore, affect expense recognized and obligations recorded in future periods.

We use discount rates that are developed by matching the expected cash flows of each benefit plan to various yield curves constructed from a portfolio of high-quality, fixed income instruments provided by the plan’s actuary as of the measurement date. As of December 31, 2024, the weighted-average discount rate was 3.3%.

The expected long-term rates of return on plan assets are determined by performing a detailed analysis of historical and expected returns based on the strategic asset allocation of the underlying asset class applicable to each country. We also consider our historical experience with the pension funds’ asset performance. The expected long-term rates of return on plan assets are assumptions and not what is expected to be earned in any one particular year. The weighted-average long-term rates of return on plan assets assumptions used for determining our net periodic pension cost for 2024 was 4.9%.

A 50 basis point increase in the discount rate would result in a decrease of $3 million to the net periodic benefit cost for 2025, while a 50 basis point decrease in the discount rate would result in an increase of approximately $3 million. A 50 basis point increase in the expected return on plan assets assumption would result in a decrease of approximately $2 million to the net periodic benefit cost for 2025, while a 50 basis point decrease in the expected return on plan assets assumption would result in an increase of approximately $2 million.

***Litigation***

Litigation liabilities and expenditures included in our consolidated financial statements include litigation matters that are liabilities of EID and its subsidiaries, which we may be required to indemnify pursuant to the Separation-related agreements executed prior to the Separation. Disputes between us and EID may arise with respect to indemnification of these matters, including disputes based on matters of law or contract interpretation. If, and to the extent these disputes arise, they could materially adversely affect our results of operations. We are also involved in various claims and legal proceedings. We regularly review the status of each significant matter and assess its potential financial exposure. If the potential loss from any claim or legal proceeding is considered probable and the amount can be reasonably estimated, we accrue a liability for the estimated loss. When a material loss contingency is reasonably possible, but not probable, we do not record a liability, but instead disclose the nature of the matter and an estimate of the loss or range of loss, to the extent such estimate can be made. Significant judgment is required in both the determination of probability and whether an exposure is reasonably estimable. Our judgments are subjective based on the status of the legal or regulatory proceedings, the merits of our defenses and consultation with in-house and outside legal counsel. Because of uncertainties related to these matters, accruals are based on the best information available at the time of the filing of this Annual Report on Form 10-K. As additional information becomes available, we reassess the potential liability related to pending claims and litigation and may revise our estimates accordingly. Due to the inherent uncertainties of the legal and regulatory process in the multiple jurisdictions in which we operate, our judgments may be materially different than the actual outcomes. Legal costs such as outside counsel fees and expenses are charged to expense in the period services are rendered. Refer to "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* in this Annual Report on Form 10-K for further information.

***Environmental Liabilities and Expenditures***

We accrue for environmental remediation costs when it is probable that a liability has been incurred and a reasonable estimate of the liability can be made. Where the available information is sufficient to estimate the amount of liability, that estimate has been used. Where the information is only sufficient to establish a range of probable liability, and no point within the range is more likely than any other, the lower end of the range has been used. Estimated liabilities are determined based on existing remediation laws and technologies and our planned remedial responses, which are derived from environmental studies, sampling, testing, and analyses. Inherent uncertainties exist in such evaluations, primarily due to unknown environmental conditions, changing governmental regulations regarding liability, and emerging remediation technologies. These liabilities are adjusted periodically as remediation efforts progress and as additional technology, regulatory, and legal information become available.

Environmental liabilities and expenditures include claims for matters that are liabilities of EID and its subsidiaries, which we may be required to indemnify pursuant to the Separation-related agreements. These accrued liabilities are undiscounted and do not include claims against third parties.

Costs related to environmental remediation are charged to expense in the period that the associated liability is accrued. Other environmental costs are also charged to expense in the period incurred, unless they increase the value of the property or reduce or prevent contamination from future operations, in which case they are capitalized and amortized.

## Recent Accounting Pronouncements

Refer to “Note 3 – Summary of Significant Accounting Policies” to the *Consolidated Financial Statements* for a discussion about recent accounting pronouncements.

## Environmental Matters

Consistent with our values and our *Environment, Health, Safety, and Corporate Responsibility* policy, we are committed to preventing releases to the environment at our manufacturing sites to keep our people and communities safe, and to be good stewards of the environment. We are also subject to environmental laws and regulations relating to the protection of the environment. We believe that, as a general matter, our policies, standards, and procedures are properly designed to prevent unreasonable risk of harm to people and the environment, and that our handling, manufacture, use, and disposal of hazardous substances are in accordance with applicable environmental laws and regulations.

***Environmental Expenditures***

We incur costs for pollution abatement activities, including waste collection and disposal, installation and maintenance of air pollution controls and wastewater treatment, emissions testing and monitoring, and obtaining permits. Annual expenses charged to current operations include environmental operating costs and increases in remediation accruals, if any, during the period reported.

Our environmental remediation expenditures are subject to considerable uncertainty and may fluctuate significantly. Capital expenditures associated with ongoing operations are expected to be required over the next decade for treatment, storage, and disposal facilities for solid and hazardous waste and for the protection of air and water resources. Considerable uncertainty remains regarding estimates for our future capital and remediation expenditures as regulatory requirements across various jurisdictions where we operate continue to evolve.

For the years ended December 31, 2024 and 2023, we spent $18 million and $30 million, respectively, on environmental capital projects that were either required by law or necessary to meet our internal environmental objectives.

We expect our future capital expenditures for environmental matters will continue to vary, based on the success of our deployed solutions, changes in our operations, technological advancements, developments in environmental requirements, and stakeholder expectations.

***Environmental Remediation***

In large part, because of past operations, operations of predecessor companies, or past disposal practices, we, like many other similar companies, have clean-up responsibilities and associated remediation costs, and are subject to claims by other parties, including claims for matters that are liabilities of EID and its subsidiaries that we may be required to indemnify pursuant to the Separation-related agreements executed prior to the Separation.

Our environmental liabilities include estimated costs, including certain accruable costs associated with on-site capital projects. The accruable costs relate to a number of sites for which it is probable that environmental remediation will be required, whether or not subject to enforcement activities, as well as those obligations that result from environmental laws such as CERCLA, RCRA, and similar federal, state, local, and foreign laws. These laws may require certain investigative, remediation, and restoration activities at sites where we conduct or EID once conducted operations or at sites where our generated waste was disposed. At December 31, 2024 and 2023, our consolidated balance sheets include environmental remediation liabilities of $571 million and $590 million, respectively, relating to these matters, which, as discussed in further detail below, include $351 million and $383 million, respectively, for Fayetteville.

The following table sets forth the activities related to our environmental remediation liabilities for the years ended December 31, 2024 and 2023.

| *(Dollars in millions)* | December 31, 2024 | December 31, 2023 |
|---|---|---|
| **Balance at January 1,** | $ 590 | $ 668 |
| Increase in remediation accruals | 70 | 66 |
| Remediation payments (1) | (89) | (144) |
| **Balance at December 31,** | $ 571 | $ 590 |

(1)Remediation payments do not include Qualified Spend that we have been reimbursed for by DuPont and/or Corteva as part of our cost-sharing agreement under the terms of the MOU.

The following table sets forth our environmental remediation liabilities by site category.

| *(Dollars in millions)* | December 31, 2024 | | December 31, 2023 | |
|---|---|---|---|---|
| **Site Category** | **Number of Sites** | **Remediation Accrual** | **Number of Sites** | **Remediation Accrual** |
| Chemours-owned | 21 | $ 507 | 21 | $ 512 |
| Multi-party Superfund/non-owned (1) | 88 | 64 | 87 | 78 |
| Closed or settled | 104 | — | 104 | — |
| **Total sites** | 213 | $ 571 | 212 | $ 590 |

(1)Sites not owned by Chemours, including sites previously owned by EID or Chemours, where remediation obligations are imposed by environmental remediation laws, such as CERCLA, RCRA, or similar state laws.

As part of our legacy as a former subsidiary of EID, we are cleaning-up historical impacts to soil and groundwater that have occurred in the past at the 21 sites that we own. These Chemours-owned sites make up approximately 89% of our environmental remediation liabilities at December 31, 2024.

We were also assigned numerous clean-up obligations from EID, which pertain to 88 sites previously owned by EID and/or us, as well as sites that we or EID never owned or operated. We are meeting our obligations to clean up those sites. The majority of these non-owned sites are multi-party Superfund sites that we, through EID, have been notified of potential liability under CERCLA, RCRA, or similar state laws and which, in some cases, may represent a small fraction of the total waste that was allegedly disposed of at a site. These sites represent approximately 11% of our environmental remediation liabilities at December 31, 2024. Included in the 88 sites are 38 inactive sites for which there has been no known investigation, clean-up, or monitoring activity, and no remediation obligation is imposed or required; as such, no remediation liabilities are recorded.

The remaining 104 sites, which are Superfund sites and other sites not owned by us, are either already closed or settled, or sites for which we do not believe we have clean-up responsibility based on current information.

The following graph sets forth the number of remediation sites by site clean-up phase and our environmental remediation liabilities by site clean-up phase as of December 31, 2024 and 2023.




(1)Number of sites does not include the 38 and 37 inactive sites for which there has been no known investigation, clean-up, or monitoring activities as of December 31, 2024 and 2023, respectively.

(2)Dollars in millions.

(3)As of December 31, 2024 and 2023, Active Remediation included $351 million and $383 million, respectively, for on-site remediation and off-site groundwater remediation at Fayetteville.

As remediation efforts progress, sites move from the investigation phase (“Investigation”) to the active clean-up phase (“Active Remediation”), and as construction is completed at Active Remediation sites, those sites move to the operation, maintenance, and monitoring (“OM&M”), or closure phase. As final clean-up activities for some significant sites are completed over the next several years, we expect our annual expenses related to these active sites to decline over time. The time frame for a site to go through all phases of remediation (Investigation and Active Remediation) may take about 15 to 20 years, followed by several years of OM&M activities. Remediation activities, including OM&M activities, vary substantially in duration and cost from site to site. These activities, and their associated costs, depend on the mix of unique site characteristics, evolving remediation technologies, and diverse regulatory requirements, as well as the presence or absence of other Potentially Responsible Parties (“PRPs”). In addition, for claims that we may be required to indemnify EID pursuant to the Separation-related agreements, we and EID may have limited available information for certain sites or are in the early stages of discussions with regulators. For these sites, there may be considerable variability between the clean-up activities that are currently being undertaken or planned and the ultimate actions that could be required. Therefore, considerable uncertainty exists with respect to environmental remediation costs, and, under adverse changes in circumstances, we currently estimate the potential liabilities may range up to approximately $720 million above the amount accrued at December 31, 2024. This estimate is not intended to reflect an assessment of our maximum potential liability. The estimated liabilities are determined based on existing remediation laws and technologies and our planned remedial responses, which are derived from environmental studies, sampling, testing, and analyses. Inherent uncertainties exist in such evaluations, primarily due to unknown environmental conditions, changing governmental regulations regarding liability, and emerging remediation technologies. We will continue to evaluate as new or additional information becomes available in the determination of our environmental remediation liability.

In general, uncertainty is greatest and the range of potential liability is widest in the Investigation phase, narrowing over time as regulatory agencies approve site remedial plans. As a result, uncertainty is reduced, and sites ultimately move into OM&M, as needed. As more sites advance from Investigation to Active Remediation to OM&M or closure, the upper end of the range of potential liability is expected to decrease over time. Some remediation sites will achieve site closure and will require no further action to protect people and the environment and comply with laws and regulations. At certain sites, we expect that there will continue to be some level of remediation activity due to ongoing OM&M of remedial systems. In addition, portfolio changes, such as an acquisition or divestiture, or notification as a PRP for a multi-party Superfund site, could result in additional remediation activity and potentially additional accrual.

Management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position or cash flows for any given year, as such obligation can be satisfied or settled over many years.

***Significant Environmental Remediation Sites***

While there are many remediation sites that contribute to our total accrued environmental remediation liabilities at December 31, 2024 and 2023, the following table sets forth the liabilities of the six sites that are deemed the most significant, together with the aggregate liabilities for all other sites.

| | December 31, | |
|---|---|---|
| *(Dollars in millions)* | **2024** | **2023** |
| Chambers Works, Deepwater, New Jersey | $ 31 | $ 30 |
| Dordrecht Works, Netherlands (1) | 28 | 4 |
| Fayetteville Works, Fayetteville, North Carolina | 351 | 383 |
| Pompton Lakes, New Jersey | 41 | 41 |
| USS Lead, East Chicago, Indiana (2) | — | 12 |
| Washington Works, West Virginia | 25 | 22 |
| All other sites | 95 | 98 |
| **Total environmental remediation** | $ 571 | $ 590 |

(1)As of December 31, 2024, environmental remediation at Dordrecht Works primarily relates to the remediation plan to be implemented as part of the letter of intent described further within “Note 22 – Commitments and Contingent Liabilities” to the *Consolidated Financial Statements*. An initial estimate of this liability was included in Accrued Litigation at December 31, 2023 and reclassified to Accrued Environmental Remediation at December 31, 2024.

(2)USS Lead, East Chicago, Indiana: Although USS Lead, East Chicago, Indiana has a $0 balance as of December 31, 2024, we continue to include this remediation site in the table above due to the accrued environmental remediation liabilities associated with it as of December 31, 2023 for comparable purposes.

The six sites listed above represent 83% of our total accrued environmental remediation liabilities at both December 31, 2024 and 2023, respectively. For these six sites, we expect to spend, in the aggregate, $164 million over the next three years. For all other sites, we expect to spend $60 million over the next three years.

*Chambers Works, Deepwater, New Jersey (“Chambers Works”)*

The Chambers Works complex is located on the eastern shore of the Delaware River in Deepwater, Salem County, New Jersey. The site comprises the former Carneys Point Works in the northern area and the Chambers Works manufacturing area in the southern area. Site operations began in 1892 when the former Carneys Point smokeless gunpowder plant was constructed at the northern end of Carneys Point. Site operations began in the manufacturing area around 1914 and included the manufacture of dyes, aromatics, elastomers, chlorofluorocarbons, and tetraethyl lead. We continue to manufacture a variety of fluoropolymers and finished products at Chambers Works. In addition, two tenants operate processes at Chambers Works. As a result of over 100 years of continuous industrial activity, site soils and groundwater have been impacted by chemical releases.

In response to identified groundwater contamination, a groundwater interceptor well system (“IWS”) was installed in 1970, which was designed to contain contaminated groundwater and restrict off-site migration. Additional remediation is being completed under a federal RCRA Corrective Action permit. The site has been studied extensively over the years, and more than 25 remedial actions have been completed to date and engineering and institutional controls put in place to ensure protection of people and the environment. In 2017, a site perimeter sheet pile barrier intended to more efficiently contain groundwater was completed.

Remaining work beyond continued operation of the IWS and groundwater monitoring includes completion of various targeted studies on site and in adjacent water bodies to close investigation data gaps, as well as selection and implementation of final remedies under RCRA Corrective Action for various solid waste management units and areas of concern not yet addressed through interim measures. Discussions are ongoing with the U.S. Environmental Protection Agency (the "EPA") and the New Jersey Department of Environmental Protection (the “NJ DEP”) relating to such remaining work as well as the scope of remedial programs and investigation relating to the Chambers Works site historic industrial activity as well as ongoing remedial programs, which could have a material adverse impact on our results of operations, financial position or cash flows for any given year.

*Dordrecht Works, Dordrecht, Netherlands*

The Dordrecht Works complex is located on the southern shore of River Beneden Merwede about 3 kilometers northeast of the city Dordrecht, Netherlands. The facility encompasses 136 acres purchased by EID in 1959. The site is located in a mixed commercial and industrial area with residential communities to the south and north across the river.  Site operations began in the early 1960’s and included nylon, filaments, and engineering polymers. Fluoropolymer manufacturing began in 1967. In July 2015, upon separation from EID, we became owner of the Dordrecht Works complex.

The site has implemented a number of environmental investigations at the request of local (Netherlands) regulatory agencies. In the early 1980’s, the first major environmental assessment of soil and groundwater at the site was conducted. In 1984, a sitewide groundwater containment system was installed to prevent off-site migration and establish hydraulic protection to the deeper groundwater aquifer. Collected groundwater containing chlorinated organics, PFOA and other PFAS compounds is treated using vapor and solid phase granular activated carbon. The pump and treat system is monitored regularly to maintain effective containment and treatment operation with documentation of results submitted annually to the regulatory agency.

As further discussed in “Note 22 – Commitments and Contingent Liabilities” to the Consolidated Financial Statements, the Company and the municipalities of Dordrecht, Papendrecht, Sliedrecht and Molenlanden signed a Letter of Intent ("LOI") that includes the implementation of a specific remediation plan for the restoration of restricted vegetables in certain areas of those municipalities to be funded by Chemours, sampling and developing a program to address the Merwelanden recreational lake, and further settlement discussions. An estimate of this liability was included in Accrued Litigation at December 31, 2023 and was reclassified to Accrued Environmental Remediation as of December 31, 2024 based on the remediation plan to be implemented as part of the LOI.

In the fourth quarter of 2024, we received comments from the Municipality of Dordrecht and the Province of South Holland on a Plan of Action for Vegetable Gardens ("Plan of Action") in the municipalities and approval for the pilot stage of the plan. The Plan of Action provides for replacement of soil impacted with PFOA above certain levels to remove RIVM documented consumption restrictions as well as providing for alternative irrigation water, if necessary, as determined by PFOA levels. Accruals related to the Plan of Action were increased $15 million in the fourth quarter of 2024 based on the comments on the plan, approval of the pilot, the number of residences potentially participating and estimates received. Further, we are in continued legal discussion with the four municipalities (Dordrecht, Papendrecht, Sliedrecht and Molenlanden) related to a fund to cover certain other expenditures aimed at environmental-related activities. An estimate of the litigation liability cannot be determined as of December 31, 2024. Management believes that it is probable that we could incur losses related to these PFAS matters in excess of amounts accrued, but any such losses, which could be material to results of operations, financial position, or cash flows are not estimable at this time due to various reasons, including, among others, that some matters are in their early stages and that there are significant factual issues to be resolved.

The Dordrecht Works facility discharges, through outfalls at the site, wastewater and stormwater pursuant to permits issued by the applicable local authorities, including the DCMR Environmental Protection Agency ("DCMR"). As the regulatory landscape has evolved in the Netherlands over the last years, there is increased focus on PFAS compounds discharged under the site's existing permits, including compounds that were previously discharged at undetected levels, and the site has been ordered to meet certain limits for these discharges or be subject to conditional fines. We regularly carry out analyses of its wastewater to assess compliance with current emission limits as well as detect other contaminants as analysis methods develop. We identified the presence of certain compounds based upon new analysis methods and reported these to DCMR and in December 2023 submitted an application under normal permitting practice for a discharge requirement based on limited information for these compounds. We have continued to engage with regulatory authorities on the application, including providing additional data and information in November 2024. In January 2025, we submitted a revised permit application. We will continue to engage with the regulatory authorities on this matter.

In December 2024, DCMR indicated an intention to impose a conditional fine of up to €3.7 million per violation for one of the compounds for which we have objected. In January 2025, we responded to this intention, including that such intention is not consistent with normal permitting practice. In February 2025, DCMR responded to us indicating it will impose the conditional fine, after a two-month grace period. We have taken and continue to take actions to reduce discharges. We are evaluating DCMR's recent response and all available legal actions and recourse available to us. We have not recorded a liability for this matter at December 31, 2024 as the conditional fine is not effective at this time and will only be imposed after the two-month grace period, if, at that time, we fail to comply with the discharge limits for the compound. We do not believe the above matter will have a material impact on our financial position, results of operation or cash flows.

In addition, in March 2022, the public prosecutor in The Netherlands has raised a matter related to an alleged infraction of Regulation (EU) 517/2014. Due to a reporting error, our Dordrecht Works facility exceeded its allocated or transferred quota of hydrofluorocarbons within the European market over several years. We implemented improvements to our reporting procedures and operated within the allocated quota. We paid a fine in the fourth quarter of 2022. On October 31, 2024, we received a request from the Dutch ILT agency to amend our F-gas reporting for certain years to reflect HFCs produced and consumed or destroyed at the Dordrecht Works facility. The agency asserts that under Regulation (EU) 2024/573, which repealed and replaced Regulation 517/2014 in February 2024, such compounds are subject to the F-gas quota system. In November 2024, we made minor amendments to its F-gas reporting for the above years and consulted with the Dutch ILT agency and EU Commission on the above. In February 2025, the Company received an intention for the ILT to collect a penalty of €1 million based on the consideration that HFC-23 imported or acquired on the market and added to the production process rather than directly sent for destruction is quota consuming. The Company is reviewing the ILT intention. Based on available information, we do not believe the above matter will have a material impact on our financial position, results of operation or cash flows.

*Fayetteville Works, Fayetteville, North Carolina*

Fayetteville is located southeast of the City of Fayetteville in Cumberland and Bladen counties, North Carolina. The facility encompasses approximately 2,200 acres, which were purchased by EID in 1970, and are bounded to the east by the Cape Fear River and to the west by North Carolina Highway 87. Currently, we manufacture fluorinated monomers, fluorinated vinyl ethers, Nafion™ membranes and dispersions, and polymerization aids at the site. A former manufacturing area, which was sold in 1992, produced nylon strapping and elastomeric tape. EID sold its Butacite® and SentryGlas® manufacturing units to Kuraray America, Inc. in September 2014. In July 2015, upon our Separation from EID, we became the owner of the Fayetteville land assets along with fluoromonomers, Nafion™ membranes, and the related polymerization aid manufacturing units. A polyvinyl fluoride resin manufacturing unit remained with EID.

Beginning in 1996, several stages of site investigation were conducted under oversight by NC DEQ, as required by the facility's hazardous waste permit. In addition, the site has voluntarily agreed to agency requests for additional investigations of the potential release of PFAS beginning with "PFOA" (collectively, perfluorooctanoic acids and its salts, including the ammonium salt) in 2006. As a result of detection of GenX in on-site groundwater wells during our investigations in 2017, NC DEQ issued a Notice of Violation ("NOV") in September 2017 alleging violations of North Carolina water quality statutes and requiring further response. Since that time, and in response to three additional NOVs issued by NC DEQ and pursuant to the Consent Order ("CO"), (as discussed below), we have worked cooperatively with the agency to investigate and address releases of PFAS to on-site and off-site groundwater and surface water.

As discussed in "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements*, we, along with NC DEQ and Cape Fear River Watch ("CFRW"), a non-profit organization, have filed a final CO that comprehensively addressed various issues, NOVs, and court filings made by NC DEQ regarding Fayetteville and resolved litigations filed by NC DEQ and CFRW. In connection with the CO, a thermal oxidizer ("TO") became fully operational at the site in December 2019 to reduce aerial PFAS emissions from Fayetteville. The CO requires us to provide permanent replacement drinking water supplies, via connection to public water supply, whole building filtration units and/or reverse osmosis units, to qualifying surrounding residents, businesses, schools, and public buildings with private drinking water wells.

In 2020, we, along with NC DEQ and CFRW, reached agreement on the terms of an addendum to the CO (the "Addendum"). The Addendum establishes the procedure to implement specified remedial measures for reducing PFAS loadings from Fayetteville to the Cape Fear River, including construction of a barrier wall with groundwater extraction system to be completed by March 15, 2023, or an extended date in accordance with the Addendum. In June 2023, we completed the construction of the barrier wall with a groundwater extraction and treatment system in accordance with the requirements under the CO. In October 2023, we submitted the engineer's certification confirming that the barrier wall was constructed and documented to be in conformance with the accepted design.

Further discussion related to Fayetteville is included under the heading "Fayetteville Works, Fayetteville, North Carolina" in "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements*.

*Pompton Lakes, New Jersey*

During the 20th century, blasting caps, fuses, and related materials were manufactured at Pompton Lakes, Passaic County, New Jersey. Operating activities at the site were ceased in the mid-1990s. The primary contaminants in the soil and sediments are lead and mercury. Groundwater contaminants include volatile organic compounds. Under the authority of EPA and NJ DEP, remedial actions at the site are focused on investigating and cleaning-up the area. Groundwater monitoring at the site is ongoing, and we have installed and continue to install vapor mitigation systems at residences within the groundwater plume. In addition, we are further assessing groundwater conditions. In September 2015, EPA issued a modification to the site's RCRA permit that requires us to dredge mercury contamination from a 36-acre area of the lake and remove sediment from two other areas of the lake near the shoreline. The remediation activities commenced when permits and implementation plans were approved in May 2016, and work on the lake dredging project is now complete. In April 2019, we submitted a revised Corrective Measures Study ("CMS") proposing actions to address on-site soils impacted from past operations that exceed applicable clean-up criteria. We received comments on the CMS from EPA and NJ DEP in March 2020, and we responded to their comments in June 2020 and continue to seek resolution with EPA.

*U.S. Smelter and Lead Refinery, Inc., East Chicago, Indiana*

The U.S. Smelter and Lead Refinery, Inc. ("USS Lead") Superfund site is located in the Calumet neighborhood of East Chicago, Lake County, Indiana. The site includes the former USS Lead facility along with nearby commercial, municipal, and residential areas. The primary compounds of interest are lead and arsenic which may be found in soils within the impacted area. The EPA is directing and organizing remediation on this site, and we are one of a number of parties working cooperatively with EPA on the safe and timely completion of this work. EID's former East Chicago manufacturing facility was located adjacent to the site, and EID assigned responsibility for the site to us in the Separation Agreement.

The USS Lead Superfund site was listed on the National Priorities List in 2009. To facilitate negotiations with PRPs, EPA divided the residential part of the USS Lead Superfund site into three zones, referred to as Zone 1, Zone 2, and Zone 3. The division into three zones resulted in Atlantic Richfield Co. ("Atlantic Richfield") and EID entering into an agreement in 2014 with EPA and the State of Indiana to reimburse EPA's costs to implement clean-up in Zone 1 and Zone 3. In March 2017, we and three other parties – Atlantic Richfield, EID, and the U.S. Metals Refining Co. ("U.S. Metals") – entered into an administrative order on consent to reimburse EPA's costs to clean-up a portion of Zone 2. In March 2018, EPA issued a Unilateral Administrative Order for the remainder of the Zone 2 work to five parties, including us, Atlantic Richfield, EID, U.S. Metals, and USS Lead Muller Group, and these parties entered into an interim allocation agreement to perform that work. As of the end of 2019, the required work in Zone 3 had been completed, and Zone 2 was completed by the end of 2021. The determination of a final allocation for Zone 2 and/or the other Zones is ongoing, and additional PRPs may be identified.

The environmental accrual for USS Lead includes completion of the remaining obligations under the 2012 Record of Decision ("ROD") and Statement of Work, which principally encompasses completion of Zone 1. The EPA released a proposed amendment to the 2012 ROD (the "ROD Amendment") for a portion of Zone 1 in December 2018 (following its August 2018 Feasibility Study Addendum), with its recommended option based on future residential use. The EPA's ROD Amendment for modified Zone 1 was released in March 2020, and selects as the preferred remedy one which requires a clean-up to residential standards based on the current applicable residential zoning. The ROD Amendment for modified Zone 1 also sets forth a selected contingent remedy which requires clean-up to commercial/industrial standards if the future land use becomes commercial/industrial. In November 2019, a Letter of Intent was executed by the City of East Chicago, Indiana and Industrial Development Advantage, LLC ("IDA"), relating to modified Zone 1 development, and EPA has indicated that it is "more likely" that future land use in this area will be commercial/industrial and not residential.

In 2021, we resolved the claims asserted by EPA related to past indirect costs associated with the 2012 ROD as amended, and the 2014 agreement entered into with EPA and the State of Indiana. In September 2022, EPA confirmed the selection of remedial actions for modified Zone 1 and provided notice to all relevant parties, including IDA, to cause the agreements between EPA, DOJ, the State of Indiana, us and other PRPs to become effective. We expect that our future costs relating to the USS Lead site will be contingent on implementation of these agreements, resolution of EPA's costs as well as any final allocation between PRPs.

*Washington Works, Parkersburg, West Virginia ("Washington Works")*

The Washington Works complex is located on the eastern shore of the Ohio River south of Parkersburg, West Virginia. The facility encompasses approximately 400 acres, which were purchased by EID in the late 1940's. Other nearby land parcels purchased by EID included Blennerhassett Island, and three separate properties where West Virginia Department of Environmental Protection ("WV DEP") permitted landfills were operated. Site operations began in 1948 and included the manufacture of nylon, filaments, and acrylics. In 1949, fluoropolymer manufacturing began, and in 1959, polyoxymethylene production was started. Landfill operations occurred from the 1960's through the early 2000's when all three were closed according to WV DEP approved closure plans. Beginning in 2014, EID no longer used PFOA as a polymerization aid to manufacture some fluoropolymer resins at Washington Works.

In July 2015, upon our separation from EID, we became the owner of the Washington Works complex. The site has implemented environmental investigations, including Verification Investigation in 1992 and RCRA Facility Investigation ("RFI") in 1999 pursuant to corrective action requirements of its RCRA Part B and HSWA Permit under EPA and the West Virginia Department of Natural Resources oversight. The RFI was approved in 2012 and a CMS was completed in 2015 that recommended certain remedial actions, including capping of the former on-site landfill and ponds, which had already been completed, sitewide groundwater hydraulic control, drinking water supply well treatment via granular activated carbon, and long-term groundwater monitoring. These actions were memorialized in a RCRA final remedy implementation plan approved by the agencies in 2018 and integrated into the updated RCRA permit in August 2020.

The remedial actions required by the RCRA final remedy implementation plan have been completed or are part of routine operations, maintenance and monitoring. Landfill post closure care includes systems to treat surface water, leachate or groundwater, landfill cover or cap maintenance, monitoring and reporting. Additionally, upgrades to the Local landfill cover are being developed. In December 2023, we entered into a voluntary Administrative Order on Consent with EPA under RCRA 3012(a) requiring monitoring, testing, analysis and reporting to complete a more comprehensive environmental assessment and site conceptual model of compounds found in soil and water at and around our manufacturing facility. This agreement is not based on any allegations of non-compliance and it builds on the significant research Chemours and its predecessor have already done to advance knowledge of older legacy compounds around the site. Accruals related to these remedial actions were $25 million and $22 million as of December 31, 2024 and 2023, respectively.

Chemours Washington Works discharges, through outfalls at the site, wastewater and stormwater pursuant to a NPDES permit issued by the WV DEP. In connection with actions being taken by us to comply with certain NPDES effluent limits, including for PFOA and hexafluoropropylene oxide dimer acid, we submitted a permit modification to WV DEP relating to groundwater abatement for certain process water used at the facility, a temperature reduction project and realigning discharge flows to certain outfalls. In July 2021, EPA provided a specific objection to the draft modification based on Clean Water Act ("CWA") regulations and requirements. In August 2021, WV DEP issued a National Pollutant Discharge Elimination System ("NPDES") permits modification to provide for the start-up of an abatement unit at the facility and to extend compliance dates for certain limits to December 2021 due to delays from the COVID-19 pandemic. In September 2021, WV DEP issued a further NPDES modification, including for the operation of an abatement unit from the site's Ranney Well, and the site is taking additional actions to reduce PFAS discharges associated with wet weather flows and continuing to assess future stormwater discharges and permitting. In April 2023, we agreed to an Administrative Order on Consent ("AOC") with EPA that includes additional sampling as well as a compliance analysis and implementation of actions to address PFOA and hexafluoropropylene oxide dimer acid ("HFPO Dimer Acid") discharge exceedances that occurred following the outfall limits for these compounds that came into effect in January 2022. In August, 2023 we submitted an Alternatives Analysis and Implementation Plan ("AA&IP") consistent with the Administrative Order on Consent. In December 2024, EPA issued comments on the AA&IP, accepting certain provisions and rejecting other provisions of the plan. In December 2024, we submitted a revised NPDES permit application which includes abatement and other practices to substantially address the discharge exceedances subject to the AOC. We expect to make future capital and other operating related expenditures at Washington Works in connection with the AOC and permit application. Additionally, effective September 1, 2024, a separate NDPES permit allows discharge of treated wastewater and non-contact cooling water from a new perfluoroalkoxy (PFA) processing line with an expiration date of July 2025 and allowing or a one-year renewal. In December 2024, the West Virginia Rivers Coalition filed a complaint under the Clean Water Act in West Virginia federal court alleging past and ongoing exceedances of certain effluent discharge limits, including those for PFOA and HFPO-DA, under the NPDES permit held by the Chemours Washington Works facility.

Further, pursuant to an Order on Consent ("OC"), entered into by EID with EPA since 2006, we provide alternate drinking water supplies, via granular activated carbon ("GAC") treatment or other approved supply, to residential well owners and local public drinking water systems near the Washington Works complex whose PFOA concentration exceeds 70 parts per trillion. We also provide regular sampling and GAC change outs activities as per OC requirements. Accruals related to this matter were $17 million and $16 million as of December 31, 2024 and 2023, respectively, and were included in Accrued Litigation liability (see additional discussions under "Leach Settlement" in "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements).*

***New Jersey Department of Environmental Protection Directives and Litigation***

In March 2019, NJ DEP issued two Directives, one being a state-wide PFAS Directive, and filed four lawsuits against us and other defendants, including allegations relating to clean-up and removal costs at four sites including Chambers Works. In December 2021, a consolidated order was entered in the lawsuits granting, in part, and denying, in part a motion to dismiss or strike parts of the Second Amended Complaints. In January 2022, NJ DEP filed a motion for a preliminary injunction requiring EID and us to establish a remediation funding source ("RFS") in the amount of $943 million for Chambers Works, the majority of which is for non-PFAS remediation items. Further discussion related to these matters is included in "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements*.

## PFOA

See our discussion under the heading "PFOA" in "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements*.

## GenX

In June 2019, the Member States Committee of the European Chemicals Agency ("ECHA") voted to list HFPO Dimer Acid as a Substance of Very High Concern. The vote was based on Article 57(f) – equivalent level of concern having probable serious effects to the environment. This identification does not impose immediate regulatory restriction or obligations, but may lead to a future authorization or restriction of the substance. On September 24, 2019, we filed an application with the EU Court of Justice for the annulment of the decision of ECHA to list HFPO Dimer Acid as a Substance of Very High Concern. In February 2022, the General Court dismissed the annulment action and we have appealed such decision. In November 2023, the EU Court of Justice dismissed our appeal.

## PFAS

Refer to our discussion under the heading "PFAS" in "Note 22 – Commitments and Contingent Liabilities" to the *Consolidated Financial Statements*.

In May 2020, ECHA announced that five Member States (Germany, the Netherlands, Norway, Sweden, and Denmark) launched a call for evidence to inform a PFAS restriction proposal to restrict the manufacture, placing on the market and use of PFAS in the EU. In this regulatory process, more than 4,000 substances, including fluorinated-gases ("F-gases") and fluoropolymers are being considered as part of this broad regulatory action. Companies producing or using PFAS, as well as selling mixture or products containing PFAS, were invited to provide input. This call for evidence closed July 31, 2020. Thousands of substances meet the definition of PFAS as outlined in the call for evidence. This very broad definition covers substances with a variety of physical and chemical properties, health and environmental profiles, uses, and benefits. We submitted information on the substances covered by the call for evidence to the Member State competent authority for Germany, which is the Federal Institute for Occupational Safety and Health ("BAuA"). On July 15, 2021, the countries submitted their restriction proposal, which informs ECHA of the intent to prepare a PFAS restriction dossier for fluorinated substances within a defined structural formula scope, including branched fluoroalkyl groups and substances containing ether linkages, fluoropolymers and side chain fluorinated polymers. The restriction dossier was submitted to ECHA in January 2023, and in February 2023 ECHA published a report and supporting annexes on the restriction proposal, which includes identified concerns for in-scope PFAS and their degradation products and the proposed restriction of a full ban with certain use-specific time-limited derogation periods. Comments were submitted from individuals and organizations during the consultation period in 2023 and the restriction dossier will be reviewed by the ECHA Risk Assessment Committee ("RAC") and Socio-economic Analysis Committees ("SEAC"). RAC and SEAC will focus on the different sectors that may be affected and elements of the proposal, and further meetings will be held in 2025. In November 2024, ECHA and the five European countries issued a progress update on the PFAS restriction, indicating that alternative restriction options, besides a full ban or a ban with time-limited derogations, are being considered for uses including, but not limited to: batteries; fuel cells; and electrolysers, and that fluoropolymers have high stakeholder interest considering availability of alternatives for certain uses and potential socio-economic impacts of a ban. The five national authorities who prepared the proposal are also updating their initial report to address the consultation comments, which will then be assessed by the ECHA committees. The estimated earliest entry into force of restrictions is 2026, contingent upon timely completion of the remaining steps in the EU Registration, Evaluation, Authorization, and Restriction of Chemicals ("REACH") restriction process.

## Item 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to changes in foreign currency exchange rates because of our global operations. As a result, we have assets, liabilities, and cash flows denominated in a variety of foreign currencies. We also have variable rate indebtedness, which subjects us to interest rate risk. Additionally, we are also exposed to changes in the prices of certain commodities that we use in production. Changes in these rates and commodity prices may have an impact on our future cash flows and earnings. We manage these risks through our normal operating and financing activities and, when deemed appropriate, through the use of derivative financial instruments. We do not enter into derivative financial instruments for trading or speculative purposes.

By using derivative financial instruments, we are subject to credit and market risk. The fair values of the derivative financial instruments are determined by using valuation models whose inputs are derived using market observable inputs, and reflect the asset or liability position as of the end of each reporting period. When the fair value of a derivative contract is positive, the counterparty owes us, thus creating a receivable risk for us. We are exposed to counterparty credit risk in the event of non-performance by counterparties to our derivative agreements. We minimize counterparty credit (or repayment) risk by entering into transactions with major financial institutions of investment grade credit ratings.

Our risk management programs and the underlying exposures are closely correlated, such that the potential loss in value for the risk management portfolio described above would be largely offset by the changes in the value of the underlying exposures. Refer to “Note 26 – Financial Instruments” to the *Consolidated Financial Statements* for further information.

### Foreign Currency Risks

We enter into foreign currency forward contracts to minimize the volatility in our earnings related to foreign exchange gains and losses resulting from remeasuring our monetary assets and liabilities that are denominated in non-functional currencies, and any gains and losses from the foreign currency forward contracts are intended to be offset by any gains or losses from the remeasurement of the underlying monetary assets and liabilities. These derivatives are stand-alone and, except as described below, have not been designated as a hedge. At December 31, 2024, we had 11 foreign currency forward contracts outstanding with an aggregate gross notional U.S. dollar equivalent of $196 million, the fair value of which amounted to less than $1 million. At December 31, 2023, we had 12 foreign currency forward contracts outstanding with an aggregate gross notional U.S. dollar equivalent of $252 million, the fair value of which amounted to less than negative $1 million. We recognized a net gain of $5 million, a net loss of $7 million and a net gain of $2 million for the years ended December 31, 2024, 2023 and 2022, respectively, within other income, net related to our non-designated foreign currency forward contracts.

We enter into certain qualifying foreign currency forward contracts under a cash flow hedge program to mitigate the risks associated with fluctuations in the euro against the U.S. dollar for forecasted U.S. dollar-denominated inventory purchases in certain of our international subsidiaries that use the euro as their functional currency. At December 31, 2024, we had 173 foreign currency forward contracts outstanding under our cash flow hedge program with an aggregate notional U.S. dollar equivalent of $178 million, the fair value of which amounted to $7 million. At December 31, 2023, we had 176 foreign currency forward contracts outstanding under our cash flow hedge program with an aggregate notional U.S. dollar equivalent of $203 million, the fair value of which amounted to negative $2 million. We recognized a pre-tax gain of $7 million, a pre-tax loss of $2 million, and a pre-tax gain of $17 million for the years ended December 31, 2024, 2023, and 2022, respectively, within accumulated other comprehensive loss. For the years ended December 31, 2024, 2023 and 2022, $1 million, $5 million and $19 million of gain was reclassified to the cost of goods sold from accumulated other comprehensive loss, respectively.

We designated our euro-denominated debt as a hedge of our net investment in certain of our international subsidiaries that use the euro as their functional currency in order to reduce the volatility in stockholders’ equity caused by changes in foreign currency exchange rates of the euro with respect to the U.S. dollar. We recognized a pre-tax gain of $47 million, a pre-tax loss $27 million, and pre-tax gain of $53 million for the years ended December 31, 2024, 2023 and 2022, respectively, on our net investment hedge within accumulated other comprehensive loss.

Concurrently with the offering of the senior unsecured notes due January 2033, we entered into a cross-currency swap to effectively convert $600 million of the senior unsecured notes due January 2033 into a euro-denominated borrowing of €567 million at prevailing euro interest rates, the fair value of which amounted to $5 million at December 31, 2024. The foreign currency swap qualifies and has been designated as a net investment hedge of our foreign currency exchange rate exposure of the net investments of certain of our euro-denominated subsidiaries. We recognized pre-tax gain of $5 million for the year ended December 31, 2024 on its cross-currency swap within accumulated other comprehensive loss. No amount was reclassified from accumulated other comprehensive loss for our cross-currency swap for the year ended December 31, 2024.

### Interest Rate Risk

We entered into interest rate swaps, to mitigate the volatility in our cash payments for interest due to fluctuations in the Secured Overnight Financing Rate ("SOFR"), as is applicable to the portion of our senior secured term loan facility denominated in U.S. dollars. At December 31, 2024, we had two interest rate swaps outstanding under our cash flow hedge program with an aggregate notional U.S. dollar equivalent of $300 million, the fair value of which amounted to negative $3 million. At December 31, 2023, we had two interest rate swaps outstanding under our cash flow hedge program with an aggregate notional U.S. dollar equivalent of $300 million, the fair value of which amounted to negative $7 million. We recognized a pre-tax gain of $9 million, a pre-tax loss of $6 million, and a pre-tax gain of $8 million for the years ended December 31, 2024, 2023 and 2022 within accumulated other comprehensive loss, respectively. For the years ended December 31, 2024, 2023 and 2022, $1 million, $4 million and $5 million of gain was reclassified to interest expense, net from accumulated other comprehensive loss, respectively.

### Concentration of Credit Risk

Our sales are not materially dependent on any single customer. At December 31, 2024, one individual customer balance represented approximately 7% of our total outstanding accounts and notes receivable balance. At December 31, 2023, no one individual customer balance represented more than 5% of our total outstanding accounts and notes receivable balance. Any credit risk associated with our accounts and notes receivable balance is representative of the geographic, industry, and customer diversity associated with our global businesses. As a result of our customer base being widely dispersed, we do not believe our exposure to credit-related losses related to our business as of December 31, 2024 and 2023 was material.

We also maintain strong credit controls in evaluating and granting customer credit. As a result, we may require that customers provide some type of financial guarantee in certain circumstances. The length of terms for customer credit varies by industry and region.

### Commodities Risk

A portion of our products and raw materials are commodities whose prices fluctuate as market supply and demand fundamentals change. Accordingly, product margins and the level of our profitability tend to fluctuate with changes in the business cycle. We try to protect against such instability through various business strategies. These include provisions in sales contracts allowing us to pass on higher raw materials costs through timely price increases and formula price contracts to transfer or share commodity price risk. We did not have any commodity derivative financial instruments in place as of December 31, 2024 and 2023.

## Item 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The financial statements and supplementary data required by this *Item 8 – Financial Statements and Supplementary Data* is incorporated by reference herein as set forth in *Item 15(a)(1) – Consolidated Financial Statements*.

## Item 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## Item 9A. CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

We maintain disclosure controls and procedures designed to provide reasonable assurance that the information required to be disclosed in our reports filed or submitted under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the U.S. Securities and Exchange Commission ("SEC"). These controls and procedures also provide reasonable assurance that information required to be disclosed in such reports is accumulated and communicated to management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), to allow timely decisions regarding required disclosures.

Our CEO and CFO, together with management, conducted an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act. Based on that evaluation, the CEO and CFO have concluded that these disclosure controls and procedures are effective at the reasonable assurance level as of December 31, 2024.

### Management's Report on Internal Control over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's internal control over financial reporting includes those policies and procedures that:

(i)pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

(ii)provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and that receipts and expenditures of the Company are being made only in accordance with authorization of management and directors of the Company; and,

(iii)provide reasonable assurance regarding prevention or timely detection of unauthorized acquisitions, uses, or dispositions of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management has assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2024 using the criteria set forth in the *Internal Control – Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO Framework").

Management completed an evaluation of our internal control over financial reporting and concluded that our internal control over financial reporting was effective as of December 31, 2024.

The effectiveness of our internal control over financial reporting as of December 31, 2024 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears in Part IV, *Item 15* of this Annual Report on Form 10-K starting on page F-2.

## Previously Identified Material Weaknesses

Management previously disclosed in our 2023 Annual Report and our Quarterly Reports in 2024 the following control deficiencies that constituted material weaknesses in our internal control over financial reporting:

We did not design and maintain an effective control environment as senior management failed to set an appropriate tone at the top resulting in a material weakness. Specifically, among other things, there was a lack of transparency with the Company's board of directors by former senior management regarding efforts to delay payments to certain vendors and to accelerate the collection of receivables, and that these individuals engaged in these efforts in part to meet free cash flow targets that the Company had communicated publicly, and which also would be a part of a key metric for determining incentive compensation applicable to both executive officers and to employees. As a result, it was concluded that former senior management violated the Company's "Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller". The ineffective control environment contributed to the following additional material weaknesses.

We did not design and maintain effective controls related to the information and communication component of the COSO Framework, and principles of internally communicating information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control. Specifically, the Company did not design and maintain effective controls to ensure appropriate communication between certain functions within the Company, including (i) the identification and communication of certain contractual arrangements and (ii) communication of business developments which impact key assumptions used in the goodwill impairment assessment. This material weakness related to information and communication contributed to an additional material weakness in that we did not design and maintain effective controls regarding the evaluation and escalation of reports made through the Chemours Ethics Hotline, including controls regarding the escalation of certain reports to the General Counsel and Chair of the Audit Committee.

Additionally, we did not design and maintain effective controls to prevent or timely detect unauthorized changes to our vendor master files in order to prevent unauthorized cash disbursements.

## Remediation of Previously Identified Material Weaknesses

We established a Project Management Office ("PMO") to monitor progress towards remediation and also engaged external legal, accounting, financial and other consulting, and professional services firms to assist senior management in the development and execution of a comprehensive remediation program. Management developed a comprehensive workplan for remediation of the material weaknesses, described in the detail below.

As previously disclosed in Item 4 of the Company's Form 10-Q as of September 30, 2024, the Company implemented remediation measures and had sufficient time to test the operating effectiveness and remediated the material weaknesses identified in the Company's internal control over financial reporting related to ethics and compliance reporting and vendor master files.

*Material Weaknesses Remediated as of December 31, 2024:*

*Tone at the Top*

With respect to designing and maintaining effective controls related to setting an appropriate tone at the top, as a result of the findings of the Audit Committee's Internal Review, the Company reassessed and redesigned certain elements of its processes and procedures and has taken certain actions in the following areas: executive leadership actions and removal; enhancement of tone at the top; enterprise-wide values articulation and training reinforcement; and Board of Directors involvement/initiatives. On February 28, 2024, our board of directors placed former President and Chief Executive Officer, former Senior Vice President and Chief Financial Officer and Vice President, Controller and Principal Accounting Officer on administrative leave. On February 28, 2024, our board of directors appointed Denise Dignam as Interim Chief Executive Officer and Matthew Abbott as Interim Chief Financial Officer (principal financial and accounting officer), and subsequently appointed Denise Dignam as President and Chief Executive Officer on March 22, 2024. On June 5, 2024, the Company announced it had appointed Shane Hostetter as Chief Financial Officer (principal financial and accounting officer), effective July 1, 2024. On July 25, 2024, the Company announced it had appointed David Will as Chief Accounting Officer and Controller (principal accounting officer), effective August 12, 2024. Additionally, the Company made other new appointments to senior management to set an appropriate tone at the top environment.

During 2024, senior leadership has held multiple all employee meetings, including holding global town halls immediately following the issuance of the Company's 2023 Annual Report on Form 10-K and Quarterly Reports on Form 10-Q. Additionally, senior leadership has disseminated company-wide and team-specific communications to explain the material weaknesses, extract key learnings for leaders, and emphasize our commitment to our core values, specifically integrity. During 2024, the Company executed a refresh of our corporate values and continued to disseminate company-wide and team-specific communications to emphasize our commitment to our core values. The Company adopted a working capital policy, which included quarterly reporting to the Audit Committee of the Board of Directors on present working capital strategies and the results of those strategies.

During the quarter ended March 31, 2024, the Company provided updated training on internal control over financial reporting and requirements under the Sarbanes-Oxley Act of 2002, including training courses on applicable federal securities laws for senior management, and training courses on ethics for finance professionals. The Company completed a company-wide ethics & compliance survey to inform us of our continued efforts in advancing our culture of ethics and compliance. Further, during the quarter ended September 30, 2024, the Company reinforced its expectation of ethical business practices via the annual, company-wide ethics & compliance training to educate executives and employees on our code of conduct, certify compliance, and outline the specific behaviors expected to fulfill our integrity core value. Additionally, the Compensation Committee has revised key metrics used in the determination of executive and employees' incentive compensation starting in 2024, to move away from working capital metrics and to use updated cash flow metrics to include average monthly outcomes over the performance period rather than being measured at a fiscal year end.

During the quarter ended December 31, 2024, the Company monitored the effectiveness of the efforts taken related to tone at the top during the year through periodic pulse surveys to the organization.

Through the efforts described above, the Company was able to implement its plan during 2024 to remediate the previously identified material weakness related to tone at the top and determine that the tone at the top was operating effectively as of December 31, 2024.

*Information and Communication*

With respect to designing and maintaining effective controls related to the information and communication component of the COSO Framework, the Company has enhanced its policies, procedures, workflows, and training as it relates to the controls over information and communication sharing, in addition to the broader based tone at the top enhancements discussed above. The Company enhanced our controls, policies, procedures, and training as it relates to timely and accurate communication and information sharing across multiple functions and the Controller's organization, including enhancing key controls concerning information communicated and used in determining the accounting for significant transactions, contracting, and business developments which impact key assumptions used in the goodwill impairment assessment.

The Company provided additional training for employees and members of management, specifically in accounting, finance, business units and legal, to ensure that relevant information is appropriately communicated to personnel involved in the preparation of our consolidated financial statements or related disclosures. Additionally, trainings were conducted for employees regarding the importance of the Company establishing and maintaining effective internal control over financial reporting and disclosure controls and procedures, for information to be appropriately communicated to all relevant personnel involved in the preparation of our financial statements and disclosures.

During the quarter ended March 31, 2024, the Company enhanced our internal management representation letter process which serves as a mechanism for internal information sharing and supports, in part, our CEO's and CFO's certifications and accuracy of our financial statements. The Company has also provided mandatory training to respondents to facilitate the receipt of complete and accurate information. The Company enhanced our Disclosure Committee process to include further representation on the Committee across the organization and increase the frequency of Disclosure Committee meetings.

Additionally, the Company enhanced our policies and protocols related to working capital management practices, including enhancing our communication of working capital management practices to our board of directors. The Company also enhanced our process around the verification of physical assets including enhancing communication of changes in the existence, operating status or impairment assessment of physical assets.

As of December 31, 2024, the remediation measures described above have been implemented and we have had sufficient time to validate the operating effectiveness and remediate the material weakness noted above and, as such, the material weakness identified in the Company's internal control over financial reporting related to information and communication has been remediated.

### Changes in Internal Control over Financial Reporting

There have been no changes in our internal control over financial reporting that occurred during the quarter ended December 31, 2024 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Item 9B. OTHER INFORMATION

None of the Company's directors or officers adopted, modified, or terminated a Rule 10b5-1 trading arrangement or a non-Rule 10b5-1 trading arrangement during the Company's fiscal quarter ended December 31, 2024.

## Item 9C. DISCLOSURE REGARDING FOREIGN JURSIDICTIONS THAT PREVENT INSPECTIONS

Not applicable.

## PART III

## Item 10. DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE

Except for information concerning executive officers, which is included in Part I of this Annual Report on Form 10-K under the caption "Information About Our Executive Officers", the information about our directors required by this *Item 10 – Directors, Executive Officers, and Corporate Governance* is contained under the caption "Proposal 1 – Election of Directors" in the 2025 Proxy Statement, which we anticipate filing with the SEC within 120 days after the end of the fiscal year to which this report relates, and is incorporated herein by reference.

Information regarding our Audit Committee and our code of ethics is contained in the 2025 Proxy Statement under the captions "Corporate Governance" and "Board Structure and Committee Composition" and is incorporated herein by reference.

We have adopted an insider trading policy that governs the purchase, sale, and/or other transactions of our securities by our directors, officers and employees and the Company itself. A copy of our insider trading policy is filed as Exhibit 19 to this Annual Report on Form 10-K.

## Item 11. EXECUTIVE COMPENSATION

The information required by this *Item 11 – Executive Compensation* is contained in the 2025 Proxy Statement under the captions "Executive Compensation", "Director Compensation", and "Compensation and Leadership Development Committee" and is incorporated herein by reference.

## Item 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required by this *Item 12 – Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters* and not otherwise set forth below is contained in the 2025 Proxy Statement under the caption "Security Ownership of Certain Beneficial Owners and Management" and is incorporated herein by reference.

**Securities authorized for issuance under equity compensation plans**

| *(Shares in thousands)* | | December 31, 2024 | |
|---|---|---|---|
| **Plan Category** | **Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants, and Rights (1)** | **Weighted-average Exercise Price of Outstanding Options, Warrants, and Rights (2)** | **Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (3)** |
| Equity compensation plans approved by security holders | 4,480 | $ 26.79 | 9,500 |

(1) Includes the approximate number of outstanding stock options, restricted stock units ("RSUs"), performance share units ("PSUs"), and performance stock options ("PSOs").

(2) Represents the weighted-average exercise price of outstanding stock options and PSOs only. RSUs and PSUs do not have associated exercise prices.

(3) Reflects the approximate shares available for issuance pursuant to The Chemours Company 2017 Equity and Incentive Plan (the "Equity Plan"), which was approved by our stockholders in 2017 and replaces The Chemours Company Equity and Incentive Plan. On April 28, 2021, stockholders approved an amendment and restatements of the Equity Plan to increase the number of shares reserved for issuance by 3,050,000. Following the amendment and restatement, the maximum number of shares of stock reserved for the grant or settlement of awards under the Equity Plan is 22,050,000.

## Item 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by this *Item 13 – Certain Relationships and Related Transactions, and Director Independence* is contained in the 2025 Proxy Statement under the captions "Director Independence" and "Certain Relationships and Transactions" and is incorporated herein by reference.

## Item 14. PRINCIPAL ACCOUNTING FEES AND SERVICES

The information required by this *Item 14 – Principal Accounting Fees and Services* is contained in the 2025 Proxy Statement under the captions "Proposal 3 – Ratification of Selection of Independent Registered Public Accounting Firm", "Fees Paid to Independent Registered Public Accounting Firm", and "Audit Committee's Pre-Approval Policies and Procedures" and is incorporated herein by reference.

**PART IV**

## Item 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

### (a)(1) Consolidated Financial Statements

Refer to the “Index to the *Consolidated Financial Statements*” commencing on page F-1 of this Annual Report on Form 10-K.

The report of our independent registered public accounting firm with respect to the above-referenced financial statements and their report on internal control over financial reporting is included on page F-2. Their consent appears as Exhibit 23 of this Form 10-K.

### (a)(2) Financial Statement Schedule

Schedules not listed herein have been omitted because they are not required, not applicable, or the required information is otherwise included in the consolidated financial statements or notes thereto.

### (a)(3) Exhibits

Refer to the “Exhibit Index” beginning on page 82 of this Annual Report on Form 10-K.

## Item 16. FORM 10-K SUMMARY

None.

**The Chemours Company**

## EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 2.1 | Separation Agreement by and between E. I. du Pont de Nemours and Company and the Chemours Company (incorporated by reference to Exhibit 2 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 2.1(1) | Amendment No. 1, dated August 24, 2017, to the Separation Agreement, dated as of July 1, 2015, by and between E. I. du Pont de Nemours and Company and The Chemours Company (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on August 25, 2017). |
| 2.2 | Purchase and Sale Agreement, dated as of July 26, 2021, by and between The Chemours Company and Manchester Acquisition Sub LLC (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 26, 2021). |
| 3.1 | Company's Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 3.2 | Company's Amended and Restated Bylaws (incorporated by reference to Exhibit 3.2 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 4.1 | Indenture (for senior debt securities), dated as of May 23, 2017, by and between The Chemours Company and U.S. Bank National Association, as trustee (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on May 23, 2017). |
| 4.1(1) | First Supplemental Indenture, dated as of May 23, 2017, by and among The Chemours Company, the guarantors named therein and U.S. Bank National Association, as trustee (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on May 23, 2017). |
| 4.1(2) | Second Supplemental Indenture, dated as of June 6, 2018, among The Chemours Company, the Guarantors named therein, U.S. Bank National Association, as trustee, Elavon Financial Services DAC, UK Branch, as paying agent, and Elavon Financial Services DAC, as registrar and transfer agent (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on June 6, 2018). |
| 4.1(3) | Specimen 5.375% Senior Note due 2027 (incorporated by reference to Exhibit 4.3 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on May 23, 2017). |
| 4.1(4) | Specimen 4.000% Senior Note Due 2026 (included in Exhibit 4.2(2)). |
| 4.2 | Indenture, dated as of November 27, 2020, between The Chemours Company and U.S. Bank National Association, as trustee (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on November 27, 2020). |
| 4.2(1) | First Supplemental Indenture, dated as of November 27, 2020, among The Chemours Company, the guarantors named therein, and U.S. Bank National Association, as trustee (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on November 27, 2020). |
| 4.2(2) | Second Supplemental Indenture, dated as of August 18, 2021, among The Chemours Company, the guarantors party thereto and U.S. Bank National Association, as trustee (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on August 18, 2021). |
| 4.2(3) | Third Supplemental Indenture, dated as of November 27, 2024, among The Chemours Company, the guarantors party thereto and Deutsche Bank Trust Company Americas, as trustee (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on November 27, 2024). |
| 4.2(4) | Specimen 5.750% Senior Notes Due 2028 (included in Exhibit 4.2(1)). |
| 4.2(5) | Specimen 4.625% Senior Notes Due 2029 (included in Exhibit 4.2(2)). |
| 4.2(6) | Specimen 8.000% Senior Notes Due 2033 (included in Exhibit 4.2(3)). |
| 4.2(7) | Instrument of Resignation, Appointment and Acceptance, dated as of August 1, 2022, between the Chemours Company, U.S. Bank National Association, as Retiring Trustee, and Deutsche Bank Trust Company Americas, as Successor Trustee (incorporated by reference to Exhibit 4.1 to the Company's Quarterly Report on Form 10-Q, as filed with the U.S. Securities and Exchange Commission on October 26, 2022). |
| 4.3 | Description of common stock (incorporated by reference to Exhibit 4.3 to the Company's Annual Report on Form 10-K for the year ended December 31, 2019). |
| 10.1 | Second Amended and Restated Transition Services Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.2 | Tax Matters Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.3 | Employee Matters Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.4 | Third Amended and Restated Intellectual Property Cross-License Agreement by and among E. I. du Pont de Nemours and Company, The Chemours Company FC and The Chemours Company TT, LLC (incorporated by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.14 | Amendment and Restatement Agreement, dated as of August 18, 2023, among The Chemours Company, the Lenders and Issuing Banks party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent. (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on August 23, 2023). |
| 10.15 | Amendment No. 1, dated as of November 29, 2024, among The Chemours Company, the other Loan Parties, and the Lenders party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent, to the Second Amended and Restated Credit Agreement dated as of August 18, 2023. |
| 10.16 | Amendment No. 2, dated as of December 13, 2024, among The Chemours Company, the other Loan Parties, and the Lenders party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent, to the Second Amended and Restated Credit Agreement dated as of August 18, 2023. |

| Exhibit Number | Description |
|---|---|
| 10.17* | The Chemours Company Equity and Incentive Plan (incorporated by reference to Exhibit 4.1 to the Company's Form S-8 (File No. 333-205391, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.18* | The Chemours Company Retirement Savings Restoration Plan (incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.19* | The Chemours Company Management Deferred Compensation Plan (incorporated by reference to Exhibit 4.1 to the Company's Form S-8 (File No. 333-205393), as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.20(1)* | The Chemours Company Stock Accumulation and Deferred Compensation Plan for Directors (incorporated by reference to Exhibit 4.1 to the Company's Form S-8 (File No. 333-205392), as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.20(2)* | The Chemours Company Stock Accumulation and Deferred Compensation Plan for Directors (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q, as filed with the U.S. Securities and Exchange Commission on May 4, 2018). |
| 10.21* | The Chemours Company Senior Executive Severance Plan (incorporated by reference to Exhibit 10.20 to the company's Amendment No. 3 to Form 10, as filed with the U.S. Securities and Exchange Commission on May 13, 2015). |
| 10.22* | Form of Option Award Terms under the Company's Equity and Incentive Plan (incorporated by reference to Exhibit 10.21 to the company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015). |
| 10.23* | Form of Restricted Stock Unit Terms under the Company's Equity and Incentive Plan (incorporated by reference to Exhibit 10.22 to the company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015). |
| 10.24* | Form of Stock Appreciation Right Terms under the Company's Equity and Incentive Plan (incorporated by reference to Exhibit 10.23 to the company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015). |
| 10.25(1)* | Form of Restricted Stock Unit Terms for Non-Employee Directors under the Company's Equity Incentive Plan (incorporated by reference to Exhibit 10.24 to the company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015). |
| 10.25(2)* | Form of Deferred Stock Unit Terms for Non-Employee Directors under the Company's Equity and Incentive Plan (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q, as filed with the U.S. Securities and Exchange Commission on May 4, 2018). |
| 10.26* | Form of Performance-Based Restricted Stock Unit Terms for August 2015 (incorporated by reference to Exhibit 10.25 to the company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015). |
| 10.27* | Form of Performance Share Unit Award Terms under the Company's Equity and Incentive Plan (incorporated by reference to Exhibit 10.26 to the company's Annual Report on Form 10-K for the year ended December 31, 2015). |
| 10.28* | Form of Cash Performance Award Terms under the Company's Equity and Incentive Plan (incorporated by reference to Exhibit 10.27 to the company's Annual Report on Form 10-K for the year ended December 31, 2015). |
| 10.29* | Form of Indemnification Agreement for officers and directors (incorporated by reference to Exhibit 10.28 to the company's Annual Report on Form 10-K for the year ended December 31, 2015). |
| 10.30 | Letter Agreement dated January 28, 2016 by and between The Chemours Company and E. I. du Pont de Nemours and Company (incorporated by reference to Item 10.2 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on February 23, 2016). |
| 10.31* | Form of Option Award Terms under the Company's Equity Incentive Plan for grantees located in the U.S. (incorporated by reference to Exhibit 10.31 to the Company's Annual Report on Form 10-K for the year ended December 31, 2016). |
| 10.32* | Form of Option Award Terms under the Company's Equity Incentive Plan for grantees located outside the U.S. (incorporated by reference to Exhibit 10.32 to the Company's Annual Report on Form 10-K for the year ended December 31, 2016). |
| 10.33* | Form of Award Terms of Time-Vested Restricted Stock Units under the Company's Equity Incentive Plan for grantees located in the U.S. (incorporated by reference to Exhibit 10.33 to the Company's Annual Report on Form 10-K for the year ended December 31, 2016). |
| 10.34* | Form of Award Terms of Time-Vested Restricted Stock Units under the Company's Equity Incentive Plan for grantees located outside the U.S. (incorporated by reference to Exhibit 10.34 to the Company's Annual Report on Form 10-K for the year ended December 31, 2016). |
| 10.35* | Form of Award Terms of Performance Share Units under the Company's Equity Incentive Plan (incorporated by reference to Exhibit 10.35 to the Company's Annual Report on Form 10-K for the year ended December 31, 2016). |
| 10.36* | The Chemours Company 2017 Equity and Incentive Plan (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on May 1, 2017). |
| 10.37 | Memorandum of Understanding, dated January 22, 2021, by and among The Chemours Company, Corteva, Inc., E. I. du Pont de Nemours and Company and DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.) (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on January 22, 2021). |
| 10.38* | Separation Agreement and Release between E. Bryan Snell and the Company effective March 1, 2021, dated March 1, 2021 (incorporated by reference in Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on March 2, 2021). |
| 10.39* | Employment Transition Agreement between Mark Vergnano and the Company, dated as of June 2, 2021 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on June 3, 2021). |
| 10.40 | Settlement Agreement, Limited Release, Waiver and Covenant Not to Sue, dated July 13, 2021, by and among The Chemours Company, Corteva, Inc., E.I. du Pont De Nemours and Company, DuPont de Nemours, Inc. and the State of Delaware (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 13, 2021). |

| Exhibit Number | Description |
|---|---|
| 10.41(1)* | Special Employment and Separation Agreement and Release between David C. Shelton and the Company, dated as of August 19, 2022 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on August 19, 2022). |
| 10.41(2)* | Amendment to the Special Employment and Separation Agreement and Release between David C. Shelton and the Company, dated as of December 19, 2023. (incorporated by reference to Exhibit 10.41(2) to the Company's Annual Report on Form 10-K for the year ended December 31, 2023). |
| 10.42 | Settlement Agreement, dated June 30 2023, by and among The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva Inc. and E. I. du Pont de Nemours and Company n/k/a EIDP, Inc. and representatives of certain U.S. public water systems as set out therein (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on June 30, 2023). |
| 10.43* | Special Employment and Separation Agreement and Release between Susan Kelliher and the Company, dated as of September 25, 2023 (incorporated by reference to Exhibit 10.43 to the Company's Annual Report on Form 10-K for the year ended December 31, 2023). |
| 10.44* | Separation and Release Agreement, dated as of March 22, 2024, by and between The Chemours Company and Mark E. Newman (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on March 25, 2024). |
| 10.45* | Separation and Release Agreement, dated as of April 23, 2024, by and between The Chemours Company and Jonathan S. Lock (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on April 25, 2024). |
| 19 | Insider Trading Policy |
| 21 | Subsidiaries of the Registrant. |
| 22 | List of Guarantor Subsidiaries. |
| 23 | Consent of Independent Registered Public Accounting Firm. |
| 31.1 | Rule 13a-14(a)/15d-14(a) Certification of the Company's Principal Executive Officer. |
| 31.2 | Rule 13a-14(a)/15d-14(a) Certification of the Company's Principal Financial Officer. |
| 32.1 | Section 1350 Certification of the Company's Principal Executive Officer. The information contained in this Exhibit shall not be deemed filed with the Securities and Exchange Commission nor incorporated by reference in any registration statement filed by the registrant under the Securities Act of 1933, as amended. |
| 32.2 | Section 1350 Certification of the Company's Principal Financial Officer. The information contained in this Exhibit shall not be deemed filed with the Securities and Exchange Commission nor incorporated by reference in any registration statement filed by the registrant under the Securities Act of 1933, as amended. |
| 95 | Mine Safety Disclosures. |
| 97 | Incentive-Based Compensation Clawback Policy for Executive Officers (incorporated by reference to Exhibit 97 to the Company's Annual Report on Form 10-K for the year ended December 31, 2023). |
| 101.INS | XBRL Instance Document. |
| 101.SCH | Inline XBRL Taxonomy Extension Schema With Embedded Linkbase Documents. |
| 104 | The cover page from the Company's Annual Report on Form 10-K for the year ended December 31, 2024, which has been formatted in Inline XBRL and included within Exhibit 101. |

* Management contract or compensatory plan or arrangement.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

THE CHEMOURS COMPANY
(Registrant)

Date: February 18, 2025

By: /s/ Shane Hostetter
Shane Hostetter
Senior Vice President, Chief Financial Officer
(As Duly Authorized Officer and Principal Financial Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant in the capacities and on the dates indicated:

| Signature | Title(s) | Date |
|---|---|---|
| /s/ Denise Dignam<br>Denise Dignam | President, Chief Executive Officer, and Director<br>(Principal Executive Officer) | February 18, 2025 |
| /s/ Shane Hostetter<br>Shane Hostetter | Senior Vice President, Chief Financial Officer<br>(Principal Financial Officer) | February 18, 2025 |
| /s/ David Will<br>David Will | Vice President and Controller<br>(Principal Accounting Officer) | February 18, 2025 |
| /s/ Dawn L. Farrell<br>Dawn L. Farrell | Chairperson of the Board | February 18, 2025 |
| /s/ Curtis V. Anastasio<br>Curtis V. Anastasio | Director | February 18, 2025 |
| /s/ Alister Cowan<br>Alister Cowan | Director | February 18, 2025 |
| /s/ Mary B. Cranston<br>Mary B. Cranston | Director | February 18, 2025 |
| /s/ Pamela Fletcher<br>Pamela Fletcher | Director | February 18, 2025 |
| /s/ Erin N. Kane<br>Erin N. Kane | Director | February 18, 2025 |
| /s/ Joseph D. Kava<br>Joseph D. Kava | Director | February 18, 2025 |
| /s/ Sean D. Keohane<br>Sean D. Keohane | Director | February 18, 2025 |
| /s/ Guillaume Pepy<br>Guillaume Pepy | Director | February 18, 2025 |
| /s/ Livingston Satterthwaite<br>Livingston Satterthwaite | Director | February 18, 2025 |

**The Chemours Company**

## INDEX TO THE CONSOLIDATED FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID: 238) | F-2 |
| Consolidated Statements of Operations for the years ended December 31, 2024, 2023, and 2022 | F-5 |
| Consolidated Statements of Comprehensive (Loss) Income for the years ended December 31, 2024, 2023, and 2022 | F-6 |
| Consolidated Balance Sheets at December 31, 2024 and 2023 | F-7 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2024, 2023, and 2022 | F-8 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2024, 2023, and 2022 | F-9 |
| Notes to the Consolidated Financial Statements | F-10 |

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of The Chemours Company

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of The Chemours Company and its subsidiaries (the "Company") as of December 31, 2024 and 2023, and the related consolidated statements of operations, of comprehensive (loss) income, of stockholders' equity and of cash flows for each of the three years in the period ended December 31, 2024, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2024, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2024 and 2023, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2024 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2024, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

***Basis for Opinions***

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A.Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

***Definition and Limitations of Internal Control over Financial Reporting***

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

***Critical Audit Matters***

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that (i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Evaluation of Per- and Polyfluoroalkyl Substances (PFAS) Environmental Remediation Liabilities*

As described in Notes 3 and 22 to the consolidated financial statements, the Company's environmental remediation liabilities for future environmental expenditures were $571 million as of December 31, 2024, the majority of which related to PFAS matters. Management accrues for environmental remediation matters when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. Where the available information is only sufficient to establish a range of probable liability, and no point within the range is more likely than any other, the lower end of the range has been used. Estimated liabilities are determined based on existing remediation laws and technologies and the Company's estimated cost to perform the planned remedial response and the time period over which remediation activities will occur, which are derived from environmental studies, sampling, testing, and analyses. From time to time, management may engage third parties ("management's specialists") to assist in obtaining and/or evaluating relevant data and assumptions when estimating the Company's remediation liabilities. The liabilities, which are undiscounted, are adjusted periodically as remediation efforts progress and as additional technological, regulatory, and legal information becomes available. Costs related to environmental remediation are charged to expense in the period that the associated liability is accrued and are reflected as a component of the cost of goods sold for on-site remediation costs or as a component of selling, general, and administrative expense for off-site remediation costs. Other environmental costs are also charged to expense in the period incurred, unless they extend the useful life of the property, increase the property's capacity, and/or reduce or prevent contamination from future operations, in which case they are capitalized and amortized.

The principal considerations for our determination that performing procedures relating to PFAS environmental remediation liabilities is a critical audit matter are (i) the significant judgment by management, including the use of management's specialists, in estimating the environmental remediation liabilities; (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating management's significant assumptions related to estimated cost to perform the planned remedial response and the time period over which remediation activities will occur; and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's process to estimate PFAS environmental remediation liabilities, including controls related to the monitoring of the recorded liability as compared to remedial activities required by regulatory authorities and/or planned by the Company, as well as the related financial statement disclosures. These procedures also included, among others, associated with the Company's planned remediation activities for certain sites, (i) testing management's process for estimating the environmental remediation liabilities; (ii) testing the reasonableness of management's significant assumptions related to estimated cost to perform the planned remedial response and the time period over which remediation will occur; (iii) evaluating the appropriateness of management's methods for estimating the environmental remediation liabilities; (iv) testing the completeness and accuracy of underlying data provided by management; (v) obtaining and evaluating responses to letters of audit inquiry from external legal counsel; and (vi) evaluating the sufficiency of the Company's disclosures related to the matters. Evaluating the reasonableness of management's assumptions related to (i) estimated cost to perform the planned remedial response involved comparing the cost estimates developed by management to third party evidence, as well as comparing actual and historical costs used to develop the estimates, as applicable, and (ii) the time period over which the remediation will occur involved comparing the Company's planned remediation activities to those communicated to regulatory authorities and to those commonly observed in conducting remediation. The work of management's specialists was used in performing certain procedures to evaluate the reasonableness of certain data used in estimating costs for certain remedial activities. As a basis for using this work, the specialists' qualifications were understood and the Company's relationship with the specialists was assessed. The procedures performed also included evaluation of the methods and assumptions used by the specialists, tests of the completeness and accuracy of certain data used by the specialists, and an evaluation of the specialists' findings. Professionals with specialized skills and knowledge were used to assist in evaluating the appropriateness of management's methods for estimating the environmental remediation liabilities and the reasonableness of the significant assumptions related to estimated cost to perform the planned remedial responses and the time period over which remediation will occur.

*PFAS - Accrued Litigation Liabilities and Disclosures*

As described in Notes 3 and 22 to the consolidated financial statements, the Company's accrued litigation liabilities was $208 million as of December 31, 2024, of which $121 million relates to PFAS-related legal matters. These liabilities represent management's estimate of probable loss for PFAS-related litigation matters. Management accrues for litigation matters when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. Where the available information is only sufficient to establish a range of probable liability, and no point within the range is more likely than any other, the lower end of the range has been used. When a material loss contingency is reasonably possible, but not probable, the Company does not record a liability, but instead discloses the nature of the matter and an estimate of the loss or range of loss, to the extent such estimate can be made. Significant judgment is required in both the determination of probability and whether a loss or range of loss is reasonably estimable. The Company's judgments are subjective based on the status of the legal or regulatory proceedings, the merits of the Company's defenses and consultation with in-house and outside legal counsel. Because of substantial uncertainties related to these matters, accruals are based on the best information available each period, including, among others, mediation, settlement discussions or agreements. Litigation-related liabilities and expenditures include legal matters that are liabilities of E.I. DuPont de Nemours and Company ("EID") and its subsidiaries, which Chemours may be required to indemnify pursuant to the separation-related agreements executed prior to the separation with EID on July 1, 2015. Because litigation is subject to significant uncertainties, and adverse rulings, judgments or other outcomes could occur in the future, it is reasonably possible that the Company could incur losses substantially in excess of accrued liabilities or with respect to matters for which no liability has been accrued because losses are not currently probable and reasonably estimable.

The principal considerations for our determination that performing procedures relating to PFAS accrued litigation liabilities and disclosures is a critical audit matter are (i) the significant judgment by management when (a) assessing whether a loss is reasonably possible or probable, (b) assessing whether the loss or range of loss can be reasonably estimated, and (c) developing the estimated loss for each PFAS-related litigation matter; and (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating audit evidence related to management's assessment of the liabilities and disclosures related to PFAS litigation matters.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's assessment of the liabilities related to PFAS accrued litigation, including controls over determining whether a loss is reasonably possible or probable and whether the loss or range of loss can be reasonably estimated, as well as the related financial statement disclosures. These procedures also included, among others, (i) obtaining and evaluating the status of significant known and potential litigation and settlement activity based on inquiry of internal legal counsel, as well as external legal counsel, when deemed necessary; (ii) obtaining and evaluating relevant PFAS-related judgments, court filings and orders, memorandums of understanding, letters of intent and settlement agreements; (iii) evaluating the reasonableness of management's assessment regarding whether an unfavorable outcome is reasonably possible or probable and reasonably estimable; and (iv) evaluating the sufficiency of the Company's disclosures related to PFAS-related litigation matters.

/s/ PricewaterhouseCoopers LLP

New York, New York
February 18, 2025

We have served as the Company's auditor since 2014.

**The Chemours Company**
**Consolidated Statements of Operations**
*(Dollars in millions, except per share amounts)*

| | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| Net sales | $ 5,782 | $ 6,078 | $ 6,831 |
| Cost of goods sold | 4,631 | 4,772 | 5,215 |
| Gross profit | 1,151 | 1,306 | 1,616 |
| Selling, general, and administrative expense | 585 | 1,290 | 710 |
| Research and development expense | 109 | 108 | 118 |
| Restructuring, asset-related, and other charges | 60 | 153 | 16 |
| Goodwill impairment charge | 56 | — | — |
| Total other operating expenses | 810 | 1,551 | 844 |
| Equity in earnings of affiliates | 43 | 45 | 55 |
| Interest expense, net | (264) | (208) | (163) |
| (Loss) gain on extinguishment of debt | (1) | (1) | 7 |
| Other income, net | 8 | 91 | 70 |
| **Income (loss) before income taxes** | 127 | (318) | 741 |
| Provision for (benefit from) income taxes | 41 | (81) | 163 |
| **Net income (loss)** | 86 | (237) | 578 |
| Less: Net income attributable to non-controlling interests | — | 1 | — |
| **Net income (loss) attributable to Chemours** | $ 86 | $ (238) | $ 578 |
| **Per share data** | | | |
| Basic earnings (loss) per share of common stock | $ 0.58 | $ (1.60) | $ 3.72 |
| Diluted earnings (loss) per share of common stock | 0.57 | (1.60) | 3.65 |

***See accompanying notes to the consolidated financial statements.***

**The Chemours Company**
**Consolidated Statements of Comprehensive (Loss) Income**
*(Dollars in millions)*

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2024 | | | 2023 | | | 2022 | | |
| | Pre-tax | Tax | After-tax | Pre-tax | Tax | After-tax | Pre-tax | Tax | After-tax |
| **Net income (loss)** | | | $ 86 | | | $ (237) | | | $ 578 |
| Other comprehensive income (loss): | | | | | | | | | |
| Hedging activities: | | | | | | | | | |
| Unrealized gain (loss) on net investment hedge | $ 52 | $ (13) | 39 | $ (27) | $ 8 | (19) | $ 53 | $ (13) | 40 |
| Unrealized gain (loss) on cash flow hedge | 16 | (3) | 13 | (8) | 2 | (6) | 25 | (4) | 21 |
| Reclassifications to net income - cash flow hedge | (2) | 1 | (1) | (9) | 1 | (8) | (24) | 4 | (20) |
| Hedging activities, net | 66 | (15) | 51 | (44) | 11 | (33) | 54 | (13) | 41 |
| Cumulative translation adjustment | (180) | — | (180) | 94 | — | 94 | (32) | — | (32) |
| Defined benefit plans: | | | | | | | | | |
| Additions to accumulated other comprehensive income (loss): | | | | | | | | | |
| Net gain (loss) | 35 | (9) | 26 | (4) | 1 | (3) | (2) | 1 | (1) |
| Prior service benefit | 1 | — | 1 | — | — | — | 2 | — | 2 |
| Curtailment gain | 2 | — | 2 | 11 | (1) | 10 | — | — | — |
| Effect of foreign exchange rates | 4 | — | 4 | (3) | — | (3) | 7 | — | 7 |
| Reclassifications to net income: | | | | | | | | | |
| Amortization of actuarial loss | 8 | (2) | 6 | 9 | (1) | 8 | 8 | (2) | 6 |
| Amortization of prior service gain | (2) | — | (2) | (3) | — | (3) | (2) | — | (2) |
| Curtailment/settlement gain | (1) | — | (1) | (1) | — | (1) | — | — | — |
| Defined benefit plans, net | $ 47 | $ (11) | 36 | $ 9 | $ (1) | 8 | $ 13 | $ (1) | 12 |
| **Other comprehensive (loss) income** | | | (93) | | | 69 | | | 21 |
| **Comprehensive (loss) income** | | | (7) | | | (168) | | | 599 |
| Less: Comprehensive income attributable to non-controlling interests | | | — | | | 1 | | | — |
| **Comprehensive (loss) income attributable to Chemours** | | | $ (7) | | | $ (169) | | | $ 599 |

***See accompanying notes to the consolidated financial statements.***

**The Chemours Company**
**Consolidated Balance Sheets**
*(Dollars in millions, except per share amounts)*

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 713 | $ 1,203 |
| Restricted cash and restricted cash equivalents | — | 604 |
| Accounts and notes receivable, net | 770 | 610 |
| Inventories | 1,472 | 1,352 |
| Prepaid expenses and other | 71 | 66 |
| Total current assets | 3,026 | 3,835 |
| Property, plant, and equipment | 9,572 | 9,412 |
| Less: Accumulated depreciation | (6,389) | (6,196) |
| Property, plant, and equipment, net | 3,183 | 3,216 |
| Operating lease right-of-use assets | 258 | 260 |
| Goodwill | 46 | 102 |
| Other intangible assets, net | 3 | 3 |
| Investments in affiliates | 152 | 158 |
| Restricted cash and restricted cash equivalents | 50 | — |
| Other assets | 797 | 677 |
| **Total assets** | $ 7,515 | $ 8,251 |
| **Liabilities** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,142 | $ 1,159 |
| Compensation and other employee-related cost | 99 | 89 |
| Short-term and current maturities of long-term debt | 54 | 51 |
| Current environmental remediation | 115 | 129 |
| Other accrued liabilities | 393 | 1,058 |
| Total current liabilities | 1,803 | 2,486 |
| Long-term debt, net | 4,054 | 3,987 |
| Operating lease liabilities | 194 | 206 |
| Long-term environmental remediation | 456 | 461 |
| Deferred income taxes | 35 | 44 |
| Other liabilities | 368 | 328 |
| Total liabilities | 6,910 | 7,512 |
| Commitments and contingent liabilities | | |
| **Equity** | | |
| Common stock (par value $0.01 per share; 810,000,000 shares authorized; 198,300,033 shares issued and 149,428,431 shares outstanding at December 31, 2024; 197,519,784 shares issued and 148,587,397 shares outstanding at December 31, 2023) | 2 | 2 |
| Treasury stock, at cost (48,871,602 shares at December 31, 2024; 48,932,387 shares at December 31, 2023) | (1,804) | (1,806) |
| Additional paid-in capital | 1,055 | 1,033 |
| Retained earnings | 1,718 | 1,782 |
| Accumulated other comprehensive loss | (367) | (274) |
| Total Chemours stockholders' equity | 604 | 737 |
| Non-controlling interests | 1 | 2 |
| Total equity | 605 | 739 |
| **Total liabilities and equity** | $ 7,515 | $ 8,251 |

***See accompanying notes to the consolidated financial statements.***

## The Chemours Company
## Consolidated Statements of Stockholders' Equity
*(Dollars in millions, except per share amounts)*

| | Common Stock | | Treasury Stock | | | | Accumulated Other | | |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Additional Paid-in Capital | Retained Earnings | Comprehensive (Loss) Income | Non-controlling Interests | Total Equity |
| **Balance at January 1, 2022** | 191,860,159 | $ 2 | 30,813,427 | $ (1,247) | $ 944 | $ 1,746 | $ (364) | $ 1 | $ 1,082 |
| Common stock issued - compensation plans | 474,730 | — | — | — | — | — | — | — | — |
| Exercise of stock options | 3,040,921 | — | — | — | 51 | — | — | — | 51 |
| Purchases of treasury stock, at cost | — | — | 16,058,353 | (492) | — | — | — | — | (492) |
| Stock-based compensation expense | — | — | — | 1 | 27 | — | — | — | 28 |
| Cancellation of unissued stock awards withheld to cover taxes | — | — | — | — | (6) | — | — | — | (6) |
| Net income | — | — | — | — | — | 578 | — | — | 578 |
| Dividends declared on common shares ($1.00 per share) | — | — | — | — | — | (154) | — | — | (154) |
| Dividends to non-controlling interests | — | — | — | — | — | — | — | (1) | (1) |
| Other comprehensive income | — | — | — | — | — | — | 21 | — | 21 |
| **Balance at December 31, 2022** | 195,375,810 | 2 | 46,871,780 | (1,738) | 1,016 | 2,170 | (343) | — | 1,107 |
| Common stock issued - compensation plans | 990,745 | — | (47,801) | 1 | (1) | (1) | — | — | (1) |
| Exercise of stock options | 1,153,229 | — | — | — | 19 | — | — | — | 19 |
| Purchases of treasury stock, at cost | — | — | 2,108,408 | (69) | — | | | | (69) |
| Stock-based compensation expense | — | — | — | — | 18 | — | — | — | 18 |
| Cancellation of unissued stock awards withheld to cover taxes | — | — | — | — | (19) | — | — | — | (19) |
| Net (loss) income | — | — | — | — | — | (238) | — | 1 | (237) |
| Dividends declared on common shares ($1.00 per share) | — | — | — | — | — | (149) | — | — | (149) |
| Contributions by non-controlling interests | — | — | — | — | — | — | — | 1 | 1 |
| Other comprehensive income | — | — | — | — | — | — | 69 | — | 69 |
| **Balance at December 31, 2023** | 197,519,784 | 2 | 48,932,387 | (1,806) | 1,033 | 1,782 | (274) | 2 | 739 |
| Common stock issued - compensation plans | 327,627 | — | (60,785) | 2 | 1 | (2) | — | — | 1 |
| Exercise of stock options | 452,622 | — | — | — | 9 | — | — | — | 9 |
| Stock-based compensation expense | — | — | — | — | 15 | — | — | — | 15 |
| Cancellation of unissued stock awards withheld to cover taxes | — | — | — | — | (3) | — | — | — | (3) |
| Net income | — | — | — | — | — | 86 | — | — | 86 |
| Dividends declared on common shares ($1.00 per share) | — | — | — | — | — | (148) | — | — | (148) |
| Dividends to non-controlling interests | — | — | — | — | — | — | — | (1) | (1) |
| Other comprehensive loss | — | — | — | — | — | — | (93) | — | (93) |
| **Balance at December 31, 2024** | 198,300,033 | $ 2 | 48,871,602 | $ (1,804) | $ 1,055 | $ 1,718 | $ (367) | $ 1 | $ 605 |

***See accompanying notes to the consolidated financial statements.***

**The Chemours Company**
**Consolidated Statements of Cash Flows**
*(Dollars in millions)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| **Cash flows from operating activities** | | | |
| Net income (loss) | $ 86 | $ (237) | $ 578 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Depreciation and amortization | 301 | 307 | 291 |
| Gain on sales of assets and businesses, net | (3) | (110) | (21) |
| Equity in earnings of affiliates, net | (1) | 11 | (22) |
| Loss (gain) on extinguishment of debt | 1 | 1 | (7) |
| Amortization of debt issuance costs and issue discounts | 12 | 9 | 9 |
| Deferred tax (benefit) provision | (27) | (158) | 20 |
| Asset-related charges | 27 | 95 | 5 |
| Stock-based compensation expense | 15 | 18 | 27 |
| Net periodic pension cost | 6 | 9 | 9 |
| Defined benefit plan contributions | (12) | (10) | (10) |
| Other operating charges and credits, net | (42) | 1 | (21) |
| Goodwill impairment | 56 | — | — |
| Decrease (increase) in operating assets: | | | |
| Accounts and notes receivable, net | (152) | (10) | 91 |
| Inventories and other current operating assets | (146) | 58 | (294) |
| Other non-current operating assets | (98) | — | (96) |
| (Decrease) increase in operating liabilities: | | | |
| Accounts payable | (9) | (72) | 105 |
| Other current operating liabilities | (660) | 642 | (47) |
| Non-current operating liabilities | 13 | 2 | 138 |
| Cash (used for) provided by operating activities | (633) | 556 | 755 |
| **Cash flows from investing activities** | | | |
| Purchases of property, plant, and equipment | (360) | (370) | (307) |
| Proceeds from sales of assets and businesses, net of cash divested | 3 | 143 | 33 |
| Foreign exchange contract settlements, net | 2 | (8) | 3 |
| Other investing activities | 2 | 6 | (13) |
| Cash used for investing activities | (353) | (229) | (284) |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of debt, net | 606 | 648 | — |
| Debt repayments | (490) | (280) | (68) |
| Payments of debt issuance costs | (9) | (4) | (1) |
| Payments on finance leases | (12) | (11) | (11) |
| Proceeds from supplier financing programs | 93 | 123 | 105 |
| Payments to supplier financing program | (102) | (87) | (106) |
| Purchases of treasury stock, at cost | — | (69) | (495) |
| Proceeds from exercised stock options | 9 | 19 | 51 |
| Payments related to tax withheld on vested stock awards | (3) | (19) | (6) |
| Payments of dividends to the Company's common shareholders | (148) | (149) | (154) |
| (Distributions to) cash received from non-controlling interest shareholders | (1) | 1 | (1) |
| Other financing activities | 21 | — | — |
| Cash (used for) provided by financing activities | (36) | 172 | (686) |
| Effect of exchange rate changes on cash, cash equivalents, restricted cash and restricted cash equivalents | (22) | 4 | (32) |
| **(Decrease) increase in cash, cash equivalents, restricted cash and restricted cash equivalents** | (1,044) | 503 | (247) |
| **Cash, cash equivalents, restricted cash, and restricted cash equivalents at January 1,** | 1,807 | 1,304 | 1,551 |
| **Cash, cash equivalents, restricted cash, and restricted cash equivalents at December 31,** | $ 763 | $ 1,807 | $ 1,304 |
| | | | |
| **Supplemental cash flows information** | | | |
| Cash paid during the year for: | | | |
| Interest, net of amounts capitalized | $ 267 | $ 223 | $ 164 |
| Income taxes, net of refunds | 73 | 54 | 131 |
| Non-cash investing and financing activities: | | | |
| Purchases of property, plant, and equipment included in accounts payable | $ 88 | $ 82 | $ 79 |
| Treasury stock repurchased, not settled | — | — | 1 |

***See accompanying notes to the consolidated financial statements.***

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

## Note 1. Background and Description of the Business

The Chemours Company ("Chemours", or the "Company") is a leading, global provider of performance chemicals that are key inputs in end-products and processes in a variety of industries. The Company delivers customized solutions with a wide range of industrial and specialty chemical products for markets, including coatings, plastics, refrigeration and air conditioning, transportation, semiconductor and consumer electronics, general industrial, and oil and gas. The Company's principal products include refrigerants, titanium dioxide ("$TiO_2$") pigment and industrial fluoropolymer resins. Chemours manages and reports its operating results through its three principal reportable segments: Thermal & Specialized Solutions, Titanium Technologies, and Advanced Performance Materials. The Thermal & Specialized Solutions segment is a leading, global provider of refrigerants, thermal management solutions, propellants, blowing agents, and specialty solvents. The Titanium Technologies segment is a leading, global provider of $TiO_2$ pigment, a premium white pigment used to deliver whiteness, brightness, opacity, durability, efficiency and protection across a variety of applications. The Advanced Performance Materials segment is a leading, global provider of high-end polymers and advanced materials that deliver unique attributes, including low friction coefficients, extreme temperature resistance, weather resistance, ultraviolet and chemical resistance, and electrical insulation. The Other Segment includes the Performance Chemicals and Intermediates business.

Chemours has manufacturing facilities, sales centers, administrative offices, and warehouses located throughout the world. Chemours' operations are primarily located in the U.S., Canada, Mexico, Brazil, the Netherlands, Belgium, China, Japan, Switzerland, Singapore, Hong Kong, India, and France. At December 31, 2024, the Company operated 28 major production facilities globally, of which eight were dedicated to Thermal & Specialized Solutions, seven were dedicated to Titanium Technologies, and 10 were dedicated to Advanced Performance Materials, and three supported multiple segments.

Chemours began operating as an independent company on July 1, 2015 (the "Separation Date") after separating from E.I. DuPont de Nemours and Company ("EID") (the "Separation"). The Separation was completed pursuant to a separation agreement and other agreements with EID, including an employee matters agreement, a tax matters agreement, a transition services agreement, and an intellectual property cross-license agreement. These agreements govern the relationship between Chemours and EID following the Separation and provided for the allocation of various assets, liabilities, rights, and obligations at the Separation Date. On August 31, 2017, EID completed a merger with The Dow Chemical Company ("Dow"). Following their merger, EID and Dow engaged in a series of reorganization steps and, in 2019, separated into three publicly-traded companies named Dow Inc., DuPont de Nemours, Inc. ("DuPont"), and Corteva, Inc. ("Corteva"). Effective January 1, 2023, EID changed its name to EIDP, Inc..

Unless the context otherwise requires, references herein to "The Chemours Company", "Chemours", "the Company", "our Company", "we", "us", and "our" refer to The Chemours Company and its consolidated subsidiaries. References herein to "EID" refer to EIDP, Inc., formerly known as EID, which is Chemours' former parent company and is now a subsidiary of Corteva.

## Note 2. Basis of Presentation

The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). In the opinion of management, all adjustments (consisting of normal, recurring adjustments) considered necessary for a fair presentation of the Company's financial position and results of operations have been included for the periods presented herein. The notes that follow are an integral part of the Company's consolidated financial statements.

Certain prior period amounts have been reclassified to conform to the current period presentation, the effect of which was not material to the Company's consolidated financial statements.

**Revision of Previously Issued Financial Statements**

Certain prior period amounts on the consolidated statements of income, reflected in the tables below, have been revised to correct for immaterial errors, as described below.

During the financial close process for the fourth quarter of 2024, the Company identified certain immaterial errors impacting previously issued financial statements beginning as of January 1, 2022, and subsequent quarterly reporting periods through September 30, 2024. Specifically, the Company identified errors related to the income statement presentation of byproduct revenue sales, which were incorrectly accounted for as a contra cost of goods sold. The Company previously determined at adoption that misclassification of these transactions was not material.

The Company assessed the materiality of these errors on prior period consolidated financial statements in accordance with the Securities and Exchange Commission ("SEC") Staff Accounting Bulletin No. 99, "Materiality", codified in ASC 250, *Accounting Changes and Error Corrections* ("ASC 250"). Based on this assessment, management concluded that the error correction is not material to any previously presented interim or annual financial statements. The impact of the revisions to the quarterly periods ended March 31, 2023, June 30, 2023, September 30, 2023, March 31, 2024, June 30, 2024 and September 30, 2024 are presented in "Note 30 – Unaudited Quarterly Financial Information".

***Revised Consolidated Statements of Income***

| | Year ended December 31, 2022 | | |
|---|---|---|---|
| | As reported | Revision | As revised |
| Net sales | $ 6,794 | $ 37 | $ 6,831 |
| Cost of goods sold | $ 5,178 | $ 37 | $ 5,215 |
| Gross profit | $ 1,616 | $ — | $ 1,616 |

| | Year ended December 31, 2023 | | |
|---|---|---|---|
| | As reported | Revision | As revised |
| Net sales | $ 6,027 | $ 51 | $ 6,078 |
| Cost of goods sold | $ 4,721 | $ 51 | $ 4,772 |
| Gross profit | $ 1,306 | $ — | $ 1,306 |

***Audit Committee Internal Review***

On February 29, 2024, the Company announced that it needed additional time to complete its 2023 year-end reporting process, including its review of internal control over financial reporting as of December 31, 2023, and for the Audit Committee of the Board of Directors (the "Audit Committee") to complete a related internal review (the "Audit Committee Internal Review"). The scope of the Audit Committee Internal Review included, among other things, reviewing (i) the process for reviewing reports made to the Chemours Ethics Hotline; (ii) the Company's practice for managing working capital, including the related impact on metrics within the Company's incentive plans; and (iii) certain non-GAAP metrics included in filings made with the Securities and Exchange Commission or otherwise publicly released, and related disclosures.

The Audit Committee has completed its planned procedures with respect to the Internal Review and determined, among other things, based on the review conducted with the assistance of independent outside counsel, that:

- the Company's then-Chief Executive Officer, then-Chief Financial Officer, and then-Controller engaged in efforts in the fourth quarter of 2023 to delay payments to certain vendors that were originally due to be paid in the fourth quarter of 2023 until the first quarter of 2024, and to accelerate the collection of receivables into the fourth quarter of 2023 that were originally not due to be received until the first quarter of 2024;
- these individuals engaged in these efforts in part to meet free cash flow targets that the Company had communicated publicly, and which also would be part of a key metric for determining incentive compensation applicable to executive officers; and
- there was a lack of transparency with the Company's Board of Directors by the members of former senior management who were placed on administrative leave with respect to these actions.

Further discussion related to the Audit Committee Internal Review is included under the heading "*Securities Related Litigation and Requests for Information Arising From Audit Committee Internal Review, and Related Indemnification Agreements*" within "Note 22 – Commitments and Contingent Liabilities".

***Insurance Recoveries***

The Consolidated Statements of Operations for the year ended December 31, 2024 include a pre-tax benefit of $20 for insurance proceeds within selling, general and administrative expenses, net of third-party legal expenses of $6. In December 2024, Chemours and EIDP agreed to a 50/50 distribution of then-available funds within the previously established joint escrow account, with Chemours receiving $20, representing a release of previously recorded restricted cash. The Company recorded $20 in cash and cash equivalents at December 31, 2024 representing its interest in the escrow account established for these insurance proceeds.

The proceeds were recovered over a period of more than four years beginning in the second quarter 2020. Of the amounts recorded in the Consolidated Statement of Operations for the year ended December 31, 2024, $13 relates to amounts collected prior to January 1, 2024. The Company assessed the materiality of these out-of-period adjustments on current and prior period consolidated financial statements in accordance with the Securities and Exchange Commission (“SEC”) Staff Accounting Bulletin No. 99, “Materiality,” codified in ASC 250, Accounting Changes and Error Corrections (“ASC 250”). Based on this assessment, management concluded that the amounts are not material to any previously presented interim or annual financial statements, or the current annual financial statements.

***Liquidity***

The Company believes it has sufficient liquidity, through future cash flows from operations, unrestricted cash on hand and availability under its revolving credit facility to timely settle its current liabilities through at least the end of February 2026, however, an adverse resolution of one or more legal or environmental matters could have a material adverse effect on the Company's liquidity.

As disclosed in "Note 22 – Commitments and Contingent Liabilities", the Company and certain of its subsidiaries are subject to various lawsuits, claims, assessments, government investigations, regulatory proceedings and other legal proceedings with respect to product liability, intellectual property, personal injury, commercial, contractual, employment, regulatory, environmental, anti-trust, and other such matters that arise in the ordinary course of business in multiple jurisdictions. The Company’s ability to timely settle its long term liabilities in the event such liabilities become current as a result of an adverse resolution of a legal matter will depend on its ability to generate sufficient future operating cash flows, resolve legal and environmental matters under acceptable terms and conditions and refinance its revolving credit facility and other long term debt on acceptable terms and conditions.

At December 31, 2024, the Company has $713 of unrestricted cash and cash equivalents, of which $404 is maintained at foreign subsidiaries. The Company anticipates generating additional positive cash flows from operations in 2025. The Company has $1,803 of current liabilities as of December 31, 2024. The Company also has $640 of availability under its revolving credit facility at December 31, 2024. The revolving credit facility contains terms that impact its capacity based in part on the Company’s twelve-month trailing EBITDA, as defined. The revolving credit facility matures on October 7, 2026. It is the Company’s intent to extend the maturity of the revolving credit facility, however, there is no assurance the Company will be able to extend the facility on acceptable terms and conditions, if at all. Accordingly, there are risks and uncertainties with respect to the Company’s ability to achieve its liquidity objectives.

## Note 3. Summary of Significant Accounting Policies

***Preparation of Financial Statements***

The consolidated financial statements have been prepared in conformity with GAAP, which requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the consolidated financial statements, and the reported amounts of revenues and expenses during the reporting period. Management's estimates are based on historical experiences, facts, and circumstances available at the time and various other assumptions that management believes are reasonable. Actual results could differ from those estimates.

***Principles of Consolidation***

The consolidated financial statements include the accounts of Chemours and its subsidiaries, as well as entities in which a controlling interest is maintained. For those consolidated subsidiaries in which the Company's ownership is less than 100%, the outside shareholders' interests are shown as non-controlling interests. Investments in companies in which Chemours, directly or indirectly, owns 20% to 50% of the voting stock, or has the ability to exercise significant influence over the operating and financial policies of the investee, are accounted for using the equity method of accounting. As a result, Chemours' share of the earnings or losses of such equity affiliates is included in the consolidated statements of operations, and Chemours' share of such equity affiliates' equity is included in the consolidated balance sheets.

The Company assesses the requirements related to the consolidation of any variable interest entity ("VIE"), including a qualitative assessment of power and economics that considers which entity has the power to direct the activities that most significantly impact the VIE's economic performance, and has the right to receive any benefits or the obligation to absorb any losses of the VIE. No such VIE was consolidated by the Company for the periods presented.

All intercompany accounts and transactions were eliminated in the preparation of the accompanying consolidated financial statements.

***Revenue Recognition***

Chemours recognizes revenue using a five-step model, resulting in revenue being recognized as performance obligations within a contract have been satisfied. The steps within that model include: (i) identifying the existence of a contract with a customer; (ii) identifying the performance obligations within the contract; (iii) determining the contract's transaction price; (iv) allocating the transaction price to the contract's performance obligations; and, (v) recognizing revenue as the contract's performance obligations are satisfied. A contract with a customer exists when: (i) the Company enters into an enforceable agreement that defines each party's rights regarding the goods or services to be transferred, and the related payment terms; (ii) the agreement has commercial substance; and, (iii) it is probable that the Company will collect the consideration to which it is entitled in the exchange. A performance obligation is a promise in a contract to transfer a distinct good or service, or a series of distinct goods or services, to a customer. The transaction price is the customary amount of consideration that the Company expects to be entitled to in exchange for a transfer of the promised goods or services to a customer, excluding any amounts collected by the Company on behalf of third parties (e.g., sales and use taxes). Judgment is required to apply the principles-based, five-step model for revenue recognition. Management is required to make certain estimates and assumptions about the Company's contracts with its customers, including, among others, the nature and extent of its performance obligations, its transaction price amounts and any allocations thereof, the critical events which constitute satisfaction of its performance obligations, and when control of any promised goods or services is transferred to its customers.

The Company's revenue from contracts with customers is reflected in the consolidated statements of operations as net sales, the vast majority of which represents product sales that consist of a single performance obligation. Product sales to customers are made under a purchase order ("PO"), or in certain cases, in accordance with the terms of a master services agreement ("MSA") or similar arrangement, which documents the rights and obligations of each party to the contract. When a customer submits a PO for product or requests product under an MSA, a contract for a specific quantity of distinct goods at a specified price is created, and the Company's performance obligation under the contract is satisfied when control of the product is transferred to the customer, which is indicated by shipment of the product and the transfer of title and the risk of loss to the customer. Revenue is recognized on consignment sales when control transfers to the customer, generally at the point of customer usage of the product. The transaction price for product sales is generally the amount specified in the PO or in the request under an MSA; however, as is common in Chemours' industry, the Company offers variable consideration in the form of rebates, volume discounts, early payment discounts, pricing based on formulas or indices, price matching, and guarantees to certain customers. Such amounts are included in the Company's estimated transaction price using either the expected value method or the most-likely amount, depending on the nature of the variable consideration included in the contract. The Company regularly assesses its customers' creditworthiness, and product sales are made based on established credit limits. Payment terms for the Company's invoices are typically less than 90 days.

The Company also licenses the right to access certain of its trademarks to customers under specified terms and conditions in certain arrangements, which is recognized as a component of net sales in the consolidated statements of operations. Under such arrangements, the Company may receive a royalty payment for a trademark license that is entered into on a stand-alone basis or incorporated into an overall product sales arrangement. Royalty income is generally based on customer sales and recognized under the sales-based exception as the customer sale occurs. When minimum guaranteed royalty amounts are included in the transaction price, the Company recognizes royalty income ratably over the license period for the minimum amount. When there is no consideration specified for the use of the Company’s trademark, the entire transaction price is recognized in connection with the transfer of control of product. Royalty income resulting from the right to use the Company’s technology is considered outside the scope of revenue recognition under GAAP as it is not a part of the Company’s ongoing major or central activities, and is recognized as a component of other income, net in the consolidated statements of operations in accordance with agreed-upon terms at the point or points in time that performance obligations are satisfied.

Consistent with the fact that the vast majority of the Company’s payment terms are less than 90 days from the point at which control of the promised goods or services is transferred, no adjustments have been made for the effects of a significant financing component. Additionally, the Company has elected to recognize the incremental costs associated with obtaining contracts as an expense when incurred if the amortization period of the assets that the Company would have recognized is one year or less. Amounts billed to customers for shipping and handling fees are considered a fulfillment cost and are included in net sales, and the costs incurred by the Company for the delivery of goods are classified as a component of the cost of goods sold in the consolidated statements of operations.

***Research and Development Expense***

Research and development (“R&D”) costs are expensed as incurred. R&D expenses include costs (primarily consisting of employee costs, materials, contract services, research agreements, and other external spend) relating to the discovery and development of new products, enhancement of existing products, and regulatory approval of new and existing products.

***Provision for (Benefit from) Income Taxes***

The provision for (benefit from) income taxes is determined using the asset and liability approach of accounting for income taxes. Under this approach, deferred taxes represent the future tax consequences expected to occur when the reported amounts of assets and liabilities are recovered or paid. The provision for (benefit from) income taxes represents income taxes paid or payable for the current year, plus the change in deferred taxes during the year. Deferred taxes result from differences between the financial and tax bases of Chemours’ assets and liabilities and are adjusted for changes in tax rates and tax laws when changes are enacted. The Company’s deferred tax assets and liabilities are presented on a net basis by jurisdictional filing group. Net deferred tax assets are presented as a component of other assets, while net deferred tax liabilities are presented as a component of deferred income taxes on the Company’s consolidated balance sheets. Valuation allowances are recorded to reduce deferred tax assets when it is more-likely-than-not that a tax benefit will not be realized.

Chemours recognizes income tax positions that meet the more-likely-than-not threshold and accrues any interest related to unrecognized income tax positions in the provision for (benefit from) income taxes in the consolidated statements of operations. The Company also recognizes income tax-related penalties in the provision for (benefit from) income taxes.

***Earnings Per Share***

Chemours presents both basic earnings per share and diluted earnings per share. Basic earnings per share excludes dilution and is computed by dividing the total net income (loss) attributable to Chemours by the weighted-average number of shares outstanding for the period. Diluted earnings per share reflects the dilution that could occur if the Company’s outstanding stock-based compensation awards, including any unvested restricted shares, were vested and exercised, thereby resulting in the issuance of common stock as determined under the treasury stock method. In periods where the Company incurs a net loss, stock-based compensation awards are excluded from the calculation of earnings per share as their inclusion would have an anti-dilutive effect.

***Cash and Cash Equivalents***

Cash and cash equivalents generally include cash, time deposits, or highly liquid investments with maturities of three months or less at the time of acquisition.

***Restricted Cash and Restricted Cash Equivalents***

The Company classifies cash and cash equivalents that are legally or contractually restricted for withdrawal or usage as restricted cash and restricted cash equivalents. Restricted cash and restricted cash equivalents are classified as a current or non-current asset based on the nature and timing when the cash is expected to be used, and carried at cost plus interest accrued, which approximates fair value.

At December 31, 2024, the Company's restricted cash and restricted cash equivalents includes cash and cash equivalents deposited in an escrow account as per the terms of the Company's Memorandum of Understanding ("MOU") agreement. At December 31, 2023, the Company's restricted cash and restricted cash equivalents principally relates to cash and cash equivalents deposited in the Water District Settlement Fund per the terms of the U.S. public water system Settlement Agreement pending final approval. See "Note 22 – Commitments and Contingent Liabilities" for further details on the MOU and Water District Settlement Fund.

***Accounts and Notes Receivable and Allowance for Doubtful Accounts***

Accounts and notes receivables are recognized net of an allowance for doubtful accounts. The allowance for doubtful accounts reflects the best estimate of losses inherent in Chemours' accounts and notes receivable portfolio, which is determined by assessing expected credit losses on the basis of historical experience, specific allowances for known troubled accounts, and other available evidence. Accounts and notes receivable are written off when management determines that they are uncollectible.

***Inventories***

Chemours' inventories are valued at the lower of cost or market or net realizable value, where applicable. Cost of inventories held at substantially all U.S. locations are determined using the last-in, first-out ("LIFO") method, while cost of inventories held outside the U.S. are determined using the average cost method. The elements of cost in inventories include raw materials, direct labor, and manufacturing overhead. Stores and supplies are valued at the lower of cost or net realizable value, and cost is generally determined by the average cost method.

***Property, Plant, and Equipment***

Property, plant, and equipment is carried at cost and is depreciated using the straight-line method. Substantially all equipment and buildings are depreciated over useful lives ranging from 15 to 25 years. Capitalizable costs associated with computer software for internal use are amortized on a straight-line basis over five to seven years. When assets are surrendered, retired, sold, or otherwise disposed of, their gross carrying values and related accumulated depreciation are removed from the consolidated balance sheets and are included in the determination of any gain or loss on such disposals.

Repair and maintenance costs that materially add to the value of the asset or prolong its useful life are capitalized and depreciated based on their extension to the asset's useful life. Capitalized repair and maintenance costs are recorded on the consolidated balance sheets as a component of other assets.

***Impairment of Long-lived Assets***

Chemours evaluates the carrying value of its long-lived assets to be held and used when events or changes in circumstances indicate the carrying value may not be recoverable. For the purposes of recognition or measurement of an impairment charge, the assessment is performed on the asset or asset group at the lowest level for which identifiable cash flows are largely independent of the cash flows of other groups of assets and liabilities. To determine the level at which the assessment is performed, Chemours considers factors such as revenue dependency, shared costs, and the extent of vertical integration. The carrying value of a long-lived asset is considered impaired when the total projected undiscounted cash flows from the use and eventual disposition of the asset or asset group are separately identifiable and are less than its carrying value. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset. The fair value methodology used is an estimate of fair market value, which is made based on prices of similar assets or other valuation methodologies, including present value techniques. Long-lived assets to be disposed of by means other than sale are classified as held for use until their disposal. Long-lived assets to be disposed of by sale are classified as held for sale and are reported at the lower of carrying amount or fair market value, less the estimated cost to sell. Depreciation and amortization are discontinued for any long-lived assets classified as held for sale.

***Leases***

The Company's lease assets and lease liabilities are recognized on the lease commencement date in an amount that represents the present value of future lease payments. Operating leases are included in operating lease right-of-use assets, other accrued liabilities, and operating lease liabilities on the Company's consolidated balance sheets. Finance leases are included in property, plant, and equipment, net, short-term and current maturities of long-term debt, and long-term debt, net, on the Company's consolidated balance sheets. The Company's incremental borrowing rate, which is based on information available at the adoption date of January 1, 2019 for existing leases and the commencement date for leases commencing after the adoption date, is used to determine the present value of lease payments. The Company combines lease components with non-lease components for most classes of assets, except for certain manufacturing facilities or when the non-lease component is significant to the lease component.

The Company does not recognize leases with an initial term of 12 months or less on its consolidated balance sheets and will recognize those lease payments in the consolidated statements of operations on a straight-line basis over the lease term. Certain leases contain variable payments which are based on usage or operating costs, such as utilities and maintenance. These payments are not included in the measurement of the right-of-use asset or lease liability due to the uncertainty of the payment amount and are recorded as lease expense in the period incurred. Leases with the options to extend their term or terminate early are reflected in the lease term when it is reasonably certain that the Company will exercise such options.

***Goodwill and Other Intangible Assets***

The excess of the purchase price over the estimated fair value of the net assets acquired in a business combination, including any identified intangible assets, is recorded as goodwill. Chemours tests its goodwill for impairment at least annually on October 1; however, these tests are performed more frequently when events or changes in circumstances indicate that the asset may be impaired. Goodwill is evaluated for impairment at the reporting unit level, which is defined as an operating segment, or one level below an operating segment. A reporting unit is the level at which discrete financial information is available and reviewed by business management on a regular basis. An impairment exists when the carrying value of a reporting unit exceeds its fair value. The amount of impairment loss recognized in the consolidated statements of operations is equal to the excess of a reporting unit's carrying value over its fair value, which is limited to the total amount of goodwill allocated to the reporting unit.

Chemours has the option to first qualitatively assess whether it is more-likely-than-not that an impairment exists for a reporting unit. Such qualitative factors include, among other things, prevailing macroeconomic conditions, industry and market conditions, changes in costs associated with raw materials, labor, or other inputs, the Company's overall financial performance, and certain other entity-specific events that impact Chemours' reporting units. When performing a quantitative test, the Company weights the results of an income-based valuation technique, the discounted cash flows method, and a market-based valuation technique, the guideline public companies method, to determine its reporting units' fair values.

Definite-lived intangible assets, such as purchased and licensed technology, patents, trademarks, customer lists and allowance units are amortized over their estimated useful lives, generally for periods ranging up to 20 years. The reasonableness of the useful lives of these assets is periodically evaluated.

***Investments in Affiliates***

The Company uses the equity method of accounting for its investments in and earnings of affiliates. The Company considers whether the fair value of any of its equity method investments has declined below their carrying value whenever adverse events or changes in circumstances indicate that recorded values may not be recoverable. If the Company considers any such decline to be other than temporary, based on various factors, a write-down would be recorded to the estimated fair value.

***Environmental Liabilities and Expenditures***

Chemours accrues for environmental remediation matters when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. Where the available information is only sufficient to establish a range of probable liability, and no point within the range is more likely than any other, the lower end of the range has been used.

Estimated liabilities are determined based on existing remediation laws and technologies and the Company's estimated cost to perform the planned remedial responses and the time period over which remediation activities will occur, which are derived from environmental studies, sampling, testing, and analyses. Inherent uncertainties exist in such evaluations, primarily due to unknown environmental conditions, changing governmental regulations regarding liability, and emerging remediation technologies. These liabilities, which are undiscounted, are adjusted periodically as remediation efforts progress and as additional technological, regulatory, and legal information becomes available.

Environmental liabilities and expenditures include claims for matters that are liabilities of EID and its subsidiaries, which Chemours may be required to indemnify pursuant to the Separation-related agreements executed prior to the Separation. These accrued liabilities are undiscounted and do not include claims against third parties.

Costs related to environmental remediation are charged to expense in the period that the associated liability is accrued and are reflected as a component of the cost of goods sold for on-site remediation costs or as a component of selling, general, and administrative expense for off-site remediation costs in the consolidated statements of operations. Other environmental costs are also charged to expense in the period incurred, unless they extend the useful life of the property, increase the property's capacity, and/or reduce or prevent contamination from future operations, in which case they are capitalized and amortized. Pursuant to the binding MOU entered into between Chemours, DuPont, Corteva, and EID, as further discussed in "Note 22 – Commitments and Contingent Liabilities", costs specific to potential future legacy per- and polyfluoroalkyl substances ("PFAS") liabilities are subject to a cost-sharing arrangement between the parties. Any recoveries of Qualified Spend (as further described in "Note 22 – Commitments and Contingent Liabilities" and as defined in the MOU) from DuPont and/or Corteva under the cost-sharing arrangement will be recognized as an offset to the Company's cost of goods sold or selling, general, and administrative expense, as applicable, when realizable. Any Qualified Spend incurred by DuPont and/or Corteva under the cost-sharing arrangement will be recognized in the Company's cost of goods sold or selling, general, and administrative expense, as applicable, when the amounts of such costs are probable and estimable.

***Asset Retirement Obligations***

Chemours records its asset retirement obligations at their fair value at the time the liability is incurred. Fair value is measured using the expected future cash outflows discounted at Chemours' credit-adjusted, risk-free interest rate, which is considered to be a Level 3 input within the fair value hierarchy. Accretion expense is recognized as an operating expense within the cost of goods sold in the consolidated statements of operations, using the credit-adjusted, risk-free interest rate in effect when the liability was recognized. The associated asset retirement costs are capitalized as part of the carrying amount of the long-lived asset and are depreciated over the estimated remaining useful life of the asset, generally for periods ranging from two to 75 years.

***Insurance***

Chemours insures for certain risks where permitted by law or regulation, including workers' compensation, vehicle liability, and employee-related benefits. Liabilities associated with these risks are estimated in part by considering any historical claims experience, demographic factors, and other actuarial assumptions. For certain other risks, the Company uses a combination of third-party insurance and self-insurance, reflecting its comprehensive review of relevant risks. A receivable for an insurance recovery is generally recognized when the loss has occurred and collection is considered probable.

***Litigation***

Chemours accrues for litigation matters when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. Where the available information is only sufficient to establish a range of probable liability, and no point within the range is more likely than any other, the lower end of the range has been used. When a material loss contingency is reasonably possible, but not probable, the Company does not record a liability, but instead discloses the nature of the matter and an estimate of the loss or range of loss, to the extent such estimate can be made. Litigation-related liabilities and expenditures included in the consolidated financial statements include legal matters that are liabilities of EID and its subsidiaries, which Chemours may be required to indemnify pursuant to the Separation-related agreements executed prior to the Separation. Legal costs, such as outside counsel fees and expenses, are charged to expense in the period that services are rendered.

***Treasury Stock***

Chemours accounts for repurchases of the Company's common stock as treasury stock using the cost method, whereby the entire cost of the acquired common stock is recorded as treasury stock. The cost of treasury stock re-issued is determined using the first-in, first-out ("FIFO") method.

***Stock-based Compensation***

Chemours' stock-based compensation consists of stock options, restricted stock units ("RSUs"), performance share units ("PSUs"), and performance stock options ("PSOs") awarded to employees and non-employee directors. Stock options, PSUs and PSOs are measured at their fair value on the grant date or date of modification, as applicable. RSUs are measured at the stock price on the grant date or date of modification, as applicable. The Company recognizes compensation expense on a straight-line basis over the requisite service and/or performance period, as applicable. Forfeitures of awards are accounted as a reduction in stock-based compensation expense in the period such awards are forfeited.

***Financial Instruments***

In the ordinary course of business, Chemours enters into contractual arrangements to reduce its exposure to foreign currency and interest rate risks. The Company has established a financial risk management program, which includes distinct risk management instruments: (i) foreign currency forward contracts, which are used to minimize the volatility in the Company's earnings related to foreign exchange gains and losses resulting from remeasuring its monetary assets and liabilities that are denominated in non-functional currencies; (ii) foreign currency forward contracts, which are used to mitigate the risks associated with fluctuations in the euro against the U.S. dollar for forecasted U.S. dollar-denominated inventory purchases in certain of the Company's international subsidiaries that use the euro as their functional currency; (iii) interest rate swaps, which are used to mitigate the volatility in the Company's cash payments for interest due to fluctuations in Secured Overnight Financing Rate ("SOFR"), as is applicable to the portion of the Company's senior secured term loan facility denominated in U.S. dollars; and (iv) euro-denominated debt and cross-currency swaps, both of which are used to reduce the volatility in stockholders' equity caused by changes in foreign currency exchange rates of the euro with respect to the U.S. dollar for certain of its international subsidiaries that use the euro as their functional currency. The Company's financial risk management program reflects varying levels of exposure coverage and time horizons based on an assessment of risk. The program operates within Chemours' financial risk management policies and guidelines, and the Company does not enter into derivative financial instruments for trading or speculative purposes.

The Company's foreign currency forward contracts that are used as a net monetary assets and liabilities hedge are not part of a cash flow hedge program or a fair value hedge program, and have not been designated as a hedge. For these instruments, all gains and losses resulting from the revaluation of derivative assets and liabilities are recognized in other income, net in the consolidated statements of operations during the period in which they occur, and any such gains or losses are intended to be offset by any gains or losses on the underlying asset or liability. For the Company's foreign currency forward contracts that have been designated under a cash flow hedge program, all gains and losses resulting from the revaluation of the derivative instruments are recognized as a component of accumulated other comprehensive loss on the consolidated balance sheets during the period in which they occur, and are reclassified to the cost of goods sold in the consolidated statements of operations during the period in which the underlying transactions affect earnings, or when it becomes probable that the forecasted transactions will not occur. For the Company's interest rate swaps that have been designated under a cash flow hedge program, all gains and losses resulting from the revaluation of the derivative instruments are recognized as a component of accumulated other comprehensive loss on the consolidated balance sheets during the period in which they occur, and are reclassified to interest expense, net in the consolidated statements of operations during the period in which the underlying transaction affects earnings. For the Company's euro-denominated debt instruments and cross-currency swap, which are designated as net investment hedges, changes due to remeasurement are included in accumulated other comprehensive loss on the consolidated balance sheets. Chemours' uses the spot method to evaluate the effectiveness of its net investment hedges.

Financial instruments are reported on a gross basis on the consolidated balance sheets.

***Foreign Currency Translation***

Chemours identifies its separate and distinct foreign entities and groups them into two categories: (i) extensions of the parent (U.S. dollar functional currency); and, (ii) self-contained (local functional currency). If a foreign entity does not align with either category, factors are evaluated, and a judgment is made to determine the functional currency. Chemours changes the functional currency of its separate and distinct foreign entities only when significant changes in economic facts and circumstances clearly indicate that the functional currency has changed.

During the periods covered by the consolidated financial statements, part of Chemours' business operated within foreign entities. For foreign entities where the U.S. dollar is the functional currency, all foreign currency-denominated asset and liability amounts are remeasured into U.S. dollars at end-of-period exchange rates, with the exception of inventories, prepaid expenses, property, plant, and equipment, goodwill, and other intangible assets. These aforementioned assets are remeasured at historical exchange rates. Foreign currency-denominated revenue and expense amounts are measured at exchange rates in effect during the period, with the exception of expenses related to any balance sheet amounts remeasured at historical exchange rates. Exchange gains and losses arising from remeasurement of foreign currency-denominated monetary assets and liabilities are included in other income, net in the consolidated statements of operations in the period in which they occurred.

For foreign entities where the local currency is the functional currency, assets and liabilities denominated in local currencies are translated into U.S. dollars at end-of-period exchange rates, and the resulting translation adjustments are reported as a component of accumulated other comprehensive loss on the consolidated balance sheets. Assets and liabilities denominated in currencies other than the functional currency are remeasured into the functional currency prior to translation into U.S. dollars, and the resulting exchange gains or losses are included in other income, net in the consolidated statements of operations in the period in which they occurred. Revenues and expenses are translated into U.S. dollars at average exchange rates in effect during the period.

***Defined Benefit Plans***

Chemours has defined benefit plans covering certain of its employees outside of the U.S. The benefits of these plans, which primarily relate to pension, are accrued over the employees' service periods. The Company uses actuarial methods and assumptions in the valuation of its defined benefit obligations and the determination of any net periodic pension income or expense. Any differences between actual and expected results, or changes in the value of defined benefit obligations and plan assets, if any, are not recognized in earnings as they occur. Rather, they are systematically recognized over subsequent periods.

***Fair Value Measurement***

Fair value is defined as the exit price, the price that would be received to sell an asset or transfer a liability in an orderly transaction between market participants at the measurement date. Under the accounting for fair value measurements and disclosures, a fair value hierarchy was established to prioritize the valuation inputs used to measure fair value. The hierarchy gives highest priority to unadjusted, quoted prices in active markets for identical assets and liabilities (i.e., Level 1 measurements) and lowest priority to unobservable inputs (i.e., Level 3 measurements). A financial instrument's level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement.

Chemours applies the following valuation hierarchy in measuring the fair values of its assets and liabilities:

- Level 1 – Quoted prices in active markets for identical assets and liabilities;
- Level 2 – Significant other observable inputs (e.g., quoted prices for similar items in active markets, quoted prices for identical or similar items in markets that are not active, inputs other than quoted prices that are observable, such as interest rate and yield curves, and market-corroborated inputs); and,
- Level 3 – Unobservable inputs for the asset or liability, which are valued based on management's estimates of assumptions that market participants would use in pricing the asset or liability.

***Assets and Liabilities Held for Sale***

The Company classifies long-lived assets or disposal groups as held for sale in the period when the following held for sale criteria are met: (i) the Company commits to a plan to sell; (ii) the long-lived asset or disposal group is available for immediate sale in its present condition subject only to terms that are usual and customary for sales of such long-lived assets or disposal groups; (iii) an active program to locate a buyer and other actions required to complete the plan to sell have been initiated; (iv) the sale is probable within one year; (v) the asset or disposal group is being actively marketed for sale at a price that is reasonable in relation to its current fair value; and (vi) it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn. Long-lived assets and disposal groups classified as held for sale are measured at the lower of their carrying amount or fair value less costs to sell. The Company ceases depreciation and amortization for a disposal group upon it being classified as held for sale.

***Recent Accounting Pronouncements***

*Accounting Guidance Issued and Not Yet Adopted*

Joint Venture Formations

In August 2023, the Financial Accounting Standards Board ("FASB") issued ASU 2023-05, *Business Combinations - Joint Venture Formations*, which requires joint ventures to initially measure its assets and liabilities at fair value on the formation date. The guidance will be effective prospectively to all joint ventures formed on or after January 1, 2025, with early adoption permitted. The Company will adopt the guidance and apply the provisions of ASU 2023-05 to joint ventures formed on or after January 1, 2025.

Improvements to Income Tax Disclosures

In December 2023, the FASB issued ASU 2023-09, *Income Taxes (Topic 740): Improvements to Income Tax Disclosures*, which requires enhanced disclosure around the effective tax rate reconciliation, along with incremental disclosure around income taxes paid and certain income statement-related disclosures. The guidance will be effective prospectively for fiscal years beginning after December 15, 2024, with early adoption permitted. The Company plans to adopt the guidance and include required enhanced disclosures in its consolidated financial statements beginning in the year ending December 31, 2025.

Disaggregation of Income Statement Expenses

In November 2024, the FASB issued ASU 2024-03, *Income Statement - Reporting Comprehensive Income - Expense Disaggregation Disclosures*, which requires more detailed disclosures of certain categories of expenses such as inventory purchases, employee compensation and depreciation that are components of existing expense captions presented on the face of the income statement. The guidance will be effective for fiscal years beginning after December 15, 2026, and interim periods within fiscal years beginning after December 15, 2027. Companies have the option to apply the guidance either on a retrospective or prospective basis, and early adoption is permitted. The Company is currently evaluating the impacts the adoption of this standard will have on its consolidated financial statements.

*Recently Adopted Accounting Guidance*

Improvements to Reportable Segment Disclosures

In November 2023, the FASB issued ASU 2023-07, *Improvements to Reportable Segment Disclosures,* which requires incremental disclosures related to a public entity's reportable segments, including the disclosure of significant segment expense categories and amounts for each reportable segment. This guidance is effective for the Company for the year beginning January 1, 2024, with early adoption permitted. The amendments should be applied retrospectively to all prior periods presented in the financial statements. The Company adopted ASU 2023-07 on December 31, 2024 and included enhanced disclosure of significant segment expense categories and amounts within "Note 29 – Geographic and Segment Information", the effect of which did not have an impact on its financial position, results of operations, or cash flows.

## Note 4. Acquisitions and Divestitures

***Divestitures***

In June 2023, the Company entered into a definitive agreement with PureTech Scientific Inc. to sell the Company's Glycolic Acid business, included in the Company's Other Segment, for cash consideration of approximately $137 (the “Glycolic Acid Transaction”). The Company completed the sale on August 1, 2023, and received net cash proceeds of $138. Upon completion of the Glycolic Acid Transaction, the Company also recorded a net pre-tax gain on sale of $106 in other income, net in the Consolidated Statements of Operations.

In December 2021, the Company entered into an agreement to sell land related to the Beaumont former operating site for cash consideration of approximately $17 (the “Beaumont Transaction”). The Company completed the land sale on May 24, 2022 and received net cash proceeds of $17. In January 2022, the Company entered into a stock agreement to sell certain of its wholly-owned subsidiaries and the remaining assets at its former Aniline business facilities in Pascagoula, Mississippi (the “Pascagoula Transaction”). The Company completed the sale on June 9, 2022 and received net cash proceeds of $16. Upon completion of the Beaumont Transaction and the Pascagoula Transaction, the Company recorded a net pre-tax gain of $5 and $18, respectively, in other income, net in the Consolidated Statements of Operations during the year ended December 31, 2022.

Cash proceeds received were reflected in the "Cash flows from investing activities" section of the Consolidated Statements of Cash Flows.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

## Note 5. Net Sales

As described further in "Note 2 – Basis of Presentation", certain prior period amounts reflected in the tables below have been revised to correct for immaterial errors pertaining to income statement presentation of byproduct revenue sales.

### *Disaggregation of Net Sales*

The following table sets forth a disaggregation of the Company's net sales by geographic region and segment for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| **Net sales by geographic region (1)** | | | |
| North America: | | | |
| Thermal & Specialized Solutions | $ 1,029 | $ 1,076 | $ 996 |
| Titanium Technologies | 1,026 | 1,054 | 1,285 |
| Advanced Performance Materials | 499 | 556 | 632 |
| Other Segment | 35 | 59 | 71 |
| Total North America | 2,589 | 2,745 | 2,984 |
| Asia Pacific: | | | |
| Thermal & Specialized Solutions | 200 | 192 | 178 |
| Titanium Technologies | 657 | 704 | 928 |
| Advanced Performance Materials | 518 | 554 | 657 |
| Other Segment | 11 | 12 | 24 |
| Total Asia Pacific | 1,386 | 1,462 | 1,787 |
| Europe, the Middle East, and Africa: | | | |
| Thermal & Specialized Solutions | 362 | 369 | 320 |
| Titanium Technologies | 511 | 519 | 695 |
| Advanced Performance Materials | 258 | 297 | 283 |
| Other Segment | 7 | 12 | 17 |
| Total Europe, the Middle East, and Africa | 1,138 | 1,197 | 1,315 |
| Latin America (2): | | | |
| Thermal & Specialized Solutions | 239 | 214 | 208 |
| Titanium Technologies | 378 | 403 | 472 |
| Advanced Performance Materials | 51 | 55 | 61 |
| Other Segment | 1 | 2 | 4 |
| Total Latin America | 669 | 674 | 745 |
| **Total net sales** | $ 5,782 | $ 6,078 | $ 6,831 |

(1) Net sales are attributed to countries based on customer location.

(2) Latin America includes Mexico.

The following table sets forth a disaggregation of the Company's net sales by product group and segment for the years ended December 31, 2024, 2023 and 2022. Certain prior period amounts have been recast in order to conform with current presentation of Thermal & Specialized Solutions net sales disaggregation.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| **Net sales by product group and segment** | | | |
| Opteon™ refrigerants | $ 810 | $ 710 | $ 597 |
| Freon™ refrigerants | 614 | 722 | 750 |
| Foam, propellants, and other | 406 | 419 | 355 |
| Total Thermal & Specialized Solutions | 1,830 | 1,851 | 1,702 |
| Titanium dioxide and other minerals | 2,572 | 2,680 | 3,380 |
| Total Titanium Technologies | 2,572 | 2,680 | 3,380 |
| Advanced materials | 808 | 916 | 1,140 |
| Performance solutions | 518 | 546 | 493 |
| Total Advanced Performance Materials | 1,326 | 1,462 | 1,633 |
| Performance chemicals and intermediates | 54 | 85 | 116 |
| Total Other Segment | 54 | 85 | 116 |
| **Total net sales** | $ 5,782 | $ 6,078 | $ 6,831 |

Substantially all of the Company's net sales are derived from goods and services transferred at a point in time. The Company's net sales from trademark licensing royalties were not significant for the years ended December 31, 2024, 2023 and 2022.

***Contract Balances***

The Company's assets and liabilities from contracts with customers constitute accounts receivable - trade, deferred revenue, and customer rebates. An amount for accounts receivable - trade is recorded when the right to consideration under a contract becomes unconditional. An amount for deferred revenue is recorded when consideration is received prior to the conclusion that a contract exists, or when a customer transfers consideration prior to the Company satisfying its performance obligations under a contract. Customer rebates represent an expected refund liability to a customer based on a contract. In contracts with customers where a rebate is offered, it is generally applied retroactively based on the achievement of a certain sales threshold. As revenue is recognized, the Company estimates whether or not the sales threshold will be achieved to determine the amount of variable consideration to include in the transaction price.

The following table sets forth the Company's contract balances from contracts with customers at December 31, 2024 and 2023.

| | December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Contract assets: | | |
| Accounts receivable - trade, net (Note 11) | $ 619 | $ 509 |
| Contract liabilities: | | |
| Deferred revenue | $ 11 | $ 16 |
| Customer rebates (Note 19) | 70 | 78 |

Changes in the Company's deferred revenue balances resulting from additions for advance payments and deductions for amounts recognized in net sales during the year ended December 31, 2024 were not significant. Changes in the Company's deferred revenue balances during the year ended December 31, 2023 were due to prepaid ore sales. For the years ended December 31, 2024 and 2023, the amount of net sales recognized from performance obligations satisfied in prior periods (e.g., due to changes in transaction price) was not significant.

There were no material contract asset balances or capitalized costs associated with obtaining or fulfilling customer contracts as of December 31, 2024 and 2023.

***Remaining Performance Obligations***

Certain of the Company's master services agreements or other arrangements contain take-or-pay clauses, whereby customers are required to purchase a fixed minimum quantity of product during a specified period, or pay the Company for such orders, even if not requested by the customer. The Company considers these take-or-pay clauses to be an enforceable contract, and as such, the legally-enforceable minimum amounts under such an arrangement are considered to be outstanding performance obligations on contracts with an original expected duration greater than one year. At December 31, 2024, Chemours had $272 of remaining performance obligations. The Company expects to recognize approximately 41% of its remaining performance obligations as revenue in 2025, approximately 30% as revenue in 2026, and approximately 29% in revenue for 2027. The Company applies the allowable practical expedient and does not include remaining performance obligations that have original expected durations of one year or less, or amounts for variable consideration allocated to wholly-unsatisfied performance obligations or wholly-unsatisfied distinct goods that form part of a single performance obligation, if any. Amounts for contract renewals that are not yet exercised by December 31, 2024 are also excluded.

## Note 6. Research and Development Expense

The following table sets forth the Company's R&D expense by segment and Corporate for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Thermal & Specialized Solutions | $ 29 | $ 25 | $ 25 |
| Titanium Technologies | 28 | 32 | 34 |
| Advanced Performance Materials | 50 | 48 | 54 |
| Other Segment | 1 | 1 | 1 |
| Corporate | 1 | 2 | 4 |
| **Total research and development expense** | $ 109 | $ 108 | $ 118 |

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

## Note 7. Restructuring, Asset-related, and Other Charges

The following table sets forth the components of the Company's restructuring, asset-related, and other charges by segment for the years ended December 31, 2024, 2023 and 2022.

| | Thermal & Specialized Solutions | Titanium Technologies | Advanced Performance Materials | Other Segment | Corporate | Total |
|---|---|---|---|---|---|---|
| **Year Ended December 31, 2024** | | | | | | |
| Employee separation charges: | | | | | | |
| 2024 Restructuring Program | $ — | $ — | $ 14 | $ — | $ 6 | $ 20 |
| Titanium Technologies Transformation Plan | — | (1) | — | — | — | (1) |
| 2023 Restructuring Program | — | — | — | — | — | — |
| Total employee separation charges | — | (1) | 14 | — | 6 | 19 |
| Decommissioning and other charges: | | | | | | |
| 2024 Restructuring Program | — | — | 3 | — | — | 3 |
| Titanium Technologies Transformation Plan | — | 11 | — | — | — | 11 |
| Total Decommissioning and other charges | — | 11 | 3 | — | — | 14 |
| Total restructuring and other charges | — | 10 | 17 | — | 6 | 33 |
| Asset-related charges: | | | | | | |
| 2024 Restructuring Program | — | — | 27 | — | — | 27 |
| Total asset-related charges | — | — | 27 | — | — | 27 |
| **Total restructuring, asset-related, and other charges** | $ — | $ 10 | $ 44 | $ — | $ 6 | $ 60 |

| | Thermal & Specialized Solutions | Titanium Technologies | Advanced Performance Materials | Other Segment | Corporate | Total |
|---|---|---|---|---|---|---|
| **Year Ended December 31, 2023** | | | | | | |
| Employee separation charges: | | | | | | |
| Titanium Technologies Transformation Plan | $ — | $ 21 | $ — | $ — | $ — | $ 21 |
| 2023 Restructuring Program | — | — | 3 | — | 1 | 4 |
| 2022 Restructuring Programs | 1 | — | (1) | — | (1) | (1) |
| ERP Implementation Abandonment Charges | — | — | — | — | 1 | 1 |
| Total employee separation charges | 1 | 21 | 2 | — | 1 | 25 |
| Decommissioning and other charges: | | | | | | |
| Titanium Technologies Transformation Plan | — | 27 | — | — | — | 27 |
| ERP Implementation Abandonment Charges | — | — | — | — | 4 | 4 |
| Total Decommissioning and other charges | — | 27 | — | — | 4 | 31 |
| Total restructuring and other charges | 1 | 48 | 2 | — | 5 | 56 |
| Asset-related charges: | | | | | | |
| Titanium Technologies Transformation Plan | | 77 | — | — | 1 | 78 |
| ERP Implementation Abandonment Charges | — | — | — | — | 11 | 11 |
| Other asset-related charges | 8 | — | — | — | — | 8 |
| Total asset-related charges | 8 | 77 | — | — | 12 | 97 |
| **Total restructuring, asset-related, and other charges** | $ 9 | $ 125 | $ 2 | $ — | $ 17 | $ 153 |

| | Thermal & Specialized Solutions | Titanium Technologies | Advanced Performance Materials | Other Segment | Corporate | Total |
|---|---|---|---|---|---|---|
| **Year Ended December 31, 2022** | | | | | | |
| Employee separation charges | $ 1 | $ 1 | $ 3 | $ — | $ 4 | $ 9 |
| Decommissioning and other charges | — | — | — | 2 | — | 2 |
| Total restructuring and other charges | 1 | 1 | 3 | 2 | 4 | 11 |
| Asset-related charges | — | 5 | — | — | — | 5 |
| **Total restructuring, asset-related, and other charges** | $ 1 | $ 6 | $ 3 | $ 2 | $ 4 | $ 16 |

***2024 Restructuring Program***

In the third quarter of 2024, management initiated certain transformation initiatives principally within the Advanced Performance Materials business and certain Corporate functions to capture operational and commercial synergies and cost optimization. As part of these efforts, during the third quarter of 2024, the Company initiated additional cost savings programs that were largely attributable to further aligning the cost structure of the Company's businesses and corporate functions with its financial objectives. As a result, during the year ended December 31, 2024, the Company recorded charges of $50, consisting of non-cash asset related charges of $27, employee separation charges of $20 and other charges of $3. The associated severance payments began in the third quarter of 2024 and are expected to be substantially completed by the second half of 2025. The $27 of asset related charges are based on decisions related to the write off of certain operating assets and associated construction-in-progress and other assets with no future intended use, as part of a strategic asset footprint transformation analysis within the Advanced Performance Materials business. The Company also expects to incur decommissioning and other charges of approximately $3 through 2026 which will be recognized as period costs as incurred.

***Titanium Technologies Transformation Plan***

On July 27, 2023, the Company announced the closure of its manufacturing site in Kuan Yin, Taiwan effective August 1, 2023, following the Company's Board of Directors approval on July 26, 2023. The Company began shutting down production and started decommissioning the plant during the third quarter of 2023 and fully completed the shut-down during the fourth quarter of 2023. Decommissioning activities were completed in the second quarter of 2024 and dismantling began thereafter. Dismantling and removal activities are expected to be completed by the first quarter of 2025.

During the year ended December 31, 2024, the Company recorded of $11 of decommissioning, dismantling and other charges related to Kuan Yin, inclusive of a reduction in certain contract termination costs. Through December 31, 2024, the Company has recorded charges of approximately $130 consisting of asset-related impairments of $78, employee separation costs of $14, contract termination costs of $14 and decommissioning and other charges of $24. The associated severance payments were started in the fourth quarter 2023 and are expected to be substantially completed in the first quarter of 2025. For the year ended December 31, 2023, the Company also recorded $40 related to the write off of certain raw materials and stores inventories that can no longer be utilized following the production shutdown. This amount is recorded in Cost of Goods Sold in the Consolidated Statement of Operations.

As part of the Titanium Technologies Transformation Plan, following the plant closure, the segment also initiated an organizational redesign to further align its cost structure with its financial objectives. As a result, cumulative employee separation charges of $6 were recorded from inception through December 31, 2024. The employee separation and related payments were substantially completed in the fourth quarter of 2024. During the year ended December 31, 2024, the Company made total cash payments of $48 associated with the Titanium Technologies Transformation Plan, inclusive of severance payments, decommissioning, and other third-party fees.

***2023 Restructuring Program***

In addition to the Titanium Technologies plans, in 2023, management also initiated additional severance programs to further align the cost structure of the Company's businesses and corporate functions with its financial objectives. From inception through December 31, 2024, the Company has recorded cumulative employee separation charges of $4. The severance costs were recognized as follows: $3 in Advanced Performance Materials and $1 in Corporate. The program and related severance payments were substantially completed in the third quarter of 2024.

***2022 Restructuring Program***

Management initiated a severance program in 2022 that was largely attributable to aligning the cost structure of the Company's businesses and corporate functions with its strategic and financial objectives. From inception through December 31, 2024, the cumulative amount incurred for the Company's 2022 restructuring program amounted to $8 and the related payments were substantially completed in the fourth quarter of 2023.

**Enterprise Resource Planning ("ERP") Implementation Abandonment Charges**

During the first quarter of 2023, the Company decided to abandon its implementation of a new ERP software platform and recorded the following charges: $11 write-off of previously deferred software development costs determined to have no alternative use, $4 related to contract termination charges, and $1 of employee separation charges. Employee severance payments related to this charge were completed during the first quarter of 2024.

***Plant and Product Line Closures***

*Thermal & Specialized Solutions*

In the year ended December 31, 2023, the Company recorded an asset-related impairment of $8 resulting from the shutdown of a production line at the Company's El Dorado site.

***Other Asset-related Charges***

*Titanium Technologies*

In the year ended December 31, 2022, the Company recorded asset-related charges of $5 resulting from the conflict between Russia and Ukraine and the Company's decision to suspend its business with Russian entities.

The following table sets forth the change in the Company's employee separation-related liabilities associated with its restructuring programs for the years ended December 31, 2024 and 2023.

| | 2024 Restructuring Program | Titanium Technologies Transformation Plan | 2023 Restructuring Program | 2022 Restructuring Program | ERP Implementation Abandonment | Total |
|---|---|---|---|---|---|---|
| **Balance at January 1, 2023** | $ — | $ — | $ — | $ 6 | $ — | $ 6 |
| Charges to income | — | 21 | 4 | (1) | 1 | 25 |
| Payments | — | (11) | — | (5) | (1) | (17) |
| **Balance at December 31, 2023** | — | 10 | 4 | — | — | 14 |
| Charges to income | 20 | (1) | — | — | — | 19 |
| Payments | (8) | (8) | (4) | — | — | (20) |
| **Balance at December 31, 2024** | $ 12 | $ 1 | $ — | $ — | $ — | $ 13 |

With respect to the $14 of contract termination liabilities associated with the Titanium Technologies Transformation Plan, the Company paid $10 during the year and as such, at December 31, 2024 the Company had $4 remaining as an outstanding liability. There were no other significant outstanding liabilities related to the Company's decommissioning and other restructuring-related charges at December 31, 2024 and 2023.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

## Note 8. Other Income, Net

The following table sets forth the components of the Company's other income, net for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Leasing, contract services, and miscellaneous income (1) | $ 5 | $ 11 | $ 53 |
| Royalty income (2) | 6 | 8 | 6 |
| Gain on sales of assets and businesses, net (3) | 3 | 110 | 21 |
| Exchange losses, net (4) | (9) | (38) | (15) |
| Non-operating pension and other post-retirement employee benefit income (5) | 3 | — | 5 |
| **Total other income, net** | $ 8 | $ 91 | $ 70 |

(1)For the year ended December 31, 2022, miscellaneous income includes proceeds from a settlement of a patent infringement matter relating to certain copolymer patents associated with the Company's Advanced Performance Materials segment.

(2)Royalty income is primarily from technology licensing.

(3)For the year ended December 31, 2023, gain on sale of assets and businesses, net includes pre-tax gain on sale of $106 related to the Glycolic Acid Transaction. For the year ended December 31, 2022, gain on sale of assets and businesses, net includes pre-tax gain on sale of $5 to the Beaumont Transaction and $18 related to the Pascagoula Transaction. Refer to "Note 4 – Acquisitions and Divestitures" for further details.

(4)Exchange (losses), net includes gains and losses on the Company's foreign currency forward contracts that have not been designated as a cash flow hedge.

(5)Non-operating pension and other post-retirement employee benefit income represents the non-service cost component of net periodic pension income.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

## Note 9. Income Taxes

The following table sets forth the components of the Company's provision for (benefit from) income taxes for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Current tax expense (benefit): | | | |
| U.S. federal | $ 6 | $ 25 | $ 83 |
| U.S. state and local | — | (5) | 13 |
| International | 62 | 57 | 47 |
| Total current tax expense | 68 | 77 | 143 |
| Deferred tax (benefit) expense: | | | |
| U.S. federal | (11) | (112) | 8 |
| U.S. state and local | (10) | (24) | (2) |
| International | (6) | (22) | 14 |
| Total deferred tax (benefit) expense | (27) | (158) | 20 |
| **Total provision for (benefit from) income taxes** | $ 41 | $ (81) | $ 163 |

The following table sets forth the components of the Company's deferred tax assets and liabilities at December 31, 2024 and 2023.

| | December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Deferred tax assets: | | |
| Environmental and other liabilities | $ 188 | $ 196 |
| Employee related and benefit items | 48 | 41 |
| Other assets and accrual liabilities | 140 | 133 |
| Intangible Assets | 124 | 155 |
| Tax attribute carryforwards | 234 | 200 |
| Operating lease liability | 60 | 63 |
| Total deferred tax assets | 794 | 788 |
| Less: Valuation allowance | (134) | (165) |
| Total deferred tax assets, net | 660 | 623 |
| Deferred tax liabilities: | | |
| Property, plant, and equipment and intangible assets | (279) | (240) |
| LIFO inventories | (14) | (8) |
| Operating lease asset | (63) | (63) |
| Other liabilities | (48) | (53) |
| Total deferred tax liabilities | (404) | (364) |
| **Deferred tax assets, net** | $ 256 | $ 259 |

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

The following table sets forth an analysis of the Company's effective tax rates for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2024 | | 2023 | | 2022 | |
| | $ | % | $ | % | $ | % |
| **Statutory U.S. federal income tax rate** | $ 27 | 21.0% | $ (67) | 21.0% | $ 156 | 21.0% |
| State income taxes, net of federal benefit | (10) | (7.9)% | (28) | 8.8% | 7 | 1.0% |
| Lower effective tax rate on international operations, net | (6) | (4.7)% | 55 | (17.3)% | (16) | (2.2)% |
| Basis difference in intangible assets, net | (1) | (0.8)% | (12) | 3.8% | — | —% |
| Tax exempt income | — | —% | (24) | 7.5% | — | —% |
| Non - deductible expenses | 13 | 10.3% | 11 | (3.4)% | 1 | 0.1% |
| Goodwill | 12 | 9.5% | — | —% | — | —% |
| Depletion | (4) | (3.1)% | (4) | 1.3% | (6) | (0.8)% |
| Exchange gains | (6) | (4.7)% | (16) | 5.0% | (8) | (1.1)% |
| Provision to return and other adjustments | 16 | 12.7% | (6) | 1.9% | (2) | (0.3)% |
| Valuation allowance | — | —% | 15 | (4.7)% | 4 | 0.5% |
| Executive compensation limitation | 1 | 0.8% | 9 | (2.8)% | 3 | 0.5% |
| Stock-based compensation | (1) | (0.8)% | (13) | 4.1% | (9) | (1.2)% |
| R&D credit | (7) | (5.5)% | (8) | 2.5% | (7) | (0.9)% |
| Uncertain tax positions | 5 | 3.9% | 7 | (2.2)% | 36 | 4.9% |
| Other, net | 2 | 1.6% | — | —% | 4 | 0.5% |
| **Total effective tax rate** | $ 41 | 32.3% | $ (81) | 25.5% | $ 163 | 22.0% |

In 2023, the Company received a ruling from the Swiss tax authorities which resulted in the recognition of a deferred tax asset related to intangibles and an accompanying valuation allowance. The current year movement of this ruling continues to be presented net of the valuation allowance in the effective tax rate reconciliation above.

The following table sets forth the Company's income (loss) before income taxes for its U.S. and international operations for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| U.S. operations (including exports) | $ (199) | $ (638) | $ 217 |
| International operations | 326 | 320 | 524 |
| **Income (loss) before income taxes** | $ 127 | $ (318) | $ 741 |

Management asserts that it is indefinitely reinvested with respect to all undistributed earnings prior to 2018 and, therefore, has not recorded deferred tax liabilities with respect to those earnings. Beginning in 2018, management determined that the Company's earnings from certain foreign subsidiaries are not indefinitely reinvested and presumed such earnings will be distributed to the U.S. At December 31, 2024 and 2023, deferred tax liabilities for the foreign subsidiaries that are not indefinitely reinvested were not material to the Company's consolidated financial statements. At December 31, 2024, the amount of indefinitely reinvested unremitted earnings was approximately $522. The potential tax implications of the repatriation of unremitted earnings are driven by the facts at the time of distribution; however, the incremental cost to repatriate earnings is expected to be primarily related to withholding taxes and is not expected to be material.

The Company reviews its tax return positions, taking into account the progress of audits by various taxing jurisdictions and other changes in relevant facts and circumstances evident at each balance sheet date. At December 31, 2024, the Company recognized net tax expense of $6 related to uncertain tax positions specific to transfer pricing and the treatment of discrete intercompany transactions. The Company maintains its as filed tax positions are appropriate and supportable.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

Under the tax laws of various jurisdictions in which the Company operates, deductions or credits that cannot be fully utilized for tax purposes during the current year may be carried forward or back, subject to statutory limitations, to reduce taxable income or taxes payable in future or prior years. At December 31, 2024, the Company's state net operating losses amounted to $22, which substantially expire between 2027 and 2043. The Company has foreign net operating losses of $41, which have various expiration dates between 2029 through 2044, as well as unlimited carryforward periods, and $19 of certain foreign tax credits, which expire between 2029 and 2034.

Each year, Chemours and/or its subsidiaries file income tax returns in the U.S. federal jurisdiction and various states and non-U.S. jurisdictions.

The following table sets forth the Company's significant jurisdictions' tax returns that are subject to examination by their respective taxing authorities for the open years listed.

| Jurisdiction | Open Years |
|---|---|
| China | 2019 through 2024 |
| India | 2016 through 2024 |
| Mexico | 2019 through 2024 |
| Netherlands | 2023 through 2024 |
| Singapore | 2019 through 2024 |
| Switzerland | 2019 through 2024 |
| Taiwan | 2023 through 2024 |
| U.S. | 2017 through 2024 |

Positions challenged by the taxing authorities may be settled or appealed by Chemours and/or EID in accordance with the tax matters agreement. As a result, income tax uncertainties are recognized in the Company's consolidated financial statements in accordance with accounting for income taxes, when applicable.

The following table sets forth the change in the Company's unrecognized tax benefits for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| **Balance at January 1,** | $ 73 | $ 65 | $ 5 |
| Gross amounts of increases and decreases in unrecognized tax benefits as a result of adjustments to tax provisions taken during the prior period | — | 2 | 54 |
| Gross amounts of increases and decreases in unrecognized tax benefits as a result of tax positions taken during the current period | 9 | 6 | 6 |
| Reduction to unrecognized tax benefits as a result of a lapse of the applicable statute of limitations | — | — | — |
| **Balance at December 31,** | $ 82 | $ 73 | $ 65 |
| | | | |
| Total unrecognized tax benefits, if recognized, that would impact the effective tax rate | $ 54 | $ 48 | $ 42 |
| Total amount of interest and penalties recognized in the consolidated statements of operations | 5 | 4 | 4 |
| Total amount of interest and penalties recognized in the consolidated balance sheets | 13 | 8 | 4 |

As of December 31, 2024, the total amount of unrecognized tax benefits was $82, of which $54 was recorded in other liabilities and $28 was recorded as an offset to deferred tax assets. These unrecognized tax benefits primarily relate to transfer pricing matters and the treatment of discrete intercompany transactions. In addition, accruals of $13 have been recorded for penalties and interest, as of December 31, 2024, in other liabilities. These liabilities at December 31, 2024 were reduced by $38 for offsetting benefits from the corresponding effects of potential transfer pricing adjustments included in other assets.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

The following table sets forth a rollforward of the Company's deferred tax asset valuation allowance for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| **Balance at January 1,** | $ 165 | $ 12 | $ 8 |
| Charges to income tax expense | 1 | 153 | 4 |
| Reduction of valuation allowance | (32) | — | — |
| **Balance at December 31,** | $ 134 | $ 165 | $ 12 |

For the years ended December 31, 2024, 2023, and 2022 the Company recorded $(31), $153, and $4 of valuation allowance, respectively. For the year ended December 31, 2024, the net change in valuation allowance was a $31 decrease primarily related to deferred tax assets of its Taiwan and Switzerland subsidiaries, which are now considered realizable.

For the year ended December 31, 2023 there was a plant closure in Taiwan during the third quarter of 2023, the Company recorded an income tax expense of $13 related to the recognition of a valuation allowance on the deferred tax assets of one of its Taiwan subsidiaries. The Company has evaluated all available positive and negative evidence, including the reversal of certain deferred liabilities, as well as the future projections of profitability for the plant shutdown. As a result, the Company determined that a majority of its deferred tax assets related to the Taiwanese subsidiary are not more likely than not to be realized and accordingly recorded a valuation allowance against those deferred tax assets. In addition, the Company recorded income tax expense of $138 related to the valuation allowance on certain deferred tax assets in its Switzerland subsidiaries. This directly relates to a deferred tax asset recorded in 2023 in conjunction with a Swiss ruling received in the fourth quarter. The valuation allowance was recorded specifically due to the limitations in the realizability and deductibility of the new deferred tax asset related to intangible assets and has no further impact to the remaining deferred tax assets of Switzerland subsidiaries. The remaining valuation allowance recorded was related to certain foreign tax credits and state net operating losses. For the year ended December 31, 2022, the Company recorded a valuation allowance of $3 against certain foreign tax credits, as well as $1 of valuation allowance on state net operating losses.

## Note 10. Earnings Per Share of Common Stock

The following table sets forth the reconciliations of the numerators and denominators of the Company's basic and diluted earnings (loss) per share calculations for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| Numerator: | | | |
| Net income (loss) attributable to Chemours | $ 86 | $ (238) | $ 578 |
| Denominator: | | | |
| Weighted-average number of common shares outstanding - basic | 149,494,462 | 148,912,397 | 155,359,361 |
| Dilutive effect of the Company's employee compensation plans (1) | 677,827 | — | 2,943,646 |
| Weighted-average number of common shares outstanding - diluted | 150,172,289 | 148,912,397 | 158,303,007 |
| | | | |
| Basic earnings (loss) per share of common stock (2) | $ 0.58 | $ (1.60) | $ 3.72 |
| Diluted earnings (loss) per share of common stock (1) (2) | 0.57 | (1.60) | 3.65 |

(1)In periods where the Company incurs a net loss, the impact of potentially dilutive securities is excluded from the calculation of EPS, as their inclusion would have an anti-dilutive effect. As such, with respect to the measure of diluted EPS, the impact of 1,584,958 potentially dilutive securities is excluded from the calculation for the year ended December 31, 2023.

(2)Figures may not recalculate exactly due to rounding. Basic and diluted earnings (loss) per share are calculated based on unrounded numbers.

The following table sets forth the average number of stock options and performance stock options that were out of the money and, therefore, were not included in the Company's diluted earnings (loss) per share calculations for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Average number of stock options | 2,246,602 | 1,444,099 | 1,077,922 |

## Note 11. Accounts and Notes Receivable, Net

The following table sets forth the components of the Company's accounts and notes receivable, net at December 31, 2024 and 2023.

| | December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Accounts receivable - trade, net (1) | $ 619 | $ 509 |
| VAT, GST, and other taxes (2) | 114 | 81 |
| Other receivables (3) | 37 | 20 |
| **Total accounts and notes receivable, net** | $ 770 | $ 610 |

(1)Accounts receivable - trade, net includes trade notes receivable of $1 and less than $1 and is net of allowances for doubtful accounts of $2 and $2 at December 31, 2024 and 2023, respectively. Such allowances are equal to the estimated uncollectible amounts.

(2)Value added tax ("VAT") and goods and services tax ("GST") for various jurisdictions.

(3)Other receivables consist of derivative instruments, advances, and other deposits including receivables under the terms of the MOU. For details of the MOU, see "Note 22 – Commitments and Contingent Liabilities".

Accounts and notes receivable are carried at amounts that approximate fair value. Bad debt expense amounted to $8, $3 and $9 for the years ended December 31, 2024, 2023 and 2022, respectively.

The following table sets forth the change in the Company's allowance for doubtful accounts for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| **Balance at January 1,** | $ 2 | $ 10 | $ 5 |
| Additions charged to expenses | 8 | 3 | 9 |
| Deductions from reserves (1) | (8) | (11) | (4) |
| **Balance at December 31,** | $ 2 | $ 2 | $ 10 |

(1)Include bad debt write-offs of less than $1 for each of the years ended December 31, 2024, 2023 and 2022, respectively.

### *Customer Vendor Financing Facilities*

The Company participates in several financing facilities maintained by our customers. These facilities allow the Company to monetize certain receivables prior to their due date. The Company receives a discounted amount from the financial institution which varies depending on the timing of the payment from the financing institution in relation to the invoice due date from the customer. The Company classifies cash received from the financial institutions as an operating cash flow. For one transaction in 2023, the Company received $26 from a financial institution prior to the recognition of revenue from the customer. For that advance, the Company classified the proceeds as a financing cash inflow under the caption "Proceeds from supplier financing programs" on the Consolidated Statement of Cash Flows for the year ended December 31, 2023. As of December 31, 2023, all revenue recognition requirements related to this transaction had been satisfied.

## Note 12. Inventories

The following table sets forth the components of the Company's inventories at December 31, 2024 and 2023.

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Finished products | $ 889 | $ 770 |
| Semi-finished products | 271 | 255 |
| Raw materials, stores, and supplies | 688 | 709 |
| Inventories before LIFO adjustment | 1,848 | 1,734 |
| Less: Adjustment of inventories to LIFO basis | (376) | (382) |
| **Total inventories** | $ 1,472 | $ 1,352 |

Inventory values, before LIFO adjustment, are generally determined by the average cost method, which approximates current cost. Inventories are valued under the LIFO method at substantially all of the Company's U.S. locations, which comprised $900 and $920 (or 49% and 53%, respectively) of inventories before the LIFO adjustments at December 31, 2024 and 2023, respectively. The remainder of the Company's inventory held in international locations and certain U.S. locations is valued under the average cost method.

## Note 13. Property, Plant, and Equipment, Net

The following table sets forth the components of the Company's property, plant, and equipment, net at December 31, 2024 and 2023.

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Equipment | $ 7,911 | $ 7,652 |
| Buildings | 1,133 | 1,180 |
| Construction-in-progress | 404 | 450 |
| Land | 88 | 94 |
| Mineral rights | 36 | 36 |
| Property, plant, and equipment | 9,572 | 9,412 |
| Less: Accumulated depreciation | (6,389) | (6,196) |
| **Total property, plant, and equipment, net** | $ 3,183 | $ 3,216 |

Property, plant, and equipment, net included gross assets under finance leases of $97 and $100 at December 31, 2024 and 2023, respectively.

Interest expense capitalized as part of property, plant, and equipment, net amounted to $10, $7, and $7 for the years ended December 31, 2024, 2023 and 2022, respectively.

Depreciation expense amounted to $301, $297, and $286 for the years ended December 31, 2024, 2023 and 2022, respectively.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

## Note 14. Leases

The Company leases certain office space, laboratory space, equipment, railcars, tanks, barges and warehouses. Lease expense is recognized over the term of these leases on a straight-line basis. The Company's leases have remaining terms of up to 22 years. Some leases of equipment contain immaterial amounts of residual value guarantees. Leases with an initial term of 12 months or less are not recorded on the consolidated balance sheets.

The following table sets forth the Company's lease assets and lease liabilities and their balance sheet locations at December 31, 2024 and 2023.

| | Balance Sheet Location | December 31, 2024 | December 31, 2023 |
|---|---|---|---|
| Lease assets: | | | |
| Operating lease right-of-use assets | Operating lease right-of-use assets | $ 258 | $ 260 |
| Finance lease assets | Property, plant, and equipment, net (Note 13) | 48 | 61 |
| **Total lease assets** | | $ 306 | $ 321 |
| | | | |
| Lease liabilities: | | | |
| Current: | | | |
| Operating lease liabilities | Other accrued liabilities (Note 19) | $ 53 | $ 55 |
| Finance lease liabilities | Short-term and current maturities of long-term debt (Note 20) | 13 | 12 |
| Total current lease liabilities | | 66 | 67 |
| Non-current: | | | |
| Operating lease liabilities | Operating lease liabilities | 194 | 206 |
| Finance lease liabilities | Long-term debt, net (Note 20) | 33 | 46 |
| Total non-current lease liabilities | | 227 | 252 |
| **Total lease liabilities** | | $ 293 | $ 319 |

The following table sets forth the components of the Company's lease cost for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| Operating lease cost | $ 61 | $ 63 | $ 51 |
| Short-term lease cost | 14 | 7 | 4 |
| Variable lease cost | 19 | 18 | 16 |
| | | | |
| Finance lease cost: | | | |
| Amortization of lease assets | 9 | 9 | 8 |
| Interest on lease liabilities | 3 | 3 | 4 |
| **Total lease cost** | $ 106 | $ 100 | $ 83 |

The following table sets forth the cash flows related to the Company's leases for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | | | |
| Operating cash flows from operating leases | $ 69 | $ 70 | $ 56 |
| Operating cash flows from finance leases | 3 | 3 | 4 |
| Financing cash flows from finance leases | 12 | 11 | 11 |
| | | | |
| Non-cash lease liabilities activity: | | | |
| Leased assets obtained in exchange for new operating lease liabilities | $ 38 | $ 66 | $ 65 |
| Leased assets obtained in exchange for new finance lease liabilities | 7 | — | — |

The following table sets forth the weighted-average terms and weighted-average discount rates for the Company's leases at December 31, 2024 and 2023.

| | December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Weighted-average remaining lease term (years): | | |
| Operating leases | 8.3 | 8.9 |
| Finance leases | 4.5 | 4.6 |
| | | |
| Weighted-average discount rate: | | |
| Operating leases | 6.09 % | 5.89 % |
| Finance leases | 5.67 % | 5.42 % |

The following table sets forth the Company's lease liabilities' maturities for the next five years and thereafter.

| | Operating Leases | Finance Leases | Total |
|---|---|---|---|
| 2025 | $ 66 | $ 16 | $ 82 |
| 2026 | 57 | 11 | 68 |
| 2027 | 41 | 9 | 50 |
| 2028 | 31 | 9 | 40 |
| 2029 | 26 | 4 | 30 |
| Thereafter | 85 | 3 | 88 |
| Total lease payments | 306 | 52 | 358 |
| Less: Imputed interest | 59 | 6 | 65 |
| **Present value of lease liabilities** | $ 247 | $ 46 | $ 293 |

***The Chemours Discovery Hub***

In October 2017, Chemours executed a build-to-suit lease agreement to construct a new 312,000-square-foot R&D facility located in the Science, Technology, and Advanced Research campus of the University of Delaware in Newark, Delaware ("Chemours Discovery Hub"). Chemours was deemed to be the owner for accounting purposes during construction of the facility. Construction was completed in the fourth quarter of 2019, and, upon its completion, Chemours evaluated whether a sale occurred for purposes of sale-leaseback accounting treatment. The Company determined that this transaction did not qualify for sale-leaseback accounting, and, as a result, the leasing arrangement is considered to be a financing transaction. At completion of the construction, the build-to-suit lease liability was reclassified as a financing obligation within long-term debt, net, and the build-to-suit lease asset was capitalized in property, plant and equipment, net. At December 31, 2024 and 2023, a financing obligation of $90 and $92, respectively, and property, plant, and equipment of $76 and $80, respectively, are recorded on the Company's consolidated balance sheet.

The following table sets forth the Company's minimum future payments due for the next five years and thereafter related to the Chemours Discovery Hub financing obligation.

| | |
|---|---|
| 2025 | $ 7 |
| 2026 | 7 |
| 2027 | 7 |
| 2028 | 7 |
| 2029 | 7 |
| Thereafter | 122 |
| Total lease payments | 157 |
| Less: Imputed interest | (67 ) |
| **Present value of financing obligation** | $ 90 |

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

## Note 15. Goodwill and Other Intangible Assets, Net

***Goodwill***

The following table sets forth the changes in the carrying amount of the Company’s goodwill by segment for the years ended December 31, 2024 and 2023.

| | Thermal & Specialized Solutions | Titanium Technologies | Advanced Performance Materials | Other Segment | Total |
|---|---|---|---|---|---|
| **Balance at January 1, 2023** | $ 33 | $ 13 | $ 56 | $ — | $ 102 |
| **Balance at December 31, 2023** | 33 | 13 | 56 | — | 102 |
| Goodwill impairment | — | — | (56) | — | (56) |
| **Balance at December 31, 2024** | $ 33 | $ 13 | $ — | $ — | $ 46 |

Chemours consists of four operating segments: Thermal & Specialized Solutions, Titanium Technologies, Advanced Performance Materials, and Performance Chemicals and Intermediates (included in Other Segment). The Company defines its reporting units as operating units or one level below its operating segments. In 2024 and 2023, the Company had three reporting units for goodwill testing, which align with the Company's operating segments: Thermal & Specialized Solutions, Titanium Technologies, and Advanced Performance Materials. The Company completes its annual goodwill impairment test on October 1 each year, or more frequently if triggering events indicate a possible impairment. The Company continually evaluates financial performance, economic conditions and other recent developments in assessing if a triggering event indicates that the carrying values of goodwill or long-lived assets are impaired.

The total accumulated impairment losses included in the Company’s goodwill balance at December 31, 2024 and 2023 amounted to $56 and $0, respectively.

During the third quarter of 2024, the Company reviewed recently released third-party industry projections, which for hydrogen reflected lower end-market demand as well as slower market growth through 2030 and a more uncertain long-term growth trajectory beyond 2030. In response to these negative market outlook developments as well as increased commercial headwinds due to limited cyclical end-markets recovery and competitive intensity, the Company has revised its financial projections for the Advanced Performance Materials business which includes reductions to its investment plans. The Company concluded that these market developments, as well as the Company's revised financial projections to reflect these events, represented a triggering event for the Company's Advanced Performance Materials reporting unit and associated goodwill, as well as the related asset group, during the third quarter of 2024. As a result of this conclusion, the Company completed an interim impairment assessment as of August 31, 2024 for its Advanced Performance Materials reporting unit and the related asset group.

The Company concluded that the undiscounted cash flows exceeded the carrying value of the long-lived assets, and that an impairment did not exist. In completing an interim quantitative goodwill impairment test, the Company compared the reporting unit's fair value to its carrying value in order to determine if an impairment charge was warranted. The fair value of the Company's Advanced Performance Materials reporting unit was determined by using a combination of discounted cash flow models (a form of the income approach) and the guideline public company method (a form of the market approach). These valuation models incorporated a number of assumptions and judgments surrounding general market and economic conditions and internal forecasts of future business performance that are based on short- and long-term revenue growth rates, EBITDA margins and prospective financial information surrounding the future cash flows of the reporting unit. Discount rate and market multiple assumptions were determined based on relevant peer companies in the chemicals sector. As a result of the analysis performed, the Company concluded that the carrying amount of the Advanced Performance Materials reporting unit exceeded its fair value resulting in a non-cash goodwill impairment charge of $56, which is recorded within “Goodwill impairment charge” on the Consolidated Statements of Operations for the year ended December 31, 2024.

No further goodwill impairments were recorded for the years ended December 31, 2024 and 2023, as the fair values of the Company's other reporting units that carry goodwill exceeded each respective reporting unit's carrying amount on October 1, 2024 and 2023.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

***Other Intangible Assets, Net***

The following table sets forth the gross carrying amounts and accumulated amortization of the Company's other intangible assets by major class at December 31, 2024 and 2023.

| | December 31, 2024 | | | December 31, 2023 | | |
|---|---|---|---|---|---|---|
| | Cost | Accumulated Amortization | Net | Cost | Accumulated Amortization | Net |
| Allowance units (1) | $ 8 | $ (5) | $ 3 | $ 13 | $ (10) | $ 3 |
| Customer lists | 2 | (2) | — | 2 | (2) | — |
| Customer relationships | 22 | (22) | — | 22 | (22) | — |
| Patents | 13 | (13) | — | 13 | (13) | — |
| Purchased and licensed technology | 3 | (3) | — | 3 | (3) | — |
| Other | 11 | (11) | — | 10 | (10) | — |
| **Total other intangible assets** | $ 59 | $ (56) | $ 3 | $ 63 | $ (60) | $ 3 |

(1) Allowance units represent rights purchased for the production and/or importation of regulated materials.

The aggregate pre-tax amortization expense for definite-lived intangible assets was less than $1, $10, and $5 for the years ended December 31, 2024, 2023 and 2022, respectively. Less than $1 of pre-tax amortization expense is estimated annually for 2025, 2026, 2027, 2028, and 2029. Definite-lived intangible assets are amortized over their estimated useful lives, generally for periods ranging up to 20 years. The reasonableness of the useful lives of these assets is periodically evaluated. The Company does not have any indefinite-lived intangible assets.

## Note 16. Investments in Affiliates

The Company holds investments in companies where it, directly or indirectly, owns 20% to 50% of the voting stock, or has the ability to exercise significant influence over the operating and financial policies of the investee.

The following table sets forth the jurisdiction, carrying value, and ownership percentages of the Company's investments in affiliates at December 31, 2024 and 2023.

| | | December 31, 2024 | | December 31, 2023 | |
|---|---|---|---|---|---|
| Investee | Jurisdiction | Carrying Value | Ownership | Carrying Value | Ownership |
| Chemours-Mitsui Fluorochemicals Company, Ltd. | Japan | $ 79 | 50.0% | $ 82 | 50.0% |
| The Chemours Chenguang Fluoromaterials Company Limited | China | 33 | 50.0% | 33 | 50.0% |
| Changshu 3F Zhonghao New Chemical Materials Co., Ltd. | China | 40 | 10.0% | 43 | 10.0% |
| | | $ 152 | | $ 158 | |

The following table sets forth the changes in the Company's investments in affiliates for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| **Balance at January 1,** | $ 158 | $ 175 | $ 169 |
| Equity in earnings of affiliates | 43 | 45 | 55 |
| Dividends | (37) | (49) | (33) |
| Currency translation and other | (12) | (13) | (16) |
| **Balance at December 31,** | $ 152 | $ 158 | $ 175 |

The Company engages in transactions with its equity method investees in the ordinary course of business. For the years ended December 31, 2024, 2023 and 2022, net sales to the Company's equity method investees amounted to $127, $144, and $193, respectively, and purchases from the Company's equity method investees amounted to $295, $221, and $218, respectively.

## Note 17. Other Assets

The following table sets forth the components of the Company's other assets at December 31, 2024 and 2023.

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Capitalized repair and maintenance costs | $ 315 | $ 230 |
| Pension assets (1) | 97 | 57 |
| Deferred income taxes | 291 | 303 |
| Miscellaneous (2) | 94 | 87 |
| **Total other assets** | $ 797 | $ 677 |

(1)Pension assets represents the funded status of certain of the Company's long-term employee benefit plans.

(2)Miscellaneous includes corresponding income tax benefits related to uncertain tax positions on transfer pricing (see "Note 9 – Income Taxes").

## Note 18. Accounts Payable

The following table sets forth the components of the Company's accounts payable at December 31, 2024 and 2023.

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Trade payables | $ 1,120 | $ 1,134 |
| VAT and other payables | 22 | 25 |
| **Total accounts payable** | $ 1,142 | $ 1,159 |

***Supplier Financing***

The Company maintains supply chain finance programs with several financial institutions. The programs allow its suppliers to sell their receivables to one of the participating financial institutions at the discretion of both parties on terms that are negotiated between the supplier and the respective financial institution. Pursuant to their agreement with a financial institution, certain suppliers may elect to be paid early at their discretion. The key terms of the supplier invoice, including the amounts due and scheduled payment dates, are not impacted by its suppliers' decisions to sell their receivables under the programs. For the Company's supplier financing program obligations classified as accounts payable, the Company agrees to pay the financial institution on those sold invoices on the original invoice due date. The Company also maintains a supplier finance program whose obligations are classified as short-term debt based on an extension of payment terms past the original invoice due date. There are no assets pledged or other forms of guarantees associated with these programs. The Company or the financial institution may terminate the program upon at least 30 days' notice.

The outstanding payment obligations at December 31, 2024 and 2023 were $180 and $197, respectively. At December 31, 2024 and 2023, $162 and $170 are in Accounts Payable in the Consolidated Balance Sheets, while $18 and $27 are included in Short-term and current maturities of long-term debt in the Consolidated Financial Statements.

The following table sets forth the changes in Company's outstanding payment obligations by balance sheet location for the years ended December 31, 2024 and 2023.

| | Accounts Payable | Short-Term Debt | Total |
|---|---|---|---|
| **Balance at January 1, 2023** | $ 164 | $ 18 | $ 182 |
| Invoices confirmed during the year | 471 | 96 | 567 |
| Confirmed invoices paid during the year | (465 ) | (87 ) | (552 ) |
| **Balance at December 31, 2023** | 170 | 27 | 197 |
| Invoices confirmed during the year | 450 | 93 | 543 |
| Confirmed invoices paid during the year | (458 ) | (102 ) | (560 ) |
| **Balance at December 31, 2024** | $ 162 | $ 18 | $ 180 |

## Note 19. Other Accrued Liabilities

The following table sets forth the components of the Company's other accrued liabilities at December 31, 2024 and 2023.

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Accrued litigation (1) | $ 112 | $ 713 |
| Asset retirement obligations (2) | 8 | 18 |
| Income taxes | 22 | 28 |
| Customer rebates | 70 | 78 |
| Accrued interest | 18 | 18 |
| Operating lease liabilities (3) | 53 | 55 |
| Miscellaneous (4) | 110 | 148 |
| **Total other accrued liabilities** | $ 393 | $ 1,058 |

(1)At December 31, 2024 and 2023, accrued litigation includes $68 for settlements with the State of Ohio and the State of Delaware. At December 31, 2024, accrued litigation also includes an accrual related to the Ohio MDL of $14. At December 31, 2023, accrued litigation also includes $592 for the United States Public Water System Settlement. Refer to "Note 22 – Commitments and Contingent Liabilities" for further details.

(2)Represents the current portion of asset retirement obligations (see "Note 22 – Commitments and Contingent Liabilities").

(3)Represents the current portion of operating lease liabilities (see "Note 14 – Leases").

(4)Miscellaneous primarily includes accruals related to utility expenses, property taxes, a workers compensation indemnification liability and other miscellaneous expenses.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

## Note 20. Debt

The following table sets forth the components of the Company's debt at December 31, 2024 and 2023.

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Senior secured term loans: | | |
| Tranche B-3 U.S. dollar term loan due August 2028 | $ 1,056 | $ 1,067 |
| Tranche B-3 euro term loan due August 2028 (€415 at December 31, 2024 and €415 at December 31, 2023) | 432 | 457 |
| Senior unsecured notes: | | |
| 4.000% due May 2026 (€0 at December 31, 2024 and €441 at December 31, 2023) | — | 485 |
| 5.375% due May 2027 | 495 | 495 |
| 5.750% due November 2028 | 783 | 783 |
| 4.625% due November 2029 | 620 | 620 |
| 8.000% due January 2033 | 600 | — |
| Finance lease liabilities | 46 | 58 |
| Financing obligation (1) | 90 | 92 |
| Supplier financing obligation (2) | 18 | 27 |
| Other | 11 | — |
| **Total debt principal** | 4,151 | 4,084 |
| Less: Unamortized issue discounts | (19) | (25) |
| Less: Unamortized debt issuance costs | (24) | (21) |
| Less: Short-term and current maturities of long-term debt | (54) | (51) |
| **Long-term debt, net** | $ 4,054 | $ 3,987 |

(1)At December 31, 2024 and 2023, financing obligation relates to the financed portion of the Chemours Discovery Hub. Refer to "Note 14 – Leases" for further details.

(2)At December 31, 2024 and 2023, supplier financing obligation relates to a supplier financing program whose obligations, based on their characteristics, are classified within short-term debt and current maturities of long-term debt. Refer to "Note 18 – Accounts Payable" for further details.

### *Senior Secured Credit Facilities*

On August 18, 2023, the Company entered into an amendment and restatement credit agreement (the "Credit Agreement") that provides for a $900 senior secured revolving credit facility (the "Revolving Credit Facility") and five-year senior secured term loans (the "Senior Secured Term Loan Facility", collectively, the "Senior Secured Credit Facilities").

The Senior Secured Term Loan Facility provides for a Tranche B-3 class of term loans, denominated in U.S. dollars, in an aggregate principal amount of $1,070 (the "Dollar Term Loan") and a class of Tranche B-3 class term loans, denominated in euros, in an aggregate principal amount of €415 (the "Euro Term Loan") (collectively, the "Term Loans"). The Company received proceeds of $367, net of original issue discount and bank fees of $32. The proceeds of the Term Loans were primarily used to prepay, in full, all outstanding amounts under the previous April 2018 Credit Agreement, which amounted to $764 for the previous dollar term loan and €333 for the previous euro term loan, fees and expenses related therewith, and to fund the Water District Settlement Fund per the terms of the U.S. public water system Settlement Agreement pending final approval (see "Note 22 – Commitments and Contingent Liabilities"). Following the first amendment to the Credit Agreement, which was entered into on November 29, 2024, the Dollar Term Loan bears a variable interest rate equal to, at the election of the Company, adjusted Term SOFR plus 3.00%, subject to an adjusted SOFR floor of 0.50%, or adjusted base rate, plus 2.00%, subject to a base rate floor of 1.00%. Following the second amendment to the Credit Agreement, which was entered into on December 13, 2024, the Euro Term Loan bears a variable interest rate equal to adjusted Euro Interbank Offered Rate ("EURIBOR") plus 3.25%, subject to an adjusted EURIBOR floor of 0.0%. The Term Loans will mature on August 18, 2028, and are subject to acceleration in certain circumstances.

At December 31, 2024, the effective interest rates on the Dollar Term Loan and the Euro Term Loan were 7.4% and 6.1%, respectively. For the years ended December 31, 2024, 2023 and 2022, the Company made term loan repayments of $11, $9 and $13 on its Term Loans, respectively.

Borrowings made under the Revolving Credit Facility may be used for working capital and other general corporate purchases and other transactions not prohibited by the Credit Agreement. The Revolving Credit Facility bears a variable interest rate range based on the Company's total net leverage ratio, as defined in the Credit Agreement, between (i) a 0.25% and a 1.00% spread for adjusted base rate loans, and (ii) a 1.25% and a 2.00% spread for SOFR and EURIBOR loans. In addition, the Company is required to pay a commitment fee on the average daily unused amount of the Revolving Credit Facility within an interest rate range based on its total net leverage ratio, between 0.10% and 0.25%. At December 31, 2024, commitment fees on the Revolving Credit Facility were assessed at a rate of 0.25% per annum. The Revolving Credit Facility will mature on October 7, 2026, subject to acceleration in certain circumstances. There were no borrowings under the Revolving Credit Facility at December 31, 2024 and 2023. Issued and outstanding letters of credit under the Revolving Credit Facility amounted to $56 and $48 at December 31, 2024 and 2023, respectively.

Under the Credit Agreement, solely with respect to the Revolving Credit Facility, the Company is required to not exceed a maximum senior secured net leverage ratio of 2.00 to 1.00 in any period of four consecutive fiscal quarters through the date of maturity. In addition, the Term Loans contain customary affirmative and negative covenants that, among other things, limit or restrict the Company's and its subsidiaries' ability, subject to certain exceptions, to incur additional indebtedness or liens, pay dividends, and engage in certain transactions, including mergers, acquisitions, asset sales, or investments, outside of specified carve-outs. The Credit Agreement also contains customary representations and warranties and events of default.

The obligations under the Senior Secured Credit Facilities are guaranteed on a senior secured basis by all of the Company's material, wholly-owned domestic subsidiaries, subject to certain agreed upon exceptions. The obligations under the Senior Secured Credit Facilities are also, subject to certain agreed upon exceptions, secured by a first priority lien on substantially all of the Company's assets and substantially all of the assets of the Company's material, wholly-owned domestic subsidiaries, including 100% of the stock of certain of the Company's domestic subsidiaries and 65% of the stock of certain of the Company's foreign subsidiaries.

***Senior Unsecured Notes***

*Senior Unsecured Notes Due May 2026*

On June 6, 2018, the Company issued an aggregate principal amount of €450 4.000% senior unsecured notes due May 2026, denominated in euros (the "2026 Euro Notes"). The 2026 Euro Notes required payment of principal at maturity and payments of interest semi-annually in cash and in arrears on May 15 and November 15 of each year. The net proceeds from the 2026 Euro Notes, together with cash on hand, were used to purchase or redeem, as the case may be, the previously outstanding euro notes due May 2023 and a $250 aggregate principal amount of the 6.625% senior unsecured notes due May 2023, denominated in U.S. dollars (the "2023 Dollar Notes") pursuant to a tender offer and the redemption, as well as pay for any fees and expenses in connection therewith. The Company purchased or redeemed, as applicable, all of its outstanding 2026 Euro Notes of €441 during the year ended December 31, 2024.

*Senior Unsecured Notes Due May 2027*

On May 23, 2017, the Company issued a $500 aggregate principal amount of 5.375% senior unsecured notes due May 2027 (the "2027 Notes"). The 2027 Notes require payment of principal at maturity and interest semi-annually in cash and in arrears on May 15 and November 15 of each year. The Company received proceeds of $489, net of an original issue discount of $5 and underwriting fees and other related expenses of $6, which are deferred and amortized to interest expense using the effective interest method over the term of the 2027 Notes. A portion of the net proceeds from the 2027 Notes was used to pay the $335 of the First MDL Settlement, as discussed in "Note 22 – Commitments and Contingent Liabilities". The remaining proceeds from the 2027 Notes were available for general corporate purposes.

The 2027 Notes are fully and unconditionally guaranteed, jointly and severally, on a senior unsecured unsubordinated basis by each of the Company's existing and future direct and indirect domestic restricted subsidiaries that (i) incurs or guarantees indebtedness under the Senior Secured Credit Facilities, or (ii) guarantees certain other indebtedness of the Company or any guarantor in an aggregate principal amount in excess of $100. The guarantees of the 2027 Notes will rank equally with all other senior indebtedness of the guarantors. The 2027 Notes rank equally in right of payment to all of the Company's existing and future unsecured unsubordinated debt and are senior in right of payment to all of its existing and future debt that is by its terms expressly subordinated in right of payment to the 2027 Notes. The 2027 Notes are subordinated to indebtedness under the Senior Secured Credit Facilities, as well as any future secured debt to the extent of the value of the assets securing such debt, and structurally subordinated to the liabilities of any non-guarantor subsidiaries.

Pursuant to the terms of the indenture governing the 2027 Notes, the Company is obligated to offer to purchase the 2027 Notes at a price of 101% of the principal amount, together with accrued and unpaid interest, if any, up to, but not including, the date of purchase, upon the occurrence of certain change of control events. The Company may redeem the 2027 Notes, in whole or in part, at an amount equal to 100% of the aggregate principal amount plus a specified “make-whole” premium and accrued and unpaid interest, if any, to the date of purchase prior to February 15, 2027. The Company may also redeem some or all of the 2027 Notes by means other than a redemption, including tender offer and open market repurchases.

*Senior Unsecured Notes Due November 2028*

On November 27, 2020, the Company issued an $800 aggregate principal amount of 5.750% senior unsecured notes due November 2028 (the “2028 Notes”) in an offering that was exempt from the registration requirements of the Securities Act. The 2028 Notes require payment of principal at maturity and interest semi-annually in cash and in arrears on May 15 and November 15 of each year. The Company received proceeds of $790, net of underwriting fees and other related expenses of $10, which are deferred and amortized to interest expense using the effective interest method over the term of the 2028 Notes. The net proceeds from the 2028 Notes were used, together with cash on hand, to purchase or redeem, as applicable, the remaining $908 aggregate principal amount of the 2023 Dollar Notes.

The 2028 Notes are fully and unconditionally guaranteed, jointly and severally, on a senior unsecured unsubordinated basis by each of the Company’s existing and future direct and indirect domestic restricted subsidiaries that (i) incurs or guarantees indebtedness under the Senior Secured Credit Facilities, or (ii) guarantees certain other indebtedness of the Company or any guarantor in an aggregate principal amount in excess of $100. The guarantees of the 2028 Notes will rank equally with all other senior indebtedness of the guarantors. The 2028 Notes rank equally in right of payment to all of the Company’s existing and future unsecured unsubordinated debt and are senior in right of payment to all of its existing and future debt that is by its terms expressly subordinated in right of payment to the 2028 Notes. The 2028 Notes are subordinated to indebtedness under the Senior Secured Credit Facilities, as well as any future secured debt to the extent of the value of the assets securing such debt, and structurally subordinated to the liabilities of any non-guarantor subsidiaries.

Pursuant to the terms of the indenture governing the 2028 Notes, the Company is obligated to offer to purchase the 2028 Notes at a price of 101% of the principal amount, together with accrued and unpaid interest, if any, up to, but not including, the date of purchase, upon the occurrence of certain change of control events. Prior to November 15, 2023, the Company may redeem the 2028 Notes (i) in whole or in part, at an amount equal to 100% of the aggregate principal amount plus a specified “make-whole” premium and accrued and unpaid interest, if any, to the date of purchase, and (ii) on one or more occasions, up to 35% of the aggregate principal amount of the notes, with the net cash proceeds of one or more equity offerings at a price equal to 105.750% of the principal amounts of such notes, plus accrued and unpaid interest, if any, up to, but excluding, the redemption date. On or after November 15, 2023, the Company may redeem the 2028 Notes at specified redemption prices. The Company may also redeem some or all of the 2028 Notes by means other than a redemption, including tender offer and open market repurchases.

*Senior Unsecured Notes Due November 2029*

On August 18, 2021, the Company issued a $650 aggregate principal amount of 4.625% senior unsecured notes due November 2029 (the “2029 Notes”) in an offering that was exempt from the registration requirements of the Securities Act. The 2029 Notes require payment of principal at maturity and interest semi-annually in cash and in arrears on May 15 and November 15 of each year. The Company received proceeds of $642, net of underwriting fees and other related expenses of $8, which are deferred and amortized to interest expense using the effective interest method over the term of the 2029 Notes. The net proceeds from the 2029 Notes were used, together with cash on hand, to purchase or redeem, as applicable, the $750 aggregate principal of the 7.000% senior unsecured notes due May 2025 (the "2025 Notes").

The 2029 Notes are fully and unconditionally guaranteed, jointly and severally, on a senior unsecured unsubordinated basis by each of the Company’s existing and future direct and indirect domestic restricted subsidiaries that (i) incurs or guarantees indebtedness under the Senior Secured Credit Facilities, or (ii) guarantees certain other indebtedness of the Company or any guarantor in an aggregate principal amount in excess of $100. The guarantees of the 2029 Notes will rank equally with all other senior indebtedness of the guarantors. The 2029 Notes rank equally in right of payment to all of the Company’s existing and future unsecured unsubordinated debt and are senior in right of payment to all of its existing and future debt that is by its terms expressly subordinated in right of payment to the 2029 Notes. The 2029 Notes are subordinated to indebtedness under the Senior Secured Credit Facilities, as well as any future secured debt to the extent of the value of the assets securing such debt, and structurally subordinated to the liabilities of any non-guarantor subsidiaries.

Pursuant to the terms of the indenture governing the 2029 Notes, the Company is obligated to offer to purchase the 2029 Notes at a price of 101% of the principal amount, together with accrued and unpaid interest, if any, up to, but not including, the date of purchase, upon the occurrence of certain change of control events. Prior to November 15, 2024, the Company may redeem the 2029 Notes (i) in whole or in part, at an amount equal to 100% of the aggregate principal amount plus a specified "make-whole" premium and accrued and unpaid interest, if any, up to, but excluding the redemption date, and (ii) on one or more occasions, up to 35% of the aggregate principal amount of the notes, with the net cash proceeds of one or more equity offerings at a price equal to 104.625% of the principal amounts of such notes, plus accrued and unpaid interest, if any, up to, but excluding, the redemption date. On or after November 15, 2024, the Company may redeem the 2029 Notes at specified redemption prices. The Company may also redeem some or all of the 2029 Notes by means other than a redemption, including tender offer and open market repurchases.

*Senior Unsecured Notes Due January 2033*

On November 27, 2024, the Company issued a $600 aggregate principal amount of 8.000% senior unsecured notes due January 2033 (the "2033 Notes") in an offering that was exempt from the registration requirements of the Securities Act. The Company received proceeds of $591, net of underwriting fees and other related expenses of $9, which are deferred and amortized to interest expense using the effective interest method over the term of the 2033 Notes. The net proceeds from the 2033 Notes were used in part to purchase or redeem, as applicable, the €441 aggregate principal of the 2026 Euro Notes. The remaining proceeds from the 2033 Notes are available for general corporate purposes.

The 2033 Notes are fully and unconditionally guaranteed, jointly and severally, on a senior unsecured unsubordinated basis by each of the Company's existing and future direct and indirect domestic restricted subsidiaries that (i) incurs or guarantees indebtedness under the Senior Secured Credit Facilities, or (ii) guarantees certain other indebtedness of the Company or any guarantor in an aggregate principal amount in excess of $150. The guarantees of the 2033 Notes will rank equally with all other senior indebtedness of the guarantors. The 2033 Notes rank equally in right of payment to all of the Company's existing and future unsecured unsubordinated debt and are senior in right of payment to all of its existing and future debt that is by its terms expressly subordinated in right of payment to the 2033 Notes. The 2033 Notes are subordinated to indebtedness under the Senior Secured Credit Facilities, as well as any future secured debt to the extent of the value of the assets securing such debt, and structurally subordinated to the liabilities of any non-guarantor subsidiaries.

Pursuant to the terms of the indenture governing the 2033 Notes, the Company is obligated to offer to purchase the 2033 Notes at a price of 101% of the principal amount, together with accrued and unpaid interest, if any, up to, but not including, the date of purchase, upon the occurrence of certain change of control events. Prior to January 15, 2028, the Company may redeem the 2033 Notes (i) in whole or in part, at an amount equal to 100% of the aggregate principal amount plus a specified "make-whole" premium and accrued and unpaid interest, if any, up to, but excluding the redemption date, and (ii) on one or more occasions, up to 40% of the aggregate principal amount of the notes, with the net cash proceeds of one or more equity offerings at a price equal to 108% of the principal amounts of such notes, plus accrued and unpaid interest, if any, up to, but excluding, the redemption date. On or after January 15, 2028, the Company may redeem the 2033 Notes at specified redemption prices. The Company may also redeem some or all of the 2033 Notes by means other than a redemption, including tender offer and open market repurchases.

*Note Repurchases*

During the year ended December 31, 2022, the Company repurchased through open market transactions, an aggregate principal of $62 of its senior unsecured notes for cash payment of $54. The Company recorded a gain of $7 in "(Loss) gain on extinguishment of debt" in the consolidated statements of operations, net of $1 in charges related to the write-off of deferred financing costs associated with the extinguished debt.

***Accounts Receivable Securitization Facility***

The Company, through a wholly-owned special purpose entity ("SPE"), executed an agreement with a bank for an accounts receivable securitization facility ("Securitization Facility") for the purpose of enhancing the Company's liquidity (the "Receivables Purchase Agreement"), as amended from time to time. Under the Securitization Facility, certain of the Company's subsidiaries sell their accounts receivable to the SPE, which is a non-guarantor subsidiary. In turn, the SPE may transfer undivided ownership interests in such receivables to the bank in exchange for cash. The bank has a first priority security interest in all receivables held by the SPE, and the SPE has not granted a security interest to anyone else. Pursuant to the Receivables Purchase Agreement, as amended, the Company no longer maintains effective control over the transferred receivables, and therefore accounts for these transfers as sales of receivables. Under the Securitization Facility, prior to March 2023, the SPE may sell at any time certain receivables and request investments and letter of credit up to a total of $150 until the earlier of March 6, 2024 or another event that constitutes a "Termination Date" under the Receivables Purchase Agreement, as amended.

On March 23, 2023, the Company, through the SPE, amended its Receivables Purchase Agreement to, among other things, increase the facility limit under the arrangement from $150 to $175, replace the interest rate benchmark from LIBOR to SOFR, add a conduit purchaser, and extend the term of the Receivables Purchase Agreement, such that the SPE may sell certain receivables and request investments and letter of credit until the earlier of March 31, 2025 or another event that constitutes a "Termination Date" under the Receivables Purchase Agreement.

Cash received from collections of sold receivables is used to fund additional purchases of receivables at 100% of face value on a revolving basis, not to exceed the facility limit, which is the aggregate purchase limit. For the years ended December 31, 2024 and 2023, the Company received $1,436 and $1,448, respectively, of cash collections on receivables sold under the Receivables Purchase Agreement, following which it sold and derecognized $1,425 and $1,433 respectively, of incremental accounts receivable. The Company maintains continuing involvement as it acts as the servicer for the sold receivables and guarantees payment to the bank. As collateral against the sold receivables, the SPE maintains a certain level of unsold receivables, which amounted to $112 and $87 at December 31, 2024 and 2023, respectively. During each of the years ended December 31, 2024, 2023 and 2022, the Company incurred $3 of fees associated with the Securitization Facility. Costs associated with the sales of receivables are reflected in the Company's consolidated statements of operations for the periods in which the sales occur.

**Other**

During the year ended December 31, 2024, the Company entered into a financing arrangement, by which an external financing company funded certain of the Company's annual insurance premiums for $21. During the year ended December 31, 2024, the Company made principal payments of $10 to the financing company, and the remaining $11 is to be repaid within the next twelve months.

***Maturities***

The following table sets forth the Company's debt principal maturities for the next five years and thereafter.

| | Senior Debt | Finance Lease Liabilities | Financing Obligation | Supplier Financing Obligation | Other | Total |
|---|---|---|---|---|---|---|
| 2025 | $ 11 | $ 16 | $ 7 | $ 18 | $ 11 | $ 63 |
| 2026 | 11 | 11 | 7 | — | — | 29 |
| 2027 | 505 | 9 | 7 | — | — | 521 |
| 2028 | 2,239 | 9 | 7 | — | — | 2,255 |
| 2029 | 620 | 4 | 7 | — | — | 631 |
| Thereafter | 600 | 3 | 122 | — | — | 725 |
| Total payments | 3,986 | 52 | 157 | 18 | 11 | 4,224 |
| Less: Imputed interest | — | (6) | (67) | — | — | (73) |
| **Total principal maturities on debt** | $ 3,986 | $ 46 | $ 90 | $ 18 | $ 11 | $ 4,151 |

The Company has required quarterly principal payments related to the Dollar Term Loan equivalent to 1.00% per annum through June 2028, with the balance due at maturity. Also, on an annual basis, the Company is required to make additional principal payments depending on leverage levels, as defined in the Credit Agreement, equivalent to up to 50% of excess cash flows based on certain leverage targets with step-downs to 25% and 0% as actual leverage decreases to below a 3.50 to 1.00 leverage target. The Company was not required to make additional principal payments in 2024.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

***Debt Fair Value***

The following table sets forth the estimated fair values of the Company's senior debt issues, which are based on quotes received from third-party brokers, and are classified as Level 2 financial instruments in the fair value hierarchy.

| | December 31, 2024 | | December 31, 2023 | |
|---|---|---|---|---|
| | Carrying Value | Fair Value | Carrying Value | Fair Value |
| Senior secured term loans: | | | | |
| Tranche B-3 U.S. dollar term loan due August 2028 | $ 1,056 | $ 1,065 | $ 1,067 | $ 1,068 |
| Tranche B-3 euro term loan due August 2028 (€415 at December 31, 2024 and €415 at December 31, 2023) | 432 | 439 | 457 | 451 |
| Senior unsecured notes: | | | | |
| 4.000% due May 2026 (€0 at December 31, 2024 and €441 at December 31, 2023) | — | — | 485 | 480 |
| 5.375% due May 2027 | 495 | 477 | 495 | 485 |
| 5.750% due November 2028 | 783 | 728 | 783 | 745 |
| 4.625% due November 2029 | 620 | 538 | 620 | 547 |
| 8.000% due January 2033 | 600 | 587 | — | — |
| **Total senior debt principal** | 3,986 | $ 3,834 | 3,907 | $ 3,776 |
| Less: Unamortized issue discounts | (19) | | (25) | |
| Less: Unamortized debt issuance costs | (24) | | (21) | |
| **Total senior debt, net** | $ 3,943 | | $ 3,861 | |

## Note 21. Other Liabilities

The following table sets forth the components of the Company's other liabilities at December 31, 2024 and 2023.

| | December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Employee-related costs (1) | $ 65 | $ 75 |
| Accrued litigation (2) | 96 | 73 |
| Asset retirement obligations (2) | 93 | 67 |
| Miscellaneous (3) | 114 | 113 |
| **Total other liabilities** | $ 368 | $ 328 |

(1)Employee-related costs primarily represents liabilities associated with the Company's long-term employee benefit plans.

(2)Represents the long-term portions of accrued litigation and asset retirement obligations (see "Note 22 – Commitments and Contingent Liabilities").

(3)Miscellaneous primarily includes accrued indemnification liabilities of $25 and $30 at December 31, 2024 and 2023, respectively. Miscellaneous also includes long-term income tax liabilities from uncertain tax positions at December 31, 2024 and 2023 (see "Note 9 – Income Taxes").

## Note 22. Commitments and Contingent Liabilities

### *Asset Retirement Obligations*

Chemours has recorded asset retirement obligations, which are primarily related to closure, reclamation, and removal for mining operations relative to the extraction of titanium ore and other saleable minerals in the Titanium Technologies segment; and cap, cover, and post-closure maintenance of landfills in all segments.

The following table sets forth the activity in the Company's asset retirement obligations for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| **Balance at January 1,** | $ 85 | $ 83 | $ 76 |
| Increase in estimated cash outflows | 24 | 1 | 2 |
| Accretion expense | (6) | 3 | 10 |
| Settlements and payments | (2) | (2) | (5) |
| **Balance at December 31,** | $ 101 | $ 85 | $ 83 |
| | | | |
| Current portion | $ 8 | $ 18 | $ 10 |
| Non-current portion | 93 | 67 | 73 |

### *Litigation Overview*

The Company and certain of its subsidiaries, from time to time, are subject to various lawsuits, claims, assessments, government investigations, regulatory proceedings and other legal proceedings with respect to product liability, intellectual property, personal injury, commercial, contractual, employment, regulatory, environmental, anti-trust, and other such matters that arise in the ordinary course of business in multiple jurisdictions. Any determination in such a proceeding that the Company's operations or activities are not, or were not, in compliance with applicable laws or regulations could result in the imposition of fines, civil or criminal penalties, and equitable remedies, including disgorgement, temporary or permanent suspension of operations or debarment or injunctive relief. In addition, Chemours, by virtue of its status as a subsidiary of EID prior to its separation on July 1, 2015 ("the Separation"), is subject to or required under the Separation-related agreements executed prior to the Separation to indemnify EID against various pending legal proceedings. The Company vigorously defends such lawsuits, claims, assessments, government investigations and other legal proceedings, whether raised against itself or under its indemnity obligation. Disputes between Chemours and EID may arise regarding indemnification matters, including disputes based on matters of law or contract interpretation. Should such disputes arise, they could materially adversely affect the Company.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

When making determinations about recording liabilities related to legal proceedings or unasserted claims that are probable of assertion, the Company complies with the requirements of ASC 450, *Contingencies*, and related guidance. If the potential loss from any claim or legal proceeding is considered probable and the amount can be reasonably estimated, the Company accrues a liability for the estimated loss. Where there is an estimated range of probable loss and an amount within the range of loss appears at the time to be a better estimate than any other amount within the range, the Company accrues a liability for that specific amount. When no amount within an estimated range of probable loss is a better estimate than any other amount, the Company accrues a liability for the minimum amount in the range. When a material loss contingency is reasonably possible, but not probable, the Company does not accrue a liability, but instead discloses the nature of the matter and an estimate of the loss or range of loss, to the extent such estimate can be made. Significant judgment is required in both the determination of probability and whether a loss or range of loss is reasonably estimable. The Company's judgments are subjective based on the status of the legal or regulatory proceedings, the merits of the Company's defenses and consultation with in-house and outside legal counsel. Because of substantial uncertainties related to these matters, accruals are based on the best information available each period, including, among others, mediation, settlement discussions or agreements. As a matter progresses, the Company may receive information, through plaintiff demands, through discovery, in the form of reports of purported experts, or in the context of settlement or mediation discussions that purport to quantify an amount of alleged damages, but with which the Company may not agree. Furthermore, settlement discussions are complex and often involve potential amounts, scope and terms, which can be monetary and non-monetary, that one or more parties may not consider reasonable under the circumstances or indicative of the merits or potential outcome of any court proceeding with respect to the underlying claims. Such information may or may not lead the Company to determine that it is able to make a reasonable estimate as to a probable loss or range of loss in connection with a matter. As additional information becomes available, the Company reassesses the potential liability related to pending claims and litigation and may revise its estimates accordingly. Due to the inherent uncertainties of the legal and regulatory process in the multiple jurisdictions in the United States and internationally, management's judgments may be materially different than the actual outcomes. The Company's ability to assess outcomes and make reasonable estimates of potential losses is further influenced by the fact that a resolution of one or more matters may impact the resolution of other similar matters in terms of timing, amount of liability, or both. Legal costs such as outside counsel fees and expenses are charged to expense in the period services are rendered.

Unless otherwise stated, the Company is unable to reasonably estimate the possible loss or a range of loss for the matters described below, potentially based on one or more of the following reasons: actual or potential plaintiffs have not claimed an amount of monetary damages or the amounts are unsupportable or exaggerated, the matters are in early stages, there is uncertainty as to the outcome of pending appeals or motions, there are significant factual issues to be resolved, the proceedings involve multiple defendants or potential defendants whose share of any potential responsibility has not been determined. Because litigation is subject to significant uncertainties, and adverse rulings, judgments or other outcomes could occur in the future, it is reasonably possible that the Company could incur losses substantially in excess of accrued liabilities or with respect to matters for which no liability has been accrued because losses are not currently probable and reasonably estimable.

Management believes the Company's accounting treatment and disclosure for the matters discussed below are appropriate based on the facts and circumstances for each matter, which are discussed in further detail below.

The following table sets forth the components of the Company's accrued litigation at December 31, 2024 and 2023.

| | December 31, | | | |
|---|---|---|---|---|
| | 2024 | | 2023 | |
| Asbestos | $ | 61 | $ | 39 |
| PFAS (1): | | | | |
| PFOA (2) | | 40 | | 26 |
| Other PFAS matters (3) | | 81 | | 712 |
| All other matters | | 26 | | 9 |
| **Total accrued litigation** | $ | 208 | $ | 786 |

(1)The Company is a named defendant and/or cost-sharing and defending DuPont, Corteva, and EID (together, the "DuPont Indemnitees") in litigation related to the production and use of per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acids and its salts, including the ammonium salt ("PFOA"); hexafluoropropylene oxide dimer acid ("HFPO Dimer Acid", sometimes referred to as "GenX" or "C3 Dimer Acid") and other compounds; and products that are manufactured or use such compounds, including Aqueous Film Forming Foam ("AFFF").

(2)PFOA includes matters under the "PFOA" section within this "Note 22 – Commitments and Contingent Liabilities".

(3)Other PFAS matters includes matters under the "PFAS" section within this "Note 22 – Commitments and Contingent Liabilities".

The following table sets forth the current and long-term components of the Company's accrued litigation and their balance sheet locations at December 31, 2024 and 2023.

| | Balance Sheet Location | December 31, 2024 | December 31, 2023 |
|---|---|---|---|
| Accrued Litigation: | | | |
| Current accrued litigation | Other accrued liabilities (Note 19) | $ 112 | $ 713 |
| Long-term accrued litigation | Other liabilities (Note 21) | 96 | 73 |
| **Total accrued litigation** | | $ 208 | $ 786 |

***Memorandum of Understanding (the "MOU") with DuPont, Corteva and EID***

In January 2021, Chemours, DuPont, Corteva, and EID, a subsidiary of Corteva, entered into a binding MOU, reflecting the parties' agreement to share potential future legacy liabilities relating to per- and polyfluoroalkyl substances ("PFAS") arising out of pre-July 1, 2015 conduct (i.e., "Indemnifiable Losses", as defined in the separation agreement, dated as of June 26, 2015, as amended, between EID and Chemours (the "Separation Agreement")) until the earlier to occur of: (i) December 31, 2040; (ii) the day on which the aggregate amount of Qualified Spend is equal to $4,000; or, (iii) a termination in accordance with the terms of the MOU (e.g., non-performance of the escrow funding requirements pursuant to the MOU by any party). As defined in the MOU, Qualified Spend includes:

- All Indemnifiable Losses (as defined in the Separation Agreement), including punitive damages, to the extent relating to, arising out of, by reason of, or otherwise in connection with PFAS Liabilities as defined in the MOU (including any mutually agreed-upon settlements);
- Any costs or amounts to abate, remediate, financially assure, defend, settle, or otherwise pay for all pre-July 1, 2015 PFAS Liabilities or exposure, regardless of when those liabilities are manifested; includes Natural Resources Damages claims associated with PFAS Liabilities;
- Fines and/or penalties from governmental agencies for legacy EID PFAS emissions or discharges prior to the spin-off; and,
- Site-Related GenX Claims as defined in the MOU.

The parties have agreed that, during the term of the cost-sharing arrangement, Chemours will bear half of the cost of such future potential legacy PFAS liabilities, and DuPont and Corteva will collectively bear the other half of the cost of such future potential legacy PFAS liabilities up to an aggregate $4,000, of which approximately $2,000 is available after consideration of the funding of the payment to the State of Ohio and supplemental payment to the State of Delaware. Any recoveries of Qualified Spend from DuPont and/or Corteva under the cost-sharing arrangement will be recognized as an offset to the Company's cost of goods sold or selling, general, and administrative expense, as applicable, when realizable. Any Qualified Spend incurred by DuPont and/or Corteva under the cost-sharing arrangement will be recognized in the Company's cost of goods sold or selling, general, and administrative expense, as applicable, when the amounts of such costs are probable and estimable or expensed as incurred with respect to period costs, such as legal expenses. During the years ended December 31, 2024 and 2023, the Company incurred expenditures subject to reimbursement of cost-sharing as Qualified Spend under the MOU of approximately $109 and $148, respectively, excluding litigation-related settlements. During the years ended December 31, 2024 and 2023, the Company received $47 and $88, respectively, of recovery from DuPont and Corteva.

After the term of this arrangement, Chemours' indemnification obligations under the Separation Agreement would continue unchanged, subject in each case to certain exceptions set out in the MOU. Pursuant to the terms of the MOU, the parties have agreed to release certain claims regarding Chemours' Delaware lawsuit and confidential arbitration (concerning the indemnification of specified liabilities that EID assigned to Chemours in its spin-off), including that Chemours has released any claim set forth in the complaint filed in the Delaware lawsuit, any other similar claims arising out of or resulting from the facts recited by Chemours in the complaint or the process and manner in which EID structured or conducted the spin-off, and any other claims that challenge the spin-off or the assumption of Chemours Liabilities (as defined in the Separation Agreement) by Chemours and the allocation thereof, subject in each case to certain exceptions set out in the MOU. The parties have further agreed not to bring any future, additional claims regarding the Separation Agreement or the MOU outside of arbitration.

As part of the MOU, the parties established an escrow account to support and manage the payments for potential future PFAS liabilities. The MOU provides that: (i) no later than each of September 30, 2021 and September 30, 2022, Chemours shall deposit $100 into an escrow account and DuPont and Corteva shall together deposit $100 in the aggregate into an escrow account, and (ii) no later than September 30 of each subsequent year through and including 2028, Chemours shall deposit $50 into an escrow account and DuPont and Corteva shall together deposit $50 in the aggregate into an escrow account. Subject to the terms and conditions set forth in the MOU, each party may be permitted to defer funding in any year. Additionally, if on December 31, 2028, the balance of the escrow account (including interest) is less than $700, Chemours will make 50% of the deposits and DuPont and Corteva together will make 50% of the deposits necessary to restore the balance of the escrow account to $700. Such payments will be made in a series of five consecutive annual equal installments commencing on September 30, 2029 pursuant to the escrow account replenishment terms as set forth in the MOU. Any funds that remain in escrow at termination of the MOU will revert to the party that deposited them. As such, future payments made by the Company into the escrow account will remain an asset of Chemours, and such payments will be reflected as a transfer to restricted cash and restricted cash equivalents on its consolidated balance sheets. As per the terms of the MOU, the Company deposited $100 into the escrow account in September 2022 and in 2021, which was recognized as restricted cash and restricted cash equivalents on its consolidated balance sheets at December 31, 2023. No withdrawals are permitted from the escrow account before January 2026, except for funding mutually agreed-upon third-party settlements in excess of $125. Starting in January 2026, withdrawals may be made from the escrow account to fund Qualified Spend if the parties' aggregate Qualified Spend in that particular year is greater than $200. Starting in January 2031, the amounts in the escrow account can be used to fund any Qualified Spend. Future payments from the escrow account for potential future PFAS liabilities will be reflected on the Company's consolidated statement of cash flows at that point in time. During 2023, $209 was drawn by Chemours from the escrow account to fund a portion of the U.S public water system class action suit settlement, which remained in escrow in a qualified settlement and is recognized as restricted cash and restricted cash equivalents on the Company's consolidated balance sheets at December 31, 2023. With the Effective date of such settlement being reached, Chemours no longer maintains its reversionary interest to the underlying restricted funds within the Water District Settlement Fund and, as such, the restricted cash and cash equivalents and the associated accrued liabilities were derecognized in the second quarter of 2024. Further discussion related to the U.S public water system class action suit settlement is included under the heading "*United States Public Water System Class Action Suit Settlement and Related Opt-Outs*" within this "Note 22 – Commitments and Contingent Liabilities".

In September 2023, the parties entered into a supplemental agreement to the MOU, whereby the parties agreed to (i) release the funds held in escrow to fund, in part, the Water District Settlement Fund (discussed further below), (ii) waive the escrow funding obligation of each party due no later than September 30, 2023, and (iii) with respect to the escrow funding obligation due no later than September 30, 2024, waive the obligation of each of the parties under certain conditions as agreed to by the parties. The parties agreed to fund the payments due by September 30, 2024, and the Company funded $50 into the escrow account on September 30, 2024. As such, at December 31, 2024 and December 31, 2023, the Company had $50 and $0 deposited into the escrow account, respectively, which is recognized as restricted cash and restricted cash equivalents on its consolidated balance sheets.

The parties have also sought insurance coverage for certain claims relating to PFAS matters, including claims in the AFFF MDL. In July 2024, a $45 settlement agreement was reached amongst the parties with one of the insurance carriers. Per agreement with the parties, the Company will receive approximately $23 of the settlement as it will be allocated amongst the parties in accordance with the percentage contribution in the Public Water System Class Action Settlement. Accordingly, during the year ended December 31, 2024, the Company recognized a $23 gain within selling, general, and administrative expense in the Consolidated Statements of Operations.

The parties will cooperate in good faith to enter into additional agreements reflecting the terms set forth in the MOU.

***Asbestos***

In the Separation, EID assigned its asbestos docket to Chemours. At both December 31, 2024 and 2023, there were approximately 800 lawsuits pending against EID alleging personal injury from exposure to asbestos, respectively. These cases are pending in state and federal court in numerous jurisdictions in the U.S. and are individually set for trial. A small number of cases are pending outside of the U.S. Most of the actions were brought by contractors who worked at sites between the 1950s and the 1990s. A small number of cases involve similar allegations by EID employees or household members of contractors or EID employees. Finally, certain lawsuits allege personal injury as a result of exposure to EID products.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

With limited exception, the Company previously rejected EID's demand for indemnity and defense of asbestos and product liability matters arising from an EID subsidiary, Sporting Goods Properties, Inc., ("SGPI"). EID brought an arbitration proceeding on this issue and in November 2024, the Company and EID reached an agreement in principle and adjourned the arbitration. We expect to finalize the settlement agreement in the first quarter of 2025. Per the terms of the agreement in principle, the Company will assume approximately 20 current SGPI asbestos cases as well as all future SGPI asbestos and product liability claims. The agreement in principle also includes that the Company is entitled to insurance recoveries where applicable under certain existing insurance policies as well as potential cost sharing between the parties for certain cases.

At December 31, 2024 and 2023, Chemours had accruals of $61 and $39 related to these matters, respectively. Asbestos reserves recorded include estimated losses for current claims as well as an estimate of losses for future claims, except for the SGPI asbestos and product liability claims. Because of the limited history of SGPI asbestos and product liability claims, the Company has concluded that it is not able to reasonably estimate probable losses for future claims for these matters at this time.

***Benzene***

In the Separation, EID assigned its benzene docket to Chemours. At December 31, 2024 and 2023, there were 22 and 20 cases pending, respectively, against EID alleging benzene-related illnesses, respectively. These cases consist of premises matters involving contractors and deceased former employees who claim exposure to benzene while working at EID sites primarily in the 1960s through the 1980s, and product liability claims based on alleged exposure to benzene found in trace amounts in aromatic hydrocarbon solvents used to manufacture EID products such as paints, thinners, and reducers.

Management believes that a loss is reasonably possible as to the docket as a whole; however, given the evaluation of each benzene matter is highly fact-driven and impacted by disease, exposure, and other factors, a range of such losses cannot be reasonably estimated at this time.

In May 2021, the Company and EID filed suit in Delaware state court against multiple insurance companies for breach of their contractual obligations to indemnify Chemours and EID against liabilities, costs and losses relating to benzene litigation which are covered under liability insurance policies purchased by EID during the period 1967 to 1986. EID and Chemours are seeking payment of all costs and settlement amounts for past and future benzene cases falling under those policies. The outcome of this matter is not expected to have a material impact on Chemours' results of operations or financial position. Over the course of the litigation, settlements have been negotiated with all of the insurers and Chemours and EIDP established a joint escrow account. In December 2024, Chemours and EIDP agreed to a 50/50 distribution of then-available escrow account funds with Chemours receiving $20, representing a release of previously recorded restricted cash.

***PFOA***

Chemours does not, and has never, used "PFOA" (collectively, perfluorooctanoic acids and its salts, including the ammonium salt) as a polymerization aid nor sold it as a commercial product. Prior to the Separation, the performance chemicals segment of EID made PFOA at its Fayetteville Works site in Fayetteville, North Carolina ("Fayetteville") and used PFOA as a polymerization aid in the manufacture of fluoropolymers and fluoroelastomers at certain sites, including: Washington Works, Parkersburg, West Virginia; Chambers Works, Deepwater, New Jersey ("Chambers Works"); Dordrecht Works, Netherlands; Changshu Works, China; and, Shimizu, Japan. These sites are now owned and/or operated by Chemours.

At December 31, 2024 and 2023, Chemours maintained an accrual of $40 and $26, respectively, related to PFOA matters under the Leach Settlement (discussed below), EID's obligations under agreements with the U.S. Environmental Protection Agency (the "EPA"), and voluntary commitments to the New Jersey Department of Environmental Protection (the "NJ DEP"). These obligations and voluntary commitments include surveying, sampling, and testing drinking water in and around certain Company sites, and offering treatment or an alternative supply of drinking water if tests indicate the presence of PFOA in drinking water at or greater than the applicable levels. The Company will continue to work with EPA, NJ DEP and other authorities regarding the extent of work that may be required with respect to these matters.

*Leach Settlement*

In 2004, EID settled a class action captioned *Leach v. DuPont*, filed in West Virginia state court, alleging that approximately 80,000 residents living near the Washington Works facility had suffered, or may suffer, deleterious health effects from exposure to PFOA in drinking water. Among the settlement terms, EID funded a series of health studies by an independent science panel of experts ("C8 Science Panel") to evaluate available scientific evidence on whether any probable link exists, as defined in the settlement agreement, between exposure to PFOA and disease.

The C8 Science Panel found probable links, as defined in the settlement agreement, between exposure to PFOA and pregnancy-induced hypertension, including preeclampsia, kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, and diagnosed high cholesterol. Under the terms of the settlement, EID is obligated to fund up to $235 for a medical monitoring program for eligible class members and pay the administrative costs associated with the program, including class counsel fees. The court-appointed Director of Medical Monitoring implemented the program, and testing is ongoing with associated payments to service providers disbursed from an escrow account which the Company replenishes pursuant to the settlement agreement. Through December 31, 2024, approximately $2 has been disbursed from escrow related to medical monitoring. While it is reasonably possible that the Company will incur additional costs related to the medical monitoring program, such costs cannot be reasonably estimated due to uncertainties surrounding the level of participation by eligible class members and the scope of testing.

In addition, under the Leach settlement agreement, EID must continue to provide water treatment designed to reduce the level of PFOA in water to six area water districts and private well users. At Separation, this obligation was assigned to Chemours, and is included in the $40 and $26 accrued at December 31, 2024 and 2023, respectively.

*PFOA Leach Class Personal Injury*

Further, under the Leach settlement, class members may pursue personal injury claims against EID only for those diseases for which the C8 Science Panel determined a probable link exists. Approximately 3,500 lawsuits were subsequently filed in various federal and state courts in Ohio and West Virginia and consolidated in multi-district litigation ("MDL") in Ohio federal court. These were resolved in March 2017 when EID entered into an agreement settling all MDL cases and claims, including all filed and unfiled personal injury cases and claims that were part of the plaintiffs' counsel's claims inventory, as well as cases tried to a jury verdict (the "First MDL Settlement") for $670.7 in cash, with half paid by Chemours, and half paid by EID.

Concurrently with the First MDL Settlement, EID and Chemours agreed to a limited sharing of potential future PFOA costs (i.e. "Indemnifiable Losses", as defined in the Separation Agreement between EID and Chemours) for a period of five years. The cost-sharing agreement entered concurrently with the First MDL Settlement has been superseded by the binding MOU addressing certain PFAS matters and costs. For more information on this matter refer to "Memorandum of Understanding (the "MOU") with DuPont, Corteva and EID" within this "Note 22 – Commitments and Contingent Liabilities".

While all MDL lawsuits were dismissed or resolved through the First MDL Settlement, the First MDL Settlement did not resolve PFOA personal injury claims of plaintiffs who did not have cases or claims in the MDL or personal injury claims based on diseases first diagnosed after February 11, 2017. Approximately 96 plaintiffs filed matters after the First MDL Settlement. In January 2021, EID and Chemours entered into settlement agreements with counsel representing these plaintiffs, providing for a settlement of all but one of the 96 then filed and pending cases, as well as additional pre-suit claims, under which those cases and claims of settling plaintiffs were resolved for approximately $83 (the "Second MDL Settlement"). Chemours contributed approximately $29, and DuPont and Corteva each contributed approximately $27 to the Second MDL Settlement.

The single matter not included in the Second MDL Settlement was a testicular cancer case tried in March 2020 to a verdict of $40 in compensatory and emotional distress damages and $10 in loss of consortium damages. The jury found that EID's conduct did not warrant punitive damages. In March 2021, the trial court issued post-trial rulings which reduced the consortium damages to $0.25. The Company paid its share from the verdict in this matter in November 2023 after all of EID's appeals process from United States Court of Appeals to the United States Supreme Court were denied.

In December 2022, the Judicial Panel on Multi-District Litigation (JPML) declined to close the Ohio MDL. As of December 31, 2024, 45 plaintiffs purporting to be Leach class members have filed personal injury cases. Trial was scheduled to start in September 2024 for two plaintiffs, with a second trial scheduled to start in March 2025 for two plaintiffs. Prior to the start of the first trial in September, EID and Chemours entered into an agreement in principle with counsel representing MDL plaintiffs providing for settlement for all filed and pending cases in the MDL as well as additional pre-suit claims, under which those cases and claims of settling plaintiffs would be resolved and the MDL closed for $58.5, with Chemours contributing $29.25 and DuPont and Corteva contributing together contributing $29.25. The parties finalized and executed the term sheet as of November 13, 2024 on terms consistent with the above-referenced agreement in principle. In December 2024, the plaintiffs filed an unopposed motion to terminate the MDL. In February 2025, the court entered an order granting the motion and suggesting dissolution of the MDL to the JPML. In December 2024, the first payment under the term sheet became payable and Chemours paid its share of $14.75. Chemours expects its share of the final payment of $14.5 will become payable under the term sheet in 2025.

***PFAS***

EID and Chemours have received governmental and regulatory inquiries and have been named in other litigations, including class actions, brought by individuals, municipalities, businesses, and water districts alleging exposure to and/or contamination from PFAS, including PFOA. Many actions include an allegation of fraudulent transfer in the spin-off that created Chemours. Chemours has declined EID's requests for indemnity for fraudulent transfer claims.

Chemours has responded to letters and inquiries from governmental law enforcement entities regarding PFAS, including in January 2020, a letter informing it that the U.S. Department of Justice, Consumer Protection Branch, and the United States Attorney's Office for the Eastern District of Pennsylvania are considering whether to open a criminal investigation under the Federal Food, Drug, and Cosmetic Act and asking that it retain its documents regarding PFAS and food contact applications. In July 2020, Chemours received a grand jury subpoena for documents. The Company is presently unable to predict the duration, scope, or result of any potential governmental, criminal, or civil proceeding that may result, the imposition of fines and penalties, and/or other remedies. The Company is also unable to develop a reasonable estimate of a possible loss or range of losses, if any.

*Fayetteville Works, Fayetteville, North Carolina*

For information regarding the Company's ongoing litigation and environmental remediation matters at Fayetteville, refer to "Fayetteville Works, Fayetteville, North Carolina" under the "Environmental Overview" within this "Note 22 – Commitments and Contingent Liabilities".

*Aqueous Film Forming Foam Matters*

Chemours does not manufacture or sell, and has never, manufactured nor sold aqueous film forming foam ("AFFF"). Numerous defendants, including EID and Chemours, have been named in approximately 5,900 matters, involving AFFF, which is used to extinguish hydrocarbon-based (i.e., Class B) fires and subject to U.S. military specifications. Most matters have been transferred to or filed directly into a multi-district litigation ("AFFF MDL") in South Carolina federal court or identified by a party for transfer. The matters pending in the AFFF MDL allege damages as a result of contamination, in most cases due to migration from military installations or airports, or personal injury from exposure to AFFF. Plaintiffs seek to recover damages for investigating, monitoring, remediating, treating, and otherwise responding to the contamination. Others have claims for personal injury, property diminution, and punitive damages.

In March 2021, ten water provider cases within the AFFF MDL were approved by the court for purposes of commencing initial discovery (Tier One discovery) and in October 2021, the court approved three of these cases for additional discovery (Tier Two discovery). In September 2022, a water provider action filed by the City of Stuart, Florida was selected for the first bellwether trial. The court encouraged all parties to discuss resolution of the water provider category of cases, and in October 2022 appointed a mediator to facilitate discussions among and between the parties. Chemours, Corteva/EID and DuPont, together, entered into U.S. public water system class action settlement agreement in June 2023, as further discussed below. Prior to the public water system class action suit settlement, in May 2023, the Plaintiffs filed, and the court granted, a motion to sever all claims against Chemours and EID from the first bellwether trial for the water provider cases. There are currently approximately 600 water provider cases in the AFFF MDL, of which approximately 40 such matters that had been filed as of the Settlement Agreement have submitted opt-outs per below discussion.

For non-water provider cases in the AFFF MDL (approximately 5,300), the parties are now proceeding with discovery in certain personal injury cases, with Tier One discovery completed in June 2024. In July 2024, the parties jointly submitted to the Court a list of proposed Group A and Group B plaintiffs for purposes of staggering Tier 2 discovery. Tier 2 expert discovery for Group A cases is being completed and Tier 2 discovery for Group 2 cases is to be completed in March 2025. An initial Tier 2 Group A trial date has been set for October 2025. Further, the Court has also established a case management process for reviewing and listing diseases claimed to be associated with exposure to an AFFF source as well a protocol for dismissing personal injury claims for unlisted diseases. Plaintiffs asserting these unlisted claims were required to dismiss their unlisted personal injury claims without prejudice by September 10, 2024 or produce medical records and expert reports on general and specific causation for the alleged disease.

There are other AFFF lawsuits pending outside the AFFF MDL that have not been designated by a party for inclusion in the MDL. These matters identifying EID and/or Chemours as a defendant are:

Valero Refining ("Valero") has five pending state court lawsuits filed commencing in June 2019 regarding its Tennessee, Texas, Oklahoma, California, and Louisiana facilities. These lawsuits allege that several defendants that designed, manufactured, marketed, and/or sold AFFF or PFAS incorporated into AFFF have caused Valero to incur damages and costs including remediation, AFFF disposal, and replacement. Valero also alleges fraudulent transfer.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

In New York state court, four individuals filed a lawsuit in September 2019 against numerous defendants including Chemours. The lawsuit alleges personal injury resulting from exposure to AFFF in Long Island drinking water and violation of New York Uniform Fraudulent Conveyance Act. Plaintiffs seek compensatory and punitive damages and medical monitoring.

In Illinois, a lawsuit was filed in May 2022 in the state court against numerous defendants, including EID. The lawsuit alleges personal injury from occupational exposure, including from AFFF-related materials/products, and seeks compensatory damages and punitive damages. In July 2023, an agreement to resolve the lawsuit was reached. This matter is now closed. Since February 2023, two other lawsuits have been filed in Illinois state court against numerous defendants, including EID, which also allege personal injury from occupational exposure, including from AFFF-related materials/products, and seeks compensatory damages and punitive damages. Chemours is not a named defendant in either of these lawsuits.

In Ontario, Canada, three lawsuits were filed by two parties in December 2022 against DuPont de Nemours, Inc. and another defendant, seeking contribution and indemnification, interest, and costs in connection with three underlying actions filed by property owners in Canada, and a related third-party action filed by some defendants in one of the matters. The plaintiffs in the underlying actions allege PFAS contamination of their respective properties from the use of firefighting foam. Chemours is not a named defendant in any of these matters but has agreed to defend pursuant to the MOU. These lawsuits against DuPont were noticed for discontinuance by two of the filing parties.

In July 2024, a civil claim was filed in Virginia state court against multiple defendants, including Chemours, alleging that plaintiff was exposed to PFAS substances through products that defendants manufactured, designed, marketed, sold, supplied, or distributed, such as turn out gear and AFFF. Plaintiffs seek both compensatory and punitive damages. Chemours has not yet been served in this matter.

In September 2024, a matter was filed in New Jersey state court against EIDP, DuPont de Nemours, Chemours and other defendants alleging personal injury due to exposure to AFFF-related PFAS in drinking water.

In British Columbia, Canada, a civil claim was filed in the Supreme Court of British Columbia in December 2023 against multiple defendants, including Chemours, seeking to certify the action as a class proceeding. The complaint identifies the class as individuals with certain diagnosed conditions after using or being exposed to AFFF containing PFAS under certain conditions and seeks compensatory and punitive damages.

Also in the British Columbia court, in June 2024, a civil claim was filed by His Majesty the King in Right of the Province of British Columbia against multiple defendants, including Chemours, seeking to certify the action as a class proceeding. The complaint identifies the class as all provincial and territorial governments that have incurred expenditures relating to alleged PFAS contamination, including from AFFF, of its water resources as well as municipalities, regional districts, and other governance authorities and persons responsible for drinking water systems. The complaint seeks compensatory and punitive damages.

In July 2024, a civil claim was filed in the Superior Court of Quebec, District of Montreal, against multiple defendants, including Chemours, seeking to certify the action as a class proceeding. The complaint identifies the class as all natural and legal persons in Quebec who own, operate, or supply water through a drinking water disbursement system intended for human consumption, and whose water source is located near sites where PFAS and PFAS-containing products, such as AFFF, were allegedly manufactured, used, transported, processed or sold by defendants. The claim seeks compensatory and punitive damages.

In August 2024, a claim was filed in the Manitoba Court of King's Bench (Winnipeg Centre) by the Muskoday First Nation against multiple defendants, including Chemours, seeking to certify the action as a class proceeding. The complaint identifies the class as Indian Bands as defined under Canadian law. Plaintiff alleges that “any water, fish, and game they obtain from the reserve is contaminated with PFAS” by PFAS and PFAS-containing products, such as AFFF, that were allegedly manufactured, used, transported, processed, or sold by defendants near their water sources. The claim seeks compensatory and punitive damages.

In August 2024, a civil claim was filed in the Superior Court of Ontario against multiple defendants, including Chemours, seeking to certify the action as a class proceeding. The complaint identifies the class as all persons in Canada who own property with a well and whose well contains PFAS. Plaintiff alleges that their well as the wells of class members were contaminated by PFAS and PFAS-containing products, such as AFFF, that were allegedly manufactured, used, transported, processed, or sold by defendants near their water sources. The claim seeks compensatory and punitive damages.

In September 2024, a civil claim was filed in the Supreme Court of British Columbia in Canada against multiple defendants, including Chemours, seeking to certify the action as a class proceeding. The complaint identifies the class as all persons in Canada who currently own property with a well, and whose well water contains PFAS. Plaintiff alleges that their well, and the wells of class members, were contaminated by PFAS and PFAS-containing products, such as AFFF, that were allegedly manufactured, used, transported, processed, or sold by defendants near their water sources. The claim seeks compensatory and punitive damages.

*United States Public Water System Class Action Suit Settlement and Related Opt-Outs*

On June 1, 2023, Chemours, Corteva/EID, and DuPont, together, entered into a binding agreement in principle to comprehensively resolve all drinking water claims related to PFAS of a defined class of U.S. public water systems that serve the vast majority of the United States population arising out of the AFFF MDL, that was finalized by a definitive agreement on June 30, 2023 (the "Settlement Agreement"), subject to approval by the United States District Court for the District of South Carolina (the “Court”). A preliminary approval of the Settlement Agreement by the Court was granted on August 22, 2023.

Under the Settlement Agreement, Chemours, Corteva and DuPont collectively established and contributed a total of $1,185 to a qualified settlement fund (“Water District Settlement Fund”). Contribution rates were consistent with the MOU, with Chemours (together with its subsidiaries) contributing 50%, and DuPont and Corteva collectively (together with their subsidiaries) contributing the remaining 50%. The settlement amounts were funded in full and deposited into the Water District Settlement Fund. On September 6, 2023, Chemours deposited $592 into the Water District Settlement Fund, which was recognized as restricted cash and restricted cash equivalents on its consolidated balance sheet at December 31, 2023. In exchange for the payment to the Water District Settlement Fund, Chemours, Corteva and DuPont (together with their subsidiaries) will receive a release of the claims from the Class (as defined below), upon entry into final judgment by the Court in accordance with the Settlement Agreement. The agreement was entered into solely by way of compromise and settlement and is not in any way an admission of liability or fault by Chemours or the other parties.

The class represented in the Settlement Agreement is composed of all Public Water Systems, as defined in 42 U.S.C. § 300f, with a current detection of PFAS or that are currently required to monitor for PFAS under the Environmental Protection Agency’s Fifth Unregulated Contaminant Monitoring Rule or other applicable federal or state law (the “Class”). The following systems are excluded from the settlement class: water systems owned and operated by a State or the United States government; small systems that have not detected the presence of PFAS and are not currently required to monitor for it under federal or state requirements; and water systems in the lower Cape Fear River Basin of North Carolina (which are included only if they so request). PFAS, as defined in the Settlement Agreement, includes PFOA and HFPO-DA among a broad range of fluorinated organic substances. While it is reasonably possible that the excluded systems or claims could result in additional future lawsuits, claims, assessments or proceedings, it is not possible to predict the outcome of any such matters, and as such, the Company is unable to develop an estimate of a possible loss or range of losses, if any, at this time.

The Settlement Agreement does not resolve claims of Public Water Systems that are not included in the settlement as described above, or of Public Water Systems that requested exclusion from the Class (“opt out”) pursuant to the process established by the Court. It also does not resolve potential future claims of Public Water Systems that have not detected and do not detect any PFAS contamination, but where such contamination first occurs in the future. The Settlement Agreement also does not resolve certain claims not related to drinking water, such as certain specified separate alleged claims relating to stormwater or wastewater treatment, or other alleged types of claims such as for personal injury or for natural resource damages claimed by state attorneys general, that remain outstanding in the AFFF MDL or other courts. Matters related to claims from other public water systems, state natural resources damages and other PFAS matters are further described below.

As part of the preliminary approval of the Settlement Agreement in August 2023, notice of the Settlement Agreement has been provided to class members and such members had until November 11, 2023 to object to the settlement or December 4, 2023 to submit a request for exclusion, indicating they wish to opt-out of the settlement class. A Final Fairness Hearing on the Settlement Agreement occurred on December 14, 2023.

On January 3, 2024, the Court-appointed Notice Administrator for the settlement submitted a declaration regarding objections to the settlement and opt-outs, and on February 6, 2024, it submitted an updated report to the Court regarding its further review of the submitted opt-outs. The Notice Administrator identified that, based on his then February 2024 review as done in accordance with the Court's guidance, opt-outs had been received from approximately 1,000 of the 14,167 listed potential Class members. In addition to those opt-outs, the Notice Administrator stated that he also received requests for exclusion from approximately 300 additional entities that were not on the list of Class members. The Court issued an order providing that the deadline for entities to withdraw a previously submitted opt-out was March 1, 2024, which was subsequently extended to March 15, 2024 by the Court. The Notice Administrator’s determinations are not dispositive of the validity of opt-outs, which may be subject to judicial review and the Notice Administrator also continues to review the opt-outs for whether they were proper or duplicative.

Chemours, Corteva and DuPont deny the allegations in the underlying litigation and reserve all legal and factual defenses against such claims if they were litigated to conclusion. On February 8, 2024, the Court issued an opinion and order granting the plaintiffs' motion for final approval of the settlement, and on February 26, 2024, the Court entered a final order and judgment. On March 11, 2024, one public water system filed a notice of appeal from the district court's judgment, and such appeal was dismissed in April 2024. No additional appeals were filed during the appeal period, and accordingly the court's approval is a final judgment in accordance with the Settlement Agreement. The Settling Defendants confirmed to the escrow agent in May 2024 that the Effective Date has occurred under the Settlement Agreement and Chemours no longer maintains its reversionary interest to the underlying restricted funds within the Water District Settlement Fund.

With respect to the submitted opt-outs, for those entities that have filed claims and/or lawsuit against numerous defendants, including Chemours, EID, Corteva, DuPont, either prior or subsequent to the Settlement Agreement, approximately 40 of such opt-out entities are in the U.S. District Court of South Carolina Multi-district litigation and approximately 90 of such opt-out entities are named plaintiffs in other various federal, state or local courts (see Other Public Water System Matters below). The Company's assessment of its potential liability with respect to the opt-outs considers numerous factors, many of which are not yet determinable. Many of these lawsuits and claims involve highly complex issues related to causation, scientific evidence and alleged actual damages and other substantial uncertainties.

Other than a single opt-out matter, for which the Company is engaged in discussions with the opt-out entity and maintains an immaterial accrual, the Company has not accrued for any potential losses with respect to the opt-out population as of December 31, 2024 and 2023, as such losses are not probable or estimable. Additional future lawsuits, claims, assessments or proceedings, including for those identified in the Other Public Water Systems Matters below, could be brought or maintained either by entities that submitted opt-outs, or by entities asserting claims that are expressly excluded from the releases in the Settlement Agreement. However, it is not possible to predict the outcome of any such matter due to various reasons including, among others, legal and factual defenses against such claims including factors noted above, timing when such claims could be resolved in court, and the number of defendants in any of those claims. While management believes that it is reasonably possible that the Company could incur losses related to the matters, which could be material to the results of operations, financial position, or cash flows, the Company is unable to develop a reasonable estimate of a possible loss or range of losses, if any, at this time.

*Other Public Water System Matters*

In addition to the matters described in the AFFF MDL, as well as the matters described in "Litigation and Other matters related to Fayetteville" within this "Note 22 – Commitments and Contingent Liabilities", other public water systems have filed lawsuits against Chemours, Corteva/EID, and DuPont including the following:

In New York federal court, 23 Long Island water suppliers that have filed lawsuits since August 2019 against several defendants including EID and Chemours alleging PFAS, PFOA, and perfluorooctanesulfonic acid ("PFOS") contamination through releases from industrial and manufacturing facilities and business locations where PFAS-contaminated water was used for irrigation and sites where consumer products were disposed. Claims vary between matters but include claims of personal injury alleging various disease conditions, product liability, negligence, nuisance, trespass and fraudulent transfer. All matters are seeking compensatory and punitive damages and, in certain cases, medical monitoring, declaratory and/or injunctive relief. In January 2022, Chemours filed a third-party claim for indemnity in connection with one of the Long Island water supplier matters. One of the water suppliers filed to opt out of the Public Water System Class Action Settlement.

The Town of Petersburgh in New York also filed suit in New York state court in August 2022 alleging defendants 3M, EID, and other defendants, are responsible for PFOA contamination of its municipal drinking water supply. The complaint alleges product liability claims, negligence, and trespass. Plaintiff seeks injunctive and declaratory relief as well as compensatory and punitive damages. In May 2024, the case was dismissed by stipulation in connection with the Public Water System Class Action Settlement, and the matter is now closed.

In New York and New Jersey federal courts, lawsuits were filed by Suez Water in December 2020 against several defendants, including EID and Chemours, alleging damages from PFAS releases into the environment, including PFOA and PFOS, that impacted water sources that the utilities use to provide water, as well as products liability, negligence, nuisance, and trespass. Defendants filed motions to dismiss the complaints in both matters. The motion was denied in the Suez Water New Jersey lawsuit in October 2021. In January 2022, the court granted defendants' motion to dismiss in the Suez New York lawsuit without prejudice and the plaintiff filed a second amended complaint in February 2022. Following the filing of the second amended complaint in the Suez New York lawsuit, the defendants filed a motion to dismiss. In March 2023, the court granted in part defendants' motion to dismiss the second amended complaint, dismissing all claims against Chemours with prejudice, and finding a claim for design defect could be maintained against EID. Suez filed to opt out these matters from the Public Water System Class Action Settlement. In March 2024, the stays in these matters were lifted and discovery is proceeding.

In Georgia and Alabama courts, lawsuits were filed beginning in 2017 against numerous carpet manufacturers, certain municipal defendants, and suppliers and former suppliers, including EID and Chemours. The lawsuits include a matter filed by the Water Works and Sewer Board of the Town of Centre, Alabama alleging negligence, nuisance, and trespass in the release of PFAS, including PFOA, into a river leading to the town's water source. The Town of Centre filed to opt out of the Public Water System Class Action Settlement, and this matter is expected to proceed to trial in March 2025.

Also, in Alabama, a purported class action was filed in July 2022 in Alabama federal court by the Utilities Board of Tuskegee on behalf of certain drinking water utilities against 3M, EID, Corteva and the Company alleging contamination of drinking water. The complaints allege negligence, public nuisance, private nuisance and trespass. The plaintiffs seek injunctive relief as well as compensatory and punitive damages. In April 2023, Shelby County, Alabama and Talladega County, Alabama, filed suit in Alabama state court against numerous carpet manufacturers located near Dalton Georgia, suppliers, EID, Chemours, and other defendants to be named later. The complaint alleges negligence, nuisance and trespass in the release by the carpet mills of PFAS compounds, including PFOA, into the water sources used by the Counties to provide drinking water. The Counties seek compensatory and punitive damages as well as injunctive relief to remove PFAS from the water supply and prevent alleged ongoing contamination. In May 2023, the matter was removed to federal court and later remanded to state court. In August 2023, the Water Works and Sewer Board of the City of Gadsden, Alabama also filed suit in Alabama state court against the Company, DuPont, Corteva and other suppliers to carpet mills in Dalton Georgia, as well as against various landfill and waste companies. The complaint alleges negligence, nuisance, and trespass in the release of PFAS compounds, including PFOA, reaching the town's water source. Gadsden seeks compensatory damages as well as expenses, potential lost profits, punitive damages and injunctive release. These matters were stayed in September 2023 pending final approval of the Public Water System Class Action Settlement. Shelby County, Talladega County, City of Gadsden and the Utilities Board of Tuskegee as well as other water utilities that may be within the class, filed to opt out of the Public Water System Class Action Settlement and the matters are now proceeding. In November 2024, the Court dismissed the Utilities Board of Tuskegee matter without prejudice. Also in November 2024, the Alabama Supreme Court accepted Defendants' mandamus petition seeking a writ to dismiss the Gadsden case on the grounds that all injuries have been redressed and that the claims are time barred. The ruling by the Alabama Supreme Court is pending.

In March 2024, the Municipal Utilities Board of the City of Albertville, Alabama filed suit in Alabama state court against certain defendants, including Chemours and EID. The complaint alleges negligence, nuisance, trespass and seeks compensatory damages, real property damages, as well as past and future expenses, potential lost profits, and punitive damages. The plaintiffs also seek injunctive relief. Albertville filed to opt out of the Public Water System Class Action Settlement.

In April 2024, the Board of Water and Sewer Commissioners of the City of Mobile, Alabama filed suit in Alabama state court against certain defendants, including Chemours, DuPont and Corteva. The complaint alleges negligence, nuisance, trespass and wantonness through disposal of construction materials made with PFAS allegedly supplied by defendants, to the local landfill, which allegedly resulted in the release of PFAS compounds reaching the town's water source. Mobile seeks compensatory damages as well as expenses, potential lost profits, punitive damages, and attorneys' fees. Mobile also seeks an injunction requiring defendants to remove PFAS from the water supply. Mobile filed to opt out of the Public Water Class Action Settlement. In October 2024, the Court dismissed Plaintiff's complaint in its entirety for failure to state a claim as well as lack of standing.

In Georgia, a lawsuit was filed by the City of Rome against numerous carpet manufacturers, certain municipal defendants, and suppliers and former suppliers, including EID and Chemours, alleging negligence, nuisance, and trespass in the release of PFAS, including PFOA, into a river leading to the town's water source. In June 2023, Chemours, DuPont and Corteva entered into a confidential settlement with the City of Rome and its claims against these parties related to this matter have been released and the matter dismissed. The Company recorded the related settlement amount in selling, general and administrative expense in the Consolidated Statement of Operations for the year ended December 31, 2023.

In Georgia, a putative class action was filed in 2019 on behalf of customers of the Rome, Georgia water division and the Floyd County, Georgia water department against the City of Dalton, Georgia, numerous carpet manufacturers located in Dalton, Georgia, Chemours and EID, alleging negligence, nuisance and other claims related to the release of perfluorinated compounds, including PFOA, into a river leading to their water sources ("Rome ratepayer matter"). In November 2022, EID and Chemours were added as defendants in a purported class action filed on behalf of residents of Summerville, Georgia and Chattooga County, Georgia in Federal Court ("Summerville ratepayer matter"). Plaintiffs seek various statutory violations as well as negligence and nuisance and seek remedies, injunctive relief, personal injury and property damages, as well as punitive damages. These matters are pending in court. Floyd County, City of Rome and Summerville filed to opt out of the Public Water System Class Action Settlement. In December 2024, the court in the Rome ratepayer matter ruled that the putative class did not have standing to seek injunctive relief and granted summary judgment for Defendants on that count. The court has stayed rulings on the pending motions in this matter to allow the parties to mediate the remaining claims for alleged damages related to rate increases during the first half of 2025.

Additionally in Georgia state court, in January 2024, certain landowners of property in Gordon County, Georgia, filed suit against the City of Calhoun, numerous carpet manufacturers operating in Calhoun, and carpet mill suppliers, including 3M, EID and Chemours. The complaint alleges that the carpet manufacturers sent PFAS containing wastewater to the Calhoun Water Pollution Control Plant for many years. It further alleges Calhoun spread the treated sludge containing PFAS from the Calhoun Water Pollution Control Plant on plaintiffs' land until 2023. Plaintiffs allege negligence and nuisance, and seek compensatory damages, including diminution of property value, and punitive damages, as well as an injunctive order to remediate the property. Calhoun filed to opt out of the Public Water System Class Action Settlement. In May 2024, a separate lawsuit was filed in Georgia state court on behalf of multiple plaintiffs located in Calhoun, Georgia, alleging that defendants, including Chemours and EID, manufacture chemicals used in carpet manufacturing processes which have been discharged in wastewater to the Calhoun Water Pollution Control Plant. Plaintiffs allege and seek damages for PFAS contamination of their properties due to sewage sludge dumped in close proximity to their properties by Defendant City of Calhoun. The lawsuit alleges negligence, failure to warn, nuisance, wanton conduct and punitive damages, public nuisance, abatement of public nuisance, and trespass. The Defendant City of Calhoun filed cross claims against numerous carpet manufacturers, and carpet mill suppliers, including EID and Chemours in both of these actions. The cross claims allege that the carpet manufacturers and suppliers knew PFAS containing wastewater sent to the Calhoun Water Pollution Control Plant and would not be removed by Calhoun's treatment systems. The City of Calhoun alleges negligence, nuisance, and statutory violations. Calhoun seek compensatory and punitive damages as well as injunctive relief ordering abatement, remediation, and attorneys' fees. Chemours and EID moved to dismiss the plaintiff's claims as well as the City of Calhoun's cross claims in the actions. In October 2024, the Court denied the motions to dismiss the plaintiffs' claims but dismissed the City of Calhoun's crossclaims.

In June 2024, the City of Columbia, South Carolina ("City of Columbia") filed suit in South Carolina state court against multiple defendants, including Chemours, EID, and DuPont De Nemours, who are alleged to be responsible for the release of PFAS into the City of Columbia's water supply as suppliers to the metal finishing, paper finishing, plastics coating, textile, and aerospace industries. The complaint alleges that a variety of industrial operations have discharged PFAS into the Broad River and the Saluda River, which are the source of the City of Columbia's drinking water, and that PFAS have been detected at high levels in these rivers and in Lake Murray (a Saluda River impoundment). The City of Columbia seeks compensatory and punitive damages. In January 2025, the Joint Municipal Water and Sewer Commission ("Joint Municipal"), Saluda County Water and Sewer Authority ("Saluda County"), and the Town of Lexington, South Carolina ("Lexington"), all of which also rely upon Lake Murray as a source of drinking water, also filed suit in South Carolina state court against multiple defendants, including Chemours, EIDP, and DuPont De Nemours, regarding alleged discharges and seeking compensatory and punitive damages. The City of Columbia, Joint Municipal, Saluda County and Lexington each filed to opt out of the Public Water Class Action Settlement.

In July 2024, the Town of Lyerly, Georgia ("Lyerly") filed suit in Georgia state court against multiple defendants, who are alleged to be responsible for the release of PFAS to the water supply from carpet mill operations or as suppliers to those carpet mills. The complaint alleges negligence, nuisance, trespass and regulatory violations. Lyerly seeks compensatory damages for past and future expenses as well punitive damages and attorneys' fees. Lyerly has filed to opt out of the Public Water System Class Action Settlement.

In July 2024, the Town of Pine Hill, Alabama ("Pine Hill") filed suit in Alabama state court against multiple defendants, including, the Company, DuPont, and Corteva, who are alleged to be responsible for the release of PFAS to the water supply through paper mill operations or as suppliers to paper mills. The complaint alleges negligence, nuisance, trespass, wantonness and punitive damages. Pine Hill seeks injunctive relief, compensatory damages for property damages, potential lost profits and past and future expense as well punitive damages and attorneys' fees. The Town of Pine Hill has filed to opt out of the Public Water System Class Action Settlement.

In August 2024, the City of Irondale, Alabama ("Irondale") filed a lawsuit in Alabama state court against multiple defendants, including Chemours. Plaintiff alleges that defendants have manufactured, supplied, and/or sold products containing PFAS that have contaminated plaintiff's water systems. Irondale disclaims any claims or causes of actions relating to AFFF and has opted out of the Public Drinking Water Settlement

In January 2025, Berkeley County, South Carolina ("Berkeley") filed suit in South Carolina state court against several defendants, including Chemours. Berkeley alleges that defendants have manufactured, sold, used, and/or caused discharge of PFAS into the Lake Moultrie and Lake Marion, which Berkeley uses for its drinking water intake through a water supply contract with South Carolina Public Service Authority. Berkeley disclaims any claims or causes of actions relating to AFFF and has opted out of the Public Drinking Water Settlement. The complaint seeks compensatory and punitive damages.

In January 2025, the Town of Whitmire, South Carolina ("Whitmire") filed suit in South Carolina state court filed suit in South state court against several defendants, including Chemours. Whitmire alleges that defendants have manufactured, sold, used, and/or caused discharge of PFAS into the Enoree River, which Whitmire uses for its drinking water intake. Whitmire disclaims any claims or causes of actions relating to AFFF and has opted out of the Public Drinking Water Settlement. The complaint seeks damages.

In January 2025, the Town of Cheraw, South Carolina ("Cheraw") filed suit in South Carolina state court against several defendants, including Chemours. Cheraw alleges that defendants discharged PFAS-containing wastewater and land-applied sludge that have contaminated Cheraw's drinking water systems. Cheraw disclaims any claims or causes of actions relating to AFFF and has opted out of the Public Drinking Water Settlement. The complaint seeks damages.

In January 2025, the City of Georgetown, South Carolina ("Georgetown") filed suit in South state court against several defendants, including Chemours. Georgetown alleges that defendants have discharged PFAS that have contaminated Georgetown's drinking water and cannot be removed by Georgetown's legacy water treatment technology. Georgetown disclaims any claims or causes of actions relating to AFFF and has opted out of the Public Drinking Water Settlement. The complaint seeks damages.

In January 2025, Georgetown County Water and Sewer District ("GCWSD") filed suit in South state court against several defendants, including Chemours. GCWSD alleges that defendants have manufactured, sold, used, and/or caused discharge of PFAS into the Waccamaw River, which GCWSD uses for its drinking water intake. GCWSD further alleges that its current legacy water treatment technology is unable to remove PFAS from source water. GCWSD disclaims any claims or causes of actions relating to AFFF and has opted out of the Public Drinking Water Settlement. The complaint seeks damages.

*State Natural Resource Damages Matters*

In addition to the State of New Jersey actions (as detailed below), a majority of the states and certain territories of the U.S., have filed lawsuits or are investigating claims against various defendants, including EID and Chemours, relating to the alleged contamination of state natural resources with PFAS compounds either from AFFF and/or other sources. These lawsuits seek damages including costs to investigate, clean up, restore, treat, monitor, or otherwise respond to contamination of natural resources and some include counts for fraudulent transfer. Chemours, Corteva/EID and DuPont, together under the MOU, are engaged with States and their counsel on certain of these cases. It is reasonably possible that these discussions could result in a loss, which could be material; however, at this time, the Company is unable to predict the duration, scope, or result of such discussions, and because of these uncertainties, the Company is also unable to develop a reasonable estimate of a possible loss or range of losses, if any.

In February 2018, the State of Ohio initiated litigation against EID regarding historical PFOA emissions from the Washington Works site. Chemours is an additional named defendant. Ohio alleges damage to natural resources and fraudulent transfer in the spin-off that created Chemours and seeks damages including remediation and other costs and punitive damages. On November 28, 2023, Chemours, DuPont, Corteva, and EID entered into a settlement agreement with the State of Ohio to settle claims, including environmental releases or sales of products containing PFAS or other known contaminants. Under the agreement, Chemours will pay $55 to the State of Ohio, which shall be used to support environmental restoration. Chemours contribution is consistent with the 50% contribution rate under the MOU. This amount is included in Accrued Litigation and expected to be paid in 2025.

On July 13, 2021, Chemours, DuPont, Corteva, and EID entered into a settlement agreement with the State of Delaware to settle such potential claims, including for environmental releases or sales of products containing PFAS or other known contaminants. Under the agreement, in January 2022, the companies paid a total amount of $50 to the State of Delaware, which shall be utilized to fund a Natural Resources and Sustainability Trust (the "Trust") to be used for environmental restoration and enhancement of resources, sampling and analysis, community environmental justice and equity grants, and other natural resource needs. Chemours contributed $25 to the settlement and the remaining $25 was divided between DuPont and Corteva which shall be treated as Qualified Spend under the MOU. If the companies enter into a proportionally similar agreement to settle or resolve claims of another state for PFAS-related natural resource damages, for an amount greater than $50, the companies may be required to make one or more supplemental payment(s) directly to the Trust, with such payment(s) not to exceed $25 in the aggregate. Following entry of the settlement agreement with the State of Ohio and its payment and pursuant to the terms of the settlement agreement with the State of Delaware, the Companies will make a supplemental payment directly to the Trust in an amount equal to $25 in the aggregate. Chemours' share of such supplemental payment is approximately $13, which is included in Accrued Litigation and expected to be paid in the 2025.

In December 2024, the State of Texas filed a Deceptive Trade Practices action in federal court against 3M Company, E. I. du Pont de Nemours and Company (EID), DuPont de Nemours, Inc. (DuPont) and Corteva alleging that the companies engaged in deceptive trade practices by failing to disclose certain health risks and environmental harm related to PFAS. The lawsuit alleges that the EID defendants' corporate restructurings were designed to avoid liability for these actions. The suit seeks injunctive relief and civil penalties. In January 2025 the case was removed to federal court.

*Other PFAS Matters*

In New York courts, EID has been named in approximately 40 lawsuits beginning in 2017, which are not part of the Leach class, brought by individual plaintiffs alleging negligence and other claims in the release of PFAS, including PFOA, into drinking water against current and former owners and suppliers of a manufacturing facility in Hoosick Falls, New York. Two additional lawsuits have been filed by a business seeking to recover its losses and by nearby property owners and residents in a putative class action. The lawsuit filed by the business was dismissed, but the claims by the individual business owner were allowed to proceed. In September 2022, the Court certified the class action, and EID filed a petition for review of the certification, which was denied in January 2023. Chemours and EID, entered into settlement agreements in principle to resolve all but seven of the pending lawsuits, including the class action suit, during the second quarter of 2023 and were substantially paid in the fourth quarter of 2023. In February 2024, the Company agreed to resolve all of the remaining individual cases and claims, including six of the seven pending lawsuits for $0.4. As of September 2024, these settlements have all been paid consistent with prior reserves in the matters. Upon completion and dismissal of the individual matters, the class action is the sole remaining lawsuit pending for these matters. In December 2024, the court scheduled the class action trial for July 2025.

In New Jersey federal court, lawsuits were filed against several defendants including EID and Chemours beginning in November 2019. The lawsuits include ten lawsuits alleging that defendants are responsible for PFAS contamination, including PFOA and PFOS, in groundwater and drinking water. During the second quarter of 2023, the companies resolved these claims. Eight lawsuits were also filed alleging exposure to PFAS and other chemicals, including two lawsuits by parents on behalf of their adult children claiming pre-natal exposure, resulted in the children's cognitive delays, neurological, genetic, and autoimmune conditions. Further, eleven additional lawsuits were filed in state court with similar allegations of personal injury, which have been removed to New Jersey federal court (and one of which was transferred to the AFFF MDL). In May 2024, a case alleging wrongful death from exposure to PFAS and other chemicals on behalf of two deceased residents of Salem County, NJ was filed naming Chemours in New Jersey state court. The case has also been removed to federal court. Plaintiffs seek certain damages including punitive damages.

In January 2025, several state court lawsuits were filed against multiple defendants, including DuPont defendants and Chemours, alleging personal injury, trespass and property damage claims primarily related to exposure to PFAS via groundwater. In New Jersey state court, a lawsuit was filed on behalf of fifteen plaintiffs who reside in the state; in New York state court the lawsuit is on behalf of thirty plaintiffs who reside in the state; in Illinois state court the lawsuit is on behalf of twenty four plaintiffs who reside in the state; and in Delaware state court three lawsuits were filed on behalf of approximately 250 plaintiffs who reside in the state. The complaints also allege fraudulent conveyance as to DuPont defendants and Chemours and demand compensatory and punitive damages.

In Ohio federal court, a putative class action ("Hardwick") was filed in October 2018 against several defendants including 3M, EID and Chemours seeking class action status for U.S. residents having a detectable level of PFAS in their blood serum. The complaint seeks declaratory and injunctive relief, including the establishment of a "PFAS Science Panel". In March 2022, the court granted in part and denied in part the plaintiff's class certification and certified a class covering anyone subject to Ohio laws having minimal levels of PFOA plus at least one other PFAS in their blood. The court requested further briefing on whether the class should be extended to include other states that recognize the claims for relief filed in the action. The defendants, including EID and Chemours, jointly filed a petition to appeal the class certification decision and in September 2022 the petition was granted. During the fourth quarter of 2023, the Court dismissed the class action against 3M, EID, Chemours and the other defendants. In December, 2023, the plaintiff filed a petition for reconsideration and for rehearing en banc with the 6th Circuit. In January 2024, the 6th Circuit denied the request for rehearing. In March 2024, the case was dismissed. In June 2024, Hardwick refiled a putative national class action in federal court in Ohio against 3M, DuPont, and the Company. The refiled Hardwick suit seeks class status for all those in the United States who have 2 ppb or more of "C8 (PFOA and PFOS combined)" in their blood and who are subject to the laws of a state that recognizes medical monitoring. The complaint alleges negligence, battery and conspiracy and seeks equitable, declaratory, and injunctive relief including medical monitoring overseen by a court-appointed independent science panel. The complaint does not seek monetary damages or personal injury. In October 2024, defendants filed a motion to dismiss the matter.

In Delaware state court, a putative class action was filed in May 2019 against two electroplating companies, 3M and EID, and two other defendants added in an amended complaint, alleging responsibility for PFAS contamination, including PFOA and PFOS, in drinking water and the environment in the nearby community. In November 2023, a motion to amend the complaint was filed seeking to add Chemours as a defendant. The putative class of residents alleges negligence, nuisance, trespass, and other claims and seeks medical monitoring, personal injury and property damages, and punitive damages. The matter has been removed to federal court. In January 2025, the federal magistrate recommended that summary judgment be entered in favor of EID and two other defendants based on lack of any record connecting the PFAS contamination alleged with products sold by these defendants. After an objection period, the court may accept the magistrate's recommendation and enter summary judgment.

In South Carolina, a putative class action was filed in March 2022 in the state court against 3M, EID and the Company alleging PFAS contamination from a former textile plant located in Society Hill, South Carolina which allegedly used PFAS containing textile treatment chemicals supplied by the defendants. The lawsuit alleges negligence, trespass, strict liability and nuisance and seeks monetary damages, including property diminution, and injunctive relief, including water treatment and remediation, as well as punitive damages. The matter has been removed to federal court. In April 2024, EID and Chemours filed a third-party complaint against Huntsman, Ciba Specialty Chemicals, Galey & Lord, Nanotex and John Does alleging indemnification and contribution. In September 2024, Huntsman filed a counterclaim against EID and Chemours alleging indemnification and contribution. In August 2024, a complaint related to the same fabric mill was filed on behalf of an individual in South Carolina state court against 3M, EID, Chemours and other companies alleging personal injuries resulting from exposure to PFAS emissions from the former textile plant. The complaint alleged negligence, strict liability, products liability counts, and fraud and seek compensatory and punitive damages and costs. In August 2024, 3M removed the matter to federal court.

In Maine, a previously filed lawsuit in federal court by individuals against various paper mills owners in Maine was amended in October 2022 to add various alleged suppliers to the paper mills as defendants, including EID. The lawsuit alleges PFAS chemicals were used in making paper products at the mills and that discharges, waste disposal and the selling of byproducts from paper mills caused property damages as well as personal injury to the plaintiffs. The lawsuit alleges various claims against the mills; alleges negligence, strict liability and nuisance against the supplier defendants; and seeks monetary damages. In March 2023, plaintiffs dismissed the case against EID and other defendants.

In Pennsylvania, in December 2023, a lawsuit was filed in state court on behalf of multiple plaintiffs alleging that defendants including Chemours, EID, Corteva and DuPont, as manufacturers of chemicals used in gas well fracking, are responsible for contamination of the water supply. The lawsuit alleges negligence, personal injury, medical monitoring, property damage and punitive damages. In May 2024, Plaintiffs filed an amended complaint and did not name Chemours, EID, Corteva or DuPont de Nemours.

In Delaware, in October 2023, a lawsuit was filed in state court on behalf of the spouse of a former EID employee, naming Chemours, EID, Corteva, DuPont and others alleging personal injury as a result of take-home exposure to PFAS and other compounds. The complaint seeks compensatory and punitive damages. In January 2025, this matter was voluntarily dismissed without prejudice.

In Missouri, in April 2024, a putative class action was filed in federal court against several defendants including 3M, EID, Corteva, DuPont, and Chemours alleging responsibility for PFAS contamination in drinking water and the environment in Portageville, Missouri. The putative class of residents alleges negligence, nuisance and strict liability. The complaint also alleges personal injury and property damages and seeks medical monitoring, abatement and compensatory and punitive damages. In August 2024, the case was dismissed against EID and Chemours for lack of personal jurisdiction.

In April 2024, three defendants in a 2022 Massachusetts federal court putative class action alleging PFAS contamination and related in part to the Massachusetts Natural Fertilizer Company Site, The Newark Group, Seaman Paper Company and Otter Farm, Inc., filed cross claims against the Company, DuPont, Corteva, EID and other defendants, including John Doe defendants, for the sole purpose of pleading and protecting any claims for indemnity or contribution they may have against the cross claim defendants, if they are found liable in the underlying putative class action. In October 2024, the Court disallowed the cross claims which ends the matter as to the Company. In December 2024, The Newark Group moved for the court to reconsider its denial of the cross claims against the Company and others and argues that the Court misapplied the law on timeliness and proper joinder.

In May 2024, a lawsuit was filed in Missouri federal court against multiple defendants, including Chemours, seeking to certify the action as a class proceeding. Plaintiffs allege that defendants have manufactured, supplied, and/or sold products containing PFAS that have contaminated the soil, groundwater, aquifer, and drinking water for plaintiffs' properties in and near Canton, Missouri. The complaint seeks certification on behalf of plaintiffs and others similarly situated whose properties were allegedly damages by contaminants produced by defendants. Plaintiffs seek a medical monitoring class as well. Plaintiffs seek compensatory and punitive damages. This case has been transferred to the AFFF MDL.

In June 2024, a lawsuit was filed in Connecticut federal court on behalf of multiple firefighter unions and individual firefighters against multiple defendants, including Chemours, EID, and DuPont De Nemours, seeking to certify the action as a class proceeding. Plaintiffs allege that defendants manufactured, sold, or supplied chemicals containing PFAS which was allegedly found in turnout gear. Plaintiffs allege strict liability, negligence, failure to warn, negligent design and manufacture, medical monitoring, and statutory punitive damages.

In September 2024, a civil claim was filed in the Supreme Court of British Columbia in Canada against multiple defendants, including Chemours, seeking to certify the action as a class proceeding. The complaint identifies the class as all resident persons or entities in Canada who purchased carpeting treated with PFAS-containing products through a retailer or distributor before January 1, 2020 and had it installed in a building still owned by such persons or entities and who have not removed the carpeting. The complaint seeks compensatory and punitive damages.

In September 2023, a civil claim was filed in Virginia state court against multiple defendants, including Chemours, alleging breach of implied warranties, breach of express warranties, negligence, gross negligence, recklessness, and willful and wanton misconduct. Plaintiff alleges that defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS, PFAS containing chemical feedstock, and PFAS-containing turnouts to firefighting training facilities and fire departments nationally, including Virginia where plaintiff's husband was a firefighter. Plaintiff alleges that repeated and extensive exposure to PFAS resulted in her husband's brain cancer. The complaint seeks compensatory and punitive damages.

In April 2024, a civil claim was filed in Virginia state court against multiple defendants, including Chemours, alleging breach of implied warranties, breach of express warranties, negligence, gross negligence, recklessness, and willful and wanton misconduct. Plaintiff alleges that Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS, PFAS containing chemical feedstock, and PFAS-containing turnouts to firefighting training facilities and fire departments nationally, including Virginia. The complaint seeks compensatory and punitive damages.

In August 2024, a putative national class action was filed in federal court in Minnesota against 3M, EIDP and Chemours related to PFAS in carpet. Violations of the federal Racketeer Influenced and Corrupt Organizations Act (RICO) are alleged as well as violations of over 30 state statutes, including consumer fraud, deceptive trade practices, misrepresentation, and unfair competition laws. The complaint also includes product liability and nuisance claims. EIDP and Chemours filed a motion to dismiss.

In November 2024, Aladdin Manufacturing Corporation, Mohawk Industries, Inc. and Mohawk Carpet, LLC (hereinafter "Mohawk"), which are carpet manufacturers with operations in Georgia, sued carpet treatment chemical suppliers 3M, EIDP ("DuPont"), Daikin and the Company in Georgia state court alleging fraud, misrepresentation, contractual and common law indemnity, negligence, nuisance, punitive damages and other claims related to future and past PFAS liabilities and attorney's fees incurred by Mohawk. Mohawk alleges concealment and misrepresentation by the suppliers related to PFAS and the carpet treatment chemicals supplied. Mohawk further claims that it has been named as a defendant in at least 8 lawsuits brought by water suppliers downstream of its carpet manufacturing operations and has already paid over $100 in settlements of some of those matters. Mohawk seeks a declaratory judgment holding the suppliers responsible for its PFAS liabilities, including damages to Mohawk's property interests, past, present, and future compensatory damages, including settlements already paid, attorneys' fees and punitive damages.

In December 2024, the City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities (hereinafter "Dalton") sued 3M, EIDP ("DuPont"), Daikin, INV Performance Surfaces, Aladdin Manufacturing, Shaw Industries, unnamed DOES and the Company in federal court in Georgia. Dalton has received and treated waste from carpet and flooring manufacturers since the 1970s and alleges that Defendants have caused long-running contamination of Dalton's wastewater treatment operations through the sale, use and disposal of PFAS. Dalton's operations include Riverbend Land Application System ("LAS") where treated wastewater is land-applied, as well as three wastewater treatment plants (collectively, the "POTW"). Dalton alleges that the Defendants sold and used PFAS containing carpet treatment chemicals while knowing the PFAS would not be removed by the POTW. Dalton further alleges that Defendants did not provide disclosures or warnings to Dalton or the public. CERCLA is asserted as the basis for cost recovery and for a declaration of Defendants' joint and several liability for past and future response costs by the POTW and abatement of PFAS. Dalton also alleges negligence, nuisance, trespass, strict liability and violations of various state statutes and seeks compensatory and punitive damages and attorneys' fees and costs.

In December 2024, Murray County, Georgia sued 3M, Daikin, Invista, Shaw, Aladdin, Mohawk, INV Performance Surfaces, EIDP, Corteva and the Company in Georgia state court alleging PFAS contamination from disposal of carpet manufacturing wastes into its landfills. Murray County asserts Georgia statutory violations as well as common law torts, including negligence and nuisance, and seeks damages arising from PFAS contamination of its property. Murray County also seeks punitive damages, attorneys' fees and costs.

In January 2025, Catoosa County, Georgia sued 3M, Daikin, Shaw, Aladdin, Mohawk, and EIDP in Georgia state court alleging PFAS related to carpet manufacturing was manufactured, used, and discharged by Defendants and exists at dangerous levels in its landfill, and in its surface water, leachate, groundwater, and methane gas. Catoosa County asserts Georgia statutory violations as well as common law torts, including negligence and nuisance, and seeks past and future compensatory and statutory damages for remediation, abatement, interference with use and enjoyment of property, and diminished property values. Catoosa County also seeks punitive damages, attorneys' fees, and costs.

In January 2025, James and Pamela Stephens filed a lawsuit in Georgia state court against the City of Calhoun, 3M, INV Performance Surfaces, Daikin, Arrowstar, Aladdin, Mohawk, Shaw, Milliken, Mannington Mills, Dixie Group, Marquis Industries, EIDP and the Company. Plaintiffs assert that PFAS containing waste from defendant carpet manufacturers and suppliers was sent to Calhoun's treatment facility and Calhoun disposed of its post treatment sludge on nearby and adjacent property which resulted in PFAS contamination to their historic home, property, creek and drinking water. Plaintiffs' assertions include negligence, nuisance, and trespass, and they seek compensatory and punitive damages as well as abatement, removal of PFAS from their property, attorneys' fees and costs.

In January 2025, Gordon County, Georgia sued 3M, Daikin, Shaw, Aladdin, Mohawk, INV Performance Surfaces, Corteva, EIDP and the Company in Georgia state court alleging PFAS related to carpet manufacturing was manufactured, used, and discharged by Defendants and exists at dangerous levels in its landfill, and in its storm water runoff, leachate, groundwater, and methane gas. Gordon County asserts Georgia statutory violations as well as common law torts, including negligence and nuisance, and seeks past and future compensatory and statutory damages for remediation, abatement, interference with use and enjoyment of property, and diminished property values. Gordon County also seeks punitive damages, attorneys' fees, and costs.

In January 2025, 1001 Newark Ave. Associates, LLC filed a lawsuit in New Jersey federal court against General Spray Drying Services, Inc., Fabvan Sales Company (d/b/a Geral Spray Drying), EIDP, DuPont de Nemours, Corteva, Chemours and other defendants related to alleged contamination at a property in Elizabeth, NJ. The complaint alleges that General Spray's processing operations resulted in discharges of other defendants' PFAS and that these compounds have contaminated underlying soil and groundwater. The Complaint is brought under the federal CERCLA Act and the New Jersey Spill Compensation and Control Act and seeks, inter alia, recovery of costs for the investigation and remediation of PFAS at the property and declaratory judgments relating thereto.

In the Netherlands, Chemours, along with DuPont and Corteva, received a civil summons filed before the Court of Rotterdam by four municipalities (Dordrecht, Papendrecht, Sliedrecht and Molenlanden) seeking liability declarations relating to the Dordrecht site's operations and emissions. Chemours reviewed the summons and filed a statement of defense during the fourth quarter of 2021, and in September 2022 the court entered an interlocutory judgment denying in part certain aspects of such statement of defense. A hearing on the merits of the municipalities' claims took place in March 2023. On September 27, 2023, the court entered a second interlocutory judgment, ruling, inter alia, that defendants were liable to the municipalities for (i) PFOA emissions during a certain time period and (ii) removal costs if deposited emissions on the municipalities land infringes their property rights by an objective standard. Any damages will be decided in a separate, subsequent proceeding. Chemours is in discussions with the municipalities to identify actions that may resolve their and other community concerns, including providing technical and financial support for activities. An initial estimate of this liability was included in Accrued Litigation at December 31, 2023 and was reclassified to Accrued Environmental Remediation as of December 31, 2024 based on the remediation plan to be implemented as part of the letter of intent ("LOI") described below.

In June 2024 the Company and the Municipalities signed a LOI that includes the implementation of a specific remediation plan for the restoration of restricted vegetable gardens in certain areas of those municipalities to be funded by Chemours, sampling and developing a program to address the Merwelanden recreational lake, and further settlement discussions, including a fund to cover certain other expenditures aimed at environmental-related activities. The LOI contemplates the possibility of settling the court dispute, although still subject to further discussions which are ongoing with the municipalities and there is no guarantee that these discussions will result in a settlement. Settlement discussions are complex and often involve potential amounts, scope and terms, which can be monetary and non-monetary. The Company does not consider these ongoing settlement discussions, including any amounts with respect to a potential fund that the municipalities put forward as part of such negotiations, to be indicative of the merits or potential outcome of any court proceeding with respect to the underlying claim. As such, as of December 31, 2024, the Company has not accrued for any amounts related to the fund mentioned above. Although the Company believes a loss is probable and could be material, it is not estimable at this time due to various reasons including, among others, that such discussions are in their early stages and have significant issues to be resolved.

Further, in the Netherlands, in September 2023, a Dutch criminal defense lawyer announced a criminal complaint with the support of a few thousand citizens against Chemours and its current and former directors for alleged unlawful emissions of PFOA and GenX in Dordrecht. This claim has been filed with the Office of the Public Prosecutor, which is proceeding with the investigation.

In May 2020, we were notified of an alleged criminal offense related to the Netherlands' Environmental Management Act and the Working Conditions Decree, regarding the use of PFOA during the pre-spin time period of June 1, 2008 to December 31, 2012. The investigation was initiated in the first quarter of 2016 by a public prosecutor. We believe that we have complied with all relevant laws, and we are in contact with the prosecutor.

In addition to the above matters, the Company may engage in discussions or dispute resolutions with various parties regarding other claims, including third-party indemnity claims, and potential resolutions of such matters. In the year ended December 31, 2024, the Company recorded an immaterial amount related to one or more of these matters.

***New Jersey Department of Environmental Protection Directives and Litigation***

In March 2019, NJ DEP issued two Directives and filed four lawsuits against Chemours and other defendants. The Directives are: (i) a state-wide PFAS Directive issued to EID, DowDuPont, DuPont Specialty Products USA ("DuPont SP USA"), Solvay S.A., 3M, and Chemours seeking a meeting to discuss future costs for PFAS-related costs incurred by NJ DEP and establishing a funding source for such costs by the Directive recipients, and information relating to historic and current use of certain PFAS compounds; and, (ii) a Pompton Lakes Natural Resources Damages ("NRD") Directive to EID and Chemours demanding $0.1 to cover the cost of preparation of a natural resource damage assessment plan and access to related documents.

The lawsuits filed in New Jersey state courts by NJ DEP are: (i) in Salem County, against EID, 3M, and Chemours primarily alleging clean-up and removal costs and damages and natural resource damages under the Spill Act, the Water Pollution Control Act ("WPCA"), the Industrial Site Recovery Act ("ISRA"), and common law regarding past and present operations at Chambers Works, a site assigned to Chemours at Separation; (ii) in Middlesex County, against EID, DuPont SP USA, 3M, and Chemours primarily alleging clean-up and removal costs and damages and natural resource damages under the Spill Act, ISRA, WPCA, and common law regarding past and present operations at Parlin, an EID owned site; (iii) in Gloucester County, against EID and Chemours primarily alleging clean-up and removal costs and damages and natural resource damages under the Spill Act, WPCA, and common law regarding past operations at Repauno, a non-operating remediation site assigned to Chemours at Separation which has been sold; and, (iv) in Passaic County, against EID and Chemours primarily alleging clean-up and removal costs and damages and natural resource damages under the Spill Act, WPCA, and common law regarding past operations at Pompton Lakes, a non-operating remediation site assigned to Chemours at Separation. The alleged pollutants listed in the Salem County and Middlesex County matters above include PFAS. Each lawsuit also alleges fraudulent transfer.

In August 2020, a Second Amended Complaint was filed in each matter, adding fraudulent transfer and other claims against DuPont SP USA, Corteva, and DuPont. For the Salem County matter, NJ DEP added claims relating to failure to comply with state directives, including the state-wide PFAS Directive.

The matters were removed to federal court and consolidated for case management and pretrial purposes. In December 2021, the federal court entered a consolidated order granting, in part, and denying, in part, a motion to dismiss or strike parts of the Second Amended Complaints. In January 2022, NJ DEP filed a motion for a preliminary injunction requiring EID and Chemours to establish a remediation funding source ("RFS") in the amount of $943 for the Chambers Works site, the majority of which is for non-PFAS remediation items. In March 2023, the four NJDEP lawsuits were referred to mediation by the federal court, with the proceedings in the matters stayed pending the mediation. In April 2024 NJDEP submitted to the court a letter declaring that the parties had reached an impasse in the mediation. A case management schedule was entered by the court in May 2024, with the Chambers Works and Pompton Lakes matter being active and the other two matters being administratively terminated without prejudice. In August 2024, Third Amended Complaints were filed in the Chambers Works and Pompton Lakes Works matters. Discovery is ongoing in the Chambers Works matter with pretrial papers due in early May 2025, with trial to begin in May 2025. Discovery is also ongoing in the Pompton Lakes matter with document and ESI discovery set to close in May 2025. Other deadlines in the Pompton Lakes matter are to be addressed in a future scheduling order. In June 2024, Carneys Point Township filed a motion to intervene in such matter seeking to bring counterclaims against both the State of New Jersey and defendants, including Chemours, related to natural resource damages, remediation funding sources, ISRA penalties, off-site remediation and lost property taxes. In November 2024, Carneys Point Township's motion to intervene was denied and it is proceeding separately in its 2016 state court matter.

EID requested that Chemours defend and indemnify it in these matters. Chemours has accepted the indemnity and defense of EID while reserving rights and declining EID's demand as to matters involving other EID entities, as well as ISRA and fraudulent transfer, subject to the terms of the MOU.

***PFOA and PFAS Summary***

With the exception of the individual matters specifically noted otherwise above, management believes that it is reasonably possible that the Company could incur losses related to PFOA and/or PFAS matters in excess of amounts accrued, but any such losses, which could be material to results of operations, financial position, or cash flows are not estimable at this time due to various reasons, including, among others, that some matters are in their early stages and that there are significant factual issues to be resolved.

***U.S. Smelter and Lead Refinery, Inc.***

There are five lawsuits currently pending in Indiana federal court, including a putative class action, by area residents concerning the U.S. Smelter and Lead Refinery multi-party Superfund site in East Chicago, Indiana. Several of the lawsuits allege that Chemours is now responsible for EID environmental liabilities. The lawsuits include allegations for personal injury damages, property diminution, and other damages. At Separation, EID assigned Chemours its former plant site, which is located south of the residential portion of the Superfund area, and its responsibility for the environmental remediation at the Superfund site. Management believes a loss, which could be material, is reasonably possible, but not estimable at this time due to various reasons including, among others, that such matters are in their early stages and have significant factual issues to be resolved.

***Securities Related Litigation and Requests for Information Arising From Audit Committee Internal Review, and Related Indemnification Agreements***

The Audit Committee, with the assistance of independent counsel, conducted an internal review in the first quarter of 2024 arising from a report made to the Chemours Ethics Hotline, and its findings include that the Company's then CEO, CFO and Controller violated the Chemours Code of Ethics for those positions. Chemours is cooperating with requests for information from the SEC and the United States Attorney's Office for the Southern District of New York concerning the results of the Audit Committee Internal Review and the Company's SEC filings and in June 2024 received a subpoena from the SEC. In March 2024, two putative class actions were filed in Delaware federal court against the Company and former officers of the Company alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. The complaints allege claims on behalf of proposed classes of purchasers of Chemours stock beginning February 10, 2023 and ending February 28, 2024 and seek compensatory damages and fees. In September 2024, an Amended Complaint was filed, and the Company and former officers filed a motion to dismiss the Amended Complaint in October 2024. In April 2024, June 2024, July 2024, August 2024 and October 2024, the Company received seven stockholder demands for inspection of books and records under Section 220 of the General Corporation Law of the State of Delaware and the common law ("Section 220 Demand"), including in its purpose the investigation of possible wrongdoing, mismanagement or breach of fiduciary duties by the Board of Directors and/or senior management in connection with the compensation of executive officers and oversight over the Company's accounting practices. In addition, the Company is aware of additional efforts by private law firms to solicit clients in regard to potential securities class action or derivative litigation. Management believes that it is not possible at this time to reasonably assess the outcome of these matters or to estimate the loss or range of loss, if any, as the matters are in their early stages with significant issues to be resolved, including, for certain matters, whether a claim will be made.

The Company has indemnification and expense advancement obligations pursuant to its bylaws and indemnification agreements with respect to certain current and former members of senior management and the Company's directors. In connection with the Audit Committee Internal Review, and above litigation matters, the Company has received requests from former members of senior management under such indemnification agreements and its bylaws to provide advances of funds for legal fees and other expenses and expects additional requests in connection with the investigation and any future related litigation. The Company incurred $1 of costs for these indemnification agreement requests during the year ended December 31, 2024. These costs have been recorded within Selling, general, and administrative expense. The Company has not recorded any material liabilities for these matters as of December 31, 2024 and 2023 as it cannot estimate the ultimate outcome at this time.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

***Environmental Overview***

Chemours, due to the terms of the Separation-related agreements with EID, is subject to contingencies pursuant to environmental laws and regulations that in the future may require further action to correct the effects on the environment of prior disposal practices or releases of chemical substances, which are attributable to EID's activities before it spun-off Chemours. Much of this liability results from the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA", often referred to as "Superfund"), the Resource Conservation and Recovery Act ("RCRA"), and similar federal, state, local, and foreign laws. These laws may require Chemours to undertake certain investigative, remediation, and restoration activities at sites where ownership was transferred to Chemours under the Separation-related agreements or at sites where EID-generated waste was disposed before the 2015 separation. The accrual also includes estimated costs related to a number of sites identified for which it is probable that environmental remediation will be required, but which are not currently the subject of enforcement activities.

Chemours accrues for remediation activities when it is probable that a liability has been incurred and a reasonable estimate of the liability can be made. Where the available information is sufficient to estimate the amount of liability, that estimate has been used. Where the available information is only sufficient to establish a range of probable liability, and no point within the range is more likely than any other, the lower end of the range has been used. Estimated liabilities are determined based on existing remediation laws and technologies and the Company's planned remedial responses, which are derived from environmental studies, sampling, testing, and analyses. Inherent uncertainties exist in such evaluations, primarily due to unknown environmental conditions, changing governmental regulations regarding liability, and emerging remediation technologies. The Company, from time to time, may engage third parties to assist in obtaining and/or evaluating relevant data and assumptions when estimating its remediation liabilities. These liabilities are adjusted periodically as remediation efforts progress and as additional technological, regulatory, and legal information becomes available. Environmental liabilities and expenditures include claims for matters that are liabilities of EID and its subsidiaries, which Chemours may be required to indemnify pursuant to the Separation-related agreements. These accrued liabilities are undiscounted and do not include claims against third parties. Costs related to environmental remediation are charged to expense in the period that the associated liability is accrued.

The following table sets forth the Company's environmental remediation liabilities at December 31, 2024 and 2023 for the six sites that are deemed the most significant during the periods presented, together with the aggregate liabilities for all other sites.

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Chambers Works, Deepwater, New Jersey | $ 31 | $ 30 |
| Dordrecht Works, Netherlands (1) | 28 | 4 |
| Fayetteville Works, Fayetteville, North Carolina (2) | 351 | 383 |
| Pompton Lakes, New Jersey | 41 | 41 |
| USS Lead, East Chicago, Indiana (3) | — | 12 |
| Washington Works, West Virginia | 25 | 22 |
| All other sites | 95 | 98 |
| **Total environmental remediation** | $ 571 | $ 590 |

(1)As of December 31, 2024, environmental remediation at Dordrecht Works primarily relates to the remediation plan to be implemented as part of the letter of intent described further within this "Note 22 – Commitments and Contingent Liabilities". An initial estimate of this liability was included in Accrued Litigation at December 31, 2023 and reclassified to Accrued Environmental Remediation at December 31, 2024

(2)For more information on this matter refer to "Fayetteville Works, Fayetteville, North Carolina" within this "Note 22 – Commitments and Contingent Liabilities".

(3)USS Lead, East Chicago, Indiana: Although USS Lead, East Chicago, Indiana has a $0 balance as of December 31, 2024, the Company continues to include this remediation site in the table above due to the accrued environmental remediation liabilities associated with it as of December 31, 2023 for comparable purposes.

The following table sets forth the current and long-term components of the Company's environmental remediation liabilities at December 31, 2024 and 2023.

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Current environmental remediation | $ 115 | $ 129 |
| Long-term environmental remediation | 456 | 461 |
| **Total environmental remediation** | $ 571 | $ 590 |

Typically, the timeframe for a site to go through all phases of remediation (investigation and active clean-up) may take about 15 to 20 years, followed by several years of operation, maintenance, and monitoring ("OM&M") activities. Remediation activities, including OM&M activities, vary substantially in duration and cost from site to site. These activities, and their associated costs, depend on the mix of unique site characteristics, evolving remediation technologies, and diverse regulatory requirements, as well as the presence or absence of other potentially responsible parties. In addition, for claims that Chemours may be required to indemnify EID pursuant to the Separation-related agreements, Chemours, through EID, has limited available information for certain sites or is in the early stages of discussions with regulators. For these sites in particular, there may be considerable variability between the clean-up activities that are currently being undertaken or planned and the ultimate actions that could be required. Therefore, considerable uncertainty exists with respect to environmental remediation costs and, under adverse changes in circumstances, management currently estimates the potential liabilities may range up to approximately $720 above the amount accrued at December 31, 2024. This estimate is not intended to reflect an assessment of Chemours' maximum potential liability. As noted above, the estimated liabilities are determined based on existing remediation laws and technologies and the Company's planned remedial responses, which are derived from environmental studies, sampling, testing, and analyses. Inherent uncertainties exist in such evaluations, primarily due to unknown environmental conditions, changing governmental regulations regarding liability, and emerging remediation technologies. Management will continue to evaluate as new or additional information becomes available in the determination of its environmental remediation liability.

In October 2021, EPA released its PFAS Strategic Roadmap, identifying a comprehensive approach to addressing PFAS. The PFAS Strategic Roadmap sets timelines by which EPA planned to take specific actions through 2024, including establishing a national primary drinking water regulation for PFOA and PFOS and taking Effluent Limitations Guidelines actions to regulate PFAS discharges from industrial categories among other actions. As provided under its roadmap, EPA also released its National PFAS Testing Strategy, under which the agency will identify and select certain PFAS compounds for which it will require manufacturers to conduct testing pursuant to the Toxic Substances Control Act ("TSCA") section 4. Chemours has received various test orders and has formed consortia to jointly manage compliance with the test order requirements. Chemours expects to receive future test orders, however the timing of the remaining test orders is not determinable at this time. The timing of the draft Effluent Limitations Guidelines for PFAS manufacturers as announced in the PFAS Strategic Roadmap is uncertain.

Also in October 2021, EPA published a final toxicity assessment for GenX compounds that decreased the draft reference dose for GenX compounds based on EPA's review of new studies and analyses. On March 18, 2022, Chemours filed a petition to EPA requesting to withdraw and correct its toxicity assessment for GenX compounds, which was denied by EPA on June 14, 2022. The next day, on June 15, 2022, EPA released health advisories for four PFAS, including interim updated lifetime drinking water health advisories for PFOA and PFOS, and final health advisories for GenX compounds, including hexafluoropropylene oxide dimer acid ("HFPO Dimer Acid"), and another PFAS compound (PFBS). On July 13, 2022 the Company filed a Petition for Review of the GenX compounds health advisory, and the Third Circuit held argument on the petition in January 2024. In July 2024, the Third Circuit dismissed the Company's petition for lack of subject matter jurisdiction, finding the health advisory was not a final agency action.

In March 2023, EPA proposed a national primary drinking water regulation ("NPDWR") to establish Maximum Contaminant Levels ("MCLs") for six PFAS, with PFOA and PFOS having MCLs as individual compounds (each proposed as 4 parts per trillion ("ppt")) and four other PFAS compounds, including HFPO Dimer Acid, having a hazard index approach limit on any mixture containing one or more of the compounds. The proposed PFAS NPDWR was subject to public comment until May 30, 2023, and on April 10, 2024 EPA issued its final rule, which included promulgating individual MCLs for PFOA and PFOS at 4ppt and individual MCLs for PFHxS, PFNA and HFPO-DA at 10ppt. In addition, EPA finalized a hazard index of 1 (unitless) as the MCL for any mixture of PFHxS, PFNA, HFPO-DA and PFBS. The final rule became effective 60 days from publication in the Federal Register and the compliance date for public water systems in the U.S. to meet the MCLs is five years from the publication date. In June 2024, Chemours, as well as other organizations including the American Water Works Association and the American Chemistry Council, filed petitions for review of the final rule in the U.S. Court of Appeals for the D.C. Circuit. This appeal is now being held in abeyance until April 2025 to allow EPA to review the underlying rule. Also in April 2024, EPA issued a final rule designating PFOA and PFOS as hazardous substances under CERCLA, which has also been challenged in the same appeals court. EPA has moved to hold this appeal also in abeyance to allow review of the underlying rule. Depending on the ultimate outcome of EPA's actions, our estimated environmental remediation liabilities and accrued litigation could increase to meet any new drinking water standards, which could have a material adverse effect on our results of operations, financial condition, and cash flows.

As further discussed in the *Other PFAS Matters* section above, the Company and the municipalities of Dordrecht, Papendrecht, Sliedrecht and Molenlanden signed a Letter of Intent ("LOI") that includes the implementation of a specific remediation plan for the restoration of restricted vegetables in certain areas of those municipalities to be funded by Chemours, sampling and developing a program to address the Merwelanden recreational lake, and further settlement discussions. In the fourth quarter of 2024, the Company received comments from the Municipality of Dordrecht and the Province of South Holland on a Plan of Action for Vegetable Gardens ("Plan of Action") in the municipalities and approval for the pilot stage of the plan. The Plan of Action provides for replacement of soil impacted with PFOA above certain levels to remove RIVM documented consumption restriction as well as providing for alternative irrigation water, if necessary, as determined by PFOA levels. This accrual had a change in estimate which increased the accrual by $15 based on the comments on the Plan of Action and other factors and is included in the environmental remediation balance as of December 31, 2024.

Further, The Dordrecht Works facility discharges, through outfalls at the site, wastewater and stormwater pursuant to permits issued by the applicable local authorities, including the DCMR Environmental Protection Agency (‘DCMR”). As the regulatory landscape has evolved in the Netherlands over the last years, there is increased focus on PFAS compounds discharged under the site’s permits, including compounds that were previously discharged at undetected levels, and the site has been ordered to meet certain limits for these discharges or be subject to conditional fines. The Company regularly carries out analyses of its wastewater to assess compliance with current emission limits as well as detect other contaminants as analysis methods develop. The Company identified the presence of certain compounds based upon new analysis methods and reported these to DCMR and in December 2023 submitted an application under normal permitting practice for a discharge requirement based on limited information for these compounds. The Company has continued to engage with regulatory authorities on the application, including providing additional data and information in November 2024. In January 2025, the Company submitted a revised permit application.

In December 2024, DCMR indicated an intention to impose a conditional fine of up to €3.7 million per violation for one of the compounds, for which the Company has objected. The Company has responded to this intention, including that such intention is not consistent with normal permitting practice. In February 2025, DCMR responded to the Company indicating it will impose the conditional fine, after a two-month grace period. The Company has taken and continues to take actions to reduce discharges. The Company is evaluating DCMR's recent response and all available legal actions and recourse available to the Company. The Company has not recorded a liability for this matter at December 31, 2024 as the conditional fine is not effective at this time and will only be imposed after the two-month grace period, if at that time, the Company fails to comply with the discharge limits for the compound. As of December 31, 2024, the Company does not believe the above matter will have a material impact on the Company's financial position, results of operations or cash flows.

The environmental remediation liabilities and accrued litigation, as applicable, recorded for Fayetteville, Washington Works, Parkersburg, West Virginia, Dordrecht Works, Netherlands and Chambers Works, Deepwater, New Jersey as of December 31, 2024 are based upon the existing Consent Orders, agreements and/or voluntary commitments with EPA, state and other local regulators and depending on the ultimate outcome of EPA’s actions, could require adjustment to meet any new drinking water standards. It is reasonably possible that additional costs could be incurred in connection with EPA’s actions, however, the Company cannot estimate the potential impact or additional cost at this time, due in part to the uncertainties of challenges to them, the, regulatory implementation site by site, where applicable, the current condition and the additional sampling required to determine the level of contamination at the site, possible method(s) of remediation that may be required, and determination of other potential responsible parties. Refer to “Fayetteville Works, Fayetteville, North Carolina” below for further detail on the impact of EPA’s final drinking water health advisory for GenX compounds, including HFPO Dimer Acid.

Chemours incurred environmental remediation expenses of $70, $66 and $269 for the years ended December 31, 2024, 2023 and 2022, respectively, of which $20, $25 and $229, respectively, relate to Fayetteville (discussed further below).

***Fayetteville Works, Fayetteville, North Carolina***

Fayetteville has been in operation since the 1970s and is located next to the Cape Fear River southeast of the City of Fayetteville, North Carolina. Hexafluoropropylene oxide dimer acid ("HFPO Dimer Acid"), (sometimes referred to as “GenX” or “C3 Dimer Acid”) is manufactured at Fayetteville. The Company has operated the site since its Separation from EID in 2015.

While the Company believes that discharges from Fayetteville to the Cape Fear River, on-site surface water, groundwater, and air emissions have not impacted the safety of drinking water in North Carolina, the Company is cooperating with a variety of ongoing inquiries and investigations from federal, state, and local authorities, regulators, and other governmental entities including EPA.

*Consent Order with North Carolina Department of Environmental Quality ("NC DEQ")*

In February 2019, the North Carolina Superior Court for Bladen County approved a Consent Order ("CO") between NC DEQ, Cape Fear River Watch ("CFRW"), and the Company, resolving the State's and CFRW's lawsuits and other matters (including Notices of Violation ("NOVs") issued by the State). Under the terms of the CO, Chemours paid $13 in March 2019 to cover a civil penalty and investigative costs and agreed to certain compliance measures (with stipulated penalties for failures to do so), including the following:

- Install a thermal oxidizer ("TO") to control all PFAS in process streams from certain processes at Fayetteville at an efficiency of 99.99%;
- Develop, submit, and implement, subject to approval from NC DEQ and CFRW, a plan for interim actions that are economically and technologically feasible to achieve the maximum PFAS reduction from Fayetteville to the Cape Fear River within a two-year period;
- Develop and implement, subject to approval, a Corrective Action Plan ("CAP") that complies with North Carolina's groundwater standards and guidance provided by NC DEQ. At a minimum, the CAP must require Chemours to reduce the total loading of PFAS originating from Fayetteville to surface water by at least 75% from baseline, as defined by the CO; and,
- Provide and properly maintain permanent drinking water supplies, including via whole-building filtration units and reverse osmosis ("RO") units to qualifying surrounding properties with private drinking water wells.

In August 2020, NC DEQ, CFRW, and the Company reached agreement on the terms of an addendum to the CO (the "Addendum"), which includes procedures for implementing specified remedial measures for reducing PFAS loadings from Fayetteville to the Cape Fear River. The Addendum also includes stipulated financial penalties, inclusive of daily and weekly fines for untimeliness in meeting deadlines for construction, installation and other requirements, as well as intermittent performance-based fines for noncompliance in meeting PFAS loading reduction requirements and removal efficiency targets. In October 2020, the Addendum was approved by the North Carolina Superior Court for Bladen County.

The following table sets forth the on-site and off-site components of the Company's accrued environmental remediation liabilities related to PFAS at Fayetteville at December 31, 2024 and 2023.

| | December 31, | |
|---|---|---|
| | 2024 | 2023 |
| On-site remediation | $ 188 | $ 208 |
| Off-site groundwater remediation | 163 | 175 |
| **Total Fayetteville environmental remediation** | $ 351 | $ 383 |

The following table sets forth the current and long-term components of the Company's accrued environmental remediation liabilities related to PFAS at Fayetteville at December 31, 2024 and 2023.

| | December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Current environmental remediation | $ 68 | $ 76 |
| Long-term environmental remediation | 283 | 307 |
| **Total Fayetteville environmental remediation** | $ 351 | $ 383 |

*Off-site replacement drinking water supplies*

The CO requires the Company to provide permanent replacement drinking water supplies, including via connection to public water supply, whole building filtration units and/or RO units, to qualifying surrounding residents, businesses, schools, and public buildings with private drinking water wells. Qualifying surrounding properties with private drinking water wells that have tested for GenX above the state provisional health goal of 140 ppt, or any applicable health advisory, whichever is lower, may be eligible for public water or a whole building filtration system. NCDEQ provided notice that the June 2022 release of the final health advisory for GenX compounds by EPA constituted an applicable health advisory for determining eligibility for public water or whole house filtration system. Additionally, under the CO, qualifying surrounding properties with private drinking water wells that have tested above 10 ppt for other perfluorinated compounds ("Table 3 Compounds") are eligible for three under-sink RO units. The Company provides bottled drinking water to a qualifying property when it becomes eligible for a replacement drinking water supply, and continues to provide delivery of bottled drinking water to the qualifying property until the eligible supply is established or installed. Under the terms of the CO, Chemours must make the offer to install a water treatment system to property owners in writing multiple times, and property owners have approximately one year to accept the Company's offer before it expires. In September 2021, the Company entered into an agreement with Bladen County, North Carolina to fund public water system upgrades and connections associated with providing permanent replacement drinking water supplies under the CO.

Further, in addition to the surrounding counties, in November 2021, NC DEQ sent a notice to Chemours regarding PFAS contamination from the Cape Fear River of groundwater monitoring wells and water supply wells in New Hanover County and potentially three other downstream counties based on new sampling data by NC DEQ and its determination of Chemours' obligations for such contamination. NC DEQ directed Chemours to submit for its review and approval a comprehensive groundwater contamination assessment in such counties, as well as an updated drinking water program to provide for sampling under the CO in such counties. In 2022, the Company submitted an interim drinking water plan and a separate assessment framework plan, which were subsequently updated and resubmitted, based on comments received from NC DEQ. In 2023, NC DEQ provided additional comments identifying additional actions regarding the groundwater assessment as well as the drinking water program, which the Company responded to.

The Company's estimated liability for off-site replacement drinking water supplies is based on management's assessment of the current facts and circumstances for this matter, including comments received from NC DEQ, which are subject to various assumptions that include, but are not limited to, the number of affected surrounding properties, response rates to the Company's offer, the timing of expiration of offers made to the property owners, the type of water treatment systems selected (i.e., public water, whole building filtration, or RO units), the cost of the selected water treatment systems, and any related OM&M requirements, fines and penalties, and other charges contemplated by the CO. For off-site drinking water supplies, OM&M is accrued for 20 years on an undiscounted basis based on the Company's current plans under the CO.

At December 31, 2024 and 2023, the Company had $141 and $147 of accrued liabilities, respectively, for off-site groundwater testing and water treatment system installations at qualifying third-party properties primarily in Bladen and Cumberland counties surrounding Fayetteville, which is expected to be disbursed over approximately 20 years. In addition, as of December 31, 2024 and 2023, the Company had $21 and $28, respectively, of accrued liabilities for the assessment and for sampling related to potential PFAS contamination of groundwater and supply of alternative drinking water in New Hanover and three other downstream counties. Off-site installation, maintenance, and monitoring cost estimates are based on management's assessment of the current facts and circumstances for these matters, including comments received from NC DEQ, and could change as actual experience may differ from management's estimates or new information may become available.

The estimated liability was based on certain assumptions, which management believes are reasonable under the circumstances and include, but are not limited to, implementation of the soil and groundwater assessment, the source and cause of PFAS contamination for the four downstream counties, the estimated number of properties at which sampling is conducted and whether such property will qualify for an alternative drinking water supply, other potentially responsible parties and the method of long-term alternative water supply, if any. Further, management's estimate of the ultimate liability for this matter is dependent upon NC DEQ approval of the proposed plans in response to various NC DEQ letters, obtaining additional information, implementation of EPA's health advisories, additional feasibility and investigation work that has not yet been scoped or performed, and the estimated additional future cost of OM&M. The ultimate resolution of the matters could have a material adverse effect on the Company's financial position, results of operations and cash flow.

*On-site surface water and groundwater remediation*

Abatement and remediation measures already taken by Chemours, including the capture and disposal of its operations' process wastewater and other interim actions, have addressed and abated nearly all PFAS discharges from the Company's continuing operations at Fayetteville. However, the Company continues to have active dialogue with NC DEQ and other stakeholders regarding the potential incremental remedies that are both economically and technologically feasible to achieve the CO and Addendum objectives related to the impact of site surface water and groundwater contamination from historical operations, during and subsequent to the optimization period of the groundwater treatment system and following installation of the barrier wall.

In 2019, the Company completed and submitted its Cape Fear River PFAS Loading Reduction Plan - Supplemental Information Report and its CAP to NC DEQ. The Supplemental Information Report provided information to support the evaluation of potential interim remedial options to reduce PFAS loadings to surface waters. The CAP described potential long-term remediation activities to address PFAS in groundwater and surface waters at the site, in accordance with the requirements of the CO and the North Carolina groundwater standards, and built upon the previous submissions to NC DEQ. The NC DEQ received comments on the CAP during a public comment period, and the Company is awaiting formal response to the CAP from NC DEQ. With respect to the CO, the Addendum was approved by the North Carolina Superior Court for Bladen County in October 2020 and establishes the procedure to implement specified remedial measures for reducing PFAS loadings from Fayetteville to the Cape Fear River, including construction of a barrier wall with a groundwater extraction system, which was completed in June 2023, followed by an engineers certification confirming that the barrier wall was constructed and documented to be in conformance with the approved design.

Based on the CO, the Addendum, the CAP, and management's plans, which are based on current regulations and technology, the Company has accrued $188 and $208 at December 31, 2024 and 2023, respectively, related to the estimated cost of on-site remediation, based on the range of potential outcomes on current potential remedial options, and the projected amounts to be paid over a period of approximately 20 years. The final costs of any selected remediation will depend primarily on permit compliance requirements, ongoing dialogue with NC DEQ and other stakeholders regarding the potential incremental remedies that are both economically and technologically feasible to achieve the CO and Addendum objectives, and estimated future cost and time period of OM&M. Further, the final cost of the on-site groundwater treatment system depends on water treatment requirements and estimated treatment reagent and media usage. As such, cost estimates could change as actual experience may differ from management's estimates. Changes in estimates are recorded in results of operations in the period that the events and circumstances giving rise to such changes occur.

The Company's estimated liability for the remediation activities that are probable and estimable is based on the CO, the Addendum, the CAP, and management's assessment of the current facts and circumstances, which is subject to various assumptions including the transport pathways (being pathways by which PFAS reaches the Cape Fear River) that will require remedial actions, the types of interim and permanent site surface water and on-site remedies and treatment systems selected and implemented, the estimated cost of such potential remedies and treatment systems, any related OM&M requirements, and other charges contemplated by the CO and the Addendum.

The Company accrued 20 years of OM&M for Fayetteville environmental remediation systems based on the CO and Addendum, which includes estimated higher power consumption, ongoing monitoring, pretreatment, filtering supplies (principally carbon) and regular maintenance of the system over a 20-year period of estimated operation starting in 2023.

It is possible that issues relating to site discharges in various transport pathways, the selection of remediation alternatives to achieve PFAS loading reductions, or the operating effectiveness of the TO could result in further litigation and/or regulatory demands with regards to Fayetteville, including potential permit modifications or penalties under the CO and the Addendum. It is also possible that, as additional data is collected on the transport pathways and dialogue continues with NC DEQ and other stakeholders, the type or extent of remediation actions required to achieve the objectives committed to in the CO may change (increase or decrease) or remediation activities could be delayed. If such issues arise, or if the CO is further amended, an additional loss is reasonably possible, but not estimable at this time.

*Litigation and Other matters related to Fayetteville*

In February 2019, the Company received an NOV from EPA, alleging certain TSCA violations at Fayetteville. Matters raised in the NOV could have the potential to affect operations at Fayetteville. For this NOV, the Company responded to EPA in March 2019, asserting that the Company has not violated environmental laws. The Company is in discussions with EPA regarding PFAS-related allegations at its sites, including the February 2019 NOV, and as of December 31, 2024, management believes a loss is reasonably possible, but not estimable at this time.

Beginning in 2017, civil actions have been filed against EID and Chemours in North Carolina courts relating to discharges from Fayetteville. These actions include a consolidated action brought by four public water suppliers seeking damages and injunctive relief, a consolidated purported class action seeking medical monitoring, and property damage and/or other monetary and injunctive relief on behalf of the putative classes of property owners and residents in areas near or that draw drinking water from the Cape Fear River, and two actions encompassing approximately 2,600 private well owners seeking compensatory and punitive damages. Ruling on the Company's motions in April 2019, the court dismissed the medical monitoring, injunctive demand, and many other alleged causes of actions in these lawsuits. In October 2023, the court certified the property damages class action. In December 2024, EID and Chemours filed a motion to decertify the class on the grounds, among others, that the class representatives are inadequate and not representative. In March 2023, one of the public water suppliers brought a complaint in Delaware Chancery Court against EID, Chemours, Corteva and DuPont alleging voidable transfer and other claims arising from the Chemours separation and DowDuPont merger and subsequent restructurings, asset transfers and separations; the matter is now stayed.

In addition to natural resource damages matter filed by the State of North Carolina (as discussed within the "PFAS" section of this "Note 22 – Commitments and Contingent Liabilities"), in September 2020, three additional lawsuits were filed in North Carolina state court against Chemours and EID, as well as other defendants. One of the lawsuits is a putative class action on behalf of residents who are served by the Cape Fear Public Water utility, alleges negligence, nuisance, and other claims related to the release of perfluorinated compounds from Fayetteville, and seeks compensatory and punitive damages and medical monitoring. The other two lawsuits were filed on behalf of individuals residing near Fayetteville and allege negligence, nuisance, and other claims related to the release of perfluorinated compounds. The individuals seek compensatory property damages, punitive damages, and, in some cases, medical monitoring. All three lawsuits allege fraudulent transfer against EID and other EID entities, but not against Chemours. In October 2020, the cases were removed to federal court and then the two lawsuits filed on behalf of individuals were remanded back to state court.

In March 2022, a lawsuit was filed on behalf of an individual residing near the Fayetteville site against Chemours, EID and other defendants alleging negligence, nuisance and other claims related to the discharges from the Fayetteville site. The individual seeks compensatory property damages, punitive damages and medical monitoring. The lawsuit also alleges fraudulent transfer against EID and other EID entities, but not against Chemours.

Also, in March 2022, Cumberland County, North Carolina filed suit in state court against Chemours, EID and other defendants related to discharges from the Fayetteville site alleging negligence, nuisance, trespass and fraudulent transfer. The lawsuit seeks damages as well as injunctive and equitable relief. In January 2025, the court informed the parties that trial will be scheduled for September 29, 2025.

In December 2022, Aqua North Carolina, Inc. filed suit in North Carolina state court alleging EID, DuPont, DowDuPont, Inc and the Company are responsible for polyfluorinated chemical contamination of the Cape Fear River, groundwater and other water sources used by Aqua North Carolina across the state to serve its water customers. The complaint alleges product liability, negligence, trespass, deceptive trade practices, unjust enrichment and fraudulent transfer. Plaintiff seeks equitable relief as well as compensatory and punitive damages. In February 2023, the matter was removed to federal court. In July 2024, the court dismissed the claims for products liability, deceptive trade practices and public nuisance.

As of December 2023, lawsuits were filed in the Eastern District of North Carolina on behalf of 59 individuals residing near Fayetteville against Chemours, EID, Corteva and DuPont alleging personal injury, property damages and deceptive trade practices related to the discharges from Fayetteville. The individuals seek compensatory damages, equitable relief, attorney fees and punitive damages. In December 2023 and January 2024, amended complaints were filed in each case dropping fraudulent transfer claims. In September 2024, the court dismissed claims for deceptive trade practices, public nuisance, negligence per se and trespass to chattels.

It is possible that additional litigation may be filed against the Company and/or EID concerning the Fayetteville discharges. It is not possible at this point to predict the timing, course, or outcome of all governmental and regulatory inquiries and notices and litigation related to Fayetteville, and it is reasonably possible that these matters could have a material adverse effect on the Company's financial position, results of operations, and cash flows. In addition, local communities, organizations, and federal and state regulatory agencies have raised questions concerning HFPO Dimer Acid and other perfluorinated and polyfluorinated compounds at certain other manufacturing sites operated by the Company. It is possible that additional developments similar to those described above and centering on Fayetteville could arise in other locations.

***Other Environmental Matters***

On October 31, 2024, the Company received a request from the Dutch ILT agency to amend the Company's F-gas reporting for certain years to reflect HFCs produced and consumed or destroyed at the Dordrecht Works facility. The agency asserts that under Regulation (EU) 2024/573, which repealed and replaced Regulation 517/2014 in February 2024, such compounds are subject to the F-gas quota system. In November 2024, the Company made minor amendments to its F-gas reporting for the above years and consulted with the Dutch ILT agency and EU Commission on the above. In February 2025, the Company received an intention for the ILT to collect a penalty of €1 million based on the consideration that HFC-23 imported or acquired on the market and added to the production process rather than directly sent for destruction is quota consuming. The Company is reviewing the ILT intention and believes it is not possible at this time to reasonably assess the outcome of this matter or to estimate the loss or range of loss, if any, as the matter continues to have significant issues to be evaluated.

In addition, in the ordinary course of business, the Company may make certain commitments, including representations, warranties, and indemnities relating to current and past operations, including environmental remediation and other potential costs related to divested assets and businesses, and issue guarantees of third-party obligations. The Company accrues for these matters when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated.

In connection with the sale of the Mining Solutions business, the Company provided a limited indemnification with respect to environmental liabilities that may arise from activities prior to the closing date. Such indemnification would not exceed approximately $78 and will expire on December 1, 2026. No liabilities have been recorded at December 31, 2024 and 2023, respectively, with respect to this indemnification.

In December 2024, the West Virginia Rivers Coalition filed a complaint under the Clean Water Act in West Virginia federal court alleging past and ongoing exceedances of certain effluent discharge limits, including those for PFOA and HFPO-DA, under the NPDES permit held by the Chemours Washington Works facility. The complaint alleges CWA violations since December 2019 and seeks civil penalties of less than $0.1 per day for each violation, as well as injunctive relief. The complaint lists 199 separate violations, including daily and monthly reporting. At this early stage of the litigation, Management believes that a loss is reasonably possible but not estimable.

## Note 23. Equity

***2018 Share Repurchase Program***

On August 1, 2018, the Company's board of directors approved a share repurchase program authorizing the purchase of shares of Chemours' issued and outstanding common stock in an aggregate amount not to exceed $750, plus any associated fees or costs in connection with the Company's share repurchases activity (the "2018 Share Repurchase Program"). On February 13, 2019, the Company's board of directors increased the authorization amount of the 2018 Share Repurchase Program from $750 to $1,000. Under the 2018 Share Repurchase Program, shares of Chemours' common stock can be purchased in the open market from time to time, subject to management's discretion, as well as general business and market conditions. On May 19, 2022, the Company completed the aggregate $1,000 in authorized purchases of Chemours' issued and outstanding common stock under the 2018 Share Repurchase Program, which amounted to a cumulative 28,603,784 shares purchased at an average share price of $34.96 per share. All common shares purchased under the 2018 Share Repurchase Program are held as treasury stock and accounted for using the cost method.

The following table sets forth the Company's share repurchase activity under the 2018 Share Repurchase Program for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Total number of shares purchased | — | — | 7,824,039 |
| Total paid for shares purchased | $ — | $ — | $ 251 |
| Average price paid per share | $ — | $ — | $ 32.06 |

***2022 Share Repurchase Program***

On April 27, 2022, the Company's board of directors approved a share repurchase program authorizing the purchase of shares of Chemours' issued and outstanding common stock in an aggregate amount not to exceed $750, plus any associated fees or costs in connection with the Company's share repurchase activity (the "2022 Share Repurchase Program"). Under the 2022 Share Repurchase Program, shares of Chemours' common stock can be purchased in the open market from time to time, subject to management's discretion, as well as general business and market conditions. The Company's 2022 Share Repurchase Program became effective on April 27, 2022 and is scheduled to continue through the earlier of its expiration on December 31, 2025 or the completion of repurchases up to the approved amount. The program may be suspended or discontinued at any time. All common shares purchased under the 2022 Share Repurchase Program are expected to be held as treasury stock and accounted for using the cost method.

The following table sets forth the Company's share repurchase activity under the 2022 Share Repurchase Program for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Total number of shares purchased | — | 2,108,408 | 8,234,314 |
| Total paid for shares purchased | $ — | $ 69 | $ 241 |
| Average price paid per share | $ — | $ 32.48 | $ 29.24 |

Through December 31, 2024, the Company purchased a cumulative 10,342,722 shares of Chemours' issued and outstanding common stock under the 2022 Share Repurchase Program, which amounted to $309 at an average share price of $29.90 per share. The aggregate amount of Chemours' common stock that remained available for purchase under the 2022 Share Repurchase Program at December 31, 2024 was $441, though the Company does not anticipate additional repurchases under the 2022 Share Repurchase Program.

## Note 24. Stock-based Compensation

The Company's total stock-based compensation expense amounted to $15, $18, and $27 for the years ended December 31, 2024, 2023 and 2022, respectively. The total stock-based compensation expense for the year ended December 31, 2024 includes $3 for modifications of the vested stock options granted to the former President and Chief Executive Officer and former Chief Financial Officer, partially offset by a $1 reduction in stock-based compensation expense related to negative discretion applied to certain vested performance share units held by former members of senior management.

In 2017, Chemours' stockholders approved Chemours' Equity and Incentive Plan (the "Equity Plan"), which provides for grants to certain employees, independent contractors, or non-employee directors of the Company of different forms of awards, including stock options, restricted stock units ("RSUs"), performance stock units ("PSUs") and performance stock options ("PSOs"), with 19,000,000 shares reserved for issuance. The Equity Plan replaced the Company's prior plan adopted at Separation (the "Prior Plan"). As a result, no further grants will be made under the Prior Plan.

On April 28, 2021, Chemours' stockholders approved an amendment and restatement of the Equity Plan to increase the number of shares of the Company's common stock reserved for issuance by 3,050,000 shares.

Following the amendment and restatement of the Equity Plan, a total of 22,050,000 shares of the Company's common stock may be subject to awards granted under the Equity Plan, less one share for every one share that was subject to an option or stock appreciation right granted after December 31, 2016 under the Prior Plan, and one-and-a-half shares for every one share that was subject to an award other than an option or stock appreciation right granted after December 31, 2016 under the Prior Plan. Any shares that are subject to options or stock appreciation rights will be counted against this limit as one share for every one share granted, and any shares that are subject to awards other than options or stock appreciation rights will be counted against this limit as one-and-a-half shares for every one share granted. Awards that were outstanding under the Prior Plan remain outstanding under the Prior Plan in accordance with their terms. The underlying share awards granted under the Prior Plan after December 31, 2016 that are forfeited, cancelled, or that otherwise do not result in the issuance of shares, will be available for issuance under the Equity Plan. At December 31, 2024, approximately 9,500,000 shares of the Equity Plan reserve are available for grants.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

The Chemours Compensation and Leadership Development Committee determines the long-term incentive mix, including stock options, RSUs, PSUs and PSOs, and may authorize new grants annually.

***Stock Options***

During the years ended December 31, 2024, 2023 and 2022, Chemours granted non-qualified stock options to certain of its employees, which will vest over a three-year period and expire 10 years from the date of grant. The fair values of the Company's stock options are based on the Black-Scholes valuation model.

The following table sets forth the weighted-average assumptions used at the respective grant dates to determine the fair values of the Company's stock option awards granted during the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Risk-free interest rate | 4.45 % | 4.18 % | 1.61 % |
| Expected term (years) | 6.00 | 6.00 | 6.00 |
| Volatility | 49.02 % | 55.63 % | 56.71 % |
| Dividend yield | 3.64 % | 2.87 % | 3.85 % |
| **Fair value per stock option** | $ 10.28 | $ 15.36 | $ 9.89 |

The Company determined the dividend yield by dividing the expected annual dividend on the Company's stock by the option exercise price. A historical daily measurement of volatility is determined based on the blended volatilities of Chemours and the average of its peer companies, adjusted for Chemours' debt leverage. The risk-free interest rate is determined by reference to the yield on an outstanding U.S. Treasury note with a term equal to the expected term of the option granted. The expected term is determined using a simplified approach, calculated as the mid-point between the graded vesting period and the contractual life of the award.

The following table sets forth Chemours' stock option activity for the years ended December 31, 2024, 2023 and 2022.

| | Number of Shares (in Thousands) | Weighted-average Exercise Price (per Share) | Weighted-average Remaining Contractual Term (in Years) | Aggregate Intrinsic Value (in Thousands) |
|---|---|---|---|---|
| **Outstanding, December 31, 2021** | 6,967 | $ 20.32 | 6.60 | $ 101,261 |
| Granted | 1,031 | 25.98 | | |
| Exercised | (3,041 ) | 16.76 | | |
| Forfeited | (202 ) | 21.29 | | |
| Expired | (87 ) | 32.78 | | |
| **Outstanding, December 31, 2022** | 4,668 | $ 23.61 | 7.08 | $ 42,668 |
| Granted | 560 | 34.82 | | |
| Exercised | (1,153 ) | 16.84 | | |
| Forfeited | (296 ) | 29.04 | | |
| Expired | (169 ) | 39.02 | | |
| **Outstanding, December 31, 2023** | 3,610 | $ 26.35 | 6.51 | $ 27,760 |
| Granted | 705 | 27.50 | | |
| Exercised | (453 ) | 18.23 | | |
| Forfeited | (290 ) | 30.01 | | |
| Expired | (267 ) | 40.04 | | |
| **Outstanding, December 31, 2024** | 3,305 | $ 26.28 | 6.22 | $ 3,294 |
| **Exercisable, December 31, 2024** | 2,319 | $ 25.27 | 5.12 | $ 3,307 |

The aggregate intrinsic values in the preceding table represent the total pre-tax intrinsic value (the difference between the Company's closing stock price on the last trading day at the end of the year and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders had all option holders exercised their in-the-money options at year-end. The amount changes based on the fair market value of the Company's stock. The total intrinsic value of all options exercised for the years ended December 31, 2024, 2023 and 2022 amounted to $1, $17, and $45, respectively.

For the years ended December 31, 2024, 2023 and 2022, the Company recorded $8, $8, and $8 in stock-based compensation expense specific to its stock options, respectively. At December 31, 2024, there was $5 of unrecognized stock-based compensation expense related to stock options, which is expected to be recognized over a weighted-average period of 2.02 years.

***Restricted Stock Units***

Chemours grants RSUs to key management employees that generally vest over a three-year period and, upon vesting, convert one-for-one to Chemours' common stock. The fair value of all stock-settled RSUs is based on the market price of the underlying common stock at the grant date. RSUs vest contingent upon a time-based vesting condition and do not have explicit performance conditions.

The following table sets forth non-vested RSUs at December 31, 2024, 2023 and 2022.

| | Number of Shares (in Thousands) | Weighted-average Grant Date Fair Value (per Share) |
|---|---|---|
| **Non-vested, December 31, 2021** | 1,159 | $ 22.20 |
| Granted | 388 | 28.08 |
| Vested | (473) | 20.97 |
| Forfeited | (77) | 21.75 |
| **Non-vested, December 31, 2022** | 997 | $ 25.10 |
| Granted | 497 | 33.22 |
| Vested | (391) | 20.71 |
| Forfeited | (236) | 18.84 |
| **Non-vested, December 31, 2023** | 867 | $ 30.86 |
| Granted | 430 | 25.02 |
| Vested | (343) | 28.65 |
| Forfeited | (152) | 32.50 |
| **Non-vested, December 31, 2024** | 802 | $ 28.36 |

For the years ended December 31, 2024, 2023 and 2022, the Company recorded $9, $9, and $11 in stock-based compensation expense specific to its RSUs, respectively. At December 31, 2024, there was $12 of unrecognized stock-based compensation expense related to RSUs, which is expected to be recognized over a weighted-average period of 1.12 years.

***Performance Share Units***

Chemours grants PSUs to key senior management employees which, upon vesting, convert one-for-one to Chemours' common stock if specified performance goals, including certain market-based conditions, are met over the three-year performance period specified in the grant, subject to exceptions through the respective vesting period of three years. Each grantee is granted a target award of PSUs, and may earn between 0% and 200% of the target amount depending on the Company's performance against stated performance goals.

The following table sets forth non-vested PSUs at 100% of target amounts at December 31, 2024, 2023 and 2022.

| | Number of Shares (in Thousands) | Weighted-average Grant Date Fair Value (per Share) |
|---|---|---|
| **Non-vested, December 31, 2021** | 755 | $ 26.72 |
| Granted | 316 | 28.77 |
| Vested | (213) | 43.83 |
| Forfeited | — | — |
| **Non-vested, December 31, 2022** | 858 | $ 22.48 |
| Granted | 103 | 40.64 |
| Vested | (410) | 17.14 |
| Forfeited | (158) | 30.63 |
| **Non-vested, December 31, 2023** | 393 | $ 31.41 |
| Granted | 73 | 32.77 |
| Vested | (103) | 26.68 |
| Forfeited | (272) | 32.84 |
| **Non-vested, December 31, 2024** | 91 | $ 33.57 |

A portion of the fair value of PSUs was estimated at the grant date based on the probability of satisfying the market-based conditions associated with the PSUs using the Monte Carlo valuation method, which assesses probabilities of various outcomes of market conditions. The other portion of the fair value of the PSUs is based on the fair market value of the Company's stock at the grant date, regardless of whether the market-based conditions are satisfied. The per unit weighted-average fair value at the date of grant for PSUs granted during the year ended December 31, 2024 was $32.77. The fair value of each PSU grant is amortized monthly into compensation expense based on its respective vesting conditions over a three-year period. Compensation cost is incurred based on the Company's estimate of the final expected value of the award, which is adjusted as required for the portion based on the performance-based condition. The Company assumes that forfeitures will be minimal and recognizes forfeitures as they occur, which results in a reduction in compensation expense. As the payout of PSUs includes dividend equivalents, no separate dividend yield assumption is required in calculating the fair value of the PSUs.

For the year ended December 31, 2024, the Company recorded a reduction of stock-based compensation expense of $3 specific to its PSUs. For the years ended December 31, 2023 and 2022, the Company recorded stock-based compensation expense of less than $1 and $8 specific to its PSUs, respectively. At December 31, 2024, based on the Company's assessment of its performance goals, approximately 188,000 additional shares may be awarded under the Equity Plan.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

***Performance Stock Options***

During the years ended December 31, 2024 and 2023, Chemours granted PSOs to certain of its key senior management employees. These awards have a strike price that is 10% above the closing stock value on the grant date and become exercisable when vested and this market condition is satisfied. These awards will vest over a three-year period and expire 10 years from the date of grant. The fair value of the Company's PSOs was estimated using a Monte Carlo valuation method.

The following table sets forth the assumptions used at the grant date to determine the fair value of the Company's performance stock option awards granted during the years ended December 31, 2024 and 2023.

| | Year Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Risk-free interest rate | 4.43 % | 4.13 % |
| Expected term (years) | 6.09 | 7.00 |
| Volatility | 48.91 % | 56.32 % |
| Dividend yield | 3.64 % | 2.87 % |
| **Fair value per performance stock option (1)** | $ 10.05 | $ 14.97 |

(1)Represents the weighted-average fair value at each point of projected exercise under the Monte Carlo valuation method.

The Company determined the dividend yield by dividing the expected annual dividend on the Company's stock by the option exercise price. A historical daily measurement of volatility is determined based on the blended volatilities of Chemours and the average of its peer companies, adjusted for Chemours' debt leverage. The risk-free interest rate is determined by reference to the yield on an outstanding U.S. Treasury note with a term equal to the expected term of the option granted. The expected term is determined using a simplified approach, calculated as the mid-point between the graded vesting period and the contractual life of the award.

| | Number of Shares (in Thousands) | Weighted-average Exercise Price (per Share) | Weighted-average Remaining Contractual Term (in Years) | Aggregate Intrinsic Value (in Thousands) |
|---|---|---|---|---|
| **Outstanding, December 31, 2022** | — | $ — | — | $ — |
| Granted | 239 | 38.32 | | |
| Vested | — | — | | |
| Forfeited | (64) | 38.32 | | |
| Expired | — | — | | |
| **Outstanding, December 31, 2023** | 175 | $ 38.32 | 9.17 | $ — |
| Granted | 204 | 30.25 | | |
| Vested | — | — | | |
| Forfeited | (97) | 37.27 | | |
| Expired | — | — | | |
| **Outstanding, December 31, 2024** | 282 | $ 32.85 | 8.97 | $ — |
| **Exercisable, December 31, 2024** | 57 | $ 38.32 | 8.17 | $ — |

The aggregate intrinsic values in the preceding table represent the total pre-tax intrinsic value (the difference between the Company's closing stock price on the last trading day at the end of the year and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders had all option holders exercised their in-the-money options at year-end. The amount changes based on the fair market value of the Company's stock.

For each the years ended December 31, 2024 and 2023, the Company recorded $1 in stock-based compensation expense specific to its PSOs. At December 31, 2024, there was $1 of unrecognized stock-based compensation expense related to PSOs, which is expected to be recognized over a weighted-average period of 2.20 years.

***Employee Stock Purchase Plan***

Since 2017, the Company has provided employees the opportunity to participate in Chemours' Employee Stock Purchase Plan ("ESPP"). Under the ESPP, a total of 7,000,000 shares of Chemours' common stock is reserved and authorized for issuance to participating employees, as defined by the ESPP, which excludes executive officers of the Company. The ESPP provides for consecutive 12-month offering periods, each with two purchase periods in March and September within those offering periods. Participating employees are eligible to purchase the Company's common stock at a discounted rate equal to 95% of its fair value on the last trading day of each purchase period. To date, the Company has executed open market transactions to purchase the Company's common stock on behalf of its ESPP participants, which amounted to 354,000 shares. The total amount of Chemours' common stock received by employees in connection with the ESPP amounted to $9 at December 31, 2024.

## Note 25. Accumulated Other Comprehensive Loss

The following table sets forth the changes and after-tax balances of the Company's accumulated other comprehensive loss for the years ended December 31, 2024, 2023 and 2022.

| | Net Investment Hedge | Cash Flow Hedge | Cumulative Translation Adjustment | Defined Benefit Plans | Total |
|---|---|---|---|---|---|
| **Balance at January 1, 2022** | $ (21) | $ 5 | $ (236) | $ (112) | $ (364) |
| Other comprehensive income (loss) | 40 | 1 | (32) | 12 | 21 |
| **Balance at December 31, 2022** | 19 | 6 | (268) | (100) | (343) |
| Other comprehensive income (loss) | (19) | (14) | 94 | 8 | 69 |
| **Balance at December 31, 2023** | — | (8) | (174) | (92) | (274) |
| Other comprehensive income (loss) | 39 | 12 | (180) | 36 | (93) |
| **Balance at December 31, 2024** | $ 39 | $ 4 | $ (354) | $ (56) | $ (367) |

## Note 26. Financial Instruments

***Net Monetary Assets and Liabilities Hedge – Foreign Currency Forward Contracts***

At December 31, 2024, the Company had 11 foreign currency forward contracts outstanding with an aggregate gross notional U.S. dollar equivalent of $196 and an average maturity of one month. At December 31, 2023, the Company had 12 foreign currency forward contracts outstanding with an aggregate gross notional U.S. dollar equivalent of $252, and an average maturity of one month. Chemours recognized a net gain of $5, a net loss of $7, and a net gain of $2 for the years ended December 31, 2024, 2023 and 2022, respectively, in other income, net.

***Cash Flow Hedge – Foreign Currency Forward Contracts***

At December 31, 2024, the Company had 173 foreign currency forward contracts outstanding under its cash flow hedge program with an aggregate notional U.S. dollar equivalent of $178, and an average maturity of four months. At December 31, 2023, the Company had 176 foreign currency forward contracts outstanding under its cash flow hedge program with an aggregate notional U.S. dollar equivalent of $203, and an average maturity of four months. Chemours recognized a pre-tax gain of $7, a pre-tax loss of $2, and a pre-tax gain of $17 for the years ended December 31, 2024, 2023, and 2022, respectively, within accumulated other comprehensive loss. For the years ended December 31, 2024, 2023, and 2022, $1, $5, and $19 of gain was reclassified to the cost of goods sold from accumulated other comprehensive loss, respectively.

The Company expects to reclassify approximately $8 of net pre-tax gain, based on current foreign currency exchange rates, from accumulated other comprehensive loss to the cost of goods sold over the next 12 months.

***Cash Flow Hedge – Interest Rate Swaps***

In October 2023, the Company entered into interest rate swaps, the objective of which is to mitigate the volatility in the Company's cash payments for interest related to the portion of its senior secured term loan facility denominated in U.S. dollars, which bears a variable interest rate equal to, at the election of the Company, adjusted Term SOFR plus 3.50% or adjusted SOFR floor of 0.50%, or an adjusted base rate plus 2.50%, subject to a base rate floor of 0.0%. At December 31, 2024 and 2023, the Company had two interest rate swaps outstanding under its cash flow hedge program with an aggregate notional U.S. dollar equivalent of $300; each of the interest rate swaps mature on October 31, 2026.

In September 2022, the Company terminated all of its outstanding interest rate swaps, which resulted in a cash settlement of $8. These interest rate swaps were related to the portion of the then senior secured term loan facility denominated in U.S. dollars, which bears a variable interest rate equal to, at the election of the Company, adjusted LIBOR plus 1.75% or adjusted base rate plus 0.75%, subject to an adjusted LIBOR or an adjusted base rate floor of 0.00% or 1.00%, respectively.

Chemours recognized a pre-tax gain of $9, a pre-tax loss of $6, and a pre-tax gain of $8 for the years ended December 31, 2024, 2023, and 2022 within accumulated other comprehensive loss, respectively. For the years ended December 31, 2024, 2023 and 2022, $1, $4, and $5 of gain was reclassified to interest expense, net from accumulated other comprehensive loss, respectively.

The Company expects to reclassify approximately $2 of net pre-tax loss from accumulated other comprehensive loss to interest expense, net over the next 12 months, based on the current market rate.

***Net Investment Hedge – Foreign Currency Borrowings***

The Company recognized a pre-tax gain of $47, a pre-tax loss of $27, and a pre-tax gain of $53 for the years ended December 31, 2024, 2023, and 2022, respectively, on its net investment hedge within accumulated other comprehensive loss. No amounts were reclassified from accumulated other comprehensive loss for the Company's net investment hedges during the years ended December 31, 2024, 2023 and 2022.

***Net Investment Hedge – Cross-Currency Swaps***

Concurrently with the offering of the senior unsecured notes due January 2033 (as described further in "Note 20 – Debt), the Company entered into a cross-currency swap to effectively convert $600 of the senior unsecured notes due January 2033 into a euro-denominated borrowing of (€567 at prevailing euro interest rates, maturing on January 15, 2030. The foreign currency swap qualifies and has been designated as a net investment hedge of the Company's foreign currency exchange rate exposure of the net investments of certain of its euro-denominated subsidiaries. The Company recognized pre-tax gain of $5 for the year ended December 31, 2024 on its cross-currency swap within accumulated other comprehensive loss. No amount was reclassified from accumulated other comprehensive loss for the Company's cross-currency swap for the year ended December 31, 2024.

***Fair Value of Derivative Instruments***

The following table sets forth the fair value of the Company's derivative assets and liabilities at December 31, 2024 and 2023.

| | | Fair Value Using Level 2 Inputs | |
|---|---|---|---|
| | **Balance Sheet Location** | **December 31, 2024** | **December 31, 2023** |
| Asset derivatives: | | | |
| Foreign currency forward contracts not designated as a hedging instrument | Accounts and notes receivable, net (Note 11) | $ 1 | $ 1 |
| Foreign currency forward contracts designated as a cash flow hedge | Accounts and notes receivable, net (Note 11) | 7 | 1 |
| Cross-currency swap designated as a net investment hedge | Accounts and notes receivable, net (Note 11) | 5 | — |
| **Total asset derivatives** | | $ 13 | $ 2 |
| Liability derivatives: | | | |
| Foreign currency forward contracts not designated as a hedging instrument | Other accrued liabilities (Note 19) | $ 1 | $ 1 |
| Foreign currency forward contracts designated as a cash flow hedge | Other accrued liabilities (Note 19) | — | 3 |
| Interest rate swaps designated as a cash flow hedge | Other accrued liabilities (Note 19) | 3 | 7 |
| **Total liability derivatives** | | $ 4 | $ 11 |

The Company's foreign currency forward contracts and interest rate swaps are classified as Level 2 financial instruments within the fair value hierarchy as the valuation inputs are based on quoted prices and market observable data of similar instruments. For derivative assets and liabilities, standard industry models are used to calculate the fair value of the various financial instruments based on significant observable market inputs, such as foreign exchange rates and implied volatilities obtained from various market sources. Market inputs are obtained from well-established and recognized vendors of market data, and are subjected to tolerance and/or quality checks.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

***Summary of Financial Instruments***

The following table sets forth the pre-tax changes in fair value of the Company's financial instruments for the years ended December 31, 2024, 2023 and 2022.

| | Gain (Loss) Recognized In | | | |
|---|---|---|---|---|
| Year Ended December 31, | Cost of Goods Sold | Interest Expense, Net | Other Income, Net | Accumulated Other Comprehensive Loss |
| **2024** | | | | |
| Foreign currency forward contracts not designated as a hedging instrument | $ — | $ — | $ 5 | $ — |
| Foreign currency forward contracts designated as a cash flow hedge | 1 | — | — | 7 |
| Interest rate swaps designated as a cash flow hedge | — | 1 | — | 9 |
| Euro-denominated debt designated as a net investment hedge | — | — | — | 47 |
| Cross-currency swap designated as a net investment hedge | — | — | — | 5 |
| **2023** | | | | |
| Foreign currency forward contracts not designated as a hedging instrument | $ — | $ — | $ (7) | $ — |
| Foreign currency forward contracts designated as a cash flow hedge | 5 | — | — | (2) |
| Interest rate swaps designated as a cash flow hedge | — | 4 | — | (6) |
| Euro-denominated debt designated as a net investment hedge | — | — | — | (27) |
| **2022** | | | | |
| Foreign currency forward contracts not designated as a hedging instrument | $ — | $ — | $ 2 | $ — |
| Foreign currency forward contracts designated as a cash flow hedge | 19 | — | — | 17 |
| Interest rate swaps designated as a cash flow hedge | — | 5 | — | 8 |
| Euro-denominated debt designated as a net investment hedge | — | — | — | 53 |

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

## Note 27. Long-term Employee Benefits

***Plans Covering Employees in the U.S.***

Chemours established a defined contribution plan, which covered all eligible U.S. employees. The purpose of the plan is to encourage employees to save for their future retirement needs. The plan is a tax-qualified contributory profit-sharing plan, with cash or deferred arrangement, and any eligible employee of Chemours may participate. Chemours matches 100% of the first 6% of the employee’s contribution election, and the plan’s matching contributions vest immediately upon contribution. In 2021, the Company enhanced its previous discretionary retirement savings contribution to provide eligible employees with a guaranteed annual contribution ranging from 1% to 3% for the first $0.1 of base salary based on age and years of service.

***Plans Covering Employees Outside the U.S.***

Pension coverage for employees of Chemours’ non-U.S. subsidiaries is provided, to the extent deemed appropriate, through separate plans established after the Separation and comparable to the EID plans in those countries. Obligations under such plans are either funded by depositing funds with trustees, covered by insurance contracts, or unfunded.

The following table sets forth the Company’s net periodic pension income and amounts recognized in other comprehensive income (loss) for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| Service cost | $ (9) | $ (9) | $ (14) |
| Interest cost | (14) | (15) | (7) |
| Expected return on plan assets | 22 | 20 | 18 |
| Amortization of actuarial loss | (8) | (9) | (8) |
| Amortization of prior service gain | 2 | 3 | 2 |
| Curtailment/settlement gain | 1 | 1 | — |
| **Total net periodic pension cost** | $ (6) | $ (9) | $ (9) |
| | | | |
| Net gain (loss) | $ 35 | $ (4) | $ (2) |
| Prior service benefit | 1 | — | 2 |
| Amortization of actuarial loss | 8 | 9 | 8 |
| Amortization of prior service gain | (2) | (3) | (2) |
| Recognition of curtailment/settlement gain | (1) | (1) | — |
| Curtailment gain | 2 | 11 | — |
| Effect of foreign exchange rates | 4 | (3) | 7 |
| Benefit recognized in other comprehensive income | 47 | 9 | 13 |
| **Total changes in plan assets and benefit obligations recognized in other comprehensive income** | $ 41 | $ — | $ 4 |

During the third quarter of 2023, the Company announced the closure of its manufacturing site in Kuan Yin, Taiwan, which resulted in employment termination of substantially all of the employees based in Kuan Yin, beginning in the fourth quarter of 2023 and expected to be completed by the second quarter of 2024. The employee terminations related to the shutdown meets the definition of a plan curtailment event by eliminating the additional accrual of defined benefits for impacted employees. As a result of the curtailment, the Company remeasured its Taiwan projected pension obligation and recorded a $1 mark-to-market loss on remeasurement of the pension liability as a result of a decrease in discount rates since December 31, 2022, and recorded a reduction in the projected benefit obligation of $11 which was recognized in accumulated other comprehensive income. The $11 curtailment gain, together with the existing $9 of plan net losses in accumulated other comprehensive income, will be amortized to the consolidated statements of operations as the impacted employees are terminated from the plan. For each of the years ended December 31, 2024 and 2023, the Company amortized $1 of net curtailment gain to net periodic pension cost.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

The following table sets forth the pre-tax amounts recognized in accumulated other comprehensive loss at years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Net loss | $ 73 | $ 123 | $ 132 |
| Prior service credit | (5) | (7) | (9) |
| **Total amount recognized in accumulated other comprehensive loss** | $ 68 | $ 116 | $ 123 |

The following table sets forth summarized information on the Company's pension plans at December 31, 2024 and 2023.

| | December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Change in benefit obligation: | | |
| Benefit obligation at beginning of year | $ 437 | $ 407 |
| Service cost | 9 | 9 |
| Interest cost | 14 | 15 |
| Plan participants' contributions | 2 | 2 |
| Actuarial loss (gain) | (9) | 26 |
| Benefits paid | (7) | (9) |
| Plan amendments | — | — |
| Curtailment | (2) | (11) |
| Settlements and transfers | (28) | (17) |
| Currency translation | (28) | 15 |
| Benefit obligation at end of year | 388 | 437 |
| Change in plan assets: | | |
| Fair value of plan assets at beginning of year | 464 | 422 |
| Actual return on plan assets | 47 | 41 |
| Employer contributions | 12 | 10 |
| Plan participants' contributions | 2 | 2 |
| Benefits paid | (7) | (9) |
| Settlements and transfers | (28) | (17) |
| Currency translation | (28) | 15 |
| Fair value of plan assets at end of year | 462 | 464 |
| Total funded status at end of year | $ 74 | $ 27 |

The following table sets forth the net amounts recognized in the Company's consolidated balance sheets at December 31, 2024 and 2023.

| | December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Non-current assets | $ 97 | $ 57 |
| Current liabilities | (1) | (1) |
| Non-current liabilities | (22) | (29) |
| **Total net amount recognized** | $ 74 | $ 27 |

The accumulated benefit obligation for all pension plans was $356 and $396 as of December 31, 2024 and 2023, respectively.

For the year ended December 31, 2024, the liability component of the Company's global pension plans generated a net actuarial gain of $9, primarily driven by $11 of gains as a result of lower inflation assumptions and increases in discount rates in most countries. Those gains were partially offset by $2 of losses primarily due to the impact of a lower discount rate applied to the Company's Swiss plan.

The Company's pension plan assets, in aggregate, generated a gain in accumulated other comprehensive income of $26 as actual returns from equity and bond performance were greater than those projected at the beginning of the year and used to record pension expense.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

The following tables set forth information related to the Company's pension plans with projected and accumulated benefit obligations in excess of the fair value of plan assets at December 31, 2024 and 2023.

| Pension plans with projected benefit obligation in excess of plan assets | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Projected benefit obligation | $ 75 | $ 110 |
| Accumulated benefit obligation | 69 | 102 |
| Fair value of plan assets | 52 | 80 |

| Pension plans with accumulated benefit obligation in excess of plan assets | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Projected benefit obligation | $ 75 | $ 86 |
| Accumulated benefit obligation | 69 | 79 |
| Fair value of plan assets | 52 | 57 |

***Assumptions***

The Company generally utilizes discount rates that are developed by matching the expected cash flows of each benefit plan to various yield curves constructed from a portfolio of high-quality, fixed income instruments provided by the plans' actuaries as of the measurement date. The expected rate of return on plan assets reflects economic assumptions applicable to each country.

The following tables set forth the assumptions that have been used to determine the Company's benefit obligations and net benefit cost at December 31, 2024 and 2023.

| Weighted-average assumptions used to determine benefit obligations | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Discount rate | 3.3 % | 3.3 % |
| Rate of compensation increase (1) | 3.2 % | 3.4 % |
| Interest crediting rate (2) | 1.8 % | 2.3 % |

(1)The rate of compensation increase represents the single annual effective salary increase that an average plan participant would receive during the participant's entire career at Chemours.

(2)The interest crediting rate, which is applicable only for account balance type plans, represents the single effective annual account balance increase that an average participant would receive during the participant's entire career at Chemours.

| Weighted-average assumptions used to determine net benefit cost | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Discount rate | 3.3 % | 3.6 % |
| Rate of compensation increase (1) | 3.4 % | 3.5 % |
| Expected return on plan assets | 4.9 % | 4.6 % |

(1)The rate of compensation increase represents the single annual effective salary increase that an average plan participant would receive during the participant's entire career at Chemours.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

***Plan Assets***

Each pension plan's assets are invested through either an insurance vehicle, a master trust fund, or a stand-alone pension fund. The strategic asset allocation for each plan is selected by management, together with the pension board, where appropriate, reflecting the results of comprehensive asset and liability modeling. For assets under its control, Chemours establishes strategic asset allocation percentage targets and appropriate benchmarks for significant asset classes with the aim of achieving a prudent balance between return and risk. Strategic asset allocations in countries are selected in accordance with the laws and practices of those countries.

The following table sets forth the weighted-average allocation for the Company's pension plan assets at December 31, 2024 and 2023.

| | December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Cash and cash equivalents | 2 % | 6 % |
| U.S. and non-U.S. equity securities | 38 % | 36 % |
| Fixed income securities | 60 % | 58 % |
| **Total weighted-average allocation** | 100 % | 100 % |

Fixed income securities include corporate-issued, government-issued, and asset-backed securities. Corporate debt investments encompass a range of credit risk and industry diversification.

Fair value calculations may not be indicative of net realizable value or reflective of future fair values. Furthermore, although Chemours believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

The following tables set forth the fair values of the Company's pension assets by level within the fair value hierarchy at December 31, 2024 and 2023.

| | Fair Value Measurements at December 31, 2024 | | |
|---|---|---|---|
| | Total | Level 1 | Level 2 |
| Asset category: | | | |
| Debt - government issued | $ 69 | $ 5 | $ 64 |
| Debt - corporate issued | 116 | 4 | 112 |
| U.S. and non-U.S. equities | 175 | 18 | 157 |
| Derivatives - asset position | 60 | — | 60 |
| Cash and cash equivalents | 9 | 9 | — |
| Other | 2 | — | 2 |
| Total pension assets at fair value | 431 | $ 36 | $ 395 |
| Pooled mortgage funds (1) | 31 | | |
| **Total pension assets** | $ 462 | | |

(1)Pooled mortgage funds consist of funds that invest in residential mortgages. These funds generally allow for monthly redemption with 30 days' notice. Timing for redemption could be delayed based on the priority of the Company's request and the availability of funds. Interests in these funds are valued using the net asset value ("NAV") per share practical expedient and are not classified in the fair value hierarchy. Pooled real estate funds consist of funds that invest in real estate. These funds generally allow for redemption upon twelve months' notice. Interests in these funds are valued using the net asset value ("NAV") per share practical expedient and are not classified in the fair value hierarchy.

| | Fair Value Measurements at December 31, 2023 | | |
|---|---|---|---|
| | Total | Level 1 | Level 2 |
| Asset category: | | | |
| Debt - government issued | $ 63 | $ 15 | $ 48 |
| Debt - corporate issued | 116 | 23 | 93 |
| U.S. and non-U.S. equities | 168 | 39 | 129 |
| Derivatives - asset position | 66 | — | 66 |
| Cash and cash equivalents | 28 | 28 | — |
| Other | 2 | — | 2 |
| Total pension assets at fair value | 443 | $ 105 | $ 338 |
| Pooled mortgage funds (1) | 21 | | |
| **Total pension assets** | $ 464 | | |

(1)Pooled mortgage funds consist of funds that invest in residential mortgages. These funds generally allow for monthly redemption with 30 days' notice. Timing for redemption could be delayed based on the priority of the Company's request and the availability of funds. Interests in these funds are valued using the NAV per share practical expedient and are not classified in the fair value hierarchy.

For pension plan assets classified as Level 1 instruments within the fair value hierarchy, total fair value is either the price of the most recent trade at the time of the market close or the official close price, as defined by the exchange on which the asset is most actively traded on the last trading day of the period, multiplied by the number of units held without consideration of transaction costs.

For pension plan assets classified as Level 2 instruments within the fair value hierarchy, where the security is frequently traded in less active markets, fair value is based on the closing price at the end of the period; where the security is less frequently traded, fair value is based on the price a dealer would pay for the security or similar securities, adjusted for any terms specific to that asset or liability. Market inputs are obtained from well-established, recognized vendors of market data and subjected to tolerance and/or quality checks. For derivative assets and liabilities, standard industry models are used to calculate the fair value of the various financial instruments based on significant observable market inputs, such as foreign exchange rates, commodity prices, swap rates, interest rates, and implied volatilities obtained from various market sources. With the exception of pooled mortgage funds and pooled real estate funds, pooled funds are valued at the per-unit NAV as determined by the fund manager based on the value of the underlying traded securities.

***Cash Flows – Defined Benefit Plans***

*Employer Contributions*

For the years ended December 31, 2024, 2023 and 2022, Chemours contributed $12, $10, and $10, respectively, to its defined benefit plans.

Chemours expects to contribute $6 to its pension plans in 2025. The Company’s future contributions to its defined benefit pension plans are dependent on market-based discount rates.

*Future Benefit Payments*

The following table sets forth the benefit payments that are expected to be paid by the plans over the next five years and the five years thereafter.

| | | |
|---|---|---|
| 2025 | $ | 11 |
| 2026 | | 11 |
| 2027 | | 12 |
| 2028 | | 13 |
| 2029 | | 17 |
| 2030 to 2034 | | 95 |

***Cash Flows – Defined Contribution Plan***

*Employer Contributions*

For the years ended December 31, 2024, 2023 and 2022, Chemours contributed $29, $30, and $31, respectively, to its defined contribution plan.

## Note 28. Supplemental Cash Flow Information

The following table provides a reconciliation of cash and cash equivalents, as reported on the Company's consolidated balance sheets, to cash, cash equivalents, restricted cash and restricted cash equivalents, as reported on the Company's consolidated statements of cash flows.

| | December 31, 2024 | December 31, 2023 | December 31, 2022 |
|---|---|---|---|
| Cash and cash equivalents | $ 713 | $ 1,203 | $ 1,102 |
| Restricted cash and restricted cash equivalents (1) | 50 | 604 | 202 |
| **Cash, cash equivalents, restricted cash and restricted cash equivalents** | $ 763 | $ 1,807 | $ 1,304 |

(1)At December 31, 2024, the restricted cash and restricted cash equivalent balance includes $50 of cash and cash equivalents deposited in an escrow account as per the terms of the MOU, which is classified as a noncurrent asset. At December 31, 2023, the restricted cash and restricted cash equivalents balance includes cash and cash equivalents deposited in the Water District Settlement Fund related to the U.S. Public Water System Class Action Suit Settlement, which was classified as a current asset. At December 31, 2022, the restricted cash and restricted cash equivalents balance includes cash and cash equivalents deposited in an escrow account as per the terms of the MOU, which was classified as a noncurrent asset. See "Note 22 – Commitments and Contingent Liabilities" for further details.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

## Note 29. Geographic and Segment Information

As described further in "Note 2 – Basis of Presentation", certain prior period amounts reflected in the tables below have been revised to correct for immaterial errors pertaining to income statement presentation of byproduct revenue sales.

### *Geographic Information*

The following table sets forth the geographic locations of the Company's net sales for the years ended and property, plant, and equipment, net as of December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2024 | | 2023 | | 2022 | |
| | Net Sales (1) | Property, Plant, and Equipment, Net | Net Sales (1) | Property, Plant, and Equipment, Net | Net Sales (1) | Property, Plant, and Equipment, Net |
| North America | $ 2,589 | $ 2,435 | $ 2,745 | $ 2,345 | $ 2,984 | $ 2,320 |
| Asia Pacific | 1,386 | 52 | 1,462 | 56 | 1,787 | 127 |
| Europe, the Middle East, and Africa | 1,138 | 285 | 1,197 | 298 | 1,315 | 249 |
| Latin America (2) | 669 | 411 | 674 | 517 | 745 | 475 |
| **Total** | $ 5,782 | $ 3,183 | $ 6,078 | $ 3,216 | $ 6,831 | $ 3,171 |

(1)Net sales are attributed to countries based on customer location.

(2)Latin America includes Mexico.

### *Segment Information*

Chemours operates through its three principal reportable segments, which were organized based on their similar economic characteristics, the nature of products and production processes, end-use markets, channels of distribution, and regulatory environments: Thermal & Specialized Solutions, Titanium Technologies, and Advanced Performance Materials. Other non-reportable segment includes the Company's Performance Chemicals and Intermediates business.

The Company's Chief Operating Decision Maker ("CODM"), which is the Company's President and Chief Executive Officer, is regularly provided adjusted earnings before interest, taxes, depreciation, and amortization ("Adjusted EBITDA") which is the primary measure of segment profitability, by segment and on a consolidated basis. The CODM uses Segment Adjusted EBITDA as the primary basis to measure segment performance relative to expectations set during the Company's annual budget process, which is where decisions regarding allocation of the Company's capital expenditures, employees and financial resources predominately occurs. This regular review of segment and consolidated Adjusted EBITDA, which takes place in monthly Business Operating Reviews (BORs), includes budget-to-actual and various period-over-period variances, which allows the CODM to modify resource allocation accordingly. Adjusted EBITDA is defined as income (loss) before income taxes, excluding the following:

- interest expense, depreciation, and amortization;
- non-operating pension and other post-retirement employee benefit costs, which represents the non-service cost component of net periodic pension (income) costs;
- exchange (gains) losses included in other income, net;
- restructuring, asset-related, and other charges;
- (gains) losses on sales of assets and businesses; and,
- other items not considered indicative of the Company's ongoing operational performance and expected to occur infrequently, including certain litigation related and environmental charges and Qualified Spend reimbursable by DuPont and/or Corteva as part of the Company's cost-sharing agreement under the terms of the MOU that were previously excluded from Adjusted EBITDA.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

The following table sets forth financial information for the Company's reportable segments as of, and for the years ended December 31, 2024, 2023 and 2022.

| | Thermal & Specialized Solutions | Titanium Technologies | Advanced Performance Materials |
|---|---|---|---|
| **Year Ended December 31, 2024** | | | |
| **Segment information from Consolidated Statements of Operations:** | | | |
| Net sales to external customers (1) | $ 1,830 | $ 2,572 | $ 1,326 |
| Segment cost of goods sold | 1,180 | 2,248 | 1,102 |
| Segment selling, general, and administrative expense | 104 | 118 | 147 |
| Segment research and development expense | 29 | 28 | 50 |
| Add back: Depreciation and amortization (2) | 53 | 133 | 89 |
| Equity in earnings of affiliates | (8) | — | (35) |
| Other segment items (3) | 2 | (1) | (10) |
| Segment Adjusted EBITDA | $ 576 | $ 312 | $ 161 |
| | | | |
| **Segment information from Consolidated Balance Sheets:** | | | |
| Total assets | $ 1,549 | $ 2,290 | $ 1,748 |
| Investments in affiliates | 72 | — | 81 |
| | | | |
| **Segment information from Consolidated Statements of Cash Flow:** | | | |
| Purchases of property, plant, and equipment | $ 168 | $ 55 | $ 122 |

| | Thermal & Specialized Solutions | Titanium Technologies | Advanced Performance Materials |
|---|---|---|---|
| **Year Ended December 31, 2023** | | | |
| **Segment information from Consolidated Statements of Operations:** | | | |
| Net sales to external customers (1) | $ 1,851 | $ 2,680 | $ 1,462 |
| Segment cost of goods sold | 1,130 | 2,370 | 1,128 |
| Segment selling, general, and administrative expense | 98 | 122 | 145 |
| Segment research and development expense | 25 | 32 | 48 |
| Add back: Depreciation and amortization (2) | 62 | 133 | 85 |
| Equity in earnings of affiliates | (10) | — | (35) |
| Other segment items (3) | (15) | (1) | (12) |
| Segment Adjusted EBITDA | $ 685 | $ 290 | $ 273 |
| | | | |
| **Segment information from Consolidated Balance Sheets:** | | | |
| Total assets | $ 1,283 | $ 2,226 | $ 1,833 |
| Investments in affiliates | 75 | — | 84 |
| | | | |
| **Segment information from Consolidated Statements of Cash Flow:** | | | |
| Purchases of property, plant, and equipment | $ 75 | $ 83 | $ 193 |

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

| | Thermal & Specialized Solutions | Titanium Technologies | Advanced Performance Materials |
|---|---|---|---|
| **Year Ended December 31, 2022** | | | |
| **Segment information from Consolidated Statements of Operations:** | | | |
| Net sales to external customers (1) | $ 1,702 | $ 3,380 | $ 1,633 |
| Segment cost of goods sold | 1,070 | 2,746 | 1,184 |
| Segment selling, general, and administrative expense | 101 | 125 | 153 |
| Segment research and development expense | 25 | 34 | 54 |
| Add back: Depreciation and amortization (2) | 55 | 125 | 82 |
| Equity in earnings of affiliates | (24) | — | (31) |
| Other segment items (3) | (18) | (1) | (12) |
| Segment Adjusted EBITDA | $ 603 | $ 601 | $ 367 |
| | | | |
| **Segment information from Consolidated Balance Sheets:** | | | |
| Total assets | $ 1,238 | $ 2,384 | $ 1,742 |
| Investments in affiliates | 82 | — | 93 |
| | | | |
| **Segment information from Consolidated Statements of Cash Flow:** | | | |
| Purchases of property, plant, and equipment | $ 30 | $ 149 | $ 115 |

(1)Segment net sales to external customers are provided by product group in "Note 5 – Net Sales".

(2)Segment depreciation and amortization expense is included as a component of cost of goods sold; selling, general, and administrative expense; and research and development expense in the amounts regularly provided to the CODM and are therefore added back to arrive at Segment Adjusted EBITDA.

(3)Other segment items includes segment other (income) expense, net.

The following table sets forth a reconciliation for instances in which the above financial information for the Company's reportable segments does not sum to consolidated amounts.

| Year Ended December 31, | Segment Total | Other Non-Reportable Segment | Corporate | Total Consolidated |
|---|---|---|---|---|
| **2024** | | | | |
| Net sales to external customers | $ 5,728 | $ 54 | $ — | $ 5,782 |
| Depreciation and amortization | $ 275 | $ 5 | $ 21 | $ 301 |
| Total assets (1) | $ 5,587 | $ 97 | $ 1,831 | $ 7,515 |
| Purchases of property, plant, and equipment | $ 345 | $ 5 | $ 10 | $ 360 |
| | | | | |
| **2023** | | | | |
| Net sales to external customers | $ 5,993 | $ 85 | $ — | $ 6,078 |
| Depreciation and amortization | $ 280 | $ 6 | $ 21 | $ 307 |
| Total assets (1) | $ 5,342 | $ 96 | $ 2,813 | $ 8,251 |
| Purchases of property, plant, and equipment | $ 351 | $ 7 | $ 12 | $ 370 |
| | | | | |
| **2022** | | | | |
| Net sales to external customers | $ 6,715 | $ 116 | $ — | $ 6,831 |
| Depreciation and amortization | $ 262 | $ 8 | $ 21 | $ 291 |
| Total assets (1) | $ 5,364 | $ 124 | $ 2,152 | $ 7,640 |
| Purchases of property, plant, and equipment | $ 294 | $ 6 | $ 7 | $ 307 |

(1)Corporate assets primarily includes cash and cash equivalents, property, plant and equipment associated with the Chemours Discovery Hub, pension assets and deferred tax assets.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

The following table sets forth a reconciliation of Segment Adjusted EBITDA to the Company's consolidated income (loss) before income taxes for the years ended December 31, 2024, 2023 and 2022.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Thermal & Specialized Solutions | $ 576 | $ 685 | $ 603 |
| Titanium Technologies | 312 | 290 | 601 |
| Advanced Performance Materials | 161 | 273 | 367 |
| **Segment Adjusted EBITDA** | 1,049 | 1,248 | 1,571 |
| Other non-reportable segment Adjusted EBITDA | 8 | 18 | 2 |
| Corporate expenses (1) | (255) | (212) | (212) |
| Unallocated Items: | | | |
| Interest expense, net | (264) | (208) | (163) |
| Depreciation and amortization | (301) | (307) | (291) |
| Non-operating pension and other post-retirement employee benefit income | 3 | — | 5 |
| Exchange losses, net (Note 8) | (9) | (38) | (15) |
| Restructuring, asset-related, and other charges (Note 7) | (58) | (153) | (15) |
| Goodwill impairment charge (Note 15) | (56) | — | — |
| Inventory write-offs (2) | — | (40) | — |
| (Loss) gain on extinguishment of debt | (1) | (1) | 7 |
| Gain on sales of assets and businesses, net (Note 4) | 3 | 110 | 21 |
| Transaction costs (3) | (18) | (16) | — |
| Qualified spend recovery (4) | 26 | 54 | 58 |
| Litigation-related charges (5) | 15 | (764) | (23) |
| Environmental charges (6) | (15) | (9) | (204) |
| **Income (loss) before income taxes** | $ 127 | $ (318) | $ 741 |

(1)Includes corporate costs and certain legal and environmental expenses, and stock-based compensations expenses excluding unallocated items as listed above.

(2)Inventory adjustments for the year ended December 31, 2023 represents write-off of certain raw materials and stores inventories from the Kuan Yin, Taiwan plant closure, which was not allocated in the measurement of Titanium Technologies segment profitability used by the CODM.

(3)For the year ended December 31, 2024, transaction costs includes $16 of third-party costs related to the Titanium Technologies Transformation Plan, which was not allocated in the measurement of Titanium Technologies segment profitability used by the CODM. For the year ended December 31, 2023, transaction costs includes $7 of costs associated with the Senior Secured Credit Facilities, which is discussed in further detail in "Note 20 – Debt", and $9 of third-party costs related to the Titanium Technologies Transformation Plan.

(4)Qualified spend recovery represents costs and expenses that were previously excluded from the determination of Segment Adjusted EBITDA, reimbursable by DuPont and/or Corteva as part of the Company's cost-sharing agreement under the terms of the MOU. Terms of the MOU are discussed in further detail in "Note 22 – Commitments and Contingent Liabilities".

(5)Litigation-related charges pertains to litigation settlements, PFOA drinking water treatment accruals, and other related legal fees. For the year ended December 31, 2024, litigation-related charges primarily includes $44 of benefits from insurance recoveries, along with the $29 accrual associated with the Ohio MDL. For the year ended December 31, 2023, litigation-related charges includes the $592 accrual related to the United States Public Water System Class Action Suit Settlement plus $24 of third-party legal fees directly related to the settlement, $55 of charges related to the Company's portion of Chemours, DuPont, Corteva, EID and the State of Ohio's agreement entered into in November 2023, $13 related to the Company's portion of the supplemental payment to the State of Delaware, $76 for other PFAS litigation matters, and $4 of other litigation matters. For the year ended December 31, 2022, litigation-related charges primarily include proceeds from a settlement in a patent infringement matter relating to certain copolymer patents associated with the Company's Advanced Performance Materials segment and $20 associated with the Company's portion of the potential loss in the single matter not included in the Leach settlement.

(6)Environmental charges pertains to management's assessment of estimated liabilities associated with certain non-recurring environmental remediation expenses at various sites. For the year ended December 31, 2024, environmental charges primarily includes off-site remediation costs at Dordrecht Works. For the years ended December 31, 2022, environmental charges primarily include $196 related to on-site and off-site remediation costs at Fayetteville. Refer to "Note 22 – Commitments and Contingent Liabilities" for further details.

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

## Note 30. Unaudited Quarterly Financial Information

As discussed in "Note 2 – Basis of Presentation", during the fourth quarter of 2024 the Company identified certain immaterial errors impacting previously issued financial statements beginning as of January 1, 2022, and subsequent quarterly reporting periods through September 30, 2024. Specifically, the Company identified errors related to: 1) the income statement presentation of byproduct revenue sales, which were historically accounted for as a contra cost of goods sold and 2) the income statement presentation of certain ore sales associated with the Company's Kuan Yin, Taiwan facility. The identified errors impacted the Company's previously issued quarterly financial statements ended March 31, 2023, June 30, 2023, September 30, 2023, March 31, 2024, June 30, 2024 and September 30, 2024. The Company adjusted the previously reported net sales and cost of goods sold for the years ended December 31, 2023 and 2022, and within each quarter for the years ended December 31, 2024 and 2023, to correct for immaterial errors. The Company intends to correct these financial statements through revisions in subsequently filed quarterly reports on Form 10-Q. The impact of these future revisions are presented in the tables below. The Company evaluated the errors, individually and in the aggregate, and concluded that the related impacts were not material to any previously presented interim financial statements.

The following sets forth a summary of the Company's quarterly results of operations for the years ended December 31, 2024, 2023 and 2022.

| | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
| **2024** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Full Year (1)** |
| Net sales (2) | $ 1,362 | $ 1,554 | $ 1,508 | $ 1,359 | $ 5,782 |
| Cost of goods sold (2) | $ 1,076 | $ 1,248 | $ 1,221 | $ 1,086 | $ 4,631 |
| Income (loss) before income taxes | $ 67 | $ 82 | $ (30) | $ 9 | $ 127 |
| Net income (loss) | $ 52 | $ 70 | $ (27) | $ (8) | $ 86 |
| Net income (loss) attributable to Chemours | $ 52 | $ 70 | $ (27) | $ (8) | $ 86 |
| Basic earnings (loss) per share of common stock | $ 0.35 | $ 0.47 | $ (0.18) | $ (0.05) | $ 0.58 |
| Diluted earnings (loss) per share of common stock | $ 0.34 | $ 0.46 | $ (0.18) | $ (0.05) | $ 0.57 |

| | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
| **2023** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Full Year (1)** |
| Net sales (2) | $ 1,549 | $ 1,660 | $ 1,501 | $ 1,368 | $ 6,078 |
| Cost of goods sold (2) | $ 1,181 | $ 1,250 | $ 1,228 | $ 1,113 | $ 4,772 |
| Income (loss) before income taxes | $ 173 | $ (433) | $ 13 | $ (71) | $ (318) |
| Net income (loss) | $ 145 | $ (376) | $ 12 | $ (18) | $ (237) |
| Net income (loss) attributable to Chemours | $ 145 | $ (376) | $ 12 | $ (18) | $ (238) |
| Basic earnings (loss) per share of common stock | $ 0.97 | $ (2.52) | $ 0.08 | $ (0.12) | $ (1.60) |
| Diluted earnings (loss) per share of common stock | $ 0.96 | $ (2.52) | $ 0.08 | $ (0.12) | $ (1.60) |

(1) Individual quarters may not sum to full year amounts due to rounding.

(2) As revised, as noted below.

***Revised Interim Consolidated Statements of Operations (unaudited)***

| | Three months ended March 31, 2023 | | |
|---|---|---|---|
| | **As reported** | **Revision** | **As revised** |
| Net sales | $ 1,536 | $ 13 | $ 1,549 |
| Cost of goods sold | $ 1,168 | $ 13 | $ 1,181 |
| Gross profit | $ 368 | $ — | $ 368 |

| | Three months ended June 30, 2023 | | |
|---|---|---|---|
| | **As reported** | **Revision** | **As revised** |
| Net sales | $ 1,643 | $ 17 | $ 1,660 |
| Cost of goods sold | $ 1,233 | $ 17 | $ 1,250 |
| Gross profit | $ 410 | $ — | $ 410 |

| | Six months ended June 30, 2023 | | |
|---|---|---|---|
| | **As reported** | **Revision** | **As revised** |
| Net sales | $ 3,179 | $ 30 | $ 3,209 |
| Cost of goods sold | $ 2,401 | $ 30 | $ 2,431 |
| Gross profit | $ 778 | $ — | $ 778 |

**The Chemours Company**
**Notes to the Consolidated Financial Statements**
*(Dollars in millions, except per share amounts and par values)*

| | Three months ended September 30, 2023 | | |
|---|---|---|---|
| | As reported | Revision | As revised |
| Net sales | $ 1,487 | $ 14 | $ 1,501 |
| Cost of goods sold | $ 1,214 | $ 14 | $ 1,228 |
| Gross profit | $ 273 | $ — | $ 273 |

| | Nine months ended September 30, 2023 | | |
|---|---|---|---|
| | As reported | Revision | As revised |
| Net sales | $ 4,666 | $ 44 | $ 4,710 |
| Cost of goods sold | $ 3,615 | $ 44 | $ 3,659 |
| Gross profit | $ 1,051 | $ — | $ 1,051 |

| | Three months ended March 31, 2024 | | |
|---|---|---|---|
| | As reported | Revision | As revised |
| Net sales | $ 1,350 | $ 12 | $ 1,362 |
| Cost of goods sold | $ 1,064 | $ 12 | $ 1,076 |
| Gross profit | $ 286 | $ — | $ 286 |

| | Three months ended June 30, 2024 | | |
|---|---|---|---|
| | As reported | Revision | As revised |
| Net sales | $ 1,538 | $ 16 | $ 1,554 |
| Cost of goods sold | $ 1,232 | $ 16 | $ 1,248 |
| Gross profit | $ 306 | $ — | $ 306 |

| | Six months ended June 30, 2024 | | |
|---|---|---|---|
| | As reported | Revision | As revised |
| Net sales | $ 2,887 | $ 28 | $ 2,915 |
| Cost of goods sold | $ 2,294 | $ 29 | $ 2,323 |
| Gross profit | $ 593 | $ (1) | $ 592 |
| Other expense, net | $ (1) | $ 1 | $ — |
| Income before income taxes | $ 149 | $ — | $ 149 |

| | Three months ended September 30, 2024 | | |
|---|---|---|---|
| | As reported | Revision | As revised |
| Net sales | $ 1,501 | $ 7 | $ 1,508 |
| Cost of goods sold | $ 1,215 | $ 6 | $ 1,221 |
| Gross profit | $ 286 | $ 1 | $ 287 |
| Other income, net | $ 7 | $ (1) | $ 6 |
| Loss before income taxes | $ (30) | $ — | $ (30) |

| | Nine months ended September 30, 2024 | | |
|---|---|---|---|
| | As reported | Revision | As revised |
| Net sales | $ 4,388 | $ 35 | $ 4,423 |
| Cost of goods sold | $ 3,510 | $ 35 | $ 3,545 |
| Gross profit | $ 878 | $ — | $ 878 |

## Note 31. Subsequent Events

In January 2025, under the Portfolio Management pillar of Pathway to Thrive, management approved a restructuring program to exit its Surface Protection Solutions ("SPS") Capstone™ business and begin the shutdown process for the underlying manufacturing assets across the Washington Works and Chambers Works sites, as well as the Villers St. Paul site pending local regulatory approval. This action was taken due to regulatory changes and uncertainty that have caused reduced demand and market deselection of telomer-based chemistries, making SPS economics unfavorable going forward. Manufacturing of SPS Capstone™ products is expected to end by June 30, 2025, pending local regulatory approval. Sales of SPS Capstone™ products were $88, $97 and $104 in the years ended December 31, 2024, 2023 and 2022, respectively. Based on current information, we expect that the total cost impact of this restructuring program will include non-cash accelerated depreciation related to the SPS Capstone™ manufacturing assets remaining useful life of approximately $30, cash payments of approximately $20 for severance and retention, contract termination costs and external spending to support various site closure activities, as well as approximately $10 for deconstruction and ongoing decommissioning expenses which will be expensed as incurred.  There are approximately 100 employees expected to be impacted by this program.

**EXHIBIT 10.15**

AMENDMENT NO. 1 dated as of November 29, 2024 (this "Amendment"), among THE CHEMOURS COMPANY, a Delaware corporation (the "Borrower"), the other LOAN PARTIES party hereto, the LENDERS party hereto and JPMORGAN CHASE BANK, N.A. ("JPMorgan"), as administrative agent (in such capacity, the "Administrative Agent"), to the Second Amended and Restated Credit Agreement dated as of August 18, 2023 (as amended, supplemented or otherwise modified from time to time prior to the Amendment Effective Date (as defined below), the "Existing Credit Agreement"), among the Borrower, the lenders and issuing banks party thereto and the Administrative Agent. Capitalized terms used in this Amendment but not otherwise defined shall have the meanings assigned to such terms in the Existing Credit Agreement, except as otherwise expressly set forth herein.

WHEREAS pursuant to the Existing Credit Agreement, the Lenders and the Issuing Banks have agreed to extend credit to the Borrower on the terms and subject to the conditions set forth therein;

WHEREAS the Borrower intends to reduce the Applicable Rate applicable to the Tranche B-3 US$ Term Loans and to effect certain other modifications to the Existing Credit Agreement as set forth herein;

WHEREAS each Tranche B-3 US$ Term Lender (each, an "Existing Term Lender") holding outstanding Tranche B-3 US$ Term Loans immediately prior to the Amendment Effective Date ("Existing Term Loans") that executes and delivers a signature page to this Amendment (each, a "Consenting Term Lender") will have agreed to the terms of this Amendment upon the effectiveness of this Amendment on the Amendment Effective Date. Each Existing Term Lender that is not a Consenting Term Lender (each, a "Non-Consenting Term Lender") will be deemed not to have agreed to this Amendment as it applies to the Existing Term Loans held by such Non-Consenting Term Lender and will be subject to the mandatory assignment provisions of Section 9.02(c) of the Existing Credit Agreement upon the effectiveness of this Amendment on the Amendment Effective Date solely with respect to its Existing Term Loans (it being understood that the interests, rights and obligations of the Non-Consenting Term Lenders and of the Consenting Term Lenders that elect "Assign and Reallocation Consent Option" on their signature page hereto (collectively, the "Assigning Term Lenders") under the Existing Credit Agreement and each other Loan Document with respect to the Existing Term Loans will be assumed by JPMorgan in accordance with Section 1 hereof and will be subsequently assigned by JPMorgan in accordance with Section 9.02(c) of the Existing Credit Agreement (JPMorgan, in its capacity as the assignee of the Existing Term Loans of the Assigning Term Lenders, the "New Term Lender");

**EXHIBIT 10.15**

WHEREAS on the Amendment Effective Date, the Borrower shall have paid to the Administrative Agent, for the ratable benefit of the Existing Term Lenders, all accrued and unpaid interest to, but not including, the Amendment Effective Date, with respect to the Existing Term Loans; and

WHEREAS the undersigned Lenders constituting the Required Lenders are willing to amend such provisions of the Existing Credit Agreement, in each case on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and subject to the conditions set forth herein, the parties hereto hereby agree as follows:

SECTION 1. Tranche B-3 US$ Term Loans.

(a) On the Amendment Effective Date, but immediately prior to giving effect to the amendments set forth in Section 2 hereof, (i) the New Term Lender shall become, and (subject to the assignment and reallocation of the Tranche B-3 US$ Term Loans of each Consenting Term Lender that elects the “Assign and Reallocation Consent Option” on their signature page hereto) each Consenting Term Lender shall continue to be, a “Tranche B-3 US$ Term Lender”, a “Term Lender” and a “Lender” under the Existing Credit Agreement and (ii) the New Term Lender shall have, and (subject to the assignment and reallocation of the Tranche B-3 US$ Term Loans of each Consenting Term Lender that elects the “Assign and Reallocation Consent Option” on their signature page hereto) each Consenting Term Lender shall continue to have, all the rights and obligations of a “Tranche B-3 US$ Term Lender”, a “Term Lender” and a “Lender” holding a Tranche B-3 US$ Term Loan under the Existing Credit Agreement. The New Term Lender consents to this Amendment and appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Existing Credit Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto.

**EXHIBIT 10.15**

(b) Pursuant to Section 9.02(c) of the Existing Credit Agreement, on the Amendment Effective Date but immediately prior to giving effect to the amendments set forth in Section 2 hereof, (i) each Assigning Term Lender shall be deemed to have assigned all its Existing Term Loans and (ii) each other Consenting Term Lender that will be allocated an aggregate principal amount of Existing Term Loans as of the Amendment Effective Date that is less than the aggregate principal amount of the Existing Term Loans of such Consenting Term Lender immediately prior to the Amendment Effective Date (as disclosed to such Consenting Term Lender by the Administrative Agent prior to the date hereof), in each case together with all its interests, rights and obligations under the Loan Documents solely in respect of the Existing Term Loans, to the New Term Lender, as an Eligible Assignee, at a purchase price equal to the principal amount of such Existing Term Loans (the "Purchase Price"). Upon (i) payment to an Assigning Term Lender of (x) the Purchase Price with respect to its Existing Term Loans so assigned, (y) accrued and unpaid interest on such Existing Term Loans through but excluding the Amendment Effective Date and (z) any amounts that such Assigning Term Lender may be owed pursuant to Section 2.16 of the Existing Credit Agreement in respect of such Existing Term Loans, which, in the case of clause (x) shall be paid by the New Term Lender, as assignee, and in the case of clauses (y) and (z) shall be paid by the Borrower and (ii) the satisfaction or waiver of the applicable conditions set forth in Sections 9.02(c) and 9.04 of the Credit Agreement, such Assigning Term Lender shall cease to be a party to the Existing Credit Agreement solely in its capacity as a Tranche B-3 US$ Term Lender (it being understood and agreed, for the avoidance of doubt, that any Consenting Term Lender that elects "Assign and Reallocation Consent Option" on its signature page hereto that purchases from the New Term Lender via assignment of any Tranche B-3 US$ Term Loans will, upon the consummation of such purchase, be a Tranche B-3 US$ Term Lender); *provided* that the Administrative Agent's delivery of a counterpart signature page shall be evidence that the Administrative Agent has deemed that the applicable conditions set forth in Sections 9.02(c) and 9.04 of the Existing Credit Agreement have been satisfied.

(c) This Amendment shall be deemed to be the Assignment and Assumption required to be delivered pursuant to Section 9.04(b) of the Existing Credit Agreement with respect to the assignments contemplated by this Section 1. By execution of this Amendment, the Borrower hereby consents to the assignments contemplated by this Section 1.

(d) This Amendment shall be deemed to be the written consent of the Administrative Agent required pursuant to clause (i) of the proviso to Section 9.02(c) of the Existing Credit Agreement with respect to the mandatory assignments contemplated herein.

**EXHIBIT 10.15**

(e) The Borrower hereby appoints (i) JPMorgan, BofA Securities Inc., Citibank, N.A., UBS Securities LLC, Goldman Sachs Bank USA, RBC Capital Markets, Deutsche Bank Securities Inc. and TD Securities (USA) LLC to act as joint bookrunners and joint lead arrangers, (ii) Barclays Bank PLC, BNP Paribas Securities Corp., Mizuho Bank Ltd. and Truist Securities, Inc. to act as joint lead arrangers and (iii) Citizens Bank, National Association and M&T Bank to act as arrangers, in each case with respect to this Amendment, it being understood and agreed that JPMorgan will have "left" placement on any and all marketing materials or other documentation used in connection with this Amendment and JPMorgan will perform the roles and responsibilities conventionally understood to be associated with such left placement.

SECTION 2. Amendments to the Existing Credit Agreement. Effective as of the Amendment Effective Date but immediately after giving effect to the transactions set forth in Section 1 hereof, the Existing Credit Agreement is hereby amended as follows (the Existing Credit Agreement as so amended, the "Amended Credit Agreement"):

(a) by inserting the following definitions in the appropriate alphabetical order in Section 1.01 of the Existing Credit Agreement:

""Amendment No. 1" means Amendment No. 1 to this Agreement, dated as of November 29, 2024.

"Amendment No. 1 Effective Date" means the Amendment Effective Date as defined in Amendment No. 1, which date (for the avoidance of doubt) will be November 29, 2024.";

(b) by replacing clause (a) of the definition of "Applicable Rate" in Section 1.01 of the Existing Credit Agreement in its entirety with the following text:

"(a) with respect to any Loan that is a Tranche B-3 US$ Term Loan, (i) prior to the Amendment No. 1 Effective Date, (A) 2.50% per annum, in the case of an ABR Loan, and (B) 3.50% per annum, in the case of a Term Benchmark Loan, and (ii) on and after the Amendment No. 1 Effective Date, (A) 2.00% per annum, in the case of an ABR Loan, and (B) 3.00% per annum, in the case of a Term Benchmark Loan";

(c) by deleting each occurrence of the text "91 days after" in clauses (ii) and (iii) of the proviso of the definition of "Refinancing Term Loan Indebtedness" in Section 1.01 of the Existing Credit Agreement;

EXHIBIT 10.15

(d) by inserting the following text immediately after the text "registered under the Securities Act" in clause (b) of the definition of "Senior Unsecured Notes" in Section 1.01 of the Existing Credit Agreement:

"(including, for the avoidance of doubt, notes issued in a Rule 144A or other private placement transaction under the Securities Act)"; and

(e) by inserting the following text immediately after the text "the date that is six months after the Effective Date" in each of clauses (i) and (ii) of Section 2.11(g) of the Existing Credit Agreement:

"(or, solely with respect to the Tranche B-3 US$ Term Borrowings, the date that is six months after the Amendment No. 1 Effective Date)".

SECTION 3. Representations and Warranties. Each Loan Party represents and warrants to the Administrative Agent and to each of the Lenders party hereto that:

(a) This Amendment has been duly authorized, executed and delivered by it and constitutes a legal, valid and binding obligation of each Loan Party, enforceable against such Loan Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b) The representations and warranties of each Loan Party set forth in the Loan Documents are true and correct in all material respects (or, in the case of representations and warranties qualified as to materiality, in all respects) on and as of the date hereof (other than with respect to any representation and warranty that expressly relates to a prior date, in which case such representation and warranty is true and correct in all material respects (or in all respects, as applicable) as of such earlier date).

(c) At the time of and immediately after giving effect to this Amendment, no Default shall have occurred and be continuing.

SECTION 4. Effectiveness. This Amendment shall become effective as of the date first above written (the "Amendment Effective Date") when:

(a) the Administrative Agent shall have received counterparts of this Amendment that, when taken together, bear the signatures of (i) each Loan Party, (ii) each Consenting Term Lender (if any), (iii) the New Term Lender, (iv) Tranche B-3 US$ Term Lenders under the Existing Credit Agreement that, immediately prior to the effectiveness of this Amendment, constitute the Required Lenders (but, in making this determination, only the Tranche B-3 US$ Term Lenders will be taken into account) and (v) solely for purposes of clauses (c) and (d) of Section 2 hereof, Lenders under the Existing Credit Agreement that constitute the Required Lenders (but, in making this determination pursuant to this clause (v), effect will be given to the transactions consummated pursuant to Section 1 hereto);

EXHIBIT 10.15

(b) the Administrative Agent shall have received (i) with respect to each Loan Party, secretary's certificates of the type delivered to the Administrative Agent pursuant to Section 4.01(c) of the Existing Credit Agreement (as such term is defined in the Existing Credit Agreement), dated as of the Amendment Effective Date, (ii) a certificate of a Responsible Officer confirming compliance with the condition set forth in paragraph (e) of this Section 4, and (iii) a favorable written opinion (addressed to the Administrative Agent and the Lenders party hereto), in form and substance reasonably satisfactory to the Administrative Agent, of Goodwin Procter LLP, counsel for the Loan Parties, dated as of the Amendment Effective Date and covering such matters relating to the Loan Parties and this Amendment as the Administrative Agent may reasonably request;

(c) the Administrative Agent, the Consenting Term Lenders and the New Term Lender shall have received payment of all fees and expenses required to be paid or reimbursed by the Borrower or any other Loan Party under or in connection with this Amendment and any other Loan Document, including those fees and expenses set forth in Section 10 hereof;

(d) the Administrative Agent shall have received (i) payment of all accrued but unpaid interest on the Existing Term Loans through (but not including) the Amendment Effective Date and (ii) an Interest Election Request with respect to the Tranche B-3 US$ Term Loans in accordance with Section 2.07 of the Amended Credit Agreement for the period commencing on the Amendment Effective Date;

(e) the representations and warranties set forth in Section 3 hereof shall be true and correct as of the Amendment Effective Date; and

(f) (i) at least five Business Days prior to the Amendment Effective Date, the Administrative Agent and the Lenders shall have received all documentation and other information required by bank regulatory authorities or reasonably requested by the Administrative Agent on behalf of itself or on behalf of any Consenting Term Lender, the New Term Lender or any other Lender under or in respect of applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, that was requested at least 10 Business Days prior to the Amendment Effective Date and (ii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least five Business Days prior to the Amendment Effective Date, any Consenting Term Lender, the New Term Lender or any other Lender that has requested, in a written notice to the Borrower at least 10 Business Days prior to the Amendment Effective Date, a Beneficial Ownership Certification in relation to the Borrower shall have received such Beneficial Ownership Certification.

SECTION 5. Post-Closing Matters Covenant. At the time of delivery of the Supplemental Perfection Certificate due pursuant to Section 5.03(b) of the Amended Credit Agreement for the fiscal year ended December 31, 2024 (or such longer period as the Administrative Agent may agree in its reasonable discretion), each applicable Loan Party shall deliver either the items listed in paragraph (a) or the items listed in paragraph (b) as follows:

**EXHIBIT 10.15**

(a) (i) an opinion or email confirmation from local counsel in each jurisdiction where a Mortgaged Property is located, in form and substance reasonably satisfactory to the Administrative Agent, to the effect that:

(A) the recording of the existing Mortgage is the only filing or recording necessary to give constructive notice to third parties of the Lien created by such Mortgage as security for the Obligations, including the Obligations evidenced by the Amended Credit Agreement and the other documents executed in connection herewith, for the benefit of the Secured Parties; and

(B) no other documents, instruments, filings, recordings, re-recordings, re-filings or other actions, including the payment of any mortgage recording taxes or similar taxes, are necessary or appropriate under applicable law in order to maintain the continued enforceability, validity or priority of the Lien created by such Mortgage as security for the Obligations, including the Obligations evidenced by the Amended Credit Agreement and the other documents executed in connection therewith, for the benefit of the Secured Parties; and

(ii)a title search to the applicable Mortgaged Property demonstrating that such Mortgaged Property is free and clear of all Liens other than Liens permitted under the Amended Credit Agreement (“Permitted Liens”); or

(b) with respect to the existing Mortgages, the following, in each case in form and substance reasonably acceptable to the Administrative Agent:

(i)with respect to each Mortgage encumbering a Mortgaged Property, an amendment or amendment and restatement thereof (each a “Mortgage Amendment”) duly executed and acknowledged by the applicable Loan Party, and in form for recording in the recording office where each Mortgage was recorded, together with such certificates, affidavits, questionnaires or returns as shall be required in connection with the recording or filing thereof under applicable law, in each case in form and substance reasonably satisfactory to the Administrative Agent;

(ii)with respect to each Mortgage Amendment, a date down and mortgage modification endorsement (each, a “Title Endorsement,” collectively, the “Title Endorsements”) to the existing title policy relating to the Mortgage encumbering the Mortgaged Property subject to such Mortgage assuring the Administrative Agent that such Mortgage, as amended by such Mortgage Amendment is a valid and enforceable first priority Lien on such Mortgaged Property in favor of the Administrative Agent for the benefit of the Secured Parties free and clear of all Liens other than Permitted Liens or otherwise consented to by the Administrative Agent of such Mortgaged Property, and such Title Endorsement shall otherwise be in form and substance reasonably satisfactory to the Administrative Agent;

**EXHIBIT 10.15**

(iii)with respect to each Mortgage Amendment, opinions of local counsel to the Loan Parties, which opinions (x) shall be addressed to the Administrative Agent and the Secured Parties, (y) shall cover the enforceability, due authorization, execution and delivery of the respective Mortgage as amended by such Mortgage Amendment and such other matters customarily covered in corporate opinions as the Administrative Agent may reasonably request and (z) shall be in form and substance reasonably satisfactory to the Administrative Agent;

(iv)with respect to each Mortgaged Property, such affidavits, certificates, surveys (including, without limitation, no-change affidavits sufficient to remove all standard survey exceptions from the title policy relating to the applicable Mortgage), information and instruments of indemnification (including without limitation, a so-called “gap” indemnification) as shall be required by the title company to induce the title company to issue the Title Endorsements; and

(v)evidence acceptable to the Administrative Agent of payment by the Borrower of all applicable title insurance premiums, search and examination charges, survey costs and related charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of the Mortgage Amendments and issuance of the Title Endorsements.

SECTION 6. Reaffirmation.

(a) Each of the Loan Parties party hereto hereby consents to this Amendment and the transactions contemplated hereby and hereby confirms its guarantees, pledges, grants of security interests and other agreements, as applicable, under each of the Security Documents to which it is party and agrees that, notwithstanding the effectiveness of this Amendment and the consummation of the transactions contemplated hereby (including the amendment of the Existing Credit Agreement), such guarantees, pledges, grants of security interests and other agreements of such Loan Parties shall continue to be in full force and effect and shall accrue to the benefit of the Secured Parties under the Amended Credit Agreement. Each of the Loan Parties party hereto further agrees to take any action that may be required under any applicable law or that is reasonably requested by the Administrative Agent, and is within the power of such Loan Party, to ensure compliance by the Borrower with the Collateral and Guarantee Requirement and Sections 5.11 and 5.12 of the Amended Credit Agreement and hereby reaffirms its obligations under each similar provision of each of the Security Documents to which it is a party.

(b) Each of the Loan Parties party hereto hereby confirms and agrees that the Tranche B-3 Euro Term Loans, the Tranche B-3 US$ Term Loans, the Revolving Loans and the Letters of Credit (in each case, if any) have constituted and continue to constitute Obligations (or any word of like import) under each of the Security Documents.

SECTION 7. Credit Agreement. Except as expressly set forth herein, this Amendment (a) shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Lenders (including, without limitation, the Tranche B-3 US$ Term Lenders), the Administrative Agent, the Borrower or any other Loan Party under the Existing Credit Agreement, the Amended Credit Agreement or any other Loan Document and (b) shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Existing Credit Agreement, the Amended Credit Agreement or any other Loan Document, all of which are ratified and affirmed in all respects and shall continue in full force and effect. Nothing herein shall be deemed to entitle the Borrower or any other Loan Party to any future consent to, or waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Amended Credit Agreement or any other Loan Document in similar or different circumstances. After the date hereof, any reference in the Loan Documents to the "Credit Agreement" shall mean the Amended Credit Agreement. This Amendment shall constitute a "Loan Document" for all purposes of the Existing Credit Agreement, the Amended Credit Agreement and the other Loan Documents.

SECTION 8. Applicable Law; Waiver of Jury Trial. (a) **THIS AMENDMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.**

(b) **EACH PARTY HERETO HEREBY AGREES AS SET FORTH IN SECTION 9.10 OF THE EXISTING CREDIT AGREEMENT AS IF SUCH SECTION WERE SET FORTH IN FULL HEREIN.**

SECTION 9. Counterparts; Amendment. This Amendment may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Amendment by telecopy or electronic transmission shall be effective as delivery of a manually executed counterpart of this Amendment. This Amendment may not be amended nor may any provision hereof be waived except pursuant to a writing signed by each Loan Party, each Consenting Term Lender, the New Term Lender, the Administrative Agent, the Required Lenders (but, in making this determination, only the Tranche B-3 US$ Term Lenders will be taken into account) and, solely in the case of the amendments contemplated by clauses (c) and (d) of Section 2 hereof, the Required Lenders. The words "execution", "signed", "signature", "delivery" and words of like import in or relating to this Amendment and/or any document to be signed in connection with this Amendment and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be. For purposes hereof, "Electronic Signature" shall mean an electronic sound, symbol or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

SECTION 10. Fees and Expenses.

(a) The Borrower agrees to pay to the Administrative Agent, for the account of each Arranger, the fees previously agreed by the Borrower to be paid to such Arranger on the Amendment Effective Date. The fees payable pursuant to this Section 10(a) will be paid in dollars in immediately available funds on the Amendment Effective Date.

(b) [Reserved].

(c) The Borrower agrees to reimburse the Administrative Agent for its reasonable out-of-pocket expenses in connection with this Amendment to the extent required under Section 9.03 of the Existing Credit Agreement.

SECTION 11. Headings. The Section headings used herein are for convenience of reference only, are not part of this Amendment and are not to affect the construction of, or to be taken into consideration in interpreting, this Amendment.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first written above.

THE CHEMOURS COMPANY

By /s/ Shane Hostetter

Name: Shane Hostetter
Title: Chief Financial Officer

THE CHEMOURS COMPANY FC, LLC

By /s/ Shane Hostetter

Name: Shane Hostetter
Title: Chief Financial Officer

FT CHEMICAL, INC.

By /s/ Shane Hostetter

Name: Shane Hostetter
Title: Chief Financial Officer

FIRST CHEMICAL HOLDINGS, LLC

By /s/ Shane Hostetter

Name: Shane Hostetter
Title: Chief Financial Officer

FIRST CHEMICAL TEXAS, L.P.,

By FT Chemical, Inc., its general partner

By /s/ Shane Hostetter

Name: Shane Hostetter
Title: Chief Financial Officer

JPMORGAN CHASE BANK, N.A., individually as a Lender, as the New Term Lender and as the Administrative Agent,

By /s/ James Shender

Name: James Shender
Title: Executive Director

[Signature pages of Consenting Term Lenders on file with the Administrative Agent.]

**EXHIBIT 10.16**

AMENDMENT NO. 2 dated as of December 13, 2024 (this "Amendment"), among THE CHEMOURS COMPANY, a Delaware corporation (the "Borrower"), the other LOAN PARTIES party hereto, the LENDERS party hereto and JPMORGAN CHASE BANK, N.A. ("JPMorgan"), as administrative agent (in such capacity, the "Administrative Agent"), to the Second Amended and Restated Credit Agreement dated as of August 18, 2023 (as amended, supplemented or otherwise modified from time to time prior to the Amendment Effective Date (as defined below), the "Existing Credit Agreement"), among the Borrower, the lenders and issuing banks party thereto and the Administrative Agent. Capitalized terms used in this Amendment but not otherwise defined shall have the meanings assigned to such terms in the Existing Credit Agreement, except as otherwise expressly set forth herein.

WHEREAS pursuant to the Existing Credit Agreement, the Lenders and the Issuing Banks have agreed to extend credit to the Borrower on the terms and subject to the conditions set forth therein;

WHEREAS the Borrower intends to reduce the Applicable Rate applicable to the Tranche B-3 Euro Term Loans and to effect certain other modifications to the Existing Credit Agreement as set forth herein;

WHEREAS each Tranche B-3 Euro Term Lender (each, an "Existing Term Lender") holding outstanding Tranche B-3 Euro Term Loans immediately prior to the Amendment Effective Date ("Existing Term Loans") that executes and delivers a signature page to this Amendment (each, a "Consenting Term Lender") will have agreed to the terms of this Amendment upon the effectiveness of this Amendment on the Amendment Effective Date. Each Existing Term Lender that is not a Consenting Term Lender (each, a "Non-Consenting Term Lender") will be deemed not to have agreed to this Amendment as it applies to the Existing Term Loans held by such Non-Consenting Term Lender and will be subject to the mandatory assignment provisions of Section 9.02(c) of the Existing Credit Agreement upon the effectiveness of this Amendment on the Amendment Effective Date solely with respect to its Existing Term Loans (it being understood that the interests, rights and obligations of the Non-Consenting Term Lenders and of the Consenting Term Lenders that elect "Assign and Reallocation Consent Option" on their signature page hereto (collectively, the "Assigning Term Lenders") under the Existing Credit Agreement and each other Loan Document with respect to the Existing Term Loans will be assumed by JPMorgan in accordance with Section 1 hereof and will be subsequently assigned by JPMorgan in accordance with Section 9.02(c) of the Existing Credit Agreement (JPMorgan, in its capacity as the assignee of the Existing Term Loans of the Assigning Term Lenders, the "New Term Lender"));

**EXHIBIT 10.16**

WHEREAS on the Amendment Effective Date, the Borrower shall have paid to the Administrative Agent, for the ratable benefit of the Existing Term Lenders, all accrued and unpaid interest to, but not including, the Amendment Effective Date, with respect to the Existing Term Loans; and

WHEREAS the undersigned Lenders are willing to amend such provisions of the Existing Credit Agreement, in each case on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and subject to the conditions set forth herein, the parties hereto hereby agree as follows:

SECTION 1. Tranche B-3 Euro Term Loans.

(a) On the Amendment Effective Date, but immediately prior to giving effect to the amendments set forth in Section 2 hereof, (i) the New Term Lender shall become, and (subject to the assignment and reallocation of the Tranche B-3 Euro Term Loans of each Consenting Term Lender that elects the “Assign and Reallocation Consent Option” on their signature page hereto) each Consenting Term Lender shall continue to be, a “Tranche B-3 Euro Term Lender”, a “Term Lender” and a “Lender” under the Existing Credit Agreement and (ii) the New Term Lender shall have, and (subject to the assignment and reallocation of the Tranche B-3 Euro Term Loans of each Consenting Term Lender that elects the “Assign and Reallocation Consent Option” on their signature page hereto) each Consenting Term Lender shall continue to have, all the rights and obligations of a “Tranche B-3 Euro Term Lender”, a “Term Lender” and a “Lender” holding a Tranche B-3 Euro Term Loan under the Existing Credit Agreement. The New Term Lender consents to this Amendment and appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Existing Credit Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto.

**EXHIBIT 10.16**

(b) Pursuant to Section 9.02(c) of the Existing Credit Agreement, on the Amendment Effective Date but immediately prior to giving effect to the amendments set forth in Section 2 hereof, (i) each Assigning Term Lender shall be deemed to have assigned all its Existing Term Loans and (ii) each other Consenting Term Lender that will be allocated an aggregate principal amount of Existing Term Loans as of the Amendment Effective Date that is less than the aggregate principal amount of the Existing Term Loans of such Consenting Term Lender immediately prior to the Amendment Effective Date (as disclosed to such Consenting Term Lender by the Administrative Agent prior to the date hereof), in each case together with all its interests, rights and obligations under the Loan Documents solely in respect of the Existing Term Loans, to the New Term Lender, as an Eligible Assignee, at a purchase price equal to the principal amount of such Existing Term Loans (the "Purchase Price"). Upon (i) payment to an Assigning Term Lender of (x) the Purchase Price with respect to its Existing Term Loans so assigned, (y) accrued and unpaid interest on such Existing Term Loans through but excluding the Amendment Effective Date and (z) any amounts that such Assigning Term Lender may be owed pursuant to Section 2.16 of the Existing Credit Agreement in respect of such Existing Term Loans, which, in the case of clause (x) shall be paid by the New Term Lender, as assignee, and in the case of clauses (y) and (z) shall be paid by the Borrower and (ii) the satisfaction or waiver of the applicable conditions set forth in Sections 9.02(c) and 9.04 of the Credit Agreement, such Assigning Term Lender shall cease to be a party to the Existing Credit Agreement solely in its capacity as a Tranche B-3 Euro Term Lender (it being understood and agreed, for the avoidance of doubt, that any Consenting Term Lender that elects "Assign and Reallocation Consent Option" on its signature page hereto that purchases from the New Term Lender via assignment of any Tranche B-3 Euro Term Loans will, upon the consummation of such purchase, be a Tranche B-3 Euro Term Lender); *provided* that the Administrative Agent's delivery of a counterpart signature page shall be evidence that the Administrative Agent has deemed that the applicable conditions set forth in Sections 9.02(c) and 9.04 of the Existing Credit Agreement have been satisfied.

(c) This Amendment shall be deemed to be the Assignment and Assumption required to be delivered pursuant to Section 9.04(b) of the Existing Credit Agreement with respect to the assignments contemplated by this Section 1. By execution of this Amendment, the Borrower hereby consents to the assignments contemplated by this Section 1.

(d) This Amendment shall be deemed to be the written consent of the Administrative Agent required pursuant to clause (i) of the proviso to Section 9.02(c) of the Existing Credit Agreement with respect to the mandatory assignments contemplated herein.

**EXHIBIT 10.16**

(e) The Borrower hereby appoints (i) JPMorgan, BofA Securities Inc., Citibank, N.A., UBS Securities LLC, Goldman Sachs Bank USA, RBC Capital Markets, Deutsche Bank Securities Inc. and TD Securities (USA) LLC to act as joint bookrunners and joint lead arrangers, (ii) Barclays Bank PLC, BNP Paribas Securities Corp., Mizuho Bank Ltd. and Truist Securities, Inc. to act as joint lead arrangers and (iii) Citizens Bank, National Association and M&T Bank to act as arrangers, in each case with respect to this Amendment, it being understood and agreed that JPMorgan will have "left" placement on any and all marketing materials or other documentation used in connection with this Amendment and JPMorgan will perform the roles and responsibilities conventionally understood to be associated with such left placement.

SECTION 2. Amendments to the Existing Credit Agreement. Effective as of the Amendment Effective Date but immediately after giving effect to the transactions set forth in Section 1 hereof, the Existing Credit Agreement is hereby amended as follows (the Existing Credit Agreement as so amended, the "Amended Credit Agreement"):

(a) by inserting the following definitions in the appropriate alphabetical order in Section 1.01 of the Existing Credit Agreement:

""Amendment No. 2" means Amendment No. 2 to this Agreement, dated as of December 13, 2024.

"Amendment No. 2 Effective Date" means the Amendment Effective Date as defined in Amendment No. 2, which date (for the avoidance of doubt) will be December 13, 2024.";

(b) by replacing clause (b) of the definition of "Applicable Rate" in Section 1.01 of the Existing Credit Agreement in its entirety with the following text:

"(b) with respect to any Loan that is a Tranche B-3 Euro Term Loan, (i) prior to the Amendment No. 2 Effective Date, 4.00% per annum, and (ii) on and after the Amendment No. 2 Effective Date, 3.25% per annum"; and

(c) by replacing the text "(or, solely with respect to the Tranche B-3 US$ Term Borrowings, the date that is six months after the Amendment No. 1 Effective Date)" in each of clauses (i) and (ii) of Section 2.11(g) of the Existing Credit Agreement in its entirety with the following text:

"(or, solely with respect to (A) the Tranche B-3 US$ Term Borrowings, the date that is six months after the Amendment No. 1 Effective Date and (B) the Tranche B-3 Euro Term Borrowings, the date that is six months after the Amendment No. 2 Effective Date)".

SECTION 3. Representations and Warranties. Each Loan Party represents and warrants to the Administrative Agent and to each of the Lenders party hereto that:

**EXHIBIT 10.16**

(a) This Amendment has been duly authorized, executed and delivered by it and constitutes a legal, valid and binding obligation of each Loan Party, enforceable against such Loan Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b) The representations and warranties of each Loan Party set forth in the Loan Documents are true and correct in all material respects (or, in the case of representations and warranties qualified as to materiality, in all respects) on and as of the date hereof (other than with respect to any representation and warranty that expressly relates to a prior date, in which case such representation and warranty is true and correct in all material respects (or in all respects, as applicable) as of such earlier date).

(c) At the time of and immediately after giving effect to this Amendment, no Default shall have occurred and be continuing.

SECTION 4. Effectiveness. This Amendment shall become effective as of the date first above written (the "Amendment Effective Date") when:

(a) the Administrative Agent shall have received counterparts of this Amendment that, when taken together, bear the signatures of (i) each Loan Party, (ii) each Consenting Term Lender (if any), (iii) the New Term Lender and (iv) Tranche B-3 Euro Term Lenders under the Existing Credit Agreement that, immediately prior to the effectiveness of this Amendment, constitute the Required Lenders (but, in making this determination, only the Tranche B-3 Euro Term Lenders will be taken into account);

(b) the Administrative Agent shall have received (i) with respect to each Loan Party, secretary's certificates of the type delivered to the Administrative Agent pursuant to Section 4.01(c) of the Existing Credit Agreement (as such term is defined in the Existing Credit Agreement), dated as of the Amendment Effective Date, (ii) a certificate of a Responsible Officer confirming compliance with the condition set forth in paragraph (e) of this Section 4, and (iii) a favorable written opinion (addressed to the Administrative Agent and the Lenders party hereto), in form and substance reasonably satisfactory to the Administrative Agent, of Goodwin Procter LLP, counsel for the Loan Parties, dated as of the Amendment Effective Date and covering such matters relating to the Loan Parties and this Amendment as the Administrative Agent may reasonably request;

(c) the Administrative Agent, the Consenting Term Lenders and the New Term Lender shall have received payment of all fees and expenses required to be paid or reimbursed by the Borrower or any other Loan Party under or in connection with this Amendment and any other Loan Document, including those fees and expenses set forth in Section 10 hereof;

**EXHIBIT 10.16**

(d) the Administrative Agent shall have received payment of all accrued but unpaid interest on the Existing Term Loans through (but not including) the Amendment Effective Date;

(e) the representations and warranties set forth in Section 3 hereof shall be true and correct as of the Amendment Effective Date; and

(f) (i) at least five Business Days prior to the Amendment Effective Date, the Administrative Agent and the Lenders shall have received all documentation and other information required by bank regulatory authorities or reasonably requested by the Administrative Agent on behalf of itself or on behalf of any Consenting Term Lender, the New Term Lender or any other Lender under or in respect of applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, that was requested at least 10 Business Days prior to the Amendment Effective Date and (ii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least five Business Days prior to the Amendment Effective Date, any Consenting Term Lender, the New Term Lender or any other Lender that has requested, in a written notice to the Borrower at least 10 Business Days prior to the Amendment Effective Date, a Beneficial Ownership Certification in relation to the Borrower shall have received such Beneficial Ownership Certification.

SECTION 5. Post-Closing Matters Covenant. At the time of delivery of the Supplemental Perfection Certificate due pursuant to Section 5.03(b) of the Amended Credit Agreement for the fiscal year ended December 31, 2024 (or such longer period as the Administrative Agent may agree in its reasonable discretion), each applicable Loan Party shall deliver either the items listed in paragraph (a) or the items listed in paragraph (b) as follows:

(a) (i) an opinion or email confirmation from local counsel in each jurisdiction where a Mortgaged Property is located, in form and substance reasonably satisfactory to the Administrative Agent, to the effect that:

(A) the recording of the existing Mortgage is the only filing or recording necessary to give constructive notice to third parties of the Lien created by such Mortgage as security for the Obligations, including the Obligations evidenced by the Amended Credit Agreement and the other documents executed in connection herewith, for the benefit of the Secured Parties; and

(B) no other documents, instruments, filings, recordings, re-recordings, re-filings or other actions, including the payment of any mortgage recording taxes or similar taxes, are necessary or appropriate under applicable law in order to maintain the continued enforceability, validity or priority of the Lien created by such Mortgage as security for the Obligations, including the Obligations evidenced by the Amended Credit Agreement and the other documents executed in connection therewith, for the benefit of the Secured Parties; and

**EXHIBIT 10.16**

(ii)a title search to the applicable Mortgaged Property demonstrating that such Mortgaged Property is free and clear of all Liens other than Liens permitted under the Amended Credit Agreement ("Permitted Liens"); or

(b) with respect to the existing Mortgages, the following, in each case in form and substance reasonably acceptable to the Administrative Agent:

(i)with respect to each Mortgage encumbering a Mortgaged Property, an amendment or amendment and restatement thereof (each a "Mortgage Amendment") duly executed and acknowledged by the applicable Loan Party, and in form for recording in the recording office where each Mortgage was recorded, together with such certificates, affidavits, questionnaires or returns as shall be required in connection with the recording or filing thereof under applicable law, in each case in form and substance reasonably satisfactory to the Administrative Agent;

(ii)with respect to each Mortgage Amendment, a date down and mortgage modification endorsement (each, a "Title Endorsement," collectively, the "Title Endorsements") to the existing title policy relating to the Mortgage encumbering the Mortgaged Property subject to such Mortgage assuring the Administrative Agent that such Mortgage, as amended by such Mortgage Amendment is a valid and enforceable first priority Lien on such Mortgaged Property in favor of the Administrative Agent for the benefit of the Secured Parties free and clear of all Liens other than Permitted Liens or otherwise consented to by the Administrative Agent of such Mortgaged Property, and such Title Endorsement shall otherwise be in form and substance reasonably satisfactory to the Administrative Agent;

(iii)with respect to each Mortgage Amendment, opinions of local counsel to the Loan Parties, which opinions (x) shall be addressed to the Administrative Agent and the Secured Parties, (y) shall cover the enforceability, due authorization, execution and delivery of the respective Mortgage as amended by such Mortgage Amendment and such other matters customarily covered in corporate opinions as the Administrative Agent may reasonably request and (z) shall be in form and substance reasonably satisfactory to the Administrative Agent;

(iv)with respect to each Mortgaged Property, such affidavits, certificates, surveys (including, without limitation, no-change affidavits sufficient to remove all standard survey exceptions from the title policy relating to the applicable Mortgage), information and instruments of indemnification (including without limitation, a so-called "gap" indemnification) as shall be required by the title company to induce the title company to issue the Title Endorsements; and

EXHIBIT 10.16

(v)evidence acceptable to the Administrative Agent of payment by the Borrower of all applicable title insurance premiums, search and examination charges, survey costs and related charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of the Mortgage Amendments and issuance of the Title Endorsements.

Notwithstanding the foregoing, the requirements of this Section 5 shall be deemed to be satisfied if the documentation delivered by or on behalf of the Loan Parties pursuant to Section 5 of Amendment No. 1 addresses the requirements of this Section 5 (and the Loan Parties shall not be required to deliver duplicative documentation pursuant to this Section 5).

SECTION 6. Reaffirmation.

(a) Each of the Loan Parties party hereto hereby consents to this Amendment and the transactions contemplated hereby and hereby confirms its guarantees, pledges, grants of security interests and other agreements, as applicable, under each of the Security Documents to which it is party and agrees that, notwithstanding the effectiveness of this Amendment and the consummation of the transactions contemplated hereby (including the amendment of the Existing Credit Agreement), such guarantees, pledges, grants of security interests and other agreements of such Loan Parties shall continue to be in full force and effect and shall accrue to the benefit of the Secured Parties under the Amended Credit Agreement. Each of the Loan Parties party hereto further agrees to take any action that may be required under any applicable law or that is reasonably requested by the Administrative Agent, and is within the power of such Loan Party, to ensure compliance by the Borrower with the Collateral and Guarantee Requirement and Sections 5.11 and 5.12 of the Amended Credit Agreement and hereby reaffirms its obligations under each similar provision of each of the Security Documents to which it is a party.

(b) Each of the Loan Parties party hereto hereby confirms and agrees that the Tranche B-3 Euro Term Loans, the Tranche B-3 US$ Term Loans, the Revolving Loans and the Letters of Credit (in each case, if any) have constituted and continue to constitute Obligations (or any word of like import) under each of the Security Documents.

**EXHIBIT 10.16**

SECTION 7. Credit Agreement. Except as expressly set forth herein, this Amendment (a) shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Lenders (including, without limitation, the Tranche B-3 Euro Term Lenders), the Administrative Agent, the Borrower or any other Loan Party under the Existing Credit Agreement, the Amended Credit Agreement or any other Loan Document and (b) shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Existing Credit Agreement, the Amended Credit Agreement or any other Loan Document, all of which are ratified and affirmed in all respects and shall continue in full force and effect. Nothing herein shall be deemed to entitle the Borrower or any other Loan Party to any future consent to, or waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Amended Credit Agreement or any other Loan Document in similar or different circumstances. After the date hereof, any reference in the Loan Documents to the “Credit Agreement” shall mean the Amended Credit Agreement. This Amendment shall constitute a “Loan Document” for all purposes of the Existing Credit Agreement, the Amended Credit Agreement and the other Loan Documents.

SECTION 8. Tax Treatment. The Borrower intends to treat this Amendment as resulting in a “significant modification” of the Existing Term Loan within the meaning of Section 1.100-3 of the U.S. Treasury Regulations.

SECTION 9. Applicable Law; Waiver of Jury Trial. (a) **THIS AMENDMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.**

(b) **EACH PARTY HERETO HEREBY AGREES AS SET FORTH IN SECTION 9.10 OF THE EXISTING CREDIT AGREEMENT AS IF SUCH SECTION WERE SET FORTH IN FULL HEREIN.**

**EXHIBIT 10.16**

SECTION 10. Counterparts; Amendment. This Amendment may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Amendment by telecopy or electronic transmission shall be effective as delivery of a manually executed counterpart of this Amendment. This Amendment may not be amended nor may any provision hereof be waived except pursuant to a writing signed by each Loan Party, each Consenting Term Lender, the New Term Lender, the Administrative Agent and the Required Lenders (but, in making this determination, only the Tranche B-3 Euro Term Lenders will be taken into account). The words "execution", "signed", "signature", "delivery" and words of like import in or relating to this Amendment and/or any document to be signed in connection with this Amendment and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be. For purposes hereof, "Electronic Signature" shall mean an electronic sound, symbol or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

SECTION 11. Fees and Expenses.

(a) The Borrower agrees to pay to the Administrative Agent, for the account of each Arranger, the fees previously agreed by the Borrower to be paid to such Arranger on the Amendment Effective Date. The fees payable pursuant to this Section 10(a) will be paid in dollars in immediately available funds on the Amendment Effective Date.

(b) [Reserved].

(c) The Borrower agrees to reimburse the Administrative Agent for its reasonable out-of-pocket expenses in connection with this Amendment to the extent required under Section 9.03 of the Existing Credit Agreement.

SECTION 12. Headings. The Section headings used herein are for convenience of reference only, are not part of this Amendment and are not to affect the construction of, or to be taken into consideration in interpreting, this Amendment.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first written above.

THE CHEMOURS COMPANY

By /s/ Shane Hostetter

Name: Shane Hostetter
Title: Chief Financial Officer

THE CHEMOURS COMPANY FC, LLC

By /s/ Shane Hostetter

Name: Shane Hostetter
Title: Chief Financial Officer

FT CHEMICAL, INC.

By /s/ Shane Hostetter

Name: Shane Hostetter
Title: Chief Financial Officer

FIRST CHEMICAL HOLDINGS, LLC

By /s/ Shane Hostetter

Name: Shane Hostetter
Title: Chief Financial Officer

FIRST CHEMICAL TEXAS, L.P.,

By FT Chemical, Inc., its general partner

By /s/ Shane Hostetter

Name: Shane Hostetter
Title: Chief Financial Officer

JPMORGAN CHASE BANK, N.A., individually as a Lender, as the New Term Lender and as the Administrative Agent,

By /s/ James Shender

Name: James Shender
Title: Executive Director

**EXHIBIT 19**

**The Chemours Company**
**Insider Trading Policy**

**1. Background**

The Chemours Company ("**Chemours**," or the "**Company**") and its directors, officers and employees worldwide must act in a manner that does not misuse material financial or other information that has not been publicly disclosed. Failure to do so impacts our integrity. Also in some jurisdictions, including the United States, insider trading violates laws that impose strict penalties on both companies and individuals, which may include financial sanctions and prison time.

Maintaining the confidence of shareholders and the public markets is important. The principle underlying Chemours' policy is fairness in dealings with others, which requires that Chemours directors, officers and employees do not take personal advantage of undisclosed information to the detriment of others who do not have the information. This means that individuals covered by this Insider Trading Policy may not make decisions to purchase, sell, give away or otherwise trade Chemours' securities or provide material nonpublic information to others outside the Company who may trade on the basis of that information.

**2. Applicability of Policy**

This Policy applies to all transactions in Chemours securities, including common stock, options and any other securities that Chemours may issue, such as preferred stock, notes, bonds and convertible securities, as well as to derivative securities relating to any Chemours securities, whether or not issued by the Company.

For purposes of this Policy, the term "**Insider**" includes all officers and directors of the Company, and all employees of, and consultants and contractors to, the Company who receive or have access to Material Nonpublic Information (as defined below) regarding the Company. This Policy also applies to any person who receives Material Nonpublic Information from any Insider. It is also the policy of the Company that the Company will not engage in transactions in Company securities while aware of material nonpublic information relating to the Company or Company securities, except that transactions may occur pursuant to a valid Rule 10b5-1 plan.

Each individual is responsible for making sure that he or she complies with this Policy, and that any family member, household member or entity whose transactions are subject to this Policy, as discussed below, also comply with this Policy. **In all cases, the responsibility for determining whether an individual is in possession of Material Nonpublic Information rests with that individual, and any action on the part of the Company, the Corporate Secretary or any other employee or director of the Company pursuant to this Policy (or otherwise) does not in any way constitute legal advice or insulate an individual from liability under applicable securities laws.**

**3. Statement of Policy**

**a. General Policy**

Except as otherwise expressly permitted under the terms and conditions of this Policy, no Insider shall: (i) make any unauthorized disclosure of any Material Nonpublic Information concerning the Company; (ii) purchase, sell, give away or otherwise trade any Company security while in possession of Material Nonpublic Information; or (iii) assist someone who is engaged in any such activities.

**b. Specific Policies**

**Trading on Material Nonpublic Information:** No Insider may engage in any transaction involving a purchase, sale, gift or trade of Chemours securities, whether or not issued by Chemours (including any offer to purchase or offer to sell), from the time he or she becomes aware of or possesses Material Nonpublic Information concerning the Company until the close of business on the second Trading Day (defined below) following the date of public disclosure of that information, or until such time as such Material Nonpublic Information is no longer material.

For purposes of this Policy, the term "**Trading Day**" means a day on which national stock exchanges, including the New York Stock Exchange ("**NYSE**"), are open for trading.

**EXHIBIT 19**

**Tipping:** No Insider may trade, tip or recommend securities (or otherwise cause the purchase or sale of securities) while in possession of information that he or she has reason to believe is Material Nonpublic Information. No Insider shall make any recommendations or express opinions on the basis of Material Nonpublic Information as to trading in the Company's securities.

**Confidentiality of Material Nonpublic Information:** Material Nonpublic Information relating to the Company is the property of the Company. All Insiders have ethical and legal responsibilities to maintain the confidentiality of Material Nonpublic Information. Insiders should not discuss internal matters or developments pertaining to the Company with anyone outside the Company, except as strictly needed to perform corporate duties. Any unauthorized disclosure of such information is strictly prohibited. If Material Nonpublic Information is disclosed, no matter what the circumstances, by an Insider, the person making or discovering that disclosure should immediately report the facts to the Corporate Secretary.

**No Exception for Hardship:** There are no exceptions to this Policy, except as specifically noted herein. Transactions that may be necessary or justifiable for independent reasons (such as the need to raise money for an emergency expenditure), or small transactions, are not exempt from this Policy. The securities laws do not recognize any mitigating circumstances.

**Family Members:** This Policy applies to any member of an Insider's immediate family or household who resides with the Insider (including a spouse, a child, a child away at college, stepchildren, grandchildren, parents, stepparents, grandparents, siblings and in-laws) and anyone else who lives in the Insider's household. This Policy also applies to any family members who do not live in the Insider's household but whose transactions in the Company's securities are directed by the Insider or are subject to the Insider's influence or control, such as parents or children who consult with the Insider before they trade in securities.

**Controlled Entities:** This Policy also applies to any entities that the Insider influences or controls, including any corporations, partnerships or trusts. Transactions by these controlled entities should be treated as if they were for the Insider's own account.

**c. Definition of Material Nonpublic Information**

It is impossible to define all categories of material information. Information should be regarded as "material" if there is a reasonable likelihood that a reasonable investor would consider that information important in making a decision to buy, hold or sell securities. Any information that could be expected to affect the Company's stock price, whether it is positive or negative, should be considered material.

There is no bright-line standard for assessing materiality; rather, materiality is based on an assessment of all of the facts and circumstances, and is often evaluated by enforcement authorities with the benefit of hindsight. Either positive or negative information may be considered material.

There are some categories of information that are particularly sensitive and, as a general rule, should always be considered as potentially material. Such categories of information may include, but are not limited to, the following:

- External earnings guidance, or financial results that would cause a change in previously published guidance;
- A pending or proposed merger, acquisition, disposition, or joint venture;
- A change in dividend policy, the declaration of a stock split;
- The establishment of a repurchase program for the Company's securities;
- A change in executive management;
- A change in auditors or notification that the auditor's reports may no longer be relied upon;
- Pending or threatened significant litigation, or the resolution of such litigation;
- Impending bankruptcy or the existence of severe liquidity problems;
- The gain or loss of a significant customer or supplier;
- Changes in debt ratings;

**EXHIBIT 19**

- •Capital market activities such as significant debt or equity issuances; or
- •A significant cybersecurity incident experienced by the Company

Nonpublic information is information that has not been previously disclosed or made available to the general public. Release of information to the media does not immediately free Insiders to trade. The market must have an opportunity to absorb and evaluate the information. As a general rule, Insiders must refrain from trading in the Company's securities for a minimum of two Trading Days following the date of public disclosure of such information. The Company may also determine that a longer period should apply to the release of certain Material Nonpublic Information.

**If you are not sure whether information is Material Nonpublic Information, you should consult with the Corporate Secretary.**

**d. Potential Criminal and Civil Liability and/or Disciplinary Action**

The Securities and Exchange Commission ("**SEC**"), the Financial Industry Regulatory Authority ("**FINRA**") and the NYSE use sophisticated electronic surveillance to monitor potential insider trading, and the SEC and U.S. Department of Justice pursue insider trading violations rigorously. Other jurisdictions, including the European Union ("**EU**"), also assess fines and penalties for insider trading and market manipulation.

**Liability for Insider Trading:** Insiders may be subject to criminal and civil penalties for trading in Chemours' securities while in possession of Material Nonpublic Information regarding the Company. For example, Section 10 of the Securities Exchange Act of 1934, as amended, prohibits trading on Material Nonpublic Information, and violations of this law can result in penalties which include fines and/or imprisonment.

**Liability for Tipping:** Insiders may also be liable for improper transactions by any person to whom the insider has disclosed ("tipped") material non-public information. The SEC has imposed large penalties even when the disclosing insider did not profit from the transaction.

**Disciplinary Actions:** In addition to severe civil and/or criminal penalties, employees who violate this Policy may be subject to disciplinary action by the Company, including dismissal for cause.

**e. Applicability of Policy to Inside Information Regarding Other Companies**

This Policy also applies to Material Nonpublic Information relating to other companies, when such information was obtained in the course of the Insider's employment with, or other services performed on behalf of the Company. Insiders should treat Material Nonpublic Information about these other companies with the same care with which they handle Material Nonpublic Information of the Company.

**4. Trading Guidelines**

**a. Trading Blackout Periods**

**Quarterly Trading Blackout Periods:** Covered Persons (defined below) may generally not trade in Chemours securities during the period beginning at the close of the market on the fifteenth (15th) day of the third month of each fiscal quarter and ending at the close of business on the day after the Company's quarterly earnings are publicly disclosed. The Company may extend these blackout periods at its discretion by notice to Covered Persons.

**Other Trading Blackout Periods:** From time to time, other types of material nonpublic information regarding the Company (such as negotiation of mergers, acquisitions or dispositions or new product developments) may be pending and not be publicly disclosed. While such material non-public information is pending, the Company may impose special blackout periods during which Covered Persons (or a subset of Covered Persons) are prohibited from trading in the Company's securities. If the Company imposes a special blackout period, it will notify such persons affected.

**EXHIBIT 19**

**Covered Persons:** The following individuals are "**Covered Persons**" for purposes of the blackout periods:

- Individuals designated by the Corporate Secretary
- Individuals who serve in the following roles:
  - Directors and "Section 16 officers" designated by the Board
  - Members of the Chemours Extended Leadership Team
  - Members of the Chemours Disclosure Committee

**b. Pre-Clearance of Securities Transactions**

**General:** To prevent inadvertent violations of this Policy, Chemours directors and employees at Grade Level 34 or above ("**Officers**") may not engage in any transaction without first obtaining pre-clearance of the transaction from the Corporate Secretary (or attorney designated by the Corporate Secretary to authorize clearance). The Corporate Secretary (or his or her designee) is under no obligation to approve a transaction submitted for pre-clearance, and may determine not to permit the transaction. If a person seeks pre-clearance and permission to engage in the transaction is denied, then he or she should refrain from initiating any transaction in the Company's securities, and should not inform any other person of the restriction.

Unless otherwise specified by the Corporate Secretary, pre-cleared trades must be effected within two business days of receipt of pre-clearance, unless an exception is granted or the person becomes aware of Material Nonpublic Information before the trade is executed — in which case the pre-clearance is void and the transaction may not be completed. Transactions not effected within the time limit would be subject to pre-clearance again.

**Chemours Debt Securities:** Engaging in the purchase or sale of Chemours debt securities, while not prohibited, is a less common securities transaction for directors, officers and employees than securities transactions involving the Company's common stock. All purchases and sales of the Company's debt securities must be pre-cleared by the Corporate Secretary (or attorney designated by the Corporate Secretary to authorize clearance) according to the same procedures outlined above.

**5. Transactions Under Company Plans**

**Stock Option Exercises:** This Policy **does not** apply to the exercise of stock options that are granted under the Company's stock option plans. The Policy **does apply**, however, to the sale of the shares that are issued as a result of the exercise of stock options, whether the sale occurs at the same time or after the exercise (e.g., any sale of stock as part of a broker-assisted cashless exercise of an option, or any other market sale for the purpose of generating the cash needed to pay the exercise price of an option). These sales are also subject to the blackout periods in the Policy.

**Restricted Stock Units:** This Policy **does not** apply to the vesting of restricted stock units. The Policy **does apply**, however, to any sale of the underlying stock in the open market.

**Performance Stock Units:** This Policy **does not** apply to the vesting of performance stock units. The Policy **does apply**, however, to any sale of the underlying stock in the open market.

**Deferred Compensation Plans:** This Policy **does not** apply to the allocation of Company stock units to your account under a deferred compensation plan resulting from your periodic deferrals under the plan pursuant to your deferral election. This Policy **does apply**, however, to certain elections you may make under a deferred compensation plan, including: (a) an election to increase or decrease the percentage of your deferral that will be allocated to Company stock units; (b) an election to make an intra-plan transfer of an existing account balance into or out of the Company stock units, if available to you.

**EXHIBIT 19**

**Employee Stock Purchase Plan:**

•**Enrollment:** This Policy **does apply** to your election to participate in the employee stock purchase plan ("ESPP") for any enrollment period. You cannot make an election to enroll in the ESPP while you are in possession of Material Nonpublic Information.

•**Purchases of Company Stock:** This Policy **does not** apply to purchases of Company stock pursuant to the ESPP resulting from your periodic contribution of money to the plan though payroll deduction.

•**Changes to Contribution Rate**: This Policy does apply to any change to your contribution rate under the ESPP. You cannot change your contribution rate under the ESPP (i.e., increase, decrease or stop future contributions (decrease contribution rates to zero)) while you are in possession of Material Nonpublic Information.

•**Withdrawals**: This Policy does apply to your election to withdraw from participation in the ESPP. You cannot make an election to withdraw from participating in the ESPP while you are in possession of Material Nonpublic Information.

•**Sales of Company Stock**: This Policy does apply to your sales of Company stock purchased under the ESPP. You cannot sell shares of Company stock you hold through the ESPP while you are in possession of Material Nonpublic Information.

**6. Additional Restrictions**

The Company considers it improper and inappropriate for those employed by or associated with the Company to engage in short-term or speculative transactions in the Company's securities or in other transactions involving the Company's securities that may lead to inadvertent violations of the insider trading laws. Accordingly, trading in the Company's securities is subject to the following additional guidance:

**Short Sales:** No Insider may engage in short sales of Chemours securities (*i.e.*, the sale of a security that the seller does not own), including a "sale against the box" (*i.e.*, a sale with delayed delivery).

**Publicly-Traded Options, Hedging Transactions:** No Insider may engage in transactions in publicly traded options ("puts," "calls" and other derivative securities to the extent applicable to the Company), on a stock exchange or in any other organized market, or enter into hedges or swaps involving Chemours securities.

**Margin Accounts, Pledged Securities:** Directors and "Section 16 officers" designated by the Board (collectively, "**Section 16 Persons**") may not hold Chemours securities in a margin account or otherwise pledge Chemours securities as collateral for a loan. The Corporate Secretary may grant exceptions to this prohibition when a Section 16 Person wishes to pledge the Company's securities as collateral for a loan (not including margin debt) and clearly demonstrates the financial capacity to repay the loan without resorting to the pledged securities. Any Section 16 Person seeking an exception must submit a request for approval to the Corporate Secretary at least two weeks prior to the transaction.

**Post-Termination Transactions:** If an Insider is aware of Material Nonpublic Information when the Insider's employment or relationship with the Company is terminated, the Insider may not trade in the Company's securities until such Material Nonpublic Information has been made public by the Company for at least two trading days or a reasonable and good faith determination is made that such information is no longer material.

**"Short-Swing" Profit Rule:** The securities laws impose liability for "short-swing profits" by Section 16 Persons and require the Company to recover those profits. Any profit realized from the open market purchase and sale or sale and purchase of the Company's securities, within any period of less than six months may be recovered in a court action brought by the Company or any stockholder on behalf of the Company. Section 16 Persons are prohibited from engaging in transactions that would generate "short-swing" profits.

**Section 16 Reports:** Section 16 Persons designated by the Board are required to file Section 16 reports. The Legal Department will help reporting persons prepare and file such required reports. Reporting persons, however, retain responsibility for the timing and contents of these reports.

**Form 144 Reports:** Section 16 Persons designated by the Board are required to file Form 144 with the SEC before making an open market sale of Company securities. This form is generally prepared by an Insider's stockbroker and is in addition to the Section 16 report filing requirement.

**EXHIBIT 19**

**7. Rule 10b5-1 Plans**

Rule 10b-5 provides a defense from insider trading liability under SEC Rule 10b-5. To be eligible for this defense, an insider may enter into a “10b5-1 plan” for trading in securities (a “**Rule 10b5-1 Plan**”). To comply with the Policy, a Rule 10b5-1 Plan must be approved by the Corporate Secretary and meet the requirements of Rule 10b5-1 and the Company’s “Guidelines for Rule 10b5-1 Plans,” which may be obtained from the Corporate Secretary.

In general, a 10b5-1 Plan must be entered into at a time when there is no undisclosed material information. Once the plan is adopted, the insider must not exercise any influence over the amount of securities to be traded, the price at which they are to be traded or the date of the trade. The plan must either specify the amount, pricing and timing of transactions in advance or delegate discretion on these matters to an independent third party.

**8. Company Assistance and Inquiries**

Compliance with this Policy is of the utmost importance both for all Insiders and the Company. If you have any questions about this Policy or its application to any proposed transaction, you may obtain additional guidance from the Company’s Corporate Secretary.

Effective July 23, 2024

**Exhibit 21**

**SUBSIDIARIES OF THE REGISTRANT**

| Name | Organized Under Laws Of |
|---|---|
| 2463297 Ontario Limited | Canada |
| Chemours Belgium BVBA | Belgium |
| Chemours Deutschland GmbH | Germany |
| Chemours France SAS | France |
| Chemours Hong Kong Holding Limited | Hong Kong |
| Chemours International Operations Sàrl | Switzerland |
| Chemours Italy S.r.l. | Italy |
| Chemours Kabushiki Kaisha | Japan |
| Chemours Korea Inc. | Korea |
| Chemours Netherlands B.V. | Netherlands |
| Chemours NL Holding 1 B.V. | Netherlands |
| Chemours NL Holding 2 B.V. | Netherlands |
| Chemours NL Holding 4 B.V. | Netherlands |
| Chemours International B.V. | Netherlands |
| Chemours Services Sàrl | Switzerland |
| Chemours Spain S.L. | Spain |
| Chemours Titanium Technologies (Taiwan) Ltd. | Taiwan |
| Chemours TR Kimyasal Ürünler Limited Şirketi | Turkey |
| Chemours UK Limited | United Kingdom |
| Chemours Vietnam Company Limited | Vietnam |
| Dordrecht Energy Supply Company (Desco) B.V. | Netherlands |
| First Chemical Holdings, LLC | Mississippi |
| First Chemical Texas, L.P | Delaware |
| FT Chemical, Inc. | Texas |
| ICOR International Inc. | Indiana |
| Initiatives Inc de México S.A. de C.V. | Mexico |
| Noluma International, LLC | Delaware |
| PT The Chemours Indonesia | Indonesia |
| Southern Ionics Minerals, LLC | Mississippi |
| The Chemours (Changshu) Fluoro Technology Company Limited | China |
| The Chemours (Taiwan) Company Limited | Taiwan |
| The Chemours (Thailand) Company Limited | Thailand |
| The Chemours 3F Fluorochemicals (Changshu) Company, Limited | China |
| The Chemours Canada Company | Canada |
| The Chemours Chemical (Shanghai) Company Limited | China |
| The Chemours China Holding Co., Ltd. | China |
| The Chemours Company (Argentina) S.R.L. | Argentina |
| The Chemours Company AR, LLC | Delaware |

| | |
|---|---|
| The Chemours Company (Australia) Pty Ltd | Australia |
| The Chemours Company Asia Pacific Operations, Inc. | Delaware |
| The Chemours Company Delaware Operations, Inc. | Delaware |
| The Chemours Company FC, LLC | Delaware |
| The Chemours Company Holding US, LLC | Delaware |
| The Chemours Company Industria E Comercio de Produtos Quimicos Ltda. | Brazil |
| The Chemours Company Mexicana S. de R.L. de C.V. | Mexico |
| The Chemours Company Mexico, S. de R.L. de C.V. | Mexico |
| The Chemours Company North America, Inc. | Delaware |
| The Chemours Company Servicios, S. de R.L. de C.V. | Mexico |
| The Chemours Company Singapore Pte. Ltd. | Singapore |
| The Chemours Company Worldwide Operations, Inc. | Delaware |
| The Chemours Holding Company, S. de R.L. de C.V. | Mexico |
| The Chemours India Private Limited | India |
| The Chemours Malaysia Sdn. Bhd. | Malaysia |

Subsidiaries not listed would not, if considered in the aggregate as a single subsidiary, constitute a significant subsidiary.

**Exhibit 22**

**LIST OF GUARANTOR SUBSIDIARIES**

As of December 31, 2024, the following subsidiaries of The Chemours Company (the “Company”) were guarantors of the Company’s 5.375% senior unsecured notes due May 2027 (the “Registered Notes”,) which are registered under the Securities Act of 1933, as amended.

| Name | Organized Under Laws Of |
|---|---|
| First Chemical Holdings, LLC | Mississippi |
| First Chemical Texas, L.P. | Delaware |
| FT Chemical, Inc. | Texas |
| The Chemours Company FC, LLC | Delaware |

**Exhibit 23**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-205391, 333-205392, 333-205393, 333-217623, 333-256592) of The Chemours Company of our report dated February 18, 2025 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
New York, New York
February 18, 2025

**Exhibit 31.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**

I, Denise Dignam, certify that:

1. I have reviewed this Annual Report on Form 10-K of The Chemours Company;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and,
    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and,
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and,
    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 18, 2025

By: /s/ Denise Dignam

Denise Dignam
President and Chief Executive Officer

**Exhibit 31.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**

I, Shane Hostetter, certify that:

1. I have reviewed this Annual Report on Form 10-K of The Chemours Company;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and,
    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and,
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and,
    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 18, 2025

By: /s/ Shane Hostetter

Shane Hostetter
Senior Vice President, Chief Financial Officer

**Exhibit 32.1**

**Certification of CEO Pursuant to**
**18 U.S.C. Section 1350,**
**As Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of The Chemours Company (the "Company") on Form 10-K for the year ended December 31, 2024 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Denise Dignam, as Chief Executive Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934; and,

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Denise Dignam

Denise Dignam
President and Chief Executive Officer
February 18, 2025

**Exhibit 32.2**

**Certification of CFO Pursuant to**
**18 U.S.C. Section 1350,**
**As Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of The Chemours Company (the "Company") on Form 10-K for the year ended December 31, 2024 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Shane Hostetter, as Chief Financial Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934; and,

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Shane Hostetter

Shane Hostetter
Senior Vice President, Chief Financial Officer
February 18, 2025

**Exhibit 95**

## MINE SAFETY DISCLOSURES

The Company owns and operates a mineral sands mining and separation facility in Starke, Florida, mineral sands mining facilities in Jesup, Georgia and Nahunta, Georgia, and a mineral sands separation facility in Offerman, Georgia. The following table provides information about citations, orders and notices issued from the Mine Safety and Health Administration ("MSHA") under the Federal Mine Safety and Health Act of 1977 ("Mine Act") for the year ended December 31, 2024.

| Mine (MSHA Identification Number) | Section 104 S&S[1] Citations (#) | Section 104(b) Orders (#) | Section 104(d) Citations and Orders (#) | Section 110(b)(2) Violations (#) | Section 107(a) Orders (#) | Total Dollar Value of MSHA Assessments Proposed ($) | Total Number of Mining Related Fatalities (#) | Received Notice of Pattern of Violations Under Section 104(e) (yes/no) | Received Notice of Potential to Have Pattern Under Section 104(e) (yes/no) | Legal Actions Pending as of Last Day of Period (#) | Legal Actions Initiated During Period (#) | Legal Actions Resolved During Period (#) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Starke, FL (0800225) | 3 | — | — | — | — | $ 6,399 | — | — | — | — | — | — |
| Jesup, GA (0901256) | 4 | — | — | — | — | $ 2,977 | — | — | — | — | — | — |
| Mission Mine (0901230) | — | — | — | — | — | $ 147 | — | — | — | — | — | — |
| Offerman MSP (0901236) | — | — | — | — | — | $ 147 | — | — | — | — | — | — |

[1] S&S refers to significant and substantial violations of mandatory health or safety standards under section 104 of the Mine Act.

# EXHIBIT 44

**United States Judicial Panel on Multidistrict Litigation** **Report Date: 12/2/2024**

# MDL Statistics Report - Distribution of Pending MDL Dockets by Actions Pending

**MDL Filters:**
**Status:** Transferred
Limited to **Active Litigations**

| District | Judge (Title) | Docket No. | Litigation | Actions Now Pending | Total Actions (Historical) |
|---|---|---|---|---|---|
| FLN | M. Casey Rodgers (U.S. District Judge) | MDL -2885 | IN RE: 3M Combat Arms Earplug Products Liability Litigation | 148,528 | 391,462 |
| NJ | Michael A. Shipp (U.S. District Judge) | MDL -2738 | IN RE: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation | 58,201 | 59,370 |
| OHS | Edmund A. Sargus, Jr (U.S. District Judge) | MDL -2846 | IN RE: Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Products Liability Litigation | 24,100 | 24,972 |
| NJ | Claire C. Cecchi (U.S. District Judge) | MDL -2789 | IN RE: Proton-Pump Inhibitor Products Liability Litigation (No. II) | 11,975 | 18,706 |
| ILN | Mary M. Rowland (U.S. District Judge) | MDL -3060 | IN RE: Hair Relaxer Marketing, Sales Practices, and Products Liability Litigation | 9,649 | 11,439 |
| LAE | Jane Triche Milazzo (U.S. District Judge) | MDL -2740 | IN RE: Taxotere (Docetaxel) Products Liability Litigation | 9,025 | 15,576 |
| MN | Joan N. Ericksen (Sr. District Judge) | MDL -2666 | IN RE: Bair Hugger Forced Air Warming Devices Products Liability Litigation | 7,672 | 8,830 |
| INS | Richard L. Young (U.S. District Judge) | MDL -2570 | IN RE: Cook Medical, Inc., IVC Filters Marketing, Sales Practices and Products Liability Litigation | 7,578 | 11,430 |
| SC | Richard M. Gergel (U.S. District Judge) | MDL -2873 | IN RE: Aqueous Film-Forming Foams Products Liability Litigation | 7,370 | 11,163 |
| ILS | Nancy J. Rosenstengel (Chief Judge, USDC) | MDL -3004 | IN RE: Paraquat Products Liability Litigation | 5,835 | 7,167 |
| CAN | Vince Chhabria (U.S. District Judge) | MDL -2741 | IN RE: Roundup Products Liability Litigation | 4,373 | 4,986 |
| OHN | Dan A. Polster (Sr. District Judge) | MDL -2804 | IN RE: National Prescription Opiate Litigation | 2,995 | 3,182 |
| GAN | Leigh Martin May (U.S. District Judge) | MDL -2974 | IN RE: Paragard IUD Products Liability Litigation | 2,862 | 3,056 |
| FLS | Robin L. Rosenberg (U.S. District Judge) | MDL -2924 | IN RE: Zantac (Ranitidine) Products Liability Litigation | 2,427 | 15,018 |
| NYE | Nicholas G. Garaufis (Sr. District Judge) | MDL -3044 | IN RE: Exactech Polyethylene Orthopedic Products Liability Litigation | 1,839 | 1,848 |
| MA | Patti B. Saris (U.S. District Judge) | MDL -3029 | IN RE: Covidien Hernia Mesh Products Liability Litigation (No. II) | 1,566 | 1,572 |
| CAN | Charles R. Breyer (Sr. District Judge) | MDL -3084 | IN RE: Uber Technologies, Inc., Passenger Sexual Assault Litigation | 1,459 | 1,468 |
| NJ | Brian R. Martinotti (U.S. District Judge) | MDL -2973 | IN RE: Elmiron (Pentosan Polysulfate Sodium) Products Liability Litigation | 1,433 | 1,985 |
| PAE | Karen S. Marston (U.S. District Judge) | MDL -3094 | IN RE: Glucagon-like Peptide-1 Receptor Agonists (GLP-1 RAs) Products Liability Litigation | 1,300 | 1,302 |
| NJ | Renee M. Bumb (Chief Judge, USDC) | MDL -2875 | IN RE: Valsartan, Losartan, and Irbesartan Products Liability Litigation | 1,283 | 1,452 |
| | Brian R. Martinotti (U.S. District Judge) | MDL -2921 | IN RE: Allergan Biocell Textured Breast Implant Products Liability Litigation | 1,261 | 1,318 |
| LAE | Eldon E. Fallon (Sr. District Judge) | MDL -2592 | IN RE: Xarelto (Rivaroxaban) Products Liability Litigation | 840 | 31,965 |
| PAE | Harvey Bartle, III (Sr. District Judge) | MDL -2848 | IN RE: Zostavax (Zoster Vaccine Live) Products Liability Litigation | 834 | 2,664 |
| PAW | Joy Flowers Conti (Sr. District Judge) | MDL -3014 | IN RE: Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Products Liability Litigation | 821 | 995 |
| CAN | Yvonne Gonzalez Rogers (U.S. District Judge) | MDL -3047 | IN RE: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation | 815 | 963 |
| AZ | David G. Campbell (Sr. District Judge) | MDL -3081 | IN RE: Bard Implanted Port Catheter Products Liability Litigation | 813 | 839 |
| OHN | J. Philip Calabrese (U.S. District Judge) | MDL -3092 | IN RE: Suboxone (Buprenorphine/Naloxone) Film Products Liability Litigation | 716 | 724 |
| ILN | Rebecca R. Pallmeyer (U.S. District Judge) | MDL -3026 | IN RE: Abbott Laboratories, et al., Preterm Infant Nutrition Products Liability Litigation | 626 | 725 |
| | Manish S. Shah (U.S. District Judge) | MDL -2492 | IN RE: National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation | 586 | 600 |
| NH | Landya B. McCafferty (Chief Judge, USDC) | MDL -2753 | IN RE: Atrium Medical Corp. C-Qur Mesh Products Liability Litigation | 564 | 3,577 |
| NYS | George B. Daniels (Sr. District Judge) | MDL -1570 | IN RE: Terrorist Attacks on September 11, 2001 | 366 | 376 |
| PAE | Anita B. Brody (Sr. District Judge) | MDL -2323 | IN RE: National Football League Players' Concussion Injury Litigation | 329 | 352 |
| LAE | Jane Triche Milazzo (U.S. District Judge) | MDL -3023 | IN RE: Taxotere (Docetaxel) Eye Injury Products Liability Litigation | 310 | 349 |
| MA | Allison D. Burroughs (U.S. District Judge) | MDL -3083 | IN RE: MOVEit Customer Data Security Breach Litigation | 305 | 344 |
| CAN | Charles R. Breyer (Sr. District Judge) | MDL -2996 | IN RE: McKinsey & Company, Inc., National Prescription Opiate Consultant Litigation | 251 | 259 |
| OHN | Jeffrey J. Helmick (U.S. District Judge) | MDL -2197 | IN RE: DePuy Orthopaedics, Inc., ASR Hip Implant Products Liability Litigation | 234 | 10,453 |
| NCW | Kenneth D. Bell (U.S. District Judge) | MDL -3036 | IN RE: Gardasil Products Liability Litigation | 212 | 220 |
| MA | Indira Talwani (U.S. District Judge) | MDL -2768 | IN RE: Stryker LFIT V40 Femoral Head Products Liability Litigation | 206 | 1,218 |
| CAN | William H. Orrick, III (U.S. District Judge) | MDL -2913 | IN RE: Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation | 198 | 7,069 |
| ILN | Thomas M. Durkin (U.S. District Judge) | MDL -3079 | IN RE: Tepezza Marketing, Sales Practices, and Products Liability Litigation | 191 | 195 |
| NYS | Lewis A. Kaplan (Sr. District Judge) | MDL -2865 | IN RE: Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation | 173 | 187 |
| CAC | Andre Birotte, Jr (U.S. District Judge) | MDL -2814 | IN RE: Ford Motor Co. DPS6 PowerShift Transmission Products Liability Litigation | 171 | 1,298 |
| PAE | Cynthia M. Rufe (Sr. District Judge) | MDL -2724 | IN RE: Generic Pharmaceuticals Pricing Antitrust Litigation | 136 | 209 |
| CAN | Charles R. Breyer (Sr. District Judge) | MDL -2672 | IN RE: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation | 130 | 1,888 |
| ILN | Matthew F. Kennelly (Sr. District Judge) | MDL -3037 | IN RE: Recalled Abbott Infant Formula Products Liability Litigation | 114 | 141 |
| CAC | James V. Selna (Sr. District Judge) | MDL -3052 | IN RE: Kia Hyundai Vehicle Theft Marketing, Sales Practices, and Products Liability Litigation | 108 | 108 |
| DC | Beryl A. Howell (Chief Judge, USDC) | MDL -2925 | IN RE: Rail Freight Fuel Surcharge Antitrust Litigation (No. II) | 108 | 112 |
| | Colleen Kollar-Kotelly (U.S. District Judge) | MDL -2656 | IN RE: Domestic Airline Travel Antitrust Litigation | 105 | 111 |
| NJ | Brian R. Martinotti (U.S. District Judge) | MDL -3080 | IN RE: Insulin Pricing Litigation | 98 | 101 |
| CAN | Beth Labson Freeman (U.S. District Judge) | MDL -3087 | IN RE: Future Motion, Inc. Products Liability Litigation | 89 | 92 |
| MT | Brian Morris (Chief Judge, USDC) | MDL -3126 | IN RE: Snowflake, Inc., Data Security Breach Litigation | 84 | 85 |

| | | | | | |
|---|---|---|---|---|---|
| TXN | Ada E. Brown (U.S. District Judge) | MDL -3114 | IN RE: AT&T Inc. Customer Data Security Breach Litigation | 79 | 79 |
| FLS | Federico A. Moreno (Sr. District Judge) | MDL -2599 | IN RE: Takata Airbag Products Liability Litigation | 78 | 350 |
| NYS | Paul A. Engelmayer (U.S. District Judge) | MDL -3028 | IN RE: ONE Apus Container Ship Incident on November 30, 2020 | 77 | 80 |
| CAN | Jacqueline Scott Corley (U.S. District Judge) | MDL -3101 | IN RE: Baby Food Products Liability Litigation | 75 | 75 |
| MD | John P. Bailey (U.S. District Judge) | MDL -2879 | IN RE: Marriott International, Inc., Customer Data Security Breach Litigation | 73 | 91 |
| CAS | Jinsook Ohta (U.S. District Judge) | MDL -3125 | IN RE: AngioDynamics, Inc., and Navilyst Medical, Inc., Port Catheter Products Liability Litigation | 72 | 72 |
| MN | Donovan W. Frank (Sr. District Judge) | MDL -3108 | IN RE: Change Healthcare, Inc., Customer Data Security Breach Litigation | 64 | 66 |
| NYE | Margo K. Brodie (Chief Judge, USDC) | MDL -1720 | IN RE: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation | 64 | 134 |
| MN | Donovan W. Frank (Sr. District Judge) | MDL -2441 | IN RE: Stryker Rejuvenate and ABG II Hip Implant Products Liability Litigation | 62 | 3,637 |
| NYE | Rachel P. Kovner (U.S. District Judge) | MDL -3096 | IN RE: Perry Johnson & Associates Medical Transcription Data Security Breach Litigation | 57 | 57 |
| ILN | Edmond E. Chang (U.S. District Judge) | MDL -2964 | IN RE: Society Insurance Company COVID-19 Business Interruption Protection Insurance Litigation | 56 | 57 |
| MN | Jerry W. Blackwell (U.S. District Judge) | MDL -3110 | IN RE: Granulated Sugar Antitrust Litigation | 56 | 56 |
| CAN | Jon S. Tigar (U.S. District Judge) | MDL -1917 | IN RE: Cathode Ray Tube (CRT) Antitrust Litigation | 54 | 75 |
| FLS | Rodolfo A. Ruiz, II (U.S. District Judge) | MDL -3090 | IN RE: Fortra File Transfer Software Data Security Breach Litigation | 52 | 52 |
| MN | John R. Tunheim (Sr. District Judge) | MDL -2998 | IN RE: Pork Antitrust Litigation | 52 | 54 |
| ILN | Matthew F. Kennelly (Sr. District Judge) | MDL -3121 | IN RE: MultiPlan Health Insurance Provider Litigation | 44 | 46 |
| NJ | Julien Xavier Neals (U.S. District Judge) | MDL -3113 | IN RE: Apple Inc. Smartphone Antitrust Litigation | 44 | 44 |
| NYS | Naomi Reice Buchwald (Sr. District Judge) | MDL -2262 | IN RE: Libor-Based Financial Instruments Antitrust Litigation | 44 | 81 |
| NJ | Madeline C. Arleo (U.S. District Judge) | MDL -2904 | IN RE: American Medical Collection Agency, Inc., Customer Data Security Breach Litigation | 43 | 56 |
| CAN | Vince Chhabria (U.S. District Judge) | MDL -2843 | IN RE: Facebook, Inc., Consumer Privacy User Profile Litigation | 41 | 49 |
| OHS | Edmund A. Sargus, Jr (U.S. District Judge) | MDL -2433 | IN RE: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation | 41 | 3,739 |
| PAW | Joy Flowers Conti (Sr. District Judge) | MDL -3021 | IN RE: SoClean, Inc., Marketing, Sales Practices and Products Liability Litigation | 41 | 62 |
| CAN | Edward M. Chen (Sr. District Judge) | MDL -3098 | IN RE: 23andMe, Inc., Customer Data Security Breach Litigation | 40 | 40 |
| TNW | Sheryl H. Lipman (Chief Judge, USDC) | MDL -3127 | IN RE: Evolve Bank & Trust Customer Data Security Breach Litigation | 39 | 39 |
| FLM | Roy B. Dalton, Jr (Sr. District Judge) | MDL -3006 | IN RE: Tasigna (Nilotinib) Products Liability Litigation | 36 | 39 |
| LAE | Eldon E. Fallon (Sr. District Judge) | MDL -2047 | IN RE: Chinese-Manufactured Drywall Products Liability Litigation | 36 | 422 |
| FLS | K. Michael Moore (U.S. District Judge) | MDL -3076 | IN RE: FTX Cryptocurrency Exchange Collapse Litigation | 35 | 37 |
| MN | John R. Tunheim (Sr. District Judge) | MDL -3031 | IN RE: Cattle and Beef Antitrust Litigation | 35 | 36 |
| CAN | Maxine M. Chesney (Sr. District Judge) | MDL -2918 | IN RE: Hard Disk Drive Suspension Assemblies Antitrust Litigation | 31 | 36 |
| CAS | Gonzalo P. Curiel (Sr. District Judge) | MDL -2992 | IN RE: Bank of America California Unemployment Benefits Litigation | 31 | 43 |
| GAN | Thomas W. Thrash, Jr (Sr. District Judge) | MDL -3115 | IN RE: Consumer Vehicle Driving Data Tracking Litigation | 31 | 32 |
| MOE | Stephen N. Limbaugh, Jr (Sr. District Judge) | MDL -2820 | IN RE: Dicamba Herbicides Litigation | 31 | 55 |
| NCM | Thomas D. Schroeder (Chief Judge, USDC) | MDL -3062 | IN RE: Crop Protection Products Loyalty Program Antitrust Litigation | 29 | 44 |
| MA | Denise J. Casper (U.S. District Judge) | MDL -2938 | IN RE: Evenflo Company, Inc., Marketing, Sales Practices and Products Liability Litigation | 28 | 28 |
| CAC | John A. Kronstadt (Sr. District Judge) | MDL -2905 | IN RE: ZF-TRW Airbag Control Units Products Liability Litigation | 27 | 27 |
| ILN | Elaine E. Bucklo (Sr. District Judge) | MDL -2931 | IN RE: Delta Dental Antitrust Litigation | 27 | 28 |
| DE | Joshua D. Wolson (U.S. District Judge) | MDL -2358 | IN RE: Google Inc. Cookie Placement Consumer Privacy Litigation | 26 | 26 |
| FLS | Cecilia M. Altonaga (Chief Judge, USDC) | MDL -2989 | IN RE: January 2021 Short Squeeze Trading Litigation | 26 | 68 |
| ILN | John Robert Blakey (U.S. District Judge) | MDL -3009 | IN RE: Seresto Flea and Tick Collar Marketing, Sales Practices and Products Liability Litigation | 26 | 26 |
| SC | Joseph F. Anderson, Jr (Sr. District Judge) | MDL -2972 | IN RE: Blackbaud, Inc., Customer Data Security Breach Litigation | 26 | 31 |
| TXN | David C. Godbey (Chief Judge, USDC) | MDL -2099 | IN RE: Stanford Entities Securities Litigation | 25 | 156 |
| GAN | Eleanor L. Ross (U.S. District Judge) | MDL -3051 | IN RE: ARC Airbag Inflators Products Liability Litigation | 24 | 24 |
| MN | Katherine Marie Menendez (U.S. District Judge) | MDL -3128 | IN RE: Dividend Solar Finance, LLC, and Fifth Third Bank Sales and Lending Practices Litigation | 24 | 24 |
| OHN | Sara Lioi (Chief Judge, USDC) | MDL -3107 | IN RE: Passenger Vehicle Replacement Tires Antitrust Litigation | 24 | 37 |
| CAS | Dana M. Sabraw (Chief Judge, USDC) | MDL -2670 | IN RE: Packaged Seafood Products Antitrust Litigation | 23 | 84 |
| VAE | Claude M. Hilton (Sr. District Judge) | MDL -3072 | IN RE: Air Crash Into the Java Sea on January 9, 2021 | 22 | 22 |
| NYS | Vernon S. Broderick (U.S. District Judge) | MDL -2542 | IN RE: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation | 21 | 30 |
| | Denise L. Cote (Sr. District Judge) | MDL -3043 | IN RE: Acetaminophen - ASD/ADHD Products Liability Litigation | 21 | 664 |
| NM | Matthew L. Garcia (U.S. District Judge) | MDL -3119 | IN RE: Shale Oil Antitrust Litigation | 20 | 20 |
| PAE | Timothy J. Savage (Sr. District Judge) | MDL -2460 | IN RE: Niaspan Antitrust Litigation | 20 | 23 |
| MOW | Brian C. Wimes (U.S. District Judge) | MDL -3073 | IN RE: T-Mobile 2022 Customer Data Security Breach Litigation | 18 | 18 |
| ILN | Rebecca R. Pallmeyer (U.S. District Judge) | MDL -2817 | IN RE: Dealer Management Systems Antitrust Litigation | 17 | 23 |
| MIE | Sean F. Cox (Chief Judge, USDC) | MDL -2311 | IN RE: Automotive Parts Antitrust Litigation | 17 | 382 |
| NM | James O. Browning (U.S. District Judge) | MDL -2695 | IN RE: Santa Fe Natural Tobacco Company Marketing and Sales Practices Litigation | 17 | 17 |
| NYS | Katherine Polk Failla (U.S. District Judge) | MDL -3050 | IN RE: Chantix (Varenicline) Marketing, Sales Practices and Products Liability Litigation (No. II) | 17 | 17 |
| | Lewis J. Liman (U.S. District Judge) | MDL -3097 | IN RE: Concrete and Cement Additives Antitrust Litigation | 17 | 17 |
| GAN | Richard W. Story (Sr. District Judge) | MDL -2782 | IN RE: Ethicon Physiomesh Flexible Composite Hernia Mesh Products Liability Litigation | 16 | 4,052 |
| NJ | Christine P. O'Hearn (U.S. District Judge) | MDL -3055 | IN RE: Samsung Customer Data Security Breach Litigation | 16 | 17 |
| NYW | Geoffrey W. Crawford (Chief Judge, USDC) | MDL -2903 | IN RE: Fisher-Price Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation | 16 | 16 |
| FLS | K. Michael Moore (U.S. District Judge) | MDL -2832 | IN RE: Liquid Toppings Dispensing System ('447) Patent Litigation | 15 | 15 |
| ILN | Virginia M. Kendall (Chief) | MDL -2867 | IN RE: Local TV Advertising Antitrust Litigation | 15 | 23 |
| MIE | Matthew F. Leitman (U.S. District Judge) | MDL -2818 | IN RE: General Motors Air Conditioning Marketing and Sales Practices Litigation | 15 | 15 |
| NJ | Michael A. Shipp (U.S. District Judge) | MDL -2779 | IN RE: FieldTurf Artificial Turf Marketing and Sales Practices Litigation | 15 | 17 |

| | | | | | |
|---|---|---|---|---|---|
| CAN | James Donato (U.S. District Judge) | MDL -2981 | IN RE: Google Play Store Antitrust Litigation | 14 | 21 |
| ILN | Iain D. Johnston (U.S. District Judge) | MDL -3030 | IN RE: Deere & Company Repair Services Antitrust Litigation | 14 | 16 |
| NYS | Vernon S. Broderick (U.S. District Judge) | MDL -1358 | IN RE: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | 14 | 190 |
| OKN | Gregory K Frizzell (Chief Judge, USDC) | MDL -2700 | IN RE: Genentech, Inc., Herceptin (Trastuzumab) Marketing and Sales Practices Litigation | 14 | 15 |
| ALN | R. David Proctor (Chief Judge, USDC) | MDL -2406 | IN RE: Blue Cross Blue Shield Antitrust Litigation | 13 | 90 |
| CAN | Richard Seeborg (Chief Judge, USDC) | MDL -2966 | IN RE: Xyrem (Sodium Oxybate) Antitrust Litigation | 13 | 13 |
| DE | Richard G. Andrews (U.S. District Judge) | MDL -3017 | IN RE: Xarelto (Rivaroxaban) ('310) Patent Litigation | 13 | 25 |
| FLS | Darrin P. Gayles (U.S. District Judge) | MDL -2841 | IN RE: MONAT Hair Care Products Marketing, Sales Practices and Products Liability Litigation | 13 | 13 |
| TNM | Waverly D. Crenshaw, Jr (U.S. District Judge) | MDL -3071 | IN RE: RealPage, Inc., Rental Software Antitrust Litigation (No. II) | 13 | 47 |
| PAW | W. Scott Hardy (U.S. District Judge) | MDL -2862 | IN RE: Diisocyanates Antitrust Litigation | 12 | 12 |
| CAN | Edward J. Davila (U.S. District Judge) | MDL -2985 | IN RE: Apple Inc. App Store Simulated Casino-Style Games Litigation | 11 | 11 |
| | Edward J. Davila (U.S. District Judge) | MDL -3001 | IN RE: Google Play Store Simulated Casino-Style Games Litigation | 11 | 12 |
| MIE | David M. Lawson (Sr. District Judge) | MDL -3040 | IN RE: Chrysler Pacifica Fire Recall Products Liability Litigation | 11 | 13 |
| GAN | Steven D. Grimberg (U.S. District Judge) | MDL -3056 | IN RE: Overby-Seawell Company Customer Data Security Breach Litigation | 10 | 10 |
| LAE | Carl J. Barbier (U.S. District Judge) | MDL -2179 | IN RE: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | 10 | 6,149 |
| NYS | J. Paul Oetken (U.S. District Judge) | MDL -2704 | IN RE: Interest Rate Swaps Antitrust Litigation | 10 | 11 |
| ILN | Rebecca R. Pallmeyer (U.S. District Judge) | MDL -2948 | IN RE: TikTok, Inc., Consumer Privacy Litigation | 9 | 39 |
| | Sharon Johnson Coleman (U.S. District Judge) | MDL -2967 | IN RE: Clearview AI, Inc., Consumer Privacy Litigation | 9 | 14 |
| MOW | Stephen R. Bough (U.S. District Judge) | MDL -2936 | IN RE: Smitty's/CAM2 303 Tractor Hydraulic Fluid Marketing, Sales Practices and Products Liability Litigation | 9 | 11 |
| PAE | Nitza I. Quinones Alejandro (U.S. District Judge) | MDL -2833 | IN RE: FedLoan Student Loan Servicing Litigation | 9 | 10 |
| WIE | Lynn S. Adelman (U.S. District Judge) | MDL -3078 | IN RE: Generac Solar Power Systems Marketing, Sales Practices and Products Liability Litigation | 9 | 9 |
| WVN | Thomas S. Kleeh (Chief Judge, USDC) | MDL -3103 | IN RE: Aflibercept Patent Litigation | 8 | 8 |
| CAC | James V. Selna (Sr. District Judge) | MDL -2151 | IN RE: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation | 7 | 465 |
| MIE | Terrence G. Berg (U.S. District Judge) | MDL -3034 | IN RE: Neo Wireless, LLC, Patent Litigation | 7 | 9 |
| MOW | Beth Phillips (Chief Judge, USDC) | MDL -2984 | IN RE: Folgers Coffee Marketing and Sales Practices Litigation | 7 | 13 |
| NYS | P. Kevin Castel (Sr. District Judge) | MDL -3010 | IN RE: Google Digital Advertising Antitrust Litigation | 7 | 37 |
| VAE | David J. Novak (U.S. District Judge) | MDL -3111 | IN RE: Capital One 360 Savings Account Interest Rate Litigation | 7 | 7 |
| CAN | Haywood S. Gilliam, Jr (U.S. District Judge) | MDL -2951 | IN RE: StubHub Refund Litigation | 6 | 6 |
| DC | Beryl A. Howell (Chief Judge, USDC) | MDL -1869 | IN RE: Rail Freight Fuel Surcharge Antitrust Litigation | 6 | 24 |
| ILN | Sara L. Ellis (U.S. District Judge) | MDL -3059 | IN RE: Beyond Meat, Inc., Protein Content Marketing and Sales Practices Litigation | 6 | 6 |
| NJ | Zahid N. Quraishi (Judge) | MDL -2332 | IN RE: Lipitor Antitrust Litigation | 6 | 34 |
| TNW | S. Thomas Anderson (U.S. District Judge) | MDL -3035 | IN RE: AME Church Employee Retirement Fund Litigation | 6 | 6 |
| DE | Colm F. Connolly (Chief Judge, USDC) | MDL -3038 | IN RE: Ozempic (Semaglutide) Patent Litigation | 5 | 9 |
| FLS | Kenneth A. Marra (Sr. District Judge) | MDL -1916 | IN RE: Chiquita Brands International, Inc., Alien Tort Statute and Shareholders Derivative Litigation | 5 | 31 |
| MOW | Beth Phillips (Chief Judge, USDC) | MDL -2945 | IN RE: Ahern Rentals, Inc., Trade Secret Litigation | 5 | 19 |
| NJ | Karen M. Williams (U.S. District Judge) | MDL -2243 | IN RE: Fosamax (Alendronate Sodium) Products Liability Litigation (No. II) | 5 | 1,288 |
| OKE | Robert J. Shelby (Chief Judge, USDC) | MDL -2977 | IN RE: Broiler Chicken Grower Antitrust Litigation (No. II) | 5 | 5 |
| UT | Robert J. Shelby (Chief Judge, USDC) | MDL -3102 | IN RE: The Church of Jesus Christ of Latter-Day Saints Tithing Litigation | 5 | 5 |
| DE | Colm F. Connolly (Chief Judge, USDC) | MDL -2895 | IN RE: Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litigation | 4 | 6 |
| | Richard G. Andrews (U.S. District Judge) | MDL -2930 | IN RE: Entresto (Sacubitril/Valsartan) Patent Litigation | 4 | 27 |
| OHN | Donald C. Nugent (Sr. District Judge) | MDL -3093 | IN RE: Pipe Flashing Patent Litigation | 4 | 4 |
| PAW | J. Nicholas Ranjan (U.S. District Judge) | MDL -2988 | IN RE: All-Clad Metalcrafters, LLC, Cookware Marketing and Sales Practices Litigation | 4 | 4 |
| ARE | Kristine G. Baker (U.S. District Judge) | MDL -2949 | IN RE: Profemur Hip Implant Products Liability Litigation | 3 | 155 |
| DC | Emmet G. Sullivan (Sr. District Judge) | MDL -2165 | IN RE: Endangered Species Act Section 4 Deadline Litigation | 3 | 40 |
| MA | Nathaniel M. Gorton (U.S. District Judge) | MDL -2566 | IN RE: TelexFree Securities Litigation | 3 | 15 |
| MD | Catherine C. Blake (Sr. District Judge) | MDL -2775 | IN RE: Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litigation | 3 | 1,089 |
| NYS | Jesse M. Furman (U.S. District Judge) | MDL -2859 | IN RE: Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis with Kinectiv Technology and Versys Femoral Head Products Liability Litigation | 3 | 332 |
| PAM | Christopher C. Conner (U.S. District Judge) | MDL -2816 | IN RE: Sorin 3T Heater-Cooler System Products Liability Litigation (No. II) | 3 | 105 |
| KS | John W. Lungstrum (Sr. District Judge) | MDL -2591 | IN RE: Syngenta AG MIR162 Corn Litigation | 2 | 2,436 |
| KYW | David J. Hale (U.S. District Judge) | MDL -2504 | IN RE: Amazon.com, Inc., Fulfillment Center Fair Labor Standards Act (FLSA) and Wage and Hour Litigation | 2 | 12 |
| NJ | Claire C. Cecchi (U.S. District Judge) | MDL -1663 | IN RE: Insurance Brokerage Antitrust Litigation | 2 | 52 |
| MIE | David M. Lawson (Sr. District Judge) | MDL -2744 | IN RE: FCA US LLC Monostable Electronic Gearshift Litigation | 1 | 39 |
| MN | John R. Tunheim (Sr. District Judge) | MDL -2642 | IN RE: Fluoroquinolone Products Liability Litigation | 1 | 1,270 |
| CAN | Edward M. Chen (Sr. District Judge) | MDL -2777 | IN RE: Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices and Products Liability Litigation | 0 | 52 |
| FLS | Raag Singhal (U.S. District Judge) | MDL -3015 | IN RE: Johnson & Johnson Sunscreen Marketing, Sales Practices and Products Liability Litigation | 0 | 16 |
| PAE | Cynthia M. Rufe (Sr. District Judge) | MDL -1871 | IN RE: Avandia Marketing, Sales Practices and Products Liability Litigation | 0 | 5,299 |
| TXN | James Edgar Kinkeade (U.S. District Judge) | MDL -2244 | IN RE: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation | 0 | 10,581 |
| **Report Totals:** | | **171** | | **325,914** | **711,540** |

Total Number of MDL Dockets: **171**
Total Number of Transferee Districts: **48**

Total Number of Transferee Judges: **142**

1 Chief
21 Chief Judge, USDC
1 Judge
38 Sr. District Judge
81 U.S. District Judge

**-- All Counts Are Based on the Report Filters Selected When Running the Report --**

| Docket Count | Range of the Number of Actions *PENDING* in a Docket | Percent of Dockets | Action Count | Percent of Actions |
|---|---|---|---|---|
| 44 | MDLs with between 0 and 10 Pending Actions | 25.73% | 220 | 0.07% |
| 79 | MDLs with between 11 and 100 Pending Actions | 46.2% | 2,701 | 0.83% |
| 27 | MDLs with 101 and 999 Pending Actions | 15.79% | 10,262 | 3.15% |
| 21 | MDLs with 1,000 or more Pending Actions | 12.28% | 312,731 | 95.96% |

| Docket Count | Range of the Number of *TOTAL* Actions in a Docket | Percent of Dockets | Action Count | Percent of Actions |
|---|---|---|---|---|
| 15 | MDLs with between 0 and 10 Actions | 8.77% | 104 | 0.01% |
| 86 | MDLs with between 11 and 100 Actions | 50.29% | 3,197 | 0.45% |
| 31 | MDLs with 101 and 999 Actions | 18.13% | 11,265 | 1.58% |
| 39 | MDLs with 1,000 or more Actions | 22.81% | 696,974 | 97.95% |

# EXHIBIT 45

# State Resolves Natural Resource Damage Claims

The State of Delaware and E. I. du Pont de Nemours and Company, The Chemours Company, DuPont de Nemours, Inc. and Corteva, Inc, (the "Companies"), businesses with a long history of operations within the State, today announced a settlement agreement designed to benefit Delaware's natural resources and the people of the State of Delaware now, and well into the future.

Under the settlement agreement, the Companies will agree to pay $50 million for environmental restoration, improvement, sampling and analysis, community environmental justice and equity grants, and other natural resource needs. The Companies will fund up to an additional $25 million if they settle similar claims with other states for more than $50 million. The settlement resolves the Companies' responsibility for damages caused by releases of historical compounds within or impacting the State, including per- and polyfluoroalkyl substances (generically referred to as "PFAS"), subject to certain limitations and preservations. Consistent with the cost-sharing arrangement entered into by the Companies in January of this year, of the $50 million, DuPont and Corteva will each contribute $12.5 million and Chemours will contribute $25 million.

"We all need to work collaboratively, fervently, and quickly to restore our natural resources and support our most vulnerable communities," said AG Jennings. "Today's agreement moves us miles ahead in that work. This is the most significant environmental settlement that the State of Delaware has ever secured, and it is being delivered on a timeline that matches the urgency of this moment. The real work still lies ahead, but I am grateful that everyone came to the table to chart a constructive path forward for Delaware, and I commit that our office will keep working to ensure justice – including environmental justice – for everyone in this state."

"These companies have a long, proud history in our state. This agreement is a natural extension of that legacy and signifies a commitment to continue investing in the quality of life of our citizens and the health of our environment," said Governor Carney.

Mark Newman, CEO of Chemours, said "We are privileged to live and work in this great state, and our actions today were very much motivated by our commitment to make a meaningful difference in the community we call home and our historical relationship with the state of Delaware. Rather than engaging in protracted and costly litigation, the State and our companies have set aside our differences and come together to put Delaware and its residents first."

"This settlement could not have been achieved without the goodwill and assistance of all parties." said Ed Breen, Executive Chairman and Chief Executive Officer of DuPont. "That goodwill is borne out of the Companies' more than 200-year relationship to the State, its people, and its economy."

"Corteva could not have become who we are today without the people of Delaware, who are our neighbors and employees. That creates a special connection with the State and its people," said Jim Collins, CEO of Corteva.

The settlement is the result of an extensive investigation into the environmental impacts of legacy industrial activities in Delaware led by the Attorney General's Office. That investigation remains ongoing and is expected to result in additional recoveries from other parties or enforcement actions. This settlement does not release or affect the liability of any other parties that may have caused damage to Delaware's natural resources, including PFAS contamination.

# EXHIBIT 46

# AG Jennings secures additional $25 million natural resource damage settlement payment

Attorney General Kathy Jennings today announced the payment of an additional $25 million by E. I. du Pont de Nemours and Company, The Chemours Company, DuPont de Nemours, Inc. and Corteva, Inc, (the "Companies") in connection with the State's July 2021 settlement with the Companies.

The 2021 settlement, which resolved allegations related to the Companies' responsibility for damages caused by releases of historical compounds within or impacting the State, including per- and polyfluoroalkyl substances (generically referred to as "PFAS"), required an additional payment to Delaware of up to $25 million upon the Companies' settlement with another state. Late last year, a settlement was finalized with the State of Ohio, triggering this additional payment. After deducting attorneys' fees, the balance of $23.75 million will be paid to a trust overseen by the Delaware Department of Natural Resources and Environmental Control (DNREC) and Delaware Health and Social Services (DHSS). As set forth in the original settlement agreement, the funds in trust must be used for initiatives related to environmental assessments, restoration, research, and justice.

> *"This is a monumental addition to what was already the most significant environmental settlement the State of Delaware has ever secured," said **Attorney General Kathy Jennings**. "Delaware is blessed with incredible natural resources from our foothills all the way down to our scenic coast; it is our duty to protect them and to hold polluters accountable for the destruction they cause. These monies represent a powerful tool in the fight to protect and restore our most vulnerable communities and ecosystems, and preserve our beloved state for generations to come."*

> *"We are grateful for the Department of Justice's persistence in securing this additional funding to hold polluters accountable and protect community health," said **DHSS Secretary Christen Linke Young**. "These funds will support DHSS' collaborative efforts with DNREC to better assess PFAS exposure, enhance health surveillance and research, and reduce risks to Delaware communities, particularly those disproportionately impacted by historical contamination."*

> *"DNREC has been utilizing prior settlement funding over the last five years to methodically build our understanding about where PFAS is in Delaware, with a focus on where it may be impacting public health," said **DNREC Secretary Greg Patterson**. "We have especially worked with the Department of Health and Social Services on PFAS research and remediation in public and private drinking water to ensure it is safe for Delawareans. And we have used the funds to educate Delawareans on PFAS itself and on our plans to deal with it going forward. This additional $25 million in settlement funds will provide more resources for the state to continue working to ensure that Delawareans' exposure to PFAS is minimized to the greatest extent possible."*

For more information about DNREC's work on PFAS, visit de.gov/pfas.

The settlement is the result of an extensive investigation into the environmental impacts of legacy industrial activities in Delaware led by Attorney General Jennings. That work remains ongoing, including currently pending efforts against other defendants related to PFAS contamination and PCB contamination.

# EXHIBIT 47






## News Releases

Search News Releases: Search

# State Secures $110 Million Settlement with DuPont for Environmental Restoration Along Ohio River

11/29/2023

(COLUMBUS, Ohio)— Ohio Governor Mike DeWine and Ohio Attorney General Dave Yost today announced a proposed $110 million settlement with DuPont over chemical contamination spanning seven decades from the company's Washington Works facility in Parkersburg, W.Va., just across the border from Washington County, Ohio.

"This settlement is a victory for all Ohioans, especially those living along the Ohio River near the Parkersburg plant," said Governor DeWine, who originated the lawsuit against DuPont while serving as Ohio's attorney general in 2018. "DuPont ignored the fact that the chemicals they were releasing were toxic, and this settlement ensures that they are held responsible for the pollution they knowingly caused to the environment. I applaud Attorney General Yost for aggressively pursuing this case and for bringing it to a successful conclusion."

For his part, Attorney General Yost said the success of the settlement should be measured not only by the dollar amount involved but, perhaps more importantly, by the long-term oversight the state will maintain over the situation.

"This settlement has been a long time coming," Yost said. "We are pleased to have the flexibility through this agreement to preserve our right to advocate for the health of Ohioans and our state's environment."

From the 1950s through 2013, DuPont manufactured Teflon products using the manmade chemical perfluorooctanoic acid, commonly known as PFOA or C8. PFOA, one of a group of synthetic per- and polyfluoroalkyl (PFAS) chemicals used in the production of numerous consumer and industrial products, has been linked to serious health issues including kidney and testicular cancer, thyroid disease, low birth weight, and high cholesterol. Known to also be toxic and carcinogenic in animals, PFOA is remarkably persistent in water and soil, resisting typical environmental degradation processes.

Ohio was the first state to legally challenge DuPont for its use of PFOA. In operating the Washington Works plant, the suit alleged DuPont released PFOA-containing emissions into the air and PFOA-containing discharges into the Ohio River despite knowing of the chemical's risks to human health and the environment.

The settlement, which is currently pending the court's entry, comes six years after DuPont and Chemours, the company that split off from DuPont in 2015, agreed to pay $670 million to settle thousands of personal injury lawsuits citing health problems related to the company's use of PFOA.

Today's settlement establishes an environmental restoration fund, with the $110 million to be allocated as follows:

- 80% to address pollution from the Washington Works plant
- 16% to address damages from firefighting foam
- 4% to mitigate damages to natural resources

The agreement also advances additional obligations and assurances allowing Ohio to continue to protect its people and drinking water. The state preserves the authority to set, regulate, and enforce more stringent drinking water standards in the future, whether dictated by the U.S. Environmental Protection Agency or the Ohio Environmental Protection Agency, for any PFAS or other hazardous substance.

Such flexibility is crucial, Yost said, given that regulatory standards are ever-evolving.
The history and fallout of DuPont's use of PFOA was dramatized in *Dark Waters*, a 2019 film starring Mark Ruffalo.

**-30-**

MEDIA CONTACT:
Dan Tierney: 614-644-0957
Jill Del Greco: 614-644-0957
Bethany McCorkle: 614-466-1339

ABOUT THE AGO
Attorney General
Administration
Public Records Access
Regional Offices
Service Divisions

SERVICES
Webcheck Community Listing
Charitable Registration
Tobacco Enforcement

TRAINING & EDUCATION
Charitable Webinars
Online Sunshine Laws Training
OPOTA Courses
Victim Service Provider Training

MEDIA
Events
News Releases
Newsletters
Reports
Videos

CAREER & EMPLOYEE RESOURCES
AG Employee Portal
myOhio.gov
Job Opportunities

PROTECTING ★ THE ★ UNPROTECTED

Notice under the Americans with Disabilities Act | Privacy Statement | Ohio Checkbook

# EXHIBIT 48

**IMMEDIATE RELEASE**
August 7, 2026

**Contact:** Larry.Hajna@dep.nj.gov
Caryn.Shinske@dep.nj.gov
Allison.Inserro@njoag.gov

# FEDERAL COURT APPROVES HISTORIC PFAS SETTLEMENTS VALUED AT APPROXIMATELY $2.5 BILLION

*SETTLEMENT WILL CLEAN UP FOUR CONTAMINATED SITES, PROTECT NEW JERSEY'S RESIDENTS, AND RESTORE NATURAL RESOURCE*

**TRENTON** – Attorney General Jennifer Davenport and Department of Environmental Protection (DEP) Acting Commissioner Ed Potosnak toc announced judicial approval of two groundbreaking settlements to remedy long-standing statewide contamination from PFAS (per- and polyfluoroalkyl substances), also known as "forever chemicals," as well as PFAS and other pollutants originating from four significant industrial sites. The settlements resolve the State's claims in years-long litigation against E.I. DuPont de Nemours and Co. (now known as EIDP, Inc.) and other DuPont-related entities, and separate litigation against 3M.

The settlement with the DuPont entities, valued at over $2 billion, is on its own the largest environmental settlement ever achieved by a single state. Together, the settlements resolving the claims against the DuPont entities and 3M are valued at approximately $2.5 billion

"This is truly a historic moment for New Jersey, which has experienced disproportionate and extensive pollution impacts from decades of PFAS manufacturing and use by DuPont and 3M," **Acting Commissioner Potosnak said**. "But this is only the beginning of what will be a long road to restore our environment from the unfortunate legacy of these chemicals. The DEP and the Sherrill Administration are committed to engaging the public and our stakeholders to maximize the public health and environmental protection benefits of these funds to heal New Jersey."

"For years, corporate polluters have profited from 'forever chemicals' while causing untold damage to our communities—endangering the health of our kids, contaminating the water we drink, and exposing our first responders to dangerous carcinogens. Today's landmark settlement cements New Jersey's national leadership in the fight against forever chemicals and is a critical first step in undoing the damage DuPont and 3M have caused to our state," **said Attorney General Davenport**. "Our office will continue to hold corporations accountable whenever they harm our communities, and I am eager to see the work begin to repair the decades of damage DuPont and 3M have caused in the Garden State."

Including the settlements announced today and other settlements announced in recent years, New Jersey is slated to recover over $3 billion from lawsuits it has commenced since 2019 to compensate the State and address the damage caused by PFAS and other pollutants—confirming the State's position as a national leader in protecting the public from the harms caused by PFAS.

**The Dangers of PFAS**

PFAS are synthetic chemicals that have been manufactured in the United States since the 1940s. They are used to make a variety of household, consumer, and industrial products and are known as "forever chemicals" because they do not degrade or break down over time, continuing to accumulate in the environment and in humans.

They are classified as likely carcinogens, with studies having shown that exposure to the chemicals may cause kidney, liver, and testicular cancer, as well as autoimmune and endocrine disorders in adults. PFAS have also been linked to developmental issues affecting fetuses during pregnancy and infants who breastfeed. In addition, babies and children are believed to be more susceptible to the harmful effects of PFAS.

**Background on the Litigation**

Together, both settlements resolve several years-long lawsuits against the DuPont defendants and 3M, including litigation regarding four DuPont industrial sites in New Jersey (including the Chambers Works site in Salem County); statewide litigation regarding the firefighting material known as aqueous film-forming foam (AFFF); and claims for PFAS contamination statewide, including claims associated with the defendants' responsibilities under DEP's Statewide PFAS Directive. The DuPont entities include EIDP, Inc.; the Chemours Company and The Chemours Company FC, LLC, both of which DuPont spun off in 2015; DuPont Specialty Products USA, LLC; Corteva Inc.; and DuPont de Nemours, Inc.

The proposed settlements with 3M and the DuPont entities, respectively, were announced in mid-2025. Consistent with New Jersey's Spill Act, DEP published notices of both proposed settlements in the New Jersey Register and on DEP's website. After sixty days of public comment, DEP carefully considered and responded to all comments before seeking judicial approval.

The State moved for judicial approval of the settlements in late 2025. Since then, the State has resolved objections raised by eighteen counties and a coalition of publicly owned wastewater treatment plants, further solidifying broad support for the settlements.

**Settlement Funds**

The total settlement payments by the DuPont entities and 3M will occur annually over 25 years.

**PFAS Abatement Fund**. Payments to be made for PFAS abatement collectively total up to $795 million. These funds will be held in dedicated trust accounts for the abatement of PFAS statewide. The PFAS Abatement Damages proceeds will be disbursed through two primary means.

First, PFAS Abatement Damages received by the State will be deposited into a separate, non-lapsing fund to be known as the "PFAS Abatement Fund." That Fund will be allocated for use by the New Jersey Water Bank to provide loans that include no-interest, low-interest, and/or principal forgiveness. Those loans will finance water quality projects to ensure that drinking water systems and publicly-owned treatment works have a long-term, reliable funding source for the needed capital upgrades to address PFAS in our water supply. DEP will provide a minimum of $150 million from the PFAS Abatement Fund to the Water Bank to assist publicly-owned treatment works with the costs of abating PFAS.

Second, DEP will also use PFAS Abatement Damages to provide financial assistance to county, municipal, and local government units and th public, including private potable well owners, for projects to remediate and otherwise abate PFAS contamination. This will include a minimur $90 million to a designated fund to be used by counties to investigate and remediate PFAS contamination at county-owned fire training academies and airports, both of which used aqueous film-forming foam containing PFAS.

**Natural Resource Damages.** Up to $365 million will compensate the State for damage to natural resources caused by releases of PFAS and other contaminants, and, consistent with the New Jersey Constitution, will be used to restore natural resources, including in the vicinity of fou specific sites. Those sites are: Pompton Lakes Works, in Pompton Lakes and Wanaque, Passaic County; the Parlin site, in Sayreville, Middlesex County; the Repauno site, in Greenwich Township, Gloucester County; and Chambers Works, in Pennsville and Carneys Point Township, Salem County.

DEP will engage with the public on potential restoration projects. Municipalities and members of the public may submit potential restoration projects through DEP Office of Natural Resource Restoration's Potential Restoration Project Submission Portal found at https://dep.nj.gov/nrr/potential-restoration-project-submission-portal/

**Remediation Funding.** In addition, to ensure that all the cleanup work at the four industrial sites is paid for without public funds, the DuPont entities also agreed to create remediation funding sources of up to $1.2 billion and to establish an additional reserve fund of $475 million to ensure that if any one of fails to fulfill their responsibilities to the state, taxpayers won't be left to foot the bill. Under the settlement, the DuPont entities are required to fully remediate the industrial sites, regardless of ultimate cost.

**Fees and costs.** Finally, approximately $195 million in recovered funds will cover legal fees and costs.

**Resources**

NJDEP Dupont/Chemours PFAS Settlement Website

NJDEP 3M PFAS Settlement Website

NJDEP PFAS Website

NJDEP PFAS Strategy

###

Calendar
Boards, Councils & Commissions
Employment Opportunities
Phone Directory
Rules
Directions to Our Office
Warn DEP
Title VI Nondiscrimination Policy

Index by Topic

Programs & Units

Fish & Wildlife
State Parks, Forests & Historic Sites
Air, Energy & Materials Sustainability
Climate Resilience
Contaminated Site Remediation & Redevelopment
Water Resource Management
Watershed & Land Management

Information Tools

DEP Online
DataMiner
DocMiner
NJ-GeoWeb
GIS Data
GIS Maps and App Gallery
Public Records (OPRA)
Rules & Regs
DEP Bulletin
Environmental Standards
Environmental Research Library
Environmental Education

DEP General Info Contacts

Environmental Protection

Commissioner Ed Potosnak
DEP Home
Press Releases
About DEP
Topics
Programs/Units
DEP Online
DEP General Info Contacts

Statewide

Governor Mikie Sherrill
Lt. Governor Dr. Dale G. Caldwell
NJ Home
Services A to Z
Departments/Agencies
FAQs
Contact Us
Privacy Notice
Legal Statement & Disclaimers
Accessibility Statement

Copyright © State of New Jersey, 1996-2026
Department of Environmental Protection
P. O. Box 420
Trenton, NJ 08625
609-777-3373

Last Update: August 10th, 2026

# EXHIBIT 49

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

and

STATE OF WEST VIRGINIA, by and through the WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION,

Plaintiffs,

v.

THE CHEMOURS COMPANY and THE CHEMOURS COMPANY FC, LLC,

Defendants.

CIVIL ACTION: No.: 2:26-cv-00418

TABLE OF CONTENTS


I. JURISDICTION AND VENUE ....................3
II. APPLICABILITY ....................4
III. DEFINITIONS ....................5
IV. CIVIL PENALTY ....................6
V. COMPLIANCE/MITIGATION ....................10
VI. REPORTING REQUIREMENTS ....................17
VII. STIPULATED PENALTIES ....................19
VIII. FORCE MAJEURE ....................27
IX. DISPUTE RESOLUTION ....................29
X. INFORMATION COLLECTION AND RETENTION ....................32
XI. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ....................35
XII. COSTS ....................39
XIII. NOTICES ....................40
XIV. EFFECTIVE DATE ....................41
XV. RETENTION OF JURISDICTION ....................41
XVI. MODIFICATION ....................42
XVII. TERMINATION ....................42
XVIII. PUBLIC PARTICIPATION ....................43
XIX. SIGNATORIES/SERVICE ....................44
XX. INTEGRATION ....................44
XXI. 26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION ....................44
XXII. HEADINGS ....................45
XXIII. APPENDICES ....................45
XXIV. FINAL JUDGMENT ....................45

Plaintiffs, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), and West Virginia Department of Environmental Protection ("WVDEP") (collectively, "Plaintiffs"), have filed a complaint in this action concurrently with the lodging of this Consent Decree, alleging that Defendants, The Chemours Company and The Chemours Company FC, LLC (collectively, "Defendants" or "Chemours"), violated Section 301 of the Clean Water Act ("CWA"), 33 U.S.C. § 1311; Sections 5 and 15 of the Toxic Substances Control Act ("TSCA"), §§ 2604 and 2614; and Section 3008 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928. The Complaint further alleges violations of Section 8 of the West Virginia Pollution Control Act ("WPCA"), W. Va. Code § 22-11-8.

The Complaint alleges, inter alia, that Defendants own and operate three manufacturing facilities that have released per- and polyfluouroalkyl substances ("PFAS") into the environment in violation of applicable federal and West Virginia law, which are Washington Works near Parkersburg, West Virginia; Fayetteville Works near Fayetteville, North Carolina; and Chambers Works in Deepwater, New Jersey. Plaintiffs allege that studies have found that some PFAS are highly persistent and bioaccumulative in the environment with little or no degradation occurring in air, water, or soil. EPA has found, as stated in EPA's Final Rule, Toxic Substances Control Act Reporting and Recordkeeping Requirements for Perfluoroalkyl and Polyfluoroalkyl Substances, 88 Fed. Reg. 70516, 70517 (October 11, 2023), that: "There is evidence that exposure to some PFAS in the environment may be linked to harmful health effects in humans and animals, and that continued exposure above specific levels to certain PFAS may lead to adverse health effects." Defendants dispute this finding.

Plaintiffs further allege that releases from the Facilities have affected surface waters, and the drinking water of tens of thousands of people in the areas near the Facilities. The Complaint

seeks injunctive relief to control Defendants' PFAS releases from the Facilities and civil penalties.

The Parties have engaged in good faith discussions concerning the violations alleged in the Complaint. Chemours has already begun planning or implementing certain operational changes at its Facilities and remedial measures, obviating the need for certain injunctive relief.

By agreeing to entry of this Consent Decree, Chemours makes no admission of law or fact with respect to the allegations in the Complaint, and continues to deny any non-compliance or violation of any law or regulation identified therein or in this Consent Decree. For the purpose of avoiding litigation among the Parties, however, Chemours agrees to the requirements of this Consent Decree;

The Parties agree that the United States' filing of the Complaint and entry into this Consent Decree, and Defendants' satisfactorily complying or having fully complied with this Consent Decree, constitute diligent prosecution by the United States and WVDEP, under the CWA, 33 U.S.C. § 1365, and TSCA**,** 15 U.S.C. § 2619, of all matters alleged in the Complaint and addressed by this Consent Decree through the Date of Lodging of this Consent Decree. Whether Defendants are satisfactorily complying with this Consent Decree shall be determined by EPA subject to the Dispute Resolution Provisions of Section IX;

The United States asserts and has taken the position in prior cases that civil penalties for violations of the CWA cannot be contractually indemnified*. See In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 148 F.Supp.3d 563 (E.D. La. 2015), and the United States has also required in a CWA consent decree that the defendant must pay its civil penalty without seeking indemnification from any other entity. *See id*., Partial Consent Decree dated February 19, 2013. The United States also asserts and takes the position

that civil penalties under TSCA cannot be contractually indemnified.

The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided above, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 309(b) of the CWA, 33 U.S.C. § 1319(b); Section 17(a) of TSCA, 15 U.S.C. §2616(a); and Section 3008(a) of RCRA, 42 U.S.C. §6928(a). The Court has supplemental jurisdiction over the WVDEP claims pursuant to 28 U.S.C. § 1367. The Court has jurisdiction over the Parties. Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), as well as Section 309(b) of the CWA, 33 U.S.C. § 1319(b); Section 17(a) of TSCA, 15 U.S.C. § 2616(a); and Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), because it is a judicial district in which Defendants are found, have been and/or are currently doing business. For purposes of this Decree, or any action to enforce this Decree, Defendants consent to the Court's jurisdiction over this Decree and any such action and over Defendants and consent to venue in this judicial district.

2. For purposes of this Consent Decree, Defendants agree that the Complaint states claims upon which relief may be granted pursuant to the CWA, TSCA, RCRA, and WPCA.

II. APPLICABILITY

3. This Consent Decree is binding upon the United States and the WVDEP, and upon Defendants and its successors, assigns, or other entities or persons otherwise bound by law.

4. No transfer of ownership or operation of all or a portion of a Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendants of its obligation to ensure that the terms of this Consent Decree are implemented, unless: (1) the transferee agrees in writing to undertake the relevant obligations required by this Consent Decree and to be substituted for Chemours as a Party to the Consent Decree and thus be bound by the terms thereof; and (2) the United States, after consultation with WVDEP only with respect to Washington Works obligations, consents in writing to relieve Defendants of their respective obligations under this Consent Decree pursuant to Section XVI of this Consent Decree (Modification). At least 30 Days prior to a proposed transfer of Chemours' obligations under this Consent Decree, or such other period agreed to by the Parties in writing: (i) Chemours shall provide a copy of this Consent Decree to the proposed transferee, if not previously provided; and (ii) shall provide written notice of the prospective transfer, together with a copy of the proposed written agreement transferring obligations to the transferee, to EPA, WVDEP, and the United States Department of Justice, in accordance with Section XIII (Notices). Any attempt to transfer ownership or operation of any Facility without complying with this Paragraph constitutes a violation of this Decree.

5. Defendants shall provide notice of this Consent Decree to each person representing Defendants whose duties might reasonably include compliance with any provision of this Decree. Defendants shall provide notice of this Consent Decree to each contractor performing any work required by this Consent Decree.

6. In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of its officers, directors, employees, agents, contractors, subcontractors or any person representing Defendants to take any actions necessary to comply with the provisions of this Consent Decree.

## III. DEFINITIONS

7. Terms used in this Consent Decree that are defined in CWA, TSCA, RCRA, Safe Drinking Water Act ("SDWA"), or the WPCA or in the regulations promulgated pursuant to the CWA, TSCA, RCRA, SDWA, or the WPCA have the meanings assigned to them in the Acts or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions apply:

"Calendar Year" means a one-year period that begins on January 1 and ends on December 31;

"Complaint" means the complaint filed by the United States and the WVDEP in this action;

"Consent Decree" or "Decree" means this Decree and all Appendices attached hereto;

"Day" means a calendar day unless expressly stated to be a business day. In computing any period of time for a deadline under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal or West Virginia holiday, the period runs until the close of business of the next business day;

"Defendants" means The Chemours Company and The Chemours Company FC, LLC;

"Deliverable" means a plan, report, or other item that Chemours submits to EPA or WVDEP pursuant to this Decree;

"DOJ" means the United States Department of Justice and any of its successor departments or agencies;

"EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" means the definition provided in Section XIV;

"Facilities" means: 1) The Chemours Washington Works Facility in Washington, near Parkersburg, West Virginia located at 8480 DuPont Road, Washington, West Virginia, on the southeastern bank of the Ohio River; 2) the Chemours Fayetteville Works Facility near Fayetteville, North Carolina located at 22828 NC Highway 87 W Fayetteville, Bladen County North Carolina; and 3) the Chemours Chambers Works Facility in Deepwater, New Jersey, located at 67 Canal Road and Route 130, Salem County New Jersey.

"Financial Information" means the documentation identified in Appendix A, which was submitted to the United States by Defendants;

"Section" means a portion of this Decree identified by a Roman numeral;

"United States" means the United States of America, acting on behalf of EPA;

"WVDEP" means the West Virginia Department of Environmental Protection.

## IV. CIVIL PENALTY

8. Defendants shall pay $22,500,000 as a civil penalty, plus interest as described in this Paragraph. This payment shall be made in 3 consecutive annual payments of $7,500,000 with the first payment due 30 Days after the Effective Date, and subsequent payments due annually thereafter. Defendants shall include with the first installment payment an additional amount for interest accrued at the current bank prime rate per year on the total penalty amount from the date the United State files a motion to enter the consent decree through the date of

payment. Defendants shall include with each subsequent payment an additional amount for interest accrued at the rate of 6.75% per year on the unpaid balance from the date of the previous payment through the date of the payment. After the Effective Date, the Financial Litigation Unit ("FLU") of the U.S. Attorney's Office for the Southern District of West Virginia will provide to Defendants a calculation of the interest due for each payment.

a. Defendants may make any payment prior to its due date but must contact the FLU in advance for a determination regarding the amount of interest to be included with the payment. If any installment payment includes an overpayment, the amount of the overpayment will be applied to the remaining principal.

b. If Defendants fail to make any payment required under this Paragraph by the due date, Plaintiffs may send Defendants a written notice of late payment. If Defendants fail to make the payment and to pay all interest and stipulated penalties owed within 60 Days of receipt of the notice, all remaining payments and all accrued interest will be due immediately. Interest will continue to accrue on any unpaid amounts until Defendants pay the total amount due. Interest required under this Paragraph is in addition to any stipulated penalties owed under Section VII.

c. Bankruptcy. If either Defendant becomes the subject of a proceeding under the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all remaining payments and all accrued interest will be due immediately, subject to applicable bankruptcy law.

9. <u>Factors Considered in Determining Civil Penalty</u>

a. The factors considered in calculating the civil penalty include: Defendants' good faith cooperation with EPA, WVDEP, and other federal and state regulatory agencies; significant remedial measures Defendants have already undertaken prior to the entry of

this Consent Decree; and the Financial Information submitted by Defendants. Taking into consideration that Financial Information and the size of the company, the United States determined that Defendants have a limited ability to pay the total civil penalty the United States could seek for the violations alleged in this case.

b. Defendants certify that, to the best of their knowledge and belief, after thorough inquiry, they have submitted to EPA and DOJ Financial Information that fairly, accurately, and materially sets forth its financial circumstances at the time provided. The United States reviewed the financial documents listed on Appendix A and publicly available information to determine the penalty amount that Defendants could pay. This certification shall not apply to any Financial Information that included projections or estimates of Defendants' future financial conditions.

10. Defendants shall pay 50% of the penalty amount, together with 50% of accrued interest, if any, to the United States by FedWire Electronic Funds Transfer ("EFT"), in accordance with instructions provided to Defendants by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Southern District of West Viriginia after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to the individuals stated in the Section XIII (Notices). Defendants may change the individual to receive payment instructions on its behalf by providing written notice of such change to DOJ and EPA in accordance with Section XIII (Notices).

11. At the time of payment, Defendants shall send notice that payment has been made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov; and (ii) to DOJ via email or

regular mail in accordance with Section XIII and (iii) to EPA in accordance with Section XIII. Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States of America and State of West Virginia, by and through the West Virginia Department of Environmental Protection v. The Chemours Company and The Chemours Company FC, LLC* and shall reference the civil action number, CDCS Number and DOJ case number 90-5-1-1-12112.

12. Defendants shall pay 50% of the penalty amount, together with 50% of accrued interest, if any, to West Virginia. Eleven Million Dollars ($11,000,000) of the civil penalty paid to WVDEP according to the terms of this consent decree, together with any accrued interest paid to WVDEP, will be deposited into the Water Quality Management Fund. Two hundred fifty thousand dollars ($250,000) of the civil penalty paid to WVDEP according to the terms of this consent decree, together with any accrued interest paid to WVDEP, will be deposited into the Hazardous Waste Management Fund. Defendants shall make payments electronically or by mail, as follows: (a) EFTs shall be made by telephone by contacting the WVDEP Business Operations Office at (304) 926-0499; or (b) payments made by certified or cashier's check shall be payable to the "West Virginia Department of Environmental Protection" and shall be mailed to:

Chief Inspector, Environmental Enforcement
West Virginia Department of Environmental Protection
601 57th Street SE
Charleston, West Virginia 25304

13. No Deductibility or Basis for Indemnity. The Defendants agree that neither they nor any affiliated entity shall capitalize into inventory or basis nor shall they take as a tax deduction, in the United States or elsewhere, any portion of the monies paid under this Section (Civil Penalty) or Section VII (Stipulated Penalties) of this Consent Decree. Nor shall the Defendants use or allow to be used any payments of civil penalties to the United States made

pursuant to this Consent Decree as a basis for indemnity or reimbursement from any other party or person. Provided that, if the United States resolves its claims for penalties related to any of the Facilities with another entity, or in the absence of settlement, the government has sued another entity for penalties, and that entity is not contractually precluded from seeking indemnification from Chemours, and in fact seeks indemnification from Chemours, Chemours shall be permitted to seek indemnification from that other entity.

## V. COMPLIANCE/MITIGATION

14. Defendants shall fund, perform, and comply with the injunctive relief provisions, including all deadlines and reporting requirements, set forth in: Appendix B (TSCA—GenX 5(e) Substances); Appendix C (TSCA—HPFO); Appendix D (TSCA—Carbooxohalide); Appendix E (Drinking Water Requirements); Appendix F (CWA—Washington Works).

15. Review of Deliverables. After reviewing any Deliverable, EPA (and with regard to CWA/WPCA relief at Washington Works, after consultation with the WVDEP) shall in writing: (a) approve the Deliverable; (b) approve the Deliverable upon specified conditions; (c) approve part of the Deliverable and disapprove the remainder; or (d) disapprove the Deliverable.

16. If the Deliverable is approved pursuant to Paragraph 15(a), Defendants shall take all actions required by the Deliverable, in accordance with its approved terms. If the Deliverable is conditionally approved or approved only in part pursuant to Paragraph 15(b) or (c), Defendants shall, upon written direction from EPA (and with regard to CWA/WPCA relief at Washington Works, after consultation with the WVDEP), take all actions required by the approved portion of the Deliverable that EPA (and with regard to CWA/WPCA relief at Washington Works, after consultation with the WVDEP) determines are severable from any disapproved portions.

17. If the submission is disapproved in whole or in part pursuant to Paragraph 15(c) or (d), Defendants shall, within 45 Days or such other time as the Parties agree to in writing, correct or otherwise address the identified deficiencies and resubmit the Deliverable, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs. If the resubmission is approved in whole or in part, Defendants shall proceed in accordance with Paragraph 16.

18. If a resubmitted Deliverable, or portion thereof, is disapproved in whole or in part, EPA (and with regard to CWA/WPCA relief at Washington Works, after consultation with the WVDEP) may again require Defendants to correct or otherwise address any identified deficiencies, in accordance with the preceding Paragraphs, or may itself correct any deficiencies.

19. If Defendants elect to invoke Dispute Resolution as set forth in Section IX (Dispute Resolution) concerning a decision by EPA to disapprove, approve on specified conditions, or modify a Deliverable, Defendants shall do so by sending a Notice of Dispute in accordance with Paragraph 50 within 30 Days (or such other time as the Parties agree to in writing) after receipt of the applicable decision.

20. Any stipulated penalties applicable to the original submission, as provided in Section VII, accrue during the 45 Day period or other specified period, but are not payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendants' obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

21. Permits and Approvals. Where any compliance obligation under this Section requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall

submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. Defendants may seek relief under the provisions of Section VIII (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely and complete applications and have taken all other actions necessary to obtain all such permits or approvals.

22. Certification regarding RCRA Compliance. Each Defendant certifies as true to the best of its knowledge and belief, after a reasonable inquiry, that it has:

a. corrected all violations alleged in the RCRA claims in the Complaint and EPA ID# WVD045875291 and W25-54-031204 CAC and in the Notices of Violation issued by WVDEP to Defendants on March 12, 2025 and April 3, 2025 ("WVDEP 2025 NOVs");

b. is in full compliance at the Facilities with the requirements associated with the violations set forth alleged in the RCRA claims in the Complaint and EPA ID# WVD045875291 and W25-54-031204 CAC, and in the WVDEP 2025 NOV; and

c. taken adequate measures to prevent a recurrence of all violations alleged in the RCRA claims in the Complaint and in the WVDEP 2025 NOV.

23. Drinking Water Relief. Defendants are subject to an administrative order under Section 1431 of SDWA related to Washington Works dated January 6, 2017. Defendants also provide drinking water to residents and drinking water treatment to water systems in the vicinity of Chambers Works. The requirements provided for in Appendix E (Drinking Water Requirements) maintain certain existing requirements and expand upon certain prior obligations by extending the geographic scope, adding contaminants, and lowering the thresholds for the provision of alternate drinking water. Defendants shall comply with the injunctive relief

provisions, including all deadlines and reporting requirements, set forth in Appendix E, and as set forth in Paragraph 71.

24. Other Controls and Mitigation. Defendants will fund and perform additional projects to further reduce their emissions and discharges of PFAS, or provide alternative drinking water relief beyond that set forth in Appendix E (Drinking Water Requirements).

a. Funding for the projects will be capped at $90,000,000 over 15 years plus applicable interest, or an average of $6,000,000 per year when reduced to 2025 dollars (the "annual spend"). To the extent Chemours spends more or less than the estimated annual spend, the difference will roll over into the available totals for subsequent years. After the first five years and each year thereafter until 15 years from the first annual spend or until the cap amount has been reached, Chemours shall adjust the annual spend to account for the average annual inflation rate as measured by the Consumer Price Index published by the Bureau of Labor Statistics using the following formula: Annual Spend = $6,000,000 x (1 + average annual inflation rate)$^{\text{number of years since Date of Lodging}}$ Annual Spend for year N= $6,000,000 x (the CPI at the beginning of year N/the CPI on the Date of Lodging). In adjusting the annual spend to account for average inflation, the adjustment shall exclude the estimated cost of any approved project or project that Chemours has proposed and which EPA has not yet acted upon pursuant to subparagraphs d and e below.

b. Defendants shall identify and provide to EPA an initial set of projects no later than six months from the Date of Entry. Defendants shall provide written project descriptions and an analysis of the expected costs and benefits of the project, the length of time to complete each of the proposed projects, and, where appropriate, any enhancement to worker exposure protections to PFAS compounds at the facility.

c. After receipt of Defendants' initial list of projects, EPA can identify and provide to Defendants in writing additional proposed projects, whether based on the list of projects provided by Chemours or projects the Agencies (EPA or WVDEP, as appropriate) identify. For any project proposed by EPA, the identification will include project descriptions and expected costs and benefits of the project, the length of time to complete a proposed project, and, where appropriate, any enhancement to eliminate or reduce worker exposure to PFAS compounds.

d. Within 60 Days of the receipt of the EPA's list of project descriptions, the Parties shall confer in good faith as to the costs, benefits, and overall length of time to complete each of the projects proposed by EPA or Chemours, on whether the same or similar benefits could be obtained at lesser costs through other potential projects, and whether Chemours is already undertaking any proposed project other than under this Consent Decree.

e. EPA shall have 90 Days after the Parties' conferral to make a determination as to whether to proceed with an identified project. Within 90 Days of a determination that any project shall proceed, Defendants shall submit for EPA's approval a detailed workplan for the project with appropriate deadlines and milestones. The process for disapproval and approval shall comply with procedures in Paragraphs 15–20 (Approval of Deliverables).

f. Following EPA's determination on Defendants' initial list of projects, Defendants can identify additional projects until approved projects have an estimated cost in exceedance of the cap. The process for EPA approval of and implementation of those projects is set forth in subparagraphs b – e above.

g. Once selected, the project descriptions and associated deadlines shall be incorporated into this Consent Decree as non-material modifications. EPA shall determine whether projects have been satisfactorily completed based upon the approved workplan and whether associated deadlines have been met.

h. If Defendants do not agree as to the project selected by EPA or with respect to whether projects have been satisfactorily completed or any other issue with respect to the selection or implementation of the project, Defendants have the right to invoke the dispute resolution provision pursuant to Section IX (Dispute Resolution).

i. Progress on the projects shall be reported in the semi-annual reports set forth in Section VI(Reporting Requirements).

j. Chemours shall keep records adequate for EPA to assess the status of work on the projects and shall provide such records upon demand by EPA.

k. Chemours shall submit, on an annual basis, a detailed accounting of the amounts spent on each project during the last calendar year and a description of the work performed since either the inception of each project or the date the immediately preceding annual report was submitted to EPA. Such accounting shall be submitted to EPA for approval 60 Days after the anniversary of this Consent Decree.

l. Defendants shall be entitled to dollar for dollar credit toward the annual spend if state authorities in New Jersey (with regard to Chambers Works) or North Carolina (with regard to Fayetteville Works) or West Virginia (with regard to Washington Works) require that Defendants undertake work that further reduces existing emissions or discharges of PFAS from the Facilities or provide drinking water relief beyond that set forth in Appendix E (Drinking Water Requirements). Costs incurred by Chemours solely to achieve or maintain compliance

with a current Facility NPDES permit or other existing requirements as of the Effective Date shall not count towards this subparagraph, nor shall costs of complying with this Consent Decree, except that, for clarity (i), any PFAS abatement project pursuant to the final Chambers Works NPDES permit (issued January 8, 2026), (ii) any additional projects beyond those required under Appendix F (CWA—Washington Works) that are developed to reduce the discharge targets set forth in Appendix F, (iii) any projects recommended by the Third Party Evaluator that are not required by the approved Response Plan pursuant to Appendix C (TSCA—HPFO); and (iv) any projects recommended by the Third Party Evaluator that are not required by the approved Response Plan pursuant to Appendix D (TSCA—Carbooxohalide), are not costs of complying with this Consent Decree and shall be eligible for consideration as a mitigation project. However, all credit shall be capped at 40% of $90,000,000. When Defendants are required by state authorities to undertake projects subject to this Paragraph, they shall inform EPA of the description of the project and estimated cost. Upon submission of such notice, Defendants shall be entitled to a provisional credit against that year's spend. Final credit will be applied only after the relevant work has been performed and Defendants have provided and EPA has approved a detailed accounting of the amounts spent on the work.

m. Any major alterations to the timetables or project selection or approval process outlined in this Paragraph may be agreed to in writing by the United States and the Defendants and will be filed with the Court as non-material modifications to the Consent Decree. Defendants shall also inform EPA in writing of minor alterations, which need not be filed with the Court.

25. Mitigation Project Certifications. For purposes of this Paragraph, "Mitigation Projects" refer only to obligations beyond those in existence prior to the Date of Lodging. With

regard to the Mitigation Projects, Defendants certify that the Mitigation Projects are not projects that Defendants were required to construct, perform, or implement other than in settlement of the claims resolved in this Decree; that Defendants have not received and will not receive credit for the Mitigation Projects in any other enforcement action; and that Defendants shall neither generate nor use any pollutant reductions from the Mitigation Projects as netting reductions, pollutant offsets, or to apply for, obtain, trade, or sell any pollutant reduction credits.

## VI. REPORTING REQUIREMENTS

26. Defendants shall submit all reports required under any Appendix hereto, under the requirements and schedules set out in such Appendix or workplan submitted under such an Appendix.

27. Defendants shall also submit the following reports to EPA, and DOJ (and with regard to CWA/WPCA relief at Washington Works, the WVDEP) at the addresses set forth in Section XIII (Notices):

a. By July 31st and January 31st of each year after the Effective Date of this Consent Decree, until termination of this Decree pursuant to Section XVII, Defendants shall submit by email a semi-annual report for the preceding six months that includes: the status of any construction or compliance measures being taken under the Consent Decree; completion of milestones; problems encountered or anticipated, together with implemented or proposed solutions; status of permit applications; operation and maintenance difficulties or concerns relating to compliance with Appendix F; and reports to state agencies.

b. The report shall also include a description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation’s likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If Defendants violate,

or have reason to believe that they may violate, any requirement of this Consent Decree, Defendants shall notify DOJ and EPA (and with regard to CWA/WPCA relief at Washington Works, the WVDEP) of such violation and its likely duration, in writing, within ten business Days of the Day Defendants first become aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, Defendants shall so state in the report. Defendants shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the Day Defendants become aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves Defendants of their obligation to provide the notice required by Section VIII (Force Majeure).

28. Whenever any violation of this Consent Decree or of any applicable permits or any other event affecting Defendants' performance under this Decree may pose an immediate and substantial endangerment to the public health or welfare or the environment, Defendants shall notify EPA (and with regard to CWA/WPCA relief at Washington Works, the WVDEP) as soon as possible, but no later than 24 hours after Defendants first knew of the violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

29. Defendants shall ensure that each report submitted under this Section is signed by an official of the submitting party and includes the following certification:

> I certify under penalty of perjury that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that

there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

30. This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

31. The reporting requirements of this Consent Decree do not relieve Defendants of any reporting obligations required by the CWA, TSCA, RCRA, SDWA, the WPCA, or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

32. Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VII. STIPULATED PENALTIES

33. Defendants shall be liable for stipulated penalties to the United States (and with regard to relief at Washington Works, the WVDEP) for violations of this Consent Decree, unless excused under Section VIII (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any work plan or schedule approved under this Consent Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree. Defendants shall be entitled to contest any claim of violation in accordance with the Dispute Resolution provisions set forth below.

34. The stipulated penalties shall be as set forth below:

| Requirement | Period of Violation | Amount Per Day |
|---|---|---|
| Late payment of civil penalty, or any applicable installments or interest | 1st through 14th Day | $5,000 |
| | 15th through 30th Day | $10,000 |
| | 31st Day and beyond | $20,000 |
| Transfer of Facilities. Failure to: (a) provide a copy of this Consent Decree to any proposed transferee; (b) provide written notice to the United States at least 30 Days prior to any transfer of any portion of the Facility; or (c) provide a copy of the proposed written agreement with the transferee as required by Paragraph 4 | 1st through 14th Day | $1,000 |
| | 15th through 30th Day | $2,500 |
| | 31st Day and beyond | $5,000 |
| Failure to timely complete and submit lists of proposed projects or to submit a timely and complete workplan under Paragraph 24 (Other Controls and Mitigation) | 1st through 14th Day | $2,500 |
| | 15th through 30th Day | $5,000 |
| | 31st Day and beyond | $10,000 |
| Failure to timely perform any project selected under Paragraph 24 (Other Controls and Mitigation) as set out in the relevant work plan and schedule for such project | 1st through 31st Day | $5,000 |
| | 31st through 60th Day | $10,000 |
| | 61st Day and beyond | $15,000 |
| Failure to comply with a specified substantive (non-reporting) compliance requirement of any Appendix, or any requirement set out in any work plans approved under any Appendix. This includes failure to obtain any needed permits. This excludes failure to submit timely and | 1st through 14th Day | $4,000 |
| | 15th through 30th Day | $6,000 |

| Requirement | Period of Violation | Amount Per Day |
|---|---|---|
| complete reports which is subject to the next entry. This also excludes stipulated penalties identified in any other stipulated penalty in this paragraph. | 31st Day and beyond | $9,000 |
| Failure to submit a timely and complete report required by: the body of the consent decree, any Appendix, or any approved workplan submitted under any Appendix. This excludes stipulated penalties for reporting obligations identified in any other stipulated penalty in this paragraph. | 1st through 14th Day | $1,000 |
| | 15th through 30th Day | $2,500 |
| | 31st Day and beyond | $5,000 |

For violations of Appendix F (CWA—Washington Works), the penalties in the table below apply to exceedances of Consent Decree limits as set forth in that Appendix at Paragraph B.3.g. Stipulated penalties for a Consent Decree limit exceedance are to be assessed monthly on a sliding scale based on the magnitude and frequency of each Consent Decree limit exceedance for the same parameter at the same monitoring point, pursuant to the following:

| | **Magnitude of Exceedance** | | |
|---|---|---|---|
| **Frequency over Rolling 12-month Period** | <2x Limit | >2x | ≥5x |
| 1–2 exceedances | $1,000 | $5,000 | $10,000 |
| 3–6 exceedances | $2,500 | $10,000 | $15,000 |
| 7–12 exceedances | $5,000 | $15,000 | $20,000 |

In addition, for each exceedance of the NPDES permit limits at Washington Works, the following stipulated penalties shall apply:

| Requirement | Daily Maximum | Monthly Average or Other |
|---|---|---|
| Exceeding any non-PFAS NPDES Permit limit at Washington Works, West Virginia. | $5,000 | $10,000 |

| Requirement | Daily Maximum | Monthly Average or Other |
| --- | --- | --- |
| Exceeding any NPDES Permit limit for PFAS at Washington Works, West Virginia during the period of installing projects under the CWA—Washington Works Appendix. This does not apply to Outfall 006. | $5,000 | $10,000 |
| Exceeding any NPDES Permit limit for PFAS at Outfall 006 at Washington Works, West Virginia before and during the period of installing projects under the CWA—Washington Works Appendix. | $2,500 | $5,000 |
| Exceeding any NPDES Permit limit for PFAS at Washington Works, West Virginia after completion of installing the projects under the CWA—Washington Works Appendix. | $7,500 | $15,000 |

There is no stipulated penalty for failing to meet Target PFAS Control Levels during a Demonstration attempt under the Appendix for CWA—Washington Works.

Stipulated penalties for violations of the TSCA appendices are provided for only as set forth in the following table:

| Requirement | Amount |
| --- | --- |
| Failure to comply with the 99% Requirement for such Facility as set forth in Paragraph 3 of Appendix B during the applicable Compliance Period, including through failure to comply with the Recordkeeping Requirement for the applicable Facility as set forth in Paragraph 2 of Appendix B (GenX). | $45,000 |

| Requirement | Amount |
|---|---|
| Failure to comply with the monitoring requirements of Paragraphs 7–8 [performing monitoring and using monitoring data] in Appendix B (GenX) for each applicable Compliance Period. This stipulated penalty shall not apply if the stipulated penalty for failure to comply with the 99% Requirement is applied to the same Facility in the same Compliance Period.<br><br>Failure to comply with LDAR requirement when required during the applicable Compliance Period pursuant to the following Paragraphs in Appendix B<br>(GenX): 15, 21, 26, and 32 [fugitive emissions requirements]. This stipulated penalty shall not apply if the stipulated penalty for failure to comply with the 99% Requirement is applied to the same Facility in the same Compliance Period.<br><br>Failure to maintain records demonstrating a Facility has met the requirements in Appendix B (GenX) of Paragraphs 5 [calculations use recognized and generally accepted good engineering principles] and 6 [Changes that are not Major Changes]. This stipulated penalty shall not apply if the stipulated penalty for failure to comply with the 99% Requirement is applied to the same Facility in the same Compliance Period.<br><br>Failure to comply with the 60-day period during which Chemours shall not make a Major Change under Paragraph 3 of Appendix D (Carbooxohalide).<br><br>Failure to comply with the terms or requirements of the following Paragraphs in Appendix D (Carbooxohalide): 12 [evaluator independence], and 14 [requirements for Chemours' contract with evaluator].<br>Failure to comply with the terms or requirements of the following Paragraphs in Appendix C (HFPO): 4 [evaluator independence], and 7 [requirements for Chemours' contract with evaluator].<br><br>Failure to comply with the documentation requirements set forth in Paragraph 17.h of Appendix D (Carbooxohalide).<br><br>Failure to comply with the documentation requirements set forth in Paragraph 10.f of Appendix C (HFPO). | $5,000 |

| Requirement | Amount |
|---|---|
| Failure to meet any deadline regarding the Engineering Evaluation pursuant to the following Paragraphs of the Appendix D (Carbooxohalide): 17, 18, 20.<br><br>Failure to meet any deadline regarding the Engineering Evaluation pursuant to the following Paragraphs of the Appendix C (HFPO): 10, 11, and 13. | 1st through 14th Day: $1,000<br>15th through 30th Day: $2,500<br>31st Day and beyond: $5,000 |
| Failure to comply with any requirement in Paragraph 7 [restrictions on Carbooxohalide Processes and safety training and PPE requirements]<br><br>Failure to meet the deadline to notify EPA of any Major Change under Paragraph 5 of Appendix D (Carbooxohalide), subject to feasibility as described in that Paragraph.<br><br>Failure to implement the approved Response Plan in accordance with the schedules set forth therein under Paragraph 19 of Appendix D (Carbooxohalide).<br><br>Failure to implement the approved Response Plan in accordance with the schedules set forth therein under Paragraph 12 of Appendix C (HFPO). | 1st through 14th Day: $2,500<br>15th through 30th Day: $5,000<br>31st Day and beyond: $10,000 |

35. Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

36. Defendants shall pay stipulated penalties to the United States and the WVDEP (with regard to CWA/WPCA relief at Washington Works) within 30 Days of a written demand by either Plaintiff, subject to Paragraph 38 with respect to Dispute Resolution. Defendants shall pay 100% of the total stipulated penalty amount to the United States except that, with regard to CWA/WPCA relief at Washington Works, Defendants shall pay 50% percent of the total stipulated penalty amount due to the United States and 50% percent to the WVDEP. The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiff.

37. Either Plaintiff may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to that Plaintiff under this Consent Decree.

38. Stipulated penalties continue to accrue as provided in Paragraph 35, during any Dispute Resolution, but need not be paid until the following:

a. If the dispute is resolved by agreement of the Parties or by a decision of EPA or the WVDEP that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing, together with interest accruing as of the date payment becomes due, to the United States or the WVDEP within 30 Days of the effective date of the agreement or the receipt of EPA's or the WVDEP's decision or order.

b. If the dispute is appealed to the Court and the United States or the WVDEP prevails in whole or in part, Defendants shall pay all accrued penalties determined by

the Court to be owing, together with interest accruing as of the date payment becomes due, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

c. If any Party appeals the District Court's decision, Defendants shall pay all accrued penalties determined to be owing, together with interest accruing as of the date payment becomes due, within 15 Days of receiving the final appellate court decision.

d. If Defendants prevail in Dispute Resolution, no penalties or interest shall be due for the disputes resolved in Defendants' favor.

39. Defendants shall pay stipulated penalties owing to the United States in the manner set forth in Paragraph 10 and with the confirmation notices required by Paragraph 11, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid. Defendants shall pay stipulated penalties owing to the WVDEP by the method stated in Paragraph 12.

40. If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the WVDEP from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

41. The payment of penalties and interest, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

42. Non-Exclusivity of Remedy. Stipulated penalties are not the United States' or the WVDEP's exclusive remedy for violations of this Consent Decree. Subject to the provisions of Section XI (Effect of Settlement/Reservation of Rights), the United States and the WVDEP

expressly reserve the right to seek any other relief they deem appropriate for Defendants' violation of this Decree or applicable law, including but not limited to an action against Defendants for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt. However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

VIII. FORCE MAJEURE

43. "Force majeure," for purposes of this Consent Decree, means any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. Given the need to protect public health and welfare and the environment, the requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure, such that any delay or non-performance is, and any adverse effects of the delay or non-performance are, minimized to the greatest extent possible. "Force majeure" does not include financial inability to perform any obligation under this Consent Decree.

44. If any event occurs for which Defendants will or may claim a force majeure, Defendants shall provide notice by email to EPA and the WVDEP (with regard to CWA/WPCA relief at Washington Works) at the email addresses in Section XIII (Notices). The deadline for the notice is seven Days after Defendants first knew or should have known that the event would

likely delay or prevent performance. Defendants shall be deemed to know of any circumstance of which any contractor of, subcontractor of, or entity controlled by Defendants knew.

45. If Defendants seek to assert a claim of force majeure concerning the event, Defendants shall submit, within seven Days after the notice under Paragraph 44, a further notice to EPA and the State that includes (a) an explanation and description of the event and its effect on Defendants' completion of the requirements of the Consent Decree; (b) a description and schedule of all actions taken or to be taken to prevent or minimize the delay and/or other adverse effects of the event; (c) if applicable, the proposed extension of time for Defendants to complete the requirements of the Consent Decree; (d) Defendants' rationale for attributing such delay to a force majeure; (e) a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health or welfare or the environment; and (f) proof supporting the claim that the delay was attributable to a force majeure.

46. Failure to submit a timely or complete notice or claim under Paragraph 44 or 45 regarding an event precludes Defendants from asserting any claim of force majeure regarding that event, provided, however, that EPA may, in its unreviewable discretion, excuse such failure if it is able to assess to its satisfaction whether the event is a force majeure, and whether Defendants have exercised its best efforts, under Paragraph 43.

47. After receipt of any claim of force majeure, EPA, after a reasonable opportunity for review and comment by the WVDEP (with regard to relief at Washington Works), will notify Defendants of its determination whether Defendants are entitled to relief under Paragraph 43, and, if so, the excuse of, or the extension of time for, performance of the obligations affected by the force majeure. Any such excuse or extension does not, of itself, excuse or extend the time for performance of any other obligation.

48. If Defendants elect to invoke the dispute resolution procedures set forth in Section IX (Dispute Resolution), it shall do so no later than 15 Days after receipt of EPA's notice. In any such proceeding, Defendants have the burden of proving that it is entitled to relief under Paragraph 43, that its proposed excuse or extension was or will be warranted under the circumstances, and that it complied with the requirements of Paragraphs 45 –47. If Defendants carry this burden, the delay or non-performance at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to EPA and the Court.

IX. DISPUTE RESOLUTION

49. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section concerning an issue of which it had notice and an opportunity to dispute under this Section prior to an action by the United States or WVDEP to enforce any obligation of Defendants arising under this Decree precludes Defendants from raising any such issue as a defense to any such enforcement action.

50. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send DOJ and EPA a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 60 Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 30 Days after the conclusion of the informal negotiation period, Defendants invoke formal dispute resolution procedures as set forth below.

51. Formal Dispute Resolution. Defendants may initiate formal dispute resolution by sending DOJ and EPA within 30 Days after the conclusion of informal dispute resolution under Paragraph 50, a written Statement of Position regarding the matter in dispute. The Statement of Position must include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants. Unless the United States agrees with Defendants' Statement of Position, the United States' responsive Statement of Position is due within 30 Days after receipt of Defendants' Statement of Position. The United States' Statement of Position must include, but need not be limited to, factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position is binding on Defendants, unless Defendants files a motion for judicial review of the dispute in accordance with the following Paragraph.

52. If the dispute is solely between Defendants and WVDEP, the procedures set forth in the preceding three paragraphs will apply except the notices and statements shall be between those Parties.

53. Judicial Dispute Resolution. Defendants may seek judicial review of the dispute by filing with the Court and serving on the United States (and with regard to CWA/WPCA relief at Washington Works, the WVDEP) a motion requesting judicial resolution of the dispute. Defendants (a) shall file the motion within ten Days of receipt of the United States' (and with regard to CWA/WPCA relief at Washington Works, the WDEP's) Statement of Position pursuant to Paragraph 51; (b) may not raise any issue not raised in informal dispute resolution pursuant to Paragraph 50, unless the Plaintiff(s) raise a new issue of law or fact in their Statement of Position; (c) shall include a written statement of Defendants' position on the

dispute, including any supporting factual data, analysis, opinion, or documentation, and (d) shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

54. The United States (and with regard to CWA/WPCA relief at Washington Works, the WVDEP) shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court. Defendants may file a reply to the extent permitted by the Local Rules.

55. In any judicial dispute resolution proceeding, EPA will compile an administrative record regarding the dispute containing all Statements of Position, including supporting documentation. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

56. Standard of Review

a. Disputes Concerning Matters Accorded Record Review. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 53 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable administrative law, Defendants shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b. Other Disputes. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 53, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree.

57. The invocation of dispute resolution procedures under this Section does not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment is stayed pending resolution of the dispute as provided in Paragraph 38. If Defendants do not prevail on the disputed issue, stipulated penalties will be assessed and must be paid as provided in Section VII Stipulated Penalties, unless otherwise ordered by the Court.

X. INFORMATION COLLECTION AND RETENTION

58. The United States, the WVDEP only as to Washington Works, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

a. monitor the progress of activities required under this Consent Decree;

b. verify any data or information submitted to the United States or the WVDEP in accordance with the terms of this Consent Decree;

c. obtain samples and, upon request, splits of any samples taken by Defendants or their representatives, contractors, or consultants;

d. obtain documentary evidence, including photographs or similar data; and

e. assess Defendants' compliance with this Consent Decree.

59. Upon request, Defendants shall provide EPA and/or the WVDEP or their authorized representatives splits of any samples taken by Defendants as part of compliance with this Consent Decree. Upon request, EPA and the WVDEP shall provide Defendants splits of any samples taken by EPA or the WVDEP related to this Consent Decree.

60. Until five years after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to retain all non-identical copies of the following documents, records, or other information (including in electronic form) in, or that come into, their or their contractors' or agents' possession or control (hereafter "Records"):

a. Documentation of all measures undertaken by Defendants to comply with the terms of this Consent Decree;

b. All reports, plans, permits, and documents submitted to the EPA or the WVDEP pursuant to this Consent Decree, including all underlying research and data;

c. All data developed by, or on behalf of, Defendants in the course of complying with the Consent Decree; and

d. All reports, plans, permits and other documents, and data contemplated by any Appendix.

61. Defendants shall maintain Records that were originally created in an electronic format in their native format or in a reasonably accessible format and shall keep them reasonably organized. Unmarked paper printouts of electronic records maintained in accordance with this Paragraph will be considered duplicates or convenience copies and need not be preserved.

62. At the end of this information-retention period, Defendants shall notify the United States and the WVDEP that they have 90 Days to request Defendants' Records. Defendants shall retain and preserve their Records until 90 Days after EPA's receipt of the notice.

63. At any time up until 90 Days after the end of the information-retention period, upon request by the United States or the WVDEP, Defendants shall provide access to the requested Records or copies thereof to the United States or the WVDEP.

64. These information-retention requirements shall apply regardless of any corporate record retention policy.

65. Privileged or Protected Records. In response to a request for Records pursuant to Paragraph 63, Defendants may assert that all or part of a Record is privileged or protected as provided by federal law. If Defendants assert such a privilege, they shall provide the following: (a) the title of the Record; (b) the date of the Record; (c) the name and title of each author of the Record; (d) the name and title of each addressee and recipient of the Record; (e) a description of the contents of the Record; and (f) the privilege or protection asserted by Defendants. If a claim of privilege or protection applies only to a portion of a Record, the Record shall be provided to the United States or the WVDEP in redacted form to mask the privileged or protected portion only. Defendants shall retain all Records that they claim to be privileged or protected until the United States has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in Defendants' favor. Defendants shall not make any claim of privilege or protection regarding the portion of any final record that Defendants are required to create or generate in accordance with this Decree.

66. Confidential Business Information Claims. Notwithstanding Paragraph 65, Defendants are entitled to claim that all or part of a Record submitted to the United States under this Section is Confidential Business Information ("CBI") that is covered by 40 C.F.R. § 2.203. Defendants shall segregate all Records or parts thereof submitted under this Decree which they claim are CBI, label them as "claimed as confidential business information" or "claimed as CBI," and state the statutory authority under which the information is being provided. If some or all information provided in response to this Information Request is claimed to be TSCA CBI, the files must be submitted via the EPA's Central Data Exchange ("CDX") Program Service titled

"CSPP: Submissions for Chemical Safety and Pesticide Programs" under its drop-down "TSCA Enforcement and Compliance Communications" application. If some or all of the information provided is claimed to be TSCA CBI, Defendants agree to complete the certification statement that is incorporated into CDX; provide a second copy of any documents claimed as TSCA CBI with CBI claims redacted to include only that information that you are not claiming as CBI. Records that Defendants properly label in accordance with the preceding sentence will be afforded the protections specified in 40 C.F.R. part 2, subpart B, 15 U.S.C. 2613, and 40 C.F.R. 703.5. If any Record is not properly labelled when it is submitted to EPA or the WVDEP, or if EPA notifies Defendants that the Record is not entitled to confidential treatment under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. part 2, subpart B, the public may be given access to such Record in accordance with the procedures established in the part 2 regulations.

67. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the WVDEP pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XI. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

68. This Consent Decree resolves the civil claims of the United States and the WVDEP for the violations alleged in the Complaint filed in this action through the date of Lodging.

69. This Consent Decree also resolves the following Notices of Violation issued to Defendants: TSCA NOV issued by EPA dated February 13, 2019 and the RCRA NOV issued by WVDEP dated April 3, 2025.

70. Additional Resolved Items.

a. This Consent Decree also resolves any potential claims of the United States against Defendants under Section 1431 of SDWA, 42 U.S.C. §300i, with respect to known PFOA and HFPO-DA (and additionally PFOS and PFNA at Chambers Works only), drinking water contamination at or emanating from Facilities as of the date of lodging to the extent this ISE is fully addressed by the work performed under the Appendices to this Consent Decree.

b. This Consent Decree also resolves any potential claims of the United States against Defendants under Section 504 of the CWA, 33 U.S.C. § 1364, with respect to known PFOA and HFPO-DA in discharges from Facilities as of the Date of Lodging to the extent this ISE is fully addressed by the work performed under the Appendices to this Consent Decree.

c. This Consent Decree also resolves any potential claims of the United States against Defendants for penalties under TSCA prior to the Date of Lodging for violations of TSCA Section 8(e), 15 U.S.C. § 2607(e), with respect to substantial risk information associated with releases of GenX Compounds at Fayetteville Works; the TSCA GenX Section 5(e) Order relating to the GenX 99% Restriction; TSCA Section 5, 15 U.S.C. § 2604, with respect to manufacture and distribution of HFPO in commerce without notifying recipients of the Significant New Use Rule Restrictions and without prior submission of a Significant New Use Notice; TSCA Section 8(a), 15 U.S.C. § 2607(a), with respect to accurate and complete

Chemical Data Reporting; and TSCA Section 12(b), 15 U.S.C. § 2611(b), with respect to timely submissions of notices accompanying exports of chemical substances.

71. Applicability of Existing Agreements and Commitments.

a. The Administrative Order on Consent issued pursuant to Section 309 of the CWA at Washington Works (dated April 26, 2023) shall be terminated upon the Effective Date.

b. The Administrative Order on Consent issued pursuant to Section 1431 of SDWA at Washington Works (dated January 6, 2017) shall be terminated with respect to Chemours upon the Effective Date and shall otherwise remain in effect. The January 6, 2017 Order will only be implemented against a third party if Chemours fails to implement the Approved SDWA Work Plan agreed to under this Consent Decree.

c. For Chambers Works, EPA shall hold Chemours responsible for the operating procedures set forth in the approved Work Plan established pursuant to Appendix E (Drinking Water Requirements) rather than the Standard Operating Procedures for the Ongoing 2016 Residential Drinking Water Well Surveying and PFAS Sampling Program, which were modified and approved in 2020.

72. The United States and the WVDEP reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree does not limit the rights of the United States or the WVDEP to obtain penalties or injunctive relief under the CWA, TSCA, RCRA, SDWA or the WPCA or their implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraphs 68–70. Except as expressly set forth in this Consent Decree, the United States and the WVDEP further reserve all legal and equitable remedies to address any conditions if, in the

future, there may be an imminent and substantial endangerment to the public health or welfare or the environment or imminently hazardous chemical substance or mixture arising at, or posed by, Defendants' Facilities, whether related to the violations addressed in this Consent Decree or otherwise, including conditions related to PFOA and HFPO-DA contamination. The United States explicitly reserves all claims under the Comprehensive Environmental Response, Compensation and Liability Act; the Defendants reserve all claims and defenses with respect thereto.

73. The United States reserves, and this Consent Decree is without prejudice to, the right to reinstitute or reopen this action, or to commence a new action seeking relief other than as provided in this Consent Decree, if the Financial Information provided by Defendants, or the financial certification made by Defendants in Paragraph 9, was false or, in any material respect, inaccurate at the time provided. This reservation shall not apply to any Financial Information that included projections or estimates of Defendants' future financial conditions.

74. In any subsequent administrative or judicial proceeding initiated by the United States or the WVDEP for injunctive relief, civil penalties, other appropriate relief relating to the Facilities' or Defendants' violations that is otherwise permissible under this Consent Decree, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, claim preclusion (res judicata), issue preclusion (collateral estoppel), claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the WVDEP in the subsequent proceeding should have been brought in the instant case; provided, however, that nothing in this Paragraph shall prevent Defendants from asserting any defense that a subsequent administrative judicial or administrative proceeding is barred by the resolution of claims set forth in Paragraphs 68 through 70.

75. This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Defendants are responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree is not a defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the WVDEP do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, TSCA, RCRA, SDWA, or the WPCA, or with any other provisions of federal, State, or local laws, regulations, or permits.

76. This Consent Decree does not limit or affect the rights of Defendants or of the United States or the WVDEP against any third parties, not party to this Consent Decree, except as expressly provided in Paragraph 71.b, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law. Notwithstanding this, the United States agrees that if Defendants are satisfactorily complying or have fully complied with the injunctive provisions set forth in Section V of this Consent Decree, the United States shall not sue any other entity with respect to the same injunctive relief. Whether Defendants are satisfactorily complying shall be determined by EPA subject to the Dispute Resolution Provisions of Section IX.

77. This Consent Decree does not create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XII. COSTS

78. The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and the WVDEP are entitled to collect the costs (including

attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

## XIII. NOTICES

79. Unless otherwise specified in this Consent Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they must be made in writing and sent by mail or email addressed as follows:

| | |
|---|---|
| As to DOJ by email (preferred): | eescdcopy.enrd@usdoj.gov<br>Re: DJ # 90-5-1-1-12112 |
| As to DOJ by mail: | EES Case Management Unit<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Re: DJ # 90-5-1-1-12112 |
| As to EPA by email (preferred): | ChemoursPFAS2026@epa.gov |
| As to EPA by mail: | EPA PFAS Enforcement Team<br>Office of Civil Enforcement<br>US Environmental Protection Agency<br>1200 Penn Ave. NW, MC: 2210A<br>Washington, DC 20460 |
| As to the WVDEP by email: | brad.m.wright@wv.gov |
| As to the WVDEP by mail: | Chief Inspector, Environmental Enforcement<br>WV Department of Environmental Protection<br>601 57th Street SE<br>Charleston, West Virginia 25304 |
| As to Chemours and Chemours FC: | The Chemours Company<br>Office of the General Counsel<br>1007 Market Street<br>Wilmington, DE 19801<br>Attn: Kristine M. Wellman<br>kristine.m.wellman@chemours.com |

With a copy to:

Allison B. Rumsey
Arnold & Porter
601 Massachusetts Ave NW
Washington DC 20001
allison.rumsey@arnoldporter.com

and

Graham W. Meli
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
gwmeli@wlrk.com

80. Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

81. Notices submitted pursuant to this Section are deemed submitted upon mailing or transmission by email, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XIV. EFFECTIVE DATE

82. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XV. RETENTION OF JURISDICTION

83. The Court retains jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections IX (Dispute Resolution) and XVI (Modification) or effectuating or enforcing compliance with the terms of this Decree.

## XVI. MODIFICATION

84. Except as otherwise set forth in any Appendix or in Paragraph 24 (Other Controls and Mitigation) the terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the United States and Defendants, and where applicable, by the WVDEP. Where the modification constitutes a material change to this Decree, it is effective only upon approval by the Court

85. If any Party seeks a modification to this Consent Decree, it shall send a written notice to the other Parties in accordance with Section XIII (Notices) setting forth the requested changes and the reasons therefor. The Parties shall negotiate informally concerning the modification for a period of up to 30 Days from the date of receipt of the notice, unless that period is modified by written agreement. If at the end of the period of informal negotiations the Parties are not in agreement, the Party seeking the modification retains any rights it may have to seek modification from the Court pursuant to Federal Rule of Civil Procedure 60(b).

## XVII. TERMINATION

86. After a period of 15 years, if Defendants have 1) completed the requirements of Section V and all Appendices, 2) maintained satisfactory compliance with this Consent Decree and all applicable NPDES permits, and 3) paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendants may serve upon the United States, and as appropriate the WVDEP, a Request for Termination, stating that Defendants have satisfied those requirements, together with all necessary supporting documentation. However, when Defendants have completed work required by particular Appendices of the Consent Decree, Defendants may request Partial Termination of that portion of the Consent Decree prior to 15 years.

87. Following receipt by the United States and the WVDEP of Defendants' Request for Partial Termination or for Complete Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendants have satisfactorily complied with the requirements for termination of this Consent Decree. If the United States after consultation with the WVDEP agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

88. If the United States, after consultation with the WVDEP with respect to CWA relief at the Washington Works Facility, does not agree that the Decree may be terminated, Defendants may invoke Dispute Resolution under Section IX. However, Defendants shall not seek Dispute Resolution of any dispute regarding termination until 90 Days after service of their Request for Termination.

XVIII. PUBLIC PARTICIPATION

89. This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendants in writing that it no longer supports entry of the Decree.

XIX. SIGNATORIES/SERVICE

90. Each undersigned representative of Defendants and representative of the Environment and Natural Resources Division of the DOJ and the WVDEP identified on the signature page below, certifies that that person is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party that person represents to this document.

91. This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. Defendants agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendants need not file an answer to the Complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

XX. INTEGRATION

92. This Consent Decree, including deliverables that are subsequently approved pursuant to this Decree, constitutes the entire agreement among the Parties regarding the subject matter of the Decree and supersedes all prior representations, agreements and understandings, whether oral or written, concerning the subject matter of the Consent Decree herein.

XXI. 26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

93. For purposes of the identification requirement in Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), and 26 C.F.R. § 1.162-21(b)(2), performance of Paragraphs 5–18, 23–25, 29, 30, 32, 61–64 and all Appendices, is restitution, remediation, or required to come into compliance with law.

XXII. HEADINGS

94. Headings to the Sections and Subsections of this Consent Decree are provided for convenience and do not affect the meaning or interpretation of the provisions of this Consent Decree.

XXIII. APPENDICES

95. The following Appendices are attached to and part of this Consent Decree:

Appendix A (list of Financial Information)

Appendix B (TSCA—GenX 5(e) Substances)

Appendix C (TSCA—HFPO)

Appendix D (TSCA—Carbooxohalide)

Appendix E (Drinking Water Requirements)

Appendix F (CWA—Washington Works).

If there is any conflict between the text of the consent decree and any Appendix, the Appendix shall control.

XXIV. FINAL JUDGMENT

96. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the WVDEP, and Defendants.

Dated and entered this day of ___________, 2026

____________________________________

UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

FOR THE UNITED STATES OF AMERICA:

Adam R.F. Gustafson
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

*<u>/s/ Steven O'Rourke</u>*
STEVEN O'ROURKE
KATHERINE A. ABEND
Senior Counsels
SYLVIA LAM
JONAH SELIGMAN
Trial Attorneys
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: 202-514-2779
Email:Steve.O'Rourke@usdoj.gov

MOORE CAPITO
United States Attorney

/s/ Jason S. Bailey
JASON S. BAILEY
Assistant United States Attorney
W. Va. State Bar No. 13582
Southern District of West Virginia
Robert C. Byrd U.S. Courthouse
300 Virginia Street East, Suite 4000
Charleston, WV 25301
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: jason.bailey2@usdoj.gov
*Counsel for United States of America*

Signature Page for *United States & WVDEP v. The Chemours Company et al.*

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

Jeffrey A. Hall
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue
Washington, D.C. 20460

Gracie Pendleton, Attorney-Adviser
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance

Michael Martucci
Regional Administrator
U.S. Environmental Protection Agency, Region 2

Amy Van Blarcom-Lackey
Regional Administrator
U.S. Environmental Protection Agency, Region 3

Kevin J. McOmber
Regional Administrator
U.S. Environmental Protection Agency, Region 4

Anne Vogel
US EPA Region 5 Administrator
& Great Lakes National Program Manager

Signature Page for *United States & WVDEP v. The Chemours Company et al.*

FOR THE WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROECTION:

/s/ C. Scott Driver

C. Scott Driver
Chief, Office of Legal Services
West Virginia Department of Environmental Protection
601 57th Street Southeast
Charleston WV 25304

THE CHEMOURS COMPANY and

THE CHEMOURS COMPANY, FC, LLC,

6/23/2026
Date

Kristine M. Wellman
Kristine M. Wellman
General Counsel
The Chemours Company and
The Chemours Company, FC, LLC.
1007 Market Street
Wilmington, DE 19801

# EXHIBIT 50

# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, DC 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): September 9, 2026**

# Corteva, Inc.
# EIDP, Inc.

**(Exact Name of Registrant as Specified in Charter)**

| | | |
|---|---|---|
| **Delaware** | **001-38710** | **82-4979096** |
| **Delaware** | **001-00815** | **51-0014090** |
| **(State or Other Jurisdiction of Incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

| | |
|---|---|
| **9330 Zionsville Road, Indianapolis, Indiana** | **46268** |
| **1000 N. West Street, Suite 900, Wilmington, Delaware** | **19801** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**Registrant's Telephone Number, including area code: (833) 267-8382**
**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c)) Securities registered pursuant to Section 12(b) of the Act:

| Registrant | Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|---|
| Corteva, Inc. | Common Stock, $0.01 par value | CTVA | New York Stock Exchange |
| EIDP, Inc. | $3.50 Series Preferred Stock | CTAPrA | New York Stock Exchange |
| EIDP, Inc. | $4.50 Series Preferred Stock | CTAPrB | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 8.01 Other Events**

On September 9, 2026, Corteva, Inc. and its subsidiary EIDP, Inc. (collectively, the "Company"), The Chemours Company ("Chemours") and its subsidiary The Chemours Company FC, and DuPont de Nemours, Inc. ("DuPont") reached a settlement with State of North Carolina, by and through the North Carolina Attorney General, and Bladen County, Brunswick County, Columbus County, Cumberland County, New Hanover County, Robeson County, Sampson County, Town of Wrightsville Beach, City of Lumberton, Village of Bald Head Island, and the Lower Cape Fear Water and Sewer Authority of statewide PFAS clams; Fayetteville Works site related claims, as well as for the Company and DuPont all claims related to historical discharges from the Fayetteville Works site and any obligations under the Chemours 2019 consent order with the North Carolina Department of Environmental Quality ("NC Consent Order"). Under the settlement the companies will collectively pay $455 million to the State of North Carolina and applicable state subdivisions over 15 years, with the Company's share being approximately $66 million. Additionally, as part of the settlement, the Company and DuPont, on a 29% and 71% basis, respectively, are required to guarantee Chemours' share of the settlement payments, as well as establish a reserve fund via a line of credit, letter of credit, and/or a surety bond capped at $135 million that the State of North Carolina may access in the event Chemours does not comply with its NC Consent Order.

In connection with the North Carolina settlement, Chemours, DuPont and the Company reached the following understandings relating to the January 2021 Memorandum of Understanding by and among Chemours, DuPont, Corteva and EIDP (the "MOU").

For purposes of calculating the amount of qualified spend applied against the MOU's $4 billion aggregate qualified spend cap, the aggregate settlement payments made to North Carolina will be applied against the MOU cap in the amount of $210 million, reflecting the net present value of such settlement payments spread equally over a twenty-five-year period from the date the settlement becomes final (rather than the actual timing of the payments) and using an 8% discount rate. Net present value also was used to determine the amount of the aggregate payments under the 2025 settlement with the State of New Jersey applied against the MOU cap, and the parties have agreed to use this net present value methodology for potential future settlements with multi-year payments.

In addition, since the aggregate payments to be made in connection with the New Jersey and North Carolina settlements will qualify for withdrawal from the MOU Escrow Account and exceed the parties' future escrow contribution obligations, all future contributions required by the parties to the MOU Escrow Account will be considered satisfied by the parties' New Jersey and North Carolina settlement payments.

**Item 9.01 Financial Statements and Exhibits**

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 10.1 | Settlement Agreement between and among the State of North Carolina, et al., on the one hand; and EIDP, Inc., Corteva, Inc., DuPont de Nemours Inc., The Chemours Company, and The Chemours Company FC, LLC, on the other hand, dated September 9, 2026. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document). |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, each registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

CORTEVA, INC.

Date: September 10, 2026

By: /s/ Jennifer A. Johnson
Name: Jennifer A. Johnson
Title: Senior Vice President, Chief Legal and Public Affairs Officer, Corporate Secretary

EIDP, INC.

Date: September 10, 2026

By: /s/ Jennifer A. Johnson
Name: Jennifer A. Johnson
Title: Senior Vice President, Chief Legal and Public Affairs Officer, Corporate Secretary

# EXHIBIT 51

Raw Transcript

31-Jul-2026

# Corteva, Inc. (CTVA)

## Q2 2026 Earnings Call


Copyright © 2001-2026 FactSet CallStreet, LLC

# MANAGEMENT DISCUSSION SECTION

**Operator**: Hello everyone. Thank you for joining us and welcome to the Corteva Agriscience Second Quarter 2026 Earnings Conference Call. After today's prepared remarks, we will host a question-and-answer session. [Operator Instructions]

I will now hand the conference over to Kim Booth, Head of Investor Relations. Kim, please go ahead.

## Unverified Participant

Good morning and welcome to Corteva's second quarter and first half 2026 earnings conference call. Our prepared remarks today will be led by Chuck Magro, Chief Executive Officer; and David Johnson, Executive Vice President and Chief Financial Officer. Additionally, Judd O'Connor, Executive Vice President Seed Business Unit; Robert King, Executive Vice President and Strategic Advisor as well as Luke Kissam, future CEO for new Corteva will join the Q&A session.

We have prepared presentation slides to supplement our remarks during this call, which are posted on the Investor Relations section of the Corteva website and through the link to our webcast. During this call, we will make forward-looking statements which are our expectations about the future. These statements are based on current expectations and assumptions that are subject to various risks and uncertainties. Our actual results could materially differ from these statements due to these risks and uncertainties, including but not limited to those discussed on this call and in the Risk Factor section of our reports filed with the SEC. We do not undertake any duty to update any forward-looking statements.

Please note in today's presentation we'll be making references to certain non-GAAP financial measures. Reconciliations of the non-GAAP measures can be found in our earnings press release and related schedules, along with our supplemental financial summary slide deck available on our Investor Relations website.

It's now my pleasure to turn the call over to Chuck.

## Unverified Participant

Thanks, Kim. Good morning, everyone, and thanks for joining us. The headline for this quarter is straightforward. We are delivering strong results. We are raising our full year outlook and we are on track to complete our separation on October 1. The first half of 2026 demonstrated the resilience of our two businesses: the value of our technology portfolio, and the execution discipline of our teams around the world. In the first half, net sales increased 4%, operating EBITDA increased 10%, and operating EPS increased 14%. These results reflect strong execution in both Seed and Crop Protection despite a dynamic operating environment. In Seed, farmers continue to place a premium on technologies that improve productivity and returns. That is reflected in the continued demand we are seeing for our latest genetics and trait offerings, and the growing contribution from our new licensing business. We saw organic growth across all regions in the first half, which speaks to the durability and the basic need of that technology demand.


Copyright © 2001-2026 FactSet CallStreet, LLC

Crop Protection also performed well this half. Volume gains on new products, which are becoming a larger part of the business every year, remain robust, and pricing of these products was essentially flat in the first half, which we consider a success in this environment. Even in markets where pricing remains competitive, our teams are delivering productivity improvements and demonstrating operating discipline that allows us to continue expanding margins and improving earnings quality. The strategy we have deployed in Crop Protection for several years, building a more differentiated portfolio supported by innovation and commercial excellence, while proactively reducing our cost to production is working. And we continue to strengthen our pipeline, particularly in nature-based products. You can find details in the deck about a recent acquisition that expands our capabilities in that area, as well as industry recognition for some of our crop health innovations.

So Corteva's first half performance was a result of execution. It was driven by technology, adoption and being nimble in the market through productivity improvements, licensing growth, operational discipline and of course strong execution across the company. Our teams have done an excellent job balancing separation-related work while maintaining focus on customers. What we are seeing today is the outcome of deliberate actions we have been making for several years. We have invested in differentiated technology. We have strengthened our germplasm portfolio. We have expanded our trade capabilities. We have built one of the strongest innovation pipelines in agriculture. And we have stayed disciplined on productivity, cost management and asset optimization.

Today, those investments are translating into measurable outcomes. What is particularly important is that these results are being achieved in a market that is increasingly rewarding innovation. Farmers around the world continue to make investment decisions based on productivity, yield potential and return on investment. That is exactly where Corteva is strongest. And while the external environment will always be dynamic concerning weather, currency, trade flows or geopolitical uncertainty, the fundamentals that matter most remain healthy. Global demand for food, feed and biofuels continues to grow. Crop prices are up. However, farmer margins remain tight, so they continue to prioritize value-driven investments, while remaining cautious on discretionary spending.

Our technology portfolio is aligned with the needs of our customers who are looking for ways to produce more by using resources more efficiently. That is supporting confidence in our business. As we look ahead, we remain confident in our outlook while continuing to monitor several external factors, including ongoing pricing pressure in pockets of the crop protection market. What gives us confidence is that the factors within our control continue to perform well. So while we remain realistic about external risks, we enter the second half with a favorable outlook, a healthy respect for the market environment and confidence in our ability to deliver the commitments reflected in our updated guidance.

As a result of our first half performance and confidence in the second half, we are increasing our full year outlook. We now expect operating EBITDA of $4.1 billion to $4.3 billion and operating EPS of $3.60 to $3.80 per share. At the midpoint, that represents approximately 9% EBITDA growth and 11% EPS growth versus last year. This is because multiple parts of our business are performing well. Strong technology adoption, new product momentum, growth in licensing, productivity gains and cost discipline. And looking beyond 2026, the long-term opportunities for both businesses become even more attractive. You'll hear more from us on that in September.

Turning to the separation, our message remains simple. We are on track and executing according to plan, on time and under budget. Over the first half of the year, we achieved several important milestones. We announced Luke as the CEO of New Corteva and he is here with us today for the Q&A session. We introduced Vylor as the name of the future advanced seed and genetics company, completed key leadership appointments, publicly filed the Form-10, appointed both boards of directors and engaged with credit rating agencies regarding our planned


Copyright © 2001-2026 FactSet CallStreet, LLC

capital structures. These milestones represent significant progress and provide confidence that both organizations will be fully prepared to operate independently.

Regarding dis-synergies, I'm happy to report that on a run rate basis, we've largely offset the impact of separation. This is the result of a lot of hard work from our employees and ensuring we're setting up two org structures in the most efficient way possible. Placing time, money and resources where they matter the most, and giving both companies the flexibility they need to excel on their own. We'll see something in the range of $25 million headwind this year due to the timing of the separation activities. But this is a great result overall.

Looking ahead, several important steps remain. We expect amendments to the Form-10, finalization of the capital structures, completion of the remaining IT separation activities, effectiveness of the Form-10, and we will be holding our Investor Day events on September 15 in New York. Assuming completion of those final milestones, we are targeting October 1 as the separation date with Vylor beginning operations as a separate public company.

While separation activities have remained a major focus for management, I want to emphasize something that I believe is important. We have maintained our performance while simultaneously preparing to launch two public companies. That speaks to the strength of our organization and the commitment of our people. Teams across the company have managed the complexity of separation work while continuing to innovate, serve customers, drive productivity and deliver strong financial results. As we enter the second half of the year, our priorities are clear. First, continue executing for our customers. Second, deliver on the commitments reflected in our increased guidance. And third, complete the separation efficiently and successfully, which will help position both companies for successful futures.

Thank you to our employees, customers, partners and shareholders for their support.

Before I turn the call over to David, I want to make a personal observation. This is my final earnings call as CEO of the combined Corteva organization before our planned separation. When I look at where the company stands today, I'm incredibly proud of what our teams have accomplished. We have strengthened our portfolio, built industry-leading innovation, improved execution, expanded margins, and positioned both future companies for success.

Coming into 2026, since the year Corteva was formed in 2019, we had already improved operating EBITDA by $1.7 billion, with over 750 basis points of margin enhancement, all while investing nearly $9 billion in R&D, which is just astonishing to think about what it is going to do to help transform the future of agriculture. And finally, we returned close to $8 billion of cash to shareholders in that same timeframe. I'm confident in the leadership teams that will guide both organizations forward. I'm confident in the opportunities ahead for both New Corteva and Vylor. And I am confident that the work we have done over the last several years has created a strong foundation for long term value creation.

With that, I'll turn the call over to David.

## Unverified Participant

Thanks, Chuck, and welcome, everyone. Let's begin on slide 6 with our first half financial performance. Overall, we delivered a strong first half with continued execution across both Seed and Crop Protection, translating into higher sales, meaningful EBITDA growth and nearly 200 basis points of margin expansion. For the quarter, net


Copyright © 2001-2026 FactSet CallStreet, LLC

sales were $6.4 billion, while operating EBITDA increased 4% to $2.3 billion. As I mentioned during our first quarter call, our business results are best reviewed in house.

Looking at the first half, net sales increased 4% to $11.3 billion, while organic sales grew 2%. Margin expanded to 32.8%, driven by continued value capture in Seed, productivity improvements across both businesses and disciplined cost management. Within Seed, organic sales improved across every region led by North America and EMEA, reflecting continued demand for our differentiated technology portfolio, our focus on capturing value and increase outlicensing income. As expected, Crop Protection pricing remained under pressure due to competitive market dynamics, particularly in Latin America. However, strong adoption of new products continued to drive volume growth, helping partially offset pricing pressure. These commercial gains, combined with productivity improvements, favorable royalty performance and lower input cost, drove operating EBITDA to $3.7 billion, an increase of 10% over prior year. Importantly, both businesses contributed to margin expansion, demonstrating that our strategy continues to balance growth with disciplined execution.

Turning to slide 7, this bridge highlights the key drivers behind the first half EBITDA improvement. Operating EBITDA increased approximately $350 million year-over-year to $3.7 billion. Price and mix contributed nearly $100 million as we continued executing our value-based pricing strategy in Seed. Although those gains were partially offset by a competitive Crop Protection pricing. Volume added roughly $40 million, reflecting strong North America Seed demand and high single digit growth in Crop Protection new products.

Cost performance remained the largest contributor, adding more than $160 million through lower input cost, manufacturing efficiencies and continued productivity initiatives. In addition, currency provided an approximately $85 million benefit during the first half, primarily driven by the euro. One additional contributor was approximately $90 million of improved Seed net royalties, reflecting lower royalty expense together with higher royalty income as we expect to be net royalty positive this year. Overall, we're continuing to demonstrate that disciplined execution and technology leadership can drive meaningful earnings growth, even in a dynamic pricing environment.

Let's move to slide 8. The first half demonstrated strong execution across both businesses. Seed organic sales increased low-single digits as North America Seed continued to benefit from market penetration and strong customer demand for our differentiated technology portfolio, coupled with increased royalty income. Crop Protection pricing declined low-single digits consistent with our expectations, while volumes increased low-single digits primarily on demand for new products. Productivity initiatives, lower input costs and favorable currency all contributed to first half margin expansion.

Looking ahead to the second half, our assumptions remain largely unchanged. We expect Brazil corn area to remain approximately flat. Within Seed, we continue to expect low single digit organic sales growth. Within Crop Protection, volumes are expected to grow at a high-single digit rate, led by continued adoption of new products, while pricing is anticipated to decline in the low to mid-single digits. We also expect productivity savings to continue contributing during the second half, while recognizing the potential impact from geopolitical uncertainty and ongoing foreign exchange movements.

Overall, the first half performance provides a strong foundation as we move through the balance of the year. As a reminder, we anticipate a typical seasonal earnings pattern in the second half with a third quarter operating EBITDA loss in the range of what we saw in 2024 and all second half earnings delivered in the fourth quarter. Overall, we expect second half EBITDA to be about flat compared to last year as the net impact of tariffs, dis-synergies and the Middle East conflict are all weighted to the back half of the year.

 Copyright © 2001-2026 FactSet CallStreet, LLC

Let's turn to slide 9. Given the strength of our first half execution, we're raising our outlook for the full year. We now expect operating EBITDA between $4.1 billion and $4.3 billion, representing approximately 9% growth at the midpoint versus last year. This outlook reflects broad based organic sales growth across the portfolio, together with additional benefits from the controllable actions we've consistently discussed throughout this year, including productivity, cost management and continued operational execution. We're also increasing our operating EBITDA margin outlook to a range of 22.5% to 23.5%, reflecting continued sales growth and disciplined cost management.

Finally, we've raised our operating EPS guidance to a range of $3.60 to $3.80 per share, an increase of 11% at the midpoint versus last year. While higher net interest expense partially offset some of the EBITDA improvement, we continue to expect another year of strong earnings growth and margin expansion. Overall, the updated guidance reflects our strong first half performance and confidence in our expectations for the balance of the year.

Turning to our key takeaways. First, we delivered a strong first half through continued commercial execution across both Seed and Crop Protection. As expected, first half cash flow was impacted by the Bayer agreement, one time separation items, and the pension contribution announced last quarter. Absent these items, we would expect full year free cash flow conversion to be in line with our midterm target discussed at the 2024 Investor Day. Second, our growth platforms and disciplined execution on controllable actions translate directly into meaningful EBITDA and margin expansion. Third, based on this performance, our confidence in the second half, we're raising our full year guidance for operating EBITDA, margins and EPS.

Finally, we're progressing as planned toward the targeted October 1 separation, and we've largely offset the impact of dis-synergies on the run rate basis. We're confident both businesses will begin the next chapter from positions of financial strength and operational momentum.

Now let's turn the call back over to Kim.

## Unverified Participant

Thanks, David. I'd like to briefly highlight a few things about our upcoming Investor Days. On September 15, we'll host separate Investor Day events for both Vylor and Corteva at the New York Stock Exchange. Both events will be webcasted and registration is currently open. These events will provide investors with a deeper look at each company's strategy, innovation pipeline, long-term financial framework and capital allocation priorities as they prepare to operate as independent public companies. We believe these sessions will provide additional insight into the value creation opportunities for both organizations, and we encourage everyone to join us by registering today through the links on the Events and Presentations page of our website.

Now let's move on to your questions. I would like to remind you that our cautions on forward-looking statements and non-GAAP measures apply to both our prepared remarks and the following Q&A. Operator, please provide the Q&A instructions.


Copyright © 2001-2026 FactSet CallStreet, LLC

# QUESTION AND ANSWER SECTION

**Operator**: We will now begin the question-and-answer session. Please limit yourself to one question. [Operator Instructions] Please stand by while we compile the Q&A roster. Your first question comes from the line of Vincent Andrews with Morgan Stanley. Vincent, your line is open. Please go ahead.

Q

Thank you and good morning to everyone. Wondering if we could talk a little bit about in the Seed business for the second half of the year. I see in the slide you're expecting flat corn acres. So I'm kind of wondering, is that what you're seeing in the order book? Is that sort of an El Niño kind of assumption? So what's driving that? And then also from a pricing and mix perspective, what you're anticipating, particularly as it relates to Conquista penetration. Thank you very much.

A

Hi. Good morning, Vincent, and thanks for your question. Yeah, for the second half of the year, obviously North America and the Northern Hemisphere is really wrapped up. It's all about what happens in Latin America and particularly in Brazil. From an acre perspective or planted area perspective, we have typically seen low-single digit Safrinha expansion on a year over year basis for the last several years, three or four or five years in a row. We could still see that, but we also could see it flattening out a little bit in 2027. Obviously, we'll have sales orders come in at the end of this year, fourth quarter. Our order book is on pace with what it's actually ahead of the market a little bit at this point in time. So we feel quite confident. Our product portfolio feels good, we're in a good position. We've had strong pricing in Latin America in particular. So all in as we go into the second half of the year and, you know, order book in the fourth quarter for Safrinha for execution in that planting window January, February, March, we feel like we're in a very strong position and yeah, we just, we feel like we're in a real good spot.

A

And Conkesta?

A

And Conkesta. Yeah, we've had good momentum with Conkesta. We think we're going to be high single digits, low double digits in terms of penetration in the market with Conkesta E3 in 2027. And so yeah on plan and continue to be very optimistic about the performance of that product.

**Operator**: Your next question comes from the line of David Begleiter with Deutsche Bank. David, your line is open. Please go ahead.

David, your line is open. Please go ahead. Your next question comes from the line of Chris Parkinson with Wolfe Research. Chris, your line is open. Please go ahead.


Copyright © 2001-2026 FactSet CallStreet, LLC

Q

Great. Thank you so much for taking my question. I'm listening to my conversation to Luke, if I may, given this is kind of your first interaction with investors regarding the kind of further, longer-term outlook for Corteva, I'm just kind of curious on what you're the most excited about in terms of the market, in terms of what you think you can do with the company's narrative. Is this going to be a focus primarily on R&D, pipeline value, new product intros, leadership? Is it going to be about balance between CPC biological seed margin opportunities? I would just love to hear how you're thinking about it on a preliminary basis and how we should triangulate this thought into the CMD. Thank you so much.

A

Yeah, thanks, Chris. I appreciate it. No, I'm very excited. I think the first thing I would say is the number one strength at Corteva is our people. There's a great team. Many of those grew up on around farm, so they understand the challenges that the customers face every day and they get excited about waking up every day solving those problems. You talked about portfolio and from a portfolio standpoint, two-thirds of our current portfolio is a differentiated technology and we're not dependent on any one active, any one segment, any one crop or any one geography. So I love the diversity of the portfolio and I love the fact that the bulk of it is differentiated product. That is a real competitive advantage.

When you add biologicals to the portfolio position, that gives us the ability to blend natural and synthetic solutions to solve growers' problems. And in our pipeline, I can't emphasize how strong I think our pipeline is. It's the best crop protection pipeline in the business with seven new actives coming into that market over the next decade. I feel like I've been drinking from a water hose for the first month or so, and if I ever need a pick me up, I wonder about greenhouses. And I'll look at the results of the R&D. And there you can see the incredible results those people are delivering against targeted pests, targeted weeds, targeted diseases, and it just gets you excited and want to come back to the office, roll up your sleeves and get after it. So we look forward to sharing more details about the R&D and our strategy with you at our Investor Day in September 15 and look forward to seeing all of you in person there.

**Operator**: Your next question comes from the line of Joel Jackson with BMO Capital Markets. Joel, your line is open. Please go, ahead.

Q

Hi, good morning, Chuck, Luke, rest of the team. Look, I know you're doing your capital markets day in a month and a half, but Chuck, Luke team, you know what I noticed is if I take your, Chuck your prior guidance targets for 2027 about $4.4 billion EBITDA at the midpoint, you get $4.2 billion this year, you get $4.2 billion this year, it's been a 5% growth rate. I would like to know if you can talk as much as you can right now, is that what you're thinking about now, mid-single digit growth into next year? Tell me why that's right or wrong. What we should think about, a little bit of preview at December, I guess.

A


Copyright © 2001-2026 FactSet CallStreet, LLC

Yeah. Good morning, Joel. So, look, maybe I'll start and then David can fill in some of the numbers. So not a lot has changed with our original thinking from earlier in the year. $4.2 billion, $4.2 billion, so if you look at the updated guide, $4.2 billion puts us very comfortably into that 2024 original communication around 2027, which you rightly called out was $4.4 billion. So our growth rates are in the range where we've communicated they would be. I'd say we're a little ahead of our original plan in 2026. And if you look at the growth, what pleases me the most is where it's coming from. It's the core parts of our business, right? So in Seed, it is licensing is literally three years ahead of our original plan, which is pretty astonishing considering that is a brand business for us.

And then if you look at Crop Protection, that new product portfolio that we've been talking about for some time, it's going to touch $2 billion this year in revenue. And the margin profile and how we've priced it is really, really strong. So these are the things that are leading the growth for Corteva combined. And then of course, you know the company, we're really focused on cost and productivity, it's part of our DNA. It needs to be in this industry. And so when I when I look at it, I'd say that our growth rates are exactly where we thought they were, but probably trending a little ahead of our original plan. David, anything to add?

A

Yeah, Joel. And if you remember, the $4.4 billion was a $1 billion increase over that three-year period of time. And we always said it was going to be a little bit more front-end loaded, mainly because of our costs and productivity that we expected in the first couple of years. As Chuck mentioned, we do feel like we are certainly ahead of where we expected to be on net royalty. So we'll take that in consideration when looking into what our guide is for 2027. But I think we feel comfortable with the $4.4 billion at this point in time.

The other thing I will mention too is I know some people were concerned about the impact of net dis-synergies and separation costs and all that against our long-term target of the $4.4 billion. As we articulated earlier today, we feel like we're tracking pretty close to flat or within plus or minus the millions of dollars that that would be within our typical guide range. So we feel really strong about the $4.4 billion.

Q

Right. And then one last comment, Joel. So in September, both companies will provide 2029 financial framework. So you're going to be able to kind of follow along with sort of where Corteva is leaving off or New Corteva and Vylor are kind of taking over. And I think when you look at that and you put it all together, there's going to be a lot to like there. So hopefully you can join us

**Operator**: . Your next question comes from the line of Kevin McCarthy with Vertical Research Partners. Kevin, your line is open. Please go ahead.

Q

Hi, this is Matt Hettwer on for Kevin McCarthy. In Crop Protection, organic sales were down about 6%. But on a product line basis, it looks like the trend was lower among herbicides, insecticides and fungicides, with the difference made up by substantial growth in the other category. Can you unpack the underlying sales trends for those products and maybe comment on what kind of trajectory we can expect for them in the back half?


Copyright © 2001-2026 FactSet CallStreet, LLC

A

Yeah, hi, Matt. It's Chuck. So let me start with the overall crop protection market, if I can. I'd say, look, again, there's not a lot here that's changed in our view of the overall market fundamentals. The crop protection market, we still think is improving, especially if you look at 2025 was essentially flat versus the prior two years. And this year, we said that the market would grow, low single digits and that's still our view. Now, the growth is slow, it's a little bumpy, but we're seeing, I think, what we wanted to see. And we always said that most likely in 2026, it was going to be a year of volume growth with low single digit down in pricing. And so not to get too much into the indication, but that's essentially what we're seeing. We probably have a bit more competitive pressure in Brazil for lots of different reasons. But that market is of course, well-supplied. It's one of the markets that's growing. So there's a focus area there. And maybe a one or two other pockets around the world.

But there's nothing here that we would say is outside of our planning horizon in terms of a structural change. In fact, when you look at Chinese exports into Brazil, they're essentially stable. They're not going down, but they're certainly not going up. And I'd say the same is true for Chinese exports going into the United States.

So all in all, I think that the market is recovering. We'll save 2027 comments for the Investor Day. And then, when I look at the indications, the only thing I'll draw you to is that we probably have in our portfolio and others certain AIs that are coming off-patent and then what we've done, so in anticipation of some of these molecules which have been well communicated, we've really redone the cost structure. And so when that happens, what we do is we have – we were going to see competitive tension. We lower our price. But if you look at the margin profile of Crop Protection, it's actually up this quarter in this first half. So, that's sort of the product life strategy that we've had, we've deployed. And then when you look forward to the new products, you know, Luke already mentioned it, we've got seven new actives coming into the market in the next decade. The first one will be in Brazil where we are seeing some pricing tension. It'll be Haviza, which we consider to be a blockbuster for fungicide. And we're just really excited to put that into the market in the next couple of years. So hopefully that helps you.

**Operator**: Your next question comes from the line of David Begleiter with Deutsche Bank. David, your line is open. Please go ahead.

Q

Thank you. Good morning. Chuck, just on the North American growing season, any share gains you can point to in either corn or soybeans that you benefited from this year?

A

Chuck  could take that question, David.

A

Yeah, David, from a share perspective, we feel pretty confident that we've picked up a little bit of share in corn. Obviously, our price value capture strategy and being premium the market, but we still feel like we've picked up some share a little bit in Pioneer, but particularly with our retail brand and a bigger share of shelf in Brevant.


Copyright © 2001-2026 FactSet CallStreet, LLC

On the soy side, we feel like we picked up share both in the Western Corn Belt. So think Mississippi West and the Eastern Corn Belt, Mississippi East with the Pioneer brand. We are one hot pocket in the south and the delta where dicamba and the return of the dicamba label has certainly been a challenge, particularly with cotton in that geography. And so we feel like we gave up a little bit of share there. On soy, I think we're going to end up pretty flat. In corn, I believe we picked up a tick, a share.

**Operator**: Your next question comes from the line of Frank Mitsch with Fermium Research. Frank, your line is open. Please go ahead.

Q

Good morning and thank you. Luke, I wanted to come back to the to the CPC side of things where you mentioned that two-thirds of the products are differentiated. I am looking at, you know, obviously pricing was down low single digits in the first half. The expectation is that pricing is going to be down low to mid-single digits in the second half. But I was wondering if you can kind of parse out as you look at your CPC portfolio, what's going on with differentiated side in terms of pricing, can you kind of kind of square why we're seeing the price degradation as much as we are given that two-thirds is differentiated? Thank you.

A

Yeah. Good morning, Frank. It's Chuck. I'll take that question. So if you think about what happened in the first half, you're right. We're down low single digits, something like 3%. It was within our expectations. I think it's important to call out Europe and the US were essentially flat. And then if you look at our new products so that what we would define as a new product for the portfolio that I mentioned will approach about $2 billion of revenue this year, that their prices are essentially flat and volume up high-single digit.

So what we're seeing is exactly what would expect in the overall pipeline, right? We're seeing the growth coming from the newer products, but the rest of the market is under some competitive pressure because you've got a well-supplied market overall. And so when we look at that, just to answer your question directly, we did move pricing for the second half to from low single digits down to mid-single digit down. Really, that is driven by what we're seeing in Brazil and perhaps one or two other pockets around. And it's not uniform that we're seeing it in pre-emergent herbicides would be one of the larger areas.

And then I think there's some other items going on when it looks at – when we look at weather, you know, when you think about fungicide application in markets that are very, very dry, for example, in Europe and parts of the United States. We're probably not going to have the same demand that we have for fungicide because of El Niño weather phenomenon that we're seeing.

But overall, I'd say we're still expecting that for our business, we will be able to grow our EBITDA led by volume with the mid single digit pricing down in the second half. And David, something like low single digit EBITDA growth I think in the...

A

Correct.

 Copyright © 2001-2026 FactSet CallStreet, LLC

A

The expectation.

A

I think that piece for those molecules, certainly the ones that are perhaps more under price pressure is the fact that the team, through their ongoing strategy over the last several years, is well ahead of the cost structure. So when you look at those particular pieces of the business and enables us grow our EBITDA dollars and year over year, last year was a growth year. This year expected to be a growth year. First half is a good start to that.

**Operator**: Your next question comes from the line of Kristen Owen with Oppenheimer. Kristen, your line is open. Please go ahead.

Q

Good morning. Thank you for the question. I wanted to continue to pull at this sort of price versus volume piece here in Seed, because I noticed in in the deck you're talking about organic volume growth in the back half of the year, not necessarily a price versus volume breakdown. Maybe I'm reading too much into this, but thinking into Capital Markets Day, I'm wondering if we can sort of parse out, understanding how much of the price that we're seeing is coming from this greater of outlicensing and how much of that offset is what we would normally see in the volume line? And should we be thinking about that KPI sort of transitioning from price and volume to this more combined organic view? Thank you.

A

Chuck?

A

Yeah. So Kristen, thanks for the question. Let me let me try to tease this out in the second half of the year, maybe start with our Seed business is really a strong first half business. So the second half of the year is significantly less and it really is all encompassing around Brazil. So how you think about our price and mix versus that volume piece. From a volume piece in the second half of the year, again, this is a Brazil market, a little bit of South African market, which our business is doing very well there. And it really depends on when farmers are ready to take Seed in that fourth quarter. We've got that forecasted to be relatively flat on a year over year basis at this point in time. We don't think we're going to have as big of an expansion of planted area in Safrinha that we've seen the last few years. So that will have a bit of an impact on volumes.

But in terms of the price mix perspective, I mean, it's all about bringing new products into the market and putting those new products in the hands of farmers. And in fact, that certainly allow us to share in a piece of that additional value that we're bringing to them. So I hope I answer your question. I think that's mix price versus what we've seen the last couple of years. But maybe, David, if you have anything to add.


Copyright © 2001-2026 FactSet CallStreet, LLC

A

Sure, Judd. Kristen as Judd mentioned, just to remind everyone that the second half of the year is about 27% of our total top line. So it is very much a first half business. When you look at what we've projected for the second half, the difference between volume and price, it's about 50/50. So we are seeing a slight gain in price and a slight, slight gain in volume over the back half of the year.

**Operator**: Your next question comes from the line of Matt DeYoe with Bank of America. Matt, your line is open. Please go ahead.

Q

Thank you. This is Fabian Jimenez on for Matt. As we think about order patterns at this point, last year you had roughly 90% of Brazil summer orders in and about 40% of Safrinha in hand, which was ahead of historical pace as fast forward to today where do your order books stand versus the historical trends and what are the drivers?

A

Yes, thanks for the question. And certainly, last year at this point in time, we did have very, very strong orders on the books. As we sit here today, we're ahead of the market in terms of what the overall orders in the market are. So we feel great about our position from a competitive standpoint. But there are some things in, particularly in Brazil, that are having growers make those decisions closer to planning time. One, credits' tough. Two, would get some impact from fuel and fertilizer prices, and so that's put some stress on margins. So we feel confident in our order book, we feel confident in our share position. And our product portfolio is as good as it's ever been in Brazil for both summer and for Safrinha.

So I guess in terms of how we think about wrapping up those orders, what comes in the fourth quarter and then having that summer crop planted and that Safrinha cup on the books, we feel like we're in a very strong competitive position, but I do have to be very transparent. Credit's tight for the Brazilian farmer right now and so we're just going to have to continue to manage them side by side.

**Operator**: Your next question comes from the line of Joshua Spector with UBS. Joshua, your line is open. Please go ahead.

Q

Thanks. Good morning. This is Lucas Beaumont on for Josh. I just wanted to follow-up on your comments around sort of the split in the second half between 3Q and 4Q. So pointing to the sort of the third quarter of 2020, you kind of indicated a loss in the third quarter of about $190 million, which would then sort of imply about $680 million in EBITDA growth in the fourth quarter. That balance there is just sort of much more fourth quarter weighted than what we've seen over the past four to five years. So could you just expand for us some of the drivers there of the timing shift and how you sort of see the upside and downside risks and just compare that relative to your confidence in the second half overall? Thanks very much.


Copyright © 2001-2026 FactSet CallStreet, LLC

A

Yes, sure. I'll take that question. So if you step back and you look at where our second half guide is in aggregate, then I'll go through between the Q3 and Q4 timing. We do have it flat versus 2025, which is around $500 million. And if you recall or second half in 2025 was up 16% versus 2024. So we are comparing against a pretty strong half at about $500 million. So, when we look at overall $4.2 billion is our full year guide, $500 million in the second half. It is by far, you know, a very small half for us. When you look at where we're seeing the year-over-year changes, we do have some unfavorable price and cost build into the second half. Unfavorable cost mainly that residual dis-synergy number that we talked about, the $25 million a little bit due to logistics and freight cost, but we're offsetting that by volume in both businesses and slight favorable currency.

So the other thing I would like to point out is when you look at our guide today, our second half is about 20% – 12% of our full year guide. And that's very much in line with the past four years or so, which was about 13%. So when you stay at the very high level, I think our first second half is very well balanced between our assumptions. But then the timing between Q3 and Q4, we did say Q3 is probably more likely to be that around $100 million loss where it was a couple of years ago. I would say that or a lower number is a little bit more common than what we had last year because we had some favorable timing of Safrinha into Q3, so on and so forth. So I would say it's very typical look our the way that the split of the business will be. And I'd also say that some of those additional costs like the net, dis-synergies or whatever, some of that will be weighted in Q3.

So just to summarize, when you look at second half, we feel it's balanced. It is a small half, you know, $5 million here there is a 1% growth. And then we do feel like that timing between Q3 and Q4 will be more like it was a couple of years ago.

**Operator**: Your next question comes from the line of Ben Theurer with Barclays. Ben, your line is open. Please go ahead.

Q

Yeah, good morning, Chuck, team, thank you very much for taking my question. Just picking up on that, wanted to dig a little bit deeper into some of the productivity savings and just lower costs that you've highlighted. I mean, first half clearly was a big driver here. You've just talked about the second half. But as we look at, the setup where you stand right now and as you think about the next coming years, where do you believe on a separate basis are the big advantages between what is Vylor and what is the New Corteva for incremental productivity savings and/or lower input cost to further drive margin expansion? Thank you.

A

So if you step back and you think about our last three-year guide, during our last Investor Day, we had articulated about $1 billion of growth productivity cost benefits and that about $700 million. Some of that was due to commodities. So you see the commodities come down. We saw that in the first couple of years. That's probably one element you won't see us in our next three-year plan. But what you will see is a continuation of really productivity in both businesses. So we're seeing it in Seed. We continue to see it in CP. I think you've seen that we've announced some additional footprint actions and restructuring, so on, so forth, particularly in CP. So you'll see those benefits continue in the next three-year plan.


Copyright © 2001-2026 FactSet CallStreet, LLC

A

Yeah. And Ben, maybe just a couple other comments. So we think that the separation is going to afford both companies with the opportunity to take out cost and productivity work to the next level. And the proof point I think is just look at the annual dis-synergy number. We thought it was going to be $100 million, which would have been on the low side of any separation that we've studied. And now we're saying it's closer to the $25 million range. The reason that is, is because we've been able to kind of find the integration cost and at the same time kind of work through those. So I think you have to tune in to September to kind of hear the rest of the story. But we would expect that what we've been able to do as Corteva, both companies will be able to kind of continue this journey and there'll be new and different opportunities for us.

**Operator**: Your next question comes from the line of Patrick Cunningham with Citi. Patrick, your line is open. Please go ahead.

**Operator**: Hi. Good morning. This is Rachel on for Patrick. How should we think about your normalized free cash flow levels maybe next year compare to the $2.1 billion to $2.3 billion framework you laid out at the last Investor Day? Are there any offsets, such as separation-related costs that we should be mindful of? Thank you.

A

Yeah, thanks for the question. We would expect that our if you looked at what our company would have been on a combined basis, we'd be well within those targets that we set kind of the 45% to 50% of EBITDA for free cash flow. For this year, obviously, a little bit. If you look at our first half, when you look at operating cash flow, we are down a couple billion dollars and most of that being the $1.1 billion that we contribute to the pension plan, the bearer agreement, restructuring and so on. If you back out, those kind of unusual items this year probably would have been around the 46% range. So well within our typical range that we communicated.

**Operator**: Your next question comes from the line of Arun Viswanathan with RBC Capital Markets. Arun, your line is open. Please go ahead.

Q

Great. Thanks for taking my question. Hope you guys are well and congrats on all the progress towards the spin. I guess my question is just, could you just provide us maybe an updated view on some broad strokes for fiscal 2027? I know that, obviously, you did have an operating plan at your Investor Day that you presented a few years ago. But are many of those assumptions still valid? I imagine they are, but maybe if there's any update you could provide at this point, that would be helpful. Thanks a lot.

**<<A>:>**

Yeah, sure. So I think we're still operating in the same environment that we had communicated. So if you look at the agricultural backdrop, there's puts and takes. But we referenced that in some of the prepared remarks. We're still seeing very strong global demand for grains and oilseeds, crop prices are actually a little bit up year-over-year. Yes, we have to watch farmer margins. Judd called out the Brazilian farmer. They are wrestling with higher


Copyright © 2001-2026 FactSet CallStreet, LLC

interest rates, some currency issues. But overall, I'd say the agricultural complex is more or less what we expected to see when we put the original 2024 plan in place.

Then if you look at the two halves of the company, I think, again, we've communicated this already today. We're seeing growth where we wanted to see it, which is on our growth platforms. Crop Protection, new products, biologicals, those are the areas that I think we wanted to see growth. And we're starting to, again, we're seeing continued really good performance in most of those areas. And then in Seed, it's been the story of entering the licensing business, and that's several years ahead of plan.

So overall, the operating environment that we originally communicated through to 2027 feels on balance that things are where we expected them to be from an external perspective. Internally, I think we're performing better than that. David said, we're a little ahead on cost and productivity. I already mentioned we're a little ahead in licensing and our new products are really being well-received in the marketplace. So I'd say on balance, the company is slightly ahead and the backdrop of the market is more or less what we would have expected.

---

**Operator**: Your next question comes from the line of Edwin (sic) [Edlain] (01:03:06) Rodriguez with Mizuho. Edwin (sic) [Edlain] (01:03:09) your line is open. Please go ahead.

---

Q

Thank you. Good morning, everyone. This is on Crop Protection. In Latin America, we're definitely seeing the pressure is not abating at all. The competitive pressure pricing. Is the high single digit price decline, the new normal, or do you expect pressure to moderate as we get into next year because maybe farm economics gets better? What are you thinking in terms of pricing pressure in Latin America?

---

A

Yeah. Good morning, Edlain. So we don't think that the high single digit pricing pressure is the new normal in Brazil. In fact, I'd say the market when we look at, as I mentioned, the imports into the country, the channel, I should say, we had very good volumes in the first half of the year. There is growing demand for Crop Protection in the market. There's growing acres, but there's also increasing in disease and pest pressure. So the fundamentals of Brazil sometimes are hard to kind of pinpoint specifically, but it is a well-supplied market, but it is a market that is growing.

I think when you look at Corteva specifically, our portfolio and I've already alluded to this, there was some portfolio specific items that we simply had a few products. One was a pre-emergent herbicide that a couple of years ago came off-patent. We were really anticipating that we were going to see generic pressure and we went really to work on our cost structure. And what we found is that we had to, of course, lower our prices because there's generics in the marketplace. But if you look at our margins, we've been able to maintain margins and share.

And that's the playbook that we have to use for the company, right? We don't want to play in the generic part of the market, but when our technology comes off-patent, we are prepared to play. And that's exactly what we've been able to do. So I actually think that when you start thinking about when you look at our Crop Protection pricing, but you look at our margins, that's the full story that have to consider here because this is going to be part of the playbook. And so when you fast forward that we mentioned, we like our portfolio, we have one of the best new pipelines coming into the market. We've got seven new actives in the next decade. Haviza will be next. These will have pricing premiums based on the market that we can see. But the market is dynamic. Farmers are


FACTSET: callstreet
1-877-FACTSET www.callstreet.com
Copyright © 2001-2026 FactSet CallStreet, LLC

under some more pressure than other parts of the world, but they are using the product, the underlying demand is quite strong. And the channel is healthy right now, but we wouldn't say it's oversupplied Now, it's ready for the next season, so it needs to go to ground now. But all indications are that we're going to have a very solid volume market in Brazil and we are going to continue to see some pricing. The one thing I would say is that we're not expecting price recovery in Brazil in 2026. But we can still compete quite nicely with our portfolio and our production base of course, and how we go to market.

**Operator**: We have reached the end of our Q&A session. I will now turn the call back to Chuck Magro for closing remarks.

## Unverified Participant

Thank you. I'd like to just take a minute to thank Robert King for his Crop Protection leadership over the past four years. It's remarkable. He's been with us four years. Robert has led, of course, the Crop Protection business over that time, and he's also led the company's charge in safety and operational excellence. And I think when I look at Corteva today, especially the Crop Protection business, we are a much better company because of his leadership. And so, this will be Robert's last earnings call. We certainly wish him the very best in his next chapter. And I just wanted to make those final comments before I turn it back over to Kim.

## Unverified Participant

Great. So thanks again for everyone joining the call and for your interest in Corteva. And we hope you have a safe and wonderful day.

**Operator**: This concludes today's call. Thank you for attending. You may now disconnect.

Disclaimer
The information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete or error-free statement or summary of the available data. As such, we do not warrant, endorse or guarantee the completeness, accuracy, integrity, or timeliness of the information. You must evaluate, and bear all risks associated with, the use of any information provided hereunder, including any reliance on the accuracy, completeness, safety or usefulness of such information. This information is not intended to be used as the primary basis of investment decisions. It should not be construed as advice designed to meet the particular investment needs of any investor. This report is published solely for information purposes, and is not to be construed as financial or other advice or as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Any information expressed herein on this date is subject to change without notice. Any opinions or assertions contained in this information do not represent the opinions or beliefs of FactSet CallStreet, LLC. FactSet CallStreet, LLC, or one or more of its employees, including the writer of this report, may have a position in any of the securities discussed herein.

THE INFORMATION PROVIDED TO YOU HEREUNDER IS PROVIDED "AS IS," AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FactSet CallStreet, LLC AND ITS LICENSORS, BUSINESS ASSOCIATES AND SUPPLIERS DISCLAIM ALL WARRANTIES WITH RESPECT TO THE SAME, EXPRESS, IMPLIED AND STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, COMPLETENESS, AND NON-INFRINGEMENT. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER FACTSET CALLSTREET, LLC NOR ITS OFFICERS, MEMBERS, DIRECTORS, PARTNERS, AFFILIATES, BUSINESS ASSOCIATES, LICENSORS OR SUPPLIERS WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS OR REVENUES, GOODWILL, WORK STOPPAGE, SECURITY BREACHES, VIRUSES, COMPUTER FAILURE OR MALFUNCTION, USE, DATA OR OTHER INTANGIBLE LOSSES OR COMMERCIAL DAMAGES, EVEN IF ANY OF SUCH PARTIES IS ADVISED OF THE POSSIBILITY OF SUCH LOSSES, ARISING UNDER OR IN CONNECTION WITH THE INFORMATION PROVIDED HEREIN OR ANY OTHER SUBJECT MATTER HEREOF.

The contents and appearance of this report are Copyrighted FactSet CallStreet, LLC 2026 CallStreet and FactSet CallStreet, LLC are trademarks and service marks of FactSet CallStreet, LLC. All other trademarks mentioned are trademarks of their respective companies. All rights reserved.